**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | |
|---|---|
| CARROLL INDEPENDENT SCHOOL DISTRICT, <br><br> *Plaintiff,* <br><br> v. <br><br> UNITED STATES DEPARTMENT OF EDUCATION; MIGUEL CARDONA, in his official capacity as Secretary of the United States Department of Education; CATHERINE E. LHAMON, in her official capacity as Assistant Secretary for Civil Rights at the United States Department of Education; UNITED STATES DEPARTMENT OF JUSTICE; MERRICK B. GARLAND, in his official capacity as Attorney General of the United States; and KRISTEN CLARKE, in her official capacity as Assistant Attorney General for the Civil Rights Division of the United States Department of Justice, <br><br> *Defendants.* | **Case No.** |

## COMPLAINT

1.     Plaintiff Carroll Independent School District (Carroll ISD) teaches its students to pursue excellence, exhibit the highest standards of integrity and character, build relationships that foster mutual respect, communicate honestly, and meaningfully serve others.

2.     In other words, it promotes the safety and flourishing of all its students.

3.     But, starting on August 1, 2024, the federal government will stand in the way of Carroll ISD achieving those goals.

1

4.     The Department of Education (ED) has redefined the word "sex" in Title IX to include "gender identity."

5.     Congress enacted that famous 1972 statute to promote equal opportunities for women and girls.

6.     But the Department of Education's new Title IX regulations force Carroll ISD—and school districts across the country—to do the opposite. *See* Nondiscrimination on the Basis of Sex in Educ. Programs or Activities Receiving Fed. Fin. Assistance, 89 Fed. Reg. 33,474 (Apr. 29, 2024) (to be codified at 34 C.F.R. § 106.1 *et seq.,* effective Aug. 1, 2024).

7.     This bureaucratic fiat prevents Carroll ISD from protecting private spaces like bathrooms, locker rooms, and showers for both girls and boys, opens girls' sports to males, and infringes on the constitutional rights of students and staff.

8.     The administrative rewrite achieves the exact opposite of Title IX's goal to promote equal opportunity for women. For fifty years, "sex" has meant the biological binary—differences between male and female. Respecting these biological differences is essential to achieving that goal—and Title IX recognizes as much. But now the Biden administration's regulations will require schools to *ignore* sex to promote a person's subjective "sense" of their gender.

9.     Schools must do so even though it deprives their female students of the equal opportunities in education that Title IX promised.

10.    Agency action cannot stand when it directly contravenes both the statute Congress enacted and fundamental constitutional guarantees.

11.    The Court should hold the Rule unlawful, set it aside as required under the Administrative Procedure Act (APA), 5 U.S.C. § 706, and enjoin Defendants from enforcing it against Plaintiff Carroll Independent School District.

## JURISDICTION AND VENUE

12.     This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because this action arises under the U.S. Constitution and federal law.

13.     This Court has jurisdiction under 28 U.S.C. § 1346(a) because this is a civil action against the United States.

14.     This Court has jurisdiction under 28 U.S.C. § 1361 to compel an officer of the United States or any federal agency to perform his or her duty.

15.     The APA waives sovereign immunity and provides jurisdiction and a cause of action to review Defendants' actions and enter appropriate relief. 5 U.S.C. §§ 553, 701–06.

16.     This Court has equitable jurisdiction and remedial power to review and enjoin ultra vires or unconstitutional agency action. *See Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689–91 (1949).

17.     This case seeks declaratory, injunctive, and other appropriate relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201–02; the APA, 5 U.S.C. §§ 701–06; and Federal Rule of Civil Procedure 57.

18.     This Court may award costs and attorney's fees under the Equal Access to Justice Act, 28 U.S.C. § 2412.

19.     Venue is proper in this Court and this division under 28 U.S.C. § 1391, including paragraph (e).

20.     Defendants are agencies of the United States and officers and employees of the United States or of any of its agencies acting in their official capacity or under color of legal authority.

21.     Plaintiff Carroll Independent School District resides at 2400 North Carroll Avenue, Southlake, Texas 76092 in the Fort Worth Division of the Northern District of Texas, and no real property interest is involved in the action.

22.     A substantial part of the events or omissions giving rise to the claims occurred in this district because the case concerns the effect of Defendants' regulation on Carroll Independent School District and its operations in this division of this district.

## PARTIES

*Plaintiff*

23.     Plaintiff Carroll Independent School District is located at 2400 North Carroll Avenue, Southlake, Texas 76092.

24.     Carroll ISD's board of trustees brings this suit in the District's name. *See* Tex. Educ. Code § 11.151(a).

25.     Before taking office, all members of the board of trustees must take the official oath of office that he or she "will to the best of [his or her] ability preserve, protect, and defend the Constitution and laws of the United States and of this State, so help me God." Tex. Const. art. XVI, § 1; Tex. Educ. Code § 17.06-App.

26.     The school district operates 11 schools for students from pre-K through 12th grade.

27.     For the 2023–24 school year, the pre-K through 12th grade student body numbered approximately 8,400.

28.     Carroll ISD receives federal financial assistance as defined by Title IX. 20 U.S.C. § 1681(a).

29.     Carroll ISD receives federal funding administered by the United States Department of Education, including funding under the Individuals with Disabilities Education Act and Titles II and III of the Elementary and Secondary Education Act.

30.     For the 2023–24 school year, Carroll ISD received approximately $2.15 million from these and other federal funding sources.

4

31.     It would cause Carroll ISD significant financial harm to lose eligibility for these federal programs.

32.     Carroll ISD also receives funding from the State of Texas.

33.     Carroll ISD superintendent Lane Ledbetter and other District personnel have already spent at least ten hours analyzing the Department of Education's new Title IX rule and obtaining legal advice on how the Rule applies to the school district.

34.     Carroll ISD schools offer extracurricular activities, including interscholastic athletics. Many school sports teams are sex-specific. For example, Carroll ISD fields separate boys' and girls' teams for basketball, cross country, soccer, swimming and diving, baseball/softball, tennis, water polo, wrestling, and track and field.

35.     Carroll ISD complies with Texas law, including the law to protect girls' sports. *See* Tex. Educ. Code § 33.0834.

36.     Carroll ISD is aware of at least 3 current students in grades 5–12 who have identified as a gender identity that differs from their sex.

37.     Carroll ISD policies treat students consistently with their sex.

38.     Carroll ISD Policy 3.19 requires its schools to "maintain separate restrooms, locker rooms, and other similar facilities designated for and used only by persons based on the person's biological sex." Ex. A at 1.

39.     Policy 3.19 defines "restroom or locker room" as "a location where a person may reasonably be in a state of undress, including a shower room." *Id.*

40.     Policy 3.19 also allows for "reasonable accommodations upon request," such as a "single user restroom" to preserve "privacy." *Id.*

41.     Carroll ISD Policy 6.9 prohibits District employees from "requir[ing] the use of pronouns that are inconsistent with a student's or other person's biological sex." Ex. B at 1.

42.     Policy 6.9 provides that the district does "not compel" staff or students "to address or refer to students in any manner that would violate the speaker's constitutionally protected rights." *Id.*

43.     Parents with children currently in Carroll ISD schools have informed board members that they will withdraw their children from Carroll ISD if Title IX forces the school district to allow males into female restrooms, locker rooms, and showers. These parents have concerns about the privacy and safety of their daughters if males are allowed into these private spaces. They also worry that their daughters will not be able to use restrooms during the school day, which could lead to health problems, because of the risk of encountering a male in those sensitive spaces.

44.     For each student that leaves the district, Carroll ISD will lose approximately $8,300.

### Defendants

45.     Defendant United States Department of Education is an agency under 5 U.S.C. §§ 551 and 701(b)(1). ED's address is 400 Maryland Avenue SW, Washington, D.C. 20202. ED promulgated the Rule, and it implements and enforces Title IX and the Rule.

46.     Defendant Miguel Cardona is sued in his official capacity as Secretary of the United States Department of Education. His address is 400 Maryland Avenue, SW, Washington, D.C. 20202.

47.     Secretary Cardona is responsible for the overall operations of the U.S. Department of Education, including the Department's administration of Title IX and the Rule.

48.     Defendant Catherine E. Lhamon is Assistant Secretary for Civil Rights at the United States Department of Education. Her address is 400 Maryland Avenue, SW, Washington, D.C. 20202.

49.     Assistant Secretary Lhamon supervises, manages, and controls ED's Office for Civil Rights (OCR).

50.     Assistant Secretary Lhamon implements and enforces Title IX and the Rule in programs administered by the Department of Education.

51.     Defendant United States Department of Justice (DOJ) is an agency under 5 U.S.C. §§ 551 and 701(b)(1). DOJ's address is 950 Pennsylvania Avenue NW, Washington, D.C. 20202.

52.     DOJ implements and enforces Title IX and the Rule, including by bringing enforcement actions for noncompliance on behalf of ED and other agencies that administer federal funding programs.

53.     Defendant Merrick B. Garland is sued in his official capacity as Attorney General of the United States. His address is 950 Pennsylvania Avenue NW, Washington, D.C. 20202.

54.     The Attorney General is responsible for the overall operations of the U.S. Department of Justice.

55.     The Attorney General implements and enforces Title IX and the Rule, including by bringing enforcement actions for noncompliance on behalf of ED and other agencies that administer federal funding programs.

56.     The Attorney General coordinates Title IX's implementation and enforcement by other executive agencies, including by approving rules, regulations, and orders of general applicability implementing Title IX. 20 U.S.C. § 1682; Exec. Order No. 12250; 28 C.F.R. § 0.51.

57.     Defendant Kristen Clarke is sued in her official capacity as Assistant Attorney General for the Civil Rights Division of the U.S. Department of Justice. Her address is 950 Pennsylvania Avenue NW, Washington, D.C. 20202.

58.     Defendant Clarke implements and enforces Title IX and the Rule, including by bringing enforcement actions for noncompliance on behalf of ED and other agencies that administer federal funding programs. 28 C.F.R. § 42.412.

59.     Defendant Clarke coordinates Title IX's implementation and enforcement by other executive agencies. 20 U.S.C. § 1682; Exec. Order No. 12250; 28 C.F.R. §§ 0.51, 42.412.

## FACTUAL ALLEGATIONS

I.     **Title IX**

   A.     **Congress enacted Title IX in 1972 to promote equal educational opportunities for women.**

60.     In 1972, Congress enacted Title IX, which forbids education programs or activities receiving federal financial assistance from discriminating on the basis of sex. Title IX provides:

> No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance[.]

20 U.S.C. § 1681(a).

61.     Title IX sought to eliminate discrimination against women in education and to provide men and women with equal educational opportunity. Its goal was to give women "equal opportunity to aspire, achieve, participate in and contribute to society based on their individual talents and capacities." *United States v. Virginia*, 518 U.S. 515, 532 (1996).

