**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | |
|---|---|
| **Carroll Independent School District**, | |
| *Plaintiff,* | Case No. 4:24-cv-00461-O |
| v. | |
| **United States Department of Education**, et al., | |
| *Defendants.* | |

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF
MOTION TO DELAY EFFECTIVE DATE AND FOR
<u>PRELIMINARY INJUNCTION</u>**

# TABLE OF CONTENTS

Table of Authorities ....................................................................................................... iii

Introduction ...................................................................................................................... 1

Background ........................................................................................................................ 2

I.    Congress enacted Title IX to promote opportunities for women while respecting natural differences between men and women. ................................ 2

II.   ED adds a gender-identity mandate to Title IX. ................................................. 3

III.  The gender-identity mandate forces Carroll to choose between adopting harmful and unlawful policies and losing all federal funding. ......................... 5

Legal Standard ................................................................................................................. 6

Argument ........................................................................................................................... 6

I.    Plaintiff Carroll ISD will likely succeed on the merits. .................................... 6

      A.    The gender-identity mandate contradicts Title IX, which prohibits treating one sex *worse than* the other. ................................................. 6

            1.    Title IX does not prohibit all sex distinctions. .............................. 8

            2.    Title IX sometimes requires sex-specific spaces. ......................... 10

            3.    Because Title IX permits and sometimes requires sex distinctions, *Bostock* cannot apply to Title IX. ........................... 12

            4.    The Rule's de-minimis-harm standard overrides Title IX's sex-based protections. ..................................................................... 14

            5.    Constitutional canons of statutory construction require rejecting ED's gender-identity mandate. ...................................... 17

      B.    The Rule infringes on First Amendment rights. ................................... 19

      C.    ED acted arbitrarily and capriciously. ................................................... 22

II.   Carroll ISD will suffer irreparable harm absent an injunction. ..................... 24

III.  The equities and the public interest favor Carroll ISD. ................................... 25

Conclusion ....................................................................................................................... 25

Certificate of Service...................................................................................................... 27

# TABLE OF AUTHORITIES

<u>Cases</u>

*Adams ex rel. Kasper v. School Board of St. Johns County,*
57 F.4th 791 (11th Cir. 2022) .................................................................. passim

*Alexander v. Choate,*
469 U.S. 287 (1985) ........................................................................ 10

*Almendarez-Torres v. United States,*
523 U.S. 224 (1998) ........................................................................ 17

*Americans for Prosperity Foundation v. Bonta,*
594 U.S. 595 (2021) ........................................................................ 20

*Biden v. Nebraska,*
143 S. Ct. 2355 (2023) ..................................................................... 19

*Bond v. United States,*
572 U.S. 844 (2014) ........................................................................ 17

*Bostock v. Clayton County,*
590 U.S. 644 (2020) ........................................................ 3, 7, 12, 13

*Brannum v. Overton County School Board,*
516 F.3d 489 (6th Cir. 2008) ........................................................... 10

*Cannon v. University of Chicago,*
441 U.S. 677 (1979) ....................................................................... 8, 9

*Cape v. Tennessee Secondary School Athletic Association,*
563 F.2d 793 (6th Cir. 1977) ........................................................... 11

*Chiu v. Plano Independent School District,*
339 F.3d 273 (5th Cir. 2003) ........................................................... 21

*Clark ex rel. Clark v. Arizona Interscholastic Association,*
695 F.2d 1126 (9th Cir. 1982) .................................................... 11, 16

*Clark v. Martinez,*
543 U.S. 371 (2005) ........................................................................ 17

*Cohen v. Brown University,*
991 F.2d 888 (1st Cir. 1993) ............................................................ 10

*Cohen v. Brown University,*
   101 F.3d 155 (1st Cir. 1996) ........................................................ 8, 13

*CSX Transportation, Inc. v. Alabama Department of Revenue,*
   562 U.S. 277 (2011) ........................................................................ 8

*Cummings v. Premier Regab Keller, P.L.L.C.,*
   596 U.S.212 (2022) ....................................................................... 18

*Davis ex rel. LaShonda D. v. Monroe County Board of Education,*
   526 U.S. 629 (1999) .................................................................. 5, 21

*Department of Homeland Security v. Regents of the University of California,*
   591 U.S. 1 (2020) ..................................................................... 14, 23

*Eknes-Tucker v. Governor of Alabama,*
   80 F.4th 1205 (11th Cir. 2023) ...................................................... 23

*Franciscan Alliance, Inc. v. Burwell,*
   227 F. Supp. 3d 660 (N.D. Tex. 2016)............................................. 7

*Frontiero v. Richardson,*
   411 U.S. 677 (1973) ........................................................................ 7

*Fry v. Napoleon Community Schools,*
   580 U.S. 154 (2017) ...................................................................... 10

*G.G. ex rel. Grimm v. Gloucester County School  Board,*
   824 F.3d 450 (4th Cir. 2016) ......................................................... 11

*Gregory v. Ashcroft,*
   501 U.S. 452 (1991) ...................................................................... 17

*Grove City College v. Bell,*
   465 U.S. 555 (1984) ........................................................................ 9

*Jackson v. Birmingham Board of Education,*
   544 U.S. 167 (2005) .................................................................. 8, 13

*Janus v. American Federation of State, County & Municipal Employees,*
   585 U.S. 878 (2018) ...................................................................... 19

*Kentucky v. Yellen,*
   54 F.4th 325 (6th Cir. 2022) ......................................................... 17

*L.W. ex rel. Williams v. Skrmetti,*
   83 F.4th 460 (6th Cir. 2023) ......................................................... 23

iv

*Louisiana v. Becerra,*
    20 F.4th 260 (5th Cir. 2021) ............................................................ 6

*Mahanoy Area School District v. B.L.,*
    594 U.S. 180 (2021) ............................................................... 19, 21

*McCormick ex rel. McCormick v. School District of Mamaroneck,*
    370 F.3d 275 (2d Cir. 2004) ............................................................ 8

*Meriwether v. Hartop,*
    992 F.3d 492 (6th Cir. 2021) ......................................................... 19

*Mississippi Power & Light Co. v. United Gas Pipe Line Co.,*
    760 F.2d 618 (5th Cir. 1985) ......................................................... 25

*Murphy v. National Collegiate Athletic Association,*
    584 U.S. 453 (2018) ..................................................................... 18

*National Federation of Independent Businesses v. Sebelius,*
    567 U.S. 519 (2012) ..................................................................... 18

*Neal v. Board of Trustees of California State Universities,*
    198 F.3d 763 (9th Cir. 1999) ......................................................... 13

*Neese v. Becerra,*
    640 F. Supp. 3d 668 (N.D. Tex. 2022) ......................................... 7, 10

*Niz-Chavez v. Garland,*
    593 U.S. 155 (2021) ....................................................................... 7

*North Haven Board of Education v. Bell,*
    456 U.S. 512 (1982) ....................................................................... 9

*O'Connor v. Board of Education of School District 23,*
    449 U.S. 1301 (1980) .................................................................... 16

*Pederson v. Louisiana State University,*
    213 F.3d 858 (5th Cir. 2000) ......................................................... 11

*Pennhurst State School & Hospital v. Halderman,*
    451 U.S. 1 (1981) ............................................................... 14, 17, 18

*Price Waterhouse v. Hopkins,*
    490 U.S. 228 (1989) ..................................................................... 23

*Sackett v. Environmental Protection Agency,*
    598 U.S. 651 (2023) ........................................................... 13, 14, 17

*South Dakota v. Dole*,
    483 U.S. 203 (1987) ................................................................. 18

*Speech First, Inc. v. Cartwright*,
    32 F.4th 1110 (11th Cir. 2022) ...................................... 21

*Speech First, Inc. v. Khator*,
    603 F. Supp. 3d 480 (S.D. Tex. 2022) ........................... 21

