UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| **CARROLL INDEPENDENT SCHOOL DISTRICT,** | § § § | |
| Plaintiff, | § § § | |
| v. | § | Civil Action No. 4:24-cv-00461-O |
| | § | |
| **UNITED STATES DEPARTMENT OF EDUCATION, et al.,** | § § § § | |
| Defendants. | § | |

## MEMORANDUM OPINION AND ORDER

The Final Rule undermines over fifty years of progress for women and girls made possible by Title IX. Worse still, the Final Rule endangers not only women and girls, but all students. Just like the subjective nature of ever-changing gender identity, the Department of Education picks and chooses which "niche" group[1] to prioritize regardless of the consequences for everyone else and regardless of its authority. Functionally displacing Title IX's understanding of "sex" while refusing to define it,[2] the Department of Education's Final Rule has "[n]o basis in reality."[3] This cannot be.

Before the Court are Plaintiff's Motion to Delay Effective Date and for Preliminary Injunction (ECF No. 15), Brief in Support (ECF No. 16), and Appendix (ECF No. 17), filed May 30, 2024; Defendants' Response (ECF No. 28) and Brief in Support (ECF No. 29), filed June 20, 2024; and Plaintiff's Reply (ECF No. 36) and Appendix (ECF No. 37), filed June 28, 2024. The Court also heard oral argument at the in-person hearing conducted on July 8, 2024 (ECF No. 42).

---

[1] Draft Tr. of July 8, 2024 Hr'g at 70–71 (describing the harms to non-transgender students as "quite niche").
[2] *Id.* at 49 ("The Department of Education has not defined sex.").
[3] *Id.* at 78 (dismissing the harms to non-transgender students as having "[n]o basis in reality").

1

Having considered the briefing and applicable law, the Court **GRANTS in part** and **DEFERS in part** Plaintiff's Motion to Delay Effective Date and for Injunction (ECF No. 15).[4]

I. **BACKGROUND**

On April 29, 2024, the Department published a new Title IX regulation: *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 89 Fed. Reg. 33,474 (Apr. 29, 2024) (to be codified at 34 C.F.R. § 106 on August 1, 2024) (the "Final Rule"). To prevent the Final Rule from taking effect, various lawsuits arose around the country. By the Court's count, there are seven such challenges.[5] The Final Rule makes clear that "[d]iscrimination on the basis of sex includes discrimination on the basis of . . . sexual orientation[] and gender identity." *Id.* at 33,886. Additionally, multiple challenges to the pre-Final Rule guidance documents (the "Guidance Documents") were also pending.[6] In one of those Guidance Documents challenges, this Court declared Defendants' Title IX interpretation unlawful and enjoined implementation and enforcement of that interpretation in Texas.[7]

Given the quantity of recent litigation surrounding the Final Rule and the similar agency action taken shortly before promulgation of the Final Rule, this regulatory landscape is well-known at this point and does not require further mention here.[8] Building on this established backdrop, the

---

[4] In light of this Court's decision in *Texas v. Cardona*, No. 4:23-cv-00604-O, 2024 WL 2947022, (N.D. Tex. June 11, 2024), Plaintiff's claims regarding the pre-Final Rule Guidance Documents are **MOOT**.

[5] *E.g.*, *Texas, et al. v. United States, et al.*, 2:24-cv-00086-Z (N.D. Tex. Apr. 29, 2024); *Alabama, et al. v. Cardona, et al.*, 7:24-cv-00533-ACA (N.D. Ala. Apr. 29, 2024); *Louisiana, et al. v. U.S. Dep't of Educ., et al.*, 3:24-cv-00563-TAD-KDM (W.D. La. Apr. 29, 2024); *Tennessee, et al. v. Cardona, et al.*, 2:24-cv-00072-DCR-CJS (E.D. Ky. Apr. 30, 2024); *Arkansas, et al. v. U.S. Dep't of Educ., et al.*, No. 4:24-cv-00636-RWS (E.D. Mo. May 7, 2024); *Kansas, et al. v. U.S. Dep't of Educ., et al.*, No. 5:24-cv-04041-JWB-ADM (D. Kan. May 14, 2024).

