

Case 7:24-cv-00533-ACA   Document 58   Filed 07/30/24   Page 1 of 122
Case 4:24-cv-00461-O   Document 53-1   Filed 07/30/24   Page 2 of 123   PageID 1154

FILED
2024 Jul-30  AM 11:46
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## WESTERN DIVISION

| | | |
|---|---|---|
| **STATE OF ALABAMA, et al.,** | ] | |
| | ] | |
| **Plaintiffs,** | ] | |
| | ] | |
| **v.** | ] | |
| | ] | **7:24-cv-533-ACA** |
| **MIGUEL CARDONA, in his official** | ] | |
| **capacity as the U.S. Secretary of** | ] | |
| **Education, et al.,** | ] | |
| | ] | |
| **Defendants.** | ] | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Title IX prohibits discrimination in any education program or activity receiving federal financial assistance against any person "on the basis of sex." 20 U.S.C. § 1681(a). The United States Department of Education is required to enact regulations consistent with Title IX's statutory directive. 20 U.S.C. § 1682. In April 2024, the Department adopted new regulations entitled Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance ("the Final Rule"). Plaintiffs filed suit, contending the Final Rule should be vacated in its entirety because it violates the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A).

Plaintiffs then moved for a preliminary injunction, seeking a stay of the Final Rule's effective date or, in the alternative, preliminarily enjoining the Department

from enforcing the Final Rule in their States. Plaintiffs must, among other things, establish a substantial likelihood of success on the claims advanced in their complaint to obtain a preliminary injunction from this court. They failed to sustain that burden. Accordingly, the court **DENIES** the motion for a preliminary injunction.

***

# TABLE OF CONTENTS

I.   INTRODUCTION................................................................................5

II.  LEGAL BACKGROUND .................................................................8

   1.   Title IX and its Enforcement ........................................................8

   2.   Title IX's Regulations ..................................................................9

   3.   The Adoption of the Final Rule...................................................11

III. FACTUAL BACKGROUND ...........................................................13

   1.   The Complaint and the Motion for a Preliminary Injunction ......13

      a.   Redefinition of Sex..............................................................17

      b.   Redefinition of Sex-Based Harassment and Recipient Obligations ........18

      c.   Procedural Requirements .....................................................19

   2.   The Oral Argument......................................................................20

IV.  STANDARD OF REVIEW ..............................................................21

V.   DISCUSSION ...................................................................................22

   1.   Standing ......................................................................................23

      a.   Injury in Fact .......................................................................24

      b.   Traceability and Redressability ............................................27

   2.   Substantial Likelihood of Success on the Merits .........................28

      a.   Severability...........................................................................29

      b.   Redefinition of Sex..............................................................36

         i.   Contrary to the Law .......................................................37

         ii.  Arbitrary or Capricious ...................................................56

      c.   Redefinition of Sex-Based Harassment and Recipient Obligations ........67

         i.   Contrary to the Law .......................................................69

         ii.  Arbitrary or Capricious ...................................................76

      d.   Procedural Requirements .....................................................84

         i.    The Grievance Process ...................................................85

         ii.   Live Hearing and Cross-Examination...............................89

         iii.  Single-Investigator Model..............................................96

         iv.   Notice and Access to Evidence.......................................101

v.     Oral Complaints ................................................................103

vi.    Burden of Proof..................................................................105

vii.   Cumulative Effect ..............................................................108

3.    Imminent Irreparable Harm.....................................................109

a.    Constitutional Injuries ...........................................................112

b.    Preemptive Effect of the Final Rule.......................................113

c.    Compliance Costs...................................................................121

VI. CONCLUSION............................................................................122

***

## I.   INTRODUCTION

Plaintiffs are the States of Alabama, Florida, Georgia, and South Carolina ("the States"), and the Independent Women's Law Center, Independent Women's Network, Parents Defending Education, and Speech First, Inc. ("the Private Plaintiffs"). (Doc. 1 ¶¶ 1–8). They seek a declaration that the Final Rule violates the APA, vacatur of the Final Rule, and a permanent injunction barring enforcement of the rule in Alabama, Florida, Georgia, and South Carolina. (*Id.* at 83).

Defendants are Miguel Cardona, sued in his official capacity as the Secretary of Education, and the U.S. Department of Education. (*Id.* ¶¶ 9–10). The Department of Education is the federal agency that enforces Title IX and effectuates it by "issuing rules, regulations, or orders of general applicability . . . consistent with the achievement of the objectives of the statute." (*Id.* ¶ 10); *see* 20 U.S.C. § 1682. This opinion addresses all Defendants collectively as "the Department."

Plaintiffs' complaint is similar to nine other cases filed throughout the country.[1] More than half the States in this nation are plaintiffs in Title IX litigation: Alabama, Alaska, Arkansas, Florida, Georgia, Idaho, Indiana, Iowa, Kansas,

---

[1] *Arkansas v. U.S. Dep't of Educ.*, no. 24-636 (E.D. Mo.); *Carroll Indep. Sch. Dist. v. Dep't of Educ.*, no. 24-461 (N.D. Tex.); *Kansas v. U.S. Dep't of Educ.*, no. 24-4041 (D. Kan.); *Louisiana v. U.S. Dep't of Educ.*, no. 24-563 (W.D. La.); *Rapides Parish Sch. Bd. v. U.S. Dep't of Educ.*, no. 24-567 (W.D. La.) (consolidated with *Louisiana*, no. 24-563); *Oklahoma State Dep't of Educ. v. United States*, no. 24-459 (W.D. Okla.); *Oklahoma v. Cardona*, no. 24-461 (W.D. Okla.); *Tennessee v. Cardona*, no. 24-72 (E.D. Ky.); *Texas v. Cardona*, no. 24-86 (N.D. Tex.).

Kentucky, Louisiana, Mississippi, Missouri, Montana, Nebraska, North Dakota, Ohio, Oklahoma, South Carolina, South Dakota, Tennessee, Texas, Utah, Virginia, West Virginia, and Wyoming. And fifteen States and the District of Columbia filed an amicus brief before this court supporting the Department. (Doc. 32).[2]

Across the ten lawsuits, seven States filed suit in district courts *outside* their home circuit court of appeals. Alaska, Idaho, and Montana lie within the Ninth Circuit but joined lawsuits filed in district courts within the Fifth and Tenth Circuits; South Carolina, Virginia, and West Virginia lie within the Fourth Circuit but joined lawsuits filed in district courts within the Sixth and Eleventh Circuits; and Indiana, a State within the Seventh Circuit, joined a lawsuit filed in a district court within the Sixth Circuit. (*See* doc. 1) (South Carolina); *Louisiana*, no. 24-563, doc. 1 (W.D. La.) (Montana and Idaho); *Kansas*, no. 24-4041, doc. 1 (D. Kan.) (Alaska); *Tennessee*, no. 24-72, doc. 1 (E.D. Ky.) (Indiana, Virginia, and West Virginia); *see also Geographic Boundaries of the U.S. Courts of Appeals and U.S. Dist. Courts*, https://www.uscourts.gov/sites/default/files/u.s._federal_courts_circuit_map_1.pdf [https://perma.cc/NVK4-K3R3]. Notably, the States that filed outside of their designated circuits are States whose designated circuit has issued binding precedent contrary to the positions they take here. *See Grimm v. Gloucester Cnty. Sch. Bd.*, 972

---

[2] Those States are California, Colorado, Delaware, Hawaii, Illinois, Massachusetts, Michigan, Minnesota, New Jersey, New York, Oregon, Pennsylvania, Rhode Island, Vermont, and Washington. (Doc. 32 at 28–30).

F.3d 586 (4th Cir. 2020); *Grabowski v. Arizona Bd. of Regents*, 69 F.4th 1110 (9th Cir. 2023); *Whitaker ex rel. Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034 (7th Cir. 2017), *abrogated on other grounds as recognized by Ill. Republican Party v. Pritzker*, 973 F.3d 760, 762 (7th Cir. 2020); *A.C. ex rel. M.C. v. Metro. Sch. Dist. of Martinsville*, 75 F.4th 760 (7th Cir. 2023). South Carolina, a plaintiff here, neither mentions nor addresses its binding Fourth Circuit precedent.

In all but one case, plaintiffs seek preliminary relief staying or enjoining the rule before its August 1st effective date. *Arkansas*, no. 24-636, doc. 9; *Carroll Indep. Sch. Dist.*, no. 24-461, doc. 15; *Kansas*, no. 24-4041, doc. 24; *Louisiana*, no. 24-563, doc. 17; *Oklahoma*, no. 24-461, doc. 21; *Tennessee*, no. 24-72, docs. 19, 63; *Texas*, no. 24-86, doc. 16; *see Oklahoma State Dep't of Educ.*, no. 24-459 (no action taken since filing of complaint). This case is no exception: shortly after filing their complaint, Plaintiffs filed a motion for preliminary injunction, seeking a stay of the Final Rule's effective date or, in the alternative, preliminarily enjoining the Department of Education from enforcing the Final Rule in their States. (Doc. 7).

After the case was reassigned to the undersigned (docs. 16, 17), the court attempted to expedite this case (*compare* doc. 13, *with* doc. 18). But at Plaintiffs' request, and upon the representation that the parties intended to rest on their briefs, the court delayed a hearing on Plaintiffs' motion until July 1, 2024. (*See* doc. 20; doc. 52 at 3–4). During the hearing, the court provided both parties an opportunity

to call witnesses or otherwise present evidence and Plaintiffs reiterated that they intended to rest on the written submissions. (Doc. 52 at 3–4). In short, Plaintiffs were given many opportunities to develop a fulsome record and declined to do so.

"Preliminary injunction motions are often, by necessity, litigated on an undeveloped record. But an undeveloped record . . . makes it harder for a plaintiff to meet his burden of proof . . . ." *Siegel v. LePore*, 234 F.3d 1163, 1175 (11th Cir. 2000) (en banc). This case is a clear example of such problems. The evidentiary record is sparse, and the legal arguments are conclusory and underdeveloped.

The court therefore must ultimately conclude that Plaintiffs have failed to "clearly" establish that they are entitled to the "extraordinary and drastic remedy" that is a preliminary injunction. *Suntrust Bank v. Houghton Mifflin Co.*, 252 F.3d 1165, 1166 (11th Cir. 2001). The court highlights that at later stages in these proceedings, more carefully developed legal arguments and the benefit of a fuller evidentiary record might yield a different result. But the court declines to exercise its discretion to grant the extraordinary relief Plaintiffs have requested. Accordingly, the court **DENIES** their motion for a preliminary injunction. (Doc. 7).

## II.   LEGAL BACKGROUND

### 1.   Title IX and its Enforcement

Title IX requires that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to

discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Through an appropriation from Congress, the Department provides recipients with federal funds. *See* 20 U.S.C. § 1682. A recipient is defined as:

> any State or political subdivision thereof, or any instrumentality of a State or political subdivision thereof, any public or private agency, institution, or organization, or other entity, or any person, to whom Federal financial assistance is extended directly or through another recipient and which operates an education program or activity which receives such assistance, including any subunit successor, assignee, or transferee thereof.

34 C.F.R. § 106.2(i). For simplicity, the court will frequently refer to recipients as "schools" or "institutions" throughout this opinion.

Section 1682 of Title IX grants the Department the authority to enforce the statute and its regulations by terminating or refusing to grant federal funds to a school that fails to comply. 20 U.S.C. § 1682. And schools may also be held liable through private lawsuits. *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 640 (1999) (recognizing an implied private right of action against schools under Title IX).

### 2.  Title IX's Regulations

Title IX also authorizes the Department to "issu[e] rules, regulations, or orders of general applicability which shall be consistent with achievement of the objectives of the statute." 20 U.S.C. § 1682. Those regulations must comply with the APA,

which has substantive and procedural requirements. 5 U.S.C. § 706. Substantively, the APA requires that a reviewing court "shall . . . hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* § 706(2)(A). As is relevant here, procedural compliance with the APA requires the agency to provide notice of the proposed rulemaking and an opportunity for the public to submit comments on the proposed rule. *Id.* § 553(b)–(c). The agency must consider the submitted comments and provide "a concise general statement of [the rule's] basis and purpose." *Id.* § 553(c).

Before any rule can take effect, the agency must submit the rule to Congress for its review. 5 U.S.C. § 801(a)(1)(A). Congress may pass a joint resolution of disapproval, which stops the rule from taking effect. *See id.* § 801(b)(1). The President may veto the joint resolution, which Congress may override. *See* U.S. Const. art. I, sec. 7, cl. 3. If Congress does not enact a joint resolution of disapproval, the court is barred from inferring "any intent of the Congress from any action or inaction of the Congress with regard to such rule, related statute, or joint resolution of disapproval." 5 U.S.C. § 801(g).

After Title IX's enactment, the Department of Health, Education and Welfare[3] adopted implementing regulations for Title IX. Two of these implementing

---

[3] When Title IX was enacted in 1972, the Department of Health, Education and Welfare was responsible for enforcing Title IX. *Iron Arrow Honor Soc'y v. Heckler*, 702 F.2d 549, 551 n.1 (5th Cir. 1983), *vacated on unrelated grounds by Iron Arrow Honor Soc'y v. Heckler*, 464 U.S. 67

regulations permit separation based on biological sex in restrooms, locker rooms, and showers (now codified at 34 C.F.R. § 106.33) as well as sports (now codified at 34 C.F.R. § 106.41(b)). *See Adams ex rel. Kasper v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 816–7 (11th Cir. 2022) (en banc); Nondiscrimination on the Basis of Sex in Education Programs and Activities Receiving or Benefiting from Federal Financial Assistance, 40 Fed. Reg. 24,137, 24,141 (June 4, 1974) (restrooms, locker rooms, showers); *id.* at 24,142–43 (athletics). Since the agency began implementing Title IX regulations, it has added or amended regulations. *See, e.g.*, Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 85 Fed. Reg. 30,026, 30,572–579 (May 19, 2020) ("the 2020 Rule"). But neither §§ 106.33 nor 106.41 has ever been amended or removed, including in the Final Rule.

### 3.  The Adoption of the Final Rule

As required by the APA, the Department of Education published a notice of proposed rulemaking to amend the Title IX regulations at issue in this case in July 2022. Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 87 Fed. Reg. 41,390 (proposed July 12, 2022). During this process, the Department received over 240,000 comments from

---

(1983). That responsibility was transferred to Department of Education in 1979. *See* Department of Education Organization Act, Pub. L. 96-88, § 201, 93 Stat. 668; *see Iron Arrow Honor Soc'y*, 702 F.3d at 551 n.1.

the public. Final Rule, 89 Fed. Reg. 33,474, 33,477 (Apr. 29, 2024). Plaintiffs maintain the vast majority of the comments were negative but do not provide any support for this claim. (Doc. 1 ¶ 60; doc. 7-1 at 13, 27); *but cf.* 89 Fed. Reg. at 33,477, 33,737, 33,840.

After responding to the comments, the Department implemented the Final Rule, which adds one new regulation and amends, revises, moves, or removes twenty-five existing regulations. *See* 89 Fed. Reg. at 33,882–96. Among other changes, the Department (1) added 34 C.F.R. § 106.10 to define the scope of sex-based discrimination to include "gender identity"; (2) amended the definition of sex-based harassment in 34 C.F.R. § 106.2 to prohibit harassment that is subjectively and objectively offensive and is severe *or* pervasive and *limits* or denies equal access to an educational program, and amended 34 C.F.R. § 106.44(f)(1) to require a Title IX coordinator to "promptly and effectively end any sex discrimination" of which it has notice; and (3) changed certain procedures in 34 C.F.R. §§ 106.44, 106.45, 106.46, that a school uses in adjudicating accusations of student misconduct under Title IX.[4] 89 Fed. Reg. at 33,882–96; (*see* doc. 1 ¶¶ 62, 74, 79).

---

[4] Section 106.10 is not currently codified in the Code of Federal Regulations, but it will be codified at 34 C.F.R. § 106.10. 89 Fed. Reg. at 33,474, 33,886. For ease of reference, the court will refer to this regulation as § 106.10 in text, although the court's citations will be to its location in the Federal Register.

Sections 106.2, 106.44, 106.45, and 106.46 are currently codified in the Code of Federal Regulations but the Final Rule amends them. For ease of reference, the court will refer to the current version of the regulations by where they are codified and will refer to the amended

The Department issued the Final Rule in April 2024. Absent a successful congressional joint resolution of disapproval, the rule will be effective on August 1, 2024. 89 Fed. Reg. at 33,474; *see* 5 U.S.C. § 801(b)(1).

## III.   FACTUAL BACKGROUND

### 1.   The Complaint and the Motion for a Preliminary Injunction

The day the Department issued the Final Rule, Plaintiffs filed their complaint. (Doc. 1). On May 8, 2024, Plaintiffs moved for a preliminary injunction, asking this court to either stay the Final Rule's effective date under 5 U.S.C. § 705 or to preliminarily enjoin the Department from enforcing the Final Rule in Alabama, Georgia, Florida, and South Carolina. (Doc. 7 at 57–58).

Plaintiffs' motion for a preliminary injunction does not contend all the amended regulations violate the APA. (*See generally* doc. 7-1). They challenge only: (1) the "redefinition" of "sex" and its effect on the other Title IX regulations, (2) the "redefinition" of "sex-based harassment," and (3) the procedures afforded students accused of misconduct under Title IX. (Doc. 7-1 at 14–19). Although they are challenging only some of the amended regulations, Plaintiffs reference "the rule" throughout their brief and during oral argument. (*See generally* doc. 7-1; doc. 52 at 14–36).

---

regulations as "amended § 106.2," "amended § 106.44(f)(1)," and so on. The court will cite the current version of these rules based on each rule's location in the Code of Federal Regulations and will cite the amended version of each rule based on its location in the Federal Register.

"The rule" is not a defined term and Plaintiffs use it to mean different things at different times. On occasion, "the rule" means the whole Final Rule, which amends, adds, or removes a total of twenty-six individual regulations, and includes the Department's recitation of commenter's comments and the Department's responses. (*See, e.g.*, doc. 7-1 at 11 ("[T]he Department's new rule turns Title IX on its head . . . . the Department knew its major provisions couldn't be enforced . . . . The rule becomes effective on August 1, 2024.") (emphasis omitted); *see also id.* at 13 (identifying the effective date of the "final rule" as August 1, 2024); *id.* at 20 ("The Department's new rule violates the APA.")). On other occasions, Plaintiffs identify individual regulations as "the rule." (*See, e.g.*, doc. 7-1 at 14 (§ 106.10); doc 7-1 at 15 (amended § 106.2); doc. 7-1 at 16 (amended § 106.44); doc. 7-1 at 17 (amended § 106.46)). There is no explanation or argument as to why the Final Rule should be considered collectively in some places and individually in others. The approach is unfortunate: it serves no appropriate purpose and intentionally burdens the court, which must attempt to discern the arguments and evaluate whether the extraordinary relief sought is warranted "without the luxury of abundant time for reflection." *Cumulus Media, Inc. v. Clear Channel Commc'ns, Inc.*, 304 F.3d 1167, 1171 (11th Cir. 2002).

Also, Plaintiffs cite their complaint only four times. (Doc. 7-1 at 12–13, 16 (citing doc. 1 ¶¶ 18, 31, 49, 76)). Of course, "injunctive relief must relate in some

fashion to the relief requested in the complaint." *Alabama v. U.S. Army Corps of Eng'rs*, 424 F.3d 1117, 1134 (11th Cir. 2005). So "[t]o secure preliminary injunctive relief, . . . [Plaintiffs] must demonstrate a substantial likelihood of prevailing on at least one of the causes of action [they have] asserted" *Id.* And because the court serves only the role of neutral arbiter of the matters presented, *United States v. Sineneng-Smith*, 590 U.S. 371, 375 (2020), it may not concoct arguments where Plaintiffs have fallen short. *Maradiaga v. United States*, 679 F.3d 1286, 1293 (11th Cir. 2012) (quoting *Fils v. City of Aventura,* 647 F.3d 1272, 1284 (11th Cir. 2011)). Consequently, the court presents the subject of Plaintiffs' arguments as they have made them in their briefs without attempting to marry either the subject or substance to any claim for relief in the complaint.

