# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### FORT WORTH DIVISION

| | |
|---|---|
| CARROLL INDEPENDENT SCHOOL DISTRICT, | |
| *Plaintiff,* | |
| v. | **Case No.** 4:24-cv-00461-O |
| UNITED STATES DEPARTMENT OF EDUCATION; ET AL., | |
| *Defendants.* | |

## PLAINTIFF CARROLL INDEPENDENT SCHOOL DISTRICT'S MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

Table of Authorities ..........................................................................................ii

Introduction .................................................................................................... 1

Statement of Facts .......................................................................................... 1

I.     Title IX promotes opportunities for girls and women while respecting
natural differences between males and females. ........................................ 1

II.    The Department's new Rule undermines Title IX. ...................................... 3

    A.    The Department added a gender-identity mandate. .................................. 3

    B.    The Rule forces recipients to violate First Amendment rights ................... 5

III.   The Rule requires Carroll ISD to adopt harmful and unlawful policies or
forgo federal funding ................................................................................. 6

Legal Standard ............................................................................................... 7

Argument ....................................................................................................... 7

I.     The Rule's gender-identity mandate and de-minimis harm provision
contradict Title IX ..................................................................................... 7

    A.    The Rule's new definition of "sex-based discrimination" in 34 C.F.R.
§ 106.10 is contrary to law, arbitrary, and capricious. ............................ 7

    B.    The Rule's new de-minimis harm provision in 34 C.F.R. § 106.31(a)(2) is
contrary to law, arbitrary, and capricious ............................................... 15

    C.    The Department's justifications are unavailing. ..................................... 22

II.    The Rule's other provisions violate the First Amendment and are arbitrary
and capricious .......................................................................................... 25

    A.    The Rule's definition of hostile-environment harassment violates the
First Amendment. ................................................................................. 25

    B.    The Rule eliminates necessary procedural protections ........................... 29

    C.    The Rule's harassment definition, self-initiation duty, gag-order
mandate, and elimination of the actual knowledge requirement are
arbitrary and capricious. ........................................................................ 30

III.   This Court should vacate the Rule. ............................................................ 32

Conclusion .................................................................................................... 35

Certificate of Service ..................................................................................... 37

i

# TABLE OF AUTHORITIES

## Cases

*A.C. ex rel. M.C. v. Metropolitan School District of Martinsville*,
75 F.4th 760 (7th Cir. 2023 ................................................................. 23

*Adams ex rel. Kasper v. School Board of St. Johns County*,
57 F.4th 791 (11th Cir. 2022) ........................................... 10, 13, 15, 19, 20, 21

*Alabama v. United States Department of Education*,
No. 24-12444 (11th Cir. July 31, 2024), ECF No. 19 ........................................ 1

*Almendarez-Torres v. United States*,
523 U.S. 224 (1998) ........................................................................ 12

*Americans. for Prosperity Foundation v. Bonta*,
594 U.S. 595 (2021) ........................................................................ 25

*Amin v. Mayorkas*,
24 F.4th 383 (5th Cir. 2022) ............................................................... 7

*Arkansas v. Department of Education*,
No. 4:24 CV 636 RWS, 2024 WL 3518588 (E.D. Mo. July 24, 2024) ................ 1

*B.P.J. v. West Virginia State Board of Education*,
550 F. Supp. 3d 347 (S.D. W. Va. 2021) ................................................ 23

*Biden v. Nebraska*,
143 S. Ct. 2355 (2023) ..................................................................... 19

*Bond v. United States*,
572 U.S. 844 (2014) ........................................................................ 18

*Bostock v. Clayton County*,
590 U.S. 644 (2020) ........................................................ 3, 9, 10, 11, 13

*Brannum v. Overton County School Board*,
516 F.3d 489 (6th Cir. 2008) .............................................................. 20

*Career Colleges. & Schools of Texas v. United States Department of Education*,
98 F.4th 220 (5th Cir. 2024) ............................................................... 32

*Chiu v. Plano Independent School District*,
339 F.3d 273 (5th Cir. 2003) .............................................................. 30

*Clark v. Martinez*,
543 U.S. 371 (2005) ........................................................................ 12

*College Republicans at San Fransisco. State University v. Reed,*
    523 F. Supp. 2d 1005 (N.D. Cal. 2007) ............................................................ 31

*D.H. ex rel. A.H. v. Williamson County Board of Education,*
    638 F. Supp. 3d 821 (M.D. Tenn. 2022)............................................................ 20

*Dambrot v. Central Michigan University,*
    55 F.3d 1177  (6th Cir. 1995) .......................................................................... 30

*Data Marketing Partnership, LP v. United States Department of Labor,*
    45 F.4th 846 (5th Cir. 2022). .......................................................................... 32

*Davis ex rel. LaShonda D. v. Monroe County Board of Education,*
    526 U.S. 629 (1999) ................................................................................ 5, 27

*DHS v. Regents of the University of California,*
    591 U.S. 1 (2020) ........................................................................................... 23

*Encino Motorcars, LLC v. Navarro,*
    579 U.S. 211 (2016) ........................................................................................ 15

*Fischer v. United States,*
    144 S. Ct. 2176 (2024) ..................................................................................... 18

*Florida v. United States Department of Health & Human Services,*
    No. 8:24-cv-1080, 2024 WL 3537510 (M.D. Fla. July 3, 2024) ......................... 1

*Franciscan Alliance, Inc. v. Burwell,*
    227 F. Supp. 3d 660 (N.D. Tex. 2016).............................................................. 12

*G.G. ex rel. Grimm v. Gloucester County School Board,*
    822 F.3d 709 (4th Cir. 2016) ........................................................................... 12

*Gregory v. Ashcroft,*
    501 U.S. 452 (1991) ................................................................................ 13, 19

*Grimm v. Gloucester County School Board,*
    972 F.3d 586 (4th Cir. 2020) ........................................................................... 23

*Janus v. American Federation of State, County & Municipal Employees,*
    585 U.S. 878 (2018) ........................................................................................ 25

*K Mart Corp. v. Cartier, Inc.,*
    486 U.S. 281  (1988) ....................................................................................... 33

*Kansas v. Department of Education,*
    No. 5:24-cv-04041-JWB, 2024 WL 3273285 (D. Kan. July 2, 2024)................. 1

iii

*King v. Burwell,*
    576 U.S. 473 (2015) ........................................................................ 13

*L.W. ex rel. Williams v. Skrmetti,*
    83 F.4th 460 (6th Cir. 2023) ......................................................... 15

*Loper Bright Enterprises v. Raimondo,*
    144 S. Ct. 2244 (2024) .................................................................. 17

*Louisiana v. Department of Education,*
    No. 3-23-CV-00563, 2024 WL 2978786 (W.D. La. June 13, 2024) ............. 1, 28

*Louisiana v. Department of Education,*
    No. 24-30399, 2024 WL 345288 (5th Cir. July 17, 2024) ................ 1, 33, 34, 35

*M.K. ex rel. Koepp v. Pearl River County School District,*
    No. 1:22-cv-25-HSO-BWR, 2023 WL 8851661 (S.D. Miss. Dec. 21, 2023) ........ 8

*Mahanoy Area School District. v. B.L. ex rel. Levy,*
    594 U.S. 180 (2021) ................................................................. 25, 28

*Mayor of Baltimore v. Azar,*
    973 F.3d 258 (4th Cir. 2020) ......................................................... 33

*Meriwether v. Hartop,*
    992 F.3d 492 (6th Cir. 2021) ..................................................... 25, 26

*Minnesota v. Mille Lacs Band of Chippewa Indians,*
    526 U.S. 172 (1999) ...................................................................... 35

*Motor Vehicle Manufacturers Association v. State Farm Auto Mutual*
    *Insurance Co.,*
    463 U.S. 29 (1983) .................................................................. 14, 15

*Muldrow v. City of St. Louis,*
    144 S. Ct. 967 (2024) .................................................................... 17

*Nasdaq Stock Market LLC v. SEC,*
    38 F.4th 1126  (D.C. Cir. 2022) ...................................................... 33

*National Federation of Independent Business v. Sebelius,*
    567 U.S. 519  (2012) ..................................................................... 14

*Neal v. Board of Trustees of California State Universities,*
    198 F.3d 763 (9th Cir. 1999) .......................................................... 17

*Neese v. Becerra,*
    640 F. Supp. 3d 668 (N.D. Tex. 2022)............................................................ 10

*North Haven Board of Education v. Bell,*
    456 U.S. 512 (1982) ....................................................................................... 3

*Ohio v. EPA,*
    144 S. Ct. 2040 (2024) ........................................................................... 22, 34

*Pennhurst State School & Hospital  v. Halderman,*
    451 U.S. 1 (1981) ......................................................................................... 13

*Perlot v. Green,*
    609 F. Supp. 3d 1106 (D. Idaho 2022) ........................................................ 29

*Sackett v. EPA,*
    598 U.S. 651 (2023) ..................................................................................... 12

*Saxe v. State College Area School District,*
    240 F.3d 200 (3d Cir. 2001) ........................................................................ 28

*Service Employees International Union, Local 5 v. City of Houston,*
    595 F.3d 588 (5th Cir. 2010) ....................................................................... 28

*Speech First, Inc. v. Cartwright,*
    32 F.4th 1110 (11th Cir. 2022) .................................................................... 28

*Speech First, Inc. v. Khator,*
    603 F. Supp. 3d 480 (S.D. Tex. 2022) ........................................................ 28

*Stollings v. Texas Tech University,*
    No. 5:20-CV-250-H, 2021 WL 3748964 (N.D. Tex. Aug. 25, 2021)................. 11

*Tennessee v. Becerra,*
    No. 1:24-cv-161-LG-BWR, 2024 WL 3283887 (S.D. Miss. July 3, 2024)........... 1

*Tennessee v. Cardona,*
    No. 2:24-cv-072-DCR, 2024 WL 3631032 (E.D. Ky. July 10, 2024) ................ 8, 12

*Tennessee v. Cardona,*
    No. 2:24-cv-072-DCR, 2024 WL 3019146
    (E.D. Ky. June 17, 2024) ........................................... 1, 2, 14–16, 18, 22, 26–28

*Tennessee v. Cardona,*
    No. 24-5588, 2024 WL 3453880 (6th Cir. July 17, 2024)............. 1, 8, 13, 22, 34

*Tennessee v. Department of Education,*
104 F.4th 577 (6th Cir. 2024) ........................................................ 34

