**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | |
|---|---|
| CARROLL INDEPENDENT SCHOOL DISTRICT,<br><br>   *Plaintiff*,<br><br>v.<br><br>U.S. DEPARTMENT OF EDUCATION et al.,<br><br>   *Defendants*. | No. 2:24-cv-00461<br>District Judge Reed O'Connor |

**MEMORANDUM IN SUPPORT OF DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND CROSS-MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

Table of Contents ............................................................................................................. i

Table of Authorities ........................................................................................................ iii

Introduction ...................................................................................................................... 1

Background ....................................................................................................................... 3

I.      Title IX and Its Implementing Regulations ............................................................ 3

II.     The Department's 2024 Rule ................................................................................... 4

III.    Procedural History ................................................................................................... 8

Legal Standard .................................................................................................................. 8

Argument .......................................................................................................................... 9

I.      The Court Should Dismiss this Case. ...................................................................... 9

      A.     The complaint should be dismissed because Texas and Plaintiff have improperly split their claims. ................................................................................ 9

      B.     The Court should dismiss Plaintiff's challenges to the Guidance Documents. .... 11

II.     The Court Should Grant Summary Judgment to Defendants. ............................... 11

      A.     Section 106.10 is consistent with the text of Title IX and is not arbitrary and capricious. ...................................................................................................... 12

              1.     Section 106.10 is consistent with the text of Title IX. .............................. 12

              2.     Section 106.10 is not arbitrary and capricious. ........................................ 16

      B.     Section 106.31(a)(2) is consistent with the text and structure of Title IX, is not arbitrary and capricious, and does not infringe on any rights to safety or privacy. ...................................................................................................................... 17

              1.     The de minimis harm standard in § 106.31(a)(2) is properly derived from the statutory text and fully consistent with Supreme Court precedent. .... 17

              2.     Plaintiff does not show that the Department's consideration of § 106.31(a)(2) was arbitrary and capricious. ........................................... 21

              3.     Section 106.31(a)(2) does not violate any right to safety or privacy........ 22

      C.     Section 106.2's definition of hostile environment harassment does not infringe on First Amendment rights, nor is it arbitrary and capricious. .................................. 24

      D.     Section 106.44(f)(1)'s requirements for Title IX Coordinators does not infringe on First Amendment rights nor is it arbitrary and capricious. .................................. 32

      E.     Section 106.45(b)(5)'s protection of the privacy of the parties and witnesses during grievance procedures does not infringe on First Amendment rights nor is it arbitrary and capricious. ...................................................................................... 33

      F.     The Final Rule does not raise a Spending Clause issue or implicate the major questions doctrine. ................................................................................................ 34

III.   To The Extent Plaintiff Is Entitled to any Relief, that Relief Should Be Limited to Plaintiff and to the Provisions of the Rule that the Court Concludes Are Unlawful. ....... 37

    A.   Any relief should be limited to Plaintiff. ............................................................... 38

    B.   Any relief should be limited to provisions of the Rule that the Court finds unlawful and that cause harm to Plaintiff. ............................................................ 42

        1.   Any injunctive relief should be appropriately tailored. ............................ 42

        2.   The Rule is severable. ............................................................................... 46

Conclusion ....................................................................................................................................... 50

## TABLE OF AUTHORITIES

<u>Cases</u>

*A.C. ex rel. M.C. v. Metro. Sch. Dist. of Martinsville,*
  75 F.4th 760 (7th Cir. 2023) ........................................................................ 15

*Alabama v. U.S. Sec'y of Edcu.,*
  No. 24-12444, 2024 WL 3981994 (11th Cir. Aug. 22, 2024) .................................. 41

*Am. Fuel & Petrochemical Mfrs. v. EPA,*
  3 F.4th 373 (D.C. Cir. 2021) ......................................................................... 47

*Ams. for Prosperity Found. v. Bonta,*
  594 U.S. 595 (2021) .................................................................................. 27

*Anatol Zukerman & Charles Krause Reporting, LLC v. U.S. Postal Serv.,*
  64 F.4th 1354 (D.C. Cir. 2023) ...................................................................... 39

*Arnold, Constable & Co. v. United States,*
  147 U.S. 494 (1893) .................................................................................. 15

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009) ................................................................................... 8

*Barr v. Am. Ass'n of Pol. Consultants, Inc.,*
  591 U.S. 610 (2020) .............................................................................. 37, 46

*Bell v. Itawamba Cnty. Sch. Bd.,*
  799 F.3d 379 (5th Cir. 2015) ........................................................................ 29

*Bostock v. Clayton Cnty.,*
  590 U.S. 644 (2020) ........................................................................... *passim*

*Califano v. Yamasaki,*
  442 U.S. 682 (1979) .................................................................................. 37

*California v. Texas,*
  593 U.S. 659 (2021) .................................................................................. 42

*Cannon v. Univ. of Chi.,*
  441 U.S. 677 (1979) .................................................................................. 45

*Cargill v. Garland,*
  57 F.4th 447 (5th Cir. 2023) ........................................................................ 40

*Cent. & S.W. Servs., Inc. v. EPA,*
  220 F.3d 683 (5th Cir. 2000) ........................................................................ 40

iii

*Chiu v. Plano Independent School District,*
    339 F.3d 273 (5th Cir. 2003) ........................................................ 34

*Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media,*
    589 U.S. 327 (2020) ............................................................. 14, 15

*Curtis v. Citibank, NA.,*
    226 F.3d 133 (2d Cir. 2000) ........................................................ 10

*DaimlerChrysler Corp. v. Cuno,*
    547 U.S. 332 (2006) ................................................................. 42

*Davis v. Monroe Cnty. Bd. of Educ.,*
    526 U.S. 629 (1999) ............................................................ *passim*

*Dep't of Com. v. New York,*
    588 U.S. 752 (2019) ................................................................. 12

*Dep't of Educ. v. Louisiana,*
    --- S. Ct. ---, 2024 WL 3841071 (U.S. Aug. 16, 2024) .................... 13, 46

*Dep't of State v. Munoz,*
    144 S. Ct. 1812 (2024) .............................................................. 22

*Direct Mktg. Ass'n v. Brohl,*
    575 U.S. 1 (2015) .................................................................... 39

*eBay Inc. v. MercExchange, LLC,*
    547 U.S. 388 (2006) ................................................................. 42

*EEOC v. Boh Bros. Constr. Co.,*
    731 F.3d 444 (5th Cir. 2013) ....................................................... 28

*FCC v. Prometheus Radio Project,*
    592 U.S. 414 (2021) ................................................................. 12

*Fed'n of Ams. for Consumer Choice, Inc. v. U.S. Dep't of Lab.,*
    2023 WL 5682411 (N.D. Tex. June 30, 2023) .................................... 8

*Fox Broad. Co. v. Dish Network L.L.C.,*
    747 F.3d 1060 (9th Cir. 2014) ..................................................... 45

*Franciscan All., Inc. v. Becerra,*
    553 F. Supp. 3d 361 (N.D. Tex. 2021) ............................................ 42

*Garland v. Aleman Gonzalez,*
    142 S. Ct. 2057 (2022) .............................................................. 40

*Gebser v. Lago Vista Indep. Sch. Dist.*,
    524 U.S. 274 (1998) ............................................................................ 28, 29

*Gen. Land Off. of Tex. v. Biden*,
    71 F.4th 264 (5th Cir. 2023) ................................................................. 9, 10

*Gill v. Whitford*,
    585 U.S. 48 (2018) ............................................................................... 37, 50

*Grabowski v. Ariz. Bd. of Regents*,
    69 F.4th 1110 (9th Cir. 2023) .................................................................... 15

*Grayned v. Rockford*,
    408 U.S. 104 (1972) .................................................................................... 31

*Grimm v. Gloucester Cnty. Sch. Bd.*,
    972 F.3d 586 (4th Cir. 2020) ............................................................... 15, 19

*Grimm v. Gloucester Cnty. Sch. Bd.*,
    No. 19-1952, 2019 WL 6341095 (4th Cir. Nov. 25, 2019) ....................... 23

*Gross v. FBL Fin. Servs., Inc.*,
    557 U.S. 167 (2009) .................................................................................... 13

*Harris v. Forklift Sys. Inc.*,
    510 U.S. 17 (1993) .............................................................................. *passim*

*Hodel v. Va. Surface Mining. & Reclamation Ass'n*,
    452 U.S. 264 (1981) .................................................................................... 36

*Jackson v. Birmingham Bd. of Educ.*,
    544 U.S. 167 (2005) ............................................................................ 1, 3, 4

*JTH Tax, LLC v. Butschek*,
    2020 WL 5083523 (S.D. Tex. Aug. 3, 2020) ............................................... 9

*Kluge v. Brownsburg Cmty. Sch. Corp.*,
    No. 21-2475, 2021 WL 5405970 (7th Cir. Nov. 8, 2021) .......................... 27

*Labrador v. Poe*,
    144 S. Ct. 921 (2024) .................................................................................. 40

*Lakoski v. James*,
    66 F.3d 751 (5th Cir. 1995) ....................................................................... 14

*Laufer v. Mann Hosp., L.L.C.*,
    996 F.3d 269 (5th Cir. 2021) ....................................................................... 8

*Lodge 207 v. Raimondo*,
  18 F.4th 38 (1st Cir. 2021) ............................................................... 45

*Lowrey v. Tex. A&M Univ. Sys.*,
  117 F.3d 242 (5th Cir. 1997) ........................................................... 14

*Maryland v. King*,
  567 U.S. 1301 (2012) ....................................................................... 45

*Massachusetts v. Mellon*,
  262 U.S. 447 (1923) ......................................................................... 35

*MD/DC/DE Broads. Ass'n v. FCC*,
  236 F.3d 13 (D.C. Cir. 2001) .......................................................... 46

*Muldrow v. St. Louis*,
  144 S. Ct. 967 (2024) ................................................................ 18, 20

*Murphy v. Nat'l Collegiate Athletic Ass'n*,
  584 U.S. 453 (2018) ......................................................................... 36

*Nat'l Ass'n of Manufacturers v. United States Sec. & Exch. Comm'n*,
  105 F.4th 802 (5th Cir. 2024) ......................................................... 46

*New York v. United States*,
  505 U.S. 144 (1992) ......................................................................... 36

*NFIB v. Sebelius*,
  567 U.S. 519 (2012) ......................................................................... 35

*North Carolina v. Covington*,
  585 U.S. 969 (2018) ......................................................................... 43

*Nuziard v. Minority Bus. Dev. Agency*,
  --- F. Supp. 3d ---, 2024 WL 965299 (N.D. Tex. Mar. 5, 2024) ............ 40

*Ohio v. EPA*,
  144 S. Ct. 2040 (2024) ..................................................................... 49

*Peltier v. Charter Day School, Inc.*,
  37 F.4th 104 (4th Cir. 2023) ........................................................... 20

*Queen v. United States*,
  99 F.4th 750 (5th Cir. 2024) ........................................................... 20

*Rest. L. Ctr. v. U.S. Dep't of Lab.*,
  66 F.4th 593 (5th Cir. 2023) ........................................................... 44

*Rowles v. Curators of the Univ. of Mo.*,
    983 F.3d 345 (8th Cir. 2020) ............................................................... 30

*Rumsfeld v. FAIR, Inc.*,
    547 U.S. 47 (2006) ............................................................................. 26

*Saxe v. State College Area School Dist.*,
    240 F.3d 200 (3d Cir. 2001) ......................................................... 29, 30

*Serafine v. Branaman*,
    810 F.3d 354 (5th Cir. 2016) ............................................................. 27

*South Dakota v. Dole*,
    483 U.S. 203 (1987) ........................................................................... 35

*Speech First, Inc. v. Khator*,
    603 F. Supp.3d 480 (S.D. Tex. 2022) ................................................ 29

*Speech First, Inc. v. Cartwright*,
    32 F.4th 1110 (11th Cir. 2022) .......................................................... 29

*Staley v. Harris Cnty.*,
    485 F.3d 305 (5th Cir. 2007) ............................................................. 39

*Sw. Elec. Power Co. v. EPA*,
    920 F.3d 999 (5th Cir. 2019) ............................................................. 46

*Tennessee v. Cardona*,
    --- F. Supp. 3d ---, 2024 WL 3019146 (E.D. Ky. June 17, 2024) .......... 41

*Texas Med. Ass'n v. U.S. Dep't of Health & Hum. Servs.*,
    110 F.4th 762 (5th Cir. 2024) ............................................................ 38

*Texas v. Biden*,
    20 F.4th 928 (5th Cir. 2021) .............................................................. 39

*Texas v. Cardona*,
    No. 23-cv-0604, 2024 WL 3658767 (N.D. Tex. Aug. 5, 2024) ...................... *passim*

*Texas v. United States*,
    No. 2:24-cv-86-Z, 2024 WL 3405342 (N.D. Tex. July 11, 2024).................. 1, 9, 41

*United States v. Texas*,
    599 U.S. 670 (2023)............................................................................ 38

*United Steel v. Pension Ben. Guar. Corp.*,
    707 F.3d 319 (D.C. Cir. 2013) ........................................................... 24

*Univ. of Texas v. Camenisch*,
  451 U.S. 390 (1981) ................................................................................................ 2

*Virginia v. Hicks*,
  539 U.S. 113 (2003) ............................................................................................. 28

*Washington v. Glucksberg*,
  521 U.S. 702 (1997) ............................................................................................. 22

*West Virginia v. EPA*,
  597 U.S. 697 (2022) ....................................................................................... 36, 37

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) .......................................................................................... 45, 46

*Woods v. Cantrell*,
  29 F.4th 284 (5th Cir. 2022) ............................................................................... 28

<u>Statutes</u>

5 U.S.C. § 703 ........................................................................................................ 38

5 U.S.C. § 705 .......................................................................................................... 8

5 U.S.C. § 706(2) ................................................................................................... 38

20 U.S.C. § 1681 .............................................................................................. 12, 13

20 U.S.C. § 1681(a) ............................................................................. 4, 14, 18, 49

20 U.S.C. § 1681(a)(6) ............................................................................................ 6

20 U.S.C. § 1681(a)(6)(A) .................................................................................... 18

20 U.S.C. § 1681(a)(6)(B) .................................................................................... 18

20 U.S.C. § 1682 ..................................................................................................... 4

20 U.S.C. § 1683 ..................................................................................................... 4

20 U.S.C. § 1686 ........................................................................................... 4, 6, 18

42 U.S.C. § 2000e-2(a)(1) ...................................................................................... 4

42 U.S.C. § 2000e-2(e) ......................................................................................... 14

<u>Rules</u>

Fed. R. Civ. P. 56(a) ............................................................................................... 8

