# Relevant Portions of the Administrative Record

| Administrative Record Beg Doc | Administrative Record End Doc | Description |
|---|---|---|
| AR_004814 | AR_004821 | Comment # 232884 (South Coastal Counties Legal Services) |
| AR_012910 | AR_013119 | Comment # 208339 (GLSEN) |
| AR_026964 | AR_026999 | Jody L. Herman, et al., Suicide Thoughts and Attempts Among Transgender Adults: Findings from the 2015 U.S. Transgender Survey (Sep. 2019) |
| AR_029016 | AR_029052 | Comment # 225048 (Montana Attorney General et al.) |
| AR_059645 | AR_059647 | Comment # 41272 (California Dept of Education) |
| AR_088215 | AR_088218 | Comment # 70384 (National PTA) |
| AR_203124 | AR_203128 | Comment # 187153 (Child Trends) |
| AR_216995 | AR_217296 | Sandy E. James et al., The Report of the 2015 U.S. Transgender Survey, Nat'l Ctr. for Transgender Equality, 14-15 (Dec. 2016) |
| AR_221384 | AR_221386 | Comment # 197356 (Univ. of Hawaii) |
| AR_221443 | AR_221461 | Comment # 197305 (Univ of Washington) |
| AR_223203 | AR_223203 | Comment # 193913 (Montgomery College) |
| AR_233141 | AR_233145 | Comment # 210649  (Ass'n of Christian Schools International) |
| AR_254561 | AR_254571 | Comment # 218786  (Indiana Attorney General et al) |
| AR_259365 | AR_259379 | Comment # 218129 (Tennessee Attorney General et al.) |
| AR_270754 | AR_270763 | EEOC, Sexual Orientation and Gender Identity (SOGI) Discrimination, https://perma.cc/W3MG-DEZB |
| AR_275092 | AR_275349 | World Professional Association for Transgender Health, Standards of Care for the Health of Transgender and Gender Diverse People, Version 8 (2022), https://www.wpath.org/publications/soc |
| AR_275350 | AR_275352 | Tanya Albert Henry, Exclusionary Bathroom Policies Harm Transgender Students, American Medical Association (Apr. 17, 2019), Exclusionary bathroom policies harm transgender students | American Medical Association (ama-assn.org) |
| AR_275860 | AR_275861 | California Department of Education, Legal Advisory regarding application of California's antidiscrimination statutes to transgender youth in school (updated Sep. 16, 2021) (Legal Advisory - Equal Opportunity & Access (CA Dept of Education) |
| AR_277240 | AR_277246 | Washoe County School District, Administrative Regulation 5161: Gender Identity and Gender Non-Conformity – Students (2019) (5161_Reg-Gender_Identify-v2.pdf (wcsdpolicy.net)) |
| AR_277290 | AR_277295 | IOC Framework on Fairness, Inclusion, and Non-Discrimination on the Basis of Gender Identity and Sex Variations (Nov. 2021) |
| AR_277559 | AR_277577 | Cora Peterson et al., Lifetime Economic Burden of Intimate Partner Violence Among U.S. Adults, 55 Am. J. Preventive Med. 433 (2018) |
| AR_277578 | AR_277580 | Centers for Disease Control and Prevention, Fast Facts: Preventing Sexual Violence, https://www.cdc.gov/violenceprevention/sexualviolence/fastfact.html (last visited June 16, 2022) |
| AR_279305 | AR_279313 | Dep't of Justice & Dep't of Educ., Dear Colleague Letter on Transgender Students (May 13, 2016) |
| AR_280865 | AR_280890 | Title IX Rule Citations - Federal Cases, Federal Court Filings, Federal Statutes, Federal Regulations, Executive Orders, Websites |
| AR_280992 | AR_281007 | Mandy Henningham & Tiffany Jones, Intersex students, sex-based relational learning & isolation, Sex Educ. (2021), DOI: 10.1080/14681811.2021.1873123, Intersex students, sex-based relational learning & isolation: Sex Education: Vol 21, No 5 (tandfonline.com) |
| AR_281253 | AR_281266 | Jason Rafferty et al., Am. Acad. of Pediatrics, Ensuring Comprehensive Care and Support for Transgender and Gender Diverse Children and Adolescents 142 Pediatrics 72 (2018) |
| AR_281740 | AR_281959 | Joseph G. Kosciw et al., GLSEN, The 2019 National School Climate Survey: The Experiences of Lesbian, Gay, Bisexual, Transgender, and Queer Youth in our Nation's Schools 28 (2020), NSCS19-FullReport-032421-Web_0.pdf (glsen.org) |
| AR_282427 | AR_282437 | Robert W.S. Coulter et al., Prevalence of Past-Year Sexual Assault Victimization Among Undergraduate Students: Exploring Differences by and Intersections of Gender Identity, Sexual Identity, and Race/Ethnicity, 18 Prevention Sci. 726 (2017) |
| AR_282642 | AR_282646 | Stephen T. Russell et al., Chosen Name Use Is Linked to Reduced Depressive Symptoms, Suicidal Ideation, and Suicidal Behavior among Transgender Youth, 63 J. Adolescent Health 503, 505 (2018), Chosen Name Use Is Linked to Reduced Depressive Symptoms, Suicidal Ideation, and Suicidal Behavior Among Transgender Youth - PubMed (nih.gov) |
| AR_283435 | AR_283514 | GLSEN, Educational Exclusion: Drop out, push out, and school-to-prison pipeline among LGBTQ youth. (2016), Educational_Exclusion_2013.pdf (glsen.org) – |

Page 1 of 3

| Administrative Record Beg Doc | Administrative Record End Doc | Description |
|---|---|---|
| AR_283569 | AR_283709 | Joseph G. Kosciw, Elizabeth M. Diaz, Involved, Indivisible, Ignored: The Experiences of Lesbian, Gay, Bisexual, and Transgender Parents and Their Children in Our Nation's K-12 Schools at xvi (2008), New York, NY: GLSEN, FamRpt-022408 (ed.gov) |
| AR_284774 | AR_284794 | Stephen T. Russell, et al.,  Are school policies focused on sexual orientation and gender identity associated with less bullying? Teachers' perspectives. 54 Journal of school psychology 29 (Nov. 27 2015) |
| AR_284953 | AR_284968 | Allegra R. Gordon et al., Gender Expression, Violence, and Bullying Victimization: Findings from Probability Samples of High School Students in 4 US School Districts, 8 J. Sch. Health 306 (2018), Gender Expression, Violence, and Bullying Victimization: Findings From Probability Samples of High School Students in 4 US School Districts - PubMed (nih.gov) |
| AR_284971 | AR_284987 | Amy C. Tishelman et al., Serving Transgender Youth: Challenges, Dilemmas and Clinical Examples, Prof. Psychol. Res. Pr. - Author Manuscript (2015) |
| AR_285044 | AR_285135 | U.S. Government Accountability Office, K-12 Education: Students' Experiences with Bullying, Hate Speech, Hate Crimes, and Victimization in Schools, GAO-22-10434, Washington: GAO, 2021, GAO-22-104341, K-12 EDUCATION: Students' Experiences with Bullying, Hate Speech, Hate Crimes, and Victimization in Schools |
| AR_292755 | AR_292852 | Jessica A. Clarke, They, Them, Theirs, 132 Harv. L. Rev. 894 (Jan. 2019) |
| AR_292853 | AR_292956 | Nhan L. Truong et al., Adrian D. Zongrone & Joseph G. Kosciw, GLSEN, Erasure and Resilience: The Experiences of LGBTQ Students of Color, Asian American and Pacific Islander LGBTQ Youth in U.S. Schools, at 17, n.35 (GLSEN, 2020), AAPI LGBTQ Students | GLSEN |
| AR_292957 | AR_292961 | Off. of Elementary & Secondary Educ., U.S. Dep't of Educ., Safe & Supportive Schools (May 30, 2023), https://oese.ed.gov/offices/office-of-formula-grants/safe-supportive-schools/ |
| AR_292981 | AR_293017 | Badgett, MM.V. Badgett, et al.,The Business Impact of LGBT-Supportive Workplace Policies, The Williams Institute (May 2013). V. L., Durso, L. E., Kastanis, A., & Mallory, C., The Business Impact of LGBT-Supportive Workplace Policies (May 2013) |
| AR_293018 | AR_293020 | Colorado High School Activities Association, Bylaw 300 Transgender Policy Statement |
| AR_293021 | AR_293038 | Framingham High School, 2022-2023 Framingham High School Athletics Handbook: Framingham Inclusive Sports Participation Policy |
| AR_293039 | AR_293053 | Amira Hasenbush et al., Gender Identity Nondiscrimination Laws in Public Accommodations: A Review of Evidence Regarding Safety and Privacy in Public Restrooms, Locker Rooms, and Changing Rooms, 16 Sexuality Rsch. & Soc. Pol'y 70 (2019) |
| AR_293056 | AR_293087 | Human Rights Watch, Shut Out: Restrictions on Bathroom and Locker Room Access for Transgender Youth in US Schools (Sept. 14, 2016) |
| AR_293089 | AR_293104 | Jody L. Herman, Gendered Restrooms and Minority Stress: The Public Regulation of Gender and Its Impact on Transgender People's Lives, 19 J. of Pub. Mgmt. & Soc. Pol'y 65, 74–75 (2013) |
| AR_293105 | AR_293108 | Katherine Szczerbinski, Education Connection: The importance of allowing students to use bathrooms and locker rooms reflecting their gender identity, 36 Child. Legal Rts. J. 153, 153 (2016) |
| AR_293140 | AR_293186 | New Jersey State Interscholastic Athletic Association, NJSIAA Guidelines, Policies and Procedures: Transgender Policy (2020-2021) |
| AR_293260 | AR_293284 | Office of Safe and Healthy Students, U.S. Dept. of Educ., Examples of Policies and Emerging Practices for Supporting Transgender Students (May 2016) |
| AR_293285 | AR_293307 | Sandy E. James, Jody L. Herman, Laura E. Durso, and Rodrigo Heng-Lehtinen, Early Insights: A Report of the 2022 U.S. Transgender Survey at 22, Nat'l Ctr. for Transgender Equality, (Feb. 2024) |
| AR_293376 | AR_293381 | Seattle Public Schools, Superintendent Procedure 3210SP.C: Nondiscrimination and Affirmative Action: Transgender and Gender-Expansive Student Rights and Supports at 3 (March 5, 2020), https://www.seattleschools.org/wp-content/uploads/2021/08/3210SP.C |
| AR_293382 | AR_293388 | Sex-Segregated Bathrooms and Suicidal Ideation in Transgender Youth, 15 J. Advanced Generalist Soc. Work Prac. 1, 27, 31-32 (2020) |

| Administrative Record Beg Doc | Administrative Record End Doc | Description |
|---|---|---|
| AR_293389 | AR_293394 | Ilan H. Meyer, et al., Sexual Orientation Enumeration in State Antibullying Statutes in the United States Associations with Bullying, Suicidal Ideation, and Suicide Attempts Among Youth. LGBT Health, 6(1), 914 (2019) |
| AR_293395 | AR_293399 | Seelman, K. L., Transgender Adults' Access to College Bathrooms and Housing and the Relationship to Suicidality. Journal of Homosexuality, 63(10) (2016) |
| AR_293400 | AR_293434 | Wylie Hembree, et al. Endocrine Treatment of Gender-Dysphoric/ Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline (Nov. 2017) |
| AR_300195 | AR_300214 | The Trevor Project, 2021 National Survey on LGBTQ Youth Mental Health, The Trevor Project National Survey |
| AR_300218 | AR_300218 | U.S. Dep't of Justice & U.S. Dep't of Educ., Confronting Anti-LGBTQI+ Harassment in Schools: A Resource for Students and Families (June 2021), https://perma.cc/KA47-U9LJ |

# SOUTH COASTAL COUNTIES LEGAL SERVICES, INC.

Fall River Law Office
22 Bedford Street
Fall River, MA 02720-3002

TEL (508) 676-6265 • (800) 244-9023
FAX (508) 676-5861

September 12, 2022

The Honorable Miguel A. Cardona
Secretary
U.S. Department of Education
400 Maryland Avenue S.W.
Washington D.C. 20202

***VIA Federal eRulemaking Portal***

**RE**: Comment on Proposed Rule Regarding Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, Docket ID: ED–2021–OCR–0166 (87 Fed. Reg. 41390 (July 12, 2022))

Dear Secretary Cardona,

South Coastal Counties Legal Services ("SCCLS") submits the following comment in response to the Department of Education's ("Department") proposed regulations published on July 12, 2022 amending Title IX of the Education Amendments of 1972 ("Title IX"). SCCLS supports the Department's overall effort to amend the current Title IX regulations to better align with Title IX's purpose to eradicate sex discrimination in federally funded education programs – including elementary and secondary institutions. SCCLS is particularly supportive of the increased protections for student with disabilities and students identifying as LGBTQ+. In consideration of the unique impact Title IX protections have on students with disabilities and LGBTQ+ students, SCCLS submits the following comments and recommendations.

## STATEMENT OF INTEREST

SCCLS is a private, non-profit law firm that provides free legal assistance in civil matters to low-income residents in Massachusetts residing in Barnstable, Bristol, Dukes, Nantucket, and Plymouth Counties, and parts of Norfolk County. Together with its wholly owned subsidiary, the Justice Center of Southeast Massachusetts, SCCLS operates community-based law offices in Fall River, New Bedford, Hyannis, and Brockton, Massachusetts.

Recognizing that the clients and communities we serve are marginalized, often under-resourced, underserved, and underrepresented, SCCLS's mission is to achieve justice for low-income clients through client-centered community based legal advocacy. In each of our practice areas, we seek to empower our clients to reach their legal objectives by recognizing that our clients are the experts of their own lives. Consistent with this mission, our Education Unit, and its work in the Civil Legal Aid to Victims of Crime project, advocates on behalf of low-income students in elementary and secondary institutions to empower our clients to achieve their educational goals and to dismantle policies and practices that operate as barriers to students obtaining equal

South Coastal Counties Legal Services is funded by individuals, corporations, municipalities, foundations, and the following partners:

        

SCCLS is a 501(c)(3), not for profit agency. All funds received by SCCLS are spent in accordance with the Legal Services Corporation Act of 1974, as amended 1977, 42 U.S.C. §§ 2996 et. seq., its implementing regulations, 45 C.F.R. § 1600 et. seq., and other applicable law.

access to educational opportunities. Many of our students are students with disabilities, students of color, and/or identify as LGBTQ+. We recognize that the students we represent hold multiple and intersecting identities that inform the experiences they have, the barriers they face, and the biases they are subjected to. To that end, in keeping with the mission and values of SCCLS, the Education Unit directly confronts the discriminatory systems affecting our clients based on their socio-economic status, disability, sex, gender identity, sexual orientation, national origin, and/or race - issues that remain persistent in our region.

SCCLS has an interest in the Department's amendments to the Title IX regulations, and in particular, the Department's clarification that Title IX prohibits a broader scope of discriminatory conduct thereby providing protections to a more inclusive population of students. *See* 87 Fed. Reg. 41531. SCCLS frequently represents students with disabilities and students who identify as LGBTQ+ who have experienced sex-based discrimination, including sexual harassment, within their educational setting. At the same time, many of our students experience other intersecting forms of discrimination, including racial and disability-based discrimination. We agree with the Department's observation that Title IX exists at the intersection of multiple harms. *See* 87 Fed. Reg. 41392.

In Southeastern Massachusetts, students with disabilities make up a disproportionately high percentage of the student body.[1] At the same time, on a national scale, individuals with disabilities are four times more likely than non-disabled individuals to experience some form of serious violent crime, including sexual assault.[2] Moreover, in national surveys, survivors of sexual assault often report they experienced their first sexual assault before they turned eighteen (18) years old.[3] The same is true in the communities we serve. In 2021, among reported sexual assault crimes, survivors under the age of 17 in Brockton,[4] Fall River,[5] and New Bedford[6] represented more than one third of all survivors in those communities. In addition, perpetration of sexual assault against individuals with disabilities is often committed by a non-family member acquaintance.[7] Accordingly, the research suggests that students with disabilities may be exposed to risks of sexual assault in school-based settings in alarmingly high numbers.

---

[1] In the 2021-2022 academic year, 18.9% of students in Massachusetts have a disability, while in Fall River 23.3% of students have a disability. In Brockton, students with disabilities make up 16.7% of the population, and in New Bedford 22.2% of the population is comprised of students with disabilities. *See Fall River School and District Profile*, Department of Elementary and Secondary Education (2021), *available at* https://profiles.doe.mass.edu/profiles/student.aspx?orgcode=00950000&orgtypecode=5&leftNavId=305&; *Brockton School and District Profile*, Department of Elementary and Secondary Education (2021), *available at* https://profiles.doe.mass.edu/profiles/student.aspx?orgcode=00440000&orgtypecode=5&leftNavId=305&; *New Bedford School and District Profile*, Department of Elementary and Secondary Education (2021), *available at* https://profiles.doe.mass.edu/profiles/student.aspx?orgcode=02010000&orgtypecode=5&leftNavId=305&

[2] Erika Harrell, *Crime Against Persons with Disabilities, 2009–2019 – Statistical Tables*, Dep't of Justice (Nov. 2021), *available at* https://bjs.ojp.gov/content/pub/pdf/capd0919st.pdf (concluding that "for persons with disabilities, the rate of violent crime, excluding simple assault, (17.9 per 1,000) was more than four times the rate for persons without disabilities (4.0 per 1,000)").

[3] Approximately 50% of female identifying rape survivors reported they were under the age of eighteen (18) when they were raped for the first time. Similarly, male identifying survivors make up approximately 57% of rape survivors who report being raped for the first time before they turned eighteen (18). These rates are consistent for survivors of unwanted sexual contact. Female identifying survivors under the age of eighteen (18) make up approximately 57% of survivors who report unwanted sexual contact for the first time, and male identifying survivors make up 43% who report unwanted sexual contact for the first time. *See* Kathleen C. Basile, Sharon G. Smith, Marcie-jo Kresnow, Srijana Khatiwada & Ruth W. Leemis, *The National Intimate Partner and Sexual Violence Survey: 2016/2017 Report on Sexual Violence*, National Center for Injury Prevention and Control, Centers for Disease Control and Prevention (2022), *available at* https://www.cdc.gov/violenceprevention/pdf/nisvs/nisvsReportonSexualViolence.pdf

[4] In Brockton, survivors under the age of 17 represented 51.8% of all survivors of sexual assault in 2021. *See* Massachusetts Crime Victim Statistics, 2021, *available at* https://masscrime.chs.state.ma.us/tops/report/violent-crimes/brockton/2021

[5] In Fall River, survivors under the age of 17 represented 34% of all survivors of sexual assault in 2021. *See* Massachusetts Crime Victim Statistics, 2021, *available at* https://masscrime.chs.state.ma.us/tops/report/violent-crimes/fall-river/2021

[6] In New Bedford, survivors under the age of 17 represented 44.5% of all survivors of sexual assault in 2021. *See* Massachusetts Crime Victim Statistics, 2021, *available at* https://masscrime.chs.state.ma.us/tops/report/violent-crimes/new-bedford/2021

[7] Harrell, *supra* note 2, at 6 (concluding that "he percentage of violent victimizations committed by a non-relative the victim knew was similar for victims with (33%) and without (30%) disabilities")

2

It is equally important to note that students with disabilities also experience other forms of sex-based discrimination, which impede their equal access to educational programs and opportunities. When determining whether to provide special education services, or what services to provide, decisions are often informed by gender biases and academic expectations rooted in problematic stereotypes.[8] As a result, female identifying students are underrepresented among students receiving special education services creating vast gender inequities.[9]

Separately, LGBTQ+ students make up a sizeable portion of the student population in Massachusetts. A 2015 Massachusetts Youth Risk Behavior Survey reported that 11.1% of students surveyed identified as gay, lesbian, bisexual, or questioning about their sexual orientation, and 2.9% identified as transgender or questioning their gender identity.[10] The same survey discovered that LGBTQ high school students in Massachusetts are nearly 3 times as likely to have experienced non-consensual sexual contact compared to their peers.[11] In addition, 28.2% of LGBTQ high school students reported they were bullied, which is more than double the rate of their peers.[12]

Given the high rate of sex-based discrimination, including sexual harassment, among young persons with disabilities and LGBTQ+ students, strong Title IX regulations are vital to ensuring the students we represent are able to benefit from and thrive in their educational programs free from sex-based discrimination and harassment. Accordingly, SCCLS is taking this opportunity to provide comments specific to the portions of the proposed regulations that address the needs of our clients who experience sex-based discrimination.

## I.    SCCLS Supports the Department's Proposed Rules to Increase Access to Title IX Processes and Protections for Students with Disabilities.

Through its proposed amendments, the Department is seeking to increase disabled students' access to Title IX processes and protections. By contrast, in its current form, the Title IX regulations are inadequate to provide disabled students with access to the Title IX process and do not afford disabled students the full benefit of Title IX protections. The inadequate protections are, in part, the product of the limited definition of sex-based discrimination, which limits sex-based discrimination to incidents that meet the narrow definition of sexual harassment. By clarifying the broader definition of sex-based discrimination, the Department is acknowledging that sex-based discrimination occurs in a myriad of ways and is not limited to sexual harassment. SCCLS agrees that this is consistent with Title IX's purpose.

In our work, SCCLS has observed instances where elementary and secondary institutions blatantly disregard their Title IX obligations. We have observed instances in which schools fail to accept complaints of sex discrimination, fail to investigate complaints, and/or fail to provide supportive measures. These failures have resulted in severe and significant set-backs for students, and have operated as a barrier to educational opportunities. In cases involving disabled students these institutions can justify their disregard of Title IX by pointing to the current regulations, which are non-inclusive and fail to recognize the ways that disabled students may report sex discrimination, comprehend information, participate in grievance processes, and/or require supportive measures to continue accessing and progressing in their education.

---

[8] Steven Severance & Erica Howell, *On Gender Disparities in Disability Identification and Special Education Services*, Journal of Gender and Power, Vol. 8, No. 2 (2017), *available at* http://gender-power.amu.edu.pl/JGP_Vol_8_No_2_C.pdf

[9] *Id.* at 28 (concluding, "thus, the gender imbalance is inequitable not because more boys are served per se; rather, it is inequitable because girls who otherwise qualify for, or would benefit from, special education services do not receive them").

[10] *Sexual Orientation and Gender Identify Among Massachusetts High School Students*, Massachusetts Commission on LGBTQ Youth (2015), *available* at https://www.mass.gov/doc/2015-youth-behavior-risk-study-sexual-orientation-and-gender-identity-among-massachusetts-high/download

[11] *How Sexual Harassment Hurts LGBTQ Youth in Massachusetts*, Massachusetts Commission on LGBTQ Youth (2015), *available at* https://www.mass.gov/doc/how-sexual-harassment-hurts-lgbtq-youth-in-ma-commission-on-lgbtq-youth/download

[12] Massachusetts Commission on LGBTQ Youth, *supra* note 10.

AR_004816

The Department's proposed amendments clarify recipient educational institutions – including elementary and secondary schools – have an obligation to comply with Title IX. Just as important, the proposed amendments would implement requirements aimed at affording students with disabilities access to a process that is currently inaccessible to them. In particular, SCCLS appreciates the opportunity to provide comments and recommendations on the following proposed amendments specific to Title IX's application to students with disabilities:

**A. SCCLS Supports the Department's Proposed Amendment to Clarify that Title IX Applies to All Forms of Sex Discrimination in Proposed 34 C.F.R. § 106.10.**

The Department's clarification that Title IX applies to all forms of sex-based discrimination, rather than limited to sexual harassment, supports all students, but in particular students with disabilities. Students with disabilities experience sex-based discrimination in ways not limited to sexual harassment, including equal access to special education services. Decisions related to special education referrals, whether to provide special education services, and what services, if any, the school must provide, are informed and clouded by gender bias.[13] These biases occur as a result of academic and behavioral expectations that are grounded in gender stereotypes, among other things.[14] Students with disabilities who are subjected to sex-based discrimination in the context of special education, or an attempt to access any other educational opportunity, should be afforded Title IX protections. Accordingly, SCCLS supports the Department's decision to clarify the broader scope of Title IX and its application to all forms of sex-based discrimination.

**B. SCCLS Supports the Department's Proposed Amendment Eliminating the definition of "Formal Complaint" in 34 C.F.R. § 106.30 and Replacing it with the Definition of "Complaint" in Proposed 34 C.F.R. § 106.2.**

The Department's proposed amendment to eliminate the definition of "Formal Complaint" and replace it with the definition of "Complaint" in 34 C.F.R. § 106.2 will create access to Title IX processes and protections for students with disabilities. A "formal complaint," as currently defined in 34 C.F.R. § 106.30, creates unnecessary hurdles for students with disabilities. Requiring a written complaint in and of itself creates barriers for all students, but poses specific barriers for students with disabilities who may require alternative means of communication. It is also a barrier for young students who may not be able to communicate effectively in writing. Additionally, requiring the complaint to contain specific language is overly prescriptive and allows educational institutions to easily disregard complaints of sex-based discrimination for failing to fully comply with each regulatory element. The current regulations do not contemplate alternative complaint mechanisms necessary to accommodate students' varied communication needs.

Relatedly, the current regulations do not require educational institutions to respond to incidents of sex-based harassment unless and until it has actual notice of the discriminatory conduct. SCCLS supports the proposed amendment to 34 C.F.R. § 106.44, which will further eliminate barriers for students with disabilities to report incidents of sex-based discrimination. Under the current regulations, students with disabilities may have difficulty reporting incidents of sex-based discrimination because they may not make a complaint to a person required to take action under Title IX. Depending on the nature of their disability, students with disabilities may not be able to report a complaint of sex-based discrimination to the Title IX Coordinator or their designee. Cognitive, communication, neurological, or mobility impairments, among other things, may operate as complete barriers. Moreover, students with disabilities may be more likely to communicate incidents of sex-based discrimination – and in particular sexual harassment, which are highly sensitive in nature – to a familiar, trusted, and accessible school faculty member. Additionally, many forms of sex-based discrimination likely do not trigger state mandated reporter laws. This coupled with the current regulations' restrictive

---

[13] Severance & Howell, *supra* note 8.
[14] *Id.*

reporting requirements likely leave many complaints by students with disabilities unacknowledged and unaddressed.

In that same vein, SCCLS also supports the Department's clarification in proposed regulation 34 C.F.R. § 106.6(g) that a parent, guardian, or authorized legal representative has the right to act on behalf of a complainant, including filing a complaint of discrimination. For the same reasons articulated above, this too, will increase students with disabilities' access to Title IX's protections – particularly students in elementary and secondary schools. Likewise, SCCLS supports the Department's proposed regulation 34 C.F.R. § 106.6(g), which also permits a parent, guardian, or other authorized legal representative to act on behalf of a respondent. Respondents with disabilities may also require additional support from a parent, guardian, or legal representative to meaningfully participate in the grievance process.

With respect to the complaint process, SCCLS believes eliminating the definition of "Formal Complaint" and replacing it with a new definition of "Complaint" is an improvement. However, SCCLS recommends that the Department go a step further to ensure that the needs of students with disabilities are fully contemplated. SCCLS suggests the Department state that it is permissible for a complainant to submit a complaint of sex-based discrimination in oral or written format, which includes adaptive communication formats. Adaptive communication formats may include sign language, physical gestures, drawings, or communicating through an aid or caregiver. Adaptive communication formats are vital for non-verbal students or students who are not literate in order to communicate their experience of sex-based discrimination and to access their Title IX protections. In turn, educational institutions should facilitate communication with students using adaptive formats if necessary to accommodate the student's disability and communication needs. Accordingly, SCCLS recommends the Department add the following language to the definition of complaint:

> Definition of complaint: "an oral or written request, *including requests using adaptive communication formats,* made to the recipient to initiate the recipient's grievance procedures for sex discrimination under § 106.45, and if applicable § 106.46." (emphasis added).

### C. SCCLS Supports the Department's Proposed Amendments 34 C.F.R. § 106.8(e) and 34 C.F.R. § 106.44(g)(7)(i) Requiring Title IX Coordinators to Consult with a Student's Individualized Education Program (IEP) Team and/or Section 504 Team.

The current Title IX regulations do not contemplate the needs of students with disabilities, and do not acknowledge the intersecting issues implicated when a student with disabilities experiences sex-based discrimination. The current regulations' disregard of students with disabilities is evidenced by the fact that the regulations do not even include a definition of a student with a disability. SCCLS supports the Department's inclusion of students with disabilities in the definition section, and its effort to make Title IX consistent and connected to Section 504 of the Rehabilitation Act of 1973 ("Section 504") and the Individuals with Disabilities Education Act ("IDEA"). SCCLS encourages the Department to retain its proposed definition that includes "an individual with a disability who *would* be covered" by Section 504 or IDEA. *See* 87 Fed. Reg. 41400 (emphasis added). Some students with disabilities may not have a Section 504 Plan or an Individualized Education Program ("IEP"), but may have a disability or suspected disability that would qualify them for special education services and/or accommodations. Those students should be considered within the definition of disability for purposes of Title IX protections, and SCCLS recommends the Department retain the definition in proposed amendment 34 C.F.R. § 106.2.

In addition, the current regulations do not support students with disabilities when considering supportive measures – both for complainants with disabilities and respondents with disabilities. SCCLS supports the proposed amendment in 34 C.F.R. § 106.8(e) that would require Title IX Coordinators in elementary and secondary institutions to consult with a student's IEP team and/or Section 504 team. Likewise, SCCLS supports the Department's proposed amendment in 34 C.F.R. § 106.44(g)(7)(i) requiring that the Title IX Coordinator consult with the IEP or Section 504 team when putting supportive measures in place for a disabled student in an elementary or secondary institution.

5

We appreciate the Department's recognition that students with disabilities disproportionately experience sex-based harassment and that supportive measures need to consider a complainant's unique disability related needs, which cannot exist in conflict with a student's IEP or 504 Plan. We agree that coordination between the Title IX Coordinator and IEP or 504 Team is necessary to ensure that special education services and/or accommodations are being provided and will be adjusted to meet the complainant's needs in light of the discrimination they experienced.

Likewise, we agree that the same consideration should be afforded to respondents with disabilities. Title IX Coordinators should coordinate with a respondent's IEP or 504 Team so that supportive measures do not undermine or conflict with their special education services or accommodations. This requirement intersects with the Department's proposed amendment in 34 C.F.R. § 106.44(g)(2), which allows for supportive measures that burden the respondent so long as they are not punitive. SCCLS agrees with the Department that supportive measures that burden the respondent should not operate as a mechanism for punishment or disciplinary action while an investigation is pending. However, SCCLS recommends that the Department make clear the connection between proposed regulation 34 C.F.R. § 106.8(e) and 34 C.F.R. § 106.44(g)(2). In other words, if supportive measures burden the respondent, those supportive measures cannot be burdensome to the point that they interfere with the respondent's special education services and/or accommodations. Accordingly, SCCLS recommends that the Department include the following language in 34 C.F.R. § 106.44(g)(2), which limits the ability of a recipient to implement supportive measures that burden a respondent:

"including measures that interfere with a respondent accessing or receiving special education services or accommodations."

SCCLS also recommends the Department provide further clarification regarding what information contained in a student's education record can be accessed and how it can be used by the Title IX Coordinator. We caution the Department that the regulations as currently proposed are vague as to the specific process and instances in which a Title IX Coordinator may access a student's educational record while they are consulting with the student's IEP or 504 Team. To that end, SCCLS recommends that the Department make clear in 34 C.F.R. § 106.8(e) and 34 C.F.R. § 106.44(g)(7)(i) that a student's disability and/or diagnosis, IEP, 504 Plan, evaluations, and other materials related to special education services and/or accommodations, should only be considered by the Title IX Coordinator if the school has received prior consent consistent with 34 CFR § 99.30, and only in the context of providing supportive measures.

The privacy interests at stake and the personally identifiable information contained in these records implicate The Family Educational Rights and Privacy Act ("FERPA"). It is not clear that the Title IX Coordinator certainly has a "legitimate educational interest" in either the complainant or respondent's IEP, 504 Plan, evaluations, and other materials related to special education services and/or accommodations. Accordingly, SCCLS recommends the Department include the following language in 34 C.F.R. § 106.8(e) and 34 C.F.R. § 106.44(g)(7)(i):

"A recipient must obtain consent in accordance with 34 CFR § 99.30 before it allows a Title IX Coordinator, or their designee, to access a complainant or respondent's education record as they meet their obligation to consult with the student's IEP or 504 Team."

SCCLS's recommended language is consistent with the Department's proposed definition of "relevant", which defines relevant as "related to the allegations of sex discrimination under investigation as part of the grievance procedures in § 106.45, and if applicable § 106.46." *See* 87 Fed. Reg. 41418. The Department proposes making it clear that relevant information must be related to the "allegations of sex discrimination" by helping to determine whether the alleged sex discrimination occurred. Records pertaining to a student's disability, IEP, or 504 Plan are not inherently related to allegations of sex discrimination. Likewise, those records are not inherently related to the "investigation as part of the grievance procedures." Records pertaining to a student's eligibility for special education services or accommodations, or the nature of the services and accommodations being provided, should not be used as evidence to support credibility determinations or

6

decisions related to responsibility. SCCLS's recommended language is consistent with the Department's proposed regulation 34 C.F.R. § 106.45(b)(7), which furthers students' privacy interests by clarifying categories of excluded evidence that cannot be considered in the grievance process.

**D. SCCLS Supports the Department's Proposed Amendment 34 C.F.R. § 106.45(b)(5) Allowing Parties to Meaningfully Participate in Title IX Investigations and Grievance Processes.**

SCCLS supports the Department's proposed amendment to 34 C.F.R. § 106.45(b)(5), which intends to balance the privacy interests of the parties, while simultaneously allowing parties access to services and support that will help them meaningfully participate in the grievance process. Complainants and respondents with disabilities may require additional support to participate in the grievance process, which may require communication with a disability related service provider, family member, confidential resource, and/or advisor. As discussed above, some students may only be able to communicate through an adaptive format, which may take the form of communication through another person. This naturally requires the student to communicate with this third party about the allegations in order to adequately participate in the grievance process. Similarly, a student with a disability may require support from a therapeutic provider or counselor, among other disability related service providers, to meaningfully engage in the grievance process. Moreover, it is especially pertinent for young students in elementary schools to be able to communicate with a family member, confidential source, or advisor so that they can understand the nature of the proceedings and allegations under investigation.

At the same time, SCCLS agrees with the Department's approach to require recipient educational institutions to take reasonable steps to protect the privacy of the parties and witnesses while the grievance process is pending. The Department's interest in privacy protection is bolstered by its proposed amendment to 34 C.F.R. § 106.2 that incorporates "peer retaliation" as a prohibited form of retaliation against the complainant. Likewise, 34 C.F.R. § 106.71, which prohibits intimidation of any person for the purpose of interfering with any right under Title IX, operates to protect parties and witnesses involved in a Title IX grievance process.

**E. SCCLS Disagrees with the Department's Proposed Amendment to 34 C.F.R. § 106.45(h)(2) that No Longer Requires a Notice of the Outcome of Complaint be Given in Writing to Both Parties.**

SCCLS recommends that the Department require elementary and secondary institutions to provide oral *and* written notice of the outcome of a complaint to both parties following a completed investigation into whether sex-based discrimination occurred. Simply providing oral notice, as required in proposed amendment 34 C.F.R. § 106.45(h)(2), is inadequate to fully inform the complainant and respondent of the outcome of the complaint, the basis for the decision, and any applicable appeal rights. Elementary and secondary institutions are required to convey specific and detailed information to both parties, which is more effectively communicated in writing, as it provides both parties time to comprehend the outcome and any further steps available to dispute the decision. To be clear, SCCLS also recognizes the benefit of elementary and secondary institutions providing this information orally, as it allows the parties to ask questions and increase their understanding. Each form of communication is vital for the parties to fully understand the outcome.

As applied to students with disabilities, limiting notice to oral communication does not consider that some students may not communicate or comprehend information orally. Providing notice orally and in writing is more inclusive and more adequately addresses the communication and comprehension needs of all students. Moreover, SCCLS suggests that the Department clarify that recipient educational institutions must provide notice of the outcome of the complaint in adaptive formats if necessary to accommodate a student's disability.

Last, SCCLS recommends that elementary and secondary institutions provide oral and written notice to the parties *and* their parents. For young students, parents need to receive a determination notice so the student can understand the outcome and the basis for the school's decision. Moreover, students with disabilities may need their parents to receive notice of the outcome in order to understand the school's determination. Providing

7

notice to a disabled student's parent also affords them the opportunity to meaningfully participate in future IEP and/or Section 504 Team meetings, which may be affected by the outcome of a Title IX investigation.

## II.    SCCLS Supports the Department's Proposed Rules to Increase Access to Title IX Processes and Protections for LGBTQ+ Students.

SCCLS supports the Department's proposed amendment to clarify that Title IX applies to all forms of sex-based discrimination, including discrimination on the basis of sexual orientation, gender identity, and sex characteristics. The current regulations do not acknowledge LGBTQ+ students' identities or experiences of sex-based discrimination, and intentionally fail to offer supports and protections. In Massachusetts alone, LGBTQ+ students are bullied[15] and subjected to non-consensual sexual contact[16] at rates much higher than their peers. Without acknowledging and accounting for the fact that sex-based discrimination can originate from biases related to a student's sexual orientation, gender identity, or sex characteristics, the current regulations exclude many types of harmful and discriminatory conduct from Title IX's application. This intentional exclusion has real and harmful effects causing LGBTQ+ students to feel unsafe and skip school as a result.[17] Moreover, this exclusion sends a signal to recipient educational institutions that LGBTQ+ students are not entitled to civil rights protections, and in doing so, are less entitled to equal access to their educational programs. Recognition is important. SCCLS agrees with the Department's legal analysis that applying Title IX protections to all forms of sex-based discrimination is consistent with the purpose of Title IX and current legal precedent. The practical effect of this clarification will permit students, who were previously excluded from accessing Title IX processes and protections, the opportunity to assert their right to equal access in their educational programs.

## CONCLUSION

SCCLS supports the Department's efforts to amend the Title IX regulations to be more inclusive and accessible to students with disabilities and LGBTQ+ students. Individuals with disabilities and LGBTQ+ students experience sex-based discrimination, including sexual harassment, at much higher rates than their peers. For that reason alone, it is imperative the Department adopt the proposed amendments. Yet, we urge the Department to consider our recommendations to further Title IX's application, solidify the intersection of Title IX and federal disability law, and afford students with disabilities and LGBTQ+ students access to Title IX processes and protections.

Respectfully Submitted,

Jeannine Schoos, Esq.
BBO# 697084
South Coastal Counties Legal Services
22 Bedford Street
Fall River, MA 02720
(774) 488-5974
jschoos@sccls.org

---

[15] Massachusetts Commission on LGBTQ Youth, *supra* note 10.
[16] Massachusetts Commission on LGBTQ Youth, *supra* note 11.
[17] Massachusetts Commission on LGBTQ Youth, *supra* note 10 (noting that 14.4% LGBTQ+ students reported skipping school in the past month because they felt unsafe and 10% reported being threatened or injured with a weapon while at school).

8



September 12, 2022

*Submitted via regulations.gov*

The Honorable Miguel Cardona
Secretary
U.S. Department of Education
400 Maryland Avenue SW
Washington DC, 20202

The Honorable Catherine Lhamon
Assistant Secretary for Civil Rights
U.S. Department of Education
400 Maryland Avenue SW
Washington, DC 20202

**RE:    Comments from educators regarding the U. S. Department of Education's proposed
Title IX Rule (87 FR 41390; ED-2021-OCR-0166)**

Dear Secretary Miguel Cardona and Assistant Secretary Catherine Lhamon,

GLSEN and the National Center for Transgender Equality respectfully submit these 209
comments from individuals who self-reported they are a teacher, school administrator, or school
staff, including 66 who self-reported that they identify at LGBTQI+ and 64 who self-reported
that they are a parent, caregiver, or family of an LGBTQI+ person. These comments were
collected via www.glsen.org/T9commentportal between Friday, August 26 and Monday,
September 12, 2022 in response to the U. S. Department of Education's proposed Title IX Rule.

When provided, the names of LGBTQI+ respondents, respondents who experienced anti-
LGBTQI+ discrimination or victimization, and respondents who identified as being connected to
a LGBTQ+ student and/or survivor of LGBTQI+ related discrimination or victimization have
been withheld to protect their privacy and out of an abundance of caution.

If you would like to discuss these comments, please contact GLSEN's Chief of Staff and Deputy
Executive Director for Public Policy and Research, Aaron Ridings, at aaron.ridings@glsen.org.
Thank you for your consideration.

Sincerely,

GLSEN
National Center for Transgender Equality

Individual self-reported they are a teacher, school administrator, or school staff and identify as LGBTQI+

State: RI

Story Title: As a university educator

As a university educator, I believe it is essential that all students are supported and seen in their educational institutions. Schools have to investigate anti-LGBTQI+ discrimination and bullying and act to prevent it from happening again. This is really important because we know that when LGBTQI+ students tell school staff this happened to them, many say nothing changes, or worse, that they are punished or told they should change. The Title IX rule should require school's nondiscrimination policies to list "sexual orientation, gender identity, sex characteristics (including intersex traits), and sex stereotypes," since we know these policies are more effective when they do. It should also clarify that deadnaming, misgendering, and refusing to use the correct name or pronouns are harmful and illegal forms of sex-based bullying.

Individual self-reported they are a teacher, school administrator, or school staff and identify as LGBTQI+
State: TX
Story Title: Make our schools safe for all LGBTQI+ students
I am a queer and transgender educator in Texas, and it is important to me that our schools are safe for all students, including all our LGBTQI+ students. I cannot teach all my students fairly and equally if the educational environment in which they are learning does not support and protect them fairly and equally.   A student cannot be expected to learn successfully in a space where, as result of LGBTQI+ discrimination within the educational environment, they might be: 1. bullied or harassed based on their sexual orientation, sexual traits, gender identity or gender expression 2. deadnamed or misgendered 3. forced to engage in social behavior that is contrary to their sexual or gender identity, such as conforming to narrow, gendered dress codes that serve no educational benefit  4. excluded from participation in sports other school activities due their their gender or sex traits, or from access to single-sex facilities that align with their self-identified gender, like bathrooms and changing rooms  All these forms of discrimination make a student feel isolated and can do real harm to both the student's well-being and their academic performance. While the proposed rule is a good start, it needs to very clearly state that LGBTQI+ student are protected from all of these forms of discrimination.   Additionally, we need this rule to also include provisions that require schools to clearly state in their non-discrimination policies that discrimination and harassment based on "sexual orientation, gender identity, sex characteristics (including intersex traits), and sex stereotypes" are prohibited. These specific categories need to be clearly stated so to be inclusive enough to protect all LGBTQI+ students.

Individual self-reported they are a teacher, school administrator, or school staff and identify as LGBTQI+
State: CA
I was diagnosed as intersex well into my adulthood. Intersex students and staff need protection because nobody knows until they go through the intense process of diagnosis whether or not they are. Intersex people like myself deserve equal protection under the law.

Individual self-reported they are a teacher, school administrator, or school staff and identify as LGBTQI+

State: MA

Story Title: At a time when transgender and other LGBTQI+ students…

At a time when transgender and other LGBTQI+ students are unfairly under attack and vilified in much of the United States for just wanting to be their true selves, it is critical that they have protection under federal law and Title IX. As a non-binary trans teacher, I want to do everything I can to support all of my students, especially those that are transgender, gender-queer, or otherwise marginalized for their gender identify and sexuality. I am extremely fortunate to work at a school that supports all students (and teachers!!) regardless of their background, but even then there are issues of bullying and students who feel at risk or suffer from trauma and mental health issues related to their identity along with all the ways they feel marginalized by recent waves of anti-trans and anti-queer legislation. This is further complicated for students who cannot be their true selves in their home but can use school as a safe place to be themselves and find community amongst other students. I am supportive of Title IX stating that discrimination and bullying based on sexual orientation, gender identity, sex characteristics (including intersex traits), and sex stereotypes is illegal. However, it can go even further in its effectiveness to support LGBTQI+ students, by requiring schools' nondiscrimination policies to list "sexual orientation, gender identity, sex characteristics (including intersex traits), and sex stereotypes, identify that students should be able to use changing rooms and bathrooms that correspond to their gender identity, prevent transgender students from being excluded from athletics, encourage gender neutral dress codes, and clarify that deadnaming and purposefully using a student's incorrect pronouns are acts of bullying. Please act to provide more support for these students that truly need it.

AR_012914

Individual self-reported they are a teacher, school administrator, or school staff and identify as LGBTQI+

State: CO

Story Title: Because it's the decent thing to do

My life, and the lives of other transgender persons, does no harm to anyone, robs no one else or their liberties, and is solely the business of me, my partner, and my doctor.

AR_012915

Individual self-reported they are a teacher, school administrator, or school staff and identify as LGBTQI+

State: IL

Story Title: Queer & Trans Students Deserve Protection

I have been out as a queer & trans person since I was a teenager, and I have the distinct privilege now of supporting LGBTQ+ youth in Illinois through my work at Youth Services, a community mental health organization in Glenview. The youth I support through weekly groups, community building events, and youth leadership teams are kind, thoughtful, strong, creative, caring, and dedicated to ensuring them and their peers get to live full, happy lives in charge of their bodies, their futures, and their community. Everyone deserves the bare minimum of consequences when not only their peers, but also their teachers, admin, parents, faith leaders, and representatives disrespect them and deny them their bodily autonomy and the right to explore & express who they are. I urge you to take action in standing with queer & trans students during this time of intensive targeting of queer & trans people's safety & agency.

Individual self-reported they are a teacher, school administrator, or school staff and identify as LGBTQI+

State: CA

Story Title: My students need this

My students need this because about 20% of them identify as LGBTQIA+. They know who the accepting and unaccepting teachers are within a week of setting foot on campus because for some of them, it can be a matter of life and death. They tell each other who they can be open around, and they find me fast, because as the only openly queer and non-gender-conforming teacher on campus, I stand out. That's on purpose. We're in an isolated semi-rural desert district with a huge number of staff belonging to the local evangelical megachurch. I might be the only safe adult they see.

AR_012917

Individual self-reported they are a teacher, school administrator, or school staff and identify as LGBTQI+

State: TN

Story Title: Greetings,

I am a non-binary, queer individual living in a characteristically conservative portion of Upstate NY, and I support this measure. It is critical that folx be free of discrimination based upon sex, gender identity and sexual preference. There are so many ways that the world will beat us down in utterly ordinary circumstances, let alone in schools, where we are mandated to be for the first 15-17 years of our lives. I feel it is of the utmost importance not to allow federally-funded programs to benefit while supporting policies that encourage discrimination, harassment and bullying. Please, be well, everyone, take good care of yourselves and your kin, and find strength and solace in solidarity with one another.

Individual self-reported they are a teacher, school administrator, or school staff and identify as LGBTQI+
State: OR
Story Title: Hi
I work part-time as a tutor here in the Central Texas area, particularly in the Dripping Springs area. I assist middle and high school aged children with math and English. While I am not in the school system proper, I spend enough time with kids that I see what's going on.  When I was in high school, graduating in 2012, the very idea of someone being openly gay was huge news in Texas, even if he was one of the most popular, beloved members of the class. One of the students I tutor is gay and is actively exploring her gender identity. I highly doubt she'll transition to being a transgendered man, but that's not my place to decide. Being a teenager and young adult is the time to explore, experiment, and find yourself. To be your happiest self, and have that happiest self contribute to society in wonderful ways.  I have so many friends who are trans adults who had horror stories of their time in school, and even as a chronically ill cisman, I know how awful bullying can be for something you cannot control.  I have seen firsthand how the lack of action from authority can be interpreted, and often is, the same as approval. If no one stops them from being transphobic, hateful, and harmful to their fellow students, that's basically the same as it being okay. Please, do something to reach out and help them feel safe, so they can focus on developing key social skills, and learn how to be a productive, innovative member of American Society.  Deadnaming and INTENTIONALLY misgendering someone, for any reason, is awful. Malicious, intentional acts done to cause harm to someone. That's bullying, full stop. These actions should be treated as such. Intentional acts meant to cause harm, and be punished and held accountable as such, by students and faculty alike. Please, consider how the lack of action is harming children just wanting to understand themselves.  I, a white man who works at a restaurant, the most average of average American from Hays County, Texas, want to see LGBTQ+ people of all ages treated with respect. To be decent to everyone, regardless of gender or sexual orientation. Please, do not let inaction continue to be a green light for those filled with hate.

Individual self-reported they are a teacher, school administrator, or school staff and identify as LGBTQI+

State: MN

Story Title: I am a Queer Trans Man Working In Education

I have been working in educational systems since 1995 and moving forward on inclusion for all students is the right thing to do. Currently, there are schools that are requiring teachers to remove rainbows from their classrooms because supporting LGBTQ+ students is a political statement. When trans students in Texas are being pulled out of classrooms to be questioned about their treatments, government organizations are causing trauma. This has to stop. Our LGBTQ+ students need to be protected by everyone.

AR_012920

Individual self-reported they are a teacher, school administrator, or school staff and identify as LGBTQI+
State: NY
Story Title: Protect queer youth
I am an public school educator. Please protect our LGBTQIA youth in schools. This law is imperative to help protect them.

AR_012921

Individual self-reported they are a teacher, school administrator, or school staff and identify as LGBTQI+
State: MI
Story Title: I am a queer transgender educator
I am a queer transgender educator, and I want all students to feel safe and seen in my classroom. As a student, I did not feel safe to be who I was, and spent years struggling with poor mental health as a result of feeling unseen and unloved. Once I was able to step out and proudly come out as the person I am, and begin to feel safer doing so, my life drastically improved. I want my students to be protected so that they don't have to spend years struggling and hurting before they can feel loved and seen. The rule clearly states that discrimination and bullying based on sexual orientation, gender identity, sex characteristics (including intersex traits), and sex stereotypes is illegal. We need this because most LGBTQI+ students experience some form of anti-LGBTQI+ discrimination or bullying at school. It should clarify that deadnaming, misgendering, and refusing to use the correct name or pronouns are harmful and illegal forms of sex-based bullying. We need to do our jobs by allowing our students a safe place to explore their identities and feel fully seen. Thank you.

Individual self-reported they are a teacher, school administrator, or school staff and identify as LGBTQI+

State: MA

Story Title: Visibility matters

As a trans teacher, I have had a huge impact on my trans students, as well as their cisgender siblings, peers and families. For some, I've been their first visible trans grown up, while for others, I've helped them better understand their own gender or sexuality. Those students are among my most vulnerable, and need protections to ensure they are given the care they need to thrive.

Individual self-reported they are a teacher, school administrator, or school staff and identify as LGBTQI+
State: MA
Story Title: I am a queer educator
I am a queer educator. Having queer peers and community at school as a student, both before and after I came out, were vital to my self-understanding and growth. Having access to queer books served me in similar ways. Now, I have many students who are queer and trans. Many of them may not come from home environments where that is safe, and school gives them a place where they can explore their identities and be accepted as they do so in community with others. It is vital that we protect schools as a place that serve students, allowing them to grow into adults with self-understanding. That means giving these students protections at schools: protections that help them survive and protections that help them flourish.

Individual self-reported they are a teacher, school administrator, or school staff and identify as LGBTQI+
State: OH
Story Title: Queer and trans student
Queer and trans students deserve to be seen, heard, represented, and protected. Period.

Individual self-reported they are a teacher, school administrator, or school staff and identify as LGBTQI+

State: OH

Story Title: Protection Matters

As a teacher myself, I fully support all the protection and acceptance we can give to queer and trans students. Often the focus of bullying and discrimination from both their peers and school personnel, they need the full protection of Title IX.

Individual self-reported they are a teacher, school administrator, or school staff and identify as LGBTQI+

State: LA

Story Title: As a transgender woman

As a transgender woman growing up in the 90's and early 2000's and living in Texas, I wasn't able to come out, and that led me to some very dark times. It is so important for kids to be able to express themselves authenticity to help reduce depression, suicidal thoughts and actions and to help them grow individually. Had I come out as a kid, I'm not sure if I would have made it to where I am today. Today I am very open and proud of the woman I have become.

Individual self-reported they are a teacher, school administrator, or school staff and identify as LGBTQI+

State: NC

Story Title: I am a bi millennial

I am a bi millennial educator in the South. I want students to be seen and supported in the classroom. The rule clearly states that discrimination and bullying based on sexual orientation, gender identity, sex characteristics (including intersex traits), and sex stereotypes is illegal. We need this because most LGBTQI+ students experience some form of anti-LGBTQI+ discrimination or bullying at school. It should clarify that deadnaming, misgendering, and refusing to use the correct name or pronouns are harmful and illegal forms of sex-based bullying. It should clarify that states enacting anti-LGBTQ+ legislation or banning LGBTQ+ content from curriculum will lose public funding.

Individual self-reported they are a teacher, school administrator, or school staff and identify as LGBTQI+
State: NJ
Story Title: Queer Lives Matter
I am an educator and all of my students need to feel safe and happy. This means being who they are openly, without fear of hate or violence. This is more important now than ever.

Individual self-reported they are a teacher, school administrator, or school staff and identify as LGBTQI+

State: WI

Story Title: I am a queer educator

I am a queer educator from WI, a GSA advisor, and adult in schools who cares deeply about creating inclusive environments where all students can thrive in their learning. I cannot express how important it is for Title IX protections to extend explicitly to queer and trans students. The prevalence of harassment, bullying, and discrimination targeting the LGBTQI+ community in schools is unacceptable and it prevents young people from their right to an education. The rule in its current form could go even further to protect trans youth in particular from the constant harassment of misgendering that has been linked to all sorts of negative health outcomes. Thank you for your time, Anthony Jennaro

Individual self-reported they are a teacher, school administrator, or school staff and identify as LGBTQI+

State: MA

Story Title: I am a LGBTQ educator

I am a LGBTQ educator, and I support the addition of protections for youth based on sexual orientation, gender identity, sex characteristics (including intersex traits), and sex stereotypes.  I want all students in my school, and in other schools around the country, to have these protections

Individual self-reported they are a teacher, school administrator, or school staff and identify as LGBTQI+

State: MN

Story Title: Too many students fear their lifestyle

I work in a high school supporting kids in grades 9-12. Our support group is the first time they feel it is ok to figure out who they are.If we were not there for student s to protect and educate the I would fear more suicide deaths

Individual self-reported they are a teacher, school administrator, or school staff and identify as LGBTQI+

State: NY

Story Title: Being a Queer Teacher

Hello.  I have been teaching in a mostly white, middle class public high school in upstate NY for 28 years.  I am the advisor of the Gay-Straight Alliance on campus and identify as Bisexual.  I've worked with LGBTQA students my entire career, and the struggle continues for these students to find acceptance and to create a safe learning environment where they can be open about who they are and how they identify themselves.  Transgendered students in particular need our help.  Please do all you can to protect the rights of LGBTQA students.  The fight for civil rights for all must continue!

AR_012933

Individual self-reported they are a teacher, school administrator, or school staff and identify as LGBTQI+

State: FL

Story Title: The silent and vulnerable must be protected.

Having grown up in the 70s/80s, I didn't have anyone to look out for me as a gay youth. I had no role models in real life, on TV, in movies, or in books. As a result, I stayed in the closet until I was 27. When I became a teacher, I made sure not only be that accepting and respectful role model for all my students, but also to protect those disenfranchised who were LGBTQ and people of color. With how much politics and this conservative sense of freedom permeates everything we do in this country, we need to ensure that those LGBTQ students are protected from abuse, bullying, and marginalization. With almost half of LGBTQ students considering or committing suicide, it's imperative that we put things into place to keep them supported and safe from harm. Unfortunately, faith-based groups choose to ostracize and denigrate this population, depriving them of necessary protections (like safe space stickers) as well as books and materials geared toward the LGBTQ community. It's not enough for them to survive; they need to thrive.

Individual self-reported they are a teacher, school administrator, or school staff and identify as LGBTQI+
State: NY
Story Title: Bullying Must Stop
Speaking as an LGBTQ+ elder and educator, I have experienced bullying, starting 75 years ago. It's hard to believe that we're still dealing with it all these years later and that, in a supposedly civilized country, we haven't found a way to protect LGBTQ+ students. Implementing the proposed Title IX Rule is the least we can do. Thank you.

Individual self-reported they are a teacher, school administrator, or school staff and identify as LGBTQI+

State: VA

Story Title: School Board Harassment

A few years ago our local Alliance Club wanted to use our School Logo for internal use but with PRIDE colors filling it in. The students wanted to go through the proper channels and wanted to make sure there would be no issues. So I, along with other staff, assisted them in going through the proper procedures. The request was completley written by the students and was hand submited by myself to the Principal of the school. They approved the use but informed us that due to the nature of our club and certain views of our community, they wanted to protect us by having it approved by the Superintendent.   The letter was then hand delivered to the Superintendent who also approved it but felt that the School Board needed to sign off on it as well. Once it was proposed to the School Board the board decided that the request needed to be made publicly at a public School Board Meeting. Before the meeting the confidential letter was leaked to a radio station along with the student's and a staff member's name.   Qucikly students were being told false information that the Alliance Club wanted to permanently change our School Logo to PRIDE colors. This caused club members to be harrased by other students as well as the community. Fast forward to the School Board Meeting and our District was divided down the middle with many people defending the LGBTQIA+ community but many more ripping apart these kids. A handful of students had the courage and bravery to stand in front of all of those adults and express the feelings of just wanting to be seen and respected. Most did so with tears in their eyes and quavering voices.   The School Board ended up postpning the vote for three month before the Club was allowed to use the Rainbow Logo internally. Only because it was determined that the School Board did not have a legal stance at the time to tell us we couldn't. But some Board members needed to voicetheir distain and even called the kids and the LGBTQIA+ Community abominations.   There is so much more to be said about these events. But this is a prime example of what our kids are still dealing with. Where the adults who are charged with lookig after the best interests of our School Districts will purposely share a student's name to the public to stir a frenzy against children who simply wanted to be respected. We have come a long way but our kids still need to be protected.

Individual self-reported they are a teacher, school administrator, or school staff and identify as LGBTQI+

State: TX

Story Title: LGBTQI Protections

Data show that LGBTQ students are bullied more than any other group. Also, far right groups have chosen LGBTQ persons as their target for harmful and hurtful rules and laws. These students need more protection.

Individual self-reported they are a teacher, school administrator, or school staff and identify as LGBTQI+

State: IL

Story Title: As a teacher, I see the dangers

As a teacher, I see the dangers and pitfalls that are associated with anti-LGBTQ+ discrimination and bullying. The damage these policies do to children is incomprehensible. Every student, regardless of how they identify, is entitled to come to school and feel safe and supported. When we target a specific group to discriminate against a target is put on the back of those children. We tell the school community and community at large that it is okay to single out individuals who are LGBTQ+. This is a horrible precedent to set. In my opinion, who says that it will stop with LGBTQ+ individuals. People in other marginalized groups could be subjected to similar discrimination and bullying. Our kids are looking at us adults and paying attention, for better or worse. We need legislation that permanently protects the LGBTQ+ students in this country so that they are free to learn without the worry of being singled out.

Individual self-reported they are a teacher, school administrator, or school staff and identify as LGBTQI+

State: IL

Story Title: All teens are vulnerable to gender and sexual orientation based harassment and violence

There was a time when I thought these issues were fading. That young people would eventually arrive in an environment where no one would delight in tormenting each other over real, or perceived, differences in gender or sexual orientation.   The last three years have horrified myself and the teenagers I work with. We hear people on the news say grotesque things about people we know and love. We witness local and state governments pass ludicrously biased legislation restricting the acknowledgement in schools of people and relationships that are simply real and as real as any other.   I always believed that the courts would maintain basic human rights, but the judicial system has become overwhelmed and corrupt. It does not function in service of all the citizens of this nation.   You must use whatever power you have to protect our children and our future from the wave of ignorance and fear. It has already cost lives and the sanity of many, queer and straight alike.

AR_012939

Individual self-reported they are a teacher, school administrator, or school staff and identify as LGBTQI+

State: AK

Story Title: The Most Marginalized Need the Most Support

In the fight for equity, and ultimately the fight for peace, we need to provide extra support for our Queer - Yes! capital Q - people. The victims of bullying, harassment, unfair treatment in all aspects of society, and even victims of violence, rape and murder, our Queer people need to be seen as a precious resource and uplifted as such. Mainstream society has too often shunned us, and made us feel as if we are abominations, going through a phase, or outright wrong. I say that we are those that have questioned our own bodies, identities, culture, and worldview to the point that we are refined observers of injustice and inequality. When we are born into a world that does not make room for who we know that we are. As such, we are the world's most adept critics. We are those that see and feel the oppression and are keen in changing it; yet, this requires support from leadership everywhere. Leadership everywhere means teachers, parents, school boards, government, and celebrity. One more thing to say about how we are the world's most adept critics - this then leads us to be critical not just of how bodies, identities, and orientations are treated - we are also more keen into seeing environmental oppression, racial oppression, all human rights oppressions. We are the arbiters of change for a more equitable, peaceful world. Thank you.

Individual self-reported they are a teacher, school administrator, or school staff and identify as LGBTQI+
State: MA
Story Title: LGBTQ students need
LGBTQ students need to know that they are not alone in their schools.

AR_012941

Individual self-reported they are a teacher, school administrator, or school staff and identify as LGBTQI+
State: NC
Story Title: We are under attack.
I'm a school counselor at a small urban high school in Cary, NC. We have many students who identify as LGBTQIA+. We are a relatively safe space for students and still trying to get small concessions for students to feel more safe is a challenge. I know that at other schools where the climate is not as positive, students are facing so many obstacles. We need students and faculty to be protected from anti-LGBTQI+ bullying and discrimination. As an LGBTQIA+ person, I have dealt with being bullied when I was in school as a student. I only felt safe coming out as an adult when I moved to a city where there was a larger population of queer educators and when the Obama administration began to support LGBTQ rights. (Thank you for your influence, President Biden!) These students and staff face enormous pressures that people are only starting to understand and recognize. Because of the rates of teen suicide in the LGBTQIA+ community, this is a public health crisis and should be treated as one. I support that the rule clearly states that discrimination and bullying based on sexual orientation, gender identity, sex characteristics (including intersex traits), and sex stereotypes is illegal. We need this because most LGBTQI+ students experience some form of anti-LGBTQI+ discrimination or bullying at school. I also support that schools have to investigate anti-LGBTQI+ discrimination and bullying and act to prevent it from happening again. This is really important because we know that when LGBTQI+ students tell school staff this happened to them, many say nothing changes, or worse, that they are punished or told they should change. I think it should go even further. We need this to be taken seriously because kids lives depend on it. Schools and school districts need to explicitly require school's nondiscrimination policies to list "sexual orientation, gender identity, sex characteristics (including intersex traits), and sex stereotypes," since we know these policies are more effective when they do. It should clearly say that students must be able to use the girls' or boys' bathroom or locker room that corresponds with their gender identity, and the same goes for things like separate gender student housing and classes. It should clarify that deadnaming, misgendering, and refusing to use the correct name or pronouns are harmful and illegal forms of sex-based bullying. It should clearly say that students must be able to use the girls' or boys' bathroom or locker room that corresponds with their gender identity, and the same goes for things like separate gender student housing and classes. It should encourage dress codes to be gender neutral by making clear that schools risk violating Title IX when they give different rules for boys and girls. A separate rule will address school sports, but this one includes confusing language that could be misread as saying that excluding transgender students from boys' and girls' school sports teams is okay. All students should have access to the benefits of school sports. Thank you for your time and efforts to improve the lives of all LGBTQIA+ students and staffs. Ryan Haymore, School Counselor

Individual self-reported they are a teacher, school administrator, or school staff and identify as LGBTQI+
State: CA
Story Title: Teacher Training
Hello President Biden, I am in my 20th year as an elementary school teacher in California. The way to protect LGBTQ+ teachers is to have mandated training for teachers on LGBTQ+ issues.

Individual self-reported they are a teacher, school administrator, or school staff and identify as LGBTQI+

State: NY

Story Title: Trans rights are hum

Trans rights are human rights.  Trans girls are girls.  Trans boys are boys.  Genderqueer folx are folx.  Why we're still discussing this like it's a topic of debate and not a fact in this, the year of our Lord 2022, is beyond me.    I'm a genderqueer high school teacher who has spent decades doing my best to protect kids from the stupidity of adult culture war nonsense, which has an immediate and immense impact on their emotional health and well-being and also leads to stigmatization, bullying, and violence against them.  Trans rights are human rights.  Trans girls are girls.  Trans boys are boys.  Genderqueer folx are folx.  Why we're still discussing this like it's a topic of debate and not a fact in this the year of our Lord 2022 is beyond me.    If we can't legislate to protect vulnerable young people, what's the point of having a government?  Isn't it your job to protect everyone but ESPECIALLY the most vulnerable among us?

Individual self-reported they are a teacher, school administrator, or school staff and identify as LGBTQI+

State: MA

Story Title: Our students represe

Our students represent America. We cannot ignore or deny parts of America. Students of all identities and orientations need to be welcomed and celebrated in their classrooms and schools. It is known that students learn best when they are comfortable and acknowledged, and it is in their best interests that they are protected by law.

Individual self-reported they are a teacher, school administrator, or school staff and identify as LGBTQI+

State: TX

Story Title: I am a queer teacher

I am a queer teacher in Texas and I believe that every student deserves to be supported and seen in the classroom. This bill is very important because it protects the rights of LGBTQ+ students- a group that is being heavily targeted right now. Most, if not all, students who identify as LGBTQ+ experience some form of bullying or discrimination at school. This bill would set a good precedent that this discrimination is never acceptable. The bill should include language that deadnaming and misgendering are harmful and illegal forms of sex-based bullying. I have seen the trauma that this causes students firsthand and think the bill should be amended to protect them from that harassment.

Individual self-reported they are a teacher, school administrator, or school staff and identify as LGBTQI+
State: CA
Story Title: I'm a parent of trans adult
I'm a parent of transgender adult that cares about LGBTQI+ equality. Luckily, my child attended schools in an area that is open and supportive. Not all children are so fortunate. Schools need to be a safe space for all people -- whatever there gender identity and expression. Education is a fundamental human right. It's also a fundamental human right for everyone to be who they are without fear of discrimination and bullying. The rule that makes it illegal to discriminate and bully based on sexual orientation, gender identity, sex characteristics (including intersex traits), and sex stereotypes is needed to ensure the safety of LGBTQI+ students. Unfortunately, this is because most LGBTQI+ students experience some form of anti-LGBTQI+ discrimination or bullying at school. The rule is missing a few additional protections that would really help protect students. The rule should require school's nondiscrimination policies to list "sexual orientation, gender identity, sex characteristics (including intersex traits), and sex stereotypes," since we know these policies are more effective when they do. The rule should clearly say that students must be able to use the girls' or boys' bathroom or locker room that corresponds with their gender identity, and the same goes for things like separate gender student housing and classes. The rule should encourage dress codes to be gender neutral by making clear that schools risk violating Title IX when they give different rules for boys and girls. The rule should clarify that deadnaming, misgendering, and refusing to use the correct name or pronouns are harmful and illegal forms of sex-based bullying. Deadnaming, misgendering, and refusing to use the correct name or pronouns can put kids in danger. Please protect our children by adding additional protections to the rule and approving the rule. Thank you!

Individual self-reported they are a teacher, school administrator, or school staff and identify as LGBTQI+
State: CA
Story Title: Everyone deserves…
Everyone deserves the right to a safe education.

AR_012948

Individual self-reported they are a teacher, school administrator, or school staff and identify as LGBTQI+
State: CA
Story Title: I am a teacher and I
I am a teacher and I believe all students should be supported, protected, and safe at school. Schools nondiscrimination policies should be required to list sexual orientation, gender identity, sex characteristics (including intersex traits), and sex stereotypes. Students  must be able to use the bathroom or locker room that corresponds with their gender identity. It needs to specify that deadnaming, misgendering, and refusing to use the correct name or pronouns are harmful and illegal forms of sex-based bullying. Protect our LGBTQI+ students!

Individual self-reported they are a teacher, school administrator, or school staff and identify as
LGBTQI+
State: IL
Story Title: Trans students add i
Trans students add important wisdom and perspectives to the community.

AR_012950

Individual self-reported they are a teacher, school administrator, or school staff and identify as LGBTQI+

State: MA

Story Title: I'm a middle school counselor and this is so important!

Please vote to add this protection to Title 9!   The rule clearly states that discrimination and bullying based on sexual orientation, gender identity, sex characteristics (including intersex traits), and sex stereotypes is illegal. We need this because most LGBTQI+ students experience some form of anti-LGBTQI+ discrimination or bullying at school. This is true in my school. Schools have to investigate anti-LGBTQI+ discrimination and bullying and act to prevent it from happening again. This is really important because we know that when LGBTQI+ students tell school staff this happened to them, many say nothing changes, or worse, that they are punished or told they should change.   Here are some things the rule is missing: It should require school's nondiscrimination policies to list "sexual orientation, gender identity, sex characteristics (including intersex traits), and sex stereotypes," since we know these policies are more effective when they do. It should clearly say that students must be able to use the girls' or boys' bathroom or locker room that corresponds with their gender identity, and the same goes for things like separate gender student housing and classes. It should encourage dress codes to be gender neutral by making clear that schools risk violating Title IX when they give different rules for boys and girls. A separate rule will address school sports, but this one includes confusing language that could be misread as saying that excluding transgender students from boys' and girls' school sports teams is okay. All students should have access to the benefits of school sports. It should clarify that deadnaming, misgendering, and refusing to use the correct name or pronouns are harmful and illegal forms of sex-based bullying.

Individual self-reported they are a teacher, school administrator, or school staff and identify as LGBTQI+
State: AZ
Story Title: All students need protection
All students need protection and the queer and trans student population even more so. They aren't the subject to much peer bullying anymore, just the government and school districts. It is much bigger and more severe now so we need to be extra careful with making sure they are safe.

Individual self-reported they are a teacher, school administrator, or school staff and identify as LGBTQI+
State: CO
Story Title: Let them learn!
My school has a large population of LGBTQ+ students who want nothing more than to be part of the group of peers. They want to be loved and accepted by the peers AND teachers.  They want to participate in extra curricular activities and see themselves represented in the class materials. They deserve to be treated like every other student - with respect, love, kindness, understanding, and acceptance.

AR_012953

Individual self-reported they are a teacher, school administrator, or school staff and identify as LGBTQI+

State: IL

Story Title: I'm an LGBTQI+ school

I'm an LGBTQI+ school administrator working in the public school system. More importantly, I was an LGBTQI+ student in a school community that neither accepted nor protected me from bullying and harassment. Schools should provide a safe, positive and supportive environment for students, and when they don't students need to be able to assert their right to that space. These rules make clear that school staff must take an active role in supporting LGBTQI+, particularly trans and GNC students. These students have become political pawns in a campaign to erase LGBTQI+ Individuals from our communities. We need to make it crystal clear that these students belong not only in our school communities, but as empowered and valued members of society writ large. While there are areas where these rules need to be strengthened, they offer an important step towards equity and inclusion and I urge the administration to finalize these rules.

Individual self-reported they are a teacher, school administrator, or school staff and identify as LGBTQI+
State: NJ
Story Title: I'm a queer high school
I'm a queer high school math coach and independent researcher who knows it is essential to have every 2SLGBTQIA+ student feel safe and seen in PK-12 Classrooms. My research is situated at the intersection of 2SLGBTQIA+ identity and mathematics identity. Based on this expertise, I can say that it is impossible for students to learn when the minimum standards of safety and belonging are not met (this is according to the brain science related to how we learn). For this reason, this rule is essential in all PK-12 (and beyond) settings. The rule, however, does not go far enough. There is no requirement that schools have a nondiscrimination policy that lists sexual orientation, gender identity, sex characteristics (including intersex folx), and sex stereotypes. Having a stated nondiscrimination policy such as this has been found most effective in fostering 2SLGBTQIA+ safety, inclusion, and belonging. Similarly, the rule lacks a clear statement that students must be able to use the bathroom or locker room, student housing facility and separately gendered classes (like sex ed) that corresponds with their gender identity. The rule should also include language that requires schools to adopt gender neutral dress codes and it should clarify that things like deadnaming and misgendering students is harmful and are illegal forms of sex-based bullying. Finally, the rules language in relation to sports is slightly confusing, which could lead someone to misread the rule to say that excluding trans students from girls' and boys' sports teams is OK, which is again, contrary to research based recommendations about safety, inclusion and belonging for 2SLGBTQIA+ individuals.

AR_012955

Individual self-reported they are a teacher, school administrator, or school staff and identify as LGBTQI+

State: VA

Story Title: They're in your class whether you or they know it. Don't make the discovery traumatizing!

We can't let biases born from cis and heteronormativity dictate the procedures and pedagogy of not-knowing and looking away. Once they discover who they are, let's make sure that they've received positive messages about themselves.

Individual self-reported they are a teacher, school administrator, or school staff and identify as LGBTQI+

State: IL

Story Title: Protect Trans Youth

Title IX should absolutely protect trans youth, especially when their own families will not.

AR_012957

Individual self-reported they are a teacher, school administrator, or school staff and identify as LGBTQI+

State: MN

Story Title: Faith

Many talk about Faith as a reason for withholding. But let me ask you, doesn't your faith speak to the acceptance of others? To do right by thy neighbor? To LOVE thy neighbor?! I have my God given Faith, empathy and understanding of what it takes to be a good person. Coming for my neighbors rights and freedoms goes against everything God stood for and what Jesus died for. We need to protect thy neighbor, not strip them of their basic human rights.

AR_012958

Individual self-reported they are a teacher, school administrator, or school staff and identify as LGBTQI+
State: NY
Story Title: Support
I'm a gay teacher who wants everyone to feel supported and seen in the classroom. The rule clearly states that discrimination policies and bullying based on sexual orientation, gender identity, sex characteristics (including intersex traits), and sex stereotypes is illegal. We need this because most LGBTQI+ students experience some form of anti-LGBTQI+ discrimination or bullying at school. Schools have to investigate anti-LGBTQI+ discrimination and bullying and act to prevent it from happening again. This is really important because we know that when LGBTQI+ students tell school staff this happened to them, many say nothing changes, or worse, that they are punished or told they should change.  Here are some things the rule is missing or could do better and you can share your story or support for including these in the rule: It should require school's nondiscrimination policies to list "sexual orientation, gender identity, sex characteristics (including intersex traits), and sex stereotypes," since we know these policies are more effective when they do. It should clearly say that students must be able to use the girls' or boys' bathroom or locker room that corresponds with their gender identity, and the same goes for things like separate gender student housing and classes. It should encourage dress codes to be gender neutral by making clear that schools risk violating Title IX when they give different rules for boys and girls. A separate rule will address school sports, but this one includes confusing language that could be misread as saying that excluding transgender students from boys' and girls' school sports teams is okay. All students should have access to the benefits of school sports. It should clarify that deadnaming, misgendering, and refusing to use the correct name or pronouns are harmful and illegal forms of sex-based bullying.

AR_012959

Individual self-reported they are a teacher, school administrator, or school staff and identify as LGBTQI+

State: NY

Story Title: To let them be THEIR SELVES

If they don't express their selves they will become miserable. and i do not think you want to live in a world with miserable people that can not be them selves because they are scared that they are going to get bullied. i have been bullied by my sexuality that i could not help but say i was straight for 10 years because i knew i was going to be made fun. I finally came out as a Non-binary Pansexual, polymerous person

Individual self-reported they are a teacher, school administrator, or school staff and identify as LGBTQI+
State: NY
Story Title: Sports are for ALL!
Every kid deserves to play sports without discrimination! I support schools free of LGBTQIA+ Discrimination of kiddos!

Individual self-reported they are a teacher, school administrator, or school staff and identify as LGBTQI+

State: MA

Story Title: LGBTQ Students

LGBTQ Students will remain marginalized in many parts of the country unless we protect them. We can not leave this to chance and we cannot leave this to individual communities to discriminate.

Individual self-reported they are a teacher, school administrator, or school staff and identify as LGBTQI+

State: GA

Story Title: I'm glad this rule would help protect trans students

I'm glad this rule would help protect trans students.  The rule clearly states that discrimination and bullying based on sexual orientation, gender identity, sex characteristics (including intersex traits), and sex stereotypes is illegal. We need this because most LGBTQI+ students experience some form of anti-LGBTQI+ discrimination or bullying at school.  I'm a former high school teacher, and I've seen some of this bullying first hand.  However, this rule should require school's nondiscrimination policies to list "sexual orientation, gender identity, sex characteristics (including intersex traits), and sex stereotypes," since we know these policies are more effective when they do.  It should also clearly say that students must be able to use the girls' or boys' bathroom or locker room that corresponds with their gender identity, and the same goes for things like separate gender student housing and classes.  It should encourage dress codes to be gender neutral by making clear that schools risk violating Title IX when they give different rules for boys and girls.  It should clarify that deadnaming, misgendering, and refusing to use the correct name or pronouns are harmful and illegal forms of sex-based bullying.  Lastly, this rule includes confusing language that could be misread as saying that excluding transgender students from boys' and girls' school sports teams is okay. All students should have access to the benefits of school sports.

AR_012963

Individual self-reported they are a teacher, school administrator, or school staff and identify as LGBTQI+

State: NY

Story Title: Lives are on the Line

Schools are supposed to be safe places for everyone, yet hate crimes against transgender individuals continue to rise. Not fully including transgender and queer individuals in protective legislation sends a message that you don't see them as important or of value. It's demoralizing and hurtful in school, but out of school it literally has life or death consequences. The murder rates of transgender individuals rose in 2020 from 2019. Teaching people that it's not okay to mistreat others because of their gender expression starts in schools. Add transgender and queer protections to your legislation. You will literally save lives

AR_012964

Individual self-reported they are a teacher, school administrator, or school staff and identify as LGBTQI+

State: PA

Story Title: All Students Deserve Cover Under Title IX

I am a bi-sexual marketing professional that works at a university in Pennsylvania. I work with a large group of student-workers in my role at the university and I want all my students to have the same rights under Title IX regardless of their sexual orientation, gender identity, or sex characteristics. They all deserve to both feel and be safe at our institution and any institution they attend and be able to seek help from the school when they are being bullied.   As it does not currently, it should be required that school's nondiscrimination policies list "sexual orientation, gender identity, sex characteristics (including intersex traits), and sex stereotypes," since we know these policies are more effective when they do.  Most LGBTQI+ students experience some form of anti-LGBTQI+ discrimination or bullying at school. Which is why it is important that the rule clearly states that discrimination and bullying based on sexual orientation, gender identity, sex characteristics (including intersex traits), and sex stereotypes is illegal.  It should also encourage dress codes to be gender neutral as it's not the schools place to decide what attire should be worn by which individual. It should also clarify that deadnaming, misgendering, and refusing to use the correct name or pronouns are harmful and illegal forms of sex-based bullying.

Individual self-reported they are a teacher, school administrator, or school staff and identify as LGBTQI+
State: NJ
Story Title: As an educator…
As an educator, I believe that the safety of all students must come first. This includes our trans students. I am in favor of the Title IX change.

AR_012966

Individual self-reported they are a teacher, school administrator, or school staff and identify as LGBTQI+
State: IL
Story Title: Protect LGBTQ+!Kids
The bullying and harassing of LGBTQ+ students is an epidemic in this country. We need to make schools safe for ALL kids. Please add LGBTQ protections to Title IX.

AR_012967

Individual self-reported they are a teacher, school administrator, or school staff and identify as LGBTQI+

State: IL

Story Title: Queer and Trans Students are at risk and under attack

These changes are critical to preserve the safety of students and their ability to learn. To argue against them is to argue for and allow harm to students.

Individual self-reported they are a teacher, school administrator, or school staff and identify as LGBTQI+

State: MI

Story Title: Every Day Is Uncertain

I am a high school teacher and the leading advocate for LGBTQI+ students in our district. In the last 8 years, I have seen students be threatened and marginalized by peers, teachers, administrators, and yes, their own families.  In many cases, these kids often face prejudice for who they are and endure the negativity of other people's ignorance.   While things have improved in the last 8 years where I work, there is still a lot left to do in order to create a safe and welcoming learning environment for all kids. In this time, I also earned my doctorate in Sociology - specializing in gender equity and intersectionally complex oppression. We need federal policy that protects EVERYONE, regardless of where they are born or are growing up! Given the ridiculously hateful state policies that criminalize safe and supportive environments. In the last several months, I have also see the destruction that this type of persecution can create in my own family.  My son and his partner were robbed of their business, home, and mental health because my in-laws don't understand their child's gender identity. Truly hateful.

Individual self-reported they are a teacher, school administrator, or school staff and identify as LGBTQI+
State: WA
Story Title: Every student deserves
Every student deserves to be welcomed, celebrated, and supported. Unfortunately there are many places in our country that our queer or questioning students are bullied, discriminated against, and harassed. Peers, staff, the surrounding community, and our school systems need to continue to work to create safe spaces for LGBTQA+ students and staff. Everyone should be able to live their life as themselves and this should be a protected right.

Individual self-reported they are a teacher, school administrator, or school staff and identify as LGBTQI+

State: OR

Story Title: SAVE LIVES

As a queer educator, I can tell you firsthand that our queer and trans students need to feel safe and affirmed in school. Data shows that by having just one affirming adult in a queer or trans students' life, suicide ideation decreases by 40%. Students spend many hours in school throughout the year. Many queer and trans students cannot be out safely at home. School should be a safe space so that they can learn effectively. Lawmakers who have zero understanding of child development are making harmful decisions about curriculum and policing teachers' abilities to create a safe space for learning because of misinformation and propaganda. Protect all queer and trans students across the US. Thanks

Individual self-reported they are a teacher, school administrator, or school staff and identify as LGBTQI+

State: CA

Story Title: I am a queer teacher

I am a queer teacher working at a diverse, low-income school in San Lorenzo, California. Fortunately, Bay Area culture is very accepting of LGBTQ+ individuals and therefore, a lot of LGBQT+ educators are attracted to California schools. Passing anti-LGBTQ+ discrimination and bullying laws would not only attract more LGBTQ+ educators into the field during this year's teacher shortage, but it will prevent unnecessary suicides or self-harming behavior from queer minors that are the frequent targets of bullying and hate speech. Although homophobic/transphobic folx are loud, you should not prioritize their opinion over the feelings and experiences of LGBTQ+ people. Ignoring or shutting down homophobes does not result in oppression and hate crimes against straight and cis people. In contrast, ignoring or shutting down LGBTQ+ people continues the violence and hate towards this minority group in society. We have to be a part of the change and prioritize inclusivity and love over hate and violence.

Individual self-reported they are a teacher, school administrator, or school staff and identify as LGBTQI+
State: MA
Story Title: As a former teacher
As a former teacher who led schools through the process of providing alternative bathroom options I can tell you that even the schools that think themselves progressive aren't serving the needs of all students.

AR_012973

Individual self-reported they are a teacher, school administrator, or school staff and identify as LGBTQI+
State: TX
Story Title: Research tells us
Research tells us that LGBTQ+youth are at great risk of attempting suicide, but that simple acts such as respecting their pronouns and protecting their right to be safe in their identity decreases the risk by as much as 50%. Why would we not want to save children's lives, and let them grow up to be happy and healthy as their true selves?!

AR_012974

Individual self-reported they are a teacher, school administrator, or school staff and identify as LGBTQI+

State: WA

Story Title: I am a queer teacher

I am a queer teacher working at a diverse, low-income school in San Lorenzo, California. Fortunately, Bay Area culture is very accepting of LGBTQ+ individuals and therefore, a lot of LGBQT+ educators are attracted to California schools. Passing anti-LGBTQ+ discrimination and bullying laws would not only attract more LGBTQ+ educators into the field during this year's teacher shortage, but it will prevent unnecessary suicides or self-harming behavior from queer minors that are the frequent targets of bullying and hate speech. Although homophobic/transphobic folx are loud, you should not prioritize their opinion over the feelings and experiences of LGBTQ+ people. Ignoring or shutting down homophobes does not result in oppression and hate crimes against straight and cis people. In contrast, ignoring or shutting down LGBTQ+ people continues the violence and hate towards this minority group in society. We have to be a part of the change and prioritize inclusivity and love over hate and violence.

Individual self-reported they are a teacher, school administrator, or school staff and identify as LGBTQI+

State: WA

Story Title: Protect our LGBTQ+ kids!

I am the parent of a transgender girl. We are fortunate to live in a progressive city (but in a red state). There is so much hatred that is fueled by all of the anti-LGBTQ+ media rhetoric & state legislation going on right now. Our kids deserve protection no matter what state they live in. They deserve to be addressed by their preferred name, they deserve to use bathrooms/locker rooms that match their gender identity, and they deserve to play sports! Please protect our children -- they are a threat to no one.

Individual self-reported they are a teacher, school administrator, or school staff
Alex
State: NJ
Story Title: Gender protections NOW!
My students deserve the dignity of being recognized for who they are. Add protections for gender language now!

Individual self-reported they are a teacher, school administrator, or school staff
Amalia
State: CA
Story Title: I support LGBTQ+ kid
I support LGBTQ+ kids and their safety in schools

Individual self-reported they are a teacher, school administrator, or school staff
Amie
State: IL
Story Title: I am a public school
I am a public school teacher. Support our students! They need protection like every other child to be themselves and to be free of bullying or phobic actions.

Individual self-reported they are a teacher, school administrator, or school staff
Andi
State: IL
Story Title: I am a teacher from the Midwest
Through my tenure as a high school educator, I have see a growing number of students who have struggled in and out of the classroom. Our youth today face so many challenges and obstacles that can get in the way of academic success. I firmly believe that no one needs an additional hurdle to jump based solely on their gender or orientation!

Individual self-reported they are a teacher, school administrator, or school staff
State: CT
Story Title: Protecting LGBTQ+ Teens
As a teacher, I have seen firsthand how essential it is to provide protections for our LGBTQ youth. Within ten years at our small district, three students have lost their lives due to hate and countless others have endured bullying and harassment. We need laws that make it clear this is unacceptable.

Individual self-reported they are a teacher, school administrator, or school staff
Ann
State: NY
Story Title: It's discouraging
It's discouraging that as a society we have to put laws in place to ensure the protection of children, but as an educator I have, unfortunately, found first hand that we do. Anyone who claims to care about children must support this legislation.   To do otherwise diminishes us all as a society

Individual self-reported they are a teacher, school administrator, or school staff
Becca
State: KS
Story Title: These are real human
These are real human beings… children… loved ones that need care and looking after. We can't
deny their existence, we need to help.

AR_012983

Individual self-reported they are a teacher, school administrator, or school staff
Blair
State: CA
Story Title: True authentic self
As an educator, it is my hope and goal to welcome and celebrate all students. It is also imperative to show each of them that we all have gifts, talents, and being different and celebrating these differences makes the world a better place. When we listen to others,  share our authentic selves, lift each other up, so many problems would be solved. These are our future leaders, our children, our friends, how can we as a society not protect these children from being their authentic selves.

Individual self-reported they are a teacher, school administrator, or school staff
Brittany
State: TX
Story Title: We need protections
We need protections for queer and trans students bc it saves lives

Individual self-reported they are a teacher, school administrator, or school staff
Cynthia
State: FL
Story Title: I am an elementary school teacher
I am an elementary school teacher and know that in order for students to succeed, they first need to be seen and supported.   Fully acknowledging a student's existence should not be controversial or considered "inappropriate ".   To that end, this law should also include requiring schools to add gender identity, sexual orientation, and sex  stereotypes to their non discrimination list.  Without this basic right, LGBTQ students and their families will continue to feel excluded and unsafe: no student or parent of a student should feel that way.  Additionally, deadnaming, correct pronoun refusal, and misgendering should be considered illegal sex-based bullying. No one has the right to undermine and ignore the existence of another, especially in a school setting.   Additionally, all students should have access to all sports and bathrooms based on their gender identity. A student's existence is not based on the opinions of others so the law must be clear to protect students from those who would deny their right of autonomy and existence.   All students need support, compassion, and acknowledgment of themselves in order to succeed in school and grow in to healthy  adults. If we cannot protect all of our students in schools or choose to deny their existence, what are we telling our LGBTQ students and families about their future in this country?

Individual self-reported they are a teacher, school administrator, or school staff
Damie
State: NM
Story Title: Respect for all
All students, all children, all teachers, everyone deserves to be true to who they are. They deserve to be respected and not be afraid to show others who they are. Bullying is never ok. Parents need to do better to teach their children acceptance and to honor all people and celebrate people for who they are.

AR_012987

Individual self-reported they are a teacher, school administrator, or school staff
Dee
State: KY
Story Title: This is a good start… BUT
It should clarify that deadnaming, misgendering, & refusing to use the correct name or pronouns are harmful & illegal forms of sex-based bullying.

Individual self-reported they are a teacher, school administrator, or school staff
Elizabeth
State: MI
Story Title: Queer and trans stud
Queer and trans students deserve to be seen, heard, represented, and protected. Period.

AR_012989

Individual self-reported they are a teacher, school administrator, or school staff
Jaclyn
State: NJ
Story Title:
I believe everyone deserves to be appreciated and respected and have fair and equitable laws to promote equity for our LGBTQI family. With my ally ship I assist my school in upholding the rights for ALL of my LGBTQIA+ students and families. While seeking services fro those who dont have outside supports in the school system. Most services are far and limited. i do my best to be a clinical support and/or assist with resources. HOWEVER, WE NEED IDENTIFIED LAWS, CURRICULUMS, AND MANDATED TRAINING SO ALL EDUCATORS CAN ASSIST OUR STUDENTS. AS WELL AS MORE FACILITIES CAN BE LOCATED IN EACH STATE/COUNTY

Individual self-reported they are a teacher, school administrator, or school staff
Jean
State: IL
Story Title: I am a high school social worker
I am a high school social worker and I see how hard it is for our kids to find their way and to fit in. They ALL deserve to feel valued, accepted and SAFE at school. Please help us to help THEM.

Individual self-reported they are a teacher, school administrator, or school staff
Jessica
State: CA
Story Title: Students thrive when…
Students thrive when they feel normal, heard, seen, celebrate, and included. Luckily, atin public schools this includes LGBTQ+ students and staff. But we feel the everyday pressure to justify existing. Protections are desperately needed because we are still recovering as a society. It's been acceptable for too long that tolerance is enough. The issue with that is it still allows enough grey area for intolerance to grow. We must move towards protection, acceptance, and celebration. Please ensure stronger title IX protections.

Individual self-reported they are a teacher, school administrator, or school staff
Jordan
State: GA
Story Title: Support LGBTQ Youth
We must protect all children's rights to safe educational spaces. Expand the coverage!!!

AR_012993

Individual self-reported they are a teacher, school administrator, or school staff
karen
State: CA
Story Title: Every Person Deserves to feel SAFE and INCLUDED
As a school counselor I know how critical it is for ALL students to feel seen for their authentic
selves! I know that one caring adult can save a life of a queer youth.  We must be available, we
must support - we in education are committed to care for our students and protect them in
whatever ways we can.  It starts with standing for diversity and inclusion.

Individual self-reported they are a teacher, school administrator, or school staff

kim

State: IL

Story Title: ALL deserve equal protection, and marginalized populations of people need specific mentioning!

Some people don't and won't include Queer and trans students as a protected group bc they are easily dismissed as being too young to know, or being rebellious, or not even considered people!! Leave no room for interpretation and be sure to make it clear that queer and trans students are protected!!

Individual self-reported they are a teacher, school administrator, or school staff
Layne
State: NC
Story Title: Because every child…
Because every child is someone's child. Every child should be treated with respect.

Individual self-reported they are a teacher, school administrator, or school staff
Lyndsey
State: OR
Story Title: Our babies are not ok....
I work as a middle school teacher and get to see and hear a diverese range of student voices everyday. The reality is that our LGBTQI+ students need us adult more than ever to amplify their voices and to protect them from discriminatory policies that are negatively impacting their lives...just a reminder, youth under 18 do not have the right to vote, so it is our job as a voting adults to vote for representatives who support all students in being free from discrimination and bullying in school. I want each every student to be given the same human right of an education free from discrimination and bias! We must enact legislation that protects students rights to be who they are - Lesbian, Gay, Bi-sexual, Transgender, Queer, Questioning, Intersex and more....everyone deserves an equitable education free from hate!

Individual self-reported they are a teacher, school administrator, or school staff
Megan
State: NJ
Story Title: Protect queer and trans students
Just because someone may be different doesn't mean we should treat them as less than.equality is equality.

AR_012998

Individual self-reported they are a teacher, school administrator, or school staff
Miles
State: OR
Story Title: Protect trans students
It is critical that young people be protected and supported by institutions as they discover who they are. This is especially true for trans and queer youth who already face discrimination and threats. I strongly support Title IX's protection of queer and trans youth in schools.

Individual self-reported they are a teacher, school administrator, or school staff
State: PA
Story Title: We Need Protections for Queer and Trans Students SO THEY CAN LIVE
I am a therapist in a public school in Philadelphia. I have seen first hand the damage that bullying and microaggressions have on LGBTQI* people. People have suffered, died, denied themselves and hurt so deeply. Please support legislation to affirm and protect our students. This will save lives.

Individual self-reported they are a teacher, school administrator, or school staff

Paulo

State: OK

Story Title: I'm a teacher who wants…

I'm a teacher who wants everyone to feel supported and seen in the classroom. Schools have to investigate anti-LGBTQI+ discrimination and bullying and act to prevent it from happening again. This is really important because we know that when LGBTQI+ students tell school staff this happened to them, many say nothing changes, or worse, that they are punished or told they should change. Area to improve: It should require school's nondiscrimination policies to list "sexual orientation, gender identity, sex characteristics (including intersex traits), and sex stereotypes," since we know these policies are more effective when they do.

Individual self-reported they are a teacher, school administrator, or school staff

Robert

State: MA

Story Title: At a time when trans

At a time when transgender and other LGBTQI+ students are unfairly under attack and vilified in much of the United States for just wanting to be their true selves, it is critical that they have protection under federal law and Title IX. As a teacher, I want to do everything I can to support all of my students, especially those that are transgender, gender-queer, or otherwise marginalized for their gender identify and sexuality. I am extremely fortunate to work at a school that supports all students regardless of their background, but even then there are issues of bullying and students who feel at risk or suffer from trauma and mental health issues related to their identity. I am supportive of Title IX stating that discrimination and bullying based on sexual orientation, gender identity, sex characteristics (including intersex traits), and sex stereotypes is illegal. However, it can go even further in its effectiveness to support LGBTQI+ students, by requiring schools' nondiscrimination policies to list "sexual orientation, gender identity, sex characteristics (including intersex traits), and sex stereotypes, identify that students should be able to use changing rooms and bathrooms that correspond to their gender identity, prevent transgender students from being excluded from athletics, encourage gender neutral dress codes, and clarify that deadnaming and purposefully using a student's incorrect pronouns are acts of bullying. Please act to provide more support for these students that truly need it.

Individual self-reported they are a teacher, school administrator, or school staff
Roselinn
State: CA
Story Title: It is our responsibility to protect LGBTQIA+ students!
President Biden et al, I voted for you. I believe in you. I know that in your heart of hearts you support ALL people from every group from small to tall. It's imperative that you use love and power to protect our children. This generation believes in acceptance at all levels, and we as parents must continue to support that way of thinking. To protect our LGBTQIA+ students and their friends at the highest level is a requirement to ensuring we raise a strong, healthy, loving contingent of individuals. We are at our strongest within a strong community of supporters, and lives are at stake. I implore you to take all measures to ensure a save environment for our children everywhere.

Individual self-reported they are a teacher, school administrator, or school staff
Sheena
State: OH
Story Title: Saving Lives
Honoring a students' pronouns, not using their dead names, and protecting them is key to saving lives. As a digital crisis counselor, a teacher, and a GLSEN board member, I've seen how important it is for students to have a safe place in school with caring and supportive adults to talk to.

Individual self-reported they are a teacher, school administrator, or school staff
Suzy
State: MI
Story Title: It is my duty as a teacher
It is my duty as a teacher to help students grow. To do this they must all feel safe & cared for. Having a GSA Club at our school and the Safe Space sticker on many teachers' doors helps build a living & supportive learning environment for ALL.

AR_013005

Individual self-reported they are a teacher, school administrator, or school staff
Tiffanie
State: TX
Story Title: From the Classroom to the Board Room, Queer & Trans Students Deserve to be Protected
I am a two-time teacher of the year and current board member who ran for school board because I was tired of having to beg elected officials to recognize the full humanity of our students. It is a moral imperative that we protect Queer and Trans students. These protections are tied to our shared humanity. We can't talk about needing more mental health services and the rising rates of death by suicide in young people while neglecting the harm we are complicit in when we fail to protect the humanity and dignity of Queer and Trans students, knowing that they die by suicide at higher rates. We can't purport to care about academic outcomes when our lack of protecting for Queer and Trans students promote physically, mentally, emotionally and socially dangerous environments where their amygdala's are hijacked, causing a flight, fight or freeze response and negatively impacting their ability to achieve academically or in any other capacity. We MUST do better. We must protect these students. No one is free until we are all free.

Individual self-reported they are a teacher, school administrator, or school staff
William
State: NJ
Story Title: High School GSA Advisor
I've noticed the rise in discrimination throughout the country. Luckily the area I live in seems to be more tolerant. At the same time, we are hearing voices who are against any mention of LGBTQ+ issues; local congressmen are spearheading policies that disallow teachers from speaking on such things, as well as students reading about them.   Again, I am fortunate where there is more support, but I also want to make sure that discussion and reading of such topics are safe for students.

Individual self-reported they are a teacher, school administrator, or school staff
State: IL
Story Title: Suffering
Our Trans and Queer youth are suffering through ongoing Hate Crimes, and it seems that no one cares. Please provide more in the form of legislation to protect our children.

Individual self-reported they are a teacher, school administrator, or school staff
State: WI
Story Title: It Matters That Teachers Are On Board
As a mother of a gay son & an advisor for our school's GSA, I feel passionate about supporting students in schools and educating staff about LGBTQ+ issues.  I've seen first-hand how well students thrive when given protections against bullying and harassment.  Students light up when they see themselves represented in our school's hallways.  Making it a practice to ask students' preferred names and pronouns gives staff an opportunity to explain why, so that all students hear their teachers speaking positively about our gender revolution and all students are given the respect they deserve.  Acceptance is a form of love.  It does not necessarily require agreement or even understanding.  Accepting, supporting, and caring for LGBTQ+ students saves lives.  It is every teacher's responsibility.  And for me, it is a great joy.

Individual self-reported they are a teacher, school administrator, or school staff
State: KS
Story Title: Kids Need Our Support
As a school teacher and administrator for 38 years, I cannot remember a time where a group of students have been more attacked or used as a political pawn than the current situation for LGBTQ+ students. What makes it so difficult is that those who openly support, or try to support these kids are then relentlessly attacked. All our marginalized groups need supported, but unfortunately, I believe the LGBTQ+ students may be the group in most need. If we truly believe that educational success comes from relationships with others, from being able to be their authentic selves, and from being able to explore their futures, then protections must be in place so they feel they are safe to do so. My daughter happens to be trans, so I have personally seen her struggles up close. She knows she has had an easier time than many, yet she has still encountered problems just trying to be herself. We owe it to everyone to create a place for them to belong.

Individual self-reported they are a teacher, school administrator, or school staff
State: CA
Story Title: Protect our students now!
I run the GSA for my high school in Taunton, Massachusetts. I am livid at the state of affairs in our country. Every day, more and more bigotry gets a free pass, or even enshrined into state law. Enough is enough! Enact federal protections for queer and trans students now! We cannot afford to waste any more time. These students' lives are at stake!

Individual self-reported they are a teacher, school administrator, or school staff
State: PA
Story Title: I have worked with queer and trans youth
I have worked with queer and trans youth for over 25 years. I see every day the impact of a positive or negative school experience, and it breaks my heart to witness the unnecessary pain these kids experience when they are exposed to discrimination and bullying. It's horrible when it comes from peers, but it's SO MUCH WORSE when it comes from the teachers, administrators, and school boards who are supposed to protect our kids.   Schools must make it clear that anti-LGBTQI+ bullying is illegal and will be immediately investigated and punished. Nondiscrimination policies should be required to specify sexual orientation, gender identity, sex characteristics (including intersex traits), and sex stereotypes," in order to be unambiguous. Dress codes should be gender neutral and not give different rules for boys and girls in dress and expression.  All students should have access to the benefits of school sports, and excluding transgender students from boys' and girls' sports teams should not be permitted.  The rule should make clear that the insidious and devastating practices of deadnaming, misgendering, and refusing to use the correct name or pronouns are harmful and illegal forms of sex-based bullying. No one can learn when they are putting all of their energy into simply surviving. All youth deserve to learn in a supportive and affirming environment so they can develop into healthy, productive adults who can make society a better place.

Individual self-reported they are a teacher, school administrator, or school staff
State: IL
Story Title:
Because they are people too.

Individual self-reported they are a teacher, school administrator, or school staff
State: TX
Story Title:
It is imperative that all students in PK-12 schools are treated fairly and equitably in ways that do not discriminate. Our schools must be safe, inviting places for all students including and in particular, especially for students in the 2SLGBTQUI+ community, their families and friends. There should be no bullying or discrimination allowed.

Individual self-reported they are a teacher, school administrator, or school staff
State: HI
Story Title: Protect LGBTQIA2S+ Students
Our students deserve protection, support, and love. Misgendering is harmful and must be directly addressed.

AR_013015

Individual self-reported they are a teacher, school administrator, or school staff
State: IL
Story Title: Advocate
I am a teacher in an elementary school. I continue to learn and grow to make sure that my classroom is a safe place where all students can thrive. We must advocate fiercely to protect LGBTQI+ students, so that they can access education without fear.

Individual self-reported they are a teacher, school administrator, or school staff
State: WI
Story Title: I am a teacher educa
I am a teacher educator who strongly believes that schools should be a safe and supportive place for people of all identities, including LGBTQIA+ identities. I support the Title IX rule.

AR_013017

Individual self-reported they are a teacher, school administrator, or school staff
State: CO
Story Title: Students need your help!
More than ever, people in our country are harming those they see as different. We must stand up and protecting them.

Individual self-reported they are a teacher, school administrator, or school staff
State: NY
Story Title:
Ensure the law includes protection about gendered pronouns use and respecting them.

Individual self-reported they are a teacher, school administrator, or school staff
State: CA
Story Title:
I'm a teacher who wants everyone to feel supported and seen in the classroom. LGBTQI+ discrimination and bullying in schools is illegal, but we know it still happens all the time. LGBTQI+ students who are transgender, nonbinary, students of color, and students with disabilities face particularly hostile school climates. The Biden Administration has proposed a Title IX rule that would make it clear that anti-LGBTQI+ discrimination and bullying is unacceptable and must be responded to quickly and effectively.   The rule clearly states that discrimination and bullying based on sexual orientation, gender identity, sex characteristics (including intersex traits), and sex stereotypes is illegal. We need this because most LGBTQI+ students experience some form of anti-LGBTQI+ discrimination or bullying at school. Schools have to investigate anti-LGBTQI+ discrimination and bullying and act to prevent it from happening again. This is really important because we know that when LGBTQI+ students tell school staff this happened to them, many say nothing changes, or worse, that they are punished or told they should change.  Here are some things the rule is missing or could do better. These should be addressed:  It should require school's nondiscrimination policies to list "sexual orientation, gender identity, sex characteristics (including intersex traits), and sex stereotypes," since we know these policies are more effective when they do.  It should clearly say that students must be able to use the girls' or boys' bathroom or locker room that corresponds with their gender identity, and the same goes for things like separate gender student housing and classes.  It should encourage dress codes to be gender neutral by making clear that schools risk violating Title IX when they give different rules for boys and girls.  A separate rule will address school sports, but this one includes confusing language that could be misread as saying that excluding transgender students from boys' and girls' school sports teams is okay. All students should have access to the benefits of school sports.  It should clarify that deadnaming, misgendering, and refusing to use the correct name or pronouns are harmful and illegal forms of sex-based bullying. Thank you for your addressing of this important educational issue.

Individual self-reported they are a teacher, school administrator, or school staff
State: PA
Story Title:
I am a teacher who wants everyone to feel supported and seen in our schools.

Individual self-reported they are a teacher, school administrator, or school staff
State: WA
Story Title:
I teach in a small rural community where students are often isolated and not supported.  We need to change this and ensure all students feel safe.

Individual self-reported they are a teacher, school administrator, or school staff
State: WA
Story Title: Community
Community means everyone, unified, working together for a better future.  Everyone has no alternative and schools should be for everyone.

Individual self-reported they are a teacher, school administrator, or school staff
State: MI
Story Title: All means all
I just believe that until the day that students are always treated the same no matter what they look like, sound like, think like, act like, or any other different characteristic that we need to ensure protections for any vulnerable group or individual.

Individual self-reported they are a teacher, school administrator, or school staff
State: IL
Story Title: Teaching the Future
I am an educator. I have the privilege of working with 7th grade students for 75 minutes each day. I want all of my students to feel safe in my classroom. Please protect all students. Please protect my most vulnerable queer and trans students.

AR_013025

Individual self-reported they are a teacher, school administrator, or school staff
State: CO
Story Title: ALL Students Matter
As a school counselor and teacher for the last 24 years, I have seen first hand how not feeling accepted for who you are demolishes students' mental health.  All students deserve to feel safe and accepted at school.  If we are to educate our children they have to feel safe and valued at school.

Individual self-reported they are a teacher, school administrator, or school staff
State: NJ
Story Title: I'm a middle school counselor
I'm a middle school counselor, Advisor to our GSA, private psychotherapist and parent of an amazing young woman who identifies as gay. It is perplexing and downright disturbing that anyone would ever question the right of any student to feel safe and protected while at school. However, since there continue to be evidence of antidiscrimination and bullying toward LGBTQ+ students in our schools across the country, it is critical that there are laws and policies in place to provide the level of protection that all students deserve.

Individual self-reported they are a teacher, school administrator, or school staff
State: IL
Story Title: Safe Schools for ALL
I'm a teacher and I want everyone to feel supported and seen in the classroom. I support the proposed Title IX rule that would make it clear that anti-LGBTQI+ discrimination and bullying is unacceptable and must be responded to quickly and effectively. We need this because most LGBTQI+ students experience some form of anti-LGBTQI+ discrimination or bullying at school. It should require school's nondiscrimination policies to list "sexual orientation, gender identity, sex characteristics (including intersex traits), and sex stereotypes," since we know these policies are more effective when they do. But there are some things that could be even clearer: It should clearly say that students must be able to use the girls' or boys' bathroom or locker room that corresponds with their gender identity, and the same goes for things like separate gender student housing and classes. It should clarify that deadnaming, misgendering, and refusing to use the correct name or pronouns are harmful and illegal forms of sex-based bullying. It should encourage dress codes to be gender neutral by making clear that schools risk violating Title IX when they give different rules for boys and girls. Finally, it should clarify that ALL students should have access to the benefits of school sports, and provide guidance for transgender students to compete on teams that correspond to their gender identity.

Individual self-reported they are a teacher, school administrator, or school staff
State: CA
Story Title: Kids can't learn if
Kids can't learn if they don't feel safe and seen. It's that simple. Under the law they have the right to a free education. They will be paying taxes just like everyone else. They deserve an equal education. It's the government's responsibility to put laws in place that protect them.

AR_013029

Individual self-reported they are a teacher, school administrator, or school staff
State: GA
Story Title: From an educator
I'm a middle school Language Arts teacher. I see firsthand how important it is for my students to feel seen and validated in the stories we read together, the books we have on our shelves, and in the ideas we discuss in class. Through writing, my students work to find their voices and develop their own identities. All children deserve schools where they feel safe to explore their identity, regardless of who they are or how they identify. It is our job as educators to help them grow into confident, capable adults who understand the power of their voice and their ability to make good in the world. It is important the laws are put in place to protect our LGBTQI+ students who are particularly vulnerable to bullying and harassment. Schools should work to be safe spaces where nondiscrimination policies include sexual orientation and gender identity, in addition to limiting ways in which gender plays a role within the building (bathrooms, gendered classes, dress code). Our children deserve spaces where they do not have to live in fear of deadnaming or forced pronoun adoption. When these conditions are met, we build spaces of tolerance that are better for everyone.

Individual self-reported they are a teacher, school administrator, or school staff
State: NM
Story Title: Some of my students
Some of my students are LGBTQ+, and they deserve to be protected. Some of my family are LGBTQ+, and they deserve to be protected. There are a lot of members of the community, and they deserve to be protected. They all have a right to be protected.

Individual self-reported they are a teacher, school administrator, or school staff
State: FL
Story Title: We need to make educational policy
We need to make educational policy that supports the whole child. I strongly support the Biden administration's proposed Title IX rule and encourage you to go further by requiring schools to explicitly include sexual orientation, gender identity, sex characteristics, and sex stereotypes in non-discrimination policies and to expressly grant access to school spaces and activities—including bathrooms, locker rooms, and extracurricular activities—that correspond to students' self-identified gender identities. Furthermore, persistently and intentionally misgendering and deadnaming students should be recognized in schools' anti-bullying policies as a form of harassment. These changes will improve the learning of all students and quite literally save the lives of some LGBTQIA+ students.

Individual self-reported they are a teacher, school administrator, or school staff
State: IL
Story Title: I teach in a rural school district
I teach in a rural school district where change to school policy only comes if mandated by the legislature or ruled to do so by the courts. Otherwise, the status quo endures, which is damaging to students who are forever in the minority.

Individual self-reported they are a teacher, school administrator, or school staff
State: MA
Story Title: Protect Trans Students
When I was 15, back in the early 90s, one of my best friends came out as trans. It was an extremely unusual and brave thing to do then. My friend faced occasional taunting (Hey, is that a boy or a girl?) but thankfully not much more than that. They were extemely lucky and their story was unusual. I helped that we were in liberal eastern Massachusetts. Today trans and nonbinary identities have become more common, but many people are still wary and unsupportive of people who don't conform to the traditional gender binary. LGBTQIAA youth face bullying, harrassment and denial of gender-affirming care. Suicide rates are still way too high in the LGBTQIAA community. As a teacher, I have seen trans students thrive in a supportive environment. Trans and non-binary everywhere deserve legal protections against those who would try and tell them that they do not deserve the same respect due to every other human being.

Individual self-reported they are a teacher, school administrator, or school staff
State: NY
Story Title: As a GSA advisor
As a GSA advisor in a middle school, I hear first hand how difficult life can be for LGBTQ+ students.  We need to educate people so these children can come to school feeling safe and protected.

AR_013035

Individual self-reported they are a teacher, school administrator, or school staff
State: CA
Story Title: Protect Queer and Trans students
Because children deserve to be seen, to be safe and to be protected for who they are. Schools are safe havens and we must support out children's identities, believe what they tell us about who they are and protect them from the bigoted and hatred of the outside world.

Individual self-reported they are a teacher, school administrator, or school staff
State: MA
Story Title:
The thing that so many conservatives, transphobes, and TERFs are scared of is that trans people exist. Full stop. They come up with their bullshit conspiracy theories, they claim it's grooming, but in the end they've always existed and still do. And everyone who exists has a right to fair treatment and happiness. It doesn't matter if you go deep into the academic study of gender or you don't understand that stuff at all; trans people exist and that alone is enough to say that discrimination against them is wrong.

Individual self-reported they are a teacher, school administrator, or school staff
State: FL
Story Title: Protect All Students
As a teacher in Florida, I've seen the damage that these new anti-trans and lgbtq+ bills do to our students. I believe that all of our students deserve the same protections regardless of their identity and that these new bills are discriminatory in their nature. We need to respect everyone and thus need to ensure these students have protections from bigots who seek to push their beliefs on students.

Individual self-reported they are a teacher, school administrator, or school staff
State: NJ
Story Title: This is for all students
Every student needs to see that we will not stand for hate. Every student needs to see that we will do everything we can to foster safety and belonging. This must be a priority, and we have a duty of care to our future.  As a long time educator I have seen the harm done in being silent. And I have seen what it means to demonstrate solidarity and to develop leaders who have empathy at the heart and soul of what they do.

Individual self-reported they are a teacher, school administrator, or school staff
State: VA
Story Title: I am teacher in a public school in Portsmouth, VA
Students are being harassed daily--teachers either don't recognize this or choose to ignore it.
Education of our teachers is needed to prevent harassments of any students being bullied for
gender or sexual affiliation.

Individual self-reported they are a teacher, school administrator, or school staff
State: NC
Story Title: I am a school counselor
I am a school counselor and I believe every student should be treated humanely, and be free from any form of harassment. I would like for every student to be supported and seen in the classroom and the hallways. Anti-LBGTQI+ behaviors are too often ignored by adults and students alike. This proposed rule clearly states that discrimination and bullying based on sexual orientation, gender identity, sex characteristics (including intersex traits), and sex stereotypes is illegal. We need this because most LGBTQI+ students experience some form of anti-LGBTQI+ discrimination or bullying at school. While this rule is important and historic, it should clarify that deadnaming, misgendering, and refusing to use the correct name or pronouns are harmful and illegal forms of sex-based bullying. It should also clearly say that students must be able to use the girls' or boys' bathroom or locker room that corresponds with their gender identity, and the same goes for things like separate gender student housing and classes. These are clearly equity and human rights issues, and I hope to see the rules strengthened in clear support of all LGBTQI+ students.

Individual self-reported they are a teacher, school administrator, or school staff
State: CA
Story Title: In Honor of My Mother & My Students
I must speak up on behalf of our queer and trans students because I saw for myself how deeply damaging homophobia and hate are to LGBTQ+ people. My mother suffered clinical depression for years due to the oppression she faced as a deeply closeted lesbian. And as a proud sponsor of the Gay-Straight Alliance at the high school where I taught, our Be Yourself Club, my students shared stories with me that crushed my heart.  Rejected by their deeply religious (but not spiritual) parents, harassed and traumatized by homophobes at school, these students had never known what it felt like to have a safe space. Over a 7 years period, the student leaders of the club worked courageously to change the environment of the school from openly hostile to one of acceptance and support. Their work saved lives!  Now, because of the rise of the religious right, their hard fought progress is being threatened and LGBTQ+ students' lives will be at risk.  We must fight to hold the line. Our queer youth are a vital, precious, and integral part of the fabric of our nation.  I stand with them all against the anti-spiritual agents of hate. Stand with us too, in the name of all that is just, ethical, and kind to protect our collective futures!

Individual self-reported they are a teacher, school administrator, or school staff
State: OH
Story Title: Equality
We saw our rights crushed this summer with the overturning of Roe v. Wade. When one group's human rights are taken away, others' rights are sure to follow. History is on my side with this statement, and as a history teacher it is my obligation to teach our LGBTQI+ students (all students, really) and empower them to act politically to protect ALL human rights. Also, weaponized Christian Nationalism is a threat to us all, particularly the beautiful rainbow that is the LGBTQI+ community!

Individual self-reported they are a teacher, school administrator, or school staff
State: AL
Story Title:
I have no special story of homophobia or anything, but I've seen bits and pieces. I just want people to feel equal and good about themselves, and to go to school and be afraid to express themselves the way they want hurts.

Individual self-reported they are a teacher, school administrator, or school staff
State: ME
Story Title: All of our students need protections especially our Queer and Trans Students
I am a teacher educator. I work with future teachers, practicing teachers and K-12 students. In order to build safe communities of learning all student identities must be valued and protected. Students can't learn if they are questioning whether the learning space values their perspective and lived experience. We must do more to protect queer and trans students. The statistics on suicide for this student population is scary. We need schools to be safe spaces in order to combat this statistic.

AR_013045

Individual self-reported they are a teacher, school administrator, or school staff
State: MI
Story Title: My Community is Full of Hate
I am a teacher in a nearby semi-rural, heavily Republican school district. Racism, homophobia, and transphobia run rampant and are the topic of lengthy, brutal school board meetings. We have four school board candidates running under the slogan of "Education Not Indoctrination." Their campaign signs are all over town.   As a teacher of secondary students, my job is to reach all of my students to deliver curriculum. Kids cannot focus on content if they are constantly being berated and belittled by their peers, their community, and, even sometimes their teachers.  My heart breaks for these kids who are just trying to make it through their days.

Individual self-reported they are a teacher, school administrator, or school staff
State: CA
Story Title: Our most vulnerable
Our most vulnerable students need to be protected.

AR_013047

Individual self-reported they are a teacher, school administrator, or school staff
State: KS
Story Title: Protect LGBTQIA students
I am a high school educator. I have worked at a Catholic school and in public schools for almost 10 years. I have been in the position to be a quiet supporter of queer students in the parochial district and a loud and proud supporter in the public schools. I much prefer being able to stand up and voice my support for my students. I have seen firsthand how much students need the support of allies in the staff and in the student population. They do not always have the support at home and are in the midst of figuring out their identity at the most important time of their lives - teenagers approaching adulthood. It is such a small ask to respect students' preferred names and pronouns. I want to help students feel safe, included, and accepted. I want to lower that percentage/number of suicides committed by LGBTQIA students who have not felt safe, included, and accepted in their communities. Students who have acceptance and support at school are less likely to engage in harmful behaviors. Two easy ways that my school has tried to be more inclusive is by having all seniors wear the same color of graduation gowns, making gender neutral bathrooms accessible to students who need them - also in a safe place (office area), and adopting a more gender neutral dress code. All students must wear a shirt with straps, have the midriff covered, and wear pants or the equivalent that goes to mid-thigh. I am still concerned about the handling of names and pronouns by the staff and with communication with parents. No one should be outed or misnamed or misgendered. Every effort should be to protect students.

Individual self-reported they are a teacher, school administrator, or school staff
State: WI
Story Title: Protect 2SLGBTQIA+ Students in Schools
I'm a teacher who has spent the last dozen years in rural districts, and I want every student to feel loved and accepted for who they are in my classroom. But one teacher alone can't change system, and that's where the administration's proposed rule comes in. The rule clearly states that discrimination and bullying based on sexual orientation, gender identity, sex characteristics (including intersex traits), and sex stereotypes is illegal. We need this because most LGBTQI+ students experience some form of anti-LGBTQI+ discrimination or bullying at school. I see this in my work, and it breaks my heart. I would also encourage the administration to consider requiring school's nondiscrimination policies to list "sexual orientation, gender identity, sex characteristics (including intersex traits), and sex stereotypes," since we know these policies are more effective when they do. Every student deserves a safe and affirming environment when they come to school. Please help make that a reality.

Individual self-reported they are a teacher, school administrator, or school staff
State: CO
Story Title: Queer and trans students
Queer and trans students need protections because adults are actively campaigning against their safety and well-being in every corner of this country. My state has a gay governor and we still have parents complaining that their third grade teacher included a pride flag in a short lesson about flags and cultures.

AR_013050

Individual self-reported they are a teacher, school administrator, or school staff
State: NJ
Story Title: I'm a teacher who wants…
I'm a teacher who wants everyone to feel supported and seen in the classroom. Schools have to investigate anti-LGBTQI+ discrimination and bullying and act to prevent it from happening again. This is really important because we know that when LGBTQI+ students tell school staff this happened to them, many say nothing changes, or worse, that they are punished or told they should change. The new law/bill should clarify that deadnaming, misgendering, and refusing to use the correct name or pronouns are harmful and illegal forms of sex-based bullying. I am so proud to work in a district in NJ that has had nongender bathrooms for years in all buildings.

AR_013051

Individual self-reported they are a teacher, school administrator, or school staff
State: CA
Story Title: Protect our queer and trans youth
I am an educator who has been teaching middle school and teaching teachers for over 20 years. As an educator who has worked with thousands of children, I know how important it is for students to be seen, affirmed and cared for. We must be committed to the well-being of our students. Students cannot learn if they don't feel accepted for who they are and don't feel safe at school. LGBTQ youth are more than four times as likely to attempt suicide than their peers (Johns et al., 2019; Johns et al., 2020), not because of their identities as LGBTQ, but largely as a result of bullying or non-affirming spaces. The proposed rule clearly states that discrimination and bullying based on sexual orientation, gender identity, sex characteristics (including intersex traits), and sex stereotypes is illegal. We need this because most LGBTQI+ students experience some form of anti-LGBTQI+ discrimination or bullying at school. We must show our queer and trans students that they matter. Schools have to investigate anti-LGBTQI+ discrimination and bullying and act to prevent it from happening again. This is really important because we know that when LGBTQI+ students tell school staff this happened to them, many say nothing changes, or worse, that they are punished or told they should change.  While the rule is an important start, the rule should also require school's nondiscrimination policies to list "sexual orientation, gender identity, sex characteristics (including intersex traits), and sex stereotypes," since we know these policies are more effective when they do. It should clearly say that students must be able to use the girls' or boys' bathroom or locker room that corresponds with their gender identity. The rule also should encourage dress codes to be gender neutral by making clear that schools risk violating Title IX when they give different rules for boys and girls. A separate rule will address school sports, but this one includes confusing language that could be misread as saying that excluding transgender students from boys' and girls' school sports teams is okay. All students should have access to the benefits of school sports. Finally, the rule should clarify that deadnaming, misgendering, and refusing to use the correct name or pronouns are harmful and illegal forms of sex-based bullying.

Individual self-reported they are a teacher, school administrator, or school staff
State: IN
Story Title: I spent 6 years as a substitute teacher
I spent 6 years as a substitute teacher in suburban St. Louis, Missouri. I was lucky enough to have several queer students in my various classes, and the idea that I would be functionally forbidden from keeping them safe in the classroom is horrifying. It is nigh impossible for a student to properly devote their attention to learning when they are faced with an omnipresent threat of physical and psychological harm. Codifying LGBTQ+ protections into Title IX rules would give teachers like my former colleagues the power and duty to stop such harassment, as well as the legal support to make such interventions mean something. This is especially important in the face of a rising tide of hysterical arguments backed by little science and less rationality. At their best, these arguments display a reasonable but unfounded concern for students' safety. At their too-common worst, they are simply anti-desegregation arguments with the serial numbers filed off. I implore the administration to enact full-throated protection for LGBTQ+ students under Title IX.

Individual self-reported they are a teacher, school administrator, or school staff
State: OH
Story Title: Kids need every form of support
I am a mathematics educator with 25 years of experience. I know and see the harm done when students cannot be themselves and be treated as the beautiful people they are. Please be sure that the final Title IX rule makes clear that discrimination based on sex stereotypes and sex characteristics is illegal. Please ensure that students can use the restrooms that correspond with their gender identity. Please ensure that dress codes are gender neutral. Please ensure that deadnaming, misgendering, and refusal to use the correct pronouns are identified as sex-based bullying and thus illegal. Thank you very much.

Individual self-reported they are a teacher, school administrator, or school staff
State: PA
Story Title: I'm a teacher who wants…
I'm a teacher who wants everyone to feel supported and seen in the classroom. Schools have to investigate anti-LGBTQI+ discrimination and bullying and act to prevent it from happening again. This is really important because we know that when LGBTQI+ students tell school staff this happened to them, many say nothing changes, or worse, that they are punished or told they should change. The new law/bill should clarify that deadnaming, misgendering, and refusing to use the correct name or pronouns are harmful and illegal forms of sex-based bullying. I am so proud to work in a district in NJ that has had nongender bathrooms for years in all buildings.

Individual self-reported they are a teacher, school administrator, or school staff and a parent, caregiver, or family of an LGBTQI+ individual

State: MD

Story Title: All students deserve

All students deserve safe places to live and learn and be themselves. Queer and trans and LGTBQIA+ students do not currently have that nationwide and federal protection is necessary, as it is a civil right.

AR_013056

Individual self-reported they are a teacher, school administrator, or school staff and a parent, caregiver, or family of an LGBTQI+ individual
State: IL
Story Title: All students should
All students should feel safe and supported at school. Schools are intended to be inclusive and safe places for kids to grow and learn. This applies to ALL students. I support the Biden administration's proposal to protect LGBTQI+ student's rights.

Individual self-reported they are a teacher, school administrator, or school staff and a parent, caregiver, or family of an LGBTQI+ individual

State: WA

Story Title: What is Freedom?

So many people seem to think that somehow their religious freedom equates to oppressing others; LGBTQIA2S students aren't "forcing" others to "join" them. They just want to exist. Be safe. Have access to health care. Have access to due process if they are not safe. LIVE.

Individual self-reported they are a teacher, school administrator, or school staff and a parent, caregiver, or family of an LGBTQI+ individual
State: PA
Story Title: Please protect LGBTQI+ students
These students' rights are just as valuable as any other student's rights are. They should not be discriminated against based on their sexual orientation or gender. I support this bill.

Individual self-reported they are a teacher, school administrator, or school staff and a parent, caregiver, or family of an LGBTQI+ individual

State: MD

Story Title:

There is a saying that I recently heard: compassion without understanding. It does not matter one bit if people don't fully understand another who is non-binary or trans, but it's time to protect our most vulnerable. LGBTQIA individuals are not new, it's not a fad, they exist and they always have since the dawn of time. We need to protect children first and foremost: ALL CHILDREN. And we need to support the families who love them and are trying to honor their existence. Stop the war against trans and lgbtqia individuals and better yet protect them from ignorant religious fanatics and white nationalistsz

Individual self-reported they are a teacher, school administrator, or school staff and a parent, caregiver, or family of an LGBTQI+ individual
State: MD
Story Title: All students should
All students should be safe and feel safe schools regardless of their sexual identities and preferences.

Individual self-reported they are a teacher, school administrator, or school staff and a parent, caregiver, or family of an LGBTQI+ individual
State: CA
Story Title: Protect trans kids!!!
Suicide rates for trans kids are so high!  Whether people agree on gender or not does not negate that trans kids are humans first and deserve to be treated with basic dignity.

Individual self-reported they are a teacher, school administrator, or school staff and a parent, caregiver, or family of an LGBTQI+ individual

State: CA

Story Title: Humanity first!

Supporting and protecting our queer and LGBTQ students and community is humanity first and pro-life. LGBTQ youth, and transgender especially, have the highest rates of suicide. By not supporting and protecting them, we are not: One Nation, Under God, With Liberty And Justice, FOR ALL. They deserves the same rights and freedoms, the same safety and opportunity, the same respect and acceptance. To not support and protect our LGBTQ community and family is to encourage the continuation of the racist, homophobic, transphobic, and hate filled actions of those who are trying to limit and silence our loved ones. Life is hard enough, love wins and hate should be a thing of the past.

AR_013063

Individual self-reported they are a teacher, school administrator, or school staff and a parent, caregiver, or family of an LGBTQI+ individual
State: NY
Story Title: Yes we need protections
Queer & trans students are individuals who deserve respect. A federal law of protection sends the message that hare will not be tolerated. It has the power to change the tone. Current laws around the country diminish the existence of queer and trans people and that needs to change.

AR_013064

Individual self-reported they are a teacher, school administrator, or school staff and a parent, caregiver, or family of an LGBTQI+ individual
State: MA
Story Title: Protect Our Students
I am an educator who believes all students deserve to be safe and protected! Our students have the right to be themselves and access education, extracurricular activities and all life has to offer as their authentic selves. Misgendering students and denying transgender students access to school spaces and activities is bullying. We need to protect our LGTIA+ students, faculty and staff!

AR_013065

Individual self-reported they are a teacher, school administrator, or school staff and a parent, caregiver, or family of an LGBTQI+ individual
State: MD
Story Title: Protect LGBTQI+ rights!
I am a member of this community we call Planet Earth, where everybody should be included and valued for who they are. I am also an educator and I applaud the Biden administration for proposing a Title IX rule that protects LGBTQI+ rights. We need this law! We need a world free of discrimination. Thank you!

Individual self-reported they are a teacher, school administrator, or school staff and a parent, caregiver, or family of an LGBTQI+ individual
State: TX
Story Title: It costs zero dollar
It costs zero dollars to be kind. It takes minimal effort to give everyone space to be themselves.

AR_013067

Individual self-reported they are a teacher, school administrator, or school staff and a parent, caregiver, or family of an LGBTQI+ individual
State: TX
Story Title: Safe education for all
All students deserve a safe place in education. Our world is changing and our kids are at the forefront. We cannot change who they are or how they feel but we can change schools to protect and serve all students and we must. It is our obligation to make education better for future generations because our country's future is literally at stake.

Individual self-reported they are a teacher, school administrator, or school staff and a parent, caregiver, or family of an LGBTQI+ individual
State: MA
Story Title: LGBTQIA kids need our help
I stand with supporting and protecting all students-- specifically supporting and protecting students who identify as part of the LGBTQIA+ community.

AR_013069

Individual self-reported they are a teacher, school administrator, or school staff and a parent, caregiver, or family of an LGBTQI+ individual
State: IL
Story Title: Protect our students
As an educator, parent, and citizen, we must always make sure that the United States holds itself to it's highest ideals, that all humans are created equal and that all citizens are protected by our laws. Me must never let bigotry, fear, and religious fundamentalism deny fellow humans their life, liberty, and ability to pursue happiness. Repression must be opposed at every level.

Individual self-reported they are a teacher, school administrator, or school staff and a parent, caregiver, or family of an LGBTQI+ individual
State: MI
Story Title: Protection Matters
As a teacher myself, I fully support all the protection and acceptance we can give to queer and trans students. Often the focus of bullying and discrimination from both their peers and school personnel, they need the full protection of Title IX.

AR_013071

Individual self-reported they are a teacher, school administrator, or school staff and a parent, caregiver, or family of an LGBTQI+ individual

State: CA

Story Title: Every child, all the time

I can't believe we are still debating whether all children need protections. It doesn't matter how you identify. If you are a minor you are in need of certain inalienable rights. Heck, if you are not a minor you are in need of the same rights. And you deserve them. Let's not even make this a debate. People are people. Give people what they need to live.

AR_013072

Individual self-reported they are a teacher, school administrator, or school staff and a parent, caregiver, or family of an LGBTQI+ individual

State: TX

Story Title:

No child should be discriminated against, particularly on the basis of sex. Keep LGBTQIA protections in title 9

AR_013073

Individual self-reported they are a teacher, school administrator, or school staff and a parent, caregiver, or family of an LGBTQI+ individual

State: CA

Story Title: LGBTQ+ in education building codes

I teach in Orange County California at a school that just opened a $67,000,000 STEM building. Did the school build in any facilities that make our gender neutral/gender fluid students feel welcome? No! If our goal was to send the message that they are not welcome at our school then we succeeded. Please write and pass some legislation, or expand Title IX to include building codes that encompass Diversity, Equity, and Inclusion.  It should not be legal to ask task payers for tens of millions of dollars and then only serve those who are already comfortable.

Individual self-reported they are a teacher, school administrator, or school staff and a parent, caregiver, or family of an LGBTQI+ individual

State: CA

Story Title: Queer and Trans kids need to be seen and protected

Queer and Trans students are under constant threat from homophobic teachers, students and community. They need their story told so they are not seen as other. Queer and trans kids are part of every school. Some may not feel ready to come out for their own safety. And others do so but pay a price. The more queer and trans kids are visible and protected, the better for everyone. Queer and trans people have made significant contributions to society and history and are making huge contributions today. These are stories that ALL students need to learn. As the mother of a transgender boy, I want him to be able to navigate the world freely and joyfully.

Individual self-reported they are a teacher, school administrator, or school staff and a parent, caregiver, or family of an LGBTQI+ individual

State: NY

Story Title: Protect our students

As an educator, parent, and citizen, we must always make sure that the United States holds itself to it's highest ideals, that all humans are created equal and that all citizens are protected by our laws. Me must never let bigotry, fear, and religious fundamentalism deny fellow humans their life, liberty, and ability to pursue happiness. Repression must be opposed at every level.

Individual self-reported they are a teacher, school administrator, or school staff and a parent, caregiver, or family of an LGBTQI+ individual
State: CA
Story Title: Inclusiveness for All
I am a school counselor who wants all of my students to feel supported. They need to feel that school is a safe and welcoming place for them. They need to know that they have the same opportunities as their peers and that there voices can be heard.

Individual self-reported they are a teacher, school administrator, or school staff and a parent, caregiver, or family of an LGBTQI+ individual
State: MO
Story Title: My queer and trans students and family members deserve to be safe.
My queer and trans students and family members deserve to be safe in school and everywhere else.

AR_013078

Individual self-reported they are a teacher, school administrator, or school staff and a parent, caregiver, or family of an LGBTQI+ individual
State: NJ
Story Title: All students deserve full protection under the law.
Every student is precious and therefore deserves to attend school in an environment that keeps them safe, and does not allow LGBTQIA+ discrimination and harassment.

AR_013079

Individual self-reported they are a teacher, school administrator, or school staff and a parent, caregiver, or family of an LGBTQI+ individual
State: IN
Story Title: I'm a parent and school counselor
I'm a parent of an elementary student and a school counselor working with high school students. The school where I work is a virtual charter school. Every week I talk to a student who has chosen my school because they did not feel safe in their prior school. They were bullied and all too often it was because they are a member of the LGBTQI+ community.   I am so excited to see a rule that will protect students from discrimination and bullying based on sexual orientation, gender identity, sex characteristics. Please consider expanding the rule to explicitly identify deadnaming, misgendering, and refusing to use the correct name or pronouns as sex-based harassment or bullying.  Thank you for working to keep all of our students safe at school.

Individual self-reported they are a teacher, school administrator, or school staff and a parent, caregiver, or family of an LGBTQI+ individual

State: IL

Story Title: Safety at School = Success

As both a teacher and the mom of a trans son, I have seen up close and personal how acceptance, accommodation, and a lack of both affects students at school.  Students cannot concentrate and learn well in an environment in which they don't feel safe. And currently far too many schools don't even do the minimum recommended/required to accommodate LGBTQ students. Students live in fear of discrimination and outing by teachers, peers, and a system that has no regard for them. The fixes are so easy, but many schools won't do them unless it is required. That's why this language is so important for their safety and educational success.

Individual self-reported they are a teacher, school administrator, or school staff and a parent, caregiver, or family of an LGBTQI+ individual

State: ME

Story Title: All students need to achieve their full potential

I write as a straight, cis mom with a 30-year career in education. My brother is gay. My godchild is trans. My students identify in numerous ways, from straight and cis to nonbinary, trans, queer, and all the beautiful options in between. Their experiences and perspectives bring value to our community because I am blessed to teach in a school where every student is celebrated and safe. Every human being should rise up each day knowing that they are valued for their humanity, and able to be authentically themselves. When this is the case, students are more successful. They learn more, they achieve more, and they contribute more to the growth and power of our communities economically, civically, and culturally.

AR_013082

Individual self-reported they are a teacher, school administrator, or school staff and a parent, caregiver, or family of an LGBTQI+ individual
State: PA
Story Title: Protection for queer and trans students
We need to make sure queer students are protected from bullying and garment. S as an educator that supports LGBTQ students and a parent of a cog that identifies in the community, I am very worried by the conservative right attacking educators, schools, student's and families. Queer youth deserve you feel safe at school, to feel accepted, and able to just live their lives as themselves. We need action to make sure bullying of a queer students is not allowed

AR_013083

Individual self-reported they are a teacher, school administrator, or school staff and a parent, caregiver, or family of an LGBTQI+ individual

State: NJ

Story Title: As a parent of trans student

As a parent of transgender student and a school administrator I know how hard it is to come out and be accepted by all. People do not understand what it means to be transgender. Our society needs to be educated and by having laws that discrimate against transgender just makes it more difficult for them to be accepted. Anti trans laws tells people being transgender is wrong which is not. It is how people are born liking having blue vs brown eyes.

Individual self-reported they are a teacher, school administrator, or school staff and a parent, caregiver, or family of an LGBTQI+ individual
State: MI
Story Title: Everyone deserves an education without discrimination
I believe that every single child deserves to be able to go to school and not be bullied, harassed, degraded, or assaulted. I'm also a parent and work in a public school district. We need to do much, much more to make school a place of safety and acceptance in addition to a place to learn.

AR_013085

Individual self-reported they are a teacher, school administrator, or school staff and a parent, caregiver, or family of an LGBTQI+ individual
State: MA
Story Title: LGBTQ+ Students Need and Deserve Protections
I am both an educator and a parent of students who identify as LGBTQ+. Our students deserve to feel safe and accepted at schools, and have access and support for participation as their cisgender peers.  The rule clearly states that discrimination and bullying based on sexual orientation, gender identity, sex characteristics (including intersex traits), and sex stereotypes is illegal. We need this because most LGBTQI+ students experience some form of anti-LGBTQI+ discrimination or bullying at school. It should require school's nondiscrimination policies to list "sexual orientation, gender identity, sex characteristics (including intersex traits), and sex stereotypes," since we know these policies are more effective when they do.

AR_013086

Individual self-reported they are a teacher, school administrator, or school staff and a parent, caregiver, or family of an LGBTQI+ individual

State: IL

Story Title: Please help kids like mine...

I call them my kids, because I am their teacher.  I teach high school in a very white, Republican, conservative county.  I am the faculty sponsor of the high school Gender and Sexualities Alliance; we call it Diversity Club.  Last week we had our first meeting.  In a school of almost 900, we had 75 queer kids and allies show up.  Most of these kids are not safe being out at home. Most of these kids have immediate and extended families who do not accept them as they are. Most of these kids lead double or very difficult lives.  The rest of the student body mirrors the community...cis, hetero, conservative.  There are parents who show up at board meetings because their cis kids are uncomfortable when I send out a student survey asking for preferred names and pronouns.  The queer kids I teach are MY kids because they don't belong to anyone else.  Please, please, please help my kids by creating and passing legislation that I can lean on when they are bullied by kids, parents, and even other teachers.  I am here to help them, but when I have the law behind me, I'm just barely strong enough to help them fight.   Thank you

Individual self-reported they are a teacher, school administrator, or school staff and a parent, caregiver, or family of an LGBTQI+ individual

State: NM

Story Title: Everyone Belongs in School and Society

Everyone belongs in school and my classroom. Everyone has the right to be the person they are and no one gets a chance to tell anyone else that they aren't who they are. Queer and trans students are under attack in ways that have led to legal and pragmatic protections for other groups who have faced discrimination. Without those legal and pragmatic protections, the very students in our classrooms and people of our communities and society confront very real, oppressive, and harmful discrimination. It is time to address that discrimination now.

AR_013088

Individual self-reported they are a teacher, school administrator, or school staff and a parent, caregiver, or family of an LGBTQI+ individual
State: VA
Story Title: Protect Trans Youth
I am a teacher who sponsors the GSA in my rural high school. As such, I hear stories and experiences from our LGBTQIA+ students pretty often. They're frightened to exist, and for good reason. In public, these kids are at risk. Often, they're even at risk in their own homes. In particular, trans women are far more likely to be victims of violent crime. Schools should be a safe place for all students-- that's where we can start fixing the atrocities that happen daily to this marginalized community. In particular, our laws need to do the following things: 1- Require schools to include sexual orientation and gender identity in their nondiscrimination clauses, and enforce those policies-- don't just give them lip service. I'm proud that my students helped to make that change here in Wythe County, where I teach. 2- Allow students to use whatever restroom is appropriate for them without jumping through hoops like paperwork or meetings. If misbehavior occurs, by all means, address it-- but trans girls aren't the threat the world portrays them to be. We all know that the perpetrators of most sexual violence are straight cisgender males.  3- Make school dress codes and activities gender neutral. I cannot think of a single reason to treat anyone differently based on their sex or gender identity in 2022. 4- Do NOT allow educators to deadname students, misuse their pronouns willfully, or . . . worst of all, to out them to their families without student consent. We have students who will be in literal danger if outed to their families, and we cannot be the creators of those situations.   As an educator who sees these children daily, please listen to my words. Students need support, acceptance, and protection. We can and must provide those.

Individual self-reported they are a teacher, school administrator, or school staff and a parent, caregiver, or family of an LGBTQI+ individual
State: CA
Story Title: We are all People with a right to education, self-expression and our gifts
I am a teacher. I teach EVERYONE. From ancient times, multi-gender people have existed and been honored. We can do the same. All have gifts to share and develop. Be their foundation by providing safety and anti-discrimination. Thank you, Mr. President

Individual self-reported they are a teacher, school administrator, or school staff and a parent, caregiver, or family of an LGBTQI+ individual
State: CA
Story Title: LGBTQ students need
LGBTQ students need protection and care - for many of them, school is their safe space. I am lucky to live in the most liberal and accepting of cities and my queer daughter will not worry much about being out and proud. I know that is not the case in other parts of America. Please protect our queer-identifying youth - they are a creative force and the fabric of the USA needs them!

Individual self-reported they are a teacher, school administrator, or school staff and a parent, caregiver, or family of an LGBTQI+ individual
State: IN
Story Title: Trans and Queer Kids Deserve to Live
As a teacher for over 30 years, I have often seen students who start college believing every scrap of misinformation they have ever heard. One group often demonized by that misinformation is the LGBTQIA+ community. I have lost track of the number of times that I have had to explain to kids that LGBTQIA+ kids are not hunting down their peers, have no unified agenda against their peers, and deserve to live in peace. Protecting a group sends a message. I remember a time when I had to act to protect mixed race couples and Asians at the place where I taught. Years of messaging have reduced the amount of open hostility to these groups. I hope it can do the same for LGBTQIA+ people.

Individual self-reported they are a teacher, school administrator, or school staff and a parent, caregiver, or family of an LGBTQI+ individual

State: ID

Story Title:

I am the parent of a genderfluid middle school student. In our last school district, my child was welcomed, quickly had their pronouns adopted and respected by the administration, and had their preferred name used everywhere, including all records. Since moving just a few miles away, we face night and day differences- constant pushback about preferred name and frequent dead naming, indifference about use of correct pronouns, weak responses to accusations of bullying, and unwillingness to follow their Gender support plan. Idaho students already face legal challenges relating to trans and genderqueer kids participation in sports, we desperately need federal support to ensure that the rights of kids ins school are protected. Our zip code should not define my child's right to safe and respectful education due to their identity.

Individual self-reported they are a teacher, school administrator, or school staff and a parent, caregiver, or family of an LGBTQI+ individual
State: PA
Story Title: I am an educator and parent of trans kid
I am an educator and parent of a trans kid. This rule is a great start! It does a lot of wonderful things for our kids. We need to make discrimination based on sexuality and gender identity illegal.   However, the rule needs to do more.   We need to protect our trans athletes (let's face it - most of these kids are not going to be college or professional athletes, but they all deserve the right to play!). As written, the rule seems to say it's ok to forbid trans kids from playing sports, and that's not ok.  We need to protect the right for kids to use the bathroom or locker room that matches their gender identity. I know kids to refuse to use the restroom at school because it's not safe. They hold it all day. We all deserve the right to the restroom!  We need to make dress codes gender neutral. Let's face it: dress codes have a lot more rules for girls than boys (trans or cis). It's a Title IX violation to make a girl miss class for dress code violations when those violations don't exist for boys. It's discrimination to make a trans kid miss class because they dress in ways that affirms their gender identity.   We need to make sure that school anti-discrimination codes clearly list that bullying and discrimination against LGBTQ kids is not acceptable AND we have to make schools take those codes seriously.

Individual self-reported they are a teacher, school administrator, or school staff and a parent, caregiver, or family of an LGBTQI+ individual
State: OH
Story Title: Identity Matters
I am a teacher of middle and high school students. I believe all students (and adults) should feel welcome and supported as they are. Schools must support students who are bullied or harassed. Dress code should apply to all students equitably and not fall solely on the female students to adhere. We must ask ourselves what messages we send to students when we lead them to believe there is something wrong with who they are, while also teaching students to make choices that reflect their values while respecting others.

Individual self-reported they are a teacher, school administrator, or school staff and a parent, caregiver, or family of an LGBTQI+ individual
State: GA
Story Title: I am a parent. I am
I am a parent. I am a teacher. I have family and friends who identify as Trans. I currently live in the deep South (Georgia) and I have Trans Godchildren who have it even worse (Florida). We cannot rely on states run by bigots who do not want to separate church and state to provide protections for those who I love. Please uphold the laws and protect school-aged children from discriminatory practices by institutions and bullying from hateful people. Discrimination policies should include gender identity to protect this vulnerable population.

Individual self-reported they are a teacher, school administrator, or school staff and a parent, caregiver, or family of an LGBTQI+ individual
State: OR
Story Title: Not allowed to tell other students she is trans
My daughter is transgender. When she was in kindergarten she was asked to leave after transitioning. The school said they could not support her and there were parent complaints. When she was in first grade in Arizona she was very proud and excited about being transgender. She had already transitioned and the other students only knew her as girl. She would ask kids if they had heard about transgender and then told them all about it. We were told by the school district that this was a banned subject because of a parents right act. She was not allowed to saw the word transgender, draw pictures that showed she was transgender or tell others about going to Pride parade. This was very upsetting for her. After awhile we were able to get this changed. We had been talking with a lawyer but fortunately we did not have use a lawyer for this to change. However it remained an uncomfortable district to be in. We tried a third school in a different district and that was better. There still were bullies and the library would not carry any books about LBGTQIA topics.

Individual self-reported they are a teacher, school administrator, or school staff and a parent, caregiver, or family of an LGBTQI+ individual

State: WI

Story Title: Queer and transgender

Queer and transgender students experience the highest rates of sexual harassment and assault and need to be protected by Title IX. The proposed policies could further support LGBTQI+ students by:  It should require school's nondiscrimination policies to list "sexual orientation, gender identity, sex characteristics (including intersex traits), and sex stereotypes," since we know these policies are more effective when they do. It should clearly say that students must be able to use the girls' or boys' bathroom or locker room that corresponds with their gender identity, and the same goes for things like separate gender student housing and classes. It should encourage dress codes to be gender neutral by making clear that schools risk violating Title IX when they give different rules for boys and girls. A separate rule will address school sports, but this one includes confusing language that could be misread as saying that excluding transgender students from boys' and girls' school sports teams is okay. All students should have access to the benefits of school sports. It should clarify that deadnaming, misgendering, and refusing to use the correct name or pronouns are harmful and illegal forms of sex-based bullying.

Individual self-reported they are a teacher, school administrator, or school staff and a parent, caregiver, or family of an LGBTQI+ individual

State: CA

Story Title: Every Student Deserves to be Safe and Supported

Hi, These protections are vital to keep all students safe.  Schools need to be inclusive places.  We know our LGBTQ+ youth are more at risk of bullying and even suicide.  Please, we need to do everything in our power to protect these children and show them how important and valued they are.

Individual self-reported they are a teacher, school administrator, or school staff and a parent, caregiver, or family of an LGBTQI+ individual
State: NC
Story Title:
Title IX should protect trans people. As an educator, I want everyone to feel supported and seen in my classroom. Diversity of expression makes learning environments richer, safer, and more productive. As the parent of LGBTQI+ children, I care deeply about equality and safety for all.

AR_013100

Individual self-reported they are a teacher, school administrator, or school staff and a parent, caregiver, or family of an LGBTQI+ individual

State: MD

Story Title:

Students need to feel safe and welcome in school in order to learn.  This isn't possible if school staff and fellow students aren't respecting and celebrating their differences.

Individual self-reported they are a teacher, school administrator, or school staff and a parent, caregiver, or family of an LGBTQI+ individual
State: MA
Story Title: Because our world is less safe for them
I am a parent and educator. While cisgender, I have never been the testosterone-fueled image of manliness the world thinks I'm supposed to be, and my children similarly fit not quite perfectly into the societally-defined boxes corresponding with their genders.  While things have improved since I was in school, it is clear that our society still uses violence, humiliation, and intimidation to enforce gender norms. We need to use the power of policy to maintain the gains, and to continue and accelerate the progress of the last 30 years.

Individual self-reported they are a teacher, school administrator, or school staff and a parent, caregiver, or family of an LGBTQI+ individual
State: CA
Story Title: Safe and affirming spaces are critical for learning
As a former elementary teacher and now a mathematics teacher educator in the southeastern United States, I have witnessed the trauma that occurs when students don't feel safe or affirmed by teachers, peers, and even a subject they are learning. The unique experiences and identities we bring to the classroom should be a strength that can enhance learning, not something that is stifled in a desire for uniformity. Having lost friends to suicide and seeing learners begin to hide their light from not being safe or valued for who they are is heartbreaking and we need to do everything in our power to stop the discrimination and bullying. This environment harms everyone as we are unable to learn, listen, and grow from the experiences of our school community. Words are not enough, we need to hold school communities accountable for actions.

Individual self-reported they are a teacher, school administrator, or school staff and a parent, caregiver, or family of an LGBTQI+ individual
State: NY
Story Title: My students are at risk
My students are at risk of violence and hateful exclusion from peers and authorities simply for who they were born to be or who they have become or are becoming. Race and Gender are constructs of our culture and time period. They should never be used as a basis for evaluating a person as normal, acceptable or healthy.  Would anyone reading this gladly accept that their child, grandchild, or they themselves deserved to be hit, publicly ridiculed, refused access to the most basic human necessities, made to accept the brand of shame or revulsion by self-perceived majority groups? This nation was created by asylum seekers, pilgrims, outsiders, slaves, and other disenfranchised people. Whatever their other flaws may have been, the founders created a body of laws championing individual life, liberty, and the pursuit of happiness. These laws have always needed strengthening and shoring up, thus the amendments and proclamations that grant there shall be no slavery, that women are citizens with voting rights, etc.   Don't fail the continuity of a nation legally free from unjust persecution and state-sanctioned hate.

Individual self-reported they are a teacher, school administrator, or school staff and a parent, caregiver, or family of an LGBTQI+ individual

State: VA

Story Title: Schools must be safe for all kids

I have taught in a public hoof school in Virginia for 18 years. Although our school policy is mandated to protect students of color and girls so they may have equal access to education, these students still face discrimination and harassment based on their skin color and/or gender. However, it is just open season on our LGBTQ students. While our administration encourages research-based practices to guide teachers in protecting these students, there is no mandate. We don't even address the mistreatment of LGBTQ students in our school climate survey.  These students are statistically more prone to suicide, depression, anxiety and lower school performance when schooled in an unsupportive environment. I support federal protections for these students. I also strongly believe trans students must be protected from dead naming and misgendering. Thank you.

Individual self-reported they are a teacher, school administrator, or school staff and a parent, caregiver, or family of an LGBTQI+ individual
State: OR
Story Title: As a teacher, I'm af
As a teacher, I'm afraid I didn't see how important it was affirm my non-binary students identities until my own child came out to us last year. It helped me reflect on my oversights in the past and make sure to be a better ally and advocate in my own school and in my child's school going forward. My child says that being non-binary just feels right for them and I cannot tell you what a difference it's made in their confidence and day to day life to be living authentically. They are able to focus on school now and are doing so much better academically than when they were distracted by this "secret." It's life-saving to be able to affirm one's identity in school.

AR_013106

Individual self-reported they are a teacher, school administrator, or school staff and a parent, caregiver, or family of an LGBTQI+ individual
State: IA
Story Title: Protect all kids
All students, regardless of identifiers, need safe spaces to participate in activities. This provides sense of belonging, reduces mental health issues, and builds stronger communities. Please ensure that all students are allowed the same opportunities across our country.  I am an educator and the parent of a queer student. Our home is a safe space for my child and their friends. I can tell you as an educator and a parent that no child chooses an identity, especially one that brings on judgement and ridicule from peers and adults. They are young people finding their way in the world. They need our support and love as they develop not judgement and barriers. Many LGBTQIA+ youth already feel a lack of belonging and acceptance in the school & locals communities. Let's not add to that weight.

Individual self-reported they are a teacher, school administrator, or school staff and a parent, caregiver, or family of an LGBTQI+ individual
State: SC
Story Title: I am the proud paren
I am the proud parent of two adult children that are members of the LGBTQI+ community. I am also a veteran public school teacher. I see the need to protect queer and Trans students from multiple sides. Students should feel free and comfortable to be their authentic selves and to feel safe enough to discover who they are. They should not feel threatened by other students or by the adults in the school. We need systems in place to help the students as well as their families feel loved and supported.

Individual self-reported they are a teacher, school administrator, or school staff and a parent, caregiver, or family of an LGBTQI+ individual

State: CO

Story Title: Mother and teacher wants guaranteed support for LGBTQ+ youth

I am a mother of three children. When I send my kids to school, I hope they come home safe. Every day, my high school daughter tells me about the anti gay slurs she hears regularly. As a 14 year old, she has never once had a teacher stick up for her in her identity. She has never once read a book about gay characters. She regularly gets physically threatened for being herself. In addition, my eight year old trans son is frequently asked to explain his gender, scared to use the bathroom, and is told that sharing that he is trans is "inappropriate" by staff and administration. I want my kids and my students to feel safe and loved in school!

Individual self-reported they are a teacher, school administrator, or school staff and a parent, caregiver, or family of an LGBTQI+ individual
State: PA
Story Title: Protect Queer and Trans Students!
As an educator and the mom of a non-binary kid, I demand their human rights and civil rights be protected, that they are safe in school, and free to express themselves without fear of bullying.

Individual self-reported they are a teacher, school administrator, or school staff and a parent, caregiver, or family of an LGBTQI+ individual
State: CA
Story Title: Our Duty to Protect
I am a high school teacher, and, as such, I work with teenagers. My number one job as an educator is to keep my students safe, because if a person doesn't feel safe, then they won't learn. I whole-heartedly support the Title 9 updates that would ensure the safety and respect of our most vulnerable, and often most mistreated, students. Trans and gender non-conforming kids should not be afraid to go to school, and they need to know the adults around them have their back. It is our job to as educators, parents, community members, and leaders to nurture and build strong kids and adolescents who will then go on to become thriving adults themselves. This is our chance to do that!!!

Individual self-reported they are a teacher, school administrator, or school staff and a parent, caregiver, or family of an LGBTQI+ individual
State: KY
Story Title: Protect Rights of Queer and Trans Kids
I'm writing in support of the new Title IX recommendations to protect students from bullying and harrassment regarding their gender or sexuality.  As an educator I see the anguish and torment that these students face daily.  They need additional legal protections.

Individual self-reported they are a teacher, school administrator, or school staff and a parent, caregiver, or family of an LGBTQI+ individual

State: NY

Story Title: Kids are at risk

As a teacher for 20 years and the mom of three kids, including two who identify as as LGBTQ, I cannot stress how important protecting LGBTQ youth is. We know that they are under a terrible assault. Which conflates sexual orientation and gender identity with sexual behaviors and labeled these as deviant. Identity is not up for debate but ignoring identity is deadly.

AR_013113

Individual self-reported they are a teacher, school administrator, or school staff and a parent, caregiver, or family of an LGBTQI+ individual

State: PA

Story Title:

I am a parent, a teacher, and a teacher educator. I work with prospective teachers to develop teaching practice that centers and affirms students. Queer and trans students deserve to be protected, to feel safe and supported and valued in schools, to see themselves reflected in curricula and school communities, and to be able to live and thrive. Schools must protect and affirm queer and trans students. The rule clearly states that discrimination and bullying based on sexual orientation, gender identity, sex characteristics (including intersex traits), and sex stereotypes is illegal. We need this because most LGBTQI+ students experience some form of anti-LGBTQI+ discrimination or bullying at school. Without safety and protections such as these students simply can't learn. While this rule does not go far enough, it is a start. Please support our children. Thanks

Individual self-reported they are a teacher, school administrator, or school staff and a parent, caregiver, or family of an LGBTQI+ individual
State: CT
Story Title:
I am a high school teacher who has seen what supportive policies do to improve the lives of LGBTQI+ students everyday. Students who feel seen and heard connect with teachers and other students, becoming a part of a community. They are happier, more confident, and more able to deal with negative comments from those who are too closed-minded to accept them for themselves. School are supposed to be safe, caring and nurturing environments for all students. Our LGBTQI+ brethren have spent too long in the shadows, and deserve protection and acknowledgment.   As a mom of a trans child, it was such a relief to talk to school officials and receive support for changing to my child's preferred name and pronouns with little fanfare. My kid, starting at a new school, was made to feel welcome and comfortable from day 1. That's what I want for all kids, and that's the expectation we should have at every school in this country.

Individual self-reported they are a teacher, school administrator, or school staff and a parent, caregiver, or family of an LGBTQI+ individual

State: MA

Story Title: My youngest brother

My youngest brother told us that he is trans a few years ago, when he was in his late 20s. For his entire childhood, he had felt alienated by the gender he had been assigned at birth, but it took until he was comfortable in his twenties and away from the K-12 experience to explore this. Learning more about his gender identity has been extremely positive, for him and the whole family, and I wish he has felt comfortable to do this earlier. I hope my students feel that comfort.

Individual self-reported they are a teacher, school administrator, or school staff and a parent, caregiver, or family of an LGBTQI+ individual
State: WA
Story Title: I'm a faculty member
I'm a faculty member at a public university and parent whose children attend public school. Every learner should feel supported and seen in their education. Schools must be safe for LGBTQI+ students.

Individual self-reported they are a teacher, school administrator, or school staff and a parent, caregiver, or family of an LGBTQI+ individual
State: CA
Story Title:
I am a high school teacher and I am an aunt of members of the LGBTQI+ community. All students need support and acceptance. The mental health of kids is deteriorating. I've been teaching for over twenty years. The trend has shifted from problems with gangs and teen moms, and has now turned to anxiety and depression. Don't let them down.

AR_013118

Individual self-reported they are a teacher, school administrator, or school staff and a parent, caregiver, or family of an LGBTQI+ individual
State: CA
Story Title: LGBTQIA kids need our help
I stand with supporting and protecting all students-- specifically supporting and protecting students who identify as part of the LGBTQIA+ community.

AR_013119

UCLA School of Law
Williams Institute

RESEARCH THAT MATTERS

# SUICIDE THOUGHTS AND ATTEMPTS AMONG TRANSGENDER ADULTS Findings from the 2015 U.S. Transgender Survey

September 2019

Jody L. Herman
Taylor N.T. Brown
Ann P. Haas

AR_026964

# EXECUTIVE SUMMARY

Over the past 20 years, a growing body of research has focused on suicidality among transgender individuals, including prevalence estimates and risk factors associated with suicide thoughts and attempts. Studies of the transgender population demonstrate that the prevalence of suicide thoughts and attempts among transgender adults is significantly higher than that of the U.S. general population. For example, transgender adults have a prevalence of past-year suicide ideation that is nearly twelve times higher, and a prevalence of past-year suicide attempts that is about eighteen times higher, than the U.S. general population. The 2015 U.S. Transgender Survey (USTS), which is the largest survey of transgender people in the U.S. to date, found that 81.7 percent of respondents reported ever seriously thinking about suicide in their lifetimes, while 48.3 percent had done so in the past year. In regard to suicide attempts, 40.4 percent reported attempting suicide at some point in their lifetimes, and 7.3 percent reported attempting suicide in the past year.

Although the research literature to date agrees that transgender people are at an elevated risk of suicide thoughts and attempts, there is still much to learn about why transgender people are particularly at risk. In this report, we utilize data from the 2015 USTS to examine the key risk factors associated with lifetime and past-year suicide thoughts and attempts among a large and diverse sample of transgender people.

## DEMOGRAPHICS

Demographic trends related to suicide thoughts and attempts among USTS respondents reflected trends found in prior research of suicidality in the U.S. general population and among transgender people.

- Among USTS respondents, suicide thoughts and attempts were more likely to be reported among those of younger ages, Alaskan Native/American Indian or Biracial/Multiracial respondents, transgender men, pansexual respondents, and non-binary respondents assigned female at birth.

- Similar to trends in the U.S. population, we found a higher prevalence across all suicide-related measures among respondents who had lower educational attainment, were unemployed, or had lower annual household income. In terms of relationship status, respondents who were partnered and living together with their partners had the lowest prevalence of suicide thoughts and attempts.

## GENERAL RISK FACTORS

Transgender people have many of the same risk factors for suicidality as found in the U.S. general population, such as depression, substance use, and housing instability. Similar to these trends in the U.S. general population, we found an elevated prevalence of suicide thoughts and attempts among USTS respondents who

- Experienced serious psychological distress and reported heavy alcohol or illicit drug use (excluding marijuana);

- Reported poor general health compared to those who reported excellent health (19.9% versus 3.6% past year suicide attempts);

AR_026965

- Reported having a disability, experienced homelessness in the past year, or had ever been arrested for any reason.

## UNIQUE RISK FACTORS

In addition to general risk factors, transgender people have additional risk factors, such as experiences of discrimination, stigma, family rejection, and lack of access to gender-affirming health care. Findings regarding these unique factors include the following:

- Experiencing discrimination or mistreatment in education, employment, housing, health care, in places of public accommodations, or from law enforcement is associated with higher prevalence of suicide thoughts and attempts. For example, the prevalence of past-year suicide attempts by those who reported that they had been denied equal treatment in the past year because they are transgender was more than double that of those who had not experienced such treatment (13.4% compared to 6.3%).

- Those who reported that their spouses, partners, or children rejected them because they are transgender reported higher prevalence of lifetime and past-year suicide attempts. Those who reported rejection by their family of origin, for example, reported twice the prevalence of past-year suicide attempts compared to those who had not experienced such rejection (10.5% compared to 5.1%).

- Respondents who had been rejected by their religious communities or had undergone conversion therapy were more likely to report suicide thoughts and attempts. For instance, 13.1 percent of those who had experienced religious rejection in the past year had attempted suicide in the past year; by contrast, 6.3 percent of respondents who had experienced religious acceptance in the past year attempted suicide in the past year.

- Experiences of violence, including intimate partner violence (IPV) are associated with higher prevalence of suicide thoughts and attempts. Over 30 percent of those who were physically attacked in a place of public accommodation reported attempting suicide in the past year, which is over four times the prevalence among respondents who were not similarly attacked.

- Those who had "de-transitioned" at some point, meaning having gone back to living according to their sex assigned at birth, were significantly more likely to report suicide thoughts and attempts, both past-year and lifetime, than those who had never "de-transitioned." Nearly 12 percent of those who "de-transitioned" attempted suicide in the past year compared to 6.7 percent of those who have not "de-transitioned."

- People who are not viewed by others as transgender and those who do not disclose to others that they are transgender reported lower prevalence of suicide thoughts and attempts. For instance, 6.3 percent of those who reported that others can never tell they are transgender attempted suicide in the past year compared to 12.2 percent of those who reported that others can always tell they are transgender.

- The cumulative effect of minority stress is associated with higher prevalence of suicidality. For instance, 97.7 percent of those who had experienced four discriminatory or violence experiences in the past year (being fired or forced to resign from a job, eviction, experiencing homelessness, and physical attack) reported seriously thinking about suicide in the past year and 51.2 percent made a suicide attempt in the past year.

AR_026966

We also found that there are some factors that are associated with lower risk of suicide thoughts and attempts for USTS respondents:

- Respondents with supportive families reported lower prevalence of past-year and lifetime suicide thoughts and attempts.

- Those who wanted, and subsequently received, hormone therapy and/or surgical care had substantially lower prevalence of past-year suicide thoughts and attempts than those who wanted hormone therapy and surgical care and did not receive them.

- A lower proportion of respondents who lived in a state with a gender identity nondiscrimination statute reported past-year suicide thoughts and attempts than those who lived in states without such a statute.

Our findings underscore the urgency of research to identify promising intervention and prevention strategies to address suicidality in this population. USTS respondents have the elevated risk of suicide thoughts and attempts that one would expect based on general risk factors that affect the U.S. population, such as substance use and serious psychological distress. Yet, it's clear that minority stress experiences, such as family rejection, discrimination experiences, and lack of access to gender-affirming health care, create added risks for transgender people. Furthermore, the cumulative effect of experiencing multiple minority stressors is associated with dramatically higher prevalence of suicidality. Future research that supports the design and evaluation of suicide intervention and prevention strategies for the transgender population is urgently needed.

# INTRODUCTION

Over the past 20 years, a growing body of research has focused on suicidality among transgender individuals, including prevalence estimates and risk factors associated with suicide thoughts and attempts. In a meta-synthesis of studies from the U.S. and Canada, Adams, Hitomi, and Moody reviewed 42 studies that appeared in peer-reviewed publications and in other literature from 1997 to 2016 with findings regarding suicide thoughts and attempts among transgender people.[1] They found a prevalence of lifetime suicide ideation of 55.5 percent (ranging from 28.9% to 96.5% across studies) and lifetime suicide attempts of 28.9 percent (ranging from 10.7% to 52.4% across studies). Additionally, they found 50.6 percent prevalence of suicide ideation in the past year (ranging from 30.8% to 80.2% across studies) and 10.7 percent prevalence of suicide attempts in the past year (ranging from 4.2% to 19.0% across studies).

Using data from the U.S. National Comorbidity Survey, a nationally representative sample, researchers have found a prevalence of lifetime suicide ideation in the U.S. population of 13.5 percent and lifetime suicide attempts of 4.6 percent.[2] According to the National Survey of Drug Use and Health, 4.3 percent of U.S. adults had suicidal thoughts in the past year, and 0.6 percent attempted suicide.[3] Comparing the findings of Adams and colleagues to these benchmarks, transgender adults have a prevalence of lifetime suicidal thoughts about four times higher, and lifetime suicide attempts about six times higher, than the U.S. population. In the past year, the prevalence of suicide ideation among transgender adults is nearly twelve times higher than in the U.S. population, and the prevalence of suicide attempts is about eighteen times higher.

Although the research literature to date has coalesced around the conclusion that transgender people are at an elevated risk of suicide thoughts and attempts, there is still much to learn about why transgender people are particularly at risk. Existing studies suggest that not only do transgender people have many of the same risk factors for suicidality found in the general population, such as depression and substance use, but in addition have risk factors related to minority stressors, such as experiences of discrimination, stigma, family rejection, and lack of access to gender-affirming health

---

[1] Adams, N., Hitomi, M., & Moody, C. (2017). Varied Reports of Adult Transgender Suicidality: Synthesizing and Describing the Peer-Reviewed and Gray Literature. *Transgender Health, 2*(1), 60-75. Their review included 32 studies of lifetime suicide attempts, 23 studies of lifetime suicide ideation, 5 studies of suicide attempts in the past year, and 5 studies of suicide ideation in the past year. In this report, suicide ideation and suicide thoughts refer to serious thoughts about suicide, including thoughts about suicide plans. The term suicidality includes suicide thoughts and behaviors, such as attempts.

[2] Kessler, R.C., Borges, G., & Walters, E.E. (1999). Prevalence of and Risk Factors for Lifetime Suicide Attempts in the National Comorbidity Survey. *Archives of General Psychiatry, 56*(7), 617-626; Nock, M.K., & Kessler, R.C. (2006). Prevalence of and Risk Factors for Suicide Attempts Versus Suicide Gestures: Analysis of the National Comorbidity Survey. *Journal of Abnormal Psychology, 115*(3), 616-623.

[3] Substance Abuse and Mental Health Services Administration. (2018). *Key substance use and mental health indicators in the United States: Results from the 2017 National Survey on Drug Use and Health* (HHS Publication No. SMA 18-5068, NSDUH Series H-53). Rockville, MD: Center for Behavioral Health Statistics and Quality, Substance Abuse and Mental Health Services Administration. Retrieved from https://www.samhsa.gov/data/.

AR_026968

care.[4] Minority stress experiences are commonly reported in studies of the transgender population, which puts this population at unique risk for suicide ideation and attempts.[5]

In 2008-2009, the National Center for Transgender Equality (NCTE) and the National LGBTQ Task Force fielded the National Transgender Discrimination Survey (NTDS) to better understand the lives and experiences of transgender adults in the United States.[6] The NTDS, which yielded about 6,500 respondents, asked a single suicide-related question, "Have you ever attempted suicide?" In 2014, the Williams Institute and the American Foundation for Suicide Prevention published a report that described the risk factors associated with lifetime suicide attempts for NTDS respondents. Our study found that the high prevalence of lifetime suicide attempts among NTDS respondents (41%) was exacerbated by discrimination experiences and other minority stressors, including family rejection and violence.[7] Our analysis was limited, however, by the limited number and scope of questions related to suicide in the NTDS questionnaire, including about mental health.

In August 2015, NCTE launched the U.S. Transgender Survey (USTS), a follow-up to the NTDS, which generated the largest survey sample of the U.S. transgender population to date (n=27,715).[8] The USTS included a new section on suicide thoughts and attempts that was based on validated measures from the National Survey of Drug Use and Health (NSDUH) and the U.S. National Comorbidity Survey Replication (NCS-R). Having addressed the limitations of the prior NTDS question on lifetime suicide attempts, and with a much larger sample, the USTS found that 40.4 percent of respondents had attempted suicide in their lifetimes, a difference of only one percentage point from NTDS. Suicide thoughts and attempts are individually distinct experiences and risk profiles for each differ.[9] Therefore, the inclusion of measures for both thoughts and attempts in USTS offers a fuller picture of suicidality among transgender people. In addition to lifetime suicide attempts, the USTS found that 81.7 percent of respondents had seriously thought about killing themselves in their lifetimes, and 48.3 percent had done so in the past year; 7.3 percent had attempted suicide in the past year.

---

[4] Meyer, I.H. (2003). Prejudice, Social Stress, and Mental Health in Lesbian, Gay, and Bisexual Populations: Conceptual Issues and Research Evidence. *Psychological Bulletin, 129*(5), 674-697; Bockting, W., Miner, M.H., Swinburne Romine, R.E., Hamilton, A., & Coleman, E. (2013). Stigma, mental health, and resilience in an online sample of the U.S. transgender population. *American Journal of Public Health, 103*(5), 943-951; Testa, R. J., Habarth, J., Peta, J., Balsam, K., & Bockting, W. (2015). Development of the gender minority stress and resilience measure. *Psychology of Sexual Orientation and Gender Diversity, 2*(1), 65-77.

[5] *See*, for instance, Grant, J.M., Mottet, L.A., Tanis, J., Harrison, J., Herman, J.L., & Keisling, M. (2011). *Injustice at Every Turn: A Report of the National Transgender Discrimination Survey.* Washington, DC: National Center for Transgender Equality and National Gay and Lesbian Task Force; James, S. E., Herman, J. L., Rankin, S., Keisling, M., Mottet, L., & Anafi, M. (2016). *The Report of the 2015 U.S. Transgender Survey.* Washington, DC: National Center for Transgender Equality.

[6] James, S.E., et al., (2016).

[7] Haas, A.P., Rodgers, P.L., & Herman, J.L. (2014). *Suicide Attempts among Transgender and Gender Non-Conforming Adults: Findings of the National Transgender Discrimination Survey.* Los Angeles, CA: The Williams Institute and the American Foundation for Suicide Prevention.

[8] James, S.E., et al., (2016).

[9] Klonsky, E.D., May, A.M., & Saffer, B.Y. (2016). Suicide, Suicide Attempts, and Suicidal Ideation. *Annual Review of Clinical Psychology, 12,* 307-330.

In addition to providing new data about suicide-related behaviors, the USTS improved upon the NTDS by incorporating validated measures of mental and physical health, and revised measures assessing discrimination and other minority stress experiences, violence, conversion therapy, law enforcement interactions, incarceration experiences, civic participation, and other topics. This new wealth of data from the USTS has given us the opportunity to further examine the key risk factors associated with lifetime and past-year suicide thoughts and attempts among a large and diverse sample of transgender people. In this report, we present our findings, discuss their implications, and conclude by identifying issues that remain to be examined in future research.

AR_026970

# METHODS

The 2015 U.S. Transgender Survey was an online survey of transgender adults, ages 18 and over, which was fielded in August and September of 2015.[10] The survey was announced and distributed with the assistance of over 300 organizations across the United States and was made available in English and Spanish. The survey questionnaire contained over 300 items covering a wide range of topics, such as demographics, experiences at work and school, interactions with law enforcement, identity documents, politics and civic participation, violence, family relationships, gender-affirming health care, mental health, substance use, and suicide thoughts and attempts. The 27,715 respondents came from all 50 U.S. states, three U.S. territories, and overseas military bases.

Overall, the survey sample was young, with a median age of 26 years compared to 38 years for the U.S. population.[11] About a third of respondents identified as gender non-binary. The sample had generally higher educational attainment than the U.S. population, with 87 percent of USTS respondents having at least some college education compared to 56 percent of U.S. adults ages 18 to 24 and 60 percent of U.S. adults ages 25 and older.[12] Yet, respondents overall reported lower household income, with median household income of $35,000-$39,999 compared to $56,500 for U.S. households at that time.[13] The sample had a higher proportion of white (non-Hispanic) adults (82%) compared to the U.S. population (62%) and also had an unusually high number of 18 year-olds.[14] A weight was developed to adjust the survey sample to the racial and ethnic composition of the U.S., based on the 2014 American Community Survey, and to adjust for the overabundance of 18 year-old respondents. This survey weight was applied in all analyses for this report.[15]

The analyses presented in this report are mainly descriptive and rely on bivariate statistical techniques to assess the relationship between characteristics and experiences of USTS respondents and suicide thoughts and attempts. Specifically, we use Pearson's chi-square tests of independence to test the statistical significance of relationships. Due to the large sample size, nearly all chi-square tests were statistically significant at the $p<0.05$ level. Throughout the report, we note in the tables the relationships that were not found to be statistically significant.[16] In addition, in some cases seemingly small differences among groups were found to be statistically significant because of the large sample size.

---

[10] The USTS was for individuals who identify as transgender, trans, non-binary, crossdressers, and other gender minority identities. In keeping with *The Report of the 2015 U.S. Transgender Survey*, we use the term "transgender" to describe those whose gender identity differs from their sex assigned at birth. We use this as an "umbrella term" to describe USTS respondents, keeping in mind the diversity of gender identities in this sample. This work is based on data generated from the 2015 U.S. Transgender Survey, which was conducted by the National Center for Transgender Equality. To find out more about the U.S. Transgender Survey, visit http://www.ustranssurvey.org/reports.

[11] U.S. Census Bureau. (2015). *Annual Estimates of the Resident Population: April 1, 2010 to July 1, 2015*, available at: https://factfinder.census.gov (last accessed August 18, 2019).

[12] James, S.E., et al., (2016).

[13] U.S. Census Bureau. (2015).

[14] James, S.E., et al., (2016).

[15] For a detailed description of the USTS methodology and survey sample, please refer to the relevant chapters and appendices in the USTS report, *The Report of the 2015 U.S. Transgender Survey*, available online at www.ustranssurvey.org.

[16] All frequencies, chi-square test statistics, and p-values are on file with the lead author.

Information reported by USTS participants about suicide ideation and suicide attempts should not be used as the basis of inferences about suicide deaths among transgender people. No jurisdiction in the U.S. routinely and systematically collects information about decedents' gender identity at the time of death, and as a result, little is known about death among transgender people, whether by suicide or any other manner or cause. Systematic data from general population studies show differences in demographic characteristics (in particular, age and gender), and suicide risk factors among people who die by suicide, compared to those who seriously consider or attempt suicide.[17] In the absence of specific information about whether transgender people show similar differences, no implications about suicide death should be drawn from findings presented in this report.

[17] DeJong, T.M., Overholser, J.C., & Stockmeier, C.A. (2010). Apples to oranges? A direct comparison between suicide attempters and suicide completers. *Journal of Affective Disorders*, *124*(1-2), 90-97; Brown, G.K., Beck, A.T., Steer, R.A., & Grisham, J.R. (2000). Risk factors for suicide in psychiatric outpatients: A 20-year prospective study. *Journal of Consulting and Clinical Psychology. 68*(3), 371-377; Duberstein, P.R., Conwell, Y., & Caine, E.D. (1994). Age differences in the personality characteristics of suicide completers: Preliminary findings from a psychological autopsy study. *Psychiatry, 57*(3), 213-224.

AR_026972

# FINDINGS

## DEMOGRAPHICS

As shown in Table 1, lifetime and past-year suicide thoughts and attempts were less commonly reported among older USTS respondents, a pattern that has also been observed in general population studies. Lifetime and past-year suicide thoughts and attempts were most commonly reported by Alaska Native/American Indian and Biracial/Multiracial respondents, and least commonly by White/Middle Eastern/North African respondents. Respondents who were assigned male sex at birth had a lower prevalence of lifetime suicide thoughts and attempts compared to those assigned female at birth. Those assigned male had birth also had a lower prevalence of suicide thoughts in the past year, although no significant difference was found in the prevalence of past-year suicide attempts between respondents assigned male, or female, at birth. Comparing respondents of different gender identities, the highest prevalence of lifetime suicide thoughts and attempts was found among transgender men and non-binary respondents assigned female at birth, while crossdressers reported substantially lower prevalence of both lifetime and past-year suicide thoughts and attempts.[18] Higher prevalence across all suicide-related measures was found among respondents who had lower educational attainment, were unemployed, or had lower annual household income. In terms of relationship status, respondents who were partnered and living together with their partners had the lowest prevalence of suicide thoughts and attempts. Those who described their sexual orientation as heterosexual or straight had lower prevalence of suicide thoughts and attempts than respondents in other sexual orientation categories; pansexual respondents reported the highest prevalence on all suicide-related measures.[19]

**Figure 1. Suicide thoughts by age group**





---

[18] The Report of the 2015 U.S. Transgender Survey provides the following definition for "crossdresser": "While definitions of 'crossdresser' vary, many use this term to describe a person who dresses in a way that is typically associated with a gender different from the one they were thought to be at birth, but who may not identify with that gender or intend to live full time as that gender" (p. 40).

[19] Pansexual is defined, generally, as being attracted to people of all genders.

**Figure 2. Suicide attempts by age group**



With few exceptions, the demographic patterns seen in the USTS data were consistent with findings from our 2014 analysis of NTDS data.[20] While generally confirming our earlier findings related to demographic characteristics of transgender people regarding the highest, and lowest, prevalence of lifetime suicide attempts, the present analysis also shows a quite similar picture regarding past-year suicide thoughts and attempts.

**Table 1. Suicide thoughts and attempts by demographic characteristics**

| | | PAST 12 MONTHS | | LIFETIME | |
|---|---|---|---|---|---|
| | | THOUGHTS | ATTEMPTS | THOUGHTS | ATTEMPTS |
| Current Age | 18 to 24 | 61.2 | 10.5 | 86.3 | 42.1 |
| | 25 to 44 | 43.6 | 6.0 | 81.8 | 42.2 |
| | 45 to 54 | 32.2 | 3.2 | 74.4 | 37.5 |
| | 55 to 64 | 25.8 | 2.1 | 68.4 | 28.6 |
| | 65 plus | 15.1 | 0.9 | 56.6 | 17.5 |
| Race/Ethnicity | Alaska Native/American Indian alone | 54.2 | 10.4 | 86.8 | 57.3 |
| | Asian/NH/PI alone | 44.8 | 7.9 | 81.8 | 40.3 |
| | Biracial/Multiracial | 53.9 | 10.4 | 88.0 | 50.4 |
| | Black/African American alone | 47.6 | 8.7 | 81.2 | 46.6 |
| | Latinx/Hispanic alone | 52.5 | 9.1 | 84.1 | 44.5 |
| | White/ME/NA alone | 47.4 | 6.3 | 80.8 | 37.4 |
| Assigned Sex | Female | 50.9 | 7.2 | 85.1 | 42.7 |
| | Male | 44.8 | 7.4 | 77.2 | 37.2 |
| Gender Identity | Crossdresser | 22.0 | 2.7 | 50.8 | 15.1 |
| | Trans women | 46.8 | 8.4 | 79.4 | 39.9 |
| | Trans men | 45.3 | 6.7 | 84.7 | 44.9 |
| | GQ/NB (AFAB) | 57.0 | 7.6 | 85.5 | 40.6 |
| | GQ/NB (AMAB) | 43.5 | 5.0 | 76.0 | 31.5 |

---

[20] Haas, A.P., et al., (2014).

Table 1. Suicide thoughts and attempts by demographic characteristics (continued)

| | | PAST 12 MONTHS | | LIFETIME | |
|---|---|---|---|---|---|
| | | THOUGHTS | ATTEMPTS | THOUGHTS | ATTEMPTS |
| Education | Less than high school | 63.1 | 17.3 | 85.0 | 51.8 |
| | High school grad (incl. GED) | 59.5 | 12.5 | 84.6 | 48.5 |
| | Some college (no degree)/Associate's | 53.7 | 8.5 | 84.9 | 44.1 |
| | Bachelor's degree | 40.4 | 4.0 | 78.6 | 33.7 |
| | Graduate or professional degree | 30.7 | 2.6 | 72.1 | 30.0 |
| Workforce Participation | Employed | 44.7 | 5.8 | 80.6 | 38.4 |
| | Unemployed | 62.5 | 12.6 | 87.1 | 46.4 |
| | Out of the labor force | 50.9 | 8.5 | 81.7 | 42.9 |
| Annual Household Income | $1 to $9,999 | 60.4 | 11.3 | 85.5 | 47.3 |
| | $10,000 to $19,999 | 55.2 | 10.4 | 86.7 | 48.5 |
| | $20,000 to $49,999 | 48.6 | 6.7 | 84.2 | 42.9 |
| | $50,000 to $100,000 | 42.6 | 5.3 | 78.8 | 36.2 |
| | $100,000 or more | 36.5 | 3.9 | 74.0 | 29.6 |
| Relationship Status | Partnered, living together | 39.5 | 4.4 | 79.3 | 40.0 |
| | Partnered, not living together | 56.0 | 10.5 | 85.5 | 43.5 |
| | Single | 51.5 | 8.0 | 81.9 | 39.5 |
| | Not listed above | 47.1 | 7.4 | 83.0 | 40.8 |
| Sexual Orientation | Asexual | 54.1 | 9.7 | 81.1 | 37.9 |
| | Bisexual | 48.0 | 7.2 | 81.1 | 40.1 |
| | Gay/Lesbian/Same Gender Loving | 43.8 | 6.4 | 79.6 | 37.3 |
| | Heterosexual/Straight | 33.6 | 4.8 | 73.2 | 38.7 |
| | Pansexual | 59.1 | 9.7 | 88.3 | 47.0 |
| | Queer | 49.2 | 6.3 | 83.9 | 39.2 |
| | Not listed above | 52.4 | 8.2 | 83.2 | 41.5 |

NOTE: Text in blue indicates there is no statistically significant relationship.

## GENERAL RISK FACTORS

The USTS collected data on a number of factors that have long been established to contribute to suicide risk in the general population, including depression and other mental health conditions, substance use, physical health and disability, and stressful life circumstances, such as homelessness or encounters with law enforcement.[21] Prior analysis of the USTS data found that respondents reported experiencing such risk factors, such as serious psychological distress and homelessness,

---

[21] *See,* for instance, Van Orden, K. A., Witte, T. K., Cukrowicz, K. C., Braithwaite, S., Selby, E. A., & Joiner, T. E. (2010). The Interpersonal Theory of Suicide. *Psychological Review, 117*(2): 575-600; Russell, D., Turner, R. J. & Joiner, T. E. (2009). Physical Disability and Suicidal Ideation: A Community-Based Study of Risk/Protective Factors for Suicidal Thoughts. *Suicide and Life-Threatening Behavior, 39*(4), 440-451; Steele, I. H., Thrower, N., Noroian, P., & Saleh, F. M. (2018). Understanding Suicide Across the Lifespan: A United States Perspective of Suicide Risk Factors, Assessment & Management. *Psychiatry & Behavioral Science, 63*(1), 162-171.

at a prevalence much higher than the U.S. general population.[22] The relationship between these risk factors and suicide thoughts and attempts are shown in Table 2.

Similar to findings in the general population, experiencing serious psychological distress and heavy alcohol use or illicit drug use (excluding marijuana) are significant risk factors for suicide thoughts and attempts among USTS respondents, both lifetime and past-year. As shown in Figure 3, respondents who rated their general health as "poor" had a dramatically increased prevalence of lifetime and past-year suicide thoughts and attempts, compared to those who described their health as "excellent." For instance, while 3.6 percent of those who reported excellent general health attempted suicide in the past year, 19.9 percent of those who reported poor health attempted suicide in the past year.

**Figure 3. Suicide thoughts and attempts in the past year by general health**



In regard to HIV status, those who reported living with HIV were more likely than those who are HIV negative or don't know their status to have attempted suicide at some point in their lives, although this group was the least likely to have attempted suicide in the past year. Respondents who indicated not knowing their HIV status were more likely than others to report thinking about and attempting suicide in the past year. Respondents who reported having a disability, either by meeting the definition of disability according to the American Community Survey or by personally identifying as having a disability, had higher prevalence on all suicide-related measures than those without disabilities.

Similarly, experiencing homelessness was associated with a markedly higher prevalence of lifetime and past-year suicide thoughts and attempts compared to those who had not experienced homelessness. Notably, over 20 percent of respondents who experienced homelessness in the past year had attempted suicide during that time. Finally, those who had been arrested for any reason in the past year were more likely to report suicide thoughts and attempts, both lifetime and past-year.

---

[22] James, S.E., et al., (2016).

**Table 2. Suicide thoughts and attempts by general risk factors**

| | | PAST 12 MONTHS | | LIFETIME | |
|---|---|---|---|---|---|
| | | THOUGHTS | ATTEMPTS | THOUGHTS | ATTEMPTS |
| Serious psychological distress (Kessler-6) | No | 29.6 | 2.9 | 73.8 | 31.5 |
| | Yes | 77.8 | 14.1 | 94.3 | 54.2 |
| Heavy alcohol use | No | 48.0 | 6.9 | 81.4 | 39.5 |
| | Yes | 53.1 | 11.8 | 85.2 | 50.3 |
| Binge alcohol use | No | 47.3 | 6.8 | 80.8 | 38.5 |
| | Yes | 51.3 | 8.7 | 83.9 | 45.5 |
| Illicit drug use (excluding marijuana) | No | 47.2 | 6.6 | 81.0 | 39.1 |
| | Yes | 60.3 | 13.6 | 88.6 | 52.9 |
| General health | Excellent | 29.1 | 3.6 | 66.9 | 26.9 |
| | Very good | 39.1 | 4.5 | 77.6 | 33.9 |
| | Good | 51.9 | 7.6 | 84.8 | 42.1 |
| | Fair | 64.9 | 11.0 | 90.3 | 52.3 |
| | Poor | 77.7 | 19.9 | 95.8 | 65.0 |
| HIV status | Living with HIV | 35.1 | 6.0 | 72.6 | 48.4 |
| | HIV negative | 43.9 | 6.5 | 82.0 | 43.4 |
| | Don't know status | 53.7 | 8.2 | 81.7 | 36.8 |
| Disability (ACS) | No | 37.0 | 4.1 | 75.7 | 32.0 |
| | Yes | 65.9 | 12.2 | 91.2 | 53.0 |
| Disability (self-identify) | No | 42.2 | 5.4 | 78.2 | 35.0 |
| | Yes | 64.5 | 12.1 | 90.9 | 54.5 |
| Homelessness (ever) | No | 44.7 | 5.3 | 77.7 | 32.2 |
| | Yes | 56.6 | 11.8 | 91.0 | 59.3 |
| Homelessness (past year) | No | 45.4 | 5.6 | 80.8 | 38.2 |
| | Yes | 66.5 | 20.4 | 91.3 | 63.5 |
| Arrested any reason (past year) | No | 48.1 | 7.1 | 81.6 | 40.1 |
| | Yes | 58.5 | 19.0 | 88.1 | 58.1 |

AR_026977

## UNIQUE RISK FACTORS

As described above, transgender people have many of the same risk factors found in the U.S. general population. In addition, transgender people have risk factors that are unique to the transgender population, such as experiences related to disclosure of transgender status, access to gender affirming care, and exposure to minority stressors, such as experiences of discrimination, stigma, and family rejection. While cisgender people (i.e., people who are not transgender) sometimes experience discrimination and rejection for various reasons, the findings presented in this section describe the unique experiences of USTS respondents that were attributed to transgender status.

### "Outness" and Disclosure

In addition to general risk factors, transgender individuals have unique factors in their lives that may increase risk of suicide thoughts and attempts. One unique factor is disclosure of transgender status to family, friends, and others (i.e., being "out" as transgender). The USTS asked respondents about the degree to which they were "out" to various people in their lives. Table 3 presents findings about how "outness" is related to suicide thoughts and attempts. While being "out" to immediate or extended family, boss, co-workers, classmates, or health care providers was not related to past-year suicide attempts, being "out" was associated with lower prevalence of past-year suicide thoughts compared with not being "out." Being "out" to an increasing number of LGBT and non-LGBT friends, however, was associated with higher prevalence of suicide thoughts and attempts, both lifetime and past-year. Strikingly, in regard to every group of people in respondents' lives examined by the USTS, respondents who indicated they had not disclosed their transgender status to anyone were the least likely to have reported lifetime suicide attempts compared to those who had disclosed their status to others. This replicates our previously reported finding from the NTDS that respondents who had told no one that they are transgender, and respondents who were not "out" to family, friends, or others, were the least likely to have reported lifetime suicide attempts.

The USTS asked respondents whether they thought other people could tell that they are transgender. Twenty-four percent of USTS respondents reported that people can never tell they are transgender, whereas 2 percent reported that people can always tell that they are transgender.[23] Those who reported that others can always tell they are transgender had the highest prevalence of both lifetime and past-year suicide thoughts and attempts. Due to the larger sample size and revised questionnaire, this finding is generally more robust than our 2014 analysis of NTDS data, where respondents who reported that others could always tell they are transgender had only a slightly elevated risk of lifetime suicide attempts. It should be noted, however, that those who reported they had not disclosed their transgender status to anyone and those who reported that people can never tell they are transgender reported a prevalence of suicide thoughts and attempts much higher than the U.S. general population.

---

[23] James, S.E., et al., (2016).

AR_026978

**Table 3.** Suicide thoughts and attempts by "outness," disclosure, and perception by others

| | | PAST 12 MONTHS | | LIFETIME | |
|---|---|---|---|---|---|
| | | THOUGHTS | ATTEMPTS | THOUGHTS | ATTEMPTS |
| "Out" to immediate family | None | 52.8 | 6.5 | 80.2 | 35.6 |
| | Some | 53.1 | 7.7 | 82.1 | 37.9 |
| | Most | 50.9 | 7.7 | 83.5 | 40.4 |
| | All | 44.7 | 7.4 | 82.1 | 42.6 |
| "Out" to extended family | None | 52.7 | 7.1 | 80.1 | 35.2 |
| | Some | 51.7 | 7.8 | 85.3 | 43.6 |
| | Most | 46.3 | 7.3 | 83.0 | 42.5 |
| | All | 38.1 | 6.6 | 80.0 | 43.1 |
| "Out" to LGBT friends | None | 41.7 | 6.6 | 72.3 | 32.4 |
| | Some | 45.3 | 5.5 | 79.0 | 35.2 |
| | Most | 50.4 | 5.9 | 82.2 | 38.2 |
| | All | 48.8 | 8.0 | 82.9 | 42.9 |
| "Out" to non-LGBT friends | None | 44.7 | 7.0 | 75.6 | 34.7 |
| | Some | 47.1 | 6.0 | 81.1 | 37.1 |
| | Most | 49.5 | 6.2 | 82.9 | 38.7 |
| | All | 49.4 | 9.0 | 83.8 | 47.1 |
| "Out" to boss | None | 48.8 | 6.5 | 80.3 | 36.2 |
| | Some | 44.8 | 6.4 | 81.6 | 41.5 |
| | Most | 44.0 | 6.9 | 80.0 | 39.5 |
| | All | 42.9 | 6.2 | 81.1 | 41.5 |
| "Out" to co-workers | None | 48.8 | 6.7 | 79.9 | 36.6 |
| | Some | 45.9 | 5.7 | 82.5 | 39.4 |
| | Most | 40.0 | 5.7 | 79.5 | 38.1 |
| | All | 42.9 | 6.4 | 80.2 | 42.1 |
| "Out" to classmates | None | 50.4 | 7.0 | 80.7 | 38.2 |
| | Some | 51.6 | 7.2 | 82.3 | 39.6 |
| | Most | 47.1 | 7.7 | 81.6 | 40.0 |
| | All | 46.1 | 8.7 | 82.2 | 46.8 |
| "Out" to health care providers | None | 53.4 | 7.6 | 81.2 | 36.5 |
| | Some | 50.0 | 6.6 | 82.8 | 39.1 |
| | Most | 45.9 | 6.0 | 80.8 | 40.6 |
| | All | 42.5 | 7.4 | 81.6 | 43.8 |
| People can tell I'm trans, even if I don't tell them | Always | 62.0 | 12.2 | 84.2 | 47.0 |
| | Most of the time | 49.6 | 9.6 | 82.3 | 42.2 |
| | Sometimes | 50.3 | 7.2 | 82.6 | 41.4 |
| | Rarely | 46.9 | 7.1 | 81.5 | 40.6 |
| | Never | 46.0 | 6.3 | 80.5 | 37.6 |

NOTE: Text in blue indicates there is no statistically significant relationship.

## Social and Medical Gender Affirmation

USTS respondents were asked about whether they live full time according to their gender identity and whether and how they have accessed gender-affirming medical care (i.e., hormones or surgery). Table 4 shows how these gender affirmation milestones are related to suicide thoughts and attempts. Those who do not want to live full time according to their gender identity generally were at similar or lower risk of lifetime suicide attempts compared to those who do not live full time yet but want to someday. Those who began to live full time according to their gender identity more recently have a higher prevalence of past-year suicide thoughts and attempts than those who began living full time longer ago. For instance, those who began to live full time according to their gender identity within the past year had nearly double the prevalence of past year suicide attempts than those who began ten or more years ago.

There was no statistically significant relationship between suicide thoughts and attempts and current hormone use, but there was a significant relationship among people receiving hormone therapy based on where they got their hormones. Respondents who got their hormones only from licensed professionals were less likely to report past-year suicide thoughts and attempts and lifetime attempts than those who got their hormones from friends or other non-licensed sources. Those who wanted, and subsequently received, hormone therapy and/or surgical care had substantially lower prevalence of past-year suicide thoughts and attempts than those who wanted hormone therapy and surgical care but had not received them. For instance, 5.1 percent of those who wanted surgical care and received it attempted suicide in the past year compared to 8.5 percent of those who wanted surgical care but did not receive it.

The USTS asked respondents if they had ever gone back to living according to their sex assigned at birth, which was referred to as "de-transitioning." Eight percent of respondents reported having "de-transitioned" at some point for reasons such as pressure from family and friends and having experienced too much harassment or discrimination. Those who had "de-transitioned" at some point were significantly more likely to report suicide thoughts and attempts, both past-year and lifetime, than those who had never "de-transitioned."

**Table 4. Suicide thoughts and attempts by gender affirmation milestones**

|  |  | PAST 12 MONTHS | | LIFETIME | |
|---|---|---|---|---|---|
|  |  | THOUGHTS | ATTEMPTS | THOUGHTS | ATTEMPTS |
| Want to live in gender identity someday | No | 36.5 | 4.1 | 71.0 | 32.6 |
|  | Yes | 55.3 | 7.4 | 81.9 | 35.6 |
|  | Not sure | 45.5 | 5.2 | 75.9 | 31.0 |
| Years since began to live according to gender identity | 0 to 1 | 54.7 | 9.7 | 84.3 | 42.3 |
|  | 2 to 5 | 50.7 | 7.9 | 86.0 | 46.3 |
|  | 6 to 9 | 39.2 | 6.6 | 80.2 | 45.6 |
|  | 10 plus | 31.5 | 5.2 | 78.4 | 43.1 |
| Currently taking hormones | No | 43.0 | 7.3 | 79.2 | 40.8 |
|  | Yes | 42.7 | 6.5 | 82.1 | 42.6 |

Table 4. Suicide thoughts and attempts by gender affirmation milestones (continued)

| | | PAST 12 MONTHS | | LIFETIME | |
| | | THOUGHTS | ATTEMPTS | THOUGHTS | ATTEMPTS |
|---|---|---|---|---|---|
| Where get hormones | Only licensed professionals | 41.6 | 5.8 | 81.7 | 41.6 |
| | Professionals and friends /other | 53.7 | 11.6 | 87.0 | 51.4 |
| | Only friends/other | 54.1 | 16.4 | 81.7 | 52.0 |
| Had/have hormones | Want them, haven't had | 57.9 | 8.9 | 84.4 | 41.1 |
| | Want them, have had | 42.9 | 6.5 | 81.9 | 42.4 |
| Had/have surgery | Want, have not had | 54.8 | 8.5 | 83.9 | 41.5 |
| | Want, have had | 38.2 | 5.1 | 79.0 | 39.5 |
| Ever "de-transitioned" | No | 44.2 | 6.7 | 81.6 | 41.8 |
| | Yes | 57.3 | 11.8 | 86.0 | 52.5 |

NOTE: Text in blue indicates there is no statistically significant relationship.

## Minority Stressors

### Family rejection and social support

Family rejection for being transgender can include such things as relationships ending, experiencing violence from a family member, being kicked out of the family home, not being allowed by their families to live according to their gender identity, and being forced to receive counseling or therapy. Table 5 shows findings for suicide thoughts and attempts related to these experiences. Respondents with supportive families were less likely to report suicide thoughts and attempts than those who reported that their spouses, partners, or children rejected them because they are transgender. Respondents who ever ran away from home as youth because of being transgender had more than double the prevalence of past year suicide attempts than those who had not had that experience. Those with supportive co-workers and classmates had a lower prevalence of suicide thoughts and attempts.

The availability and quality of resources for social support can have an impact on suicidality.[24] As one measure of social support resources, the USTS asked respondents about whether and how they socialize with other transgender people. Overall, there was no significant relationship between socializing with other transgender people and suicide thoughts or attempts. However, some significant relationships emerged when looking at specific ways in which respondents socialized with other transgender people. Those who socialize with other transgender people online were more likely to report suicide thoughts and attempts, while those who socialize with other transgender people in person were less likely to report suicide thoughts and attempts. Those who socialize with other transgender people in political activism had a higher prevalence of suicide thoughts and attempts than those who did not socialize with other transgender people in this way.

---

[24] *See*, for instance, Bauer, G. R., Pyne, J., Francino, M. C., & Hammond, R. (2013). Suicidality among trans people in Ontario: Implication for social work and social justice. *Service Social*, *59*(1), 35-62; Zeluf, G., Dhejne, C., Orre, C., Mannheimer, L. N., Deogan, C., Hoijer, J., Winzer, R., & Thorson, A. E. (2018). Targeted Victimization and Suicidality Among Trans People: A Web-Based Survey. *LGBT Health*, *5*(3), 180-190.

AR_026981

**Table 5. Suicide thoughts and attempts by experiences of family rejection and social support**

| | | PAST 12 MONTHS | | LIFETIME | |
|---|---|---|---|---|---|
| | | THOUGHTS | ATTEMPTS | THOUGHTS | ATTEMPTS |
| Spouse or partner ended relationship | No | 46.8 | 6.4 | 81.5 | 39.2 |
| | Yes, only because I'm trans | 48.8 | 11.3 | 85.6 | 54.3 |
| | Yes, because I'm trans and other reasons | 46.6 | 8.4 | 83.4 | 46.7 |
| Child ended relationship | No | 34.6 | 4.2 | 74.1 | 35.9 |
| | Yes | 41.3 | 8.1 | 83.6 | 50.5 |
| Family support | Supportive | 41.9 | 5.8 | 79.3 | 37.3 |
| | Neutral | 50.8 | 7.4 | 84.2 | 42.4 |
| | Unsupportive | 60.3 | 13.1 | 89.9 | 54.0 |
| Rejected by family of origin | No | 42.2 | 5.1 | 77.3 | 33.1 |
| | Yes | 53.5 | 10.5 | 88.4 | 52.0 |
| Ever ran away from home | No | 45.6 | 6.4 | 81.2 | 38.4 |
| | Yes | 61.1 | 17.2 | 91.6 | 67.5 |
| Co-worker support | Supportive | 40.2 | 5.2 | 79.2 | 38.5 |
| | Neutral | 49.0 | 7.1 | 84.3 | 42.7 |
| | Unsupportive | 66.3 | 12.3 | 91.0 | 54.7 |
| Classmate support | Supportive | 45.1 | 6.2 | 79.9 | 39.5 |
| | Neutral | 53.1 | 8.8 | 84.4 | 43.3 |
| | Unsupportive | 65.9 | 16.5 | 90.3 | 55.0 |
| Socializing with other trans people | I do socialize | 48.5 | 7.2 | 81.7 | 40.4 |
| | I do not socialize | 46.5 | 7.7 | 81.4 | 39.9 |
| Socialize in political activism | No | 47.6 | 7.3 | 80.3 | 38.8 |
| | Yes | 49.9 | 7.2 | 84.7 | 43.7 |
| Socialize online | No | 40.8 | 6.2 | 77.2 | 36.9 |
| | Yes | 50.3 | 7.5 | 82.9 | 41.3 |
| Socialize in person | No | 51.6 | 8.4 | 82.8 | 41.5 |
| | Yes | 46.5 | 6.7 | 81.1 | 39.8 |
| Socialize in support groups | No | 49.1 | 7.1 | 82.1 | 39.6 |
| | Yes | 46.6 | 7.7 | 80.9 | 42.1 |

NOTE: Text in blue indicates there is no statistically significant relationship.

## Religion

As can be seen in Table 6, lifetime suicide thoughts and attempts were marginally more common among respondents who had ever been a part of a religious or spiritual community, although this group showed marginally lower suicide thoughts and attempts in the past year. Elevated prevalence of both lifetime and past-year suicide thoughts and attempts was observed among respondents who had left a religious or spiritual community because they felt rejected, as well as those who reported experiencing religious rejection in the past year. Conversely, respondents who experienced religious acceptance in the past year were markedly less likely to report past-year suicide thoughts and attempts.

Table 6. Suicide thoughts and attempts by experiences with religion

| | | PAST 12 MONTHS | | LIFETIME | |
|---|---|---|---|---|---|
| | | THOUGHTS | ATTEMPTS | THOUGHTS | ATTEMPTS |
| Ever part of religious community | No | 49.7 | 8.1 | 80.7 | 38.6 |
| | Yes | 47.6 | 6.8 | 82.2 | 41.3 |
| Left religious community rejected | No | 45.9 | 5.8 | 80.2 | 36.8 |
| | Yes | 54.7 | 11.0 | 90.8 | 60.4 |
| Found accepting religious community | No | 59.3 | 12.2 | 92.6 | 60.8 |
| | Yes | 48.2 | 9.4 | 88.1 | 60.0 |
| Part of religious community (past year) | No | 50.0 | 6.7 | 83.8 | 41.8 |
| | Yes | 42.0 | 7.2 | 78.4 | 40.1 |
| Religious acceptance (past year) | No | 54.6 | 22.5 | 87.4 | 46.3 |
| | Yes | 39.6 | 6.3 | 79.3 | 41.5 |
| Religious rejection (past year) | No | 38.9 | 5.5 | 78.7 | 40.0 |
| | Yes | 46.1 | 13.1 | 84.1 | 49.1 |

NOTE: Text in blue indicates there is no statistically significant relationship.

## Conversion therapy

A prior analysis of USTS data found that 18 percent of respondents reported that a psychologist, counselor, religious advisor, or other professional with whom they had discussed their gender identity attempted to stop them from being transgender.[25] Fourteen percent reported that such a professional had attempted to change their sexual orientation. As shown in Table 7, having either of these experiences is associated with a higher prevalence of both lifetime and past-year suicide thoughts and attempts. Whether the professional in question was a religious advisor or non-religious professional was not significantly related to these outcomes.

Table 7. Suicide thoughts and attempts by experiences with conversion therapy

| | | PAST 12 MONTHS | | LIFETIME | |
|---|---|---|---|---|---|
| | | THOUGHTS | ATTEMPTS | THOUGHTS | ATTEMPTS |
| Professional tried to stop them being trans | No | 45.7 | 6.4 | 81.3 | 38.7 |
| | Yes | 57.4 | 11.9 | 90.9 | 58.3 |
| Professional was a religious counselor | No | 57.3 | 11.1 | 91.4 | 58.4 |
| | Yes | 57.7 | 13.7 | 89.9 | 58.1 |
| Professional tried to change sexual orientation | No | 47.2 | 6.5 | 82.4 | 39.9 |
| | Yes | 59.4 | 12.2 | 92.9 | 63.1 |

NOTE: Text in blue indicates there is no statistically significant relationship.

---

[25] James, S.E., et al., (2016).

AR_026983

## Violence

Physical victimization, sexual violence, and intimate partner violence (IPV) have been shown to increase risk of suicidal ideation and behavior in the general population.[26] Prior research suggests that transgender people experience violence more often than the general population, including violence that is related to transgender status.[27] Table 8 presents findings regarding relationships between experiences of violence and suicide thoughts and attempts. Past-year suicide thoughts and attempts were considerably more prevalent among respondents who reported having experienced physical attacks during the past year, compared to respondents who did not have that experience. The large majority of respondents who reported they had been physically attacked attributed the attack to their transgender status. This group of respondents was significantly more likely to report lifetime suicide thoughts and attempts than those who did not have that experience.

Very similar results were obtained in relation to other types of violent experiences, including unwanted sexual contact and intimate partner violence (IPV), such as IPV centering on coercive control and also physically abusive IPV. In addition to other types of coercive control IPV, respondents were asked if an intimate partner had ever withheld hormones, threatened to "out" them, or told them they weren't a real man or women. Unwanted sexual contact and all aspects of IPV explored in the USTS were associated with a higher prevalence of suicide thoughts and attempts, both lifetime and in the past year.

**Table 8. Suicide thoughts and attempts by experiences with violence**

| | | PAST 12 MONTHS | | LIFETIME | |
|---|---|---|---|---|---|
| | | THOUGHTS | ATTEMPTS | THOUGHTS | ATTEMPTS |
| Physically attacked, any reason (past year) | No | 45.2 | 5.6 | 80.1 | 36.7 |
| | Yes | 68.7 | 18.4 | 92.4 | 64.9 |
| Physically attacked because trans (past year) | No | 46.2 | 6.0 | 80.5 | 37.7 |
| | Yes | 70.1 | 20.9 | 93.8 | 69.2 |
| Unwanted sexual contact (ever) | No | 41.1 | 4.7 | 74.7 | 28.7 |
| | Yes | 56.5 | 10.2 | 89.7 | 53.6 |
| Unwanted sexual contact (past year) | No | 45.8 | 5.9 | 80.4 | 38.2 |
| | Yes | 70.6 | **19.4** | 93.2 | 59.8 |
| Coercive control IPV (ever) | No | 44.1 | 5.7 | 77.1 | 31.4 |
| | Yes | 53.6 | 9.2 | 87.4 | 51.8 |
| Coercive control IPV, trans-related (ever) | No | 46.4 | 6.1 | 79.6 | 35.5 |
| | Yes | 53.4 | 10.3 | 87.2 | 53.4 |

[26] Klomek A.B., Kleinman M., Altschuler E., Marrocco, F., Amakawa, L., & Gould, M.S. (2013). Suicidal adolescents' experiences with bullying perpetration and victimization during high school as risk factors for later depression and suicidality. *Journal of Adolescent Health, 53*(1), Supplement, S37–42.

[27] Stotzer, R. L. (2009). Violence against transgender people: A review of United States data. *Aggression and Violent Behavior, 14*(3), 170-179; Lombardi, E. L., Wilchins, R.A., Priesing, D., & Malouf, D. (2001). Gender violence: transgender experiences with violence and discrimination. *Journal of Homosexuality, 42*(1), 89-101.

**Table 8. Suicide thoughts and attempts by experiences with violence (continued)**

| | | PAST 12 MONTHS | | LIFETIME | |
|---|---|---|---|---|---|
| | | THOUGHTS | ATTEMPTS | THOUGHTS | ATTEMPTS |
| Physical IPV (ever) | No | 46.0 | 6.1 | 78.4 | 32.8 |
| | Yes | 52.7 | 9.4 | 87.9 | 54.3 |
| Severe physical IPV (ever) | No | 46.0 | 6.0 | 79.1 | 34.1 |
| | Yes | 55.8 | 11.2 | 89.9 | 60.2 |
| Any type of IPV (ever) | No | 43.7 | 5.7 | 75.8 | 29.4 |
| | Yes | 52.2 | 8.6 | 86.7 | 49.7 |

**Discrimination**

The USTS collected data on discrimination experiences across many areas of life, such as school, work, health care, and public accommodations, including public restrooms. Prior research shows that such discrimination experiences are minority stressors, which negatively impact mental and physical health.[28] Tables 9a through 9g present findings related to the generally strong association of discrimination experiences and past-year and lifetime suicide thoughts and attempts.

*Denied equal treatment & verbal harassment*

As shown in Table 9, significantly large proportions of respondents who reported being denied equal treatment or being verbally harassed in the past year, either for any reason or specifically because of their transgender status, reported past-year suicide thoughts and attempts, compared to those who did not have these experiences.

**Table 9. Suicide thoughts and attempts by experiences of being denied equal treatment and verbal harassment**

| | | PAST 12 MONTHS | | LIFETIME | |
|---|---|---|---|---|---|
| | | THOUGHTS | ATTEMPTS | THOUGHTS | ATTEMPTS |
| Denied equal treatment, any reason (past year) | No | 46.1 | 6.2 | 80.2 | 37.5 |
| | Yes | 60.2 | 12.8 | 89.8 | 55.7 |
| Denied equal treatment because trans (past year) | No | 46.2 | 6.3 | 80.3 | 37.8 |
| | Yes | 61.3 | 13.4 | 90.3 | 56.4 |
| Verbally harassed, any reason (past year) | No | 36.3 | 4.1 | 74.6 | 30.7 |
| | Yes | 58.4 | 10.0 | 87.7 | 48.5 |
| Verbally harassed because trans (past year) | No | 39.5 | 5.0 | 76.1 | 32.9 |
| | Yes | 58.8 | **10.0** | 88.4 | 49.4 |

---

[28] Tucker, R. P., Testa, R. J., Reger, M. A., Simpson, T. L., Shipherd, J. C., & Lehavot, K. (2018). Current and Military-Specific Gender Minority Stress Factors and Their Relationship with Suicide Ideation in Transgender Veterans. *Suicide Life-Threatening Behavior, 49*(1), 155-166; Testa, R. J. Michaels, M. S., Bliss, W., Rogers, M. L., Balsam, K. F., & Joiner, T. (2017). Suicidal ideation in transgender people: Gender minority stress and interpersonal theory factors. *Journal of Abnormal Psychology, 126*(1), 125-136.

AR_026985

*Education*

Table 10 shows that USTS respondents who reported negative experiences in K-12 educational settings, such as being verbally harassed, physically attacked, or sexually assaulted, had higher prevalence of lifetime and past-year suicide thoughts and attempts than respondents who did not have such experiences. Similar patterns emerge for those who left school due to mistreatment or were expelled. Notably, the group with the lowest prevalence of suicide thoughts and attempts—much lower than the overall USTS averages in some cases—are those who were not "out" or perceived by others to be transgender or lesbian, gay, bisexual, or queer (LGBQ) in K through 12. Yet, the prevalence of suicide thoughts and attempts in that group remains much higher than the U.S. general population. Those who reported harassment in college or who left college due to harassment had a higher prevalence of past-year and lifetime suicide attempts than those who did not have those experiences.

**Table 10. Suicide thoughts and attempts by experiences in educational settings**

|  |  | PAST 12 MONTHS | | LIFETIME | |
|  |  | THOUGHTS | ATTEMPTS | THOUGHTS | ATTEMPTS |
|---|---|---|---|---|---|
| Out or perceived as trans or LGBQ in K-12 | Out or perceived as trans/LGBQ | 51.8 | 8.0 | 85.1 | 44.2 |
|  | Not out or perceived as trans/LGBQ | 36.5 | 4.4 | 70.5 | 27.1 |
| Verbally harassed in K-12, because trans | No | 51.2 | 7.9 | 83.1 | 41.6 |
|  | Yes | 58.0 | 11.8 | 89.9 | 54.9 |
| Physically attacked in K-12, because trans | No | 53.6 | 8.4 | 85.1 | 43.5 |
|  | Yes | 59.1 | 15.2 | 92.2 | 65.7 |
| Unwanted sexual in K-12, because trans | No | 53.8 | 8.8 | 86.1 | 45.9 |
|  | Yes | 61.9 | **18.1** | 91.9 | 67.6 |
| Left K-12 due to mistreatment so bad | No | 53.0 | 8.7 | 85.6 | 44.7 |
|  | Yes | 64.3 | 16.6 | 92.7 | 69.3 |
| Expelled from K-12 | No | 54.4 | 9.5 | 86.4 | 47.7 |
|  | Yes | 63.2 | 18.2 | 94.2 | 67.8 |
| Any negative K-12 experience | No | 47.5 | 7.2 | 79.3 | 36.5 |
|  | Yes | 57.1 | 10.9 | 89.0 | 52.5 |
| Verbally harassed in college because trans | No | 47.0 | 6.4 | 82.2 | 39.3 |
|  | Yes | 57.7 | 10.3 | 91.7 | 57.2 |
| Left college due to mistreatment so bad | No | 56.0 | 9.1 | 91.1 | 54.8 |
|  | Yes | 66.0 | 15.4 | 95.0 | 69.6 |

NOTE: Text in blue indicates there is no statistically significant relationship.

*Employment & Workplace*

Table 11 presents findings about the relationship between employment and workplace discrimination to suicide thoughts and attempts. As shown, losing a job because of one's transgender status (as opposed to losing a job for any reason) was significantly related to past-year and lifetime suicide thoughts and attempts. Respondents who reported negative past-year work experiences because of their transgender status, such as being fired or forced to resign, not being hired, and being harassed,

attacked, or physically assaulted in the workplace had higher prevalence of past-year suicide thoughts and attempts than those who had not experienced these events. Those who took steps to avoid mistreatment at work, such as quitting their job or hiding their gender identity, were more likely to report suicide thoughts and attempts compared to those who did not take such steps to avoid mistreatment.

**Table 11. Suicide thoughts and attempts by experiences with employment and in the workplace**

| | | PAST 12 MONTHS | | LIFETIME | |
| | | THOUGHTS | ATTEMPTS | THOUGHTS | ATTEMPTS |
|---|---|---|---|---|---|
| Ever lost job, any reason | No | 48.3 | 7.3 | 80.0 | 36.4 |
| | Yes | 48.4 | 7.3 | 84.0 | 45.7 |
| Ever lost job because trans/GNC | No | 47.9 | 7.0 | 80.7 | 38.3 |
| | Yes | 51.5 | 9.2 | 88.5 | 55.1 |
| Denied promotion because trans (past year) | No | 50.8 | 7.7 | 83.1 | 40.3 |
| | Yes | 61.3 | 9.6 | 90.7 | 59.1 |
| Fired/forced to resign because trans (past year) | No | 50.8 | 7.5 | 83.2 | 40.5 |
| | Yes | 64.1 | 15.3 | 90.3 | 59.8 |
| Not hired because trans (past year) | No | 48.2 | 6.5 | 81.4 | 37.6 |
| | Yes | 62.2 | 12.4 | 90.7 | 54.6 |
| Took steps to avoid discrimination at work (past year) | No | 33.6 | 4.7 | 76.0 | 35.0 |
| | Yes | 54.5 | 7.5 | 85.2 | 42.2 |
| Any mistreatment by employer (past year) | No | 46.5 | 5.8 | 80.8 | 36.2 |
| | Yes | 60.1 | 10.4 | 90.6 | 54.9 |
| Harassed, attacked, sexual assault at work (past year) | No | 47.0 | 5.9 | 81.5 | 37.7 |
| | Yes | 64.6 | 12.2 | 92.1 | 56.6 |

NOTE: Text in blue indicates there is no statistically significant relationship.

*Housing*

Housing instability is a known risk factor for suicide thoughts and attempts in the general population.[29] Prior research suggests that transgender people have high prevalence of housing instability compared to the general population, including experiencing homelessness.[30] The figures in Table 12 show the impact of recent housing discrimination and instability on suicidality among USTS respondents. Those who reported being evicted or denied a home or apartment in the past year due to their transgender status had an especially high prevalence of past-year suicide thoughts and attempts, with those being evicted having nearly four times higher prevalence of attempted suicide in the past year compared to those who were not evicted. Similarly, respondents who had "couch

---

[29] Van Orden, K. A., et al., (2010).

[30] Begun, S. & Kattari, S.K. (2016). Conforming for survival: Associations between transgender visual conformity/passing and homelessness experiences. *Journal of Gay & Lesbian Social Services*, *28*(1), 54-66; Spicer, S. S., Schwartz, A., & Barber, M.E. (2016). Special Issue on Homelessness and the Transgender Homeless Population. *Journal of Gay and Lesbian Mental Health, 14*(4), 267-270.

surfed" during the past year, meaning they relied on short-term accommodations in the homes of friends or family members to avoid being homeless, had over three times the prevalence of past-year suicide attempts than those who were not in that position.

**Table 12. Suicide thoughts and attempts by experiences with housing**

| | | PAST 12 MONTHS | | LIFETIME | |
| | | THOUGHTS | ATTEMPTS | THOUGHTS | ATTEMPTS |
|---|---|---|---|---|---|
| Evicted from home/apartment (past year) | No | 46.0 | 6.1 | 81.3 | 40.0 |
| | Yes | 69.1 | 22.3 | 90.9 | 65.6 |
| Denied a home/apartment (past year) | No | 46.1 | 6.4 | 81.5 | 40.6 |
| | Yes | 65.0 | 19.8 | 88.4 | 63.3 |
| Couch surfing (past year) | No | 44.4 | 5.5 | 80.6 | 37.8 |
| | Yes | 69.0 | **18.8** | 90.9 | 64.3 |

*Health Care*

The initial USTS report found that many respondents encountered discrimination within health care settings.[31] As shown in Table 13, more respondents who were denied care from a health care provider in the past year reported suicide thoughts and attempts compared to those who were not denied care. Conversely, those who reported that their health care provider knew they were transgender and treated them with respect had significantly lower prevalence of suicide thoughts and attempts. Other negative health-care-related experiences in the past year, such as not having health insurance, or being mistreated in any way by a health care provider, were also associated with a higher prevalence of past-year suicide thoughts and attempts.

**Table 13. Suicide thoughts and attempts by experiences in health care settings**

| | | PAST 12 MONTHS | | LIFETIME | |
| | | THOUGHTS | ATTEMPTS | THOUGHTS | ATTEMPTS |
|---|---|---|---|---|---|
| Has health insurance | No | 56.4 | 10.5 | 85.6 | 47.4 |
| | Yes | 47.0 | 6.7 | 81.1 | 39.2 |
| Doctor knew trans and treated with respect (past year) | No | 55.2 | 8.4 | 82.3 | 39.1 |
| | Yes | 43.3 | 6.4 | 81.4 | 41.7 |
| Doctor refused to give trans-related care (past year) | No | 46.7 | 6.5 | 81.0 | 39.1 |
| | Yes | 62.0 | 14.4 | 90.8 | 59.5 |
| Doctor refused to give other care (past year) | No | 47.2 | 6.8 | 81.4 | 39.8 |
| | Yes | 68.2 | **18.8** | 91.8 | 68.6 |
| Any negative experience in doctor/health setting (past year) | No | 44.3 | 5.7 | 78.5 | 35.5 |
| | Yes | 55.0 | 10.2 | 88.2 | 51.3 |

NOTE: Text in blue indicates there is no statistically significant relationship.

---

[31] James, S.E., et al., (2016).

*Public Accommodations*

Places of public accommodation, such as restaurants, public transportation, retail stores, hotels, and government agencies (DMV, Social Security Office) can be places of vulnerability for transgender people. In a prior analysis, nearly one-third of USTS respondents reported being denied equal treatment or service, verbally harassed, or physically assaulted in a place of public accommodation in the past year.[32] Twenty percent of USTS respondents had avoided places of public accommodation in the past year to avoid mistreatment.[33] As shown in Table 14, the present analysis shows that having negative experiences in places of public accommodation in the past year, or avoiding these places all together, is associated with a higher prevalence of suicide thoughts and attempts compared to respondents who did not have these experiences in the past year. Over 30 percent of those who were physically attacked in a place of public accommodation reported attempting suicide in the past year, which is over four times higher than the prevalence found among respondents who were not similarly attacked. Experiences in public restrooms reveal a similar pattern, with respondents who were denied access to restrooms, or harassed, physically attacked, or sexually assaulted in restrooms during the past year reporting more past-year suicide thoughts and attempts than those who did not have these experiences. Those who completely avoided using public restrooms in the past year had much higher prevalence of past-year suicide thoughts and attempts than those who did not avoid restrooms or only sometimes avoided them.

**Table 14.** Suicide thoughts and attempts by experiences in places of public accommodation

| | | PAST 12 MONTHS | | LIFETIME | |
| | | THOUGHTS | ATTEMPTS | THOUGHTS | ATTEMPTS |
|---|---|---|---|---|---|
| Avoided public accom for fear of mistreatment (past year) | No | 44.9 | 6.1 | 79.7 | 37.1 |
| | Yes | 62.1 | 11.9 | 90.5 | 54.0 |
| Denied equal treatment in public accom (past year) | No | 47.6 | 6.7 | 81.4 | 38.8 |
| | Yes | 60.3 | 12.9 | 90.3 | 57.1 |
| Verbally harassed in public accom (past year) | No | 45.8 | 6.1 | 80.5 | 37.0 |
| | Yes | 63.6 | 13.1 | 90.6 | 57.5 |
| Physically attacked in public accom (past year) | No | 48.4 | 7.0 | 82.0 | 40.0 |
| | Yes | 75.1 | 30.9 | 93.1 | 74.5 |
| Any neg experience in public accom (past year) | No | 45.3 | 5.9 | 80.0 | 36.2 |
| | Yes | 61.5 | 12.4 | 90.1 | 56.1 |
| Any neg experience with TSA (past year) | No | 38.1 | 4.7 | 76.0 | 32.1 |
| | Yes | 50.7 | 7.3 | 82.8 | 41.7 |
| Told that you were in wrong restroom (past year) | No | 45.6 | 6.2 | 80.2 | 37.2 |
| | Yes | 57.2 | 10.6 | 86.7 | 50.7 |
| Denied access to a restroom (past year) | No | 47.0 | 6.4 | 80.9 | 38.5 |
| | Yes | 62.1 | 15.9 | 89.6 | 59.8 |

---

[32] James, S.E., et al., (2016).

[33] James, S.E., et al., (2016).

**Table 14. Suicide thoughts and attempts by experiences in places of public accommodation (continued)**

| | | PAST 12 MONTHS | | LIFETIME | |
|---|---|---|---|---|---|
| | | THOUGHTS | ATTEMPTS | THOUGHTS | ATTEMPTS |
| Harassed, attacked, sexual assault in restroom (past year) | No | 46.4 | 6.3 | 80.7 | 37.9 |
| | Yes | 62.8 | 14.2 | 89.4 | 59.1 |
| Any negative experience in restroom (past year) | No | 45.1 | 6.0 | 79.9 | 36.5 |
| | Yes | 57.5 | 11.0 | 86.8 | 51.3 |
| Avoided restrooms (past year) | Not avoided | 39.1 | 4.9 | 75.6 | 34.1 |
| | Sometimes avoided | 51.9 | 7.9 | 84.7 | 42.8 |
| | Always avoided | 63.7 | 12.9 | 89.4 | 51.1 |
| | Not listed above | 52.0 | 7.9 | 82.8 | 42.0 |

*Law Enforcement*

As can be seen in Table 15, respondents who described themselves as very uncomfortable seeking help from the police and those who reported being disrespected or mistreated by police in the past year all were more likely to report past year suicide thoughts and attempts than those who did not report having these experiences. Twenty-three percent of those who said they were not treated with respect in any past-year encounters with police attempted suicide in the past year. This is a prevalence nearly three times higher than those who reported having always been treated with respect by police in the past year.

**Table 15. Suicide thoughts and attempts by experiences with law enforcement**

| | | PAST 12 MONTHS | | LIFETIME | |
|---|---|---|---|---|---|
| | | THOUGHTS | ATTEMPTS | THOUGHTS | ATTEMPTS |
| How comfortable are you seeking help from the police? | Very comfortable | 25.1 | 3.6 | 64.6 | 27.7 |
| | Somewhat comfortable | 35.2 | 4.2 | 73.6 | 31.6 |
| | Neutral | 43.9 | 6.0 | 79.9 | 37.3 |
| | Somewhat uncomfortable | 52.4 | 6.7 | 84.9 | 40.1 |
| | Very uncomfortable | 63.2 | 11.5 | 90.9 | 51.9 |
| Police treated you with respect (past year) | Never treated with respect | 68.7 | 23.1 | 91.6 | 67.0 |
| | Sometimes treated with respect | 59.3 | 13.7 | 90.5 | 58.7 |
| | Always treated with respect | 43.1 | 8.4 | 79.2 | 41.6 |
| Any mistreatment by police (past year) | No | 41.5 | 6.1 | 79.2 | 40.8 |
| | Yes | 62.3 | 17.6 | 90.7 | 60.9 |

**Protection against gender identity discrimination**

The Movement Advancement Project (MAP) has tracked state-level policies that positively or negatively impact the transgender population in the United States, including state statutes prohibiting

AR_026990

discrimination against transgender people in employment, housing, and public accommodations.[34] By providing at least some level of protection against discrimination based on gender identity, state nondiscrimination policies are thought to enhance the health and well-being of transgender people.[35] Because USTS respondents reported their state of residence, we were able to categorize respondents by whether they lived in states that had, or did not have, a statute prohibiting gender identity discrimination in employment, housing, and public accommodations at the time of the survey (2015).[36] As is shown in Table 16, a lower proportion of respondents who lived in a state with a gender identity nondiscrimination statute reported past-year suicide thoughts and attempts than those who lived in states without such a statute.

**Table 16.** Suicide thoughts and attempts by presence of state gender identity nondiscrimination statutes in state of residence

|  | PAST 12 MONTHS | |
| --- | --- | --- |
|  | THOUGHTS | ATTEMPTS |
| No comprehensive statute | 49.9 | 7.8 |
| Has comprehensive statute | 46.8 | 6.7 |

## Cumulative effect of minority stressors

Minority stress can be exacerbated when multiple discriminatory experiences occur within a period of time. This can have a compounding effect on mental and physical health. To better understand this "cumulative effect" of minority stress experiences, we "scored" respondents using four selected discriminatory experiences that we considered to be of relatively high impact in one's life, were measured in the past-year time frame, and were attributed by the respondent to their transgender status: being fired or forced to resign from a job, eviction, experiencing homelessness, and physical attack. Respondents received a score of 0, which means they had none of these experiences, up to a score of 4, which means they had all four of these experiences in the past year.

Figure 4 shows how these scores were associated with suicide thoughts and attempts in the past year. With each added experience, the prevalence of suicide thoughts and attempts increases. Among those who had all four experiences in the past year, 97.7 percent had suicide thoughts in the past year and 51.2 percent made a suicide attempt. Additionally, Figure 4 shows that a higher number of discrimination experiences is associated with a higher prevalence of serious psychological distress. As was described earlier in this report, serious psychological distress is related to suicidality, so as the number of discriminatory experiences increases, the higher prevalence of serious psychological distress acts as a possible pathway for increased suicide thoughts and attempts.

---

[34] Movement Advancement Project. "Equality Maps." Available at http://www.lgbtmap.org/equality-maps/legal_equality_by_state (last accessed August 18, 2019).

[35] Hatzenbuehler, M.L. (2016). Structural Stigma and Health Inequalities: Research Evidence and Implications for Psychological Science. *American Psychologist*, 71(8), 742-751.

[36] Movement Advancement Project. "Equality Maps." Additional adjustments to the nondiscrimination maps to reflect the 2015 state policy landscape provided by Christy Mallory of the Williams Institute.

**Figure 4. Current serious psychological distress and past-year suicide thoughts and attempts by cumulative discrimination experiences in the past year**



Number of major discrimination experiences in the past year

ATTEMPTS   SERIOUS DISTRESS   THOUGHTS

## Other Potential Risk Factors

The broad scope of topics included in the USTS provided an opportunity to explore relationships between suicide thoughts and attempts and potential risk/protective factors that have not received much attention in prior research among transgender people. Table 17 describes relationships between suicide thoughts and attempts and non-binary identity disclosure, identity documents, sex work and other work in the underground economy, and political and civic participation.

Non-binary respondents were asked what they do when someone incorrectly assumes their gender. Those who always disclose that they are non-binary were more likely to report past-year suicide attempts and lifetime suicide thoughts and attempts, compared to those who do not always disclose that that are non-binary. Those who have no identity documents listing their correct name and gender had higher prevalence of suicide thoughts and attempts than those having some or all correct identity documents. Respondents who have engaged in sex work and who work in the underground economy reported a higher prevalence of suicide thoughts and attempts than those who have not engaged in those types of work. In regard to civic participation, those who believe they can influence government decisions were less likely to report suicide thoughts and attempts than those who believed they could not influence government decisions. Engaging in political activity, protests, and rallies were either not statistically significantly associated with suicide thoughts or attempts or the differences between those who do and do not engage in these activities were small.

AR_026992

Case 4:24-cv-00461-O   Document 66   Filed 09/06/24   Page 252 of 300   PageID 2142
Suicide Thoughts and Attempts Among Transgender Adults in the US  |  29

**Table 17: Suicide thoughts and attempts by other potential risk factors**

| | | PAST 12 MONTHS | | LIFETIME | |
|---|---|---|---|---|---|
| | | THOUGHTS | ATTEMPTS | THOUGHTS | ATTEMPTS |
| Nonbinary respondents: When someone assumes wrong gender | Let them assume I'm man/woman | 52.6 | 6.9 | 81.4 | 34.8 |
| | Sometimes tell them I'm NB/GQ | 55.4 | 6.6 | 85.2 | 41.0 |
| | Always tell them I'm NB/GQ | 65.7 | 14.0 | 89.5 | 57.5 |
| Name and gender correct on IDs | All | 29.5 | 4.0 | 73.4 | 34.0 |
| | Some | 39.3 | 6.3 | 81.0 | 43.0 |
| | None | 54.2 | 8.1 | 83.4 | 40.7 |
| Ever engaged in sex work | No | 47.4 | 6.5 | 81.2 | 38.1 |
| | Yes | 55.2 | 12.8 | 85.6 | 57.4 |
| Engaged in sex work (past year) | No | 47.6 | 6.7 | 81.5 | 39.4 |
| | Yes | 61.1 | 17.3 | 85.4 | 57.8 |
| Drug sales/underground economy (ever) | No | 47.1 | 6.8 | 80.5 | 37.8 |
| | Yes | 57.6 | 10.7 | 90.4 | 59.5 |
| Drug sales/underground economy (past year) | No | 52.2 | 7.8 | 89.5 | 57.6 |
| | Yes | 66.9 | 16.3 | 91.5 | 63.3 |
| Someone like me can't influence government decisions | Strongly agree | 61.5 | 13.7 | 87.5 | 50.5 |
| | Agree | 53.4 | 6.9 | 83.5 | 40.8 |
| | Neither agree nor disagree | 48.8 | 7.0 | 82.0 | 39.3 |
| | Disagree | 42.9 | 5.1 | 79.7 | 36.8 |
| | Strongly disagree | 40.7 | 6.8 | 78.0 | 39.9 |
| Civic or political activity (past year) | No | 46.0 | 8.3 | 78.6 | 39.5 |
| | Yes | 49.1 | 6.8 | 82.9 | 40.7 |
| Attended political protest or rally (past year) | No | 48.0 | 7.4 | 80.5 | 38.9 |
| | Yes | 49.1 | 7.0 | 84.3 | 43.5 |

NOTE: Text in blue indicates there is no statistically significant relationship.

AR_026993

# DISCUSSION

The U.S. Transgender Survey provides a unique and valuable data source for understanding suicide risk factors among transgender people. Our findings underscore the urgency of research to identify promising intervention and prevention strategies to address suicide thoughts and attempts in this population. The prevalence of lifetime suicide attempts remained consistent with the prior iteration of the survey (i.e., 41% in the NTDS). Since the USTS sample is substantially younger than the U.S. population generally, one might assume that high overall prevalence of reported suicide thoughts and attempts is driven, at least in part, by age. However, as shown in Figures 6 and 7, USTS respondents reported substantially higher prevalence of suicide thoughts and attempts in each age group compared to the 2015 NSDUH, which is a representative sample of the U.S. population. Factors beyond age must explain the relatively high overall prevalence of suicide thoughts and attempts among USTS respondents.

**Figure 6. Suicide thoughts in the past year by age group, USTS v. NSDUH**



**Figure 7. Suicide attempts in the past year by age group, USTS v. NSDUH**



Our 2014 study examining risk factors for suicidality among NTDS respondents and our current study of USTS respondents found very similar relationships between demographic factors and discrimination experiences and suicide attempts. Overall, it is a consistent finding that those who are younger, assigned female at birth, have lower incomes and educational attainment, are not partnered, and do not identify as heterosexual or straight have higher prevalence of suicide attempts.

AR_026994

It is also a consistent finding that being "out" to others about being transgender can be an added risk factor in some circumstances, including being "out" to LGBT and non-LGBT friends. Additionally, the ways in which transgender people socialize with each other may be related to an increase or decrease in risk of suicide thoughts and attempts. Findings regarding "outness" and socializing may reflect added or reduced stress that results from negative or positive aspects of relationships that transgender people navigate. Alternately, other aspects of life that may be related to suicidality, such as isolation or living far from other transgender people, may necessitate making social connections in certain ways (e.g., online versus in person, or in ways that don't meet one's needs for socialization). Furthermore, it should be noted that not being "out" and socializing with trans people in ways that appear to be positive for suicide thoughts and attempts are both associated with a prevalence of suicidality much higher than the U.S. general population. This suggests that there are more complex factors that contribute to risk of suicide thoughts and attempts for these groups.

The present analysis indicates that the elevated risk of suicide thoughts and attempts among USTS respondents is related, in part, to the same risk factors that affect the U.S. population as a whole, including substance use and serious psychological distress. At the same time, it is also clear that minority stress experiences, such as family rejection, discrimination experiences, and lack of access to gender-affirming health care, create added risks for transgender people. In particular, "de-transitioning" is associated with a higher risk of suicide thoughts and attempts compared to those who are living their lives according to their gender identity and those who have not yet begun to, signaling that "de-transitioning" is a uniquely stressful experience for transgender people. Furthermore, the cumulative effect of experiencing multiple minority stressors dramatically increases serious psychological distress and suicidality.

A strength of this report, compared to our 2014 report using NTDS data, was our ability to look at timing of gender-affirming care and suicide thoughts and attempts in the past year time frame. We found that transgender people who want to have gender-affirming medical care (i.e., hormones and/or surgery) and are able to get it have a lower prevalence of suicide thoughts and attempts, particularly in the past year time frame. This finding is not surprising given that a thorough review of the 73 extant studies on mental and physical health outcomes for transgender people who have had gender-affirming medical care found that gender-affirming care effectively treats symptoms of gender dysphoria, improves well-being and quality of life, and reduces suicide risk factors, like depression and substance use, as well as reducing suicidality itself.[37] In our prior 2014 report using NTDS data, we were only able to look at gender-affirming care and lifetime suicide attempts, which is a time frame that does not allow the effects of receiving gender-affirming health care to be assessed.

---

[37] What We Know. (2017). *What does the scholarly research say about the effect of gender transition on transgender well-being?* New York: Cornell University, available at https://whatweknow.inequality.cornell.edu/topics/lgbt-equality/what-does-the-scholarly-research-say-about-the-well-being-of-transgender-people/#top (last accessed August 18, 2019).

AR_026995

# LIMITATIONS

The findings presented in this report have some notable limitations. USTS was a cross-sectional study that asked respondents to report information about suicide thoughts and attempts and other experiences across their lifetimes, and responses may have been affected by recall bias and temporal ordering. Additionally, the USTS sample, though large, diverse, and nationally well-distributed, was not randomly selected and thus cannot be considered nationally representative. Findings in this report should be understood to represent the nearly 28,000 USTS respondents rather than the full U.S. transgender population. Further, our analysis relied on bivariate techniques, which did not adjust for other respondent characteristics, like age, nor simultaneously account for other experiences, like discrimination and other factors that may help explain the relationship between the two variables presented. Despite these limitations, a major strength of this report is that we are able to present topically broad findings, which point to characteristics and experiences that are related to an elevated prevalence of suicide thoughts and attempts (i.e., risk factors). We then point to areas needing further examination to understand additional related factors that may contribute to that elevated prevalence and help target and design interventions.

# FUTURE RESEARCH

Future research that supports the design and evaluation of suicide intervention and prevention strategies for the transgender population is urgently needed. For instance, in-depth understanding of risk factors and the timing of suicide thoughts and attempts compared to gender affirmation milestones would help to target prevention and intervention strategies. We are currently limited by the availability and quality of data about the transgender population in the United States. Large surveys like the NTDS and USTS can provide a wealth of knowledge about the lives and experiences of transgender people in the United States, but are limited in their generalizability. This report has presented descriptive analyses that provide a broad view of suicide risk factors for USTS respondents. Additional, more topically-focused research utilizing multi-variate models is needed to provide better depth of understanding of particular risk factors. In addition to surveys like the NTDS and USTS that provide large samples and describe experiences relevant to the transgender population, large, nationally representative surveys, like the National Survey of Drug Use and Health, could provide valuable, population-based data about the transgender population and suicide risk if they were to include questions to identify transgender respondents. While much progress has been made, further research is needed to refine and field gender identity measures in large, nationally representative surveys.

The USTS provides the ability to create time lines of gender affirmation milestones, suicide attempts, and timing of discriminatory experiences, substance use, and experiences of serious psychological distress. With the large sample size, additional bivariate and multivariate models could be created to understand how gender affirmation milestones relate to timing of discriminatory experiences and measures of mental and physical health. This could inform research into suicide intervention and prevention by pinpointing particular time periods of vulnerability relative to gender affirmation milestones where intervention and prevention strategies would be most needed and most effective. Research that makes use of these rich data is highly recommended.

Over 20 percent of USTS respondents who have attempted suicide reported having done so five or more times. Our analyses in this report did not address multiple attempts. Indicators of past year and lifetime suicide attempts lump together respondents who have had one or more attempts, but respondents in this group are diverse in number of attempts and recent timing of attempts. Future research is needed that accounts for a broader range of co-existing and co-occurring experiences, including mapping out milestones of those reporting multiple attempts, to describe these diverse groups and their different risk profiles.

In this report, we found that cumulative discrimination experiences are associated with higher risk of suicide thoughts and attempts. The USTS gives us the ability to not only look at multiple discrimination experiences based on anti-transgender bias, but to also look at discrimination experiences based on other characteristics, such as race, age, and disability. Analyses using intersectional approaches could further elucidate the ways in which discrimination experiences based on multiple experiences and multiple characteristics affect suicidality. Studies that aim to assess effective strategies to decrease minority stress, including structural stigma, would help inform suicide prevention and intervention strategies that focus on alleviating such risk factors.

AR_026997

Finally, this report points to new areas of research that are promising for expanding knowledge about suicide risks, interventions, and prevention. For instance, the USTS provides a large sample and geographic coding down to the zip code level. It would be possible with this dataset to expand analyses of structural types of stigma, such as public policy environments, and its relationship to suicide. This study suggests that there is more to learn about the associations between suicidality and socializing with others, disclosure of transgender status, and civic and political participation. A better understanding is needed of how and why community connectedness, social isolation, HIV status, political and civic engagement, and disclosure of transgender status affect suicide thoughts and attempts, including through qualitative studies.

# AUTHORS

**Jody L. Herman**
A Scholar of Public Policy at the Williams Institute, Jody holds a Ph.D. in Public Policy and Public Administration from The George Washington University.

**Taylor N.T. Brown**
A Project Manager at the Williams Institute, Taylor holds a Masters of Public Policy from the University of Virginia.

**Ann P. Haas**
Professor Emerita in the Department of Health Sciences, Lehman College of the City University of New York, Ann holds a Ph.D. in Sociology from Fordham University.

**Acknowledgments**

The authors wish to thank Christy Mallory for her contribution to the analyses in this report and Kerith Conron, Jocelyn Samuels, Rachel Dowd, Winston Luhur, and Ilan Meyer for their thoughtful reviews and other contributions. The authors would also like to thank the National Center for Transgender Equality for access to the 2015 U.S. Transgender Survey dataset.

## ABOUT THE WILLIAMS INSTITUTE

The Williams Institute is dedicated to conducting rigorous, independent research on sexual orientation and gender identity law and public policy. A think tank at UCLA Law, the Williams Institute produces high-quality research with real-world relevance and disseminates it to judges, legislators, policymakers, media and the public. These studies can be accessed at the Williams Institute website.

**FOR MORE INFORMATION**
The Williams Institute, UCLA School of Law
1060 Veteran Avenue, Suite 134
Box 957092, Los Angeles, CA 90095-7092
williamsinstitute.law.ucla.edu

RESEARCH THAT MATTERS

AR_026999



**AUSTIN KNUDSEN** ★ STATE OF MONTANA

Hon. Miguel Cardona
Secretary of Education
U.S. Department of Education
400 Maryland Avenue SW
Washington, DC 20202

September 12, 2022

**Re: Docket ID ED-2021-OCR-0166, RIN 1870-AA16**

**Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance**

Dear Secretary Cardona:

We submit these formal comments to duly note our opposition to the Department of Education's proposed rulemaking on Title IX of the Education Amendments of 1972 ("Title IX"). As a general matter, the Department has not provided sufficient reasoning for why it's embarking on a new Title IX rulemaking less than two years after the 2020 regulations went into effect. In May 2020, after thoroughly considering over 124,000 public comments, the Department issued its historic Title IX Regulations, *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 85 Fed. Reg. 30026 (May 19, 2020) ("2020 Rule"), to better align the Title IX regulations with the text and purpose of 20 U.S.C. § 1681, Supreme Court precedent and other case law, and to address the practical challenges facing students, employees, and schools with respect to sexual harassment allegations. For the first time in history, regulations regarding sexual harassment under Title IX were codified into law. The Department has not presented sufficient evidence that the current Title IX system requires modification. In many instances, moreover, the Department's Proposed Rule conflicts with the text, purpose, and longstanding interpretation of Title IX. It also negatively impacts free speech, academic freedom, and campus life. We also once again call for Assistant Secretary Lhamon to recuse herself from the rulemaking process.

# I. THE PROPOSED RULE WRONGLY INCLUDES "GENDER IDENTITY" IN THE DEFINITION OF "SEX."

## A. The proposed rule exceeds the Department's statutory authority.

The Department proposes defining "sex discrimination" under Title IX to include discrimination on the basis of "gender identity." 87 Fed. Reg. 41390, 41391, 41392, 41410 (July 12. 2022). With this proposal, the rule would make it unlawful for a school to deny participation in any education program or activity consistent with a student's "gender identity." 87 Fed. Reg. at 41410. These changes constitute a stunning affront to the purpose of Title IX, which is to provide equal access to education and prohibit denial of education benefits and opportunities on the basis of sex. "Sex" means what it has meant since the beginning of time: the immutable fact of being male or female.

The Department's reimagining of Title IX to cover discrimination on the basis of gender identity plainly exceeds its rulemaking authority under Title IX. Title IX prohibits discrimination "on the basis of sex" in any education program or activity receiving Federal financial assistance. Statutory and regulatory text and structure, contemporaneous Supreme Court authorities, and the U.S. Department of Education's historic practice demonstrate that the ordinary public meaning of the term "sex" at the time of Title IX's enactment could only have been biological distinctions between male and female. A person's biological sex is relevant for Title IX considerations involving athletics, and distinctions based on sex are permissible (and may be required) because the sexes are—simply—not similarly situated for all purposes. *See* 20 U.S.C. §§ 1681(a), 1686; 34 C.F.R. §§ 106.32(b), 106.33, 106.34, 106.40, 106.41, 106.43. 106.52, 106.59, 106.61; *Meriwether v. Hartop*, 992 F.3d 492, 510 n.4 (6th Cir. 2021) (noting Title IX expressly authorizes separation based on sex in certain circumstances). This is because biological females and biological males possess profound physiological differences that are relevant in certain circumstances. *See United States v. Virginia*, 518 U.S. 515, 533 (1996) (per Ginsburg, J.) ("Physical differences between men and women, however, are enduring.").

## B. The Proposed Rule fails to define the terms "sex" and "gender identity."

The proposed rule asserts that discrimination on the basis of sex includes discrimination on the basis of "gender identity," 87 Fed. Reg. at 41,410, but fails to define either. Without definitions for these terms, the rule is vague, arbitrary, and capricious.

Additionally, in the preamble to the current regulations, the Department stated: "Title IX and its implementing regulations include provisions that presuppose

2

sex as a binary classification, and provisions in the Department's current regulations … reflect this presupposition." 85 Fed. Reg. 30,178. It continued, "[i]n promulgating regulations to implement Title IX, the Department expressly acknowledged physiological differences between the male and female sexes." *Id*.

The Proposed Rule clearly attempts to change the starting point for all of Title IX—the definition of sex. Yet the Department provides no alternate definition(s) for the public to evaluate and scrutinize. It simply waives its hand and—by regulatory fiat—alters a fundamental term, as if its novel definition was axiomatic. As discussed, the baseline, historical, scientific definition currently used by the Department (biological sex) cannot include gender identity.

Without a definition, the concept of "gender identity"—already an extremely amorphous concept—becomes a moving target. It's also internally inconsistent to fail to define a key term such as "sex" but then claim the Department understands sex to include "gender identity. As a result, the Proposed Rule fails to provide recipients adequate notice of the types of discrimination they must address to meet their obligations under Title IX.

### C. Defining sex discrimination to include gender identity will cause discrimination on the basis of sex.

#### 1. The Proposed Rule will harm students by eliminating single-sex facilities.

The Proposed Rule's inclusion of gender identity in its definition of sex discrimination will harm students and violate Title IX. Single-sex spaces, such as bathrooms and locker rooms, are important for students to preserve bodily privacy and personal dignity from exposure of one's body to members of the opposite sex. This would fall especially hard on young females because in addition to privacy and dignity harms, girls and women are vulnerable in intimate spaces to being sexually harassed and even assaulted by boys and men. For example, the NPRM fails to take into consideration incidents such as one in Loudon County, Virginia in 2021 where a transgender teenager was allowed access to the girls' restroom.[1] After the assault, the perpetrator was transferred to another school where he allegedly assaulted a second female student in early October.[2]

That also violates Title IX. The ordinary public meaning of the term "sex" at the time of Title IX's enactment (and now) was biological sex, male or female. That

---

[1] Caroline Downey, *Judge Rules Loudoun County Teen Sexually Assaulted Female Student in Girls' Bathroom*, YAHOO NEWS (Oct. 26, 2021), https://news.yahoo.com/judge-rules-loudoun-county-teen-131413442.html.

[2] *Id*.

AR_029018

too was the meaning given to the term when it was used in the Department's implementing regulations approved by Congress. *See, e.g., Bell*, 456 U.S. at 531–32; 34 CFR §§ 106.32(b)(1), 106.33, 106.34, 106.40, 106.41, 106.43. 106.52, 106.59, 106.61. 34 C.F.R. § 106.33 permits schools to provide separate bathrooms, locker rooms, and showers "on the basis of sex," as long as the school provides comparable facilities for "each sex." So under Title IX's ordinary public meaning, the law *requires* a recipient to provide a "separate toilet, locker room, and shower facilities on the basis of sex" to regulate access based on *biological* sex.

### 2. The Proposed Rule will deny equal access to athletics for women and girls and jeopardize their safety.

The Department's Proposed Rule defeats the entire original purpose of Title IX and will have a devastating impact on women's athletics. Since its enactment in 1972, Title IX has led to an important increase in athletic opportunity for girls and women in sports.[3] In the name of equity, the proposed Rule travels backward to a pre-Title IX era when schools had no obligation to provide equal, safe, and fair athletic opportunities for women and girls. It mandates open access to every education program and activity based on the amorphous concept of "gender identity." So now, any school, college, or university that separates athletic teams based solely on biological sex will be actively committing a federal civil rights violation.

In turn, the Department's definition of discrimination will actually discriminate against female athletes by denying them equal athletic opportunity and endangering their safety. Forcing female athletes to compete against male athletes is unfair and ignores science.[4] Biological differences between males and females mean that girls and women are at an enormous disadvantage when competing against biological men in many sports. This also puts women and girls at greater risk of injury when competing against biological males in contact and combat sports.

---

[3] In 2021, 3.4 million girls played high school sports and 219,000 women played NCAA sports. In fact, NCAA statistics show that since 1982 (when the NCAA began separating male and female participation rates) female participation rates in athletics have risen from 43% of the male participation rate (74,329 to 169,800) in 1982 to 78% (219,177 to 278,988) in 2021—almost doubling. NCAA Sports Sponsorship and Participation Rates Database, https://www.ncaa.org/sports/2018/10/10/ncaa-sports-sponsorship-and-participation-rates-database.aspx.

[4] Males typically have a 10-50% performance advantage, depending on the particular sport. Males have 45% more lean body mass, 33% more lower body muscle mass and 40% more upper body muscle mass, 54% higher knee extension strength, and 30% higher maximum cardiac output. By the ages of 14–15, many adolescent males have surpassed the best measurable elite female performances in nearly all sports. *See* Hilton, E.N., Lundberg, T.R., Transgender Women in the Female Category of Sport: Perspectives on Testosterone Suppression and Performance Advantage, *Sports Med.* 2021 Feb;51(2): 199-214.

AR_029019

Several of the states have enacted legislation to protect athletic opportunities for women by prohibiting biological males from competing in female athletics. *See, e.g.*, H.B. 112, 2021 Leg. (Mt. 2021); H.B. 25, 87th Sess. (Tx. 2021); H.B. 3293, 2021 Leg., H.B. 500, 65th Leg., 2d Sess. (*Id.* 2020). Those laws undoubtedly conflict with the Department's Proposed Rule. *Cf. City of L.A. v. Barr*, 929 F.3d 1163, 1174 (9th Cir. 2019) ("[I]f Congress decides to impose conditions on the allocation of funds to the states, it 'must do so unambiguously … enabl[ing] the States to exercise their choice knowingly, cognizant of the consequences of their participation.'") (quoting *South Dakota v. Dole*, 483 U.S. 203, 207 (1987)).

## D. The Proposed Rule infringes on parental rights.

Even more pernicious, the Proposed Rule would federally coerce schools to indoctrinate children into gender identity theories that are heavy on political asperity and light on scientific corroboration. This would require everyone in the school environment to accept that being a boy, girl, both, or neither is only a matter of subjective identity. Under this Proposed Rule, schools would have to treat any skepticism of "gender identity" as discrimination/harassment, which would effectively override the fundamental rights of parents to rear their own children in matters of reason, morality, and faith. Because it treats failure to affirm gender identity the same as traditional forms of discrimination (*e.g.*, excluding girls from the debate team), a school wouldn't need to obtain parental consent before pushing "gender affirmation" of whatever self-declared identity a child announces in school; the school would never have to disclose that affirmation program to the child's parents, and must—at any rate—pursue it even over parents' objections.

## II. THE PROPOSED RULE WILL INFRINGE UPON AND CHILL FREE SPEECH BY VASTLY EXPANDING THE DEFINITION OF SEXUAL HARASSMENT IN 34 C.F.R § 106.30.

The Department proposes changing the current definition of "sexual harassment" contained in 34 C.F.R § 106.30. The Department's new definition of hostile environment sexual harassment not only conflicts with Supreme Court precedent, but will have a detrimental impact on free speech, campus life, and the free exchange of ideas. When combined with the Department's proposed changes to the current due process protections, the proposed rule will chill protected speech—allowing unscrupulous students and ideologically biased bureaucrats to weaponize Title IX against those with whom they disagree on hotly contested issues of political, societal, religious, and moral importance. At private schools, where the First Amendment does not apply, the Department still lacks the power to compel schools to suppress speech that would violate the First Amendment.

AR_029020

## A. The Proposed Rule improperly deviates from the Supreme Court's Title IX threshold.

### 1. The *Gebser/Davis* standard

Not every unpleasant interaction in the course of an educational program or activity automatically amounts to a federal civil rights violation. The Supreme Court, in fact, has set a relatively high threshold for when sex-based speech rises to that level. The current regulations respect that threshold. The Proposed Rule does not.

In *Cannon v. Univ. of Chi.,* 441 U.S. 677, 680 (1979), the Supreme Court held that a judicially implied private right of action exists under Title IX. In *Franklin v. Gwinnett Cty. Pub. Sch.,* 503 U.S. 60, 62 (1992), the Court held that money damages are an available remedy in a private lawsuit alleging a school's intentional discrimination in violation of Title IX. The Court acknowledged in *Franklin* that sexual harassment and sexual abuse of a student by a teacher may mean the school itself engaged in intentional sex discrimination.

In *Gebser v. Lago Vista Indep. Sch. Dist.,* 524 U.S. 274 (1998), the Court analyzed the conditions under which a school district will be liable for money damages for an employee sexually harassing a student. The *Gebser* Court began its analysis by stating that while *Franklin* acknowledged that a school employee sexually harassing a student may constitute the school itself committing intentional discrimination on the basis of sex, it was necessary to craft standards defining "the contours of that liability." *Gebser* held that where a school has "actual knowledge" of an employee sexually harassing a student but responds with "deliberate indifference" to such knowledge, the school itself has engaged in discrimination, subjecting the school to money damages in a private lawsuit under Title IX. The *Gebser* Court was particularly concerned about the possibility of requiring a school to pay money damages for harassment of which it was not aware and in amounts that exceeded the recipient's level of Federal funding. *Gebser*, 524 U.S. 289–90.

In 1999, the Court decided *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, (1999), and held that where sexual harassment is committed by a peer rather than an employee, the same standards of actual knowledge and deliberate indifference apply. The *Davis* Court additionally crafted a definition of when sex-based conduct becomes actionable sexual harassment, defining the conduct as "so severe, pervasive, and objectively offensive" that it denies its victims equal access to education. *Id.* at 651. *Davis* and *Gebser* built upon the Supreme Court's previous Title IX decisions in *Cannon* and *Franklin* to establish a three-part framework describing when a school's inadequate response to sexual harassment constitutes the school itself committing discrimination. The three parts of this framework are: definition of actionable sexual harassment, the school's actual knowledge, and the school's deliberate indifference (sufficiency of the school's response).

6

Nothing in the *Gebser* or *Davis* framework purports to restrict the *Gebser/Davis* framework only to private lawsuits for money damages. For example, a variety of courts have used the framework to award injunctive relief. *E.g.*, *Fitzgerald v. Barnstable Sch. Dist.*, 555 U.S. 246, 255 (2009) ("In addition, this Court has recognized an implied private right of action …. In a suit brought pursuant to this private right, both injunctive relief and damages are available.") (internal citations omitted; emphasis added); *Hill v. Cundiff*, 797 F.3d 948, 972–73 (11th Cir. 2015) (reversing summary judgment against plaintiff's claims for injunctive relief because a jury could find that the alleged conduct was "severe, pervasive, and objectively offensive" under Davis); *B.H. ex rel. Hawk v. Easton Area Sch. Dist.*, 725 F.3d 293, 322–23 (3d Cir. 2013) (upholding preliminary injunction against school for banning students from wearing bracelets because the school failed to show that the "bracelets would breed an environment of pervasive and severe harassment" under *Davis*); *Haidak v. Univ. of Mass. at Amherst*, 299 F. Supp. 3d 242, 270 (D. Mass. 2018) (denying plaintiff's request for a preliminary injunction because he failed to show that the school was deliberately indifferent to an environment of severe and pervasive discriminatory conduct under *Davis*), *aff'd in part, vacated in part, remanded by Haidak v. Univ. of Mass.-Amherst*, 933 F.3d 56 (1st Cir. 2019).

Accordingly, the starting place for describing a school's legal obligations under Title IX is adoption of the *Gebser/Davis* framework because that framework describes when sexual harassment amounts to a school, itself, discriminating on the basis of sex. The definition of "hostile environment sexual harassment" should, likewise, continue to align with the standard set by the Supreme Court's cases assessing liability under Title IX for money damages in private litigation. The Supreme Court's decisions in *Gebser* and *Davis* are based on a textual interpretation of Title IX and important policy rationales that the Department has failed to consider in its NPRM. The current Title IX regulations predominantly follow the *Davis* standard—and for good reason.

There are several key reasons why the Department shouldn't depart from the *Gebser/Davis* framework. The Court, importantly, held that Title IX governs misconduct by *recipients*, not by third parties such as teachers and students. Title IX was "designed primarily to prevent recipients of federal financial assistance from using the funds in a discriminatory manner." *Gebser*, 524 U.S. at 292; *see also Cannon v. Univ. of Chicago*, 414 U.S. 677, 704 (1979) (primary congressional purpose behind the statutes was "to avoid the use of federal resources to support discriminatory practices"). So it's a recipient's own misconduct—not that of employees, students, or other third parties—that subjects the recipient to liability under Title IX.

Next, since Congress enacted Title IX under its Spending Clause authority, the obligations it imposes on recipients resemble those of a contract. *Gebser*, 524 U.S. at

7

286; *Davis*, 526 U.S. at 640. The Supreme Court reasoned in *Davis* that it follows from this that recipients must be on clear notice of what conduct is prohibited and that recipients must be held liable only for conduct over which they have control. *Id.* at 644–45. As its (now-repealed) 2001 Guidance said, the Department has an interest in providing recipients with "consistency and simplicity in understanding what is sexual harassment for which the school must take responsive action." U.S. Dep't. of Education, Office for Civil Rights, *Revised Guidance on Sexual Harassment: Harassment of Students by School Employees, Other Students, or Third Parties* (Jan. 19, 2001), at vi.

Third, the Court reasoned in *Davis* that any interpretation of Title IX must leave room for flexibility in schools' disciplinary decisions and not place courts in the position of second-guessing disciplinary decisions made by administrators and faculty. *Davis*, 526 U.S. at 648.

Finally—and most importantly—the plain text of Title IX prohibits only discrimination that has the *effect of denying access* to the recipient's educational program or activities. *Id.* at 650–52. Title IX, therefore, does not prohibit sex-based misconduct that does not rise to that level of severity. All speech related considerations in the Final Rule should follow this principle.

The current Title IX regulations define sexual harassment as:

(1) An employee of the recipient conditioning the provision of an aid, benefit, or service of the recipient on an individual's participation in unwelcome sexual conduct;
(2) Unwelcome conduct determined by a reasonable person to be so severe, pervasive, and objectively offensive that it effectively denies a person equal access to the recipient's education program or activity; or
(3) "Sexual assault" as defined in 20 U.S.C. 1092(f)(6)(A)(v), "dating violence" as defined in 34 U.S.C. 12291(a)(10), "domestic violence" as defined in 34 U.S.C. 12291(a)(8), or "stalking" as defined in 34 U.S.C. 12291(a)(30).

34 C.F.R. § 106.30. The law currently applies the *Davis* standard verbatim for category 2 (hostile environment sexual harassment).

The Proposed Rule changes the definition of hostile environment sexual harassment to:

Unwelcome sex-based conduct that is sufficiently severe or pervasive, that, based on the totality of the circumstances and evaluated subjectively and objectively, denies or limits a person's ability to

participate in or benefit from the recipient's education program or activity (i.e., creates a hostile environment).

87 Fed. Reg. at 41410. The Department's "tentative view" that this proposed hostile environment framework appropriately captures the key concepts articulated by the Supreme Court in *Davis* and protects the First Amendment rights and interests of students and employees is sorely mistaken. *Id.* at 41413.

The Department should withdraw its proposal to change the definition of hostile environment sexual harassment.

### 2. The proposed definition of sexual harassment lowers the threshold for what counts as "harassment."

Title IX prohibits *discrimination*—not offensive speech. The *Davis* standard forces recipients to punish true harassment under Title IX while leaving lesser disciplinary matters to school conduct codes (and applicable legal requirements such as the First Amendment). Incidents such as so-called "microaggressions," offensive jokes, and social media banter are not *per se,* or even putative, federal civil rights violations. But the proposed new definition radically lowers the threshold for what counts as "harassment." This will allow schools to investigate speech that is subjectively offensive to anyone—even if it is neither severe, nor pervasive, or nor objectively offensive. This will massively chill academic and campus debates over sex, gender identity, and other issues implicated by the Proposed Rule.[5]

Offensive speech is protected in many instances and contexts. Indeed, the preamble to the current regulations emphasizes that offensive speech is protected, particularly at the postsecondary level:

> The Supreme Court has also rejected the idea that "because of the acknowledged need for order, First Amendment protections should apply with less force on college campuses than in the community at large. Quite to the contrary, 'the vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools.'" *Healy v. James*, 408 U.S. 169, 180 (1972) (internal citations omitted). Further, these protections apply even to highly offensive speech on campus: "[T]he mere dissemination of ideas—no matter how offensive to good taste—on a state university campus may not be shut off in the name alone of 'conventions of decency.'" *Papish v. Bd. of Curators*, 410 U.S. 667, 670 (1973) (internal citations omitted).

---

[5] *See, e.g.*, Cantu and Jussim, *Microaggressions, Questionable Science, and Free Speech*, TEX. REV. L. & POL. (Feb. 2021), *available at* https://ssrn.com/abstract=3822628.

9

85 Fed. Reg. at 30141 n. 623.  Higher education institutions differ from the workplace. In workplaces, it may be natural to ban offensive speech to maximize efficiency or prevent a hostile or offensive environment.  Colleges, however, exist for the very purpose of exchanging ideas and pursuing the truth—even if words and ideas offend listeners.  *See, e.g., Dambrot v. Cent. Mich. Univ.*, 55 F.3d 1177 (6th Cir. 1995) (holding hostile environment harassment code was unconstitutionally vague and overbroad and was not a valid prohibition of fighting words).  The Proposed Rule's new lower threshold will no doubt stifle the airing of controversial (but protected) ideas on campus.

As for elementary and secondary education, the *Davis* Court expressly required that conduct be severe *and* pervasive for Title IX liability.  This is because, unlike workplace conduct under Title VII, elementary and secondary school students frequently behave in ways that would be unacceptable among adult workers.  *Davis*, 526 U.S. at 651–52 (citing *Meritor*, 477 U.S. at 67).

### 3.  The Department has failed to provide adequate reasoning for the definition change to sexual harassment in § 106.30.

The Proposed Rule recognizes that the new definition of hostile environment sexual harassment abandons the verbatim *Davis* standard used in the current regulations, but reasons that that caselaw allows the Department to promulgate rules requiring conduct that—in its absence—would not constitute sex discrimination. 87 Fed. Reg. at 41413. The Department then adopts its new standard "because the [new] definition of 'sex-based harassment' covers a broader range of sexual misconduct than that covered … in the current regulations," and because "Title IX's plain language prohibits any discrimination on the basis of sex." *Id.* To be sure, the Department may adopt prophylactic requirements that are broader than the requirement to refrain from discrimination on the basis of sex.  But such prophylaxis must be designed to prevent *discrimination on the basis of sex*—not some other undefined classification.  Here, instead, the Department is attempting to redefine sex discrimination itself, broadening that discernable concept beyond recognition.  Because the NPRM neither defines the concept nor explains why it must be expanded so dramatically, the Proposed Rule reveals its own arbitrariness.

Next, the Department fails to explain why it dropped the "objectively offensive" element from the current definition.  *See* 34 C.F.R. 106.30 ("(2) Unwelcome conduct determined by a reasonable person to be so severe, pervasive, and objectively offensive that it effectively denies a person equal access to the recipient's education program or activity"). The objectively offensive element is important because it judges the content by the standards of what a reasonable person would observe. Thus, in order for speech to create a hostile environment, it must offend a reasonable person. The Department has no good reason for dropping this crucial element of the *Davis* standard.

10

Finally, the Department fails to adequately explain why its new definition is tied to the Title VII framework. In fact, the only insight provided is the Department's tentative assertion that "this alignment will better facilitate recipients' ability to comply with their obligations" under both statutes. 87 Fed. Reg. at 41415. But elsewhere, the Department also admits that the analysis of whether a hostile environment exists is necessarily fact-specific and, among other things, must consider how a student—versus an employee—reasonably perceives the environment. Since the analyses differ for students and employees, it's unclear what benefits accrue to schools from similarity between the Title VII and Title IX formulations (especially where analysis of peer-on-peer discrimination is at issue). In contrast, the Preamble to the current regulations explained that aligning the Title VII and Title IX definitions of sexual harassment didn't further the purpose of Title IX or benefit students and employees participating in education programs or activities. 85 Fed. Reg. at 30151 (citing, *e.g.*, Azhar Majeed, *The Misapplication of Peer Harassment Law on College and University Campuses and the Loss of Student Speech Rights*, 35 J. COLL. & UNIV. L. 385, 449 (2009) (arguing that restrictions on workplace speech "ultimately do not take away from the workplace's essential functions—to achieve the desired results, make the client happy, and get the job done" and free expression in the workplace "is typically not necessary for that purpose" such that workplaces are often "highly regulated environments" while "[o]n the other hand, freedom of speech and unfettered discussion are so essential to a college or university that compromising them fundamentally alters the campus environment to the detriment of everyone in the community" such that free speech and academic freedom are necessary preconditions to a university's success.).

The Department must provide a sufficient explanation.

## B. The proposed change to the definition of sexual harassment in § 106.30 will violate First Amendment rights and chill the free exchange of ideas.

The NPRM pays lip service to free speech in its preamble. *See* 87 Fed. Reg. at 41415 ("Title IX protects individuals from sex discrimination and does not regulate the content of speech as such. OCR has expressed this position repeatedly in discussing Title IX in prior guidance. See 2001 Revised Sexual Harassment Guidance at 22; 2003 First Amendment Dear Colleague Letter; 2014 Q&A on Sexual Violence at 43-44. The Department emphasizes that in cases of alleged sex-based harassment, the protections of the First Amendment must be considered if, for example, issues of speech or expression.").

The Department has failed to heed the warnings of the past and account for the reasons why the current regulations were put into place. In the preamble to the 2020 regulations, the Department stated:

11

The "Sexual Harassment" subsection of the "Section 106.30 Definitions" section of this preamble discusses in greater detail how the *Davis* definition of sexual harassment as "severe, pervasive, and objectively offensive" comports with First Amendment protections, and the way in which a broader definition, such as severe, persistent, or pervasive (as used in the 1997 Guidance and 2001 Guidance), has led to infringement of rights of free speech and academic freedom of students and faculty.

85 Fed. Reg. at 30036 n.88; *see also id.* at 30130 ("Failure to recognize and respect principles of free speech and academic freedom has led to overly broad anti-harassment policies that have resulted in chilling and infringement of constitutional protections."). The current definition contained in § 106.30 captures categories of misconduct likely to impede educational access while avoiding a chill on free speech and academic freedom. The failure to recognize and respect free speech principles and academic freedom has led to overly broad anti-harassment policies in the past that have resulted in chilling and infringement of constitutional protections. Several provisions in the Proposed Rule tread the same, anti-speech path.

### 1. The Proposed Rule would modify 34 C.F.R. § 106.44 to require schools to respond to sex discrimination, regardless of whether schools know about it, and impose monitoring duties on Title IX coordinators, which would chill speech.

The current regulations require that a recipient must possess "actual knowledge" in order to be held liable under Title IX. *See* 34 CFR § 106.44(a) ("A recipient with actual knowledge of sexual harassment in an education program or activity of the recipient against a person in the United States, must respond promptly in a manner that is not deliberately indifferent."); see also 85 Fed. Reg. at 30038 ("These final regulations adopt the actual knowledge condition from the *Gebser/Davis* framework so that these final regulations clearly prohibit a recipient's own intentional discrimination, but adapt the *Gebser/Davis* condition of actual knowledge to include notice to more recipient employees than what is required under the Gebser/Davis framework, in a way that takes into account the different needs and expectations of students in elementary and secondary schools, and in postsecondary institutions, with respect to sexual harassment and sexual harassment allegations."); *id.* at 30035 ("The withdrawn 2011 Dear Colleague Letter continued to recommend that schools act upon constructive notice (rather than actual knowledge) and to hold schools accountable under a strict liability standard rather than deliberate indifference.").

The NPRM proposes modifying 34 C.F.R. 106.44(a) and (b) to say:

12

> (a) A recipient must take prompt and effective action to end any sex discrimination that has occurred in its education program or activity, prevent its recurrence, and remedy its effects.
> (b) A recipient must …. Require its Title IX Coordinator to monitor the recipient's education program or activity for barriers to reporting information about conduct that may constitute sex discrimination under Title IX.

87 Fed. Reg. at 41572.

This new duty will lead to Title IX coordinators zealously policing protected speech as a prophylactic measure to avoid Title IX violations. Unsurprisingly, this will have a detrimental effect on campus culture and campus life.

### 2. Schools are expected to counter "derogatory" speech.

Under the Proposed Rule, schools must *counter* "derogatory opinions," making a non-response to any such opinions a potential Title IX violation. The NPRM says:

> For instance, although the First Amendment may prohibit a recipient from restricting the rights of students to express opinions about one sex that may be considered derogatory, the recipient can affirm its own commitment to nondiscrimination based on sex and take steps to ensure that competing views are heard. The age of the students involved and the location or forum in which such opinions are expressed may affect the actions a recipient can take consistent with the First Amendment.

87 Fed. Reg. at 41515. Institutions of higher education cannot suppress student thought on controversial issues simply because some students find it "offensive." Under the proposed rule (particularly in light of the lower threshold for hostile environment claims), cancel culture will become the norm on K-12 and college campuses, as students, teachers, and professors are threatened or punished for engaging in protected First Amendment speech on sex or LGBT issues. *See W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943) ("If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein.). And, even without official action to enforce these new rules, the threat of Title IX investigations will intimidate students and faculty into keeping quiet on controversial issues. Schools are likely to ostracize students who express disfavored political, moral, and social opinions, including on gender identity. But, as the Supreme Court has said:

13

Probably no deeper division of our people could proceed from any provocation than from finding it necessary to choose what doctrine and whose program public educational officials shall compel youth to unite in embracing. Ultimate futility of such attempts to compel coherence is the lesson of every such effort from the Roman drive to stamp out Christianity as a disturber of its pagan unity, the Inquisition, as a means to religious and dynastic unity, the Siberian exiles as a means to Russian unity, down to the fast failing efforts of our present totalitarian enemies. Those who begin coercive elimination of dissent soon find themselves exterminating dissenters. Compulsory unification of opinion achieves only the unanimity of the graveyard.

*Id.* at 641. This principle has even more teeth at institutions of higher learning. *See Healy v. James*, 408 U.S. 169, 180 (1972) ("[T]he precedents of this Court leave no room for the view that, because of the acknowledged need for order, First Amendment protections should apply with less force on college campuses than in the community at large. Quite to the contrary, the vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools.") (cleaned up).

The Department should withdraw this proposed change to protect free speech.

### 3. The NPRM Removes the current prohibition in § 106.44(a) on using speech suppression to prevail in OCR investigations.

The current regulations provide that: "The Department may not deem a recipient to have satisfied the recipient's duty to not be deliberately indifferent under this part based on the recipient's restriction of rights protected under the U.S. Constitution, including the First Amendment, Fifth Amendment, and Fourteenth Amendment." 34 CFR § 106.44(a). This means that institutions—public and private—cannot use Title IX as an excuse for suppressing protected student or faculty speech. The Proposed Rule removed this provision. See 87 Fed. Reg. at 41432, 41572-41575. The Department has not explained why it removed this provision and must do so. The Department should withdraw this proposal to prevent schools from using their obligations under federal civil rights law to shut down protected speech.

### 4. The Proposed Rule's gender identity provisions turn protected speech into harassment.

As discussed above, the proposed rule defines sex-based harassment to include offensive conduct on the basis of "gender identity." The proposed Rule effectively requires schools to micromanage and control the speech of all students, teachers, and staff. This now includes things like (1) compelling the use of each person's preferred

14

pronouns that may contradict the person's sex; and (2) characterizing as punishable harassment any objection to allowing male participation on girls sports teams.

The Proposed Rule vaguely defines both the hostile environment standard and the obligation of the school to provide "supportive measures." Under this paradigm, an accusation by a student or teacher of "sex-based harassment" could arise from any other student or teacher refusing to "validate" or "affirm" the person's "gender identity." This could happen when a student refuses to use another student's neo-pronoun or if a lesbian turns down a date with a man, who has "identified" as a woman and tells the man the objective fact that she doesn't date men.

This clearly violates students' and teachers' First Amendment rights to express their views on scientific, moral, and religious issues. *See Janus v. AFSCME*, Council 31, 138 S. Ct. 2448, 2464 (2018) ("Forcing free and independent individuals to endorse ideas they find objectionable is always demeaning, and … a law commanding involuntary affirmation of objected-to beliefs would require even more immediate and urgent grounds than a law demanding silence) (internal quotations omitted); *Reed v. Town of Gilbert*, 576 U.S. 155, 168 (2015) ("Government discrimination among viewpoints—or the regulation of speech based on the specific motivating ideology or the opinion or perspective of the speaker—is a more blatant and egregious form of content discrimination.") (internal quotations omitted)).

Even worse, it compels students and faculty to deny objective truth.[6]

### 5. The Proposes Rule removes the provision in 34 C.F.R. § 106.71(b)(1) that makes clear that exercise of rights protected under the First Amendment does not constitute retaliation

34 C.F.R. § 106.71 prohibits recipients or individuals from retaliating against individuals who participate in the Title IX process:

No recipient or other person may intimidate, threaten, coerce, or discriminate against any individual for the purpose of interfering with any right or privilege secured by title IX or this part, or because the individual has made a report or complaint, testified, assisted, or participated or refused to participate in any manner in an investigation, proceeding, or hearing under this part. Intimidation, threats, coercion, or discrimination, including charges against an individual for code of conduct violations that do not involve sex discrimination or sexual harassment, but arise out of the same facts or circumstances as a report

---

[6] Legend has it that when Galileo was put on trial for his heretic belief that the Earth revolved the Sun and eventually forced to recant, he muttered under his breath "*Eppur si muove*" or "it still moves."

AR_029030

or complaint of sex discrimination, or a report or formal complaint of sexual harassment, for the purpose of interfering with any right or privilege secured by title IX or this part, constitutes retaliation. The recipient must keep confidential the identity of any individual who has made a report or complaint of sex discrimination, including any individual who has made a report or filed a formal complaint of sexual harassment, any complainant, any individual who has been reported to be the perpetrator of sex discrimination, any respondent, and any witness, except as may be permitted by the FERPA statute, 20 U.S.C. 1232g, or FERPA regulations, 34 CFR part 99, or as required by law, or to carry out the purposes of 34 CFR part 106, including the conduct of any investigation, hearing, or judicial proceeding arising thereunder. Complaints alleging retaliation may be filed according to the grievance procedures for sex discrimination required to be adopted under § 106.8(c).

34 C.F.R. § 106.71(a). The regulations also, however, make clear that "the exercise of rights protected under the First Amendment does not constitute retaliation prohibited under paragraph (a) of this section." 34 C.F.R. § 106.71(b)(1).

The Proposed Rule eliminates § 106.71(b)(1). The NPRM reasons that "106.71(b)(1) is redundant and its removal would be appropriate" because "[a]s explained in the discussion of the definition of prohibited "sex-based harassment" (proposed § 106.2), the Department has long made clear that it enforces Title IX consistent with the requirements of the First Amendment." This discussion and rationale are wholly inadequate. Removal of § 106.71(b)(1) will chill free speech and infringe on First Amendment rights.

The NPRM fails to take into account the real-life examples of Title IX's retaliation provisions being abused to chill free speech. For example, the saga of Northwestern Professor Laura Kipnis is instructive:

In 2015, she published a polemic in *The Chronicle of Higher Education* titled "Sexual Paranoia Strikes Academe." Kipnis argued that students' sense of vulnerability on campus was expanding to an unwarranted degree, partly owing to new enforcement policies around Title IX, which prohibits sex discrimination at educational institutions that receive federal funds. The new Title IX policies on sexual misconduct which were then sweeping campuses perpetuated "myths and fantasies about power," Kipnis wrote, which enlarged the invasive power of institutions while undermining the goal of educating students in critical thinking and resilience. "If you wanted to produce a pacified, cowering citizenry, this would be the method," she concluded. Kipnis wrote of a philosophy

16

professor, Peter Ludlow, whom Northwestern disciplined for sexual harassment; Kipnis questioned the logic of the accusations against him. One of Ludlow's accusers, a graduate student (unnamed in Kipnis's essay), then joined a fellow graduate student in the philosophy department in filing Title IX complaints against Kipnis, under Northwestern's sexual-misconduct policy. Through her essay and a subsequent tweet about the essay, Kipnis was alleged to have violated the part of the sexual-misconduct policy prohibiting "retaliation"; additionally, she was alleged to have created a "hostile environment" and a "chilling effect" on complaints. Northwestern launched a formal Title IX investigation of Kipnis.

Most people under Title IX investigation don't speak publicly about it, even to defend themselves. But Kipnis responded by publishing a follow-up essay in the Chronicle, called "My Title IX Inquisition," decrying the investigation as a misuse of Title IX that allowed "intellectual disagreement to be redefined as retaliation." On the same day, Northwestern cleared Kipnis of wrongdoing, finding that "viewpoint expression" is not retaliation, and that a "reasonable person" in the complainant's position "would not suffer a hostile environment on account of" the essay and the tweet.[7]

The Department demonstrates absolutely no awareness of harmful instances such as this—and its effects on free speech and weaponization of the Title IX process. The Department fails to provide a reasoned explanation for eliminating § 106.71(b)(1).

### 6. The Proposed Rule plainly ignores the mountain of evidence demonstrating that it will chill free speech on campus.

The Proposed Rule is arbitrary and capacious because it wrongly believes its new definition of sexual harassment will not chill free speech. The Department claims that "Title IX protects individuals from sex discrimination and does not regulate the content of speech as such. OCR has expressed this position repeatedly in discussing Title IX in prior guidance. *See* 2001 Revised Sexual Harassment Guidance at 22; 2003 First Amendment Dear Colleague Letter; 2014 Q&A on Sexual Violence at 43-44." 87 Fed. Reg. at 41415. But this proclamation is contradicted by a mountain of public evidence and the Department's past statements.

---

[7] Jeanie Suk Gersen, Laura Kipnis's Endless Trial by Title IX, THE NEW YORKER (Sept. 20, 2017); see also Laura Kipnis, *My Title IX Inquisition*, THE CHRONICLE OF HIGHER EDUCATION, May 29, 2015, http://laurakipnis.com/wp-content/uploads/2010/08/My-Title-IX-Inquisition-The-Chronicle-Review-.pdf.

AR_029032

Free speech was routinely suppressed or punished from 2011 to 2017 under Title IX. Through sub-regulatory guidance and administrative enforcement OCR created an expansive definition of sexual harassment that included "verbal conduct" (i.e., speech) such as "making sexual comments, jokes or gestures," "spreading sexual rumors," and "creating e-mails or Web sites of a sexual nature."[8] The environment became so precarious that Harvard Law School professor Jeannie Suk Gersen wrote in 2014 that law school faculty were increasingly reluctant to teach rape law for fear of offending or upsetting their students.[9] When the University of Montana sensibly incorporated the *Davis* standard into its sexual harassment policy, OCR objected.[10] OCR insisted in 2013 that the university establish policies to "encourage students to report sexual harassment early, before such conduct becomes severe or pervasive, so that it can take steps to prevent the harassment from creating a hostile environment."[11] The broad definition of sexual harassment was a so-called "national blueprint" for schools[12] and led OCR to regulate conduct that was not covered under Title IX.[13] Two scholars wrote that OCR's guidance required schools to regulate student conduct "that is not creating a hostile environment and therefore is not sexual harassment and therefore not sex discrimination."[14]

The Department itself recognized this in 2020. *See, e.g.*, 85 Fed Reg. at 20036 ("The 'Sexual Harassment' subsection of the 'Section 106.30 Definitions' section of this preamble discusses in greater detail how the *Davis* definition of sexual harassment as 'severe, pervasive, and objectively offensive' comports with First Amendment protections, and the way in which a broader definition, such as severe, persistent, or pervasive (as used in the 1997 Guidance and 2001 Guidance), has led

---

[8] *Id.*

[9] THE NEW YORKER, Dec. 15, 2014, http://www.newyorker.com/news/news-desk/trouble-teaching-rape-law.; *see also* Jacob Gersen and Jeannie Suk, The Sex Bureaucracy, The Chronicle of Higher Educ. (Jan. 6, 2017) (https:// www.chronicle.com/article/The-College-Sex-Bureaucracy/238805) (OCR's "broad definition" of sexual harassment has "grown to include most voluntary and willing sexual contact").

[10] U.S. Dep't. of Education, Office for Civil Rights, Letter of Findings to University of Montana, May 8, 2013, https://www2.ed.gov/documents/press-releases/montana-missoula-letter.pdf.

[11] BROOKINGS INSTITUTION, Jan. 24, 2019, https://www.brookings.edu/blog/brown-center-chalkboard/2019/01/24/the-department-of-educations-proposed-sexual-harassment-rules-looking-beyond-the-rhetoric/.

[12] FOUNDATION FOR INDIVIDUAL RIGHTS IN EDUCATION, Departments of Education and Justice: National "Blueprint" for Unconstitutional Speech Codes, https://www.thefire.org/cases/departments-of-education-and-justice-national-requirement-for-unconstitutional-speech-codes/.

[13] *See, e.g.*, Jacob Gersen and Jeannie Suk, *The Sex Bureaucracy*, 104 CALIF. L. REV. 881, 902–03 (2016) (Asserting that the Obama OCR's guidance required schools to regulate student conduct "that [was] not creating a hostile environment and therefore is not sexual harassment and therefore not sex discrimination" and concluding that OCR's guidance overstep[ped] OCR's jurisdictional authority).

[14] *E.g.*, Jacob Gersen and Jeannie Suk, The Sex Bureaucracy, 104 CALIF. L. REV. 881, 902–03 (2016).

AR_029033

to infringement of rights of free speech and academic freedom of students and faculty.").

The Department's failure to recognize these incontrovertible facts renders its explanation insufficient, arbitrary, and capricious.

### III. THE PROPOSED RULE REMOVES KEY DUE PROCESS PROTECTIONS FROM THE CURRENT REGULATIONS.

Due process is a fundamental constitutional principle in American jurisprudence. Due process is a legal principle which has been shaped and developed through the process of applying and interpreting a written constitution. "Fair process" or "procedural justice" increases outcome legitimacy. Indeed, "[r]esearch demonstrates that people's views about their outcomes are shaped not solely by how fair or favorable an outcome appears to be but also by the fairness of the process through which the decision was reached. A fair process provided by a third party leads to higher perceptions of legitimacy; in turn, legitimacy leads to increased compliance with the law."[15]

As a result, due process protections are a critical part of a Title IX. Fair grievance procedures benefit both complainants and respondents, as well as recipients. Both parties benefit from equal opportunities to participate by setting forth their own views of the allegations. Everyone benefits from processes geared toward reaching factually accurate outcomes. The grievance process prescribed in the current regulations provides a fair process rooted in due process protections that improves the accuracy and legitimacy of the outcome for the benefit of both parties.

---

[15] Rebecca Holland-Blumoff, *Fairness Beyond the Adversary System: Procedural Justice Norms for Legal Negotiation*, 85 FORDHAM L. REV. 2081, 2084 (2017) (internal citations omitted).

Any Title IX grievance procedure mandated by the Department must comport with due process guarantees[16] as well as fundamental fairness.[17]

## A. The Proposed Rule removes or modifies important due process safeguards in the Title IX grievance process.

### 1. The Proposed Rule violates due process because it removes the provisions in 34 CFR § 106.45 requiring evidence to be provided to both parties.

The Department should withdraw its proposal to modify the provisions of 34 CFR § 106.45 relating to the opportunities of parties to inspect and review evidence during the grievance process. The current regulations require the recipient to:

> Provide both parties an equal opportunity to inspect and review any evidence obtained as part of the investigation that is directly related to the allegations raised in a formal complaint, including the evidence upon which the recipient does not intend to rely in reaching a determination regarding responsibility and inculpatory or exculpatory evidence whether obtained from a party or other source, so that each party can meaningfully respond to the evidence prior to conclusion of the investigation.

34 CFR § 106.45.

---

[16] *See Goss v. Lopez*, 419 U.S. 565, 583–84 (1975) ("On the other hand, requiring effective notice and informal hearing permitting the student to give his [or her] version of the events will provide a meaningful hedge against erroneous action. At least the disciplinarian will be alerted to the existence of disputes about facts and arguments about cause and effect. He may then determine himself to summon the accuser, permit cross-examination, and allow the student to present his own witnesses. In more difficult cases, he may permit counsel. In any event, his discretion will be more informed and we think the risk of error substantially reduced."); Nicola A. Boothe-Perry, *Enforcement of Law Schools' Non-Academic Honor Codes: A Necessary Step Towards Professionalism?*, 89 NEB. L. REV. 634, 662–63 (2012) ("Thus, while well-settled that there is no specific procedure required for due process in school disciplinary proceedings, the cases establish the bare minimum requirements of: (1) adequate notice of the charges; (2) reasonable opportunity to prepare for and meet them; (3) an orderly hearing adapted to the nature of the case; and (4) a fair and impartial decision .... Where disciplinary measures are imposed pursuant to non-academic reasons (e.g., fraudulent conduct), as opposed to purely academic reasons, the courts are inclined to reverse decisions made by the institutions without these minimal procedural safeguards.") (internal citations omitted).

[17] *E.g.*, Kathryn M. Reardon, *Acquaintance Rape at Private Colleges and Universities: Providing for Victims' Educational and Civil Rights*, 38 SUFFOLK UNIV. L. REV. 395, 406–07 (2005) ("Courts around the nation have taken a relatively consistent stance on what type of process private colleges and universities owe to their students .... Courts expect that schools will adhere to basic concepts of fairness in dealing with students in disciplinary matters. Schools must employ the procedures set out in their own policies, and those policies must not be offensive to fundamental notions of fairness.").

AR_029035

The Department proposes allowing parties to be given, instead, an "oral description" of the evidence: "(4) Provide each party with a description of the evidence that is relevant to the allegations of sex discrimination and not otherwise impermissible, as well as a reasonable opportunity to respond." 87 Fed. Reg. at 41481. To maintain a transparent process, however, the parties need a complete understanding of the evidence obtained by the recipient and how a determination regarding responsibility is made. A written description places parties—particularly respondents—at a severe disadvantage, forcing them to trust that a school has provided a complete and accurate description of every piece of relevant evidence. We know from experience that the single-investigator model has a tremendous potential for abuse. *See* Part III(B), *infra*.

Additionally, this puts educational institutions in the position to pre-judge important issues such as relevance. It would, thus, permit these institutions to make a determination regarding relevance and then withhold evidence on that basis.

The Department should withdraw the proposal.

### 2. *The Department should require schools to maintain a consistent evidentiary standard in 34 CFR 106.45.*

The current regulations provide:

> Schools must use either "the preponderance of the evidence standard or the clear and convincing evidence standard, [and] apply the same standard of evidence for formal complaints against students as for formal complaints against employees, including faculty, and apply the same standard of evidence to all formal complaints of sexual harassment."

34 CFR § 106.45. The Proposed Rule tweaks the current evidentiary rule in 34 C.F.R. § 106.45: "Schools must "[u]se the preponderance of the evidence standard of proof to determine whether sex discrimination occurred, unless the recipient uses the clear and convincing evidence standard of proof in all other comparable proceedings, including proceedings relating to other discrimination complaints, in which case the recipient may elect to use that standard of proof in determining whether sex discrimination occurred." 87 Fed. Reg. at 41576.

First, this creates an internal contradiction. One reason the NPRM gives for this provision is that "a singular imposition of a higher standard for sex discrimination complaints would impermissibly discriminate on the basis of sex." 87 Fed. Reg. at 41486. But the Proposed Rule permits using a lower standard for sex discrimination than for other complaints, including racial discrimination complaints.

So by the Rule's own logic, schools may discriminate on the basis of race by imposing a lower standard for racial than for sex discrimination.  That makes no sense.

And, the Department fails to offer a justification for mandating that sex discrimination complaints be addressed under no higher standard than other complaints but—at the same time—refusing to mandate that they also be addressed under no lower a standard.

The Department should maintain the current evidentiary standard requirements set forth in 34 CFR 106.45.  If it, however, does wish to change the current standard, it should not deviate further from the Proposed Rule.  It's important that (1) recipients not use an evidentiary standard below the preponderance of the evidence; (2) a recipient's grievance process state up front which of the two permissible standards of evidence the recipient has selected and (3) apply that selected standard to all formal complaints of sexual harassment, including those against employees.

### 3. The Proposed Rule modifies 34 CFR § 106.45 to bring back the biased and unfair single-investigator model

The current regulations flatly prohibit the single investigator model.  *See* 34 CFR § 106.45 ("The role of Title IX Coordinator and the role of the Title IX investigator must be distinct from the role of Title IX adjudicator.").  This is because fundamental fairness to both parties requires that the intake of a report and formal complaint, the investigation (including party and witness interviews and collection of documentary and other evidence), drafting of an investigative report, and ultimate decision about responsibility should not be left in the hands of a single person (or team of persons each of whom performed all those roles).  Rather, after the recipient has conducted its impartial investigation, a separate decision-maker must reach the determination regarding responsibility; that determination can be made by one or more decision-makers (such as a panel), but no decision-maker can be the same person who served as the Title IX Coordinator or investigator.

The Proposed Rule eliminates this prohibition and expressly permits the decision-maker to be the same person as the Title IX coordinator.  Integrating the investigative and decision-making functions will (1) substantially impair the overall fairness of the grievance process; (2) decrease the reliability of fact-finding and the accuracy of outcomes; (3) lower party and public confidence in outcomes; and (4) decrease the accuracy of the determination regarding responsibility in Title IX cases because individuals who perform both roles may have confirmation bias and other prejudices that taint the proceedings, whereas separating those functions helps prevent bias and prejudice from impacting the outcome.

22

Prior to the current regulations, Both OCR and the White House pressured schools to employ the single investigator model.[18] Schools housed these investigators/adjudicators in their Title IX offices, which had strong incentives to ensure the school stayed compliant with the DCLs to avoid losing federal funding. Many Title IX offices assumed every role in the process, acting as prosecutor, judge, jury, and appeals board

The biases of individuals in the single-investigator role had disastrous consequences. *See, e.g.*, Laura Kipnis, UNWANTED ADVANCES 33 (2017) ("The reality is that a set of incomprehensible directives, issued by a branch of the federal government, are being wielded in wildly idiosyncratic ways, according to the whims and biases of individual Title IX officers operating with no public scrutiny or accountability. Some of them are also all too willing to tread on academic and creative freedom as they see fit"). Even proponents of a strong role for Title IX coordinators acknowledged that corruption existed in the process.[19]

Indeed, courts have called the fairness of this model into question over the last few years. *See, e.g., Doe v. Claremont McKenna Coll.*, 25 Cal. App. 5th 1055, 1072–73 (Cal. App. 2018) (all decision makers "must make credibility determinations, and not simply approve the credibility determinations of the one Committee member who was also the investigator."); *Doe v. Miami Univ.*, 882 F.3d 579, 601, 605 (6th Cir. 2018) (court found "legitimate concerns" raised by the investigator's "alleged dominance on the three-person [decision-making] panel" because "she was the only one of the three with conflicting roles."); *Doe v. Brandeis Univ.*, 177 F. Supp. 3d 561, 573 (D. Mass. 2016) (referring to the "obvious" "dangers of combining in a single individual the power to investigate, prosecute, and convict, with little effective power of review"); *Doe v. Allee*, 30 Cal. App. 5th 1036, 1068 (Cal. App. 2019) ("As we have explained, in USC's system, no in-person hearing is ever held, nor is one required. Instead, the Title IX investigator interviews witnesses, gathers other evidence, and prepares a

---

[18] *See Doe v. Univ. of Scis.*, 961 F.3d 203, 213 (3d Cir. 2020) (describing the pressure universities faced as a result of the Dear Colleague Letter). In the "single investigator" model, there is no hearing. One person conducts interviews with each party and witness, and then makes the determination whether the accused is responsible. No one knows what the investigator hears or sees in the interviews except the people in the room at the time. This makes the investigator all-powerful. Neither accuser nor accused can guess what additional evidence to offer, or what different interpretations of the evidence to propose because they are completely in the dark about what the investigator is learning and are helpless to fend off the investigator's structural and personal biases as they get cooked into the evidence-gathering.

[19] *See, e.g.*, Association of Title IX Administrators (ATIXA), *ATIXA Position Statement: Why Colleges Are in the Business of Addressing Sexual Violence* 3–4 (Feb. 17, 2017) (acknowledging that due process has been denied in some recipients' Title IX proceedings but insisting that "Title IX isn't the reason why due process is being compromised .... Due process is at risk because of the small pockets of administrative corruption ... and because of the inadequate level of training currently afforded to administrators. *College administrators need to know more about sufficient due process protections and how to provide these protections in practice*.") (emphasis added).

AR_029038

written report in which the investigator acts as prosecutor and tribunal, making factual findings, deciding credibility, and imposing discipline. The notion that a single individual, acting in these overlapping and conflicting capacities, is capable of effectively implementing an accused student's right of cross-examination by posing prepared questions to witnesses in the course of the investigation ignores the fundamental nature of cross-examination: adversarial questioning at an in-person hearing at which a neutral fact finder can observe and assess the witness' credibility.").

The Proposed Rule pays lip service to the concerns of the 2020 rule in ensuring that a person's experience investigating a claim of harassment does not bias him or her in a subsequent role of determining whether harassment occurred. It somehow concludes, however, that unifying the investigatory and adjudicatory roles does not raise a substantial risk of bias because "the recipient is not in the role of prosecutor seeking to prove a violation of its policy," but rather "the recipient's role is to ensure that its education program is free of unlawful sex discrimination, a role that does not create an inherent bias or conflict of interest in favor of one party or another." 87 Fed. Reg. at 41467.

Perhaps most shockingly, the Department wrongly claims that a separate adjudicator would not help the reliability of the grievance process. 87 Fed. Reg. at 41466–41467. It cites no evidence in support of this claim. *Id.* This rationale is inadequate and fails to account for the real-world evidence that led to the 2020 Regulations.

A separate, neutral adjudicator is also necessary because of the Title IX incentive structure. The incentive structure pushes recipients toward findings of fault. That is, if there is discrimination that a recipient fails to redress, they could lose federal funding, so they are incentivized to stamp out as many Title IX violations as possible. On the other hand, however, if there is non-discriminatory conduct that schools redress, it often costs the recipient nothing. It's common sense, moreover, that an investigator may come to hold views that favor one party or another during an investigation. A neutral decisionmaker is one of the best ways to ensure a fair process.

The Department's proposed change would return to the flawed and highly unfair system that led to the enactment of the 2020 Regulations.

### *4. The Proposed Rule violates Due Process by removing written notice provisions in 34 C.F.R. 106.45(b)(2)(i)(B).*

The current regulations require the recipient to provide written notice of a formal complaint to a respondent. In that written notice, a respondent must be

24

provided with (1) presumption of innocence statement; (2) right to advisor of choice; (3) penalty for false statements:

> The written notice must include a statement that the respondent is presumed not responsible for the alleged conduct and that a determination regarding responsibility is made at the conclusion of the grievance process. The written notice must inform the parties that they may have an advisor of their choice, who may be, but is not required to be, an attorney, under paragraph (b)(5)(iv) of this section, and may inspect and review evidence under paragraph (b)(5)(vi) of this section. The written notice must inform the parties of any provision in the recipient's code of conduct that prohibits knowingly making false statements or knowingly submitting false information during the grievance process.

34 CFR 106.45(b)(2)(i)(B). The Proposed Rule removes those three requirements from the written notice:

> (c) Notice of allegations. Upon initiation of the recipient's grievance procedures, a recipient must provide notice of the allegations to the parties whose identities are known. (1) The notice must include: (i) The recipient's grievance procedures under this section, and if applicable § 106.46, and any informal resolution process under § 106.44(k); (ii) Sufficient information available at the time to allow the parties to respond to the allegations. Sufficient information includes the identities of the parties involved in the incident, the conduct alleged to constitute sex discrimination under Title IX, and the date and location of the alleged incident, to the extent that information is available to the recipient; and (iii) A statement that retaliation is prohibited.

87 Fed. Reg. at 41575. The Department has failed to provide any justification for why it removed the requirements that recipients inform accused students about the presumption of innocence, the right to counsel, or the penalties for false statements.

### 5. *The Proposed Rule removes the due process protection of mandating live hearings for postsecondary settings.*

The Title IX regulations currently require a live hearing at the postsecondary level. 34 CFR § 106.45(b)(6)(i) ("For postsecondary institutions, the recipient's grievance process must provide for a live hearing."). The Proposed Rule removes that requirement. 87 Fed. Reg. at 41462, 41497, 41498. "A postsecondary institution's sex-based harassment grievance procedures may, but need not, provide for a live hearing."

25

Relatedly, under the current regulations the parties must be allowed at live hearings to ask questions directly through their advisors:

> At the live hearing, the decision-maker(s) must permit each party's advisor to ask the other party and any witnesses all relevant questions and follow-up questions, including those challenging credibility. Such cross-examination at the live hearing must be conducted directly, orally, and in real time by the party's advisor of choice and never by a party personally, notwithstanding the discretion of the recipient under paragraph (b)(5)(iv) of this section to otherwise restrict the extent to which advisors may participate in the proceedings.

34 C.F.R. § 106.45(b)(6)(i).

At the postsecondary level, live hearings are key to seeking truth and determining responsibility. Because most parties and witnesses are adults there, grievance procedures' live cross-examination at a hearing is both appropriate and worthwhile. The current regulations require institutions to provide a live hearing, and to allow the parties' advisors to cross-examine the other party and witnesses.

The current regulations balance the importance of cross-examination with any potential harm from personal confrontation between the complainant and the respondent by requiring questions to be asked by an advisor aligned with the party. Further, they allow either party to request that the recipient facilitate the parties being located in separate rooms during cross-examination while observing the questioning live via technological means. The current regulations thereby provide the benefits of cross-examination while avoiding any unnecessary trauma that could arise from personal confrontation between the complainant and the respondent.[20]

The Proposed Rule obviously doesn't require a live hearing. But it also now appears to only require schools to let parties submit written questions to each other on the limited topic of "credibility":

> This assessment of credibility includes either (i) Allowing the decisionmaker to ask the parties and witnesses, during individual

---

[20] *Cf. Baum*, 903 F.3d at 583 ("Universities have a legitimate interest in avoiding procedures that may subject an alleged victim to further harm or harassment. And in sexual misconduct cases, allowing the accused to cross-examine the accuser may do just that. But in circumstances like these, the answer is not to deny cross-examination altogether. Instead, the university could allow the accused student's agent to conduct cross-examination on his behalf. After all, an individual aligned with the accused student can accomplish the benefits of cross-examination— its adversarial nature and the opportunity for follow-up—without subjecting the accuser to the emotional trauma of directly confronting her alleged attacker.").

meetings with the parties or at a live hearing, relevant and not otherwise impermissible questions under §§ 106.2 and 106.45(b)(7) and follow-up questions, including questions challenging credibility, before determining whether sex-based harassment occurred and allowing each party to propose to the decisionmaker or investigator relevant and not otherwise impermissible questions under §§ 106.2 and 106.45(b)(7) and follow-up questions, including questions challenging credibility, that the party wants asked of any party or witness and have those questions asked during individual meetings with the parties …

87 Fed. Reg. at 41577–41578. The wording of this provision is vague, but it appears that recipients can exclude questions between parties as long as credibility isn't in dispute. **We request further clarification as to when a recipient may exclude questions between the parties.** If the Department does not provide clarification, the Proposed Rule is arbitrary and capricious.

Finally, at the postsecondary level, the Proposed Rule imagines that college students will mostly "self-advocate" in harassment proceedings. Although students would be entitled to an advisor, postsecondary institutions would not have to permit parents to be involved in the process. The Department has failed to give any meaningful reason for excluding parents from these proceedings. Students in higher education would undoubtedly benefit from a parent's counsel and the Proposed Rule fails to provide a single reason for excluding parents from the process.

### 6. The Proposed Rule's "Supportive Measures" provision is internally inconsistent.

The proposed rule allows "supportive measures" that temporarily burden a respondent only during the pendency of the proceedings. 87 Fed. Reg. at 41421. This provision is internally contradictory because, elsewhere in the NPRM, it emphasizes the need for equitable treatment in the Title IX process between complainants and respondents. *Id.* at 41453. Here, however, both are not subject to the same rules and the Department has not acknowledged or explained that departure. This is also irrational because there's no basis for distinguishing between complainants and respondents on the basis of their conduct. Since respondents are afforded the presumption of innocence by the NPRM, *id.* at 41488, 41508, this makes no sense.

This provision is also flawed because there are no limits to how burdensome the supportive measures may be. In theory, a respondent could be suspended from all classes and dismissed from campus on the basis of an unproven allegation. A school wouldn't even need to find that the complainant is likely to prevail on his or her claim of discrimination to impose that *de facto* sanction.

27

**B. The totality of the Proposed Rule returns to the problematic paradigm from the 2011–17 era and fails to adequately consider the mountain of evidence that strong due process protections are necessary for Title IX grievances procedures.**

The current regulations in 34 CFR § 106.45 (and elsewhere) set forth clear legal obligations that require schools to promptly respond to allegations of sexual harassment, follow a fair grievance process to resolve those allegations, and provide remedies to victims.  It guarantees victims and accused students strong, clear procedural rights in a predictable, transparent process designed to reach reliable outcomes.[21]  When taken as a whole, the current regulations were enacted following regulatory and constitutional mess from 2011 to 2017.  The proposed rule would re-institute many of those flawed policies.

OCR's 2011 *Dear Colleague Letter: Sexual Violence* ("2011 DCL") wreaked havoc on campuses across the country (The 2011 DCL was expanded upon by a 2014 *Questions and Answers on Title IX and Sexual Violence*).  It was a Kafkaesque disciplinary disaster that resulted in hundreds of successful lawsuits against schools and widespread criticism from across the ideological spectrum.  The 2011 DCL compelled schools to adopt the lowest standard of proof for proving sexual harassment and sexual assault claims—preponderance of the evidence—and pressured schools to find accused students responsible for sexual misconduct even where there was significant doubt about culpability.[22]

A laundry list of due process violations—reminiscent of Star Chamber—stacked the deck against accused students: schools failed to give students the complaint against them, or notice of the factual basis of charges, the evidence gathered, or the identities of witnesses; schools fail to provide hearings or to allow

---

[21] *See, e.g.*, U.S. Dep't of Educ. YouTube Channel, *OCR Webinar on Due Process Protections under the New Title IX Regulations* (July 21, 2020), https://youtu.be/48UwobtiKDI; U.S. Dep't of Educ. YouTube Channel, *OCR Title IX Webinar: Bias and Conflicts of Interest* (Jan 15, 2021), https://www.youtube.com/watch?v=vHppcOdrzCg.

[22] OCR found numerous institutions in violation of Title IX for failing to adopt the preponderance of the evidence standard in its investigations of sexual harassment, even though the notion that the preponderance of the evidence standard is the only standard that might be applied under Title IX was set forth in the 2011 Dear Colleague Letter and not in the Title IX statute, current regulations, or other guidance. *E.g.*, U.S. Dep't. of Education, Office for Civil Rights, Letter of Findings to Harvard Law School 7, Dec. 10, 2014, https://www2.ed.gov/documents/press-releases/harvard-law-letter.pdf ("[I]n order for a recipient's grievance procedures to be consistent with the Title IX evidentiary standard, the recipient must use a preponderance of the evidence standard for investigating allegations of sexual harassment, including sexual assault/violence."); *see also* Blair A. Baker, *When Campus Sexual Misconduct Policies Violate Due Process Rights*, 26 CORNELL J. L. & PUB. POL'Y 533, 542 (2016) (The 2011 DCL "forced universities to change their former policies drastically, with regards to their specific procedures as well as the standard of proof, out of fear that the Department of Education will pursue their school for a violation of Title IX.").

the accused student's lawyer to attend or speak at hearings; schools barred the accused from putting questions to the accuser or witnesses, even through intermediaries; schools denied parties the right to see the investigative report or get copies for their lawyers for preparing an appeal; schools allowed appeals only on very narrow grounds such as new evidence or procedural error, providing no meaningful check on the initial decisionmaker. A study by the Foundation for Individual Rights in Education found that 73% of the top universities in America did not guarantee the presumption of innocence in campus proceedings.[23]

By 2014, OCR had stopped using the terms complainant/alleged victim and alleged perpetrator and replaced them with victim/survivor and perpetrator. OCR then began keeping a public list of the schools at which it was investigating possible Title IX violations, putting schools under a cloud of suspicion.

This resulted in a Title IX system that quite literally resembled Kafka's *The Trial*.[24] Here are just a few examples of the infamous system created during the 2011–17 paradigm:

- An athlete of color at Colorado State University-Pueblo was accused of sexually assaulting a female trainer, but not by her. Despite the trainer saying that she had not been raped, University officials pointed out that according to Title IX, they got to decide the accused student's fate and the student was found guilty and expelled.[25]

- At USC, a student-athlete was kicked out of school for abusing his girlfriend—despite the fact his girlfriend never reported any abuse and vehemently denied any abuse ever took place—after a neighbor saw the couple playfully roughhousing in the front yard.[26]

- A Howard University law professor was punished, following a 16-month investigation, because an exam question he wrote involving a bikini wax was deemed to have created an unsafe environment after a student "allegedly

---

[23] FOUNDATION FOR INDIVIDUAL RIGHTS IN EDUCATION, Dec. 18, 2018, https://www.thefire.org/report-as-changes-to-title-ix-enforcement-loom-americas-top-universities-overwhelmingly-fail-to-guarantee-fair-hearings-for-students/.

[24] *See, e.g.,* COMMENTARY MAGAZINE, June 2017, https://www.commentarymagazine.com/articles/kc-johnson/kafka-u/.

[25] REASON, Apr. 19, 2016, https://reason.com/2016/04/19/female-student-said-im-fine-and-i-wasnt/.

[26] REASON, Aug. 2, 2017, https://reason.com/2017/08/02/student-athletes-torn-apart-by-title-ix/.

AR_029044

believed the question's premise somehow required her to reveal to the class whether she'd had a Brazilian wax."[27]

- A judge rebuked Brandeis University for denying fundamental due process rights to a student who was found guilty of sexual misconduct for a variety of non-violent offenses: most notably, because he had awakened his then-boyfriend with nonconsensual kisses.[28]

- Northwestern University Professor Laura Kipnis (herself a liberal feminist) faced a Title IX complaint and investigation simply for writing an essay about sex on campus and criticizing sexual harassment policies (the complaint alleged she created a "chilling environment" for reporting sexual harassment or assaults).[29]

- Carleton College suspended a student for drunken sex and then expelled the student as soon as he appealed the suspension, with the Dean writing to him that "the fact you continue to assert that it was okay to engage in sexual activity with a person in [Jane Doe's] condition is deeply troubling."[30]

- A University of Tennessee student was investigated for sexual harassment because he wrote his instructor's name wrong.[31]

- Resident Advisors at University of Massachusetts-Amherst told students that making jokes about Harambe, the dead gorilla and internet meme, could constitute a violation of Title IX.[32]

---

[27] FOUNDATION FOR INDIVIDUAL RIGHTS IN EDUCATION, July 6, 2017, https://www.thefire.org/a-sticky-situation-at-howard-university-brazilian-wax-test-question-nets-professor-a-504-day-title-ix-investigation-sanctions/.

[28] REASON, Apr. 1, 2016, https://reason.com/2016/04/01/judge-sides-with-gay-brandeis-student-gu/; https://www.washingtonexaminer.com/federal-judge-rebukes-lack-of-due-process-in-campus-sex-assault-procedures.

[29] THE CHRONICLE OF HIGHER EDUCATION, May 29, 2015, http://laurakipnis.com/wp-content/uploads/2010/08/My-Title-IX-Inquisition-The-Chronicle-Review-.pdf.

[30] REASON, Aug. 1, 2019, https://reason.com/2019/08/01/carleton-college-title-ix-expelled-football-student-lawsuit/.

[31] REASON, Oct. 12, 2016, https://reason.com/2016/10/12/ut-student-now-being-investigated-for-se/.

[32] REASON, Sept. 6, 2016, https://reason.com/2016/09/06/umass-amherst-harambe-jokes-are-racist-m/.

One of the more tragic ironies is that the 2011 DCL resulted in a disproportionate number of expulsions and scholarship losses for Black male students.[33]

The criticisms of the 2011–17 system spanned the ideological spectrum. Here are just a few examples:

- Four feminist law professors at Harvard wrote that the Biden/Lhamon Title IX system "put pressure on [schools] to stack the system so as to favor alleged victims over those they accuse and that "procedures for enforcing [definitions of sexual harassment] are frequently so unfair as to be truly shocking."[34]

- More than two dozen other Harvard Law School professors wrote a letter in 2014 objecting to the school's Title IX process as unfair.[35]

- A group of 16 law professors from the University of Pennsylvania argued "we believe that OCR's approach exerts improper pressure upon universities to adopt procedures that do not afford fundamental fairness."[36]

- Janet Halley, a self-described feminist and professor at Harvard Law School told Congress that "the rate of complaints and sanctions against male (including transitioning to male) students of color is unreasonably high."[37]

---

[33] REALCLEAREDUCATION, Jan. 21, 2019, https://www.realcleareducation.com/articles/2019/01/21/black_men_title_nine_and_the_disparate_impact_of_discipline_policies_110308.html.

[34] Elizabeth Bartholet et al., *Fairness For All Students Under Title IX*, Aug. 21, 2017, https://dash.harvard.edu/bitstream/handle/1/33789434/Fairness%20for%20All%20Students.pdf?sequence=1&isAllowed=y.

[35] BOSTON GLOBE, Oct. 14, 2014, https://www.bostonglobe.com/opinion/2014/10/14/rethink-harvard-sexual-harassment-policy/HFDDiZN7nU2UwuUuWMnqbM/story.html ("Harvard has adopted procedures for deciding cases of alleged sexual misconduct which lack the most basic elements of fairness and due process").

[36] Open Letter from Members of the Penn Law School Faculty, *Sexual Assault Complaints: Protecting Complainants and the Accused Students at Universities*, WALL ST. J., Feb. 18, 2015, http://online.wsj.com/public/resources/documents/ 2015_0218_upenn.pdf (statement of 16 members of the University of Pennsylvania Law School faculty).

[37] THE COLLEGE FIX, Aug. 4, 2015, https://www.thecollegefix.com/shut-out-of-sexual-assault-hearing-critics-of-pro-accuser-legislation-flood-senate-committee-with-testimony/ ; Additionally, Harvard Law Professor Jeannie Suk Gersen wrote in The New Yorker in 2015 that the administrators and faculty members she'd spoken with who "routinely work on sexual-misconduct cases" said that "most of the complaints they see are against minorities." The New Yorker, Dec. 11, 2015, https://www.newyorker.com/news/news-desk/argument-sexual-assault-race-harvard-law-school.

AR_029046

- The past President of the American Civil Liberties Union remarked in 2015 that "OCR's distorted concept of sexual harassment actually does more harm than good to gender justice, not to mention to free speech."[38]

- The American College of Trial Lawyers issued a report concluding that OCR had imperiled due process and free speech.[39]

The due-process deficiencies in the 2011 DCL and 2014 Q&A led to over 600 lawsuits by accused students against their academic institutions.[40]  These lawsuits, more often than not,[41] resulted in victories for accused students across the country in state and federal court, including key wins at the appellate level.  *See, e.g.*, *Doe v. Oberlin Coll.*, 963 F.3d 580, 581 (6th Cir. 2020); *Doe v. Univ. of the Scis.*, 961 F.3d 203, 205 (3d Cir. 2020); *Doe v. Purdue Univ.*, 928 F.3d 652, 656 (7th Cir. 2019); *Haidak v. Univ. of Mass.-Amherst*, 933 F.3d 56, 60 (1st Cir. 2019); *Doe v. Miami Univ.*, 882 F.3d 579 (6th Cir. 2018); *Doe v. Baum*, 903 F.3d 575 (6th Cir. 2018); *Doe v. Univ. of Cincinnati*, 872 F.3d 393 (6th Cir. 2017); *Doe v. Claremont McKenna Coll.*, 25 Cal. App. 5th 1055, 1070 (2018); *Doe v. Regents of Univ. of Cal.*, 28 Cal. App. 5th 44, 61 (2018).

The Department has proposed returning—in large part—to the problematic Title IX grievance system from the 2011–17 era.  It has utterly failed to reconcile these past failures of OCR policy with its Proposed Rule.

---

[38] Shorenstein Center, *Nadine Strossen: "Free Expression: An Endangered Species on Campus?" Transcript*,  https://shorensteincenter.org/nadine-strossen-free-expression-an-endangered-species-on-campus-transcript/.

[39] American College of Trial Lawyers, *Task Force on the Response of Universities and Colleges to Allegations of Sexual Violence, White Paper on Campus Sexual Assault Investigations*, 2017, https://www.actl.com/docs/defaultsource/defaultdocumentlibrary/positionstatementsandwhitepapers/task_force_allegations_of_sexual_violence_white_paper_final.pdf.

[40] *See Milestone: 600+ Title IX/Due Process Lawsuits in Behalf of Accused Students*, TITLE IX FOR ALL, Apr. 1, 2020, https://www.titleixforall.com/milestone-600-title-ix-due-process-lawsuits-in-behalf-of-accused-students; *see also* Diane Heckman, *The Assembly Line of Title IX Mishandling Cases Concerning Sexual Violence on College Campuses*, 336 WEST'S EDUC. L. REP. 619, 631 (2016) (stating that since 2014 "there has been an influx of lawsuits contending post-secondary schools have violated Title IX due to their failure to properly handle sexual assault claims. What is unusual is that both sexes are bringing such Title IX mishandling cases due to lack of or failure to follow proper process and due process from each party's perspective. A staggering number of cases involve incidents of alcohol or drug usage or intoxication triggering the issue of the negating a voluntary consent between the participants.") (internal citations omitted).

[41] *See* Samantha Harris & KC Johnson, *Campus Courts in Court: The Rise in Judicial Involvement in Campus Sexual Misconduct Adjudications*, 22 N.Y.U. J. LEGIS. & PUB. POL'Y 49 (2019).

AR_029047

IV.  ASSISTANT SECRETARY LHAMON MUST RECUSE FROM THE RULEMAKING PROCESS

Assistant Secretary Lhamon must recuse herself from the rulemaking process. The 2020 Rule was enacted in response to a constitutional and regulatory mess created by OCR from 2011 to 2016. As Assistant Secretary for Civil Rights from 2013 to 2017, Assistant Secretary Lhamon played a crucial role in creating this problem. OCR's infamous 2011 Dear Colleague Letter: Sexual Violence ("2011 DCL") and 2014 Questions and Answers on Title IX and Sexual Violence ("2014 Q&A") wreaked havoc on campuses across the country. OCR compelled schools to adopt the lowest standard of proof for proving sexual harassment and sexual assault claims—preponderance of the evidence—and pressured schools to find accused students responsible for sexual misconduct even where there was significant doubt about culpability.

At OCR, Assistant Secretary Lhamon pressured schools to employ the single investigator model that gives one person appointed by the school's Title IX coordinator authority both to investigate alleged misconduct and to determine guilt and innocence. OCR didn't merely put its thumb on the scale of justice under her leadership, it became a biased institution. Investigations were not an inquiry into discrete complaints, but instead fishing expeditions into every aspect of schools' adjudication process and campus life. By 2016, "the average investigation had been open for 963 days, up from an average in 2010 of 289 days." Former and current OCR investigators told the media "the perceived message from Washington was that once an investigation into a school was opened, the investigators in the field offices were not meant to be objective fact finders. Their job was to find schools in violation of Title IX."

Given her past statements and record, there's no possible way OCR or the Department can conduct the rulemaking process in accordance with the Administrative Procedure Act's requirements for reasoned decision-making. When the 2020 Rule was released, Assistant Secretary Lhamon claimed that it was "taking us back to the bad old days, when it was permissible to rape and sexually harass students with impunity." During her subsequent Senate Confirmation hearing, she confirmed that this was still her view. With her mind already made up regarding the 2020 Rule—and her attachment to the defective regime it replaced—her involvement would taint the rulemaking process with bias. *See, e.g., Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971) (a strong showing of bad faith may require the administrative officials who participated in a decision to give testimony explaining their action); *United States v. Oregon*, 44 F.3d 758, 772 (9th Cir. 1994) (decisionmaker cannot possess "an unacceptable probability of actual bias"). Further, any future rationale for changing the 2020 Rule that's offered by the Department would be invalid because her statements prove the Department's outcome is pre-ordained. *See Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2573

(2019) (uncontested that decision resting on "pretextual basis" "warrant[s] a remand to the agency").

We brought this conflict of interest to the Department's attention via letter on April 5, 2022 (Attachment A), and then again on June 23, 2022 (Attachment B). The Proposed Rule, however, doesn't discuss these concerns. If the Department doesn't provide an adequate explanation regarding Assistant Secretary Lhamon's involvement, the rulemaking process is tainted and the Final Rule is arbitrary and capricious.

## V. THE DEPARTMENT MUST CLARIFY THAT TAX-EXEMPT STATUS ALONE DOES NOT CONSTITUTE "FEDERAL FINANCIAL ASSISTANCE."

Title IX applies only to entities that are recipients of federal financial assistance. 20 U.S.C. § 1681(a). The current Title IX regulations define the term federal financial assistance:

Federal financial assistance means any of the following, when authorized or extended under a law administered by the Department:

(1) A grant or loan of Federal financial assistance, including funds made available for:

(i) The acquisition, construction, renovation, restoration, or repair of a building or facility of any portion thereof; and

(ii) Scholarships, loans, grants, wages or other funds extended to any entity for payment to or on behalf of students admitted to that entity, or extended directly to such students for payment to that entity.

(2) A grant of Federal real or personal property or any interest therein, including surplus property, and the proceeds of the sale or transfer of such property, if the Federal share of the fair market value of the property is not, upon such sale or transfer, properly accounted for to the Federal Government.

(3) Provision of the services of Federal personnel.

(4) Sale or lease of Federal property or any interest therein at nominal consideration, or at consideration reduced for the purpose of assisting the recipient or in recognition of public interest to be served thereby, or permission to use Federal property or any interest therein without consideration.

34

(5) Any other contract, agreement, or arrangement which has as one of its purposes the provision of assistance to any education program or activity, except a contract of insurance or guaranty.

34 C.F.R. § 106.2(g).

Two federal district courts have now determined that an entity's tax-exempt status under Section 501(c)(3) of the Internal Revenue Code, 26 U.S.C. § 501(c)(3), constitutes federal financial assistance. *See E.H. v. Valley Christian Acad.*, 2022 U.S. Dist. LEXIS 132893, at *17 (C.D. Cal. July 25, 2022); *Buettner-Hartsoe v. Balt. Lutheran High Sch. Ass'n*, 2022 U.S. Dist. LEXIS 130429, at *15 (D. Md. July 21, 2022). Both decisions held that 501(c)(3) status made private high schools indirect recipients of federal financial assistance, therefore, subjected them to Title IX.

Prior to these decisions, 501(c)(3) had never been considered federal financial assistance. Income tax exemptions are "conspicuously absent from [the] laundry list" of examples in 34 C.F.R. § 106.2(g). *Johnny's Icehouse, Inc. v. Amateur Hockey Ass'n*, 134 F. Supp. 2d 965, 971 (N.D. Ill. 2001); see also *Zimmerman v. Poly Prep Country Day Sch.*, 888 F. Supp. 2d 317, 332 n.2 (E.D.N.Y. 2012) (citing, *e.g.*, *Stewart v. New York Univ.*, 430 F. Supp. 1305, 1314 (S.D.N.Y. 1976)).

The Department should clarify in 34 C.F.R. § 106.2(g) that 501(c)(3) status does not constitute federal financial assistance. Extending Title IX to schools because of 501(c)(3) status would be a drastic extension of Title IX. It would force every private school enjoying tax-exempt status to comply with Title IX.

## VI. THE DEPARTMENT MUST ASSESS THE IMPACT OF THE PROPOSED REGULATIONS ON FAMILIES AND PARENTAL RIGHTS PURSUANT TO 5 U.S.C § 601.

Section 654 of the Treasury and General Government Appropriations Act, 1999, Pub. L. 105-277, codified at 5 U.S.C § 601, provides:

Before implementing policies and regulations that may affect family well-being, each agency shall assess such actions with respect to whether … the action strengthens or erodes the authority and rights of parents in the education, nurture, and supervision of their children.

5 U.S.C § 601 (statutory notes). As discussed in Part I(D), the Proposed Rule infringes on parental rights because it treats failure to "affirm[] gender identity" the same as traditional forms of discrimination (*e.g.*, excluding girls from the debate team), a school wouldn't need to obtain parental consent before pushing "gender affirmation" of whatever self-declared identity a child announces in school; the school would never

35

have to disclose that affirmation program to the child's parents, and must—at any rate—pursue it even over parents' objections. The statute clearly provides that the Department must evaluate its proposed actions with respect to whether the "action strengthens or erodes the authority and rights of parents in the education, nurture, and supervision of their children." *Id.*

The Department must conduct the impact analysis as required by Pub. L. 105-277, codified at 5 U.S.C § 601, or the Proposed Rule is arbitrary, capricious, and not in accordance with law.

Sincerely,

AUSTIN KNUDSEN
ATTORNEY GENERAL OF MONTANA


STEVE MARSHALL
ATTORNEY GENERAL OF ALABAMA

DEREK SCHMIDT
ATTORNEY GENERAL OF KANSAS

LESLIE RUTLEDGE
ATTORNEY GENERAL OF ARKANSAS

DANIEL CAMERON
ATTORNEY GENERAL OF KENTUCKY

CHRISTOPHER M. CARR
ATTORNEY GENERAL OF GEORGIA

JEFF LANDRY
ATTORNEY GENERAL OF LOUISIANA

THEODORE E. ROKITA
ATTORNEY GENERAL OF INDIANA

LYNN FITCH
ATTORNEY GENERAL OF MISSISSIPPI

36

DOUG PETERSON
ATTORNEY GENERAL OF NEBRASKA

JOHN M. O'CONNOR
ATTORNEY GENERAL OF OKLAHOMA

ALAN WILSON
ATTORNEY GENERAL OF SOUTH
CAROLINA

MARK VARGO
ATTORNEY GENERAL OF SOUTH DAKOTA

JONATHAN SKRMETTI
ATTORNEY GENERAL OF TENNESSEE

KEN PAXTON
ATTORNEY GENERAL OF TEXAS

SEAN D. REYES
ATTORNEY GENERAL OF UTAH

JASON MIYARES
ATTORNEY GENERAL OF VIRGINIA

AR_029052



**CALIFORNIA DEPARTMENT OF EDUCATION**

**TONY THURMOND**
*STATE SUPERINTENDENT OF PUBLIC INSTRUCTION*

1430 N STREET, SACRAMENTO, CA 95814-5901 • 916-319-0800 • WWW.CDE.CA.GOV

August 25, 2022

The Honorable Suzanne Goldberg
Office of Civil Rights
U.S. Department of Education
400 Maryland Avenue SW
Washington, DC 20202

Dear Acting Assistant Secretary Goldberg:

The California Department of Education (CDE) appreciates and supports the U.S. Department of Education's (ED's) Title IX proposed rule related to discrimination in the form of sexual harassment, sexual violence in educational environments, and discrimination based on sexual orientation, gender identity, and gender expression.

The CDE believes that all students, staff, and faculty should be treated fairly and be afforded a positive educational environment. In California, the definition of sexual harassment is comprehensive, covering all unwelcome conduct of a sexual nature that has the purpose or effect of having a negative impact on the individual's academic performance or of creating an intimidating, hostile, or offensive educational environment. That is also why we applaud ED's commitment to protect all students and employees from discrimination and retaliation in a prompt manner when entities become aware of troubling allegations.

Additionally, California is a state that prohibits discrimination based on sexual orientation, gender identity, and gender expression. The disregard of, or unwillingness to accept, a student's gender expression is a form of bullying and harassment. We know that when students' gender identities are respected, they thrive. That is why California strongly supports the updated protections for LQBTQIA+ students outlined in the proposed rule.

The CDE would like to suggest some changes to the proposed Title IX rule in order to provide greater clarity and efficiency for schools. The CDE has concerns related to the proposed language for 34 CFR 106.8(e), which states that if a student with an Individualized Education Program (IEP) is either the complainant or the respondent in a complaint of sex-based discrimination, the Title IX coordinator must consult with the

August 25, 2022
Page 2

student's "IEP team" to ensure compliance with the Individuals with Disabilities Education Act (IDEA) throughout the Title IX investigative process. This language may be confusing to the field, and difficult to implement, as explained below.

The first concern is with the language that states that the Title IX coordinator must consult specifically with "the IEP team." The "IEP team" is an often-changing group of people whose specific membership is identified only in the context of a particular IEP meeting for a particular student. Also, the proposed regulation could be read to suggest that the consultation needs to take place in the context of an *IEP meeting*, because that is the only occasion when the "IEP team" is assembled. Such an interpretation would result in the Title IX regulations imposing a new meeting requirement on IEP teams that does not otherwise exist in IDEA or its implementing regulations. We recommend that the proposed language "IEP team" be changed to "a school administrator familiar with the student's IEP" in order to (1) provide more specificity as to who should be consulted and (2) clarify that there is no expectation that the consultation must take place in the context of an additional IEP team meeting.

The second concern is that while it is reasonable to have the Title IX coordinator consult with a school administrator familiar with the IEP of a student who is a complainant or respondent, the proposed wording states that the purpose of doing so is to ensure compliance with "the requirements of IDEA." Instead, in our view the purpose would be to ensure that the Title IX investigation properly considers the impact of the student's disability. The CDE recommends changing the proposed regulation to strike the reference to "to help ensure that recipient complies with the requirements of IDEA" and add language clarifying that the purpose of the consultation is to "ensure that the Title IX investigation properly considers any impact of the student's disability."

Similarly, we have a concern regarding the language in the proposed 34 CFR 106.8(e) that states that if a student with a disability covered by Section 504 of the Rehabilitation Act is either the complainant or the respondent, the Title IX coordinator must consult with the "group of persons responsible for the student's placement decision," or "Section 504 team," to help ensure compliance with Section 504 throughout the Title IX investigative process. First, while IDEA specifically provides for an IEP team, IEP team meetings, and written IEPs, the Section 504 regulations do not specifically provide for a particular group of persons who are responsible for the student's placement or who would make up a student's "Section 504 team," nor do they specifically provide for Section 504 team meetings or a written Section 504 plan. We suggest that the references to a "group of persons responsible for the student's placement" and a "Section 504 team" be removed and replaced with a reference to "a

school administrator familiar with the student's disability and written 504 plan, if any." Second, we recommend removing the reference to "to help ensure that the recipient complies with the requirements of Section 504." Instead, language might be added to clarify that the purpose of the consultation is to "ensure that the Title IX investigation properly considers any impact of the student's disability."

August 25, 2022
Page 3

The proposed 34 CFR 106.10 expands the scope of Title IX to include any discrimination on the basis of sex, including discrimination on the basis of sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, and gender identity. California currently has a robust complaint and appeal system in place to address these types of formal complaints. Expanding the scope of the Title IX regulations would be duplicative and may cause confusion at the school and district level for these kinds of formal complaints. Title IX regulations should explicitly allow for flexibility for states like California that already have systems in place to address discrimination complaints to the same high standards set out in the rule. The California Code of Regulations, Title 5 (5 CCR), Section 4600 et seq. establishes Uniform Complaint Procedures (UCP) to be followed for complaints of discrimination, harassment, intimidation, and/or bullying based on a protected class. The regulations require each local educational agency (LEA) to adopt policies and procedures for accepting and investigating complaints of discrimination, harassment, intimidation, and/or bullying based on a protected characteristic. When investigating, LEAs must submit an investigation report to complainants within 60 days. In addition, California has established a state appeal process by which complainants may appeal the LEA's investigation report.

California greatly appreciates the opportunity to provide comment and support of the Title IX proposed rule. We believe it is vital to protect all students and staff in order to advance educational equity and opportunity for all. If additional information regarding this request is needed, please contact Joseph Saenz, Federal Policy Liaison, Government Affairs Division, by telephone at 916-591-6391 or by email at [ HYPERLINK "mailto:jsaenz@cde.ca.gov" ].

Sincerely,

Malia Vella
Deputy Superintendent of Superintendent's Initiatives
California Department of Education

**National PTA**
*every child. one voice.®*

September 1, 2022

*Submitted via www.regulations.gov*

Dr. Miguel Cardona                    Catherine E. Lhamon
Secretary of Education                Assistant Secretary, Office for Civil Rights
U.S. Department of Education          U.S. Department of Education
400 Maryland Ave SW                   400 Maryland Ave SW
Washington, DC 20202                  Washington, DC 20202

**Re: ED Docket No. ED-2021-OCR-0166, RIN 1870-AA16, Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance.**

Dear Secretary Cardona and Assistant Secretary Lhamon:

On behalf of the National Parent Teacher Association and our millions of members nationwide, we appreciate the opportunity to comment on the U.S. Department of Education's proposed rule implementing Title IX of the Education Amendments of 1972. Based on our experience working in schools and for children across the country, we believe the proposed rule represents a critical step towards helping to decrease harassment in our schools and ensure that schools are safe, supportive and inclusive environments for all of our students.

PTA is the oldest and largest child advocacy association in America, comprised of millions of parents, teachers, grandparents, caregivers, foster parents and other caring adults who share a commitment to improving the education, health and safety of all children. Our association believes all children deserve the opportunity to reach their full potential in safe and welcoming environments. As such, we support federal policies that protect against sexual harassment and sex discrimination in education, including policies that specifically protect LGBTQI+ youth, and local practices that create and maintain safe, affirming, and inclusive learning environments for all students.

<u>**Response to Sexual Harassment & Sexual Violence Affecting Students**</u>

National PTA and its constituent associations have long believed that every child deserves to go to school excited to learn in a safe and nurturing environment, without the fear of bullying, violence or discrimination. To that end, we support the strengthening of Title IX and other federal, state and local laws that identify, address the effects of, and prohibit sexual harassment and sexual violence impacting students. Our PTAs collaborate with school administrations, institutions of higher learning, and community partners to ensure that every school provides support services for victims of sexual harassment and sexual violence, presents awareness and prevention programs that address sexual harassment and sexual violence affecting students, and include training on the

AR_088215



responsibilities of educational institutions, as well as the rights of sexual violence and sexual harassment victims under Title IX and other laws and regulations.

The rule proposed by the Department of Education would strengthen Title IX protections in schools, clarify the responsibilities of educational institutions when sexual harassment occurs, encourage schools to provide support services for victims of sexual harassment and sexual violence, and require schools establish grievance procedures that are prompt and equitable. In particular, the proposed rule requires schools to address all types of sex-based harassment including those that occur on school grounds, or during school activities off campus and abroad. It requires schools to address the hostile environment created on campus even if the harassment occurred off-campus. It requires action from the school whenever the incident is so "severe" or "pervasive" that it limits a student's access to education, thereby violating the Title IX protection that "No person in the United States shall, on the basis of sex...be denied the benefits of...any education program or activity receiving Federal financial assistance."

Sexual harassment has devastating effects on students by negatively impacting their emotional and physical well-being, ultimately acting as a barrier to equal and free access to public education. Moreover, women and girls of color, disabled survivors, and LGBTQI+ survivors are at a disproportionately high risk of being denied the benefits of an education due to sexual harassment, as they face stereotypes casting them as less credible when they report sexual misconduct. Research shows that, of available reporting statistics, up to forty percent (40%) of middle and high school students report being victims of sexual violence or sexual harassment, but that this number is likely much higher because it does not account for the vast underreporting of sexual harassment. Research further indicates educational institutions are the most common location of peer sexual victimization. This reporting underscores the need for a fully inclusive definition of sexual harassment that encourages students to come forward when they are being harassed rather than remaining silent and potentially making them vulnerable to continued or escalating harassment and assault.

As experts in the field of family engagement and effective family-school partnerships, we also encourage the Department to include language in the final rule that ensures that the development of grievance procedures include parents, families, community members, students and other stakeholders. School community members are entitled to a transparent grievance procedure development process with ample opportunity to offer input and feedback. National PTA will continue to urge and support family engagement in schools and as it pertains to the development of grievance procedures that keep all students safe. We hope the Department will join in this important effort.

## Recognition of LGBTQ Individuals as a Protected Class

National PTA and its constituent associations believe that all children and youth should be able to attend school in a safe and inclusive environment free from discrimination and

AR_088216