

violence. However, the reality is that too many LGBTQI+ students are bullied, are physically assaulted, and feel unsafe in school because of their actual or perceived sexual orientation or gender identity. We are committed to advocating for policies and protections for LGBTQI+ youth to make sure they have positive school experiences and the opportunity to reach their full potential.

We support the Department's proposed Title IX rule requiring schools to support students who report sex discrimination, by providing them with supportive measures and investigate complaints, and clarifying that anti-LGBTQI+ discrimination is prohibited sex discrimination under Title IX, including discrimination based on sexual orientation, gender identity, and sex characteristics (like intersex traits). Enumeration is essential to protecting as many students as possible from bullying, harassment and discrimination. The strength of an enumerated law or policy is that it underscores those students who research shows are most likely to be bullied and harassed and least likely to be protected under non-enumerated anti-bullying laws and policies. Enumeration provides teachers and school personnel with the tools they need to implement anti-bullying and harassment policies, making it easier for them to prevent bullying and intervene when incidents occur. Given that so many states have sought to pass laws—with many succeeding—threatening the well-being, safety, and educational opportunities of LGBTQI+ youth, it has become increasingly urgent for the Department to make clear that Title IX protects LGBTQI+ students from discrimination, harassment, violence, and bullying. In light of this, we strongly support the proposed Title IX rule clarifying that schools must protect students' access to sex-separated school activities and facilities, including bathrooms and locker rooms, consistent with their gender identity. This clarification will strengthen enforcement of Title IX's protection that no student be "excluded from participation in" "any education program or activity receiving Federal financial assistance" "on the basis of sex."

We also ask the Department to ensure that schools are required to enumerate sexual orientation, gender identity, sex characteristics, and sex stereotypes in their official nondiscrimination policies, and that these policies be made available and accessible to families in the community. We know that harassment and bullying policies that specifically mention sexual orientation, gender identity and gender expression are associated with: students feeling more safe; lower levels of bullying; decreased incidents of harassment related to sexual orientation; increased teacher/staff intervention; and a greater reporting of incidents. Indeed, the National School Climate survey shows that LGBTQ students in schools with enumerated policies were more than twice as likely to report that teachers intervened regularly compared to students in schools with generic anti-bullying policies, and more than three times as likely compared to students in schools with no policy at all. Our families, students, educators, school staff, administrators, and advocates need to understand their rights and responsibilities under Title IX, and ensuring that school policies on discrimination, harassment, and bullying are fully transparent and accessible is of critical importance to our association in their

AR_088217

efforts to help create safe, supportive, and inclusive schools and a positive school climate for all.

We appreciate the opportunity to provide comments on the Department's proposed Title IX rule and encourage the Department to ensure that parents, families, students and other stakeholders are fully engaged throughout the Title IX process. Our association believes all children deserve the opportunity to reach their full potential in safe and welcoming environments, and believe the proposals outlined above represent steps towards that goal. Please contact Kate Clabaugh, National PTA Director of Government Affairs, at kclabaugh@pta.org or (703) 944-1026 to answer any questions or provide further input as needed.

Sincerely,

Anna King
President
National PTA

Nathan R. Monell, CAE
Executive Director
National PTA

AR_088218



September 12, 2022

Assistant Secretary Catherine Lhamon
Office for Civil Rights
U.S. Department of Education

**Re: Docket ID ED-2021-OCR-0166**

Dear Assistant Secretary Lhamon,

Child Trends is a highly respected, nonpartisan research organization focused exclusively on improving the lives and prospects of children, youth, and their families. For more than 40 years, decision makers have relied on our rigorous research, unbiased analyses, and clear communication to improve public policies and interventions that serve children and families. Our researchers and evaluators have a deep bench of experience advising local, state, and federal agencies on how to advance education equity within our nation's schools, and how to create safer, more supportive school environments for our nation's children.

On July 17, 2022, the Office for Civil Rights (OCR) published proposed regulations regarding *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance.* The proposed regulations would restore and extend sexual harassment protections for students in both K-12 and higher education settings under Title IX of the Education Amendments of 1972. The proposed regulations are broadly consistent with research-based best practices for supporting students who have experienced harassment and would restore alignment between state anti-bullying and anti-harassment statutes and federal civil rights enforcement. Because Child Trends' education work has primarily focused on students in K-12 settings, our comments focus primarily on the implications for students in these settings.

Below, we detail our support for five of the proposed revisions to the regulation: (1) restoring the definition of harassment to align with other federal civil rights enforcement and state anti-bullying and anti-harassment statutes; (2) more explicitly including sexual orientation, gender identity, and pregnancy status under protections based on sex; (3) reducing barriers for students to report their experiences of harassment and receive assistance; (4) excluding confidential employees from reporting requirements; and (5) reorganizing and clarifying administrative and reporting requirements.

**Child Trends supports the proposed regulations' definition of harassment, which better aligns with enforcement of other civil rights laws (e.g., Title VI, IDEA), state anti-bullying and anti-harassment statutes, and OCR's historic implementation guidance.**

The 2020 regulations, currently in effect, use an unduly high bar for determining when behavior is considered harassment: They rely largely on court standards for issuing monetary damages rather than administrative enforcement.[1]

Prior to the 2020 regulations, though, the U.S. Department of Education (USED) consistently used the definition of harassment contained in the proposed regulations—namely, that harassment is behavior that "… creates a hostile environment when the conduct is sufficiently severe, pervasive, or persistent so as to interfere with or limit a student's ability to participate in or benefit from the services, activities, or opportunities offered by a school."[2] This definition is provided in at least six guidance documents issued by USED from 1994 to 2014, providing consistent protections under Title IX, Title VI, and the Individuals with Disabilities Education Act for harassment based on sex; race, color, or national origin; and disability, respectively. Schools have applied this broader definition since at least 1994. Moreover, this definition is reflected in the vast majority of state anti-bullying and anti-harassment statutes and regulations.[3]

The 2020 regulations—in which the definition of harassment contained in Title IX regulations is stricter than other federal civil rights laws and state statutes—establish a higher burden of harm for sexual harassment than for other forms of harassment, and places schools in the position of being legally mandated to hold different standards depending on the type of harassment incident. The proposed regulation would return consistency to the definition of harassment and help ensure that students receive support regardless of whether harassment is based on sex or another enumerated characteristic.

**Child Trends strongly supports the explicit inclusion of harassment based on sexual orientation and gender identity in the definition of sex-based harassment.**

Students who identify as lesbian, gay, bisexual, or transgender (LGBT) consistently report being bullied or harassed at significantly higher rates than their heterosexual and cisgender peers.[4] In 2010, USED made clear that Title IX protects students from harassment based on gender stereotypes, which includes much of the harassment LGBT students may face.[5] However, the existing Title IX regulations do not enumerate protections for LGBT students. Over the past decade, several research studies have demonstrated that clearly and specifically enumerating protections against harassment based on sexual orientation and gender identity reduces rates of bullying and suicidality—not only for LGBT students but

---

[1] U.S. Department of Education, Office for Civil Rights' response to the National School Boards Association, 2011. https://cdn-files.nsba.org/s3fs-public/reports/ED_Response_-_NSBA_Bullying_Letter_2011.pdf?4UUksgR3RQaYuOc0N8_ykcb8qwBnqikE

[2] U.S. Department of Education, Dear Colleague Letter on Bullying and Harassment 2010. https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201010.pdf. See also: harassment guidance from 1994, 1997, 2000, 2001, 2008, and 2014.

[3] National Association of State Boards of Education (2021). State Policy Database on School Health. https://statepolicies.nasbe.org/health/categories/social-emotional-climate/bullying-harassment-and-intimidation-policy

[4] Pampati, S., Andrzejewski, J., Sheremenko, G., Johns, M., Lesesne, C., & Rasberry, C. (2020). School Climate Among Transgender High School Students: An Exploration of School Connectedness, Perceived Safety, Bullying, and Absenteeism. *Journal of School Nursing*, 36(4): 293-303. https://stacks.cdc.gov/view/cdc/105974/cdc_105974_DS1.pdf

[5] Ibid 2

for all students.[6] Still, as of 2021, only 24 states included enumerated protections for sexual orientation and gender identity as part of their anti-bullying or anti-harassment statutes and regulations for schools.[7] Providing such enumeration in Title IX regulations would codify USED's existing practices and further affirm schools' responsibility to address harassment based on sexual orientation and gender identity.

Additionally, enumerating Title IX regulations to include sexual orientation and gender identity may support students' ability to create safe spaces for LGBT students. Gender and sexuality alliances (also known as gay-straight alliances or GSAs) are affinity groups, created by students, that have demonstrated evidence of improving students' senses of belonging, improving school climate, and reducing bullying and harassment.[8] As of 2018, only nine states and the District of Columbia had GSAs in more than half of their secondary schools.[9] In 2011, USED made clear that the Equal Access Act protects students' rights to form a GSA, provided that a school allows other such student-initiated groups.[10] However, students across the country have faced growing barriers in their efforts to form GSAs.[11] Where student GSA organizers have encountered opposition to their affinity group, the opposition could potentially be considered harassment under the proposed Title IX regulations; as such, the proposed regulations could provide a critical foundation from which students can continue to form these affirming and preventative clubs.

**Child Trends supports the proposed regulation's return to requiring schools to address harassment for which school staff have constructive knowledge, rather than the more narrow "actual knowledge" and "deliberate indifference" standard.**

---

[6] Hatzenbuehler, M. L., Flores, J. E., Cavanaugh, J. E., Onwuachi-Willig, A., & Ramirez, M. R. (2017). Anti-bullying policies and disparities in bullying: A state-level analysis. *American journal of preventive medicine*, *53*(2), 184-191.; Hatzenbuehler, M. L., & Keyes, K. M. (2013). Inclusive anti-bullying policies and reduced risk of suicide attempts in lesbian and gay youth. *Journal of Adolescent Health*, *53*(1), S21-S26; Meyer, I. H., Luo, F., Wilson, B. D., & Stone, D. M. (2019). Sexual orientation enumeration in state antibullying statutes in the United States: Associations with bullying, suicidal ideation, and suicide attempts among youth. *LGBT health*, *6*(1), 9-14.; Russell, S. T., Day, J. K., Ioverno, S., & Toomey, R. B. (2016). Are school policies focused on sexual orientation and gender identity associated with less bullying? Teachers' perspectives. *Journal of school psychology*, *54*, 29-38.

[7] Temkin, D., Lao, K., Nuñez, B., Kelley, C., Kelley, S., & Stuart-Cassel, V. (2022). Most state policies that address LGBTQ+ students in schools are affirming despite recent trends toward exclusion. Child Trends. DOI: 10.56417/8595e2094d

[8] Poteat, V. P., Sinclair, K. O., DiGiovanni, C. D., Koenig, B. W., & Russell, S. T. (2013). Gay–straight alliances are associated with student health: A multischool comparison of LGBTQ and heterosexual youth. *Journal of Research on Adolescence*, *23*(2), 319-330.; Ioverno, S., Belser, A. B., Baiocco, R., Grossman, A. H., & Russell, S. T. (2016). The protective role of gay–straight alliances for lesbian, gay, bisexual, and questioning students: A prospective analysis. *Psychology of sexual orientation and gender diversity*, *3*(4), 397.

[9] Gabriel, A., Stratford, B., Steed, H. (2021). Only 9 states and DC Report That More Than Half of Secondary Schools Have a Gender and Sexuality Alliance. Child Trends. https://www.childtrends.org/blog/only-9-states-and-the-district-of-columbia-report-that-more-than-half-of-secondary-schools-have-a-gender-and-sexuality-alliance

[10] See, Department of Education, Key Policy Letters from the Education Secretary and Deputy Secretary, 2011. https://www2.ed.gov/policy/elsec/guid/secletter/110607.html

[11] Natanson, H. (2022). LGBTQ clubs were havens for students. Now they're under attack. *The Washington Post*. https://www.washingtonpost.com/education/2022/06/28/gay-straight-alliance-indoctrination-school-club/

More than half of students who report being bullied on USED's School Crime Supplement to the National Crime Victimization Survey have never told an adult about their experiences.[12] Moreover, if and when a student who has been harassed or bullied does tell an adult, that adult must have an existing, strong relationship with the student. Students might approach any adult in the school building.[13] As such, limiting protections under Title IX to incidents for which schools have "actual knowledge" through only a limited number of school staff creates an unreasonably high standard under which many students who are experiencing harassment are left unprotected. The proposed regulations would return to a standard in which schools are obligated to address harassment about which they reasonably should know, including harassment reported to any nonconfidential employee; this will help ensure that schools take action on more cases of harassment.

**Child Trends supports the exclusion of confidential employees from reporting requirements but recommends expanding this exclusion to include those collecting research approved by an Institutional Review Board.**

Child Trends strongly recommends expanding the definition of employees protected under this category to not only include employees at postsecondary institutions, but also those at research institutions that are not associated with an institute of higher education, who may be collecting research in partnership with or contracted by a school system. For example, Child Trends is an independent, nonprofit research organization (501(c)3) that frequently conducts research in schools, including research on harassment and bullying; all research on human subjects must be reviewed by Child Trends' internal Institutional Review Board. Under the proposed definition of confidential employee, it is unclear whether harassment data collected by an independent organization such as Child Trends would be subject to reporting under Title IX when such data collection is done at the request of the school system. We strongly suggest revising the definition to eliminate reference to postsecondary institutions and instead apply it to any individual or entity conducting research approved by an IRB.

**Child Trends supports the reorganization and renaming of the administrative requirements section of the regulations to emphasize the importance of Title IX training that does not rely on sex stereotypes—including racialized sex stereotypes—and to broaden record-keeping requirements that ensure recipients operate education programs and activities free from racialized sex discrimination.**

Sex stereotypes that can introduce bias in Title IX sexual assault and harassment proceedings are complex and intersect with race and other dimensions of social identity in ways that may place particular groups of students at disproportionate risk. These stereotypes often portray women as "victims" and men as "perpetrators," despite research demonstrating that this is an oversimplification of people involved in nonconsensual sexual contact.[14] For Black male adolescents and young adults, the

---

[12] Burns, E., Mann, R., & Yanez, C. (2022). Student Reports of Bullying: Results From the 2019 School Crime Supplement to the National Crime Victimization Survey. *National Center for Education Statistics*. https://nces.ed.gov/pubs2022/2022031.pdf

[13] Blomqvist, K., Saarento-Zaprudin, S., & Salmivalli, C. (2020). Telling adults about one's plight as a victim of bullying: Student-and context-related factors predicting disclosure. Scandinavian journal of psychology, 61(1), 151-159.; Espelage, D. L., Rulison, K. L., Ingram, K. M., Valido, A., Schmeelk-Cone, K., & Wyman, P. A. (2022). Social networks of adolescent sexual violence perpetrators: peer friendship and trusted adult characteristics. Prevention science, 23(1), 154-166.

[14] Stemple, L., Flores, A., & Meyer, I. H. (2017). Sexual victimization perpetrated by women: Federal data reveal surprising prevalence. Aggression and Violent Behavior, 34, 302-311.

sex-based stereotype of sexual predator is particularly prevalent[15] and may place them at disproportionate risk of identification as respondents in Title IX sexual assault and harassment cases and for harsher disciplinary sanctions.[16] Beyond college campuses, available research, data, and history have clearly shown that Black men have long been victims of false accusations of rape.[17] However, as college campuses have not been required to collect data that allow for disaggregation by race and gender, the prevalence of Title IX complaints targeting Black men is not currently known.

Given the strong possibility of racial bias in Title IX sexual assault and harassment claims and proceedings and the personal and educational ramifications for both complainants and respondents, we recommend that recipients' Title IX training be required to comprehensively address racialized sex stereotypes. Relatedly, we support plans for broadening record-keeping requirements to cover records related to a recipient's actions in response to all forms of sex discrimination—not only sexual harassment—and for maintaining the seven-year retention period for records and the general types of records described in the current regulations. Additionally, to bring greater transparency to Title IX sexual assault and harassment processes and to ensure equitable application of supportive measures, remedies, and disciplinary sanctions, we suggest that recipients also be required to collect data on the race, ethnicity, gender, sexual orientation, and disability status of complainants and respondents. These data should be available for review and analysis by the recipients, and by external researchers, to monitor for patterns of bias—thereby helping recipients fulfill "Title IX and OCR's commitment to ensuring equal and nondiscriminatory access to education for students at all educational levels."

We appreciate the opportunity to provide comments and suggestions regarding *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, and we are able to expand on any of these points. For any questions regarding this letter, please contact Deborah Temkin, deputy chief operating officer and vice president for education and youth development at Child Trends (dtemkin@childtrends.org).

Sincerely,


/s/



Carol Emig
President
Child Trends

---

[15] Yoffe., E. (2017). *The Question of Race in Campus Sexual-Assault Cases*. The Atlantic. https://www.theatlantic.com/education/archive/2017/09/the-question-of-race-in-campus-sexual-assault-cases/539361/
[16] Trachtenberg, B. (2017). How university Title IX enforcement and other discipline processes (probably) discriminate against minority students. Nev. LJ, 18, 107; Swan, S. L. (2020). Discriminatory dualism in process: title IX, reverse title ix, and campus sexual assault. Okla. L. Rev., 73, 69; Perry, L. (2021). From Brock Turner to Brian Banks: Protecting victims and preserving due process in the new area of Title IX. DePaul J. Soc. Just., 14, 1.
[17] Gross, S., Possley, M., Stephens, K. (2017). Race and wrongful convictions in the United States. National Registry of Exonerations. https://www.law.umich.edu/special/exoneration/Documents/Race_and_Wrongful_Convictions.pdf



# THE REPORT OF THE

# 2015 U.S. TRANSGENDER SURVEY



National Center for
TRANSGENDER
EQUALITY

AR_216995

## About the National Center for Transgender Equality

The National Center for Transgender Equality (NCTE) is the nation's leading social justice policy advocacy organization devoted to ending discrimination and violence against transgender people. NCTE was founded in 2003 by transgender activists who recognized the urgent need for policy change to advance transgender equality. NCTE now has an extensive record winning life-saving changes for transgender people. NCTE works by educating the public and by influencing local, state, and federal policymakers to change policies and laws to improve the lives of transgender people. By empowering transgender people and our allies, NCTE creates a strong and clear voice for transgender equality in our nation's capital and around the country.

© 2016 The National Center for Transgender Equality. We encourage and grant permission for the reproduction and distribution of this publication in whole or in part, provided that it is done with attribution to the National Center for Transgender Equality. Further written permission is not required.

## RECOMMENDED CITATION

James, S. E., Herman, J. L., Rankin, S., Keisling, M., Mottet, L., & Anafi, M. (2016). *The Report of the 2015 U.S. Transgender Survey*. Washington, DC: National Center for Transgender Equality.

# The Report of the
# 2015 U.S. Transgender Survey

by:

Sandy E. James

Jody L. Herman

Susan Rankin

Mara Keisling

Lisa Mottet

Ma'ayan Anafi

**December 2016**

AR_216997

# Table of Contents

Acknowledgements ............................................................................................1

Executive Summary...........................................................................................3

Chapter 1: Introduction .................................................................. 18

Chapter 2: Methodology................................................................. 21

Chapter 3: Guide to Report and Terminology ..................................................39

Chapter 4: Portrait of USTS Respondents......................................................43

Chapter 5: Family Life and Faith Communities................................................64

Chapter 6: Identity Documents ...................................................... 81

Chapter 7: Health ...........................................................................92

Chapter 8: Experiences at School.................................................. 130

Chapter 9: Income and Employment Status.................................... 139

Chapter 10: Employment and the Workplace.................................. 147

Chapter 11: Sex Work and Other Underground Economy Work ...................... 157

Chapter 12: Military Service ........................................................... 166

Chapter 13: Housing, Homelessness, and Shelter Access ............................ 175

Chapter 14: Police, Prisons, and Immigration Detention................................ 184

Chapter 15: Harassment and Violence ........................................... 197

Chapter 16: Places of Public Accommodation and Airport Security.............. 212

Chapter 17: Experiences in Restrooms ..........................................224

Chapter 18: Civic Participation and Policy Priorities ...................... 231

About the Authors.......................................................................... 241

Appendix A: Characteristics of the Sample....................................243

Appendix B: Survey Instrument (Questionnaire) ............................ 250

Appendix C: Detailed Methodology ................................................ 291

# Acknowledgements

The report authors extend our gratitude to all the members of the transgender community who participated in the 2015 U.S. Transgender Survey and the hundreds of individuals and organizations that made this survey report possible.

The following individuals in particular are recognized for their contributions during one or more stages of the process, including survey development, implementation, distribution, data preparation and analysis, and reporting:

| | | | |
|---|---|---|---|
| Osman Ahmed | Andrew Cray | Chai Jindasurat | Gabriel Rodenborn |
| M. V. Lee Badgett | Kate D'Adamo | JoAnne Keatley | Shelby Rowe |
| Kellan Baker | Laura Durso | Elliot Kennedy | Brad Sears |
| Genny Beemyn | Jake Eleazer | Paul Lillig | Jama Shelton |
| Aaron Belkin | Gary J. Gates | Emilia Lombardi | Jillian Shipherd |
| Walter Bockting | Jaime Grant | Jenifer McGuire | Sharon Stapel |
| Kyler Broadus | Emily Greytak | Ilan Meyer | Michael Steinberger |
| David Chae | Ann Haas | Shannon Price Minter | Catalina Velasquez |
| Cecilia Chung | Jack Harrison-Quintana | Aaron Morris | Bianca Wilson |
| Loree Cook Daniels | Mark Hatzenbuehler | Asaf Orr | |
| Keirth Conron | Darby Hickey | Dylan Orr | |
| Ruby Corado | Lourdes Ashley Hunter | Sari Reisner | |

*The authors extend special gratitude to the following individuals for their contributions to the project:*

**Ignacio Rivera**, Survey Outreach Coordinator, for leading the survey outreach efforts and building a network of individuals and organizations that led to the unprecedented levels of participation in this survey.

**Andrew Flores** for assistance with questionnaire development and the weighting procedures to prepare the data for analysis.

**Daniel Merson** for continued work in cleaning the data set, re-coding the data, and providing population numbers for comparative purposes in the final report.

**Michael Rauch** for programming and implementation of the complex survey.

*Appreciation is also extended to **NCTE interns, law fellows, staff, and volunteers** who assisted with the project, including outreach across the country, development of outreach materials, and translation:*

| | | | |
|---|---|---|---|
| Bre Kidman | Mati Gonzalez Gil | Kory Masen | Cullen O'Keefe |
| Cyres Gibson | Romeo Jackson | Imari Moon | Nowmee Shehab |

AR_216999

*A special thanks is also extended to* **USTS Interns, Fellows, and Assistants** *for their work at various stages of the project:*

| | | | |
|---|---|---|---|
| Rodrigo Aguayo-Romero | Shabab Mirza | Jeymee Semiti | Venus Selenite |
| Willem Miller | Davida Schiffer | Danielle Stevens | |

*The authors also thank the* **USTS Advisory Committee** *(UAC) members, who devoted their time to the project by giving valuable recommendations around project development and community outreach:*

| | | | |
|---|---|---|---|
| Danni Askini | Brooke Cerda Guzman | Angelica Ross | Brynn Tannehill |
| Cherno Biko | Trudie Jackson | Nowmee Shehab | |
| Thomas Coughlin | Andrea Jenkins | Stephanie Skora | |

Additional acknowledgement goes to the **more than 300 transgender, LGBT, and allied organizations** that promoted and distributed the survey to its members throughout the country for completion.

*The authors also acknowledge current and former NCTE staff for their work on the project, particularly:*

**Theo George** and **Vincent Villano** for their pivotal work in survey project development and distribution through their respective roles in digital media and communication strategy.

**Arli Christian, Joanna Cifredo, K'ai Smith**, and **Harper Jean Tobin** for their contributions as report co-writers, including lending their subject-matter expertise and analysis to the findings included in this report.

*Various individuals and firms assisted in spreading the word about the survey, both prior to and during the data collection phase, and they also assisted with survey translation, design, and reporting. Thanks goes to:*

| | | |
|---|---|---|
| Sean Carlson | Anna Zuccaro | ThoughtWorks |
| Leah Furumo | Design Action Collective | TransTech Social Enterprises |
| Molly Haigh | Dewey Square Group | ZERN |

Additionally, NCTE would like to express special appreciation to **an anonymous donor** for providing the largest share of the funds needed to conduct and report on the U.S. Transgender Survey. Other important funders were the **Arcus Foundation**, the **Gill Foundation**, the **Human Rights Campaign Foundation**, and the **David Bohnett Foundation**. NCTE is also grateful to its other funders, many of which supported this project through general operating support, including the **Ford Foundation**, the **Evelyn & Walter Haas, Jr. Fund**, and the **Tides Foundation**.

Finally, NCTE would like to give special thanks to the **National LGBTQ Task Force**, for its previous partnership in conducting the National Transgender Discrimination Survey as a joint project from 2008 to 2011, as well as for its support of NCTE's re-development of it as the U.S. Transgender Survey.



# EXECUTIVE
# SUMMARY

# USTS Executive Summary

The 2015 U.S. Transgender Survey (USTS) is the largest survey examining the experiences of transgender people in the United States, with 27,715 respondents from all fifty states, the District of Columbia, American Samoa, Guam, Puerto Rico, and U.S. military bases overseas. Conducted in the summer of 2015 by the National Center for Transgender Equality, the USTS was an anonymous, online survey for transgender adults (18 and older) in the United States, available in English and Spanish. The USTS serves as a follow-up to the groundbreaking 2008–09 National Transgender Discrimination Survey (NTDS), which helped to shift how the public and policymakers view the lives of transgender people and the challenges they face. The report of the 2015 USTS provides a detailed look at the experiences of transgender people across a wide range of categories, such as education, employment, family life, health, housing, and interactions with the criminal justice system.

The findings reveal disturbing patterns of mistreatment and discrimination and startling disparities between transgender people in the survey and the U.S. population when it comes to the most basic elements of life, such as finding a job, having a place to live, accessing medical care, and enjoying the support of family and community. Survey respondents also experienced harassment and violence at alarmingly high rates. Several themes emerge from the thousands of data points presented in the full survey report.

## Pervasive Mistreatment and Violence

Respondents reported high levels of mistreatment, harassment, and violence in every aspect of life. One in ten (10%) of those who were out to their immediate family reported that a family member was violent towards them because they were transgender, and 8% were kicked out of the house because they were transgender.

The majority of respondents who were out or perceived as transgender while in school (K–12) experienced some form of mistreatment, including being verbally harassed (54%), physically attacked (24%), and sexually assaulted (13%) because they were transgender. Further, 17% experienced such severe mistreatment that they left a school as a result.

In the year prior to completing the survey, 30% of respondents who had a job reported being fired, denied a promotion, or experiencing some other form of mistreatment in the workplace due to their gender identity or expression, such as being verbally harassed or physically or sexually assaulted at work.

AR_217002

In the year prior to completing the survey, 46% of respondents were verbally harassed and 9% were physically attacked because of being transgender. During that same time period, 10% of respondents were sexually assaulted, and nearly half (47%) were sexually assaulted at some point in their lifetime.

# Severe Economic Hardship and Instability

The findings show large economic disparities between transgender people in the survey and the U.S. population. Nearly one-third (29%) of respondents were living in poverty, compared to 12% in the U.S. population. A major contributor to the high rate of poverty is likely respondents' 15% unemployment rate—three times higher than the unemployment rate in the U.S. population at the time of the survey (5%).

Respondents were also far less likely to own a home, with only 16% of respondents reporting homeownership, compared to 63% of the U.S. population. Even more concerning, nearly one-third (30%) of respondents have experienced homelessness at some point in their lifetime, and 12% reported experiencing homelessness in the year prior to completing the survey because they were transgender.

# Harmful Effects on Physical and Mental Health

The findings paint a troubling picture of the impact of stigma and discrimination on the health of many transgender people. A staggering 39% of respondents experienced serious psychological distress in the month prior to completing the survey, compared with only 5% of the U.S. population. Among the starkest findings is that 40% of respondents have attempted suicide in their lifetime—nearly nine times the attempted suicide rate in the U.S. population (4.6%).

Respondents also encountered high levels of mistreatment when seeking health care. In the year prior to completing the survey, one-third (33%) of those who saw a health care provider had at least one negative experience related to being transgender, such as being verbally harassed or refused treatment because of their gender identity. Additionally, nearly one-quarter (23%) of respondents reported that they did not seek the health care they needed in the year prior to completing the survey due to fear of being mistreated as a transgender person, and 33% did not go to a health care provider when needed because they could not afford it.

AR_217003

# The Compounding Impact of Other Forms of Discrimination

When respondents' experiences are examined by race and ethnicity, a clear and disturbing pattern is revealed: transgender people of color experience deeper and broader patterns of discrimination than white respondents and the U.S. population. While respondents in the USTS sample overall were more than twice as likely as the U.S. population to be living in poverty, people of color, including Latino/a (43%), American Indian (41%), multiracial (40%), and Black (38%) respondents, were more than three times as likely as the U.S. population (12%) to be living in poverty. The unemployment rate among transgender people of color (20%) was four times higher than the U.S. unemployment rate (5%). People of color also experienced greater health disparities. While 1.4% of all respondents were living with HIV—nearly five times the rate in the U.S. population (0.3%)—the rate among Black respondents (6.7%) was substantially higher, and the rate for Black transgender women was a staggering 19%.

Undocumented respondents were also more likely to face severe economic hardship and violence than other respondents. In the year prior to completing the survey, nearly one-quarter (24%) of undocumented respondents were physically attacked. Additionally, one-half (50%) of undocumented respondents have experienced homelessness in their lifetime, and 68% have faced intimate partner violence.

Respondents with disabilities also faced higher rates of economic instability and mistreatment. Nearly one-quarter (24%) were unemployed, and 45% were living in poverty. Transgender people with disabilities were more likely to be currently experiencing serious psychological distress (59%) and more likely to have attempted suicide in their lifetime (54%). They also reported higher rates of mistreatment by health care providers (42%).

# Increased Visibility and Growing Acceptance

Despite the undeniable hardships faced by transgender people, respondents' experiences also show some of the positive impacts of growing visibility and acceptance of transgender people in the United States.

One such indication is that an unprecedented number of transgender people—nearly 28,000—completed the survey, more than four times the number of respondents in the 2008–09 NTDS. This number of transgender people who elevated their voices reflects the historic growth in visibility that the transgender community has seen in recent years. Additionally, this growing visibility has lifted up not only the voices of transgender men and women, but also people who are non-binary, which is a term that is often used to describe

AR_217004

people whose gender identity is not exclusively male or female, including those who identify as having no gender, a gender other than male or female, or more than one gender. With non-binary people making up over one-third of the sample, the need for advocacy that is inclusive of all identities in the transgender community is clearer than ever.

Respondents' experiences also suggest growing acceptance by family members, colleagues, classmates, and other people in their lives. More than half (60%) of respondents who were out to their immediate family reported that their family was supportive of them as a transgender person. More than two-thirds (68%) of those who were out to their coworkers reported that their coworkers were supportive. Of students who were out to their classmates, more than half (56%) reported that their classmates supported them as a transgender person.

---

O verall, the report provides evidence of hardships and barriers faced by transgender people on a day-to-day basis. It portrays the challenges that transgender people must overcome and the complex systems that they are often forced to navigate in multiple areas of their lives in order to survive and thrive. Given this evidence, governmental and private institutions throughout the United States should address these disparities and ensure that transgender people are able to live fulfilling lives in an inclusive society. This includes eliminating barriers to quality, affordable health care, putting an end to discrimination in schools, the workplace, and other areas of public life, and creating systems of support at the municipal, state, and federal levels that meet the needs of transgender people and reduce the hardships they face. As the national conversation about transgender people continues to evolve, public education efforts to improve understanding and acceptance of transgender people are crucial. The rates of suicide attempts, poverty, unemployment, and violence must serve as an immediate call to action, and their reduction must be a priority. Despite policy improvements over the last several years, it is clear that there is still much work ahead to ensure that transgender people can live without fear of discrimination and violence.

# Overview of Key Findings

## Family Life and Faith Communities

- **A majority of respondents (60%) who were out to the immediate family they grew up with said that their family was generally supportive of their transgender identity**, while 18% said that their family was unsupportive, and 22% said that their family was neither supportive nor unsupportive.

- **Those who said that their immediate families were supportive were less likely to report a variety of negative experiences related to economic stability and health**, such as experiencing homelessness, attempting suicide, or experiencing serious psychological distress.



### Negative experiences among those with supportive and unsupportive families



| | 0% | 10% | 20% | 30% | 40% | 50% | 60% |
|---|---|---|---|---|---|---|---|
| Experienced homelessness | | | | 27% | 45% | | |
| Attempted suicide | | | | 37% | 54% | | |
| Currently experiencing serious psychological distress | | | 31% | 50% | | | |

■ % of respondents whose families were supportive
▨ % of respondents whose families were unsupportive

- **One in ten (10%)** respondents who were out to their immediate family reported that **a family member was violent towards them** because they were transgender.

- **One in twelve (8%)** respondents who were out to their immediate family **were kicked out of the house**, and one in ten (10%) ran away from home.

- **Nineteen percent (19%) of respondents who had ever been part of a spiritual or religious community left due to rejection.** Forty-two percent (42%) of those who left later found a welcoming spiritual or religious community.

2015 U.S. TRANSGENDER SURVEY

AR_217006

# Identity Documents

- **Only 11% of respondents reported that** *all* **of their IDs had the name and gender they preferred, while more than two-thirds (68%) reported that** *none* **of their IDs had the name and gender they preferred.**



**Updated name or gender on ID**
OUT OF THOSE WHO HAD ID AND WANTED TO UPDATE IT (%)

Driver's license/state-issued ID: 44% (Updated name), 29% (Updated gender)
Social Security records: 43% (Updated name), 23% (Updated gender)
Student records (current or last school attended): 31% (Updated name), 18% (Updated gender)
Passport: 28% (Updated name), 18% (Updated gender)
Birth certificate: 18% (Updated name), 9% (Updated gender)

■ Updated name    ▨ Updated gender

- **The cost of changing ID documents was one of the main barriers respondents faced**, with 35% of those who have not changed their legal name and 32% of those who have not updated the gender on their IDs reporting that it was because they could not afford it.

- Nearly **one-third (32%)** of respondents **who have shown an ID with a name or gender that did not match their gender presentation were verbally harassed, denied benefits or service, asked to leave, or assaulted.**

EXECUTIVE SUMMARY

9

AR_217007

## Health Insurance and Health Care

- **One in four (25%) respondents experienced a problem in the past year with their insurance related to being transgender,** such as being denied coverage for care related to gender transition or being denied coverage for routine care because they were transgender.

- **More than half (55%) of those who sought coverage for transition-related surgery in the past year were denied,** and 25% of those who sought coverage for hormones in the past year were denied.

- **One-third (33%) of those who saw a health care provider in the past year reported having at least one negative experience related to being transgender,** with higher rates for people of color and people with disabilities. This included being refused treatment, verbally harassed, or physically or sexually assaulted, or having to teach the provider about transgender people in order to get appropriate care.

- In the past year, **23% of respondents did not see a doctor when they needed to because of fear of being mistreated as a transgender person,** and 33% did not see a doctor when needed because they could not afford it.

## Psychological Distress and Attempted Suicide

- **Thirty-nine percent (39%) of respondents experienced serious psychological distress** in the month before completing the survey (based on the Kessler 6 Psychological Distress Scale), compared with only 5% of the U.S. population.

- **Forty percent (40%) have attempted suicide** *in their lifetime,* **nearly nine times the rate in the U.S. population (4.6%).**

- **Seven percent (7%) attempted suicide** *in the past year*—**nearly twelve times the rate in the U.S. population (0.6%).**

## HIV

- Respondents were **living with HIV (1.4%) at nearly five times the rate in the U.S. population (0.3%).**

- **HIV rates were higher among transgender women (3.4%),** especially transgender women of color. **Nearly one in five (19%) Black transgender women were living with HIV,** and American Indian (4.6%) and Latina (4.4%) women also reported higher rates.

AR_217008

# Experiences in Schools

- **More than three-quarters (77%)** of those who were out or perceived as transgender at some point between Kindergarten and Grade 12 (K–12) **experienced some form of mistreatment**, such as being verbally harassed, prohibited from dressing according to their gender identity, disciplined more harshly, or physically or sexually assaulted because people thought they were transgender.

- **Fifty-four percent (54%)** of those who were out or perceived as transgender in K–12 **were verbally harassed, nearly one-quarter (24%) were physically attacked, and 13% were sexually assaulted in K–12 because of being transgender.**

- **Seventeen percent (17%) faced such severe mistreatment as a transgender person that they left a K–12 school.**

- **Nearly one-quarter (24%)** of people who were out or perceived as transgender in college or vocational school **were verbally, physically, or sexually harassed.**



Experiences of people who were out as transgender in K–12 or believed classmates, teachers, or school staff thought they were transgender

| EXPERIENCES | % OF THOSE WHO WERE OUT OR PERCEIVED AS TRANSGENDER |
|---|---|
| Verbally harassed because people thought they were transgender | 54% |
| Not allowed to dress in a way that fit their gender identity or expression | 52% |
| Disciplined for fighting back against bullies | 36% |
| Physically attacked because people thought they were transgender | 24% |
| Believe they were disciplined more harshly because teachers or staff thought they were transgender | 20% |
| Left a school because the mistreatment was so bad | 17% |
| Sexually assaulted because people thought they were transgender | 13% |
| Expelled from school | 6% |
| **One or more experiences listed** | **77%** |

AR_217009

# Income and Employment Status

- **The unemployment rate among respondents (15%) was three times higher than the unemployment rate in the U.S. population (5%),** with Middle Eastern, American Indian, multiracial, Latino/a, and Black respondents experiencing higher rates of unemployment.



- **Nearly one-third (29%) were living in poverty, more than twice the rate in the U.S. population (12%).**

# Employment and the Workplace

- **One in six (16%)** respondents who have ever been employed—or 13% of all respondents in the sample—**reported losing a job because of their gender identity or expression** in their lifetime.

- **In the past year, 27%** of those who held or applied for a job during that year—19% of all respondents—**reported being fired, denied a promotion, or not being hired for a job they applied for because of their gender identity or expression.**

- **Fifteen percent (15%) of respondents who had a job in the past year were verbally harassed, physically attacked, and/or sexually assaulted** at work because of their gender identity or expression.

- **Nearly one-quarter (23%) of those who had a job in the past year reported other forms of mistreatment** based on their gender identity or expression during that year,

2015 U.S. TRANSGENDER SURVEY

AR_217010

such as being forced to use a restroom that did not match their gender identity, being told to present in the wrong gender in order to keep their job, or having a boss or coworker share private information about their transgender status without their permission.

- **Overall, 30% of respondents who had a job in the past year reported being fired, denied a promotion, or experiencing some other form of mistreatment related to their gender identity or expression.**

- **More than three-quarters (77%)** of respondents who had a job in the past year **took steps to avoid mistreatment in the workplace**, such as hiding or delaying their gender transition or quitting their job.

## Housing, Homelessness, and Shelter Access

- **Nearly one-quarter (23%) of respondents experienced some form of housing discrimination in the past year**, such as being evicted from their home or denied a home or apartment because of being transgender.

- **Nearly one-third (30%) of respondents have experienced homelessness at some point in their lives.**

- **In the past year, one in eight (12%) respondents experienced homelessness** because of being transgender.

- **More than one-quarter (26%) of those who experienced homelessness in the past year avoided staying in a shelter because they feared being mistreated as a transgender person.** Those who did stay in a shelter reported high levels of mistreatment: **seven out of ten (70%)** respondents who stayed in a shelter in the past year reported some form of mistreatment, including being harassed, sexually or physically assaulted, or kicked out because of being transgender.

**Seven out of ten respondents who stayed in a shelter in the past year reported being mistreated because of being transgender.**



- Respondents were nearly **four times less likely to own a home (16%) compared to the U.S. population (63%)**.

AR_217011

# Sex Work and Other Underground Economy Work

- Respondents reported high rates of experience in the underground economy, including sex work, drug sales, and other work that is currently criminalized. **One in five (20%) have participated in the underground economy** for income at some point in their lives—including 12% who have done sex work in exchange for income—and 9% did so in the past year, with higher rates among women of color.

- Respondents who interacted with the police either while doing sex work or while the police mistakenly thought they were doing sex work reported high rates of police harassment, abuse, or mistreatment, with **nearly nine out of ten (86%) reporting being harassed, attacked, sexually assaulted, or mistreated in some other way by police.**

- **Those who have done income-based sex work were also more likely to have experienced violence.** More than three-quarters (77%) have experienced intimate partner violence and 72% have been sexually assaulted, a substantially higher rate than the overall sample. Out of those who were working in the underground economy at the time they took the survey, nearly half (41%) were physically attacked in the past year and over one-third (36%) were sexually assaulted during that year.

# Police Interactions and Prisons

- **Respondents experienced high levels of mistreatment and harassment by police.** In the past year, of respondents who interacted with police or law enforcement officers who thought or knew they were transgender, **more than half (58%) experienced some form of mistreatment.** This included being verbally harassed, repeatedly referred to as the wrong gender, physically assaulted, or sexually assaulted, including being forced by officers to engage in sexual activity to avoid arrest.

- **Police frequently assumed that respondents—particularly transgender women of color—were sex workers.** In the past year, of those who interacted with law enforcement officers who thought or knew they were transgender, one-third (33%) of Black transgender women and 30% of multiracial women said that an officer assumed they were sex workers.

- **More than half (57%)** of respondents said they would feel **uncomfortable asking the police for help** if they needed it.

- Of those who were arrested in the past year (2%), **nearly one-quarter (22%) believed they were arrested because they were transgender**.

AR_217012



**Transgender women reporting that police assumed they were sex workers in the past year (out of those who interacted with officers who thought they were transgender)**
RACE/ETHNICITY (%)

| | |
|---|---|
| Overall* | 11% |
| American Indian women | 23% |
| Asian women | 20% |
| Black women | 33% |
| Latina women | 25% |
| Middle Eastern women** | |
| Multiracial women | 30% |
| White women | 11% |

*Represents respondents of all genders who interacted with officers who thought they were transgender
**Sample size too low to report

- Respondents who were held in jail, prison, or juvenile detention in the past year faced **high rates of physical and sexual assault by facility staff and other inmates**. In the past year, nearly one-quarter (23%) were physically assaulted by staff or other inmates, and one in five (20%) were sexually assaulted. Respondents were over **five times more likely to be sexually assaulted by facility staff** than the U.S. population in jails and prisons, and over **nine times more likely to be sexually assaulted by other inmates**.

# Harassment and Violence

- **Nearly half (46%) of respondents were verbally harassed** in the past year because of being transgender.

- **Nearly one in ten (9%) respondents were physically attacked** in the past year because of being transgender.

- **Nearly half (47%) of respondents were sexually assaulted** at some point in their lifetime and **one in ten (10%) were sexually assaulted in the past year.** Respondents who have done sex work (72%), those who have experienced homelessness (65%), and people with disabilities (61%) were more likely to have been sexually assaulted in their lifetime.

- **More than half (54%) experienced some form of intimate partner violence**, including acts involving coercive control and physical harm.

- **Nearly one-quarter (24%) have experienced severe physical violence by an intimate partner, compared to 18% in the U.S. population.**

AR_217013

# Places of Public Accommodation

- Respondents reported being denied equal treatment or service, verbally harassed, or physically attacked at many places of public accommodation—places that provide services to the public, like retail stores, hotels, and government offices. Out of respondents who visited a place of public accommodation where staff or employees thought or knew they were transgender, **nearly one-third (31%) experienced at least one type of mistreatment in the past year in a place of public accommodation**. This included 14% who were denied equal treatment or service, 24% who were verbally harassed, and 2% who were physically attacked because of being transgender.

- **One in five (20%) respondents did not use at least one type of public accommodation** in the past year because they feared they would be mistreated as a transgender person.

**Denied equal treatment or service, verbally harassed, or physically attacked in public accommodations in the past year because of being transgender**

| LOCATION VISITED | % OF THOSE WHO SAID STAFF KNEW OR THOUGHT THEY WERE TRANSGENDER |
|---|---|
| Public transportation | 34% |
| Retail store, restaurant, hotel, or theater | 31% |
| Drug or alcohol treatment program | 22% |
| Domestic violence shelter or program or rape crisis center | 22% |
| Gym or health club | 18% |
| Public assistance or government benefit office | 17% |
| Department of Motor Vehicles (DMV) | 14% |
| Nursing home or extended care facility | 14% |
| Court or courthouse | 13% |
| Social Security office | 11% |
| Legal services from an attorney, clinic, or legal professional | 6% |



# Experiences in Restrooms

The survey data was collected before transgender people's restroom use became the subject of increasingly intense and often harmful public scrutiny in the national media and legislatures around the country in 2016. Yet respondents reported facing frequent harassment and barriers when using restrooms at school, work, or in public places.

- **Nearly one in ten (9%) respondents reported that someone denied them access to a restroom in the past year.**

- In the past year, **respondents reported being verbally harassed (12%), physically attacked (1%), or sexually assaulted (1%)** when accessing a restroom.

2015 U.S. TRANSGENDER SURVEY

AR_217014

- **More than half (59%)** of respondents **avoided using a public restroom** in the past year because they were afraid of confrontations or other problems they might experience.

- **Nearly one-third (32%)** of respondents **limited the amount that they ate and drank** to avoid using the restroom in the past year.

- **Eight percent (8%)** reported having a **urinary tract infection, kidney infection, or another kidney-related problem** in the past year as a result of avoiding restrooms.

**More than half (59%)** of respondents **avoided using a public restroom** in the past year because they were afraid of confrontations or other problems they might experience.

# Civic Participation and Party Affiliation

- **More than three-quarters (76%) of U.S. citizens of voting age in the sample reported that they were registered to vote in the November 2014 midterm election,** compared to 65% in the U.S. population.

- **More than half (54%)** of U.S. citizens of voting age **reported that they had voted in the midterm election,** compared to 42% in the U.S. population.

- **Half (50%) of respondents identified as Democrats, 48% identified as Independents, and 2% identified as Republicans,** compared to 27%, 43%, and 27% in the U.S. population, respectively.

**Political party affiliation**

| POLITICAL PARTY | % IN USTS | % IN U.S. POPULATION (GALLUP) |
|---|---|---|
| Democrat | 50% | 27% |
| Independent | 48% | 43% |
| Republican | 2% | 27% |





# CHAPTER 1
# Introduction

This report presents the findings of the 2015 U.S. Transgender Survey (USTS), a study conducted by the National Center for Transgender Equality (NCTE). With 27,715 respondents, it is the largest-ever survey examining the lives of transgender people in the United States. The USTS provides a detailed portrait of the experiences of transgender people across many areas, including health, family life, employment, and interactions with the criminal justice system.

The USTS serves as a follow-up to the National Transgender Discrimination Survey (NTDS), which was developed by NCTE and the National LGBTQ Task Force and conducted in 2008–09. The NTDS was the first comprehensive survey examining the lives and experiences of transgender and gender nonconforming people in the United States. With 6,456 respondents reporting on a range of experiences throughout their lives, the NTDS was a groundbreaking study. The results were published in the 2011 report, *Injustice at Every Turn*, and showed that discrimination against transgender people was pervasive in many areas of life, including education, employment, health care, and housing. The report also highlighted the resilience of transgender people in the face of such discrimination and found that family and peer support could have a substantially positive impact on a transgender person's quality of life. The report quickly became a vital source of information about transgender people and continues to serve as an important resource for advocates, policymakers, educators, service providers, media, and the general public.

Much has changed since the NTDS was conducted in 2008–09 and results were published in 2011, including increased visibility of transgender people in the media and in society in general. Despite making significant strides in the five years since the report was published, there is still a substantial amount of work to be done to address critical needs in transgender communities throughout the United States. Transgender people continue to experience discrimination and anti-transgender bias in virtually all areas of life.

The 2015 U.S. Transgender Survey was developed by the National Center for Transgender Equality to provide updated and more detailed data to inform a wide range of audiences about the experiences of transgender people, how things are changing, and what can be done to improve the lives of transgender individuals in the United States. It is the largest survey of transgender people conducted to date, far surpassing the previous survey, with 27,715 respondents. This study explores a wider range of topics than the previous survey and more deeply examines specific issue areas where transgender people are disparately impacted, such as health care, HIV/AIDS, housing, workplace discrimination, immigration, sex work, and police interactions. Additionally, by closely mirroring questions from federal and other existing surveys, this study seeks to fill in the gaps left by the lack of data collected about transgender people in national surveys. Since federal survey data is often used by government agencies to make key determinations about policies and programs that affect individuals in many areas of life, such as employment and health, it is important to provide specific data on the potential impact of such policies on transgender people. This report on the U.S. Transgender Survey data draws comparisons between transgender people and the U.S. population and examines disparities across multiple issue areas.

This report demonstrates that transgender people continue to face discrimination in numerous areas that significantly impact quality of life, financial stability, and emotional wellbeing, including employment, education, housing, and health care. Furthermore, many respondents experienced discrimination in multiple areas of their lives, the cumulative effect of which leads to severe economic and emotional hardship and can in turn have devastating effects on other outcome areas, such as health and safety.

Although issues impacting transgender people have become more visible in the years since the NTDS was published, the data overwhelmingly demonstrates that there is still a long way to go towards eliminating harmful discrimination and providing sustainable systems of support for transgender people throughout their lives. These findings are presented with the recognition that advocates, researchers, and transgender communities will greatly benefit from additional research conducted using this extensive data source. The authors encourage subsequent analyses to delve into areas of the data that this report is unable to address, and as before, will strive to make the dataset available for such analyses.

INTRODUCTION

AR_217017

# Report Roadmap

The next chapter of the report will give an overview of the study's methodology, which will be followed by a guide to this report, including information about terminology used throughout. These will be followed by chapters discussing respondents' experiences across a range of areas that impact transgender people's lives:

- Portrait of USTS Respondents
- Family Life and Faith Communities
- Identity Documents
- Health
- Experiences at School
- Income and Employment Status
- Employment and the Workplace
- Sex Work and Other Underground Economy Work
- Military Service
- Housing, Homelessness, and Shelter Access
- Police, Prisons, and Immigration Detention
- Harassment and Violence
- Places of Public Accommodation and Airport Security
- Experiences in Restrooms
- Civic Participation and Policy Priorities

The report also contains three appendices, which offer more detailed information related to the study:

Appendix A: Characteristics of the Sample

Appendix B: Survey Instrument (Questionnaire)

Appendix C: Detailed Methodology

AR_217018



# CHAPTER 2
# Methodology

The U.S. Transgender Survey is the largest survey ever conducted to examine the experiences of transgender people in the United States. The survey instrument was comprised of thirty-two sections reflecting 1,140 distinct variables that covered a broad array of topics, such as health and health care access, and experiences around employment, education, housing, law enforcement, and public accommodation.[1] The survey was developed by a team of researchers and advocates and administered online to transgender adults residing in the United States.[2] The survey was accessible via any web-enabled device (e.g., computer, tablet, netbook, smart phone), accessible for respondents with disabilities (e.g., through screen readers), and made available in English and Spanish. Rankin & Associates Consulting hosted the survey on several secure servers. The survey was accessed exclusively through a website created specifically for the promotion and distribution of the survey.[3] Data was collected over a 34-day period in the summer of 2015,[4] and the final sample included 27,715 respondents from all fifty states, the District of Columbia, American Samoa, Guam, Puerto Rico, and U.S. military bases overseas. The survey contained mainly closed-ended questions, but respondents were also offered the opportunity to provide write-in responses in fifty-three of the survey questions. Over 80,000 write-in responses were provided by respondents.

METHODOLOGY

21

AR_217019

# I. About the U.S. Transgender Survey

The U.S. Transgender Survey (USTS) was developed as the follow-up to the groundbreaking National Transgender Discrimination Survey (NTDS), which was the first study to comprehensively measure experiences and life outcomes of transgender people in the United States. Fielded in late 2008 to early 2009 by the National Center for Transgender Equality (NCTE) and the National LGBTQ Task Force ("the Task Force"), the NTDS provided data that has informed policymakers, advocates, and educators since its publication in 2011. However, the NTDS report acknowledged that the study had "just scratched the surface of this extensive data source" and encouraged advocates and researchers to conduct additional research to continue collecting data aimed at identifying and addressing the needs of transgender people.[5] The NTDS authors also examined the survey instrument and concluded that there were "imperfections" in the manner in which several questions had been posed.[6] The authors addressed areas for potential improvement with respect to both survey question design and substantive content in an "issues and analysis" section of the report.[7] These recommendations were considered in the development of the U.S. Transgender Survey.

In subsequent years, researchers have performed additional analyses using the NTDS public use dataset provided by NCTE and the Task Force. These analyses provided further insight into the experiences of transgender people, but also increased awareness of the questions that remained unanswered after the NTDS report was published. In some instances, there was insufficient information to draw nuanced comparisons between life outcomes of transgender people collected in the NTDS and the U.S. general population. In other cases,

the ability to form additional conclusions was limited due to a lack of follow-up questions. For example, the NTDS asked a single question about suicide attempts, which did not allow for a clear examination of suicidal thoughts and behaviors.[8] Additionally, given the deficiency of longitudinal data on outcomes specific to transgender people, there remained a need to collect data that could speak to the experiences of transgender people over time and how outcomes may have changed in the years since the NTDS was published. In these respects, the NTDS provided an important platform upon which to build the USTS to address identified areas for improvement and collect data that would enable new insights to be drawn about transgender people in the United States.

The study was renamed the U.S. Transgender Survey for several reasons. One was to clarify the geographical location of the intended study sample both during the data collection period and following report publication. The use of "U.S." signaled that this study was developed with the unique needs of transgender people in the United States and U.S. territories in mind, considering relevant policies, procedures, and practices applicable to residents of the United States at the time of the study in areas such as health care and insurance, income, employment, housing, and education. Recognizing the contextual differences between the experiences of transgender people in the U.S. and in other parts of the world, the research team sought to dispel any confusion arising from the use of "national" in the title. The new name was also intended to reflect the depth and breadth of the experiences of transgender people in the U.S. and elevate a variety of narratives beyond discrimination, including the resilience and resourcefulness of the transgender community in the face of hardship, as well as experiences of acceptance and affirmation. "Discrimination" was removed from the title to clarify that the survey was designed to capture all such experiences. Additionally, removing the word

AR_217020

reduced potential bias in respondents' answers or resulting from primarily attracting respondents who felt they had experienced discrimination.

# II. USTS Respondents

The study population included individuals who identified as transgender, trans, genderqueer, non-binary, and other identities on the transgender identity spectrum, in order to encompass a wide range of transgender identities, regardless of terminology used by the respondent. Although "transgender" was defined broadly for the purposes of this study as being inclusive of a wide range of identities—such as genderqueer, non-binary, and crossdresser—the research team recognized that many individuals for whom the study was intended may have used different terminology or definitions and might have assumed that the term "transgender" did not include them. To address this, promotional materials affirmed that the survey was inclusive of all transgender, trans, genderqueer, and non-binary people. Additionally, materials specified that the survey was for adults at any stage of their lives, journey, or transition to encourage participation among individuals with diverse experiences regarding their transgender identity. An in-depth description of survey respondents is available in the *Portrait of USTS Respondents* chapter.

The study included individuals aged 18 and older at the time of survey completion, as did the NTDS. The study was not offered to individuals under the age of 18 due to limitations created by specific risk factors and recommendations associated with research involving minors. These considerations, including requirements for parental/guardian consent, would have impacted the survey's scope and content and also reduced the literacy level at which the survey could be offered.[9] Furthermore, the current experiences and needs of transgender youth often differ from those of adults in a number of key areas, including experiences related to education, employment, accessing health care, and updating identity documents, and many of these experiences or needs could not be adequately captured in a survey that was not specifically tailored to transgender people under the age of 18.

The sample was limited to individuals currently residing in a U.S. state or territory, or on a U.S. military base overseas, since the study focused on the experiences of people who were subject to U.S. laws and policies at the time they completed the survey. Individuals residing outside of the U.S. may have vastly different experiences across a number of outcome measures based on each respective country's laws, policies, and culture, particularly in the areas of education, employment, housing, and health care. Additionally, many survey questions were taken from U.S. federal government surveys that also limit their sample population to individuals in the U.S., and the research team sought to examine a similar population with regard to geographical location to allow for comparisons to the U.S. general population.

# III. Developing the Survey Instrument

The USTS survey instrument was developed over the course of a year by a core team of researchers and advocates in collaboration with dozens of individuals with lived experience, advocacy and research experience, and subject-matter expertise. When developing the survey instrument, the research team focused on creating a questionnaire that could provide data to address both current and emerging needs of transgender people while gathering information about disparities

AR_217021

that often exist between transgender people and non-transgender people throughout the U.S. To achieve this, questions were included that would allow comparisons between the USTS sample and known benchmarks for the U.S. population as a whole or populations within the U.S. Consequently, questions were selected to best match those previously asked in federal government or other national surveys on a number of measures, such as measures related to income and health.[10] Changes were made to the language of comparable questions whenever it was required to more appropriately reflect issues pertaining to transgender people and language in common use in the transgender community while maintaining comparability to the best extent possible. However, in many cases, language was preserved to ensure that responses to a USTS question would maintain maximum comparability with surveys such as the U.S. Census Bureau's American Community Survey and Current Population Survey.

Several questions were also included in an attempt to provide comparability between the NTDS, where possible, to determine how certain outcomes may have changed since the NTDS data was collected in 2008–09. While the USTS provides crucial updated data, it is important to note that many of the questions asked in the NTDS were either not included in the USTS, or they were asked in a manner that reduced comparability with the NTDS. For example, many USTS questions asked about whether certain experiences occurred within the past year instead of asking whether those experiences occurred at any point during an individual's lifetime. These questions were included for both comparability with federal government or other national surveys and also to yield improved data regarding changing experiences in future iterations of the USTS. In such instances, the NTDS continues to provide the best available data regarding experiences that occurred over respondents' lifetime. The authors suggest referring to both the USTS and the NTDS to gain a full picture of issues impacting transgender people.

The survey instrument was reviewed by researchers, members of the transgender community, and transgender advocates at multiple intervals throughout the development process. This included thorough reviews of sections that addressed specific subject matter and the entire questionnaire. The questionnaire was revised based on feedback from dozens of reviewers.

## a. Pilot Study

Prior to finalizing the survey instrument and launching the survey in field, a pilot study was conducted to evaluate the questionnaire. The pilot study was conducted among a small group of individuals with characteristics that were representative of the sample the study was intended to survey. The pilot study was administered through an online test site using the same platform and format in which the final survey later appeared. The purpose of the pilot study was to provide both a substantive and technical evaluation of the survey. Approximately 100 individuals were invited to complete and evaluate the survey online during a specified period of time. In order to receive access to the pilot study test site, invitees were required to confirm their participation by indicating that they met the following pilot study criteria: they were (1) 18 years or older, (2) transgender, (3) willing to provide feedback that would be used to make improvements to the survey, (4) available to take the survey online during specified dates, and (5) agreeing to not share the questions in the pilot study with anyone so as to not compromise the study. Forty (40) individuals confirmed their participation and received access to the pilot study test site. Thirty-two (32) people completed the study and submitted feedback on the questionnaire, including participants in fifteen states ranging in age from 19 to 78. Participants

AR_217022

reported identifying with a range of gender identities[11] and racial and ethnic identities, including 34% who identified as people of color.[12]

In addition to providing general feedback on individual questions and the entire questionnaire, pilot study participants were asked to address specific questions as part of their evaluation, including: (1) how long it took to complete the survey, (2) what they thought about the length of the survey, (3) whether any existing questions were confusing or difficult to answer, (4) whether they found any questions offensive or thought they should be removed or fixed, (5) whether they experienced technical or computer issues while taking the survey, and (6) what they thought about the statement explaining why the term "trans" was used throughout the survey.[13] All participant feedback was compiled, discussed, and used to further develop the questionnaire, such as through the revision of language and the addition of questions to more thoroughly examine an issue.

### b. Length

The final survey questionnaire contained a total of 324 possible questions in thirty-two discrete sections addressing a variety of subjects, such as experiences related to health and health care access, employment, education, housing, interactions with law enforcement, and places of public accommodation. The online survey platform allowed respondents to move seamlessly through the questionnaire and ensured they only received questions that were appropriate based on previous answers. This was accomplished using skip logic, which created unique pathways through the questionnaire, with each next step in a pathway being dependent on an individual respondent's answer choices. For example, respondents who reported that they had served in the U.S. Armed Forces, Reserves, or National Guard received a series of questions about their military service, but those who had not served

did not receive those questions. Due to the customized nature of the survey, the length varied greatly between respondents, and no respondent received all possible questions. Prior to the pilot study, estimates indicated a survey-completion time of 30–45 minutes. The completion-time estimate was extended to 60 minutes based on feedback from pilot study participants, and it was consistent with many reports during the fielding period.[14]

Despite observations about survey length discussed in the NTDS,[15] evolving data needs relating to issues affecting transgender people required an in-depth treatment of multiple issue areas. This often required multiple questions to thoroughly assess an issue—including in areas where the NTDS asked only one question—and resulted in a lengthier survey. Survey instrument length was assessed throughout its development to ensure it would be manageable for as many participants as possible. Furthermore, through multiple reviews and evaluations of the survey instrument—including the pilot study—survey takers reported that the length was appropriate for a survey addressing such a wide range of issues and the need for data outweighed concerns about the overall length of the survey.

# IV. Survey Distribution and Sample Limitations

The survey was produced and distributed in an online-only format after a determination that it would not be feasible to offer it in paper format due to the length and the complexity of the skip logic required to move through the questionnaire. With so many unique possibilities for a customized survey experience for each respondent, the intricate level of navigation through the survey

would have created an undue burden and confusion for many respondents. This could have led to questions being answered unnecessarily or being skipped completely, which could have increased the potential for missing data in the final dataset.[16] This made online programming the best option for ensuring that respondents received all of the questions that were appropriate based on their prior answers, decreasing the probability of missing data. However, the potential impact of internet survey bias on obtaining a diverse sample has been well documented in survey research,[17] with findings that online and paper surveys may reach transgender respondents with "vastly different health and life experiences."[18] With those considerations in mind, outreach efforts were focused on addressing potential demographic disparities in our final sample that could result from online bias and other issues relating to limited access. Although the intention was to recruit a sample that was as representative as possible of transgender people in the U.S., it is important to note that respondents in this study were not randomly sampled and the actual population characteristics of transgender people in the U.S. are not known. Therefore, it is not appropriate to generalize the findings in this study to all transgender people.

# V. Outreach

The main outreach objective was to provide opportunities to access the survey for as many transgender individuals as possible in different communities across the U.S. and its territories. Additionally, outreach efforts focused on reaching people who may have had limited access to the online platform and who were at increased risk of being underrepresented in such survey research. This included, but was not limited to, people of color, seniors, people residing in rural areas, and low-income individuals. The outreach strategy was

a multi-pronged approach to reach transgender people through various connections and points-of-access, including transgender- or LGBTQ-specific organizations, support groups, health centers, and online communities.

Outreach efforts began approximately six months prior to the launch of the data-collection period with a variety of tactics designed to raise awareness of the survey, inform people when it would be available, and generate opportunities for community engagement, participation, and support. A full-time Outreach Coordinator worked for a period of six months to develop and implement the outreach strategy along with a team of paid and volunteer interns and fellows.[19]

An initial phase of outreach involved developing lists of active transgender, LGBTQ, and allied organizations who served transgender people and would eventually support the survey by spreading the word through multiple communication platforms and in some cases providing direct access to the survey at their offices or facilities. Establishing this network of "supporting organizations" was an essential component of reaching a wide, diverse sample of transgender people.

Over 800 organizations were contacted by email, phone, and social media, and they were asked if they would support the survey by sharing information about it with their members and contacts. Specifically, supporting organizations were asked to share information through email blasts and social media channels, and the research team provided language and graphics for organizations to use in an effort to recruit appropriate respondents into the study. Of the organizations contacted, approximately half responded to requests for support, resulting in direct recruitment correspondence with nearly 400 organizations at regular intervals during the pre-data-collection period and while the survey was in the field.[20,21] These organizations

performed outreach that contributed to the far reach of the survey and unprecedented number of respondents.[22] The organizations were also featured on the survey website so potential respondents could determine whether organizations they knew and trusted had pledged support for the survey.

Nearly 400 organizations responded to outreach and confirmed their support for the survey. The remaining organizations did not respond directly to invitations to learn more about the survey and become supporters. Consequently, these organizations did not receive correspondence aimed at directly recruiting respondents prior to the survey launch or during the data-collection period. It is possible, however, that survey respondents were still made aware of the survey through those organizations. Since there is no information regarding whether these organizations shared information about the survey through their channels, it is difficult to assess the full scope of the outreach efforts.

## a. Advisory Committee

A significant element of outreach involved convening a USTS Advisory Committee (UAC). The UAC was created to increase community engagement in the survey project and raise awareness by connecting with transgender people in communities across the country through a variety of networks. The UAC was comprised of eleven individuals with advocacy, research, and lived experience from a wide range of geographical locations.[23] Members were invited to join the committee as advisors on survey outreach to facilitate the collection of survey data that would best reflect the range of narratives and experiences of transgender people in the U.S. Each member brought unique skills and expertise to contribute to the committee's objectives. UAC members participated in five monthly calls with members of the USTS outreach team from May

to September 2015. UAC monthly calls focused on providing project updates and identifying pathways by which outreach could be conducted to increase the survey's reach and promote participation from a diverse sample. Members suggested organizations, individuals, and other avenues through which to conduct outreach, shared ideas and strategies for improving outreach to specific populations of transgender people, and spread the word about the survey through their professional and personal networks.

## b. Survey-Taking Events

In an effort to increase accessibility of the survey, the outreach team worked with organizations across the country to organize events or venues where people could complete the survey. *Survey-Taking Events*,[24] or "survey events," were spaces in which organizations offered resources to provide access to the survey, such as computers or other web-enabled devices. These organizations provided a location in which to take the survey at one particular time or over an extended period of time, such as during specified hours over the course of several days.[25] The events were created with the intention of providing access to individuals with limited or no computer or internet access, those who may have needed assistance when completing the survey, or those who needed a safe place to take the survey. Additionally, the population that had previously been identified as being more likely to take a paper survey than an online survey were considered,[26] and the events were developed to target those individuals.

Given the potential variety of these survey events—including the types of available resources and times at which they were conducted—guidelines were needed to maintain consistency across the events and preserve the integrity of the data-collection process. A protocol was developed outlining the rules for hosting a survey event to advise hosts on best practices for ensuring

a successful data-collection process, including guidelines to prevent the introduction of bias into survey responses. The protocols described the steps for becoming a survey-event host and tips for how to conduct outreach about the event. The protocol also specified that hosts should inform NCTE of their event prior to hosting and report on how many people attended the event and how many people completed and submitted the survey. This was helpful information for evaluating the relative success and benefits of these events. All confirmed supporting organizations were invited to become survey event hosts, and those who accepted the invitation were sent the protocol. Seventy-one (71) organizations accepted the invitation and confirmed the date(s) and time(s) of their events.[27]

Survey events were promoted on the survey website and given a specific designation on the supporting organization map (described further in the "Survey Website" section), including information about where and when people could attend. Hosts were encouraged to promote their event through multiple channels and consider outreach methods beyond online avenues, such as direct mail or flyers, to better reach transgender people with limited or no internet access. Additionally, hosts were provided with flyer templates so they could promote the events in their facilities or through communications with their members or constituents. Of the organizations who confirmed their survey events, 46 reported information about attendance at the event. The hosts reported that 341 people attended their events, including transgender and non-transgender friends, family, and volunteers. Approximately 199 respondents completed the survey at these events.[28] However, survey responses indicate that additional unreported survey events or similar gatherings may have been held where participants had an opportunity to complete the survey.[29] Event-related information submitted by organizations following the fielding

period was not comprehensive enough to make a thorough determination as to whether the events had achieved their previously stated objectives.[30]

### c. Incentives

As an incentive for completing the survey, participants were offered a cash-prize drawing. Incentives, such as cash prizes are widely accepted as a means by which to encourage and increase participation in survey research.[31] Studies have shown that such incentives may have a positive effect on survey response rate, which is the proportion of individuals in the population of interest that participates in the survey.[32] Research has also found that lottery-style cash drawings may be beneficial in online surveys,[33] since they offer a practical method for providing incentives in surveys with a large number of respondents by eliminating the potential high cost of both the cash incentive and prize distribution.[34]

USTS respondents were offered the opportunity to enter into a drawing for one of three cash prizes upon completion of the survey, including one $500 cash prize and two $250 cash prizes.[35] After completing and submitting their anonymous survey responses, USTS respondents were re-directed away from the survey hosting site[36] to a web page on the NCTE-hosted USTS website. In addition to being thanked for their participation on this page, respondents received a message confirming that their survey had been submitted and any further information they gave would not be connected to their survey responses. Only individuals who completed and submitted the survey were eligible for one of the cash prizes. To enter into the prize drawing, respondents were required to check a box giving their consent to be entered.[37] Respondents were also asked to provide their contact information in order to be notified if selected in the drawing. The final drawing contained 17,683 entrants. Each entrant was assigned a number, and six numbers were randomly chosen by a non-NCTE party: three

AR_217026

numbers for the prize winners and three for alternates if necessary. The three prize winners were contacted and awarded their prizes upon acceptance.

# VI. Communications

Communications for the survey required a multifaceted approach and a coordinated effort with the outreach strategy to most effectively reach a wide range of transgender people and ensure a robust sample size. The goals of survey communications were to: (1) inform people that NCTE would be conducting a survey to further the understanding of the experiences of transgender people in the U.S initially gleaned through the NTDS, (2) communicate when the survey would be available to complete and how it could be accessed, and (3) find creative ways of reaching diverse populations of potential respondents. This involved raising awareness of the survey through several communication methods, including email, social media, and print media, as well as through additional unique campaigns. Many survey promotional materials were produced in English and Spanish to increase the accessibility of the survey.[38]

## a. Survey Website

A website was created and designed specifically for the promotion and distribution of the survey.[39] This website served as a platform for providing information about the survey starting several months prior to its release in the field, such as a description of the survey, information about the team working on the survey, frequently asked questions, and sample language and graphics for individuals and organizations to use for email and social media communications, including sample Facebook and Twitter postings. The website also featured an interactive map, which included information about organizations that had pledged to support the survey. Additionally, the map distinctly indicated information about organizations that were hosting survey-taking events, including the date, time, and location of such events. The website later served as the only platform through which the survey could be accessed and provided English and Spanish links to enter the survey, since there was no direct link available to the off-site hosting platform.

## b. Survey Pledge

The survey pledge campaign was developed to raise awareness about the survey and generate investment in the project. The campaign engaged potential participants and allies by inviting them to pledge to take the survey and/or spread the word about the survey. The survey pledge was a critical method of both informing people that the survey would be launching and sustaining engagement with potential respondents in the months leading up to the fielding period. Pledges received reminders about the survey launch date and availability through email communications. Beginning in January 2015, pledge palm cards were distributed at a variety of events across the country, including conferences and speaking engagements. The cards contained information about the upcoming survey and asked people to sign up to help by committing to: (1) spread the word about the survey; and/or (2) take the survey. Transgender and non-transgender individuals were asked to complete the pledge information, either through a palm card or directly online through the survey website. Individuals who completed pledge information received email communications throughout the pre-data-collection phase. Pledge information was collected continuously for several months, and by the time of the survey launch, over 14,000 people had pledged to take the survey. Additionally, more than 500 people pledged to promote the survey among their transgender friends and family.[40] The pledge proved to be

an effective method of assessing how many people had learned about the survey and were interested in completing it, where potential survey respondents were distributed geographically, and how more potential respondents could be effectively engaged.

## c. Photo Booth Campaign

In January 2015, a photo booth campaign was launched as another method for engaging people and raising awareness about the survey. Individuals and groups were asked to take photos holding one of two signs with messages expressing support for the survey.[41] USTS photo booths were conducted at several conferences and events across the country. More than 300 photos were collected and shared directly through NCTE's Facebook page. Photos were also sent to most participants so they could conduct their own promotion using their photos.

## d. Social Media

With the increased use of social media in the years since the previous survey (the NTDS), it was important to engage via these outlets to further the reach of the survey. Facebook and Twitter[42] became the primary social media outlets used throughout the survey project, and their use significantly amplified awareness, increasing the number of people who were exposed to the survey. A series of postings provided the ability to rapidly and succinctly communicate with individuals and groups who had an interest in contributing to the survey's success by completing the survey and spreading the word about it. Although social media reach fluctuated during the months leading up to the survey launch, over 96,000 Facebook users were estimated to have received NCTE's post announcing that the survey was live and available for completion on August 19, 2015.

## e. USTS Awareness Week

Prior to launching the survey in the field, communication was maintained with thousands of individuals and organizations who fell into three categories: (1) people who had signed up to take or spread the word about the survey ("pledge list"), (2) organizations that had committed to support the survey through outreach efforts ("supporting organization list"), and (3) people who had signed up to be in communication with NCTE about the organization's work and projects ("NCTE list").

Communication with the individuals and groups on these lists through targeted messages occurred at various intervals; however, one of the most important methods for promoting the survey was through USTS Awareness Week. This campaign was designed to share a significant amount of information about the survey over a concentrated period of time in close proximity to the launch of the survey. Awareness Week occurred during the week of July 27, 2015 and highlighted different aspects of the survey focusing on a different medium each day, including social media, email, and blogs. Awareness Week was introduced to the communication lists on July 15, and recipients were invited to access and download a planning kit for the campaign, which was available on the survey website. The planning kit included language and graphics for email and social media communications. Communications were sent on each of the days devoted to social media,[43] email,[44] and blogs[45] with appeals for organizations to share the information with their membership and individuals to share the information through their personal networks. Awareness Week proved to be one of the most effective methods for increasing the number of individuals who pledged to take the survey and likely increased the number of eventual respondents.[46]

### f. Additional Communications Methods

The overall approach to survey communications was diverse and captured many media forms. In addition to the previously stated campaigns and projects, communications involved working with a variety of individuals such as bloggers, artists, advocates, and others to create print blogs and videos promoting the survey. Op-eds were another medium that contributed to survey promotion, and media consultants and traditional media sources aided in expanding the survey's reach even further. Approximately 50 articles, blogs, and op-eds focused on the survey were produced and distributed by organizations, including NCTE, and individuals prior to the launch of the survey and during the data-collection period. The wide variety of approaches contributed to the number of individuals who were reached through all communications and likely impacted the final number of respondents in the sample.

# VII. Language and Translation

Throughout the survey questionnaire, the use of accessible language was balanced with preserving the meaning of each question to the greatest extent possible. This was of particular importance in maintaining comparability with questions from existing surveys that allowed conclusions to be drawn about how the experiences of the USTS sample compares to the U.S. population. In order to make assessments about USTS survey respondents in relation to the U.S. population, it was important that USTS respondents had similar interpretations of questions taken from other surveys as non-transgender survey takers had to those questions in federal surveys. In many places, language was revised to use terminology that would most appropriately speak to individuals in the many communities for which the survey was intended. However, several areas required difficult choices about keeping language that may have caused discomfort for some respondents. Throughout the questionnaire, language was avoided that could be interpreted as stigmatizing or characterized as a value judgment wherever possible while maintaining objectivity in crafting sound research questions. For example, at times survey questions referred to work or activities that were "currently considered illegal." Such deliberate language was used in an attempt to separate the issue of criminalization from the activity in question while maintaining comparability with other surveys. This was a difficult balance to achieve throughout the survey. Eliminating technical language was also necessary, unless it was widely used and accepted in transgender communities, such as some medical terminology. Short descriptions or parenthetical explanations were provided whenever technical language was required for those who may not have been familiar with the language. Additionally, hyperlinked explanations of specific terms were included when those terms could be interpreted in several ways or if similar explanations were provided in the federal surveys from which the questions were taken. For example, explanations were provided for the terms "active duty" when asking about military service and "household" when asking about income.

The research team remained conscious of individual and collective identities throughout the survey instrument drafting process, and attempted to use language that acknowledged the breadth and significance of individual identities while also making the questions accessible to the widest range of transgender people possible across the U.S. and in the territories. The questionnaire was reviewed and revised for consistent readability at an eighth-grade literacy level where possible,[47] although several

terms used in the survey were at a considerably higher literacy level. This included places where language was preserved for comparability with other surveys and when language describing transgender-specific experiences or procedures was used. Additionally, community members and researchers reviewed the survey and suggested revised language throughout the development process. This collaborative process was beneficial in providing collective insight on the best language to use in each particular instance based on lived experience and research expertise. The research team acknowledges, however, a continuing need to work towards identifying suitably inclusive terminology within an evolving language and community for future iterations of the survey.

The questionnaire was translated into Spanish by a translation service, and several native-Spanish-speaking community members and NCTE staff and interns reviewed and revised the language to use terminology that was most prevalent in Spanish-speaking transgender communities in the U.S. In many instances, it was difficult to find language that accurately captured the meaning of a question or specific terms, but in each case language was selected to convey interpretations as close to the English-language question interpretations as possible.

# VIII. Institutional Review

The study was vetted through an Institutional Review Board (IRB) process, which is meant to ensure confidentiality and protect the rights and welfare of individuals participating in a research study. The USTS underwent a full board review by the University of California Los Angeles (UCLA) IRB. As a requirement of approval, the questionnaire began with a study information

sheet describing aspects of the study and rights of individuals as participants in the study.[48] To be included in the study, participants were required to indicate their consent at the end of the information sheet. This process established that participants were fully informed about the risks and benefits of participating in the study and that their participation was voluntary. IRB review also required the submission of all recruitment materials leading up to the launch of the survey and throughout the time the survey was in the field.[49] This required the production of a large volume of messaging for the many different types of media through which people were invited to participate in the survey in both English and Spanish. It also required anticipating how messaging might need to change while the survey was in the field and submitting this language for pre-approval for later use as needed.

# IX. Survey Hosting

The survey was hosted online by Rankin & Associates Consulting, under the supervision of USTS research team member, Dr. Susan Rankin. Access to the survey was provided exclusively through the USTS website. All programming of the questionnaire and online administration of the survey was handled through Rankin & Associates Consulting, which managed the process of collecting the survey data throughout the 34-day fielding period.

The survey was anonymous, and maintaining privacy and confidentiality in the collection and maintenance of survey data was an important component of preserving participants' anonymity. Furthermore, as a condition of IRB approval, the research team was required to ensure that confidentiality protections were in place for the study and demonstrate sufficiency of data security protocols. Accordingly, data from online

AR_217030

participants was submitted through seven secure firewalls servers with forced 256-bit SSL (Secure Sockets Layer) security and Security-Enhanced Linux (SELinux) security extensions to encrypt and protect the survey data. Given the volume of traffic on the seven servers during the initial launch of the survey, an eighth server was added. The survey was stored in an SQL database that could only be accessed locally. The servers themselves were only accessible using encrypted SSH (Secure Shell) connections originating from the local network. The servers were also in RAID (Redundant Array of Inexpensive Disks), which is a data storage virtualization technology that combines multiple physical disk drive components into a single logical unit for the purposes of data redundancy, performance improvement, or both, to reduce the chance of any data loss due to hardware failure. The servers performed nightly security audits from data acquired via the system logs and notified the system administrators.

Despite a successful data-collection period evidenced by the large final sample size, it is important to note issues that occurred in the initial days of the survey data-collection period, given the potential impact on the data collection and the final sample. Prior to the survey launch, the online platform had been assessed and capacity was predicted for the seven dedicated servers based on reasonable estimated response rates. However, in the first days of the data-collection period, exceptionally high levels of traffic to the survey far exceeded the predicted response rates and overwhelmed the capacity of the servers, causing significant delays in accessing and completing the survey. The resulting server delays occurred within hours of the survey launch on August 19, 2015, producing unusually long page-loading times and may have served as a barrier to completing the survey.[50] The survey team notified potential respondents of the delays through email and social media communication and updated the first page of the online survey questionnaire with

a note about the issues and information about the continued availability of the survey.[51] The hosting team added a server to process the high level of traffic and returned the survey to normal loading speeds within a couple days of the initial reports. Although high numbers of survey submissions were received throughout these days, it is likely that the server delays affected the completion and submission of some surveys or may have discouraged individuals from attempting to take the survey.

# X. Cleaning the Data

The dataset was cleaned following collection to remove survey responses that did not belong in the final sample.[52] Data cleaning is the process of detecting and removing some survey responses (e.g., duplicate responses, incomplete responses, illogical responses) in order to improve the quality of the sample. This dataset was "cleaned" using commonly accepted procedures.[53] The first step was to remove survey responses from individuals who did not consent to take the survey and those who did not meet the eligibility criteria, such as not being at least 18 years of age and not residing in the U.S. These survey respondents had been automatically sent to a disqualification page,[54] but their responses were included in the initial dataset. Incomplete responses were then removed from the sample based on a requirement that respondents minimally complete specific questions in Section 2 of the questionnaire to be included in the final dataset.[55] Duplicate survey responses were removed next, as were those with illogical responses, such as those with contradictory responses to related questions. Missing-data analyses were then conducted to determine the percentage of missing data.[56]

The next step of the process was recoding data, including re-categorization of answer choices

in several questions for improved analysis or to match existing categories for comparison to other surveys. Answers were evaluated for those questions that allowed a write-in response when the selected option was "not listed above." In some cases, these answers were recoded into existing answer choices where appropriate, and in other cases, new answer categories were created for write-in responses that were frequently repeated. The recoding process included two coding teams. The first coding team conducted initial data recoding, and the second team reviewed the recoding and flagged areas of disagreement.  A simple percent agreement score was calculated to determine inter-rater reliability.[57]

Several survey weights were developed for presentation of results in the report.[58] A race and ethnicity weight was developed based on the Census Bureau's 2014 American Community Survey (ACS).[59] Additionally, given the disproportionally large number of respondents who reported an age of 18 years old, a weight was created to balance the representation in the sample of those respondents in relation to the rest of the sample.[60] The race and ethnicity weight and the 18-year-old weight were both included in a "standard weight" applied to the dataset. All results presented in this report are weighted based on the standard weight unless otherwise noted. Additional survey weights were created for the purposes of comparability with federal government and national data sources, including weights for age and educational attainment.[61] These weights were applied in addition to the standard weight when comparing the USTS sample to the U.S. population for items that are sensitive to age and educational attainment, such as individual and household income, and are noted accordingly as the "supplemental weight."

# XI. Data Analysis and Presentation of Findings

The data was first analyzed to tabulate individual responses to each of the questions in the survey. The respondents included in each tabulation differed throughout the survey due to certain questions only being asked of a particular set of respondents and/or due to some respondents choosing not to answer a question. Analyses were performed to explore how survey responses differed based on demographic characteristics—such as race, gender, and income—and non-demographic factors—such as experience with sex work, HIV status, and experiences of family support or rejection.

All findings in the report are presented as weighted percentages of the entire sample or of the subgroups being examined. For example, educational attainment is presented as a percentage of the whole sample, while much of the data related to HIV care represent percentages of those respondents who are living with HIV. In limited instances, unweighted frequencies are included where the additional information could be informative and to provide context for the weighted percentages reported.

Percentages are rounded to whole numbers, except in cases where a more exact comparison to national data sources was desired or where more precision was needed due to the reported percentages being small. When rounding to whole numbers, the following convention was generally followed: findings containing decimals of 0.50 and above were rounded up, and findings with 0.49 and below were rounded down (e.g., 1.50% was rounded to 2% and 1.49% was rounded to 1%). Additionally, a finding of 0.49% and below was generally labeled "less than 1%" or "<1%." Throughout the report, results are presented in

AR_217032

various figures and tables. The percentages in these figures and tables do not always add up to 100% due to respondents being able to select more than one answer to a question ("mark all that apply") or due to rounding.

Throughout the report, U.S. population findings are provided for comparison to USTS findings or to provide context for USTS findings, where available and/or applicable. Where USTS data is compared to data from existing research, the data source is specified. When providing U.S. population comparisons, the research team made efforts to limit the comparisons to adults (18 years and older) to most appropriately match the USTS sample. Whenever that was not possible, notes as to age ranges or other limitations are provided. Additionally, calculations made by the research team when necessary to present U.S. population findings are noted. Data in this report is generally presented without information regarding statistical testing.[62]

**ENDNOTES** | CHAPTER 2: METHODOLOGY

1    The survey included questions related to the following topics (in alphabetical order): accessing restrooms; airport security; civic participation; counseling; education; employment; faith; family and peer support; health and health insurance; HIV; housing and homelessness; identity documents; immigration; income; intimate partner violence; military service; police and incarceration; policy priorities; public accommodations; sex work; sexual assault; substance use; suicidal thoughts and behaviors; unequal treatment, harassment, and physical attack; and voting.

2    Detailed information about survey methodology is available in *Appendix C (Detailed Methodology)*.

3    www.USTransSurvey.org

4    The survey was in the field between August 19 and September 21, 2015.

5    Grant, J. M., Mottet, L. A., Tanis, J., Harrison, J., Herman, J. L., & Keisling, M. (2011). *Injustice at Every Turn: A Report of the National Transgender Discrimination Survey*. (p. 11). DC: National Center for Transgender Equality and National Gay and Lesbian Task Force.

6    Grant et al., p. 182.

7    Grant et al.

8    See Haas, A. P., Rodgers, P. L., & Herman, J. L. (2014). *Suicide Attempts Among Transgender and Gender Non-Conforming Adults*. New York, NY & Los Angeles, CA: American Foundation for Suicide Prevention & Williams Institute.

9    See e.g., The GenIUSS Group. (2014). In J. L. Herman (Ed.), *Best Practices for Asking Questions to Identify Transgender and Other Gender Minority Respondents on Population-Based Surveys* (p. vii). Los Angeles, CA: Williams Institute. ("Adolescents may have particular difficulties with complex vocabulary and sentences. Therefore, questions designed for adolescents should take extra care to use plain language and simple sentences. Terms used in measures of sex and gender should be defined since adolescents, and cisgender (non-transgender) adolescents in particular, conflate the terms sex and gender, and have varying understanding of the term *transgender, masculine, and feminine*."). Given the need to collect data about the unique experiences of transgender youth, it is important to design and conduct future studies focusing on the issue areas and needs most applicable to transgender youth.

10    Information about the source of survey questions used for comparison to the U.S. population can be found in *Appendix C (Detailed Methodology)*.

11    Forty-four (44%) of pilot participants identified as a woman or trans woman (MTF), 41% as a man or trans man (FTM), and 16% as non-binary or genderqueer.

12    These pilot participants identified as American Indian, Asian, multiracial, Black, Latino/a, and a racial/ethnic identity not listed above, in addition to 66% who identified as white.

13    The following statement was provided to explain why the word "trans" was used throughout the survey: We know that not everyone is comfortable with the word "transgender," but for this survey, we must use one word to refer to all trans and non-binary identities. Because of this we will use the word "trans" in this survey to refer to all trans and non-binary identities."

METHODOLOGY

AR_217033

14  A notable exception to the 30–60 minute estimate for completing the survey occurred during the first days of the survey's availability, when a high volume of survey takers overwhelmed multiple servers, causing lengthy delays when completing the survey. This is discussed further in the "Survey Hosting" section.

15  Grant et al., p. 13.

16  Post-NTDS analysis of respondents who had completed that survey online or in paper format found that surveys completed online were less likely to have missing data, providing further support for the decision to only offer the survey online. See Reisner, et al. (2014). Comparing in-person and online survey respondents in the U.S. National Transgender Discrimination Survey: Implications for transgender health research. *LGBT Health, 1*(2), 98–106.

17  See Dillman, D. A., Smyth, J. D., & Christian, L. M. (2014). *Internet, Phone, Mail, and Mixed-Mode Surveys: The Tailored Design Method* (4th ed.). Hoboken, NJ: John Wiley & Sons.

18  Reisner et al., p. 98. See note 16. This analysis also found that "[a] higher proportion of in-person respondents were young, male-to-female, people of color, publicly insured, with lower incomes and lower educational attainment than online respondents (all $p<0.05$). In-person respondents also were more likely than online respondents to be current daily smokers, to endorse substance use to cope with mistreatment, and to self-report as HIV-positive (all $p<0.05$)."

19  Although outreach efforts were instrumental in obtaining the largest sample of transgender respondents ever collected, a longer outreach period may have resulted in reaching more individuals in communities that are often underrepresented in online surveys.

20  A total of 827 organizations received at least one outreach email, and organizations received additional outreach emails and/or phone calls if no response was received. Out of those organizations, 392 confirmed their support, and 435 did not respond to any communications.

21  Correspondence included almost one dozen emails with asks to spread the word about the survey and with various information about the availability of the survey.

22  The research team attempted to ascertain the level of outreach engagement of supporting organizations; however, the limited amount of information received about the outreach did not allow a calculation of a response rate. Of the 392 organizations that pledged their support, 58 (15%) reported information on their outreach activities and estimated reaching over 20,000 transgender people through their channels. In the future, researchers are encouraged to collect consistent outreach activity data from supporting organizations that will help to better assess the effectiveness of outreach and response rate estimates.

23  Information about UAC members can be found in the *Acknowledgements* section of the report.

24  These events were promoted as "Survey-Taking Events" on recruitment materials and described accordingly (see note 25). However, it is possible that the name did not appropriately capture the nature of these vastly differing events. A lack of clarity may have decreased the number of people who attempted to access the survey through organizations who offered space or computers to complete the survey online.

25  Survey-Taking Events were described as "a function in which an organization or group opens its doors and provides access to its facilities (such as community centers and office buildings) to allow trans survey participants use of its resources (including computers, tablets, and internet access) to complete the USTS. This will occur during specified periods of time or throughout the time the survey is available on a drop-in basis. For example, a community center might participate by setting aside one Saturday from 9am–6pm where some or all of its computers are available for survey takers to use, or it might host people on Monday–Friday from 5pm–9pm each evening for a week, or longer."

26  A total of 435 NTDS respondents completed the survey in paper format (7% of the sample) and were found to differ from online survey takers in sociodemographic characteristics, health outcomes, and life experiences. Reisner et al., p. 98, 103. See note 16.

27  Although only 71 organizations confirmed their events, based on information reported at various intervals throughout the data-collection period, it appeared that more organizations hosted survey events or similar gatherings to complete the survey without reporting them to the survey outreach team. Additionally, it is also possible that individuals and organizations held informal parties where groups of friends could gather to complete the survey at the same time. Data regarding this sort of activity was not collected or received.

28  This completion rate is a conservative estimate based on reports that some individuals started the survey at the event and then left to complete it on their own at a later time.

29  Four hundred and seventeen (417) respondents answered "yes" in response to the following survey question: "Are you taking this survey at a survey event or meeting, such as one hosted by an LGBTQ or Trans organization or meeting?"

30  In future iterations of the USTS and other research studies, the research team suggests a more robust approach towards organizing, conducting, and monitoring survey events to increase the reach and availability of such events in providing access to the survey. Researchers are also encouraged to conduct follow-up analyses to

AR_217034

determine the demographic characteristics of individuals who completed the survey at events and whether these events were successful in capturing a similar demographic to those who had completed paper surveys in the previous survey. See Reisner, et al. (discussing the demographics of online and paper respondents in the NTDS).

31  See e.g., Göritz, A. S. (2006). Incentives in web studies: Methodological issues and a review. *International Journal of Internet Science, 1*(1), 58–70. (finding that "material incentives increase the odds of a person responding by 19% over the odds without incentives").

32  Pedersen, M. J. & Nielsen, C. V. (2016). Improving survey response rates in online panels: Effects of low-cost incentives and cost-free text appeal interventions. *Social Science Computer Review, 34*(2), 229–243.

33  Pedersen et al., pp. 237–238.

34  Singer, E. & Ye, C. (2013). The use and effects of incentives in surveys. *The ANNALS of the American Academy of Political and Social Science, 645*(1), 123–124.

35  Participants were informed of the cash prize incentives in several ways. The study information sheet placed at the beginning of the survey prior to obtaining each respondent's consent to enter the survey contained the following information in response to the question of whether respondents would be paid for their participation: "You will receive no payment for your participation. You will have the option to voluntarily enter a drawing to win one of three cash prizes: one prize of $500 and two prizes of $250." The frequently asked questions section of the survey website also offered the following statement: "When you complete the survey, you will have the option to enter a drawing to win one of three cash prizes: one prize of $500 and two prizes of $250. Because thousands of trans people across the country will complete the survey, we cannot offer payment to each participant." Additionally, some recruitment materials mentioned the cash-prize drawing, including email blasts.

36  The survey was hosted by Rankin & Associates Consulting. Further details are described in the "Survey Hosting" section.

37  The check box stated: "Enter me in the drawing for one of three cash prizes: one prize of $500 and two prizes of $250!"

38  Due to limited funding, it was not possible to translate all survey materials, such as email communications. Translation of all promotional materials may positively impact the response rate amongst respondents with limited English proficiency in future iterations of the study.

39  www.USTransSurvey.org

40  Final pledge numbers were 14,005 and 561 for survey takers and promoters, respectively.

41  Photo booth participants could choose from one of two signs indicating that the survey was coming in the summer of 2015 and stating the following: (1) "My Voice Counts: I'm Taking the #USTransSurvey" or (2) "Every Voice Counts: Spread the Word About the #USTransSurvey."

42  The Twitter hashtag used to promote the survey was #USTransSurvey.

43  For social media day, recipients received one of the following requests, based on whether they were organizations or individuals: (1) "Use the hashtag #USTransSurvey on social media asking your social networks to join us" or (2) "Please join Social Media day. We have sample copy and a variety of photos and graphics."

44  For email day, recipients received one of the following requests, based on whether they were organizations or individuals: (1) "Email a friend explaining why this is so important to you" or (2) "Download the sample email and send it to your membership list today."

45  For blog day, recipients were invited to share a blog written by Outreach Coordinator, Ignacio Rivera, cross post the blog on an organization's blog site, or draft a blog about the importance of the survey.

46  The number of individuals who pledged to take the survey on the pledge list increased from approximately 7,700 when the initial Awareness Week email was sent on July 15 to over 14,000 at the time the survey launched in the field. The 82% increase in the numbers of survey pledges is likely due to the increased exposure generated by Awareness Week communications.

47  The initial literacy level review and revision was conducted by a certified copy editor proficient in reading levels, and the questionnaire was determined to be at an eighth grade reading level.

48  Due to IRB requirements, the language in the study information sheet was generally at a higher literacy level than the rest of the questionnaire.

49  This included all materials aimed at "recruiting" or getting people to participate in a research study, such as website pages, flyers, emails, and social media messages.

50  The research team received reports that it took some individuals up to several hours to complete the survey on the first day, and others reported that they were not able to complete or submit their survey at all due to the technical issues.

METHODOLOGY

AR_217035

51  The following note was added to the first page of the survey (in English and Spanish) to notify respondents of the delay: "Our servers have been overwhelmed by the number of enthusiastic participants and some are experiencing unusual delays. We apologize for the inconvenience as we work to address this issue. You can complete the survey now but may experience delays. However, the survey will be available to complete through at least September 21st. If you experience delays, we encourage you to return to this site in the coming days. If the survey is slow to respond, you can leave the page open and return later. If the survey times out, you can hit the 'back' button. However, if you close your browser, you may have to restart the survey."

52  A detailed description of the cleaning process is included in *Appendix C (Detailed Methodology)*.

53  Rahm, E. & Do, H. H. (2000). Data cleaning: Problems and current approaches. *IEEE Data Engineering Bulletin, 23*(4), 3–13.

54  Ineligible respondents were sent to one of two disqualification pages notifying them of their ineligibility and providing either an opportunity to visit the survey website for more information or giving information about their gender identity or expression and experiences related to gender identity or expression.

55  See *Appendix C (Detailed Methodology)* for more information on the Section 2 questions that were required to remain in the sample.

56  Missing-data analyses determined that there was less than 5% missing data on all but two questions. Therefore, the research team did not impute the missing data. See *Appendix C (Detailed Methodology)* for more information.

57  A modified version of an inter-rater reliability metric was used by the two teams that conducted the review. Each team included a principal researcher and an outside researcher. One researcher on each team conducted the initial coding and the other researcher reviewed the coding for approval or revisions. See *Appendix C (Detailed Methodology)* for more information.

58  "Weighting" is a common statistical technique used to adjust data with disproportionate sample sizes to be more representative of the population from which the sample was drawn. For example, the proportion of respondents aged 18–24 and 25–44 in a survey sample taken in the U.S. may differ from the proportion of those age groups in the total U.S. population. Therefore, weights are applied to survey data in order to make comparisons between the collected survey data and the total population. See *Appendix C (Detailed Methodology)* for more detailed information about weights applied to the survey data.

59  Studies using representative samples of transgender adults have found that transgender adults differ from the general population in regard to race and ethnicity, with transgender people more likely to be people of color. See e.g., Flores, A. R., Brown, T. N. T., & Herman, J. L. (2016). *Race and Ethnicity of Adults who Identify as Transgender in the United States*. Los Angeles, CA: Williams Institute; Conron, K. J., Scott, G., Stowell, G. S., & Landers, S. J. (2012). Transgender health in Massachusetts: Results from a household probability sample of adults. *American Journal of Public Health, 102*(1), 118–122. However, the USTS sample has a higher percentage of white respondents than the U.S. general population. To help correct for this sampling bias, the research team applied U.S. population weights for race and ethnicity. While this may still over-represent white respondents, this weighting procedure brings the sample closer to what is estimated to be the true population distribution for race and ethnicity for transgender people.

60  The weight for 18-year-old respondents was created with propensity scores developed using a regression discontinuity model. For more information on this process and other weighting procedures, see *Appendix C (Detailed Methodology)*.

61  The age, race, and educational attainment weights were created based on the Census Bureau's 2014 American Community Survey (ACS).

62  Due to the large sample size, bivariate statistical tests largely result in statistically significant differences among the groups being compared. Small group differences often will be found to be statistically significant, even when the differences are small and, therefore, not particularly meaningful. In writing the findings to this report, the research team considered other measures when pointing out meaningful differences among groups, such as a particular cell's contribution to an overall chi-square test statistic and effect sizes. These tests are on file with the research team. Future researchers are encouraged to use additional bivariate and multivariate modeling to provide more nuanced understanding of group differences.

AR_217036

# CHAPTER 3

# Guide to Report and Terminology

Throughout the report, the authors use a variety of terminology to refer to respondents in the sample or experiences that respondents reported. The authors also applied several conventions in the reporting of results. While explanations are often included in chapters to provide context and clarity, several terms and conventions that are used widely throughout the report are outlined in this chapter to make the report more accessible to a broad range of audiences.

GUIDE TO REPORT AND TERMINOLOGY

39

# I. Use of the Term "Transgender" in this Report

The term "transgender" is often used to describe people whose gender identity or expression differs from what is associated with the gender they were thought to be at birth. Although this term has often been described as an "umbrella term" that encompasses the spectrum of identities and captures the diversity of transgender people, the authors recognize that one term cannot reflect each individual's unique identity and some people prefer to use other terms to describe their gender identity. However, in order to make the report's findings clear and accessible, it was important to select a single term for consistent use throughout this report that could best represent the range of identities expressed in the USTS survey sample.

In promotional materials, the survey was described as being inclusive of all "transgender, trans, genderqueer, and non-binary" people, so that those who might have assumed that "transgender" did not include them would know their voice was welcomed. The survey also acknowledged the limitation of current language and used "trans"—a shorthand term that is widely accepted amongst transgender people—consistently throughout the questions. While respondents in this study identified with a wide range of terms—including more than 500 unique terms that were reported in response to survey questions—88% of respondents thought of themselves as transgender, and 86% expressed that they were "very comfortable," "somewhat comfortable," or "neutral" when asked how comfortable they were with the word "transgender" being used to describe them. This included 82% percent of non-binary respondents. This provides evidence of the term's continued broad usage and general acceptance. Based on this information, the

term *transgender* is used for the purposes of this report to represent the diverse identities of the individuals who made their voices heard by completing the survey.

# II. Other Transgender-Specific Terminology

### Non-binary:

This term is used by some to describe people whose gender is not exclusively male or female, including those who identify as having no gender, a gender other than male or female, or more than one gender. In this report, "non-binary respondents" refers to respondents who said that the term "non-binary/genderqueer" best describes their current gender identity in response to Q. 2.3.

### Crossdresser:

While definitions of "crossdresser" vary, many use this term to describe a person who dresses in a way that is typically associated with a gender different from the one they were thought to be at birth, but who may not identify with that gender or intend to live full time as that gender. In this report, the term "crossdressers" refers to respondents who said that the term "cross-dresser" best described their current gender identity in response to Q. 2.3.

### Gender transition:

This is a process in which a person begins to live according to their gender identity, rather than the gender they were thought to be at birth. Not all transgender people have transitioned or intend to do so, but many do. Gender transition looks different for every person. Possible steps in a gender transition may or may not include changing one's clothing, appearance, name

AR_217038

and identity documents (for example, a driver's license), or undergoing medical procedures such as hormone therapy to change one's physical characteristics. This report refers to gender transition in several places when discussing steps that may be included in one's gender transition, such as updating the name and gender on identity documents. Additionally, the report includes a variety of terms to refer to therapy/counseling, hormone therapy, surgical treatments, and other health services transgender people may undergo as part of their transition, including "health care related to gender transition" or "transition-related care." In this report, the term "respondents who have transitioned" refers to respondents who reported that they are living full time in response to Q. 1.12 (see below).

## Living full time:

Respondents in the sample who were described in the report as "living full time" are those who reported that they lived full time in a gender different than the gender they were thought to be at birth in response to Q. 1.12. For many people, living full time may include changing one's name, clothing, and/or appearance, or taking other actions related to their gender transition.

## Gender identity or expression:

Several questions throughout the report asked whether respondents thought that an experience had occurred due to their "transgender status/ gender identity" and/or "gender expression/ appearance." Both answer choices were included so that respondents could select what they felt best represented their experience. Since there was a substantial overlap of respondents who selected both reasons, and because these terms are commonly used interchangeably or with very similar meanings, responses of those who selected one or both of these reasons were collapsed for reporting in one "gender identity/

expression" category. Additionally, several phrases are used interchangeably to describe experiences that respondents had as a result of biases due to being known or perceived to be transgender. These include, for example: "because they were transgender," "because of their transgender status," or "because of their gender identity or expression."

# III. Additional Terms and Conventions Used in the Report

## Sexual assault:

In this report, the term "sexual assault" refers to a variety of experiences of unwanted sexual contact. These may include, but are not limited to, oral, genital, or anal contact or penetration, forced fondling, and rape. Respondents were asked about their experiences with unwanted sexual contact or sexual assault in a number of different contexts. Definitions of these terms varied in some questions based on the context or, in some cases, on the national survey from which a question was adapted. Where applicable, the definition provided for "sexual assault" or "unwanted sexual contact" in each question is included in the report.

## Underground economy:

This terminology refers to fields of work that, in general, are currently criminalized in the United States. In this report, this term includes income-based sex work (including forms of work in the sex trade that are not criminalized, such as pornography), drug sales, and other income-based work that is currently criminalized. See *Sex Work and Other Underground Economy Income* chapter.

AR_217039

## Time period of reported experiences:

In the survey, respondents answered questions about experiences that occurred within a period of time prior to having taken the survey, such as in the past year or the past 30 days. The report refers to the time when these experiences occurred in comparison to the time when the respondent completed the survey. For example, respondents who had certain experiences within the 12 months prior to completing the survey were reported as having those experiences "in the past 12 months" or "in the past year." If a respondent had an experience that occurred within the 30 days prior to completing the survey, the experience was referred to as occurring "in the past month," "in the past 30 days," or "currently."

## Write-in responses:

At several places in the survey, respondents were given an opportunity to write in a response to a question. These write-in responses were reviewed for recoding to categorize the responses into existing answer choice categories or new categories when feasible. When it was possible to recode write-in answers into a new category, those answers were often listed in the report and labeled as a "write-in response." In many cases, it was not possible to recode the answers into existing or new categories, and these write-in-responses were included in categories such as "a reason not listed above." For more information about how write-in answers were recoded, refer to *Appendix C: Detailed Methodology.*

## U.S. population comparisons and other resources:

References to experiences of the U.S. population are included in the report for comparison and to provide context for findings where feasible. References to other research are also provided as resources in several places throughout the report. However, the list of references is not exhaustive, and should be not be treated as a comprehensive list of sources on any particular subject presented in this report.

## Stories included in the report:

Throughout the report, excerpts of stories are included in sections titled "In Our Own Voices." These stories, which were submitted by respondents after they completed the survey, are provided to support the findings of the report and offer important anecdotal evidence and context for respondents' reported experiences. These stories have been edited for length and clarity.

AR_217040

# CHAPTER 4

# Portrait of USTS Respondents

With 27,715 respondents, the U.S. Transgender Survey (USTS) is the largest survey ever conducted of transgender people in the United States, providing a rich understanding of numerous aspects of their lives and experiences. In this chapter, an overview of respondents' diverse gender identities and experiences with transitioning is presented. Additional characteristics of USTS respondents, such as race and ethnicity, age, educational attainment, and geographic location, are also presented. This information is discussed in the following sections:

I. Gender Identity and Expression
II. Experiences with Transitioning
III. Being Perceived as a Transgender Person by Others
IV. Outness
V. Race and Ethnicity
VI. Age
VII. Location
VIII. Primary Language Spoken in Home
IX. Religious or Spiritual Identity
X. Income and Employment Status
XI. Educational Attainment
XII. Disability
XIII. Citizenship and Immigration Status
XIV. Sexual Orientation
XV. Relationship Status

# I. Gender Identity and Expression

## a. Identity

The word *transgender* is often used as an "umbrella term" intended to encompass the spectrum of identities and capture the diversity of people whose gender differs from the one they were thought to be at birth. However, language describing identity continues to evolve, and it is difficult to describe all of those identities using just one term. Acknowledging this wide range of identities, the survey asked respondents if they thought of themselves as "transgender." Eighty-eight percent (88%) of respondents reported that they thought of themselves as transgender, while the remaining 12% used other terms to describe their gender and related experiences.[1]

Respondents were also asked how comfortable they were with the word "transgender" being used to describe them on a five-point scale from "very comfortable" to "very uncomfortable." Eighty-six percent (86%) expressed that they were comfortable or neutral using this term, including 82% percent of non-binary respondents. Forty-three percent (43%) were "very comfortable," and only 14% expressed discomfort with being described as transgender[2] (Figure 4.1).

**Figure 4.1: Respondent's level of comfort with the word "transgender" being used to describe them**



Respondents were also offered a list of identity terms from which they could check all terms that described their gender identity, and they were also given an opportunity write in a gender that was not listed (Table 4.1). In addition to the listed terms, respondents wrote in more than 500 unique gender terms with which they identified.

**Table 4.1: Gender identity terms**

| Gender identity terms | % of respondents |
|---|---|
| Transgender | 65% |
| Trans | 56% |
| Trans woman (MTF, male to female) | 32% |
| Trans man (FTM, female to male) | 31% |
| Non-binary | 31% |
| Genderqueer | 29% |
| Gender non-conforming or gender variant | 27% |
| Gender fluid/fluid | 20% |
| Androgynous | 18% |
| Transsexual | 18% |
| Agender | 14% |
| Two-spirit | 7% |
| Bi-gender | 6% |
| Butch | 5% |
| Crossdresser | 5% |
| Multi-gender | 4% |
| Third gender | 4% |
| Intersex | 3% |
| Drag performer (king/queen) | 2% |
| A.G. or aggressive | 1% |
| Stud | 1% |
| Travesti | 1% |
| Bulldagger | <1% |
| Fa'afafine | <1% |
| Mahu | <1% |
| A gender not listed above | 12% |

## b. Gender Identity Categories Used for Analysis

Respondents were also asked to choose only one term that best described their current gender identity out of six possible terms (*woman, man, trans woman (MTF), trans man (FTM), non-binary/genderqueer*, or *crossdresser*) to determine the gender identity categories used for primary analysis.[3] Respondents

AR_217042

were grouped into four gender identity categories based on their responses. These four categories are used throughout this report to discuss the experiences of those who completed the survey: *transgender women*, *transgender men*, *non-binary people*, and *crossdressers*.[4] Those who said that *woman* or *transgender woman* best described their gender identity were included in the transgender women analytical category (33%), and those who said that *man* or *transgender man* best described their gender identity were included in the transgender men analytical category (29%). Overall, 62% of respondents were included in the transgender men and women categories. Three percent (3%) said that *crossdresser* best described their gender identity. More than one-third (35%) of respondents indicated that their gender identity was best described as *non-binary* or *genderqueer*, a term often used to describe people whose gender is not exclusively male or female, including those who identify with a gender other than male or female, as more than one gender, or as no gender[5] (Figure 4.2). Throughout the report, these respondents are referred to as "non-binary."

**Figure 4.2: Gender identity**



3%
Crossdressers

29%
Transgender men

35%
Non-binary people

**% of respondents**

33%
Transgender women

## c. Gender Assignment at Birth

Respondents were asked about the sex they were "assigned at birth, on [their] original birth certificate."[6] In this report, the term "respondents with male on their original birth certificate" is used

to describe respondents who were thought to be male when they were born (such as transgender women), and "respondents with female on their original birth certificate" is used to describe respondents who were thought to be female when they were born (such as transgender men). More than half (57%) of respondents had female on their original birth certificate, and 43% had male on their original birth certificate. Of those who were non-binary, 80% had female on their original birth certificate, and 20% had male on their original birth certificate.

## d. Development of Transgender Identity and Interactions with Other Transgender People

Respondents received questions related to the development of their transgender identity throughout their lives. A majority of respondents (60%) reported that they began to feel "different" from the sex on their original birth certificate at age 10 or younger, including 32% who began to feel different at age 5 or younger, and 28% who began to feel different between the ages of 6 and 10. Six percent (6%) reported that they began to feel different at age 21 or older (Figure 4.3).

**Figure 4.3: Age they began to feel gender was different from the one on their original birth certificate**



4%
21 to 25

2%
26 and over

13%
16 to 20

32%
5 and under

**% of respondents**

21%
11 to 15

28%
6 to 10

Respondents were also asked how old they were when they started to think of themselves as transgender, even if they did not know that word. One in ten (10%) reported that they began thinking of themselves as transgender at age 5 or younger. Sixteen percent (16%) began to think of themselves as transgender between the ages of 6 and 10, and 28% between the ages of 11 and 15. Eight percent (8%) reported beginning to think of themselves as transgender at age 26 or older (Figure 4.4).

**Figure 4.4: Age they started to think they were transgender**



Respondents were also asked at what age they began to tell others that they were transgender. One in ten (10%) respondents reported that they began to tell others that they were transgender between the ages of 11 and 15, and more than one-third (37%) did so between the ages of 16 and 20. Another 30% began telling people that they were transgender between the ages of 21 and 30, and 14% began telling people that they were transgender at age 31 or older. Additionally, 5% reported that they had not told anyone else that they were transgender (Figure 4.5).

**Figure 4.5: Age they started to tell others that they were transgender**



## e. Gender Identity and Current Age

The age profile of respondents[7] differed widely by gender identity categories, with nearly half (47%) of transgender men and women being aged 25–44, compared to 35% of non-binary respondents, and 29% of crossdressers. Non-binary respondents were more likely to be younger, with nearly two-thirds (61%) being aged 18–24, in contrast to transgender men (43%), transgender women (24%), and crossdressers (8%). One in five (20%) crossdressers were aged 65 or older, compared to only 5% of transgender women, 1% of non-binary respondents, and less than 1% of transgender men (Figure 4.6).

**Figure 4.6: Gender identity by current age**



AR_217044

# II. Experiences with Transitioning

Transitioning is a process by which a person begins to live in a gender that is different than the one on their original birth certificate. Not all transgender people have transitioned or intend to do so, but many do. Gender transition can involve many different aspects, including changing one's clothing, appearance, name, and identity documents (such as driver's licenses or passports) and asking people to use different pronouns (such as he, she, or they) than the ones associated with the gender on one's original birth certificate. Transitioning may also include undergoing medical procedures, such as hormone therapy or surgeries, to change one's physical characteristics. Some people make many of these changes while others do not, depending on their needs and resources. Additionally, some transgender people may desire and make some of these changes even if they do not intend to live full time in a gender that is different than the one on their original birth certificate. However, many people who want to take these steps are not able to do so because of financial constraints, safety concerns, fear of discrimination and rejection, and other barriers.

## a. Full-Time Status and Transition

Nearly two-thirds (62%) of respondents were currently living full time in a gender that was different from the one on their original birth certificate. Throughout the report, the process of living full time in a gender that is different than that on one's original birth certificate is described as "transitioning." Twenty-two percent (22%) of respondents reported that they wanted to transition someday, 13% were unsure, and 3% did not want to transition (Figure 4.7). Three-quarters (75%) of transgender men and women had transitioned, and 43% of non-binary respondents had transitioned (Figure 4.8).[8]



Figure 4.7: Transition status of respondents



Figure 4.8: Transition status of respondents
GENDER IDENTITY (%)

Respondents were also asked what gender they were living in on a day-to-day basis. Thirty-five percent (35%) of respondents reported that they currently lived as a man on a daily basis, 30% lived as a woman, 21% lived as neither a man nor a woman, and 15% lived part time in one gender and part time in another.

PORTRAIT OF USTS RESPONDENTS

AR_217045

## b. Age of Transition

Those who have transitioned reported the age at which they began transitioning, or living full-time in a gender other than that on their original birth certificate. Nearly half (43%) reported that they began transitioning between the ages of 18 and 24, and nearly one-quarter (24%) transitioned between ages 25 and 34. Fifteen percent (15%) transitioned under the age of 18, and 18% transitioned at age 35 or older. Non-binary respondents and transgender men were more likely to have transitioned at a younger age, with 24% of non-binary respondents and 17% of transgender men transitioning under the age of 18, compared to 7% of transgender women (Figure 4.9).[9]

**Figure 4.9: Age began transitioning**
GENDER IDENTITY (%)



## c. Number of Years Since Transitioning

The number of years since a respondent had transitioned was determined in order to provide valuable information and context for some of the respondents' experiences.[10] Nearly one-third (31%) of those who had transitioned had done so within one year of taking the survey, 38% had transitioned 2 to 5 years prior, 13% transitioned 6 to 9 years prior, and 18% had transitioned 10 or more years prior (Figure 4.10).

**Figure 4.10: Number of years since transitioning**



## d. Additional Questions for Non-Binary Respondents

Non-binary respondents received questions about what they tell other people about their gender identity. They were asked about what gender they were perceived to be by people who did not know they were non-binary. A majority reported that people usually assumed they were non-transgender women (58%), including 72% of non-binary respondents with female on their original birth certificate, and 2% of non-binary respondents with male on their birth certificate. Seventeen percent (17%) reported that other people assumed they were non-transgender men, including 77% of non-binary respondents with male on their original birth certificate, and 3% of non-binary respondents with female on their birth certificate. Nearly one in five (19%) reported that assumptions about their gender varied (Figure 4.11).

**Figure 4.11: Gender that people who do not know they are non-binary usually assume they are**



AR_217046

Non-binary respondents were asked how they responded when people in their life assumed their gender was something other than non-binary. Almost half (44%) reported that they usually let others assume they were a man or woman, and 53% sometimes corrected others and told them about their non-binary identity. Only 3% always told others that they were non-binary (Figure 4.12).

**Figure 4.12: Response when people assume that their gender is something other than non-binary**



3%
They always tell others they are non-binary

53% They some- times tell others they are non- binary

44% They usually let others assume they are a man or a woman

% of non-binary respondents

Non-binary respondents who reported that they usually let others assume they are a man or woman or only sometimes tell people they are non-binary were asked for the main reasons they do not tell others about their non-binary identity. Respondents could select multiple reasons for choosing not to tell people about their non-binary identity. A majority of non-binary respondents reported that people do not understand so they do not try to explain it (86%) or that it is easier not to say anything (82%). Approximately two-thirds reported that their non-binary identity is often dismissed as not being a real identity or just a phase (63%), and others feared they might face violence (43%) (Table 4.2).

**Table 4.2: Main reasons for not telling people they are non-binary**

| Main reasons for not telling others about non-binary identity | % of non-binary respondents |
|---|---|
| Most people do not understand so they do not try to explain it | 86% |
| It is easier not to say anything | 82% |
| Most people dismiss it as not being a real identity or a "phase" | 63% |
| They might face violence | 43% |
| They are not ready to tell people they identify as non-binary | 35% |
| They might lose their job or not be able to get a job | 35% |
| They might not get the medical care they need | 24% |
| They might be hurt financially | 23% |
| They might face mistreatment at school | 18% |
| Their friends might reject them | 18% |
| They might become homeless | 12% |
| Their church or faith community might reject them | 6% |
| A reason not listed above | 18% |

## e. Pronouns

Eighty-four percent (84%) of respondents reported that the pronouns they used were different from those associated with the sex on their original birth certificate. Respondents reported a wide range of pronouns that they asked people to use when referring to them and could select more than one pronoun. The most widely used pronouns were "he/his" (37%), "she/her" (37%), and "they/their" (29%). One in five (20%) reported that they did not ask people to use specific pronouns when referring to them, and another 4% indicated that they used pronouns other than those provided in the answer choices. This included more than a dozen additional pronouns provided through write-in responses (Figure 4.13).



Figure 4.13: Pronouns respondents ask people to use

could tell they were transgender without being told "most of the time," 32% said others could "sometimes" tell, and 24% said that others could never tell (Figure 4.14).[11] Respondents' experiences with others' perception of their transgender status varied by gender identity (Figure 4.15).

Figure 4.14: How often people could tell they were transgender without being told



## III. Being Perceived as a Transgender Person by Others

Some transgender people find that others can routinely tell that they are transgender without being told, while others are generally perceived as the gender they identify with, and still others are perceived as the gender they were thought to be at birth. Many interactions and experiences of transgender people may be influenced by others' perceptions of them as being a transgender person. Transgender people who are visually or otherwise perceived by others as transgender or gender non-conforming may be more vulnerable to negative interactions in public or other settings.

To assess whether respondents were perceived as transgender, they were asked whether others could tell that they were transgender even without being told on a five-point scale from "always" to "never." Nearly one in ten (9%) reported that others

Figure 4.15: How often people could tell they were transgender without being told
**GENDER IDENTITY (%)**



AR_217048

# IV. Outness

Respondents were asked whether they thought different groups of people in their lives knew that they were transgender to determine if they were "out"[12] about their transgender identity to family members, friends, supervisors and colleagues at work, classmates, and health care providers. Respondents were asked whether all, most, some, or none of the people in their lives knew they were transgender in each of the groups of people in their lives. Results reflect only those respondents who had people from each group in their lives. Overall, 8% reported that they were out to all of the people in their lives, across all groups of people, 48% were out to most, 43% were out to some, and only 2% were out to none of the people in their lives.

Nearly two-thirds (62%) were out to all or most of the immediate family that they grew up with, and 38% were out to all or most of their extended family.[13] Regarding workplace environments, nearly one-half reported that none of their current supervisors (49%) or coworkers (42%) knew that they were transgender.[14] In terms of health care providers, although 40% reported that all of their health care providers knew that they were transgender, almost one-third (31%) indicated that none of their health care providers knew that they were transgender (Figure 4.16).

Of all groups of people the survey asked about, respondents were most likely to be out to all of their LGBT friends (62%). Respondents were also asked about the methods by which they socialize with other transgender people. Sixty-four percent (64%) reported that they socialized with other transgender people in person, and 79% socialized online. Nearly one-third (32%) said they interacted with transgender people in political activism, and 10% reported that they did not socialize with other transgender people.



**Figure 4.16: Outness to people in respondents' lives**

PORTRAIT OF USTS RESPONDENTS

# V. Race and Ethnicity

Respondents received a question on race and ethnicity and were asked to select only one of the following categories that most accurately described their racial or ethnic identity:

- Alaska Native (received a write-in option)[15]

- American Indian (received a write-in option)[16]

- Asian or Asian American

- Biracial or multiracial (received a follow-up question)[17]

- Black or African American

- Latino/a or Hispanic

- Middle Eastern or North African

- Native Hawaiian or Pacific Islander

- White or European American

- A racial or ethnic identity not listed above (received a follow-up question)[18]

Throughout the report, respondents who identified as biracial, multiracial, or more than one racial or ethnic category are included in the multiracial group. Additionally, due to small sample sizes and for purposes of analysis, certain racial and ethnic groups were combined into single categories. American Indian and Alaska Native respondents are combined in one category and reported as "American Indian." Similarly, the Asian/Asian American and Native Hawaiian/Pacific Islander groups are also combined in one category and reported as "Asian."[19]

The USTS sample had a percentage of white respondents that is notably higher than the U.S. general population, which is common among internet-based surveys.[20] Therefore, a race and ethnicity weight was developed to more closely represent what is estimated to be the actual racial and ethnic distribution for the transgender population in the U.S., based on the Census

Bureau's 2014 American Community Survey (ACS).[21] Racial and ethnic categories were weighted to reflect the ACS distribution for race and ethnicity as part of the standard survey weight that was applied to all results presented in the report (Figure 4.17).[22]

**Figure 4.17: Race and ethnicity of respondents**



0.7%
American Indian

5.1%
Asian

12.6%
Black

% of respondents

16.6%
Latino/a

62.2%
White

0.4%
Middle Eastern

2.5%
Multiracial

# VI. Age

The age of respondents in the sample ranged from 18 to 87. The overall age of respondents in the sample was generally younger than that in the U.S population. In addition to having a younger age distribution, a disproportionally large number of respondents reported an age of 18 years old. Therefore a weight was created to balance the representation in the sample of those 18-year-old respondents in relation to the rest of the sample. This weight was part of the standard survey weight that was applied to all results presented in this report (Figure 4.18). Additionally, for certain findings in this report, a "supplemental weight" was applied to adjust the USTS sample to reflect the age distribution for the U.S. population based on the ACS.[23]

**Figure 4.18: Age of respondents**




# VII. Location

The sample included respondents from all 50 states, the District of Columbia, American Samoa, Guam, Puerto Rico, and several U.S. military bases overseas. The geographic distribution of the sample generally mirrors that of the U.S. general population (Figure 4.19).

The sample was divided into regions based on the Census Bureau regions, which included the Northeast, Midwest, South, and West (Figure 4.20). These regional categories did not include U.S. territories or U.S. military bases overseas.

**Figure 4.19**




*Each dot on the maps represents the number of people in a zip code. Every dot corresponds to at least one person, and the size of each dot increases in accordance with the number of people in each zip code.*

PORTRAIT OF USTS RESPONDENTS

53

**Figure 4.20: Respondents' location by region**





▨ Northeast (CT, ME, MA, NH, NJ, NY, PA, RI, VT)

☐ Midwest (IA, IN, IL, KS, MI, MN, MS, NE, ND, OH, SD, WI)

▨ South (AL, AR, DE, DC, FL, GA, KY, LA, MD, MS, NC, OK, SC, TN, TX, VA, WV)

▨ West (AK, AZ, CA, CO, HI, ID, MT, NM, NV, OR, UT, WA, WY)

# VIII. Primary Language Spoken in Home

Respondents were asked about the primary language spoken in their home. Eighty-four percent (84%) reported that English was the only language spoken in their home, compared to 79% in the U.S. general population, as reported in the American Community Survey (ACS).[25] Fourteen percent (14%) reported that English and another language were mainly spoken in their home, and 2% reported that a language other than English was the primary language spoken in their home. In addition to spoken languages, 0.4% of respondents also reported that American Sign Language was either the main language or one of the main languages used in their home.

Spanish (including Spanish Creole) was reported as the most common language spoken in their home other than English, with 10% of respondents reporting Spanish was the main language spoken in their home, exclusively or along with English. This was slightly lower than the percentage of those who spoke Spanish in the home in the U.S. general population (13%).[26] Each of the other identified languages were spoken by less than 1% of respondents.

# IX. Religious or Spiritual Identity

Respondents were asked about their current religious or spiritual identity and could select one or more identities from a provided list, or they could select a religious affiliation or spiritual identity not listed.[27,28] Sixty-three percent (63%) of respondents reported that they had a spiritual or religious identity, and 37% of respondents reported that they did not have a spiritual or religious identity.[29] Respondents were most likely to identify as agnostic (23%), atheist (22%), or Christian (21%), followed by a smaller percentage who identified as Pagan (9%), Buddhist (6%), or Jewish (4%). One-quarter (25%) of respondents identified as spiritual, but with no religious affiliation. Thirteen percent (13%) had no religious or spiritual affiliation, and 7% identified with a religious affiliation or spiritual identity that was not listed (Table 4.3).

Table 4.3: Current religious or spiritual identity

| Current religious or spiritual identity | % of respondents |
|---|---|
| Spiritual, but no religious affiliation | 25% |
| Agnostic | 23% |
| Atheist | 22% |
| Christian | 21% |
| Pagan | 9% |
| Buddhist | 6% |
| Jewish | 4% |
| Secular Humanist | 4% |
| Wiccan | 4% |
| Druid | 1% |
| Hindu | 1% |
| Muslim | 1% |
| Native American Traditional Practitioner or Ceremonial | 1% |
| Polytheist (write-in response) | 1% |
| Taoist | 1% |
| Baha'i | <1% |
| Confucian | <1% |
| Jain | <1% |
| Jehovah's Witness | <1% |
| Rastafarian | <1% |
| Scientologist | <1% |
| Shinto | <1% |
| Sikh | <1% |
| Tenrikyo | <1% |
| A religious affiliation or spiritual identity not listed above | 7% |
| No affiliation | 13% |

# X. Income and Employment Status

Respondents were asked about various aspects of their income using a series of questions based on the Current Population Survey (CPS).[30] Results for income and employment status are presented

briefly in this section and discussed in greater detail in the *Income and Employment Status* chapter. In order to compare USTS respondents' income and employment data with data from the CPS and other national data sources, income and employment results are presented with the "supplement weight" applied.[31]

## a. Sources of Income

Nearly half (45%) of respondents received income from multiple sources, such as employment, Social Security income, or a pension. Thirty-six percent (36%) received income solely from their own employment or a partner or spouse's employment (not including underground economy work, such as sex work, drug sales, or other work that is currently criminalized). Nearly one in ten (9%) received income from Social Security, including disability, and 3% received income solely from a pension. Three percent (3%) reported that they were currently working in the underground economy, including 1% whose income came solely from underground economy work (Table 4.4).

Table 4.4: Current sources of income by single and multiple sources

| Sources of income | % of respondents (supplemental weight) |
|---|---|
| Employment only (from their own employer, partner/spouse's employer, or self-employment) | 36% |
| Social Security income/disability only | 9% |
| Pension/retirement only | 3% |
| Other sources of income only | 3% |
| No income | 2% |
| Sex work and other underground economy work only | 1% |
| Unemployment benefits/cash assistance only | 1% |
| Multiple sources | 45% |

AR_217053

## b. Individual and Household Income

Individual and household incomes for the USTS sample and the U.S. population were reported from 2014, the last full year prior to the survey for which annual income figures were available. Respondents reported lower incomes than the U.S. population (Figure 4.21 & Figure 4.22).[32]

**Figure 4.21: Individual income in 2014**



- % in USTS (supplemental weight)
- % in U.S. adult population (CPS)

**Figure 4.22: Household income in 2014**



- % in USTS (supplemental weight)
- % in U.S. adult population (CPS)

## c. Poverty

Nearly one-third (29%) of respondents were living in poverty,[33] more than twice the poverty rate among the general U.S. adult population (12%).[34]

## d. Employment Status

When asked about their current employment status, 35% of respondents reported that they currently had at least one full-time job, 15% had at least one part-time job, 15% were self-employed, and 11% were students. The unemployment rate for USTS respondents was 15%, three times the U.S. unemployment rate at the time of the survey (5%).[35]

# XI. Educational Attainment

Respondents were asked about the highest level of education or degree that they had completed. Thirteen percent (13%) of respondents had a high school diploma or GED, or did not complete high school. Forty percent (40%) had completed some college but had not obtained a degree, 9% had an associate's degree, and 38% had received a bachelor's degree or higher (Figure 4.23).

**Figure 4.23: Educational attainment (categories used in report)**



Throughout the report, educational attainment is reported according to the categories reflected in Figure 4.23. However, alternative categories are

AR_217054

also presented here for comparison to the U.S. population.[36] The USTS sample overall reflected higher educational attainment than the U.S. population, which is common among internet-based surveys.[37] To account for differences in educational attainment by age, USTS respondents are compared to the U.S. population for two age ranges: (1) ages 18 to 24 (Figure 4.24) and (2) ages 25 and older (Figure 4.25).[38]



**Figure 4.24: Educational attainment (ACS categories), ages 18 to 24**

- % in USTS
- % in U.S. population (ACS)



**Figure 4.25: Educational attainment (ACS categories), age 25 and older**

- % in USTS
- % in U.S. population (ACS)

# XII. Disability

Respondents received questions about their disability status based on questions from the American Community Survey (ACS) in order to compare those in the USTS sample to those with disabilities in the U.S. general population. Overall, 39% of respondents indicated that they had one or more disability as described in the ACS, compared to 15% of the general population.[39] Four percent (4%) of the sample reported that they were deaf or had serious difficulty hearing, similarly to the U.S. general population (4%).[40] Three percent (3%) reported that they were blind or had serious difficulty seeing even when wearing glasses, similarly to those in the U.S. population (3%).[41] USTS respondents were six times as likely to report having serious difficulty concentrating, remembering, or making decisions because of a physical, mental, or emotional condition (30%), in contrast to those in the U.S. population (5%).[42] Respondents were also almost four times as likely to report difficulty doing errands alone, such as visiting a doctor's office or shopping because of a physical, mental, or emotional condition (22%), compared to the U.S. population (6%) (Figure 4.26).[43]

**Figure 4.26: Disability status**



- % in USTS
- % in U.S. population (ACS)

PORTRAIT OF USTS RESPONDENTS

57

AR_217055

Respondents were also asked if they identified as a person with a disability to better capture disabilities that were not outlined in the ACS. Twenty-eight percent (28%) of the sample identified as a person with a disability.[44] Throughout the report, the experiences of "people with disabilities" reflect the experiences of these individuals.

# XIII. Citizenship and Immigration Status

Respondents were asked about their citizenship or immigration status. In addition to those who were citizens in the sample (97%), respondents reported a range of immigration statuses, including being permanent residents (1%), visa holders (1%), refugees (<1%), or undocumented residents (<1%) (Table 4.5).

Table 4.5: Citizenship or immigration status

| Citizenship or immigration status | % of respondents |
|---|---|
| U.S. citizen (by birth) | 94% |
| U.S. citizen (naturalized) | 3% |
| Permanent resident | 1% |
| A visa holder (such as F-1, J-1, H1-B, or U) | 1% |
| Undocumented resident | <1% |
| DACA (Deferred Action for Childhood Arrival) | <1% |
| Refugee status | <1% |
| Currently under a withholding of removal status | <1% |
| DAPA (Deferred Action for Parental Accountability) | <1% |
| Other documented status not listed | <1% |

Six percent (6%) of respondents were not citizens by birth, compared to 16% in the U.S. population.[45] This included approximately 3% who were naturalized citizens, 2% who were documented residents (such as permanent residents and visa holders), and <1% who were undocumented residents[46] (Table 4.6).

Table 4.6: Citizenship or immigration status (collapsed)

| Citizenship or immigration status | % in USTS | % in U.S. population (Census) |
|---|---|---|
| U.S. citizen (by birth) | 94% | 84% |
| U.S. citizen (naturalized) | 3% | 8% |
| Documented resident | 2% | 8% |
| Undocumented resident | <1% | |

Respondents who were not U.S. citizens by birth were asked if they had ever applied for asylum in the United States. Seven percent (7%) applied for asylum, including 3% who applied on the basis of their gender identity or sexual orientation. Of those who did not apply for asylum, 51% reported that they did not need asylum in order to stay in the United States because they had access to other avenues for becoming citizens, permanent residents, or visa holders.[47] Other respondents indicated that they did not know how to apply (17%) or did not apply for other reasons (Table 4.7).

Table 4.7: Reasons for not applying for asylum

| Reasons for not applying for asylum | % of those who did not apply for asylum |
|---|---|
| They had access to other legal statuses | 51% |
| They did not know how to apply | 17% |
| They did not want to apply | 16% |
| They did not need to or were not eligible | 12% |
| They were afraid to apply | 3% |
| They believed they were past the one-year deadline | 2% |
| A reason not listed above | 30% |

Nearly half (48%) of respondents who applied for asylum received it. Another 32% did not receive asylum but instead received a "withholding of removal" status, an alternative form of relief that allows someone to stay in the United States under certain conditions. One in five (20%) of these respondents were denied asylum (Figure 4.27). Of the respondents who were denied asylum (n=11, unweighted),[48] 31% reported that they were denied asylum because they were past the one-year deadline, 44% indicated that it was because the immigration official decided that they did not face danger in their country of origin, and 25% reported that it was because of a reason not listed.

**Figure 4.27: Outcome of asylum application**



# XIV. Sexual Orientation

Respondents were asked which terms best described their sexual orientation. Respondents were most likely to identify as queer (21%), and they also identified as pansexual (18%), gay, lesbian, or same-gender-loving (16%), straight (15%), bisexual (14%), and asexual (10%) (Figure 4.28).

**Figure 4.28: Sexual orientation**



# XV. Relationship Status

Respondents were asked about their relationship status. Thirty-one percent (31%) were partnered and living together, 17% were partnered and not living together, 49% were single, 2% were in a polyamorous relationship, and 1% had a relationship status that was not listed. Respondents were also asked about their current legal marital status for the purpose of comparison to the U.S. adult population through the ACS. Eighteen percent (18%) of USTS respondents were currently married, in contrast to 52% in the U.S. adult population (Figure 4.29).[49] Almost three-quarters (72%) of respondents have never been married, which is more than twice as many as the U.S. adult population (30%).

**Figure 4.29: Currently married**
**CURRENT AGE (%)**



**ENDNOTES** | CHAPTER 4: PORTRAIT OF USTS RESPONDENTS

1 Respondents who were among the 12% who did not "think of [themselves] as transgender" in Q. 1.10 were eligible for the survey based on answers they provided to questions Q. 1.11–1.13. See *Appendix C (Detailed Methodology)* for a discussion of eligibility. Many of those individuals identified other terms that better described their gender and experiences.

2 Although only 12% of respondents reported that they did not think of themselves as transgender in response to Q. 1.10, a slightly larger number (14%) expressed discomfort with the word "transgender" being used to describe them in Q. 2.4. This may have been due to respondents' differentiation between identity and the terminology used to describe their identity. For example, while a respondent may have identified with the word transgender, they may not have been comfortable using the term "transgender" and would have instead preferred another term to describe their identity.

3 See Q. 2.3.

4 While most respondents were categorized for analysis by gender identity based on their selection of the term that best described them in Q. 2.3 and their selection in Q. 2.1 (sex assigned at birth on their original birth certificate) alone, a small number of respondents (n=439) required further analysis of their survey responses to determine if they met the eligibility criteria for the survey and, if so, what the most appropriate gender identity categories were for analysis. This included, for example, respondents who indicated in Q. 2.1 that the gender on their original birth certificate was female and that they identified as a woman in Q. 2.3, or who indicated that the gender on their original birth certificate was male and that they identified as a man. This recoding process is described in further detail in *Appendix C (Detailed Methodology)*.

5 Respondents were also asked in an earlier question (Q. 1.11) if they identified "as more than one gender or as no gender (such as genderqueer or non-binary)," without asking them if that is the *best* term to describe their gender identity. Nearly half (47%) of respondents said that they identify as such. This means that some respondents who said that another term (such as transgender man, transgender woman, or crossdresser) best described their gender identity also identified as having more than one gender or as no gender.

6 Although the vast majority of people have either male or female on their original birth certificate, there are rare instances where the sex on a birth certificate is left blank or where a gender marker other than "male" or "female"

is listed at the time of birth. It is possible that some respondents had an original birth certificate that did not list them as "male" or "female" at the time of their birth. These respondents may not have been able to accurately answer this question. Respondents were required to select one response to the question about the sex listed on their original birth certificate in Q. 2.1—either "female" or "male"—in order to proceed, since this answer was used to determine subsequent questions that they would receive later in the survey.

7 The age of respondents in the sample is discussed in further detail in section VI of this chapter.

8 Note that Q. 1.12 asked whether respondents were currently living full time in a gender different from the one assigned to them at birth. Some non-binary respondents may have been living as a non-binary person full time (including people for whom living part time in one gender and part time in another gender is most consistent with their non-binary identity), but did not select "yes" because they assumed the survey was asking only about people who were living exclusively in a binary gender (male or female) that is different than the gender on their original birth certificate.

9 Although 6% of crossdressers reported that they had transitioned based on Q. 1.12, the sample size of crossdressers who had transitioned was too low to report on their experiences by age.

10 The number of years since transitioning was calculated based on respondents' current age as reported in Q. 2.13, and the age at which they began to transition, as reported in Q. 1.13.

11 Throughout this report, respondents' experiences with being perceived as transgender by others are reported according to three categories: those who said that people could tell they were transgender "always" or "most of time" (11%), those who said that others could "sometimes" tell (32%), and those who said that others could "rarely" or "never" tell (57%).

12 The term "out" is used here to describe a person who openly self-identifies as transgender in their private, public, and/or professional lives.

13 See the *Family Life and Faith Communities* chapter for a more detailed discussion of respondents' experiences with being out to the immediate family they grew up with and their extended family, as well as their experiences with being out to partners or spouses and children.

14 Respondents' experiences with being out in the workplace are further discussed in the *Employment and the Workplace* chapter.

AR_217058

15    Respondents who reported that "Alaska Native" most accurately described their racial or ethnic identity were asked to enter their enrolled or principal corporation.

16    Respondents who reported that "American Indian" most accurately described their racial or ethnic identity were asked to enter their enrolled or principal tribe.

17    Those who reported that "biracial/multiracial" best described their racial or ethnic identity received a follow-up question in which they could select one or more of the racial or ethnic identities listed above that best described them.

18    Those who selected "a racial/ethnic identity not listed above" were asked to specify their identity and then received a follow-up question asking them to select the racial/ethnic identity or identities that best described them from the list above, with the exception of the "identity not listed above" category.

19    Racial and ethnic categories are combined in a manner similar to that in the U.S. Census, which is important for the purposes of making racial and ethnic comparisons to the U.S. population. A notable exception to U.S. Census categorization is that Middle Eastern and white respondents are reported separately throughout the report. The U.S. Census also offers Asians and Native Hawaiians/Other Pacific Islanders as two separate racial categories. Additionally, this report includes a Latino/a category, and other racial and ethnic categories should be considered to be of "non-Hispanic" origin, based on U.S. Census categories.

20    The difference in racial and ethnic population distribution in the USTS sample and the U.S. general population may be due to sampling bias that is common in internet-based surveys and convenience samples. See e.g., Dillman, D. A., Smyth, J. D., & Christian, L. M. (2014). *Internet, Phone, Mail, and Mixed-Mode Surveys: The Tailored Design Method (4th ed.)*. Hoboken, NJ: John Wiley & Sons. See also the *Methodology* chapter and *Appendix C (Detailed Methodology)* for more information about potential internet-based survey sampling bias. See *Appendix A (Characteristics of the Sample)* for unweighted frequencies and percentages for race and ethnicity in the USTS sample.

21    Prior research using representative samples of transgender adults have found that transgender adults differ from the general population in regard to race and ethnicity, with transgender people being more likely to be people of color. See e.g., Flores, A. R., Brown, T. N. T., & Herman, J. L. (2016). *Race and Ethnicity of Adults who Identify as Transgender in the United States*. Los Angeles, CA: Williams Institute; Conron, K. J., Scott, G., Stowell, G. S., & Landers, S. J. (2012). Transgender health in Massachusetts: Results from a household probability sample of adults. *American Journal of Public Health, 102*(1), 118–122. The USTS sample has a higher percentage of white respondents than the U.S. general population. To help correct for this sampling bias, weights for race and ethnicity were applied based on the racial and ethnic makeup of the U.S. population. While this may still over-

represent white respondents relative to the makeup of the transgender adult population, this weighting procedure brings the sample closer to what is estimated to be the true population distribution for race and ethnicity for transgender people. See the *Methodology* chapter and *Appendix C (Detailed Methodology)* for more information on weighting procedures applied to the sample. See also *Appendix A (Characteristics of the Sample)* for unweighted frequencies and percentages for race and ethnicity in the USTS sample.

22    Although the ACS groups Middle Eastern and white people in one category, the experiences of Middle Eastern respondents are presented separately from white respondents throughout this report. Despite a low number of Middle Eastern respondents in the sample overall (<1%), it is important to report in a manner that best reflects the unique circumstances of transgender people who identify as Middle Eastern.

23    The weight for 18-year-old respondents was created with propensity scores developed using a regression discontinuity model. For more information on this process and other weighting procedures, such as the development and application of the "supplemental weight," see *Appendix C (Detailed Methodology)*. See *Appendix A (Characteristics of the Sample)* for unweighted frequencies and percentages for age in the USTS sample.

24    U.S. Census Bureau. (2015). *Annual Estimates of the Resident Population: April 1, 2010 to July 1, 2015*. Available at: https://factfinder.census.gov/faces/tableservices/jsf/pages/productview.xhtml?pid=PEP_2015_PEPANNRES&src=pt.

25    U.S. Census Bureau. (2015). *2015 American Community Survey 1-Year estimates: Language spoken at home by ability to speak English for the population 5 years and over*. Available at: https://factfinder.census.gov/faces/tableservices/jsf/pages/productview.xhtml?pid=ACS_15_1YR_B16001&prodType=table. The percentages of people who reported on the primary language spoken in their home in the American Community Survey (ACS) were calculated by the research team. ACS findings include those in the U.S. population who are 5 years of age and older, in contrast to the USTS sample, which includes respondents who are 18 and older. Therefore, the comparison to the USTS sample should be interpreted with caution.

26    U.S. Census Bureau. (2015). *2015 American Community Survey 1-Year estimates: Language spoken at home by ability to speak English for the population 5 years and over*. See note 25.

27    Q. 2.12 asked about religious or spiritual identity only, rather than current involvement in a faith community. More information about respondents' experiences in faith communities (including religious and spiritual communities) can be found in the *Family and Faith Communities* chapter.

28  In addition to the main drop-down list of affiliations, those who identified as Christian, Jewish, or Muslim were able to provide additional specificity for their identity from a drop-down list of more specific religious affiliations in Q. 2.12. Although respondents were provided with numerous categories to specify for Christian, Jewish, and Muslim faiths, these lists were not exhaustive and likely did not capture all religious or spiritual identities represented in the sample. Furthermore, while those who identified as Christian were given an option to write in a Christian affiliation that was not listed, Jewish and Muslim respondents did not receive that option, which may have limited the manner in which they were able to identify their religious or spiritual identity.

29  Respondents who reported that they did not have a religious or spiritual identity included those who selected agnostic, atheist, or no affiliation without selecting another religious or spiritual identity.

30  The Current Population Survey is used by the Bureau of Labor Statistics to make determinations about the state of employment in the United States.

31  The "supplemental weight" includes the standard survey weight for 18-year-olds and race and ethnicity, as well as additional weights for age and educational attainment that were created based on the Census Bureau's 2014 American Community Survey (ACS). This weight was applied when comparing the USTS sample to the U.S. population for items that were sensitive to age and educational attainment, such as employment status and individual and household income.

32  USTS respondents seem to have similar household sizes to the U.S. population. For instance, according to the CPS, 2015 Annual Social and Economic Supplement, 28% of U.S. households have a household size of one, whereas 29% of USTS respondents have a household size of one (supplemental weight applied). However, USTS respondents are less likely to be living with family members, rather than with unrelated members of the household. Sixty-four percent (64%, supplemental weight applied) of USTS respondents reported a family size of one compared to 24% in U.S. population as reported in the CPS. Available at: https://www2.census.gov/programs-surveys/cps/techdocs/cpsmar15.pdf. Calculations were completed by the research team.

33  "Living in poverty" means living at or near the poverty line. The research team calculated the USTS poverty measure using the official poverty measure, as defined by the U.S. Census Bureau, which can be found at: https://www.census.gov/hhes/www/poverty/about/overview/measure.html. The income ranges in the USTS allowed for designation of respondents as living in or near poverty if their total family income fell under 125% of the official poverty line.

34  Proctor, B. D., Semega, J. L., & Kollar, M. A. (2016). *Income and Poverty in the United States: 2015*. (p. 13). DC: U.S. Census Bureau. Available at: https://www.census.gov/content/dam/Census/library/publications/2016/demo/p60-256.pdf. Calculations were completed by the research team.

35  Bureau of Labor Statistics. (2015). *The Employment Situation—August 2015*. Available at: http://www.bls.gov/news.release/archives/empsit_09042015.pdf; Bureau of Labor Statistics. (2015). *The Employment Situation—September 2015*. Available at: http://www.bls.gov/news.release/archives/empsit_10022015.pdf.

36  The educational attainment results reported for USTS respondents likely overestimates the number of transgender people with a level of education beyond high school and/or some college. This may be due to the method by which the survey was administered (online only) and the sampling technique (convenience sampling). Population-based surveys in several states have found lower educational attainment or no difference in educational attainment among transgender people when compared to non-transgender people. Conron, et al. See note 21; Meyer, I .H., Brown, T. N. T., Herman, J. L., Reisner, S. L., & Bockting, W. O. (in press). Demographic characteristics and health outcomes among transgender adults in select U.S. regions in the Behavioral Risk Factor Surveillance System. *American Journal of Public Health*.

37  See the *Methodology* chapter and the detailed methodology explanation in *Appendix C (Detailed Methodology)* for more information about potential internet-based survey sampling bias. See also note 20.

38  U.S. Census Bureau. (2015). *2015 American Community Survey 1-Year estimates: Educational Attainment*. Available at: https://factfinder.census.gov/faces/tableservices/jsf/pages/productview.xhtml?pid=ACS_15_1YR_S1501&prodType=table.

39  U.S. Census Bureau. (2015). *2015 American Survey 1-Year estimates: Disability characteristics*. Available at: http://factfinder.census.gov/faces/tableservices/jsf/pages/productview.xhtml?pid=ACS_15_1YR_S1810&prodType=table. Calculations were completed by the research team.

40  U.S. Census Bureau. (2015). See note 39.

41  U.S. Census Bureau. (2015). See note 39.

42  U.S. Census Bureau. (2015). See note 39.

43  U.S. Census Bureau. (2015). See note 39.

44  The difference in the reported rate of those who had one or more listed ACS disabilities (39%) and those who identified as a person with a disability (28%) may be due to some individuals not being comfortable referring to themselves as a person with a disability. However, those who identified as people with a disability likely reflect a much wider range of disabilities.

AR_217060

45  U.S. Census Bureau. (2015). *2015 American Community Survey 1-Year estimates: Sex by age by nativity and citizenship status.* Available at: https://factfinder. census.gov/faces/tableservices/jsf/pages/productview. xhtml?pid=ACS_15_1YR_B05003&prodType=table. Calculations were completed by the research team.

46  Documented and undocumented residents are often underrepresented in surveys for many reasons, including concerns about jeopardizing their residency by revealing information about their immigration status on a survey. When asking questions relating to citizenship and immigration status, the survey included statements reminding respondents that their answers were confidential and could not be used against them. However, it is likely that the number of documented and undocumented residents is underrepresented in this sample.

47  This percentage includes those who reported that they had access to other legal statuses and those who indicated that they were already citizens or permanent residents in Q. 9.8.

48  Due to the small sample size, the unweighted frequency is being presented alongside weighted percentages here to be clear that the percentages reflect the experiences of a small sample of respondents. While it is important to present these experiences in this report, the findings presented in this sentence should be interpreted with caution due to the small sample size.

49  U.S. Census Bureau. (2015). *2015 American Community Survey 1-Year Estimates: Sex by marital status by age for the population 15 years and over.* Available at: https://factfinder.census.gov/faces/tableservices/ jsf/pages/productview.xhtml?pid=ACS_15_1YR_ B12002&prodType=table. These findings, as presented in the ACS, include adults who are currently married with both spouses who are present and not present based on the ACS definitions. Calculations were completed by the research team.

PORTRAIT OF USTS RESPONDENTS

AR_217061



# CHAPTER 5

# Family Life and Faith Communities

2015 U.S. TRANSGENDER SURVEY

F amily life and the state of relationships with family members, including immediate and extended family, spouses and partners, and children, have been shown to impact life outcomes in many areas, such as physical and mental health, economic status, and housing stability.[1] Experiences of support and rejection within the family environment can have a profound effect on these outcomes for transgender people. The survey explored aspects of family relationships for transgender people, particularly the impact of family acceptance and rejection.

Since spiritual and religious communities (such as within a church, synagogue, mosque, or other faith community) can play a significant role within families and throughout an individual's life, the survey also examined respondents' experiences with faith communities.

Notable differences in respondents' experiences based on demographic and other characteristics are reported throughout the chapter.

AR_217062

**KEY FINDINGS**

▶ Sixty percent (60%) of respondents who were out to the immediate family they grew up with reported that they had supportive families, and 40% had families that were neutral or not supportive.

- One in ten (10%) reported that an immediate family member had been violent towards them because they were transgender.

- Fifteen percent (15%) ran away from home and/or were kicked out of the house because they were transgender.

▶ More than one-quarter (27%) of respondents who have been out to any of their past or current spouses or partners reported that a spouse or partner ended their relationship solely or partly because they were transgender, including 10% who had a relationship end solely because they were transgender.

▶ Eighteen percent (18%) of respondents were parents.

▶ Twenty-one percent (21%) of respondents who were out to their children had a child who stopped speaking to them or spending time with them after coming out as transgender.

▶ One-half (50%) of respondents who were out to their family experienced at least one form of rejection from the immediate family they grew up with, their spouse or partner, and/or their children because they were transgender.

▶ Family support was associated with positive outcomes while family rejection was associated with negative outcomes. Respondents who were rejected were:

- Nearly twice as likely to have experienced homelessness (40%) as those who were not rejected (22%).

- Almost twice as likely to have engaged in sex work (16%) as those who were not rejected (9%).

- More likely to have attempted suicide (49%) than those who were not rejected (33%).

▶ Nearly one in five (19%) respondents who had ever been part of a spiritual or religious community left due to rejection. Forty-two percent (42%) of those who left found a welcoming spiritual or religious community.

FAMILY LIFE AND FAITH COMMUNITIES

AR_217063

# I. Outness to Family and Friends

Respondents received a series of questions to determine whether they were "out"[2] about their transgender identity to various family members and friends. Specifically, respondents were asked whether people in different groups knew they were transgender, including spouses and partners, children, immediate family they grew up with, extended family, LGBT[3] friends, and straight and non-transgender (non-LGBT) friends. Respondents then received questions regarding the impact that anti-transgender bias had on the relationships with most of the people in those groups.

Eighty-six percent (86%) of respondents reported having a current or former spouse or partner. Fifty-eight percent (58%) of those were out to their current spouse or partner and 53% had been out to at least one of their former spouses or partners. Overall, 88% of these respondents were or have been out to a current or former spouse or partner.

Of the 18% of respondents who had children, 69% reported being out to at least one child. This varied by race and ethnicity, with American Indian respondents (78%) reporting the highest level of outness, and Black (62%), Latino/a (62%), and Asian (55%) individuals being out to their children less often (Figure 5.1).

Respondents were asked whether they were currently out to all, most, some, or none of the people in several groups, including the immediate family they grew up with, extended family,[4] LGBT friends, and straight and non-transgender (non-LGBT) friends. Results for each group reflect only respondents who reported having people from that group in their lives.

More than half (53%) of respondents reported that they were out to all immediate family they grew up with. This number decreased to 49% when considering spouses or partners and children as part of the immediate family. Respondents were less likely to be out to extended family members, with 23% reporting that they were out to all extended family. Overall, less than one-quarter (22%) of respondents were out to all immediate family members—including spouses, partners and children—and extended family members.

Respondents were also asked whether their LGBT and non-LGBT friends knew that they were transgender. LGBT friends were the largest group of people among whom survey respondents were out, with 62% reporting that they were out to all of their LGBT friends. In contrast, less than one-third (32%) of respondents were out to all of their non-LGBT friends (Table 5.1).

**Figure 5.1: Out to children**
RACE/ETHNICITY (%)



**Table 5.1: Outness to family and friend groups**

| Family and friend groups | % of respondents who had people from the family or friend group in their lives | | |
|---|---|---|---|
| | All | Most or some | None |
| Lesbian, gay, bisexual, or transgender (LGBT) friends | 62% | 34% | 4% |
| Immediate family they grew up with (such as parents or siblings) | 53% | 25% | 22% |
| Immediate family they grew up with, spouses/partners, children | 49% | 43% | 8% |
| Straight, non-transgender (non-LGBT) friends | 32% | 56% | 12% |
| Extended family (such as aunts, uncles, and cousins) | 23% | 38% | 39% |
| Immediate family they grew up with, extended family, spouses/ partners, and children | 22% | 70% | 8% |

*Sample size too low to report

2015 U.S. TRANSGENDER SURVEY

AR_217064

# II. Relationships with Spouses or Partners

Those who were out to a spouse or partner were asked whether a spouse or partner had ended their relationship because they were transgender. More than a quarter (27%) reported that a spouse or partner ended their relationship solely or partly because they were transgender, including 10% who had a relationship end solely because they were transgender.

Whether a relationship ended solely due to being transgender differed based on a respondents' current age, with those aged 45 and older being twice as likely to have this experience (Figure 5.2).

**Figure 5.2: Spouse/partner ended relationship solely because of transgender status**
CURRENT AGE (%)



The age at which a respondent transitioned also affected the likelihood of a relationship ending. Respondents who transitioned at age 35 or older were more than twice as likely to have their relationship end solely due to being transgender (24%) (Figure 5.3).

**Figure 5.3: Spouse/partner ended relationship solely because of transgender status**
AGE OF TRANSITION (%)



The likelihood of a relationship ending also differed by gender identity, with transgender women (18%) being more likely to have a relationship with a spouse or partner end solely because of being transgender than transgender men (9%), crossdressers (6%), and non-binary people (3%) (Figure 5.4).

**Figure 5.4: Spouse/partner ended relationship solely because of transgender status**
GENDER IDENTITY (%)



FAMILY LIFE AND FAITH COMMUNITIES

AR_217065

*More than one-quarter (27%) of respondents who were out to their spouse or partner reported that a spouse or partner ended their relationship solely or partly because they were transgender, including 10% who had a relationship end solely because they were transgender.*

Respondents were also asked whether a current or former romantic or sexual partner had ever been violent toward them. More than half (54%) reported that they had experienced some form of intimate partner violence. Experiences with intimate partner violence are discussed further in the *Harassment and Violence* chapter.

## III. Parental Status and Related Children in the Household

Eighteen percent (18%) of people in the sample were parents,[5] and of those individuals, more than two-thirds (69%) reported that they were out as transgender to at least one of their children.

In comparison to the U.S. adult population, USTS respondents were substantially less likely to have related children living in their home. According to the Current Population Survey, 34% of adults in the U.S. population had at least one related child under the age of 18 living in their household in 2015,[6] which was more than twice as many

# In Our Own Voices

"When I finally had the courage to come out, my parents, who I knew would freak out, did the unthinkable. They assured me I had their complete support to be who I am. I was never prouder than in that moment."

"My father physically assaulted me and kicked me out of the house. He screamed at me, calling me pathetic, a waste, worthless, and so on. I sat in silence."

"When I was 20, I slipped up and accidentally outed myself to my parents. It was the worst mistake of my life. They spoke with a pastor who convinced them that I was possessed by demon. A couple of days later, they told me to leave and not come back. I spent the next six months homeless."

"Within an hour of coming out to my parents, I was kicked out into the cold with very few items and my car taken away. I was soon informed by my college that my parents had withdrawn my tuition for the upcoming spring semester. I was devastated."

"It took my family a while to come around. At first they didn't accept me, but they eventually saw how much happier I am and are now my biggest supporters."

AR_217066

as USTS respondents (14%).[7] These differences persisted across all age groups, with USTS respondents aged 25 to 44 being more than four times less likely to have a related child under the age of 18 living in their household (12%) than the corresponding age group in the U.S. population (54%) (Figure 5.5).

**Figure 5.5: Respondents with related children under 18 living in household**
AGE (%)



USTS respondents with a related child under 18 in household

Adults in the U.S. population with a related child under 18 in household (CPS)

# IV. Relationships with Children

Respondents who reported that they were out to at least one of their children were asked a question to determine whether being transgender had ever negatively impacted a relationship with their child. Specifically, they were asked whether any of their children had ever stopped speaking to or spending time with them because they were transgender. More than one in five (21%) reported that at least one of their children stopped speaking

*More than one in five (21%) of those who were out to their children reported that at least one of their children stopped speaking or spending time with them, temporarily or permanently.*

or spending time with them, at least for a period of time.

The likelihood of this experience differed by gender identity, with transgender women (28%) being more than four times as likely to report that their child stopped speaking or spending time with them as transgender men (6%) and non-binary respondents (6%) (Figure 5.6).

**Figure 5.6: Children stopped speaking or spending time with respondent because of transgender status**
GENDER IDENTITY (%)



Overall, of respondents who have had a spouse or partner and/or who have children, 28% have had a relationship with their spouse or partner or child end, at least temporarily.

# V. Family Acceptance and Support

Respondents who reported that they were out to all, most, or some of the immediate family they grew up with were asked to assess how supportive their family was of them as a transgender person using a five-point scale from "very supportive" to "very unsupportive." The categories were collapsed to create a new variable reflecting a supportive, neutral, or unsupportive family.[8]

More than half (60%) reported that their family was supportive, 18% had unsupportive families, and 22% had families that were neither supportive nor unsupportive ("neutral").

*Experiences varied widely between those with family support and those with unsupportive families, with family support being associated with a reduced likelihood of negative experiences. Respondents with family support were:*

- *More likely to be employed (65%) than those with unsupportive families (52%).*

- *Less likely to have ever done sex work (11%) than those with unsupportive families (16%).*

- *Less likely to have experienced homelessness (27%) than those with unsupportive families (45%).*

- *Less likely to report currently experiencing serious psychological distress[9] (31%) in contrast to those with unsupportive families (50%).*

- *Less likely to have attempted suicide (37%) than those with unsupportive families (54%).*

*More than half (60%) of those who were out to their immediate family reported that their family was supportive, while 18% said that their family was unsupportive.*

# VI. Relationships with Immediate Family/ Family of Origin[10]

Nearly half (44%) of respondents who were out to all, most, or some of the immediate family they grew up with (such as parents and siblings) reported that they had experienced at least one form of family rejection outlined in the survey. This rejection included relationships ending, family violence, being kicked out of the house, not being allowed to wear clothes matching their gender identity, and being sent to a professional to stop them from being transgender.

## A. Ended Relationships

Among those who were out to their immediate family, more than one-quarter (26%) reported that an immediate family member stopped speaking to them for a long time or ended their relationship altogether because they were transgender. This was higher among American Indian (38%), Middle Eastern (37%), and Black (30%) respondents, and lower for Asian (22%) respondents (Figure 5.7). Undocumented residents (39%) were also more likely to face this form of family rejection than documented non-citizens (22%) and citizens (26%).

AR_217068



Figure 5.7: Immediate family member stopped speaking or ended relationship
RACE/ETHNICITY (%)

Whether a family member stopped speaking to or ended a relationship with a respondent differed by age, with 18 to 24 year olds experiencing the least amount of family rejection of this nature (18%) compared to those in other age groups, such as 45 to 64 year olds (37%) (Figure 5.8).



Figure 5.8: Immediate family member stopped speaking or ended relationship
CURRENT AGE (%)

Those who transitioned in the last year (24%) were less likely to have a family member stop speaking to them or end a relationship than those who transitioned 2 to 5 years ago (29%), 6 to 9 years

*More than one-quarter (26%) of respondents reported that an immediate family member stopped speaking to them for a long time or ended their relationship altogether because they were transgender.*

ago (37%), and 10 or more years ago (43%) (Figure 5.9).



Figure 5.9: Immediate family member stopped speaking or ended relationship
YEARS SINCE TRANSITIONING (%)

## B. Family Violence

Among those who were out to their immediate family, one out of every ten (10%) respondents reported that a family member was violent towards them because they were transgender. Prevalence of family violence differed greatly depending on the time period during which a respondent transitioned, with those transitioning 10 or more years ago (15%) experiencing almost twice as much violence as those who transitioned in the past year (8%) (Figure 5.10).

FAMILY LIFE AND FAITH COMMUNITIES

71

**Figure 5.10: Experienced violence by family member**
YEARS SINCE TRANSITIONING (%)



*Family violence was associated with increased likelihood of negative experiences. Those who experienced family violence were:*

- *More than twice as likely to have experienced homelessness (59%) than those who did not experience family violence (29%).*

- *More likely to be currently experiencing serious psychological distress (53%) than those who did not experience family violence (35%).*

- *More likely to have attempted suicide in their lifetime (65%) than those who did not experience family violence (39%).*

American Indian respondents (20%) were twice as likely to experience family violence, and other people of color, such as Asian (15%) and Middle Eastern (14%) respondents, also experienced higher rates of violence (Figure 5.11).

## C. Kicked out of the House

Eight percent (8%) of respondents who were out to the immediate family they grew up with were kicked out of the house, which represents 6% of the whole sample. Those who transitioned 10 or more years ago were twice as likely to have been kicked out of the house (16%) as those who transitioned within the last year (7%) (Figure 5.12).

**Figure 5.11: Experienced violence by family member**
RACE/ETHNICITY (%)



**Figure 5.12: Kicked out of the house by family**
YEARS SINCE TRANSITIONING (%)



Undocumented residents were more than twice as likely to have experienced family violence (25%) as their documented non-citizen (13%) and citizen (9%) counterparts.

People of color were kicked out of the house at higher rates, with Middle Eastern respondents (17%) being twice as likely, and American Indian (14%), Black (12%), Latino/a (11%), multiracial (11%), and Asian (9%) respondents experiencing this form of rejection more than white respondents (6%) (Figure 5.13).

AR_217070

**Figure 5.13: Kicked out of the house by family**
RACE/ETHNICITY (%)



*Being kicked out of the house was associated with an increased likelihood of a range of negative experiences related to economic stability, mental health, and physical health. Respondents who were kicked out of the house were:*

- *More likely to be living in poverty (43%) than those who were not kicked out of the house (28%), and had lower incomes overall.*

- *Three times more likely to have ever done sex work (33%) than those who were not kicked out of the house (11%).*

- *Almost three times as likely to have experienced homelessness (74%) as those who were not kicked out of the house (28%).*

- *More than twice as likely to be living with HIV (3.5%) than those who were not kicked out of the house (1.5%).*

- *Substantially more likely to have attempted suicide (66%) than those who were not kicked out of the house (39%).*

- *More likely to be currently experiencing serious psychological distress (50%) than those who were not kicked out of the house (36%).*

*Fourteen percent (14%) of respondents who were out to their immediate family reported that their family sent them to a professional—such as a therapist, counselor, or religious advisor—to stop them from being transgender.*

## D. Not Allowed To Wear Clothes Matching One's Gender Identity

More than one-quarter (27%) of respondents who were out to the immediate family they grew up with were not allowed to wear clothes that matched their gender.

## E. Sent to a Professional to Stop Them from Being Transgender

Fourteen percent (14%) of respondents who were out reported that their immediate family had sent them to a professional—such as a therapist, counselor, or religious advisor—to stop them from being transgender. This represents 11% of the whole sample. Those who transitioned 6 or more years ago (20%) were twice as likely to be sent to a professional as those who transitioned within the last year (11%) (Figure 5.14).

**Figure 5.14: Sent to a professional to stop them from being transgender**
YEARS SINCE TRANSITIONING (%)



FAMILY LIFE AND FAITH COMMUNITIES

73

AR_217071

Rates differed by race and ethnicity, with nearly one-third of Middle Eastern respondents (31%) and nearly one-quarter of American Indian respondents (24%) being sent to a professional (Figure 5.15).

**Figure 5.15: Sent to a professional to stop them from being transgender**
RACE/ETHNICITY (%)



Additional details on respondents' experiences with professionals who attempted to change their gender identity are discussed further in the "Conversion Therapy and Other Pressures to De-Transition" section of the *Health* chapter.

# VII. Ran Away From Home

One out of every ten (10%) respondents who were out to their immediate family ran away from home because they were transgender. Almost one-third (32%) of those individuals ran away at age 15 or younger.

Respondents were more than twice as likely to have run away from home if they transitioned 10 or more years ago (19%) as compared to those who had transitioned within the past year (8%) (Figure 5.16).

**Figure 5.16: Ran away from home**
YEARS SINCE TRANSITIONING (%)



People of color were more likely to have run away from home, with Middle Eastern (25%), American Indian (18%), Black (15%), multiracial (14%), Asian (12%), and Latino/a (12%) respondents all reporting that they had run away at higher rates than white respondents (8%) (Figure 5.17).

**Figure 5.17: Ran away from home**
RACE/ETHNICITY (%)



Rates also differed according to citizenship status, with undocumented residents (36%) running away from home more than three times as often as citizens (10%) and more than documented non-citizen residents (14%).

AR_217072

Overall, 15% of those who were out to their immediate family, or 11% of the whole sample, ran away from home and/or were kicked out of the house.

# VIII. Supportive Family Behaviors

Those who were out to their immediate family were asked whether any of the immediate family they grew up with demonstrated support of them as a transgender person through any specific acts listed in the question, such as using preferred names, using correct pronouns, and providing financial support for their transition. Eighty-two percent (82%) of respondents reported that at least one immediate family member supported them through at least one of these acts, while 18% did not experience any of the supportive acts (Table 5.2).

Table 5.2: Family support

| Supportive family behaviors | % of respondents |
|---|---|
| Told respondent they respect and/or support them | 65% |
| Used their preferred name | 58% |
| Used the correct pronouns | 55% |
| Stood up for them with family, friends, or others | 36% |
| Did research to learn how to best support them | 33% |
| Gave money to help with gender transition | 18% |
| Supported them in another way | 11% |
| Provided help with changing name and/or gender on an ID document | 10% |
| **One or more experiences listed** | **82%** |

# IX. Family Rejection Overall

A variable was created to combine all forms of family rejection examined in the survey. This included whether the respondent had a spouse, partner, or child end a relationship, reported that their family was unsupportive, or had any of the five specific rejecting experiences outlined in section VI of this chapter. One half (50%) of respondents who were out to family members reported that they experienced some form of family rejection, which represents 46% of the overall sample.[11]

Experience with family rejection differed by the age at which a respondent transitioned, with 68% of those who transitioned at age 35 or older experiencing rejection, compared to 56% of those who transitioned under the age of 18 (Figure 5.18). Among respondents who transitioned ten or more years ago, 68% reported family rejection compared to 48% of those who transitioned in the past year (Figure 5.19).

**Figure 5.18: Any family rejection**
AGE OF TRANSITION (%)



AR_217073

**Figure 5.19: Any family rejection**
YEARS SINCE TRANSITIONING (%)



Family rejection also differed by gender identity, with transgender women (63%) experiencing rejection more than transgender men (55%), and transgender men and women (59%) experiencing nearly twice as much rejection as non-binary respondents (32%) (Figure 5.20).

**Figure 5.20: Any family rejection**
GENDER IDENTITY (%)



Family rejection among respondents of different racial or ethnic identities varied little, although American Indian (66%) respondents experienced higher levels of rejection (Figure 5.21).

**Figure 5.21: Any family rejection**
RACE/ETHNICITY (%)



*Respondents who experienced family rejection were:*

- *Almost twice as likely to have experienced homelessness (40%) as those who were not rejected (22%).*

- *Nearly twice as likely to have done in sex work (16%) as those who were not rejected (9%).*

- *More likely to have attempted suicide (49%) than those who were not rejected (33%).*

# X. Experiences with a Faith Community

The survey explored respondents' experiences with a spiritual or religious community ("faith community"), such as a church, synagogue, mosque, or other faith community. Two-thirds (66%) of the survey sample had been part of a faith community at some point in their life. Black (77%) and Middle Eastern (71%) respondents were more likely to have been part of a faith community than respondents of other races and ethnicities (Figure 5.22).

AR_217074



Figure 5.22: Ever been part of a faith community
RACE/ETHNICITY (%)

## A. Leaving a Faith Community Due to Fear of Rejection

More than one-third (39%) of respondents who have been part of a faith community left due to fear of being rejected because they were transgender. People of color, including Middle Eastern (54%), American Indian (51%), Black (49%), Latino/a (46%), Asian (43%), and multiracial (40%) respondents, were more likely to leave because they were afraid of rejection (Figure 5.23).

Figure 5.23: Ever left faith community due to fear of rejection
RACE/ETHNICITY (%)



## B. Leaving a Faith Community Due to Rejection

Nearly one in five (19%) respondents who had been part of a faith community left because they were actually rejected (in contrast to feared rejection as reported in the last subsection), which represents 12% of all respondents. Experiences varied based on the amount of time since transition, with nearly one-third (32%) of those who transitioned 10 or more years ago leaving a faith community due to rejection (Figure 5.24).

Figure 5.24: Ever left faith community due to rejection
YEARS SINCE TRANSITIONING (%)



People of color were rejected by their faith communities at higher rates, with one-third of American Indian respondents (33%) and almost one-quarter of Black (24%) and Middle Eastern (24%) individuals leaving for this reason (Figure 5.25).

*More than one-third (39%) of respondents who have been part of a faith community left because they feared rejection as a transgender person.*

FAMILY LIFE AND FAITH COMMUNITIES

77



Figure 5.25: Ever left faith community due to rejection
RACE/ETHNICITY (%)

Nearly one-third (30%) of those who had ever been part of a faith community reported that they had been part of such a community in the past year, which is 19% of the overall sample. Additionally, sixty percent (60%) of them were in a community where leaders or other members thought or knew they were transgender.

## D. Acceptance Within Faith Communities in the Past Year

Respondents whose faith community leaders or members thought or knew they were transgender were asked about a series of behaviors that signaled acceptance within the community in the past year. Ninety-four percent (94%) reported that community leaders and/or members accepted them for who they are as a transgender person, and more than three-quarters (80%) were told their religion or faith accepts them. Ninety-six percent (96%) of respondents who were in a faith community in the past year experienced at least one of the accepting behaviors (Table 5.3).

## C. Welcoming Communities and Experiences Within the Past Year

Of the people who had been rejected by a faith community, 42% found a new community that welcomed them as a transgender person. This differed by respondents' race or ethnicity, with American Indian respondents (54%) being more likely to find a welcoming community, and Latino/a (37%) and Asian (34%) respondents being least likely (Figure 5.26).

Table 5.3: Acceptance within a faith community in the past year

| Acceptance within faith community in past year | | | |
|---|---|---|---|
| | Many times | A few times | Once or twice |
| Community leaders and members accepted them for who they are as a transgender person | 75% | 11% | 8% |
| A leader or member of their faith community made them feel welcome as a transgender person | 72% | 12% | 9% |
| They were told that their religion or faith accepts them as a transgender person | 59% | 12% | 9% |
| **One or more experiences listed**[12] | **96%** | | |



Figure 5.26: Found new welcoming faith community after rejection
RACE/ETHNICITY (%)

*Sample size too low to report

AR_217076

## *E. Rejection Within Faith Communities in the Past Year*

Those with faith community leaders or members who thought or knew they were transgender were also asked about behaviors that signaled rejection in the past year. Among them, 6% were asked to meet with faith leaders to stop them from being transgender, and 5% were asked to stop coming to services or faith community functions (Table 5.4).

**Table 5.4: Rejection within a faith community in the past year**

| Rejection within faith community in past year | Many times | A few times | Once or twice |
|---|---|---|---|
| They were told that being transgender is a sin or that their religion does not approve of them | 5% | 5% | 7% |
| They were asked to meet with faith leaders to stop them from being transgender | 1% | 2% | 3% |
| Community leaders or members asked them to seek medical or psychological help to stop them from being transgender | 1% | 2% | 3% |
| They were asked to stop coming to services or faith community functions | 1% | 1% | 3% |
| **One or more experiences listed[13]** | | **18%** | |

Nearly one in five (18%) respondents who were in a faith community in the past year reported that they experienced at least one of the rejecting behaviors. Rejection was more likely among Asian (40%) and Black (25%) respondents (Figure 5.27).

***Nearly one in five (19%) respondents who had been part of a faith community left because they were rejected.***

**Figure 5.27: Any rejecting behavior by faith community in past year**
**RACE/ETHNICITY (%)**

*Sample size too low to report

# Conclusion

Results showed significant challenges in many areas of family life, including the retention of relationships with immediate and extended family, spouses and partners, and children. However, results also demonstrate that survey respondents were able to maintain relationships and successfully build family units despite those challenges. They further show the importance of family support in promoting positive experiences in many aspects of life. Results demonstrate that family rejection is strongly correlated with increased negative effects on a wide range of major life experiences, including income, homelessness, HIV infection, serious psychological distress, and suicidal behavior. Additionally, although many respondents experienced negative interactions within their faith communities, many others were able to find welcoming and supportive communities. While respondents' experiences varied overall, these findings reveal the substantial challenges facing many transgender people within their families and faith communities.

**ENDNOTES** | CHAPTER 5: FAMILY LIFE AND FAITH COMMUNITIES

1    Grant, J. M., Mottet, L. A., Tanis, J., Harrison, J., Herman, J. L., & Keisling, M. (2011). *Injustice at Every Turn: A Report of the National Transgender Discrimination Survey.* (pp. 88–105). DC: National Center for Transgender Equality & National Gay and Lesbian Task Force; Huebner, D., Diaz, R. M., & Sanchez, J. (2010). Family acceptance in adolescence and the health of LGBT young adults. *Journal of Child and Adolescent Psychiatric Nursing, 23*(4), 205–213.

2    The term "out" is used here to describe a person who openly self-identifies as transgender in their private, public, and/or professional lives.

3    Lesbian, gay, bisexual, and transgender (LGBT).

4    See Q. 4.5 for descriptions of groups of family members.

5    A respondent's status as a parent was determined based on Q. 4.3, which asked if a respondent was out to any of their children. Eighty-two percent (82%) reported that they "do not have any children," and the remaining 18% answered "yes" or "no" to whether they were out to their children. This question established whether a respondent had at least one child, but did not determine the number of children, ages of children, or whether the children lived in the respondent's household.

6    U.S. Census Bureau. (2015). *Current Population Survey, Annual Social and Economic Supplement.*

7    The percentage of USTS respondents with related children under the age of 18 in the household is based on Q. 7.6.

8    "Very supportive" and "supportive" categories were collapsed into a single "supportive" category. "Very unsupportive" and "unsupportive" categories were collapsed into a single "unsupportive" category. See Q. 4.6.

9    The "serious psychological distress" measure was developed from the Kessler 6 scale. See Q. 12.2. See also *Health* chapter.

10    Section 4 asked about experiences with "immediate family [respondent] grew up with," and indicated that the definition included parents and siblings.

11    The figure of 50% of respondents experiencing family rejection is based on a variable created to reflect any family rejection among several questions, including: (1) Q. 4.2 (spouse/partner ended relationship), (2) Q. 4.4 (child stopped speaking or spending time with respondent), (3) Q. 4.6 (reported level of supportiveness of immediate family), and (4) acts listed in Q. 4.7.

12    The "any accepting behavior" variable was created based on respondents who had experienced an accepting behavior listed in Q. 5.7 once or twice, a few times, or many times.

13    The "any rejecting behavior" variable was created based on respondents who had experienced a rejecting behavior listed in Q. 5.7 once or twice, a few times, or many times.

AR_217078



# CHAPTER 6

# Identity Documents

M ost non-transgender people take their identity documents (IDs) for granted, but for transgender people, updating and using IDs may present substantial challenges. Transgender people often need to update their IDs to reflect their gender and name. Changing the name listed on most state or federal IDs and records typically involves obtaining a legal name change from a court.[1] Changing the gender marker listed on most IDs and records generally requires documentation of gender transition from a health provider, though the requirements of this documentation may vary greatly for each type of ID and from jurisdiction to jurisdiction.[2] Previous researchers have documented barriers preventing transgender people from updating the name and gender on their IDs.[3]

This chapter explores respondents' experiences with their IDs and records, including updating their name and/or gender, and interactions with others related to updating and presenting their IDs and records. Notable differences in respondents' experiences based on demographic and other characteristics are reported throughout the chapter.

IDENTITY DOCUMENTS

AR_217079

**KEY FINDINGS**

▶ Eleven percent (11%) of respondents had their preferred name and gender on all IDs and records, while 68% reported that none of their IDs had the name and gender they preferred.

..................................................................................................................................

▶ Forty-nine percent (49%) did not have an ID or record with the name they preferred, and 67% did not have an ID or record with the gender they preferred.

..................................................................................................................................

▶ Thirty percent (30%) of respondents completed a legal name change.

..................................................................................................................................

▶ Thirty-four percent (34%) of people who were granted a legal name change reported that they had spent over $250, and 11% spent over $500.

..................................................................................................................................

▶ Thirty-five percent (35%) of those who did not try to change their legal name did not try because they could not afford it.

..................................................................................................................................

▶ Of those who wanted to update their driver's license or state ID, an estimated 44% were able to change their name on the license and an estimated 29% were able to change their gender.

..................................................................................................................................

▶ Of those who wanted to change the gender on their birth certificate, only an estimated 9% were able to do so.

..................................................................................................................................

▶ As a result of showing an ID with a name or gender that did not match their gender presentation, 25% of people were verbally harassed, 16% were denied services or benefits, 9% were asked to leave a location or establishment, and 2% were assaulted or attacked.

# I. Access to Legal Name Changes

Changing a name is a step in the transition process for some, but not all, transgender people. A legal name change order is almost always required to update the name listed on many forms of official IDs and records, such as driver's licenses, passports, and Social Security cards.[4] Legal name changes typically happen through a court order, and the process for obtaining a court order varies in each state and territory. Respondents were asked a series of questions about factors in their decision to legally change their name and their access to a legal name change.

Approximately one-third (36%) of respondents have tried to obtain a legal name change, and 30% were able to do so. This rate varied greatly according to gender identity, where transgender men and women (51%) were almost five times as likely to have tried or completed the name change process as non-binary people (11%). A vast majority (96%) of respondents who underwent the process did so through a court order, less than 1%

AR_217080

# Thirty percent (30%) of respondents completed the legal name change process.

did so through the immigration or naturalization process, and 4% did so by other methods, including marriage, an informal or assumed name, or a process in another country. Eighty-eight percent (88%) of those who attempted to legally change their name were granted a name change. Those who attempted but did not complete the process reported a variety of reasons, such as being denied, running out of money, or giving up (Table 6.1).

Table 6.1: Outcome of legal name change attempt

| Outcome of legal name change attempt | % of those who attempted a legal name change |
|---|---|
| Court granted name change | 88% |
| Court denied name change | 1% |
| They are still in process of changing name | 6% |
| They stopped trying because they ran out of money | 2% |
| They gave up | 2% |
| Court initially denied, then later granted name change | <1% |
| Not listed above | <1% |

Forty-one percent (41%) of those who attempted a legal name change through a court did so at age 24 or younger, 45% between the ages of 25 and 44, 13% between the ages of 45 and 64, and less than 1% at age 65 or older.

Nearly two-thirds (64%) of respondents have never tried to change their legal name. These participants reported a variety of reasons for not engaging in the process, including 28% who felt that their name did not conflict with their gender identity (Table 6.2). This reason was more common among non-binary people (45%) and crossdressers (36%) than transgender men and women (10%).

Table 6.2: Reasons for not attempting to change legal name

| Reasons for not attempting to change legal name | % of those who had not attempted name change |
|---|---|
| They are not ready | 40% |
| They cannot afford it | 35% |
| Their name does not conflict with gender identity or expression | 28% |
| They do not know how | 24% |
| They were worried that changing their name would out them | 24% |
| They do not believe they are allowed | 3% |
| A reason not listed | 20% |

## a. Assistance with a Legal Name Change

The legal name change process can be complicated to navigate, and while many people undergo the process without help, some seek the assistance of others. Of people who tried or completed the name change process, 60% did so without help and 40% received help, including free help from a clinic or non-profit organization (17%), assistance from a from a friend (11%), or help from a paid attorney (9%) (Table 6.3).

Table 6.3: Assistance for people who tried or completed the legal name change process

| Type of assistance | % of those who attempted name change |
|---|---|
| None | 60% |
| Free help from a legal clinic or non-profit organization | 17% |
| Help from a friend | 11% |
| Legal help from a paid attorney | 9% |
| Help from another source | 7% |

## b. Interactions with Judges and Court Staff

Those who interacted with judges and court staff during the name change process reported widely varying experiences. Of the 84% who believed

AR_217081

*More than one-third (35%) of respondents who did not try to legally change their name said that it was because they could not afford it.*

that the judges and/or court staff thought or knew they were transgender during their interaction, three-quarters (75%) felt they were always treated with respect, almost one-quarter (22%) felt they were only sometimes treated with respect, and 2% felt they were never treated with respect. Reports of only sometimes or never being treated with respect were higher for certain groups of people, including people who were currently working in the underground economy, such as sex work, drug sales, or other work that is currently criminalized (41%), and people who had not had any hormonal or surgical treatment (35%).

Respondents who interacted with judges or court staff who thought or knew they were transgender were asked about specific experiences during their interactions. Twenty-three percent (23%) were referred to by the wrong gender pronouns (such as he, she, or they) or title (such as Mr. or Ms.) during their interactions. Almost one in five (19%) people who interacted with judges or court staff were asked questions about their gender transition, such as whether they take hormones or have had any surgery. Nearly one in ten (9%) reported that they received unequal treatment or service, and 3% were verbally harassed. Overall, more than one-third (36%) of those who interacted with judges or court staff during the name change process reported having at least one of these experiences.

## c. Cost Associated with a Legal Name Change

The process of obtaining a legal name change may include many different fees, such as the cost of legal help, court fees, and newspaper publication. The survey asked respondents to recall how much they spent on the name change process. Approximately one-quarter (27%) of those who were granted a legal name change reported that the process cost less than $100, more than half (55%) reported it costing $100–$499, and 10% reported the process costing $500–$2,000 (Figure 6.1).

**Figure 6.1: Reported cost of a legal name change**



The cost of obtaining a legal name change may make the process inaccessible for some people. Thirty-five percent (35%) of people who had not tried to legally change their name reported that they did not try because they could not afford it. Additionally, of people who had attempted the legal name change process, 2% did not complete the process because they ran out of money.

AR_217082

## II. Experiences with Updating Name and Gender on IDs

Transgender individuals may seek to update the name on their IDs and records, the gender marker (such as M or F), or both. Only 11% of respondents reported that *all* of their IDs and records listed both the name and gender they preferred, and rates were lower for certain populations, such as undocumented individuals (4%), people aged 18–24 (5%), and people with no income (6%). More than two-thirds (68%) reported that *none* of their IDs or records had both the name and gender they preferred. The following sections will first discuss respondents' experiences with updating the name on their IDs or records, and then their experiences with updating the gender marker.

### a. Updating Name on IDs and Records

In order to change the name on IDs and records, one often needs to first obtain a legal name change. Generally, a court order granting a name change must then be presented to update each ID or record separately. Respondents were asked whether all, some, or none of their IDs and records reflected the name they preferred. Thirty percent (30%) of respondents had the name they preferred on all IDs and records, and 22% had the name they preferred on some IDs and records. Nearly half (49%) of respondents did not have any ID or record with the name they preferred. Non-citizens, including undocumented residents (68%), were more likely to say that none of their IDs or records reflected the name they preferred. Respondents with lower incomes were also more likely to say that none of their IDs or records had the name they preferred.

## In Our Own Voices

"I was intentionally misgendered and continually verbally harassed by DMV employees. Even after paying for proper identification to be issued, they refused to send the identification because my female photo didn't match my 'M' gender marker."

......................................................

"As a non-binary person, not being able to change my gender on any of my identification documents is really disheartening, dysphoria inducing, and kind of dehumanizing. I'm not allowed to be me."

......................................................

"My legal name and gender are not yet changed on any documents due to the price. The process for that should be easier or cheaper because that is the main thing that stops me from doing things that require ID."

......................................................

"Because my state won't update the gender markers on its birth certificates, the only way to update my driver's license is by changing my information on a federal level with my passport. The problem is that now my documents don't match."

......................................................

IDENTITY DOCUMENTS

AR_217083

Respondents were also asked about their experiences with updating the name on specific kinds of IDs or records, like driver's licenses and birth certificates. Among those respondents who had a driver's license or state ID and wanted to update their name on it, less than half (44%) were estimated[5] to have done so. An estimated 44% have changed their name on a work ID, and 43% have changed their name with the Social Security Administration. In contrast, less than one-third (31%) have changed their name on student records, 28% on their passport, and 18% on their birth certificate.

Respondents who transitioned were more likely to have changed the name on their IDs.[6] For example, while 44% of the whole sample had updated their name on their driver's license, 56% of those who had transitioned had updated their name on their driver's license. Transgender men and women who had transitioned were more likely to have updated their name on various types of IDs than non-binary respondents who had transitioned. For example, (61%) of transgender men and women who had transitioned changed their name their driver's license, in contrast to non-binary respondents who had transitioned (39%) (Figure 6.2).

*More than two-thirds (68%) of respondents did not have any ID or record that reflected both the name and gender they preferred.*

Those who indicated that some or all of their IDs listed the name they prefer were asked specific questions about their experiences updating the name on different kinds of IDs and records. For each type of ID or record, those respondents were asked if (1) they had been able to change the name on that ID, (2) they were in process of doing so, (3) they tried to change the name on the ID but were denied, or (4) they had not tried to change the name on that ID but wanted to do it someday.[7] Respondents were most likely to have successfully changed the name on their driver's license (87%), work ID (88%), and Social Security records (84%), and they were most likely to be denied a name change on their birth certificate (6%) (Figure 6.3).



Figure 6.2: Updated NAME on ID or record, by gender identity and transition status (estimated)



AR_217084

Figure 6.3: Experiences updating **NAME** on specific IDs (among those who updated some or all of their IDs/records)



*The above chart reflects respondents who have been able to update some or all of their IDs only (omitting those who have not been able to update any IDs). It also does not include those who do not have the ID/record or do not want to update it. These numbers should not be reported without clearly stating that they represent only a subset of the respondents. For overall ability to change records, see Figure 6.2.*

## b. Updating Gender on IDs and Records

Updating the gender marker on any ID or record is typically a distinct process from updating the name, and may require documentation regarding gender transition from a healthcare provider, a court order of gender change, an updated birth certificate, or other documentation. Respondents were asked whether all, some, or none of their IDs and records listed the gender they preferred. More than two-thirds (67%) of respondents did not have any ID or record that listed the gender they preferred. Twelve percent (12%) of respondents had the gender they preferred on all IDs and records, and 21% of respondents had the gender they preferred on some IDs and records.

Respondents were also asked about their experiences with updating the gender on specific kinds of IDs or records, like driver's licenses and birth certificates. Among those respondents who had a driver's license or state ID and wanted

to update their gender on it, an estimated[8] less than one-third (29%) had done so, and only 9% were able to change their gender on their birth certificate. Twenty-three percent (23%) of those with a Social Security card who wanted to update their gender on it were estimated to have done so, and only 18% had updated their gender on their passport.

Respondents who had transitioned were more likely to have changed their gender on their IDs. For example, 29% of the overall sample have updated the gender on their driver's license, while 42% of those who have transitioned updated the gender marker on their driver's license. Transgender men and women who had transitioned (52%) were much more likely to have updated the gender on their driver's license, in contrast to non-binary respondents who had transitioned (9%) (Figure 6.4).

IDENTITY DOCUMENTS

AR_217085



Figure 6.4: Updated GENDER on ID or record, by gender identity and transition status (estimated)

Those who indicated that some or all of their IDs listed the gender they preferred were asked specific questions about their experiences updating the gender on different kinds of IDs and records. For each type of ID or record, those respondents were asked if (1) they had been able to change the gender on that ID, (2) they were in process of doing so, (3) they tried to change the gender on the ID but were denied, or (4) they had not tried to change the gender on that ID but wanted to do it someday.[9] Respondents were most likely to change the gender on their driver's license (90%) and Social Security records (70%), and they were most likely to be denied a gender marker change on their birth certificate (15%) (Figure 6.5).



Figure 6.5: Experiences updating GENDER on specific IDs (among those who updated some or all of their IDs/Records)

*The above chart reflects respondents who have been able to update some or all of their IDs only (omitting those who have not been able to update any IDs). It also does not include those who do not have the ID/record or do not want to update it. These numbers should not be reported without clearly stating that they represent only a subset of the respondents. For overall ability to change records, see Figure 6.4.*

AR_217086

*Nearly one-third (32%) of respondents who did not have their preferred gender on any of their IDs or records reported that they could not afford to change them.*

Those who said that none of the IDs reflected the preferred gender were asked why that was the case. Twenty-five percent (25%) of these respondents believed they were not allowed to change the gender on their IDs or records, for reasons such as not having undergone medical treatment needed to change their gender on an ID or not having a doctor's letter. Nearly one-third (32%) of respondents indicated that none of their IDs or records had the gender they preferred because they could not afford it. Eighty-eight percent (88%) of non-binary individuals who indicated that none of their IDs or records had the gender they preferred reported that it was because the available gender options (male or female) did not fit their gender identity, in contrast to 4% of transgender men and women (Table 6.4).

**Table 6.4: Reasons for not changing gender on IDs or records**

| Reasons for not changing gender | % of those who reported having no IDs/records with the gender they preferred |
|---|---|
| They have not tried yet | 44% |
| The available gender options (male or female) do not fit their gender identity | 41% |
| They could not afford it | 32% |
| They were not ready | 30% |
| They did not know how | 26% |
| They believed they were not allowed | 25% |
| They worried that they might lose benefits or services | 25% |
| They worried that changing gender would cost them | 25% |
| Their request was denied | 1% |
| A reason not listed | 10% |

# III. Experiences When Presenting Incongruent Identity Documents

Respondents were asked about their experiences when they have shown an ID with a name or gender that did not match the gender in which they present. Overall, nearly one-third (32%) of individuals who have shown IDs with a name or gender that did not match their presentation reported negative experiences, such as being harassed, denied services, and/or attacked.

One-quarter (25%) of these respondents reported being verbally harassed. Middle Eastern (44%) and American Indian (39%) respondents reported experiencing this more often than other racial or ethnic groups (Figure 6.6).

**Figure 6.6: Verbally harassed when using an ID with a name or gender that did not match their presentation**
**RACE/ETHNICITY (%)**



Sixteen percent (16%) of people who showed IDs with a name or gender that did not match the gender they present in were denied services or benefits. Transgender men and women were more likely to have been denied services or benefits (20%) compared to non-binary respondents (10%).

IDENTITY DOCUMENTS

89

*Nearly one-third (32%) of individuals who have shown IDs that did not match their presentation reported negative experiences, such as being harassed, denied services, and/or attacked.*

Nine percent (9%) of people who showed an incongruent ID were asked to leave. Transgender women were more likely to have been asked to leave after presenting incongruent IDs (13%), compared to transgender men (9%) and non-binary people (6%).

Two percent (2%) of people who showed IDs with a name and gender that did not match the gender they present in were assaulted or attacked. These experiences differed by race and ethnicity. Middle Eastern respondents were almost five times as likely (9%) to report experiencing this, American Indians were three times as likely (6%), and Black respondents were twice as likely (4%) (Figure 6.7). Undocumented residents were also substantially more likely to report being assaulted or attacked (15%), in contrast to documented residents (3%) and citizens (2%).

**Figure 6.7: Assaulted or attacked when using an ID with a name or gender that did not match their presentation**
RACE/ETHNICITY (%)



# Conclusion

Findings indicate that respondents encountered substantial issues related to obtaining IDs and records that reflect their gender identity, including financial, procedural, and eligibility barriers. The data suggests that the cost of a legal name change presents a considerable challenge to getting a preferred name on identity documents. Results also indicate that the cost of updating gender markers and procedural requirements (such as providing documentation of certain medical procedures) are among the main barriers preventing respondents from updating the gender on their IDs and records. Further, results suggest that respondents who presented IDs that did not correspond with the gender they presented in were put at risk of harassment, assault, and other forms of negative treatment. Overall, these findings illustrate a variety of difficulties that arise during the name and gender change process and emphasize the importance of access to accurate identity documentation for the safety and well-being of transgender people.

AR_217088

**ENDNOTES** | CHAPTER 6: IDENTITY DOCUMENTS

1    Forty-nine states and all five U.S. territories have a court order process for changing a legal name. Hawai'i is currently the only state with an administrative name change process. Additionally, a legal name change may be obtained through other processes, such as through naturalization or a common law name change. See NCTE's Identity Document Center for more information, available at: www.transequality.org/documents.

2    For more information on gender marker change requirements for state and federal IDs, see NCTE's Identity Document Center, available at www.transequality.org/documents.

3    Brown, T. N. T. & Herman, J. L. (2016). *Voter ID Laws and Their Added Costs for Transgender Voters*. Los Angeles, CA: Williams Institute. Available at: http://williamsinstitute.law.ucla.edu/wp-content/uploads/Voter-ID-Laws-and-Their-Added-Costs-for-Transgender-Voters-March-2016.pdf; Hussey, H. (2015). *Expanding ID Card Access for LGBT Homeless Youth*. DC: Center for American Progress. Available at: https://cdn.americanprogress.org/wp-content/uploads/2015/10/01071118/IDhomelessLGBT.pdf; Grant, J. M., Mottet, L. A., Tanis, J., Harrison, J., Herman, J. L., & Keisling, M. (2011). *Injustice at Every Turn: A Report of the National Transgender Discrimination Survey*. (pp. 138–156). DC: National Center for Transgender Equality & National Gay and Lesbian Task Force.

4    See NCTE's Identity Document Center, available at: www.transequality.org/documents.

5    Due to an error in skip logic in this section of the survey, a portion of the respondents who should have seen questions about updating identity documents—specifically, respondents who said that none of their documents had the name or gender they preferred—did not receive them. To create a denominator that included those individuals, the research team used question answers from the respondents who *did* see the questions to estimate the number of respondents from the full sample who did have the ID in question and wanted to update it. This estimated denominator was used to calculate the percentages of those who updated these IDs out of respondents in the full sample who had the ID and wanted to update it.

6    For the purposes of this report, "transitioned" is defined as living full-time in a gender different than the one on a person's original birth certificate, as indicated by the answer to Q. 1.12.

7    Respondents could also select from the following additional answer choices about changing their name: (1) "I do not have this ID/record" and (2) "I do not want to change this ID/record." If a respondent selected one of those answers, they were removed from the calculation. Therefore, results only reflect the answers of those who had a particular ID/record and wanted to change the record. See Q. 10.14.

8    See note 5 regarding the estimated calculations in this section.

9    Respondents could also select from the following additional answer choices about changing their gender: (1) "I do not have this ID/record" and (2) "I do not want to change this ID/record." If a respondent selected one of those answers, they were removed from the calculation. Therefore, results only reflect the answers of those who had a particular ID/record and wanted to change the record. See Q. 10.16.

AR_217089



# CHAPTER 7
# Health

Disparities in health and health care among transgender people have been documented in prior research.[1] The survey explored several areas related to health care, including respondents' overall physical and mental health, and their experiences accessing health care services, both related to gender transition and routine health care.

Results related to health and health care are presented in six sections:

A.  Routine and Transition-Related Health Care and Coverage

B.  Overall Health and Psychological Distress

C.  Conversion Therapy and Other Pressures to De-Transition

D.  Suicidal Thoughts and Behaviors

E.  Substance Use

F.  HIV Testing and Care

Notable differences in respondents' experiences based on demographic and other characteristics are reported throughout the chapter.

AR_217090

# A. ROUTINE AND TRANSITION-RELATED HEALTH CARE AND COVERAGE

Previous studies indicate that transgender people face barriers to accessing quality, affordable health care. These barriers include lack of adequate insurance coverage, mistreatment by health providers, and health providers' discomfort or inexperience with treating transgender people.[2] Such barriers make it harder for transgender people to seek both routine health care that is unrelated to their transgender status, and health care related to gender transition ("transition-related care"). Transition-related care can include a variety of treatments, such as counseling, hormone therapy, and surgical procedures. While not every transgender person may need or want medical care related to gender transition, many do, and the specific treatments that they may undergo vary based on their individualized needs.

Respondents were asked about their experiences with health insurance coverage, including coverage for transition-related care. They were also asked about their experiences receiving general health care from doctors and other health providers, including how providers treated them as transgender people. Finally, respondents were asked about transition-related care they have had or wanted to have.

**KEY FINDINGS**

▶ One in four (25%) respondents experienced a problem with their insurance in the past year related to being transgender, such as being denied coverage for care related to gender transition.

- One-quarter (25%) of those who sought coverage for hormones in the past year were denied, and 55% of those who sought coverage for transition-related surgery in the past year were denied.

▶ One-third (33%) of respondents who had seen a health care provider in the past year reported having at least one negative experience related to being transgender, such as verbal harassment, refusal of treatment, or having to teach the health care provider about transgender people to receive appropriate care.

▶ In the past year, 23% of respondents did not see a doctor when they needed to because of fear of being mistreated as a transgender person, and 33% did not see a doctor because of cost.

▶ While more than three-quarters (78%) of respondents wanted hormone therapy related to gender transition, only 49% had ever received it.

▶ One-quarter (25%) of respondents have undergone some form of transition-related surgery.

AR_217091

# I. Health Insurance

## a. Insurance Coverage and Source of Coverage

Respondents were asked a series of questions about health insurance coverage. Eighty-six percent (86%) reported that they were covered by a health insurance or health coverage plan, and 14% reported that they were uninsured. This compares to 89% of adults in the U.S. general population who were covered by a health insurance or health coverage plan in 2015, as reported in the American Community Survey (ACS).[3] Insurance coverage differed by region, with those in the South (20%) being more likely to be uninsured than those in the overall sample, compared to those in the Midwest (13%), West (11%), and Northeast (9%). Among people of color, Black (20%), American Indian (18%), and Latino/a (17%) respondents were more likely to be uninsured (Figure 7.1). Respondents who were not U.S. citizens were more likely to be uninsured, including nearly one-quarter (24%) of documented non-citizens and a majority (58%) of undocumented residents.

**Fourteen percent (14%) of respondents were uninsured, compared to 11% of adults in the U.S. population.**

The most common source of health insurance reported by respondents was an employer-sponsored insurance plan (either through the respondent's employer or someone else's employer) (53%). Fourteen percent (14%) of respondents had individual insurance plans that they or someone else purchased directly from an insurance company, through healthcare.gov, or from a health insurance marketplace, and 13% were insured through Medicaid (Table 7.1).

Table 7.1: Type of health insurance or health coverage plan

| Health insurance source | % in USTS | % in U.S. general population (ACS)[4] |
|---|---|---|
| Insurance through current or former employer or union (belonging to respondent or a family member) | 53% | 56% |
| Insurance they or someone else purchased directly from an insurance company or through a health insurance marketplace (such as healthcare.gov) | 14% | 16% |
| Medicaid | 13% | 15% |
| Medicare | 5% | 22% |
| TRICARE or other military health care | 2% | 3% |
| VA | 2% | 3% |
| Indian Health Service | <1% | 1%[5] |
| Another type of insurance | 6% | N/A |

More than one-quarter (26%) of respondents sought options for health insurance from a state or federal health insurance marketplace, such as through healthcare.gov, in the past year.[6] Of those who sought insurance through a marketplace, 42% purchased a plan. When acquiring health insurance through healthcare.gov or state marketplaces, most enrolled in a Medicaid plan (58%), 27% received a subsidy to buy a private plan, and 12% purchased a private plan without a subsidy.

**Figure 7.1: Uninsured**
RACE/ETHNICITY (%)



AR_217092

## b. Negative Experiences with Insurance Coverage

One in four (25%) respondents reported having problems with their insurance in the past year related to being transgender, such as being denied coverage for care related to gender transition. Among those who were insured and made the relevant requests of their insurer,[7] several problems were reported. Seventeen percent (17%) of respondents had an insurer refuse to change their name and/or gender in their insurance record when requested. Thirteen percent (13%) reported that they were denied coverage for services often considered to be gender-specific, including routine sexual or reproductive health screenings (such as Pap smears, prostate exams, and mammograms). Seven percent (7%) reported that they were denied coverage for other routine health care. More than half (55%) of respondents who sought transition-related surgery coverage were denied, and one-quarter (25%) of those who sought coverage for hormones were denied (Table 7.2).

Table 7.2: Negative action or policy by health insurer

| Negative action or policy | % of respondents who made such a request of their insurer |
|---|---|
| Denied coverage for transition-related surgery | 55% |
| Covered only some of the surgical care needed for transition (respondent could not get coverage for treatment they needed) | 42% |
| Denied coverage for transition-related hormone therapy | 25% |
| Covered surgery for transition, but had no surgery providers in their network | 21% |
| Refused to change records to list current name or gender | 17% |
| Denied coverage for care often considered gender-specific because of transgender status | 13% |
| Denied other routine health care because of transgender status | 7% |

Denials for hormone coverage differed by gender, with transgender men (32%) and non-binary people who had female on their original birth certificate (36%) more likely to report being denied hormone coverage than transgender women (18%) and non-binary people who had male on their original birth certificate (16%). Respondents who were insured solely through Medicare were least likely to be denied coverage for hormones (14%) (Figure 7.2).[8]

Figure 7.2: Denied coverage for hormone therapy in the past year
INSURANCE TYPE (%)



Transgender men (57%) were more likely to be denied surgery coverage than transgender women (54%) and non-binary people, including non-binary people with female on their original birth certificate (49%) and non-binary people with male on their original birth certificate (35%). With the exception of those who were solely covered by Medicare (48%), the rate of denials for surgery was similar among the different types of insurance providers (Figure 7.3).

Figure 7.3: Denied coverage for surgery in the past year
INSURANCE TYPE (%)



AR_217093

# II. Experiences with Health Care Providers

## a. Outness to Health Care Providers

Respondents were asked whether their current health care providers knew they were transgender. Of respondents who currently had health care providers, 40% reported that all of their current health care providers knew they were transgender, 13% reported that most knew, and 17% reported that some knew that they were transgender. Nearly one-third (31%) of respondents reported that none of their health care providers knew they were transgender.

## b. Treatment by Health Care Providers as a Transgender Person

Eighty-seven percent (87%) of respondents had seen a health care provider in the year prior to taking the survey. Those respondents received questions about how their health care provider interacted with them as a transgender person. Of those who had seen a provider in the past year, 62% said that at least one provider they saw knew they were transgender and treated them with respect. However, one-third (33%) of respondents who had seen a provider in the past year reported having at least one negative experience with a doctor or other health care provider related to being transgender. This included having to teach the provider about transgender people in order to receive appropriate care (24%), being asked invasive or unnecessary questions about being transgender not related to the reason for the visit (15%), or being refused transition-related health care (8%) (Table 7.3).

## In Our Own Voices

"My state Medicaid does not cover hormones or surgeries. With my very limited income, it is difficult to afford the treatment I need and I will most likely never be able to have surgeries."

"I was consistently misnamed and misgendered throughout my hospital stay. I passed a kidney stone during that visit. On the standard 1–10 pain scale, that's somewhere around a 9. But not having my identity respected, that hurt far more."

"Multiple medical professionals have misgendered me, denied to me that I was transgender or tried to persuade me that my trans identity was just a misdiagnosis of something else, have made jokes at my expense in front of me and behind my back, and have made me feel physically unsafe. I often do not seek medical attention when it is needed, because I'm afraid of what harassment or discrimination I may experience in a hospital or clinic."

"When I was in college, I had my health insurance list me as male, and then they denied coverage for my routine pap smear and a gynecological prescription due to my gender."

AR_217094

**Table 7.3: Negative experiences when seeing a health care provider in the past year**

| Negative experience | % of those who had seen a provider in the past year |
|---|---|
| They had to teach their health care provider about transgender people to get appropriate care | 24% |
| A health care provider asked them unnecessary or invasive questions about their transgender status that were not related to the reason for their visit | 15% |
| A health care provider refused to give them transition-related care | 8% |
| They were verbally harassed in a health care setting (such as a hospital, office, or clinic) | 6% |
| A health care provider used harsh or abusive language when treating them | 5% |
| A health care provider refused to give them care not related to gender transition (such as physicals or care for the flu or diabetes) | 3% |
| A health care provider was physically rough or abusive when treating them | 2% |
| They were physically attacked by someone during their visit in a health care setting (such as a hospital, office, or clinic) | 1% |
| They were sexually assaulted[9] in a health care setting (such as a hospital, office, or clinic) | 1% |
| One or more experiences listed | 33% |

Negative experiences with doctors and other health care providers varied by race and ethnicity. American Indian respondents (50%) reported the highest level of negative experiences, and rates among Middle Eastern (40%) and multiracial (38%) respondents were also higher (Figure 7.4).

**Figure 7.4: One or more negative experiences with health provider in the past year**
RACE/ETHNICITY (%)



Negative experiences with health care providers also varied by gender identity. Transgender men (42%) were more likely to report negative experiences than transgender women (36%) and non-binary respondents (24%). People with disabilities[10] (42%) were also more likely to have at least one negative experience in the past year, compared with respondents who did not identify as having a disability (30%).

## c. Providers' Knowledge About Transgender People

Respondents were asked about the health providers they saw for transgender-related care and for routine health care needs and the providers' level of knowledge about transgender health care. More than half (56%) of respondents currently had a provider specifically for transition-related care, such as hormone therapy. Of those, 65% reported that this provider knew "almost everything" or "most things" about providing health care for transgender people. Seventeen percent (17%) of respondents reported that their provider for transition-related care knew only "some" things about the subject, 8% said this provider knew "almost nothing," and 10% said they were not sure.

Fifty-one percent (51%) of respondents reported that they saw the same provider for transition-related care and other routine health care. One-third (33%) indicated that they have a separate provider for routine care who is different from the provider they see for transition-related care. Fifteen percent (15%) of respondents reported that they have no transition-related or routine health care provider.

Respondents with a separate provider for routine care were asked about that provider's level of knowledge about caring for transgender people. More than half (54%) of these respondents were unsure how much their provider knew about health care for transgender people, while others

AR_217095

indicated that their routine health care provider knew "some things" (16%) or "almost nothing" (24%). Only 6% of respondents reported that their routine care provider knew "almost everything" or "most things" about caring for transgender people.

## d. Barriers to Accessing Care

Respondents were asked about barriers to accessing health care, including cost of care, fear of being mistreated as a transgender person, and distance required to travel to see health providers for transition-related care.

Cost was a major factor in accessing health care, with one-third (33%) of respondents reporting that there was at least one time in the past year when they needed to see a doctor or other health care provider but did not because of cost. People of color, including multiracial (42%), American Indian (41%), Black (40%), and Latino/a (37%) respondents, were more likely to not have seen a doctor or other health care provider due to cost in the past year (Figure 7.5). People with disabilities (42%) were also more likely to not have seen a health provider when they needed to because of cost.

**Figure 7.5: Did not see health provider due to cost in the past year**
RACE/ETHNICITY (%)



*Nearly one-quarter (23%) of respondents reported that they avoided seeking health care they needed in the past year due to fear of being mistreated as a transgender person.*

Additionally, nearly one-quarter (23%) of respondents reported that at some point in the past year they needed health care but did not seek it due to fear of being disrespected or mistreated as a transgender person. American Indian (37%) and Middle Eastern (34%) respondents were more likely to not have gone to a doctor or other health care provider due to fear of being disrespected or mistreated as a transgender person (Figure 7.6).

**Figure 7.6: Did not see health provider due to fear of mistreatment in the past year**
RACE/ETHNICITY (%)



Fear of being disrespected or mistreated by a health care provider also differed by gender identity, with transgender men (31%) being more likely to avoid care out of fear of discrimination than transgender women (22%) and non-binary respondents (20%).

To examine the accessibility of respondents' health care providers, respondents were asked how far they had to travel to receive routine care and care

AR_217096

related to gender transition (transition-related care). Respondents reported having to travel further for transition-related care than routine care. While 63% indicated that they received routine care from providers within 10 miles of their home, less than half (45%) reported that they received transition-related health care within 10 miles of their home. Respondents were three times more likely to have to travel more than 50 miles for transgender-related care than for routine care (Figure 7.7).

**Figure 7.7: Distance to health care provider**



transgender men and women (81%) were only slightly more likely to have ever wanted gender-related counseling than non-binary respondents (70%), transgender men and women were more than twice as likely to have actually had counseling (73%) as compared to non-binary respondents (31%). Access to counseling varied greatly by income, with those who reported having no individual income (39%) and those who earned an income of $1 to $9,999 (48%) being much less likely to have received counseling than those who earned $50,000 or more (76%) (Figure 7.8).

**Figure 7.8: Counseling/therapy for gender identity or transition**
**INDIVIDUAL INCOME (%)**



# III. Transition-Related Health Care

Respondents received questions about whether they had ever had, or wanted to have, a range of potential health care services related to gender transition.

## a. Counseling

More than three-quarters (77%) of respondents said they wanted counseling or therapy for their gender identity or gender transition at some point in their life, but only 58% of respondents have ever received counseling or therapy. While

## b. Hormone Therapy

Seventy-eight percent (78%) of respondents wanted to receive hormone therapy at some point in their life, but only 49% of respondents have ever received it. Ninety-two percent (92%) of those who have ever received hormone therapy were currently still receiving it, representing 44% of all respondents. A large majority of transgender men and women (95%) have wanted hormone therapy, compared to 49% of non-binary respondents. Transgender men and women were about five times more likely to have ever had hormone therapy (71%) than non-binary respondents (13%).

AR_217097

*Seventy-eight percent (78%) of respondents wanted to receive hormone therapy at some point in their life, but only 49% of respondents have ever received it.*

There were also substantial differences in access to hormone therapy by income. Respondents who reported having no individual income (31%) or earning an income of $1 to $9,999 (37%) were about half as likely to have received hormone therapy as those who earned $25,000 or more (Figure 7.9).

**Figure 7.9: Hormone therapy for gender transition**
INDIVIDUAL INCOME (%)



Of respondents who have ever had hormone therapy, 4% started hormone therapy before the age of 18, 41% began between the ages of 18 and 24, 43% began between the ages of 25 and 44, and 13% began after age 45.

While the majority (91%) of respondents received their hormone medications only from licensed professionals, 6% received them from both licensed professionals and friends, and 2% reported receiving them only from friends, online sources, or other non-licensed sources.[11] Those who were uninsured were five times more likely to receive their hormones only from unlicensed sources (10%). Respondents who were currently working in the underground economy (such as sex work, drug sales, or other work that is currently criminalized) (8%), who have ever done sex work in their lifetime (5%), or who were living in poverty (4%), were more likely to receive their hormones only from unlicensed sources, as were transgender women (4%).

## c. Puberty-Blocking Hormones

Fifteen percent (15%) of respondents reported that at some point in their lives, they wanted puberty-blocking medications, which are hormone suppressors that are used to delay physical changes associated with puberty and were described as those usually being used by youth between the ages of 9 and 16. However, less than 1% of respondents reported ever having them.[12]

## d. Surgeries and Other Procedures

One in four (25%) reported having had some form of transition-related surgery.[13] Transgender men (42%) were more likely to have had any kind of surgery than transgender women (28%) or non-binary respondents (9%). Respondents who were living in poverty[14] (17%) were less likely to have had any surgery, as were those who had low incomes (Figure 7.10). Respondents who were uninsured (18%) were also less likely to have any surgery, while those who were insured through Medicare only were most likely (44%) (Figure 7.11).[15]

*One in four (25%) respondents reported having had some form of transition-related surgery.*

AR_217098

**Figure 7.10: Any surgery for gender transition**
INDIVIDUAL INCOME (%)



**Figure 7.11: Any surgery for gender transition**
INSURANCE TYPE (%)



Respondents were asked a series of questions about whether they had received or wanted to have specific surgical and other procedures. Respondents received different questions based on the sex that they reported was listed on their original birth certificate.[16]

## i. Experiences of Respondents With Female on Their Original Birth Certificate

Of respondents who had female on their original birth certificates, 21% had a chest reduction or reconstruction[17] and 8% had a hysterectomy.[18] Only 2% reported having any genital surgery, such as metoidioplasty[19] (1%) or phalloplasty[20] (1%) (Table 7.4). These experiences differed greatly by gender identity, with transgender men (Figure 7.12) being

more likely to have had any of the procedures than non-binary respondents who had female on their original birth certificate (Figure 7.13).

**Table 7.4: Procedures among respondents with female on their original birth certificate**

| Type of procedure | Have had it | Want it some day | Not sure if they want this | Do not want this |
|---|---|---|---|---|
| Chest surgery reduction or reconstruction | 21% | 52% | 17% | 10% |
| Hysterectomy | 8% | 44% | 28% | 19% |
| Metoidioplasty | 1% | 15% | 37% | 47% |
| Phalloplasty | 1% | 11% | 31% | 56% |
| Other procedure not listed | 3% | 7% | 13% | 77% |

**Figure 7.12: Procedures among transgender men**



**Figure 7.13: Procedures among non-binary respondents with female on their original birth certificate**



AR_217099

Among those who had female on their original birth certificate respondents and who had undergone any of these surgical procedures, 3% had their first procedure before the age of 18. More than one-third (35%) had their first procedure between the ages of 18 and 24, 40% between the ages of 25 and 34, and 22% after the age of 34.

In addition to transition-related care, respondents who had female on their original birth certificate were also asked whether they had received a Pap smear in the past year. Only 27% reported that they had a Pap smear in the past year, compared to 43% in the U.S. adult population.[21,22]

## ii. Experiences of Respondents With Male on Their Original Birth Certificate

Among respondents who had male on their original birth certificate, hair removal or electrolysis was both the most commonly reported and the most commonly desired procedure. Forty-one percent (41%) have had hair removal or electrolysis, and 11% had received voice therapy, the second most commonly reported procedure. Regarding surgical procedures, 10% of respondents had undergone vaginoplasty and/or labiaplasty,[23] 9% had an orchiectomy,[24] 6% had undergone facial feminization surgery,[25] 8% had augmentation mammoplasty (top surgery),[26] 4% had a tracheal shave,[27] and 1% had undergone voice surgery (Table 7.5). These experiences varied by gender identity, with transgender women (Figure 7.14) being more likely to have had the procedures than non-binary respondents who had male on their original birth certificate (Figure 7.15).

Table 7.5: Procedures among respondents with male on their original birth certificate

| Type of procedure | Have had it | Want it some day | Not sure if they want this | Do not want this |
|---|---|---|---|---|
| Hair removal or electrolysis | 41% | 49% | 5% | 5% |
| Voice therapy (non-surgical) | 11% | 46% | 19% | 24% |
| Vaginoplasty or labiaplasty | 10% | 45% | 23% | 22% |
| Augmentation mammoplasty | 8% | 36% | 31% | 24% |
| Orchiectomy | 9% | 40% | 24% | 27% |
| Facial feminization surgery | 6% | 39% | 30% | 25% |
| Tracheal shave | 4% | 29% | 29% | 38% |
| Silicone injections[28] | 2% | 9% | 27% | 61% |
| Voice surgery | 1% | 16% | 32% | 51% |
| Other procedure not listed | 5% | 13% | 15% | 67% |



Figure 7.14: Procedures among transgender women

Hair removal or electrolysis — 48% · 47% · 3% 2%
Voice therapy (non-surgical) — 14% · 48% · 17% · 21%
Vaginoplasty or labiaplasty — 12% · 54% · 22% · 12%
Augmentation mammoplasty — 11% · 40% · 30% · 19%
Orchiectomy — 11% · 47% · 22% · 20%
Facial feminization surgery — 7% · 45% · 29% · 21%
Tracheal shave — 6% · 28% · 35%
Silicone injections — 3% 9% · 27% · 60%
Voice surgery — 2% · 32% · 40%
Other procedure not listed — 6% · 19% · 64%

- Have had it
- Want it some day
- Not sure if they want this
- Do not want this

AR_217100



Figure 7.15: Procedures among non-binary respondents with male on their original birth certificate

Hair removal or electrolysis: 13% / 65% / 8% / 8%
Voice therapy (non-surgical): 34% / 29% / 35%
Vaginoplasty or labiaplasty: 28% / 59%
Augmentation mammoplasty: 35% / 47%
Orchiectomy: 12% / 53%
Facial feminization surgery: 35% / 42%
Tracheal shave: 33% / 5%
Silicone injections: 26% / 70%
Voice surgery: 31% / 63%
Other procedure not listed: 6% / 75%

0%   20%   40%   60%   80%   100%

■ Have had it
■ Want it some day
Not sure if they want this
Do not want this

Two percent (2%) of respondents with male on their original birth certificate had their first transition-related procedure (not including hormone therapy) before the age of 18. Nearly one-quarter (23%) had their first procedure between the ages of 18 and 24, 32% had their first procedure between the ages 25 and 34, and 43% after the age of 34.

## e. Summary of Transition-Related Health Care

When examining the responses of all respondents, 91% reported that they had wanted counseling, hormones, and/or puberty blockers for their gender identity or gender transition at some point, but only 65% reported ever having any of them. Overall, 58% of respondents had received counseling. Approximately half (54%) had received hormone therapy and/or some form of surgery, including 49% who had hormone therapy and 25% who had undergone some form of transition-related surgery.

# B. OVERALL HEALTH AND PSYCHOLOGICAL DISTRESS

There is a well-documented link between experiences of discrimination and marginalization and poor physical and mental health outcomes. Populations that face widespread stigma and discrimination are more likely to report poor overall health and are more vulnerable to a variety of physical and mental health conditions.[29] Previous research has described substantial health disparities affecting transgender people and the impact that experiences of discrimination, rejection, and violence have on these disparities.[30]

**KEY FINDINGS**

▶ Twenty-two percent (22%) of respondents rated their health as "fair" or "poor," compared with 18% of the U.S. population.

▶ Thirty-nine percent (39%) of respondents were currently experiencing serious psychological distress, nearly eight times the rate in the U.S. population (5%).

HEALTH

103

AR_217101

# I. Current Health

Respondents were asked to rate their current overall health on a scale from "excellent" to "poor." Nearly half (45%) of respondents said their health was "excellent" or "very good" and one-third (33%) said it was "good." Twenty-two percent (22%) said it was "fair" or "poor" (Figure 7.16), compared with 18% of the U.S. general population (Figure 7.17).[31]

**Figure 7.16: General health rating**



**Figure 7.17: General health rating**



Respondents' self-reported health varied by gender identity, with non-binary respondents with female on their original birth certificate (35%) being less likely to report excellent or very good health compared to transgender men (47%), non-binary people with male on their original birth certificate (48%), transgender women (50%),

and crossdressers (57%). Reporting also differed by age, with older respondents more likely to report excellent or very good health than younger respondents, such as those aged 65 and older (60%) and 45–64 (53%), compared with those aged 25–44 (48%) and 18–24 (39%) (Figure 7.18).

**Figure 7.18: Reported overall health
CURRENT AGE (%)**



Family support was associated with an increased likelihood of reporting excellent or very good health. Respondents who were out to their immediate family and described their family as supportive were more likely to report excellent or very good health (52%) than those whose families were neutral (42%) or unsupportive (38%) (Figure 7.19).

**Figure 7.19: Reported overall health
LEVEL OF FAMILY SUPPORT (%)**



AR_217102

*Thirty-nine percent (39%) of respondents reported currently experiencing serious psychological distress, a rate nearly eight times higher than in the U.S. population (5%).*

# II. Serious Psychological Distress

Respondents were asked questions to assess their level of psychological distress in the past 30 days, based on the Kessler Psychological Distress Scale (K6), a scale that is widely used when assessing mental health outcomes and is included in the National Health Interview Survey (NHIS).[32] The K6 includes mental health screening questions and is designed to identify people who are experiencing serious psychological distress. The K6 questions asked respondents to rate how often they experienced several feelings related to psychological distress—such as hopelessness or worthlessness—during the past month on a scale that included "none of the time," "a little of the time," "some of the time," "most of the time," and "all of the time."[33]

Respondents who reported experiencing feelings related to psychological distress at least "a little of the time" for one or more of the K6 questions were asked how much the feelings interfered with their life or activities. Among them, 27% reported that the psychological distress interfered with their life or activities a lot during the past 30 days, and 58% said it interfered some or a little. Only 10% of respondents reported that it did not interfere with their life or activities during the past 30 days (Figure 7.20), in contrast to the 35% in the U.S. general population who reported no interference with their lives (Figure 7.21).[34]

Figure 7:20: Interference of psychological distress with life or activities among those who reported feelings of distress in the past 30 days



Figure 7:21: Interference of psychological distress with life or activities among those who reported feelings of distress in the past 30 days



A variable was developed from the K6 questions to reflect respondents' current serious psychological distress (serious psychological distress experienced in the 30 days prior to participating in the survey).[35] Thirty-nine percent (39%) of respondents reported currently experiencing serious psychological distress, which is nearly eight times the rate reported in the U.S. population (5%).[36] Current serious psychological distress varied by gender identity. Non-binary respondents (49%) were more likely to report serious psychological distress than transgender men and women (35%) and crossdressers (18%).

HEALTH

AR_217103

While all age groups of USTS respondents reported substantially more distress than their counterparts in the U.S. population, younger survey respondents were more likely to report current serious psychological distress. Fifty-three percent (53%) of USTS respondents aged 18 to 25 reported experiencing current serious psychological distress, which was more than six times as high as the rate among respondents who were 65 and older (8%) (Figure 7.22).[37] A similar pattern emerged in reporting of current serious psychological distress in the U.S. population, with those aged 18 to 25 (10%) being five times as likely to report experiencing serious psychological distress as those aged 65 and older (2%).[38]

**Figure 7:22: Currently experiencing serious psychological distress**
**CURRENT AGE (%)**



■ % in USTS
□ % in U.S. population (NSDUH)

Experiences with current psychological distress differed according to educational attainment. Respondents who had not completed high school (58%), those who had completed high school or a GED only (54%), and those with some college education (48%) were more likely to report currently experiencing serious psychological distress than respondents who had completed an associate's degree (32%) or higher (Figure 7.23).

# In Our Own Voices

"I spent decades torturing myself into depression because I was certain that coming out would destroy my life. I did everything I could to get my transness to go away but it left me physically and psychologically weak, and on the verge of suicide."

"I had suffered from anxiety and depression as a direct result of gender dysphoria. This caused me to become more and more unable to function in society as time went on. Only when my state expanded Medicaid was I finally able to start dealing with all of these issues so I could become a productive member of society."

"I have struggled with depression and anxiety ever since puberty. I've failed classes, isolated myself, and considered suicide because of this. A year ago, I felt hopeless and had daily suicidal thoughts, and today I've got a plan for the future and haven't had a serious suicidal thought in months. I firmly believe this is because of my transition. I feel so much more comfortable and happy than I've ever been."

2015 U.S. TRANSGENDER SURVEY

AR_217104



**Figure 7.23: Currently experiencing serious psychological distress**
EDUCATIONAL ATTAINMENT (%)

Respondents who had transitioned ten or more years prior to participating in the survey (24%) were substantially less likely to be currently experiencing serious psychological distress, in contrast to those who had transitioned within the past year (41%) (Figure 7.24). While psychological distress was higher among those early in their transition, it was higher yet among those who have not transitioned but wanted to. Nearly half (49%) of those who have not transitioned but wanted to were currently experiencing serious psychological distress, compared with 36% of those who had transitioned at any time prior to taking the survey.



**Figure 7.24: Currently experiencing serious psychological distress**
YEARS SINCE BEGAN TRANSITIONING (%)

Respondents who were living in poverty were more likely to currently be experiencing serious psychological distress (52%). People with disabilities (59%) were nearly twice as likely to currently experience psychological distress compared to those who did not identify as having a disability (31%).

*Psychological distress was associated with a variety of experiences of rejection, discrimination, and violence:*

- *Respondents who were out to their immediate families and described them as supportive (31%) were less likely to report serious psychological distress than those whose families were neutral (42%) or unsupportive (50%).*

- *Respondents who were fired or forced to resign, denied a promotion, or not hired in the past year because they were transgender (51%) were more likely to report current serious psychological distress than those who did not have those experiences in the past year (36%).*

- *Respondents who were physically attacked in the past year (59%) were more likely to be currently experiencing serious psychological distress than those who were not physically attacked in the past year (36%).*

- *Respondents who were sexually assaulted in the past year[35] (60%) were more likely to be currently experiencing serious psychological distress than those who were not sexually assaulted in the past year (37%).*

AR_217105

# C. CONVERSION THERAPY AND OTHER PRESSURES TO DE-TRANSITION

Many transgender people discuss their gender identity with professionals, such as health care providers or religious advisors. However, despite the medical consensus that efforts to change someone's gender identity or stop them from being transgender ("conversion therapy") are ineffective, harmful, and even abusive,[40] some professionals still attempt to do so. Additionally, some transgender people feel pressure to hide their gender identity or to go back to living according to the gender they were thought to be at birth ("de-transition") for a variety of other reasons. For example, some transgender people are pressured to avoid or put off their transition, or to de-transition after they have started their transition, by family members or employers, as well as religious advisors or health professionals. Others face significant discrimination when they begin transitioning, like losing their jobs or home or being rejected by their family or friends, and may decide to temporarily delay or even reverse their transition as a result.

The survey explored respondents' experiences discussing their gender identity with professionals, such as psychologists, counselors, and religious advisors, including pressure from those professionals to de-transition or stop being transgender. Experiences with de-transitioning were also examined. Respondents overall demonstrated high levels of resistance to such pressure and other forms of discrimination. Few respondents de-transitioned, and many of those who did de-transition did so only temporarily and were living according to their gender identity at the time of the survey.

**KEY FINDINGS**

▶ Thirteen percent (13%) of respondents reported that one or more professionals, such as a psychologist, counselor, or religious advisor, tried to stop them from being transgender.

▶ Eight percent (8%) of respondents had de-transitioned temporarily or permanently at some point, meaning that they went back to living as the gender they were thought to be at birth for a period of time.

▶ The majority of respondents who de-transitioned did so only temporarily, and 62% were currently living full time in a gender different than the one they were thought to be at birth.

▶ Respondents who de-transitioned cited a number of reasons for doing so, including facing too much harassment or discrimination after they began transitioning (31%), having trouble getting a job (29%), or pressure from a parent (36%), spouse (18%), or other family members (26%).

AR_217106

# I. Discussing Gender Identity with Professionals and Conversion Therapy

The survey examined a variety of experiences with professionals—such as psychologists, counselors, and religious advisors—with whom respondents had discussed their gender identity. Almost three-quarters of respondents (72%) reported that they had discussed their gender identity with such a professional.

Whether an individual discussed their gender identity with a professional differed by gender, with transgender men and women (84%) being more likely to do so than non-binary respondents (52%) and crossdressers (46%) (Figure 7.25).



**Figure 7.25: Ever discussed gender identity with a professional**
GENDER IDENTITY (%)

Of all respondents who discussed their gender identity with a professional, nearly one in five (18%) reported that the professional tried to stop them from being transgender, representing 13% of all respondents in the sample.[41] Four percent (4%) of all respondents saw a religious/spiritual counselor or advisor who tried to stop them

*Nearly one in five (18%) of those who discussed their gender identity with a professional—or 13% of all respondents—reported that the professional tried to stop them from being transgender.*

from being transgender, and nearly one in ten (9%) respondents saw a non-religious/spiritual professional (such as a therapist or a counselor) who tried to stop them from being transgender.

The likelihood that a professional tried to stop a respondent from being transgender differed by race and ethnicity. While Middle Eastern (32%) and American Indian (27%) respondents were most likely to have this experience, rates were lower for Black (16%) and Asian (14%) respondents (Figure 7.26).



**Figure 7.26: Professional tried to stop them from being transgender**
RACE/ETHNICITY (%)

More than three-quarters (78%) of respondents were under the age of 25 when they had this experience, 51% were 18 or younger, and 28% were 15 or younger.

HEALTH

AR_217107

Of the 4% who reported that a religious or spiritual counselor or advisor tried to stop them from being transgender, American Indian (9%) and Middle Eastern (7%) respondents were more likely to have such an experience with a religious or spiritual counselor or advisor (Figure 7.27).

**Figure 7.27: Religious counselor tried to stop them from being transgender**
RACE/ETHNICITY (%)



*Participants who had a professional try to stop them from being transgender were:*

- *Far more likely to currently be experiencing serious psychological distress (47%) than those who did not have the experience (34%).*

- *More likely to have attempted suicide (58%) than those who did not have the experience (39%).*

- *Nearly three times as likely to have run away from home (22%) than those who did not have the experience (8%).*

- *More likely to have ever experienced homelessness (46%) than those who did not have the experience (29%).*

- *More likely to have ever done sex work (18%) than those who did not have the experience (11%).*

# In Our Own Voices

"The doctor figured out I was trans and practiced conversion therapy without telling anyone, including my parents. I tried to tell my family that the doctor was not working, but nobody listened. I was sent there for over three years. I became so badly suicidal that I didn't go a minute without thinking of death."

"When I was 18, I had to leave where I grew up after threats of physical violence and conversion therapy from my family. My parents were abusive before they knew I was trans, but when they found out, they used that to hurt and control me more."

"[An] OB/GYN forced me onto birth control pills to 'fix' me into thinking I was a woman again. I ended up in the psychiatric ward of my local hospital on suicide watch after three days on birth control."

"I was kicked out of my parents' home. I ran out of what little money I had, and I had nowhere to go. My family offered to let me return to their home on the condition that I de-transition and live as a man. I accepted because I had no choice."

AR_217108

Sixty-nine percent (69%) of respondents discussed their sexual orientation with a professional. Of those, 14% reported that a professional tried to change their sexual orientation, representing 10% of the overall sample.

# II. De-Transitioning

Respondents were asked whether they had ever "de-transitioned," which was defined as having "gone back to living as [their] sex assigned at birth, at least for a while." Eight percent (8%) of respondents reported having de-transitioned at some point. Most of those who de-transitioned did so only temporarily: 62% of those who had de-transitioned reported that they were currently living full time in a gender different than the gender they were thought to be at birth.

Transgender women were more likely to report having de-transitioned (11%), in contrast to transgender men (4%). Rates of de-transitioning also differed by race and ethnicity, with American Indian (14%), Asian (10%), and multiracial (10%) respondents reporting the highest levels of de-transitioning (Figure 7.28).

Respondents who had de-transitioned cited a range of reasons, though only 5% of those who had de-transitioned reported that they had done so because they realized that gender transition was not for them, representing 0.4% of the overall sample.[42] The most common reason cited for de-transitioning was pressure from a parent (36%). Twenty-six percent (26%) reported that they de-transitioned due to pressure from other family members, and 18% reported that they de-transitioned because of pressure from their spouse or partner. Other common reasons included facing too much harassment or discrimination after they began transitioning (31%), and having trouble getting a job (29%) (Table 7.6).

**Table 7.6: Reasons why respondents de-transitioned, at least for a little while**

| Reasons for de-transitioning | % of those who had ever de-transitioned |
|---|---|
| Pressure from a parent | 36% |
| Transitioning was too hard for them | 33% |
| They faced too much harassment or discrimination as a transgender person | 31% |
| They had trouble getting a job | 29% |
| Pressure from other family members | 26% |
| Pressure from a spouse or partner | 18% |
| Pressure from an employer | 17% |
| Pressure from friends | 13% |
| Pressure from a mental health professional | 5% |
| Pressure from a religious counselor | 5% |
| They realized that gender transition was not for them | 5% |
| Initial transition did not reflect the complexity of their gender identity (write-in response) | 4% |
| Financial reasons (write-in response) | 3% |
| Medical reasons (write-in response) | 2% |
| A reason not listed above | 35% |

**Figure 7.28: Ever de-transitioned**
RACE/ETHNICITY (%)



HEALTH

AR_217109

# D. SUICIDAL THOUGHTS AND BEHAVIORS

The prevalence of suicide attempts among transgender people is reported in the literature as being substantially higher than that in the U.S. general population. Previous studies identify a variety of risk and protective factors that affect the rates of suicidal thoughts and behaviors among transgender people, including family support, experiences of anti-transgender discrimination and violence, and access to health care, employment, and housing.[43]

The survey explored suicidal thoughts and behaviors among respondents both over the course of their lifetime and in the year prior to completing the survey. Respondents were asked whether they had seriously thought about, made a plan, or tried to kill themselves at any time in their lives or in the past twelve months to assess a range of suicidal thoughts and behaviors. Questions were patterned on the National Survey on Drug Use and Health[44] and National Comorbidity Survey Replication[45] to allow for comparison to the U.S. population.

KEY FINDINGS

▶ Forty percent (40%) of respondents have attempted suicide at some point in their life, compared to 4.6% in the U.S. population.

........................................................................................................

▶ Forty-eight percent (48%) of respondents have seriously thought about killing themselves in the past year, compared to 4% of the U.S. population, and 82% have had serious thoughts about killing themselves at some point in their life.

........................................................................................................

▶ Nearly one-quarter (24%) of respondents made plans to kill themselves in the past year, compared to 1.1% of the U.S. population.

........................................................................................................

▶ Seven percent (7%) of respondents attempted suicide in the past year, compared to 0.6% in the U.S. population.

........................................................................................................

▶ More than two-thirds (71%) of respondents who have attempted suicide have done so more than once in their lifetime, with 46% of those who have attempted suicide reporting three or more attempts.

## I. Suicidal Thoughts and Behaviors in the Past Year

Nearly half (48%) of all respondents reported that they had seriously thought about killing themselves in the past twelve months, compared to 4% of the U.S. general population.[46] Nearly one-quarter (24%) of respondents reported making plans to kill themselves in the past year, compared

to 1.1% in the U.S. population.[47]

Seven percent (7%) of all respondents attempted suicide in the past year, nearly twelve times the rate of attempted suicide in the U.S. population in the past year (0.6%).[48] The rate of attempted suicide in the past year was higher among people of color, including American Indian (10%), multiracial (10%), Black (9%), and Latino/a (9%) respondents (Figure 7.29). The rate of attempted suicide in the past year was also higher among people with disabilities (12%).

AR_217110



**Figure 7.29: Attempted suicide in the past year**
RACE/ETHNICITY (%)

*Seven percent (7%) of all respondents attempted suicide in the past year, nearly twelve times the rate of attempted suicide in the U.S. population (0.6%).*

Respondents who did not complete high school (17%) were more than twice as likely as the overall sample to have attempted suicide in the past year, and those who completed high school or a GED only (13%) were almost twice as likely to have attempted suicide in that time period (Figure 7.30).

Respondents whose current income came only from work in the underground economy, such as sex work, drug sales, or other criminalized work, had a higher rate of suicide attempts in the past year (27%). Additionally, respondents who described their families as unsupportive (13%) were more than twice as likely to have attempted suicide in the past year as those who described their families as supportive (6%).

The rate of suicide attempt in the past year varied by age, with younger respondents being more likely to have attempted suicide in the past year, a similar pattern to that found in the general U.S. population.[49] One in ten (10%) USTS respondents aged 18–25 have attempted suicide in the past year, ten times the rate among those aged 65 and older (1%) (Figure 7.31). Similarly, those aged 18–25 in the U.S. population (1.6%) were eight times more likely to report having attempted suicide in the past year than those aged 65 and older (0.2%).[50]



**Figure 7.30: Attempted suicide in the past year**
EDUCATIONAL ATTAINMENT (%)



**Figure 7.31: Attempted suicide in the past year**
CURRENT AGE (%)

■ % in USTS
□ % in U.S. population (NSDUH)

AR_217111

Of those who attempted suicide in the past year, 45% received medical attention[51] as a result, compared to 60% who attempted suicide and received medical attention in the U.S. population.[52] Thirty percent (30%) of respondents who attempted suicide stayed in a hospital for at least one night, compared to 41% of those who attempted suicide in the U.S. population.[53]

## II. Lifetime Suicidal Thoughts and Behaviors

Eighty-two percent (82%) of all respondents had seriously thought about killing themselves at some point in their lives, and 40% of respondents in the sample reported having attempted suicide at some point in their life. This lifetime suicide attempt rate is nearly nine times as high as the prevalence in the U.S. population (4.6%).[54]

Lifetime suicide attempt rates were higher for transgender men (45%) than for transgender women (40%) and non-binary respondents (39%), and crossdressers had a substantially lower rate of attempted suicide in their lifetime (15%). Lifetime suicide attempts were also higher among people of color, with American Indian (57%) respondents reporting the highest rates, followed by multiracial (50%), Black (47%), Latino/a (45%), and Middle Eastern (44%) respondents, in contrast to white (37%) respondents (Figure 7.32).

**Figure 7.32: Ever attempted suicide**
RACE/ETHNICITY (%)



*Forty percent (40%) of respondents have attempted suicide in their lifetime, nearly nine times the rate reported in the U.S. population (4.6%).*

People with disabilities (54%) in the sample were more likely to report attempting suicide. Lifetime suicide attempts also varied by level of education, with the highest rates among those who did not complete high school (52%), and the lowest rates among those with a bachelor's degree (34%) or higher (30%) (Figure 7.33).

**Figure 7.33: Ever attempted suicide**
EDUCATIONAL ATTAINMENT (%)



Among respondents who were out to the immediate family they grew up with, lifetime suicide attempts varied significantly by family support. A majority (54%) of those who described their families as unsupportive had attempted suicide in their lifetime, in contrast to 37% of those with supportive families.[55]

Lifetime suicide attempts were also higher for respondents who were physically attacked in the past year (65%), or have ever experienced homelessness (59%), done sex work (57%), lost their job for being transgender (55%), or been sexually assaulted[56] (54%).

AR_217112

More than two-thirds (71%) of all respondents who had ever attempted suicide did so more than once, including 46% who reported three or more attempts, and 21% who reported five or more attempts.

# III. Age of Suicide Attempts

## a. Age of First Attempt

Respondents who have attempted suicide (once or multiple times) were asked about the age of their first suicide attempt. More than one-third (34%) reported that their first attempt was at age 13 or younger. Thirty-nine percent (39%) reported that their first attempt occurred between the ages of 14 and 17, 20% reported that it occurred between age 18 and 24, and 8% reported that their first attempt was at age 25 or older.

## b. Age of Most Recent Attempt

Among respondents who reported a suicide attempt,[57] 6% reported that their most recent attempt happened at age 13 or younger. More than one-quarter (26%) reported the most recent attempt occurred between the ages of 14 and 17, 41% reported that it happened between the ages of 18 and 24, and 27% reported that their most recent attempt was at age 25 or older.

# E. SUBSTANCE USE

Substance use is an important indicator of mental health as well as physical wellbeing, and it may reflect an individual's level of exposure to a variety of risk and protective factors, such as family acceptance, homelessness, violence, and economic opportunity.[58] The survey explored patterns in respondents' substance use with questions informed by the National Survey on Drug Use and Health[59] to allow for comparison to substance use trends in the U.S. population. Respondents were asked whether they had ever consumed certain substances, including alcohol, tobacco, marijuana, and other drugs, such as cocaine, heroin, and methamphetamine. Respondents who reported using such substances received a series of follow-up questions about the frequency and quantity of their substance use.

**KEY FINDINGS**

▶ One-quarter (25%) of respondents used marijuana within the past month, compared to 8% of the U.S. population.

▶ Seven percent (7%) of respondents used prescription drugs that were not prescribed to them or used them not as prescribed ("nonmedical prescription drug use") in the past month, compared to 2% of the U.S. population.

▶ Four percent (4%) of respondents used illicit drugs (not including marijuana and nonmedical use of prescription drugs) in the past month, and 29% have used them in their lifetime.

▶ Overall, 29% of respondents reported illicit drug use, marijuana consumption, and/or nonmedical prescription drug use in the past month, nearly three times the rate in the U.S. population (10%).

HEALTH

AR_217113

# I. Alcohol Consumption

Ninety percent (90%) of respondents reported having a drink of alcohol, such as beer, wine, or hard liquor, at any point in their lives, compared to 86% in the U.S. adult population.[60] Sixty-three percent (63%) of respondents were currently using alcohol, meaning that they had consumed at least one alcoholic beverage within the 30 days prior to taking the survey, compared with 56% of the U.S. adult population.[61]

## a. Frequency of Current Alcohol Use

Respondents who were currently using alcohol were asked how many days they had used alcohol in the past month. Twenty-nine percent (29%) used alcohol on 1 or 2 days, and 28% had used alcohol on 3–5 days during the prior month. Nineteen percent (19%) used alcohol on 6–10 of the past 30 days, and 23% consumed alcohol on 11 or more days.

## b. Binge and Heavy Drinking

Current alcohol users were also asked for the number of days in the month when they consumed 5 or more drinks on the same occasion, meaning at the same time or within a couple of hours of each other ("binge drinking").[62] Twenty-seven percent (27%) of the sample reported binge drinking in the past month, slightly higher than the rate in the U.S. adult population in 2014 (25%).[63]

Respondents who were currently working in the underground economy, such as sex work, drug sales, or other criminalized work, were nearly twice as likely to engage in binge drinking as those in the overall sample, with nearly half (49%) reporting binge drinking at least one time in the past month.

Latino/a (32%), Middle Eastern (30%), and Black (30%) respondents were more likely to report binge drinking, while white (25%) and Asian (19%) respondents reported lower levels (Figure 7.34).



Figure 7.34: Reported binge drinking in the past month RACE/ETHNICITY (%)

Nine percent (9%) of respondents reported binge drinking on one day during the month and 10% on 2–4 days. Seven percent (7%) of respondents reported binge drinking on 5 more days that month ("heavy drinking"), the same rate as the U.S. population (7%).[64] Respondents who were currently working in the underground economy (19%) were more than twice as likely to report heavy drinking in the past month as those in the overall sample.

# II. Tobacco Use

## a. Lifetime and Current Tobacco Use

Fifty-seven percent (57%) of respondents reported that they had smoked all or part of a cigarette at any point in their lives, lower than the rate in the U.S. population (63%).[65] Twenty-two percent (22%) were current smokers, meaning that they smoked at least one cigarette or part of a cigarette within thirty days of taking the survey, which compares to 21% of the U.S. population.[66]

Respondents who were currently working in the underground economy were more than twice as likely as the overall sample to have smoked tobacco within the past month, with 51% reporting current tobacco use.

AR_217114

## b. Frequency of Tobacco Use Among Current Users

Current smokers were also asked the number of days on which they had smoked tobacco in the past month. Twenty-nine percent (29%) of current users smoked tobacco on 4 days or fewer in the past month, and one-quarter (24%) smoked tobacco on 5–20 days. More than one-third (38%) of current smokers smoked tobacco daily during the past month, compared to 59% of current smokers in the U.S. population.[67]

Among daily smokers, nearly one-third (32%) smoked one or more packs each day. Smoking more than one pack a day was more likely to be reported by daily smokers aged 45–64 (54%) and 65 and over (50%) (Figure 7.35), as well as American Indian (44%) and white (40%) respondents (Figure 7.36).

**Figure 7.35: Daily smokers consuming one or more packs a day in the past month**
CURRENT AGE (%)



**Figure 7.36: Daily smokers consuming one or more pack a day in the past month**
RACE/ETHNICITY (%)



*Sample size too low to report

# III. E-Cigarettes or Vaping Products

More than one-third (36%) of respondents had used e-cigarettes or vaping products at some point in their lives. Lifetime use of these products was elevated among respondents who have worked in the underground economy, with 57% reporting past use. Thirty percent (30%) of respondents who had ever used e-cigarettes or vaping products used them within 30 days of taking the survey. An additional 40% used them more than 30 days prior but less than a year before taking the survey, and 29% had used them more than 12 months before taking the survey.

# IV. Marijuana Use

Nearly two-thirds (64%) of respondents reported having ever used marijuana,[68] compared with 47% of the general population.[69]

## a. Current Marijuana Use

One-quarter (25%) of the sample reported current use, meaning that they used marijuana within 30 days of taking the survey, compared to 8% of the U.S. general population.[70] Current marijuana use was elevated among those who were currently working in the underground economy (60%) and those who were living with HIV (48%).

## b. Frequency of Marijuana Use

Respondents who had used marijuana in the month before taking the survey were asked for the number of days in which they smoked marijuana during that period. More than one in five (22%) smoked marijuana on 1–2 days that month. Thirty percent (30%) smoked marijuana on 3–12 days, 26% on 13–28 days, and nearly one-quarter (23%) smoked marijuana on 29 or on all 30 of the past 30 days.

Among those who were currently working in the underground economy, approximately one-third (34%) reported using marijuana on 29–30 days in

HEALTH

117

the past month. Respondents who were living with HIV (34%) were also more likely to use marijuana on 29–30 days within that month.

# V. Illicit Drugs

Nearly one-third (29%) of respondents reported ever using illegal or illicit drugs, such as cocaine, crack, heroin, LSD, methamphetamine, or inhalants like poppers or whippits (but not including marijuana).[71] Prior use of illicit drugs was particularly high among respondents who have done sex work (56%) and those who have done underground economy work other than sex work (such as drug sales) (75%). Past illicit drug use was also higher among those who have lost a job because of being transgender (43%) or who have ever experienced homelessness (42%).

## a. Current Illicit Drug Use

Four percent (4%) of respondents in the sample reported current use of illicit drugs (not including marijuana), meaning they had consumed them within 30 days of taking the survey.

Respondents who were currently working in the underground economy (26%) were nearly nine times as likely as those who were not currently working in the underground economy (3%) to have used illicit drugs within the past month.

# VI. Nonmedical Prescription Drug Use

Approximately one-third (34%) of respondents have taken prescription drugs, such as Oxycontin, Xanax, Adderall, or Ambien, for "nonmedical use," meaning that the drugs were not prescribed to them or that they were not being taken as prescribed.

Among respondents who have worked in the underground economy, almost two-thirds (63%) reported nonmedical prescription drug use, compared with 26% of those who had no experience in the underground economy. Rates of nonmedical

*Almost one-third (29%) of respondents reported illicit drug use, marijuana consumption, and/or nonmedical prescription drug use in the past month, compared with 10% of the U.S. population.*

prescription drug use were particularly high among those who had done underground economy work other than sex work, such as drug sales, with 75% reporting nonmedical prescription drug use.

Younger respondents were more likely to report nonmedical prescription drug use, with those aged 25–44 (39%) being most likely, and those aged 65 and older (18%) being the least likely to report such prescription drug use (Figure 7.37).

**Figure 7.37: Nonmedical use of prescription drugs**
CURRENT AGE (%)



## a. Current Nonmedical Prescription Drug Use

Of respondents who reported nonmedical use of prescription drugs, over half (51%) had last engaged in such use more than a year before taking the survey, and 28% had done so within that year but more than a month earlier. More than one in five (21%) reported nonmedical prescription drug use within 30 days of taking the survey. This represents 7% of the overall sample, compared to 2% of the U.S. population.[72]

AR_217116

# VI. Overall Current Drug Use

Almost one-third (29%) of respondents in the overall sample were currently using illicit drugs, marijuana, and/or prescription drugs not prescribed to them or not as prescribed, meaning they consumed them within 30 days of taking the survey. This was nearly three times higher than usage in the U.S. general population (10%).[73]

More than two-thirds (68%) of those currently working in the underground economy reported illicit drug use (including marijuana and prescription drug use) in the past month (Figure 7.38).

Figure 7:38: Substance use in the past month among respondents currently working in the underground economy



■ % in USTS currently working in underground economy
■ % in USTS not currently working in underground
▨ % in U.S. population (NSDUH)

AR_217117

# F. HIV TESTING AND CARE

The prevalence of HIV and AIDS has been found in prior research to be higher among transgender people than in the U.S. general population.[74] The Centers for Disease Prevention and Control found that a number of factors increase transgender people's vulnerability to HIV, including social rejection and stigma, inadequate access to transgender-competent care, barriers to accessing education, employment, and housing, and high rates of intimate partner violence.[75] Respondents received a series of questions to examine experiences related to HIV testing, HIV care, and living with HIV. Several of the questions in this section of the survey were patterned on national surveys, including the National Health Interview Survey (NHIS)[76] and Behavioral Risk Factor Surveillance System (BRFSS),[77] so that answers could be compared to the U.S. population.

**KEY FINDINGS**

▷ More than half (55%) of the sample has been tested for HIV, compared to 34% of the U.S. adult population.

▷ Respondents reported that they were diagnosed with HIV at a rate of 1.4%, a substantially higher rate than in the U.S. population (0.3%).

▷ Transgender women were more than twice as likely to be living with HIV (3.4%) as the overall sample.

▷ Nearly one in five (19.0%) Black transgender women were living with HIV, and American Indian (4.6%) and Latina (4.4%) transgender women were more than three times as likely to be living with HIV as the overall sample.

## I. HIV Testing

Respondents were asked whether they had ever been tested for HIV, aside from testing obtained through the blood donation process. More than half (55%) of respondents had been tested for HIV, in comparison to 34% of the U.S. adult population.[78] This varied by gender identity, with transgender women (62%) and transgender men (58%) being more likely to be tested, compared to non-binary people (45%). Black respondents (70%) and American Indian (65%) respondents were more likely to have been tested than other people of color and white respondents (Figure 7.39).



Figure 7.39: Ever been tested for HIV
RACE/ETHNICITY (%)

AR_217118

People who were currently working in the underground economy, including sex work and drug sales, were also more likely to have been tested (78%).

## a. Test Location

Those who were tested for HIV received tests in a wide range of locations, with nearly one-half (45%) being tested at their private doctor's or HMO office, more than one-quarter (26%) at a clinic, and 11% in a counseling or testing site. Testing locations followed a similar pattern in the U.S. general population, with a few exceptions. USTS respondents were almost three times as likely to have been tested at a counseling or testing site (11%) than those in the U.S. general population (4%),[79] and three times less likely to be tested as a hospital inpatient (Table 7.7).

**Table 7.7: Locations where last tested for HIV**

| Location | % in USTS | % in U.S. population (BRFSS) |
|---|---|---|
| Private doctor or HMO office | 45% | 47% |
| Clinic | 26% | 23% |
| Counseling or testing site | 11% | 4% |
| Hospital inpatient | 3% | 9% |
| Emergency room | 1% | 2% |
| Home | 1% | 2% |
| Jail, prison, or other correctional facility | <1% | 1% |
| Drug treatment facility | <1% | <1% |
| Somewhere else | 9% | 11% |
| Military (write-in response) | 2% | --- |
| Mobile clinic or testing site (write-in response) | 2% | --- |
| Do not know or not sure | --- | 1% |

## b. Year of Last Test

Thirty-eight percent (38%) of respondents who have ever been tested for HIV had most recently been tested in 2015 (the year the survey was conducted), and more than two-thirds (71%) had last been tested in 2013 or later (Figure 7.40).

**Figure 7.40: Year of last HIV test**



% of those who have been tested for HIV

38% 2015
22% 2014
11% 2013
6% 2012
3% 2011
20% 2010 or earlier

## c. Reason For Not Being Tested

Forty-five (45%) percent of respondents reported that they had not been tested for HIV. Of those who had not been tested, 86% reported that the main reason for not being tested was that exposure to HIV was unlikely, similarly to the rate in the U.S. general population (86%).[80] Respondents also reported a variety of additional reasons for not being tested (Table 7.8).

**Table 7.8: Main reason for not being tested for HIV**

| Reason | % of those who have not been tested in USTS | % of those who have not been tested in U.S. population (NHIS) |
|---|---|---|
| Unlikely they have been exposed to HIV | 86% | 86% |
| Their doctor/health care provider never mentioned getting an HIV test | 3% | --- |
| They did not know where to get tested | 1% | 0% |
| They did not want to think about HIV or being HIV-positive | 1% | 0% |
| They did not like needles | 1% | 0% |
| They were afraid to find out if they were HIV-positive | 1% | 0% |
| They were worried their name would be sent to the government if they tested positive | <1% | <1% |
| They were afraid of losing their job, insurance, home, friends, or family if people knew they were tested | <1% | <1% |
| Some other reason | 2% | 1% |
| No particular reason | 6% | 12% |

AR_217119

## II. HIV Status

The rate of respondents who were living with HIV (1.4%)[81,82] was more than four times as high as that in the U.S. general population (0.3%).[83] More than half (53%) were HIV negative,[84] and 46% had not been tested or did not know the results of their HIV test. This included 1% of those who were tested but did not know their status because they never received the results and less than 1% who received results that were unclear, which meant the test did not determine if they had HIV.

HIV status varied by gender identity, with transgender women being most likely to report they were living with HIV (3.4%), in contrast to transgender men (0.3%) and non-binary people (0.4%) (Figure 7.41).

**Figure 7.41: Living with HIV**
GENDER IDENTITY (%)



The rate of HIV differed by race and ethnicity, with Black respondents being almost five times as likely to be HIV positive or reactive (6.7%). American Indian (2.0%) and Latino/a (1.6%) participants also had higher rates of HIV compared to the sample and in contrast to Asian (0.5%) and white (0.4%) respondents (Figure 7.42).

# In Our Own Voices

"I have consulted with surgeons [for gender transition] only to be told they would charge me 50–100% more for the surgery because I am HIV positive. Every day is a double coming out process as transgender and being undetectably HIV positive."

- - - - - - - - - - - - - - - - - - - - - -

"The nurse refused to give me HIV testing because she said those funds were reserved for men who have sex with men and I'm 'not a real man.' She told me I was born female and just needed to accept reality."

- - - - - - - - - - - - - - - - - - - - - -

"I am a trans man who has been living with HIV for 25 years. I have good health insurance and get excellent trans-related and HIV-related health care. I have access to a great therapist who is an expert in gender issues and transitioning. All these factors contribute to my survival and my success."

- - - - - - - - - - - - - - - - - - - - - -

"My first time in jail, and possibly the time I became infected with HIV, was the scariest of all. There were so many times I was in jail and participated in unprotected sex out of fear and necessity. This is just one of the harsh realities for young vulnerable trans women like myself. It is truly bewildering that this reality was so commonly accepted among trans women of color."

- - - - - - - - - - - - - - - - - - - - - -

AR_217120

*The rate of respondents living with HIV (1.4%) was nearly five times higher than in the U.S. population (0.3%).*

**Figure 7.42: Living with HIV**
RACE/ETHNICITY (%)



Nearly one in five (19.0%) Black transgender women reported living with HIV, a rate that is more than thirteen times higher than that in the overall sample. American Indian (4.6%) and Latina (4.4%) transgender women also reported substantially higher rates of HIV (Figure 7.43).

**Figure 7.43: Living with HIV among transgender women**
RACE/ETHNICITY (%)



The rate of HIV also differed by current age, with it being highest among those aged 45–64 (3.3%) and also higher for the 25–44 age group (2.0%) (Figure 7.44).

**Figure 7.44: Living with HIV**
AGE (%)



Undocumented residents (15.0%) were more than ten times as likely to report that they were living with HIV as the overall sample, and documented non-citizens (3.6%) were also more likely. There were also substantial differences when examining rates of HIV by educational attainment. Those who did not complete high school (7.2%) were more than five times as likely to be living with HIV as those in the overall sample, in contrast to the lower rates for those with a bachelor's degree (0.7%) or a graduate or professional degree (0.8%) (Figure 7.45).

**Figure 7.45: Living with HIV**
EDUCATIONAL ATTAINMENT (%)



AR_217121

The rate of HIV was more than ten times higher for respondents whose current sole source of income was from underground economy work (15.0%), five times higher among those who have participated in sex work at any point in their lifetime (7.9%), and almost twice as high for those who have experienced homelessness (2.7%).

# III. HIV Health Care

Medical providers and HIV health care advocates often describe effective treatment and management of HIV in terms of the HIV care continuum or the HIV treatment cascade. The HIV care continuum describes stages of HIV medical care, including "diagnosis of HIV infection, linkage to care, retention in care, receipt of antiretroviral therapy, and achievement of viral suppression."[85] Respondents were asked whether they had received HIV-related health care in the year prior to the survey, and were also asked about other aspects of the HIV care continuum.

Most of the respondents who were living with HIV had received HIV-specific health care within the past year, not including care received during an emergency room visit or during a hospital stay. Eighty-nine percent (89%) of respondents living with HIV had seen a doctor or health care provider for HIV care in the past 12 months, and 87% received HIV care in the past 6 months.

Respondents who had not seen a doctor for HIV care *in the past 6 months* offered a range of reasons, including not being ready to find health care for HIV, not being able to afford HIV care, not feeling sick enough to look for HIV care, and their HIV is well controlled enough to only see a doctor once per year.[86] Similarly, those who had not seen a doctor for HIV care *in the past 12 months* offered a variety of reasons, including not having health insurance, not being able to afford HIV care, not

knowing where to go for HIV care, not feeling sick enough to look for health care, relying on a higher power or God to help with their HIV, only recently finding out about their HIV status, and other unspecified reasons.[87]

Of respondents who were living with HIV, 82% reported that they had their blood tested to determine their viral load and CD4 counts in the past 6 months. Five percent (5%) had most recently received such testing between 6 and 12 months ago, 6% were last tested more than a year ago, and 7% had never had a blood test for their viral load and CD4 counts.

Eighty-seven percent (87%) of respondents living with HIV have been prescribed anti-retroviral therapy (ART), which are medications that can reduce the amount of HIV in the body.[88] This is compared to 94% of those living with HIV in the general population.[89] Eighty-one percent (81%) of people living with HIV reported that they were currently taking their ART medications. Of those who had been prescribed ART, almost two-thirds (64%) reported taking it regularly and as prescribed all of the time, one-third (33%) took it most of the time, 2% rarely took it, and 1% never took it regularly and as prescribed. Approximately half (45%) of respondents who were not taking their ART medication all of the time—including those who took it most of the time, rarely, or never—reported that the main reason for not taking it as they were supposed to was that they forgot to take it. The remaining respondents (n=23, unweighted) reported several reasons why that they did not take their medication as prescribed, including not being able to afford the medication, not having health insurance, concerns about conflicts with other medications, concerns about weight gain, not wanting to take ART, and other reasons not listed in the question.

AR_217122

# Conclusion

Findings throughout the chapter indicated that respondents were impacted by substantial health-related disparities, including access to quality care and health outcomes. Respondents reported substantial barriers to receiving the care that they need, such as financial constraints, lack of health insurance or insurance that does not adequately address their health needs, and lack of access to health care providers who can administer health care respectfully and with a sufficient knowledge of transgender patients' needs. Furthermore, although some respondents were able to access health care related to gender transition, such as counseling, hormone therapy, or a variety of surgical procedures, a large number have not received such health care despite wanting to do so, often due to income and economic instability and lack of access to adequate health insurance insurance.

Results also suggest that insufficient access to quality care and coverage contributed to poor health outcomes among respondents. Respondents were substantially more likely to be living with HIV than the general population, with much higher rates among transgender women of color. Respondents were also more likely to report poor mental health outcomes, including higher rates of substance use, serious psychological distress, and suicide attempts. Findings demonstrated an association between poor health outcomes and a number of risk factors, such as economic instability, housing instability, lower educational attainment, and lack of family support.

**ENDNOTES** | CHAPTER 7: HEALTH

1    Bockting, W. O., Miner, M. H., Swinburne Romine, R. E., Hamilton, A., & Coleman, E. (2013). Stigma, mental health, and resilience in an online sample of the US transgender population. *American Journal of Public Health, 103*(5), 943–951; Grant, J. M., Mottet, L. A., Tanis, J., Harrison, J., Herman, J. L., & Keisling, M. (2011). *Injustice at Every Turn: A Report of the National Transgender Discrimination Survey. (pp. 72–87).* DC: National Center for Transgender Equality & National Gay and Lesbian Task Force; Institute of Medicine. (2011). *The Health of Lesbian, Gay, Bisexual, and Transgender People: Building a Foundation for Better Understanding.* DC: National Academy of Sciences.

2    Kosenko, K., Rintamaki, L., Raney, S., Maness, K. (2013). Transgender patient perceptions of stigma in health care contexts. *Medical Care, 51*(9), 819–822; Poteat, T., German, D., & Kerrigan, D. (2013). Managing uncertainty: A grounded theory of stigma in transgender health encounters. *Social Science & Medicine, 84*(1), 22–29; Grant, et al. (2011). pp. 72–87; Lambda Legal. (2010). *When Health Care Isn't Caring: Lambda Legal's Survey of Discrimination Against LGBT People and People with HIV.* New York, NY: Lambda Legal.

3    U.S. Census Bureau. (2015). 2015 American Community Survey 1-Year Estimates. Available at: https://factfinder. census.gov/faces/tableservices/jsf/pages/productview. xhtml?pid=ACS_15_1YR_S2701&prodType=table.

4    U.S. Census Bureau. (2015). *2015 American Community Survey 1-Year Estimates: Private Health Insurance Coverage By Type.* Available at: https://factfinder.census.gov/faces/ tableservices/jsf/pages/productview.xhtml?pid=ACS_15_1YR_ S2703&prodType=table; U.S. Census Bureau. (2015). *2015 American Community Survey 1-Year Estimates: Public Health Insurance Coverage by Type.* Available at: https://factfinder. census.gov/faces/tableservices/jsf/pages/productview. xhtml?pid=ACS_15_1YR_S2704&prodType=table.

5    The estimate for the percentage of people who receive coverage through the Indian Health Service was calculated based on a 2015 statement that approximately 2.2 million American Indian and Alaska Native people were served by the Indian Health Service. https://www.ihs.gov/newsroom/ factsheets/quicklook/.

6    Q. 11.9 specified that "[h]ealth insurance marketplaces are part of the new health care law, sometimes called 'Obamacare' or the 'Affordable Care Act,' where people can get insurance online, such as through healthcare.gov, over the phone, or in person."

7    "Insurer" here refers to insurers providing coverage under both private insurance plans (such as those purchased through an employer) and public plans (such as through Medicaid or Medicare).

HEALTH

AR_217123

8    The "other insurance" category includes TRICARE or other military coverage, VA, Indian Health Service, and other types of insurance not listed. See Table 7.1.

9    Respondents were asked if they had "experienced unwanted sexual contact (such as fondling, sexual assault, or rape) in a health care setting (such as a hospital, office, clinic)" in Q.12.7.

10    "People with disabilities" here refers to respondents who identified as a person with a disability in Q. 2.20.

11    Respondents on active duty in military service were asked separately about where they received transition-related health care. These results are reported in the *Military Service* chapter.

12    Although 1.5% of respondents in the sample reported having taken puberty-blocking medication, the percentage reported here reflects a reduction in the reported value based on respondents' reported ages at the time of taking this medication. While puberty-blocking medications are usually used to delay physical changes associated with puberty in youth ages 9–16 prior to beginning hormone replacement therapy, a large majority (73%) of respondents who reported having taken puberty blockers in Q.12.9 reported doing so after age 18 in Q.12.11. This indicates that the question may have been misinterpreted by some respondents who confused puberty blockers with the hormone therapy given to adults and older adolescents. Therefore, the percentage reported here (0.3% or "less than 1%") represents only the 27% of respondents who reported taking puberty-blocking medication before the age of 18.

13    "Transition-related surgery" here includes all procedures listed in Table 7.4 and 7.5, with the exception of electrolysis and non-surgical voice therapy.

14    Respondents who are "living in poverty" represent those who are living at or near the poverty line. See the *Income and Employment Status* chapter for more information about the poverty line calculation.

15    The "other insurance" category in Figure 7.11 includes TRICARE or other military coverage, VA, Indian Health Service, and other types of insurance not listed. See Table 7.1.

16    Since the available surgical procedures related to transition generally vary based on individuals' sex assigned at birth (the gender they were thought to be when they were born), respondents received different questions about surgical procedures based on their response to Q. 2.1, which asked about the sex listed on respondents' original birth certificate. Respondents who said that they had female on their original birth certificate received Q. 12.15, and respondents who said they had male on their original birth certificate received Q. 12.18. Although the vast majority of respondents received only questions about medical procedures available to them, 2.7% of respondents indicated that they were intersex, and a portion of them may not have received questions about all the surgical procedures that best fit their health care needs.

17    Respondents were asked about having "top/chest surgery reduction or reconstruction" in Q. 12.15.

18    Respondents were asked about having a "hysterectomy/'hysto' (removal of the uterus, ovaries, fallopian tubes, and/or cervix)" in Q. 12.15.

19    Respondents were asked about having a "clitoral release/metoidioplasty/centurion procedure" in Q. 12.15. These are genital procedures that separate the clitoris from the labia.

20    Respondents were asked about having a "phalloplasty (creation of a penis)" in Q. 12.15. This is a genital procedure involving the construction of a larger phallus.

21    The U.S. Preventive Services Task Force currently recommends Pap smears every three years for adults who have a cervix and are between the ages 21 and 65. U.S. Preventive Services Task Force. (2012). *Cervical Cancer: Screening.* Available at: http://www.uspreventiveservicestaskforce.org/Page/Document/UpdateSummaryFinal/cervical-cancer-screening.

22    Centers for Disease Prevention and Control. (2016). *2015 National Health Interview Survey: Sample Adult File.* Available at: ftp://ftp.cdc.gov/pub/Health_Statistics/NCHS/Dataset_Documentation/NHIS/2015/samadult_freq.pdf

23    Respondents were asked about having a "vaginoplasty/labiaplasty/SRS/GRS/GCS" in Q. 12.18. A vaginoplasty is a surgical creation of a vagina. A labiaplasty is a surgical modification or construction of the labia.

24    Respondents were asked about having an "orchidectomy/'orchy'/removal of the testes" in Q. 12.18.

25    Respondents were asked about having "facial feminization surgery (such as nose, brow, chin, cheek)" in Q.12.18.

26    Respondents were asked about having "breast augmentation/top surgery" in Q. 12.18. This refers to an augmentation mammoplasty, which reshapes or increases the size of the breast.

27    Respondents were asked about having a "tracheal shave (Adam's apple or thyroid cartilage reduction)" in Q. 12.18.

28    Although silicone injections are sometimes used to modify one's appearance, they are often risky and can lead to disfigurement, injury, and even death. Such injections are illegal in the United States. However, due to barriers to affordable care, some transgender people turn to silicone injections as a less expensive or more easily accessible substitute for safer treatments.

29    See e.g., Pascoe, E. A. & Richman, L. S. (2009). Perceived discrimination and health: A meta-analytic review. *Psychological Bulletin, 135*(4), 531–554.

30    See e.g., Bariola, E. Lyons, A., Leonard, W., Pitts, M., Badcock, P., Couch, M. (2015). Demographic and psychosocial factors associated with psychological distress and resilience among transgender individuals. *American Journal of Public Health, 105*(10), 2108–2116; Nuttbrock, L., Brocking, W., Rosenblum, A., Hwahng, S., Mason, M., Macri, M., & Becker, J. (2014). Gender abuse and major depression among transgender women: A prospective study of vulnerability and resilience.

AR_217124

*American Journal of Public Health, 104*(11), 2191, 2198; Bockting, W. O., Miner, M. H., Swinburne Romine, R. E., Hamilton, A., & Coleman, E. (2013). Stigma, mental health, and resilience in an online sample of the US transgender population. *American Journal of Public Health, 103*(5), 943–951; Institute of Medicine. (2011). *The Health of Lesbian, Gay, Bisexual, and Transgender People: Building a Foundation for Better Understanding.* DC: National Academy of Sciences.

31    The general health rating among adults in the U.S. population was calculated by the research team using data from the Behavioral Risk Factor Surveillance System (BRFSS). Centers for Disease Control and Prevention. (2015). *BRFSS Prevalence & Trends Data.* Available at: http://www.cdc.gov/brfss/brfssprevalence.

32    The Kessler Psychological Distress Scale, or K6, assesses psychological distress based on how often in the past 30 days respondents felt so sad that nothing could cheer them up, nervous, restless or fidgety, hopeless, that everything was an effort, or worthless. See Q. 12.2. See the National Health Interview Survey for additional information about the K6 mental health screening instrument and measure of serious psychological distress in adults (available at: http://www.healthindicators.gov/indicators/Serious-psychological-distress-adults-percent_50055/Profile).

33    The K6 scale rates how often feelings are experienced on the following scale: (0) none of the time, (1) a little of the time, (2) some of the time, (3) most of the time, and (4) all of the time. See Q. 12.2. A total score of 13 or above across all six measures indicates serious psychological distress.

34    Centers for Disease Prevention and Control. (2016). *2015 National Health Interview Survey: Sample Adult File.* Available at: ftp://ftp.cdc.gov/pub/Health_Statistics/NCHS/Dataset_Documentation/NHIS/2015/samadult_freq.pdf.

35    See note 33 for an explanation of how "serious psychological distress" is calculated based on the K6 scale.

36    Center for Behavioral Health Statistics and Quality. (2016). *Results from the 2015 National Survey on Drug Use and Health: Detailed Tables.* Rockville, MD: Substance Abuse and Mental Health Services Administration. Available at: http://www.samhsa.gov/data/sites/default/files/NSDUH-DetTabs-2015/NSDUH-DetTabs-2015/NSDUH-DetTabs-2015.pdf.

37    Serious psychological distress is related to age and educational attainment in the U.S. general population. (see note 33; http://www.cdc.gov/mmwr/preview/mmwrhtml/mm6340a13.htm). Those who are younger and have lower educational attainment have a higher prevalence of serious psychological distress. When the "supplemental weight" is applied to the USTS sample's prevalence of serious psychological distress to adjust the sample to reflect the age and educational attainment of the U.S. adult population, the prevalence is reduced to 30%, six times the national prevalence for U.S. adults. Based on

studies using population-based samples of transgender adults, it is estimated that the transgender population is younger and has lower educational attainment than the U.S. adult population. Flores, A. R., Brown, T. N. T., & Herman, J. L. (2016). Race and Ethnicity of Adults who Identify as Transgender in the United States. Los Angeles, CA: Williams Institute; Conron, K. J., Scott, G., Stowell, G. S., & Landers, S. J. (2012). Transgender health in Massachusetts: Results from a household probability sample of adults. American Journal of Public Health, 102(1), 118–122. Therefore, the finding of 39% for prevalence of serious psychological distress is reported here using the standard weight only.

38    *Results from the 2015 National Survey on Drug Use and Health: Detailed Tables.* Table 8.86B. See note 36.

39    Results for respondents who were sexually assaulted here reflect those who reported that they had "experienced unwanted sexual contact (such as oral, genital, or anal contact or penetration, forced fondling, rape)" in the past year (see Q. 18.3).

40    Substance Abuse and Mental Health Services Administration. (2015). *Ending Conversion Therapy: Supporting and Affirming LGBTQ Youth.* Available at: http://store.samhsa.gov/shin/content//SMA15-4928/SMA15-4928.pdf.

41    Additionally, eleven percent (11%) of respondents in the sample said they were sent to a therapist, counselor, or religious advisor by immediate family members to stop them from being transgender. See the "Sent to a Professional for Being Transgender" section of the *Family Life and Faith Communities* chapter for a discussion about respondents who were sent to a professional by their family.

42    Although 0.4% of the overall sample reported that gender transition was not for them, these respondents did identify as transgender, meeting all criteria for inclusion in the survey (see Q. 1.10–1.18).

43    Haas, A. P., Rodgers, P. L., & Herman, J. L. (2014). *Suicide Attempts Among Transgender and Gender Non-Conforming Adults.* New York, NY & Los Angeles, CA: American Foundation for Suicide Prevention & Williams Institute; Moody, C. & Smith, N. G. (2013). Suicide protective factors among trans adults. *Archives of Sexual Behavior 42*(5), 739–752; Grant, J. M., Mottet, L. A., Tanis, J., Harrison, J., Herman, J. L., & Keisling, M. (2011). *Injustice at Every Turn: A Report of the National Transgender Discrimination Survey.* (p. 82). DC: National Center for Transgender Equality & National Gay and Lesbian Task Force.

44    Lipari, R., Piscopo, K., Kroutil, L. A., & Miller, G. K. (2015). *Suicidal Thoughts and Behaviors Among Adults: Results from the 2014 National Survey on Drug Use and Health.* Rockville, MD: Substance Abuse and Mental Health Services Administration.

45    Kessler, R. C., Berglund, P., Chiu, W. T., Demler, O., Heeringa, S., Hiripi, E., . . . Zheng, H. (2004). The US National Comorbidity Survey Replication (NCS-R): design and field procedures. *International Journal of Methods in Psychiatric Research, 13*(2), 69–92.

HEALTH

AR_217125

46   *Results from the 2015 National Survey on Drug Use and Health: Detailed Tables.* Table 8.70B. See note 36.

47   *Results from the 2015 National Survey on Drug Use and Health: Detailed Tables.* Table 8.69B. See note 36.

48   *Results from the 2015 National Survey on Drug Use and Health: Detailed Tables.* Table 8.70B. See note 36.

49   *Results from the 2015 National Survey on Drug Use and Health: Detailed Tables.* Table 8.70B. See note 36.

50   *Results from the 2015 National Survey on Drug Use and Health: Detailed Tables.* Table 8.70B. See note 36.

51   Whether or not a person receives medical attention following a suicide attempt is often used as a measure of the severity of the attempt. However, because many transgender people report avoiding medical professionals because of fear of mistreatment (see, for example, the previous section on "Experiences with Health Care Providers"), it may be difficult to use this measure to gauge the severity of the attempt among USTS respondents.

52   *Results from the 2015 National Survey on Drug Use and Health: Detailed Tables.* Table 8.77B. See note 36.

53   *Results from the 2015 National Survey on Drug Use and Health: Detailed Tables.* Table 8.77B. See note 36.

54   Kessler, R. C., Borges, G., & Walters, E. E. (1999). Prevalence of and risk factors for lifetime suicide attempts in the National Comorbidity Survey. *Archives of General Psychiatry, 56*(7), 617–626. See also Nock, M. K., Hwang, I., Sampson, N. A., & Kessler, R. C. (2010). Mental disorders, comorbidity and suicidal behavior: Results from the National Comorbidity Survey Replication. *Molecular Psychiatry, 15*(8), 868–876; Nock, M. K., Borges, G., Bromet, E. J., Cha, C. B., Kessler, R. C., & Lee, S. (2008). Suicide and suicidal behavior. *Epidemiologic Reviews, 30*(1), 133–154 (finding a lifetime prevalence of suicide ideation of 5.6–14.3%, a lifetime prevalence for suicide plans of 3.9%, a lifetime prevalence for suicide attempts of 1.9–8.7%).

55   Respondents who reported that they were out to all, most, or some of the immediate family they grew up with were asked to assess how supportive their family was using a five-point scale from "very supportive" to "very unsupportive". The categories were collapsed to create a new variable reflecting a supportive, neutral, or unsupportive family.

56   Results for respondents who were sexually assaulted here reflect those who reported that they had "experienced unwanted sexual contact (such as oral, genital, or anal contact or penetration, forced fondling, rape)" in their lifetime (see Q.18.1).

57   The age of the most recent suicide attempt reported here includes responses from both respondents who reported a single attempt and those who reported multiple attempts. For respondents who reported a single suicide attempt, the age of the most recent suicide attempt is also the age of their first suicide attempt as reported in the previous section.

58   See e.g., Cleveland, M. J., Feinberg, M. E., Bontempo, D. E., & Greenberg, M. T. (2008). The role of risk and protective factors in substance use across adolescence. *Journal of Adolescent Health, 43*(2), 157–164; Kilpatrick, D. G., Ruggiero, K. J., Acierno, R., Saunders, B. E., Resnick, H. S., & Best, C. L. (2003). Violence and risk of PTSD, major depression, substance abuse/dependence, and comorbidity: Results from the National Survey of Adolescents. *Journal of Consulting and Clinical Psychology, 71*(4), 692–700.

59   Center for Behavioral Health Statistics and Quality. (2015). *2015 National Survey on Drug Use and Health Questionnaire.* Available at http://www.samhsa.gov/data/population-data-nsduh/reports?tab=39.

60   Center for Behavioral Health Statistics and Quality. (2015). *Results from the 2014 National Survey on Drug Use and Health: Detailed Tables.* Table 2.6B. Rockville, MD: Substance Abuse and Mental Health Services Administration. Available at http://www.samhsa.gov/data/sites/default/files/NSDUH-DetTabs-2015/NSDUH-DetTabs-2015/NSDUH-DetTabs-2015.pdf.

61   *Results from the 2014 National Survey on Drug Use and Health: Detailed Tables.* Table 2.6B. See note 60.

62   This report follows the 2014 National Survey on Drug Use and Health (NSDUH) definition for binge drinking, which is defined as "drinking five or more drinks on the same occasion on at least 1 day in the past 30 days." As this definition differs from the 2015 NSDUH definition, general population comparisons for binge and heavy drinking in this report will be drawn from the 2014 NSDUH data. Hedden, S. L., Kennet, J., Lipari, R., Medley, G., Tice, P., Copello, E. A. P., & Kroutil, L. A. (2015). *Behavioral Health Trends in the United States: Results from the 2014 National Survey on Drug Use and Health.* Rockville, MD: Substance Abuse and Mental Health Services Administration. Available at: http://www.samhsa.gov/data/sites/default/files/NSDUH-FRR1-2014/NSDUH-FRR1-2014.pdf.

63   *Results from the 2014 National Survey on Drug Use and Health: Detailed Tables.* Table 2.46B. See note 60.

64   *Results from the 2014 National Survey on Drug Use and Health: Detailed Tables.* Table 2.46B. See note 60.

65   *Results from the 2015 National Survey on Drug Use and Health: Detailed Tables.* Table 2.28B. See note 36.

66   *Results from the 2015 National Survey on Drug Use and Health: Detailed Tables.* Table 2.16B. See note 36.

67   *Results from the 2015 National Survey on Drug Use and Health: Detailed Tables.* Table 6.7B. See note 36.

68   Respondents were instructed to include products such as "weed, joints, hashish, hash, or hash oil" when reporting on marijuana use. See Q. 15.1.

69   *Results from the 2015 National Survey on Drug Use and Health: Detailed Tables.* Table 1.35B. See note 36.

70   *Results from the 2015 National Survey on Drug Use and Health: Detailed Tables.* Table 1.35B. See note 36.

AR_217126

71    For the purposes of this report, "illicit drugs" include those such as cocaine, crack, heroin, LSD, methamphetamine, and inhalants, but does not include marijuana or nonmedical use of prescription drugs. See Q. 15.1. This differs from illicit drugs as reported in the NSDUH, which includes "the misuse of prescription psychotherapeutics or the use of marijuana, cocaine (including crack), heroin, hallucinogens, inhalants, or methamphetamine." *Results from the 2015 National Survey on Drug Use and Health: Detailed Tables.* Table 1.30B. See note 36. Due to the difference between the two definitions, a comparison to the U.S. general population for the overall use of illicit drugs (not including marijuana or nonmedical use of prescription drugs) is not possible.

72    *Results from the 2015 National Survey on Drug Use and Health: Detailed Tables.* Table 1.22B. See note 36.

73    *Results from the 2015 National Survey on Drug Use and Health: Detailed Tables.* Table 1.30B. See note 36.

74    Centers for Disease Control and Prevention. (2016). *HIV and Transgender Communities.* Available at: http://www.cdc.gov/hiv/pdf/policies/cdc-hiv-transgender-brief.pdf; Baral, S. D., Poteat, T., Strömdahl, S., Wirtz, A. L., Guadamuz, T. E., & Beyrer, C. (2013). Worldwide burden of HIV in transgender women: a systematic review and meta-analysis. *The Lancet Infectious Diseases, 13*(3), 214–222; Grant, J. M., Mottet, L. A., Tanis, J., Harrison, J., Herman, J. L., & Keisling, M. (2011). *Injustice at Every Turn: A Report of the National Transgender Discrimination Survey.* (p. 80). DC: National Center for Transgender Equality & National Gay and Lesbian Task Force; Reisner, S. L., Poteat, T., Keatley, J., Cabral, M. Mothopeng, T., Dunham, E., Holland, C. E., Max, R., Baral, S. D. (2016). Global health burden and needs of transgender populations: a review. *The Lancet Infectious Diseases, 388*(10042), 412–436.

75    Centers for Disease Control and Prevention. (2016). *HIV and Transgender Communities.* Available at: http://www.cdc.gov/hiv/pdf/policies/cdc-hiv-transgender-brief.pdf.

76    Centers for Disease Control and Prevention (2015). *National Health Interview Survey: Survey Description.* Available at: ftp://ftp.cdc.gov/pub/Health_Statistics/NCHS/Dataset_Documentation/NHIS/2014/srvydesc.pdf .

77    Centers for Disease Control and Prevention (2014). *2015 Behavioral Risk Factor Surveillance System Questionnaire.* Available at: http://www.cdc.gov/brfss/questionnaires/pdf-ques/2015-brfss-questionnaire-12-29-14.pdf.

78    Centers for Disease Control and Prevention. (2015). *BRFSS Prevalence & Trends Data.* Available at: http://www.cdc.gov/brfss/brfssprevalence.

79    Centers for Disease Control and Prevention. (2016). *Behavioral Risk Factor Surveillance System: 2015 Codebook Report.* Available at: http://www.cdc.gov/brfss/annual_data/2015/pdf/codebook15_llcp.pdf.

80    Centers for Disease Prevention and Control. (2016). *2015 National Health Interview Survey: Sample Adult File.* Available at: https://www.cdc.gov/nchs/nhis/nhis_2015_data_release.htm.

81    Percentages related to HIV status are presented with one decimal place throughout the section for more accurate comparison with general population figures.

82    The rate of respondents living with HIV includes those who were HIV-positive or reactive. Among respondents who had been tested, the rate of those who tested positive for HIV was 2.6%.

83    Centers for Disease Control and Prevention. (2015). HIV Surveillance Report, 2014; vol. 26. Table 18a. Available at: http://www.cdc.gov/hiv/library/reports/surveillance/. The HIV Surveillance Report provides data for those who were living with diagnosed HIV infection in the U.S. population in 2013. The U.S. population data includes those who are 15 years of age and older and does not include rate for those who are under 18, so it was not possible to exactly match the USTS sample with the U.S. population data. However, when estimating the impact of including 15–17 year olds in the U.S. population rate of those living with HIV, research team calculations estimated a difference of approximately 0.002% in the rate, which would not impact the rate of those living with HIV in the U.S. population as reported here.

84    Ninety-seven percent (97%) of those who were tested for HIV were HIV negative.

85    AIDS.Gov. (2015). *HIV Care Continuum.* Available at: https://www.aids.gov/federal-resources/policies/care-continuum.

86    Due to a low sample size, response figures could not be reported for those who had not seen a doctor for HIV care in the past 6 months.

87    Due to a low sample size, response figures could not be reported for those who had not seen a doctor for HIV care in the past 12 months.

88    See AIDS.Gov. (2015). *Overview of HIV Treatments.* Available at: https://www.aids.gov/hiv-aids-basics/just-diagnosed-with-hiv-aids/treatment-options/overview-of-hiv-treatments.

89    Centers for Disease Control and Prevention. (2016). Behavioral and Clinical Characteristics of Persons Receiving Medical Care for HIV Infection—Medical Monitoring Project, United States, 2013 Cycle (June 2013–May 2014). HIV Surveillance Special Report 16. Available at: http://www.cdc.gov/hiv/pdf/statistics/systems/mmp/cdc-hiv-hssr-mmp-2013.pdf.

AR_217127



# CHAPTER 8
# Experiences at School

**M**any schools provide supportive environments that promote learning and growth, while some schools can be unwelcoming and unsupportive for transgender students, whether in Kindergarten through 12th grade (K–12), or in technical or higher education institutions (such as a college or university). Other studies have shown that many students feel unsafe and have been verbally harassed or physically attacked because of their transgender identity.[1,2]

Survey respondents were asked whether they were out or perceived as transgender in K–12 and in higher education institutions. Those who said that they were out as transgender or that others thought they were transgender were asked additional questions about negative experiences based on their transgender status, including verbal harassment, physical and sexual assault, leaving school because of mistreatment, and expulsion. Throughout the chapter, notable differences in respondents' experiences based on demographic and other characteristics are reported.

KEY FINDINGS

▶ Twelve percent (12%) of respondents were out as transgender at some point from Kindergarten through the 12th grade.

▶ More than three-quarters (77%) of respondents who were out or perceived as transgender in K–12 had one or more negative experiences, such as being verbally harassed, prohibited from dressing according to their gender identity, or physically or sexually assaulted.

▶ Fifty-four percent (54%) of people who were out or perceived as transgender in K–12 were verbally harassed, and 24% were physically attacked.

▶ Seventeen percent (17%) of people who were out or perceived as transgender left a K–12 school because the mistreatment was so bad, and 6% were expelled.

▶ Twenty-four percent (24%) of people who were out or perceived as transgender in college or vocational school were verbally, physically, or sexually harassed.

# I. Outness in K–12

Twelve percent (12%) of respondents reported that they were out as transgender at some point between Kindergarten and the 12th grade (K–12). Of those who were not out as transgender, 28% said that they believed classmates, teachers, or school staff thought they were transgender.

All respondents, including those who were out or perceived as transgender in K–12, were also asked whether classmates, teachers, or school staff thought or knew that they were lesbian, gay, bisexual, or queer (LGBQ) in K–12. Three-quarters (75%) believed that classmates, teachers, or school staff thought or knew they were LGBQ. Younger respondents were much more likely to report that classmates, teachers, or staff in K–12 thought or knew they were LGBQ than older respondents,

such as 18- to 24-year-olds (85%) in contrast to 45- to 64-year-olds (51%) (Figure 8.1).

**Figure 8.1: Perceived as LGBQ in K–12**
CURRENT AGE (%)



EXPERIENCES AT SCHOOL

131

AR_217129

*More than three-quarters (77%) of those who were out or perceived as transgender had one or more negative experiences at school because they were transgender, such as being verbally harassed or physically attacked.*

# II. Treatment in K–12

Respondents who were out as transgender in K–12 or who said that others thought that they were transgender received additional questions about negative experiences in K–12, such as being verbally harassed, physically attacked, or expelled. Overall, 77% of those who were out or perceived as transgender had one or more of these negative experiences, while only 23% did not have any of these experiences (Table 8.1). American Indian (92%), Middle Eastern (84%), and multiracial (81%) respondents (Figure 8.2) and people with disabilities[3] (82%) were more likely to have one or more negative experiences.

**Figure 8.2: Had one or more negative experiences in K–12 (of those who were out or perceived as transgender)**
RACE/ETHNICITY (%)



*Poor treatment in school was associated with a variety of negative experiences. Respondents who were out or perceived as transgender in K–12 and had one or more negative experiences outlined in this chapter were:*

- *More likely to have attempted suicide (52%) than those who were out or perceived as transgender and did not have any of these negative experiences (37%).*

- *More likely to have experienced homelessness (40%) than those who were out or perceived as transgender and did not have any of the negative experiences (22%).*

- *More likely to currently be experiencing serious psychological distress (47%) than those who were out or perceived as transgender and did not have any of the negative experiences (37%).*

- *More likely to have ever worked in the underground economy, such as in sex work or drug sales (28%), compared with those who were out or perceived as transgender and did not have any of the negative experiences (18%).*

**Table 8.1: Experiences of people who were out as transgender in K–12 or believed classmates, teachers, or school staff thought they were transgender**

| Experiences | % of those who were out or perceived as transgender |
|---|---|
| Verbally harassed because people thought they were transgender | 54% |
| Not allowed to dress in a way that fit their gender identity or expression | 52% |
| Disciplined for fighting back against bullies | 36% |
| Physically attacked because people thought they were transgender | 24% |
| Believe they were disciplined more harshly because teachers or staff thought they were transgender | 20% |
| Left a school because the mistreatment was so bad | 17% |
| Sexually assaulted because people thought they were transgender | 13% |
| Expelled from school | 6% |
| **One or more experiences listed** | **77%** |

## a. Verbal Harassment

More than half (54%) of people who were out or perceived as transgender in K–12 were verbally harassed because they were transgender. Verbal harassment differed among people of color, with American Indian (69%) and Middle Eastern (61%) respondents being more likely to have this experience, and Latino/a (52%) and Black (51%) respondents being less likely (Figure 8.3).

**Figure 8.3: Verbally harassed in K–12 because people thought they were transgender**
RACE/ETHNICITY (%)



## b. Physical Attack

Nearly one-quarter (24%) were physically attacked because of being transgender. Transgender women (38%) were more likely to have been physically attacked than transgender men (20%) and non-binary people (16%) (Figure 8.4). American Indian respondents (49%) were more than twice as likely to have been physically attacked, and Middle Eastern (36%), multiracial (31%), and Black (28%) respondents were also more likely to have had this experience, in contrast to Latino/a (24%), white (23%), and Asian (17%) respondents (Figure 8.5).

*Nearly one-quarter (24%) of those who were out or perceived as transgender in school were physically attacked because of being transgender.*

**Figure 8.4: Physically attacked in K–12 because people thought they were transgender**
GENDER IDENTITY (%)



**Figure 8.5: Physically attacked in K–12 because people thought they were transgender**
RACE/ETHNICITY (%)



EXPERIENCES AT SCHOOL

133

## c. Sexual Assault

Thirteen percent (13%) of people who were out or perceived as transgender in K–12 were sexually assaulted in school because they were transgender.[4] Transgender women (21%) and crossdressers (18%) were more likely to have been sexually assaulted than transgender men (9%) and non-binary people (10%) (Figure 8.6).

**Figure 8.6: Sexually assaulted in K–12 because people thought they were transgender**
GENDER IDENTITY (%)



Whether a respondent was sexually assaulted in K–12 varied by age, with older respondents such as 45- to 64-year-olds being more likely to have been sexually assaulted (22%) than younger respondents such as 25- to 44-year-olds (16%) (Figure 8.7).

**Figure 8.7: Sexually assaulted in K–12 because people thought they were transgender**
CURRENT AGE (%)



# In Our Own Voices

"I was constantly bullied and physically assaulted by my classmates. Teachers would often see it happen and make no move to intervene. The harassment continued, and I eventually had to change high schools three times, each time just as bad as the last, until I finally gave up on public schools."

"I'd get hit by soda cans, spit balls, and paper airplanes of hate mail. Teachers weren't there or didn't care. I had to avoid social interactions like buses and school bathrooms because I didn't feel safe."

"Every single day at college, I was harassed for being a visibly trans woman. People slowed their cars down to stare at me, they shouted slurs at me from their dorm windows, insulted me in class, and a lot more I'd rather not think about. It got so bad that I tried to kill myself twice over the course of three months. Getting out of that school has been the best thing to have happened to me."

"In high school, the staff told me I could not use the men's bathroom because I'd make other students uncomfortable, even though I was out to everyone and none of the students were bothered by my gender."

AR_217132

### d. Left School Due to Harassment

Seventeen percent (17%) of those who were out or perceived as transgender left a school because the mistreatment was so bad. Transgender women (22%) were more likely to have left a school because of mistreatment, in contrast to transgender men (15%) and non-binary people (15%) (Figure 8.8).

**Figure 8.8: Left school due to mistreatment in K–12**
GENDER IDENTITY (%)



American Indian (39%) and Middle Eastern (36%) respondents were more than twice as likely to have left a school because the mistreatment was so bad, and Black (22%) and multiracial (21%) respondents were also more likely to have left a school for this reason (Figure 8.9).

**Figure 8.9: Left school due to mistreatment in K–12**
RACE/ETHNICITY (%)



> **Seventeen percent (17%) of people who were out or perceived as transgender in K–12 left a school because the mistreatment was so bad.**

### e. Expelled from School

Six percent (6%) of people who were out or perceived as transgender were expelled from school. Transgender women were nearly twice as likely to have been expelled, with one in ten (10%) reporting that experience (Figure 8.10). Further, respondents who were currently working in the underground economy (18%) were three times as likely to have been expelled from school.

**Figure 8.10: Expelled from school in K–12**
GENDER IDENTITY (%)



AR_217133

# III. Outness and Treatment in College or Vocational School

Of respondents who had attended college or vocational school, 46% said their classmates, professors, or staff at college or vocational school thought or knew they were transgender. Nearly one-quarter (24%) of respondents who indicated that classmates, professors, or staff at college or vocational school thought or knew they were transgender were verbally, physically, or sexually harassed. American Indian (37%), Black (28%), and Middle Eastern (27%) respondents were more likely to have had these experiences, while white (23%), Latino/a (23%), and Asian (22%) respondents were less likely (Figure 8.11).

**Figure 8.11: Verbally, physically, or sexually harassed in college or vocational school**
RACE/ETHNICITY (%)



Of respondents who were out or perceived as transgender and who experienced some form of harassment, 16% left college or vocational school because the harassment was so bad. This represents 2% of all respondents who attended a higher education institution. Of those who experienced some form of harassment, transgender women (21%) were more likely to

have left college or vocational school for this reason than transgender men (16%) and non-binary people (12%) (Figure 8.12). Respondents currently working in the underground economy were almost twice as likely (31%) to have left college because of harassment than other respondents. American Indian (23%), Latino/a (23%), Black (21%), and multiracial (20%) respondents were more likely to report leaving school for that reason (Figure 8.13).

**Figure 8.12: Left college or vocational school because harassment was so bad (of those who were harassed)**
GENDER IDENTITY (%)



**Figure 8.13: Left college or vocational school because harassment was so bad (of those who were harassed)**
RACE/ETHNICITY (%)



*Sample size too low to report

In addition to the 2% who left because the harassment was so bad, 1% of respondents who attended college or vocational school were expelled or forced out, and 5% left because of other reasons related to being transgender.

AR_217134

# IV. Current Outness and Support of Classmates

In addition to questions about being out to classmates at any time while they were in school, respondents were asked whether they currently had classmates, and whether those classmates knew that they were transgender. Of respondents who currently had classmates, only 15% said that all of their classmates knew that they were transgender, 10% said that most of them knew, 28% said that some of them knew, and nearly half (47%) said that none of their classmates knew that they were transgender.

Respondents who currently had classmates and reported that all, most, or some of their classmates knew that they were transgender were asked how supportive their classmates generally were of them as a transgender person. Responses were given on a five-point scale from "very supportive" to "very unsupportive." The categories were collapsed to create a new variable reflecting supportive, neutral, or unsupportive classmates.[5] More than half (56%) reported that their classmates were supportive, 39% had classmates that were neither supportive nor unsupportive, and only 5% reported that their classmates were unsupportive (Table 8.2).

Table 8.2: Classmates' level of support of them as a transgender person

| Level of support | % of those who reported that all, most, or some of their classmates knew they were transgender |
|---|---|
| Very supportive | 21% |
| Supportive | 35% |
| Neither supportive nor unsupportive | 39% |
| Unsupportive | 4% |
| Very unsupportive | 1% |

*More than half (56%) of those who had at least some classmates who knew they were transgender reported that their classmates were supportive.*

# Conclusion

Results indicated that the majority of those who were out or perceived as transgender in K–12 had one or more negative experiences, and that such experiences were correlated with a variety of poor outcomes, such as higher rates of attempted suicide, homelessness, and serious psychological distress. Although negative experiences were reported at all age groups, results found that older individuals were less likely to have been out as transgender in K–12 than younger respondents, but when out, they were more likely to have experienced negative treatment in schools. This indicates that school environments have improved for transgender people over the years, though high rates of mistreatment were reported even among younger respondents.

Additionally, results indicated that those who attended college or another higher education institution were out or perceived as transgender at high rates. However, they also suggest that transgender students in such institutions are subject to harmful experiences that lead to negative outcomes, such as having to leave school to avoid being harassed because of being transgender.

EXPERIENCES AT SCHOOL

137

AR_217135

**ENDNOTES** | CHAPTER 8: EXPERIENCES AT SCHOOL

1   Kosciw, J. G., Greytak, E. A., Palmer, N. A., & Boesen, M. J. (2014). *The 2013 National School Climate Survey: The Experiences of Lesbian, Gay, Bisexual and Transgender Youth in Our Nation's Schools.* New York, NY: Gay, Lesbian & Straight Education Network; Kosciw, J. G., Palmer, N. A., Kull, R. M., & Greytak, E. A. (2013). The effect of negative school climate on academic outcomes for LGBT youth and the role of in-school supports. *Journal of School Violence, 12*(1), 45–63.

2   Rankin, S. & Beemyn, G. (2012). Beyond a binary: The lives of gender-nonconforming youth. *About Campus, 17*(4), 2–10; Rankin, S., Weber, G., Blumenfeld, W., & Frazer, S. (2010). *2010 State of Higher Education for LGBT People.* Charlotte, NC: Campus Pride.

3   "People with disabilities" here refers to respondents who identified as a person with a disability in Q. 2.20.

4   This data is derived from responses to Q. 26.4, where respondents were asked if they had "experienced unwanted sexual contact because people thought [they were] trans."

5   "Very supportive" and "supportive" categories were collapsed into a single "supportive" category. "Very unsupportive" and "unsupportive" categories were collapsed into a single "unsupportive" category. See Q. 4.12.

AR_217136



# CHAPTER 9

# Income and Employment Status

High rates of poverty, unemployment, and economic vulnerability among transgender people have been documented in prior research.[1] These disparities can lead to numerous negative outcomes in housing, health, and many other aspects of life. The survey explored respondents' employment status and income sources with questions that were patterned on the Current Population Survey (CPS), a survey used by the Bureau of Labor Statistics to assess economic indicators and the state of the labor force in the United States.[2,3] The questions were used to compare the income and employment experiences of the USTS sample with those in the U.S. population.[4] Notable differences in respondents' experiences based on demographic and other characteristics are reported throughout the chapter.

AR_217137

▶ The unemployment rate among respondents was 15%, three times higher than the U.S. unemployment rate at the time of the survey (5%).

▶ Nearly one-third (29%) of respondents were living in poverty, more than twice the rate in the U.S. adult population (12%).

▶ One in eight (12%) respondents reported an annual household income between $1 and $9,999, three times higher than the U.S. adult population in this income bracket (4%).

# I. Employment Status

Respondents were asked a series of questions about their current employment status. More than one-third (35%) currently had a full-time job, 15% had at least one part-time job, 15% were self-employed, and 11% were students (Table 9.1). Nine percent (9%) of those who were employed were working more than one full-time or part-time job, which represents 4% of the whole sample.

Two percent (2%) of respondents were currently employed doing sex work, selling drugs, or doing other work in the underground economy for income. Of these, 60% indicated that they were currently looking for work that is not criminalized.[5]

Of those who were working either full time or part time for an employer, 13% were members of a labor union or an employee association similar to a union (representing 6% of the full sample), while another 2% of those who were working for an employer were not union members but were covered by a union or employee association contract. This compares to 12% of wage and salary workers in the U.S. population who were members of a union or were not union members but were covered by a union or employee association contract.[6]

Table 9.1: Current employment status

| Employment status | % of respondents (supplemental weight) |
|---|---|
| Work full time for an employer | 35% |
| Work part time for an employer | 15% |
| Self-employed in own business, profession or trade, or operate a farm (not including underground economy) | 15% |
| Retired | 14% |
| Not employed due to disability | 13% |
| Student | 11% |
| Unemployed but looking for work | 11% |
| Unemployed and have stopped looking for work | 5% |
| Homemaker or full-time parent | 3% |
| Work for pay from sex work, selling drugs, or other work currently criminalized | 2% |
| Not listed above | 4% |

The national unemployment rate, as reported by the Bureau of Labor Statistics, is calculated out of only those who are currently "in the labor force." This includes people who are employed and those who are unemployed but looking for work. It does not include those who are unemployed but not looking for work, since they are considered to be out of the labor force. For the purposes of comparison, the unemployment rate for USTS respondents reported here was calculated in the same manner. The unemployment rate for

*The unemployment rate for USTS respondents was 15%, three times the unemployment rate in the U.S. population.*

USTS respondents was 15%, three times the U.S. unemployment rate at the time of the survey (5%).[7] Nearly one-half (49%) of undocumented residents were unemployed. The unemployment rate was also higher among people with disabilities[8] (24%) and people of color, with Middle Eastern (35%), American Indian (23%), multiracial (22%), Latino/a (21%), and Black (20%) respondents being more likely to be unemployed. Unemployment rates among Asian, multiracial, Latino/a, and Black USTS respondents were between two and three times higher than Asian, Latino/a, multiracial, and Black people in the U.S. population (Figure 9.1).[9]

**Figure 9.1: Unemployment rate**
RACE/ETHNICITY (%)



■ % in USTS (supplemental survey weight applied)
□ % in U.S. population (ACS)

*U.S. population data for Middle Eastern people alone is not available. See note 10.*

# II. Sources of Income and Assistance

Respondents were asked about their income sources, and they reported a wide range of sources. In order to compare the USTS sample to the U.S. population in the CPS, the USTS data presented in Table 9.2 is limited to respondents ages 25 and older only. Compared to findings from the CPS, respondents' sources of income differed from the U.S. population in several categories. For instance, 57% of USTS respondents aged 25 and older had income from their own and/or their spouse's employment, compared to 67% of adults aged 25 and older in the U.S. population (Table 9.2).

**Table 9.2: Current sources of income (ages 25 and older only)**

| Income source | % in USTS (supplemental weight) | % in U.S. adult population (CPS) |
|---|---|---|
| Pay from respondent's and/or partner's full-time or part-time job | 57% | 67% |
| Self-employment income from own business, profession or trade, or farm (not including underground economy) | 18% | 7% |
| Social Security retirement, railroad retirement income, or Social Security disability benefits (SSDI) | 25% | 25% |
| Private pension, government employee pension, or other retirement income | 13% | 13% |
| Income from dividends, estates or trusts, royalties, rental income, savings, or bonds | 12% | 61% |
| Supplemental Security Income (SSI) | 7% | 3% |
| Regular contributions from people not living in household | 4% | 1% |
| Veterans disability benefits and other veterans benefits | 4% | 2% |
| Pay from sex work, selling drugs, or other work currently criminalized | 3% | -- |
| Cash assistance from welfare (such as TANF) or other public cash assistance program (not including SNAP or WIC) | 2% | 1% |
| Unemployment benefits | 2% | 2% |
| Child support or alimony | 1% | 2% |
| Workers' compensation or other disability | 1% | 1% |
| Income not listed above | 9% | -- |

Responses were examined to determine whether respondents had one source of income or multiple sources. Nearly one-half (45%) of all respondents reported having multiple sources of income. Thirty-seven percent (37%) reported that their sole source of income was from their own employment or their partner's employment. Nearly one in ten (9%) reported that their sole source of income was Supplemental Security Income (SSI) or disability, 1% received their only income from unemployment benefits or cash assistance programs, and 1% reported that their sole source of income was from underground economy work, including sex work, drug sales, or other work that is currently criminalized (Table 9.3).

**Table 9.3: Current sources of income by single and multiple sources**

| Income source | % of respondents (supplemental weight) |
|---|---|
| Employment only (from their own employment, partner/spouse's employment, or self-employment) | 37% |
| SSI/disability only | 9% |
| Pension/retirement only | 3% |
| Other sources only | 3% |
| Pay from sex work, selling drugs, or other work that is currently criminalized only | 1% |
| Unemployment benefits/cash assistance only | 1% |
| Multiple sources | 45% |

Fifteen percent (15%) of respondents reported receiving assistance through food stamps (SNAP)[11] and/or WIC.[12] Forty-one percent (41%) of respondents living with HIV received SNAP and/or WIC assistance. People with disabilities (29%), and Black (23%), American Indian (19%), and Latino/a (18%) respondents were also more likely to receive SNAP and/or WIC assistance (Figure 9.2).



**Figure 9.2: Currently receive SNAP or WIC assistance RACE/ETHNICITY (%)**

# III. Individual and Household Income and Poverty

Respondents also received questions about their individual[13] and household[14] incomes from the year 2014, which was the last full year prior to the survey for which they could provide annual income figures. They reported lower incomes overall than the U.S. population as a whole, as well as higher poverty rates. Most of the analysis and reporting in this chapter focuses on household income.

## a. Individual Income

When asked about their *individual* income, 8% of respondents reported that they had no individual income, compared to 10% in the U.S. adult population.[15,16] Nearly one-quarter (22%) of respondents reported that they had an income between $1 and $9,999 per year, compared to 15% in the U.S. adult population (Figure 9.3).[17]

*One in eight (12%) respondents reported that they had a household income between $1 and $9,999 per year, three times the rate in the U.S. population (4%).*

AR_217140

*Nearly one-third (29%) of respondents were living in poverty, more than twice the rate in the U.S. population (12%).*

# In Our Own Voices

**Figure 9.3: Individual income in 2014**



■ % in USTS (supplemental weight)
□ % in U.S. adult population (CPS)

## b. Household Income

Turning to household income, 4% of respondents reported that they had no *household* income, which was four times higher than the rate of those with no income in the U.S. adult population (12%).[18] Additionally, one in eight (12%) respondents reported earning an annual household income between $1 and $9,999, which was three times as many when compared to the U.S. adult population (4%) (Figure 9.4).[19] Respondents were nearly twice as likely to have a household income of only $10,000 to $24,999 (22%) as those in the U.S. adult population (12%). Furthermore, respondents were less likely to have household incomes of $50,000 to $100,000 (23%) than those in the U.S. adult population (31%).

"The day I came out as transgender at work, I was let go. Since transitioning, employment has been difficult, with a 95% reduction in earnings."

.............................................................

"I quit after seven months of unbearable working conditions. I have been struggling to keep afloat financially. I'm afraid of going to apply for unemployment or SNAP benefits because I know that I will be discriminated against. I'm on the brink of being homeless and my own family hasn't even reached out to help me."

.............................................................

"I have had to live my life with no safety net or resources, and it's hard. I'm constantly battling homelessness, I rarely get hired because I'm mixed and visibly queer, and I end up having to rely on government assistance and friends with available couches."

.............................................................

"In the nearly seven years since I transitioned, I have been unemployed, surviving off the charity of friends and family, and government assistance when I could get it. I have over 20 years of experience in my field, yet I cannot even land a part-time retail position."

.............................................................

INCOME AND EMPLOYMENT STATUS

AR_217141



Figure 9.4: Household income in 2014

- % in USTS (supplemental weight)
- % in U.S. adult population (CPS)



Figure 9.5: Household income from $1 to $9,999
RACE/ETHNICITY (%)

More than half (53%) of respondents whose sole source of income was from the underground economy had a household income between $1 and $9,999 per year, more than four times the rate in the overall sample. Nearly one-third (31%) of those who were currently working in the underground economy and also had additional sources of income reported this low household income, nearly three times the rate of the overall sample. People with disabilities (21%) were nearly twice as likely as the overall sample, and those living with HIV (19%) and people of color, including Black (19%), Latino/a (18%), and American Indian (16%) respondents, were also more likely to have a household income between $1 and $9,999 (Figure 9.5).

## c. Poverty

Nearly one-third (29%) of respondents were living in poverty,[20] more than twice the rate of people living in poverty in the U.S. adult population at the time of the survey (12%).[21]

More than two-thirds (69%) of undocumented residents and nearly two-thirds (62%) of those currently working in the underground economy were living in poverty. Respondents living with HIV (51%) and people with disabilities (45%) were also more likely to be living in poverty. Among people of color, Latino/a (43%), American Indian (41%), multiracial (40%), and Black (38%) respondents were most likely to be living in poverty (Figure 9.6).

AR_217142

**Figure 9.6: Living in poverty**
RACE/ETHNICITY (%)



# Conclusion

The results indicate that respondents faced higher levels of unemployment and poverty compared to the U.S. adult population. They were three times more likely than the U.S. adult population to be unemployed, more than twice as likely to be living in poverty, and more than three times as likely to have an annual household income below $10,000. People of color, undocumented residents, people with disabilities, and respondents living with HIV were more likely to report being unemployed, living in poverty, and having low incomes, which indicate that these respondents have experienced substantial economic instability.

---

**ENDNOTES** | CHAPTER 9: INCOME AND EMPLOYMENT STATUS

1   Grant, J. M., Mottet, L. A., Tanis, J., Harrison, J., Herman, J. L., & Keisling, M. (2011). *Injustice at Every Turn: A Report of the National Transgender Discrimination Survey*. (p. 22). DC: National Center for Transgender Equality & National Gay and Lesbian Task Force; Center for American Progress & Movement Advancement Project. (2015). *Paying an Unfair Price: The Financial Penalty for Being Transgender in America*. Available at: http://www.lgbtmap. org/file/paying-an-unfair-price-transgender.pdf.

2   U.S Census Bureau & Bureau of Labor Statistics. (2015). *Current Population Survey (CPS)*.

3   This chapter provides an overview of respondents' income and employment status. Experiences in specific fields of work are discussed further in the *Sex Work and Other Underground Economy Work* and *Military Service* chapters. Experiences in employment settings, such being fired or harassed in the workplace, are discussed in more detail in the *Employment and the Workplace* chapter.

4   Throughout this chapter, findings regarding respondents' income and employment have been weighted with a supplemental survey weight to reflect the age and educational attainment of the U.S. population in addition to the standard survey weight. The USTS sample differs substantially from the U.S. population in regard to age and educational attainment. Therefore, this additional weight is applied to all percentages reported in this chapter in

order to provide a more accurate comparison to the U.S. general population. See the *Methodology* and *Portrait of USTS Respondents* chapters for more information about the supplemental survey weight.

5   Experiences of respondents with sex work and other underground economy work are discussed further in the *Sex Work and Other Underground Economy Work* chapter.

6   Bureau of Labor Statistics. (2016). *Union Affiliation of Employed Wage and Salary Workers by Selected Characteristics, 2014–2015 Annual Averages*. Available at: http://www.bls.gov/news.release/union2.t01.htm#union_ a01.f.1. The percentage of people in the U.S. who are members of a union or covered by a union or employee association contract includes those in the U.S. population who are 16 years of age and older, in contrast to the USTS sample, which includes respondents who are 18 and older. Therefore, the comparison to the USTS sample should be interpreted with caution.

7   Bureau of Labor Statistics. (2015). *The Employment Situation—August 2015*. Available at: http://www.bls.gov/ news.release/archives/empsit_09042015.pdf; Bureau of Labor Statistics. (2015). *The Employment Situation— September 2015*. Available at: http://www.bls.gov/news. release/archives/empsit_10022015.pdf. The national unemployment rate for August and September 2015, as published by the Bureau of Labor Statistics, includes those

INCOME AND EMPLOYMENT STATUS

AR_217143

in the U.S. population who are 16 years of age and older. The USTS sample includes respondents who are 18 and older. Therefore, the comparison between the national unemployment rate and the USTS unemployment rate sample should be interpreted with caution.

8    "People with disabilities" here refers to respondents who identified as a person with a disability in Q. 2.20.

9    The unemployment rate by race and ethnicity among adults in the U.S. population was calculated by the research team using CPS data available via the CPS Table Creator (http://www.census.gov/cps/data/cpstablecreator.html). CPS Table Creator data utilizes data from the March 2015 Current Population Survey Annual Social and Economic Supplement, in which the overall U.S. unemployment rate was 5.5%. This March 2015 national unemployment rate was higher than the national rate at the time of the survey (5.1% in August and September 2015), as outlined in this report (see the unemployment rate time series table available through the Bureau of Labor Statistics, available at http://data.bls.gov/timeseries/LNS14000000). Given the higher national unemployment rate in March 2015, the comparison of the national unemployment rate by race and ethnicity to the unemployment rate for USTS respondents by race and ethnicity as reported here likely reflects smaller differences in the unemployment rate than would have existed at the time of the survey. Therefore, these comparisons should be interpreted accordingly.

10   CPS data combines people of Middle Eastern descent and white people in a single "white/Caucasian" category, therefore Middle Eastern respondents in the U.S. population are included in the CPS percentage for this category.

11   See Q. 7.10. Respondents received the following definition for SNAP: "The Supplemental Nutrition Assistance Program (SNAP) is sometimes called the Food Stamp program. It helps people who have low or no income to buy food, usually with an EBT card." SNAP benefits are not considered income.

12   See Q. 7.10. Respondents received the following definition for WIC: "'WIC' stands for 'Women, Infants, and Children.' It's the short name for the Special Supplemental Nutrition Program for Women, Infants, and Children. WIC is a federal program to help women who are pregnant or breastfeeding and children less than five years old get health care and healthy food." WIC benefits are not considered income.

13   See Q. 7.12. Respondents received the following note describing individual income: "'Individual income' includes money from jobs, employment, net income from business, income from farms or rentals, income from self-employment, pensions, dividends, interest, social security payments, and other money income that you personally received in 2014. Do not include assistance from food stamps (SNAP) or WIC as income."

14   See Q. 7.14. Respondents received the following note describing household income: "'Household income' includes you and all members of your household who have lived with you during the past 12 months and includes money from jobs, employment, net income from business, income from farms or rentals, income from self-employment, pensions, dividends, interest, social security payments, and any other money income received by you and members of your household who are 15 years of age or older in 2014. Do not include assistance from food stamps (SNAP) or WIC as income."

15   Current Population Survey (CPS). See note 2.

16   Those who report having "no income" in the USTS and CPS are a group with characteristics that are distinct from low-income earners, such as those who earn an income between $1 and $9,999. For example, they are more likely to be out of the labor force. Therefore, when differences in experiences by income level are highlighted in this report, the experiences of those who report no household income are generally presented separately from those of low-income earners.

17   Current Population Survey (CPS). See note 2.

18   Current Population Survey (CPS). See note 2.

19   Current Population Survey (CPS). See note 2.

20   The research team calculated the USTS poverty measure using the official poverty measure, as defined by the U.S. Census Bureau, which can be found at: https://www.census.gov/hhes/www/poverty/about/overview/measure.html. The income ranges in the USTS allowed for designation of respondents as in or near poverty if their total family income fell below 125% of the official poverty measure for purposes of comparison to the U.S. adult population. Respondents who are "living in poverty" represent those who are living at or near the poverty line.

21   Proctor, B. D., Semega, J. L., & Kollar, M. A. (2016). Income and Poverty in the United States: 2015. (p. 13). DC: U.S. Census Bureau. Available at: https://www.census.gov/content/dam/Census/library/publications/2016/demo/p60-256.pdf. Calculations were completed by the research team.

AR_217144

# CHAPTER 10

# Employment and the Workplace

Access to employment is critical to people's ability to support themselves and their families. Prior research has shown that transgender people face pervasive mistreatment, harassment, and discrimination in the workplace and during the hiring process.[1] In addition to being fired, forced out of their jobs, or not hired for jobs because of their gender identity or expression, transgender people are also often subject to additional forms of mistreatment at work, such as being verbally harassed, being forced to present as the wrong gender in order to keep their jobs, or being physically attacked at work.[2]

Respondents were asked about being out in the workplace and the level of support they received from coworkers. They were also asked how they were treated in the workplace as a transgender person, including whether they had been fired, denied a promotion, or not hired because of being transgender, whether they had been harassed or faced other forms of mistreatment, and whether they had to take actions to avoid mistreatment, such as quitting their job or delaying their transition. Throughout the chapter, notable differences in respondents' experiences based on demographic and other characteristics are reported.

EMPLOYMENT AND THE WORKPLACE

147

KEY FINDINGS

▶ Sixteen percent (16%) of respondents who have ever been employed reported losing at least one job because of their gender identity or expression.

▶ Thirty percent (30%) of respondents who had a job in the past year reported being fired, denied a promotion, or experiencing some other form of mistreatment in the workplace related to their gender identity or expression, such as being harassed or attacked.

▶ In the past year, 27% of those who held or applied for a job reported being fired, denied a promotion, or not hired for a job they applied for because of their gender identity or expression.

▶ Fifteen percent (15%) of respondents who had a job in the past year were verbally harassed, physically attacked, and/or sexually assaulted at work because of their gender identity or expression.

▶ Nearly one-quarter (23%) of those who had a job in the past year reported other forms of mistreatment based on their gender identity or expression during that year, such as being told by their employer to present as the wrong gender in order to keep their job or having employers or coworkers share private information about their transgender status with others without permission.

▶ More than three-quarters (77%) of respondents who had a job in the past year took steps to avoid mistreatment in the workplace, such as hiding or delaying their gender transition or quitting their job.

# I. Outness and Support in the Workplace

Respondents were asked whether their current bosses or supervisors and their current coworkers knew they were transgender. Of respondents who currently had bosses or supervisors, 35% said that all of their current bosses or supervisors knew they were transgender, 6% reported that most knew, and 10% indicated that some knew that they were transgender. Nearly half (49%) reported that none of their bosses or supervisors knew that they were transgender. Of respondents who currently had coworkers, less than one-quarter (23%) reported that all of their coworkers knew they were transgender, 11% reported that most of their coworkers knew, and 24% said that some of their coworkers knew they were transgender. Forty-two percent (42%) indicated that none of their coworkers knew that they were transgender.

Respondents who currently had coworkers and reported that all, most, or some of their coworkers knew that they were transgender were asked how supportive their coworkers generally were of them as a transgender person.[3] Responses were provided on a five-point scale from "very

AR_217146

supportive" to "very unsupportive." More than two-thirds (68%) of these respondents reported that their coworkers were supportive, 29% had coworkers who were neither supportive nor unsupportive, and only 3% had unsupportive coworkers (Figure 10.1).

**Figure 10.1: Level of support**



## II. Loss of Employment During Lifetime

Eighty-one percent (81%) of respondents had worked at a job or business at some point in their lifetime.[4] Those respondents were asked whether they had ever experienced a loss of employment, including losing a job, being laid off, being fired, or being forced to resign, and the reasons they believed this happened.

Overall, more than half (53%) of respondents who had ever held a job experienced a loss of employment for any reason. Respondents who were living with HIV (78%) and those who have done sex work (73%) were more likely to have lost a job at some point in their lifetime. American

Indian (66%) and Black (60%) respondents (Figure 10.2), transgender women (66%), and people with disabilities[5] (59%) were also more likely to have ever lost a job.

**Figure 10.2: Ever lost job for any reason**
RACE/ETHNICITY (%)



Respondents who had lost a job at some point in their lifetime were asked what they believed the reasons were for that treatment, and they selected one or more reasons from a list, such as age, race or ethnicity, and gender identity or expression (Table 10.1).

**Table 10.1: Reported reasons for losing a job**

| Reason for losing job | % of those who have ever lost job | % of those who have been employed |
|---|---|---|
| Age | 7% | 4% |
| Disability | 13% | 7% |
| Income level or education | 5% | 2% |
| Gender identity or expression | 30% | 16% |
| Race or ethnicity | 5% | 3% |
| Religion or spirituality | 2% | 1% |
| Sexual orientation | 13% | 7% |
| None of the above | 61% | 32% |

One in six (16%) respondents who have been employed reported that they had lost a job because of their gender identity or expression.[6] This represents 13% of the overall sample.

AR_217147

American Indian (21%), multiracial (18%), and Black (17%) respondents were more likely than the overall sample to have lost a job because of their gender identity or expression (Figure 10.3). More than one-quarter of respondents who have done sex work (27%) and respondents living with HIV (26%) have lost a job because of being transgender. Transgender women (18%) were more likely than transgender men (14%) and non-binary people (7%) to have lost a job because of their gender identity or expression (Figure 10.4).

**Figure 10.3: Ever lost job because of being transgender RACE/ETHNICITY (%)**



**Figure 10.4: Ever lost job because of being transgender GENDER IDENTITY (%)**



# III. Firing, Hiring, and Promotions in the Past Year

Seventy percent (70%) of respondents had held and/or applied for a job in the past year. Those respondents were asked if they had negative experiences related to firing, hiring, and promotions in the past year.

Overall, approximately two-thirds (67%) of respondents who held or applied for a job in the past year reported that they were fired or forced to resign from a job, not hired for a job that they applied for, and/or denied a promotion (Table 10.2). Respondents currently working in the underground economy, such as sex work, drug sales, or other work that is currently criminalized (78%), and people with disabilities (75%) were more likely to have had one or more of these experiences in the past year. Black (75%) and Middle Eastern (74%) respondents were also more likely to have had one or more of these experiences in the past year, in contrast to white (63%) and American Indian (64%) respondents (Figure 10.5).

**Table 10.2: Fired, not hired, or denied a promotion for any reason in the past year**

| Occurrence in the past year | % of those who held or applied for job |
|---|---|
| Not hired for a job they applied for | 61% |
| Denied a promotion | 13% |
| Fired or forced to resign | 12% |
| **One or more experiences listed** | **67%** |

*More than one-quarter (27%) of those who held or applied for a job in the past year reported not being hired, being denied a promotion, or being fired during that year because of their gender identity or expression.*

AR_217148

Figure 10.5: Fired, not hired, or denied a promotion for any reason in the past year
RACE/ETHNICITY (%)



# In Our Own Voices

Respondents who reported these experiences were asked what they believed the reasons were for that treatment. Forty-one percent (41%) of respondents who were fired or forced to resign from a job, not hired for a job that they applied for, or were denied a promotion believed that it was due to their gender identity or expression (Table 10.3). This means that 27% of all of those who held or applied for a job in the past year (or 19% of the overall sample) reported not being hired for a job they applied for, being denied a promotion, or being fired from a job in the past year because of their gender identity or expression.

Table 10.3: Reported reasons for not being hired, being denied a promotion, or being fired in the past year

| Reported reasons for negative experience in the past year | Reasons for not being hired (% of those not hired) | Reasons for being denied promotion (% of those denied promotion) | Reasons for being fired (% of those fired) |
|---|---|---|---|
| Age | 21% | 16% | 6% |
| Disability | 7% | 9% | 15% |
| Income level or education | 21% | 13% | 6% |
| Gender identity or expression | 39% | 49% | 43% |
| Race or ethnicity | 11% | 14% | 10% |
| Religion or spirituality | 1% | 3% | 2% |
| Sexual orientation | 10% | 16% | 14% |
| None of the above | 41% | 33% | 40% |

"Coworkers would gossip about me as news about my trans status spread through the workplace. I was treated significantly differently once people heard about me being trans. Coworkers felt they had the right to disrespect me because the owners set the tone. I became a spectacle in my own workplace."

..........................................................

"The day before I started work, HR sent a mass email to everyone in the office 'warning' them about my trans status. I used the women's bathroom since starting, but a month in to the job, I was called to my manager's office and told that I could not use the women's bathroom. I did not feel safe in the men's bathroom, so I told the HR manager that due to city law, I could not be denied access to the bathroom matching my gender identity. I was fired the next day for no given reason."

..........................................................

"I changed jobs from a high-paying one where I was not comfortable being out as a trans person to a much lower-paying one where I felt that my identity would be respected. Having a job where my gender identity is respected consistently, where I don't have to constantly fight for myself or hide myself, has improved my quality of life more than any other aspect of my transition."

..........................................................

EMPLOYMENT AND THE WORKPLACE

# IV. Responses to Firing Due to Transgender Status

Respondents who reported that they had been fired in the past year because of their gender identity or expression were asked how they responded. While more than two-thirds (69%) of these respondents did not take any formal action in response, 14% filed an official complaint (Table 10.4). Respondents who filed a complaint were asked where they filed it. More than half (53%) reported that they filed a complaint with their employer's human resources or personnel department. One-third (33%) of respondents who filed complaints did so with the federal Equal Employment Opportunity Commission (EEOC), the agency that enforces federal employment nondiscrimination laws (Table 10.5).

**Table 10.4: Response to being fired in the past year because of their gender identity or expression**

| Response to being fired | % of those fired because of their gender identity or expression |
|---|---|
| They did nothing | 69% |
| They contacted a lawyer (see Table 10.6) | 15% |
| They made an official complaint (see Table 10.5) | 14% |
| They contacted a transgender, LGBT, or other group | 10% |
| They contacted their union representative | 2% |
| Not listed above | 7% |

**Table 10.5: Location where respondent made an official complaint**

| Place complaint was filed | % of those who filed an official complaint |
|---|---|
| Employer's human resources or personnel department | 53% |
| Equal Employment Opportunity Commission (EEOC) | 33% |
| Employer's Equal Employment Opportunity (EEO) office | 18% |
| Local or state human rights commission | 17% |
| Supervisor or manager | 9% |
| Not listed above | 26% |

Fifteen percent (15%) of those who were fired in the past year because of their gender identity or expression responded by contacting a lawyer. These respondents were asked what happened after they contacted the lawyer. Nearly one-third (29%) reported that they were not able to hire the lawyer. Other respondents reported that the lawyer filed a lawsuit (21%), helped them file an official complaint (14%), called or wrote a letter to their employer (10%), or advised them not to take any action (10%) (Table 10.6).

**Table 10.6: Assistance provided to those who contacted a lawyer**

| Outcome of contacting lawyer | % of those who contacted a lawyer |
|---|---|
| They were not able to hire the lawyer | 29% |
| Lawyer filed a lawsuit | 21% |
| Lawyer helped them to file an official complaint | 14% |
| Lawyer called or wrote a letter to employer | 10% |
| Lawyer advised them to take no action (write-in response) | 10% |
| Lawyer did nothing or did not follow up (write-in response) | 7% |
| Not listed above | 9% |

AR_217150

# V. Other Forms of Mistreatment in the Past Year

Respondents who held a job in the past year were asked a series of questions about other forms of mistreatment in the workplace that happened because they were transgender.

## a. Verbal Harassment, Physical Attack, and Sexual Assault

In the past year, 15% of respondents who had held a job during that year were verbally harassed, physically attacked, and/or sexually assaulted at work because of their transgender status.[7] Respondents currently working in the underground economy (34%), American Indian respondents (28%), and Middle Eastern respondents (26%) were more likely to report one or more of those experiences in the past year (Figure 10.6).

**Figure 10.6: Verbally harassed, physically attacked, or sexually assaulted at work in the past year**
**RACE/ETHNICITY (%)**



Fourteen percent (14%) of those who held a job in the past year were verbally harassed at work because they were transgender. Respondents who said that others can always or usually tell that they are transgender (23%) were more likely

to be verbally harassed at work in the past year, compared with those who said that others can sometimes (19%) and rarely or never (10%) tell they are transgender.

One percent (1%) of respondents were physically attacked at work in the past year because they were transgender, with higher numbers among respondents who were currently working in the underground economy (4%).

One percent (1%) reported that they were sexually assaulted at work in the past year because they were transgender. Asian (4%) and American Indian (2%) respondents and transgender women (2%) were more likely report this experience.

## b. Other Mistreatment in the Past Year

Respondents were asked if their employer, boss, or coworkers took other negative actions in the past year because of their transgender status, such as telling them to present as the wrong gender in order to keep their jobs, removing them from direct contact with clients, or sharing private information.

Nearly one-quarter (23%) of respondents who held a job in the past year reported that they experienced one or more of those actions in the past year because of their transgender status. One in six (16%) said that, because they were transgender, a boss or coworker shared personal information about them that should not have been shared. Six percent (6%) said that their boss gave them a negative review because they were transgender, 4% were told to present in the wrong gender in order to keep their job, and 4% said that they were not allowed to use the restroom consistent with their gender identity (Table 10.7).

**Table 10.7: Mistreatment at work due to being transgender in the past year**

| Mistreatment at work due to being transgender in the past year | % of those who had a job |
|---|---|
| Employer/boss or coworkers shared information about them they should not have | 16% |
| Employer/boss gave them a negative job review | 6% |
| Employer/boss forced them to resign | 4% |
| Employer/boss did not allow them to use the restroom they should be using based on their gender identity | 4% |
| Employer/boss told them to present in the wrong gender to keep their job | 4% |
| Employer/boss removed them from direct contact with clients, customers, or patients | 3% |
| Employer/boss could not work out an acceptable restroom situation with them | 3% |
| Employer/boss forced them to transfer to a different position or department at their job | 2% |
| **One or more experiences listed** | **23%** |

**Table 10.8: Actions taken to avoid anti-transgender discrimination at work in the past year**

| Actions taken to avoid anti-transgender discrimination at work in the past year | % of those who had a job |
|---|---|
| They had to hide their gender identity | 53% |
| They did not ask employer to use pronouns they prefer (such as he, she, or they) | 47% |
| They delayed their gender transition | 26% |
| They stayed in a job they would have preferred to leave | 26% |
| They hid the fact that they had already transitioned gender | 25% |
| They kept a job for which they were overqualified | 24% |
| They quit their job | 15% |
| They did not seek promotion or raise | 13% |
| They requested transfer to a different position or department | 6% |
| **One or more experiences listed** | **77%** |

## c. Efforts to Avoid Discrimination

Respondents who held a job in the past year were also asked a series of questions about actions they took in order to avoid discrimination at work in the past year, including hiding their gender identity, delaying their transition, and quitting their job. More than three-quarters (77%) took one or more actions to avoid discrimination (Table 10.8).

*More than three-quarters (77%) of respondents who had a job in the past year hid their gender identity at work, quit their job, or took other actions to avoid discrimination.*

Respondents who were living in poverty[8] (82%), non-binary respondents (81%), and people with disabilities (81%) were more likely to take one or more of these steps to avoid discrimination.

More than half (53%) reported having to hide their gender identity at work.[9] Nearly half (47%) said they did not ask their employer to refer to them with correct pronouns (such as he, she, or they) out of fear of discrimination. Non-binary respondents (66%) were nearly twice as likely to avoid asking to be referred to by their correct pronouns compared to transgender men and women (34%).

More than one-quarter (26%) said that they stayed at a job that they would have preferred to leave for fear of encountering discrimination elsewhere. American Indian (40%), Black (31%), and Latino/a (28%) respondents and respondents with disabilities (30%) were more likely to stay at a job that they would have preferred to leave in order to avoid discrimination.

AR_217152

One-quarter (25%) of respondents reported that they hid the fact that they had already transitioned. In the past year, more than one-third (36%) of transgender men hid their past gender transition in the workplace in order to avoid discrimination (Figure 10.7).

**Figure 10.7: Hid past transition to avoid discrimination in the past year**
GENDER IDENTITY (%)



Fifteen percent (15%) of respondents who held a job in the past year reported that they quit their job in order to avoid workplace discrimination. Those currently working in the underground economy (28%), American Indian respondents (23%), Black respondents (19%), and people with disabilities (21%) were more likely to quit their job to avoid discrimination (Figure 10.8).

**Figure 10.8: Quit job to avoid discrimination in the past year**
RACE/ETHNICITY (%)



# VI. Overall Negative Experiences in the Workplace

Overall, 30% of all respondents who held a job in the past year experienced some form of workplace discrimination during that year, including being fired or being denied a promotion because of their gender identity or expression, being harassed or assaulted at work, or experiencing one or more of the other forms of mistreatment discussed in section V of this chapter.[12] This represents 16% of all respondents. Further, 80% of respondents who held a job in the past year reported either experiencing some form of discrimination and/or taking steps to avoid discrimination at work, representing 41% of all respondents.

## Conclusion

Respondents reported high levels of workplace discrimination based on their gender identity or expression, including losing employment opportunities, being harassed, being assaulted, and facing other forms of mistreatment because of being transgender. Many reported losing their job due to anti-transgender bias, with the experience being more likely to occur among people of color, people with underground economy experience, and people with disabilities. Many respondents who applied for or held a job in the past year reported that they were fired, denied a promotion, or not hired for a job they applied for because of their gender identity or expression. Respondents also faced substantial levels of harassment and mistreatment on the job because of their gender identity or expression, including verbal harassment, physical and sexual assault, and breaches of confidentiality. A large number of respondents felt they had to take actions to avoid discrimination, such as quitting a job or hiding their transition, despite the potential impact on their wellbeing or financial stability.

**ENDNOTES** | CHAPTER 10: EMPLOYMENT AND THE WORKPLACE

1    Grant, J. M., Mottet, L. A., Tanis, J., Harrison, J., Herman, J. L., & Keisling, M. (2011). *Injustice at Every Turn: A Report of the National Transgender Discrimination Survey.* (pp. 50–71). DC: National Center for Transgender Equality & National Gay and Lesbian Task Force; Sears, B. & Mallory, C. (2011). *Documented Evidence of Employment Discrimination & Its Effect on LGBT People.* Los Angeles, CA: Williams Institute. Available at: http://williamsinstitute. law.ucla.edu/wp-content/uploads/Sears-Mallory-Discrimination-July-20111.pdf; Rainey, T. & Imse, E. E. (2015). *Qualified and Transgender: A Report on Results of Resume Testing for Employment Discrimination Based on Gender Identity.* DC: DC Office of Human Rights. Available at: http://ohr.dc.gov/sites/default/files/dc/sites/ ohr/publication/attachments/QualifiedAndTransgender_ FullReport_1.pdf.

2    Grant, et al.; Sears, et al.

3    Respondents were not asked about the level of support from their current boss or supervisor.

4    Q. 21.1 and other questions in this chapter asked only about jobs doing legal work and excluded underground economy work, such as sex work, drug sales, and other work that is currently illegal.

5    "People with disabilities" here refers to respondents who identified as a person with a disability in Q. 2.20.

6    The survey included both "transgender status/gender identity" and "gender expression/appearance" as answer choices so that respondents could select what they felt best represented their experience. Because there was a substantial overlap of respondents who selected both reasons, and because these terms are commonly used interchangeably or with very similar meanings, responses of those who selected one or both of these reasons are collapsed for reporting as "gender identity or expression."

7    Respondents were asked whether they had "experienced unwanted sexual contact (such as fondling, sexual assault, or rape)" at work because they were transgender in Q. 22.3.

8    Respondents who are "living in poverty" represent those who are living at or near the poverty line. See the *Income and Employment* chapter for more information about the poverty line calculation.

9    Respondents were asked if they "had to be in the closet about [their] gender identity in the past year" in order to avoid discrimination.

10   This figure does not include the experience of not being hired for a job in the past year, since this figure represents adverse actions in the workplace experienced by those who had a job only. It also does not include experiences of those who applied for a job but did not work a job in the past year.

AR_217154



## CHAPTER 11

# Sex Work and Other Underground Economy Work

**M**any people participate in sex work, drug sales, and other activities that are currently criminalized ("underground economy") to earn an income, or in exchange for food, a place to sleep, or other goods or services. The commercial sex trade exists in a variety of forms, including street-based sex work, pornography, and escort services.[1] Participation in the sex trade is often higher among those who have faced family rejection, poverty, or unequal opportunities in employment, housing, and education.[2] Previous studies have documented higher levels of participation in sex work among transgender people, and in particular people of color and those facing homelessness or poverty.[3] They have also found high rates of negative mental and physical health outcomes, police abuse, and experiences of violence among transgender people who have done sex work.[4]

Respondents were asked a series of questions about their participation in sex work and other underground economy work, and their interactions with law enforcement officers when they were doing sex work or when police thought that they were doing sex work. Notable differences in respondents' experiences based on demographic and other characteristics are reported throughout the chapter.

SEX WORK AND OTHER UNDERGROUND ECONOMY WORK

AR_217155

**KEY FINDINGS**

▶ One in five (20%) respondents have participated in the underground economy for income at some point in their lives, including in sex work, drug sales, and other currently criminalized work, and 9% did so in the past year.

▶ One in eight (12%) respondents have participated in sex work for income. Six percent (6%) have engaged in sexual activity for food, and 8% have done so for a place to sleep. Overall, nearly one in five (19%) respondents reported doing some type of sex work, such as for money, food, or a place to sleep.

▶ Three percent (3%) of all respondents have interacted with the police either while they were doing sex work or while police thought that they were doing sex work.

   • Of those who interacted with the police while doing or thought to be doing sex work, 86% reported some form of police harassment, abuse, or mistreatment, including being verbally harassed, physically attacked, or sexually assaulted by police.

   • Of those who interacted with the police while doing or thought to be doing sex work, 32% said that at least one of those interactions led to an arrest. Nearly half (44%) of respondents who were arrested said that police used condoms in their possession as evidence of sex work.

▶ One in eight (12%) respondents have earned income by selling drugs (11%) or by doing other work that is currently criminalized (2%), other than sex work.

# I. Overall Underground Economy Participation

Respondents were asked about their participation in sex work, drug sales, and other forms of work in areas that are currently criminalized, referred to throughout this report as underground economy work.

Overall, one in five (20%) respondents had participated in the underground economy for income at some point in their lives. Undocumented residents (38%) and respondents who have lost a job because of their gender identity or expression (37%) were more likely to have participated in the underground economy. Transgender women of color were also more likely to participate in the underground economy for income, including Black (44%), American Indian (41%), multiracial (38%), and Latina (30%) respondents (Figure 11.1).



**Figure 11.1: Underground economy experience among transgender women**
RACE/ETHNICITY (%)

2015 U.S. TRANSGENDER SURVEY

AR_217156

*One in five (20%) respondents have participated in the underground economy at some point in their lives and 9% participated in the past year.*

Nearly one in ten (9%) respondents have participated in the underground economy for income in the past year (Table 11.1). Undocumented residents (29%) were more than three times as likely to have worked in the underground economy in the past year. Further, respondents who have been homeless in the past year (23%) were nearly three times as likely to have worked in the underground economy during that year.

**Table 11.1: Income-based underground economy experiences**

| Type of work | % of respondents (past year) | % of respondents (in lifetime) |
|---|---|---|
| Income-based sex work | 5% | 12% |
| Drug sales | 4% | 11% |
| Other criminalized work | 1% | 2% |
| Any underground economy work | 9% | 20% |

# II. Sex Work

## a. Income-Based Sex Work

One in eight (12%) respondents have done sex work for income at some point in their lifetime, meaning that they have exchanged sex or sexual activity for money or worked in the sex industry, such as in erotic dancing, webcam work, or pornography.

Of respondents who have done sex work for money in their lifetime, transgender women represent one-half (50%), non-binary people with female on their original birth certificates represent nearly one-quarter (23%), and transgender men represent 19% (Figure 11.2). While this chapter primarily highlights the experiences of transgender women of color due to their disproportionately high representation among those who have done sex work, it is also

important to recognize that non-binary people with female on their original birth certificates and transgender men account for a large proportion of those in the sample who have done sex work.

**Figure 11.2: Income-based sex work in lifetime**
GENDER IDENTITY (%)



Transgender women of color, including Black (42%), American Indian (28%), multiracial (27%), Latina (23%), and Asian (22%) women (Figure 11.3), were more likely to have participated in sex work than the overall sample. Undocumented residents (36%), those who have lost a job because of their gender identity or expression (25%), and those who have ever experienced homelessness (23%) were also more likely to have participated in sex work.

**Figure 11.3: Income-based sex work among transgender women**
RACE/ETHNICITY (%)



AR_217157

# One in eight (12%) respondents have done sex work for income, and 5% of respondents did so in the past year.

Respondents who have done income-based sex work during their lifetime were more likely to have experienced a number of challenges:

- Nearly half (45%) of respondents who have done income-based sex work were currently living in poverty, in contrast to 26% of those who have not done sex work.

- Nearly three-quarters (72%) of respondents who have done income-based sex work have been sexually assaulted in their lifetime, in contrast to those who have not done sex work (44%).

- More than three-quarters (77%) of respondents who have done income-based sex work have experienced some form of intimate partner violence, compared with 51% of those who have not done sex work.

- Respondents with sex work experience were nearly sixteen times as likely to be living with HIV (7.9%) as those who have never done sex work (0.5%), and nearly six times more likely than those in the overall sample (1.4%).

Five percent (5%) of all respondents did sex work for income in the past year. More than half (55%) of those who did income-based sex work in the past year were transgender women, 22% were non-binary people with female on their original birth certificate, and 14% were transgender men (Figure 11.4).

**Figure 11.4: Income-based sex work in past year**
GENDER IDENTITY (%)



Respondents who experienced homelessness in the past year (17%) were more than three times as likely to have participated in sex work during that year compared to the overall sample. Respondents who were living with HIV (32%) and undocumented residents (29%) were substantially more likely to have participated in sex work in the past year. Additionally, transgender women of color reported higher rates of sex work participation in the past year, particularly Black transgender women (24%), who were almost five times as likely to have done sex work for income in the past year (Figure 11.5).

**Figure 11.5: Income-based sex work in past year among transgender women**
RACE/ETHNICITY (%)



AR_217158

Respondents who have done sex work for income reported working in a wide range of settings, including sex work advertised online (36%), webcam work (35%), and street-based sex work (21%) (Table 11.2). Among those who have done some type of sex work, transgender women (30%) were more likely than others with sex work experience to have done street-based sex work, with women of color, including American Indian (50%), Black (48%), and Latina (31%) women, being substantially more likely to participate in street-based sex work (Figure 11.6).

**Table 11.2: Type of income-based sex work**

| Type of sex work | % of those who have ever done sex work |
|---|---|
| Informal sex work through word of mouth, occasional hook ups with dates in my networks, or things like that | 38% |
| Sex work advertised online | 36% |
| Webcam work | 35% |
| Pornography (picture or video) | 28% |
| Fetish work | 24% |
| Street-based sex work | 21% |
| Phone sex | 14% |
| Escort, call girl, or rent boy with an agency | 12% |
| Erotic dancer or stripper | 11% |
| Sex work advertised in magazines or newspapers | 7% |
| Not listed above | 9% |

**Figure 11.6: Participation in street-based sex work among transgender women who have done sex work**
RACE/ETHNICITY (%)



* Sample size too low to report

# In Our Own Voices

"At 17, I ran away with no way of supporting myself. I turned to Internet prostitution, which allowed me to do things for myself that I couldn't [before], like buy girl clothes, pay out of pocket for my doctor to prescribe HRT, and put a roof over my head."

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

"Sometimes I slept in my truck when friends couldn't put me up at their house, and sometimes I would meet people at a bar and have sex with them to really just sleep over and shower."

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

"I couldn't find work. I watched one guy throw away my application literally 30 seconds after turning it in. I resorted to escorting. It's the only way to keep food in my belly and a roof over my head."

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

"I became a sex worker to support myself and pay for my transition. I did not want to do sex work, but I have had worse jobs that paid less."

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

"An officer attempted to arrest me on prostitution charges because I was at a street corner. It was roughly noon, I was holding a bag of food in my hand, and I was clearly waiting for the street light to change so I could cross the street."

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

SEX WORK AND OTHER UNDERGROUND ECONOMY WORK

AR_217159

*Nearly one in five (19%) respondents participated in sex work, such as for money, food, a place to sleep, or other goods or services.*

## b. Sex Work for Goods or Services

All survey respondents, including those who did not report doing sex work for income, were asked whether they had sex or engaged in sexual activity for food, for a place to sleep, for drugs, or in exchange for something else (Table 11.3).

**Table 11.3: Engaged in sexual activity in exchange for goods or services**

| Type of activity | % of respondents (past year) | % of respondents (in lifetime) |
|---|---|---|
| Engaged in sexual activity for food | 2% | 6% |
| Engaged in sexual activity for a place to sleep (in someone's bed, at their home, or in their hotel room) | 2% | 8% |
| Engaged in sexual activity for drugs | 1% | 5% |
| Engaged in sexual activity in exchange for something not listed above | 3% | 7% |

Six percent (6%) of respondents have ever engaged in sexual activity for food. Respondents living with HIV (32%) were more than five times as likely to have engaged in sexual activity for food. Undocumented residents (17%) and American Indian (15%), Black (12%), and multiracial (10%) respondents were also more likely to have engaged in sexual activity for food.

One in twelve (8%) respondents engaged in sexual activity for a place to sleep. Respondents who were living with HIV (28%), who have ever experienced homelessness (20%), or who were undocumented residents (17%) were more likely to have engaged in sexual activity for a place to sleep.

Overall, 19% participated in sex work, such as for money, food, a place to sleep, or other goods or services.

## c. Police Interactions

All survey respondents were asked if they had ever interacted with police either while doing sex work, or when police thought they were doing sex work. One percent (1%) of respondents said that they interacted with police while participating in sex work, and an additional 2% said they did so when police thought they were doing sex work. Overall, 3% of respondents have interacted with police while doing sex work or when police thought they were doing sex work.

Transgender women of color, including Black (15%), Middle Eastern (13%), American Indian (12%), multiracial (8%), and Latina (7%) women, were more likely than the overall sample to interact with police who *thought* they were doing sex work (Figure 11.7).

**Figure 11.7: Interacted with police who thought they were doing sex work among transgender women**
RACE/ETHNICITY (%)



AR_217160

Respondents who interacted with the police while doing sex work or when police thought they were doing sex work were asked about specific experiences they had with police. Eighty-six percent (86%) reported at least one negative experience during the interaction (Table 11.4).

**Table 11.4: Interactions with police while doing or when police thought they were doing sex work**

| Type of interaction | % of those who interacted with police who thought they were doing sex work, or while doing sex work |
|---|---|
| Officers kept using the wrong gender pronouns (such as he, she, or they) or the wrong title (such as Mr. or Ms.) | 69% |
| Officers verbally harassed them | 65% |
| Officers asked questions about their gender transition (such as hormones and surgical status) | 41% |
| Officers sexually assaulted them | 27% |
| Officers physically attacked them | 18% |
| Officers forced them to have sex or engage in sexual activity to avoid arrest | 14% |
| Arrested for drugs in their possession when police stopped them for doing sex work | 11% |
| One or more experiences listed | 86% |

More than two-thirds (69%) said that officers repeatedly referred to them as the wrong gender. This experience was more likely among transgender women (74%). Nearly two-thirds (65%) were verbally harassed by police.

More than one-quarter (27%) of respondents who had interacted with police in this context were sexually assaulted by an officer, including being fondled, raped, or experiencing another form of sexual assault.[6] Respondents who have ever experienced homelessness (34%) were more likely to be sexually assaulted by an officer. Fourteen percent (14%) also reported that they were forced to have sex or engage in sexual activity to avoid arrest.

### d. Arrest

Respondents who interacted with police while engaging in sex work or when police thought they were engaging in sex work were also asked if they were arrested during any of those interactions. Almost one-third (32%) reported being arrested during at least one interaction. Black respondents (50%) and transgender women (40%) were more likely to report that their interaction with the police led to an arrest.

Respondents who reported being arrested were asked how many times they were arrested while they were doing sex work or when police thought they were doing sex work. Approximately one-third (34%) were arrested once, 32% were arrested two or three times, and 35% were arrested four or more times (Figure 11.8).

**Figure 11.8: Number of times arrested while doing or when police thought they were doing sex work**



Respondents who were arrested while doing or while police thought they were doing sex work were also asked whether police considered items in their possession, such as condoms, as "evidence of prostitution." Forty-four percent (44%) said that the police considered condoms in their possession to be evidence of prostitution (Figure 11.9).

AR_217161

**Figure 11.9: Items in possession considered as evidence when arrested (% of those arrested while doing or suspected of doing sex work)**



Respondents were asked about the outcomes of their arrests. More than half (55%) of the respondents who were arrested pleaded guilty in connection to one or more of their arrests, while nearly half (48%) reported that the charges were dropped on at least one occasion (Figure 11.10).

**Figure 11.10: Outcome of arrest (% of those arrested while doing or suspected of doing sex work)**



# III. Drug Sales and Other Underground Economy Work

One in eight (12%) respondents have done work in the underground economy other than sex work at some point in their lifetime. This included those who had participated in drug sales (11%) and/or other work that is currently criminalized (2%).[7] Respondents who were living with HIV (27%), who have lost a job because of their gender identity or expression (22%), or have ever experienced homelessness (21%) were more likely to have been paid for underground economy work apart from sex work during their lifetime.

In the past year, 4% of all respondents have participated in drug sales, and 1% have participated in other underground economy work (other than drug sales or sex work) (see Table 11.1).

# Conclusion

Respondents reported substantial levels of involvement in sex work and other underground economy work, particularly people of color, those living with HIV, undocumented residents, and those who have experienced homelessness. Many respondents, especially transgender women of color, also reported that police often assumed they were doing sex work, even when they were not. The vast majority of those who interacted with the police while doing sex work or while suspected of doing sex work reported being mistreated by police, including being verbally harassed, physically attacked, or sexually assaulted by law enforcement officers.

AR_217162

**ENDNOTES** | CHAPTER 11: SEX WORK AND OTHER UNDERGROUND ECONOMY WORK

1  See Ditmore, M. & Thukral, J. (2011). *Behind Closed Doors: An Analysis of Indoor Sex Work in New York City.* New York, NY: Sex Workers Project at the Urban Justice Center). Available at: http://sexworkersproject.org/downloads/BehindClosedDoors.pdf; Ditmore, M. & Thukral, J. (2003). *Revolving Door: An Analysis of Street-Based Prostitution in New York.* NY, New York: Sex Workers Project at the Urban Justice Center. Available at: http://sexworkersproject.org/downloads/RevolvingDoor.pdf.

2  Amnesty International. (2016). *Amnesty International Policy on State Obligations to Respect, Protect and Fulfil the Human Rights of Sex Workers.* Available at: https://www.amnesty.org/en/documents/pol30/4062/2016/en.

3  Fitzgerald, E., Elspeth, S., & Hicky, D. *Meaningful Work: Transgender Experiences in the Sex Trade.* DC & NY, New York: Best Practices Policy, National Center for Transgender Equality, & Red Umbrella Project. Available at: http://www.transequality.org/sites/default/files/Meaningful%20Work-Full%20Report_FINAL_3.pdf; Amnesty International. (2016). *Amnesty International Policy on State Obligations to Respect, Protect and Fulfil the Human Rights of Sex Workers.* Available at: https://www.amnesty.org/en/documents/pol30/4062/2016/en.

4  Fitzgerald, et al. See note 3.

5  Respondents were asked whether they had "ever engaged in sex or sexual activity for money (sex work) or worked in the sex industry (such as erotic dancing, webcam work, or porn films)" in Q. 6.1 and whether they had done such work in the past year in Q. 6.2. This report uses the term "sex work" to refer to all work in the sex industry or involving the exchange of sexual activity for income, food, a place to sleep, or other goods or services. While many of forms of sex work are currently criminalized in the United States, some of them are not.

6  Respondents were asked whether they had "experienced unwanted sexual contact from an officer (such as fondling, sexual assault, or rape)" in Q. 6.6.

7  Respondents were asked in Q. 6.11 if they had "ever been paid for selling drugs or other work that is currently considered illegal."

AR_217163



# CHAPTER 12
# Military Service

Prior research suggests that transgender people serve in the military at a higher rate than the U.S. general population.[1] USTS respondents with military experience were asked a series of questions about their service, their treatment as transgender service members, and their separation from the military. They were also asked about health care that they received through military providers and the Veterans Health Administration.

At the time that survey data was collected in 2015, the military still barred transgender people from serving openly in the military, and service members could be discharged simply for being transgender.[2] The Department of Defense announced that it was lifting the ban on June 30, 2016, with full implementation of specific policies related to transgender service members expected to be completed in 2017.[3] Despite the long-standing ban, thousands of transgender people have served and continue to serve in the military, many of them openly and with the support of their colleagues and commanders.

This chapter examines the experiences of current and former service members, including their interactions with leadership and health care providers as transgender people. It also explores veterans' unique experiences of separating from the military and accessing health care. Notable differences in respondents' experiences based on demographic and other characteristics are reported throughout the chapter.

AR_217164

**KEY FINDINGS**

▶ Nearly one in five (18%) respondents have served in the military, including veterans and those currently on active duty.

▶ Of current service members whose leadership or commanding officers knew or thought they were transgender, nearly one-quarter (23%) said that actions were taken to discharge them.

▶ Sixty percent (60%) of service members who separated from the military within the past ten years said that they might or would return to the military if the ban on transgender service members were lifted.

▶ Nearly one in five (19%) respondents who separated from the military more than ten years ago said they were discharged partly or completely because of their transgender status, and 19% left the military to avoid being mistreated or harassed as a transgender person.

# I. Current and Past Military Service

Nearly one in five (18%) respondents in the sample have served in the military, including respondents who were currently serving in the military on active duty (0.5%), and those who were currently on active duty for training in the Reserves or National Guard (2%).[4] Fifteen percent (15%) of respondents were veterans, compared with 8% in the U.S. population.[5]

Respondents in every age group were more likely to be veterans than their counterparts in the U.S. population. More than half (52%) of respondents over the age of 75 and 40% of respondents between the ages of 65 and 74 were veterans, compared with 22% and 18% of those age groups in the U.S. population, respectively.[6] One-quarter (25%) of respondents between the ages of 55 and 64 were veterans, more than three times higher than that age group in the U.S. population (8%).[7]

Fifteen percent (15%) of respondents between the ages of 35 and 54 were veterans, which was three times higher than the same age group in the U.S. population (5%)[8] (Figure 12.1).

**Figure 12.1: Veteran status**
AGE (%)



% in USTS (supplemental survey weight applied)

% in U.S. general population (ACS)

MILITARY SERVICE

AR_217165

Among those with past or current military service, crossdressers (33%), transgender women (23%), and non-binary people with male on their original birth certificate (22%) were more likely to have served, compared with transgender men (8%) and non-binary people with female on their original birth certificate (2%) (Figure 12.2). White (21%), American Indian (20%), and Middle Eastern (20%) respondents were more likely to have served in the military, while Asian (7%) and Latino/a (7%) respondents were less likely (Figure 12.3). Multiracial respondents were ten times as likely as the overall sample to currently be on active duty, with 5% on active duty at the time they took the survey.

*Fifteen percent (15%) of respondents were veterans, compared with 8% in the U.S. population.*

Of those who reported military service, 2% were still serving. Nearly one-third (31%) of those who were no longer serving separated from military service within the past ten years, and 69% separated from military service more than ten years ago.

# II. Branch of Service

Current and former service members were asked to identify their current or most recent branch of service. Twenty-eight percent (28%) of these respondents currently or most recently served in the Army, 22% in the Navy, 18% in the Air Force, 7% in the Marine Corps, and 1% served in the Coast Guard. Nearly one-quarter (24%) served in the Reserves or the National Guard (Table 12.1).

**Figure 12.2: Past or current military service**
GENDER IDENTITY (%)



**Table 12.1: Current or most recent branch of service**

| Branch of service | % of current or former service members |
|---|---|
| Air Force | 18% |
| Air Force Reserve | 2% |
| Air National Guard | 2% |
| Army | 28% |
| Army Reserve | 8% |
| Army National Guard | 8% |
| Coast Guard | 1% |
| Coast Guard Reserve | <1% |
| Marine Corps | 7% |
| Marine Corps Reserve | 1% |
| Navy | 22% |
| Navy Reserve | 3% |

**Figure 12.3: Past or current military service**
RACE/ETHNICITY (%)



2015 U.S. TRANSGENDER SURVEY

# III. Outness or Being Perceived as Transgender

Current service members[9] were asked how many people in the military (with the exception of other transgender people) thought or knew that they were transgender.[10]

More than half (52%) of current service members said that, as far as they knew, no one else thought or knew that they were transgender. Approximately one-third (34%) of current service members indicated that a few or some people in the military thought or knew that they were transgender, and 13% indicated that most or all people in the military thought or knew that they were transgender (Figure 12.4).[11]

**Figure 12.4: Number of people in the military who thought or knew that respondent was transgender**



*More than half (52%) of current service members said that, as far as they knew, no one else thought or knew that they were transgender.*

# IV. Leadership Response to Transgender Status

Among current service members who said that a few, some, most, or all others in the military thought or knew they were transgender, 48% indicated that their leadership or commanding officer thought or knew that they were transgender.

These respondents were asked about the ways in which their leadership or commanding officer responded to them being transgender, and they selected one or more response. Many reported that their leadership or commanding officer responded to their transgender status in a variety of positive ways, including supporting their name change (47%) and supporting their transition-related medical treatment (36%). Thirty percent (30%) reported that their leadership or commanding officer ignored their transgender status or looked the other way. Approximately one-quarter (23%) reported that their leadership or commanding officer had taken actions to discharge them (Table 12.2).

One-third (33%) of these respondents wrote in responses describing additional actions their leadership or commanding officers took because they thought or knew the respondent was transgender. Their write-in responses included several positive actions, such as supporting their social transition or their use of pronouns and uniforms that were consistent with their gender identity. These respondents also offered several additional negative actions, such as forcing respondents to present in a way that was inconsistent with their gender identity, forbidding them from discussing their transgender status with anyone else, passing them over for awards and duties, and subjecting them to administrative discipline.

**Table 12.2: Response of leadership and/or commanding officer to being transgender**

| Leadership or commanding officers' response | % of current service members whose commanding officer thought/knew they were transgender |
|---|---|
| Supported name change | 47% |
| Supported medical treatment | 36% |
| Ignored or looked the other way | 30% |
| Took actions to discharge them | 23% |
| Not listed above | 33% |

# V. Separation from Military Service

Veterans were divided into two groups for the purposes of analysis: those who separated within the past ten years and those who separated more than ten years prior to taking the survey. The two groups were given distinct questions based on a consideration of the types of experiences a service member may have encountered during their service and the changing nature of the military.[12]

## a. Type of Discharge

Respondents who separated from military service more than ten years ago[13] were asked about the reasons for their separation from service, including the type of discharge they received. More than three-quarters (79%) of these respondents reported being honorably discharged, and the remaining 21% reported a variety of other types of discharges (Table 12.3).

**Table 12.3: Type of discharge**

| Discharge | % of veterans who separated more than 10 years ago |
|---|---|
| Honorable | 79% |
| General | 7% |
| Medical | 6% |
| Other-than-honorable | 3% |
| Entry level separation | 2% |
| Bad conduct | 1% |
| Retired | 1% |
| Dishonorable | <1% |
| Not listed above | 2% |

# In Our Own Voices

"I began to accept myself as a woman. I was happier than I ever had been before. But the army didn't share my enthusiasm. A year after returning from deployment, I was kept in under penal conditions. I was demoted from a sergeant to a private, the lowest rank in the army."

"I am repeatedly harassed in my workplace, and am continually required to conceal my transgender status. When I sought assistance from the Equal Opportunity Office, I was told that they were unable to help because transgender individuals are not protected against harassment in the military."

## b. Discharged Because of Transgender Status

While 81% of respondents who had separated from service more than ten years prior reported that they did not believe their discharge was related to being transgender, 19% believed their discharge was either partially related (14%) or completely related (5%) to being transgender.

Respondents who indicated that their discharge was related to being transgender were less likely to have been honorably discharged. Eighty-six percent (86%) of those who said their discharge was not related to their transgender status were honorably discharged, while only 45% of those who

AR_217168

said their discharge was partially related to being transgender and 51% of those who indicated that it was completely related were honorably discharged.

Respondents with female on their original birth certificate (24%) were more likely to say that their discharge was partially or completely related to being transgender than those with male on their original birth certificate (17%). Latino/a (28%) and Black (24%) respondents were also more likely to report that their transgender status was a factor in their discharge, compared with white (16%) respondents.

Even though these discharges took place more than ten years ago, the experience of being discharged partly or completely because of one's transgender status was associated with a variety of negative outcomes affecting respondents at the time they took the survey. Respondents who were currently living in poverty (29%) or currently working in the underground economy (34%) were more likely to say that their discharge was completely or partially connected to their transgender status, as were respondents who were currently experiencing serious psychological distress (28%).

## c. Separated to Transition or Avoid Harassment

Nearly one in ten (9%) respondents who separated from military service more than ten years ago left the service in order to transition, and an additional 19% said they left the service to avoid being mistreated or harassed as a transgender person.

Differences emerged by race, where Latino/a (28%) and Black respondents (26%) were more likely to have left to avoid mistreatment or harassment.

Approximately one-third (32%) of those who were currently living in poverty and more than one-third of those who have done sex work (38%) also left the military to avoid mistreatment or harassment.

# VI. Name Change on Discharge Papers

Respondents who separated from military service more than ten years earlier were also asked if they had changed their name on their military discharge papers, known as the DD 214. Two percent (2%) applied for and received an updated DD 214 with a new name, or they received a DD 215 (an alternative form used to correct errors in a DD 214) with their new name. Six percent (6%) applied for a name change on their military discharge papers, but their request was denied. The remaining 92% had not tried to change their name on their military discharge papers.

# VII. Health Care Treatment from Military Providers

Current service members and veterans who separated from military service within the ten years prior to taking the survey were asked whether they had received health care related to gender transition from a military provider, not including the Veterans Health Administration. Twelve percent (12%) had received mental health treatment related to gender transition from a military provider, and 4% had received medical treatment related to gender transition other than mental health treatment, such as hormone therapy or surgical care, from a military provider.

Even though this survey was conducted prior to the Department of Defense's announcement of plans to allow transgender people to serve openly, more than one-quarter (28%) of all current service members reported taking hormones for their gender identity or gender transition at the time they participated in the survey. Among these

MILITARY SERVICE

171

current service members, 28% reported getting their hormones from an on-post medical doctor and/or pharmacy. Nearly three-quarters (74%) received their hormones through an off-post medical doctor, and 57% received them through an off-post pharmacy (Table 12.4).

Table 12.4: Source of hormones

| Source of hormones | % of current service members who take hormones |
|---|---|
| Off-post medical doctor | 74% |
| Off-post pharmacy | 57% |
| On-post pharmacy | 15% |
| Friends, online, or other non-licensed sources | 15% |
| On-post medical doctor | 13% |

Current services members were asked whether a military medical provider, including any mental health provider, had reported to their commanding officer that they were transgender or recommended them for discharge. Of current service members whose providers knew they were transgender,[14] 86% reported no action being taken by military medical or mental health providers. However, 8% said that their provider reported their transgender status to their commander, and 12% said that their provider recommended them for discharge.

# VIII. Veterans Health Care

Veterans who separated from the military more than ten years ago were asked about their experiences receiving health care through the Veterans Health Administration (VA).[15]

Forty percent (40%) of former service members have received health care through the VA, 75% of whom were currently receiving care through the VA. Of those who received health care through the

VA at any point, more than half (56%) received care related to gender transition.

Nearly three-quarters (72%) indicated that they were out to their VA providers as transgender. Of those who were out to their VA providers as transgender, almost half (47%) reported that they were always treated respectfully as a transgender person, and 40% said that they received mostly respectful care. Eleven percent (11%) reported that they were sometimes treated respectfully, and 3% said that they were never treated respectfully (Figure 12.5).

Figure 12.5: Frequency of respectful treatment at the VA



# IX. Impact of Repealing Ban on Transgender Service

At the time the survey was taken, the military had not yet announced it would let transgender people serve openly. Current military service members were asked what they would do if the military allowed transgender people to serve openly. Nearly one-quarter (24%) said that they would start to transition while still serving, and 18% said that they would finish the transition that they

AR_217170

had already started while continuing to serve. Additionally, 21% reported that they had already transitioned (Table 12.5).

**Table 12.5: What respondent would do if open service in the military was allowed for transgender people**

| What they would do if allowed to serve openly | % of current service members |
|---|---|
| They would start to transition while still serving | 24% |
| They have already transitioned | 21% |
| They would finish the transition they already started and continue to serve | 18% |
| They would leave the military to transition and not return | 6% |
| They do not want to transition | 6% |
| They would leave the military to transition and then return to service | 3% |
| They would not finish the transition they already started and continue to serve | 1% |
| Not listed above | 21% |

Veterans who separated from the military within the past ten years were asked whether they would return to military service if transgender people were allowed to serve. Nearly one-third (30%) of these respondents indicated that they would return, 30% said that they might return, and the remaining 39% reported that they would not return to military service. Transgender men (42%) were more likely than transgender women (25%) and non-binary people (18%) to say that they would return to service.

# Conclusion

Despite a ban on transgender service members at the time the survey was administered, nearly one in five respondents reported having served in the military, and respondents were nearly twice as likely to be veterans as the general U.S. population. The findings indicated that a majority of current service members were interested in serving openly as transgender people, including those who would transition during their military service. Responses also indicated diverse experiences of acceptance and rejection of transgender people in military and veteran settings by military officials, direct superiors, and health care providers. The results suggest that lifting the ban on transgender service members and implementing new policies could lead to a substantial number of current and former service members continuing or resuming their military service.

MILITARY SERVICE

173

AR_217171

1 Gates, G. J. & Herman, J. L. (2014). *Transgender Military Service in the United States.* Los Angeles, CA: Williams Institute. Available at: http://williamsinstitute.law.ucla.edu/wp-content/uploads/Transgender-Military-Service-May-2014.pdf; Blosnich, J. R., Brown, G. R., Shipherd, J. C., Kauth, M., Piegari, R. I., & Bossarte, R. M. (2013). Prevalence of gender identity disorder and suicide risk among transgender veterans utilizing Veterans Health Administration care. *American Journal of Public Health, 103*(10), e27–e32; Shipherd, J. C., Mizock, L., Maguen, S., & Green, K. E. (2012). Male-to-female transgender veterans and VA health care utilization. *International Journal of Sexual Health, 24*(1), 78–87.

2 Although the ban is described in this chapter as being one that prevented "transgender people from serving openly in the military," in actuality, the ban categorically barred transgender people from serving, regardless of whether or not they were open about being transgender. However, it is clear that tens of thousands of transgender people chose to serve in the military despite the ban, and many had to hide their identity to do so. Therefore, the ban is being described here as relating to open service as a transgender person.

3 See e.g., Rosenberg, M. (2016, June 30). Transgender people will be allowed to serve openly in military. *The New York Times.* Available at: http://www.nytimes.com/2016/07/01/us/transgender-military.html.

4 In this section of this chapter, the percentages of respondents who have served or are currently serving in the U.S. Armed Forces have been weighted to reflect the age and educational attainment of the U.S. population in addition to the standard survey weight. The USTS sample differs substantially from the U.S. population in regard to age and educational attainment, and therefore, this additional weight is applied in order to provide a more accurate comparison to the percentage of U.S. adults who have served in the armed forces, as reported in the American Community Survey. See the *Methodology* and *Portrait of USTS Respondents* chapters for more information about the application of the supplemental survey weight.

5 U.S. Census Bureau. (2015). *American Community Survey 1-Year Estimates: Veteran status*. Available at: https://factfinder.census.gov/faces/tableservices/jsf/pages/productview.xhtml?pid=ACS_15_1YR_S2101&prodType=table.

6 U.S. Census Bureau. See note 5.

7 U.S. Census Bureau. See note 5.

8 U.S. Census Bureau. See note 5.

9 "Current service members" includes individuals who were (1) currently serving on active duty, (2) only on active duty for training in the Reserves or National Guard, or (3) no longer on active duty but had been in the past and were still serving in the military. See Q. 2.17.

10 Q. 8.9 asked, "How many people in the military (who aren't trans) believe you are trans?" In the context of the questions in this section, this question was intended to assess how many people were out as transgender in the military by determining if other non-transgender people thought or knew that they were transgender.

11 This question (Q. 8.9) did not distinguish between service members who were not out or perceived as transgender because they were not living according to their gender identity, and those who were already living full time according to their gender identity but did not disclose the fact that they had previously transitioned. However, 47% of service members who said that no one in the military thought or knew they were transgender also reported that they were living full-time in Q. 1.12, suggesting that a substantial number of respondents who were not out to others in the military were living according to their gender identity without disclosing their past transition.

12 During the development of the survey questionnaire, the research team consulted with individuals and groups with subject-matter expertise in LGBT military service in general, and transgender military service in particular. After consultation, the research team chose to divide those who had separated from service into two groups to evaluate the experiences that each group might have had based on their time of service and separation. It was determined that those who had separated from service within the past ten years were serving in a time of changing societal and military culture and policies—including the repeal of "Don't Ask, Don't Tell," permitting lesbian, gay, and bisexual (but not transgender) service members to serve openly—and may have had different experiences as a result. This group may have also had different experiences with transitioning, receiving medical care for transition- and non-transition-related health care, and eligibility to return to service. The two groups were directed to specific questions accordingly.

13 Those who separated within the past ten years should have received questions 8.12–8.21 (which covered the reasons for separation and the nature of their discharge, VA health care, and military discharge papers) to evaluate the differences in experiences between them and those who separated more than ten years prior to participating in the survey. However, due to a programming error, respondents who separated within the past ten years did not receive these questions. Therefore, results of questions that addressed veterans' issues only reflected the experiences of those who separated more than ten years prior and likely underestimated certain experiences reported in this section.

14 Thirty-seven percent (37%) of current service members said that the question did not apply to them, as none of their military health providers knew that they were transgender, while 63% indicated that at least one military health provider knew they were transgender.

15 Veterans who separated from the military within the past ten years did not receive this question due to a programming error. See note 13.



# CHAPTER 13

# Housing, Homelessness, and Shelter Access

Housing is one of the most vital needs all people share. However, many transgender people have faced discrimination when seeking housing, and are vulnerable to actions such as eviction because of their transgender status. Such discrimination, in addition to family rejection and other risk factors, can lead to housing instability and higher rates of homelessness.[1] For transgender people who experience homelessness, shelters present additional problems and often are unsafe environments. Previous studies have found that shelters frequently turn transgender people away because of their gender identity, or require them to stay in facilities that are inappropriate for their gender, often putting them at further risk of violence and harassment.[2]

This chapter explores respondents' current living arrangements and their experiences with homelessness, as well as with specific forms of housing discrimination and instability occurring in the past year because of their transgender status. It also examines respondents' experiences with homelessness in the past year, including access to shelters and the treatment they received in those shelters as transgender people. Notable differences in respondents' experiences based on demographic and other characteristics are reported throughout the chapter.

**KEY FINDINGS**

▶ Only 16% of respondents owned their homes, in contrast to 63% in the U.S. population.

▶ Nearly one-third (30%) of respondents have experienced homelessness at some point in their lives. One in eight (12%) experienced homelessness in the past year because of being transgender.

▶ Nearly one-quarter (23%) of respondents experienced some form of housing discrimination in the past year, such as being evicted from their home or denied a home or apartment because of being transgender.

▶ More than one-quarter (26%) of respondents who were homeless in the past year avoided staying in homeless shelters because they feared they would be mistreated as a transgender person. Additionally, six percent (6%) were denied access to a shelter, including 4% who were denied access due to being transgender.

▶ Seventy percent (70%) of those who stayed in a shelter in the past year reported some form of mistreatment because of being transgender.

  • More than half (52%) of those who stayed at a shelter in the past year were verbally harassed, physically attacked, and/or sexually assaulted because of being transgender.

  • Nearly one in ten (9%) respondents were thrown out once the shelter staff found out that they were transgender, and 44% decided to leave the shelter because of poor treatment or unsafe conditions.

  • One-quarter (25%) decided to dress or present as the wrong gender in order to feel safe in a shelter, and 14% said that the shelter staff forced them to dress or present as the wrong gender in order to stay at the shelter.

AR_217174

# I. Current Living Arrangements

Respondents were asked what their current living arrangements were at the time they participated in the survey. Nearly half (44%) of respondents were living in a house, apartment, or condo they rented, either alone or with others, which was the most commonly reported living arrangement. Seventeen percent (17%) had not yet left home and were living with their parents or the family they grew up with (Table 13.1).

Table 13.1: Current living arrangements

| Current living arrangements | % of respondents |
|---|---|
| Living in house, apartment, or condo they rent (alone or with others) | 44% |
| Living with parents or family they grew up with because they have not yet left home | 17% |
| Living in house, apartment, or condo they own (alone or with others) | 16% |
| Living temporarily with friends or family because they cannot afford their own housing | 9% |
| Living in campus or university housing | 7% |
| Living with a partner, spouse, or other person who pays for the housing | 5% |
| Living on the street, in a car, in an abandoned building, in a park, or a place that is NOT a house, apartment, shelter, or other housing | <1% |
| Living in a shelter (including homeless, domestic violence, or other type of emergency shelter) or in a hotel or motel with an emergency shelter voucher | <1% |
| Living in transitional housing or a halfway house | <1% |
| Living in a hotel or motel that they pay for | <1% |
| Living in military barracks | <1% |
| Living in a nursing home or other adult care facility | <1% |
| Living in a foster group home or other foster care | <1% |
| Living in a hospital | <1% |
| Not listed above | 2% |

In contrast to the 63% homeownership rate in the U.S. at the time of the survey,[3] USTS respondents were nearly four times less likely to own a home, with only 16% reporting that they were living in a house, apartment, or condo that they owned. A large difference in the rate of homeownership was consistent across age groups (Figure 13.1).[4]



Figure 13.1: Homeownership rate
CURRENT AGE (%)

% in USTS

% in U.S. population (ACS)

Respondents also reported substantial housing instability. Nearly one in ten (9%) respondents were living temporarily with friends or family because they could not afford their own housing. Approximately half of one percent (0.53%) of respondents were homeless at the time they participated in the survey, including those who were living in a shelter (other than a domestic violence shelter), or on the street. This was three times the rate of current homelessness among adults in the U.S. population (0.18%), as reported by the Department of Housing and Urban Development.[5]

# II. Homelessness During One's Lifetime

Nearly one-third (30%) of respondents have experienced homelessness during their lifetime, including those who have stayed in a shelter, lived on the street, lived out of a car, or stayed temporarily with family or friends because they could not afford housing. The homelessness rate was substantially higher among respondents whose immediate family had kicked them out of the house, with nearly three-quarters (74%) of these respondents experiencing homelessness. The homelessness rate was also nearly twice as high among respondents who have done sex work (59%) and those living with HIV (59%), as well as respondents who have lost their job because of their gender identity or expression (55%). Transgender women of color, including American Indian (59%), Black (51%), multiracial (51%), and Middle Eastern (49%) women, also experienced especially high rates of homelessness (Figure 13.2).

**Figure 13.2: Lifetime homelessness rate among transgender women**
RACE/ETHNICITY (%)



# III. Housing Discrimination and Homelessness in the Past Year

Respondents were asked about specific experiences with housing discrimination and instability in the past year, such as being evicted or being homeless, because they were transgender (Table 13.2).[6]

**Table 13.2: Housing situations that occurred in the past year because of being transgender**

| Housing situation | % of people to whom situation applied |
|---|---|
| They had to move back in with family members or friends | 20% |
| They slept in different places for short periods of time (such as on a friend's couch) | 15% |
| They had to move into a less expensive home or apartment | 13% |
| They experienced homelessness | 12% |
| They were denied a home or apartment | 6% |
| They were evicted from a home or apartment | 5% |
| **One or more experiences listed** | **30%** |

One in eight (12%) respondents reported experiencing homelessness in the past year as a result of anti-transgender bias. Those currently working in the underground economy (such as sex work, drug sales, and other work that is currently criminalized) (37%), undocumented residents (32%), and those living with HIV (27%) were more likely to report experiencing homelessness in the past year because they were transgender. Transgender women of color, including Black (31%), American Indian (27%), multiracial (18%), and Latina (18%) women, were substantially more likely to report being homeless in the past year because of being transgender (Figure 13.3).

AR_217176

**Figure 13.3: Homelessness in the past year because of being transgender among transgender women**
RACE/ETHNICITY (%)



*Sample size too low to report

Six percent (6%) of respondents were denied a home or apartment in the past year because they were transgender, with transgender women of color, including Black (17%), multiracial (15%), and Latina (11%) women, being more likely to have this experience (Figure 13.4).

**Figure 13.4: Denial of home/apartment in the past year due to being transgender among transgender women**
RACE/ETHNICITY (%)



*Sample size too low to report

# In Our Own Voices

"I was ejected from my apartment while I was out of town after my landlord discovered I was trans. The apartment was empty when I returned home."

..............................................................

"I lost my job after I came out as transgender. I became homeless for about year. I never stayed in a shelter because I feared harassment."

..............................................................

"When I was 18, I ran away from my abusive parents who had been violent toward me because of my sexuality and gender expression. I became homeless for several years, traveling all over the country, stealing food and sleeping in abandoned buildings."

..............................................................

"When I go to shelters, I am admonished and told that I should return to 'being a woman' in order to use the shelter system."

..............................................................

"I've tried shelters. The men's ones aren't safe for trans men: if those men find out who you are, you're opening yourself up to physical and sexual violence. And when I turned to the women's shelters, I was too masculine to make the women comfortable."

..............................................................

HOUSING, HOMELESSNESS, AND SHELTER ACCESS

AR_217177

*Five percent (5%) of respondents were evicted from their home in the past year because of anti-transgender bias.*

Five percent (5%) of respondents were evicted from their home or apartment in the past year because of anti-transgender bias. Differences emerged by demographic characteristics, where undocumented residents (18%), people with disabilities[7] (8%), and people of color, including American Indian (9%) and Black (9%) respondents, were more likely to report this experience.

Overall, nearly one-third (30%) of respondents to whom these housing situations applied—23% of all respondents—experienced one or more forms of housing discrimination or instability in the past year because they were transgender. Respondents who were currently working in the underground economy (59%) and those who had been kicked out of the house by their family at some point in their lives because they were transgender (59%) were nearly twice as likely to report one or more of these experiences. Undocumented residents (50%) and transgender women of color were also more likely have had one or more of these experiences, including Black (49%), multiracial (39%), American Indian (39%), and Latina (37%) women (Figure 13.5).

**Figure 13.5: Any housing discrimination and/or instability in past year due to being transgender among transgender women**
RACE/ETHNICITY (%)



*Sample size too low to report

# IV. Shelters

## a. Access to Shelters

Respondents who experienced homelessness in the past year because of their transgender status were asked whether they had gone to a homeless shelter during that year (Table 13.3).

**Table 13.3: Experiences with homeless shelters in the past year**

| Experiences with homeless shelters | % of people who were homeless |
|---|---|
| They sought shelter and stayed at one or more shelters | 10% |
| They sought shelter and were denied access to one or more shelters | 6% |
| They did not seek shelter, because they feared mistreatment as a transgender person | 26% |
| They did not seek shelter for other reasons | 59% |

One in ten (10%) respondents sought shelter and stayed at one or more shelters in the past year. Higher percentages were noted among respondents living with HIV (22%) and American Indian (23%) and Black (15%) respondents.

More than one-quarter (26%) did not seek shelter because they feared being mistreated as a transgender person in the past year. Asian (43%) and American Indian (37%) respondents were more likely to report avoiding a shelter for this reason, in contrast to other people of color, such as Black (25%) and Latino/a (22%) respondents (Figure 13.6). Respondents currently working in the underground economy (36%), and respondents whose families had kicked them out of the house for being transgender (35%) were more likely to avoid seeking shelter for fear of being mistreated.

AR_217178



Figure 13.6: Did not seek shelter for fear of mistreatment as a transgender person in the past year
RACE/ETHNICITY (%)

*Sample size too low to report

Six percent (6%) of respondents were denied access to a shelter in the past year. Transgender women of color were more likely to be denied access to a shelter, with multiracial women (30%) being five times as likely, and Black women (13%) being more than twice as likely. Those who were currently working in the underground economy (13%) were also more likely to be denied access to a shelter.

Respondents who were denied access to one or more shelters in the past year were asked what they believed the reasons were for that treatment, and they selected one or more reasons from a list, such as age, race or ethnicity, and gender identity. Nearly three-quarters (74%) believed that they were denied access to a shelter because of their gender identity or expression.[8] This represents 4% of those who were homeless in the past year (Table 13.4).

*Seven out of ten (70%) respondents who stayed at a shelter in the past year faced some form of mistreatment, such as being forced out, harassed, or attacked because of being transgender.*

Table 13.4: Reported reasons for being denied access to one or more shelters

| Reason for denial | % of those denied access to shelter |
|---|---|
| Age | 7% |
| Disability | 8% |
| Income level or education | 5% |
| Gender identity or expression | 74% |
| Race or ethnicity | 4% |
| Religion or spirituality | 4% |
| Sexual orientation | 17% |
| None of the above | 19% |

## b. Treatment in Shelters

Respondents who stayed at one or more shelters in the past year received questions about how they were treated at the shelter(s) as a transgender person. Seventy percent (70%) encountered at least one negative experience based on their transgender status in the past year, such as being forced out, harassed, or attacked because they were transgender.

Nearly one in ten (9%) respondents who stayed at a shelter in the past year were thrown out after the shelter staff found out that they were transgender. Forty-four percent (44%) decided to leave the shelter because of poor treatment or unsafe conditions, even though they had no other place to go. One-quarter (25%) of respondents decided to dress or present as the wrong gender in order to feel safe in a shelter, and 14% said that the shelter staff forced them to dress or present as the wrong gender in order to stay at the shelter (Table 13.5).

HOUSING, HOMELESSNESS, AND SHELTER ACCESS

AR_217179

**Table 13.5: Experiences while staying in homeless shelters in the past year**

| Experiences while staying in homeless shelters | % of people who stayed in a shelter |
|---|---|
| They left because of poor treatment or unsafe conditions, even though they had nowhere else to go | 44% |
| They decided to dress or present as the wrong gender to feel safe in shelter | 25% |
| The shelter required them to dress or present as the wrong gender | 14% |
| They were thrown out after shelter staff learned they were transgender | 9% |
| **One or more experiences listed** | **58%** |

Respondents who stayed at a homeless shelter in the past year were also asked whether they were verbally harassed, physically attacked, or sexually assaulted[9] at the shelter because they were transgender. Nearly half (49%) reported that they were verbally harassed because they were transgender. Nearly one-fifth (19%) were physically attacked, and 17% were sexually assaulted at the shelter because they were transgender (Table 13.6).

**Table 13.6: Verbal harassment, physical attack, and sexual assault in homeless shelters in the past year because they were transgender**

| Experiences while staying in homeless shelters | % of people who stayed in a shelter |
|---|---|
| Verbally harassed | 49% |
| Physically attacked | 19% |
| Sexually assaulted | 17% |
| **One or more experiences listed** | **52%** |

# Conclusion

Respondents reported high rates of homelessness both in their lifetime and the past year. The results also indicated that a substantial number of respondents experienced housing discrimination and housing instability in the past year based on their transgender status, with higher rates among transgender women of color, people living with HIV, people who have been kicked out of their homes by their families, and respondents currently working in the underground economy. Many of those who experienced homelessness in the past year reported that they avoided using a shelter because they feared being mistreated as a transgender person, and those who did use a shelter in the past year faced high rates of mistreatment based on their transgender status, such as being kicked out of the shelter, being verbally harassed, physically attacked, or sexually assaulted.

AR_217180

ENDNOTES | CHAPTER 13: HOUSING, HOMELESSNESS, AND SHELTER ACCESS

1   See e.g., Davidson, C. (2014). Gender minority and homelessness. *In Focus: A Quarterly Research Review of the National Health Care for the Homeless Council,* 3(1). Available at: http://www.nhchc.org/wp-content/uploads/2014/10/in-focus_transgender_sep2014_final.pdf; Durso, L. E. & Gates, G. J. (2012). *Serving Our Youth: Findings from a National Survey of Service Providers Working with Lesbian, Gay, Bisexual, and Transgender Youth who are Homeless or at Risk of Becoming Homeless.* Los Angeles, CA: Williams Institute. Available at: http://williamsinstitute.law.ucla.edu/wp-content/uploads/Durso-Gates-LGBT-Homeless-Youth-Survey-July-2012.pdf; Grant, J. M., Mottet, L. A., Tanis, J., Harrison, J., Herman, J. L., & Keisling, M. (2011). *Injustice at Every Turn: A Report of the National Transgender Discrimination Survey.* (p. 112). DC: National Center for Transgender Equality & National Gay and Lesbian Task Force.

2   Grant, et al.; Rooney, C., Durso, L. E., & Gruberg, S. (2016). *Discrimination Against Transgender Women Seeking Access to Homeless Shelters.* DC: Center for American Progress. Available at: https://www.americanprogress.org/issues/lgbt/report/2016/01/07/128323/discrimination-against-transgender-women-seeking-access-to-homeless-shelters/.

3   U.S. Census Bureau. (2015). *American Community Survey 1-Year Estimates: Homeownership Rate by Age of Householder.* The ACS homeownership rate include ages 15 and older, in contrast to the USTS rate, which includes respondents who are 18 and older. Because the ACS includes people under 18 years of age, an exact comparison to the USTS sample could not be made. Therefore, this comparison should be interpreted with caution.

4   U.S. Census Bureau. (2015). *American Community Survey 1-Year Estimates: Homeownership Rate by Age of Householder.* The ACS homeownership rate for the "under 25" age group includes those who are 15–24 years of age, in contrast to the USTS rate, which includes respondents who are 18–24 years of age. See note 3.

5   The homelessness point-in-time estimate is based on January 2015 data. Department of Housing and Urban Development. (2015). *2015 Annual Homelessness Assessment Report (AHAR) to Congress.* Available at: https://www.hudexchange.info/resources/documents/2015-AHAR-Part-1.pdf. Calculation is based on the 436,921 people over the age of 18 who were homeless on a given night in 2015 and the January 2015 estimated adult population (247,492,492).

6   Respondents were given the choice of answering "yes," "no," or "does not apply to me" for each housing scenario listed in Q. 23.2. They were instructed to select "does not apply to me" if the housing situation could not have happened to them in the past year. For example, those who did not rent a home in the past year could not have been evicted, and were instructed to select "does not apply to me" for that question. The results reported in this section do not include those who answered "does not apply to me" for each of the housing situations.

7   "People with disabilities" here refers to respondents who identified as a person with a disability in Q. 2.20.

8   The survey included both "transgender status/gender identity" and "gender expression/appearance" as answer choices so that respondents could select what they felt best represented their experience. Because there was a substantial overlap of respondents who selected both reasons, and because these terms are commonly used interchangeably or with very similar meanings, responses of those who selected one or both of these reasons are collapsed for reporting as "gender identity or expression."

9   Respondents were asked if they had experienced "unwanted sexual contact (such as fondling, sexual assault, or rape)" in Q. 24.4.

HOUSING, HOMELESSNESS, AND SHELTER ACCESS

AR_217181



# CHAPTER 14

# Police, Prisons, and Immigration Detention

Transgender people, particularly transgender people of color, face elevated levels of negative interactions with law enforcement officers and the criminal justice system. This includes higher rates of police mistreatment,[1] incarceration,[2] and physical and sexual assault in jails and prisons.[3] Furthermore, when navigating the United States immigration system, many transgender people, including those who are seeking asylum based on their gender identity, face the prospect of being placed into unsafe immigration detention centers. While in immigration detention, transgender people are often placed in facilities that do not match their gender identity or face extended periods of solitary confinement, leaving them vulnerable to physical and sexual abuse, denial of medical treatment, and other dangerous conditions.[4]

This chapter explores respondents' experiences with police and other law enforcement officers, in jail, prison, or juvenile detention centers, and in immigration detention, including experiences of physical and sexual assault during interactions with law enforcement and while incarcerated. Many of the questions in this section were modeled on the Bureau of Justice Statistics' National Inmate Survey. Results in this chapter are presented in three sections: (A) Interactions with Law Enforcement Officers, (B) Incarceration in Jail, Prison, or Juvenile Detention, and (C) Experiences in Immigration Detention. Notable differences in respondents' experiences based on demographic and other characteristics are reported throughout the chapter.

AR_217182

# A. INTERACTIONS WITH LAW ENFORCEMENT OFFICERS

**KEY FINDINGS**

▶ Of respondents who interacted with police or law enforcement officers who thought or knew they were transgender in the past year, 57% said they were never or only sometimes treated respectfully. Further, 58% reported some form of mistreatment, such as being repeatedly referred to as the wrong gender, verbally harassed, or physical or sexually assaulted.

▶ More than half (57%) of respondents said they were either somewhat or very uncomfortable asking the police for help.

▶ Two percent (2%) of respondents were arrested in the past year, and of those arrested, 22% believed they were arrested because they were transgender.

## I. Law Enforcement Interactions in the Past Year

Forty percent (40%) of respondents said that they interacted with the police or other law enforcement officers in the past year. Of those, 65% said that they believed none of the officers thought or knew they were transgender, and 35% said that some or all of the officers thought or knew they were transgender (Figure 14.1).

**Figure 14.1: Interaction with officers who thought or knew respondents were transgender**



Respondents who said that some or all of the law enforcement officers thought or knew they were transgender were then asked whether they were treated with respect during the interactions. More than half of these respondents (57%) said that they were never or only sometimes treated with respect, and 43% reported that they were always treated with respect (Figure 14.2).

**Figure 14.2: Frequency of respectful treatment by police or other law enforcement officers in the past year**



Respondents who were currently working in the underground economy (80%) were more likely to

POLICE, PRISONS, AND IMMIGRATION DETENTION

AR_217183

report never or only sometimes being treated with respect, as were those who were currently living in poverty[5] (69%). Non-binary respondents (70%) and transgender men (62%) were more likely to report having never or only sometimes been treated with respect than transgender women (51%) (Figure 14.3). People of color were also more likely to report never or only sometimes being treated with respect, particularly American Indian (72%) and Black (70%) respondents (Figure 14.4).



**Figure 14.3: Never or only sometimes treated with respect by law enforcement officers in the past year GENDER IDENTITY (%)**



**Figure 14.4: Never or only sometimes treated with respect by law enforcement officers in the past year RACE/ETHNICITY (%)**

*Sample size too low to report

Respondents who said that some or all of the officers they interacted with thought or knew they were transgender were also asked whether they experienced specific forms of mistreatment in their interactions with law enforcement officers in the past year, such as being repeatedly referred to as the wrong gender, verbally harassed, or physically attacked. More than half (58%) of these respondents reported having experienced one or more forms of mistreatment (Table 14.1).

**Table 14.1: Mistreatment by police or other law enforcement officers in the past year**

| Experiences of mistreatment in the past year | % of those who interacted with officers who thought or knew they were transgender in the past year |
| --- | --- |
| Officers kept using the wrong gender pronouns (such as he/him or she/her) or wrong title (such as Mr. or Ms.) | 49% |
| Verbally harassed by officers | 20% |
| Officers asked questions about gender transition (such as about hormones or surgical status) | 19% |
| Officers assumed they were sex workers | 11% |
| Physically attacked by officers | 4% |
| Sexually assaulted by officers | 3% |
| Forced by officers to engage in sexual activity to avoid arrest | 1% |
| **One or more experiences listed** | **58%** |

People of color, including American Indian (74%), multiracial (71%), Latino/a (66%), and Black (61%) respondents, were more likely to have experienced one or more forms of mistreatment (Figure 14.5). Respondents who were homeless in the past year (78%), those who were currently unemployed (75%), and people with disabilities[6] (68%) were also more likely to report one or more of these experiences.

AR_217184

*More than half (58%) of respondents who interacted with a law enforcement officer who thought or knew that they were transgender were verbally harassed, physically or sexually assaulted, or mistreated in another way in the past year.*

**Figure 14.5: Experienced one or more forms of mistreatment by law enforcement officers in the past year**
**RACE/ETHNICITY (%)**

**Sample size too low to report*

Verbal harassment was frequently reported by respondents who interacted with police or other law enforcement officers who thought or knew they were transgender. In the past year, one in five (20%) of these respondents reported verbal harassment by an officer. Those who had been homeless in the past year were twice as likely to be verbally harassed by an officer (40%), and those who were currently working in the underground economy were more than twice as likely to be verbally harassed (51%).

In the past year, more than one in ten (11%) respondents who interacted with law enforcement officers who thought or knew they were transgender reported that an officer assumed that they were sex workers. Transgender women of color were more likely to report that an officer assumed they were sex workers, including Black (33%), multiracial (30%), Latina (25%), American Indian (23%), and Asian (20%) women (Figure 14.6).

**Figure 14.6: Law enforcement officer assumed they were a sex worker in the past year among transgender women**
**RACE/ETHNICITY (%)**

**Sample size too low to report*

Respondents who interacted with law enforcement officers who thought or knew they were transgender in the past year also reported being physically or sexually assaulted. Six percent (6%) of these respondents were physically attacked, sexually assaulted,[7] and/or forced to engage in sexual activity to avoid arrest by an officer. Respondents who were currently working in the underground economy (27%) and those who were homeless in the past year (17%) were more

likely to report one or more of these experiences. Transgender women of color, including American Indian (20%), Black (17%), and multiracial (16%) women, were also more likely to report one or more of these experiences (Figure 14.7).

**Figure 14.7: Physically attacked, sexually assaulted, and/or forced to engage in sexual activity to avoid arrest in the past year among transgender women RACE/ETHNICITY (%)**



*Sample size too low to report

# II. Comfort Interacting with Law Enforcement Officers

All respondents were asked how comfortable they would feel asking for help from the police if they needed it. Twenty-nine percent (29%) reported that they would either be very comfortable or somewhat comfortable asking for help from the police, and 15% said they were neutral. A majority (57%) of the sample said that they were somewhat uncomfortable or very uncomfortable asking for help from the police (Figure 14.8).

# In Our Own Voices

"When I began to live in my correct gender, I was stopped by police and forced to strip in public in front of them as well as being verbally harassed, threatened with arrest, and accused of being a sex worker."

"While I was in solitary, a cop asked me about my gender. I told him I was male, and he told me I sounded female. Next thing I knew, I was being taken to the jail doctor to spread my legs and have him confirm my gender. It was humiliating."

"I was in [jail] for 12 days housed with male detainees. Upon being booked, I was escorted to the shower area where I was forced to strip down and shower with male inmates who made sexual advances towards me while mocking me for being different. I feared for my life and the guards were of no help because they mocked me for being transgender."

"When I was booked, the officers asked very intrusive questions about my genitalia in a very nonprofessional manner and laughed about it. They ended up booking me into an all-female solitary confinement cell, kept calling me 'miss,' and gave me female colors even though I pass full time as male."

AR_217186

Figure 14.8: Comfort asking the police for help



*A majority (57%) of respondents said they would be somewhat or very uncomfortable asking for help from the police if they needed it.*

Middle Eastern (70%), Black (67%), and multiracial (67%) respondents were more likely to say that they were either somewhat or very uncomfortable asking for help from the police (Figure 14.9). Respondents with disabilities (70%) and those who were living in poverty (67%) were also more likely to be somewhat or very uncomfortable asking for help from the police.

# III. Arrest

Two percent (2%) of all respondents reported having been arrested in the past year. Almost one-quarter (22%) of those who were arrested believed that they were arrested because they were transgender.

Respondents who were homeless in the past year (6%) were more likely to be arrested during that year. Transgender women of color, including Black (6%), American Indian (6%), and multiracial (3%) women, were also more likely to be arrested in the past year (Figure 14.10).

Figure 14.9: Somewhat or very uncomfortable asking the police for help
RACE/ETHNICITY (%)



Figure 14.10: Arrested in the past year for any reason among transgender women
RACE/ETHNICITY (%)



POLICE, PRISONS, AND IMMIGRATION DETENTION

189

AR_217187