# B. INCARCERATION IN JAIL, PRISON, OR JUVENILE DETENTION

KEY FINDINGS

▶ Two percent (2%) of respondents were held in jail, prison, or juvenile detention in the past year.

▶ Nearly one-third (30%) of respondents who were incarcerated were physically and/or sexually assaulted by facility staff and/or another inmate in the past year.

▶ During the past year, more than one-third (37%) of respondents who were taking hormones before their incarceration were prevented from taking their hormones while incarcerated.

## I. Overall Incarceration Rates

Two percent (2%) of respondents were incarcerated (held in jail, prison, or juvenile detention) in the past year. Twelve percent (12%) of undocumented respondents were incarcerated in the past year. Transgender women of color, including Black (9%) and American Indian (6%) women, were more likely to have been incarcerated in the past year (Figure 14.11), as were respondents who had been homeless in the past year (7%).

Respondents who were incarcerated in the past year were asked what type of jail, prison, or juvenile detention facility they were in, and they made one or more selections. Most of these respondents were incarcerated in a local jail (64%) and/or held in a holding cell (58%) (Figure 14.12).

**Figure 14.12: Types of incarceration facilities**



**Figure 14.11: Incarcerated in the past year among transgender women**
RACE/ETHNICITY (%)



2015 U.S. TRANSGENDER SURVEY

AR_217188

# II. Physical and Sexual Assault During Incarceration

Respondents who were incarcerated in jail, prison, or juvenile detention in the past year were asked whether they had been physically or sexually assaulted[8] by facility staff or other inmates during that time period. One in five (20%) respondents reported being sexually assaulted by facility staff or other inmates. This rate was five to six times higher than the rates of sexual assault by facility staff or other inmates reported by the U.S. incarcerated population in prisons (4%) and in jails (3.2%).[9] Nearly one-quarter (23%) were physically assaulted.[10] Overall, 30% were physically and/or sexually assaulted in the past year while incarcerated (Figure 14.13). Physical and sexual assault by staff or other inmates is explored separately in the following sections.

**Figure 14.13: Physical and sexual assault by staff or inmates in the past year during incarceration**



## a. Physical and Sexual Assault by Facility Staff

One in five (20%) respondents who were incarcerated in jail, prison, or juvenile detention in the past year were physically and/or sexually assaulted by facility staff during that time (Figure 14.14).

**Figure 14.14: Physical and sexual assault by facility staff during the past year**



Almost one in five (18%) respondents who were incarcerated in the past year were physically assaulted by facility staff during their time in jail, prison, or juvenile detention. Respondents who were physically assaulted by facility staff in the past year were asked how many times it happened. More than half (53%) reported that they had been physically assaulted once, 12% reported that it happened twice, 16% said that it happened between three and seven times, and nearly one in five (19%) reported that it happened eight or more times (Figure 14.15).

**Figure 14.15: Number of physical assaults by facility staff**



AR_217189

Eleven percent (11%) were sexually assaulted by facility staff in the past year during their time in jail, prison, or juvenile detention. The rate among USTS respondents was five to six times higher than the rates of sexual assault by facility staff reported by the U.S. incarcerated population in prisons (2.4%) and in jails (1.8%).[11] Respondents who were sexually assaulted by facility staff in the past year were asked how many times it happened. Nearly half (49%) said that it happened once, 9% reported that it happened twice, 19% said it happened between three and seven times, and almost one-quarter (23%) said that it happened eight or more times (Figure 14.16).

**Figure 14.16: Number of sexual assaults by facility staff**



## b. Physical and Sexual Assault by Other Inmates

Twenty-two percent (22%) of respondents who were incarcerated in jail, prison, or juvenile detention in the past year reported that they were physically and/or sexually assaulted by other inmates during that time (Figure 14.17).

**Figure 14.17: Physical and sexual assault by other inmates during the past year**



One in six (16%) respondents who were incarcerated in the past year were physically assaulted by another inmate during their time in jail, prison, or juvenile detention. Respondents who were physically assaulted by another inmate in the past year were asked how many times it happened. Fewer than half (43%) of those respondents were physically assaulted once, 13% were physically assaulted twice, 34% said that it happened between three and seven times, and one in ten (10%) said that it happened eight or more times (Figure 14.18).

*Respondents who were incarcerated were five to six times more likely than the general incarcerated population to be sexually assaulted by facility staff, and nine to ten times more likely to be sexually assaulted by another inmate.*

AR_217190

Figure 14.18: Number of physical assaults by another inmate



Figure 14.19: Number of sexual assaults by another inmate



Seventeen percent (17%) of respondents who were incarcerated in the past year reported that they were sexually assaulted by another inmate during their time in jail, prison, or juvenile detention. The rate among USTS respondents was nine to ten times higher than the rates of sexual assault by other inmates reported by the U.S. incarcerated population in prisons (2%) and in jails (1.6%).[12]

Respondents who were sexually assaulted by another inmate in the past year were asked how many times it happened. Forty-three percent (43%) of those respondents were sexually assaulted once, and 16% were sexually assaulted twice. Nearly one in five (18%) said it happened between three and seven times, and nearly one-quarter (23%) said that it happened eight or more times (Figure 14.19).

# III. Hormone Therapy During Incarceration

Over half (58%) of respondents who were incarcerated in the past year had been taking hormones before their time in jail, prison, or juvenile detention. Of those, 82% had a prescription for those hormones. More than one-third (37%) of respondents who had been taking hormones before their incarceration were prohibited from taking their hormones in the past year while in jail, prison, or juvenile detention.

*In the past year, more than one-third (37%) of respondents who had been taking hormones before being incarcerated were prohibited from taking those hormones while in jail, prison, or juvenile detention.*

AR_217191

# C. EXPERIENCES IN IMMIGRATION DETENTION

▶ Four percent (4%) of respondents who were not U.S. citizens by birth had been held in immigration detention at some point in their lives.

▶ More than half (52%) of respondents who were held in immigration detention were segregated from other people in detention, including 42% who were held in solitary confinement.

▶ Forty-five percent (45%) of respondents who were in immigration detention experienced some form of mistreatment, such as being physically or sexually assaulted or being denied access to hormones.

## I. Placement in Immigration Detention

Respondents who were not U.S. citizens by birth were asked if they had ever been held in immigration detention, such as being held in an Immigration and Customs Enforcement (ICE) detention center or a local jail just for immigration court proceedings.[13] Four percent (4%) (n=30, unweighted)[14] had been held in immigration detention. More than two-thirds (69%) of those who were held in immigration detention said that staff, guards, or others thought or knew that they were transgender or lesbian, gay, or bisexual (LGB).

## II. Isolation and Solitary Confinement

Respondents who were detained were asked whether they had been segregated from others who were also in detention. Of the thirty respondents who answered this question, more than half (52%) reported being isolated in one or more ways. Seventeen percent (17%) were held in a separate area for transgender and/or LGB people, such as a pod, unit, tank, or other housing area. Forty-two percent (42%) were held in solitary confinement.

Those who were held in solitary confinement were asked how long they were held in confinement. Of the nine respondents who had been in solitary confinement, forty percent (40%) were held for 14 days or less (up to two weeks). More than one-quarter (28%) were held for 1–3 months, while 14% were held in solitary confinement for over six months (Figure 14.20).

AR_217192

**Figure 14.20: Duration of solitary confinement (n=9, unweighted)**



% of those held in solitary confinement

14%
Six months to a year

14%
3–6 months

40%
14 days or less

29%
1–3 months

3%
15–30 days

*Due to the small sample size, these findings should be interpreted with caution.*

# III. Mistreatment and Assault in Immigration Detention

Those who were placed in immigration detention were asked about any mistreatment they faced while they were there, such as being physically or sexually assaulted, threatened with sexual assault, or denied access to hormones or gender-appropriate clothing. Of the twenty-nine respondents who answered these questions, 45% reported one or more of these experiences from their time in immigration detention.

Approximately one-quarter (23%) were physically assaulted and 15% were sexually assaulted by staff or detention officers or by other detainees or inmates, while 19% were threatened with sexual assault. Nearly one-third (29%) were denied access to hormone treatment (Table 14.2).

**Table 14.2: Mistreatment and assault in immigration detention**

| Form of mistreatment or assault (n=29, unweighted) | % of those detained |
| --- | --- |
| Denied access to hormones | 29% |
| Physically assaulted | 23% |
| Denied gender-appropriate clothing | 22% |
| Threatened with sexual assault | 19% |
| Sexually assaulted | 15% |
| **One or more experiences listed** | **45%** |

*Due to the small sample size, these findings should be interpreted with caution.*

# Conclusion

Respondents reported frequent contact with the law enforcement and criminal justice systems, as well as high rates of mistreatment by police, physical and sexual abuse in jails and prisons, and denial of medical treatment while incarcerated. Experiences with law enforcement varied by demographic groups, with transgender people of color, those who have experienced homelessness, people with disabilities, and low-income transgender people reporting higher rates of discomfort with and mistreatment by police and other law enforcement officers. Results also indicated substantial levels of mistreatment and abuse in jail, prisons, and juvenile detention centers. Additionally, the experiences of respondents who were placed in immigration detention included harmful conditions and mistreatment, such as lengthy periods of solitary confinement and physical and sexual assault by detention staff and other detainees.

POLICE, PRISONS, AND IMMIGRATION DETENTION

195

AR_217193

**ENDNOTES** | CHAPTER 14: POLICE, PRISONS, AND IMMIGRATION DETENTION

1  Center for American Progress & Movement Advancement Project. (2016). *Unjust: How the Broken Criminal Justice System Fails LGBT People*. Available at: http://www.lgbtmap.org/file/lgbt-criminal-justice.pdf.

2  Center for American Progress & Movement Advancement Project. (2016). *Unjust: How the Broken Criminal Justice System Fails LGBT People*. Available at: http://www.lgbtmap.org/file/lgbt-criminal-justice.pdf; Lydon, J. (2015). *Coming out of Concrete Closets: A Report on Black & Pink's National LGBTQ Survey*. Available at: http://www.blackandpink.org/wp-content/upLoads/Coming-Out-of-Concrete-Closets.-Black-and-Pink.-October-21-2015..pdf.

3  Beck, A. J. (2014). *Sexual Victimization in Prisons and Jails Reported by Inmates, 2011–12: Supplemental Tables: Prevalence of Sexual Victimization Among Transgender Adult Inmates*. DC: Bureau of Justice Statistics. Available at: https://www.bjs.gov/content/pub/pdf/svpjri1112_st.pdf.

4  Human Rights Watch. (2016). *"Do You See How Much I'm Suffering Here?": Abuse Against Transgender Women in US Immigration Detention*. NY, New York: Human Rights Watch. Available at: https://www.hrw.org/sites/default/files/report_pdf/us0316_web.pdf; Jeanty, J. & Tobin, H. J. (2013). *Our Moment for Reform: Immigration and Transgender People*. DC: National Center for Transgender Equality. Available at: http://www.transequality.org/sites/default/files/docs/resources/OurMoment_CIR_en.pdf.

5  Respondents who are "living in poverty" represent those who are living at or near the poverty line. See the *Income and Employment Status* chapter for more information about the poverty line calculation.

6  "Respondents with disabilities" here refers to respondents who identified as a person with a disability in Q. 2.20.

7  Respondents received the following answer choice in Q. 28.5: "I experienced unwanted sexual contact from an officer (such as fondling, sexual assault, or rape)."

8  Respondents were asked in Q. 28.10 and Q. 28.12 whether they were "physically forced, pressured, or made to feel that [they] had to have sex or sexual contact" with facility staff or with another inmate. This question was based on the language used by the Bureau of Justice's National Inmate Survey to allow for comparison with the general incarcerated population. Beck, A. J., Berzofsky, M., Caspar, R., & Krebs, C. (2013). *Sexual Victimization in Prisons and Jails Reported by Inmates 2011–12*. DC: Bureau of Justice Statistics. Available at: https://www.bjs.gov/content/pub/pdf/svpjri1112.pdf.

9  Beck et al. See note 8. The Bureau of Justice Statistics (BJS) presents data separately for people incarcerated in state and federal prisons and people incarcerated in jails, but they do not present data for those held in juvenile detention facilities. USTS data includes the experiences of those who were incarcerated in jail, prison, and juvenile detention. Therefore, data from the U.S. incarcerated population in this section is provided as a benchmark for experiences among USTS respondents and should be interpreted with caution.

10  The National Inmate Survey does not ask about physical assault that does not involve sexual violence.

11  Beck et al. See note 8.

12  Beck et al. See note 8.

13  This section discusses the specific experiences of those held in immigration detention. General information about citizenship and immigration status, including experiences with applications for asylum, is provided in the *Portrait of USTS Respondents* chapter.

14  Although a small number of respondents in the sample (n=30, unweighted) had been held in an immigration detention facility, it was important to highlight their experiences in this report. Due to the small sample size, unweighted frequencies are presented alongside weighted percentages in this section to be clear that the percentages reflect the experiences of a small number of respondents. While it is important to present these experiences in this report, the findings presented in this section should be interpreted with caution due to the small sample size.

AR_217194



# CHAPTER 15

# Harassment and Violence

The freedom to participate in public life without fear of discrimination, harassment, and violence has been shown to have wide-ranging impacts on health, economic stability, and other key aspects of life.[1] Transgender people, however, are often vulnerable to mistreatment in public spaces, resulting in barriers to civic and economic participation.[2] Transgender people also face high rates of violence, including physical attacks, sexual assault, and intimate partner violence.[3]

Respondents were asked about their experiences in the past year with unequal treatment or service[4] in businesses, government agencies, and other public places (more broadly than just in public accommodations, which are covered in the *Places of Public Accommodation and Airport Security* chapter), as well their experiences with verbal harassment.[5] They also received questions about experiences with being physically attacked or sexually assaulted in a variety of settings. Finally, they were asked about experiences with intimate partner violence. Questions were informed by several national surveys, including the National Crime Victimization Survey and the National Intimate Partner and Sexual Violence Survey.[6] Notable differences in respondents' experiences based on demographic and other characteristics are reported throughout the chapter.

AR_217195

KEY FINDINGS

▶ Nearly half (48%) of all respondents in the sample reported being denied equal treatment, verbally harassed, and/or physically attacked in the past year because of being transgender.

- One in seven (14%) respondents reported that they were denied equal treatment or service in a public place in the past year because of being transgender.

- Nearly half (46%) of respondents reported that they were verbally harassed in the past year because of being transgender.

- Nearly one in ten (9%) respondents reported that they were physically attacked in the past year because of being transgender.

........................................................................................................

▶ Nearly half (47%) of respondents have been sexually assaulted at some point in their lifetime.

........................................................................................................

▶ One in ten (10%) respondents in the survey were sexually assaulted in the past year.

........................................................................................................

▶ More than half (54%) of respondents experienced some form of intimate partner violence.

- More than one-third (35%) experienced physical violence by an intimate partner, compared to 30% of the U.S. adult population. Nearly one-quarter (24%) experienced severe physical violence by a current or former partner, compared with 18% of the U.S. population.

## I. Overall Experiences of Unequal Treatment, Harassment, and Physical Attack

Respondents were asked if they had been denied equal treatment or service, verbally harassed, or physically attacked in the past year for any reason, regardless of whether it happened because they were transgender. This section of the chapter will examine respondents' overall experiences in the past year, and is followed by separate sections

examining denial of equal treatment, verbal harassment, and physical attacks in greater detail.

Fifty-eight percent (58%) of respondents said that they were denied equal treatment or service, verbally harassed, and/or physically attacked in the past year for any reason. Respondents who were currently working in the underground economy, such as sex work, drug sales, or other work that is currently criminalized (82%), and people with disabilities[7] (69%) were more likely to report one or more of these experiences. Middle Eastern (70%), multiracial (70%), and American Indian (69%) respondents were also more likely to report one or more of these experiences (Figure 15.1).

2015 U.S. TRANSGENDER SURVEY

AR_217196



Figure 15.1: Unequal treatment, verbal harassment, and/or physical attack for any reason in the past year
RACE/ETHNICITY (%)

Respondents who had one or more of these experiences were then asked what they believed the reasons were for that treatment. Eighty-four percent (84%) believed that it happened because of their gender identity or expression. This means that 48% of all respondents in the survey reported that they were denied equal treatment or service, verbally harassed, and/or physically attacked because of being transgender in the past year (Table 15.1).

Table 15.1: Denial of equal treatment, verbal harassment, and physical attack in the past year

| Experience | Had experience for any reason (% of respondents) | Had experience because of being transgender (% of respondents) |
|---|---|---|
| Denied equal treatment | 16% | 14% |
| Verbally harassed | 54% | 46% |
| Physically attacked | 13% | 9% |
| One or more experiences listed | 58% | 48% |

*Nearly half (48%) of respondents reported that they were denied equal treatment or service, verbally harassed, and/or physically attacked because of being transgender in the past year.*

Those who said that others could usually or always tell that they were transgender (66%) were more likely to report having one or more of these experiences because of being transgender, in contrast to those who said that others could rarely or never tell that they were transgender (39%) (Figure 15.2).



Figure 15.2: Denial of equal treatment, verbal harassment, and physical attack in the past year
OTHERS' PERCEPTION OF TRANSGENDER STATUS (%)

■ % of those who said others could *always or usually* tell they were transgender

▨ % of those who said others could *sometimes* tell they were transgender

░ % of those who said others could *rarely or never* tell they were transgender

Almost three-quarters (73%) of respondents who were currently working in the underground economy reported being denied equal treatment, verbally harassed, and/or physically attacked in the past year because of being transgender (Figure 15.3).

AR_217197



Figure 15.3: Unequal treatment, harassment, and physical attack in the past year
CURRENT PARTICIPATION IN THE UNDERGROUND ECONOMY (%)

■ % of those who are currently working in the underground economy
▨ % of those who are not currently working in the underground economy

# II. Unequal Treatment or Service

Sixteen percent (16%) of respondents were denied equal treatment or service in the year before taking the survey, such as at a place of business, government agency, or other public place, for any reason, regardless of whether it was related to being transgender.

People of color were more likely to have experienced unequal treatment or service. Almost one-third (30%) of American Indian respondents reported being denied equal treatment or service at a public place in the past year. Middle Eastern (23%), multiracial (22%), and Black (20%) respondents also reported higher rates (Figure 15.4). Undocumented residents (39%) were more than twice as likely to have been denied equal treatment or service as those in the overall sample, in contrast to documented non-citizens (20%) and citizens (16%).



Figure 15.4: Denial of equal treatment or service for any reason in the past year
RACE/ETHNICITY (%)

Respondents who were denied equal treatment or service were asked what they believed the reasons were for that treatment, and they selected one or more reasons from a list, such as age, race or ethnicity, and gender identity or expression (Table 15.2).

Table 15.2: Reported reasons for denial of equal treatment or service

| Reason for experience[8] | % of those denied equal treatment | % of whole sample |
|---|---|---|
| Age | 14% | 2% |
| Disability | 14% | 2% |
| Income level or education | 13% | 2% |
| **Gender identity or expression** | **88%** | **14%** |
| Race or ethnicity | 24% | 4% |
| Religion or spirituality | 5% | 1% |
| Sexual orientation | 36% | 6% |
| None of the above | 2% | <1% |

Fourteen percent (14%) of all respondents said they had been denied equal treatment or service in the past year because of their gender identity or expression.[9]

Respondents also reported that they had been denied equal treatment or service because of their race or ethnicity. Among people of color, Black (15%), Asian (9%), and multiracial (8%) respondents were

AR_217198

most likely to report being denied equal treatment or service because of their race or ethnicity (Figure 15.5).

**Figure 15.5: Denial of equal treatment or service in the past year because of race or ethnicity**
RACE/ETHNICITY (%)



## III. Verbal Harassment

Respondents were asked if anyone had verbally harassed them in the past year for any reason, regardless of whether it was related to being transgender. More than half (54%) reported that they had experienced verbal harassment. Those who were currently working in the underground economy (77%) were more likely to experience verbal harassment. Among people of color, Middle Eastern (67%), multiracial (66%), and American Indian (65%) respondents were more likely to have been verbally harassed in the past year (Figure 15.6).

**Figure 15.6: Verbal harassment for any reason in the past year**
RACE/ETHNICITY (%)



# In Our Own Voices

"When people have tried to grope me in the street or have verbally harassed me, it's usually either because they see me as a sexual target or because they can't figure out whether I am a 'man' or a 'woman' and they think they have the right to demand an explanation."

....................................................

"I was sexually assaulted at my university. I was also attacked and stalked. The university didn't do anything to help me. Instead, it threatened to punish me. I lived in terror the entire time I was on campus. I was denied a rape kit because I was transgender and the police were completely uninterested."

....................................................

"I was found in a ditch after being brutally raped for three days. I was taken to an ER. There I met an officer who told me I deserved it for attempting to be a woman and should have died. He also refused to take a report."

....................................................

"I was a victim of spousal abuse for over ten years. This grew worse when I transitioned, as [my transition] became an easy justification for verbally, emotionally and physically abusing me."

....................................................

"My trans status was used as a tool to [make me] stay with my former partner. She would say things such as 'no one else would ever love you.'"

....................................................

HARASSMENT AND VIOLENCE

201

Respondents who were verbally harassed were asked what they believed the reasons were for that treatment (Table 15.3).

**Table 15.3: Reported reasons for verbal harassment**

| Reason for experience | % of those verbally harassed | % of whole sample |
|---|---|---|
| Age | 10% | 5% |
| Disability | 10% | 5% |
| Income level or education | 7% | 4% |
| **Gender identity or expression** | **84%** | **46%** |
| Race or ethnicity | 16% | 9% |
| Religion or spirituality | 5% | 3% |
| Sexual orientation | 42% | 23% |
| None of the above | 8% | 4% |

Nearly half (46%) of respondents in the overall sample reported they were verbally harassed in the past year because of being transgender.

Among people of color, Black (29%), Asian (27%), Middle Eastern (25%), and multiracial (18%) respondents were most likely to report being verbally harassed because of their race or ethnicity (Figure 15.7).

**Figure 15.7: Verbal harassment in the past year because of race or ethnicity**
RACE/ETHNICITY (%)



Respondents were asked if they had been verbally harassed in public *by strangers* because of being transgender in the past year.[10] One-third (33%) of all respondents reported having this experience in

the past year. Transgender women of color were more likely to be harassed by strangers because of their gender identity or expression, particularly multiracial (51%) and American Indian (47%) women (Figure 15.8). Those who said that others could always or usually tell that they were transgender, even without being told (55%), were substantially more likely to have been verbally harassed by strangers, in contrast to those who said that people could rarely or never tell that they were transgender (22%).

**Figure 15.8: Verbal harassment in public by strangers in the past year among transgender women**
RACE/ETHNICITY (%)



# IV. Physical Attack

Thirteen percent (13%) of respondents said that someone had physically attacked them in the past year, such as by grabbing them, throwing something at them, punching them, or using a weapon against them for any reason.

Those who were currently working in the underground economy (41%) were more than three times as likely to report being physically attacked in the past year. Undocumented residents (24%) were almost twice as likely to report being physically attacked. Experiences of physical attack also varied by race and ethnicity, with American Indian (25%), Middle Eastern (25%), and multiracial

AR_217200

(19%) respondents being more likely to report a physically attack in the past year (Figure 15.9).

**Figure 15.9: Physical attack for any reason in the past year**
RACE/ETHNICITY (%)



Those who had been physically attacked in the past year were asked what they believed the reasons were for that attack (Table 15.4).

**Table 15.4: Reported reasons for physical attack**

| Reason for experience | % of those physically attacked | % of whole sample |
|---|---|---|
| Age | 7% | 1% |
| Disability | 8% | 1% |
| Income level or education | 5% | 1% |
| **Gender identity or expression** | **66%** | **9%** |
| Race or ethnicity | 11% | 1% |
| Religion or spirituality | 3% | <1% |
| Sexual orientation | 32% | 4% |
| None of the above | 25% | 3% |

Nearly one in ten (9%) respondents in the overall sample reported being physically attacked in the past year because of being transgender. American Indian (19%), Middle Eastern (14%), multiracial respondents (12%), and Asian respondents (11%) were more likely to report being attacked because of being transgender (Figure 15.10), as were undocumented residents (23%).

**Figure 15.10: Physical attack in the past year because of being transgender**
RACE/ETHNICITY (%)



Respondents also reported that they had been physically attacked because of their race or ethnicity. Among people of color, Middle Eastern (6%), American Indian (4%), Black (4%), and Asian (4%) respondents were most likely to report being physically attacked because of their race or ethnicity (Figure 15.11).

**Figure 15.11: Physical attack in the past year because of race or ethnicity**
RACE/ETHNICITY (%)



Five percent (5%) of respondents in the overall sample were physically attacked in public *by strangers* because of being transgender.[11] Undocumented residents (20%) and respondents currently working in the underground economy (20%) were four times more likely to report this experience than the overall sample. Transgender women of color were also more likely to report this experience, particularly American Indian (19%), Middle Eastern (12%), and multiracial (11%) women

**Figure 15.12: Physical attack in public by strangers in the past year among transgender women**
RACE/ETHNICITY (%)



Respondents who were physically attacked for any reason in the past year were asked how many times they had been attacked. Forty-five percent (45%) were attacked once that year, and 25% were attacked twice. Thirteen percent (13%) were attacked three times, and 16% were attacked four or more times that year (Figure 15.13).

**Figure 15.13: Number of physical attacks in the past year**



These respondents were also asked to specify how they were attacked. Nearly three-quarters (73%) of those who were physically attacked in the past year reported that someone had grabbed, punched, or choked them. Twenty-nine percent (29%) reported that someone threw an object at them, like a rock or a bottle. Nearly one-third (29%)

of those who reported being physically attacked were sexually assaulted.[12] (Table 15.5).

**Table 15.5: Means of physical attack in the past year**

| Type of physical attack | % of those physically attacked |
|---|---|
| By being grabbed, punched, or choked | 73% |
| By having something thrown at them (such as a rock or bottle) | 29% |
| By being sexually assaulted | 29% |
| With another weapon (like a baseball bat, frying pan, scissors, or stick) | 7% |
| With a knife | 5% |
| With a gun | 3% |
| Not listed above | 9% |

Three percent (3%) of respondents who were physically attacked reported being attacked with a gun in the past year. Transgender women of color, particularly Black (11%) and Latina (11%) women, were nearly four times as likely to report that they were attacked with a gun (Figure 15.14). Respondents currently working in the underground economy (10%) were more than three times as likely to have been attacked with a gun, and those whose only source of income was from underground economy work (16%) were more than five times as likely to have been attacked with a gun.

**Figure 15.14: Attacked with a gun among transgender women who were physically attacked in the past year**
RACE/ETHNICITY (%)



*Sample size too low to report

AR_217202

*Nearly half (47%) of respondents have been sexually assaulted at some point in their lifetime.*

# V. Sexual Assault

In addition to questions about being physically attacked in the past year, respondents were asked questions about their experiences with sexual assault during their lifetime and in the past year,[13] informed by questions from the National Intimate Partner and Sexual Violence Survey (NISVS).[14]

Nearly half (47%) of respondents have been sexually assaulted at some point in their lifetime. This included any experiences with "unwanted sexual contact, such as oral, genital, or anal contact, penetration, forced fondling, or rape."[15,16]

Respondents who have participated in sex work (72%), those who have experienced homelessness (65%), and people with disabilities (61%) were more likely to have been sexually assaulted in their lifetime. Among people of color, American Indian (65%), multiracial (59%), Middle Eastern (58%), and Black (53%) respondents were most likely to have been sexually assaulted in their lifetime (Figure 15.15). Experiences also varied across gender, with transgender men (51%) and non-binary people with female on their original birth certificate (58%) being more likely to have been sexually assaulted, in contrast to transgender women (37%) and non-binary people with male on their original birth certificate (41%) (Figure 15.16). Among transgender men and non-binary people with female on their original birth certificates, rates of sexual assault were higher among people of color, particularly American Indian, Middle Eastern, and multiracial people (Figure 15.17 & Figure 15.18).



Figure 15.15: Lifetime sexual assault
RACE/ETHNICITY (%)



Figure 15.16: Lifetime sexual assault
GENDER IDENTITY (%)



Figure 15.17: Lifetime sexual assault among transgender men
RACE/ETHNICITY (%)

AR_217203

**Figure 15.18: Lifetime sexual assault among non-binary people with female on their original birth certificate**
RACE/ETHNICITY (%)



*One in ten (10%) respondents in the survey were sexually assaulted in the past year.*

One in ten (10%) respondents in the survey were sexually assaulted in the past year.[17,18] Respondents who were currently working in the underground economy (36%) were more than three times as likely to have been sexually assaulted in the past year.

# VI. Intimate Partner Violence

## a. Overall Intimate Partner Violence

Respondents who reported this experience were then asked who had committed the sexual assault. Approximately one-third (34%) of those who were sexually assaulted said that a current or former partner had sexually assaulted them. One-quarter (25%) of sexual assault survivors reported that a relative was the perpetrator. Nearly one-third (30%) of sexual assault survivors reported that a stranger committed the assault (Table 15.6).

Respondents who reported ever having had a romantic or sexual partner received questions about their experiences with harm involving a current or former intimate partner, including physical, emotional, or financial harm, many of which were based on questions in the National Intimate Partner and Sexual Violence Survey (NISVS).[19] Such acts of harm as described in the survey are defined as "intimate partner violence."[20]

Overall, more than half (54%) of all respondents experienced some form of intimate partner violence in their lifetime. Over three-quarters (77%) of respondents who have done sex work and nearly three-quarters (72%) of those who have been homeless experienced intimate partner violence. Undocumented residents (68%), people with disabilities (61%), and people of color, including American Indian (73%), multiracial (62%), and Middle Eastern (62%) respondents, were also more likely to report this experience (Figure 15.19).

**Table 15.6: Person who committed sexual assault**

| Person who committed sexual assault | % of respondents who have been sexually assaulted |
|---|---|
| A friend or acquaintance | 47% |
| A partner or ex-partner | 34% |
| A stranger | 30% |
| A relative | 25% |
| A coworker | 5% |
| A health care provider or doctor | 4% |
| A teacher or school staff member | 3% |
| A law enforcement officer | 2% |
| A boss or supervisor | 2% |
| A person not listed above | 12% |

AR_217204

**Figure 15.19: Intimate partner violence**
RACE/ETHNICITY (%)



**Table 15.7: Intimate partner violence involving coercive control, including intimidation, emotional and financial harm, and physical harm to others**

| Type of intimate partner violence involving coercive control | % of respondents |
|---|---|
| Told them that they were not a "real" woman or man | 25% |
| Tried to keep them from seeing or talking to family or friends | 23% |
| Stalked | 16% |
| Kept them from leaving the house when they wanted to go | 15% |
| Threatened to call the police on them | 11% |
| Threatened to "out" them | 11% |
| Kept them from having money for their own use | 9% |
| Hurt someone they love | 9% |
| Threatened to hurt a pet or threatened to take a pet away | 6% |
| Would not let them have their hormones | 3% |
| Would not let them have other medications | 3% |
| Threatened to use their immigration status against them | 1% |
| **One or more experiences listed** | **44%** |
| **One or more experiences related to being transgender listed** | **27%** |

## b. Intimidation, Emotional, and Financial Harm

Respondents received two sets of questions covering a range of experiences with intimate partner violence. The first set of questions involved experiences with coercive control, including intimidation, emotional and financial harm, and physical harm to others who were important to respondents. Sixteen percent (16%) of respondents reported that they had been stalked, compared to 6% in the U.S. population.[21] One in four (25%) respondents were told that they were not a "real" woman or man by a partner, 23% were kept from seeing or talking to family or friends, and 15% were kept from leaving the house when they wanted to go (Table 15.7).

*More than half (54%) of all respondents experienced some form of intimate partner violence in their lifetime.*

Overall, nearly half (44%) of respondents in the sample experienced some form of intimate partner violence involving coercive control, including intimidation, emotional, and financial harm. Experience with this type of intimate partner violence differed by race, with American Indian (66%), Middle Eastern (56%), and multiracial (51%) respondents reporting higher rates of these experiences (Figure 15.20). Respondents who have done sex work (66%), have experienced homelessness (62%), or were undocumented (60%) were also more likely to have experienced intimate partner violence of this form.

HARASSMENT AND VIOLENCE

AR_217205

**Figure 15.20: Intimate partner violence involving intimidation, emotional, and financial harm**
RACE/ETHNICITY (%)



## c. Intimate Partner Violence Involving Physical Harm

Respondents received additional questions about experiences of intimate partner violence involving physical harm inflicted on them (Table 15.8).

**Table 15.8: Intimate partner violence involving physical harm**

| Type of intimate partner violence | % of USTS respondents | % in U.S. population (NISVS) |
|---|---|---|
| Pushed or shoved | 30% | 23% |
| Slapped | 24% | 19% |
| Made threats to physically harm them | 20% | -- |
| Forced them to engage in sexual activity | 19% | -- |
| Hit them with a fist or something hard | 16% | 12% |
| Slammed them against something | 14% | 9% |
| Hurt them by pulling their hair | 11% | 6% |
| Kicked | 10% | 6% |
| Tried to hurt them by choking or suffocating them | 7% | 9% |
| Beat them | 6% | 6% |
| Used a knife or gun against them | 3% | 3% |
| Burned them on purpose | 2% | 1% |
| **Any physical violence** | **35%** | **30%** |
| **Any severe physical violence** | **24%** | **18%** |
| **One or more experiences listed** | **42%** | **---** |

Furthermore, more than a quarter (27%) of survey respondents reported acts of coercive control related to their transgender status, including being told that they were not a "real" woman or man, threatened with being "outed" by revealing their transgender status, or prevented from taking their hormones. Transgender women of color, including American Indian (57%) and multiracial (39%) women, were more likely to report acts of harm related to their transgender status (Figure 15.21).

**Figure 15.21: Intimate partner violence related to transgender status among transgender women**
RACE/ETHNICITY (%)



Overall, 42% of all survey respondents reported experiencing some form of intimate partner violence involving physical harm, including the threat of physical violence, over their lifetime. Respondents who have done sex work (67%) or who have experienced homelessness (61%) were more likely to report intimate partner violence involving physical harm, as were undocumented (59%), American Indian (61%), multiracial (54%), and Middle Eastern (49%) respondents (Figure 15.22).

AR_217206

**Figure 15.22: Intimate partner violence involving physical harm**
RACE/ETHNICITY (%)



More than one-third (35%) experienced some form of physical violence by an intimate partner, as defined by the National Intimate Partner and Sexual Violence Survey,[22] compared to 30% of the U.S. adult population.[23] Moreover, nearly one-quarter (24%) of respondents reported having experienced severe physical violence from a partner, compared to 18% in the U.S. population.[24]

# Conclusion

The findings indicated that respondents faced high levels of unequal treatment, harassment, and physical attacks in the past year, with higher rates of these experiences reported among people of color, respondents currently working in the underground economy, and those who reported that others can tell that they are transgender. Respondents also experienced high rates of sexual assault in their lifetime and in the past year, and were more likely than the U.S. population to experience physical intimate partner violence. People of color and undocumented residents were more likely to report experiences of sexual assault and intimate partner violence, as were respondents who have worked in the underground economy or who have experienced homelessness.

**ENDNOTES** | CHAPTER 15: HARASSMENT AND VIOLENCE

1   Langton, L. & Truman, J. (2014). *Socio-Emotional Impact of Violent Crime.* DC: Bureau of Justice Statistics. Available at: http://www.bjs.gov/content/pub/pdf/sivc.pdf; Lick, D. J., Durso, L. E., & Johnson, K. L. (2013). Minority stress and physical health among sexual minorities. *Perspectives on Psychological Science, (8)*521. Available at: http://pps.sagepub.com/content/8/5/521.full.pdf+html.

2   See e.g., Grant, J. M., Mottet, L. A., Tanis, J., Harrison, J., Herman, J. L., & Keisling, M. (2011). *Injustice at Every Turn: A Report of the National Transgender Discrimination Survey.* (pp. 124–135). DC: National Center for Transgender Equality & National Gay and Lesbian Task Force.

3   See e.g., Grant et al., 100, 127; Beemyn, G. & Rankin, S. (2011). *The Lives of Transgender People.* New York, NY: Columbia University Press.

4   This chapter discusses general experiences with unequal treatment in public places in the past year, which includes both public accommodations as well as other public spaces. For findings related to unequal treatment in specific public places, such as stores, restaurants, and government agencies, see the *Places of Public Accommodation and Airport Security* chapter.

5   This chapter discusses overall experiences with verbal harassment in the past year. Findings related to verbal harassment in specific settings are discussed in other chapters, such as the *Experiences at School*, *Employment and the Workplace*, and *Health* chapters.

HARASSMENT AND VIOLENCE

AR_217207

6   Truman, J. L. & Morgan, R. E. (2016). *Criminal Victimization, 2015*. DC: Bureau of Justice Statistics; Breiding, M. J., Smith, S. G., Basile, K. C., Walters, M. L., Chen, J., & Merrick, M. T. (2014). Prevalence and characteristics of sexual violence, stalking, and intimate partner violence victimization—National Intimate Partner and Sexual Violence Survey, United States, 2011. *MMWR, 63*(8). Available at: http://www.cdc.gov/mmwr/pdf/ss/ss6308.pdf.

7   "People with disabilities" here refers to respondents who identified as a person with a disability in Q. 2.20.

8   Respondents were asked to select all the reasons that applied to their experience.

9   The survey included both "transgender status/gender identity" and "gender expression/appearance" as answer choices so that respondents could select what they felt best represented their experience. Because there was a substantial overlap of respondents who selected both reasons, and because these terms are commonly used interchangeably or with very similar meanings, responses of those who selected one or both of these reasons are collapsed for reporting as "gender identity or expression."

10  Only respondents who reported that they were verbally harassed because of their transgender status, gender identity, gender expression, or appearance received this question (Q. 17.6), which asked: "In the past year, did strangers verbally harass you in public because of your trans status, gender identity, or gender expression?" Results are reported out of the full sample.

11  Only respondents who reported that they were physically attacked because of their transgender status, gender identity, gender expression, or appearance received this question (Q. 17.10), which asked: "In the past year, did strangers physically attack you in public because of your trans status, gender identity, or gender expression?" Results are reported out of the full sample.

12  In Q. 17.8, respondents were asked if they were physically attacked with "unwanted sexual contact (such as rape, attempted rape, being forced to penetrate)."

13  Q.18.1 asked if respondents had ever "experienced unwanted sexual contact, such as oral, genital, or anal contact, penetration, forced fondling, or rape."

14  Breiding et al. See note 6.

15  Respondents were asked if they had ever "experienced unwanted sexual contact, such as oral, genital, or anal contact, penetration, forced fondling, or rape" in Q. 18.1. This definition of sexual assault encompassed several categories of sexual violence as outlined in the National Intimate Partner and Sexual Violence Survey (NISVS). See note 16.

16  Due to differences between Q. 18.1 and the NISVS questions about sexual violence, a direct comparison to the U.S. population was not feasible for this report. However, as context for USTS respondents' experience with sexual assault, NISVS findings indicate that an estimated 11% of adults in the U.S. population have been raped in their lifetime, 19% have experienced unwanted sexual contact, 10% have experienced sexual coercion, and 4% were forced to penetrate someone. Breiding et al. See note 6. The figures for the prevalence of sexual violence during one's lifetime in the U.S. population were calculated by the research team to present a combined percentage for the experiences of men and women using 2011 data from the NISVS, as reported by the Centers for Disease Control. Since NISVS respondents could report experiences with multiple forms of sexual violence, an NISVS respondent's experiences could be reflected in several categories of sexual violence. The research team was unable to avoid double counting respondents who reported more than one experience in the NISVS, and therefore, were unable to combine the percentages of NISVS respondents who experienced *any* form of sexual violence to match the broader USTS category of "unwanted sexual contact," and make a direct comparison. Therefore, findings for the U.S. population in regard to rape, unwanted sexual contact, sexual coercion, and being forced to penetrate are presented separately, and comparisons between the NISVS and USTS findings should be interpreted with caution.

17  The 10% rate of sexual assault in the past year reported in this section was based on Q. 18.3. This differs from the rate of sexual assault in the past year reported in the "Physical Attack" section of this chapter (4%), which was based on Q. 17.8. This difference is likely due to the number of respondents in the sample who received each question based on skip-logic patterns. While all respondents in the sample received Q. 18.3, a limited number of respondents received Q. 17.8 based on their answer to Q. 17.3. Respondents who indicated that they had been physically attacked in Q. 17.3, received a follow-up question asking how they were physically attacked (Q. 17.8), which included an answer choice of "unwanted sexual contact." Those respondents who did not identify their experience of unwanted sexual contact as a form of physical attack would not have received the follow-up question regarding the method of the attack, if they had not reported another form of physical attack. Additionally, the difference in reporting may partly result from the more inclusive examples of unwanted sexual contact provided in Q. 18.3 ("such as oral, genital, or anal contact, penetration, forced fondling, or rape"), in contrast to the definition of unwanted sexual contact in Q. 17.8 ("such as rape, attempted rape, being forced to penetrate").

AR_217208

18    Due to differences between Q. 18.3 (sexual assault in the past year) and the NISVS questions about sexual violence, a direct comparison to the U.S. population was not feasible for this report. However, as context for USTS respondents' experience with sexual assault, NISVS findings indicate that an estimated 1.9% of adults in the U.S. population experienced unwanted sexual contact in the past year and an estimated 1.7% experienced sexual coercion in the past year. These figures were calculated by the research team to present a combined percentage for the experiences of men and women using 2011 data from the NISVS. Additionally, an estimated 1.6% of women were raped in the past year. Due to the small number of men who reported being raped in the past year, a reliable estimate was not available for men. An estimated 1.7% of men were forced to penetrate a perpetrator in the past year, while the number of women who were forced to penetrate a perpetrator was too low to produce a reliable estimate. Breiding et al. See note 6. Since NISVS respondents could report experiences with multiple forms of sexual violence, an NISVS respondent's experiences could be reflected in several categories of sexual violence. The research team was unable to avoid double counting respondents who reported more than one experience in the NISVS, and therefore, were unable to combine the percentages of NISVS respondents who experienced *any* form of sexual violence to match the broader USTS category of "unwanted sexual contact," and make a direct comparison. Therefore, findings for the U.S. population in regard to rape, unwanted sexual contact, sexual coercion, and being forced to penetrate are presented separately, and comparisons between the NISVS and USTS findings should be interpreted with caution.

19    Breiding et al. See note 6.

20    See Q. 19.2 and Q. 19.3 for a list of acts described as forms of intimate partner violence.

21    Breiding et al. See note 6.

22    The NISVS measure for "any physical violence" includes all of the actions listed in Table 15.8, except for forced sexual activity and threats of physical violence.

23    The figures for the prevalence of intimate partner violence involving physical violence and/or severe physical violence in the U.S. population was calculated by the research team to present a combined percentage for the experiences of men and women using 2011 data from the NISVS, as reported by the Centers for Disease Control and Prevention. See Breiding et al. See note 6.

24    According to the NISVS, "severe physical violence" includes being hurt by having one's hair pulled, being hit with a fist or something hard, kicked, slammed against something, choked or suffocated, beaten, burned, or attacked with a knife or gun.

AR_217209

# CHAPTER 16

# Places of Public Accommodation and Airport Security

2015 U.S. TRANSGENDER SURVEY

Public accommodations are places of business or other locations generally open to the public, which provide essential services that allow people to meet basic needs and participate in civic life, including government agencies, retail stores, and restaurants.[1] For transgender people, places of public accommodation are potentially unwelcoming or unsafe. Prior research has found that transgender people may face unequal treatment or harassment in public settings such as retail stores.[2] The survey explored respondents' experiences in specific types of public accommodations in the past year and found that respondents were denied equal treatment, verbally harassed, and physically attacked in several of these locations.

Respondents were also asked questions about their experiences in airports related to their gender identity or expression in the past year, given numerous reports of transgender people being subjected to excessive scrutiny and searches by Transportation Security Administration (TSA) officers when going through airport security screening.[3] Widely used body scanners often flag transgender people's bodies and gender-related clothing or items for additional screening, which can lead to unnecessary searches and make them vulnerable to harassment and discriminatory treatment by TSA officers and bystanders.[4]

Notable differences in respondents' experiences based on demographic and other characteristics are reported throughout the chapter.

AR_217210

▶ Of respondents who said that staff or employees at a place of public accommodation they visited thought or knew that they were transgender, nearly one-third (31%) experienced at least one type of negative experience, including being denied equal treatment or service (14%), verbally harassed (24%), and/or physically attacked (2%) in the past year.

- Among those who visited a retail store, restaurant, hotel, or theater and said that staff or employees thought or knew that they were transgender, 31% were denied equal treatment, verbally harassed, and/or physically attacked there.

- Approximately one-third (34%) of respondents had one or more of these negative experiences in the past year when using public transportation where employees thought or knew they were transgender.

- Nearly one-quarter (22%) of respondents had one or more of these experiences in the past year when visiting a domestic violence shelter or program or a rape crisis center where employees thought or knew they were transgender.

▶ One in five (20%) respondents did not use one or more places of public accommodation in the past year because they thought they would be mistreated as a transgender person.

▶ Additionally, 43% of respondents who went through airport security in the past year experienced a problem related to being transgender, such as being patted down or searched because of a gender-related item, having the name or gender on their ID questioned, or being detained.

# I. Overall Experiences in Places of Public Accommodation

Respondents received questions about their experiences in places of public accommodation, such as hotels, restaurants, or government agencies in the past year. They were first asked whether they had visited or used services in specific kinds of public accommodations, and they then received follow-up questions based on their responses. For each type of location that they had visited in the past year, respondents were asked whether they thought that staff or employees at the location knew or thought they were transgender. They were also asked whether

they had been denied equal treatment, verbally harassed, or physically attacked at the selected type of location because they were transgender.

Nearly all respondents in the sample (96%) had visited or used services in at least one of the places of public accommodation outlined in this chapter in the past year. Of those who had visited or used services, 50% reported that they thought the staff or employees knew or thought they were transgender at one or more of the locations. Nearly one-third (31%) of those who said that staff or employees knew or thought they were transgender experienced negative treatment in at least one of the locations, including being denied equal treatment or service, verbally harassed, or physically attacked (Table 16.1).

AR_217211

Table 16.1: Overall experiences in any place of public accommodation in the past year because of being transgender

| Experience at a place of public accommodation | % of those who believe staff knew or thought they were transgender |
|---|---|
| Denied equal treatment or service | 14% |
| Verbally harassed | 24% |
| Physically attacked | 2% |
| **One or more experiences listed** | **31%** |

Respondents' experiences in each type of public accommodation visited or used in the past year are described in detail throughout the chapter (Table 16.2). Those who had not visited a specific type of public accommodation were asked whether they did not visit or use services at that place because they were afraid of being mistreated as a transgender person. Overall, one in five (20%) reported that they did not visit or use services at one or more of these locations because they thought they would be mistreated as a transgender person.

Table 16.2: Negative experiences in places of public accommodation in the past year because of being transgender

| Location visited | % of those who believe staff knew or thought they were transgender |
|---|---|
| Public transportation | 34% |
| Retail store, restaurant, hotel, or theater | 31% |
| Drug or alcohol treatment program | 22% |
| Domestic violence shelter or program or rape crisis center | 22% |
| Gym or health club | 18% |
| Public assistance or government benefit office | 17% |
| DMV (Department of Motor Vehicles) | 14% |
| Nursing home or extended care facility | 14% |
| Court or courthouse | 13% |
| Social Security office | 11% |
| Legal services from an attorney, clinic, or legal professional | 6% |

# II. Public Transportation

Two-thirds (66%) of the sample used public transportation services in the past year, such as a bus, train, subway, or taxi. Two percent (2%) of respondents did not use public transportation in the past year for fear of mistreatment as a transgender person. Twenty-four percent (24%) of those who used public transportation believed that the employees knew or thought they were transgender. Of those, 34% reported being denied equal treatment or service, verbally harassed, or physically attacked because of being transgender while using public transportation (Table 16.3).

Table 16.3: Experiences on public transportation in the past year because of being transgender

| Experience in location | % of those who believe staff knew or thought they were transgender |
|---|---|
| Denied equal treatment or service | 4% |
| Verbally harassed | 32% |
| Physically attacked | 3% |
| **One or more experiences listed** | **34%** |

Non-binary people (39%) were more likely to have experienced negative treatment than transgender men and women (32%) when using public transportation (Figure 16.1). These experiences also varied by race and ethnicity, with American Indian (48%), multiracial (45%), and Asian (39%) respondents being more likely to have a negative experience (Figure 16.2). Those who were currently working in the underground economy (such as sex work, drug sales, or other work that is currently criminalized) (49%) and those who were living in poverty (39%) were also more likely to report such an experience.

AR_217212

**Figure 16.1: Negative experiences on public transportation in the past year**
**GENDER IDENTITY (%)**



**Figure 16.2: Negative experience on public transportation in the past year**
**RACE/ETHNICITY (%)**



*Sample size too low to report

*Nearly one-third (31%) of respondents who visited a store, restaurant, hotel, or theater where the staff knew or thought they were transgender were mistreated because of their gender identity or expression.*

# III. Retail Store, Restaurant, Hotel, or Theater

Ninety-one percent (91%) of respondents visited or used services in a retail store, restaurant, hotel, or theater in the past year. One percent (1%) of respondents reported not visiting a retail store, restaurant, hotel, or theater in the past year because they were afraid of mistreatment as a transgender person. Approximately one-third (34%) of those who visited or used services at these locations believed that the staff or employees knew or thought they were transgender. Of those, 31% reported being denied equal treatment or service, verbally harassed, or physically attacked because of being transgender (Table 16.4).

**Table 16.4: Experiences in a retail store, restaurant, hotel, or theater in the past year because of being transgender**

| Experience in location | % of those who believe staff knew or thought they were transgender |
|---|---|
| Denied equal treatment or service | 11% |
| Verbally harassed | 24% |
| Physically attacked | 1% |
| **One or more experiences listed** | **31%** |

American Indian (49%), multiracial (41%), Black (36%), and Asian (36%) respondents were more likely to have a negative experience (Figure 16.3). Those who were currently working in the underground economy (52%), those who were living in poverty level (37%), and people with disabilities[5] (39%) were also more likely to have such experiences in these locations.

**Figure 16.3: Experiences in a retail store, restaurant, hotel, or theater in the past year because of being transgender**
**RACE/ETHNICITY (%)**



## In Our Own Voices

"When I attempted to change my gender marker on my state ID, I was denied three times. All three times I was harassed. In one incident, the manager of the DMV location made fun of me and started laughing and talked so loud that other patrons at the DMV also began to laugh."

..............................................................

"A year ago I had my Social Security updated to reflect my new name and gender. I was treated with respect at all times. The woman working in the Social Security office wrote 'congratulations' and drew a heart on my copy of the documentation."

..............................................................

"A TSA officer referred to me as 'it' when I couldn't walk through their security screen following top surgery. I had to argue with TSA that a male employee needed to do the pat down and I was informed that a woman would be more appropriate. I stood my ground after repeatedly being told that I was not a man."

..............................................................

"I was subjected to a longer TSA screening while they searched my bag, pulled out my intimate items, and called over friends to look and laugh. I had to remove my wig to prove I was the same person. I was humiliated."

..............................................................

# IV. Drug or Alcohol Treatment Program

Two percent (2%) of the sample visited or used services at a drug or alcohol treatment program in the past year. One percent (1%) of respondents did not go to a treatment center in the past year because of fear of mistreatment as a transgender person. Of those who visited or used services at a treatment program, 58% believed that the staff or employees knew or thought they were transgender. Of those, 22% reported being denied equal treatment or service, verbally harassed, or physically attacked because of being transgender (Table 16.5).

**Table 16.5: Experiences in a drug or alcohol treatment program in the past year because of being transgender**

| Experience in location | % of those who believe staff knew or thought they were transgender |
|---|---|
| Denied equal treatment or service | 11% |
| Verbally harassed | 13% |
| Physically attacked | 1% |
| **One or more experiences listed** | **22%** |

AR_217214

Those who were currently working in the underground economy (34%) and those who were living in poverty (27%) were more likely to report having a negative experience in a drug or alcohol treatment program.

# V. Domestic Violence Shelter, Domestic Violence Program, or Rape Crisis Center

One percent (1%) of the sample visited or used services at a domestic violence (DV) shelter, DV program, or rape crisis center in the past year. Two percent (2%) of respondents did not go to a DV shelter or program or rape crisis center in the past year because they were afraid they would be mistreated as a transgender person. Of those who went to one of these locations, more than half (59%) believed that the staff or employees knew or thought they were transgender. Of those, nearly one-quarter (22%) reported being denied equal treatment or service, verbally harassed, or physically attacked because of being transgender (Table 16.6).

**Table 16.6: Experiences in a DV shelter, DV program, or rape crisis center in the past year because of being transgender**

| Experience in location | % of those who believe staff knew or thought they were transgender |
|---|---|
| Denied equal treatment or service | 16% |
| Verbally harassed | 11% |
| Physically attacked | 2% |
| **One or more experiences listed** | **22%** |

Transgender women (28%) were more likely to report having a negative experience at a DV shelter, DV program, or rape crisis center (Figure 16.4).

*Nearly one in four (22%) respondents who went to a domestic violence shelter or program or rape crisis center where staff knew or thought they were transgender experienced mistreatment of some kind.*

**Figure 16.4: Negative experiences in domestic violence shelter in the past year**
GENDER IDENTITY (%)



*Sample size too low to report

# VI. Gym or Health Club

More than one-third (35%) of the sample had visited or used services at a gym or health club in the past year. Fourteen percent (14%) of respondents did not go to a gym or health club in the past year because they were afraid of mistreatment as a transgender person. Of those respondents who had visited a gym or health club, 28% believed that the staff or employees knew or thought they were transgender. Of those, 18% reported being denied equal treatment or service, verbally harassed, or physically attacked because of being transgender (Table 16.7).

**Table 16.7: Experiences in a gym or health club in the past year because of being transgender**

| Experience in location | % of those who believe staff knew or thought they were transgender |
|---|---|
| Denied equal treatment or service | 7% |
| Verbally harassed | 13% |
| Physically attacked | 1% |
| **One or more experiences listed** | **18%** |

**Table 16.8: Experiences in a public assistance or government benefits office in the past year because or being transgender**

| Experience in location | % of those who believe staff knew or thought they were transgender |
|---|---|
| Denied equal treatment or service | 11% |
| Verbally harassed | 9% |
| **One or more experiences listed** | **17%** |

Respondents who were currently working in the underground economy were nearly twice as likely to report having a negative experience in a gym or health club (35%).

# VII. Public Assistance or Government Benefits Office

Twelve percent (12%) of the sample had visited or used services at a public assistance or government benefits office in the past year, such as for receiving Supplemental Nutrition Assistance Program (SNAP or food stamps) or Women, Infants, and Children (WIC) benefits. Two percent (2%) of respondents did not go to such an agency in the past year because they feared mistreatment as a transgender person. Over one-third (36%) of those who visited or used services at these locations believed that the staff or employees knew or thought they were transgender. Of those, 17% reported being denied equal treatment or service or being verbally harassed because of being transgender (Table 16.8).

American Indian (25%), multiracial (22%), Black (20%), and Latino/a (20%) respondents reported higher rates of mistreatment, in contrast to 15% of white respondents (Figure 16.5). People with disabilities (21%) and those who were currently working in the underground economy (24%) were also more likely to report having a negative experience in a public assistance or government benefits office.

**Figure 16.5: Negative experiences in a public assistance or government benefits office in the past year RACE/ETHNICITY (%)**



*Sample size too low to report

AR_217216

# VIII. DMV

Nearly half (44%) of the sample visited or used services at a DMV (Department of Motor Vehicles) in the past year. Three percent (3%) of respondents did not go to a DMV in the past year because of fear of mistreatment as a transgender person. More than one-third (36%) of those who visited this location believed that the staff or employees knew or thought they were transgender. Of those, 14% reported being denied equal treatment or service or being verbally harassed because of being transgender (Table 16.9).

Table 16.9: Experiences in a DMV in the past year because of being transgender

| Experience in location | % of those who believe staff knew or thought they were transgender |
|---|---|
| Denied equal treatment or service | 9% |
| Verbally harassed | 7% |
| **One or more experiences listed** | **14%** |

# IX. Nursing Home or Extended Care Facility

Four percent (4%) of the sample visited or used services at a nursing home or extended care facility in the past year. One percent (1%) of respondents did not go to a nursing home or extended care facility in the past year because they were afraid of mistreatment as a transgender person. Twenty-two percent (22%) of those who visited or used services in this location believed that the staff or employees knew or thought they were transgender. Of those, 14% reported being denied equal treatment or service, verbally harassed, or physically attacked because of being transgender (Table 16.10).

*Nearly one in five (18%) respondents who went to a gym or health club where staff knew or thought they were transgender experienced mistreatment of some kind.*

Table 16.10: Experiences in a nursing home or extended care facility in the past year because of being transgender

| Experience in location | % of those who believe staff knew or thought they were transgender |
|---|---|
| Denied equal treatment or service | 6% |
| Verbally harassed | 11% |
| Physically attacked | 1% |
| **One or more experiences listed** | **14%** |

# X. Court or Courthouse

Approximately one in four (22%) respondents in the sample visited or used services at a court or courthouse in the past year. Two percent (2%) of respondents did not go to a court or courthouse in the past year because they were afraid of mistreatment as a transgender person. One-half (50%) of those who visited or used services there believed that court staff or employees knew or thought they were transgender. Of those, 13% reported being denied equal treatment or service, verbally harassed, or physically attacked because of being transgender (Table 16.11).

AR_217217

**Table 16.11: Experiences in court or a courthouse in the past year because of being transgender**

| Experience in location | % of those who believe staff knew or thought they were transgender |
|---|---|
| Denied equal treatment or service | 8% |
| Verbally harassed | 8% |
| Physically attacked | <1% |
| **One or more experiences listed** | **13%** |

Those who were currently working in the underground economy (37%) were substantially more likely to report having a negative experience in court or a courthouse, and the rate was also higher among people with disabilities (19%).

# XI. Social Security Office

Nearly one in four respondents (19%) visited or used services at a Social Security office in the past year, such as for updating the name or gender on their records, receiving or changing a Social Security card, or accessing public benefits. Four percent (4%) of respondents did not go to a Social Security office in the past year for fear of mistreatment as a transgender person. Fifty-seven percent (57%) of those who went to a Social Security office believed that the staff or employees knew or thought they were transgender. Of those, 11% reported being denied equal treatment or service, verbally harassed, or physically attacked because of being transgender (Table 16.12).

**Table 16.12: Experiences in a Social Security office in the past year because of being transgender**

| Experience in location | % of those who believe staff knew or thought they were transgender |
|---|---|
| Denied equal treatment or service | 8% |
| Verbally harassed | 5% |
| Physically attacked | <1% |
| **One or more experiences listed** | **11%** |

Asian (15%), Black (15%), and Latino/a (14%) respondents were more likely to report having a negative experience in a Social Security office (Figure 16.6). Respondents who were currently working in the underground economy (36%) and people with disabilities (16%) were also more likely to have such an experience.

**Figure 16.6: Negative experience in a Social Security office in the past year**
**RACE/ETHNICITY (%)**

**Sample size too low to report*

# XII. Legal Services from an Attorney, Clinic, or Legal Professional

Twelve percent (12%) of the sample visited or used legal services from an attorney, clinic, or legal professional in the past year. Two percent (2%) of respondents did not visit or use such services in the past year due to fear of mistreatment as a transgender person. Fifty-seven percent (57%) of those who sought services from an attorney, legal clinic, or legal professional believed that the staff or employees knew or thought they were transgender. Of those respondents, 6% reported being denied equal treatment or service, verbally harassed, or physically attacked because of being transgender (Table 16.13).

Table 16.13: Experiences with legal services from an attorney, clinic, or legal professional in the past year because of being transgender

| Experience in location | % of those who believe staff knew or thought they were transgender |
| --- | --- |
| Denied equal treatment or service | 4% |
| Verbally harassed | 3% |
| One or more experiences listed | 6% |

Non-binary respondents (12%) were more than twice as likely to report having a negative experience when seeking legal services, in contrast to transgender men and women (5%) (Figure 16.7). Those who were currently working in the underground economy (23%) were almost four times as likely to report a negative experience as the overall sample.

Figure 16.7: Negative experiences with legal services from an attorney, clinic, or legal professional in the past year
GENDER IDENTITY (%)



*Sample size too low to report

# XIV. Experiences with Airport Security

In addition to the questions regarding mistreatment in and avoidance of public accommodations, respondents were asked about their experiences traveling through airport security in the United States in the past year. More than half (53%) of respondents reported having gone through airport security during that time period. These respondents were asked about specific experiences and interactions with Transportation Security Administration (TSA) officers during the security screening process.

*Forty-three percent (43%) of those who went through airport security in the past year experienced at least one problem related to their gender identity or expression.*

AR_217219

Forty-three percent (43%) of those who went through airport security in the past year experienced at least one issue related to their gender identity or expression, such as TSA officers using the wrong pronoun or title to refer to them, searching their bodies or belongings because of a gender-related item, or detaining them (Table 16.14).

Table 16.14: Issues when going through airport security in the past year

| Airport security issue | % of those who had gone through airport security |
|---|---|
| TSA officers used the wrong pronouns (such as he, she, or they) or title (such as Mr. or Ms.) | 29% |
| They were patted down due to gender-related clothing/items (such as a binder or packer) | 17% |
| They were patted down by TSA officers of the wrong gender | 14% |
| TSA officers questioned the name or gender on ID | 11% |
| TSA officers loudly announced or questioned their gender, body parts, or sensitive items (e.g., binder, packer) | 6% |
| Their bag was searched due to a gender-related item (such as a binder or packer) | 5% |
| They were asked to remove or lift clothing to show binder, undergarment, or other sensitive area | 4% |
| They were taken to a separate room for questioning or examination | 4% |
| They were verbally harassed by TSA officers | 2% |
| They experienced unwanted sexual contact (beyond typical pat down by TSA officers) | 1% |
| They were detained for over an hour | 1% |
| They missed their flight due to screening | 1% |
| TSA officers called the police about them | <1% |
| They were physically attacked attacked by TSA officers | <1% |
| They were not allowed to fly | <1% |
| **One or more experiences listed** | **43%** |

More than half (56%) of Middle Eastern and 50% of multiracial respondents who went through airport security in the past year reported one or more of these experiences (Figure 16.8). Respondents who said that others can always or usually (61%) or sometimes (53%) tell that they are transgender were more likely to report one or more of these experiences, in comparison to those who said that others can rarely or never tell that they are transgender without being told (35%). Experiences also differed by gender, with transgender men (52%) being more likely to report one or more of these experiences than transgender women (31%). Respondents who said that none of their IDs reflect the name and/or gender they prefer (51%) were also more likely to report negative experiences in airport security related to their gender identity.

Figure 16.8: Negative experience in airport security in the past year
RACE/ETHNICITY (%)



## Conclusion

Responses indicated that many respondents faced mistreatment in places of public accommodation, including being denied equal treatment or service, verbally harassed, and/or physically attacked in one or more of the locations. People of color and respondents currently working in the underground economy were more likely to report mistreatment. A substantial number of respondents also did

AR_217220

not visit or use services in places of public accommodation altogether because of fear of being mistreated as a transgender person. Additionally, findings demonstrated that many transgender people experienced mistreatment related to their gender identity when passing through airport security and, as a result, were at risk of potential harm while traveling through airports.

**ENDNOTES** | CHAPTER 16: PLACES OF PUBLIC ACCOMMODATION AND AIRPORT SECURITY

1    The legal definitions of public accommodations vary according to local, state, and federal laws, but frequently include places open to the public, such as restaurants, stores, hotels, places of public transportation, and government agencies.

2    See e.g., Equal Rights Center. (2016). *Room for Change*. DC: Equal Rights Center. Available at: http://www.equalrightscenter.org/site/DocServer/Contents.pdf?docID=2681.

3    See e.g., Charles, C. (2015, October 1). Dear TSA, my body is not an anomaly. *The Advocate*. Available at: http://www.advocate.com/commentary/2015/10/01/dear-tsa-my-body-not-anomaly; Ennis, D. (2015, October 21). Traveling while trans: Women share their stories. *The Advocate*. Available at: http://www.advocate.com/transgender/2015/10/21/traveling-while-trans-women-share-their-stories; Rogers, K. (2015, September 22). T.S.A. defends treatment of transgender air traveler. *New York Times*. Available at: http://www.nytimes.com/2015/09/23/us/shadi-petosky-tsa-transgender.html.

4    TSA body scanners examine each passenger's body based on the gender the officer perceives the passenger to be. As a result, transgender people's body parts, or items such as chest binders (compression garments) and prosthetics (such as packers and breast forms), may get flagged. This often causes transgender passengers to be outed or to face additional searches and scrutiny. See note 3.

5    "People with disabilities" here refers to respondents who identified as a person with a disability in Q. 2.20.

PLACES OF PUBLIC ACCOMMODATION
AND AIRPORT SECURITY

AR_217221



# CHAPTER 17

# Experiences in Restrooms

Safe access to public restrooms is a basic necessity and essential for most people's participation in civic life, the workplace, and school.[1] Many transgender people, however, face harassment and violence when seeking to use public restrooms, or they are excluded from restrooms by policies or staff.[2] Lack of safe restroom access has been linked to medical problems such as kidney infections, urinary tract infections, and stress-related conditions.[3] Transgender people who are denied equal access to restrooms consistent with their gender identity are vulnerable to harassment, violence, and poor mental health, including higher levels of suicidal thoughts and behaviors.[4]

This chapter explores respondents' experiences in restrooms in public places, at work, and at school, including experiences with denial of access, harassment, and violence, as well as avoidance of public restrooms. Notable differences in respondents' experiences based on demographic and other characteristics are reported throughout the chapter.

It is important to note that the survey was conducted between August and September 2015, more than six months before the state of North Carolina passed a law in March 2016 restricting transgender people's restroom access, and before similar legislation was introduced in at least 23 other states in 2016.[5] This legislation prompted substantial media coverage and public scrutiny of transgender people's restroom access. Widespread anecdotal evidence suggests that this climate had an adverse effect on the experiences of transgender people in restrooms and their perceptions of safety when accessing and using public restrooms. As a result, data collected after March 2016 would likely differ from USTS survey results, with potentially higher numbers of respondents reporting negative experiences in public restrooms.

KEY FINDINGS

▷ Nearly one-quarter (24%) of respondents said that someone had questioned or challenged their presence in a restroom in the past year.

▷ Nearly one in ten (9%) respondents reported that someone denied them access to a restroom in the past year.

▷ One in eight (12%) respondents were verbally harassed, physically attacked, or sexually assaulted when accessing or using a restroom in the past year.

▷ More than half (59%) avoided using a public restroom in the past year because they were afraid of having problems.

▷ Nearly one-third (32%) limited the amount they ate or drank to avoid using the restroom in the past year.

▷ Eight percent (8%) reported having a urinary tract infection, kidney infection, or another kidney-related problem in the past year as a result of avoiding restrooms.

# I. Access to Restrooms

Nearly one-quarter (24%) of respondents said that someone told them or asked them if they were using the wrong restroom in the past year, and nearly one in ten (9%) said that someone stopped them from entering or denied them access to a restroom in the past year. American Indian (18%), Asian (13%), and Middle Eastern (12%) respondents were more likely to report that someone stopped them from entering or denied them access to a restroom in the past year (Figure 17.1). Undocumented residents (23%) and respondents currently working in the underground economy, such as sex work, drug sales, and other work that is currently criminalized (20%), were more than twice as likely to be denied access to restrooms than those in the overall sample.

**Figure 17.1: Denied access to a restroom in the past year**
RACE/ETHNICITY (%)



EXPERIENCES IN RESTROOMS

AR_217223

*Nearly one in ten (9%) respondents said that someone stopped them from entering or denied them access to a restroom in the past year.*

# II. Verbal Harassment, Physical Attack, and Sexual Assault

Twelve percent (12%) of respondents reported being verbally harassed, physically attacked, and/or sexual assaulted[6] when accessing or while using a restroom in the past year. These experiences were more frequently reported by undocumented residents (34%), respondents currently working in the underground economy (25%), and American Indian (24%) and multiracial (16%) respondents (Figure 17.2).



Figure 17.2: Verbal harassment, physical attack, and/or sexual assault in a restroom in the past year
RACE/ETHNICITY (%)

## a. Verbal Harassment

One out of eight (12%) respondents were verbally harassed in a restroom in the past year.

Respondents who were verbally harassed in restrooms were asked for the places where the harassment had occurred. Eighty-nine percent (89%) were verbally harassed in a restroom at a public place, such as a restaurant, shopping mall, or movie theater, and 20% were verbally harassed in a school restroom (Table 17.1).

Table 17.1: Location of verbal harassment in restroom in past year

| Restroom location | % of respondents who were verbally harassed |
|---|---|
| Public place (such as a restaurant, shopping mall, or movie theater) | 89% |
| School | 20% |
| Workplace | 14% |
| Another location | 5% |

## b. Physical Attack

One percent (1%) of the sample (228 respondents, unweighted) was physically attacked in a restroom in the past year. Undocumented residents (4%) and American Indian respondents (3%) were more likely to be physically attacked in a restroom.

Respondents who were physically attacked were asked where they had experienced the physical attack. Eighty-six percent (86%) were physically attacked in a restroom at a public place, such as a restaurant, shopping mall, or movie theater, and over one-quarter (27%) said they were physically attacked in a restroom at school (Table 17.2).

Table 17.2: Location of physical attack in restroom in past year

| Restroom location | % of respondents who were physically attacked |
|---|---|
| Public place (such as a restaurant, shopping mall, or movie theater) | 86% |
| School | 27% |
| Workplace | 14% |
| Another location | 9% |

AR_217224

## c. Sexual Assault

Approximately one percent (0.6%) of the sample (139 respondents, unweighted) reported being sexually assaulted in a restroom in the past year. Those currently working in the underground economy were more likely to have had this experience (4%). Additionally, transgender women of color, including Asian (3.2%), Middle Eastern (3.2%), American Indian (2.8%), and multiracial (2.4%) women were more likely to have been sexually assaulted in a restroom in the past year (Figure 17.3).



**Figure 17.3: Sexual assault in a restroom in the past year among transgender women**
RACE/ETHNICITY (%)

More than three-quarters (78%) of respondents who were sexually assaulted reported that the sexual assault occurred in a restroom at a public place, and 19% were sexually assaulted at a school restroom (Table 17.3).

**Table 17.3: Location of sexual assault in restroom in past year**

| Restroom location | % of respondents who were sexually assaulted |
|---|---|
| Public place (such as a restaurant, shopping mall, or movie theater) | 78% |
| School | 19% |
| Workplace | 14% |
| Another location | 18% |

# III. Overall Access to and Treatment in Restrooms

Overall, in the year prior to taking the survey, 26% of all respondents were denied access to restrooms, had their presence in a restroom questioned, and/or were verbally harassed, physically attacked, or sexually assaulted in a restroom. This was nearly twice as high for undocumented residents (50%) and was also higher for respondents currently working in the underground economy (39%). It was also higher among American Indian (36%) and multiracial (32%) respondents (Figure 17.4). Respondents who said that others could always or usually tell they were transgender without being told (45%) or sometimes tell they were transgender (38%) were more likely to report one or more of these experiences, in contrast to those who said that others could rarely or never tell that they were transgender (16%).



**Figure 17.4: Any reported problem in a restroom in the past year**
RACE/ETHNICITY (%)

EXPERIENCES IN RESTROOMS

227

# IV. Avoidance of Public Restrooms

Even prior to the increased public scrutiny and conversations in North Carolina and across the country about anti-transgender bathroom legislation in 2016, 59% of respondents reported that in the past year they had either sometimes (48%) or always (11%) avoided using a restroom, such as in public, at work, or at school, because they were afraid of confrontations or other problems.

Transgender men (75%) were far more likely to report sometimes or always avoiding using a public restroom, in contrast to transgender women (53%) and non-binary respondents (53%) (Figure 17.5). Undocumented residents were also more likely to report sometimes or always avoiding using a public restroom in the past year (72%). Eighty percent (80%) of respondents who said that others could always or usually tell that they were transgender and 72% of those who said that others can sometimes tell they are transgender reported avoiding using public restroom, in contrast to 48% of those who said that others can rarely or never tell that they are transgender.

**Figure 17.5: Sometimes or always avoided bathrooms in the past year**
GENDER IDENTITY (%)



# In Our Own Voices

"I either have to 'hold it' or break down and use a male restroom in a public place. I'm not allowed to use the female restroom and have been confronted multiple times when attempting to."

...........................................................

"I went into the men's bathroom, being a man and all. I was using a stall, and I came out only to find one person who apparently thought it was okay to go after me. I was just washing my hands when he first punched me in the back and then went for my vagina. I nearly passed out due to the blow."

...........................................................

"I walked into a stall to do my business like I had done so many times before. This time, though, someone recognized me. He and his buddies circled around me as I tried to exit the restroom and pushed me around between them. A police officer walked into the restroom and tried to protest their harassment. The men responded by ripping my pants down. The officer shot me a disgusted look and left the room."

...........................................................

"I spent high school having to use the nurse's bathroom, because if I used the boys' bathroom, I would get reprimanded, and the same would happen if I went into the girls' bathroom since I was living as a boy. Going to the nurse's office always felt like a walk of shame, like there was no dignified place for me simply because I'm transgender."

...........................................................

2015 U.S. TRANSGENDER SURVEY

AR_217226

*Nearly one-third (32%) of the sample avoided drinking or eating so that they would not need to use the restroom, and 8% reported having a urinary tract infection or kidney-related medical problem as a result of avoiding restrooms in the past year.*

Respondents were also asked if they had experienced any physical problems as a result of avoiding restrooms in public places, at work, or at school. Nearly one-third (32%) of the sample avoided drinking or eating so that they would not need to use the restroom, and 8% reported having a urinary tract infection or kidney-related medical problem as a result of avoiding restrooms in the past year (Table 17.4).

**Table 17.4: Physical problems due to avoiding public restrooms in the past year**

| Physical problem | % of respondents who avoided using restrooms | % of all respondents |
|---|---|---|
| Did not use the restroom when needed to ("held it") | 89% | 55% |
| Avoided drinking or eating | 52% | 32% |
| Urinary tract infection | 12% | 8% |
| Kidney infection | 2% | 1% |
| Other kidney-related problems | 2% | 1% |
| Kidney-related problem and/or a urinary tract infection | 13% | 8% |
| A problem not listed | 2% | 1% |

## Conclusion

Responses suggest that using restrooms in public places, at work, or at school presents serious challenges for transgender people. Respondents faced numerous barriers and problems when attempting to use a public restroom, including being verbally harassed, physically attacked, sexually assaulted, or denied access to the restroom altogether. In many instances, these experiences were more frequently reported by people of color. A majority of people had avoided using public restrooms in the past year due to fear of encountering confrontations and other problems, which led to a range of health issues, including urinary tract infections and kidney-related problems.

EXPERIENCES IN RESTROOMS

AR_217227

**ENDNOTES** | CHAPTER 17: EXPERIENCES IN RESTROOMS

1   Department of Labor & Occupational Safety and Health Administration. (2015). *Best Practices: A Guide to Restroom Access for Transgender Workers.* Available at: https://www.osha.gov/Publications/OSHA3795.pdf.

2   Herman, J. L. (2013). Gendered restrooms and minority stress: The public regulation of gender and its impact on transgender people's lives. *Journal of Public Management & Social Policy, 19*(1), 65–85.

3   Herman, J. L. See note 2.

4   Seelman, K. L. (2016). Transgender adults' access to college bathrooms and housing and the relationship to suicidality. *Journal of Homosexuality, 63*(10), 1378–1399.

5   Movement Advancement Project, Equality Federation Institute, Freedom for All Americans, & National Center for Transgender Equality. (2016). *The Facts: Bathroom Safety, Nondiscrimination Laws, and Bathroom Ban Laws.* Available at: http://www.lgbtmap.org/file/bathroom-ban-laws.pdf.

6   Respondents were asked if they had experienced "unwanted sexual contact" when accessing or while using a bathroom in Q. 20.3 and Q. 20.6.

7   Movement Advancement Project et al. See note 5.

AR_217228



# CHAPTER 18

# Civic Participation and Policy Priorities

Voting and other forms of participation in the political process are important methods by which people involve themselves in their communities and can have a voice in governance at the local, state, and federal levels. They are also significant avenues by which individuals and groups can affect change and influence the policies and procedures that impact their lives.

Respondents received questions about voting in the previous national election (November 2014)[1] to assess levels of voting and determine reasons for not participating, including potential barriers to voting such as voter identification laws. Relevant questions were patterned on the November 2014 Voting and Registration Supplement of the Current Population Survey (CPS). Additionally, respondents were asked questions about their political engagement, political party affiliation, and policy priorities as they relate to issues that impact transgender people, some of which were patterned on the Gallup U.S. Daily Tracking Poll. Notable differences in respondents' experiences based on demographic and other characteristics are reported throughout the chapter.

AR_217229

KEY FINDINGS

▶ More than three-quarters (76%) of U.S. citizens of voting age in the sample reported that they were registered to vote in the November 2014 midterm election, compared to 65% of individuals in the U.S. population who reported that they were registered.

▶ More than half (54%) of U.S. citizens of voting age in the sample reported that they had voted in the election, compared to 42% of those who reported they had voted in the U.S. population.

▶ Over one-quarter (27%) of those who said they had not been registered to vote said that the main reason was that they were not interested in the election or not involved in politics.

▶ Three percent (3%) of those who said they were *not registered to vote* reported that the main reason was that they wanted to avoid harassment by election officials because they were transgender.

▶ Nineteen percent (19%) of those who reported they were registered but did not vote said that they thought their vote would not make a difference or they were not interested in the election, compared to 16% of those in the U.S. population.

▶ Three percent (3%) of those who reported *being registered to vote but not voting* said that the main reason was that they wanted to avoid harassment by election officials because they were transgender.

▶ When asked about what they believed the most important policy priorities were for transgender people, respondents most often identified addressing violence against transgender people (25%), health insurance coverage (15%), and racism (11%) as their top priorities.

# I. Voter Registration and Voting

## a. Voter Registration

Survey respondents were asked about voting in relation to the November 4, 2014 midterm election, which was the national election held in closest proximity to the survey. More than three-quarters (76%) of U.S. citizens in the survey sample who were of voting age at the time of the election[2] reported that they were registered to vote, compared to 65% of those individuals in the U.S. population.[3] The number of reported registered voters differed by race or ethnicity, with Middle Eastern (71%), Latino/a (70%), and Asian (65%) respondents being less likely to be registered than American Indian (77%), white (78%), and Black (79%) respondents (Figure 18.1).

AR_217230

**Figure 18.1: Registered to vote**
RACE/ETHNICITY (%)



Naturalized citizens (69%) were less likely to report being registered than citizens who were born in the United States (76%). There were also differences in voting registration based on respondents' sources of income, with only 48% of those whose sole source of income was from the underground economy—including sex work, drug sales, and other work that is currently criminalized—reporting being registered. Respondents whose only source of income was from unemployment benefits or other cash assistance programs such as TANF[4] (65%) were also less likely to be registered (Figure 18.2).

**Figure 18.2: Registered to vote**
SOURCES OF INCOME (%)



## b. Reasons for Not Registering to Vote

Respondents who said they were not registered to vote in the November 4, 2014 election were asked to identify the main reason why they were not registered based on categories outlined in the Current Population Survey (CPS) and additional experiences they might have had as a transgender person. More than one-quarter (27%) of those in the sample who reported that they were not registered to vote said that they were not interested in the election or not involved in politics, which was the most frequently selected reason for not being registered. Sixteen percent (16%) did not know where or how to register, and 15% indicated that they did not meet registration deadlines. One in eight (12%) felt that their vote would not make a difference and therefore did not register (Table 18.1).[5]

Additionally, respondents reported not being registered to vote because they wanted to avoid anti-transgender harassment by election officials (3%), because they did not have their current name updated on their Social Security card (2%), and because they thought their state's voter identification law would stop them from voting (1%). Avoiding anti-transgender harassment by election officials was a more common reason for transgender men and women (5%) than for crossdressers (2%) and non-binary respondents

*Three percent (3%) of respondents who were citizens and of voting age at the time of the 2014 midterm election were not registered to vote because they wanted to avoid anti-transgender harassment by election officials.*

(1%) (Figure 18.3). Those who reported that people could always or usually tell they were transgender even without being told were more than twice as likely to report this reason (8%), in contrast to those who said people could rarely or never tell they were transgender without being told (3%). Black respondents (7%) were also more likely to report that they did not register to vote in order to avoid harassment by election officials (Figure 18.4).

**Table 18.1: Main reason for not being registered to vote on November 4, 2014**

| Reasons for not being registered to vote | % of USTS citizens not registered to vote |
| --- | --- |
| They were not interested in the election or not involved in politics | 27% |
| They did not know where or how to register | 16% |
| They did not meet registration deadlines | 15% |
| They felt their vote would not make a difference | 12% |
| They did not live in place long enough or meet residency requirements | 5% |
| They were not eligible to vote (due to criminal/felony conviction or other reason) | 3% |
| Permanent illness or disability | 2% |
| Difficulty with English | <1% |
| Other reasons (including): | 19% |
| They wanted to avoid harassment by election officials because they were transgender | 3% |
| They did not have an identity document (ID) and thought they needed one to register | 2% |
| Their current name did not match the name on their Social Security card | 2% |
| They thought their state's voter ID law would stop them from voting | 1% |
| Protest or philosophical reasons (write-in response) | 1% |



**Figure 18.3: Not registered due to avoiding anti-transgender harassment**
GENDER IDENTITY (%)

**Figure 18.4: Not registered due to avoiding anti-transgender harassment**
RACE/ETHNICITY (%)



## c. Voting in the 2014 Election

More than half (54%) of U.S. citizens in the sample who were of voting age at the time of the election reported that they voted in the election, compared to 42% of those in the U.S. population.[6] Among people of color, Asian respondents (44%) were least likely to report having voted, and Latino/a (48%) and Black (50%) respondents were also less likely to report voting (Figure 18.5).

*More than half (54%) of respondents who were citizens and of voting age at the time of the 2014 midterm election reported that they voted in the election, compared to 42% in the U.S. population.*

AR_217232

**Figure 18.5: Voted in election**
RACE/ETHNICITY (%)



Respondents who were living in poverty[7] (41%) were also less likely to say they had voted, as were those who were currently working in the underground economy (40%), unemployed (42%), or out of the labor force (50%).

## d. Reasons for Not Voting

Respondents who reported being registered but did not vote in the November 4, 2014 election were asked to identify the main reason why they did not vote, based on categories outlined in the CPS and additional experiences they might have had as a transgender person. Nearly one in five (19%) respondents who reported they were registered but did not vote reported that they were not interested or felt their vote would not make a difference, compared to 16% of such voters in the U.S. population.[8] Respondents were also more than twice as likely to report not voting due to registration problems, such as not receiving an absentee ballot or not being registered in the current location (5%), than registered voters in the U.S. general population (2%) (Table 18.2).

Among those who provided additional reasons for not voting that were not included in the CPS, 3% of respondents reported that they wanted to avoid harassment by election officials because they were transgender. Transgender men and women

# In Our Own Voices

"Lawmakers pushed through voter ID reforms in my state, requiring every voter to present a photo ID with a gender marker. Since I was unable to do so, I was a victim of 'de facto' disenfranchisement and voter intimidation tactics that are now, unfortunately, all too common."

......................................................

"When changing my name on my voter registration, the DMV put in the wrong name. I don't know how to fix it and I'm scared that if I try to vote (something I really want to do!) I won't be able to because the voter registration has the wrong name."

......................................................

"I had to try twice to get my county to change my name in the voter registration, which is extremely embarrassing as people are essentially shouting that you're trans in a public place. Some accused me of attempting voter fraud when all I wanted to do was try to make sure I had the best candidates who would protect my rights."

......................................................

CIVIC PARTICIPATION AND POLICY PRIORITIES

AR_217233

(4%) were more likely to report that they did not vote because they wanted to avoid harassment by an election official than non-binary respondents (<1%) (Figure 18.6). Two percent (2%) of those who did not vote said that the main reason was that their ID did not match their current name or gender or that their photo did not match their appearance, and 1% said that the main reason was that their current name or gender that did not match their voter registration.

Table 18.2: Main reason for not voting on November 4, 2014

| Reasons included in the Current Population Survey (CPS): | % of USTS respondents who were registered but did not vote | % in U.S. population who were registered but did not vote (CPS) |
|---|---|---|
| They were not interested or felt their vote would not make a difference | 19% | 16% |
| They forgot to vote or send in an absentee ballot | 19% | 8% |
| They were too busy or had a conflicting work or school schedule | 16% | 28% |
| They were out of town or away from home | 12% | 10% |
| They did not like the candidates or campaign issues | 8% | 8% |
| Registration problems (e.g., they did not receive an absentee ballot or they were not registered in their current location) | 5% | 2% |
| Illness or disability (own or family's) | 5% | 11% |
| Inconvenient hours, polling place, or hours or lines too long | 3% | 2% |
| Transportation problems | 3% | 2% |
| Bad weather conditions | <1% | <1% |
| Other reasons | 10% | 9% |
| **Additional reasons not included in the CPS:** | | |
| They wanted to avoid harassment by election officials because they were transgender | 3% | --- |
| Their ID did not match their current name or gender, or they had an old photo | 2% | --- |
| Name or gender on ID did not match voter registration | 1% | --- |
| They did not have the ID they needed to vote | 1% | --- |
| They did not know the process for voting or did not know about the candidates (write-in response) | 1% | --- |
| Protest or philosophical reasons (write-in response) | 1% | --- |
| They were not allowed by a poll worker or election official because they were transgender | <1% | --- |

Figure 18.6: Did not vote due to avoiding anti-transgender harassment
GENDER IDENTITY (%)



have some influence on government decisions than those who believed they could not influence government decisions.

Figure 18.7: Perception of ability to influence government decisions



# II. Political Engagement and Party Affiliation

Respondents received a question about political affairs to examine how much of an influence they believed they could have on government decisions. Specifically, they were asked to rate on five-point scale from "strongly agree" to "strong disagree" what they thought about the following statement: "Someone like me can't really influence government decisions." Nearly half (44%) of respondents disagreed or strongly disagreed with the statement, and approximately one-third (32%) agreed or strongly agreed with the statement (Figure 18.7). This means that there were more respondents who thought that they could

*Half (50%) of respondents identified as Democrats, 48% identified as Independents, and 2% identified as Republicans, compared to 27%, 43%, and 27% in the U.S. general population, respectively.*

Respondents were also asked about their political party affiliation with questions that were patterned on the Gallup U.S. Daily Tracking Poll, including whether they consider themselves a Republican, Democrat, or Independent. Half (50%) of respondents identified as Democrats, 48% identified as Independents, and 2% identified as Republicans, compared to 27%, 43%, and 27% in the U.S general population, respectively (Figure 18.8).[9] Respondents who did not identify as Democrats or Republicans wrote in several political parties and political movements, including socialist or democratic socialist (4%), Green Party (2%), Libertarian (1%), and anarchist (1%). For comparison with the Gallup Daily Tracking Poll, these respondents are included as Independents in Figure 18.8.

Those who identified as Independents were also asked whether they lean more to the Democratic Party or the Republican Party. Overall, 79% in the sample reported that they were Democrats or lean towards the Democratic Party, 4% were Republicans or lean towards the Republican Party,

CIVIC PARTICIPATION AND POLICY PRIORITIES

AR_217235

and 17% were Independents who do not lean towards the Democratic or Republican parties. This compares to 44% in the U.S. population who are Democrats or lean towards the Democratic Party, 45% who are Republicans or lean towards the Republican Party, and 11% who are Independents and do not lean towards either party (Figure 18.9).[10]

When asked about their political views, more than half (55%) of the sample described themselves as "very liberal," 27% selected "liberal," 15% selected "moderate," 2% selected "conservative," and only 1% described themselves as "very conservative."

**Figure 18.8: Consider themselves a Republican, Democrat, or Independent**





**Figure 18.9: Democratic or Republican party affiliation and leaning**





# III. Policy Priorities

The survey explored respondents' opinions on the most important policy priorities for transgender people in the U.S. and asked for those issues to be ranked from "very important" to "not very important." Violence against transgender people was most widely selected as being a very important issue (94%). Insurance coverage for transgender-related health care (90%), police mistreatment of transgender people (88%), and

AR_217236

employment (87%) were also commonly selected as very important priorities (Table 18.3).

**Table 18.3: Respondents' policy priorities**

| Issue | Very important | Important | Not very important |
|---|---|---|---|
| Violence against transgender people | 94% | 5% | 1% |
| Insurance coverage for transgender-related health care | 90% | 9% | 1% |
| Police mistreatment of transgender people | 88% | 11% | 1% |
| Employment | 87% | 13% | 1% |
| Training health care providers about transgender health | 86% | 13% | 1% |
| Housing and homelessness | 85% | 14% | 1% |
| Poverty | 84% | 15% | 1% |
| Bullying and discrimination in schools | 84% | 15% | 1% |
| Racism | 83% | 15% | 3% |
| Mistreatment in prisons or jails | 82% | 16% | 2% |
| Identity documents | 79% | 20% | 1% |
| HIV/AIDS | 68% | 29% | 3% |
| Parenting and adoption rights | 68% | 28% | 4% |
| Conversion therapy | 68% | 22% | 10% |
| Immigration reform | 60% | 30% | 10% |
| Marriage recognition | 55% | 32% | 13% |
| Military (open service for transgender people) | 49% | 33% | 18% |

Respondents were also asked for their top three policy priorities. One-quarter (25%) reported that violence against transgender people was the top policy priority for them, and more than half (54%) reported that it was one of their top three priorities. Fifteen percent (15%) reported that health insurance coverage was the most important priority for them, and 11% reported that racism was the most important policy priority for them (Table 18.4).

**Table 18.4: Top policy priorities**

| Respondents' most important priority | % of respondents |
|---|---|
| Violence against transgender people | 25% |
| Insurance coverage for transgender-related health care | 15% |
| Racism | 11% |
| Employment | 7% |
| Identity documents | 7% |
| Poverty | 6% |
| Bullying and discrimination in schools | 5% |
| Training health care providers about transgender health | 5% |
| Police mistreatment of transgender people | 5% |
| Housing and homelessness | 4% |
| Mistreatment in prisons or jails | 2% |
| HIV/AIDS | 1% |
| Conversion therapy | 1% |
| Military (open service for transgender people) | 1% |
| Immigration reform | 1% |
| Parenting and adoption rights | 1% |
| Marriage recognition | 1% |

# Conclusion

Participation in the political process through activities such as voting is a vital component of influencing policies that impact lives and communities at the local, state, and national levels throughout the U.S. However, the process may be inaccessible at times or may otherwise present a difficult avenue through which policy priorities and day-to-day needs can be expressed. The results indicate that while a majority of eligible respondents had registered to vote in the most recent national election, only half had engaged in the process by voting, providing reasons such as not believing their vote would make a difference or

wanting to avoid potential harassment by election officials as a transgender person. Respondents were substantially more likely to identify with the Democratic Party or lean towards the Democratic Party than other political parties. Policy priorities that respondents identified as most important are those directly related to the safety and wellbeing of transgender people, including violence against transgender people, health insurance and health care, police treatment of transgender people, racism, employment, and housing.

**ENDNOTES** | CHAPTER 18: CIVIC PARTICIPATION AND POLICY PRIORITIES

1    Questions referred to the midterm elections held on Tuesday, November 4, 2014, and respondents received the explanation that "[t]his was the election in November 2014 to elect members of the U.S. Congress and state-level offices." See Q. 29.1 and 29.2.

2    Voter registration and voting results reported in this chapter are based on the responses of U.S. citizens in the sample who were aged 18 or older at the time of the election to provide the most appropriate comparison to Current Population Survey data on registration and voting in the U.S. population.

3    Reported voter registration in the U.S. is among U.S. citizens aged 18 and over. U.S. Census Bureau. (2014, November). *Current Population Survey: Reported Voting and Registration, by Sex and Single Years of Age: November 2014.* Available at: https://www.census.gov/data/tables/time-series/demo/voting-and-registration/p20-577.html.

4    TANF (the Temporary Assistance for Needy Families program) is a federal cash assistance program.

5    Although the Current Population Survey asked about the main reason for not registering to vote on November 4, 2014, U.S. population data for that question was not available at the time of this report.

6    The number of USTS respondents who voted represents 70% of those in the sample who were registered to vote in the election. According to the CPS, 42% of citizen voters aged 18 and older voted in the 2014 election, which represents 65% of registered voters. U.S. Census Bureau. (2014, November). *Current Population Survey. Reported*

*Voting and Registration, by Sex and Single Years of Age: November 2014.* Available at: https://www.census.gov/data/tables/time-series/demo/voting-and-registration/p20-577.html. See also File, T. (2015). *Who Votes? Congressional Elections and the American Electorate: 1978-2014.* (p. 2). DC: U.S. Census Bureau. Available at: https://www.census.gov/content/dam/Census/library/publications/2015/demo/p20-577.pdf.

7    Respondents who are "living in poverty" represent those who are living at or near the poverty line. See the *Income and Employment Status* chapter for more information about the poverty line calculation.

8    U.S. Census Bureau. (2014, November). *Current Population Survey. Voting and Registration in the Election of November 2014.* Available at: https://www.census.gov/data/tables/time-series/demo/voting-and-registration/p20-577.html.

9    This data is based on Gallup Poll results from September 9–13, 2015, the poll in closest proximity to when the survey was in the field. Gallup Poll. (2015, September 9–13). *Party Affiliation.* Available at: http://www.gallup.com/poll/15370/party-affiliation.aspx.

10   Gallup Poll. (2015, September 9–13). *Party Affiliation.* Available at: http://www.gallup.com/poll/15370/party-affiliation.aspx.

AR_217238

# About the Authors

## Sandy E. James

As Survey Project Manager at the National Center for Transgender Equality, Sandy led the research team in developing, fielding, analyzing, and presenting the 2015 U.S. Transgender Survey. After a decade-long career as a forensic toxicologist, Sandy launched a new career as a civil rights advocate focused on law, research, and policy to advance transgender rights. He has worked on numerous projects involving trans-related legislation, policy, and research, including extensive work with data from the 2008–09 National Transgender Discrimination Survey. Sandy has been published in *The Georgetown Journal of Gender and the Law* and the *LGBTQ Policy Journal at the Harvard Kennedy School.* Sandy received a J.D and M.A in American Government from Georgetown University, where he is also currently pursuing his Ph.D.

## Jody L. Herman

Jody L. Herman is a Scholar of Public Policy at the Williams Institute at the UCLA School of Law. She holds a Ph.D. in Public Policy and Public Administration in the field of Gender and Social Policy from the George Washington University, where she also earned her M.A. in Public Policy with a concentration in Women's Studies. Her doctoral dissertation focused on the problems transgender and gender non-conforming people face when using public restrooms and the development of anti-discrimination protections in public accommodations based on gender identity and expression. She has worked on issues of poverty, women's rights, voting rights, and anti-discrimination policy development with non-profit research, advocacy, and direct-service organizations in the United States and Mexico. She served as a co-author on the groundbreaking report *Injustice at Every Turn*, based on the National Transgender Discrimination Survey conducted by the National Gay and Lesbian Task Force and the National Center for Transgender Equality. Her research at the Williams Institute focuses on the prevalence and impact of interpersonal and structural discrimination based on gender identity or expression.

## Sue Rankin

Sue Rankin is the principal of Rankin & Associates Consulting. She retired from the Pennsylvania State University in 2013 after 36 years, where she most recently served as an Associate Professor of Education, and Associate in the Center for the Study of Higher Education. Sue earned her B.S. from Montclair State University in 1978, and an M.S. and Ph.D. from the Pennsylvania State University. She has presented and published widely on the impact of sexism, racism, and heterosexism in the academy and in intercollegiate athletics. Her current research focuses on the assessment of institutional climate and providing program planners and policymakers with recommended strategies to improve the campus climate for under-served communities. Her recent publications include *The State of Higher Education for LGBT People* and *The Lives of Transgender People* in 2010 and an *NCAA Student-Athlete Climate Study* in 2011. In addition to serving as a consultant for the National Transgender Discrimination Survey in 2011, she has collaborated with over 170 institutions in implementing assessments and developing strategic plans regarding social justice issues.

ABOUT THE AUTHORS

AR_217239

## Mara Keisling

Mara Keisling is the founding Executive Director of the National Center for Transgender Equality, one of the nation's leading social justice organizations winning life-saving change for transgender people. After a 25-year career in survey research, Mara helped found NCTE and quickly became one of the nation's foremost authorities on transgender issues. Mara has led organizational and coalition efforts that have won significant advances in transgender equality throughout the country, especially in federal law and policy. Under her leadership, NCTE has won well over 100 federal policy changes that have improved the lives of transgender people. Mara was a co-author of *Injustice at Every Turn: The Report of the National Transgender Discrimination Survey*. A native of Pennsylvania and a transgender woman, Mara holds a B.A. from Pennsylvania State University and conducted her graduate studies in American Government at Harvard University.

## Lisa Mottet

Lisa Mottet joined the National Center for Transgender Equality as the Deputy Executive Director in 2013, helping to grow NCTE from 5 staff to now 15 staff. She helps guide the organization's local, state, and federal policy advocacy, while also helping to oversee communications and development. In her previous position as Director of the Transgender Civil Rights Project at the National LGBTQ Task Force (formerly the National Gay and Lesbian Task Force), where she served for 12 years, she was a member of the research team for the National Transgender Discrimination Survey, and co-authored the report of its findings, *Injustice at Every Turn* (2011). As a long-time ally to the transgender community, Lisa was a major figure in promoting trans-inclusion in the LGBT movement and, while at the Task Force, she helped engineer the addition of "gender identity" to the Matthew Shepard and James Byrd, Jr. Hate Crimes Prevention Act, which became law in 2009, and to the Employment Non-Discrimination Act. Her thoughts and guidance on trans-inclusion were recorded in the 2008 publication, *Opening the Door to Transgender Inclusion: The Nine Keys to Making LGBT Organizations Fully Transgender-Inclusive*. Also while at the Task Force, Lisa co-authored *Transitioning Our Shelters: A Guide to Making Homeless Shelters Safe for Transgender People*. Lisa graduated from the University of Washington in 1998 and received her J.D. from the Georgetown University Law Center in 2001.

## Ma'ayan Anafi

Ma'ayan Anafi is a Policy Counsel at the National Center for Transgender Equality. As part of the NCTE team, Ma'ayan has worked to strengthen and preserve nondiscrimination protections for transgender communities, with a focus on efforts to defeat anti-transgender state legislation and the implementation of federal nondiscrimination laws in health care, employment, education, and housing. Ma'ayan obtained a J.D. from Harvard Law School and a B.A. from the University of Toronto. An Autistic and non-binary transgender person, Ma'ayan is the co-leader of the DC chapter of the Autistic Self-Advocacy Network.

AR_217240



# Appendix A

Demographic Description and
Other Characteristics of the Sample

Throughout the report, findings were presented with the standard or supplemental survey weight applied. These weights adjusted the sample to reflect the U.S. population in regard to age, race, and educational attainment and also adjusted for disproportionate representation of 18-year-olds in the sample. In this appendix, unweighted tabulations of selected demographic and other variables are presented to provide a description of the sample before weights were applied. This includes recoded variables, which are indicated as such. See the *Methodology* chapter and *Appendix C: Detailed Methodology* for a description of the weights used in this report.

APPENDIX A

243

AR_217241

| Q1.4. What U.S. state or territory do you currently live in? | Unweighted frequency | Unweighted % |
|---|---|---|
| U.S. military base outside of the U.S. | 32 | 0.1% |
| Alabama | 228 | 0.8% |
| Alaska | 84 | 0.3% |
| American Samoa | 2 | 0.0% |
| Arizona | 537 | 1.9% |
| Arkansas | 222 | 0.8% |
| California | 3453 | 12.5% |
| Colorado | 669 | 2.4% |
| Connecticut | 319 | 1.2% |
| Delaware | 84 | 0.3% |
| District of Columbia | 214 | 0.8% |
| Florida | 1099 | 4.0% |
| Georgia | 614 | 2.2% |
| Guam | 2 | 0.0% |
| Hawai'i | 69 | 0.3% |
| Idaho | 155 | 0.6% |
| Illinois | 1082 | 3.9% |
| Indiana | 452 | 1.6% |
| Iowa | 219 | 0.8% |
| Kansas | 197 | 0.7% |
| Kentucky | 274 | 1.0% |
| Louisiana | 274 | 1.0% |
| Maine | 182 | 0.7% |
| Maryland | 662 | 2.4% |
| Massachusetts | 1195 | 4.3% |
| Michigan | 894 | 3.2% |
| Minnesota | 670 | 2.4% |
| Mississippi | 82 | 0.3% |
| Missouri | 509 | 1.8% |
| Montana | 72 | 0.3% |
| Nebraska | 165 | 0.6% |
| Nevada | 206 | 0.7% |
| New Hampshire | 225 | 0.8% |
| New Jersey | 550 | 2.0% |
| New Mexico | 213 | 0.8% |
| New York | 1779 | 6.4% |
| North Carolina | 686 | 2.5% |
| North Dakota | 46 | 0.2% |
| Ohio | 941 | 3.4% |
| Oklahoma | 215 | 0.8% |

| Q1.4. What U.S. state or territory do you currently live in? (continued) | Unweighted frequency | Unweighted % |
|---|---|---|
| Oregon | 1152 | 4.2% |
| Pennsylvania | 1171 | 4.2% |
| Puerto Rico | 27 | 0.1% |
| Rhode Island | 119 | 0.4% |
| South Carolina | 233 | 0.8% |
| South Dakota | 43 | 0.2% |
| Tennessee | 416 | 1.5% |
| Texas | 1490 | 5.4% |
| Utah | 270 | 1.0% |
| Vermont | 163 | 0.6% |
| Virginia | 723 | 2.6% |
| Washington | 1667 | 6.0% |
| West Virginia | 83 | 0.3% |
| Wisconsin | 541 | 2.0% |
| Wyoming | 44 | 0.2% |
| **Total** | **27715** | **100%** |

| Q1.4. U.S. region of current residence (recode based on Census regions) | Unweighted frequency | Unweighted % |
|---|---|---|
| Northeast | 5703 | 21% |
| Midwest | 5759 | 21% |
| South | 7599 | 27% |
| West | 8591 | 31% |
| **Total** | **27652** | **100%** |

| Q1.10. Do you think of yourself as transgender? | Unweighted frequency | Unweighted % |
|---|---|---|
| No | 3270 | 12% |
| Yes | 24445 | 88% |
| **Total** | **27715** | **100%** |

| Q1.11. Do you identify as more than one gender or as no gender? | Unweighted frequency | Unweighted % |
|---|---|---|
| No | 14362 | 52% |
| Yes | 13353 | 48% |
| **Total** | **27715** | **100%** |

| Q1.12. Do you currently live full-time in a gender that is different from the one assigned to you at birth? | Unweighted frequency | Unweighted % |
|---|---|---|
| No | 11135 | 40% |
| Yes | 16580 | 60% |
| **Total** | **27715** | **100%** |

**Q1.14. Someday do you want to live full time in a gender that is different from the one assigned to you at birth?\***

| | Unweighted frequency | Unweighted % |
|---|---|---|
| No | 770 | 7% |
| Yes | 6497 | 58% |
| Not sure | 3862 | 35% |
| **Total** | **11129** | **100%** |

*Asked of those who responded "No" to Q1.12.*

**Q1.16. Have you seriously thought about living in a gender that is different from the one assigned to you at birth (transitioning gender)?\***

| | Unweighted frequency | Unweighted % |
|---|---|---|
| No | 251 | 33% |
| Yes | 519 | 67% |
| **Total** | **770** | **100%** |

*Asked of those who responded "No" to Q1.12 and Q1.14.*

**Q1.17. Do you consider yourself to be a cross-dresser?**

| | Unweighted frequency | Unweighted % |
|---|---|---|
| No | 25225 | 91% |
| Yes | 2490 | 9% |
| **Total** | **27715** | **100%** |

**Q1.18. Do you live part of the time in one gender and part of the time in another gender?**

| | Unweighted frequency | Unweighted % |
|---|---|---|
| No | 19063 | 69% |
| Yes | 8652 | 31% |
| **Total** | **27715** | **100%** |

**Q2.1. What sex were you assigned at birth, on your original birth certificate?**

| | Unweighted frequency | Unweighted % |
|---|---|---|
| Female | 15858 | 57% |
| Male | 11857 | 43% |
| **Total** | **27715** | **100%** |

**Q2.1 & Q2.3. Gender categories used for analysis (recode)**

| | Unweighted frequency | Unweighted % |
|---|---|---|
| Crossdressers | 758 | 3% |
| Transgender women | 9238 | 33% |
| Transgender men | 7950 | 29% |
| Non-binary people, assigned female at birth | 7844 | 28% |
| Non-binary people, assigned male at birth | 1925 | 7% |
| **Total** | **27715** | **100%** |

**Q2.1 & Q2.3. Gender categories (collapsed recode)**

| | Unweighted frequency | Unweighted % |
|---|---|---|
| Transgender men and women | 17188 | 64% |
| Non-binary people | 9769 | 36% |
| **Total** | **26957** | **100%** |

**Q2.4. How comfortable are you with the word "transgender" being used to describe you?**

| | Unweighted frequency | Unweighted % |
|---|---|---|
| Very comfortable | 12189 | 44% |
| Somewhat comfortable | 7413 | 27% |
| Neutral | 4129 | 15% |
| Somewhat uncomfortable | 3116 | 11% |
| Very uncomfortable | 830 | 3% |
| **Total** | **27677** | **100%** |

**Q2.5. What gender pronouns do you ask people to use to refer to you?**

| | Unweighted frequency | Unweighted %\* |
|---|---|---|
| He, his | 9981 | 36% |
| She, hers | 10138 | 37% |
| They, their | 8026 | 29% |
| Ze, hir | 466 | 2% |
| No pronouns. I ask people only to use my name. | 1095 | 4% |
| I don't ask people to use specific pronouns. | 5619 | 20% |
| Pronouns not listed above | 1162 | 4% |

*Multiple choices were allowed, so percentages do not add to 100%.*

**Q2.6. What gender do you currently live in on a day-to-day basis?**

| | Unweighted frequency | Unweighted % |
|---|---|---|
| Man | 9418 | 34% |
| Woman | 8271 | 30% |
| Neither man nor woman/ Genderqueer/Non-binary | 5721 | 21% |
| Part time one gender/part time another gender | 4305 | 16% |
| **Total** | **27715** | **100%** |

**Q2.7. People can tell I am trans even if I don't tell them.**

| | Unweighted frequency | Unweighted % |
|---|---|---|
| Always | 549 | 2% |
| Most of the time | 2629 | 10% |
| Sometimes | 9139 | 33% |
| Rarely | 8986 | 33% |
| Never | 6346 | 23% |
| **Total** | **27649** | **100%** |

AR_217243

| Q2.8. What best describes your current sexual orientation? | Unweighted frequency | Unweighted % |
|---|---|---|
| Asexual | 2984 | 11% |
| Bisexual | 4129 | 15% |
| Gay | 1316 | 5% |
| Heterosexual/Straight | 3363 | 12% |
| Lesbian | 3037 | 11% |
| Same-gender loving | 264 | 1% |
| Pansexual | 5056 | 18% |
| Queer | 5706 | 21% |
| Demisexual* | 287 | 1% |
| A sexual orientation not listed above | 1573 | 6% |
| **Total** | **27715** | **100%** |

*Added to the response list from write-in responses.

| Q2.9-Q2.11. Race/ethnicity (recode) | Unweighted frequency | Unweighted % |
|---|---|---|
| Alaska Native alone | 17 | 0.1% |
| American Indian alone | 302 | 1.1% |
| Asian/Asian American alone | 721 | 2.6% |
| Biracial/Multiracial | 1513 | 5.5% |
| Black/African American alone | 796 | 2.9% |
| Latino/a/Hispanic alone | 1473 | 5.3% |
| Middle Eastern/North African alone | 132 | 0.5% |
| Native Hawaiian/Pacific Islander alone | 62 | 0.2% |
| White/European American alone | 22658 | 81.8% |
| A racial/ethnic identity not listed above | 41 | 0.2% |
| **Total** | **27715** | **100%** |

| Q2.12. Religious/spiritual identity (recode) | Unweighted frequency | Unweighted % |
|---|---|---|
| Not religious/spiritual | 10460 | 38% |
| Religious/spiritual | 17195 | 62% |
| **Total** | **27655** | **100%** |

| Q2.13. Age ranges (recode) | Unweighted frequency | Unweighted % |
|---|---|---|
| 18 to 24 | 11840 | 43% |
| 25 to 44 | 10987 | 40% |
| 45 to 64 | 4085 | 15% |
| 65 and over | 803 | 3% |
| **Total** | **27715** | **100%** |

| Q2.15. What is your current relationship status? | Unweighted frequency | Unweighted % |
|---|---|---|
| Partnered, living together | 8762 | 31.6% |
| Partnered, not living together | 4630 | 16.7% |
| Single | 13219 | 47.7% |
| Not listed above | 404 | 1.5% |
| Aromantic/not active/platonic* | 67 | 0.2% |
| Open relationship* | 53 | 0.2% |
| Poly* | 535 | 1.9% |
| Single, divorced* | 11 | 0.0% |
| Single, widowed* | 28 | 0.1% |
| **Total** | **27709** | **100%** |

*Added to the response list from write-in responses.

| Q2.16. What is your current legal marital status? | Unweighted frequency | Unweighted % |
|---|---|---|
| Married | 4671 | 16.9% |
| Legally recognized civil union | 67 | 0.2% |
| Registered domestic partnership | 238 | 0.9% |
| Widowed | 216 | 0.8% |
| Divorced | 2538 | 9.2% |
| Separated | 456 | 1.7% |
| Single, never married | 19463 | 70.4% |
| **Total** | **27649** | **100%** |

| Q2.17. Have you ever served on active duty in the U.S. Armed Forces, Reserves, or National Guard? | Unweighted frequency | Unweighted % |
|---|---|---|
| Never served in the military | 25263 | 91.3% |
| Only active duty for training in the Reserves or National Guard | 298 | 1.1% |
| Now on active duty | 129 | 0.5% |
| On active duty in the past, but not now | 1976 | 7.1% |
| **Total** | **27666** | **100%** |

| Q2.18. What is your citizenship or immigration status in the U.S.? | Unweighted frequency | Unweighted % |
|---|---|---|
| U.S. citizen, birth | 26684 | 96.3% |
| U.S. citizen, naturalized | 555 | 2.0% |
| Permanent Resident | 249 | 0.9% |
| A visa holder (such as F-1, J-1, H1-B, and U) | 115 | 0.4% |
| DACA (Deferred Action for Childhood Arrival) | 16 | 0.1% |
| DAPA (Deferred Action for Parental Accountability) | 1 | 0.0% |
| Refugee status | 6 | 0.0% |
| Other documented status not mentioned above | 40 | 0.1% |
| Currently under a withholding of removal status | 3 | 0.0% |
| Undocumented resident | 46 | 0.2% |
| **Total** | **27715** | **100%** |

AR_217244

| Q2.20. Disability (questions based on American Community Survey, with the exception of the last question) | Unweighted frequency | Unweighted %* |
|---|---|---|
| Are you deaf or have serious difficulty hearing? | 1072 | 4% |
| Are you blind or have serious difficulty seeing even when wearing glasses? | 679 | 2% |
| Because of a physical mental or emotional condition, do you have serious difficulty concentrating, remembering, or making decisions? | 8471 | 31% |
| Do you have serious difficulty walking or climbing stairs? | 1729 | 6% |
| Do you have difficulty dressing or bathing? | 924 | 3% |
| Because of a physical, mental, or emotional condition, do you have difficulty doing errands alone, such as visiting a doctor's office or shopping? | 6200 | 23% |
| Do YOU identify as a person with a disability? | 7764 | 28% |

*Multiple choices were allowed, so percentages do not add to 100%.

| Q2.20. Any disability (recode) (based on American Community Survey questions only, not including self-identification) | Unweighted frequency | Unweighted % |
|---|---|---|
| No | 16305 | 60% |
| Yes | 10913 | 40% |
| Total | 27218 | 100 |

| Q2.21. What is the main language that people speak in your home? | Unweighted frequency | Unweighted % |
|---|---|---|
| English only | 24958 | 90.1% |
| Language(s) other than English | 285 | 1.0% |
| English and other language(s) | 2461 | 8.9% |
| Total | 27704 | 100% |

| Q2.22. What is the highest level of school or degree you have completed? | Unweighted frequency | Unweighted % |
|---|---|---|
| Less than 8th grade | 48 | 0.2% |
| 8th grade | 54 | 0.2% |
| Some high school, no diploma or GED | 804 | 2.9% |
| GED | 661 | 2.4% |
| High school graduate | 2806 | 10.1% |
| Some college, no degree (including currently in college) | 10486 | 37.8% |
| Associate degree in college—Occupational/vocational program | 858 | 3.1% |
| Associate degree in college—Academic program | 1475 | 5.3% |
| Bachelor's degree | 5291 | 19.1% |
| Some graduate work, no graduate degree | 1652 | 6.0% |
| Master's degree (M.A, M.S., MBA) | 2562 | 9.2% |
| Doctoral degree (e.g., Ph.D., Ed.D.) | 504 | 1.8% |
| Professional degree (e.g., MD, JD) | 514 | 1.9% |
| Total | 27715 | 100% |

| Q2.23. What are your current living arrangements? | Unweighted frequency | Unweighted % |
|---|---|---|
| Living in house/apartment/condo I OWN alone or with others (with a mortgage or that you own free and clear) | 4697 | 17.0% |
| Living in house/apartment/condo I RENT alone or with others | 11507 | 41.5% |
| Living with a partner, spouse, or other person who pays for the housing | 1443 | 5.2% |
| Living temporarily with friends or family because I can't afford my own housing | 2229 | 8.0% |
| Living with parents or family I grew up with because I have not yet left home | 5149 | 18.6% |
| Living in a foster group home or other foster care | 10 | 0.0% |
| Living in campus/university housing | 1821 | 6.65% |
| Living in a nursing home or other adult care facility | 9 | 0.0% |
| Living in a hospital | 2 | 0.0% |
| Living in military barracks | 31 | 0.1% |
| Living in a hotel or motel that I pay for myself | 37 | 0.1% |
| Living in a hotel or motel with an emergency shelter voucher | 6 | 0.0% |

AR_217245

| Q2.23. What are your current living arrangements? (continued) | Unweighted frequency | Unweighted % |
|---|---|---|
| Living in transitional housing/halfway house | 48 | 0.2% |
| Living on the street, in a car, in an abandoned building, in a park, or a place that is NOT a house, apartment, shelter, or other housing | 91 | 0.3% |
| Living in a homeless shelter | 36 | 0.1% |
| Living in a domestic violence shelter | 6 | 0.0% |
| Living in a shelter that is not a homeless shelter or domestic violence shelter | 3 | 0.0% |
| A living arrangement not listed above | 126 | 0.5% |
| Mobile housing (RV, camper, etc.)* | 40 | 0.1% |
| A place owned/rented by someone else* | 176 | 0.6% |
| A group home or treatment facility* | 13 | 0.1% |
| At home/with family for other reasons* | 186 | 0.7% |
| Nomadic* | 16 | 0.1% |
| Commune/co-op/collective* | 28 | 0.1% |
| **Total** | **27710** | **100%** |

*Added to the response list from write-in responses.*

| Q2.24. Is there at least one telephone INSIDE your home that is currently working and is not a cell phone? | Unweighted frequency | Unweighted % |
|---|---|---|
| No | 18255 | 66% |
| Yes | 9313 | 34% |
| **Total** | **27568** | **100%** |

| Q2.24. Do you have a cell phone? | Unweighted frequency | Unweighted % |
|---|---|---|
| No | 882 | 3% |
| Yes | 26744 | 97% |
| **Total** | **27626** | **100%** |

| Q14.1 & Q14.2 HIV status (recode) | Unweighted frequency | Unweighted % |
|---|---|---|
| HIV positive | 179 | 0.7% |
| HIV negative | 13869 | 50.2% |
| Don't know/not tested | 13606 | 49.2% |
| **Total** | **27654** | **100%** |

| Q7.7 Employment status | Unweighted frequency | Unweighted %* |
|---|---|---|
| Work for pay from sex work, selling drugs, or other work that is currently considered illegal | 516 | 1.9% |
| Work full-time for an employer | 9560 | 34.5% |
| Work part-time for an employer | 6735 | 24.3% |
| Self-employed in your own business, profession or trade, or operate a farm (not including sex work, selling drugs, or other work that is currently considered illegal) | 3868 | 14.0% |
| Unemployed but looking for work | 3991 | 14.4% |
| Unemployed and have stopped looking for work | 1247 | 4.5% |
| Not employed due to disability | 2255 | 8.1% |
| Student | 8639 | 31.2% |
| Retired | 1107 | 4.0% |
| Homemaker or full-time parent | 549 | 2.0% |
| Not listed above | 1240 | 4.5% |
| Seasonal work/odd jobs/other part-time work* | 136 | 0.5% |
| Volunteer* | 76 | 0.3% |
| Internship* | 66 | 0.2% |

*Multiple choices were allowed, so percentages do not add to 100%.*

| Q7.8. Respondent is member of a union (recode) | Unweighted frequency | Unweighted % |
|---|---|---|
| No | 25997 | 94% |
| Yes | 1691 | 6% |
| **Total** | **27688** | **100%** |

| Q7.8 & Q7.9. Respondent is a union member or under a union contract (recode) | Unweighted frequency | Unweighted % |
|---|---|---|
| No | 25623 | 92% |
| Yes | 2082 | 8% |
| **Total** | **27705** | **100%** |

| Q7.10. Do you currently receive assistance from food stamps (SNAP) or WIC? | Unweighted frequency | Unweighted % |
|---|---|---|
| No | 25060 | 91% |
| Yes | 2606 | 9% |
| **Total** | **27666** | **100%** |

| Q7.11. Current sources of income (recode) | Unweighted frequency | Unweighted % |
|---|---|---|
| Pay from sex work, selling drugs, or other work that is currently considered illegal only | 143 | 0.6% |
| Pay from employment only | 10519 | 40.4% |
| Pay from pension or retirement only | 227 | 0.9% |
| SSI or disability income only | 903 | 3.5% |
| Unemployment benefits or cash assistance only | 207 | 0.8% |
| Other income source only | 1165 | 4.5% |
| Multiple income sources | 12183 | 46.8% |
| No income | 664 | 2.6% |
| **Total** | **26011** | **100%** |

| Q7.12. Individual income in 2014 (includes all income sources except food stamps (SNAP) or WIC) | Unweighted frequency | Unweighted % |
|---|---|---|
| No income | 3913 | 14.4% |
| $1 to $5,000 | 4647 | 17.1% |
| $5,000 to $7,499 | 1665 | 6.1% |
| $7,500 to $9,999 | 1444 | 5.3% |
| $10,000 to $12,499 | 1743 | 6.4% |
| $12,500 to $14,999 | 1184 | 4.4% |
| $15,000 to $17,499 | 843 | 3.1% |
| $17,500 to $19,999 | 772 | 2.9% |
| $20,000 to $24,999 | 1568 | 5.8% |
| $25,000 to $29,999 | 1071 | 4.0% |
| $30,000 to $34,999 | 1163 | 4.3% |
| $35,000 to $39,999 | 888 | 3.3% |
| $40,000 to $49,999 | 1355 | 5.0% |
| $50,000 to $59,999 | 1049 | 3.9% |
| $60,000 to $74,999 | 1070 | 3.9% |
| $75,000 to $99,999 | 1118 | 4.1% |
| $100,000 to $149,999 | 998 | 3.7% |
| $150,000 or more | 636 | 2.3% |
| **Total** | **27127** | **100%** |

| Q7.12 - Q7.14 Household income in 2014 (recode) | Unweighted frequency | Unweighted % |
|---|---|---|
| No income | 996 | 3.9% |
| $1 to $5,000 | 1433 | 5.7% |
| $5,000 to $7,499 | 811 | 3.2% |
| $7,500 to $9,999 | 869 | 3.4% |
| $10,000 to $12,499 | 1109 | 4.4% |
| $12,500 to $14,999 | 897 | 3.6% |
| $15,000 to $17,499 | 725 | 2.9% |
| $17,500 to $19,999 | 725 | 2.9% |
| $20,000 to $24,999 | 1571 | 6.2% |
| $25,000 to $29,999 | 1220 | 4.8% |
| $30,000 to $34,999 | 1367 | 5.4% |
| $35,000 to $39,999 | 1224 | 4.8% |
| $40,000 to $49,999 | 1872 | 7.4% |
| $50,000 to $59,999 | 1806 | 7.1% |
| $60,000 to $74,999 | 2096 | 8.3% |
| $75,000 to $99,999 | 2360 | 9.3% |
| $100,000 to $149,999 | 2418 | 9.6% |
| $150,000 or more | 1797 | 7.1% |
| **Total** | **25296** | **100%** |

| Q29.1 & Q29.2 Registered to vote on November 4, 2014 (recode) | Unweighted frequency | Unweighted % |
|---|---|---|
| No | 8468 | 31% |
| Yes | 19215 | 69% |
| **Total** | **27683** | **100%** |

| Q29.1. Did you vote in the election held on Tuesday, November 4, 2014? | Unweighted frequency | Unweighted % |
|---|---|---|
| No | 13846 | 50% |
| Yes | 13805 | 50% |
| **Total** | **27651** | **100%** |



# Appendix B

Survey Instrument (Questionnaire)

2015 U.S. TRANSGENDER SURVEY

AR_217248

*The survey was offered online only. The questionnaire has been reproduced here to best reflect what respondents saw when completing the survey. Programming notes are indicated in italics.*

## QUESTIONNAIRE:

The National Center for Transgender Equality welcomes you to the 2015 U.S. Trans Survey, the follow up to the National Transgender Discrimination Survey: Injustice At Every Turn. We thank you for participating in this survey. Every voice counts in documenting and better understanding the lives and experiences of trans people in the United States, and we appreciate yours.

Sincerely,

The National Center for Transgender Equality Survey Team



## UNIVERSITY OF CALIFORNIA LOS ANGELES
### Study information sheet

## 2015 U.S. Trans Survey

This study has been commissioned by the National Center for Transgender Equality (NCTE). A research team made up of Jody L. Herman, Ph.D. and Susan Rankin, Ph.D. are conducting this study. Your participation in this study is voluntary.

### WHY IS THIS STUDY BEING DONE?

This study is being conducted to better understand the demographics, health, and experiences of trans people in the United States. The findings of this study will be used for the benefit of the trans community and the research community.

### WHAT WILL HAPPEN IF I TAKE PART IN THIS RESEARCH STUDY?

If you volunteer to participate in this study, the researchers ask that you participate in an online survey. The purpose of the survey is to gather information about you and your experiences as a trans person in the United States. You will be one of over 700,000 possible participants who may take part in this survey, which is the current best estimate of the total number of trans-identified adults in the United States.

### HOW LONG WILL I BE IN THE RESEARCH STUDY?

Participation in the study will take between 30 and 60 minutes.

### ARE THERE ANY RISKS OR DISCOMFORTS THAT I CAN EXPECT FROM THIS STUDY?

Participating in this study poses no risks that are not ordinarily encountered in daily life. Any information you provide in the survey will be confidential. Some of the questions asked of you as part of this survey may make you feel uncomfortable. You may refuse to answer questions posed to you by skipping the question. You may stop your participation in this study at any time by exiting the survey. Should you need them, there will be a list of resources, including hotlines, provided at the end of the survey.

### ARE THERE ANY BENEFITS IF I PARTICIPATE?

The results of the research will be used for the benefit of the trans community in the United States and the research community. You will not directly benefit from your participation in the research.

### WILL I BE PAID FOR MY PARTICIPATION?

You will receive no payment for your participation. You will have the option to voluntarily enter a drawing to win one of three cash prizes: one prize of $500 and two prizes of $250.

### HOW WILL INFORMATION ABOUT ME AND MY PARTICIPATION BE KEPT CONFIDENTIAL?

Your survey response will be anonymous, so no information that can be used to identify you will be collected unless you voluntarily provide it. Any information that is obtained in connection with this study and that can identify you will remain confidential. If you do voluntarily provide any information that could be used to identify you, the research team will maintain your confidentiality by taking precautions to minimize any risk to your privacy from participating in this survey.

You will be given the option at the end of the survey to be directed to a separate page on a secure website if you wish to provide your contact information to receive survey results from NCTE, be entered into the drawing for one of three cash prizes, or share your personal story with NCTE. NCTE will NOT be provided with any responses from your survey in connection with your contact information. NCTE will only know that you have participated in the survey. NCTE will not provide to the research team any information that could be used to identify you, such as your name. Therefore, you will remain anonymous to the research team.

AR_217249

Results of this research study that are reported in published form will not name you or identify you as a participant. If you choose to self-identify anywhere on the survey and provide a written response, a different name will be created and used instead of your name if quoting you directly in any publication and any content of quotes that could be used to identify you will be removed.

**CAN THE RESEARCHERS REMOVE ME FROM THIS STUDY?**

The researchers will not remove you from the study. You may remove yourself from the study by exiting the survey. If you exit the survey, your responses will not be recorded or used in the study.

**WHAT ARE MY RIGHTS IF I TAKE PART IN THIS STUDY?**

Taking part in this study is your choice. You can choose whether or not you want to participate. Whatever decision you make, there will be no penalty to you.

- You have a right to have all of your questions answered before deciding whether to take part in the study.
- If you decide to take part in the study, you have the right to exit the study at anytime by exiting the survey.
- If you decide at any point to stop participating in this study, you have the right to exit the study at any time by exiting the survey.

**WHO CAN I CONTACT IF I HAVE QUESTIONS ABOUT THIS STUDY?**

The Research Team:

You may contact Jody L. Herman at (310) 267-4382 or Susan Rankin at (814) 625-2780 with any questions or concerns about the research or your participation in this study.

UCLA Office of the Human Research Protection Program (OHRPP):

If you have questions about your rights while taking part in this study, or you have concerns or suggestions and you want to talk to someone other than the researchers about the study, you may contact the UCLA OHRPP by phone: (310) 825-7122 or U.S. mail: UCLA OHRPP, 11000 Kinross Ave., Suite 102, Box 951694, Los Angeles, CA 90095-1694.

If you agree to take part in this study, as described in detail above, please click on the "**I AGREE**" button below. By clicking on the "**I AGREE**" button, you will indicate your consent to participate in this study.

If you do not agree to take part in this study, as described above, please click on the "**I DO NOT AGREE**" button below.

☐ **I AGREE**
I agree and give my consent to participate in this study.

☐ **I DO NOT AGREE**
I do not agree to participate in this study.

*Respondents who selected "do not agree" were sent a disqualification page #2.[1]*

## Survey Instructions

Please read and answer each question carefully. For each answer, click on the appropriate oval and/or fill in the appropriate blank. If you want to change an answer, click on the oval of your new answer and/or edit the appropriate blank, and your previous response will be erased.

You may decline to answer specific questions. The survey will take between 30-60 minutes to complete.

There will be several places in the survey where you will see a word or phrase that is underlined and bolded. You can click on those words or phrases and a definition or additional information will be offered.

In order to clear a response choice, please use the back button on your browser.

**WARNING: If you use the back button on your browser to return to a previous question, the responses you have entered for each page you clicked back on will be erased. For instance, if you click back three pages in the survey, your answers on those three pages will be erased. Responses before those three pages would stay the same.**

In the survey, please do not provide any information that could be used to identify you, such as your name or contact information. All of your answers are confidential and cannot be used against you.

**You must hit the "submit" button on the last page of the survey for your responses to be included in the final analyses.**

## Section 1

**1.1** Please make an ID in question 1.1. The research team will use the ID for their analysis. It will not be used to identify you.

Enter the first and last letter of your preferred first name. For example, if your first name is "Robert", enter "RT".

*[Text box]*

Enter the first letter of your preferred last name. For example, if your last name is "Smith", enter "S".

*[Text box]*

**1.2** It is important that people only complete this survey one time so that we can gather accurate information. You will only be entered into the prize drawing once, even if you complete this survey more than once. Have you already completed this survey before? *[Must answer to continue.]*

No

Yes *[Sent to disqualification page #1][2]*

**1.3** Are you 18 years of age or older? *[Must answer to continue.]*

No *[Sent to disqualification page #2][3]*

Yes

AR_217250

**1.4** What U.S. state or territory do you currently live in? *[Must answer to continue.]*

> *[Drop-down list of all U.S. states and territories.]*
>
> I do not live in a U.S. state or territory. *[Sent to disqualification page #1]* [1]

**1.5** How did you hear about this survey? **(Mark all that apply.)**

> Email from an organization (listserv, e-newsletter)
>
> Social networking site (such as Facebook)
>
> Organization website (such as NCTE)
>
> I was told about it in person (at an organization, event, or support group)
>
> Flier or print advertisement
>
> Word of mouth (e-mail from a friend, a friend told you about it)
>
> Not listed above (please specify) _____

**1.6** Are you taking this survey at a survey event or meeting, such as one hosted by an LGBTQ or Trans organization or meeting?

> No
>
> Yes

**1.7** How are you taking this survey?

> On my home computer/laptop
>
> On my work computer
>
> On a public computer (such as in a computer lab or library)
>
> On my mobile phone or tablet
>
> On a friend's or family member's mobile phone, tablet, or computer
>
> Not listed above (please specify) _____

**1.8** Not including for this survey, do you use the internet or email, at least occasionally? **(Mark all that apply.)**

> No *[Respondents could not select "No" in combination with any other option.]*
>
> Yes, the internet
>
> Yes, email

**1.9** If a national survey company, like Gallup, asked you the following question: "We are asking only for statistical purposes: Do you, personally, identify as lesbian, gay, bisexual, or transgender?" How would you answer?

> I would answer No
>
> I would answer Yes
>
> I would not answer the question

**PLEASE READ AND RESPOND CAREFULLY TO THE FOLLOWING QUESTIONS.**

This is a survey for people who are transgender, trans, or non-binary. It doesn't matter if you have transitioned gender or if you plan to. To see if this survey is for you, please answer the following questions.

**1.10** Do you think of yourself as transgender? *[Must answer to continue.]*

> No
>
> Yes

**1.11** Do you identify as more than one gender or as no gender (such as genderqueer or non-binary)? *[Must answer to continue.]*

> No
>
> Yes

**1.12** Do you currently live full-time in a gender that is different from the one assigned to you at birth? *[Must answer to continue.]*

> No *[Skip to 1.14]*
>
> Yes

**1.13** How old were you when you started to live full-time in a gender that is different from the one assigned to you at birth? *[Only respondents who selected "Yes" in response to 1.12 received this question.]*

> *[Drop-down list of all ages from "1" through "99," and "100 and above" as final response choice]*

**1.14** Someday do you want to live full-time in a gender that is different from the one assigned to you at birth? *[Respondents who selected "No" in response to 1.12 must answer to continue.]*

> No *[Skip to 1.16]*
>
> Yes
>
> Not sure

**1.15** What are the main reasons that you don't live full-time in a gender that is different from the one assigned to you at birth? **(Mark all that apply.)** *[Only respondents who selected "Yes" or "Not sure" in response to 1.14 received this question.]*

> My spouse and/or kids might reject me.
>
> My parents might reject me.
>
> I might lose my job or not be able to get a job.
>
> I might face mistreatment at school.
>
> My friends might reject me.
>
> I might not get the medical care I need.
>
> I might be hurt financially.
>
> I might become homeless.
>
> My church or faith community might reject me.

APPENDIX B

AR_217251

I might face violence.

I am not ready to transition.

A reason not listed above
(please specify) _____

**1.16** Have you seriously thought about living in a gender that is different from the one assigned to you at birth (transitioning gender)? *[Respondents who selected "No" in response to 1.13 must answer to continue.]*

No

Yes

**1.17** Do you consider yourself to be a cross-dresser? *[Must answer to continue.]*

No

Yes

**1.18** Do you live part of the time in one gender and part of the time in another gender? *[Must answer to continue.]*

No

Yes

*[Respondents who answered "No" to 1.10, 1.11, 1.12, 1.14, 1.16, 1.17, and 1.18 were sent to disqualification page #1.]*[5]

## Section 2

**2.1** What sex were you assigned at birth, on your original birth certificate? *[Must answer to continue.]*

Female

Male

**2.2** Which of these terms do you identify with? **(Mark all that apply.)**

A.G. or aggressive

Agender

Androgynous

Bi-gender

Butch

Bulldagger

Cross dresser

Drag performer (king/queen)

Fa'afafine

Gender non-conforming or gender variant

Genderqueer

Gender fluid/fluid

Intersex

Mahu

Multi-gender

Non-binary

Third gender

Stud

Transgender

Trans

Trans man (FTM, female to male)

Transsexual

Trans woman (MTF, male to female)

Travesti

Two-spirit

A gender not listed above
(please specify)_____

**2.3** If you had to choose only one of the following terms, which best describes your current gender identity? **(Please choose only one answer.)**

Cross-dresser

Woman

Man

Trans woman (MTF)

Trans man (FTM)

Non-binary/Genderqueer *[Respondents who selected this answer received questions 2.3_1, 2.3_2, and 2.3_3.]*

**2.3_1** For people in your life who don't know that you're non-binary/genderqueer, what gender do they usually think you are? *[Only respondents who selected "Non-binary/Genderqueer" in response to 2.3 received this question.]*

Man

Woman

Trans Man

Trans Woman

Non-Binary/Genderqueer

They can't tell

It varies

**2.3_2** When people in your life assume you are something other than non-binary/genderqueer (such as a man or a woman), how do you respond? *[Only respondents who selected "Non-binary/Genderqueer" in response to 2.3 received this question.]*

I **usually** let them assume I am a man or a woman

I **sometimes** tell them I identify as non-binary/genderqueer (or whatever words I use)

I **always** tell them I identify as non-binary/genderqueer (or whatever words I use) *[Skip to 2.4.]*

**2.3_3** What are the main reasons that you don't tell people you identify as non-binary/genderqueer? **(Mark all that apply).** *[Only respondents who selected "Non-binary/Genderqueer" in response to 2.3 and either selected "I usually let them assume I am a man or a woman" or "I sometimes tell them I identify as non/binary genderqueer" in response to 2.3_2 received this question.]*

- Most people don't understand so I don't try to explain it.
- Most people dismiss it as not being a real identity or a "phase."
- It is just easier not to say anything.
- I am not ready to tell people I identify as non-binary/ genderqueer.
- I might lose my job or not be able to get a job.
- I might face mistreatment at school.
- My friends might reject me.
- I might not get the medical care I need.
- I might be hurt financially.
- I might become homeless.
- My church or faith community might reject me.
- I might face violence.
- A reason not listed above (please specify) _____

**2.4** How comfortable are you with the word "transgender" being used to describe you?

- Very comfortable
- Somewhat comfortable
- Neutral
- Somewhat uncomfortable
- Very uncomfortable

*[All respondents received the following message.]* **We know that not everyone is comfortable with the word "transgender," but for this survey, we must use one word to refer to all trans and non-binary identities. Because of this we will use the word "trans" in this survey to refer to all trans and non-binary identities.**

**2.5** What gender pronouns do you ask people to use to refer to you? *[Respondents could mark all answers that applied.]*

- He, his
- She, hers
- They, their
- Ze, hir
- No pronouns. I ask people only to use my name.
- I don't ask people to use specific pronouns.
- Pronouns not listed above (please specify) _____

**2.6** What gender do you currently live in on a day-to-day basis?

- Man
- Woman
- Neither man nor woman/Genderqueer/Non-binary
- Part time one gender/part time another gender

**2.7** People can tell I am trans even if I don't tell them.

- Always
- Most of the time
- Sometimes
- Rarely
- Never

**2.8** What best describes your current sexual orientation?

- Asexual
- Bisexual
- Gay
- Heterosexual/Straight
- Lesbian
- Same-gender loving
- Pansexual
- Queer
- A sexual orientation not listed above (please specify) _____

**2.9** Although the choices listed below may not represent your full identity or use the language you prefer, for this survey please select the choice that most accurately describes your racial/ethnic identity. **(Please choose only one answer.)**

- Alaska Native
  - Enter your enrolled or principal corporation: _____ *[required]*
- American Indian
  - Enter your enrolled or principal tribe: _____ *[required]*
- Asian/Asian American
- Biracial/Multiracial *[respondents received follow-up question 2.10]*
- Black/African American
- Latino/a/Hispanic
- Middle Eastern/North African
- Native Hawaiian/Pacific Islander
- White/European American
- A racial/ethnic identity not listed above (please specify) _____ *[respondents received follow-up question 2.11]*

**2.10** You said that you are biracial or multiracial. Please choose the racial/ethnic identities that best describe you. **(Mark all that apply.)**

*[Only respondents who selected "Biracial/Multiracial" in 2.9 received this question.]*

    Alaska Native

        Enter your enrolled or principal corporation:
        _____ *[required]*

    American Indian

        Enter your enrolled or principal tribe:
        _____ *[required]*

    Asian/Asian American

    Black/African American

    Latino/a/Hispanic

    Middle Eastern/North African

    Native Hawaiian/ Pacific Islander

    White/European American

    A racial/ethnic identity not listed above
    (please specify) _____

**2.11** You said that you had a racial/ethnic identity that was not listed above. Please choose the racial/ethnic identities that best describe you. **(Mark all that apply.)**

*[Only respondents who selected "A racial/ethnic identity not listed above" in 2.9 received this question.]*

    Alaska Native

        Enter your enrolled or principal corporation:
        _____ *[required]*

    American Indian

        Enter your enrolled or principal tribe:
        _____ *[required]*

    Asian/Asian American

    Black/African American

    Latino/a/Hispanic

    Middle Eastern/North African

    Native Hawaiian/ Pacific Islander

    White/European American

**2.12** What is your current religious or spiritual identity? **(Mark all that apply.)**

    Agnostic

    Atheist

    Baha'i

    Buddhist

    Christian (Please click here to specify) *[Respondents received the following drop-down list.]*

        African Methodist Episcopal

        African Methodist Episcopal Zion

        Assembly of God

        Baptist

        Catholic/Roman Catholic

        Church of Christ

        Church of God in Christ

        Christian Orthodox

        Christian Methodist Episcopal

        Christian Reformed Church (CRC)

        Episcopalian

        Evangelical

        Greek Orthodox

        Lutheran

        Mennonite

        Moravian

        Nondenominational Christian

        Pentecostal

        Presbyterian

        Protestant

        Protestant Reformed Church (PR)

        Quaker

        Reformed Church of America (RCA)

        Russian Orthodox

        Seventh Day Adventist

        The Church of Jesus Christ of Latter-day Saints

        United Methodist

        Unitarian Universalist

        United Church of Christ

        A Christian affiliation not listed above
        (please specify) _____

    Confucianist

    Druid

    Hindu

    Jain

    Jehovah's Witness

    Jewish (Please click here to specify) *[Respondents received the following drop-down list.]*

        Conservative

        Orthodox

        Reform

    Muslim (Please click here to specify) *[Respondents received the following drop-down list.]*

        Ahmadi

        Shi'ite

        Sufi

        Sunni

    Native American Traditional Practitioner or Ceremonial

    Pagan

AR_217254

Rastafarian

Scientologist

Secular Humanist

Shinto

Sikh

Taoist

Tenrikyo

Wiccan

Spiritual, but no religious affiliation

No affiliation

A religious affiliation or spiritual identity not listed above
(please specify) _____

**2.13** What is your current age?

*[Drop-down list of all ages from "18" through "99," and
"100 and above" as final response choice]*

**2.14** What month and year were you born?

Month *[Drop-down list of all months]*

Year *[Drop-down list with years 1997–1915, and earlier as
final response choice]*

**2.15** What is your current relationship status?

Partnered, living together

Partnered, not living together

Single

Not listed above (please specify) _____

**2.16** What is your current legal marital status?

Married

Legally recognized civil union

Registered domestic partnership

Widowed

Divorced

Separated

Single, never married

**2.17** Have you ever served on active duty in the U.S. Armed
Forces, Reserves, or National Guard? *As a reminder, your
answers are confidential and cannot be used against you.*

Never served in the military

Only on active duty for training in the Reserves or National
Guard

Now on active duty[6]

On active duty in the past, but not now

**2.18** What is your citizenship or immigration status in the U.S.?
*As a reminder, your answers are confidential and cannot be
used against you.*

U.S. citizen, birth *[Respondents directed to 2.19]*

U.S. citizen, naturalized

Permanent Resident

A visa holder (such as F-1, J-1, H1-B,  and U)

DACA (Deferred Action for Childhood Arrival)

DAPA (Deferred Action for Parental Accountability)

Refugee status

Other documented status not mentioned above

Currently under a withholding of removal status

Undocumented resident

**2.19** In what U.S. state or territory were you born? *[Only
respondents who selected "U.S. citizen, birth" in 2.18 received
this question.]*

I was not born in a U.S. state or territory.

*[Drop-down list for all U.S. states and territories for other
response choices. Respondents who selected "New York"
received an additional drop-down choice for "New York
City."]*

**2.20** Please answer each question below. **(Please provide an
answer in each row.)**

|  | No | Yes |
|---|---|---|
| Are you deaf or have serious difficulty hearing? | O | O |
| Are you blind or have serious difficulty seeing even when wearing glasses? | O | O |
| Because of a physical mental or emotional condition, do you have serious difficulty concentrating, remembering, or making decisions? | O | O |
| Do you have serious difficulty walking or climbing stairs? | O | O |
| Do you have difficulty dressing or bathing? | O | O |
| Because of a physical, mental, or emotional condition, do you have difficulty doing errands alone, such as visiting a doctor's office or shopping? | O | O |
| Do YOU identify as a person with a disability? | O | O |

**2.21** What is the main language that people speak in your
home?

English only

Language(s) other than English

Armenian

Chinese

French

German

Greek

Italian

Japanese

Korean

Persian

Polish

Portuguese or Portuguese Creole

Russian

Serbo-Croatian

Spanish or Spanish Creole

Tagalog

Vietnamese

Yiddish

A language not listed above

(_____)

English and other language(s)

Armenian

Chinese

French

German

Greek

Italian

Japanese

Korean

Persian

Polish

Portuguese or Portuguese Creole

Russian

Serbo-Croatian

Spanish or Spanish Creole

Tagalog

Vietnamese

Yiddish

A language not listed above

(_____)

**2.22** What is the highest level of school or degree you have completed?

Less than 8th grade

8th grade

Some high school, no diploma or GED

GED

High school graduate

Some college, no degree (including currently in college)

Associate degree in college – Occupational/vocational program

Associate degree in college – Academic program

Bachelor's degree

Some graduate work, no graduate degree

Master's degree (M.A, M.S., MBA)

Doctoral degree (e.g., Ph.D., Ed.D.)

Professional degree (e.g., MD, JD)

**2.23** What are your current living arrangements?

Living in house/apartment/condo I OWN alone or with others (with a mortgage or that you own free and clear)

Living in house/apartment/condo I RENT alone or with others

Living with a partner, spouse, or other person who pays for the housing

Living temporarily with friends or family because I can't afford my own housing

Living with parents or family I grew up with because I have not yet left home

Living in a foster group home or other foster care

Living in campus/university housing

Living in a nursing home or other adult care facility

Living in a hospital

Living in military barracks

Living in a hotel or motel that I pay for myself

Living in a hotel or motel with an emergency shelter voucher

Living in transitional housing/halfway house

Living on the street, in a car, in an abandoned building, in a park, or a place that is NOT a house, apartment, shelter, or other housing *[Skip to 2.25]*

Living in a homeless shelter *[Skip to 2.25]*

Living in a domestic violence shelter *[Skip to 2.25]*

Living in a shelter that is not a homeless shelter or domestic violence shelter *[Skip to 2.25]*

A living arrangement not listed above (please specify) _____

**2.24** Is there at least one telephone INSIDE your home that is currently working and is not a cell phone?

No

Yes

**2.25** Do you have a cell phone?

No

Yes

**2.26** What is the zip code where you currently live? _____

AR_217256

## Section 3

**3.1** At about what age did you begin to feel that your gender was "different" from your assigned birth sex?

> *[Drop-down list of ages]*

**3.2** At about what age did you start to think you were trans (even if you did not know the word for it)?

> *[Drop-down list of ages]*

**3.3** At about what age did you first start to tell others that you were trans (even if you did not use that word)?

> I have not told others that I am trans.
>
> *[Drop-down list of ages for other responses]*

**3.4** How do you socialize with other trans people? **(Mark all that apply.)**

> In political activism
>
> Socializing in person
>
> Socializing on-line (such as Facebook or Twitter)
>
> In support groups
>
> I don't socialize with other trans people *[Respondents could not select this answer in combination with any other option.]*
>
> Not listed above (please specify) _____

## Section 4

**These are questions about the people in your life and whether they know you are trans.**

**4.1** Have any of your spouses/partners known that you are trans during your relationship with them? **(Mark all that apply.)**

> I have never had a spouse/partner *[Respondents could not select this answer in combination with any other option. Skip to 4.3 if selected.]*
>
> No *[Respondents could not select this answer in combination with any other option. Skip to 4.3 if selected.]*
>
> Yes, my current spouse/partner knows I am trans
>
> Yes, at least one of my former spouses or partners knew I was trans

**4.2** Have any of your spouses/partners ended your relationship because you are trans? *[Only respondents who indicated that at least one of their past or current spouses knew they were trans in 4.1 received this question.]*

> No
>
> Yes, only because I was trans.
>
> Yes, because I was trans and other reasons.

**4.3** Do any of your children know you are trans?

> I do not have any children *[Skip to 4.5]*

No *[Skip to 4.5]*

Yes

**4.4** Have any of your children ever stopped speaking to you or spending time with you because you are trans?

> No
>
> Yes

**4.5** How many people in each group below currently know you are trans? **(Please provide an answer in each row.)**

| | I currently have no people like this in my life | All know that I am trans | Most know that I am trans | Some know that I am trans | None know that I am trans |
|---|---|---|---|---|---|
| Immediate family you grew up with (mother, father, sisters, brothers, etc.) | O | O | O | O | O |
| Extended family (aunts, uncles, cousins, etc.) | O | O | O | O | O |
| Lesbian, gay, bisexual, or trans (LGBT) friends | O | O | O | O | O |
| Straight, non-trans (non-LGBT) friends | O | O | O | O | O |
| Current boss/manager/supervisor | O | O | O | O | O |
| Current coworkers | O | O | O | O | O |
| Current classmates | O | O | O | O | O |
| Current health care providers | O | O | O | O | O |

**4.6** You said some or all of your immediate family you grew up with (mother, father, sisters, brothers, etc.) know that you are trans. On average, how supportive are they of you being trans? *[Only respondents who said in response to 4.5 that some, most, or all of their immediate family members knew they were trans received this question.]*

> Very supportive
>
> Supportive
>
> Neither supportive nor unsupportive
>
> Unsupportive
>
> Very unsupportive

**4.7** Did any of your immediate family members you grew up with (mother, father, sisters, brothers, etc.) do any of these things to you because you are trans? **(Mark all that apply.)** *[Only respondents who said in response to 4.5 that some, most, or all of their immediate family members knew they were trans received this question.]*

> Stopped speaking to you for a long time or ended your relationship
>
> Were violent towards you
>
> Kicked you out of the house

AR_217257

Did not allow you to wear the clothes that matched your gender

Sent you to a therapist, counselor, or religious advisor to stop you from being trans

None of the above *[Respondents could not select this answer in combination with any other option.]*

**4.8** Did any of your immediate family members you grew up with (mother, father, sisters, brothers, etc.) do any of these things to **support** you? **(Mark all that apply.)** *[Only respondents who said in response to 4.5 that some, most, or all of their immediate family members knew they were trans received this question.]*

Told you that they respect and/or support you

Used your preferred name

Used your correct pronouns (such as he/she/they)

Gave you money to help with any part of your gender transition

Helped you change your name and/or gender on your identity documents (ID), like your driver's license (such as doing things like filling out papers or going with you to court)

Did research to learn how to best support you (such as reading books, using online information, or attending a conference)

Stood up for me with family, friends, or others

Supported you in another way not listed above (please specify)_____

None of the above *[Respondents could not select this answer in combination with any other option.]*

**4.9** Did you ever run away from home because you are trans? *[Only respondents who said in response to 4.5 that some, most, or all of their immediate family members knew they were trans received this question.]*

No *[Skip to 4.11]*

Yes

**4.10** At what age did you run away from home because you are trans? *[Only respondents who selected "Yes" in 4.9 received this question.]*

*[Drop-down list of ages]*

**4.11** On average, how supportive are your co-workers with you being trans? *[Only respondents who said in response to 4.5 that some, most, or all of their coworkers knew they were trans received this question.]*

Very supportive

Supportive

Neither supportive nor unsupportive

Unsupportive

Very unsupportive

**4.12** On average, how supportive are your classmates with you being trans? *[Only respondents who said in response to 4.5 that some, most, or all of their classmates knew they were trans received this question.]*

Very supportive

Supportive

Neither supportive nor unsupportive

Unsupportive

Very unsupportive

## Section 5

**These questions are about your experiences with your church, synagogue, mosque, or other faith community.**

**5.1** Have you ever been part of a spiritual/religious community (such as a church, synagogue, mosque, or other faith community)?

No *[Skip to 6.1]*

Yes

**5.2** Have you ever left your spiritual/religious community because you **were afraid** they might reject you because you are a trans person?

No

Yes

**5.3** Have you ever left your spiritual/religious community because they **did reject** you because you are a trans person?

No *[Skip to 5.5]*

Yes

**5.4** After you stopped attending, did you find a spiritual/religious community that welcomed you as a trans person? *[Only respondents who selected "Yes" in 5.4 received this question.]*

No

Yes

**5.5 Now just thinking about the past year,** have you been part of a spiritual/religious community?

No *[Skip to 6.1]*

Yes

**5.6 In the past year,** did any leaders or other members of your spiritual/religious community think or know you were trans?

No *[Skip to 6.1]*

Yes

AR_217258

**5.7 In the past year,** how often did leaders or other members of your spiritual/religious community… **(Please provide an answer in each row.)**

| In the past year… | Never | Once or twice | A few times | Many times |
|---|---|---|---|---|
| Make you feel welcome as a trans person attending services/faith community functions? | O | O | O | O |
| Accept you for who you are as a trans person? | O | O | O | O |
| Tell you that your religion/faith accepts you as a trans person? | O | O | O | O |
| Tell you that your being trans is a sin or that your religion does not approve of your being trans? | O | O | O | O |
| Ask you to meet with spiritual/religious leaders to stop you from being trans? | O | O | O | O |
| Ask you to seek medical/psychological help to stop you from being trans? | O | O | O | O |
| Ask you to stop coming to services or faith community functions? | O | O | O | O |

## Section 6

**These are questions about work for pay in the sex industry and sex work. As a reminder, your answers are confidential and cannot be used against you.**

**6.1** Have you ever engaged in sex or sexual activity **for money** (sex work) or worked in the sex industry (such as erotic dancing, webcam work, or porn films)?

No *[Skip to 6.4]*

Yes

**6.2 Now just thinking about the past year,** have you engaged in sex or sexual activity for money (sex work) or worked in the sex industry (such as erotic dancing, webcam work, or porn films) in the past year? *[Only respondents who selected "Yes" in 6.1 received this question.]*

No

Yes

**6.3** What type of sex work or work in the sex industry have you **ever** done? **(Mark all that apply).** *[Only respondents who selected "Yes" in 6.1 received this question.]*

Street-based sex work

Sex work advertised online

Sex work advertised in magazines or newspapers

Informal sex work through word of mouth, occasional hook ups with dates in my networks, or things like that

Escort/call girl/rent boy with an agency

Pornography/picture or video

Phone sex

Webcam work

Erotic dancer/stripper

Fetish work (Domme, sub, switch)

Not listed above (please specify) _____

**6.4** Have you engaged in sex or sexual activity for any of the following? **(Please mark all that apply in each row.)** *[Respondents could not select "No" in combination with any other option.]*

| | No | Yes, within the past year | Yes, but more than a year ago |
|---|---|---|---|
| I engaged in sex or sexual activity for food | O | O | O |
| I engaged in sex or sexual activity for a place to sleep in someone's bed, at their home, or in their hotel room | O | O | O |
| I engaged in sex or sexual activity for drugs | O | O | O |
| For something not listed above (please specify) _____ *[Response recorded as "No" if text left blank.]* | O | O | O |

**6.5** Did you ever interact with the police while doing sex work or **when police thought** you were doing sex work? *[Respondents could select multiple answer choices, but could not select "No" in combination with any other option.]*

No *[Skip to 6.11]*

Yes, while I was doing sex work.

Yes, when police thought I was doing sex work.

**6.6** When you interacted with police while doing sex work or when police thought you were doing sex work, did you experience any of the following? **(Please provide an answer in each row.)**

| | No | Yes |
|---|---|---|
| Officers kept calling me by the wrong gender pronouns (such as he/him or she/her) or the wrong title (such as Mr. or Ms.). | O | O |
| Officers asked me questions about my gender transition (such as hormones and surgical status). | O | O |
| Officers verbally harassed me. | O | O |
| Officers physically attacked me. | O | O |
| Officers forced me to have sex or sexual activity to avoid arrest. | O | O |
| I experienced unwanted sexual contact from an officer (such as fondling, sexual assault, or rape). | O | O |
| I was arrested for drugs in my possession when police stopped me for doing sex work. | O | O |

**6.7** Have you ever been arrested for doing sex work or **when police thought** you were doing sex work? *[Only respondents who selected "Yes, while I was doing sex work" and/or "Yes, when police thought I was doing sex work" in 6.5 received this*

*question. Respondents could select multiple answer choices but could not select "No" in combination with any other option.]*

No *[Skip to 6.11]*

Yes, while I was doing sex work

Yes, when the police thought I was doing sex work

**6.8** How many times have you been arrested for doing sex work or when police thought you were doing sex work?

*[Drop-down list of 1–10 and "11 or more"]*

**6.9** When police arrested you, did they consider things in your possession such as condoms or sex toys as "evidence of prostitution"? *[Respondents could select multiple answer choices.]*

No

Yes, condoms

Yes, sex toys

Yes, items not listed above (please specify)

-----------------------------------

I don't know

**6.10** Did any of these things happen when you were arrested? **(Mark all that apply.)**

The charges were dropped.

I pled guilty.

I went to trial and was found not guilty.

I went to trial and was found guilty.

Something not listed above (please specify) -----------------

**6.11** Have you ever been paid for selling drugs or other work that is currently considered illegal? **(Mark all that apply.)** *[Respondents could not select "No" in combination with any other option.]*

No *[Skip to 7.1]*

Yes, selling drugs

Yes, other work (please specify) -------------------------

**6.12 Now just thinking about the past year,** were you paid for selling drugs or other work that is currently considered illegal in the past year? **(Mark all that apply.)** *[Only respondents who selected an answer choice other than "No" received this question. Respondents could not select "No" in combination with any other option.]*

No

Yes, selling drugs

Yes, other work (please specify) ------------------------

## Section 7

These questions are about your household, your income, and your current job. As a reminder, your answers are confidential and cannot be used against you. These questions are based on national surveys that we will use to compare with the U.S. population.

**7.1** How many adults (age 18 or older) live in your underlined{household},[7] including yourself? (Do not include neighbors or others who do not live with you in your house, apartment, or single housing unit.) For more information, click on **household** above.

1 *[Skip to 7.5]*

2

3

4

5

6

7

8

9 or more

**7.2** How are the other adults (age 18 or older) who live in your household related to you? **(Mark all that apply.)**

Spouse (legally married)

Partner (not legally married)

Child or children

Grandchild or grandchildren

Parent(s) (Mother/Father/Step-Parent(s))

Brother(s)/Sister(s)/Step-Brother(s)/Step-Sister(s)

Other relative(s) (Aunt, Cousin, Nephew, Mother-in-law, etc.)

Foster child or foster children

Housemate(s)/Roommate(s)

Roomer(s)/Boarder(s)

Other non-relative(s)

Not listed above (please specify) ------------------------

**7.3** How many adults in your household are related to you[8] by birth (blood relatives), adoption, or legal marriage? Don't include partners who aren't legally married to you or adults who aren't related to you. We will ask about them later.

0 *[Skip to 7.5]*

1

2

3

4

5

6

7

8

9 or more

AR_217260

**7.4** Is any person aged 65 or older named on the lease, mortgage, or deed[8] for your household?

No

Yes

**7.5** How many babies and other children under age 18 live in your household?

0 *[Skip to 7.7]*

1

2

3

4

5

6

7

8

9 or more

**7.6** How many of the children under age 18 who live in your household are related to you[9] by birth (blood relatives) or adoption? Don't include children who aren't related to you by birth or legal adoption. We will ask about them later.

0

1

2

3

4

5

6

7

8

9 or more

**7.7** What is your current employment status? **(Mark all that apply.)**

Work for pay from sex work, selling drugs, or other work that is currently considered illegal

*[Respondents who selected this answer choice received the following question.] Are you actively looking for legal work outside sex work, selling drugs , or other work that is currently considered illegal*

No

Yes

Work full-time for an employer

*[Respondents who selected this answer choice received the following question.] Do you have more than one full-time job?*

No

Yes

Work part-time for an employer

*[Respondents who selected this answer choice received the following question.] Do you have more than one part-time job?*

No

Yes

Self-employed in your own business, profession or trade, or operate a farm (not including sex work, selling drugs, or other work that is currently considered illegal)

Unemployed but looking for work

Unemployed and have stopped looking for work

Not employed due to disability

Student

Retired

Homemaker or full-time parent

Not listed above (please specify) _____

**7.8** On any of your full-time or part-time jobs, are you a member of a labor union or of an employee association similar to a union? *[Only respondents who selected "Work full-time for an employer" and/or "Work part-time for an employer" in 7.7 received this question. Respondents could select multiple answer choices but could not select "No" in combination with any other option.]*

No

Yes in a part-time job *[Skip to 7.10]*

Yes in a full-time job *[Skip to 7.10]*

**7.9** On any of your full-time or part-time jobs, are you covered by a union or employee association contract? *[Only respondents who selected "Work full-time for an employer" and/or "Work part-time for an employer" in 7.7 AND selected "No" in 7.8 received this question. Respondents could select multiple answer choices but could not select "No" in combination with any other option.]*

No

Yes in a part-time job

Yes in a full-time job

**7.10** Do you currently receive assistance from FOOD STAMPS (SNAP)[11] or WIC[12]? **(Mark all that apply.)** *[Respondents could not select "No" in combination with any other option.]*

No

Yes, assistance from food stamps (SNAP)[13]

Yes, assistance from WIC[14,15]

**7.11** What are your current sources of income? **(Mark all that apply.)**

Pay from sex work, selling drugs, or other work that is currently considered illegal

Pay from your full-time or part-time job

Pay from your partner's/spouse's full-time or part-time job

AR_217261

Self-employment income from your own business, profession or trade, or farm (not including underground economy)

Income from dividends, estates or trusts, royalties, or rental income

Interest income (on savings or bonds)

Cash assistance from welfare (such as TANF) or other public cash assistance program (DO NOT include food stamps (SNAP) or WIC)

Unemployment benefits

Child support or alimony

Social security retirement or railroad retirement income

Private pension or government employee pension

Other retirement income

Social security disability benefits (SSDI)

Supplemental security income (SSI)

Workers' comp or other disability

Veteran's disability benefits and other Veteran's benefits

Regular contributions from people who don't live in the household

Income not listed above, (please specify) _____

**7.12** What was your total combined **Individual Income**[16] (before taxes) **in 2014**? This includes all income sources **except** food stamps (SNAP) or WIC.

No income

1 to 5,000

5,000 to 7,499

7,500 to 9,999

10,000 to 12,499

12,500 to 14,999

15,000 to 17,499

17,500 to 19,999

20,000 to 24,999

25,000 to 29,999

30,000 to 34,999

35,000 to 39,999

40,000 to 49,999

50,000 to 59,999

60,000 to 74,999

75,000 to 99,999

100,000 to 149,999

150,000 or more

**7.13** What was your total combined **Family Income**[17] (before taxes) **in 2014**? This includes all income from all family members who are related to you by legal marriage, birth, or adoption and who have lived with you during the last 12

months. **Don't include** food stamps (SNAP) or WIC. *[Only respondents who selected an answer choice other than "0" in 7.3 (related adults in household) and/or selected an answer choice other than "0" in 7.6 (related children in household) received this question.]*

No income

1 to 5,000

5,000 to 7,499

7,500 to 9,999

10,000 to 12,499

12,500 to 14,999

15,000 to 17,499

17,500 to 19,999

20,000 to 24,999

25,000 to 29,999

30,000 to 34,999

35,000 to 39,999

40,000 to 49,999

50,000 to 59,999

60,000 to 74,999

75,000 to 99,999

100,000 to 149,999

150,000 or more

**7.14** How much was your total combined **HOUSEHOLD INCOME**[18] (before taxes) **in 2014**? This includes income from all members of your household from all sources **except** food stamps (SNAP) or WIC. *[Only respondents with non-related adults and/or non-related children in their household received this question. Respondents received this question if they indicated that they had non-related adults in their household (they selected "2" or more in 7.1 and selected a higher number in response to 7.3 than in response to 7.1) and/or they indicated that they had non-related children in the household (they selected "1" or more in 7.5 and selected a higher number in response to 7.6 than in response to 7.5).]*

No income

1 to 5,000

5,000 to 7,499

7,500 to 9,999

10,000 to 12,499

12,500 to 14,999

15,000 to 17,499

17,500 to 19,999

20,000 to 24,999

25,000 to 29,999

30,000 to 34,999

35,000 to 39,999

40,000 to 49,999

50,000 to 59,999

AR_217262

60,000 to 74,999

75,000 to 99,999

100,00 to 149,999

150,000 or more

## Section 8

*[Only respondents who selected an answer choice other than "never served in the military" in 2.17 received question in this section.]*

**You said earlier that you currently serve or have served on active duty in U.S. Armed Forces, Reserves, or National Guard. These are questions about your military service. As a reminder, your answers are confidential and cannot be used against you.**

8.1 What is your current or most recent branch of service?

Air Force

Air Force Reserve

Air National Guard

Army

Army Reserve

Army National Guard

Coast Guard

Coast Guard Reserve

Marine Corps

Marine Corps Reserve

Navy

Navy Reserve

8.2 Are you still serving in the military? *[Only respondents who selected "on active duty in the past, but not now" in 2.17 received this question.]*

No

Yes *[Skip to 8.4]*

8.3 Did you separate from military service within the last 10 years? *[Only respondents who selected "on active duty in the past, but not now" in 2.17 received this question.]*

Yes

No *[Skip to 8.12]*

8.4 While serving in the military, have you ever received **mental health** treatment related to a gender transition from a military provider (do not include VA)? *[Only respondents who selected "Yes" in 8.2 or selected "Yes" in 8.3 received this question.]*

No

Yes

8.5 While serving in the military, have you ever received **medical** treatment related to a gender transition from a military provider (do not include VA)? *[Only respondents who selected "Yes" in 8.2 or selected "Yes" in 8.3 received this question.]*

No

Yes

8.6 Has any military medical or mental health provider reported to your commanding officer that you are trans or recommended you for discharge? **(Mark all that apply.)** *[Only respondents who selected "Yes" in 8.2 received this question. Respondents could not select "No" in combination with any other option.]*

No

Yes, reported that I was trans

Yes, recommended me for discharge

Does not apply to me, none of these providers knew that I was trans

8.7 If trans people were allowed to serve openly, which of these would apply to you? *[Only respondents who selected "Yes" in 8.2 received this question.]*

I would start to transition while still serving

I would finish the transition that I have already started while still serving

I would not finish the transition that I have already started while still serving

I would leave military service so that I could transition, and not return.

I would leave military service so that I could transition, then return to service after transition

I do not want to transition

I have already transitioned

None of the options listed above

8.8 If trans people were allowed to serve openly, I would return to service: *[Only respondents who selected "Yes" in 8.3 received this question.]*

Yes

No

Maybe

8.9 How many people in the military (who aren't trans) believe you are trans? *[Only respondents would selected "Yes" in 8.2 received this question.]*

None *[Skip to 9.1]*

A few

Some

Most

All

AR_217263

**8.10** Does your leadership or commanding officer (or both) think or know you are trans? *[Only respondents who selected "Yes" in 8.2 and an answer choice other than "None" in 8.9 received this question.]*

No *[Skip to 9.1]*

Yes

**8.11** How has your leadership or commanding officer (or both) reacted to you being trans? **(Mark all that apply.)** *[Only respondents who selected "Yes" in 8.10 received this question.]*

Supported my name change

Supported my medical treatment

Ignored it or looked the other way

Took actions to discharge me

Not listed above (please specify) _____

*[Only respondents who selected "No" in 8.2 and "No" in 8.3 received questions 8.12–8.21]*

**8.12** What was your character of discharge?

Entry Level Separation

Honorable

General

Medical

Other-than-honorable

Bad Conduct

Dishonorable

None of the options listed above (please specify) _____

**8.13** Do you believe your discharge was related to being trans?

No

Yes, partially

Yes, completely

**8.14** Did you leave the service in order to transition?

No

Yes

**8.15** Did you leave the service to avoid mistreatment/harassment?

No

Yes

**8.16** Did any military medical or mental health provider tell your commander that you are trans or recommend you for discharge? **(Mark all that apply.)** *[Respondents could not select "No" in combination with any other option.]*

No

Yes, reported that I was trans.

Yes, recommended me for discharge.

Does not apply to me, none of these providers knew that I was trans.

**8.17** Did you ever get any type of health care through the VA?

No *[Skip to 8.21]*

Yes

**8.18** Did you ever get health care related to a gender transition through the VA?

No

Yes

**8.19** Do you currently get any type of health care through the VA?

No

Yes

**8.20** As a trans person, have you received respectful care at the VA?

Never

Sometimes

Mostly

Always

Does not apply to me, the VA staff do not know I'm trans

**8.21** Have you changed your name on your DD214 military discharge papers?

Yes, I received an updated DD214 with new name.

Yes, I received a DD215 (amended) with new name.

No, I was denied.

No, I never tried.

## Section 9

*[Only respondents who selected any answer choice other than "U.S. citizen, birth" in 2.18 received questions in this section.]*

**You said earlier that you are not a U.S. citizen by birth. These are questions about immigration experiences you may have had. As a reminder, your answers are confidential and cannot be used against you.**

**9.1** Have you ever been held in immigration detention (such as being held in an Immigration and Customs Enforcement (ICE) detention center or local jail just for immigration court proceedings)?

No *[Skip to 9.6]*

Yes

AR_217264

**9.2** While you were in immigration detention, do you believe staff, guards, or others thought or knew you were trans or lesbian, gay, or bisexual (LGB)?

> No
>
> Yes

**9.3** When you were in immigration detention, separated from others who were also in detention? (**Mark all that apply.**) *[Respondents could not choose "No" in combination with any other option.]*

> No *[Skip to 9.5]*
>
> Yes, in solitary confinement
>
> Yes, in a separate area for trans or LGB people (such as a pod, unit, tank, or other housing area) *[Skip to 9.5]*
>
> Not listed above (please specify) _____ *[Skip to 9.5]*

**9.4** In total, how long were you held in solitary confinement? *[Only respondents who selected "Yes, in solitary confinement" received this question.]*

> Up to 14 days (up to two weeks)
>
> 15 days to 30 days (three or four weeks)
>
> 31 days to 90 days (1-3 months)
>
> 91 days to 180 days (3-6 months)
>
> 181 days to one year (more than 6 months up to a year)
>
> More than 1 year

**9.5** When you were in immigration detention, did any of these things happen to you? (**Mark all that apply.**) *[Respondents could not select "None of these things happened to me" in combination with any other option.]*

> I was physically assaulted.
>
>> *[Respondents who selected this answer choice received the following question.]* Were you physically assaulted by:
>>
>> Staff or detention officers
>>
>> Other detainees or inmates
>
> I was sexually assaulted.
>
>> *[Respondents who selected this answer choice received the following question.]* Were you sexually assaulted by:
>>
>> Staff or detention officers
>>
>> Other detainees or inmates
>
> I was threatened with sexual assault
>
>> *[Respondents who selected this answer choice received the following question.]* Were you threatened with sexual assault by:
>>
>> Staff or detention officers
>>
>> Other detainees or inmates
>
> I was denied access to hormones that I use.
>
> I was denied gender-appropriate clothing.
>
> None of these things happened to me.

**9.6** Have you ever applied for asylum in the United States? *[Respondents could select multiple answer choices but could not select "No" in combination with any other answer choice.]*

> No *[Skip to 9.8]*
>
> Yes, because I am trans or LGB
>
> Yes, for another reason

**9.7** Did you receive asylum in the United States? *[Only respondents who selected "Yes, because I am trans or LGB" or "Yes, for another reason" received this question.]*

> Yes *[Skip to 10.1]*
>
> No *[Skip to 9.9]*
>
> No, but I received a "withholding of removal" status. *[Skip to 10.1]*

**9.8** Why didn't you apply for asylum? *[Only respondents who selected "No" in 9.6 received this question.]*

> I didn't know how to apply.
>
> I have access to other legal statuses.
>
> I didn't want to apply.
>
> I was afraid to apply.
>
> I believed I was past the 1 year deadline.
>
> A reason not listed above (please specify) _____

**9.9** Why didn't you receive asylum? *[Only respondents who selected "No" in 9.7 received this question.]*

> I was past the 1 year deadline.
>
> The immigration official decided that I didn't face danger in my country.
>
> A reason not listed above (please specify) _____

## Section 10

**These are questions about legal name change and your current identification documents, such as your birth certificate or driver's license.**

**10.1** Did you ever try **OR** complete the process to get a legal name change to match your gender identity?

> No *[Skip to 10.12]*
>
> Yes

**10.2** How did you try to change your name?

> With a court order
>
> During the immigration/naturalization process *[Skip to 10.13]*
>
> By another method (Please tell us what method) _____ *[Skip to 10.13]*

AR_217265

**10.3** For your legal name change, did you interact with judges or court staff? *[Only respondents who selected "With a court order" in 10.2 received this question.]*

No *[Skip to 10.7]*

Yes

**10.4** Do you believe the judges or court staff you interacted with thought or knew you were trans? *(Only respondents who selected "Yes" in 10.3 received this question.)*

No *[Skip to 10.7]*

Yes

**10.5** When you interacted with judges or court staff, were you treated with respect? *[Only respondents who selected "Yes" in 10.4 received this question.]*

I was never treated with respect

I was sometimes treated with respect

I was always treated with respect

**10.6** When you interacted with judges or court staff, did you experience any of the following? **(Please provide an answer in each row.)** *[Only respondents who selected "Yes" in 10.4 received this question.]*

|  | No | Yes |
|---|---|---|
| I was verbally harassed. | ○ | ○ |
| I received unequal treatment/service. | ○ | ○ |
| They kept calling me by the wrong gender pronouns (such as he/him or she/her) or a wrong title (Mr. or Ms.). | ○ | ○ |
| I was asked questions about my gender transition (such as hormones and surgical status). | ○ | ○ |

**10.7** Did the court grant your name change? *[Only respondents who selected "With a court order" in 10.2 received this question.]*

Yes, the court granted my name change. *[Skip to 10.9]*

No, the court denied my name change.

No, I ran out of money to complete the process. *[Skip to 10.9]*

No, I gave up. *[Skip to 10.9]*

Not sure yet. I am still in the process of getting my court ordered name change.*[Skip to 10.9]*

Not listed above (please specify) _____ *[Skip to 10.9]*

**10.8** Why did the court deny your name change? *[Only respondents who selected "No, the court denied my name change" in 10.7 received this question.]*

*[Text box]*

**10.9** How old were you when you went to court to get your legal name change? *[Only respondents who selected "With a court order" in 10.2 received this question.]*

*[Drop-down list of ages]*

**10.10** Did you get legal help to change your name? *[Only respondents who selected "With a court order" in 10.2 received this question.]*

No

Yes, I got legal help from a paid attorney.

Yes, I got help for free from a legal clinic or non-profit organization.

Yes, I got help from a friend.

Yes, I got help from some other source.

**10.11** How much did your legal name change cost? Please include the cost of legal help, court fees, newspaper publication, etc. *[Only respondents who selected "Yes, the court granted my name change" in 10.7 received this question.]*

$0

$1 - $99

$100 - $249

$250 - $499

$500 - $749

$750 - $999

$1,000 - $2,000

More than $2,000

I do not remember the cost of my legal name change.

**10.12** Why you have not tried to legally change your name? **(Mark all that apply.)** *[Only those who selected "No" in 10.1 received this question.]*

I feel like my name doesn't conflict with my gender identity or expression.

I am not ready.

I cannot afford it.

I don't know how.

I believe I am not allowed (for example, because of my criminal record, immigration status, or residency).

I am worried that changing my name would out me.

A reason not listed above (please specify) _____

**10.13** Thinking about how your **NAME** is listed on all of your IDs and records that list your name, such as your birth certificate, driver's license, passport, etc. Which of the statements below is most true? *[All respondents received this question.]*

All of my IDs and records list the name I prefer.

Some of my IDs and records list the name I prefer.

None of my IDs and records list the name I prefer. *[Skip to 10.15]*

**10.14** Which of these IDs/records have you changed to list your preferred **NAME**? **(Please provide an answer in each row.)** *[Only respondents who selected "All of my IDs and records list the name I prefer" or "Some of my IDs and records list the name I prefer" in 10.13 received this question.]*

2015 U.S. TRANSGENDER SURVEY

AR_217266

| | I do not have this ID/ record | I changed my NAME on this ID/record | I was denied a NAME change on this ID/ record | I am in the process of chang- ing my NAME on this ID/record | I have not tried to change my NAME on this ID/ record but I want to | I do not want to change my NAME on this ID/ record |
|---|---|---|---|---|---|---|
| Birth certificate | O | O | O | O | O | O |
| Driver's license and/ or state issued non-driver ID | O | O | O | O | O | O |
| Social Security records | O | O | O | O | O | O |
| Passport | O | O | O | O | O | O |
| Student records (current or last school attended) | O | O | O | O | O | O |
| Work ID | O | O | O | O | O | O |

**10.15** Thinking about how your **GENDER** is listed on all of your IDs and records that list your gender, such as your birth certificate, driver's license, passport, etc. Which of the statements below is most true? *[All respondents received this question.]*

    All of my IDs and records list the gender I prefer.

    Some of my IDs and records list the gender I prefer.

    None of my IDs and records list the gender I prefer. *[Skip to 10.17]*

**10.16** Which of these IDs/records have you changed to list your preferred **GENDER**? **(Please provide an answer in each row.)** *[Only respondents who selected "All of my IDs and records list the gender I prefer" or "Some of my IDs and records list the gender I prefer" in 10.15 received this question.]*

| | I do not have this ID/ record | I changed my GENDER on this ID/ record | I was denied a GENDER change on this ID/re- cord | I am in the pro- cess of chang- ing my GENDER on this ID/re- cord | I have not tried to change my GENDER on this ID/ record but I want to | I do not want to change my GENDER on this ID/ record |
|---|---|---|---|---|---|---|
| Birth certificate | O | O | O | O | O | O |
| Driver's license and/or state issued non-driv- er ID | O | O | O | O | O | O |
| Social Security records | O | O | O | O | O | O |
| Passport | O | O | O | O | O | O |
| Student records (current or last school attended) | O | O | O | O | O | O |

**10.17** You said that none of your IDs or records list the gender you prefer. Why haven't you changed your gender on your IDs or records? **(Mark all that apply.)** *[Only respondents who selected "None of my IDs and records list the gender I prefer" in 10.15 received this question.]*

    The gender options that are available (male or female) do not fit my gender identity.

    I have not tried yet.

    My request was denied.

    I am not ready.

    I cannot afford it.

    I do not know how.

    I believe I am not allowed. (For example, I have not had the medical treatment needed to change my gender on ID. Or I can't get a doctor's letter or other letter that is needed to update the gender.)

    I am worried that if I change my gender, I might not be able to get some benefits or services. These might include medical, insurance, employment, etc.

    I am worried that changing my gender would out me.

    A reason not listed above (please specify)_____

**10.18** When I have shown IDs with my name or gender that do not match the gender I present as... **(Mark all that apply.)** *[All respondents received this question. Respondents could not select "I have had none of the above problems" or "This does not apply to me. I have only shown IDs that match" in combination with any other option.]*

    I have been verbally harassed.

    I have been assaulted/attacked.

    I have been asked to leave.

    I have been denied services or benefits.

    I have had none of the above problems.

    This does not apply to me. I have only shown IDs that match.

## Section 11

These are questions about your current health insurance coverage, your health care providers, and the health insurance marketplace (such as healthcare.gov).

**11.1** Are you currently covered by any health insurance or health coverage plan?

    No *[Skip to 11.4]*

    Yes

**11.2** What type of health insurance or health coverage plan do you have? **(Mark all that apply.)**

    Insurance through my current or former employer or union

    Insurance through someone else's current or former employer or union

    Insurance I or someone else purchased through

AR_217267

HealthCare.Gov or a Health Insurance Marketplace (sometimes called "Obamacare")

Insurance I or someone else purchased directly from an insurance company

Medicare (for people 65 and older, or people with certain disabilities)

Medicaid (government-assistance plan for those with low incomes or a disability)

TRICARE or other military health care

VA (including those who have ever used or enrolled for VA health care)

Indian Health Service

Any other type of health insurance or health coverage plan (please specify) _____

**11.3 In the past year,** did any of these things happen with your health insurance company? (**Please provide an answer in each row.** If you didn't try to get the kind of care listed or if you never tried to change your records, choose "I have not asked for this.")

| In the past year... | Yes | No | I have not asked for this |
|---|---|---|---|
| My health insurance company wouldn't change my records to list my current name or gender. | ○ | ○ | ○ |
| My health insurance company denied me hormone therapy for transition. | ○ | ○ | ○ |
| My health insurance company denied me surgery for transition. | ○ | ○ | ○ |
| My health insurance company covers only some of the surgical care I need for my transition. | ○ | ○ | ○ |
| My health insurance company covers surgery for transition, but has no surgery providers in their network. | ○ | ○ | ○ |
| My health insurance company denied me gender-specific health care (such as Pap smears, prostate exams, mammogram, etc.) because I am trans. | ○ | ○ | ○ |
| My health insurance company denied me other routine health care because I am trans. | ○ | ○ | ○ |

**11.4** Thinking about the doctor or provider you go to for your **trans-related** health care (such as hormone treatment), how much do they know about providing health care for trans people?

I don't have a trans-related doctor or health care provider right now *[Skip to 11.7]*

They know almost everything about trans healthcare

They know most things about trans healthcare

They know some things about trans healthcare

They know almost nothing about trans healthcare

I am not sure

**11.5** How far do you travel to see your trans-related health care provider?

Less than 10 miles

10-25 miles

25-50 miles

50-75 miles

75-100 miles

Over 100 miles

**11.6** Do you also go to your **trans-related** health care provider for your routine health care, like physicals, flu, diabetes, etc.?

Yes, I see my trans health care provider for my routine health care *[Skip to 11.9]*

No, I see a different doctor or health care provider for my routine healthcare

No, I do not get any routine health care *[Skip to 11.9]*

**11.7** How much does your *routine health care* provider (who you see for physicals, flu, diabetes, etc.) know about health care for trans people? *[Only respondents who selected "No, I see a different doctor or health care provider for my routine healthcare" received this question.]*

I don't have a routine health care provider *[Skip to 11.9]*

They know almost everything about trans health care

They know most things

They know some things

They know almost nothing

I am not sure

**11.8** How far do you travel to see your routine health care provider? *[Only respondents who selected "No, I see a different doctor or health care provider for my routine healthcare" received this question.]*

Less than 10 miles

10-25 miles

25-50 miles

50-75 miles

75-100 miles

Over 100 miles

**11.9 In the past year,** did you look for health insurance from a state or federal health insurance marketplace? (Health insurance marketplaces are part of the new health care law, sometimes called "Obamacare" or the "Affordable Care Act," where people can get insurance online, such as through healthcare.gov, over the phone, or in person.)

No *[Skip to 12.1]*

Yes

**11.10** Did you buy insurance or enroll in a state Medicaid program through a health insurance marketplace? *[Only respondents who selected "Yes" in 11.9 received this question.]*

No *[Skip to 12.1]*

Yes

AR_217268

**11.11** What type of insurance coverage did you buy? *[Only respondents who selected "Yes" in 11.10 received this question.]*

Coverage through a state Medicaid program

Coverage through a private plan with a subsidy, so I pay a lower price because of my income

Coverage through a private plan without a subsidy

Not listed above (please specify) _____

## Section 12

**These are questions about your health, experiences with doctors or health care providers, and health care.**

**12.1** Would you say that in general your health is...

Excellent

Very good

Good

Fair

Poor

**12.2** The following questions ask about how you have been feeling **during the past 30 days**. For each row, please select the column that best describes how often you had this feeling. **(Please provide an answer in each row.)**

| During the past 30 days, how often did you feel... | All of the time | Most of the time | Some of the time | A little of the time | None of the time |
|---|---|---|---|---|---|
| ...so sad that nothing could cheer you up? | O | O | O | O | O |
| ...nervous? | O | O | O | O | O |
| ...restless or fidgety? | O | O | O | O | O |
| ...hopeless? | O | O | O | O | O |
| ...that everything was an effort? | O | O | O | O | O |
| ...worthless? | O | O | O | O | O |

**12.3** We just asked about a number of feelings you had **during the past 30 days**. Altogether, how MUCH did these feelings interfere with your life or activities? *[Only respondents who selected an answer choice other than "None of the time" in 12.2 received this question.]*

A lot

Some

A little

Not at all

**12.4** Was there a time **in the past 12 months** when you needed to see a doctor but could not because of cost?

No

Yes

**12.5** Was there a time in the **past 12 months** when you needed to see a doctor but did not because you thought you would be disrespected or mistreated as a trans person?

No

Yes

**12.6 In the past year**, have you seen a doctor or health care provider?

No *[Skip to 12.8]*

Yes

**12.7 In the past year**, did you have any of these things happen to you, as a trans person, when you went to see a doctor or health care provider? **(Please provide an answer in each row.)** *[Only respondents who selected "Yes" in 12.6 received this question.]*

| In the past year... | No | Yes |
|---|---|---|
| My doctor knew I was trans and treated me with respect. | O | O |
| I had to teach my doctor or other health-care provider about trans people so that I could get appropriate care. | O | O |
| A doctor or other health care provider refused to give me trans-related care. | O | O |
| A doctor or other health care provider refused to give me other health care (such as for like physicals, flu, diabetes). | O | O |
| My doctor asked me unnecessary/invasive questions about my trans status that were not related to the reason for my visit. | O | O |
| A doctor or other health care provider used harsh or abusive language when treating me. | O | O |
| A doctor or other health care provider was physically rough or abusive when treating me. | O | O |
| I was verbally harassed in a health care setting (such as a hospital, office, clinic). | O | O |
| I was physically attacked by someone during my visit in a health care setting (such as a hospital, office, clinic). | O | O |
| I experienced unwanted sexual contact (such as fondling, sexual assault, or rape) in a health care setting (such as a hospital, office, clinic). | O | O |

**12.8** Have you **ever wanted** any of the health care listed below for your gender identity or gender transition? **(Mark all that apply.)** *[Respondents could not select "None of the above" in combination with any other option.]*

Counseling/Therapy

Hormone Treatment/HRT

Puberty Blocking Hormones (usually used by youth ages 9-16)

None of the above

**12.9** Have you **ever had** any of the health care listed below for your gender identity or gender transition? **(Mark all that apply.)** *[Respondents could not select "None of the above" in combination with any other option.]*

Counseling/Therapy

Hormone Treatment/HRT

Puberty Blocking Hormones (usually used by youth ages 9-16)

None of the above

**12.10** At what age did you begin hormone treatment/HRT treatment? *[Only respondents who selected "Hormone Therapy/HRT" in 12.9 received this question.]*

*[Drop-down list of ages]*

**12.11** At what age did you begin taking Puberty Blocking Hormones? *[Only respondents who selected "Puberty Blocking Hormones" in 12.9 received this question.]*

*[Drop-down list of ages]*

**12.12** Are you currently taking hormones for your gender identity or gender transition?

No *[Skip to 12.15]*

Yes

**12.13** Where do you currently get your hormones? *[Only respondents who selected "Yes" in 12.12 and did not select "Now on active duty" in 2.17 received this question.]*

I only go to licensed professionals (like a doctor) for hormones

In addition to licensed professionals, I also get hormones from friends, online, or other non-licensed sources

I ONLY get hormones from friends, online, or other non-licensed sources

**12.14** Where do you currently get your hormones? **(Mark all that apply.)** *[Only respondents who selected "Yes" in 12.12 and selected "Now on active duty" in 2.17 received this question.]*

On-post medical doctor

Off-post medical doctor

On-post pharmacy

Off-post pharmacy

Through friends, online, or other non-licensed sources (not through a doctor or medical provider)

Another source not listed above (please specify) _____

**12.15** Have you had or do you want any of the health care listed below for gender transition? **(Please give an answer in each row.)** *[Only respondents who selected "Female" in 2.1 received this question.]*

| | Have had it | Want it some day | Not sure if I want this | Do not want this |
|---|---|---|---|---|
| Top/chest surgery reduction or reconstruction | O | O | O | O |
| Hysterectomy/"hysto" (removal of the uterus, ovaries, fallopian tubes, and/or cervix) | O | O | O | O |
| Clitoral release/metoidioplasty/ centurion procedure | O | O | O | O |
| Phalloplasty (creation of a penis) | O | O | O | O |
| Other procedure not listed: | O | O | O | O |

**12.16** You said that you had at least one procedure for your gender transition. At what age did you have your first procedure (other than hormones)? *[Only respondents who selected "Have had it" at least once in 12.15 received this question.]*

*[Drop-down list of ages]*

**12.17** Have you had a Pap smear or Pap test in the past year? *[Only respondents who selected "Female" in 2.1 received this question.]*

No

Yes

**12.18** Have you had or do you want any of the health care listed below for gender transition? **(Please provide an answer in each row.)** *[Only respondents who selected "Male" in 2.1 received this question.]*

| | Have had it | Want it some day | Not sure if I want this | Do not want this |
|---|---|---|---|---|
| Hair removal/electrolysis | O | O | O | O |
| Breast augmentation / top surgery | O | O | O | O |
| Silicone injections | O | O | O | O |
| Orchidectomy / "orchy" / removal of testes | O | O | O | O |
| Vaginoplasty/labiaplasty/SRS/GRS/GCS | O | O | O | O |
| Trachea shave (Adam's apple or thyroid cartilage reduction) | O | O | O | O |
| Facial feminization surgery (such as nose, brow, chin, cheek) | O | O | O | O |
| Voice therapy (non-surgical) | O | O | O | O |
| Voice surgery | O | O | O | O |
| Other procedure not listed: | O | O | O | O |

**12.19** You said that you had at least one procedure for your gender transition. At what age did you have your first procedure (other than hormones)? *[Only respondents who selected "Have had it" at least once for a procedure other than "voice therapy (non-surgical)" in 12.15 received this question.]*

*[Drop-down list of ages]*

**12.20** Have you ever de-transitioned? In other words, have you ever gone back to living as your sex assigned at birth, at least for a while?

I have never transitioned. *[Skip to 13.1]*

No *[Skip to 13.1]*

Yes

**12.21** Why did you de-transition? In other words, why did you go back to living as your sex assigned at birth? **(Mark all that apply.)**

Pressure from spouse or partner

Pressure from a parent

AR_217270

Pressure from other family members

Pressure from friends

Pressure from my employer

Pressure from a religious counselor

Pressure from a mental health professional

I had trouble getting a job.

I realized that gender transition was not for me.

I faced too much harassment/discrimination.

It was just too hard for me.

Not listed above (please specify)_____

## Section 13

**These are questions about experiences you may have had with some professionals, such as psychologists, counselors, religious advisors.**

**13.1** Did you ever discuss your gender identity or trans identity with a professional (such as a psychologist, counselor, religious advisor)?

No *[Skip to 13.5]*

Yes

**13.2** Did any professional (such as a psychologist, counselor, religious advisor) try to make you identify only with your sex assigned at birth (in other words, try to stop you being trans)?

No *[Skip to 13.5]*

Yes

**13.3** How old were you the first time a professional tried to make you identify only with your sex assigned at birth (in other words, try to stop you being trans)? *[Only respondents who selected "Yes" in 13.2 received this question.]*

*[Drop-down list of ages]*

**13.4** Was this person a religious or spiritual counselor/advisor? *[Only respondents who selected "Yes" in 13.2 received this question.]*

No

Yes

**13.5** Did you ever discuss your **sexual orientation** with any professional (such as a psychologist, counselor, religious advisor)?

No *[Skip to 14.1]*

Yes

**13.6** Did any professional (such as a psychologist, counselor, religious advisor) ever try to change your **sexual orientation**

or who you are attracted to (such as try to make you straight/heterosexual)? *[Only respondents who selected "Yes" in 13.5 received this question.]*

No

Yes

## Section 14

**These are questions about HIV testing and care.**

**14.1** This question is about the test for HIV, the virus that causes AIDS. Except for tests you may have had as part of blood donations, have you ever been tested for HIV?

No *[Skip to 14.3]*

Yes

**14.2** What was the result of your most recent HIV test? *[Only those who selected "Yes" in 14.1 received this question.]*

HIV positive or reactive, meaning I have HIV. *[Skip to 14.4]*

HIV negative, meaning I do not have HIV. *[Skip to 14.4]*

HIV test results were unclear, meaning the test could not determine if I have HIV. *[Skip to 14.4]*

I don't know. I never received the results. *[Skip to 14.4]*

**14.3** Here is a list of reasons why some people have not been tested for HIV (the virus that causes AIDS). Which one of these would you say is the MAIN reason why you have not been tested? *[Only respondents who selected "No" in 14.1 received this question.]*

It's unlikely I've been exposed to HIV.

I was afraid to find out if I was HIV positive (that you had HIV).

I didn't want to think about HIV or about being HIV positive.

I was worried my name would be sent to the government if I tested positive.

I didn't know where to get tested.

I don't like needles.

I was afraid of losing my job, insurance, home, friends, or family if people knew I was tested for AIDS infection.

My doctor/health care provider never mentioned getting an HIV test.

Some other reason

No particular reason

**14.4_1** Where were you last tested? *[Only respondents who selected "Yes" in 14.1 received this question.]*

Private doctor or HMO office

Counseling and testing site

Emergency room

Hospital inpatient

AR_217271

Clinic

Jail or prison (or other correctional facility)

Drug treatment facility

At home

Somewhere else

A place not listed above
(please specify) _____

**14.4_2** Not including blood donations, in what month and year was your last HIV test? *[Only respondents who selected "Yes" in 14.1 received this question.]*

Month *[Drop-down list of all months]*

Year *[Drop-down list with years 2015–1984 and "before 1984" as a final option]*

*[Only respondents who selected "HIV positive or reactive, meaning I have HIV" in 14.2 received questions 14.5–14.13.]*

**14.5** In the past 12 MONTHS, have you seen a doctor or health care provider for HIV care? Don't include care you received during emergency room visits or while staying in the hospital.

No

Yes *[Skip to 14.7]*

**14.6** What is the main reason you haven't seen a doctor or health care provider for HIV care in the past 12 months? *[Only respondents who selected "No" in 14.5 received this question.]*

I couldn't afford it.

I have no health insurance.

I only recently found out I have HIV.

I have needed other types of medical or mental health care.

I didn't know where to go for HIV care.

I wasn't ready to look for health care for HIV.

I didn't feel sick enough to look for health care.

My family or partner would find out I have HIV.

I believed that I would be mistreated because I am trans.

I rely on a higher power/God to help my HIV.

A reason not listed above
(please specify) _____

**14.7** In the past 6 MONTHS, have you seen a doctor or health care provider for HIV care? Don't include care you received during emergency room visits or while staying in the hospital. *[Only respondents who selected "Yes" in 14.5 received this question.]*

No

Yes *[Skip to 14.9]*

**14.8** What is the main reason that you haven't seen a doctor or health care provider for HIV care in the past 6 months? *[Only*

*respondents who selected "No" in 14.7 received this question.]*

I couldn't afford it.

I have no health insurance.

I have needed other types of medical or mental health care.

I didn't know where to go for HIV care.

I wasn't ready to look for health care for HIV.

I didn't feel sick enough to look for health care.

My family or partner would find out I have HIV.

I believed that I would be mistreated because I am trans.

I rely on a higher power/God to help my HIV.

A reason not listed above
(please specify) _____

**14.9** When was your last blood test to determine your viral load and CD4 counts?

Within the past 6 months

Within the past year

More than a year ago

I have never had a blood test for my viral load and CD4 count.

**14.10** Have you ever been prescribed anti-retroviral therapy, which are the pills that reduce the amount of HIV in your body (often called ART)?

No

Yes

**14.11** Are you currently taking anti-retroviral therapy (ART)?

No *[Skip to 14.13]*

Yes

**14.12** Do you take your anti-retroviral therapy (ART) like you're supposed to (regularly and as prescribed)?

Never

Rarely

Most of the time

All of the time *[Skip to 15.1]*

**14.13** What is the main reason that are you not taking or not regularly taking anti-retroviral therapy (ART) all of the time? *[Only respondents who selected "No" in 14.11 or "Never," "Rarely," or "Most of the time" in 14.12 received this question.]*

I can't afford it.

I have no health insurance.

I only recently found out I have HIV.

My doctor or health care provider said I didn't need it.

I am afraid it would conflict with my hormones.

I am afraid it would conflict with my other medications.

I would gain weight.

AR_217272

I don't know where to get it.

I don't want to take anti-retroviral therapy (ART).

I don't feel sick enough to take anti-retroviral therapy (ART).

My family, partner, or friends would find out I have HIV.

I rely on a higher power/God to help my HIV.

A reason not listed above
(please specify) _____

## Section 15

**These are questions about your use of alcohol, tobacco, marijuana, or other drugs.**

**15.1** Have you **ever** had a drink[19] of any type of alcoholic beverage, smoked part or all of a cigarette, or used any of the other following substances? **(Please provide an answer in each row.)**

| | No | Yes |
|---|---|---|
| Alcohol[20] (such as beer, wine, or hard liquor) | O | O |
| Cigarettes[21] (tobacco only) | O | O |
| E-cigarettes or vaping products[22] | O | O |
| Marijuana or hashish[23] (such as weed, joints, hash, hash oil) | O | O |
| Illegal or illicit drugs[24] (such as cocaine, crack, heroin, LSD, meth, inhalants like poppers or whippits) | O | O |
| Prescription drugs[25] (such as Oxycontin, Xanax, Adderall, Ambien) that weren't prescribed to you, or that you didn't take as prescribed. | O | O |

*[Only respondents who selected "Yes" under "Alcohol (such as beer, wine, or hard liquor)" in 15.1 received questions 15.2–15.4]*

**15.2** How long has it been since you last drank an alcoholic beverage[26]?

　　Within the past 30 days

　　More than 30 days ago but within the past 12 months

　　More than 12 months ago

**15.3** During the past 30 days, on how many days did you drink one or more drinks[27] of an alcoholic beverage? *[Only respondents who selected "Within the past 30 days" in 15.2 received this question.]*

　　*[Drop-down list of numbers 1–30]*

**15.4** During the past 30 days, on how many days did you have 5 or more drinks[28] on the same occasion? By 'occasion,' we mean at the same time or within a couple of hours of each other. *[Only respondents who selected "Within the past 30 days" in 15.2 received this question.]*

　　*[Drop-down list of numbers 1–30]*

*[Only respondents who selected "Yes" under "Cigarettes (tobacco only)" in 15.1 received questions 15.5–15.7]*

**15.5** How long has it been since you last smoked part or all of a cigarette?

　　Within the past 30 days

　　More than 30 days ago but within the past 12 months

　　More than 12 months ago

**15.6** During the past 30 days, on how many days did you smoke part or all of a cigarette? *[Only respondents who selected "Within the past 30 days" in 15.5 received this question.]*

　　*[Drop-down list of numbers 1–30]*

**15.7** On the days you smoked cigarettes during the past 30 days, how many cigarettes did you smoke per day, on average? *[Only respondents who selected "Within the past 30 days" in 15.5 received this question.]*

　　Less than one cigarette per day

　　1 cigarette per day

　　2 to 5 cigarettes per day

　　6 to 15 cigarettes per day (about ½ pack)

　　16 to 25 cigarettes per day (about 1 pack)

　　26 to 35 cigarettes per day (about 1 ½ packs)

　　More than 35 cigarettes per day (about 2 packs or more)

**15.8** How long has it been since you last used E-Cigarettes or vaping products? *[Only respondents who selected "Yes" under "E-cigarettes or vaping products" in 15.1 received this question.]*

　　Within the past 30 days

　　More than 30 days ago but within the past 12 months

　　More than 12 months ago

**15.9** How long has it been since you last used marijuana or hashish? *[Only respondents who selected "Yes" under "Marijuana or hashish (such as weed, joints, hash, hash oil)" in 15.1 received this question.]*

　　Within the past 30 days

　　More than 30 days ago but within the past 12 months

　　More than 12 months ago

**15.10** During the past 30 days, on how many days did you use marijuana or hashish? *[Only respondents who selected "Within the past 30 days" in 15.9 received this question.]*

　　*[Drop-down list of numbers 1–30]*

**15.11** How long has it been since you last used any illegal/illicit drug (such as cocaine, crack, heroin, LSD, meth, inhalants like poppers or whippits)? *[Only respondents who selected "Yes" under "Illegal or illicit drugs (such as cocaine, crack, heroin, LSD, meth, inhalants like poppers or whippits)" in 15.1 received this question.]*

　　Within the past 30 days

　　More than 30 days ago but within the past 12 months

　　More than 12 months ago

**15.12** How long has it been since you last used any prescription drugs not as prescribed or not prescribed to you? *[Only respondents who selected "Yes" under "Prescription drugs (such as Oxycontin, Xanax, Adderall, Ambien) that weren't prescribed to you, or that you didn't take as prescribed" in 15.1 received this question.]*

Within the past 30 days

More than 30 days ago but within the past 12 months

More than 12 months ago

## Section 16

**These are questions about suicidal thoughts and behaviors. Talking about suicidal thoughts or behaviors sometimes brings up difficult emotions. If you experience any difficult emotions because of these questions we encourage you to get help from someone you trust or call one of the anonymous helplines listed at the end of the section.**

**16.1** The next few questions are about thoughts of suicide. **At any time in the past 12 months** did you **seriously think about trying to kill yourself?**

No *[Skip to 16.6]*

Yes

**16.2** During the past 12 months, did you **make any plans** to kill yourself? *[Only respondents who selected "Yes" in 16.1 received this question.]*

No

Yes

**16.3** During the past 12 months, did you **try** to kill yourself? *[Only respondents who selected "Yes" in 16.1 received this question.]*

No *[Skip to 16.8]*

Yes

**16.4** During the past 12 months, did you get medical attention from a doctor or other health professional as a result of an attempt to kill yourself? *[Only respondents who selected "Yes" in 16.3 received this question.]*

No *[Skip to 16.9]*

Yes

**16.5** Did you stay in a hospital overnight or longer because you tried to kill yourself? *[Only respondents who selected "Yes" in 16.4 received this question.]*

No *[Skip to 16.9]*

Yes *[Skip to 16.9]*

**16.6 At any time in your life**, have you **seriously thought** about trying to kill yourself? *[Only respondents who selected "No" in 16.1 received this question.]*

No *[Skip to 17.1]*

Yes

**16.7** At any time in your life, did you **make any plans** to kill yourself? *[Only respondents who selected "Yes" in 16.6 received this question.]*

No

Yes

**16.8** At any time in your life, did you **try** to kill yourself? *[Only respondents who said "Yes" in 16.6 received this question.]*

No *[Skip to 17.1]*

Yes

**16.9** How many times have you tried to kill yourself in your lifetime? *[Only respondents who selected "Yes" in 16.3 "or "Yes" to 16.8 received this question.]*

*[Drop-down list of numbers 1–25 and "more than 25" as last option]*

**16.10** How old were you when you tried to kill yourself? *[Only respondents who selected "1" in 16.9 received this question.]*

*[Drop-down list of ages]*

**16.11** How old were you the **first time** you tried to kill yourself? *[Only respondents who selected a value other than "1" in 16.9 received this question.]*

*[Drop-down list of ages]*

**16.12** How old were you the **last time** you tried to kill yourself?

*[Drop-down list of ages]*

If you are experiencing any difficult emotions after answering these questions and would like to talk to someone, please contact one of the anonymous resources below:

**National Suicide Prevention Helpline**
1-800-273-8255
http://www.suicidepreventionlifeline.org/

**Veterans Crisis Line** (for veterans, military personnel, and their families)
1-800-273-8255 and Press 1
http://veteranscrisisline.net/

**The Trevor Project**
The Trevor Project is a phone and internet chat hotline for LGBTQ people. For those participating in this survey, The Trevor Project will speak or chat with people of all ages.
1-866-488-7386
http://www.thetrevorproject.org/section/get-help

AR_217274

## Section 17

**These are questions about being treated unequally, harassed, or physically attacked.**

**17.1 In the past year,** have you been denied equal treatment or service, such as at a place of business, government agency, or public place for any reason?

No

Yes

**17.2 In the past year,** did anyone verbally harass you for any reason?

No

Yes

**17.3 In the past year,** did anyone physically attack you (such as grab you, throw something at you, punch you, use a weapon) for any reason?

No

Yes

**17.4** You said that you were denied equal treatment or service **in the past year.** Do you believe any of those experiences were because of your... **(Mark all that apply.)** *[Only respondents who selected "Yes" in 17.1 received this question. Respondents could not select "None of the above" in combination with any other option.]*

Age

Disability

Income level or education

Trans status/gender identity

Gender expression/appearance

Race/ethnicity

Religion/spirituality

Sexual orientation

None of the above

**17.5** You said that you have been verbally harassed **in the past year.** Do you believe any of those experiences were because of your... **(Mark all that apply.)** *[Only respondents who selected "Yes" in 17.2 received this question. Respondents could not select "None of the above" in combination with any other option.]*

Age

Disability

Income level or education

Trans status/gender identity

Gender expression/appearance

Race/ethnicity

Religion/spirituality

Sexual orientation

None of the above

**17.6 In the past year,** did strangers verbally harass you in public because of your trans status, gender identity, or gender expression? *[Only respondents who selected "Trans status/gender identity" or "Gender expression/appearance" in 17.5 received this question.]*

No

Yes

*[Only respondents who selected "Yes" in 17.3 received questions 17.7–17.10.]*

**17.7 In the past year,** how many times were you physically attacked? _____

*[Drop-down list of numbers]*

**17.8** How were you physically attacked? **(Mark all that apply.)**

With a gun

With a knife

With another weapon (like a baseball bat, frying pan, scissors, or stick)

By something thrown (such as a rock or bottle)

By someone grabbing, punching, or choking you

Unwanted sexual contact (such as rape, attempted rape, being forced to penetrate)

Not listed above

**17.9** When you were physically attacked **in the past year,** do you believe any of those experiences were because of your... **(Mark all that apply).** *[Respondents could not select "None of the above" in combination with any other option.]*

Age

Disability

Income level or education

Trans status/gender identity

Gender expression/appearance

Race/ethnicity

Religion/spirituality

Sexual orientation

None of the above

**17.10** In the past year, did strangers physically attack you in public because of your trans status, gender identity, or gender expression? *[Only respondents who selected "Trans status/gender identity" or "Gender expression/appearance" in 17.9 received this question.]*

No

Yes

AR_217275

## Section 18

These are questions about unwanted sexual contact. Some people get sexual attention that they don't want and don't ask for. It could come from someone they know well - a romantic or sexual partner, a friend, a teacher, a coworker, a supervisor, or a family member. These questions are based on national surveys that we will use to compare with the U.S. population. If you experience any difficult emotions because of these questions we encourage you to get help from someone you trust or call one of the anonymous helplines listed at the end of the section.

**18.1** Have you ever experienced unwanted sexual contact (such as oral, genital, or anal contact or penetration, forced fondling, rape)?

No *[Skip to 19.1]*

Yes

**18.2** Who did this to you? **(Mark all that apply.)**

A partner/ex-partner

A relative

A friend/acquaintance

A law enforcement officer

A health care provider/doctor

A stranger

A boss or supervisor

A co-worker

A teacher or school staff member

A person not listed above

**18.3** Now just thinking about **the past year,** have you experienced unwanted sexual contact (such as oral, genital, or anal contact or penetration, forced fondling, rape)?

No

Yes

If you are experiencing any difficult emotions after answering these questions and would like to talk to someone, please contact one of the anonymous resources below:

**Veterans Crisis Line** (for veterans, military personnel, and their families)
1-800-273-8255 and Press 1
http://veteranscrisisline.net/

**FORGE Transgender Sexual Violence Project**
414-559-2123
http://forge-forward.org/anti-violence/for-survivors/ to list of resources

**National Sexual Assault Hotline**
800-656-HOPE (4673)
https://ohl.rainn.org/online/

## Section 19

These are questions about any harm caused by a current or former romantic or sexual partner. This could include physical, emotional, or financial harm.

**19.1** Have you ever had a romantic or sexual partner?

No *[Skip to 20.1]*

Yes

**19.2** Have any of your romantic or sexual partners ever...?
**(Please provide an answer in each row.)**

|  | No | Yes |
|---|---|---|
| Tried to keep you from seeing or talking to your family or friends | O | O |
| Kept you from having money for your own use | O | O |
| Kept you from leaving the house when you wanted to go | O | O |
| Hurt someone you love | O | O |
| Threatened to hurt a pet or threatened to take a pet away from you | O | O |
| Wouldn't let you have your hormones | O | O |
| Wouldn't let you have other medications | O | O |
| Threatened to call the police on you | O | O |
| Threatened to "out" you | O | O |
| Told you that you weren't a "real" woman or man | O | O |
| Stalked you | O | O |
| Threatened to use your immigration status against you | O | O |

**19.3** Have any of your romantic or sexual partners ever...?
**(Please provide an answer in each row.)**

|  | No | Yes |
|---|---|---|
| Made threats to physically harm you | O | O |
| Slapped you | O | O |
| Pushed or shoved you | O | O |
| Hit you with a fist or something hard | O | O |
| Kicked you | O | O |
| Hurt you by pulling your hair | O | O |
| Slammed you against something | O | O |
| Forced you to engage in sexual activity | O | O |
| Tried to hurt you by choking or suffocating you | O | O |
| Beaten you | O | O |
| Burned you on purpose | O | O |
| Used a knife or gun on you | O | O |

AR_217276

## Section 20

**These are questions about your experiences with bathrooms while in public places, at work, or at school.**

**20.1 In the past year,** did anyone tell or ask you if you were using the wrong bathroom?

No

Yes

**20.2 In the past year,** did anyone stop you from entering or deny you access to a bathroom?

No

Yes

**20.3 In the past year,** were you verbally harassed, physically attacked, or experience unwanted sexual contact when accessing or while using a bathroom? **(Mark all that apply.)** *[Respondents could not select "No" in combination with any other option.]*

No *[Skip to 20.7]*

Yes, verbally harassed

Yes, physically attacked

Yes, experienced unwanted sexual contact

**20.4** You said that you were **verbally harassed** in a bathroom in the past year. Where did this happen? **(Mark all that apply.)** *[Only respondents who selected "Yes, verbally harassed" in 20.3 received this question.]*

A bathroom in a public place (such as a restaurant, shopping mall, movie theater, etc.)

A bathroom at my workplace

A bathroom at my school

A bathroom at another location (please specify) _____

**20.5** You said that you were **physically attacked** in a bathroom in the past year. Where did this happen? **(Mark all that apply.)** *[Only respondents who selected "Yes, physically attacked" in 20.3 received this question.]*

A bathroom in a public place (such as a restaurant, shopping mall, movie theater, etc.)

A bathroom at my workplace

A bathroom at my school

A bathroom at another location (please specify) _____

**20.6** You said that you **experienced unwanted sexual contact** in a bathroom in the past year. Where did this happen? **(Mark all that apply.)** *[Only respondents who selected "Yes, experienced unwanted sexual contact" in 20.3 received this question.]*

A bathroom in a public place (such as a restaurant, shopping mall, movie theater, etc.)

A bathroom at my workplace

A bathroom at my school

A bathroom at another location (please specify) _____

**20.7 In the past year,** did you avoid going to the bathroom because you were afraid of having problems using them? This would include bathrooms in public, at work, or at school.

I have never avoided them *[Skip to 21.1]*

I have sometimes avoided them

I have always avoided them

Not listed above (please specify) _____

**20.8** Did you experience any of the following because you avoided using bathrooms in public places, at work, or at school? **(Mark all that apply.)** *[Only respondents who selected an answer choice other than "I have never avoided them" in 20.8 received this question.]*

Not going when needed ("holding it")

I avoided drinking or eating

Urinary tract infection

Kidney infection

Other kidney-related problems

I have never had physical problems from avoiding bathrooms

Not listed above (please specify) _____

## Section 21

**These are questions about things that might have happened to you at your job or business, or while you were looking for work.**

**21.1** Have you ever worked at a job or business? Do not include sex work, selling drugs, or other work that is currently considered illegal.

No *[Skip to 21.6]*

Yes

**21.2** Have you ever lost a job or been laid off?

No *[Skip to 21.4]*

Yes

**21.3** Do you believe that you were ever laid off or lost a job because of your... **(Mark all that apply.)** *[Only respondents who selected "Yes" in 21.2 received this question. Respondents could not select "None of the above" in combination with any other option.]*

Age

Disability

Income level or education

Trans status/gender identity

Gender expression/appearance

Race/ethnicity

Religion/spirituality

Sexual orientation

None of the above

**21.4** Have you ever been fired or forced to resign from a job?

No *[Skip to 21.6]*

Yes

**21.5** Do you believe that you were ever fired or forced to resign because of your... **(Mark all that apply.)** *[Only respondents who selected "Yes" in 21.4 received this question. Respondents could not select "None of the above" in combination with any other option.]*

Age

Disability

Income level or education

Trans status/gender identity

Gender expression/appearance

Race/ethnicity

Religion/spirituality

Sexual orientation

None of the above

**21.6 Now just thinking about the past year,** did you apply for a job and/or work at a job or business? Do not include sex work, selling drugs, or other work that is currently considered illegal. **(Mark all that apply.)** *[Respondents could not select "No" in combination with any other option.]*

No *[Skip to 22.1]*

Yes, I applied for a job

Yes, I worked at job or business

**21.7 In the past year,** how many times have you been... **(Please provide an answer in each row.)**

| In the past year... | 0 times | 1 time | 2 times | 3 times | 4 times | 5 or more times |
|---|---|---|---|---|---|---|
| Denied a promotion at a job | O | O | O | O | O | O |
| Not hired for a job you applied for | O | O | O | O | O | O |
| Fired or forced to resign from a job | O | O | O | O | O | O |

**21.8_1** Do you believe that any of the times that you were **denied a promotion at a job** in the past year were because of your... **(Mark all that apply.)** *[Only respondents who selected a value other than "0" under "Denied a promotion at a job" in 21.7 received this question. Respondents could not select "None of the above" in combination with any other option.]*

Age

Disability

Income level or education

Trans status/gender identity

Gender expression/appearance

Race/ethnicity

Religion/spirituality

Sexual orientation

None of the above

**21.8_2** Do you believe that any of the times that you were **not hired for a job you applied for** in the past year were because of your... **(Mark all that apply.)** *[Only respondents who selected a value other than "0" under "Not hired for a job you applied for" in 21.7 received this question. Respondents could not select "None of the above" in combination with any other option.]*

Age

Disability

Income level or education

Trans status/gender identity

Gender expression/appearance

Race/ethnicity

Religion/spirituality

Sexual orientation

None of the above

**21.8_3** Do you believe that any of the times that you were **fired or forced to resign from a job** in the past year were because of your... **(Mark all that apply.)** *[Only respondents who selected a value other than "0" under "Fired or forced to resign from a job" in 21.7 received this question. Respondents could not select "None of the above" in combination with any other option.]*

Age

Disability

Income level or education

Trans status/gender identity

Gender expression/appearance

Race/ethnicity

Religion/spirituality

Sexual orientation

None of the above

AR_217278

*[Only respondents who selected "Trans status/gender identity" or "gender expression/appearance" in 21.8_3 received questions 21.9–21.11.]*

**21.9** Now just thinking about when you were **fired or forced to resign from a job** because of your gender identity, trans status, and/or gender expression in the past year, please describe your response. **(Mark all that apply.)**

I did nothing *[Skip to 22.1]*

I contacted a lawyer.

I contacted a trans, LGBT, or other non-profit group. *[Skip to 22.1]*

I contacted my union representative. *[Skip to 22.1]*

I made an official complaint.

Not listed above (please specify) _____ *[Skip to 22.1]*

**21.10** You said that you contacted a lawyer in response to being **fired or forced to resign from a job** in the past year. What did the lawyer do to help you? *[Only respondents who selected "I contacted a lawyer" in 21.9 received this question.]*

I was not able to hire the lawyer.

The lawyer called or wrote a letter to my employer.

The lawyer helped me file an official complaint.

The lawyer filed a lawsuit for me.

Not listed above (please specify) _____

**21.11** You said that you made an official complaint in response to being **fired or forced to resign from a job** in the past year. Where did you make the official complaint? **(Mark all that apply.)** *[Only respondents who selected "I made an official complaint" in 21.9 received this question.]*

EEOC (Equal Employment Opportunity Commission)

Local/State Human Rights Commission

The Human Resources or Personnel department of the employer

Equal Employment Opportunity (EEO) office of the employer

Not listed above (please specify) _____

## Section 22

*[Only respondents who selected "Yes, I worked at a job or business" in 21.6 received questions 22.1–22.3.]*

**22.1 In the past year, to avoid trans discrimination at work... (Please provide an answer in each row.)**

|  | No | Yes |
|---|---|---|
| I asked for a transfer to a different position/department at my job in the past year | ○ | ○ |
| I stayed in a job I'd prefer to leave in the past year | ○ | ○ |
| I didn't seek a promotion or a raise in the past year | ○ | ○ |
| I quit my job in the past year | ○ | ○ |
| I had/have a job for which I am over-qualified (in the past year) | ○ | ○ |
| I had to be in the closet about my gender identity in the past year | ○ | ○ |
| I delayed my gender transition in the past year | ○ | ○ |
| I did not ask my employer to use the pronouns I prefer in the past year (such as he, she, or they) | ○ | ○ |
| I hid the fact that I have transitioned gender already in the past year | ○ | ○ |

**22.2 In the past year, did any of these things happen to you because of trans discrimination at work? (Please provide an answer in each row.)**

|  | No | Yes |
|---|---|---|
| My employer/boss forced me to resign in the past year. | ○ | ○ |
| My employer/boss forced me to transfer to a different position/department at my job in the past year. | ○ | ○ |
| My employer/boss removed me from direct contact with clients, customers, or patients in the past year. | ○ | ○ |
| My employer/boss told me to present in the wrong gender in order to keep my job in the past year. | ○ | ○ |
| My employer/boss gave me a negative job review in the past year. | ○ | ○ |
| My employer/boss and I could not work out an acceptable bathroom situation in the past year. | ○ | ○ |
| My employer/boss did not let me use the bathroom I should be using based on my gender identity in the past year. | ○ | ○ |
| My employer/boss or coworkers shared information about me that they should not have in the past year. | ○ | ○ |

**22.3 In the past year**, did any of these things happen to you at work because you are trans? **(Mark all that apply.)** *[Respondents could not select "None of the above" in combination with any other option.]*

I was verbally harassed

I was physically attacked

I experienced unwanted sexual contact (such as fondling, sexual assault, or rape)

None of the above

## Section 23

**These are questions about experiences you may have had with housing.**

**23.1** Have you ever experienced homelessness? Experiencing homelessness includes such things as staying in a shelter, living on the street, living out of a car, or staying temporarily with family or friends because you can't afford housing.

No

Yes

**23.2 Now just thinking about the past year,** have you had any of these housing situations **because you are trans? (Please provide an answer in each row.)**

Please choose "Does not apply to me" if you could not have had that housing situation in the past year. For example, if you didn't rent a home in the past year, you would answer "Does not apply to me" to the first question because you could not have been evicted.

| In the past year... | Yes | No | Does not apply to me |
|---|---|---|---|
| I was evicted from my home/apartment. | ○ | ○ | ○ |
| I was denied a home/apartment. | ○ | ○ | ○ |
| I experienced homelessness.[29] | ○ | ○ | ○ |
| I had to move back in with family members or friends. | ○ | ○ | ○ |
| I had to move into a less expensive home/apartment. | ○ | ○ | ○ |
| I slept in different places for short periods of time, such as on a friend's couch. | ○ | ○ | ○ |

## Section 24

*[Only respondents who selected "I experienced homelessness" in 23.2 received questions 24.1–24.4.]*

**24.1** When you experienced homelessness **this past year**, did you seek shelter in a homeless shelter? **(Mark all that apply.)** *[Respondents could not select a "No" answer in combination with a "Yes" answer.]*

Yes, and I stayed at one or more shelters. *[Skip to 24.3]*

Yes, but I was denied access to one or more shelters.

No, because I feared I would be mistreated as a trans person *[Skip to 25.1]*

No, for other reasons *[Skip to 25.2]*

**24.2** Do you believe that you were denied access to a homeless shelter in the past year because of your ... **(Mark all that apply.)** *[Only respondents who selected "Yes, but I was denied access to one or more shelters" in 24.1 received this question. Respondents could not select "None of the above" in combination with any other option.]*

Age

Disability

Income level or education

Trans status/gender identity

Gender expression/appearance

Race/ethnicity

Religion/spirituality

Sexual orientation

None of the above

**24.3 In the past year,** did any of these things happen to you in the homeless shelter? **(Please provide an answer in each row.)** *[Only respondents who selected "Yes, and I stayed at one or more shelters" in 24.1 received this question.]*

| | No | Yes |
|---|---|---|
| I was thrown out after they learned I was trans. | ○ | ○ |
| I decided to dress/present as the wrong gender to feel safe in a shelter. | ○ | ○ |
| They required me to dress/present as the wrong gender in the shelter. | ○ | ○ |
| I decided to leave a shelter because of poor treatment or unsafe conditions, even though I had no place to go. | ○ | ○ |

**24.4 In the past year,** did any of these things happen to you in a homeless shelter because you are trans? **(Mark all that apply.)** *[Only respondents who selected "Yes, and I stayed at one or more shelters" in 24.1 received this question. Respondents could not select "None of the above" in combination with any other option.]*

I was verbally harassed

I was physically attacked

I experienced unwanted sexual contact (such as fondling, sexual assault, or rape)

None of the above

## Section 25

**These are questions about your experiences in places of public accommodations, such as hotels, restaurants, or government agencies.**

**25.1 In the past year,** have you visited or used services in any of these places? **(Mark all that apply.)** *[Respondents could not select "I have not visited or used services in any of these places" in combination with any other option.]*

Domestic violence shelter/DV program/Rape crisis center

Drug/alcohol treatment program

DMV or RMV (Department or Registry of Motor Vehicles)

Social Security office (such as for name or gender change, Social Security card, public benefits)

2015 U.S. TRANSGENDER SURVEY

Public assistance/government benefits office (such as SNAP, WIC)

Gym/health club

Legal services from an attorney, clinic, or legal professional

Court/court house

Nursing home/extended care facility

Public transportation (such as bus, train, subway, taxi)

Retail store, restaurant, hotel, theater

I have not visited or used services in any of these places.

**25.2 In the past year,** did you **NOT** visit or use services at these places because you thought you would be mistreated as a trans person? **(Please give an answer for each place.)** *[Respondents received this question for each of the locations that they did not select in 25.1.]*

| | No | Yes (I did NOT visit because I thought I would be mistreated) |
|---|---|---|
| *[Location not selected in 25.1]* | ○ | ○ |

**25.3 In the past year,** when you visited or used services at these places, do you think the staff or employees knew or thought you were trans? **(Please give an answer for each place.)** *[Respondents received this question for each of the locations that they selected in 25.1.]*

| | No | Yes |
|---|---|---|
| *[Location selected in 25.1]* | ○ | ○ |

**25.4 In the past year,** when you visited or used services at these places, did any of these things happen to you because you are trans? **(Please provide an answer for each location.)** *[Respondents received this question for each of the locations that they selected in 25.1.]*

| | Denied equal treatment or service | Verbally harassed | Physically attacked | None of these things happened to me at this place |
|---|---|---|---|---|
| *[Location selected in 25.1]* | ○ | ○ | ○ | ○ |

## Section 26

**These are questions about experiences you may have had in school.**

**26.1** Were you out as trans in school at any time between Kindergarten and 12th grade?

No

Yes *[Skip to 26.3]*

**26.2** Do you believe that any of your classmates, teachers, or school staff in Kindergarten through 12ᵗʰ grade (K-12) **thought** you were trans? *[Only respondents who selected "No" in 26.1 received this question.]*

No

Yes

**26.3** Do you believe that any of your classmates, teachers or school staff in K-12 thought or knew you were lesbian, gay, bisexual, or queer (LGBQ)?

No

Yes

**26.4** Did any of these happen to you while in K-12? (If any of these things were done to you in K-12 by classmates, teachers, or school staff, please answer "yes.") **(Please provide an answer in each row.)** *[Only respondents who selected "Yes" in 26.1 or "Yes" in 26.2 received this question.]*

| | NO | YES |
|---|---|---|
| I was verbally harassed because people thought I was trans. | ○ | ○ |
| I was physically attacked because people thought I was trans. | ○ | ○ |
| I experienced unwanted sexual contact because people thought I was trans | ○ | ○ |
| I wasn't allowed to dress in the way that fit my gender identity/expression. | ○ | ○ |
| I was disciplined for fighting back against bullies. | ○ | ○ |
| I believe I was disciplined more harshly because teachers/staff thought I was trans. | ○ | ○ |
| I left a school because the mistreatment was so bad. | ○ | ○ |
| I was expelled from school. | ○ | ○ |

**26.5** Did any of these happen to you while in K-12? (If any of these things were done to you in K-12 by classmates, teachers, or school staff, please answer "yes.") **(Please provide an answer in each row.)** *[Only respondents who selected "No" in 26.1, AND "No" in 26.2, AND "Yes" in 26.3 received this question.]*

| | YES | NO |
|---|---|---|
| I was verbally harassed because people thought I was LGBQ. | ○ | ○ |
| I was physically attacked because people thought I was LGBQ. | ○ | ○ |
| I experienced unwanted sexual contact because people thought I was LGBQ. | ○ | ○ |
| I wasn't allowed to dress in a way that fit my gender identity/expression. | ○ | ○ |
| I was disciplined for fighting back against bullies. | ○ | ○ |
| I left a school because the mistreatment was so bad. | ○ | ○ |
| I was expelled from school. | ○ | ○ |

*[Only respondents who selected a level of educational attainment higher than "high school graduate" in 2.22 received questions 26.6–26.9.]*

**26.6** Now just thinking about classmates, professors, or staff at your college or vocational school, did they think or know you were trans?

No *[Skip to 26.9]*

Yes

**26.7** Were you harassed (verbally, physically, or sexually) at college or vocational school because people thought or knew you were trans? *[Only respondents who selected "Yes" in 26.6 received this question.]*

No *[Skip to 26.9]*

Yes

**26.8** Did you have to leave your college or vocational school because the harassment was so bad? *[Only respondents who selected "Yes" in 26.7 received this question.]*

No

Yes

**26.9** Did you leave or were you forced to leave a college or vocational school because you are trans? **(Mark all that apply.)** *[Respondents could not select "No" in combination with any other option.]*

No

Yes, I left school because the mistreatment was so bad.

Yes, I was expelled or forced out.

Yes, I left for other trans-related reasons.

## Section 27

**These are questions about things that may have happened to you when going through airport security.**

**27.1** In the past year, have you gone through airport security in the United States?

No *[Skip to 28.1]*

Yes

**27.2** When you went through airport security in the past year, did a TSA officer do any of these things to you? **(Mark all that apply.)** *[List was randomized for each respondent. Respondents could not select "None of the above" in combination with any other option.]*

They questioned the name or gender on my ID.

They used the wrong pronouns with me (he/him or she/her) or wrong title (Mr. or Ms.)

They patted me down due to gender-related clothing or items (such as a binder, packer).

I was patted down by a TSA officer of the wrong gender.

They searched my bag due to a gender-related item (such as binder, packer).

They asked me to remove or lift clothing to show a binder, undergarment, or other sensitive area.

They took me to a separate room for questioning/examination.

They announced or questioned loudly my gender, body parts, or sensitive items (such as a binder, packer).

They called the police about me.

I missed my flight due to screening.

I was not allowed to fly.

They detained me for over an hour.

They verbally harassed me.

They physically attacked me.

I experienced unwanted sexual contact (beyond a typical pat down by a TSA officer)

None of the above

## Section 28

**These are questions about things that happened to you with police, in jail, in prison, or in a juvenile detention center.**

**28.1** If you needed help from the police, how comfortable would you feel asking them for help?

Very comfortable

Somewhat comfortable

Neutral

Somewhat uncomfortable

Very uncomfortable

**28.2** In the past year, did you interact with the police or other law enforcement officers?

No *[Skip to 28.8]*

Yes

**28.3** In the past year, do you believe the police or other law enforcement officers you interacted with thought or knew you were trans?

None of the officers thought or knew I was trans. *[Skip to 28.6]*

Some officers thought or knew I was trans, some did not.

All officers thought or knew I was trans.

**28.4** In the past year, when you interacted with police or other law enforcement officers, were you treated with respect?

I was never treated with respect.

I was sometimes treated with respect.

I was always treated with respect.

AR_217282

**28.5 In the past year**, when you interacted with police or other law enforcement officers, did any of these things happen to you? **(Please give an answer in each row.)**

| In the past year... | No | Yes |
|---|---|---|
| Officers kept called me by the wrong gender pronouns (such as he/him or she/her) or wrong title (Mr. or Ms.) | ○ | ○ |
| Officers asked me questions about my gender transition (such as hormones and surgical status). | ○ | ○ |
| Officers assumed I was a sex worker. | ○ | ○ |
| Officers verbally harassed me. | ○ | ○ |
| Officers physically attacked me. | ○ | ○ |
| Officers forced me to engage in sexual activity to avoid arrest | ○ | ○ |
| I experienced unwanted sexual contact from an officer (such as fondling, sexual assault, or rape) | ○ | ○ |

**28.6 In the past year**, were you arrested for any reason?

    No *[Skip to 28.8]*

    Yes

**28.7 In the past year**, do you believe that you were arrested because you were trans?

    No

    Yes

**28.8 In the past year**, at any time were you held in jail, prison, or juvenile detention?

    No *[Skip to 29.1]*

    Yes

*[Only respondents who selected "Yes" in 28.8 received questions 28.9–28.20.]*

**28.9 In the past year**, what types of jail, prison or juvenile detention facility were you in? **(Mark all that apply.)**

    Federal prison

    State prison

    Local jail

    Holding cell

    State juvenile system

    Locally or privately-operated juvenile facilities

    Other correctional facility
    (please specify) _____

**28.10 In the past year**, during your time in jail, prison or juvenile detention facility were you physically forced, pressured, or made to feel that you had to have sex or sexual contact with any **facility staff**?

    No *[Skip to 28.12]*

    Yes

**28.11 In the past year**, how many times did this happen to you? *[Only respondents who selected "Yes" in 28.10 received this question.]*

    *[Drop-down list of numbers 1–10 and "11 or more"]*

**28.12 In the past year**, during your time in jail, prison or juvenile detention facility, were you physically forced, pressured, or made to feel that you had to have sex or sexual contact with **another inmate**?

    No *[Skip to 28.14]*

    Yes

**28.13 In the past year**, how many times did this happen to you? *[Only respondents who selected "Yes" in 28.12 received this question.]*

    *[Drop-down list of numbers 1–10 and "11 or more"]*

**28.14 In the past year**, during your time in jail, prison or juvenile detention facility were you **physically** assaulted or attacked by **facility staff**?

    No *[Skip to 28.16]*

    Yes

**28.15 In the past year**, how many times did this happen to you? *[Only respondents who selected "Yes" in 28.14 received this question.]*

    *[Drop-down list of numbers 1–10 and "11 or more"]*

**28.16 In the past year**, during your time in jail, prison or juvenile detention facility were you **physically** assaulted or attacked by **another inmate**?

    No *[Skip to 28.18]*

    Yes

**28.17 In the past year**, how many times did this happen to you? *[Only respondents who selected "Yes" in 28.16 received this question.]*

    *[Drop-down list of numbers 1–10 and "11 or more"]*

**28.18 Before your time in jail, prison, or juvenile detention**, were you taking hormones?

    No *[Skip to 29.1]*

    Yes

**28.19 Did you have a prescription** for the hormones you were taking?

    No

    Yes

**28.20 In the past year,** during your time in jail, prison, or juvenile detention, were you not allowed to take your hormones?

    No

    Yes

## Section 29

**Now we have some questions about voting and registration.**

**29.1** In any election, some people are not able to vote because they are sick or busy or have some other reason, and others do not want to vote. Did you vote in the election held on <u>Tuesday, November 4, 2014</u>[36]?

    No

    Yes *[Skip to 30.1]*

**29.2** Were you registered to vote in the <u>November 4, 2014 election</u>[37]? *[Only respondents who selected "No" in 29.1 received this question.]*

    No

    Yes *[Skip to 29.4]*

**29.3** Which of the following was the MAIN reason you were not registered to vote? **(Please choose only one response.)** *[Only respondents who selected "No" in 29.2 received this question.]*

    Not eligible to vote because I am not a U.S. citizen.

    I wanted to avoid being harassed by election officials because I am trans.

    My current name does not match social security card.

    I thought my state's voter ID law could stop me from voting.

    I don't have ID and thought I would need one to register.

    Did not meet registration deadlines.

    Did not know where or how to register

    Did not live here long enough/did not meet residency requirements.

    Permanent illness or disability

    Difficulty with English

    Not interested in the election or not involved in politics.

    My vote would not make a difference.

    Not eligible to vote because of a criminal/felony conviction.

    Not eligible to vote for a reason other than a criminal/felony conviction.

    A reason not listed above (please specify) _____

**29.4** What was the MAIN reason you did not vote? **(Please choose only one response.)** *[Only respondents who selected "Yes" in 29.2 received this question.]*

    I wanted to avoid being harassed by election officials because I am trans.

    Illness or disability (own or family's)

    Out of town or away from home

    Forgot to vote (or send in absentee ballot)

    Not interested, felt my vote wouldn't make a difference

    Too busy, conflicting work or school schedule

    Transportation problems

    Didn't like candidates or campaign issues.

    Registration problems (for example, I didn't receive an absentee ballot or wasn't registered in current location)

    Bad weather conditions

    Inconvenient hours, polling place, or hours or lines too long

    I didn't have the identification documents (ID) I needed to vote.

    My identification documents (ID) do not match my current name, gender, or have an old photo.

    My gender/name on my identification document (ID) does not match my voter registration.

    I was not allowed to vote by a poll worker or election official because I am trans.

    A reason not listed above (please specify) _____

## Section 30

**These are questions about civic and political activities.**

**30.1** Do you agree or disagree with the following statement about political affairs in this country?

Someone like me can't really influence government decisions.

    Strongly agree

    Agree

    Neither agree nor disagree

    Disagree

    Strongly disagree

**30.2** People may be involved in civic and political activities. In the last <u>Presidential election in 2012</u>[32] did you... **(Please provide an answer in each row.)** *[Response choices were randomized, keeping the first two and last two grouped together in the following order.]*

| In the last Presidential election in 2012 did you ... | No | Yes |
|---|---|---|
| Volunteer or work for a Presidential campaign | | |
| Volunteer or work for another political candidate, issue, or cause | | |
| Give money to a Presidential campaign | | |
| Give money to another political candidate, issue, or cause | | |

2015 U.S. TRANSGENDER SURVEY

AR_217284

**30.3** In the past 12 months have you... **(Please provide an answer in each row.)** *[Response choices were randomized.]*

| In the past 12 months, have you... | No | Yes |
|---|---|---|
| Attended a political protest or rally | | |
| Contacted a government official | | |
| Worked with others in your community to solve a problem | | |
| Served on a community board | | |
| Written a "letter to the editor" | | |
| Commented about politics on a message board or internet site | | |
| Held a publicly elected office | | |

**30.4** In politics, as of today, do you consider yourself a Republican, a Democrat, or an Independent?

Republican *[Skip to 30.6]*

Democrat *[Skip to 30.6]*

Independent

Other party (please specify) _____

**30.5** As of today, do you lean more to the Democratic Party or the Republican Party? *[Only respondents who selected "Independent" or "Other party" in 30.4 received this question.]*

Democratic

Republican

Neither/Other

**30.6** How would you describe your political views?

Very conservative

Conservative

Moderate

Liberal

Very liberal

## Section 31

This question asks for your opinion on the most important policy priorities for trans people in the United States.

**This is a two-part question:**

**31.1** For each issue below that affects trans people in the U.S., please mark how important it is. **(Please provide an answer in each row.)** *[Response choices were randomized. Respondents could select up to 3 response choices in the last column.]*

| | Very Important | Important | Not very Important |
|---|---|---|---|
| HIV/AIDS | O | O | O |
| Identity documents (ID) (updating name and gender) | O | O | O |
| Bullying/discrimination in schools | O | O | O |
| Police mistreatment of trans people | O | O | O |
| Mistreatment in prisons/jails | O | O | O |
| Immigration reform | O | O | O |
| Military (ability to be openly trans) | O | O | O |
| Training health care providers about trans health | O | O | O |
| Insurance coverage for trans-related health care | O | O | O |
| Employment | O | O | O |
| Housing and homelessness | O | O | O |
| Violence against trans people | O | O | O |
| Parenting and adoption rights | O | O | O |
| Marriage recognition | O | O | O |
| Conversion Therapy | O | O | O |
| Racism | O | O | O |
| Poverty | O | O | O |

**31.2** Of these issues, please select your top 3 most important issues.

Issue#1 *[Drop-down list of issues listed in 31.1]*

Issue#2 *[Drop-down list of issues listed in 31.1]*

Issue#3 *[Drop-down list of issues listed in 31.1]*

## Section 32

**32.1** Is there anything else that you would like to tell us about your experiences of acceptance or discrimination so we can better understand your experiences?

No *[Responses were submitted and respondents were directed to the Thank You Page hosted by NCTE.]*

Yes

**32.2** Please tell us anything else that you would like to tell us about your experiences of acceptance or discrimination so we can better understand your experiences. Please do not provide any information that could be used to identify you, such as your name or contact information. Your response will be anonymous. *[Only respondents who selected "Yes" in 32.1 received this question.]*

[Text box]

Please enter your survey responses by clicking on the submit button below:

SUBMIT

*[Once completed, responses were submitted and respondents were directed to the Thank You Page hosted by NCTE.]*

## Thank You Page

THANK YOU FOR MAKING YOUR VOICE HEARD

YOUR SURVEY HAS BEEN SUBMITTED

Want to be one of the first to get the survey results?

Want to win one of the cash prizes?

Give us your info here.

This information will not be connected to your survey responses.

    Preferred name

    Email address

    Zip Code (required)

    Phone (optional)

    [ ] Send me the results of the survey when you release them!

    [ ] Enter me in the drawing for one of three cash prizes: one prize of $500 and two prizes of $250!

SUBMIT

## RESOURCES

We recognize that answering some of the questions on this survey may have been hard. If you are experiencing any difficult emotions after answering the questions and would like to talk to someone, please contact one of the anonymous resources below:

**National Suicide Prevention Helpline**
1-800-273-8255
http://www.suicidepreventionlifeline.org/

**FORGE Transgender Sexual Violence Project**
414-559-2123
http://forge-forward.org/anti-violence/for-survivors/ to list of resources

**Veterans Crisis Line** (for veterans, military personnel, and their families)
1-800-273-8255 and Press 1
http://veteranscrisisline.net/

**The Trevor Project**
The Trevor Project is a phone and internet chat hotline for LGBTQ people. For those participating in this survey, The Trevor Project will speak or chat with people of all ages.
1-866-488-7386
http://www.thetrevorproject.org/section/get-help

**National Sexual Assault Hotline**
800-656-HOPE (4673)
https://ohl.rainn.org/online/

## ENDNOTES | APPENDIX B

1    Respondents who were sent to disqualification page #2 received the following message: "Based on your answers, you are not eligible to complete this survey. Thank you for your interest in participating in this study. For more information about this project please visit the NCTE website: http://www.ustranssurvey.org."

2    Respondents who were sent to disqualification page #1 received the following message: "Thank you for your survey responses. We're interested to learn more about your identity and experiences. If you would like to tell us more, please respond to the following questions. Please **do not** provide any information that could be used to identify you, such as your name or contact information.

    Tell us about your gender identity or expression. *[Text box.]*

    Tell us about your experiences related to your gender identity or expression. *[Text box.]"*

3    See note 1.

4    See note 2.

5    See note 2.

6    Respondents received the following hyperlinked definition for "active duty": "Active duty means full-time service, other than active duty for training as a member of the Army, Navy, Air Force, Marine Corps, Coast Guard, or as a commissioned officer of the Public Health Service or the National Oceanic and Atmospheric Administration, or its predecessors, the Coast and Geodetic Survey or Environmental Science Service Administration. Active duty also applies to a person who is a cadet attending one of the five United States Military Service Academies. For a person with service in the military Reserves or National Guard, mark the "Only on active duty for training in the Reserves or National Guard" box if the person has never been called up for active duty, mobilized, or deployed. For

AR_217286

a person whose only service was as a civilian employee or civilian volunteer for the Red Cross, USO, Public Health Service, or War or Defense Department, mark the 'Never served in the military' box. For Merchant Marine service, count only the service during World War II as active duty and no other period of service."

7     Respondents received the following hyperlinked definition for "household": "A household includes all the adults who live with you in the same house, apartment, group of rooms, or room that is used as one home. If you live in group housing, such as a dormitory, only include yourself and your adult family members who live with you."

8     Respondents received the following hyperlinked note regarding the term "related to you": "Include only adults you're related to by blood, legal adoption, or legal marriage that is recognized by the U.S. government. Do not include your unmarried partner or unrelated adults. Later we will ask about the people not included here."

9     Respondents received the following hyperlinked note regarding the term "named on the lease, mortgage, or deed": "This includes people who are listed on the lease, mortgage, or deed for your home. If your home is not owned or rented by anyone who lives with you, include any adult in the home except roomers, boarders, or paid employees."

10    Respondents received the following hyperlinked note regarding the term "related to you": "Do not include children that are not related to you by birth or by legal adoption. For instance, your unmarried partner's children would not be included here unless you have legally adopted them. We ask about these members of your household elsewhere in the survey."

11    Respondents received the following hyperlinked definition for "SNAP": "The Supplemental Nutrition Assistance Program (SNAP) is sometimes called the Food Stamp program. It helps people who have low or no income to buy food, usually with an EBT card."

12    Respondents received the following hyperlinked definition for "WIC": "'WIC' stands for 'Women, Infants, and Children.' It's the short name for the Special Supplemental Nutrition Program for Women, Infants, and Children. WIC is a federal program to help women who are pregnant or breastfeeding and children less than five years old get health care and healthy food."

13    Respondents who selected this answer choice received the message and clicked "OK" to proceed: "Please note that for upcoming questions about income, don't include food stamps (SNAP) as income."

14    Respondents who selected this answer choice received the message and clicked "OK" to proceed: "For upcoming questions about income, don't include assistance from WIC as income."

15    Respondents who selected multiple answer choices in this question received the following message and clicked "OK" to proceed: "Please note that for upcoming questions

about income, don't include assistance from food stamps (SNAP) or WIC as income."

16    Respondents received the following hyperlinked definition for "Individual income": "'Individual income' includes money from jobs, employment, net income from business, income from farms or rentals, income from self-employment, pensions, dividends, interest, social security payments, and other money income that you personally received in 2014. Do not include assistance from food stamps (SNAP) or WIC as income."

17    Respondents received the following hyperlinked definition for "Family income": "'Family income' includes you and members of your family related by legally-recognized marriage, by birth, or by adoption who have lived with you during the last 12 months and includes money from jobs, employment, net income from business, income from farms or rentals, income from self-employment, pensions, dividends, interest, social security payments, and any other money income received by you and family members in your household who are 15 years of age or older in 2014. Do not include assistance from food stamps (SNAP) or WIC as income."

18    Respondents received the following hyperlinked definition for "Household income": "'Household income' includes you and all members of your household who have lived with you during the past 12 months and includes money from jobs, employment, net income from business, income from farms or rentals, income from self-employment, pensions, dividends, interest, social security payments, and any other money income received by you and members of your household who are 15 years of age or older in 2014. Do not include assistance from food stamps (SNAP) or WIC as income."

19    Respondents received the following hyperlinked note regarding the term "had a drink": "Please do not include any time when you only had a sip or two from a drink."

20    Respondents received the following hyperlinked definition for "alcohol": "Alcoholic beverages, such as beer, wine, brandy, and mixed drinks."

21    Respondents received the following hyperlinked definition for "cigarettes": "Cigarettes made of tobacco. Do not include electronic cigarettes (E-cigs)."

22    Respondents received the following hyperlinked definition for "e-cigarettes or vaping products": "This includes electronic cigarettes (e-cigs or e-cigarettes), personal vaporizer (PV), or electronic nicotine delivery system (ENDS), all of which are battery-powered vaporizers that feel similar to tobacco smoking."

23    Respondents received the following hyperlinked definition for "marijuana or hashish": "Marijuana is also called pot or grass. Marijuana is usually smoked, either in cigarettes, called joints, or in a pipe. It is sometimes cooked in food. Hashish is a form of marijuana that is also called 'hash.' It is usually smoked in a pipe. Another form of hashish is hash oil."

AR_217287

24    Respondents received the following hyperlinked definition for "illegal or illicit drugs": "Drugs like cocaine, crack, heroin, LSD, and meth that are considered to be illegal. Inhalants are liquids, sprays, and gases that people sniff or inhale to get high or to make them feel good, like poppers or whippits. We are not interested in times when you inhaled a substance accidentally— such as when painting, cleaning an oven, or filling a car with gasoline."

25    Respondents received the following hyperlinked definition for "prescription drugs": "Use of prescription drugs in any way a doctor did not direct you to use them. When you answer this question, please think only about your use of the prescription drug in any way a doctor did not direct you to use it, including:

   • Using it without a prescription of your own

   • Using it in greater amounts, more often, or longer than you were told to take it

   • Using it in any other way a doctor did not direct you to use it"

29    Respondents received the following hyperlinked definition for "homelessness": "Experiencing homelessness includes such things as staying in a shelter, living on the street, living out of a car, or staying temporarily with family or friends because you can't afford housing."

26    Respondents received the following note regarding the term "drank an alcoholic beverage": "A can or bottle of beer, a glass of wine or a wine cooler, a shot of liquor, or a mixed drink with liquor in it. We are not asking about times when you only had a sip or two from a drink."

27    Respondents received the following note regarding the term "drink one or more drinks": "A can or bottle of beer, a glass of wine or a wine cooler, a shot of liquor, or a mixed drink with liquor in it. We are not asking about times when you only had a sip or two from a drink."

28    Respondents received the following note regarding the term "drinks": "A can or bottle of beer, a glass of wine or a wine cooler, a shot of liquor, or a mixed drink with liquor in it. We are not asking about times when you only had a sip or two from a drink."

30    Respondents received the following hyperlinked note: "This was the election in November 2014 to elect members of the U.S. Congress and state-level offices."

31    Respondents received the following hyperlinked note: "This was the election in November 2014 to elect members of the U.S. Congress and state-level offices."

32    Respondents received the following hyperlinked note regarding this term: "This was the presidential election in 2012 between Mitt Romney and Barack Obama."

2015 U.S. TRANSGENDER SURVEY

AR_217288



# Appendix C
## Detailed Methodology

## Survey Sources

When developing the survey instrument, the research team focused on creating a questionnaire that could provide data to address both current and emerging needs of transgender people while gathering information about disparities that often exist between transgender people and non-transgender people throughout the United States. To achieve this, questions were included that would allow comparisons between the U.S. Transgender Survey (USTS) sample and known benchmarks for the U.S. population as a whole or populations within the U.S. Consequently, questions were selected to best match those previously asked in federal government or other national surveys on a number of measures, such as measures related to income and health. Questions in the USTS survey instrument were drawn from federally administered national population-based surveys, either exactly as they appeared in the source survey or with modifications, as follows:

AR_217289

| USTS Questions | Source Survey |
|---|---|
| 2.16–2.22; 11.1 & 11.2 | American Community Survey (ACS) |
| 2.24 & 2.25; 15.1–15.12; 16.1–16.5 | National Survey on Drug Use and Health (NSDUH) |
| 7.1–7.14 | Current Population Survey (CPS) |
| 12.1; 12.4; 12.6; 12.17; 14.4 | CDC's Behavioral Risk Factor Surveillance System (BRFSS) |
| 12.2 & 12.3; 14.1; 14.3 | National Health Interview Survey (NHIS) |
| 16.6–16.12 | National Comorbidity Survey Replication (NCS-R) |
| 17.7 & 17.8 | National Crime Victimization Survey (NCVS) |
| 18.1–18.3; 19.2 & 19.3 | National Intimate Partner and Sexual Violence Survey (NISVS) |
| 28.10–28.17 | National Inmate Survey (NIS) |
| 29.1–29.4 | Current Population Survey (CPS) 2014 November Supplement |
| 30.4–30.6 | Gallup Daily Tracking Poll (U.S. Political and Economic Daily Tracking) |

# Data Cleaning

Data cleaning is the process of detecting and removing some survey responses (e.g., duplicate responses, incomplete responses, illogical responses) in order to improve the quality of the sample. Cleaning of the USTS data proceeded in the following steps: (1) flagging and removal of respondents not eligible to take the survey, (2) flagging and removal of incomplete responses, (3) flagging and removal of duplicate responses, and (4) flagging and removal of illogical responses.

The first step was to remove survey responses from individuals who did not meet basic eligibility criteria for the survey. Respondents had to consent to take the survey, be at least 18 years of age, and reside in the U.S., a U.S. territory, or on a U.S. military base. Additionally, respondents needed to identify as transgender—including non-binary identities—or meet other criteria related to their

gender identity or expression. Additionally, respondents were asked if they had already completed this survey before. Respondents who indicated that they had completed the survey before were also ineligible to take the survey. Skip logic was added to the survey to send respondents who did not meet these basic eligibility criteria to a disqualification page, but their responses were included in the initial dataset and had to be removed. Additional analyses of the dataset were completed to remove ineligible respondents. Respondents who provided a month and year of birth that indicated they were under 18 at the time they took the survey were flagged and removed from the dataset. Additional analyses of responses related to gender identity and transition status in Sections 1 and 2 of the survey were completed to flag additional ineligible respondents, which included those who did not identify as transgender or with a range of other gender-related experiences associated with transgender communities. Please see the "Variable Recoding Process" section below for a more detailed description of this process. In all, 10,304 responses were removed from the initial dataset due to being ineligible to take the survey.

Incomplete responses were then removed from the sample based on a requirement that respondents minimally complete Section 1 and specific demographic questions in Section 2 of the questionnaire. Missing data was otherwise allowed provided respondents completed these questions. The required Section 2 questions were as follows: 2.1, 2.3, 2.6, 2.8, 2.9, either 2.13 or 2.14, 2.15, 2.18, 2.19, 2.22, 2.23, and 2.26. It was determined that these questions would provide key information about respondents, including questions used to determine eligibility, and these questions were used to set a minimal level of survey "completeness" the research team was willing to accept for a respondent to remain in the dataset. In all 515 respondents were removed for incomplete survey responses.

AR_217290

Duplicate survey responses were then flagged and removed. Duplicates were determined based on all quantitative responses in the survey. Qualitative ("write-in") responses were not considered when determining whether a response was a duplicate. In all, 329 responses were considered duplicates and were removed from the final dataset.

Finally, respondents who provided more than one illogical response were flagged and removed from the final dataset. An illogical response is one that provides information that contradicts other information provided by a respondent. For instance, the USTS survey included 16 questions related to respondents' age, including current age, age they first disclosed to others they are transgender, age of suicide attempts, and ages of other milestones or experiences. An example of an illogical response would be a respondent who reported they attempted suicide at an age older than their current age. An illogical response could be due to an accidental miscode on the part of the respondent, meaning they accidentally filled out a question incorrectly, or could be evidence that a respondent is not taking the survey in earnest. The research team considered a respondent having more than one illogical response as evidence that the respondent may not have been taking the survey in earnest. In all, 53 respondents had more than one illogical response and were removed from the final dataset.[1]

| | |
|---|---:|
| Total initial sample: | 38,916 |
| Total cases removed: | 11,201 |
| Did not consent to take survey | 223 |
| Not eligible: under 18 years of age | 6,168 |
| Not eligible: had already taken survey | 1,072 |
| Not eligible: did not live in U.S., territory, or military base | 1,052 |
| Not eligible: gender identity or expression did not meet minimum criteria | 1,789 |
| Duplicate responses | 329 |
| Incomplete responses | 515 |
| Illogical responses | 53 |
| Final sample: | 27,715 |

# Missing Data and Imputation

When a dataset has substantial amounts of missing data, such as over 5% missing data, researchers should consider techniques to impute the missing data.[2] The research team conducted an analysis to determine whether missing data should be imputed in the USTS dataset. The percentage of missing data due to item non-response (not including intentionally missing data due to skip logic) on any original quantitative variable (not including recoded variables or "write-in" variables) was less than 5%, with the exception of two variables. Question 14.4 regarding the month of respondents' last HIV test had 5.9% missing data (Q. 14.4: "Not including blood donations, in what month was your last HIV test?"). This item may have had relatively higher item non-response because respondents may have been more likely to recall the year of their last HIV test, which was also requested in Q. 14.4, than the month. Question 7.11 regarding respondents' sources of income had 6.2% missing data (Q. 7.11: "What are your current sources of income?"). This may reflect a general reluctance to provide financial information that is routinely found in item non-response to income-related questions in population-based surveys. The research team determined that due to the low amount of missing data, including minimal missing data on questions that routinely have high item non-response in population-based surveys (e.g., individual and household income), missing data imputation was not necessary for this report. Future researchers are encouraged to investigate the impact of data imputation when using this dataset.

AR_217291

# Variable Recoding Process

The initial final dataset contained 1,140 unique variables based on 324 items respondents could have received in the survey. Most of these variables required quantitative or qualitative recoding for use in the study. Quantitative recodes, such as for creating variables to reflect how "out" a respondent was about their transgender identity, were completed by one primary researcher and the syntax for that recode was reviewed by another researcher. Any errors in the syntax that were found in the review were submitted to the primary researcher in order to make corrections. The primary researcher completed any corrections and the variable was then considered a final recode. In all, the research team produced over 2,000 recodes used to generate the findings presented in this report.

Respondents to the survey had many opportunities to write in responses to questions by selecting an answer such as "none of the above" and writing in a unique response or responding to an open-ended question. The research team reviewed approximately 80,000 write-in responses for recoding. The recoding process included two coding teams that conducted initial coding, which was reviewed by another coding team and areas of disagreement were flagged. A simple percent agreement score was calculated to assess inter-rater reliability. For nearly all variables that were recoded, the coding team and the review team had 90% or higher agreement, two variables had agreement between 80% and 90%, and three fell below 80% agreement (Q. 1.7 (79%), Q. 9.3 (67%), and Q. 21.11 (70%)).

In the case of a question with write-in responses where only one answer option was allowed, write-in responses were reviewed to see if they could be recoded into existing answer options. If substantial numbers of respondents wrote in the same response, a new answer option could be added to the question to reflect those responses. If it was not feasible for a response to be recoded into an existing answer option or to be combined with others to create a new answer option, the response remained in the "none of the above" category as a unique response. In the case of a question that allowed multiple choices, a similar process took place. However, if a substantial number of responses could be grouped into a new answer option and a new variable was created to describe those responses, those respondents also remained in the "none of the above" category. Therefore, new answer options based on write-in questions that allowed multiple answer choices should be viewed as a subset of the "none of the above" category.

A different recoding process was established in order to recode respondents into four gender identity categories: transgender women, transgender men, non-binary people, and crossdressers. To categorize respondents based on gender identity, the research team relied on respondents' self-selected gender category in Q. 2.3, which was cross-tabulated with Q. 2.1 to identify transgender men and transgender women. For instance, the researchers would categorize someone assigned female at birth in Q. 2.1 who identifies as a man in Q. 2.3 as a transgender man and would categorize someone assigned male at birth in Q. 2.1 who identifies as a woman in Q. 2.3 as a transgender woman. In a few cases (n=439), a respondent selected female in Q. 2.1 and woman in Q. 2.3 or selected male in Q. 2.1 and man in Q. 2.3. These respondents required additional analysis of their survey responses in order to determine if they met the eligibility criteria for the survey, and if so, to categorize them as transgender men, transgender women, non-binary people, or crossdressers. The research team relied on questions in Sections 1, 2, and 12 to help make these determinations. Members

of the research team completed initial recoding of these respondents to indicate whether they were eligible for the survey, and if so, in which of these categories they should be included. These initial recodes were reviewed by other members of the research team. When initial recoders and reviewers were not in agreement on a recode, the team met to discuss the disagreements and made a final decision on the recode as a group. In all, 250 respondents were determined to be ineligible for the survey based on this recoding and review process and were removed from the final dataset.

# Weights

The USTS sample was a purposive sample that was created using direct outreach, modified venue-based sampling, and "snowball" sampling. As a non-probability sample, generalizability is limited, meaning it is unclear whether the findings presented in this report would hold true for the transgender population of the U.S. as a whole. In addition, prior research has found that online surveys have a known bias, particularly in regard to demographic representation. Online samples tend to over-represent those who are white, young, more highly educated, and with higher incomes.[3] In order to address these biases, at least in part, the research team created and utilized weights to adjust the USTS sample in certain ways in order to better represent what is believed to be the actual population characteristics of transgender people in the U.S. and in order to make more accurate comparisons with population-based samples of the U.S. population.

Prior research using probability samples of transgender adults have found that transgender adults differ from the general population in regard to race and ethnicity and age, with those that identify as transgender being more likely to be people of color and younger than the general

population.[4] Studies have found no difference in educational attainment or lower educational attainment and have found lower incomes among transgender people as compared to non-transgender people.[5] The USTS sample has a higher percentage of white, young, and more highly educated respondents than the U.S. general population, which may be due, at least in part, to internet survey bias. However, the younger age is also likely due to the transgender population being younger overall. The USTS sample also has higher incidence of low incomes as compared to the U.S. population, which goes against the typical internet survey bias. Based on the existing research about the transgender population, there is not adequate information available to attempt to correct for bias in the sample based on age, educational attainment, or income. However, there is sufficient evidence to indicate that the race and ethnicity of the USTS sample does not reflect the racial and ethnic makeup of the U.S. transgender population as a whole.

"Weighting" is a common statistical technique used to adjust data drawn from a sample of a population to be more representative of the population from which the sample was drawn. For example, in a survey sample of the U.S. population, the proportion of respondents aged 18–24 may differ from the proportion of that age group in the U.S. population as a whole, in which case weights are commonly applied to adjust the sample to be more representative of the U.S. population. To help correct for sampling bias in the USTS sample in regard to race and ethnicity, U.S. population weights based on the American Community Survey for race and ethnicity were created as part of the standard weight applied to all findings in this report. While this may still over-represent white respondents relative to the makeup of the transgender adult population, this weighting procedure brings the sample closer to what is believed to be the true population distribution for race and ethnicity for

AR_217293

transgender people in the U.S. The standard weight also includes an adjustment to the 18-year-old category, described in more detail below. Additional survey weights were created for the purposes of comparability with federal government and national data sources, including weights for age and educational attainment.[6] These weights were applied in addition to the standard weight when comparing the USTS sample to the U.S. population for items that are sensitive to age and educational attainment, such as individual and household income, and are noted accordingly as the "supplemental weight." Weighted percentages for these and other variables can be found in the *Portrait of USTS Respondents* chapter. Unweighted frequencies and percentages for these and other variables can be found in *Appendix A (Characteristics of the Sample)*.

In addition to the potential biases described above, the USTS had a high volume of respondents who indicated that their age was 18 years old, and respondents who, based on their birth date, were 17 years old.[7] It was suspected that the increased binning of 18-year-olds may be attributable to multiple factors, including a higher prevalence of respondents who were younger than 18 at the time of the survey. This resulted in 18-year-olds comprising 9% of the sample, compared to 19-year-olds comprising 6% of the sample. It is impossible to determine the source of this binning entirely, but in order to correct for it, the research team created a weight to adjust the 18-year-olds in the sample so that respondents reporting that age appeared more like the 19-year-old respondents in both sample size and other demographics. The rationale behind this adjustment is that a person's year of birth is likely randomly distributed around the date in which they took the survey. This would imply that the composition of 18-year-olds should strongly match the composition of 19-year-olds.

A sample matching and weighting procedure was used to balance the composition of 18-year-old respondents to 19-year-old respondents. This process is done by using the Covariate Balance Propensity Score (CBPS), which treats the 18-year-olds as a "treatment group" and 19-year-olds as a baseline "control group."[8] The estimation procedure then tries to achieve balance on covariates used in the model while simultaneously accounting for the conditional probability of being in one group over the other. The former process reduces observable differences among 18-year-olds to make their demographic composition reflect 19-year-olds.[9] The latter process weights the data such that the two groups are of equivalent size. After weighting, the size of the 18-year-old sample comprises 6%, which is the same as the 19-year-old sample. Any observed demographic differences between 18- and 19-year-olds were minimized, and many failed to reach statistical significance.

The goal of this weighting process is to up-weight respondents who are most likely 18 years old by making them observationally equivalent to the age cohort closest to them (i.e., 19-year-olds) and to down-weight respondents who are less likely to actually be 18 years old. This way, if respondents who were binned at 18 years of age are really younger than 18 years of age, it would be expected that their responses would diverge from 19-year-olds as that age gap increases.[10] The weighting process down-weights 18-year-old respondents as they diverge from 19-year-olds, minimizing the influence of that group on findings. This adjustment for 18-year-olds was included in the standard survey weight applied to all findings in this report.

**ENDNOTES** | APPENDIX C

1    Respondents sometimes provided responses that seemed unlikely, for instance running away from home at a very young age, such as two years old. These types of responses were only considered to be illogical responses if they contradicted other responses. In the case of responses that were considered unlikely, they were allowed to remain in the dataset. These outliers were negligible in the overall findings in that only a handful of outliers are found in any given variable and, therefore, they do not skew the findings. Findings based on age and other variables are often presented in ranges, which also helps to mitigate any influence of outliers.

2    Dong, Y. & Pang, C. Y. J. (2013). Principled missing data methods for researchers. *SpringerPlus, 2,* 222.

3    Online survey bias is related to demographic differences in internet access. See e.g., Dillman, D. A., Smyth, J. D., & Christian, L. M. (2014). *Internet, Phone, Mail, and Mixed-Mode Surveys: The Tailored Design Method* (4th ed.). Hoboken, NJ: John Wiley & Sons; Smith, A. (2014). *African Americans and Technology Use: A Demographic Portrait.* DC: The Pew Research Center; Herman, J. L. & Hess, D. R. (2009). *Internet Access and Voter Registration.* DC: Project Vote.

4    See e.g., Flores, A. R., Brown, T. N. T., & Herman, J. L. (2016). *Race and Ethnicity of Adults who Identify as Transgender in the United States.* Los Angeles, CA: Williams Institute; Conron, K. J., Scott, G., Stowell, G. S., & Landers, S. J. (2012). Transgender health in Massachusetts: Results from a household probability sample of adults. *American Journal of Public Health, 102*(1), 118–122; Meyer, I. H., Brown, T. N. T., Herman, J. L., Reisner, S. L., & Bockting, W. O. (in press). Demographic characteristics and health outcomes among transgender adults in select regions in the Behavioral Risk Factor Surveillance System. *American Journal of Public Health.* (accepted); Harris, B.C. (2015). *Likely Transgender Individuals in U.S. Federal Administrative Records and the 2010 Census,* Working Paper #2015-03. DC: Center for Administrative Records Research and Applications Working Papers. Available at: https://www.census.gov/srd/carra/15_03_Likely_Transgender_Individuals_in_ARs_and_2010Census.pdf.

5    See note 4.

6    The weights for race, age, and educational attainment were created based on the Census Bureau's 2014 American Community Survey (ACS).

7    Respondents who are younger than 18 were removed from the final dataset and, therefore, are excluded from all reporting because they were not eligible to participate in the study.

8    Imai, K. & Ratkovic, M. (2014). Covariate balancing propensity score. *Journal of the Royal Statistical Society, Series B, 76*(1), 243–263.

9    Variables used for covariate balance were based on the following questions: Q. 1.4; Q. 1.10; Q. 1.11; Q. 1.12; Q. 1.14; Q. 1.16; Q. 1.17; Q. 1.18; Q. 2.1; Q. 2.3; Q. 2.4; Q. 2.5; Q. 2.6; Q. 2.7; Q. 2.9; Q. 2.16; Q. 2.17; Q. 2.18; Q. 2.19; Q. 2.22; Q. 2.23; Q. 3.1; Q. 3.2; Q. 3.3; Q. 4.1; Q. 4.3; Q. 4.5; Q. 6.1; Q. 7.7; Q. 7.12; Q. 7.13; Q. 7.14; Q. 10.1; Q. 11.1; Q. 11.2; Q. 12.1; Q. 12.8; Q. 12.12; Q. 12.20; Q. 13.1; Q. 14.1; Q. 15.2; Q. 15.9; Q. 16.3; Q. 16.8; Q. 17.1; Q. 17.2; Q. 17.4; Q. 17.5; Q. 17.6; Q. 17.3; Q. 17.9; Q. 18.1; Q. 18.3; Q. 19.1; Q. 20.1; Q. 20.2; Q. 20.7; Q. 21.1; Q. 21.2; Q. 21.7; Q. 23.1; Q. 23.2; Q. 26.1; Q. 26.6; Q. 27.1; Q. 28.1; Q. 28.2; Q. 29.1; Q. 29.2; Q. 30.4; and Q. 30.6.

10   Prior to weighing, the demographic characteristics of 18-year-olds were more similar to respondents who were identified as being 17 years of age and had less similarity to 19-year-olds. After weighting, there are many more similarities between 18- and 19-year-olds and far less commonality with 17-year-olds.

AR_217295

Updated December 2017

**THE REPORT OF THE**



2015 U.S. TRANSGENDER SURVEY



National Center for TRANSGENDER EQUALITY

ustranssurvey.org I transequality.org

Office of Institutional Equity
University of Hawaii System
1960 East-West Rd., BioMed A210
Honolulu, Hawaii 96822
Phone: (808) 956-8629
Email: institutional.equity@hawaii.edu

UNIVERSITY
of HAWAIʻI®
SYSTEM

September 9, 2022

TO:             U.S. Department of Education

FROM:           Jennifer Rose
                Director
                Office of Institutional Equity
                Vice President for Administration

SUBJECT:        **Docket ID: ED-2021-OCR-0166**

**Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance**

The University of Hawaiʻi (the "University") is committed to maintaining safe and respectful campus environments where everyone can strive toward their academic, career, and personal goals. Consistent with those principles, the University supports the underlying purpose of Title IX and its implementing regulations.

The University believes that, overall, the Department of Education's proposed regulations benefit institutions by respecting their educational mission and rejecting highly prescriptive, adversarial processes.

In support of further improvements, the University respectfully submits the following comments regarding the proposed regulations.

Hostile Environment Harassment. Proposed 34 CFR § 106.2 defines Hostile Environment Harassment as "Unwelcome sex-based conduct that is sufficiently severe or pervasive, that, based on the totality of the circumstances and evaluated subjectively and objectively, denies or limits a person's ability to participate in or benefit from the recipient's education program or activity (i.e., creates a hostile environment) [.]" The University supports this change as it clarifies how this term is defined for the purposes of Title IX. It also encourages a uniform approach to Hostile Environment Harassment, noting that this concept evolved through jurisprudence interpreting other Federal statutes prohibiting discrimination, including Title VII and Title VI.

Use and Adaptation of Clery Act Definitions. Proposed 34 CFR § 106.2 provides definitions within the text itself instead of cross-referencing the applicable provisions in VAWA and the Clery Act. The University supports these changes, which clarify how these terms are defined for the purposes of Title IX.

An Equal Opportunity/Affirmative Action Institution

Scope. Proposed 34 CFR § 106.10 includes "discrimination on the basis of sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, and gender identity." The University supports these changes, which further define the scope of Title IX. The University notes that these changes are also well-aligned with protections under Hawaiʻi state law.

Informal Resolution Process. Proposed 34 CFR § 106.44 (k)(1) provides that "At any time prior to determining whether sex discrimination occurred under § 106.45, and if applicable § 106.46, a recipient may offer to a complainant and respondent an informal resolution process, unless there are allegations that an employee engaged in sex discrimination toward a student or such a process would conflict with Federal, State or local law."

The University suggests that institutions should be afforded broader discretion to determine when informal resolution may be appropriate, provided that institutions document parties' voluntary, informed consent to participate in the process. The University recognizes the benefits of parties exercising agency while engaging in institutional processes. Creating undue barriers to autonomy or limiting parties' choices could create a sense of powerlessness or risk retraumatization. By contrast, offering parties options for meaningful participation in institutional processes fosters a sense of empowerment. Furthermore, institutions are best prepared to meet their communities' unique needs when given latitude to consider case-specific circumstances and relevant cultural practices, such as Hoʻoponopono.

The University also requests confirmation that the Department intends to prohibit informal resolution where "there are allegations that an employee engaged in sex discrimination toward a student[.]" Proposed 34 CFR § 106.44 (k)(1) (emphasis added); see also NPRM Preamble at 235. The University makes this request based on an apparent conflict between Proposed 34 CFR § 106.44 (k)(1) and language in the preamble, which states the tentative view that "a recipient must not offer an informal resolution process to resolve allegations that an employee engaged in sex-based harassment toward a student. In that circumstance, the Department is concerned that it is too difficult to ensure that mediation or other forms of informal resolution would be truly voluntary on the part of a student who reports sex-based harassment[.]" NPRM Preamble at 237-238 (emphasis added). The University would appreciate clarification but recommends giving institutions latitude to determine whether informal resolution may be appropriate.

Exclusion of Evidence. Proposed 34 CFR § 106.45(f)(4) provides that "If a party does not respond to questions related to their credibility, the decision maker must not rely on any statement of that party that supports that party's position." The University is concerned that this proposed provision will prevent a decision maker from considering statements that are probative, reliable, and otherwise permitted under the regulations. The University is also concerned that such a rule may undermine parties' trust in the grievance process and may have a chilling effect. The University suggests that a party's refusal to respond to questions should factor into

AR_221385

credibility assessments, but should not, as a blanket rule, prevent a decision maker from considering statements that are otherwise permitted under the regulations.

<u>Optional Live Hearing</u>. Proposed 34 CFR § 106.46(g) provides that "A postsecondary institution's sex-based harassment grievance procedures may, but need not, provide for a live hearing." The University supports making the live hearing process optional for postsecondary institutions. This change moves away from highly prescriptive, adversarial processes that run contrary to schools' core educational purpose.

Thank you for considering these comments.

Office of Institutional Equity | University of Hawaii System | 1960 East-West Rd., BioMed A210 | Honolulu, Hawaii 96822
Phone: (808) 956-8629 | Email: institutional.equity@hawaii.edu

AR_221386



# UNIVERSITY *of* WASHINGTON

*Ana Mari Cauce*
*Professor of Psychology*
PRESIDENT

The Honorable Miguel Cardona, Ed.D.
Secretary of Education
U.S. Department of Education

September 9, 2022

Re: Docket ID ED-2021-OCR-0166 Proposed Rulemaking on Title IX

Dear Secretary Cardona,

The University of Washington (UW) thanks the Department of Education (Department) for the opportunity to provide comments in response to the Notice of Proposed Rulemaking (NPRM) published on July 12, 2022. The UW is a flagship university where we currently enroll approximately 60,000 students and employ approximately 53,000 individuals, making the university one of the top five employers in the state of Washington. We take seriously our responsibility to protect all of our students and employees from sex- and gender-based discrimination, harassment, and violence and are committed to fair and impartial investigations, adjudications, and conduct proceedings that protect due process. We respectfully submit our comments in that spirit.

**The UW applauds the many positive changes** in the proposed regulations. These changes are detailed below and include, among other things, the broader scope of discrimination and less prescriptive grievance procedures. The UW also seeks clarification on a number of technical aspects of the proposed regulations; these are also spelled out in the comments below.

**Of gravest concern** to the University of Washington, however, is the Department's proposed regulations on **mandatory reporting** (34 C.F.R. § 106.44(c) "notification requirements"). This proposed change would result in **nearly all employees being required to report** any possible sex- or gender-based violence or harassment, even if the survivor does not want such a report. This proposed requirement **directly contradicts nearly a decade of research** on such policies and is seemingly rooted in the unfounded assumption that broad mandatory reporting policies are both necessary and effective for addressing sex- and gender-based violence and harassment. On behalf of the UW and personally, I urge the Department to carefully review the evidence and research, which suggests that such broad requirements do little (if anything) to prevent or address the harm caused by harassment and violence but instead often further harm a survivor, and eliminate this requirement. We include alternative protocol suggestions in our complete comments.

Thank you for the opportunity to respond to the proposed regulations, and we include detailed comments following this letter.

Sincerely,

*Ana Mari Cauce*

Ana Mari Cauce
President
University of Washington

**University of Washington (UW) Response to the**
**2022 Notice of Proposed Rulemaking on Title IX**

The comments below have been prepared by the UW's Office of the Title IX Coordinator in consultation with partners across the University who assist in implementing and facilitating the University's system of policies, programs, and services that collectively protect educational access, advance gender equity, and prevent and respond to sex- and gender-based violence, harassment, and discrimination. Our comments are divided into three sections, which include **our responses to three[1] of the directed questions**.

- First, we identify those elements of the proposed regulations representing both significant and positive change in the ongoing quest to achieve gender equity. The broader scope of discrimination, the broader geographical and jurisdictional application, the less prescriptive grievance procedures, and the important role of informal resolution options are among other valuable and positive elements of the NPRM.
- Second, we identify our primary concern with the proposed regulations. The proposal to expand mandated reporting, while well-intentioned, will not enhance our ability to prevent or remedy instances of discrimination, harassment, and violence. It will instead undermine the agency of complainants; exacerbate some complainants' experience of harm where they've already experienced trauma, harm, or other nonconsensual experiences; and erode trust among faculty, advisors, and students.
- Third, and last, we outline specific areas of the proposed regulations that are problematic from an operational and compliance perspective. We ask the Department of Education (Department) to remove these requirements from the regulations, to confirm institutional flexibility in these areas, or to provide clarity to aid recipients' compliance with the regulations.

## I.  THE UW SUPPORTS MANY CHANGES IN THE PROPOSED REGULATIONS.

The UW supports numerous elements of the proposed regulations and believes these will ultimately promote sex and gender equity at institutions of higher education. Specifically, we applaud the Department for the following proposed regulations.

- Scope of Discrimination. The proposed 106.10[2] broadens the scope of regulations to include discrimination on the basis of sex, sex stereotypes, sex characteristics, pregnancy and related conditions, sexual orientation, and gender identity. The UW already prohibits discrimination on these bases through an executive order[3] applicable to all UW community members and through our student conduct code.[4] Accordingly, such a proposed change aligns with the UW's values and commitments. Further, Washington law[5] as well as Title VII[6] prohibit discrimination on these same bases.

---

[1] We do not answer the **first directed question**.
[2] To aid in readability, the University only uses full citations to the proposed regulations when referencing language in the preamble. Full citation form is not utilized in referencing the proposed regulations themselves. Instead, the University writes "proposed [number of the proposed regulation]."
[3] Nondiscrimination and Affirmative Action, Executive Order 31, available at
https://www.washington.edu/admin/rules/policies/PO/EO31.html
[4] Washington Administrative Code (WAC) 478-121 *et seq.*
[5] *See, e.g.,* Revised Code of Washington (RCW) 49.60 *et seq.*
[6] As explained in the Supreme Court's decision, *Bostock v. Clayton County*, 590 U.S. ___, 140 S.Ct. 1731 (2020), Title VII also prohibits discrimination on the basis of sexual orientation and/or gender identity.

AR_221444

- <u>Broader Application and Jurisdictional Scope.</u> Proposed regulation 106.11's broader application of Title IX would include all locations where UW students study abroad as well as everywhere students and employees conduct fieldwork if the alleged conduct impacts a program or activity within the United States. Since August 14, 2020, alleged conduct impacting our community which occurred abroad has been investigated and adjudicated under UW policies and processes that do not incorporate the federal Title IX regulations. We believe Title IX *is* the appropriate framework to apply to sex discrimination allegations impacting our education programs and activities regardless of where the sites and programs from which such allegations arise are located. Further, we appreciate the Department's recognition that though alleged conduct may occur outside of an institution's programs or activities—such as in off-campus housing and at off-campus events and activities—any such conduct may create a hostile environment within the institution's program or activities. Again, we believe Title IX appropriately applies more broadly, which the Department's proposed regulations reflect.

- <u>Definition of Complainant.</u> The proposed definition of "complainant" in proposed 106.2 would better represent those individuals with allegations of sex discrimination who may be permitted to make a complaint and engage in a grievance procedure. Rather than submitting a complaint only to have such a complaint dismissed under the 2020 federal Title IX regulations (and instead investigated at the UW under a separate university process), the proposed definition would allow individuals who felt compelled to leave the institution due to their experiences of sex discrimination to have their complaint investigated pursuant to Title IX. The UW welcomes this proposed definitional change.

- <u>Less Prescriptive Grievance Procedures.</u> The UW is fully committed to protecting due process rights, and we appreciate the flexibility and latitude in the grievance procedures in proposed sections 106.45 and 106.46. As a publicly funded university and state agency, there are some processes and situations in which the UW is required to follow the Washington State Administrative Procedures Act (APA).[7] The 2020 federal Title IX regulations imposed specific requirements that did not comport well with the APA. The two laws (2020 Title IX regulations and APA) required different procedural steps and/or different timelines that when combined— and in order to provide equitable timelines for the parties—resulted in an even longer grievance procedure. The UW has long been required to hold hearings in certain cases where the APA applies, and the UW appreciates the Department's giving institutions flexibility with respect to how cross-examination occurs when a hearing is held. The UW also appreciates that the proposed 106.45 and 106.46 rightly acknowledge that institutions of higher education employ a variety of employees: part-time, full-time, classified, union represented, tenured, and student employees which, as the proposed regulations point out, "may be entitled to unique grievance procedures based on their respective employment designations."[8] Further, due to the additional laws and contracts governing our employees, including but not limited to the Faculty Code and no fewer than 15 collective bargaining agreements, grievance procedures that allow the

---

[7] RCW 34.05 *et seq.*

[8] Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 87 Fed. Reg. 41,459 (July 12, 2022) (to be codified at 34 C.F.R. pt. 106). To aid in readability, the University hereinafter refers to the NPRM, fully cited as—Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 87 Fed. Reg. 41,390-41,567 (July 12, 2022) (to be codified at 34 C.F.R. pt. 106)—as "Preamble" and writes "Preamble at [page number of the NPRM]."

necessary latitude to meet all requirements beyond those outlined in federal Title IX regulations place the UW in a better position to respond in a more timely manner to complaints.

- <u>Preponderance of the Evidence Standard.</u> The Department, through its **fourth directed question**, specifically requested feedback on the proposed 106.45(h)(1). The UW has traditionally employed the preponderance of evidence standard as the most equitable one and the one that best balances due process and safety in university-environment proceedings. We will continue to use that standard.

- <u>Informal Resolution Options.</u> Though the UW has not yet been able to offer informal resolution as an option to complainants and respondents, many individuals at the UW recognize the value and importance of this alternative and are committed to developing informal resolution options. We are encouraged that informal resolution remains an option through proposed regulation 106.44(k), particularly even in the absence of a (formal) complaint. We believe the notice requirements in proposed 106.44(k) adequately ensure a participating respondent understands the allegations and process requirements.

  Despite our support for this proposed regulation, the UW seeks clarification that an informal resolution facilitator could serve as a witness **only** "for purposes other than providing information obtained solely through the informal resolution process."[9] By adding the additional word, "only," the Department would further clarify the limits of any informal resolution facilitator's role as a potential witness.

## II.  <u>THE MANDATORY REPORTING AND RELATED REQUIREMENTS IN PROPOSED 106.44(c)(2) AND 106.44(f)(5) WILL DIRECTLY HARM COMPLAINANTS.</u>

Proposed 106.44(c)(2)(ii) requires that any non-confidential employee who has responsibility for administrative leadership, teaching, or advising notify the Title IX Coordinator when such an employee has information about a *student* being subjected to conduct that may constitute sex discrimination. Proposed 106.44(c)(2)(iii) modifies this requirement when the employee with administrative leadership, teaching, or advising responsibilities learns that an *employee* may have been subject to conduct constituting sex discrimination, although it still *allows* institutions to require Title IX Coordinator notification. Proposed 106.44(c)(2)(iv) similarly allows institutions to create a policy requiring all *non-confidential* employees to notify the Title IX Coordinator whenever they have information about conduct constituting sex discrimination.

These proposed regulations greatly expand the current requirement that officials who have the "authority to institute corrective measures" notify the Title IX Coordinator of potential reports or allegations of sexual harassment.[10] ***Such a change is <u>neither trauma-informed nor survivor-centered</u>; the change also <u>ignores years of research</u> in this area, removes agency and empowerment from those who experienced sex discrimination, <u>infantilizes adult college students</u>, and will be <u>more harmful to complainants/survivors</u> than the regulations they intend to replace.*** We ask the Department to amend the proposed regulations to better account for research regarding mandatory reporting in this area.

---

[9] Proposed 106.44(k)(3)(viii).
[10] 34 C.F.R. § 106.30(a).

AR_221446

A. **Research Supports That Requiring Employees To Share Information Without a Complainant's Consent Harms Complainants.**

Nearly a decade of peer-reviewed research in the area of "mandatory reporting" in response to sex- and gender-based violence, harassment, and discrimination demonstrates the importance of protecting survivors' autonomy. This research outlines numerous problems with the concept of mandatory reporting.[11] Furthermore, evidence does not suggest mandated reporting has been an effective strategy for preventing and responding to harassment and violence.[12] For example, in an article published in *The Chronicle of Higher Education*, researchers in this area outlined the significant problems with requiring trusted instructors to report to the Title IX Coordinator all instances of suspected sex discrimination, even when the student does not expect or want that reporting to occur. Reporting under these circumstances, which arise frequently, effectively ***forces the trusted instructor or other employee to betray the student's trust***. Requiring that trusted faculty and advisors disclose a student's experiences without that student's consent violates autonomy and potentially subjects that student to an arduous grievance process the student explicitly wanted to avoid.[13] Research suggests that ***when control and choice is taken from a complainant/survivor/victim, that individual is more likely to experience post-traumatic stress, depression, and/or anxiety***.[14] Indeed, other research supported that the mere existence of mandatory reporting policies can cause harm, for example, by preventing survivors from seeking treatment and support because doing so will jeopardize their safety and control and/or will result in their further stigmatization and humiliation.[15]

In line with this research, UW employees who were asked to provide perspectives about the proposed regulations based on their current roles and professional expertise were immediately concerned about the Department's requirement that so many individuals would become mandatory reporters. UW employees expressed beliefs that students would hesitate to share their experiences with *any* employee for fear that their privacy would be violated and that the UW would be forced to respond to a situation where the student does not want the larger institution's involvement. UW employees noted the mandatory reporting requirement would likely most negatively impact communities who have historically experienced marginalization and are already reticent to disclose experiences of sex- and gender-based violence and harassment, such as students of color, students who are immigrants, students with disabilities, and students who identify as LGBTQIA+. This could ***result in decreased resource utilization within the most vulnerable communities***.

We anticipate the Department will receive numerous comments on this proposed change, particularly from researchers and experts in this area. We urge the Department to consider and modify the

---

[11] *See, e.g.*, Kathryn J. Holland, Jennifer J. Freyd, and Elizabeth A. Armstrong, *Mandatory reporting is exactly not what victims need: Proposed Title IX regulations intended to help students will only make things worse*, CHRON. OF HIGHER EDUC. (July 22, 2022), at https://www.chronicle.com/article/mandatory-reporting-is-exactly-not-what-victims-need

[12] Kathryn J. Holland, Lilia M. Cortina, & Jennifer J. Freyd, *Compelled disclosure of college sexual assault*, 73(3) AM. PSYCHOLOGIST 256-268 (2018).

[13] Kathryn J. Holland, Jennifer J. Freyd, and Elizabeth A. Armstrong, *Mandatory reporting is exactly not what victims need: Proposed Title IX regulations intended to help students will only make things worse*, CHRON. OF HIGHER EDUC. (July 22, 2022), at https://www.chronicle.com/article/mandatory-reporting-is-exactly-not-what-victims-need

[14] Emily R. Dworkin, Charlotte D. Brill, & Sarah E. Ullman, *Social reactions to disclosure of interpersonal violence and psychopathology: A systematic review and meta-analysis*, 72 CLINICAL PSYCHOLOGY REV. 101750 (2019).

[15] Kathryn J. Holland, Lilia M. Cortina, & Jennifer J. Freyd, *Compelled disclosure of college sexual assault*, 73(3) AM. PSYCHOLOGIST 256-268 (2018).

AR_221447

proposed regulations to account for the research and knowledge of those experts best positioned to explain the harm these proposed regulations will likely cause.

**B. UW Policies Emphasize Providing Support, Resources, and Reporting Options to Complainants.**

The UW encourages the Department to consider the UW's current model of employee categories and revise the proposed regulations to reflect something more in alignment with our model. The UW has identified three categories of employees—confidential employees, employees providing support, and officials required to report. Depending on an employee's categorization, they have different obligations and expectations.

- Confidential Employees. Confidential employees, as their name implies, are mental and physical health professionals as well as confidential advocates; this category of employees all have legally-defined privileges or confidentiality obligations that prevent the disclosure of client information without express permission or as required by law.

- Employees Providing Support. Employees providing support comprise the largest category of employees; this category includes most instructors, advisors, and administrators. Employees providing support receive guidance on how best to respond to someone who discloses an experience of sex- or gender-based violence.[16] These employees are then encouraged to take action to direct that person to expert support and reporting options. These employees are not required to disclose the identity of a complainant unless the complainant gives them permission to do so; instead, they are asked to contact the UW's violence prevention and response team to share limited information and ensure the complainant receives the UW's Know Your Rights & Resources guide and information about the UW's confidential advocates.

- Officials Required to Report. Officials Required to Report are those employees with the authority to take corrective measures as outlined by the current Title IX regulations. This category of employees includes individuals who report directly to the UW's president and/or provost, those with delegated authority to impose a full range of corrective actions, and those who have specific compliance-oriented and investigative responsibilities. These Officials Required to Report are, as their name implies, required to report all information they receive about potential instances of sex- and gender-based violence and harassment, including any known identities of complainants and respondents.

A system such as ours allows the majority of UW employees to support the individuals who trust them enough to disclose a situation of sex- or gender-based violence or harassment. In nearly all circumstances, it allows the person who experienced the behavior to choose whether to be identified or to remain anonymous. ***The UW is highly invested in not undermining the autonomy of someone who has already been subjected to harassment or violence on the basis of their sex or gender.***

If the Department adheres to its broader stance on required reporting,[17] the Department should instead require employees to ask students if they wish for their name to be shared with the Title IX Coordinator

---

[16] *See, e.g.,* the UW's four-minute video on Title IX & Responding with Care available on [ HYPERLINK "https://www.washington.edu/titleix/supporting-students-employees/" ]. How to respond with care and in an appropriate way is also covered in the UW's *Husky Prevention and Response* courses, which all employees and all new students are required to complete.

[17] Preamble at 41,438.

in order to address the conduct or behaviors. If students decline (i.e., state they do not wish their name to be shared), then the employee should instead be required to provide resources and reporting options to the student and then inform the Title IX Coordinator that they have provided the information to a student (but withhold the student's name as requested). The Department's stated belief—that post-secondary "students are differently situated than employees and may be less capable of self-advocacy"[18]—is infantilizing in its assumption that students are unable to make decisions or clearly state preferences themselves and ignores that many students (like employees) have different experiences in self-advocacy based on their identities and other life experiences. The UW, in its commitment to educate a diverse student body to become responsible global citizens and future leaders,[19] considers its students to be adults and treats them as such.

### C. Proposed 106.44(f)(5) Also Could Further Harm a Complainant and Does Not Appropriately Balance Potential Harms.

The Department acknowledges that individuals may wish to report conduct that comprises sex discrimination without making a complaint to initiate a grievance procedure. The Department's solution to addressing its requirement that an institution respond even when a complainant does not want to engage in a process is to explain to complainants that their telling specific individuals, including trusted instructors and advisors, may obligate the institution to take further action.[20] This solution forces a complainant to engage in an undesirable calculus: they can either choose to tell someone what they are experiencing in order to seek help or supportive measures—and thereby invite the risk that their autonomy and privacy will be violated—or remain silent and suffer.

If the complainant decides to seek help, which likely results in the Title IX Coordinator being informed of the alleged sex discrimination, proposed 106.44(f)(5) then requires a Title IX Coordinator to determine whether to initiate a complaint themselves in order to address conduct that may constitute sex discrimination. The Department imagines that, for some cases, the only way to end the discrimination and prevent its recurrence may be through the imposition of disciplinary sanctions[21]—which cannot occur absent a grievance procedure and is unlikely to result in any finding of responsibility if a complainant does not want to participate. ***Thus, by mandating reporting and mandating that every instance of sex discrimination be addressed and remedied, the Department <u>sets up Title IX Coordinators to</u> be asked repeatedly to <u>either undermine complainant autonomy</u> and create further harm <u>or violate the regulations</u> by neither investigating nor responding to allegations of sex discrimination.*** Such an act will erode trust in Title IX Coordinators, which will further impact their ability to accomplish their responsibilities.

The UW asks the Department to revise its proposed regulations to instead, in the absence of a complainant's desire to initiate a complaint, require a Title IX Coordinator when informed of an incident to conduct an individualized assessment considering potential harm to both the complainant and the community and to document that such assessment occurred and its outcome. When contemplating taking action against a complainant's wishes, the dynamics and context of each situation must be considered to weigh and balance potential additional harm to the complainant with the University's obligation to provide a safe and nondiscriminatory environment for all community members. This suggested revised approach would allow the Department to center the interests of the complainant,

---

[18] Preamble at 41,438.
[19] *See* UW Vision Statement, available at https://www.washington.edu/about/visionvalues/
[20] Preamble at 41,427.
[21] Preamble at 41,447.

AR_221449

who has been most negatively impacted by the sex discrimination. Without an approach that balances potential harm to the complainant in initiating a proceeding with the potential harm to the community in not initiating it, the Department unduly creates tension among complainant autonomy, mandatory reporting, and the need for prompt and effective actions. This tension may not be easily navigated by an institution like the UW, whose Office of the Title IX Coordinator identifies survivor choice as a primary guiding value.[22]

### III.  ASPECTS OF THE PROPOSED REGULATIONS ARE INSUFFICIENTLY CLEAR TO BE IMPLEMENTED IN A MANNER THAT ALLOWS COMPLIANCE AND AVOIDS LITIGATION.

Lastly, the UW would like to outline a number of areas where the proposed regulations are problematic from an operational and/or compliance perspective. *We seek clarity and/or confirmation of institutional flexibility* with respect to the following ten areas, organized in five sections:

**Definitions**
- Definition of and standards for what constitutes sex discrimination;
- The application of the hostile environment definition of sex-based harassment;
- A specific definition of sexual assault;

**Prompt and Effective Action**
- The requirement to address, prevent, and remedy sex discrimination;
- The provision of supportive measures;

**Grievance Procedures**
- The need to assess complaints before any initiation of grievance procedure;
- The framework for dismissals and any appeal thereof;
- The application of proposed 106.46;

**Pregnancy Provisions**
- Standards for providing modifications, support, and/or accommodation to individuals who are pregnant and/or experiencing pregnancy-related conditions; and

**Posting Training Materials**
- The requirement to post training materials.

While some of these areas are new, others exist in the current Title IX regulations. We ask the Department to clarify or remove these sections with the goal of improving consistency and comprehensibility.

### A.  The Proposed Regulations Do Not Include a Definition of and Standards Related to Sex Discrimination and Could Better Define Sex-Based Harassment, Including Sexual Assault.

The UW asks the Department to clarify its definition of sex discrimination and what standards need to be applied in determining whether sex discrimination is, in fact, present. We further ask the Department to provide additional standards in interpreting the five factors to be considered under sex-based harassment, and we ask the Department to provide, in the final regulations, the definition of sexual assault rather than refer institutions to a Federal Bureau of Investigation (FBI) guide.

---

[22] *See* UW Office of the Title IX Coordinator Mission & Vision, available at https://www.washington.edu/titleix/about-title-ix/

AR_221450

1. ***The absence of a definition of or standards for what constitutes "sex discrimination" obscures recipients' responsibilities.***

***Without a clear definition or standard against which to measure alleged behavior, an investigation*** and/or adjudication process, as is proposed in 106.45 and 106.46, ***cannot determine whether that definition has been met or whether a standard was violated.*** Thus, the UW requests the Department clearly define "sex discrimination" and the standards used to determine in presence, including providing guidance to assess complaints.

Presently, the proposed regulations do not define succinctly or clearly the conduct, behaviors, or actions that would constitute sex discrimination. Proposed 106.2 includes a definition of a subset of sex discrimination—sex-based harassment—but not of sex discrimination itself. Proposed 106.10 clarifies that sex discrimination includes discrimination on the basis of sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, and gender identity—but still does not set forth standards for determining what constitutes "discrimination." When the proposed regulations would impose on an institution the responsibility to "take prompt and effective action to end any sex discrimination that has occurred in its education program or activity, prevent its recurrence, and remedy its effects,"[23] it is imperative the institution understand what amounts to sex discrimination (to be able to identify when such discrimination may be occurring or has already occurred) in order to prevent and remedy such discrimination.

Based on proposed regulation 106.31(a)(1), an institution could surmise sex discrimination would likely be found when a person is "excluded from participation in" or "denied the benefits of" any academic, extracurricular, research, occupational training, or other education program or activity. Proposed 106.31(a)(1) also suggests there are additional ways a person may "otherwise be subjected to discrimination," though it is unclear what those include. Based on the proposed regulations, it appears sex discrimination may occur anytime someone is treated differently because of sex and that person experiences more than *de minimis* harm.[24] However, the proposed regulations also do not clearly define or provide standards for determining what constitutes "*de minimis* harm." The preamble references case law for the proposition that *de minimis* harm may include emotional stress and/or dignitary harm,[25] but it is unclear on what standard such an evaluation should be made with respect to Title IX. Title VII typically requires that an adverse action occur,[26] which is arguably a higher bar than experiencing *de minimis* harm and more akin to being "excluded from participation" or denied an articulable benefit.

If a student's statements that they were treated differently because of sex and experienced emotional harm[27] sufficiently state a prima facie claim of sex discrimination under Title IX, then institutions will

---

[23] Proposed 106.44(a)

[24] *See* Proposed 106.31(a)(2).

[25] Preamble at 41,535.

[26] The preamble explicitly differentiates between Title VII and Title IX, noting that both the Department and the courts interpret the two laws differently, because educational and work environments are different from one another. However, litigation under Title VII—and what constitutes an adverse action and/or what being treated differently on the basis of a protected class means—has been on-going for decades. If Title VII's adverse action requirement was carried into the Title IX sex discrimination definition, it would be rare that any differential treatment was severe enough to comprise an adverse action in situations involving only students.

[27] If such a statement is sufficient to allege sex discrimination and then require the provision of supportive measures and institutional responsibilities to address, prevent, and respond to the allegation, we hope and assume the Department would first allow an institution to assess how the student was treated differently and the severity of alleged harm prior to triggering any responsibility to provide supportive measures and to take other action.

UW NPRM Comment – page [ PAGE  \* MERGEFORMAT ]

experience no end to sex discrimination allegations that require, based on the proposed regulations, an institution to act, prevent the discrimination, and remedy the harm *even in the absence* of any assessment or investigation. A student who makes such a statement would further be entitled to supportive measures, regardless of whether there is any merit to their statement. A clear definition and standard are necessary in the regulations—even if the Code of Federal Regulations refers to standards established elsewhere—because the Department, as it proposes, will require institutions to address all reports, regardless of any merit and/or in the absence of any investigation.

**2. *The definition of hostile environment harassment includes consideration of factors that do not align with Title VII; the Department needs to further explain these factors to avoid their inconsistent application.***

Though the Department states its intent for the hostile environment category of "sex-based harassment" in Title IX to more closely align with Title VII,[28] the Department outlines several factors to consider in determining whether sex-based harassment occurred that are not considered when assessing whether sexual harassment occurred under Title VII.

In discussing the five factors to consider in determining whether a hostile environment has been created, the Department—in the preamble—offers numerous examples; not all of these would appropriately be considered within current Title VII or Title IX frameworks. This includes cases where the conduct of numerous individuals toward the same complainant collectively constitute sex discrimination, but the conduct of any individual alone would not rise to the level of sex-based harassment or amount to sex discrimination.[29] In such an example, where the individual actions of each person may be problematic but alone would not constitute sex discrimination or sex-based harassment, an institution's responsibility to address, prevent, and remedy that behavior is not sufficiently detailed. Additional guidance on the interpretation of these five factors—including how they might result in similar or different[30] findings in relation to the Title VII definition of sexual harassment—would be beneficial. From a compliance perspective, clearly articulated standards applied in a consistent manner are essential to maintain consistent outcomes and avoid litigation.

**3. *We respectfully request the Department explicitly include the definition of "sexual assault" institutions of higher education are required to employ.***

Proposed regulation 106.2's definition of specific offenses of sex-based harassment points institutions to the uniform crime reporting system of the FBI to define "sexual assault." The Department explains in the preamble that stakeholders experienced confusion regarding the cross-reference to definitions; the Department also notes that rather than include cross-references to statutory provisions, it would include language from those other statutory definitions to clarify how terms are to be defined for Title IX.[31] While the Department does this for dating violence, domestic violence, and stalking, the Department still refers to the uniform crime reporting system of the FBI in defining "sexual assault." The uniform crime reporting program's website is convoluted, and it is difficult to locate the Department's intended definition of sexual assault. We ask that the Department—instead of referencing the crime

---

[28] *See* Preamble at 41,415.
[29] *See* Preamble at 41,417.
[30] If Title IX's sex-based harassment standard differs from Title VII's sexual harassment standard, multiple standards would need to be applied when employees' actions are being considered; this would result in confusion and lead to potentially different outcomes when applying both Title VII and Title IX in employee matters.
[31] Preamble at 41,410.

AR_221452

reporting system—simply include the definition of sexual assault that the Department wants institutions to use. This will also ensure that should the FBI revise its definitions prior to any new Title IX regulations going into effect, institutions will be able to work with a stable definition.

## B. We Seek Clarification to Understand Fully the Department's Intent Regarding Prompt and Effective Action.[32]

Proposed 106.44 obligates an institution to take "prompt and effective action to end any sex discrimination that has occurred in its education program or activity, prevent its recurrence, and remedy its effects." The Department states an institution has a "legal duty to operate its education program or activity in a manner in which people are not subjected to sex discrimination."[33]

### 1. We seek clarification as to whether the proposed regulations impose a requirement that institutions take action to prevent and remedy any and every report of what a reporter believes to be sex discrimination.

The Department—though stating it would not obligate an institution to respond to sex discrimination that has not yet occurred[34]—nevertheless imposes an obligation in proposed 106.44(f) for the Title IX Coordinator to address *every* report of sex discrimination, potentially *even when insufficient information is provided* to understand what is being reported or potentially even before any assessment about what has been reported may occur. Indeed, the Department states that even "outside the context of a recipient's grievance procedures for complaints of sex discrimination, the Department reaffirms that 'prompt' action to end sex discrimination ... 'is necessary to further Title IX's nondiscrimination mandate.'"[35] The Department further notes an institution's Title IX Coordinator must take other appropriate prompt and effective steps to ensure sex discrimination does not continue to occur *even in the case that a complaint is dismissed*[36]—which may occur *after the institution has determined already the conduct alleged would not constitute sex discrimination* under Title IX.[37] Such requirements are illogical. Requiring that a Title IX Coordinator act in response to a report of sex discrimination (without first assessing the alleged conduct through an investigation or otherwise) or take action even after a complaint was dismissed because what was alleged was determined to not constitute sex discrimination[38] does not make sense and—hence—would require an unfathomable amount of resources.

If what the Department means is that: 1) an institution should not actively or purposely prevent the Title IX Coordinator from learning of possible sex discrimination; 2) an institution is responsible to address alleged sex discrimination after an assessment or investigation yields evidence such discrimination existed; and 3) there is no required action if what's been alleged on its face would not constitute sex

---

[32] This section, III.B., and the next section, III.C., collectively comprise the UW's response to the **second directed question**.

[33] Preamble at 41,433.

[34] Preamble at 41,434.

[35] Preamble at 41,434.

[36] *See* Proposed 106.45(d)(4)(iii). This proposed section includes language that states what a recipient must, at a minimum, do; not all of these actions make sense when a report does not adequately allege sex discrimination.

[37] *See* Proposed 106.45(d)(1)(iv); *see* Preamble at 41,474.

[38] Refer to section III.C.1. for additional information about UW's robust intake assessment process, which involves an intake meeting between a complainant and legally-trained investigator. The UW believes that through this intake meeting, complaints may be appropriately assessed, and an investigator may determine accurately whether a complainant alleges sex discrimination.

AR_221453

discrimination, then the UW is in agreement. The UW, however, objects to any requirement to respond to alleged sex discrimination until at least some type of assessment—if not an investigation[39]—of a report occurs. Similarly, the UW also objects to any requirement (or any interpretation of a requirement) promulgated through Title IX regulations that it must respond to a report or complaint that, after it conducts an assessment or investigation, does not meet a definition of and standards for sex discrimination, regardless of what a complainant asserts.[40] Indeed, our position is supported elsewhere in the preamble: for example, the preamble states that nothing in the proposed regulations would require an institution to address sex-based harassment that does not meet the definition of sex-based harassment.[41]

In discussing proposed 106.44(f)(6), the Department again notes the Title IX Coordinator must take steps, even beyond the provision of supportive measures or remedies, to ensure sex discrimination does not continue or recur outside of the institution's grievance procedures.[42] We ask the Department to clarify that proposed 106.44(f)(6) applies *only after the Title IX Coordinator assesses the information[43] of which they were notified and determines whether a response is merited.* In some cases, if the complainant decides not to initiate a grievance procedure (which would require an investigation at the UW) and the reported conduct does not rise to the level where a Title IX Coordinator believes it necessary to override a complainant's wishes, then the UW asks the Department to provide flexibility and recognize that the "appropriate prompt and effective steps" in proposed 106.44(f)(6) may be to take no action because whomever notified the Title IX Coordinator of conduct that may constitute sex discrimination was mistaken in believing sex discrimination may have occurred.

The UW takes seriously its responsibility to ensure its environments are free from sex discrimination. However, prior to *requiring* an institution to remedy a situation, the Department should clarify that an institution **must first assess an allegation or report to determine** what is alleged or reported and **whether that constitutes sex discrimination**. While institutions may aim to address a broader range of potentially problematic behavior, *requiring* institutions to respond fully to every situation and every allegation, even those that do not adequately or plausibly allege sex discrimination, would instead result in the expenditure of unnecessary resources and require burdensome remedies in the absence of actual sex discrimination, thereby diverting resources from where they are most needed.

---

[39] We assert an investigation is the *only* way to affirmatively determine whether evidence supports the presence of sex discrimination; however, absent an investigation occurring, some type of an assessment is needed to gather at least enough information to determine the potential severity or persistence of conduct described in a report that initially lacks adequate information on its own.

[40] While there are many instances in which the UW already does and will continue to respond to situations in ways beyond what is required through federal regulations or any other compliance-based mechanism, the UW also seeks to protect its finite employee and financial resources. In so doing, the UW wants to ensure the proposed regulations do not require a response simply because a complainant uses specific words (e.g. "sex discrimination" or "sex-based harassment") that compel a response under Title IX when a Title IX response may not be warranted.

[41] Preamble at 41,411.

[42] Preamble at 41,446.

[43] The preamble, on page 41,446, describes an "assessment" in which the Title IX Coordinator reviews video footage and visitor logs; at UW, we believe that such actions implicate due process and cannot be taken without a respondent being put on notice of an investigation.

UW NPRM Comment – page [ PAGE  \* MERGEFORMAT ]

**2. *We seek clarification to understand fully the Department's intended use of supportive measures; alternatively, we seek confirmation that supportive measures are not required when Title IX is not implicated.***

In addition to the requirement that an institution take action in response to any report of sex discrimination, the proposed regulations require the provision of "supportive measures, as appropriate, to the complainant or respondent to the extent necessary to restore or preserve that party's access to [an] education program or activity."[44] Though the proposed regulations note supportive measures are to be provided "as appropriate" and as "available and reasonable,"[45] the UW asks the Department to confirm that **before supportive measures are provided, an institution has the flexibility to assess any report or complaint of sex discrimination and determine whether the alleged conduct may constitute sex discrimination**. When the report or complaint does not include allegations that may constitute sex discrimination, we ask the Department to confirm that an institution is not obligated to provide supportive measures because Title IX is not implicated.

The reason we request such clarification is because proposed 106.45(d)(4) requires that when a complaint is dismissed, an institution still, among other things, *must* provide a complainant with supportive measures as appropriate.[46] The Department proposes that an institution may dismiss a complaint of sex discrimination and/or some of its allegations if the institution determines that the alleged conduct—*even if proven*—would not constitute sex discrimination under Title IX.[47] Thus, where it is determined that a complainant has alleged conduct that would not constitute sex discrimination or fall under Title IX, it follows that an institution *should not be required* to provide supportive measures to a complainant whose experience would be something other than sex discrimination under Title IX.

**C. The Grievance Procedures in Proposed 106.45 and 106.46 Require Clarification to Avoid Internal Contradictions and Confusion.**

Generally, the UW agrees with the Department's restructuring of the grievance procedures and removal of the most prescriptive elements that exist within the current Title IX regulations' grievance process. Despite our general agreement, the proposed regulations and guidance through the preamble—in explaining the proposed grievance procedures—are not sufficiently clear in outlining all requirements.

**1. *We seek confirmation that a recipient may first assess a complaint to determine whether it is subject to the grievance procedures before providing any notice to parties.***

Proposed 106.45(c) states, "Upon initiation of the recipient's grievance procedures, a recipient must provide notice of the allegations to the parties whose identities are known." Proposed 106.45(c) then outlines the requirements of appropriate notice. The proposed regulations, in 106.2, define "complaint" as "an oral or written request to the recipient to initiate the recipient's grievance procedures as described in 106.45, and if applicable 106.46." It is unclear what an institution may do between the receipt of such a complaint and the initiation of its grievance procedures or whether—to the Department—the complaint *automatically triggers* the grievance procedure including notice. We ask the regulations' language be clarified to allow institutional flexibility such that institutions may first assess a complaint for adequacy and specificity in alleging sex discrimination *before* providing notice. As

---

[44] Proposed 106.44(g).
[45] Proposed 106.44(g)(1).
[46] *See* Preamble at 41,474.
[47] Preamble at 41,474.

AR_221455

written now, it is unclear whether an institution could be at risk of litigation if, before initiating a grievance procedure, it initially engages in a process to assess the complaint.

When the UW receives a discrimination complaint, verbally or in writing, an intake is scheduled, so an investigator may speak with the complainant to determine if their concerns would fall within the purview of UW policies and procedures. Once this determination is made, the UW will then provide notice to the parties that an investigation is opening. Even if a robust intake procedure is not contemplated or required by the proposed regulations, an institution of higher education must still gather enough information, so it can include "sufficient information ... to allow the parties to respond to the allegations."[48] The Department provides a caveat regarding the notice in that information in the notice should include the identities of the parties involved, the conduct alleged to constitute sex discrimination, and the date and location of the alleged incident *to the extent it is known to the institution*.[49] Thus, an institution only needs to notify parties to the extent the complaint (or complainant) provided that information to the institution; taking this proposed regulation to its logical conclusion would mean an institution may issue a notice that simply states, "[Respondent's name], you are under investigation because it has been alleged that you engaged in sex discrimination" if that is the only information available. Such notice is effectively meaningless and would not allow a respondent to respond to the allegation in a meaningful matter. Instead, ***the regulations should confirm that an institution may first assess a complaint,*** including whether the institution has jurisdiction, ***before it initiates any grievance procedure and provides notice***. This assessment allows the institution to appropriately and meaningfully provide notice to parties that a grievance procedure has been initiated and would establish a better process by which to manage dismissals, as discussed next.

### 2. We ask the Department to clarify and confirm that if a matter is dismissed prior to a respondent being notified, then no notification of dismissal or appeal for the respondent is necessary; we seek further clarification regarding appeal rights following dismissals.

Proposed 106.45(d) permits an institution to dismiss, for a variety of reasons, a complaint of sex discrimination. Such reasons include: the inability to identify the respondent; the university's lack of jurisdiction over a respondent; a complainant's voluntary withdrawal of a complaint or specific allegations in a complaint; and/or a determination that the conduct alleged in the complaint would not constitute sex discrimination even if such allegations are proven.[50] With the exception of a complainant's voluntary withdrawal of a complaint or specific allegations in a complaint resulting in dismissal, the UW believes it would be inappropriate (or impossible, when a respondent's identity is unknown) to initiate a grievance procedure or provide notice in these circumstances where the Department would permit dismissal. The UW ordinarily would not initiate an investigation or grievance procedure in any of these circumstances due to a lack of jurisdiction. In the absence of a grievance procedure, notice would not be required, and dismissal would not be necessary.

The Department's proposed regulations, guidance, and preamble regarding dismissals contain internal contradictions and thus establish requirements that do not make sense. Proposed 106.45(d)(2) states, "if the dismissal occurs after the respondent has been notified of the allegations, then the recipient must also notify the respondent of the dismissal and the basis for the dismissal...." However, proposed 106.45(d)(3) then compels an institution to notify all parties that a dismissal may be appealed and contains further requirements regarding the appeal. Proposed 106.46(d) further requires that a post-

---

[48] Proposed 106.45(c)(ii).
[49] Proposed 106.45(c)(ii).
[50] Proposed 106.45(d)(1).

AR_221456

secondary institution notify the parties, simultaneously, of the dismissal and its basis. We ask the Department to revise the proposed regulations in both sections 106.45(d) and 106.46(d) and **to confirm that if a matter is dismissed prior to a respondent being notified, then no appeal**—and hence, no notification of the dismissal and/or right to appeal—**for the respondent is necessary** or appropriate.

The Department's proposed 106.45(d)(2)—which requires a respondent be notified of a dismissal *only if* they were notified of the allegations—is logical in that a respondent who was never notified they were accused of sex discrimination, including sex-based harassment, need not be notified that a complaint will not be pursued. When a respondent has not been notified of any allegations, much less when the identity of the respondent is not known, it would be inappropriate and potentially problematic to notify an individual (who is not even a respondent because of the absence of a procedure) that a complaint is being dismissed. In such a case, the respondent would be informed a complainant raised a concern but such a concern will not be pursued.

Potential harm may occur when a respondent is notified of a dismissal when the respondent has not been notified of the initiation of a grievance process. For example, a respondent whose conduct would not yet rise to the level of constituting sex discrimination may escalate their conduct, further harming a complainant, if the respondent negatively reacts to their being reported. Such a situation is easily imaginable where a respondent's reported conduct borders on—but does not yet meet the definition of—for example, dating or domestic violence. Further, telling a respondent, who may not have otherwise known they were reported, invites the possibility of retaliation between parties. By ensuring a robust assessment of any complaint before providing the parties notice, an institution would appropriately ensure a complaint adequately alleges sex discrimination on its face and avoid creating other problematic issues by initiating an unnecessary grievance procedure.[51]

As written now, proposed 106.46(d)(1) seems to suggest a respondent must be notified of the dismissal of a complaint and basis thereof *even if* they were never notified of the complaint. In addition to the potential harm described in the paragraph above, these notifications also would be incredibly confusing to an individual who may, in one communication, be notified that: 1) they were identified as a respondent in a complaint that did not adequately allege sex discrimination; 2) the complaint was dismissed because an allegation was not stated sufficiently; and 3) they may appeal the dismissal determination. Where an institution does not contemplate initiating an investigation in response to a complaint, it is highly unlikely that a respondent would wish to appeal that decision. Furthermore, offering an appeal right to a respondent, even without notice of a complaint or any intent to initiate a grievance procedure, would—at best—create confusion and—at worst—invite retaliation and/or further harm to a complainant.

Therefore, we ask the Department to **revise proposed 106.46(d)(1)** to reflect that notice of a **dismissal is necessary only if a respondent was notified of the initiation of a grievance procedure**. We further ask the Department to **revise 106.45(d)(3)** be revised to reflect that **respondents only be notified of an appeal following a dismissal if the respondent was notified of the initiation of any grievance procedure**.

Finally, since the proposed regulations do not sufficiently outline what is required for any appeal process related to the dismissal of a complaint or on what grounds an appeal based on a complaint's dismissal would be granted, we ask the Department to provide guidance in these areas.

---

[51] Preamble at 41,477-41,478.

**3. The Department should amend 106.46, as aspects of this proposed regulation should apply any time sex-based harassment is alleged and not only when either party is a student.**

Proposed 106.46 establishes grievance procedures for sex-based harassment involving student complainants and/or student respondents. Given the Department's stated intent of providing discretion and flexibility to institutions in light of an institution's use of many categories of employees (faculty, unionized employees, contract employees, etc.) who may be entitled to unique grievance procedures based on their employment designation,[52] the Department should reconsider its proposed 106.46 to specify what is necessary in the case of *any complaint* of sex-based harassment at an institution of higher education and what is necessary for *a complaint that a student respondent* engaged in sex-based harassment. At present, it is not clear what elements of proposed 106.46 are intended to protect student complainants versus what elements of proposed 106.46 are intended to provide due process to student respondents.

Proposed 106.46 presently contains requirements that would need to be added to already-existing processes involving employee respondents, which seems counter-intuitive to the Department's goal of providing the appropriate flexibility and discretion—a goal stated no fewer than twenty times in the preamble[53]—for recipient institutions.

Applying the grievance procedures in proposed 106.46 would ensure that student complainants are guaranteed specific guardrails on any process concerning sex-based harassment in which they participate. However, applying the proposed 106.46 grievance procedure in matters involving sex-based harassment allegations against employee respondents would require the development of two separate processes for employees: one that is utilized when a student is the complainant and a second that is utilized for any non-student complainant. This would be confusing, cumbersome, and more expensive; it would also require significant negotiations with faculty governance structures and labor unions. Instead, we request that the department *identify key process pieces that must be incorporated into employee sex-based harassment grievance procedures **regardless of who the complainant is***. Those elements could include: written notice of allegations to all parties[54]; written notice of all meetings and investigative interviews[55]; the requirement to gather and consider relevant evidence from both parties; and the provision of a brief written determination of the results of an investigation to all parties.[56]

While some of what is proposed in section 106.46 should be provided regardless of whether the complainant or respondent is a student or employee, other aspects of proposed 106.46 should not be required when the respondent is an employee. For example, we do not believe it is necessary that an appeal process be required for employee respondents accused of sex-based harassment, as doing so would differentiate allegations of sex-based harassment from what is required for other allegations such as race-based or disability-based harassment or may require two appeal procedures if a collective bargaining agreement allows the respondent (but not complainant) an opportunity to appeal. Or, in the case of at-will employees, the proposed regulations would permit an appeal procedure for allegations of sex-based harassment, even where such at-will employees may be terminated for significantly less severe allegations and/or substantiated conduct.

---

[52] *See* Preamble at 41,459.
[53] *See* Preamble at 41,457, 41,460, 41,473, and 41,546.
[54] *See* Proposed 106.46(c).
[55] *See* Proposed 106.46(e)(1).
[56] *See* Proposed 106.46(h).

AR_221458

If proposed section 106.46 otherwise remains unchanged, the UW seeks clarification that a proposed 106.46-compliant procedure involving *both a student complainant and student respondent* may differ from a proposed 106.46-compliant procedure involving *a student complainant and employee respondent*. Washington law requires a live hearing, presided over by someone other than the investigator, for student respondents in cases involving possible suspension or dismissal. This is true for both those matters involving sex-based harassment or sex or gender-based violence as well as those matters involving other severe academic or behavioral misconduct. These Washington laws do not apply uniformly to employee respondents. Because the UW must conduct a live hearing and, hence, may not utilize a single-investigator model in some cases but would prefer to use a single-investigator model when not otherwise prohibited by Washington law, we seek confirmation from the Department that a single 106.46-compliant procedure would not be required for both student and employee respondents. To elaborate and answer the Department's **third directed question**,[57] the UW favors utilizing a single-investigator model where due process and/or Washington law do not require otherwise. We believe that a well-trained, single investigator is properly equipped to conduct fair and impartial investigations which properly consider relevant evidence and protect parties' due process rights.

### D. Proposed Requirements Regarding Modifications for Individuals Experiencing Pregnancy and Related Conditions Create Confusing and Inconsistent Standards.

Proposed 106.40 establishes a number of requirements related to pregnancy and pregnancy-related conditions that will likely result in confusion and litigation. To avoid this, we ask the Department to confirm institutional flexibility in providing modifications for individuals who are pregnant and/or have related conditions. The UW is committed to ensuring its pregnant students and employees do not experience discrimination and are provided with the modifications and/or accommodations they need to remain in their educational and work environments. The UW is simultaneously committed to ensuring its instructors, supervisors, and other employees support students' and employees' pregnancy and pregnancy-related healthcare needs while holding them to appropriate academic and professional standards.

#### 1. The proposed regulations incorporate a number of standards to meet the needs of individuals who are pregnant that, in practice, would create conflicting policies and procedures.

Various provisions of the proposed regulations set forth differing and potentially inconsistent standards regarding modifications and accommodations for individuals who are pregnant or experiencing related conditions. For example, proposed 106.40(b)(3)(iii) states that students must be granted leave for "the period of time deemed medically necessary by the student's physician or other licensed healthcare provider." Yet, if a modification "would fundamentally alter the recipient's education program or activity,"[58] such modification does not need to be offered or implemented—which may be the case when a student, through their medical provider, requests a length of leave that would fundamentally alter the education program or activity.

For example, to maintain sequenced curriculum for clinical or cohort programs, or for those requiring external internships or placements, it may be necessary for a student to take an amount of leave longer than that which is medically necessary *and* longer than that student wishes to take. Under the proposed regulations, it is unclear whether an institution may effectively compel a student to take a longer period of leave than is medically necessary to avoid fundamentally altering that student's program or to best

---

[57] *See* Preamble at 41,544.
[58] Proposed 106.40(b)(4)(i).

ensure a student's success in their program where courses must be sequenced. It is also unclear who is responsible for any additional expenses incurred as a result of medically necessary leave. For example, a longer leave period could result in additional student loan and interest expenses that are incurred when (re-)enrollment is postponed to accommodate structured cohort modeled education, particularly in clinical healthcare programs. The UW asks the Department to *confirm institutional flexibility* when addressing issues tangential to the amount of medically necessary leave for pregnancy or a pregnancy-related condition, particularly *when the requested leave would fundamentally alter a program*.

Proposed regulation 106.40(b)(5) also would require that an institution treat pregnancy or related conditions "in the same manner and under the same policies as any other temporary disability or physical condition"; however, how a temporary disability is handled would not align with required modifications for pregnancy in all cases. Simply put, the Department outlines *a number of requirements and standards that do not consistently coincide*. Thus, institutions would be forced to choose with which standard to comply. The UW requests the Department emphasize institutional flexibility in addressing and responding to the needs of individuals who are pregnant and/or experiencing pregnancy-related conditions.

The Department *must either clarify its requirement* that institutions treat pregnancy or a pregnancy-related condition as it would any other temporary disability *or revise its requirement* to offer greater institutional flexibility.[59] If a Title IX Coordinator is required to grant modifications to a student who is pregnant or experiencing a pregnancy-related condition as requested by that student's medical provider, the Department *already* establishes a process that differs from how the UW otherwise considers and grants accommodations for students with disabilities. While a medical provider may certify a student's disability, the medical provider is not—in all situations—able to specify that a student receive a specific accommodation; instead, the interactive process involves on-going consultation and evaluation. Thus, while a student may request one accommodation, the UW may, after an interactive process, eventually provide another accommodation that sufficiently eliminates the barrier to the student's access. In other words, a request for leave is a specific accommodation request that may not always be granted in the case of a disability or temporary disability because specific accommodation requests are not always granted. Instead, another accommodation that enables an individual to access their course or course material may be deemed more appropriate than what was originally requested. If the Department intends to require institutions grant whatever specific accommodation—in the form of leave—a healthcare provider requests, the *Department is establishing a requirement that departs from* how institutions address *temporary disabilities* *while simultaneously compelling* the institution to follow that same standard.

### 2. The proposed regulations require clarification for when institutions must provide and implement reasonable modifications for individuals who are pregnant or experiencing pregnancy-related conditions.

Proposed regulation 106.40(b)(3)(i)(B) provides that an institution must provide students "with the option of reasonable modifications to the recipient's policies, practices, or procedures because of pregnancy or related conditions." Proposed regulation 106.40(b)(3)(ii) similarly requires institutions to provide students, because of pregnancy or related conditions, "voluntary reasonable modifications" to policies, practices, or procedures. The UW requests the Department confirm this requirement to provide modifications or accommodations applies *if and only when* an institution learns of such a need in a reasonable and sufficiently timely manner. If the Department is inclined to provide a specific timeframe

---

[59] *See* Proposed 106.40(b)(5).

AR_221460

rather than allowing flexibility based on the complexity of the request, the UW also asks that an overly prescriptive timeline be avoided, as some modifications and/or accommodations may require longer than a week—or even two weeks—for assessment and implementation. *Some situations are complex and take time to address*, and the proposed regulations do not offer guidance regarding whether any burden may be placed on a student to help identify the means by which an appropriate solution could be implemented. In current circumstances where some—but not all—course requirements may be met online or asynchronously, the UW seeks further *clarification regarding* not only *the timeframe in which modifications or accommodations must be requested* but also with respect to the limits of the Department's requirements. While we strive to ensure accessible education and programming to meet the needs of all of our students, we also ask the Department to acknowledge there are logistical limits to our being able to do so.

**E. Proposed section 106.8(f)(3) imposes undue administrative burdens on institutions.**

Proposed section 106.8(f)(3) maintains the current regulations' requirement that the Title IX Coordinator post on the recipient's website all materials, including those created by third parties, used to provide training to 1) all employees; 2) investigators, decisionmakers, and other persons responsible for implementing the grievance procedures or who have the authority to modify or terminate supportive measures; 3) facilitators of informal resolution processes; and 4) the Title IX Coordinator and designees. We believe this regulation does little to ensure an institution's employees involved in the administration of Title IX are appropriately trained and instead imposes additional burdens on an institution while providing little benefit. We ask that the proposed regulations be modified such that institutions are required to post a statement on their websites that interested parties may request a copy of training materials, particularly those our employees receive when attending trainings presented by third-party organizations, either as per an institution's relevant public records act or by emailing the Title IX Coordinator.

**IV. CONCLUSION**

In conclusion, the UW applauds many of the Department's proposed changes and reiterates the UW's commitment to fulfilling its Title IX requirements; in fact, we believe we already do and seek to continue to go beyond what is federally required. We believe many of the proposed regulations would codify policies already in place at the UW and expand the federal Title IX regulations to better ensure Title IX accomplishes its goal of prohibiting sex discrimination in education programs and activities. However, we believe the proposed regulations' imposition of mandated reporting requirements on all employees would impede the UW's ability to provide autonomy to its students and employees and/or support its students' wishes as they deal with and encounter sex discrimination. In addition, several areas of the proposed regulations require clarification and/or revision to aid institutions in implementing, complying with, and avoiding litigation as a result of Title IX responsibilities and requirements.

**As of:** May 13, 2024
**Received:** September 09, 2022
**Status:** Posted
**Posted:** October 28, 2022
**Category:** Institution of Higher Education
**Tracking No.** l7v-0mha-ojrz
**Comments Due:** September 12, 2022
**Submission Type:** Web

# PUBLIC SUBMISSION

**Docket:** ED-2021-OCR-0166
Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance

**Comment On:** ED-2021-OCR-0166-0001
Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance

**Document:** ED-2021-OCR-0166-193913
Comment on FR Doc # 2022-13734

---

## Submitter Information

**Email:** Kristen.roe@montgomerycollege.edu
**Government Agency Type:** Local
**Government Agency:** Montgomery College

---

## General Comment

The proposed regulations provide welcomed clarification that through Title IX, institutions of higher education are required to address sex-based harassment that is inclusive of sexual harassment (including dating violence, domestic violence, sexual assault and stalking) and not exclusive of other forms of sex-based discrimination. Montgomery College is supportive of the Department's efforts to clarify the scope of sex discrimination covered by Title IX, including recipients' obligations to prevent and address discrimination based on sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, and gender identity. While it is the culture of Montgomery College to create an environment free from sex-based discrimination in all its forms, this clarification of the regulatory scope of Title IX is welcomed as reinforcement of the expressed values and practices of our institution.
We feel that the proposed rule provides a clear framework for guiding our prevention of and response to sex-based harassment in our educational programs and activities. Montgomery College agrees with the Department that the proposed rule is not a departure from or broadening of Title IX as it was originally envisioned, but rather a clarification of what it was always intended to address. It is impossible to adequately and comprehensively address gender discrimination in the form of sexual misconduct and sexual harassment without also addressing sex-based harassment.
The College is supportive of the proposed regulations concerning harassment that creates a hostile environment that is sufficiently severe or pervasive that, based on the totality of the circumstances and evaluated subjectively and objectively, denies or limits a person's ability to participate in or benefit from the recipient's education program or activity. (Proposed S. 106.2) The 2020 regulations severely limited the scope of hostile environment sexual harassment behaviors that could be addressed through the grievance process by establishing a standard of so severe, pervasive and objectively offensive that it effectively denied a person equal access to the recipient's education program or activity. The Department has proposed a better definition of hostile environment in an educational program or activity. This will enable Montgomery College to respond to a broader range of sexual harassment hostile environment complaints that are brought forward for processing through our Title IX grievance process. The new definition will allow the College to be more responsive to the complaints we receive by allowing a greater number of complaints to proceed through the Title IX formal and informal grievance processes.
The College is supportive of the proposed rule to allow former students or employees who are not participating or attempting to participate in the recipient's education program or activity to file a complaint. As a community college, we know that our students move in and out of our programs over time. The ability of the College to respond to a complaint from a former student or employee who isn't currently engaging in the educational program or activity is reasonable and would effectively help the College better address reports of discrimination in its educational program or activities. Although the proposed rule permits dismissal of a complaint if the respondent is not participating in the recipient's education program or activity and is not employed by the recipient, there is some concern that, without some limitation on the period in which a complaint can be filed, the institution's efforts to identify or locate witnesses, collect relevant evidence, etc., and otherwise take the steps necessary to conduct a prompt and equitable resolution of complaints may be hampered.

Montgomery College is supportive of the addition of a new requirement to increase reporting of student disclosures of pregnancy and related conditions. The proposed rule states that recipients must ensure that when a student tells an employee of their pregnancy or related condition, the employee must provide information on how to contact the Title IX Coordinator. While this is the current practice of our institution, a more formal requirement for employees to make referrals is reasonable and could lead to additional referrals and earlier support for students experiencing pregnancy and related conditions.
Montgomery College is supportive of the Department's continued expectation as articulated in the proposed rule that institutions act to end sex discrimination that is alleged to have occurred in its educational program or activity, prevent its recurrence, and remedy its effects.



September 10, 2022

Hon. Miguel Cardona
Secretary of Education
U.S. Department of Education
400 Maryland Avenue, SW
Washington, DC 20202

**Docket Number: ED-2021-OCR-0166**

**Re: Notice of Proposed Rulemaking (NPRM) – Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance**

**Federal Registry No: 2022-13734**

**Submitted electronically**

Dear Secretary Cardona:

The Association of Christian Schools International (ACSI) is the largest Protestant school association and serves 2,250 member schools in the United States alone with a total of some 5,000 member schools around the globe.  Through extended services and resources beyond formal membership, ACSI has the privilege of serving and influencing over 25,000 Christian schools all over the world. ACSI exists to strengthen Christian schools and equip Christian educators worldwide as they prepare students academically and inspire them to become devoted followers of Jesus Christ.

The Christian faith teaches the dignity of each human person, each of whom is made in the image of God and thus deserving of respect. This imperative of love and respect for every human person inspired Christians to rescue foundlings in pagan Rome, found hospitals, promote education, serve the poor, and promote liberty of conscience. Thus, Christian schools stand for human dignity and do not condone bullying or discrimination. The Christian faith does not permit the mistreatment of individuals made in God's image.

In terms of sexuality, the Christian faith teaches that human flourishing calls for sex to be reserved for marriage only, and that marriage is a covenant between one man and one woman for one lifetime with children as God may give. It is worth noting that Orthodox and Catholic Christians teach that marriage is also a sacrament, thus implicating marriage as a means of God's grace, His "unmerited favor towards sinners." And, all three branches of Christianity – Protestant, Orthodox, and Catholic – have a high view of marriage and, consequently, a strong conviction against divorce except in limited, specific circumstances.

ASSOCIATION OF CHRISTIAN SCHOOLS INTERNATIONAL
Phone 719.528.6906 | Fax 719.531.0631 | ACSI.org
731 Chapel Hills Drive  Colorado Springs, CO  80920

AR_233141

Christian schools therefore teach, and Christian individuals do their best to live out, these timeless, proven truths which, in fact, promote *individual*, personal flourishing in ways that a real and loving God intended. Naturally, individual flourishing in community also promotes the *common* good and contributes in positive ways to a thriving society.

These Christian standards are part and parcel of a Christian faith and practice that reflects the Good News of the Gospel of Jesus Christ:  a loving God has created an understandable order designed to benefit His special creation, each human person. He provided a Redeemer who took the punishment each individual deserves for his sin precisely so each person may enjoy God's free offer of forgiveness. God offers each human person a clear conscience simply upon our asking and our turning away from sin and toward what He intends for our good. Proverbs 13 promises that "he who confesses and forsakes them [i.e., his transgressions] will find compassion." Proverbs chapter three summarizes: "Fear the Lord and turn away from evil. It will be healing to your body and refreshment to your bones" (NASB).

In this regard, the federal Constitution guarantees freedom of conscience in the First Amendment which forbids the federal government from establishing an official religion and compels the federal government to respect the free exercise of religion.  The *first* line of the *first* item in the Bill of Rights is "Congress *shall make no law* respecting an establishment of religion, or prohibiting the free exercise thereof."  Christians, like all others, have a lawful, inherent right to expect the full freedom to live out their faith and, as a practical example in just one area of concern, to be treated equally – not as second class citizens – in government programs of general applicability. The Supreme Court has made this non-religious-discrimination requirement clear in cases such as *Trinity Lutheran Church of Columbia, Inc. v. Comer,* 137 S. Ct. 2012 (2017) and *Espinoza v. Montana Department of Revenue*, 140 S. Ct. 2246 (2020).

As federal actors, the U.S. Department of Education (USDE) has an obligation to ensure that those rights are respected.

On June 23, 2022, the 50th anniversary of Title IX of the Education Amendments of 1972, the USDE announced it would issue a Notice of Proposed Rulemaking (NPRM) related to Title IX which it did formally on July 12, 2022 with 60 days for public comment. The NPRM came slightly more than one year after a USDE request for public input in June 2021 sparked by two Executive Orders: Executive Order 13988, *Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation* (published January 25, 2021), and Executive Order 14021, *Guaranteeing an Educational Environment Free from Discrimination on the Basis of Sex, Including Sexual Orientation or Gender Identity* (published March 11, 2021).  In particular, the latter sought review of agency actions that "are or may be inconsistent with governing law, including Title IX."

ACSI submitted public comment on June 10, 2021, in response to the request for public input. Regrettably, the NPRM repeats, and, in many ways, worsens the errors of the original Executive Order which we examined in our original submission. The NPRM thus would formalize those errors into regulation as we explain below.

The NPRM, like Executive Order 13988 from which it springs, erroneously attempts to apply the Supreme Court's decision in *Bostock v. Clayton County,* 140 S. Ct. 1731 (2020) to the wholly unrelated law in Title IX of the Education Amendments of 1972 when the decision itself is clearly limited to employment issues specific to Title VII of the Civil Rights Act, to wit:

> *The employers worry that our decision will sweep beyond Title VII to other federal or state laws that prohibit sex discrimination. And, under Title VII itself, they say sex-segregated bathrooms, locker rooms, and dress codes will prove unsustainable after our decision today. But none of these other laws are before us; we have not had the benefit of adversarial testing about the meaning of their terms, and we do not prejudge any such question today. Under Title VII, too, we do not purport to address bathrooms, locker rooms, or anything else of the kind. The only question before us is whether an employer who fires someone simply for being homosexual or transgender has discharged or otherwise discriminated against that individual "because of such individual's sex."* Bostock v. Clayton County, *140 S. Ct. 1731 (2020) at 1753.*

Not only did the Court make clear that its ruling applied *only* to Title VII, it emphasized that: "Whether other policies and practices might or might not qualify as unlawful discrimination or find justifications under other provisions of Title VII are questions for future cases, not these." *Ibid.*

Our own public comment in June 2021 urged the Department to reverse course, but, in addition, on July 15, 2022, a federal court enjoined enforcement on procedural grounds of the guidance in a Notice of Interpretation of June 22, 2021, which the Department issued ahead of the 2022 NPRM. The legal challenge to the Department's reasoning was brought by 20 state attorneys general, led by Tennessee. The preliminary injunction is thus in place in nearly half the states.

In addition, for the last 50 years, Congress has had every opportunity to redefine the concept of sex within Title IX. It has refused to do so. Thus, the Executive Branch has plain evidence from the Judicial and the Legislative Branches that it has no authority to reinterpret Title IX in the way the NPRM attempts to do.

The NPRM, then, was issued based on a misapplication of a Supreme Court decision which itself explicitly applied only to Title VII of the Civil Rights Act and no other statute. That wrongful approach became part of a Notice of Interpretation which was challenged by 20 states and subsequently enjoined by a federal court as the case proceeds. It was issued despite Congressional refusal to change the meaning of sex. And, further, the NPRM goes well beyond sexual orientation to include discrimination on the basis of "sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, and gender identity."

One reason the Court did not apply its ruling in *Bostock* beyond Title VII of the Civil Rights Act is clearly stated in the citation above: the Court did not evaluate any other law. *Bostock* was about discrimination in employment (Title VII) whereas Title IX is about sex discrimination in educational programs. The Court did not attempt to determine the implications for free speech (use of pronouns) or privacy (bathrooms, locker rooms, dormitories) or religious liberty (human dignity that respects the human person and the truth about marriage) in an *employment* case. And yet that is precisely what

the NPRM attempts to do without authority here in the case of education where all of these are seriously implicated.

**We note that the NPRM did not change the current regulation governing the exemption for religious schools guaranteed in the statute. This is a good thing.** However, the NPRM could consider adding how the Department would protect faith-informed institutions and their participants from the wrongful application of its requirements. For example, despite Title IX's religious exemption, over the spring and summer of 2022, the U.S. Department of Agriculture (USDA) attempted to impose on religious schools non-discrimination categories from which they are exempt. The USDA relented only when litigation was brought in Florida that led it to issue clarifying guidance.

Thus, there is reason for the Department of Education separately to acknowledge the existence of the religious exemption and the fact that religious institutions are or may well be exempt from its wrongful application of Title IX to sexual orientation and gender identity precisely because religious institutions respect human dignity, acknowledge the reality of biological sex, and teach that sexuality is best channeled into marriages of one man and one woman for one lifetime with children as God may give.

We would also urge the Department within the bounds of its authority to encourage other federal agencies to adopt the Department's standard for the Title IX religious exemption, namely that schools are not required to seek written assurance of their exemption or lose their right to the exemption in the event of a complaint or investigation. To require pre-approval, as the Department itself has attempted in the past, is unlawful and lacks statutory authority.

Along these lines, the Department does have the authority to pledge that it will not allow or participate in any retaliatory action against religious institutions which assert their statutory right to the Title IX exemption. In the past, the Department has taken actions, now rectified, that were widely interpreted as hostile to religious institutions which asserted their statutory Title IX exemption. **It would therefore be appropriate for the Department to make a statement which could be a part of the Final Rule to the effect that it will not engage in such hostility nor encourage others to do so.**

The Department must be careful to recognize – and not to restrict – the right of religious Americans and religious institutions to full participation in American life. This includes religious institutions which choose to be recipients of federal financial assistance (in accord with the Supreme Court's multiple rulings barring discrimination in programs of general applicability). At minimum, the Department must make clear that it is not discrimination to teach and to live out the reality that sexuality is best reserved for marriage, that all children deserve to use a restroom that respects their privacy, and thus gives them the human dignity that they do, in fact, possess.

**ACSI thus recommends that the NPRM withdraw its proposed changes that expand the meaning of sex to include "sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, and gender identity" in Section 106.10.**

We note that the NPRM puts off possible new regulations covering sports. However, Section 106.31's expansive revisions prohibit "more than a *de minimis* harm" when treating the sexes differently or

separating them, and then defines "more than a *de minimis* harm" at Section 106.31(a)(2) to include a policy or practice "that prevents a person from participating in an education program or activity consistent with the person's **gender identity**." (Emphasis added). This would surely be used to compel schools to allow a student who may identify as transgender to play on teams aligned with the student's gender identity, not a student's biological sex. **We recommend the Department withdraw its proposed changes to Section 106.31.**

Finally, we note that Section 654 of the Treasury and General Government Appropriations Act of 1999 (Public Law 105-277) requires agencies to conduct a family impact assessment of "proposed agency actions on family well-being" including assessing whether –

> (1) the action strengthens or erodes the stability or safety of the family, and, particularly, the marital commitment;

> (2) the action strengthens or erodes the authority and rights of parents in the education, nurture, and supervision of their children;

These standards seem relevant here and **we urge the Department to conduct such an assessment as part of its responsibilities related to the NPRM.**

Thank you for the opportunity to express our views.

Respectfully submitted,

P. George Tryfiates
Vice President for Public Policy & Legal Affairs



OFFICE OF THE ATTORNEY GENERAL
STATE OF INDIANA

302 W. WASHINGTON ST, IGCS 5TH FLOOR
INDIANAPOLIS, IN 46204-2770

## TODD ROKITA
ATTORNEY GENERAL

September 12, 2022

Dr. Miguel Cardona
Secretary of Education
U.S. Department of Education
400 Maryland Avenue, SW
Washington, DC 20202

*Re: Title IX Notice of Proposed Rulemaking Docket ID ED-2021-OCR-0166*

Dear Secretary Cardona:

As you are aware, State Attorneys General play a critical role in preserving federalism and the constitutionally prescribed balance of power between the States and the federal government. The threat of federal overreach is particularly acute with statutes such as Title IX that regulate education, where, as Congress recognized when enacting the Department of Education Organization act, "parents have the primary responsibility for the education of their children, and States, localities, and private institutions have the primary responsibility for supporting that parental role." 20 U.S.C.A. § 3401(3) (Pub. L. 96–88, title I, § 101(3), Oct. 17, 1979, 93 Stat. 669). To that end, we have steadfastly fought to protect the rights of girls and women under Title IX against attacks from this Administration, including by obtaining an injunction against your efforts to weaken Title IX through administrative "guidance." *Tennessee et al. v. United States Dep't of Educ.*, No. 3:21-CV-308, 2022 WL 2791450, at *1 (E.D. Tenn. July 15, 2022).

Rather than protect the rights of girls and women, your Notice of Proposed Rulemaking (hereinafter, "Proposed Rule") redefining the term "sex" in Title IX from "biological sex" to mean "gender identity" harms the rights of women and girls. Your erroneous reliance on the Supreme Court's decision in *Bostock v. Clayton County*, 140 S. Ct. 1731 (2020), destroys the progress made to protect the rights of girls and women under Title IX over the past fifty years. Worse, your misguided and illegal efforts seek to preempt protections afforded girls and women by individual States. Just as we are successfully fighting your gross violation and disregard of federalism and the law in courts, so too will we fight the overreach in your Proposed Rule.

The Proposed Rule is unlawful for many reasons, but this letter will address only three specific legal defects:

1

1. The Proposed Rule's reliance on *Bostock v. Clayton County* is erroneous and contradicts the Department of Education's General Counsel's prior guidance on the subject.

2. The Proposed Rule's attempt to preempt State laws protecting the rights of girls and women lacks grounding in a clear statement of authority by Congress.

3. The Proposed Rule's restriction of the role of parents in directing their children's education violates parents' constitutional rights.

## 1. *Bostock* does not apply to Title IX.

In seeking to expand the definition of "discrimination on the basis of sex" from biological sex, which was the meaning intended by Congress when it passed Title IX in 1972, to include "discrimination on the basis of sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, and gender identity,"[1] the Proposed Rule ignores fifty years of precedent limiting the term to biological sex. Indeed, the Proposed Rule attempts to rewrite Title IX's fifty-year-old definition of "sex" to mean gender identity, a 180-degree change from the position taken by the Department on the exact same issue one year earlier.

The Proposed Rule cites *Bostock v. Clayton County.* as the legal basis for reinterpreting the term "sex" to mean gender identity,[2] but that misconstrues and improperly extends *Bostock*, which did not redefine the term "sex." As noted by The Department's General Counsel in 2021, the Supreme Court expressly limited its decision in *Bostock* to Title VII and merely held that under Title VII, discrimination on the basis of "sexual orientation," "gender identity," or "transgender" status was prohibited because discrimination involving these characteristics "necessarily and intentionally applies sex-based rules."[3] *Bostock* "assum[ed]" that the term "sex" means "biological distinctions between male and female." 140 S. Ct. at 1739, 1746–47.

*Bostock* also narrowly addressed employment termination and explicitly refrained from addressing key items under Title IX, such as "sex-segregated bathrooms, locker rooms, and dress codes."[4] Indeed, *Bostock* expressly stated that its decision did not "sweep beyond Title VII to other federal or state laws that prohibit sex discrimination" or address other issues not before the Court. 140 S. Ct. at 1753. *Bostock*'s holding thus "extends no further than Title VII." *Pelcha v. MW Bancorp.*, 988 F.3d 318, 324 (6th Cir. 2021); *see Tennessee v. U.S. Dep't of Educ.*, No. 3:21-CV-308, 2022 WL 2791450, at *21 (E.D. Tenn. July 15, 2022) ("in applying *Bostock* to Title IX, the Department overlooked the caveats expressly recognized by the Supreme Court and created new law").

In addition, Title IX expressly recognizes the biological differences between male and female students. Its text explicitly states that, "[n]otwithstanding anything to the contrary in this chapter, nothing contained herein shall be construed to prohibit any educational

---

[1] 87 Fed. Reg. at 41398.

[2] 140 S. Ct. 173 (2020).

[3] *Id.* at 1745.

[4] *Id.* at 1753; *see also U.S. Dep't of Justice, Application of Bostock*, at 4 ("*Bostock* does not require any changes to . . . sex-specific facilities or policies.").

2

institution receiving funds under this Act, from maintaining separate living facilities for the different sexes." 20 U.S.C. § 1686. Regulations embrace the same understanding when they provide that Title IX recipients "may operate or sponsor separate teams for members of each sex where selection for such teams is based upon competitive skill or the activity involved is a contact sport." 34 C.F.R. § 106.41(b).

The Proposed Rule departs most significantly from *Bostock* when it protects gender identity at the expense of biological sex, saying that "adopting a policy or engaging in a practice that prevents a person from participating in an education program or activity consistent with the person's gender identity subjects a person to more than *de minimis* harm on the basis of sex" and therefore violates Title IX.[5] The Proposed Rule undermines Title IX: Schools cannot "provide equal athletic opportunity for the [members of both] sexes" if the Department functionally forbids them from acknowledging two biologically distinct sexes.[6]

Since Title IX's enactment in 1972, participation of girls and women in sports has exploded. In 2021, 3.4 million girls played high school sports, and 219,000 women played NCAA sports.[7] The Proposed Rule's departure from the sex dichotomy ignores science. The athletic performance advantage of men over women is typically 10-50% depending on the sport.[8] The reason for male athletic advantage is biology: males on average have 45% higher lean body mass, 33% higher lower body muscle mass, 40% higher upper body muscle mass, 54% higher knee extension strength, and 30% higher maximum cardiac output.[9] The result is that by the age of 14-15, many adolescent males athletes have surpassed the best measurable elite (i.e., Olympic and world-championship level) female performances in nearly all sports.[10]

Male athletic advantages, which begin with surges in testosterone in the womb and during a mini-puberty stage during the first six months after birth, cannot be suppressed to an extent that would allow meaningful competition between males who identify as women and biological females.[11] Early surges of testosterone lead, for instance, to higher bone density in

---

[5] 87 Fed. Reg. at 41571.

[6] 87 Fed. Reg. at 41537; *See* NPRM § 106.41(c).

[7] NCAA Sports Sponsorship and Participation Rates Database, https://www.ncaa.org/sports/2018/10/10/ncaa-sports-sponsorship-and-participation-rates-database.aspx. In fact, NCAA statistics show that since 1982 (when the NCAA began separating male and female participation rates), female participation rates rose from 43% of the male participation rate (74,329 to 169,800) to 78% (219,177 to 278,988) in 2021—almost doubling.

[8] Hilton, E.N., Lundberg, T.R., Transgender Women in the Female Category of Sport: Perspectives on Testosterone Suppression and Performance Advantage, *Sports Med.* 2021 Feb;51(2): 199-214.

[9] *Id.*

[10] *Id.*

[11] *Id.*; Wiik, A., Lundberg, T.R., Rullman, E., Andersson, D.P., Holmberg, M., Mandic, M., Brismar, T.B., Dahlqvist Leinhard, O., Chanpen, S., Flanagan, J.N., Arver, S., Gustaffson, T., Muscle Strength, Size, and Composition Following 12 Months of Gender-affirming Treatment in Transgender Individuals, *J. Clin. Endocrinol. Metab.* 2020 Mar 1;105(3):dgz247. *See, e.g.*, Pedersen, Ultrasound evidence of sexual difference in fetal size in first trimester, *Br. Med. J.* 1980 281(6250): 1253; Persson et al., Impact of fetal and maternal factors on the normal growth of the biparietal diameter, *Scandinavian Association of Obstetricians and Gynaecologists* 1978 78: 21-27; Schwartzler et al., Sex-specific antenatal reference growth charts for uncomplicated singleton pregnancies at 15—40 weeks of gestation, *Ultrasound in Obstetrics and Gynaecology* 2004 23(1): 23-29; Broerre-Brown, et al., Sex-specific differences in fetal and infant growth patterns: a prospective population-based cohort study, *Biology of Sex Differences* 2016 7: 65; Galjaard, et al., Sex differences in fetal growth and immediate birth outcomes in a low-risk Caucasian population, 2019 *Biology of Sex Differences* 10: 48; Gilsanz, et al., Differential

3

the spine and larger axial skeletons in infant males.[12] Male athletic-performance advantages are observable well before adolescence.[13] Even with pre-puberty hormone suppression, biological males who identify as women will still have a height advantage, among other advantages, over biological females.[14] Of course, height is a key factor in athletic success in many sports.

In short, females and males are biologically distinct, and those key biological differences cannot be undone, leaving females at an enormous competitive disadvantage when facing biological males in sports. Permitting males who identify as women to compete against biological females would subject biological females to far more than *de minimis* harm on the basis of sex.

### 2. The Proposed Rule's attempt to preempt State laws protecting the rights of girls and women confuses spending conditions for law, undermines representative government, and violates the *Pennhurst* clear-statement rule.

The Proposed Rule also seeks to preempt State laws that protect the rights of girls and women based on biological sex. "The Department proposes eliminating § 106.6(h) entirely and simplifying § 106.6(b) to clarify that all Title IX regulations preempt State or local law."[15]

The Supremacy Clause, which authorizes federal preemption in some circumstances, provides that "the Laws of the United States . . . shall be the supreme Law of the Land." U.S. Const. art. VI. Title IX and its implementing regulations, however, simply impose conditions on federal grants. And conditions on federal grants are not "law" under the Supremacy Clause. Historically, "regulation was traditionally a matter of public congressional enactment" and Congress was "reluctan[t] . . . to use conditions as a means of national domestic regulation." Philip Hamburger, *Purchasing Submission: Conditions, Power, and Freedom* 91 n.\* (2021). Attaching conditions to federal grants affords a way to incent desired behavior without commanding it. "Unlike ordinary legislation, which 'imposes congressional policy' on regulated parties 'involuntarily,' Spending Clause legislation operates based on consent," *i.e.*,

---

Effect of Gender on the Sizes of the Bones in the Axial and Appendicular Skeletons, *J. of Clin. Endocrin. And Metabol.* 1997 21(3): 415-430; Lanciotti, et al., Up-To-Date Review About Minipuberty and Overview on Hypothalamic-Pituitary-Gonadal Axis Activation in Fetal and Neonatal Life, *Frontiers in Endocrinology* 2018 9:410; Boas, et al., Postnatal penile length and growth rate correlate to serum testosterone levels: a longitudinal study of 1962 normal boys, *Eur. J. of Endocrin.* 2006 154(1): 125-129; Kiviranta, et al., Transient Postnatal Gonadal Activation and Growth Velocity in Infancy, *Pediatrics* 2016 138(1): e20153561; Becker, et al., Hormonal 'minipuberty' influences the somatic development of boys but not of girls up to the age of 6 years, *Clin. Endocrin.* 2015 83: 694-701.

[12] *Id.*

[13] Catley, M.J., Tomkinson, G.R., Normative health-related fitness values for children: analysis of 85347 test results on 9-17-year-old Australians since 1985. *Br. J. Sports Med.* 2013 Jan;47(2):98-108 (showing 9-yr. old males 9.8% faster in short sprints, 16.6% faster in mile run, 9.5% better standing long jump, completed 33% more push-ups in 30 seconds and had a 13.8% stronger grip); Tambalis K.D., Panagiotakos, D.B., Psarra, G., Daskalakis, S., Kavouras, S.A., Geladas, N., Tokmakidis, S., Sidossis, L.S., Physical fitness normative values for 6-18-year-old Greek boys and girls, using the empirical distribution and the lambda, mu, and sigma statistical method, *Eur. J. Sport Sci.* 2016 Sep;16(6):736-46 (6-yr. old boys when compared to 6-yr. old girls completed 16.6% more shuttle runs in a given time and could jump 9.7% further from a standing position).

[14] Boogers, L.S., Wiepjes, C.M., Klink, D.T., Hellinga, I., van Trotsenburg, A.S.P., de Heijer, M., Hannema, S.E., Trans girls grow tall: adult height is unaffected by GnRH analogue and estradiol treatment, *J. Clin. Endocrinol. Metab.* 2022 Jun 6:dgac349. Doi: 10.1210/cinlnem/dgac349.

[15] 87 Fed. Reg. at 41404.

4

the consent of the individual accepting a federal grant, as opposed to the consent of the people writ large. *Cummings v. Premier Rehab Keller*, 142 S. Ct. 1562, 1570 (2022) (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 16–17 (1981)).

The distinction is critical to a proper understanding of the spending power and its limits. In sum, "the 'legitimacy of Congress' power' to enact Spending Clause legislation rests not on its sovereign authority to enact binding laws, but on 'whether the [recipient] voluntarily and knowingly accepts the terms of th[at] contract.'" *Id.* (quoting *Barnes v. Gorman*, 536 U.S. 181, 186 (2002)). In other words, "Congress' *legislative* powers *cannot be avoided* by simply opting out," but "Congress' power to spend money is *not a legislative* power." David Engdahl, *The Contract Thesis of the Federal Spending Power*, 52 S.D. L. Rev. 496, 498 (2007). That limitation protects critical state interests. Thus, "unlike statutory provisions that are grounded in Congress' *legislative* powers, spending terms and conditions are obligatory and enforceable only if voluntarily accepted." *Id.* at 500. The "knowing acceptance" standard preserves the vertical balance of power between States and the federal government, "ensuring that Spending Clause legislation does not undermine the status of the States as independent sovereigns in our federal system." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 577 (2012) (opinion of Roberts, C.J., joined by Breyer and Kagan, JJ.).

For this reason, the Supreme Court has set limits on the conditions that Congress may impose on federal funding. For instance, Congress may impose "conditions that define the limits of the government spending program" but not "conditions that seek to leverage funding to regulate speech outside the contours of the program itself." *United States Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214–15 (2013). And while Congress may financially induce States to accept policy changes, it may not impose conditions "so coercive as to pass the point at which pressure turns into compulsion." *NFIB*, 567 U.S. at 580 (quoting *South Dakota v. Dole*, 483 U.S. 203, 211 (1987)).

Critically, a grantee need not accept a federal contract in the first instance, and if it does, the remedy for violation of its terms is a matter between the grantee and the United States. Thus, "when a federal statute does not directly require adherence to its provisions, but instead proposes them as terms of a contractual promise, it is not giving them the obligation of law." Hamburger, *supra*, at 132. Because "conditions do not purport to bind . . . in the manner of law," "[n]o federal condition, by whatever means adopted, should be understood to defeat the obligation of contrary state law." *Id.* at 131. Otherwise, "[i]n shifting legislative power to . . . private decisions, conditions displace public representative self-government . . . with private barter." *Id.* at 92. Treating grant conditions as "law" that trumps a generally applicable state exercise of the police power thus threatens a fundamental alteration of the relationships among citizens, their States, and the federal government, whereby the federal government may induce citizens and political subdivisions to violate state law with impunity.

The Supreme Court has never countenanced such a capacious understanding of congressional spending power, and the Department should not attempt to exercise such power here. It is worth observing that neither of the two existing Title IX regulations that purport to preempt state law, 34 CFR § 106.6(b) & (h), have been contested and upheld. And indeed, when the Department promulgated § 106.6(h) in 2020, it did not cite any Supreme Court cases upholding its authority to use spending conditions to preempt state law. Each of the cases it cited upheld preemption under Commerce Clause legislation, not spending power legislation. *See* 85 Fed. Reg. 97,30454 fn. 1653 (May 19, 2020) (codified at 34 C.F.R. § 106.6 (2020)) (citing *Hillsborough Cnty., Fla. v. Automated Med. Labs., Inc.*, 471 U.S. 707, 713 (1985) (FDA regulations authorized by the Public Health Service Act); *Geier v. Am. Honda*

5

*Motor Co., Inc.*, 529 U.S. 861, 873 (2000) (National Traffic and Motor Vehicle Safety Act); *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 396 (1986) (FCC regulations authorized by the Communications Act); *Freightliner Corp. v. Myrick*, 514 U.S. 280, 287 (1995) (National Traffic and Motor Vehicle Safety Act).

Furthermore, unlawful coercion occurs in violation of the Tenth Amendment where Congress uses its taxing-and-spending power to enter the arena of general police power and override contrary state laws. So, for example, in *Linder v. United States*, 268 U.S. 5 (1925), the Court rejected use of the power to tax for the general welfare to regulate the practice of medicine. It said that "[o]bviously, direct control of medical practice in the states is beyond the power of the federal government," which meant that "[i]ncidental regulation of such practice by Congress through a taxing act cannot extend to matters plainly inappropriate and unnecessary to reasonable enforcement of a revenue measure." *Id.* at 18; *see also United States v. Doremus*, 249 U.S. 86, 93 (1919) (invalidating a federal regulation of physicians predicated on the taxing power because it invaded the police power of States and observing, "[o]f course Congress may not in the exercise of federal power exert authority wholly reserved to the states").

The Proposed Rule's preemption threat constitutes just such an invasion of core state police power. As the Supreme Court has observed, "States traditionally have been accorded the widest latitude in ordering their internal governmental processes, and school boards, as creatures of the State, obviously must give effect to policies announced by the state legislature." *Washington v. Seattle Sch. Dist. No. 1*, 458 U.S. 457, 476 (1982) (citation omitted). Congress noted in the Department of Education Organization Act that "in our Federal system, the primary public responsibility for education is reserved respectively to the States and the local school systems and other instrumentalities of the States." 20 USC § 3401(4); *see also* 20 USC § 3403(a)&(b) ("The establishment of the Department of Education shall not increase the authority of the Federal Government over education or diminish the responsibility for education which is reserved to the States and the local school systems and other instrumentalities of the States"). Indeed, the Department's own website acknowledges that "[e]ducation is primarily a State and local responsibility in the United States." The Federal Role in Education," U.S. Department of Education, June 15, 2021, https://www2.ed.gov/about/overview/fed/role.html.

Moreover, because the Proposed Rule would suspend state police power regulations without the State's consent, it undermines state sovereignty in a way that implicates the Republican Form of Government Clause. While the federal government may "induce the states to adopt policies that the Federal Government itself could not impose," it cannot induce citizens (corporate or otherwise) or political subdivisions to violate state law. A "republican form of government" is one where the people are governed by legislatively enacted laws, not one where a different sovereign tempts some citizens or political subdivisions to exempt themselves from state laws. Manifestly, "the purchase of submission is not what traditionally was understood as a republican form of government." Hamburger, *supra*, at 147. That observation is particularly apt where the submission is not undertaken by the State itself, but by a citizen or political subdivision being paid by the federal government to violate state law. And while the Supreme Court has never directly enforced the Guarantee Clause against the United States, it has observed that "perhaps not all claims under the Guarantee Clause present nonjusticiable political questions." *New York v. United States*, 505 U.S. 144, 185 (1992). Where Congress (or the Executive Branch) "actively interfere[s] in the states' republican self-governance," courts do not face unanswerable questions about how the United States itself should "guarantee" republican government. Hamburger, *supra*, at 147.

6

Even assuming that the Department could theoretically use spending conditions to preempt state law, any attempt to do so would run afoul of basic preemption doctrine, including the presumption against preemption, which is grounded in the structural disfavor of preemption. *See e.g., Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947). "In all preemption cases, and particularly in those in which Congress has 'legislated ... in a field which the States have traditionally occupied,' ... we 'start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.'" *Wyeth v. Levine*, 555 U.S. 555, 565 (2009). "[W]here a statute regulates [a] field traditionally occupied by states, such as health, safety, and land use, a 'presumption against preemption' adheres.*" Atay v. Cnty. of Maui*, 842 F.3d 688, 699 (9th Cir. 2016) (quoting *Wyeth v. Levine*, 555 U.S. 555, 565 n.3 (2009)). Courts "assume that a federal law does not preempt the states' police power absent a clear and manifest purpose of Congress." *Atay*, 842 F.3d at 699; *Geier v. Am. Honda Motor Co., Inc.*, 529 U.S. 861, 885 (2000). The presumption against preemption is particularly strong in areas of core state responsibility, including (as described above) education.

Next, under the clear-statement rule of *Pennhurst State School and Hospital v. Halderman*, 451 U.S. 1 (1981), the Department cannot change the conditions attached to federal funds without statutory text expressly authorizing it to do so. No one takes seriously the idea that, from the get-go, grant recipients understood Title IX to make a clear statement that gender identity discrimination was prohibited. *See Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 295–96 (2006) (observing that the Court must consider conditions on federal grants "from the perspective of a state official who is engaged in the process of deciding" whether to accept grant funds and "ask whether such a state official would clearly understand" the asserted condition). Put another way, preempting state and local laws protecting girls and women based on biological sex would breach the contractual agreement by which States and their educational entities accepted federal funds under Title IX and other federal statutes.

The Proposed Rule erroneously relies on *Bostock* to claim falsely that the term "sex" has always meant gender identity, and that States and their officials "would clearly understand" as much. But when Title IX was enacted in 1972, "sex" carried a "narrow, traditional interpretation." *Ulane v. E. Airlines, Inc.*, 742 F.2d 1081, 1085–86 (7th Cir. 1984). The Supreme Court did not apply Title VII to transgender employees until 2020. And even then, the majority stopped short of holding that its reasoning would condemn "sex-segregated bathrooms," "locker rooms," "dress codes," or "anything else of the kind" under Title VII. *Bostock*, 140 S. Ct. at 1753. So recent a decision under Title VII cannot be the basis for invaliding separate-sex sports policies under Title IX, especially given the differences between the two statutes.

When Title IX was enacted, the term "sex," scientific in nature, referred to the "two divisions" of organisms, "designated *male* and *female*," classified "according to their reproductive functions." *The American Heritage Dictionary of the English Language* 1187 (1980). Title IX reflects Congress's understanding that "sex" refers to a binary, biological characteristic. It even distinguishes between institutions, organizations, and activities open to "only students of one sex" and those open to "students of both sexes." 20 U.S.C. § 1681(a)(2); *see also* § 1681(a)(5), (a)(6), (a)(7), (a)(8), (a)(9), (b). And as examples of organizations and activities open to "one sex," Title IX lists the "Young Men's Christian Association, Young Women's Christian Association, Girl Scouts, Boy Scouts, Camp Fire Girls," "father-son" activities, "mother-daughter" activities, and "beauty pageants." § 1681(a)(6)(B), (a)(7), (a)(8), (a)(9). Title IX also speaks of "separate living facilities for the different sexes," authorizing separate

7

showers, bathrooms, and bunks. § 1686. All of these provisions presume two discrete sexes with different anatomies and physiologies—not "gender identity," *i.e.*, an "individual's self-identification as being male, female, neither gender, or a blend of both genders." *The American Heritage Dictionary of the English Language* (5th ed. 2022).

Preempting state laws governing education would unlawfully "diminish the responsibility for education which is reserved to the States" and thereby violate a host of constitutional limits and doctrines. Preemption should therefore be removed from the Proposed Rule.

### 3. The Proposed Rule would sharply restrict a parent's right to direct their child's education and thereby violate parents' constitutional rights.

The Proposed Rule would allow school officials to provide counseling to any student about gender identity issues, to allow the child to choose a gender identity without regard to biological sex, and even to refer a child for medical attention, all without parental notice. By requiring public elementary and secondary schools to affirm a child's gender identity without parental approval or knowledge, the Proposed Rule would strip parents of the right to direct education decisions relating to their children, as protected by a century of Supreme Court precedent and the Department of Education's own Organization Act.

The right of parents to direct the education and upbringing of their children is deeply rooted in our Nation's history and traditions, as the Supreme Court recently reaffirmed. *See Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2257 (2022) (reaffirming "the right to make decisions about the education of one's children"). In *Pierce v. Society of Sisters*, 268 U.S. 510 (1925), where the Court upheld the right of parents to educate their children in a private religions school, the Court observed that "[t]he child is not the mere creature of the state; those who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations." Congress embraced this conception of parental rights in the Department's organizing act, where it found that "parents have the primary responsibility for the education of their children, and States, localities, and private institutions have the primary responsibility for supporting that parental role."[16]

Many cases apply this right. *See Meyer v. Nebraska*, 262 U.S. 390 (1923) (affirming the right of parents to teach their children German); *Wisconsin v. Yoder*, 406 U.S. 205, 233 (1972) (permitting parents to educate children at home); *Parham v. J. R.*, 442 U.S. 584, 621 (1979) (upholding a juvenile civil commitment process that depended substantially on parental judgment because, "[f]or centuries it has been a canon of the common law that parents speak for their minor children" and "[t]he statist notion that governmental power should supersede parental authority in all cases because some parents abuse and neglect children is repugnant to American tradition."); *Troxel v. Granville*, 530 U.S. 57, 65 (2000) (invalidating presumption of grandparent visitation over parental objection because "the liberty interest at issue in this case—the interest of parents in the care, custody, and control of their children—is perhaps the oldest of the fundamental liberty interests recognized by this Court"); *Zelman v. Simmons-Harris*, 536 U.S. 639, 680 n. 5 (2002) (upholding school choice scholarships in part because "[t]his Court has held that parents have the fundamental liberty to choose how and in what manner to educate their children.").

---

[16] 20 U.S.C.A. § 3401(3).

Ignoring this "fundamental liberty," the Proposed Rule strips parents of their rights by requiring public elementary and secondary schools to affirm a child's gender identity without the approval or knowledge of parents. It even goes so far as to encourage school officials, without prior parental knowledge or consent, to provide counseling to children about gender identity issues and even refer a child for medical attention and procedures such as sex change surgery. The concern seems to be that many parents will discourage their children from adopting a gender identity at odds with biological sex. And the solution is to keep the parents in the dark and permit federally funded schools to do the work of raising the children. The Constitution does not permit such parental bypass.

The Court's decision in *Parham v. J. R.*, 442 U.S. 584 (1979), is particularly instructive on this point, as it addressed methods of treating children with mental health issues. The Court permitted the juvenile commitment procedures at issue over the objections of children committed to mental hospitals principally because those procedures required parental assent. Of critical importance here, the Court observed that, "[s]imply because the decision of a parent is not agreeable to a child, or because it involves risks, does not automatically transfer the power to make that decision from the parents to some agency or officer of the state." *Id.* at 603. As if anticipating the Proposed Rule, the Court recognized that "[m]ost children, even in adolescence, simply are not able to make sound judgments concerning many decisions, including their need for medical care or treatment. Parents can and must make those judgments." *Id.* Even more to the point: "The fact that a child may . . . complain about a parental refusal to provide cosmetic surgery does not diminish the parents' authority to decide what is best for the child." *Id. at* 604. In the end, "[n]either state officials nor federal courts are equipped to review such parental decisions." *Id.* The Proposed Rule, however, proceeds as if the opposite were true by preventing parents from making decisions for their children.

Perhaps even worse, the Proposed Rule requires schools to hide information relating to a child's professed gender identity from parents even as it disclaims any obligation of a grant recipient to "[r]estrict any other rights guaranteed against government action by the U.S. Constitution."[17] The Department needs to concern itself with everyone's constitutional rights, not merely those that it prefers.

<div align="center">***</div>

The Proposed Rule threatens to destroy Title IX. Our States will ensure that American women and girls are treated with more respect than this Administration offers in the proposed rule.

Respectfully,

*[signature]*

TODD ROKITA
ATTORNEY GENERAL OF INDIANA

---

[17] 34 C.F.R. §106.6(d).

AR_254569



STEVE MARSHALL
Attorney General of Alabama



MARK BRNOVICH
Attorney General of Arizona



LESLIE RUTLEDGE
Attorney General of Arkansas



CHRIS CARR
Attorney General of Georgia



DEREK SCHMIDT
Attorney General of Kansas



DANIEL CAMERON
Attorney General of Kentucky



JEFF LANDRY
Attorney General of Louisiana



LYNN FITCH
Attorney General of Mississippi



AUSTIN KNUDSEN
Attorney General of Montana



DOUGLAS J. PETERSON
Attorney General of Nebraska

JOHN M. O'CONNOR
Attorney General of Oklahoma

ALAN WILSON
Attorney General of South Carolina

10

MARK VARGO
Attorney General of South Dakota

JONATHAN SKRMETTI
Attorney General of Tennessee

KEN PAXTON
Attorney General of Texas

SEAN REYES
Attorney General of Utah

JASON MIYARES
Attorney General of Virginia

PATRICK MORRISEY
Attorney General of West Virginia

11

STATE OF TENNESSEE

# Office of the Attorney General



**Jonathan Skrmetti**
**Attorney General and Reporter**

P.O. Box 20207
Nashville, TN 37202
Telephone: (615) 741-3491
Facsimile: (615) 741-2009

September 12, 2022

**SUBMITTED ELECTRONICALLY**
**VIA REGULATIONS.GOV**

The Honorable Miguel Cardona
Secretary of Education
Department of Education Building
400 Maryland Ave., SW
Washington, D.C. 20202

**Re:    Docket No. ED-2021-OCR-0166 ("Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance")**

Dear Secretary Cardona,

The People and State of Tennessee, joined by nineteen co-signing States, appreciate the opportunity to comment on the U.S. Department of Education's recent proposal to amend the federal regulations implementing Title IX.  *See* Dep't of Educ., *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance* ("Proposal"), 87 Fed. Reg. 41,390 (July 12, 2022).  We share the Department's interest in providing every primary, secondary, and post-secondary student an educational environment free from harassment and incongruous discrimination.  Unfortunately, the Department's proposed rule changes would force educators to pursue that end through unreasonable, unlawful, and counter-productive means.

As you are doubtless aware, Title IX's general prohibition on sex-based discrimination, *see* 20 U.S.C. § 1681(a), applies to "all the operations" of nearly every school in the country, *id.* § 1687; *see* 34 C.F.R. § 106.2(g).  Read in that light, the Department's proposed amendments to 34 C.F.R. Part § 106 give us pause.  In particular, the Department intends to expand the "scope" of Title IX by specifying that "[d]iscrimination on the basis of sex" in 20 U.S.C. § 1681 includes "discrimination on the basis of … gender identity," Proposal at 41,571 (proposed 34 C.F.R. § 106.10), despite Congress omitting the term "gender identity" from all of Title IX's numerous provisions.

State of Tennessee Comments
ED-2021-OCR-0166
Page 2

The Department has also proposed equally atextual additions to 34 C.F.R. § 106.31(a).  At present, 34 C.F.R. § 106.31(a) largely tracks the language of Title IX itself, stating in relevant part that:

> Except as provided elsewhere in this part, no person shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any academic, extracurricular, research, occupational training, or other education program or activity operated by a recipient which receives Federal financial assistance.

To this, the Department proposes adding:

> In the limited circumstances in which Title IX or [34 C.F.R. pt. 106] permits different treatment or separation on the basis of sex, a recipient must not carry out such different treatment or separation in a manner that discriminates on the basis of sex by subjecting a person to more than de minimis harm, unless otherwise permitted by Title IX or this part.  Adopting a policy or engaging in a practice that prevents a person from participating in an education program or activity consistent with the person's gender identity subjects a person to more than de minimis harm on the basis of sex.

Proposal at 41,571 (proposed 34 C.F.R. § 106.31(a)(2)).

These new rules lack statutory foundation and will trench on constitutional rights.  They will also negatively impact countless students, teachers, and school administrators in ways the Department has failed to address — or even recognize.  We thus offer the following comments with the hope that the Department will reconsider the proposed rules and avoid potential litigation:

## I.     The Department's proposed rules conflict with Title IX and violate the Constitution.

The Department has an obligation to "reasonably explain[]" how its rules fit within its lawful administrative authority.  *Advocs. for Highway & Auto Safety v. FMCSA*, 41 F.4th 586, 596 (D.C. Cir. 2022) (quoting *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021)).  But because the Department has disregarded the text of Title IX and multiple constitutional restraints, there can be no reasonable explanation for its proposals.

### A.     The Department has not grounded its proposed rules in the text, structure, or purpose of Title IX.

The Department cannot lawfully promulgate rules that conflict with Title IX.  *E.g.*, *Children's Health Def. v. FCC*, 25 F.4th 1045, 1052 (D.C. Cir. 2022).  Title IX's meaning comes from its terms, "read in context," and in light of "the problem Congress sought to solve."  *Goldstein v. SEC*, 451 F.3d 873, 878 (D.C. Cir. 2006) (quoting *PDK Labs. Inc. v. DEA*, 362 F.3d 786, 796 (D.C. Cir. 2004)).  On every level of analysis, however, the Department's proposed rules run counter to the statute.  *See Tennessee v. U.S. Dep't of Educ.*, No. 3:21-cv-00308, 2022 WL 2791450, at *21 (E.D. Tenn. July 15, 2022) (noting that the Department's proposed policies "create[] rights for students and obligations for regulated entities … that appear nowhere in … Title IX").

State of Tennessee Comments
ED-2021-OCR-0166
Page 3

To begin with, Title IX explicitly addresses "sex," not gender identity. It starts by prohibiting discrimination "on the basis of sex" and "sex" alone. 20 U.S.C. § 1681. It then identifies examples of "sex"-based discrimination to which the prohibition does *not* apply. *See id.* § 1681(a). Following this, the statute clarifies that discrimination "on the basis of sex" does *not* encompass the "maintain[ence of] separate living facilities for the different sexes." 20 U.S.C. § 1686.

These repeated references to "sex" must be read "in accord with the ordinary public meaning of ['sex'] at the time of [Title IX was] enact[ed]." *Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1738 (2020). And at that time, "virtually every dictionary definition of 'sex' referred to the physiological distinctions between males and females." *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 632 (4th Cir. 2020) (Niemeyer, J. dissenting), *cert. denied*, 141 S. Ct. 2878 (2021). In 1961, the Oxford English Dictionary defined "Sex" as "[t]he sum of those differences in the structure and function of the reproductive organs on the ground of which beings are distinguished as male and female, and of the other physiological differences consequent on these." 9 Oxford English Dictionary 578 (1961). In 1970, the American College Dictionary defined "Sex" to mean "the sum of the anatomical and physiological differences with reference to which the male and the female are distinguished." The American College Dictionary 1109 (1970). A year later, Webster's Third New International Dictionary defined "Sex" to mean "the sum of the morphological, physiological, and behavioral peculiarities of living beings that subserves biparental reproduction." Webster's Third New International Dictionary 2081 (1971). The year after Title IX became law, Random House defined "Sex" as "either the male or female division of a species, esp. as differentiated with reference to the reproductive functions." The Random House College Dictionary 1206 (rev. ed. 1973). And a few years after that, the American Heritage Dictionary defined "Sex" as "[t]he property or quality by which organisms are classified according to their reproductive functions." American Heritage Dictionary 1187 (1976). Each of these sources indicates that Title IX uses "sex" as a reference to the categories of "male" and "female," which "simply are not physiologically the same." *Bauer v. Lynch*, 812 F.3d 340, 350 (4th Cir. 2016) (citing and discussing *United States v. Virginia*, 518 U.S. 515 (1996)).

Linguistic context and statutory structure both confirm that Congress meant "sex" as a reference to this biological dichotomy, not the abstruse concept of gender identity. Advocates for gender-identity-based public policy often stress that a person's "innermost concept of" gender may fluctuate over time and defy biology's "male" or "female" binary. *See, e.g.*, *Sexual Orientation and Gender Identity Definitions*, Human Rights Campaign (last visited Sept. 8, 2022).[1] Title IX, by contrast, speaks of permitting sex-based discrimination among "Men's" and "Women's" associations and organizations for "Boy[s]" and "Girls," "the membership of which has traditionally been limited to persons of one [or the other] sex." 20 U.S.C. § 1681(a)(6)(B). The statute also describes how an institution may change "from ... admit[ting] only students of one sex" (that is, male *or* female) "to ... admit[ting] students of both sexes," (male *and* female). 20 U.S.C. § 1681(a)(2). In addition to implying that "sex" means "sex," those provisions foreclose any reading of "sex" that incorporates gender identity. It would make no sense to reference schools that "admit students of *both* [gender identities]," *id.*, if in fact such "identities" have "no fixed number" and populate an "infinite" spectrum of "possibilities,"

---

[1] https://www.hrc.org/resources/sexual-orientation-and-gender-identity-terminology-and-definitions (attached hereto as Exhibit A).

State of Tennessee Comments
ED-2021-OCR-0166
Page 4

Veronica Zambon, *What Are Some Different Types of Gender Identity?*, Medical News Today (Updated May 12, 2022) ("Medically reviewed by Francis Kuehnle, NSN, RN-BC").[2]

Clues from history cut against the Department as well. To begin with, "[t]he phrase 'gender identity' did not exist" in 1972 "outside of some esoteric psychological publications." Ryan T. Anderson, Ph.D, & Melody Wood, *Gender Identity Policies in Schools: What Congress, the Courts, and the Trump Administration Should Do* (Heritage Found. Backgrounder No. 3201, 2017).[3] In fact, "the word 'gender'" itself "had been coined only recently in contradistinction to sex." *Id.* It thus comes as no surprise that the earliest Title IX rulemaking codified sex-separated "toilet, locker room, and shower facilities" without a whiff of discussion about gender identity. HEW, *Nondiscrimination on Basis of Sex*, 40 Fed. Reg. 24,127, 24,141 (June 4, 1975) (now codified at 34 C.F.R. § 106.33); *see* HEW, *Education Programs and Activities Receiving or Benefiting from Federal Financial Assistance*, 39 Fed. Reg. 22,227, 22,230 (June 20, 1974) (proposing the rule without explanation); 40 Fed. Reg. at 24,141 (finalizing the rule without justification or response to commentary). And those same regulations (again) implied that "sex" would naturally differentiate athletes by virtue of "competitive skill" and raise safety issues when "the activity involved is a contact sport" — something that cannot be said of gender identity. 40 Fed. Reg. at 24,134 (discussing 45 C.F.R. § 86.41, predecessor to 34 C.F.R. § 106.41).

Finally, reading "sex" to mean "sex" neatly aligns with Title IX's indisputable aim: ending the "corrosive and unjustified discrimination against *women*" that was "overt and socially acceptable within the academic community" in the early 1970s. 118 Cong. Rec. 5803 (1972) (remarks of Senator Bayh) (emphasis added). *That* invidious, sex-based discrimination prompted a series of congressional hearings, which eventually inspired the legislation. *Cannon v. Univ. of Chicago*, 441 U.S. 677, 696 n.16 (1979). And in recognition of this fact, the courts have long construed Title IX as conferring a "special benefit" on "persons discriminated against" because they are biologically female — not because they *identify* as women. *Id.* at 694; *see also id.* at 680 ("Petitioner's complaints allege that her applications for admission to medical school were denied by the respondents because she *is* a woman." (emphasis added)).

The Department nonetheless insists that discrimination "on the basis of sex" necessarily *includes* discrimination "on the basis of gender identity" under the Supreme Court's decision in *Bostock v. Clayton County*, 140 S. Ct. 1731 (2020). *See, e.g.*, Proposal at 41,530–32. That's wrong. The *Bostock* case concerned a funeral home employee who had been fired "simply for being … transgender." 140 S. Ct. at 1737. The question was whether that firing constituted discrimination "because of ... sex" under Title VII. *Id.* at 1738 (quoting 42 U.S.C. § 2000e-2(a)(1)). The Court "proceed[ed] on the assumption that 'sex'" was a "biological distinction[] between male and female," nothing more or less. *Id.* at 1739. In fact, it explicitly "agree[d]" with the defendants that "transgender status" is a "distinct concept[] from sex." *Id.* at 1747. Even so, the Court held that the firing violated Title VII specifically because a male employee was punished for behavior permitted for the employee's female colleagues. *Id.* at 1744.

In reaching that holding, however, the Court explicitly declined to address sex segregation at schools under Title IX. *See id.* at 1753; *see also Pelcha v. MW Bancorp, Inc.*, 988 F.3d 318, 324 (6th Cir. 2021)

---

[2] https://www.medicalnewstoday.com/articles/types-of-gender-identity (attached hereto as Exhibit B).

[3] https://www.heritage.org/sites/default/files/2017-03/BG3201.pdf (attached hereto as Exhibit C).

State of Tennessee Comments
ED-2021-OCR-0166
Page 5

(recognizing *Bostock*'s "narrow reach"). And for good reason: Title VII is *not* Title IX. *Meriwether v. Hartop*, 992 F.3d 492, 510 n.4 (6th Cir. 2021). Whereas Title VII prohibits any adverse employment action "because of … sex," full stop, 42 U.S.C. § 2000e-2, Title IX explicitly *permits* discrimination "on the basis of sex" in numerous circumstances, 20 U.S.C. § 1681(a)(1)–(9). More importantly, Title IX dictates that "maintaining separate living facilities for the different sexes" is *not* sex-based discrimination in the first place. 20 U.S.C. § 1686. The Department fails to account for those distinctions in its misapplication of *Bostock*.

Moreover, even if the Department had the correct reading of *Bostock*, its rules would still conflict with Title IX. Most strikingly, the Department wants to mandate accommodation of a person's gender identity *even* when "Title IX … permits different treatment or separation on the basis of sex." Proposal at 41,571 (proposed 34 C.F.R. § 106.31(a)(2)). The Department has neither identified a textual basis for that rule nor explained how it follows from *Bostock* or any other precedent. And although the rule includes a carveout in cases where discrimination is "otherwise permitted by Title IX or [34 C.F.R. part 106]," *id.*, the Department has not explained how the rule's general prohibition and exception work together. The regulation seems to contemplate circumstances where "Title IX … permits different treatment … on the basis of sex" but does *not* "otherwise permit" a failure to accommodate "gender identity." *Id.* What are those circumstances? If the Department believes they exist, it should specify them now rather than cause "unfair surprise" through sporadic, after-the-fact applications. *Kisor v. Wilkie*, 139 S. Ct. 2400, 2404 (2019) (quoting *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 159 (2007)).

Indeed, the Department's "erratic[]" and "inconsistent[]" approach to the gender-identity issue only heightens the need for a cogent and clearly articulated interpretation of Title IX, grounded in the statute's actual terms. *Nat'l Treasury Emps. Union v. FLRA*, 399 F.3d 334, 337 (D.C. Cir. 2005) (quoting *Am. Fed'n of Gov't Employees v. FLRA*, 712 F.2d 640, 643 n.17 (D.C.Cir.1983)). If the Department cannot provide that logical underpinning, it must abandon its rulemaking proposal.

Further, the Department repeatedly relies upon a 2021 Notice of Interpretation that the U.S. District Court for the Eastern District of Tennessee has preliminarily enjoined the Department from enforcing against twenty States, including Tennessee and several other signatories to this letter. *E.g.*, Proposal at 41,531–33 (citing Dep't of Educ., *Enforcement of Title IX with Respect to Discrimination Based on Sexual Orientation and Gender Identity in Light of* Bostock v. Clayton County, 86 Fed. Reg. 32,637 (June 22, 2021)); *see Tennessee*, 2022 WL 2791450, at *24. In its filings in that case, the Department has agreed that it may "not cite, reference, treat as binding, or otherwise rely upon" the 2021 Notice of Interpretation in any enforcement or administrative action against the twenty States. Notice of Compliance at 2, *Tennessee*, ECF No. 97. To comply with the preliminary injunction, the Department cannot continue to treat the enjoined 2021 Notice of Interpretation as binding. Further, if the Department insists on pursuing its rulemaking proposal, the Department must "make appropriate changes" to the proposed rule, *Mann Constr., Inc. v. United States*, 27 F.4th 1138, 1142 (6th Cir. 2022), that acknowledge how such proposed rulemaking "creates rights for students and obligations for regulated entities not to discriminate based on … gender identity that appear nowhere in *Bostock*, Title IX, or its [current] implementing regulations." *Tennessee*, 2022 WL 2791450, at *21.

State of Tennessee Comments
ED-2021-OCR-0166
Page 6

> ### B.   The proposed rules would infringe on the constitutional rights and interests of students, parents, school faculty, and the States.

The Department has also failed to account for the impact its proposed rules will have on fundamental constitutional rights and interests.  Attempting to expand the reach of its preferred policies, the Department says it will require schools to "take prompt and effective action to end any sex discrimination …, prevent its recurrence, and remedy its effects."  Proposal at 41,572 (proposed 34 C.F.R. § 106.44(a)).  In practice, that means policing interactions among students, parents, and faculty to compel public accommodation of each person's highly individualized, potentially fluid, and unverifiable gender identity.  *See id.* at 41,571 (proposed 34 C.F.R. §§ 106.10, 106.31(a)(2)).  This will trench on multiple constitutional rights and interests in ways that are easy to predict.

*First*, state-run public colleges will have to compel speech in violation of the First Amendment.  This issue will predictably arise from the forced used of certain pronouns and other referential terms. *Meriwether*, 992 F.3d at 498.  Advocates for transgender rights have repeatedly stressed that the language others use to refer to a person is "pivotal to [that person's] gender identity and how [he or she] relate[s] to the world," *Pronouns*, The Center (last visited Sept. 8, 2022),[4] and that referring to someone with language that does *not* fit that person's gender identity can thus cause feelings of "exhaust[ion]," "demoralize[ation]," and "invalidat[ion]," Sabra L. Katz-Wise, *Misgendering: What It Is and Why It Matters*, Harvard Health Blog (July 23, 2021).[5]  In light of this, the Department's rules suggest that any failure to police referential speech could be considered "sex discrimination" if it "prevents a person from participating in an education program or activity consistent with the person's gender."  Proposal at 41,571 (proposed 34 C.F.R. § 106.31(a)(2)).  If that is the case, however, the new prohibitions will necessarily compel public schools to violate the First Amendment.  There can be no doubt that some college faculty will resist referring to students and colleagues by their "preferred pronouns."  *See, e.g.*, *Meriwether*, 992 F.3d at 498–503.  And whether motivated by faith, pedagogical theory, or simple disagreement, those speakers will have a right to express themselves under the First Amendment.  *See id.* at 506.  Indeed, "[i]f professors lacked free-speech protections when teaching, a university would wield alarming power to compel ideological conformity."  *Id.*  Yet the Department's rules *require* schools to wield such power without so much as acknowledging the ensuing First Amendment problem.

*Second*, school administrators may feel forced — or empowered — to insert themselves into constitutionally protected family affairs.  The Department must recognize that "[t]here [is] a 'private realm of family life which the state cannot enter,' that has been afforded both substantive and procedural protection[s]" under our Constitution.  *Smith v. Org. of Foster Fams. for Equal. & Reform*, 431 U.S. 816, 842 (1977) (quoting *Prince v. Massachusetts*, 321 U.S. 158, 166 (1944)) (citation and footnote calls omitted).  Those protections extend to cover the rights of parents to "bring up" their children as they deem fit, including through instruction on matters of behavior and ethics.  *See M.L.B. v. S.L.J.*, 519 U.S. 102, 116 (1996) (citing *Meyer v. Nebraska*, 262 U.S. 390 (1923)); *see also Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 822 (2011) (Thomas, J., dissenting) (explaining "the founding generation['s]" fundamental belief that "parents had absolute authority … to direct the proper development of their

---

[4] https://gaycenter.org/pronouns/#more (attached hereto as Exhibit D).
[5] https://www.health.harvard.edu/blog/misgendering-what-it-is-and-why-it-matters-202107232553 (attached hereto as Exhibit E).

State of Tennessee Comments
ED-2021-OCR-0166
Page 7

[minor] children"). All parents thus retain a constitutionally protected right to guide their own children on matters of identity, including the decision to adopt or reject various gender norms and behaviors.

The Department's proposed rules threaten that right by requiring school administrators to "take prompt and effective action" to accommodate the stated gender identity of each student — including very small children. Proposal at 41,571–72 (proposed 34 C.F.R. § 106.44(a)). At a minimum, those provisions bind school faculty to treat such children "consistent with [their] gender ident[ies]" on school grounds, even if that conflicts with a parent's preferences or nurturing judgment. *Id.* at 41,571 (proposed 34 C.F.R. § 106.31(a)(2)). But the rules could go much further. For example, parents have already reported instances of school administrators, clothed in Title IX's auspices, taking extreme measures to ensure gender-identity "affirmance" in the *home*. *See* Kaylee McGhee White, *Biden's New Title IX Rules Deputize Teachers to Override Parents on Gender Identity*, Independent Women's Forum (Aug. 16, 2022).[6] Nothing could be more noxious to the "enduring American tradition" that grants parents the "primary role … in the upbringing of their children." *Barrett v. Steubenville City Sch.*, 388 F.3d 967, 972 (6th Cir. 2004) (quoting *Wisconsin v. Yoder*, 406 U.S. 205, 232 (1972)).

*Finally*, the Department's novel attempt to expand Title IX would push the statute beyond Congress's lawmaking authority. Congress does not have the ability to set education policy directly. Instead, it enacted Title IX through its broader power to tax and spend in pursuit of the "general Welfare." U.S. Const. art. I, § 8, cl. 1. But the exercise of that power comes with special limitations. Most notably, when Congress aims to direct State and local policy via the Spending Clause, it must do so through "clear[ ]statement[s]" in the legislation itself. *Haight v. Thompson*, 763 F.3d 554, 568 (6th Cir. 2014) ("Clarity is demanded *whenever* Congress legislates through the spending power …."); *see also Texas Educ. Agency v. U.S. Dep't of Educ.*, 992 F.3d 350, 361 (5th Cir. 2021) ("Relying on regulations to present the clear condition, therefore, is an acknowledgment that Congress's condition was not unambiguous …."). Only then can States "voluntarily and knowingly accept[]" or decline any obligations attached to federal funds. *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981). In this case, however, the Department wants to read new gender identity protections into Title IX without grounding them in clear statutory text. *See supra* Part I.A; *Tennessee*, 2022 WL 2791450, at *21. And the Department's reliance on *Bostock* provides no retort, for reasons already stated. *See supra* at 4–5. The upshot is that the new regulations would push Title IX beyond what the Constitution allows.

These constitutional concerns warrant greater attention if the Department intends to defend its new rules as anything other than arbitrary. The bedrock principles of administrative law require that all Title IX regulations reasonably fit the statute's language after the "ordinary tools of statutory construction" have been brought to bear. *Air Transp. Ass'n of Am., Inc. v. USDA*, 37 F.4th 667, 672 (D.C. Cir. 2022). One of those tools is the canon of constitutional avoidance, which requires that statutes "be construed to avoid serious constitutional doubts," whenever possible. *Brawner v. Scott Cnty.*, 14 F.4th 585, 592 (6th Cir. 2021) (quoting *FCC v. Fox Televisions Stations, Inc.*, 556 U.S. 502, 516 (2009)). Yet the constitutional issues just discussed receive scant, if any, consideration in the Department's rulemaking proposal. We urge the Department to consider and address those issues or else abandon this rulemaking exercise.

---

[6] https://www.iwf.org/2022/08/16/bidens-new-title-ix-rules-deputize-teachers-to-override-parents-on-gender-identity/ (attached hereto as Exhibit F).

State of Tennessee Comments
ED-2021-OCR-0166
Page 8

## II.    The Department has ignored crucial policy issues that undermine its proposed rules.

Even if the Department could fit its new regulations within the proper constitutional and statutory boundaries, it still has not grappled with several knotty issues of policy.  In wielding its rulemaking authority, the Department must "'reasonably consider[] the relevant issues' and factors" bearing on its course, *Advocates*, 41 F.4th at 586 (quoting *Prometheus*, 141 S. Ct. at 1158), and it must draw "rational connection[s] between the facts" and its proposed rules, *id.* (quoting *State Farm*, 463 U.S. at 43).  The Proposal fails to do so in multiple critical respects.

### A.    The Department has not considered or addressed the difficulties of authenticating gender identity.

The Department's first and most fundamental error is a failure to consider how school administrators can put these new rules into practice.  Specifically, although the Department wants students to "participat[e] in … education program[s and] activit[ies] consistent with th[ier] gender identit[ies]," Proposal at 41,571 (proposed 34 C.F.R. § 106.31(a)(2)), it does not explain how school faculty should go about *determining* each student's gender identity.

That is no small feat.  As already mentioned, the proponents of transgender rights often stress that gender identity "differ[s] from sex" precisely because it cannot be "define[d]" or verified as a matter of "genetic[s]" or biology.  Zambon, *supra*.  Instead, gender identity comes from "the inside," and "only the person themselves can determine what their gender identity is."  *Id.*; *see also id.* ("The term gender identity refers to the personal sense of an individual's own gender."); Am. Psych. Ass'n, *Guidelines for Psychological Practice with Transgender and Gender Nonconforming People*, 70 Am. Psychologist 862 (Dec. 2015) ("[G]ender identity is internal ….").[7]    Although "[p]eople *may* use clothing, appearances, and behaviors to express the gender that they identify with," they also may not — it is up to them.  Zambon, *supra*.  In addition, and again unlike sex, gender identity cannot be "divided along the binary lines of 'man' and 'woman.'"  *Id.*  Instead, it is thought to exist on a "spectrum," from which a person may choose any number of gender identities — or none at all — and may alter that choice at a moment's notice, "shift[ing] between, or … outside of, society's expectations."  *Id.*; *accord* Jason Rafferty, *Ensuring Comprehensive Care & Support for Transgender & Gender-Diverse Children & Adolescents*, Pediatrics, Oct. 2018, at 2[8]; *see also* Zambon, *supra* (identifying and defining various gender identities, including "agender," "bigender," "omnigender," "polygender," "genderqueer," and "gender outlaw," to name just a few).

How, then, can teachers and school administrators determine and accommodate each student's gender identity?  Should students be required "to meet with … trained and licensed … counselors" and be assigned to sex-separated facilities, events, and activities on a "case-by-case basis"?  *Doe ex rel. Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518, 524 (3d Cir. 2018).  Or should faculty simply accept and rely on each student's own reporting of what it means to live "consistent with [that student's] gender identity"?  Proposal at 41,571 (proposed 34 C.F.R. § 106.31(a)(2)).  If the Department proposes the latter, then how (if at all) should schools account for a student's mental and emotional maturity or possible ulterior motives?  More pointedly, if *outwardly* identifying as a girl grants access to the girls' locker room after gym class, what will stop pubescent males from taking advantage of that means of

---

[7] https://www.apa.org/practice/guidelines/transgender.pdf (attached hereto as Exhibit G)
[8] https://perma.cc/EE6U-PN66 (attached hereto as Exhibit H).

State of Tennessee Comments
ED-2021-OCR-0166
Page 9

access? *Cf.* Expert Declaration and Report of Kenneth V. Lanning at 10, 13, *Carcaño v. McCrory*, 203 F. Supp. 3d 615 (M.D.N.C. 2016) (No. 1:16-cv-00236-TDS-JEP), ECF No. 149-14 [hereinafter "Lanning Report"] (attached hereto as Exhibit I) (noting that "some adolescent high school boys or college males … might want to get into the girls' locker room" without "realiz[ing] that such activity is illegal" or "consider[ing] its effect on victims," *id.* at 10). The Department's proposed rules seem to require "prompt and effective action" to enable that very scenario. Proposal at 41,572 (proposed 34 C.F.R. § 106.44(a)).

Unless the Department addresses this problem, it cannot claim to have "reasonably considered" every "relevant issue[]" arising from its Proposal. *Advocates*, 41 F.4th at 586 (quoting *Prometheus*, 141 S. Ct. at 1158). And until the Department can produce a cogent response, it should refrain from finalizing new rules.

### B.     The Department's proposal dismisses well-founded concerns regarding student and faculty safety.

On a related note, the Department has not adequately accounted for the risks these new regulations could pose to student and faculty safety. Schools at every level of the education system have long provided sex-separated facilities — including locker rooms, restrooms, and dormitories — as a means of protecting *all* students, staff, and visitors in their most vulnerable moments. But what makes these places private also makes them susceptible to abuse by bad actors. Public restrooms and locker rooms, in particular, have long been designed to feature deliberately obstructed sightlines, few entrances or exits, and a categorical exemption from most forms of surveillance. Add the fact that most people using these facilities are partially or completely undressed, and the potential for voyeurism, harassment, and even violent crime should be obvious.

Contrary to the Department's apparent assumptions, last year's nationally recognized story of a "15-year-old [Virginia] boy" who "sexually assault[ed] a female classmate in a school bathroom" was no anomaly. Laura Wainman & Nicole DiAntoniao, *Teen Boy Sexually Assaulted Classmate in a School Bathroom, Judge Says*, WUSA 9 (Oct. 26, 2021).[9] News reports and court records have long illustrated the unfortunate truth "that public toilets … are often the locale of [numerous crimes]," *People v. Young*, 214 Cal. App. 2d 131, 135 (Cal. Dist. Ct. App. 1963), specifically because they provide offenders the opportunity to "seek out victims in a planned and deliberate way," Expert Opinion of Sheriff Tim Hutchinson (Retired) at 6, *Carcaño*, ECF No. 149-15 [hereinafter "Hutchinson Report"] (attached hereto as Exhibit K). Take, for example, the recent report from Detroit of a fifteen-year-old male suspect "hid[ing] inside a stall" in a women's restroom "for about 20 minutes" before attacking a twenty-nine-year-old female. *See, e.g.*, Amber Ainsworth, *15-Year-Old Boy Charged After Trying to Sexually Assault Woman in Downtown Plymouth Public Bathroom*, Fox 2 Detroit (Nov. 24, 2021).[10] And the sixteen-year-old Michigan girl allegedly groped by "a man [who] came up behind her in the women's bathroom" at a bookstore. Roxanne Werly, *Surveillance Video Released Following Alleged Bathroom Assault*,

---

[9] https://www.wusa9.com/article/news/legal/teen-found-guilty-loudoun-county-bathroom-sexual-assault/65-e383c241-afd1-4539-8fa3-4ccb01562ea9 (attached hereto as Exhibit J).
[10] https://www.fox2detroit.com/news/15-year-old-boy-charged-after-trying-to-sexually-assault-woman-in-downtown-plymouth-public-bathroom (attached hereto as Exhibit L).

State of Tennessee Comments
ED-2021-OCR-0166
Page 10

UpNorthLive (Nov. 9, 2017).[11] And the seven-year-old San Francisco girl accosted by a male suspect "in the female restroom at [a public] park." Nick Smith, *Young Girl Assaulted in SF Park Bathroom*, ABC 7 News (Nov. 22, 2014).[12] And the Los Angeles man who reportedly "walked into the women's restroom" at a restaurant "and sexually assaulted" a ten-year-old "as she got out of a stall." Juan Flores, *Man Sought in Sexual Assault of Girl, 10, in Denny's Restroom*, DTLA 5 Morning News (updated Jan. 7, 2014).[13] And the nightmare experienced by the eight-year-old Oklahoma girl locked inside a restroom by "a mostly naked man" who reportedly "got between her and the door[,] … wrapped a … coat around her neck[,] and began choking her." *Update: Homeless Man Suspected of Attacking Child in Gas Station Bathroom*, Oklahoma's News 4 (Sept. 16, 2013).[14] In each of those instances, and countless others, *see, e.g.*, Hutchinson Report at 7–8, 20–23, a male perpetrator exploited a bathroom's privacy-enhancing features to prey on a vulnerable female victim.

The Department nonetheless fails to recognize that its new rules will *enable* this nefarious conduct. At present, a woman encountering a male in a "sex-segregated space … do[es] not have to wait until the man has already assaulted her before she can fetch security." Cambridge Radical Feminist Network, *There Is Nothing Progressive About Removing Women-Only Bathrooms*, Medium (Jan. 13, 2019) [hereinafter "CRFM"].[15] But if a person's self-report (and potentially multifaceted or shifting) gender identity can determine the bathrooms he may use, that safety valve will be bolted shut. *See id.* Some women may not even have recourse *following* abuse if their male perpetrators had every right to be present, expose themselves, or witness others changing in a restroom or locker room space. *See, e.g.*, *Man in Women's Locker Room Cites Gender Rule*, King 5 Seattle (Feb. 16, 2016).[16] In fact, the victims of voyeurism might not even realize when it has occurred or have any hope of identifying a suspect afterwards. *See, e.g.*, *Man Dressed as Woman Arrested for Spying into Mall Bathroom Stall, Police Say*, 4 Washington (last updated Nov. 18, 2015).[17]

Given that "children often delay reporting of sexual abuse until adulthood" and "only about 30% of sex crimes are reported overall," Hutchinson Report at 10, the Department cannot credibly dismiss these security concerns as "unsubstantiated," Proposal at 41,535; *see also* Hutchinson Report at 11 (noting additional reasons why schools and localities may not observe "an increase in reported offenses" following implementation of a gender-identity-based bathroom policy, including the ever-

---

[11] https://upnorthlive.com/news/local/gallery/surveillance-video-released-following-bathroom-assault (attached hereto as Exhibit M).

[12] https://abc7news.com/sfpd-search-suspect-man/407219/ (attached hereto as Exhibit N).

[13] https://ktla.com/news/man-sought-in-sexual-assault-of-girl-10-in-palmdale-restroom/ (attached hereto as Exhibit O).

[14] https://kfor.com/news/police-okc-homeless-man-attacks-8-year-old-girl-in-bathroom/ (attached hereto as Exhibit P).

[15] https://medium.com/@camradfems/there-is-nothing-progressive-about-removing-women-only-bathrooms-37729064cfb7 (attached hereto as Exhibit Q).

[16] https://www.king5.com/article/news/local/seattle/man-in-womens-locker-room-cites-gender-rule/281-65533111 (attached hereto as Exhibit R).

[17] https://www.nbcwashington.com/news/local/man-dressed-as-woman-arrested-for-spying-into-mall-bathroom-stall-police-say/1979764/#:~:text=Richard%20Rodriguez%2C%2030%2C%20filmed%20a,been%20filming%20her%2C%20police%20said (attached hereto as Exhibit S).

State of Tennessee Comments
ED-2021-OCR-0166
Page 11

present incentive "to minimize the appearance of a sex offense problem"); Lanning Report at 10–11 (explaining the many reasons why "nuisance" sex offenses go unreported, unrecorded, uninvestigated, and unprosecuted). Rather, they are the factually grounded and predictable outgrowth of an all-comers approach to bathrooms and other living facilities. And although "many women and young children would choose to leave a facility without reporting a sex offense, the scars from the crime would live on forever with these victims." Hutchinson Report at 11.

The Department will doubtless respond that these crimes can occur with or without sex-segregated living spaces. It may even note that most sexual crimes and offenses against children occur at home, not in public restrooms or locker rooms. Respectfully, that is no response at all. The problem with the Proposal is *not* that it fails to prevent these crimes in all instances; the problem with the Proposal is that it demonstrably *facilitates* these crimes in at least *some* instances by stripping away crucial safeguards. "[E]xisting trespassing, indecent exposure, peeping and other laws deter at least some" of the abovementioned offenses if and when facilities have clear and enforced sex designations. *Id.* But "[i]f someone c[an] enter a public facility based entirely upon their 'internal sense of gender,' then law enforcement personnel, bystanders, and potential victims would have to be able to read minds … to determine whether a man entering a women's facility was really transgender or was instead there to commit a sex offense." *Id.* And even after an incident — particularly voyeurism or exposure — has occurred, "offenders aren't as likely to be observed by or reported to police." *Id.*; *see id.* at 12.

Nor can the Department counter with any hard, contradictory data to allay these concerns. The law requires the Department to identify "the most critical factual material … used to support" its new rules *before* they are finalized, specifically for the purpose of "expos[ing]" such material "to refutation" in the public comment process. *Chamber of Com. of U.S. v. SEC*, 443 F.3d 890, 900 (D.C. Cir. 2006) (quoting *Ass'n of Data Processing Serv. Orgs., Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 745 F.2d 677, 684 (D.C. Cir. 1984)). "An agency commits serious procedural error when it fails to reveal … the technical basis for a proposed rule in time to allow for meaningful commentary." *Connecticut Light & Power Co. v. NRC*, 673 F.2d 525, 530–31 (D.C. Cir. 1982). In this instance, the Department has declined to provide any credible empirical analysis supporting its new policies. That silence speaks volumes. Indeed, how can the Department conclude that "the benefits" of these new rules "far outweigh [their] estimated costs," Proposal at 41,547, when it fails to account for even the possibility that abolishing sex-separated facilities could increase crime and deter students and faculty from using public accommodations? *See id.* at 41,561.

### C.    The Department has not adequately accounted for the sex-based discrimination that will *result* from its proposed rule.

Finally, the Department has all but ignored the discrimination its new rules will visit on Title IX's primary intended beneficiaries: female students. Despite generally prohibiting invidious sex-based discrimination, the law has long preserved certain female-only spaces and activities precisely because they *benefit* female students and enrich their educational experiences. *See* 20 U.S.C. § 1681(a)(1)–(9); *id.* § 1686; *see also* Proposal at 41,534 ("The Department's regulations have recognized limited contexts in which recipients are permitted to employ sex-specific rules or to separate students on the basis of sex because the Department has determined that in those contexts such treatment does not generally impose harm on students." (citing 34 CFR §§ 106.33, 106.34(a)(3))). If male students can nonetheless enter those same spaces and engage in those same activities by merely professing a particular gender identity, female students will necessarily be harmed.

State of Tennessee Comments
ED-2021-OCR-0166
Page 12

*First*, female students will suffer mental, emotional, and developmental harm from the loss of female-only dormitories, bathrooms, locker rooms, and showers. "[L]eaving aside the risk of assault, sex-segregated bathrooms give women the peace of mind of knowing they can use the bathroom, attend to their menstrual needs and to small children, with a degree of privacy and dignity that would otherwise not exist." CRFM, *supra*. And the loss of that private space will fall most heavily on "those individuals who — due to having a history of sexual assault, or for religious reasons — do not feel comfortable using a shared intimate space with male strangers." *Id.* Some female students may thus feel compelled to avoid certain bathrooms and other facilities, or even school altogether, which would undermine Title IX's principal aim. This concern is not hypothetical. By way of example, a group of young female students in Nebraska recently walked out of their high school classes to protest the loss of their sex-segregated bathrooms under a policy inspired by the statements of this Department. *See* Tara Campbell, *Transgender Rights Clash Prompts Walkout at CB Abraham Lincoln High*, 6 News WOWT (Apr. 11, 2019).[18] Yet the Department's proposal does not acknowledge this issue, much less explain why the purported interest of transgender students should take precedence over the interest of the female students that Title IX was enacted to serve.

*Second*, female students will be deprived of opportunities to participate in safe and fair athletics. The Department once championed those opportunities, *see, e.g.*, U.S. Dep't of Ed., *Athletics* (last visited Sept. 8, 2022),[19] and its Proposal apparently contemplates a separate rulemaking on "the question of what criteria, if any, [schools] should be permitted to use to establish students' eligibility to participate on a particular male or female athletics team," Proposal at 41,537. Nevertheless, an overarching policy allowing all students to "participat[e] in" school "program[s and] activit[ies] consistent with th[eir] gender identity" could effectively guarantee male students an absolute right to play women's sports. Proposal at 41,571. That is not fair to female athletes.

Following puberty, in particular, the androgenized bodies of male athletes give them "categorically different strength, speed, and endurance" as measured by both elite and average performance. Doriane Lambelet Coleman & Wickliffe Shreve, Comparing Athletic Performances the Best Women to Boys and Men (last visited Sept. 9, 2022)[20]; *see also* Lydia C. Hallam & Fabiano T. Amorim, *Expanding the Gap: an Updated Look into Sex Differences in Running Performance*, Frontiers in Physiology, Jan. 2022, at 2 (explaining that "[t]he sex gap in sports performance is primarily rooted in biological differences between the sexes, namely in relation to male[s'] superior skeletal muscle mass, oxidative capacities and lower fat mass").[21] To illustrate, the Olympic gold medalist Tori Bowie — an incredible female sprinter — has run the one-hundred-meters in a lifetime-best 10.78 seconds. *Id.* In 2017, no fewer than 15,000 male runners beat that mark in recorded competition. *Id.* That example "is far from the exception. It's the rule." *Id.* In fact, "the sex gap is smaller between elite males and females compared to sub-elite and recreational runners." Hallam & Amorim, *supra*. And it persists "across sporting

---

[18] https://www.wowt.com/content/news/Transgender-rights-clash-prompts-walkout-at-CB-Abraham-Lincoln-High-508449271.html (attached hereto as Exhibit T).

[19] https://www2.ed.gov/about/offices/list/ocr/frontpage/pro-students/issues/sex-issue04.html (attached hereto as Exhibit U).

[20] https://law.duke.edu/sites/default/files/centers/sportslaw/comparingathleticperformances.pdf (attached hereto as Exhibit V).

[21] https://www.frontiersin.org/articles/10.3389/fphys.2021.804149/full (attached hereto as Exhibit W).

State of Tennessee Comments
ED-2021-OCR-0166
Page 13

events," with "the best male athletes consistently outperform[ing] their female peers" by anywhere "between 5 and 17%, depending on the sporting discipline, event duration and competitive standard." *Id.* Both the National Collegiate Athletic Association and the U.S. Olympic and Paralympic Committee have recognized this, which is why those organizations seek to "balanc[e] fairness, inclusion and safety for all who compete" by limiting the participation of transgender athletes based on testosterone levels. *Board of Governors Updates Transgender Participation Policy*, NCAA Media Center (Jan. 19, 2022).[22]

The Department's rules, by contrast, could push schools to allow students to choose their sports and teams based on self-reported gender identity alone. *See* Proposal at 41,571 (proposed 34 C.F.R. § 106.31(a)(2)). The result would threaten decades worth of gains in women's athletics and all the character-building benefits that have come along with those gains. For every male athlete permitted in women's competition, a female athlete is denied that same opportunity. *See* Editorial Staff, *16 Penn Swim Team Members Ask School, Ivy League to Refrain from Litigation to Allow Lia Thomas to Race at NCAAs*, Swimming World (Feb. 3, 2022).[23] For every male athlete who sets a new women's performance record, a female predecessor is robbed of a signature achievement. *See id.* And for every new policy implemented to ensure these results, legions of female athletes are affirmed in their belief that speaking out for their own rights and interests will only invite hostility and ridicule. *See id.*

Again, the Department has not delineated clear limits to its new policies. *See supra* at 5. But if its past pronouncements are any indication, it would rather dictate orthodoxy with respect to gender identity than actually prohibit discrimination in education on the basis of sex. Be that as it may, the law requires the Department to reason through the abovementioned issues before promulgating its new rules. To do any less would be an arbitrary and capricious exercise of administrative power and would have no legitimacy in our constitutional system.

\* \* \*

Thank you, again, for your consideration of these concerns. Any further failure to "clearly disclose[]" or "adequately sustain[]" the new rules, especially in light of the deficiencies detailed above, will justify Tennessee and the co-signing States in taking further action to protect their citizens' rights and interests under the Administrative Procedure Act. *Oncor Elec. Delivery Co. LLC v. NLRB*, 887 F.3d 488, 493 (D.C. Cir. 2018) (quoting *SEC v. Chenery Corp.*, 318 U.S. 80, 94 (1943)); *see also Cytori Therapeutics, Inc. v. FDA*, 715 F.3d 922, 926 (D.C. Cir. 2013) (noting that agency action must be both "reasonable and reasonably explained" (citing *Motor Vehicle Manufacturers Assn. v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29 (1983)). We therefore urge the Department to comply with the law or else abandon this misguided rulemaking.

---

[22] https://www.ncaa.org/news/2022/1/19/media-center-board-of-governors-updates-transgender-participation-policy.aspx (attached hereto as Exhibit X).
[23] https://www.swimmingworldmagazine.com/news/penn-swim-team-members-ask-school-ivy-league-to-refrain-from-litigation-to-allow-lia-thomas-to-race-at-ncaas/ (attached hereto as Exhibit Y).

State of Tennessee Comments
ED-2021-OCR-0166
Page 14

Sincerely,

Jonathan Skrmetti
Tennessee Attorney General & Reporter

Steve Marshall
Alabama Attorney General

Treg R. Taylor
Alaska Attorney General

Mark Brnovich
Arizona Attorney General

Leslie C. Rutledge
Arkansas Attorney General

Chris Carr
Georgia Attorney General

Todd Rokita
Indiana Attorney General

Derek Schmidt
Kansas Attorney General

Daniel Cameron
Kentucky Attorney General

Jeff Landry
Louisiana Attorney General

Lynn Fitch
Mississippi Attorney General

Austin Knudsen
Montana Attorney General

Douglas J. Peterson
Nebraska Attorney General

State of Tennessee Comments
ED-2021-OCR-0166
Page 15

John M. O'Conner
Oklahoma Attorney General

Alan Wilson
South Carolina Attorney General

Mark Vargo
South Dakota Attorney General

Ken Paxton
Texas Attorney General

Sean D. Reyes
Utah Attorney General

Jason S. Miyares
Virginia Attorney General

Patrick Morrisey
West Virginia Attorney General

 **U.S. Equal Employment Opportunity Commission**

# Sexual Orientation and Gender Identity (SOGI) Discrimination

In *Bostock v. Clayton County, Georgia,* No. 17-1618 (S. Ct. June 15, 2020),**[1]** the Supreme Court held that firing individuals because of their sexual orientation or transgender status violates Title VII's prohibition on discrimination because of sex. The Court reached its holding by focusing on the plain text of Title VII. As the Court explained, "discrimination based on homosexuality or transgender status necessarily entails discrimination based on sex; the first cannot happen without the second." For example, if an employer fires an employee because she is a woman who is married to a woman, but would not do the same to a man married to a woman, the employer is taking an action because of the employee's sex because the action would not have taken place but for the employee being a woman. Similarly, if an employer fires an employee because that person was identified as male at birth but uses feminine pronouns and identifies as a female, the employer is taking action against the individual because of sex since the action would not have been taken but for the fact the employee was originally identified as male.

The Court also noted that its decision did not address various religious liberty issues, such as the First Amendment, Religious Freedom Restoration Act, and exemptions Title VII provides for religious employers.

# SOGI Discrimination & Work Situations

The law forbids sexual orientation and gender identity discrimination when it comes to any aspect of employment, including hiring, firing, pay, job assignments, promotions, layoff, training, fringe benefits, and any other term or condition of employment.

# SOGI Discrimination & Harassment

It is unlawful to subject an employee to workplace harassment that creates a hostile work environment based on sexual orientation or gender identity. Harassment can include, for example, offensive or derogatory remarks about sexual orientation (e.g., being gay or straight). Harassment can also include, for example, offensive or derogatory remarks about a person's transgender status or gender transition.

Although accidental misuse of a transgender employee's name and pronouns does not violate Title VII, intentionally and repeatedly using the wrong name and pronouns to refer to a transgender employee could contribute to an unlawful hostile work environment.

While the law doesn't prohibit simple teasing, offhand comments, or isolated incidents that aren't very serious, harassment is unlawful when it is so frequent or severe that it creates a hostile work environment or when it results in an adverse employment decision (such as the victim being fired or demoted).

The harasser can be the victim's supervisor, a supervisor in another area, a co-worker, or someone who is not an employee of the employer, such as a client or customer.

# SOGI Discrimination & Employment Policies/Practices

As a general matter, an employer covered by Title VII is not allowed to fire, refuse to hire, or take assignments away from someone (or discriminate in any other way)

because customers or clients would prefer to work with people who have a different sexual orientation or gender identity. Employers also are not allowed to segregate employees based on actual or perceived customer preferences. (For example, it would be discriminatory to keep LGBTQ+ employees out of public-facing positions, or to direct these employees toward certain stores or geographic areas.)

Prohibiting a transgender person from dressing or presenting consistent with that person's gender identity would constitute sex discrimination.

Courts have long recognized that employers may have separate bathrooms, locker rooms, and showers for men and women, or may choose to have unisex or single-use bathrooms, locker rooms, and showers. The **Commission has taken the position (https://www.eeoc.gov/sites/default/files/migrated_files/decisions/0120133395.txt)** that employers may not deny an employee equal access to a bathroom, locker room, or shower that corresponds to the employee's gender identity. In other words, if an employer has separate bathrooms, locker rooms, or showers for men and women, all men (including transgender men) should be allowed to use the men's facilities and all women (including transgender women) should be allowed to use the women's facilities.

# SOGI Discrimination & Retaliation

It is illegal for an employer to retaliate against, harass, or otherwise punish any employee for:

- opposing employment discrimination that the employee reasonably believed was unlawful;

- filing an EEOC charge or complaint;

- or participating in any investigation, hearing, or other proceeding connected to Title VII enforcement.

Retaliation is anything that would be reasonably likely to discourage workers from protesting discrimination.

AR_270756

# Laws the Commission Enforces

- 42 U.S.C. § 2000e-2 (Section 703)

  This is the section of the law that was at issue in *Bostock* and applies to the private sector, state and local governments, employment agencies, and labor organizations. *Bostock* made clear that section 703's prohibition of discrimination based on sex includes sexual orientation and transgender status.

- 42 U.S.C. § 2000e-16 (Section 717)

  Section 717 covers employees of the federal government. The Commission has applied *Bostock* in federal sector decisions under section 717. (See **https://www.eeoc.gov/federal-sector/reports/federal-sector-cases-involving-transgender-individuals (https://www.eeoc.gov/federal-sector/reports/federal-sector-cases-involving-transgender-individuals)** .)

# What to Do if You Think You Have Been Discriminated Against

If you believe you have been discriminated against, you may take action to protect your rights under Title VII by filing a complaint:

- **Private sector and state/local government employees** may file a charge of discrimination by contacting the EEOC at 1-800-669-4000 or going to **https://www.eeoc.gov/how-file-charge-employment-discrimination (https://www.eeoc.gov/how-file-charge-employment-discrimination)** .

- **Federal government employees** may initiate the complaint process by contacting an EEO counselor at your agency; more information is available at **https://www.eeoc.gov/federal-sector/overview-federal-sector-eeo-complaint-process (https://www.eeoc.gov/federal-sector/overview-federal-sector-eeo-complaint-process)** .

# Other Laws

Other laws that also may apply:

- Federal contractors and sub-contractors are covered by a separate, explicit prohibition on transgender or sexual orientation discrimination in employment pursuant to Executive Order (E.O.) 13672 enforced by the U.S. Department of Labor's **Office of Federal Contract Compliance Programs (https://www.dol.gov/agencies/ofccp)** .

- State or local fair employment laws also may prohibit discrimination based on sexual orientation or transgender status.  Contact information for state and local fair employment agencies can be found on the page for EEOC's **field office (https://www.eeoc.gov/field-office)** covering that state or locality.

[**1**] This also served as the decision for *Altitude Express, Inc., et al. v. Zarda et al.* (No. 17–1623) and *R. G. & G. R. Harris Funeral Homes, Inc. v. EEOC et al.* (No. 18–107).



**([https://www.eeoc.gov/sites/default/files/2022-06/LGBTQI%20Civil%20Rights%20Infographic.pdf](https://www.eeoc.gov/sites/default/files/2022-06/LGBTQI%20Civil%20Rights%20Infographic.pdf))**

*Download Infographic (PDF)* **([https://www.eeoc.gov/sites/default/files/2022-06/LGBTQI%20Civil%20Rights%20Infographic.pdf](https://www.eeoc.gov/sites/default/files/2022-06/LGBTQI%20Civil%20Rights%20Infographic.pdf))**

# From the EEOC Newsroom

**A Message from EEOC Chair Charlotte A. Burrows for 2024 Pride Month (https://www.eeoc.gov/wysk/message-eeoc-chair-charlotte-burrows-2024-pride-month)**

**EEOC Sues Two Employers for Sex Discrimination (https://www.eeoc.gov/newsroom/eeoc-sues-two-employers-sex-discrimination)**

**Honolulu Restaurant and HR Company to Pay $115,000 in EEOC Sexual Harassment Lawsuit (https://www.eeoc.gov/newsroom/honolulu-restaurant-and-hr-company-pay-115000-eeoc-sexual-harassment-lawsuit)**

**Columbia River Healthcare to Settle EEOC Harassment Charge (https://www.eeoc.gov/newsroom/columbia-river-healthcare-settle-eeoc-harassment-charge)**

**Amerigo Italian Restaurant Owner Companies Pay $60,000 in EEOC Discrimination Suit (https://www.eeoc.gov/newsroom/amerigo-italian-restaurant-owner-companies-pay-60000-eeoc-discrimination-suit)**

**TA Dedicated to Pay $460,000 in EEOC Sexual Orientation and Retaliation Suit (https://www.eeoc.gov/newsroom/ta-dedicated-pay-460000-eeoc-sexual-orientation-and-retaliation-suit)**

**EEOC Sues Sis-Bro, Inc. for Gender Identity Discrimination and Harassment (https://www.eeoc.gov/newsroom/eeoc-sues-sis-bro-inc-gender-identity-discrimination-and-harassment)**

**Sandia Transportation Reaches $97,500 Settlement with EEOC in Harassment Case (https://www.eeoc.gov/newsroom/sandia-transportation-reaches-97500-settlement-eeoc-harassment-case)**

**T.C. Wheelers to Pay $25,000 to Settle EEOC Sex Harassment Lawsuit (https://www.eeoc.gov/newsroom/tc-wheelers-pay-25000-settle-eeoc-sex-harassment-lawsuit)**

**EEOC Sues Mariscos El Puerto and La Catrina for Sexual Harassment, Discrimination, and Harassment Against Gay and Lesbian Worker (https://www.eeoc.gov/newsroom/eeoc-sues-mariscos-el-puerto-and-la-catrina-sexual-harassment-discrimination-and)**

**EEOC Sues Culver's Restaurants of Cottage Grove for Multiple Forms of Harassment (https://www.eeoc.gov/newsroom/eeoc-sues-culvers-restaurants-cottage-grove-multiple-forms-harassment)**

# Employer Coverage

15 or more employees

# Time Limits

180 days to **file a charge (https://www.eeoc.gov/employees/charge.cfm)** *(may be extended by state laws)*

Federal employees have 45 days to **contact an EEO Counselor (https://www.eeoc.gov/federal/fed_employees/complaint_overview.cfm)**

# For more information, see:

- Supreme Court Decision in ***Bostock v Clayton County* (https://www.supremecourt.gov/opinions/19pdf/17-1618_hfci.pdf)**

- **Title VII of the Civil Rights Act of 1964 (https://www.eeoc.gov/laws/statutes/titlevii.cfm)**

- **FAQs on Sex Discrimination (including Sexual Orientation and Gender Identity discrimination) (https://www.eeoc.gov/laws/guidance/sex-discrimination)**

- **Fact Sheet: Facility/Bathroom Access and Gender Identity (https://www.eeoc.gov/laws/guidance/fact-sheet-facilitybathroom-access-and-gender-identity)**

- **Youth@Work: FAQs on Sex Discrimination (including Sexual Orientation and Gender Identity discrimination) (https://www.eeoc.gov/youth/sex-discrimination-faqs)**

# EEOC Enforcement & Litigation

- **Statistics (https://www.eeoc.gov/statistics/lgbtq-based-sex-discrimination-charges)**

- **Fact Sheet: Notable EEOC Litigation Regarding Title VII & Discrimination Based on Sexual Orientation and Gender Identity (https://www.eeoc.gov/fact-sheet-notable-eeoc-litigation-regarding-title-vii-discrimination-based-sexual-orientation-and)**

# Resources for Federal Employees

- **EEOC, MSPB, OPM, & OSC -- Addressing Sexual Orientation and Gender Identity Discrimination in Federal Civilian Employment (https://op.bna.com/gr.nsf/id/llbe-9x5qcw/$File/OPM%20EEOC%20MSPB%20OSC%20Guide.pdf)**

- **EEOC -- Processing EEO Discrimination Complaints Involving SOGI Discrimination Filed By Federal Employees (https://www.eeoc.gov/federal-sector/management-directive/processing-complaints-discrimination-lesbian-gay-bisexual-and)**

- **EEOC -- Federal-Sector EEO Cases Involving Sexual Orientation or Gender Identity (SOGI) Discrimination (https://www.eeoc.gov/federal-sector/federal-sector-eeo-cases-involving-sexual-orientation-or-gender-identity-sogi)**

- **EEOC -- Discrimination in Federal Government Based on Marital Status, Political Affiliation, Status as a Parent, Sexual Orientation, and Gender Identity (https://www.eeoc.gov/federal-sector/facts-about-discrimination-federal-government-employment-based-marital-status)**

- Executive Orders **13087 (https://www.eeoc.gov/executive-order-13087)** & **13672 (https://www.govinfo.gov/content/pkg/CFR-2015-title3-vol1/pdf/CFR-2015-title3-vol1-eo13672.pdf)**

INTERNATIONAL JOURNAL OF TRANSGENDER HEALTH
2022, VOL. 23, NO. S1, S1–S258
https://doi.org/10.1080/26895269.2022.2100644

REPORT



&#128275; OPEN ACCESS    Check for updates

# Standards of Care for the Health of Transgender and Gender Diverse People, Version 8

E. Coleman[1], A. E. Radix[2,3], W. P. Bouman[4,5], G. R. Brown[6,7], A. L. C. de Vries[8,9], M. B. Deutsch[10,11], R. Ettner[12,13], L. Fraser[14], M. Goodman[15], J. Green[16], A. B. Hancock[17], T. W. Johnson[18], D. H. Karasic[19,20], G. A. Knudson[21,22], S. F. Leibowitz[23], H. F. L. Meyer-Bahlburg[24,25], S. J. Monstrey[26], J. Motmans[27,28], L. Nahata[29,30], T. O. Nieder[31], S. L. Reisner[32,33], C. Richards[34,35], L. S. Schechter[36], V. Tangpricha[37,38], A. C. Tishelman[39], M. A. A. Van Trotsenburg[40,41], S. Winter[42], K. Ducheny[43], N. J. Adams[44,45], T. M. Adrián[46,47], L. R. Allen[48], D. Azul[49], H. Bagga[50,51], K. Başar[52], D. S. Bathory[53], J. J. Belinky[54], D. R. Berg[55], J. U. Berli[56], R. O. Bluebond-Langner[57,58], M.-B. Bouman[9,59], M. L. Bowers[60,61], P. J. Brassard[62,63], J. Byrne[64], L. Capitán[65], C. J. Cargill[66], J. M. Carswell[32,67], S. C. Chang[68], G. Chelvakumar[69,70], T. Corneil[71], K. B. Dalke[72,73], G. De Cuypere[74], E. de Vries[75,76], M. Den Heijer[9,77], A. H. Devor[78], C. Dhejne[79,80], A. D'Marco[81,82], E. K. Edmiston[83], L. Edwards-Leeper[84,85], R. Ehrbar[86,87], D. Ehrensaft[19], J. Eisfeld[88], E. Elaut[74,89], L. Erickson-Schroth[90,91], J. L. Feldman[92], A. D. Fisher[93], M. M. Garcia[94,95], L. Gijs[96], S. E. Green[97], B. P. Hall[98,99], T. L. D. Hardy[100,101], M. S. Irwig[32,102], L. A. Jacobs[103], A. C. Janssen[23,104], K. Johnson[105,106], D. T. Klink[107,108], B. P. C. Kreukels[9,109], L. E. Kuper[110,111], E. J. Kvach[112,113], M. A. Malouf[114], R. Massey[115,116], T. Mazur[117,118], C. McLachlan[119,120], S. D. Morrison[121,122], S. W. Mosser[123,124], P. M. Neira[125,126], U. Nygren[127,128], J. M. Oates[129,130], J. Obedin-Maliver[131,132], G. Pagkalos[133,134], J. Patton[135,136], N. Phanuphak[137], K. Rachlin[103], T. Reed[138†], G. N. Rider[55], J. Ristori[93], J. Robbins-Cherry[4], S. A. Roberts[32,139], K. A. Rodriguez-Wallberg[140,141], S. M. Rosenthal[142,143], K. Sabir[144], J. D. Safer[60,145], A. I. Scheim[146,147], L. J. Seal[35,148], T. J. Sehoole[149], K. Spencer[55], C. St. Amand[150,151], T. D. Steensma[9,109], J. F. Strang[152,153], G. B. Taylor[154], K. Tilleman[155], G. G. T'Sjoen[74,156], L. N. Vala[157], N. M. Van Mello[9,158], J. F. Veale[159], J. A. Vencill[160,161], B. Vincent[162], L. M. Wesp[163,164], M. A. West[165,166] and J. Arcelus[5,167]

[1]Institute for Sexual and Gender Health, Department of Family Medicine and Community Health, University of Minnesota Medical School, Minneapolis, MN, USA; [2]Callen-Lorde Community Health Center, New York, NY, USA; [3]Department of Medicine, NYU Grossman School of Medicine, New York, NY, USA; [4]Nottingham Centre for Transgender Health, Nottingham, UK; [5]School of Medicine, University of Nottingham, Nottingham, UK; [6]James H. Quillen College of Medicine, East Tennessee State University, Johnson City, TN, USA; [7]James H. Quillen VAMC, Johnson City, TN, USA; [8]Department of Child and Adolescent Psychiatry, Amsterdam UMC Location Vrije Universiteit Amsterdam, Amsterdam, Netherlands; [9]Center of Expertise on Gender Dysphoria, Amsterdam UMC Location Vrije Universiteit Amsterdam, Amsterdam, The Netherlands; [10]Department of Family & Community Medicine, University of California—San Francisco, San Francisco, CA, USA; [11]UCSF Gender Affirming Health Program, San Francisco, CA, USA; [12]New Health Foundation Worldwide, Evanston, IL, USA; [13]Weiss Memorial Hospital, Chicago, IL, USA; [14]Independent Practice, San Francisco, CA, USA; [15]Emory University Rollins School of Public Health, Atlanta, GA, USA; [16]Independent Scholar, Vancouver, WA, USA; [17]The George Washington University, Washington, DC, USA; [18]Department of Anthropology, California State University, Chico, CA, USA; [19]University of California San Francisco, San Francisco, CA, USA; [20]Independent Practice at dankarasic.com; [21]University of British Columbia, Vancouver, Canada; [22]Vancouver Coastal Health, Vancouver, Canada; [23]Ann & Robert H. Lurie Children's Hospital of Chicago, Chicago, IL, USA; [24]New York State Psychiatric Institute, New York, NY, USA; [25]Department of Psychiatry, Columbia University, New York, NY, USA; [26]Ghent University Hospital, Gent, Belgium; [27]Transgender Infopunt, Ghent University Hospital, Gent, Belgium; [28]Centre for Research on Culture and Gender, Ghent University, Gent, Belgium; [29]Department of Pediatrics, The Ohio State University College of Medicine, Columbus, OH, USA; [30]Endocrinology and Center for Biobehavioral Health, The Abigail Wexner Research Institute at Nationwide Children's Hospital, Columbus, OH, USA; [31]University Medical Center Hamburg-Eppendorf, Interdisciplinary Transgender Health Care Center Hamburg, Institute for Sex Research, Sexual Medicine and Forensic Psychiatry, Hamburg, Germany; [32]Harvard Medical School, Boston, MA, USA; [33]Harvard T. H. Chan School of Public Health, Boston, MA, USA; [34]Regents University London, UK; [35]Tavistock and Portman NHS Foundation Trust, London, UK; [36]Rush University Medical Center, Chicago, IL, USA; [37]Division of Endocrinology, Metabolism & Lipids, Department of Medicine, Emory University School of Medicine, Atlanta, GA, USA; [38]Atlanta VA Medical Center, Decatur, GA, USA; [39]Boston College, Department of Psychology and Neuroscience, Chestnut Hill, MA, USA; [40]Bureau GenderPRO, Vienna, Austria; [41]University Hospital Lilienfeld—St. Pölten, St. Pölten, Austria; [42]School of Population Health, Curtin University, Perth, WA, Australia; [43]Howard Brown Health, Chicago, IL, USA; [44]University of Toronto, Ontario Institute for Studies in Education, Toronto, Canada; [45]Transgender Professional Association for Transgender Health (TPATH); [46]Asamblea Nacional de Venezuela, Caracas, Venezuela; [47]Diverlex Diversidad e Igualdad a Través de la Ley, Caracas, Venezuela;

CONTACT Dr Eli Coleman, PhD &#9993; Institute for Sexual and Gender Health, Department of Family Medicine and Community Health, University of Minnesota Medical School, Minneapolis, MN, USA
†Deceased.

© 2022 The Author(s). Published with license by Taylor & Francis Group, LLC.
This is an Open Access article distributed under the terms of the Creative Commons Attribution-NonCommercial-NoDerivatives License (http://creativecommons.org/licenses/by-nc-nd/4.0/), which permits non-commercial re-use, distribution, and reproduction in any medium, provided the original work is properly cited, and is not altered, transformed, or built upon in any way.

[48]University of Nevada, Las Vegas, NV, USA; [49]La Trobe Rural Health School, La Trobe University, Bendigo, Australia; [50]Monash Health Gender Clinic, Melbourne, Victoria, Australia; [51]Monash University, Melbourne, Victoria, Australia; [52]Department of Psychiatry, Hacettepe University, Ankara, Turkey; [53]Independent Practice at Bathory International PLLC, Winston-Salem, NC, USA; [54]Durand Hospital, Guemes Clinic and Urological Center, Buenos Aires, Argentina; [55]National Center for Gender Spectrum Health, Institute for Sexual and Gender Health, Department of Family Medicine and Community Health, University of Minnesota Medical School, Minneapolis, MN, USA; [56]Oregon Health & Science University, Portland, OR, USA; [57]NYU Langone Health, New York, NY, USA; [58]Hansjörg Wyss Department of Plastic Surgery, New York, NY, USA; [59]Department of Plastic Surgery, Amsterdam UMC Location Vrije Universiteit Amsterdam, , Amsterdam, Netherlands; [60]Icahn School of Medicine at Mount Sinai, New York, NY, USA; [61]Mills-Peninsula Medical Center, Burlingame, CA, USA; [62]GrS Montreal, Complexe CMC, Montreal, Quebec, Canada; [63]Université de Montreal, Quebec, Canada; [64]University of Waikato/Te Whare Wānanga o Waikato, Hamilton/Kirikiriroa, New Zealand/Aotearoa; [65]The Facialteam Group, Marbella International Hospital, Marbella, Spain; [66]Independent Scholar; [67]Boston's Children's Hospital, Boston, MA, USA; [68]Independent Practice, Oakland, CA, USA; [69]Nationwide Children's Hospital, Columbus, OH, USA; [70]The Ohio State University, College of Medicine, Columbus, OH, USA; [71]School of Population & Public Health, University of British Columbia, Vancouver, BC, Canada; [72]Penn State Health, PA, USA; [73]Penn State College of Medicine, Hershey, PA, USA; [74]Center for Sexology and Gender, Ghent University Hospital, Gent, Belgium; [75]Nelson Mandela University, Gqeberha, South Africa; [76]University of Cape Town, Cape Town, South Africa; [77]Department of Endocrinology, Amsterdam UMC Location Vrije Universiteit Amsterdam, , Amsterdam, Netherlands; [78]University of Victoria, Victoria, BC, Canada; [79]ANOVA, Karolinska University Hospital, Stockholm, Sweden; [80]Department of Medicine Huddinge, Karolinska Institutet, Stockholm, Sweden; [81]UCTRANS—United Caribbean Trans Network, Nassau, The Bahamas; [82]D M A R C O Organization, Nassau, The Bahamas; [83]University of Pittsburgh School of Medicine, Pittsburgh, PA, USA; [84]Pacific University, Hillsboro, OR, USA; [85]Independent Practice, Beaverton, OR, USA; [86]Whitman Walker Health, Washington, DC, USA; [87]Independent Practice, Maryland, USA; [88]Transvisie, Utrecht, The Netherlands; [89]Department of Clinical Experimental and Health Psychology, Ghent University, Gent, Belgium; [90]The Jed Foundation, New York, NY, USA; [91]Hetrick-Martin Institute, New York, NY, USA; [92]Institute for Sexual and Gender Health, Institute for Sexual and Gender Health, Department of Family Medicine and Community Health, University of Minnesota Medical School, Minneapolis, MN, USA; [93]Andrology, Women Endocrinology and Gender Incongruence, Careggi University Hospital, Florence, Italy; [94]Department of Urology, Cedars-Sinai Medical Center, Los Angeles, CA, USA; [95]Departments of Urology and Anatomy, University of California San Francisco, San Francisco, CA, USA; [96]Institute of Family and Sexuality Studies, Department of Neurosciences, KU Leuven, Leuven, Belgium; [97]Mermaids, London/ Leeds, UK; [98]Duke University Medical Center, Durham, NC, USA; [99]Duke Adult Gender Medicine Clinic, Durham, NC, USA; [100]Alberta Health Services, Edmonton, Alberta, Canada; [101]MacEwan University, Edmonton, Alberta, Canada; [102]Beth Israel Deaconess Medical Center, Boston, MA, USA; [103]Independent Practice, New York, NY, USA; [104]Northwestern Feinberg School of Medicine, Chicago, IL, USA; [105]RMIT University, Melbourne, Australia; [106]University of Brighton, Brighton, UK; [107]Department of Pediatrics, Division of Pediatric Endocrinology, Ghent University Hospital, Gent, Belgium; [108]Division of Pediatric Endocrinology and Diabetes, ZNA Queen Paola Children's Hospital, Antwerp, Belgium; [109]Department of Medical Psychology, Amsterdam UMC Location Vrije Universiteit Amsterdam, , Amsterdam, Netherlands; [110]Department of Psychiatry, Southwestern Medical Center, University of Texas, Dallas, TX, USA; [111]Department of Endocrinology, Children's Health, Dallas, TX, USA; [112]Denver Health, Denver, CO, USA; [113]University of Colorado School of Medicine, Aurora, CO, USA; [114]Malouf Counseling and Consulting, Baltimore, MD, USA; [115]WPATH Global Education Institute; [116]Department of Psychiatry & Behavioral Sciences, Emory University School of Medicine, Atlanta, GA, USA; [117]Jacobs School of Medicine and Biomedical Sciences, University at Buffalo, Buffalo, NY, USA; [118]John R. Oishei Children's Hospital, Buffalo, NY, USA; [119]Professional Association for Transgender Health, South Africa; [120]Gender DynamiX, Cape Town, South Africa; [121]Division of Plastic Surgery, Seattle Children's Hospital, Seattle, WA, USA; [122]Division of Plastic Surgery, Department of Surgery, University of Washington Medical Center, Seattle, WA, USA; [123]Gender Confirmation Center, San Francisco, CA, USA; [124]Saint Francis Memorial Hospital, San Francisco, CA, USA; [125]Johns Hopkins Center for Transgender Health, Baltimore, MD, USA; [126]Johns Hopkins Medicine Office of Diversity, Inclusion and Health Equity, Baltimore, MD, USA; [127]Division of Speech and Language Pathology, Department of Clinical Science, Intervention and Technology, Karolinska Institutet, Stockholm, Sweden; [128]Speech and Language Pathology, Medical Unit, Karolinska University Hospital, Stockholm, Sweden; [129]La Trobe University, Melbourne, Australia; [130]Melbourne Voice Analysis Centre, East Melbourne, Australia; [131]Stanford University School of Medicine, Department of Obstetrics and Gynecology, Palo Alto, CA, USA; [132]Department of Epidemiology and Population Health, Stanford, CA, USA; [133]Independent PracticeThessaloniki, Greece; [134]Military Community Mental Health Center, 424 General Military Training Hospital, Thessaloniki, Greece; [135]Talkspace, New York, NY, USA; [136]CytiPsychological LLC, San Diego, CA, USA; [137]Institute of HIV Research and Innovation, Bangkok, Thailand; [138]Gender Identity Research and Education Society, Leatherhead, UK; [139]Division of Endocrinology, Boston's Children's Hospital, Boston, MA, USA; [140]Department of Reproductive Medicine, Karolinska University Hospital, Stockholm, Sweden; [141]Department of Oncology-Pathology, Karolinska Institute, Stockholm, Sweden; [142]Division of Pediatric Endocrinology, UCSF, San Francisco, CA, USA; [143]UCSF Child and Adolescent Gender Center; [144]FtM Phoenix Group, Krasnodar Krai, Russia; [145]Mount Sinai Center for Transgender Medicine and Surgery, New York, NY, USA; [146]Epidemiology and Biostatistics, Dornsife School of Public Health, Drexel University, Philadelphia, PA, USA; [147]Epidemiology and Biostatistics, Schulich School of Medicine and Dentistry, Western University, Ontario, Canada; [148]St George's University Hospitals NHS Foundation Trust, London, UK; [149]Iranti, Johannesburg, South Africa; [150]University of Houston, Houston, TX, USA; [151]Mayo Clinic, Rochester, MN, USA; [152]Children's National Hospital, Washington, DC, USA; [153]George Washington University School of Medicine, Washington, DC, USA; [154]Atrium Health Department of Obstetrics and Gynecology, Division of Female Pelvic Medicine and Reconstructive Surgery, Charlotte, NC, USA; [155]Department for Reproductive Medicine, Ghent University Hospital, Gent, Belgium; [156]Department of Endocrinology, Ghent University Hospital, Gent, Belgium; [157]Independent Practice, Campbell, CA, USA; [158]Department of Obstetrics and Gynaecology, Amsterdam UMC Location Vrije Universiteit Amsterdam, Amsterdam, Netherlands; [159]School of Psychology, University of Waikato/Te Whare Wānanga o Waikato, Hamilton/Kirikiriroa, New Zealand/Aotearoa; [160]Department of Psychiatry & Psychology, Mayo Clinic, Rochester, MN, USA; [161]Division of General Internal Medicine, Mayo Clinic, Rochester, MN, USA; [162]Trans Learning Partnership at https://spectra-london.org.uk/trans-learning-partnership, UK; [163]College of Nursing, University of Wisconsin MilwaukeeMilwaukee, WI, USA; [164]Health Connections Inc., Glendale, WI, USA; [165]North Memorial Health Hospital, Robbinsdale, MN, USA; [166]University of Minnesota, Minneapolis, MN, USA; [167]Bellvitge Biomedical Research Institute (IDIBELL), L'Hospitalet de Llobregat, Barcelona, Spain.

AR_275093

**ABSTRACT**

**Background:** Transgender healthcare is a rapidly evolving interdisciplinary field. In the last decade, there has been an unprecedented increase in the number and visibility of transgender and gender diverse (TGD) people seeking support and gender-affirming medical treatment in parallel with a significant rise in the scientific literature in this area. The World Professional Association for Transgender Health (WPATH) is an international, multidisciplinary, professional association whose mission is to promote evidence-based care, education, research, public policy, and respect in transgender health. One of the main functions of WPATH is to promote the highest standards of health care for TGD people through the Standards of Care (SOC). The SOC was initially developed in 1979 and the last version (SOC-7) was published in 2012. In view of the increasing scientific evidence, WPATH commissioned a new version of the Standards of Care, the SOC-8.

**Aim:** The overall goal of SOC-8 is to provide health care professionals (HCPs) with clinical guidance to assist TGD people in accessing safe and effective pathways to achieving lasting personal comfort with their gendered selves with the aim of optimizing their overall physical health, psychological well-being, and self-fulfillment.

**Methods:** The SOC-8 is based on the best available science and expert professional consensus in transgender health. International professionals and stakeholders were selected to serve on the SOC-8 committee. Recommendation statements were developed based on data derived from independent systematic literature reviews, where available, background reviews and expert opinions. Grading of recommendations was based on the available evidence supporting interventions, a discussion of risks and harms, as well as the feasibility and acceptability within different contexts and country settings.

**Results:** A total of 18 chapters were developed as part of the SOC-8. They contain recommendations for health care professionals who provide care and treatment for TGD people. Each of the recommendations is followed by explanatory text with relevant references. General areas related to transgender health are covered in the chapters Terminology, Global Applicability, Population Estimates, and Education. The chapters developed for the diverse population of TGD people include Assessment of Adults, Adolescents, Children, Nonbinary, Eunuchs, and Intersex Individuals, and people living in Institutional Environments. Finally, the chapters related to gender-affirming treatment are Hormone Therapy, Surgery and Postoperative Care, Voice and Communication, Primary Care, Reproductive Health, Sexual Health, and Mental Health.

**Conclusions:** The SOC-8 guidelines are intended to be flexible to meet the diverse health care needs of TGD people globally. While adaptable, they offer standards for promoting optimal health care and guidance for the treatment of people experiencing gender incongruence. As in all previous versions of the SOC, the criteria set forth in this document for gender-affirming medical interventions are clinical guidelines; individual health care professionals and programs may modify these in consultation with the TGD person.

**KEYWORDS**

adolescents; assessment; children; communication; education; endocrinology; eunuch; gender diverse; health care professional; institutional settings; intersex; mental health; nonbinary; population; postoperative care; primary care; reproductive health; sexual health; SOC8; Standards of Care; surgery; terminology; transgender; voice

AR_275094

## Table of contents

|  |  | Page No. |
|---|---|---|
|  | **Introduction** | **S5** |
| **Chapter 1.** | **Terminology** | **S11** |
| **Chapter 2.** | **Global Applicability** | **S15** |
| **Chapter 3.** | **Population Estimates** | **S23** |
| **Chapter 4.** | **Education** | **S27** |
| **Chapter 5.** | **Assessment of Adults** | **S31** |
| **Chapter 6.** | **Adolescents** | **S43** |
| **Chapter 7.** | **Children** | **S67** |
| **Chapter 8.** | **Nonbinary** | **S80** |
| **Chapter 9.** | **Eunuchs** | **S88** |
| **Chapter 10.** | **Intersex** | **S93** |
| **Chapter 11.** | **Institutional Environments** | **S104** |
| **Chapter 12.** | **Hormone Therapy** | **S110** |
| **Chapter 13.** | **Surgery and Postoperative Care** | **S128** |
| **Chapter 14.** | **Voice and Communication** | **S137** |
| **Chapter 15.** | **Primary Care** | **S143** |
| **Chapter 16.** | **Reproductive Health** | **S156** |
| **Chapter 17.** | **Sexual Health** | **S163** |
| **Chapter 18.** | **Mental Health** | **S171** |
|  | **Acknowledgements** | **S177** |
|  | **References** | **S178** |
|  | **Appendix A: Methodology** | **S247** |
|  | **Appendix B: Glossary** | **S252** |
|  | **Appendix C: Gender-Affirming Hormonal Treatments** | **S254** |
|  | **Appendix D: Summary Criteria for Hormonal and Surgical Treatments for Adults and Adolescents** | **S256** |
|  | **Appendix E: Gender-Affirming Surgical Procedures** | **S258** |

## INTRODUCTION

### Purpose and use of the Standards of Care

The overall goal of the World Professional Association for Transgender Health's (WPATH) Standards of Care—Eighth Edition (SOC-8) is to provide clinical guidance to health care professionals to assist transgender and gender diverse (TGD) people in accessing safe and effective pathways to achieving lasting personal comfort with their gendered selves with the aim of optimizing their overall physical health, psychological well-being, and self-fulfillment. This assistance may include but is not limited to hormonal and surgical treatments, voice and communication therapy, primary care, hair removal, reproductive and sexual health, and mental health care. Healthcare systems should provide medically necessary gender-affirming health care for TGD people: See Chapter 2—Global Applicability, Statement 2.1.

WPATH is an international, multidisciplinary, professional association whose mission is to promote evidence-based care, education, research, public policy, and respect in transgender health. Founded in 1979, the organization currently has over 3,000 health care professionals, social scientists, and legal professionals, all of whom are engaged in clinical practice, research, education and advocacy that affects the lives of TGD people. WPATH envisions a world wherein people of all gender identities and gender expressions have access to evidence-based health care, social services, justice, and equality.

One of the main functions of WPATH is to promote the highest standards of health care for individuals through the Standards of Care (SOC) for the health of TGD people. The SOC-8 is based on the best available science and expert professional consensus. The SOC was initially developed in 1979, and the last version was published in 2012.

Most of the research and experience in this field comes from a North American and Western European perspective; thus, adaptations of the SOC-8 to other parts of the world are necessary. Suggestions for approaches to cultural relativity and cultural competence are included in this version of the SOC.

WPATH recognizes that health is not only dependent upon high-quality clinical care but also relies on social and political climates that ensure social tolerance, equality, and the full rights of citizenship. Health is promoted through public policies and legal reforms that advance tolerance and equity for gender diversity and that eliminate prejudice, discrimination, and stigma. WPATH is committed to advocacy for these policy and legal changes. Thus, health care professionals who provide care to TGD people are called upon to advocate for improved access to safe and licensed gender-affirming care while respecting the autonomy of individuals.

While this is primarily a document for health care professionals, individuals, their families, and social institutions may also use the SOC-8 to understand how it can assist with promoting optimal health for members of this diverse population.

The SOC-8 has 18 chapters containing recommendations for health care professionals working with TGD people. Each of the recommendations is followed by explanatory text with relevant references. The recommendations for the initiation of gender-affirming medical and/or surgical treatments (GAMSTs) for adults and adolescents are contained in their respective chapters (see Assessment for Adults and Adolescent chapters). A summary of the recommendations and criteria for GAMST can be found in Appendix D.

### Populations included in the SOC-8

In this document, we use the phrase transgender and gender diverse (TGD) to be as broad and comprehensive as possible in describing members of the many varied communities that exist globally of people with gender identities or expressions that differ from the gender socially attributed to the sex assigned to them at birth. This includes people who have culturally specific and/or language-specific experiences, identities or expressions, which may or may not be based on or encompassed by Western conceptualizations of gender or the language used to describe it.

WPATH SOC-8 expands who is included under the TGD umbrella, and the settings in which these guidelines should be applied to promote equity and human rights.

AR_275096

Globally, TGD people encompass a diverse array of gender identities and expressions and have differing needs for gender-affirming care across their lifespan that is related to individual goals and characteristics, available health care resources, and sociocultural and political contexts. When standards of care are absent for certain groups this vacuum can result in a multiplicity of therapeutic approaches, including those that may be counterproductive or harmful. The SOC-8 includes recommendations to promote health and well-being for gender diverse groups that have often been neglected and/or marginalized, including nonbinary people, eunuch, and intersex individuals.

The SOC-8 continues to outline the appropriate care of TGD youth, which includes, when indicated, the use of puberty suppression and, when indicated, the use of gender-affirming hormones.

Worldwide, TGD people commonly experience transphobia, stigmatization, ignorance, and refusal of care when seeking health care services, which contributes to significant health disparities. TGD people often report having to teach their medical providers how to care for them due to the latter's insufficient knowledge and training. Intersectional forms of discrimination, social marginalization, and hate crimes against TGD people lead to minority stress. Minority stress is associated with mental health disparities exemplified by increased rates of depression, suicidality, and non-suicidal self-injuries than rates in cisgender populations. Professionals from every discipline should consider the marked vulnerability of many TGD people. WPATH urges health care authorities, policymakers, and medical societies to discourage and combat transphobia among health care professionals and ensure every effort is made to refer TGD people to professionals with experience and willingness to provide gender-affirming care.

### Flexibility in the SOC

The SOC-8 guidelines are intended to be flexible to meet the diverse health care needs of TGD people globally. While adaptable, they offer standards for promoting optimal health care and for guiding treatment of people experiencing gender incongruence. As in all previous versions of the SOC, the criteria put forth in this document for gender-affirming interventions are clinical guidelines; individual health care professionals and programs may modify them in consultation with the TGD person. Clinical departures from the SOC may come about because of a patient's unique anatomic, social, or psychological situation; an experienced health care professional's evolving method of handling a common situation; a research protocol; lack of resources in various parts of the world; or the need for specific harm-reduction strategies. These departures should be recognized as such, explained to the patient, and documented for quality patient care and legal protection. This documentation is also valuable for the accumulation of new data, which can be retrospectively examined to allow for health care—and the SOC—to evolve.

The SOC-8 supports the role of informed decision-making and the value of harm reduction approaches. In addition, this version of the SOC recognizes and validates various expressions of gender that may not necessitate psychological, hormonal, or surgical treatments. Health care professionals can use the SOC to help patients consider the full range of health services open to them in accordance with their clinical needs for gender expression.

### Diversity versus Diagnosis

The expression of gender characteristics, including identities, that are not stereotypically associated with one's sex assigned at birth is a common and a culturally diverse human phenomenon that should not be seen as inherently negative or pathological. Unfortunately, gender nonconformity and diversity in gender identity and expression is stigmatized in many societies around the world. Such stigma can lead to prejudice and discrimination, resulting in "minority stress." Minority stress is unique (additive to general stressors experienced by all people), socially based, and chronic, and may make TGD individuals more vulnerable to developing mental health concerns such as anxiety and depression. In addition to prejudice and discrimination in society at large, stigma can contribute to abuse and

neglect in one's interpersonal relationships, which in turn can lead to psychological distress. However, these symptoms are socially induced and are not inherent to being TGD.

While Gender Dysphoria (GD) is still considered a mental health condition in the Diagnostic and Statistical Manual of Mental Disorders, (DSM-5-TR) of the American Psychiatric Association. Gender incongruence is no longer seen as pathological or a mental disorder in the world health community. Gender Incongruence is recognized as a condition in the International Classification of Diseases and Related Health Problems, 11th Version of the World Health Organization (ICD-11). Because of historical and current stigma, TGD people can experience distress or dysphoria that may be addressed with various gender-affirming treatment options. While nomenclature is subject to change and new terminology and classifications may be adopted by various health organizations or administrative bodies, the medical necessity of treatment and care is clearly recognized for the many people who experience dissonance between their sex assigned at birth and their gender identity.

Not all societies, countries, or health care systems require a diagnosis for treatment. However, in some countries these diagnoses may facilitate access to medically necessary health care and can guide further research into effective treatments.

### Health care services

The goal of gender-affirming care is to partner with TGD people to holistically address their social, mental, and medical health needs and well-being while respectfully affirming their gender identity. Gender-affirming care supports TGD people across the lifespan—from the very first signs of gender incongruence in childhood through adulthood and into older age—as well as people with concerns and uncertainty about their gender identity, either prior to or after transition.

Transgender health care is greater than the sum of its parts, involving holistic inter- and multidisciplinary care between endocrinology, surgery, voice and communication, primary care, reproductive health, sexual health and mental health disciplines to support gender-affirming interventions as well as preventive care and chronic disease management. Gender-affirming interventions include puberty suppression, hormone therapy, and gender-affirming surgeries among others. It should be emphasized there is no 'one-size-fits-all' approach and TGD people may need to undergo all, some, or none of these interventions to support their gender affirmation. These guidelines encourage the use of a patient-centered care model for initiation of gender- affirming interventions and update many previous requirements to reduce barriers to care.

Ideally, communication and coordination of care should occur between providers to optimize outcomes and the timing of gender-affirming interventions centered on the patient's needs and desires and to minimize harm. In well-resourced settings, multidisciplinary consultation and care coordination is often routine, but many regions worldwide lack facilities dedicated to transgender care. For these regions, if possible, it is strongly recommended that individual care providers create a network to facilitate transgender health care that is not available locally.

Worldwide, TGD people are sometime forced by family members or religious communities to undergo conversion therapy. WPATH strongly recommends against any use of reparative or conversion therapy (see statements 6.5 and 18.10).

### Health care settings

The SOC-8 are guidelines rooted in the fundamental rights of TGD people that apply to all settings in which health care is provided regardless of an individual's social or medical circumstances. This includes a recommendation to apply the standards of care for TGD people who are incarcerated or living in other institutional settings.

Due to a lack of knowledgeable providers, untimely access, cost barriers and/or previous stigmatizing health care experiences, many TGD people take non-prescribed hormone therapy. This poses health risks associated with the use of unmonitored therapy in potentially supratherapeutic doses and the potential exposure to blood-borne illnesses if needles are shared for administration. However, for many individuals, it is the only means of acquiring medically necessary

AR_275098

gender-affirming treatment that is otherwise inaccessible. Non-prescribed hormone use should be approached with a harm-reduction lens to ensure individuals are connected with providers who can prescribe safe and monitored hormone therapy.

In some countries, the rights of TGD are increasingly being recognized, and gender clinics are being established that can serve as templates for care. In other countries, however, such facilities are lacking and care may be more fragmented and under-resourced. Nonetheless, different models of care are being pioneered, including efforts to decentralize gender-affirming care within primary care settings and establish telehealth services to reduce barriers and improve access. Regardless of the method of care delivery, the principles of gender-affirming care as outlined in the SOC-8 should be adapted to align with local sociocultural, political, and medical contexts.

### Methodology

This version of the Standards of Care (SOC-8) is based upon a more rigorous and methodological evidence-based approach than previous versions. This evidence is not only based on the published literature (direct as well as background evidence) but also on consensus-based expert opinion. Evidence-based guidelines include recommendations intended to optimize patient care that are informed by a thorough review of evidence, an assessment of the benefits and harms, values and preferences of providers and patients, and resource use and feasibility.

While evidence-based research provides the basis for sound clinical practice guidelines and recommendations, it must be balanced by the realities and feasibility of providing care in diverse settings. The process for development of the SOC-8 incorporated the recommendations on clinical practice guideline development set forth by the National Academies of Medicine and the World Health Organization, which addressed transparency, conflict-of-interest policy, committee composition, and group process.

The SOC-8 guidelines committee was multidisciplinary and consisted of subject matter experts, health care professionals, researchers, and stakeholders with diverse perspectives and geographic

representation. A guideline methodologist assisted with the planning and development of questions and systematic reviews with additional input provided by an international advisory committee and during the public comment period. All committee members completed conflict of interest declarations. Recommendations in the SOC-8 are based on available evidence supporting interventions, a discussion of risks and harms, as well as feasibility and acceptability within different contexts and country settings. Consensus on the final recommendations was attained using the Delphi process that included all members of the guidelines committee and required that recommendation statements were approved by at least 75% of members. A detailed overview of the SOC-8 Methodology is included in Appendix A.

### SOC-8 Chapters Summary

The SOC-8 represents a significant advancement from previous versions. Changes in this version are based upon a fundamentally different methodology, significant cultural shifts, advances in clinical knowledge, and appreciation for the many health care issues that can arise for TGD people beyond hormone therapy and surgery.

These updated guidelines continue the process started with the SOC-7 in 2011 to broaden in scope and move from a narrow focus on psychological requirements for "diagnosing transgenderism" and medical treatments for alleviation of gender dysphoria to gender-affirming care for the whole person. WPATH SOC-8 expands guidelines specifying who is included under the TGD umbrella, what should and should not be offered with gender-affirming care, and the settings in which these guidelines should be applied to promote equity and human rights.

The SOC-8 has several new chapters such as the Assessment of Adults, Education, Eunuchs, and a Nonbinary chapter. In addition, the chapter for children and adolescents of the SOC-7 has been divided into two different chapters. Overall, the SOC-8 is considerably longer than previous versions and provides a more in-depth introduction and recommendations for health care professionals. A summary of every chapter of the SOC-8 can be found below:

### Chapter 1—Terminology

This new chapter lays the framework for language used in the SOC-8 and offers consensually agreed upon recommendations for the use of terminology. The chapter provides (1) terms and definitions, and (2) best practices for utilizing them. This document is accompanied by a glossary (see Appendix B) of common terms and language to provide a framework for use and interpretation of the SOC-8.

### Chapter 2—Global Applicability

This chapter references key literature related to development and delivery of health care services, broader advocacy care for TGD people from beyond Western Europe and North America and provides recommendations for adapting and translating the SOC-8 to varied contexts.

### Chapter 3—Population Estimates

This chapter updates the population estimates of TGD people in society. Based on the current evidence, this proportion may range from a fraction of a percent to several percentage points depending on the inclusion criteria, age group, and geographic location.

### Chapter 4—Education

This new chapter provides a general review of the literature related to education in TGD health care. It offers recommendations at governmental, nongovernmental, institutional and provider levels to increase access to competent, compassionate health care. The intent is to lay the groundwork in the education area and invite a much broader and deeper discussion among educators and health care professionals.

### Chapter 5—Assessment of Adults

This new chapter provides guidance on the assessment of TGD adults who are requesting gender-affirming medical and surgical treatments (GAMSTs). It describes and updates the assessment process as part of a patient-centered approach and the criteria that health care professionals may follow in order to recommend GAMSTs to TGD adults.

### Chapter 6—Adolescents

This new chapter is dedicated to TGD adolescents, is distinct from the child chapter, and has been created for this 8th edition of the Standards of Care given (1) the exponential growth in adolescent referral rates; (2) the increase in studies available specific to adolescent gender diversity-related care; and (3) the unique developmental and gender-affirming care issues of this age group. This chapter provides recommendations regarding the assessment process of adolescents requiring GAMSTs as well as recommendations when working with TGD youth and their families.

### Chapter 7—Children

This new chapter pertains to prepubescent gender diverse children and focuses on developmentally appropriate psychosocial practices and therapeutic approaches.

### Chapter 8—Nonbinary

This new chapter in the SOC-8 consists of a broad description of the term nonbinary and its usage from a biopsychosocial, cultural, and intersectional perspective. The need for access to gender-affirming care, specific gender-affirming medical interventions, as well as an appropriate level of support is discussed.

### Chapter 9—Eunuchs

This new chapter describes the unique needs of eunuchs, and how the SOC can be applied to this population.

### Chapter 10—Intersex

This chapter focuses on the clinical care of intersex individuals. It addresses the evolving terminology, prevalence, and diverse presentations of such individuals and provides recommendations for providing psychosocial and medical care with their evidence-based explanations.

### Chapter 11—Institutional Environments

This chapter has been expanded to include both carceral and non-carceral settings and has been built upon the last 3 versions of the SOC. This chapter describes how the SOC-8 can be applied to individuals living in these settings.

### Chapter 12—Hormone Therapy

This chapter describes the initiation of gender-affirming hormone therapy, the recommended regimens, screening for health concerns before and during hormone therapy, and specific considerations regarding hormone therapy prior to surgery. It includes an expanded discussion about the safety of gonadotropin releasing hormone (GnRH) agonists in youth, various hormone regimens, monitoring to include the development of potential therapy-related health concerns, and guidance on how hormone providers should collaborate with surgeons.

### Chapter 13—Surgery and Postoperative Care

This chapter describes a spectrum of gender-affirming surgical procedures for the diverse and heterogeneous community of individuals who identify as TGD. It provides a discussion about the optimal surgical training in GAS procedures, post-surgical aftercare and follow-up, access to surgery by adults and adolescents, and individually customized surgeries.

### Chapter 14—Voice and Communication

This chapter describes professional voice and communication support and interventions that are inclusive of and attentive to all aspects of diversity and no longer limited only to voice feminization and masculinization. Recommendations are now framed as affirming the roles and responsibilities of professionals involved in voice and communication support.

### Chapter 15—Primary Care

This chapter discusses the importance of primary care for TGD individuals, including topics of cardiovascular and metabolic health, cancer screening, and primary care systems.

### Chapter 16—Reproductive Health

This chapter provides recent data on fertility perspectives and parenthood goals in gender diverse youth and adults, advances in fertility preservation methods (including tissue cryopreservation), guidance regarding preconception and pregnancy care, prenatal counseling, and chest feeding. Contraceptive methods and considerations for TGD individuals are also reviewed.

### Chapter 17—Sexual Health

This new chapter acknowledges the profound impact of sexual health on physical and psychological well-being for TGD people. The chapter advocates for sexual functioning, pleasure, and satisfaction to be included in TGD-related care.

### Chapter 18—Mental Health

This chapter discusses principles of care for managing mental health conditions in TGD adults and the nexus of mental health care and transition care. Psychotherapy may be beneficial but should not be a requirement for gender-affirming treatment, and conversion treatment should not be offered.

## CHAPTER 1 Terminology

This chapter will lay the framework for language used in the SOC-8. It offers recommendations for use of terminology. It provides (1) terms and definitions, and (2) best practices for utilizing them. This document is accompanied by a glossary of common terms and language to provide a framework for use and interpretation of the SOC-8. See Appendix B for glossary.

### Terminology

In this document, we use the phrase transgender and gender diverse (TGD) to be as broad and comprehensive as possible in describing members of the many varied communities globally of people with gender identities or expressions that differ from the gender socially attributed to the sex assigned to them at birth. This includes people who have culturally specific and/or language-specific experiences, identities or expressions, and/or that are not based on or encompassed by Western conceptualizations of gender, or the language used to describe it. TGD is used for convenience as a shorthand for transgender and gender diverse.

The decision to use transgender and gender diverse resulted from an active process and was not without controversy. Discussions centered on avoiding over-emphasis on the term transgender, integrating nonbinary gender identities and experiences, recognizing global variations in understandings of gender, avoiding the term gender nonconforming, and recognizing the changing nature of language because what is current now may not be so in coming years. Thus, the term transgender and gender diverse was chosen with the intent to be most inclusive and to highlight the many diverse gender identities, expressions, experiences, and health care needs of TGD people. A Delphi process was used wherein SOC-8 chapter authors were anonymously and iteratively surveyed over several rounds to obtain consensus on terms. The SOC-8 presents standards of care that strive to be applicable to TGD people globally, no matter how a person self-identifies or expresses their gender.

### Context

The language selected in this chapter may not be (nor ever could be) comprehensive of every culture and geographic region/locale. Differences and debates over appropriate terms and specific terminologies are common, and no single term can be used without controversy. The goal of this chapter is to be as inclusive as possible and offer a shared vocabulary that is respectful and reflective of varied experiences of TGD people while remaining accessible to health practitioners and providers, and the public, for the purposes of this document. Ultimately, access to transition-related health care should be based on providing adequate information and obtaining informed consent from the individual, and not on what words TGD people, or their service providers, use to describe their identities. Using language and terminology that is respectful and culturally responsive is a basic foundation in the provision of affirming care, as is reducing the stigma and harm experienced by many TGD people seeking health care. It is vital for service providers to discuss with service users what language is most comfortable for them and to use that language whenever possible.

This chapter explains why current terms are being used in preference to others. Rather than use specific terms for medical, legal, and advocacy groups, the aim is to foster a shared language and understanding in the field of TGD health, and the many related fields (e.g., epidemiology, law), in order to optimize the health of transgender and gender diverse people.

Sex, gender, gender identity, and gender expression are used in the English language as descriptors that can apply to all people—those who are TGD, and those who are not. There are complex reasons why very specific language may be the *most* respectful, *most* inclusive, or *most* accepted by global TGD communities, including the presence or absence of words to describe these concepts in languages other than English; the structural relationship between sex and gender; legal landscapes at the local, national, and international levels; and the consequences of historical and present-day stigma that TGD people face.

SOC8 for the Health of TGD People

---

**Statements of Recommendations**

1.1- We recommend health care professionals use culturally relevant language (including terms to describe transgender and gender diverse people) when applying the Standards of Care in different global settings.

1.2- We recommend health care professionals use language in health care settings that uphold the principles of safety, dignity, and respect.

1.3- We recommend health care professionals discuss with transgender and gender diverse people what language or terminology they prefer.

---

Because at present, the field of TGD health is heavily dominated by the English language, there are two specific problems that constantly arise in setting the context for terminology. The first problem is that words exist in English that do not exist in other languages (e.g., "sex" and "gender" are only represented by one word in Urdu and many other languages). The second problem is that there are words that exist outside of English that do not have a direct translation into English (e.g., *travesti, fa'afafine, hijra, selrata, muxe, kathoey, transpinoy, waria, machi*). Practically, this means the heavy influence of English in this field impacts both what terms are widely used and which people or identities are most represented or validated by those terms. The words used also shape the narratives that contribute to beliefs and perceptions. While in past versions of the Standards of Care, World Professional Association for Transgender Health (WPATH) has used only transgender as a broadly defined umbrella term, version 8 broadens this language to use TGD as the umbrella term throughout the document (see Chapter 2—Global Applicability).

Furthermore, the ever-evolving nature of language is impacted by external factors and the social, structural, and personal pressures and violence enacted on TGD people and their bodies. Many of the terms and phrases used historically have been marred by how, when, and why they were used in discussing TGD people, and have thus fallen out of use or are hotly contested among TGD people, with some individuals preferring terms others find offensive. Some wish that these Standards of Care could provide a coherent set of universally accepted terms to describe TGD people, identities, and related health services. Such a list, however, does not and cannot exist without exclusion of some people and without reinforcing structural oppressions, with regards to race,

national origin, Indigenous status, socioeconomic status, religion, language(s) spoken, and ethnicity, among other intersectionalities. It is very likely that at least some of the terminology used in SOC-8 will be outdated by the time version 9 is developed. Some people will be frustrated by this reality, but it is hoped it will be seen instead as an opportunity for individuals and communities to develop and refine their own lexicons and for people to develop a still more nuanced understanding of the lives and needs of TGD people, including TGD people's resilience and resistance to oppression.

Finally, law and the work of legal professionals are within the remit of these Standards of Care. As such, language used most widely in international law is included here to help with the development of the functional definitions of these terms and encourage their usage in legal contexts in lieu of more antiquated and/or offensive terms. The currently most thorough document in international human rights law uses the term "gender diverse."[1]

All the statements in this chapter have been recommended based on a thorough review of evidence, an assessment of the benefits and harms, values and preferences of providers and patients, and resource use and feasibility. In some cases, we recognize evidence is limited and/or services may not be accessible or desirable.

## Statement 1.1

**We recommend health care professionals use culturally relevant language (including terms to describe transgender and gender diverse people) when applying the Standards of Care in different global settings.**

Culturally relevant language is used to describe TGD people in different global settings. For example, the concepts of sex, gender, and gender diversity differ across contexts, as does the language used to describe them. Thus, the language used when caring

for TGD people in Thailand is not going to be the same as that used for TGD care in Nigeria. When applying the Standards of Care globally, we recommend health care professionals (HCPs) utilize local language and terms to deliver care in their specific cultural and/or geographical locale.

Gender affirmation refers to the process of recognizing or affirming TGD people in their gender identity—whether socially, medically, legally, behaviorally, or some combination of these (Reisner, Poteat et al., 2016). Health care that is gender-affirming or trans-competent utilizes culturally specific language in caring for TGD people. Gender-affirming care is not synonymous with transition-related care. Provision of transition-related care, such as medical gender affirmation via hormones or surgery, does not alone ensure provision of gender-affirming care, nor does it indicate the quality or safety of the health care provided.

Consultation and partnerships with TGD communities can help to ensure relevancy and inclusivity of the language used in providing health care locally in a particular context and setting.

## Statement 1.2
**We recommend health care professionals use language in health care settings that upholds the principles of safety, dignity, and respect.**

Safety, dignity, and respect are basic human rights (International Commission of Jurists, 2007). We recommend HCPs utilize language and terminology that uphold these human rights when providing care for TGD people. Many TGD people have experienced stigma, discrimination, and mistreatment in health care settings, resulting in suboptimal care and poor health outcomes (Reisner, Poteat et al., 2016; Safer et al., 2016; Winter, Settle et al., 2016). Such experiences include misgendering, being refused care or denied services when sick or injured and having to educate HCPs to be able to receive adequate care (James et al., 2016). Consequently, many TGD people feel unsafe accessing health care. They may avoid health care systems and seek other means of getting health-related needs met, such as taking hormones without a medical prescription or monitoring and relying on peers for medical advice. Furthermore, previous negative experiences in health care settings are associated with future avoidance of care among TGD people.

Many TGD people have been treated unjustly, with prejudice, and without dignity or respect by HCPs, and lack of trust is often a barrier to care. Using language grounded in the principles of safety, dignity, and respect in health care settings is paramount to ensure the health, well-being, and rights of TGD people globally. Language is a significant component of gender-affirming care, but language alone does not resolve or mitigate the systematic abuse and sometimes violence TGD people face globally in care settings. Language is but one important step toward patient/client-centered and equitable health care among TGD people. Other concrete actions HCPs can take include obtaining informed consent and refraining from making assumptions about a person's needs based on their gender or TGD status.

## Statement 1.3
**We recommend health care professionals discuss with transgender and gender diverse people what language or terminology they prefer.**

In providing health care to TGD people, we recommend HCPs discuss with their patients what language or terminology they prefer be used when referring to them. This discussion includes asking TGD people how they would like to be addressed in terms of name and pronouns, how they self-identify their gender, and about the language that should be used to describe their body parts. Utilizing affirming language or terminology is a key component of TGD-affirming care (Lightfoot et al., 2021; Vermeir et al., 2018). Furthermore, these discussions and communications can serve to build rapport and reduce the mistrust many TGD people feel toward HCPs and experience within health care systems. Discussions and usage of language or terminology can also facilitate engagement and retention in care that is not specifically TGD-related, such as uptake of routine preventive screenings and any necessary medical follow-up of findings. In electronic health records, organ/anatomical inventories can be standardly used to inform appropriate clinical care, rather than relying solely on assigned sex at birth and/or gender identity designations.

HCPs and health care settings can implement standardized procedures to facilitate these conversations such as: using intake forms that include chosen pronouns and name, inviting

all staff (regardless of gender, i.e., cisgender, TGD) to use pronouns in introductions, having pronouns accompany names on a document for all patients, and not using gendered honorifics (e.g., Ms., Mr.). Policies for HCPs and health care settings can be put in place to ensure a TGD person's privacy and right to confidentiality, including when they disclose being a TGD person, and if/how to appropriately document. For example, a clinic policy may be to record this information as private and confidential between HCPs and patients/clients, and that it should only be disclosed on a "need to know" basis.

**Note**

1. A/73/152, Report of the Independent Expert on protection against violence and discrimination based on sexual orientation and gender identity

## CHAPTER 2 Global Applicability

People who defy cultural boundaries of sex and gender have existed in cultures worldwide since ancient times, sometimes acknowledged in local language terms (Feinberg, 1996). In contrast to the more recent pathologization of gender diversity as an illness, some cultures traditionally celebrated and welcomed this diversity (e.g., Nanda, 2014; Peletz, 2009). Today, the English language umbrella term transgender and gender diverse (TGD) describes a huge variety of gender identities and expressions, and therefore a population with diverse health care experiences and needs. Together, TGD people represent important aspects of human diversity the World Professional Association for Transgender Health (WPATH) asserts should be valued and celebrated. TGD people continue to make vital contributions to the societies in which they live, although often these are unrecognized.

Disturbingly, many TGD people in the modern world experience stigma, prejudice, discrimination, harassment, abuse and violence, resulting in social, economic and legal marginalization, poor mental and physical health, and even death—a process that has been characterized as a stigma-sickness slope (Winter, Diamond et al., 2016). Experiences such as these (and the anticipation or fear of encountering such experiences) leads to what Meyer has described as minority stress (Meyer, 2003; see also Bockting et al., 2013 writing specifically about TGD people), and are associated with poor physical (e.g. Rich et al, 2020) and psychological (e.g., Bränström et al., 2022; Scandurra et al., 2017; Shipherd et al., 2019, Tan et al., 2021) health outcomes.

Violence against TGD people is a particular problem. Seen from a global perspective, it is widespread, diverse in nature (emotional, sexual and physical, e.g., see Mujugira et al., 2021), and involves a range of perpetrators (including State actors). Statistics on murder, the form of violence most extreme in its consequences, are alarming. Worldwide, there were over 4,000 documented killings between January 2008 and September 2021; a statistic widely regarded as flawed by under-reporting (TGEU, 2020).

Since the publication of the Standards of Care Version 7 (SOC-7), there have been dramatic changes in perspectives on TGD people and their health care. Mainstream global medicine no longer classifies TGD identities as a mental disorder. In the Diagnostic and Statistical Manual Version 5 (DSM-5) from the American Psychiatric Association (APA, 2013), the diagnosis of *Gender Dysphoria* focuses on any distress and discomfort that accompanies being TGD, rather than on the gender identity itself. A text revision (DSM-5-TR) was published in 2022. In the International Classification of Diseases, Version 11 (ICD-11), the diagnostic manual of the World Health Organization (WHO, 2019b), the *Gender Incongruence* diagnosis is placed in a chapter on sexual health and focuses on the person's experienced identity and any need for gender-affirming treatment that might stem from that identity. Such developments, involving a depathologization (or more precisely a de-psychopathologization) of transgender identities, are fundamentally important on a number of grounds. In the field of health care, they may have helped support a care model that emphasizes patients' active participation in decision-making about their own health care, supported by primary health care professionals (HCPs) (Baleige et al., 2021). It is reasonable to suppose these developments may also promote more socially inclusive policies such as legislative reform regarding gender recognition that facilitates a rights-based approach, without imposing requirements for diagnosis, hormone therapy and/or surgery. TGD people who have changed gender markers on key documents enjoy better mental health (e.g., Bauer et al., 2015; Scheim et al., 2020). A more rights-based approach in this area may contribute greatly to the overall health and well-being of TGD people (Arístegui et al., 2017).

Previous editions of the SOC have revealed much of the recorded clinical experience and knowledge in this area is derived from North American and Western European sources. They have focused on gender-affirming health care in high income countries that enjoy relatively well-resourced health care systems (including those with trained mental health providers, endocrinologists, surgeons and other specialists) and where services are often funded publicly or (at least for some patients) through private insurance.

AR_275106

For many countries, health care provision for TGD people is aspirational; with resourcing in this area limited or non-existent, and services often unavailable, inappropriate, difficult to access and/or unaffordable. Few if any HCPs (primary or specialist) may exist. Funding for gender-affirming health care may be absent, with patients often bearing the full costs of whatever health care they access. Health care providers often lack clinical and/or cultural competence in this area. Training for work with these patients may be limited (e.g., Martins et al., 2020). For all these reasons and because of mainstream "Western" medicine's historical view of TGD people as mentally disordered (a perspective that has only recently changed), TGD people have commonly found themselves disempowered as health care consumers.

Health care providers have found the relevant literature is largely North American and European, which present particular challenges for persons working in health care systems that are especially poorly resourced. Recent initiatives that often involve TGD stakeholders as partners are changing this situation somewhat by providing a body of knowledge about good practice in other regions, including how to provide effective, culturally-competent TGD health care in low- and middle-income countries outside the global north.

Within the field, a wide range of valuable health care resources have been developed in recent years. Dahlen et al (2021) review twelve international clinical practice guidelines; over half those reviewed originate from professional bodies based in North America (e.g., Hembree et al., 2017) or Europe (e.g., T'Sjoen et al., 2020). Three are from WHO (the most recent being WHO, 2016). Nowadays, there are numerous other resources, not on Dahlen et al.'s list, that explicitly draw on expertise from regions outside North America and Europe. Examples can be found in Asia and the Pacific (APTN, 2022; Health Policy Project et al., 2015), the Caribbean (PAHO, 2014), Thailand, Australia (Telfer et al., 2020), Aotearoa New Zealand (Oliphant et al., 2018), and South Africa (Tomson et al., 2021) (see also TRANSIT (UNDP et al., 2016)). These resources have commonly been created through the initiatives of or in partnership with TGD communities locally or internationally. This partnership approach, focused on meeting local needs in culturally safe and competent ways, can also have broad international relevance. Some of these publications may be of particular value to those planning, organizing and delivering services in low-income, low-resource countries. There are likely to be other resources published in languages other than English of which we are unaware.

Globally, TGD identities may be associated with differing conceptual frameworks of sex, gender, and sexuality and exist in widely diverse cultural (and sometimes spiritual) contexts and histories. Considering the complex relationships between social and cultural factors, the law, and the demand for and provisions of gender-affirming health care, the SOC-8 should be interpreted through a lens that is appropriate for and within the context of each HCP's individual practice while maintaining alignment to the core principles that underscore it (APTN and UNDP, 2012; Health Policy Project et al., 2015; PAHO, 2014).

It is within this context and by drawing broadly on the experiences of TGD people and health care providers internationally that we consider the global applicability of SOC-8 within this chapter. We set out key considerations for HCPs and conclude by recommending core principles and practices fundamental to contemporary health care for TGD people, regardless of where they live or whether there are resources available to those who seek to provide such health care.

### Statement 2.1
**We recommend health care systems should provide medically necessary gender-affirming health care for transgender and gender diverse people.**

Medical necessity is a term common to health care coverage and insurance policies globally. A common definition of medical necessity as used by insurers or insurance companies is "Health care services that a physician and/or health care professional, exercising prudent clinical judgment, would provide to a patient for the purpose of preventing, evaluating, diagnosing or treating an illness, injury, disease or its symptoms, and that are: (a) in accordance with generally accepted standards of medical practice; (b) clinically

---

**Statements of Recommendations**

2.1- We recommend health care systems should provide medically necessary gender-affirming health care for transgender and gender diverse people.

2.2- We recommend health care professionals and other users of the Standards of Care, Version 8 (SOC-8) apply the recommendations in ways that meet the needs of local transgender and gender diverse communities, by providing culturally sensitive care that recognizes the realities of the countries they are practicing in.

2.3- We recommend health care providers understand the impact of social attitudes, laws, economic circumstances, and health systems on the lived experiences of transgender and gender diverse people worldwide.

2.4- We recommend translations of the SOC focus on cross-cultural, conceptual, and literal equivalence to ensure alignment with the core principles that underpin the SOC-8.

2.5- We recommend health care professionals and policymakers always apply the SOC-8 core principles to their work with transgender and gender diverse people to ensure respect for human rights and access to appropriate and competent health care, including:

*General principles*
- Be empowering and inclusive. Work to reduce stigma and facilitate access to appropriate health care for all who seek it;
- Respect diversity. Respect all clients and all gender identities. Do not pathologize differences in gender identity or expression;
- Respect universal human rights including the right to bodily and mental integrity, autonomy and self-determination; freedom from discrimination, and the right to the highest attainable standard of health.

*Principles around developing and implementing appropriate services and accessible health care*
- Involve transgender and gender diverse people in the development and implementation of services;
- Become aware of social, cultural, economic, and legal factors that might impact the health (and health care needs) of transgender and gender diverse people, as well as the willingness and the capacity of the person to access services;
- Provide health care (or refer to knowledgeable colleagues) that affirms gender identities and expressions, including health care that reduces the distress associated with gender dysphoria (if this is present);
- Reject approaches that have the goal or effect of conversion and avoid providing any direct or indirect support for such approaches or services.

*Principles around delivering competent services*
- Become knowledgeable (get training, where possible) about the health care needs of transgender and gender diverse people, including the benefits and risks of gender-affirming care;
- Match the treatment approach to the specific needs of clients, particularly their goals for gender identity and expression;
- Focus on promoting health and well-being rather than solely the reduction of gender dysphoria, which may or may not be present;
- Commit to harm reduction approaches where appropriate;
- Enable the full and ongoing informed participation of transgender and gender diverse people in decisions about their health and well-being;
- Improve experiences of health services including those related to administrative systems and continuity of care.

*Principles around working towards improved health through wider community approaches*
- Put people in touch with communities and peer support networks;
- Support and advocate for clients within their families and communities (schools, workplaces, and other settings) where appropriate.

---

appropriate, in terms of type, frequency, extent, site and duration, and considered effective for the patient's illness, injury, or disease; and (c) not primarily for the convenience of the patient, physician, or other health care provider, and not more costly than an alternative service or sequence of services at least as likely to produce equivalent therapeutic or diagnostic results as to the diagnosis or treatment of that patient's illness, injury or disease." The treating HCP asserts and documents that a proposed treatment is medically necessary for treatment of the condition (American Medical Association, 2016).

Generally, "accepted standards of medical practice" means standards that are based on credible scientific evidence published in peer-reviewed medical literature generally recognized by the relevant medical community, designated Medical Specialty Societies and/or legitimate Medical Colleges' recommendations, and the views of physicians and/or HCPs practicing in relevant clinical areas.

Medical necessity is central to payment, subsidy, and/or reimbursement for health care in parts of the world. The treating HCP may assert and document that a given treatment is medically necessary for the prevention or treatment of the condition. If health policies and practices challenge the medical necessity of a treatment, there may be an opportunity to appeal to a governmental agency or other entity for an independent medical review.

It should be recognized gender diversity is common to all human beings and is not pathological. However, gender incongruence that causes clinically significant distress and impairment often requires medically necessary clinical

AR_275108

interventions. In many countries, medically necessary gender-affirming care is documented by the treating health professional as treatment for Gender Incongruence (HA60 in ICD-11; WHO, 2019b) and/or as treatment for Gender Dysphoria (F64.0 in DSM-5-TR; APA, 2022).

There is strong evidence demonstrating the benefits in quality of life and well-being of gender-affirming treatments, including endocrine and surgical procedures, properly indicated and performed as outlined by the Standards of Care (Version 8), in TGD people in need of these treatments (e.g., Ainsworth & Spiegel, 2010; Aires et al., 2020; Aldridge et al., 2020; Almazan & Keuroghlian, 2021; Al-Tamimi et al., 2019; Balakrishnan et al., 2020; Baker et al., 2021; Buncamper et al., 2016; Cardoso da Silva et al., 2016; Eftekhar Ardebili, 2020; Javier et al., 2022; Lindqvist et al., 2017; Mullins et al., 2021; Nobili et al., 2018; Owen-Smith et al., 2018; Özkan et al., 2018; T'Sjoen et al., 2019; van de Grift, Elaut et al., 2018; White Hughto & Reisner, Poteat et al., 2016; Wierckx, van Caenegem et al., 2014; Yang, Zhao et al., 2016). Gender-affirming interventions may also include hair removal/transplant procedures, voice therapy/surgery, counseling, and other medical procedures required to effectively affirm an individual's gender identity and reduce gender incongruence and dysphoria. Additionally, legal name and sex or gender change on identity documents can also be beneficial and, in some jurisdictions, are contingent on medical documentation that patients may call on practitioners to produce.

Gender-affirming interventions are based on decades of clinical experience and research; therefore, they are not considered experimental, cosmetic, or for the mere convenience of a patient. They are safe and effective at reducing gender incongruence and gender dysphoria (e.g., Aires et al., 2020; Aldridge et al., 2020; Al-Tamimi et al., 2019; Balakrishnan et al., 2020; Baker et al., 2021; Bertrand et al., 2017; Buncamper et al., 2016; Claes et al., 2018; Eftekhar Ardebili, 2020; Esmonde et al., 2019; Javier et al., 2022; Lindqvist et al., 2017; Lo Russo et al., 2017; Marinkovic & Newfield, 2017; Mullins et al., 2021; Nobili et al., 2018; Olson-Kennedy, Rosenthal et al., 2018; Özkan et al., 2018; Poudrier et al., 2019; T'Sjoen et al., 2019; van de Grift, Elaut et al., 2018; White Hughto & Reisner,

Poteat et al., 2016; Wierckx, van Caenegem et al., 2014; Wolter et al., 2015; Wolter et al., 2018).

Consequently, WPATH urges health care systems to provide these medically necessary treatments and eliminate any exclusions from their policy documents and medical guidelines that preclude coverage for any medically necessary procedures or treatments for the health and well-being of TGD individuals. In other words, governments should ensure health care services for TGD people are established, extended or enhanced (as appropriate) as elements in any Universal Health Care, public health, government-subsidized systems, or government-regulated private systems that may exist. Health care systems should ensure ongoing health care, both routine and specialized, is readily accessible and affordable to all citizens on an equitable basis.

Medically necessary gender-affirming interventions are discussed in SOC-8. These include but are not limited to hysterectomy +/- bilateral salpingo-oophorectomy; bilateral mastectomy, chest reconstruction or feminizing mammoplasty, nipple resizing or placement of breast prostheses; genital reconstruction, for example, phalloplasty and metoidioplasty, scrotoplasty, and penile and testicular prostheses, penectomy, orchiectomy, vaginoplasty, and vulvoplasty; hair removal from the face, body, and genital areas for gender affirmation or as part of a preoperative preparation process; gender-affirming facial surgery and body contouring; voice therapy and/or surgery; as well as puberty blocking medication and gender-affirming hormones; counseling or psychotherapeutic treatment as appropriate for the patient and based on a review of the patient's individual circumstances and needs.

Statement 2.2

**We recommend health care professionals and other users of the Standards of Care, Version 8 (SOC-8) apply the recommendations in ways that meet the needs of local transgender and gender diverse communities, by providing culturally sensitive care that recognizes the realities of the countries they are practicing in.**

TGD people identify in many different ways worldwide, and those identities exist within a cultural context. In English speaking countries, TGD people variously identify as *transsexual,*

*trans, gender nonconforming, gender queer or diverse, nonbinary,* or indeed *transgender and/or gender diverse,* as well as by other identities; including (for many identifying inside the gender binary) *male* or *female.* (e.g., James et al., 2016; Strauss et al., 2017; Veale et al., 2019).

Elsewhere, identities include but are not limited to *travesti* (across much of Latin America), *hijra* (across much of South Asia), *khwaja sira* (in Pakistan), *achout* (in Myanmar), *maknyah, paknyah* (in Malaysia), *waria* (Indonesia) *kathoey, phuying kham phet, sao praphet song* (Thailand), *bakla, transpinay, transpinoy* (Philippines), *fa'afafine* (Samoa), *mahu* (French Polynesia, Hawai'i), *leiti* (Tonga), *fakafifine* (Niue), *pinapinaaine* (Tuvalu and Kiribati), *vakasalewalewa* (Fiji), *palopa* (Papua Niugini), *brotherboys* and *sistergirls* (Aboriginal and Torres Strait Islander people in Australia), and *akava'ine* (Cook Islands) (e.g., APTN and UNDP, 2012; Health Policy Project et al., 2015; Kerry, 2014). There are also a large number of *two spirit* identities across North America (e.g., *nadleehi* in Navajo (Diné) culture) (Sheppard & Mayo, 2013). The identities to which each of these terms refer are often culturally complex and may exist in a spiritual or religious context. Depending on the cultures and the identities concerned, some may be regarded as so-called "third genders" lying beyond the gender binary (e.g., Graham, 2010; Nanda, 2014; Peletz, 2009). Some TGD identities are less firmly established than others. In many places worldwide, the visibility of transgender men and nonbinary trans masculine identities is relatively recent, with few or no applicable traditional terms in local languages (Health Policy Project et al., 2015). Regardless of where or with whom HCPs work (including those working with ethnic minority persons, migrants and refugees), they need to be aware of the cultural context in which people have grown up and live as well as the consequences for health care.

Worldwide the availability, accessibility, acceptability and quality of health care vary greatly, with resulting inequities within and across countries (OECD, 2019). In some countries, formal health care systems exist alongside established traditional and folk health care systems, with indigenous models of health underpinning the importance of holistic health care (WHO, 2019a).

HCPs should be aware of the traditions and realities within which health care is available and provide support that is sensitive to the local needs and identities of TGD people and provide them with culturally competent and safe care.

Statement 2.3

**We recommend health care providers understand the impact of social attitudes, laws, economic circumstances, and health systems on the lived experiences of transgender and gender diverse people worldwide.**

TGD people's lived experiences vary greatly, depending on a range of factors, including social, cultural (including spiritual), legal, economic and geographic. When TGD people live in environments that affirm their gender and/or cultural identities, then these experiences can be very positive. Families are particularly important in this regard (e.g., Pariseau et al., 2019; Yadegarfard et al., 2014; Zhou et al., 2021). However, when viewed from a global perspective, the circumstances in which TGD people live are often challenging. They are commonly denied widely accepted rights in international human rights law. These include rights to education, health and protection from medical abuses, work and an adequate standard of living, housing, freedom of movement and expression, privacy, security, life, family, freedom from arbitrary deprivation of liberty, fair trial, treatment with humanity while in detention, and freedom from torture, inhuman or degrading treatment or punishment (International Commission of Jurists, 2007, 2017).

It is widely accepted that denial of rights can impact sexual and gender minority health and well-being (e.g., OHCHR et al., 2016; WHO, 2015). We therefore reaffirm here the importance of the rights listed above for TGD people and note WPATH's previous rights advocacy, including through numerous policy documents (e.g., WPATH, 2016, 2017, 2019). HCPs can play an important role in rights advocacy, including the right to quality gender-affirming health care that is appropriate, affordable, and accessible.

Across the world, a large number of studies detail the challenges TGD people face in their lives, and the impact on their health and well-being (e.g., Aurat Foundation, 2016;

Bhattacharya & Ghosh, 2020; Chumakov et al., 2021; Coleman et al., 2018; Heylens, Elaut et al., 2014; Human Rights Watch, 2014; James et al, 2016; Lee, Operario et al., 2020; Luz et al., 2022; McNeil et al., 2012, 2013; Motmans et al., 2017; Muller et al., 2019; Scandurra et al., 2017; Strauss et al., 2019; Suen et al., 2017; Valashany & Janghorbani, 2019; Veale et al., 2019; Wu et al., 2017). The research shows TGD people often experience stigma and prejudice as well as discrimination and harassment, abuse and violence, or they live in anticipation and fear of such actions. Social values and attitudes hostile to TGD people, often communicated to young people in school curricula (e.g., Olivier & Thurasukam, 2018), are also expressed in family rejection (e.g., Yadegarfard et al., 2014), and perpetuated in laws, policies and practices that limit freedom to express one's gender identity and sexuality and hinder access to housing, public spaces, education, employment and services (including health care). The end result is TGD people are commonly deprived of a wide range of opportunities available to their cisgender counterparts and are pushed to the margins of society, without family supports. To make matters worse, across much of the world TGD people's access to legal gender recognition is restricted or non-existent (e.g., ILGA World, 2020a; TGEU, 2021; UNDP and APTN, 2017). In some countries, such barriers nowadays draw on support from "gender-critical theorists" (as critiqued by e.g., Madrigal-Borloz, 2021; Zanghellini, 2020).

Gender identity change efforts (gender reparative or gender conversion programs aimed at making the person cisgender) are widespread, cause harm to TGD people (e.g., APTN, 2020a, 2020b, 2020c, 2021; Bishop, 2019; GIRES et al., 2020; Turban, Beckwith et al., 2020), and (like efforts targeting sexual orientation) are considered unethical (e.g., APS, 2021; Trispiotis and Purshouse, 2021; Various, 2019, 2021). These efforts may be viewed as a form of violence. The UN independent expert on protection against violence and discrimination based on sexual orientation and gender identity has called for a global ban on such practices (Madrigal-Borloz, 2020). An increasing number of jurisdictions are outlawing such work (ILGA World, 2020b).

Inequities arise from a range of factors, including economic considerations and values underpinning the provision of health care systems, particularly with regard to the emphasis placed on public-, private- and self-funding of health care. Lack of access to appropriate and affordable health care can lead to a greater reliance on informal knowledge systems. This includes information about self-administration of hormones, which, in many cases, is undertaken without necessary medical monitoring or supervision (e.g., Do et al., 2018; Liu et al., 2020; Rashid et al., 2022; Reisner et al., 2021; Winter & Doussantousse, 2009).

In some parts of the world, large numbers of transgender women employ silicone as a means of modifying their bodies, drawing on the services of silicone "pumpers" and/or attending pumping "parties", often within their communities. The immediate results of silicone pumping contrast with significant downstream health risks (e.g., Aguayo-Romero et al., 2015; Bertin et al., 2019; Regmi et al., 2021), particularly where industrial silicone or other injectable substances have been used and where surgical removal may be difficult.

Finally, sexual health outcomes for TGD people are poor. HIV prevalence for transgender women reporting to clinical organizations in metropolitan areas is approximately 19% worldwide, which is 49 times higher than the background prevalence rate in the general population (Baral et al., 2013). Sexual health outcomes for transgender men are also problematic (e.g., Mujugira et al., 2021).

Statement 2.4

**We recommend translations of the SOC focus on cross-cultural, conceptual and literal equivalence to ensure alignment with the core principles that underpin the SOC-8.**

Much of the research literature on TGD people is produced in high-income and English-speaking countries. global northern perspectives about TGD people (including those related to health care needs and provision) dominate this literature. A May 2021 Scopus database search undertaken by the current authors shows 99% of the literature on transgender health care comes out of Europe, North America, Australia, or New Zealand. Overall, 96% of the literature is in the English language. TGD people of the Global

South have received relatively little attention in the English language literature, and the work of those HCPs who interact with them has often gone unrecognized and unpublished or has not been translated into English. Applying resources produced in the global north risks overlooking the relevance and nuance of local knowledge, cultural frameworks and practices, and missed opportunities to learn from the work of others.

When translating the principles set out in the SOC, we recommend following best practice guidelines for language translation to ensure high quality written resources are produced that are culturally and linguistically appropriate to the local situation. It is important translators have knowledge about TGD identities and cultures to check that literal translations are culturally competent and safe for local TGD people. It is also important translation should follow established processes for quality assurance (Centers for Medicare & Medicaid Services, 2010; Sprager & Martinez, 2015)

<u>Statement 2.5</u>
**We recommend health care professionals and policymakers always apply the SOC-8 core principles to their work with transgender and gender diverse people to ensure respect for human rights and access to appropriate and competent health care, including:**

*General principles*

- Be empowering and inclusive. Work to reduce stigma and facilitate access to appropriate health care, for all who seek it;
- Respect diversity. Respect all clients and all gender identities. Do not pathologize differences in gender identity or expression;
- Respect universal human rights, including the right to bodily and mental integrity, autonomy, and self-determination; freedom from discrimination and the right to the highest attainable standard of health.

*Principles around developing and implementing appropriate services and accessible health care*

- Involve TGD people in the development and implementation of services;

- Become aware of social, cultural, economic, and legal factors that might impact the health (and health care needs) of transgender and gender diverse people, as well as the willingness and capacity of the person to access services;
- Provide health care (or refer to knowledgeable colleagues) that affirms gender identities and expressions, including health care that reduces the distress associated with gender dysphoria (if this is present);
- Reject approaches that have the goal or effect of conversion, and avoid providing any direct or indirect support for such approaches or services

*Principles around delivering competent services*

- Become knowledgeable (get training, where possible) about the health care needs of transgender and gender diverse people, including the benefits and risks of gender-affirming care;
- Match the treatment approach to the specific needs of clients, particularly their goals for gender identity and expression;
- Focus on promoting health and well-being rather than solely the reduction of gender dysphoria, which may or may not be present;
- Commit to harm reduction approaches where appropriate;
- Enable the full and ongoing informed participation of transgender and gender diverse people in decisions about their health and well-being;
- Improve experiences of health services, including those associated with administrative systems and continuity of care.

*Principles around working towards improved health through wider community approaches*

- Put people in touch with communities and peer support networks;
- Support and advocate for clients within their families and communities (schools, workplaces, and other settings) where appropriate.

We have already cited research detailing the broad range of challenges TGD people may face; social economic and legal obstacles, as well those related to health care access. While overall health care services are diverse across the world (in terms of availability, accessibility, and quality), those services available to TGD people are often inadequate. Numerous reports from diverse regions worldwide show, while TGD people may report positive health care experiences, many others do not (e.g., Callander et al., 2019; Costa, da Rosa Filho et al., 2018; Do et al., 2018; Gourab et al., 2019; Health Policy Project et al., 2015; Liu et al., 2020; Motmans et al., 2017; Muller et al., 2019; PAHO, 2014; Reisner et al., 2021; Strauss et al., 2017; TGEU, 2017). Mainstream health care options often do not meet their needs for general, sexual, or gender-affirming health care. Standard patient management procedures at clinics and hospitals often fail to recognize the gender identities of their TGD patients (including where outside of the binary their patients identify). Patients may be housed in wards that are gender inappropriate for them, putting them at risk of sexual harassment. TGD patients often encounter unsupportive or hostile attitudes from HCPs and ancillary staff and may even be refused service. Of great concern, HCPs in some parts of the world are involved in gender identity change efforts of the sort described earlier in this chapter.

Throughout the world, there are many other barriers to the provision of gender-affirming health care. Health care professionals may often be unwilling to provide the services TGD people seek. In some countries, there may be laws or regulations inhibiting or preventing them from doing so. When general practitioners and other health care providers do not have access to clear guidelines in their own language, they may be deterred from providing services. Even in situations where health care is available, patients may find it is difficult to access because of distance, gatekeeping practices, supply and demand issues that result in long wait lists or cost increases. Indeed, gender-affirming procedures may not be incorporated into a universal health care provision or be covered by private insurance, even though similar procedures may be covered for cisgender patients.

For all these reasons, many TGD people avoid formal health care services whenever they can. Their own communities commonly fill the void, acting as important resources for their members. They provide social and emotional support, often in an otherwise hostile environment. In addition, they often act as reservoirs of shared information about available options for health care, including parallel and informal health care options outside of (and more accessible and affordable than) mainstream medicine. As we saw earlier in this chapter, this often includes sharing of information about silicone and other injectable substances for bodily transformation and about hormones that are self-administered without necessary medical monitoring or supervision. WHO notes TGD individuals who self-administer gender-affirming hormones would benefit from access to evidence-based information, quality products, and sterile injection equipment (WHO, 2021). Access to such information can form part of a broader harm reduction approach (e.g., Idrus & Hyman, 2014).

Putting the important core principles outlined above into practice can improve health care experiences and promote respect for TGD people in all local contexts. This can occur regardless of the realities of a health care system (including the cultural, social, legal, economic context in which health care is provided), the level of provision available, or the TGD people seeking such services.

AR_275113

## CHAPTER 3 Population Estimates

In the previous edition of its Standards of Care, Version 7, World Professional Association for Transgender Health (WPATH) identified only a small number of articles attempting to estimate the size of the transgender and gender diverse (TGD) population and characterized the state-of-the-science as "a starting point" requiring further systematic study (Coleman et al., 2012). Since then, the literature on this topic has expanded considerably as evidenced by a number of recent reviews that have sought to synthesize the available evidence (Arcelus et al., 2015; Collin et al., 2016; Goodman et al., 2019; Meier & Labuski, 2013; Zhang et al., 2020).

In reviewing epidemiologic data pertaining to the TGD population, it may be best to avoid the terms "incidence" and "prevalence." Avoiding these and similar terms may preclude inappropriate pathologizing of TGD people (Adams et al., 2017; Bouman et al., 2017). Moreover, the term "incidence" may not be applicable in this situation because it assumes TGD status has an easily identifiable time of onset, a prerequisite for calculating incidence estimates (Celentano & Szklo, 2019). For all the above reasons, we recommend using the terms "number" and "proportion" to signify the absolute and the relative size of the TGD population.

Perhaps the most important consideration in reviewing this literature is the variable definition applied to the TGD population (Collin et al., 2016; Meier & Labuski, 2013). In clinic-based studies, the data on TGD people are typically limited to individuals who received transgender-related diagnoses or counseling or those who requested or underwent gender-affirming therapy, whereas survey-based research typically relies on a broader, more inclusive definition based on self-reported gender identities.

Another methodological consideration in assessing the size and distribution of the TGD population is the need to understand what constitutes the sampling frame. As noted in recent reviews (Goodman et al., 2019; Zhang et al., 2020), many of the published studies, especially those conducted more than a decade ago, first assessed the number of patients seen at a particular clinical center and then divided that number by an approximated population size. This was unlikely to produce an accurate estimate because the numerator in the calculations is not necessarily included in the denominator, and the true size of the denominator often remains unknown.

With these considerations in mind, it is advisable to focus specifically on recent (published within the last decade) peer-reviewed studies that utilized sound methodology in identifying TGD people within a well-defined sampling frame. For all of the above reasons, the present chapter is focused on studies that met the following inclusion criteria 1) appeared in press in 2009 or later; 2) used a clear definition of TGD status; 3) calculated proportions of TGD people based on a well-defined population denominator; and 4) were peer-reviewed. These types of studies can provide more accurate contemporary estimates.

The available studies can be assigned into three groups 1) those that reported proportions of TGD people among individuals enrolled in large health care systems; 2) those that presented results from population surveys of predominantly adult participants; and 3) those that were based on surveys of youth conducted in schools. Of these three categories, the most informative and methodologically sound studies are summarized below. Additional details about these and other similar studies can be found in recent literature reviews (Goodman et al., 2019; Zhang et al., 2020).

Among studies that estimated the size of the TGD population enrolled in large health care systems, all were conducted in the US, and all relied on information obtained from electronic health records. Four of those health system-based studies relied exclusively on diagnostic codes to ascertain the TGD population; two studies (Blosnich et al., 2013; Kauth et al., 2014) used data from the Veterans Health Affairs system, which provides care to over 9 million people, and two studies (Dragon et al., 2017; Ewald et al., 2019) used claims data from Medicare, the federal health insurance program that primarily covers people 65 years of age or older. The proportions of TGD people reported in these diagnostic code-based studies ranged from approximately 0.02% to 0.03%. Another more recent publication also used Medicare data along with commercial insurance claims to identify TGD people and applied expanded inclusion criteria to supplement

diagnostic codes with information on procedures and hormone therapy (Jasuja et al., 2020). Using this methodology, the proportion of TGD people among all persons enrolled in the participating health plans was 0.03%. The sixth health systems-based study (Quinn et al., 2017) was conducted at Kaiser Permanente plans in the states of Georgia and California; these plans provide care to approximately 8 million members enrolled through employers, government programs, or individually. The TGD population in the Kaiser Permanente study was ascertained across all age groups using both diagnostic codes and free-text clinical notes. The proportions of TGD people identified at Kaiser Permanente were higher than the corresponding proportions reported in the Veterans Health Affairs and Medicare studies with the most recent estimates ranging from 0.04 to 0.08%.

In contrast to results from the health system-based studies, findings from surveys that relied on self-reported TGD status produced much higher estimates. Two US studies took advantage of the Behavioral Risk Factor Surveillance Study (BRFSS), which is an annual telephone survey conducted in all 50 states and US territories (Conron et al., 2012; Crissman et al., 2017). The first study used data from the 2007–2009 BRFSS cycles in the state of Massachusetts, and the second study used the 2014 BRFSS data from 19 states and the territory of Guam. Both studies reported that approximately 0.5% of adult participants (at least 18 years of age) responded "Yes" to the question "Do you consider yourself to be transgender?"

An internet-based survey administered to a sample of the Dutch population 15–70 years of age (Kuyper & Wijsen, 2014) asked participants to score the following two questions using a 5-point Likert scale: "Could you indicate to which degree you psychologically experience yourself as a man?" and "Could you indicate to which degree you psychologically experience yourself as a woman?" The respondents were considered "gender ambivalent" if they gave the same score to both statements and "gender incongruent" when they reported a lower score for their sex assigned at birth than for their gender identity. The proportions of participants reporting incongruent and ambivalent gender identity were 1.1% and 4.6%, respectively, for persons who were assigned male at birth (AMAB), and 0.8% and 3.2%, respectively, for persons assigned female at birth (AFAB).

A similarly designed study estimated the proportion of TGD residents in the Flanders region of Belgium using a sample drawn from the country's National Register (Van Caenegem, Wierckx et al., 2015). Participants were asked to score the following statements: "I feel like a woman" and "I feel like a man" on a 5-point Likert scale. Using the same definitions applied in the Dutch study (Kuyper & Wijsen, 2014), the proportion of gender incongruent individuals was 0.7% for AMAB people and 0.6% for AFAB people. The corresponding estimates for gender ambivalence among AMAB and AFAB people were 2.2% and 1.9%, respectively.

A more recent population-based study evaluated the proportion of TGD people among approximately 50,000 adult residents of Stockholm County, Sweden (Åhs et al., 2018). The numerator was determined by asking participants the following question: "I would like hormones or surgery to be more like someone of a different sex." Two additional items were designed to identify individuals experiencing gender incongruence: "I feel like someone of a different sex" and "I would like to live as or be treated as someone of a different sex." The need for either hormone therapy or gender-affirming surgery was reported by 0.5% of participants. Individuals who expressed feeling like someone of a different sex and those who wanted to live as or be treated as a person of another sex constituted 2.3% and 2.8% of the total sample, respectively.

Population-based data outside of North America and Western Europe are less common. One recent study offers valuable data from a large representative survey of 6,000 adults in Brazil (Spizzirri et al., 2021). Gender identity of participants was assessed based on the following three questions 1) "Which of the following options best describes how you currently feel?" (Options: I feel I am a man, I feel I am a woman, and I feel I am neither a man nor a woman); 2) "What is the sex on your birth certificate?" (Options: male, female, and undetermined); and 3) "Which of

these situations do you most closely relate to?" (Options: I was born male, but I have felt female since childhood; I was born female, but I have felt male since childhood; I was born male, and I feel comfortable with my body; I was born female, and I feel comfortable with my body). Based on the responses to these three questions, the authors determined 1.9% of the survey respondents were TGD (0.7% defined as transgender, and 1.2% defined as nonbinary).

The literature on the population proportions of TGD youth (persons under 19 years of age) includes several survey studies conducted in schools. A 2012 national cross-sectional survey in New Zealand collected information on TGD identity among high school students (Clark et al., 2014). Among over 8,000 survey participants, 1.2% self-identified as TGD and 2.5% reported they were not sure. Another study of schoolchildren was based on a 2016 survey of 9th and 11th grade students (ages 14–18 years) in the US state of Minnesota (Eisenberg et al., 2017). Of the nearly 81,000 survey respondents, 2.7% reported being TGD. A more recent study (Johns et al., 2019) presented results of the Youth Risk Behavior Survey (YRBS), which is conducted biennially among local, state, and nationally representative samples of US high school students in grades 9–12 (approximate age range 13–19 years). The 2017 YRBS cycle was carried out in 10 states and 9 large urban areas and included the following sequence: "*Some people describe themselves as transgender when their sex at birth does not match the way they think or feel about their gender. Are you transgender?*" Among nearly 120,000 participants across the 19 sites, 1.8% responded "*Yes, I am transgender,*" and 1.6% responded "*I am not sure if I am transgender.*"

Another recently published school-based study in the US presented results of a 2015 survey conducted in Florida and California with the aim of identifying gender diverse children and adolescents in a sample of just over 6,000 students in grades 9–12 (Lowry et al., 2018). "High gender-nonconforming" was used to define AMAB children who reported being very/mostly/somewhat feminine or AFAB children who reported being very/mostly/somewhat masculine. Based on these definitions, the proportions of

TGD participants were reported to be 13% among AMAB students, 4% among AFAB students, and 8.4% overall.

Only one study examined the proportion of self-identified TGD children in a younger age group. Shields et al. analyzed the data from a 2011 survey of 2,700 students in grades 6–8 (age range 11–13 years) across 22 San Francisco public middle schools (Shields et al., 2013). Thirty-three children self-identified as TGD based on the question "*What is your gender?*" where the possible responses were "*female, male, or transgender.*" The resulting proportion of transgender survey respondents was 1.3%. However, this definition would exclude TGD persons self-identifying as nonbinary and those who do not explicitly identify as transgender.

Taken together, these data indicate among health system-based studies that relied on diagnostic codes or other evidence documented in the medical records (Blosnich et al., 2013; Dragon et al., 2017; Ewald et al., 2019; Kauth et al., 2014; Quinn et al., 2017), the proportions of TGD people reported in recent years (2011–2016) ranged from 0.02% to 0.08%. By contrast, when the TGD status was ascertained based on self-report, the corresponding proportions were orders of magnitude higher and reasonably consistent, if the studies used similar definitions. When the surveys specifically inquired about "transgender" identity, the estimates ranged from 0.3% to 0.5% among adults and from 1.2% to 2.7% in children and adolescents. When the definition was expanded to include broader manifestations of gender diversity, such as gender incongruence or gender ambivalence, the corresponding proportions were higher: 0.5% to 4.5% among adults and 2.5% to 8.4% among children and adolescents.

As reviewed elsewhere (Goodman et al., 2019), another noteworthy observation is the continuous increase in both the size and the composition of the TGD population with upward trends in the proportion of TGD people observed in health care systems, through population-based surveys, as well as in the data on legal gender recognition. The higher estimates observed in more recent literature support some of the previous publications indicating the size of TGD population was

> **Summary of reported proportions of TGD people in the general population**
>
> Health systems-based studies: 0.02–0.1%
> Survey-based studies of adults: 0.3–0.5% (transgender), 0.3–4.5% (all TGD)
> Survey-based studies of children and adolescents: 1.2–2.7% (transgender), 2.5–8.4% (all TGD)

likely underestimated in earlier studies (Olyslager & Conway, 2008).

The temporal trends in AMAB to AFAB ratio have also been reported in studies analyzing referrals to clinics as well as data from integrated health systems; this ratio has changed from predominantly AMAB in previous decades to predominantly AFAB in recent years, especially among TGD youth (Aitken et al., 2015; de Graaf, Carmichael et al., 2018; de Graaf, Giovanardi et al. 2018; Steensma et al., 2018; Zhang et al., 2021). The trend towards a greater proportion of TGD people in younger age groups and the age-related differences in the AMAB to AFAB ratio likely represent the "cohort effect," which reflects sociopolitical advances, changes in referral patterns, increased access to health care and to medical information, less pronounced cultural stigma, and other changes that have a differential impact across generations (Ashley 2019d; Pang et al., 2020; Zhang et al., 2020).

Despite recent improvements in the quality of published studies, an important limitation of the existing literature is the relative paucity of peer-reviewed publications from regions outside of Western Europe or North America. Some of the relevant information on global estimates can be obtained from reports supported by the governments or non-governmental organizations (Fisher et al., 2019; Kasianczuk & Trofymenko, 2020), but these reports may be difficult to systematically identify and evaluate until they appear in peer-reviewed literature. Other barriers to evaluating the global distribution of the TGD populations include inadequate access to demographic data and over-representation of English-language journals in the world literature.

These limitations notwithstanding, the available highest-quality data clearly indicate TGD people represent a sizable and growing proportion of the general population. Based on the credible evidence available to date, this proportion may range from a fraction of a percent to several percentage points depending on the inclusion criteria, age group, and geographic location. Accurate estimates of the proportion, distribution, and composition of the TGD population as well as a projection of resources required to adequately support the health needs of TGD people should rely on systematically collected high-quality data, which are now increasingly available. Continuous and routine collection of these data is needed to decrease variability and minimize over- and under-estimation of the reported results. For example, far more accurate and precise estimates should become available when population censuses begin systematically collecting and reporting data on sex assigned at birth and gender identity, including asexual and nonbinary categories, using the now well-validated two-step method. The first such census-based estimate was released by the national statistical office of Canada. Based on the 2021 census data, 100,815 of 30.5 million Canadians self-identified as transgender or nonbinary; this accounted for 0.33% of the population 15 years of age or older (Statistics Canada, 2022). Consistent with the published literature, the proportions of transgender and nonbinary people were much higher for Generation Z (born between 1997 and 2006, 0.79%) and millennials (born between 1981 and 1996, 0.51%) than for Generation X (born between 1966 and 1980, 0.19%), baby boomers (born between 1946 and 1965, 0.15%), and the Interwar and Greatest Generations (born in 1945 or earlier, 0.12%). While these results represent the highest quality data available to date, it is not clear how the population proportions reported in Canada may compare with those in other countries. The variability in the definitions of what constitutes the TGD population and the differences in data collection methods can be reduced further by improving international collaborations.

AR_275117

## CHAPTER 4 Education

This chapter will provide a general review of the literature related to education in transgender and gender diverse (TGD) health care. Recommendations are offered at governmental, nongovernmental, institutional, and provider levels with the goal of increasing access to competent, compassionate health care. In turn, this increased access should improve health outcomes in TGD populations. As this is a novel chapter in the World Professional Association for Transgender Health (WPATH) Standards of Care, the intent is to lay the groundwork for the education area and invite a broader and deeper discussion among educators and health professionals.

Health professionals involved in transgender care encompass a broad range of disciplines. Health professional education varies considerably by country or region in terms of structure, licensure, and policy. Published literature on education in TGD health care is predominantly from North America, Europe, Australia and New Zealand. This chapter does not provide a review of the education literature for each discipline, the needs specific to each discipline (which can be found in the relevant chapters), or the needs specific to each country/region's health education system. Greater understanding and research are needed on the intersection of health education systems, licensure, and transgender health across the world.

On a global level, TGD health education is imperative if national and international health disparities are to be addressed. Cultural competency related to TGD communities continues to be lacking. The World Bank Group (2018) reports widespread discrimination, harassment, violence, and abuse affecting TGD people. They also report TGD people face the highest rates of violence and discrimination (World Bank Group, 2018). Although many higher income countries have national antidiscrimination laws with gender identity as a protected characteristic, discrimination in the workplace, in education, and in health care remains problematic (World Bank Group, 2018).

Across disciplines, curricula at all levels—undergraduate, graduate, residency, or continuing education—historically have ignored TGD cultural or clinical education. The Joint Commission (US) has recommended health care organizations "provide educational programs and forums that support the unique needs of the LGBT community" and "offer educational opportunities that address LGBT health issues" (The Joint Commission, 2011). However, this is not enforced.

On an individual level, several questions need answers. What type of education interventions can most effectively address transphobia and lead to long-standing changes in attitudes? What interventions translate into increasing the number of care providers in this area as well as the number of TGD people receiving care? Does clinical exposure increase the confidence of providers over time? What educational interventions lead to improved health outcomes in the TGD population and, if so, when and how did these interventions accomplish this? Although health professions have begun to incorporate TGD health into education using a variety of modalities and at varying levels of training, efforts differ by health profession and are neither systemic nor systematic in nature (e.g., Brennan et al., 2012; Chinn, 2013; Eliason et al., 2010; Lim et al., 2015; Obedin-Maliver et al., 2011; Rondahl, 2009).

Attaining cultural humility with the full appreciation of the intersectionality of humanity is an ultimate educational goal. That said, this initial call for education is focused on building the foundation in cultural awareness and cultural competency that is currently weak or non-existent in much of the world.

All the statements in this chapter have been recommended based on a thorough review of evidence, an assessment of the benefits and harms, values and preferences of providers and patients, and resource use and feasibility. In some cases, we recognize evidence is limited and/or services may not be accessible or desirable.

AR_275118