*Hearing children, parents, and members of the school staff uttering the word 'fag'*

Some parents described situations in which the behavior of school staff or other parents was overtly hostile toward them:

*The school psychologist has been openly hostile…to both me and to my son.*

*Teacher refused to work with us on communication issues between her and our daughter.*

*A very conservative religious parent became upset because my partner was the Brownie troop leader at our school. She withdrew her daughter from the troop. Then, months later, she called the Girl Scouts to say that my partner was teaching inappropriate religious material (on Judaism) at a Catholic school.*

Often it was parents' children, not themselves, who experienced such behavior at school:

*My daughter was bullied by a lunch lady who insisted that every child has a daddy. When I followed up with the teacher, principal, and assistant superintendent they all conveyed to me that this was simply a 'misunderstanding' and a great deal of time and effort was spent to help me understand the lunch lady's perspective and 'background.' I repeatedly indicated that I want my child to be safe and respected at school and this includes respecting her family (two moms) experience.*

*My youngest daughter in 7th grade had a recent experience where one on her teacher said my daughter had a 'weird family'*

*My 9 year old daughter received pro-Christian, anti-gay literature in her backpack from a classmate. The child's mother indicated to the child that the pamphlets were because my child had parents that were going to hell-but that the mother loved my child anyway.*

*Teasing comments made by classmates of my son about having two mothers*

*At the fifth grade graduation my child did not want me to attend, and would not state a specific reason. Only to say that the other children gave her a hard time about me since I am not her birth mother.*

One parent, who was also a teacher at her/his child's school, described an incident of verbal and physical violence:

*My main problem is with other parents, I keep my personal life private because I work at the school my children attend. As a teacher, I don't feel I have to announce anything but other parents who have assumed that I'm a lesbian have made a point of spreading the word. There was also a teacher who thought it was her place to 'out' me to the other teachers at a*

*meeting that I was not at. I have had to file a police report on a parent for putting their hands on my son and screaming and calling me a 'stupid lesbian bitch' in the office while my stepson's class was passing.*

**General Sense of Discomfort in School.** There were some parents who did not experience overt mistreatment or exclusion, but described experiencing a general discomfort at their children's schools. Feeling uncomfortable in their school community was often connected to feeling like a minority or outsider among other parents:

*At a gymnastics meet there was a parent night and every parent was from a two person heterosexual white family and I felt uncomfortable because I was single and gay. We had introductions before the meet to the audience and it was so heterogeneous that anything different stood out.*

*Nothing has happened. I'm just not as comfortable sitting at events with my partner.*

*Parents get very quiet when I or my partner show up.*

*Some parents and staff are uncomfortable around our family.*

This discomfort was also connected to encountering other individuals' lack of knowledge about LGBT people and families. For example, one parent remarked: "His teacher thought since I was his biological mother that I should be the only one making the decisions regarding our son. I quickly set her straight." Below are additional comments:

*Mostly, I find the mistreatment in having to over-explain that my family is normal and that we do normal things like eat dinner at the table most nights, wash clothes and help with homework. I've had teachers ask me what we really do at home as though it's some big homo-erotic mystery.*

*"What do you mean, Johnny has two mothers?" That can't be right.*

*I feel that his last teacher was just confused and mixed both my partner and I up.*

**Parenting Skills Questioned by Members of the School Community.** A few parents (5%) described experiences in which school staff or other parents at their child's school questioned their parenting abilities specifically because they were LGBT:

*An incident occurred with a teacher and one of the children. It was not sexual in nature, but the principal made a point to tell any other authorities that her parents were lesbians and tried to say the problem was possibly our daughter's fault because her parents were lesbian.*

*I had cross words with the principal regarding an attendance issue with my child and her need to be kept home periodically due to issues with her disability. He made a crack about attendance but I perceived it as a slur re our abilities as*

*gay parents…*

*Our daughter's teacher told me that we should not have any more children when my daughter showed some signs of stress when we began foster-parenting our youngest daughter. This is none of her business and clearly a sign that she was uncomfortable with the configuration of our family…*

*The counselor said that I needed to have a member of the opposite sex talk to my child about making relationships with the opposite sex. Since my child would probably not feel comfortable talking with me; as I did not understand those sorts of relationships.*

**Mistreatment Based on Other Characteristics.** There were a few parents (5%) who noted that they had experienced difficulty or mistreatment at their child's school because of other characteristics or issues not specifically related to being LGBT, such as their status as a single parent or their family income:

*[One parent] was organizing a get-together for all the parents of my son's class. When I explained to her that, being a single parent, it's difficult for me to attend night meetings without my children, she said that, "obviously, you're not committed to your son's education." When I challenged her for raising her voice at my son, she called me a "coward" for bringing the issue up in an email.*

*Actually, the difficulty is more because I am a single, working mother and this is a very affluent school.*

*My battles with the school haven't been about glbt issues. They have been about Christian bias i.e. their obsession with Christmas holiday activities.*

*The school discriminates more against our child because he is Black than because we are gay. Race is a much bigger issue!*

*Mostly it is that it is a very small school and is part of a Catholic church, and most of the kids go to church there, as well as attend school. It is very 'clique-ish' and non-Catholics, in general, have a hard time fitting in. Sometimes I don't know if people are "snobby" acting because of that or because they know I'm a lesbian.*

The universe of these comments is important in that it illustrates the many different and often subtle ways schools may discriminate against LGBT families. Furthermore, it illustrates how such negative interactions from school personnel and other members of the school community may negatively affect the family-school relationship among these families. Furthermore, even though the parent may have been the target of the anti-LGBT interaction, a child's exposure to the events is yet another form of a hostile climate for students with LGBT parents and may have serious consequences for their feelings of safety, their access to a quality education and their ability to learn. In

fact, of the small percentage of parents who reported any occurrence of such negative events in the past 12 months, about half (52%) reported that their child had been present.

It is important to note that although the percent of parents who experienced mistreatment from school personnel was relatively low, it was not nonexistent. About 1 in 20 parents reported having negative experiences with their child's teachers, principal or other school staff. Schools must ensure that all members of the school community are treated with respect and are free from harm—thus, even one parent in twenty experiencing mistreatment at school is too many.

### *Effects of Parents' Negative Experiences on Family-School Relationship*

Given the importance of the family-school relationship for children's achievement, we wanted to examine whether the negative experience of LGBT parents with members of the school community had a deleterious effect on their involvement in their child's education, including involvement in school activities and communication with school personnel. Parents' experiences of mistreatment, anti-LGBT comments or negative comments about their parenting were not related to parent-school communication or parent-school involvement.[91] Although negative experiences were not related to the level of involvement in the parent-teacher organization activities, they were related to parents' comfort in attending meetings of the organization. Higher frequency of mistreatment and hearing anti-LGBT comments in school were both related to decreased parental comfort attending parent-teacher organization meetings.[92]

Frequency of parents' negative experiences was further related to their feelings of exclusion from the school community. As shown in Figures 38a and 38b, parents who reported that they did not feel able to participate fully in their child's school as an LGBT parent or that they were not fully acknowledged by the school as an LGBT family were more likely to report all types of maltreatment in school in the past year.[93] For example, among those parents who had felt not able to participate in their child's school, over half (58%) of parents had experienced some incident of mistreatment compared to only about a quarter (26%) of other parents (see Figure 38a). We found the same relationship betweeen negative school experiences and parents' feeling not fully acknowledged as an LGBT famiy at their child's school—parents who expressed having such feelings of exclusion were much more likely to report negative experiences at school, such as mistreatment or hearing negative comments about being LGBT (see Figure 38b).

Negative interactions with school staff may also hinder the relationship between the LGBT parent and school personnel. For this reason, we examined the relationship between parents' negative experiences with specific school personnel and their reported comfort level in talking to them about their family. For all three types of school







Figure 38a. Negative Treatment at School
and Parents' Feelings of Exclusion

Mistreatment
Negative Comments about Being LGBT
Negative Comments about Parenting
Other Negative Experiences or Discrimination

70%
60%
50%
40%
30%
20%
10%
0%
60%
58%
47%
26%
26%
14%
9%
21%
No Experience in the Past Year
Any Experience in the Past Year
Feeling Not Fully Able to Participate in School Community

**Figure 38b. Negative Treatment at School and Parents' Feelings of Exclusion**

- Mistreatment
- Negative Comments about Being LGBT
- Negative Comments about Parenting
- Other Negative Experiences or Discrimination

60%
50%
40%
30%
20%
10%
0%
57%
54%
50%
27%
26%
17%
9%
24%
No Experience in the Past Year
Any Experience in the Past Year
Feeling Not Fully Acknowledged as an LGBT Family

86

AR_283677

personnel about whom parents were asked, the level of comfort in talking with the school personnel was related to whether or not the parent had had any negative interactions with them (see Figure 39).[94] For example, among parents who had never experienced any negative treatment from their child's teacher, 90% reported that they would be somewhat or very comfortable talking to their child's teacher about their family. Among parents who had had some negative incident with the teacher related to their LGBT family, a significantly lower percentage (77%) reported the same level of comfort in talking about their family.

**Figure 39. Relationship Between Negative Experiences With and Comfort Talking to School Personnel about One's Family**

## Notes

91 To examine the relationship of parents' negative experiences and parent-school communication and involvement, we examined bivariate correlations between these reported activities and the overall level of mistreatment, hearing anti-LGBT comments and hearing negative comments about parenting using the computed average across the five types of school community members (i.e., teacher, principal, other school staff, students and parents). Because of the large number of correlations, both a conservative error term was used ($p<.001$) and the magnitude of the relationship was considered (small/moderate effect of $r=.2$ or greater).

92 Mistreatment, $r=-.29$; Negative comments, $r=-.23$, $p<.001$ for both.

93 The graphics represent a correlational relationship. The correlation coefficients between "not fully able to participate" and negative experiences were: Mistreatment, $r=.45$; Negative Comments, $r=.30$; Negative Parenting Comments, $r=.17$, and Other Negative Experiences, $r=.56$. For "not fully acknowledged," the correlation coefficients were: Mistreatment, $r=.48$; Negative Comments, $r=.34$; Negative Parenting Comments, $r=.25$, and Other Negative Experiences, $r=.49$. All significant at $p<.001$.

94 To examine the relationship of parents' negative experiences with school personnel and comfort speaking to the same school personnel about their family, we computed a dichotomous variable for each school personnel type where 0 indicated no negative experience and 1 indicated any of the three types of negative experience (mistreatment, negative comments about being LGBT and negative comments about parenting) within each type of school personnel (teacher, principal and other school personnel). We used a dichotomous indicator because the variance among the negative experiences variables for school personnel was so low. We then performed a series of chi-square analyses, negative experiences x comfort. for teachers, $\chi^2=10.1$, $\phi=.13$, $p<.001$; for principals, $\chi^2=13.6$, $\phi=.15$, $p<.001$, and for other school staff, $\chi^2=12.9$, $\phi=.15$, $p<.001$.



## Inclusivity of LGBT Issues in School and Other School Supports

GLSEN's research related to the school experiences of LGBT students indicates that few schools have positive LGBT resources, such as inclusive curriculum or a safe school policy that includes specific protections based on sexual orientation and/or gender identity.[95] For students with LGBT parents, this lack of supportive resources may also negatively affect their school experience. Furthermore, LGBT families may be invisible in representations of family life. If an elementary school library does not include books that represent different types of families, including LGBT families, then those students with LGBT parents may feel excluded or that their family is somehow strange. If a school record only allows for "mother's name and father's name," LGBT parents may feel that they are not accepted into the school community as non-LGBT parents would be. We asked parents how inclusive overall was their child's school of LGBT families and of other kinds of families that are often considered "nontraditional," such as a single-parent headed family. About two-thirds of the parents thought that the school was somewhat or very inclusive of LGBT families (68%), yet a higher percentage (85%) thought that the school was inclusive of other kinds of families (see Figure 40). Elementary school parents were more likely to believe that the school was inclusive on both indicators than other parents, although the difference was more striking regarding inclusivity of LGBT families (see Figure 41).[96] Parents whose child attended a non-religious private school were also more likely to rate the school as more inclusive (see also Figure 41).[97] Specifically, these private school parents were higher



**Figure 40. Parents' Reports on Inclusivity of Their Child's School: LGBT and Other "Nontraditional" Families**

**Figure 41. Parents' Reports on Inclusivity of Their Child's School by School Characteristics**

than all other parents in their ratings on inclusion of LGBT families and were higher than elementary school parents on inclusivity of other nontraditional families.

### *Access to Information About LGBT Families and Other LGBT-Related Topics*

Many advocates of multicultural education, such as the National Association of Multicultural Education, believe that an inclusive curriculum promotes equity for all students, regardless of culture, race/ethnicity, gender and sexual orientation and that it enables the individual to believe in one's own intrinsic worth and in one's own culture.[98] Thus, GLSEN advocates that curricula and other school-based resources that provide positive representations of LGBT people, history and events are important indicators of school climate and positively affect students' experiences at school.

Students and parents were asked about the presence of LGBT-inclusive curricula and resources in their school. Less than a third of both students (27%) and parents (29%) reported that the school curriculum included representations of LGBT people, history or events in the past school year. Among students who had been taught about LGBT-related topics in a class, History/Social Studies, English and Health were the classes most often mentioned as being inclusive of LGBT topics (see Table 23). Many of these students also mentioned other classes, such as Psychology, Sex Education, Media, and Religious Studies, which were not categories explicitly listed on the survey. Among students who said that LGBT-related topics were included in their classroom curricula, 77% thought that these were represented in a somewhat or very positive manner (see Figure 42), which translates into less than a quarter (21%) of all students in our survey reporting that positive representations of LGBT people, history or events were included in their classroom activities.

Students were also specifically asked if representations of LGBT families were included in classroom activities when the topic of family entered into the curriculum. Less than a third (30%) of all students said that representations of LGBT families were included in the curriculum when the topic of families came up during class activities (see Figure 43). Students in the Northeast and the West were far more likely to report that representations of families with LGBT parents were included in their class activities or curriculum. More than a third (37%) of students in the West and 40% in the Northeast said that representations of LGBT families were included in classroom activities, compared to less than a fifth of students in the Midwest (14%) and South (13%).[99]

With regard to parents' perspectives, the prevalence of an inclusive curriculum varied by the type of school. As shown in Figure 44, High school parents were much more likely than middle school and elementary school parents to report that their child's curriculum was inclusive of LGBT issues (44% v. 28% and 24%, respectively).[100] The

## Table 23. Most Commonly Reported Subject Areas in which LGBT Issues are Included

**Student Reports**
(percent of those reporting any LGBT inclusion)

| Grade Level | Subject Area | Percent of Students |
|---|---|---|
| Middle School (Grades 6–8) | Other Classes | 50% |
| | Health Education | 44% |
| | History/Social Studies | 25% |
| | Science; English | 19% |
| High School (Grades 9–12) | History/Social Studies | 50% |
| | English | 46% |
| | Health Education | 42% |
| | Other Classes | 25% |

**Parental Reports**
(percent of those reporting any LGBT inclusion)

| Grade Level | Subject Area | Percent of Students |
|---|---|---|
| Elementary School | Family-Related Curriculum | 61% |
| | History | 34% |
| | Reading/Language Arts/English | 19% |
| Middle School | Family-Related Curriculum | 30% |
| | History | 30% |
| | Health | 22% |
| High School | Health | 90% |
| | History | 24% |
| | English | 22% |

nature of the curricular inclusion also varied somewhat by the school level. As also shown in Table 23, parents of high school students were most likely to report History, Health and English as subjects in which LGBT issues were discussed, similar to results from the student survey. Parents of elementary and middle school students, however, were also likely to report inclusion in family-related curriculum.

As with other resources, parents with a child at a non-religious private school were also more likely to report LGBT-inclusive material in school than other parents (see Figure 45)—half of these parents (51%) compared to about a quarter of other parents (25% and 28%, respectively).[101]

### *Supportive Student Clubs*

Existing research has shown that the presence of Gay-Straight Alliances (GSAs) and other types of student clubs that address LGBT student issues may have a positive impact on school climate and the experiences of LGBT students.[102] Student clubs that provide support to LGBT students may also be a resource and source of support for students from LGBT families. For example, these types of clubs may provide a space in which students with LGBT parents can talk openly about their experience, regardless of their own sexual orientation or gender identity. Thus, students were asked about the presence of supportive student clubs at their school. Only about a third (34%) said that their school had a GSA or other kind of student club that addressed LGBT student issues. Students in high school were much more likely to report that their school had a GSA or other supportive student club than students in middle school (48% vs. 15%).[103] In addition, students with LGBT parents were more likely than the general population of students to report that their school had a student club that addresses LGBT issues (34% vs. 22%).[104]

### *Supportive Members of the School Community*

For any student, having a supportive adult at school can have great benefits for the student's academic experience. For students with LGBT parents, supportive teachers or staff may be even more important, particularly if she or he receives negative reactions from other members of the school community because of her or his family. The vast majority (87%) of students reported that they had at least one teacher or other school staff member who was supportive of LGBT issues, such as students with LGBT parents and more than half (55%) said they had six or more supportive school staff people. Furthermore, about half (51%) could identify at least one school staff person who was open about being lesbian, gay, bisexual and/or transgender.

Students were also asked several questions about their comfort level with regard to being open about their family or having an LGBT parent. Figure 46 illustrates the level of comfort students reported with various members of the school community: teacher(s), principal, counselor or psychologist, nurse, librarian, close friends and other

classmates. The vast majority of students reported feeling somewhat or very comfortable talking with close friends about their family (82%) yet only about half reported being comfortable talking with other classmates (52%). Among the adult members of the school community, about two-thirds reported that they would be comfortable talking to a teacher or their school counselor or psychologist (65% and 62%, respectively).

Students were also asked how comfortable they would be with other interactions between their family and members of the school community: inviting friends home, inviting friends to spend time with their family, introducing their parents to the parents of their friends and having their parents attending school events. Overall, as shown in Figure 47, students reported being comfortable with these other family-school intersections.

Given the importance of the family-school relationship for student academic success, it was also important to examine whether the LGBT parents in our survey believed that teachers in their child's school were supportive of LGBT issues. Two-thirds (67%) of parents reported that there were supportive teachers (at least a few) at their child's school and a third (33%) reported that most or all of the teachers were supportive of LGBT issues. Elementary school parents reported, on average, a greater number of supportive teachers than middle and high school parents, and parents of children attending non-religious private schools also reported more supportive teachers (see Figure 48).[105]

Parents differed in their reports of supportive teachers based on the region and locale in which they lived. As shown in Figure 49, parents from the South reported fewer supportive teachers than parents for other regions.[106] Parents from urban schools identified more supportive teachers than parents from suburban and small town/rural schools (see also Figure 49).[107]

### *Safe School Policies*

Having a policy or procedure for reporting incidents of harassment in school is an important tool for making schools safer for all students. When such policies or procedures exist and are enforced, schools send a message to the student population that victimizing behaviors will not be tolerated. Comprehensive safe schools policies that enumerate categories of protections, such as sexual orientation and gender identity/expression, may provide students with greater protection against bullying and harassment in that they offer explicit protections. Although almost three-quarters (73%) of students reported that their school had some type of policy for dealing with incidents of harassment and assault, far fewer reported that their school's policy explicitly mentioned sexual orientation and/or gender identity/expression (see Table 24).

Although safe school policies would have the most direct benefit for the student population, it is also important for all parents to know what type of safe school policy their child's school has as it provides parents with an understanding of the level of protection that their child is afforded in school. Also, in the event of their child being bullied or harassed in school, knowledge of the school's policy may also provide parents with the foundation for addressing the problem with school personnel. In addition, for LGBT parents, whether or not a school's policy includes sexual orientation or gender identity/expression may be an additional indicator of how welcoming the school is of their type of family, as well as an additional level of protection for their child if she or he is harassed because of having LGBT parents. As shown in Table 25, whereas three-quarters of LGBT parents reported that their child's school had some type of safe school policy, less than half of parents (42%) reported that the policy specifically included language about sexual orientation and/or gender identity/expression. Although there were no significant differences across school level with regard to safe school policies, there were significant differences across school type. Parents whose children attended a non-religious private school were much more likely than other parents to report that the school had a comprehensive policy—nearly two-thirds (63%) compared to about a third for both public school parents and religious school parents (38% and 33%, respectively).[108]

## *Other School Supports*

Parents and students were also asked about other types of school activities or characteristics that may be supportive for LGBT families. Having other LGBT people who are part of the school community may provide a greater sense of attachment to the school and may be a resource for some LGBT parents. As shown in Figure 44, over half (61%) of the parents in the survey reported that there were other LGBT families who were part of the school and nearly half (47%) reported that there were teachers who openly identified as LGBT. Although parents' knowledge of other LGBT people at school did not vary across elementary, middle and high schools, it did differ across type of school. Parents with a child in a non-religious private school were much more likely than other parents to report that there were other LGBT families in the school community and that there were LGBT school personnel (see Figure 45).[109]

Another consideration for LGBT parents in assessing their child's school climate would be whether school personnel had had any training on LGBT issues.[110] Overall, few parents (10%) reported being aware of such trainings (see also Figures 44 and 45) and this low percentage was consistent across school levels. However, with regard to school type, the percentage of public school parents reporting such trainings was lower than private school parents (both religious and other).[111]

With regard to student reports, few students reported having access to LGBT-inclusive resources at their school. Less than a fifth (14%) reported that LGBT-related topics were included in any of their textbooks, and only a little more than a quarter (29%) said that their school library contained materials that included LGBT-related topics. Furthermore, less than half (45%) of students said that they were able to use school computers to access websites about LGBT-related information. Students were more likely to report that they had supports in the form of other students with LGBT parents. More than half (58%) of students in our survey reported knowing at least one other student at their school who had an LGBT parent or parents. Outside of school, almost two-thirds (62%) had at least one friend with an LGBT parent and 15% had more than 10 friends with an LGBT parent.

**Figure 42. Students' Reports on Quality of Representations of LGBT-Related Issues in Class**

**Figure 43. Students' Reports on Representation of LGBT Families in Family-Related Curriculum**

**Figure 44. Parents' Reports of Other LGBT-Related Resources in School by School Level**



**Figure 45.** **Parents' Reports of Other LGBT-Related Resources in School by School Type**

**Figure 46.** **Percentage of Students Who Were"Somewhat" or "Very Comfortable" Talking with School Community Members About Their LGBT Parents or Family**



**Figure 47. Percentage of Students Who Were "Somewhat" or "Very Comfortable" re: Various School and Home Activities**

100%
80%
60%
40%
20%
0%
82%
81%
73%
80%
Inviting Friends to Your Home
Inviting Friends to Spend Time with Your Family
Introducing Your Parents to Your Friends' Parents
LGBT Parents Attending School Events

**Figure 48. Parents' Report on Teachers Supportive of LGBT Issues by Characteristics**

How many teachers or other school staff do you know who are supportive of LGBT issues?
All or Most
Many
A Few
No/Don't Know
100%
80%
60%
40%
20%
0%
Total: 34%, 19%, 14%, 33%
Elementary School: 41%, 18%, 11%, 30%
Middle School: 27%, 18%, 15%, 40%
High School: 20%, 24%, 19%, 37%
Public: 27%, 21%, 14%, 38%
Private-Religious: 31%, 8%, 23%, 38%
Private-Other: 70%, 14%, 7%, 9%

98

AR_283689



**Figure 49. Parents' Report on Teachers Supportive of LGBT Issues by Locale and Region**

How many teachers or other school staff do you know who are supportive of LGBT issues?

## Table 24. Students' Reports Regarding Safe School Policies

| | Total |
|---|---|
| No Policy [a] | 27% |
| Any Policy | 73% |
| Comprehensive Policy | 35% |
| Generic Policy [b] | 38% |

[a] Includes those students who indicated they did not know if there was a policy or not.
[b] Includes those students who indicated they did not know if the policy included specific enumeration.

## Table 25. Parents' Reports Regarding Safe School Policies by School Type

| | Total | Public | Private–Religious | Private Other |
|---|---|---|---|---|
| No Policy [a] | 25% | 26% | 23% | 21% |
| Any Policy | 75% | 74% | 77% | 79% |
| Comprehensive Policy | 42% | 38% | 33% | 63% |
| Generic Policy [b] | 33% | 36% | 44% | 13% |

[a] Includes those parents who indicated they did not know if there was a policy or not.
[b] Includes those parents who indicated they did not know if the policy included specific enumeration.

## *Utility of School Resources and Supports*

In addition to documenting whether or not schools have institutional supports for LGBT families, such as supportive faculty, inclusive curricula, or Gay-Straight Alliances, it is also important to examine how such institutional supports may benefit LGBT parents and their children.

Even though most parents have a more limited day-to-day relationship with their child's school, the quality of the family-school relationship could be affected by the nature of LGBT-related resources and supports, particularly educator trainings regarding LGBT issues and comprehensive safe school policies.

**Supportive Educators.** The presence of school staff who were supportive of students with LGBT parents was related to students' academic achievement. As shown in Figure 50, as the number of supportive school staff increased, students' reported grade point averages (GPAs) also increased.[112] For example, students who could identify many (six or more) supportive staff at their school reported a GPA half a grade higher than students with no supportive school staff (3.4 versus 2.9).

A greater number of supportive educators was also related to fewer missed days of school due to safety concerns.[113] For example, almost a fifth (16%) of students who said they had no supportive staff reported missing school because they felt unsafe, compared to 10% of those who had many supportive staff at their school.

Given the relationships between the presence of supportive educators and student's academic achievement and sense of safety, it is important for schools to provide training for educators about LGBT-related issues, including how to provide appropriate support to students with LGBT parents. Such training may foster a more positive school climate for LGBT parents as well as students.

**Figure 50.** Student Achievement and Supportive School Staff

**Figure 51. Parents' Reports of LGBT-Related Educator Trainings in School and Indicators of School Climate**

Even though the minority of parents reported that their child's school had training related to LGBT issues, there were significant relationships between trainings and various aspects of school climate. Parents who reported that the school had such training were less likely to report that they were not acknowledged by the school as LGBT families and more likely to rate the school as inclusive of LGBT families as well as inclusive of other "nontraditional" families (see Figure 51).[114] With regard to harassment or mistreatment, these parents were also less likely to report that they themselves had experienced mistreatment in school related to being LGBT and less likely to report that their child had told them about being bullied or harassed in school (see also Figure 51).[115]

For parents who reported their child had been bullied or harassed in school, whether or not the school had had LGBT-related training was not related to the frequency with which parents addressed the problem with school staff. However, those parents who reported that the school had had training were more likely to report that addressing the problem with school personnel was indeed effective (see also Figure 51).[116]

It is possible that the parents in this study may have made an assumption that school personnel had had training related to LGBT issues as a result of their more positive experiences with the school. However, these results regarding educator trainings may be an indication that such trainings have a positive effect on how school personnel address LGBT issues in school. Future research is needed to understand the effect of educator trainings on school climate for LGBT parents and their children.

**Safe School Policies.** Parents' ratings on their school's inclusivity varied by the type of safe school policy the school reportedly had (see Figure 52). Parents from schools with comprehensive policies were least likely to feel unacknowledged as an LGBT family and most likely to rate the school as more inclusive not only of LGBT families but of other types of "nontraditional" families as well.[117] Furthermore, there was no evidence that having a generic policy was any different than having no policy whatsoever. Parents from schools with comprehensive policies were also less likely to report that they themselves had experienced mistreatment in school related to being LGBT.[118] Overall, parents whose child's school had a comprehensive safe school policy reported the lowest level of mistreatment and there were no differences between the no-policy and generic-policy groups (see also Figure 52).

There were no significant differences by school policy with regard to parents' reports of child harassment in school. Also, among parents whose children had been harassed, there were no differences in the frequency with which they talked to the school about the harassment. However, school policy appeared to make a difference in how parents felt the school handled issues related to child harassment. As also shown in Figure 52, parents from schools with comprehensive

**Figure 52. Parents' Reports of Safe School Policy and Indicators of School Climate**

Parents' Reports of Inclusivity
Percent Feeling Not Acknowledged as LGBT Family (Sometimes, Often, Frequently)
9%
18%
20%
Percent Reporting School Inclusive of LGBT families
81%
56%
62%
Percent Reporting School Inclusive of Other "Nontraditional" Families
91%
83%
78%
0%
20%
40%
60%
80%
100%
No Policy
Generic Policy
Comprehensive Policy

Parents' Experiences of Mistreatment in School
Percent of Parents Reporting Any Type of Mistreatment in School Because of Being LGBT (Sometimes, Often, Frequently)
9%
16%
23%
0%
20%
40%
60%
80%
100%

Parents' Interventions: Child Harassment
Percent of Parents Reporting that Staff Was Receptive When Parent Addressed Harassment (Somewhat or Very)
97%
90%
79%
Percent of Parents Reporting that Addressing Harassment with Staff Was Effective (Somewhat or Very)
89%
72%
62%
0%
20%
40%
60%
80%
100%

103

AR_283694

policies reported school personnel as most receptive to them when they addressed the issue of their child being harassed in school, followed by parents from schools with a generic policy.[119] Parents from schools with a comprehensive policy were also most likely to report that addressing child harassment with staff was effective.[120] Furthermore, there were no differences between the no-policy and generic-policy groups in effectiveness. Thus, although the presence of a comprehensive policy may not necessarily influence whether or not a parent decides to speak with school officials about their child's experiences of harassment, its existence may affect how school officials address the concerns of the LGBT parents who do bring the issue to their attention.

Although there were few significant differences in students' reports of school climate by type of school policy, there was a general trend in the data that students in schools with a comprehensive safe school policy reported fewer negative experiences in school. For example, Figure 53 illustrates that students in schools with comprehensive policies typically reported a lower incidence of mistreatment than students in schools with a generic policy or no policy at all. The difference was, in fact, significant for mistreatment by teachers—students in schools with comprehensive policies were less likely than other students to report mistreatment by a teacher.[121]

**State Safe School Legislation.** A growing number of states across the country have added explicit protections for LGBT students in their state education anti-discrimination and harassment statutes. As with school-level policies, whereas such laws perhaps have primary importance for protecting students from bullying and harassment, they may also afford protection to the children of LGBT parents with regard to harassment related to their actual or perceived sexual orientation and harassment related to their family constellation. Currently, ten states plus the District of Columbia prohibit discrimination or harassment on the basis of sexual orientation in schools and four of these states also include protections on the basis of gender identity.[122] Ten states currently have statewide "anti-bullying" laws that do not explicitly define "bullying" or list categories of students who should be protected from specific and prevalent forms of bullying.[123] Many safe school advocates believe that general anti-bullying laws are insufficient in protecting students from harassment and discrimination in schools because they are too vague and do not provide teachers and administrators with clear legal guidance. Proponents of general bullying laws often argue that enumerated categories do not necessarily provide stronger protection and are not necessary for protective safe schools legislation.

Given there were significant differences in LGBT parents' reports of school climate regarding the type of school-level safe schools policy, it is important to examine school climate for LGBT families and state-level safe schools legislation.[124] With regard to students' experiences in school, the existence of comprehensive safe schools legislation

**Figure 53. Safe School Policies and Students' Experiences of Mistreatment in School**

**Figure 54. State Safe Schools Legislation and Students' Reports of Biased Remarks**

**Figure 55. State Safe School Legislation and Indicators of School Climate for LGBT Parents**

was related to their reports of hearing certain types of biased language in school. As shown in Figure 54, students in states with comprehensive legislation were less likely to report hearing high frequencies of homophobic remarks and racist remarks than all other students. With regard to remarks about having LGBT parents, however, students from states with no safe school legislation were significantly higher than students from states with any type of safe school law and there were no differences between those from states with generic laws and those from states with comprehensive laws.[125]

With regard to parents' reports on school climate, although there were no significant differences across state legislations groups with regard to parental mistreatment and child harassment, there were differences in parental reports on school inclusivity.[126] Parents from states with comprehensive legislation were least likely to report not feeling acknowledged by the school community as an LGBT family and were most likely to report that the school was inclusive of LGBT families (see Figure 55). Furthermore, there is no evidence that generic safe schools legislation has any benefits over having no

legislation on these indicators of climate. Although there may be many contributing factors that might result in differences across states by type of safe school legislation, these findings nevertheless lend evidence to the claim that comprehensive safe school laws may be more effective than generic laws or no law at all in creating safer schools for LGBT students and families.

## Notes

95 See Kosciw, J. & Diaz, E. (2006). *The 2005 National School Climate Survey: The experiences of lesbian, gay, bisexual and transgender students in our nation's schools*. New York: GLSEN.

96 Percentages shown in the Figure are for illustrative purposes. Because the two inclusivity variables were highly correlated, differences between groups were tested by a multivariate analysis of variance. The multivariate effect was significant, Pillai's trace=.07, $F(4,1118)=10.6$, $p<.001$. Univariate effects were considered at $p<.01$.

97 Percentages shown in the Figure are for illustrative purposes. Because the two inclusivity variables were highly correlated, differences between groups were tested by a multivariate analysis of variance. The multivariate effect was significant, Pillai's trace=.09, $F(4,1120)=13.4$, $p<.001$. Univariate effects were considered at $p<.01$.

98 To learn more about the National Association of Multicultural Education, go to: http://www.nameorg.org/resources/FAQs.htm. (Accessed August 27, 2007).

99 Percentages shown in Figure for illustrative purposes. Group differences were examined using one-way analyses of variance. Findings were significant: $F(3, 141)=3.3$, $p=.021$, univariate effects were considered at $p<.05$.

100 Chi-square test was performed: $\chi^2=17.6$, $p<.001$, $df=2$, Cramer's V=.17.

101 Chi-square test was performed: $\chi^2=22.9$, $p<.001$, $df=4$, Cramer's V=.20.

102 Goodenow, C., Szalacha, L., & Westhimer, K. (2006). School support groups, other school factors, and the safety of sexual minority adolescents. *Psychology in the Schools*, 43(5), 573–589.

Harris Interactive & GLSEN (2005). *From teasing to torment: School climate in America, a survey of teachers and students*. New York: GLSEN.

Kosciw, J. G. & Diaz, E. M. (2006). *2005 National School Climate Survey: The experiences of lesbian, gay, bisexual, and transgender youth in our nation's schools*. New York: GLSEN.

Russell, S. T., McGuire, J. K., Laub, C., & Manke, E. (2006). *LGBT student safety: Steps schools can take. California Safe Schools Coalition Research Briefs No. 3*. San Francisco: California Safe Schools Coalition.

Szalacha, L. A. (2003). Safer sexual diversity climates: Lessons learned from an evaluation of Massachusetts safe schools program for gay and lesbian students. *American Journal of Education*, 110(1), 58–88.

103 Differences were examined using independent samples t-tests and percentages are for illustrative purposes. The t-statistic was significant: $t= -4.6$, $df=147.3$, $p<.001$.

104 Harris Interactive, Inc. & GLSEN Study: 2005 Data File. New York; GLSEN. Chi-square nonparametric test was performed to compare the percentages of students in the current study who reported that their school had a GSA with the percentages of students from the national population. $\chi^2=13.2$, $df=1$, $p<.001$.

105 School level: $\chi^2=22.3$, $p<.001$, $df=6$, Cramer's V=.14; School type: $\chi^2=70.4$, $p<.001$, $df=6$, Cramer's V=.25.

106 Chi-square test was performed: $\chi^2=26.9$, $p<.001$, $df=9$, Cramer's V=.13.

107 Chi-square test was performed: $\chi^2=23.6$, $p<.001$, $df=9$, Cramer's V=.14.

108 Chi-square test was performed: $\chi^2=24.3$, $p<.001$, $df=4$, Cramer's V=.15.

109 Other LGBT Families: $\chi^2=14.3$, $p<.001$, $df=2$, Cramer's V=.16; LGBT school personnel: $\chi^2=28.1$, $p<.001$, $df=2$, Cramer's V=.23.

110 This question was worded: "Does the staff at your child's school receive any sort of training in how to support students with LGBT families?"

111 $\chi^2=18.8$, $p<.001$, $df=2$, Cramer's V=.18.

112 The figure represents a correlational relationship. Pearson correlation: $r=.21$, $p<.05$.

113 Pearson correlation: $r=-.19$, $p<.05$.

114 Analysis excluded those parents who did not know whether the school had had educator trainings. Percentages shown in Figure for illustrative purposes. To examine differences between those parents who reported training and those who did not on feeling acknowledged and perceptions of inclusivity, independent-sample t-tests were conducted. Group differences were significant for not feeling acknowledged ($t=6.4$, $df=132$, $p<.01$) and for both inclusive regarding LGBT families ($t=-7.4$, $df=175$, $p<.01$) and inclusive regarding other "nontraditional" families ($t=-3.8$, $df=174$, $p<.01$).

115 Independent-sample t-test was employed to examine group differences. For parental mistreatment, we used the mean of the five mistreatment variables as an overall indicator of mistreatment by teachers, by principal, by other school staff, by students and by other parents. The t-statistic was significant for both mistreatment ($t=-2.8$, $df=175$, $p<.01$) and child reports of harassment in general ($t=-2.2$, $df=174$, $p<.05$) and child reports of harassment LGBT-related ($t=-3.2$, $df=175$, $p<.01$).

116 Analysis excluded those parents who did not know whether the school had had educator trainings. Percentages shown in Figure for illustrative purposes. To examine differences between those parents who reported training and those who did not on effectiveness of addressing harassment and receptiveness of school staff, independent-sample t-tests were conducted. Group differences were significant only for effectiveness of addressing harassment: $t=-2.74$, $df=82$, $p<.01$.

117 Percentages shown in Figure for illustrative purposes. To examine mean differences by type of policy (no policy, generic policy and comprehensive policy) on the acknowledgement and inclusivity variables, one-way analyses of variance were conducted. Group differences were significant for acknowledgement [$F(2,570)=7.7$, $p<.001$] and for both inclusive regarding LGBT families [$F(2,564)=27.4$, $p<.001$] and inclusive regarding other "nontraditional" families [$F(2,570)=9.9$, $p<.001$]. Univariate effects were considered at $p<.01$.

118 Percentages shown in Figure for illustrative purposes. For parental mistreatment, we used the mean of the five mistreatment variables as an overall indicator of mistreatment by teachers, by principal, by other school staff, by students and by other parents. Group differences regarding mistreatment were examined using one-way analyses of variance. Findings for overall mistreatment were significant: $F(2,575)=4.8$, $p<.01$, univariate effects were considered at $p<.05$.

119 Percentages shown in Figure for illustrative purposes. Group differences were examined using one-way analyses of variance. There were significant mean differences on receptiveness to parents addressing harassment with staff: $F(2,253)= 7.4$, $p<.001$. Given that the smaller sample size of parents who reported their child had been harassed and that the parent had addressed the issue with school personnel, univariate effects were considered at $p<.05$ rather than the more conservative $p<.01$ used in other full sample analyses.

120 Percentages shown in Figure for illustrative purposes. Group differences were examined using one-way analyses of variance. There were significant mean differences on effectiveness of addressing harassment with staff: $F(2,253)= 13.2$, $p<.001$. Given that the smaller sample size of parents who reported their child had been harassed and that the parent had addressed the issue with school personnel, univariate effects were considered at $p<.05$ rather than the more conservative $p<.01$ used in other full sample analyses.

121 To examine group differences on school policy on students' reports of harassment and mistreatment, a series of multivariate analyses of variance (MANOVAs) were performed. The multivariate effect for the five mistreatment dependent variables (mistreatment because of having LGBT parents from teacher, principal, other school staff, other parents, or peers) was marginally significant, Pillai's trace=.12, $F(10,290)=1.8$, $p<.10$. The univariate effect for mistreatment from teachers was significant ($p<.05$), and the univariate effects for mistreatment from principal and from peers were marginally significant ($p<.10$). The univariate effects for mistreatment by other school staff and from other parents were not statistically significant. Figure 52 shows percentages of high mistreatment by policy group only for illustrative purposes. In that no student reported high levels (sometimes or greater) of mistreatment by the school principal, the marginal effect for that variable is not shown.

122 States that include protection based on sexual orientation are: California, Connecticut, Iowa, Maine, Massachusetts, Minnesota, New Jersey, Vermont, Washington, and Wisconsin. States that also include protection on the basis of gender identity are California, Iowa, Maine, Minnesota and New Jersey. For more information on state laws as well as a state-by-state analysis of school safety protections, see GLSEN's report, *State of the States 2004: A Policy Analysis of Lesbian, Gay, Bisexual and Transgender (LGBT) Safer School Issues*. Available from the GLSEN website: www.glsen.org.

123 States that have generic legislation are: Arizona, Arkansas, Colorado, Georgia, Louisiana, Oklahoma, Oregon, Illinois, New Hampshire, Rhode Island and West Virginia. Also see GLSEN's State of the States 2004 report.

124 Of the states with comprehensive legislation, Iowa and Maine passed their legislation after data collection for this survey was completed, and thus, they were not included in the Comprehensive group but in the No Legislation group for analytical purposes. Similarly, Arizona passed their generic legislation after data collection was completed and were also included in the No Legislation group.

125 Percentages shown in Figure for illustrative purposes. To examine mean differences by type of state law (no law, generic law and comprehensive law), one-way analyses of variance were conducted. Group differences were significant for homophobic remarks [$F(2,152)=12.6$, $p<.01$], racist remarks [$F(2,151)=14.4$, $p<.01$] and remarks about having LGBT parents [$F(2,151)=10.2$, $p<.01$]. Univariate effects were considered at $p<.05$.

126 Percentages shown in Figure for illustrative purposes. To examine mean differences by type of state law (no law, generic law and comprehensive law) on the acknowledgement and inclusivity variables, one-way analyses of variance were conducted. Group differences were significant for acknowledgement [$F(2,572)=5.6$, $p<.01$] and for inclusive regarding LGBT families [$F(2,565)=7.4$, $p<.001$]. Univariate effects were considered at $p<.01$. For the acknowledgement variable, mean differences were significant only between the comprehensive law group and the no law group. For the inclusivity variable, mean differences were significant only between the comprehensive law group and the other two groups.

# DISCUSSION AND RECOMMENDATIONS

110

## Limitations

Before discussing the implications of the current study, it is important to note some of the limitations. We employed two methods for obtaining participants and each of the two methods had differing success rates for the parent and the student surveys. In contrast to our previous research on LGBT students, obtaining students with LGBT parents via the Internet was less successful in this study and more rigorous recruitment was needed via community groups for LGBT families, family events and summer camps. For parents, the Internet survey resulted in a greater number of respondents than did the paper surveys by way of community groups and family events. It may be that students with LGBT parents are less likely to be connected to community listservs and other email lists, the primary route for announcing our on-line survey. Many community groups for LGBT families were no longer active or only existed in "virtual" capacities (e.g., through email lists or listservs), and it may be that there are fewer physical community-based supports (e.g., groups with regular meetings or family activities). For LGBT parents, it may be that they are more likely to subscribe to e-mail lists and belong to LGBT parenting listservs. Furthermore, it may be that the flexibility of taking an on-line survey at one's own convenience is more suitable for a parent's busy schedule.

LGBT families who were represented in this study had some connection with the LGBT community, either through a national organization for LGBT parents and/or their children, and local community groups or services for this population. Thus, the results in this report may not be representative of those families who may not be aware of such community supports or who cannot access them. For example, many of the parents and students who completed the survey were attending summer vacation events that attract families from all over the country.Yet some families may not have the time or financial resources to attend such events. Similarly, given that the student survey was only for those attending secondary school, it is difficult to know how certain common adolescent developmental characteristics, such as individuation from family, play a role in participation in the survey. For example, some adolescents with LGBT parents may not be interested in attending events for children of LGBT parents because they do not want to attend family-related functions, in general, or they may not feel the need to connect with other students based on a shared parental characteristic.

As mentioned in the Methods section, although the majority of students identified as heterosexual, the student sample may have had a higher representation of students identifying as lesbian, gay or bisexual than might be expected from national percentages. Given that a large portion of the survey respondents learned about the survey via GLSEN's website and given that GLSEN provides information and resources for LGBT-identified students, it is likely that the percentages of students in this study who identified as lesbian,

gay or bisexual is greater than would be expected in the general population of adolescents with LGBT parents. In fact, this hypothesis is borne out by the fact that more students who learned about the study via GLSEN's website identified as lesbian or gay than students who took the paper version of the survey. Furthermore, it is possible that LGBT students who happen to have LGBT parents may be more comfortable with their sexual orientation and gender identity and may be more connected to LGBT community organizations such as GLSEN or COLAGE (Children Of Lesbians And Gays Everywhere) through which they learned abut the current study. It is also worth noting that the higher percentage of LGB-identified students in the sample may also be a reflection of the fact that LGBT adolescents in the foster care system may often be placed with and perhaps adopted by LGBT-identified adults[127] and that LGBT adolescents are in the foster care system in significant numbers.[128] Given the number of LGB-identified students in the sample, the overall view of school climate depicted in this report, related to issues of sexual orientation and gender identity/expression, could be somewhat skewed—LGB students were more likely than non-LGB students to report victimization in school based on their gender, sexual orientation and gender identity/expression.Yet there were no differences by sexual orientation on students' reports of bias in school related to having LGBT parents. Further research is needed that examines the intersection of LGBT identity of students and LGBT family status as it relates to student school experiences.

Although examining demographic differences among families was not the main purpose of this study, a larger sample size would have allowed for more comparisons in educational experiences across different types of families (e.g., families with gay fathers versus lesbian mothers, adoptive versus non-adoptive families). Among the parent sample, for example, the most common type of family constellation was two lesbian parents with a child in elementary school. Furthermore, it is important to note that there were very few parents in the study who identified as transgender and because of this small representation, we were not able to discern whether transgender parents differed significantly in their interactions with their children's schools. Among the student sample, there were few students who identified as transgender and only a small number of students of color, which limited our ability to examine whether the school experiences for these students were different than other students in the study. More large scale research is needed to examine in greater detail how the family-school connection may vary by family composition.

It is important to note that the level of analysis for this study was not at the family-level and the parents and students who participated in the surveys were not necessarily from the same families. For this reason, we were not able to examine any relationship between student reports and parent reports. Future research is needed that can explore how parental involvement or intervention with the school

may affect the child's experience of school climate. Lastly, the data from our survey is largely cross-sectional, meaning that the data was collected at one point in time. Thus, with the possible exception of the policy analyses, we cannot determine causality. For example, we cannot make definitive statements regarding the effectiveness of having supportive school staff, although we can say that there was a positive relationship between the number of supportive staff and parental involvement in the school.

## Conclusions and Recommendations

The results of this survey help to further the discussion of LGBT issues in K–12 education by highlighting the experiences of LGBT parents and their children. Furthermore, it highlights how schools must understand school climate and school safety not only for students but for other members of the school community, such as parents. Educational experts maintain that the family-school relationship is an important factor in academic success for the student. To the extent that certain parents are excluded or not welcome in school activities or are mistreated by school staff and other parents, they may feel that they have less access to school information or educational resources for their children or may not have the same rights to voice problems or concerns than other parents, which in turn, could have negative consequences for student academic performance. LGBT parents in this study were more likely to report having problems with students in the school or parents of other students than they were to report having problems with school personnel (the principal, teachers and other staff). It is important for school personnel to understand that harassment by students of anyone in the school community, whether it be a student or a parent of a student, should not be tolerated. Furthermore, school personnel must consider that their responsibility for maintaining a safe environment for all members of the school community extends beyond students, teachers and staff. Parents must be held accountable for their actions while on school premises and mistreatment by parents of students while at school is the responsibility of the school. Parent-teacher organizations must also address issues of school climate and educate parents about school safety and their responsibility for creating and maintaining a safe and welcoming environment for all parents as well.

Many LGBT parents in the survey carefully considered certain characteristics of a school when deciding on their child's enrollment, perhaps in order to ensure a safer and better learning environment for their children. Although the majority of parents reported that their child attended public school, the percentage of parents whose children were enrolled in private school (both religious and non-religious) was higher than the national percentage. Furthermore, nearly half of all parents in the study reported that they made the decision to enroll their child in a particular school for reasons other

than it was their local school. Although the most common reason for school selection was the academic reputation of the school, another common reason was the diversity of the school population. In addition, nearly half of the parents also sought out information about the school regarding how the school would address LGBT issues and the majority of these parents said this information was very important in their decision-making. LGBT parents may choose diverse schools or assess the reputation of the school regarding LGBT issues as protective measures to ensure a more positive school experience for their child or a more positive family-school connection. Such protective measures may also be more important for parents with younger age children as elementary school parents in our study were more likely to base their school selection on these factors.

It is important to reiterate that not all LGBT parents may have the ability to select the school their child attends. Sending one's child to a non-public school may involve a financial commitment that many parents may not be able to afford. Some public school districts, particularly smaller districts, may not have multiple schools at each level from which parents could choose. Some districts may not allow parents to enroll their child in a school that is not their designated school. Furthermore, some parents may not feel comfortable speaking with their school about LGBT issues for a myriad of reasons prior to enrollment. For example, a parent may not be open about being LGBT or feel safe in their community as an LGBT person, or a parent may anticipate that the reaction will not be positive and to do so would negatively affect their child's school experience.

LGBT parents in the survey often reported being very involved in school activities and having frequent communication with school personnel about their child's education. In fact, these parents were more likely than parents nationally to volunteer in school activities, attend parent-teacher conferences and belong to the parent-teacher organization. As with decision-making about school enrollment, LGBT parents may be more involved in their child's school in order to have greater information about what their child is experiencing in school and to ensure that she or he is safe.

In our previous research with secondary students, both LGBT and non-LGBT, students often heard homophobic remarks and other kinds of biased language in school. The students in our current study were no exception and most reported hearing these types of remarks frequently in their schools. However, these students also appeared to experience certain unique forms of harassment. A substantial percentage of students heard negative remarks about having an LGBT parent—remarks that may or may not have been directed specifically at them and many students also reported being verbally harassed because of having LGBT parents. In addition, it was not uncommon for some students to have been harassed because of their sexual orientation or because their peers assumed they were gay or lesbian because of their parents. Although these incidents

were not experienced by the majority of students in the survey, they were the most commonly reported forms of harassment—higher than harassment based on religion, race/ethnicity or disability, for example. It is particularly disturbing that many students reported being mistreated because of having LGBT parents by other parents in the school. These findings again raise the concern that schools must hold all members of the school community—school personnel, students and parents alike—accountable for their actions when they add to a hostile environment for students.

As we have found in previous studies with LGBT students, most students with LGBT parents do not report harassment to school authorities and often think that school personnel will not effectively address the problem. In contrast to the experiences of LGBT students, most of the LGBT students with LGBT parents had told their parent or guardian when victimized in school and most also reported that the parent or guardian addressed the matter with the school. Furthermore, most parents in the study reported that they had addressed the harassment with the school. Thus, in contrast to other populations of students such as LGBT students who may not be "out" to family members, it appears that students with LGBT parents may have more supports in that they may feel they can talk to their parents about negative experiences in school, particularly if these experiences are related to their family or perhaps even to their own sexual orientation or gender identity/expression. When parents intervened, they most often felt that that school personnel were very receptive and that the intervention was effective. Parents, however, may not be the best judge of the effectiveness of talking with school personnel on their child's behalf and students were not asked in the study how effective they felt their parental intervention was. Future research is needed, particularly at the family-level, that examines the relationship between student's experiences in school, parent's knowledge of their child's school experience and the effect that parental involvement and intervention has on the student's academic experience.

The findings from the survey remind us that school climate is much more than a safety issue; it is also an issue of a student's right to an education. Students in our survey who experienced frequent harassment because of having LGBT parents, or because of their own sexual orientation or gender expression reported skipping classes and missing more days of school than other students. Thus, steps that schools take to improve school climate are also an investment in better educational outcomes.

Results from this study also highlight the important role that institutional supports can play in making schools safer for these students. Students whose school had a comprehensive safe school policy were less likely to report mistreatment because of having LGBT parents. The results of the parents survey provide further evidence of the importance of institutional supports regarding LGBT issues in school. Parents who

reported that their child's school had a comprehensive policy were more likely to report that addressing their child's harassment was an effective intervention, relative to other parents. Parents themselves reported a lower frequency of mistreatment in school when the school had a comprehensive policy. Results also provide evidence regarding the importance of supportive staff in the school experiences of students with LGBT parents. As the number of supportive school staff increased, students' reported grade point averages increased, and their frequency of missing school because of feeling unsafe decreased. The results also provide evidence supporting school personnel trainings on LGBT issues. Those parents who reported their child's school had had such a training were less likely to report that their child had been bullied or harassed in school, both in general and specifically related to their family. In addition, parental reports of educator trainings were associated with a more positive response from school personnel when parents addressed their child's harassment.

As with school-level policies, state-level comprehensive safe school legislation was associated with better school climate for LGBT families. Students in states with comprehensive legislation were less likely to hear homophobic and racist remarks in their schools and LGBT parents in these states were more likely to feel included in the school community. Unfortunately, while some states have made progress in implementing such laws, the majority of our nation's students remained unprotected at the state level.

It is clear that there is an urgent need for action to create a safer school climate for all students. There are steps that all concerned stakeholders can take to remedy the situation. Results from this study illustrate the ways in which the presence of effective legislation or policy and in-school resources and supports can have positive effects on school climate, students' sense of safety, and, ultimately, on students' academic achievement and educational aspirations. Furthermore, these results show how such school resources also enhance the family-school relationship, which in turn could further benefit for student achievement. Therefore, we recommend educators and education leaders and policymakers:

- Advocate for comprehensive anti-bullying and anti-discrimination legislation at the state and federal level that specifically enumerate sexual orientation and gender identity/expression as protected categories alongside others such as race, faith and age;
- Adopt and implement comprehensive anti-bullying policies in individual schools and districts, with clear and effective systems for reporting and addressing incidents that students experience;
- Provide training for school staff to improve rates of intervention regarding bullying and harassment, and increase the number of supportive faculty and staff available to students;

- Include multicultural diversity training into professional development that includes information about LGBT families;
- Support student clubs, such as GSAs, that address LGBT issues in education; and
- Increase student access to appropriate and accurate information regarding LGBT people, history and events.

Parent-teacher associations must also acknowledge the diversity of their school communities and take steps to ensure that no one experiences mistreatment—students and parents alike. Thus, we advocate that they:

- Endorse policies and practices about appropriate and acceptable conduct for parents at school, and
- Offer educational programs for parents in the school community that include information about LGBT families.

Taken together, such measures can move us towards a future in which every child learns to respect and accept all people, regardless of sexual orientation or gender identity/expression and a future in which parents and school personnel can work together to promote a positive learning environment for all children.

## Notes

127 A report from the Evan B. Donaldson Institute has shown that agencies focusing on "special needs" children and youth were much more likely to accept applications from gays and lesbians than other agency types which is noteworthy in that many of the LGBTQ youth in foster care would be considered "special needs" children. Source: Brodzinsky, D.M. (2003) *Adoption by lesbians and gays: A national survey of adoption agency policies, practices, and attitudes.* New York: Evan B. Donaldson Adoption Institute. http://www.adoptioninstitute.org/whowe/ Gay%20and%20Lesbian%20Adoption1.html.

128 Sullivan, C.; Sommer, S., & Moff, J. (2001). *Youth in the margins: A report on the unmet needs of lesbian, gay, bisexual, and transgender adolescents in foster care.* New York: Lambda Legal. Accessed from: http://www.lambdalegal.org/our-work/publications/page.jsp?itemID=32009148.



GLSEN

Gay, Lesbian and Straight Education Network
90 Broad Street
2nd Floor
New York, NY 10004
www.glsen.org

ISBN-13: 978-1-934092-02-6
ISBN-10: 1-934092-02-9
51500
EAN
9 781934 092026

HHS Public Access
Author manuscript
*J Sch Psychol*. Author manuscript; available in PMC 2016 June 30.

Published in final edited form as:
*J Sch Psychol*. 2016 February ; 54: 29–38. doi:10.1016/j.jsp.2015.10.005.

# Are School Policies Focused on Sexual Orientation and Gender Identity Associated with Less Bullying? Teachers' Perspectives

**Stephen T. Russell**,
University of Texas at Austin, United States

**Jack K. Day**,
University of Texas at Austin, United States

**Salvatore Ioverno**, and
Sapienza University, Italy

**Russell B. Toomey**
University of Arizona, United States

## Abstract

Bullying is common in U.S. schools and is linked to emotional, behavioral, and academic risk for school-aged students. School policies and practices focused on sexual orientation and gender identity (SOGI) have been designed to reduce bullying and show promising results. Most studies have drawn from students' reports: We examined teachers' reports of bullying problems in their schools along with their assessments of school safety, combined with principals' reports of SOGI-focused policies and practices. Merging two independent sources of data from over 3,000 teachers (*California School Climate Survey*) and nearly 100 school principals (*School Health Profiles*) at the school level, we used multi-level models to understand bullying problems in schools. Our results show that SOGI-focused policies reported by principals do not have a strong independent association with teachers' reports of bullying problems in their schools. However, in schools with more SOGI-focused policies, the association between teachers' assessments of school safety and bullying problems is stronger. Recent developments in education law and policy in the United States and their relevance for student well-being are discussed.

School bullying has received significant public attention in recent years. There has been rising concern that experiences of bullying are linked to emotional, behavioral, and academic risk for school-aged youth (Hong & Espelage, 2012), as well as growing interest in school policies and practices that can reduce bullying in schools (Hatzenbeuhler & Keyes, 2013; Russell, Kosciw, Horn, & Saewyc, 2010). School policies and practices focused on sexual orientation and gender identity (SOGI) emerged in the last decades in response to the well-documented problem of bullying and lack of school safety for lesbian, gay, bisexual, transgender, queer and questioning (LGBTQ) students (Collier, Beusekom, Bos, & Sandfort, 2013; Russell et al., 2010). Research has identified SOGI-focused policies that are associated with lower rates of bullying (e.g., Kosciw, Greytak, Palmer, & Boesen, 2014; O'Shaughnessy, Russell, Heck, Calhoun, & Laub, 2004; Russell et al., 2010). Such policies and practices include enumerated school nondiscrimination and anti-bullying policies; the availability of health, psychological, and social services designed to address the unique

Author Manuscript Author Manuscript Author Manuscript Author Manuscript

Author Manuscript Author Manuscript Author Manuscript Author Manuscript

needs of LGBTQ students; teacher professional development to address SOGI issues; and the presence of safe spaces and school clubs such as gay-straight alliances (GSAs; see Russell et al., 2010 for a review of research on SOGI-focused policies and practices).

In addition to SOGI-focused policies and practices, the climate of safety in schools is an important factor related to bullying. Multiple studies document the strong association between students' perceptions of feeling unsafe and their bullying experiences at school (Berkowitz & Benbenishty, 2012; Glew, Fan, Katon, & Rivara, 2007; Srabstein & Piazza, 2008), and there is evidence that there is less bullying in schools characterized by safe school environments (Espelage, Low, & Jimerson, 2014; Hong & Espelage, 2012). Thus, as illustrated in the conceptual model in Figure 1, both the presence of policies and practices designed to reduce bullying (path A) as well as the safety climate of schools (path B) should be associated with lower bullying or fewer bullying problems in schools. Because SOGI-focused policies and practices are intended to create the broader context for positive school climates and less bullying, the association between school safety and bullying may be stronger in the absence of such policies and practices (illustrated by the moderating path, C).

In this study we used multi-level models to examine teachers' perceptions of bullying at school, taking into consideration their reports of the overall safety climate of schools along with differences across schools in SOGI-focused policies and practices reported by school principals. This approach is distinct for several reasons. First, most research on bullying, school safety, and SOGI-focused policies and practices in schools has relied on student-level data. Relatively little research has used administrative reports of school policies, or has considered teachers' perspectives of school bullying (Espelage et al., 2014; Yoon & Bauman, 2014). Because of their position within schools, teachers' roles extend beyond instruction and exist at the heart of everyday interactions among students. They are in a unique and typically overlooked position to provide a point of view regarding bullying in schools that takes into account their understanding of the climate of school safety and students' experiences (Troop-Gordon & Ladd, 2015). Second, an important finding that has emerged from studies of bullying and school safety is that not all schools are the same: Rates of bullying and school safety vary notably across schools (Russell & McGuire, 2008; Toomey, McGuire, & Russell, 2012). These differences across schools have been shown to be partly attributable to educational policies and practices designed to create safe and supportive school climates (Russell & McGuire, 2008; Toomey et al., 2012), yet few studies account for differences across schools in policies and practices.

In the following sections we first review what is known about SOGI-focused policies and practices. We then consider prior research on bullying and school safety, including a review of the small existing body of research that focuses explicitly on teachers and other school personnel, and their role in creating safe schools and reducing bullying. We presented analyses that strategically combined two independent state-wide databases from California, one from school principals and one from teachers, merged at the school level. These data allowed us to model teachers' perceptions of the school climate with respect to bullying, accounting for their perspectives on safety, as well as differences across schools in SOGI-focused policies and practices as reported by principals.

Author Manuscript Author Manuscript Author Manuscript Author Manuscript

## SOGI-Focused Policies and Practices

Several SOGI-focused policies and practices have been shown to promote school safety and reduce bullying. Some relevant studies have been conducted with samples of LGBT students, and others have shown the efficacy of SOGI-focused policies and practices in samples of general student populations.

First, at the most basic policy level, enumerated policies that prohibit discrimination and bullying based on sexual orientation and gender identity or expression have been linked with multiple positive outcomes for students. Students in schools with enumerated policies report stronger connections to school, more safety, and less bullying or harassment (O'Shaughnessy et al., 2004; Kosciw et al., 2014), and among LGBTQ youth, fewer suicide attempts (Goodenow, Szalacha, & Westheimer, 2006; Hatzenbuehler & Keyes, 2013). Such SOGI-focused policies create a policy context for other practices in schools that support school safety and reduce bullying (Black, Fedewa, & Gonzales, 2012; Russell & McGuire, 2008).

Second, with enumerated policies as a foundation, the availability of SOGI-focused information, resources, and curricula is another area of school policy and practice associated with positive school climates (Lipkin, 1999). A study of over 6,000 students in 17 California schools found that students who reported that they knew where to go for "information and support about sexual orientation, gender identity, or LGBT issues" reported hearing fewer LGBT-related slurs at school; independently, the proportion of students who reported knowing where to go for information and support was associated with rates of reported LGBT-related slurs across schools (Russell & McGuire, 2008). LGBTQ Students in a national study who reported having learned about LGBTQ issues at school reported: (a) fewer homophobic slurs; (b) less homophobic victimization; (c) more feelings of safety; and (d) more supportive conversations with teachers at school (Kosciw et al., 2014).

Yet most public school districts across the United States have not institutionalized policies and programs to address anti-LGBTQ bullying, nor to promote safety in school for LGBTQ youth (Rienzo, Button, Sheu, & Li, 2006). For example, the majority of LGBTQ students in the national study (89.9%) reported that they do not have access to comprehensive resources related to sexual orientation and gender identity at school (Kosciw et al., 2014). Further, according to nation-wide data from principals from the *School Health Profile* surveys (Demissie et al., 2013), the presence of SOGI-focused policies varies widely across U.S. states. The percentage of schools that facilitate access to providers who have experience providing health and social and psychological services to LGBTQ youth ranged from 29% to 63% across states, and the proportion of schools that provide materials about HIV, sexually transmitted disease, pregnancy prevention information relevant to LGBTQ youth ranges widely from 8% to 44% across states (Demissie et al., 2013). These studies document that access to resources and support regarding LGBTQ youth and issues greatly varies across schools and states, but is important for creating a climate of safety at schools and for preventing bullying.

Author Manuscript Author Manuscript Author Manuscript Author Manuscript

Third, training for teachers on SOGI issues also has been identified as an important strategy to promote school safety and reduce bullying (Sawyer, Porter, Lehman, Anderson, & Anderson, 2006) and many schools offer SOGI-specific professional development opportunities to teachers and staff (e.g., Demissie et al., 2013). Such training is needed because school personnel have reported discomfort addressing SOGI issues in the classroom, and some even report a belief that harassment is caused or exacerbated by the victims themselves (Human Rights Watch, 2001). A state-wide study in Massachusetts showed that students reported a safer diversity climate in schools in which teachers were trained in LGBTQ youth violence and suicide prevention (Szalacha, 2003). Importantly, bullying intervention research shows that when teachers intervene in bullying, they model these skills for students and increase students' confidence to address bullying (Hirschstein, Edstrom, Frey, Snell & MacKenzie, 2007), and reduce the negative effects of a hostile school (Greytak, Kosciw, & Boesen, 2013; Russell, Seif, & Truong, 2001). A recent U.S. survey of LGBTQ secondary school students (Kosciw et al., 2014) found that students who reported a greater number of supportive school personnel also reported feeling more safe at school, less truancy, a greater sense of connectedness, and higher grade point averages.

Finally, the availability of safe spaces, including youth-led GSAs or similar student clubs, is linked with school safety and lower bullying for LGBTQ as well as heterosexual students. Students in schools with GSAs report fewer homophobic remarks, less harassment and bullying based on sexual orientation or gender identity, are less likely to miss school because of feeling unsafe, and are more likely to feel a sense of belonging to their school (e.g., Toomey & Russell, 2013; Kosciw et al., 2014). In a state-wide study in Massachusetts, Szalacha (2003) found that the presence of a GSA (not necessarily membership or participation in it) was a strong predictive factor in perceived school safety for LGBTQ as well as heterosexual students. Another study documented that the presence of a GSA reduced sexual prejudice among heterosexual students (Horn & Szalacha, 2009). Further, several studies have found associations between the presence of a GSA and lower engagement in health-risk behaviors such as smoking, drinking, or risky sexual behavior (e.g., Poteat, Sinclair, DiGiovanni, & Russell 2013), and mental health outcomes (e.g., depressive symptoms; Toomey, Ryan, Diaz, & Russell, 2011).

In summary, a number of SOGI-related policies and practices have been shown to be associated with student safety and well-being, and less bullying. Notably, most studies have treated these policies and practices separately: Few studies account for multiple SOGI-focused school policies and practices (for exceptions see Kosciw et al., 2014; O'Shaughnessy et al., 2004; Szalacha, 2003).

## School Safety: Teachers' Perspectives

In recent years there has been a growing shift to move beyond a focus on the individual student to examine the climate of schools as a crucial factor for understanding student safety and well-being (Horn, Kosciw, & Russell, 2009; Szalacha, 2003). For example, in studying peer groups within schools, Poteat (2008) found that youth who were in homophobic peer groups were more likely to respond aggressively to personal victimization by calling another peer a homophobic epithet, whereas youth in less homophobic peer groups were less likely

Author Manuscript Author Manuscript Author Manuscript Author Manuscript

to respond to victimization with aggression. Other studies have documented differences across schools in youths' experiences of school safety. Data from a national study showed that a substantial proportion of the statistical variability in perceptions of school safety was between schools (an intraclass correlation of 8%; Russell & McGuire, 2008). In a large sample of California high school students, over 10% of the variance in perceptions of safety for LGBTQ students was between schools (Russell & McGuire, 2008), and 13% – 18% of the variance in perceptions of safety for gender non-conforming students was between schools (Toomey et al., 2012). Compared to other studies of school-level variability in adolescent health and behavior data (e.g., Anderman, 2002; Murray & Blitstein, 2003), this variability in safety across schools is notable and nontrivial.

This attention to school-level differences underscores the relevance of studying teachers' perspectives regarding school climate and bullying, as well as administrative information about school policies and practices. Teachers generally tend to underestimate bullying in schools compared to students (e.g., Bradshaw, Sawyer, & O'Brennan, 2007); nevertheless, the evidence suggests that there is strong correspondence between teachers and students in assessments of bullying and school climate. A recent study (Espelage, Polanin, & Low, 2014) used multi-informant multilevel modeling and found an overlap between teachers, staff, and students in their perceptions of school environment: In schools where teachers perceived aggression problems, students reported greater bullying, victimization, and aggression. Other research has examined teachers' perceptions of the administrative climate of schools and found that when teachers believe that policies are effectively articulated and implemented, they may also perceive or observe lower levels of bullying in their schools. For example, in one study, teachers' perceptions of administrator commitment to bullying prevention was associated with less frequent bullying in schools (e.g., Low & Van Ryzin, 2014).

Teachers play an important role in promoting safety and reducing bullying in schools. Studies show that there are lower levels of bullying or a reduction in bullying behavior over time in elementary schools in which students perceive more support from teachers (Gage, Prykanowski, & Larson, 2014) or are more willing to report bullying to teachers (Cortes & Kochenderfer-Ladd, 2014). Similar results have been found among middle and high school-aged students (Turner, Reynolds, Lee, Subasic, & Bromhead, 2014). The role that teachers play in actively reducing bullying is influenced both by their perceptions of the problem of bullying in their schools (e.g., Holt & Keyes, 2004) as well as their perceptions of the overall school climate. For example, a recent study (Oldenburg et al., 2014) showed that higher victimization rates in classrooms are associated with a greater tendency among teachers to attribute the cause of the bullying to factors outside of their control and, consequently, to feel less confident about their abilities to intervene in bullying. Espelage and colleagues (2014) reported that staff and teachers' commitment to prevent bullying was associated with less bullying, fighting and peer victimization. Likewise, Low and Ryzin, (2014) examined school climate as a moderator of bullying prevention efforts over 1-year period and found a reduction in bullying in schools in which staff and teachers had clear commitment to bullying prevention and perceived a more positive psychosocial school climate. Thus, although teachers may perceive less bullying than students overall, there is evidence that

Author Manuscript Author Manuscript Author Manuscript Author Manuscript

their perspectives on bullying are reliable and related to their perceptions of the school administration and climate.

Finally, there are other characteristics of teachers (Hold & Keyes, 2004) and of schools (Kasen, Berenson, Cohen, & Johnson, 2004) that may influence bullying problems or teachers' perspectives of them. Programs that focus directly on bullying prevention are generally effective in reducing bullying (Ttofi & Farrington, 2010). Further, teachers with more classroom experience and from racial/ethnic minority backgrounds may have more awareness of bullying (Gregory et al., 2010), and bullying may be more common in schools in disadvantaged communities (Gregory et al., 2010) and with low overall academic performance.

## The Current Study

In the current study we examined differences across schools in SOGI-focused policies and practices as they relate to teachers' perceptions of bullying at school. We included teachers' perceptions of school safety, and examined whether a lack of safety in school is associated with more bullying in the absence of SOGI-focused policies and practices:

> $H_1$: More SOGI-focused policies and practices will be associated with fewer bullying problems as reported by teachers across schools (Figure 1, path A).
>
> $H_2$: Teachers' reports of school safety will be negatively associated with reports of bullying problems (path B).
>
> $H_3$: The association between school safety and bullying problems will be stronger in the absence of SOGI-focused policies and practices (path C).

## Methods

### Sample

We merged two independent surveys with overlapping samples, one based on school principal reports and the other on reports from teachers. School-level data are based on principal reports from the 2010 California *School Health Profile* (SHP), developed by the Center for Disease Control and Prevention and collected in public schools across the United States biennially (Demissie et al., 2013). Teacher-level data came from the *California School Climate Survey* (CSCS), collected in the years following the SHP data, between 2011 and 2013. The CSCS is administered in all schools across California at least every two years, though teacher participation is voluntary, in conjunction with the *California Healthy Kids Survey* (CHKS), and in compliance with the No Child Left Behind Act (http://cscs.wested.org). In addition to these surveys we merged a third source of data: Administrative data regarding school academic and demographic characteristics that are publicly available from the California Department of Education (CDE).

### Measures

**Bullying problems—**Teacher perceptions of bullying, our outcome, is assessed through responses to the CSCS question, "At this school, how much of a problem is harassment or

Author Manuscript Author Manuscript Author Manuscript Author Manuscript

bullying among students?" The item is measured on a scale from 0 (*insignificant problem*) to 3 (*severe problem*).

**SOGI-focused policies—**The presence or absence of SOGI-focused policies within schools were reported in the SHP. Principals reported on five SOGI-focused policies (1 = policy is present, 0 = policy is not present) by answering the prompt: "Does your school…" (1) "prohibit harassment based on perceived or actual SOGI;" (2) "encourage staff to attend professional development on safe and supportive school environments;" (3) "identify safe spaces for LGBTQ youth;" (4) either "facilitate access to providers not on school property who have experience in providing health services, including HIV/STD testing and counseling, to LGBTQ youth" or "facilitate access to providers not on school property who have experience in providing social and psychological services to LGBTQ youth" (1 = positive response to either); and (5) "have a student-led club to create a safe school environment for all youth, regardless of SOGI." We created an index measure by taking the sum score of these items (0 = no SOGI-focused policies; 5 = all 5 policies; $M = 3.59$). Descriptive statistics for each item are reported in Table 2.

**School safety—**An index of school safety was created with teacher responses to 7 items from the CSCS ($\alpha = .87$): (1)"school is a safe place for students" (0 = *strongly agree*, 3 = *strongly disagree*); (2) "school is a safe place for staff" (0 = *strongly agree*, 3 = *strongly disagree*); (3) "How much of a problem at this school is physical fighting between students" (0 = *insignificant problem*, 3 = *significant problem*); (4) "How much of a problem at this school is gang-related activity" (0 = *insignificant problem*, 3 = *significant problem*); (5) "How much of a problem at this school is weapons possession (0 = *insignificant problem*, 3 = *significant problem*); (6) "How much of problem at this school is vandalism" (0 = *insignificant problem*, 3 = *significant problem*); and (7) "How much of a problem at this school is theft" (0 = *insignificant problem*, 3 = *significant problem*). The mean for this construct was calculated from the standardized z-score of each of the items, and the scale was reverse coded (lower scores reflect lower evaluations of safety).

**Teacher and school characteristics—**At the teacher level, we include data from the CSCS on teachers' race/ethnicity (1 = white, 0 = non-white) and the number of years they have worked at their respective schools (0 = less than 1 year, 1 = 1 to 2 years, 2 = 3 to 5 years, 3 = 6 to 10 years, 4 = over 10 years). At the school level we use data available from the CDE, including the percentage of students eligible for free and reduced meal programs (as a proxy for school socioeconomic status), and school Academic Performance Index (API), a measure of a school's academic performance based on statewide assessments that summarize student performance across multiple content areas into a single index that ranges from 200 to 1,000. Finally, we included principal reports from the SHP of the presence of a bullying prevention program ("Does your school have … a program to prevent bullying," 1 = yes, 0 = no).

### Analytic Strategy

A total of 154 schools participated in both the SHP in 2010 and CHKS in 2011–2013; 96 had corresponding CSCS data with a total of 3,756 teachers within these schools (although

Author Manuscript Author Manuscript Author Manuscript Author Manuscript

multiple imputation was used to account for missing data, sample sizes for descriptive statistics and models vary from the total sample size because of missing data across all variables). Enrollment within these schools ranged from 106 to 4,540 students ($M$ = 1,814, $SD$ = 659). In 53% of the schools, more than 50% of students are eligible for the free and reduced meal program. Nine percent (9%) of the teachers worked at their school less than one year, 28% worked between 1 to 5 years, 26% between 6 and 10 years, and 37% ten years or more. Most of the teachers in our sample identified as White (74%), with the next largest racial/ethnic group being Hispanic or Latino/a (11%). The racial composition of the analytic sample is representative of the full sample of teachers that completed the CSCS between 2011 and 2013.

Years worked and free and reduced lunch were reverse-coded to simplify interpretation, and continuous variables (years worked and school safety) were grand mean centered ($M$ = 2.73 and $M$ = −.15, respectively).

We iteratively fit multilevel models with the meologit command to account for the categorical nature of our outcome variable using Stata MP 13 (Rabe-Hesketh & Skrondal, 2012). Multilevel analyses were employed to account for the nested nature of the data, and to test for the associations between school-level SOGI-focused policies and teacher reported assessments of school safety with bullying problems (Raudenbush & Byrk, 2002). We first estimated an unconditional model to assess the amount of variance explained by differences between schools (the intraclass correlation – ICC). We next ran a conditional model including teacher-level indicators, (i.e., covariates accounting for teacher demographics and teachers' perceptions of school safety and implementation; Figure 1 path A), followed by a model including school-level indicators (i.e., items related to SOGI-focused policies; Figure 1 path B). Finally, we defined a model that included a cross-level interaction between the SOGI summary measure the school safety scale (Figure 1 path C). Only final models with significant interactions are presented below, though results for each model are presented in Table 3.

In order to identify whether individual SOGI-focused policies were most strongly linked to teachers' perceptions of bullying problems, in follow-up analyses we tested the full model with cross-level interaction for each SOGI-focused policy individually. Simple slopes analyses were conducted using the margins command in Stata to decompose the significant interaction effect (Preacher, Curran, & Bauer, 2006), with the slopes of school safety estimated for each level of SOGI-focused policies. Because the results do not differ substantively from logistic analyses, we illustrate and report the simple slopes from tests of a linear model for ease of interpretation.

Missing data were determined to be MAR and imputed using the multiple imputation procedure in Stata (mi imput); listwise deletion would have resulted in a loss of 46% of the sample (Acock, 2005; Allison, 2002; Rubin, 1996). Fifty (50) imputed datasets were created, seeded at 29,390 for replicability (Allison, 2001; McKnight, McKnight, Sidani, & Figueredo, 2007). Parameters were estimated using maximum likelihood estimation with robust standard errors.

Author Manuscript Author Manuscript Author Manuscript Author Manuscript

## Results

Results for each model and for the ICC of teacher perceptions of bullying problems are reported in Table 3. A majority of the variance in bullying problems (83%) is explained by between-teacher variation, yet a notable 17% of the variance in bullying problems is attributable to differences between schools. This is an important initial finding: Simply put, independent of the diversity of teachers' perspectives on bullying at their school, on average some schools have greater bullying problems than others.

The first hypothesis, tested with a conditional model with only level 2 indicators, was not supported: Principal reports of SOGI-focused policies were unrelated to teachers' perceptions of bullying problems ($OR = .99$, $p = .576$). Further, the presence of a bullying program was also unrelated to bullying problems ($OR = 1.00$, $p = .997$). Notably, neither report by principals – of SOGI-focused policies nor of the presence of bullying programs – were correlated with teachers' perceptions of bullying problems ($r = .04$ and $r = .01$, respectively; see Table 1).

Consistent with our second hypothesis tested with a conditional model with only level 1 indicators, school safety was associated with bullying problems. The main effect shows lower odds of reporting that bullying is a problem at higher levels of school safety ($OR = .14$, $p \leq .001$). Additionally, fewer years worked as a teacher was associated with higher odds that teachers perceived bullying as a problem ($OR = 1.11$, $p \leq .001$).

To test the third hypothesis we modeled the interaction between principal-reported SOGI-focused policies and teacher-reported school safety. The interaction between SOGI-focused policies and school safety was significant ($OR = 1.13$, $p = 0.010$; see Table 3). Additionally, schools with lower proportions of students eligible for free or reduced meal programs had higher odds that teachers reported bullying as a problem ($OR = 2.07$, $p = .042$); all other significant covariates from previous models remained significant. The interaction is illustrated in Figure 2: Consistent with our hypothesis, the association between safety and bullying problems is stronger in schools with no SOGI-focused policies. Further, compared to safe schools, unsafe schools had fewer bullying problems in the presence of all five SOGI-focused policies and practices. Simple slope tests revealed that the slopes for schools with no SOGI-focused polices ($b = -.73$, $p \leq .001$) and five SOGI-focused policies ($b = -.56$, $p \leq .001$) significantly differed from zero, Analyses of covariance between bullying problems and school safety reveal greater variance in the absence of SOGI-focused policies and practices ($F = 287.79$, $p \leq .001$).

Follow-up analyses of individual SOGI-focused policies showed that only the interaction between school safety and having a safe space for LGBTQ youth on campus was significant ($OR = 1.34$, $p = .041$). These results point to the importance of safe spaces in the context of school safety, but also suggest that the presence of multiple policies may have more influence than any single policy on its own.

Author Manuscript Author Manuscript Author Manuscript Author Manuscript

## Discussion

We capitalized on a unique opportunity to combine databases otherwise not typically used in research to address a pressing question about the role of SOGI-focused policies in association with bullying. We find that SOGI-focused school policies and practices do not have a robust independent influence on teachers' perspectives on bullying problems in schools. Yet the relationship between perceptions of school safety and bullying is moderated by SOGI-focused policies. Importantly, in schools that need it the most—those judged as least safe by teachers—reports of bullying are lower in the presence of more SOGI-focused policies.

An important preliminary finding was that teachers' perceptions of bullying vary substantially across schools (17% of the variance was at the school level). In educational research, variance between schools greater than 5% is an indication of distinct differences in school climate and culture (Anderman, 2002; Murray & Blitstein, 2003). In such cases, the role of school policies and practices are more likely to have potential to explain school-level variance.

We expected that SOGI-focused policies and programs would have a direct association with teachers' reports of school bullying, but found no strong effect. This result is disappointing, especially given the substantial variation between schools in teachers' reports of bullying. One possible explanation is that there may be other school characteristics, policies, or practices that play a stronger role in explaining differences across schools in teachers' perceptions of bullying (notably, the strongest school-level correlate was the proportion of students receiving free or reduced cost meal programs). Second, the results may be a product of shared method variance (Podsakoff, MacKenzie, Lee, & Podsakoff, 2003) given that the teacher-reported measures were generally stronger in association with teachers' reports of bullying than the measures taken from administrative data or principals' reports. Further, several studies that focus only on individual student reports (not taking into account differences across schools) find robust links between SOGI-focused policies and lower reports of bullying (Black et al., 2012; Chesir-Teran & Hughes, 2009; Goodenow et al., 2006). Perhaps those associations are stronger because they take into account variability across students and their personal experiences of bullying: Visible SOGI-focused policies may be especially salient to students who are bullied. By contrast, our study relied on teachers' global assessment of school bullying which may not be as sensitive as individual students' reports (Bradshaw, Sawyer, & O'Brennan, 2007).

We conducted additional analyses of each SOGI-focused policy separately to identify potential differences across policies. The results showed that having safe spaces for LGBTQ students was associated with fewer reports by teachers of bullying problems when teachers judged schools to be unsafe, but the effect was not as strong as for the sum score of all five policies, suggesting that the combination of multiple policies has the strongest influence on bullying problems. Overall, our results are consistent with a solid body of research based on studies of students that shows that SOGI-focused policies and practices influence a number of positive outcomes, including bullying (Kosciw et al., 2014; O'Shaughnessy et al., 2004). Those studies indicate that SOGI-focused policies and practices matter not only for LGBTQ

Author Manuscript Author Manuscript Author Manuscript Author Manuscript

students, but for all students in schools where they are implemented (e.g., Poteat et al., 2013; 2014).

Our study contributes to this body of research in several respects. The current study represents an important shift to expand emphasis beyond the nearly exclusive focus on students' experiences to include teachers' perspectives: We modeled the perspectives of over 3,700 teachers on bullying and school safety, linked to data on SOGI-focused policies and practices that were independently reported by school principals. Research on bullying and school safety has typically focused on the individual student level rather than the institutional or school climate level, and therefore efforts to improve student experiences logically focus on changing the perceptions, behaviors, or experiences of individual students. As a result of the focus on students, responsibility for personal safety may be placed on the individual student rather than on the school and its personnel – we may inadvertently "blame the victims" of unsafe school climates. Indeed, there are anecdotal reports consistent with this argument (Human Rights Watch, 2001). Student-focused strategies may divert attention from the responsibility of schools to ensure the safety of all students.

Our results may help illuminate contradictory and counter-intuitive findings from prior studies. In one study of California schools, students' reports of SOGI-focused policies were associated with more (rather than less) bullying (Russell & McGuire, 2008), and a second study of California students found that SOGI-focused policies were associated with less (rather than more) safety (Toomey et al., 2012). Those studies may have captured schools at different stages in the process of incorporating SOGI-focused or other school safety changes, and the results might be explained by the introduction of SOGI-focused policies or practices in schools that have greater problems with bullying to begin with. Our study, which is based on larger-scale data collected from independent sources but from the same schools, suggests that adopting multiple SOGI-focused programs and practices may be most beneficial to schools that are least safe, or where they are needed most. The best way to account for such complexities will be large-scale, multi-site studies that trace changes in school policies and teachers' perspectives and students' experiences across time.

## Limitations

The SHP offers unique SOGI-focused school policy and practice data, but the CSCS includes no questions specific to SOGI-focused policies or practices, or to the experiences of LGBTQ students. Ideal would be to have SOGI-specific measures from teachers, including policies and practices as well as discriminatory or anti-LGBTQ bullying and indicators of the LGBTQ climate of schools. SOGI-focused policies and practices may have distinct relevance to LGBTQ students; indeed, much of the research on such programs and practices has been based on samples designed to reach LGBTQ students (e.g., Kosciw et al., 2014; Russell & McGuire, 2008; Toomey et al., 2012). Future studies could link administrative and policy information about schools with students' reports about their experiences of bullying; such studies should ideally include measures of anti-LGBTQ bullying as well as the LGBTQ identities of students.

Author Manuscript Author Manuscript Author Manuscript Author Manuscript

Unique data sources were strategically combined, but each had limitations, a challenge that is typical in the analysis of secondary data (Russell & Matthews, 2011). First, the combined sample included 96 schools and over 3,700 teachers, but had only a 62% overlap between the principal (SHP) and teacher (CSCS) surveys. Technical reports note the low response rate among teachers (indeed, there were some schools with data for the SHP for which no teacher data are available even though the school participated in the CHKS; see Austin & Bailey, 2008). Thus, the design is novel and includes an unusually large sample of teachers, but represents only a small portion of public schools and teachers in California. A second limitation pertains to measures: We relied on a single-item measure of bullying problems in schools, and the scale that we used to measure school safety is based on available items in the survey and has not been validated in other studies. Third, the measures of SOGI-focused policies and practices reported by principals simply indicate the presence or absence of each policy or practice, and we have no further information on implementation of these policies and practices. Thus, we are unable to distinguish between schools in which policies are actively publicized, promoted, and/or enforced, and those that are simply adopted by a governing body and ignored. Additionally, we cannot rule out that principals in our study were more likely to report SOGI-focused policies and practices because of real or perceived bullying problems in schools.

We also noted that 4 of the 96 school principals reported that their school did not "prohibit harassment based on a student's perceived or actual sexual orientation or gender identity," yet California passed a state law more than a decade ago (AB537, The Student Safety and Violence Prevention Act of 2000) that establishes state-wide non-discrimination in education based on actual or perceived sexual orientation and gender identity or expression. Future studies might investigate the school safety climate in schools where principals' indicated that their policies are out of compliance with state laws (in our case, we re-analyzed our data dropping those 4 schools to ensure that the associations we found were not due to those unusual cases; results were unchanged).

Finally, the data we use were collected between 2010 and 2013; although these remain relatively recent sources of data, the pace of social change with regard to SOGI issues has been dramatic, and it is likely that there have been changes in recent years in the numbers of SOGI-focused policies and practices in schools in California, as well as across the United States and other parts of the world. For example, the Fair, Accurate, Inclusive, and Respectful (FAIR) Education Act was passed as California law in 2011 and directs the inclusion of political, economic, and social contributions of LGBTQ people in educational textbooks and social studies curricula in California public schools. It is possible that even 5 years later more schools in California will have implemented SOGI-focused policies.

## Conclusion

Efforts to reduce harassment and bullying in U.S. schools using systemic strategies began to take hold a decade ago. Two federal laws in the United States would have provided explicit protections to LGBTQ students in public schools: the Safe Schools Improvement Act (SSIA) introduced in 2007 (SSIA, 2007), and the Student Non-Discrimination Act (SNDA) introduced in 2011 (SNDA, 2011), though both died in committee (SSIA, 2013; SNDA,

Author Manuscript Author Manuscript Author Manuscript Author Manuscript

2013). These federal policies would have the effect of establishing enumerated non-discrimination and anti-bullying policies for all students in the nation. Although our study and others (Russell & McGuire, 2008) shows that the influence of such broad policies may have only an indirect influence on bullying in schools, policies provide the context for implementation of other safe schools strategies that do directly influence school climate and student wellbeing. Our study, with others, shows that the structural conditions of schools matter to reduce bullying, and highlights the importance of efforts to ensure and implement an equitable learning environment for all students.

## References

Acock A. Working with missing values. Journal of Marriage and Family. 2005; 67:1012–1028.

Akaike H. New look at the statistical model identification. IEEE Transactions of Automatic Control. 1974; 19:716–723.

Allison, PD. Missing Data. Thousand Oaks, CA: Sage Publications, Inc; 2001.

Anderman EM. School effects on psychological outcomes during adolescence. Journal of Educational Psychology. 2002; 94:795–809.

Berkowitz R, Benbenishty R. Perceptions of teachers' support, safety, and absence from school because of fear among victimize, bullies, and bully-victims. American Journal of Orthopsychiatry. 2012; 82:67–74. [PubMed: 22239395]

Black WW, Fedewa AL, Gonzalez KA. Effects of "safe school" programs and policies on the social climate for sexual-minority youth: A review of the literature. Journal of LGBT Youth. 2012; 9:321–339.

Bradshaw CP, Sawyer AL, O'Brennan LM. Bullying and peer victimization at school: Perceptual differences between students and school staff. School Psychology Review. 2007; 36:361–382.

Bradshaw CP, Waasdorp TE, O'Brennan LM, Gulemetova M. Teachers' and education support professionals' perspectives on bullying and prevention: Findings from a national education association study. School Psychology Review. 2013; 42:280. [PubMed: 25414539]

Chesir-Teran D. Conceptualizing and assessing heterosexism in high schools: A setting-level approach. American Journal of Community Psychology. 2003; 31:267–279. [PubMed: 12866684]

Chesir-Teran D, Hughes D. Heterosexism in high school and victimization among lesbian, gay, bisexual, and questioning students. Journal of Youth and Adolescence. 2009; 38:963–975. [PubMed: 19636739]

Collier KL, van Beusekom G, Bos HMW, Sandfort TGM. Sexual orientation and gender identity/expression related peer victimization in adolescence: A systematic review of associated psychosocial and health outcomes. The Journal of sex Research. 2013; 50:299–317. [PubMed: 23480074]

Cortes KI, Kochenderfer-ladd B. To tell or not to tell: What influences children's decisions to report bullying to their teachers? School Psychology Quarterly. 2014; 29:336–348. [PubMed: 25198616]

Demissie, Z.; Brener, ND.; McManus, T.; Shanklin, SL.; Hawkin, J.; Kann, L. School health profiles 2012: Characteristics of health programs among secondary schools. Atlanta, GA: Centers for Disease Control and Prevention; 2013.

Espelage DL, Low SK, Jimerson SR. Understanding school climate, aggression, peer victimization, and bully perpetration: Contemporary science, practice, and policy. School Psychology Quarterly. 2014; 29:233–237. [PubMed: 25198615]

Espelage DL, Polanin JR, Low SK. Teacher and staff perceptions of school environment as predictors of student aggression, victimization, and willingness to intervene in bullying situations. School Psychology Quarterly. 2014; 29:287–305. [PubMed: 25089334]

Gage, Na; Prykanowski, DA.; Larson, A. School climate and bullying victimization: A latent class growth model analysis. School Psychology Quarterly. 2014; 29:256–271. [PubMed: 24933216]

Glew GM, Fan M, Katon W, Rivara FP. Bullying and school safety. The Journal of Pediatrics. 2007; 152:123–128. [PubMed: 18154913]

Author Manuscript Author Manuscript Author Manuscript Author Manuscript

GLSEN & Harris Interactive. The principal's perspective: School safety, bullying and harassment, asurvey of public school principals. New York: GLSEN; 2008.

Goodenow C, Szalacha LA, Westheimer K. School support groups, other school factors, and the safety of sexual minority adolescents. Psychology in the Schools. 2006; 43:573–589.

Gregory A, Cornell D, Fan X, Sheras P, Shih TH, Huang F. Authoritative school discipline: High school practices associated with lower bullying and victimization. Journal of Educational Psychology. 2010; 102:483–496.

Greytak EA, Kosciw JG, Boesen MJ. Educating the educator: Creating supportive school personnel through professional development. Journal of School Violence. 2013; 12:80–97.

Hatzenbuehler ML, Keyes KM. Inclusive anti-bullying policies and reduced risk of suicide attempts in lesbian and gay youth. Journal of Adolescent Health. 2013; 53:S21–S26. [PubMed: 23790196]

Heck NC, Flentje A, Cochran BN, Youth TL. Offsetting risks : High school Gay-Straight Alliances and lesbian, gay, bisexual, and transgender (LGBT) youth. School Psychology Quarterly. 2011; 26:161–174.

Hirschstein MK, Edstrom LVS, Frey KS, Snell JL, MacKenzie EP. Walking the talk in bullying prevention: Teacher implementation variables related to initial impact of the Steps to Respect program. School Psychology Review. 2007; 36:3–21.

Holt, MK.; Keyes, MA. Teachers' attitudes toward bullying. In: Espelage, D.; Swearer, SM., editors. Bullying in American schools: A social-ecological perspective on prevention and intervention. Mahwah, NJ: Erlbaum; 2004. p. 121-140.

Hong JS, Espelage DL. A review of research on bullying and peer victimization in school: An ecological system analysis. Aggression and Violent Behavior. 2012; 17:311–322.

Horn SS, Kosciw JG, Russell ST. New research on lesbian, gay, bisexual, and transgender youth: Studying lives in context. Journal of Youth and Adolescence. 2009; 38:863–866. [PubMed: 19636731]

Horn SS, Szalacha LA. School differences in heterosexual students' attitudes about homosexuality and prejudice based on sexual orientation. European Journal of Developmental Sciences. 2009; 3:66–81.

Horn, S.; Sullivan, S. Addressing anti-LGBT bias in schools: Changing educators' knowledge, beliefs, and behaviours through professional development. Paper presented at the American Educational Research Association Annual Meeting; Vancouver, BC. 2012 Apr.

Human Rights Watch. Hatred in the hallways: Violence and discrimination against lesbian, gay, bisexual, and transgender students in U.S. schools. New York: Human Rights Watch; 2001.

Kasen, S.; Berenson, K.; Cohen, P.; Johnson, JG. The effects of school climate on change in aggressive and other behaviors related to bullying. In: Espelage, D.; Swearer, SM., editors. Bullying in American schools: A social-ecological perspective on prevention and intervention. Mahwah, NJ: Erlbaum; 2004. p. 187-210.

Kosciw, JG.; Greytak, EA.; Palmer, NA.; Boesen, MJ. The 2013 National School Climate Survey: The experiences of lesbian, gay, bisexual and transgender youth in our nation's schools. New York: GLSEN; 2014.

Lipkin, A. Understanding homosexuality, changing schools. Boulder, CO: Westview Press; 1999.

Low S, Van Ryzin MJ, Brown EC, Smith BH, Haggerty KP. Engagement matters: Lessons from assessing classroom implementation of steps to respect: A bullying prevention program over a one-year period. Prevention Science. 2014; 15:165–176. [PubMed: 23456311]

Low S, Van Ryzin MJ. The moderating effects of school climate on bullying prevention efforts. School Psychology Quarterly. 2014; 29:306–319. [PubMed: 25089333]

McKnight, PE.; McKnight, KM.; Sidani, S.; Figueredo, AJ. Missing data: A gentle introduction. New York, NY: Guilford Press; 2007.

Migliaccio T. Teacher engagement with bullying: Managing an identity within a school. Sociological Spectrum. 2015; 35:84–108.

Murray DM, Blitstein JL. Methods to reduce the impact of intraclass correlation in group-randomized trials. Evaluation Review. 2003; 27:79–103. [PubMed: 12568061]

Author Manuscript Author Manuscript Author Manuscript Author Manuscript

O'Shaughnessy, M.; Russell, S.; Heck, K.; Calhoun, C.; Laub, C. Safe place to learn: Consequences of harassment based on actual or perceived sexual orientation and gender non-conformity and steps for making schools safer. San Francisco, CA: California Safe Schools Coalition; 2004.

Oldenburg B, van Duijn M, Sentse M, Huitsing G, van der Ploeg R, Salmivalli C, Veenstra R. Teacher characteristics and peer victimization in elementary schools: A classroom-level perspective. Journal of Abnormal Child Psychology. 2014; 43:33–34. [PubMed: 24395617]

Podsakoff PM, MacKenzie SB, Lee J-Y, Podsakoff NP. Common method biases in behavioral research: A critical review of the literature and recommended remedies. Journal of Applied Psychology. Oct. 2003 88:879–903. [PubMed: 14516251]

Poteat P. Contextual and moderating effects of the peer group climate on use of homophobic epithets. School Psychology Review. 2008; 37:188–201.

Poteat VP, Sinclair KO, DiGiovanni CD, Koenig BW, Russell ST. Gay–Straight Alliances are associated with student health: A multischool comparison of LGBTQ and heterosexual youth. Journal of Research on Adolescence. 2013; 23:319–330.

Poteat VP, Yoshikawa H, Calzo JP, Gray ML, DiGiovanni CD, Lipkin A, Shaw MP. Contextualizing Gay-Straight Alliances: Student, advisor, and structural factors related to positive youth development among members. Child Development. 2014; 86(1):176–193. [PubMed: 25176579]

Preacher KJ, Curran PJ, Bauer DJ. Computational tools for probing interaction effects in multiple linear regression, multilevel modeling, and latent curve analysis. Journal of Educational and Behavioral Statistics. 2006; 31:437–448.

Rabe-Hesketh, S.; Skrondal, A. Multilevel and longitudinal modeling using Stata. 3rd. College Station, TX: Stata Press; 2012.

Raudenbush, SW.; Byrk, AS. Hierarchical linear models: Applications and data analysis methods. 2nd. Newbury Park, CA: Sage; 2002.

Rienzo BA, Button JW, Sheu JJ, Li Y. The politics of sexual orientation issues in American Schools. Journal of School Health. 2006; 76:93–97. [PubMed: 16475984]

Rubin DB. Multiple imputation after 18+ years (with discussion). Journal of the American Statistical Association. 1996; 91:473–489.

Russell ST, Kosciw J, Horn S, Saewyc E. Safe schools policy for LGBTQ students. Social Policy Report. 2010; 24(4):1–17. Retrieved from http://www.srcd.org/sites/default/files/documents/spr_24_4_final.pdf.

Russell, ST.; Matthews, EM. Using archival data to study adolescence and adolescent development. In: Trzeniwski, K.; Donnellan, MB.; Lucas, RE., editors. Obtaining and analyzing archival data: Methods and illustrations. Washington, DC: APA Books; 2011. p. 163-176.

Russell ST, Ryan C, Toomey RB, Diaz RM, Sanchez J. Lesbian, gay, bisexual, and transgender adolescent school victimization: Implications for young adult health and adjustment. Journal of School Health. 2011; 81:223–230. [PubMed: 21517860]

Russell, ST.; McGuire, JK. The school climate for lesbian, gay, bisexual, and transgender (LGBT) students. In: Shinn, M.; Yoshikawa, H., editors. Toward positive youth development: Transforming schools and community programs. New York: Oxford University Press; 2008. p. 133-149.

Russell ST, Seif H, Truong NL. School outcomes of sexual minority youth in the United States: Evidence from a national study. Journal of Adolescence. 2001; 24:111–127. [PubMed: 11259074]

Russell ST, Sinclair KO, Poteat VP, Koenig BW. Adolescent health and harassment based on discriminatory bias. American Journal of Public Health. 2012; 102:493–495. [PubMed: 22390513]

Saewyc E, Konishi C, Rose H, Homma Y. School-based strategies to reduce suicidal ideation, suicide attempts, and discrimination among sexual minority and heterosexual adolescents in Western Canada. International Journal of Child, Youth and Family Studies. 2014; 5:89–112.

Safe Schools Improvement Act of 2007, H.R. 3132, 110th Congress (2007–2008)

Safe Schools Improvement Act of 2013, S. 403, 113th Congress (2013–2014)

Sandoval J, London MD, Rey T. Status of suicide prevention in California schools. Death Studies. 1994; 18:595–608.

Sawyer RJ, Porter JD, Lehman TC, Anderson C, Anderson KM. Education and Training Needs of School Staff Relevant to Preventing Risk Behaviors and Promoting Health Behaviors Among Gay,

Author Manuscript Author Manuscript Author Manuscript Author Manuscript

Lesbian, Bisexual, and Questioning Youth. Journal of HIV/AIDS Prevention in Children and Youth. 2006; 7:55–73.

Sinclair KO, Bauman S, Poteat VP, Koenig B, Russell ST. Cyber and bias-based harassment: Associations with academic, substance use, and mental health problems. Journal of Adolescent Health. 2012; 50:521–523. [PubMed: 22525118]

Srabstein J, Piazza T. Public health, safety, and educational risks associated with bullying behaviors in American adolescents. International Journal of Adolescent Medicine and Health. 2008; 20:223–233. [PubMed: 18714558]

Student Non-Discrimination Act of 2011, H.R.998, 112th Congress (2011–2012)

Student Non-Discrimination Act of 2013, H.R.1652, 113th Congress (2013–2014)

Szalacha LA. Safer sexual diversity climates: Lessons learned from an evaluation of Massachusetts safe schools program for gay and lesbian students. American Journal of Education. 2003; 110:58–88.

Toomey RB, McGuire JK, Russell ST. Heteronormativity, school climates, and safety for gender nonconforming students. Journal of Adolescence. 2012; 35:187–196. [PubMed: 21481925]

Toomey RB, Russell ST. Gay-Straight Alliances, social justice involvement, and school victimization of lesbian, gay, bisexual, and queer youth: Implications for school well-being and future civic engagement. Youth & Society. 2013; 45:500–522. [PubMed: 26224893]

Toomey RB, Ryan C, Diaz RM, Russell ST. High school Gay–Straight Alliances (GSAs) and young adult well-being: An examination of GSA presence, participation, and perceived effectiveness. Applied Developmental Science. 2011; 15:175–185. [PubMed: 22102782]

Troop-Gordon W, Ladd GW. Teachers' victimization-related beliefs and strategies: Associations with students' aggressive behavior and peer victimization. Journal of Abnormal Child Psychology. 2015; 43:45–60. [PubMed: 24362767]

Ttofi MM, Farrington DP. Effectiveness of school-based programs to reduce bullying: A systematic and meta-analytic review. Journal of Experimental Criminology. 2010; 7:27–56.

Turner I, Reynolds KJ, Lee E, Subasic E, Bromhead D. Well-being, school climate, and the social identity process: A latent growth model study of bullying perpetration and peer victimization. School Psychology Quarterly. 2014; 29:320–335. [PubMed: 24933217]

Yoon J, Bauman S. Teachers: A critical but overlooked component of bullying prevention and intervention. Theory Into Practice. 2014; 53:308–314.

Russell et al. Page 17

Author Manuscript Author Manuscript Author Manuscript Author Manuscript

Between Schools
(Principals)
SOGI-Focused Policies and
Practices
Within Schools
(Teachers)
School Safety
Bullying Problem
A
B
C

**Figure 1.**
Conceptual model illustrating moderation of school safety by SOGI-focused policies and practices.

*J Sch Psychol.* Author manuscript; available in PMC 2016 June 30.

AR_284790

Russell et al. Page 18

Author Manuscript Author Manuscript Author Manuscript Author Manuscript

Bullying Problems
2.5
2
1.5
1
.5
-1.5
-.75
0
.75
1.01
School Safety Scale
SOGI-Focused Policies = 0
SOGI-Focused Policies = 5

**Figure 2.**
Interaction between school safety scale and SOGI-focused policies

*J Sch Psychol.* Author manuscript; available in PMC 2016 June 30.

AR_284791

Author Manuscript Author Manuscript Author Manuscript Author Manuscript

**Table 1**

Correlation matrix and descriptive statistics for items included in final analytic model

| | Bullying Problems | Years Worked | Race (white) | Safety Scale | SOGI Policies | Bullying Policy | FRMP | API |
|---|---|---|---|---|---|---|---|---|
| Bullying Problems | 1.000 | | | | | | | |
| Years Worked | −0.050** | 1.000 | | | | | | |
| Race (white) | −0.010 | 0.105*** | 1.000 | | | | | |
| Safety Scale | −0.531*** | −0.001 | 0.068*** | 1.000 | | | | |
| SOGI-Focused Policies | 0.042* | −0.017 | 0.024 | −0.064*** | 1.000 | | | |
| Bullying Prevention Policy | 0.011 | 0.072*** | 0.065*** | 0.078*** | −0.027 | 1.000 | | |
| Free/reduced Meal Program (FRMP) | 0.157*** | −0.055** | −0.120*** | −0.460*** | −0.031 | −0.020 | 1.000 | |
| Academic Performance Index (API) | −0.218*** | 0.070*** | 0.124*** | 0.547*** | −0.133*** | 0.197*** | −0.789*** | 1.000 |
| *Mean / %* | 1.45 | 2.73 | — | −.15 | 3.55 | 72.39% | 45.39% | 794.27 |
| *SD* | .77 | 1.29 | — | .77 | 1.31 | — | — | 82.10 |
| *n* | 3,408 | 3,418 | 3,398 | 3,445 | 3,756 | 3,756 | 2,417 | 3,634 |

*Note*. Bullying problems (0 = insignificant problem, 3 = severe problem); Safety scale, constructed with standardized z-scores and reverse coded (−3.16 = school is unsafe, 1.01 = school is safe); Bullying prevention policy is presented as percentage of principals that endorse that school has policy; Free/reduced meal program is presented as the average percentage of eligible students within schools; Academic Performance Index (API) measures schools' academic performance ranging from 200 (low) to 1,000 (high). Means, standard deviations, and *n*s are based on data prior to imputation to account for missing data. Therefore, sample sizes vary.

AR_284792

Author Manuscript Author Manuscript Author Manuscript Author Manuscript

**Table 2**

Frequencies and percentages of SOGI-focused policies across schools, and teachers in those schools.

| | Schools | | Teachers | |
|---|---|---|---|---|
| | **%** | ***k*** | **%** | ***n*** |
| SOGI-Focused policies (summary) | — | 96 | — | 3,404 |
| LGBTQ prohibit harassment | 95.83 | 92 | 97.09 | 3,404 |
| LGBTQ professional development | 67.02 | 63 | 71.76 | 3,201 |
| LGBTQ safe space | 67.00 | 57 | 69.28 | 3,311 |
| LGBTQ health services | 64.89 | 61 | 73.00 | 3,307 |
| Student SOGI club | 42.71 | 41 | 52.79 | 3,404 |
| Bullying program | 70.83 | 68 | 72.08 | 3,404 |

*Note. k refers* to the number of schools, and *n* to the total number of teachers within these schools, in which each respective policy is present. *n*s for individual items are based on data prior to imputation to account for missing data. Therefore, sample sizes vary.

Author Manuscript Author Manuscript Author Manuscript Author Manuscript

**Table 3**

Multilevel model with ordinal outcome for teacher and school-level effects on teachers reports of bullying being a problem.

| | Unconditional Model | Conditional Model with Level 1 Indicators | Conditional Model with Level 2 Indicators | Full Model with Interactions |
|---|---|---|---|---|
| | OR (SE) | OR (SE) | OR (SE) | OR (SE) |
| ***Teacher Level Indicators*** | | | | |
| Years worked | — | 1.11*** (.03) | 1.11*** (.03) | 1.12*** (.03) |
| Race / Ethnicity | — | 1.09 (.09) | 1.06 (.09) | 1.06 (.09) |
| School safety scale | — | .14*** (.01) | .14*** (.01) | .09*** (.02) |
| ***School Level Indicators*** | | | | |
| Free/reduced meal program | — | — | 1.84 (.62) | 2.07* (.73) |
| Academic Performance Index | — | — | 1.00 (.00) | 1.00 (.00) |
| Bullying program | — | — | .99 (.21) | 1.00 (.21) |
| SOGI-Focused policies | — | — | 0.96 (.06) | .97 (.06) |
| School safe × SOGI policies | — | — | — | 1.13** (.05) |
| Residual variance | .83 (.16) | .56 (.11) | .52 (.12) | .48 (.11) |
| *ICC* | .17 (.03) | — | — | — |

*Note.*

* $p \leq .050$,

** $p \leq .010$,

*** $p \leq .001$

HHS Public Access
Author manuscript
*J Sch Health*. Author manuscript; available in PMC 2019 April 01.

Published in final edited form as:
*J Sch Health*. 2018 April ; 88(4): 306–314. doi:10.1111/josh.12606.

# Gender expression, violence, and bullying victimization: findings from probability samples of high school students in 4 US school districts

**Allegra R. Gordon, ScD, MPH**,
Fellow, Division of Adolescent & Young Adult Medicine, Boston Children's Hospital and Harvard Medical School, 300 Longwood Avenue (AU-Box 17, BCH 3189), Boston, MA 02115

**Kerith J. Conron, ScD**,
Blachford-Cooper Distinguished Scholar and Research Director, The Williams Institute, UCLA School of Law, Los Angeles, CA 90095-1476

**Jerel P. Calzo, PhD, MPH**,
Associate Professor, Graduate School of Public Health, Core Investigator, Institute for Behavioral and Community Health, San Diego State University, San Diego, CA 92182-4162

**Matthew T. White, PhD**,
Statistician – Department of Clinical Research Center, Boston Children's Hospital, Boston, MA 02115

**Sari L. Reisner, ScD**, and
Assistant Professor of Pediatrics, Harvard Medical School, Assistant Professor, Department of Epidemiology, Harvard T.H. Chan School of Public Health, 300 Longwood Avenue, Boston, MA 02115

**S. Bryn Austin, ScD**
Professor, Department of Social & Behavioral Sciences, Harvard T.H. Chan School of Public Health, Professor, Division of Adolescent and Young Adult Medicine, Boston Children's Hospital, Boston, MA 02115

## Abstract

**BACKGROUND—**Young people may experience school-based violence and bullying victimization related to their gender expression, independent of sexual orientation identity. However, the associations between gender expression and bullying and violence have not been examined in racially and ethnically diverse population-based samples of high school students.

**METHODS—**This study includes 5469 students (13–18 years) from the 2013 Youth Risk Behavior Surveys conducted in 4 urban school districts. Respondents were 51% Hispanic/Latino, 21% black/African-American, 14% white. Generalized additive models were used to examine the functional form of relationships between self-reported gender expression (range: 1=Most gender conforming, 7=Most gender nonconforming) and 5 indicators of violence and bullying

Corresponding Author: Allegra R. Gordon, Phone: (617) 355-0922, argordon@mail.harvard.edu.

Author Manuscript Author Manuscript Author Manuscript Author Manuscript

Author Manuscript Author Manuscript Author Manuscript Author Manuscript

victimization. We estimated predicted probabilities across gender expression by sex, adjusting for sexual orientation identity and potential confounders.

**RESULTS—**Statistically significant quadratic associations indicated that girls and boys at the most gender conforming and nonconforming ends of the scale had elevated probabilities of fighting and fighting-related injury, compared to those in the middle of the scale ($p < .05$). There was a significant linear relationship between gender expression and bullying victimization; every unit increase in gender nonconformity was associated with 15% greater odds of experiencing bullying ($p < .0001$).

**CONCLUSIONS—**School-based victimization is associated with conformity and nonconformity to gender norms. School violence prevention programs should include gender diversity education.

**Keywords**

bullying; child & adolescent health; public health; stress; violence; special populations

---

There has been heightened attention to bullying and violence victimization in US schools, particularly for lesbian, gay, bisexual, and transgender (LGBT) youth.[1–5] Less is known about bullying and violence directed at adolescents who do not conform to societal expectations for masculine or feminine appearance and behavior (that is, have a nonconforming gender expression). Some research suggests that youths with a nonconforming gender expression are also at high risk of bullying victimization, discrimination, and violence.[2,6,7] A 2013 national convenience sample of LGBT high school students found that 55% of respondents had been verbally harassed and 11% had been physically assaulted at school due to their gender expression.[2] However, data from heterogeneous population-based samples of youth are lacking.

There is a particular need to understand links between victimization and perceived gender expression for youth of all sexual orientation identities. Evidence indicates that sexual minority youth are more likely to be gender nonconforming.[8–10] Yet, gender expression is distinct from sexual orientation identity and many heterosexual youth also report gender nonconformity.[11,12] Thus, to increase our understanding of the stigma-related factors that contribute to adolescent experiences of bullying and violence, it is essential to investigate the relationship between gender expression and victimization, and its potential implications for adolescent health, independently of sexual orientation identity. Indeed, violence and bullying victimization toward those perceived as gender nonconforming have been associated with adverse mental and physical health outcomes, including depression and suicidality, not only among sexual minorities[13] but across all sexual orientation identities, including heterosexuals.[12,14]

In addition to a need for research on gender expression and victimization for those of all sexual orientation identities, few studies have been able to examine violence and bullying victimization across the full range of gender expression (from highly gender conforming to highly gender nonconforming). The relationship between having a highly *conforming* gender expression and violence or bullying is especially poorly understood, although there is evidence that pressures to conform to gender norms may also impact health risks for more

Author Manuscript Author Manuscript Author Manuscript Author Manuscript

gender conforming adolescents. For example, men who report greater conformity to masculinity norms are more likely to engage in risk-taking, including high-risk alcohol use and more frequent tobacco use,[15–17] and to have engaged in intimate partner violence.[18] Few studies have quantified relationships between conformity to femininity norms and risk-taking or violence exposure, although qualitative research has linked conventional feminine gender ideologies in girls and women to increased tolerance of sexual risk behavior and risk of intimate partner violence.[19,20]

Leveraging data from the 2013 Youth Risk Behavior Surveillance System on gender expression in school contexts, this study sought to address these gaps by examining the association between self-reported gender expression and school-based victimization within ethnically diverse probability samples of public high school students from 4 urban locations.

## METHODS

### Participants

The current study used 2013 Youth Risk Behavior Survey (YRBS) data from 4 jurisdictions that included a novel measure of perceived gender expression (described below): Broward County, FL; Chicago, IL; Los Angeles, CA; and San Diego, CA (N = 6000). Each survey used a 2-stage cluster sample design to produce a representative sample of 9th through 12th grade students.[21] The surveys were conducted following local parental permission procedures. Due to small sample size, participants who were 12 years of age were excluded. Individuals missing responses on key variables were excluded from the analysis (gender expression, 4.9%; sex, <1%; key covariates, 3.1%). In addition, respondents missing information on each outcome were excluded from outcome-specific analyses. Final unweighted analytic samples ranged from N = 5412 to N = 5469.

### Measures

**Sex—**Respondents were asked "What is your sex?" with response options male or female. No jurisdiction included a question on gender identity or other items that would permit identification of transgender respondents.

**Gender expression (GE)—**Perceived GE was assessed with a self-report question, based on a 2-item measure developed for adolescents[22] and adapted and tested for use in YRBS questionnaires by making it specific to school contexts.[23] This item purposefully solicits self-reported perceptions, given the central role that such perceptions play in stigmatization processes.[22,24] Respondents were asked: "A person's appearance, style, dress, or the way they walk or talk may affect how people describe them. How do you think other people at school would describe you?" with response options ranging on a seven-point scale from "very feminine" to "very masculine." Responses were recoded based on respondent sex to create a continuous variable indicating degree of conformity or nonconformity to societal norms of GE (range: 1 = most gender conforming, 7 = most gender nonconforming).

**School-based violence and bullying victimization—**In the jurisdictions in this study, 6 items assessed violence and bullying victimization. Three items asked about experiences

Author Manuscript Author Manuscript Author Manuscript Author Manuscript

of physical violence in the past year ("How many times were you in a physical fight on school property?" "How many times has someone threatened or injured you with a weapon such as a gun, knife, or club on school property?" "How many times were you in a physical fight in which you were injured and had to be treated by a doctor or nurse?"), with 5 to 8 response options. One item asked about perceived safety ("During the past 30 days, on how many days did you **not** go to school because you felt you would be unsafe at school or on your way to or from school?"). Each outcome was dichotomized (0 = no occurrence, 1 = at least one occurrence). Two dichotomous items asked about bullying victimization in the past year: "During the past 12 months, have you ever been bullied on school property?" and "During the past 12 months, have you ever been electronically bullied?" The distribution of these 2 items was similar across GE, and thus, the items were combined into a single indicator of any past year bullying victimization (in-school or electronic; 0 = no, 1 = yes).

**Sexual orientation identity and other demographic characteristics—**Sexual orientation identity was assessed with the question: "Which of the following best describes you?" (heterosexual (straight), gay or lesbian, bisexual, not sure). Race/ethnicity was assessed using two survey questions: "Are you Hispanic or Latino?" (yes or no) and "What is your race?" (select all that apply). Responses were classified as Hispanic/Latino, black/African-American, white, Asian/Pacific Islander, and another race/multiracial. Age was assessed via self-report in years.

### Data Analysis

We conducted descriptive analyses and hypothesis testing using SAS version 9.3 procedures designed to account for the complex sampling design and survey weights (eg, PROC SURVEYLOGISTIC).[25] Following descriptive analyses, we used generalized additive models (GAMs; SAS PROC GAM) to examine the functional form (that is, function that describes the shape of the relationship between variables) of the associations between GE score and the proportion reporting each outcome. GAMs help in examining potential non-linear associations by relaxing assumptions of linearity and generating smoothed curves of association with 95% confidence intervals.[26] Based on patterns observed in GAMs, we used logistic regression models including linear, quadratic, and cubic polynomial functions of GE as predictors of the odds of reporting each form of victimization, adjusted for age, sex, race/ethnicity, and sexual orientation identity. Sex-by-GE and sexual orientation identity-by-GE interactions were included to examine whether sex or sexual orientation identity, respectively, modified the associations between GE and each outcome. Finally, the predicted probability of endorsing each outcome across the GE spectrum was calculated as the inverse logit of the model-based estimate; probabilities were calculated at the average sample age (16.1 years), weighting the racial/ethnic and sexual orientation identity variables by their marginal distributions.

## RESULTS

The analytic sample included 2921 girls and 2548 boys in high school who participated in a 2013 YRBS in one of the 4 included jurisdictions. Weighted socio-demographic characteristics of respondents are shown in the first column of Table 1. Table 1 also presents

Author Manuscript Author Manuscript Author Manuscript Author Manuscript

the weighted distributions of each of the five violence and bullying victimization outcomes by sociodemographic characteristics and by GE.

Figure 1 depicts the weighted distribution of GE across sex and sexual orientation identity in this sample. A higher proportion of male than female participants were located at the most gender nonconforming end of the spectrum (for example, 6% vs. 1%, respectively, for those with a GE score = 7). Greater gender nonconformity was also associated with sexual minority identities: there were higher proportions of those identifying as gay/lesbian (13%) or unsure (9%) than those identifying as heterosexual (3%) at the most nonconforming end of the spectrum. Conversely, a higher proportion of heterosexual respondents (35%) than sexual minority respondents (16% for gay/lesbian, 13% for bisexual, and 18% for unsure) located themselves at the most gender conforming end of the spectrum (GE score = 1).

GAM analyses and subsequent multivariable logistic models demonstrated statistically significant quadratic associations between GE and fighting and fight-related injury needing treatment, for both boys and girls (Figures 2a, 2b). Notably, sex was significantly associated with both outcomes, with boys having a higher probability of fighting ($p < .001$) and of injury in a fight ($p = .006$) across all levels of GE; no sex-by-GE interactions were observed for these outcomes. The J-shaped relationship between GE and fighting, in particular, suggests that the most gender conforming and the most gender nonconforming respondents had an elevated risk of fighting, relative to respondents in the middle of the GE spectrum (Figure 2a). For example, the adjusted predicted probability (95% confidence interval) of having been in at least one fight was 6.8% (5.3%, 8.7%) for girls and 11.8% (9.4%, 13.5%) for boys at the most gender conforming end of the scale (GE = 1) compared to their more moderately conforming peers (GE = 2: 5.1% [4.1%, 6.3%] for girls and 8.9% [7.4%, 10.8%] for boys). At the most nonconforming end of the GE range (GE = 7), the probability of having been in a fight was 14.4% (8.7%, 22.9%) for girls and 23.5% (15.4%, 34.1%) for boys.

There was a significant sex-by-GE interaction when modeling the risk of being threatened or injured with a weapon (interaction p-values < .05). GAM analyses suggested a significant quadratic relationship between GE and this outcome for girls and a significant cubic relationship between GE and this outcome for boys (Figure 2c). Among girls, the quadratic model indicated a pronounced elevated probability of victimization with a weapon for the most gender nonconforming girls (36% predicted probability for the most nonconforming girls compared to 4% for those in mid-range of GE). Among boys, the cubic model indicated increased probability of victimization with a weapon for boys at the most conforming end of the range (5.7% if GE = 1 compared to 3.9% if GE = 2), and an overall elevated probability among the nonconforming boys, tapering off for the most nonconforming (15.5% if GE = 6, 11.8% if GE = 7).

In contrast to the above outcomes, a linear relationship best fit the association between GE and bullying victimization and missing school due to feeling unsafe (Figures 3a, 3b). Greater gender nonconformity was significantly associated with higher odds of having experienced in-school or electronic bullying victimization in the past year or having missed school for safety reasons in the past month (both $p < .001$). Girls had a higher probability of being

Author Manuscript Author Manuscript Author Manuscript Author Manuscript

bullied across all levels of GE ($p < .001$). Sex-by-GE interaction terms were only significant for missing school ($p < .001$): the most gender conforming boys were less likely, while the most nonconforming boys were more likely, than girls to have missed school for safety reasons. There were no significant interactions between sexual orientation identity and GE for any outcome; thus, these interaction terms were not included in final models.

## DISCUSSION

In probability samples of public high school students from four urban locations, the odds of being targeted for bullying and violence were found to significantly differ by gender expression, after adjusting for the effects of sexual orientation identity. The J-shaped relationships for violence-related outcomes suggest increased risk for youths who are perceived by others at school as highly gender conforming as well as those perceived as highly gender nonconforming. In contrast, there was a linear relationship between gender nonconformity and odds of in-school or electronic bullying or missing school due to feeling unsafe.

These findings expand the existing literature on gender nonconformity and violence and discrimination among adolescents. Previously, most of this research has focused on sexual minorities.[2,6,7,13] We found associations between gender nonconformity and violence and bullying even after accounting for sexual orientation identity. Further, sexual minorities were more likely to report a nonconforming gender expression; however, the majority of respondents at the gender nonconforming end of the scale were heterosexual, underscoring the importance of these issues for both heterosexual and sexual minority youth. These findings add support to prior studies conducted in a predominantly white, middle-income cohort that demonstrated increased risk of childhood abuse and bullying victimization among gender nonconforming heterosexual and sexual minority young people.[12,14] Our findings indicate similar associations in an ethnically diverse adolescent sample. Although sample size limitations precluded an examination of differences by race/ethnicity in this analysis, future research is needed that explores these intersections.

We also observed modestly elevated odds of fighting, injury needing treatment, and missing school due to feeling unsafe for boys and girls reporting the highest levels of gender conformity. For the boys in the sample, this aligns with a robust body of work describing male conformity to masculinity norms as a predictor of aggression, violence perpetration, and violence victimization among men.[27–30] Conformity to masculinity norms in adolescence and young adulthood has also been associated with heavier alcohol use,[15,31] which raises risk of experiencing or perpetrating violence.[32,33] One study even found differences in injury-risk behaviors associated with conformity to masculinity norms in children as young as 3–6 years old.[34] However, few studies have specifically examined the experience of adolescents who report that they are *perceived* as having a highly conforming gender expression, which may be distinct from an individual's adherence to conventional masculine and/or feminine ideologies.

In this study, there was some suggestion that the violence-related risks of highly gender conforming girls followed a pattern similar to that of the boys in the sample. Literature on

Author Manuscript Author Manuscript Author Manuscript Author Manuscript

violence and female conformity to femininity norms has largely focused on sexual and romantic relationships, including sexual risks and intimate partner violence.[19,36] There is much still to be understood about the relationship between high degrees of gender conformity and violence perpetration as well as victimization, particularly given that perpetrators may also be victims of bullying and discrimination.[37,38] The factors underlying the related but distinct outcomes examined may vary by gender in ways that are beyond the scope of this study. For example, highly gender conforming girls may be experiencing elevated levels of sexual harassment compared to girls in the middle of the spectrum, which may lead some to miss school due to feeling unsafe. Elevated odds of having been in a physical fight may be related to fighting back in response to harassment, may indicate exposure to intimate partner violence,[39] or may be related to other forms of social group conflict.[35] For example, Brown and Tappan[35] described shifting femininity ideologies among US middle school age girls in conjunction with a rise in media images of teenage girls in physical fights, which could also have implications for the links between perceived gender conformity and physical fighting in girls.

Sex-by-gender expression interactions were found for two outcomes: having being threatened or injured with a weapon and having missed school due to feeling unsafe. For the outcome of threat or injury with a weapon, the cubic effect among boys was distinct from all other observed patterns, and the elevated risk among girls at the most nonconforming end of the spectrum was substantially higher than for all other outcomes except bullying. This differing shape may be driven by relatively sparse data for this outcome but also could be related to differences in the social environments and social experiences of boys and girls who reported being at the most nonconforming end of the scale compared to those who were slightly less nonconforming. These differences might reflect community-level differences in availability of guns, school violence policies, or local drug-related or law enforcement activity. Although this study adjusted for clustering by region and school, there may be other factors related to sex and perceived gender expression that remained unmeasured.

Overall, the prevalence of violence and bullying victimization in this four school district sample was similar to levels reported on the 2013 national YRBS, with the exception of physical fighting, which was reported by 9% of our sample compared to 25% of respondents nationwide.[36] The lower prevalence of physical fighting in our sample is notable, and may suggest key differences between the districts in this sample and the US in general that could have implications for reducing exposure to violence and should be examined in future research.

We note several limitations to this study. First, all measures are self-reported and there may be additional factors we could not account for that might lead some students to report higher levels of gender conformity or nonconformity, including factors also linked to violence or bullying victimization (such as characteristics of perpetrators). Further, gender expression is multidimensional, and our measure represents only one approach to the measurement of perceived masculine and feminine expression; although survey research requires brief, validated measures such as this one, alternate strategies for assessing gender expression at the population level should be explored in future research. In addition, the YRBS questionnaires did not include measures allowing for the identification of transgender youth,

Author Manuscript Author Manuscript Author Manuscript Author Manuscript

a group that may be heavily impacted by gender expression-related discrimination. Efforts have already begun—and should be expanded—to promote visibility of transgender youth on population-based surveys such as the YRBS.[37,38]

Second, as a cross-sectional study, temporal ordering of these relationships cannot be determined. There is robust evidence that gender nonconformity may be targeted by peers for discrimination and victimization,[2,6,14] but there is also the possibility that prior victimization experiences may impact reported or actual gender expression. In a study of 5th graders, peer victimization in the fall term predicted decreased engagement in gender nonconforming behaviors in the spring for boys, while among girls, victimization predicted decreased engagement in both conforming and nonconforming activities.[39] Longitudinal research is necessary to disentangle these relationships. Third, generalizability is limited as this sample comes from four urban school districts that were motivated to include a novel measure of gender expression. Yet, even in these jurisdictions that may already have been more attuned to issues of gender diversity in their student body, greater gender nonconformity was strongly associated with elevated odds of victimization, suggesting that these may be underestimates of the experiences of youth nationwide. Future uptake of this item by additional jurisdictions or as part of the national YRBS will allow for greater generalizability to the US high school student population, and will also permit needed examination of gender expression differences by race/ethnicity and geographic area.

## IMPLICATIONS FOR SCHOOL HEALTH

To our knowledge, this study is the first to use a geographically diverse population-based sample to better understand experiences related to gender expression, bullying, and violence in school contexts for 9th through 12th grade students. Based on these findings, schools should consider the following in efforts to address and prevent bullying and violence:

- Both girls and boys who are more gender nonconforming may be at elevated risk of violence and bullying victimization in school settings;
- These preventable experiences of stigmatization and discrimination based on gender expression impact not only LGBT students, but students of all sexual orientation identities;
- Given our finding that highly gender conforming youth may be at elevated risk of fighting and victimization, school-based violence prevention programs should incorporate curriculum celebrating gender diversity and identifying the negative effects of gender stereotypes across a full spectrum of gender expression.

In our study's probability sample, which was predominantly youth of color, findings emphasize the need for future research focused on the intersections of gender expression, racial/ethnic background, and sexual orientation identity. This will have additional implications for the development and implementation of effective anti-violence and anti-bullying initiatives that address the interplay of multiple forms and multiple levels of stigma and discrimination in school contexts (from state- and district-level policies pertaining to gender and sexual diversity to individual experiences of bullying or violence at school). Inclusion of gender expression norms and gender diversity in relation to other social

Author Manuscript Author Manuscript Author Manuscript Author Manuscript

determinants of health within school violence prevention efforts may offer new insights and pathways toward promoting school health and mitigating the social stressors that drive health inequities.

### Human Subjects Approval Statement

The Boston Children's Hospital Institutional Review Board determined that protocol approval was not necessary because the study used de-identified data from secondary sources.

## Acknowledgments

The authors thank the 2013 Youth Risk Behavior Survey participants and the US Centers for Disease Control and Prevention for the data used in this study. AR Gordon is supported by NIH F32DA042505. JP Calzo is supported by NIH K01DA034753. SB Austin is supported by NIH R01 HD066963 and R01 HD057368 and by the Maternal and Child Health Bureau, Health Resources Services Administration, US Department of Health & Human Services (T71-MC00009; T76-MC00001). The funders played no role in the study design, collection, analysis, interpretation of data, or writing of the manuscript.

## References

1. Birkett M, Russell ST, Corliss HL. Sexual-orientation disparities in school: the mediational role of indicators of victimization in achievement and truancy because of feeling unsafe. Am J Public Health. 2014; 104(6):1124–1128. [PubMed: 24825216]
2. Kosciw, JG., Greytak, EA., Palmer, NA., Boesen, MJ. The 2013 National School Climate Survey: The Experiences of Lesbian, Gay, Bisexual and Transgender Youth in Our Nation's Schools. New York, NY: GLSEN; 2014. Available at: http://www.glsen.org/article/2013-national-school-climate-survey. Accessed April 19, 2015.
3. Mueller AS, James W, Abrutyn S, Levin ML. Suicide ideation and bullying among us adolescents: examining the intersections of sexual orientation, gender, and race/ethnicity. Am J Public Health. 2015; 105(5):980–985. [PubMed: 25790421]
4. Olweus D. School bullying: development and some important challenges. Annu Rev Clin Psychol. 2013; 9:751–780. [PubMed: 23297789]
5. Russell ST, Ryan C, Toomey RB, Diaz RM, Sanchez J. Lesbian, gay, bisexual, and transgender adolescent school victimization: implications for young adult health and adjustment. J Sch Health. 2011; 81(5):223–230. [PubMed: 21517860]
6. Gordon AR, Meyer IH. Gender nonconformity as a target of prejudice, discrimination, and violence against LGB individuals. J LGBT Health Res. 2007; 3(3):55–71.
7. Toomey RB, Ryan C, Diaz RM, Card NA, Russell ST. Gender-nonconforming lesbian, gay, bisexual, and transgender youth: school victimization and young adult psychosocial adjustment. Dev Psychol. 2010; 46(6):1580–1589. [PubMed: 20822214]
8. Rieger G, Linsenmeier JAW, Gygax L, Bailey JM. Sexual orientation and childhood gender nonconformity: Evidence from home videos. Dev Psychol. 2008; 44(1):46–58. [PubMed: 18194004]
9. Rieger G, Savin-Williams RC. Gender nonconformity, sexual orientation, and psychological well-being. Arch Sex Behav. 2012; 41(3):611–621. [PubMed: 21350914]
10. Bailey JM, Zucker KJ. Childhood sex-typed behavior and sexual orientation: a conceptual analysis and quantitative review. Dev Psychol. 1995; 31(1):43–55.
11. Plöderl M, Fartacek R. Childhood gender nonconformity and harassment as predictors of suicidality among gay, lesbian, bisexual, and heterosexual Austrians. Arch Sex Behav. 2007; 38(3): 400–410. [PubMed: 18040769]
12. Roberts AL, Rosario M, Corliss HL, Koenen KC, Austin SB. Childhood gender nonconformity: a risk indicator for childhood abuse and posttraumatic stress in youth. Pediatrics. 2012; 129(3):410–417. [PubMed: 22351893]

Author Manuscript Author Manuscript Author Manuscript Author Manuscript

13. Friedman MS, Koeske GF, Silvestre AJ, Korr WS, Sites EW. The impact of gender-role nonconforming behavior, bullying, and social support on suicidality among gay male youth. J Adolesc Health. 2006; 38(5):621–623. [PubMed: 16635780]
14. Roberts AL, Rosario M, Slopen N, Calzo JP, Austin SB. Childhood gender nonconformity, bullying victimization, and depressive symptoms across adolescence and early adulthood: an 11-year longitudinal study. J Am Acad Child Adolesc Psychiatry. 2013; 52(2):143–152. [PubMed: 23357441]
15. Iwamoto DK, Cheng A, Lee CS, Takamatsu S, Gordon D. "Man-ing" up and getting drunk: the role of masculine norms, alcohol intoxication and alcohol-related problems among college men. Addict Behav. 2011; 36(9):906–911. [PubMed: 21620570]
16. Pachankis JE, Westmaas JL, Dougherty LR. The influence of sexual orientation and masculinity on young men's tobacco smoking. J Consult Clin Psychol. 2011; 79(2):142–152. [PubMed: 21443320]
17. Courtenay WH. Engendering health: a social constructionist examination of men's health beliefs and behaviors. Psychol Men Masc. 2000; 1(1):4–15.
18. Santana MC, Raj A, Decker MR, La Marche A, Silverman JG. Masculine gender roles associated with increased sexual risk and intimate partner violence perpetration among young adult men. J Urban Health. 2006; 83(4):575–585. [PubMed: 16845496]
19. Jewkes R, Morrell R. Sexuality and the limits of agency among South African teenage women: theorising femininities and their connections to HIV risk practises. Soc Sci Med. 2012; 74(11): 1729–1737. [PubMed: 21696874]
20. Kerrigan D, Andrinopoulos K, Johnson R, Parham P, Thomas T, Ellen JM. Staying strong: gender ideologies among African-American adolescents and the implications for HIV/STI prevention. J Sex Res. 2007; 44(2):172–180. [PubMed: 17599274]
21. US Centers for Disease Control and Prevention. Methodology of the youth risk behavior surveillance system — 2013. MMWR Morb Mortal Wkly Rep. 2013; 62(1):1–25. [PubMed: 23302815]
22. Wylie S, Corliss HL, Boulanger V, Prokop LA, Austin SB. Socially assigned gender nonconformity: a brief measure for use in surveillance and investigation of health disparities. Sex Roles. May.2010
23. Greytak, EA., Gill, A., Conron, KJ., et al. Identifying transgender and other gender minority respondents on population-based surveys: special considerations for adolescents, race/ethnicity, socioeconomic status, and intersex status. In: Herman, JL., editor. Best Practices for Asking Questions to Identify Transgender and Other Gender Minority Respondents on Population- based Surveys. Los Angeles, CA: The Williams Institute; 2014. p. 29-43.Available at: http://williamsinstitute.law.ucla.edu/wp-content/uploads/geniuss-report-sep-2014.pdf. Accessed March 1, 2015.
24. Goffman, E. Stigma: Notes on the Management of Spoiled Identity. Englewood Cliffs, NJ: Prentice-Hall; 1963.
25. SAS Institute Inc.. SAS Software, Version 9.3 of the SAS System for Windows. Cary, NC: SAS Institute Inc; 2011.
26. Hastie, T., Tibshirani, R. Generalized Additive Models. New York, NY: Chapman and Hall; 1990.
27. Hong L. Toward a transformed approach to prevention: breaking the link between masculinity and violence. J Am Coll Health. 2000; 48(6):269–279. [PubMed: 10863870]
28. Moore TM, Stuart GL. A review of the literature on masculinity and partner violence. Psychol Men Masc. 2005; 6(1):46.
29. Katz J. Reconstructing masculinity in the locker room: the Mentors in Violence Prevention Project. Harv Educ Rev. 1995; 65(2):163–175.
30. Mahalik JR, Locke BD, Ludlow LH, et al. Development of the conformity to masculine norms inventory. Psychol Men Masc. 2003; 4(1):3–25.
31. Mahalik JR, Burns SM. Predicting health behaviors in young men that put them at risk for heart disease. Psychol Men Masc. 2011; 12(1):1–12.

Author Manuscript Author Manuscript Author Manuscript Author Manuscript

32. Wells S, Flynn A, Tremblay PF, Dumas T, Miller P, Graham K. Linking masculinity to negative drinking consequences: the mediating roles of heavy episodic drinking and alcohol expectancies. J Stud Alcohol Drugs. 2014; 75(3):510–519. [PubMed: 24766763]

33. Lisco CG, Leone RM, Gallagher KE, Parrott DJ. “Demonstrating masculinity” via intimate partner aggression: the moderating effect of heavy episodic drinking. Sex Roles. 2015; 73(1):73–71. [PubMed: 26456996]

34. Granié M-A. Gender stereotype conformity and age as determinants of preschoolers’ injury-risk behaviors. Accid Anal Prev. 2010; 42(2):726–733. [PubMed: 20159100]

35. Brown LM, Tappan MB. Fighting like a girl fighting like a guy: gender identity, ideology, and girls at early adolescence. New Dir Child Adolesc Dev. 2008; (120):47–59.

36. Kann L, Kinchen S, Shanklin S, et al. Youth Risk Behavior Suveillance – United States, 2013. MMWR Morb Mortal Wkly Rep. 2014; 63(4):1–168. [PubMed: 24402465]

37. Federal Interagency Working Group on Improving Measurement of Sexual Orientation and Gender Identity in Federal Surveys. Toward a Research Agenda for Measuring Sexual Orientation and Gender Identity in Federal Surveys: Findings, Recommendations, and Next Steps. Washington, DC: Federal Committee on Statistical Methodology; 2016. Available at: https://fcsm.sites.usa.gov/files/2014/04/SOGI_Research_Agenda_Final_Report_20161020.pdf. Accessed October 31, 2016

38. The GenIUSS Group. Best Practices for Asking Questions to Identify Transgender and Other Gender Minority Respondents on Population-Based Surveys. Los Angeles, CA: The Williams Institute; 2014. Available at: http://williamsinstitute.law.ucla.edu/wp-content/uploads/geniuss-report-sep-2014.pdf. Accessed March 1, 2015

39. Ewing Lee EA, Troop-Gordon W. Peer socialization of masculinity and femininity: differential effects of overt and relational forms of peer victimization. Br J Dev Psychol. 2011; 29(Pt 2):197–213. [PubMed: 21592148]

Gordon et al. Page 12

Author Manuscript Author Manuscript Author Manuscript Author Manuscript

2%
Female (n=2921)
35%
35%
15%
11%
2%
Male (n=2548)
31%
33%
15%
10%
4%
3%
6%
4%
Heterosexual (n=4855)
35%
35%
14%
9%
2%
4%
Bisexual (n=302)
13%
29%
21%
26%
7%
Gay/Lesbian (n=104)
16%
10%
10%
21%
21%
10%
13%
Unsure (n=208)
18%
26%
19%
16%
7%
4%
9%
1
2
3
4
5
6
7
Gender Expression (1=Highly gender conforming; 7=Highly gender nonconforming)

**Figure 1.**
Gender Expression among High School Students by Sex and Sexual Orientation Identity in 4 Urban School Districts (2013 Youth Risk Behavior Surveys; N = 5469)

*J Sch Health*. Author manuscript; available in PMC 2019 April 01.

AR_284964

Author Manuscript Author Manuscript Author Manuscript Author Manuscript

**Figure 2. Predicted Probabilities of Fighting or Violence Victimization in School Settings by Perceived Gender Expression and Sex among High School Students in 4 Urban School Districts (2013 Youth Risk Behavior Surveys; N = 5469)**

Note.

Graphs show predicted probabilities separately by sex (girls=dashed line; boys=solid line). Shaded areas represent 95% confidence intervals around predicted probabilities. All models account for clustering by school district, are weighted to account for sampling design, and are adjusted for age, race/ethnicity, and sexual orientation identity. Models: (2a) probability of having been in a physical fight in past year; (2b) probability of injury in a physical fight, needing treatment by a doctor or nurse in the past year; and (2c) probability of having been threatened or injured with a weapon in the past year. In all models, a main effect of sex was observed; in Model 2c, there was also a significant interaction between sex and gender expression. There were no significant interactions between sexual orientation identity and gender expression.

Author Manuscript Author Manuscript Author Manuscript Author Manuscript

**Figure 3. Predicted Probabilities of Bullying or Missing School for Safety Reasons by Perceived Gender Expression and Sex (girls=dashed line; boys=solid line) among High School Students in 4 Urban School Districts (2013 Youth Risk Behavior Surveys; N = 5469)**

Note.

Graphs show predicted probabilities separately by sex (girls=dashed line; boys=solid line). Shaded areas represent 95% confidence intervals around predicted probabilities. All models account for clustering by school district, are weighted to account for sampling design, and are adjusted for age, race/ethnicity, and sexual orientation identity. Models: (3a) probability of experiencing at-school or electronic bullying victimization in past year; and (3b) probability of having missed school 1+ days in past month due to feeling unsafe. In all models, a main effect of sex was observed; additionally, in Model 3b, there was a significant interaction between sex and gender expression. There were no significant interactions between sexual orientation identity and gender expression.

Author Manuscript Author Manuscript Author Manuscript Author Manuscript

## Table 1

Demographic Characteristics and Reported School-related Violence and Bullying Victimization among 2013 Youth Risk Behavior Survey Respondents (ages 13–18 years) from 4 Urban School Districts[a]

| | Total, % | In 1+ physical fights (past yr.) | Threat/injury w. weapon (past yr.) | Injured in fight, needed trt. (past yr.) | Missed school because felt unsafe (past mo.) | Any bullying vict. (past yr.) |
|---|---|---|---|---|---|---|
| | % (N) | (N=5412) % | (N=5448) % | (N=5437) % | (N=5424) % | (N=5469) % |
| **Overall** | 100 (5469) | 8.8 | 5.6 | 3.7 | 7.7 | 17.9 |
| **Sex** | | | | | | |
| Female | 50.5 (2921) | 6.5 | 4.7 | 2.8 | 8.2 | 20.7 |
| Male | 49.5 (2548) | 11.1 | 6.5 | 4.5 | 7.1 | 15.0 |
| **Race/Ethnicity** | | | | | | |
| Hispanic/Latino | 55.9 (2793) | 8.2 | 5.6 | 3.5 | 7.5 | 17.6 |
| Black/African American | 21.0 (1076) | 13.7 | 6.9 | 5.9 | 9.6 | 15.5 |
| White | 13.5 (812) | 4.6 | 4.2 | 1.6 | 7.5 | 21.8 |
| Asian/Pacific Islander | 6.4 (504) | 6.2 | 3.1 | 2.5 | 4.9 | 19.6 |
| Multi/Another | 3.2 (284) | 9.6 | 6.7 | 3.2 | 5.5 | 18.3 |
| **Sexual orientation identity** | | | | | | |
| Heterosexual | 88.6 (4855) | 8.2 | 4.9 | 3.2 | 6.9 | 15.8 |
| Gay/Lesbian | 1.9 (104) | 20.4 | 19.8 | 10.9 | 21.8 | 29.7 |
| Bisexual | 5.6 (302) | 14.8 | 8.3 | 6.3 | 10.7 | 34.0 |
| Not Sure | 3.9 (208) | 8.8 | 9.6 | 7.4 | 13.1 | 35.1 |
| **Gender expression score[b]** | | | | | | |
| 1 | 33.7 (1816) | 9.9 | 5.2 | 3.7 | 7.0 | 14.7 |
| 2 | 32.5 (1866) | 6.1 | 3.4 | 2.3 | 5.4 | 15.6 |
| 3 | 14.9 (802) | 7.3 | 4.9 | 3.1 | 7.9 | 20.6 |
| 4 | 10.3 (564) | 8.0 | 7.1 | 4.0 | 8.5 | 25.2 |
| 5 | 3.0 (164) | 13.9 | 10.6 | 6.9 | 13.6 | 26.2 |
| 6 | 1.8 (96) | 14.3 | 16.1 | 6.2 | 14.2 | 21.7 |
| 7 | 3.8 (161) | 24.4 | 16.0 | 12.5 | 21.6 | 26.2 |

Note.

For all demographic variables and outcomes % is weighted; n is unweighted

Gordon et al. Page 16

Author Manuscript

[a]Broward Co., FL; Chicago, IL; Los Angeles, CA; San Diego, CA

[b]Gender expression score range: 1 = Most gender conforming; 7 = Most gender nonconforming

*J Sch Health*. Author manuscript; available in PMC 2019 April 01.

AR_284968

HHS Public Access
Author manuscript
*Prof Psychol Res Pr*. Author manuscript; available in PMC 2016 January 20.

Published in final edited form as:
*Prof Psychol Res Pr*. 2015 ; 46(1): 37–45. doi:10.1037/a0037490.

# Serving Transgender Youth: Challenges, Dilemmas and Clinical Examples

**Amy C. Tishelman, Ph.D.**[1], **Randi Kaufman, Psy.D.**[1], **Laura Edwards-Leeper, Ph.D.**[2], **Francie H. Mandel, LICSW**[3], **Daniel E. Shumer, M.D.**[3], and **Norman P. Spack, M.D.**[1]

[1]Boston Children's Hospital and Harvard Medical School

[2]Pacific University School of Professional Psychology

[3]Boston Children's Hospital

## Abstract

Historically, many gender variant individuals have lived in a chronic state of conflict between self-understanding and physical being, one in which there was a continual misalignment between others' perceptions of them and their internal self-perception of gender. Only recently have professionals from mental health and medical realms come together to provide services to these youth. This paper describes an innovative program: the first mental health and medical multidisciplinary clinic housed in a pediatric academic center in North America to serve the needs of gender variant youth. We describe our model of care, focusing on the psychologist's role within a multidisciplinary team and the mental health needs of the youth and families assisted. We highlight clinical challenges and provide practice clinical vignettes to illuminate the psychologist's critical role.

### Keywords

transgender; gender dysphoria; gender non-conforming; youth; adolescent

## Introduction

Historically, many gender variant individuals have lived in a chronic state of conflict between self-understanding and physical being, with a continual misalignment between others' perceptions of them and their internal self-perception of gender. Only recently have professionals from mental health and medical realms come together to provide services to youth and, hopefully, some validation. As with other newly evolving fields of study, initial interventions were applied without the benefit of much research or precedent for guidance, and at times in an atmosphere of professional division (see Drescher & Byne, 2012, for a summary of continued controversies).

Correspondence regarding this article may be sent to the lead author at: Amy C. Tishelman, Ph.D., Boston Children's Hospital, 333 Longwood Avenue, 6th Floor, Endocrinology, Boston, MA 02115.

Author Manuscript Author Manuscript Author Manuscript Author Manuscript

Author Manuscript Author Manuscript Author Manuscript Author Manuscript

The Gender Management Services-Disorders of Sexual Development Program (GeMS-DSD) evolved due to the dearth of available services for two distinct populations: a) youth with Disorders of Sexual Development (DSD) and b) gender variant youth. DSD refer to biological conditions in which anatomic sexual development is atypical (Houk, Hughes, Ahmed, & Lee, 2006) whereas gender variance refers to gender expression and/or identity inconsistent with prevailing societal expectations and norms (Kulick, 1999). The term transgender typically refers to those individuals for whom genotype and phenotype are mismatched. Therefore, biologically male children may self-identify as female and vice versa, or youth may not fit neatly into either category. This paper will focus on the gender variant group served by GeMS-DSD. We highlight clinical challenges, and provide clinical vignettes to illuminate the psychologist's critical role. Please refer to the online supplemental materials for further description of terms relevant to gender, sex and sexuality, and a summary of suggested psychosocial evaluation recommendations.

The development of the GeMS-DSD Program was made possible because the initiative of an endocrinologist with prior expertise treating transgender adults, and a strong passion to assist gender variant youth without access to care. As with any novel program, a vision and a sense of possibility are essential aspects of effective action. With a strong belief in the need for such a program in a multidisciplinary hospital setting, the GeMS-DSD service was developed, partially dependent upon the persuasive abilities of the founding physicians, but also within the structure of an institution that encouraged care for underserved youth and with clinic directors and hospital administrators who fostered innovation. The GeMS-DSD program became the first multidisciplinary mental health and medical program housed in a pediatric academic center in North America to serve youth with DSD or gender variance, and has forged a path for the development of other clinics in the United States. Many mental health professionals, medical students, pediatric house officers, endocrine fellows, and staff endocrinologists have participated in our program.

## Program Development

The development of GeMS-DSD was a shared effort, requiring extensive multidisciplinary collaboration. Consultation was sought from urology, endocrinology, medical ethics, genetics, neonatology, gynecology, psychology, and hospital administration. When the program opened, it was co-directed by a pediatric urologist with expertise treating children with DSD and a pediatric endocrinologist, working in tandem with a psychologist to provide evaluations and services for gender variant youth and their families. The remainder of the discussion will focus on the gender variant group in the GeMS program, with an emphasis on the crucial role of psychologists within this multidisciplinary team.

In order to develop our mental health protocols, our hospital supported the GeMS psychologist receiving training in Amsterdam from Peggy Cohen-Kettenis, PhD and her team, pioneers in assessing and treating transgender youth. The purpose of the trip was to learn and adapt the Dutch protocol for use in the United States. The Amsterdam group opened the first specialized gender identity clinic for children and adolescents in 1987 (deVries & Cohen-Kettenis, 2012) and have published numerous studies based on their protocol and interventions (e.g., Delemarre-van de Waal & Cohen-Kettenis, 2006; deVries,

Author Manuscript Author Manuscript Author Manuscript Author Manuscript

Steensma, Doreleijers, & Cohen-Kettenis, 2011; Wallien & Cohen-Kettenis, 2008; deVries & Cohen-Kettenis, 2012). During the training trip, the GeMS psychologist and endocrinologist participated in the first international Adolescent Gender Identity Research Group Meeting. Psychological measures were selected collaboratively for clinics to use in the evaluation of transgender youth, based on shared experience with this population, while each clinic adapted and added measures as needed for individual sites.

When opened, the GeMS clinic was flooded with inquiries from families, not only from the local region, but also from across the nation and internationally. Notably, before the GeMS program existed, the demand for services was largely invisible. In addition, children and families struggled to identify resources (many of which were predominantly non-existent) without the aid of trained professionals, while sometimes coping with significant and multifaceted psychosocial challenges. These could include a range of issues such as managing family responses, including anxieties and discord related to atypical gender expressions and/or disclosures of children; managing peer, school and other social circumstances in contexts that were often less than accepting; and managing mental health issues. Numerous articles have been published outlining similar multifaceted issues gender nonconforming children and families may face (e.g., Dreger, 2009; Ehrensaft, 2007; Malpas, 2011; Menvielle, 2012). In response to the increasing volume of cases a social worker joined the team to conduct pre-screening telephone intakes, aid families in finding resources, and to help develop written clinic protocols in collaboration with the psychologist.

## Clinic Practice

The GeMS program, based on the model of care first developed and shaped in Amsterdam, continues to be adapted over time in response to new developments in the field and service demands. Our protocol relies on existing guidelines and standards for working with transgender individuals developed by various disciplines. For example, the World Professional Association for Transgender Health (WPATH) Standards of Care (Coleman et al., 2011), the Endocrine Society Guidelines (Hembree et al., 2009), the Report of the American Psychological Association (APA) Task Force on Gender Identity and Gender Variance (2009; http://www.apa.org/pubs/info/reports/gender-identity.aspx), and the American Counseling Association Competencies for Counseling with Transgendered Clients (2010) each offer valuable recommendations for working with the transgender population. Generally, these guidelines and standards are similar in that they all recommend supporting transgender individuals in their affirmed gender identity, which often includes assisting in medical interventions that will help make the individual's body congruent with their affirmed gender. The APA Task Force report (APA, 2009) states support for the "efficacy, benefit, and medical necessity of gender-transition treatments for appropriately evaluated individuals…" (p.67), a statement consistent with the goals of the GeMS team.

Nevertheless, many of these guidelines do not focus on issues specific to transgender youth. The Society for Adolescent Health and Medicine (2013) has issued recommendations for promoting the health and well-being of lesbian, gay, bisexual and transgender adolescents, and the American Academy of Child and Adolescent Psychiatry (2012) has published practice parameters addressing gay, lesbian, bisexual, gender nonconforming and gender

Author Manuscript Author Manuscript Author Manuscript Author Manuscript

discordant children and adolescents. The APA also published a helpful and accessible pamphlet regarding gender identity and gender expression, with some information about transgender youth (http://www.apa.org/topics/sexuality/transgender.pdf). They note that "it may be helpful to consult with mental health and medical professionals familiar with gender issues in children" (p. 3), while also emphasizing that "identifying as transgender does not constitute a mental disorder" (p. 3) and that "it is not helpful to force the child to act in a more gender-conforming way" (p. 3). This position is aligned with our gender affirming approach to care (see Hidalgo et al., 2013 for an elaboration of a gender affirming model) which views gender variations as part of an expected diversity, and not pathology. Mental health challenges may emerge related to cultural and social responses to a child or co-exist with gender non-conformity. Consistent with much literature (e.g., Hidalgo et al., 2013; Steensma, McGuire, Kreukels, Beelman & Cohen-Kettenis, 2013; Wallien & Cohen-Kettenis, 2008) we view gender as sometimes fluid over time, recognizing that not all gender non-conforming children fit neatly into male or female identities, and that gender identity (internal sense of self) and gender expression (outward expression of gender) may modify over time. Members of the GeMS team have played a role in the development of standards and guidelines, including as a member of the active APA Task Force to develop guidelines for psychological practice with transgender and gender non-conforming clients.

As time has elapsed, and our clinical expertise has developed, we have advanced to a more flexible, individualized approach to care than was utilized at the clinic's inception, which may evolve further with increasing research to inform best practices. Within our current model we continue to prioritize evaluation and treatment, mental health and readiness for medical treatment, but allow for a variable structure and account for the unique circumstances of the youth and family. Therefore, the model set forth below is adaptable, serving as a guide for care as opposed to an inelastic protocol. Clinical discretion and family needs are prioritized, as deemed appropriate by the psychologist working within a multidisciplinary team. In addition, as the field evolves, our future practices may vary from those delineated. However, we anticipate that our fundamental approach will endure, and can be described as the intertwining of mental health and medical expertise, each informing the other to best assist families and youth.

## Intake

The initial telephone intake, conducted by a GeMS clinical social worker, includes gathering a substantial amount of information and allows the parent and/or guardian the opportunity to tell their story to a knowledgeable professional, often for the first time. The information includes reasons for concerns about gender variance, current crises, and developmental, medical, and mental health history. Other services include support, psycho-education, explanation of protocols, outside referrals and scheduling a clinic appointment when appropriate. We believe that it is imperative for a qualified and experienced clinician to be the first point of clinical contact to set the roadmap for future care, and to act as an identified trusted individual to whom the family can turn. The intake frequently plants the seeds of hope, providing relief for families who have been enduring the stress of a situation for which they have had little preparation, often within a context of isolation. A description of the patient population presenting in GeMS through the year 2010 indicated that the mean age at

Author Manuscript Author Manuscript Author Manuscript Author Manuscript

intake was approximately 14, with a slight preponderance of genotypic female to male patients, many of whom (approximately 44%) presented with a significant psychiatric history (Spack et al, 2012).

It is important to note that the earliest we medically treat children is when puberty has just begun, medically defined as Tanner Stage 2 (Marshall and Tanner, 1969, 1970). A youth's chronological age is less relevant than their biological development and a cognitive level necessary to adequately assent to treatment. However, we do not accept new patients for treatment older than eighteen.

In the case of younger children who are not yet approaching puberty, guidance is often sought for gender related challenges, in which case we provide psycho-education, and offer referrals for families to receive supportive mental health counseling. These services may assist the youth in clarifying their gender identity, and help youth and families navigate the many anticipated and unanticipated issues they may confront, including whether or not to initiate a social transition (presenting in social settings as the affirmed gender). Children may experience anxiety and depression, often secondary to the social and familial ramifications of their gender questioning and/or atypical presentation, and a mental health professional with relevant expertise can be tremendously helpful.

When a child is seeking services closer to puberty, our current model typically recommends three to six months of psychotherapy. For some children who feel a compelling sense of urgency in light of impending physiological changes, this recommendation may be modified, especially when complicating factors are absent and the child is well supported. This aspect of the model reflects our recognition that many youth and/or parents seeking services in our clinic are in the early stages of gender exploration and consideration of medical intervention options, and need a safe forum in which to learn more about the issues involved, and treatment available. Further, we have found psychotherapy exceedingly helpful for treating co-occurring mental health issues and for exploring the child and/or adolescents' thought processes, family functioning, strengths and support systems. In addition, psychotherapy enables a deeper exploration of the child's Gender Dysphoria (GD), the range of gender expression and gender identity questioning, and whether the subjective experience fits more into a model of binary identity (e.g., male/female) versus a fluidity of gender and gender nonconformity. Mental health intervention can also support problem-solving regarding the medical and social challenges that lie ahead. It helps facilitate discussion between families and other support systems (schools, extended family, religious/sectarian community affiliates) as next steps are contemplated. Many authors also have noted the importance of mental health services (e.g., Bernal & Coolhart, 2011; Menvielle, 2012; Turek, 2011). Drescher & Byne (2012) emphasize that "the majority of adolescent persisters do well when they receive family and professional support for early interventions" (p. 504). Therefore, GeMS patients are asked to continue working with their outside mental health provider during the course of medical treatment in our clinic.

One of the purposes of the puberty blocking medical intervention (described below) is to buy time for the adolescent to continue exploring gender identity issues without the added stress of a puberty that is inconsistent with their self-identity. In our view, it is often

Author Manuscript Author Manuscript Author Manuscript Author Manuscript

unrealistic to expect an adolescent to sort through the myriad of issues related to gender variance without the help of a professional. Many of the challenges adolescents face regard the reactions of others to their gender identity and/or expression, but can also include gender-related questioning and confusion (see Cohen-Kettenis, Steensma & de Vries, 2011, for an interesting discussion of psychological interventions for adolescents with GD).

## Psychological Evaluation

The goals of evaluation, conducted by a licensed psychologist, are to further understand the child and family's needs, and to inform medical treatment interventions. Before initiating the evaluation, we typically request a letter from the child's outside community therapist composed with the aid of a guide we provide. The therapist is asked to address their understanding of the patient's gender identity history, including length of time the patient has had gender questioning feelings, how long he/she has been living in the role of a different gender (if at all), and how persistent his/her identification with a different gender has been, if ever, over the course of time. The letter includes the therapist's impression of the patient's supports, the therapist's perception of other mental health issues or developmental concerns, and finally, the therapist's perception of benefits/drawbacks related to medical intervention.

Assuming that the therapist's letter is generally supportive of medical intervention, following review by our mental health clinicians, we move forward with an on-site psychological evaluation. This evaluation consists of extensive interviews of youth and families, and measures of anxiety, depression, self-concept, behavioral and social functioning, autism spectrum disorder (ASD), and gender identity. With consent, outreach is often made to collateral informants, and we review relevant documents (e.g., neuropsychological evaluations), as appropriate.

In the clinical interview, we address what the youth and parents hope to accomplish from the evaluation, family and developmental history, school and academic history, mental health and medical history, substance use, and trauma history. We gather an extensive gender history including the youth's subjective experience of gender across time, gender presentation, gender role expression, and sexual orientation. Considerable attention is paid to factors that make these cases more complicated, such as patients presenting with features of ASD, severe psychiatric concerns (e.g., suicidality, self-harming behaviors, psychosis, violence and aggression, and history of abuse/trauma), and/or complicated family factors (e.g., divorced parents, unsupportive family members). We assess support structures and strengths, familial attitudes about non-traditional gender roles and sexual orientation preferences, religious, cultural and ethnic background, and additional individual and family stressors. The youth's age at first signs of GD or disclosures is always noted; families may be caught off guard when their children first disclose gender questioning close to adolescence or after the onset of puberty, and often the evaluations of these youth and families are particularly complex.

Consistent with psychological evaluations in general, the rationale for numerous measures and methods of information gathering is to obtain the most authentic and comprehensive clinical picture possible. This is particularly critical, given that the results and clinical

Author Manuscript Author Manuscript Author Manuscript Author Manuscript

formulation play the primary role in deciding whether to move forward with a potentially life-changing medical intervention for the adolescent. We synthesize and interpret the information obtained, and use the evaluation as a way to understand the youth and family's state of mind, ambivalences, and overt and covert pressures. We also want to ensure that, to the extent possible, a youth's cultural and social environment will support their chosen gender identity and provide a safety net as they move forward. A full clinical report is written that integrates the information, and provides a formulation and recommendations. The team psychologist then meets with the family to review this information. Medical interventions that often follow are either in the form of puberty blockers, and/or cross-sex hormone therapy, described below.

As noted above, continuing psychotherapy for youth is typically recommended by our protocol. At times we recommend family treatment and/or support groups to help with the family's adjustment to their child's transition. The GeMS team then remains in contact with community providers as clinical care dictates. In addition, youth treated in our program return for regular clinic visits, meeting with both mental health and medical team members, in order to provide continuity of care and further assist adolescents and family members as needed.

## Medical Intervention

Medical intervention with transgender youth in GeMS occurs under the auspices of a subdivision within the Endocrine Department. In brief, as alluded to above, with children who have recently begun puberty, puberty-blocking hormones are often prescribed. These are administered in the form of subcutaneous implants in the upper arm, which last two to three years, or monthly injections. These treatments are not routinely covered by health insurance in the United States and may range in cost from $120 to over $1,000 per month. Other medical services, laboratory tests, and sometimes cross-sex hormones may be covered by insurance.

In the absence of pubertal blockers, biological males with affirmed female identities may experience significant growth, permanent facial hair and vocal changes, and intolerable erections. A voice that has deepened cannot be raised through hormone therapy, and requires difficult and expensive speech therapy, in order to affect a higher voice. Similarly, without such intervention, biological females who identify as male may experience menstruation and breast development; the latter can only be modified through surgery. Nevertheless, an adolescent who has initiated puberty blockers can decide to terminate the intervention and allow physiological changes to occur as they would have, had the medical intervention never been initiated.

Only with an older adolescent, typically around age sixteen, are irreversible interventions initiated, and only after psychotherapy and a careful psychological evaluation has taken place. In this way, we try to ensure that an adolescent is not ambivalent, and that these interventions are well thought through and understood without coercion from others, and with full consent. When these conditions are met, an adolescent may be placed on cross-sex hormones (estrogen for genetic males and testosterone for genetic females), to facilitate a more complete transition into that individual's affirmed gender. When natal puberty has

Author Manuscript Author Manuscript Author Manuscript Author Manuscript

been previously blocked, the cross-sex hormones are even more effective in rendering a more gender consonant, "typical" presentation. For male-to-female (MTF) patients, treating with pubertal suppression in early puberty followed by estrogen in later adolescence causes enhanced breast development, vocal quality consistent with the affirmed gender, no development of a protruding larynx or "Adam's Apple", absence of male-typical facial or body hair, and diminished masculinization of the body frame and facial bones. For female-to-male (FTM) patients, pubertal suppression in early puberty followed by treatment with testosterone later in adolescence leads to development of facial and body hair, deepening of the voice, masculinization of the body frame and facial bones, no need for mastectomies, and no menarche (see Delmarre-van de Waal & Cohen-Kettenis, 2006 and Shumer & Spack, 2013 for further information).

A common scenario is for GeMS to recommend puberty blockers, when the youth and/or the parent may feel that it would be best to start cross-sex hormone therapy instead. The delay of puberty, rather than the immediate onset of the puberty of choice (utilizing cross-sex hormones) is sometimes difficult for the youth or family to accept. This is an area where we currently have little research to guide us, and the decision of whether to block puberty, or instead move forward with an affirmed gender (i.e., cross–sex hormones) must be weighed carefully. Aside from the irreversible nature of cross-sex hormone initiation, this intervention has significant ramifications for fertility, while puberty blockers do not (Lazar, L, Meyerovitch,, de Vries,, Phillip & Lebanthal, 2014).

Anecdotally, we have found that the GeMS evaluation has been invaluable by providing information to guide subsequent psychosocial and medical decision-making. In general, adolescence is marked by a search for identity and personal transformation, and at times impetuous decision-making. Given the implications of social transition and medical intervention, coupled with the developmental challenges of identity consolidation, we feel the need to progress with care and forethought, to ensure that all interventions proceed safely, to minimize medical and psychosocial contraindications or complications, and to make sure it is the appropriate timeframe for intervention. We also want to ensure that the child/adolescent who may be gender variant does not feel compelled to choose a gender (male/female), when in actuality they may not fit into a typically recognized gender identity. Nevertheless, these considerations always need to be balanced by the very real physiological ticking clock, especially for the younger child on the verge of a puberty that they deeply want to avoid.

## Challenges and Dilemmas of Psychosocial Practice

### Child and Family Expectations

When confronted by a gender variant child, a parent may be caught very much off guard, with no ability to rehearse the best response to such an unanticipated circumstance. In addition, for a parent, it may feel like a loss of the daughter or son to whom they became so bonded. Moreover, some families are aware of their child's GD in early childhood while others are surprised to learn about it when their child is in their teens. Both instances carry particular emotional impact for families. Many parents are resilient and loving in the face of these challenges, but may experience an understandable drive for rapid certainty and

Author Manuscript Author Manuscript Author Manuscript Author Manuscript

solutions. We have also encountered parents who are resistant to accepting this diagnostic picture, and believe their child's gender variance is a phase, or a manifestation of some other psychological issue that can be resolved, thus resolving the gender variance. Unfortunately, the problems and issues that often exist for gender variant children and their families are nuanced and indeterminate, and the resolutions may evolve through a time consuming process without a known end. This can add to the stress and consequent pressure to "solve" the issues (see Bernal & Coolhart, 2012, Dreger, 2009, Menvielle, 2012 and Turek, 2011 for further discussion of family issues).

It can be particularly challenging when two parents or guardians with legal custody are in dissent about how to proceed, especially in contentious divorce situations when communication is minimal or hostile, yet medical consensus needs to be reached. Typically, our program requires consent of both parents before medical treatment can go forward and mental health and/or medical clinicians may need to be proactive in trying to resolve disputes with sensitivity.

## Psychosocial Considerations

Any number of psychological, social and cultural factors can impinge upon youth and their family, and influence decision-making, expectations and emotional reactions. The Report of the APA Task Force on Gender Identity and Gender Variance (2009) summarizes some of these factors, including general behavior problems, peer related problems and other mental health issues. Below we outline some of the common issues we have encountered in our work.

Not infrequently, children and adolescents are involved in meaningful activities, which will be likely impacted by a gender transition. Prominent among these are youth sports teams, which are typically grouped by gender. Adolescents are often loath to lose these areas of gratification, along with the opportunity for social bonding. Other hobbies and interests that are often impacted include dancing, theatre, cheer leading and sleep-away camp, and children and families may be unable to forecast how they will weather these transitions. Therefore, a child may face the dilemma of losing the opportunity to sustain an ability or talent they value in order to live in a gender they embrace.

A youth's environment and culture is essential to consider when evaluating treatment options. Ideally, the family and community should provide every child safety, love and solace, and the support a gender questioning child and/or adolescent needs (as any youth does) to thrive into a healthy maturity. However, such youth often struggle for acceptance within their families and communities. We know from prior research (Dean, et al., 2000; Fitzpatrick, Jones, & Schmidt, 2005; Gibson & Catlin, 2011; Grossman & D'Augelli, 2007; Hass, et. al., 2010; Spack et al., 2012) that many children with GD become deeply anxious and depressed, and resort to suicide attempts. Others are at risk of leaving home and living a life with high costs and risks, including of exploitation, abuse, and as victims of violence, while obtaining hormones illicitly without the oversight of a qualified medical professional.

Even when families and children seek professional service and care, external factors beyond their control can impede access. Many geographic areas still lack basic services for children

Author Manuscript Author Manuscript Author Manuscript Author Manuscript

with GD, and traveling for access to medical care is not always an option for families living within modest means. Furthermore, schools and religious institutions vary in level of comfort dealing with transgender children, and may not have the understanding or training to navigate the complexities of their transgender student or member's needs. Learning to deal with social issues such as bullying and isolation, and practical issues such as bathroom and locker use, requires open and honest dialogue with experts familiar with gender issues; not all communities are able or willing to avail themselves to this kind of discussion.

One positive outgrowth of the Internet and widespread coverage of transgender issues is mainstream access to information about gender variance and dysphoria. Families can become much less isolated by accessing on-line social networks and organizations such as Parents, Families, and Friends of Lesbians and Gays (PFLAG), even when there is not a chapter in their vicinity. However, the increased availability of differing professional standards and practices can sometimes also confuse families, who may specifically seek out professionals who seem open to providing services desired by the patient or parents, even if they are inconsistent with typical practice standards. This could result in circumventing the input of mental health professionals, or providing irreversible intervention for a young or ambivalent child.

## Mental health

Sadly, we know that transgender youth are at risk for anxiety, depression, self-harm, suicidal ideation, psychiatric hospitalizations, homelessness, exploitation, and abuse (Dean, et al., 2000; Fitzpatrick, Jones, & Schmidt, 2005; Gibson & Catlin, 2011; Grossman & D'Augelli, 2007; Hass, et. al., 2010Grossman & D'Augelli, 2007; Spack et al., 2012). In addition, the spectrum of issues that can present in any child or adolescent can present in gender variant youth, including history of trauma, oppositional defiant disorder/conduct disorder, and learning disabilities. These youth may do poorly in school, and/or have difficulty with socializing, and negotiating the normal developmental challenges of adolescence. Optimally, a pubescent child and adolescent should be stable, safe, and supported in advance of receiving medical interventions such as puberty blockers or cross-sex hormones. Yet, for many, medical intervention is an antidote for some of their mental health problems. This poses a dilemma for the clinician, who may be averse to going forward with medical intervention, but feel compelled to do so in case that is the critical step needed to jump start a child's recovery. Such intervention should only take place once the crisis of active suicidal ideation, behavior and/or self-harm has receded, and following a full psychosocial evaluation if it had not taken place already, as well as with close monitoring to ensure that the child is safe and that the dangers continue to remit. Delays can be particularly difficult and contribute to a child's distress because of the limited physiological time frame. At the very least, psychological services should help to ensure adequate support systems before any medical intervention occurs, and puberty blockers can buy time and allow for a child to make thoughtful decisions about his or her gender.

Finally, there appears to be a higher than expected incidence of co-occurring GD with ASDs based on clinical experience as well as research, although more empirical study needs to be completed (e.g. deVries, Noens, Cohen-Kettenis, van Berckelaer-Onnes, & Doreleijers,

Author Manuscript Author Manuscript Author Manuscript Author Manuscript

2010; Drescher, 2012; Spack et al, 2012). Very often adolescents on the autism spectrum know they are different from peers, but have only recently identified gender identity as a factor contributing to this divergence. Sometimes they and their families believe that a gender transition will solve all problems, and/or latch on to gender as the sole reason they are unlike their peers. Similarly, parents may believe that the GD is a manifestation of the ASD, and resist treatment. Parents of youth on the autism spectrum may be concerned that their child's intense focus on gender is a fleeting concern, particularly if their child has a history of transitory preoccupations. When children with an ASD are evaluated, it is often more difficult to discern the degree of gender variance given the relatively concrete and binary thought processes and communication patterns that typify this population. A child with an ASD already has challenges in social realms and is faced with an additional unique and complex set of social circumstances. A comprehensive evaluation should help sort through these issues and it may be necessary to move forward cautiously. However, it is our opinion that treatment not be withheld indefinitely as these youth experience the same biological time constraints characteristic of all pubescent individuals, and therefore need to receive optimally timed interventions to the extent possible.

## Service Gaps and Evolution of Practice

Watching clinical services grow is rewarding, especially when they translate into more contented and peaceful lives for youth and their families. Nevertheless, evidence-based practices are aspirational when a new field emerges with no guiding clinical precedent. Controversies among providers in the mental health and medical fields are abundant. Drescher & Byne (2012) and Stein (2012) provide excellent discussions of issues of consensus versus continued controversies. These include differing assumptions regarding whether early intervention with gender variant youth can encourage desistance, and whether that is an appropriate practice. Other areas of debate include the age at which children (or adolescents) should be encouraged or permitted to socially transition; whether cross-sex hormones and surgery should be offered to youth, and if so, at what age; whether parental consent be required for these medical interventions; and whether mental health involvement be required, including psychological evaluation, prior to each stage of medical intervention. These issues are complex and providers in the field continue to be at odds in their efforts to work in the best interest of the youth they serve. Addressing each of these controversies goes beyond the scope of this paper; however, the GeMS team continues to stay abreast of these issues and actively participates in ongoing discussion and research (see Schwartz, D., 2012; Ehrensaft, D., Minter, S.P., 2012; Zucker, K.J., Wood, H., Singh, D., & Bradley, S.J., 2012; and Shwartz, D., 2012 for discussions of some of the issues and differing viewpoints).

An important priority going forward is to develop research to enhance our understanding of what typifies this population of children, and their developmental course and patterns, and to examine the long-term outcomes of treatment. The field needs to better comprehend which children are most likely to have a life-long and persistent identification with a different gender than the one they were assigned versus those who cease to self-identify as transgender over the course of time. Although some information is available (e.g., American Psychiatric Association, 2013; Steensma, McGuire, Kreukels, Beekman, & Cohen-Kettenis, 2013; Zucker, Wood, Singh, & Bradley, 2012) much more research in this area is needed.

Author Manuscript Author Manuscript Author Manuscript Author Manuscript

Other high priority areas for systematic examination include the effects and side effects of various medical interventions, especially given that they are initiated with youth who may be on a lifetime course of hormone treatment, and psychosocial outcomes for youth who receive medical intervention during adolescence.

Finally, we can only report on children with access to services; youth may not have access because of geography and lack of availability, lack of financial means, and/or because of social structures that do not support them. As noted earlier, these children are at risk to be exploited, to be runaways, street youth and sex workers, and to self-medicate and self-harm. Prevention and outreach, to shelter at-risk youth from damaging and avoidable traumas, and to improve access to mental health services, should be one of the highest priorities for health care providers.

## Clinical Case-Composites

### The following represent composites, not actual cases, to serve as examples of how GeMS has addressed common clinical scenarios

#### Case Scenario # 1: Early Puberty

**Referral Information:** M. is a 10 year old Black natal female who identifies as male. He and his parents came to the clinic stating a desire to initiate puberty blockers to avoid feminizing.

**History:** Although only 10, M's pediatrician had put his pubertal development as Tanner Stage 2 (pubertal), and he was developing breasts. He had been living as a boy at school and elsewhere for two years, and was quite concerned that his pubertal changes might alert others to his natal gender, and was very also very assertive about his desire to avoid the onset of menstruation. He had been in therapy for two years, and was also being treated by a psychiatrist for anxiety symptoms. His therapist had written a letter in support of M living in his affirmed gender.

**Psychological Evaluation:** The formal psychological evaluation indicated that M had a longstanding identification as male, which emerged in his early preschool years, as well as ongoing GD, which predominantly took the form of anxiety. His anxiety diminished, according to him and his family, as well as his therapist and psychiatrist, as he transitioned socially and began to live and be treated as a male at home and at school. Information from school revealed that he was viewed as normal and high functioning in all areas. As an example of a response to gender-related questions, M stated that he was not a transgender boy, but just a regular boy. M did report significant anxieties related to social situations, as well as to bathing and bathroom situations. M resides with two biological parents who were both supportive and in accord with pursuing medical treatment, although they reported that it initially had been difficult for them to accept his social transition.

**Recommendations:** Given his long-standing history of GD, positive adjustment at school, the consistency of data obtained from the his psychiatrist, psychologist, both parents and himself, the GeMS team recommended puberty blockers as well as continued psychological treatment to help diminish his anxiety and problem-solve social situations as they may arise.

Author Manuscript Author Manuscript Author Manuscript Author Manuscript

Continuing follow-up with the GeMS psychologist indicated that his anxiety diminished as his impending puberty was forestalled, with strong acceptance for his affirmed gender from his family and others.

### 2. Case Scenario # 2: Parent: Adolescent Conflict

**Referral Information:** E. is a 17 year old Hispanic natal male who came to the clinic with her parents, who immigrated to the United States soon after E's birth. E was hoping to be able to be treated with puberty blockers and female hormones, while her parents were unified in believing that psychotherapy could resolve her GD, and were hoping to have this confirmed by a psychological evaluation.

**History:** E's parents were invested in her remaining male, partially due to the elevation of male status in their traditional culture. Reportedly, E. had been interested in receiving care for her gender dysphoria for several years prior to the current appointment, to avoid the onset of pubertal changes she was already experiencing. However, her parents had been resistant. She had been in therapy with a psychologist for many years, and her therapist was instrumental in helping to persuade her parents to bring her to the clinic.

**Psychological Evaluation:** The evaluation revealed that E had identified as female since the age of 5, including using female pronouns, attempting to wear female underwear, playing with traditionally female toys, and identifying with female characters during pretend play. At present, E wore female clothing and had grown her hair, but appeared androgynous due to a deep voice and some light facial hair. She was generally assumed to be male at school and elsewhere, although her closest friends used her female name and pronouns at her request. The psychological evaluation revealed a strong cross-sex identification as female, and mild depression.

**Recommendation:** Puberty blockers were recommended, with possible cross-sex hormones in about six months. The psychologist spent considerable time with E's parents and with E, reviewing the results of the evaluation, and the basis for the recommendations. E's parents were distressed during discussion to learn that there was some urgency to proceed quickly, believing incorrectly that medical intervention could reverse pubertal changes. The treatment recommendations also included family therapy, to facilitate positive communication within the family and provide support and psycho-education for E's parents. We also recommended a continuation of psychotherapy for E., to help her adjust to personal and social changes, provide support, and to help her cope with family discord. E. continues to be seen by the psychologist in our clinic for consultation, and is adjusting well to the initiation of hormone treatment.

### Case # 3. Ambivalence and Mental Health Complexity

**Referral Information:** L. is a 16 year old White European American natal female who presents as male, and has chosen a male name and male pronouns. He has been in therapy since the age of 8, and was initially evaluated and put on pubertal blockers in our clinic at age 13. His mother called the clinic requesting that L. be considered for cross-sex hormones.

Author Manuscript Author Manuscript Author Manuscript Author Manuscript

L. was not seen for a full evaluation as he is an ongoing patient in our service, but for a screening related to his mother's request that cross-sex hormonal treatment be initiated.

**History:** L. was adopted at the age of 1, and his early history is not known. He has been diagnosed with depression, anxiety, and Conduct Disorder. He has a history of self-harm related to depression, academic pressure, and of being bullied in school. His social, academic, and emotional functioning tends to be poor, and he is emotionally and behaviorally dysregulated, with periods of rage at school and at home, and some known drug use. He was recently suspended at school for cheating and for provoking physical altercations. His mother believes that cross-sex hormones would alleviate his distress and dysregulation,

**Psychological Screening:** L's therapist, when contacted with the family's consent, indicated that L. appears ambivalent about his affirmed gender, and therefore did not believe that cross-sex hormones should be initiated. Other aspects of our evaluation also suggested ambivalence on L's part. Although he ultimately agreed with his mother that he should start testosterone, he began the evaluation by suggesting it was "too early" to start them. In addition L. reported that he binds his breasts on occasion (1 × per week) to present convincingly as male, but mostly does not, and that he has been involved in an ongoing heterosexual romantic relationship as a male. He stated that this relationship has been very gratifying, and indicated concern about losing his girlfriend when he started testosterone. Although he stated that he wants to be viewed as male, L also stated that he did not look forward to the changes that testosterone would cause.

**Recommendations:** Given that L was initially resistant to the initiation of cross-sex hormones, and that his mother initiated the consultation, along with L's ambivalence about the changes that testosterone would precipitate, cross-sex hormones were not recommended at this juncture. Instead, we recommended that L. continue to sort out his desires in his therapy relationship, while also addressing some of his other concerning behavioral and mental health issues. We also recommended family therapy, as it appeared that parental anxieties and pressures may have been impacting L's choices. We agreed to consult with L and his family again in 3 to 6 months.

### Case #4.: Autistic Spectrum Disorder

**Referral Information:** B. is a 12 year old White European American natal male, Tanner stage 1, who has been increasingly presenting as female for approximately six months to one year. She and her parents presented in our clinic seeking an evaluation and recommendations for treatment.

**History:** B. was diagnosed with high functioning ASD at the age of 7, after experiencing social difficulties for several years. Although intellectually bright, B. has not done well in school. B. spends much of her spare time on the computer, investigating various subjects and reporting the details to her parents. Her parents worry about her poor academic progress and her socialization, and she has been in treatment since her initial diagnosis. B. disclosed

Author Manuscript Author Manuscript Author Manuscript Author Manuscript

that she was a girl to her therapist and her parents 6 months earlier, after increasing depression and suicidal feelings.

**Psychological Evaluation:** The evaluation revealed that B. strongly identified as female. B. stated that this feeling had begun within the past year at the start of the school year. Her parents indicated that they would support her if she were truly transgender, but expressed concern that B. may be unhappy socially and using a transgender diagnosis as a means to attempt to resolve her social isolation, and as a result of self-hatred. They also expressed concern that B.'s identification as female is a passing phase, similar to other passing phases/obsessions she experienced throughout her life, rather than an enduring identification, and that B had limited understanding of the impact of changing genders. B.'s therapist was unsure of whether B. should be treated with hormones yet, expressing similar concerns to her parents. School reports indicated that B. was sometimes taunted by peers, apathetic about schoolwork, often inattentive, and increasingly isolated. All data consistently indicated depression and anxiety.

**Recommendations:** Because of the complexities of B.'s situation, including a relatively recent identification as female, and limited social understanding, we recommended continued psychotherapy and monitoring of her GD, with treatment addressing her depression and anxiety, without immediate medical intervention. We also recommended that her therapist consult with her school to problem-solve solutions to isolation and bullying, and interventions to increase gratifying activities for B. outside the home. We recommended a psychiatric consultation for possible psychopharmacological intervention as well, and a return visit in 3 months to monitor B's progress and her gender identification in light of the new interventions.

## Supplementary Material

Refer to Web version on PubMed Central for supplementary material.

## References

American Academy of Child and Adolescent Psychiatry. Practice parameters on gay, lesbian, or bisexual sexual orientation, gender nonconformity, and gender discordance in children and adolescents. Journal of the American Academy of Child and Adolescent Psychiatry. 2012; 51 (9): 957–974. [PubMed: 22917211]

American Counseling Association Competencies for Counseling with Transgender Clients. Journal of LGBT Issues in Counseling. 2010; 4 (3–4):135–159.

American Psychiatric Association. Diagnostic and statistical manual of mental disorders. 4. Washington, DC: Author; 2000. Text Revision

American Psychiatric Association. Diagnostic and statistical manual of mental Disorders. 5. Washington, DC: Author; 2013.

American Psychological Association, Task Force on Gender Identity and Gender Variance. Report of the Task Force on Gender Identity and Gender Variance. Washington, DC: Author; 2009.

Bernal AT, Coolhart D. Treatment and ethical considerations with transgender children and youth in family therapy. Journal of Family Psychotherapy. 2012; 23 (4):287–303.

Cohen-Kettenis PT, Steensma TD, de Vries AL. Treatment of adolescents with GD in the Netherlands. Child and Adolescent Psychiatric Clinics of North America. 2011; 20:689–700. [PubMed: 22051006]

Author Manuscript Author Manuscript Author Manuscript Author Manuscript

Coleman E, Bockting W, Botzer M, Cohen-Kettenis P, DeCuypere G, Fedlman J, Zucker K. Standards of care for the health of transsexual, transgender, and gender-nonconforming people, version 7. International Journal of Transgenderism. 2011; 13:165–232.

Dean L, Meyer IH, Robinson K, Sell RL, Sember R, Silenzio VMB, Xavier J. Lesbian, gay, bisexual, and transgender health: Findings and concerns. Journal of the Gay and Lesbian Medical Association. 2000; 4(3):102–151.

Delmarre-van de Waal HA, Cohen-Kettenis PT. Clinical management of gender identity disorder in adolescents: A protocol on psychological and paediatric endocrinology aspects. European Journal of Endocrinology. 2006; 155:131–137. [PubMed: 16793959]

deVries AL, Cohen-Kettenis PT. Clinical management of gender dysphora in children and adolescents: The Dutch approach. Journal of Homosexuality. 2012; 59 (3):301–320. [PubMed: 22455322]

deVries AL, Noens IL, Cohen-Kettenis PT, van Berckelaer-Onnes IA, Doreleijers TA. Asperger Spectrum Disorders in Gender Dysphoric Children and Adolescents. Journal of Autism and Developmental Disorders. 2010; 40(8):930–6. [PubMed: 20094764]

deVries AL, Steensma TD, Doreleijers TA, Cohen-Kettenis PT. Puberty suppresssion in adolescents with Gender Identity Disorder: A prospective follow-up study. The Journal of Sexual Medicine. 2011; 8(8):2276–83. [PubMed: 20646177]

Dreger A. Gender identity disorder in childhood: Inconclusive advice to parents. Hastings Center Report. 2009; 39:26–29. [PubMed: 19213192]

Drescher J, Byne W. Gender Dysphoric/Gender Variant (GD/GV) children and adolescents: Summarizing what we know and what we have left to learn. Journal of Homosexuality. 2012; 59 (3):501–510. [PubMed: 22455333]

Ehrensaft D. Raising girlyboys: A parent's perspective. Studies in Gender and Sexuality. 2007; 8:269–302.

Ehrensaft D. From gender identity disorder to gender identity creativity: true gender self child therapy. Journal of Homosexuality. 2012; 59:337–356. [PubMed: 22455324]

Fitzpatrick KK, Euton SJ, Jones JN, Schmidt NB. Gender role, sexual orientation, and suicide risk. Journal of Affective Disorders. 2005; 87(1):35–42. [PubMed: 15893824]

Gibson B, Catlin AJ. Care of the child with the desire to change gender-part I. Urologic Nursing. 2011; 31(4):222–9. [PubMed: 21913596]

Grossman AH, D'Augelli AR. Transgender youth and life-threatening behaviors. Suicide and Life-Threatening Behavior. 2007; 37(5):527–537. [PubMed: 17967119]

Haas AP, Eliason M, Mays VM, Mathy RM, Cochran SD, D'Augelli, Clayton PJ. Suicide and suicide risk in lesbian, gay, bisexual, and transgender populations: Review and recommendations. Journal of Homosexuality. 2010; 58(1):10–51. [PubMed: 21213174]

Hembree WC, Cohen-Kettenis P, Delemarre-van de Waal HA, Gooren LJ, Meyer WJ III, Spack NP, Montori VM. Endocrine treatment of transsexual persons: An Endocrine Society clinical practice guideline. Journal of Clinical Endocrinology Metabolism. 2009; 94(9):3132–3154. [PubMed: 19509099]

Hidalgo MA, Ehrensaft D, Tishelman AC, Clark L, Garafalo R, Rosenthal SM, Spack NP, Olson J. The gender affirmative model: What we know and what we aim to learn. Human Development. 2013; 56:285–290.

Houk CP, Hughes IA, Ahmed SF, Lee PA. Summary of consensus statement on intersex disorders and their management. Pediatrics. 2006; 118 (2):753–757. http://www.apa.org/topics/sexuality/transgender.pdf. [PubMed: 16882833]

Kulick D. Transgender and language. GLQ: A Journal of Lesbian & Gay Studies. 1999; 4:604–623.

Lazar L, Meyerovitch J, de Vries L, Phillip M, Lebanthal Y. Treated and untreated women with idiopathic precocious puberty: long-term follow-up and reproductive outcome between the third and fifth decades. Clinical Endocrinologyy. 2014; 80 (4):570–576.

Malpas J. Between pink and blue: A multi-dimensional family approach to gender nonconforming children and their families. Family Process. 2011; 50 (4):453–470. [PubMed: 22145719]

Marshall WA, Tanner JM. Variations in pattern of pubertal changes in girls. Archives of Disease in Childhood. 1969; 44:291–303. [PubMed: 5785179]

Author Manuscript Author Manuscript Author Manuscript Author Manuscript

Marshall WA, Tanner JM. Variations in the pattern of pubertal changes in boys. Archives of Disease in Childhood. 1970; 45:13–23. [PubMed: 5440182]

Menvielle E. A comprehensive program for children and gender variant behaviors and gender identity disorders. Journal of Homosexuality. 2012; 59:357–368. [PubMed: 22455325]

Minter SP. Supporting transgender children: New legal, social, and medical approaches. Journal of Homosexuality. 2012; 59(3):422–433. [PubMed: 22455328]

Schwartz D. Listening to children imagining gender. Journal of Homosexuality. 2012; 59(3):460–479. [PubMed: 22455331]

Shumer DE, Spack NP. Current management of gender identity disorder in childhood and adolescence: Guidelines, barriers and areas of controversy. Current Opinion in Endocrinology, Diabetes, & Obesity. 2013; 20 (1):69–73.

Society for Adolescent Health and Medicine. Recommendations for promoting the health and well-being of Lesbian, Gay, Bisexual and transgender Adolescents: A position paper of the Society for Adolescent Health and Medicine. Journal of Adolescent Health. 2013; 52:506–510. [PubMed: 23521897]

Spack NP, Edwards-Leeper L, Feldman HA, Leibowitz S, Mandel F, Diamond DA, Vance SR. Children and adolescents with Gender Identity Disorder referred to a pediatric medical center. Pediatrics. 2012; 129:418–425.10.1542/peds.2011-0907 [PubMed: 22351896]

Steensma TD, McGuire JK, Kreukels BPC, Beekman AJ, Cohen-Kettenis PT. Factors associated with desistence and persistence of childhood gender dysphoria: A quantitative follow-up study. Journal of the American Academy of Child & Adolescent Psychiatry. 2013; 52 (6):582–590. [PubMed: 23702447]

Stein D. Commentary of the treatment of gender variant and gender dysphoric children and adolescents: Common themes and ethical reflections. Journal of Homosexuality. 2012; 59:480–500. [PubMed: 22455332]

Turek C. Considerations for affirming gender nonconforming boys and their families: New approaches, new challenges. Child and Adolescent Psychiatric Clinics of North America. 2011; 20:767–777. [PubMed: 22051012]

Wallien MS, Cohen-Kettenis PT. Psychosexual outcome of gender-dysphoric children. Journal of the American Academy of Child and Adolescent Psychiatry. 2008; 47:1413–1423. [PubMed: 18981931]

Zucker KJ, Wood H, Singh D, Bradley SJ. A developmental, biopsychosocial model for the treatment of children with Gender Identity Disorder. Journal of Homosexuality. 2012; 59 (3):369–397. [PubMed: 22455326]



United States Government Accountability Office

Report to the Chairman, Committee on Education and Labor, House of Representatives

November 2021

# K-12 EDUCATION

# Students' Experiences with Bullying, Hate Speech, Hate Crimes, and Victimization in Schools

GAO@100
A Century of Non-Partisan Fact-Based Work

GAO-22-104341

November 2021

# GAO@100 Highlights

Highlights of GAO-22-104341, a report to the Chairman, Committee on Education and Labor, House of Representatives

# K-12 EDUCATION

## Students' Experiences with Bullying, Hate Speech, Hate Crimes, and Victimization in Schools

### Why GAO Did This Study

Hostile behaviors, including bullying, harassment, hate speech and hate crimes, or other types of victimization like sexual assault and rape, in schools can negatively affect K-12 students' short- and long-term mental health, education, income, and overall well-being. According to Education's guidance, incidents of harassment or hate, when motivated by race, color, national origin, sex (including sexual orientation and gender identity), or disability status can impede access to an equal education. In certain circumstances, these kinds of incidents may violate certain federal civil rights laws, which Education's OCR is tasked with enforcing in K-12 schools.

GAO was asked to review hostile behaviors in K-12 schools. This report examines (1) the prevalence and nature of hostile behaviors in K-12 public schools; (2) the presence of K-12 school programs and practices to address hostile behaviors; and (3) how Education has addressed complaints related to these issues in school years 2010-11 through 2019-20.

GAO conducted descriptive and regression analyses on the most recent available data for two nationally generalizable federal surveys: a survey of 12- to 18-year-old students for school years 2014-15, 2016-17, and 2018-19, and a survey of schools for school years 2015-16 and 2017-18. GAO also analyzed 10 years of civil rights complaints filed with OCR against schools; reviewed relevant federal laws, regulations, and documents; and interviewed relevant federal and national education and civil rights organization officials. GAO incorporated technical comments from Education as appropriate.

View GAO-22-104341. For more information, contact Jacqueline M. Nowicki at (617) 788-0580 or nowickij@gao.gov.

### What GAO Found

Students experience a range of hostile behaviors at schools nationwide, according to GAO's analysis of nationally generalizable surveys of students and schools. About one in five students aged 12 to 18 were bullied annually in school years 2014-15, 2016-17, and 2018-19. Of students who were bullied in school year 2018-19, about one in four students experienced bullying related to their race, national origin, religion, disability, gender, or sexual orientation. About one in four of all students aged 12 to 18 saw hate words or symbols written in their schools, such as homophobic slurs and references to lynching. Most hostile behaviors also increased in school year 2017-18, according to our analysis of the school survey. Hate crimes—which most commonly targeted students because of their race and national origin—and physical attacks with a weapon nearly doubled (see figure). Sexual assaults also increased during the same period.

**Hostile Behaviors in K-12 Public Schools, School Years 2015-16 to 2017-18**

Source: GAO analysis of the Department of Education's School Survey on Crime and Safety for school years 2015-16 and 2017-18. | GAO-22-104341

Nearly every school used programs or practices to address hostile behaviors, and schools' adoption of them increased from school year 2015-16 to 2017-18, according to our analysis of the school survey. About 18,000 more schools implemented social emotional learning and about 1,200 more used in-school suspensions. Additionally, 2,000 more schools used school resource officers (SRO)—career officers with the ability to arrest students—in school year 2017-18. SROs' involvement in schools, such as solving problems, also increased.

The Department of Education resolved complaints of hostile behaviors faster in recent years, due in part to more complaints being dismissed and fewer complaints being filed. In the 2019-20 school year, 81 percent of such resolved complaints were dismissed, most commonly because Education's Office for Civil Rights (OCR) did not receive consent to disclose the complainant's identity to those they filed the complaint against. Complaints of hostile behaviors filed with OCR declined by 9 percent and 15 percent, respectively, in school years 2018-19 and 2019-20. Civil rights experts GAO interviewed said that in recent years they became reluctant to file complaints on students' behalf because they lost confidence in OCR's ability to address civil rights violations in schools. The experts cited, in part, Education's rescission of guidance to schools that clarified civil rights protections, such as those for transgender students. Since 2021, Education has started reviewing or has reinterpreted some of this guidance.

# Contents

| | | |
|---|---|---|
| Letter | | 1 |
| | Background | 6 |
| | Students Experience a Range of Hostile Behaviors at Schools Nationwide | 14 |
| | Nearly Every School Has Used Programs or Practices to Address Hostile Behaviors | 26 |
| | Recently, Education Resolved Complaints of Hostile Behaviors Faster, Due in Part to More Dismissals and Fewer Complaints Filed | 41 |
| | Agency Comments | 52 |
| Appendix I | Objective, Scope, and Methodology | 53 |
| Appendix II | Regression Analysis | 59 |
| Appendix III | GAO Contact and Staff Acknowledgments | 84 |
| Tables | | |
| | Table 1: Selected Department of Education Documents and Resources on Addressing Discrimination, Including Harassment | 11 |
| | Table 2: Estimated Number of Hate Crimes in K-12 Public Schools, School Years 2015-2016 to 2017-2018 | 22 |
| | Table 3: Estimated Percentage of K-12 Public Schools with School Resource Officers (SRO) That Had Agreements on Roles and Responsibilities, School Years 2015-2016 to 2017-2018 | 40 |
| | Table 4: Average Number of Days to Resolve Complaints of Hostile Behaviors in K-12 Schools Filed with the Department of Education's Office for Civil Rights (OCR) by Resolution Type, School Years 2010-2011 to 2019-2020 | 44 |

Table 5: Variables Included in GAO's Regression Model on the Department of Education's School Crime Supplement (SCS) to the Department of Justice's National Crime Victimization Survey, School Years 2014-2015, 2016-2017, and 2018-2019 61
Table 6: Associations of Regression Model Variables with Bullying based on the Department of Education's School Crime Supplement to the Department of Justice's National Crime Victimization Survey, School Years 2014-2015, 2016-2017, and 2018-2019 63
Table 7: Created Variables Used in the Regression Analysis of the Department of Education's School Survey on Crime and Safety (SSOCS), School Years 2015-2016 and 2017-2018 69
Table 8: Variables Included in Our Regression Models Using the Department of Education's School Survey on Crime and Safety (SSOCS), School Years 2016-2017 and 2017-2018 76
Table 9: Associations of Multinomial Logistic Regression Model Variables based on the Department of Education's School Survey on Crime and Safety, School Years 2015-2016 and 2017-2018 78
Table 10: Associations of Poisson and Binary Logistic Regression Model Variables for the Department of Education's School Survey on Crime and Safety, School Years 2015-2016 and 2017-2018 81

Figures

Figure 1: Estimated Percentage of Students Who Were Bullied, by Presence or Availability of Alcohol, Drugs, Weapons, and Gangs in Their Schools, School Year 2018-2019 16
Figure 2: Estimated Percentage of Students Experiencing Bullying Related to Identity in K-12 Public Schools, School Years 2014-2015, 2016-2017, and 2018-2019 18
Figure 3: Estimated Percentage of Students Targeted by a Hate-Related Word in K-12 Public Schools, by Identity, School Years 2014-2015, 2016-2017, and 2018-2019 20
Figure 4: Estimated Number of K-12 Public Schools Where at Least One Hate Crime Occurred by Student Identities Targeted, School Years 2015-2016 and 2017-2018 22
Figure 5: Example of K-12 Public School Response to Hate 23

Figure 6: Estimated Number of Rapes or Attempted Rapes and Sexual Assaults in K-12 Public Schools, School Years 2015-2016 to 2017-2018 24
Figure 7: Estimated Number of Physical Attacks with Weapons and Threats of Attack with Weapons in K-12 Public Schools, School Years 2015-2016 to 2017-2018 25
Figure 8: Estimated Number of Physical Attacks without Weapons in K-12 Public Schools, School Years 2015-2016 to 2017-2018 26
Figure 9: Estimated Percentage of K-12 Public Schools with Student Programs to Address Hostile Behaviors and Promote School Safety, School Years 2015-2016 and 2017-2018 28
Figure 10: Estimated Percentage of K-12 Public Schools with Diversity Groups, School Years 2015-2016 and 2017-2018 30
Figure 11: Estimated Percentage of K-12 Public Schools Offering Training to Teachers, Staff, and Parents to Address Hostile Behaviors and Promote School Safety, School Years 2015-2016 and 2017-2018 31
Figure 12: Estimated Percentage of K-12 Public Schools with Available Mental Health Services, School Year 2017-2018 33
Figure 13: Estimated Percentage of Disciplinary Actions Most Commonly Available and Used to Address Issues in K-12 Public Schools, School Years 2015-2016 and 2017-2018 34
Figure 14: Security Mechanisms Most Commonly Used to Maintain Safety in K-12 Public Schools Increased, School Years 2015-2016 and 2017-2018 36
Figure 15: Examples of Security Mechanisms in K-12 Public Schools 37
Figure 16: School Resource Officers' (SRO) Most Common Activities (Estimated), School Years 2015-2016 and 2017-2018 39
Figure 17: Average Resolution Time (days) of Complaints of Hostile Behaviors in K-12 Schools Filed with the Department of Education's Office for Civil Rights, School Years 2010-2011 to 2019-2020 42
Figure 18: Department of Education's Office for Civil Rights' (OCR) Complaint Processing Procedures and Resolution Types 43

Figure 19: Percentage of Resolved Complaints of Hostile Behaviors in K-12 Schools Filed with Education's Office for Civil Rights, by Resolution Type, School Years 2010-2011 to 2019-2020 46
Figure 20: Five Most Common Reasons for Dismissals of Complaints of Hostile Behaviors in K-12 Schools by Education's Office for Civil Rights, School Years 2010-2011 to 2019-2020 47
Figure 21: Complaints of Hostile Behaviors in K-12 Schools Filed with the Department of Education's Office for Civil Rights, School Years 2010-2011 to 2019-2020 49

**Abbreviations**

| | |
|---|---|
| Education | U.S. Department of Education |
| Health and Human Services | U.S. Department of Health and Human Services |
| Justice | U.S. Department of Justice |
| OCR | Education Office for Civil Rights |
| SAMHSA | Substance Abuse and Mental Health Services Administration |
| SCS | School Crime Supplement to the National Crime Victimization Survey |
| Section 504 | Section 504 of the Rehabilitation Act of 1973 |
| SRO | School Resource Officer |
| SSOCS | School Survey on Crime and Safety |
| Title II | Title II of the Americans with Disabilities Act of 1990 |
| Title VI | Title VI of the Civil Rights Act of 1964 |
| Title IX | Title IX of the Education Amendments of 1972 |

This is a work of the U.S. government and is not subject to copyright protection in the United States. The published product may be reproduced and distributed in its entirety without further permission from GAO. However, because this work may contain copyrighted images or other material, permission from the copyright holder may be necessary if you wish to reproduce this material separately.

GAO@100 U.S. GOVERNMENT ACCOUNTABILITY OFFICE
A Century of Non-Partisan Fact-Based Work
441 G St. N.W.
Washington, DC 20548

November 24, 2021

The Honorable Robert C. "Bobby" Scott
Chairman
Committee on Education and Labor
House of Representatives

Dear Mr. Chairman:

Every year millions of K-12 students experience hostile behaviors including bullying, hate speech, and hate crimes while in school. In recent years, the U.S. Departments of Education and Justice have issued reminders to schools about their obligations to address harassment and discrimination targeting Muslim, Asian-American, Jewish, LGBTQI+, and immigrant students.[1] According to Education's guidance, incidents of harassment or hate, when motivated by race, color, national origin, sex (including sexual orientation and gender identity), or disability status can impede access to an equal education.[2] In certain circumstances, these kinds of incidents may violate one or more federal civil rights laws or regulations.

Hostile behaviors, like sexual assault, rape, and hate crimes, are generally underreported to authorities, according to Justice's Bureau of Justice Statistics and the Federal Bureau of Investigation.[3, 4] In other cases, allegations are reported but ignored for years. For example, a

---

[1]While a number of variations on this acronym are currently in use to describe individuals with diverse sexual orientations and gender identities, in this report, we define LGBTQI+ as lesbian, gay, bisexual, transgender, queer, questioning, or intersex. The "plus" is meant to be inclusive of identities that may not be covered by the acronym LGBTQI, including asexual, non-binary, and individuals who identify their sexual orientation or gender identity in other ways.

[2]Title VI of the Civil Rights Act of 1964 does not explicitly cover discrimination on the basis of religion. In certain cases, Education may become involved in investigations of allegation of discrimination or harassment based on religion and national origin. Education does, however, collect information on harassment based on religion.

[3]U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Statistics, Criminal Victimization, NCJ 255113 (2020).

[4]Federal Bureau of Investigation, FBI Baltimore Launches Hate Crimes Awareness Campaign (Baltimore, Md.: 2021), accessed October 19, 2021, https://www.fbi.gov/contact-us/field-offices/baltimore/news/press-releases/fbi-baltimore-launches-hate-crimes-awareness-campaign.

2019 investigation by Education's Office for Civil Rights (OCR) revealed that sexual harassment, sexual assault, and rape of students by other students and staff in Chicago Public Schools persisted for years, creating a hostile environment as the district failed to respond to allegations.[5] OCR reported that the district "management, handling, and oversight of complaints of . . . sexual harassment [of students] have been in a state of disarray." Further, OCR reported that the "the district's investigations were poorly managed and were often conducted by staff who were not properly trained." According to OCR, over the course of the investigation, "the district acknowledged systemic failures to ensure a prompt and equitable response to student sexual harassment complaints," which was "consistent with OCR's . . . review of the information produced in connection with 2,800 student on student complaints and 357 adult on student complaints." More recently, in September 2021, Justice reported that school and district officials in Utah's Davis School District "had actual knowledge of at least 212 incidents in which Black students were called the n-word across 27 schools, as well as additional incidents of race-based harassment of Black or Asian-American students."[6] For example, according to Justice, Black students in the Davis School District reported that "White and other non-Black students routinely called Black students the n-word . . . [said] that their skin was dirty and looked like feces . . . taunted Black students with monkey noises, [and] touch[ed] and pull[ed] their hair."[7] Justice also found that school and district officials ignored student and parent complaints about hostile behaviors, and "were deliberately indifferent to known racial harassment of students." Justice's investigation also "found that the district disregarded student witnesses who corroborated allegations and took no or minimal action to eliminate the hostile environment. For example, one school received a complaint that a teacher constantly ridiculed a Hispanic student and taunted him for working at a taco truck (though the student did not)." Justice's

[5]U.S. Department of Education, Office for Civil Rights, Letter to the Chicago Public Schools District, 05-15-1178 and 05-17-1062 (2019).

[6]U.S. Department of Justice, Civil Rights Division, Education Opportunities Section, Letter to the Davis School District, DJ 169-77-26 SS:WP:AV:JJ and USAO:2019V00231 (2021).

[7]Among other examples, Justice reported that "peers taunted Black students . . . repeatedly referencing slavery and lynching, and telling Black students 'go pick cotton' and 'you are my slave'" and that a "White student dressed as Hitler for Halloween, marched in a parade throughout his elementary school while performing the Nazi salute, and no school staff stopped him or reported his costume and behavior to school administration."

investigation "uncovered systemic failures in the district's handling of complaints of racial student-on-student and staff-on-student harassment."

Exposure to such harassment and victimization can have lifelong consequences for students' overall well-being if left unaddressed.[8] These may include: depression, anxiety, involvement in interpersonal violence or sexual violence, substance abuse, poor social functioning, and poor school performance, including lower grade point averages, standardized test scores, and poor attendance. The Centers for Disease Control (CDC) reported that youth who report frequently bullying others and youth who report being frequently bullied are at increased risk for suicide-related behavior. It also reported that the serious and lasting negative effects on mental health and overall well-being affect youth involved in bullying in any way including: those who bully others, those who are bullied, as well as those who both bully others and are bullied by others (bully-victims). According to CDC, even youth who have observed but not participated in bullying behavior report significantly more feelings of helplessness and less sense of connectedness and support from responsible adults (parents/schools) than youth who are have not witnessed bullying behavior.

Some federal agencies have long recognized the importance of providing resources for students, parents, school staff, and others struggling with such issues. For example, stopbullying.gov, a federal government website managed by the Department of Health and Human Services, provides information from various government agencies on what bullying is, what cyberbullying is, who is at risk, and how to prevent and respond to bullying. These include, among other things, information on how to file complaints with Education and Justice, how to find counselors and local mental health services, how to document and report cyberbullying, and contact information for the National Suicide Prevention Lifeline. Health and Human Services' Substance Abuse and Mental Health Services Administration (SAMHSA) is responsible for maintaining the National Suicide Prevention Lifeline—(800) 273-8255.[9] The Lifeline is a network of over 150 crisis centers nationwide that offer free, confidential support from trained counselors for individuals in crisis. More recently, In October

[8]K. Wang, et al., *Indicators of School Crime and Safety: 2019,* NCES 2020-063/NCJ 254485 (Washington, D.C.: National Center for Education Statistics, U.S. Department of Education, and Bureau of Justice Statistics, Office of Justice Programs, U.S. Department of Justice, 2020).

[9]42 U.S.C. § 290bb-36c

2021, Education and Justice also released information on supporting students at the risk of self-harm during the COVID-19 pandemic, including students being bullied related to physical or mental health disabilities.[10] The document includes steps schools can take to create a supportive environment for students, as well as contact information and links to Health and Human Services-recommended crisis resources such as the National Suicide Prevention Lifeline and information on where to find 24/7 crisis intervention and suicide prevention services for LGBTQI+ youth.

You asked us to examine hostile behaviors, such as bullying, harassment, hate, and victimization in K-12 public schools. This report examines: (1) the prevalence and nature of hostile behaviors in K-12 public schools; (2) the presence of K-12 school programs and practices to address hostile behaviors; and (3) how Education has addressed complaints related to these issues in school years 2010-11 through 2019-20.

To address the first two objectives, we analyzed the most recent data from two nationally generalizable federal surveys. To address the third objective, we analyzed 10 years of Education's OCR case management system data. The surveys and case management system are:

- **School Crime Supplement to the National Crime Victimization Survey (student survey).** We analyzed data from Education's biennial survey of students between the ages of 12 to 18 for school years 2014-15, 2016-17, and 2018-19, the most recent available.[11] We conducted a descriptive analysis of the data to learn about the prevalence of hostile behaviors in K-12 public schools, and practices and programs schools use to address these behaviors. We also conducted a regression analysis to examine the relationship between

[10]U.S. Department of Justice Civil Right Division and U.S. Department of Education Office for Civil Rights, Supporting and Protecting the Rights of Students at Risk of Self-Harm in the Era of COVID-19 (2021), accessed November 18, 2021, https://www2.ed.gov/about/offices/list/ocr/docs/ocr-factsheet-students-self-harm-covid-19.pdf.

[11]With a 95 percent confidence interval, we estimated that there were approximately 22 million students ages 12 to 18 (20,986,567 to 23,972,017) in school year 2014-15; 22 million students ages 12 to 18 (21,218,217 to 23,327,983) in school year 2016-17; and 23 million students ages 12 to 18 (21,733,074 to 24,488,300) in school year 2018-19. In general, the number of students ages 12 to 18 attending K-12 public schools in the United States has remained similar for the time periods we analyzed.

the prevalence of bullying and hate, and school characteristics, such as size, grade level, and demographics.

- **School Survey on Crime and Safety (school survey).** We analyzed data from Education's survey of K-12 schools for school years 2015-16 and 2017-18, the most recent available.[12] We conducted a descriptive analysis to learn about the prevalence of hostile behaviors and school practices and programs to address these behaviors, such as teacher and student training, disciplinary actions, and security mechanisms, in K-12 public schools. Additionally, we conducted a regression analysis to examine the association between the incidence of bullying, harassment, hate, and victimization, and school practices and programs.
- **OCR Case Management System.** We analyzed data from Education's OCR case management system to identify trends in the types and numbers of complaints, resolutions, and processing times of hostile behaviors in K-12 schools related to race, color, national origin, sex, or disability status for school years 2010-11 through 2019-20.

We assessed the reliability of these data by reviewing existing documentation about the data and performing electronic testing on required data elements and determined they were sufficiently reliable for the purposes of our analysis.

In addition, we conducted a search of recent media articles published between January 2019 and September 2020 to identify reported incidents of bullying, harassment, hate, and victimization of K-12 students related to race, color, national origin, religion, sex, or disability status. We randomly selected examples of these reported incidents and used them for illustrative purposes in the report. We did not independently verify these incidents. Finally, we reviewed relevant federal agency documentation, regulations, and laws; and interviewed relevant federal and national education officials and civil rights organization experts. See appendix I for detailed information about our methodology.

We conducted this performance audit from May 2020 to November 2021 in accordance with generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain

[12]Respondents to the school survey are primarily principals and other knowledgeable school administrators. With a 95 percent confidence interval, we estimated 83,591 schools (83,532 to 83,651) in school year 2015-16 and 82,288 schools (82,190 to 82,385) in school year 2017-18. In general, the number of public schools in the United States has remained similar for the time periods we analyzed.

sufficient, appropriate evidence to provide a reasonable basis for our findings, and conclusions based on our audit objectives. We believe that the evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objectives.

# Background

## Hostile Behaviors

For the purposes of this report, the term hostile behaviors is used as an umbrella term to capture a range of behaviors. These behaviors are not necessarily mutually exclusive, and can overlap. We defined these terms as follows:[13]

- **Bullying.** Unwanted, aggressive behavior among school-aged children that involves an observed or perceived power imbalance, physically or socially.[14] The behavior can be repeated, or has the potential to be repeated, over time. Such behavior can involve verbal, social, or physical incidents—for example, students being made fun of, called names, or insulted; being the subject of rumors; being threatened with harm; being pushed, shoved, tripped, or spit on; being made to do things they did not want to; being excluded from activities on purpose; or having their property destroyed on purpose.
- **Cyberbullying.** Bullying that occurs when willful and repeated harm is inflicted through the use of computers, cell phones, or other electronic devices.
- **Harassment.** Conduct that is unwelcome and denies or limits a student's ability to participate in or benefit from a school's education program. All students can be victims of harassment and the harasser can share the same characteristics as the victim.
- **Hate speech.** Words or symbols—either verbally directed at students or written on school surfaces—that express or incite hatred against a

[13]Unless otherwise noted, we used Education's definitions as listed in the School Survey on Crime and Safety for school year 2017-18.

[14]We developed our bullying definition based on how the term is used in questions from Education's School Crime Supplement to Justice National Crime Victimization Survey and the School Survey on Crime and Safety.

group or individuals based on their belonging to a specific identity group.[15]

- **Hate crimes.** A committed criminal offense that is motivated, in whole or in part, by the offender's bias(es) against a race, ethnicity, national origin, religion, disability, sex, sexual orientation, or gender identity.
- **Physical attack or fight.** An actual and intentional touching or striking of another person against their will, or the intentional causing of bodily harm to an individual.
- **Rape.** Forced sexual intercourse (vaginal, anal, or oral penetration). This includes sodomy and penetration with a foreign object. All students, regardless of sex or gender identity, can be victims of rape.
- **Sexual assault.** An incident that includes threatened rape, fondling, indecent liberties, or child molestation. All students, regardless of sex or gender identity, can be victims of sexual assault.
- **Victimization.** Victimization includes direct personal experience of threats or harm, such as sexual assault, rape, or physical assault.[16]

Hostile behaviors may negatively affect students' short- and long-term mental health, education, income, and overall well-being.[17] These issues may persist into adulthood and may affect students who bully, as well as students who witness the bullying (see text box).

[15]We developed our hate speech definition based on academic literature as well as how the term is used in questions from Education's School Crime Supplement to the National Crime Victimization Survey for school year 2018-19 and the School Survey on Crime and Safety for school year 2017-18.

[16]For the purposes of this report, victimization is used as an umbrella term for sexual assault, rape, and physical attacks.

[17]National Academies of Sciences, Engineering, and Medicine, *Preventing Bullying Through Science, Policy, and Practice* (Washington, D.C.: 2016), accessed July 27, 2021, https://doi.org/10.17226/23482.

**Effects of Hostile Behaviors on K-12 Students**

Students who experience hostile behaviors are more likely to experience:

- Depression and anxiety
- Interrupted sleep and eating disorders
- Loss of interest in activities they used to enjoy
- Physical health complaints
- Decreased academic achievement and school participation

Students who bully others are more likely to:

- Abuse alcohol and other drugs in adolescence and as adults
- Get into fights, vandalize property, and drop out of school
- Engage in early sexual activity
- Have criminal convictions and traffic citations as adults
- Be abusive toward their romantic partners, spouses, or children as adults

Students who witness bullying are more likely to:

- Have increased use of tobacco, alcohol, or other drugs
- Have increased mental health problems, including depression and anxiety
- Miss or skip school

Source: www.stopbullying.gov. | GAO-22-104341

## Relevant Federal Civil Rights Laws Enforced by Education

Education's OCR is responsible for enforcing certain federal civil rights laws.[18] These include:

- Title VI of the Civil Rights Act of 1964 (Title VI), which prohibits discrimination on the basis of race, color, or national origin in programs or activities that receive federal assistance;[19]
- Title IX of the Education Amendments of 1972 (Title IX), which prohibits sex discrimination in programs or activities that receive federal financial assistance;[20] and
- Section 504 of the Rehabilitation Act of 1973 (Section 504) and Title II of the Americans with Disabilities Act of 1990 (Title II), which prohibit discrimination on the basis of disability.[21] Section 504 prohibits discrimination in programs or activities that receive federal financial assistance, and Title II prohibits discrimination by public entities, whether or not they receive federal financial assistance.

According to Education's guidance, schools might violate Title VI, Section 504, or Title II and related regulations enforced by Education when the hostile behavior that targets a victim based on an identity protected under

---

[18]The U.S. Departments of Justice and Health and Human Services also play a role in addressing hostile behaviors in schools. Justice's Educational Opportunities Section has jurisdiction to address certain complaints of prohibited harassment or other prohibited activity in public schools, as well as private schools that receive federal funding from Justice. In addition, Health and Human Services manages the website stopbullying.gov, which provides information about preventing and responding to bullying. Health and Human Services' SAMHSA funds and manages the National Suicide Prevention Lifeline, (800) 273-8255. This report focuses on OCR's enforcement of the civil rights laws listed above.

[19]42 U.S.C. § 2000d et seq. Title VI of the Civil Rights Act of 1964 prohibits discrimination on the basis of race, color, and national origin in programs and activities receiving federal financial assistance. Although Title VI does not prohibit discrimination on the basis of religion, according to Education, Title VI protects students of any religion from discrimination, including harassment, based on a student's actual or perceived shared ancestry or ethnic characteristics, or citizenship or residency in a country with a dominant religion or distinct religious identity.

[20]20 U.S.C. § 1681 et seq.

[21]Section 504: 29 U.S.C. § 794; Title II: 42 U.S.C. § 12131 et seq. OCR also enforces the Age Discrimination Act of 1975, which prohibits discrimination based on age in programs or activities that receive federal financial assistance, and the Boy Scouts of America Equal Access Act of 2001, which prohibits public schools or state or local education agencies from excluding groups officially affiliated with the Boy Scouts of America from meeting on school premises or in school facilities if the opportunity is available to other youth or community groups. OCR's enforcement of these two Acts is excluded from this report.

relevant federal law is sufficiently serious that it limits the ability of a student to participate in or benefit from a school's program or activities, and is not adequately addressed by school employees. Relevant protected classes in this context include race, national origin, color, or disability.[22]

Under Title IX, a recipient must follow Education's implementing regulations, as amended in 2020, which require, among other things, that a recipient with actual knowledge of sexual harassment respond promptly in a manner that is not deliberately indifferent.[23]

According to Education's guidance, OCR's enforcement of these laws is primarily focused on responding to complaints of alleged violations. Anyone can file a complaint with OCR if they experienced, witnessed, or heard about an alleged violation. Once a complaint is received, OCR evaluates it to determine if an investigation is warranted, and if a violation is found, how the school district should address it. In addition to responding to complaints, OCR may also initiate investigations to examine potential systemic violations based on sources other than complaints.

In addition to responding to complaints of alleged civil rights violations, in recent years, Education has published several reminders detailing schools' responsibilities to address discrimination in schools, often in response to hostile incidents happening in schools (see table 1). For example, in a recent factsheet, Education described incidents that OCR could investigate, such as if students record and post on social media videos of themselves yelling "virus spreaders!" at their Asian American classmates, and then, after being made aware of the video, school

[22]Other federal or state laws may provide additional legal protections. For example, the Department of Justice has jurisdiction over Title IV of the Civil Rights Act of 1964, which prohibits discrimination on the basis of race, color, sex, religion, or national origin by public elementary and secondary schools and public institutions of higher education. 42 U.S.C. § 2000c et seq.

[23]Sexual harassment is defined under 34 C.F.R. § 106.30 in Education's Title IX implementing regulations. 34 C.F.R. § 106.44 outlines recipient's obligations to respond to sexual harassment.

administrators refuse to investigate or take any action to protect Asian American students from further harassment.[24]

**Table 1: Selected Department of Education Documents and Resources on Addressing Discrimination, Including Harassment**

| Date | Statute | Title and focus | Link |
|---|---|---|---|
| 10/13/2021 | Section 504 of the Rehabilitation Act of 1973 (Section 504)<br>Americans with Disabilities Act of 1990 (Title II) | **Supporting and Protecting the Rights of Students at Risk of Self-Harm in the Era of COVID-19**<br>Education's Office for Civil Rights (OCR) and Justice's Civil Rights Division (CRT) issued a reminder for schools that students with mental health disabilities are protected by federal civil rights laws and shared resources for students at risk of self-harm. | https://www2.ed.gov/about/offices/list/ocr/docs/ocr-factsheet-students-self-harm-covid-19.pdf |
| 8/19/2021 | Title VI of the Civil Rights Act of 1964 (Title VI) | **Confronting Discrimination Based on National Origin and Immigration Status**<br>Education's OCR and Justice's CRT issued an updated resource on confronting discrimination based on national origin and immigration status. | https://www2.ed.gov/about/offices/list/ocr/docs/confronting-discrimination-national-origin-immigration-status |
| 6/23/2021 | Title IX of the Education Amendments of 1972 (Title IX) | **Dear Educator Letter on 49th Anniversary of Title IX**<br>Education's OCR clarified Title IX's protection against discrimination based on sexual orientation or gender identity. | https://www2.ed.gov/about/offices/list/ocr/correspondence/stakeholders/educator-202106-tix.pdf |
| 6/23/2021 | Title IX | **Confronting Anti-Lesbian, Gay, Bisexual, Transgender, Queer, Question, or Intersex+ (LGBTQI+) Harassment in Schools**<br>Education's OCR and the Justice's CRT explained that discrimination against students based on their sexual orientation or gender identity is a form of sex discrimination. | https://www2.ed.gov/about/offices/list/ocr/docs/ocr-factsheet-tix-202106.pdf |

[24]U.S. Department of Education Office for Civil Rights and U.S. Department of Justice, Civil Rights Division, *Confronting COVID-19-Related Harassment in Schools A Resource for Families* (2021), accessed November 3, 2021, https://www2.ed.gov/about/offices/list/ocr/docs/ocr-factsheet-aapi-202105.pdf.

| Date | Statute | Title and focus | Link |
|---|---|---|---|
| 5/26/2021 | Title VI<br>Title IX<br>Section 504 | **Letter to Educators regarding Discrimination Against Asian American and Pacific Islander Students**<br>Education's OCR issued a reminder of schools' obligations to address increased harassment and violence directed at Asian American and Pacific Islanders. | https://www2.ed.gov/about/offices/list/ocr/correspondence/stakeholders/educator-202105-aapi.pdf |
| 1/19/2021 | Title VI | **Questions and Answers on Executive Order 13899 (Combatting Anti-Semitism) and OCR's Enforcement of Title VI of the Civil Rights Act of 1964**<br>Education's OCR provided information on Executive Order 13899, Title VI, and enforcement of Title VI by OCR in cases involving anti-Semitism. | https://www2.ed.gov/about/offices/list/ocr/docs/qa-titleix-anti-semitism-20210119.pdf |
| 6/26/2020 | Title VI | **56th Anniversary of the Civil Rights Act of 1964**<br>As a result of recent events that contributed to racial discord and strife, Education issued a reminder to schools of their responsibilities to investigate discrimination based on race, color, or national origin. | https://www2.ed.gov/about/offices/list/ocr/correspondence/stakeholders/20200625-qa-titlevi-56thanniversary.pdf |
| 3/4/2020 | Title VI | **Letter from Assistant Secretary Marcus to Education Leaders on Preventing and Addressing Potential Discrimination Associated with COVID-19**<br>Education reminded schools about their responsibilities to ensure healthy, safe, and free from bias or discrimination, particular in regards to COVID-19-related harassment of Asian Americans, including persons perceived to be of Chinese-American or Asian descent. | https://www2.ed.gov/about/offices/list/ocr/correspondence/stakeholders/20200304-covid-19-outbreak-statement.pdf |

| Date | Statute | Title and focus | Link |
| --- | --- | --- | --- |
| 6/6/2016 | Title VI | **Combatting Discrimination against Asian American, Native Hawaiian, and Pacific Islander (AANHPI) and Muslim, Arab, Sikh, and South Asian (MASSA) students**<br>Education's OCR, Justice's CRT, and the White House Initiative on Asian Americans and Pacific Islanders outlined technical assistance for combating discrimination against AANHPI and MASSA. | www.ed.gov/about/offices/list/ ocr/docs/aanhpi-massa-factsheet-201606.pdf |
| 10/21/2014 | Title II<br>Section 504 | **Dear Colleague Letter on Bullying of Students with Disabilities**<br>Education's OCR reminded schools of the rights of students with disabilities, particular in regards to bullying | http://www2.ed.gov/about/offices/list/ ocr/letters/colleague-bullying-201410.pdf |
| 10/26/2010 | Title VI<br>Title IX<br>Section 504<br>Title II | **Dear Colleague Letter on Bullying and Harassment**<br>Education's OCR reminded schools that student misconduct that falls under a school's anti-bullying policy also may trigger responsibilities under one or more of the federal antidiscrimination laws enforced by OCR. As of 2020, OCR noted that this document is inconsistent in some respects to Education's regulations implementing Title IX and Executive Orders 13988 and 14021. | https://www2.ed.gov/about/offices/list/ ocr/letters/colleague-201010.pdf |

Source: GAO Analysis of Selected Department of Education Documents and Resources | GAO-22-104341

## Students Experience a Range of Hostile Behaviors at Schools Nationwide

### Bullying Is Widespread in Schools Nationwide

In general, bullying occurred in nearly every school, with about one in five students aged 12 to 18 (an estimated 5.2 million students in school year 2018-19) bullied each year, according to the most recent data available from nationally generalizable surveys of schools and students.[25, 26, 27] Specifically, we estimate that:

- School officials were aware of students being bullied regularly in about 30 percent of schools and occasionally in about 64 percent of schools.[28]

[25] The School Survey on Crime and Safety surveys a representative sample of schools. The School Crime Supplement surveys a representative sample of students as part of the National Crime Victimization Survey. We analyzed the school survey for school years 2015-16 and 2017-18 and the student survey for school years 2014-15, 2016-17, and 2018-19. We conducted descriptive analyses and regression analyses to better understand the prevalence of bullying, harassment, or violence. Unless otherwise stated, all data comparisons are statistically significant. Because the design used a probability procedure based on random selections, the sample is only one of a large number of samples that might have been drawn. Since each sample could have provided different estimates, we express our confidence in the precision of the particular sample's results as a 95 percent confidence interval. All estimates from the survey are subject to sampling error. See appendix I for more information on sampling error for survey estimates. See appendix II for more information on the regression methodology.

[26]The 95 percent confidence interval for the estimated number of students bullied is 4.7 to 5.8 million students in school year 2018-19.

[27]For the purposes of this report, students who said that they experienced any of the following behaviors were counted as having been bullied: being made fun of (e.g., name calling or insults); spreading rumors; threatening harm; being pushed, shoved, tripped, or spit on; being coerced to do things (e.g., give money); being excluded from activities on purpose; or having property destroyed. Education's school survey defined bullying as any unwanted aggressive behavior(s) by another youth or group of youths that involves an observed or perceived power imbalance and is repeated multiple times or is highly likely to be repeated. Bullying occurs among youth who are not siblings or current dating partners.

[28]For the purposes of this report, bullying is "regular" if a school responded that it occurs daily, weekly, or monthly. The 95 percent confidence interval for the estimated percentage of schools reporting regular bullying is 29.9 to 30.5 percent in school year 2017-18. For schools reporting occasional bullying, the 95 percent confidence interval is 63.9 to 64.5 percent in school year 2017-18.

- School officials were aware of students being cyberbullied regularly in about 30 percent of schools and occasionally in about 52 percent of schools.[29]
- Fewer than one-half of all bullied students (44 percent in school year 2018-19) reported the bullying to a teacher or another adult at school.[30]

Our regression analysis of the student survey found that certain school characteristics were associated with more bullying, while controlling for other student and school characteristics.[31] For example:

- middle school students were more likely to be bullied than high school students, and
- students in schools with 300 or fewer students were more likely to report being bullied than were students in schools with 1,000 or more students.

Our descriptive and regression analyses of the student survey found that certain aspects of school climate were associated with more bullying. Our descriptive analysis found that students who observed the presence or availability of drugs, alcohol, or weapons at school reported being bullied more than students who did not (see fig. 1).

Even when controlling for key student and school characteristics, our regression analyses found that certain aspects of school climate were associated with more bullying. For example:

- Schools experiencing widespread disorder in the classroom, student verbal abuse and disrespect of teachers, gang activities, and student racial/ethnic tensions were also more likely to report that bullying and cyberbullying occurred daily, weekly, or monthly, according to the school survey.

[29]The 95 percent confidence interval for the estimated percentage of schools reporting regular cyberbullying is 29.8 to 30.3 percent and occasional cyberbullying is 51.9 to 52.8 percent in school year 2017-18.

[30]The 95 percent confidence interval for the percentage of students who reported being bullied to an adult is 40 to 47 percent in school year 2018-19.

[31]All regression analysis results in this report are associational and do not imply a causal relationship. See appendix II for more details.

- Students who observed the presence or availability of drugs, alcohol, or weapons in their schools were also more likely to be bullied, according to the student survey.

**Figure 1: Estimated Percentage of Students Who Were Bullied, by Presence or Availability of Alcohol, Drugs, Weapons, and Gangs in Their Schools, School Year 2018-2019**

Source: GAO analysis of the Department of Education's School Crime Supplement to the Department of Justice's National Crime Victimization Survey for school year 2018-19. | GAO-22-104341

## Bullying Related to Students' Identity

Of the estimated 5.2 million students bullied in school year 2018-19, one in four students (an estimated 1.3 million students) experienced bullying related to their race, national origin, religion, disability, gender, or sexual orientation, according to the student survey (see text box).[32] Figure 2 shows the student identities that bullying most commonly targeted in schools.

[32]The 95 percent confidence interval for the estimated number of students that experienced bullying related to their race, national origin, religion, disability, gender, or sexual orientation is about 1 million to 1.5 million in school year 2018-19. We did not assess whether these incidents could constitute unlawful discrimination or hate crimes under federal or state law. The School Crime Supplement to the National Crime Victimization Survey asks survey respondents about gender and does not include questions about sex.

**Examples of Media Reports of Bullying or Harassment of K-12 Students Related to Race, National Origin, Religion, Disability, Sex, Gender Identity, or Sexual Orientation, January 2019 to September 2020**

- Students were sent a video of a fellow classmate wearing blackface and using a racial slur. After reporting it, one student was harassed by fellow students.
- A homophobic message was attached to the picture of a student on social media. When the victim confronted the perpetrator, the confrontation escalated into a physical fight.
- A transgender student emailed a teacher to ask that the teacher refer to her with female pronouns. The teacher refused and told the student to either identify as a man or switch classes.
- A Muslim student was physically attacked, subjected to anti-Muslim slurs, and had her hijab yanked off of her head on video.
- A Jewish student was harassed by another student who was using anti-Semitic slurs and Holocaust related threats. It culminated with the student making a swastika with tape on the classroom wall.
- A teacher at a high school was accused of criminal sexual conduct.
- Two high-school students pushing and hitting a student with autism were captured on video.

Source: GAO analysis of selected news media reports. | GAO-22-104341

**Figure 2: Estimated Percentage of Students Experiencing Bullying Related to Identity in K-12 Public Schools, School Years 2014-2015, 2016-2017, and 2018-2019**

Source: GAO analysis of the Department of Education's School Crime Supplement to the Department of Justice's National Crime Victimization Survey for school years 2014-15, 2016-17, and 2018-19. | GAO-22-104341

According to the school survey, the percentage of schools affected by racial or ethnic tension increased, from an estimated 58 percent to 61 percent from school years 2015-16 to 2017-18.[33] The estimated percentage of schools where students were sexually harassed or

[33]The 95 percent confidence interval for the percent of schools affected by racial or ethnic tension regularly is 5.92 to 6.28 for 2015-16 (estimate 6.10) and 6.33 to 6.70 in school year 2017-18 (estimate 6.51). For those affected occasionally, the confidence interval is 51.44 to 52.45 (estimate 51.94) in school year 2015-16 and 53.57 to 54.32 (estimate 53.94) in school year 2017-18.

experienced harassment related to their sexual orientation or gender identity increased similarly during the same time period.[34]

## Hate Speech: Words or Symbols That Express or Incite Hatred

We estimate that about one in four students aged 12 to 18 (about 5.8 million students in 2018-19) saw hate words or symbols written at school in 2014-15, 2016-17, and 2018-19, according to the student survey.[35] These could include racial and homophobic slurs, anti-Semitic slurs and symbols, references to lynching and the Holocaust, and anti-immigrant rhetoric.

We estimate that about 7 percent of students (about 1.6 million students in school year 2018-19) were subjected to hate speech related to their race, religion, ethnic background/national origin, disability, gender, or sexual orientation.[36] Figure 3 shows the student identities that hate-related words most commonly targeted in schools, with race being the most common identity, by far. The textbox below lists examples of hate speech verbally directed at students from our analysis of media reports published in 2019 and 2020.

[34]Data on harassment related to disability status and religion were not collected in the 2015-16 survey, therefore we were unable to test for any patterns in these incidents.

[35]The 95 percent confidence interval for the estimated number of students that saw hate words or symbols written in their schools is 5.2 to 6.3 million in school year 2018-19.

[36]The survey asked students if anyone had called them an insulting or bad name having to do with their race, religion, ethnic background or national origin, disability, gender, or sexual orientation. The survey subsequently referred to these as "hate-related words." The 95 percent confidence interval for the estimated number of students that were targets of hate speech in their schools is 6.19 to 8.24 percent or 1.4 to 1.9 million in school year 2018-19.

**Figure 3: Estimated Percentage of Students Targeted by a Hate-Related Word in K-12 Public Schools, by Identity, School Years 2014-2015, 2016-2017, and 2018-2019**

Student identity
Race
42
38
47
National origin
26
23
24
Sexual orientation
13
12
18
Gender
14
14
16
Disability
8
11
12
Religion
13
11
11
0
10
20
30
40
50
60
70
Estimated percentage of students in K-12 public schools
Error bars display 95 percent confidence interval for estimates
2014-15
2016-17
2018-19

Source: GAO analysis of the Department of Education's School Crime Supplement to the Department of Justice's National Crime Victimization Survey for school years 2014-15, 2016-17, and 2018-19. | GAO-22-104341

Page 20 GAO-22-104341 K-12 Education

AR_285070

**Examples From Media Reports of Hate Speech Verbally Directed at Students**

Students reported being taunted using phrases such as:

- Chinese virus or Asian virus (referring to COVID-19)
- Build that wall
- Go back to your country
- Where is your passport?
- We are going to call ICE on you
- Wall jumper
- I'm going to lynch you
- Savages
- Burn in the oven

Source: GAO analysis of media reports published from January 2019 to September 2020. | GAO-22-104341

## Hate Crimes: Criminal Offenses Motivated, in Whole or in Part, by Bias

We estimate that the number of hate crimes in schools and the number of schools where at least one hate crime occurred almost doubled from 2015 -16 to 2017-18, according to our analysis of the school survey (see table 2).[37] Figure 4 shows the number of schools where hate crimes occurred and the student identities targeted, with hate crimes motivated by race or color the most common, by far.

[37]In school year 2015-16, of the estimated 83,591 schools nationwide, an estimated 875 schools had at least one hate crime occur. The 95 percent confidence interval for schools nationwide is 83,532 to 83,651 and for number of schools where at least one hate crime occurred is 829 to 922. In school year 2017-18, of the estimated 82,288 schools nationwide, an estimated 1,597 schools had at least one hate crime occur. The 95 percent confidence interval for schools nationwide is 82,190 to 82,385, and for number of schools where at least one hate crime occurred is 1,532 to 1,663.

**Table 2: Estimated Number of Hate Crimes in K-12 Public Schools, School Years 2015-2016 to 2017-2018**

| | 2015-16 | 2017-18 | Change |
|---|---|---|---|
| Number of hate crimes | 3,166<br>(2,900 to 3,432) | 5,732<br>(5,228 to 6,235) | + 81%<br>(59 to 103%) |
| Number of schools where at least one hate crime occurred | 875<br>(829 to 922) | 1597<br>(1532 to 1663) | + 82%<br>(70 to 95%) |

Source: GAO analysis of the Department of Education's School Survey on Crime and Safety for 2015-16 and 2017-18 | GAO-22-10434

Note: Numbers in parentheses provide 95 percent confidence intervals.

**Figure 4: Estimated Number of K-12 Public Schools Where at Least One Hate Crime Occurred by Student Identities Targeted, School Years 2015-2016 and 2017-2018**

Source: GAO analysis of the Department of Education's School Survey on Crime and Safety for school years 2015-16 and 2017-18. | GAO-22-104341

Note: To maintain confidentiality, data necessary to estimate the number of schools affected by crimes targeting students because of the students' gender, gender identity, disability, and religion in 2015-16 were not available.

Some schools and district officials have responded to incidents of hate speech or hate crimes by issuing statements condemning the incidents,

implementing new teacher and staff training, conducting listening sessions with students or parents, establishing protocols for addressing hate speech on campus, or creating spaces in their schools that celebrate diversity. For example, a school district worked with an organization with experience in matters of equity to study, among other things, students' experiences at school with regard to social, cultural, and racial identities, including instance of hostile behaviors. Figure 5 shows an example of a high school's response to hate-related incidents.

**Figure 5: Example of K-12 Public School Response to Hate**

After experiencing incidents of racism, high school community members made a statement against hate.

Source: Calvert High School. | GAO-22-104341

## Rape and Sexual Assault

An estimated 1,064 rapes or attempted rapes occurred in 726 schools in school year 2017-18, similar to 2015-16 data, according to the school survey.[38] We also found that sexual assaults other than rape increased by an estimated 17 percent during the same time period (see fig. 6).[39] In addition, during this period:

[38]The 95 percent confidence interval for the number of rapes in 2017-18 is 1009 to 1120. The 95 percent confidence interval for the number of schools reporting rape in school year 2017-18 is 689 to 763.

[39]The 95 percent confidence interval for the percentage increase in sexual assaults other than rape in school year 2017-18 is 9.25 to 25.02 percent.

- The number of schools reporting at least one sexual assault increased, from an estimated 2,805 schools to 4,247 schools.[40]
- An estimated 939 schools reported sexual misconduct from staff against students.[41]

**Figure 6: Estimated Number of Rapes or Attempted Rapes and Sexual Assaults in K-12 Public Schools, School Years 2015-2016 to 2017-2018**

Source: GAO analysis of the Department of Education's School Survey on Crime and Safety for school years 2015-16 and 2017-18. | GAO-22-104341

[40]The 95 percent confidence interval for the number of schools reporting sexual assaults is 4,141 to 4,353 in school year 2017-18 and 2,716 to 2,894 in school year 2015-16. With a 95 percent confidence interval, the percentage of schools reporting at least one sexual assault was about 3.4 percent (2.6 to 4.2 percent) in school year 2015-16 and about 5.2 percent (5 to 5.3 percent) in school year 2017-18.

[41]The 95 percent confidence interval for number of schools reporting sexual misconduct is 895 to 982 in school year 2017-18. In school year 2015-16, Education's School Survey on Crime and Safety did not ask about sexual misconduct.

## Physical Attacks

We found that the estimated number of physical attacks in schools with and without weapons increased from school year 2015-16 to 2017-18 (see figs. 7 and 8).[42] While the number of physical attacks with weapons are much less prevalent, they almost doubled during this time period.[43] Physical attacks without weapons were the most common type of incident, by far.

**Figure 7: Estimated Number of Physical Attacks with Weapons and Threats of Attack with Weapons in K-12 Public Schools, School Years 2015-2016 to 2017-2018**

Source: GAO analysis of the Department of Education's School Survey on Crime and Safety for school years 2015-16 and 2017-18. | GAO-22-104341

[42]With a 95 percent confidence interval, there were about 5,326 (4,968 to 5,684) incidents of physical attack with a weapon in school year 2015-16 and about 10,472 (9,673 to 11,270) incidents of physical attack with a weapon in school year 2017-18. With a 95 percent confidence interval, there were about 567,049 (556,750 to 577,349) incidents of physical attack without a weapon in school year 2015-16 and 597,268 (587,740 to 606,796) incidents of physical attack without a weapon in school year 2017-18.

[43]With a 95 percent confidence interval, the number of physical attacks with weapons nearly doubled (an estimated 96.63 percent increase) (76.65 to 116.62 percent) in school year 2017-18.

**Figure 8: Estimated Number of Physical Attacks without Weapons in K-12 Public Schools, School Years 2015-2016 to 2017-2018**

Source: GAO analysis of the Department of Education's School Survey on Crime and Safety for school years 2015-16 and 2017-18. | GAO-22-104341

## Nearly Every School Has Used Programs or Practices to Address Hostile Behaviors

### Programs Have Been Common in Schools in Recent Years, and Their Adoption Increased in School Year 2017-18

Nationwide, in school years 2015-16 and 2017-18, schools used a variety of programs and approaches—including programs and training for students, teachers, and staff; diversity groups; mental health services; disciplinary action; security mechanisms; and school resource officers—to help address hostile behaviors and to create positive school environments.[44] In addition, schools added more programs and practices to address hostile behaviors in school year 2017-18.

### Training and Programs for Students

We estimate that nearly all schools offered students programs, including social emotional learning, peer mediation, and restorative circles, to address hostile behaviors in school years 2015-16 and 2017-18,

[44]We analyzed Education's School Survey on Crime and Safety for school years 2015-16 and 2017-18. We conducted descriptive analyses and regression analyses to better understand the presence of school programs and practices that could address bullying, harassment, or violence, and the relationship between those programs and practices and these issues. Unless otherwise stated, all data comparisons presented are statistically significant.

according to our analysis of the school survey (see fig. 9).[45] From school year 2015-16 to 2017-18, the percentage of schools that used such programs generally increased. Schools that offered these programs to students had slightly less bullying occur regularly than schools that did not offer such programs.[46] According to subject matter experts we interviewed, schools that experience bullying on a regular basis—daily, weekly, and monthly—benefit from programming for students, which help improve school climates.

[45]According to Education's School Survey on Crime and Safety for school year 2017-18, restorative circles are a formal mediation process led by a facilitator that brings affected parties of a problem together to explore what happened, reflect on their roles, find a solution, and ultimately restore harmony to individual relationships and the larger community.

[46]For the purposes of this report, bullying is "regular" if it occurs daily, weekly, and monthly. With a 95 percent confidence interval, an estimated 30 percent of schools (29.7 to 30.3) where regular bullying occurred had student programs, compared to 32 percent of schools (31.3 percent to 33.4 percent) where regular bullying occurred without such programs. While the comparison between schools where regular bullying occurred with student programming and schools without those programs are statistically different, the difference may not be of practical importance. An estimated 65 percent of schools (64.4 to 65.05) where occasional bullying occurred had student programs, compared to 56 percent (54.9 to 57.3) where bullying occasionally occurred without such programs.

**Figure 9: Estimated Percentage of K-12 Public Schools with Student Programs to Address Hostile Behaviors and Promote School Safety, School Years 2015-2016 and 2017-2018**

Source: GAO analysis of the Department of Education's School Survey on Crime and Safety for school years 2015-16 and 2017-18. | GAO-22-104341

There was an increase of about 17 percent (or about 5,000) in schools offering diversity groups in school year 2017-18 (see fig. 10), and schools where bullying regularly occurred added LGBTQI+ and cultural clubs at higher rates than those with occasional bullying.[47] For example, between school years 2015-16 and 2017-18, in schools where bullying regularly occurred:

- The number of schools with the presence of LGBTQI+ clubs increased by an estimated 55 percent, compared to a 32 percent increase where bullying happened occasionally.[48]
- The number of schools with the presence of cultural clubs increased by an estimated 22 percent, compared to a 9 percent increase where bullying happened occasionally.[49]

[47]For the purposes of this report, schools with diversity groups were those with at least one of the following: LGBTQI+ groups, cultural groups, or clubs for students with disabilities. The 95 percent confidence interval for the percentage increase, from school years 2015-16 to 2017-18, in number of schools that offered diversity groups to students is 15.1 to 18.3 percent. In addition to LGBTQI+ and cultural clubs, schools offered clubs for students with disabilities. From 2015-16 to 2017-18, we found that the number of schools with the presence of clubs for students with disabilities increased by an estimated 18.5 percent (15.3 to 22) in schools with regular bullying, compared to a 23 percent (20.4 to 25.5) increase where bullying happened occasionally. These comparisons are not statistically significant.

[48]The 95 percent confidence interval for the percentage increase, from school year 2015-2016 to 2017-18, in number of schools with LGBTQI+ groups where bullying regularly occurred is 50.8 to 60 and in schools where bullying happened occasionally is 28.7 to 35.3. From school years 2015-16 to 2017-18, we found that an estimated 4,336 schools (4,079 to 4,592) added these groups, up from an estimated 10,329 schools (10,182 to 10,475) that had these groups in school year 2015-16. We found that schools that never experienced bullying added these groups at higher rates (an estimated 98 percent), however these schools represented the smallest number of schools (an estimated 178 schools) compared to schools where bullying regularly and occasionally occurred (an estimated 4,157).

[49]The 95 percent confidence interval for the percentage increase, from school years 2015-2016 to 2017-18, in number of schools with cultural clubs where bullying regularly occurred is 17.9 to 25.4 and in schools where bullying happened occasionally is 6 to 11.5. From school years 2015-16 to 2017-18, we found that an estimated 2,205 schools (1,851 to 2,560) added these groups, up from an estimated 17,907 schools (17,653 to 18,160) that had these groups in school year 2015-16. We found that schools that never experienced bullying added these groups at lower rates (an estimated -2.9 percent), representing about 29 fewer schools, compared to about 2,235 schools where bullying regularly and occasionally occurred.

**Figure 10: Estimated Percentage of K-12 Public Schools with Diversity Groups, School Years 2015-2016 and 2017-2018**

Source: GAO analysis of the Department of Education's School Survey on Crime and Safety for school years 2015-16 and 2017-18. | GAO-22-104341

Note: For the purposes of this report, schools with diversity groups were those with at least one of the following: LGBTQI+ groups, cultural groups, or clubs for students with disabilities.

## Training for Teachers and Staff

We estimate that nearly all schools offered teacher and staff training to address hostile behaviors and to build positive school environments in school years 2015-16 and 2017-18, according to our analysis of the school survey. In school year 2017-18, of schools that offered teacher and staff training on bullying policies, an estimated 29 percent had regular bullying and 65 percent had occasional bullying, compared to an estimated 37 and 57 percent, respectively, that did not offer this training.[50] We would expect to see less regular bullying (e.g., daily, weekly, or monthly incidents) in schools with training and more occasional bullying, according to subject matter experts. This is because, if the behavior is reduced, but not completely extinguished, the reduction in the regular

[50]The 95 percent confidence interval for schools that offered teacher and staff training on bullying policies with regular bullying is 28.44 to 29.16, and for schools with occasional bullying is 65.5 to 66 for school year 2017-18. The 95 percent confidence interval for schools that did not offer teacher and staff training on bullying policies with regular bullying is 36.1 to 37.9, and for schools with occasional bullying is 56 to 57.9 for school year 2017-18.

category would result in more schools reporting occasional bullying. As shown in figure 11, the percentage of schools that added such trainings generally increased in school year 2017-18.

**Figure 11: Estimated Percentage of K-12 Public Schools Offering Training to Teachers, Staff, and Parents to Address Hostile Behaviors and Promote School Safety, School Years 2015-2016 and 2017-2018**

Source: GAO analysis of the Department of Education's School Survey on Crime and Safety for school years 2015-16 and 2017-18. | GAO-22-104341

Federal technical assistance and resources are also available to schools and districts to help address hostile behaviors (see textbox).

**Federal Efforts to Help Address Hostile Behaviors**

Education, along with other federal partners, have developed initiatives to help schools and districts address hostile behaviors. For example, a federal government website—stopbullying.gov—provides information on federal laws and training materials on bullying prevention programs (see figure). Additionally, stopbullying.gov lists resources for students in crisis—such as the National Suicide Prevention Lifeline's toll-free number, (800) 273-8255—and provides information for reporting incidents to Education and Justice. Education has also provided school leaders with information on preventing and addressing civil rights violations. For example, Education's National Center on Safe Supportive Learning Environments provides information and technical assistance to states, districts, and schools, among others, focused on improving school learning environments and conditions for learning. Education has also developed initiatives to address specific issues. For example, in 2020, Education launched a new civil rights initiative to combat sexual assault in K-12 public schools to address the rise of sexual assault in schools. According to Education officials, for this initiative, they have conducted compliance reviews that examine school district's handling of sexual assault cases.

**Example of Federal Training from** stopbullying.gov

Source: stopbullying.gov. | GAO-22-104341

## Mental Health Services

Mental health services were available in many schools to promote safe environments in school year 2017-18 (see fig. 12).[51] For school years 2015-16 and 2017-18, schools offering mental health services were also more likely to have higher rates of crime and violence than in schools

[51]With a 95 percent confidence interval, 51.24 percent of schools (50.9-51.6) offered mental health assessments, and 38.31 percent of schools (38-38.63) offered mental health treatments in school year 2017-18. Education changed how they asked about mental health services in the school survey after school year 2015-16. We do not have comparable data for school year 2015-16.

without mental health services, according to our regression analysis of the school survey.[52]

**Figure 12: Estimated Percentage of K-12 Public Schools with Available Mental Health Services, School Year 2017-2018**

Source: GAO analysis of the Department of Education's School Survey on Crime and Safety for school year 2017-18. | GAO-22-104341

## Disciplinary Actions

Schools have at their disposal a range of disciplinary actions to address hostile behaviors.[53] Figure 13 shows the percentages of schools that have disciplinary actions available and percentage of schools that use them.

---

[52] All regression analysis results in this report are associational and do not imply a causal relationship. See appendix II for more details.

[53] In 2018, we reported that Black students, boys, and students with disabilities were more likely to be disciplined than their peers. *GAO, K-12 Education: Discipline Disparities for Black Students, Boys, and Students with Disabilities*, GAO-18-258 (Washington, D.C.: Mar. 22, 2018).

**Figure 13: Estimated Percentage of Disciplinary Actions Most Commonly Available and Used to Address Issues in K-12 Public Schools, School Years 2015-2016 and 2017-2018**

Source: GAO analysis of the Department of Education's School Survey on Crime and Safety for school years 2015-16 and 2017-18. | GAO-22-104341

## Monitoring and Security Mechanisms

Most schools generally increased the use of security mechanisms and protocols to maintain safe school environments and to provide students with avenues to report safety concerns from school years 2015-16 to 2017-18, according to our analysis of the school survey (see fig. 14). Figure 15 shows examples of schools' security mechanisms.

Regarding security mechanisms, according to our regression analysis of the student survey for school years 2014-15, 2016-17 and 2018-19 we found that:

- Students attending schools where there were options to anonymously report hostile behaviors were also less likely to hear hate-related speech or to get into fights.
- Students attending schools where staff supervised students in hallways were also less likely to say they experienced or witnessed emotional bullying or heard hate speech.

**Figure 14: Security Mechanisms Most Commonly Used to Maintain Safety in K-12 Public Schools Increased, School Years 2015-2016 and 2017-2018**

Source: GAO analysis of the Department of Education's School Survey on Crime and Safety for school years 2015-16 and 2017-18. | GAO-22-104341

**Figure 15: Examples of Security Mechanisms in K-12 Public Schools**

Left picture shows an anonymous drop box where students can report hostile behaviors—e.g., bullying, harassment, hate, or violence. Center picture features a sign that reminds visitors to check in with the administrative office and that they are under surveillance. Right picture features a sign requiring visitors to check in with administrative office.

Source: GAO. | GAO-22-104341

## School Resource Officers

The number of schools with school resource officers (SRO) increased by over 2,000 schools from school year 2015-16 to 2017-18.[54] Unlike other school security personnel (e.g., security guards or adult hall monitors), SROs are career sworn law enforcement officers with the authority to arrest, have specialized training, and are to work in collaboration with school organizations.[55] In school year 2017-18, an estimated 51 percent of schools nationwide had SROs present at least once a week compared to 48 percent in school year 2015-16, according to our analysis of the

[54]The 95 percent confidence interval for the number of more schools that used SROs in school year 2017-18 is 1,776 to 2,674. With a 95 percent confidence interval, about 39,911 schools (39,573 to 40,248), or about 48 percent (47.3 to 48.2 percent), had SROs in school year 2015-16 compared to about 42,136 schools (41,863 to 42,409), or about 51 percent (50.9 to 51.5 percent) had SROs in school year 2017-18.

[55]U.S. Department of Education, *Survey on School Crime and Safety,* 2019 (Washington, D.C.: September 2019).

school survey.[56] Subject matter experts told us that SROs are often added in response to hostile behaviors. This is in line with our data analysis, which found that schools that had SROs had more frequent incidents of regular bullying, harassment, or sexual harassment, compared to schools that did not use SROs.[57] SROs' involvement in particular activities to address hostile behaviors in schools also increased from school year 2015-16 to 2017-18 (see fig.16).

According to our regression analysis of the school survey, for school years 2015-16 and 2017-18, schools reporting sworn law enforcement (including SRO) participation in school activities were also more likely to have higher rates of crime and violence in schools compared to schools which did not have participation.

[56]The 95 percent confidence interval for the percentage of schools that had SROs in school year 2017-18 is 50.9 to 51.4 percent and in school year 2015-16 is 47.3 to 48.2 percent.

[57]Similar to our regression analysis, this relationship does not imply causation. In school year 2017-18, with a 95 percent confidence interval, 34 percent of schools (33.8 to 34.6) had SROs and regular bullying, compared to 26 percent of schools (25.6 to 26.4) without SROs; 73 percent of schools (72.2 to 73.1) had SROs and harassment incidents, compared to 65 percent of schools (64 to 65.6) without SROs; and 7 percent of schools (6.9 to 7.3) had SROs and sexual harassment incidents, compared to 3.8 percent of schools (2.6 to 5.2) without SROs.

**Figure 16: School Resource Officers' (SRO) Most Common Activities (Estimated), School Years 2015-2016 and 2017-2018**

Source: GAO analysis of the Department of Education's School Survey on Crime and Safety for school years 2015-16 and 2017-18. | GAO-22-104341

Note: SROs provide information to school authorities about the legal definitions of behavior for recording or reporting purposes (e.g., defining assault for school authorities).

Schools vary in the types of activities SROs are involved in. About two-thirds of schools had written agreements in place to govern SROs' relationship with schools; the remainder did not.[58] Further, most SROs carry firearms, chemical sprays, and/or physical restraints. Over one-third of officials from schools that had written agreements did not know whether the agreements include information about SROs' roles and responsibilities in administering student discipline, making arrests, or using firearms in the school (see table 3). The use of body cameras

[58]With a 95 percent confidence interval, an estimated 63.74 percent of schools (63.32-64.15) had some type of written agreement on SROs' roles and responsibilities and 36.26 percent of schools (35.85-36.68) did not in school year 2017-18.

approximately doubled, with over one-third of SROs wearing them in school year 2017-18 compared to about 15 percent in school year 2015-16.[59]

**Table 3: Estimated Percentage of K-12 Public Schools with School Resource Officers (SRO) That Had Agreements on Roles and Responsibilities, School Years 2015-2016 to 2017-2018**

| SRO agreement | 2015-2016 | | | 2017-2018 | | |
|---|---|---|---|---|---|---|
| | Yes | No | Don't know | Yes | No | Don't know |
| Student discipline | 57.9 (57.2-58.6) | 13.8 (13.8-14.2) | 28.4 (27.7-29.1) | 55.2 (54.7-55.6) | 12.2 (11.9-12.6) | 32.6 (32.2-33) |
| Use of physical or chemical restraints | 44.9 (44.2-45.6) | 18.46 (18-18.9) | 36.64 (35.9-37.4) | 43.7 (43.3-44.1) | 16.03 (15.6-16.4) | 40.28 (39.8-40.8) |
| Use of firearms | 40 (39.3-40.7) | 19.79 (19.4-20.2) | 40.22 (39.5-40.9) | 41 (40.6-41.4) | 16.65 (16.3-17) | 42.34 (41.9-42.8) |
| Making arrests on school grounds | 57.5 (56.8-58.2) | 11.05 (10.7-11.4) | 31.46 (30.7-32.2) | 55.7 (55.2-56.1) | 10.21 (9.9-10.5) | 34.13 (33.6-34.6) |
| Reporting criminal offenses to authorities | 64.32 (63.7-64.9) | 7.27 (7-7.5) | 28.41 (27.7-29.1) | 64.8 (64.4-65.2) | 4.88 (3.8-6.2) | 30.31 (29.9-30.7) |

Source: GAO analysis of the Department of Education's School Survey on Crime and Safety for school years 2015-16 and 2017-18. | GAO-22-104341

Note: Numbers in parentheses provide 95 percent confidence intervals.

[59]With a 95 percent confidence interval, an estimated 32.59 percent of schools (32.07-33.12) had SROs with body cameras in school year 2017-18 and an estimated 16.33 percent of schools (15.94-16.72) had SROs with them in school year 2015-16.

## Recently, Education Resolved Complaints of Hostile Behaviors Faster, Due in Part to More Dismissals and Fewer Complaints Filed

### Since the 2016-17 School Year, the Length of Time to Resolve Complaints of Hostile Behaviors Declined

Since the 2016-17 school year, Education's OCR has resolved complaints of alleged civil rights violations in K-12 schools that involved hostile behaviors targeting people in protected classes faster than it did in each previous year.[60] For this set of complaints, our analysis showed that the average resolution time dropped and remained below the 180 day target for each protected class—race, color, or national origin; sex; or disability status since school year 2017-18 (see fig. 17). Such declines were the greatest for complaints of alleged violations on the basis of sex, with the average number of days to resolve these complaints peaking at 447 in school year 2015-16, and declining every year until reaching an average of 74 days in school year 2019-20.

[60]For this section of the report, hostile behaviors are limited to complaints categorized by OCR as: racial harassment (verbal, assault, or other); retaliation based on race, color, or national origin; national origin discrimination involving religion; sexual harassment (verbal, physical, sexual violence, gender stereotyping, other); retaliation based on sex; disability harassment (verbal, assault, or other); or retaliation based on disability status at elementary or secondary schools. See appendix I for additional information about the complaints included in our analysis. According to OCR officials, they do not collect information about the alleged victim that would allow us to isolate incidents that affected students. Similarly, the alleged perpetrators can be students or staff and are not distinguishable in the data available in OCR's case management system.

**Figure 17: Average Resolution Time (days) of Complaints of Hostile Behaviors in K-12 Schools Filed with the Department of Education's Office for Civil Rights, School Years 2010-2011 to 2019-2020**

Source: GAO analysis of Department of Education's Office for Civil Rights data. | GAO-22-104341

Notes: School years in figure begin July 1 and end June 30. Hostile behaviors include those categorized by the Office for Civil Rights as: racial harassment (verbal, assault, or other); retaliation based on race, color, or national origin; national origin discrimination involving religion; sexual harassment (verbal, physical, sexual violence, gender stereotyping, other); retaliation based on sex; disability harassment (verbal, assault, or other); or retaliation based on disability status.

Figure 18 describes the different ways OCR resolves complaints. Of the ways to resolve complaints, dismissing them generally took the least amount of time over the 10 years included in our analysis, and closures with change took the most time (see table 4).

**Figure 18: Department of Education's Office for Civil Rights' (OCR) Complaint Processing Procedures and Resolution Types**

Source: GAO summary of OCR's case processing procedures. | GAO-22-104341

[a]This is coded as "no violation or insufficient evidence" in OCR's Case Management System.

[b]Prior to 2015, a facilitated resolution between the parties was called an early complaint resolution.

[c]Prior to 2018, OCR distinguished between dismissals and administrative closures based on when, during the investigation, the determination was made that the complaint met the criteria for dismissal.

**Table 4: Average Number of Days to Resolve Complaints of Hostile Behaviors in K-12 Schools Filed with the Department of Education's Office for Civil Rights (OCR) by Resolution Type, School Years 2010-2011 to 2019-2020**

| | 2010-2020 10-year average | 2010-2011 | 2011-2012 | 2012-2013 | 2013-2014 | 2014-2015 | 2015-2016 | 2016-2017 | 2017-2018 | 2018-2019 | 2019-2020 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Dismissal | 100 | 69 | 63 | 77 | 70 | 161 | 201 | 166 | 82 | 59 | 60 |
| Facilitated resolution between the parties | 199 | 79 | 82 | 98 | 172 | 322 | 360 | 391 | 200 | 154 | 117 |
| No violation or insufficient evidence | 319 | 225 | 217 | 225 | 324 | 414 | 463 | 451 | 307 | 218 | 186 |
| Closure with change | 364 | 291 | 297 | 323 | 393 | 514 | 526 | 432 | 273 | 230 | 167 |

Source: GAO analysis of Department of Education's Office for Civil Rights data. | GAO-22-104341

Notes: Two complaints that resulted in enforcement action during the 10-year period are not depicted in the table because an average could not be calculated. School years in table begin July 1 and end June 30. Hostile behaviors include those categorized by the Office for Civil Rights as: racial harassment (verbal, assault, or other); retaliation based on race, color, or national origin; national origin discrimination involving religion; sexual harassment (verbal, physical, sexual violence, gender stereotyping, other); retaliation based on sex; disability harassment (verbal, assault, or other); or retaliation based on disability status.

## Higher Dismissal Rates and, More Recently, Fewer Complaints Contributed to Shorter Resolution Times

Education's OCR uses timeliness metrics to evaluate its effectiveness in addressing complaints of alleged civil rights violations in schools, aiming to resolve at least 80 percent of all new complaints within 180 days.[61] Across all types of complaints received, OCR has reported meeting this metric every fiscal year between 2009 and 2020, with the exception of 2016. For the set of complaints of hostile behaviors we analyzed, an increase in the use of dismissals and a decrease in the number of complaints filed with OCR in recent years contributed to faster resolution times and also helped OCR address its case backlog.

[61]According to OCR officials, OCR also aims to have no more than 25 percent of all pending complaints older than 180 days. We focused on the timeliness of resolutions for our analysis. In addition, according to OCR officials, OCR uses two metrics associated with annual staff performance plans, both also centered on timeliness: (1) the staff reduces the number of pending complaints that are 730 days old and older by 20 percent compared to the number of such pending complaints on the first day of the fiscal year, and (2) the staff, on average, responds to appeals that are filed and for which a response is due within 90 days of receipts by the regional office. GAO did not analyze metrics related to individual OCR staff or regional offices.

## Increased Dismissals

Over the 10-year period, OCR increasingly resolved complaints of hostile behaviors by dismissing them. Dismissals accounted for 49 percent of resolutions in the 2010-11 school year, rising to 81 percent in the 2019-20 school year, as shown in figure 19. Complaints of alleged civil rights violations on the basis of sex were the most frequently dismissed complaint in the 2019-20 school year (88 percent), followed by those on the basis of race, class, or national origin (87 percent), and disability status (76 percent).

Complaints can be dismissed for a variety of reasons. As shown in figure 20, OCR most frequently dismissed complaints in recent years because it did not receive consent to disclose the name of the complainant. Such dismissals accounted for 8 percent of resolutions at the beginning of the 10-year period, rising to 21 percent at the end of the 10-year period.[62]

When asked about the increase in dismissals in recent years, OCR officials only chose to comment on the increase in dismissals of complaints related to gender identity. OCR officials said that after Education rescinded its May 2016 Dear Colleague Letter on Transgender Students in February 2017, it subsequently dismissed the majority of these kinds of complaints.[63]

[62]OCR requires written consent from the complainant to disclose the complainant's identity to the recipient and witnesses when such disclosure is needed to resolve the complaint. When written consent is necessary, OCR informs the complainant that the complaint will be dismissed if it does not receive the written consent within 20 calendar days of the date that OCR requests consent from the complainant. This requirement was in place for the 10-year period we reviewed. According to OCR officials, prior to 2008 these dismissals were coded as "insufficient factual basis."

[63]In May 2016, Education and Justice issued a joint Dear Colleague Letter to affirm Title IX protections for transgender students. The guidance did not add requirements to applicable law, but instead clarified how Education and Justice evaluate a school's compliance with the law. For example, the guidance addressed issues such as treating students consistent with their gender identity in terms of their names and pronouns and their participation in single-sex activities and facilities. The letter was rescinded by both agencies on February 22, 2017.

In June 2021, Education issued a Notice of Interpretation clarifying that Education interprets Title IX's prohibition on sex discrimination to encompass discrimination based on sexual orientation and gender identity. Enforcement of Title IX of the Education Amendments of 1972 With Respect to Discrimination Based on Sexual Orientation and Gender Identity in Light of Bostock v. Clayton County, 86 Fed. Reg. 32,637 (June 22, 2021). Justice issued a Memorandum to Federal Agency Civil Rights Directors in March 2021 concluding that Bostock's analysis applies to Title IX. Both of these changes were made subsequent to our analysis of complaints filed with OCR.

**Figure 19: Percentage of Resolved Complaints of Hostile Behaviors in K-12 Schools Filed with Education's Office for Civil Rights, by Resolution Type, School Years 2010-2011 to 2019-2020**

Source: GAO analysis of Department of Education's Office for Civil Rights data. | GAO-22-104341

Notes: Two complaints that resulted in enforcement action during the 10-year period are not depicted in the figure. School years in figure begin July 1 and end June 30. Hostile behaviors include those categorized by the Office for Civil Rights as: racial harassment (verbal, assault, or other); retaliation based on race, color, or national origin; national origin discrimination involving religion; sexual harassment (verbal, physical, sexual violence, gender stereotyping, other); retaliation based on sex; disability harassment (verbal, assault, or other); or retaliation based on disability status.

**Figure 20: Five Most Common Reasons for Dismissals of Complaints of Hostile Behaviors in K-12 Schools by Education's Office for Civil Rights, School Years 2010-2011 to 2019-2020**

Source: GAO analysis of Department of Education's Office for Civil Rights data. | GAO-22-104341

Notes: School years in figure begin July 1 and end June 30. Hostile behaviors include those categorized by the Office for Civil Rights as: racial harassment (verbal, assault, or other); retaliation based on race, color, or national origin; national origin discrimination involving religion; sexual harassment (verbal, physical, sexual violence, gender stereotyping, other); retaliation based on sex; disability harassment (verbal, assault, or other); or retaliation based on disability status.

While OCR reported an overall substantial increase in the number of complaints resolved with change across all of its complaints for the 4-year period between fiscal years 2017 and 2020, we found that the number of complaints specifically related to hostile behaviors in K-12 schools that were resolved with change declined for the 4-school-year period 2016-17 through 2019-20. Resolutions with change, which include complaints closed with change and complaints resolved through facilitated resolutions between the parties according to OCR officials, require schools or districts to make substantive changes to protect students' civil rights, such as training teachers or revising school or district policies. OCR reported resolving 4,443 complaints with change over the 4-year period from fiscal year 2013 through 2016, and resolving 6,018 over the following 4-year period from fiscal 2017 through 2020. In contrast, since school year 2017-18, the number of complaints alleging civil rights violations in K-12 schools that involved hostile behaviors targeting people in protected classes that were resolved with change declined, falling from 1,300 from school years 2012-13 through 2015-16 to 1,078 from school years 2016-17 through 2019-20.

### Declining Number of Complaints

The number of complaints of hostile behaviors filed with OCR declined in both the 2018-19 and 2019-20 school years following a general increase over the previous 8 years (see fig. 21). This decline in recent years contributed to faster resolutions in two ways: (1) with fewer complaints to address, OCR could tend to them more quickly and (2) OCR could address the complaint backlog that had grown in previous years.

**Figure 21: Complaints of Hostile Behaviors in K-12 Schools Filed with the Department of Education's Office for Civil Rights, School Years 2010-2011 to 2019-2020**

Source: GAO analysis of Department of Education's Office for Civil Rights data. | GAO-22-104341

Notes: Sum of bars for each identity may exceed the total line in a year because complaints can contain alleged violations related to more than one group. School years in figure begin July 1 and end June 30. Hostile behaviors include those categorized by the Office for Civil Rights as: racial harassment (verbal, assault, or other); retaliation based on race, color, or national origin; national origin discrimination involving religion; sexual harassment (verbal, physical, sexual violence, gender stereotyping, other); retaliation based on sex; disability harassment (verbal, assault, or other); or retaliation based on disability status.

OCR officials said that several factors could affect the number of complaints they receive each year, including new guidance or regulations, changes in the law, and administration specific projects or initiatives. A portion of the decline in complaints filed in the 2019-20 school year—for example those related to physical harassment/assault—is also likely attributable to schools' transition to distance learning in March 2020 due to the COVID-19 pandemic.

Several civil rights experts we spoke with said that in recent years, changes to OCR's guidance made them reluctant to file some types of complaints on behalf of students or to encourage students and their families to file some types of complaints with OCR. As OCR's priorities changed, some civil rights experts lost confidence in OCR's ability to address civil rights violations in schools, they noted. For example:

- Representatives from one legal organization focused on civil rights protections said that in recent years they have opted to file complaints related to racial harassment or discrimination in federal court instead of filing complaints with OCR. They said that OCR no longer following its 2014 Dear Colleague Letter on the Nondiscriminatory Administration of School Discipline was a deterrent to filing racial harassment or discrimination complaints with OCR. That guidance, which had discussed disproportionate discipline of students of color and called for investigations to examine disproportionate impact in complaints related to discipline, was rescinded in December 2018.[64] Although the guidance specifically applied to school discipline, the legal organization perceived the rescission as a broader shift in Education's investigations of alleged racial harassment violations.
- Representatives of another civil rights organization said that in recent years they were hesitant to encourage students and families to file complaints with OCR, particularly in instances of alleged sex

[64]In January 2014, Education and Justice issued a Joint Dear Colleague Letter on Nondiscriminatory Administration of School Discipline on the basis of race, color, or national origin. According to the guidance, the administration of student discipline can result in unlawful discrimination based on race if a student is subjected to different treatment based on the student's race or if, even though a policy is neutral on its face and is administered in an evenhanded manner, the policy has an unlawful disparate impact, i.e., a disproportionate and unjustified effect on students of a particular race. The guidance acknowledges racial disparities in the frequency and severity of the administration of school discipline, particularly for Black students, and provides guidance for both agencies to assess for different treatment and disparate impact in the investigation of complaints. The guidance was rescinded by both agencies on December 21, 2018. As of July 30, 2021, subsequent to our analysis of complaints filed with OCR, the guidance and underlying issues are under review by Education and Justice.

discrimination against LGBTQI+ students. They said this was because of Education rescinding its Dear Colleague Letter affirming Title IX protections for transgender students. The representatives said rescinding this guidance in February 2017 also created concern that continued filing of such complaints might have prompted Education to create new policies that could further impact students.

- Representatives from a third organization said that in the last 5 years students and advocates have been reluctant to file complaints related to sexual harassment and violence. They said that under Education's 2011 guidance on standards of evidence for investigating alleged sexual assault and violence, students felt like they understood their rights. That guidance was withdrawn in September 2017 and the Title IX Final Rule went into effect in August 2020.[65] As a result, the organization said that there has been a mistrust of Education and lack of confidence in OCR.

Regarding the changes to guidance cited by civil rights experts above, Education has started to review or has reinterpreted each of them. The Joint Dear Colleague Letter on Nondiscriminatory Administration of School Discipline to assess for different treatment based on race that was rescinded in 2018 is under review by both Education and Justice as of July 2021. While the guidance affirming Title IX protections for transgender students was rescinded in 2017, Education issued a Notice of Interpretation in June 2021 clarifying that Education interprets Title IX's prohibition on sex discrimination to encompass discrimination based on sexual orientation and gender identity.[66] Finally, regarding regulations related to investigating allegations of sexual misconduct in schools,

[65]On April 4, 2011, Education had issued a Dear Colleague Letter addressing sexual violence. Among other things, the Dear Colleague Letter stated that preponderance of the evidence is the appropriate standard for investigating allegations of sexual harassment or violence in schools, as opposed to the clear and convincing standard. On September 22, 2017, Education issued a Dear Colleague Letter withdrawing the 2011 Dear Colleague Letter and additional guidance related to sexual harassment and violence. These 2017 guidance documents were rescinded in August 2020, when the Title IX Final Rule went into effect. The Title IX Final Rule defines sexual harassment, including sexual assault, as unlawful sex discrimination and established new processes for investigating allegations of sexual misconduct in schools.

In April 2021, subsequent to our analysis of complaints filed with OCR, Education announced that OCR would be launching a comprehensive review of Title IX regulations. During this review process, the existing Title IX regulations, as amended in 2020, remain in effect.

[66]Enforcement of Title IX of the Education Amendments of 1972 With Respect to Discrimination Based on Sexual Orientation and Gender Identity in Light of Bostock v. Clayton County, 86 Fed. Reg. 32,637 (June 22, 2021).

Education announced in April 2021 that OCR would be launching a comprehensive review of Title IX regulations, including the new Title IX Final Rule.

## Agency Comments

We provided a draft of this report to the Department of Education for review and comment. Education provided written technical comments, which we incorporated as appropriate.

At this time, we will send copies of this report to the appropriate congressional committees and the Secretary of Education. In addition, the report is available at no charge on the GAO website at https://www.gao.gov.

If you or your staff have any questions about this report, please contact me at (617) 788-0580 or nowickij@gao.gov. Contact points for our Offices of Congressional Relations and Public Affairs may be found on the last page of this report. GAO staff who made key contributions to this report are listed in appendix III.

Sincerely yours,

Jacqueline M. Nowicki, Director
Education, Workforce, and Income Security Issues

# Appendix I: Objective, Scope, and Methodology

## Overview

This report examines: (1) the prevalence and nature of hostile behaviors in K-12 public schools; (2) the presence of K-12 school programs and practices to address hostile behaviors; and (3) how the Department of Education has addressed complaints related to these issues in school years 2010-11 through 2019-20.

To conduct this work, we analyzed the most recent years of data available that capture hostile behaviors exhibited in K-12 public schools, including bullying, hate speech and hate crimes, sexual assault and rape, and physical violence, from two nationally generalizable federal surveys. Specifically, we conducted descriptive and regression analyses on Education's School Crime Supplement (SCS) to the Department of Justice's National Crime Victimization Survey and the School Survey on Crime and Safety (SSOCS). See appendix II for information on our regression analysis. The SCS provides information from students' perspectives and the SSOCS provides information from schools' perspectives. We assessed the reliability of the data by reviewing existing documentation about the data and performing electronic testing on required data elements from both surveys and determined they were sufficiently reliable for the purposes of our analyses. We analyzed the SCS and SSOCS data using the analysis weights and sampling design information in order to account for the complex sample design. We express the precision of our particular sample's results with a 95 percent confidence interval, meaning we are 95 percent confident that the true values in the study population are within this range. All regressions use the 0.05 level of significant to determine statistically significant.

Additionally, we analyzed Education's Office for Civil Rights' (OCR) case management system database for school years 2010-11 through 2019-20, which captures the types and numbers of complaints it receives, resolutions, and processing times. We assessed the reliability of OCR's case management system data by checking for errors or inconsistencies in the data and interviewing OCR officials familiar with the system. We limited our analysis to data elements that were sufficiently reliable.

To inform all aspects of our work, we interviewed academic researchers, education policy organizations, civil rights experts, and federal agency officials from Education and Justice. We also selected examples of hostile behaviors by randomly selecting from a list of news articles from calendar years 2019 and 2020. Finally, we reviewed relevant federal agency documentation, regulations, and laws. The following sections contain detailed information about the scope and methodology for this report.

## Analysis of the School Crime Supplement to the National Crime Victimization Survey (student survey)

The School Crime Supplement (SCS)—referred to in the body of this report as the student survey—is a biennial survey that was created as a supplement to the National Crime and Victimization Survey.[1] The survey is co-designed by Education's National Center for Education Statistics and Justice's Bureau of Justice Statistics and is a nationally representative survey of approximately 9,500 students between the ages of 12 through 18 in grades 6 to 12, enrolled in U.S. public and private elementary, middle, and high schools.[2] Because our focus is on public schools, we excluded students that attended private schools for each survey year in our analysis.

Our analysis was conducted using the public-use data file of the SCS for the three most recent surveys (school years 2014-15, 2016-17, and 2018-19.) The SCS data are self-reported by students, and consequently, as is generally true with self-reported data, there is potential for misreporting of information. The SCS asks about school-related topics such as alcohol and drug availability; fighting, bullying, and hate-related behaviors; fear and avoidance behaviors; safety measures; gun and weapon carrying; and gangs at school.

We analyzed the 3 most recent school years of the SCS to learn about (1) the prevalence of hostile behaviors (e.g., bullying, harassment, and hate speech), (2) student perceptions of the school climate and fear and avoidance behaviors, and (3) characteristics of schools where such incidents happen more frequently.

In some instances, we consolidated responses to multiple related survey questions. For example, to estimate the percentage of all students nationwide that were bullied related to their identity, we consolidated all responses by students who were bullied related to their identity. In

[1]The National Crime Victimization Survey is administered by Justice's Bureau of Justice Statistics and collects data every year from a nationally representative sample of households. Persons are interviewed on the frequency, characteristics, and consequences of criminal victimization. In some years, the survey included the School Crime Supplement, which collects data about victimization at school. For more information, please see https://bjs.ojp.gov/data-collection/ncvs.

[2]With a 95 percent confidence interval, we estimated that there were approximately 22 million students ages 12-18 (20,986,567 to 23,972,017) in school year 2014-15; 22 million students ages 12-18 (21,218,217 to 23,327,983) in school year 2016-17; and 23 million students ages 12-18 (21,733,074 to 24,488,300) in school year 2018-19. In general, the number of students ages 12 to 18 attending K-12 public schools in the United States has remained similar for the time periods we analyzed.

addition, we estimated percentages of students experiencing various types of hostile behavior by certain school characteristics—location, school size, grade level, percent who were minority, percent who were eligible for free or reduced priced lunch, and residential classification (urban, suburban, and rural).

## Analysis of the School Survey on Crime and Safety (school survey)

The School Survey on Crime and Safety (SSOCS)—referred to in the report as the school survey—is a nationally representative survey of principals in K-12 public schools conducted by the National Center for Education Statistics about every 2 years.[3] The survey collects data from schools to provide estimates of school crime, security mechanisms, programs and policies.[4] The survey samples approximately 4,800 U.S. public school principals or other administrators. Our analysis was conducted using the restricted-use data file of the SSOCS for school years 2015-16 and 2017-18, the most recent data available at the time of our analysis. The SSOCS data are self-reported by principals or other administrators, and consequently, as is generally true with self-reported data, there is potential for misreporting of information.

The survey covers school security practices, student training programs, parent and community involvement at school, numbers and duties of school security staff, school mental health services, staff training and practices, adverse incidents, disciplinary problems and disciplinary actions. The survey also includes information on hate crimes and other types of crime.

We conducted a descriptive analysis of the SSOCS using the 2 most recent years. For the SSOCS, there were two sets of variables we analyzed: (1) incidents of bullying, hate crimes, and victimization; and (2) programs to address behavior and create safe environments, such as training and programs for staff and students, mental health services, discipline and school security staff and programs.

To further understand the extent to which incidents such as bullying or hate crimes may vary by school characteristics, and the extent to which

[3]Respondents to the school survey are primarily principals and other knowledgeable school administrators. We estimated 83,591 schools (83,532 to 83,651) in school year 2015-16 and 82,288 schools (82,190 to 82,385) in school year 2017-18. In general, the number of public schools in the United States has remained similar for the time periods we analyzed.

[4]For the 2017-18 survey, 4,803 public schools were sampled, and a total of 2,762 submitted completed questionnaires for a weighted response rate of 61.7 percent.

programs to address behavior and create safe environment may vary by school characteristics, we also analyzed those data by characteristics such as a schools' locale, size, level (e.g., elementary or high school), percent of students who were minority, and percent of students who were eligible for free or reduced lunch.

We conducted generalized linear regressions using the 2015-16 and 2017-18 SSOCS data to explore associations between selected school-level characteristics and programs and frequencies of crime and violence, in addition to occurrences of hate crimes, disciplinary problems, and bullying, while controlling for other factors.[5] Such a model allowed us to test the association between adverse school climate incidents, such as bullying or incidents of crime and violence, and school characteristics, programs and policies, while holding other school characteristics constant (e.g. student demographics, school security measures, teacher training, school type).

## Analysis of Education's Office for Civil Rights Case Management Data

To assess Education's response to complaints of hostile behaviors, we analyzed data from OCR's case management system that met the following criteria:

- institution type was elementary or secondary;
- case type was complaint;
- case opening date was between July 1, 2010 and June 30, 2020;
- specific basis was Title VI of the Civil Rights Act of 1964 (Title VI), Title IX of the Education Amendments of 1972 (Title IX), Title II of the Americans with Disabilities Act of 1990 (Title II), or Section 504 of the Rehabilitation Act of 1973 (Section 504), and the complaint filed involved one of the following:
  - Title VI: racial harassment (assault); racial harassment (insults, slurs, derogatory expressions); racial harassment (other); retaliation; national origin discrimination involving religion;
  - Title IX: sexual harassment (sexual violence); sexual harassment (physical harassment or intimidation); sexual harassment (insults,

[5]We used a Poisson generalized linear regression for this analysis because the data on incidents of crime and violence represent counts and therefore are not appropriate for a traditional normal linear model. In addition, we used a negative binomial regression instead of a Poisson regression because negative binomial models are appropriate for count analyses with observed over-dispersion (i.e., when the variance of the count variable is much larger than the mean of that variable).

slurs, derogatory expressions); sexual harassment (gender stereotyping); sexual harassment (other); gender harassment (not of a sexual nature), retaliation; or

- Title II or Section 504: disability harassment (assault); disability harassment (insults, slurs, and derogatory expressions); disability harassment (other); and retaliation.

If the complaint data in the case management system did not include information in any of the fields related to the criteria mentioned above, we excluded the case from our analysis.

We performed descriptive analyses of the complaints that met the criteria to understand trends in the nature of complaints filed over the 10-year period, including the number of complaints filed and their specific bases (protected class); the manner of resolution; the most common reasons for dismissing complaints; and average resolution times and resolution types, compared to OCR's 180 day resolution target. Some complaints contained alleged violations related to more than one protected class or more than one type of hostile behavior. In these instances, we counted such complaints as one complaint, but counted each alleged violation named in a complaint separately in our analyses.

## Selecting Examples of Hostile Social Behaviors

### News Articles

Because the surveys we analyzed do not contain detailed, descriptive information about the hostile behaviors that occur in K-12 schools, we conducted a news media search and randomly selected examples from the results for inclusion in the report to provide illustrative examples of some of these types of incidents. To obtain recent results, we limited the search to articles published between January 2019 and September 2020. We searched databases using specific keywords to identify incidents where students were targeted related to their membership in certain identity groups: race, color, or national origin; religion; sex (including sexual orientation and gender identity); or disability status. Next, we sorted the results into lists by identity group (for example race or disability status) and type of incident (for example sexual harassment) and randomized the lists. In randomized order, we analyzed the incidents using sufficiency and relevancy criteria, including whether the article had information about the nature of the incident and where it occurred, and whether a student was the alleged target. We selected the first two examples from each list that met our criteria: one in which a student was the alleged perpetrator and one in which school staff was the alleged

perpetrator. The news articles provide illustrative descriptions of individual incidents and do not represent the experiences of all students and schools. We did not assess whether the incidents could potentially constitute unlawful discrimination or hate crimes under federal or state law.

## Interviews

In total, we interviewed representatives of 25 groups representing civil rights experts, education advocacy organizations, and academic researchers, among others. Our interviews gathered information on the prevalence of hostile behaviors in schools (e.g., bullying, harassment, hate, and victimization); practices and programs schools use to prevent and address these issues; and Education's role in responding to incidents involving discriminatory harassment, hate, and victimization.

We selected groups for interviews based on their knowledge of relevant information and their ability to describe school practices. Regarding civil rights experts, we interviewed leadership from several associations representing a range of identity groups including race and ethnicity; sex; sexual orientation and gender identity; and disabilities because students in those categories have experienced increased hostile behaviors. These groups accounted for the largest share of bullying, discriminatory harassment, hate speech and hate crimes, and victimization incidents in our data analysis. We also interviewed national groups representing a range of K-12 school officials, including teachers, principals, and school social workers.

We conducted this performance audit from May 2020 to November 2021 in accordance with generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objectives. We believe that the evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objectives.

# Appendix II: Regression Analysis

## Overview

We conducted generalized linear regressions using the School Crime Supplement (SCS) to the National Crime Victimization Survey and the School Survey on Crime and Safety (SSOCS) survey data to explore associations between selected school-level characteristics and programs and outcomes of hostile behaviors such as bullying. Such a model allowed us to test the association between incidents of hostile behaviors, such as bullying, and school programs and policies, while holding other school characteristics constant (such as school demographics). We conducted a separate regression for each of the hostile behaviors relating to adverse climate incidents.

Typically, a generalized linear regression model is appropriate when the model assumption of normality is not appropriate, as is the case with a binary (yes/no) outcome for logistic regressions, or a count outcome for Poisson regressions. A logistic regression model provides an estimated odds ratio of an event occurring, such as whether a school characteristic is associated with higher or lower odds of bullying. A Poisson regression model provides an estimated incidence rate ratio of an event, such as whether a school policy or program is associated with higher rates of crime and violence. For both the estimated odds ratio and estimated incidence rate ratio, a value greater than one indicates a higher or positive association, and a value less than one indicates a lower or negative association. For example, an estimated odds ratio less than one indicates lower odds of being bullied when a factor is present. Additionally, one can quantify just how much more or less likely the incidence is, according to the estimated model coefficients. For example, an incidence rate ratio of 2.5 would indicate that a school having regular student disorder would be associated with 2.5 times higher incidence of bullying relative to schools never experiencing student disorder, holding all other variables in the model constant. Given limitations of our models, including that we must rely on observational data which did not come from an experimental design which would allow for causal inference, we present a general summary of associations by providing the direction, rather than an estimated rate (incidence) of hostile behaviors.

To obtain a better understanding of potential control variables and their association with outcomes, and to identify potential controls used by subject matter experts from studies using similar methodologies, a literature review was performed. In particular, regression studies, which were similar in scope to the engagement objectives, were reviewed and summarized. Data from these regression studies represent a range of school years from 2003 to 2015. This information was used to inform our final control variable selection.

## Regression Analysis of the School Crime Supplement to the National Crime Victimization Survey

Our regression model used the same universe of approximately 22 million students as our descriptive analysis of the SCS data for each of the three time periods surveyed. Since the regression models are based on observations across all independent variables, and some variables had a small number of missing data points, our final models had between 5,600 and 6,000 observations, depending on the outcome. For two survey years, 2014-15 and 2018-19, a split sample questionnaire was used for bullying-related items, where only a portion of the sample was relevant for items in our analysis. For each year, we used the SCS person weights (incoming and continuing) for our analyses. For the 2014-15 and 2018-19 SCS data, we only used respondents to version 1 of the respective questionnaires and adjusted those weights to account for this, following technical documentation. For 2014-15, we doubled the person weights. For 2018-19, we multiplied person weights by a factor of 100/60.

All regression models are subject to limitations and for this model, some known limitations include:

- Some variables that might be related to student or school characteristics were not available in the data. For example, in this context, it could be household income adjusted for family size or household type (single- versus multiple-headed households) that could be related to students' vulnerability or bully-related experiences. Additionally, these data are subject to both sampling and non-sampling error. While the analysis has accounted for sampling error, survey data are also affected by non-sampling error which could occur for many reasons, including a failure to sample a segment of the population, inability to obtain information for all respondents in the sample, inability or unwillingness of respondents to provide correct information, mistakes by respondents, and errors made in the collection or processing of data (such as imputation or data quality checks). A nonresponse bias analysis and nonresponse adjustments were carried out in order to address non-sampling error associated with nonresponse.
- Results of our analyses are associational and do not imply a causal relationship.

Table 5 lists the variables we included in our regression model. We conducted a separate regression for each of the hostile behaviors listed as an outcome variable.

**Table 5: Variables Included in GAO's Regression Model on the Department of Education's School Crime Supplement (SCS) to the Department of Justice's National Crime Victimization Survey, School Years 2014-2015, 2016-2017, and 2018-2019**

| Independent variables |
|---|
| **Percent of the student population racial/ethnic demographics:** percent of combined American Indian/Alaska Native, Asian, Black/African American, Hispanic/Latino, Native Hawaiian/Other Pacific Islander: 0 to less than 5 percent, 5 to less than 20 percent, 20 to less than 50 percent, 50 percent or more (SCS220) |
| **School level:** primary, middle, high (SCS217) |
| **Locale:** rural, suburban, town, city (SCS216) |
| **School size:** 1-299 students, 300-599 students, 600-999 students, 1,000-1,499 students, 1,500-1,999 student, 2,000 or more students (SCS218) |
| **School region:** Midwest, Northeast, South, West (SCS218) |
| **School security measures:** guards or assigned police officers (VS0036), adult hall supervisor (VS0036), metal detectors (VS0038), locked entrance/exit (VS0039), visitor sign in and badge (VS0040), locker checks (VS0041), students wear badge or picture ID (VS0042), security cameras (VS0043), code of conduct (VS0044), anonymous reporting of threats (VS0045) |
| **Student teacher ratio:** less than 13, 13-15, 16-19, 20 or more (SCS219) |
| **Alcohol and drug availability:** students under the influence of illegal drugs or alcohol at school (SCS210), access to illegal drugs or alcohol at school (VS0058, VS0059, VS0067, SCS209) |
| **Weapon carrying and availability:** brought gun, knife, or other weapons to school or know of/see others at school with a gun (VS0127, VS0128, VS0129, VS0130) |
| **Gang presence:** gangs at school (VS0133) |
| **Feelings about school:** agree that rules are fair and enforced, punishment is known and the same for all students, feel safe at school, crime in the neighborhood of the school (SCS189) |
| **Student demographics:** sex (V3018), white non-Hispanic (V3023A, V3024), household income (categories: $0-$24,999, $25,000-$49,999,$ 50,000-$74,999, $75,000 or more) (SCS214A) |
| **Extracurricular activities:** participated in any activity (VS0029, VS0030, VS0031, VS0032, VS0033, VS0034, VS0035) |
| **School year:** 2014-15, 2016-17, or 2018-19 |
| **Outcome (or dependent) variables** |
| • Any bullying (VS0073, VS0074, VS0075, VS0076, VS0077, VS0078, VS0079)<br>• Physical bullying (VS0075, VS0076, VS0079)<br>• Emotional bullying (VS0073, VS0074, VS0077, VS0078)<br>• Hate words (VS0105)<br>• Physical fight (VS0071)<br>• Bullied related to students' identity/bullied for any other reason (SCS200, SCS201, SCS202, SCS203, SCS204, SCS205) |

Source: GAO analysis of the Department of Education's School Crime Supplement to the Department of Justice's National Crime Victimization Survey for school years 2014-15, 2016-17, and 2018-19. | GAO-22-104341

Given the limitations of our model as described above, we present the results of our regression model in table 6 by describing the direction of the associations, rather than the estimated odds of outcome variables. For categorical variables in these tables, we describe the comparison school characteristic in the column labeled "Effect: groups compared in Odds Ratio Estimate." For example, the results in these tables should be

Appendix II: Regression Analysis

interpreted as a student that reports feeling safe in school (yes) is less likely to report being bullied than a student that reports not feeling safe, because the association is negative.

Page 62 GAO-22-104341 K-12 Education

AR_285112

**Table 6: Associations of Regression Model Variables with Bullying based on the Department of Education's School Crime Supplement to the Department of Justice's National Crime Victimization Survey, School Years 2014-2015, 2016-2017, and 2018-2019**

| Variable label | Effect: groups compared in odds ratio estimate | Logistic any bullying | Logistic physical bullying | Logistic emotional bullying | Logistic hate words | Logistic physical fight | Multinomial bullied identity vs. not bullied | Multinomial bullied not identity vs. not bullied |
|---|---|---|---|---|---|---|---|---|
| Security measure: guards or assigned police officers | Yes vs. no | — | — | — | — | — | — | — |
| Security measure: hall supervisor | Yes vs. no | Negative | — | Negative | Negative | — | — | — |
| Security measure: metal detectors | Yes vs. no | Negative | — | Negative | Negative | — | — | — |
| Security measure: locked entrance/exit | Yes vs. no | — | — | — | — | — | — | — |
| Security measure: visitor sign in or badge | Yes vs. no | Positive | — | Positive | Positive | — | Positive | Positive |
| Security measure: locker checks | Yes vs. no | — | — | — | — | — | — | — |
| Security measure: student wear badge/picture ID | Yes vs. no | — | — | — | — | — | — | — |
| Security measure: security cameras | Yes vs. no | — | — | — | — | — | — | — |
| Security measure: code of conduct | Yes vs. no | — | — | — | — | — | — | — |
| Security measure: anonymous reporting of threats | Yes vs. no | Negative | — | Negative | Negative | Negative | — | Negative |
| Observed students under influence of illegal drugs or alcohol at school | Yes vs. no | Positive | Positive | Positive | Positive | — | Positive | Positive |
| Access to illegal drugs or alcohol at school | Yes vs. no | Positive | Positive | Positive | Positive | — | Positive | Positive |

| Variable label | Effect: groups compared in odds ratio estimate | Logistic any bullying | Logistic physical bullying | Logistic emotional bullying | Logistic hate words | Logistic physical fight | Multinomial bullied identity vs. not bullied | Multinomial bullied not identity vs. not bullied |
|---|---|---|---|---|---|---|---|---|
| Brought gun, knife, or other weapons to school or know of/seen others at school with gun | Yes vs. no | Positive | Positive | Positive | Positive | Positive | Positive | Positive |
| Gangs at your school? | Yes vs. no | Positive | Positive | Positive | Positive | Positive | Positive | Positive |
| Agree with any of the fairness questions, rules known and consequences are the same. | Yes vs. no | — | — | — | — | — | — | — |
| Feel safe at school | Yes vs. no | Negative | Negative | Negative | Negative | — | Negative | Negative |
| High school crime in school neighborhood | Yes vs. no | — | — | — | — | — | — | — |
| Sex | Female vs. male | Positive | Negative | Positive | — | Negative | Positive | Positive |
| White non-Hispanic | Yes vs. no | Positive | Positive | Positive | — | — | — | Positive |
| Household income | $25,000 to $49,999 vs. less than $25,000 | — | -— | — | — | — | — | — |
| Household income | $50,000 to $74,999 vs. less than $25,000 | — | Negative | — | — | — | — | — |
| Household income | $75,000 and over vs. less than $25,000 | Negative | Negative | — | — | Negative | Negative | — |
| Participate in activity , sports, spirit, academic, student government | Yes vs. no | Positive | — | Positive | — | — | — | Positive |
| School locale | Suburb vs. city | — | — | — | — | — | — | — |
| School locale | Town vs. city | -— | — | — | Negative | — | — | — |
| School locale | Rural vs. city | — | — | — | — | — | — | — |
| School level | Primary vs. middle | — | — | — | — | — | — | — |

| Variable label | Effect: groups compared in odds ratio estimate | Logistic any bullying | Logistic physical bullying | Logistic emotional bullying | Logistic hate words | Logistic physical fight | Multinomial bullied identity vs. not bullied | Multinomial bullied not identity vs. not bullied |
|---|---|---|---|---|---|---|---|---|
| School level | High vs. middle | Negative | Negative | Negative | Negative | Negative | Negative | Negative |
| School level | Other vs. middle | — | Negative | — | — | Negative | — | — |
| School enrollment size | 300-599 vs. less than 300 | — | — | — | — | — | — | — |
| School enrollment size | 600-999 vs. less than 300 | — | — | — | — | — | — | — |
| School enrollment size | 1,000-1,499 vs. less than 300 | Negative | — | Negative | — | — | — | Negative |
| School enrollment size | 1,500-1,999 vs. less than 300 | Negative | — | Negative | — | Negative | — | Negative |
| School enrollment size | 2,000 or more vs. less than 300 | Negative | — | Negative | — | — | — | Negative |
| Student to full-time-equivalent teacher ratio | 13 to less than 16 vs. less than 13 students | — | — | — | — | — | — | — |
| Student to full-time-equivalent teacher ratio | 16 to less than 20 vs. less than 13 students | — | — | — | — | — | — | — |
| Student to full-time-equivalent teacher ratio | 20 or more vs. less than 13 students | — | — | — | — | — | — | — |
| Percent of combined American Indian/Alaska Native, Asian, Black/African American, Hispanic/Latino, Native Hawaiian/Other Pacific Islander | 5 to less than 20 percent vs. less than 5 percent | — | — | — | Positive | — | Positive | — |

| Variable label | Effect: groups compared in odds ratio estimate | Logistic any bullying | Logistic physical bullying | Logistic emotional bullying | Logistic hate words | Logistic physical fight | Multinomial bullied identity vs. not bullied | Multinomial bullied not identity vs. not bullied |
|---|---|---|---|---|---|---|---|---|
| Percent of combined American Indian/Alaska Native, Asian, Black/African American, Hispanic/Latino, Native Hawaiian/Other Pacific Islander | 20 to less than 50 percent vs. less than 5 percent | — | — | Positive | — | — | Positive | — |
| Percent of combined American Indian/Alaska Native, Asian, Black/African American, Hispanic/Latino, Native Hawaiian/Other Pacific Islander | 50 percent or more vs. less than 5 percent | — | — | — | — | — | — | — |
| School region | Midwest vs. northeast | — | — | — | — | — | — | — |
| School region | South vs. northeast | — | — | — | — | — | — | — |
| School region | West vs. northeast | — | — | — | — | — | — | — |
| 2014-15 or 2016-17 | 2015 vs. 2017 | — | — | — | — | — | — | — |
| 2014-15 or 2018-19 | 2015 vs. 2019 | — | — | — | — | — | — | — |

Source: GAO analysis of the Department of Education's School Crime Supplement to the Department of Justice's National Crime Victimization Survey, school years 2014-15, 2016-17, and 2018-19. | GAO-22-104341

Note: Cells marked "Positive" indicate instances where we found school characteristics were associated with a significantly higher likelihood of experiencing the given hostile behavior. Cells marked "Negative" indicate a significantly lower likelihood of experiencing the given hostile behavior. Cells marked as "—" indicate no association between the given school characteristic and the likelihood of experiencing the given hostile behavior. Significance is indicated by a p value of less than 0.05.

## Regression Analysis of the School Survey on Crime and Safety

We conducted generalized linear regressions using the same universe of approximately 4,800 U.S. school principals and other administrators sampled from Education's School Survey on Crime and Safety (SSOCS) for school years 2015-16 and 2017-18 as our descriptive analysis of the SSOCS data.[1] Because one regression outcome could only be calculated using SSOCS 2017-18 data, that regression model was limited to the sample of approximately 2,700 schools from that year. Because the data come from a nationally representative survey, these data use sampling weights to allow for inferences to be made about the larger population of schools from which the sample units were drawn. For each year, SSOCS covers a population of over 84,000 schools. In addition to incorporating sample weights, the data contain replicate weights which were used in variance estimation to account for the sample design.

All regression models are subject to limitations and for this model, the limitations included:

- Data analyzed for these regression analyses were by school rather than by student. Consequently, they are not able to describe the association between our independent variables and a student's experience of incidents of hostile behaviors, such as bullying or crime and violence, while controlling for characteristics of an individual student such as gender, race or ethnicity, or grade level. Instead, the school-level nature of the SSOCS data limited this particular analysis of the associations between school characteristics and school practices and programs to whether there was an increase, decrease, or no effect on measure of hostile behaviors, such as bullying and incidents of crime and violence, controlling for other characteristics of the entire school's population, such as school type, or percent of students who are male.
- Some variables which may be related to school practices and hostile behaviors are not available in the data. For example, in this context, it could be a school's average student household income adjusted for family size that could be related to students' exposure to adverse incidents in schools, such as bullying.
- Results of our analyses are associational and do not imply a causal relationship because, for example, SSOCS data are observational in nature and were not gathered by a randomized controlled trial, where students would be randomized to attend schools with certain characteristics.

[1]We used a Poisson generalized linear regression since the data on incidents of crime and violence represent counts and therefore are not appropriate for a traditional normal linear model. In addition, we used a negative binomial regression instead of a Poisson regression because negative binomial models are appropriate for count analyses with observed over-dispersion (i.e. when the variance of the count variable is much larger than the mean of that variable).

- Additionally, SSOCS data are subject to both sampling and non-sampling error. While the analysis has accounted for sampling error, survey data are also affected by non-sampling error which could occur for many reasons, including a failure to sample a segment of the population, inability to obtain information for all respondents in the sample, inability or unwillingness of respondents to provide correct information, mistakes by respondents, and errors made in the collection or processing of data (such as imputation or data quality checks).

For the purposes of our analysis, we created some composite variables (see table 7). Table 8 lists the variables we included in our regression model. We conducted a separate regression for each of the hostile behaviors listed as an outcome variable.

Table 7: Created Variables Used in the Regression Analysis of the Department of Education's School Survey on Crime and Safety (SSOCS), School Years 2015-2016 and 2017-2018

| GAO category | Variables from SSOCS | Recoded value(s) |
|---|---|---|
| School type | Type of school (C0564):<br>• Regular public school<br>• Charter school<br>• Has a magnet program for part of the school<br>• Exclusively a magnet school<br>• Other (specify) | Regular public school<br>Magnet school (exclusively or partially)<br>Charter or other school |
| Net transfers | • Transferred to (C0570)<br>• Transferred from (C0572) | Transferred to (minus) Transferred from (continuous) |
| Disorder | • Student racial ethnic tensions (C0374)<br>• Student verbal abuse of teachers (C0380)<br>• Widespread disorder in classrooms (C0382)<br>• Student acts of disrespect for teachers (C0384)<br>• Gang activities (C0386) | Regular (if at least one occurs daily or weekly)<br>Rare (if else at least one occurs monthly or occasionally)<br>Never (if all never occur) |

| GAO category | Variables from SSOCS | Recoded value(s) |
|---|---|---|
| Total security practices | • During the school year, was it a practice of your school to do the following?<br>• Require visitors to sign or check in and wear badges (C0110)<br>• Control access to school buildings during school hours (e.g., locked or monitored doors, loading docks) (C0112)<br>• Control access to school grounds during school hours (e.g., locked or monitored gates) (C0114)<br>• Require metal detector checks on students every day (C0116)<br>• Perform one or more random metal detector checks on students (C0120)<br>• Equip classrooms with locks so that doors can be locked from the inside (C0121)<br>• Close the campus for most or all students during lunch (C0122)<br>• Perform one or more random sweeps (e.g., locker checks, dog sniffs) for contraband (e.g., drugs or weapons) (C0125)<br>• Require drug testing for students participating in athletics or other extracurricular activities (C0129)<br>• Require students to wear uniforms (C0134)<br>• Enforce a strict dress code (C0136)<br>• Provide school lockers to students (C0138)<br>• Require clear book bags or ban book bags on school grounds (C0140)<br>• Have “panic button(s)” or silent alarm(s) that directly connect to law enforcement in the event of an incident (C0139)<br>• Provide an electronic notification system that automatically notifies parents in case of a school-wide emergency (C0141)<br>• Provide a structured anonymous threat reporting system (e.g., online submission, telephone hotline, or written submission via drop box) (C0143)<br>• Require students to wear badges or picture IDs (C0142)<br>• Require faculty and staff to wear badges or picture IDs (C0144)<br>• Use one or more security cameras to monitor the school (C0146)<br>• Provide two-way radios to any staff (C0150)<br>• Prohibit non-academic use of cell phones or smartphones during school hours (C0153) | Count of number of security measures in place |

| GAO category | Variables from SSOCS | Recoded value(s) |
| --- | --- | --- |
| Total school activities | • During the school year, did your school have any activities that included the following components for students?<br>• Prevention curriculum, instruction, or training for students (e.g., conflict resolution, anti-bullying, dating violence prevention) (C0174)<br>• Social emotional learning for students (e.g., social skills, anger management, mindfulness) (C0183)<br>• Behavioral or behavior modification intervention for students (including the use of positive reinforcements) (C0176)<br>• Individual mentoring/tutoring/coaching of students by adults (C0181)<br>• Student involvement in peer mediation (C0175)<br>• Student court to address student conduct problems or minor offenses (C0177)<br>• Student involvement in restorative circles (e.g., “peace circles,” “talking circles,” “conflict circles”) (C0179)<br>• Programs to promote a sense of community/social integration among students (C0186) | Count of number of school activities in place |
| School prevention program | • During the school year, did your school have any activities that included the following components for students?<br>• Prevention curriculum, instruction, or training for students (e.g., conflict resolution, anti-bullying, dating violence prevention) (C0174)<br>• Social emotional learning (SEL) for students (e.g., social skills, anger management, mindfulness) (C0183)<br>• Behavioral or behavior modification intervention for students (including the use of positive reinforcements) (C0176)<br>• Individual mentoring/tutoring/coaching of students by adults (C0181)<br>• Programs to promote a sense of community/social integration among students (C0186) | Yes (if at least one program is in place)<br>No (if no programs are in place) |
| Student involvement program | • During the school year, did your school have any activities that included the following components for students?<br>• Student involvement in peer mediation (C0175)<br>• Student court to address student conduct problems or minor offenses (C0177)<br>• Student involvement in restorative circles (e.g., “peace circles,” “talking circles,” “conflict circles”) (C0179) | Yes (if at least one program is in place)<br>No (if no programs are in place) |

| GAO category | Variables from SSOCS | Recoded value(s) |
|---|---|---|
| Inclusive student groups | • During the school year, did your school have any recognized student groups with the following purposes?<br>• Acceptance of sexual orientation and gender identity of students (e.g., Gay-Straight Alliance) (C0604)<br>• Acceptance of students with disabilities (e.g., Best Buddies) (C0606)<br>• Acceptance of cultural diversity (e.g., Cultural Awareness Club) (C0608) | Yes (if at least one program is in place)<br>No (if no programs are in place) |
| Parental involvement | • Which of the following does your school do to involve or help parents?<br>• Have a formal process to obtain parental input on policies related to school crime and discipline (C0190)<br>• Provide training or technical assistance to parents in dealing with students' problem behavior (C0192) | Yes (if at least one occurs)<br>No (if none occur) |
| Total parent and community involvement activities | • During the school year, were any of the following community and outside groups involved in your school's efforts to promote safe, disciplined, and drug-free schools?<br>• Parent groups (C0204)<br>• Social service agencies (C0206)<br>• Mental health agencies (C0212)<br>• Civic organizations/service clubs (C0214)<br>• Private corporations/businesses (C0216)<br>• Religious organizations (C0218) | Count of number of community involvement activities in place |
| Justice involvement | • During the school year, were any of the following community and outside groups involved in your school's efforts to promote safe, disciplined, and drug-free schools?<br>• Juvenile justice agencies (C0208)<br>• Law enforcement agencies (C0210) | Yes (if at least one occurs)<br>No (if none occur) |
| Sworn Law Enforcement Office (SLEO) participation | • Did these SLEOs (including School Resource Officers) participate in the following activities at your school?<br>• Security enforcement and patrol (C0630)<br>• Maintaining student discipline (C0632)<br>• Identifying problems in the school and proactively seeking solutions to those problems (C0636)<br>• Recording or reporting discipline problems to school authorities (C0644) | Yes (if at least one occurs)<br>No (if none occur) |
| Additional security | • Aside from SLEOs (including School Resource Officers), how many additional security guards or security personnel were present at your school at least once a week? (C0232, C0234) | Yes (if reported a value greater than 0 for at least one)<br>No (if reported a value of 0 for both) |

| GAO category | Variables from SSOCS | Recoded value(s) |
|---|---|---|
| Mental health services (for SSOCS 2018 only) | • During the 2017–18 school year, did your school provide diagnostic mental health assessments (e.g., psychological/psychiatric diagnostics assessments) to evaluate students for mental health disorders? (C0663, for SSOCS 2017-18 only)<br>• During the 2017–18 school year, did your school provide treatment (e.g., psychotherapy, medication) to students for mental health disorders? (C0667, for SSOCS 2017-18 only) | Yes (if at least one occurs)<br>No (if none occur) |
| Mental health services (for SSOCS 2016 only) | • Diagnostic assessment at school by school-employed mental health professional (C0662, for SSOCS 2015-16 only)<br>• Diagnostic assessment at school by school-funded mental health professional (C0664, for SSOCS 2015-16 only)<br>• Diagnostic assessment outside of school by school-funded mental health professional (C0666, for SSOCS 2015-16 only)<br>• Treatment at school by school-employed mental health professional (C0668, for SSOCS 2015-16 only)<br>• Treatment at school by school-funded mental health professional (C0670, for SSOCS 2015-16 only)<br>• Treatment outside of school by school-funded mental health professional (C0672, for SSOCS 2015-16 only) | Yes (if at least one occurs)<br>No (if none occur) |

| GAO category | Variables from SSOCS | Recoded value(s) |
| --- | --- | --- |
| Total staff training measures | • During the school year, did your school or school district provide any of the following for classroom teachers or aides?<br>• Training in classroom management for teachers (C0266)<br>• Training in school-wide discipline policies and practices related to violence (C0268)<br>• Training in school-wide discipline policies and practices related to cyberbullying (C0265)<br>• Training in school-wide discipline policies and practices related to bullying other than cyberbullying (C0267)<br>• Training in school-wide discipline policies and practices related to alcohol and/or drug use (C0269)<br>• Training in safety procedures (e.g., how to handle emergencies) (C0270)<br>• Training in recognizing early warning signs of students likely to exhibit violent behavior (C0272)<br>• Training in recognizing signs of self-harm or suicidal tendencies (C0278, for SSOCS 2017-18 only)<br>• Training in intervention and referral strategies for students displaying signs of mental health disorders (e.g., depression, mood disorders, ADHD) (C0271)<br>• Training in recognizing physical, social, and verbal bullying behaviors (C0273)<br>• Training in recognizing signs of students using/abusing alcohol and/or drugs (C0274)<br>• Training in positive behavioral intervention strategies (C0276)<br>• Training in crisis prevention and intervention (C0277) | Count of number of staff training measures in place |
| Total exclusionary disciplinary measures | • During the school year, did your school allow for the use of the following disciplinary actions? If “yes,” were the actions used this school year?<br>• Removal with no continuing school services for at least the remainder of the school year (C0390)<br>• Removal with school-provided tutoring/home instruction for at least the remainder of the school year (C0394)<br>• Transfer to a specialized school for disciplinary reasons (C0398)<br>• Transfer to another regular school for disciplinary reasons (C0402)<br>• Out-of-school suspension or removal for less than the remainder of the school year (C0406,C0410)<br>• In-school suspension for less than the remainder of the school year (C0414,C0418) | Count of number of disciplinary measures in place |

| GAO category | Variables from SSOCS | Recoded value(s) |
|---|---|---|
| Total other disciplinary measures | • During the school year, did your school allow for the use of the following disciplinary actions? If "yes," were the actions used this school year?<br>• Referral to a school counselor (C0422)<br>• Assignment to a program (during school hours) designed to reduce disciplinary problems (C0426)<br>• Assignment to a program (outside of school hours) designed to reduce disciplinary problems (C0430)<br>• Loss of school bus privileges due to misbehavior (C0434)<br>• Corporal punishment (C0438)<br>• Placement on school probation with consequences if another incident occurs (C0442)<br>• Detention and/or Saturday school (C0446)<br>• Loss of student privileges (C0450)<br>• Requirement of participation in community service (C0454) | Count of number of disciplinary measures in place |
| Total crime and violence incidents | • Rape or attempted rape (C0310)<br>• Sexual assault other than rape (C0314)<br>• Robbery, with and without weapon (C0318 + C0322)<br>• Physical attack or fight, with and without weapon (C0326 + C0330)<br>• Threats of physical attack, with and without weapon (C0334 + C0338)<br>• Theft/larceny (C0342)<br>• Hate crimes (C0690)<br>• Possession of weapons, firearms and knives (C0346 + C0350) | Count of number of incidents |
| Bullying, sexual harassment, and cyberbullying | • Student bullying (C0376)<br>• Student sexual harassment (C0378)<br>• Cyberbullying among students (C0389) | Regularly (if at least one occurs daily, at least once a week, or at least once a month)<br>Rarely (if else at least one occurs on occasion)<br>Never (if none occur) |
| Bullying based on identity (for SSOCS 2017-18 only) | • Student harassment based on sexual orientation (C0381)<br>• Student harassment based on gender identity (C0383)<br>• Student harassment based on religion (C0385)<br>• Student harassment based on disability (C0387) | Regularly (if at least one occurs daily, at least once a week, or at least once a month)<br>Rarely (if else at least one occurs on occasion)<br>Never (if none occur) |

Source: GAO analysis of the Department of Education's School Survey on Crime and Safety, school years 2015-16 and 2017-18. | GAO-22-104341

**Table 8: Variables Included in Our Regression Models Using the Department of Education's School Survey on Crime and Safety (SSOCS), School Years 2016-2017 and 2017-2018**

| **Control/Independent variables** | |
|---|---|
| **School characteristics (continuous):** total enrollment (C0522); percent eligible for free or reduced lunch (C0524); percent English language learner (C0526); percent special education students (C0528); percent male (C0530); percent below the 15th percentile on standardized tests (C0532); percent likely to go to college after high school (C0534); average daily attendance (C0568); net transfers; school year | |
| **School characteristics (categorical):** Crime level in the area where your school is located (C0560: low, moderate, high; students come from areas with very different levels of crime); school type (public school, magnet (exclusively or partially), charter or other school); disorder (regularly, rarely, never) | |
| **School security practices (continuous):** total security practices | |
| School security practices (categorical, yes/no): require visitors to sign or check in and wear badges (C0110); Control access to school buildings during school hours (e.g., locked or monitored doors, loading docks) (C0112); Perform one or more random metal detector checks on students (C0120); Perform one or more random sweeps (e.g., locker checks, dog sniffs) for contraband (e.g., drugs or weapons) (C0125); Provide a structured anonymous threat reporting system (e.g., online submission, telephone hotline, or written submission via drop box) (C0143); Require students to wear badges or picture IDs (C0142); Prohibit non-academic use of cell phones or smartphones during school hours (C0153) | |
| **School activities (continuous): total school activities** | |
| **School activities (categorical, yes/no):** school prevention program; student involvement program; inclusive student groups | |
| **Parent and community involvement (categorical, yes/no):** parental involvement; justice involvement; SLEO participation; additional security | |
| **Parent and community involvement (continuous):** total parent and community involvement activities | |
| **Parent and community involvement (continuous):** total parent and community involvement activities | |
| **Staff training and practices (continuous):** total staff training measures | |
| **Staff training and practices (categorical, yes/no):** mental health services | |
| **Disciplinary actions (continuous):** total exclusionary disciplinary measures; total other disciplinary measures | |
| **Outcome/Dependent variables** | **Model specification** |
| Frequency of crime and violence (continuous, count) | Poisson regression |
| Bullying, sexual harassment, and cyberbullying (categorical)<br>Never occurring vs. rarely occurring vs. frequently occurring<br>• Frequently occurring bullying vs. infrequently (rarely or never) occurring bullying<br>• Frequently occurring bullying vs. infrequently (rarely or never) occurring bullying | Multinomial logistic regression<br>Logistic regression |
| Bullying based on identity (categorical) (*for SSOCS 2017-18 only*)<br>• Never occurring vs. rarely occurring vs. frequently occurring<br>• Any bullying occurring (frequent or rarely) vs. never or no bullying occurring | Multinomial logistic regression<br>Logistic regression |

Source: GAO analysis of the Department of Education's School Survey on Crime and Safety 2015-16 and 2017-18. | GAO-22-104341

Given the limitations of our model as described above, we present the results of our regression models in tables 9 and 10, by describing the direction of the associations. Positive means that a particular variable was significantly associated with an increase in the bullying, sexual harassment, or cyberbullying rate or odds at the 0.05 level and negative indicates a decrease in the rate or odds, while holding all other variables in the model constant. Insignificant indicates the variable is not significantly associated with the given bullying, sexual harassment, or cyberbullying action at the 0.05 level. For categorical variables in these tables, we provided the comparison school characteristic in brackets. For example, the results in these tables should be interpreted as a school that reports disorder occurring is more likely to report discipline problems occurring because the association is positive.

**Table 9: Associations of Multinomial Logistic Regression Model Variables based on the Department of Education's School Survey on Crime and Safety (SSOCS), School Years 2015-2016 and 2017-2018**

| | | Model type, outcome | | | |
|---|---|---|---|---|---|
| **Variable** | **Effect of Variable** | **Frequency of bullying based on identity (rarely vs. never)** | **Frequency of bullying based on identity (regularly vs. never)** | **Frequency of bullying, sexual harassment, or cyberbullying (rarely vs. never)** | **Frequency of bullying, sexual harassment, or cyberbullying (regularly vs. never)** |
| Additional security | Yes vs. no | — | — | Positive | Positive |
| Require visitors to sign or check in and wear badges | Yes vs. no | — | — | — | — |
| Control access to school buildings during school hours | Yes vs. no | — | — | — | — |
| Perform one or more random metal detector checks on students | Yes vs. no | — | — | — | — |
| Perform one or more random sweeps (e.g., locker checks, dog sniffs) for contraband | Yes vs. no | — | — | — | Positive |
| Require students to wear badges or picture IDs | Yes vs. no | — | — | — | — |
| Provide a structured anonymous threat reporting system | Yes vs. no | — | — | — | — |
| Prohibit non-academic use of cell phones or smartphones during school hours | Yes vs. no | — | — | — | — |
| Total student enrollment | For one unit increase | — | — | — | — |
| Percent eligible for free or reduced lunch | For one unit increase | — | — | — | — |
| Percent English language learner students | For one unit increase | — | — | — | — |

| | | Model type, outcome | | | |
|---|---|---|---|---|---|
| **Variable** | **Effect of Variable** | **Frequency of bullying based on identity (rarely vs. never)** | **Frequency of bullying based on identity (rarely vs. never)** | **Frequency of bullying based on identity (rarely vs. never)** | **Frequency of bullying based on identity (rarely vs. never)** |
| Percent 'Special education students' | For one unit increase | — | — | — | — |
| Percent male students | For one unit increase | — | — | — | — |
| Percent students below the 15th percentile on standardized tests | For one unit increase | — | — | — | — |
| Percent students likely to go to college after high school | For one unit increase | — | — | — | — |
| Crime level in the area where school is located | Low level of crime vs High level of crime | — | — | — | — |
| Crime level in the area where school is located | Moderate level of crime vs High level of crime | — | — | — | — |
| Crime level in the area where school is located | Students come from areas with very different levels of crime vs High level of crime | — | — | — | — |
| School average daily attendance | For one unit increase | — | — | — | — |
| Total parent and community involvement activities | For one unit increase | — | Positive | — | — |
| Disorder | Rarely vs. Never | Positive | — | Positive | Positive |
| Disorder | Regularly vs. Never | Positive | — | — | — |
| Total exclusionary disciplinary measures | For one unit increase | — | — | — | — |
| Inclusive student groups | Yes vs. no | — | — | — | — |
| Justice Involvement | Yes vs. no | — | — | — | — |

| | | Model type, outcome | | | |
|---|---|---|---|---|---|
| Variable | Effect of Variable | Frequency of bullying based on identity (rarely vs. never) | Frequency of bullying based on identity (rarely vs. never) | Frequency of bullying based on identity (rarely vs. never) | Frequency of bullying based on identity (rarely vs. never) |
| Mental health services | Yes vs. no | — | — | — | — |
| Net transfers | For one unit increase | — | — | — | — |
| Total other disciplinary measures | For one unit increase | Positive | Positive | — | — |
| Parental involvement | Yes vs. no | — | — | — | — |
| School prevention program | Yes vs. no | — | — | — | — |
| Total school activities | For one unit increase | — | — | — | — |
| School type | Magnet program (exclusive or partial) vs. Charter or Other school | — | — | — | — |
| School type | Regular Public school vs. Charter or Other school | — | — | — | — |
| Total security practices | For one unit increase | — | — | — | — |
| SLEO Participation | Yes vs. no | — | — | — | — |
| Total staff training measures | For one unit increase | — | — | — | — |
| Student involvement program | Yes vs. no | — | — | — | — |
| SSOCS School Year | 2017-2018 vs. 2015-2016 | — | — | — | — |

Source: GAO analysis of the Department of Education's School Survey on Crime and Safety, school years 2015-16 and 2017-18. | GAO-22-104341

Note: Cells marked "positive" indicate instances where we found school characteristics were associated with a significantly higher likelihood of experiencing the given hostile behavior. Cells marked "negative" indicate a significantly lower likelihood of experiencing the given hostile behavior. Cells marked as "—" indicate no association between the given school characteristic and the likelihood of experiencing the given hostile behavior. Significance is indicated by a p value of less than 0.05.

Table 10: Associations of Poisson and Binary Logistic Regression Model Variables for the Department of Education's School Survey on Crime and Safety (SSOCS), School Years 2015-2016 and 2017-2018

| | | Model Type, Outcome | | |
|---|---|---|---|---|
| Variable | Effect of Variable | Poisson regression: Count of incidents of crime and violence | Logistic regression: Bullying and cyberbullying at schools (Frequent vs. Infrequent Bullying) | Logistic regression: Bullying based on identity at schools (Any bullying vs. Never Bullying) SSOCS18 only |
| Additional security | Yes vs. no | — | — | — |
| Require visitors to sign or check in and wear badges | Yes vs. no | — | — | — |
| Control access to school buildings during school hours | Yes vs. no | — | — | — |
| Perform one or more random metal detector checks on students | Yes vs. no | — | Negative | — |
| Perform one or more random sweeps (e.g., locker checks, dog sniffs) for contraband | Yes vs. no | — | Positive | — |
| Require students to wear badges or picture IDs | Yes vs. no | — | — | — |
| Provide a structured anonymous threat reporting system | Yes vs. no | — | — | — |
| Prohibit non-academic use of cell phones or smartphones during school hours | Yes vs. no | — | — | — |
| Total student enrollment | For one unit increase | — | — | — |
| Percent eligible for free or reduced lunch | For one unit increase | — | — | — |
| Percent English language learner students | For one unit increase | — | — | — |
| Percent 'Special education students' | For one unit increase | — | — | — |
| Percent male students | For one unit increase | — | — | — |

AR_285131

| | | Model Type, Outcome | | |
|---|---|---|---|---|
| **Variable** | **Effect of Variable** | **Poisson regression: Count of incidents of crime and violence** | **Poisson regression: Count of incidents of crime and violence** | **Poisson regression: Count of incidents of crime and violence** |
| Percent students below the 15th percentile on standardized tests | For one unit increase | — | — | — |
| Percent students likely to go to college after high school | For one unit increase | — | — | — |
| Crime level in the area where school is located | Low level of crime vs. high level of crime | Negative | — | — |
| Crime level in the area where school is located | Moderate level of crime vs. high level of crime | — | — | — |
| Crime level in the area where school is located | Students come from areas with very different levels of crime vs. high level of crime | — | — | — |
| School average daily attendance | For one unit increase | — | — | — |
| Total parent and community involvement activities | For one unit increase | — | — | — |
| Disorder | Rarely vs. never | Positive | Positive | Positive |
| Disorder | Regularly vs. never | Positive | Positive | Positive |
| Total exclusionary disciplinary measures | For one unit increase | — | — | — |
| Inclusive student groups | Yes vs. no | — | — | — |
| Justice Involvement | Yes vs. no | — | — | — |
| Mental health services | Yes vs. no | Positive | — | — |
| Net transfers | For one unit increase | — | — | — |
| Total other disciplinary measures | For one unit increase | — | Positive | Positive |

| | | Model Type, Outcome | | |
|---|---|---|---|---|
| **Variable** | **Effect of Variable** | **Poisson regression: Count of incidents of crime and violence** | **Poisson regression: Count of incidents of crime and violence** | **Poisson regression: Count of incidents of crime and violence** |
| Parental involvement | Yes vs. no | — | — | — |
| School prevention program | Yes vs. no | — | — | — |
| Total school activities | For one unit increase | — | — | — |
| School type | Magnet program (exclusive or partial) vs. Charter or Other school | — | — | — |
| School type | Public school vs. charter or other school | Positive | — | — |
| Total security practices | For one unit increase | — | — | — |
| SLEO Participation | Yes vs. no | Positive | — | — |
| Total staff training measures | For one unit increase | — | — | — |
| Student involvement program | Yes vs. no | — | — | — |
| SSOCS school year | 2017-18 vs. 2015-16 | — | — | — |

Source: GAO analysis of the Department of Education's School Survey on Crime and Safety for school years 2015-16 and 2017-18. | GAO-22-104341

Note: Cells marked "positive" indicate instances where we found school characteristics were associated with a significantly higher likelihood of experiencing the given hostile behavior. Cells marked "negative" indicate a significantly lower likelihood of experiencing the given hostile behavior. Cells marked as "—" indicate no association between the given school characteristic and the likelihood of experiencing the given hostile behavior. Significance is indicated by a p value of less than 0.05.

# Appendix III: GAO Contact and Staff Acknowledgments

## GAO Contact

Jacqueline M. Nowicki, Director, (617) 788-0580 or nowickij@gao.gov

## Staff Acknowledgments

In addition to the contact named above, Sherri Doughty (Assistant Director), Lara Laufer (Analyst in Charge), Manuel Valverde (Analyst in Charge), Christina Bixby, Elizabeth Calderon, Justin Dunleavy, Holly Dye, Sarah Gilliland, Jessica Mausner, Jean McSween, John Mingus, Mimi Nguyen, Almeta Spencer, Frances Tirado, Tania Uruchima, and Sonya Vartivarian made key contributions to this report.

## GAO's Mission

The Government Accountability Office, the audit, evaluation, and investigative arm of Congress, exists to support Congress in meeting its constitutional responsibilities and to help improve the performance and accountability of the federal government for the American people. GAO examines the use of public funds; evaluates federal programs and policies; and provides analyses, recommendations, and other assistance to help Congress make informed oversight, policy, and funding decisions. GAO's commitment to good government is reflected in its core values of accountability, integrity, and reliability.

## Obtaining Copies of GAO Reports and Testimony

The fastest and easiest way to obtain copies of GAO documents at no cost is through our website. Each weekday afternoon, GAO posts on its website newly released reports, testimony, and correspondence. You can also subscribe to GAO's email updates to receive notification of newly posted products.

### Order by Phone

The price of each GAO publication reflects GAO's actual cost of production and distribution and depends on the number of pages in the publication and whether the publication is printed in color or black and white. Pricing and ordering information is posted on GAO's website, https://www.gao.gov/ordering.htm.

Place orders by calling (202) 512-6000, toll free (866) 801-7077, or TDD (202) 512-2537.

Orders may be paid for using American Express, Discover Card, MasterCard, Visa, check, or money order. Call for additional information.

## Connect with GAO

Connect with GAO on Facebook, Flickr, Twitter, and YouTube.
Subscribe to our RSS Feeds or Email Updates. Listen to our Podcasts.
Visit GAO on the web at https://www.gao.gov.

## To Report Fraud, Waste, and Abuse in Federal Programs

Contact FraudNet:

Website: https://www.gao.gov/about/what-gao-does/fraudnet

Automated answering system: (800) 424-5454 or (202) 512-7700

## Congressional Relations

A. Nicole Clowers, Managing Director, ClowersA@gao.gov, (202) 512-4400, U.S. Government Accountability Office, 441 G Street NW, Room 7125, Washington, DC 20548

## Public Affairs

Chuck Young, Managing Director, youngc1@gao.gov, (202) 512-4800
U.S. Government Accountability Office, 441 G Street NW, Room 7149
Washington, DC 20548

## Strategic Planning and External Liaison

Stephen J. Sanford, Managing Director, spel@gao.gov, (202) 512-4707
U.S. Government Accountability Office, 441 G Street NW, Room 7814, Washington, DC 20548

Please Print on Recycled Paper.

# THEY, THEM, AND THEIRS

*Jessica A. Clarke*

## CONTENTS

INTRODUCTION ....................................................................................................................896
I. NONBINARY GENDER ....................................................................................................904
A. *The Diversity of Nonbinary Gender Identities* ...........................................................905
B. *Reasons for Bias Against Nonbinary People* ...............................................................910
C. *Convergences and Divergences with Other Rights Struggles* .....................................914
1. *Feminist Arguments* ....................................................................................................915
2. *Transgender Rights* ......................................................................................................921
3. *Sexual Orientation* .......................................................................................................925
4. *Intersex Variations* .......................................................................................................928
5. *Antiracist and Postcolonial Struggles* .........................................................................930
II. A CONTEXTUAL APPROACH TO NONBINARY GENDER RIGHTS ..............................933
A. *Against Universal Definitions of Sex and Gender* ......................................................933
B. *Regulatory Models for Nonbinary Gender Rights* ......................................................936
1. *Third-Gender Recognition* ..........................................................................................937
2. *Sex or Gender Neutrality* ............................................................................................940
3. *Integration into Binary Sex or Gender Regulation* .....................................................945
III. LEGAL INTERESTS IN BINARY SEX OR GENDER? ......................................................945
A. *Identification* ...................................................................................................................947
B. *Antidiscrimination Rules* ...............................................................................................951
1. *Data Collection and Affirmative Action* .....................................................................952
2. *Pregnancy Protections* ..................................................................................................954
3. *Misgendering and Pronouns* ........................................................................................957
C. *Sex-Specific Roles and Programs* ....................................................................................963
1. *Education* .......................................................................................................................963
2. *Athletics* .........................................................................................................................966
3. *Workplaces* ....................................................................................................................974
D. *Sex-Segregated Spaces* .....................................................................................................981
1. *Restrooms and Changing Facilities* .............................................................................981
2. *Housing* ..........................................................................................................................983
E. *Health Care* ......................................................................................................................986
CONCLUSION .......................................................................................................................990

# THEY, THEM, AND THEIRS

*Jessica A. Clarke**

*Nonbinary gender identities have quickly gone from obscurity to prominence in American public life, with growing acceptance of gender-neutral pronouns, such as "they, them, and theirs," and recognition of a third-gender category by U.S. states including California, Colorado, Minnesota, New Jersey, Oregon, and Washington. People with nonbinary gender identities do not exclusively identify as men or women. Feminist legal reformers have long argued that discrimination on the basis of gender nonconformity — in other words, discrimination against men perceived as feminine or women perceived as masculine — is a harmful type of sex discrimination that the law should redress. But the idea of nonbinary gender as an identity itself appears only at the margins of U.S. legal scholarship. Many of the cases recognizing transgender rights involve plaintiffs who identify as men or women, rather than plaintiffs who seek to reject, permute, or transcend those categories. The increased visibility of a nonbinary minority creates challenges for other rights movements, while also opening new avenues for feminist and LGBT advocacy. This Article asks what the law would look like if it took nonbinary gender seriously. It assesses the legal interests in binary gender regulation in areas including law enforcement, employment, education, housing, and health care, and concludes these interests are not reasons to reject nonbinary gender rights. It argues that the law can recognize nonbinary gender identities, or eliminate unnecessary legal sex classifications, using familiar civil rights concepts.*

*What gender am I? I bet you thought either male or female before I even asked the question. And this assumption is called the gender binary.*

*I was born non-binary, meaning my body and mind don't fit into either gender. At the age of 2, I told my parents I wasn't a girl. At 12, I was the only person on my football team without a penis. And today at 36, I can wield a chainsaw 50 feet up a tree, and I'm also really a soft sensitive artist type.*

---

* Professor of Law, Vanderbilt University Law School. Thanks to Toby Adams, Bradley Areheart, Genny Beemyn, Stephanie Bornstein, Mary Bryson, Erin Buzuvis, Mary Anne Case, Paul Castillo, Arli Christian, David Cruz, Heath Fogg Davis, Robin Dembroff, Deborah Dinner, Elizabeth Emens, Katie Eyer, Joseph Fiskhin, Andrea Freeman, Andrew Gilden, Michele Goodwin, Aimi Hamraie, Gautam Hans, Jill Hasday, Aziz Huq, Alex Iantaffi, Neha Jain, Dru Levasseur, Bill McGeveran, Shannon Minter, Amy Monahan, Rebecca Morrow, Douglas NeJaime, AJ Neuman Wipfler, Bethany Davis Noll, David Noll, Aaron Potenza, Jessica Roberts, Darren Rosenblum, Laura Rosenbury, Alan Rozenshtein, Naomi Schoenbaum, Jennifer Shinall, Russell Spiker, Maayan Sudai, Hudson Taylor, Ezra Young, the University of Minnesota Public Law Workshop, the Institute for Advanced Study at the University of Minnesota, the Vanderbilt LGBT Policy Lab, the University of Chicago Workshop on Regulation of Family, Sex, and Gender, and the law faculties at the University of Minnesota and the University of Florida for conversations and comments on this project. Thanks to Katie Hanschke of the Vanderbilt Law Library for tracking down sources. For research assistance and valuable substantive feedback, I am grateful to Maria Brekke, Emily Lamm, Sara Lewenstein, Jessica Sharpe, Derek Waller, Claire Williams, and the editors of the *Harvard Law Review*. All opinions expressed here are my own.

*Our identities, who we know ourselves to be, is affected by our biology and the environment, nature and nurture. There are non-binary folks who are intersex, they have ambiguous genitalia, chromosomes that are not XX or XY. 1 in 100 people have bodies that differ from standard male or female.*

*And there are non-binary folks who do have genitalia that is considered standard male or female, but our brains have always been transgender. And collectively, we are the solid evidence that there is, and always has been, a spectrum of gender variation in the human species.*

— Carly Mitchell[1]

## INTRODUCTION

With stunning speed, nonbinary gender identities have gone from obscurity to prominence in American public life. The use of gender-neutral pronouns such as "they, them, and theirs" to describe an individual person is growing in acceptance.[2] "All gender" restrooms are appearing around the country.[3] And an increasing number of U.S. jurisdictions are recognizing a third-gender category. In June 2016, an Oregon court became the first U.S. court to officially recognize nonbinary gender identity.[4] In October 2017, California passed its Gender Recognition Act,[5] a law allowing any individual to change the sex

[1] *Gender Identity: Female, Male, or Nonbinary: Hearing on S.B. 179 Before the Assemb. Standing Comm. on Judiciary*, 2017–2018 Leg., Reg. Sess. (Cal. 2017) [hereinafter *Cal. Assemb. Judiciary Hearing*] (statement of Carly Mitchell), https://ca.digitaldemocracy.org/hearing/53965?startTime=705&vid=55910b927084f97bc382c39bf0ecade2 [https://perma.cc/H8T3-NJ6R].

[2] *See, e.g.*, THE ASSOCIATED PRESS STYLEBOOK 274 (Paula Froke et al. eds., 2017) (advising journalists in describing "people who identify as neither male nor female or ask not to be referred to as he/she/him/her" to "[u]se the person's name in place of a pronoun, or otherwise reword the sentence, whenever possible. If they/them/their use is essential, explain in the text that the person prefers a gender-neutral pronoun. Be sure that the phrasing does not imply more than one person" (emphasis omitted)); Lexy Perez, *Super Bowl: Coca-Cola Represents "Them" in Non-binary Ad*, HOLLYWOOD REP. (Feb. 5, 2018, 10:37 AM), https://www.hollywoodreporter.com/news/super-bowl-coca-cola-represents-binary-ad-1081767 [https://perma.cc/JJ3B-4ZWD] (discussing a Super Bowl advertisement featuring a person described as a "them" rather than a "him" or a "her").

Not all nonbinary people use "they, them, and theirs" but these seem to be the most commonly used gender-neutral pronouns. SANDY E. JAMES ET AL., THE REPORT OF THE 2015 U.S. TRANSGENDER SURVEY 18, 49 (2016), http://www.transequality.org/sites/default/files/docs/usts/USTS%20Full%20Report%20-%20FINAL%201.6.17.pdf [https://perma.cc/35MN-AVDX] (surveying 27,715 transgender people and reporting that 29% use "they/them," *id.* at 49). Some people who have male or female gender identities use "they, them, and theirs" as well.

[3] Aimee Lee Ball, *In All-Gender Restrooms, the Signs Reflect the Times*, N.Y. TIMES (Nov. 5, 2015), https://nyti.ms/1RxHpEM [https://perma.cc/789Q-N2TX].

[4] *In re* The Sex Change of Jamie Shupe, No. 16CV13991, slip op. at 1 (Cir. Ct. Or. Multnomah Cty. June 10, 2016).

[5] S.B. 179, 2017 Leg., Reg. Sess. (Cal. 2017) (enacted).

designation on their official documents to "nonbinary."[6] At the time of this writing, eight states, New York City, and Washington, D.C., have all adopted rules to allow "non-binary" or "X" designations on certain identification documents.[7] These U.S. jurisdictions are catching up with other countries, including Canada, Australia, India, and Germany.[8]

People with nonbinary gender identities do not exclusively identify as men or women.[9] The term "gender identity" generally refers to a person's internal sense of whether they are a man or a woman[10] while "sex" refers to "bodily characteristics" or the male or female designation ascribed to an infant at birth.[11] Nonbinary people are often said to fit

[6] *Id.* § 11 (allowing applicants to change the sex markers on their birth certificates and drivers' licenses to "nonbinary" upon attestation that the change "is to conform the person's legal gender to the person's gender identity and is not made for any fraudulent purpose").

[7] *Id.*; N.J. STAT. ANN. § 26:8-40.12 (West 2018) (allowing people to change their birth certificate gender markers to "undesignated/non-binary" effective February 2019); Nonbinary Identification Cards Amendment Act of 2018, D.C. Act 22-466, 65 D.C. Reg. 011402 (Oct. 9, 2018) (to be codified at D.C. CODE § 50-1401.01 after a 30-day period of congressional review) (allowing applicants for drivers' licenses to "designate their gender as nonbinary"); WASH. ADMIN. CODE § 246-490-075 (2018) (allowing people to identify as X rather than M or F on birth certificates); N.Y.C., N.Y., ADMIN. CODE § 17-167.1 (Oct. 9, 2018) (allowing an "x" designation on birth records to designate "a sex that is not exclusively male or female," *id.* § 17-167.1(a)); Press Release, Dep't of the Sec'y of State, State of Me., Maine BMV to Offer Non-binary Gender Designation on Driver's Licenses, ID Cards (June 11, 2018), https://www.maine.gov/sos/news/2018/genderdesignationdlid.html [https://perma.cc/T9XA-Y9XQ]; News Release, Or. Dep't of Transp., "Not Specified" Gender Choice Coming to Driver Licenses (June 15, 2017), https://content.govdelivery.com/accounts/ORDOT/bulletins/1a2bd9e [https://perma.cc/9JU4-86C4]; Associated Press, *Minnesota Licenses Can Now Designate Gender as "Nonbinary*," STARTRIBUNE (Oct. 3, 2018, 1:00 PM), http://www.startribune.com/Minnesota-licenses-can-now-designate-gender-as-nonbinary/495046021/ [https://perma.cc/PJH5-5BDG]; Curtis M. Wong, *Arkansas Has Been Offering a Nonbinary Gender Option on State IDs for Years*, HUFFINGTON POST (Oct. 17, 2018, 6:50 PM), https://www.huffingtonpost.com/entry/Arkansas-gender-neutral-state-id-option_us_5bc79f75e4b0d38b5874a669 [https://perma.cc/GF2K-ZA3S]; *FAQ: Non-binary Sex Identifier on Driver Licenses and Identification Cards*, COLO. DEP'T OF REVENUE (Nov. 8, 2018), https://www.colorado.gov/pacific/sites/default/files/CO%20non-binary%20sex%20identifier%20FAQ%2011.08.18.pdf [https://perma.cc/K6G6-M7L8].

[8] Canada began offering nonbinary designations on identity documents in August 2017, joining Australia, Bangladesh, Germany, India, Malta, Nepal, New Zealand, and Pakistan, which all offer some form of nonbinary recognition. Niraj Chokshi, *Canada Introduces "X" as a Third Sex Category for Passport Holders*, N.Y. TIMES (Aug. 25, 2017), https://nyti.ms/2wvdnRf [https://perma.cc/JG9H-CKU7].

[9] GLAAD MEDIA REFERENCE GUIDE 11 (10th ed. 2016), http://www.glaad.org/sites/default/files/GLAAD-Media-Reference-Guide-Tenth-Edition.pdf [https://perma.cc/Z7PR-C8ZQ]. I offer the definitions in this paragraph in the interest of clarity. I do not purport that these definitions are "correct" in any metaphysical or moral sense, nor do I argue the law should define these terms in any particular way in every context. *See infra* section II.A, pp. 933–36 (arguing against any one definition). I also note that terminology is in flux. While these terms and definitions are standard at present, they may one day be supplanted by others as social movements refine the relevant terminology to reflect evolving understandings.

[10] GLAAD MEDIA REFERENCE GUIDE, *supra* note 9, at 10 (defining "gender identity" as "[a] person's internal, deeply held sense of their gender," most commonly whether they are "man or woman (or boy or girl)").

[11] *Id.* (explaining that "sex" means "a combination of bodily characteristics including: chromosomes, hormones, internal and external reproductive organs, and secondary sex characteristics").

under the heading "transgender": "An umbrella term for people whose gender identity and/or gender expression differs from what is typically associated with the sex they were assigned at birth."[12] But not all nonbinary people identify as transgender, and many transgender people identify as men or women.[13] Nonbinary gender identity is not the same thing as intersex variation. "'Intersex' refers to people who are born with any of a range of sex characteristics that may not fit a doctor's notions of binary 'male' or 'female' bodies."[14] While some nonbinary people have intersex variations, not all do,[15] and many people with intersex variations have male or female gender identities.[16]

Nonbinary gender identities are not new,[17] but media attention to nonbinary people in the United States has increased significantly since 2015.[18] Nonbinary characters are now portrayed on television as

---

[12] *Id.* Gender expression means "[e]xternal manifestations of gender, expressed through a person's name, pronouns, clothing, haircut, behavior, voice, and/or body characteristics." *Id.*

[13] *See, e.g.*, Paisley Currah, *Gender Pluralisms Under the Transgender Umbrella*, *in* TRANSGENDER RIGHTS 3, 4–5 (Paisley Currah et al. eds., 2006).

[14] *Intersex Definitions*, INTERACT, https://interactadvocates.org/intersex-definitions/ [https://perma.cc/JA3P-JXA5] ("Variations may appear in a person's chromosomes, genitals, or internal organs like testes or ovaries. Some intersex traits are identified at birth, while others may not be discovered until puberty or later in life."). The percentage of the population with intersex traits is estimated at less than 2%. Melanie Blackless et al., *How Sexually Dimorphic Are We? Review and Synthesis*, 12 AM. J. HUM. BIOLOGY 151, 161 (2000) (surveying medical literature since 1955 and concluding that deviation from medical ideals of dimorphism in chromosomes, gonads, and genitalia could be as frequent as 2% of live births, although a much smaller percentage of those infants would be recognized as intersex). While this percentage may seem small, it is larger than the incidence of children born with Down syndrome. Kristin Zeiler & Anette Wickström, *Why Do "We" Perform Surgery on Newborn Intersexed Children? The Phenomenology of the Parental Experience of Having a Child with Intersex Anatomies*, 10 FEMINIST THEORY 359, 359 (2009).

[15] *See supra* note 1 and accompanying text.

[16] *See, e.g.*, SHARON E. PREVES, INTERSEX AND IDENTITY: THE CONTESTED SELF 60–85 (2003) (interviewing people with intersex variations who struggle to be accepted as women or men).

[17] *See, e.g.*, Gilbert Herdt, *Preface*, *in* THIRD SEX, THIRD GENDER: BEYOND SEXUAL DIMORPHISM IN CULTURE AND HISTORY 11, 11 (Gilbert Herdt ed., 1996) ("For centuries the existence of people who did not fit the sex/gender categories male and female have been known but typically dismissed from reports of certain non-Western societies, while in the Western European tradition they have been marginalized, stigmatized and persecuted."). While nonbinary gender identity has only recently become prominent in national media in the United States, people have been publicly identifying as nonbinary since at least the 1990s. *See* KATE BORNSTEIN, GENDER OUTLAW: ON MEN, WOMEN AND THE REST OF US 51–69 (Vintage Books 1995) (1994); GENDERQUEER: VOICES FROM BEYOND THE SEXUAL BINARY (Joan Nestle et al. eds., 2002).

[18] *See, e.g.*, *Gender: The Space Between* (CBS News television broadcast Mar. 27, 2017), https://www.cbsnews.com/video/gender-the-space-between/ [http://perma.cc/9THJ-KNZL]; Julie Scelfo, *A University Recognizes a Third Gender: Neutral*, N.Y. TIMES (Feb. 3, 2015), https://nyti.ms/16rpy0Y [https://perma.cc/B343-ABH4]. This group identifies by a variety of terms, including "genderqueer," "gender-nonconforming, bi-gender, non-binary, or just being fluid." Steven Petrow, *Don't Know What "Genderqueer" Is? Meet Someone Who Identifies that Way.*, WASH. POST (May 9, 2016), http://wapo.st/1OhnQ14 [https://perma.cc/7LSG-27HQ].

sympathetic rather than silly.[19] In the largest survey of transgender people to date, 35% stated that they identify as nonbinary.[20] If that survey is representative, there may be about half a million people who identify as nonbinary in the United States, a population the size of the city of Miami.[21] These numbers are likely to increase as social acceptance of nonbinary gender identities grows.[22] Yet nonbinary people still face discrimination. Medical professionals are recognizing individuals with nonbinary identities as a population at risk of particular mental health problems due to stress stemming from marginalization and victimization.[23] Survey responses about transgender people's experiences with

---

[19] *See, e.g.*, Scott Collins, *Asia Kate Dillon on "Billions," Acting and Non-binary Choices*, VARIETY (June 6, 2017, 11:30 AM), http://variety.com/2017/tv/awards/asia-kate-dillon-billions-acting-non-binary-choices-showtime-1202454977/ [https://perma.cc/DP8Z-4799] (discussing Asia Kate Dillon, who identifies as nonbinary and plays Taylor Mason, a nonbinary character on the cable-network show *Billions*); Danielle Corcione, *"Chilling Adventures of Sabrina" Star Lachlan Watson on Non-binary Identity and Telling a Bit of Their Own Story Through Susie Putnam*, TEEN VOGUE (Oct. 29, 2018, 2:54 PM), https://www.teenvogue.com/story/lachlan-watson-susie-putnam-chilling-adventures-of-sabrina [https://perma.cc/CXL4-TL25] (discussing a nonbinary actor who plays a character who "is exploring their gender" on a Netflix series); Jackie Strause, *Blowing Up the Binary: How "Transparent" Season 4 Is Personal for Jill Soloway*, HOLLYWOOD REP. (Sept. 25, 2017, 9:35 AM), https://www.hollywoodreporter.com/live-feed/transparent-season-4-jill-soloway-gender-binary-1042629 [https://perma.cc/PJZ9-CT3P] (discussing an Amazon series that "features one character's journey to identifying as gender non-binary"). In the 1990s, the Saturday Night Live sketch "It's Pat" featured a character whose indeterminate sex was played for laughs. *See* MARJORIE GARBER, VICE VERSA: BISEXUALITY AND THE EROTICISM OF EVERYDAY LIFE 207, 230–31 (1995).

[20] JAMES ET AL., *supra* note 2, at 18, 45 (describing the results of the U.S. Transgender Survey (USTS) and concluding: "With non-binary people making up over one-third of the sample, the need for advocacy that is inclusive of all identities in the transgender community is clearer than ever," *id.* at 5). The USTS defined its study population to include "individuals who identified as transgender, trans, genderqueer, non-binary, and other identities on the transgender identity spectrum . . . at any stage of their lives, journey, or transition." *Id.* at 23.

[21] This rough calculation assumes 35% of the 1.4 million transgender adults in the United States identify as nonbinary. ANDREW R. FLORES ET AL., WILLIAMS INST., HOW MANY ADULTS IDENTIFY AS TRANSGENDER IN THE UNITED STATES? 2 (2016), https://williamsinstitute.law.ucla.edu/wp-content/uploads/How-Many-Adults-Identify-as-Transgender-in-the-United-States.pdf [https://perma.cc/M9LJ-3HHQ] (estimating that 1.4 million adults identify as transgender). This figure may not reflect the growing number of people who do not identify exclusively as men or women. In a 2017 survey of 31,217 college students, 1.5% reported that they describe their gender identity as something other than man, woman, trans man, or trans woman. AM. COLL. HEALTH ASS'N, NATIONAL COLLEGE HEALTH ASSESSMENT, FALL 2017 REFERENCE GROUP DATA REPORT 55, https://www.acha.org/documents/ncha/NCHA-II_FALL_2017_REFERENCE_GROUP_DATA_REPORT.pdf [https://perma.cc/A9T9-NELK] (surveying students from fifty-two postsecondary institutions in the United States).

[22] One commonly reported experience is a "moment" when a nonbinary person first realized that a gender identity other than man or woman might be possible and "everything . . . fell into place and made sense." *Gender: The Space Between*, *supra* note 18, at 11:36 (interview with Ela Hosp). The Internet is facilitating this moment. *See id.* at 21:00 (interview with Talia Bellia).

[23] *See, e.g.*, Hélène Frohard-Dourlent et al., *"I Would Have Preferred More Options": Accounting for Non-binary Youth in Health Research*, 24 NURSING INQUIRY, Jan. 2017, at 1, 4; Christina Richards et al., *Non-binary or Genderqueer Genders*, 28 INT'L REV. PSYCHIATRY 95, 97–98 (2016).

education, health care, employment, and policing suggest that those with nonbinary gender identities are "suffering significant impacts of anti-transgender bias and in some cases are at higher risk for discrimination and violence" than transgender men and women.[24]

Nonbinary gender identity is not a niche concern. To the contrary, the legal response to nonbinary gender has important implications for a variety of other identity-based legal movements. Feminist legal reformers have long argued that discrimination on the basis of gender nonconformity — in other words, against men perceived as feminine or women perceived as masculine — is a harmful type of sex discrimination that the law should redress.[25] And scholars advocating for transgender rights have debated the role of what we might today call nonbinary identities in transgender rights struggles.[26] But surprisingly, the idea of nonbinary gender as an identity itself has appeared only at the margins of legal scholarship, not as a central object of study.[27]

This Article asks what American law would look like if it took nonbinary gender seriously.[28] What would it mean for the law to ensure

---

[24] Jack Harrison et al., *A Gender Not Listed Here: Genderqueers, Gender Rebels, and OtherWise in the National Transgender Discrimination Survey*, 2 LGBTQ POL'Y J. HARV. KENNEDY SCH. 13, 13 (2011–2012) (describing results of the 2008 National Transgender Discrimination Survey (NTDS), which surveyed 6450 transgender and gender-nonconforming people).

[25] *See, e.g.*, Mary Anne C. Case, *Disaggregating Gender from Sex and Sexual Orientation: The Effeminate Man in the Law and Feminist Jurisprudence*, 105 YALE L.J. 1, 2–3 (1995); Katherine M. Franke, *The Central Mistake of Sex Discrimination Law: The Disaggregation of Sex from Gender*, 144 U. PA. L. REV. 1, 3–5 (1995); Vicki Schultz, *Reconceptualizing Sexual Harassment*, 107 YALE L.J. 1683, 1774–88 (1998); Francisco Valdes, *Queers, Sissies, Dykes, and Tomboys: Deconstructing the Conflation of "Sex," "Gender," and "Sexual Orientation" in Euro-American Law and Society*, 83 CALIF. L. REV. 1, 9–10 (1995).

[26] *See, e.g.*, Currah, *supra* note 13, at 4–5. Legal scholars have argued about whether sex discrimination law would protect nonbinary genders. *Compare, e.g.*, David B. Cruz, *Acknowledging the Gender in Anti-transgender Discrimination*, 32 LAW & INEQ. 257, 258 (2014) (arguing that sex discrimination law forbids discrimination against "transgender people," including those with an "inner sense of themselves as female or male (or less often, as both or neither)"), *with* Stevie V. Tran & Elizabeth M. Glazer, Trans*genderless*, 35 HARV. J.L. & GENDER 399, 403 (2012) (arguing that "imperfect gender-nonconformists, whose gender identities are more difficult to understand from a binary perspective . . . would likely fall outside of the protection of federal civil rights law in its current formulation of gender non-conformity as sex discrimination"). The law review literature has advanced broad theories of gender deconstruction, including recent works such as Adam R. Chang & Stephanie M. Wildman, *Gender In/sight: Examining Culture and Constructions of Gender*, 18 GEO. J. GENDER & L. 43, 54–63, 67–68 (2017) (outlining concepts); and Melina Constantine Bell, *Gender Essentialism and American Law: Why and How to Sever the Connection*, 23 DUKE J. GENDER L. & POL'Y 163, 206–220 (2016) (advocating an approach to challenge sex classifications grounded in Canadian doctrine).

[27] Christina Richards et al., *Introduction*, *in* GENDERQUEER AND NON-BINARY GENDERS 2 (Christina Richards et al. eds., 2017) (discussing "the dearth of existing literature" on nonbinary gender from various academic perspectives, and offering a chapter on U.K. but not U.S. law).

[28] No prior work of legal scholarship has asked this question. A few articles have focused on identity documents. *See, e.g.*, Dean Spade, *Documenting Gender*, 59 HASTINGS L.J. 731, 732–38 (2008) (discussing gender reclassification doctrines for transgender people); Anna James (AJ) Neuman Wipfler, *Identity Crisis: The Limitations of Expanding Government Recognition of Gender*

nonbinary people's full participation in social, political, and economic life? This Article assesses the legal interests in maintaining systems that divide people into male and female categories in areas including law enforcement, employment, education, housing, and health care, and demonstrates that those interests are not reasons to reject the project of nonbinary inclusion. The law can recognize nonbinary gender using familiar civil rights tools and concepts. Nonbinary gender rights might take the form of recognition of a third-gender category, elimination of unnecessary legal sex classifications, or thoughtful integration of nonbinary people into rules or spaces that require binary categories. Many of the interventions suggested in this Article would require only modest extensions of existing law.

One contribution of this Article is to offer the legal literature a descriptive account of nonbinary gender. While nonbinary gender is not new, its legal possibilities are. Rights claims based on nonbinary gender require particular attention, because they are distinct from, if overlapping with, those focused on women or men who are gender-nonconforming, transgender, lesbian, gay, bisexual, or intersex. Nonbinary people pose a direct challenge to all modes of sex segregation, unlike transgender people seeking recognition as men or women.[29] Earlier iterations of feminist argument against binary gender took place within a cultural context in which alternatives to binary gender were scarcely imaginable. To many jurists and theorists, the concept of gender freedom seemed too "conceptually complex and practically costly" to implement.[30] Against this backdrop, challenges to binary gender appeared theoretical, utopian, and impossible, and therefore threatening to other feminist and LGBT projects. The increased visibility and advocacy of nonbinary people, as a minority, makes new legal arguments possible.[31] Yet nonbinary gender is, in many ways, a misfit for legal

---

*Identity and the Possibility of Genderless Identity Documents*, 39 HARV. J.L. & GENDER 491, 491 (2016) (advocating the eventual end of sex classification). My own work has explored binary sex classifications by analogy to the problem of *numerus clausus* in commercial law: When should there be a limited number of legal forms that the law recognizes, as in property, as opposed to a nearly infinite variety of agreements, as in contract? *See* Jessica A. Clarke, *Adverse Possession of Identity: Radical Theory, Conventional Practice*, 84 OR. L. REV. 563, 609 (2005); Jessica A. Clarke, *Identity and Form*, 103 CALIF. L. REV. 747, 768–69 (2015). For a different take on that analogy, see Sonia K. Katyal, *The* Numerus Clausus *of Sex*, 84 U. CHI. L. REV. 389, 398–400 (2017) (arguing that sex is better analogized to intellectual property than to real estate). This Article's ambition is different — it is to examine the very recent and dramatic advance in nonbinary visibility and to ask what the law would look like, as a practical matter, if it took nonbinary gender seriously.

[29] *Cf.* Whitaker *ex rel.* Whitaker v. Kenosha Unified Sch. Dist., 858 F.3d 1034, 1055 (7th Cir. 2017) (noting approvingly that "allowing transgender students to use [male or female] facilities that align with their gender identity has actually reinforced the concept of separate facilities for boys and girls").

[30] KIMBERLY A. YURACKO, GENDER NONCONFORMITY AND THE LAW 143–44 (2016).

[31] *Cf.* S. Bear Bergman & Meg-John Barker, *Non-binary Activism*, *in* GENDERQUEER AND NON-BINARY GENDERS, *supra* note 27, at 31, 33 (discussing how the "new social movement," as

categorization because nonbinary people defy categorization as a group. In resisting categorization, this minority casts new light on long-running debates over sex and gender regulation.

But this Article is not about theories of gender. Sex and gender regulation is an area of legal scholarship that might be described as *over*-theorized.[32] A second contribution of this Article is to suggest a contextual approach to debates over sex and gender regulation: analysis of the interests at stake in binary gender in each particular legal context. It examines recent legal, public, and legislative debates over nonbinary gender rights. These debates are often stymied by efforts to craft an all-purpose definition of sex or gender. They are hindered by simplistic assumptions about the shape that nonbinary gender rights must take. Opponents caricature the options as either creating a separate third-gender category that is afforded special legal treatment, or stripping law and society of all gender. For example, they ask, would nonbinary people require their own sports teams under Title IX?[33] Or would they demand the end of all women's sports under Title IX?[34]

This Article argues that U.S. civil rights law offers many options for addressing nonbinary gender rights. One strategy might be sex neutrality: eliminating the use of unnecessary sex classifications by government. This strategy would not attempt to abolish gender or mandate androgyny.[35] It would simply mean getting rid of rules that require people to choose the "male" or "female" category, when those rules do not serve important interests. For example, there is no good reason to designate

---

well as "the longer histories of non-binary gender experience which have often been erased," can "provide some sense of liveable non-binary lives").

[32] *See infra* section II.A, pp. 933–36 (discussing theoretical debates about the definitions of sex, gender, and gender identity).

[33] *See Gender Identity: Female, Male, or Nonbinary: Hearing on S.B. 179 Before the S. Standing Comm. on Judiciary*, 2017–2018 Leg., Reg. Sess. (Cal. 2017) (statement of Jonathan Keller, Chairman and CEO, California Family Council), https://ca.digitaldemocracy.org/hearing/52473?startTime=465&vid=64fe0449e847fdf5c9d8d349540eaa75 [https://perma.cc/8HEA-SVDH] ("The third gender would be subject to Title IX, which could mean that California's 150 public universities, and over 10,000 public schools serving K-12 students would be required under federal law to not only provide male and female athletic teams and facilities, but non-binary facilities and teams as well.").

[34] *See infra* section III.C.2, pp. 966–74.

[35] For example, it is telling that MTV's first gender-neutral acting award went to an actor portraying a Disney princess. Hilary Lewis, *MTV Movie & TV Awards: Asia Kate Dillon Presents Gender-Neutral Acting Award to Emma Watson*, HOLLYWOOD REP. (May 7, 2017, 5:31 PM), http://www.hollywoodreporter.com/news/mtv-movie-tv-awards-asia-kate-dillon-presents-gender-neutral-acting-award-emma-watson-1000935 [https://perma.cc/DQ68-M2YF] (discussing Emma Watson's award for her role as the bookish princess Belle in Disney's live-action *Beauty and the Beast*). This move toward gender neutrality is hardly the end of gender. Instead, it is a renegotiation of gender roles, which might be analyzed critically. *See, e.g.*, PEGGY ORENSTEIN, CINDERELLA ATE MY DAUGHTER: DISPATCHES FROM THE FRONT LINES OF THE NEW GIRLIE-GIRL CULTURE 14 (2011).

single-user restrooms as men's and women's.[36] But sometimes, sex or gender classifications may serve useful functions. For example, at present, having an identification document with a sex designation that matches one's self-reported gender identity may protect a person from harassment by government officials.[37] In such cases, the appropriate strategy might be third-gender recognition: providing a third category to protect people with nonbinary gender identities and to express that they deserve the same respect as men and women. In a limited number of cases, there may be significant impediments to both third-gender recognition and sex neutrality. Sex-segregated prison housing might be an example.[38] In such cases, thoughtful integration of nonbinary people into binary categories may be the best short-term approach. This approach would redefine binary sex and gender categories to best fulfill the purposes of the regulation, while also respecting every person's gender identity, to the extent possible. This Article argues that these approaches are not mutually exclusive and that no one approach is the best fit for every context.

Opponents of nonbinary gender recognition argue that their "objections go well beyond the ideological" and pertain to the government's "many legitimate interests" in maintaining a system of binary sex classification.[39] They claim that the right to nonbinary gender identity will "open[] a Pandora's Box" of unforeseen evils.[40] A final contribution of this Article is to demonstrate this is not the case. Now that marriage law no longer needs to determine anyone's sex,[41] a diminishing number of legal arrangements rely on binary sex or gender classifications. This Article assesses the remaining legal interests in dividing people into male and female categories, including: ensuring the accuracy of identification documents and data; facilitating law enforcement; administering pregnancy protections; allowing people to use gendered pronouns without fear of liability for harassment; maintaining single-sex restrooms, educational programs, sports, and housing facilities; hiring members of one sex for particular jobs; and avoiding health care costs. It does not aim to rehash debates about transgender rights in general; it takes as a given

---

36 *See infra* section III.D.1, pp. 981–83.

37 *See infra* section III.A, pp. 947–51.

38 *See infra* section III.D.2, pp. 983–86.

39 *WoLF Members Pushing Back Against Local "Gender Identity" Legislation*, WOMEN'S LIBERATION FRONT (Aug. 21, 2017), http://womensliberationfront.org/wolf-members-pushing-back-against-local-gender-identity-legislation/ [https://perma.cc/JH7T-F46M].

40 Tammerlin Drummond, *Not Male or Female: Proposed Law Would Create Gender-Neutral Option on California IDs*, EAST BAY TIMES (Aug. 21, 2017, 9:37 AM), http://www.eastbaytimes.com/2017/08/20/not-male-or-female-proposed-law-would-create-third-gender-neutral-option-on-california-ids/ [https://perma.cc/RVR6-KETB] (quoting Jonathan Keller, CEO of the Family Research Council).

41 Obergefell v. Hodges, 135 S. Ct. 2584, 2604–05 (2015).

that the law should generally respect a transgender person's gender identity as a man or a woman.[42] This Article is interested in how nonbinary gender changes the discussion in each particular context of binary gender regulation. Upon careful examination, it turns out that rather than opening Pandora's box, nonbinary gender rights may have unforeseen benefits.

This Article proceeds in three Parts. Part I describes nonbinary gender identity as a discrete phenomenon, advancing legal claims that both converge with and diverge from those of other civil rights movements. Part II argues for a contextual approach to nonbinary gender rights, demonstrating that civil rights law offers many possible legal models. Part III applies that contextual approach, cataloguing and assessing potential legal interests in keeping sex and gender binary, as opposed to the best legal alternatives in each context. It concludes the law does not require a universal definition of sex or gender that limits the options to two.

## I. NONBINARY GENDER

This Part describes nonbinary gender identities. It discusses the diversity of nonbinary genders and reasons for bias against nonbinary people. It then situates nonbinary gender with respect to movements around other identity issues, including feminist arguments for rights to gender nonconformity, the rights of transgender men and women, intersex advocacy, arguments for sexual-orientation nondiscrimination, and antiracist and postcolonial struggles. While there are overlaps between these rights claims, there are also areas of divergence.

This Part makes descriptive claims based on currently available data and information. These claims are provisional, by necessity, because nonbinary gender identities, terminology, and legal arguments are ever evolving. This Article does not presume to speak for any particular person or group. People with nonbinary gender identities and their advocates are developing a variety of arguments for inclusion, based on values such as liberty, equality, respect, privacy, and human flourishing. While I hope that some of these arguments may resonate with readers, this Article's goal is not to build the positive case for inclusion as an abstract matter.[43] I ask readers to assume that the law should treat

---

[42] This Article cannot and does not attempt to persuade any reader who does not share this premise or is unwilling to assume it for the sake of argument. For a human rights argument, see Holning Lau, *Gender Recognition as a Human Right*, *in* NEW HUMAN RIGHTS: RECOGNITION, NOVELTY, RHETORIC (Andreas von Arnauld et al. eds., forthcoming), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3056110 [https://perma.cc/Q8WR-HBWB].

[43] One U.K. court made the positive case for nonbinary gender rights in terms of the rights to "private life" and "gender identification" protected by the European Convention on Human Rights.

nonbinary gender identities as having the same status as male and female ones. My question is what legal results would follow. This Article's normative argument, advanced in Parts II and III, is that the law has no abiding interest in maintaining a universal scheme of binary sex or gender regulation that would exclude nonbinary people.

### A. *The Diversity of Nonbinary Gender Identities*

There is no single model or even archetype of nonbinary gender identity. The following is a brief overview of the diversity of nonbinary gender identities. My purpose is not to offer anything approaching a precise definition of nonbinary gender, nor is it to flatten the diversity of nonbinary genders into a classificatory scheme.[44] Social media site Facebook offers its U.S. English–language users the option to describe their own gender identities in "a free-form field."[45] As one set of survey researchers concluded, the wide array of gender identifiers listed by respondents "speak[s] to the creative project of gender identity creation" and "testifies to resilience, humor, and a spirit of resistance to gender indoctrination and policing."[46] Nonbinary people may have any number of relationships to gender, including, to name a few, hybridity, rejection, dynamism, insistence on a third option, subversion, or all of these.[47]

---

R (on the application of Elan-Cane) v. Sec'y of State for the Home Dep't [2018] EWHC (Admin) 1530 [107]–[08], 2018 WL 03093374.

For thoughts on normative theories that might ground claims to nondiscrimination in the U.S. context, see Jessica A. Clarke, *Against Immutability*, 125 YALE L.J. 2 (2015) (criticizing theories based on immutability and advancing theories based on antisubordination); and Elizabeth F. Emens, *Compulsory Sexuality*, 66 STAN. L. REV. 303, 377–78 (2014) (listing criteria that might apply to traits covered by discrimination law).

44 I use the umbrella term nonbinary following the USTS, JAMES ET AL., *supra* note 2, at 4–5, while recognizing there is controversy over the best umbrella term to describe those people who do not exclusively identify as men or women, as well as controversy over whether an umbrella term is appropriate at all.

If anything, I aim to suggest a "nonce taxonomy" of individualized gender identities. "Nonce" means a term that can be used only once. *Cf.* EVE KOSOFSKY SEDGWICK, EPISTEMOLOGY OF THE CLOSET 23 (1990). Sedgwick wrote of the diversity of desires — each one unique — but "nonce taxonomy" is also an apt descriptor for a discussion of nonbinary gender identities.

45 Facebook Diversity, FACEBOOK (Feb. 26, 2015), https://www.facebook.com/facebookdiversity/posts/774221582674346 [https://perma.cc/SWN9-NZKZ]; *see also* Dylan Vade, *Expanding Gender and Expanding the Law: Toward a Social and Legal Conceptualization of Gender that Is More Inclusive of Transgender People*, 11 MICH. J. GENDER & L. 253, 261 (2005) (rejecting the analogy of gender to a "spectrum" and referring to it as a "galaxy").

46 Harrison et al., *supra* note 24, at 20.

47 *See, e.g.*, *id.* ("There appears to be no tension for many [survey respondents who wrote in their gender identities] between simultaneously identifying as fluidly gendered, multiply gendered, performing gender, or having no gender."); Interview by Andrea Jenkins with Alex Iantaffi, Transgender Oral History Project 3 (Oct. 6, 2015) [hereinafter Iantaffi Interview], https://umedia.lib.umn.edu/sites/default/files/archive/60/application/pdf/1553623.pdf [https://perma.cc/HM52-4G2Z] (describing their gender identity as "non-binary gender-queer trans masculine"); Interview by Andrea Jenkins with Kate Bornstein, Transgender Oral History Project 3 (Aug. 20, 2015) [hereinafter Bornstein Interview], https://umedia.lib.umn.edu/sites/default/files/archive/60/application/

Examples of gender hybridity — combining gender roles into non-traditional configurations — might include bigender, pangender, and androgynous identities. For example, during an interview with the Transgender Oral History Project, therapist and scholar Alex Iantaffi described their identity as "mixed": "not fully masculine, not fully feminine."[48] They recall seeing the movie *Flashdance* when they were fourteen years old and identifying with the main character, named Alex, who "had sexual agency, she wears this tuxedo thing at one point, and she is a metal-welding dancer."[49] College student Quinn Cox explains: "My gender identity, or how I feel inside, is more masculine, but still not fully male. If being female was like vanilla ice cream and male was like chocolate, I would be chocolate with a tiny vanilla stripe."[50]

Examples of gender rejection — refusal to adopt traditional gender categories — might include agender, genderless, gender neutral, or unisex identities. For example, as one person explained: "I take agender a bit literally, in that my gender is more about the lack of it. Growing up, I never had that sense of being a guy, girl, or something else. My gender simply isn't there."[51] Gender rejection may also be about avoiding stereotyped expectations. Television producer and writer Jill Soloway observes that "when people see me as non-binary, I get treated more as a human being."[52] They explain: "I identify as trans, which means that I am not seeking to synthesise my appearance with the label assigned to me at birth and instead am opting to live in a space where a label other than male or female is used to define me."[53]

Examples of gender dynamism — gender identities that are not static over time — might include gender fluidity.[54] A gender fluid person

---

pdf/1337158.pdf [https://perma.cc/VZ6Z-Y5FH] ("[R]ight now I would call myself non-binary . . . femme-identified transsexual, or transgender . . . . [T]here's my sexual identity . . . I would call that diesel-femme. . . . Then there's the identity I live every day now and I would call that, 'little old lady.' Really.").

[48] Iantaffi Interview, *supra* note 47, at 16.

[49] *Id.*

[50] Quinn Cox, Opinion, *The Sex "X" Bill*, WESTERN HERALD (Nov. 9, 2017), http://www.westernherald.com/opinion/article_3267eb80-c564-11e7-8548-f77dde6f35e1.html [https://perma.cc/9HYZ-7DJX] (describing their identity as "landing on the genderqueer spectrum").

[51] Vera Papisova, *What It Means to Identify as Agender*, TEEN VOGUE (Jan. 20, 2016, 9:51 AM), https://www.teenvogue.com/story/what-is-agender [https://perma.cc/ACY6-YWSJ] (quoting an unidentified interviewee).

[52] Hadley Freeman, *Transparent's Jill Soloway: "The Words Male and Female Describe Who We Used to Be*," THE GUARDIAN (May 21, 2017, 10:00 AM), https://www.theguardian.com/tv-and-radio/2017/may/21/transparents-jill-soloway-the-words-male-and-female-describe-who-we-used-to-be [https://perma.cc/AFM6-ZZTS]. At the same time, Soloway has stated that they are "happy to speak on behalf of women and on behalf of feminism." *Id.* They "agree that 'woman' shouldn't mean a particular thing." *Id.*

[53] *Id.*

[54] *See, e.g.*, Harrison et al., *supra* note 24, at 14 (reporting that 20% of 2008 NTDS respondents selected "part time as one gender, part time as another" for their primary gender identity today).

might experience their gender differently at different times.[55] Actor Amandla Stenberg has said "I don't think of myself as statically a girl."[56] Gender fluid people may feel more male and use "he" pronouns on some occasions and feel more female and use "she" pronouns on others.[57] Or a person might be working on discovery of their gender identity, conceptualizing it as a journey or process. Professor Petra Doan's experience of gender fluidity has prompted her to ask "whether one can perform the same gender twice."[58] Author, playwright, and scholar Kate Bornstein has described gender fluidity as "the ability to freely and knowingly become one or many of a limitless number of genders, for any length of time, at any rate of change."[59]

Examples of third genders — categories in addition to man and woman — might include "Two-Spirit (First-Nations)" or "Mahuwahine (Hawaiian)," or any number of other culturally recognized gender forms.[60] They might include "creative and unique" genders, "such as twidget, birl, OtherWise, and transgenderist."[61] For example, Jessi Brandon, another participant in the Transgender Oral History Project, identified themself as "non-binary, although [they] have had thoughts of maybe identifying . . . as a demiboy . . . where you feel partially like a boy but not really."[62]

---

[55] Laura K. Case & Vilayanur S. Ramachandran, *Alternating Gender Incongruity: A New Neuropsychiatric Syndrome Providing Insight into the Dynamic Plasticity of Brain-Sex*, 78 MED. HYPOTHESES 626, 627 (2012) (studying the experiences of thirty-two bigender people who experience "involuntary" gender switches as frequently as "multiple times a day").

[56] Abby Aguirre, *Amandla Stenberg Is a Voice for the Future*, VOGUE (Apr. 19, 2017, 9:01 AM), https://www.vogue.com/article/amandla-stenberg-interview-gender-feminism-black-culture [https://perma.cc/JSK2-7PA6].

[57] Vivian Giang, *What It's Like to Be Young, Gender Neutral and in the Job Market*, FORTUNE (Oct. 20, 2015), http://fortune.com/2015/10/20/gender-neutral-fluid-job/ [https://perma.cc/EQU8-2ZY9]; *see also Gender: The Space Between*, *supra* note 18, at 27:45 (interviewing Brendan Jordan and his friends with Jordan explaining that he is not offended when his friends use both "he" and "she" to refer to him).

[58] Petra L. Doan, *The Tyranny of Gendered Spaces — Reflections from Beyond the Gender Dichotomy*, 17 GENDER, PLACE & CULTURE 635, 639 (2010).

[59] BORNSTEIN, *supra* note 17, at 52.

[60] Harrison et al., *supra* note 24, at 14. Some cultures have more than three genders. *See, e.g.*, SHARYN GRAHAM DAVIES, GENDER DIVERSITY IN INDONESIA: SEXUALITY, ISLAM AND QUEER SELVES 2, 10–11 (2010) (discussing the Bugis, an ethnic group in South Sulawesi).

[61] Harrison et al., *supra* note 24, at 14 (listing responses to the gender identity question on the 2008 NTDS); *id.* at 20 (describing other write-in genders including "Jest me, skaneelog, . . . gendertreyf, trannydyke genderqueer wombat fantastica, Best of Both, and gender blur").

[62] Interview by Andrea Jenkins with Jessi Brandon, Transgender Oral History Project 6 (Nov. 27, 2016) [hereinafter Brandon Interview], https://umedia.lib.umn.edu/sites/default/files/archive/60/application/pdf/1553882.pdf [https://perma.cc/S77K-YGFQ].

Examples of subversive genders — gender identities that parody or deconstruct the gender binary — might include genderqueer.[63] For example, Bornstein describes their identity as a set of paradoxes, including "not man, not woman," "lovable freak," and "[s]mart blonde."[64] In response to the question, "What is your primary gender today?," some 2008 National Transgender Discrimination Survey Respondents wrote that "gender is a performance."[65]

People with nonbinary identities may view their gender identity, in terms of their inner sense of self, as separate from their gender expression, in terms of their outward appearance.[66] They may sometimes be perceived as men or women.[67] High school student Star Hagen-Esquerra, for example, "likes to wear lacy dresses, dramatic cat-eye makeup, and their hair styled in cascading curls. They like to date straight boys. This made coming out as nonbinary harder, more confusing."[68]

Like transgender men and women, nonbinary people may or may not seek or require medical treatment.[69] Some nonbinary people may not seek medical treatment because they do not wish to "pass" as men

---

[63] The term "genderqueer" derives from "queer theory," an academic theory that questions and critiques norms with respect to sex, gender, and sexuality. *See* Jen Jack Gieseking, *Queer Theory*, *in* 2 ENCYCLOPEDIA OF SOCIAL PROBLEMS 737 (Vincent N. Parrillo et al. eds., 2008) (describing queer theory); Riki Wilchins, *A Certain Kind of Freedom: Power and the Truth of Bodies — Four Essays on Gender*, *in* GENDERQUEER: VOICES FROM BEYOND THE SEXUAL BINARY, *supra* note 17, at 23, 27–29 (discussing the term "genderqueer").

[64] Bornstein Interview, *supra* note 47, at 6.

[65] Harrison et al., *supra* note 24, at 20. Other subversive gender identities included "genderfuck, rebel, or radical." *Id.* The statement "gender is a performance" may be a reference to ideas from queer theory. *See supra* note 63.

[66] See *supra* note 12 for a definition of "gender expression."

[67] JAMES ET AL., *supra* note 2, at 48 (asking nonbinary respondents to the 2015 USTS "what gender they were perceived to be by people who did not know they were non-binary," and reporting that 58% "assumed they were non-transgender women," 17% "assumed they were non-transgender men," and 19% "reported that assumptions about their gender varied"); *id.* at 50 (asking nonbinary respondents "[h]ow often people could tell they were transgender without being told," and reporting that 6% said "[a]lways or most of the time," 32% said "sometimes," and 62% said "[r]arely or never").

[68] Jessica Testa, *This 17-Year-Old Could Be the First Teenager to Put Nonbinary on Their Driver's License*, BUZZFEED NEWS (May 27, 2017, 10:04 AM), https://www.buzzfeed.com/jtes/california-non-binary-gender-identity-recognition [https://perma.cc/NU6R-5WMV].

[69] *See, e.g.*, James Bellringer, *Surgery for Bodies Commonly Gendered as Male*, *in* GENDERQUEER AND NON-BINARY GENDERS, *supra* note 27, at 247, 249–50, 261–62 (discussing possible surgical options for nonbinary people); David Ralph et al., *Genital Surgery for Bodies Commonly Gendered as Female*, *in* GENDERQUEER AND NON-BINARY GENDERS, *supra* note 27, at 265, 267, 280 (same); Andrew Yelland, *Chest Surgeries*, *in* GENDERQUEER AND NON-BINARY GENDERS, *supra* note 27, at 225, 225–26 (same).

or women.[70] Others might seek medical treatment so as not to have physical features inconsistent with their gender identities.[71]

While nonbinary gender may be most prevalent among younger people, it is not limited to millennials.[72] In the 2015 U.S. Transgender Survey (USTS), 80% of nonbinary respondents "had female on their original birth certificate, and 20% had male on their original birth certificate."[73] Most nonbinary respondents who reported having transitioned stated that they began their transitions between the ages of eighteen and twenty-four.[74] Nonbinary people do not share uniform views on political issues, not even those related to transgender rights.[75] Some nonbinary people are religious.[76] There is some evidence nonbinary people are less likely to be white and more likely to be multiracial than other transgender people.[77] They have a variety of sexual orientations,

---

[70] *See* Tim Murphy, *Non-binary Brown Alumni Discuss Life Beyond the Bounds of Gender*, NEWS FROM BROWN (Aug. 15, 2018), https://news.brown.edu/articles/2018/08/nonbinary [https://perma.cc/BT7U-36DK] (interviewing Dréya St. Clair) ("I actually had started meeting trans women of color not on campus but in the broader Providence community, in clubs, and some of them were pressuring me into taking hormones, telling me that I had soft features and that I could easily transition and pass on the streets. But I didn't want that. I was saying, 'I'm a boy who's feminine and dresses like a girl and there's nothing wrong with that.' And I've stayed on that course ever since.").

[71] Colby Sangree, *A Non-binary Perspective on Top Surgery*, HUFFINGTON POST (Mar. 23, 2017), https://www.huffingtonpost.com/entry/a-non-binary-perspective-on-top-surgery_us_58d27b27e4b062043ad4ae76 [https://perma.cc/K552-DBB5] (discussing reasons for seeking "top surgery": "Everyone in my life told me that growing breasts defined femininity. No longer could I remain a tomboy — genderfluid, free to express myself — I was on my way to a forced womanhood").

[72] JAMES ET AL., *supra* note 2, at 46 (reporting that 61% of nonbinary respondents to the 2015 USTS were aged eighteen to twenty-four, 35% were aged twenty-five to forty-four, and 5% were forty-five or older).

[73] *Id.* at 45.

[74] *See id.* at 48 (reporting that 24% of nonbinary respondents transitioned under the age of eighteen, 56% between the ages of eighteen and twenty-four, 16% between the ages of twenty-five and thirty-four, and 4% at the age of thirty-five or over). The survey defined transitioning as "living full-time in a gender other than that on their original birth certificate." *Id.*

[75] For example, Jamie Shupe, the first person to win a U.S. court order changing their sex designation to nonbinary, has argued there can be "problems with transgender military service." Jamie Shupe, *This Debate Is About Gender Dysphoria, Not Transgender Military Service*, MERCATORNET (Aug. 1, 2017), https://www.mercatornet.com/conjugality/view/this-debate-is-about-gender-dysphoria-not-transgender-military-service/20168 [https://perma.cc/WL8H-GJ6A] ("President Trump is seriously mistaken in putting a blanket ban on transgender military service because not every trans service member is impacted by gender dysphoria. Neither does every trans person need to transition their sex. But the President and those that share his views are not completely wrong.").

[76] Wail Qasim, *Being a Black, British, Queer, Non-binary Muslim Isn't a Contradiction*, THE GUARDIAN (June 20, 2016, 4:00 AM), https://www.theguardian.com/commentisfree/2016/jun/20/black-british-queer-non-binary-muslim-isnt-contradiction [https://perma.cc/Z5VH-W8SL]; Brandon Interview, *supra* note 62, at 11 ("One of my main concerns was finding a place where I could be out as queer but I could also be a Christian and talk about how my queerness and my religion intersect . . . .").

[77] Harrison et al., *supra* note 24, at 18–19 (reporting that those selecting "gender not listed here" on the 2008 NTDS were 70% white, compared with 77% of other respondents; 18% multiracial,

although only 2% identify as "[s]traight or heterosexual."[78] Some survey evidence suggests that this population has a significantly higher level of educational attainment than average, but a lower household income.[79] They may be more likely to live on the coasts and in the Northeast than transgender men and women.[80]

### *B. Reasons for Bias Against Nonbinary People*

Nonbinary people report that they face harassment, violence, and discrimination, with adverse health consequences. Out of nonbinary respondents to the 2015 USTS, 39% had attempted suicide, compared with 4.6% of the general population.[81] This may relate to other findings of the survey — that nonbinary people experience high rates of discrimination, family rejection, harassment, and assault.[82] Nonbinary people may encounter mistreatment for a variety of reasons, including disbelief in nonbinary identity, erasure of nonbinary experiences, dehumanization of those who do not fit conventional gender categories, concern that nonbinary people will undermine traditional gender roles, and politicization of nonbinary identity in a time of increasing polarization.

Bias against nonbinary people often takes the form of disbelief, disregard, disrespect, and paternalism. Nonbinary people report that one of the most common reasons for bias against them is the belief that they are insincere and attention seeking,[83] or that nonbinary identity is a

compared with 11% of other respondents; 5% Black, compared with 4% of other respondents; 3% Asian, compared with 2% of other respondents, and 4% Latino/a, compared with 5% of other respondents).

[78] JAMES ET AL., *supra* note 2, at 59 (reporting that, among nonbinary respondents to the 2015 USTS, 34% identify as queer, 21% identify as pansexual, 17% identify as asexual, 10% identify as bisexual, 8% identify as gay, lesbian, or same-gender-loving, 2% as straight or heterosexual, and 8% as an orientation not listed).

[79] Harrison et al., *supra* note 24, at 19–20. The 2008 NTDS respondents in general had a higher level of educational attainment than the general population. *Id.* at 20.

[80] *Id.* at 19.

[81] JAMES ET AL., *supra* note 2, at 114; *see also id.* at 105 (49% of nonbinary people reported current, serious psychological distress).

[82] *Id.* at 76 (32% reported family rejection since transitioning); *id.* at 133–34 (16% reported being physically attacked and 10% reported being sexually assaulted in K-12 schools because of the perception that they were transgender); *id.* at 135 (15% left a K-12 school because of mistreatment); *id.* at 150 (7% lost a job because of their gender identity or expression); *id.* at 186 (71% reported that they were never or only sometimes treated with respect by law enforcement).

[83] Papisova, *supra* note 51 ("For Mya, the biggest misconception they face about their gender identity is 'definitely that it doesn't exist, or that I'm just trying to get attention.'"); Brandon Interview, *supra* note 62, at 12 (describing the response: "They're just being special snowflakes who want attention"). Psychologists regard it as unlikely that claiming a nonbinary gender is attention-seeking behavior. *See* STEPHANIE BRILL & LISA KENNEY, THE TRANSGENDER TEEN: A HANDBOOK FOR PARENTS AND PROFESSIONALS SUPPORTING TRANSGENDER AND NON-BINARY TEENS 14 (2016) ("Being . . . non-binary . . . is a difficult road to walk. . . . If your teen simply wanted to annoy you or try to get your undivided attention with their gender, they would likely do