62.     Before Title IX was enacted in 1972, women were excluded from many colleges and universities. Even where women were admitted, they were often subject to higher admissions requirements and excluded from many programs, like law school and medical school.

63.    As summarized by DOJ, Title IX has been strikingly successful in accomplishing its goals:

> In 2009, approximately 87 percent of women had at least a high school education and approximately 28 percent had at least a college degree, up from 59 percent with a high school education and 8 percent with a college degree in 1970. Additionally, enrollment in higher education has increased at a greater rate for females than for males; since 1968, the percentage of women between the ages of 25 and 34 with at least a college degree has more than tripled.

*Equal Access to Education: Forty Years of Title IX*, U.S. Dep't Just. 2 (June 23, 2012), https://perma.cc/3GFD-74YX.

### B.    Title IX promotes equal opportunities for women in athletics.

64.    Before Title IX, schools often emphasized boys' athletic programs "to the exclusion of girls' athletic programs." *Williams v. Sch. Dist. of Bethlehem*, 998 F.2d 168, 175 (3rd Cir. 1993). Many high schools did not have girls' sports teams, which reduced the number of women who could compete in college. And the average university devoted a mere two percent of its athletic budget to women's sports.

65.    To end this discrimination against women in athletics, Title IX and its implementing regulations have long defined "program or activity" to include interscholastic athletics. *See* 34 C.F.R. § 106.41(a); 44 Fed. Reg. 71,413, 71,413–15, 71,417–18 (Dec. 11, 1979).

66.    Title IX and its longstanding implementing regulations allow an entity subject to Title IX to provide athletic programs or opportunities separated by sex and require those programs to do so in a manner that "provide[s] *equal athletic opportunity* for members of *both sexes*." 34 C.F.R. § 106.41(c) (emphasis added).

67.    Title IX recognizes that there are biological differences between the sexes, and these differences sometimes require sex-specific activities and facilities to provide equal educational opportunity.

68.     Title IX and ED's longstanding regulations expressly permit schools to sponsor sex-specific sports teams "where selection for such teams is based upon competitive skill or the activity involved is a contact sport," 34 C.F.R. § 106.41(b), and allow "separation of students by sex within physical education classes" for sports whose major activity involves bodily contact, 34 C.F.R. § 106.34(a)(1).

69.     The same regulations require institutions to "effectively accommodate the interests and abilities of members of *both sexes*" when offering sex-separated athletic programs. 34 C.F.R. § 106.41(c) (emphasis added).

70.     Title IX has been strikingly successful towards its intended goals of providing women with opportunities for athletic competition and scholarships. It has increased the opportunities for women and girls to benefit from being on athletic teams, develop skills associated with competitive sports, attend college on athletic scholarships, and participate in high-level competitions.

### C.    Title IX gives the federal government and private parties a myriad of enforcement mechanisms.

71.     Educational institutions receiving federal funding, like Carroll ISD, must adopt policies that comply with Title IX and its implementing regulations. They may not maintain policies that violate Title IX and its implementing regulations.

72.     Any member of the public may file a complaint about an educational institution that he or she believes is not complying with Title IX or the implementing regulations.

73.     ED's OCR can investigate complaints alleging that an institution has violated Title IX and its implementing regulations. ED also has the authority to initiate an investigation without receiving a complaint.

74.     If ED's OCR finds a covered institution is noncompliant, ED may require the institution to take remedial action at the risk of losing federal funding. 20 U.S.C. § 1682; 34 C.F.R. § 106.3.

75.     The Supreme Court has interpreted Title IX to provide for a judicially implied private right of action, *Cannon v. Univ. of Chi.*, 441 U.S. 677, 709, 717 (1979), including a damages remedy, *Franklin v. Gwinnett Cnty. Pub. Sch.*, 503 U.S. 60, 76 (1992), and awards of attorney's fees under 42 U.S.C. § 1988(b), *see Cummings v. Premier Rehab Keller, PLLC*, 596 U.S. 212, 218–19 (2022).

76.     Defendants claim that the substantive requirements they impose through their Title IX regulations are enforceable through Title IX's private right of action.

77.     The Attorney General may bring an enforcement action against an educational institution that is not in compliance with Title IX and its implementing regulations.

78.     Any enforcement action puts an educational institution, like Carroll ISD, at risk of losing federal financial assistance.

## II.     Building off agency action in the Obama Administration, the Biden Administration imposes gender-identity mandates on federal antidiscrimination laws.

### A.     The Obama administration begins the rewrite of Title IX.

79.     In 2013 and 2015, Congress considered and rejected amending Title IX to prohibit "gender identity" discrimination. Student Non-Discrimination Act of 2013, H.R. 1652, 113th Cong. (2013); Student Non-Discrimination Act of 2015, S.439, 114th Cong. (2015).

80.     So the Obama administration turned from the People's representatives to agency action.

81.     In 2014, the Department's OCR published a "guidance" document asserting that "Title IX's sex discrimination prohibition extends to claims of discrimination based on gender identity" and "sexual orientation." *Questions and Answers on Title IX and Sexual Violence* B-2, OCR (Apr. 29, 2014).

82.     In May 2016, the Department issued a "Dear Colleague" letter informing educational institutions about their new "Title IX obligations regarding transgender students." *2016 Dear Colleague Letter on Title IX and Transgender Students* 2, U.S. Dep'ts of Educ. & Justice (May 13, 2016) (2016 letter), perma.cc/2VTQ-RUYP.

83.     The 2016 letter required that schools allow students to access locker rooms, restrooms, showers, and overnight accommodations based on a student's self-asserted gender identity. *Id.* at 3–4.

84.     The 2016 letter required schools to "treat students consistent with their gender identity," including by using "pronouns and names consistent with a transgender student's gender identity." *Id.* at 3.

85.     This Court enjoined the implementation of the 2016 letter as contrary to law, holding "that the plain meaning of the term sex as used in § 106.33 when it was enacted by [ED] following passage of Title IX meant the biological and anatomical differences between male and female students as determined at their birth." *Texas v. United States*, 201 F. Supp. 3d 810, 832–33 (N.D. Tex. 2016).

86.     In 2017, ED under the Trump administration withdrew the 2016 letter. *2017 Dear Colleague Letter on Title IX*, U.S. Dep'ts of Educ. & Justice (Feb. 22, 2017).

87.     In 2020, ED under the Trump administration promulgated regulations implementing Title IX that recognized—consistent with how Title IX has been applied since its enactment—"sex" means biological sex. *See* Nondiscrimination on the Basis of Sex in Educ. Programs or Activities Receiving Fed. Fin. Assistance, 85 Fed. Reg. 30,026, 30,036 (May 19, 2020).

### B.     President Biden directed federal executive agencies to add gender identity to federal laws.

88.     Building on the Obama Administration's efforts to rewrite Title IX without the People's representatives, President Biden directed federal administrative agencies to implement gender-identity mandates throughout federal law.

89.     In *Bostock v. Clayton County*, 590 U.S. 644 (2020), the U.S. Supreme Court held that under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2, terminating an employee "simply for being homosexual or transgender" constitutes discrimination "because of … sex." *Id.* at 681.

90.     The Court assumed that "sex" in Title VII "refer[s] only to biological distinctions between male and female." *Id.* at 655.

91.     The Court also recognized that "transgender status" is a "distinct concept[] from sex." *Id.* at 669.

92.     The Court emphasized that "other federal or state laws that prohibit sex discrimination," such as Title IX, were not "before" the Court. *Id.* at 681.

93.     The Court did not compare Title IX's nondiscrimination provision with the distinct text of Title VII. *Compare* 42 U.S.C. § 2000e-2(a) (Title VII), *with* 20 U.S.C. § 1681(a) (Title IX).

94.     Nor did the *Bostock* Court address Title IX's provision allowing for sex-separated living facilities or any of the other distinctions between the two sexes that Title IX recognizes and permits.

95.     Even so, on his first day in office President Biden declared that *Bostock*'s analysis changed the meaning of all federal law on sex discrimination, claiming that any statutory reference to sex discrimination includes gender-identity discrimination "so long as the laws do not contain sufficient indications to the contrary." Exec. Order No. 13,988, Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation, 86 Fed. Reg. 7023 (Jan. 20, 2021). The President ordered all executive-branch agencies to implement this view. *Id.*

96.     A short time later, DOJ's Civil Rights Division issued a memorandum instructing all federal agencies that "*Bostock* applies to Title IX." Memorandum from Pamela S. Karlan, Principal Deputy Assistant Att'y Gen., U.S. Dep't of Just. C.R. Div., to Fed. Agency C.R. Dirs. and Gen. Couns. (Mar. 26, 2021).

97.    To Carroll ISD's knowledge, the Biden administration has yet to say that a single federal law banning sex discrimination does *not* also ban "gender identity" discrimination.

**C.    The Department of Education at first tried to implement a gender-identity mandate through "guidance" documents.**

98.    Even before promulgating the Rule at issue, ED engaged in other agency action to implement President Biden's Executive Order.

99.    *First*, ED published an interpretation in the Federal Register, Enforcement of Title IX of the Education Amendments of 1972 With Respect to Discrimination Based on Sexual Orientation and Gender Identity in Light of *Bostock v. Clayton County*, 86 Fed. Reg. 32,637 (June 22, 2021) ("Interpretation").

100.    ED concluded that the phrase "on the basis of sex" in Title IX has the same meaning as the phrase "because of … sex" in Title VII and that this interpretation "is most consistent with the purpose of Title IX." *Id.* at 32,638–39.

101.    Relying on *Bostock*, ED pledged to enforce its Title IX interpretation and declared that it "will fully enforce Title IX to prohibit discrimination based on sexual orientation and gender identity in education programs and activities that receive Federal financial assistance from the Department." *Id.* at 32,639.

102.    *Second*, Acting Assistant Secretary Suzanne B. Goldberg issued a "Dear Educator" letter notifying Title IX recipients of the Interpretation and reiterating that ED "will fully enforce Title IX to prohibit discrimination based on sexual orientation and gender identity." Letter to Educators on Title IX's 49th Anniversary 2 (June 23, 2021), https://bit.ly/3ksLLDj.

103.    The Dear Educator letter included a "fact sheet" issued by the Civil Rights Division of the DOJ and OCR at the Department of Education. U.S. Dep't of Justice & U.S. Dep't of Educ., Confronting Anti-LGBTQI+ Harassment in Schools: A Resource for Students and Families, https://perma.cc/KA47-U9LJ ("Fact Sheet").

104.     A federal court preliminarily enjoined enforcement of the Interpretation and the Fact Sheet in 20 states. *See Tenn. v. U.S. Dep't. of Educ.*, 615 F. Supp. 3d 807, 838 (E.D. Tenn. 2022), *appeal docketed* No. 22-5807 (6th Cir. June 13, 2022). That court concluded the challengers were likely to show that the Interpretation was a legislative Rule under the APA that required notice and comment, which was not conducted.