*Texas v. United States*,
    201 F. Supp. 3d 810, 833 (N.D. Tex. 2016)...................... 4, 17

*Threat v. City of Cleveland*,
    6 F.4th 672 (6th Cir. 2021) ........................................... 7

*Tinker v. Des Moines Independent Community School*,
    393 U.S. 503 (1969) ..................................................... 19

*United States v. Riverside Bayview Homes, Inc.*,
    474 U.S. 121 (1985) ..................................................... 9

*United States v. Virginia*,
    518 U.S. 515 (1996) ........................................ 2, 8, 10, 11

*Vlaming v. West Point School Board*,
    895 S.E.2d 705 (Va. 2023) ........................................... 19

*Wages & White Lion Investments, LLC v. FDA*,
    16 F.4th 1130 (5th Cir. 2021................................... 6, 22, 25

*West Virginia v. Environmental Protection Agency*,
    597 U.S. 697 (2022) .............................................. 14, 19

*Whitman v. American Trucking Associations*,
    531 U.S. 457 (2001) ..................................................... 8

*Williams v. School District of Bethlehem*,
    998 F.2d 168 (3d Cir. 1993) .......................................... 12

*Women's Medical Center of Northwest Houston v. Bell*,
    248 F.3d 411 (5th Cir. 2001) ........................................ 22

*Yellow Springs Exempted Village School  District Board of Education v. Ohio High School Athletic Association*,
    647 F.2d 651 (6th Cir. 1981) ........................................ 11

## Statutes

20 U.S.C. § 1686.......................................................................................... 2, 8, 15, 17

5 U.S.C. § 705 ................................................................................................................ 6

5 U.S.C. § 706(2) ........................................................................................................... 6

Educational Amendments of 1972, Pub. L. 92–318, title IX, § 901, June 23,
    1972, 86 Stat. 373.................................................................................................... 2

Tex. Educ. Code § 33.0834 ....................................................................................... 5, 18

## Regulations

34 C.F.R. § 106.10 (effective Aug. 1, 2024) ............................................................. 3, 4

34 C.F.R. § 106.31(a)(2) (effective Aug. 1, 2024) ....................................................... 4

34 C.F.R. § 106.33 .................................................................................................. 4, 5, 14

34 C.F.R. § 106.34(a)(1) ................................................................................................ 4

34 C.F.R. § 106.34(a)(2) ................................................................................................ 4

34 C.F.R. § 106.41(a)................................................................................................. 4, 22

34 C.F.R. § 106.41(b)........................................................................................... 4, 11, 22

34 C.F.R. § 106.41(c) .................................................................................................... 11

34 C.F.R. § 106.45(b)(5) (effective Aug. 1, 2024) ...................................................... 21

34 C.F.R. § 106.6(b) (effective Aug. 1, 2024) ............................................................ 18

34 C.F.R. §§ 106.14–41 ................................................................................................. 9

40 Fed. Reg. 24,128 (June 4, 1975) .......................................................................... 3, 9

44 Fed. Reg. 71,413 (Dec. 11, 1979) .......................................................................... 12

86 Fed. Reg. 32,637 (June 22, 2021) ............................................................................ 3

86 Fed. Reg. 7023 (Jan. 20, 2021) ................................................................................ 3

87 Fed. Reg. 42,390 (July 12, 2022) ........................................................................... 23

89 Fed. Reg. 33,474 (Apr. 29, 2024) ..................................................................... passim

## **Other Authorities**

117 Cong. Rec. 30,407 (1971) (Sen. Bayh) ..................................................................... 2

118 Cong. Rec. 5807 (1972) (Sen. Bayh) ....................................................................... 2

Antonin Scalia & Bryan A. Garner,
    *Reading Law: The Interpretation of Legal Texts* (2012) ................................ 7, 9

Brief for the United States as Amicus Curiae in Support of Plaintiff-
    Appellant and Urging Reversal, *B.P.J. v. West Virginia State Board of
    Education*, 98 F.4th 541 (4th Cir. 2024) (Nos. 23-1078, 23-1130), 2023
    WL 2859726 ......................................................................................................... 23

Letter on Title IX and Transgender Students,
    U.S. Dep'ts of Educ. & Justice (May 13, 2016) ................................................. 4

Letter Regarding Title IX Obligations in Athletics,
    U.S. Dep't of Educ. (Nov. 11, 1975) ................................................................ 12

Letter to Educators on Title IX's 49th Anniversary,
    U.S. Dep't of Educ. (June 23, 2021) .................................................................. 3

Webster's Third New International Dictionary (1966) ............................................... 7

## INTRODUCTION

Fifty years ago, Congress revolutionized our educational system. In 1970, nearly 34% of working women lacked high-school diplomas. In 2016, it was 6%.[1] In 1972, 7% of high-school varsity athletes were women. In 2018, it was 43%.[2] The change occurred because the people's representatives balanced competing interests and produced legislation outlining what is—and what is not—prohibited discrimination "on the basis of … sex" in education. 20 U.S.C.§ 1681(a).

A different sort of revolution took place a few weeks ago. On April 29, unelected Department of Education (ED) officials published a Title IX regulation that adds the concept of gender identity—"an individual's sense of their [sic] gender." Nondiscrimination on the Basis of Sex, 89 Fed. Reg. 33,474, 33,809 (Apr. 29, 2024). The new Rule prioritizes this subjective concept over someone's objective sex, requiring school districts—like Carroll Independent School District (Carroll ISD)—to allow males to use girls' restrooms, change in girls' locker rooms, shower in girls' showers, and compete in girls' sports. *Id.* at 33,887. The result is that Title IX's primary beneficiaries are denied the privacy, dignity, equality, and fairness needed to benefit from Title IX and the equal educational opportunity it promised.

That turns Title IX's text, structure, and purpose upside down, exchanging a well-established, biological, and binary concept of sex for an undefinable, subjective, and fluid concept of "gender identity." ED usurped Congress's role, aggrandized itself, and made Title IX incoherent. Its gender-identity mandate will force Carroll to repeal policies designating bathrooms, locker rooms, and showers by sex. ED puts Carroll to the impossible choice of following Texas law protecting girls' sports or sacrificing all federal funding—approximately $1.8 million in its annual budget.

---

[1]    U.S. Bureau of Labor Statistics, TED, https://perma.cc/EH4F-2CYD.

[2]    50 Years of Title IX, WSF (May 2022), https://perma.cc/TN74-PJ4S.

And it will require Carroll to unconstitutionally police the speech of its students and staff on the important policy issue of gender identity. This Court should therefore stay the effective date of the Rule—and preliminarily enjoin its enforcement—because it is contrary to law and it is arbitrary and capricious.

**BACKGROUND**

**I.    Congress enacted Title IX to promote opportunities for women while respecting natural differences between men and women.**

In 1972, Congress enacted Title IX of the Education Amendments, which forbids education programs or activities receiving federal financial assistance from discriminating "on the basis of sex." 20 U.S.C. § 1681(a). As the above statistics show, Title IX has had striking success. Girls now benefit from opportunities to pursue advanced education, attend college, and develop skills associated with competitive athletics.

Title IX also recognizes the "enduring" "differences between men and women." *United States v. Virginia*, 518 U.S. 515, 533 (1996) (*VMI*). The statute does not "requir[e] integration of dormitories between the sexes" or mandate co-ed locker rooms or football teams. 117 Cong. Rec. 30,407 (1971) (Sen. Bayh). Congress peppered the statute with explicit references to the biological, binary categories of two sexes with repeated references to "one sex" and "both sexes" and included a rule of construction recognizing respect for "personal privacy." 118 Cong. Rec. 5807 (1972) (Sen. Bayh); Educ. Amends. of 1972, Pub. L. 92–318, title IX, § 901, June 23, 1972, 86 Stat. 373; *see* 20 U.S.C. § 1686. The statute exempts traditional single-sex institutions and programs, like father-daughter and mother-son activities, from its requirements. *See id.* § 1681(a)(5)–(9). In 1972, "sex" meant male or female.