[6] *E.g.*, *Tennessee, et al. v. U.S. Dep't of Educ., et al.* (*Tennessee Case*), 615 F. Supp. 3d 807, 830 (E.D. Tenn. July 15, 2022), *aff'd*, No. 22-5807 (6th Cir. June 14, 2024); *Texas v. Cardona*, No. 4:23-cv-00604-O, 2024 WL 2947022, (N.D. Tex. June 11, 2024); *Texas*, 2024 WL 2947022.

[7] *Texas v. Cardona*, 2024 WL 2947022, at *52.

[8] This background information can be found in the Court's June 11, 2024 decision in the Guidance Documents case. *Texas v. Cardona*, 2024 WL 2947022, at *1–*52. Additional background information

arguments during the July 8, 2024 hearing are highly relevant to the Court's decision and reveal the significant problems with the logical underpinning and application of the Final Rule.[9]

## II. THRESHOLD ISSUE

As an initial matter, Defendants argue that this case should be dismissed because it perfectly overlaps with the claims brought in related case by the State of Texas in *Texas v. United States*, 2:24-cv-86-Z (N.D. Tex. Apr. 29, 2024) (the "Amarillo Case").[10] According to Defendants, Carroll ISD's lawsuit is in privity with the Amarillo Case and implicates the rule against claim splitting. But there is a notable difference: a jurisdictional challenge. In the Amarillo Case, Defendants challenged Texas's standing to sue on behalf of school districts.[11] Defendants do not challenge standing in the present case. In fact, Defendants conceded at the July 8, 2024 hearing that dismissal of the Amarillo Case on jurisdictional grounds would undermine their claim splitting argument.[12] For this reason, the Court determines that Carroll ISD's challenge should proceed at this stage. Defendants may reassert their claim splitting argument, as appropriate, later in this litigation.

## III. LEGAL STANDARD

"The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits[.]" *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981).

---

specific to the Final Rule can be found in the decisions reached by three other federal courts on this exact issue. *Louisiana, et al. v. U.S. Dep't of Educ., et al.*, 3:24-cv-00563-TAD-KDM, 2024 WL 2978786, at *3–*5 (W.D. La. June 13, 2024); *Tennessee, et al. v. Cardona, et al.*, No. 2:24-cv-00072-DCR-CJS, 2024 WL 301914, at *1–*7 (E.D. Ky. June 17, 2024); *Kansas, et al. v. U.S. Dep't of Educ., et al.*, 5:24-cv-04041-JWB-ADM, 2024 WL 3273285, at *1–*5 (D. Kan. July 2, 2024).

[9] July 8, 2024 Hr'g Minute Entry, ECF No. 42.

[10] Defs.' Br. in Support of Resp. to Pl.'s Mot. 26, ECF No. 29. Because Carroll ISD's other claims based on the Guidance Documents are moot due this Court's decision in *Texas*, 2024 WL 2947022, the remaining claims perfectly overlap with the Amarillo Case.

[11] Defendants' Br. in Support of Resp. at 32–35, *Texas*, 2:24-cv-86-Z (N.D. Tex. Apr. 29, 2024) (ECF No. 41).

[12] Draft Tr. of July 8, 2024 Hr'g at 94.

A plaintiff must demonstrate (1) a substantial likelihood of prevailing on the merits; (2) a substantial threat of irreparable injury; (3) that the threatened injury outweighs any harm that will result to the non-movant if the injunction is granted; and (4) that the injunction will not disserve the public interest. *Robinson v. Ardoin*, 86 F.4th 574, 587 (5th Cir. 2023); *Air Prods. & Chems., Inc. v. Gen. Servs. Admin.*, No. 2:23-CV-147-Z, 2023 WL 7272115, at *2 (N.D. Tex. Nov. 2, 2023).