Finally, many arguments in Plaintiffs' motion are inadequately briefed. To adequately brief an argument, a party must cite authority, refer to the facts of the party's case, and provide a "meaningful explanation" for how the legal authority "appl[ies] to [the party's] claim." *Harner v. Soc. Sec. Admin., Comm'r*, 38 F.4th 892, 899 (11th Cir. 2022). Plaintiffs often fail to meet this standard. (*See*, *e.g.*, doc. 7-1 at 21 (stating without analysis that "Title IX clearly does not cover discrimination based on 'gender identity'"); *id.* at 27 (arguing without explanation that sex-separated facilities and athletics are "plainly" fundamental issues); *id.* at 28 (failing to cite § 106.31(a)(2) in arguing that the effect on bathrooms makes the Final Rule

arbitrary or capricious); *id.* at 29 (failing to provide any authority for why passing a regulation abrogating an earlier regulation requires the Department to address all other regulations passed at the same time); doc. 7-1 at 35 (failing to explain what the Family Educational Rights and Privacy Act of 1974 ("FERPA") requires that the Final Rule would not permit); *id.* at 46–52 (referencing "due process concerns" without actually making an argument that the amended regulations are unconstitutional); *id.* at 52 (failing to explain how an amended regulation requiring a Title IX coordinator to start a grievance procedure without a complaint is different from the current regulation, which also appears to require the same); *id.* at 55 (saying the Final Rule conflicts with state statutes and policies without any explanation of how any of the statutes conflict with the Final Rule)). With each failure to provide a meaningful explanation, Plaintiffs forfeit the argument. *United States v. Campbell*, 26 F.4th 860, 873 (11th Cir. 2022) (en banc); *see also*, *United States v. Esformes*, 60 F.4th 621, 635 (11th Cir. 2023); *Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 681 (11th Cir. 2014); *Carmichael v. Kellogg, Brown & Root Servs., Inc.*, 572 F.3d 1271, 1283 (11th Cir. 2009).

With those caveats in mind, the court will summarize each of Plaintiffs arguments below.

### a. Redefinition of Sex

There is no regulation that defines the word "sex," *see* 89 Fed. Reg. at 33,884; (doc. 1 ¶ 63), and the regulations have never before defined the scope of sex discrimination, *see* 34 C.F.R. § 106.2. The amended regulations add § 106.10, which states: "Discrimination on the basis of sex includes discrimination on the basis of sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, and gender identity." 89 Fed. Reg. at 33,886 (to be codified at 34 C.F.R. § 106.10).

Plaintiffs contend that § 106.10's "redefinition of 'sex' to include 'gender identity' is illegal" because the Eleventh Circuit foreclosed that analysis in *Adams*. (Doc. 7-1 at 20–21). They also insist that sex discrimination means only discrimination based on biological sex because *Adams* held that the United States Supreme Court's decision in *Bostock v. Clayton County*, 590 U.S. 644 (2020) applies only to Title VII and *Eknes-Tucker v. Governor of Alabama*, 80 F.4th 1205 (11th Cir. 2023) reaffirms that holding. (Doc. 7-1 at 21). They further contend that § 106.10 is contrary to the law because it violates the major questions doctrine (*id.* at 26–27) and the Spending Clause's clear statement requirement (*id.* at 24–26). And they assert the Department's addition of § 106.10 was arbitrary and capricious for multiple reasons. (*Id.* at 28–36).

b. *Redefinition of Sex-Based Harassment and Recipient Obligations*

The current regulation, adopted in 2020, defines "sexual harassment" in relevant part as "[u]nwelcome conduct determined by a reasonable person to be so severe, pervasive, and objectively offensive that it effectively denies a person equal access to the . . . education program or activity." 34 C.F.R. § 106.30(a)(2). This definition is the standard the Supreme Court employed in *Davis* to determine whether Title IX created a private cause of action against a school for its deliberate indifference to known acts of student-on-student harassment. 526 U.S. at 643.

The Final Rule, on the other hand, defines "sex-based" "hostile environment harassment" in relevant part as "[u]nwelcome sex-based conduct that, based on the totality of the circumstances, is subjectively and objectively offensive and is so severe *or* pervasive that it *limits* or denies a person's ability to participate in or benefit from the . . . education program or activity." 89 Fed. Reg. at 33,884 (to be codified at 34 C.F.R. § 106.2) (emphasis added). And amended § 106.44(f)(1) adds this language: "[a] recipient must require its Title IX Coordinator, when notified of conduct that reasonably may constitute sex discrimination under Title IX or this part, to take [specified] actions to promptly and effectively end any sex discrimination in its education program or activity, prevent its recurrence, and remedy its effects." 89 Fed. Reg. at 33,889 (to be codified at 34 C.F.R. § 106.44(f)(1)).

Plaintiffs contend those changes to amended §§ 106.2 and 106.44(f)(1) are contrary to the law because they impose a harassment standard broader than the one the Supreme Court articulated in *Davis*. (Doc. 7-1 at 36–39). They further argue the rule is contrary to the law because the harassment standard's breadth likely violates the First Amendment. (*Id.* at 43–45). Finally, they assert the Department was arbitrary or capricious because, among other reasons, it failed to engage in reasoned decisionmaking. (*Id.* at 40–43, 45–46).

### c.  *Procedural Requirements*

The Final Rule allows institutions to remove certain procedures that the current regulations require for misconduct complaints. Some of those permissive changes include: (1) removal of live hearings for sex-based harassment grievance procedures at postsecondary institutions, *compare* 34 C.F.R. § 106.45(b)(6)(i), *with* 89 Fed. Reg. at 33,895 (to be codified at 34 C.F.R. § 106.46(g); and (2) permitting schools to use a single-investigator model in which the decisionmaker of a grievance complaint may also be the Title IX coordinator or investigator, *compare* 34 C.F.R. § 106.45(b)(7)(i), *with* 89 Fed. Reg. at 33,891 (to be codified at 34 C.F.R. § 106.45(b)(2).

But the Final Rule does amend the regulations in two ways that would require schools to change their policies in the event their current policies conflict with the amended regulations. First, the current regulations allow schools to use either a

preponderance of the evidence standard or a clear and convincing evidence standard for all complaints of sexual harassment. 34 C.F.R. § 106.45(b)(1)(vii). Amended § 106.45 requires a school to use a preponderance of the evidence standard for sex discrimination cases, unless the school uses a clear and convincing standard in "all other comparable proceedings," in which case the school may use a clear and convincing standard in sex discrimination cases. 89 Fed. Reg. at 33,893 (to be codified at 34 C.F.R. § 106.45(h)(1)). Second, the current regulations require schools to initiate grievance procedures upon receipt of a "formal complaint," defined as "a document filed by a complainant or signed by the Title IX Coordinator." 34 C.F.R. §§ 106.45(b)(2)(i), 106.30. Amended § 106.2 now defines "complaint" to include an oral complaint as well as a written one. 89 Fed. Reg. at 33,882 (to be codified at 34 C.F.R. § 106.2).

Plaintiffs contend the changes to the grievance procedures are arbitrary or capricious because the Department failed to adequately explain the reduction in protections of the accused, implicating due process. (Doc. 7-1 at 46–55).

### 2.  The Oral Argument

On July 1, 2024, the court held oral argument on Plaintiffs' motion for a preliminary injunction. (Doc. 52). At the hearing, Plaintiffs' counsel confirmed that they are primarily resting on the briefs (*see id.* at 3–4) and the argument was consistent with that representation. No party presented live witnesses or evidentiary

material beyond what Plaintiffs attached to their motion for a preliminary injunction. (*See generally id.*).

## IV.   STANDARD OF REVIEW

"[A] preliminary injunction is 'an extraordinary remedy never awarded as of right.'" *Benisek v. Lamone*, 585 U.S. 155, 158 (2018) (quoting *Winter v. Nat. Res. Def. Council, Inc*., 555 U.S. 7, 24 (2008)); *see also Siegel*, 234 F.3d at 1176 (reiterating that a movant must "clearly establish" entitlement to relief). Indeed, "[t]he denial of a preliminary injunction rests within the sound discretion of the district court." *L.E. ex rel. Cavorley v. Super. of Cobb Cnty. Sch. Dist*., 55 F.4th 1296, 1299 (11th Cir. 2022) (quotation marks omitted).

The movant bears the burden of showing "(1) substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." *Callahan v. U.S. Dep't of Health & Hum. Servs*., 939 F.3d 1251, 1257 (11th Cir. 2019) (quotation marks omitted). "Likelihood of success on the merits is generally the most important of the four factors." *Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1124 (11th Cir. 2022) (quotation marks omitted); *see Ohio v. EPA*, 603 U.S. __, 144 S. Ct. 2040, 2052–53 (2024) ("When States and other parties seek to stay the enforcement of a federal regulation against

them, often the harms and equities will be very weighty on both sides" and "resolution . . . ultimately turns on the merits . . . .") (quotation marks omitted; alteration accepted). "[T]he burdens at the preliminary injunction stage track the burdens at trial." *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 429 (2006).

## V.   DISCUSSION

Plaintiffs argue the Final Rule violates the APA because some of the amended regulations are arbitrary, capricious, contrary to the law, and in excess of statutory authority. (Doc. 7-1 at 20); *see* 5 U.S.C. § 706(2)(A), (C). The Department challenges the merits of Plaintiffs' arguments and also Plaintiffs' standing to bring their challenge to the procedural requirements. (Doc. 24).

"The standing doctrine stems directly from Article III's 'case or controversy' requirement and implicates [the court's] subject matter jurisdiction." *Kennedy v. Floridian Hotel, Inc.*, 998 F.3d 1221, 1229 (11th Cir. 2021) (some quotation marks omitted). And "[c]ourts have an independent obligation to determine whether subject-matter jurisdiction exists, even when no party challenges it." *Hertz Corp. v. Friend*, 559 U.S. 77, 94 (2010). So the court's analysis begins with whether Plaintiffs have standing to assert *any* of their claims. Because the court concludes that Plaintiffs have standing for all of their claims, the court's analysis proceeds.

1.  Standing

Standing is determined "as of the time at which" Plaintiffs filed their complaint, *Focus on the Fam. v. Pinellas Suncoast Transit Auth.*, 344 F.3d 1263, 1275 (11th Cir. 2003), and is "an indispensable part of the plaintiff's case," *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). A plaintiff must "have suffered an injury in fact, that is fairly traceable to the challenged conduct of the defendant, and that is likely to be redressed by a favorable judicial decision." *Glynn Env't Coal., Inc. v. Sea Island Acquisition, LLC*, 26 F.4th 1235, 1240 (11th Cir. 2022) (quotation marks omitted; alterations accepted). "[E]ach element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Lujan*, 504 U.S. at 561.

Because Plaintiffs are before this court seeking a preliminary injunction, they "must make a 'clear showing' that [they are] 'likely' to establish each element of standing." *Murthy v. Missouri*, 144 S. Ct. 1972, 1986 (2024) (quoting *Winter*, 555 U.S. at 22). Plaintiffs' motion for a preliminary injunction does not involve any factual disputes; it involves only questions of law. (*See generally* doc. 7-1). As a result, Plaintiffs carry their burden as long as the pleadings clearly show that they likely have standing. *See Cartwright*, 32 F.4th at 1119.

Standing must also exist "for each claim" and "for each form of relief." *Davis v. FCC*, 554 U.S. 724, 734 (2008). Where multiple plaintiffs seek monetary damages in their own names, each plaintiff must establish standing. *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 417, 430–42 (2021) (holding, in a class action, that some members of the class had standing and others lacked standing); *see also Town of Chester v. Laroe Ests., Inc.*, 581 U.S. 433, 440 (2017). But where multiple plaintiffs assert the same claim and seek the same relief, the court has jurisdiction if any plaintiff has standing. *See Murthy*, 144 S. Ct. at 1985 ("A proper case or controversy exists only when at least one plaintiff establishes that [it] has standing to sue.") (quotation marks and some alterations omitted); *see also Biden v. Nebraska*, 600 U.S. __, 143 S. Ct. 2355, 2365 (2023); *Vill. of Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252, 264 n.9 (1977). Here, all eight plaintiffs seek the exact same relief: a declaration that the Final Rule violates the APA, vacatur of the rule, a stay of the Final Rule's effective date, and an injunction barring enforcement of the rule in Alabama, Georgia, Florida, and South Carolina. (Doc. 1 at 83). Accordingly, as long as at least one of the plaintiffs has standing for each claim, the court has jurisdiction over that claim.

### a.  Injury in Fact

An injury in fact is "an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or

hypothetical." *Lujan*, 504 U.S. at 560 (cleaned up). At the pleading stage, "general

factual allegations of injury can suffice, so long as the complaint plausibly and

clearly alleges a concrete injury. "Only factual allegations, and not legal conclusions,

are relevant to [the] inquiry, and mere conclusory statements do not suffice." *Glynn*

*Env't Coal., Inc.*, 26 F.4th at 1240 (cleaned up). In addition to the pleadings,

Plaintiffs have also presented affidavits in support of their standing. (Docs. 7-2 to 7-

13). And those affidavits echo the allegations made in the complaint. (*Compare, e.g.*,

doc. 1 ¶¶ 91–103, *with* doc. 7-2 ¶¶ 8–19).

Because only one plaintiff needs to establish standing for this court to have

subject matter jurisdiction over this claim, *see Murthy*, 144 S. Ct. at 1985, the court

will discuss only Alabama. A State has standing to vindicate its own injuries. *Biden*,

143 S. Ct. at 2366–68 (discussing *Arkansas v. Texas*, 346 U.S. 368 (1953)). And

injuries to the instrumentalities of a State are injuries to the State itself. *See, e.g.*, *id.*

at 2366 (holding that a State had standing to vindicate the harms suffered by its

instrumentality, despite the separate corporate form, because that entity "was created

by the State to further a public purpose, is governed by state officials and state

appointees, reports to the State, and may be dissolved by the State"); *see also, e.g.*,

*Arkansas*, 346 U.S. at 370 ("[A]s we read Arkansas law the University of Arkansas

is an official state instrumentality; and we conclude that . . . any injury under the

contract to the University is an injury to Arkansas."). Accordingly, Alabama has

standing to vindicate its own injuries and the injuries of its public schools so long as its public schools are instrumentalities of the State.

Alabama law provides that its public universities are instrumentalities of the State. *See Cox v. Bd. of Trustees of Univ. of Ala.*, 49 So. 814, 817 (Ala. 1909) (holding that the University of Alabama "is a part of the state; that it was founded by the state; that it is under the state control, and that the University is therefore a public municipal corporation; that as to its lands the state is and has always been the trustee; and that the board of trustees are mere agents of the state"); *Hutchinson v. Bd. of Trs. of Univ. of Ala.*, 256 So. 2d 281, 283 (Ala. 1971) ("[P]ublic institutions created by the State [p]urely for charitable or educational purposes are a part of the State . . . ."); *Harden v. Adams*, 760 F.2d 1158, 1163–64 (11th Cir. 1985) (holding that Alabama's state universities are agencies or instrumentalities of Alabama). So Alabama is authorized to sue on behalf of its public schools, including its public universities, for the harms its public schools may suffer because of the Final Rule.

It is undisputed that Alabama accepts federal funds for education programs or activities and therefore is subject to Title IX and the Final Rule. (Doc. 1 ¶ 91; doc. 7-2 ¶ 8); *see also* 89 Fed. Reg. at 33,541. It is further undisputed that Alabama will need to spend "substantial time and money" to bring its public schools into compliance with the Final Rule. (Doc. 7-2 ¶ 16). Indeed, during the rulemaking process, the Department estimated that reviewing the Final Rule as a whole will take

a Title IX coordinator four hours and will cost public schools $24,058,044 in the first year "across all recipients." 89 Fed. Reg. at 33,867. Accordingly, at the time Plaintiffs filed their complaint, a school's need to have its Title IX coordinator review the Final Rule was "actual or imminent." *Lujan*, 504 U.S. at 560 (quotation marks omitted).

### b. Traceability and Redressability

Because Plaintiffs have alleged and adduced evidence of an injury in fact, the court's remaining standing analysis is quite straightforward. The remaining two elements consider whether Plaintiffs have shown "a causal connection between [their] injury and the challenged action of the defendant" and whether "a favorable judgment will redress [that] injury." *Lewis v. Governor of Alabama*, 944 F.3d 1287, 1296 (11th Cir. 2019) (en banc) (quotation marks omitted)

At the time the complaint was filed, a court order staying the Final Rule or setting it aside could have redressed Alabama's injury because its public school's Title IX coordinators would not have to spend any further time reading the Final Rule to determine what, if any, changes the institutions might have to make.[5] *See Glynn Env't Coal., Inc.*, 26 F.4th at 1240. Accordingly, the court finds that Plaintiffs

---

[5] It is unclear to the court whether Title IX coordinators have since read and reviewed the amended regulations. Their having done so would not change Plaintiffs' standing at the time the complaint was filed, but it might eventually make part of the case moot if the Final Rule does not alter existing grievance procedures at the States' institutions. Plaintiffs will need to address this jurisdictional defect at summary judgment.

have adequately established, at the preliminary injunction stage, standing to challenge the Final Rule. *See Murthy*, 144 S. Ct. at 1986.

<u>2.</u>  <u>Substantial Likelihood of Success on the Merits</u>

Plaintiffs argue the Final Rule violates the APA because some of the amended regulations are arbitrary, capricious, or "not in accordance with law." *See* 5 U.S.C. § 706(2)(A); (doc. 7-1 at 20). To determine whether an agency action is "not in accordance with law," which the parties and the court refer to as "contrary to the law," a court must exercise its independent judgment. 5 U.S.C. § 706(2)(A); *see Loper Bright Enter. v. Raimondo*, 144 S. Ct. 2244, 2273 (2024). To conduct that analysis, the court uses traditional tools of statutory interpretation. *See Loper Bright Enter.*, 144 S. Ct. at 2268, 2273.

"The APA's arbitrary-[or]-capricious standard requires that agency action be reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). "Judicial review under that standard is deferential, and a court may not substitute its own policy judgment for that of the agency." *Id.* "A court simply ensures that the agency has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision." *Id.*

Although "[a]n agency's view of what is in the public interest may change[,] . . . . an agency changing its course must supply a reasoned analysis." *Motor Vehicle*

*Mfrs. Assoc. of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 57 (1983). So an agency must assess the issues its rule creates and explain how the agency's approach addresses those issues. *Am. Clean Power Ass'n v. FERC*, 54 F.4th 722, 727 (D.C. Cir. 2022);[6] *see also*, *e.g.*, *Motor Vehicle Mfrs. Assoc. of the U.S., Inc.*, 463 U.S. at 35, 37 (reiterating that an agency does not have "to consider all policy alternatives in reaching [its] decision" but cannot abandon its prior positions "without any consideration whatsoever" of its prior factual findings of those positions). Additionally, an agency must consider contrary evidence. *See FCC v. Fox Television Stations, Inc*., 556 U.S. 502, 515 (2009).

With these legal principles in mind, the court turns to merits of Plaintiff's claims. The court's analysis proceeds first to a preliminary issue of severability and then the court examines each challenge to the Final Rule.

### a. Severability

Plaintiffs ask the court to stay the Final Rule's effective date or enjoin the Department from enforcing any of the Final Rule in Alabama, Florida, Georgia, or South Carolina. (Doc. 7-1 at 57–58). In response, the Department contends that the Final Rule is severable, so that if the court finds that any part of the Final Rule should

---

[6] Decisions of the District of Columbia Circuit are not binding on this court, but such decisions may be cited as persuasive authority. *See Roe v. Michelin N. Am., Inc.*, 613 F.3d 1058, 1062 (11th Cir. 2010) ("[W]e consider decisions from other circuits as persuasive authority"); *see also Generali v. D'Amico*, 766 F.2d 485, 489 (11th Cir. 1985). The court finds the District of Columbia Circuit's explanation of the law persuasive.

be stayed or enjoined, the court should sever that part. (Doc. 24 at 69); *see* 34 C.F.R. § 106.46; 89 Fed. Reg. at 33,893 (recodifying 34 C.F.R. § 106.46 as 34 C.F.R. § 106.48). Plaintiffs reply that the Department did not adequately brief the issue of severability in its brief and has failed to carry its burden to show that the Final Rule is severable. (Doc. 38 at 35–36). The court will address Plaintiffs' failure to sustain their burden first.

Plaintiffs' initial brief does not address severability. (*See* doc. 7-1). Yet they seek an order from this court staying or enjoining the entirety of the Final Rule, even though they challenge only parts of it. Because Plaintiffs bear the burden of establishing their entitlement to this extraordinary relief, *see Benisek*, 585 U.S. at 158; *see also Siegel*, 234 F.3d at 1176, they likewise bear an initial burden of showing that, if any part of their challenge is successful, they can prevail as to the entirety of the Final Rule, *see Suntrust Bank v. Houghton Mifflin Co.*, 268 F.3d 1257, 1275 n.31 (11th Cir. 2001) (observing that "[a]t the injunction stage, the burden remains in the party seeking restraint to demonstrate the likelihood of success on the merits" even when a potential defense may be available); *CBS Broad., Inc. v. EchoStar Commc'ns Corp.*, 265 F.3d 1193, 1202 (11th Cir. 2001) (explaining that even "[w]here the ultimate burden of proof at trial is on the non-movant, the party seeking a preliminary injunction must nonetheless make some prima facie showing before the burden of production or proof shifts to the non-movant"); *see also Canal*

*Auth. of Fla. v. Callaway*, 489 F.2d 567, 573 (5th Cir. 1974) ("[I]t should not have been incumbent upon the defendants to prove" that a preliminary injunction should *not* be issued.).[7] Because Plaintiffs did not even attempt to shoulder this burden in their initial brief (*see generally* doc. 7-1), their argument fails on that basis alone, *see Barber v. Governor of Alabama*, 73 F.4th 1306, 1321 n.22 (11th Cir. 2023); *Nat'l Mining Ass'n v. United Steel Workers*, 985 F.3d 1309, 1326 n.15 (11th Cir. 2021) (reiterating that arguments "fairly raised for the first time in reply briefs" "come too late") (quotation marks omitted).