*Texas Medical Association v. United States Department of Health & Human Services,*
No. 23-40217, 2024 WL 3633795 (5th Cir. Aug. 2, 2024) ............................... 32

*Texas v. Becerra,*
No. 6:24-cv-211-JDK, 2024 WL 3297147 (E.D. Tex. July 3, 2024).................... 1

*Texas v. Cardona,*
No. 4:23-CV-00604-O, 2024 WL 3658767
(N.D. Tex. Aug. 5, 2024)..............1, 2, 7–9, 11–13, 15, 19, 20, 22, 23, 26, 32, 35

*Texas v. EEOC,*
633 F. Supp. 3d 824 (N.D. Tex. 2022).......................................................... 11

*Texas v. United States,*
2:24-cv-00086-Z, 2024 WL 3405342 (N.D. Tex. July 11, 2024) ........................ 1

*Texas v. United States,*
40 F.4th 205 (5th Cir. 2022) ........................................................................ 33

*Texas v. United States,*
691 F. Supp. 3d 763 (S.D. Tex. 2023) .......................................................... 33

*Texas Workforce Commission v. United States Department of Education,*
973 F.3d 383 (5th Cir. 2020)........................................................................ 17

*Tinker v. Des Moines Independent Community School District,*
393 U.S. 503 (1969) .................................................................................. 25

*United States v. Booker,*
543 U.S. 220 (2005).................................................................................. 35

*United States v. Virginia,*
518 U.S. 515 (1996) ........................................................................... 2, 15, 20

*West Virginia v. EPA,*
597 U.S. 697 (2022) .................................................................................. 19

*Wood v. Florida Department of Education,*
No. 4:23-cv-00526, 2024 WL 3380723 (N.D. Fla. June 27, 2024).................... 27

*Wooley v. Maynard,*
430 U.S. 705 (1977) .................................................................................. 26

**Statutes**

5 U.S.C. § 706(2) ................................................................................................ 7

20 U.S.C. § 1681................................................................................................ 2, 17

20 U.S.C. § 1681(a) .................................................................................. 2, 5, 8, 10

20 U.S.C. § 1682................................................................................................... 17

20 U.S.C. § 1686................................................................................................... 13

42 U.S.C. § 2000e–2(a)(1) ..................................................................................... 9

Educational Amendments of 1972, Pub. L. 92–318, § 901, 86 Stat. 373 (June 23, 1972) ................................................................................................................. 2

Educational Amendments of 1974, Pub. L. 93-380 (H.R. 69), § 844, 88 Stat. 484 (Aug. 21, 1974) ................................................................................................. 3

Tex. Educ. Code § 33.0834 .................................................................................... 6

 **Rules and Regulations**

34 C.F.R. § 106.31(c) .......................................................................................... 10

34 C.F.R. § 106.32(a) ............................................................................................ 4

34 C.F.R. § 106.32(b)(ii) ..................................................................................... 10

34 C.F.R. § 106.32(c)(2) ..................................................................................... 10

34 C.F.R. § 106.33.......................................................................................... 4, 13

34 C.F.R. § 106.34(b)(2) ..................................................................................... 10

34 C.F.R. § 106.37(c) .......................................................................................... 10

34 C.F.R. § 106.41(b) ...................................................................................... 5, 11

34 C.F.R. § 106.41(c) .......................................................................................... 11

34 C.F.R. §§ 106.44(b) .......................................................................................... 6

34 C.F.R. § 106.45(b)(5)(iii) ................................................................................. 6

40 Fed. Reg. 24,128 (June 4, 1975) ...................................................................... 3

85 Fed. Reg. 30,026 (May 19, 2020) ................................................................ 27, 30, 31

87 Fed. Reg. 41,390 (July 12, 2022) ............................................................................ 11

89 Fed. Reg. 33,474 (April 29, 2024) ..............3–9, 11, 14–18, 20–26, 28–30, 32, 34, 35

Fed. R. Civ. P. 56 ........................................................................................................ 7

## **Other Authorities**

117 Cong. Rec. 30,407 (1971) (Sen. Bayh) .................................................................. 2

118 Cong. Rec. 5807 (1972) (Sen. Bayh) ..................................................................... 2

Amended Complaint, *Doe v. Univ. of Idaho*, No. 1:23-cv-00409-AKB
    (D. Idaho Dec. 29, 2023) ...................................................................................... 29

Antonin Scalia & Bryan A. Garner,
    *Reading Law: The Interpretation of Legal Texts* (2012) .................................... 17

Brief for the United States as Amicus Curiae in Support of Plaintiff-Appellant and
    Urging Reversal, *B.P.J. v. West Virginia. State Board of Education*, 98 F.4th
    541 (4th Cir. 2024) (Nos. 23-1078(L), 23-1130), 2023 WL 2859726 .......... 23, 24

John F. Manning, *The Absurdity Doctrine*,
    116 Harv. L. Rev. 2387 (2003) .......................................................................... 18

John F. Manning, *What Divides Textualists from Purposivists?*,
    106 Colum. L. Rev. 70 (2006) ............................................................................ 18

Samuel L. Bray,
    *The Mischief Rule*, 109 Geo. L.J. 967 (2021) .................................................... 17

## INTRODUCTION

In April 2024, the Department of Education sidestepped Congress and issued a sweeping new Title IX rule that tried to reshape America's educational system to reflect the Department's gender ideology. Since then, this Court rejected the Rule's core logic by vacating the Department's Title IX guidance documents; this Court and six others enjoined enforcement of the Rule; two appellate courts affirmed the scope of those injunctions; and three other courts rejected the Rule's unlawful Title IX interpretation when applied to Section 1557 of the Affordable Care Act.[1] All these courts got it right. This Court should now follow its prior decision and vacate the Department's unlawful Title IX rule, protecting the privacy and First Amendment rights of students and teachers across the country.

## STATEMENT OF FACTS

**I.    Title IX promotes opportunities for girls and women while respecting natural differences between males and females.**

In 1972, Congress enacted Title IX, which forbids education programs receiving federal financial assistance from discriminating "on the basis of sex."

---

[1] *Texas v. Cardona*, No. 4:23-CV-00604-O, 2024 WL 3658767, at *37 (N.D. Tex. Aug. 5, 2024) (*Texas*); Order, ECF No. 43 at 14; *Louisiana v. Dep't of Educ.*, No. 3-23-CV-00563, 2024 WL 2978786, at *21 (W.D. La. June 13, 2024) (*Louisiana I*), *stay denied* No. 24-30399, 2024 WL 3452887, at *2–3 (5th Cir. July 17, 2024) (*Louisiana II*); *Tennessee v. Cardona*, No. 2:24-cv-072-DCR, 2024 WL 3019146, at *44 (E.D. Ky. June 17, 2024) (*Tennessee I*), *stay denied* No. 24-5588, 2024 WL 3453880 (6th Cir. July 17, 2024) (*Tennessee III*); *Texas v. United States*, 2:24-cv-00086-Z, 2024 WL 3405342, at *16 (N.D. Tex. July 11, 2024); *Kansas v. Dep't of Educ.*, No. 5:24-cv-04041-JWB, 2024 WL 3273285, at *21 (D. Kan. July 2, 2024); *Alabama v. U.S. Dep't of Educ.*, No. 24-12444 (11th Cir. July 31, 2024), ECF No. 19 (issuing administrative injunction pending appeal); *Arkansas v. Dep't of Educ.*, No. 4:24 CV 636 RWS, 2024 WL 3518588, at *1 (E.D. Mo. July 24, 2024); *Florida v. U.S. Dep't of Health & Human Servs.*, No. 8:24-cv-1080, 2024 WL 3537510, at *20–21 (M.D. Fla. July 3, 2024); *Tennessee v. Becerra*, No. 1:24-cv-161-LG-BWR, 2024 WL 3283887, at *14 (S.D. Miss. July 3, 2024); *Texas v. Becerra*, No. 6:24-cv-211-JDK, 2024 WL 3297147, at *12 (E.D. Tex. July 3, 2024).

Educ. Amends. of 1972, Pub. L. 92-318, § 901, 86 Stat. 373 (June 23, 1972) (now codified at 20 U.S.C. § 1681 *et seq.*). Congress did so after "years of intense legislative debate premised on the fixed biological dichotomy between males and females." *Tennessee I*, 2024 WL 3019146, at *3.

In its five decades, Title IX has produced striking results. In 1970, only 66% of working women had high-school diplomas; in 2016, it was 94%.[2] In 1972, only 7% of high-school varsity athletes were women; by 2018, it was 43%.[3] Girls and women now benefit from opportunities to pursue advanced education, attend college, and develop skills associated with competitive athletics.

Title IX achieves its nondiscrimination mandate by recognizing the "enduring" "differences between men and women." *United States v. Virginia*, 518 U.S. 515, 533 (1996) (*VMI*). The statute does not "requir[e] integration of dormitories between the sexes" or mandate co-ed locker rooms or football teams. 117 Cong. Rec. 30,407 (1971) (Sen. Bayh). The statute repeatedly describes sex in biological and binary terms. It permits schools to go from admitting "students of one sex" to "students of both sexes." 20 U.S.C. § 1681(a)(2). It preserves "father-son or mother-daughter activities," while requiring that "if such activities are provided for students of one sex, opportunities for reasonably comparable activities shall be provided for students of the other sex." *Id.* § 1681(a)(8). And the Department and courts must construe Title IX to allow "separate living facilities for the different sexes." *Id.* § 1686. This construction rule requires respect for "personal privacy." 118 Cong. Rec. 5807 (1972) (Sen. Bayh). In short, "sex" in 1972 meant male or female. *Texas*, 2024 WL 3658767, at *30.

---

[2] U.S. Bureau of Labor Statistics, *A look at women's education and earnings since the 1970s*, TED: The Economics Daily (Dec. 27, 2017), https://perma.cc/B2C8-47QB.
[3] Women's Sports Found., 50 Years of Title IX at 12 (May 2022), https://perma.cc/TN74-PJ4S.

The first regulations promulgated under Title IX recognized that biological binary. In 1974, Congress passed the Javits Amendment, which directed the Department's predecessor to issue rules "implementing the provisions of Title IX," including "reasonable provisions considering the nature of particular sports." Educ. Amends. of 1974, Pub. L. 93-380 (H.R. 69), § 844, 88 Stat. 484 (Aug. 21, 1974). The resulting 1975 regulations "required" schools "to provide separate teams for men and women in situations where the provision of only one team would not 'accommodate the interests and abilities of members of both sexes.'" Nondiscrimination on the Basis of Sex, 40 Fed. Reg. 24,128, 24,134 (June 4, 1975). After six days of hearings on whether the rules were "consistent with the law" and its intent, Congress allowed the regulations to take effect. *N. Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 531–32 (1982).