<u>Regulations</u>

34 C.F.R. § 100.7 .................................................................................................... 4

34 C.F.R. § 100.8(a) ............................................................................................... 4

34 C.F.R. § 106.2 ........................................................................................... *passim*

34 C.F.R. § 106.6(d) ................................................................................................ 25, 34

34 C.F.R. § 106.6(d)(1) ....................................................................................................... 7

34 C.F.R. § 106.8 .............................................................................................................. 47

34 C.F.R. § 106.8(a) ..................................................................................................... 5, 49

34 C.F.R. § 106.9 ......................................................................................................... 8, 47

34 C.F.R. § 106.10 ................................................................................................... *passim*

34 C.F.R. § 106.18 ....................................................................................................... 8, 47

34 C.F.R. § 106.24 ....................................................................................................... 8, 47

34 C.F.R. § 106.30 (2020) ............................................................................................... 30

34 C.F.R. § 106.31(a)(2) .......................................................................................... *passim*

34 C.F.R. § 106.33 ........................................................................................................... 19

34 C.F.R. § 106.40(b) .................................................................................................. 5, 43

34 C.F.R. § 106.41(a) ...................................................................................................... 17

34 C.F.R. § 106.45(b)(5) .......................................................................................... *passim*

34 C.F.R. § 106.46 ....................................................................................................... 8, 47

34 C.F.R. § 106.62 ....................................................................................................... 8, 47

34 C.F.R. § 106.71 ..................................................................................................... 43, 49

34 C.F.R. § 106.72 ....................................................................................................... 8, 47

34 C.F.R. § 106.82 ....................................................................................................... 8, 47

45 C.F.R. § 86. ................................................................................................................. 49

62 Fed. Reg. 12,034 (Mar. 13, 1997) .............................................................................. 29

85 Fed. Reg. 30,026 (May 19, 2020) ..................................................................... 4, 31, 32

87 Fed. Reg. 41,390 (July 12, 2022) .................................................................................. 4

Exec. Order No. 14,021, 86 Fed. Reg. 13,803 (Mar. 8, 2021) .......................................... 4

*Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance: Sex-Related Eligibility Criteria for Male & Female Athletic Teams*, 88 Fed. Reg. 22,860 (proposed Apr. 13, 2023) ...................................................... 16

*Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 89 Fed. Reg. 33,474 (Apr. 29, 2024) ............................... *passim*

Other Authorities

*Education Connection: The Importance of Allowing Students to Use Bathrooms and Locker Rooms Reflecting Their Gender Identity*, 36 Child. Legal Rts. J. 153 (2016) ........................................................................... 19

## INTRODUCTION

Title IX prohibits sex discrimination in federally funded education programs and activities. As the Supreme Court has made clear, "Congress gave the statute a broad reach" to cover a "wide range of intentional unequal treatment." *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 175 (2005). Congress also authorized the Department of Education ("Department") to issue rules to effectuate the statute's sweeping prohibition on sex discrimination. In April 2024, the Department exercised that authority by issuing an omnibus rule that makes amendments to its Title IX regulations. *See Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 89 Fed. Reg. 33,474 (Apr. 29, 2024) ("Rule"). Plaintiff seeks to vacate the entire Rule based on statutory and constitutional challenges to five of the Rule's many provisions. *See* Pl. Carroll ISD's Mot. for Summ. J., ECF No. 58; Pl. Carroll ISD's Mem. in Supp. of Mot. for Summ. J., ECF No. 58-59 ("PMSJ").

As an initial matter, this Court should dismiss this suit in its entirety without reaching the merits. Plaintiff's challenges to the Rule should be dismissed on claim-splitting grounds because Plaintiff's claims and interests overlap with the claims and interests already brought by the State of Texas in *Texas v. United States*, No. 2:24-cv-86-Z, 2024 WL 3405342 (N.D. Tex. July 11, 2024). And Plaintiff's only other claims challenge the Department's 2021 Notice of Interpretation and Fact Sheet ("Guidance Documents"), which this Court already vacated in *Texas v. Cardona*, No. 23-cv-0604 (N.D. Tex. Aug. 5, 2024). Plaintiff's challenge to the Guidance Documents should be dismissed as Plaintiff now acknowledges that it suffers no injury because of them.

If this Court reaches the merits, it should grant judgment to Defendants. Defendants acknowledge that the Court has already held that Plaintiff is likely to prevail on some of its challenges. *See* Mem. Op. & Order, ECF No. 43 ("PI Op."); Mem. Op. & Order, ECF No. 55

("Stay Op."). But "[t]he purpose of a preliminary injunction is merely to preserve the relative positions of the parties" until the Court can render a final disposition. *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981). Accordingly, "the findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding" on summary judgment. *Id.*

In particular, three aspects of this case warrant a closer look. The first is the structure of the Rule itself, which consists of numerous severable provisions, including many that Plaintiff does not even challenge—ranging from revising recordkeeping requirements to guaranteeing access to lactation spaces for breastfeeding students. Because Plaintiff challenges discrete provisions (the "challenged provisions"), the remaining provisions of the Rule should be permitted to go into effect. But the challenged provisions, too, should be permitted to take effect because they are consistent with—or even compelled by—the text and structure of Title IX. To wit, § 106.10 recognizes, consistent with the Supreme Court's interpretation of Title VII's materially indistinguishable text, that Title IX's prohibition on sex discrimination encompasses discrimination based on gender identity. Section 106.31(a)(2) reflects Title IX's statutory design by providing that a school violates Title IX when it differentiates on the basis of sex in a way that causes any student more than de minimis harm, unless Congress has authorized such differentiation. Section 106.2 includes a definition of "hostile environment harassment" that the Department designed to effectuate Title IX's broad reach, consistent with the definitions used in other civil-rights statutes. Section 106.44(f)(1) effectuates Title IX's mandate to eliminate sex discrimination by providing adequate guidelines to recipients to ensure that their Title IX Coordinators promptly respond to allegations of sex discrimination and initiate complaints in appropriate circumstances. Section 106.45(b)(5) aims to ensure the fairness of grievance procedures by protecting the privacy of the parties and witnesses. Each of these provisions can

operate separately and must be examined individually.

The second is that Defendants now have the opportunity to provide a more robust explanation of the reasoning underlying the challenged provisions of the Rule—one that draws upon the extensive administrative record. That record furnishes ample support for propositions that the Court found lacking, like evidence of the serious physical and emotional harms that can be caused by excluding transgender students from facilities that correspond to their gender identity, and evidence that allowing transgender students to use such facilities does not interfere with other students' interests in safety and privacy. The Department's fact-based conclusions about the need for the challenged provisions, backed as they are by the Department's enforcement experience, relevant case law, empirical evidence, and stakeholder comments, should not lightly be cast aside.

The third is the importance of tailored relief. Plaintiff seeks an expansive remedy: vacatur, and in the alternative, an injunction against enforcement of the entire Rule. Particularly given that Plaintiff does not challenge the vast majority of the Rule's provisions and that the Rule can function without the challenged provisions, the presumption of severability and the balance of equities clearly counsel in favor of limited relief.

For the foregoing reasons, the Court should dismiss this case, or alternatively enter judgment for Defendants. In the alternative, any relief should be limited to Plaintiff and to the provisions of the Rule that the Court concludes are unlawful.

## BACKGROUND

## I.      Title IX and Its Implementing Regulations

Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). "Congress gave the statute['s]" prohibition on sex discrimination "a broad reach" subject only to

3

a "list of narrow" statutory exceptions and exclusions. *Jackson*, 544 U.S. at 173, 175; *see* 20 U.S.C. §§ 1681(a), 1686. Congress also "authorized and directed" the Department to "issu[e] rules . . . consistent with achievement of the objectives of the statute." 20 U.S.C. § 1682. And Congress established a detailed administrative scheme requiring the Department to first attempt to secure compliance through voluntary means before the Department may suspend or terminate federal financial assistance. *See id.* §§ 1234g(a), 1682–1683; *see also* 34 C.F.R. §§ 100.7(a)–(d), 100.8(a).

Since Title IX's enactment, the Department has promulgated regulations implementing the statute's prohibition on sex discrimination, including in 2020. *See* 85 Fed. Reg. 30,026 (May 19, 2020). One month after publication of the 2020 rule, the Supreme Court held that the prohibition on discrimination "because of . . . sex" in Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a)(1), necessarily encompasses discrimination because of sexual orientation and gender identity. *See Bostock v. Clayton Cnty.*, 590 U.S. 644, 660 (2020). Following *Bostock*, the President directed the Department to review the 2020 rule "for consistency with governing law." Exec. Order No. 14,021, § 2(a), 86 Fed. Reg. 13,803 (Mar. 8, 2021).

## II.    The Department's 2024 Rule

Following an extensive public engagement process, the Department issued the Rule. In June 2021, the Department's Office for Civil Rights held a nationwide virtual public hearing on Title IX. 89 Fed. Reg. at 33,480. OCR received more than 30,000 written comments in connection with the hearing as well as over 280 live comments. *Id.* at 33,835, 33,860. OCR also held listening sessions with a wide variety of stakeholders. *Id.* at 33,480. In July 2022, the Department issued a Notice of Proposed Rulemaking ("NPRM"). *See* 87 Fed. Reg. 41,390 (July 12, 2022). Following extensive review of the over 240,000 comments submitted in response to the NPRM, the Department published the Rule, which went into effect as to states and schools not encompassed within a preliminary injunction on August 1, 2024. *See* 89 Fed. Reg. at 33,476.

The omnibus Rule contains a multitude of provisions intended to "fully effectuate Title IX's sex discrimination prohibition." *Id.* Among other things, the Rule contains provisions that streamline requirements related to designating Title IX Coordinators, 34 C.F.R. § 106.8(a); revise recipients' notice of nondiscrimination and record-keeping requirements, *id.* § 106.8(c), (f); and ensure access to lactation spaces for breastfeeding students and employees, *id.* §§ 106.40(b)(3)(v), 106.57(e)(2). Many could have been entirely separate rulemakings.

Plaintiff's challenges focus on other provisions: specifically, §§ 106.10, 106.31(a)(2), and the definition of "hostile environment harassment" in § 106.2, and particularly those provisions' application to gender-identity discrimination; two discrete sub-provisions of § 106.44(f)(1); and § 106.45(b). *See* PMSJ 7–32.

**Section 106.10** recognizes that "[d]iscrimination on the basis of sex includes discrimination on the basis of sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, and gender identity." 34 C.F.R. § 106.10. Consistent with the Supreme Court's reasoning in *Bostock*, the Rule explains that "discrimination on each of those bases is sex discrimination because each necessarily involves consideration of a person's sex, even if that term is understood to mean only physiological or 'biological distinctions between male and female.'" 89 Fed. Reg. at 33,802 (quoting *Bostock*, 590 U.S. at 655).

**Section 106.31(a)(2)** sets out the general principle that Title IX permits "different treatment or separation on the basis of sex" only to the extent that such differential treatment or separation does not "discriminate[]. . . by subjecting a person to more than de minimis harm." 34 C.F.R. § 106.31(a)(2). The Department derived the de minimis harm standard from the "well-established" understanding "that the concept of discrimination includes an element of injury or harm." 89 Fed. Reg. at 33,815. This provision also recognizes, however, that Congress carved out

certain contexts in which a school may permissibly differentiate on the basis of sex even though greater than de minimis harm may result. *See, e.g.*, 20 U.S.C. § 1681(a)(6) (membership in fraternities or sororities); *id.* § 1686 (maintenance of sex-separate living facilities). The Rule also makes explicit that it does not amend § 106.41(b), which concerns sex separation in athletic teams and is the subject of a separate rulemaking, and that § 106.31(a)(2) does not apply in that context. *See* 89 Fed. Reg. at 33,817; PI Op. 78–79.

Applying this framework, the final sentence of § 106.31(a)(2) provides that a policy or practice that "prevents a person from participating in an education program or activity consistent with the person's gender identity subjects a person to more than de minimis harm on the basis of sex." 89 Fed. Reg. at 33,887. That provision reflects the Department's evidence-based conclusion that "students experience sex-based harm that violates Title IX when a recipient bars them from accessing sex-separate facilities or activities consistent with their gender identity," including "physical, emotional, and dignitary harms." *Id.* at 33,818.

**Section 106.2** is a glossary of terms used in the Department's Title IX regulations, and the amendments to § 106.2 address over a dozen terms, including "sex-based harassment." One form of sex-based harassment is "[h]ostile environment harassment," defined as "[u]nwelcome sex-based conduct that, based on the totality of the circumstances, is subjectively and objectively offensive and is so severe or pervasive that it limits or denies a person's ability to participate in or benefit from the recipient's education program or activity (i.e., creates a hostile environment)." 34 C.F.R. § 106.2. The Department drew the definition of hostile environment harassment from "Title IX's broad language," further concluding that the definition "will better align with the definitions of harassment in other civil rights laws[] and will reduce confusion." 89 Fed. Reg. at 33,497. As with other civil rights statutes, § 106.2 explains that "[w]hether a hostile environment has been

created is a fact specific inquiry that includes consideration" of several enumerated factors.

In promulgating § 106.2's "hostile environment harassment" definition, the Department took multiple steps to protect First Amendment rights. The Department preserved language from the 2020 amendments stating that nothing in the Department's Title IX regulations "requires a recipient to . . . [r]estrict any rights" protected "by the First Amendment of the U.S. Constitution," 34 C.F.R. § 106.6(d)(1); reiterated that "a recipient must formulate, interpret, and apply its rules in a manner that respects the legal rights of students and employees"; and acknowledged that "the First Amendment may in certain circumstances constrain the manner in which a recipient responds to sex-based harassment in the form of speech." 89 Fed. Reg. at 33,503.

**Section 106.44(f)(1)** effectuates Title IX's mandate of eliminating sex discrimination in educational programs and activities by "reaffirm[ing] and clarify[ing] the duty of [] Title IX Coordinator[s]." *Id* at 33,591. Specifically, § 106.44(f)(1) provides that a recipient must require its Title IX Coordinator to take action to "promptly and effectively end any sex discrimination," and § 106.44(f)(1)(v) provides clarification regarding when Title IX Coordinators may initiate a complaint by outlining fact-intensive, minimum factors that must be considered before initiating a complaint in a "very specific and limited set of circumstances." 89 Fed. Reg. at 33,590.