### D.     The Department of Education issues a new Rule redefining "sex" and trampling constitutional rights.

105.     Now the agency has undertaken notice-and-comment rulemaking. *See* 89 Fed. Reg. 33,474.

#### 1.     The new definition of discrimination "on the basis of sex"

106.     Under the Rule, "[d]iscrimination on the basis of sex includes discrimination on the basis of sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, and gender identity[.]" 89 Fed. Reg. at 33,886. This new regulatory demand will appear at 34 C.F.R. § 106.10.

107.     The Department's rationale for its definition comes straight from *Bostock*: "[D]iscrimination on each of those bases is sex discrimination because each necessarily involves consideration of a person's sex, even if that term is understood to mean only physiological or 'biological distinctions between male and female.'" 89 Fed. Reg. at 33,802; *see Bostock*, 590 U.S. at 659–60 ("If the employer intentionally relies in part on an individual employee's sex when deciding to discharge the employee—put differently, if changing the employee's sex would have yielded a different choice by the employer—a statutory violation has occurred.").

108.     The Rule provides for discriminatory-intent liability, disparate-impact liability, hostile-environment liability, harassment liability, and other theories of liability on recipients of federal financial assistance like Carroll ISD.

109.    As the Department's notice of proposed rulemaking (NPRM) explained it, this provision is intended to codify the Department's view that "Title IX's broad prohibition on discrimination 'on the basis of sex' … encompasses, at a minimum, discrimination against an individual because, for example, they are or are perceived to be male, female, or nonbinary; transgender or cisgender; intersex; currently or previously pregnant; lesbian, gay, bisexual, queer, heterosexual, or asexual; or gender-conforming or gender-nonconforming." Nondiscrimination on the Basis of Sex in Educ. Programs or Activities Receiving Fed. Fin. Assistance, 87 Fed. Reg. 41,390, 41,532 (proposed July 12, 2022).

110.    Nothing on this point changed in the final Rule. The Rule says that Title IX applies to "discrimination against an individual based on sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, and gender identity" because "[a]ll of these classifications depend, at least in part, on consideration of a person's sex." 89 Fed. Reg. at 33,493.

111.    The new regulatory provisions do not define "sex," "gender identity," or the other terms in this new definition.

112.    As to "sex," the Rule says, "it is not necessary to resolve the question of what 'sex' means in Title IX for the Department to conclude that no statutory provision permits a recipient to discriminate against students … in the context of maintaining certain sex-separate facilities or activities." 89 Fed. Reg. at 33,821.

113.    Nor does the Rule define "gender identity," though the Rule's preamble says that ED "understands" the term to "describe an individual's sense of their gender, which may or may not be different from their sex assigned at birth." 89 Fed. Reg. at 33,809.

114.    The Rule's revised version of 34 C.F.R. § 106.10 treats the new enumerated bases of liability—sex stereotyping and the like—as overlapping ways in which Title IX addresses gender identity.

115.   For example, the Rule defines gender-identity discrimination to be sex discrimination, but the Rule also defines sex-stereotype discrimination to be sex discrimination, and *also* considers sex-stereotype discrimination to encompass gender-identity discrimination. *E.g.*, 89 Fed. Reg. at 33,807 ("A person's nonconformity with expectations about … the sex with which they should identify implicate one's sex, and discrimination on that basis is prohibited."). Built on this framework, the Rule implements Title IX to prohibit educational institutions from distinguishing between persons based on sex in a vast set of circumstances. At the same time, the Rule implements Title IX to *require* educational institutions to ignore sex in favor of a person's "sense of their gender"—in other words, schools must treat a boy who identifies as a girl as if he were a girl (and vice versa). When this Complaint refers to the Rule and Defendants' actions prohibiting discrimination based on gender identity, Plaintiff intends to encompass any alternative theory that Defendants may use to achieve these ends.

116.   The Rule applies to "all of the operations" of Carroll ISD. 89 Fed. Reg. at 33,883.

117.   The Rule thus requires Carroll ISD to treat students and employees consistent with a self-asserted "gender identity," and do the same with regard to "applicants for admission or employment," parents, "students from other institutions," "visiting lecturers," or other community members on campus, including volunteers. 89 Fed. Reg. at 33,816.

### 2.   The new "de minimis harm" standard: gender identity controls over sex

118.   The Rule revises 34 C.F.R. § 106.31(a)(2) to say:

In the limited circumstances in which Title IX or this part permits different treatment or separation on the basis of sex, a recipient must not carry out such different treatment or separation in a manner that discriminates on the basis of sex by subjecting a person to more than de

17

minimis harm, except as permitted by 20 U.S.C. 1681(a)(1) through (9) and the corresponding regulations §§ 106.12 through 106.15, 20 U.S.C. 1686 and its corresponding regulation § 106.32(b)(1), or § 106.41(b).

89 Fed. Reg. at 33,887 (to be codified at 34 C.F.R. § 106.31(a)(2)).

119.   The Rule then specifies that "[a] policy or… practice that prevents a person from participating in an education program or activity *consistent with the person's gender identity* subjects a person to more than de minimis harm on the basis of sex." 89 Fed. Reg. at 33,887 (to be codified at 34 C.F.R. § 106.31(a)(2)) (emphasis added).

120.   ED's view is that *any* consideration of sex presumptively causes harm, but when the statute allows sex-based designation anyway, sex differentiation is permissible even though (ED claims) it presumptively causes more than de mini*s* harm. 89 Fed. Reg.33,814–15; *see* 87 Fed. Reg. at 41,536 (explaining that "regardless of whether some students might experience more than de minimis harm if excluded from a particular sex-separate living facility on the basis of sex, Congress has nonetheless permitted that exclusion"). In other words, ED's interpretation is that Congress actually *intended* to permit "more than de minimis harm" in circumstances like sex-specific "living facilities," 20 U.S.C. § 1686, or "father-son or mother-daughter activities," *id.* § 1681(a)(8).

121.   The Rule declares that these new standards apply to sex-designated restrooms and locker rooms, single-sex classes or portions of classes, and dress codes. 89 Fed. Reg. at 33,816.

122.   The Rule's preamble states that "§ 106.31(a)(2) does not apply to male and female athletic teams a recipient offers under § 106.41(b)." 89 Fed. Reg. 33,816 (discussing provision to be codified at 34 C.F.R. § 106.31(a)(2)). By this, ED implies that designating athletic teams by sex (ignoring gender identity) might be permissible even if it causes "more than de minimis harm."

123.    This caveat does not protect women's sports. *First*, the Rule elsewhere says that gender-identity discrimination is a kind of sex discrimination, 34 C.F.R. § 106.10, which requires schools to treat a boy who identifies as a girl as if he *were* a girl. And the Rule also specifies that "[a] policy or… practice that prevents a person from participating in an education program or activity consistent with the person's gender identity subjects a person to more than de minimis harm on the basis of sex." 89 Fed. Reg. at 33,887 (to be codified at 34 C.F.R. § 106.31(a)(2)).

124.    *Second*, section 106.31(a)(2) exempts subsection (b) of 34 C.F.R. § 106.41, but not subsection (a). 89 Fed. Reg. at 33,887. Subsection (a) says, "[n]o person shall, *on the basis of sex*, be excluded from participation in, be denied the benefits of, be treated differently from another person or otherwise be discriminated against in any interscholastic, intercollegiate, club or intramural athletics offered by a recipient, and no recipient shall provide any such athletics separately on such basis." 34 C.F.R. § 106.41(a) (2020) (emphasis added); *see* 89 Fed. Reg. at 33,887 (to be codified as 34 C.F.R. § 106.31(a)(2)).

125.    That means a school risks sex-discrimination liability if a student is excluded from athletics "on the basis of [gender identity]," or "on the basis of [sex stereotypes]." The upshot of the Rule is schools may have designated boys' and girls' teams, but must let a male onto the girls' team if he identifies himself as a girl. Thus, in practice under the Rule, schools cannot maintain teams that are truly designated by sex.

126.    This requirement tracks what the Biden administration has elsewhere stated about Title IX's mandates. DOJ has recently and repeatedly argued that, under existing 34 C.F.R. § 106.41(b), student-athletes must be able to participate based on their gender identity rather than their sex. *E.g.*, Br. for the United States as Amicus Curiae in Supp. of Pl.-Appellant and Urging Reversal at 24–27, *B.P.J. v. W. Va. State Bd. of Educ.*, Nos. 23-1078, 23-1130 (4th Cir. April 3, 2023); Statement

of Interest of the United States at 1, 7, *B.P.J. v. W. Va. State Bd. of Educ.*, No. 2:21-cv-00316 (S.D. W. Va. June 17, 2021), ECF No. 42.

127.   Even if the Rule does not require gender-identity-based athletics, the Interpretation and the Fact Sheet do. *See supra* ¶¶ 98–104.

### 3.   The new definition of "sex-based harassment" tramples constitutional rights.

128.   The current regulations implement the Supreme Court's definition of hostile-environment harassment: "[u]nwelcome conduct determined by a reasonable person to be so severe, pervasive, and objectively offensive that it effectively denies a person equal access to the recipient's education program or activity." 34 C.F.R. § 106.30(a)(2); *accord Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 652 (1999).

129.   In 2020, ED appropriately recognized that First Amendment protections required a "narrowly tailored" harassment definition to avoid censoring protected speech. 85 Fed. Reg. at 30,142.

130.   The Rule prohibits "[u]nwelcome sex-based conduct that, based on the totality of the circumstances, is subjectively and objectively offensive and is so severe or pervasive that it limits or denies a person's ability to participate in or benefit from the recipient's education program or activity (*i.e.*, creates a hostile environment)." 89 Fed. Reg. at 33,884 (34 C.F.R. § 106.2).

131.   ED admits that its hostile-environment harassment definition is "broader" than the 2020 rule and the *Davis* standard. 89 Fed Reg. at 33,498.

132.   The Rule's definition is "broader" than the *Davis* definition in two ways:

    a.    It prohibits conduct that "limits" a person's "ability to participate in or benefit from" a program or activity, rather than "denies" a person "access to the educational opportunities or benefits provided by the school." As ED summarizes, the definition

requires only "some impact on" complainants' "ability to participate or benefit from the education program or activity, but the definition does not specify any particular limits or denials." 89 Fed. Reg. at 33,511; and

b.   It prohibits conduct that is "severe *or* pervasive," rather than "severe *and* pervasive."

133.   Thus, prohibited harassment extends even to a "single serious" incident that merely "limits" someone's ability to participate in an educational program. 89 Fed. Reg. at 33,500.