Three years later, ED's predecessor, HEW, promulgated regulations that "required" a school "to provide separate teams for men and women in situations where the provision of only one team would not 'accommodate the interests and

2

abilities of members of both sexes.'" Nondiscrimination on the Basis of Sex, 40 Fed. Reg. 24,128, 24,134 (June 4, 1975) (now codified at 34 C.F.R. § 106.41(c)(1)).

## II.     ED adds a gender-identity mandate to Title IX.

In *Bostock v. Clayton County*, 590 U.S. 644 (2020), the Supreme Court held that under Title VII of the Civil Rights Act of 1964, terminating an employee "simply for being homosexual or transgender" constitutes discrimination "because of ... sex." *Id.* at 681. But the Court expressly disclaimed that its holding applied to other antidiscrimination laws, such as Title IX. *See id.* Its decision did "not purport to address bathrooms, locker rooms, or anything else of the kind." *Id.*

Yet, on his first day in office, President Biden unilaterally attempted to conform the entire United States Code to *Bostock*. He declared that any statutory reference to sex discrimination includes gender-identity discrimination "so long as the laws do not contain sufficient indications to the contrary." Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation, Exec. Order No. 13,988, 86 Fed. Reg. 7023, 7023 (Jan. 20, 2021).

To implement that executive order, ED first pledged to "fully enforce Title IX to prohibit discrimination based on sexual orientation and gender identity." Enf't of Title IX of the Educ. Amends. of 1972 With Respect to Discrimination Based on Sexual Orientation and Gender Identity in Light of *Bostock v. Clayton County*, 86 Fed. Reg. 32,637 (June 22, 2021); *see* ECF No. 1 ¶¶ 99–101. The next day, ED issued a Fact Sheet and notified schools of its Interpretation. Letter to Educators on Title IX's 49th Anniversary, U.S. Dep't of Educ. (June 23, 2021); *see* ECF No. 1 ¶¶ 102–03. Now, disregarding Congress's "indications to the contrary," ED has promulgated a gender-identity mandate through two key regulatory provisions.

*First*, the Rule defines Title IX's prohibition of "sex-based discrimination" to include "discrimination on the basis of sex stereotypes, sex characteristics, ... and gender identity." 89 Fed. Reg. at 33,886 (to be codified at 34 C.F.R. § 106.10). The

Rule applies *Bostock*'s reasoning to Title IX, declaring that "discrimination on each of those bases is sex discrimination because each necessarily involves consideration of a person's sex, even if [the word "sex"] is understood to mean only physiological or 'biological distinctions between male and female.'" 89 Fed. Reg. at 33,802. As the Rule puts it, "sex discrimination" is "any discrimination that depends" even "in part on consideration of a person's sex." *Id.* at 33,803.

*Second*, the Rule creates a novel and atextual "de minimis harm" standard for sex distinctions. Any policy or "practice that prevents a person from participating in an education program or activity consistent with the person's gender identity" causes more than de minimis harm, the Rule says, and is thus prohibited absent a statutory (20 U.S.C. § 1681(a) (1)–(9)) or regulatory (34 C.F.R. § 106.41(b), (c)) exception recognized by ED. 89 Fed. Reg. at 33,818.

Sections 106.10 and 106.31(a)(2) together, like the Interpretation and Fact Sheet, impose a gender-identity mandate. ED says that while "sex separation … is not presumptively unlawful," sex distinctions cannot deny "a transgender student access to a sex-separate facility or activity consistent with that student's gender identity." 89 Fed. Reg. at 33,818. In other words, schools must "treat a student's gender identity as the student's sex for purposes of Title IX and its implementing regulations." Letter on Title IX and Transgender Students 2, U.S. Dep't of Educ. & Justice (May 13, 2016), perma.cc/2VTQ-RUYP; *see Texas v. United States*, 201 F. Supp. 3d 810, 833 (N.D. Tex. 2016) (holding this interpretation unreasonable).

The Rule's gender-identity mandate flips Title IX on its head. It applies to longstanding regulations for "separate toilet, locker room, and shower facilities," 34 C.F.R. § 106.33, "[c]ontact sports in physical education classes," lessons on "[h]uman sexuality," *id.* § 106.34(a)(1), (2), and "interscholastic, intercollegiate, club or intramural athletics," *id.* § 106.41(a). Schools must allow biological males into female restrooms, locker rooms, and showers. They must assign biological males to

4

the health class covering the female reproductive system. They must allow biological males to play against girls in sports and P.E. class athletics. Finally, the Rule permits schools to limit "housing," or dormitories, to biological females, but it irrationally eliminates that same option when it comes to other bathrooms and locker rooms, as well as overnight accommodations on field trips. *Id.* § 106.33.

Further, rejecting the Supreme Court's definition of prohibited sex-based harassment in *Davis ex rel. LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629 (1999), the Rule creates a "broader standard." 89 Fed. Reg. at 33,498. It expands "sex-based harassment" to include "severe or pervasive" conduct that merely "limits" participation in an educational program. 89 Fed. Reg. at 33,884. It also eliminates the requirement that schools have actual knowledge of harassment to be held liable and applies its definition to off-campus, non-school "conduct" occurring on social media or even outside the United States. 89 Fed. Reg. at 33,535, 33,886.

### III.   The gender-identity mandate forces Carroll to choose between adopting harmful and unlawful policies and losing all federal funding.

Carroll ISD seeks to promote the safety and flourishing of its 8,400 students in pre-K through twelfth grade at 11 school campuses. ECF No. 1 ¶ 27; App.2. Its policies protect students by designating restrooms, locker rooms, and shower facilities for each sex (Policy 3.19) and allowing students and employees to avoid using pronouns inconsistent with sex (Policy 6.9). App.8, 9. Consistent with Texas law, Carroll protects girls' sports by keeping them designated for females. App.2–3; *see* Tex. Educ. Code § 33.0834.

Complying with the gender-identity mandate would force Carroll to amend or repeal its policies and violate state law. Males could enter the girls' locker rooms— exposed spaces with little individual privacy—and the girls' showers. App.4–5. The district would have to open girls' sports teams to males, which not only puts girls at an inherent disadvantage, but also threatens their physical safety. App.3; *see infra*

at 11. But if Carroll allowed males to play on girls' teams, it would violate Texas law and its students couldn't compete in statewide competitions. App.3. Moreover, the broadened definition of sex-based harassment would violate students' and staff's First Amendment rights by requiring gender-identity-based pronouns and other speech endorsing ED's views. App.5. But failing to change its policies and practices would force Carroll to forgo $1.8 million in annual federal funding. App.6. Losing eligibility for this funding would cause significant financial harm. *Id.*

## LEGAL STANDARD

A preliminary injunction should be issued when a movant shows: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable harm; (3) that outweighs any harm that will result if the injunction is granted; and (4) an injunction is in the public interest. *Louisiana v. Becerra*, 20 F.4th 260, 262 (5th Cir. 2021) (cleaned up). The same standards apply to "postpon[ing] the effective date of an agency action," 5 U.S.C. § 705, to "prevent irreparable injury," *Wages & White Lion Investments, LLC v. FDA*, 16 F.4th 1130, 1143 (5th Cir. 2021).

## ARGUMENT

## I.   Plaintiff Carroll ISD will likely succeed on the merits.

The gender-identity mandate found in the Interpretation, Fact Sheet, and Rule contradicts Title IX and violates the Constitution. The Rule also infringes on free speech and is arbitrary and capricious. 5 U.S.C. § 706(2).