The first two factors are most critical, and the latter two merge when the government is an opposing party. *Valentine v. Collier*, 956 F.3d 797, 801 (5th Cir. 2020); *Nken v. Holder*, 556 U.S. 418, 435 (2009). That said, no factor has a "fixed quantitative value." *Mock v. Garland*, 75 F.4th 563, 587 (5th Cir. 2023). On the contrary, "a sliding scale is utilized, which takes into account the intensity of each in a given calculus." *Id.* In sum, "[t]he decision to grant or deny a preliminary injunction lies within the sound discretion of the trial court[.]" *White v. Carlucci*, 862 F.2d 1209, 1211 (5th Cir. 1989).

## IV.    ANALYSIS

### A.  Carroll ISD is substantially likely to prevail on the merits.

The merits of the Final Rule and its underlying interpretation have been addressed in some fashion by multiple courts, including this one.[13] To date, three of the seven courts considering Final Rule challenges concluded that the plaintiffs in those cases are likely to succeed on the merits.[14] And this Court, having already reached the merits stage with respect to the Guidance

---

[13] *See Louisiana, et al. v. U.S. Dep't of Educ., et al.*, 2024 WL 2978786, at *21 (granting preliminary injunction to Louisiana, Mississippi, Montana, Idaho, and various school entities); *Tennessee, et al. v. Cardona, et al.*, 2024 WL 3019146, at *44 (granting preliminary injunction to Tennessee, Kentucky, Ohio, Indiana, Virginia, and West Virginia, and intervening organization); *Kansas, et al. v. U.S. Dep't of Educ., et al.*, 2024 WL 3273285, at *22 (granting preliminary injunction to Kansas, Alaska, Utah, Wyoming, and various schools).

[14] *Louisiana*, 2024 WL 2978786, at *2; *Tennessee*, 2024 WL 3019146, at *1; *Kansas*, 2024 WL 3273285, at *6.

Documents, concluded that the pre-Final Rule agency action relied on an interpretation of Title IX that is contrary to law.[15] The Court agrees with and fully incorporates here the analyses in those decisions. Building on the reasoning of sister courts, the July 8, 2024 hearing confirmed the soundness of those opinions and the myriad of ways in which Carroll ISD is ultimately likely to succeed on the merits. Perhaps the most surprising moments from the hearing are those that revealed the shocking consequences and logical inconsistencies associated with the Final Rule.

Oral argument made clear that the Final Rule functionally displaces the statutory language "on the basis of sex" with "on the basis of gender identity." Despite repeatedly stressing that no redefinition of sex exists in the Final Rule, in the same breath Defendants claim there is no material way to distinguish between sex and gender identity.[16] This suggests both concepts are one in the same despite the representation that the Final Rule does not redefine sex away from biological. Defendants failed to adequately explain how the binary definition of "sex" (as inherently objective and tethered to biology) is somehow consistent with the fluid notion of gender identity (inherently subjective and untethered from biology).

In an effort to comprehend the Final Rule, the Court posed a variety of hypothetical situations to understand how agency action would work in practice for school districts like Carroll ISD. Yet Defendants supplied almost no guidance whatsoever. Instead, Defendants evaded the hypotheticals by describing application of the Final Rule as "a deeply intensive factual inquiry."[17]

---

[15] *Texas v. Cardona*, 2024 WL 2947022, at *28–*43.

[16] Draft Tr. of July 8, 2024 Hr'g at 18 ("Contrary to what plaintiffs argue here today it is not a redefinition" and instead "simply a straightforward application of *Bostock*."); *see also id.* at 19 ("[T]his is not a redefinition of sex."); *id.* at 53 ("[W]hat's key is that . . . this is not a redefinition of sex.").