Separately, and even if the court considers all arguments regardless of when they were raised, the arguments Plaintiffs made in their reply brief, supplemental brief, and at oral argument are each deficient. In Plaintiffs' reply brief, they rely on an out of circuit district court opinion for the legal framework, without acknowledging its lack of binding authority on this court, and without attempting to describe what framework is or should be used in the Eleventh Circuit. (*See* doc. 38 at 36 (citing *Texas v. United States*, 691 F. Supp. 3d 763, 788 (S.D. Tex. 2023))). This effectively puts the onus on this court to research and determine what test the Eleventh Circuit uses to evaluate the severability of regulations and whether the

---

[7] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down before October 1, 1981.

district court conducted a similar analysis. The court declines to undertake that task when the party seeking relief has not done so first.

During oral argument, Plaintiffs argued that severability is "a very obvious issue." (Doc. 52 at 38). But if the issue was "very obvious," Plaintiffs should have addressed the lack of severability in their initial brief rather than purposely ignoring it. *See Suntrust Bank*, 268 F.3d at 1276 n.31; *CBS Broad., Inc.*, 265 F.3d at 1202; *see also Canal Auth. of Fla.*, 489 F.2d at 573. Plaintiffs then directed the court to the Supreme Court's recent *Ohio* decision, which Plaintiffs contended places the burden of severability on the Department (*see* doc. 52 at 37–38).

The court has read *Ohio* and concludes that Plaintiffs' reliance on it is misplaced. In that case, States submitted plans for implementing standards for air pollutants set by the Environmental Protection Agency ("EPA"). *Ohio*, 144 S. Ct. at 2048. The EPA rejected twenty-three States' plans and proposed a federal plan meant to bind those States. *Id.* at 2049. Commenters warned that the EPA's rejection of the States' plans was flawed, so that adoption of a federal plan was impermissible. *Id.* at 2050–51. In response, the EPA adopted a severability provision stating that if a court found that the federal plan was invalid as to any State, the plan could still be implemented as to the remaining States. *Id.* at 2051; *see also* Federal "Good Neighbor Plan" for the 2015 Ozone Nat'l Ambient Air Quality Standards, 88 Fed. Reg. 36,654, 36,693 (June 5, 2023).

The EPA argued that the adoption of the severability provision meant the rule was not arbitrary or capricious because it showed that the agency had considered whether the federal plan could be applied to a "subset" of the twenty-three States. *Ohio*, 144 S. Ct. at 2054 (quotation marks omitted). The Supreme Court held that, although the severability provision showed "that the EPA was aware of [commenters'] concerns," the EPA "did not address the [commenters'] concern so much as sidestep it." *Id.* at 2054–55. The *Ohio* court did not hold that, when a plaintiff seeks a preliminary injunction enjoining an entire rule, the agency bears the burden of showing that the rule is severable. Instead, the *Ohio* case addressed whether adding a severability provision overcame the lack of reasonable explanation for the agency's original action. *Id.* at 2054–55.

Finally, in supplemental briefing, Plaintiffs submitted two recent decisions from the Fifth and Sixth Circuit that, they say, "upheld . . . preliminary injunction[s] of the entire rule" in part because the Department forfeited any severability argument. (Doc. 54 at 2). Plaintiffs misrepresent what the Fifth and Sixth Circuits held.

In *Tennessee v. Cardona*, the district court enjoined the entirety of the Final Rule; the Department appealed and requested that the Sixth Circuit issue a partial stay of the injunction. No. 24-5588, 2024 WL 3453880, at *1–2 (6th Cir. 2024), *application for stay filed in Cardona v. Tennessee* (U.S. July 22, 2024) (No. 24A79).

The Department argued that § 106.10 did not exceed the Department's statutory authority and the district court's injunction should have been limited to § 106.31(a)(2) and § 106.2's definition of "hostile environment harassment" as applied to "discrimination on the basis of gender identity." *Id.* at *2. The Sixth Circuit held that the Department failed to satisfy its burden in requesting a stay because it had not shown a substantial likelihood of success on the merits of its claim that § 106.10 was within its statutory authority or that § 106.10 was severable from the rest of the Final Rule. *Id.* at *2–4. One member of the panel dissented and explained that he would have granted the stay because the Department had shown a substantial likelihood of success in its appeal of the injunction with respect to the parts of the Final Rule that the plaintiffs did not challenge. *Id.* at *5–7 (Mathis, J., dissenting).

The *Tennessee* decision did not "uphold" the injunction issued by the district court (*see* doc. 54 at 2); the Department's appeal of that injunction remains pending. All the *Tennessee* decision did was deny the Department's request for the extraordinary relief of staying the district court's order because the Department, as the movant on appeal, had not carried *its* burden. *Tennessee*, 2024 WL 3453880, at *4. But here, *Plaintiffs* are the ones seeking extraordinary relief.

The same is true of *Louisiana v. U.S. Department of Education*. No. 24-30399, 2024 WL 3452887 (5th Cir. 2024), *application for stay filed in Dep't of Educ. v.*

*Louisiana* (U.S. July 22, 2024) (No. 24A78). The Fifth Circuit faced the same procedural posture as the Sixth Circuit: the district court granted the plaintiffs an injunction enjoining the entirety of the Final Rule; the Department appealed, and the Department moved for a partial stay of the district court's injunction, relying "in part on the [Final] Rule's severability provision." *Id.* at *1. The Fifth Circuit held that the Department, as the movant, failed to carry its burden because it gave the Fifth Circuit "little basis to assess the likelihood of success," either in its briefing on appeal or in its briefing to the district court. *Id.* at *1–2. By contrast, the plaintiffs had "demonstrate[d] beyond peradventure in affidavits and submissions that an order allowing the Rule to remain in place pending appeal would inflict enormous administrative costs and great legal uncertainty on recipients of federal funds." *Id.* at *2. One of the judges dissented without an opinion. *Id.* at *1 n.*. As with the *Tennessee* case, the *Louisiana* case involved whether the Department showed its entitlement to relief. And unlike this case, the *Louisiana* plaintiffs presented both argument and evidence in support of their opposition to severability.

Having determined that Plaintiffs failed to prove that the Final Rule is not severable, the court turns to the issue of whether the Department adequately briefed Plaintiffs' failure. Where a party fails to address a relevant burden, the opposing party need only raise the issue, not establish the movant's inability to sustain it. *See CBS Broad., Inc.*, 265 F.3d at 1202 (explaining how burden shifting might work

when the party who seeks a preliminary injunction does not bear "the ultimate burden of proof at trial"); *see also, e.g.*, *Willis v. Royal Caribbean Cruises, Ltd.*, 77 F.4th 1332, 1336 n.7 (11th Cir. 2023) (applying a similar rule at the summary judgment stage). Suffice it to say here that the Department clearly raised the issue, cited the specific applicable regulation supporting its claim, reiterated that Plaintiffs challenge only portions of the Final Rule, and accurately quoted Supreme Court precedent that addresses the severability issue. (Doc. 24 at 69 (citing *Ayotte v. Planned Parenthood of N. New England,* 546 U.S. 320, 328–29 (2006))). In the light of the foregoing, the court will instead assume that the regulations in the Final Rule are severable pursuant to 34 C.F.R. §§ 106.9, 106.18, 106.24, 106.46, 106.62, 106.72, and 106.82 because Plaintiffs have not carried their burden of showing they are not. *See* 89 Fed. Reg. at 33,848 (declining to change any of the severability regulations because of "the Department's position that each of the provisions of these final regulations discussed in this preamble serve an important, related, but distinct purpose").

### b. *Redefinition of Sex*

Plaintiffs' first challenge is to a new regulation in the Final Rule to be codified at 34 C.F.R. § 106.10. (Doc. 7-1 at 14–15, 20–35; *see also, e.g.*, doc. 1 ¶¶ 162–89). Section 106.10 states that "[d]iscrimination on the basis of sex includes discrimination on the basis of sex stereotypes, sex characteristics, pregnancy or

related conditions, sexual orientation, and gender identity." 89 Fed. Reg. at 33,886 (to be codified at 34 C.F.R. § 106.10). Plaintiffs claim that § 106.10 is both contrary to the law and arbitrary or capricious. (Doc. 7-1 at 20). The court will examine each argument in turn.

### i.   Contrary to the Law

Plaintiffs contend that § 106.10 is contrary to the text, history, and purpose of Title IX because it illegally redefines "sex" to include gender identity (*id.* at 20–24) and violates the Spending Clause and major questions doctrine (*id.* at 24–26). As Plaintiffs currently present these arguments, they have not established substantial likelihood of success on any of them. The court examines each.

#### *Redefining Sex*

Under Title IX, "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Title IX does not define "discrimination," "on the basis of," or "sex." *See* 20 U.S.C. § 1681(a); *but see id.* §§ 1681(c), 1689 (defining other terms). The word "sex" as used in Title IX is unambiguous and refers only to biological sex. *Adams*, 57 F.4th at 812, 815. And "discrimination" is likewise unambiguous: "an intentional response" that subjects an individual "to differential treatment." *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 174 (2005)

(collecting cases defining discrimination in the context of a retaliation claim); *see also id*. at 175 ("Discrimination is a term that covers a wide range of intentional unequal treatment . . . .") (quotation marks omitted). Finally, "on the basis of" generally "invokes but-for causation." *Akridge v. Alfa Ins. Cos.*, 93 F.4th 1181, 1192 (11th Cir. 2024) (examining this identical language in the Americans with Disabilities Act of 1990 and collecting cases involving "federal antidiscrimination laws") (quotation marks omitted).

In most instances, a school violates Title IX when an individual's biological sex causes the school to "exclude" an individual from participation in, "deny" an individual the benefits of, or otherwise treat an individual differently in an education program or activity. 20 U.S.C. § 1681(a); *Adams*, 57 F.4th at 812, 815; *Jackson*, 544 U.S. at 174; *Akridge*, 93 F.4th at 1192. But in some instances, Title IX permits a public school to treat an individual differently because of that individual's biological sex.

Title IX has several statutory exceptions, 20 U.S.C. §§ 1681(a)(1)–(9) and 1686, as well as regulatory exceptions, 34 C.F.R. §§ 106.33 and 106.41, each of which *allow* different treatment between the biological sexes. Under those provisions, a school can exclude, deny, or otherwise treat an individual of one biological sex differently than it treats individuals of the other biological sex. *See* 20

U.S.C. §§ 1681(a)(1)–(9), 1686; 34 C.F.R. §§ 106.33, 106.41. The Final Rule does

not alter or amend the language in any of the statutory or regulatory exceptions.

Plaintiffs first argue that § 106.10 redefines the word "sex" to include gender

identity, which Plaintiffs contend is an impermissible reading of Title IX. (Doc. 7-1

at 20). But Plaintiffs do not trouble themselves with presenting an argument on how

§ 106.10 redefines the word "sex." (*Id*. at 20–21). Instead, they recite the language

of one statutory exception and three regulatory exceptions and conclude, without

further argument, that "Title IX *clearly* does not cover discrimination based on

'gender identity.'" (*Id*. at 21 (emphasis added)). Because this argument lacks any

meaningful explanation, the court rejects it.

Plaintiffs next argue that § 106.10 "steamrolls [Title IX's] text, [the

Department's] own regulations, and the history of Title IX." (*Id*.). But instead of

engaging in any statutory interpretation of Title IX, Plaintiffs merely point out that

the Final Rules do not define "sex," that the Department does not argue "sex" means

anything other than biological sex, and the Department nevertheless maintains that

sex discrimination encompasses both sexual orientation and gender identity. (Doc.

7-1 at 21). Without any analysis, Plaintiffs conclude that the Department "is playing

word games" by assuming that "sex" means "biological sex" and "inject[ing], for

the first time, gender ideology into Title IX, contrary to longstanding practice and

the statute's original public meaning." (*Id.* at 21). Because this argument is conclusory and lacks any meaningful explanation, the court rejects it.

Plaintiffs' first non-conclusory argument is that the Department impermissibly relied on the Supreme Court's decision in *Bostock* to inform its "redefinition of 'sex.'" (Doc. 7-1 at 21). The Department does not deny that it relies on *Bostock*. (*See, e.g.*, doc. 24 at 18). The Department maintains § 106.10 merely clarifies the different types of sex discrimination Title IX prohibits and does so in a manner that is compelled by Title IX's statutory text and the Supreme Court's decision in *Bostock*. (*Id.* at 17–19). Plaintiffs' argument does not include a discussion of the facts, issue presented, or the Supreme Court's holding in *Bostock* as part of its analysis of why the Department cannot rely on it in enacting regulations, but the court will here.

In *Bostock*, three plaintiffs (two of whom were gay and one of whom was transgender) sued their employers for sex discrimination, in violation of Title VII, 42 U.S.C. § 2000e-2(a)(1). 590 U.S. at 653–54. The transgender employee began her employment "present[ing] as a male." *Id.* at 653. Her "clinicians diagnosed her with gender dysphoria and recommended that she begin living as a woman," so the employee "wrote a letter to her employer explaining that she planned to live and work full-time as a woman." *Id.* at 654 (quotation marks omitted). Her employer subsequently fired her. *Id.* The employee sued, contending that her termination

violated Title VII, which forbids employers from taking certain actions "because of" sex. *Id*.

The *Bostock* Court assumed that "sex" in Title VII "refer[s] only to biological distinctions between male and female." *Id*. at 655 (quotation marks omitted). But that did not end the Court's inquiry because Title IX "prohibits employers from taking certain actions 'because of' sex," not "solely" because of sex or "primarily because of" sex. *Id*. at 656–57. "[T]he ordinary meaning of 'because of' is 'by reason of' or 'on account of.'" *Id*. at 656 (citing *University of Tex. Southwestern Medical Center v. Nassar*, 570 U.S. 338, 350 (2013) and *Gross v. FBL Financial Services, Inc.*, 557 U.S. 167 (2009)) (cleaned up). And an employers' decision can be "by reason of" or "on account of" more than one thing. *Bostock*, 590 U.S. at 656 (quotation marks omitted). Thus, whether the employee's complaint stated a violation of Title VII depended on whether it plausibly alleged the employer's decision relied at least in part on the employee's sex. *Id*. at 659–60.

Applying this rule to the transgender plaintiff, the Court concluded that the employer violated Title VII when it terminated the employee for "plan[ning] to live and work full-time as a woman." *Id*. at 654, 683 (quotation marks omitted). The Court reasoned that "[i]f the employer retains an otherwise identical employee who was identified as female at birth, the employer intentionally penalizes a person identified as male at birth for traits or actions that it tolerates in an employee

identified as female at birth." *Id*. at 660. Ultimately, the employee's biological "sex plays an unmistakable and impermissible role in the discharge decision." *Bostock*, 590 U.S. at 660. And the role of biological sex in that calculus "defies the law." *Id*. at 683.

After *Bostock*, the en banc Eleventh Circuit decided *Adams*. The facts of *Adams* are simple: a school board adopted a bathroom policy requiring individuals to use the restroom that aligned with that individual's biological sex but "provid[ed] accommodative sex-neutral bathrooms" for transgender individuals. 57 F.4th at 802–03. A transgender student who desired to use a restroom that was consistent with the student's gender identity but inconsistent with the student's biological sex filed suit, alleging that the policy violated the Equal Protection Clause and Title IX. *Id*. at 798.

The Eleventh Circuit held that the school's bathroom policy violated neither the Equal Protection Clause nor Title IX. In its analysis of Title IX, the court first held that "sex," as used in Title IX, unambiguously means biological sex. *Id*. at 812–13. And because Title IX's statutory language and the implementing regulations at that time allowed schools to separate bathrooms by biological sex, *id*. at 812, 815 (discussing 20 U.S.C. § 1686 and 34 C.F.R. §§ 106.32(b) and 106.33), the student's Title IX claim failed.

Plaintiffs here contend that § 106.10 is contrary to the law because *Adams* held that "*Bostock* does not apply to Title IX and is limited to Title VII" given the

"crucially different texts, histories, and purposes" of Title VII and Title IX. (Doc. 7-1 at 22). That is incorrect. The discussion Plaintiffs cite came from the part of the *Adams* opinion addressing whether the student could establish an equal protection violation, not a Title IX violation. (*Compare id*. (citing *Adams*, 57 F.4th at 808)), *with Adams*, 57 F.4th at 808. The student in *Adams* argued, and the district court accepted, that the bathroom policy's classification based on sex necessarily classified based on transgender status under *Bostock*. *Adams*, 57 F.4th at 808. The Eleventh Circuit rejected that argument because *Bostock* involved Title VII, not the Equal Protection Clause, and the policy did not "facially discriminate on the basis of transgender status." *Id*. at 808–09. That part of the *Adams* opinion had nothing to do with Title IX.

Again, Plaintiffs make no argument about the "texts, histories, and purposes" of Title VII and Title IX, such that the Department acted contrary to the law in relying on *Bostock*. (*See* doc. 7-1 at 21–23). Nor does *Adams* address the "texts, histories, and purposes" of those statutes. In *Adams*, the Eleventh Circuit observed that "*Bostock* held that discrimination based on homosexuality or transgender status necessarily entails discrimination based on sex, [and] *that statement is not in question in this appeal*." 57 F.4th at 808–09 (emphasis added; quotation marks and citation omitted). In fact, the majority clearly stated that it could not, "as the Supreme Court did in *Bostock*, decide only whether discrimination based on transgender status

43

necessarily equates to discrimination on the basis of sex" to resolve the issue before it. *Id*. at 811. That is because the issue presented in *Adams* was whether the word "sex" included "gender identity," not whether sex discrimination includes discrimination based on sexual orientation or transgender status. (*See id*.). Thus, the Eleventh Circuit did not hold "that the Supreme Court's decision in *Bostock* is limited to Title VII and does not extend to Title IX." (Doc. 7-1 at 21); *see also Clark v. Martinez*, 543 U.S. 371, 379 (2005) ("This mistakes the reservation of a question with its answer."). Because the Department does not claim "sex" means anything other than biological sex, § 106.10 is not contrary to *Adams*.

Plaintiffs next insist that *Eknes-Tucker* "reaffirmed *Adams*'s conclusion that *Bostock* applies only to Title VII" because "'*Bostock* relied exclusively on the specific text of Title VII' and 'bears minimal relevance' to cases with 'a different law . . . and a different factual context.'" (Doc. 7-1 at 23 (quoting *Eknes-Tucker*, 80 F.4th at 1228–29)). The court has carefully reviewed *Eknes-Tucker* and is unable to find any language limiting *Bostock* exclusively to Title VII.

In *Eknes-Tucker*, the plaintiffs challenged a state statute criminalizing medical treatment for the purpose of "alter[ing] [a minor's] appearance" or "affirm[ing] the minor's perception of his or her gender or sex, if that appearance or perception is inconsistent with the minor's sex" under the Due Process Clause and Equal Protection Clause. 80 F.4th at 1210, 1218–19 (quotation marks omitted). The district

court granted preliminary relief in the plaintiffs' favor, relying primarily on *Bostock*. *See id*. at 1227–29. And the Eleventh Circuit reversed. *Id*. at 1210–11, 1228–29.

The *Eknes-Tucker* court reasoned that the *Bostock* decision "relied exclusively on the specific text of Title VII," but "[t]he Equal Protection Clause contains none of the text that the [Supreme] Court interpreted in *Bostock*." *Id*. at 1228–29. So *Bostock* had "minimal relevance to" the claims presented in *Eknes-Tucker*. 80 F.4th at 1229. The important lesson to be taken from *Eknes-Tucker* is the necessity of carefully examining the relevant statutory language and factual context before using legal standards from one statute to interpret a different statute. *See id*. at 1228–29; *accord Liese v. Indian River Cnty. Hosp. Dist.*, 701 F.3d 334, 347 n.9 (11th Cir. 2012) (highlighting that the caselaw from one federal antidiscrimination statute "should [not] be automatically imputed to" another statute, but such caselaw "is instructive in situations where the Supreme Court's reasoning naturally applies with equal force to the" other antidiscrimination statute). That careful examination is precisely what Plaintiffs failed to do in their request for preliminary injunctive relief.

Finally, Plaintiffs contend that "[e]ven if *Bostock* applies" to Title IX, "the rule misapplies it." (Doc. 7-1 at 24). Here, "the rule" to which Plaintiffs refer is unclear. To be sure, the argument is within Plaintiffs' claim that § 106.10 is contrary to the law, and the brief lacks any indication of a transition to address a regulation other than § 106.10. But read in context, this argument appears to address §§ 106.33

and 106.41(b). (*See id.* (distinguishing *Bostock*'s conclusion that sexual orientation or transgender status is irrelevant to employment decisions because "a student's biology *is* relevant to decisions about athletics, bathrooms, and locker rooms") (emphasis in original)). So the court addresses this argument with respect to §§ 106.33 and 106.41.