## II.   The Department's new Rule undermines Title IX.

Now, the Department says Title IX also covers gender-identity and sex-stereotype discrimination, citing *Bostock v. Clayton County*, 590 U.S. 644 (2020), as justification. Nondiscrimination on the Basis of Sex in Ed. Programs or Activities Receiving Fed. Fin. Assistance, 89 Fed. Reg. 33,474 (April 29, 2024). The new Rule attempts to graft a gender-identity mandate onto Title IX while silencing those who disagree with its gender ideology.

### A.   The Department added a gender-identity mandate.

The Rule imposes a gender-identity mandate through two key provisions. *First*, it expands "[d]iscrimination on the basis of sex" to "include[ ] discrimination on the basis of sex stereotypes … and gender identity." 89 Fed. Reg. at 33,886 (to be codified at 34 C.F.R. § 106.10). "[S]ex discrimination," the Department says, is "any discrimination that depends" even "in part on consideration of a person's sex." *Id.* at 33,803. So Title IX applies to any consideration of gender identity because that "necessarily involves consideration of a person's sex, even if [the word "sex"] is

understood to mean only physiological or 'biological distinctions between male and female,' as the Supreme Court assumed in *Bostock*." *Id.* at 33,802 (citation omitted).

*Second*, the Rule creates a new form of sex-based discrimination applicable only to gender identity. 89 Fed. Reg. at 89,887 (to be codified at 34 C.F.R. § 106.31(a)(2)); *accord* Order 10 ("[U]nder the Final Rule, gender identity is the most salient consideration (over biological sex) for differentiating permissible from impermissible sex separation."). To do so, the Department crafted a new "de minimis harm" standard that permits certain sex distinctions so long as they do not cause more than de minimis harm. 89 Fed. Reg. at 33,887 (to be codified at 34 C.F.R. § 106.31(a)(2)).

On first read, the first sentence of § 106.31(a)(2) might seem evenhanded, and the Department claims this provision "protects all students from harm when a recipient separates or treats students differently based on sex." 89 Fed. Reg. at 33,820. But the new form of discrimination is ideological. The final sentence reveals what is really at stake: the only sex distinctions that cause harm are those that "prevent[] a person from participating … consistent with the person's gender identity." *Id.* Lest there be any doubt about who can claim this new form of discrimination, the Department has emphasized that § 106.31(a)(2) does not "kick in" unless the alleged harm is "based on gender identity." MPI Tr. 89:21–24.

To account for Title IX's numerous provisions *allowing* consideration of sex and distinctions based on sex, however, the Rule carves out specific exceptions from § 106.31(a)(2)'s new form of discrimination. So—notwithstanding the Department's view that such distinctions cause "more than de minimis harm" to some protected students, the new form of sex discrimination cannot be invoked for sex-specific "living facilities"—understood to mean only "housing," 34 C.F.R. § 106.32(a), not locker rooms and showers, *id.* § 106.33; traditional sex-specific programs like

4

sororities and fraternities, girl and boy scouts, and Girls State and Boys State conferences, 20 U.S.C. § 1681(a)(1)–(9); and "separate [athletics] teams for members of each sex," 34 C.F.R. § 106.41(b). In these instances, even the Department had to recognize that the statute allows distinctions based on biology, not gender identity.

###### B.     The Rule forces recipients to violate First Amendment rights.

The Rule requires recipients to "promptly and effectively end any sex discrimination"—under its new definition. 89 Fed. Reg. at 33,889 (34 C.F.R. § 106.44(f)(1)). It eliminates the actual knowledge or deliberate indifference requirement triggering a recipient's duty to respond to allegations of discrimination. *Id.* And in addition to expanding the definition of sex discrimination through its gender-identity mandate, the Rule broadens the standard for hostile-environment harassment. The Rule further allows the Title IX coordinator to self-initiate a grievance complaint and requires recipients to issue gag orders during grievance proceedings.

The Rule imposes a "broader standard" for hostile-environment claims. 89 Fed. Reg. at 33,498. Prohibited harassment now need only be severe *or* pervasive. Complainants need not "demonstrate any particular harm," or show the conduct denied them access to the educational program. *Id.* at 33,511. Harassment can be anything students deem "unwelcome" or that "limits" students' access to a benefit. *Id.* at 33,884 (to be codified at 34 C.F.R. § 106.2). The Department admits that this standard is "broader" than the Supreme Court's Title IX interpretation in *Davis ex rel. LaShonda D. v. Monroe County Board of Education*, 526 U.S. 629, 641 (1999). *Id.* at 33,498. That makes it independently unlawful. And when combined with § 106.10, § 106.2 now requires students and staff to endorse gender-identity ideology by using pronouns based on gender identity (not sex) and by restricting speech saying sex is a binary concept. *See id.* at 33,516.

The Rule also eliminates two key procedural protections necessary to protect First Amendment freedoms. The current regulations require a "formal complaint" to initiate the grievance process and prohibit recipients from "restrict[ing] the ability of either party to discuss the allegations under investigation." 34 C.F.R. §§ 106.44(b), 106.45(b)(5)(iii). But now, a Title IX coordinator can initiate a grievance process even in "the absence of a complaint or [after] the withdrawal of any or all of the allegations in a complaint." 89 Fed. Reg. at 33,889 (34 C.F.R. § 106.44(f)(1)(v)). For that grievance process, the Rule imposes a gag-order requirement demanding that recipients "take reasonable steps to protect the privacy of the parties and witnesses." 89 Fed. Reg. at 33,891 (34 C.F.R. § 106.45(b)(5)).

## III.   The Rule requires Carroll ISD to adopt harmful and unlawful policies or forgo federal funding.

Carroll ISD seeks to promote the safety and flourishing of its 8,100 students in pre-K through twelfth grade at 11 school campuses. MSJ App.2. Its policies protect students by designating restrooms, locker rooms, and shower facilities for each sex (Policy 3.19) and allowing students and employees to avoid using pronouns inconsistent with sex (Policy 6.9). App.2–3. Consistent with Texas law, Carroll protects girls' sports by keeping them designated for females. App.3–4; *see* Tex. Educ. Code § 33.0834.

Complying with the gender-identity mandate would force Carroll to amend or repeal its policies and violate state law. Males could enter the girls' locker rooms—exposed spaces with little individual privacy—and the girls' showers. App.4–5. The district would have to open girls' sports teams to males, which not only puts girls at an inherent disadvantage, but also threatens their physical safety. App.3–4. But if Carroll allowed males to play on girls' teams, it would violate Texas law and its students couldn't compete in statewide competitions.

App.3. Moreover, the broadened definition of sex-based harassment would violate students' and staff's First Amendment rights by requiring gender-identity-based pronouns and other speech endorsing the Department's views. App.6. But failing to change its policies and practices would force Carroll to forgo $1.8 million in annual federal funding. App.6. Losing eligibility for this funding would cause significant financial harm. App.7.

## LEGAL STANDARD

The Court "shall grant summary judgment" when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. "Disputes arising under the APA are commonly resolved on summary judgment, where district courts sit as an appellate tribunal to decide legal questions on the basis of the administrative record." *Texas*, 2024 WL 3658767, at \*27 (citing *Amin v. Mayorkas*, 24 F.4th 383, 391 (5th Cir. 2022)).

The "APA requires the district court to 'hold unlawful and set aside agency action'" that is "contrary to [law]" or "arbitrary" or "capricious." *Id.* (quoting 5 U.S.C. § 706(2)). Here, the Rule is both contrary to law and arbitrary and capricious because it contradicts Title IX and violates the First Amendment and the fundamental right to bodily privacy. Thus, this Court should vacate the Rule and enjoin its enforcement.

## ARGUMENT

**I.    The Rule's gender-identity mandate and de-minimis harm provision contradict Title IX.**

**A.    The Rule's new definition of "sex-based discrimination" in 34 C.F.R. § 106.10 is contrary to law, arbitrary, and capricious.**

**1.** While the Rule assumes that "sex" means biological differences, it refuses to define the term. 89 Fed. Reg. at 33,802; *accord* MPI Tr. 54–56 (Department declined to define "sex"). That alone makes the Rule arbitrary and capricious. As this Court has explained, in "1972, 'sex' carried an unambiguously binary

meaning"—"a person's biological sex—that is, either male or female—which is an immutable characteristic determined solely at birth." *Texas*, 2024 WL 3658767, at *30 (cleaned up). Numerous other courts agree. *See supra* n.1.

Yet the Rule declares that "[d]iscrimination on the basis of sex includes discrimination on the basis of sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, and gender identity." 89 Fed. Reg. at 33,886 (to be codified at 34 C.F.R. § 106.10). To justify this new definition, the Department contends that "on the basis of sex" means the same thing as "because of such individual's … sex," so *Bostock*'s logic must apply to Title IX. MPI Opp. 7–8, ECF No. 29; *see* 89 Fed. Reg. at 33,807; *see also id.* at 33,803 ("[T]he bases in § 106.10 [are] examples to clarify the scope of Title IX's coverage of sex discrimination, which includes any discrimination that depends in part on consideration of a person's sex."). But as this Court has recognized—along with numerous others—*Bostock*'s logic applies to Title VII and not Title IX. *Texas*, 2024 WL 3658767, at *37. That is correct for two main reasons.

*First,* "the statutes use materially different language." *Tennessee III*, 2024 WL 3453880, at *3. While Title VII forbids discrimination "because of such individual's" sex, Title IX says "no person" shall be subject to discrimination "on the basis of sex." 20 U.S.C. § 1681(a). This general language differs from Title VII's focus on hiring or firing "an employee." *Texas*, 2024 WL 3658767, at *37. Other courts have noted similar textual distinctions. *See Tennessee v. Cardona*, No. 2:24-cv-072-DCR, 2024 WL 3631032, at *4 (E.D. Ky. July 10, 2024) (*Tennessee II*) ("Title VII's prohibition is victim-centric, whereas Title IX's makes a broad categorical distinction."); *M.K. ex rel. Koepp v. Pearl River Cnty. Sch. Dist.*, No. 1:22-cv-25-HSO-BWR, 2023 WL 8851661, at *8 (S.D. Miss. Dec. 21, 2023) (indefinite article "'the'—indicates that *the* basis of the discrimination [in Title IX] must be the student's sex.").