**Section 106.45(b)(5)** requires a recipient "to take reasonable steps to protect the privacy of the parties and witnesses during the pendency of a recipient's grievance procedures" so long as the steps do not unduly restrict the parties' ability to participate in the grievance proceedings. 34 C.F.R. § 106.45(b)(5). The Department promulgated this provision "in recognition of the fact that a party's improper disclosure of information could compromise the fairness of the grievance procedures." 89 Fed. Reg. at 33,831.

**Severability.** Although the Department "believes that every provision of the final

regulations is legally supportable," it reiterated that the severability clauses in its existing regulations "continue[d] to be applicable." *Id.* at 33,848; *see, e.g.*, 34 C.F.R. §§ 106.9, 106.18, 106.24, 106.46, 106.62, 106.72, 106.82. And the Department described how different provisions— including §§ 106.2, 106.10, and 106.31(a)(2)—operate independently from one another and from the remainder of the Rule. 89 Fed. Reg. at 33,848.

## III.   Procedural History

On May 21, 2024, Plaintiff filed its complaint. ECF No. 1 ("*Carroll* Compl."). On May 30, 2024, Plaintiff filed its motion to delay the effective date of the Rule and for a preliminary injunction. ECF No. 15. On July 11, 2024, the Court granted Plaintiff's motion for a preliminary injunction, but deferred ruling on Plaintiff's simultaneous request for a stay of the Final Rule's effective date under 5 U.S.C. § 705 pending further briefing. *See* PI Op. Following supplemental briefing, the Court denied Plaintiff's request for a stay. *See* Stay Op. On August 16, 2024, Plaintiff filed a motion for summary judgment. ECF No. 58.

## LEGAL STANDARD

Under Rule 12(b)(1), the Court can dismiss an action for lack of subject matter jurisdiction. "The burden of proof for a Rule 12(b)(1) motion to dismiss is on the party asserting jurisdiction." *Laufer v. Mann Hosp., L.L.C.*, 996 F.3d 269, 271 (5th Cir. 2021) (quotations omitted). Under Rule 12(b)(6), the Court can dismiss a cause of action for failure to state any claim upon which relief can be granted. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Under Rule 56(a), summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In an APA action, "the district judge sits as an appellate tribunal [and] the entire case on review is a question of law." *Fed'n of Ams. for Consumer Choice, Inc. v. U.S. Dep't of Lab.*, 2023 WL 5682411, at *9 (N.D. Tex. June 30, 2023) (quoting and citation omitted).

8

**ARGUMENT**

**I.      The Court Should Dismiss this Case.**

As a threshold matter, the Court should dismiss this case under Rule 12(b)(6) because Plaintiff in this case and the State of Texas in *Texas v. Cardona* ("*Texas I*"), 4:23-cv-00604-O (N.D. Tex. filed June 14, 2023) and *Texas v. United States* ("*Texas II*"), 2:24-cv-86-Z (N.D. Tex. filed Apr. 29, 2024), have split claims. *See JTH Tax, LLC v. Butschek*, 2020 WL 5083523, at *4-6 (S.D. Tex. Aug. 3, 2020) (dismissing complaint under Rule 12(b)(6) for claim splitting). Additionally, the Court should dismiss Plaintiff's claims with respect to the Guidance Documents under Rule 12(b)(1) for the independent reason that, as this Court concluded, and as Plaintiff acknowledges, Plaintiff does not suffer an injury from those documents.

> **A.      The complaint should be dismissed because Texas and Plaintiff have improperly split their claims.**

Plaintiff's complaint violates the rule against claim-splitting because Plaintiff and Texas are in privity with one another for purposes of Texas' challenge to the Final Rule in *Texas II* and Texas' challenge to the Guidance Documents in *Texas I*.

Previously, this Court allowed this case to proceed despite overlapping claims brought by Texas because the court in *Texas II* had not yet determined whether Texas had standing to proceed and noted that "Defendants may reassert their claim splitting argument, as appropriate, later in this litigation." PI Op. 3. Since that decision, the *Texas* court determined that the State has standing. *See Texas II*, 2024 WL 3405342. Accordingly, the sole basis this Court gave for rejecting Defendants' claim-splitting argument no longer justifies allowing Plaintiff's claims to proceed.

Plaintiff's lawsuit runs afoul of the rule against claim-splitting, which "prohibits a party or parties in privity from simultaneously prosecuting multiple suits involving the same subject matter against the same defendants." *Gen. Land Off. of Tex. v. Biden*, 71 F.4th 264, 269–70 (5th Cir.

2023). The claim-splitting rule arises from the common-sense principle that "plaintiffs have no right to maintain two actions on the same subject in the same court, against the same defendant at the same time." *Curtis v. Citibank, NA.*, 226 F.3d 133, 138-39 (2d Cir. 2000). Parties are in privity "where the non-party's interests were adequately represented by a party to the original suit." *Gen. Land Off. of Tex.*, 71 F.4th at 270.

Here, Plaintiff's claims with respect to the Rule and the Guidance Documents amount to improper claim-splitting. As for Plaintiff's claims with respect to the Rule, (1) this suit and *Texas II* "involv[e] the same subject matter," and (2) Texas and Carroll ISD are in privity with each other for purposes of the rule against claim-splitting. There is no question that the two suits relate to the same subject matter as they both challenge the Final Rule. *See* PI Op. 3 n.10 ("Because Carroll ISD's other claims based on the Guidance Documents are moot due to this Court's decision in [*Texas I*], the remaining claims perfectly overlap with the Amarillo case."). Moreover, Carroll ISD's interest in this suit—i.e., preventing the Rule from taking effect in its district and/or preventing potential loss of federal funds for Carroll ISD—is adequately represented and encompassed by the interest asserted by Texas in *Texas II*—i.e., stopping the Rule from taking effect in schools across the entire state, which includes Carroll ISD, and maintaining federal funds for Texas school districts. *See Texas II*, (N.D. Tex. filed Apr. 29, 2024); Am. Compl. ¶¶ 117–122, 129–130, 140, ECF No. 12 ("*Texas II* Compl."); *Carroll* Compl. ¶¶ 29–31.[1]

---

[1] This case is distinguishable from the Fifth Circuit's recent decision in *Gen. Land Off. of Tex.*, 71 F.4th, where the court concluded that Texas and the Texas General Land Office and its commissioner ("the GLO") were not in privity. Unlike here, in *Gen. Land Off. of Tex.,* the original suit was brought by the GLO, a Texas state agency—not the State of Texas. The Fifth Circuit concluded that the district court erred in dismissing the lawsuit by Texas because Texas had distinct and broader interests that were not represented in the original suit brought by the GLO. *See id.* at 270–71. Here, by contrast, the original suit was brought by Texas, which asserts an interest in maintaining federal funds for Texas school districts, which adequately encompasses

Plaintiff's claims with respect to the Guidance Documents also amount to improper claim-splitting as those claims overlap with Texas's claims in *Texas I*, and are adequately represented by Texas. *See* PI Op. 3 n.10 (reasoning that "Carroll ISD's other claims based on the Guidance Documents are moot due to this Court's decision in *Texas*, 2024 WL 2947022").[2]

Because Texas has already challenged the Guidance Documents and the Final Rule in *Texas I* and *Texas II*, and Plaintiff's interests are adequately represented by Texas in those suits, this suit should be dismissed under Rule 12(b)(6) on claim-splitting grounds.

**B.    The Court should dismiss Plaintiff's challenges to the Guidance Documents.**

In addition to challenging the Rule, Plaintiff's Complaint also challenges the Guidance Documents. *Carroll* Compl. ¶¶ 317-46, But this Court has since vacated the Guidance Documents and enjoined their enforcement. *See Texas I* at *52. As a result, this Court has already noted that Plaintiff's claim regarding "the pre-Final Rule Guidance Documents are MOOT." PI Op. 2 n.4. Indeed, Plaintiff concedes that, as a result of this Court's ruling in *Texas I*, it "is not currently suffering injury from" the Guidance Documents, and therefore "does not object to this Court dismissing without prejudice Counts 5 and 6 of its Complaint." ECF No. 58 at 1 n.1. Because Plaintiff suffers no injury as a result of the now-vacated Guidance Documents, Counts 5 and 6 of Plaintiff's Complaint should be dismissed under Rule 12(b)(1).

**II.    The Court Should Grant Summary Judgment to Defendants.**

The challenged provisions of the Rule—(i) the description of the scope of prohibited sex discrimination in § 106.10, (ii) the specification of how Title IX's prohibition on sex

---

Carroll ISD's narrower interest in maintaining federal funds for Carroll ISD. Indeed, in its complaint, Texas explicitly invokes Carroll ISD's interests as a basis for seeking relief. *Texas II* Compl. ¶¶ 167, 169.

[2] In addition to claim-splitting, as explained in Section I.B, Plaintiff's challenges to the Guidance Documents are also subject to dismissal under Rule 12(b)(1).

discrimination applies to certain sex-separated contexts in § 106.31(a)(2), (iii) the definition of hostile environment harassment in § 106.2, (iv) the requirements for Title IX Coordinators in § 104.44(f)(1), and (v) the privacy protections in § 106.45(b)(5)—are lawful in their application to gender-identity discrimination and otherwise. The Department is therefore entitled to judgment.

Plaintiff's APA challenges fail because the challenged provisions of the Rule are consistent with—indeed, in substantial measure, compelled by—the text of Title IX, its statutory design, and pertinent Supreme Court decisions, including *Bostock*. To the extent the Rule reflects interstitial policy decisions by the Department, the Department acted well within the "zone of reasonableness" in making them. *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021); *see also Dep't of Com. v. New York*, 588 U.S. 752,773 (2019) (explaining that review under the arbitrary and capricious standard is "deferential").

To the extent Plaintiff raises constitutional challenges, those likewise fail, whether Plaintiff's concerns are framed in terms of constitutional violations, canons of statutory interpretation and avoidance doctrines, or factors the Department was obliged to consider in exercising its policy discretion. The Rule neither infringes on any constitutional privacy right nor violates the First Amendment. The challenged provisions of the Rule should therefore be upheld.

**A.    Section 106.10 is consistent with the text of Title IX and is not arbitrary and capricious.**

Section 106.10's articulation of the scope of Title IX's prohibition of discrimination "on the basis of sex," *see* 20 U.S.C. § 1681, is consistent with the text of Title IX and Supreme Court precedent and is not arbitrary and capricious.

**1.    Section 106.10 is consistent with the text of Title IX.**

Title IX prohibits discrimination "on the basis of sex." 20 U.S.C. § 1681. Section 106.10 accurately describes the scope of that prohibition: "[d]iscrimination on the basis of sex includes

discrimination on the basis of sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, and gender identity," 34 C.F.R. § 106.10, "because each necessarily involves consideration of a person's sex, even if that term is understood to mean only physiological or 'biological distinctions between male and female,'" 89 Fed. Reg. at 33,802 (quoting *Bostock*, 590 U.S. at 655). Section 106.10 thus makes clear that prohibited sex discrimination includes actions like excluding a student from a homecoming dance for being pregnant, giving a student detention for being gay, or barring a student from band for being transgender. That interpretation is lawful.

Section 106.10 reflects a straightforward application of *Bostock*'s two-step reasoning to the materially indistinguishable language of Title IX's prohibition on sex discrimination. *Contra* PMSJ 8–15; *Texas*, 2024 WL 3658767, at *37–38.[3]

*First,* by prohibiting discrimination "on the basis of" sex, 20 U.S.C. § 1681, Title IX "incorporates" a causation standard no more stringent than "the 'simple' and 'traditional' standard of but-for causation." *Bostock*, 590 U.S. at 656 (quotation omitted). In other contexts, the Supreme Court has explained that "the phrase 'based on' indicates a but-for causal relationship" and that the phrase has "the same meaning as the phrase, 'because of.'" *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176 (2009) (citation omitted). The same is true of the phrase "on the basis of," which is

---

[3] In two parallel lawsuits challenging the Rule, the Department filed applications with the Supreme Court to partially stay preliminary injunctions pending appeal. *Dep't of Educ. v. Louisiana*, --- S. Ct. ---, 2024 WL 3841071 (U.S. Aug. 16, 2024). In denying the stay applications, the Supreme Court did not address—or even mention—the applicability of *Bostock* to Title IX's text. Nor did it otherwise resolve the merits of the Department's appeals from the preliminary injunction, let alone plaintiffs' request for more permanent relief. The brief per curiam order merely stated that "all Members of the Court today accept[ed] that the plaintiffs were entitled to preliminary relief as to" the challenged provisions, noting that the dispute before the Court concerned whether "other provisions of the new rule should still be permitted to take effect in the interim period while the Government's appeals of the preliminary injunctions are pending in the Courts of Appeals." *Id.* at *1. This statement described only a stay-stage determination regarding the preliminary injunctions, as the dissent made clear. *Id.* at *1; *see id.* at *2 (Sotomayor, J., dissenting in part).

"strongly suggestive of a but-for causation standard." *Comcast Corp. v. Nat'l Ass'n of Afr. Am.- Owned Media*, 589 U.S. 327, 335 (2020).

Contrary to Plaintiff's arguments, the fact that Title IX and Title VII use slightly different words does not preclude the application of *Bostock*. *Contra* PMSJ 8–10; *Texas*, 2024 WL 3658767, at *29–31. The Fifth Circuit has consistently relied on interpretations of Title VII's prohibition on discrimination "because of . . . sex" to interpret Title IX's textually similar provision. *Lowrey v. Tex. A&M Univ. Sys.*, 117 F.3d 242, 248 (5th Cir. 1997). The Fifth Circuit has emphasized "Title IX's similarity to Title VII," explaining that "the prohibitions of discrimination on the basis of sex [in] Title IX and Title VII are the same." *Lakoski v. James*, 66 F.3d 751, 757 (5th Cir. 1995). In *Bostock* itself, the Supreme Court substituted the phrase "on the basis of" for Title VII's "because of" formulation at least eight times. *See, e.g.*, 590 U.S. at 649 (noting that "in Title VII, Congress outlawed discrimination in the workplace on the basis of race, color, religion, sex, or national origin"). Other differences between Title IX and Title VII are similarly immaterial: both speak in equally broad terms, and prohibit discrimination—understood in either context as acts that cause cognizable harm—against individuals where sex plays an impermissible role. And the fact that Title VII also prohibits discrimination on other protected bases does not affect the requisite causal relationship between the harmful act and the prohibited basis, whatever it may be.