134.   The Rule applies its definition of hostile-environment harassment in two other, "broader" ways compared to the current regulations:

a.   It requires recipients to "promptly and effectively end any sex discrimination," regardless of whether they had "actual knowledge" of hostile-environment harassment or were deliberately indifferent to it. 89 Fed. Reg. at 33,889 (34 C.F.R. § 106.44(f)(1)); and

b.   It requires recipients to police off-campus, non-school "conduct that is subject to the recipient's disciplinary authority" even if it occurs "outside the United States." 89 Fed. Reg. at 33,886 (34 C.F.R. § 106.11). That includes speech "on social media." 89 Fed. Reg. at 33,535.

135.   ED is already applying this broader definition. It recently asked Carroll ISD to enter a resolution agreement of Title IX complaints involving allegations of sexual-orientation harassment including from social media interactions.

### 4. The Rule removes crucial procedural protections necessary to protect First Amendment freedoms.

136. ED's regulations currently require a "formal complaint" to initiate the grievance process and prohibit recipients from "restrict[ing] the ability of either party to discuss the allegations under investigation." 34 C.F.R. §§ 106.44(b), 106.45(b)(5)(iii).

137. The Rule eliminates these two key procedural protections:

    a. It allows the recipient's Title IX coordinator to initiate a grievance process even in "the absence of a complaint or the withdrawal of any or all of the allegations in a complaint." 89 Fed. Reg. at 33,889 (34 C.F.R. § 106.44(f)(1)(v)). If the Title IX coordinator makes the "fact-specific determination" that "the conduct as alleged presents an imminent and serious threat to the health or safety of the complainant or other person, or that the conduct as alleged prevents the recipient from ensuring equal access" to education, the Title IX Coordinator "may initiate a complaint." *Id.*

    b. It requires recipients like Carroll ISD to "take reasonable steps to protect the privacy of the parties and witnesses during the pendency of a recipient's grievance process" (the "gag order requirement"). 89 Fed. Reg. at 33,891 (34 C.F.R. § 106.45(b)(5)).

138. The Rule as a whole transforms the ability of the Title IX coordinator to initiate a complaint sua sponte into an obligation.

139. Self-initiation of complaints coupled with the recipient's duty to "end" the Department's expanded interpretation of "sex" discrimination (without an actual-knowledge or deliberate-indifference requirement), forces Title IX coordinators to investigate claims of even single instances of protected speech or rumors about alleged conduct.

22

140.   The Title IX Coordinator must also account for threats to "health or safety" without any limitation to physical health or safety.

141.   Many today claim that protected speech threatens mental, emotional, and physical safety. *E.g.*, *Perlot v. Green*, 609 F. Supp. 3d 1106, 1114 (D. Idaho 2022) (student claimed professor's agreement with comments that the Bible reserves marriage to be between one man and one woman "caused [her] to fear for [her] life"); *Doe v. Univ. of Idaho*, No. 1:23-cv-00409-AKB, ECF No. 24 (D. Idaho Dec. 29, 2023) (Title IX lawsuit based in part on this event).

142.   The requirement will force Title IX coordinators to begin time- and resource-intensive procedures against students and employees based on their protected speech, even in the absence of a complaint from the purported victim, or the school district will face enforcement action and private lawsuits.

143.   The gag order requirement forces recipients like Carroll ISD to categorically issue gag orders to the parties during any grievance process.

144.   It will prevent the parties—either complainants or respondents—from discussing perceived shortcomings or seeking assistance in the grievance process, which was a central concern of the 2020 regulations. 85 Fed. Reg. 30,295.

145.   It mandates recipients like Carroll ISD "impose prior restraints on students' and employees' ability to discuss (i.e., speak or write about) the allegations under investigation" or face enforcement actions and private lawsuits. 85 Fed. Reg. at 30,295.

### E.   The Rule contradicts Title IX's text and history.

146.   Although Title IX does not define "sex" or "on the basis of sex," Title IX's plain text, history, and past application all prove that these terms refer to sex according to *biology*, not "gender identity."

147.   The dictionary definition of the term "sex" has never—including when Title IX was enacted in 1972—meant "gender identity" as that term is used in the

Rule. Instead, the word "sex" refers to the biological binary of male and female, or to the physiological and biological differences between male and female.

148.    For decades, Title IX has been understood to allow distinctions by sex. Recognizing the biological differences between males and females is necessary to achieving Title IX's policy goal of promoting educational opportunity for women.

149.    Title IX specifies that it cannot be construed to prevent sex separation in "living facilities." 20 U.S.C. § 1686. ED has long implemented that statutory mandate in regulations to permit "separate … [h]ousing," 34 C.F.R. § 106.32(b)(1), as well as "separate toilet, locker room, and shower facilities," 34 C.F.R. § 106.33.

150.    The Rule eviscerates Title IX's respect for the biological differences between male and female by requiring schools to categorize students in line with their self-asserted "gender identity" while ignoring their sex.

151.    The Rule also erases Title IX's longstanding recognition that sex in the human species is binary. *See, e.g.*, 20 U.S.C. § 1681(a)(2) ("both sexes"); 34 C.F.R. § 106.32(c)(2) (referring to "housing … provided to students of one sex, when compared to that provided to students of the other sex").

152.    For example, the Rule revises 34 C.F.R. § 106.21 by replacing the statutory term "both sexes" with the term "all applicants." 89 Fed. Reg. at 33,887. The notice of proposed rulemaking said that this change was "in recognition of the fact that some applicants may have a nonbinary gender identity." 87 Fed. Reg. at 41,517, 41,528. The final Rule's preamble continues to refer to the concept of a "nonbinary" gender. *See, e.g.*, 89 Fed. Reg. at 33807.

153.    That reasoning conflicts with the statute. Title IX's statutory text and its implementing regulations—until now—have used "sex" to mean the biological binary of male and female.

154.    Redefining discrimination "on the basis of sex" to include "gender identity" will preclude school policies and practices that recognize sex to equalize

opportunity, ensure privacy, and safeguard students, such as designating restrooms, locker rooms, and school sports teams based on biological sex.

## III. The Rule, Interpretation, and Fact Sheet injure Carroll ISD.

155.    The Rule takes effect on August 1, 2024. It will impose immediate and long-lasting harm on Carroll ISD as well as its staff and students and their parents.

### A.    The Rule, Interpretation, and Fact Sheet create new liability risks for Carroll ISD.

156.    The Rule creates new risks for Carroll ISD because it could lose federal funding, incur significant burdens and costs, or face liability.

157.    Failure to follow the Rule and its interpretation of Title IX risks the burdens and costs of federal investigations and enforcement proceedings.

158.    Failure to follow the Rule and its interpretation of Title IX risks disallowance, exclusion, suspension, and debarment from receipt of federal funding.

159.    Failure to follow the Rule and its interpretation of Title IX risks liability for Carroll ISD under a cause of action in civil litigation, including in suits brought by private individuals. Additionally, Title IX complaints have already been filed against Carroll ISD and other Texas school districts under the interpretation that "sex" includes "gender identity" and "sexual orientation."

160.    ED requires any applicant for federal funds to assure that its programs "will be operated … in compliance" with Title IX and its implementing regulations and to "commit itself to take whatever remedial action is necessary … to eliminate existing discrimination on the basis of sex or to eliminate the effects of past discrimination." 34 C.F.R. § 106.4(a)

161.    The Rule, Interpretation, and Fact Sheet directly conflict with Texas law on sports. This collision forces Carroll ISD to choose between, on the one hand, following what the Rule demands on sports in violation of Texas law and, on the other

hand, ignoring what the Rule says to comply with Texas law. Either way, Carroll ISD is exposed to liability.

162.   Texas law protects female sports: "[A]n interscholastic athletic team sponsored or authorized by a school district … may not allow a student to compete in an interscholastic athletic competition sponsored or authorized by the district … that is designated for the biological sex opposite to the student's biological sex." Tex. Educ. Code § 33.0834(a).

163.   If Carroll ISD disregarded this law, its athletic teams could not compete against other teams in the University Interscholastic League (UIL).

164.   At least 23 other states have similar laws. *See* Ala. Code § 16-1-52(b)(2) (2023); Alaska Admin. Code tit. 4, § 06.115(b)(5)(D) (2023); Ariz. Rev. Stat. § 15-120.02 (2022); Ark. Code § 6-1-107(b)–(c) (2021); Fla. Stat. § 1006.205(3)(a) (2021); Idaho Code § 33-6203(1) (2020); Ind. Code § 20-33-13-4 (2022); Iowa Code § 261I.2 (2022); Kan. Stat. § 60-5603 (2023); Ky. Rev. Stat. § 156.070(g) (2022); La. Stat. Ann. § 4:444 (2022); Miss. Code §§ 37-97-1 to 37-97-5 (2021); Mo. Rev. Stat. § 163.048 (2023); Mont. Code § 20-7-1306 (2023); N.C. Gen. Stat. § 116-401 (2023); N.D. Cent. Code § 15-10.6-02 (2023); Okla. Stat. tit. 70, § 27-106 (2022); S.C. Code § 59-1-500 (2022); S.D. Codified Laws § 13-67-1 (2022); Tenn. Code § 49-6-310 (2022); Utah Code § 53G-6-902 (2022); W. Va. Code § 18-2-25d (2021); Wyo. Stat. § 21-25-102 (2023).

165.   These laws align with Title IX's text and the ED guidance issued and enforcement actions taken in the first four decades of Title IX's existence.

166.   The Rule, Interpretation, and Fact Sheet's requirement that schools allow students to participate on sex-specific sports teams according to gender identity conflicts with Texas law.

167.   But the Rule states that a recipient's "obligation to comply [with the Rule] is not obviated or alleviated by any State or local law or other requirement."

89 Fed. Reg. at 33,885 (to be codified at 28 C.F.R. § 106.6(b)); *see also id.* at 33,805–06.

168.   Carroll ISD's policy and practice are to comply with all Texas laws, including its law to protect female sports. The Rule threatens to require Carroll ISD to violate state law as a condition of receiving any federal funds.

169.   Disregarding Texas law threatens Carroll ISD's state funds—funds that make up a significant portion of the board's annual budget.

**B.   The Rule imposes immediate, ongoing compliance costs.**

170.   Under the Rule, as a condition of continuing to accept federal funding for education, Carroll ISD must begin immediately to repeal existing policies, adopt new policies, make assurances to the federal government, and train staff to comply with the Rule's new mandates. Carroll ISD will have to spend time and resources fulfilling these requirements.

171.   ED concedes that "all regulated entities will experience an increased recordkeeping burden under the final regulations," acknowledges that "recipients would be required to address more complaints," projects "a 10 percent increase in the number of investigations conducted annually," and admits that the Rule "could result in increased costs to recipients." 89 Fed. Reg. at 33,881, 33,492, 33,850, 33,877.