### A.   The gender-identity mandate contradicts Title IX, which prohibits treating one sex *worse than* the other.

Title IX does not prohibit all sex distinctions—it prohibits schools from treating one sex worse than the other. Indeed, Title IX sometimes requires sex-based distinctions. That makes *Bostock* inapposite. ED's gender-identity mandate and de-minimis-harm standard conflict with Title IX's text and purpose.

Statutory interpretation begins with the text. Courts give "terms their ordinary meaning at the time Congress adopted them." *Niz-Chavez v. Garland*, 593 U.S. 155, 160 (2021). Start with "on the basis of sex." "The text of Title IX indicates Congress's binary definition of 'sex,'" *Franciscan All., Inc. v. Burwell*, 227 F. Supp. 3d 660, 687 (N.D. Tex. 2016), and unambiguously refers to "biological sex," *Adams ex rel. Kasper v. Sch. Bd. of St. Johns Cty.*, 57 F.4th 791, 812 (11th Cir. 2022) (en banc); *accord Neese v. Becerra*, 640 F. Supp. 3d 668, 680 (N.D. Tex. 2022). So the Rule, too, "assum[es] that 'sex' refers to 'biological distinctions between male and female.'" 89 Fed. Reg. at 33,804–05 (citing *Bostock*, 590 U.S. at 655).

Next, consider the word "discrimination." Sometimes, it means "to make a distinction," Webster's Third New International Dictionary 648 (1966) ("Webster's Third"), or to treat someone "differently," *Threat v. City of Cleveland*, 6 F.4th 672, 677 (6th Cir. 2021) (citing Webster's Third 648). But to "be subjected to discrimination," 20 U.S.C. § 1681(a), suggests a distinction for the wrong reasons: "a difference in treatment or favor on a class or categorical basis in disregard of individual merit." Webster's Third 648. The Supreme Court explained in 1975—a few years after Title IX's enactment—that distinctions between males and females are problematic when they "have the effect of invidiously relegating the entire class of females to inferior legal status without regard to the capabilities of its individual members." *Frontiero v. Richardson*, 411 U.S. 677, 686–87 (1973) (emphasis added).

Title IX also prohibits excluding from or denying benefits of an educational program. 20 U.S.C. § 1681(a). These nearby terms help clarify "discrimination." Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 195–98 (2012) (explaining associated-words canon). To "exclude" means to "bar from participation, enjoyment, consideration, or inclusion." Webster's Third 793. And to "deny" here means to "turn down or give a negative answer." *Id.* 603. These words reinforce that discrimination is not merely "differential" treatment but "less

7

favorable" treatment based on sex, *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 174 (2005), where "there is no justification for the difference in treatment," *CSX Transp., Inc. v. Ala. Dep't of Revenue*, 562 U.S. 277, 287 (2011).

Finally, these words apply within the context of an "education program," like classrooms and sports. Putting these parts together shows that Title IX prohibits differential treatment that disfavors, denies, or treats one sex worse than the other sex when it comes to the full and equal enjoyment of educational opportunities. *See Adams*, 57 F.4th at 811 (explaining Title IX's "purpose, as derived from its text, is to prohibit sex discrimination in education").

What dictionaries say, "statutory and historical context" confirms. *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 471 (2001). As courts have recognized, "Title IX was enacted in response to evidence of pervasive discrimination against women with respect to educational opportunities." *McCormick ex rel. McCormick v. Sch. Dist. of Mamaroneck*, 370 F.3d 275, 286 (2d Cir. 2004); *Cannon v. Univ. of Chicago*, 441 U.S. 677, 704 & n.36 (1979). That means its "remedial focus is, quite properly, not on the overrepresented gender, but on the underrepresented gender; in this case, women." *Cohen v. Brown Univ.*, 101 F.3d 155, 175 (1st Cir. 1996) (*Cohen II*).

### 1.      Title IX does not prohibit all sex distinctions.

**a.** While Title IX prohibits sex *discrimination*, it does not forbid all sex *distinctions*. That is because men and women have "enduring" differences. *VMI*, 518 U.S. at 533. As to privacy, for example, "biological sex is the sole characteristic" that determines whether persons are similarly situated. *Adams*, 57 F.4th at 803 n.6.

"A community made up exclusively of one sex is different from a community composed of both." *VMI*, 518 U.S. at 533 (cleaned up). So Title IX permits sex-specific spaces, like living facilities and social organizations, and events, like beauty pageants. *E.g.*, 20 U.S.C. §§ 1681(a)(7), (8), 1686. Though sororities and pageants

may not be essential to ensure educational opportunities, Congress protected them anyway, recognizing that traditional single-sex spaces are not discriminatory. That's all the more true for areas like communal locker rooms, which must be sex-specific to ensure meaningful access for girls and boys, respectively.

**b.** Title IX's history confirms its plain meaning. The Supreme Court has interpreted Title IX's "postenactment developments" as "authoritative expressions concerning the [statute's] scope and purpose." *N. Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 535 (1982) (citation omitted). When Congress accepts a statute's settled interpretation, courts assume this interpretation is correct. *See Cannon*, 441 U.S. at 687 n.7, 702; *see* Scalia & Garner, *supra*, 322–26 (prior-construction canon).

Start with Title IX's original implementing regulations. *Compare Nondiscrimination on the Basis of Sex in Education Programs and Activities Receiving or Benefiting from Federal Financial Assistance,* 40 Fed. Reg. 24,128, 24,139–43 (June 4, 1975) ("1975 rulemaking"), *with* 34 C.F.R. §§ 106.14–41. They permit sex-specific programs and spaces like physical-education classes, restrooms, showers, locker rooms, and sports teams. Congress required HEW to submit the rules for its review. 1975 rulemaking, 40 Fed. Reg. 24,128. After six days of hearings on whether the rules were "consistent with the law" and its intent, Congress allowed the regulations to take effect. *N. Haven*, 456 U.S. at 531–32.

Courts and the executive branch have long understood the 1975 regulations to "accurately reflect congressional intent." *Grove City Coll. v. Bell*, 465 U.S. 555, 568 (1984); *see also* 89 Fed. Reg. at 33,817. Unlike situations where Congress merely fails to act, refusing "to overrule an agency's construction" that Congress was aware of provides "some evidence of the reasonableness of that construction." *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 137 (1985). It's more probative still because Congress mandated congressional review of the regulations, which is why courts have given Title IX's implementing regulations a "high" degree

of deference. *E.g.*, *Cohen v. Brown Univ.*, 991 F.2d 888, 895 (1st Cir. 1993) (*Cohen I*); *Kelley v. Bd. of Trs.*, 35 F.3d 265, 270 (7th Cir. 1994).

### 2.    Title IX sometimes requires sex-specific spaces.

**a.** While Title IX permits some sex distinctions, other times it requires them. Again, start with the text. "Students are not only protected from discrimination, but also specifically shielded from being 'excluded from participation in' or 'denied the benefits of' any 'education program or activity[.]'" *Davis*, 526 U.S. at 650 (quoting 20 U.S.C. § 1681(a)). That could be harassment that prevents girls "from using … an athletic field." *Id.* at 650–51. In analogous contexts, it means any action that precludes "meaningful access" to the sought-after benefit. *Alexander v. Choate*, 469 U.S. 287, 301 (1985).

Ignoring biological differences sometimes deprives girls of meaningful access to education. The "yardstick for measuring the adequacy of the education that a school offers" depends on results and reality. *Fry v. Napoleon Cmty. Schs.*, 580 U.S. 154, 167 (2017). Consider showers and locker rooms. Students retain "a significant privacy interest in their unclothed bodies," including "the right to shield [their] body from exposure to viewing by the opposite sex." *Brannum v. Overton Cty. Sch. Bd.*, 516 F.3d 489, 494, 496 (6th Cir. 2008); *accord Neese*, 640 F. Supp. 3d at 681 n.9 (collecting cases). As Justice Ginsburg observed, integrating the VMI "would undoubtedly require alterations necessary to afford members of each sex privacy from the other sex in living arrangements." *VMI*, 518 U.S. at 550 n.19.