[17] *Id.* at 30; *see also id.* at 34 ("[T]here's a recognition by the Department of Education that this is going to be very fact intensive."); *id.* at 73 ("I'm hesitant to answer that question, because the rule doesn't speak specifically to that scenario of separating out students in like a sex education class."); *id.* ("[T]he Department of Education would need to know more facts. So I'm hesitant to answer that question without more facts."); *id.* ("I'm hesitant to answer a hypothetical that the rule doesn't speak on."); *id.* at 74 ("[T]he question of de minimis harm is going to be a fact specific inquiry.").

When asked what facts would be necessary to discuss the hypothetical scenario, Defendants simply restated the generic formula: "the relevant facts would be . . . is this exclusion on the basis of sex . . . and does it cause the student more than de minimis harm."[18]

Upon finally engaging, Defendants described harms resulting from the exclusion of non-transgender students as "just a hypothetical" and "not real."[19] When pressed further, Defendants eventually acknowledged that there "could . . . be a [non-transgender] student somewhere out there that feels" subjectively harmed by the differential treatment but dismissed that student's feelings as either an "outlier" or having "[n]o basis in reality."[20] But to many in society, potentially ever-changing gender identity harms may similarly have "no basis in reality." Defendants do not explain why their view in the Final Rule adequately accounted for other perspectives. Ignoring this major question,[21] Defendants contend their preferential treatment of transgender students—compared to non-transgender students—is nonetheless justified. Why? Because denying the non-transgender student access or opportunities would not be on the basis of the student's gender identity which means that the action "doesn't fall within the scope of the regulation."[22] As Defendants see it, gender identity discrimination is "not what this [non-transgender] student's facing" so there is no Title IX violation.[23] These statements make clear that even if sex is not formally redefined, it is functionally redefined based on gender identity.

Even worse, oral argument exposed the arbitrary nature of this functional change to the statutory language. There are two ways this was made clear. First, Defendants repeatedly stated, without identifying, that the specific "evidence" they "[l]ooked at" derived from "the concerns

---

[18] *Id.* at 74.
[19] *Id.* at 79.
[20] *Id.* at 78, 80.
[21] *Texas*, 2024 WL 2947022, at *35–*40.
[22] Draft Tr. of July 8, 2024 Hr'g at 82.
[23] *Id.* at 81.

people were raising" during the notice-and-comment period.[24] It seems that Defendants summarily dismissed the concerns of non-transgender students.[25] Second, Defendants' admission that gender identity is subjective and can change over time lends itself to opportunistic uses of gender identity.[26] For instance, the non-transgender student who is denied access or an opportunity need only temporarily identify as transgender in order to obtain those benefits. Once the benefit is obtained, the non-transgender student can switch back to their gender-conforming identity. For the Final Rule to allow students to switch their gender identity on and off based on subjective preferences without a cognizable justification is not just arbitrary—it is circular. What's worse, Defendants allow this amorphous term to influence their assumed meaning of "sex" while also refusing to actually define "sex."[27] So long as a student identifies with the opposite gender, that student is imbued with extra opportunities and protections. But that same student would be denied those extra identical opportunities and protections without claiming a nonconforming gender identity. This cannot be.

Defendants' arguments also prove too much. Perhaps unintended, efforts to eliminate discrimination on the basis of gender identity ironically seem to function as impermissible sex discrimination under Title IX. The Court already explained that sex discrimination is the inferior treatment on the basis of sex rather than benign differentiation.[28] But Defendants' application of the Final Rule to hypothetical situations reveals that inferior treatment of non-transgender students

---

[24] *Id.* at 79.
[25] *Id.* at 78–79.
[26] This admission at the hearing tracks with the Final Rule: "an individual's sense of their gender, which *may or may not* be different from their sex assigned at birth." 89 Fed. Reg. at 33809 (emphases added).
[27] Draft Tr. of July 8, 2024 Hr'g at 54 ("We are not assuming that the Department of Education has defined sex to be binary or biological. Because again, it wasn't relevant.").
[28] *Texas*, 2024 WL 2947022, at *31 ("Title IX prohibits differential treatment that disfavors, denies, excludes, or otherwise treats one biological sex worse than the other. But Title IX does *not* prohibit differential treatment that allows for sex-separation or sex-specific benefits, provided that one biological sex is not treated as inferior to the other in the process.").