Section 106.33 permits schools to "provide separate toilet, locker room, and shower facilities on the basis of sex" as long as the "facilities provided for students of one sex shall be comparable to such facilities provided for students of the other sex." 34 C.F.R. § 106.33. Similarly, § 106.41(b) permits schools to "operate or sponsor separate teams for members of each sex where selection for such teams is based upon competitive skill or the activity involved is a contact sport." *Id.* § 106.41(b). The Final Rule does not amend §§ 106.33 or 106.41 in any way. *See* 89 Fed. Reg. at 33,887–88. But it does amend § 106.31(a)(2), which affects how schools must operate their bathroom, shower, and locker room facilities.[8]

Section 106.31(a)(2) provides that, in the circumstances in which the statute or the regulations "permit[] different treatment or separation on the basis of sex, a recipient must not carry out such different treatment or separation in a manner that

---

[8] The current version of § 106.31 does not contain subparagraph (a)(2). That subparagraph will be codified at 34 C.F.R. § 106.31 on August 1, 2024. 89 Fed. Reg. at 33,887. For ease of reference, the court will refer to this regulation as § 106.31(a)(2) in text, although the court's citations will be to its location in the Federal Register.

discriminates on the basis of sex by subjecting a person to more than de minimis harm." 89 Fed. Reg. at 33,887 (to be codified at 34 C.F.R. § 106.31(a)(2)). The regulation further provides that "[a]dopting a policy or engaging in a practice that prevents a person from participating in an education program or activity consistent with the person's gender identity subjects a person to more than de minimis harm on the basis of sex." 89 Fed. Reg. at 33,887 (to be codified at 34 C.F.R. § 106.31(a)(2)). The regulation exempts from the de minimis harm standard any separation permitted by the statute (*i.e.*, 20 U.S.C. §§ 1681(a)(1)–(9) and 1686) and regulations corresponding to those sections of the statute (*i.e.*, 34 C.F.R. §§ 106.12–106.15, 106.32(b)(1), and 106.41(b)). *Id.* Because § 106.31(a)(2) exempts athletics from its purview, the court struggles to discern how § 106.31(a)(2) "misapplies" *Bostock* in the context of sex-separate athletic programs. (*See* doc. 7-1 at 24). Accordingly, the court rejects Plaintiffs' arguments regarding the effect of the Final Rule on athletic programs.

But § 106.31(a)(2) does not exempt § 106.33, which permits sex-separate bathrooms, locker rooms, and shower facilities. *See* 89 Fed. Reg. at 33,887 (to be codified at 34 C.F.R. § 106.31(a)(2)). During rulemaking, the Department defended the lack of exemption on the grounds that § 106.33 was not enacted in reliance on any statutory exemption in Title IX. *See* 89 Fed. Reg. at 33,821. So the effect of § 106.31(a)(2) on § 106.33 is that a school may have sex-separated bathrooms, locker

rooms, and showers, 34 C.F.R. § 106.33, but it must permit students to use the facility corresponding to their gender identity, 89 Fed. Reg. at 33,887 (to be codified at 34 C.F.R. § 106.31(a)(2)).

Plaintiffs do not include § 106.31(a)(2) as part of, or in addition to, their argument that § 106.10 is contrary to the law or their claim that "the rule" misapplies *Bostock*. (*See* doc. 7-1 at 20–24). Indeed, Plaintiffs appear to avoid § 106.31(a)(2) throughout their brief, citing to it only once in their background section and providing explicit argument about it only in its argument that the treatment of bathrooms is arbitrary or capricious. (*Id*. at 14, 29). Because Plaintiffs' argument that "the rule" misapplies *Bostock* refers only to regulations that the Final Rule does not change (*id*. at 24) and does not attempt to argue how "the rule's" misapplication impacts § 106.33 (*id*. at 20–24), the argument fails.

### *Spending Clause*

Congress passed Title IX pursuant to its authority under the Spending Clause. *Adams*, 57 F.4th at 815; U.S. Const. art. I, § 8, cl. 1. "[L]egislation enacted pursuant to the spending power is a species of contract." *West Virginia ex rel. Morrisey v. U.S. Dep't of the Treasury*, 59 F.4th 1124, 1141 (11th Cir. 2023) (quotation marks omitted). To that end, a condition on funding must be: (1) ascertainable, meaning "[a] state must . . . clearly understand the obligations of the deal," *id*. at 1143 (quotation marks omitted; alterations accepted), and (2) voluntarily accepted, which

requires that the condition imposed by the federal government not be "so coercive as to pass the point at which pressure turns into compulsion," *NFIB v. Sebelius*, 567 U.S. 519, 580 (2012) (quoting *South Dakota v. Dole*, 483 U.S. 203, 211 (1987)). Plaintiffs argue that § 106.10 violates "the Spending Clause's clear-statement rule" and is coercive. (Doc. 7-1 at 24–25 (quotation marks omitted)).

First, "if Congress intends to impose a condition on the grant of federal moneys under its Spending Clause authority, it must do so unambiguously." *Adams*, 57 F.4th at 815 (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981)) (alterations accepted). This clarity "must come directly from the statute." *Morrisey*, 59 F.4th at 1147 (quotation marks omitted). So an agency has "authority to fill in gaps that may exist in a[n] [unambiguous] spending condition," but an agency cannot "impose a condition that is not otherwise ascertainable in the law Congress enacted." *Id.* at 1147–48.

Plaintiffs argue that the Final Rule violates the Spending Clause because Title IX did not put them on notice that a public school could not separate bathrooms, living facilities, and sports based on biological sex. (Doc. 7-1 at 25). Because Plaintiffs have been imprecise about which specific regulations they challenge under the Spending Clause, the court pauses to clarify.

Nothing in the Final Rule purports to affect the statutory exemption for sex-separate living facilities provided by 20 U.S.C. § 1686 or to affect sport regulations.

Indeed, § 106.31(a)(2) explicitly exempts both forms of sex separation. *See* 89 Fed. Reg. at 33,887–88. The only change affecting bathrooms precipitated by the Final Rule is § 106.31(a)(2). *See id*. at 33,887 (to be codified at 34 C.F.R. § 106.31); *see also* 89 Fed. Reg. at 33,818–21. The court therefore limits its discussion to § 106.31(a)(2) in connection with § 106.33.

The first inquiry is whether "Congress . . . spell[ed] out a condition clearly enough for the states to make an informed choice." *Morrisey*, 59 F.4th at 1142 (quotation marks omitted). Plaintiffs do not argue that Title IX is itself ambiguous or that the condition it imposed (not to discriminate based on sex) is unclear; to the contrary, they correctly maintain that the statute is unambiguous. (*See* doc. 7-1 at 25–26); *see Adams*, 57 F.4th at 815. Instead, they argue that "the rule," which the court assumes is § 106.31(a)(2), does not "match Congress's unambiguous command" in Title IX. (Doc. 7-1 at 26 (quotation marks omitted)). In other words, this is a challenge to § 106.31(a)(2) as being contrary to Title IX.

But Plaintiffs do not explain their position that § 106.31(a)(2) is contrary to the law; they instead refer to their argument that § 106.31(a)(2) is arbitrary or capricious. (*See* doc. 7-1 at 26, 28–35). As the court explains below, Plaintiffs have not carried their burden of establishing a substantial likelihood of success on the merits of their claim that § 106.31(a)(2) is arbitrary or capricious. Plaintiffs' circuitous argument therefore does not establish a substantial likelihood of success

on the merits of the claim that the Department violated the Spending Clause by enacting the Final Rule as a whole.

Second, a condition is coercive if "the financial inducement offered by Congress was so coercive to pass the point at which pressure turns into compulsion." *Sebelius*, 567 U.S. at 581 (quotation marks omitted). Plaintiffs argue "the rule" (again, without specifying which regulation they mean) "jeopardizes billions of dollars for each State" which is "a significant amount of these States' education-related funding," thereby "leaving the States with no real option but to acquiesce." (Doc. 7-1 at 25 (quotation marks and emphasis omitted)).

When considering whether Congress's financial inducement is coercive, courts consider what percent of the State's budget is comprised of the federal funds at issue. *E.g.*, *Sebelius*, 567 U.S. at 581–82. A condition which threatens to withhold federal funds that is "less than half of one percent of [a State's] budget" is permissible "encouragement" because it "remain[s] the prerogative of the States" to decline such funds and institute its own policies. *Id.* (summarizing *Dole*, 483 U.S. at 211–12) (quotation marks omitted). But a condition that threatens "the loss of over 10 percent of a State's overall budget, in contrast, is economic dragooning that leaves the States with no real option but to acquiesce" to the financial inducement. *Id.* These precedents require the court to consider not only the amount of funding at stake but the effect of losing that funding in the context of the State's total budget. *See id.*

Plaintiffs present evidence of the *amount* of federal funding they receive for public education. (*See* doc. 7-1 at 25 (citing doc. 7-2 ¶¶ 8–9; doc. 7-3 ¶¶ 5–6; doc. 7-8 ¶¶ 5–6; doc. 7-10 ¶¶ 5–6)). They do not present evidence or argument about their total budgets or what *percentage* of their budget the education funding comprises. (*See id.* (citing doc. 7-2 ¶¶ 8–9; doc. 7-3 ¶¶ 5–6; doc. 7-8 ¶¶ 5–6; doc. 7-10 ¶¶ 5–6)). The Department identified this deficiency in response to Plaintiffs' motion. (Doc. 24 at 59). Plaintiffs did not correct this deficiency in their reply brief (*see* doc. 38 at 11–12) and declined to offer witness testimony during the hearing (doc. 52 at 3–4). In the absence of such evidence, Plaintiffs have not established a substantial likelihood of success that the Final Rule violates the Spending Clause because it is unduly coercive.

### Major Questions

Plaintiffs' major questions doctrine argument also fails. (*See* doc. 7-1 at 26–27). The major questions doctrine applies to "extraordinary cases . . . in which the 'history and the breadth of the authority that the agency has asserted,' and the 'economic and political significance' of that assertion, provide a 'reason to hesitate before concluding that Congress' meant to confer such authority." *West Virginia v. EPA*, 597 U.S. 697, 721 (2022) (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159–60 (2000)) (alterations accepted). Mindful that Congress does not "typically use oblique or elliptical language to empower an agency to make

a radical or fundamental change to a statutory scheme," the court considers "whether Congress in fact meant to confer the power the agency has asserted." *EPA*, 597 U.S. at 721, 723 (quotation marks omitted). An agency must "point to clear congressional authorization to justify the challenged" action. *Biden*, 143 U.S. at 2375 (quotation marks omitted).

Plaintiffs argue that several reasons, considered together, show that §§ 106.10 and 106.31(a)(2) involve a major question. (Doc. 7-1 at 26–27). Specifically, Plaintiffs argue that the Final Rule, in general, "seeks to intrude into [education,] an area that is the particular domain of state law" (*id*. at 26 (quotation marks omitted)); § 106.10's redefinition of "sex . . . breaks new ground on issues of political significance" (*id*. at 27 (quotation marks omitted)); the rulemaking process for the Final Rule resulted in 240,000 comments, "most of which were negative," and the Department delayed issuing the Final Rule "because of the extraordinary significance of its decision"; (*id*.); "sex-separated facilities and athletics raise questions that are personal and emotionally charged" (doc. 7-1 at 27 (quotation marks and alteration omitted)); and Congress tried and failed to amend Title IX "to add gender identity and sexual orientation" (*id*. (quotation marks omitted)).

Those reasons can be placed into two groups. The first group are the reasons Plaintiffs do not substantiate. For example, Plaintiffs state that education is historically an area of state sovereignty and the Final Rule in general intrudes in that

domain, but they do not refer to any specific amended regulation, state law, or even their complaint, to support that statement. (*Id*. at 26–27). Another example is Plaintiffs' representation that Congress has tried and failed "to add gender identity and sexual orientation" to Title IX. (*Id*. at 27 (quotation marks omitted)). Plaintiffs' brief cites no evidence to establish whether that is true, or the precise action Congress was considering but failed to enact. (Doc. 7-1 at 27; *see also id*. at 10–13). And the court declines to look outside Plaintiffs' brief to find evidence they neither cite nor attach in support of their request for extraordinary relief.

The second group (*i.e.*, the political significance of the issue, the volume and nature of comments during rulemaking, and the "personal and emotionally charged" nature of the subject matter), are reasons that show the Final Rule regulates a controversial subject matter. (*See* doc. 7-1 at 27 (quotation marks omitted)). But a regulation related to a controversial subject, without more, does not mean it is a "major policy decision[ ]" or an "extraordinary case." *See EPA*, 597 U.S. at 721–23.

In addition, Plaintiffs provide no support for their assertion that the 240,000 comments the Department received were mostly negative; their citation to the Federal Register supports only the assertion that the Department received that volume of comments. (*See* doc. 7-1 at 27 (citing 89 Fed. Reg. at 33,477)). They likewise provide no support for their assertion that the Department delayed issuance of the Final Rule "because of [its] extraordinary significance." (*See* doc. 7-1 at 27).

Similarly, although Plaintiffs assert that athletics raises a "fundamental issue[] of our time" (*id.* (quotation marks omitted)), § 106.31(a)(2) exempts sex-separate athletics, *see* 89 Fed. Reg. at 33,887 (to be codified at 34 C.F.R. § 106.31(a)(2)). Finally, they provide no evidence that sex-separation of bathrooms is of such importance that it rises to a major question, instead stating in a conclusory manner that it "plainly" does. (Doc. 7-1 at 27). The court declines to issue extraordinary relief based on such a conclusory argument.

Separately, and even assuming Plaintiffs have shown this is an extraordinary case in which the major questions doctrine applies, the Department "must point to clear congressional authorization for the power it claims." *EPA*, 597 U.S. at 723 (quotation marks omitted). The Department points to two places: the unambiguous text of Title IX's general prohibition of discrimination and its authority to promulgate regulations. (*See* doc. 24 at 62–63). Because the court has found that Plaintiffs have not established a substantial likelihood of success that § 106.10 is contrary to the law or that any other amended regulations are arbitrary or capricious, the court likewise finds that Plaintiffs have not established a substantial likelihood of success that the Department lacks clear congressional authorization for the power it claims.

## ii. Arbitrary or Capricious

In the alternative, Plaintiffs contend that they are substantially likely to succeed on their request to permanently set aside "the rule" because "[t]he redefinition of sex discrimination is arbitrary or capricious." (Doc. 7-1 at 28 (emphasis omitted)); *see also* 5 U.S.C. § 706(2)(A) (permitting this court can set aside agency action on that basis). Before the court determines whether "the rule" is arbitrary and capricious, it must again identify "the rule" at issue in this part of Plaintiffs' brief.

Plaintiffs argue that § 106.10 is arbitrary or capricious because the Department did not engage in reasoned decisionmaking in "at least" six ways: by (1) making a mess of the Department's own regulations by creating a "confusing" regulatory scheme regarding bathrooms; (2) failing to meaningfully "consider[] how the redefinition [of sex discrimination] affects sports"; (3) failing to adequately define gender identity; (4) failing to consider public schools' reliance interests regarding sex-separate bathrooms and sports; (5) failing to adequately explain the impact of a recent Supreme Court standard on the de minimis harm standard; and (6) failing to adequately consider parental rights. (Doc. 7-1 at 28–35).

Only one of those six ways (the failure to define "gender identity") relates to § 106.10. The bathroom regulation is found in § 106.33 and is affected by § 106.31(a)(2), not § 106.10; the failure to consider the impact of the regulations on

sports is, likewise, affected by § 106.31(a)(2), not § 106.10; the reliance interests relate to bathrooms and sports; the de minimis standard is found in § 106.31(a)(2); and parental rights are addressed in § 106.6(g) and (e). *See* 34 C.F.R. §§ 106.33, 106.41(b); 89 Fed. Reg. at 33,885 (to be codified at 34 C.F.R. § 106.6); 89 Fed. Reg. at 33,887 (to be codified at 34 C.F.R. § 106.31); *but see* 89 Fed. Reg. at 33,886 (to be codified at 34 C.F.R. § 106.10). Accordingly, to the extent Plaintiffs contend that § 106.10 is arbitrary or capricious because the Department failed to engage in reasoned decisionmaking in enacting §§ 106.31(a)(2) or 106.6, they have not carried their burden of showing a substantial likelihood of success on the merits. To the extent they contend that §§ 106.31(a)(2) and 106.6 are themselves arbitrary or capricious, the court will address those arguments separately.

Agency actions are arbitrary or capricious when the agency (1) "relied on factors Congress did not intend it to consider," (2) "entirely failed to consider an important aspect of the problem," (3) "offered an explanation for its decision that runs counter to the evidence before the agency," or (4) takes action "so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Ga. Dep't of Educ. v. U.S. Dep't of Educ.*, 883 F.3d 1311, 1314 (11th Cir. 2018) (quotation marks omitted). Plaintiffs often do not explain the precise way in which the Department has failed to engage in reasoned decisionmaking. So when the court examines Plaintiffs' arguments, the court attempts to identify the precise

challenge Plaintiffs have made, but the court observes that this imprecision is yet another example of how the underdeveloped legal arguments "make[] it harder for" Plaintiffs "to meet [their] burden of proof." *Siegel*, 234 F.3d at 1175.

The court begins with the only argument relating to § 106.10: "the fail[ure] to . . . define gender identity." (Doc. 7-1 at 30 (quotation marks omitted)). Plaintiffs contend that the lack of definition is arbitrary or capricious because it does not provide any guidance about what gender identities schools must accept or how schools can verify a student's gender identity. (*Id*. at 30–31). Plaintiffs' argument appears to be that the Department "entirely failed to consider an important aspect of" the effect of § 106.10 during the rulemaking process. *Ga. Dep't of Educ.*, 883 F.3d at 1314 (quotation marks omitted).

During the rulemaking process, the Department declined to "further clarify" the meaning of gender identity and explained that it "understands gender identity to describe an individual's sense of their gender, which may or may not be different from their sex assigned at birth." 89 Fed. Reg. at 33,809. The Department explained that it did not need "to articulate a specific definition" because multiple court decisions had used the term in a manner consistent with that understanding. *Id*. As for verification, the Department stated that many recipients already "rel[ied] on a student's consistent assertion to determine their gender identity, or on written confirmation of the student's gender identity by the student or student's parent,

counselor, coach, or teacher." *Id*. at 33,819. The Department further explained that "requiring . . . invasive medical inquiries or burdensome documentation" would not be appropriate and that schools could not require "documentation (such as an amended birth certificate or evidence of medical treatment) . . . if access to such documentation is prohibited by law in that jurisdiction." *Id*. This court cannot find that the Department "entirely failed to consider" the issues of how schools can define and verify students' gender identities. *See Ga. Dep't of Educ.*, 883 F.3d at 1314 (quotation marks omitted).

Perhaps, as a matter of policy, a uniform set of gender identities and verification procedures would be helpful. But this court may not make its own policy judgments in conducting a review of whether an agency's action was arbitrary or capricious. *See Prometheus Radio Project*, 592 U.S. at 423; *see also Ohio*, 144 S. Ct. at 2053. The Department elected to provide schools flexibility in their approach to verify a student's gender identity and it provided an explanation for why it chose that route. Plaintiffs have not explained how the Department's action was arbitrary or capricious. (*See* doc. 7-1 at 30–32).

Instead, Plaintiffs rely on an out-of-circuit decision addressing the "fair notice doctrine," which provides that due process requires an agency to provide clarity in its statements and regulations before imposing "drastic" sanctions. (*Id.* at 31); *Wages & White Lion Invs., LLC v. FDA*, 90 F.4th 357, 375 (5th Cir. 2024) (en banc), *cert.*

*granted FDA v. Wages & White Lion*, No. 23-1038, 2024 WL 3259693 (U.S. July 2, 2024). Plaintiffs have offered nothing other than a citation to this case to explain how the fair notice doctrine applies. (*See* doc. 7-1 at 31). And the court has doubts about its application in this Circuit. *See Glob. Green, Inc. v. SEC*, 631 F. App'x 868, 870 (11th Cir. 2015) (observing that the doctrine applies "only in a very limited set of cases") (quotation marks omitted); *Crimson Stone v. Fed. Mine Safety*, 198 F. App'x 846, 850 (11th Cir. 2006).