8

Title IX forbids sex-based discrimination in "any education program" (like classrooms and sports), whereas Title VII forbids discrimination directed against any individual based on *various traits* "with respect to … employment." *Bostock*, 590 U.S. at 658 (quoting 42 U.S.C. § 2000e–2(a)(1)). So Title IX's text contemplates unique aspects of sex-based distinctions in unique educational spaces (such as sports). *Texas*, 2024 WL 3658767, at *37. In contrast, Title VII treats an individual's sex in employment like race and religion, where none of these factors are "relevant." *Bostock*, 590 U.S. at 660.

The textual differences don't stop there. Title IX includes a construction rule that forecloses applying *Bostock* to Title IX. 20 U.S.C. § 1686 (Title IX's antidiscrimination rule cannot "be construed" to prohibit "maintaining separate living facilities for the different sexes"). Even the Department recognizes it cannot impose its gender-identity mandate on school "housing." *See* 89 Fed. Reg. at 33,821 (recognizing the Rule's gender-identity mandate cannot apply to "living facilities" or the "the Department's housing provision at [34 C.F.R.] § 106.32(b)(1)"). But this construction rule does not exempt living facilities from § 1681(a)'s anti-discrimination mandate; the construction rule clarifies the meaning and scope of that mandate: § 1681(a) allows sex distinctions to protect student privacy.

Finally, § 106.10 does not merely explain what the Department understands "sex" to mean, it defines "sex-based discrimination." *Contra* 89 Fed. Reg. at 33,803. That is the central prohibition of Title IX. Redefining Title IX's core rule by referencing additional attributes contradicts the statute. *See* Order 6 ("[E]ven if sex is not formally redefined, it is functionally redefined based on gender identity."). It would prohibit schools "from installing or enforcing the otherwise permissible sex-based carve-outs," like "toilet, locker room, and shower facilities" under 34 C.F.R. § 106.33, "when the carve-outs come into conflict with a transgender person's gender identity." *Adams ex rel. Kasper v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791,

814 (11th Cir. 2022) (en banc). This impermissible reading would "establish dual protection under Title IX based on *both* sex and gender identity when gender identity does not match sex." *Id.* That is inconsistent with the statute Congress enacted.

*Second*, Title IX often applies to the two sexes as groups in recognition that boys and girls are not similarly situated in many circumstances at school. Unlike *Bostock*'s Title VII assessment, Title IX *does* operate by "ensur[ing] equal treatment between groups of men and women," *Bostock*, 590 U.S. at 671, or, put differently, "achiev[ing] classwide equality between the sexes," *id.* at 664.

In provision after provision, Title IX and longstanding regulations allow schools to "treat[] males and females comparably as groups." *Id.* at 665 (rejecting this reading of Title VII); *accord Neese v. Becerra*, 640 F. Supp. 3d 668, 680 (N.D. Tex. 2022). The statute exempts "father-son or mother-daughter activities" so long as "opportunities for reasonably comparable activities [are] provided for students of the other sex." 20 U.S.C. § 1681(a)(8). Schools "may provide separate housing on the basis of sex," but the housing for each sex must be "[c]omparable in quality and cost to the student." 34 C.F.R. § 106.32(b)(ii); *see also id.* § 106.32(c)(2) (similar). "[T]oilet, locker room, and shower facilities" must likewise be comparable as between the two sexes. 34 C.F.R. § 106.33. The list goes on. *See, e.g.*, *id.* at § 106.31(c) (school assisting with foreign scholarships available to only one sex must "make[ ] available reasonable opportunities for similar studies for members of the other sex"); *id.* at § 106.34(b)(2) (when school provides permissible "single-sex class or extracurricular activity," it "may be required to provide a substantially equal [opportunity] for students of the excluded sex"); *id.* § 106.37(c) (athletic scholarships require "reasonable opportunities … for members of each sex in proportion to the number of students of each sex participating"). And, importantly, schools must "provide equal athletic opportunity for members of both sexes," *id.*

§ 106.41(c), but need not provide the same sports or teams to boys and girls, *id.* § 106.41(b).

Even the Rule recognizes this difference sometimes, allowing the Department to issue athletic regulations that deprive students of opportunities based on sex if "the regulations are otherwise reasonable and require a recipient to provide equal athletics opportunities in its program as a whole." Nondiscrimination on the Basis of Sex in Ed. Programs or Activities Receiving Fed. Fin. Assistance, 87 Fed. Reg. 41,390, 41,538 (July 12, 2022); *see* 89 Fed. Reg. at 33,818 (adopting this rationale); *cf.* 87 Fed. Reg. at 41,462 (evaluating Title IX complaints frequently involves "analysis of available data and information" pertaining to "equal opportunity" for males and females as groups). The Rule distinguishes athletics because prior regulations "have always permitted" such sex distinctions based on "unique considerations." 89 Fed. Reg. at 33,819. But even longstanding regulations cannot alter Title IX's text. If Title IX itself does not allow these sex-based distinctions on a group basis, an agency could not permit them.

But Title IX *does* allow such distinctions: the athletics regulations (like the others adopted in 1975) show that Title IX is not blind to sex. *See Texas*, 2024 WL 3658767, at *33, 37, 42. Unlike *Bostock*'s understanding of Title VII, Title IX calls for schools to sometimes "treat[ ] males and females comparably as groups," 590 U.S. at 665, when it comes to matters of privacy and physical differences.

**2.** Even if *Bostock*'s but-for-causation rationale applies to Title IX, the Rule goes too far in defining "sex-based discrimination" to include considerations like "sex stereotypes," "gender identity" and "sex characteristics." This Court and others have recognized that *Bostock* did not create any new protected classes. *Texas v. EEOC*, 633 F. Supp. 3d 824, 831 (N.D. Tex. 2022); *Stollings v. Tex. Tech Univ.*, No. 5:20-CV-250-H, 2021 WL 3748964, at *10 (N.D. Tex. Aug. 25, 2021); *accord* MPI

11

Tr. 90; *Texas*, 2024 WL 3658767, at *31 ("As the text makes plain, sexual orientation and gender identity are statuses," not protected classes).

But the Rule's new definition does just that, elevating "gender identity" and other characteristics to protected-class status under Title IX. "By preceding these new classifications with 'on the basis of,' a plain reading of § 106.10 coupled with the Department's *Bostock* interpretation would necessarily lead to the conclusion that Title IX also prohibits all things 'inextricably bound up' with sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, and gender identity.'" *Tennessee II*, 2024 WL 3631032, at *5.[4] By elevating gender identity to the same level as sex, the Rule tries to create a new protected class. That is contrary to law even under *Bostock*.

**3.** Title IX is clear, but the Rule would fail even if Title IX were ambiguous. When "competing plausible interpretations" exist, *Clark v. Martinez*, 543 U.S. 371, 381 (2005), courts should construe a statute "to avoid not only the conclusion that it is unconstitutional but also grave doubts upon that score," *Almendarez-Torres v. United States*, 523 U.S. 224, 237 (1998) (cleaned up). And Congress must use "exceedingly clear language if it wishes to significantly alter the balance between federal and state power." *Sackett v. EPA*, 598 U.S. 651, 679 (2023) (cleaned up). When Congress enacts statutes based on its spending power, it "must speak with a

---

[4] The Department has been trying to create this new class for nearly a decade. *See, e.g.*, *2016 Dear Colleague Letter on Title IX and Transgender Students* 2, U.S. Dep'ts of Educ. & Justice (May 13, 2016), perma.cc/2VTQ-RUYP (declaring Department will "treat a student's gender identity as the student's sex."); *G.G. ex rel. Grimm v. Gloucester Cnty. Sch. Bd.*, 822 F.3d 709, 719–23 (4th Cir. 2016) (adopting *Auer* deference at the federal government's request based on claimed ambiguity in "how a school should determine whether a transgender individual is a male or female."); *see also Franciscan All., Inc. v. Burwell*, 227 F. Supp. 3d 660, 687 (N.D. Tex. 2016).

clear voice before it imposes new mandates on the States." *Tennessee III*, 2024 WL 3453880, at *3.[5]

The Rule's gender-identity mandate is not "unmistakably clear in the language of [Title IX]." *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991) (cleaned up). In 1972, no one understood "discrimination on the basis of sex" to require schools to ignore sex in favor of gender identity. *See Adams*, 57 F.4th at 815. Indeed, both Title IX's rule of construction and longstanding regulations have recognized sex-specific privacy interests for fifty years. 20 U.S.C. § 1686; *e.g.*, 34 C.F.R. § 106.33.

This, too, distinguishes *Bostock,* which did not confront the clear-statement rule or the major-questions doctrine because *Bostock* did not involve spending-clause legislation or agency action. To impose conditions under the Spending Clause, Congress must speak "unambiguously" with "a clear voice" to give funding recipients notice of their obligations. *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981). And under the major-questions doctrine, courts should not assume Congress delegated questions of "deep economic and political significance" unless done so expressly. *King v. Burwell*, 576 U.S. 473, 486 (2015) (cleaned up). The *Bostock* Court itself admitted "many, maybe most, applications of Title VII's sex provision were 'unanticipated' at the time of the law's adoption." *Bostock*, 590 U.S. at 679; *see id.* at 649 ("unexpected consequences"), 660 (calling its holding "momentous"). As this Court has ruled, "*Bostock*'s holding cannot be reconciled with an argument that Congress spoke clearly on this 'unexpected' condition Defendants ask the Court to read into Title IX." *Texas*, 2024 WL 3658767, at *42.

The Rule also exceeds Congress's spending power, which occurs when "pressure turns into compulsion." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S.

---

[5] Relatedly, Congress could not have intended to delegate the important question about the meaning of sex discrimination to unelected bureaucrats. So the Department's reading of Title IX also violates the major-questions doctrine.

519, 577–78 (2012) (*NFIB*) (opinion of Roberts, C.J.) (cleaned up). Compulsion characterizes the Rule, which leaves "no real option but to acquiesce" to the federal government's policy. *Id.* at 582. Schools must adopt the Rule's new gender-identity mandate or sacrifice all federal funds—here, $1.8 million annually. App.6. The Rule is all the more coercive because states and school districts like Carroll must upend "intricate statutory and administrative regimes [implemented] over the course of many decades." *NFIB*, 567 U.S. at 581.[6] Requiring schools nationwide to give up all federal funding is a "gun to the head." *Id.*

**4.** The Rule's expanded definition of sex-based discrimination is also arbitrary and capricious. Agency action is arbitrary and capricious if "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mf'rs Ass'n v. State Farm Auto Mut. Ins. Co.*, 463 U.S. 29, 43 (1983). "[I]t is arbitrary to rely on *Bostock*'s reasoning as a source of support for upending" the meaning of "on the basis of sex" "when the text, structure, purpose, and history of the statutes vary considerably." *Tennessee I*, 2024 WL 3019146, at *32.