As for the fact that Title IX and its original implementing regulations contain provisions allowing differentiation based on sex in some contexts, *contra* PMSJ 10–11; *Texas*, 2024 WL 3658767, at *31–34, those provisions do not compel a different understanding of what constitutes sex discrimination. Title VII also contains statutory exceptions, *see* 42 U.S.C. § 2000e-2(e) (bona fide qualifications), and has long been understood to allow certain forms of sex differentiation, like "sex-segregated bathrooms, locker rooms, and dress codes," and yet the Supreme Court still

held that gender-identity discrimination is necessarily a form of sex discrimination. *Bostock*, 590 U.S. at 681. In any event, the presence of statutory provisions that allow for sex separation in certain contexts demonstrates that Congress understood Title IX's general prohibition against sex discrimination otherwise could have been interpreted to generally preclude such separation. *See Arnold, Constable & Co. v. United States*, 147 U.S. 494, 499 (1893) ("[T]he exception of a particular thing from general words proves that, in the opinion of the lawgiver, the thing excepted would be within the general clause had the exception not been made." (quotation omitted)).

*Second*, whether in the workplace or in a school, "sex is necessarily a but-for cause" of discrimination on the basis of sexual orientation or gender identity "because it is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex." *Bostock*, 590 U.S. at 660–61 (emphasis omitted). That is why various courts have concluded that in light of *Bostock*, discrimination on the basis of sexual orientation and gender identity are necessarily forms of prohibited sex discrimination under Title IX. *See, e.g.*, *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 616 (4th Cir. 2020), *as amended* (Aug. 28, 2020); *A.C. ex rel. M.C. v. Metro. Sch. Dist. of Martinsville*, 75 F.4th 760, 769 (7th Cir. 2023); *Grabowski v. Ariz. Bd. of Regents*, 69 F.4th 1110, 1116 (9th Cir. 2023).

Plaintiff's responses are unavailing. Like the Court in *Bostock*, the Department did not "redefine" the term sex, nor assume the term "sex" in Title IX to mean anything other than "physiological or 'biological distinctions between male and female.'" 89 Fed. Reg. at 33,802 (quoting *Bostock*, 590 U.S. at 655). *Contra* PMSJ 7–15; PI Op. 5. Section 106.10, like *Bostock*, recognizes that gender-identity discrimination is sex discrimination even under that binary understanding of sex. 89 Fed. Reg. at 33,802. Indeed, Plaintiff states that the Rule "assumes that 'sex' means biological differences," but faults the Department for declining to define the term

15

"sex." PMSJ 7. The Department rightly concluded, however, that defining the term "sex" was unnecessary, 89 Fed. Reg. at 33,802, given that the Department's regulations have long referred to, without defining, "discrimination on the basis of sex." *See infra* pages 48-49.

### 2. Section 106.10 is not arbitrary and capricious.

Plaintiff's arbitrary-and-capricious arguments largely reprise their statutory arguments or rest on misunderstandings of what § 106.10 does. *See* PMSJ 7–15. To start, it was not arbitrary and capricious for the Department to rely on *Bostock*; its reasoning applies to Title IX's materially indistinguishable language for the reasons provided above. *Contra* PMSJ 8–12; *Texas*, 2024 WL 3658767, at *37–38. Nor does § 106.10 improperly redefine sex discrimination, elevate new protected classes, or encompass characteristics that have nothing to do with sex. *Contra* PMSJ 9– 10; PI Op. 6–11. To discriminate on any of the bases listed in § 106.10, including on the basis of sex stereotypes, *contra* PMSJ 15, is simply to make impermissible sex-based distinctions. For example, permitting only male students to enroll in a woodworking class because woodworking is a hobby only men are interested in would constitute discrimination on the basis of sex stereotypes, and thereby be discrimination on the basis of sex. Finally, it was not unreasonable for the Department to follow *Bostock*'s lead in declining to address contexts involving sex separation in § 106.10. *See* 89 Fed. Reg. at 33,809; *Bostock*, 590 U.S. at 681 (declining "to address bathrooms, locker rooms, or anything else of the kind"); *contra* PMSJ 15. Those questions are appropriately addressed by § 106.31(a)(2) or, for sex-separate athletic teams, by separate rulemaking that is still pending. *See Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance: Sex-Related Eligibility Criteria for Male and Female Athletic Teams*, 88 Fed. Reg. 22,860 (proposed Apr. 13, 2023).

Plaintiff's insinuations that § 106.10 secretly imposes specific requirements on subjects like sex-separate bathrooms and athletics are off-base. PMSJ 22–23. As the Supreme Court

illustrated in *Bostock*, one can address the meaning of discrimination based on sex without addressing that meaning's implications for sex separate contexts. Just so with the Rule, which addresses sex-separate contexts in § 106.31(a)(2) (not § 106.10), and which does not affect the Department's regulation concerning sex-separate athletic teams at all. *See, e.g.*, 89 Fed. Reg. at 33,809 ("declin[ing] the suggestion to revise § 106.10 to address separation of students based on sex"); *accord Bostock*, 590 U.S. at 681 (declining "to address bathrooms, locker rooms, or anything else of the kind"). Plaintiff suggests that a series of court cases and filings that predate the Rule are indicative of § 106.10's implications, *see* PMSJ 22–23, but it is § 106.10 that appears in the Code of Federal Regulations, not these other documents. As to athletics, until the Proposed Athletics Rule is finalized and issued, the current regulations on athletics continue to apply.[4]

> **B.    Section 106.31(a)(2) is consistent with the text and structure of Title IX, is not arbitrary and capricious, and does not infringe on any rights to safety or privacy.**

Contrary to Plaintiff's contentions, the Rule's explanation of the extent to which Title IX permits separate or different sex-based treatment follows from Title IX's operative text, is not arbitrary or capricious, and does not infringe on any purported right to safety or privacy.

> **1.    The de minimis harm standard in § 106.31(a)(2) is properly derived from the statutory text and fully consistent with Supreme Court precedent.**

Section 106.31(a)(2) addresses how Title IX's prohibition on sex discrimination applies to sex separation or differentiation in three steps:

*First*, § 106.31(a)(2) effectuates Title IX's plain text, which prohibits "discrimination" on

---

[4] Plaintiff invokes concerns about how § 106.10 might hypothetically apply to the general prohibition on sex discrimination in athletics, *see* 34 C.F.R. § 106.41(a), suggesting § 106.10 could somehow have implications for sex-separate athletic teams. But § 106.10 does not address the limits on permissible sex separation under Title IX, and Plaintiff's claimed harms all relate to sex separation in competitive or contact sports, PMSJ at 24, a topic addressed by separate regulations and which the Rule does not reach. 89 Fed. Reg. at 33,817.

the basis of sex, 20 U.S.C. § 1681(a), by providing that Title IX generally permits "different treatment or separation on the basis of sex" only to the extent that such differential treatment or separation does not "discriminate[] … by subjecting a person to more than de minimis harm." 89 Fed. Reg. at 33,887. As the Supreme Court has explained, "the term 'discriminate against' refers to distinctions or differences in treatment that injure protected individuals." *Bostock*, 590 U.S. at 681 (quotation omitted); *see Muldrow v. St. Louis*, 144 S. Ct. 967, 974 (2024) (same). Because "the concept of discrimination includes an element of injury or harm," 89 Fed. Reg. at 33,815, the Department "does not interpret Title IX to prohibit all sex-based distinctions or separation," including where such distinctions cause no harm, *id.* at 33,814.

*Second*, § 106.31(a)(2) follows Congress's direction by excepting certain contexts in which Congress permitted recipients to separate or distinguish on the basis of sex, even if doing so causes cognizable harm. *See id.* at 33,886. Those limited contexts include separation by sex in fraternities and sororities, 20 U.S.C. § 1681(a)(6)(A); certain youth service organizations, *id.* § 1681(a)(6)(B); and sex-separate "living facilities," *id.* § 1686. The Rule effectuates Congress's decision to treat certain contexts differently by providing that § 106.31(a)(2)'s de minimis harm standard does not apply to the statutory carve outs and their implementing regulations. 89 Fed. Reg. at 33,816.

*Third*, in addition to setting out a general rule, § 106.31(a)(2) specifies a particular context in which separation or differential treatment on the basis of sex causes more than de minimis harm: preventing someone from participating in an education program or activity consistent with the person's gender identity. Therefore, except as covered by a congressionally specified exclusion, recipients must permit individuals to access sex-separate facilities and activities consistent with their gender identity. In particular, the Department has long recognized that sex separation "in the context of bathrooms or locker rooms[] is not presumptively unlawful sex discrimination" because,

for example, a cisgender male suffers no sex-based harm from being excluded from a comparable women's restroom. 89 Fed. Reg. at 33,818; *see* 34 C.F.R. § 106.33. But it violates Title IX to bar transgender students from accessing restrooms that align with their gender identity because restrooms are not exempted from the statute's general nondiscrimination mandate and barring such students *does* cause them cognizable sex-based harm. 89 Fed. Reg. at 33,818. Consistent with that conclusion, various courts have held that policies that prevent students from accessing the restrooms that correspond to their gender identity violate Title IX. *See, e.g.*, *A.C*, 75 F.4th at 769; *Grimm*, 972 F.3d at 616.

Plaintiff does not challenge the Department's conclusion—supported by ample case law, research, testimony and comments from stakeholders, and evidence from schools' experience, *see* 89 Fed. Reg. at 33,818–19—that preventing a person from participating in programs or accessing sex-separate facilities consistent with their gender identity subjects them to harm. Not could it. As the American Medical Association and thirteen other medical associations have explained, substantial evidence[5] demonstrates that excluding students from facilities that correspond to their gender identity "endangers their health, safety and well-being, leads to negative health outcomes and heightens stigma and discrimination." Tanya Albert Henry, *Exclusionary Bathroom Policies Harm Transgender Students*, Am. Med. Ass'n (Apr. 17, 2019), AR_275350–52.

---

[5] *See, e.g.*, Jody L. Herman, *Gendered Restrooms and Minority Stress: The Public Regulation of Gender and Its Impact on Transgender People's Lives*, 19 J. of Pub. Mgmt. & Soc. Pol'y 65 (2013), AR_293089–104; Jason Rafferty et al., Am. Acad. of Pediatrics, *Ensuring Comprehensive Care and Support for Transgender and Gender Diverse Children and Adolescents*, 142 Pediatrics 1 (2018), AR_281253–66; Thea A. Schlieben, *Sex-Segregated Bathrooms and Suicidal Ideation in Transgender Youth*, 15 J. Adv. Gen. Soc. Work Prac. 1 (2020), AR_293382–88; Kristie L. Seelman, *Transgender Adults' Access to College Bathrooms and Housing and the Relationship to Suicidality*, 63 J. Homosexuality 1378 (2015), AR_293395, https://perma.cc/W6UL-NKSW; Katherine Szczerbinski, *Education Connection: The Importance of Allowing Students to Use Bathrooms and Locker Rooms Reflecting Their Gender Identity*, 36 Child. Legal Rts. J. 153, 153 (2016), AR_293105–08.

Instead of contesting that evidence-based conclusion, Plaintiff contends that § 106.31(a)(2) improperly grants preferential treatment to transgender students. PMSJ 16–18; *see also* PI Op. 6–11. Section 106.31(a)(2)'s protections, however, are not limited to transgender students, but apply "with equal force to all students." 89 Fed. Reg. at 33,818; *see also id* at 33,820 (explaining that § 106.31(a)(2) "protects all students from harm"). The Rule protects all students from harmful sex-based distinctions, such as discriminatory dress and appearance codes. *See, e.g.*, *Peltier v. Charter Day School, Inc.*, 37 F.4th 104, 130 (4th Cir. 2023) (en banc) (school dress code "requirement that only girls must wear skirts, when boys may wear shorts or pants" discriminates in violation of Title IX if girls "are harmed by the requirement"). The Rule simply recognizes, as many courts have, that "prevent[ing] a person from participating in an education program or activity consistent with the person's gender identity" is one example of separation or differentiation that "subjects a person to more than de minimis harm on the basis of sex." 89 Fed. Reg. at 33,818. Plaintiff offers no reason to doubt that well-reasoned conclusion.

Plaintiff also asserts, and the Court concluded, that Title IX's text does not support a de minimis harm standard at all. *See* PMSJ 16; PI Op. 10. But "it is well-established that the concept of discrimination includes an element of injury or harm." 89 Fed. Reg. at 33,815 (collecting cases); *see also Muldrow*, 144 S. Ct. at 974 ("The words 'discriminate against,' we have explained, refer to 'differences in treatment that injure' employees.") (quoting *Bostock*, 590 U.S. at 681). And courts, including the Fifth Circuit, have conceived of de minimis harm as harm that does not rise to the level of a constitutionally cognizable injury. *Queen v. United States*, 99 F.4th 750, 752 (5th Cir. 2024). Thus, the de minimis harm standard is well-grounded in the statute's text.

Nor does § 106.31(a)(2) produce inconsistencies with Title IX's statutory exceptions. *Contra* PMSJ at 18. Rather, the Department explained that § 106.31(a)(2) reflects the distinctions

20

that Congress drew in enacting Title IX. For example, *Congress* (not the Department) expressly excepted fraternities' membership practices from Title IX's general nondiscrimination mandate. *See* 89 Fed. Reg. at 33,816. *Congress* included no such exception for restrooms and locker rooms. *Id.* at 33,819. The Department's reliance on Congress's distinctions was not "throwaway reasoning," as Plaintiff suggests. PMSJ at 18. On the contrary, the Rule's careful adherence to statutory text and structure is appropriate, given that neither courts nor agencies may "disregard [a statute's] plain terms based on some extratextual consideration," *Bostock*, 590 U.S. at 674–75.

## 2. Plaintiff does not show that the Department's consideration of § 106.31(a)(2) was arbitrary and capricious.

Plaintiff's arbitrary-and-capricious arguments reprise their statutory arguments, and fail for similar reasons. *See* PMSJ 20–22.[6] The Department addressed concerns about recipients' reliance interests and potential costs. *Contra* PMSJ 21–22; Compl. ¶ 308. The Department explained that recipients may, but are not required to, provide "single-occupancy facilities" both "because such facilities are not the only way a recipient could provide nondiscriminatory access" and because it "would likely carry significant cost implications." 89 Fed. Reg. at 33,820.