172.   Covered educational institutions must agree to comply with the Rule, including the prohibition on discrimination on the basis of gender identity.

173.   The Rule requires covered entities to provide a notice of nondiscrimination stating that they will not discriminate on the basis of gender identity. *See* 34 C.F.R. § 106.8(a), (b). Carroll ISD will have to spend time and resources on these notices.

174.   The Rule prohibits covered institutions from stating that they will engage in actions or omissions inconsistent with the Rule's prohibitions on discrimination on the basis of gender identity. *See* 34 C.F.R. § 106.8(b)(2)(ii).

175.   Under the Rule, covered institutions must train current and new employees on the Rule's required policies and procedures. *See* 89 Fed. Reg. at 33,885 (to be codified at 34 C.F.R. § 106.8(d)).

176.   The Rule will require careful review of and changes to Carroll ISD's policies and practices.

177.   Carroll ISD's policies reflect Title IX's use of the term "sex" to mean the biological binary between males and females.

178.   For example, Carroll ISD Policy 3.19 requires "separate restrooms, locker rooms, and other similar facilities" to be used in accord with biological sex. Ex. A at 1. Under the Rule, Carroll ISD will have to repeal Policy 3.19. Carroll ISD will have to spend time and resources on these changes. Changing Policy 3.19 to comply with the Rule will prevent Carroll ISD from protecting vulnerable students.

179.   As another example, Carroll ISD Policy 6.9 protects the right of students and employees not to use pronouns inconsistent with a person's sex. Ex. B at 1. Under the Rule, failure to use pronouns consistent with sex can constitute hostile-environment harassment. Carroll ISD will have to spend time and resources changing its policy. Changing Policy 6.9 to comply with the Rule will require Carroll ISD to violate the constitutional rights of its students and staff.

180.   Carroll ISD would maintain each of these existing policies and practices without the Rule. The cost of amending these policies is an injury to Carroll ISD.

181.   At least 3 students have identified as a gender identity that differs from their sex. Under the Rule, Carroll ISD must immediately allow these students to "participate in" school programs and activities "consistent with their gender identity." 89 Fed. Reg. at 33,887 (to be codified at 34 C.F.R. § 106.31(a)(2)).

182.   At a minimum, that will require that these students immediately be allowed to use opposite-sex locker rooms, restrooms, and other sex-designated spaces consistent with their gender identity. That would violate Carrol ISD Policy 3.19.

**C.     The Rule, Interpretation, and Fact Sheet will harm Carroll ISD's students, parents, and employees.**

183.    On May 6, Carroll ISD's board adopted a resolution denouncing the Rule. Ex. C at 1.

184.    The resolution emphasized that the Rule could "jeopardiz[e] the safety and well-being of students in" Carroll ISD. *Id.*

185.    The Rule, Interpretation, and Fact Sheet prevent Carroll ISD from protecting private spaces, athletics, and the constitutional rights of its students and employees.

186.    Allowing students to access sex-specific private spaces like locker rooms according to their gender identity effectively eliminates the sex designation in those spaces.

187.    Carroll ISD has determined that eliminating these sex-specific private spaces violates students' fundamental rights of privacy and safety.

188.    Carroll ISD designates such spaces by sex—meaning biological sex. Males do not enter the girls' locker rooms, restrooms, or showers; likewise, females do not enter the boys' locker rooms, restrooms, or showers.

189.    The presence of opposite-sex students in these spaces deprives children of privacy and threatens their personal sense of safety and security. These harms are more than de minimis, but the Rule disregards them.

190.    The Rule requires Carroll ISD to allow adults, such as parent volunteers, chaperones, teachers, and coaches, to access private spaces consistent with their gender identities. That harms students as well as other adults forced to share private spaces with a person of the opposite sex. These harms are more than de minimis, but the Rule disregards them.

191.    Requiring students to use restrooms, locker rooms, and showers in the presence of the opposite sex also deprives them of access to equal educational

opportunity. Allowing males into spaces reserved for girls subjects girls to distress and embarrassment, at best, and an increased risk of harassment or assault, at worst. Preventing girls from accessing educational opportunities on equal terms violates Title IX.

192.    Carroll ISD's athletic programs and female athletes will also be harmed by the Rule, the Interpretation, and the Fact Sheet because schools must allow boys who identify as girls to participate on the girls' sports teams.

193.    This undermines the privacy and safety of the girls on those sports teams. These harms are more than de minimis, but the Rule disregards them.

194.    Athletics provides female students with countless advantages. Athletic participation is associated with positive educational outcomes, including better attendance, higher grades, fewer disciplinary issues, a greater desire to go to college, and higher advanced placement enrollment rates. Girls who participate in sports are more confident and have higher self-esteem.

195.    Participating in high school sports can provide girls with opportunities for athletic scholarships in college. These athletic scholarships lower the cost of higher education and provide other benefits including access to medical facilities, health benefits, travel expenses, and gear such as shoes, clothes, and bags.

196.    The Rule, the Interpretation, and the Fact Sheet threaten to reduce substantially the benefits of athletics to female student-athletes by requiring them to compete against males who identify as girls for spots on their school's teams and then to compete against males on opposing schools' female athletic teams.

197.    Males have physiological athletic advantages over similarly fit females, including in the respiratory, cardiovascular, muscular, and other systems. These advantages result in higher short-term and sustained levels of oxygen to transport to the muscles and increased muscle fibers and muscle mass.

198.   The physiological differences between males and females directly result in stark disparities in the athletic record books because boys and men can consistently run faster and jump higher and farther than comparably fit girls and women.

199.   When males compete in female events, gifted and dedicated female athletes are denied the equal athletic opportunity that Title IX guarantees by being forced to compete against male athletes who have inherent and immutable advantages.

200.   Physiological differences between the two sexes, combined with basic principles of physics, also create enhanced risks of injury—and more severe injuries— for female athletes when competing against male athletes than in competition involving female athletes only.

201.   Increasing numbers of boys and men are competing and trying to compete in female sports and depriving girls and women of athletic opportunities and accomplishments. For example, in Connecticut, two males competing in girls' high school track and field won 15 women's state championship titles—titles previously held by nine different girls.

202.   Providing physical education and athletic opportunities is part of Carroll ISD's educational mission.

203.   If Carroll ISD were to comply with the Rule, its schools would risk losing students to private schools that are not required to comply with the Rule and thus can recognize the biological differences between boys and girls, including as they relate to athletics.

## IV.   The Rule infringes on the constitutional rights of students and employees.

204.   The First Amendment to the U.S. Constitution protects the free exercise of religion and free speech rights of all.

205.   By rewriting Title IX to include "gender identity," the Rule threatens the First Amendment rights of all students and employees in Carroll ISD.

206.   The Rule requires Carroll ISD to implement content and viewpoint discriminatory policies that impose overbroad and vague restrictions on speech.

207.   The Rule requires Carroll ISD to implement policies that unconstitutionally compel speech.

208.   The Rule's "broader" definition and its expansive interpretation of "sex" force Carroll ISD to violate students' and employees' First Amendment freedoms by requiring the district to:

   a.   Regulate even single instances of speech, including speech on the important topics of gender identity and protecting women's sports.

   b.   Police off-campus and even international speech despite the Supreme Court's admonition that "courts must be more skeptical of a school's efforts to regulate off-campus speech, for doing so may mean the student cannot engage in that kind of speech at all." *Mahanoy Area Sch. Dist. v B.L.*, 594 U.S. 180, 189–90 (2021).

   c.   Mandate that students and employees use "pronouns and names consistent with a transgender student's gender identity" and not based on the student's sex. 2016 Letter at 3. Indeed, ED repeatedly and approvingly cites a district court decision upholding a K-12 school district's ban on using pronouns consistent with a student's sex. *See* 89 Fed. Reg. at 33,504, 33,506 (citing *Parents Defending Educ. v. Olentangy Loc. Sch. Dist.*, 2023 WL 4848509, at *2, 16 (S.D. Ohio July 28, 2023)). The Biden administration has consistently taken the position that failing to use opposite-sex names or pronouns is discriminatory under Title

VII and section 1557 of the Affordable Care Act—a statute that incorporates Title IX. *See, e.g.*, U.S. Equal Employment Opportunity Commission, *Fact Sheet: Notable EEOC Litigation Regarding Title VII & Discrimination Based on Sexual Orientation and Gender Identity*, https://bit.ly/3RrIkwv.

209.    The Rule chills speech in favor of the religious and traditional understanding that sex is binary or against the practice of transitioning a child to a gender identity that does not conform with his or her sex. There is a substantial risk that students and staff will refrain from voicing their views on these important topics or will simply acquiesce in using pronouns or names inconsistent with sex out of fear they will be accused of and punished for discriminatory harassment.

210.    The risk of such self-censorship is real. In schools that have adopted policies treating gender identity as "sex" for purposes of sex discrimination, teachers have faced discipline for refusing to use pronouns inconsistent with sex because this allegedly constitutes "sex-based" harassment or discrimination. *See, e.g.*, *Ricard v. USD 475 Geary Cnty. Sch. Bd.*, No. 5:22-cv-04015, 2022 WL 1471372, at *1 (D. Kan. May 9, 2022); *Geraghty v. Jackson Loc. Sch. Dist. Bd. of Educ.*, Complaint, ECF 1, No. 5:22-cv-2237 (N.D. Ohio Dec. 12, 2022).

211.    Requiring staff and students to participate in social transition by using pronouns and names inconsistent with a student's sex, for example, infringes on their First Amendment right to be free from compelled speech.

212.    Public school teachers do not surrender their First Amendment rights as a condition of serving the public. *See Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968). Their speech as citizens on matters of public concern is protected by the First Amendment.

213.    A teacher's refusal to participate in a social transition through speech is constitutionally protected activity because refraining from participating in social

transition implicates the teacher's interests as a private citizen, speech associated with social transition implicates matters of urgent public concern, and the government has no interest that could outweigh a teacher's First Amendment rights. *See Meriwether v. Hartop*, 992 F.3d 492, 506 (6th Cir. 2021).

214.   A public school cannot "treat[] everything teachers … say in the workplace as government speech subject to government control." *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 530–31 (2022). Endorsing the administration's preferred gender ideology is not part of an educator's job duties, and refraining from doing so is protected.

215.   The Rule threatens Carroll ISD with Title IX liability unless it compels staff to speak consistent with the Biden administration's preferred ideology about the nature of sex. At the same time, the Rule threatens Title IX liability unless Carroll ISD enacts content and viewpoint discriminatory and overbroad policies about sex-based harassment that chill protected speech.

216.   Because the Rule requires Carroll ISD to treat protected expression as if it were sex-based harassment, the Rule would force Carroll ISD to amend its policies to violate the constitutional rights of students and employees and to chill wide swaths of protected speech.