But the gender-identity mandate requires partially co-ed showers and locker rooms. That result is impossible to square with Title IX. The interest in bodily privacy is sex-specific because of—not in spite of—the anatomical differences between male and female. *See, e.g.*, *Adams*, 57 F.4th at 803 n.6. Separating private spaces based on gender identity thus "den[ies] all affected persons the dignity and freedom of bodily privacy." *G.G. ex rel. Grimm v. Gloucester Cty. Sch. Bd.*, 824 F.3d

450, 452 (4th Cir. 2016) (Niemeyer, J., dissenting from denial of rehearing).

Similarly, for "equal opportunity" in sports, "relevant differences cannot be ignored." *Yellow Springs Exempted Vill. Sch. Dist. Bd. of Ed. v. Ohio High Sch. Athletic Ass'n*, 647 F.2d 651, 657 (6th Cir. 1981). Because of the "average physiological differences" between men and women, "males would displace females to a substantial extent if they were allowed to compete" for the same teams. *Clark ex rel. Clark v. Ariz. Interscholastic Ass'n*, 695 F.2d 1126, 1131 (9th Cir. 1982). Males as a class consistently beat females in athletic competition—males run faster and jump higher and farther than comparably fit girls and women. App.76–82, 177–81, 216–21, 253, 316–32. Competing against males subjects girls to greater risks of injury and more severe injury. App.218–19, 258–61, 424–47. Unfair competition and risks of injuries deprive girls of equal opportunity and are a known consequence of eliminating female-only sports. App.67–90 (discussing and citing evidence).

Without girls' teams, "the great bulk of the females would quickly be eliminated from participation and denied any *meaningful* opportunity for athletic involvement." *Cape v. Tenn. Secondary Sch. Athletic Ass'n*, 563 F.2d 793, 795 (6th Cir. 1977) (per curiam) (emphasis added). So failing to offer some women's sports teams "certainly creates a barrier for female students" to achieve equal athletic opportunities. *Pederson v. La. State Univ.*, 213 F.3d 858, 871 (5th Cir. 2000).

**b.** While ED now pretends biological differences are artificial, a long line of administrations have recognized that sex distinctions can advance "the talent and capacities of our Nation's people." *VMI*, 518 U.S. at 533. Along with allowing sex-specific teams for contact sports and sports involving "competitive skill," longstanding regulations require "equal athletic opportunity for members of both sexes." 34 C.F.R. § 106.41(b), (c). This includes equal opportunities in "the selection of sports and levels of competition" necessary to "effectively accommodate the interests and abilities of members of both sexes." *Id.* § 106.41(c)(1).

So a long line of administrations understood Title IX to permit and even require sex-specific sports teams. In 1975, HEW explained that schools could not eliminate women's teams and tell women to try out for men's teams if "only a few women were able to qualify."[3] And in 1979, the agency issued a guidance document stating that schools that sponsor sports teams "for members of one sex" "may be required … to sponsor a separate team for the previously excluded sex." *Title IX of the Education Amendments of 1972; a Policy Interpretation; Title IX and Intercollegiate Athletics*, 44 Fed. Reg. 71,413 (Dec. 11, 1979). This makes sense too. The athletics regulations sought to overcome "the historic emphasis on boys' athletic programs to the exclusion of girls' athletic programs." *Williams v. Sch. Dist. of Bethlehem*, 998 F.2d 168, 175 (3d Cir. 1993). The solution was to give women their own playing field—otherwise, men would displace them in competition.

### 3.   Because Title IX permits and sometimes requires sex distinctions, *Bostock* cannot apply to Title IX.

ED justifies its gender-identity mandate by citing *Bostock*, but that case does not fit here for at least five reasons.

*First*, *Bostock* did not change the meaning of "sex" in Title VII (or Title IX). *Bostock*, 590 U.S. at 656. Nor does the gender-identity mandate purport to equate gender identity with "sex." *E.g.*, 89 Fed. Reg. at 33807. That is fatal because *Bostock* said that gender-identity discrimination is a form of sex-based discrimination, not that all sex-based distinctions are a form of gender-identity discrimination.

*Second*, *Bostock* dealt with hiring and firing in employment, while Title IX deals with educational opportunities. "[T]he school is not the workplace." *Adams*, 57 F.4th at 808. And "Title VII … is a vastly different statute from Title IX." *Jackson*,

---

[3]     Letter Regarding Title IX Obligations in Athletics, Dep't of Educ. (Nov. 11, 1975), https://perma.cc/7T36-TJCZ.

544 U.S. at 175. That was why *Bostock* did not "purport to address bathrooms, locker rooms, or anything else of the kind." 590 U.S. at 681. And Title VII lacks a provision like 20 U.S.C. 1686, which provides a rule of construction that cannot be squared with *Bostock*'s but-for-causation rule.

*Third*, *Bostock* held that "sex is not relevant to the selection, evaluation, or compensation of employees" under Title VII, which treats sex like race, national, origin, and other protected classifications. 590 U.S. at 660 (cleaned up). But Title IX *only* covers sex, which often *is* relevant to educational opportunities. *Supra* at 8–12. Take sports. Under *Bostock*, employers cannot consider sex to hire or fire an employee. Applied to sports, that logic would mean schools cannot consider sex to create a sports team. But "athletics programs *necessarily* allocate opportunities separately for male and female students." *Cohen II*, 101 F.3d at 177. "Unlike most employment settings, athletic teams are gender segregated[.]" *Neal v. Bd. of Tr. of Cal. State Univs.*, 198 F.3d 763, 772 n.8 (9th Cir. 1999). Applying *Bostock* here would require schools to allow boys to compete against girls, allowing males to displace females and limiting women's opportunities. So here, "only one" inter-pretation "produces a substantive effect that is compatible with the rest of the law." *Sackett v. EPA*, 598 U.S. 651, 676 (2023) (citation omitted). That is why courts distinguish athletics and employment, each of which "requires a different analysis in order to determine the existence *vel non* of discrimination." *Cohen II*, 101 F.3d at 177; *Neal*, 198 F.3d at 772 n.8 (Title VII "precedents are not relevant in the context of collegiate athletics.").

*Fourth*, *Bostock*'s logic contradicts the very distinctions drawn by ED. For example, the Rule in theory allows men's and women's restrooms—just separated by gender identity instead of sex. 89 Fed. Reg. at 33,818. But even facilities separated by gender identity discriminate based on sex under ED's interpretation; "it is impossible to discriminate against a person because of their … gender identity

without discriminating against that individual based on sex." *Id.* at 33,816 (cleaned up). So even under ED's logic, the Rule draws distinctions forbidden by Title IX's general non-discrimination text. Its gender-identity mandate is incoherent.

ED's logic works only if the provisions permitting sex-specific intimate spaces say "sex" but mean "gender identity." *E.g.*, 34 C.F.R. § 106.33 (allowing "separate toilet, locker room, and shower facilities on the basis of [gender identity]"). But ED has already disclaimed that argument. *E.g.*, 89 Fed. Reg. at 33,807. So, in ED's view, the *statute* prohibits schools from considering sex (per *Bostock*), while the Rule's gender-identity mandate sometimes overrides the statute, discards *Bostock*, and permits these forbidden distinctions. In other words, "sex" means "sex," except when it means gender identity. Nothing in the statute's text supports this illogic. And ED cannot defend the Rule on this basis anyway. *See DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 20 (2020) (judicial review is "limited to the grounds that the agency invoked when it took the action" (cleaned up)).

*Fifth*, *Bostock* has no application to spending-clause statutes like Title IX. They demand Congress speak with "a clear voice," "unambiguously" to give funding recipients notice of their obligations. *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981). That is doubly so when ED asserts "highly consequential" and "transformative" power to remake the nation's educational system. *West Virginia v. EPA*, 597 U.S. 697, 724 (2022). And it is triply so when an agency "significantly alter[s] the balance between federal and state power" in an area traditionally regulated by the states (like education). *Sackett*, 598 U.S. at 679.