7

is permissible. Defendants attempted to excuse their form of differential treatment as permissible because there is "no harm" to the non- transgender student.[29] This "no harm" conclusion lacks support—particularly given that stigmatization harms are, as Defendants suggest, inherently subjective[30]—and Defendants never explain why there is no harm. As this Court has already explained, sex differentiation is permissible only when (1) there is no invidious reason and (2) when comparable opportunities generally exist.[31] But it is unclear how there is comparative harm when the transgender student is allowed to use a preferred bathroom while the non- transgender student is robbed of that same benefit. It is difficult to see how affording extra privileges to the transgender student based on subjective feelings of discomfort while simultaneously excluding the non- transgender student for similarly subjective feelings is something other than invidious discrimination. Simply put, the non-transgender kid is being treated as inferior and has access to fewer spaces and opportunities. The statutory text does not allow for this.

Making matters worse, Defendants' interpretation actually works against them by providing different rules based on whether a student professes a conforming or nonconforming gender identity. Taking Defendants' characterization at face value that gender identity is one in the same as sex, this logic would create *additional* access and opportunities for transgender students. Such favoritism "unfairly allocates benefits and burdens." *J.E.B. v. Alabama ex rel T.B.*, 511 U.S. 127, 131 (1994). This is beyond Title IX's scope and even conflicts with its anti-

---

[29] Draft Tr. of July 8, 2024 Hr'g at 23, 78, 79.
[30] *Id.* at 55. Defendants' inability and resistance to applying the Final Rule to various situations that schools may experience reveals the lack of clarity in the Final Rule. If the architects and defenders of the Final Rule cannot provide insight, how will individual schools navigate this morass? Given the stakes that flow from messing up, this uncertainty is likewise problematic under the Spending Clause.
[31] *Texas*, 2024 WL 2974022, at *31 ("Recognition of innate biological differences is permissible—encouraged, even—under Title IX but invidious subjugation based on such differences is not.")

discrimination mandate. Either both biological sexes receive equal access and opportunities or neither one does. Injecting gender identity into the mix upsets this balance.

One explanation for this distortion of Title IX may be attributable to Defendants' inconsistent reliance on the statutory exemptions. On the one hand, Defendants contend that the *only* permissible forms of sex differentiation, notwithstanding whether some harm results, are found in the statutory exemptions.[32] But, on the other hand, Defendants supply a standard for identifying when differentiation is permissible: de minimis harm.[33] If Defendants wish to strictly adhere to these exemptions, it follows that these exemptions constitute the complete universe of permissible sex differentiation. Under this construction, everything outside of these specific exemptions would be impermissible sex differentiation.[34] Not only does such a construction undermine the plain reading of what counts as "sex discrimination" under Title IX, but it is also inconsistently applied. Strict adherence to the statutory exemptions also reveals that there is zero need for the de minimis harm standard Defendants articulate. Either the categories are strictly adhered to or inform what else would qualify as permissible sex differentiation. The de minimis harm standard only aligns with the latter.

When pressed about the empirical evidence that supports prioritizing psychological harm to transgender students (stigmatization due to lack of access to preferred spaces, etc.) over harm to non-transgender students (privacy or safety concerns created by inclusion of transgender students), Defendants were unable to identify any authority that supports this notion.[35] In fact, Defendants could not identify (1) how the Final Rule accounted for the harms to non-transgender

---

[32] Draft Tr. of July 8, 2024 Hr'g at 90–91.
[33] *Id.* at 89–93.
[34] *Id.* at 22 ("Congress knew exactly how to create exemptions when it wanted to and it didn't create them for bathrooms, showers, and locker rooms.").
[35] *Id.* at 57, 64, 70, 71.