Plaintiffs' final argument relating to the definition of gender identity is that the Department did not adequately explain how "its rule" applies to nonbinary students. (Doc. 7-1 at 32). Although Plaintiffs make arguments about whether a nonbinary person could show but-for causation supporting a claim of sex discrimination for being denied access to a bathroom, they do not cite any part of the Final Rule in which a commenter raised this issue and the Department declined to respond. (*See id.*). The sole citation Plaintiffs provide is to a page where the Department stated that a public school could coordinate with a nonbinary student and the student's parent or guardian to determine how to provide that student access to facilities. (*See id.* (citing 89 Fed. Reg. at 33,818)). Accordingly, Plaintiffs have not established that the Department entirely failed to consider important aspects of "its rule" (*see* doc. 7-1 at 32) or that its considerations exceeded the zone of

reasonableness, *see Prometheus Radio Project*, 592 U.S. at 423; *see also Ohio*, 144 S. Ct. at 2053.

Plaintiffs' remaining challenges relate to bathrooms, sports, reliance interests, and parental rights. Plaintiffs' first argument is that "the rule announces that schools violate Title IX if they don't allow transgender students access to the bathroom" designated for the sex with which the student identifies and that this "announce[ment]" makes a "mess" of existing regulations. (Doc 7-1 at 28). Plaintiffs do not cite the current or amended regulations relating to bathrooms. (*See id.* at 28–29). But for the reader's ease, the court will again explain how these regulations work.

Section 106.33 permits schools to provide separate bathrooms "on the basis of sex" as long as the separate facilities are "comparable." 34 C.F.R. § 106.33. Section 106.31 provides that "[a]dopting a policy or engaging in a practice that prevents a person from participating in an education program or activity consistent with the person's gender identity subjects a person to more than de minimis harm on the basis of sex." 89 Fed. Reg. at 33,887 (to be codified at 34 C.F.R. § 106.31(a)(2)). The effect, as the Department concedes, is that although public schools may continue to separate bathrooms by biological sex, such schools may not bar a student from using the bathroom of the student's gender identity, even if that student's gender

identity does not match the student's biological sex. (*See* doc. 52 at 47–48, 53–54; doc. 24 at 28–29).

Plaintiffs argue that this is arbitrary or capricious because it "makes a mess" of the regulations and causes the regulations to conflict with each other. (Doc. 7-1 at 28). As an initial matter, Plaintiffs assertion that the two regulations conflict and are "a mess" is conclusory, at best. But on a more substantive level, Plaintiffs, the court, and the Department appear to all be able to understand the effect of these two regulations: a school may have sex-separate bathrooms, 34 C.F.R. § 106.33, yet may not prevent a student from accessing such a facility in a manner that is inconsistent with that student's gender identity, 89 Fed. Reg. at 33,887 (to be codified at 34 C.F.R. § 106.31(a)(2)). And Plaintiffs have not challenged the Department's proffered explanation for its change. (*See* doc. 7-1 at 28). Accordingly, Plaintiffs have not carried their burden of establishing substantial likelihood of success that this regulation exceeds the bounds of reasonableness.

Next, Plaintiffs argue that the Department failed to consider how the "redefinition of sex discrimination" impacts sports. (*Id*. at 29–30). Plaintiffs insist that the Department's refusal to address sports in the Final Rule is arbitrary or capricious because the Department did not refuse to address bathrooms in the Final Rule, even though the bathroom and sports regulations were originally enacted in the "same batch of regulations," which "Congress did not disapprove." (*Id.* at 29).

The court first notes that when Congress has not enacted a joint resolution of disapproval of an agency rule, the court is prohibited from inferring "any intent of the Congress from any action or inaction of the Congress with regard to such rule, related statute, or joint resolution of disapproval." 5 U.S.C. § 801(g). Consistent with this directive, the court declines Plaintiffs' invitation to glean intent from the fact that "Congress did not disapprove" the Department's initial "batch of regulations" regarding sports and athletics. (Doc. 7-1 at 29); 5 U.S.C. § 801(g).

Plaintiffs do not explain why an agency's passage of a rule amending an old rule requires that the agency also address every other rule passed at the same time. (*See* doc. 7-1 at 29–30). Nor do Plaintiffs cite any authority for this specific position. (*See id*.). So again, the court is left with an argument that is presented only in legal conclusions. Without any supporting explanation or authority, Plaintiffs have not carried their burden of establishing substantial likelihood of success that this regulation exceeds the bounds of reasonableness.

The same is true of Plaintiffs' claim that the Department failed to consider the States' reliance interests in creating sex separate bathrooms, locker rooms and showers. (*See id*. at 32–34). Although Plaintiffs argue that the Department did not assess whether reliance interests weighed against separation based on biological sex in "athletics programs and intimate spaces," they do not cite any comments raising this issue or any part of the Final Rule to show that this assertion is true, leaving this

court to comb the hundreds of pages of the Final Rule on its own. (*See id*. at 32); *see also Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 20 (2020) ("Deciding whether agency action was adequately explained requires, first, knowing where to look for the agency's explanation."). The court declines to do so and will limit itself to the arguments made in Plaintiffs' brief.

Plaintiffs assert that the Department failed to consider the use of single-occupancy bathrooms (doc. 7-1 at 33) (citing 89 Fed. Reg. at 33,820), but the part of the Final Rule that they cite states that "nothing in Title IX or the final regulations prevents a recipient from offering single-occupancy facilities, among other accommodations" and that "access to gender-neutral or single-occupancy facilities may be helpful." 89 Fed. Reg. at 33,820. Plaintiffs cite the same section of the Federal Register to show that the Department did not adequately consider safety and privacy concerns (doc. 7-1 at 33–34), but that section incorporates the Department's notice of proposed rulemaking, 89 Fed. Reg. at 33,820, which found that multiple court decisions had found no such risks, 87 Fed. Reg. at 41,535–36.

At their core, Plaintiffs' arguments are not that the Department exceeded the zone of reasonableness, but rather, that Plaintiffs disagree as a policy matter. (*See, e.g.*, doc. 7-1 at 34). The "court may not substitute its own policy judgment for that of the agency." *Prometheus Radio Project*, 592 U.S. at 423. In the absence of any adequate argument about why the Department's explanation was so lacking that it

was arbitrary or capricious, Plaintiffs have not established substantial likelihood of success on the merits that the Department did not consider their reliance interests.

Next, Plaintiffs challenge the de minimis standard adopted in § 106.31(a)(2) on the ground that the Department failed to consider the Supreme Court's decision in *Muldrow v. City of St. Louis*, 144 S. Ct. 967 (2024). (Doc. 7-1 at 34–35). In *Muldrow* (issued twelve days before issuance of the Final Rule), the Supreme Court held that an employee can prevail on a Title VII claim even without showing "serious, . . . substantial," or "significant" harm from discriminatory treatment. 144 S. Ct. at 974. Plaintiff argues that the Department acted arbitrarily or capriciously by "fail[ing] to consider this" new harm standard and why it "does not unravel [the Department's] heavy reliance on the concept of 'de minimis harm.'" (Doc. 7-1 at 34–35).

The court begins by noting the decided oddity of Plaintiffs challenging the Department's failure to consider a Title VII case in enacting § 106.31(a)(2), given their dismay at the Department's reliance on another Title VII case (*Bostock*) in enacting § 106.10. (*See id*. at 22–23). Putting that aside, however, Plaintiffs do not explain how the de minimis standard set out in § 106.31(a)(1) conflicts with *Muldrow*. (*See id*. at 34–35). Plaintiffs therefore have not provided adequate argument for the court to find a substantial likelihood of success on the merits of the

claim that § 106.31(a)(2) is arbitrary or capricious because the Department failed to adequately consider *Muldrow*.

Plaintiffs' final assertion of arbitrariness or capriciousness relates to parental rights. (*See id*. at 35). They argue that the Final Rule "says it trumps parents' rights, including their right to access their child's information under FERPA and state laws." (Doc. 7-1 at 35). Here, Plaintiffs cite to specific parts of the Final Rule in support of their argument. (*See id.*) (citing 89 Fed. Reg. at 33,885 (to be codified at 34 C.F.R. § 106.6)). But their citations do not support their argument.

During the rulemaking process, the Department clarified that "nothing in these final regulations prevents a recipient from disclosing information about a minor child to their parent who has the legal right to receive disclosures on behalf of their child" and "nothing in the final regulations restricts any right of a parent to act on behalf of a minor child or requires withholding of information about a minor child from their parents." 89 Fed. Reg. at 33,822. Indeed, the new regulation § 106.6(g) provides that "[n]othing in Title IX or this part may be read in derogation of any legal right of a parent, guardian, or other authorized legal representative to act on behalf of a complainant, respondent, or other person, subject to paragraph (e) of this section." 89 Fed. Reg. at 33,885 (to be codified at 34 C.F.R. § 106.6(g)).

Section (e) in turn provides that "[t]he obligation to comply with Title IX and this part is not obviated or alleviated by FERPA, 20 U.S.C. 1232g, or its

66

implementing regulations, 34 CFR part 99." 89 Fed. Reg. at 33,885 (to be codified at 34 C.F.R. § 106.6(e)).  The court assumes that this provision is what Plaintiffs rely on, but Plaintiffs have not explained what part of the Final Rule conflicts with FERPA. (*See* doc. 7-1 at 35). Instead, they misleadingly contend that the Department "decline[d] to opine" on whether parents would lose parental rights. (*Id.* (quotation marks omitted)). But the part of the commentary Plaintiffs quote for that proposition was actually "declin[ing] to opine on how § 106.31(a)(2) interacts or conflicts with specific State laws because it would require a fact-specific analysis." 89 Fed. Reg. at 33,822. That declination has nothing to do with any conflict with FERPA or any obligation to withhold information from parents. Accordingly, Plaintiffs have not established a substantial likelihood of success on the merits of the claim that § 106.6 "trumps parents' rights" and is therefore arbitrary or capricious. (Doc. 7-1 at 35).

Based on the foregoing, the court **WILL DENY** Plaintiffs' motion for stay of effective date or preliminary injunction on the grounds that the Department's adoption of § 106.10 was arbitrary or capricious.

### c. Redefinition of Sex-Based Harassment and Recipient Obligations

Plaintiffs argue the amendments to §§ 106.2 and 106.44(f)(1) redefine hostile-environment sex-based harassment in a way that is contrary to the law and arbitrary or capricious. (*See* doc. 7-1 at 36–46). The court will first summarize the current and amended regulations before turning to Plaintiffs' arguments.

The current regulations define "sexual harassment" to mean, in relevant part, "[u]nwelcome conduct determined by a reasonable person to be so severe, pervasive, and objectively offensive that it effectively denies a person equal access to the . . . education program or activity." 34 C.F.R. § 106.30(a)(2). It also defines "actual knowledge" to mean "notice of sexual harassment or allegations of sexual harassment to a recipient's Title IX Coordinator or any official of the recipient who has authority to institute corrective measures on behalf of the recipient, or to any employee of an elementary and secondary school." *Id.* § 106.30(a). The regulation specifically provides that "[i]mputation of knowledge based solely on vicarious liability or constructive notice is insufficient to constitute actual knowledge." *Id.* § 106.30(a).

Amended § 106.2, on the other hand, defines "sex-based" "hostile environment harassment" as "[u]nwelcome sex-based conduct that, based on the totality of the circumstances, is subjectively and objectively offensive and is so severe *or* pervasive that it *limits* or denies a person's ability to participate in or benefit from the . . . education program or activity (i.e., creates a hostile environment)." 89 Fed. Reg. at 33,884 (to be codified at 34 C.F.R. § 106.2) (emphasis added). Amended § 106.2 also clarifies that "[w]hether a hostile environment has been created is a fact-specific inquiry that includes consideration" of various factors including, among other factors, "[t]he degree to which the conduct

affected the complainant's ability to access the . . . education program or activity";
"[t]he type, frequency, and duration of the conduct"; and "[t]he location of the
conduct and the context in which the conduct occurred." *Id.* at 33,884 (to be codified
at 34 C.F.R. § 106.2). And amended § 106.44(f)(1) requires that when a school's
Title IX coordinator is "notified of conduct that reasonably may constitute sex
discrimination under Title IX or this part," the coordinator must "promptly and
effectively end any sex discrimination." *Id.* at 33,889 (to be codified at 34 C.F.R.
§ 106.44(f)(1)).

### i.   Contrary to the Law

Plaintiffs argue the amendments to §§ 106.2 and 106.44(f)(1) are contrary to
the law for two reasons. First, they contend that hostile-environment harassment is
broader than the standard articulated in *Davis*. (Doc. 7-1 at 39). Second, relying
predominantly on the Eleventh Circuit's decision in *Cartwright*, Plaintiffs argue
amended §§ 106.2 and 106.44(f)(1)'s breadth likely violates students' First
Amendment rights. (*See id.* at 38–39). The court examines each argument in turn.

### Deviation from the Davis Standard

Plaintiffs maintain that amended §§ 106.2 and 106.44(f)(1) are contrary to the
law because they include three material changes from the *Davis* standard. Those
three changes are (1) the expansion of protected conduct to include "severe *or*
pervasive" conduct rather than "severe *and* pervasive" conduct; (2) the expansion of

harm to include harassment that "*limits*" a person's ability to participate in a program, rather than only "denies" participation; and (3) the inclusion of a requirement that a recipient "promptly and effectively end any sex discrimination," rather than not be deliberately indifferent to such discrimination. (*See* doc. 7-1 at 38) (emphasis added). For its part, the Department does not dispute that amended §§ 106.2 and 106.44(f)(1) are broader than the standard in *Davis* because the Department's position is that it is not required to adopt the *Davis* standard. (*See* doc. 24 at 39–41); *see also* 89 Fed. Reg. at 33,498 ("The Department's final definition is not identical to *Davis*, however, because the Department also believes a broader standard is appropriate to enforce Title IX's prohibition on sex discrimination in the administrative context . . . .").

In *Davis*, the Supreme Court considered whether a public school may be liable for damages under Title IX for student-on-student sexual harassment. 526 U.S. at 639. Plaintiffs correctly state that *Davis* "authoritatively defined when sexual harassment by students makes a school liable for sex discrimination under Title IX." (Doc. 7-1 at 39). But Plaintiffs ignore that *Davis* did not address the harassment standard Title IX imposes on school administrators to maintain their Title IX funding, which is the standard the Final Rule amends. *See Davis*, 526 U.S. at 639 ("[W]e are asked to do more than define the scope of the behavior that Title IX proscribes. We must determine whether a district's failure to respond to student-on-

70

student harassment in its schools can *support a private suit for money damages*.")
(emphasis added).

At oral argument, Plaintiffs cited for the first time *NCAA v. Smith*, 525 U.S.
459 (1999) for the proposition that private and administrative enforcement standards
should be the same.[9] (*See* doc. 52 at 23). But *NCAA* does not stand for that
proposition. In a footnote, the Court in *NCAA* rejected an argument that the private
enforcement standard could be broader than the administrative enforcement
standard. *See* 525 U.S. at 467 n.5. The Supreme Court did not reject that argument
because private and administrative enforcement standards must be the same; instead,
the Court reasoned that a private right of action cannot be broader than the
administrate enforcement standard because "it would be anomalous to assume that
Congress intended the implied private right of action to proscribe conduct that
[g]overnment enforcement may not check." *Id.* at 467 n.5.

Here, Plaintiffs are challenging the amendments to §§ 106.2 and 106.44(f)(1)
because the private right of action would be *narrower* than the administrative
enforcement standard. (*See* doc. 7-1 at 15). But *Davis*'s own language strongly
suggests the standards are different: "[W]e are asked to do more than define the

---

[9] Plaintiffs did not cite *NCAA* in their initial brief or reply brief. (*See* docs. 7-1, 38). Of
course, the court does not consider new arguments raised for the first time at oral argument. *See
Hernandez v. Plastipak Packaging, Inc.*, 15 F.4th 1321, 1330 (11th Cir. 2021). To the extent that
Plaintiffs raised this argument in its briefs and merely presented new authority for that argument
at oral argument, the court nevertheless rejects it.

scope of the behavior that Title IX proscribes. We must determine whether a district's failure to respond to student-on-student harassment in its schools can support a private suit for money damages." *Davis*, 526 U.S. at 639. Accordingly, as a threshold matter, Plaintiffs have not established substantial likelihood of success on the merits that *Davis* is a controlling standard in the administrative enforcement context.

The Department is also not required to adopt *Davis* as the standard for student discipline to extinguish all "constitutional concerns," as Plaintiffs seem to suggest. (*See* doc. 7-1 at 36, 39). *Davis* did not adopt the standard for sex-based harassment to avoid constitutional concerns, as Plaintiffs contend. (*See id.* at 36). Rather, the "practical realities" of different fact patterns and potential exposure to constitutional or statutory claims necessitated the "deliberately indifferent" theory of direct liability only when the school's "response . . . or lack thereof is clearly unreasonable in light of the known circumstances." *Davis*, 526 U.S. at 648–49; *see also id.* at 653. Accordingly, Plaintiffs have again failed to sustain their burden based on *Davis*.

Because Plaintiffs have not established a substantial likelihood of success that *Davis* forecloses agency interpretation of sex-based harassment, the court will analyze whether amended §§ 106.2 and 106.44(f)(1) are contrary to Title IX's language. The analysis is straightforward: Title IX prohibits discrimination on the basis of sex. 20 U.S.C. § 1681(a). Sex-based harassment can rise to the level of

discrimination for purposes of Title IX. *See Davis*, 526 U.S. at 639. Plaintiffs do not argue otherwise. (Doc. 7-1 at 36–39).

But none of the changes Plaintiffs identify in amended §§ 106.2 and 106.44(f)(1) conflict with that statutory language. The rule's inclusion of conduct that is severe *or* pervasive does not prohibit conduct the statute's language permits.

Nor does including language that harassment is actionable if it *limits* access to educational benefits conflict with the statutory language. Again, Title IX prohibits any person being "excluded from participation in, be[ing] denied the benefits of, or be[ing] subjected to discrimination under any education program or activity." 20 U.S.C. § 1681(a). The Department contends that because Title IX contains "be excluded from participation in" and "be denied the benefit of" language, the statute cannot mean only "denies." (Doc. 24 at 42). It argues the "excluded from participation" language exclusively covers a denial of benefits such that Congress's inclusion of the "denied the benefit of" language would be surplusage. (*Id.*). Plaintiffs do not respond to that argument. (Doc. 38 at 17–20). And therefore, Plaintiffs have not carried their burden of "clearly establish[ing]" their entitlement to relief. *Siegel*, 234 F.3d at 1176.

Finally, there is no statutory authority to suggest that requiring a recipient to respond to complaints of sex-based discrimination "promptly and effectively" violates Title IX's requirement that the Department implement rules that effectuate

the objectives of the statute. 20 U.S.C. § 1682; *see* 89 Fed. Reg. at 33,889 (to be codified at 34 C.F.R. § 106.44(f)(1)). Although Plaintiffs cite amended § 106.44(f)(1) in their brief (*see* doc. 7-1 at 38), Plaintiffs do not appear to make any substantive argument that a "prompt" investigation of sex-based discrimination is contrary to Title IX's prohibition of discrimination (*see id*. at 38–39). Accordingly, Plaintiffs have again failed to carry their burden as to amended § 106.44(f)(1).

### *First Amendment Considerations*

Relying primarily on the Eleventh Circuit's decision in *Cartwright*, Plaintiffs contend that amended §§ 106.2 and 106.44(f)(1) are contrary to the law because the new definition of sex-based harassment is so broad it will likely violate students' First Amendment rights. (*See id.* at 38–39). Plaintiffs separately argue that the amended regulations are arbitrary or capricious because *Cartwright* held a similar policy was likely overbroad. (*Id.* at 43–45; doc. 38 at 11–13; doc. 52 at 23–27). In this section, the court will analyze only the arguments that Plaintiffs have clearly briefed as being contrary to the law, beginning with explaining the *Cartwright* decision.

In *Cartwright*, the Eleventh Circuit considered challenges to a public university's two speech-related policies, of which only one is relevant to this case. 32 F.4th at 1113. That policy, which the Eleventh Circuit characterized as "staggeringly broad":

> (1) prohibit[ed] a wide range of "verbal, physical, electronic, and other" expression concerning any of (depending on how you count) some 25 or so characteristics; (2) stat[ed] that prohibited speech "may take many forms, including verbal acts, name-calling, graphic or written statements" and even "other conduct that *may* be humiliating"; (3) employ[ed] a gestaltish "totality of known circumstances" approach to determine whether particular speech, for instance, "unreasonably . . . alters" another student's educational experience; and (4) reach[d] not only a student's own speech, but also her conduct "encouraging," "condoning," or "failing to intervene" to stop another student's speech.

*Id.* at 1125. Because this policy "cover[ed] substantially more speech than the First Amendment permits," the Eleventh Circuit held that the plaintiffs had established substantial likelihood of success that the policy was "fatally overbroad." *Id.*

Plaintiffs argue amended §§ 106.2 and 106.44(f)(1) are contrary to the law because they have two provisions materially similar to the policy in *Cartwright*. (Doc. 7-1 at 38–39). Those provisions are: (1) the prohibition on severe *or* pervasive language; and (2) the inclusion of actionable harassment that *limits* as well as denies the terms and conditions of a program or activity. (*Id.* at 38).