The Department tries to counter that *Bostock* and its but-for-causation test only identify bases of discrimination, MPI Opp. 6, not (in the Rule's words) "'forms' of sex discrimination … like pay inequity, … sex-based harassment, or treating a person inconsistent with their gender identity," 89 Fed. Reg. at 33,802–03. But the Department wants *Bostock* to control applications too, requiring gender identity to

---

[6] The Association of Title IX Administrators estimated that recipients would have to change 60–70% of their existing Title IX policies and practices to comply with the Rule. Brett A. Sokolow, *Title IX—You've Never Had a Regs Implementation Like This Before*, https://perma.cc/6N59-BN9P.

determine access to bathrooms, locker rooms, and sports teams. The Department can't have it both ways. If the Department has changed its mind about how *Bostock* applies to Title IX, it must say so and explain why. *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016) (agency must "display awareness that it is changing position"). Failure to do so is "arbitrary and capricious." *See id.* at 222.

Similarly, the Department acts arbitrarily by denying § 106.10's effect on sex-specific private spaces and athletics. That "entirely fail[s] to consider [these] important aspect[s] of the problem[.]" *State Farm*, 463 U.S. at 43. The Rule admits that the Title IX athletic *regulations* require equal treatment for groups, but the Rule never explains why it elsewhere demands sex-blindness for individuals. Nor does the Rule acknowledge the many other provisions that focus on group equality. Regulated parties like Carroll ISD must square the circle about why or how *Bostock* can be transplanted into Title IX. That lacks reason.

*Finally*, the Rule wrongly equates sex with "sex stereotypes" in its new definition. The "general prohibition on sex discrimination in § 1681 means that only discrimination based on biological sex is prohibited." *Texas*, 2024 WL 3658767, at *33. The Department doesn't dispute that sex does not mean "sex stereotypes," and that "recognizing and respecting biological sex differences does not amount to stereotyping." *Tennessee I*, 2024 WL 3019146, at *11 (quoting *L.W. ex rel. Williams v. Skrmetti*, 83 F.4th 460, 486 (6th Cir. 2023)); *accord Adams*, 57 F.4th 791, 809–810. But the Rule fails to explain why it treats "sex stereotypes" the same as "sex" while admitting that "[n]ot all conduct one might label 'sex stereotyping' necessarily violates Title IX." 89 Fed. Reg. at 33,811. That's arbitrary.

**B.      The Rule's new de-minimis harm provision in 34 C.F.R. § 106.31(a)(2) is contrary to law, arbitrary, and capricious.**

As the Supreme Court has explained, "the two sexes are not fungible." *VMI*, 518 U.S. at 533. Title IX recognizes as much. "Safeguarding … equal educational

opportunities for men and women necessarily requires differentiation and separation" of the sexes "at times." *Texas*, 2024 WL 3658767, at *32. The upshot: Title IX's respect for longstanding sex distinctions contradicts the Rule's equating these distinctions to "discrimination" causing "more than de minimis harm." 89 Fed. Reg. at 33,887. Yet, as this Court has recognized, the Department has created a new form of discrimination that allows gender identity to trump sex, making these long-recognized sex distinctions unlawful. Order 6. That is contrary to law.

**1.** Section 106.31(a)(2)'s new form of discrimination subverts Title IX's sex-based protections and is "arbitrary in the truest sense of the word." *Tennessee I*, 2024 WL 3019146, at *43. *First*, as this Court has said, the new de-minimis-harm provision "lacks any support in the statutory text." Order 10. *Second*, the new provision's reasoning is circular: "more than de minimis harm" is "legally cognizable injury," 89 Fed. Reg. at 33,814, and an injury is cognizable under Title IX if it "impose[s] more than de minimis harm," *id.* at 33,811. *Third*, the Rule makes "more than de minimis harm" discrimination available based on gender identity alone. *Id.* at 33,887. Only in that context are sex-based distinctions per se illegal—except when they aren't. The de-minimis-harm provision, after all, allows sex and gender-identity distinctions for Title IX's statutory exemptions, "living facilities," and athletics. *Id.* None of that makes sense. *See* Order 9.

*Fourth*, as this Court has recognized, the Department's new form of discrimination elevates gender identity above sex. *Id.* at 8, 10–11. For example, take a boy who identifies as male but wants to use the female restroom. *See* MPI Tr. 83. He unquestionably is excluded based on sex and suffers an injury. *Id.* But Title IX allows that exclusion to protect girls' privacy. Under the new Rule too, that harm is "de minimis." *E.g.*, *id.* at 83–87; 89 Fed. Reg. at 33,820.

Now assume the same boy identified as a girl. Same policy. Same exclusion. Same privacy interests. Yet for the Department, a different injury. While a sex-

16

based exclusion to protect privacy is de minimis, a sex-based exclusion applied to someone who happens to identify as transgender is more than de minimis. MPI Tr. 89 (exclusion "would have to be based on gender identity for [de-minimis-harm provision] to kick in"). That "add[s] words" and "impose[s] a new requirement" that Title IX does not. *Muldrow v. City of St. Louis*, 144 S. Ct. 967, 974 (2024). "Privileging gender identity over biological sex is in no way authorized by the statutory text." Order 11.

Far from employing an "objective standard," the Rule says harm is cognizable only if it implicates a person's "subjective, deep-core sense of self." *Compare* 89 Fed. Reg. at 33,815, *with id.* at 33,809; *see also Muldrow*, 144 S. Ct. at 974–75 (explaining elevated harm showing leads to subjective evaluations of what counts as "significant"). Nothing in Title IX's text distinguishes between sex-based exclusions "causing significant disadvantages and [sex-based exclusions] causing not-so-significant ones." *Muldrow*, 144 S. Ct. at 974.

To make matters worse, the de-minimis-harm provision undermines Title IX's context: its objective is to ensure no person is "denied the benefits of … any education program" on the basis of sex. 20 U.S.C. § 1681. That naturally includes alleviating "discrimination against women in education." *Neal v. Bd. of Trs. of Cal. State Univs.*, 198 F.3d 763, 766 (9th Cir. 1999). A statute "can be sensibly understood only by reviewing text in context," *Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244, 2261 n.4 (2024) (cleaned up), and the Department's rulemaking must "be consistent with the achievement of the objectives of the statute," 20 U.S.C. § 1682. Courts should adopt a "a textually permissible interpretation that furthers rather than obstructs the document's purpose." *Tex. Workforce Comm'n v. U.S. Dep't of Educ.*, 973 F.3d 383, 389 (5th Cir. 2020) (citing Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 63 (2012)); *see also* Samuel L. Bray, *The Mischief Rule*, 109 Geo. L.J. 967, 968–76

17

(2021) (explaining how textualists can consider "the problem to which the statute was addressed, and also the way in which the statute is a remedy for that problem"); John F. Manning, *What Divides Textualists from Purposivists?*, 106 Colum. L. Rev. 70, 84 (2006) ("[T]extualists recognize that the relevant context for a statutory text includes the mischiefs the authors were addressing."). The de-minimis-harm provision falters at this most basic level.

So even if the Department's interpretation of Title IX were "literally permissible" as a matter of statutory construction—though it is not—the Court should reject it. The Department's new form of discrimination "defies the most plausible understanding" of Title IX's text and its historical context. *Fischer v. United States*, 144 S. Ct. 2176, 2190 (2024). By having gender identity trump sex-based privacy protections, the new standard itself "seem[s] to function as impermissible sex discrimination under Title IX." Order 7. That is inconsistent with "the context from which the statute arose." *Fischer*, 144 S. Ct. at 2190 (quoting *Bond v. United States*, 572 U.S. 844, 860 (2014)).

*Fifth*, the Rule's de-minimis-harm standard creates absurd results. Under the Rule's logic, Congress *intended* schools to sometimes inflict more than de minimis harm. 89 Fed. Reg. at 33,818 (explaining that statutory carveouts allow "sex-specific policies and practices … that may cause more than de minimis harm to a protected individual"). That "throwaway reasoning" would mean Congress cared more about sex designating "Boy Scouts or Girl Scouts" than privacy in female-only showers and locker rooms. *Tennessee I*, 2024 WL 3019146, at *12–13. That cannot be right and goes entirely unexplained. *See* Order 9 (discussing the Department's "inconsistent reliance" on the statutory carveouts). The Department's new de-minimis harm standard contradicts not only Title IX's text, context, and structure, but common sense too. *See* John F. Manning, *The Absurdity Doctrine*, 116 Harv. L. Rev. 2387, 2461 (2003) ("[B]ecause people typically try to choose

words to effect their desired ends, textual interpretation that accounts for contextual social usage, including colloquial usage, should eliminate … absurdity.").

**2.** The Rule's new form of sex-based discrimination also violates the clear-statement rule, contravenes the major-questions doctrine, and exceeds Congress's spending power.

*First*, the new type of "sex-based discrimination" is not "unmistakably clear in the language of [Title IX]." *Gregory*, 501 U.S. at 460 (cleaned up). And second, it imposes sweeping new requirements on schools, which must refer to "gender identity" instead of sex in all manner of formerly sex-specific circumstances. But courts "presume that Congress intends to make major policy decisions itself, not leave those decisions to agencies." *West Virginia v. EPA*, 597 U.S. 697, 723 (2022) (cleaned up). Like HHS's nationwide eviction ban, the Labor Department's nationwide vaccine mandate, or the EPA's attempt to restructure the nation's energy industry, imposing a novel gender-identity mandate on all schools is a matter of "staggering" "economic and political significance" for which Congress has given the Department no clear authority. *Biden v. Nebraska*, 143 S. Ct. 2355, 2373 (2023) (cleaned up). Our nation has engaged in a sustained debate about allowing men to access women's sports and private spaces. *E.g.*, *Adams*, 57 F.4th 791. Congress would not hide this extremely controversial public-policy question in Title IX without making itself clear. Meanwhile, this question's economic significance is also massive—subjecting schools nationwide to losing billions in federal funding. *See Texas*, 2024 WL 3658767, at *4 (In fiscal year 2022, public schools in Texas alone received nearly $15 billion in federal funding). The Department cannot adopt this major policy change by administrative fiat.