Similarly, the Department addressed scenarios concerning (i) the application of § 106.31(a)(2) to individuals whose gender identity is nonbinary and (ii) the provisions' interaction with parental rights. As to how § 106.31(a)(2) applies to individuals whose gender identity is nonbinary, the Department explained that "a recipient may, for example, coordinate with the student, and the student's parent or guardian as appropriate, to determine how to best provide the student with safe and nondiscriminatory access to facilities." 89 Fed. Reg. at 33,818. As to the Rule's interaction with parental rights, the Rules makes clear that "nothing in the final regulations

---

[6] Plaintiff's argument that the Rule fails to consider how privacy interests are threatened and is therefore arbitrary and capricious, PMSJ 20–21, is addressed *infra* Section II.B.3.

disturbs parental rights." 89 Fed. Reg. at 33,822. Specifically, "[w]hen a parent and minor student disagree about how to address sex discrimination against that student, deference to the judgment of a parent, guardian, or other authorized legal representative with a legal right to act on behalf of that student is appropriate." *Id.*; *contra* PMSJ 22.

### 3.     Section 106.31(a)(2) does not violate any right to safety or privacy.

Plaintiff also incorrectly asserts that § 106.31(a)(2) violates purported constitutional rights to bodily safety and privacy, which it variously frames in terms of statutory construction, *see* PMSJ 2, 9, 11, 13, 18; constitutional rights, *see id.* at 1, 19–20; and, the APA's arbitrary-and-capricious standard, *see id.* at 20–21. Each of these arguments, however, falters in light of the record before the Department, which decisively rebuts such concerns.

As an initial matter, Plaintiff fails to identify any case that has recognized a constitutional right to privacy along the lines it suggests. Substantive due process analysis "start[s] with a 'careful description of the asserted fundamental liberty interest,'" *Dep't of State v. Munoz*, 144 S. Ct. 1812, 1822 (2024) (quoting *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997)), which Plaintiff has not done. But regardless, § 106.31(a)(2) does not violate any right to privacy or safety, and the Department thoroughly addressed all concerns to the contrary. The Department "agree[d] that recipients have a legitimate interest in protecting all students' safety and privacy," and concluded that such goals are not "inconsistent with § 106.31(a)(2)." 89 Fed. Reg. at 33,820. Specifically, the Department emphasized that nothing prevents recipients from taking steps "to ensure privacy and safety for all students in a recipient's sex-separate facilities—steps that many recipients already take consistent with their general codes of conduct, including rules prohibiting harassment, assault, and other forms of misconduct." *Id.* The Rule further explained that recipients may, but would not be required to, "offer[] single-occupancy facilities, among other accommodations, to any students who seek additional privacy for any reason." *Id.*

The Department's conclusion that § 106.31(a)(2) would not infringe upon safety and privacy was amply backed by the record before the agency. The Department explained that based on its "enforcement experience, listening sessions with stakeholders, and its review of Federal case law," it disagreed that "transgender students pose a safety risk to cisgender students, or that the mere presence of a transgender person in a single-sex space compromises anyone's legitimate privacy interests." 89 Fed. Reg. at 33,820. The Department further pointed to the experience of schools across the country which attested that, when required to "integrate transgender students into gender-specific facilities," "hypothetical fears and concerns" regarding safety and privacy have been "wholly unfounded in practice." Amici Br. of School Administrators *18–19, *Grimm v. Gloucester Cnty. Sch. Bd.*, No. 19-1952, 2019 WL 6341095 (4th Cir. Nov. 25, 2019) (cited at 89 Fed. Reg. at 33,820; AR_280882). And it noted court decisions that have rejected "unsubstantiated" and "generalized" claims that "transgender persons' access to sex-separate spaces infringes on other students' privacy or safety." 89 Fed. Reg. at 33,820. Again, empirical evidence confirms the Department's conclusions.[7]

To the extent commenters expressed concerns that non-transgender individuals might attempt to exploit § 106.31(a)(2) to gain access to sex-separate spaces, the Department addressed ways that recipients can verify an individual's gender identity for purposes of allowing them to access the appropriate facility. *Contra* PMSJ 20–21. The Department acknowledged that "many

---

[7] *See, e.g.*, Amira Hasenbush et al., *Gender Identity Nondiscrimination Laws in Public Accommodations: A Review of Evidence Regarding Safety and Privacy in Public Restrooms, Locker Rooms, and Changing Rooms*, 16 Sexuality Rsch. & Soc. Pol'y 70 (2019), AR_293039–53 (reviewing public records to compare the safety of public restrooms, locker rooms, and changing rooms in localities that permit access based on gender identity with localities that do not and concluding that those laws are not related to the frequency of criminal incidents); Office of Safe & Healthy Students, U.S. Dep't of Educ., *Examples of Policies and Emerging Practices for Supporting Transgender Students* (May 2016), AR_293260–84 (providing examples of how schools have provided access without resulting in safety and privacy concerns).

recipients rely on a student's *consistent* assertion to determine their gender identity, or on written confirmation of the student's gender identity by the student or student's parent, counselor, coach, or teacher." 89 Fed. Reg. at 33,819 (emphasis added). Recipients may also request documentation so long as they are not invasive or burdensome, or where "access to such documentation is prohibited by law." *Id.* That hardly amounts to a requirement of allowing unverified access, as demonstrated by the practices of the many recipients that permit students to access facilities based on their gender identity while simultaneously prohibiting abuse of such policies.

No more was required to justify the conclusion that a "recipient can make and enforce rules that protect all students' safety and privacy without also excluding transgender students from accessing sex-separate facilities and activities consistent with their gender identity." 89 Fed. Reg. at 33,821. The Department did not ignore contrary evidence, as Plaintiff suggests; after careful consideration, it simply concluded that the evidence summarized above outweighed the evidence put forth by some commenters. The Department's reasonable assessment of the facts is entitled to deference, and should be upheld. *See United Steel v. Pension Ben. Guar. Corp.*, 707 F.3d 319, 325 (D.C. Cir. 2013) ("[W]eighing the evidence is not the court's function.").

### C.   Section 106.2's definition of hostile environment harassment does not infringe on First Amendment rights, nor is it arbitrary and capricious.

The Final Rule defines hostile environment sex-based harassment, in relevant part, as "[u]nwelcome sex-based conduct that, based on the totality of the circumstances, is subjectively and objectively offensive and is so severe or pervasive that it limits or denies a person's ability to participate in or benefit from the recipient's education program or activity." 34 C.F.R. § 106.2. Plaintiff is wrong to contend that this definition requires recipients to violate the First Amendment and is arbitrary and capricious. *Contra* PMSJ 25–28, 30-31. Plaintiff's argument boils down to the unfounded assertion that recipients will need to adopt policies in response to this definition that

violate the First Amendment. PMSJ at 26-28. But § 106.2's definition mirrors long-applied standards in the Title VII and Title IX contexts, which, prior to this litigation, no court had held contravened the First Amendment. Conversely, the Supreme Court upheld "similar proscriptions on hostile environment harassment" in both contexts "without raising any First Amendment concerns." 89 Fed. Reg. at 33,506 (citing *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629 (1999); *Harris v. Forklift Sys. Inc.*, 510 U.S. 17, 23 (1993)).

Moreover, the Department structured the definition of hostile environment harassment to redress First Amendment concerns by "cover[ing] only sex-based conduct that is unwelcome, both subjectively and objectively offensive, *and* so severe or pervasive that it limits" a person's ability to participate in the recipient's education program or activity. 89 Fed. Reg. at 33,503 (emphasis added). And the Department "revised the definition to retain the 2020 amendments' reference to offensiveness," *id.*, and made plain that the definition "only prohibit[s] conduct that meets all the elements" set forth, *id.* at 33,506. The Department also clarified that "a stray remark, such as a misuse of language, would not constitute harassment." *Id.* at 33,516.

If any doubt remained, the Rule also makes clear that "nothing in the regulations"—including any definition in § 106.2—"requires or authorizes a recipient to violate anyone's First Amendment rights." *Id.*; *see also* 34 C.F.R. § 106.6(d). Thus, while recipients must address hostile environments, the "First Amendment may in certain circumstances constrain the manner in which a recipient responds to sex-based harassment in the form of speech." 89 Fed. Reg. at 33,503. To the extent recipients adopt policies that raise First Amendment concerns, those policies are neither required nor authorized by the definition in § 106.2.

Plaintiff's First Amendment theories fare no better when assessed individually.

a.      As to compelled speech and viewpoint discrimination, Plaintiff speculates that

recipients will adopt policies to comply with § 106.2's definition of hostile environment harassment that "require" the use of preferred pronouns and compel or prohibit certain viewpoints on subjects of sex and gender. *See* PMSJ 26–27. But the definition does not require schools to adopt any particular policy and neither compels any particular speech by students or staff, nor requires anyone to affirm "any particular view on any issue." 89 Fed. Reg. at 33,505. It merely requires that recipients address sex-based harassment that is "subjectively and objectively offensive" and so "severe or pervasive" as to limit or deny a person's ability to access their programs. 34 C.F.R. § 106.2.

Requiring schools to address sex-based harassment—even where it involves speech—is different in kind from "telling" students and staff "what they must say." *Rumsfeld v. FAIR, Inc.*, 547 U.S. 47, 61 (2006). The government can ensure that the classroom, no less than the workplace, is free from sex-based "intimidation, ridicule, and insult" without governing every "utterance." *Harris*, 510 U.S. at 21 (citation omitted). Indeed, the Rule requires recipients to "formulate, interpret, and apply its rules in a manner that respects the legal rights of students and employees when taking action to end sex-based harassment that creates a hostile environment." 89 Fed. Reg. at 33,503. That is true in every context, including with respect to gender identity.

Even if there were circumstances in which the repeated or acute refusal to use pronouns consistent with a student's gender identity contributed to a hostile environment, nothing in the Rule would "require[] or authorize[]" the recipient to take remedial measures that would "violate anyone's First Amendment rights," *id.* at 33,516. Nor would anything in the Rule require or authorize the recipient to "compel[] silence of opposing viewpoints." *Id*. In other words, while the Department cannot "prejudge or comment on whether specific cases or factual scenarios comply with Title IX prior to conducting an investigation and evaluating the relevant facts and

26

circumstances," 89 Fed. Reg. at 33,507, the Rule makes clear that the only measures that can be required in any given case are those that comport with the First Amendment.

Plaintiff also distorts the government's position in other submissions. *See* PMSJ 27. In *Kluge*, for example, the only claim at issue was grounded in Title VII, and concerned whether a school permissibly declined to retain a particular accommodation for a teacher's religious objection to using preferred names and pronouns where the accommodation "harmed students" and created Title IX-related litigation risk for the school. *See* Amicus Br. of the U.S. 2–3, 29–30, *Kluge v. Brownsburg Cmty. Sch. Corp.*, No. 21-2475, 2021 WL 5405970 (7th Cir. Nov. 8, 2021). Nothing in the filing addressed the standard for hostile environment harassment, much less undermines the Department's commitment that "nothing in the [Rule] requires or authorizes a recipient to violate anyone's First Amendment rights." 89 Fed. Reg. at 33,516.

      **b.**      Even if the definition of hostile environment harassment were susceptible to unconstitutional applications in certain contexts, that still would not warrant invalidating the definition. "[A] law may be invalidated as overbroad if a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 615 (2021) (citation omitted). As the Fifth Circuit has warned, "applying the overbreadth doctrine is strong medicine." *Serafine v. Branaman*, 810 F.3d 354, 363 (5th Cir. 2016) (citation omitted). Such extraordinary relief is not warranted here.

The definition poses no overbreadth problems. It "covers only sex-based conduct that is unwelcome, both subjectively and objectively offensive, and so severe or pervasive that it limits or denies a person's ability to participate," 89 Fed. Reg. at 33,503, and "only prohibit[s] conduct that meets all the[se] elements" and requires an evaluation based on the "totality of the circumstances" to ensure that no "required element[] . . . is ignored," *Id.* at 33,506. Even if the

prohibition occasionally "sweeps in speech," *id.* at 33,494, the standard does not prohibit a "substantial" amount of protected speech "in an absolute sense" or relative to the Rule's "plainly legitimate sweep." *Virginia v. Hicks*, 539 U.S. 113, 118–20 (2003) (internal citations omitted).

Courts, including the Fifth Circuit, have long applied similar standards under Title VII. *See, e.g., EEOC v. Boh Bros. Constr. Co.*, 731 F.3d 444, 457, 461–62 (5th Cir. 2013) (en banc) (deeming the evidence sufficient to find that a plaintiff suffered "sufficiently severe or pervasive" sex-based harassment where, *inter alia*, he was repeatedly called sex-based epithets by a supervisor); *Woods v. Cantrell*, 29 F.4th 284, 285 (5th Cir. 2022) ("We have further said, however, that under the totality of the circumstances test, a single incident of harassment, if sufficiently severe, can give rise to a viable Title VII claim." (cleaned up)).

By contrast, Plaintiff's reliance on *Davis ex rel. LaShonda D. v. Monroe County Board of Education*, 526 U.S. 629 (1999) is misplaced. PMSJ 27. In *Davis*, the Supreme Court addressed the "scope of liability in private damages actions" under Title IX's judicially implied right of action, 526 U.S. at 641, a context in which courts have "a measure of latitude to shape a sensible remedial scheme that best comports with the statute," *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 284 (1998). In that specific "context," 526 U.S. at 649, the Court adopted a standard for monetary damages actions designed to adhere to the principle that "a recipient of federal funds may be liable in damages under Title IX only for its own misconduct," *id.* at 640. Although the dissent discussed the First Amendment, the majority nowhere suggested that its holding was motivated by such concerns. *See* 526 U.S. at 667 (Kennedy, J., dissenting). Rather, the Court made clear that the standard reflected the appropriate limits on Title IX's judicially implied damages action, *see id.* at 640 (majority opinion), which implicates issues of fair notice not presented in the administrative-enforcement context, *see Gebser*, 524 U.S. at 290 (explaining that federal funding

28

can be terminated administratively only after "notice and unsuccessful efforts to obtain compliance" and limiting implied private damages action under Title IX to "comparable conditions"). Indeed, the Court approvingly cited the Department's then-applicable hostile-environment standard, *id.* at 647-48, 651, which—similar to the Rule—defined sex-based harassment to include "severe, persistent, or pervasive" conduct, 62 Fed. Reg. 12,034, 12,034 (Mar. 13, 1997).