217.   The Rule also requires Carroll ISD to categorically issue gag orders during grievance proceedings.

218.   Those gag orders impose prior restraints which are presumptively unconstitutional.

219.   To pass constitutional muster, gag orders must have both substantive and procedural safeguards.

220.   The Rule requires Carroll ISD to issue gag orders with no substantive or procedural safeguards, which violates the free speech rights of those students and

employees subject to the gag orders. *See, e.g., Perlot*, 609 F. Supp. 3d 1106 (preliminarily enjoining Title IX office's imposition of no-contact orders).

221.   The Rule also both censors and compels student speech on issues of gender identity and the immutability of sex, in violation of students' beliefs.

## V.   Carroll ISD needs urgent judicial relief to prevent irreparable harm.

222.   All the acts of Defendants described above, and their officers, agents, employees, and servants, were executed and are continuing to be executed by Defendants under the color and pretense of the policies, statutes, ordinances, regulations, customs, and usages of the United States.

223.   The Rule is "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704.

224.   No statute precludes judicial review of the Rule, and the Rule is not committed to agency discretion by law under 5 U.S.C. § 701(a).

225.   The Interpretation and the Fact Sheet are "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704.

226.   No statute precludes judicial review of the Interpretation and the Fact Sheet, and they are not committed to agency discretion by law under 5 U.S.C. § 701(a).

227.   Carroll ISD has no adequate or available administrative remedy.

228.   In the alternative, any effort to obtain an administrative remedy would be futile.

229.   Carroll ISD suffers legal wrong and harm from the Rule, Interpretation, and Fact Sheet.

230.   Carroll ISD is a regulated party under the Rule, Interpretation, and Fact Sheet.

231.   The Rule, Interpretation, and Fact Sheet are definitive and determine the rights and obligations of persons, including Carroll ISD.

232.   ED declares that the Rule has the full force of law.

233.   Carroll ISD faces imminent irreparable harm and is susceptible to risk of enforcement under the Rule beginning on its effective date.

234.   Carroll ISD's compliance costs constitute ongoing irreparable harm caused by the Rule. Carroll ISD has no way to obtain monetary compensation from the federal government for its compliance costs. ED itself has estimated compliance costs from "reviewing and making necessary changes to policies, procedures, and training to implement the final regulations" nationwide will exceed $98 million in the first year. 89 Fed. Reg. 33,861.

235.   Absent injunctive and declaratory relief granted before the Rule's effective date, Carroll ISD has been and will continue to be harmed by the Rule's immediate, ongoing compliance costs and by continued exposure to legal penalties if it fails to adopt policies that align with the Rule's mandates.

236.   Carroll ISD has no adequate remedy at law.

237.   The equities favor Carroll ISD's request for injunctive relief or vacatur, which will maintain the status quo that has been in place for five decades.

## FIRST COUNT
## RULE—CONTRARY TO STATUTE
### (5 U.S.C. § 706; 28 U.S.C. § 2201)

238.   Plaintiff realleges and incorporates paragraphs 1–237 of this Complaint.

239.   Each Defendant Department is an "agency" under the APA. 5 U.S.C. § 701(b)(1).

240.   Under the APA, a court "shall" "hold unlawful and set aside agency action" if the agency action is "not in accordance with law," "in excess of statutory

jurisdiction, authority, or limitations, or short of statutory right," or "contrary to constitutional right, power, privilege, or immunity" under 5 U.S.C. § 706.

241.   The Rule is not in accordance with law and exceeds statutory jurisdiction, authority, and limitations in many respects.

242.   Title IX uses the word "sex" to mean the biological, binary distinction between male and female. Title IX repeatedly imposes an approach to educational opportunity that is cognizant of two sexes and their differences, using such terms as "both sexes" and the "opposite sex."

243.   The Rule imposes an approach irreconcilable with the statute. It requires schools to adopt a "nonbinary" approach to sex discrimination and sex differences. This rewrites the statute from one requiring equal opportunity for both sexes (often through the explicit consideration of sex differences) into one requiring equal opportunity based on gender identity. At the same time, the Rule requires equal treatment based on "nonbinary" or "asexual" gender identities—classifications that are defined without reference to a person's sex.

244.   Title IX prohibits discrimination "on the basis of sex" while specifically allowing distinctions based on sex differences to achieve equal opportunity. That prohibition does not include discrimination "on the basis of gender identity" as distinct from an individual's sex.

245.   Congress has not delegated to Defendants the authority to prohibit gender-identity discrimination under Title IX.

246.   Title IX expressly contemplates sex-specific educational programs. *E.g.*, 20 U.S.C. § 1686 (separate living facilities). The statute does not permit educational institutions to *ignore* sex in favor of gender identity.

247.   The Rule's gender-identity mandates make the statute nonsensical and unworkable. Under the Rule, students who claim a gender identity different from their sex could claim unlawful discrimination based on both gender identity and sex.

For example, consider a male student who identifies as a girl. It would be discrimination on the basis of sex to exclude this student from boys' locker rooms, but it would also be discrimination on the basis of gender identity to exclude this student from the girls' locker rooms. *See* 34 C.F.R. § 106.33. The student can demand access anywhere.

248.   ED's "de minimis harm" standard is not found in the statutory text and goes against the rule of construction in 20 U.S.C. § 1686.

249.   Substantive canons of statutory construction preclude reading Title IX's references to "sex" to include "gender identity" that differs from a person's biology.

***Clear Statement Rule***

250.   A clear statement is necessary for a statute to preempt the historical police powers of the States, to abrogate state sovereign immunity, or to permit an agency to regulate a matter in areas of traditional state responsibility. This is especially true when Congress conditions such a change in the balance of federal and state power on the receipt of federal funding.

251.   A clear statement is needed to displace the states' traditional authority over public education, which includes retaining sex designation in sports, as well as in school restroom facilities, locker room facilities, and shower facilities. When Title IX was enacted in 1972, the public lacked clear notice that Title IX would apply in the way mandated by the Rule. The clear statement rule therefore precludes ED from interpreting Title IX to include the Rule's redefinition of "sex."

252.   The Rule threatens to override state laws, including Texas's law protecting female sports.

***Major Questions Doctrine***

253.   The major questions doctrine also precludes reading "on the basis of sex" in Title IX to include the gender-identity mandates created by the Rule.

254.   Title IX's statutory text respects the biological differences between male and female. When biological differences matter, Title IX respects them by permitting sex-designated programs offered on equal terms. That includes housing, restroom facilities, locker room facilities, shower facilities, and sports.

255.   If Congress wanted to require schools to *ignore* biological differences for students who identify themselves with a different gender identity, it would have said so openly. Title IX, which is filled with references to the inherent biological differences between male and female, cannot be read to give administrative agencies like ED authority to mandate that schools ignore the biological distinctiveness of girls and boys.

### Conditional Spending

256.   When Congress imposes conditions on acceptance of federal funds under the Spending Clause, the Constitution limits the States' and the public's obligations to those requirements "unambiguously" set out on the face of the statute. *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981).

257.   No funding recipient could unmistakably know or clearly understand that Title IX would impose the gender-identity mandates created by the Rule as a condition of accepting federal funds from ED.

258.   The public lacked the constitutionally required clear notice that the Act would apply in this way when Title IX was passed or when funding grants were made. *Bennett v. New Jersey*, 470 U.S. 632, 638 (1985).

259.   As a result, the Rule must be held unlawful and set aside under 5 U.S.C. § 706.

260.   The Rule must also be enjoined and declared unenforceable under 5 U.S.C. § 705 to preserve status and rights pending review of this Court.

**SECOND COUNT**
**RULE—INFRINGES ON CONSTITUTIONAL RIGHTS**
**(5 U.S.C. § 706; 28 U.S.C. § 2201; ULTRA VIRES)**

261.    Plaintiff realleges and incorporates paragraphs 1–237 of this Complaint.

262.    Each Defendant Department is an "agency" under the APA. 5 U.S.C. § 701(b)(1).

263.    Under the APA, a court "shall" "hold unlawful and set aside agency action" if the agency action is "contrary to constitutional right, power, privilege, or immunity" under 5 U.S.C. § 706.

264.    A court has equitable jurisdiction to review and enjoin ultra vires or unconstitutional agency action. *See Larson*, 337 U.S. at 689–91.

265.    Carroll ISD has standing to challenge the Rule because the Rule forces it to choose between respecting individuals' constitutional rights and complying with federal law. *See Bd. of Educ. of Cent. Sch. Dist. No. 1 v. Allen*, 392 U.S. 236, 241 n.5 (1968) (school board had standing because the challenged law compelled members to "choose between violating their oath [to uphold the Constitution] and taking a step— refusal to comply with [the law]—that would be likely to bring their expulsion from office and also a reduction in state funds for their school districts").

266.    Carroll ISD has standing to vindicate the rights of staff and students under the First Amendment overbreadth doctrine. *See Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1122 (11th Cir. 2022).

267.    Carroll ISD has third-party standing to vindicate the rights of its students and its employees. *Kowalski v. Tesmer*, 543 U.S. 125, 129–30 (2004). Carroll ISD is directly injured by the Rule because, as an educational institution that receives federal funding through ED, it is the object of the regulation.

268.    Carroll ISD shares a close relationship with its students and employees and can effectively advocate for their constitutional rights. *See Washington v. Trump*,

847 F.3d 1151, 1160 (9th Cir. 2017); *Parks Sch. of Bus., Inc. v. Symington*, 51 F.3d 1480, 1487 (9th Cir. 1995).

269.    Students and staff face obstacles that bar them from effectively advocating for their constitutional rights. Among other things, asserting their First Amendment rights on the hotly charged issue of gender identity subjects them to harassment and ostracization.

270.    The Rule's treatment of speech as discriminatory harassment will likely create "self-censorship and chilling of expression" by staff and students, *Clark v. City of Lakewood*, 259 F.3d 996, 1010 (9th Cir. 2001), making it appropriate for Carroll ISD to represent their interests.

271.    Under the First Amendment to the U.S. Constitution, "Congress shall make no law … abridging the freedom of speech … or the right of the people peaceably to assemble …." U.S. Const. amend. I. The First Amendment applies to the States and to Carroll ISD as incorporated through the Fourteenth Amendment.

272.    Students' speech is protected by the First Amendment.

273.    Employees' speech on matters of public concern is protected by the First Amendment.

274.    The Rule restricts and compels employee and student speech in violation of the First Amendment.

275.    The Rule would require Carroll ISD to adopt policies that both restrict and compel staff and student speech in violation of the First Amendment as incorporated through the Fourteenth Amendment.