### 4. The Rule's de-minimis-harm standard overrides Title IX's sex-based protections.

Because *Bostock* cannot apply to Title IX, ED concocts a new de-minimis-harm standard to achieve its desired ends. 89 Fed. Reg. at 33,887 (to be codified at 34 C.F.R. § 106.31(a)). But this standard flouts Title IX's text and purpose.

Title IX's text never mentions de minimis harm. It prohibits schools from excluding, denying benefits, or discriminating—meaning to "treat worse." *Muldrow v. City of St. Louis*, 144 S. Ct. 967, 974 (2024). "But neither that phrase nor any other says anything about how much worse." *Id.* The Supreme Court addressed this issue in Title VII—the statute ED cites to justify its new standard. 89 Fed. Reg. at 33,815. But as *Muldrow* clarified, nothing in Title VII's text requires plaintiffs to show "an elevated threshold of harm." 144 S. Ct. at 974. Instead, a plaintiff need only show "some injury," *id.* at 977, not one that is "serious, or substantial, or any similar adjective suggesting that the disadvantage … must exceed a heightened bar," *id.* at 974. Title IX has no such bar either. And yet Congress directed courts *not* to "construe[]" Title IX to prohibit sex separation in "living facilities." 20 U.S.C. § 1686. That rule of construction forecloses reading Title IX to say that sex separation based on biological differences is discrimination. Otherwise, Congress would have intentionally subjected students to sex discrimination in all manner of traditionally sex-specific programs. ED's de-minimis-harm rule is not a plausible interpretation of the statute.

The de-minimis-harm rule also creates gaping inconsistencies. For example, ED insists that sex distinctions *always* cause more than de minimis harm, but only when applied to persons with certain gender identities. *E.g.*, 89 Fed. Reg. at 33,887; *see also id.* at 33,815 (explaining "stigmatic injuries" are per se harmful). So sex-specific rules for restrooms cause mere de minimis harm when applied to men who identify as men but more than de minimis harm when applied to men who identify as women. *Id.* at 33,820. On this logic, gender identity trumps sex-based protections—the very thing the statute explicitly protects. *Adams*, 57 F.4th at 814.

Meanwhile, the gender-identity mandate implausibly exempts many sex-specific spaces, including housing, single-sex colleges, military schools, fraternities, sororities, boys' and girls' clubs, and beauty pageants. 89 Fed. Reg. at 33,818–19.

15

Schools can enforce biology-based standards for dorms but not locker rooms; colleges but not sports; beauty pageants but not showers. That makes little sense. Privacy matters at least as much in showers and locker rooms as it does in dorms.

By elevating gender identity above Title IX's protections for sex, ED defines harms ideologically rather than biologically. This causes bizarre results, like women's colleges accepting both females and males—but not males who identify as male. *E.g.*, Barnard College, Transgender Policy, https://perma.cc/5KXR-KJJW. The gender-identity mandate also takes a fluid approach to sex distinctions. For example, sometimes it laments "harms associated with being treated consistent with a gender identity that differs from one's sex," like forcing females who identify as male to compete on the men's athletic team. 89 Fed. Reg. at 33,819–20. But elsewhere ED discourages schools from requiring students to abide by their gender identity. *Id.* (explaining that individuals can "weigh … for themselves" whether to participate in programs according to their gender identity or their sex). In the end, the gender-identity mandate permits persons who identify as transgender to abide by biological sex distinctions—or not. That gives them a choice denied to others.

ED also claims that "transgender students experience" harm from sex-based distinctions, but it's "unaware" of analogous harms to "cisgender students." *Id.* at 33,820. Yet schools have often excluded students from opposite-sex teams *because of their sex. E.g., O'Connor v. Bd. of Ed. of Sch. Dist. 23*, 449 U.S. 1301, 1306 (1980) (Stevens, J., in chambers) (girl excluded from boys' basketball team); *Clark*, 695 F.2d at 1131 (boy excluded from girls' volleyball team). Title IX allows these types of sex *distinctions* despite a ban on sex *discrimination*. It similarly must allow sex distinctions in intimate spaces regardless of alleged harms based on gender identity, a trait Title IX never mentions.

### 5.   Constitutional canons of statutory construction require rejecting ED's gender-identity mandate.

Even where a statute is subject to "competing plausible interpretations," *Clark v. Martinez*, 543 U.S. 371, 381 (2005), the statute must be construed "to avoid not only the conclusion that it is unconstitutional but also grave doubts upon that score," *Almendarez-Torres v. United States*, 523 U.S. 224, 237 (1998) (cleaned up). The clear-statement rule, the limitations on Spending Clause legislation, and the major-questions doctrine all foreclose ED's interpretation of Title IX and prove that the gender-identity mandate is contrary to law.

**a.** Federalism principles require that Congress use "exceedingly clear language if it wishes to significantly alter the balance between federal and state power." *Sackett*, 598 U.S. at 679 (cleaned up). Even in interpreting "expansive language," courts "insist on a clear" statement, especially with Spending Clause legislation, before intruding on the states' traditional police powers, like education. *Bond v. United States*, 572 U.S. 844, 860 (2014); *Pennhurst*, 451 U.S. at 17. Congress may not use "expansive language" to impose vague conditions, *Bond*, 572 U.S. at 857–58, 860, and an agency may not add new conditions itself, *Kentucky v. Yellen*, 54 F.4th 325, 354 (6th Cir. 2022).

ED's gender-identity mandate is not "unmistakably clear in the language of [Title IX]." *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991) (cleaned up). Indeed, just eight years ago, ED and DOJ claimed the meaning of "sex" was so ambiguous that its first attempt at a gender-identity mandate was entitled to *Auer* deference. *See Texas*, 201 F. Supp. 3d at 831–32 (rejecting this argument). They cannot now claim this has always been "unmistakably clear" in the statutory text. It has not. In 1972, no one understood "discrimination on the basis of sex" to require schools to *ignore* sex in favor of gender identity. *See Adams*, 57 F.4th at 815. And Title IX has recognized sex-specific privacy interests for fifty years. 20 U.S.C. § 1686.

17

**b.** Congress exceeds its Spending Clause power when "pressure turns into compulsion." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 577–78 (2012) (*NFIB)* (opinion of Roberts, C.J.) (quoting *South Dakota v. Dole*, 483 U.S. 203, 211 (1987)). Compulsion easily describes the Rule, which leaves "no real option but to acquiesce" to the federal government's policy. *Id.* at 582. Schools must adopt the Rule's new gender-identity mandate or sacrifice all federal funds—here, $1.8 million annually. App.6. The Rule is all the more coercive because states and school districts like Carroll must upend "intricate statutory and administrative regimes [implemented] over the course of many decades." *NFIB*, 567 U.S. at 581. Requiring schools nationwide to give up all federal funding is a "gun to the head." *Id.*

ED also exceeds Congress's Spending Clause power by claiming that the Rule preempts contrary state law. *See* 89 Fed. Reg. at 33,541–42, 33,885 (to be codified at 34 C.F.R. § 106.6(b)). Foremost among the relevant state laws are the statutes in 24 states, including Texas, that prohibit schools from opening girls' athletic teams to biological males. *See* Tex. Educ. Code § 33.0834. The Rule cannot preempt those laws. The anti-commandeering doctrine prevents the federal government from requiring the states to repeal their laws. *See Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 470–75 (2018). And the Spending Clause does not give an administrative agency power to authorize schools to violate state law. "Unlike ordinary legislation, which 'imposes congressional policy' on regulated parties 'involuntarily,' Spending Clause legislation operates based on consent: 'in return for federal funds, the [recipients] agree to comply with federally imposed conditions.'" *Cummings v. Premier Regab Keller, P.L.L.C.*, 596 U.S. 212, 219 (2022) (quoting *Pennhurst*, 451 U.S. at 16, 17). There is no "conflict" between following state law and declining to accept conditions on federal funding, so there can be no preemption. *Murphy*, 584 U.S. at 471.