students (namely, young biological girls who want to *avoid exposing their unclothed bodies* to biological boys who identify as transgender) and (2) described concerns for non-transgender students as "quite niche" without identifying any sort of medical study or other evidence to support this characterization.[36] But "niche" denotes a small or specialized segment of the population. At no more than roughly 1% to 2% of the population, it is difficult to see how transgender students are not also "niche."[37]

Defendants decided to prioritize harms subjectively felt by transgender students without identifying a sufficient rationale in the Final Rule for doing so at the expense of non-transgender students. And Defendants fail to address the countervailing concern that encouraging and normalizing nonconforming gender identity may actually cause harm rather than prevent it.[38] Without justification, Defendants would permit recipients of federal funds to separate biological sexes for all the reasons listed in 20 U.S.C. § 1681(a)(1)–(9) and § 1986. Beyond these categories, sex separation under the Final Rule is allowed only if it satisfies an *additional* requirement found nowhere in Title IX: accommodate for those with dysphoric notions of gender. 34 C.F.R. §§ 106.31(a)(2), 106.33, 106.34. Not only would this requirement render the statutory carve-outs meaningless, as this Court explained elsewhere, but it lacks any support in the statutory text.[39]

Treating non-transgender students differently than transgender students reveals that, under the Final Rule, gender identity is the more salient consideration (over biological sex) for differentiating permissible from impermissible sex separation. In other words, where gender

---

[36] *Id.* at 70–71.
[37] *New estimates show 300,000 youth ages 13-17 identify as transgender in the US*, UCLA (June 10, 2022) https://williamsinstitute.law.ucla.edu/press/transgender-estimate-press-release/.
[38] As one example, encouragement of a student's nonconforming gender identity may encourage the student to pursue gender transition or other gender-affirming care that a student may later regret.
[39] *See Texas*, 2024 WL 2947022, at *33 ("[T]he Department's expanded interpretation injects notions of self-professed and potentially ever-changing gender identity into "sex," rendering other provisions of Title IX meaningless.").

identity and biological sex are pitted against one another, oral argument revealed that gender identity will always win out under the Final Rule *unless* there is a statutory exemption disallowing this new preferential treatment.[40] Privileging gender identity over biological sex is in no way authorized by the statutory text. And the consequences based on this statutory distortion appear limitless. For these reasons, and those stated by other federal courts, Carroll ISD is likely to succeed on the merits of their challenge to the Final Rule.

### B. Carroll ISD will suffer irreparable harm without injunctive relief.

Not only is the Final Rule likely unlawful, it also risks irreparable harm to Carroll ISD. This risk of harm "must be more than an unfounded fear on the part of the applicant." *Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.*, 710 F.3d 579, 585 (5th Cir. 2013) (cleaned up). It is "well established that an injury is irreparable only 'if it cannot be undone through monetary remedies.'" *Dennis Melancon, Inc. v. City of New Orleans*, 703 F.3d 262, 279 (5th Cir. 2012) (quoting *Interox Am. v. PPG Indus., Inc.*, 736 F.2d 194, 202 (5th Cir.1984)). But if those costs cannot be recovered, the harm is still irreparable. *Wages & White Lion Invs., L.L.C. v. FDA*, 16 F.4th 1130, 1142 (5th Cir. 2021). Qualifying non-financial injuries include "increased costs of compliance, necessary alternations in operation procedures, and immediate threats of costly and unlawful adjudications of liability." *Career Colls. & Schs. of Texas v. U.S. Dep't of Educ.*, 98 F.4th 220, 235 (5th Cir. 2024).

Although Defendants characterize Carroll ISD's compliance costs as "speculative" injuries,[41] the record suggests otherwise. Defendants admit that compliance costs include "reviewing and making necessary changes to policies, procedures, and training to implement the final regulations." 89 Fed. Reg. 33,861. Carroll ISD estimates that these changes will cost schools

---

[40] Draft Tr. of July 8, 2024 Hr'g at 87.
[41] Defs.' Br. in Support of Resp. to Pl.'s Mot. 27, ECF No. 29.

in its district more than $98 million in the first year alone.[42] It is easy to see how Carroll ISD arrived at this estimate based on the need to reallocate Title IX resources, seek legal advice to develop new policies, and train over 1,000 employees.[43] The compliance costs also go beyond monetary harm given the potential to infringe on constitutional rights, which is per se irreparable injury. *Tennessee*, 2024 WL 3019146, at *2. These injuries are anything but speculative.