The policy in *Cartwright* did indeed contain those terms, but the opinion never discussed them as causing the policy's potential constitutional overbreadth. 32 F.4th at 1125. Although Plaintiffs characterize the rules as "materially similar," they offer no argument demonstrating why that is so. (Doc. 7-1 at 38–39). They cite only the parts of *Cartwright* that are the same as the amended regulations here yet say nothing about the parts that are different. (*See id.*). In short, Plaintiffs' argument is this: amended §§ 106.2 and 106.44 are contrary to the law because the Eleventh Circuit

held that a somewhat similar rule was "*almost certainly* unconstitutionally overbroad." (*Id.*) (quoting *Cartwright*, 32 F.4th at 1125 (emphasis added)).

But that argument is not sufficient to satisfy Plaintiffs' burden of showing a substantial likelihood on the merits of their claim that *this* policy is constitutionally overbroad—particularly in the absence of any argument regarding why amended §§ 106.2 and 106.44(f)(1) are similar to the *Cartwright* policy and in the absence of any acknowledgement regarding why the differences between amended §§ 106.2 and 106.44(f)(1) and the *Cartwright* policy are immaterial. (*See id.*). Accordingly, Plaintiffs have not established a substantial likelihood of success on their argument that amended §§ 106.2 and 106.44(f)(1) are unconstitutionally overbroad.

### ii. Arbitrary or Capricious

Plaintiffs also argue amended §§ 106.2 and 106.44(f)(1) are arbitrary or capricious. (Doc. 7-1 at 40–46). They argue the Department failed to consider, or meaningfully address, three problems: (1) amended §§ 106.2 and 106.44(f)(1)'s departure from the *Davis* standard, (2) those amended regulations' likelihood of violating the First Amendment, and (3) concerns that a harassment policy following these amended regulations would treat misgendering—*i.e.*, not using a person's preferred pronouns—as sex-based harassment. (*Id.*). The Department responds that it adequately addressed all those concerns and that its rule is within the zone of

reasonableness to survive arbitrary-or-capricious review. (Doc. 24 at 43–47). The court will address each of Plaintiffs' arguments in turn.

*Deviation from the* Davis *Standard*

First, consistent with their contrary to the law argument, Plaintiffs argue the *Davis* standard is the exclusive standard for Title IX sex-based harassment. (Doc. 7-1 at 40–42). And from that premise, they argue the amended regulations' deviation from the *Davis* standard is arbitrary or capricious because the Department had no authority to do so. (*See id.* at 41).

Unlike their contrary to the law arguments, Plaintiffs maintain that *Clark v. Martinez*, 543 U.S. 371 (2005) precludes a statute from imposing two standards of liability. (*Id.* at 40). The question presented in *Clark* was whether a Supreme Court decision that imposed a limiting construction to an immigration statute's application to one group of aliens should apply equally to the statute's application to another group of aliens. 543 U.S. at 378–79. The Court reasoned that although the constitutional concerns that motivated its limiting construction for one group of aliens were not present for the other group, the statute's language treats both groups the same and the limiting construction must therefore apply to all person subject to the statute. *Id.* at 380. Plaintiffs do not make any argument that *Clark*'s reasoning does, or should, apply when construing the standard or standards to be used for liability under an implied private right of action versus an explicit directive requiring

administrative enforcement of conditions recipients accepted in exchange for federal funds. *Cf. Davis*, 526 U.S. at 639 ("[W]e are asked to do more than define the scope of the behavior that Title IX proscribes. We must determine whether a district's failure to respond to student-on-student harassment in its schools can support a private suit for money damages."). Instead, Plaintiffs simply conclude that under *Clark*, amended §§ 106.2 and 106.44(f)(1) are arbitrary or capricious. (*See* doc. 7-1 at 40). This does not suffice to carry Plaintiffs' burden.

In the alternative, Plaintiffs argue that even if there can be different standards, the Department failed to reasonably explain how a school can have "one harassment policy to avoid private liability but different harassment policy to avoid administrative enforcement." (*See* doc. 7-1 at 41). They reason that "schools must adopt the more draconian one to avoid penalties—rendering *Davis* a dead letter." (*See id.*). As an initial matter, Plaintiffs have not explained why a recipient's desire to maintain two separate policies would make the Department's regulations governing administrative enforcement arbitrary or capricious. (*See id.*). But in any event, the Department reasonably addressed that concern. *See* 89 Fed. Reg. at 33,499–500.

Again, *Davis* established that a student can use the implied private right of action to seek private money damages from a recipient when the recipient was deliberately indifferent to student-on-student harassment of which it had actual

knowledge. 526 U.S. at 643. In the Final Rule, the Department explained that private

lawsuits for damages provide no opportunity to a recipient to take corrective actions,

but in the administrative enforcement context, the Department gives schools notice

and an opportunity to comply with its rules before it terminates federal funding. 89

Fed. Reg. at 33,500; *see also* 20 U.S.C. § 1682. The Department further reasoned

that the *Davis* standard "does not provide a reason to conclude that the harassing

student or employee is immune from [internal] disciplinary action" simply because

the school was not deliberately indifferent to harassment. 89 Fed. Reg. at 33,499.

Accordingly, Plaintiffs have not established substantial likelihood of success that

Department's failed to consider these concerns or that its decisionmaking exceeded

the zone of reasonableness. *See Prometheus Radio Project*, 592 U.S. at 423.

Plaintiffs also challenge the Department's reasoning that "limits or denies" is

the same as *Davis*'s "denies" requirement. (Doc. 7-1 at 42). As an initial matter,

Plaintiffs fail to provide evidence that the Department claims the standards are

identical; indeed, the citation Plaintiffs provide for this assertion does not support it.

(*See id.*) (citing 89 Fed. Reg. at 33,511).

During the rulemaking process, the Department explained its view that "[i]f

Title IX only covered exclusion from participation or denial of access, there would

have been no reason for Congress to add 'be denied the benefits of.'" 89 Fed. Reg.

at 33,511. The Department concluded that "[a] limitation on equal access constitutes

a denial of benefits." *Id.* (quotation marks omitted). So under the Final Rule, "a complainant must demonstrate some impact on their ability to participate or benefit from the education program or activity, but the definition [of sex-based hostile environment harassment] does not specify any particular limits or denials." *Id.* This discussion reflects the Department's view of "the full scope of Title IX's nondiscrimination mandate," but the Department does not appear to suggest that "limits or denies" is the same as *Davis*'s "denies" requirement. Rather, the Department's position appears to be that its "limits or denies" language is consistent with Title IX's prohibition of sex discrimination. *See id.*

Plaintiffs next argue that amended §§ 106.2 and 106.44(f)(1)'s inclusion of harassment that "limits" a person's participation in or benefit from a program is vague, a low bar, and amorphous. (Doc. 7-1 at 42) (quotation marks omitted). But Plaintiffs do not provide the court with any persuasive argument explaining *why* "limits" is so amorphous that it is an unworkable standard. (*See id.* at 42–43). Although they cite *Cartwright* to support that proposition, *Cartwright* did not describe "limits" as vague, low bar, or amorphous. *See* 32 F.4th at 1121. Instead, the "amorphous" quote on which Plaintiffs rely described the policy's prohibition on speech that "unreasonably . . . alter[s]" a student's experience. *Id.* In short, Plaintiffs have failed to show the Department's inclusion of the word "limits" fell outside the zone of reasonableness. *See Prometheus Radio Project*, 592 U.S. at 423.

*First Amendment Considerations*

Second, Plaintiffs argue amended §§ 106.2 and 106.44(f)(1) are arbitrary or capricious because the Department failed to reasonably explain how those amended regulations can be reconciled with the Eleventh Circuit's decision in *Cartwright*, where the Eleventh Circuit found a university harassment policy likely violated the First Amendment. (Doc. 7-1 at 43–45).

As an initial matter, to the extent Plaintiffs contend that the amended regulations are facially unconstitutional, a challenge for being arbitrary or capricious is not the proper vehicle to do so. The plaintiffs in *FCC v. Fox Television Stations, Inc.* took a similar approach by repeatedly referring to the First Amendment within the context of their arbitrary-or-capricious argument. 556 U.S. at 516. If Plaintiffs here "invite [the court] to apply a more stringent arbitrary-[or]-capricious review to agency actions that implicate constitutional liberties," the court follows the Supreme Court and rejects the invitation. *Id.* "If the [agency]'s action here was not arbitrary or capricious in the ordinary sense, it satisfies the Administrative Procedure Act's arbitrary or capricious standard; its lawfulness under the Constitution is a separate question to be addressed in a constitutional challenge." *Fox Television Stations, Inc.*, 556 U.S. at 516 (quotation marks omitted).

The court therefore limits its discussion to whether Plaintiffs have adequately established a likelihood of success on the merits of their claim that the Department

unreasonably considered *Cartwright*. (Doc. 7-1 at 43–45). They have not. The Department addressed how the amended regulations are materially distinguishable from *Cartwright* as well as other First Amendment concerns. *See, e.g.*, 89 Fed. Reg. at 33,494–96 (vagueness and overbreadth); *id.* at 33,501 & n.11 (discussing *Cartwright* and chilled speech); *id.* at 33,501–08 (First Amendment considerations). The Department also analyzed cases from other circuits that support the Department's reasoning that the amended regulations do not violate the First Amendment. *See id.* at 33,494–95; *Rowles*, 983 F.3d at 352; *DeJohn v. Temple Univ.*, 537 F.3d 301, 320 (3d Cir. 2008) ("Yet, unless harassment is qualified with a standard akin to a severe or pervasive requirement, a harassment policy may suppress core protected speech.").

The Department acknowledged it was changing its position and explained that it thinks the new regulations are better aligned with Title IX. *See* 89 Fed. Reg. at 33,490, 33,499–500; *see Fox Television Stations, Inc.*, 556 U.S. at 515 ("[I]t suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better, which the conscious change of course adequately indicates."). Accordingly, Plaintiffs have not established a substantial likelihood of success on the claim that the Department failed to consider these concerns or that its decisionmaking exceeded the zone of reasonableness. *See Prometheus Radio Project*, 592 U.S. at 423.

*Misgendering*

Third, Plaintiffs argue the Department failed to reasonably respond to comments that amended §§ 106.2 and 106.44(f)(1)'s harassment language could require schools to punish students for misgendering another person. (*See* doc. 7-1 at 45–46). In response to similar concerns during rulemaking, the Department reasoned that "whether verbal conduct [such as misgendering] constitute sex-based harassment is necessarily fact-specific" and that "a stray remark, such as a misuse of language, would not constitute harassment under this standard." 89 Fed. Reg. at 33,516.

Plaintiffs argue "[t]hat terse statement is hardly reasoned decisionmaking." (Doc. 7-1 at 46) (quotation marks omitted). But the Department addressed the commentors' questions about whether misgendering could constitute harassment under the amended regulations: it reasoned a stray instance of misgendering would not be actionable, but like any other instance of verbal conduct, additional conduct could turn the misgendering into actionable harassment. *See* 89 Fed. Reg. at 33,516; *see Prometheus Radio Project*, 592 U.S. at 423. And amended § 106.2 sets out factors to consider when deciding if conduct creates a hostile environment, which would guide a Title IX coordinator in his or her determination. *See* 89 Fed. Reg. at 33,884 (to be codified at 34 C.F.R. § 106.2).

In short, although Plaintiffs may dislike the Department's rules, they have failed to show a substantial likelihood of success in proving the Department's rulemaking was unreasonable or not reasonably explained under APA's deferential arbitrary-or-capricious standard. *See Prometheus Radio Project*, 592 U.S. at 423. Accordingly, the court **WILL DENY** Plaintiffs' motion for a preliminary injunction on their claim that §§ 106.2 and 106.44(f)(1) are contrary to the law or arbitrary or capricious.

### d. Procedural Requirements

Plaintiffs challenge the removal of the procedures set out in the current regulations to address "formal complaints" of "sexual harassment." (Doc. 1 ¶¶ 207–23); 34 C.F.R. § 106.45(b). Plaintiffs contend that the amended regulations to be codified at 34 C.F.R. §§ 106.46(g), 106.45(b)(2), 106.45(f), and 106.45(h)(1) are arbitrary or capricious because they remove procedures that provided due process protections. (Doc. 7-1 at 46–54; *see* doc. 1 ¶¶ 211–23). But their substantive argument is that the reduction in protections has constitutional implications for students accused of sexual misconduct. (*See* doc. 7-1 at 46–54). They do not argue that amended §§ 106.46(g), 106.45(b)(2), 106.45(f), and 106.45(h)(1) are facially unconstitutional but instead limit their argument to the "due-process concerns" raised by some of these changes. (Doc. 7-1 at 47–52). As the court explained above, *supra* at 82, "[i]f the [agency]'s action here was not arbitrary or capricious in the

ordinary sense, it satisfies the Administrative Procedure Act's arbitrary or capricious standard; its lawfulness under the Constitution is a separate question to be addressed in a constitutional challenge." *Fox Television Stations, Inc.*, 556 U.S. at 516 (quotation marks omitted).

To the extent Plaintiffs intended to argue that amended §§ 106.46(g), 106.45(b)(2), 106.45(f), and 106.45(h)(1) *are* unconstitutional, they have not adequately raised that argument for the court's consideration at the preliminary injunction stage, where they bear the burden of "clearly establish[ing]" their entitlement to relief. *Siegel*, 234 F.3d at 1176. The court limits itself to Plaintiffs' argument that the parts of the Final Rule that they challenge are arbitrary or capricious. The court will first summarize how the grievance process operates under the current and amended regulations. The court will then examine Plaintiffs' arguments regarding each individual change in turn. Finally, the court will consider Plaintiffs' arguments regarding the cumulative effect of the changes.

### i. The Grievance Process

Section 106.45(b) of the current regulations require initiation of the grievance process "[u]pon receipt of a formal complaint." 34 C.F.R. § 106.45(b)(2)(i). A "[f]ormal complaint" is defined as "a document filed by a complainant or signed by the Title IX Coordinator" that alleges sexual harassment and requests investigation of the allegation. *Id.* § 106.30(a).

The investigation requires "an equal opportunity for the parties" to inspect and review all relevant evidence obtained in the investigation and to present fact and expert witnesses. *Id.* § 106.45(b)(5)(ii), (vi). Each party has the opportunity to be accompanied to all related proceedings by an advisor of their choice. *Id.* § 106.45(b)(5)(iv). The advisor can be an attorney. 34 C.F.R. § 106.45(b)(5)(iv). Postsecondary institutions have to provide a live hearing at which "each party's advisory [may] ask the other party and any witnesses all relevant questions and follow-up questions, including those challenging credibility." *Id.* § 106.45(b)(6)(i).

The decisionmaker "cannot be the same person(s) as the Title IX Coordinator or the investigator(s)." *Id.* § 106.45(b)(7)(i). The regulation gives institutions the option to use either a preponderance of the evidence standard or a clear and convincing evidence standard, so long as the institution uses "the same standard of evidence for formal complaints against students as for formal complaints against employees, including faculty, and . . . the same standard of evidence [for] all formal complaints of sexual harassment." *Id.* § 106.45(b)(1)(vii).

The Final Rule removes the mandatory nature of many of those protections. Amended § 106.45 sets out grievance procedures applicable to all complaints of sex discrimination and amended § 106.46 sets out additional grievance procedures applicable to complaints of sex-based harassment involving student complainants or student respondents at postsecondary institutions. 89 Fed. Reg. at 33,891, 33,893.

The amended regulations now define a "complaint" as "an oral or written request to the recipient that objectively can be understood as a request for" an investigation. 89 Fed. Reg. at 33,882 (to be codified at 34 C.F.R. § 106.2). And when a Title IX coordinator is "notified of conduct that reasonably may constitute sex discrimination under Title IX or this part," the Title IX coordinator must determine whether to initiate a complaint of sex discrimination of their own initiative based on a non-exhaustive list of considerations. 89 Fed. Reg. at 33,889 (to be codified at 34 C.F.R. § 106.44(f)(1)(v)).

The amended regulations permit institutions to provide either access to "the relevant and not otherwise impermissible evidence" or a description of the evidence with a statement that the parties may request access to the evidence. 89 Fed. Reg. at 33,892 (to be codified at 34 C.F.R. § 106.45(f)(4)(i)–(ii)); *id.* at 33,894 (to be codified at 34 C.F.R. § 106.46(e)(6)). Parties have the right to present fact witnesses and "inculpatory and exculpatory evidence that [is] relevant and not otherwise impermissible," *Id.* at 33,892 (to be codified at 34 C.F.R. § 106.45(f)(2)), but postsecondary institutions may bar expert witnesses "as long as the determination applies equally to the parties," *Id.* at 33,894 (to be codified at 34 C.F.R. § 106.46(e)(4)). Parties still have the right to an advisor, who may be an attorney, but the institution "may establish restrictions regarding the extent to which the

advisor may participate in the grievance procedures, as long as the restrictions apply equally to the parties." *Id*. at 33,894 (to be codified at 34 C.F.R. § 106.46(e)(2)).

Amended § 106.46 allows postsecondary institutions to elect whether to provide live hearings for complaints of sex-based harassment involving student complainants or student respondents. *Id.* at 33,895 (to be codified at 34 C.F.R. § 106.46(g)). If the institution elects not to provide a live hearing, the investigator or decisionmaker must be able to ask questions during individual meetings with the parties or witnesses; each party is allowed to propose questions to ask the parties or witnesses and, if the questions are relevant and not otherwise impermissible, the investigator or decisionmaker must ask those questions during individual meetings; and the institution must provide "an audio or audiovisual recording or transcript with enough time for the party to have a reasonable opportunity to propose follow-up questions." *Id*. at 33,894 (to be codified at 34 C.F.R. § 106.46(f)(i)).

Schools must use a preponderance of evidence standard "unless the recipient uses the clear and convincing evidence standard of proof in all other comparable proceedings, including proceedings relating to other discrimination complaints, in which case the recipient may elect to use that standard of proof in determining whether sex discrimination occurred." *Id.* at 33,893 (to be codified at 34 C.F.R. § 106.45(h)(1)). The "decisionmaker may be the same person as the Title IX

Coordinator or investigator." 89 Fed. Reg. at 33,891 (to be codified at 34 C.F.R. § 106.45(b)(2)).

### ii. Live Hearing and Cross-Examination

Amended § 106.45 eliminates two mandatory procedural requirements present in the current regulations: a live hearing and direct adversarial cross-examination. Plaintiffs contend that the Department's explanation does not provide adequate justification for the change in light of the "grave due-process concerns" in cases involving witness credibility. (Doc. 7-1 at 46–49).

The current regulations mandate a live hearing for complaints of sexual harassment at postsecondary institutions. 34 C.F.R. § 106.45(b)(6)(i). At the hearing, each party's advisory can "ask the other party and any witnesses all relevant questions and follow-up questions, including those challenging credibility. Such cross-examination at the live hearing must be conducted directly, orally, and in real time by the party's advisor of choice and never by a party personally." *Id.* The decisionmaker must determine whether each question was relevant before the witness answers it. *Id.*

The amended regulations permit but do not require a live hearing for complaints of sex-based harassment involving a student complainant or student respondent at a postsecondary institution. 89 Fed. Reg. at 33,895 (to be codified at 34 C.F.R. § 106.46(g)). If the institution does not have a live hearing, the investigator

or decisionmaker must be able to ask relevant and not otherwise impermissible questions and follow-up questions during individual meetings with the parties and witnesses, including relevant and permissible questions proposed by the parties. *Id.* at 33,894 (to be codified at 34 C.F.R. § 106.46(f)(i)(A)–(C)). The postsecondary institution must provide both parties an audio or audiovisual recording or transcript with enough time for the parties to have a reasonable opportunity to propose follow-up questions. *Id.*

In the commentary to the 2020 Rule, the Department noted that the U.S. Supreme Court has not clarified the precise due process requirements for complaints of sexual harassment at postsecondary schools. 85 Fed. Reg. at 30,327. The Department acknowledged that the Sixth Circuit has held that where a public university seeks to discipline a student for misconduct based on "competing narratives," "some form of live questioning in front of the fact-finder" is required, *Doe v. Baum*, 903 F.3d 575, 578, 583 (6th Cir. 2018) (emphasis omitted). 85 Fed. Reg. at 30,327–28. The First Circuit has held that a school's questioning of the witnesses was sufficient to satisfy due process, *Haidak v. Univ. of Mass.-Amherst*, 933 F.3d 56, 68–70 (1st Cir. 2019). 85 Fed. Reg. at 30,329. The Department elected to follow *Baum* because, although that decision was limited to public universities that are required to provide due process, the Department believed "consistent application of a grievance process to accurately resolve allegations of sexual

harassment under Title IX is as important in private institutions as public ones." *Id.*

at 30,328.