**3.** The Rule's de-minimis-harm proviso violates staff and students' constitutional and statutory privacy rights. The Rule "mandate[s] that schools must permit biological men into women's intimate spaces within the educational

environment, and vice versa, based on nothing more than a person's subjective gender identity." *Texas*, 2024 WL 3658767, at *34. That denies "the dignity and freedom of bodily privacy." *Id.* The Rule violates students' fundamental right "to shield one's body from exposure to viewing by the opposite sex." *Id.* (quoting *Brannum v. Overton Cnty. Sch. Bd.*, 516 F.3d 489, 494, 496 (6th Cir. 2008)). The Sixth Circuit applied that privacy right to school restrooms, showers, and locker rooms where students appear in their "underwear." *Brannum*, 516 F.3d at 495; *accord Adams*, 57 F.4th at 805 (collecting cases). That privacy interest "is sex-specific because of—not in spite of—the different male and female anatomies." *Texas*, 2024 WL 3658767, at *34. Yet when it comes to sharing these spaces with members of the opposite sex, the Department incredibly says no one has a "legitimate privacy interest" at stake, 89 Fed. Reg. at 33,820, and that such "privacy concerns [are] unfounded," MPI Tr. 67.

Nothing—much less a compelling interest—justifies this intrusion. As the Supreme Court recognized in *VMI*, stopping sex discrimination is perfectly consistent with "afford[ing] members of each sex privacy from the other." 518 U.S. at 550 n.19. In fact, the government's real interest runs in the opposite direction of the Rule. Enforcing sex-designated spaces—not destroying them—"advances the important governmental objective" of protecting citizens' privacy. *Adams*, 57 F.4th at 804–07; *accord D.H. ex rel. A.H. v. Williamson Cnty. Bd. of Educ.*, 638 F. Supp. 3d 821, 834–35 (M.D. Tenn. 2022).

**4.** Section 106.31(a)(2) is also arbitrary and capricious for four reasons.

*First,* the Department never seriously engaged with how the Rule threatens the privacy interests mentioned above. *E.g. Texas*, 2024 WL 3658767, at *34. Defendants' requirement that "schools must permit biological men into women's intimate spaces … is not only impossible to square with Title IX, but also with the broader guarantee of equal protection." *Id.* The Department claims "no evidence" of

privacy or safety concerns exist with eliminating sex-specific private spaces. MPI Tr. 72; *accord* 89 Fed. Reg. 33,820. Yet, the comments show both privacy and safety issues. One comment informed the Department about the "extreme discomfort" in the locker room felt by female teammates of Lia Thomas (a male swimmer using female facilities) because Lia had "male body parts" and was "attracted to women." App.41. It also discussed a female athlete "psychologically traumatized by a violent rape" who would suffer "additional trauma … if forced to undress in front of a male." App.42. Another comment cited a sexual assault in a public school's girls' restroom committed by a male wearing a skirt. App.438; *accord* App.468–70 (collecting incidents of assault against females by males in private facilities). Yet the Department did "not agree" with that "alleged … evidence" and merely cited federal court decisions (incorrectly) suggesting that as a matter of law transgender-identifying students in private spaces do not pose privacy or safety risks. 89 Fed. Reg. 33,820. That's arbitrary and capricious.

*Second*, the Department failed to consider reliance interests. The Rule's position that schools and educators had "notice that its policy of separating male and female bathrooms," locker rooms, and showers "violate[d] Title IX" is "untenable." *Adams*, 57 F.4th at 816. Schools built sex-designated facilities consistent with Title IX as they understood it for five decades. App.1, 4–5. Absent relief from this Court, school districts like Carroll ISD will have to construct single-user facilities to protect student and staff privacy. *See* App.4–5. While the Department says the Rule doesn't require "single-occupancy facilities," its continued denial of legitimate privacy interests means schools have little choice but to construct single-occupant bathrooms, locker rooms, and showers for all. *See* 89 Fed. Reg. at 33,820. The Rule concedes the "significant cost implications" of single-occupant facilities and even notes that such a requirement would necessitate further "public comment." *Id.* The failure to account for those expenses underscores

21

the inaccuracy of the Department's compliance cost estimate. And the Department's assumption that schools would not consider such facilities necessary for compliance also renders the Rule arbitrary and capricious. *See Ohio v. EPA*, 144 S. Ct. 2040, 2053–55 (2024).

*Third*, the Department failed to explain why it requires schools to open up all private spaces to students and staff who identify as the opposite sex, but not to students and staff who identify as nonbinary. 89 Fed. Reg. at 33,818. This cannot be squared with the Rule's determination that *Bostock* forbids applying any sex distinction to persons who identify as nonbinary. *Id*. at 33,807.

*Fourth*, the Rule "fails" to "answer[ ]" whether Title IX would prohibit schools and educators from "treat[ing] a student according to [his or her] biological sex [if] requested by the parents to do so." *Texas*, 2024 WL 3658767, at *41 n.135. Parents have the fundamental right to determine whether to affirm a student's "gender identity" when it differs from the child's sex. *Tennessee I*, 2024 WL 3019146, at *31. The Department fails to recognize the "private realm of family life which the state cannot enter." *Id*.

## C. The Department's justifications are unavailing.

To defend the Rule, the Department claims that § 106.10 doesn't harm Carroll ISD and that the Rule will not affect sports. *See* MPI Tr. 21 (claiming § 106.10 "does not speak to sex-separate facilities" and does not redefine sex discrimination); MPI Opp. 14–15 (denying the Rule's effect on sports). Neither defense holds up.

**1.** This Court and others have correctly rejected the Department's contention that § 106.10 causes no harm. *See* Order 6 ("[E]ven if sex is not formally redefined, it is functionally redefined based on gender identity"); *Tennessee III*, 2024 WL 3453880, at *2. The Department's litigation position contradicts (1) its own

22

reasoning in the Rule's preamble and (2) the Department's prior positions aired publicly and in court.

*First*, the Rule itself invokes cases that have (incorrectly) read *Bostock* to require schools to open restrooms and athletics based on gender identity. 89 Fed. Reg. at 33,807 (citing, *inter alia*, *A.C. ex rel. M.C. v. Metro. Sch. Dist. of Martinsville*, 75 F.4th 760, 769 (7th Cir. 2023); *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 616 (4th Cir. 2020)); *id.* at 33,818 (incorporating 87 Fed. Reg. at 41,535, which relied on, *inter alia*, *B.P.J. v. W. Va. State Bd. of Educ.*, 550 F. Supp. 3d 347, 356 (S.D. W. Va. 2021)). Having used these cases to justify § 106.10, the Department cannot plausibly maintain that § 106.10 causes no harm and "simply clarifies that discrimination on the basis of sex includes discrimination on the basis of gender identity." MPI Tr. 22. This Court must judge the Rule on its own terms, not based on post hoc positions. *See DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 20 (2020).

*Second*, the Department has spent the past three years arguing that *Bostock* requires schools to open school restrooms and sports based on gender identity. In its now-vacated 2021 guidance documents, the Department identified restrooms, personal pronouns, and athletic teams based on biological sex as examples of unlawful discrimination, citing *Bostock*. *See Texas*, 2024 WL 3658767, at *32–33. And just last year, DOJ argued that *Bostock* requires gender identity to control over sex in Title IX athletics. Br. for the U.S. as Amicus Curiae in Supp. of Pl.-Appellant and Urging Reversal 27–28, *B.P.J. v. W. Va. State Bd. of Educ.*, 98 F.4th 541 (4th Cir. 2024) (Nos. 23-1078(L), 23-1130), 2023 WL 2859726 ("BPJ Brief"). The Department cannot whitewash its prior positions to claim that redefining "sex-based discrimination" really has no effect. And again, if the agency has changed its mind, it had to recognize and explain that change in position.

**2.** Nor are women's sports safe from the Rule. It applies its gender-identity mandate to sports with four overlapping moves. *First*, § 106.10 broadly redefines sex discrimination throughout the Rule to include gender identity. *See* Order 6. *Second*, § 106.11 makes clear that "this part" including § 106.10 "applies…to *all sex discrimination* occurring under a recipient's education program or activity…" (emphasis added). That includes athletics. *See* 89 Fed. Reg. at 33,528 (interpreting "'program or activity' broadly and without geographical limitation"). *Third*, § 106.31(a)(1) separately reiterates that the ban on sex discrimination (as defined to include gender identity in § 106.10) covers "other education program[s] or activit[ies]…." That too includes athletics. *Fourth*, § 106.31(a)(2) only exempts § 106.41(b); it does not exempt § 106.41(a), which bans sex discrimination "in any interscholastic, intercollegiate, club or intramural athletics…." And § 106.31(a)(2) does not cut back § 106.10 or § 106.11's broad scope covering athletics. The net result is that § 106.10's general default rule redefining sex still applies to educational programs generally via § 106.11 (which includes sports), *and* § 106.10's default rule still specifically applies to § 106.41(a) (which explicitly covers sports). Through either route, the Rule and its redefinition of sex doubly apply to athletics.

The Department has not disavowed this interpretation. Nor could it. *Cf.* Order 5 (discussing the Rule's "shocking consequences and logical inconsistencies"). In fact, the Department has already interpreted § 106.41(a) incorrectly to require opening women's sports based on gender identity. BPJ Brief at 27–28. Sections 106.10 and 106.11 create an independent default rule doing the same while also redefining sex in § 106.41(a) to ensure it explicitly opens sports based on gender identity. Based on these changes, Carroll ISD needs relief against the Rule no matter whether the administration finalizes a subsequent athletics rule.

II.     **The Rule's other provisions violate the First Amendment and are arbitrary and capricious.**

The Rule's admittedly "broader" definition of hostile-environment harassment, its self-initiation duty coupled with the elimination of the actual knowledge or deliberate indifference requirement for sex discrimination, and its gag-order mandate violate the First Amendment and are arbitrary and capricious. A long line of precedent shows that the gender-identity mandate together with the broader harassment definition and gag-order requirement violate constitutional protections against compelled speech, viewpoint discrimination, prior restraints, overbreadth, and vagueness. Further, the Department's 2020 regulations rejected the Rule's harassment definition, gag-order mandate, and self-initiation duty. That shows they are arbitrary and capricious.