Nor does the definition sweep in protected speech simply because it may apply to speech located outside of the physical classroom. *Contra* PMSJ 28. As the Department explained, a recipient is obligated to address a hostile environment occurring "under its education program or activity, even when some conduct alleged to be contributing to the hostile environment occurred outside" the program or activity. 89 Fed. Reg. at 33,530. That is consistent with Fifth Circuit's precedent, which recognizes that schools may regulate certain off-campus speech. *See, e.g.*, *Bell v. Itawamba Cnty. Sch. Bd.*, 799 F.3d 379, 396 (5th Cir. 2015) (holding that schools may regulate "speech reasonably understood by school officials to threaten, harass, and intimidate a teacher, even when such speech originated, and was disseminated, off-campus without the use of school resources"). The definition also bears no resemblance to the policy in *Speech First, Inc. v. Cartwright*, which "reache[d] not only a student's own speech, but also her conduct 'encouraging,' 'condoning,' or 'failing to intervene' to stop another student's speech," 32 F.4th 1110, 1125 (11th Cir. 2022).[8] Moreover, the definition bears no resemblance to the policy in *Saxe v. State Coll. Area School Dist.,* 240 F.3d 200 (3d Cir. 2001), which provided that "[h]arassment can include any

---

[8] The conclusory opinion in *Speech First v. Khator*, 603 F. Supp.3d 480 (S.D. Tex. 2022), likewise identifies no persuasive ground to find that the challenged definition is inconsistent with the First Amendment. *See* 603 F. Supp. 3d at 482 & n.6 (concluding, with no analysis, that plaintiff would "likely succeed on the merits because [the university's] original policy does not comport with the standard adopted by the Supreme Court [in *Davis*]").

unwelcome verbal, written or physical conduct which offends, denigrates or belittles an individual because of any of the [specified] characteristics," regardless of whether such conduct was severe or pervasive, and without requiring that such conduct be both subjectively and objectively offensive. *Id.* 203-204.

  **c.**  Section 106.2's definition of hostile environment harassment also is not vague. *Contra* PMSJ 28. It offers "specific and required elements," 89 Fed. Reg. at 33,506, "using language with common usage and understanding" in the antidiscrimination context, *Rowles v. Curators of the Univ. of Mo.*, 983 F.3d 345, 352, 358 (8th Cir. 2020). And it enumerates relevant considerations that "courts and agencies have used in evaluating a hostile environment" in both the Title VII and Title IX contexts. *Id.* at 33,512. Indeed, the Department discussed at length questions regarding the "objectively offensive," "severe or pervasive" and "limits or denies" elements. *See id.* at 33,508–11. The hostile environment standard's specificity and long lineage more than suffices to put the public on constitutionally adequate notice of its contours and demonstrates that it is neither unworkable nor prone to arbitrary enforcement. Indeed, the 2020 Rule, to which Plaintiff raised no objection, used many of the same terms. Plaintiff offers no explanation why, for instance, "severe or pervasive" is unconstitutionally vague but "severe and pervasive" was unobjectionable.

  In fact, § 106.2's definition of hostile environment harassment utilizes many of the same terms as the standard adopted by the 2020 rule (which Plaintiff did not challenge and has not challenged here), including "[u]nwelcome," "severe," "pervasive," and "objectively offensive." 34 C.F.R. § 106.30 (2020). The Rule adds the term "limits," but the Department explained that the term is consistent with how the Department previously construed the term "denies" and "more accurately captures the full scope of Title IX's nondiscrimination mandate." 89 Fed. Reg. at

33,511. It simply requires a complainant to "demonstrate some impact on their ability to participate or benefit from the education program or activity," but "does not specify any particular limits or denials." *Id.* Likewise, the standard is not vague merely because it applies to discrimination based on "gender identity," a term the Department did not define because it "is now well understood" and "used widely in laws and policies." *Id.* at 33,809. Even so, the Rule explained that gender identity "describe[s] an individual's sense of their gender." *Id.*

To be sure, the hostile environment standard is fact-dependent; it is "not, and by its nature cannot be, a mathematically precise test." *Harris*, 510 U.S. at 22. The Department permissibly did not answer "all the potential questions it raises," and reiterated that "whether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances." *Id.* at 22-23. "It will always be true that the fertile legal imagination can conjure up hypothetical cases in which the meaning of (disputed) terms will be in nice question," but that does not render the definition unconstitutionally vague. *Grayned v. Rockford*, 408 U.S. 104, 110 n.15 (1972) (cleaned up).

Plaintiff's arbitrary-and-capricious challenge to the definition is simply a re-packaging of its First-Amendment challenge, *see* PMSJ 30-31, and fails for the same reasons. In a cursory attempt to challenge the definition under the APA, Plaintiff contends that the definition is arbitrary and capricious because it deviates from the 2020 Rule's adoption of the *Davis* standard and "suffers from numerous constitutional infirmities." *See id.* But, as explained above, the definition does not infringe on any First Amendment rights, and Plaintiff's reliance on *Davis* is misplaced because *Davis* addressed the standard a plaintiff must meet in a private action for damages under Title IX's implied private right of action, 526 U.S. at 650. Further, the Department thoroughly addressed the First Amendment and *Davis*-related concerns by commenters. 89 Fed. Reg. at 33,497–517. And, importantly, even the 2020 Rule did more than "simply codify" *Davis*. *See* 85

Fed. Reg. 30,026, 30,033.

> **D.      Section 106.44(f)(1)'s requirements for Title IX Coordinators does not infringe on First Amendment rights nor is it arbitrary and capricious.**

Under § 106.44(f)(1), a recipient must require its Title IX Coordinator to take action to "promptly and effectively end any sex discrimination," and § 106.44(f)(1)(v) provides guidelines for when a Title IX Coordinator may initiate a complaint in the absence of a complaint or withdrawal of allegations. Contrary to Plaintiff's contention, these provisions do not "withdraw[] crucial protections necessary to protect First Amendment rights," PMSJ 29, and are lawful.

**Section 106.44(f)(1).** Plaintiff fails to cite any case law in support of its challenges to § 106.44(f)(1)—nor could it. Section 106.44(f)(1) merely "reaffirms and clarifies the duty of a Title IX Coordinator … to remedy the effects of any sex discrimination." 89 Fed. Reg. at 33,591. Moreover, the Rule recognizes that "there is not a specific timeframe for 'prompt' action" and that "[a] reasonably prompt response" should be "judged in the context of the recipient's obligation to provide students and employees with education programs and activities free from sex discrimination." *Id.* (citation omitted).

**Section 106.44(f)(1)(v).** Contrary to Plaintiff's contention, *see* PMSJ 29-32, § 106.44(f)(1)(v) is not arbitrary and capricious nor does it violate the First Amendment by purportedly compelling Title IX Coordinators to initiate frivolous complaints. As the Rule emphasizes, "nothing in the Title IX regulations requires a recipient to restrict any rights that would otherwise be protected from government action by the First Amendment," 89 Fed. Reg. at 33,503, and § 106.44(f)(1)(v) is no exception.

Moreover, contrary to Plaintiff's contention, PMSJ 31, this provision does not "require[] recipients to investigate everything that subjectively might be considered sex discrimination." Instead, it provides guidelines for initiating such complaints "only in a very specific and limited

set of circumstances," 89 Fed. Reg. at 33,590, where "the conduct as alleged presents an imminent and serious threat to the health or safety of the potential complainant or other person or prevents the recipient from ensuring equal access based on sex to its education program or activity," *id.* at 33,488; 34 C.F.R. § 106.44(f)(1)(v)(B).

This authority is not new. "Title IX regulations have long permitted a Title IX Coordinator to initiate complaints." 89 Fed. Reg. at 33,590. Section 106.44(f)(1)(v) merely provides clarification and guidance for Title IX Coordinators by "enumerat[ing] eight factors that a Title IX Coordinator must consider, at a minimum, in making the fact-specific determination whether to initiate a complaint," including, for example, the complainant's request not to proceed with initiating a complaint, the risk of additional sex discrimination if a complaint is not initiated, and the severity of the alleged discrimination. *Id.* at 33,594; 34 C.F.R. § 106.44(f)(1)(v)(A)(1)–(8). In promulgating § 106.44(f)(1)(v), the Department acted reasonably by providing clear, fact-intensive, and reasonably tailored guidelines to Title IX Coordinators to ensure that they initiate complaints only in circumstances where there is imminent and serious threat to health or safety of individuals, or, where necessary, to address alleged sex discrimination.

## E. Section 106.45(b)(5)'s protection of the privacy of the parties and witnesses during grievance procedures does not infringe on First Amendment rights nor is it arbitrary and capricious.

Section 106.45(b)(5) "[r]equire[s] the recipient to take reasonable steps to protect the privacy of the parties and witnesses during the pendency of a recipient's grievance procedures." This is an appropriately flexible standard, which, contrary to Plaintiff's contention, PMSJ 30-31, is not arbitrary and capricious. Nor does it impose "gag orders" amounting to unconstitutional prior restraints. *Contra id.* at 31. Indeed, the Department directly addressed concerns that this provision would invite recipients to impose "gag orders," reiterating that "students, employees, and third parties retain their First Amendment rights," and that, in applying § 106.45(b)(5),

recipients must respect those rights. 89 Fed. Reg. at 33,674; *see also id.* at 33,670-71 (stating that "any steps that infringe on constitutional rights or otherwise undermine due process are inherently unreasonable, and such steps do not qualify as 'reasonable steps' under § 106.45(b)(5)" (citing § 106.6(d))). Far from imposing a "gag-order requirement," PMSJ 31, the Rule provides safeguards against any steps that would infringe on constitutional or due process rights. 89 Fed. Reg. at 33,832. Specifically, § 106.45(b)(5) requires that the recipient's reasonable steps to protect privacy must "not restrict the ability of the parties to: obtain and present evidence, including by speaking to witnesses . . . ; consult with their family members, confidential resources, or advisors; or otherwise prepare for or participate in the grievance procedures."

Plaintiff's reliance on *Chiu v. Plano Indep. Sch. Dist.*, is misguided because there, the court held that the school policy at issue was an unconstitutional prior restraint as applied to parents who were actually prevented from distributing non-school materials on campus based on the school's "standardless" pre-approval policy. 339 F.3d 273, 281–82 (5th Cir. 2003). Unlike in *Chiu*, Plaintiff's claim here is a *facial* challenge. And, unlike the "standardless" policy in *Chiu*, § 106.45(b)(5) provides robust safeguards around any step taken to protect the parties' and witnesses' privacy during grievance procedures, such as providing that any steps taken pursuant to § 106.45(b)(5) "do not restrict the ability of the parties to[] obtain and present evidence." In sum, § 106.45(b)(5) provides for proper privacy protections while imposing safeguards to prevent any infringement on First Amendment rights.

**F.    The Final Rule does not raise a Spending Clause issue or implicate the major questions doctrine.**

Plaintiff's Spending Clause and "major question" arguments fail because the Rule neither expands the conditions for federal funding under Title IX, nor constitutes an extraordinary action taken without clear congressional authorization.

*First*, the challenged provisions of the Rule do not pose any issues under the Spending Clause because they merely apply Title IX's unambiguous prohibition on sex discrimination. *See* 89 Fed. Reg. at 33,802. The Spending Clause grants Congress broad power to achieve its policy aims through conditioned offers of funding, so long as those conditions, *inter alia*, (1) are "unambiguous[]," (2) relate "to the federal interest" in the project, and (3) are consistent with "other constitutional provisions." *South Dakota v. Dole*, 483 U.S. 203, 207-08, 211 (1987) (citation omitted). Plaintiff argues that the Rule violates the Spending Clause because under the Rule, "[s]chools must adopt the Rule's new gender-identity mandate or sacrifice all federal funds." PMSJ 13–14 (citing *NFIB v. Sebelius*, 567 U.S. 519, 581 (2012)). But it was Congress, not the Executive Branch, that established Title IX's funding conditions, and Title IX has long been held to be consistent with the Spending Clause. *Davis*, 526 U.S. at 640.

Moreover, § 106.10 simply reflects the scope of Title IX's unambiguous prohibition on sex discrimination in light of *Bostock*. "[T]he fact that a statute has been applied in situations not expressly anticipated by Congress does not demonstrate ambiguity; instead, it simply demonstrates the breadth of a legislative command." *Bostock*, 590 U.S. at 674 (cleaned up). Title IX places recipients clearly on notice of the statute's prohibition on sex discrimination.

To the extent Plaintiff intends to raise a standalone Spending Clause challenge to § 106.10 (or any of the Rule's other provisions), that claim is underdeveloped and meritless. *Contra* PMSJ 13. No court has ever held Title IX to be coercive or to otherwise violate the Spending Clause, and Plaintiff certainly has not met the high bar to show that the Rule's implementation of Title IX is coercive; "in the typical case we look to the States to defend their prerogatives by adopting 'the simple expedient of not yielding' to federal blandishments." *NFIB*, 567 U.S. at 579 (quoting *Massachusetts v. Mellon*, 262 U.S. 447, 482 (1923)). Nor do the other factors support Plaintiff: the

Rule advances Title IX's legitimate purpose of protecting all individuals from sex discrimination, while respecting First Amendment rights. *See* 89 Fed. Reg. at 33,516, 33,810.

In connection with its Spending Clause argument, Plaintiff alleges that the Rule violates the anti-commandeering doctrine by preempting conflicting state laws. *Carroll* Compl. ¶ 289 (citing *Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 470–75 (2018)). Plaintiff seemingly abandons this claim in its Motion for Summary Judgment—and rightly so. Its assertion misunderstands the anti-commandeering doctrine, which prohibits the federal government from "commandeering the legislative processes of the States." *New York v. United States*, 505 U.S. 144 (1992). The doctrine does not, as Plaintiff suggests in its Complaint, bar the federal government from enacting legislation through the Spending Clause that preempts conflicting state laws. *See Hodel v. Va. Surface Mining. & Reclamation Ass'n*, 452 U.S. 264, 290 (1981) (rejecting commandeering argument regarding Commerce Clause legislation, citing Supremacy Clause).