276.    The Rule is so vague and overbroad that it will chill protected expression that disagrees with ED and DOJ's view about the meaning of sex: "[M]any persons, rather than undertake the considerable burden (and sometimes risk) of vindicating their rights … will choose simply to abstain from protected speech—harming not only

themselves but society as a whole, which is deprived of an uninhibited marketplace of ideas." *Virginia v. Hicks*, 539 U.S. 113, 119 (2003) (citation omitted).

277.   Adopting policies required by the Rule exposes Carroll ISD to lawsuits and liability for violating individuals' First Amendment rights.

278.   Students also have a constitutionally protected privacy interest in preventing persons of the opposite sex from seeing their unclothed or partially clothed bodies. *See, e.g.*, *Brannum v. Overton Cnty. Sch. Bd.*, 516 F.3d 489, 495 (6th Cir. 2008). The Rule forces Carroll ISD to open restrooms, locker rooms, and shower facilities to students of the opposite sex, which violates that protected privacy interest.

279.   The Rule is contrary to law because ED lacks authority to compel funding recipients to violate individuals' constitutional rights.

280.   As a result, the Rule must be held unlawful and set aside under 5 U.S.C. § 706 and the Court's inherent equitable power to enjoin ultra vires and unconstitutional actions.

281.   The Rule must also be enjoined and declared unenforceable under 5 U.S.C. § 705 to preserve status and rights pending review of this Court.

## THIRD COUNT
## RULE—EXCEEDS FEDERAL POWER
### (5 U.S.C. § 706; 28 U.S.C. § 2201; ULTRA VIRES)

282.   Plaintiff realleges and incorporates paragraphs 1–237 of this Complaint.

283.   Each Defendant Department is an "agency" under the APA. 5 U.S.C. § 701(b)(1).

284.   Under the APA, a court "shall" "hold unlawful and set aside agency action" if the agency action is "contrary to constitutional right, power, privilege, or immunity" under 5 U.S.C. § 706.

285.   A court has equitable jurisdiction to review and enjoin ultra vires or unconstitutional agency action. *Larson*, 337 U.S. at 689–91.

286.   Even if ED's interpretation of Title IX were a reasonable interpretation of the statute, it would be constitutionally impermissible because it exceeds Congress's Article I enumerated powers and transgresses on the reserved powers of the States under the federal constitution's structural principles of federalism and the Tenth Amendment. U.S. Const. art. I, § 8, cl. 1; *id.* amend. X.

287.   The Rule requires Carroll ISD to apply gender-identity mandates as a condition of receiving federal funding. Federal funding accounts for $2.15 million of Carroll ISD's annual budget.

288.   Such a requirement is unconstitutionally coercive. The Rule requires Carroll ISD to adopt a controversial gender ideology or give up more than $2 million and disregard the Title IX systems put in place over five decades. That leaves Carroll ISD with no meaningful choice. It is an improper use of the Spending Clause.

289.   Carroll ISD cannot accept the gender-identity mandates as applied to interscholastic sports because that would conflict with Texas law, *see* Tex. Educ. Code § 33.0834, and the federal government cannot commandeer state and local governments in that way, *see Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 470–75 (2018).

290.   Requiring Texas schools to give up all federal funding—which is what they would have to do to comply with Texas law—amounts to a "gun to the head." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 581 (2012) (plurality). Similarly, requiring Texas to repeal its law protecting female sports or deprive its citizens of the billions of dollars in education funding that their federal tax dollars underwrite, *see id.* at 676–81 (Scalia, J., concurring in relevant part), is "economic dragooning that leaves the States with no real option but to acquiesce," *id.* at 582 (plurality).

291.   The Rule exceeds federal Spending Clause power.

292.   The Rule also violates Article I's vesting of "[a]ll legislative Powers herein granted" to Congress. U.S. Const. art. I, § 1.

293.   Congress cannot "abdicate or … transfer to others the essential legislative functions with which it is thus vested." *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 529 (1935). When authorizing administrative regulations, Congress must at least provide "an intelligible principle" to ensure that "the agency exercises only executive power." *Jarkesy v. SEC*, 34 F.4th 446, 461 (5th Cir. 2022).

294.   If Congress delegated the authority to issue the Rule to ED (which it did not), then that delegation violates Article I's Vesting Clause. Congress would have given ED free reign to interpret "sex" in whatever way it chooses. Congress's direction to target sex discrimination in education fails to give an intelligible principle because if "sex" can mean "gender identity," Title IX becomes inconsistent with itself.

295.   As a result, the Rule is required to be held unlawful and set aside under 5 U.S.C. § 706 and the Court's inherent equitable power to enjoin ultra vires and unconstitutional actions.

296.   The Rule must also be enjoined and declared unenforceable under 5 U.S.C. § 705 to preserve status and rights pending review of this Court.

### FOURTH COUNT
### RULE—ARBITRARY AND CAPRICIOUS
### (5 U.S.C. § 706; 28 U.S.C. § 2201)

297.   Plaintiff realleges and incorporates paragraphs 1–237 of this Complaint.

298.   Each Defendant Department is an "agency" under the APA. 5 U.S.C. § 701(b)(1).

299.   Under the APA, a reviewing Court "shall" "hold unlawful and set aside agency action" if the agency action is "arbitrary," "capricious," or "an abuse of discretion." 5 U.S.C. § 706(2)(A).

300.    Agency action is arbitrary and capricious if "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mf'rs Ass'n v. State Farm Auto Mut. Ins. Co.*, 463 U.S. 29, 43 (1983).

301.    The Rule fails to define the key terms, "sex," "gender identity," "sexual orientation," "sex stereotypes," "sex characteristics," "transgender," and "sex assigned at birth."

302.    In drafting and promulgating the Rule, ED failed to undertake reasoned decision-making in many respects.

303.    *First*, the Rule acts irrationally by using *Bostock* to justify its gender-identity regime, even though the *Bostock* Court expressly disclaimed that its holding applied to other civil rights statutes that address sex discrimination (as Title IX does) or circumstances implicating private spaces or physical contact (as Title IX does). The agency's explicit and pivotal reliance on *Bostock* represents a fundamental error at the heart of the Rule and renders it arbitrary and capricious on its face.

304.    *Second,* the Rule's gender-identity mandates are vague and impossible to apply. The Rule describes "gender identity" as "an individual's sense of their gender." This is undefinable and unworkable. Schools cannot know what it means or apply it consistently. It has no basis in the statutory text. It rejects the explicit biological binary of Title IX and therefore undermines the statute's purposes.

305.    The Rule imposes inconsistent requirements. For example, the Rule requires schools to let males who identify as girls into girls' rest rooms and locker rooms even though limiting males from girls' programs is not a gender identity distinction. Yet ED and DOJ consider such distinctions a violation of the Rule.

306.   34 C.F.R. §§ 106.10 and 106.31(a)(2) mandate gender-identity discrimination despite purporting to prohibit it. For example, under the Rule schools must let students use a locker room based on the sex with which they identify, meaning that a male who "identifies" as a boy cannot use the girls' locker room, but a male who identifies as a female can. The Rule requires the school to treat the two males differently based on gender identity, even as the Rule purports to prohibit discrimination based on gender identity. The Rule fails to consider this important aspect of the problem. Such unexplained inconsistency is arbitrary and capricious.

307.   ED's inclusion of "sex stereotypes" as a version of sex discrimination is also unreasoned. "[B]iological differences between males and females" are "not stereotypes associated with either sex." *Eknes-Tucker v. Governor of Ala.*, 80 F.4th 1205, 1229 (11th Cir. 2023); *accord L.W. ex rel. Williams v. Skrmetti*, 83 F.4th 460, 484 (6th Cir. 2023). ED fails to explain why it considers biological differences to be sex stereotypes within the meaning of *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989) (plurality). That is a failure of reasoned decision-making.

308.   *Third*, ED disregards the effect of its Rule on school policies that direct staff not to tell parents when their children decide to identify as the opposite sex. Rather than disavow the parental-exclusion policies in the two example school policies that the NPRM cited with approval, *see* 87 Fed. Reg. 41,561, ED continues to cite the same examples in the Rule, 89 Fed. Reg. at 33,709. ED's failure to address how the Rule affects these parental-exclusion policies is a lack of reasoned decision-making.

309.   *Fourth*, the Rule does not consider the privacy interest in not exposing one's unclothed body to persons of the opposite sex. A student has a constitutionally protected privacy interest in preventing persons of the opposite sex from seeing her unclothed or partially clothed body. *See, e.g.*, *Brannum*, 516 F.3d at 495. This interest in bodily privacy, which is protected even in prisons, *see, e.g.*, *Fortner v. Thomas*, 983

F.2d 1024, 1030 (11th Cir. 1993), applies to public-school students in housing as well as restroom, locker room, and shower facilities. By putting persons of the opposite sex into these sex-specific spaces, the Rule creates a serious risk that students will be forced to expose their bodies to the opposite sex against their wishes. Children will reasonably hesitate to object lest the objection be taken as discriminatory harassment based on gender identity. ED's failure to consider these privacy interests lacks reasoned decision-making.

310. *Fifth*, the Rule does not explain ED's reversal of its previous position that "restroom, locker room, and shower facilities" are "living facilities" subject to 20 U.S.C. § 1686.

311. *Sixth*, ED failed to consider schools' reasonable reliance interests when promulgating the Rule. For instance, the agency failed to consider the changes to longstanding policies, practices, and facilities that schools would need to undertake to comply with the Rule while respecting the privacy rights and safety interests of others. Schools adopted these policies and practices and built expensive facilities in reliance on ED's prior positions. The failure to consider these reliance interests renders the Rule arbitrary and capricious.

312. *Seventh*, ED had no reasonable justification to expand its definition of hostile-environment harassment beyond the 2020 regulations and *Davis* definition, including by expanding its scope to apply even off campus and to social media. Nor did ED have any reasonable justification to eliminate the actual knowledge or deliberate indifference requirement pertaining to sex discrimination.

313. *Eighth*, ED failed to consider any alternative policies, such as (1) taking no action; (2) creating rules to protect privacy and girls' equal access to athletic programs, under the correct understanding of Title IX; (3) grandfathering existing categories of programs and practices covered by Title IX; or (4) creating or expanding existing exemptions for those with safety concerns or other reliance on past policies.

314. *Ninth*, the Rule does not adequately explain how it proscribes discrimination against non-binary students or justify its inconsistent use of the de minimis harm standard to students who identify as transgender, as non-binary, and as consistent with their sex. The Rule's preamble states that schools cannot exclude a student from using bathrooms or locker rooms "consistent with that student's gender identity" because that "imposes more than de minimis injury." 89 Fed. Reg. at 33,818. The Rule's preamble also says that discrimination based on sex, including "access [to] sex-separate facilities ... applies with equal force to all students, including ... nonbinary students." *Id.* at 33,818; *see also id.* at 33,807. But the Rule simultaneously does "not specify how a recipient must provide access to sex separate facilities for students who do not identify as male or female." *Id.* at 33,818. These contradictions and non-explanations show a failure of reasoned decision-making.