18

**c.** Moreover, Courts "presume that Congress intends to make major policy decisions itself, not leave those decisions to agencies." *West Virginia v. EPA*, 597 U.S. 697, 723 (2022) (cleaned up). Like HHS's nationwide ban on evictions, the Labor Department's nationwide vaccine mandate, or the EPA's restructuring of the nation's energy industry, imposing a novel gender-identity mandate on all schools and education programs is a matter of "staggering" "economic and political significance" for which Congress has given ED no clear authority. *See, e.g.*, *Biden v. Nebraska*, 143 S. Ct. 2355, 2373 (2023) (cleaned up). Our nation has engaged in sustained discourse about sex-specific facilities and allowing men to participate in women's sports. *E.g.*, *Adams*, 57 F.4th 791. The economic significance is also massive—subjecting schools nationwide to the loss of billions of dollars in federal funding. ED cannot adopt this major policy change by administrative fiat.

**B.     The Rule infringes on First Amendment rights.**

Neither "students [n]or teachers shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker v. Des Moines Ind. Cmty. Sch.*, 393 U.S. 503, 506 (1969). "*Tinker*'s demanding standard" protects student speech unless the school can show it "materially disrupts classwork or involves substantial disorder or invasion of the rights of others." *Mahanoy Area Sch. Dist. v. B.L.*, 594 U.S. 180, 188, 193 (2021). The First Amendment also protects public employees' speech as citizens on matters of public concern, including "gender identity"—"a hotly contested matter of public concern." *Meriwether v. Hartop*, 992 F.3d 492, 506 (6th Cir. 2021); *accord Vlaming v. W. Point Sch. Bd.*, 895 S.E.2d 705, 740 (Va. 2023). The government bears a "heavier burden" to justify a regulation that compels speech. *Janus v. Am. Fed'n of State, Cty. & Mun. Emps.*, 585 U.S. 878, 907 (2018).

The gender-identity mandate and Rule violate the First Amendment for two main reasons. *First*, the gender-identity mandate expands the definition of "sex" to include subjective concepts like "gender identity" and "sex stereotypes." 89 Fed. Reg.

at 33,886. The mandate doesn't even define "gender identity," except to say it "describe[s] an individual's sense of their [sic] gender." *Id.* at 33,809. *Second*, the Rule creates an amorphous, "broader standard" for hostile-environment claims. *Id.* at 33,498. Harassment need only be severe *or* pervasive. A complainant need not "demonstrate any particular harm," or denial of access to an educational program. 89 Fed. Reg. at 33,511. Harassment can be anything that the student considers "unwelcome" or that "limits" the student's ability to benefit. *Id.* at 33,884 (to be codified at 34 C.F.R. § 106.2). And the Rule's definition of harassment applies even to speech online or outside the United States. 89 Fed. Reg. at 33,535, 33,886.

The Rule thus violates constitutional protections against overbreadth and vagueness. The overbreadth doctrine prohibits a law that has "a substantial number" of unconstitutional "applications … in relation to" its "plainly legitimate sweep." *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 615 (2021). But the gender-identity mandate and Rule force students and teachers to speak inaccurate pronouns and punishes anyone who says that sex is binary. The Rule applauded punishing a student for wearing a t-shirt saying, "THERE ARE ONLY TWO GENDERS," because that speech "invades the rights of others." 89 Fed. Reg. at 33,504. This tracks the administration's position elsewhere. ECF No. 1 ¶ 208. ED says that failing to treat individuals consistent with their gender identity imposes "more than de minimis harm." 89 Fed. Reg. at 33,887. So failing to use pronouns inconsistent with sex causes more than de minimis harm, which likely explains why ED says that "misgendering" can be harassment. *Id.* at 33,516. Plus, the harassment need not be severe. *Id.* at 33,498. Pervasiveness is enough, and pronoun usage is pervasive given its ubiquity in conversation. *Id.*

The gender-identity mandate and Rule are also overbroad because they require schools to police speech far beyond the *Davis* standard. The *Davis* Court held that schools only had Title IX liability for deliberate indifference to sexual

harassment "so severe, pervasive, *and* objectively offensive that it effectively *bars* the victim's access to an educational opportunity or benefit." 526 U.S. at 633 (emphasis added). It crafted this rule to fit with First Amendment protections, explaining in response to the dissent's concerns about free-speech rights, that "it would be entirely reasonable for a school to refrain from a form of disciplinary action that would expose it to constitutional or statutory claims." *Id.* at 649. Additionally, the harassment definition sweeps up speech even off campus or outside the United States, which disregards the Supreme Court's admonition that "courts must be more skeptical of a school's efforts to regulate off-campus speech, for doing so may mean the student cannot engage in that kind of speech at all." *B.L.*, 594 U.S. at 189–90. Courts regularly invalidate as overbroad definitions of harassment mirroring the Rule's. *E.g.*, *Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1114–15, 1125 (11th Cir. 2022); *Speech First, Inc. v. Khator*, 603 F. Supp. 3d 480, 482 & n.6 (S.D. Tex. 2022).

Finally, during harassment grievance proceedings, the Rule requires gag orders "to protect the privacy of the parties and witnesses." 89 Fed. Reg. at 33,891 (34 C.F.R. § 106.45(b)(5)). Such a prior restraint—which prohibits discussing the case with the media or publicly criticizing the recipient's handling of the process— bears a heavy presumption of unconstitutionality and requires substantive and procedural safeguards. *See Chiu v. Plano Ind. Sch. Dist.*, 339 F.3d 273, 281–82 (5th Cir. 2003). Students and teachers have "a clearly established right to be free of prior restraints except where they are designed to maintain discipline or to prevent school disruption and are narrowly drawn to achieve that goal," *id.* at 282, yet the Rule's gag orders apply to any speech during a grievance proceeding.

The vagueness doctrine protects against laws that fail to give "reasonable" warning of what "conduct is prohibited" or use "indefinite" terms that "allow[ ] arbitrary and discriminatory enforcement." *Women's Med. Ctr. of NW Houston v.*

21

*Bell*, 248 F.3d 411, 421 (5th Cir. 2001). The gender-identity mandate and Rule fail both for the reasons discussed above. ED's "broader" definition means nearly any statement about gender identity—a term left undefined by the Rule—could subject a student or employee to a harassment claim. And the Rule says Carroll ISD must enforce that vague definition.

### C.    ED acted arbitrarily and capriciously.

Courts "shall" vacate as arbitrary and capricious agency action that is not "reasonable and reasonably explained." *Wages & White Lion*, 16 F.4th at 1136. The Rule is arbitrary and capricious for at least eight reasons.

*First*, the Rule acts irrationally by resting its gender-identity mandate on *Bostock*, even though *Bostock* explicitly disclaimed its application to "bathrooms, locker rooms," or other statutory contexts allowing distinctions based on sex. ED knew about this problem and ignored it. *See* App.21–23.

*Second*, the Rule disregards the privacy interest in not exposing one's unclothed body to persons of the opposite sex. By putting persons of the opposite sex into private spaces, the Rule creates a serious risk that children will have to expose their bodies to the opposite sex against their wishes. App.91–93. ED's dismissal of privacy interests reflects a lack of reasoned decision-making.