### C. The public interest and balance of equities favor Carroll ISD.

Finally, the remaining injunction factors—balance of the equities and public interest—also tilt in Carroll ISD's favor. When the government is a party to a case, the balance-of-equities and public-interest factors "merge." *Nken v. Holder*, 556 U.S. 418, 435 (2009). The Court must weigh whether "the threatened injury outweighs any harm that may result from the injunction to the non-movant" and whether "the injunction will not undermine the public interest." *Valley v. Rapides Parish Sch. Bd.*, 118 F.3d 1047, 1051, 1056 (5th Cir. 1997). Likewise, the Court must "pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (quoting *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982)).

The balance of the equities and the public interest favor Carroll ISD. Because this Court—along with at least three others—determined that the challenge to the Final Rule is likely to succeed on the merits, it follows that the loss of federal funding would harm Carroll ISD as a result of this likely unlawful rulemaking. *Cf. Career Colls.*, 98 F.4th at 254–55 (explaining that "a failure to stay [unlawful agency action] would significantly constrain schools' operations and prevent them from devoting resources to educating their students, upgrading facilities, and constructing new ones"). This makes sense. Federal funding helps cover the salaries of school

---

[42] Pl.'s Compl. ¶ 234, ECF No. 1.
[43] Pl.'s Mem. in Support of Mot. 24, ECF No. 16.

personnel and underwrites safety initiatives on campus.[44] Without funding, Carroll ISD would likely cancel programs and services or quickly find alternative funding sources.[45]

Likewise, "[s]uch a consequence would harm the public at large." *Id.* at 255. But even more fundamentally, "[t]he public interest is served when administrative agencies comply with their obligations under the APA." *Northern Mariana Islands v. United States*, 686 F. Supp. 2d 7, 21 (D.D.C. 2009). There is no public interest in favor of preventing unlawful and unconstitutional government action. *Wages & White Lion Invs., L.L.C.*, 16 F.4th at 1143; *see also BST Holdings, L.L.C. v. OSHA*, 17 F.4th 604, 618 (5th Cir. 2021) (emphasizing that "enforcing an unlawful" law or agency action is an "illegitimate" interest).

In contrast, Defendants would likely suffer no harm. Despite contending that the Final Rule is urgently needed to prevent sex discrimination,[46] Defendants are the ones "responsible for a significant change in the status quo and for the short three-month deadline they gave [school districts] to comply." *Louisiana*, 2024 WL 2978786, at *20. Title IX has prohibited sex discrimination without reference to gender identity for over 50 years. And it will continue to do so. Defendants and the public would suffer "relatively little harm to . . . maintain the status quo pending the resolution of this lawsuit." *Tennessee*, 2024 WL 3019146, at *42. Defendants must "simply suspend administrative alteration of the status quo" that has existed for decades. *Wages & White Lion*, 16 F.4th at 1144 (cleaned up). If the harm Defendants would suffer without the Final Rule are indeed significant, taking more than three years to apply *Bostock* to Title IX, as instructed by President Biden, belies any sense of urgency. With a preliminary injunction, Carroll ISD will continue to apply Title IX in the same manner it did during this three-year delay. There

---

[44] Pl.'s Mem. in Support of Mot. 25, ECF No. 16 (citing Appendix 6).
[45] *Id.*
[46] Defs.' Br. in Support of Resp. to Pl.'s Mot. 28–29, ECF No. 29.

is no injury to Defendants.