In its notice of proposed rulemaking, which preceded the Final Rule, the

Department stated that "some postsecondary institutions reported that they

experienced a decrease in the number of complaints filed as well as an increase in

the number of individuals who report sexual harassment but decline to move forward

with the grievance process once they are provided with information about the

grievance process." 87 Fed. Reg. at 41,505. The schools making those reports

attributed these changes to the requirement of a live hearing and advisor-conducted

cross-examination requirements. *Id.* And some postsecondary institutions had found

the live hearing and cross-examination requirements "overly burdensome and

prescriptive," interfering with their "ability to meet their Title IX obligations." *Id.*

The Department also acknowledged comments expressing a preference for the 2020

Rule from "several non-recipient stakeholders." *Id.* In eliciting comments about the

proposed changes, the Department explained its "tentative view . . . that neither Title

IX nor due process and fundamental fairness require postsecondary institutions to

hold a live hearing with advisor-conducted cross-examination in all cases," but that

institutions must "provide a live-questioning process that enables the decisionmaker

to adequately assess the credibility of the parties and witnesses to the extent

credibility is in dispute and is relevant." 87 Fed. Reg. at 41,505.

In its comments regarding the amended regulations, the Department stated it had received a "variety of views . . . regarding whether due process and basic fairness require live hearings with questioning by an advisor for all complaints of sex-based harassment involving a student complainant or student respondent at a postsecondary institution." 89 Fed. Reg. at 33,733. The Department reiterated the lack of Supreme Court guidance and the split among courts, including two more recent decisions holding that due process was satisfied by live questioning by the factfinder if the respondent had an opportunity to submit questions. *Id.* at 33,736 (citing *Overdam v. Texas A&M Univ.*, 43 F.4th 522, 529–30 (5th Cir. 2022) and *Boermeester v. Carry*, 532 P.3d 1084, 1098 (Cal. 2023)). After discussing the caselaw, the Department maintained its position "that neither Title IX nor due process or basic fairness require postsecondary institutions to hold a live hearing with questioning by an advisor in all cases" because a due process analysis involves reviewing "the specific facts and circumstances to determine what process was required, including what other procedural protections, if any, were provided to the respondent and the potential burden on the postsecondary institution of requiring cross-examination at a live hearing." *Id.* at 33,734, 33,736.

The Department's review of the caselaw "persuaded [it] that affording more discretion to recipients to develop processes for conducting grievance procedures is appropriate." *Id.* at 33,737. The Department stated that it believed the new

procedures protected "the ability to probe the credibility of parties and witnesses; and also protect the postsecondary institution's interest in helping the decisionmaker seek the truth and make a reliable determination, while minimizing any chilling effects on reporting of sex-based harassment and on full participation of parties and witnesses in the grievance procedures." *Id.* at 33,734. And the Department emphasized that nothing in amended §§ 106.45 or 106.46 "precludes a postsecondary institution from choosing to use a live hearing with questioning by an advisor." *Id.* at 33,737.

Plaintiffs have not carried their burden of showing a substantial likelihood of success on the merits of their claim that this change is arbitrary or capricious. As the court stated above, to the extent Plaintiffs contend that this change is facially unconstitutional as a violation of due process, that contention is irrelevant to the arbitrariness or capriciousness of the rule. *See Fox Television Stations, Inc.*, 556 U.S. at 516. So the court turns to Plaintiffs' arguments that the Department failed to meaningfully explain its departure from the current regulations and gave an unconvincing explanation about its desire to lessen the burdens on smaller institutions. (Doc. 7-1 at 47–49).

Regardless of whether the court agrees with the agency's "policy judgment," *Prometheus Radio Project*, 592 U.S. at 423, the Department provided a reasoned explanation for its rule change, *see* 89 Fed. Reg. at 33,733–34, 33,736–37. In

particular, the court notes that the Department acknowledged that at least one circuit court of appeals has held that public institutions "must allow for some form of *live* questioning *in front of* the fact-finder," *Baum*, 903 F.3d at 583, but it also explained that its rule allows such institutions to continue providing live hearings with adversarial cross-examination, *see* 89 Fed. Reg. at 33,737; *see also id.* at 33,895 (to be codified at 34 C.F.R. § 106.46(g)). The new regulation lowers the mandatory requirements for grievance procedures but institutions may continue to use more stringent requirements if they choose. *See id.* at 33,895 (to be codified at 34 C.F.R. § 106.46(g)). The Department's new position is not "so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Ga. Dep't of Educ.*, 883 F.3d at 1314 (quotation marks omitted).

And although the amended regulations represent a change in the Department's policy, the Supreme Court has rejected the view that "agency change [is] subjected to more searching review" than initial action. *Fox Television Stations, Inc.*, 556 U.S. at 514. Although an agency may not "depart from a prior policy *sub silentio* or simply disregard rules that are still on the books," an agency changing positions "need not demonstrate to a court's satisfaction that the reasons for the new policy are *better* than the reasons for the old one; it suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better." *Id.* at 515.

Plaintiffs' argument about the change to this part of the regulation is simply that the Department's justification was not sufficiently detailed in light of the finding, in 2020, that "the alternatives it now champions were problematic." (Doc. 7-1 at 48–49). But what they cite as findings are the following statements: (1) the Department's "belie[f]" that the 2020 procedures "meet or exceed the due process required" under Supreme Court due process jurisprudence, 85 Fed. Reg. at 30,330; (2) the Department's "agree[ment] with commenters that in too many instances" recipients "ha[d] stifled the value of cross-examination," *id.* at 30,313; (3) the Department's position that cross-examination "is as useful and powerful a truth-seeking tool for a complainant's benefit as for a respondent," *id.* at 30,330; and (4) the Department's "belie[f] that the risks of allowing personal confrontation between parties in sexual harassment cases outweigh the downsides of allowing advisors to actively participate in the limited role of conducting cross-examination," *id.* at 30,340. The Plaintiffs also cite another page from the Department's discussion but do not direct the court to any specific findings there. (*See* doc. 7-1 at 49); *see also* 85 Fed. Reg. at 30,316.

If an agency's position were considered a "finding" requiring "detailed justification" to change (*see* doc. 7-1 at 49), then every rule that changes an agency's policy would be subject to that more stringent review. But the Supreme Court has held in the clearest possible terms that an "agency need *not* always provide a more

detailed justification than what would suffice for a new policy created on a blank slate." *Fox Television Stations, Inc*., 556 U.S. at 515 (emphasis added). Plaintiffs have not cited any factual findings, as opposed to policy positions, that the amended regulations overturned. (*See* doc. 7-1 at 47–49); *cf. Motor Vehicle Mfrs. Assoc. of the U.S., Inc.*, 463 U.S. at 35, 51 (finding arbitrary or capricious an agency's rescission of a regulation without addressing the agency's previous finding that enactment of the regulation "could prevent approximately 12,000 deaths and over 100,000 serious injuries annually"). Nor have they adequately explained why, if the policy positions do count as findings, the Department's rationale is not sufficiently detailed. (*See* doc. 7-1 at 47–49).

As described above, the Department provided a reasoned and reasonable explanation for its change of position, and that is all the APA requires. *See Fox Television Stations, Inc*., 556 U.S. at 515. Plaintiffs have not shown a substantial likelihood of success on the merits of their claim that the elimination of a right to a live hearing with adversarial cross-examination is arbitrary or capricious.

### iii. Single-Investigator Model

Plaintiffs next challenge amended § 106.45(b)(2), which allows the same person to function as Title IX coordinator, investigator, and decisionmaker. (Doc. 7-1 at 49–51). The parties and the court refer to this as the "single-investigator model." Plaintiffs contend that this change "threatens to inject bias into the proceedings,

raises still more due-process concerns, and risks proceedings that result in sex discrimination." (*Id.* at 50). Again, because Plaintiffs do not squarely challenge the constitutionality of the single-investigator model, the court disregards their references to the "due-process concerns."[10] *See Fox Television Stations, Inc.*, 556 U.S. at 516.

The current regulation provides that the decisionmaker cannot be the same person as the Title IX Coordinator or the investigator. 34 C.F.R. § 106.45(b)(7)(i). When it adopted this rule, the Department explained that it believed separation of the rules "will not only increase the overall fairness of the grievance process but also will increase the reliability of fact-finding and the accuracy of outcomes, as well as improve party and public confidence in outcomes." 85 Fed. Reg. at 30,367; *see also id.* 30,367–72 (continuing the discussion of comments for and against the prohibition of the single-investigator model).

---

[10] The court has nevertheless carefully read each of the cases Plaintiff cite (doc. 7-1 at 49–51) and finds those cases distinguishable. In one case, the court was concerned about the lack of live hearing and adversarial cross-examination, not the use of a single-investigator model. *Doe v. Univ. of Scis.*, 961 F.3d 203, 216 (3d Cir. 2020). In another, the court took issue with the appeal process because the appeals officer consulted with the adjudicator and was therefore not impartial. *Doe v. Grinnell Coll.*, 473 F. Supp. 3d 909, 924 (S.D. Iowa 2019). In a third case, the court believed "[t]he dangers" of a single-investigator model "can be considerably mitigated if there is effective review by a neutral party." *Doe v. Brandeis Univ.*, 177 F. Supp. 3d 561, 606 (D. Mass. 2016). But Plaintiffs here make no argument about the adequacy of the appeal process provided by the Final Rule. The other cases Plaintiffs cite involve determinations made by decisionmakers who did not view the witnesses' demeanors, *see Doe v. Claremont McKenna Coll.*, 25 Cal. App. 5th 1055, 1065, 1073 (Cal. Ct. App. 2018), or actual bias on the part of an investigator who also acted as a decisionmaker, *see Doe v. Miami Univ.*, 882 F.3d 579, 601 (6th Cir. 2018). These cases also do not establish that the use of a single-investigator model is facially unconstitutional.

In the 2022 notice of proposed rulemaking, the Department noted that since passage of the current regulations, schools have indicated that the prohibition on the single-investigator model has been "burdensome for some schools in a way that undermined these schools' ability to ensure that their education programs or activities are free from sex discrimination under Title IX, particularly those that are under-resourced or that do not have a large number of staff." 87 Fed. Reg. at 41,466–67. Schools also indicated that having multiple people involved in the investigation and decisionmaking process "results in a prolonged Title IX process, negatively impacting the students who are participating in that process." *Id.* at 41,467. Other recipients expressed that when using the single-investigator model, "they saw more students seeking institutional support and resolution of complaints," and for "small or under-resourced" recipients, involving multiple people "increases the likelihood of the parties having to interact with those employees in the regular course of their participation in the recipient's education program or activity," leading to students who "changed majors or avoided courses, clubs and organizations, and athletic opportunities to avoid interacting with employees in those areas who had also administered their grievance procedures related to sexual harassment allegations." *Id.* In light of these concerns, the Department proposed allowing the single-investigator model "in conjunction with the other proposed measures designed to ensure equitable treatment of the parties." *Id.*

In the Final Rule, the Department explained that allowing the use of the single-investigator model would answer the concerns schools had voiced about flexibility in "structur[ing] their Title IX grievance procedures to accommodate each institution's unique circumstances," including the "institution's administrative structure, educational community, and applicable Federal and State case law and State or local legal requirements." 89 Fed. Reg. at 33,662. The Department took the position that the other procedural protections provided by the rule guarded against conflicts of interest, bias, and deprivation of due process. *Id.* at 33,663. It reiterated its belief that the single-investigator model "will relieve administrative burden[s] for some recipients, especially smaller institutions, without sacrificing the quality and reliability of investigations or decisionmaking." *Id.* And it rejected any suggestion that allowing the single-investigator model would cause delays in the grievance process, noting that "commenters had varying views of which model . . . would cause more delay." *Id.* at 33,664. Amended § 106.45(b)(2) therefore gave public schools the option, although not the requirement, to use a single-investigator model, so long as "any person designated as a Title IX Coordinator, investigator, or decisionmaker not have a conflict of interest or bias for or against complainants or respondents generally or an individual complainant or respondent." 89 Fed. Reg. at 33,891 (to be codified at 34 C.F.R. § 106.45(b)(2)).

Plaintiffs argue that the Department did not adequately explain its change from the Final Rule because the Department failed to explain its decision to abandon its own previous finding from the 2020 Rule. (Doc. 7-1 at 49–51). Again, the findings it cites are not evidence-based factual findings, but instead the Department's previous belief about the best practice. *See* 85 Fed. Reg. at 30,367. Accordingly, all the Department needed to do was show that the "new policy is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better, which the conscious change of course adequately indicates." *Fox Television Stations, Inc.*, 556 U.S. at 515. The Department provided a detailed explanation for its decision to make this change. 89 Fed. Reg. at 33,663. In particular, the Department explained that it was allowing public schools the option to use a single-investigator model because "the single-investigator model supports quality grievance procedures and decision-making, and recipients expressed their belief that the single-investigator model resulted in more students seeking institutional support and resolution of complaints." *Id.* at 33,857 (incorporating 87 Fed. Reg. at 41,467).

To prevail on their request for a preliminary injunction, Plaintiffs needed to show a substantial likelihood of success on the merits of their claim that the Department lacked good reasons for the change allowing (but not requiring) public schools to use a single-investigator model. *See Siegel*, 234 F.3d at 1176. Plaintiffs instead argue that the Department's policy judgment is poor. (*See* doc. 7-1 at 50–

51). But in reviewing the arbitrariness or capriciousness of agency action, the "court may not substitute its own policy judgment for that of the agency." *Prometheus Radio Project*, 592 U.S. at 423. Plaintiffs have not carried their burden at the preliminary injunction stage.

### iv. Notice and Access to Evidence

Next, Plaintiffs challenge the purported removal of a student's right to inspect all the evidence against that student. (Doc. 7-1 at 51–52). They contend that the Department failed to provide a reasonable explanation for its decision to require students to request access to the evidence instead of giving them access automatically. (*Id.*).

The current regulation requires that both parties have the "opportunity to inspect and review any evidence obtained as part of the investigation that is directly related to the allegations raised in a formal complaint, including the evidence upon which the recipient does not intend to rely in reaching a determination regarding responsibility and inculpatory or exculpatory evidence whether obtained from a party or other source." 34 C.F.R. § 106.45(b)(5)(vi). It further requires that "[p]rior to completion of the investigative report, the recipient must send to each party and the party's advisor, if any, the evidence subject to inspection and review." *Id.*

Under amended §§ 106.45 and 106.46, the school must "provide an equal opportunity to access either the relevant and not otherwise impermissible evidence,

or an accurate description of the evidence," but if the school elects to give a description, "it must further provide the parties with an equal opportunity to access the relevant and not otherwise impermissible evidence upon the request of any party." 89 Fed. Reg. at 33,892 (to be codified at 34 C.F.R. § 106.45(f)(4)(i)–(ii)); *accord id.* at 33,894 (to be codified at 34 C.F.R. § 106.46(e)(6)).

The Final Rule defines "relevant" evidence as "related to the allegations of sex discrimination under investigation as part of the grievance procedures under § 106.45, and if applicable § 106.46. . . . [E]vidence is relevant when it may aid a decisionmaker in determining whether alleged sex discrimination occurred." *Id.* at 33,884 (to be codified at 34 C.F.R. § 106.2). The Final Rule defines "impermissible" evidence as privileged evidence (unless there is waiver of the privilege), medical records "in connection with the provision of treatment" (unless the person provides written consent), and evidence of the complainant's sexual interests or prior sexual conduct (unless offered to prove that someone else committed the alleged conduct or offered to prove consent). 89 Fed. Reg. at 33,891 (to be codified at 34 C.F.R. § 106.45(b)(7)).

Plaintiffs contend that this rule impermissibly removes a student's right to inspect "all the evidence against them" because if a school elects to provide a list, the student "has no way of knowing what relevant evidence was missing (or incompletely summarized in) the report." (Doc. 7-1 at 51–52). But Plaintiffs do not

acknowledge that the previous rule required a public school to provide an accused only the evidence "directly related to the allegations raised in a formal complaint." 34 C.F.R. § 106.45(b)(5)(vi). Plaintiffs have made no attempt to explain how "directly related" is different from "relevant and not otherwise impermissible." (*See* doc. 7-1 at 51–52). And in any event, the court notes that the Department addressed the change at length in its response to comments. *See* 89 Fed. Reg. at 33,725–26. Because Plaintiffs have not addressed the response to those comments, the court will not either. On this briefing, Plaintiffs have not established a substantial likelihood of success on the merits of their claim that the Department acted arbitrarily or capriciously by changing the rule from automatically providing all evidence "directly related" to allowing recipients to provide "relevant and not otherwise impermissible evidence" on request.

### v. Oral Complaints

Plaintiffs also challenge the amendments to the regulations about grievance procedures relating to the trigger for an investigation. Under the current regulation, the grievance process for complaints of sexual harassment began "[u]pon receipt of a formal complaint," 34 C.F.R. § 106.45(b)(2)(i), where a "formal complaint" was defined as "a document filed by a complainant or signed by the Title IX Coordinator alleging sexual harassment against a respondent and requesting that the recipient investigate the allegation of sexual harassment," *id.* § 106.30. The Final Rule

amends the definition of "complaint" to include "an oral or written request," so that under amended § 106.45(a)(2), an oral complaint of any type of sex discrimination may initiate a grievance procedure. 89 Fed. Reg. at 33,882 (to be codified at 34 C.F.R. § 106.2); *id.* 33,891 (to be codified at 34 C.F.R. § 106.45(a)(2)). And "when notified of conduct that reasonably may constitute sex discrimination under Title IX or this part," the Title IX coordinator must, "[i]n the absence of a complaint or the withdrawal of any or all of the allegations in a complaint, and in the absence or termination of an informal resolution process, determine whether to initiate a complaint of sex discrimination that complies with the grievance procedures under § 106.45, and if applicable § 106.46." *Id.* at 33,889 (to be codified at 34 C.F.R. § 106.44(f)(1)(v)).

Plaintiffs contend that this change is arbitrary or capricious because the Department "failed to reasonably address the extraordinary implications of these changes or reasonably explain why a formal written complaint is unfair, impractical, or unwise." (Doc. 7-1 at 52–53). But Plaintiffs have not explained what the "extraordinary implications" of this change would be or why this court should substitute its judgment about fairness, practicality, or wisdom of permitting investigations based on oral complaints instead of formal written complaints. (*See id.*). Nor have Plaintiffs addressed the Department's detailed comments about its reasons for making this change. *See* 89 Fed. Reg. at 33,484–86, 33,591–92.

In particular, the court highlights Plaintiffs' failure to address (1) the Department's position that allowing a Title IX coordinator to initiate a complaint is consistent with the 2020 Rule, which defined a "formal complaint" to be one "filed by a complainant *or* signed by the Title IX Coordinator," 34 C.F.R. § 106.30 (emphasis added), and (2) the Department's comments in the 2020 Rule that "the Title IX Coordinator should have the discretion to initiate a grievance process," 85 Fed. Reg. at 30,131, and "[w]hen a Title IX Coordinator determines that an investigation is necessary even where the complainant (*i.e.*, the person alleged to be the victim) does not want such an investigation, the grievance process can proceed without the complainant's participation; however, the complainant will still be treated as a party in such a grievance process," 85 Fed. Reg. at 30,131.

Given Plaintiffs' sparse argument about this part of the rule change, they have not carried their burden of establishing a substantial likelihood of success on the merits of their argument that the ability to initiate a grievance process based on an oral complaint or based on a Title IX coordinator's discretion is arbitrary or capricious.

### vi. Burden of Proof

Plaintiffs' next challenge to the new grievance procedures relates to the burden of proof. (Doc. 7-1 at 53). Under the current regulations, institutions have the option to use either a preponderance of the evidence standard or a clear and

convincing evidence standard, so long as the institution uses "the same standard of evidence for formal complaints against students as for formal complaints against employees, including faculty, and . . . the same standard of evidence [for] all formal complaints of sexual harassment." 34 C.F.R. § 106.45(b)(1)(vii). Under amended § 106.45, public schools must use a preponderance of evidence standard "unless the recipient uses the clear and convincing evidence standard of proof in all other comparable proceedings, including proceedings relating to other discrimination complaints, in which case the recipient may elect to use that standard of proof in determining whether sex discrimination occurred." 89 Fed. Reg. at 33,893 (to be codified at 34 C.F.R. § 106.45(h)(1)).

Plaintiffs contend that the change is arbitrary and capricious because the Department failed to define what a "comparable proceeding" is, making this a "de facto ban on the clear-and-convincing-evidence standard without ever having to justify such a rule." (Doc. 7-1 at 53) (alteration accepted). The commentary to the Final Rule acknowledged that some commenters sought clarification on the definition of "comparable proceedings." 89 Fed. Reg. at 33,704. The Department "decline[d] to define that term" because "[t]here are many different types of disciplinary proceedings, which may vary from recipient to recipient, and the Department does not want to enshrine too rigid a definition of 'comparable proceedings' in the regulatory text instead of leaving determinations of

comparability to each recipient's reasonable discretion." *Id.* at 33,704. The Department, however, "clarifie[d] that it generally understands and intends comparable proceedings to include, for example, allegations of similar types of person-to-person (as distinct from recipient-to-person) offenses that are physical in nature and not based on sex." *Id.* The Department indicated that "allegations of non-sexual physical violence" would be comparable to "allegations of sexual violence." *Id.* But, according to the Department, proceedings against faculty or staff would not be considered comparable to proceedings against students. *See id.* at 33,705.