A.     **The Rule's definition of hostile-environment harassment violates the First Amendment.**

Students and teachers do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969). "*Tinker*'s demanding standard" protects student speech unless schools show it "materially disrupts classwork or involves substantial disorder or invasion of the rights of others." *Mahanoy Area Sch. Dist. v. B.L. ex rel. Levy*, 594 U.S. 180, 188, 193 (2021). The First Amendment also protects public employee speech on matters of public concern, including "gender identity," which is "a hotly contested matter of public concern." *Meriwether v. Hartop*, 992 F.3d 492, 506 (6th Cir. 2021). The government bears an even "heavier burden" to justify compelling speech. *Janus v. Am. Fed'n of State, Cnty., & Mun. Emps.*, 585 U.S. 878, 907 (2018) (cleaned up). And the overbreadth doctrine prohibits a law that has "a substantial number" of unconstitutional "applications … in relation to" its "plainly legitimate sweep." *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 615 (2021).

The Rule violates this blackletter law for two main reasons. *First*, the gender-identity mandate expands the definition of "sex" to include subjective concepts like "gender identity" and "sex stereotypes." 89 Fed. Reg. at 33,886. The Department doesn't even define "gender identity," except to say it "describe[s] an individual's sense of their [sic] gender." *Id.* at 33,809. *Second*, the Rule creates an amorphous, "broader standard" for hostile-environment claims. *Id.* at 33,498. Harassment need only be severe *or* pervasive. Complainants need not show "any particular harm" or denial of access to an educational program. *Id.* at 33,511. Harassment can be anything students consider "unwelcome" or that "limits" their ability to benefit. *Id.* at 33,884. And the Rule's harassment definition applies to speech online or outside the country. *Id.* at 33,535, 33,886.

The Department's broader definition violates protections against compelled speech, viewpoint discrimination, overbreadth, and vagueness. The Rule transforms Carroll ISD into a "federally commandeered censor[ ] of speech" to require its students and teachers to use pronouns inconsistent with sex and avoid saying sex is binary. *See Texas*, 2024 WL 3658767, at *28 n.119. The Rule itself admits that "misgendering" can be considered illegal harassment. 89 Fed. Reg. at 33,516. Plus, that harassment need not be severe. *Id.* at 33,498. Pervasiveness is enough, and pronouns are pervasive, given their "ubiquity" in conversation. *Tennessee I*, 2024 WL 3019146, at *25. Using pronouns is "a virtual necessity for most Americans." *See Wooley v. Maynard*, 430 U.S. 705, 715 (1977). Eliminating them "altogether [is] next to impossible, especially when teaching." *See Meriwether*, 992 F.3d at 499. The Rule thus unconstitutionally compels speech in a viewpoint discriminatory manner. As for further viewpoint discrimination, the Rule applauded punishing a student for wearing a t-shirt saying, "THERE ARE ONLY TWO GENDERS," because that speech "invades the rights of others." 89 Fed. Reg. at 33,504. Thus, the Rule forces Carroll ISD to restrict protected speech and put

students and teachers in fear that nearly anything they say about sex or gender issues could be construed as sex stereotyping or harassment.

The Department cannot feign confusion about the Rule's effect. The Department of Justice (DOJ) has already filed amicus briefs saying teachers can create Title IX liability when they refuse to use gender-identity-based pronouns. *Tennessee I*, 2024 WL 3019146, at *21. And just recently, DOJ argued that a school policy requiring teachers to use gender-neutral titles like "teacher" or "coach," but not honorifics and pronouns based on gender identity, creates a hostile environment under Title VII. Statement of Interest of the United States of America, *Wood v. Fla. Dep't of Educ.*, No. 4:23-cv-00526, 2024 WL 3380723 (N.D. Fla. June 27, 2024). That supposed Title VII standard "aligns closely with the definition of hostile environment sexual harassment" the Rule applies to Title IX. 89 Fed. Reg. at 33,500. But, as the Department recognized in 2020, "recipients are in the business of education where people are engaged in a marketplace of ideas that may challenge their own." Nondiscrimination on the Basis of Sex in Ed. Programs or Activities Receiving Fed. Fin. Assistance, 85 Fed. Reg. 30,026, 30,440 (May 19, 2020). So the Department rejected Title VII's automatic application to Title IX to "avoid restrictions on the speech, conduct, and other expressive activity that helps provide a robust education for students and academic freedom for faculty and staff." *Id.*; *accord id.* at 30,165.

The Rule is also overbroad beyond its application to gender identity. It requires schools to police speech far outside the *Davis* standard, which made schools liable under Title IX for deliberate indifference to sexual harassment "so severe, pervasive, *and* objectively offensive that it effectively *bars* the victim's access to an educational opportunity or benefit." 526 U.S. at 633 (emphasis added). The Supreme Court crafted this rule to honor First Amendment protections, responding to the dissent's concerns that "it would be entirely reasonable for a

school to refrain from a form of disciplinary action that would expose it to constitutional or statutory claims" based on free speech. *Id.* at 649. What's more, the Rule's harassment definition sweeps up speech off campus or outside the United States, disregarding that courts should be "skeptical of a school's efforts to regulate off-campus speech, for doing so may mean the student cannot engage in that kind of speech at all." *B.L.*, 594 U.S. at 189–90. Thus, courts regularly invalidate—and have already invalidated—similarly overbroad definitions of harassment. *E.g.*, *Tennessee I*, 2024 WL 3019146, at *26; *Louisiana I*, 2024 WL 2978786, at *13; *Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 215–18 (3d Cir. 2001) (Alito, J.); *Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1114–15, 1125 (11th Cir. 2022); *Speech First, Inc. v. Khator*, 603 F. Supp. 3d 480, 482 & n.6 (S.D. Tex. 2022).

Finally, the Rule's definition of harassment is unconstitutionally vague. "Because the First Amendment needs breathing space," government regulations touching on speech must have "clear" prohibitions. *Serv. Emps. Int'l Union, Loc. 5 v. City of Hous.*, 595 F.3d 588, 596 (5th Cir. 2010) (cleaned up). Any such regulations "must provide fair notice so that its prohibitions may be avoided by those who wish to do so." *Id.* at 596–97 (cleaned up). The Rule fails. The Rule's standard for harassment is "as user-friendly and objective as Justice Stewart's obscenity test: 'I know it when I see it.'" *Tennessee I*, 2024 WL 3019146, at *26 (cleaned up). The Rule doesn't define "gender identity," except to say it "describe[s] an individual's sense of their [sic] gender." 89 Fed. Reg. at 33,809. A finding of harassment "depend[s] on vague terminology [Defendants have] elected not to define." *Tennessee I*, 2024 WL 3019146, at *25. "Such a sweeping and subjective standard most certainly chills protected speech." *Id.* at *27.

**B.     The Rule eliminates necessary procedural protections.**

The Rule withdraws crucial procedural protections necessary to protect First Amendment rights. It first eliminates the requirement that an alleged victim's complaint begin the grievance process and then requires recipients like Carroll ISD to issue gag orders during that process. The Rule's mandate to recipients to "end" sex discrimination coupled with the Title IX coordinator's new ability to self-initiate grievance processes creates a duty for a recipient like Carroll ISD to investigate protected speech.

The Rule requires recipients to "promptly and effectively end any sex discrimination," regardless of whether they had actual knowledge of hostile-environment harassment or were deliberately indifferent to it. *See* 89 Fed. Reg. at 33,889 (34 C.F.R. § 106.44(f)(1)). And it then allows the recipient's Title IX coordinator to initiate a grievance process even in "the absence of a complaint or the withdrawal of any or all of the allegations in a complaint." 89 Fed. Reg. at 33,889 (34 C.F.R. § 106.44(f)(1)(v)). If the Title IX coordinator makes the "fact-specific determination" that "the conduct as alleged presents an imminent and serious threat to the health or safety of the complainant or other person, or that the conduct as alleged prevents the recipient from ensuring equal access" to education, the Title IX Coordinator "may initiate a complaint." *Id.* (34 C.F.R. § 106.44(f)(1)(v)). Taken together and coupled with the gender-identity mandate, the Rule forces Title IX coordinators to investigate claims of even single instances of protected speech or rumors about alleged conduct.

For example, the Title IX Coordinator must account for threats to "health or safety" without any limitation to physical health or safety. But many today claim that protected speech threatens mental and emotional safety. *E.g.*, *Perlot v. Green*, 609 F. Supp. 3d 1106, 1114 (D. Idaho 2022) (student claimed professor's agreement with comments that the Bible reserves marriage to be between one man and one

woman "caused [her] to fear for [her] life"); Am. Compl., *Doe v. Univ. of Idaho*, No. 1:23-cv-00409-AKB (D. Idaho Dec. 29, 2023) (Title IX lawsuit based in part on this event). The requirement will force Title IX coordinators to begin time- and resource-intensive procedures against students and employees based on their protected speech, even in the absence of a complaint from the purported victim, or risk enforcement action from the Department and private lawsuits.

The Rule also mandates that Carroll ISD issue gag orders during harassment grievance proceedings "to protect the privacy of the parties and witnesses." 89 Fed. Reg. at 33,891 (34 C.F.R. § 106.45(b)(5)). Such a prior restraint—which prohibits discussing the case with the media or publicly criticizing the recipient's handling of the process—bears a heavy presumption of unconstitutionality and requires substantive and procedural safeguards. *See Chiu v. Plano Ind. Sch. Dist.*, 339 F.3d 273, 281–82 (5th Cir. 2003). Students and teachers have "a clearly established right to be free of prior restraints except where they are designed to maintain discipline or to prevent school disruption and are narrowly drawn to achieve that goal," *id.* at 282, yet the Rule's gag orders apply to any speech during a grievance proceeding.

### C.     The Rule's harassment definition, self-initiation duty, gag-order mandate, and elimination of the actual knowledge requirement are arbitrary and capricious.

The Department had no good reason to deviate from the 2020 regulations' well-considered requirements. That year, the Department adopted the *Davis* standard and recognized that the First Amendment demands a "narrowly tailored" harassment definition to avoid censoring protected speech. 85 Fed. Reg. at 30,142; *accord id.* at 30,033 ("Including the *Davis* definition of sexual harassment for Title IX purposes … helps ensure that Title IX is enforced consistent with the First Amendment."). Yet now the Department insists its admittedly "broader" definition

30

still satisfies the First Amendment. 89 Fed. Reg. at 33,498. But, as discussed above, its broader definition suffers from numerous constitutional infirmities. And its boilerplate First Amendment disclaimer means nothing. *See Dambrot v. Cent. Mich. Univ.*, 55 F.3d 1177, 1183 (6th Cir. 1995) (disregarding savings clause in harassment policy); *Coll. Republicans at S.F. State Univ. v. Reed*, 523 F. Supp. 2d 1005, 1020–21 (N.D. Cal. 2007) (disclaimer that "behavior protected by the First Amendment" could not be punished "communicate[d] virtually nothing," given the complex nature of First Amendment law that poses "so much difficulty" even for "judges").