*Second*, none of the challenged provisions runs afoul of the major questions doctrine because each is supported by Title IX's text and structure, and so reflects "policy decisions" made by "Congress . . . itself." *West Virginia v. EPA*, 597 U.S. 697, 723 (2022) (citation omitted). *Contra* PMSJ 13, 19; PI Op. 6 & n.21 (citing *Texas*, 2024 WL 2947022, at *35, *40). Specifically, § 106.10 rests on an interpretation of Title IX's unambiguous text, *see Bostock*, 590 U.S. at 688 (Alito, J., dissenting); § 106.31(a)(2) reflects the meaning of "discrimination" and Congress's decision to exempt certain contexts from Title IX's overarching prohibition; and § 106.2's definition of hostile environment harassment implements the statute's broad reach in a manner consistent with the definitions of harassment used in other civil-rights contexts.

Regardless, the major questions doctrine is reserved for "extraordinary" cases that involve "unprecedented" agency action relying on "ancillary" statutory provisions to regulate issues of

great "economic and political significance." *West Virginia*, 597 U.S. at 721–24 (citation omitted). In contrast, the challenged provisions exercise the Department's longstanding authority to implement Title IX. Plaintiff also has not shown that any of the challenged provisions will "require the kind of costs or restructuring that might implicate the major questions doctrine," a prediction the Department rejected. 89 Fed. Reg. at 33,815.

### III.   To The Extent Plaintiff Is Entitled to any Relief, that Relief Should Be Limited to Plaintiff and to the Provisions of the Rule that the Court Concludes Are Unlawful.

The Rule is lawful in its entirety, and summary judgment in favor of Defendants is therefore appropriate on all claims. But to the extent the Court disagrees, Plaintiff's requested relief is overbroad. In crafting any remedy, the Court should adhere to a twin set of well-established, intertwined principles.

*First*, because a federal court's "constitutionally prescribed role is to vindicate the individual rights of the people appearing before it," "[a] plaintiff's remedy must be tailored to redress the plaintiff's particular injury." *Gill v. Whitford*, 585 U.S. 48, 72–73 (2018). "[I]njunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs" on their valid claims. *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). *Second*, the Supreme Court has "developed a strong presumption of severability," reflecting a court's obligation to "salvage rather than destroy" an otherwise lawful statute or regulation. *Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 591 U.S. 610, 625-26 (2020) (plurality).[9]

Because the Rule clearly evinces the Department's determination that the Rule's component parts can sensibly function independently and that the Department would have promulgated them even in isolation, the Court should opt for no more than a party-specific

---

[9] Six Justices agreed as to the severability portion of the Court's opinion. *Barr*, 591 U.S. at 625 (Kavanaugh, Roberts & Alito, JJ.); *id.* at 648 (Breyer, Ginsburg & Kagan, JJ.).

injunction targeted against only those provisions that Plaintiff has shown to be both unlawful and cause them injury.

###### A.      Any relief should be limited to Plaintiff.

Plaintiff first urges the Court to vacate the Rule in its entirety. PMSJ 32. But the APA does not provide for universal vacatur as a remedy, and in any case, neither vacatur nor a nationwide injunction is appropriate here.

As an initial matter, the APA's provision for courts to "set aside" unlawful agency actions, 5 U.S.C. § 706(2), does not authorize the type of universal vacatur that Plaintiff seeks. As a matter of first principles, the "set aside" language in § 706(2) should not be read as authorizing remedies, which are governed by § 703 of the APA. Section 703 states that "[t]he form of proceeding for judicial review" of agency action is either a "special statutory review proceeding" or, in "the absence or inadequacy thereof," any "applicable form of legal action, including actions for declaratory judgments or writs of prohibitory or mandatory injunction or habeas corpus." 5 U.S.C. § 703. Because Plaintiff does not purport to identify any applicable "special statutory review proceeding," § 703 affords it only traditional equitable remedies like injunctions. In contrast, § 706(2) does not address remedies at all. Rather, § 706(2) is properly understood as a rule of decision directing the reviewing court to disregard unlawful "agency action, findings, and conclusions" in resolving the case before it, consistent with basic principles of judicial review. Universal vacatur is therefore not an available remedy under the APA. *See United States v. Texas*, 599 U.S. 670, 693–99 (2023) (Gorsuch, J., concurring in the judgment).

Defendants recognize that the Fifth Circuit has held that "APA 'empowers and commands courts to set aside unlawful agency actions,' allowing a district court's vacatur to render a challenged agency action 'void.'" *Texas Med. Ass'n v. U.S. Dep't of Health & Hum. Servs.*, 110 F.4th 762, 779 (5th Cir. 2024) (internal citation omitted). Even still, vacatur is not required. *See*

*Staley v. Harris Cnty.*, Tex., 485 F.3d 305, 310 (5th Cir. 2007) ("[V]acatur is to be determined on a case-by-case basis, governed by facts and not inflexible rules."). Whether vacatur is appropriate depends on "the seriousness of the deficiencies of the action" and "the disruptive consequences of vacatur." *Texas v. Biden*, 20 F.4th 928, 1000 (5th Cir. 2021), *as revised* (Dec. 21, 2021), *rev'd on separate grounds and remanded*, 142 S. Ct. 2528 (2022) (citation omitted).

Vacatur would be inappropriate under this standard. Here, as described above, the Department's position is not wrong on the merits.[10] *See supra* Section II. Moreover, vacatur of the Rule would be deeply disruptive in the many states where it has not been enjoined and has already been implemented by thousands of schools. *See infra* Section III.B.1.c. Most important, though, is that the Court has powerful, equitable alternatives available. Declaratory or limited injunctive relief, as opposed to vacatur, could be tailored to Plaintiff. Declaratory relief could adequately define the legal rights of the parties and establish any unlawfulness of the Rule, preventing any alleged harm. *See Anatol Zukerman & Charles Krause Reporting, LLC v. U.S. Postal Serv.*, 64 F.4th 1354, 1366–67 (D.C. Cir. 2023). And if the Court chooses to implement an injunction, it could do so in a way that would fully resolve any harm to Plaintiff. The injunction "restrict[s] or stop[s] official action," *Direct Mktg. Ass'n v. Brohl*, 575 U.S. 1, 13 (2015), and it requires federal officials to "refrain from taking actions to enforce, implement, or otherwise carry out" agency action that contravenes the injunction. *Garland v. Aleman Gonzalez*, 142 S. Ct. 2057, 2065 (2022).

And, if the Court were to enter a permanent injunction, it can—and should—be limited to enforcement of the Rule against Plaintiff. The problems caused by overbroad universal remedies

---

[10] The "seriousness of the error" factor also considers whether the agency's error can be corrected on remand. *Texas v. Biden*, 20 F.4th at 1000. To the extent the Court were to find that the Department failed to adequately explain its interpretation of the statute, or that the Department's determinations were arbitrary and capricious, those errors could potentially be rectified on remand.

are well catalogued and apply whether such a remedy takes the form of a universal vacatur or a nationwide injunction. *See, e.g., Labrador v. Poe*, 144 S. Ct. 921, 921–28 (2024) (Gorsuch, J., concurring); *see also Cargill v. Garland*, 57 F.4th 447, 472 (5th Cir.) (en banc) (plurality opinion) (concluding without contradiction from any other member of the Court that the district court could consider on remand "a more limited remedy" than universal vacatur, and instructing the district court to "determine what remedy . . . is appropriate to effectuate" the judgment), *cert. granted*, 144 S. Ct. 374 (2023); *Cent. & S.W. Servs., Inc. v. EPA*, 220 F.3d 683, 692 (5th Cir. 2000) (declining to enter vacatur in favor of remand); *Nuziard v. Minority Bus. Dev. Agency*, ---F. Supp. 3d---, 2024 WL 965299, at *40–44 (N.D. Tex. Mar. 5, 2024) (rejecting universal vacatur for equitable reasons where injunction would suffice).  As such, this Court should limit its relief to declaratory relief or a limited injunction, which provide sufficient relief to Plaintiff.

Enjoining enforcement of the Rule as to Plaintiff would fully resolve the only harms it alleges that could arguably be cognizable—*i.e.*, costs associated with Plaintiff coming into compliance with the Rule and the threat of enforcement proceedings if Plaintiff fails to come into compliance. By contrast, Plaintiff's argument that such limited relief would be insufficient lacks merit. *Contra* PMSJ 33. Plaintiff argues that, absent universal relief, Carroll ISD students will be harmed by the Rule during upcoming participation in interscholastic competitions in Ohio, Florida, Georgia, Kentucky, Iowa, California, New York, and Oregon, as well as other locations in Texas, in the event it arises that they have to share sex-separate facilities with transgender students in those other locations. *See id.* As an initial matter, this argument ignores that Carroll ISD lacks standing to raise claims on behalf of its students. Carroll ISD does not even attempt to explain why alleged harms to students' interests are an injury, or justify relief, to Carroll ISD itself. As noted above, *see supra* Section III.A, the traditional equitable principle that a judicial remedy may be no

broader than necessary to redress the complainant's injury is bound up in Article III's case or controversy requirement. Basing the scope of relief on alleged harms to individuals other than the complainant would violate both principles of equity and constitutional limits on jurisdiction.

Further, standing aside, the alleged injuries to Carroll ISD students are entirely speculative. Carroll ISD identifies no evidence that any student who objects to the relevant portions of the Rule will be imminently negatively affected by those provisions during out-of-state travel. Indeed, the Department's enforcement of § 106.31(a)(2)—the relevant provision of the Rule—is already preliminarily enjoined in Kentucky, Ohio, Iowa, and Texas. *Tennessee v. Cardona*, --- F. Supp. 3d ---, 2024 WL 3019146, at *44 (E.D. Ky. June 17, 2024), *appeal filed*, No. 24-5588 (6th Cir. June 26, 2024); Mem. Op. & Order, *Arkansas v. U.S. Dep't of Educ.*, No. 4:24- CV-636 RWS (E.D. Mo. July 24, 2024), ECF No. 54; Mem. Op. & Order 32, *Texas v. United States*, No. 2:24-cv-00086-Z (N.D. Tex. July 11, 2024), ECF No. 48. And the Rule is also enjoined from enforcement in Florida and Georgia pending appeal of the district court's preliminary injunction order. *Alabama v. U.S. Sec'y of Educ.*, No. 24-12444, 2024 WL 3981994, (11th Cir. Aug. 22, 2024). Even without the Final Rule, California, New York, and Oregon already have sex-separate school bathroom and locker room policies that require schools to allow students to use such facilities consistent with their gender identity. *See* Cal. Sch. Bds. Ass'n, *Final Guidance: AB 1266, Transgender and Gender Nonconforming Students, Privacy, Programs, Activities & Facilities* 2 (Mar. 2014), https://www.csba.org/Advocacy/~/media/CSBA/Files/Advocacy/ELA/2014_03_AB1266_Final Guidance.ashx (last accessed Sept. 6, 2024); Or. Dep't of Educ., *Supporting Gender Expansive Students: Guidance for Schools* 24–26 (Jan. 5, 2023), https://www.oregon.gov/ode/students-and-family/equity/civilrights/Documents/ODE-Supporting-Gender-Expansive-Students.pdf (last accessed Sept. 6, 2024); N.Y. State Educ. Dep't, *Creating a Safe, Supportive, and Affirming School*

*Environment for Transgender and Gender Expansive Students: 2023 Legal Update and Best Practices* 22–24 (June 12, 2023), https://www.nysed.gov/sites/default/files/programs/student-support-services/creating-a-safe-supportive-and-affirming-school-environment-for-transgender-and-gender-expansive-students.pdf  (last accessed Sept. 6, 2024). Thus, Plaintiff's alleged injury would not be redressable through this action in those locations.

### B.    Any relief should be limited to provisions of the Rule that the Court finds unlawful and that cause harm to Plaintiff.

#### 1.    Any injunctive relief should be appropriately tailored.

To obtain a permanent injunction, a plaintiff must demonstrate irreparable injury, that remedies at law are unavailable, and that the balance of equities and the public interest warrant a permanent injunction. *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006). Unlike a preliminary injunction, which only requires plaintiff to show likelihood of success on the merits, a permanent injunction requires a plaintiff to "demonstrate actual success on the merits." *Franciscan All., Inc. v. Becerra*, 553 F. Supp. 3d 361, 368 (N.D. Tex. 2021), *aff'd in part, dismissed in part*, 47 F.4th 368 (5th Cir. 2022) (citation omitted).

##### (a)    Plaintiff has not attempted to establish that most of the Rule is unlawful.

As this Court correctly determined in its prior Order, any relief should be limited to the portions of the Rule that were challenged by Plaintiff. PI Op. 14.[11] The legal violations asserted by Plaintiff—if any—relate exclusively to §§ 106.10, 106.31(a)(2), 106.2's definition of hostile environment harassment, § 106.44(f)(1), and § 106.45(b)(5). Any relief should go no further.

---

[11] Plaintiff also lacks standing to seek relief as to portions of the Rule that it does not challenge. *California v. Texas*, 593 U.S. 659, 680 (2021) (holding that injury must be fairly traceable to "the defendants' conduct in enforcing the specific statutory provision they attack as unconstitutional"); *see also DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006) ("[A] plaintiff must demonstrate standing separately for each form of relief sought." (citation omitted)).

Broad swaths of the Rule have nothing to do with gender identity or the challenged provisions. To identify a few specific examples:

- The Rule requires schools to provide pregnant and postpartum students with reasonable modifications and to notify pregnant students of their rights. 34 C.F.R. § 106.40(b).

- The Rule alters the definition of "complainant" to permit complaints by former students and employees who suffered discrimination while participating or attempting to participate in a covered program. 34 C.F.R. § 106.2; *see* 89 Fed. Reg. at 33,481-33,884.

- The Rule clarifies that funding recipients must prohibit retaliation, including peer retaliation, and take appropriate action in response to information about conduct that reasonably may constitute retaliation. 34 C.F.R. § 106.71.

None of those amendments depends in any way on the challenged provisions, which address gender-identity discrimination and harassment. All of them would remain fully operative if the challenged provisions were enjoined in whole or in part, and each of them could easily have been issued as separate rules. Without holding that these provisions conflict with Title IX, the Constitution, or any other federal law, the Court should not enjoin them. *See, e.g.*, *North Carolina v. Covington*, 585 U.S. 969, 978 (2018) (per curiam) (a court's "remedial authority" is "limited" to curing the violation established by the plaintiffs).