315. Thus, the Rule must be held unlawful and set aside under 5 U.S.C. § 706.

316. The Rule must also be enjoined and declared unenforceable under 5 U.S.C. § 705 to preserve status and rights pending review of this Court.

**FIFTH COUNT**
**INTERPRETATION AND FACT SHEET—CONTRARY TO LAW**
**(5 U.S.C. § 706)**

317. Plaintiff realleges and incorporates paragraphs 1–237 of this Complaint.

318. Each Defendant Department is an "agency" under the APA. 5 U.S.C. § 701(b)(1).

319. Under the APA, a reviewing Court "shall" "hold unlawful and set aside agency action" if the agency action is "not in accordance with law," "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," or "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(A)-(C).

320.   An agency has no power to act unless Congress confers that power, and actions that are unauthorized by Congress are ultra vires.

321.   Title IX and its regulations do not prohibit discrimination on the basis of gender identity.

322.   The Interpretation and the Fact Sheet's mandates to the contrary exceed ED's authority under Title IX and related regulations.

323.   Congress has not delegated to the executive branch any authority to impose the mandates found in the Interpretation and the Fact Sheet.

324.   The Interpretation and the Fact Sheet's reading of Title IX must satisfy the clear-notice rule, a substantive canon of statutory interpretation that applies because ED's construction displaces traditional state police power authority, implicitly abrogates state sovereign immunity, and interprets Spending Clause legislation.

325.   The Interpretation and the Fact Sheet violate the major questions doctrine because Congress's enactment of Title IX did not unambiguously give ED authority to impose the Interpretation and the Fact Sheet since it vastly changes the rights and obligations in Title IX.

326.   Because the Interpretation and the Fact Sheet exceed ED's authority under Title IX and its implementing regulations, the Interpretation and the Fact Sheet are ultra vires, contrary to law, and issued in excess of ED's authority.

327.   The Interpretation and the Fact Sheet go so far beyond any reasonable reading of the relevant congressional text and its implementing regulations that the Interpretation and the Fact Sheet functionally exercise lawmaking power reserved only to Congress. U.S. Const. art. I, § 1.

328.   The Interpretation and the Fact Sheet are contrary to law and exceed ED's statutory authority because *Bostock*'s interpretation of Title VII's language is inapplicable to Title IX.

329. The Interpretation and the Fact Sheet are contrary to law because, properly interpreted, Title IX's prohibition of discrimination "on the basis of sex" does not encompass discrimination based on gender identity.

330. The Interpretation and the Fact Sheet's rationale is contrived for the President's policy convenience rather than based on law and necessary considerations under the APA. *See Dep't of Com. v. New York*, 139 S. Ct. 2551, 2575–76 (2019).

331. As a result, the Interpretation and the Fact Sheet must be held unlawful and set aside under 5 U.S.C. § 706 and the Court's inherent equitable power to enjoin ultra vires and unconstitutional actions.

## SIXTH COUNT
## INTERPRETATION AND FACT SHEET—ARBITRARY AND CAPRICIOUS
## (5 U.S.C. § 706)

332. Plaintiff realleges and incorporates paragraphs 1–237 of this Complaint.

333. Each Defendant Department is an "agency" under the APA. 5 U.S.C. § 701(b)(1).

334. Under the APA, a reviewing Court "shall" "hold unlawful and set aside agency action" if the agency action is "arbitrary," "capricious" or "an abuse of discretion." 5 U.S.C. § 706(2)(A).

335. The Interpretation and the Fact Sheet, and Defendants' enforcement of them, explicitly rely on an interpretation of Title IX and a reading of *Bostock* that is erroneous.

336. Without reliance on this legal interpretation, the Interpretation and the Fact Sheet would not have been promulgated.

337. ED failed adequately to consider important aspects of the issue.

338. The Interpretation and the Fact Sheet create inconsistent and confusing standards, cause absurd results, lead to discrimination, and undermine other sex-based classifications.

50

339.   In promulgating the Interpretation and the Fact Sheet, ED failed to consider a gender-identity mandate's effect on schools, staff, and students, including their constitutional rights, their interests in maintaining sex-specific facilities, and their interests in maintaining sex-specific athletic teams.

340.   In promulgating the Interpretation and the Fact Sheet, ED failed to consider their impact on the interests of female athletes, including their privacy interests and their interests in receiving an equal opportunity to participate in and benefit from interscholastic athletics as part of their education.

341.   In promulgating the Interpretation and the Fact Sheet, ED failed to consider reliance interests of schools in not being subject to a prohibition on discrimination on the basis of gender identity under Title IX.

342.   In promulgating the Interpretation and the Fact Sheet, ED failed to adequately acknowledge that the Interpretation and the Fact Sheet were a change in position from its existing regulations and initial post-*Bostock* guidance.

343.   ED failed to consider any alternative policies, such as (1) taking no action; (2) creating regulations to protect female sports and privacy under the correct understanding of Title IX; (3) grandfathering existing categories of programs and practices covered by Title IX; or (4) creating or expanding existing exemptions for those with safety concerns or other reliance on past policies.

344.   These failures render the Interpretation and the Fact Sheet arbitrary, capricious, and an abuse of discretion.

345.   The Interpretation's and the Fact Sheet's rationale is contrived for the President's policy convenience rather than based on law and necessary considerations under the APA. *See Dep't of Com. v. New York*, 139 S. Ct. 2551, 2575–76 (2019).

346.   As a result, the Interpretation and the Fact Sheet must be held unlawful and set aside under 5 U.S.C. § 706.

## PRAYER FOR RELIEF

Plaintiff Carroll ISD respectfully prays for judgment in its favor and requests the following relief:

A.      That, pursuant to 5 U.S.C. § 706, this Court hold unlawful and set aside the Rule's definition of "sex-based discrimination" in 34 C.F.R. § 106.10, and the corresponding definition in the Interpretation and the Fact Sheet.

B.      That, pursuant to 5 U.S.C. § 706, this Court hold unlawful and set aside the Rule's de minimis harm provision in 34 C.F.R. § 106.31(a)(2).

C.      That this Court declare unlawful the Rule's definition of "sex-based discrimination" in 34 C.F.R. § 106.10, and the corresponding definition in the Interpretation and the Fact Sheet; as well as the de minimis harm provision in 34 C.F.R. § 106.31(a)(2).

D.      That this Court declare unlawful the Rule's de minimis harm provision in 34 C.F.R. § 106.31(a)(2).

E.      That, pursuant to 5 U.S.C. § 706, this Court declare unlawful and set aside the Rule's elimination of the actual knowledge or deliberate indifference requirement for sex discrimination (89 Fed. Reg. at 33,889 (34 C.F.R. § 106.44(f)(1))); implementation of the Title IX coordinator's duty to self-initiate a grievance process (89 Fed. Reg. at 33,889 (34 C.F.R. § 106.44(f)(1)(v))); and the gag order requirement (89 Fed. Reg. at 33891 (34 C.F.R. § 106.45(b)(5)).

F.      That this Court issue a declaratory judgment and permanent injunction preventing Defendants, including their employees, agents, successors, and all persons in active concert or participation with them, from

implementing, enforcing, or applying the Rule or the Interpretation and the Fact Sheet to require covered institutions to:

1.   Apply Title IX's prohibition on discrimination "on the basis of sex" as a prohibition on discrimination on the basis of gender identity.

2.   Apply Title IX's prohibition on discrimination "on the basis of sex" as a prohibition on discrimination on the basis of sex stereotypes.

3.   Enroll students in classes or athletic programs based on students' gender identity instead of their sex.

4.   Open single-sex housing, locker rooms, changing rooms, showers, and restrooms to individuals of the opposite biological sex.

5.   Mandate that students or staff participate in or affirm a self-identified transgender student's gender transition, including by requiring students or staff to use names or pronouns inconsistent with a student's sex.

6.   When enforcing Title IX's sex-based harassment prohibitions, treat disfavored speech on the topic of gender identity as prohibited harassment; or treat failure to use names or pronouns inconsistent with a student's sex as prohibited harassment.

7.   Enforce a definition of "sex-based harassment" that violates constitutional rights.

8.   Self-initiate a grievance process.

9.   Issue gag orders during a grievance process.

G.   That this Court issue all necessary and appropriate process, including a preliminary injunction and temporary order under 5 U.S.C. § 705, to

postpone the effective date of the Rule or to preserve status or rights pending conclusion of the judicial review proceedings.

H.      That this Court enter a preliminary injunction enjoining Defendants from enforcing their Interpretation and Fact Sheet.

I.      That this Court award to Plaintiff attorney's fees, costs, and other expenses of this action under any applicable federal statute, including 28 U.S.C. § 2412.

J.      That this Court grant the requested injunctive relief without a condition of bond or other security being required of Plaintiff; and

K.      That this Court grant any other relief that is equitable, just, and proper.

L.      That this Court retain jurisdiction over this matter for the purpose of enforcing its orders.

Respectfully submitted this 21st day of May, 2024.

/s/ Tim Davis

| | |
|---|---|
| Natalie D. Thompson** | Tim Davis |
| Texas Bar No. 24088529 | Texas Bar No. 24086142 |
| ALLIANCE DEFENDING FREEDOM | Allison Allman |
| 440 First Street NW, Suite 600 | Texas Bar No. 24094023 |
| Washington, DC 20001 | Trevor Paul |
| Telephone: (202) 393-8690 | Texas Bar No. 24133388 |
| Facsimile: (202) 347-3622 | JACKSON WALKER LLP |
| nthompson@ADFlegal.org | 777 Main Street, Suite 2100 |
| | Fort Worth, Texas 76102 |
| | Telephone: (817) 334-7200 |
| Jonathan A. Scruggs* | tdavis@jw.com |
| Arizona Bar No. 030505 | aallman@jw.com |
| ALLIANCE DEFENDING FREEDOM | tpaul@jw.com |
| 15100 N. 90th Street | |
| Scottsdale, Arizona 85260 | Tyson C. Langhofer* |
| Telephone: (480) 444-0020 | Virginia Bar No. 95204 |
| Facsimile: (480) 444-0028 | Mathew W. Hoffmann* |
| jscruggs@ADFLegal.org | DC Bar No. 1617417 |
| | ALLIANCE DEFENDING FREEDOM |
| | 44180 Riverside Pkwy |
| | Lansdowne, Virginia 20176 |
| | Telephone: (571) 707-4655 |
| | Facsimile: (571) 707-4656 |
| | tlanghofer@ADFlegal.org |
| | mhoffmann@ADFlegal.org |

*Counsel for Plaintiff*

*Motion for pro hac vice admission filed concurrently

**Practice supervised by one or more D.C. Bar members while D.C. Bar application is pending.*

55