*Third*, ED fails to grapple with the impact on sports—a central part of Title IX's purpose. ED first pretends that its gender-identity mandate does not apply to sports. 89 Fed. Reg. at 33,817. But at most, the Rule claims to exempt one provision regulating sports (34 C.F.R. § 106.41(b)) from the mandate. 89 Fed. Reg. at 33,887 (to be codified at 34 C.F.R. § 106.31(a)(2)). But the Rule does not exempt the other sports provision (§ 106.41(a)) from this mandate. *Id.* And DOJ has repeatedly told courts that § 106.41(a)—not just § 106.41(b)—requires schools to admit males who identify as women into women's sports. Br. for the U.S. as Amicus Curiae in Supp. of Pl.-Appellant and Urging Reversal 24–27, *B.P.J. v. W. Va. State Bd. of Educ.*, 98

F.4th 541 (4th Cir. 2024) (Nos. 23-1078, 23-1130), 2023 WL 2859726. If the existing version of § 106.41(a) required this (though it does not), the new version must as well. The administration's position has only become clearer.

Fourth, ED's suggestion that schools discriminate based on "sex stereotypes" when requiring students to access sex-specific facilities and programs based on their sex rather than their gender identity is unreasoned. "[B]iological differences between males and females" are "not stereotypes associated with either sex." *Eknes-Tucker v. Governor of Ala.*, 80 F.4th 1205, 1229 (11th Cir. 2023); *accord L.W. ex rel. Williams v. Skrmetti,* 83 F.4th 460, 484 (6th Cir. 2023). ED fails to give a reasoned explanation for treating biological differences as if they were sex stereotypes within *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989) (plurality), despite comments bringing that problem to its attention. *E.g.*, App.28–29, 71.

Fifth, ED ignored the effect of its Rule on school policies that require staff to conceal a child's request to be treated as the opposite sex from the child's parents. The notice of proposed rulemaking, Nondiscrimination on the Basis of Sex, 87 Fed. Reg. 42,390 (July 12, 2022), favorably cited two such policies, *see* 89 Fed. Reg. at 33,709, and the notice-and-comment process made the agency aware of this threat to parental rights, *see* App.49–51.

Sixth, ED disregarded schools' reasonable reliance interests. For instance, the agency glossed over the changes to longstanding policies, practices, and facilities required if a school is to comply with the Rule while respecting the privacy and safety of all students. Schools adopted existing policies and practices and built expensive facilities based on ED's prior positions—for example, building communal restrooms and locker rooms rather than single-occupant facilities. App.4–5. The failure to consider reliance interests renders the Rule arbitrary. *Regents*, 591 U.S. at 24–30.

Seventh, ED had no reasonable justification to expand its definition of

23

hostile-environment harassment beyond the *Davis* standard or to impose its gag order requirement. Nor did ED have any reasonable justification to eliminate the actual knowledge or deliberate indifference requirement pertaining to sex discrimination or to require Title IX coordinators to self-initiate a grievance process. Those changes deviate from *Davis* and require recipients to even single instances of protected speech or rumors about alleged conduct, in violation of constitutional rights. It is irrational to interpret the same text one way when it comes to liability for private damages and another when it comes to administrative enforcement.

*Eighth*, the gender-identity mandate applies arbitrarily. For example, it allows biology-based standards for beauty pageants, girls and boys clubs, and admissions, but not for restrooms, showers, locker rooms, or physical-education classes where biological differences play at least an equal role. 89 Fed. Reg. 33,887. Under ED's implausible read, Congress in 1972 cared more about ensuring Camp Fire Girls' clubs were female-only than protecting privacy in showers.

## II.   Carroll ISD will suffer irreparable harm absent an injunction.

"[I]ncreased costs of compliance, necessary alterations in operating procedures, and immediate threats of costly and unlawful adjudications of liability" all "satisfy" the irreparable injury "standard for a preliminary injunction." *Career Colls. & Schs. of Tex. v. U.S. Dep't of Ed.*, 98 F.4th 220, 235 (5th Cir. 2024). Carroll ISD will suffer all three. *First*, compliance would take at least 50 hours of the Title IX coordinator's time, consume resources on legal advice and time spent by the school board to consider and adopt new policies, and require training over 1,100 employees. App.5–6. *Second*, compliance with the Rule will require, at a minimum, amending or repealing existing policies and practices (like 3.19 and 6.9) and time spent analyzing and discussing the Rule. App.5. *Third*, Carroll would immediately risk private lawsuits and enforcement action. ECF No. 1 ¶¶ 142, 145, 277.

## III.    The equities and the public interest favor Carroll ISD.

The court must "balance the harm that would be suffered by the public if the preliminary injunction were denied against the possible harm that would result to [the defendants] if the injunction were granted." *Miss. Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 626 (5th Cir. 1985). Preliminary relief is appropriate where the "irreparable harm asserted is the adverse impact … on the public," and the "dominant presence of the public interest" is a "central issue in th[e] case." *Id.* at 623 (cleaned up).

Here, the threatened harm to Carroll ISD, schoolchildren, and educators outweighs any harm to the federal government. Loss of federal funds would harm the district's students and families. Federal funding pays salary and benefits for over a dozen special-education teachers and other special-education professionals and underwrites safety initiatives on school campuses, for example. App.6. Carroll would have to either cancel programs and services or seek new funding, and even if alternative sources were available, programs would likely be shut down in the meantime. *Id.* But if the district adopted the policies mandated by the gender-identity mandate and Rule, it would harm its students and staff in all the ways addressed above.

Defendants will not be prejudiced by temporary relief, which would "simply suspend administrative alteration of the status quo" that has existed for fifty years. *Wages & White Lion*, 16 F.4th at 1144 (cleaned up). It took ED nearly two years to finalize the Rule, and it has been more than three years since the President instructed agencies to apply *Bostock*. The Biden administration can hardly object to delay for judicial review. Meanwhile, Carroll will keep applying Title IX as it has been understood for decades during this litigation. There is no injury to Defendants.

## CONCLUSION

The Court should grant Plaintiff's motion.

Respectfully submitted this 30th day of May, 2024.

/s/ Natalie D. Thompson

|  |  |
|---|---|
| **Tim Davis** | **Natalie D. Thompson**** |
| Texas Bar No. 24086142 | Texas Bar No. 24088529 |
| **Allison Allman** | **ALLIANCE DEFENDING FREEDOM** |
| Texas Bar No. 24094023 | 440 First Street NW, Suite 600 |
| **Trevor Paul** | Washington, DC 20001 |
| Texas Bar No. 24133388 | Telephone: (202) 393-8690 |
| **JACKSON WALKER LLP** | Facsimile: (202) 347-3622 |
| 777 Main Street, Suite 2100 | nthompson@ADFlegal.org |
| Fort Worth, Texas 76102 | |
| Telephone: (817) 334-7200 | **Tyson C. Langhofer*** |
| tdavis@jw.com | Virginia Bar No. 95204 |
| aallman@jw.com | **Mathew W. Hoffmann*** |
| tpaul@jw.com | DC Bar No. 1617417 |

**Jonathan A. Scruggs***
Arizona Bar No. 030505
**ALLIANCE DEFENDING FREEDOM**
15100 N. 90th Street
Scottsdale, Arizona 85260
Telephone: (480) 444-0020
Facsimile: (480) 444-0028
jscruggs@ADFLegal.org

**ALLIANCE DEFENDING FREEDOM**
44180 Riverside Pkwy
Lansdowne, Virginia 20176
Telephone: (571) 707-4655
Facsimile: (571) 707-4656
tlanghofer@ADFlegal.org
mhoffmann@ADFlegal.org

*Counsel for Plaintiff*

**Admitted pro hac vice*

***Practice supervised by one or more D.C. Bar members while application is pending.*

26

## CERTIFICATE OF SERVICE

I certify that on May 30, 2024, this document was served on all counsel of record via the Court's CM/ECF system and on Elizabeth Tulis, counsel for Defendants, via USPS mail with a courtesy copy to Elizabeth.Tulis@usdoj.gov.

*/s/ Natalie D. Thompson*
Natalie D. Thompson
Counsel for Plaintiff