## V. CONCLUSION

Consistent with other federal courts across the country, the Court **GRANTS in part** Plaintiff's Motion to Delay Effective Date for Preliminary Injunction (ECF No. 15). Pending final resolution of this case, Defendants are **ENJOINED** from implementing, enacting, enforcing, or taking any action in any manner to enforce the Final Rule against Carroll ISD. Specifically, Defendants are **ENJOINED** from:

1. Enforcing the Final Rule's novel standard for unlawful sex-based harassment and a recipient's liability for sex discrimination, including 34 C.F.R. §§ 106.2 and 106.44(f)(1), as amended;

2. Enforcing the Final Rule's requirement that a Title IX coordinator self-initiate certain grievance processes under 34 C.F.R. § 106.44(f)(1)(v), as amended;

3. Enforcing the gag order requirement under 34 C.F.R. § 106.45(b)(5), as amended; and

4. Requiring Plaintiff to enforce or apply these provisions and standards, or any policy implementing these provisions and standards, against its students, staff, or any other individual.

The court **WAIVES** the security requirement of Federal Rule of Civil Procedure 65(c).[47] *See Kaepa, Inc. v. Achilles Corp.*, 76 F.3d 624, 628 (5th Cir. 1996) (holding that the district court has discretion to waive the security requirement).

With respect to Carroll ISD's request to stay the Final Rule's August 1, 2024 effective date under 5 U.S.C. § 705, the Court **DEFERS** ruling on this issue pending further briefing. Although similar in many respects, technical differences exist between the equitable remedy of an injunction and the statutory remedy of a stay or vacatur. *Data Mktg. P'ship v. U.S. Dep't of Lab.*, 45 F.4th 846, 859 (5th Cir. 2022) ("'Unlike an injunction, which merely blocks enforcement, vacatur

---

[47] Because neither party raises and briefs the security requirement in Rule 65(c), no security is ordered. FED. R. CIV. P. 65(c).

14

unwinds the challenged agency action.'") (citation omitted)). Recent guidance from the Fifth Circuit indicates that a stay pursuant to § 705 cannot be limited to specific parties because it is inherently universal in character. *See Career Colls.*, 98 F.4th at 255 (emphasizing that a stay under § 705 is "not party-restricted" and "limit[ing] any relief to the named parties . . . do[es] not hold water").[48] The parties disagreed on this point during the July 8, 2024 hearing.[49] Therefore, the Court **ORDERS** cross-supplemental briefing on the following topics:

1. Whether a stay, like a vacatur, is the default remedy at the preliminary stage of an APA challenge to agency action;

2. Whether a stay under 5 U.S.C. § 705 exclusively contemplates a universal scope or could also allows for party-specific relief;

3. Whether complete relief to Carroll ISD is possible without a 5 U.S.C. § 705 stay given that its students may travel out of state for school-sponsored activities and the concern regarding private lawsuits not covered by the injunction; and

4. Whether non-party limitations on the scope of a 5 U.S.C. § 705 stay, such as only staying certain provisions, is appropriate in this case.

The cross-supplemental briefs **SHALL** be submitted no later than **July 18, 2024**. In the interim, Carroll ISD is covered by preliminary injunctive relief.

**SO ORDERED** on this **11th** day of **July, 2024**.

_____
Reed O'Connor
UNITED STATES DISTRICT JUDGE

---

[48] *See generally* Jonathan Mitchell, *The Writ-of-Erasure Fallacy*, 104 VA. L. REV. 933, 1012–13 (2018) ("Unlike judicial review of statutes, in which courts enter judgments and decrees only against litigants, the APA . . . go[es] further by empowering the judiciary to act directly against the challenged agency action. This statutory power to 'set aside' agency action is more than a mere non-enforcement remedy."); Mila Sohoni, *The Power to Vacate a Rule*, 88 GEO. WASH. L. REV. 1121, 1173 (2020) ("The term 'set aside' means invalidation—and an invalid rule may not be applied to anyone.") (footnote omitted)).

[49] Draft Tr. of July 8, 2024 Hr'g at 94–95, 98.

15