Whether Plaintiffs have carried their burden of establishing that this rule change is arbitrary or capricious is closer than in the other rule changes relating to grievance procedures. Section 106.45(h)(1)'s language is not entirely clear about what constitutes a "comparable proceeding." *Id.* at 33,893 (to be codified at 34 C.F.R. § 106.45(h)(1)). Some commenters pointed out this lack of clarity. *Id.* at 33,704. The Department acknowledged those commenters and provided some explanation about what it considers a "comparable proceeding," although it is not clear to the court that the language of the new § 106.45(h)(1) actually reflects the Department's understanding. *Compare* 89 Fed. Reg. at 33,704–06, *with id.* at 33,893 (to be codified at 34 C.F.R. § 106.45(h)(1)).

However, Plaintiffs have cited no authority in support of their contention that the lack of clarity makes the rule arbitrary or capricious. (*See* doc. 7-1 at 53). And

in similar circumstances, the Eleventh Circuit has declined to address a party's argument that an ambiguous regulation was arbitrary and capricious. *See Nat'l Mining Ass'n*, 985 F.3d at 1326 n.15 ("Petitioners' initial brief refers in cursory manner to an argument that, because the challenged terms are grievously ambiguous, the Final Rule is rendered arbitrary and capricious. We do not think this argument is fairly raised; petitioners cite no case law supporting the claim that ambiguous provisions in a regulation can render that regulation arbitrary and capricious."). The burden is on Plaintiffs to show their entitlement to the extraordinary relief they seek. *See Siegel*, 234 F.3d at 1176. And their argument is limited to pointing out the lack of definition of "comparable proceeding" and a conclusory statement that the lack of definition makes this a "de facto ban on the clear-and-convincing-evidence standard." (Doc. 7-1 at 53) (alteration accepted). The court cannot find a substantial likelihood of success on the merits of the claim based on that sparse argument.

### vii. Cumulative Effect

Plaintiffs' last argument is that the changes to the grievance procedures are arbitrary or capricious because the Department failed to consider the cumulative effect of the changes. (*Id.* at 54–55; doc. 52 at 33–34). Plaintiffs do not address that almost all of the changes made by the Final Rule are optional and they do not address how the mandatory changes, considered cumulatively, make the Final Rule arbitrary or capricious. (*See* doc. 7-1 at 54–55; doc. 52 at 33–34). They have not sufficiently

raised this issue for the court to find that they have a substantial likelihood of success on the merits.

### 3. Imminent Irreparable Harm

Even if Plaintiffs could establish a substantial likelihood of success on the merits, a preliminary injunction is appropriate only if they can establish that "irreparable injury will be suffered unless the injunction issues." *Wreal, LLC v. Amazon.com, LLC*, 840 F.3d 1244, 1247 (11th Cir. 2016); *see also Siegel*, 234 F.3d at 1176. The irreparable harm must be "imminent": "the very idea of a *preliminary* injunction is premised on the need for speedy and urgent action to protect a plaintiff's rights before a case can be resolved on its merits." *Wreal, LLC*, 840 F.3d at 1248 (quotation marks omitted). "[T]he asserted irreparable injury must be neither remote nor speculative, but actual and imminent." *Siegel*, 234 F.3d at 1176 (quotation marks omitted).

Plaintiffs assert that they will suffer irreparable harm because (1) some parts of the Final Rule conflict with policies and statutes enacted by the States; (2) the States will incur significant costs in complying with the new regulations and they cannot recover money damages for those compliance costs because of the government's sovereign immunity; and (3) members of the Private Plaintiffs will suffer chilled speech and loss of their First and Fourteenth Amendment rights. (Doc. 7-1 at 55–56; *see also* doc. 52 at 35). At the hearing, Plaintiffs stated that their

compliance cost injuries are occurring now, and that their other injuries will occur on August 1, the effective date of the Final Rule, but not before. (*See* doc. 52 at 8).

As an initial matter, Plaintiffs have not acted with urgency in this case thus far. They filed the complaint on April 29, 2024, the same day the Final Rule became final. (Doc. 1); 89 Fed. Reg. at 33,474. The case was initially assigned to a magistrate judge. Plaintiffs served the Department three days later, on May 2, 2024, and filed the motion for a preliminary injunction six days after that, on May 8, 2024. (Docs. 6, 7). The next day (May 9, 2024), the parties jointly proposed a six-week briefing schedule, giving the Department until June 5, 2024 to file a response brief and Plaintiffs until June 19, 2024 to file a reply brief. (Doc. 13). The parties requested that, if the court "deem[ed] it necessary," they could make oral arguments in the first week of July 2024. (*Id.*).

On May 13, 2024, the magistrate judge reassigned this case to the undersigned. (Docs. 16, 17). The next day, the court entered the agreed-upon briefing schedule and, in an attempt to expedite the submission date of the motion, set oral argument for June 26, 2024. (Doc. 18). At Plaintiffs' request, and upon the representation that the parties intended to rest on their briefs, the court delayed the hearing until July 1, 2024. (*See* doc. 20; *see also* doc. 52 at 3–4).

"A delay in seeking a preliminary injunction of even only a few months— though not necessarily fatal—militates against a finding of irreparable harm." *Wreal,*

*LLC*, 840 F.3d at 1248. Although Plaintiffs here did not delay for months, they did set a leisurely seven-and-a-half-week schedule to bring this motion under submission. As the Eleventh Circuit has held, this delay is "not . . . fatal," but it does call into question the true exigency of their request. *See id.*

The court further highlights that Plaintiffs have not argued they will suffer an immediate irreparable injury from the revocation of funding if they fail to comply with the new regulations. (*See* doc. 7-1 at 55–56; doc. 52 at 34–35). Even if they had, Title IX sets out a detailed scheme for compliance actions. *See* 20 U.S.C. § 1682. Termination of funding can occur only after a hearing, a finding of failure to comply, advising "the appropriate person or persons" of the failure to comply, determining that "compliance cannot be secured by voluntary means," filing a written report with the relevant House and Senate committees, and passage of thirty days after the filing of such a report. *Id.* Accordingly, denial of funding is not imminent and cannot support a finding of irreparable injury at this stage.

Finally, it has come to this court's attention that another district court has stayed the effective date of the rule in a number of schools across the country. *See Kansas*, no. 24-4041, doc. 53. That order affects multiple schools in the States. *See id.*, doc. 67-1. Although Plaintiffs notified the court that this district court had granted the plaintiffs' request for a preliminary injunction, they did not disclose the impact on schools within the States. (*See* doc. 50). Those schools could not suffer

any irreparable harm from this court's denial of an injunction because the Final Rule is already enjoined as to those schools.

Turning to the arguments Plaintiffs did make, the court begins with the constitutional injuries the private organizations assert their members will suffer, then turns to the preemptive effect of the Final Rule, before addressing the non-reimbursable compliance costs. The court emphasizes at the outset that the only evidence Plaintiffs submit in support of their assertion of irreparable harm is affidavits listing state statutes Plaintiffs allege are incompatible with parts of the Final Rule, affidavits stating, in the most general terms, that compliance "will be costly," and citations to the Final Rule's estimations about the nationwide cost to schools of complying with the amended regulations. (Doc. 7-1 at 55–56). The court has doubts that this evidence is sufficient to show the irreparable harm is imminent such that the court should grant relief to Plaintiffs before a final adjudication on the merits.

### a.  Constitutional Injuries

Plaintiffs assert, in one sentence, that the members of Private Plaintiffs face irreparable injury "in the form of chilled speech and the loss of their First and Fourteenth Amendment rights." (Doc. 7-1 at 56; *see also* doc. 52 at 35). This single sentence, with no accompanying argument, is insufficient to carry the burden of "clearly establish[ing]" an imminent and irreparable injury. *See Siegel*, 234 F.3d at

1176. Accordingly, Private Plaintiffs' arguments fail simply on the basis that they are inadequately presented.

But even if the court considers these arguments, they fail. As the court described in the substantive discussion of Plaintiffs' claims, Plaintiffs do not clearly argue, much less show, a substantial likelihood of success on the merits of a claim that any part of the Final Rule is likely to facially violate the First or Fourteenth Amendment rights of students. (*See* doc. 7-1 at 14–54). And Plaintiffs' reliance on *Cartwright*—which noted that an ongoing violation of the First Amendment always constitutes an irreparable injury sufficient to support a preliminary injunction—is unavailing. (*Id.* at 56); *Cartwright*, 32 F.4th at 1128.

In *Cartwright*, the Eleventh Circuit held that the district court abused its discretion in refusing to preliminarily enjoin the enforcement of a specific existing discriminatory harassment policy after deciding that the policy likely violated the First Amendment. (Doc. 7-1 at 56) (citing *Cartwright*, 32 F.4th at 1128). But here, Plaintiffs have not carried their initial burden of substantial likelihood of success that their constitutional rights likely will be violated, so the court likewise cannot conclude that Plaintiffs have demonstrated an irreparable injury.

### b. Preemptive Effect of the Final Rule

Next, Plaintiffs contend that the States face irreparable injury because the Final Rule contains a "preemption provision" that will affect their ability to enforce

their own laws. (Doc. 7-1 at 55). The Final Rule amends 34 C.F.R. § 106.6(b) to provide that "[t]he obligation to comply with Title IX and this part is not obviated or alleviated by any State or local law or other requirement that conflicts with Title IX or this part." 89 Fed. Reg. at 33,885 (to be codified at 34 C.F.R. § 106.6(b)). Each State points to state laws that they say conflict with parts of the Final Rule.

First, the States argue they will suffer immediate irreparable injury from being unable to enforce their state laws about sex-separation in sports. (Doc. 7-1 at 55; *see also* doc. 7-2 ¶ 14; doc. 7-3 ¶ 9; doc. 7-4 ¶ 8; doc. 7-10 ¶ 10). But sports regulations are not before the court, and the Final Rule plainly permits such sex separation. *See* 34 C.F.R. § 106.41(b); *see also* 89 Fed. Reg. at 33,888 (indicating no change to 34 C.F.R. § 106.41(b)). To the extent the States contend that the Final Rule will eventually lead to the destruction of sex-separation in sports, they have not carried their burden of showing that this destruction is imminent such that it can support a request for immediate injunctive relief. Accordingly, the States have not shown an irreparable injury from being unable to enforce their state laws about sex-separation in sports.

The court observes that South Carolina does not cite any other state statute that conflicts with the Final Rule. (*See* doc. 7-1 at 55; doc. 7-10 ¶ 10). Accordingly, South Carolina has not established any irreparable injury from the preemptive effect

114

of the Final Rule. The court's analysis therefore will proceed only as to Alabama, Georgia, and Florida.

In support of its contention about irreparable injury, Georgia cites an affidavit from its State Superintendent of Education, who states that the Final Rule "conflicts with Georgia laws that govern K-12 institutions. *See, e.g.*, Ga. Code Ann. § 20-2-786 (Parents' Bill of Rights)." (Doc. 7-1 at 55; doc. 7-8 ¶ 9). It is not immediately apparent what part of § 20-2-786 conflicts with the Final Rule, and the citation, without further explanation, does not assist the court in making that determination. The court declines to make Plaintiffs' argument about the effect of this state statute for them. *See Fils*, 647 F.3d at 1284 ("To prevail on a particular theory of liability, a party must present that argument to the district court. Our adversarial system requires it; district courts cannot concoct or resurrect arguments neither made nor advanced by the parties.") (citation omitted). Accordingly, Georgia has not shown an irreparable injury based on a conflict between § 20-2-786 and the Final Rule.

That leaves Alabama and Florida, each of which cites specific state statutes that they argue conflict with the Final Rule. None of the statutes cited relate in any way to the amended grievance procedures (34 C.F.R. §§ 106.46(g), 106.45(b)(2), 106.45(f), and 106.45(h)(1)). (*See* doc. 7-1 at 55; doc. 7-2 ¶ 14; doc. 7-3 ¶ 9; doc. 7-4 ¶ 8). Accordingly, Alabama and Florida have not shown an irreparable injury

arising from any conflict between their state laws and the new grievance procedures challenged in that part of the case.

However, Alabama and Florida do highlight state laws relating to sex-separated bathrooms at school, parents' rights to information about their children, and the definition of harassment at school. (*See* doc. 7-1 at 55; doc. 7-2 ¶ 14; doc. 7-3 ¶ 9; doc. 7-4 ¶ 8). The court therefore turns to whether Alabama and Florida have shown an irreparable injury for the Final Rule's changes relating to bathrooms and parental rights, and the definition of harassment.

As discussed at length already, Plaintiffs claim § 106.10 "redefin[es]" the word "sex" to include "gender identity," focusing on how this definition will affect schools' regulation of sex-separated bathrooms and parental rights to access information about children. (*See* doc. 1 ¶¶ 162–189; doc. 7-1 at 20–35).

Alabama points to two of its state laws: one requiring that public K-12 schools mandate "every multiple occupancy restroom or changing area designated for student use to be used by individuals based on their biological sex," Ala. Code § 16-1-54(b) (2022), and one prohibiting school employees at public or private schools from "[e]ncourag[ing] or coerc[ing] a minor to withhold from the minor's parent or legal guardian the fact that the minor's perception of his or her gender or sex is inconsistent with the minor's sex" or "[w]ithhold[ing] from a minor's parent or legal guardian information related to a minor's perception that his or her gender or sex is

inconsistent with his or her sex," Ala. Code § 26-26-5 (2022). (Doc. 7-1 at 55; doc.

7-3 ¶ 9). Florida points to its "Safety in Private Spaces Act." (Doc. 7-4 ¶ 8; *see* doc.

7-1 at 55). As best the court can determine, that act requires educational institutions

to establish disciplinary procedures for students who willfully enter restrooms or

changing facilities designated for the opposite sex and refuse to leave when asked to

do so by authorized personnel. Fla. Stat. § 553.865(9) (2024).

  To start, it is not clear that Alabama Code § 26-26-5 conflicts with any part of

the Final Rule. That statute prohibits school employees from (1) encouraging a

minor to withhold information about the minor's perception about his or her gender

identity from his or her parents and (2) withholding from a minor's parents

information about the minor's perception about his or her gender identity. Ala. Code

§ 26-26-5. Alabama provides no argument about what part of the Final Rule conflicts

with this statute. (*See* doc. 7-1 at 55).

  Elsewhere in its brief, Plaintiffs maintain that, in response to the proposed

rules, the Department "concede[d] that the rule *can* require such results" thereby

infringing on parental rights. (Doc. 7-1 at 35). But the part of the Final Rule cited

explicitly states that Title IX and the regulations do not displace a parent's right to

act on their child's behalf and that the final regulations do not "prevent[ ] a recipient

from disclosing information about a minor child to their parent who has the legal

right to receive disclosures on behalf of their child" or "restrict[ ] any right of a

parent to act on behalf of a minor child or require[ ] withholding of information about a minor child from their parents." 89 Fed. Reg. at 33,821–22.

Indeed, amended § 106.6(g) provides that "[n]othing in Title IX or this part may be read in derogation of any legal right of a parent, guardian, or other authorized legal representative to act on behalf of a complainant, respondent, or other person, subject to paragraph (e) of this section." 89 Fed. Reg. at 33,885. Amended § 106.6(e) in turn provides that "[t]he obligation to comply with Title IX and this part is not obviated or alleviated by FERPA, 20 U.S.C. 1232g, or its implementing regulations, 34 CFR part 99." *Id.* The court assumes that this is what Plaintiffs rely on, but Plaintiffs have not explained what part of the Final Rule conflicts with FERPA. (*See* doc. 7-1 at 35). Instead, they contend that the Department "decline[d] to opine" on the questions whether parents would lose parental rights. (*Id.* at 35). But the part of the regulations they quote for that proposition was actually "declin[ing] to opine on how § 106.31(a)(2) interacts or conflicts with specific State laws because it would require a fact-specific analysis." 89 Fed. Reg. at 33,822. That declination has nothing to do with any conflict with FERPA or any obligation to withhold information from parents. In short, Plaintiffs have not shown how the Final Rule conflicts with Alabama Code § 26-26-5. As a result, they have not shown any irreparable injury from any such conflict.

The court does, however, agree that Alabama Code § 16-1-54(b) (the bathroom statute) and Florida's Safety in Private Spaces Act appear to conflict with § 106.31(a)(2)'s instruction that preventing a person from participating in a program or activity consistent with the person's gender identity subjects the person to more than a de minimis harm, when considered in connection with § 106.33's permission for public schools to provide sex-separated bathrooms. *See* Ala. Code § 16-1-54(b); Fla. Stat. § 553.865(9); 89 Fed. Reg. at 33,887 (to be codified at 34 C.F.R. § 106.31(a)(2)); 34 C.F.R. § 106.33. The court must therefore address whether that conflict would impose an irreparable injury on Alabama and Florida.

Those States argue that they will be irreparably harmed because some parts of the Final Rule are unlawful and would preempt the state statutes, infringing on state sovereignty. (Doc. 7-1 at 55). In other words, their argument about irreparable injury depends on the success of their merits argument. (*See id.*). This court has already determined that Plaintiffs have not shown a substantial likelihood of success on the merits of their argument that the relevant parts of the Final Rule are unlawful. Accordingly, they also have not shown an irreparable injury from the inability to enforce their own laws based on the enactment of an unlawful regulation.

The court notes that the Department argues that it, not Plaintiffs, would be irreparably harmed by an injunction because it has an interest in administering the Final Rule. (Doc. 24 at 63–64). The Department cites a case about injunctions of

"statutes enacted by representatives of [the] people." (*Id.*) (citing *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers). But the Final Rule is not a statute and congressional representatives did not enact it. Accordingly, the Department's argument is unpersuasive.

But the Department does not have to make persuasive arguments regarding its asserted injury because the burden is on Plaintiffs to show their entitlement to relief, not on the Department to show Plaintiffs' lack of entitlement to relief. *See Siegel*, 234 F.3d at 1176; *see also Canal Auth. of Fla.*, 489 F.2d at 573. And Plaintiffs' arguments regarding irreparable injury fail because these arguments depend on the success on their challenge to the Final Rule. Plaintiffs have not shown that they will suffer an irreparable injury based on any asserted conflict between the Final Rule and state law.

Plaintiffs also challenge the redefinition of "sexual harassment." (Doc. 1 ¶¶ 190–206). The only State that cites a state law conflicting with the Final Rule's definition of "harassment" is Alabama. (*See* doc. 7-1 at 55; doc. 7-1 ¶ 14). Accordingly, Florida, Georgia, and South Carolina have not established an irreparable injury based on any conflict between the Final Rule and state law.

Alabama points to its state law requiring "public institutions of higher learning" to "prohibit harassment in a manner consistent with the definition provided in this chapter, and no more expansively than provided herein." (Doc. 7-2 ¶ 14). The

chapter defines "harassment" as "[e]xpression that is so severe, pervasive, and objectively offensive that it effectively denies access to an educational opportunity or benefit provided by the public institution of higher education." Ala. Code § 16-68-2(4) (2019). The court agrees that § 106.2's definition of sex-based "[h]ostile environment harassment" conflicts with Alabama's definition of "harassment." *Compare id.*, *with* 89 Fed. Reg. at 33,884 (to be codified at 34 C.F.R. § 106.2).

But Alabama's assertion of irreparable harm nevertheless fails. Alabama's only argument is that the rule is unlawful, so allowing it to preempt state laws would inflict an irreparable harm (Doc. 7-1 at 55). But Alabama has not made a showing of substantial likelihood of success on the merits of its challenge to the definition of sex-based "[h]ostile environment harassment." Accordingly, its claim of irreparable injury likewise fails.

### c. Compliance Costs

Next, the States argue that they will suffer immediate irreparable injuries if they incur compliance costs in connection with the Final Rule because they will not be able to recoup those costs when the rules are invalidated. (Doc. 7-1 at 56). They offer no evidence of what the compliance costs will be. (*Id.* at 55–56). Moreover, like their argument about conflicting state laws, their assertion of irreparable injury from the expenditure of compliance costs depends on the argument that the regulation will be held invalid. (*Id.*). But they have not satisfied this court that they

have a substantial likelihood of success on the merits. Accordingly, they have not carried their burden of showing an irreparable injury based on the amorphous compliance costs they contend they will be forced to spend without the possibility of reimbursement.

## VI.   CONCLUSION

For the reasons explained above, the court **DENIES** Plaintiffs' motion for a preliminary injunction.

**DONE** and **ORDERED** this July 30, 2024.

_____
**ANNEMARIE CARNEY AXON**
UNITED STATES DISTRICT JUDGE