The gag-order requirement is arbitrary for the same reason. The Department recognized in 2020 that such a requirement "impose[s] prior restraints on students' and employees' ability to discuss … the allegations under investigation." 85 Fed. Reg. at 30,295. And those gag orders would prevent the parties—either complainants or respondents—from discussing perceived shortcomings or seeking assistance in the grievance process. *Id.* But the Department offers no reasoned explanation for its unconstitutional 180° turn.

The Department further acted arbitrarily by removing the actual knowledge or deliberate indifference requirement and adding the self-initiation power. Title IX "prevent[s] recipients … from using [federal] funds in a discriminatory manner," so "it is a recipient's *own* misconduct … that subjects [it] to liability." *Id.* at 30,038. A recipient like Carroll ISD "cannot commit its own misconduct unless [it] first knows of the sexual harassment that needs to be addressed." *Id.* That makes sense because this Spending Clause legislation imposes obligations "in the nature of a contract." *Id.* By removing the actual knowledge requirement and adding the self-initiation discretion, the Department now requires recipients to investigate everything that subjectively might be considered sex discrimination under its

unlawful and exceptionally broad definition. That has no relation to Title IX's text and shows a failure in reasoned decisionmaking.

### III.    This Court should vacate the Rule.

**A.** Under the APA, this Court "shall … set aside" unlawful agency action. 5 U.S.C. § 706. The Rule is unlawful for all the reasons addressed above, and that is all a claimant must show to obtain vacatur of unlawful agency action. Vacatur "is the only statutorily prescribed remedy for a successful APA challenge" and is thus the "default" remedy. *Tex. Med. Ass'n v. U.S. Dep't of Health & Hum. Servs.*, No. 23-40217, 2024 WL 3633795, at *11 (5th Cir. Aug. 2, 2024); *Data Mktg. P'ship, LP v. U.S. Dep't of Lab.*, 45 F.4th 846, 859–60 (5th Cir. 2022). That vacatur "by its very nature … is universal in scope because an unlawful regulation cannot be vacated as to only one party." *Texas*, 2024 WL 3658767, at *47 (citing *Career Colls. & Schs. of Tex. v. U.S. Dep't of Educ.*, 98 F.4th 220, 255 (5th Cir. 2024)). This Court should thus vacate the Rule and declare it unlawful.

In the alternative to vacatur, the Court should issue a permanent injunction against enforcement of the Rule and the Department's unlawful interpretations of Title IX. This Court has already found irreparable harm and the public interest favors Carroll ISD. Order 11–14. That conclusion still holds. For example, the Rule itself estimates compliance costs from "reviewing and making necessary changes to policies, procedures, and training to implement the final regulations" nationwide will exceed $98 million in the first year. 89 Fed. Reg. at 33,861. Carroll ISD would suffer a portion of those estimated costs, including from training its over 1,100 employees. App.6. Additionally, compliance with the Rule will require, at a minimum, amending or repealing existing policies and practices (like 3.19 and 6.9) and using employee time to analyze and discuss the Rule. App.5–6. Carroll ISD—and all other recipients—"will continue to apply Title IX in the same manner" as it has been understood "for over 50 years." Order 13.

**B.** A remedy limited to Carroll ISD would not provide full relief to Carroll. Carroll ISD students traveling out of state—and even to in-state schools—risk having to use bathrooms and locker rooms with students of the opposite sex; its female students risk having to play sports against males; and all traveling students and employees risk unconstitutional restrictions on their speech. App.7–8. This school year, Carroll ISD students will travel to California, Georgia, Kentucky, Iowa, New York, Ohio, Oklahoma and Oregon. App.7–8. The Rule is currently effective in California, New York, and Oregon. Vacatur will prevent the Rule from applying in those states. Carroll ISD doesn't ask this Court to rule on laws of other states. Adequate redress doesn't require that. All redressability demands is that "a favorable ruling could potentially lessen" Carroll ISD's "injury." *Texas v. United States*, 40 F.4th 205, 219 (5th Cir. 2022). And vacatur or a permanent injunction would redress that injury by preventing the federal government from enforcing the unlawful Rule regardless of state law. What's more, state laws that impose a gender-identity mandate similar to the Rule's "function as impermissible sex discrimination under Title IX." Order 7. So post-vacatur, Carroll ISD students or staff injured by such law or policies could bring a Title IX action to vindicate their rights.

**C.** Whether the Court vacates the Rule or enjoins enforcement, relief should extend to the entire Rule. Carroll ISD challenged the clearly unlawful portions of the Rule, but the Department cannot establish that the Rule is severable. *See Louisiana II*, 2024 WL 3452887, at *2. "[I]nclusion of an express severability clause is an aid merely; not an inexorable command." *Texas v. United States*, 691 F. Supp. 3d 763, 788–89 (S.D. Tex. 2023) (cleaned up). Instead, to determine severability, courts ask whether (1) severance would "impair the function" of the rule "as a whole" and (2) the agency would have enacted the rule absent the challenged provisions. *Id.* (citing *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 294 (1988) and

*Nasdaq Stock Mkt. LLC v. SEC*, 38 F.4th 1126, 1144 (D.C. Cir. 2022)). A court shouldn't sever a final rule when "there is substantial doubt that the agency would have adopted the severed portion on its own." *Mayor of Balt. v. Azar*, 973 F.3d 258, 292 (4th Cir. 2020). The Department cannot make its showing.

The challenged provisions lie "at the heart of the 423-page Rule"; the other provisions cannot function as designed without them. *Louisiana II*, 2024 WL 3452887, at *1. Defendants' "new definition of sex discrimination" in 34 C.F.R. § 106.10 "touch[es] every substantive provision of the Rule." *Tennessee III*, 2024 WL 3453880, at *3. For example, the Rule's 34 C.F.R. § 106.8 addresses the appointment and duties of Title IX coordinators, the recipient's duty to publish a notice of nondiscrimination, and the requirement that it maintain records for at least seven years. But compliance with these provisions depends on whether the challenged provisions—34 C.F.R. §§ 106.10, 106.31(a)(2), and 106.2—are in effect. Each of these provisions "implicates the new definition of sex discrimination." *Tennessee III*, 2024 WL 3453880, at *3. The Department promulgated those provisions with the aim of applying its new definition of sex discrimination. So vacating that definition impairs the function of the Rule as a whole.

Defendants have not shown that the Department would have issued the rest of the Rule absent the unlawful portions. The Department "did not contemplate enforcement of the Rule without *any* of the core provisions." *Id.* Defendants justify the Rule and its high costs based on benefits they expect from implementing the challenged provisions—especially §§ 106.10 and 106.31(a)(2). 89 Fed. Reg. at 33,861–62. That cost-benefit analysis didn't incorporate "the idea of allowing" the rest of the Rule "to go into effect with a *different* definition of sex discrimination." *Tennessee III*, 2024 WL 3453880, at *4; *cf. Ohio v. EPA*, 144 S. Ct. at 2053–54 (agency action was likely arbitrary and capricious when the government estimated different costs than the actual costs but went ahead with the same action). Indeed,

it is not even apparent what that definition would be, which makes implementation even more uncertain and costly. *Id.* (citing *Tennessee v. Dep't of Educ.*, 104 F.4th 577 (6th Cir. 2024)). Defendants do not show the costs are worth it.

Vacating only certain provisions here would "involve this [C]ourt in making predictions … about the interrelated effects of the remainder of the Rule on thousands of covered educational entities"—all contrary to severability analysis. *Louisiana II*, 2024 WL 3452887 at *2. This Court should not assume Defendants "would have preferred to apply the [Rule] in as many" situations "as possible" if "key" provisions were held invalid. *United States v. Booker*, 543 U.S. 220, 248 (2005). The Rule is "highly complex" and riddled with "interrelated provisions." *Id.* It is "one coherent policy," *Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 194 (1999), principally ensuring that students are not denied educational opportunities, *see* 89 Fed. Reg. at 33,476 (Rule aims "to fully effectuate Title IX's sex discrimination prohibition."). And the Department has said that its provision redefining sex discrimination is "essential" to this goal. *Id.* at 33,500. It's "not th[e] court's job" to embark on a "judicial rewriting of the Rule." *Louisiana II*, 2024 WL 3452887, at *2.

## CONCLUSION

The Rule "rob[s] women and girls of meaningful access to education and related opportunities" Congress enacted Title IX to protect. *Texas*, 2024 WL 3658767, at *34. Carroll ISD respectfully requests that the Court grant this motion, vacate the Rule, and enter judgment as a matter of law in its favor.

Respectfully submitted this 16th day of August, 2024.

/s/ Mathew W. Hoffmann

**Tim Davis**
Texas Bar No. 24086142
**Allison Allman**
Texas Bar No. 24094023
**Trevor Paul**
Texas Bar No. 24133388
**JACKSON WALKER LLP**
777 Main Street, Suite 2100
Fort Worth, Texas 76102
Telephone: (817) 334-7200
tdavis@jw.com
aallman@jw.com
tpaul@jw.com

**Jonathan A. Scruggs***
Arizona Bar No. 030505
**ALLIANCE DEFENDING FREEDOM**
15100 N. 90th Street
Scottsdale, Arizona 85260
Telephone: (480) 444-0020
Facsimile: (480) 444-0028
jscruggs@ADFLegal.org

**Tyson C. Langhofer***
Virginia Bar No. 95204
**Mathew W. Hoffmann***
Virginia Bar No. 100102
**ALLIANCE DEFENDING FREEDOM**
44180 Riverside Pkwy
Lansdowne, Virginia 20176
Telephone: (571) 707-4655
Facsimile: (571) 707-4656
tlanghofer@ADFlegal.org
mhoffmann@ADFlegal.org

**Natalie D. Thompson****
Texas Bar No. 24088529
**ALLIANCE DEFENDING FREEDOM**
440 First Street NW, Suite 600
Washington, DC 20001
Telephone: (202) 393-8690
Facsimile: (202) 347-3622
nthompson@ADFlegal.org

**Counsel for Plaintiff Carroll ISD**

*Admitted pro hac vice

**Practice supervised by one or more D.C. Bar members while D.C. Bar application is pending.

36

## CERTIFICATE OF SERVICE

I hereby certify that on August 16, 2024, a copy of the foregoing document was filed with the Clerk of Court using the CM/ECF system. I further certify that the foregoing document was served using the CM/ECF system on all counsel of record.

/s/ Mathew W. Hoffmann
Mathew W. Hoffmann
*Counsel for Plaintiff Carroll ISD*