Moreover, although Plaintiff purports to challenge § 106.10, it does not identify any harm it would suffer as a result of § 106.10's inclusion of gender identity discrimination within the scope of Title IX's prohibition on sex discrimination. Plaintiff has never suggested that it wishes to punish transgender students "simply for being . . . transgender," *Bostock*, 590 U.S. at 651, by, for example, barring them from participating in the science fair or the marching band because they are transgender. And § 106.10 addresses much more than gender-identity discrimination, including "discrimination on the basis of sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, and gender identity." 89 Fed. Reg. at 33,886. Plaintiff has not sought to discriminate against students for being pregnant, gay, or failing to conform to sex stereotypes.

There is no reason to enjoin § 106.10, and certainly not the portions unrelated to gender identity.

Section 106.2 also contains numerous definitions that Plaintiff has not contested. As discussed above, amended § 106.2 serves as a glossary, defining terms used throughout the Title IX regulations that range from "administrative law judge" to "complaint" and "complainant" to "remedies." 34 C.F.R. § 106.2. Plaintiff challenges the definition of only one term, "hostile-environment harassment." And Plaintiff focuses its challenge on alleged harms to First Amendment rights from the application of that definition to certain scenarios involving gender-identity discrimination. *See* PMSJ 25–28. There is thus no basis for enjoining other definitions in § 106.2 or other applications of § 106.2's definition of hostile-environment harassment.

### (b)    Plaintiff has not demonstrated irreparable harm, and certainly has not for unchallenged portions of the Rule.

To constitute irreparable harm, the asserted injury "must be based on more than 'speculat[ion]' or 'unfounded fears.'" *Rest. L. Ctr. v. U.S. Dep't of Lab.*, 66 F.4th 593, 597 (5th Cir. 2023) (citation omitted). Plaintiff's request for an injunction rests entirely on the Court's earlier determination of irreparable harm as a result of costs of complying with the Rule. PI Op. 11-12. Defendants continue to maintain that Plaintiff fails to demonstrate irreparable harm because it has provided only vague and speculative assertions regarding its alleged compliance costs. *See* Defendant's PI Opp. 27-28; *see also Rest. L. Ctr.*, 66 F.4th at 597 (reasoning that in order for compliance costs to qualify as irreparable harm, they "must be based on more than 'speculat[ion]' or 'unfounded fears'" (citation omitted)).

But in any event, the majority of the costs identified are associated with the Rule's training requirements as well as the costs of reviewing and analyzing the Rule. *See* PMSJ 32. Those costs represent the sort of garden-variety expenses that districts incur every year—and are not tied to any allegedly wrongful conduct. To the degree the Court believes Plaintiff's alleged harms could

be sufficient, those harms still do not justify relief as to the entire Rule. Irreparable harm must be tied to *wrongful* conduct, but Plaintiff fails to make that connection, and does not even try to do so as to unchallenged portions of the Rule. *See Fox Broad. Co. v. Dish Network L.L.C.*, 747 F.3d 1060, 1072–73 (9th Cir. 2014) (reasoning that the district court properly concluded that there was no irreparable harm because the alleged harms resulted from the entire program rather than "flow[ing] from" the quality assurance copies, which were the only copies likely to infringe).

> ### (c)   The balance of the equities and public interest counsels against enjoining the entire Rule.

The equities and public interest tilt decisively towards the Department and against an overbroad injunction. "Any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (citation omitted). That is all the more true for the federal government, which is responsible for implementing Acts of Congress that serve and protect the people of all States. *See Dist. 4 Lodge of the Int'l Ass'n of Machinists & Aerospace Workers Loc. Lodge 207 v. Raimondo*, 18 F.4th 38, 47 (1st Cir. 2021) (applying *Maryland v. King* to federal agencies). Enjoining the Rule—particularly the portions of the Rule with which the Court has no disagreement—prevents the Department from exercising the authority given to it by Congress under Title IX and therefore causes it irreparable harm.

The harm is particularly pronounced here because the Rule effectuates the compelling public interest of "avoid[ing] the use of federal resources to support discriminatory practices [and] provid[ing] individual citizens effective protection against those practices." *Cannon v. Univ. of Chi.*, 441 U.S. 677, 704 (1979). Plaintiff's harms, even if the Court finds them cognizable, are dramatically outweighed by the government's interest in stamping out sex discrimination and ensuring all students' access to federally funded educational opportunities. *Cf. Winter v. Nat. Res.*

*Def. Council, Inc.*, 555 U.S. 7, 23 (2008) (public interest in naval training "outweighed" irreparable injury to wildlife). And Plaintiff's interests are further reduced by granting a limited injunction going only to any provisions of the Rule that are found to be unlawful.

**2.     The Rule is severable.**

Whatever form of relief the Court elects to enter, the "strong presumption of severability," *Barr*, 591 U.S. at 625, coupled with the severability provisions in the Department's Title IX regulations, 89 Fed. Reg. at 33,848, confirm that any such relief should be limited to the provisions that the Court has concluded are unlawful. "Whether the offending portion of a regulation is severable depends upon [1] the intent of the agency and [2] upon whether the remainder of the regulation could function sensibly without the stricken provision." *MD/DC/DE Broads. Ass'n v. FCC*, 236 F.3d 13, 22 (D.C. Cir. 2001) (emphasis omitted); *accord Sw. Elec. Power Co. v. EPA*, 920 F.3d 999, 1033 (5th Cir. 2019) (vacating only "the portions of the final rule" that the court decided were unlawful). In determining intent, "courts hew closely to the text of severability or nonseverability clauses." *Barr*, 591 U.S. at 624; *see also Nat'l Ass'n of Manufacturers v. United States Sec. & Exch. Comm'n*, 105 F.4th 802, 816 (5th Cir. 2024) (reasoning that "[t]he severability clause in the [statute] dispels any doubt" regarding the intent of the agency to sever). Here, each prong favors severability.[12]

**a)     The Rule's severability clause establish that the agency intended for the Rule to be broadly severable.**

The agency "intent" prong of the severability analysis is clear—the Department expressly

---

[12] In reviewing the stay application and the severability question, the Supreme Court emphasized that its evaluation was in an "emergency posture" and on a "limited record" where "the burden is on the Government as applicant to show" entitlement to emergency relief. *Louisiana*, 2024 WL 3841071, at *1. Here, by contrast, it is Plaintiff's burden on summary judgment to demonstrate it is entitled to the relief sought. The Supreme Court's determination that the Government had not met its burden to demonstrate entitlement to a stay of an already-issued preliminary injunction does not control this Court's decision as to whether Plaintiff has satisfied its burden now.

determined and provided in the Rule itself that the Rule's various provisions are severable. The Department explained that each provision serves "an important, related, but distinct purpose," and that "[e]ach provision provides a distinct value" that is "separate from, and in addition to, the value provided by the other provisions." 89 Fed. Reg. at 33,848. The Department thus "confirm[ed]" that "each of the provisions" is "intended to operate independently" and that "the potential invalidity of one provision should not affect the other provisions." *Id.* The Department also invoked the severability provisions in its existing regulations, which provide as to each relevant subpart that "[i]f any provision of this subpart or its application to any person, act, or practice is held invalid, the remainder of the subpart or the application of its provisions to any person, act, or practice shall not be affected." *Id.* (citing 34 C.F.R. §§ 106.9, 106.18 (redesignated in the Rule as § 106.16), 106.24, 106.46 (redesignated in the Rule as § 106.48), 106.62, 106.72, and 106.82). The Department unambiguously confirmed that those severability instructions apply to the provisions added or amended by the Rule. *Id.* These severability determinations remove any doubt that the Department would have adopted the Rule's unchallenged provisions addressing retaliation, lactation accommodations, among others. *See Am. Fuel & Petrochemical Mfrs. v. EPA*, 3 F.4th 373, 384 (D.C. Cir. 2021) (explaining that severability of regulations "depends on the issuing agency's intent," and whether the "agency would have adopted the severed portion on its own" to "operate[] independently" (citations omitted)).

**b)      The Rule can function without the challenged provisions.**

This Court, in only enjoining the challenged provisions in its preliminary injunction ruling, correctly recognized that the Rule can function without the challenged provisions. *See* PI Op. 14. Plaintiff fails to undermine that determination. In a passing attempt to justify relief as to the entire Rule, Plaintiff provides the following singular example: "the Rule's 34 C.F.R. § 106.8 addresses the appointment and duties of Title IX coordinators, the recipient's duty to publish a notice of

nondiscrimination, and the requirement that it maintain records for at least seven years," and argues that "compliance with these provisions depends on whether the challenged provisions—34 C.F.R. §§ 106.10, 106.31(a)(2), and 106.2—are in effect." PMSJ 34. Plaintiff is plainly wrong on this score. Assuming the Court only enjoins the challenged provision, nothing would prevent the recipient from complying with relevant coordinator duties, publishing notices about its compliance with the applicable regulations, and maintaining records for at least seven years.

Nor is Plaintiff correct to assert that the Rule's other provisions "implicate[] the new definition of sex discrimination." PMSJ 34 (citation omitted). As to § 106.10, for decades the Department's Title IX regulations have functioned without a regulatory provision clarifying the scope of sex discrimination. Enjoining § 106.10 would not leave recipients without an understanding of sex discrimination, and the remaining regulations would remain operable. *See supra* Section III.B.1.a (providing examples of provisions that can operate independently).[13]

*First*, any relief as to § 106.10 should be limited to the portion of § 106.10 recognizing that sex discrimination includes gender-identity discrimination—the only aspect challenged as unlawful. With such an injunction in place, the Department would be required to treat §106.10 as if it provided: "Discrimination on the basis of sex includes discrimination on the basis of sex stereotypes, sex characteristics, pregnancy or related conditions, [and] sexual orientation." Such an injunction would not render the unchallenged remainder incoherent or unworkable.

*Second*, even if § 106.10 were enjoined or vacated in its entirety, the remainder of the Rule could remain in place using the pre-Rule understanding of sex discrimination. The Department's pre-existing regulations (amended in 2020 by then-Secretary DeVos) repeatedly reference "sex

---

[13] As to §§ 106.31(a)(2), 106.2, 106.44(f)(1), and 106.45(b)(5), those provisions address plainly discrete topics, and Plaintiff provides no substantive reason to ignore the severability clauses as to these four sections.

discrimination" without defining that term. *See, e.g.*, 34 C.F.R. §§ 106.8(a) (Title IX coordinators), 106.8(c) (grievance procedures), 106.8(d) (extraterritoriality), and 106.71(a) (retaliation) (2020). Earlier regulations, too, referred to "discrimination on the basis of sex" and "discrimination based on sex" without defining those terms. *See, e.g.*, 45 C.F.R. §§ 86.1, 86.3(a)-(b), 86.4, 86.6(a), 86.9(a) and (c), 86.36(a)-(c), 86.37(a)(2) and (b), 86.38(a), 86.39, 86.51(a)(4), 86.53, 86.56(b), 86.59 (1975). In short, the term "sex discrimination" or its variants have been ubiquitous in the Department's Title IX regulations for decades, and both the Department and regulated entities have understood that term to simply incorporate Title IX's prohibition on discrimination "on the basis of sex," 20 U.S.C. 1681(a), without a further regulatory gloss.

Section 106.10 refines that approach by expressly specifying that the Department understands Title IX's prohibition against sex-based discrimination to "include[]" discrimination based on gender identity and certain other grounds. 89 Fed. Reg. at 33,886. But if § 106.10 remained enjoined, regulated entities would simply apply the rest of the Final Rule in accordance with the text of Title IX, relevant precedent, and valid and unenjoined regulations and agency guidance, just as they have for nearly 50 years.

Finally, altering or excising § 106.10 would not be inconsistent with the Department's cost-benefit analysis. *Contra* PMSJ 34. As a general matter, it cannot be that an agency must separately justify every permutation for how a rule may someday be severed—an impossible task.[14] Regardless, Plaintiff's argument mischaracterizes the careful balancing that the Department

---

[14] The Supreme Court's decision in *Ohio v. EPA*, 144 S. Ct. 2040 (2024), is not to the contrary. There, the Court stayed the application of a rule because it concluded that the agency had not adequately responded to comments objecting that the agency's justification for the rule would no longer be valid if the rule applied in fewer States than originally contemplated. *Id.* at 2054–55. Plaintiff does not suggest that it or anyone else raised any similar objection to severability during the rulemaking process here. To the contrary, the Rule's preamble notes that there were no comments on severability. 89 Fed. Reg. at 33,848.

undertook. Although the total benefit of the Rule is "difficult to quantify," it is still significant: "reduc[ing] the occurrence of sex discrimination in a recipient's education program or activity and facilitat[ing] a prompt and equitable resolution when sex discrimination occurs, thereby supporting a recipient's efforts to provide an educational environment free from sex discrimination." 89 Fed. Reg. at 33,861. Although it would be unfortunate for an injunction to eliminate the benefits associated with prohibiting gender identity discrimination, the remainder of the Rule continues to carry these other significant benefits forward, as described in the Rule. As for costs, the Department took reasonable steps to keep them as low as possible, *see id.* at 33,851, and those costs are unlikely to increase based on the precise contours of § 106.10.

* * *

For these reasons, if the Court determines that an injunction or partial vacatur is necessary, it should restrict only the application of the challenged provisions to Plaintiff in ways the Court has concluded would be unlawful. Specifically, it should enjoin or vacate only the application of § 106.31(a)(2), § 106.44(f)(1), § 106.45(b)(5), and the application of the term "hostile environment harassment" in § 106.2 to gender-identity discrimination. If the Court finds it necessary to address § 106.10, it should enjoin or vacate only the application of the term "gender identity." No more is required to "redress the plaintiff's particular injury." *Gill*, 585 U.S. at 73.

**CONCLUSION**

For the foregoing reasons, the Court should enter judgment for Defendants. In the alternative, any relief should be limited to Plaintiff and to the provisions of the Rule that the Court concludes are unlawful.

50

Dated: September 6, 2024                                        Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

EMILY B. NESTLER
Assistant Branch Director

*/s/ Pardis Gheibi*
ELIZABETH TULIS
REBECCA KOPPLIN
BENJAMIN TAKEMOTO
PARDIS GHEIBI
CLAYTON BAILEY
JOHN T. LEWIS
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
P.O. Box No. 883, Ben Franklin Station
Washington, DC 20044
Phone: 202-305-3246
Fax: (202) 616-8470
E-mail: Pardis.Gheibi@usdoj.gov

*Attorneys for Defendants*