trend or a political posture.[84]  Some opponents of nonbinary recognition argue that science and religion demonstrate that everyone is either a man or a woman, and the idea of a third gender is "ridiculous," "nonsense," "insane," "absurd," and the result of "brainwash[ing]."[85]  Another common reaction is that nonbinary identities should not be respected because those identities are a developmental phase, a result of confusion, or a form of experimentation.[86]  Relatedly, bias against nonbinary people is often rooted in paternalism: beliefs by medical professionals, family members, and educators that nonbinary people must be protected from themselves, lest they make choices they will come to regret, such as medical intervention, or that will expose them to tragic and irreversible social consequences.[87]

Yet another form of bias is erasure — a sense of "feeling like the debris that is falling through the cracks" of policies aimed at transgender inclusion.[88]  Some nonbinary people may be criticized for "not being trans enough" and left out of networks of support for transgender people.[89]  Mistreatment of nonbinary people may sometimes result from

---

what teens have done for generations and use gender expression to assert their individuality and independence (think hair, makeup, clothing styles).").

[84]  *See, e.g.*, Trav Mamone, *9 Things Not to Say to a Non-binary Person*, EVERYDAY FEMINISM (Feb. 15, 2017), https://everydayfeminism.com/2017/02/things-not-to-say-non-binary-ppl/ [https://perma.cc/SGL6-ZFNY] (discussing people "who want to write off anything that doesn't fit the binarist view of gender as 'made up'" and the false charge that the social media site Tumblr "invented" nonbinary gender).

[85]  Just Want Privacy, *Oppose 3rd Gender Option on WA Birth Certificates*, FACEBOOK (Dec. 5, 2017), https://www.facebook.com/events/967556456753263/ [https://perma.cc/2SMH-L3FX] (quotations from a public Facebook page collecting comments on Washington State's rule to allow a nonbinary designation on birth certificates).

[86]  At the hearing for recognition of Star Hagen-Esquerra's nonbinary gender identity, the judge asked them if they were making an impulsive decision. Hagen-Esquerra, an AP student, responded, "I've never made an impulsive decision in my entire life."  Testa, *supra* note 68; *see also Gender Identity: Female, Male, or Nonbinary: Hearing on S.B. 179 Before the Assemb. Standing Comm. on Transp.*, 2017–2018 Leg., Reg. Sess. (Cal. 2017) [hereinafter *Cal. Assemb. Transp. Hearing*] (statement of Jonathan Clay), https://ca.digitaldemocracy.org/hearing/54049?startTime=0&vid= a0f9eb2f37a98dafa47cac34d69378d8 [https://perma.cc/ZC5J-VRR7] ("We've been asked many times, is this a phase for our child?  And the answer's no.  I mean, since a very early age, it's now, looking back, been pretty apparent, that this was . . . the path our child is taking.").

[87]  Parents of transgender children commonly report concern that their children will never find romantic love, will be targeted for violence and discrimination, or will engage in self-harm.  BRILL & KENNEY, *supra* note 83, at 19–20.

[88]  Interview by Andrea Jenkins with Roze (R.B.) Brooks, Transgender Oral History Project 11 (Nov. 3, 2016) [hereinafter Brooks Interview], https://umedia.lib.umn.edu/sites/default/files/archive/60/application/pdf/1553885.pdf [https://perma.cc/K5YB-PZM9].

[89]  Genny Beemyn, *Get Over the Binary: The Experiences of Nonbinary Trans College Students*, *in* TRANS PEOPLE IN HIGHER EDUCATION (Genny Beemyn ed., forthcoming 2019) (manuscript at 251) (on file with the Harvard Law School Library) (discussing nonbinary interviewees who were assigned male at birth and were "frequently critiqued by both cis and other trans people on how well they 'do transgender'").

ignorance or misunderstanding.[90] Policymakers may sometimes refuse to entertain the claims of nonbinary people because they believe it is only "a very small number of people" that "consider themselves to be of neither gender."[91] A related form of discrimination is insistence that nonbinary people hide, "cover," or downplay their nonbinary identities so as not to disrupt their schools or workplaces.[92] Many nonbinary people report that they often let strangers assume they are men or women, rather than spend their time trying to explain nonbinary gender identities.[93] Nonbinary respondents to the 2015 USTS were almost twice as likely as other transgender respondents to avoid asking their employers to use their correct pronouns.[94]

Other reactions to nonbinary identities may be dehumanizing. The moment the sonogram technician proclaims "It's a girl!" or "It's a boy!" may be the moment someone is first recognized as human.[95] Some people regard as monstrous "that which eludes gender definition."[96] They may react with discomfort, disgust, or anger, feeling that a nonbinary person is trying to deceive them.[97] Nonbinary people may be targeted

---

[90] Misunderstandings abound; there is an entire genre of online news articles that lists them. *See, e.g.*, Suzannah Weiss, *9 Things People Get Wrong About Being Non-binary*, TEEN VOGUE (Feb. 15, 2018, 4:56 PM), https://www.teenvogue.com/story/9-things-people-get-wrong-about-being-non-binary [https://perma.cc/NDR5-3TSZ]; Meg Zulch, *7 Things Genderqueer People Want You to Know*, BUSTLE (Dec. 3, 2015), https://www.bustle.com/articles/124009-7-things-genderqueer-people-want-you-to-know [https://perma.cc/TA5M-YNZ9].

[91] Bergman & Barker, *supra* note 31, at 36 (quoting a U.K. Ministry of Justice statement that it is "not aware that that results in any specific detriment" to this group).

[92] JAMES ET AL., *supra* note 2, at 155 (reporting that 14% of nonbinary respondents to the USTS hid their "past transition to avoid discrimination in the past year"); Giang, *supra* note 57 (quoting one nonbinary job seeker: "I fear I and many other people may have to hide an essential part of who we are — our genders — in order to find jobs"). *See generally* KENJI YOSHINO, COVERING: THE HIDDEN ASSAULT ON OUR CIVIL RIGHTS ix (2006) ("To cover is to tone down a disfavored identity to fit into the mainstream.").

[93] JAMES ET AL., *supra* note 2, at 49 (finding that 44% of nonbinary respondents to the 2015 USTS "usually let others assume they were a man or woman, and 53% sometimes corrected others"). The most common reasons for not disclosing a nonbinary identity were: "[m]ost people do not understand so they do not try to explain it" (86%), "[i]t is easier not to say anything" (82%), "[m]ost people dismiss it as not being a real identity or a 'phase'" (63%), and "[t]hey might face violence" (43%). *Id.*

[94] *Id.* at 154.

[95] *See* JUDITH BUTLER, BODIES THAT MATTER 232 (1993).

[96] PETER BROOKS, *What is a Monster? (According to* Frankenstein*)*, *in* BODY WORK 199, 219 (1993) ("Because a monster is that which calls into question all our cultural codes, including language itself, we can understand the persistent afterlife of Mary Shelley's creation, which shows us that, quite literally, once you have created a monster, whatever the ambiguities of the order of its existence, you can never get rid of it."); *cf.* Susan Stryker, *My Words to Victor Frankenstein Above the Village of Chamounix: Performing Transgender Rage*, 1 GLQ: J. LESBIAN & GAY STUD. 237, 250 (1994) ("Like [Mary Shelley's] creature, I assert my worth as a monster in spite of the conditions my monstrosity requires me to face, and redefine a life worth living.").

[97] Doan recalls an incident of street harassment in which a man confronted her with "smouldering anger" and "started yelling 'I know what you are! You can't fool me! You are disgusting!'" Doan, *supra* note 58, at 640.

for violence and assault because they are perceived as both socially vulnerable and without human feeling and dignity.[98]  Nonbinary gender identities may unleash moral panic because they call into question accepted social norms about gender identity.[99]  One agender person reports regularly being told to "throw myself on the tracks" when waiting for a subway train.[100]  People may fear that those who are willing to transgress social norms with respect to binary gender may also be willing to transgress other social boundaries, posing threats to safety.[101]  Or they may fear contagion.  One nonbinary trans man reports that his father kicked him out of the house for fear that he would influence his younger sister to "be gay or be trans."[102]

Investments in binary gender may also drive animus against nonbinary people.  Those who celebrate and cherish gender difference may fear that nonbinary identities will render their views politically incorrect or even legally impermissible.[103]  They may worry that binary gender will become a minority perspective that is no longer the default position respected by public discourse or institutions.  Additionally, those who are privileged because they fall on the masculine side of the gender binary may fear a loss of that privilege if gender were reconceived as a free-form range of possibilities.  Or, those whose feminine identities afford them particular forms of privilege — such as access to all-female social spaces or awards — may fear the intrusion of nonbinary people, the dilution of benefits as nonbinary people insist on spaces for themselves, or the dissolution of the very categories of women or femininity.[104]

---

[98] Doan tells about an incident in which a drunken man in an elevator groped her breasts, expecting to find them false. *Id.* at 641.  What was most hurtful about the assault was that the man had a female companion, which had "lulled" Doan "into feeling safe." *Id.*  Doan writes, "I am fairly certain that if he had tried to fondle a female whose femininity was unimpeachable, his companion would probably have pulled him back in horror. . . . This incident simply drove home the point that people whose gender does not seem quite right are fair game for all manner of treatment." *Id.*

[99] *See* Tucker Carlson, *Are "Gender-Neutral" Babies the Future?*, FOX NEWS (July 17, 2017), http://video.foxnews.com/v/5510847908001/?#sp=show-clips [https://perma.cc/FU8K-YQGY] ("Well for all of our lives we've lived in a world of boys and girls but that is changing along with everything else in 2017. . . . Are we ready for a world here where baby boys and girls are replaced by baby somethings?").  For discussion of moral panics, see generally STANLEY COHEN, FOLK DEVILS AND MORAL PANICS: THE CREATION OF THE MODS AND ROCKERS (1972).

[100] *Gender: The Space Between*, *supra* note 18, at 7:00 (interviewing Brin Solomon).

[101] *Cf.* Kath Browne, *Genderism and the Bathroom Problem: (Re)materialising Sexed Sites, (Re)creating Sexed Bodies*, 11 GENDER, PLACE & CULTURE 331, 336–38 (2004) (discussing experiences of the "bathroom problem" "where individuals are challenged in toilet spaces and their gender questioned," *id.* at 336–37, and hypothesizing that "where bodies are revealed as unstable and porous, flowing between sexes may be more threatening," *id.* at 338).

[102] *Gender: The Space Between*, *supra* note 18, at 2:34 (interviewing Quinn Diaz).

[103] *See Cal. Assemb. Transp. Hearing*, *supra* note 86 (statement of Michael McDermott) (opposing California's Gender Recognition Act because "the purpose of political correctness is neither to inform nor to educate, but rather to humiliate").

[104] *See* Jessica Chasmar, *Girls Complain After "Non-binary" Boy* [sic] *Is Crowned Prom Queen in NYC*, WASH. TIMES (June 29, 2016), https://www.washingtontimes.com/news/2016/jun/29/high-

*HARVARD LAW REVIEW* [Vol. 132:894]

General trends of increasing political polarization may increase hostility toward nonbinary people, who may be figured as emblems of the left's position on gender roles. Opposition to nonbinary gender identity may result in intentional "misgendering": the refusal to refer to a person by the correct pronouns or other gender designations.[105] Nonbinary people may be stereotyped as "difficult."[106] Underlying this concern may be a fear of causing social offense by using the wrong terms.[107] Nonbinary people may be associated with controversial ideas in higher education, such as "trigger warnings" or "political correctness."[108]

### C. *Convergences and Divergences with Other Rights Struggles*

Advocates of nonbinary recognition have framed their case in terms of universal values such as self-determination, love, safety, privacy, human flourishing, inclusion, and respect.[109] This section begins to map out some of the connections between the movement for nonbinary gender rights and feminist, LGBT, intersex, antiracist, and postcolonial

---

school-girls-complain-after-non-binary-boy-is/ [https://perma.cc/WB6N-CY8J] (discussing negative reactions on social media). *But see* Zoe Sullivan, *Wisconsin High School to Unveil Gender-Neutral Homecoming Court*, THE GUARDIAN (Oct. 16, 2015, 7:00 AM), https://www.theguardian.com/us-news/2015/oct/16/wisconsin-high-school-to-unveil-gender-neutral-homecoming-court [https://perma.cc/SY3S-WGYL] ("A high school in Wisconsin is poised to unveil a gender-neutral homecoming court after nearly half the student body signed a petition calling for changes to the court's structure. . . . Instead of being crowned 'king' or 'queen', the top vote earners at Madison West will be able to choose their titles.").

[105]  Misgendering may also be negligent or accidental. Nonbinary people sometimes report that a consequence of accidental misgendering is a demand that the nonbinary person forgive and console the person who made the mistake. *See, e.g.*, Mamone, *supra* note 84; Paulus van Horne, *Introducing Myself as "They/Them/Their" at My Workplace*, at 19:58, PUB. RADIO INT'L (Aug. 8, 2016, 11:00 AM), https://www.pri.org/stories/2016-08-08/so-what-are-your-pronouns [https://perma.cc/WQK6-GNFD] (interview with Jack Qu'emi) ("You don't need to make a big deal about it. . . . I had somebody misgender me and then cry in front of me about it. I was uncomfortable . . . .").

[106]  Bergman & Barker, *supra* note 31, at 37.

[107]  *See supra* note 105.

[108]  Bergman & Barker, *supra* note 31, at 37.

[109]  *See, e.g.*, Cal. Assemb. Judiciary Hearing, *supra* note 1 (statement of Cristina Garcia, Member, Assemb. Standing Comm. on Judiciary) (responding to an opponent of the Gender Recognition Act: "I do hope that as we move forward, we come from a place of love, a place of understanding, and a place where we let individuals decide for themselves what they need"); *id.* (statement of Ash Kalra, Member, Assemb. Standing Comm. on Judiciary) (arguing in support of the Gender Recognition Act as a way to "stand on the side of ensuring that we create not just a safe community for all but one in which everyone can live their full potential and live their lives in a way that allows them to be loved and supported by their community"); Press Release, Exec. Office of the Mayor of D.C., Mayor Bowser Announces Addition of Gender Neutral Identifier to Drivers Licenses and Identification Cards (June 23, 2017), https://mayor.dc.gov/release/mayor-bowser-announces-addition-gender-neutral-identifier-drivers-licenses-and [https://perma.cc/V4VS-8AYT] (quoting a Washington, D.C., official: "The implementation of a gender neutral identifier is consistent with our DC values of inclusion and respect").

advocacy, with an emphasis on legal arguments.[110]   It is beyond the scope of this Article to canvass these connections in any comprehensive way.   This section intends to provide an overview of some potential convergences and divergences among the legal interests of these identity movements.   Its aim is to illustrate that nonbinary gender identity is worthy of independent analysis and has broad implications.

*1. Feminist Arguments.* — Feminist theory of the late twentieth century criticized binary concepts of gender, and those critiques found limited uptake in the law.   Nonbinary gender rights advocacy today both draws on feminist arguments and diverges from them, opening new legal possibilities.

Early feminist critiques of binary gender were built on a distinction between sex as physical and gender as social.[111]   In 1975, cultural anthropologist Gayle Rubin criticized the "sex/gender system," which she analogized to Marx's explanation of the relationship between race and slavery.[112]   Rubin argued for critical analysis of the "social apparatus which takes up females as raw materials and fashions domesticated women as products."[113]   She described how kinship systems, resting on "[c]ompulsory heterosexuality,"[114] organized social life and production around marriage and "the sexual division of labor," making men dominant breadwinners and women subordinate caretakers.[115]   This system rests on "a taboo against the sameness of men and women, a taboo dividing the sexes into two mutually exclusive categories, a taboo which exacerbates the biological differences between the sexes and thereby *creates* gender."[116]   Thus, Rubin made the case for freeing women from the constraints of subordination.   But her theory was also about broader gender freedom.   She concluded: "Ultimately, a thoroughgoing feminist revolution would liberate more than women.   It would liberate forms of sexual expression, and it would liberate human personality from the straightjacket of gender."[117]

---

[110]  These topics were selected due to the extent of their overlap with nonbinary rights claims, but that is not to deny that there may also be useful intersections to explore with respect to disability, class, age, religion, and other identities.

[111]  *See, e.g.*, Donna J. Haraway, *"Gender" for a Marxist Dictionary: The Sexual Politics of a Word*, *in* CULTURE, SOCIETY AND SEXUALITY: A READER 82, 86–89 (Richard Parker & Peter Aggleton eds., Routledge 2d ed. 2007) (1999).

[112]  *See* Gayle Rubin, *The Traffic in Women: Notes on the "Political Economy" of Sex*, *in* TOWARD AN ANTHROPOLOGY OF WOMEN 157, 158–59 (Rayna R. Reiter ed., 1975).

[113]  *Id.* at 158.

[114]  *Id.* at 198.   This term was popularized in an essay by Adrienne Rich.   Adrienne Rich, *Compulsory Heterosexuality and Lesbian Existence*, 5 SIGNS: J. WOMEN CULTURE & SOC'Y 631 (1980).

[115]  Rubin, *supra* note 112, at 178.

[116]  *Id.*

[117]  *Id.* at 200.

*HARVARD LAW REVIEW*              [Vol. 132:894

Twentieth-century feminists debated whether this liberation would result in a sort of idealized androgyny, where all individuals combine the best of both masculine and feminine traits,[118] or in an unbounded diversity of gender identities, with each person determining their own reconfigurations of masculinity and femininity, and other genders off the spectrum.[119]  Fiction, like Ursula Le Guin's novel *The Left Hand of Darkness*, assisted in the project of imagining different configurations of gender.[120]

At the same time, feminist lawyers pursued legal strategies that attempted to chip away at legally enforced sex roles for men and women, stereotype-by-stereotype, rather than engaging in wholesale critique of binary gender.[121]  In these cases, men challenged rules that assumed that only women would be caretakers,[122] and women challenged rules that assumed only men would be breadwinners.[123]  Today, the U.S. Supreme Court is skeptical of laws that classify on the basis of sex, requiring that they be supported by an "exceedingly persuasive justification."[124]  That justification must hold up by present-day standards.[125]  The Supreme Court's sex-stereotyping jurisprudence protects gender nonconformists: for example, women who want to attend military academies and men

---

[118] *Compare* CAROLYN G. HEILBRUN, TOWARD A RECOGNITION OF ANDROGYNY, at ix–x (1973) ("[O]ur future salvation lies in a movement away from sexual polarization and the prison of gender toward a world in which individual roles and the modes of personal behavior can be freely chosen."), *with* Joan W. Scott, *Deconstructing Equality-Versus-Difference: Or, the Uses of Poststructuralist Theory for Feminism*, 14 FEMINIST STUD. 33, 45 (1988) (arguing that the problem with "subsuming women into a general 'human' identity" is that it brings us back "to the days when 'Man's' story was supposed to be everyone's story").

[119] *See, e.g.*, Frances E. Olsen, *The Family and the Market: A Study of Ideology and Legal Reform*, 96 HARV. L. REV. 1497, 1578 (1983) ("Rather than shades of grey as an alternative to all black and all white, I envision reds and greens and blues.").

[120] URSULA K. LE GUIN, THE LEFT HAND OF DARKNESS (1969) (depicting, in science fiction, an androgynous species in which individuals move back and forth between male and female reproductive roles).  For a different fictional vision of androgyny, see MARGE PIERCY, WOMAN ON THE EDGE OF TIME (1976).

[121] *See, e.g.*, Cary Franklin, *The Anti-stereotyping Principle in Constitutional Sex Discrimination Law*, 85 N.Y.U. L. REV. 83, 120 (2010).

[122] *See, e.g.*, Weinberger v. Wiesenfeld, 420 U.S. 636, 648–53 (1975) (holding unconstitutional a Social Security rule that provided benefits to mothers but not fathers).

[123] *See, e.g.*, Frontiero v. Richardson, 411 U.S. 677, 688–91 (1973) (plurality opinion) (holding unconstitutional a statutory requirement that female officers, but not male officers, needed to prove the dependency of their spouse in order to receive benefits).

[124] Sessions v. Morales-Santana, 137 S. Ct. 1678, 1690 (2017) (quoting United States v. Virginia, 518 U.S. 515, 531 (1996)).

[125] *Id.* ("Moreover, the classification must substantially serve an important governmental interest *today*, for 'in interpreting the [e]qual [p]rotection [guarantee], [we have] recognized that new insights and societal understandings can reveal unjustified inequality . . . that once passed unnoticed and unchallenged.'" (alterations and omission in original) (quoting Obergefell v. Hodges, 135 S. Ct. 2584, 2603 (2015))).

who want to attend nursing schools.[126]  Even without the Court's direction, the antistereotyping principle has succeeded in convincing legislatures to remove sex classifications from the statute books.[127]

But the force of the antistereotyping principle has been limited.  The Court has distinguished laws based on "overbroad generalizations about the different talents, capacities, or preferences of males and females" from those sex classifications based on the "enduring" nature of "[p]hysical differences between men and women."[128]  Thus, equal protection challenges against laws that forbid women, but not men, to bare their chests, have had mixed success.[129]  Courts have refused to upset sex-specific rules they regard as reflecting "comfortable gender conventions" and having a trivial impact on women, such as job requirements that women, but not men, wear makeup.[130]  And courts have upheld policies that consider sex for affirmative action purposes.[131]

In the twentieth century, the more radical feminist project of re-envisioning gender identity to include genders that are not male or female ran into opposition.  Conventional wisdom is that everywhere one looks, one sees human life sorted into male and female categories — with counterexamples written off as exceptions to the rule.[132]  The

---

[126] *Virginia*, 518 U.S. at 534 (holding that the exclusion of women from the Virginia Military Institute was unconstitutional); Miss. Univ. for Women v. Hogan, 458 U.S. 718, 729–31 (1982) (holding unconstitutional a policy of excluding men from a nursing school because it "tends to perpetuate the stereotyped view of nursing as an exclusively woman's job," *id.* at 729).

[127] For example, although the Supreme Court in 1981 upheld a state statute defining statutory rape as sexual intercourse by a male with a female, Michael M. v. Superior Court, 450 U.S. 464, 472–73 (1981), all U.S. states have since amended their laws to apply to anyone who has sex with a minor, Carolyn Cocca, *"16 Will Get You 20": Adolescent Sexuality and Statutory Rape Laws, in* ADOLESCENT SEXUALITY: A HISTORICAL HANDBOOK AND GUIDE 15, 21 (Carolyn Cocca ed., 2006).  Though the statutes may be gender neutral, it is important to note they are selectively enforced along gendered lines.  *See* Cynthia Godsoe, *Recasting Vagueness: The Case of Teen Sex Statutes*, 74 WASH. & LEE L. REV. 173, 204 (2017).

[128] *Virginia*, 518 U.S. at 533; *see also id.* at 550 n.19 (noting that physical differences between male and female cadets "would undoubtedly require alterations necessary to afford members of each sex privacy from the other sex in living arrangements, and to adjust aspects of the physical training programs").  In 2001, the Supreme Court upheld an immigration rule that "require[d] unwed U.S.-citizen fathers, but not mothers, to formally acknowledge parenthood of their foreign-born children in order to transmit their U.S. citizenship to those children." *Morales-Santana*, 137 S. Ct. at 1694 (discussing Nguyen v. INS, 533 U.S. 53, 62–63 (2001)).  The explanation: because of the physical nature of pregnancy, a woman's parental status is established when she gives birth, while an unwed father's connection to a child requires some additional evidence. *Id.*

[129] *Compare* Free the Nipple v. City of Fort Collins, 216 F. Supp. 3d 1258, 1264–66 (D. Colo. 2016) (denying a motion to dismiss plaintiff's equal protection challenge), *with* Tagami v. City of Chicago, 875 F.3d 375, 380 (7th Cir. 2017) (upholding, in a divided decision, a law that allows men, but not women, to bare their breasts against equal protection challenge).

[130] YURACKO, *supra* note 30, at 45.

[131] *See, e.g.,* Johnson v. Transp. Agency, 480 U.S. 616, 619–20 (1987) (Title VII challenge); Schlesinger v. Ballard, 419 U.S. 498, 499–500, 510 (1975) (constitutional challenge).

[132] *See* Joan C. Williams, *Feminism and Post-Structuralism*, 88 MICH. L. REV. 1776, 1778 (1990) (reviewing ZILLAH R. EISENSTEIN, THE FEMALE BODY AND THE LAW (1988)) (arguing that

HARVARD LAW REVIEW [Vol. 132:894

critique of binary gender is often reduced to straw figures easily dismissed. For example, critics charge that feminists deny biological facts about sexual dimorphism in the human species or deny biology altogether.[133] Critics assume the only alternative is an impossible form of gender blindness or a tyrannical form of gender abolition.[134]

Some advocates for nonbinary people today frame their arguments in terms that recall Rubin's idea of "liberat[ing] human personality from the straightjacket of gender."[135] These new arguments emphasize the liberty and autonomy of each individual with respect to gender, rather than the potential for subordination in dualisms like male/female.[136] They also emphasize authenticity.

Consider the case brought by Dana Zzyym challenging the State Department's policy of requiring an applicant to mark either M or F on a passport application.[137] Zzyym is intersex[138] and nonbinary[139] and uses they/them pronouns.[140] Zzyym requested a passport with an X as the sex designation, and the State Department denied that request.[141] The district court ruled for Zzyym, holding that the State Department's "gender policy is arbitrary and capricious and not the product of rational decision making."[142] While the court's decision did not discuss the

---

theory cannot dissuade people, rather, feminists need "detailed redescription" in the form of "psychological data that allows us to see how a continuum of behavior variation is so consistently interpreted as a male/female dichotomy" in order to "help[] people recognize the artificiality of the gender verities they 'see' at work around them").

[133] Many feminist arguments have been "interactionist": about the relationship between biology and culture, not a denial of biology. Haraway, *supra* note 111, at 87.

[134] Suzanne B. Goldberg, Essay, *Risky Arguments in Social-Justice Litigation: The Case of Sex-Discrimination and Marriage Equality*, 114 COLUM. L. REV. 2087, 2089, 2133 (2014) (arguing that judges may have "an internalized sense . . . that if sex-based rules were not tolerated on occasion, we would all wind up in unisex tunics, having lost our sexed and gendered bearings," *id.* at 2133); Joan Williams, *Implementing Antiessentialism: How Gender Wars Turn Into Race and Class Conflict*, 15 HARV. BLACKLETTER L.J. 41, 81 (1999) ("We live in a world where most people feel awkward if they don't know whether you are a 'he' or a 'she.' A world where gender was as unimportant as eye color, many people feel, would leave them literally speechless. (The alternative of inventing a new language, which holds considerable appeal for intellectuals, probably holds little appeal for most people.)").

[135] Rubin, *supra* note 112, at 200.

[136] *See, e.g.*, *Cal. Assemb. Judiciary Hearing*, *supra* note 1 (statement of Carly Mitchell) ("We need autonomy over our own bodies and minds, which means we need doctors taken out of this process.").

[137] *Zzyym v. Pompeo*, No. 15-cv-02362, 2018 WL 4491434, at *1 (D. Colo. Sept. 19, 2018).

[138] *Id.*

[139] Reporter's Transcript Hearing on Pending Motions at 7, *Zzyym v. Kerry*, 220 F. Supp. 3d 1106 (D. Colo. 2016) (No. 15-cv-02362) [hereinafter Zzyym Transcript].

[140] *Id.*

[141] *Zzyym*, 2018 WL 4491434, at *1.

[142] *Id.* at *8. The court also held that the State Department had exceeded its statutory authority, because "[t]he authority to issue passports and prescribe rules for the issuance of passports under 22 U.S.C. § 211a does not include the authority to deny an applicant on grounds pertinent to basic identity, unrelated to any good cause as described in" Supreme Court precedents. *Id.* at *9.

nature of the harm to Zzyym, Zzyym's rights claims were plainly important. The government's lawyer accused Zzyym of "cause litigation," arguing they were "asking the Court to upset the traditional binary that pervades our society."[143] The accusation of "cause litigation" suggests that theoretical arguments against binary gender are not persuasive, perhaps because they are political rather than legal. The government further argued that the passport "is not a matter of self-expression," rather, it "is a government form."[144]

The judge, however, asked questions suggesting the issue was the right of nonbinary people to travel internationally, without having to misrepresent their identities by selecting inaccurate F or M designations.[145] This argument stakes a claim to a type of liberty, but not in the thin sense of freedom of choice. It asserts that nonbinary people should not be forced to adopt a binary sex category that is a lie. As California Senator Scott Wiener explained in support of the Gender Recognition Act: "[W]e want people to live their authentic lives as who they are, and this is simply removing a government barrier."[146] Senator Wiener connected the Gender Recognition Act to the feminist critique of binary gender:

> We have a history in this country and in this world of forcing people into gender roles. Whether it's forcing women to be a certain way in life or forcing young boys to be a certain way or forcing all manner of people to be who society says they are as opposed to who they actually are.[147]

While nonbinary gender rights claims may build on feminist arguments, it is important to note potential areas of divergence between feminist and nonbinary gender advocacy. Some feminists may be concerned that expanding the space outside binary gender will trade off with efforts to expand what it means to be a woman.[148] Others may believe sex discrimination law should challenge only the most egregious forms of subordination of women, rather than pursuing the libertarian project

---

143  Zzyym Transcript, *supra* note 139, at 45.

144  *Id.* at 52.

145  *See, e.g., id.* at 14 (question from Judge Jackson asking the lawyer for the government to respond to the concern that a "person with . . . ambiguous genitalia, who is neither male or female, can't leave the country because you have to have the passport to get out legally, can't leave the country unless they lie. And by lie, they check 'F' or they check 'M.'").

146  *Cal. Assemb. Judiciary Hearing, supra* note 1 (statement of Sen. Scott Wiener).

147  *Id.; see* Brandon Interview, *supra* note 62, at 13 ("[T]o me, really, identifying as non-binary is really a rather cool notion because you're basically looking at centuries worth of this enforced expectation of the gender you were assigned at birth and just saying, 'Screw that, that's not how I feel, this is how I feel and I want this to be respected.'").

148  *Cf.* Freeman, *supra* note 52 (discussing an interview with nonbinary writer and director Jill Soloway in which the interviewer voiced the concern "that the definition of a woman should be broader, as they have shown in their work. To retreat from being called a woman feels as if they are giving up the field").

of releasing all people from the straightjacket of gender.[149] And others have criticized moves toward gender neutrality on the ground that, due to the unique forms of subordination experienced by people who were socialized as women, certain spaces or opportunities should be reserved for only those who were assigned female at birth.[150] In debates over nonbinary gender rights, some radical feminists have expressed concerns about the "implications . . . for the safety, privacy, and bodily integrity of women and girls."[151]

Other feminists have drawn upon transgender experiences without concern about how feminist projects would affect transgender people.[152] Feminists have been criticized for reducing transgender people to useful examples, rather than subjects in their own right. In the 1990s, Riki Wilchins described the evolution of academic approaches to transgender people as one in which "psychiatrists" first cast them as "patients," and "[t]hen came the feminist theorists who — while erasing our own voices, and without soiling their pages with the messy complexities of our lived experience — appropriated us as illustrations for their latest telling theories or perceptive insights. We had become examples."[153] A feminist movement focused on expanding the social space for gender nonconforming women or men does not necessarily make space for those who cast off those labels altogether.

As nonbinary people become increasingly visible, their existence may work to undermine the conventional wisdom that gender identities are binary and that sex-specific rules are largely inoffensive. The circulation of narratives about nonbinary people trying to navigate social and

---

[149] See YURACKO, supra note 30, at 23–24 (describing how this view influences legal doctrine in the context of "sex-based grooming codes").

[150] For an example of this genre of "radical feminist" writing, see Sheila Jeffreys, *The Politics of the Toilet: A Feminist Response to the Campaign to "Degender" a Women's Space*, 45 WOMEN'S STUD. INT'L F. 42, 42 (2014). For background on arguments raised by radical feminists such as Jeffreys against transgender rights in general, see Michelle Goldberg, *What Is a Woman?: The Dispute Between Radical Feminism and Transgenderism*, NEW YORKER (Aug. 4, 2014), https://www.newyorker.com/magazine/2014/08/04/woman-2 [https://perma.cc/565N-5DBQ]. For a thoughtful response to the radical feminist argument, see generally Lori Watson, *The Woman Question*, 3 TRANSGENDER STUD. Q. 246 (2016).

[151] *WoLF Members Pushing Back Against Local "Gender Identity" Legislation, supra* note 39 ("Will any man, for any reason, be allowed to declare himself to be 'nonbinary gender' and gain access to women's spaces? Will the District's special programs for women and girls become available to men who self-identify as 'non-binary'?").

[152] The same could be said of some feminist appropriations of postcolonial and antiracist struggles, without concern for how feminist projects might impact people of color. *See infra* section I.C.5, pp. 930–33.

[153] RIKI ANNE WILCHINS, READ MY LIPS: SEXUAL SUBVERSION AND THE END OF GENDER 21 (1997). This Article makes no effort to advance any particular gender theory. It does not intend to use nonbinary people as "patients," "examples," or, as Wilchins charges anthropologists with doing, as "natives." *Id.* at 22. This Article attempts to ask what it would mean for U.S. law to take nonbinary people seriously as full and equal participants in social, economic, and political life.

legal institutions founded on binary sex classifications can compel empathy, understanding, and efforts at inclusion.[154]  As the diversity of nonbinary gender identities becomes more apparent, it may defang the arguments that inclusion requires enforced androgyny, the end of gender, or the abolition of programs that benefit women.

2. *Transgender Rights.* — Some nonbinary people identify as transgender, but others do not.[155]  Most transgender respondents to the 2015 USTS primarily identified as men or women.[156]  From its inception, the transgender rights movement has included voices arguing for what might now be called nonbinary inclusion.[157]  But the legal strategies of transgender men and women may sometimes diverge from those whose gender identities are nonbinary.

Whatever their gender identities, transgender people may share interests in self-determination with respect to sex and gender.[158]  They may sometimes agree that the law should not classify people by sex or gender at all.[159]  Advocates for nonbinary rights also stake their claims in terms of the commonalities of discrimination, oppression, and violence visited upon nonbinary people and transgender men and women.[160]

---

[154] *Cf.* Edward Schiappa et al., *The Parasocial Contact Hypothesis*, 72 COMM. MONOGRAPHS 92, 94–97, 111 (2005) (discussing support for the "Contact Hypothesis": that interpersonal contact with members of minority groups reduces prejudice, especially with respect to gay men and lesbians, and conducting experiments providing some support for the "Parasocial Contact Hypothesis": that exposure to television and other mass media depictions of "gay men and male transvestites" also reduces prejudice, *id.* at 111); Martha Minow, *Rights of One's Own*, 98 HARV. L. REV. 1084, 1099 (1985) (reviewing ELISABETH GRIFFITH, IN HER OWN RIGHT: THE LIFE OF ELIZABETH CADY STANTON (1984)) (discussing the history of women's rights struggles, including "Lucy Stone's unprecedented decision to keep her own name after marriage," and reflecting that "[a]lthough one who takes extreme positions runs the risk of moving beyond the comprehension of people in the mainstream, being 'ultra' may also succeed in expanding the bounds of what is comprehensible").

[155] For a definition of "transgender," see *supra* text accompanying note 12.  Out of nonbinary respondents to the 2015 USTS, 82% reported they were "'very comfortable,' 'somewhat comfortable,' or 'neutral' . . . with the word 'transgender' being used to describe them."  JAMES ET AL., *supra* note 2, at 40.

[156] JAMES ET AL., *supra* note 2, at 45 (reporting that 29% of USTS survey respondents identified primarily as a "transgender man" or a "man" and 33% identified primarily as a "transgender woman" or a "woman").  *But see* Rob Clucas & Stephen Whittle, *Law*, in GENDERQUEER AND NON-BINARY GENDERS, *supra* note 27, at 73, 74 (arguing it is "short sighted" to view transgender men and women as binary, because they too undermine the naturalization of gender).

[157] *See, e.g.*, Bergman & Barker, *supra* note 31, at 32–33 (discussing work by Kate Bornstein and Stephen Whittle written in the 1990s).

[158] *See, e.g.*, Clarke, *Identity and Form*, *supra* note 28, at 763–64 (discussing "elective" concepts of sex and gender).

[159] *See, e.g.*, Olga Tomchin, Comment, *Bodies and Bureaucracy: Legal Sex Classification and Marriage-Based Immigration for Trans\* People*, 101 CALIF. L. REV. 813, 815 n.4, 818 (2013) (arguing that "only total elimination of 'sex' as a legal category will eliminate [the] harms" of rules such as those "governing marriage-based immigration for trans\* people," *id.* at 818).

[160] *See, e.g.*, *Cal. Assemb. Judiciary Hearing*, *supra* note 1 (statement of Carly Mitchell) ("So, why do we need a non-binary identification?  This week alone, I was harassed multiple times, because

*HARVARD LAW REVIEW* [Vol. 132:894

These claims sound in universal rights to human flourishing and respect, rather than liberty. They tap into arguments against group-based stigma, caste, and subordination.[161]

But "who decides your sex or gender?" is a different question than "how many options are there?" In law, arguments for transgender rights have sometimes been in tension with critiques of binary gender.[162] Some transgender people may want legal recognition of their male or female gender identities, rather than elimination of those categories.[163] On the flip side, scholars and activists who critique binary gender have long debated whether the inclusion of transgender people in the existing categories of "male" or "female" will make it more difficult to reimagine those categories.[164]

Pragmatic legal advocates may calculate that it is strategic to decouple arguments for recognition of a male or female gender identity from arguments for recognition of nonbinary identities. Nonbinary gender may sound less sympathetic, more disruptive, and too novel to judges and the public. There is a Kafkaesque "man trapped in a woman's body" narrative that is sometimes persuasive to non-transgender people, who can imagine what it would be like to wake up one day in the wrong body.[165] But nonbinary people may seem to disrupt this narrative. For example, Wilchins has said, "I've never been trapped in anyone else's body, and I hope you haven't either . . . . I admit I do still occasionally

---

I deviate from my assigned gender. We are assaulted, imprisoned, murdered, and this daily stress has caused 41% of us to attempt suicide, like I did."); *supra* p. 910.

[161] *See* Jessica A. Clarke, *Frontiers of Sex Discrimination Law*, 115 MICH. L. REV. 809, 833–37 (2017) (book review) (discussing antisubordination theories and their potential in transgender rights litigation).

[162] *See, e.g.*, JANET HALLEY, SPLIT DECISIONS: HOW AND WHY TO TAKE A BREAK FROM FEMINISM 262–63 (2006) (asking how "insistence on the fluidity of all the elements of gender and sexuality" would "cope with the strong desire of many transsexuals to embody one gender or the other, *really*, and to consolidate themselves and their lovers as m or f all the way down").

[163] *See, e.g.*, Talia Mae Bettcher, *Trapped in the Wrong Theory: Rethinking Trans Oppression and Resistance*, 39 SIGNS: J. WOMEN CULTURE & SOC'Y 383, 385 (2014) ("Many trans people see themselves as men and women. Taken to its most extreme, the beyond-the-binary model suggests these people are mistaken (i.e., it invalidates their self-identities).").

[164] *See, e.g.*, WILCHINS, *supra* note 153, at 67 (expressing the concern that a "transgender rights movement . . . unable to interrogate the fact of its own existence, will merely end up cementing the idea of a binary sex which I am presumed to somehow transgress or merely traverse"). For a recent debate about how this plays out in legal arguments, *compare* YURACKO, *supra* note 30, at 174 (arguing that "[v]ictory" for nonconformists who rely on arguments about the immutability of gender identity "may come at the expense of greater rigidity of gender roles and expectations for all workers"), *with* Paisley Currah, *Transgender Rights Without a Theory of Gender?*, 52 TULSA L. REV. 441, 446 (2017) (book review) (arguing that Yuracko has no evidence of a causal connection between the successes of transgender plaintiffs who argue gender identity is immutable and the losses of other gender-nonconforming plaintiffs), *and* Cruz, *supra* note 26, at 277 (arguing that those authors concerned about tradeoffs "overstate what a court must do to rule for a transgender plaintiff").

[165] Riki Wilchins, *Epilogue: Gender Rights Are Human Rights*, *in* GENDERQUEER: VOICES FROM BEYOND THE SEXUAL BINARY, *supra* note 17, at 289, 290.

AR_292783

awake quivering in the night with the conviction that I am trapped in the wrong culture."[166]

Additionally, nonbinary gender seems to require more extensive social change in disrupting sex-segregated spaces and binary gender norms. In a 2017 case in which a transgender boy won the right to use facilities consistent with his gender identity, the court noted approvingly that "allowing transgender students to use [male or female] facilities that align with their gender identity has actually reinforced the concept of separate facilities for boys and girls."[167] Courts may perceive requests for accommodation from nonbinary individuals as a much greater "ask" than requests to be integrated into male or female categories.

Opponents of the extension of discrimination law to cover gender identity may point to nonbinary people as demonstrating the purported absurdity of the project.[168] While these opponents may have been willing to agree that it is gender identity–based harassment for an employer to insist on referring to a transgender woman as "he" and "Mr.," they may not agree that employers should be required to use more unfamiliar pronouns, such as "ze and hir."[169] Issues related to pronouns are often distorted and politicized. After a guide on gender-neutral pronouns led to false reports that the University of Tennessee, Knoxville, had banned the use of "he" and "she," the Tennessee legislature voted to defund the University's Office for Diversity and Inclusion, and to forbid the University from using state funds "to promote the use of gender neutral pronouns."[170] But sometimes, nonbinary gender recognition may be uncontroversial. When New Jersey passed its Babs Siperstein Law[171] recognizing the right of transgender people to change the sex designations on their birth certificates without the need for any medical

---

[166] *Id.* at 290–91.

[167] Whitaker *ex rel.* Whitaker v. Kenosha Unified Sch. Dist., 858 F.3d 1034, 1055 (7th Cir. 2017).

[168] *See supra* notes 85–86 and accompanying text (discussing unique reasons for opposition to nonbinary gender identities, including the idea that these identities are a trend or are absurd).

[169] *Cf.* Eugene Volokh, Opinion, *You Can Be Fined for Not Calling People "Ze" or "Hir," If That's the Pronoun They Demand that You Use*, WASH. POST: VOLOKH CONSPIRACY (May 17, 2016), https://wapo.st/24Xqa6Y [https://perma.cc/3D4H-5B2E] [hereinafter Volokh, *You Can Be Fined*] ("Or what if some people insist that their title is 'Milord,' or 'Your Holiness'? They may look like non-gender-related titles, but who's to say?"). Professor Volokh himself, however, has a number of First Amendment objections to harassment doctrine in general, and might not even agree that it should be illegal harassment to insult a transgender woman by calling her "Mr." and "him." *See, e.g.*, Eugene Volokh, Comment, *Freedom of Speech and Workplace Harassment*, 39 UCLA L. REV. 1791, 1819–43, 1846 (1992). For a discussion of harassment law, see *infra* section III.B.3, pp. 957–63.

[170] TENN. CODE ANN. § 9-4-5119 (West 2018); *see also* Scott Jaschik, *Fear of New Pronouns*, INSIDE HIGHER ED (Sept. 8, 2015), https://www.insidehighered.com/news/2015/09/08/u-tennessee-withdraws-guide-pronouns-preferred-some-transgender-people [https://perma.cc/L7R3-X2QT].

[171] N.J. STAT. ANN. § 26:8-40.12 (West 2018).

documentation, the fact that the law also included a new "undesignated/non-binary" option did not seem to attract any specific opposition.[172]

A related novelty concern may be that legal claims that sex discrimination law prohibits discrimination on the basis of transgender status will be weighed down by nonbinary gender, because nonbinary gender was not envisioned by the drafters of civil rights–era statutes in the 1960s and 1970s.[173] This controversy turns on what "sex" discrimination means.[174] Federal courts increasingly agree that discrimination against someone for being transgender is a form of sex discrimination because it rests on sex stereotypes.[175] The Obama Administration explicitly extended this logic to nonbinary gender identity, promulgating regulations that clarify that "[sex] stereotypes can include the expectation that individuals will consistently identify with only one gender."[176] This

---

[172] Or at least, none is apparent from the legislative history. *See Hearing on A.1718 Before the Assemb. Human Servs. Comm.*, 218th Leg., 2018 Sess., at 1:07:08 (N.J. 2018) https://www.njleg.state.nj.us/media/mp.asp?M=A/2018/AHU/0312-0200PM-M0-1.M4A&S=2018 [https://perma.cc/X5MA-BES2].

[173] *See* Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2(a) (2012); Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a) (2012). There is a good argument that the drafters' intentions should *not* govern this question. *See* Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 79–80 (1998) (Scalia, J.) (holding that, with respect to the meaning of "sex" discrimination in Title VII, "statutory prohibitions often go beyond the principal evil to cover reasonably comparable evils, and it is ultimately the provisions of our laws rather than the principal concerns of our legislators by which we are governed," *id.* at 79).

[174] *See* Clarke, *supra* note 161, at 824. Title VII and Title IX do not include "gender identity" as a prohibited ground for discrimination, although many state and local rules do. *See State Maps of Laws & Policies*, HUM. RTS. CAMPAIGN, https://www.hrc.org/state-maps [https://perma.cc/2DQ3-C2QZ] (cataloguing state laws that prohibit discrimination on the basis of gender identity in education, employment, identification documents, hate crimes, housing, public accommodations, and health care). *But cf.* Mary Anne Case, Essay, *Legal Protections for the "Personal Best" of Each Employee: Title VII's Prohibition on Sex Discrimination, the Legacy of* Price Waterhouse v. Hopkins, *and the Prospect of ENDA*, 66 STAN. L. REV. 1333, 1366–68 (2014) (discussing how "gender identity" provisions might be defined or interpreted so as to preclude coverage for nonbinary forms of gender identity and expression).

[175] Grimm v. Gloucester Cty. Sch. Bd., 302 F. Supp. 3d 730, 745–46 (E.D. Va. 2018) (discussing precedents from the First, Sixth, Ninth, and Eleventh Circuits). A recent Sixth Circuit opinion held that discrimination based on transgender status is sex discrimination because, among other reasons, it rests on sex stereotyping and might be analogized to discrimination based on religious conversion. EEOC v. R.G. & G.R. Harris Funeral Homes, Inc., 884 F.3d 560, 574–76 (6th Cir. 2018).

[176] 45 C.F.R. § 92.4 (2017) (defining sex stereotypes in Department of Health and Human Services (HHS) regulations interpreting the Affordable Care Act); Nondiscrimination in Health Programs and Activities, 81 Fed. Reg. 31,375, 31,392 (May 18, 2016) (responding to the comment that there was no authority for the proposition that "non-binary genders" are "a protected class" by explaining that prohibited "[s]ex stereotypes can also include a belief that gender can only be binary and thus that individuals cannot have a gender identity other than male or female"). The Affordable Care Act borrows its definition of sex discrimination from Title IX. 42 U.S.C. § 18116(a) (2012). For discussion of litigation over this regulation, see *infra* section III.E, pp. 986–90.

The Sixth Circuit noted its approval of the Obama Administration's argument in a Title VII sex discrimination case, stating:

[D]iscrimination because of a person's transgender, intersex, or sexually indeterminate status is no less actionable than discrimination because of a person's identification with two

interpretation may be exploited by opponents of transgender rights.[177] Their argument: Congress's references to "one sex" or "the other sex" in another provision of the statute demonstrate that Congress could not have intended to cover nonbinary genders.[178] But no court has adopted this view. If a court were to agree with this argument, it would justify voiding the regulation only as to nonbinary gender, not as to transgender men and women.

    *3. Sexual Orientation.* — Gender identity is conceptually distinct from sexual orientation.[179] Nonbinary people have a diverse array of sexual orientations. In response to the 2015 U.S. Transgender Survey, 17% of nonbinary people reported being asexual,[180] 2% reported being straight or heterosexual, and the other 81% reported various orientations, such as queer, pansexual, bisexual, gay, or lesbian.[181] In discussing why many nonbinary people prefer terms such as pansexual and queer, scholar Genny Beemyn explains: "They see *bisexual* as implying a binary, and they are attracted to individuals who are outside of a gender binary or identify outside of a gender binary themselves, or they consider bisexuals to be attracted to different aspects of gender in different people, whereas they are attracted to people regardless of gender."[182]

    There are many convergences between arguments for equality based on nonbinary gender identity and arguments for lesbian, gay, and bisexual equality. Advocates for nonbinary recognition often phrase their claims in the same core values of the marriage equality movement, such as love and acceptance.[183] Legal arguments for nonbinary gender

---

religions, an unorthodox religion, or no religion at all. And 'religious identity' can be just as fluid, variable, and difficult to define as 'gender identity'; after all, both have 'a deeply personal[,] internal genesis that lacks a fixed external referent.'

    *R.G. & G.R. Harris Funeral Homes, Inc.*, 884 F.3d at 575 n.4 (quoting Sue Landsittel, Comment, *Strange Bedfellows? Sex, Religion, and Transgender Identity Under Title VII*, 104 NW. U. L. REV. 1147, 1172 (2010)).

[177] *See* Plaintiffs' Brief in Support of Their Motion for Partial Summary Judgment or, in the Alternative, Preliminary Injunction at 13, Franciscan All., Inc. v. Burwell, 227 F. Supp. 3d 660 (N.D. Tex. 2016) (No. 16-cv-00108), 2016 WL 9049696.

[178] *Id.* at 16 (quoting 20 U.S.C. § 1681(a)(2), (8)). The relevant provisions of Title IX include an exception for "father-son or mother-daughter activities at an educational institution, but if such activities are provided for students of one sex, opportunities for reasonably comparable activities shall be provided for students of the other sex," 20 U.S.C. § 1681(a)(8), as well as an exemption for certain institutions transitioning from single-sex to admitting "students of both sexes," *id.* § 1681(a)(2).

[179] GLAAD MEDIA REFERENCE GUIDE, *supra* note 9, at 6 (defining sexual orientation as "an individual's enduring physical, romantic and/or emotional attraction to members of the same and/or opposite sex, including lesbian, gay, bisexual, and heterosexual (straight) orientations").

[180] *See* Emens, *supra* note 43, at 307–29 (discussing asexuality as a sexual orientation).

[181] *See supra* note 78 and accompanying text.

[182] Genny Beemyn, *Coloring Outside the Lines of Gender and Sexuality: The Struggle of Nonbinary Students to Be Recognized*, 79 EDUC. F. 359, 360 (2015) (discussing interviews of college students).

[183] *See* sources cited *supra* note 109.

inclusion in the United States are possible only against the backdrop of prior achievements in sexual orientation equality.[184] Before *Obergefell v. Hodges*,[185] opponents of nonbinary gender rights had the easy argument that binary sex definitions were required to ensure marriage was only between a man and a woman.[186] That argument is no longer in their quiver.

However, nonbinary people may end up with interests in conflict with some LGBT rights arguments, for reasons similar to the marginalization of bisexuality.[187] As Professor Kenji Yoshino has explained, one reason bisexuality is often left out of discussions of LGBT rights is that it seems to detract from the argument that sexual orientation is immutable.[188] "[I]mmutability offers absolution by implying a lack of choice."[189] Yet bisexuals are perceived to have had the choice to engage in heterosexual relationships.[190] On the one hand, nonbinary gender identity might be perceived as mutable, particularly by those who see it as a phase, a political statement, or a trend.[191] On the other hand, nonbinary gender (like bisexuality) might be immutable in the sense of being an expression of one's authentic self and a fundamental feature of identity that no one should be asked to change.[192] A second reason for bisexual erasure is that the LGBT community may perceive bisexuals as "flight risks — individuals who could at any time abandon the gay

---

[184] *See* Obergefell v. Hodges, 135 S. Ct. 2584, 2607 (2015) (holding that same-sex couples may not be deprived of the right to marry); United States v. Windsor, 570 U.S. 744, 751 (2013) (striking down a federal law that excluded same-sex partners from the definition of "spouse"); Lawrence v. Texas, 539 U.S. 558, 578 (2003) (striking down a Texas statute criminalizing same-sex intimacy between consenting adults).

[185] 135 S. Ct. 2584.

[186] *See, e.g.*, Mathew D. Staver, *Transsexualism and the Binary Divide: Determining Sex Using Objective Criteria*, 2 LIBERTY U. L. REV. 459, 473 (2008).

[187] *See* Michael Boucai, *Sexual Liberty and Same-Sex Marriage: An Argument from Bisexuality*, 49 SAN DIEGO L. REV. 415, 452–53 (2012) (discussing how advocates in the marriage equality cases went to great lengths to ignore bisexuality and to characterize their clients as lesbian or gay); Ann E. Tweedy & Karen Yescavage, *Employment Discrimination Against Bisexuals: An Empirical Study*, 21 WM. & MARY J. WOMEN & L. 699, 699–700 (2015) (arguing that bisexuals "remain largely invisible in the case law and in the popular understanding of discrimination").

[188] *See, e.g.*, Kenji Yoshino, *The Epistemic Contract of Bisexual Erasure*, 52 STAN. L. REV. 353, 405–07 (2000) (offering several explanations for the marginalization of bisexuals in lesbian and gay rights movements).

[189] *Id.* at 406; *see also* Clarke, *supra* note 43, at 13–17 (discussing the "powerful intuitive appeal," *id.* at 17, of the concept that a person should not be penalized for "'accidents of birth' . . . because they bear no relationship to individual responsibility," *id.* at 16, and tracing this idea through equal protection law).

[190] Yoshino, *supra* note 188, at 406. This is despite the fact that some bisexuals report they could not live exclusively as heterosexuals or homosexuals. *Id.* at 407 n.294.

[191] *See supra* pp. 910–11; *cf.* Tran & Glazer, *supra* note 26, at 401–02 ("[W]hat troubles society most about transgender people is that they make choices about aspects of their gender that society believes are not their choices to make.").

[192] *See* Clarke, *supra* note 43, at 23–28 (discussing this version of immutability).

community to lead straight lives."[193]    Similarly, one reason for bias against nonbinary people is fear that their choices as to gender identity will be reversed.[194]   A third reason for bisexual erasure is that, by asserting that sex might not be the primary factor in desire, bisexuality threatens sex as a primary category of social organization.[195]   Many variations on nonbinary gender identity do this explicitly rather than implicitly.[196]   And finally, bisexual people make poor poster children due to stereotypes that they are "promiscuous."[197]   Nonbinary people, many of whom adopt sexual orientations other than straight, gay, or lesbian, may trigger this prejudice as well.

Yet there are also opportunities for convergence.   To the extent that nonbinary legal advocacy challenges the need for legal sex classifications, it may assist legal arguments for nondiscrimination on the basis of sexual orientation.   Federal antidiscrimination statutes, such as Title VII of the Civil Rights Act of 1964[198] and Title IX of the Education Amendments of 1972,[199] do not explicitly prohibit discrimination on the basis of "sexual orientation."   One controversy in federal courts is whether discrimination on the basis of sexual orientation is always a type of sex discrimination prohibited by federal law.[200]   The Second Circuit has accepted the argument that it is, because to discriminate on the basis of sexual orientation, the discriminator must first classify people based on sex — for example, the discriminator must identify a person as a woman, and then disapprove of her sexual attraction for other women.[201]   Opponents argue that this logic would void every sex classification by employers, disturbing, for example, sex-differentiated dress

---

[193] Yoshino, *supra* note 188, at 407.

[194] *See supra* notes 83–86 and accompanying text (discussing the fear of flight*iness* as a reason for bias against nonbinary people).

[195] Yoshino, *supra* note 188, at 413 ("Without a clear and privileged distinction between 'man' and 'woman,' there is no clear and privileged distinction between 'straight' and 'gay.'").

[196] *See supra* notes 95–98 and accompanying text.   Some forms of third-gender identity may serve to underscore the importance of sex as a category of social organization.   *See infra* note 236 and accompanying text.

[197] Yoshino, *supra* note 188, at 420.

[198] 42 U.S.C. § 2000e-2(a)(1) (2012).

[199] 20 U.S.C. § 1681(a) (2012).

[200] *Compare* Zarda v. Altitude Express, Inc., 883 F.3d 100, 108 (2d Cir. 2018) (en banc) (holding it is), *and* Hively v. Ivy Tech Cmty. Coll., 853 F.3d 339, 341 (7th Cir. 2017) (en banc) (same), *with* Evans v. Ga. Reg'l Hosp., 850 F.3d 1248, 1255 (11th Cir.) (holding it is not), *cert. denied*, 138 S. Ct. 557 (2017).

[201] *Zarda*, 883 F.3d at 113–14.   A similar argument is that discrimination against, for example, a lesbian, is sex discrimination because if she were a man, her employer would not object to her sexual attraction to women.   *Hively*, 853 F.3d at 345.   This argument is consistent with a concept of sexual orientation that recognizes people outside of sex and gender binaries.   Robin A. Dembroff, *What Is Sexual Orientation?*, 16 PHILOSOPHERS' IMPRINT, no. 3, Jan. 2016, at 1, 19–20.

codes for men and women.[202]  As nonbinary people challenge the need for sex-differentiated rules across a number of domains of social life, and as nonbinary gender identities gain greater acceptance, they may undermine the persuasive force behind this type of argument.

   4. *Intersex Variations.* — There are also obvious overlaps between intersex and nonbinary organizing.[203]  But the intersex movement is a distinct one, with its own particular relationships to other social justice movements.[204]  Many people with intersex variations have binary gender identities, but not all do.[205]  And many people with nonbinary gender identities do not have intersex variations.[206]  These groups may sometimes share legal interests, although their interests may sometimes diverge.

   Individuals who are both intersex and nonbinary may be at the forefront of advocacy efforts, for strategic and practical reasons.  Nonbinary people with intersex traits may seem more sympathetic to the public and judiciary, because intersex traits are regarded as somatic rather than psychological or elective.[207]  In American legal discourse, psychological conditions are often treated with skepticism.[208]  Nonbinary people like Dana Zzyym, whose claims appear to be grounded in their physical bodies, may have more legitimacy with a skeptical public and judiciary.[209]

---

[202] *See Zarda*, 883 F.3d at 150–51 (Lynch, J., dissenting); Brief for the United States as Amicus Curiae at 17, *Zarda*, 883 F.3d 100 (No. 15-3775), 2017 WL 3277292.  There are also doctrinal arguments against this position, for example, that courts can and do handle dress code controversies under a special doctrinal framework.

[203] One advocacy group marries these two concerns, calling itself the Intersex & Genderqueer Recognition Project.  INTERSEX & GENDERQUEER RECOGNITION PROJECT, http://www.intersexrecognition.org/ [https://perma.cc/L9NH-SWGS].

[204] *See, e.g.*, JULIE A. GREENBERG, INTERSEXUALITY AND THE LAW: WHY SEX MATTERS 97–105 (2012) (mapping out conflicts).  To say the movement is distinct is not to say that everyone agrees "intersex" is an identity.  *See* Ellen K. Feder & Katrina Karkazis, *What's in a Name?: The Controversy over "Disorders of Sex Development,"* 38 HASTINGS CTR. REP., no. 5, Sept.–Oct. 2008, at 33, 35 (discussing controversies over conceptualizing intersex as an identity versus a set of "clinically specific diagnoses" that are "widely disparate" in their features).

[205] *See, e.g.*, PREVES, *supra* note 16, at 60–85.

[206] *See, e.g.*, JAMES ET AL., *supra* note 2, at 44 (describing a USTS survey question asking participants to check all items that described their gender identities in which 31% of respondents selected "non-binary" but only 3% selected "intersex").

[207] *See* M. Dru Levasseur, *Gender Identity Defines Sex: Updating the Law to Reflect Modern Medical Science Is Key to Transgender Rights*, 39 VT. L. REV. 943, 988 (2015) ("One of the barriers to recognition and respect that transgender people face in the courts and beyond is that 'brain sex' is not readily apparent, and transgender people must be believed about who they are." (footnote omitted)).

[208] *See, e.g.*, Dov Fox & Alex Stein, *Dualism and Doctrine*, 90 IND. L.J. 975, 977–80 (2015) (arguing that "much of our doctrine . . . treats mind and body as if they work and matter in critically different ways," often minimizing mental harm, *id.* at 979).  Judges may be wholly unsympathetic to what they perceive as choices with respect to identities.  *See* sources cited *supra* note 189 and accompanying text.

[209] *See supra* pp. 918–19.  In the *Zzyym* case, the government argued that it could not issue passports with gender options other than M or F because of "uncertainty about how it would evaluate persons 'transitioning' to a third sex." Zzyym v. Pompeo, No. 15-cv-02362, 2018 WL 4491434,

They may be able to secure legal changes that redound to the benefit of all nonbinary people. Intersex people in general embody the argument that sex is not a coherent set of binary traits: that chromosomes, hormones, and phenotype do not always provide a consistent answer to the question of whether a person is male or female.[210]

There is a risk, though, that legal efforts on behalf of people with intersex variations may be limited to those deemed to possess an immutable or natural trait.[211] This might exclude altogether the claims of nonbinary people without intersex traits. Or it might support arguments for medical gatekeeping — requiring that nonbinary people secure a physician's opinion regarding their psychological gender as a prerequisite to legal protection.[212] Moreover, opponents of nonbinary recognition often point to the fact that a small percentage of the population is intersex as a reason the law should not protect nonbinary people at all.[213]

One area of potential convergence is with respect to ending the practice of unnecessary surgeries to "fix" intersex infants. The new visibility of nonbinary people may lend support to "[t]he primary goal of the intersex movement," which "is to eliminate or decrease the number of medically unnecessary cosmetic genital surgeries being performed on infants with an intersex condition."[214] A United Nations Special Rapporteur

---

at *7 (D. Colo. Sept. 19, 2018). The court held that this argument "misse[d] the ball" because "intersex people are born as they are." *Id.* This argument also misses the ball for people undergoing transitions to nonbinary gender identities. The State Department's rules for receiving a passport with a different gender marker simply require a letter from a doctor "stating the applicant has had appropriate clinical treatment for gender transition to the new gender of either male or female." U.S. DEP'T OF STATE, 8 FOREIGN AFFAIRS MANUAL 403.3-2(B)(d)(5) (2018), https://fam.state. gov/FAM/08FAM/08FAM040303.html [https://perma.cc/K7CD-2863]. Appropriate clinical treatment does not always entail surgery or hormone therapy. *See, e.g.*, WORLD PROF'L ASS'N FOR TRANSGENDER HEALTH, STANDARDS OF CARE FOR THE HEALTH OF TRANSSEXUAL, TRANSGENDER, AND GENDER NONCONFORMING PEOPLE 2, 8–9 (7th ed. 2011) [hereinafter WPATH STANDARDS]. If there is some reason a doctor's certification is required, people with nonbinary gender identities might also provide letters certifying that they have received appropriate clinical treatment for their gender transitions.

[210] *See* sources cited *supra* note 14 and accompanying text.

[211] *See* Clarke, *supra* note 43, at 32–52 (discussing ways courts have artificially curtailed the reach of discrimination law to exclude protection for traits deemed mutable).

[212] *Cf.* Dean Spade, *Resisting Medicine, Re/modeling Gender*, 18 BERKELEY WOMEN'S L.J. 15, 24 (2003) (critiquing requirements that trans people perform a certain narrative of binary gender identity to medical professionals before receiving legal protection).

[213] *See, e.g.*, Letter from Women's Liberation Front to John Wiesman, Sec'y, Wash. State Dep't of Health, Comments on Preproposal Statement of Inquiry to Amend Chapter 246-490 WAC, Vital Statistics (Aug. 22, 2017), at 2–3 (Sept. 28, 2017) [hereinafter WoLF Letter], http://womensliberationfront. org/wp-content/uploads/2017/09/Comment-on-wac-246-490-075-birth-certificates_final_9-28-17.pdf [https://perma.cc/C9UF-TKKC].

[214] GREENBERG, *supra* note 204, at 4. *See generally* GEORGIANN DAVIS, CONTESTING INTERSEX: THE DUBIOUS DIAGNOSIS (2015); ALICE DOMURAT DREGER, HERMAPHRODITES

has characterized "involuntary genital normalizing surgery" as a form of torture.[215]  An international coalition of medical authorities recommends delaying "unnecessary genital surgery to an age of patient informed consent."[216]  Surgeries on infants have been criticized for "caus[ing] more physical and psychological trauma than does growing up with atypical genitalia."[217]  One justification for these surgeries has been that binary sexual anatomy is crucial for parents to raise a child with a binary gender identity.[218]  Parents are sometimes advised to allow these surgeries to avoid stigmatization of their child, or to ensure their child appears "normal."[219]  But, as Professor Georgiann Davis writes: "Intersex is a problem because it disrupts the traditional gender order. If our behaviors weren't constrained by gender, if opportunities weren't filtered through gender, and if gender weren't tied to bodies and identities, it is doubtful that intersex would be as problematic throughout the world as it is today."[220]  As nonbinary lives become mainstream, parents and the medical profession may have less to fear for children with ambiguous genitalia or other sex characteristics, and these surgeries may decrease.[221]

5. *Antiracist and Postcolonial Struggles.* — Struggles for nonbinary gender rights also have convergences with and divergences from antiracist and postcolonial arguments.

Some nonbinary people point to intersections with antiracist struggles.  For example, Jessi Brandon reports that what resonated with them was the slogan "[r]espect my existence or expect my resistance," because

---

AND THE MEDICAL INVENTION OF SEX (1998); KATRINA KARKAZIS, FIXING SEX: INTERSEX, MEDICAL AUTHORITY, AND LIVED EXPERIENCE (2008); SUZANNE J. KESSLER, LESSONS FROM THE INTERSEXED (1998).

[215] Juan E. Mendéz (Special Rapporteur on Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment), *Rep. of the Special Rapporteur on Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment* ¶ 77, U.N. Doc. A/HRC/22/53 (Feb. 1, 2013), http://www.ohchr.org/Documents/HRBodies/HRCouncil/RegularSession22/A.HRC.22.53_English.pdf [https://perma.cc/K72Z-U8M6].

[216] Christopher P. Houk et al., *Summary of Consensus Statement on Intersex Disorders and Their Management*, 118 PEDIATRICS 753, 755 (2006); *see also* INTERACT & LAMBDA LEGAL, PROVIDING ETHICAL AND COMPASSIONATE HEALTH CARE TO INTERSEX PATIENTS 2 (2018), https://www.lambdalegal.org/sites/default/files/publications/downloads/resource_20180731_hospital-policies-intersex.pdf [https://perma.cc/7X96-XMTC] ("Leading medical associations, recognizing that irreversible and deeply life-altering procedures can be safely delayed to both ensure best outcomes and avoid the potential ramifications of anesthesia on the developing brain, are developing policies informed by the patient community to delay harmful, medically unnecessary procedures.").

[217] GREENBERG, *supra* note 204, at 18.

[218] *See, e.g.*, Zeiler & Wickström, *supra* note 14, at 367.

[219] *Id.* at 360; *see also id.* at 367.

[220] DAVIS, *supra* note 214, at 7–8.

[221] *But cf.* Maayan Sudai, *Revisiting the Limits of Professional Autonomy: The Intersex Rights Movement's Path to De-medicalization*, 41 HARV. J.L. & GENDER 1, 19–20 (2018) (discussing how some parents of intersex children may prefer medical understandings of intersex traits to avoid associating their children with the LGBT movement).

"all Black people want, what people of color want, all that queer people and non-binary people want is to be respected and treated as equals, as equals to someone who is cis gender or straight or white."[222]  Others point to how the intersection of racial and gender stereotypes can complicate nonbinary identity.  As writer Cicely-Belle Blain explains: "Society does not allow space for black folks to be alternative, to be nerdy, to be weird, to be queer, to be different from the narrow boxes created for us throughout history."[223]

   Others argue by analogy.  Lauren Lubin, a nonbinary athlete, criticizes application forms that force an applicant to select one of two categories for sex, asking: "Can you imagine if you did that with race?"[224]  This argument invites a comparison to multiracial identities.  In the race context, there is debate over whether racial fluidity makes it impossible to collect meaningful data about the persistence of racial disparities or to identify beneficiaries of affirmative action programs.[225]  Those who "decline to state" their race on official forms may be making the political statement that they believe race should not be significant for purposes of diversity programs.[226]  While it is unlikely that those nonbinary people who resist sex classifications are doing so because they oppose affirmative action, similar concerns might be raised about the impact of gender fluidity on data about sexism.[227]  Moreover, there could be tensions between the goals of nonbinary rights movements and antiracist struggles.  For example, advocates for nonbinary and other transgender

---

[222] Brandon Interview, *supra* note 62, at 14.  "Cis" is a term meaning the opposite of trans — in other words, a person who identifies with the gender associated with the sex they were assigned at birth.

[223] Cicely-Belle Blain, Opinion, *The Political Rebellion of Being Black and Non-binary*, XTRA (June 9, 2017, 1:34 PM), https://www.dailyxtra.com/the-political-rebellion-of-being-black-and-non-binary-73646 [https://perma.cc/JW4S-X7RM].  Ashleigh Shackelford makes another intersectional argument: "As we see in the media and within our interpersonal spaces, femininity is significantly scripted through whiteness and thinness.  I am none of those things."  Ashleigh Shackelford, *Why I'm Non-binary but Don't Use "They/Them,"* HUFFINGTON POST (Feb. 21, 2017, 1:36 PM), https://www.huffingtonpost.com/entry/why-im-nonbinary-but-dont-use-they-them_us_58ac875ee4b05e6b9b192c07 [https://perma.cc/T6SH-QN6K] ("The way whiteness and white supremacist ideology is set up, we're not seen as feminine or woman or human.  In many ways, the masculinizing of our bodies and performance has been the basis for our dehumanizing and denial of gender conformity.").

[224] Aimee Heckel, *Lauren Lubin, Former CU Athlete, Subject of Documentary*, DAILY CAMERA (Sept. 5, 2016, 9:25 PM), http://www.dailycamera.com/news/ci_30326197/lauren-lubin-former-cu-athlete-subject-documentary [https://perma.cc/66Y4-7FYH].

[225] *See* Lauren Sudeall Lucas, Essay, *Undoing Race? Reconciling Multiracial Identity with Equal Protection*, 102 CALIF. L. REV. 1243, 1245 (2014).

[226] Camille Gear Rich, *Decline to State: Diversity Talk and the American Law Student*, 18 S. CAL. REV. L. & SOC. JUST. 539, 549 (2009).

[227] *See, e.g.*, WoLF Letter, *supra* note 213, at 4 (speculating about the impact of nonbinary gender recognition on the collection of crime statistics based on sex).

people might seek better enforcement of hate crime statutes.[228]  But those laws operate within the context of a criminal justice system that disproportionately burdens racial minorities.[229]

Other advocates of nonbinary recognition may link their resistance with anticolonialism, pointing to the history of suppression of third genders in non-Western cultures.[230]  Researchers highlight that nonbinary genders have existed "across time and place" to challenge the view that humanity is naturally and inevitably divided into male and female categories.[231]  Historical and present-day examples include Indian Hijra, Thai Kathoey, Indonesian Waria, various Two-Spirit identities of First Nations tribes, and South American Machi identities, among others, each with a distinct meaning not reducible to man or woman.[232]  These examples may suggest it is possible "for alternate genders and sexual categories to emerge in certain times and places, transcending sexual dimorphism."[233]  But these examples have been overlooked due to "ethno-centric Western interpretations of gender" that "have dominated the natural and social sciences."[234]  For example, when the British came to rule India, they passed laws criminalizing Hijra practices and removing state protection.[235]  Cross-cultural and historical arguments may serve to denaturalize binary gender arrangements.  But they may not point the way toward gender liberation.  For example, in India, despite "the continued salience of the alternative gender role of the hijra," hijras

---

[228] However, it is important to note that transgender people, particularly those who are people of color, are often reluctant to seek assistance from law enforcement.  *See* JAMES ET AL., *supra* note 2, at 188 (reporting that 57% of transgender respondents to the 2015 USTS were "somewhat uncomfortable or very uncomfortable asking for help from the police"); *id.* at 189 fig. 14.9 (breaking down percentages by race and ethnicity).  Seventy-one percent of nonbinary respondents to the 2015 USTS reported they were "never or only sometimes . . . treated with respect" by law enforcement, compared with 55% of transgender men and women.  *Id.* at 186.

[229] *See generally* MICHELLE ALEXANDER, THE NEW JIM CROW: MASS INCARCERATION IN THE AGE OF COLORBLINDNESS (rev. ed. 2012).

[230] *See* Iantaffi Interview, *supra* note 47, at 18 ("[T]here are the bigger issues tha[n] the gender binary itself . . . it's part of this colonizing, Christianizing, white supremacist thing because the more we really look at evidence from anthropology, there have always been a variety of genders in lots of different cultures and places." (ellipsis in original)).

[231] Ben Vincent & Ana Manzano, *History and Cultural Diversity*, *in* GENDERQUEER AND NON-BINARY GENDERS, *supra* note 27, at 11, 11; *see also, e.g.*, Herdt, *supra* note 17; Vincent & Manzano, *supra*, at 18–25.  Vincent and Manzano also point out that European history includes examples of nonbinary understandings of gender, such as English mollies, Italian femminielli, and Albanian sworn virgins.  Vincent & Manzano, *supra*, at 13–17.

[232] *See* Vincent & Manzano, *supra* note 231, at 18–25.  I cannot do justice here to these identities, so I will not attempt to explain them.  I refer readers to the cited texts.

[233] Herdt, *supra* note 17, at 16 (posing this as a question).

[234] Vincent & Manzano, *supra* note 231, at 12.

[235] Serena Nanda, *Hijras: An Alternative Sex and Gender Role in India*, *in* THIRD SEX, THIRD GENDER: BEYOND SEXUAL DIMORPHISM IN CULTURE AND HISTORY, *supra* note 17, at 373, 414.  In 2014, India's Supreme Court recognized a third gender category entitled to equal rights under India's Constitution.  Nat'l Legal Servs. Auth. v. Union of India, (2014) 5 SCR 119, 142–44.

remain stigmatized, and the "role functions in a culture in which male and female sex and gender roles are viewed as essential, sharply differentiated and hierarchical."[236]

\* \* \*

Thus, nonbinary gender identities are diverse. Nonbinary people are targeted for discrimination due to animus, ignorance, disbelief, disregard, disrespect, and the threat they pose to traditional gender norms. The movement for nonbinary gender rights has complicated relationships with other identity-based legal arguments. It may sometimes be in tension with feminist, LGBT, intersex, and antiracist legal efforts, but it also offers these movements new opportunities and possibilities for convergence.

## II. A CONTEXTUAL APPROACH TO NONBINARY GENDER RIGHTS

This Part asks how the law might respond to rights claims by a diverse nonbinary minority.[237] Its purpose is not to prescribe any particular model for legal response. Rather, it is to argue that there are many ways the law might address nonbinary gender, and that efforts to find a one-size-fits-all theory stifle discussion. It argues instead for a contextual approach. It will begin by resisting the demand to define sex and gender with precision, arguing instead that these terms are and should be culturally contested, and must be defined with attention to each legal context. It will then discuss possible regulatory models, resisting the characterization of the issue as either third-gender recognition or gender abolition.

### A. Against Universal Definitions of Sex and Gender

Rather than attempting an all-purpose legal definition of sex or gender, this section argues that when a definition is required, it should be tailored to serve the interests at stake in regulation. Attempts to settle metaphysical debates about what sex and gender *are* distract from the question of how these concepts *should be* defined in particular legal contexts, if at all.

---

[236] Nanda, *supra* note 235, at 417. *But see* Andrew Gilden, *Toward a More Transformative Approach: The Limits of Transgender Formal Equality*, 23 BERKELEY J. GENDER L. & JUST. 83, 122 (2008) (discussing historical examples from Native American societies in which "[g]ender variance was fully incorporated into tribal life and was generally well-respected and valued within the community").

[237] I note where these various approaches are already supported by U.S. legal doctrine, but I leave for another day questions about whether courts, legislatures, or agencies, or federal, state, or local governments are best suited to implement legal change.

934                      *HARVARD LAW REVIEW*                      [Vol. 132:894

Debates over procedural rules are instructive here.[238] In these debates, scholars ask whether rules should be "transsubstantive," meaning the same in every substantive context.[239] The benefits of uniform rules are simplicity and depoliticization. Uniform rules are easier for courts, lawyers, and the public to learn.[240] They are depoliticizing, because they avoid debates over which rules apply in which contexts — debates that will inevitably entail political judgments.[241] The main disadvantage is that uniform rules may not serve the interests of particular substantive regulatory schemes. Uniform definitions are inappropriate for terms like "employee," a concept that serves different purposes under the common law, the Fair Labor Standards Act, the Occupational Safety and Health Act, the Tax Code, and so forth.[242]

The "simplicity" advantage of universal rules does not have much force in the context of sex and gender. Because there are relatively few contexts left in which the law requires an operative definition of sex or gender, devising contextual definitions is not an unwieldy legal project.[243]

The "depoliticization" argument works against universal definitions. Because sex and gender identities are deeply controversial, personal, and important to many people, any attempt at universal definition will be met with immediate resistance. Even the distinction between sex and gender, once the pivot point of feminist argument, is controversial.[244] Some on the left would prefer to deconstruct the distinction — following the views of influential theorist Judith Butler.[245] They argue that the hormonal, genetic, nervous, and morphological aspects of what we call sex are only about sex because we call them that.[246] Some on the right

---

[238] I have previously analogized legal sex to the property law "metaphor of a bundle of sticks." Clarke, *Identity and Form, supra* note 28, at 829. Rather than thinking of ownership as a right to a thing, this metaphor suggests it "is a bundle of rights, such as the right to exclude others from the property, . . . to sell the property, and so forth." *Id.* We might similarly think of legal identities as bundles of rights that can be unbundled. Sex might be unbundled into the right to use certain restrooms, to have particular occupations, to participate on certain sports teams, and so forth. *See id.* at 831–32; *see also infra* Part III, pp. 945–90.

[239] *See, e.g.*, Stephen N. Subrin, *The Limitations of Transsubstantive Procedure: An Essay on Adjusting the "One Size Fits All" Assumption*, 87 DENV. U. L. REV. 377, 378 (2010).

[240] *Id.* at 387.

[241] *See id.* at 387–88.

[242] *See, e.g.*, Kristin E. Hickman & Claire A. Hill, *Concepts, Categories, and Compliance in the Regulatory State*, 94 MINN. L. REV. 1151, 1179–81 (2010).

[243] *See infra* Part III, pp. 945–90 (listing possible contexts).

[244] *See supra* section I.C.1, pp. 915–21.

[245] *See* JUDITH BUTLER, GENDER TROUBLE: FEMINISM AND THE SUBVERSION OF IDENTITY 1–34 (1990).

[246] Please forgive me for this oversimplification for the sake of brevity. *See, e.g.*, Judith Butler, *Performative Acts and Gender Constitution: An Essay in Phenomenology and Feminist Theory*, 40 THEATRE J. 519, 522 (1988) (arguing that although sex and gender purport to be natural, they are both constituted by "tacit collective agreement to perform, produce, and sustain discrete and polar genders").

would prefer to reconstruct an integrated understanding of sex and gender.[247] For example, the Catholic Church views traditional roles for men and women as natural rather than socially constructed.[248] The nuances of these debates may be altogether lost on the judiciary, which uses the word "gender" rather than "sex" because the term "sex" sounds salacious.[249] Ultimately, neither the Catholic Church,[250] nor the American Psychological Association,[251] nor the state of North Carolina[252] can settle ideological controversies over sex and gender by defining terms.

Moreover, "there is no logically necessary connection between showing or proving that gender is contingent and achieving any particular substantive outcome or result."[253] Some opponents of transgender rights base their arguments on the premise that there is a distinction between sex and gender identity.[254] They argue sex should be primary.[255] Which definition of sex or gender should matter is a moral or political question. It cannot be settled with factual arguments.[256]

---

[247] Consider the views of the Vatican. *See* Mary Anne Case, *After Gender the Destruction of Man? The Vatican's Nightmare Vision of the "Gender Agenda" for Law*, 31 PACE L. REV. 802, 803 (2011) ("For the last several decades, the English word 'gender' has been anathema to the Vatican and those seeking to influence secular law and policy throughout the world on its behalf.").

[248] The Church's reasons include opposition to "ideologies which, for example, call into question the family, in its natural two-parent structure of mother and father, and make homosexuality and heterosexuality virtually equivalent, in a new model of polymorphous sexuality." *Id.* at 806–07 (quoting Letter from Joseph Cardinal Ratzinger, Prefect, Congregation for the Doctrine of the Faith, to the Bishops of the Catholic Church on the Collaboration of Men and Women in the Church and in the World (May 31, 2004), http://www.vatican.va/roman_curia/congregations/cfaith/documents/rc_con_cfaith_doc_20040731_collaboration_en.html [https://perma.cc/7J5R-NNAX]).

[249] In a now-famous story, then-lawyer Ruth Bader Ginsburg began using the term "gender" rather than "sex" in the 1970s, after her assistant pointed out that judges would be distracted by seeing the term "sex" in legal briefs. For a colorful retelling, listen to *More Perfect: Sex Appeal*, WNYC STUDIOS (Nov. 23, 2017), https://www.wnycstudios.org/story/sex-appeal/ [https://perma.cc/946D-BR3J].

[250] *See* Case, *supra* note 247, at 806–07.

[251] *See* AM. PSYCHOLOGICAL ASS'N, DEFINITIONS RELATED TO SEXUAL ORIENTATION AND GENDER DIVERSITY IN APA DOCUMENTS (2015), https://www.apa.org/pi/lgbt/resources/sexuality-definitions.pdf [https://perma.cc/CEA8-CWHH] (adopting progressive definitions).

[252] *See* Public Facilities Privacy & Security Act, 2016 N.C. Sess. Laws 3, § 1.3 (defining "biological sex" as "male" or "female"), *repealed by* 2017 N.C. Sess. Laws 4, § 1.

[253] Shannon Minter, Why Gender Theory Should Not Determine Transgender Advocacy 13 (2010) (unpublished manuscript) (on file with the Harvard Law School Library).

[254] *See, e.g.*, Boyden v. Conlin, No. 17-cv-264, 2018 WL 4473347, at *4 (W.D. Wis. Sept. 18, 2018) (discussing the argument of opponents of health insurance coverage for transition-related care that "sex is immutable, whereas gender identity is a developmental process"); WoLF Letter, *supra* note 213, at 2 (opposing nonbinary recognition on the ground that "[s]ex and 'gender' are distinct concepts" and arguing the law should only recognize sex).

[255] WoLF Letter, *supra* note 213, at 2–4.

[256] *See* David B. Cruz, Essay, *Getting Sex "Right": Heteronormativity and Biologism in Trans and Intersex Marriage Litigation and Scholarship*, 18 DUKE J. GENDER L. & POL'Y 203, 217 (2010) ("It misdirects our focus, to someone's political detriment, to appeal to the natural or to 'the facts' of sex (as proclaimed by medical practitioners) as the basis for what are really political judgments about what identities and relationships to recognize."); Robin Dembroff, Real Talk on the

Conversation might be facilitated by careful examination of the interests at stake in each potential area of sex or gender regulation.[257] Whether sex or gender should be defined based on genetics, hormones, morphology, physiology, psychology, elective choice, documentary evidence such as birth certificates, public perceptions, something else, or not at all — is a difficult question to answer in general.[258] The answer may be different if the law's purpose is to forbid discrimination, express respect for a person's identity, ensure accurate medical records, create fair divisions in sporting events, provide affirmative action for people disadvantaged by male dominance, or some mix of these goals. Meanings may change over time. Rather than attempting to settle questions once and for all, contextualized definitions might create opportunities for various constituencies to argue about what is at stake in each context of sex or gender regulation. To be sure, one danger of contextual analysis is that its results are contestable. Decisionmakers may ultimately prioritize interests in different ways and arrive at different outcomes.[259] But a particularized approach may create opportunities for discussion about nonbinary gender rights that are not foreclosed at the outset by ideological or theoretical disagreements about the meaning of sex or gender.[260]

## B. Regulatory Models for Nonbinary Gender Rights

Discussions of nonbinary gender rights are often stifled by the assumption that those rights must always take the form of gender neutrality or, alternatively, that the law must always recognize a third gender.

---

Metaphysics of Gender 1–2 (May 15, 2017) (unpublished manuscript) (on file with the Harvard Law School Library).

[257] *But see* Talia Mae Bettcher, *Trans Women and the Meaning of "Woman,"* in THE PHILOSOPHY OF SEX: CONTEMPORARY READINGS 233, 243 (Nicholas Power et al. eds., 6th ed. 2013) (objecting to context-specific definitions of who is a woman because they mean that there could be contexts in which a trans woman's claims to being a woman might be false, while, on the author's alternative "multiple-meaning view, a trans woman can say that she is a woman in *all* legitimate contexts because those contexts in which she is not a woman occur in a dominant culture" with a view of gender that she rejects on philosophical grounds). While this Article assumes that people's gender identities are what they say they are, it does not begin from the premise that there could never be a context in which the law might legitimately offer definitions based on something other than self-identification. Instead, it examines each legal context.

[258] *See, e.g.,* Clarke, *Identity and Form, supra* note 28, at 760, 763–64, 792–99 (discussing alternative legal definitions of "sex").

[259] This objection is roughly analogous to a line of criticism of balancing tests in constitutional law. *See, e.g.,* T. Alexander Aleinikoff, *Constitutional Law in the Age of Balancing*, 96 YALE L.J. 943, 982 (1987) (arguing that balancing approaches to constitutional law are problematic because, among other reasons, "[n]o system of identification, evaluation, and comparison of interests has been developed").

[260] Consider, for example, how some advocates of policies to address climate change have overcome polarization by framing discussions around individual legal or policy questions on a micro level. Hari M. Osofsky & Jacqueline Peel, *Energy Partisanship*, 65 EMORY L.J. 695, 701–02 (2016) (discussing research from psychology that explains why political polarization makes solutions to climate change at the federal legislative level impossible and proposing that change proceed locally by building consensus on specific proposals).

Rather than advocating either of these options as the best fit for nonbinary gender rights, this section describes potential upsides and downsides of each model. It proposes that there are variations on these models, and combinations of the two approaches, that might best fit different circumstances. There is also a third option: integrating nonbinary people into binary sex or gender regulations, but tailoring the definition of "sex" or "gender" so as to best fulfill the purposes of the regulation, while respecting every person's gender identity to the extent possible.

*1. Third-Gender Recognition.* — A recognition model would provide a third option to better reflect the lived experiences of people who do not check the M or F boxes. This model has the potential upsides of conferring legal dignity and protection, as well as facilitating affirmative efforts at inclusion and accommodation. But recognition also has potential downsides: the forms of gender identity the law can recognize are limited. Additionally, a third legal option may generate backlash, reinforce stereotypes about the third category, and domesticate the radical potential of nonbinary gender.

A first potential benefit of third-gender recognition is in conferring legal status and protection. A recognition model responds to concerns about disbelief, disrespect, and disregard of nonbinary people. Recognition legitimates nonbinary identity as a "civil status"; in other words, it affirms the "position of a person within the legal system."[261] By giving legal imprimatur to nonbinary gender, on par with the gender identities of men and women, recognition expresses the civil equivalence of nonbinary identities. Legal recognition may serve as a shield, giving nonbinary people authority in their demands for fair treatment from public and private actors.

Another advantage of recognition is that it might facilitate projects that see nonbinary gender as an aspect of organizational diversity that should be sought after. Recognition can facilitate the collection of data and information on the nonbinary population to identify problems and challenges people with nonbinary gender identities commonly face, as with the U.S. Transgender Survey. It might entail a right to affirmative changes in policy to accommodate nonbinary gender identities. The concept of "reasonable accommodation" found in disability law is a type

---

[261] Press Release No. 95/2017, Bundesverfassungsgericht, Civil Status Law Must Allow a Third Gender Option (Nov. 8, 2017), https://www.bundesverfassungsgericht.de/SharedDocs/Pressemitteilungen/EN/2017/bvg17-095.html [https://perma.cc/F5HP-MP8G] (describing an order of the First Senate of the German Federal Constitutional Court recognizing the right to registration of a "diverse" gender other than male or female); Peter Dunne & Jule Mulder, Developments, *Beyond the Binary: Towards a Third Sex Category in Germany?*, 19 GERMAN L.J. 627, 636–37 (2018) (discussing how the German decision "expressly acknowledges and validates the legitimacy of non-male and non-female identities," *id.* at 637).

of recognition.[262]  On this theory, institutions must make reasonable adjustments to their policies and practices to accommodate people with disabilities.[263]  When a person with a disability requests an accommodation, their employer must engage in an "interactive process" to come to a solution.[264]

Whether the Americans with Disabilities Act[265] (ADA) protects nonbinary gender, as a legal matter, is a complicated question.  The ADA explicitly excludes "gender identity disorders not resulting from physical impairments."[266]  But one court has construed this provision "narrowly to refer to simply the condition of identifying with a different gender, not to exclude from ADA coverage disabling conditions that persons who identify with a different gender may have — such as . . . gender dysphoria."[267]  This reasoning could extend to those nonbinary people with gender dysphoria, but would not cover anyone unwilling or unable to assert they suffer from a "disabling condition."[268]  Some, but not all, nonbinary people may have gender dysphoria.[269]  At present, U.S. sex discrimination law does not include any right to reasonable

---

[262] *See, e.g.*, 42 U.S.C. § 12112(b)(5)(A) (2012) (providing that prohibited discrimination includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability . . . unless . . . the accommodation would impose an undue hardship on the operation of the business").

[263] *Id.*

[264] 29 C.F.R. § 1630.2(o)(3) (2018) ("To determine the appropriate reasonable accommodation [for a given employee,] it may be necessary for the [employer] to initiate an informal, interactive process with the [employee].").

[265] 42 U.S.C. §§ 12101–12213.

[266] *Id.* § 12211(b)(1).  For an argument that this exclusion is a violation of the Constitution's Equal Protection Clause, see Kevin M. Barry et al., *A Bare Desire to Harm: Transgender People and the Equal Protection Clause*, 57 B.C. L. REV. 507, 551, 557–58 (2016).

[267] Blatt v. Cabela's Retail, Inc., No. 14-cv-04822, 2017 WL 2178123, at *4 (E.D. Pa. May 18, 2017).  Gender dysphoria is significant distress or impairment resulting from incongruence between one's gender identity and one's assigned sex.  *Id.* at *2 & n.1.  The Trump Administration agrees that the ADA covers gender dysphoria when it results from a "physical impairment."  Statement of Interest of the United States of America at 3, Doe v. Arrisi, No. 16-cv-08640 (D.N.J. July 17, 2017).

[268] *Blatt*, 2017 WL 2178123, at *3–4 (concluding that the plaintiff's gender dysphoria was a disability because it "substantially limits her major life activities of interacting with others, reproducing, and social and occupational functioning," *id.* at *4).  One concern may be that disability law pathologizes transgender identity.  *But see* Kevin Barry & Jennifer Levi, Blatt v. Cabela's Retail, Inc. *and a New Path for Transgender Rights*, 127 YALE L.J.F. 373, 386 (2017) ("This concern ignores the distinction between transgender identity and gender dysphoria.  Transgender identity is *not* a medical condition.  Gender dysphoria, on the other hand, *is* a medical condition; it is real, serious, and physically incapacitating, and often can only be ameliorated by medical care." (footnote omitted)).

[269] In 2013, the American Psychiatric Association's Diagnostic Statistical Manual updated the definition of "[g]ender dysphoria," to "reflect[] a change in conceptualization of the disorder's defining features by emphasizing the phenomenon of 'gender incongruence' rather than cross-gender identification per se."  AM. PSYCHIATRIC ASS'N, HIGHLIGHTS OF CHANGES FROM DSM-IV-TR TO DSM-5, at 14 (2013).  It clarifies: "The experienced gender incongruence and resulting gender dysphoria may take many forms."  *Id.*

accommodation.[270]  Whether or not the letter of the law applies, nonbinary people might make arguments for institutional inclusion that sound in the theory of reasonable accommodation: sometimes equality requires affirmative changes in structures and rules.

However, the recognition model also has potential drawbacks.  One is that recognition may be purely expressive, amounting to lip service to nonbinary gender that does not disturb existing institutional arrangements that work to the advantage of the binary majority.  Recognition does not always entail accommodation.  For example, recognition could mean that a university includes "nonbinary" as an optional sex designation in its official records but does no work to educate staff or students about nonbinary gender identities, fails to respond to complaints of harassment from nonbinary students, and maintains only single-sex dormitories.

Additionally, precisely because it expresses the legitimacy of nonbinary gender identities, recognition may incur political backlash from those who are invested in maintaining binary gender.  As new identities make claims for recognition, they are also met with resistance from those fatigued by identity politics in general.[271]  To the extent that recognition is perceived to entail costly accommodations, it may incur all the more resistance.[272]

Moreover, adding an X option to M and F does not confer dignity on every gender identity; it only expands the list of legal sex classifications to three.  The X designation may be a poor fit for those people who regard their gender identities as hybrids of M and F, altogether absent, or subversive.  Conceivably, sex designations could be a blank form field, allowing people to choose whatever gender descriptor they might prefer, as on social media websites.[273]  But in the law, infinite variation can be a problem.  On the principle of *numerus clausus*, the law sometimes limits the types of social forms that will be legally recognized because third parties have an interest in understanding legal claims.[274]  To the extent that there are third-party interests in understanding someone's sex or gender identity, it may be impossible to

---

[270] This is relevant assuming that sex discrimination includes discrimination against someone for having a nonbinary gender identity.  *See supra* p. 924.

[271] *See, e.g.*, Kenji Yoshino, *The New Equal Protection*, 124 HARV. L. REV. 747, 794 (2011).

[272] *See, e.g.*, Michelle A. Travis, *Lashing Back at the ADA Backlash: How the Americans with Disabilities Act Benefits Americans Without Disabilities*, 76 TENN. L. REV. 311, 311–12 (2009) (identifying a "socio-legal backlash," for which "[a] primary target . . . has been the ADA's accommodation mandate").

[273] *See, e.g.*, Facebook Diversity, *supra* note 45.

[274] *See* Thomas W. Merrill & Henry E. Smith, *Optimal Standardization in the Law of Property: The* Numerus Clausus *Principle*, 110 YALE L.J. 1, 4 (2000).  This is the case in property law, where a limited number of types of ownership are recognized.  *Id.*  In other instances, such as in contract law, the law enforces a nearly unlimited variety of forms of private agreements.  *Id.* at 3.  For applications of this theory to sex and gender, see Clarke, *Identity and Form*, *supra* note 28, at 769; and Katyal, *supra* note 28.

recognize an unlimited variety of identities. Many fill-in-the-blank gender identities are unlikely to have widespread social understanding or may be misunderstood.

By identifying a third gender, the recognition model also runs the risk of reinforcing new stereotypes, exclusionary categories, and stigmatizing practices. The X category may come to stand for a new "package" of gender stereotypes, rather than opening space for a diversity of gender identities.[275] Authorities may end up policing who is and is not a legitimate member of the third category. The history of racial categorization demonstrates that the addition of new categories can be in the service of subordination rather than liberation.[276] Even if it is freely chosen, the X may come to mark stigma. In those cultures that recognize third genders, the third-gender category is usually subordinate.[277]

A recognition model also risks domesticating nonbinary identity, in the way that queer theorists expressed concern that marriage would domesticate LGB people, blunting the edge of radical critiques of normative sexualities.[278] Integration of nonbinary people into a third category may remove the pressure to eliminate the state's power to impose legal sex classifications.[279] But whether this is likely to be true in a given context is an empirical question. Social movements might pursue recognition as a stopgap strategy, while keeping more radical goals as long-term aspirations. Or they might pursue limited forms of recognition in some contexts and make more radical demands for sex or gender neutrality in others.

*2. Sex or Gender Neutrality.* — An alternative legal strategy is sex or gender neutrality. The term "gender neutrality" has long generated confusion.[280] One question is what aspects of sex or gender the law should treat neutrally. Another question is how neutrality is to be achieved. Neutrality is unlikely to mean enforced androgyny. Rather, the law might insist on masking gendered characteristics in certain contexts, eliminating rules that classify by sex, or decoupling certain traits

---

[275] *See* Mary Anne Case, *Unpacking Package Deals: Separate Spheres Are Not the Answer*, 75 DENV. U. L. REV. 1305, 1306 (1998).

[276] Professor Mary Anne Case offers the example of "the ever finer slicing of racial classifications from Black and White to quadroon and octoroon in antebellum Louisiana, or the distinction between Black, White, and Colored in South African apartheid law." Case, *supra* note 25, at 15 n.35.

[277] *See, e.g.*, S.F. Ahmed et al., Review, *Intersex and Gender Assignment; The Third Way?*, 89 ARCHIVES OF DISEASE IN CHILDHOOD 847, 848 (2004). *But see* Gilden, *supra* note 236, at 122–23 (describing the "high status granted to gender variant individuals" in some Native American communities, *id.* at 123).

[278] *See, e.g.*, MICHAEL WARNER, THE TROUBLE WITH NORMAL: SEX, POLITICS, AND THE ETHICS OF QUEER LIFE 84–116 (1999); Katherine M. Franke, Commentary, *The Domesticated Liberty of* Lawrence v. Texas, 104 COLUM. L. REV. 1399, 1400–01 (2004).

[279] *Cf.* Currah, *supra* note 164, at 445–46 (discussing an analogous debate with respect to rights for transgender men and transgender women).

[280] *See, e.g.*, Joan C. Williams, *Deconstructing Gender*, 87 MICH. L. REV. 797, 837–38 (1989).

from sex classifications. Alternatively, it might follow the nonendorsement or pluralism strands of the law's treatment of religion.

One view is that the law should be neutral not only with respect to sex, in the physical sense of that term, but also with respect to gender, in the social sense of masculinity and femininity.[281] This would mean abolition of gender — the old radical feminist dream of an androgynous or unisex society.[282] But ending gender is a troublesome legal project, for theoretical and practical reasons.[283] As a matter of theory — what would it mean to end gender? Would it mean no one could wear frilly dresses or suits and ties?[284] Would it mean jobs like firefighting, which prize traditionally masculine traits, like risk-taking and physical strength, must be restructured to give equal weight to traditionally feminine traits, like caretaking and gentleness?[285] As a practical matter, this version of "gender neutrality" would be difficult to implement and likely to encounter political resistance. The idea that law could eradicate social practices like race or gender, even if it tried, is questionable.[286] Whatever the virtues of gender abolition might be, the idea is unlikely to catch on in a culture in which gender remains a source of meaning and identity for many people, including many transgender men, transgender women, and nonbinary people.

Alternatively, gender neutrality might attempt a project of lesser ambition. It might aim not to eradicate gender across the board, but to "mask" gendered social characteristics in certain contexts, as in the famous orchestra auditions study in which aspiring musicians played behind a curtain so that the judges could not guess their sexes or gender

---

[281] Psychologists have devised measures for determining what traits are gendered in this social sense, such as the Bem Sex Role Inventory, which report the results of surveys about whether particular traits, behaviors, or characteristics are desirable in men or women. *See, e.g.*, Andrew P. Smiler & Marina Epstein, *Measuring Gender: Options and Issues*, *in* 1 HANDBOOK OF GENDER RESEARCH IN PSYCHOLOGY 133, 134 (Joan C. Chrisler & Donald R. McCreary eds., 2010). Notably, these surveys allow masculinity and femininity to be assessed independently; individuals may be high in both male and female traits or low in both. *See id.*

[282] *See supra* p. 916.

[283] *See* YURACKO, *supra* note 30, at 144.

[284] *See* JULIA SERANO, EXCLUDED: MAKING FEMINIST AND QUEER MOVEMENTS MORE INCLUSIVE 128 (2013) ("What exactly is the 'end of gender'? What does it look like? Are there words to describe male and female bodies at the end of gender? Or do we purge all words that refer to male- or female-specific body parts and reproductive functions for fear that they will reinforce gender distinctions? Do we do away with activities such as sports, sewing, shaving, cooking, fixing cars, taking care of children, and of course, man-on-top-woman-on-bottom penetration sex, because these have been too closely associated with traditional masculine and feminine roles in the past? What clothes do we wear at the end of gender?").

[285] *See* YURACKO, *supra* note 30, at 146–48. Or would it mean somehow attempting to delink these stereotypical traits from gender?

[286] Antidiscrimination law has more moderate ambitions: to intervene in particular social practices that uphold racialized, gendered, or otherwise problematic hierarchies. *See, e.g.*, Robert Post, 1998–99 Brennan Center Symposium Lecture, *Prejudicial Appearances: The Logic of American Antidiscrimination Law*, 88 CALIF. L. REV. 1, 17 (2000).

identities, and as a result, more women ended up being selected.[287] This approach might aim to protect privacy in addition to ensuring equality.

Another limited form of neutrality is anticlassification. Rather than insisting that the law neuter society, this variation on neutrality would insist that legal rules stop classifying people based on sex.[288] Rather than adding a third-gender option to identity forms, this approach might mean eliminating the sex category altogether from official documents. It would mean treating sex more like race, which was once, but is no longer, a classification listed on the face of birth certificates[289] and a mode of segregating restrooms. Eliminating classifications makes it more difficult for governments and others "to locate and persecute members of stigmatized groups."[290]

Yet another approach is decoupling. Neutrality might mean decoupling traits or characteristics associated with men or women from sex. To give another musical example, an a cappella group might limit its members to those with tenor, baritone, or bass voices, rather than to men only.[291] Family law rules might define their beneficiaries in terms of the category of "primary caretakers," who could be men, fathers, or parents with nonbinary gender identities, rather than limiting their benefits to mothers.[292] Or a sports team might limit players to those with low levels of testosterone, rather than women per se.[293]

Thus, these limited forms of sex neutrality may reduce discrimination against nonbinary people. But sex neutrality may also have advantages for other transgender and gender-nonconforming people, and for society as a whole. One is that sex neutrality avoids the need for

---

[287] *See* Claudia Goldin & Cecilia Rouse, *Orchestrating Impartiality: The Impact of "Blind" Auditions on Female Musicians*, 90 AM. ECON. REV. 715, 715–16 (2000).

[288] *See* HEATH FOGG DAVIS, BEYOND TRANS: DOES GENDER MATTER? 10 (2017) (arguing that "[t]he administrative discretion to decide who is female and who is male is the essence" of a harmful type of sex discrimination that the author terms "sex identity discrimination"); Tomchin, *supra* note 159, at 861 (arguing that "legal sex classification . . . — which hurts so many — should be eliminated, much like the formerly ubiquitous system of legal racial classification," but not proposing "gender-blindness," which, "like race-blindness, would harm those who are most impacted by discrimination").

[289] Racial data are still collected. *See* Clarke, *Identity and Form*, *supra* note 28, at 800.

[290] Laurie Shrage, *Does the Government Need to Know Your Sex?*, 20 J. POL. PHIL. 225, 228 (2012).

[291] *See* Pat Eaton-Robb, *Poof! Ivy League Glee Club's Gender Restrictions Disappear*, ASSOCIATED PRESS (Feb. 11, 2018), https://www.apnews.com/76974daffade44ed811961818f8437fca0 [https://perma.cc/7BBA-7MH8] ("The 14-member Whiffenpoofs, a group formed in 1909, will continue to comprise tenor, baritone and bass voices, and the Whims will continue to be for sopranos and altos.").

[292] *See, e.g.*, Williams, *supra* note 280, at 839–40 ("People disadvantaged by gender can be protected by properly naming the group: in this case, not mothers, but anyone who has eschewed ideal worker status to fulfill child-care responsibilities.").

[293] *See, e.g.*, Joanna Harper, *Athletic Gender*, 80 LAW & CONTEMP. PROBS. 139, 151–53 (2017) (proposing the concept of "athletic gender," which would be determined based on testosterone levels solely for purposes of sporting events and considered distinct from one's gender identity).

gender policing, which can be degrading and humiliating. Professor Heath Fogg Davis offers the example of the "male" and "female" stickers that the Southeastern Pennsylvania Transportation Authority insisted on affixing to bus passes up until 2013.[294] As a result of the stickers, many gender-nonconforming people were refused rides, harassed, humiliated, or had their passes confiscated.[295] This included both people who self-identified as LGBT and those who did not, such as younger and older people with more androgynous appearances.[296] Gender policing is often based on definitions of masculinity and femininity inflected with classism and racism.[297] A second set of advantages is expressive. Sex segregation may reflect archaic or confining stereotypes about men and women. Its unquestioned use sends the message that sex is a primary and important way of dividing people into groups.[298] It also suggests one's sex is, and should be, a public matter or one left to the government.[299] A third advantage is practical: as with the a cappella example, it is possible that the best baritone is not a man. Confining the group to men means that the group may not include the best voices.

But even limited forms of sex neutrality have drawbacks. The anticlassification strand in race discrimination law is often faulted for failing to redress covert or implicit biases, disparate impacts, and structural inequalities.[300] These same criticisms are leveled at contemporary sex discrimination doctrine. Neutrality may be in name only. Neutral rules may have the purpose or effect of classifying based on traditional notions of sex, for example, if testosterone testing is intended to (or widely believed to) preserve women's sports for "real women."[301] In practice,

---

[294] DAVIS, *supra* note 288, at 2. The purported purpose of these stickers was to stop husbands and wives from sharing monthly bus passes. *Id.* at 2–3.

[295] *Id.* at 3 (describing "the widespread harm done by the stickers" to "people who self-identified as transgender and those who did not, as well as . . . riders who self-identified as queer and those who did not").

[296] *Id.* at 5–6.

[297] *See, e.g., id.* at 30.

[298] *Cf. id.* at 14 ("We are asked to tick binary sex boxes on myriad bureaucratic forms ranging from school, job, mortgage, and apartment rental applications to government census forms, dental and medical intake questionnaires, online dating sites, social media and marketing surveys, and on and on.").

[299] *Cf.* Robin Dembroff, *The Nonbinary Gender Trap*, N.Y. REV. BOOKS (Jan. 30, 2018, 7:00 AM), http://www.nybooks.com/daily/2018/01/30/the-nonbinary-gender-trap/ [https://perma.cc/DRV6-GTJF] ("For me, adding 'nonbinary' to the list of legal gender options does not address the core problem: any legal system that requires a person to record their gender perpetuates government control over our bodies and identities.").

[300] *See, e.g.,* Neil Gotanda, *A Critique of "Our Constitution is Color-Blind,"* 44 STAN. L. REV. 1, 68 (1991); Reva B. Siegel, *Discrimination in the Eyes of the Law: How "Color Blindness" Discourse Disrupts and Rationalizes Social Stratification*, 88 CALIF. L. REV. 77, 84–107 (2000).

[301] *Cf.* Katrina Karkazis & Morgan Carpenter, *Impossible "Choices": The Inherent Harms of Regulating Women's Testosterone in Sport*, J. BIOETHICAL INQUIRY 3 (Aug. 16, 2018), https://

supposedly neutral baselines often favor those who adopt traditionally male life patterns. Feminists have long argued that in workplace and family law, the sex-blind approach can result in rules tailored for the "ideal worker" who needs no flexibility because he is supported at home by a caretaking partner.[302] While women could theoretically meet the "ideal worker" standard, they rarely do because of the prevalence of gender roles. Moreover, a rule against all sex classifications could sweep away not only those classifications that perpetuate subordination, but also those designed to remedy it.[303] For example, some legal rules might give women favorable treatment.[304] To impose "neutrality" might mean "leveling down" by holding women to the same inhumane standards as men, rather than "leveling up" to give men the same humane treatment as women.[305]

Another version of the neutrality model would draw on religious freedom for support, employing concepts such as nonendorsement and pluralism.[306] Such a model might protect a panoply of beliefs about gender identity, just as the First Amendment protects a wide array of religious beliefs without endorsing any particular set of beliefs. For purposes of this Article, I will refer to pluralism strategies as those in which a sex or gender neutral option is created alongside a sex or gender segregated one. In practice, however, the neutral category may end up indistinguishable from a third-gender one, incurring all the disadvantages of third-gender recognition, such as the possibility of stereotyping and stigmatization. Moreover, a pluralism model invites objections from those with religious commitments to traditional, binary

---

link.springer.com/article/10.1007/s11673-018-9876-3 [https://perma.cc/2ETP-QWPX] (arguing that even a testosterone rule that states that it does not intend to question a competitor's sex can "mete out both suspicion and judgment on the sex and gender identity of the athletes regulated").

[302] JOAN WILLIAMS, UNBENDING GENDER: WHY FAMILY AND WORK CONFLICT AND WHAT TO DO ABOUT IT 2 (2000); *see also, e.g.*, *id.* at 1–3.

[303] *See, e.g.*, CATHARINE A. MACKINNON, SEXUAL HARASSMENT OF WORKING WOMEN 117 (1979) (proposing an alternative approach to sex classifications that would ask "whether the policy or practice in question integrally contributes to the maintenance of an underclass or a deprived position because of gender status").

[304] *See, e.g.*, Sessions v. Morales-Santana, 137 S. Ct. 1678, 1689–93 (2017) (scrutinizing an immigration rule that gave favorable treatment to the children of unmarried citizen mothers over those of unmarried citizen fathers).

[305] *See id.* at 1701 (selecting leveling down as a remedy to apply the same harsh standard whether the child's U.S. citizen parent was their mother or father).

[306] *See* David B. Cruz, *Disestablishing Sex and Gender*, 90 CALIF. L. REV. 997, 1005, 1040 (2002) (discussing the analogy to religious freedom and describing how U.S. law's neutrality, non-preferentialism, and nonendorsement approaches to religion could be translated to sex and gender); Katyal, *supra* note 28, at 477 (advocating "gender pluralism as a replacement for the binary system" that would "demonopolize the classificatory power of the state in determining sex or gender identity").

notions of sex, who will argue that their interests should win out over the interests of gender nonconformists when in competition.[307]

*3. Integration into Binary Sex or Gender Regulation.* — A final approach to nonbinary gender rights would be to integrate nonbinary people into binary sex or gender regulations, while tailoring the definition of "sex" or "gender" so as to best fulfill the purposes of each legal rule, and respecting every person's gender identity, to the extent possible.[308] This approach would ask what interests sex segregation serves, and whether the definition of sex or gender used is tailored to meet that interest.[309] For example, if a program sought to increase gender diversity in a traditional, male-dominated workplace, it might define its beneficiaries as not just "women," but also "people who do not identify exclusively as male and LGBT people."[310] The advantage of this approach is that it may be the least disruptive to binary structures that would require time and money to change, such as physical or digital architectures, and so it might serve as a stopgap or compromise solution as regulators consider recognition and neutrality approaches. But integration strategies have all the drawbacks of third-gender recognition. In addition, they are likely to shoehorn nonbinary people into misfit categories at the expense of gender self-determination.

\* \* \*

Rather than being faced with a choice between third-gender recognition and gender neutrality, the law offers an array of options for the protection of nonbinary gender identities. Determining which legal model is optimal requires investigation of the interests at stake in binary sex or gender, and will therefore depend on context. Any definition of sex or gender should be tailored to serve the purposes of regulation.

## III. LEGAL INTERESTS IN BINARY SEX OR GENDER?

This Part responds to the claim that nonbinary gender rights would upset a host of legal interests that are ostensibly advanced by maintaining a single, uniform system of binary sex classification.[311] Nonbinary rights would have implications for the law with respect to identification documents, antidiscrimination, and sex-segregated physical spaces and

---

[307] For an example of these arguments in the sexual orientation context, see *Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Commission*, 138 S. Ct. 1719, 1724 (2018).

[308] This integration strategy differs from the decoupling strategy described above only in that there is no formal attempt at neutrality — it uses binary categories that are explicitly about sex or gender.

[309] *See supra* section II.A, pp. 933–36.

[310] *See infra* section III.B.1, pp. 952–54.

[311] *See supra* p. 903.

activities.[312]   These domains have also been sites of contestation for transgender people seeking recognition as men and women.  It is often assumed that nonbinary people only complicate and heighten these challenges.  But that assumption may be based on unquestioned premises about the need for binary categories and simplistic ideas about the legal options for advancing nonbinary gender rights.

This Part rebuts the argument that nonbinary gender rights would upset some foundational premise of the legal order, with unforeseen and catastrophic results.  Rather than being a universal ordering principle, legal sex and gender classifications are diminishing and exceptional.  A careful look at the remaining contexts in which the law regulates sex and gender reveals no abiding and universal interest in binary classification.  Rather, it shows that the purported interests binary classifications serve are variable and context dependent.  These interests might include protecting conventionally gendered ideas of privacy or safety; facilitating easy identification; preserving free speech; providing opportunities for women; collecting relevant data; creating educational, athletic, or health care programs tailored toward the needs of specific populations defined by sex or gender; or avoiding the costs of transition.  This Part argues that in most instances, these interests are weak or unsubstantiated, or they can be accommodated, if not better served, by one of the regulatory approaches to nonbinary gender rights discussed in Part II: neutrality, recognition, or integration.

This Part builds from the premise that in most every context of sex or gender regulation, the law should recognize self-determination with respect to someone's gender identity as a man or woman.[313]  It also takes for granted that nonbinary genders deserve the same legal status as binary ones, rather than making that case on abstract grounds.[314]  It asks how the assumption that nonbinary gender identities should be accorded the same status as male and female gender identities would transform legal debates.  It offers tentative conclusions on the best regulatory model for nonbinary gender rights in each context, considering how nonbinary rights claims might converge and diverge with those of other identity-based movements, including feminist and other LGBT interests.  These conclusions reflect political judgments about how to prioritize the various interests at stake in each context.  There is room for reasonable disagreement with my particular conclusions as to the best approach in each case.  But my overall argument does not depend on the outcomes of these fine-grained legal debates.  Rather, I aim to show that legal regimes that rely on binary sex or gender classification are

---

[312] While my main focus is on legal rules, at points this discussion also considers how nongovernmental institutions might revise their rules and procedures to take nonbinary gender identities seriously.  For detailed advice on how to conduct a "gender audit" to "make [an] organization[] more inclusive of people with diverse sex identities," see DAVIS, *supra* note 288, at 151.

[313] *See supra* note 42 and accompanying text.

[314] *See supra* note 43 and accompanying text.

exceptional, not inevitable, and not a reason to resist the larger project of nonbinary gender rights.

## A. Identification

One argument often raised against nonbinary inclusion is that it will render efforts at identification and surveillance by law enforcement more difficult. This argument has long been made with respect to *any* changes to official sex markers, even from M to F or F to M.[315] But the argument takes new forms with respect to nonbinary gender, which would also require the recognition of an X category or, alternatively, the elimination of any sex or gender markers altogether. The question is, does law enforcement need binary M and F sex markers to identify people, determine police or emergency response, or track crimes?[316] Third-gender recognition is the best option in this context, at least at present.

Those who assert the importance of binary gender markers for identification documents do not explain why law enforcement needs those markers in addition to photographs.[317] In *Zzyym v. Pompeo*,[318] the court concluded that the State Department's policy of requiring an applicant to mark either M or F on a passport application was arbitrary and capricious.[319] Not all law enforcement databases include sex or gender designations, and in the case of transgender individuals, the designations in various databases may already conflict.[320] The "identity fraud" argument — that criminals will change their gender markers so that their names do not come up in law enforcement databases — is not a unique problem with recognizing nonbinary gender; it is a problem with any system that allows corrections to gender markers. The State Department already allows sex marker corrections between M and F, without proof of surgery.[321] Moreover, fraud concerns are dubious considering the

---

[315] *See, e.g.*, Lisa A. Mottet, *Modernizing State Vital Statistics Statutes and Policies to Ensure Accurate Gender Markers on Birth Certificates: A Good Government Approach to Recognizing the Lives of Transgender People*, 19 MICH. J. GENDER & L. 373, 413–15 (2013).

[316] *See* WoLF Letter, *supra* note 213, at 2 (arguing that the government has "legitimate interests in recording and maintaining accurate information about its residents' sex, for purposes of identification, tracking crimes, . . . and determining the appropriate emergency medical and police services").

[317] Even if photographs can be tampered with, those seeking to commit fraud can tamper with the gender marker as well, or can simply find false passports with M or F markers that match their own appearances. Facial recognition and other biometric forms of identification are better tailored to address fraud concerns.

[318] No. 15-cv-02362, 2018 WL 4491434 (D. Colo. Sept. 19, 2018).

[319] *Id.* at *1. Zzyym brought suit under the Administrative Procedure Act, which disallows agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (2012).

[320] *See Zzyym*, 2018 WL 4491434, at *6 (noting that a passport holder's identity could be verified without checking the gender designation because databases include "other fields" such as "social security number, date of birth, name, etc.").

[321] Mottet, *supra* note 315, at 415.

number of other countries, including Australia, New Zealand, and India, that have managed nonbinary markers without apparent incident.[322] The United States accepts passports from these countries with nonbinary gender markers.[323] The International Civil Aviation Organization, the UN agency that sets international standards for machine-readable passports, has long allowed "X" as a sex marker for "unspecified."[324] As Judge Jackson put it during a hearing in the *Zzyym* case, "I'll bet you that if the State Department rethought its policy and decided to accept the X designation, the sun would still come up tomorrow."[325]

Another version of this argument might be that law enforcement and emergency services routinely use binary gender identifiers to visually identify crime suspects and people in need of assistance.[326] But authorities may use any number of descriptors for these purposes, not just perceived sex or gender presentation, but also race, age, height, weight, and other identifying features. Under equal protection doctrine, this limited use of visually identifying features, even racial ones, is widely regarded as permissible.[327] It is therefore implausible that recognition of nonbinary gender rights would invalidate the use of perceived gendered characteristics for purposes of visual identifications. Nor should it.

Opponents of nonbinary gender recognition have also expressed the worry that it would skew crime statistics, obscuring the fact that men commit more violent crimes than women.[328] But considering the vast disparities in violent crime rates between men and women, the number of criminals likely to identify as nonbinary is too small to have this effect.[329]

---

[322] *See Zzyym* Transcript, *supra* note 139, at 37. The lawyer from the State Department in *Zzyym* was not aware of any evidence that jurisdictions that recognize an X designation had any law enforcement trouble. *Id.* at 46.

[323] *Id.* at 35–36 (discussing how the U.S. State Department will permit noncitizens from Australia to enter the United States with an X designation on their passports, but will not allow citizens of the United States to leave with an X designation).

[324] Int'l Civil Aviation Org. [ICAO], *Machine Readable Travel Documents*, at 14, ICAO Doc. 9303 (7th ed. 2015), https://www.icao.int/publications/Documents/9303_p4_cons_en.pdf [https://perma.cc/H6DH-LFN4] (allowing "F for female, M for male, or X for unspecified").

[325] Zzyym Transcript, *supra* note 139, at 52.

[326] Bela August Walker, Note, *The Color of Crime: The Case Against Race-Based Suspect Descriptions*, 103 COLUM. L. REV. 662, 671 (2003) ("The description of a criminal suspect, whether created by the victim, an eyewitness, or the police, always begins with race and gender.").

[327] R. Richard Banks, *Race-Based Suspect Selection and Colorblind Equal Protection Doctrine and Discourse*, 48 UCLA L. REV. 1075, 1090–95 (2001) (explaining that race-based suspect descriptions have not triggered equal protection scrutiny because "the prevailing approach [is to assume] that suspect description reliance should never be viewed as a racial classification"). Even if this were not the case, suspect descriptions might survive the test of strict scrutiny, as narrowly tailored to achieve a compelling state interest. *See id.* at 1119.

[328] *See* WoLF Letter, *supra* note 213, at 4.

[329] *See id.* (citing FBI statistics that men committed 88% of murders in 2015). The Williams Institute estimates that 0.58% of adults in the United States identify as transgender. FLORES ET AL., *supra* note 21, at 3.

Recognition of an X designation may have law enforcement *benefits*. Some nonbinary people do not consistently appear to others as men or women.[330] A third designation might better match how they are perceived.[331] Providing an X designation might avoid friction from police, customs, or TSA officers who would otherwise question a person whose gender identity does not appear to match the designation on their documents.[331] This type of friction is administratively costly for law enforcement, leading to unnecessary delays and even wrongful arrests and detentions. More importantly, it harms nonbinary people and their families, who are forced to reargue their gender identities with officials on a regular basis.[332]

As many have argued, the fact that official documents include sex designations at all is offensive to the values of self-determination and privacy, and it reinforces state authority over sex and gender in a troubling way.[333] An X designation has the potential drawback of allowing those who would harm nonbinary people to identify targets for violence and abuse, although I am unaware of any examples in which identity documents have been used for this purpose.[334] At present, there are good reasons to prefer a recognition model to a neutrality one. Recognition is more politically palatable, it allows the limited collection of sex-differentiated statistics to continue, and identity documents that reflect a person's gender identity offer that person a measure of security and legitimacy. A partial solution is to make sex designators on identification documents optional, giving people the choice to leave them blank, as New York City does with its identification cards.[335]

---

330 *See* JAMES ET AL., *supra* note 2, at 48; *supra* p. 908.

331 *See* JAMES ET AL., *supra* note 2, at 89 (reporting that 10% of nonbinary respondents to the 2015 USTS had been denied services or benefits when the name or gender on their identification documents did not match their gender presentation).

332 *Cal. Assemb. Transp. Hearing*, *supra* note 86 (statement of Jonathan Clay) (discussing how a nonbinary child's incorrect ID "always opens us up to all sorts of questions going through security and other places. . . . Which is very difficult for my wife and I, because it puts [us] in a role where we are now having conversations with people, whether it's security, doctors, other folks. Having this conversation in a venue that we don't control, and unfortunately, it typically happens in front of our child which is also very difficult. Because that identity is very important to them").

333 *See, e.g.*, Spade, *supra* note 28, at 738 ("Why is gender identification taken for granted as a legitimate domain of governance?"); Wipfler, *supra* note 28, at 492 ("Ultimately, . . . so long as such documents include a sex designation field, new and seemingly progressive government policies of gender inclusivity harmfully reify sex classification.").

334 This concern was initially raised in litigation over the X designation on U.K. passports, but dropped when evidence failed to substantiate it. R (on the application of Elan-Cane) v. Sec'y of State for the Home Dep't [2018] EWHC (Admin) 1530 [16], [82], 2018 WL 03093374. The U.K. court nonetheless refused to require an X designation on passports pending a "comprehensive review" of the implications of such a change by U.K. authorities. *Id.* at [124].

335 Wipfler, *supra* note 28, at 526 (discussing this approach, which has been adopted by a number of municipalities, but arguing it "still runs the risk of outing those who choose not to include a sex designation as abnormal if the majority of bearers opt to display their gender"). Another idea would

One reason the drafters of California's Gender Recognition Act opted for the recognition model was because it had been used by the District of Columbia, Oregon, and countries outside of the United States without problems.[336] Additionally, federal regulations implementing the REAL ID Act require "gender" designations on identity documents, giving states discretion to define that term.[337]

Moreover, the federal government uses birth certificate sex data, just as it uses data on race, for purposes of collecting public health statistics.[338] Although this is an argument for continuing to collect the data, it does not suggest that the data must be displayed on the face of the certificate.[339] Collection of information on intersex infants and nonbinary gender identities might improve this data by allowing researchers to study the health of these populations.[340]

Additionally, identity documents with gender designations can act as shields against discrimination and sources of validation for transgender people, whether those designations are M, F, or X. Designations that better match a person's self-presentation may help avoid difficult and dangerous conflicts with law enforcement.[341] Transgender men and

---

be to design application forms that leave the gender designation blank by default, requiring individuals who wish to have gender designations to affirmatively select them.

[336] *Cal. Assemb. Transp. Hearing, supra* note 86 (statement of Sen. Toni Atkins) (responding to the question, "why even have gender or sex on an ID card, or on a driver's license specifically" with the answer: "We could go the other route, but we really would then be further out of compliance with what other countries and states are doing").

[337] 6 C.F.R. § 37.17 (2018) ("To be accepted by a Federal agency for official purposes, REAL ID driver's licenses and identification cards must include on the front of the card (unless otherwise specified below) the following information: . . . (c) *Gender,* as determined by the State.").

[338] Wipfler, *supra* note 28, at 539.

[339] One scholar has proposed a partial neutrality approach: that the birth certificate provided to parents not include sex information on its face, but that data about the baby's phenotypical sex at birth be collected and sent to the National Center for Health Statistics, to be treated like data on race and kept confidential. *See* Elizabeth Reilly, *Radical Tweak — Relocating the Power to Assign Sex,* 12 CARDOZO J.L. & GENDER 297, 318 (2005) (proposing that the "sex" field on the birth certificate be moved from the section on identifying data to the one on "information for medical and health purposes only").

[340] How sex or gender should be defined depends on the aims of the research. Canada offers one model. *See, e.g., Gender of Person,* STAT. CAN. (Jan. 25, 2018), http://www23.statcan.gc.ca/imdb/p3Var.pl?Function=DEC&Id=410445 [https://perma.cc/CR2J-XNDM] (urging that users of statistics exercise caution in comparing indicators for sex and gender, as "[s]ex and gender refer to two different concepts"); *Classification of Gender,* STAT. CAN. (Jan. 25, 2018), http://www23.statcan.gc.ca/imdb/p3VD.pl?Function=getVD&TVD=467245 [https://perma.cc/Q4SK-EMY8] (providing options for gender including "Male gender," "Female gender," and "Gender diverse").

[341] *See Cal. Assemb. Transp. Hearing, supra* note 86 (statement of Cecilia Aguiar-Curry, Member, Assemb. Standing Comm. on Transp.) ("In emergency services, and if someone were to come upon an automobile accident or something along that, be able to look at someone's identification and know that they're special and may need special handling, that would be really important to me as a family member."). Documents alone cannot always overcome prejudice. *See* DAVIS, *supra* note 288, at 55 (discussing an incident in which a bouncer harassed a transgender woman in the women's restroom, and when she showed him an ID demonstrating she was a woman, he said: "Your ID is

women may need readily available documentation to prove they are not trespassing in sex-segregated spaces like restrooms.[342] This may be a particularly acute concern "[f]or low-income trans women of color," for whom an "'accurate' ID is essential to avoiding harassment or violence, being turned away for public assistance, or being placed in dangerous sex-segregated environments in detention facilities and/or homeless shelters."[343]

Identity documents such as passports, driver's licenses, and birth certificates can also play a meaningful role in a person's conception of self.[344] The documentary formalities that recognize nonbinary gender can legitimate an individual's claim to that status.[345] In recognizing nonbinary gender, state and local governments express its moral equivalence to male and female gender identities, which may undermine discrimination by delegitimizing arguments that nonbinary identity is not real or valid.

## B. Antidiscrimination Rules

Taking nonbinary gender seriously would entail protection from discrimination and harassment in housing, employment, education, public accommodations, and other domains.

As an initial matter, some might object that nonbinary identities are too diverse and amorphous to be included as a "protected class" for purposes of antidiscrimination law. But antidiscrimination law can protect a diverse array of nonbinary gender identities, just as it protects people of every race and religion.[346] Nondiscrimination rules do not generally define identity groups with precision; rather, they define prohibited grounds for discrimination (such as "sex" or "gender identity").[347] The question in a sex discrimination case is not whether the plaintiff belonged to a particular class.[348] It is whether the plaintiff was mistreated because of sex. For example, it is sex discrimination for an employer to

---

neither here nor there"); Wipfler, *supra* note 28, at 539 (arguing that in the short term, transgender people need IDs reflecting their gender identities to avoid "gender-probing" and other administrative problems).

[342] Wipfler, *supra* note 28, at 541.

[343] *Id.* at 540 (footnote omitted).

[344] *See* Clarke, *Identity and Form*, *supra* note 28, at 792.

[345] *See, e.g.*, JAMES ET AL., *supra* note 2, at 85 (quoting one survey respondent: "As a non-binary person, not being able to change my gender on any of my identification documents is really disheartening, dysphoria inducing, and kind of dehumanizing. I'm not allowed to be me").

[346] Including atheists. Nancy Leong, *Negative Identity*, 88 S. CAL. L. REV. 1357, 1402 (2015) (discussing antidiscrimination protection for atheists).

[347] Jessica A. Clarke, *Protected Class Gatekeeping*, 92 N.Y.U. L. REV. 101, 110 (2017).

[348] *See id.*; *see also* Cruz, *supra* note 26, at 278 ("Title VII sex discrimination doctrine . . . does not actually confine protection to a limited class of persons and so does *not* require courts to decide the sex/gender class to which a plaintiff belongs.").

insist that a worker conform to sex stereotypes.[349]  In the federal courts, there is an emerging consensus that discrimination on the ground of transgender status is a form of sex discrimination because it rests on sex stereotypes.[350]  This logic extends to discrimination against someone for not adhering to sex stereotypes that require binary gender identity.[351]  Those federal, state, and local rules that ban discrimination on the basis of "gender identity" should cover nonbinary gender identities as well.[352]

Most of the arguments against prohibiting discrimination against nonbinary gender identities are no different from the arguments against prohibiting discrimination against transgender identities in general.  But there are some questions uniquely applicable to extending protection to nonbinary gender identities, including (1) whether it would eliminate data collection necessary to identify patterns of sex discrimination, and relatedly, whether it would eliminate affirmative action for women, (2) whether it would preclude pregnancy protections, and (3) whether harassment law would require the use of unfamiliar pronouns.  This section will discuss these arguments, which apply to antidiscrimination doctrines generally.  Later sections will discuss arguments that apply specifically to the operation of antidiscrimination law in particular domains, such as educational programs, the workplace, housing, and health care.

*1. Data Collection and Affirmative Action.* — With respect to data and affirmative action, recognition approaches work best.[353]  Institutions collect information on racial identity, even though some people's identities are multiracial and others refuse to state any racial information.[354]  The existence of complicated racial identities does not preclude the enforcement of legal doctrines that depend on statistical underrepresentation of minority groups, despite the fact that a larger percentage of people identify as multiracial than transgender.[355]  Neither

---

[349] *See, e.g.*, Price Waterhouse v. Hopkins, 490 U.S. 228, 251 (1989) (plurality opinion) ("[W]e are beyond the day when an employer could evaluate employees by assuming or insisting that they matched the stereotype associated with their group . . . .").

[350] *See supra* note 175.

[351] *See supra* note 176.

[352] *See supra* p. 924.

[353] For a discussion of theories of discrimination that rely on statistical patterns, such as "pattern or practice" and "disparate impact," and an argument that these theories can work without a concept of the "protected class," see Clarke, *supra* note 347, at 173–77.

[354] *See* Lucas, *supra* note 225, at 1249; Rich, *supra* note 226, at 549.

[355] *See* FLORES ET AL., *supra* note 21, at 3 (reporting that 0.58% of adults in the United States identify as transgender); NICHOLAS A. JONES & JUNGMIWHA BULLOCK, U.S. DEP'T OF COMMERCE, THE TWO OR MORE RACES POPULATION: 2010, at 4 tbl.1 (2012), https://www.census.gov/prod/cen2010/briefs/c2010br-13.pdf [https://perma.cc/7MNL-C2ZA] (reporting that 2.9% of the population identified as two or more races).

should the existence of complicated gender identities be a barrier to collection of information on sex or gender identity.[356]

As for affirmative action, the Supreme Court has held that Title VII allows employers to consider an applicant's sex as a factor pursuant to an affirmative action plan.[357]  Nonbinary gender and other LGBT identities can be factors recognized for diversity or affirmative action programs as well.[358]

Nor does nonbinary gender throw a wrench into gender-based affirmative action programs with numerical requirements.[359]  The recognition that some people's genders are not binary does not render unadministrable laws that would require, for example, that corporate boards include one or more self-identified women.[360]  The Democratic National Committee charter states that all committees "shall be as equally divided as practicable between men and women (determined by gender self-identification) meaning that the variance between men and women in the group cannot exceed one," and that "gender non-binary delegates . . . shall not be counted as either a male or female, and the remainder of

---

[356]  Equal Employment Opportunity Commission (EEOC) forms require data on race and sex to help the Agency identify discriminatory patterns and trends.  Camille Gear Rich, *Elective Race: Recognizing Race Discrimination in the Era of Racial Self-Identification*, 102 GEO. L.J. 1501, 1520 (2014).  At present, these forms include only two options for sex, but multiple options for "Race/ Ethnicity" including "Two or more races." *See* Equal Emp't Opportunity Comm'n, Standard Form 100, EMPLOYER INFORMATION REPORT EEO-1 (2006) https://www.eeoc.gov/employers/ eeo1survey/upload/eeo1-2-2.pdf [https://perma.cc/9DXU-VPTU].  The rules for racial data collection prioritize self-determination and privacy. *See* Rich, *supra*, at 1520–27.  Just as rulemakers give consideration to whether they are interested in data on race or ethnicity, they can give consideration to whether they are interested in data on sex, gender identity, or some other trait. *See supra* note 340 (discussing how Canada's national statistical agency takes this approach).

[357]  Johnson v. Transp. Agency, 480 U.S. 616, 632 (1987) (allowing consideration of sex as a factor pursuant to an affirmative action plan designed to eliminate a "manifest imbalance" in a "traditionally segregated job category").

[358]  *See, e.g.*, Exec. Order No. 11,246, 3 C.F.R. 339 (1964–1965), *amended by* Exec. Order No. 11,375, 32 Fed. Reg. 14,303 (Oct. 17, 1967), Exec. Order No. 13,672, 79 Fed. Reg. 42,971 (July 21, 2014), *reprinted as amended in* 42 U.S.C.A. § 2000e (West 2018) (providing that federal contractors "will take affirmative action to ensure that applicants are employed, and that employees are treated during employment, without regard to their race, color, religion, sex, sexual orientation, gender identity, or national origin"); CAL. PUB. RES. CODE § 25230(a)(4), (b)(1) (West 2018) (requiring that a state commission that administers grants and loans "implement an outreach program" to minority businesses, including "LGBT business enterprises" defined as those that are "at least 51 percent owned by a lesbian, gay, bisexual, or transgender person or persons").

[359]  These rules may fall outside the ambit of Title VII because Title VII applies only to employment relationships.  They are not subject to constitutional requirements unless they are tied to state action.

[360]  *See* 2018 Cal. Legis. Serv. 954 (S.B. 826) (West) (to be codified at CAL. CORP. CODE §§ 301.3, 2115.5).  The question whether any particular gender-based affirmative action policy by a government entity will survive constitutional scrutiny has never turned on whether gender is or is not binary. *Cf.* Ajmel Quereshi, *The Forgotten Remedy: A Legal and Theoretical Defense of Intermediate Scrutiny for Gender-Based Affirmative Action Programs*, 21 AM. U. J. GENDER SOC. POL'Y & L. 797, 813–17 (2013) (outlining the various legal tests courts have applied to gender-based affirmative action under the Constitution).

the delegation shall be equally divided."[361]  Such a rule does not create incentives to exclude nonbinary people, but neither does it create any incentives to include them.  Policymakers should go further to reconsider the purposes of these programs and ask whether those purposes might be better served by rules that aim to affirmatively encourage the inclusion of nonbinary and other LGBT people.[362]

2. *Pregnancy Protections.* — Like transgender men who become pregnant, nonbinary people may at first seem to pose a challenge to rules that prohibit discrimination on the basis of pregnancy and related conditions, or rules that afford accommodations for pregnancy[363] or special treatment for biological mothers.[364]  In the pregnancy context, a decoupling approach works.[365]  Pregnancy is distinct from gender identity.  People of all gender identities can be pregnant,[366] and pregnancy protections can be neutral as to gender identity.  Sometimes such protection requires no stretch of the statutory language.  Title VII, for example, prohibits pregnancy discrimination by defining discrimination

---

[361] DEMOCRATIC NAT'L COMM., THE CHARTER & THE BYLAWS OF THE DEMOCRATIC PARTY OF THE UNITED STATES 8 (2018), https://democrats.org/wp-content/uploads/2018/10/DNC-Charter-Bylaws-8.25.18-with-Amendments.pdf [https://perma.cc/HG2Y-2J45].

[362] The moral case may be stronger than the business one.  *See, e.g.*, Deborah L. Rhode & Amanda K. Packel, *Diversity on Corporate Boards: How Much Difference Does Difference Make?*, 39 DEL. J. CORP. L. 377, 379 (2014) ("[T]he 'business case for diversity' is less compelling than other reasons rooted in social justice, equal opportunity, and corporate reputation.").

[363] *See* NAT'L P'SHIP FOR WOMEN & FAMILIES, REASONABLE ACCOMMODATIONS FOR PREGNANT WORKERS: STATE AND LOCAL LAWS (2018), http://www.nationalpartnership.org/research-library/workplace-fairness/pregnancy-discrimination/reasonable-accommodations-for-pregnant-workers-state-laws.pdf [https://perma.cc/45XZ-PWLS] (surveying state and local laws).

[364] *See, e.g.*, Douglas NeJaime, *The Nature of Parenthood*, 126 YALE L.J. 2260, 2314 (2017) (reviewing the law of parentage with respect to artificial reproductive technologies and concluding that "even in an age of sex and sexual-orientation equality, courts and legislatures continue to treat *biological mothers* as the parents from whom the *legal family* necessarily springs").

[365] I focus here on pregnancy rather than parenting in general, but with respect to parental leave, consider that even a scholar arguing for "fatherhood bonuses" to encourage fathers to take parental leave admits that these benefits should also be extended to "lesbian co-mothers" and even "single parents" who would receive double the benefits.  Keith Cunningham-Parmeter, *(Un)Equal Protection: Why Gender Equality Depends on Discrimination*, 109 NW. U. L. REV. 1, 55 (2014).

[366] *See, e.g.*, Lara Karaian, *Pregnant Men: Repronormativity, Critical Trans Theory and the Re(conceive)ing of Sex and Pregnancy in Law*, 22 SOC. & LEGAL STUD. 211, 212–13 (2013); Tori Truscheit, *All the Things I Worry About as My Nonbinary Partner Prepares to Give Birth*, THE CUT (Dec. 12, 2017), https://www.thecut.com/2017/12/giving-birth-outside-the-gender-binary.html [https://perma.cc/7MVL-X2DA].  Nonbinary people may also menstruate, *see, e.g.*, James Michael Nichols, *Powerful Photo Shows that Women Aren't the Only Ones Who Get Periods*, HUFFINGTON POST (Dec. 22, 2017), https://www.huffingtonpost.com/entry/cass-clemmer-trans-periods_us_597101bce4b0aa14ea78a251 [https://perma.cc/7XWB-DYS4] (discussing trans menstrual health advocate Cass Clemmer), and lactate, *see, e.g.*, Trevor MacDonald et al., *Transmasculine Individuals' Experiences with Lactation, Chestfeeding, and Gender Identity: A Qualitiative Study*, 16 BMC PREGNANCY & CHILDBIRTH 1, 2 (2016), https://bmcpregnancychildbirth.biomedcentral.com/articles/10.1186/s12884-016-0907-y [https://perma.cc/6J8Y-3LEX].

based on "sex" to include discrimination based on pregnancy.[367]  This provision is not limited to discrimination against women.[368]  But sometimes statutory language refers to females or women.  For example, Title VII also includes a provision that states: "women affected by pregnancy, childbirth, or related medical conditions" are to be treated the same as nonpregnant workers "similar in their ability or inability to work."[369]  Rules such as this can be clarified to specify that they apply to all people who are pregnant.[370]  In statutes governing family law as well, terms such as "gestational mother" might be replaced with "gestational parent."[371]

One feminist objection might be that this logic severs pregnancy from women's issues and indirectly hinders arguments for constitutional protection.[372]  In 1974, the Supreme Court rejected an equal protection challenge to a state disability fund that excluded pregnancy coverage, reasoning that "[t]he program divides potential recipients into two groups — pregnant women and nonpregnant persons.  While the first group is exclusively female, the second includes members of both sexes."[373]  One rebuttal to this formalistic argument is to insist, just as formalistically, on the equivalence of women and pregnancy, because only "biological women" get pregnant.[374]  This rebuttal has had some

---

[367]  42 U.S.C. § 2000e(k) (2012) (defining discrimination "because of sex" to include discrimination "because of . . . pregnancy, childbirth, or related medical conditions").

[368]  *See* Newport News Shipbuilding & Dry Dock Co. v. EEOC, 462 U.S. 669, 684–85 (1983) (allowing male employees to challenge employer benefits plans that covered female employees' pregnancies but not male employees' spouses' pregnancies).

[369]  42 U.S.C. § 2000e(k).

[370]  For an example of one fix, see Cal. Fair Emp't & Housing Council, Amendments to the Fair Employment and Housing Act Regulations 25–26 (2015) (codified at CAL. CODE REGS. tit. 2, § 11035(f)–(g) (2018))  https://www.dfeh.ca.gov/wp-content/uploads/sites/32/2017/06/FinalText.pdf [https://perma.cc/UPX7-TLUU] (clarifying that an "eligible female employee" for purposes of pregnancy accommodation includes "a transgender employee who is disabled by pregnancy").

[371]  The 2017 Uniform Parentage Act's definitions of parents have moved in the direction of gender neutrality.  *See, e.g.*, UNIF. PARENTAGE ACT § 107 (UNIF. LAW COMM'N 2017) ("To the extent practicable, a provision of this [act] applicable to a father-child relationship applies to a mother-child relationship and a provision of this [act] applicable to a mother-child relationship applies to a father-child relationship." (alterations in original)).  However, the Act still uses gendered terms such as "woman who gave birth to a child." *E.g., id.* § 301.  This language could be changed to "person who gave birth to a child" or "gestational parent" to include nonbinary people and transgender men.

[372]  *Cf.* Chase Strangio, *Can Reproductive Trans Bodies Exist?*, 19 CUNY L. REV. 223, 229–30 (2016) (offering examples of this genre of argument against transgender inclusion in reproductive rights discussions).

[373]  Geduldig v. Aiello, 417 U.S. 484, 496 n.20 (1974).

[374]  *See, e.g.*, Vivian M. Gutierrez & Berta E. Hernández-Truyol, *UnSexing Pregnancy?, in* Darren Rosenblum et al., *Pregnant Man?: A Conversation*, 22 YALE J.L. & FEMINISM 207, 233 (2010) ("A person/parent with a female reproductive system is pregnant, regardless of how that person presents socially or legally.").

success in state courts interpreting their own constitutions to prohibit discrimination based on pregnancy.[375]

But the argument also has risks for feminists. If the law defines women as a class by their capacity to become pregnant, then this capacity appears to be a legitimate basis for discrimination against women.[376] In any event, there are any number of more substantive arguments linking pregnancy discrimination to sex: for example, that in practice, discrimination based on pregnancy drives women's inequality,[377] that it is based on the assumption that all workers meet a traditionally male norm,[378] or that it is a thinly veiled attempt to exclude women from the workplace.[379] The fact that nonbinary people, like transgender men, may also avail themselves of pregnancy protections in no way undermines these substantive arguments.

Likewise, in the family law domain, even scholars arguing for rules that would mostly benefit mothers are able to cast their prescriptive recommendations in sex-neutral terms.[380] Laws governing parents might go further in the direction of gender neutrality by recognizing more of the social as well as biological aspects of parenthood.[381] Nonbinary parents, like many other LGBT parents, may demonstrate the

---

[375] A Connecticut state court advanced this formalistic argument, among several others, in holding that the Connecticut Constitution's Equal Rights Amendment prohibited the state from refusing to fund medically necessary abortions. Doe v. Maher, 515 A.2d 134, 159–60 (Conn. Super. Ct. 1986) ("Since only women become pregnant, discrimination against pregnancy by not funding abortion when it is medically necessary and when all other medical expenses are paid by the state for both men and women is sex oriented discrimination." *Id.* at 159.).

[376] *See, e.g.,* Cary Franklin, *Biological Warfare: Constitutional Conflict over "Inherent Differences" Between the Sexes,* 2017 SUP. CT. REV. 169, 180 ("[P]regnancy is, in some instances, deemed to be a fundamental difference between the sexes that gives the state a legitimate reason to treat men and women differently.").

[377] This was the type of argument that the *Doe* court regarded as "most important." *Doe,* 515 A.2d at 159 ("Since time immemorial, women's biology and ability to bear children have been used as a basis for discrimination against them. . . . This discrimination has had a devastating effect upon women.").

[378] *Cf. id.* (holding that a benefits plan was discriminatory because "all the male's medical expenses associated with their reproductive health, for family planning and for conditions unique to his sex are paid and the same is provided for women *except* for the medically necessary abortion that does not endanger her life").

[379] *See* Geduldig v. Aiello, 417 U.S. 484, 496 n.20 (1974) (stating that "a showing that distinctions involving pregnancy are mere pretexts designed to effect an invidious discrimination against the members of one sex or the other" would be sufficient to constitute a violation of the Equal Protection Clause).

[380] *See, e.g.,* Jennifer S. Hendricks, *Fathers and Feminism: The Case Against Genetic Entitlement,* 91 TUL. L. REV. 473, 500 (2017) (arguing that genetics alone should not entitle a person to parental rights, but biology along with a relationship should).

[381] For an argument about how "[p]arentage law could move away from separate regulations of *maternity and paternity* and instead work toward general regulation of *parentage*" by considering social as well as biological connections, see NeJaime, *supra* note 364, at 2337–38. For an argument that the law should go even further to "unsex" pregnancy protections by encouraging nonpregnant partners to engage in more care work, such as setting up health care appointments, choosing a

importance of social bonds as well as biological relationships in family law, reproductive health care, and parenting.[382]

3. *Misgendering and Pronouns.* — Another concern is whether law will require the use of nonbinary pronouns and titles. Most transgender people, including many who identify as nonbinary, use gendered pronouns such as he and she.[383] However, 29% of transgender respondents to the USTS stated they use "they/them" pronouns.[384] Some transgender people may request even more unfamiliar pronouns, such as ze (pronounced "zee") and hir (pronounced "hear").[385] Rather than Ms., Mrs., or Mr., some may request the honorific prefix Mx. (most often pronounced "Mix").[386] When nonbinary people request unfamiliar pronouns, they may encounter discrimination and harassment.[387] The law should recognize nonbinary gender identities in this context, just as it requires equal respect for male and female gender identities. Whether harassment law applies will depend on the circumstances: harassment

---

pediatrician, purchasing a car seat, or taking a childcare class, *see* David Fontana & Naomi Schoenbaum, *The Sexed Pregnancy*, COLUM. L. REV. (forthcoming 2019) (manuscript at 16–20) (on file with the Harvard Law School Library).

[382] This Article does not develop these arguments, because they have been discussed in other work. *See e.g.*, Darren Rosenblum, *Epilogue and Response*, *in* Rosenblum et al., *supra* note 374, at 261, 269 ("Parenting should be unsexed to embrace both the fluidity of contemporary understandings of gender and the need for balancing roles within the family."); *supra* note 381.

[383] JAMES ET AL., *supra* note 2, at 49 (reporting that 37% of nonbinary respondents to the 2015 USTS use he/his pronouns, 37% use she/her, 29% use they/their, 20% do not ask for any particular pronouns, and 4% use other unique choices).

[384] *Id.*

[385] *See, e.g., id.* at 49–50 (reporting that 2% use ze/hir); Beemyn, *supra* note 182, at 359. Beemyn explains that "students who want to be recognized as nonbinary have tended to gravitate toward 'they/them/their,' because it is language that others already have and its usage to describe one person is gaining support in the dominant society." Beemyn, *supra* note 89, at 251 (discussing the results of a survey of 111 nonbinary college students in 2014). "The handful of students I interviewed who had chosen other pronoun options, specifically 'ze/hir/hir,' 'ze/zim/zir,' or 'xe/xem/xir,' often had difficulty, or did not try, getting people beyond their close friends to refer to them with these pronouns." *Id.*

[386] Robin Henry, *Now Pick Mr, Mrs, Miss, Ms . . . or Mx for No Specific Gender*, THE TIMES (May 3, 2015, 1:01 AM), https://www.thetimes.co.uk/article/now-pick-mr-mrs-miss-ms-or-mx-for-no-specific-gender-t2rb5bh62rs [https://perma.cc/B489-J2Y4] (reporting that "[t]he first recorded use of Mx was in Single Parent, the American magazine, in 1977" and quoting an assistant editor of the Oxford English Dictionary as saying: "The early proponents of the term seem to have had gender politics as their central concern [and] saw the title as one which could sidestep the perceived sexism of the traditional 'Mr', 'Mrs' and 'Miss.'" (second alteration in original)); *On the Pronunciation of Mx*, GENDER CENSUS (Apr. 25, 2016, 12:40 PM), http://gendercensus.com/post/143382802540/on-the-pronunciation-of-mx [https://perma.cc/X83B-6BG6] (informal online poll on pronunciation).

[387] *See, e.g.*, Casey Parks, *Gresham-Barlow School District Agrees to Pay Transgender Teacher, Add Gender-Neutral Bathrooms After Complaint*, OR. LIVE (May 20, 2016), http://www.oregonlive.com/education/index.ssf/2016/05/gresham_barlow_transgender_tea.html [https://perma.cc/Q8DW-JJAZ]; Lori Rozsa, *Transgender Teacher Removed from Classroom After Some Parents Object to Gender-Neutral Prefix "Mx.,"* WASH. POST (Sept. 29, 2017), http://wapo.st/2xLEiYL [https://perma.cc/BRN4-SDK5].

law does not reach accidental or isolated remarks, nor does it generally require the use of any idiosyncratic pronouns a person might request.

Sincere questions about pronouns, as well as accidental or isolated misgendering, do not qualify as harassment. This is because the law generally requires that harassment be "severe or pervasive" to be actionable.[388] Even in the most protective of jurisdictions, harassment law does not reach "petty slights and trivial inconveniences."[389] For example, the New York City Commission on Human Rights has issued a guidance document stating that City rules require employers, landlords, and providers of public accommodations "to use an individual's preferred name, pronoun, and title (e.g., Ms./Mrs.)."[390] It further provides that pronouns may include "they/them/theirs or ze/hir."[391] As an example of a violation of the law, the guidance gives: "[i]ntentional or repeated refusal" to use the correct terms "after [a person] has made clear which pronouns and title she uses."[392] Misgendering a nonbinary person could therefore be part of a pattern of prohibited gender-identity or sex-based harassment.[393]

Additionally, the law requires that harassment be objectively hostile, not just subjectively offensive.[394] Thus, the law must account for the social meaning of harassing language, not just the individual victim's

---

[388] Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993).

[389] Nelson v. HSBC Bank USA, 929 N.Y.S.2d 259, 264 (N.Y. App. Div. 2011). New York does not have a "severe or pervasive" requirement. Id. at 263.

[390] N.Y.C. COMM'N ON HUMAN RIGHTS, LEGAL ENFORCEMENT GUIDANCE ON DISCRIMINATION ON THE BASIS OF GENDER IDENTITY OR EXPRESSION: LOCAL LAW NO. 3 (2002); N.Y.C. ADMIN. CODE § 8-102(23), at 4 (2016), https://www1.nyc.gov/assets/cchr/downloads/pdf/publications/GenderID_InterpretiveGuide_2015.pdf [https://perma.cc/C994-QAMV]. This Article generally avoids the term "preferred pronouns" because this phrasing suggests pronoun usage is a matter of mere preference rather than an issue of equal respect. It uses the term "correct pronouns" instead.

[391] Id.

[392] Id. at 5; see also D.C. MUN. REGS. tit. 4, § 808.2 (2017) (providing that "[d]eliberately misusing an individual's preferred name[,] form of address or gender-related pronoun" "may constitute evidence of unlawful harassment and hostile environment" considering "the nature, frequency, and severity of the behavior," among other factors).

[393] A court might require a plaintiff to demonstrate some form of mistreatment in addition to refusal to use gender-neutral pronouns. I have found no cases in which a nonbinary person has brought a claim alleging discrimination based solely on a refusal to use gender-neutral pronouns. In one Oregon case, a schoolteacher alleged that their employer forbade other employees from using the correct pronoun ("they"), and their coworkers called them "she," "lady," or "Miss," smeared Vaseline on their cabinets, yelled insults at them in the hallway, and conspired to prevent them from using the school's only gender-neutral restroom. Parks, supra note 387. The teacher won a settlement. Id.

[394] Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993) ("Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment — an environment that a reasonable person would find hostile or abusive — is beyond Title VII's purview.").

perspective.[395]  Harassment that expresses disrespect for a person's gender identity is objectively hostile, just like harassment that expresses disrespect for a person's racial or religious identity.  For example, imagine a scenario in which xenophobes harass a coworker they know to be from India by referring to him as an "Arab."[396]  This deliberate ascription of an incorrect identity is a form of racism — among other things, it expresses the idea that all people with brown skin are "Arab" and that Indian identity is unworthy of respect.[397]  Similarly, intentional misgendering expresses stereotypes about what real "men" and "women" are and informs its target that their own gender identity is unworthy of respect.  It is unreasonable to refuse to refer to a person by their first name, for example, calling a man "Jane" rather than "John," due to a disagreement about whether his male gender identity is valid.[398]  Likewise, it is unreasonable to insult him by referring to him as "she," as the Equal Employment Opportunity Commission has concluded.[399]  And if a person uses they/them pronouns, it is unreasonable to insist on referring to them as "he" or "she."[400]

But what if a person who goes by the name Jane-John insists on a new set of pronouns that no one else uses?[401]  At present, it does not seem unreasonable to deny this request, although it may be unkind.  The law does not protect a person's right to be identified in any manner they wish; it prohibits harassment based on sex.  Pronouns, unlike proper names, are "closed class words" that require particular "mental effort"

---

[395]  Some courts may consider the inquiry to ask what a reasonable person would think, "from the victim's perspective," noting that men and women may view the same conduct differently.  *See, e.g.*, Ellison v. Brady, 924 F.2d 872, 878 (9th Cir. 1991).  But not even this standard is a subjective one; it asks what a reasonable person in the plaintiff's circumstances would perceive.

[396]  *See, e.g.*, EEOC v. WC&M Enters. Inc., 496 F.3d 393, 401–02 (5th Cir. 2007) (reversing a district court's conclusion that an Indian plaintiff whose coworkers called him an "Arab" was unprotected by Title VII).

[397]  *Cf.* Robin Dembroff & Daniel Wodak, *He/She/They/Ze*, 5 ERGO 371, 376 n.8 (2018).  It also denigrates Arab identity, but that is not the only reason it is wrong.

[398]  This is true whether or not John is transgender.

[399]  *See* Lusardi v. McHugh, EEOC Appeal No. 0120133395, 2015 WL 1607756, at *11 (Apr. 1, 2015) ("While inadvertent and isolated slips of the tongue likely would not constitute harassment, under the facts of this case, S3's actions and demeanor made clear that S3's use of a male name and male pronouns in referring to Complainant was not accidental, but instead was intended to humiliate and ridicule Complainant.  As such, S3's repeated and intentional conduct was offensive and demeaning to Complainant and would have been so to a reasonable person in Complainant's position.").

[400]  *See* Dembroff & Wodak, *supra* note 397, at 372 ("[E]nough of the morally relevant facts that explain why it is wrong to misgender transgender women . . . are equally applicable to genderqueer individuals . . . .").

[401]  *Cf.* Brenda Cossman, *Gender Identity, Gender Pronouns, and Freedom of Expression: Bill C-16 and the Traction of Specious Legal Claims*, 68 U. TORONTO L.J. 37, 51 (2018) (discussing the "unsettled" controversy over whether Ontario's human rights law grants the right to choose *which* gender neutral pronouns to use).

to adopt.[402] They create a sort of *numerus clausus* problem.[403] What is objectively unreasonable is to misgender Jane-John as "he" or "she" when there are gender-neutral alternatives, like the singular "they" or "hir." These options are not wholly idiosyncratic,[404] they are not novel,[405] and regulated entities in some places have been put on notice by administrative agencies that they might be required to use such terms.[406] Readers may object that harassment law offers no bright-line rule as to what modes of address are required, but there is never any bright-line test of what constitutes sexual, racial, or religious harassment.[407] The test cannot be pinned down with precision or frozen in time because it must depend on context and contemporary norms.[408]

There are special institutional contexts in which there might be particular reasons to compel recognition of any pronouns used by a person, including idiosyncratic ones. A California law known as the LGBT Senior Bill of Rights, passed in October 2017, makes it unlawful for nursing home staff to "[w]illfully and repeatedly fail to use a resident's preferred name or pronouns after being clearly informed of the preferred name or pronouns," unless that requirement is "incompatible with any professionally reasonable clinical judgment."[409] Such a rule is warranted in the context of the long-term care industry, which involves a

---

[402] *See* John McWhorter, *Goodbye to "He" and "She" and Hello to "Ze"?*, CNN (Oct. 14, 2015, 8:31 AM), https://www.cnn.com/2015/10/14/opinions/mcwhorter-pronouns-gender-neutral/index.html [https://perma.cc/SU86-NJ55].

[403] *See supra* p. 939.

[404] *See supra* p. 957.

[405] *See, e.g.,* LESLIE FEINBERG, TRANS LIBERATION: BEYOND PINK OR BLUE 71 (1998) (discussing the author's use of "hir" and "ze" in the 1990s).

[406] *See supra* p. 958.

[407] *See, e.g.,* Post, *supra* note 286, at 17 ("[A]ntidiscrimination law is itself a social practice, which regulates other social practices, because the latter have become for one reason or another controversial. It is because the meaning of categories like race, gender, and beauty have become contested that we seek to use antidiscrimination law to reshape them in ways that reflect the purposes of the law.").

[408] *Cf.* Ash v. Tyson Foods, Inc., 546 U.S. 454, 456 (2006) (per curiam) (holding that a court of appeals had erred by concluding that the insult "boy," used to describe an adult African American man, was nondiscriminatory, and noting that whether a term is evidence of discrimination "depend[s] on various factors including context, inflection, tone of voice, local custom, and historical usage").

[409] CAL. HEALTH & SAFETY CODE § 1439.51 (West 2018). This is a criminal rather than a civil statute because, when the law was first proposed, the long-term care industry objected to any private right of action. *See, e.g., Hearing on S.B. 219 Before the S. Standing Comm. on Judiciary, 2017–2018 Leg., Reg. Sess. (Cal. 2017)* [hereinafter *Cal. Hearing on S.B. 219*] (statement of Matthew Robinson, California Association of Health Facilities), https://ca.digitaldemocracy.org/hearing/52473?startTime=52&vid=6c776ddd1a23558229f9c6de97aadecc [https://perma.cc/ZDK7-DB4U]; *id.* (statement of Lori Ferguson, California Assisted Living Association). Violations are misdemeanors, which could technically be penalized with fines of up to $2500, 180 days in county jail, or both, depending on factors including "[w]hether the violation exposed the patient to the risk of death or serious physical harm." CAL. HEALTH & SAFETY CODE § 1290(c). If the statute were ever enforced, it is likely that prosecutors would seek small fines. Chris Nichols, *Claims Mislead About*

captive and vulnerable population of LGBT seniors.[410]  Long-term care providers are charged with protecting the physical and mental health of this population and should not endanger the well-being of their charges by disrespecting their identities, however idiosyncratic.

A number of objections have been raised to the extension of harassment law to require recognition of nonbinary identity.  Some object that by requiring pronouns other than "he" or "she," government is taking sides on the acceptability of nonbinary gender identities, an issue on which public opinion polls are divided.[411]  But discrimination law always takes sides in social controversies,[412] and harassment law inevitably intervenes in the use of language.  Changing modes of address often express changes in the social status of groups.  During the civil rights era, the Supreme Court once intervened to require that an African American woman be addressed with the honorific "Miss," just like a white woman.[413]  Formerly common modes of class-based address — such as "my lord" — have fallen out of favor.[414]  Experience with "Ms." demonstrates that new forms of address are possible and can quickly become culturally legible.[415]

Other objections are particular to pronouns.  Law professor Eugene Volokh has argued that "[c]ompelling people to change the way they use the ordinary, commonplace words of everyday speech — turning plurals into singulars (or vice versa) — is a serious imposition."[416]  But why is

---

*California Forcing Jail Time for Using Wrong Transgender Pronoun*, POLITIFACT (Sept. 26, 2017, 5:13 PM), http://www.politifact.com/california/article/2017/sep/26/claims-mislead-about-california-bill-forcing-jail-/ [https://perma.cc/U22T-QF5U] (statement by the bill's sponsor, Senator Scott Wiener, that "no one is going to jail" for incorrect pronoun use, an infraction that he predicts will be treated akin to a violation of the ban on smoking).

[410]  *See Cal. Hearing on S.B. 219, supra* note 409 (statement of Sen. Scott Wiener) ("[T]hese seniors, people who are in their 70s, 80s, 90s and above today, are the people who created the modern LGBT community. . . . These are heroes, and they deserve to age gracefully and with the dignity and respect that they have earned 100 times over.").

[411]  *See* Josh Blackman, Opinion, *The Government Can't Make You Use "Zhir" or "Ze" in Place of "She" and "He,"* WASH. POST (June 16, 2016), https://wapo.st/1tt4rWZ [https://perma.cc/Q4MC-GTTW] (opposing antiharassment rules that would require gender-neutral pronouns on the ground that "while a non-binary view of gender may be orthodoxy in certain segments of society, a near-majority of Americans reject it as a fact of life").

[412]  *See* Post, *supra* note 286, at 17.

[413]  Bell v. Maryland, 378 U.S. 226, 248 n.4 (1964) (Douglas, J., concurring) (discussing Hamilton v. Alabama, 376 U.S. 650 (1964) (per curiam)).

[414]  Titles of nobility never made it over to the United States.  *See* U.S. CONST. art. I, § 9, cl. 8 ("No Title of Nobility shall be granted by the United States . . . .").

[415]  "Ms." has a long history, but quickly entered common usage in the 1970s due to feminist advocacy.  *See, e.g.,* Ben Zimmer, *Ms.,* N.Y. TIMES MAG. (Oct. 23, 2009), https://nyti.ms/2k9ehvH [https://perma.cc/KQV6-CXDS].

[416]  Eugene Volokh, Opinion, *Claims by Transgender Schoolteacher (Who Wants to Be Called "They") Yield $60,000 Settlement, Agreement to Create Disciplinary Rules Regulating "Pronoun Usage,"* WASH. POST: VOLOKH CONSPIRACY (May 25, 2016), https://wapo.st/1qJ29RU [https://perma.cc/X6NS-BMUX].

this a "serious" imposition?  The objection might be related to grammar, clarity, or compulsion.

Rules of grammar are often invoked to resist gender-neutral pronouns.[417]  The primary problem with this objection is that it elevates rules of grammar over considerations of how to treat one another equally.  But even on its own terms, the grammatical objection is dubious.  Language is ever evolving.  The American Dialect Society voted the singular "they" Word of the Year in 2015, noting that it was used by writers including Geoffrey Chaucer, William Shakespeare, and Jane Austen to refer to an unknown person.[418]  Usage of the singular "they" to describe an unknown person is still ubiquitous, despite the strivings of Victorian grammarians to replace it with a universal "he."[419]

A related objection may be the lack of clarity — is the referent of "they" a singular person or group?  But context is usually clarifying, as with "you," a pronoun that is both singular and plural.[420]  While English speakers once distinguished "thou" (singular) from "you" (plural), "thou" has disappeared.[421]  While new uses of language may at first cause friction, as new terms become more familiar, confusion abates.  The English language is plastic, and "change is normal, ongoing, and entertaining."[422]  In any event, as philosophers Robin Dembroff and Daniel Wodak have argued, "[e]ven if using *they* slightly complicates communication, it is preferable to further maligning minority gender groups."[423]

The objection may be about government compulsion of speech: mandating particular pronouns rather than forbidding misgendering.[424]  Yet

---

[417] Some ersatz grammarians are insincere.  Bergman & Barker, *supra* note 31, at 43 (pointing out that some people who oppose the singular "they" do not otherwise care about grammatical rules and hypothesizing that grammatical objections are easier to voice than the real sentiment: "I think your identity is invalid because it challenges my beliefs about the world").

[418] *2015 Word of the Year Is Singular "They,"* AM. DIALECT SOC'Y (Jan. 8, 2016), https://www.americandialect.org/2015-word-of-the-year-is-singular-they [https://perma.cc/F3MD-V296].

[419] Geoff Nunberg, *Everyone Uses Singular "They," Whether They Realize It or Not*, NPR (Jan. 13, 2016, 1:00 PM), https://www.npr.org/2016/01/13/462906419/everyone-uses-singular-they-whether-they-realize-it-or-not [https://perma.cc/9PDN-4LEP].

[420] *See* McWhorter, *supra* note 402.

[421] *See id.*

[422] AM. DIALECT SOC'Y, *supra* note 418.

[423] Robin Dembroff & Daniel Wodak, *The Problem with Pronouns*, PHILOSOPHER (June 23, 2017), https://politicalphilosopher.net/2017/06/23/featured-philosophers-robin-dembroff-daniel-wodak/ [https://perma.cc/LUR6-UG5D].

[424] *See* Cossman, *supra* note 401, at 42–45 (discussing the compelled speech objection to Canadian gender nondiscrimination law); Volokh, *You Can Be Fined*, *supra* note 169 ("New York is requiring people to actually say words that convey a message of approval of the view that gender is a matter of self-perception rather than anatomy, and that, as to 'ze,' were deliberately created to convey that . . . message.").

harassment law constantly compels speech by requiring people to inter-
act on equal terms with others they believe are unequal.[425]  For example,
a sexist police officer would be compelled to refer to a female colleague
as "Officer," even if he believes women should not have that title because
their role is in the home.  Alternatively, those who object to the gender-
neutral honorific "Mx." have the option of avoiding gendered honorifics
altogether, and not referring to any students or coworkers as "Mr." or
"Ms."  An analogy to our instincts about harassment based on religion
might be instructive.  Should it be considered harassment on the basis
of religion to refuse to refer to a person by religious titles such as "Your
Holiness," "Rabbi," or "Imam," when no one else in a school or work-
place uses religious titles?  To compel participants in secular life to use
religious honorifics seems incorrect.  Those who object to gender-neutral
pronouns may use proper names to refer to everyone, as the district court
ultimately did in one of its *Zzyym* opinions.[426]  In close quarters, where
it is impossible to avoid the use of pronouns, equal treatment means
giving "them" the same respect as "he" and "she."

### C.  Sex-Specific Roles and Programs

The law allows binary sex segregation in some educational programs,
sporting events, and workplaces.  These limited contexts are not reasons
to reject the project of nonbinary inclusion.

*1.  Education.* — Many controversies over transgender students —
such as whether schools should respect the gender identities of children
over parental opposition — are not any different with respect to nonbi-
nary gender, and so are beyond the scope of this Article.  But nonbinary
students may pose special challenges for sex-segregated schools, class-
rooms, and programs.  Various neutrality, recognition, and integration
strategies may be ways forward in these contexts.

Many feminist scholars have advocated for an anticlassification ap-
proach to education, based on research finding that single-sex programs
have negligible educational benefits, they are costly, and they advance
damaging gender stereotypes.[427]  The existence of nonbinary students,

---

[425]  In 2006, the Supreme Court rejected a compelled speech objection to a law that required law
schools to treat military recruiters like other recruiters, even though it compelled law schools to
speak by including military recruiters in their promotional materials.  Rumsfeld v. Forum for Acad.
& Institutional Rights, Inc., 547 U.S. 47, 61–62 (2006).  The Court noted that the regulation of
speech is always "incidental" to the enforcement of antidiscrimination laws: the fact that Title VII
"will require an employer to take down a sign reading 'White Applicants Only' hardly means that
the law should be analyzed as one regulating the employer's speech rather than conduct."  *Id.* at
62.

[426]  *See* Zzyym v. Kerry, 220 F. Supp. 3d 1106 *passim* (D. Colo. 2016) (referring to the plaintiff
throughout as "Dana" without pronouns).

[427]  *See, e.g.,* Rebecca S. Bigler et al., *Analysis and Evaluation of the Rationales for Single-Sex
Schooling, in* 47 ADVANCES IN CHILD DEVELOPMENT AND BEHAVIOR 225, 252–53 (Lynn S.

who do not fit the stereotypes behind single-sex education, provides another argument against these programs. But those who disagree on the policy arguments need not oppose inclusion of nonbinary people in general, because the law requires pluralism. Department of Education regulations permit funding of single-sex schools and classes, so long as student enrollment is "completely voluntary" and the school "provides to all other students, including students of the excluded sex, a substantially equal coeducational class or extracurricular activity in the same subject or activity."[428] Thus, all students have the option of coeducational classes, while students who wish to claim binary gender identities can opt into segregated classes.

Nonbinary gender also creates challenges for private women's colleges.[429] But these institutions have responded to these challenges with integration strategies: asking what interests sex-segregation serves and whether the definition of sex or gender used is tailored to meet those interests.[430] Thus, many are moving toward admitting any students who identify as transgender (men or women) or nonbinary.[431] The argument in favor of this move is that these institutions regard their missions as countering marginalization based on sex and gender identity.[432] Professor Davis suggests that these colleges should go further to become

---

Liben & Rebecca S. Bigler eds., 2014) (arguing that empirical research does not support rationales for single-sex education, and that studies that show benefits fail to control for selection effects); Diane F. Halpern et al., *The Pseudoscience of Single-Sex Schooling*, 333 SCIENCE 1706, 1707 (2011) (discussing evidence of the stereotyping argument); Erin Pahlke et al., *The Effects of Single-Sex Compared with Coeducational Schooling on Students' Performance and Attitudes: A Meta-Analysis*, 140 PSYCHOL. BULL. 1042, 1064–65 (2014) (meta-analysis of 184 studies of single-sex education concluding that those that used the best research methods demonstrated only trivial advantages, and noting that poorly designed studies may be fueling advocacy for single-sex schooling).

[428] 34 C.F.R. § 106.34(b) (2018). For an argument that this regulation is unconstitutional, see David S. Cohen & Nancy Levit, *Still Unconstitutional: Our Nation's Experiment with State-Sponsored Sex Segregation in Education*, 44 SETON HALL L. REV. 339 (2014).

[429] Title IX includes an exemption for "any public institution of undergraduate higher education which is an institution that traditionally and continually from its establishment has had a policy of admitting only students of one sex." 20 U.S.C. § 1681(a)(5) (2012).

[430] *See* DAVIS, *supra* note 288, at 98–101.

[431] *See Admission of Transgender Students*, MOUNT HOLYOKE, https://www.mtholyoke.edu/policies/admission-transgender-students [https://perma.cc/BLV2-HDLZ] (clarifying that it admits anyone "who is female or identifies as a woman" in whole or in part); Anna North, *Can Transgender Students Go to Women's Colleges? Across the Country, the Answer Is Evolving.*, VOX (Sept. 22, 2017, 11:17 AM), https://www.vox.com/identities/2017/9/21/16315072/spelman-college-transgender-students-womens-colleges [https://perma.cc/CAB3-MEXC] (surveying women's colleges and demonstrating the trend toward admitting all transgender students).

[432] Scott Jaschik, *Trans Applicants Welcome*, INSIDE HIGHER ED (Sept. 3, 2014), https://www.insidehighered.com/news/2014/09/03/mount-holyoke-will-now-accept-applications-transgender-women [https://perma.cc/5NVG-GCQ6].

AR_292825

"historically women's colleges," following the model of historically black institutions that now admit students of all races.[433]

Nonbinary students might also challenge school dress codes that prescribe different standards for boys and girls. This would be a good thing, because sex-differentiated dress codes perpetuate gender stereotypes that are harmful to all students, "communicat[ing] that girls' bodies are inherently sexual, provocative, [and] dangerous" and that boys will inevitably objectify and harass girls.[434] The best practice is sex neutrality: to prohibit certain forms of inappropriate apparel or "mandate[] which body parts must be covered," and to apply the rules uniformly.[435]

Another question is whether teachers should refer to students with gendered terms. A radical demand would be for gender-neutral early-childhood education, to allow young children to work out their own gender identities.[436] This would follow the model of some taxpayer-funded preschools in Stockholm, Sweden, where teachers assiduously avoid gendering their young charges, using the gender-neutral Swedish pronoun "hen," calling them "friends" rather than "boys and girls," and not treating them according to stereotypes.[437] In the United States, however, where publicly funded preschool is not even universally available, the goal of eliminating sex stereotyping in early childhood education

---

[433] DAVIS, *supra* note 288, at 87; *see id.* at 107 (arguing that single-sex admissions policies are not essential to the mission of women's colleges and suggesting instead that these colleges require essays that "ask prospective students to reflect upon how their own sex identities relate to the college's commitment to fighting institutional sexism").

[434] Meredith Johnson Harbach, *Sexualization, Sex Discrimination, and Public School Dress Codes*, 50 U. RICH. L. REV. 1039, 1044 (2016); *id.* at 1047 (discussing successful equal protection challenges to discriminatory school dress codes).

[435] Kimmie Fink, *The Importance of Inclusive School Dress Codes*, HUM. RTS. CAMPAIGN (Jan. 30, 2017), https://www.hrc.org/blog/the-importance-of-inclusive-school-dress-codes [https://perma.cc/J3NT-86HS] (advising schools to "[a]void gender-specific policies altogether and instead allow all students the same clothing choices regardless of gender").

[436] *See* Iantaffi Interview, *supra* note 47, at 18 ("I dream of a world where a child is born and, of course, we're not going to know their gender until they tell us. So we just use gender neutral pronouns and then when they're four or five, they'll tell us because that's when children tell you who they are.").

[437] John Tagliabue, *Swedish School's Big Lesson Begins with Dropping Personal Pronouns*, N.Y. TIMES (Nov. 13, 2012), https://nyti.ms/2uLI7sq [https://perma.cc/CJT7-9S4Y]. One study found that children at a gender-neutral preschool scored lower on a measure of gender stereotyping and were more willing to play with children of other genders. Kristin Shutts et al., *Early Preschool Environments and Gender: Effects of Gender Pedagogy in Sweden*, 162 J. EXPERIMENTAL CHILD PSYCHOL. 1, 12 (2017). Other Swedish psychologists are skeptical that the schools will have any long-term impacts on the children or society. Katy Scott, *These Schools Want to Wipe Away Gender Stereotypes from an Early Age*, CNN (Nov. 1, 2018, 8:39 AM), https://www.cnn.com/2017/09/28/health/sweden-gender-neutral-preschool/index.html [https://perma.cc/8NK8-WG9E].

seems a remote one.[438]  Nonetheless, teachers might work to avoid language that excludes nonbinary students, using terms like "students" rather than "ladies and gentlemen."[439]  Educational institutions should provide nonbinary students with processes that allow them to decide when to disclose their pronouns, without requiring that they confront teachers or putting them on the spot to announce their gender identities in front of other students.[440]

   *2. Athletics.* — Another domain in which nonbinary inclusion poses a challenge is sports.  In the longer term, nonbinary athletes may inspire society to think creatively about forms of sport in which many different types of bodies are competitive.  But in the shorter term, neutrality strategies may come at the cost of women's participation, and integration of nonbinary athletes into the men's or women's divisions may be preferable.  Whether neutrality or integration is the best solution will depend on the type of competition, the age of the competitors, and the reasons for sex-segregated events.[441]  In any event, the legal issues that nonbinary gender raises for sports are not reasons to reject nonbinary gender wholesale.

   Sex discrimination in athletics may run afoul of U.S. law, most notably Title IX, which forbids sex discrimination in sports programs at schools receiving federal funding.[442]  In 1975, Department of Education

---

[438] *See, e.g.*, U.S. DEP'T OF EDUC., A MATTER OF EQUITY: PRESCHOOL IN AMERICA (2015), https://www2.ed.gov/documents/early-learning/matter-equity-preschool-america.pdf [https://perma.cc/8ZX7-EXH3] (describing the lack of access to preschool for many American children).

[439] Meg-John Barker et al., *Non-binary Staff and Student Guidance for Higher Education Institutions*, REWRITING THE RULES 4, https://rewriting-the-rules.com/wp-content/uploads/2017/01/Non-BinaryGenderHigherEducationGuidance-1.pdf [https://perma.cc/UX7Y-GWS7].

[440] *Id.* at 3–4; Beemyn, *supra* note 182, at 361 (interviewing over 200 college students who identify outside of gender or sexual binaries and reporting "[t]he interviewees who approached faculty members about their pronouns stated that most were willing to use the requested pronouns, but many of the students did not feel comfortable going to their instructors, not knowing how they would react or not wanting to have such a conversation with a professor"); Dembroff & Wodak, *supra* note 423 ("Your student should get to choose whether and when they disclose their gender identity to others; you should not force them to disclose this information to strangers, partly out of respect for their autonomy, and partly to protect them from serious risks of stigmatization and discrimination.").

[441] *Cf.* DAVIS, *supra* note 288, at 113–14 (asking that, for each age and level of play, organizations reconsider the aims of sex segregation in athletics, which might be fostering equal opportunity, student athleticism, recreation, or elite competition, or catering to the desires of fans for gender specialization).

[442] 20 U.S.C. § 1681(a) (2012) ("No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance [with certain specified exceptions]."). Additionally, the Fourteenth Amendment may forbid sex discrimination by sports leagues that qualify as "state actors." *See* Perkins v. Londonderry Basketball Club, 196 F.3d 13, 18 (1st Cir. 1999) (concluding that a "voluntary, nonprofit" basketball league, *id.* at 16, did not qualify as a "state actor"). Some state and local laws may forbid sex discrimination by sports leagues that qualify as public accommodations. *See* Nat'l Org. for Women v. Little League Baseball, Inc., 318 A.2d

regulations carved out an exception to this rule, allowing sex-segregated teams "where selection for such teams is based upon competitive skill or the activity involved is a contact sport."[443]  If selection is based on competitive skill, members of the sex whose athletic opportunities were previously limited (generally women or girls) "must be allowed to try-out for the team offered unless the sport involved is a contact sport."[444]  The regulation requires that, on the whole, a school must "provide equal athletic opportunity for members of both sexes."[445]

Third-gender recognition is an unlikely approach to athletics.  Opponents of California's Gender Recognition Act argued that recognition of nonbinary gender would require that schools establish separate sports teams just for nonbinary students.[446]  Even assuming the regulation applies to nonbinary athletes despite its reference to "both sexes," separate teams would not "effectively accommodate" nonbinary athletes because they are too small in number at present.[447]  Moreover, without a critical mass of athletes, separate nonbinary divisions are likely to amount to stigmatization rather than inclusion.[448]

The best way to accommodate nonbinary athletes may be incremental moves toward eliminating sex classifications in sports.[449]  Growing recognition of gender fluidity renders the project of classification of athletes into the male and female divisions more difficult and suspect.[450]

---

33, 37–38 (N.J. Super. Ct. App. Div. 1974) (holding that a Little League was a place of public accommodation and therefore could not discriminate on the basis of sex under New Jersey antidiscrimination law).

[443]  34 C.F.R. § 106.41(b) (2018).  For legal discussion of the interaction between Title IX and equal protection standards, and an argument in favor of revision of the statute or Department of Education regulations, see Jamal Greene, *Hands Off Policy: Equal Protection and the Contact Sports Exemption of Title IX*, 11 MICH. J. GENDER & L. 133, 163–65 (2005).

[444]  34 C.F.R. § 106.41(b).

[445]  *Id.* § 106.41(c).

[446]  *See* sources cited *supra* note 33 and accompanying text.

[447]  *See* 34 C.F.R. § 106.41(c) (discussing factors to consider in assessing "whether equal opportunities are available," including whether the allocation of teams "effectively accommodate[s] the interests and abilities of members of both sexes").

[448]  A third category for intersex athletes is particularly troubling.  Karkazis & Carpenter, *supra* note 301, at 6–7 (opposing the creation of an intersex division in track and field on the grounds that it forces people into the "third sex as punishment" for refusing to submit to medical treatments that would lower their testosterone and requires an athlete to disclose her "intersex variation violating her privacy and calling her identity into question," *id.* at 7).

[449]  Erin Buzuvis, *Hormone Check: Critique of Olympic Rules on Sex and Gender*, 31 WIS. J.L. GENDER & SOC'Y 29, 48 (2016) ("The approach of eliminating gender categories [in sporting events] would also be inclusive of those individuals whose gender-identities are non-binary or fluid."); Alex Channon et al., *Introduction: The Promises and Pitfalls of Sex Integration in Sport and Physical Culture*, *in* SEX INTEGRATION IN SPORT AND PHYSICAL CULTURE 1, 3 (Alex Channon et al. eds., 2017) (discussing, as a benefit of sex-integrated sports, "greater inclusivity of non-binary people").

[450]  *See* Ronald S. Katz & Robert W. Luckinbill, *Changing Sex/Gender Roles and Sport*, 28 STAN. L. & POL'Y REV. 215, 241 (2017) ("[I]n a gender-fluid era, by what right does an organization or person dictate to another on the subject of that other's sex or gender?").

968                     *HARVARD LAW REVIEW*                     [Vol. 132:894

Nonbinary people's narratives of the cruelties and indignities of classi-
fication are also persuasive arguments for integrating sports.[451] Nonbi-
nary athlete Lauren Lubin has said: "The first identity I ever formed, as
a young child, was 'I'm an athlete,' before even a gender."[452] Lubin
played women's college basketball until the dissonance with their inter-
nal sense of nonbinary identity caused them to quit the team and lose
their scholarship.[453]

Reenvisioning sports without sex classifications aligns with the goals
of much feminist theory. A large body of sociological research describes
how sports inculcate gender roles: producing, maintaining, and validat-
ing male privilege and virtue.[454] While women's sports have given
women a chance to "challenge the notion that it is only men who can be
brave, competitive, and strong," the fact that sports remain sex segre-
gated sends the message that men will always have the edge with respect
to these characteristics.[455]

There are already many examples of integrated sports leagues for
children in grades K–12.[456] Prior to puberty, children can play in the
same games, and arguments about safety and fairness find no basis in
statistical differences between boys' and girls' bodies.[457] Some sociolog-
ical research supports the argument that at older ages, desegregated
events — such as equestrian competitions, cheerleading, karate, tennis,
korfball, quidditch, and floorball — can emphasize "collaboration and
teamwork" over "policing gender divisions and broadly help to establish

---

[451] Jon Shadel, *This Gender Neutral Athlete Wants to End Sex Segregation in Sports*, VICE (Nov.
10, 2016, 4:28 PM), https://www.vice.com/en_us/article/mvk33x/this-gender-neutral-athlete-wants-
to-end-sex-segregation-in-sports [https://perma.cc/AKD9-53Y6] (observing that nonbinary "athletes
face a dizzying, seemingly impossible choice: disregard their gender identity — arguably an un-
healthy and wholly unacceptable option given the negative effects of remaining closeted — or sac-
rifice their love of sports").

[452] NON-BINARY INCLUSION IN SPORTS (WNET New York Public Media 2015), https://tpt.
pbslearningmedia.org/resource/fp17.lgbtq.werun.nonbinary/non-binary-inclusion-in-sports/ [https://
perma.cc/K9Q2-LQVB].

[453] Kristin Russo, *An Athlete Makes the Case for Gender Not to Matter in Sports*, TIME (Oct. 7,
2015), http://time.com/4063096/how-important-is-gender/ [https://perma.cc/6Z92-5J97].

[454] Channon et al., *supra* note 449, at 1.

[455] *Id.* at 2; *see also* Nancy Leong, *Against Women's Sports*, 95 WASH. U. L. REV. 1249, 1275–78
(2018) (discussing how sex-segregated sports perpetuate gender stereotypes).

[456] Scott Skinner-Thompson & Ilona M. Turner, *Title IX's Protections for Transgender Student
Athletes*, 28 WIS. J.L. GENDER & SOC'Y 271, 274–79 (2013).

[457] *See id.* at 287; *see also* Susanna Stenevi Lundgren et al., *Normative Data for Tests of Neuro-
muscular Performance and DXA-Derived Lean Body Mass and Fat Mass in Pre-Pubertal Children*,
100 ACTA PÆDIATRICA 1359, 1361 (2011) (finding "no constant gender differences" in neuromus-
cular performance such as balance and jumping in boys and girls under age twelve); Marnee J.
McKay et al., *Reference Values for Developing Responsive Functional Outcome Measures Across
the Lifespan*, 88 NEUROLOGY 1512, 1516 (2017) (comparing physical capabilities of children aged
three to nine and finding no significant sex differences).

positive, supportive, mutually respectful relationships between men and women."[458]

Sports might be redesigned so as not to advantage male or female bodies.[459] The Paralympic movement demonstrates how restructured games and the integration of technology can facilitate competition for athletes with different types of bodies.[460] It also suggests ways athletes might be classified other than by sex, including by age, body mass, or performance level.[461] Handicaps in golf and weight classes in wrestling are examples.[462] At some point in the future, the advantages of male bodies might be leveled out by genetic enhancements or e-sports.[463] When asked about how sports will change to include nonbinary people, Lubin said: "There's not a single answer. I believe this is going to be the culmination of many different disciplines and institutions coming together to reorganize themselves."[464]

But in the short term, inclusion of nonbinary athletes may require integration into sporting events that are segregated by sex (or that, like

---

[458] Channon et al., *supra* note 449, at 3; *see, e.g.*, Eric Anderson, *"I Used to Think Women Were Weak": Orthodox Masculinity, Gender Segregation, and Sport*, 23 Soc. F. 257, 258 (2008) (studying "heterosexual men who were first socialized into the masculinized sport of high school football but later joined the feminized sport of collegiate cheerleading" and finding that "[v]irtually all informants who had not previously respected women's athleticism reported changing their attitudes; and all informants said they had learned to better respect women's leadership abilities and to value their friendship"); Adam Cohen et al., *Investigating a Coed Sport's Ability to Encourage Inclusion and Equality*, 28 J. SPORT MGMT. 220, 226 (2014) (conducting qualitative analysis of the coed sport quidditch, including surveys and focus groups, and finding that "both females and males reported a stereotype reduction of the opposite gender occurring due to their participation in the sport"). This is not to say integrated sports are necessarily egalitarian; paternalistic sex stereotypes and male dominance may simply change form in integrated games. *See, e.g.*, Channon et al., *supra* note 449, at 4 (offering examples); Cohen et al., *supra*, at 230 (noting that among quidditch players, "some males held a degree of ambivalent sexism toward their female teammates . . . commend[ing] them for their efforts, but maintain[ing] the belief that they are sacrificing competitiveness for the sake of fairness or inclusivity").

[459] *See* Leong, *supra* note 455, at 1286–87 (imagining a gymnastics competition combining men's and women's events, "floor, vault, beam, parallel bars, uneven parallel bars, high bar, pommel horse, and rings," in which the best all-around athlete would win).

[460] For a critical take, see generally DAVID HOWE, THE CULTURAL POLITICS OF THE PARALYMPIC MOVEMENT 120–52 (2008).

[461] *See, e.g.*, Sean M. Tweedy et al., *Paralympic Classification: Conceptual Basis, Current Methods, and Research Update*, 6 PM&R S11, S12 (2014); *see also* Leong, *supra* note 455, at 1284.

[462] Another example is a recreational tennis league that divides athletes into A, B, C, and D skill levels, rather than by gender. *See* DAVIS, *supra* note 288, at 138.

[463] *Cf.* THE FUTURE OF SPORTS 14–15, 30–33 (Josh McHugh et al. eds., 2015), https://www.gannett-cdn.com/usatoday/editorial/sports/The-Future-of-Sports-2015-Report.pdf [https://perma.cc/4DGP-98QN] (predicting that genetic enhancements for athletes will one day become commonplace and regulated and that e-sports will grow in popularity). To say this might be possible as a technical matter is not to say it is likely that gaming culture will welcome non-male competitors. *Cf.* Giovanni Luca Ciampaglia, *Can Online Gaming Ditch Its Sexist Ways?*, THE CONVERSATION (Nov. 16, 2017, 7:59 PM), https://theconversation.com/can-online-gaming-ditch-its-sexist-ways-74493 [https://perma.cc/MB7X-2CPX].

[464] Shadel, *supra* note 451.

mixed doubles tennis or pairs figure skating, require an athlete of each sex).[465]  Integration requires careful analysis of the purposes for limiting eligibility in each division, so that definitions of eligibility can be tailored to meet those purposes.[466]

The arguments in favor of excluding "non-males" (however defined) from any male sports are weak.  While some non-males may not have the ability to compete at high levels, that is not an argument for excluding those who do.[467]  The exception for contact sports in Title IX's implementing regulations is much criticized.[468]  Courts have rejected the argument that certain games are too dangerous for girls,[469] and the number of girls playing football is on the rise.[470]  To the extent that male games are too dangerous for women, girls, and nonbinary people, they are likely too dangerous for men and boys as well.[471]  Paternalistic arguments support banning these games, or changing the rules or equipment to make them safer for everyone, rather than excluding non-males.  Arguments that nonbinary and female athletes degrade homosocial male sporting experiences deserve particular skepticism for how they might perpetuate toxic gender ideologies.[472]

---

[465]  One alternative is a gender maximum rule.  Quidditch, a game with seven athletes per team, requires that teams may not have more than four or five players "who identify as the same gender in play" at various points during the game.  US QUIDDITCH RULEBOOK 10 (12th ed. 2018), https://www.usquidditch.org/files/USQ_Rulebook_12.pdf [https://perma.cc/86QB-T3JL].  This rule applies to "those who don't identify within the binary gender system" as well as those who do.  *Id.*

[466]  For an argument that this analysis is required by the Constitution's Equal Protection Clause, see Leong, *supra* note 455, at 1283–84.

[467]  *See, e.g.*, Greene, *supra* note 443, at 136 ("[T]he skills gap, long used to justify exclusion of females, is the best argument in favor of a reasonable one-way ratchet that allows women to participate in male-only sports without extending the same opportunity to males who wish to participate in female-only sports."); Katz & Luckinbill, *supra* note 450, at 226 ("[P]rohibiting females from trying out for contact sports — has been consistently found by the courts to be unconstitutional. . . . Why should the 180-pound woman be prevented from trying out for football when the 97-pound male may do so?"); Skinner-Thompson & Turner, *supra* note 456, at 276 ("Put simply, courts have often rejected essentialist arguments claiming that girls are physically incapable of participating in youth sports with boys.").

[468]  *See, e.g.*, Greene, *supra* note 443, at 160–63 (arguing that "[t]he contact sports exemption, even if it directly affects only younger athletes, eventually affects the interest and abilities of older ones," *id.* at 160; that it limits the number of teams on which women can be involved and thereby excludes them from the educational, social, and health advantages of sports; and that it sends an expressive message enforcing gender stereotypes).

[469]  Skinner-Thompson & Turner, *supra* note 456, at 275 (discussing cases rejecting arguments about "keeping girls safe").

[470]  Cork Gaines, *The Number of Girls Playing High School Football Is on the Rise Even Though Overall Participation Is Down*, BUS. INSIDER (Oct. 3, 2016, 2:47 PM), https://www.businessinsider.com/more-girls-are-playing-high-school-football-2016-10 [https://perma.cc/PPT7-7DCA] (describing data from the National Federation of State High School Associations showing an increasing number of girls playing football).

[471]  *See* Leong, *supra* note 455, at 1271–72.

[472]  *See, e.g.*, Anderson, *supra* note 458, at 257 (discussing how "segregation of men into a homosocial environment limits their social contact with women and fosters an oppositional masculinity

As for women's sports, this is a context in which gender neutrality can have the disadvantage of precluding equal opportunity for women.[473]  Where the competitive stakes are low, as with most high school and amateur athletics, the best rule is one like California's or CrossFit's: deference to a person's choice to play in the women's division if it best matches their gender identity.[474]  Some nonbinary people may be willing to play on women's teams.[475]  A self-identification rule is best because "equal opportunity" in this context means giving everyone a chance to participate.  It does *not* mean fairness in the sense of leveling any natural advantage that was not the result of hard work and training.  Not just testosterone, but many traits give athletes advantages: height, body mass, better eyesight, larger hands, coordination, and lung

---

that influences the reproduction of orthodox views regarding women"); Deborah L. Brake, *Wrestling with Gender: Constructing Masculinity by Refusing to Wrestle Women*, 13 NEV. L.J. 486, 488 (2013) (arguing that when boys refuse to wrestle girls, "what is really at stake in the incident is the construction of masculinity, both the masculinity of the forfeiter and the masculinity of the sport of wrestling — a masculinity that is deeply threatened by mixed-sex wrestling competition"); Channon et al., *supra* note 449, at 1 ("[T]he exclusion of women from many high-profile sporting competitions throughout much of the twentieth century preserved much of sport as a symbolic space for celebrating men's embodiment of . . . 'masculine' virtues, while the tendency to stigmatize and ridicule female athletes when they did enter the 'male' sporting arena helped prevent them from effectively challenging the legitimacy of men's symbolic ownership of sport and its requisite qualities.").

[473]  *See* Buzuvis, *supra* note 449, at 48–49.

[474]  *See, e.g.*, CAL. EDUC. CODE § 221.5(f) (West 2018) ("A pupil shall be permitted to participate in sex-segregated school programs and activities, including athletic teams and competitions, and use facilities consistent with his or her gender identity, irrespective of the gender listed on records."); Mary Emily O'Hara, *EXCLUSIVE: The CrossFit Games Will Now Allow Transgender Athletes to Compete*, THEM. (Aug. 4, 2018), https://www.them.us/story/crossfit-games-trans-policy [https:// perma.cc/UEZ4-TSQM] (discussing the announcement by CrossFit's CEO that "[i]n the 2019 CrossFit competitive season, starting with the Open, transgender athletes are welcome to participate in the division with which they identify").

In 2016, the Obama Department of Education took the position that Title IX requires that schools defer to students' gender identities rather than the sex assigned at birth, but the Trump Administration rescinded that advice and is now reconsidering the issue.  Dear Colleague Letter from Sandra Battle, Acting Assistant Sec'y for Civil Rights, U.S. Dep't of Educ. & T.E. Wheeler, II, Acting Assistant Attorney Gen. for Civil Rights, U.S. Dep't of Justice (Feb. 22, 2017), http://www2.ed.gov/about/offices/list/ocr/letters/colleague-201702-title-ix.docx  [https://perma.cc/ SZX3-4E82] (withdrawing the Obama Administration's May 13, 2016 letter "in order to further and more completely consider the legal issues involved").

[475]  *See, e.g.*, Kevin Majoros, *Breaking Barriers for Non-binary Athletes*, WASH. BLADE (Aug. 24, 2017, 3:51 PM), http://www.washingtonblade.com/2017/08/24/breaking-barriers-non-binary-athletes/ [https://perma.cc/X3JA-KPEG] (discussing competitive swimmer G Ryan who "identifies as non-binary or genderqueer and swims on the women's team at the University of Michigan"); NCAA OFFICE OF INCLUSION, NCAA INCLUSION OF TRANSGENDER STUDENT-ATHLETES 15 (2011), https://www.ncaa.org/sites/default/files/Transgender_Handbook_2011_Final.pdf [https:// perma.cc/UL7N-A2L7] (quoting Morgan Dickens, former Cornell basketball and rugby player, as saying: "There are differences between being male and female, but being gender fluid doesn't mean I reject these differences, it just means I'm rejecting the idea that I have to be defined one way or another").

capacity, among other accidents of birth.[476] Some male athletes have atypically high testosterone levels, but no one suggests they be barred from competition.[477] In any event, gains in "fairness" must be weighed against the costs of subjecting intersex and transgender athletes to cruel and demeaning sex-verification rules.

The specter of fraud haunts these discussions, but it is hard to find evidence of recent bad faith claims to gender identity in sports, however "bad faith" is defined.[478] Due to continued stigma and bias against transgender people, it is unlikely that many people would be willing to claim a gender identity not their own in any public context. A more likely "gender identity fraud" scenario is the man who chooses to identify as nonbinary in an effort to show how lax the self-determination standard is and thereby undermine the case for nonbinary rights.[479] A rule against bad faith conduct would screen out these types of behavior. The rule could forbid athletes from selecting nonbinary or female gender identities for the sole purpose of prevailing in or disrupting athletic competition. Such rules would not be inadministrable. The law of religious accommodation offers a model for how to ensure that claims to identity are not made insincerely.[480]

There may be different considerations in elite sports. There is typically a ten to twelve percent performance difference between male and

---

[476] Buzuvis, *supra* note 449, at 43 (citing Chand v. Athletics Fed'n of India, CAS 2014/A/3759 ¶ 260 (CAS July 24, 2015)) (listing "increased hemoglobin levels caused by defective EPO receptors, tallness (in some sports), shortness (in others), low body mass index, unusually high lung capacity, mitochondrial conditions that increase aerobic capacity, acromegaly (i.e. large hands and feet), perfect vision, and unusually efficient systems for muscle growth and blood flow").

[477] *See id.*

[478] *See* Katz & Luckinbill, *supra* note 450, at 242.

[479] Similar protest strategies have been attempted in school restroom cases. *See* Doe v. Reg'l Sch. Unit 26, 86 A.3d 600, 603 (Me. 2014) (discussing how a transgender girl's "use of the girls' bathroom went smoothly, with no complaints from other students' parents, until a male student followed her into the restroom on two separate occasions, claiming that he, too, was entitled to use the girls' bathroom. The student was acting on instructions from his grandfather, who was his guardian and was strongly opposed to the school's decision to allow [the transgender girl] to use the girls' bathroom").

[480] Courts are generally reluctant to find religious beliefs to be insincere. *See* Frederick Mark Gedicks, *"Substantial" Burdens: How Courts May (and Why They Must) Judge Burdens on Religion Under RFRA*, 85 GEO. WASH. L. REV. 94, 112 (2017) ("Even when religiously contradictory behavior is evident, the courts defer to the claimant's explanations."). But they can tell when a claim to religious faith is no more than a sham to gain some particular benefit. *See, e.g.*, Ideal Life Church of Lake Elmo v. County of Washington, 304 N.W.2d 308, 318 (Minn. 1981) (holding that an institution was not a "church" where "the primary, and perhaps the sole, purpose for incorporating . . . was to provide [taxpayers] the benefit of a tax-free home while maintaining the same use and control they had prior to incorporation"); *see also* Ben Adams & Cynthia Barmore, Essay, *Questioning Sincerity: The Role of the Courts After Hobby Lobby*, 67 STAN. L. REV. ONLINE 59, 59–60 (2014) ("There is a long tradition of courts competently scrutinizing asserted religious beliefs for sincerity without delving into their validity or verity.").

AR_292833

female competitors at elite levels.[481]    Testosterone may be the reason, although the evidence on this is, to say the least, complex.[482]    Professor Erin Buzuvis has argued: "If eliminating the binary in sport is a strategy for challenging gender stereotypes, it is one with great potential to back-fire."[483]    At elite levels, gender neutrality would reduce the number of women who qualify for national teams and win medals.[484]    If only a few women succeed, they will be written off as "outliers" and their small numbers will be used as evidence of women's natural athletic inferiority rather than "an indictment of society's suppression of female athleticism."[485]

This Article's task is to argue nonbinary gender inclusion is feasible; it cannot settle broader debates about intersex and transgender inclusion in elite women's sports.    But one principle to consider might be protecting the reliance interests of those people who have competed in women's sports all their lives.[486]    This principle avoids hormonal testing of athletes with intersex variations, which is widely regarded as a public referendum on a female athlete's gender identity.[487]    Athletes with intersex variations disqualified from women's sports have faced stigmatization and shunning, and as a result of one case, an athlete attempted suicide.[488]    On the ground, sex verification practices are suspiciously intertwined with racialized notions of femininity; it cannot be ignored that

---

[481]    *See, e.g.*, Robinson Meyer, *We Thought Female Athletes Were Catching Up to Men, but They're Not*, THE ATLANTIC (Aug. 9, 2012), https://www.theatlantic.com/technology/archive/2012/08/we-thought-female-athletes-were-catching-up-to-men-but-theyre-not/260927/ [https://perma.cc/B6Y5-98HD].

[482]    Buzuvis, *supra* note 449, at 40–42 (discussing evidence that there is no linear relationship between endogenous testosterone and performance, that elite male and female performance levels often overlap, that women whose bodies are insensitive to testosterone are overrepresented among female athletes, and that many male athletes have low testosterone levels).    *But see* Doriane Lambelet Coleman, *Sex in Sport*, 80 LAW & CONTEMP. PROBS. 63, 70–84 (2017) (arguing the ten to twelve percent performance gap is driven by differences in testosterone, even if there is no perfect mathematical correlation).

[483]    Buzuvis, *supra* note 449, at 48.

[484]    *Id.*

[485]    *Id.* at 49.

[486]    *Id.* at 54–55 ("Reliance is the legal principle that says in some circumstances, one's rights are determined by the fact that one has been exercising those rights for a long time on the reasonable assumption that those rights were secure." *Id.* at 54.); *see also* Katz & Luckinbill, *supra* note 450, at 241 ("[I]ndividuals should not have to go through invasive, humiliating and degrading procedures about one of the most personal subjects, one's sex or gender."").    Bioethicist Alice Dreger has long taken this position.    *See, e.g.*, Alice Dreger, *Intersex and Sports: Back to the Same Old Game*, HASTINGS CTR.: BIOETHICS F. (Jan. 22, 2010), https://www.thehastingscenter.org/intersex-and-sports-back-to-the-same-old-game/ [https://perma.cc/ELE4-637N].

[487]    *See* Buzuvis, *supra* note 449, at 47 ("[A]s long as the categories for participation are still called 'men's' and 'women's,' (rather than 'above' and 'below' 10 nmol/L) the hormone standard will likely be interpreted as a proxy for sex verification.").

[488]    *Id.* at 37.

women of color from the Global South are disproportionately (if not exclusively) scrutinized by sporting authorities.[489]

Some transgender men may also have reliance interests in playing women's sports, having been denied equal athletic opportunities for most of their lives.[490]  But there are concerns that, due to high levels of testosterone from hormone treatments, these athletes will dominate and crowd out opportunities for others.  Accordingly, the NCAA allows transgender men who are not taking testosterone to play women's sports.[491]  Transgender women, however, may not have had the same history of disadvantage.  Buzuvis therefore suggests a rule that "would exclude transgender women who have not undergone hormone treatment" from elite women's sports unless they "bring their testosterone level below the 'normal male range' cutoff of 10 nmol/L."[492]  This same rationale would support allowing elite nonbinary athletes who have long competed in women's sports to continue to do so, as long as they are not pursuing masculinizing hormonal therapy.[493]

While nonbinary athletes present a long-term challenge to sex-segregated sports, in the short term, they may prompt rethinking of the rules of eligibility for particular events, along with transgender and intersex athletes.

*3. Workplaces.* — Another potential argument against nonbinary inclusion is that the labor market requires that men and women do different jobs.  Although the majority of job categories are filled primarily by women (like administrative assistant) or men (like truck driver), formal occupational sex segregation is rare.[494]  Title VII bars employer rules

---

[489] Katrina Karkazis & Rebecca M. Jordan-Young, *The Powers of Testosterone: Obscuring Race and Regional Bias in the Regulation of Women Athletes*, 30 FEMINIST FORMATIONS, 2018, at 1, 6 (discussing how "black and brown women from the Global South come to be the exclusive targets of the supposedly new, neutral, and scientific T regulation").

[490] Buzuvis, *supra* note 449, at 51–52 ("[A] transgender man may by virtue of his female body and birth assignment have been raised as female, a designation that influenced — and likely limited — his athletic opportunities." *Id.* at 52.).

[491] *Id.* at 52 (citing NCAA OFFICE OF INCLUSION, *supra* note 475, at 8).

[492] *Id.* at 53.  The International Association of Athletics Federations now recommends a threshold of 5 nmol/L for certain track and field events.  Press Release, Int'l Ass'n of Athletics Fed'ns, IAAF Introduces New Eligibility Regulations for Female Classification (Apr. 26, 2018), https://www.iaaf.org/news/press-release/eligibility-regulations-for-female-classifica [https://perma.cc/3LSA-GCE5].

[493] *See* Buzuvis, *supra* note 449, at 55.  For an argument that it is unwise and unfair to require any hormonal treatment as a condition of participation in collegiate sports, see Elliot S. Rozenberg, *The NCAA's Transgender Student-Athlete Policy: How Attempting to Be More Inclusive Has Led to Gender* and *Gender-Identity Discrimination*, 22 SPORTS LAW. J. 193, 207–08 (2015).

[494] *See, e.g.*, ARIANE HEGEWISCH ET AL., INST. FOR WOMEN'S POLICY RESEARCH, BRIEFING PAPER: SEPARATE AND NOT EQUAL? GENDER SEGREGATION IN THE LABOR MARKET AND THE GENDER WAGE GAP 13 (2010).

that classify by sex,[495] except where sex is a bona fide occupational qualification (BFOQ).[496] This defense is construed "narrowly,"[497] and applies to a diminishing number of jobs. The simple fact that customers might prefer men or women cannot support a BFOQ defense.[498] Nor can stereotypes about men or women.[499] Apart from the BFOQ defense, there are also judicially crafted exceptions to Title VII's ban on explicit sex-based classifications with respect to sex-differentiated dress codes and physical standards.[500] In light of the small number of remaining employment contexts in which binary sex segregation is permissible, the main challenge in integrating nonbinary people into employment markets is overcoming the biases against them. Nonetheless, nonbinary workers may prompt renewed scrutiny of the validity of BFOQ defenses, dress codes, and physical standards, requiring that employers and courts rethink whether sex classifications meet important interests or reaffirm stereotypes.

　　*(a) The BFOQ Defense.* — The most commonly accepted sex-based BFOQ argument is that certain positions must be filled by men or women to protect the privacy interests of patients, customers, or inmates in being viewed or touched only by members of the same sex.[501] To the extent that nonbinary people throw a wrench in this doctrine, it is good riddance. The doctrine tends to disadvantage women in the labor market.[502] The cases are premised on a troubling assumption of universal

---

[495] *See, e.g.,* City of L.A. Dep't of Water & Power v. Manhart, 435 U.S. 702, 709 (1978).

[496] 42 U.S.C. § 2000e-2(e) (2012) (allowing discrimination "on the basis of . . . sex . . . in those certain instances where . . . sex . . . is a bona fide occupational qualification reasonably necessary to the normal operation of that particular business or enterprise").

[497] Int'l Union, UAW v. Johnson Controls, Inc., 499 U.S. 187, 201 (1991).

[498] *See, e.g.,* Diaz v. Pan Am. World Airways, Inc., 442 F.2d 385, 389 (5th Cir. 1971) ("[I]t would be totally anomalous if we were to allow the preferences and prejudices of the customers to determine whether the sex discrimination was valid. Indeed, it was, to a large extent, these very prejudices the Act was meant to overcome."); 29 C.F.R. § 1604.2(a)(1) (2018).

[499] *See, e.g.,* Phillips v. Martin Marietta Corp., 400 U.S. 542, 545 (1971) (Marshall, J., concurring) ("By adding the prohibition against job discrimination based on sex to the 1964 Civil Rights Act Congress intended to prevent employers from refusing 'to hire an individual based on stereotyped characterizations of the sexes.' . . . The exception for a 'bona fide occupational qualification' was not intended to swallow the rule." (footnote omitted)).

[500] Theories of discrimination that rely on statistical showings and affirmative action are discussed *supra* pp. 952–54.

[501] Amy Kapczynski, Note, *Same-Sex Privacy and the Limits of Antidiscrimination Law,* 112 YALE L.J. 1257, 1259–60 (2003) (describing cases in which courts accepted this defense in "contexts including labor and delivery rooms, mental hospitals, youth centers, washrooms, and nursing homes" (footnotes omitted)).

[502] *Id.* at 1283 (describing how same-sex privacy BFOQs disadvantage women in labor markets because in the prison context, ninety-five percent of prisoners are men, and in the nursing context, they prevent men from filling jobs in lower-status care work); *see also* KATHARINE T. BARTLETT & DEBORAH L. RHODE, GENDER AND LAW: THEORY, DOCTRINE, COMMENTARY 116–17 (4th ed. 2006) (arguing that the BFOQ defense reinforces "age-old stereotypes that Title VII was meant

heterosexuality — that there is no same-sex sexual desire.[503]  The cases overvalue traditional notions of female modesty and discount threats to men.[504]  They sanction stereotypes about the female gaze as nonthreatening[505] and men as natural predators.[506]  They are "shot through with discriminatory attitudes about class and possibly race."[507]  To give legal sanction to these attitudes is troubling.

However, there may be instances in which the privacy BFOQ holds up to scrutiny, involving physical touching or bodily exposure of vulnerable populations.  Professor Amy Kapczynski has explained "the same-sex privacy BFOQ" as "a concession to the way people experience cross-sex bodily exposure as a threat or risk."[508]  She gives an example of a woman in a prison who was forced to undergo a clothed body search by a male correctional officer.  The woman "was so distressed that 'her fingers had to be pried loose from the bars she had grabbed; she returned to her cell-block, vomited, and broke down.'"[509]  Kapczynski reflects:

> We could insist, of course, that her reaction was a kind of false consciousness, that she was misidentifying all men as a threat, or at least misidentifying *this* man as a threat.  There is a way in which these things in fact might be true — but is *this* the place to make that point?  Would it be possible, in a context in which approximately eighty-five percent of women have been sexually or physically abused by men, to remake associations between gender and assault by ignoring them?[510]

---

to condemn — i.e., women's role washing and cleaning up after people, and men's role as the skilled professional," *id.* at 117).

[503] Kapczynski, *supra* note 501, at 1287.

[504] *See id.* at 1291 (discussing how courts disregard the threat of same-sex assault against male inmates).

[505] *See* Kim Shayo Buchanan, *Engendering Rape*, 59 UCLA L. REV. 1630, 1638–39 (2012) ("[S]urvey respondents consistently report much higher rates of sexual victimization by women staff than by fellow inmates.").

[506] *See, e.g.,* Ambat v. City and County of San Francisco, 757 F.3d 1017, 1028 (9th Cir. 2014) (reversing grant of summary judgment on a prison employer's BFOQ defense because "the County has not shown that the Sheriff had 'a substantial basis for believing that all or nearly all' male deputies were likely to engage in sexual misconduct with female inmates, nor has it shown that 'it is impossible or highly impractical . . . to insure by individual testing' that a male deputy does not pose such a threat" (omission in original)); Breiner v. Nev. Dep't of Corr., 610 F.3d 1202, 1211 (9th Cir. 2010) (rejecting a BFOQ defense based on arguments that male correctional officers presented a risk of sexual misconduct in a women's prison as based on "unproven and invidious stereotype[s]"); Kapczynski, *supra* note 501, at 1281.

[507] Kapczynski, *supra* note 501, at 1286 ("Courts have been more solicitous of the privacy interests of white collar men who fear that a cleaning woman might knock on their bathroom door than of the privacy interests of women and men incarcerated in prisons that are often the site of severe violations of physical and sexual integrity." (footnote omitted)).

[508] *Id.* at 1274.

[509] *Id.* at 1288 (quoting Jordan v. Gardner, 986 F.2d 1521, 1534 (9th Cir. 1993) (Reinhardt, J., concurring)).

[510] *Id.* (footnote omitted).  Men are also victims of sexual assault, including by other men. Bennett Capers, *Real Rape Too*, 99 CALIF. L. REV. 1259, 1266–71 (2011).  However, the law concedes here to social norms that construct cross-gender exposure as uniquely threatening to one's

Kapczynski proposes that the costs of changing gender norms should not be imposed on particularly vulnerable persons, such as inmates and patients in residential care.[511]

The best approach to this problem is to ask: "Might there be technologies, if not today, then tomorrow, that can accomplish the state's interest in engaging in bodily searches to maintain safety without raising the troubling issue of gender?"[512]  In the interim, integration may be best.  Whether any particular nonbinary person might trigger fear of sexual assault in vulnerable populations is not a question that can be answered in general, due to the diversity of the nonbinary population.  Fears of sexual assault from nonbinary people may stem from anti-transgender biases in general, that, like racism, the law cannot endorse.[513]  In the limited set of jobs involving bodily contact with vulnerable people, or exposure of naked bodies, a compromise would be to exclude those nonbinary people who will not identify as women (or men) for purposes of the job.

The BFOQ defense might also justify sex-specific casting calls in entertainment,[514] and sex-specific hiring for sex work, although there is little litigation on these questions.[515]  The idea of a sex BFOQ for acting and sex work that might exclude transgender people is a strange one, as transgender people have long been actors and sex workers.[516]  In the

---

dignity.  *See, e.g.*, Byrd v. Maricopa Cty. Sheriff's Dep't, 629 F.3d 1135, 1142 (9th Cir. 2011) (en banc) (holding that a strip search of a male inmate was unreasonable under the Fourth Amendment because it was conducted by a female officer in the absence of an emergency).

[511] Kapczynski, *supra* note 501, at 1291–92; *see also* Teamsters Local Union No. 117 v. Wash. Dep't of Corr., 789 F.3d 979, 990, 994 (9th Cir. 2015) (affirming summary judgment to a prison employer on its BFOQ defense for a narrow category of female-only job assignments to ensure inmate privacy, improve security by allowing more pat downs, and prevent sexual assaults); Jones v. Henryville Corr. Facility, 220 F. Supp. 3d 923, 929 (S.D. Ind. 2016) (granting summary judgment to an employer on its BFOQ defense where the prison preferred male employees for particular shifts in case a strip search of male inmates might be required).

[512] I. Bennett Capers, *Unsexing the Fourth Amendment*, 48 U.C. DAVIS L. REV. 855, 916 (2015) (footnotes omitted) (discussing advances in surveillance technologies).

[513] *Cf. TLDEF Helps Transgender Man Achieve Settlement in Discrimination Suit*, TRANSGENDER LEGAL DEF. & EDUC. FUND, http://www.transgenderlegal.org/headline_show. php?id=429 [https://perma.cc/2DRK-3NY9] (discussing a 2011 settlement in a discrimination case on behalf of a transgender man who was fired from a job "monitoring male outpatients as they provided urine samples for drug testing" after his employer learned he was transgender).

[514] *See* 29 C.F.R. § 1604.2(a)(2) (2018); Russell K. Robinson, *Casting and Caste-ing: Reconciling Artistic Freedom and Antidiscrimination Norms*, 95 CALIF. L. REV. 1, 3 (2007).

[515] Those cases discussed in Kimberly A. Yuracko, *Private Nurses and Playboy Bunnies: Explaining Permissible Sex Discrimination*, 92 CALIF. L. REV. 147, 157 & n.27 (2004), mostly involve dicta about the possibility of this defense.  For an argument that discriminatory preferences should be allowed in "proximate sex work that involves physical contact or face-to-face interactions" because of the implications for "decisional privacy," see Adrienne D. Davis, *Regulating Sex Work: Erotic Assimilationism, Erotic Exceptionalism, and the Challenge of Intimate Labor*, 103 CALIF. L. REV. 1195, 1269 (2015); and also *id.* at 1262–69.

[516] *Cf.* Case, *supra* note 25, at 12 n.23 ("I find it bizarre that sex is considered a BFOQ, in the interests of 'authenticity or genuineness,' for the job of actor or actress.  After all, the very essence

---

*HARVARD LAW REVIEW* [Vol. 132:894]

1950s and 1960s, "[t]ransitioning often led to sharp downward mobility, and for working class women especially, dancing and sex work were two of the most likely jobs after surgery."[517] Nonbinary people might also play roles as men or women. Nonbinary actor Asia Kate Dillon, for example, has played female characters[518] as well as a nonbinary character.[519] Dillon has said they wished to play male characters as well.[520]

*(b) Dress Codes.* — Under a judicially crafted exception to Title VII, employers are permitted to prescribe sex-differentiated dress codes, so long as those dress codes do not impose "unequal burdens" on men and women.[521] This separate-but-equal doctrine is explained by courts' desires to protect employer prerogatives and comfortable gendered social conventions, while avoiding subordination of women by ensuring women are not overly burdened.[522] Sex-differentiated dress codes may not be problematic for transgender people, so long as they are permitted to choose the set of rules consistent with their gender identities.[523] But they pose a challenge for those nonbinary people who do not feel comfortable complying with either set of rules.

While courts have not been persuaded by what they regard as freedom of expression arguments in favor of dress code noncompliance,[524] they are more likely to be persuaded by the claims of nonbinary people. One reason is that many nonbinary people make arguments in the register of immutability: that they have a core, authentic, essential identity that they should not be forced to sacrifice to keep their jobs.[525] A second reason is the increasing uptake of the argument that binary gender is

---

of this job is to pretend to be something one is not. All that a producer should be allowed to require is that the pretense be convincing." (citation omitted)).

[517] *See* Margot Canaday, Pink Precariat: LGBT Workers in the Shadow of Civil Rights, 1945–2000 ch. 2, at 40 (Oct. 27, 2017) (unpublished manuscript) (on file with the Harvard Law School Library). Professor Canaday discusses transgender soap opera star Aleshia Brevard, who had a successful career as an actress in the 1960s. *Id.* at 35–40.

[518] Julie Miller, *Meet the Actor Breaking Down Hollywood's Gender Barriers*, VANITY FAIR (May 5, 2017, 1:21 PM), https://www.vanityfair.com/hollywood/2017/05/asia-kate-dillon-mtv-awards [https://perma.cc/F9BU-4Z8S] (mentioning Asia Kate Dillon's role as a female character on the television show *Orange is the New Black*).

[519] *The Ellen DeGeneres Show* (CBS television broadcast Mar. 20, 2017), https://www.youtube.com/watch?v=f97aLkl_kWc [https://perma.cc/D3VC-FP9X] (discussing the character Taylor Mason on *Billions*).

[520] *Id.* (discussing their childhood desire to play the title role in *Oliver!*).

[521] *See, e.g.*, Jespersen v. Harrah's Operating Co., 444 F.3d 1104, 1108–11 (9th Cir. 2006) (en banc).

[522] *See* YURACKO, *supra* note 30, at 24.

[523] *See* EEOC v. R.G. & G.R. Harris Funeral Homes, Inc., 884 F.3d 560, 572–74 (6th Cir. 2018) (rejecting the argument that enforcement of a sex-specific dress code that required men to wear a pants-suit with a necktie and women to wear a skirt-suit would be a defense against a discrimination suit brought by a transgender woman).

[524] *See* YURACKO, *supra* note 30, at 137–46.

[525] *See* Clarke, *supra* note 43, at 23–27 (discussing the persuasiveness of the "new immutability," and the drawbacks of this argument).

itself a subordinating sex-stereotype that may not be enforced.[526] And a third reason is that, as nonbinary gender presentations become more mainstream, the implicit assumption that they are disruptive to employer prerogatives loses force.[527] This mainstreaming also makes it less likely that employers will respond to calls for neutrality by insisting that all workers dress in a blandly androgynous manner.[528]

*(c) Physical Standards.* — As for differential physical standards,[529] many of the same arguments that apply to segregated sports apply in this context as well.[530] But here, sex neutrality may be the best approach: leveling down to the minimum standard required to do the job. Courts have gone wrong by inventing legal rules that ask only whether different rules for men and women are "separate but equal," and giving no consideration to whether the standard has any relationship to the job.[531] Disparate standards may perpetuate false stereotypes about women's inferiority for law enforcement and fire-fighting jobs.[532] An inquiry into the business reasons for disparate standards is likely to reveal that the bar is set too high for men: if women can do the job by meeting a lower standard, then men can too.[533]

---

[526] *See supra* note 176.

[527] *Cf.* YURACKO, *supra* note 30, at 146.

[528] *But see id.* at 52 ("The employer who does not want to employ men in bob haircuts will simply not make this an option under its dress code, even if it does not mind women wearing them.").

[529] A 2003 study found that approximately twenty-seven percent of police departments surveyed that use physical fitness tests apply different cutoffs for men and women. Kimberly A. Lonsway, *Tearing Down the Wall: Problems with Consistency, Validity, and Adverse Impact of Physical Agility Testing in Police Selection*, 6 POLICE Q. 237, 258 (2003).

[530] *See supra* section III.C.2, pp. 966–74.

[531] In one recent case, *Bauer v. Lynch*, 812 F.3d 340 (4th Cir. 2016), the Fourth Circuit applied the judicially invented "equal burdens" analysis, *id.* at 349, which asks only if men and women are equally burdened by separate tests. *Id.* at 349–51 (upholding a sex-differentiated standard for a push-up test against a challenge by a male applicant for a position as an FBI special agent). But the Supreme Court has prescribed a different rule in an analogous situation involving race. *See* Ricci v. DeStefano, 557 U.S. 557, 585 (2009). Under *Ricci*, a higher standard for men would only be allowed if an employer had a strong basis in evidence for believing that applying the same standard would have a disparate impact on women and if applying the same standard would not serve a business necessity. *See id.* There is no basis in the text of Title VII for rejecting this rule in a sex discrimination case. *See* Price Waterhouse v. Hopkins, 490 U.S. 228, 244 n.9 (1989) (plurality opinion) ("[T]he statute on its face treats each of the enumerated categories exactly the same."). The only potential difference is the BFOQ defense, which applies to sex but not race. Like the *Ricci* framework, the BFOQ defense would have required an examination of the business justifications for the disparate standard. *See* Eve A. Levin, Note, *Gender-Normed Physical-Ability Tests Under Title VII*, 118 COLUM. L. REV. 567, 590 (2018) (arguing the BFOQ defense should have applied in *Bauer*).

[532] *Cf.* Ruth Colker, *Rank-Order Physical Abilities Selection Devices for Traditionally Male Occupations as Gender-Based Employment Discrimination*, 19 U.C. DAVIS L. REV. 761, 796 (1986) ("The stereotype that 'more strength is better' has led employers to use physical performance tests on a rank-order basis and thereby exclude women from employment opportunities.").

[533] *Id.; see also* Case, *supra* note 25, at 88–94.

A number of nonbinary people serve in the military.[534] Title VII does not apply to the U.S. military, but the military too is moving away from sex classifications, even with respect to physical fitness standards.[535] Although the Supreme Court upheld the male-only draft system in 1981,[536] as of 2012, all positions in the U.S. military are formally open to women.[537] Only the Marine Corps still segregates male and female troops for basic training.[538] It is true that the status of transgender servicemembers is now uncertain. But the Trump Administration's legal arguments in favor of exclusion of transgender service members are based in speculation about medical costs and do not differentiate between binary and nonbinary gender identities.[539]

---

[534] JAMES ET AL., *supra* note 2, at 168 (reporting that 22% of "non-binary people with male on their original birth certificate" and 2% of "non-binary people with female on their original birth certificate" were "[a]mong those with past or current military service").

[535] *See* Jeff Schogol, *The PFT and CFT Can Be Gender Neutral. Here's How.*, MARINE CORPS TIMES (July 10, 2017), https://www.marinecorpstimes.com/off-duty/military-fitness/2017/07/10/the-pft-and-cft-can-be-gender-neutral-here-s-how/ [https://perma.cc/YN94-BEXM] (quoting Lt. Col. Misty Posey, commander of the Marine Corps' only female recruit training battalion, as saying: "Whether intentional or not, the Marine Corps has been evolving toward a single fitness standard"). Air Force Major Mary Jennings Hegar argues, "I've seen firsthand that the warrior spirit is not directly proportional to how many pull-ups you can do. . . . In my opinion, you keep the standards very high and you maintain one standard. There shouldn't be two standards for women and men, there should be *a* standard for this job: To do this job, you should have to do these things. And those requirements should be job-specific and not arbitrarily high in order to specifically keep women out." *A Purple Heart Warrior Takes Aim at Military Inequality in "Shoot Like a Girl,"* NPR: FRESH AIR (Mar. 2, 2017, 2:56 PM) (alteration in original), https://www.npr.org/2017/03/02/517944956/a-purple-heart-warrior-takes-aim-at-military-inequality-in-shoot-like-a-girl [https://perma.cc/37NJ-FRAS].

[536] *See* Rostker v. Goldberg, 453 U.S. 57, 83 (1981). Should the draft return, it seems likely it would be gender neutral. *See* Jill Elaine Hasday, *Fighting Women: The Military, Sex, and Extrajudicial Constitutional Change*, 93 MINN. L. REV. 96, 134 (2008) ("[E]xtrajudicial changes since *Rostker* in women's military status may undermine *Rostker* and support a Court judgment striking down male-only registration, conscription eligibility, and combat positions."). In 2016, the Senate approved a bill that would extend the draft to women, although the effort ultimately failed. Jennifer Steinhauer, *Senate Votes to Require Women to Register for the Draft*, N.Y. TIMES (June 14, 2016), https://nyti.ms/1UtDflf [https://perma.cc/TRN3-7UGS].

[537] Memorandum from Martin E. Dempsey, Chairman of the Joint Chiefs of Staff & Leon Panetta, Sec'y of Def., to Sec'ys of the Military Dep'ts, Acting Under Sec'y of Def. for Pers. and Readiness & Chiefs of the Military Servs. (Jan. 24, 2013), https://dod.defense.gov/Portals/1/Documents/WISRJointMemo.pdf [https://perma.cc/C7AM-M9GD]. Women have even begun Navy SEAL training, although none have yet made it through. Nancy Coleman, *First Woman Enlists to Become a Navy SEAL*, CNN (July 22, 2017, 11:19 PM), http://www.cnn.com/2017/07/21/us/first-female-navy-candidates-seal-trnd/index.html [https://perma.cc/3YCQ-6MNC].

[538] Associated Press, *The Marine Corps Is the Only Military Boot Camp that Separates Sexes. That Could Soon Change in Southern California*, L.A. TIMES (Aug. 8, 2017, 8:25 AM), https://www.latimes.com/nation/nationnow/la-na-women-in-combat-training-20170808-story.html [https://perma.cc/8JTV-Q6TG].

[539] *See* Defendants' Motion to Dismiss and Opposition to Plaintiffs' Motion for a Preliminary Injunction at 33–34, Karnoski v. Trump, No. C17-1297 (W.D. Wash. Dec. 29, 2017), 2017 WL 7058272 (arguing that the exclusion "rests on the reasonable concern that at least some transgender

### D. Sex-Segregated Spaces

The law allows, and sometimes requires, sex segregation of public and private spaces, most notably restrooms, changing facilities, and dormitories. But these arrangements are exceptional, not inevitable, and not a reason to resist the larger project of nonbinary inclusion.

*1. Restrooms and Changing Facilities.* — The restroom debate has engendered political controversy over claims for recognition of the gender identities of transgender people who are asking only to use the male or female facilities.[540] This Article is interested in how people with nonbinary gender identities change that debate. People with nonbinary gender identities, like many transgender men and women, report avoiding public restrooms altogether, with adverse health consequences.[541] Because their gender presentations may not accord with norms, the presence of a nonbinary person in either the men's or women's restroom may result in harassment or even violence.[542] The best solution is neutrality: to phase out gendered restrooms in favor of spaces that provide safety and privacy for each individual. This approach would require legal, architectural, and social change — but that is not an argument for disregarding nonbinary gender altogether. Stopgap efforts include integration: allowing people to use whichever male or female facility they are most comfortable in, or recognition: creating third options such as "family" restrooms, in addition to "male" and "female" ones.

---

individuals suffer from medical conditions that could impede the performance of their duties," *id.* at 33).

[540] *See, e.g.,* G.G. *ex rel.* Grimm v. Gloucester Cty. Sch. Bd., 822 F.3d 709, 714–15 (4th Cir. 2016), *vacated and remanded,* 137 S. Ct. 1239 (2017) (mem.); Carcaño v. McCrory, 203 F. Supp. 3d 615, 621 (M.D.N.C. 2016).

[541] JAMES ET AL., *supra* note 2, at 228 (reporting that 53% of nonbinary respondents to the 2015 USTS stated they "[s]ometimes or always avoid[ed] bathrooms in the past year").

[542] *See, e.g.,* Hannah Boufford, *Transgender, Non-binary Students Discuss Bathroom Concerns,* IND. DAILY STUDENT (Feb. 19, 2017, 7:58 PM), http://www.idsnews.com/article/2017/02/transgender-non-binary-students-discuss-bathroom-concerns [https://perma.cc/NN2B-ZFGG] (quoting nonbinary student Spencer Biery: "They say you can use whichever [restroom] you're comfortable with . . . . And I'm not comfortable going into a restroom with a bunch of guys, but I also know that if I went into a female restroom — which I also don't really identify with — people would cause even more of a ruckus."); Ashe McGovern, Commentary, *Bathroom Bills, Selfies, and the Erasure of Nonbinary Trans People,* ADVOCATE (Apr. 1, 2016, 6:01 AM), https://www.advocate.com/commentary/2016/4/01/bathroom-bills-selfies-and-erasure-nonbinary-trans-people [https://perma.cc/NL5H-KYTV] ("Most days, entering a bathroom means experiencing discomfort because of disapproving, confused looks and comments. But it also brings up memories of when I've been physically threatened and attacked because someone believes I'm in the 'wrong bathroom.' . . . As a white, masculine-presenting person, I know experiences like mine, although far too common, are also far from the worst ones."); Jacob Tobia, *Why All Bathrooms Should Be Gender-Neutral,* TIME (Mar. 23, 2017), http://time.com/4702962/gender-neutral-bathrooms/ [https://perma.cc/CVK2-EQAJ] ("If I choose the women's restroom, I risk facing panicked women who take one look at my facial hair and assume that I'm a predator. If I choose the men's restroom, I risk facing transphobic men who, with one glance at my dangling earrings, begin hurling slurs or throwing punches.").

The ideal solution is neutrality: making all facilities "all gender," with larger, open, public spaces and fully enclosed private stalls that would better ensure safety, accommodate families, and operate fairly and efficiently.[543] There are design ideas and architectural solutions that would enable "people [to] sort themselves out by the equipment they need rather than what they putatively *are*."[544] As people gain experience using all-gender facilities, concerns about safety, cleanliness, and discomfort will deflate.[545]

One revelation of the locker room debate is that many students — whatever their gender identities — would prefer private spaces for undressing.[546] As the awareness and acceptability of same-sex desire have increased, the assumption that same-sex spaces are "no sex" spaces has withered.[547] And students may want privacy for reasons other than avoiding sexualization, such as maintaining autonomy over who can view (and possibly judge and shame them for) their naked bodies.[548] In one case, an investigation revealed that girls in a girls' locker room had

---

[543] *See, e.g.*, Mary Anne Case, *Why Not Abolish Laws of Urinary Segregation?*, *in* TOILET: PUBLIC RESTROOMS AND THE POLITICS OF SHARING 211, 220–25 (Harvey Molotch & Laura Norén eds., 2010) (debunking the various arguments in favor of "urinary segregation"); Ruth Colker, *Public Restrooms: Flipping the Default Rules*, 78 OHIO ST. L.J. 145, 152 (2017) ("We should transition towards making large, communal public restrooms available to 'all-comers,' with a variety of private toileting options, as well as have available a limited number of single-stall restrooms."); Terry S. Kogan, *Public Restrooms and the Distorting of Transgender Identity*, 95 N.C. L. REV. 1205, 1206, 1234–38 (2017) (discussing the sexist origins of separate men's and women's facilities, and arguing that "all gender, multi-user public restrooms," *id.* at 1238, would best protect everyone's privacy and safety); Joel Sanders & Susan Stryker, *Stalled: Gender-Neutral Public Bathrooms*, 115 S. ATLANTIC Q. 779, 781–88 (2016) (similar).

[544] Harvey Molotch, *On Not Making History: What NYU Did with the Toilet and What It Means for the World*, *in* TOILET: PUBLIC RESTROOMS AND THE POLITICS OF SHARING, *supra* note 543, at 255, 265; *see also* Lisa Selin Davis, *The Simple Design Solutions that Can Make Bathrooms Better — For All Genders*, QUARTZ (Mar. 16, 2017), https://qz.com/933704/how-to-design-transgender-friendly-bathrooms-that-make-people-of-all-genders-feel-safe/ [https://perma.cc/LT82-N4FV].

[545] It is false that women's restrooms provide safe hiding places from violent men, as men can and do enter women's restrooms to commit violence. Case, *supra* note 543, at 220. And it is false that women's restrooms are cleaner than men's. *See, e.g.*, Mary Schmich, *Sharing Bathroom with Men Raises Question of Cleanliness*, CHI. TRIB. (Jan. 29, 2016, 5:02 AM), http://www.chicagotribune.com/news/columnists/schmich/ct-gender-neutral-bathroom-mary-schmich-0129-20160128-column.html [https://perma.cc/4JMV-SRTM] (reporting the comment of the owner of one commercial cleaning service that women's restrooms are dirtier "hands down"). In any event, it is unfair to subject men or women to dirtier spaces based on stereotypes.

[546] *See* Clarke, *supra* note 161, at 829.

[547] Naomi Schoenbaum, *Heteronormativity in Employment Discrimination Law*, 56 WASHBURN L.J. 245, 249 (2017) ("[O]ne of the reasons behind sex-segregated bathrooms is the heteronormative assumption that same-sex spaces will not entail sexuality or acts of sex.").

[548] Carcaño v. McCrory, 203 F. Supp. 3d 615, 624 (M.D.N.C. 2016) (discussing the testimony of a school diversity officer who was "confident that the privacy interests of transgender and non-transgender students alike could be accommodated through the same means used to accommodate any student with body image or shyness issues" in locker rooms).

devised a "buddy system" in which friends would hold up towels to protect one another's privacy while they changed into swimming attire.[549] The best solution might be to provide privacy curtains for all students who would prefer them.

But it is costly to upgrade old facilities. Moreover, some anachronistic building codes require separate spaces.[550] A pluralism approach is an interim solution: creating additional "all gender" or "family" spaces alongside the men's and women's ones.[551] This approach is not optimal, as it runs the risk of signaling that transgender people are different. Transgender people might end up being *required* to use inadequate or stigmatizing third facilities, when the male or female facilities would accord with their gender identities.[552] Another temporary solution is to permit nonbinary people to use whichever facility they feel the safest in, or which they believe best matches their sex or gender, just as transgender men and women should be able to.

*2. Housing.* — Nonbinary inclusion may also threaten interests in sex-segregated housing in unique institutional contexts such as incarceration, shelters, long-term care facilities, and education. Changing all spaces to neutral ones is worth consideration. Barring that, institutions can take an integration approach: determining the placement that will be the safest and most affirming.

Third-category recognition strategies have been tried in some contexts, but they have major drawbacks. In the prison context, one example is L.A. County's special facility for LGBT inmates.[553] This approach is problematic in many ways, including that prison officials rely on stereotypes to determine which prisoners are LGBT; that it, in effect, excludes bisexual people; that it constructs gay and transgender people as victims; and that it forces inmates to disclose their LGBT status in the violent context of incarceration.[554] Sometimes correctional facilities may have space to house nonbinary people in individual sleeping

---

[549] Letter from Adele Rapport, Reg'l Dir., U.S. Dep't of Educ., Office for Civil Rights, to Daniel E. Cates, Superintendent, Twp. High Sch. Dist. 211, at 6 (Nov. 2, 2015), https://www2.ed.gov/documents/press-releases/township-high-211-letter.pdf [https://perma.cc/A44V-GET9].

[550] Colker, *supra* note 543, at 161.

[551] *See, e.g.*, Keress Weidner, *I'm Non-binary, and "Trans-Accessible" Restrooms Should Include Me, Too*, GLSEN, https://www.glsen.org/blog/i%E2%80%99m-non-binary-and-%E2%80%9Ctrans-accessible%E2%80%9D-restrooms-should-include-me-too [https://perma.cc/V74X-D6EN].

[552] *See, e.g.*, G.G. *ex rel.* Grimm v. Gloucester Cty. Sch. Bd., 822 F.3d 709, 716–17 (4th Cir. 2016), *vacated and remanded*, 137 S. Ct. 1239 (2017) (mem.).

[553] Russell K. Robinson, *Masculinity as Prison: Sexual Identity, Race, and Incarceration*, 99 CALIF. L. REV. 1309, 1309 (2011) ("The Los Angeles County Men's Jail segregates gay and transgender inmates and says that it does so to protect them from sexual assault. But not all gay and transgender inmates qualify for admission to the K6G unit. Transgender inmates must appear transgender to staff that inspect them.").

[554] *Id.* (among other drawbacks).

quarters, but there is a danger that they will end up isolated for too long, which can be psychologically damaging.[555]

As Professor Dean Spade has explained, gender-neutral prisons, or "co-corrections," are not unprecedented.[556] Beginning in the 1970s, a number of minimum security prisons housed men and women together, although men and women had separate living units.[557] Some survey research suggests these programs provided more safety and better training opportunities for women, although they came with the disadvantage of increased surveillance.[558] But "[i]n the eyes of conservative politicians," these "minimum-security facilities were . . . coed 'country clubs.'"[559] The co-correctional experiment was a casualty of the "tough-on-crime" policies of the 1990s, and by 1999 there were no co-correctional facilities left.[560] The experiment is worth trying again.

From 2012 to 2018, the federal approach to housing gender-nonconforming prisoners was integration: determining the best placement for gender-nonconforming prisoners on a case-by-case basis.[561] Facilities were required to screen all individuals for their risk of perpetrating or experiencing sexual abuse, and to use that information to determine housing.[562] Rather than presenting an insurmountable challenge to sex classification in prisons, nonbinary people were assimilated into it. This ought to have allayed any fears that nonbinary gender might open a Pandora's box of disruptive consequences for prison housing.[563] Yet the Trump Administration has revised the policy to give

---

[555] RHODES PERRY ET AL., N.Y.C. ADMIN. FOR CHILDREN'S SERVS., SAFE & RESPECTED: POLICY, BEST PRACTICES, & GUIDANCE FOR SERVING TRANSGENDER, GENDER EXPANSIVE, & NON-BINARY CHILDREN AND YOUTH INVOLVED IN THE CHILD WELFARE, DETENTION, AND JUVENILE JUSTICE SYSTEMS 26–27 (2017), https://www1.nyc.gov/assets/acs/pdf/lgbtq/SAFEAndRespectedUpdate061417.pdf [https://perma.cc/56F4-F48S].

[556] Spade, *supra* note 28, at 811.

[557] MICHAEL WELCH, CORRECTIONS: A CRITICAL APPROACH 195 (3d ed. 2011) (discussing a co-correctional facility, the Federal Correctional Institution in Fort Worth, Texas, which housed "low-risk and non-violent" inmates between 1971 and 1988).

[558] Sue Mahan et al., *Sexually Integrated Prisons: Advantages, Disadvantages and Some Recommendations*, 3 CRIM. JUST. POL'Y REV. 149, 149 (1989) ("Despite the shortcomings, staff and inmate responses were in general agreement with the statement: 'For the most part the co-corrections institution is an agreeable place.'"); *cf.* James R. Davis, *Co-Corrections in the U.S.: Housing Men and Women Together Has Advantages and Disadvantages*, 23 CORRECTIONS COMPENDIUM, Mar. 1998, at 1, 3 (discussing the need for longitudinal studies on co-correctional facilities).

[559] WELCH, *supra* note 557, at 195–96.

[560] *Id.* at 196 ("In view of the tough-on-crime campaigns and President George Bush's initiative to eliminate furlough and other unpopular policies, the U.S. Department of Justice worried that co-corrections did not uphold the 'tough' image of prison life that the White House had been fiercely promoting.").

[561] 28 C.F.R. § 115.42(a), (c) (2018).

[562] *Id.*

[563] It should be worrying, however, that anyone can be assimilated into the system of mass incarceration. *See generally* ALEXANDER, *supra* note 229.

THEY, THEM, AND THEIRS

primacy to "biological sex" for purposes of placement of transgender and intersex inmates.[564]

Economically marginalized transgender people encounter difficulties seeking social services and shelters due to sex segregation.[565] As a result of fear of violence and harassment, transgender and nonbinary people who need these services may not even approach them.[566] The Department of Housing and Urban Development's regulations require that single-sex emergency shelters and other services defer to a person's stated gender identity,[567] but this policy does not assist in cases in which a person's identity is nonbinary.[568] Gender-neutral social services may be the best option for survivors of gender-based violence.[569] Arguments related to women's safety are troubling in this context.[570] The assumptions of masculine predation and invulnerability that underlie these defenses of sex-segregated services are not supported and are harmful to men.[571] There is some anecdotal evidence that trainings and education may help to undermine these assumptions.[572] Providing all residents with doors that lock, panic buttons, and other measures may improve safety and ensure a sense of security.[573] Nonetheless, for temporary shelters, or those that cannot afford private rooms or apartments, there may be a good argument for continuing to sex-segregate shared bedrooms by gender identity[574] — based on the same considerations that might

---

[564] FED. BUREAU OF PRISONS, U.S. DEP'T OF JUSTICE, CHANGE NOTICE, TRANSGENDER OFFENDER MANUAL 6 (2018), https://www.bop.gov/policy/progstat/5200-04-cn-1.pdf [https://perma.cc/AAA2-V85R]. The policy allows assignment to facilities in accord with an inmate's gender identity in certain cases "where there has been significant progress towards transition as demonstrated by medical and mental health history." Id.

[565] Spade, supra note 28, at 752–53, 778–80.

[566] See, e.g., MICHAEL MUNSON & LOREE COOK-DANIELS, FORGE, GENDER-INTEGRATED SHELTERS: EXPERIENCE AND ADVICE 7 (2016), http://forge-forward.org/wp-content/docs/gender-integrated-shelter-interivews-FINAL.pdf [https://perma.cc/9MWQ-G2ZG] (reporting on a survey of 1000 transgender and nonbinary individuals in 2011, in which nearly two-thirds stated they would not, or might not, access domestic violence or rape crisis centers).

[567] 24 C.F.R. § 5.106 (2018). The Violence Against Women Act (VAWA), which provides federal grants to programs like emergency shelters, prohibits discrimination on the basis of "gender identity" by grant recipients. 34 U.S.C.A. § 12291(b)(13)(A) (West 2018). It allows "sex-specific programming" that "is necessary to the essential operation of a program," so long as "comparable services" are provided to those who are excluded from those programs. Id. § 12291(b)(13)(B).

[568] MUNSON & COOK-DANIELS, supra note 566, at 8.

[569] Id. (arguing that integrated services are the most inclusive way to respond to VAWA's requirement of offering "comparable services" to all, and noting that alternatives, such as putting male survivors up in hotels, are not cost effective).

[570] Id. at 23–28 (listing objections to integration such as the concern that cisgender men would assault women and children in the shelter).

[571] Cf. id. at 12–17 (offering anecdotes from staff at integrated shelters about men, including men who are not LGBTQ, who are survivors of abuse).

[572] Id. at 31–33 (discussing experiences with training shelter staff).

[573] Id. at 45–46.

[574] See OFFICE FOR CIVIL RIGHTS, U.S. DEP'T OF JUSTICE, FREQUENTLY ASKED QUESTIONS: NONDISCRIMINATION GRANT CONDITION IN THE VIOLENCE AGAINST WOMEN

support the privacy BFOQ.[575] Nonbinary people might appropriately be placed where they are most safe and comfortable.[576]

As for housing on college campuses and in other educational and professional contexts, institutions are adopting a pluralism strategy. Campus housing is a problem for transgender students in general.[577] Many educational institutions are developing gender-inclusive housing policies.[578] One school, for example, "allows students to live in a suite with others regardless of their sex or gender identity" if they "complete a gender inclusive housing contract confirming their agreement."[579] Some colleges designate certain residence halls or floors as gender neutral, or provide living space for students who identify as LGBTQ.[580] Others provide case-by-case accommodation.[581]

### E. Health Care

In the health care domain, the ideal approach would be an individualized sort of recognition: to tailor care to the particular needs of each

---

REAUTHORIZATION ACT OF 2013, at 6–7 (2014) (discussing situations in which sex-segregated housing may be appropriate, depending on the circumstances); MUNSON & COOK-DANIELS, *supra* note 566, at 39.

[575] *See supra* p. 976.

[576] *See* MUNSON & COOK-DANIELS, *supra* note 566, at 39–40.

[577] JAIME M. GRANT ET AL., INJUSTICE AT EVERY TURN: A REPORT OF THE NATIONAL TRANSGENDER DISCRIMINATION SURVEY 33 (2011), https://transequality.org/sites/default/files/docs/resources/NTDS_Report.pdf [https://perma.cc/ZP9E-4JKE] (reporting that nearly one-fifth of respondents in higher education were denied appropriate campus housing, and five percent were denied housing altogether).

[578] Joseph Erbentraut, *College Campuses Are More Trans-Inclusive than Ever, but Still Have a Long Way to Go*, HUFFINGTON POST (Dec. 6, 2017), http://www.huffingtonpost.com/2015/05/18/trans-friendly-colleges_n_7287702.html [https://perma.cc/46ZG-HX52]. For a list of the 267 colleges and universities with gender-inclusive housing, see *Colleges and Universities that Provide Gender-Inclusive Housing*, CAMPUS PRIDE, https://www.campuspride.org/tpc/gender-inclusive-housing/ [https://perma.cc/TFF5-P6QB].

[579] *Harvard College Handbook for Students: Gender Inclusive Housing*, HARV. U., https://handbook.fas.harvard.edu/book/gender-neutral-housing [https://perma.cc/8345-NEFX].

[580] *See, e.g., Gender Neutral Program*, DARTMOUTH GROUP DIRECTORY, http://dgd.dartmouth.edu/group/450 [https://perma.cc/RXV9-RBVS] ("Gender neutral housing allows for same-gender, opposite-gender or other-gender identities to live together regardless of biological sex. This program floor will provide a living/learning environment where residents can learn about and explore gender identity and expression in a supportive environment."); *Inclusive Housing*, U. NEB. OMAHA, https://www.unomaha.edu/student-life/housing-and-residential-life/prospective-students/inclusive-housing.php [https://perma.cc/22T8-ULSW] ("Any student who is lesbian, gay, bisexual, transgender, queer/questioning, intersex, asexual, not straight, gender nonconforming, (LGBTQIA+) and/or ally is eligible to live in University housing including in an apartment designated as Gender-Inclusive Housing.").

[581] *See, e.g., Contract*, U. WIS.-MADISON, https://www.housing.wisc.edu/residence-halls/assignments/contract/ [https://perma.cc/8FPA-5W7E] ("University Housing acknowledges that not all students may identify as female or male, and we want to create a welcoming environment for you in the residence halls. We would be happy to work with students who may identify as trans*gender, genderqueer, gender non-conforming, and/or non-binary regarding life in the halls.").

nonbinary person, with awareness of the unique forms of bias that non-binary people may face.[582]  Like other gender-nonconforming people, nonbinary people may ask that reproductive health care be offered in ways that do not assume gender roles or stereotypes.[583]  Nonbinary people, like transgender men and women, may require transition-related health care and be diagnosed with gender dysphoria.[584]  However, the law requires no more than neutrality with respect to any transgender patient.

Health care providers are beginning to recognize the unique needs of nonbinary patients, and finding ways to provide more supportive and affirming care.[585]  In addition to asking for a patient's "sex" assigned at birth, health care forms should also ask an open-ended question about "current gender identity."[586]  Patients must be assured that their responses to questions about sex and gender identity will be kept confidential, like other health care information.  One set of guidelines concludes, "all of the recommended practices could be easily implemented in any health care setting, without a need for large-scale structural change, or extensive knowledge on gender identity."[587]

Like transgender men and women, some nonbinary adults have sought or received access to transition-related health care services, such as hormone therapy, chest reduction or reconstruction, augmentation mammoplasty, phalloplasty, vaginoplasty, hair removal, and voice surgery, among other treatments.[588]  Nonbinary children, like other transgender children, may seek reversible puberty-blocking hormones and other treatments.[589]  Opponents liken such treatments to "elective

---

[582]  *See* NAT'L LGBT HEALTH EDUC. CTR., PROVIDING AFFIRMATIVE CARE FOR PATIENTS WITH NON-BINARY GENDER IDENTITIES 8–9 (2017), https://www.lgbthealtheducation.org/wp-content/uploads/2017/02/Providing-Affirmative-Care-for-People-with-Non-Binary-Gender-Identities.pdf [https://perma.cc/DDS7-CJ5T].

[583]  *See supra* note 366 and accompanying text.

[584]  *See* Richards et al., *supra* note 27, at 3; *see also supra* note 269 and accompanying text.

[585]  NAT'L LGBT HEALTH EDUC. CTR., *supra* note 582, at 3.

[586]  *Id.* at 7.  One sample form offers the options "male," "female," and "choose not to disclose" for sex assigned at birth.  *Id.*

[587]  *Id.* at 13.

[588]  *See, e.g.*, JAMES ET AL., *supra* note 2, at 99, 101 fig.7.13, 103 fig.7.15.  In general, people who identify as nonbinary report less interest in these treatments than do transgender men and women.  *See, e.g.*, *id.* at 99 (reporting that 95% of transgender men and women have wanted hormone therapy, compared with 49% of nonbinary survey respondents).

[589]  *See* Sara Solovitch, *When Kids Come in Saying They Are Transgender (or No Gender), These Doctors Try to Help*, WASH. POST (Jan. 21, 2018), http://wapo.st/2DrsBL4 [https://perma.cc/MG8N-645Z].

    In the United States, parental consent is generally required for minors seeking medical treatments.  Anne C. Dailey & Laura A. Rosenbury, *The New Law of the Child*, 127 YALE L.J. 1448, 1534–35 (2018).  While there is research suggesting positive mental health outcomes from allowing transgender children to "socially transition" to their male or female gender identity, more research is required on nonbinary children.  Jack L. Turban, *Transgender Youth: The Building Evidence Base for Early Social Transition*, 56 J. AM. ACAD. CHILD & ADOLESCENT PSYCHIATRY 101, 102

cosmetic surgery" that is not covered by insurance.[590]  But unlike elective cosmetic surgery, transition-related services are covered by health insurers as medically necessary to treat gender dysphoria.[591]  Patients should not be required to conform to binary concepts of gender to receive care.[592]  Under section 1557 of the Affordable Care Act[593] (ACA), any health program or activity that receives federal funds may not discriminate on the basis of sex.[594]  Federal courts have interpreted such language to preclude discrimination against someone due to transgender identity.[595]  A set of 2016 regulations interpreting the ACA clarified that providers could not discriminate based on "[s]ex stereotypes" including "the expectation that individuals will consistently identify with only one gender."[596]  Health plans may also be precluded from discriminating against transgender patients under Title VII, which bars sex discrimination in employment;[597] the Fourteenth Amendment, which bars sex discrimination by public entities;[598] and some state insurance laws, which bar discrimination based on gender identity.[599]

While health care providers should affirmatively accommodate nonbinary patients and insurers should cover medically necessary care, the law seems to require, at most, neutrality.  The 2016 ACA regulations provide that covered entities may not deny health care coverage "for specific health services related to gender transition if such denial . . .

---

(2017) ("Children have a range of identities along a spectrum that might not fall neatly into male or female categories.  More data are needed to better understand the benefits of social transition in these gender-non-binary children.").

[590]  See, e.g., Activist-Clinicians Tout "Cultural Humility" & Surgery-on-Demand for "Nonbinaries" & "Genderfluids," 4THWAVENOW (Dec. 27, 2015), https://4thwavenow.com/2015/12/27/activist-clinicians-tout-cultural-humility-surgery-on-demand-for-nonbinaries-genderfluids/ [https://perma.cc/EKF3-E2VC] (characterizing nonbinary people seeking transition-related services as motivated by "[c]omfort, exploration, wants" rather than medical necessity). 4thWaveNow is a website that describes itself as "[a] community of parents & others concerned about the medicalization of gender-atypical youth and rapid-onset gender dysphoria." Id.

[591]  See AM. MED. ASS'N HOUSE OF DELEGATES, RESOLUTION: 122, SUBJECT: REMOVING FINANCIAL BARRIERS TO CARE FOR TRANSGENDER PATIENTS (2008) (recognizing "[a]n established body of medical research" that "demonstrates the effectiveness and medical necessity of mental health care, hormone therapy and [gender-affirming] surgery as forms of therapeutic treatment for many people diagnosed with [gender dysphoria]"); WPATH STANDARDS, supra note 209, at 8; see also Boyden v. Conlin, No. 17-cv-264, 2018 WL 4473347, at *11–15 (W.D. Wis. Sept. 18, 2018) (rejecting an "unsupported analogy," id. at *12, between gender-conforming surgeries and uncovered cosmetic surgeries on the ground that it does not rest on judgments about what is appropriate treatment according to medical standards and research).

[592]  See, e.g., Spade, supra note 212, at 19–23.

[593]  Patient Protection and Affordable Care Act, Pub. L. No. 111-148, 124 Stat. 119 (2010) (codified as amended in scattered sections of 26 and 42 U.S.C.).

[594]  42 U.S.C. § 18116 (2012).

[595]  See, e.g., supra note 175.

[596]  See supra note 176.

[597]  Boyden v. Conlin, No. 17-cv-264, 2018 WL 4473347, at *11–15 (W.D. Wis. Sept. 18, 2018).

[598]  Id. at *16–18.

[599]  See, e.g., CAL. CODE REGS. tit. 10, § 2561.2(a)(4)(A) (2018).

results in discrimination against a transgender individual."[600] Whether a denial constitutes "discrimination" is a difficult question. It may be discrimination if a provider acknowledges it declined coverage because the services in question were transition related.[601] Or it may be discrimination if similar services are covered for people who are not seeking transition-related care.[602] This latter rule is unlikely to apply in a scenario in which "a medical procedure would be denied as cosmetic or medically unnecessary in all other cases, but is in fact medically necessary to treat gender dysphoria."[603] Thus, if for example, a health plan never covered hair removal, it would not have to cover hair removal as treatment for gender dysphoria. But in any event, the rules are likely to apply (or not), to transgender women, transgender men, and nonbinary people alike.

The 2016 regulation has been challenged in court and seems likely to be reversed by the Trump Administration.[604] The questions in litigation are whether there must be religious exemptions to the regulations, and whether the definition of "sex" should include "gender identity" at all, or is limited "to the biological differences between males and

---

[600] 45 C.F.R. § 92.207(b)(5) (2017).

[601] Nondiscrimination in Health Programs and Activities, 81 Fed. Reg. 31,376, 31,433 (May 18, 2016) ("OCR will evaluate whether coverage for the same or a similar service or treatment is available to individuals outside of that protected class or those with different health conditions and will evaluate the reasons for any differences in coverage. Covered entities will be expected to provide a neutral, nondiscriminatory reason for the denial or limitation that is not a pretext for discrimination."). Sex stereotypes, such as the idea that transgender people should "maintain the physical characteristics of their natal sex," will not suffice. *Boyden*, 2018 WL 4473347, at *12.

[602] *Boyden*, 2018 WL 4473347, at *12 (concluding that a health insurance plan discriminated on the basis of "natal sex" by covering care like reconstructive breast surgery for women who were assigned the female sex at birth, but not chest surgery for transgender women who had been assigned the male sex at birth); Nondiscrimination in Health Programs and Activities, 81 Fed. Reg. at 31,433.

[603] Samuel Rosh, *Beyond Categorical Exclusions: Access to Transgender Healthcare in State Medicaid Programs*, 51 COLUM. J.L. & SOC. PROBS. 1, 20 (2017).

[604] In 2016, a number of states and health care providers brought suit, arguing that the rule's provision with respect to "gender identity" violates the Administrative Procedure Act because it is incorrect as a matter of law, and that it violates the Religious Freedom Restoration Act because it fails to include religious exemptions. Franciscan All., Inc. v. Price, No. 16-CV-00108, 2017 WL 3616652, at *1 (N.D. Tex. July 10, 2017). A federal district court in Texas granted a preliminary injunction, preventing the HHS from enforcing the regulation. *Id.* at *2. The litigation is now stayed while the Trump Administration reassesses the regulation. *Id.* at *5. But the injunction purports to apply only to government actions to enforce the regulation, not private parties seeking to enforce the statute's nondiscrimination provisions. *See, e.g.*, Prescott v. Rady Children's Hosp.-San Diego, 265 F. Supp. 3d 1090, 1105 (S.D. Cal. 2017) (holding that a private action alleging gender-identity discrimination under the ACA could proceed based on the language of the statute and did not need to rely on the 2016 HHS regulations).

females."[605]  The resolution of this dispute does not turn on whether nonbinary people are covered.[606]

* * *

This examination of the few remaining contexts of sex or gender regulation demonstrates that the law has no reason to require a universal definition of sex or gender that limits the options to two. The purpose of this Part has not been to definitively settle particular legal debates, but rather, to argue that U.S. civil rights law offers various tools to resolve controversies over inclusion of nonbinary gender identities. As U.S. states increasingly enact legislation to recognize nonbinary gender, researchers will have more opportunities to collect empirical evidence on the upsides and downsides of different interventions.[607]

## CONCLUSION

This Article has asked what it would mean for the law to take nonbinary gender seriously, in other words, to treat people with nonbinary gender identities as full participants in social, economic, and political life. It has argued for a contextual approach to nonbinary gender rights, rather than insisting on uniform definitions or universal rules. This approach would examine each context of sex or gender regulation, considering the relative merits of various strategies for achieving nonbinary gender rights, including third-gender recognition, the elimination of sex classifications, or integration into binary sex or gender categories. While opponents have argued that nonbinary gender rights would have unforeseen and dangerous effects on a host of legal regimes, careful analysis reveals that there are few contexts left in which the law relies on binary sex classifications after *Obergefell*. In those few remaining contexts of binary sex regulation, there are many possible paths forward for nonbinary gender rights.

Theoretical debates — such as how the law should define sex or gender as a general matter, or whether the optimal end state is third-gender recognition or gender neutrality — can make it appear as though there are irreconcilable conflicts among nonbinary gender rights claims and feminist and LGBT priorities, particularly those of transgender men and women. But analysis of each legal context suggests fewer such conflicts in practice. Existing sex discrimination law protects transgender men and women because bias against them is based on sex stereotypes, not

---

[605] Franciscan All., Inc. v. Burwell, 227 F. Supp. 3d 660, 688 (N.D. Tex. 2016).

[606] Opponents of the regulation pointed to the fact that it covered nonbinary gender identities in their legal briefs — as if that were a damaging fact for the government. *See supra* notes 177–178 and accompanying text. But it did not seem to matter in terms of the legal argument, and the court made no mention of it. *See Franciscan All., Inc.*, 227 F. Supp. 3d 660.

[607] International experience may also prove instructive. *See supra* note 8.

because they are a protected class or because their identities are immutable in some way. The same anti-stereotyping argument precludes discrimination against people with nonbinary gender identities. Rather than requiring dramatic legal changes or novel theories, protection of nonbinary rights may only require moderate extensions of existing law and the application of familiar civil rights concepts from doctrine on sex, race, and religion.

Feminists have long argued for release from the straightjacket of gender, but never before have nonbinary gender identities seemed so likely to go mainstream. This movement may be challenged by entrenched attitudes about the naturalness of binary gender and the belief that the legal options are limited to unpalatable forms of gender recognition or absolute gender neutrality. But on a closer look, it is apparent that neither human lives nor legal options are binary. Indisputably, nonbinary gender poses challenges to legal interests, but these challenges are not insurmountable, and the possibility of inclusion, which not long ago seemed unimaginable, is now beginning to seem inevitable.



# Erasure and Resilience: The Experiences of LGBTQ Students of Color

## Asian American and Pacific Islander LGBTQ Youth in U.S. Schools



A Report from GLSEN and
the National Queer Asian Pacific Islander Alliance

AR_292853

AR_292854



# Erasure and Resilience: The Experiences of LGBTQ Students of Color

**Asian American and Pacific Islander**

**LGBTQ Youth in U.S. Schools**

by  Nhan L. Truong, Ph.D.
    Adrian D. Zongrone, M.P.H.
    Joseph G. Kosciw, Ph.D.

AR_292855

**National Headquarters**
110 William St., 30th Floor
New York, NY 10038
Ph: 212-727-0135 Fax: 212-727-0254

**DC Policy Office**
Make Office K Street
6th Floor, Attn: GLSEN
1015 15th Street, NW
Washington, DC, 20005
Ph: 202-347-7780 Fax: 202-347-7781

© 2020 GLSEN

ISBN 978-1-934092-30-9

glsen@glsen.org
www.glsen.org

When referencing this document, we recommend the following citation:
Truong, N. L., Zongrone, A. D., & Kosciw, J. G. (2020). *Erasure and resilience: The experiences of LGBTQ students of color, Asian American and Pacific Islander LGBTQ youth in U.S. schools.* New York: GLSEN.

**GLSEN** is the leading national education organization focused on ensuring safe schools for all students. Established in 1990, GLSEN envisions a world in which every child learns to respect and accept all people, regardless of sexual orientation or gender identity/expression. GLSEN seeks to develop school climates where difference is valued for the positive contribution it makes to creating a more vibrant and diverse community. For more information on our educator resources, research, public policy agenda, student leadership programs, or development initiatives, visit www.glsen.org.

Graphic design: Adam Fredericks

Cover illustration: Mohammed Fayaz

Electronic versions of this report and all other GLSEN research reports are available at www.glsen.org/research.

AR_292856

# TABLE OF CONTENTS

PREFACE...................................................................................................................vii

ACKNOWLEDGEMENTS..............................................................................................xi

EXECUTIVE SUMMARY.............................................................................................xiii

    English.................................................................................................................xiii

    Chinese (Simplified)............................................................................................. xxi

    Korean...............................................................................................................xxix

    Vietnamese ..................................................................................................... xxxvii

    Hindi.................................................................................................................. xlv

INTRODUCTION........................................................................................................ 1

METHODS AND SAMPLE DESCRIPTION ..................................................................... 5

PART ONE: SAFETY AND EXPERIENCES WITH HARASSMENT AND ASSAULT AT SCHOOL.................. 11

    Safety................................................................................................................ 13

    Biased Remarks.................................................................................................. 14

    Harassment and Assault ...................................................................................... 14

    Reporting School-Based Harassment and Assault.................................................... 18

    Insight on Family Reporting and Intervention.......................................................... 19

    Conclusions....................................................................................................... 20

PART TWO: SCHOOL PRACTICES ............................................................................. 21

    Experiences with School Discipline........................................................................ 23

    School-Based Supports and Resources for AAPI LGBTQ Students............................. 25

    Insight on Club Participation and Leadership.......................................................... 28

    Insight on Inclusive Curriculum ........................................................................... 32

    Conclusions....................................................................................................... 33

DISCUSSION .......................................................................................................... 35

    Limitations......................................................................................................... 37

    Conclusions....................................................................................................... 37

    Recommendations .............................................................................................. 38

ENDNOTES.............................................................................................................. 41

AR_292857

## LIST OF TABLES AND FIGURES

Table S.1        Demographic Characteristics of Survey Participants.................................................. 8

Table S.2        Characteristics of Survey Participants' Schools .......................................................... 9

Figure 1.1       AAPI LGBTQ Students Who Felt Unsafe at School Because of Actual or
                 Perceived Personal Characteristics.............................................................................. 13

Figure 1.2       Frequency of Hearing Anti-LGBTQ and Racist Remarks in School ................................ 14

Figure 1.3       Percentage of AAPI LGBTQ Students Who Experienced Victimization
                 Based on Personal Characteristics .............................................................................. 15

Figure 1.4       Victimization Based on Sexual Orientation and AAPI LGBTQ Student
                 Well-Being and Academic Outcomes.......................................................................... 15

Figure 1.5       Victimization Based on Race/Ethnicity and AAPI LGBTQ Student Well-Being and
                 Academic Outcomes.................................................................................................. 16

Figure 1.6       Differences in Level of Victimization by Trans/GNC Status........................................... 16

Figure 1.7       Differences in Level of Victimization by Multiple Racial/Ethnic Identities...................... 17

Figure 1.8       AAPI LGBTQ Student Well-Being and Multiple Forms of Victimization
                 Based on Sexual Orientation and Race/Ethnicity ......................................................... 17

Figure 1.9       Frequency of AAPI LGBTQ Students Reporting Incidents of Harassment and
                 Assault to School Staff .............................................................................................. 18

Insight Figure:  Frequency of Intervention by AAPI LGBTQ Students' Family Members ......................... 19

Figure 2.1       Percentage of AAPI LGBTQ Students Who Experienced School Discipline..................... 23

Figure 2.2       Experiences of School Discipline by Missing School Because of Feeling Unsafe ........... 24

Figure 2.3       Experiences of School Discipline by Anti-LGBTQ Discrimination .................................. 25

Figure 2.4       Availability of GSAs and Ethnic/Cultural Clubs .......................................................... 26

Insight Figure:  Participation in GSAs and Ethnic/Cultural Clubs........................................................ 28

Figure 2.5       AAPI LGBTQ Students' Reports on the Number of Teachers and
                 Other School Staff Who are Supportive of LGBTQ Students.......................................... 30

Figure 2.6       AAPI LGBTQ Students' Reports on How Supportive Their
                 School Administration is of LGBTQ Students ............................................................... 30

Figure 2.7       Supportive School Staff and Well-Being and School Belonging .................................... 31

Insight Figure:  Inclusive Curriculum and Feelings of Safety, Peer Acceptance,
                 and School Belonging among AAPI LGBTQ Students ................................................... 32

AR_292859

AR_292860

# Preface

AR_292861

AR_292862

Twenty years ago, GLSEN began investing in applied research capacity to build the evidence base for action on LGBTQ issues in K–12 schools, and to track the impact of efforts to improve the lives and life prospects of LGBTQ students. Now conducted under the banner of the GLSEN Research Institute, each new report in this body of work seeks to provide clarity, urgency, and renewed inspiration for the education leaders, advocates, and organizational partners dedicated to the work.

*Erasure and Resilience: The Experiences of LGBTQ Students of Color* is a series of four reports, each publication focusing on a different group of LGBTQ students, their lives at school, and the factors that make the biggest difference for them. The reports in this series examine the school experiences of Asian American and Pacific Islander (AAPI), Black, Latinx, and Native and Indigenous LGBTQ youth. Each report was conducted and is released in partnership with organizations specifically dedicated to work with the student population in question. We are so grateful for the partnership of the National Queer Asian Pacific Islander Alliance, the National Black Justice Coalition, UnidosUS and the Hispanic Federation, and the Center for Native American Youth.

These reports arrive as the United States wrestles with two fundamental challenges to our commitment to provide a K–12 education to every child — the depth of the systemic racism undermining true educational equity in our K–12 school systems; and the rising tide of racist, anti-LGBTQ, anti-immigrant, and White Christian nationalist sentiment being expressed in the mainstream of U.S. society. The students whose lives are illuminated in these reports bear the brunt of both of these challenges. Their resilience calls on each of us to join the fight.

Eliza Byard, Ph.D.
Executive Director
GLSEN

ix

Dear Readers,

For almost 30 years, GLSEN has worked to defend the rights of LGBTQ youth. Despite growing awareness built by communities like GLSEN and NQAPIA, GLSEN's research shows that youth continue to face discrimination and marginalization. As the country grows to understand queer and gender expansive youth, we must remember to highlight the unique experiences Asian American and Pacific Islanders (AAPIs) face at the intersections of their identities. We must uplift the complex experiences of youth of color and recognize a need for a nuanced framework that enhances liberation of all.

NQAPIA feels deeply honored and proud to support GLSEN's *Erasure and Resilience: The Experiences of LGBTQ Students of Color, Asian American and Pacific Islander LGBTQ Youth in U.S. Schools* and their work in creating these nuanced frameworks. With research like this and resources like the, "10 Things To Know About LGBTQ AAPI Communities," created by GLSEN, NQAPIA & the NEA, we can begin to provide the life-saving and culturally relevant support for our youth that they need. This research will help us navigate how to best support our youth in their schools and communities as we continue to strive to build a world in which all AAPI LGBTQ individuals are fully accepted as they are.

We stand with GLSEN in the belief that school is and should be a safe space for all our youth. Unfortunately, racism toward youth of color and discrimination against LGBTQ youth are prevalent in secondary schools. While research has shown that AAPI students commonly experience racism in school, discussions around harassment toward AAPI youth in schools are often missing. As a result, there is a lack of visibility around these types of school experiences for AAPI students, and even more so for AAPI LGBTQ students.

This report examines the intersectional, educational experiences of AAPI LGBTQ secondary school students, and demonstrates that the majority of AAPI LGBTQ students experience safety concerns and harassment in school because of their sexual orientation, gender expression, and race/ethnicity. The report also shows that AAPI LGBTQ students who experience both homophobic and racist harassment in school have the poorest academic outcomes and psychological well-being. Further, AAPI LGBTQ students who experience harassment in school are also more likely to experience school discipline.

This report is a critical tool for educators, policymakers, safe school advocates and others who want to make schools a more inclusive space for marginalized groups of students to continue to work on making accessible specific resources that support AAPI LGBTQ students. NQAPIA is proud to work with GLSEN to present this important research and we stand alongside GLSEN to do our part in ensuring safe and supportive school environments for AAPI LGBTQ students in the U.S. NQAPIA strongly encourages you to not only read the report, but translate this information into knowledge and informed care. We hope this information will lead to deeper conversations and nuanced work to enhance the lives of AAPI LGBTQ students.

Sincerely,

Khudai Tanveer
Organizing Director
National Queer Asian Pacific Islander Alliance

*Acknowledgements*

The authors first wish to thank the students who participated in our *2017 National School Climate Survey*, the data source for this report. We also wish to acknowledge the full LGBTQ Students of Color Committee for their invaluable feedback throughout the process of the report. We offer particular thanks to the members of the AAPI report subcommittee: Kevin Kumashiro, Kevin Nadal, Marcus Breed, Vinisha Rana, and Tamanna Sohal. We also thank our Research Assistant, Alicia Menard-Livingston for helping to write the Executive Summary and for proofreading the report. We are indebted to our former GLSEN Director of Research, Emily Greytak, for her guidance and support from the study's inception. Finally, much gratitude goes to Eliza Byard, GLSEN's Executive Director, for her comments and her deep commitment to GLSEN Research.

AR_292865

AR_292866

# Executive Summary

AR_292867

AR_292868

## Introduction

Existing research has illustrated that both Asian American and Pacific Islander (AAPI) as well as lesbian, gay, bisexual, transgender, and queer (LGBTQ) youth often face unique issues in school related to their marginalized identities. For instance, AAPI youth are also challenged with the model minority stereotype that all AAPI students are hardworking and excel academically, which can deny, downplay, or erase racism and discrimination that AAPI students experience. Yet prior studies have shown that the incidence of racism from peers against elementary and secondary AAPI students is common. This may, in part, be why AAPI youth are often missing from policy discussions on bullying in schools. With regard to LGBTQ youth, they often face unique challenges related to their sexual orientation, gender identity, and gender expression. LGBTQ youth often reported experiencing victimization and discrimination, resulting in poorer educational outcomes and decreased psychological well-being. Further, they have limited or no access to in-school resources that may improve school climate and students' experiences. Although there here has been a growing body of research on the experiences of AAPI youth and LGBTQ youth in schools, there has been little research examining the intersections of these identities – the experiences of AAPI LGBTQ students. Existing studies show that schools nationwide are hostile environments for LGBTQ youth of color, where they experience victimization and discrimination based on race, sexual orientation, gender identity, or all of these identities. This report is one of a series of reports that focus on LGBTQ students of different racial/ethnic identities, including Black, Latinx, and Native and Indigenous LGBTQ youth.

In this report, we examine the experiences of AAPI LGBTQ students with regard to indicators of negative school climate and their impact on academic achievement, educational aspirations, and psychological well-being:

- Feeling unsafe in school because of personal characteristics, such as sexual orientation, gender expression and race/ethnicity, and missing school because of safety reasons;

- Hearing biased remarks, including homophobic and racist remarks, in school;

- Experiencing victimization in school; and

- Experiencing school disciplinary practices.

In addition, we examine whether AAPI LGBTQ students report these experiences to school officials or their families, and how these adults address the problem.

We also examine the degree to which AAPI LGBTQ students have access to supportive resources in school, and explore the possible benefits of these resources:

- GSAs (Gay-Straight Alliances or Gender and Sexuality Alliances) or similar clubs;

- Ethnic/cultural clubs;

- Supportive school staff; and

- Curricular resources that are inclusive of LGBTQ-related topics.

## Methods

Data for this report came from GLSEN's *2017 National School Climate Survey* (*NSCS*). The full sample for the *2017 NSCS* was 23,001 LGBTQ middle and high school students between 13 and 21 years old. In the *NSCS*, when asked about their race and ethnicity, participants had the option to choose "Asian," and "Pacific Islander," among other racial/ethnic categories. The sample for this report consists of any

AR_292869

LGBTQ student in the national sample who identified as "Asian or South Asian" or "Native Hawaiian or Other Pacific Islander" (henceforth referred to as Asian American and Pacific Islander or AAPI), including those who only identified as AAPI, and those who identified as AAPI and one or more additional race/ethnic identities (multiracial AAPI). It is important to note that the sample size of Pacific Islander LGBTQ students was too small to examine their school experiences alone. Therefore, LGBTQ students who identified as Pacific Islander were combined with those who identified as Asian.

The final sample for this report was a total of 1,480 AAPI LGBTQ students. Students were from all states except for Wyoming, as well as District of Columbia, Puerto Rico, and the U.S. Virgin Islands. Two-fifths (40.0%) identified as gay or lesbian, over half (57.7%) were cisgender, and over half (56.0%) identified with one or more racial/ethnic identities in addition to AAPI. The majority of students were born in the U.S. and nearly all learned English as their first language, or as one of their first languages. The majority of students attended high school and public schools.

## Key Findings

### *Safety and Victimization at School*

**School Safety**

- Over half of AAPI LGBTQ students (51.8%) felt unsafe at school because of their sexual orientation, 41.1% because of their gender expression, and 26.4% because of their race or ethnicity.

- Over a quarter of AAPI LGBTQ students (27.6%) reported missing at least one day of school in the last month because they felt unsafe or uncomfortable, and nearly one-tenth (8.4%) missed four or more days in the past month.

**Biased Remarks at School**

- 97.8% of AAPI LGBTQ students heard "gay" used in a negative way; almost two-thirds (61%) heard this type of language often or frequently.

- 92.4% of AAPI LGBTQ students heard other homophobic remarks; over half (51.1%) heard this type of language often or frequently.

- 89.3% of AAPI LGBTQ students heard negative gender expression remarks about not acting "masculine" enough; half (50.2%) heard these remarks often or frequently.

- 81.4 % of AAPI LGBTQ students heard remarks about not acting "feminine" enough; a third (33.9%) heard these remarks often or frequently.

- 89.3% of AAPI LGBTQ students heard racist remarks; just over half (52.7%) heard these remarks often or frequently.

- 82.3% of AAPI LGBTQ students heard negative remarks about transgender people; over a third (35.5%) heard these remarks often or frequently.

**Harassment and Assault at School**

- Many students experienced harassment or assault at school based on personal characteristics, including sexual orientation (60.5%), gender expression (54.7%), and race/ethnicity (53.8%).

- AAPI LGBTQ students who experienced higher levels of victimization based on sexual orientation at school:

AR_292870

- were more than three times as likely to skip school because they felt unsafe (57.5% vs. 16.9%);

- were somewhat less likely to plan to graduate high school (96.1% vs. 99.3%); and

- experienced lower levels of school belonging (22% vs 60.9%) and greater levels of depression (73.2% vs. 41.2%).

- AAPI LGBTQ students who experienced higher levels of victimization based on race/ethnicity at school:

  - were almost twice as likely to skip school because they felt unsafe (35.5% vs. 18.4%); and

  - experienced lower levels of school belonging and greater levels of depression.

- Transgender and gender nonconforming (trans/GNC) AAPI students experienced greater levels of victimization based on sexual orientation and gender expression than LGBQ cisgender AAPI students.

- AAPI LGBTQ students who identified with multiple racial/ethnic identities experienced greater levels of victimization based on sexual orientation and gender expression than LGBTQ students who only identified as AAPI.

- Two-fifths of AAPI LGBTQ students (40.0%) experienced harassment or assault at school due to both their sexual orientation and their race/ethnicity. Compared to those who experienced one form of victimization or neither, AAPI LGBTQ students who experienced both forms of victimization:

  - experienced the lowest levels of school belonging;

  - had the greatest levels of depression; and

  - were the most likely to skip school because they felt unsafe.

**Reporting School-based Harassment and Assault, and Intervention**

A majority of AAPI LGBTQ students (56.5%) who experienced harassment or assault in the past year never reported victimization to staff, most commonly because they did not think that staff would do anything about it (67.4%).

- Less than half (42.3%) reported that staff responded effectively when students reported victimization.

- Less than half (43.5%) of AAPI LGBTQ students had told a family member about the victimization they faced at school.

- Among AAPI LGBTQ students who reported victimization experiences to a family member, half (50.5%) indicated that a family member talked to their teacher, principal or other school staff.

*School Practices*

**Experiences with School Discipline**

- Nearly a third of AAPI LGBTQ students (30.7%) experienced some form of school discipline, such as detention, out-of-school suspension, or expulsion.

- Multiracial AAPI LGBTQ students experienced greater levels discipline than those who identified only as AAPI.

AR_292871

- Negative school experiences were related to experiences of school discipline for AAPI LGBTQ students. Those who experienced school discipline:

  - experienced higher rates of victimization based on sexual orientation, gender expression, and race/ethnicity;

  - were more likely to skip school because they felt unsafe; and

  - were more likely to experience anti-LGBTQ discriminatory school policies or practices.

- Experiences with school discipline may also negatively impact educational outcomes for AAPI LGBTQ students. Those who experienced school discipline:

  - were less likely to plan on pursuing post-secondary education; and

  - had lower grade point averages (GPAs).

---

### School-Based Supports and Resources for AAPI LGBTQ Students

---

**GSAs**

***Availability and Participation***

- Almost two-thirds of AAPI LGBTQ students (63.5%) reported having a GSA at their school.

- AAPI LGBTQ students who attended rural schools, schools in the South, and smaller schools, were less likely to have access to a GSA.

- The majority of AAPI LGBTQ students (57.7%) who had access to a GSA participated in the club, and 18.9% participated as an officer or a leader.

***Utility***

- Compared to those without a GSA, AAPI LGBTQ students with a GSA:

  - were less likely to miss school due to safety concerns (22.4% vs. 36.9%);

  - were less likely to feel unsafe because of their sexual orientation (45.6% vs. 62.3%) and gender expression (38.6% vs. 45.4%); and

  - felt greater belonging to their school community.

- AAPI LGBTQ students who participated in their GSA felt more comfortable bringing up LGBTQ issues in class and were more likely to participate in a GLSEN Day of Action or in a political rally, protest, or demonstration.

**Ethnic/Cultural Clubs**

***Availability and Participation***

- Three-quarters of AAPI LGBTQ students (74.6%) reported that their school had an ethnic or cultural club at their school.

AR_292872

- 12.2% of AAPI LGBTQ students with an ethnic/cultural club at school attended meetings, and 2.4% participated as an officer or leader.

**Utility**

- AAPI LGBTQ students who had an ethnic/cultural club at their school:

  - felt greater belonging to their school community; and

  - were less likely to feel unsafe due to their race/ethnicity.

- AAPI LGBTQ students who were born in another country were more likely to participate in ethnic/cultural clubs than those who were born in the U.S.

**Supportive School Personnel**

*Availability*

- The vast majority of AAPI LGBTQ students (97.2%) could identify at least one supportive staff member at school, but only about half (48.5%) could identify many supportive staff (11 or more).

- Only about half of AAPI LGBTQ students (49.2%) reported having somewhat or very supportive school administration.

- Multiracial AAPI LGBTQ students reported having fewer supportive staff and less supportive administrators than students who identified as AAPI only.

*Utility*

- AAPI LGBTQ students who had more staff who were supportive of LGBTQ students:

  - were less likely to miss school due to safety concerns;

  - were less likely to feel unsafe because of their sexual orientation, gender expression, and race/ethnicity;

  - had higher levels of self-esteem and lower levels of depression;

  - had greater feelings of connectedness to their school community;

  - had higher GPAs (3.5 vs. 3.2); and

  - were more likely to plan to pursue post-secondary education (97.6% vs. 93.8%).

**Inclusive Curriculum**

We also examined the inclusion of LGBTQ topics in school curriculum. We found that just over a quarter of AAPI LGBTQ students (27.4%) were taught positive representations of LGBTQ people, history, or events. Further, we found that AAPI LGBTQ students who had some positive LGBTQ inclusion in the curriculum at school were:

- less likely to feel unsafe because of their sexual orientation (16.8% vs. 30.2%) and gender expression (19.4% vs. 30.1%);

xix

- more likely to have peers be accepting of LGBTQ people at school (76.4% vs. 43.7%); and

- felt more connected to their school community.

We were unable to examine other important forms of curricular inclusion, such as positive representations of people of color and their histories and communities. Nevertheless, we did find that AAPI LGBTQ students with an LGBTQ-inclusive curriculum were less likely to feel unsafe at school because of their race or ethnicity (22.5% vs. 27.8%).

## Conclusions and Recommendations

AAPI LGBTQ students' have unique experiences with victimization, discriminatory school practices and access to supportive resources. Results from this report show that AAPI LGBTQ students experience institutional and interpersonal discrimination. The findings also demonstrate the ways that school supports and resources, such as GSAs and supportive school personnel can positively affect AAPI LGBTQ students' school experiences. Based on these findings, we recommend that school leaders, education policymakers, and other individuals who want to provide safe learning environments for AAPI LGBTQ students to:

- Support student clubs, such as GSAs and ethnic/cultural clubs. Organizations that work with GSAs and ethnic/cultural clubs should also come together to address AAPI LGBTQ students' needs related to their multiple marginalized identities, including sexual orientation, gender, and race/ethnicity.

- Provide professional development for school staff that addresses the intersections of identities and experiences of AAPI LGBTQ students.

- Increase student access to curricular resources that include diverse and positive representations of both AAPI and LGBTQ people, history, and events.

- Establish school policies and guidelines for staff in responding to anti-LGBTQ and racist behavior, and develop clear and confidential pathways for students to report victimization that they experience. Local, state, and federal education agencies should also hold schools accountable for establishing and implementing these practices and procedures.

- Work to address the inequities in funding at the local, state, and national level to increase access to institutional supports and education in general, and to provide more professional development for educators and school counselors.

Taken together, such measures can move us toward a future in which all students have the opportunity to learn and succeed in school, regardless of sexual orientation, gender identity, gender expression, race, or ethnicity.

执行摘要

AR_292875

AR_292876

## 引言

现有研究表明，亚裔美国人和太平洋岛民（AAPI）以及女同性恋、男同性恋、双性恋、跨性别者和酷儿

（LGBTQ）青少年在学校经常面临与其边缘化身份相关的独特问题。例如，AAPI 青少年还会面临模范少数族裔刻板印象带来的挑战，即所有 AAPI 学生都勤奋努力且成绩优异，这可以否决、淡化或消除AAPI学生经历的种族主义和歧视。然而，之前的研究表明，在小学和中学同龄人对AAPI 学生的种族歧视是很常见的。这可能部分解释了为何在有关校园欺凌的政策讨论中经常缺少AAPI 青少年。就 LGBTQ 青少年而言，他们往往在性倾向、性别认同和性别表达等方面面临特别的挑战。经常会有 LGBTQ 青少年遭受侵害和歧视的报道，导致教育成果较差以及心理健康状况下降。此外，他们只有很少或根本无法获得可以改善学校环境和LGBTQ学生体验的校内资源。虽然有越来越多针对AAPI 青少年和LGBTQ 青少年在学校经历的研究，但很少有研究审视这些身份的交叉性——即AAPI LGBTQ学生的经历。现有研究表明，全国范围内的校园环境对于有色人种 LGBTQ 青少年来说都充满恶意的，他们在那里经历着因种族、性倾向、性别身份或所有这些身份带来的侵害和歧视。本报告是一个系列报告之一，该系列报告关注不同种族/民族身份的 LGBTQ 学生，包括黑人、拉丁裔和美国原住民 LGBTQ 青少年。

在这份报告中，我们调查了 AAPI LGBTQ 学生群体关于负面校园氛围的经历，及其对于学业成绩、教育抱负和心理健康的影响：

- 因性倾向、性别表达和种族/民族等个人特征而在学校感到不安全，并因为安全原因而缺课；
- 在学校听到带有偏见的言论，包括恐同和种族主义言论；
- 在学校遭受侵害；以及
- 遭受学校的纪律处罚。

此外，我们亦调查了 AAPI LGBTQ 学生群体是否会向学校员工或其家人报告这些经历，以及这些成年人如何解决这些问题。

我们还研究了 AAPI LGBTQ 学生群体在学校能够获得支持资源的程度，并探讨了这些资源可能会带来的益处：

- GSA（同性恋-异性恋联盟或性倾向联盟）或类似团体；
- 民族/文化社团；
- 友好支持的学校教职员工；以及
- 包括 LGBTQ 相关主题的课程资源。

## 方法

本报告的数据来自 GLSEN 的《2017 年全国学校氛围调查》(NSCS)。2017 NSCS 的完整样本是23,001 名年龄在 13 到 21 岁之间的 LGBTQ 初中和高中学生群体。在NSCS中，当被问及他们的种族和民族时，参与者可以选择"亚裔"和"太平洋岛民"，以及其他种族/民族类别。本报告的样本包括任何

自我认同为"亚裔或南亚裔"或是"夏威夷原住民或其他太平洋岛民"的全国样本中的 LGBTQ 学生群体（此后称为亚裔美国人和太平洋岛民或 AAPI），包括那些只认同为 AAPI，以及那些认同同时具备 AAPI 和一个或多个其他种族/民族身份之人（多种族AAPI）。值得注意的是，太平洋岛民 LGBTQ 学生群体的样本数量太少，无法单独研究其学校经历。因此，太平洋岛民的 LGBTQ 学生与亚裔 LGBTQ 学生的数据结合在一起进行分析。

这份报告的最终样本是 1480 名 AAPI LGBTQ 学生。学生来自除怀俄明州、哥伦比亚特区、波多黎各和美属维尔京群岛以外的所有州府。五分之二（40.0%）确认为同性恋，超过一半

AR_292877

（57.7%）为顺性别者，超过一半（56.0%）确认具备 AAPI 以外的一个或多个种族/民族身份。绝大多数学生出生于美国，几乎所有人都将英语作为母语或母语之一。大多数学生都上高中和公立学校。

## 主要发现

### *在校安全与侵害*

#### *学校安全*

超过一半 AAPI LGBTQ 学生群体（51.8%）因其性倾向感到在学校不安全，还有 41.1% 因其性别表达以及 26.4% 因其种族或民族身份感到不安全。

超过四分之一的 AAPI LGBTQ 学生（27.6%）表示他们上个月因为感到不安全或不自在而至少缺课一天，近十分之一（8.4%）的学生在上个月缺课四天或以上。

#### *学校的偏见性言论*

- 97.8% 的 AAPI LGBTQ 学生听到过"同性恋"被用作贬义词；近三分之二（61%）的学生经常或频繁听到此类语言。
- 92.4% 的 AAPI LGBTQ 学生听到过其他恐同言论；超过一半（51.1%）的学生经常或频繁听到此类语言。
- 89.3% 的 AAPI LGBTQ 学生听到过关于性别表达不够"男性化"的负面言论；一半（50.2%）学生经常或频繁听到此类言论。
- 81.4% 的 AAPI LGBTQ 学生听到过关于性别表达不够"女性化"的负面言论；三分之一（33.9%）的学生经常听到此类言论。
- 89.3% 的 AAPI LGBTQ 学生听到过种族主义言论；超过一半（52.7%）学生经常或频繁听到此类言论。
- 82.3% 的 AAPI LGBTQ 学生听到过关于跨性别的负面言论；超过三分之一（35.5%）的学生经常或频繁听到此类言论。

#### *在学校受到的侵害*

- 许多学生因个人特征在学校经历过骚扰或攻击，包括性倾向（60.5%）、性别表达（54.7%）和种族/民族（53.8%）。
- 因性倾向而在学校遭受更高程度侵害的 AAPI LGBTQ 学生：
  - 因为感到不安全而逃学的可能性是其他人的三倍以上（57.5% 比 16.9%）；
  - 更低可能性计划高中毕业（96.1% 比 99.3%）；以及
  - 对学校的归属感较低（22% 比 60.9%），抑郁程度则更高（73.2% 比 41.2%）。
- 因种族/民族而在学校遭受更高程度侵害的 AAPI LGBTQ 学生：
  - 因为感到不安全而逃学的可能性是其他人的近两倍（35.5% 比 18.4%）；以及
  - 对学校的归属感较低，而抑郁程度则更高。
- 跨性别(Transgender)和非性别常规者（Gender non-confroming, GNC）AAPI 生会因性倾向和性别表达而比 LGBQ 顺性别 AAPI 学生遭受更大程度的侵害。

AR_292878

- 认同具备多种族/民族身份的 AAPI LGBTQ 学生会因性倾向和性别表达而比仅确认为 AAPI 的 LGBTQ 学生遭受更大程度的侵害。

- 五分之二的 AAPI LGBTQ 学生（40.0%）会同时因其性倾向和种族/民族这两种身份而受到骚扰或攻击。与那些只经历一种或并未经历侵害的学生相比，同时经历这两种侵害的 AAPI LGBTQ 学生：

  - 对于学校的归属感最低；

  - 抑郁程度最高；以及

  - 最有可能因为感到不安全而逃学。

**报告在学校遭受的骚扰和攻击，以及干预**

大多数过去一年遭受过骚扰或攻击的 AAPI LGBTQ 学生（56.5%）从未向教职员工报告过侵害事件，最常见的原因是他们认为教职员工不会采取任何行动（67.4%）。

- 不到一半（42.3%）的学生报告教职员工会在学生报告自己受到侵害时做出有效回应。

- 不到一半（43.5%）的 AAPI LGBTQ 学生告诉了家人他们在学校遭受的侵害。

- 在向家庭成员报告自己遭受侵害的 AAPI LGBTQ 学生当中，有一半（50.5%）表示家庭成员与老师、校长或其他学校教职员工进行了交谈。

## 学校措施

### 学校纪律惩罚经历

- 近三分之一的 AAPI LGBTQ 学生（30.7%）经历过某种形式的学校纪律惩罚，如留校、停课或开除。

- 多种族 AAPI LGBTQ 学生比那些仅具备 AAPI 身份的学生经历更高程度的惩罚。

美国学校中的亚裔美国人和太平洋岛民青少年 LGBTQ 群体

- AAPI LGBTQ 学生的负面学校经历与学校纪律惩罚经历有关。经历学校纪律惩罚的学生：

  - 曾因性倾向、性别表达和种族/民族而经历更高比例的侵害；

  - 更有可能因感到不安全而逃课；以及

  - 更有可能经历歧视 LGBTQ 学生的学校政策或措施。

- 学校惩罚经历还可能会对 AAPI LGBTQ 学生的教育结果产生负面影响。经历学校惩罚的学生：

  - 更低可能性继续接受中学后教育；以及

  - 平均绩点（GPA）更低。

## AAPI LGBTQ 学生在学校获得的支持与资源

### GSA

### 可及性与参与

- 近三分之二的 AAPI LGBTQ 学生（63.5%）自己学校有 GSA。

- 在乡村学校、南方学校和规模较小学校就读的 AAPI LGBTQ 学生能接触到 GSA 的可能性较小。

- 大多数能接触到 GSA 的 AAPI LGBTQ 学生（57.7%）参与到团体当中，其中有 18.9% 以干事或领导者身份参与其中。

*效用*

- 与无法接触到 GSA 的学生相比，能够接触到 GSA 的 AAPI LGBTQ 学生：

  - 因安全顾虑而缺课的可能性较低（22.4% 比 36.9%）；

  - 因性倾向（45.6% 比 62.3%）和性别表达（38.6% 比 45.4%）而感到不安全的可能性较低；以及

  - 对于学校社区的归属感更强。

- 参与 GSA 的 AAPI LGBTQ 学生更愿意在课堂上提出 LGBTQ 议题，也更愿意参加 GLSEN 行动日或政治集会、抗议或示威活动。

### 民族/文化社团

*可及性与参与*

- 四分之三的 AAPI LGBTQ 学生（74.6%）报告他们的学校设有民族或文化社团。
- 学校设有民族/文化社团的 AAPI LGBTQ 学生中有 12.2% 会参加会议，有 2.4% 会以干事或领导者身份参加。

*效用*

- 学校设有民族/文化社团的 AAPI LGBTQ 学生：

  - 对于学校社区的归属感更强；以及

  - 因种族/民族而感到不安全的可能性较低。

- 出生于其他国家的 AAPI LGBTQI 学生比出生于美国的学生参加民族/文化社团的可能性更高。

### 学校支持人员

*可及性*

- 绝大多数 AAPI LGBTQ 学生（97.2%）能确认学校有至少一名支持Ta们的教职员工，但只有大约一半（48.5%）能够确认众多支持性教职员工(11 名或以上)。
- 只有大约一半的 AAPI LGBTQ 学生（49.2%）表示学校管理能够提供一些或较多支持。
- 多种族 AAPI LGBTQ 学生表示与仅具备 AAPI 身份的学生相比，支持他们的教职员工和管理人员更少。

*效用*

- 拥有更多支持 LGBTQ 学生群体的教职员工的 AAPI LGBTQ 学生：

  - 因安全顾虑而缺课的可能性较低；

  - 因性倾向、性别表达和种族/民族而感到不安全的可能性较低；

  - 自尊心更强，抑郁程度更低；

  - 与其学校社区有更强的情感联结；

- 平均绩点（GPA）更高（3.5 比 3.2）；以及

- 计划继续接受中学后教育的可能性更高（97.6% 对 93.8%）。

**包容性课程**

我们还研究了学校课程对于 LGBTQ 话题的包容性。我们发现，仅从略超过四分之一的 AAPI LGBTQ 学生（27.4%）获得了关于 LGBTQ 人群、历史或事件的正面教育。此外，我们发现学校课程包含LGBTQ 正面内容的 AAPI LGBTQ 学生：

• 因性倾向（16.8% 比 30.2%）和性别表达（19.4% 比 30.1%）而感到不安全的可能性较低；以及

• 在学校有同伴能够接受 LGBTQ 人群的可能性较高（76.4% 比 43.7%）；以及

• 感觉与学校社区的联系更加紧密。

我们无法研究其他重要的课程包容形式，比如对有色人种及其历史和群体的正面表述。虽然如此，我们确实发现有 LGBTQ 包容性课程的 AAPI LGBTQ 学生因其种族或民族而在学校感到不安全的可能性较低（22.5% 对 27.8%）。


## 结论与建议

AAPI LGBTQ 学生群体面临与受侵害、歧视性学校措施和获得支持性资源相关的独特经历。本报告的结果显示，AAPI LGBTQ 学生群体经历了制度上和人际上的歧视。研究结果也证明了如 GSA 和支持性学校人员等学校支持和资源，能够对 AAPI LGBTQ 学生的学校经历产生积极影响。基于这些结果，我们建议学校领导、教育决策者和其他想要为 AAPI LGBTQ 学生群体提供安全学习环境的个人：

• 支持如 GSA 和民族/文化社团等学生社团。与 GSA 和民族/文化社团合作的组织也应当一起来应对 AAPI LGBTQ 学生群体关于自身多重边缘化身份（包括性倾向、性别和种族/民族）的需求。

• 就 AAPI LGBTQ 学生问题为学校教职员工提供职业培训。

• 增加学生接触课程资源的机会，包括对于 AAPI 和 LGBTQ 人群、历史和事件的多样化与积极表述。

• 针对反 LGBTQ 和种族主义行为制定学校政策和指导方针，并为学生建立明确保密的渠道，方便他们报告自己所遭受的侵害。当地、州府和联邦教育机构也应当督促学校负责建立和实施这些措施。

• 努力解决当地、州府和国家层面资金不平等的问题，增加获得机构支持和教育的机会，为教育工作者和学校辅导员提供更多专业培训机会。

综合起来，这些措施可以推动我们走向更美好的未来，届时，所有学生，无论其性倾向、性别身份、性别表达、种族或民族为何，都将有机会在学校求学并取得成功。

xxvii

AR_292882

# 개요서

AR_292883

AR_292884

## 서론

기존의 연구에 따르면, 레즈비언, 게이, 양성, 성전환 및 퀴어 (LGBTQ, 성 소수자)뿐만 아니라, 아시아계 미국인과 태평양 섬 주민 (AAPI) 젊은이들은 학교에서 소외된 정체성에 관련된 독특한 문제를 종종 직면한다. 이를 테면, AAPI 젊은이들은 또한 열심히 공부하고 학교에서 성적이 좋다는 전형적인 소수 고정관념의 도전을 받는데, 이는 AAPI 학생들이 경험하는 인종 차별주의와 차별을 부정하고 과소 평가하거나 지워버릴 수가 있다. 하지만 이전의 연구에 따르면, 초등 및 중등 AAPI 학생들에 대한 또래들의 인종 차별 발생 건수는 흔하다고 한다. 부분적으로는 바로 그러한

이유 때문에 학교에서의 왕따에 대한 정책 토론에서 AAPI 젊은이들이 종종 보이지 않는다. LGBTQ 젊은이들에 관해서 말하자면, 그들은 자주 성적 성향, 성 정체성 및 성 표현에 관련된 독특한 도전에 직면한다. LGBTQ 젊은이들은 종종 피해자가 되고 차별을 경험하면서 초라한 교육적 결과를 낳고 심리적 행복이 줄어든다. 더구나, 그들은 학교 분위기나 학생들의 경험을 개선해줄지도 모르는 학교 내 자원에 대한 접근이 제한되거나 또는 전무하다. 학교 내 AAPI 젊은이와 LGBTQ 젊은이들의 경험에 대한 연구가 많이 진행되고 있지만, 이 두 정체성의 교차점, 즉 AAPI LGBTQ 학생들의 경험을 조사하는 연구는

거의 없었다. 기존의 연구에 따르면, 전국의 학교는 LGBTQ 유색 젊은이들에게 적대적인 환경이고, 그 환경에서 그들은 인종, 성적 성향, 성 정체성 혹은 그러한 모든 정체성에 근거하여 괴롭힘과 차별을 경험한다. 이 보고서는 흑인, 라틴계 및 아메리카 인디언 LGBTQ 젊은이들을 포함하여, 여러 인종/민족 정체성을 가진 LGBTQ 학생들에 집중하는 일련의 보고서 중의 하나이다.

이 보고서에서는 부정적인 학교 분위기 지표와 그 지표가 학교 성적, 교육 열망 및 심리적 복지에 미치는 영향에 관하여 AAPI LGBTQ 학생들의 경험을 조사한다:

- 개인적 특성, 이를테면 성적 성향, 성 표현 및 인종/민족 등 때문에 학교에서 불안을 느끼고, 안전 이유 때문에 학교를 빠짐;
- 학교에서 동성애를 혐오하고 인종차별주의적인 발언 등의 편향된 말을 들음;
- 학교에서 괴롭힘을 당하는 경험을 함; 그리고
- 학교 훈육 방법을 경험함.

게다가, AAPI LGBTQ 학생들이 자신의 경험을 학교 관리나 가족에게 보고하는지 그리고 어떻게 이런 어른들이 그 문제에 접근을 하는지 조사한다.

또한 AAPI LGBTQ 학생들이 학교에서 지원 자원에 대한 접근을 할 수 있는지 이런 자원의 가능한 혜택을 알아보는 정도를 조사할 것이다:

- GSA (동성애-일반 연합 혹은 성 및 성생활 연합) 혹은 비슷한 클럽;
- 민족/문화 클럽;
- 지원하는 학교 직원; 그리고
- LGBTQ 관련 토픽을 포함하는 교과과정 자원.

## 방법

이 보고서의 데이터는 GLSEN의 2017년 전국 학교 분위기 설문조사 (NSCS)에서 나왔다. 2017 NSCS의 전체 샘플은 23,001명의 13-21세 LGBTQ 중, 고등 학교 학생이다. NSCS에서 인종과 민족에 대한 질문을 받았을 때, 참가자들은 여러 인종/민족 범주 중에서 "아시아인" 과 "태평양 섬 주민"을 선택하는 옵션을 갖고 있었다. 이 보고서의 샘플에 속한 사람들은

전국 샘플 중에서 "아시아인 혹은 남 아시아인" 또는 "하와이 원주민 혹은 다른 태평양 섬 주민" (이하 아시아계 미국인 혹은 태평양 섬 주민, 즉 AAPI로 지칭함)으로 자신을 밝히는 LGBTQ 학생들인데, 여기에는 자신을 AAPI라고 밝힌 사람들, 자신을 AAPI라고 밝히고 하나 혹은 그 이상의 추가적인 인종/민족적 정체성 (다 인종 AAPI)을 밝힌 사람들이 포함된다. 태평양 섬 주민 LGBTQ 학생의 샘플 크기는 너무 적어서 학교 경험만을 조사할 수 없었음을 주목하는 것이 중요하다. 그러므로, 자신을 태평양 섬 주민이라고 밝힌 LGBTQ 학생들은 아시아인이라고 밝힌 학생들과 합쳐졌다.

이 보고서의 최종 샘플은 총 1,480명의 AAPI LGBTQ 학생들이었다. 학생들은 와이오밍, 콜롬비아 특별구, 푸에르토리코 및 미국 버진 아일랜드를 제외한 모든 주에서 온 학생들이다. 2/5 (40.0%)가 동성애자, 레즈비언이라고 밝혔고, 반 이상 (57.7%)이 시스젠더라고 밝혔고, 반 이상 (56.0%)이 AAPI 외에도 하나 혹은 그 이상의 인종/민족적 정체성이 있음을 밝혔다. 대부분의 학생은 고향은

미국이고, 거의 모두 영어가 모국어이거나 제1 언어 중의 하나였다. 대부분의 학생은 고등학교, 공립학교를 다녔다.

## 주요 결과

### 학교에서의 안전 및 괴롭힘

#### 학교안전

- 반 이상의 AAPI LGBTQ 학생이불안을 느낀 경우 중에서, 51.8%가 성적 성향 때문, 41.1%가 성 표현 그리고 26.4%가 인종 혹은 민족 때문이었다.

- 무려 ¼의 AAPI LGBTQ 학생 (27.6%)이 불안 혹은 불편하다고 느꼈기 때문에 지난 달 학교를 하루 안 나갔다고 보고했고, 거의 1/10 (8.4%)이 지난 달에 4일 이상을 빠졌다고 했다.

#### 학교에서의 편향된 발언

- 97.8%의 AAPI LGBTQ 학생이 "동성애자"라는 말이 부정적으로 사용되는 것을 들었고; 거의 2/3 (61%)가 종종 혹은 자주 이런 유형의 표현을 들었다.

- 92.4%의 AAPI LGBTQ 학생이 다른 동성애 혐오 발언을 들었고; 무려 반 (51.1%) 이상이 이런 유형의 표현을 종종 혹은 자주 들었다.

- 89.3%의 AAPI LGBTQ 학생이 "남자답게" 행동하지 못하는 것에 대하여 부정적인 성 표현 용어를 사용하였고; 반 (50.2%)이 그런 용어를 종종 혹은 자주 들었다.

- 81.4%의 AAPI LGBTQ 학생이 "여자답게" 행동하지못하는 것에 대한 표현을 들었고; 1/3 (33.9%)이 이런 표현을 종종 혹은 자주 들었다.

- 89.3%의AAPI LGBTQ 학생이 인종 차별 주의적인 표현을 들었고; 반 이상 (52.7%)이 그런 표현을 종종 혹은 자주 들었다.

- 82.3%의AAPI LGBTQ 학생이 성 전환한 사람들에 대한 부정적인 표현을 들었고; 무려 1/3 (35.5%)이 이런 표현을 종종 혹은 자주 들었다.

#### 학교에서의 괴롭힘

- 많은 학생이 개인적 특성에 근거한 괴롭힘 혹은 공격적인 행동을 학교에서 경험했는데, 개인적 특성에는 성적 성향 (60.5%), 성 표현 (54.7%) 및 인종/민족 (53.8%)이 포함된다.

- 학교에서 성적 성향에 근거한 높은 수준의 괴롭힘을 경험한AAPI LGBTQ 학생은,

AR_292886

- 불안하다고 느끼기 때문에 학교를 빠질 가능성이 3배 이상 높았고 (57.5% 대 16.9%),

- 고등학교를 졸업할 가능성이 다소 낮았고 (96.1% 대 99.3%), 그리고

- 학교 소속감이 더 낮은(22% 대 60.9%) 경험을 하고, 더 큰 수준의 우울증 (73.2% 대 41.2%)을 경험하였다.

• 인종/민족 때문에 학교에서 높은 수준의 괴롭힘을 경험한 AAPI LGBTQ 학생은

- 불안하다고 느끼기 때문에 학교를 빠질 가능성이 거의 두 배에 달했고 (35.5% 대 18.4%), 그리고

- 학교 소속감 수준이 더 낮고 우울증 수준이 더 높았다.

• 성 전환한 사람과 생물학적 성에 불응하는 (트랜스//GNC) AAPI 학생은 성적 성향과 성 표현에 근거하여 LGBTQ 시스젠더 AAPI 학생들보다 더 큰 수준의 괴롭힘을 경험하였다.

• 자신이 다 인종/민족 정체성을 갖고 있다고 밝힌 AAPI LGBTQ 학생은 성적 성향과 성 표현에 근거하여 AAPI라고만 밝힌 LGBTQ 학생보다 더 큰 수준의 괴롭힘을 경험하였다.

• 2/5의 AAPI LGBTQ 학생 (40.0%)이 성적 성향과 인종/민족 때문에 학교에서 괴롭힘이나 공격적인 행동을 경험하였다. 하나의 괴롭힘이나 괴롭힘을 경험하지 않은 학생과 비교했을 때, 두 가지의 괴롭힘을 모두 경험한 AAPI LGBTQ 학생은

- 가장 낮은 수준의 학교 소속감을 경험했고,

- 가장 높은 수준의 우울증을 가졌고,

- 불안하게 느껴서 학교를 빠질 가능성이 가장 높았다.

### 학교에서의 괴롭힘과 공격적인 행동의 보고 및 개입

괴롭힘이나 공격적인 행동을 경험한 과반수의 AAPI LGBTQ 학생 (56.5%)이 그 사실을 직원에게 알리지 않았는데, 대부분의 이유는 직원이 그것에 대하여 뭘 할 수 있다고 생각하지 않았기 때문이다.

• 반 이하 (42.3%)가 괴롭힘을 보고했을 때 직원이 효과적으로 대응했다고 보고했다.

• 반 이하 (43.5%)의 AAPI LGBTQ 학생이가 학교에서 직면한 괴롭힘에 대하여 가족 구성원에게 말했다.

• 가족에게 괴롭힘 경험을 보고한 AAPI LGBTQ 학생 중에서 반 (50.5%)이 가족 구성원이 교사, 교장 혹은 학교 직원에게 이야기했다고 말했다.

### 학교의 관행

### *학교 규율에 대한 경험*

• AAPI LGBTQ 학생의 거의 1/3 (30.7%)이 어떤 형태의 학교 훈육, 이를테면, 방과 후 남기, 정학 혹은 추방을 경험하였다.

• 다인종 AAPI LGBTQ 학생은 AAPI라고만 밝힌 학생들보다 더 큰 훈육을 경험하였다.

• 부정적인 학교 경험은 AAPI LGBTQ 학생의 학교 훈육 경험과 관련이 있었다. 학교 훈육을 경험한 학생은

- 성적 성향, 성 표현 및 인종/민족에 근거한 괴롭힘을 경험한 비율이 더 높았고

- 안전하지 않다고 느껴서 학교를 빠질 가능성이 더 높았고

- LGBTQ에 반하는 차별적인 학교의 방침이나 관행을 경험할 가능성이 더 높았다.

xxxiii

- 학교 훈육 경험은 또한 AAPI LGBTQ 학생의 교육적 결과에 부정적으로 영향을 미칠 수가 있다 학교 훈육을 경험한 학생은

  - 고등학교 이후의 교육에 대한 계획을 세울 가능성이 덜하고

  - 평점 (GPA)도 낮았다.

## *AAPI LGBTQ 학생들을 위한 학교에 근거한 지원과 자원*

### GSA

#### *가용성 및 참여*
- 거의 2/3의 AAPI LGBTQ 학생 (63.5%)이 학교에서 GSA가 있다고 보고했다.
- 지방 학교, 남부 학교, 더 작은 학교 등을 다녔던 AAPI LGBTQ 학생은 GSA를 접할 가능성이 더 적었다.
- GSA을 접할 수 있었던 대부분의 AAPI LGBTQ 학생 (57.7%)이 그 클럽에 참여하였고 18.9%가 간부 혹은 지도자로 참여하였다.

#### *유용성*
- GSA 가 없는 학생과 비교하여 GSA가 있는 AAPI LGBTQ 학생은

  - 안전 걱정 때문에 학교를 빠질 가능성이 더 적었고 (22.4% 대 36.9%),

  - 자신의 성적 성향 (45.6% 대 62.3%)과 성 표현 (38.6% 대 45.4%) 때문에 불안하다고 느낄 가능성이 더 적었고,

  - 학교 공동체에 대한 소속감이 더 크다고 느꼈다.
- GSA에 참여한 AAPI LGBTQ 학생은 수업시간에 LGBTQ 문제를 꺼내는데 더 편안함을 느꼈고 GLSEN 행동의 날, 정치 집회, 항의 혹은 시위에 참여할 가능성이 더 높았다.

### 민족/문화 클럽

#### *가용성 및 참여*
- ¾의 AAPI LGBTQ 학생 (74.6%)이 자신의 학교가 민족적 혹은 문화적 클럽을 갖고 있다고 보고했다.
- 학교에 민족/문화 클럽이 있는AAPI LGBTQ 학생의12.2%가 회의에 참석하고 2.4%가 간부 혹은 지도자로 참여했다.

#### *유용성*
- 학교에 민족/문화 클럽이 있는 AAPI LGBTQ 학생은

  - 학교 공동체에 대한 소속감이 더 크다고 느꼈고

  - 인종/민족 때문에 불안하다고 느낄 가능성이 덜 했다.
- 다른 나라에서 태어난 AAPI LGBTQ 학생은 미국에서 태어난 학생보다 민족/문화 클럽에 참여할 가능성이 더 컸다.

**지원하는 학교 직원**

*가용성*

- 압도적인 다수의 AAPI LGBTQ 학생 (97.2%)이 학교에서 적어도 하나 이상의 도움을 주는 직원을 알수 있었지만, 약 반 (48.5%)만이 그런 직원을 많이 (11명 이상) 확인할 수 있었다.

- AAPI LGBTQ 학생의 약 반 (49.2%)만이 학교 행정이 다소 혹은 매우 도움을 준다고 보고했다.

- 다인종 AAPI LGBTQ 학생은 AAPI라고만 밝힌 학생보다 도움을 주는 직원 수가 적었고 학교 행정관이 도움을 덜 준다고 보고했다.

*유용성*

- LGBTQ 학생을 도와주는 더 많은 직원을 가진 AAPI LGBTQ 학생은

  - 안전 문제로 학교를 빠질 가능성이 적었고,

  - 성적 성향, 성 표현 및 인종/민족 때문에 불안하다고 느낄 가능성이 더 적었고,

  - 더 높은 수준의 자존감과 낮은 수준의 우울증을 가졌고,

  - 학교 공동체와의 연결 느낌이 더 컸고,

  - 평점도 높았고 (3.5 대 3.2),

  - 고등학교 이후의 교육을 계획할 가능성이 더 높았다 (97.6% 대 93.8%).

**포괄적인 교과과정**

우리는 또한 학교 교과과정에서LGBTQ 토픽을 포함하는 지의 여부를 조사하였다. 무려 ¼의 AAPI LGBTQ 학생 (27.4%)이 LGBTQ, 역사 및 행사에 대한 긍정적인 표상을 배웠다는 것을 알았다. 게다가, 교과과정에서LGBTQ를 긍정적으로 포괄하는 학교의 AAPI LGBTQ 학생은

- 성적 성향 때문에 (16.8% 대 30.2%) 그리고 성 표현 때문에(19.4% 대 30.1%) 불안을 느낄 가능성이 더 적었고,

- 학교에서 LGBTQ를 수용하는 또래를 가질 가능성이 더 컸고,

- 자신의 학교 공동체에 대한 소속감이 더 컸다.

다른 포괄적인 교과과정, 이를테면, 유색 인종과 역사 및 지역 공동체에 대한 긍정적인 표상 같은 다른 중요한 형태를 조사할 수 없었다. 그럼에도 불구하고, LGBTQ를 포괄하는 교과과정이 있는 학교의 AAPI LGBTQ 학생은 자신의 인종 및 민족 때문에 불안을 느낄 가능성이 덜 했다는 것을 발견했다 (22.5% 대 27.8%).

## 결론 및 권장 사항

AAPI LGBTQ 학생은 괴롭힘, 학교의 차별적인 관행 및 지원 자원에 대한 차별적인 접근 같은 독특한 경험을 갖고 있다. 이 보고서의 결과에 따르면, AAPI LGBTQ 학생은 제도적이고 대인관계적인 차별을 경험한다고 한다. 이 결과는 또한 학교 지원과 자원, 이를테면 GSA와 학교 지원 직원 등이 AAPI LGBTQ 학생의 학교 경험에 긍정적인 영향을 줄 수 있는 방법을 보여준다. 이런 결과에 근거하여, 우리는 학교 지도자, 교육 정책 입안자 및 AAPI LGBTQ 학생에 대한 안전한 학습 환경을 제공하고 싶어하는 다른 사람들이

- GSA와 민족/문화 클럽을 지원할 것을 권장한다. GSA와 민족/문화 클럽과 협력하는 조직은, 성적 성향, 성 및 인종/민족 등을 포함하여 다중의 소외된 정체성과 관련된 AAPI LGBTQ 학생의 요구사항을 함께 다루어야 한다.

- AAPI LGBTQ 학생의 문제에 대하여 학교 직원의 전문적 발달을 제공한다.

- AAPI LGBTQ, 역사 및 행사를 다양하고 긍정적으로 대표해주는 교과과정 자원에 대한 학생의 접근을 높인다.

- 반 LGBTQ 행동 및 인종 차별 행동에 대한 반응으로 직원에 대한 학교 방침과 가이드라인을 확립하고 학생들이 경험하는 괴롭힘을 보고할 수 있는 분명하고도 비밀을 보장하는 경로를 개발한다.

- 지역, 주 및 연방 교육 기관은 또한 학교가 이러한 관행과 절차를 확립하고 수행하도록 해야 한다.

- 지역, 주 및 연방 수준에서의 자금 지원 불평등 문제를 다루어서 기관의 지원 및 교육 일반에 대한 접근을 더 가능하게 하고, 교육자와 학교 상담사에게 더 많은 전문적인 개발을 제공하도록 힘쓴다.

종합하면, 그러한 조치는 성적 성향, 성 정체성, 성 표현, 인종 및 민족에 관계없이 모든 학생이 학교에서 배우고 성공할 기회를 갖는 그런 미래로 우리를 이끌어 줄 수 있다.

AR_292890

# Tóm tắt
# dự án

AR_292892

## Giới thiệu

Nghiên cứu hiện nay đã cho thấy rằng cả các bạn trẻ người Mỹ gốc Á và Quần đảo Thái Bình Dương (AAPI) cũng như các bạn trẻ đồng tính nữ, đồng tính nam, lưỡng tính, chuyển giới và lệch lạc giới tính (LGBTQ) thường phải đối mặt với các vấn đề của riêng mình tại trường liên quan đến các bản sắc bên lề của mình. Ví dụ, các bạn trẻ AAPI cũng bị thách thức với định kiến về nhóm thiểu số gương mẫu, bị cho rằng tất cả học sinh AAPI đều chăm chỉ và xuất sắc trong học tập, có thể từ chối, xem thường hoặc xóa bỏ hành vi phân biệt chủng tộc và phân biệt đối xử mà học sinh AAPI gặp phải. Tuy nhiên, các nghiên cứu trước đây đã cho thấy mức độ phổ biến của hành vi phân biệt chủng tộc từ các bạn học đối với các học sinh AAPI tiểu học và trung học. Điều này có thể là một phần lý do

vì sao các bạn trẻ AAPI thường không có mặt trong các buổi thảo luận về chính sách đối với nạn bắt nạt học đường. Về các bạn trẻ LGBTQ, các bạn thường phải đối mặt với những thách thức của riêng mình liên quan đến xu hướng tính dục, bản dạng giới tính và thể hiện giới. Các bạn trẻ LGBTQ hay báo việc mình bị ngược đãi và bị phân biệt đối xử, dẫn đến kết quả học tập kém hơn và sức khỏe tinh thần bị sa sút. Ngoài ra, các bạn cũng bị hạn chế hay không được tiếp cận các nguồn tài nguyên học tập tại trường để có thể cải thiện môi trường học đường và những trải nghiệm của học sinh. Mặc dù đã có một tổ chức đang phát triển nghiên cứu về các trải nghiệm của các bạn trẻ AAPI và các bạn trẻ LGBTQ tại các trường, nhưng vẫn có rất ít nghiên cứu xem xét sự giao thoa của những bản dạng này - những trải nghiệm của các bạn học sinh LGBTQ AAPI. Các nghiên cứu hiện nay cho thấy các trường học trên toàn quốc là môi trường không thân thiện đối với các bạn trẻ LGBTQ da màu, là nơi các bạn bị ngược đãi hay bị phân biệt đối xử về chủng tộc, xu hướng tính dục, bản dạng giới tính hoặc tất cả các bản sắc này. Báo cáo này là một trong chuỗi các báo cáo tập trung vào các học sinh LGBTQ thuộc chủng tộc/ dân tộc khác nhau, bao gồm các bạn trẻ LGBTQ da đen, Latinh và người Mỹ bản địa.

Trong báo cáo này, chúng tôi xem xét các trải nghiệm của các bạn học sinh LGBTQ AAPI khi xét về yếu tố về môi trường học đường tiêu cực và tác động của chúng đến thành tích học tập, nguyện vọng học tập và sức khỏe tâm lý:

- Cảm thấy không an toàn ở trường vì các đặc điểm cá nhân, ví dụ như xu hướng tính dục, thể hiện giới tính và chủng tộc/ dân tộc, và nghỉ học vì lý do an toàn;
- Nghe nhận xét thiên vị tại trường học, bao gồm nhận xét đồng tính và phân biệt chủng tộc;
- Bị ngược đãi tại trường; và
- Bị kỷ luật;

Ngoài ra, chúng tôi có xét đến việc các học sinh LGBTQ AAPI có báo cáo những trải nghiệm này cho các cán bộ nhà trường hoặc gia đình của mình hay không và cách thức những người trưởng thành này giải quyết vấn đề.

Chúng tôi cũng xét đến mức độ học sinh LGBTQ AAPI được truy cập vào các tài nguyên hỗ trợ học tập tại trường, và khám phá những lợi ích có thể có được từ các tài nguyên này:

- Các câu lạc bộ GSAs (Liên minh Người đồng tính nam – Người dị tính hay Liên minh Giới tính và Xu hướng tình dục) hay các câu lạc bộ tương tự;
- Các câu lạc bộ dân tộc / văn hóa;
- Nhân viên nhà trường hỗ trợ; và
- Nguồn tài nguyên học tập ngoại khóa bao gồm các chủ đề liên quan đến LGBTQ.

AR_292893

## Các phương pháp

Dữ liệu cho báo cáo này được lấy từ bài Khảo sát Môi trường Học đường Toàn quốc 2017 (NSCS) của GLSEN. Toàn bộ mẫu đối tượng khảo sát cho 2017 NSCS là 23.001 học sinh LGBTQ tại trường trung học cơ sở và trung học phổ thông từ 13 đến 21 tuổi. Trong NSCS, khi được hỏi về chủng tộc và dân tộc của mình, những người tham gia khảo sát có quyền tùy chọn "Người Châu Á", "Người Quần đảo Thái Bình Dương", trong số các chủng tộc và dân tộc khác Mẫu đối tượng khảo sát của báo cáo này bao gồm bất kỳ

học sinh LGBTQ trong mẫu đối tượng toàn quốc, những người đã xác định là "Người Châu Á hoặc Nam Á", hoặc "Người Hawaii bản xứ hay Người Quần đảo Thái Bình Dương khác" (nay gọi là Người Mỹ gốc Á và Quần đảo Thái Bình Dương hoặc AAPI), bao gồm cả những người chỉ xác định là người AAPI và những người xác định như người AAPI và một hoặc nhiều chủng tộc/ dân tộc khác (AAPI đa chủng tộc). Điều quan trọng cần lưu ý là kích thước mẫu đối tượng học sinh LGBTQ Quần đảo Thái Bình Dương quá nhỏ đến nỗi không thể xem xét riêng những trải nghiệm của các bạn tại trường. Do đó, các bạn học sinh LGBTQ, những người xác định là Người Quần đảo Thái Bình Dương đã được kết hợp với những người xác định là người châu Á.

Mẫu đối tượng cuối cùng của báo cáo này có tổng cộng 1.480 học sinh LGBTQ AAPI. Học sinh đến từ tất cả các tiểu bang, trừ bang Utah, cũng như Quận Columbia, Puerto Rico và Quần đảo Virgin thuộc Hoa Kỳ. Hai phần năm (40,0%) đã xác định là đồng tính nam hoặc đồng tính nữ, hơn một nửa (57,7%) là người có bản dạng giới tính đúng với giới tính sinh học và hơn một nửa (56,0%) đã xác định thuộc một hoặc nhiều chủng tộc/ dân tộc ngoài AAPI. Phần lớn các học sinh được sinh tại

Hoa Kỳ và hầu hết tất cả học sinh đều đã học tiếng Anh là ngôn ngữ đầu tiên của mình, hoặc là một trong những ngôn ngữ đầu tiên của mình. Phần lớn là các học sinh học trường trung học và công lập.

## Các nhận định chính

### *Sự an toàn và ngược đãi tại trường*

**Sự an toàn tại trường**

- Hơn một nửa số học sinh LGBTQ AAPI (51,8%) cảm thấy không an toàn ở trường vì xu hướng tính dục của mình, 41,1% vì thể hiện giới tính của mình và 26,4% vì chủng tộc hoặc dân tộc của mình.
- Hơn một phần tư học sinh LGBTQ AAPI (27,6%) đã được báo là nghỉ học ít nhất một ngày trong tháng trước vì cảm thấy không an toàn hoặc không thoải mái, và gần một phần mười (8,4%) nghỉ học từ bốn ngày trở lên trong tháng vừa qua.

**Những nhận xét thiên vị ở trường**

- 97,8% học sinh LGBTQ AAPI đã nghe nói từ "đồng tính nam" một cách tiêu cực; gần hai phần ba (61%) hay hoặc thường xuyên nghe loại ngôn từ này.
- 92,4% học sinh LGBTQ AAPI nghe những nhận xét đồng tính khác; hơn một nửa (51,1%) hay hoặc thường xuyên nghe loại ngôn từ này.
- 89,3% học sinh LGBTQ AAPI đã nghe nhận xét tiêu cực về thể hiện giới tính đối với việc chưa ứng xử đủ mức "nam tính"; một nửa (50,2%) hay hoặc thường xuyên nghe những nhận xét này.

- 81,4% học sinh LGBTQ AAPI đã nghe nhận xét tiêu cực đối với việc chưa ứng xử đủ mức "nữ tính"; một phần ba (33,9%) hay hoặc thường xuyên nghe những nhận xét này.

- 89,3% học sinh LGBTQ AAPI đã nghe những nhận xét phân biệt chủng tộc; chỉ hơn một nửa (52,7%) hay hoặc thường xuyên nghe những nhận xét này.

- 82,3% học sinh LGBTQ AAPI đã nghe những nhận xét tiêu cực về người chuyển giới; hơn một phần ba (35,5%) hay hoặc thường xuyên nghe những nhận xét này.

**Việc ngược đãi tại trường**

- Nhiều học sinh đã bị quấy rối hoặc bạo hành tại trường do các đặc điểm cá nhân, bao gồm xu hướng tính dục (60,5%), thể hiện giới tính (54,7%) và chủng tộc/ dân tộc (53,8%).

- Học sinh LGBTQ AAPI bị ngược đãi nhiều hơn tại trường do xu hướng tình dục:

  - có nhiều khả năng bỏ học gấp ba lần vì cảm thấy không an toàn (57,5% so với 16,9%);

  - ít có khả năng dự định tốt nghiệp trung học (96,1% so với 99,3%); và

  - cảm nhận là thành viên trường được tôn trọng ở mức độ thấp (22% so với 60,9%) và mức độ trầm cảm cao hơn (73,2% so với 41,2%).

- Học sinh LGBTQ AAPI bị ngược đãi nhiều hơn tại trường do chủng tộc/ dân tộc:

  - gần như có gấp đôi khả năng bỏ học vì cảm thấy không an toàn (35,5% so với 18,4%); và

  - cảm nhận là thành viên trường được tôn trọng ở mức độ thấp và mức độ trầm cảm cao hơn.

- So với các bạn học sinh AAPI có giới tính phù hợp với giới tính sinh học LGBQ, các bạn học sinh AAPI là người chuyển giới và người không theo chuẩn giới nào (trans / GNC) bị ngược đãi nhiều hơn tại trường do xu hướng tình dục và thể hiện giới tính.

- Các bạn học sinh LGBTQ AAPI , những người xác định thuộc nhiều chủng tộc/ dân tộc bị ngược đãi nhiều hơn do xu hướng tính dục và thể hiện giới tính so với các bạn học sinh LGBTQ chỉ xác định là AAPI.

- Hai phần năm học sinh LGBTQ AAPI (40,0%) bị quấy rối hoặc bạo hành ở trường do cả xu hướng tính dục và chủng tộc / dân tộc của mình. So với những bạn từng hay chưa từng bị ngược đãi, các bạn học sinh LGBTQ AAPI đã bị ngược đãi dưới hai hình thức sau:

  - cảm nhận là thành viên trường được tôn trọng ở mức độ thấp;

  - có mức độ trầm cảm nhiều hơn; và

  - gần như có gấp đôi khả năng bỏ học vì cảm thấy không an toàn;

**Báo cáo quấy rối và bạo hành ở trường, và Sự can thiệp**

Phần lớn các bạn học sinh LGBTQ AAPI (56,5%) từng bị quấy rối hoặc bạo hành trong năm qua chưa bao giờ báo cho cán bộ nhà trường việc mình bị ngược đãi, chủ yếu vì các bạn không cho rằng cán bộ nhà trường sẽ làm điều gì đó để giải quyết vấn đề (67,4%).

  - Chưa đến một nửa (42,3%) đã báo rằng cán bộ nhà trường đã giải quyết một cách hiệu quả khi các bạn học sinh báo việc ngược đãi.

  - Chưa đến một nửa (43,5%) số học sinh LGBTQ AAPI đã nói với thành viên gia đình về việc mình bị ngược đãi ở trường.

AR_292895

- Trong số các bạn học sinh LGBTQ AAPI đã báo cho thành viên gia đình việc mình bị ngược đãi, một nửa (50,5%) trong số các bạn đã xác nhận việc thành viên trong gia đình đã nói chuyện với giáo viên, hiệu trưởng hoặc cán bộ khác tại trường.

## Các quy định thực hành tại trường

### Bị kỷ luật tại trường

- Gần một phần ba các bạn học sinh LGBTQ AAPI (30,7%) đã bị phạt một số hình thức kỷ luật tại trường, như phạt ở lại, đình chỉ việc học, hoặc cho thôi học.

- Các bạn học sinh LGBTQ AAPI đa chủng tộc bị kỷ luật nặng hơn so với các bạn học sinh chỉ xác định là AAPI.

- Những trải nghiệm tiêu cực tại trường liên quan đến việc bị kỷ luật tại trườn đối với các bạn học sinh LGBTQ AAPI Các bạn học sinh từng bị kỷ luật tại trường:

  - bị ngược đãi nhiều hơn do xu hướng tình dục, thể hiện giới tính, và chủng tộc/ dân tộc;

  - có nhiều khả năng bỏ học do cảm thấy không an toàn; và

  - có nhiều khả năng trải nghiệm các chính sách hoặc thực tiễn phân biệt đối xử chống lại cộng đồng LGBTQ.

  - Việc bị kỷ luật tại trường có thể ảnh hưởng tiêu cực đến kết quả học tập đối với các bạn học sinh LGBTQ AAPI . Các bạn học sinh từng bị kỷ luật tại trường:

- ít có khả năng lên kế hoạch theo học chương trình giáo dục sau trung học; và

- có điểm trung bình (ĐTB) thấp hơn (GPAs).

## Sự hỗ trợ và Các nguồn tài nguyên học tập tại trường dành cho các bạn học sinh LGBTQ AAPI

### GSAs (Các Câu lạc bộ Liên minh Người đồng tính nam – Người dị tính)

#### Tình trạng hoạt động và sự tham gia

- Gần hai phần ba các bạn học sinh LGBTQ AAPI (63,5%) đã báo cáo có GSA tại trường của mình.

- Các bạn học sinh LGBTQ AAPI học tại các trường ở nông thôn, các trường ở miền Nam và các trường nhỏ hơn, ít có khả năng tiếp cận với GSA

- Phần lớn các bạn học sinh LGBTQ AAPI (57,7%) có quyền tiếp cận GSA đã tham gia câu lạc bộ, và 18,9% đã tham gia giữ chức vụ hay làm người chỉ dẫn;

#### Lợi ích

- So với các bạn học sinh không có GSA, các bạn học sinh LGBTQ AAPI có GSA:

  - ít có khả năng nghỉ học do vấn đề an toàn (22,4% so với 36,9%);

  - ít có khả năng cảm thấy không an toàn vì xu hướng tình dục của mình (45,6% so với 62,3%) và thể hiện giới tính (38,6% so với 45,4%); và

  - cảm thấy là thành viên được tôn trọng hơn trong cộng đồng học đường.

- Các bạn học sinh LGBTQ AAPI tham gia GSA cảm thấy thoải mái hơn khi đưa ra các vấn đề về LGBTQ trong lớp và có nhiều khả năng tham gia Ngày hành động vì cộng đồng GLSEN hoặc biểu tình, bảo vệ, biểu dương chính trị.

### Các câu lạc bộ Văn hoá/ Dân tộc

#### Tình trạng hoạt động và sự tham gia

- Ba phần tư học sinh LGBTQ AAPI (74,6%) báo cáo rằng trường của họ có một câu lạc bộ Văn hóa hoặc Dân tộc tại trường của mình.
- 12,2% các bạn học sinh LGBTQ AAPI với một câu lạc bộ văn hóa / dân tộc tại trường đã tham dự các cuộc họp và 2,4% các bạn học sinh này đã tham gia giữ chức vụ hay làm người chỉ dẫn;

#### Lợi ích

- Các bạn học sinh LGBTQ AAPI có câu lạc bộ văn hóa / dân tộc tại trường của mình:
- cảm thấy là thành viên được tôn trọng hơn trong cộng đồng học đường; và
- ít có khả năng cảm thấy không an toàn vì chủng tộc/ dân tộc
- Các bạn học sinh LGBTQ AAPI sinh ra tại một quốc gia khác có nhiều khả năng tham gia các câu lạc bộ văn hóa/ dân tộc hơn so với những bạn sinh ra ở Hoa Kỳ.

#### Bộ phận Nhân sự Hỗ trợ của Nhà trường

#### Tình trạng hoạt động

- Đại đa các bạn học sinh LGBTQ AAPI (97,2%) có thể xác định ít nhất một thành viên là cán bộ hỗ trợ tại trường, nhưng chỉ khoảng một nửa (48,5%) trong số các bạn có thể xác định nhiều cán bộ hỗ trợ (11 cán bộ hỗ trợ trở lên).
- Chỉ có khoảng một nửa trong số các bạn học sinh LGBTQ AAPI (49,2%) đã báo cáo có bộ phận hành chính nhà trường đã rất hỗ trợ hay giải quyết phần nào vấn đề.
- Các bạn học sinh LGBTQ AAPI thuộc đa chủng tộc đã báo cáo việc có ít cán bộ nhà trường hỗ trợ và ít cán bộ hành chính hỗ trợ hơn so với các bạn học sinh chỉ xác định là AAPI.

#### Lợi ích

- Các bạn học sinh LGBTQ AAPI có nhiều cán bộ hỗ trợ hơn cho các bạn học sinh LGBTQ:
  - ít có khả năng nghỉ học do vấn đề an toàn;
  - ít có khả năng cảm thấy không an toàn vì xu hướng tình dục, thể hiện giới tính, dân tộc và chủng tộc;
  - có mức độ tự trọng cao hơn và mức độ trầm cảm thấp hơn;
  - cảm thấy kết nối tốt hơn với cộng đồng học đường;
  - có ĐTB học tập cao hơn (3,5 so với 3,2); và
  - có nhiều khả năng lên kế hoạch theo học chương trình sau trung học hơn (97,6% so với 93,8%).

#### Chương trình giảng dạy được lồng ghép

Chúng tôi cũng đã xem xét việc lồng ghép các chủ đề LGBTQ vào chương trình giảng dạy tại

AR_292897

trường. Chúng tôi thấy rằng chỉ hơn một phần tư các bạn học sinh LGBTQ AAPI (27,4%) được giảng dạy với nội dung trình bày tích cực về con người, lịch sử, hay các sự kiện LGBTQ. Ngoài ra, chúng tôi cũng nhận thấy rằng các bạn học sinh LGBTQ AAPI tham dự chương trình giảng dạy có lồng ghép tích cực nội dung về LGBTQ:

- ít có khả năng cảm thấy không an toàn vì xu hướng tình dục của mình (16,8% so với 30,2%) và thể hiện giới tính (19,4% so với 30,1%);

- có nhiều khả năng được các ba5n học chấp nhận là người LGBTQ tại trường (76,4% so với 43,7%); và

- cảm thấy kết nối nhiều hơn với cộng đồng học đường;

Chúng tôi không thể xem xét các hình thức lồng ghép nội dung quan trọng khác trong chương trình giảng dạy, như trình bày nội dung tực về người da màu và lịch sử cũng như cộng đồng của họ. Tuy nhiên, chúng tôi đã nhận thấy rằng các bạn học sinh LGBTQ AAPI trong chương trình giảng dạy được lồng ghép chủ đề LGBTQ ít có khả năng thấy không an toàn ở trường vì chủng tộc hoặc dân tộc của mình (22,5% so với 27,8%).


## Kết luận và Kiến nghị

Các bạn học sinh LGBTQ AAPI có những trải nghiệm của riêng mình về các quy định thực hành tại trường đối với việc phân biệt đối xử, ngược đãi, và truy cập các nguồn hỗ trợ. Kết quả từ báo cáo này cho thấy các bạn học sinh LGBTQ AAPI đã trải nghiệm trường hợp phân biệt đối xử giữa các cá nhân và tổ chức. Các phát hiện cũng cho thấy cách thức nhà trường hỗ trợ và các nguồn hỗ trợ, như GSA và bộ phận nhân sự hỗ trợ của nhà trường, có thể ảnh hưởng tích cực đến trải nghiệm của các bạn học sinh LGBTQ AAPI tại trường. Dựa trên những phát hiện này, chúng tôi kiến nghị các nội dung sau đến ban giám hiệu nhà trường, các nhà hoạch định chính sách giáo dục và các cá nhân khác muốn cung cấp môi trường học tập an toàn cho các bạn học sinh LGBTQ AAPI :

- Các câu lạc bộ hỗ trợ học sinh, như GSA và các câu lạc bộ văn hoá/ dân tộc; Các tổ chức làm việc với GSA và các câu lạc bộ văn hóa / dân tộc cũng nên hợp tác để đáp ứng nhu cầu của các bạn học sinh LGBTQ AAPI , liên quan đến nhiều bản sắc bên lề, bao gồm các bản sắc xu hướng tính dục, giới tính và chủng tộc/ dân tộc.

- Mang đến sự phát triển chuyên môn cho các cán bộ nhà trường liên quan đến các vấn đề của học sinh LGBTQ AAPI.

- Tăng khả năng tiếp cận của học sinh đối với các nguồn tài nguyên học tập bao gồm các nội dung trình bày đa dạng và tích cực về con người, lịch sử và sự kiện AAPI và LGBTQ.

- Lập các nội dung chính sách và hướng dẫn của trường dành cho các cán bộ xử lý hành vi phân biệt chủng tộc và chống đối cộng đồng LGBTQ, đồng thời phát triển các quy trình bảo mật rõ ràng để học sinh báo vấn đề bị ngược đãi của mình.

- Các cơ quan quản lý giáo dục tại địa phương, tiểu bang và liên bang cũng nên yêu cầu nhà trường chịu trách nhiệm cho việc lập và thực hiện các quy định thực hành và thủ tục này.

- Làm việc để giải quyết sự bất bình đẳng trong hoạt động tài trợ ở cấp địa phương, tiểu bang và quốc gia để tăng khả năng tiếp cận các hoạt động giáo dục và hỗ trợ từ các tổ chức nói chung, và mang đến sự phát triển chuyên nghiệp hơn cho các nhà giáo dục và cán bộ tư vấn học đường.

Khi được kết hợp lại với nhau, các biện pháp này có thể đưa chúng ta đến một tương lai mà các bạn học sinh có cơ hội học tập và đạt kết quả tốt tại trường, bất kể mọi xu hướng tính dục, bản dạng giới tính, thể hiện giới tính, chủng tộc hay dân tộc.

AR_292898

एक्ज़ीक्यूटवि सारांश

AR_292899

AR_292900

## परिचय

मौजूदा शोध में बताया गया है कि स्कूल में एशियाई अमेरिकी और प्रशांत द्वीप वासी (AAPI), दोनों के लेस्बियन, गे, बाईसेक्सुअल, ट्रांसजेंडर, और होमोसेक्सुअल (LGBTQ) युवा अक्सर अपनी अधिकारहीन पहचान से संबंधित खास समस्याओं का सामना करते हैं. उदाहरण के लिए, AAPI के युवाओं को मॉडल माइनॉरिटी स्टीरियोटाइप (आदर्श अल्पसंख्यक रूढ़िबद्ध धारणा) के साथ चुनौती भी दी जाती है. AAPI के सभी विद्यार्थी शैक्षणिक रूप से मेहनती और विशिष्ट हैं, इससे उस जातिवाद और भेदभाव का खंडन किया जा सकता है, उसके महत्व को कम किया जा सकता है, या खत्म किया जा सकता है जिसे AAPI के विद्यार्थी अनुभव करते हैं. इससे पहले के अध्ययनों में देखा गया है कि AAPI के प्राथमिक और माध्यमिक विद्यार्थियों के विरुद्ध महपाठियों द्वारा जातिवाद की घटना सामान्य है. ऐसा आंशिक रूप से इसलिए हो सकता है

क्योंकि AAPI के युवा अक्सर स्कूलों में धमकी पर होने वाली नीतिगत चर्चा में शामिल नहीं होते। LGBTQ युवा होने के कारण, वे अक्सर अपने लैंगिक-रुझान, लिंग पहचान और लिंग अभिव्यक्ति से संबंधित खास चुनौतियों का सामना करते हैं। LGBTQ युवाओं ने कई बार उत्पीड़न और भेदभाव की रिपोर्ट की है जिसके कारण शैक्षिक परिणाम अच्छे नहीं रहे और मनोवैज्ञानिक हित में कमी आई। इसके अलावा, उनके पास स्कूल में मौजूद उन संसाधनों तक सीमित पहुंच है या कोई पहुंच नहीं है जिससे स्कूल के परिवेश और विद्यार्थियों के अनुभव को बेहतर बनाया जा सके। हालांकि, यहां स्कूलों में AAPI के युवाओं और LGBTQ युवाओं के अनुभवों पर काफ़ी शोध किया जा रहा है, इन पहचानों के प्रतिच्छेदन की जांच में बहुत कम शोध हुए हैं – AAPI LGBTQ

विद्यार्थियों के अनुभव. मौजूदा अध्ययनों से पता चलता है कि सार्वजनिक स्कूलों में LGBTQ युवाओं के रंग को लेकर द्वेषपूर्ण परिवेश है जहां वे जाति, लैंगिक-रुझान, लिंग पहचान, या इन सभी पहचानों के आधार पर उत्पीड़न और भेदभाव का अनुभव करते हैं। यह रिपोर्ट उन रिपोर्टों की एक श्रृंखला है जिसमें ब्लैक, लेटिनिक्स और मूल अमेरिकी LGBTQ युवाओं सहित अलग-अलग जातीय/संजातीय पहचान वाले LGBTQ विद्यार्थियों पर फ़ोकस किया गया है।

इस रिपोर्ट में, हम स्कूल में नकारात्मक परिवेश के संकेतकों, और शैक्षणिक उपलब्धि, शैक्षिक आकांक्षाओं, और मनोवैज्ञानिक हित पर उनके प्रभाव के संबंध में AAPI LGBTQ विद्यार्थियों के अनुभव की जांच कर रहे हैं:

- व्यक्तिगत विशिष्टताओं, जैसे कि लैंगिक-रुझान, लिंग अभिव्यक्ति और जाति/संजातीयता, के कारण स्कूल में असुरक्षित महसूस करना, और सुरक्षा कारणों के कारण स्कूल न आना;
- स्कूल में पक्षपातपूर्ण टिप्पणियां सुनना जिसमें समलैंगिकता और जातीयता से संबंधित टिप्पणियां शामिल हैं;
- स्कूल में उत्पीड़न का अनुभव करना; और
- स्कूल की अनुशासनात्मक कार्यप्रणालियों का अनुभव करना।

इसके अलावा, हम इसकी जांच रहे हैं कि AAPI LGBTQ विद्यार्थी इन अनुभवों के बारे में स्कूल के अधिकारियों या अपने परिजनों को बताते हैं या नहीं, और ये लोग समस्या पर कैसे कार्य करते हैं।

हम उस स्थिति की भी जांच कर रहे हैं जिसके लिए AAPI LGBTQ विद्यार्थियों के पास स्कूल के सहायक संसाधनों तक पहुंच है, और इन संसाधनों के संभावित लाभों का पता लगाते हैं:

- GSA (गे-स्ट्रेट एलायंस या जेंडर ऐंड सेक्सुअलिटी एलायंस) या इससे मिलते-जुलते संघ;
- जातीय/सांस्कृतिक संघ;
- सहायक स्कूल कर्मचारी; और
- पाठ्यचर्या संबंधी संसाधन जिन्हें LGBTQ से संबंधित विषयों में शामिल किया जाता है।

## तरीके

इस रिपोर्ट का डेटा GLSEN के 2017 नेशनल स्कूल क्लाइमेट सर्वे (NSCS) से प्राप्त किया गया है। 2017 NSCS के पूरे सैंपल में 23,001 LGBTQ विद्यार्थियों को शामिल किया गया था जो मिडिल और हाई स्कूल के थे और उनकी आयु 13 से लेकर 21 वर्ष के बीच थी। NSCS में, जब उनसे उनकी जाति और संजातीयता के बारे में पूछा गया, तो प्रतिभागियों के पास अन्य जाति/संजातीयता श्रेणियों के बीच "एशियाई," और "प्रशांत द्वीप वासी" चुनने का विकल्प था। इस रिपोर्ट के सैंपल में नेशनल सैंपल के ऐसे

किसी भी LGBTQ विद्यार्थी को शामिल किया जाता है जो "एशियाई या दक्षिणी एशियाई" या "मूल हवाई या अन्य प्रशांत द्वीप वासी" (इसलिए, उन्हें एशियाई अमेरिकी और प्रशांत द्वीप वासी या AAPI के रूप में संदर्भित किया जाता है) के रूप में पहचाने जाते हैं, इसमें वे लोग भी शामिल हैं जो केवल AAPI के रूप में पहचाने जाते हैं, और जो AAPI और एक या एक से अधिक अतिरिक्त जातीय/संजातीय पहचानों (बहुजातीय AAPI) के रूप में पहचाने जाते हैं। यह ध्यान रखना ज़रूरी है कि प्रशांत द्वीप वासी LGBTQ विद्यार्थियों का सैंपल साइज़ स्कूल में केवल उनके अनुभवों की जांच करने के लिए बहुत कम था। इसलिए, प्रशांत द्वीप वासी के रूप में पहचाने गए LGBTQ विद्यार्थियों को उन विद्यार्थियों के साथ संयुक्त किया गया जिन्हें एशियाई के रूप में पहचाना गया।

इस रिपोर्ट के आखिरी सैंपल में कुल 1,480 AAPI LGBTQ विद्यार्थी थे। व्योमिंग, डिस्ट्रिक्ट ऑफ़ कोलंबिया, प्यूर्टो रिको और यूएस वर्जिनि आइलैंड को छोड़कर सभी राज्यों के विद्यार्थी इसमें थे। दो बटा पांच (40.0%) को गे या लेस्बियन के रूप में पहचाना गया, आधे से अधिक (57.7%) सिसजेंडर थे, और AAPI के अलावा एक या एक से अधिक जातीय/संजातीय पहचान के साथ आधे से अधिक (56.0%) को पहचाना गया। अमेरिका में अधिकांश विद्यार्थियों के लिए

पाया गया कि लगभग सभी ने अपनी पहली भाषा के रूप में, या अपनी पहली भाषाओं में से एक के रूप में अंग्रेजी का अध्ययन किया। अधिकांश विद्यार्थी हाई स्कूल और पब्लिक स्कूलों में उपस्थिति हुए।

# मुख्य निष्कर्ष

## स्कूल में सुरक्षा और उत्पीड़न

### स्कूल सुरक्षा

- आधे से अधिक AAPI LGBTQ विद्यार्थियों (51.8%) ने अपने लैंगिक-रुझान के कारण, 41.1% ने अपनी लिंग अभिव्यक्ति के कारण, और 26.4% ने अपनी जातीय या संजातीयता के कारण स्कूल में असुरक्षित महसूस किया।
- एक चौथाई से अधिक AAPI LGBTQ विद्यार्थियों (27.6%) को पिछले महीने स्कूल में कम से कम एक दिन अनुपस्थिति इस कारण पाया गया क्योंकि उन्होंने असुरक्षित या असहज होने का अनुभव किया, और पिछले महीने में लगभग एक बटा दस (8.4%) विद्यार्थी चार या इससे अधिक दिन अनुपस्थित रहे।

### स्कूल में पक्षपातपूर्ण टिप्पणियां

- 97.8% AAPI LGBTQ विद्यार्थियों ने "गे" शब्द का उपयोग नकारात्मक तरीके से करते हुए सुना; लगभग दो-तिहाई विद्यार्थियों (61%) ने कई बार या बार-बार इस तरह के शब्दों को सुना।
- 92.4% AAPI LGBTQ विद्यार्थियों ने समलैंगिकता संबंधी अन्य टिप्पणियों को सुना; आधे से अधिक विद्यार्थियों (51.1%) ने कई बार या बार-बार इस तरह के शब्दों को सुना।
- 89.3% AAPI LGBTQ विद्यार्थियों ने अपर्याप्त "पुरुष" से संबंधित नकारात्मक लैंगिक अभिव्यक्ति की टिप्पणियां सुनी; आधे विद्यार्थियों (50.2%) ने इन टिप्पणियों को कई बार या बार-बार सुना।
- 81.4 % AAPI LGBTQ विद्यार्थियों ने अपर्याप्त "स्त्री" से संबंधित टिप्पणियां सुनी; एक तिहाई विद्यार्थियों (33.9%) ने इन टिप्पणियों को कई बार या बार-बार सुना।
- 89.3% AAPI LGBTQ विद्यार्थियों ने जातीय टिप्पणियां सुनी; आधे से अधिक विद्यार्थियों (52.7%) इन टिप्पणियों को कई बार या बार-बार सुना।
- 82.3% AAPI LGBTQ विद्यार्थियों ने ट्रांसजेंडर होने के संबंध में नकारात्मक टिप्पणियां सुनी; एक तिहाई से अधिक विद्यार्थियों (35.5%) इन टिप्पणियों को कई बार या बार-बार सुना।

### स्कूल में उत्पीड़न

- कई विद्यार्थियों ने स्कूल में निजी विशिष्टताओं पर आधारित उत्पीड़न या अवैध भाषा का अनुभव किया जिसमें लैंगिक-रुझान (60.5%), लिंग अभिव्यक्ति (54.7%), और जातीय/संजातीयता (53.8%) शामिल है।
- AAPI LGBTQ विद्यार्थी जिन्होंने स्कूल में लैंगिक-रुझान के आधार पर उच्च उत्पीड़न स्तर का अनुभव किया:

- स्कूल छोड़ने की संभावना तीन गुना से अधिक इस कारण थी क्योंकि वे असुरक्षित महसूस करते थे (57.5% बनाम 16.9%);

- हाईस्कूल पूरा करने की योजना संभावित रूप से काफ़ी हद तक कम थी (96.1% बनाम 99.3%); और

- संबंधित स्कूल में निम्न स्तर (22% बनाम 60.9%), और डिप्रेशन के उच्च स्तर का अनुभव किया (73.2% बनाम 41.2%)।

- AAPI LGBTQ विद्यार्थी जिन्होंने स्कूल में जाति/सिंजातीयता के आधार पर उच्च उत्पीड़न स्तर का अनुभव किया:

- स्कूल छोड़ने की संभावना लगभग दो गुना इस कारण थी क्योंकि वे असुरक्षित महसूस करते थे (35.5% बनाम 18.4%);

- संबंधित स्कूल में निम्न स्तर और डिप्रेशन के उच्च स्तर का अनुभव किया।

- ट्रांसजेंडर और जेंडर नॉनकॉन्फॉर्मिंग (trans/GNC) AAPI विद्यार्थियों ने लैंगिक-रुझान और लिंग अभिव्यक्ति के आधार पर उच्च स्तर वाले उत्पीड़न का अनुभव LGBQ सिसजेंडर AAPI विद्यार्थियों से अधिक किया।

- एक से अधिक जाति/सिंजातीय पहचानों वाले AAPI LGBTQ विद्यार्थियों ने लैंगिक-रुझान और लिंग अभिव्यक्ति के आधार पर उच्च स्तर वाले उत्पीड़न का अनुभव उन LGBTQ विद्यार्थियों से अधिक किया जो केवल AAPI विद्यार्थी के रूप में पहचाने गए।

- दो बट्टा पांच AAPI LGBTQ विद्यार्थियों (40.0%) ने अपने लैंगिक-रुझान और अपनी जाति/सिंजातीयता, दोनों के कारण स्कूल में उत्पीड़न या अवैध भाषा का अनुभव किया। उत्पीड़न के एक रूप का अनुभव या उत्पीड़न का अनुभव नहीं करने वाले AAPI LGBTQ विद्यार्थियों की तुलना में, उत्पीड़न के दोनों रूपों का अनुभव करने वाले AAPI LGBTQ विद्यार्थियों ने:

- संबंधित स्कूल में निम्न स्तरों का अनुभव किया;

- डिप्रेशन के उच्चतर स्तरों का अनुभव किया; और

- स्कूल छोड़ने की सबसे अधिक संभावना इसलिए जताई क्योंकि वे असुरक्षित महसूस करते थे।

### स्कूल आधारित उत्पीड़न और अवैध भाषा की रिपोर्टिंग, और बीच-बचाव

पिछले वर्ष उत्पीड़न या अवैध भाषा का अनुभव करने वाले अधिकांश AAPI LGBTQ विद्यार्थियों (56.5%) ने उत्पीड़न की रिपोर्ट कर्मचारियों को कभी नहीं की, सबसे आम कारण यह था कि उन्हें ऐसा नहीं लगा कि कर्मचारी इस संबंध में कुछ भी करेंगे (67.4%)।

- आधे से भी कम विद्यार्थियों (42.3%) ने बताया कि विद्यार्थियों द्वारा उत्पीड़न की रिपोर्ट किए जाने पर कर्मचारियों ने प्रभावी ढंग से कार्रवाई की।

- आधे से भी कम AAPI LGBTQ विद्यार्थियों (43.5%) ने स्कूल में उनके द्वारा सामना किए जा रहे उत्पीड़न के बारे में परिजनों को बताया।

- जिन AAPI LGBTQ विद्यार्थियों ने परिजनों को उत्पीड़न के अनुभव की सूचना दी, उनमें से आधे (50.5%) ने बताया कि परिजनों ने उनके शिक्षक, प्रिंसिपल या स्कूल के अन्य कर्मचारी से इस संबंध में बात की।

## स्कूल की कार्यप्रणाली

### स्कूल व्यवस्था के साथ अनुभव

- लगभग एक तिहाई AAPI LGBTQ विद्यार्थियों (30.7%) ने स्कूल व्यवस्था के कुछ कार्यों का अनुभव किया, जैसे कि अवरोधन, स्कूल से निलंबन, या निष्कासन।

- बहुजातीय AAPI LGBTQ विद्यार्थियों ने उन विद्यार्थियों की तुलना में उच्च स्तरीय व्यवस्था का अनुभव किया जिन्हें केवल AAPI के रूप में पहचाना गया।

- स्कूल के नकारात्मक अनुभव, AAPI LGBTQ विद्यार्थियों के लिए स्कूल व्यवस्था के अनुभवों से संबंधित थे। स्कूल व्यवस्था का अनुभव करने वाले विद्यार्थियों ने:

**xlix**

- लैंगिक-रुझान, लिंग अभिव्यक्ति, और जाति/संजातीयता के आधार पर उच्च उत्पीड़न दर का अनुभव किया;
- स्कूल छोड़ने की अधिक संभावना इसलिए जताई क्योंकि उन्होंने असुरक्षित महसूस किया; और
- स्कूल में LGBTQ पक्षपाती विरोधी नीतियों या कार्यप्रणालियों का अनुभव करने की अधिक संभावना जताई।
- स्कूल व्यवस्था वाले अनुभव भी AAPI LGBTQ विद्यार्थियों के शैक्षिक परिणामों पर नकारात्मक प्रभाव डाल सकते हैं। स्कूल व्यवस्था का अनुभव करने वाले विद्यार्थियों ने:
  - माध्यमिक शिक्षा के बाद आगे की शिक्षा के लिए योजना बनाने की कम संभावना जताई; और
  - निम्न ग्रेड पॉइंट एवरेज (GPA) का प्रदर्शन किया।

---

### *AAPI LGBTQ विद्यार्थियों के लिए स्कूल द्वारा दी जाने वाली सहायता और संसाधन*

### GSA

#### *उपलब्धता और भागीदारी*
- लगभग दो-तिहाई AAPI LGBTQ विद्यार्थियों (63.5%) ने अपने स्कूल में GSA होने की सूचना दी।
- ग्रामीण स्कूलों, दक्षिण के स्कूलों, और छोटे स्कूलों के AAPI LGBTQ विद्यार्थियों ने GSA तक पहुंच होने की कम संभावना जताई।
- GSA तक पहुंच वाले अधिकांश AAPI LGBTQ विद्यार्थियों (57.7%) ने संघ में भाग लिया, और 18.9% विद्यार्थियों ने अधिकारी या नेता के रूप में भाग लिया।

#### *उपयोगिता*
- बिना GSA वाले AAPI LGBTQ विद्यार्थियों की तुलना में GSA वाले AAPI LGBTQ विद्यार्थियों ने:
  - सुरक्षा चिंताओं के कारण स्कूल छोड़ने की कम संभावना जताई (22.4% बनाम 36.9%);
  - अपने लैंगिक-रुझान (45.6% बनाम 62.3%) और लिंग अभिव्यक्ति (38.6% बनाम 45.4%) के कारण असुरक्षित होने का अनुभव करने में कम संभावना जताई; और
  - अपने संबंधित स्कूल समुदाय में अधिक बेहतर होने का अनुभव किया।
- GSA में भाग लेने वाले AAPI LGBTQ विद्यार्थियों ने कक्षा में LGBTQ की समस्याओं को सामने लाने में अधिक सहज होने का अनुभव किया, और GLSEN डे ऑफ एक्शन में, या राजनीतिक रैली, विरोध प्रदर्शन या प्रदर्शन में भाग लेने की अधिक संभावना जताई।

### जातीय/सांस्कृतिक संघ;

#### *उपलब्धता और भागीदारी*
- तीन-चौथाई AAPI LGBTQ विद्यार्थियों (74.6%) ने बताया कि उनके स्कूल में एक जातीय या सांस्कृतिक संघ था।
- स्कूल के जातीय/सांस्कृतिक संघ वाले 12.2% AAPI LGBTQ विद्यार्थियों ने बैठकों में भाग लिया, और 2.4% विद्यार्थियों ने अधिकारी या नेता के रूप में भाग लिया।

#### *उपयोगिता*
- अपने स्कूल के जातीय/सांस्कृतिक संघ से जुड़े AAPI LGBTQ विद्यार्थियों ने:
  - अपने संबंधित स्कूल समुदाय में अधिक बेहतर होने का अनुभव किया; और
  - अपनी जाति/संजातीयता के कारण असुरक्षित होने की कम संभावना जताई।

AR_292904

- किसी अन्य देश के AAPI LGBTQ विद्यार्थियों ने अमेरिकी AAPI LGBTQ विद्यार्थियों की तुलना में जातीय/सांस्कृतिक संघों में भाग लेने की अधिक संभावना जताई।

## सहायक स्कूल कर्मचारी

### उपलब्धता

- अधिकांश AAPI LGBTQ विद्यार्थी (97.2%) स्कूल के कम से कम एक सहायक कर्मचारी की पहचान कर पा रहे थे, लेकिन केवल लगभग आधे विद्यार्थी (48.5%) ही कई सहायक कर्मचारियों (11 या इससे अधिक) की पहचान कर पा रहे थे।
- केवल लगभग आधे AAPI LGBTQ विद्यार्थियों (49.2%) ने कुछ हद तक या बहुत अधिक सहायक स्कूल प्रशासन होने की सूचना दी।
- बहुजातीय AAPI LGBTQ विद्यार्थियों ने, केवल AAPI के रूप में पहचाने गए विद्यार्थियों की तुलना में कम सहायक कर्मचारी और कम सहायक प्रशासन होने की सूचना दी।

### उपयोगिता

- वे AAPI LGBTQ विद्यार्थी जिन्होंने LGBTQ विद्यार्थियों की सहायता करने वाले अधिक कर्मचारियों की सूचना दी, उन्होंने:

  – सुरक्षा चिंताओं के कारण स्कूल छोड़ने की कम संभावना जताई;

  – अपने लैंगिक-रुझान, लिंग अभिव्यक्ति, और जाति/संजातीयता के कारण असुरक्षित होने की कम संभावना जताई;

  – उच्च स्तरीय आत्म-सम्मान और निम्न स्तरीय डिप्रेशन का प्रदर्शन किया;

  – अपने स्कूल समुदाय से जुड़ाव की अधिक भावना का प्रदर्शन किया;

  – उच्च GPA (3.5 बनाम 3.2) का प्रदर्शन किया; और

  – माध्यमिक शिक्षा के बाद आगे की शिक्षा के लिए योजना बनाने की अधिक संभावना जताई (97.6% बनाम 93.8%)।

### समावेशी पाठ्यक्रम

हमने स्कूल के पाठ्यक्रम में LGBTQ विषयों को शामिल करने की भी जांच की। हमने पाया कि केवल एक चौथाई AAPI LGBTQ विद्यार्थियों (27.4%) को LGBTQ लोगों, इतिहास, या कार्यक्रमों के सकारात्मक प्रतिरूप के बारे में बताया गया था। इसके अलावा, हमने यह भी पाया कि जिन AAPI LGBTQ विद्यार्थियों को स्कूल के पाठ्यक्रम में LGBTQ समुदाय से जुड़े कुछ सकारात्मक पहलूओं को बताया गया था, उन्होंने:

- अपने लैंगिक-रुझान (16.8% बनाम 30.2%) और लिंग अभिव्यक्ति (19.4% बनाम 30.1%) के कारण असुरक्षित होने का अनुभव करने में कम संभावना जताई;
- स्कूल में सहपाठियों द्वारा LGBTQ लोगों को स्वीकार करने की अधिक संभावना जताई (76.4% बनाम 43.7%); और
- अपने स्कूल समुदाय में अधिक जुड़ाव का अनुभव किया।

हम पाठ्यक्रम समावेश के अन्य महत्वपूर्ण रूपों की जांच नहीं कर पाएं, जैसे कि अलग-अलग रंग वाले लोगों, और उनके इतिहास और समुदायों का सकारात्मक प्रतिरूप। इसके बावजूद, हमने पाया कि LGBTQ-समावेशी पाठ्यक्रम में शामिल वाले AAPI LGBTQ विद्यार्थियों में अपनी जाति या संजातीयता के कारण स्कूल में असुरक्षित होने का अनुभव करने की संभावना कम थी (22.5% बनाम 27.8%)।


## निष्कर्ष और सुझाव

AAPI LGBTQ विद्यार्थियों में उत्पीड़न, स्कूल की पक्षपाती कार्यप्रणालियों, और सहायक संसाधनों तक पहुंच से संबंधित अद्वितीय अनुभव है। इस रिपोर्ट के परिणाम बताते हैं कि AAPI LGBTQ विद्यार्थी संस्थागत और

AR_292905

पारस्परिक भेदभाव का अनुभव करते हैं। निष्कर्ष में स्कूल द्वारा दी जाने वाली सहायता और संसाधन जैसे तरीके भी सामने आए हैं, जैसे कि GSA और सहायक स्कूल कर्मचारी, AAPI LGBTQ विद्यार्थियों के स्कूल के अनुभवों पर सकारात्मक रूप से असर डाल सकते हैं। इन निष्कर्षों के आधार पर, हम सुझाव देते हैं कि स्कूल लीडर, शिक्षा नीति निर्माता, और AAPI LGBTQ विद्यार्थियों को सुरक्षित शिक्षण परिवेश देने की चाह रखने वाले अन्य व्यक्ति:

- GSA और जातीय/सांस्कृतिक संघ जैसे विद्यार्थी संघों का समर्थन करें। GSA और जातीय/सांस्कृतिक संघों के साथ कार्य करने वाले संगठन को AAPI LGBTQ विद्यार्थियों की उन आवश्यकताओं को पूरा करने के लिए काम करना चाहिए जो लैंगिक-रुझान, लिंग, और जाति/संजातीयता सहित उनकी कई अधिकारहीन पहचानों से संबंधित हैं.

- AAPI LGBTQ विद्यार्थी की समस्याओं के बारे में स्कूल के कर्मचारियों को पेशेवर सुधार की जानकारी दें।

- उन पाठ्यक्रम संसाधनों तक विद्यार्थी की पहुंच को बढ़ाएं जिनमें AAPI और LGBTQ, दोनों के लोगों, इतिहास और कार्यक्रमों के विविध और सकारात्मक प्रतिरूप शामिल हों।

- LGBTQ और जातीय विरोधी व्यवहार के संबंध में कर्मचारियों के लिए स्कूल नीतियों और दिशानिर्देशों को स्थापित करें, और विद्यार्थियों द्वारा उस उत्पीड़न की रिपोर्ट करने के लिए स्पष्ट और गोपनीय तरीके बनाएं जिनका वे अनुभव करते हैं।

- स्थानीय, राज्य और संघीय शिक्षा एजेंसियों द्वारा भी इन कार्यप्रणालियों और प्रक्रियाओं को स्थापित करने और लागू करने के लिए स्कूलों को जवाबदेह बनाया जाना चाहिए।

- सामान्य रूप से संस्थागत समर्थन और शिक्षा तक पहुंच बढ़ाने के लिए स्थानीय, राज्य और राष्ट्रीय स्तर पर वित्त पोषण में असमानताओं को संबोधित करने का कार्य करें, और शिक्षकों और स्कूल के परामर्शदाताओं के लिए अधिक पेशेवर विकास प्रदान करें।

ऐसे उपाय एक साथ मिलाकर करने से हम ऐसे भविष्य की ओर जा सकते हैं जिसमें लैंगिक-रुझान, लिंग पहचान, लिंग अभिव्यक्ति, जाति, या संजातीयता को नज़रअंदाज़ करते हुए सभी विद्यार्थियों को स्कूल में पढ़ने और सफल होने का अवसर मिलता है।

AR_292906

# Introduction

AR_292908

Asian American and Pacific Islander (AAPI)[1] elementary and secondary school students represent 5% of the U.S. population, yet they are often missing from policy discussions on bullying in schools.[2] In fact, national data on school victimization for AAPI are often missing or unavailable.[3] It may be that smaller racial/ethnic student populations, such as AAPI and Native American youth, are often overlooked because of population size. However, AAPI students may also be left out of school bullying conversations, in part, because of the model minority myth that AAPI students are innately intelligent and hardworking, and excel academically.[4] These stereotypes perpetuate fallacies, create social pressures for high achievement, and deny, downplay, or erase the racism and discrimination that AAPI students experience, and as a result, can be damaging to the student.[5] Prior studies, in fact, show that the incidence of racism from peers against AAPI elementary and secondary school students is common.[6] Another consequence of the model minority myth may be the false assumption that all AAPI youth are driven to excel academically and, thus, are somehow able to avoid experiences of bullying and harassment at school. This may lead educators and administrators to believe that, by focusing on their studies, AAPI youth are able to avoid situations that lead to bullying, and thus, they do not experience bullying in school.

Lesbian, gay, bisexual, transgender, and queer (LGBTQ) youth often face unique challenges related to their sexual orientation, gender identity, and gender expression, challenges which most of their non-LGBTQ peers do not face. GLSEN's *2017 National School Climate Survey* found that schools are often unsafe places for LGBTQ students.[7] LGBTQ youth often reported experiencing harassment, discrimination, and other troubling events in school, often specifically related to their sexual orientation, gender identity and/or how they express their gender,[8] including high levels of verbal and physical harassment and assault, sexual harassment, social exclusion and isolation, and other interpersonal problems with peers. In addition, many LGBTQ students did not have access to in-school resources that may improve school climate and students' experiences, such as Gender and Sexuality Alliances (GSAs), supportive educators, and supportive and inclusive school policies.

Although a growing body of research has focused on examining AAPI youth's school experiences

and LGBTQ youth's school experiences separately or uniquely, much less research has examined the school experiences of LGBTQ AAPI students. Research on LGBTQ youth of color in general has shown that schools nationwide are hostile environments for LGBTQ youth of color, where they experience victimization and discrimination based on race, sexual orientation, and gender identity, or all of the above simultaneously.[9] Because LGBTQ youth are not a monolithic population, some research has examined racial/ethnic group differences in school climate indicating that AAPI LGBTQ students tended to fare better than other groups, including lower levels anti-LGBTQ victimization, and school disciplinary action.[10] Nevertheless, it was still a common occurrence that AAPI LGBTQ students experience a hostile school climate. Therefore, it is important to highlight the experiences of AAPI LGBTQ students, and how school climate is related to their educational experiences and psychological well-being. In this report, we explore more deeply the school experiences of AAPI LGBTQ students.

Given that the majority of research on this population has examined AAPI youth and LGBTQ youth separately, we approach this report with an intersectional framework.[11] Where possible, we examine the school experiences of AAPI LGBTQ student's multiple intersecting marginalized identities (e.g., race, gender, sexual orientation) in relation to multiple interlocking systems of oppression (e.g., racism, transphobia, homophobia). For instance, the homophobic bias that an AAPI LGBTQ individual may experience is tied to their experiences of racism as an AAPI individual. Our focal point is on the school experiences of AAPI LGBTQ youth as a whole, with attention to also examining differences within AAPI LGBTQ youth. This report will not compare AAPI LGBTQ youth to other racial/ethnic LGBTQ groups.

This report is one of a series of reports on LGBTQ students of color, including Black, Latinx, and Native and Indigenous LGBTQ youth. In this report, we examine the experiences of AAPI LGBTQ students with regard to indicators of negative school climate, as well as supports and resources. In *Part One: Safety and Victimization at School*, we begin with examining AAPI LGBTQ students' feelings of safety at school due to their personal characteristics (race/ethnicity, sexual orientation, and gender identity/expression), experiences of racist and anti-LGBTQ victimization from

3

peers, as well as reporting racist and anti-LGBTQ victimization to school staff and staff responses to these reports, and family reporting and intervention as an additional form that impacts their school experiences. In *Part Two: School Practices*, we shift to AAPI LGBTQ students' experiences with school staff and practices, including experiences of school disciplinary action and its relation to anti-LGBTQ discriminatory school policies and practices, as well as school resources and supports for AAPI LGBTQ students, and club participation and leadership.

# Methods and Sample Description

AR_292911

AR_292912

## Methods

Data for this report came from GLSEN's *2017 National School Climate Survey (NSCS)*, a biennial survey of U.S. secondary school students who identify as LGBTQ. Participants completed an online survey about their experiences in school during the 2016-2017 school year, including hearing biased remarks, feelings of safety, experiencing harassment and assault, feeling comfortable at school, and experiencing anti-LGBTQ discriminatory school policies and practices. They were also asked about their academic achievement, attitudes about school, school involvement, and availability and impact of supportive school resources. Eligibility for participation in the survey included being at least 13 years of age, attending a K-12 school in the United States during the 2016-2017 school year, and identifying as lesbian, gay, bisexual, queer, or a sexual orientation other than heterosexual (e.g., pansexual, questioning) or being transgender or as having a gender identity that is not cisgender (e.g., genderqueer, nonbinary). For a full discussion of methods, refer to GLSEN's *2017 NSCS* report.[12]

The full sample for the *2017 NSCS* was 23,001 LGBTQ middle and high school students between 13 and 21 years old. In the survey, participants were asked how they identified their race/ethnicity, including "Asian or South Asian" and "Native Hawaiian or other Pacific Islander". Participants could check all that apply. The sample for this report consisted of any LGBTQ student in the national sample who identified as "Asian or South Asian" or "Native Hawaiian or other Pacific Islander" (henceforth referred to as Asian American and Pacific Islander), including those who only identified as AAPI, and those who identified as AAPI and one or more additional racial/ethnic identities (multiracial AAPI). It is important to note that the sample size of Pacific Islander LGBTQ students was too small to examine their school experiences alone. Therefore, LGBTQ students who identified as Pacific Islander were combined with those who identified as Asian. The final sample for this report was a total of 1,480 AAPI LGBTQ students.

## Sample Description

As seen in Table S.1, two-fifths (40.0%) of AAPI LGBTQ students in the sample identified as gay or lesbian, with just over a quarter (28.9%) identifying as bisexual and nearly one-fifth (19.8%) identifying as pansexual. Just over half (57.7%) identified as cisgender, nearly a quarter (22.1%) identified as transgender, and the remainder identified with another gender identity or were unsure of their gender identity. Among students who only identified as only AAPI, 91.7% identified as Asian or South Asian, and 13.7% identified as Pacific Islander or Native Hawaiian (see Table S.1). Just over half of the AAPI LGBTQ students in this report (56.0%) identified with one or more racial/ethnic identities in addition to AAPI, as described in Table S.1. For example, nearly half of respondents (45.9%) also identified as White. The majority of respondents were born in the U.S. (86.9%) and nearly all learned English as their first language, or as one of their first languages (91.1%). Additionally, just over half (54.5%) identified with no religion.

Students attended schools in all 50 states, the District of Columbia, Puerto Rico, Guam, American Samoa, and the Northern Mariana Islands. As seen in Table S.2, the majority of students attended high school (67.0%), the vast majority attended public school (87.7%), and just over half attended majority-White schools (56.5%).

AR_292913

## Table S.1. Demographic Characteristics of Survey Participants

**Sexual Orientation**[13] (n = 1474)

| | |
|---|---|
| Gay or Lesbian | 40.0% |
| Bisexual | 28.9% |
| Pansexual[14] | 19.8% |
| Queer | 4.0% |
| Asexual[15] | 2.7% |
| Another Sexual Orientation (e.g., fluid, heterosexual) | 3.9% |
| Questioning or Unsure | 3.3% |

**Race and Ethnicity**[16] (n = 1480)

| | |
|---|---|
| Asian or Pacific Islander Only | 44.0% |
| *Asian or South Asian* | *91.7%* |
| *Pacific Islander or Native Hawaiian* | *13.7%* |
| Multiple Racial/Ethnic Identities[17] | 56.0% |
| *White* | *45.9%* |
| *Native American, American Indian, or Alaska Native* | *7.8%* |
| *Black or African American* | *8.4%* |
| *Hispanic or Latino/Latina/Latinx* | *12.8%* |
| *Middle Eastern or Arab American* | *2.9%* |

**Immigration Status** (n = 1478)

| | |
|---|---|
| U.S. Citizen | 96.8% |
| *Born in the U.S. or a U.S. territory* | *86.9%* |
| *Born in another country*[18] | *9.9%* |
| U.S. Non-citizen | 3.1% |
| *Documented* | *2.8%* |
| *Undocumented* | *0.3%* |

**English Learned as First Language** (n = 1462) — 91.1%

**Average Age** (n = 1480) = 15.5 years

**Grade in School** (n = 1449)

| | |
|---|---|
| 6th | 1.2% |
| 7th | 7.5% |
| 8th | 14.4% |
| 9th | 20.2% |
| 10th | 23.4% |
| 11th | 21.7% |
| 12th | 11.5% |

**Gender**[19] (n = 1425)

| | |
|---|---|
| Cisgender | 57.7% |
| *Female* | *37.3%* |
| *Male* | *17.3%* |
| *Unspecified* | *3.1%* |
| Transgender | 22.1% |
| *Female* | *1.8%* |
| *Male* | *13.9%* |
| *Nonbinary (i.e., not identifying as male or female, or identifying as both male and female)* | *5.1%* |
| *Unspecified* | *1.3%* |
| Genderqueer | 11.2% |
| Another Nonbinary Identity (e.g., agender, genderfluid) | 7.3% |
| Questioning or Unsure | 1.8% |

**Religious Affiliation** (n = 1475)

| | |
|---|---|
| Christian (non-denominational) | 13.5% |
| Catholic | 10.6% |
| Protestant | 1.4% |
| Jewish | 1.2% |
| Buddhist | 6.2% |
| Muslim | 1.3% |
| Another Religion (e.g., Unitarian Universalist, Wiccan) | 11.3% |
| No Religion, Atheist, or Agnostic (and not affiliated with a religion listed above) | 54.5% |

**Received Educational Accommodations**[20] (n = 1466) — 23.6%

AR_292914

**Table S.2. Characteristics of Survey Participants' Schools**

| | | | | |
|---|---|---|---|---|
| **Grade Level** (n = 1474) | | | **School Type** (n = 1453) | |
| K through 12 School | 7.7% | | Public School | 87.7% |
| Lower School (elementary and middle grades) | 1.8% | | *Charter* | *5.3%* |
| | | | *Magnet* | *11.2%* |
| Middle School | 15.3% | | Religious-Affiliated School | 4.6% |
| Upper School (middle and high grades) | 8.2% | | Other Independent or Private School | 7.7% |
| High School | 67.0% | | | |
| | | | **Single-Sex School** (n = 1474) | 1.9% |
| **Region**[21] (n = 1472) | | | | |
| Northeast | 17.1% | | **School Locale** (n = 1452) | |
| South | 24.2% | | Urban | 27.7% |
| Midwest | 15.3% | | Suburban | 54.2% |
| West | 41.2% | | Rural or Small Town | 18.1% |
| U.S. Territories | 2.2% | | | |
| **School Racial Composition** (n = 1316) | | | | |
| Majority AAPI | 13.1% | | | |
| Majority White | 56.5% | | | |
| Majority Other Race | 18.6% | | | |
| No Majority Race | 11.8% | | | |

**9**

AR_292916

# Part One: Safety and Victimization at School

AR_292917

AR_292918

For AAPI LGBTQ youth, school can be an unsafe place. Our previous research indicates that the majority of LGBTQ students regularly hear biased language at school, and most experience some form of identity-based harassment or assault. These experiences may negatively impact students' academic outcomes, as well as their psychological well-being. Thus, we explored the reasons AAPI LGBTQ students feel unsafe at school, the types of biased language they hear, and both the extent and effects of in-school harassment and assault. Because school staff have a responsibility to intervene on such incidents of bias, we also examined AAPI LGBTQ students' rates of reporting their victimization to staff, and how school staff responded.

## Safety

We asked students if they ever felt unsafe at school due to any personal characteristics. As shown in Figure 1.1, the most common reason for AAPI LGBTQ students to feel unsafe was due to their actual or perceived sexual orientation (51.8%), followed by the way they express their gender, or how traditionally "masculine" or "feminine" they were in appearance or behavior (41.1%).[22] Additionally, just over a quarter of students (26.4%) felt unsafe due to their race or ethnicity. For some, feeling unsafe at school may even result in avoiding school altogether. When asked about absenteeism, over a quarter of AAPI LGBTQ students (27.6%) reported missing at least one day of school in the last month because they felt

**Figure 1.1 AAPI LGBTQ Students Who Felt Unsafe at School Because of Actual or Perceived Personal Characteristics**



13

AR_292919

unsafe or uncomfortable, and nearly one-tenth (8.4%) missed four or more days in the last month.

## Biased Remarks

AAPI LGBTQ students may feel unsafe at school, in part, because of homophobic, racist, or other types of biased language that they hear from their peers in classrooms or hallways. We asked students how often they heard anti-LGBTQ language from other students, including: the word "gay" being used in a negative way (such as "that's so gay" being used to call something "stupid" or "worthless"), other homophobic remarks (such as "faggot" and "dyke"), comments about students not acting "masculine" enough, comments about students not acting "feminine" enough, and negative remarks about transgender people (such as "tranny" or "he/she"). We also asked students how often they heard racist language from other students at school. As shown in Figure 1.2, the most common form of biased language was "gay" used in a negative way, followed by racist remarks. Nearly two-thirds of AAPI LGBTQ students heard "gay" used in a negative way often or frequently (61.9%), and just over half heard racist remarks often or frequently (52.7%). The next most common forms of biased remarks heard by AAPI LGBTQ students were other homophobic remarks and comments about not acting "masculine" enough (see also Figure 1.2).[23]

## Harassment and Assault

In addition to hearing biased language in hallways or classrooms, many students experience victimization at school, including verbal harassment (e.g., being called names or threatened), physical harassment (e.g., being shoved or pushed), and physical assault (e.g., being punched, kicked, or injured with a weapon). LGBTQ students who experience harassment or assault may feel excluded and disconnected from their school community, and may respond by avoiding school. This victimization may also have a negative impact on students' psychological well-being and academic success.[24] Therefore, we examined how often AAPI LGBTQ students experienced victimization in the past year based on their actual or perceived sexual orientation, the way they express their gender, and their actual or perceived race/ethnicity. We also examined whether victimization based on sexual orientation or based on race/ethnicity was associated with academic outcomes as well as key indicators of student well-being, including: educational aspirations, skipping school due to feeling unsafe, school belonging, and depression.

**Extent and effects of harassment and assault based on personal characteristics.** As shown in Figure 1.3, the majority of AAPI LGBTQ students experienced harassment and assault based on their race/ethnicity, sexual orientation and gender expression. Victimization based on their sexual orientation was most common, followed by victimization because of gender expression (see also Figure 1.3).[25]

We examined whether victimization at school due to sexual orientation and victimization due to race or ethnicity were associated with AAPI LGBTQ students' psychological well-being and



Figure 1.2 Frequency of Hearing Anti-LGBTQ and Racist Remarks in School

AR_292920

educational outcomes. We found that victimization based on sexual orientation was related to skipping school due to feeling unsafe, lower educational aspirations, lower levels of school belonging, and greater levels of depression.[26] For example, as seen in Figure 1.4, students were more than three times as likely to skip school because they felt unsafe if they experienced higher than average levels of victimization based on sexual orientation (57.5% vs. 16.9%). Similarly, we found that victimization based on race/ethnicity was related to skipping school due to feeling unsafe, lower levels of school belonging, and greater levels of depression (see Figure 1.5).[27] We did not, however, observe a relationship between victimization based on race/ethnicity and educational aspirations.

*Differences in victimization by transgender status.* Previous research, from GLSEN, as well as other scholars, has demonstrated that transgender and other gender nonconforming (trans/GNC) students experience greater levels of anti-LGBTQ victimization and harassment than cisgender LGBQ students.[28] We found this to be true for AAPI LGBTQ students as well. Specifically, we found that trans/GNC AAPI students experienced greater levels of victimization based on sexual orientation and gender expression than their cisgender LGBQ AAPI peers (see Figure 1.6), but they did not differ on victimization based on race/ethnicity (see also Figure 1.6).[29] Given that the general population tends to hold less favorable views of transgender people than of gay and lesbian people,[30] trans/ GNC AAPI students may be greater targets for anti-LGBTQ victimization.

*Differences in victimization by multiple racial/ ethnic identities.* For multiracial students, their own racial/ethnic identification or how they are identified by their peers in terms of their race/ ethnicity may vary based on context.[31] Because they do not belong to any single racial/ethnic group, these students may face greater levels of social exclusion that may result in increased risks for peer victimization.[32] Thus, we examined whether AAPI LGBTQ students who endorsed multiple racial/ethnic identities differed from those who identified only as AAPI with regard to their experiences of victimization. We found that multiracial AAPI LGBTQ students experienced greater levels of victimization based on sexual

**Figure 1.3 Percentage of AAPI LGBTQ Students Who Experienced Victimization Based on Personal Characteristics**



**Figure 1.4 Victimization Based on Sexual Orientation and AAPI LGBTQ Student Well-Being and Academic Outcomes**



15

orientation and based on gender expression than LGBTQ students who identified only as AAPI (see Figure 1.7).[33]

We did not find that multiracial AAPI LGBTQ students, overall, experienced different levels of race-based harassment than those who only identified as AAPI. However, we did find differences when we considered the racial composition of the school. In majority AAPI schools, multiracial AAPI LGBTQ students experienced a higher severity of racist victimization than LGBTQ students who only identified as AAPI. However in all other school compositions — majority White, majority other non-White race, and no majority race schools — LGBTQ students who only identified as AAPI experienced higher

severity of racist victimization than multiracial AAPI students.[34] It is possible that multiracial AAPI students are more likely to be targeted for victimization in AAPI majority schools because of their other racial/ethnic identities, whereas students who only identify as AAPI may be more targeted for victimization in schools where they are not a racial majority. Further research is warranted to explore other possible connections between multiracial/multiethnic identity and different forms of victimization among students of color.

**Experiencing multiple forms of victimization.** Thus far in this section, we have discussed AAPI LGBTQ students' in-school experiences of victimization based on sexual orientation, on gender expression, and on race/ethnicity independently. However,

**Figure 1.5 Victimization Based on Race/Ethnicity and AAPI LGBTQ Student Well-Being and Academic Outcomes**



- Planning to Graduate High School: 99.1%, 98.0%
- Missed School in the Past Month: 18.4%, 35.5%
- School Belonging (Above Average Levels): 63.4%, 39.7%
- Depression (Above Average Levels): 38.5%, 59.4%

Lower than Average Levels of Victimization    Higher than Average Levels of Victimization

**Figure 1.6 Differences in Level of Victimization by Trans/GNC Status**
(Percentage of AAPI LGBTQ Students Experiencing Higher than Average Levels of Victimization)



- Victimization Based on Sexual Orientation: 20.0%, 34.4%
- Victimization Based on Gender Expression: 14.9%, 43.0%
- Victimization Based on Race/Ethnicity: 53.7%, 53.3%

Cisgender LGBQ AAPI Students    Trans/GNC AAPI Students

AR_292922

many AAPI LGBTQ students experience victimization that targets both their LGBTQ and their racial/ethnic identities. In fact, two-fifths of AAPI LGBTQ students in our study (40.0%) experienced harassment or assault based on both their sexual orientation and their race/ethnicity.[35] Previously in this report, we reported that both

types of victimization separately were related to skipping school due to feeling unsafe, lower school belonging, and greater levels of depression. However, it is important to understand how these outcomes are associated with experiencing multiple forms of harassment. Therefore, we examined the combined effects of race-based



**Figure 1.7 Differences in Level of Victimization by Multiple Racial/Ethnic Identities**
(Percentage of AAPI LGBTQ Students Experiencing Higher than Average Levels of Victimization)



**Figure 1.8 AAPI LGBTQ Student Well-Being and Multiple Forms of Victimization Based on Sexual Orientation and Race/Ethnicity**

**17**

and homophobic victimization on missing school, school belonging, and depression. We found that students who experienced both homophobic and racist victimization were the most likely to skip school due to feeling unsafe,[36] experienced the lowest levels of school belonging,[37] and experienced the highest levels of depression,[38] as compared to those who experienced only one form of victimization or neither (see Figure 1.8).

In that AAPI LGBTQ students likely have a longer history with experiencing victimization based on their race/ethnicity than their LGBTQ identity, it is possible that these experiences of race-based victimization may equip AAPI LGBTQ students with skills to navigate other types of victimization, such as anti-LGBTQ victimization, and provide a buffer against the psychological harms of these additional forms of victimization.[39] Thus, we also examined how the experience of racist victimization might alter the effect of homophobic victimization on school outcomes and well-being. We found that the effects of victimization on school belonging and depression were more pronounced if students only experienced one form of victimization.[40] For example, the negative effect of homophobic victimization on depression was strongest among AAPI LGBTQ students who experienced higher levels of homophobic victimization and lower levels of racist victimization. Thus, the findings suggest that an AAPI LGBTQ student who has early and possibly ongoing experiences of racist victimization may be better equipped to respond to subsequent victimization, including harassment based on their sexual orientation.[41] We did not find this same effect with regard to missing school, however. More investigation is warranted to further understand the impacts of multiple forms of victimization, although it remains clear that experiencing additional forms of victimization means experiencing additional harm, and AAPI LGBTQ students who experienced victimization targeting both their race/ethnicity and sexual orientation experienced the poorest outcomes.

## Reporting School-Based Harassment and Assault

GLSEN advocates for clear guidelines for school staff on anti-bullying and harassment incidents, and for staff to be trained in effectively responding to victimization incidents. We asked AAPI LGBTQ students who had experienced harassment or

assault in the past school year how often they had reported the incidents to school staff, and found that the majority of students (56.5%) never reported victimization to staff (see Figure 1.9). Less than 1 in 5 students (17.1%) reported victimization to staff "most of time" or "always."

AAPI LGBTQ students who indicated that they had not always told school personnel about their experiences with harassment or assault were asked why they did not always do so. The most common reason for not reporting victimization to staff was that they did not think that staff would do anything about it (67.4%).

We asked LGBTQ students who had reported incidents to school staff about the actions that staff had taken in response to the reported incident. The most common staff responses to students' reports of harassment and assault was talking to the perpetrator/telling the perpetrator to stop (42.3%), followed by telling the student to ignore it (40.8%), and doing nothing/taking no action (34.3%). Thus, AAPI LGBTQ students may be justified in thinking that staff may not address the victimization they experience. Furthermore, nearly half of students (44.9%) reported that staff responded ineffectively to their reports of victimization. We also found that the only common response that could be considered appropriate or effective was talking to the perpetrator/telling the perpetrator to stop.[42]



**Figure 1.9 Frequency of AAPI LGBTQ Students Reporting Incidents of Harassment and Assault to School Staff** (n=687)

Some of the Time 26.4%

Most of the Time 10.5%

Always 6.6%

Never 56.5%

AR_292924

# Insight on Family Reporting and Intervention

Family support has been shown to improve educational opportunities and academic success for marginalized groups, such as students with disabilities and students of color.[43] However, little is known about factors that contribute to family support, particularly for AAPI LGBTQ students. Prior studies have focused on AAPI parents' involvement in their children's academic achievement.[44] In part, this may be because education research regarding parental involvement in general, regardless of the students' race/ethnicity, has typically examined the relationship between parental involvement and academic achievement.[45] Therefore, relatively less attention has been paid to non-educational outcomes in the school lives of AAPI youth, including family support for AAPI students with regard to bullying. In this section, we examined family intervention in response to their child's victimization at school, and conditions that promote family intervention for AAPI LGBTQ students.

**Reporting Victimization to Family.** Given that family members may be able to intervene when incidents of victimization occur, we asked students in our survey if they reported harassment or assault to a family member. Less than half of AAPI LGBTQ students (43.5%) said that they had ever told a family member about the victimization they faced at school. When LGBTQ students experience victimization at school, they may be hesitant to tell family members if they are not out to them. We found that students who were out as LGBTQ to at least one family member were more likely to tell their families about the victimization they were experiencing at school, but it remained only slightly more than half (52.3% of those out to family vs. 32.0% of those not out).[46]

**Family Intervention.** Among AAPI LGBTQ students who reported victimization experiences to a family member, half (50.5%) reported that a family member talked to their teacher, principal or other school staff about the harassment or assault they experienced (see Figure).



**Frequency of Intervention by AAPI LGBTQ Students' Family Members** (n = 687)

Some of the Time 28.7%
Most of the Time 10.6%
Always 11.2%
Never 49.5%

Certain factors may increase the likelihood that family members intervene on behalf of the student with the school. Family members may be more likely to intervene when the student experiences a high severity of victimization. Further, family members of students with disabilities or educational accommodations may be more likely to be involved in the student's general school life and thus, more likely to intervene when that student is victimized in school. In fact, we found that family members of AAPI LGBTQ students were more likely to talk to staff about victimization when the student had experienced higher levels of victimization based on gender expression (54.5% vs. 45.2%).[47] However, victimization based on sexual orientation and victimization based on race/ethnicity were not related to family members talking to staff about victimization. We also found that AAPI LGBTQ students who had a disability were more likely to report that their family members talked to staff about their victimization, compared to AAPI LGBTQ students who did not have a disability (54.4% vs. 44.6%).[48] Receiving educational accommodation services was not related to family members talking to staff about victimization.

**Conclusions.** We found that many AAPI LGBTQ students who experienced victimization in school reported victimization to their family members and many family members talked to staff about victimization experiences. Certain conditions at school make it more likely for family members of AAPI LGBTQ students to intervene, such as when there is a more hostile school climate and when their child has a disability. It is interesting to note that family members of AAPI LGBTQ students were more likely to intervene when the student experienced higher levels of victimization based on gender expression, but this was not the case for victimization based on sexual orientation and victimization based on race/ethnicity. Further research is warranted to explore connections between different forms of victimization and family intervention among AAPI LGBTQ students. Finally, findings from our data show whether family members intervene, but not how effective their interventions are. Thus, it is critical for research to assess the effectiveness of family intervention efforts in improving school climate.

AR_292925

## Conclusions

The majority of AAPI LGBTQ students experienced anti-LGBTQ and racist victimization, and these forms of victimization may result in poorer academic outcomes and student well-being. In fact, those who experienced both of these forms of victimization had the most adverse outcomes with regard to skipping school due to feeling unsafe, school belonging, and depression. Thus, it is important that educators be particularly attentive to the needs of students who lie at the intersection of multiple forms of bias. Unfortunately, we also found that the majority of AAPI LGBTQ students who experienced victimization at school never reported these experiences to staff. Further, for those who did report their victimization to staff, the second most common staff response was telling the student to ignore the incident. Thus, it is critical that schools implement clear and confidential pathways for students to report incidents of bias that they experience, and that educators and other school staff receive training to understand how to intervene effectively on both anti-LGBTQ and racist victimization.

AR_292926

# Part Two:
# School Practices

AR_292927

AR_292928

Schools have a responsibility to promote positive learning for all students, including AAPI LGBTQ students. The availability of resources and supports in school for AAPI LGBTQ students is another important dimension of school climate. There are several key resources that may help to promote a safer climate and more positive school experiences for students: student clubs that address issues for LGBTQ students; school personnel who are supportive of LGBTQ students; and LGBTQ-inclusive curricular materials. However, our previous research has found that many LGBTQ students do not have such supports available in their schools.[49] In addition, schools also often have disciplinary practices that contribute to a hostile school climate. Thus, in this section, we examined school practices, and their impact on the educational outcomes and well-being of AAPI LGBTQ students. Specifically, we examined AAPI LGBTQ students' experiences of school disciplinary action, as well as the availability and utility of specific supports and resources that may uniquely impact AAPI LGBTQ students in ways that differ from the general LGBTQ student population, including student clubs that address LGBTQ and ethnic/cultural issues, school personnel, and LGBTQ-inclusive curriculum.

## Experiences with School Discipline

The use of harsh and exclusionary discipline, such as zero tolerance policies, has contributed to higher dropout rates as well as reliance on alternative educational settings, where educational supports and opportunities may be less available.[50] Prior research shows that school disciplinary policies and practices disproportionately targets LGBTQ students,[51] and may have serious academic consequences for these students. School discipline can also be directly connected to greater time out of school and even a greater likelihood in juvenile justice system involvement. We examined three categories of school disciplinary action: in-school discipline (including referral to the principal, detention, and in-school suspension), out-of-school discipline (including out-of-school suspension and expulsion), and having had contact with the criminal justice or juvenile justice system as a result of school discipline, such as being arrested and serving time in a detention facility. As shown in Figure 2.1, nearly a third of AAPI LGBTQ students (30.7%) reported having ever been disciplined at school. Students most commonly reported in-school discipline, and fewer students received out-of-school suspension and expulsion.

**Figure 2.1 Percentage of AAPI LGBTQ Students Who Experienced School Discipline**



AR_292929

A small percentage of students (1.4%) had had contact with the criminal justice or juvenile justice system.

**Impact of victimization and safety on school discipline.** Several factors may be associated with LGBTQ students' school disciplinary experiences, including those stemming from unsafe or discriminatory school environments. As we found in GLSEN's *2017 National School Climate Survey*, LGBTQ students are often disciplined when they are, in fact, the victim of harassment or assault. We found that AAPI LGBTQ students who experienced greater levels of victimization based on sexual orientation, gender expression, and race/ethnicity were more likely to experience all three forms of school discipline (in-school discipline, out-of-school discipline, and contact with law enforcement).[52]

LGBTQ students who are victimized at school may also miss school because they feel unsafe, and thus, face potential disciplinary consequences for truancy. We found that AAPI LGBTQ students who missed more days of school were more likely to experience all three forms of discipline (in-school, out-of-school, and contact with law enforcement).[53] For instance, as shown in Figure 2.2, just over two-fifths of AAPI LGBTQ students (42.8%) who missed school in the past month because they felt unsafe experienced some form of in-school discipline, compared to a quarter of students (24.5%) who did not miss school.

**Impact of discriminatory school policies and practices on school discipline.** Schools often employ anti-LGBTQ discriminatory practices, which may lead to more disciplinary action against LGBTQ students. In our survey, we asked LGBTQ students about a number of specific LGBTQ-related discriminatory school policies and practices at their school that they may have personally experienced, such as being disciplined for expressing public displays of affection, prevented from starting a GSA, and gender-related discrimination (e.g., prevented from using the bathroom or locker room that aligns with their gender, prevented from using their chosen name or pronouns). Half of AAPI LGBTQ students (50.0%) experienced discriminatory school policies and practices.

We examined how anti-LGBTQ discriminatory school policies and practices were associated with school disciplinary action. As illustrated in Figure 2.3, we found that AAPI LGBTQ students who experienced discrimination in school were more likely to experience both in-school and out-of-school-discipline than AAPI LGBTQ students who did not experience discrimination, but did not find any differences with regard to contact with law enforcement.[54]

**Differences in school discipline by transgender status.** Previous research from GLSEN has demonstrated that, in general, transgender and other gender nonconforming (trans/GNC) students experience higher rates of in-school discipline and



**Figure 2.2 Experiences of School Discipline by Missing School Because of Feeling Unsafe**
(Percentage of AAPI LGBTQ Students Who Experienced School Discipline)

AR_292930

out-of-school discipline, compared to cisgender LGBQ students.[55] We also found this to be true for AAPI LGBTQ students. Trans/GNC AAPI students were more likely to experience in-school discipline and out-of-school discipline than cisgender LGBQ AAPI students.[56] However, trans/GNC AAPI students did not differ with regard to contact with law enforcement.

Given our previous finding that trans/GNC AAPI students experienced greater levels of anti-LGBTQ victimization and that they are more likely to experience in-school and out-of-school discipline than cisgender LGBQ AAPI students, we examined whether anti-LGBTQ victimization played a role on the relationships between trans/GNC status and in-school and out-of-school discipline. We found that trans/GNC AAPI students experienced greater levels of anti-LGBTQ victimization than their cisgender LGBQ AAPI peers, and in turn, they were more likely to experience in-school and out-of-school discipline.[57]

**Differences in school discipline by multiple racial/ethnic identities.** Prior research has found that among secondary school students, students who identify as two or more racial/ethnic identities are at greater risk for school disciplinary action than other racial/ethnic groups.[58] Thus, we examined whether AAPI LGBTQ students who endorsed multiple racial/ethnic identities differed from those who only identified as AAPI with regard to their experiences with school disciplinary action. We found that multiracial AAPI LGBTQ students were more likely to experience all three forms of school discipline, including in-school discipline (34.6% vs. 23.0%), out-of-school discipline (5.9% vs. 3.1%), and contact with law enforcement (2.2% vs. 0.3%), than AAPI LGBTQ students who identified only as AAPI.[59] Further research is warranted to explore the possible connections between multiracial/multiethnic identity and school discipline among students of color.

**Impact of school discipline on educational outcomes.** School disciplinary action may impinge on a student's educational success. Exclusionary school disciplinary practices, those that remove students from the classroom, may lead to poorer grades and a diminished desire to continue on with school. In fact, we found that AAPI LGBTQ students' experiences with in-school discipline, out-of-school discipline, and contact with law enforcement were related to lower likelihood to plan on pursuing post-secondary education,[60] and lower grade point average (GPA)[61] than those who did not experience in-school discipline, out-of-school discipline and contact with law enforcement.

## School-Based Supports and Resources for AAPI LGBTQ Students

In our *2017 National School Climate Survey* report, we demonstrated the positive impact of LGBTQ-related school resources and supports on educational outcomes and well-being for LGBTQ secondary school students in general. Unfortunately, we also found that many LGBTQ



**Figure 2.3 Experiences of School Discipline by Anti LGBTQ Discrimination**
(Percentage of AAPI LGBTQ Students Who Experienced School Discipline)

students did not have access to these types of resources in school. Thus, in this section, we examined the availability and utility of school supports, including LGBTQ-related school supports as well as student-led ethnic/cultural clubs, for AAPI LGBTQ students. It is important to note that for institutional supports, including the presence of GSAs and ethnic/cultural clubs, school characteristics may be related to their availability, such as region, locale, school racial composition, and school size. Other school supports, such as having educators and administrators who are supportive of LGBTQ students, may differ based on the identities of AAPI LGBTQ students. For example, a student's AAPI or LGBTQ identities may not be related to whether they have a GSA or an ethnic/cultural club, but they may be related to how supportive their teachers are. Yet, one's racial/ethnic identities may be related to the types of schools one attends or has access to (e.g., school racial composition, region, locale), and schools then vary in the availability of LGBTQ-related institutional supports (see GLSEN's *2017 National School Climate Survey* report for full discussion of school characteristics and the availability of supports). Therefore, we also examined how the availability of these supports may be related to various demographic and school characteristics, such as school location and student body racial composition.

**GSAs.** GSAs, often known as Gay-Straight Alliances or Gender and Sexuality Alliances, are student-led clubs that address LGBTQ student issues and can be supportive spaces for LGBTQ students.



**Figure 2.4 Availability of GSAs and Ethnic/Cultural Clubs**
(Percentage of AAPI LGBTQ Students Who Reported Having Club at Their School)

The presence of GSAs, regardless of participation in them, can provide LGBTQ students with a safe and affirming space within a school environment that may be hostile. Nearly two-thirds of AAPI LGBTQ students (63.5%) reported having a GSA at their school (see Figure 2.4). While our findings show that just over a third of AAPI LGBTQ students (36.5%) do not have access to a GSA, the percentage of AAPI LGBTQ students who have access to a GSA is still higher than the national percentage for LGBTQ students, based on the *2017 National School Climate Survey*.[62] Further research is warranted to explore possible school-level characteristics that may contribute to differences in access to GSAs for AAPI LGBTQ students, compared to LGBTQ students nationally.

We also examined whether school characteristics, including school racial composition, locale (urban, suburban, rural), region (Northwest, South, Midwest, West), and school size were related to the availability of GSAs. With regard to locale, AAPI LGBTQ students in suburban schools were most likely and rural schools were least likely to have a GSA at their school.[63] Regarding region, AAPI LGBTQ students who attended schools in the South were the least likely to have a GSA, and those attending schools in the West were more likely to have a GSA than those in the Midwest.[64] Finally, regarding size of the school population, AAPI LGBTQ students who attended larger schools were more likely to have a GSA at their school.[65] School racial composition was not related to GSA availability.[66]

GSAs and other similar student clubs can provide a safe and inclusive school environment for LGBTQ students and their allies to meet, socialize, and advocate for change in their school communities.[67] Thus, students who have a GSA may feel more connected to school and may be less likely to miss school because they have supportive groups for LGBTQ students. Also, in that GSAs can often effect change in schools for a safer environment for LGBTQ students, LGBTQ students with a GSA may be less likely to feel unsafe at school and feel a greater sense of belonging to the school community. AAPI LGBTQ students with a GSA at their school were less likely to miss school due to safety concerns (22.4% vs. 36.9%), and felt more connected to their school community than those who did not have a GSA.[68] AAPI LGBTQ students who had a GSA at their school were also less likely to feel unsafe because of their sexual orientation

AR_292932

(45.6% vs. 62.3%) and gender expression (38.6% vs. 45.4%).[69] There was, however, no relationship with feeling unsafe because of race/ethnicity.

**Ethnic/cultural clubs.** Ethnic/cultural clubs that bring together students of a particular racial, ethnic, and/or cultural background can offer a supportive space in school for those students. As such, the presence of these clubs, regardless of participation in them, may offer AAPI LGBTQ youth a network of peer support with other AAPI youth that may be more difficult to find in the general student population. Three-quarters of AAPI LGBTQ students (74.6%) reported that their school had an ethnic or cultural club at their school (see Figure 2.4). We also found that certain school characteristics were related to the availability of ethnic/cultural clubs.

Regarding school racial composition, the availability of ethnic/cultural clubs was greater in majority-AAPI schools than in majority-White schools.[70] Given that the AAPI population is ethnically and culturally diverse, AAPI LGBTQ students in majority-AAPI schools may be more likely to have ethnic/cultural clubs than AAPI LGBTQ students in majority-White schools because majority-AAPI schools have a larger pool of AAPI ethnic subgroups.

Regarding region, AAPI LGBTQ students who attended schools in the West were more likely to have an ethnic/cultural club than those who attended schools in the South and Northeast.[71] This may be, in part, because majority-AAPI schools were more likely to be in the West than in other regions.[72]

Regarding locale, AAPI LGBTQ students who attended rural schools were less likely to have an ethnic/cultural club than those who attended urban and suburban schools.[73] Regarding size of the school population, AAPI LGBTQ students who attended larger schools were more likely to have an ethnic/cultural club at their school.[74]

Schools with ethnic/cultural clubs may afford AAPI LGBTQ students the opportunity to network with other AAPI students. Further, similar to GSAs, regardless of participation, ethnic/cultural clubs may indicate to the LGBTQ AAPI student that the school is a welcoming and supportive place for them. We, in fact, found that AAPI LGBTQ students who had an ethnic/cultural club at their school felt safer due to their race/ethnicity, and had greater feelings of school belonging.[75]

27

AR_292933

# Insight on Club Participation and Leadership

As discussed in this report, having a GSA or ethnic/cultural club at school is associated with several benefits for AAPI LGBTQ students, regardless of whether one participates in these clubs. However, it is also important to examine participation in these types of clubs and the possible benefits of participating for AAPI LGBTQ students. Prior research has demonstrated that participation in GSAs may mitigate some of the harmful effects of anti-LGBTQ victimization.[76] However, some research on AAPI gay cis male youth indicates that these youth may have negative perceptions of GSA participation, including a fear of being targeted for discrimination.[77] There is also evidence that ethnic/cultural clubs may provide a means of cultural validation for students of color.[78] However, there has been little research on the benefits of participation in these clubs for LGBTQ students of color. Thus, we examined the effects of participation on student well-being. Also, given that GSAs and ethnic/cultural clubs may encourage students to work toward social and political change,[79] we examined the relationship between club participation and civic engagement.

**GSA Participation.** As previously noted, nearly two-thirds of AAPI LGBTQ students (63.5%) had a GSA or similar club at their school. As shown in the figure, the majority of AAPI LGBTQ students with a GSA participated in the club (57.7%). Given the prior research indicating that AAPI LGBTQ youth may be hesitant to participate in GSAs, it is possible that certain school characteristics may be related to their participation in GSAs, such as school racial composition. However, no differences in GSA participation were found by racial composition of the school that AAPI LGBTQ students attend.[80] Participation in GSAs may also differ by demographic characteristics of AAPI LGBTQ students, specifically race/ethnicity (multiracial vs. AAPI only) and immigration status, but we found no significant differences in this regard.[81]

**Participation in GSAs and Ethnic/Cultural Clubs**



Given that GSAs may offer AAPI LGBTQ youth a network of support at school, we examined whether GSA members felt an increased sense of school belonging, but did not observe a significant relationship.[82] However, we did find that GSAs may offer students opportunities and build skills to work towards more LGBTQ-inclusive schools and communities. For example, we found that AAPI LGBTQ students who led their GSAs and other GSA members felt more comfortable bringing up LGBTQ issues in class than those who were not part of their GSA.[83] We also found that GSA members were more likely than those who did not attend meetings to participate in a GLSEN Day of Action (such as Day of Silence)[84] or in a rally, protest, or demonstration for a cause, with GSA leaders being most likely to take part in either of these activities.[85] Moreover, GSA leaders were also more likely than those not involved in their GSA, to participate in a boycott against a company, and contact politicians, governments, or authorities about issues that are important to them.[86] Finally, we found that GSA members were more likely than those who did not attend meetings to participate in an event where people express their political views (such as a poetry slam or youth forum), volunteer to campaign for a political cause or candidate, and express views about politics or social issues on social media, with no differences between leader and non-leader GSA members.[87]

AAPI LGBTQ students who participate in GSAs may also face challenges at school regarding their LGBTQ identity. We found that GSA leaders experienced greater levels of victimization due to sexual orientation and gender expression than GSA non-leaders and those not involved in their GSA.[88] However, there were no differences between GSA non-leader members and those not involved in their GSA. It could be that greater levels of anti-LGBTQ harassment compel AAPI LGBTQ students to lead their school's GSA and take action toward making school safer for themselves and for other LGBTQ students. It may also be that GSA leaders are more visible as LGBTQ and, thus, more likely to be targeted for anti-LGBTQ victimization than GSA non-leaders and those not involved in their GSA.

**Ethnic/Cultural Club Participation.** As previously noted, a majority of AAPI LGBTQ students (74.8%) had an ethnic/cultural club at their school; however, only 16.4% of those with such a club attended meetings, with 3.2% who participated as an officer or a leader (see Figure). Although the percentage of those

AR_292934

participating in these clubs may seem low, it is important to note that some may have an ethnic/cultural club at their school for an ethnic or cultural community with which they do not identify.

Given that we previously found that AAPI LGBTQ students had more access to ethnic/cultural clubs in majority AAPI schools than in majority White schools, the racial composition of the school that AAPI LGBTQ students attend may also play a role in their participation in these clubs. However, we did not find differences in ethnic/cultural club participation by school racial composition.[89]

We did find demographic differences in ethnic/cultural club attendance and leadership, specifically with immigration status. AAPI LGBTQ students who were born in another country were more likely to participate as leaders in ethnic/cultural clubs than those who were born in the US.[90] However, multiracial AAPI LGBTQ students and those who only identify as AAPI did not differ on ethnic/cultural club attendance and leadership.[91]

Ethnic/cultural clubs may create a space for students of a particular racial, ethnic, or cultural background to meet, offering a network of peer support with other AAPI LGBTQ youth at school. However, we found no differences in sense of school belonging between those who had and had not attended ethnic/cultural clubs.[92] One possible explanation is that participation in ethnic/cultural clubs may foster a greater sense of school belonging for AAPI LGBTQ students when they attend AAPI majority schools compared to non-AAPI majority schools. However, we did not find any differences in school belonging by ethnic club participation when we considered the racial composition of the school.[93]

We found that involvement in the school's ethnic/cultural club was related to engagement in the various forms of activism discussed above with regard to GSA involvement. AAPI LGBTQ students who attended meetings at their ethnic/cultural club were more likely to participate in all forms of activism than those who did not attend meetings, except for a GLSEN Day of Action.[94] However, ethnic/cultural club leaders did not differ from non-leaders in these activities. This suggest that ethnic/cultural club membership itself may be associated with greater civic engagement, regardless of the level of club participation.

It is possible that AAPI LGBTQ student are more likely to participate in an ethnic/cultural club when they experience more racial victimization at school and have a greater need for support. However, we found that AAPI LGBTQ students who attended an ethnic/cultural club did not differ from those who did not attend meetings on experiencing race-based victimization.[95]

**Conclusions**. GSA and ethnic/cultural club participation were both associated with positive outcomes for AAPI LGBTQ students. For instance, participation in GSAs and ethnic/cultural clubs were both associated with greater levels of civic engagement. Future research is warranted regarding GSA and ethnic/cultural club activities that may promote political action and advocacy efforts among club members.

Our findings also suggest that having an ethnic/cultural club may be especially important for AAPI LGBTQ students who were born in another country, given their higher rates of ethnic/cultural club participation. It may be that AAPI LGBTQ students who were born in another country are more interested in participating in ethnic/cultural clubs because these students may already feel more connected to their cultural heritage, and participating in these clubs may be a way for them to maintain these ties.

It is interesting to note that GSA and ethnic/cultural club participation were not related to feelings of school belonging, but having access to them were, as discussed elsewhere in this report. This suggests that for AAPI LGBTQ students in general, it may simply be the presence of a GSA and ethnic/cultural club at their school that signals to these students that their school is a supportive place for them.

Finally, we found that AAPI LGBTQ students who led their GSAs experienced greater levels of anti-LGBTQ victimization, although ethnic/cultural club participation was not related to racist victimization. It may be that attending a GSA brings visibility to one's actual or perceived LGBTQ status, whereas the same would not be true for attending an ethnic/cultural club. However, it is unclear whether heightened visibility among students who lead their GSA leads to greater levels of victimization, or whether greater levels of victimization lead students to lead their GSAs. Further research is needed to examine the nature of this relationship, the reasons that compel LGBTQ students to participate in GSAs, and the impact of GSA leadership.

**Supportive school personnel.** Previous research has established that for LGBTQ students in general, having supportive teachers, principals, and other school staff and administration has benefits for educational and psychological outcomes. However, educators who are supportive of LGBTQ students may vary in their ability to respond to the needs of youth of color.[96] For AAPI LGBTQ students, having such supports may be especially beneficial because they may experience victimization or discrimination that targets their multiple identities, and because they may receive less support in general because of both their race/ethnicity and LGBTQ identity. In our survey, we asked about how many school staff are supportive of LGBTQ students, and how supportive administrators are of LGBTQ students. Similar to our findings on LGBTQ students in general from the *2017 National School Climate Survey* report, the vast majority of AAPI LGBTQ students (97.2%) could identify at least one supportive staff member at school. However, only about half (48.5%) reported having 11 or more supportive staff (see Figure 2.5). Furthermore, only about half of AAPI LGBTQ students (49.2%) reported having somewhat or very supportive school administration (see Figure 2.6). It is possible that multiracial AAPI LGBTQ students may be treated differently by educators and administrators than those who only identify as AAPI. In fact, we found that multiracial AAPI LGBTQ students reported having fewer supportive staff and a lower level of support from administrators than students who identified only as AAPI.[97] This may be due to differences in educator and administrator attitudes toward various racial/ethnic groups.

Given that AAPI LGBTQ students often feel unsafe and unwelcome in school, as discussed earlier in this report, having access to supportive school personnel may be critical for creating better learning environments for AAPI LGBTQ students. Therefore, we examined the relationships between the presence of staff who are supportive of LGBTQ students and several indicators of school climate, including: absenteeism, feeling unsafe because of personal characteristics, psychological well-being, feelings of school belonging, academic achievement, and educational aspirations.

As illustrated in Figure 2.7, AAPI LGBTQ students who had more staff who were supportive of LGBTQ students:

- had increased feelings of connectedness to their school community;

- had higher levels of self-esteem; and

- had lower levels of depression.[98]

In addition, AAPI LGBTQ students who had more staff who were supportive of LGBTQ students:

- were less likely to miss school due to safety concerns (e.g., 15.3% with 11 or more supportive staff reported missing at least one day of school in the past month vs. 41.5% with no supportive staff);

- were less likely to feel unsafe because of their sexual orientation (e.g., 40.6% with 11 or more supportive staff reported feeling unsafe



**Figure 2.5 AAPI LGBTQ Students' Reports on the Number of Teachers and Other School Staff Who are Supportive of LGBTQ Students**

None 2.8%
One 4.3%
11 or More 48.5%
Between 2 and 5 25.4%
Between 6 and 10 19.0%



**Figure 2.6 AAPI LGBTQ Students' Reports on How Supportive Their School Administration is of LGBTQ Students**

Very Unsupportive 7.5%
Very Supportive 23.4%
Somewhat Unsupportive 12.9%
Somewhat Supportive 25.8%
Neutral 30.3%

AR_292936

because of their sexual orientation vs. 70.7% with no supportive staff);

- were less likely to feel unsafe because of their gender expression (e.g., 33.9% with 11 or more supportive staff reported feeling unsafe because of their gender expression vs. 43.9% with no supportive staff);

- were less likely to feel unsafe because of their race/ethnicity (e.g., 20.8% with 11 or more supportive staff reported feeling unsafe because of their race/ethnicity vs. 29.3% with no supportive staff);

- had higher GPAs (e.g., average GPA of 3.5 with 11 or more supportive staff vs. 3.2 with no supportive staff);[99] and

- had greater educational aspirations (e.g., 97.6% with 11 or more supportive staff planning to pursue post-secondary education vs. 93.8% with no supportive staff).[100]



Figure 2.7 Supportive School Staff and Well-Being and School Belonging

School Belonging (Above Average Levels)

Self-Esteem (Above Average Levels)

Depression (Above Average Levels)

AR_292937

# Insight on Inclusive Curriculum

Findings from GLSEN's *2017 National School Climate Survey* show that having an LGBTQ inclusive curriculum, such as learning about LGBTQ history and positive roles models, can positively shape the school experiences of LGBTQ students in general. With regard to LGBTQ curricular inclusion, we found that just over a quarter of AAPI LGBTQ students (27.4%) were taught positive representations of LGBTQ people, history, or events, which is similar to the percentage of the full sample of LGBTQ students.

Teaching students about LGBTQ people, history, and events in a positive manner may help AAPI LGBTQ students feel more valued at school, and it may also promote positive feelings toward LGBTQ students from peers. Thus, we examined the relationship between having an inclusive curriculum and feeling unsafe because of personal characteristics, peer acceptance of LGBTQ people, and school belonging. As shown in the figure, compared to AAPI LGBTQ students who did not have an inclusive curriculum at their school, those who had an inclusive curriculum:

- were less likely to feel unsafe because of their sexual orientation and gender expression;[101]
- were more likely to have peers at school be accepting of LGBTQ people;[102] and
- felt more connected to their school community.[103]

Interestingly, AAPI LGBTQ students who had an LGBTQ inclusive curriculum were also less likely to feel unsafe because of their race/ethnicity than those who did not have an LGBTQ inclusive curriculum (22.5% vs. 27.8%).[104] It may be that teaching students positive representations of LGBTQ people, history, and events not only makes peers more accepting of LGBTQ students, but perhaps also more accepting of diversity in general, including racial/ethnic diversity. It is also possible that schools or school districts that include positive representations of LGBTQ topics may also be more likely to have positive inclusion about race/ethnicity in their curriculum, policies and practices.



**Inclusive Curriculum and Feelings of Safety, Peer Acceptance, and School Belonging among AAPI LGBTQ Students**

- Felt Unsafe Because of Sexual Orientation: 30.2% (Did Not Have LGBTQ-Inclusive Curriculum), 16.8% (Had LGBTQ-Inclusive Curriculum)
- Felt Unsafe Because of Gender Expression: 30.1% (Did Not Have LGBTQ-Inclusive Curriculum), 19.4% (Had LGBTQ-Inclusive Curriculum)
- Peers Accepting Toward LGBTQ People: 43.7% (Did Not Have LGBTQ-Inclusive Curriculum), 76.4% (Had LGBTQ-Inclusive Curriculum)
- Higher than Average Levels of School Belonging: 41.4% (Did Not Have LGBTQ-Inclusive Curriculum), 74.9% (Had LGBTQ-Inclusive Curriculum)

It is important to note that we did not ask questions about other types of curricular inclusion, such as content about AAPI people, history or events. Previous research has shown that for students of color, positive representations of people of color, history and events can help to dissolve stereotypical mainstream representations.[105] This would also benefit the learning experience and well-being of AAPI LGBTQ youth, and could also work in concert with LGBTQ inclusion to greater benefit this population of students.

**Conclusions.** A school curriculum that is inclusive of diverse identities may help to instill beliefs in the intrinsic value of all individuals. We found that AAPI LGBTQ students who were taught positive representations about LGBTQ people, history, and events at school felt more connected to their school community and felt safer at school, not only with regard to their LGBTQ identity, but also with their racial/ethnic identity. Therefore, having an LGBTQ curriculum may mitigate anti-LGBTQ victimization, as well as racist victimization for AAPI LGBTQ students. However, such an inclusive curriculum was unavailable for the majority of AAPI LGBTQ youth. Thus, it is imperative that educators are provided with both training and resources to deliver school lessons and activities that reflect the diverse identities and communities present in their classrooms.

## Conclusions

In this section, we examined AAPI LGBTQ students' experiences with school practices, particularly school disciplinary action and school resources and supports. AAPI LGBTQ students experienced somewhat high rates of school discipline, with the most common form being in-school discipline. We also found that AAPI LGBTQ students who experienced institutional discrimination were more likely to experience both in-school and out-of-school discipline. Research and policy initiatives that attempt to address school disciplinary action and juvenile justice must be inclusive of, and respond to the experiences of AAPI LGBTQ youth. In order to ensure that schools are welcoming and affirming to all students, schools should eliminate policies and practices that discriminate against AAPI LGBTQ students. Moreover, administrators, policymakers, and teachers should advocate for disciplinary policies that are restorative instead of punitive.

Overall, having access to school supports and resources helped to improve the school safety and educational outcomes for AAPI LGBTQ students. We found that having more LGBTQ-supportive staff was associated with greater feelings of school belonging and school safety, greater educational outcomes, and improved psychological well-being. Similarly, having an LGBTQ-inclusive curriculum was related to greater feelings of school belonging and school safety. Further, not only are the availability of and participation in GSAs beneficial for AAPI LGBTQ students, but ethnic/cultural clubs are as well. However, as our findings indicate, many AAPI LGBTQ students do not have access to these supportive resources. It is important to note that we did not explore any other resources regarding race/ethnicity, and so we do not have information on racial/ethnic specific resources. For instance, we do not know whether AAPI LGBTQ students are exposed to positive representations of AAPI history, people, and events or how such representations may be beneficial for their educational experience. Further, we were able to examine the benefits of having school personnel who are supportive of LGBTQ students, but were not able to examine school personnel who are supportive of AAPI students in general. Given that the experiences of AAPI LGBTQ students lie at the intersection of multiple forms of bias, future research should examine resources that support and affirm these students' multiple marginalized identities.

AR_292939

AR_292940

# Discussion

AR_292942

## Limitations

The findings presented in this report provide new information and valuable insights on the school experiences of AAPI LGBTQ students. However, there are some limitations to our study. The participants in this study were only representative of those who self-identified as lesbian, gay, bisexual, transgender, or queer, and have some connection to the LGBTQ community either through local organizations or online, and LGBTQ youth who were not comfortable identifying their sexual orientation in this manner may not have learned about the survey. Therefore, AAPI LGBTQ youth who self-identified as LGBTQ but had no connection to the LGBTQ community may be underrepresented in this sample. The participants in this study also did not include students who have a sexual attraction to the same gender or multiple genders, but do not identify themselves as LGBQ.

In the survey, there were several instances where we asked about sexual orientation, gender identity, and gender expression as it pertained to the unique school experiences of LGBTQ youth of color, but we did not ask similar questions regarding race/ethnicity. For instance, we did not ask about peer or educator support related to race/ethnicity, which would have provided a more comprehensive understanding on the school experiences of AAPI LGBTQ students.

In the survey, we only included two ethnic categories for AAPI when we asked students about their race/ethnicity: "Asian or South Asian" (Asian) and "Native Hawaiian or Pacific Islander" (Pacific Islander). Therefore, we could not examine school experiences within and across Asian LGBTQ students (e.g., Southeast Asian, South Asian, East Asian). Also, as noted in the Methods section of this report, the sample size of Pacific Islander LGBTQ students was too small to examine their school experiences alone; therefore, students who identified as Pacific Islander were combined with those who identified as Asian. Examining feelings of safety, victimization experiences, school discipline, and supports and resources among Asian ethnic groups and among Pacific Islanders, as well as differences across these ethnic groups, could provide more insight into the unique school experiences of AAPI LGBTQ students.

It is also important to note that our survey only reflects the experiences of LGBTQ students who were in school during the 2016-2017 school year. Thus, findings from this survey may not necessarily reflect the experiences of AAPI LGBTQ students who had already dropped out of school, whose experiences may be different from students who remained in school.

## Conclusions

Findings presented in this report highlight the unique experiences of AAPI LGBTQ students at the intersection of their various identities, including race, gender, and sexual orientation. The majority of AAPI LGBTQ students experienced harassment in school in the past year because of their sexual orientation, gender expression, and race/ethnicity. Experiences of anti-LGBTQ victimization were particularly severe for both trans/GNC AAPI students as well as multiracial AAPI students, which may be related to greater levels of social exclusion faced by these groups at school. We also found that racist victimization was particularly severe for multiracial AAPI LGBTQ students who attended majority AAPI schools. It may be that AAPI LGBTQ students who attend majority AAPI schools experience greater levels of social exclusion based on their multiracial status. Further, we also found that AAPI LGBTQ students who experienced both homophobic and racist victimization experienced the poorest academic outcomes and psychological well-being. AAPI LGBTQ youth who experienced sexual orientation-based victimization, gender expression-based victimization, or race-based victimization were also more likely to experience exclusionary school discipline, such as detention, suspension, or expulsion. Such disciplinary actions may increase their likelihood of involvement with the criminal and juvenile justice system.

The findings in this report help to provide a deeper understanding of the experiences of AAPI students by examining the school-related experiences of AAPI LGBTQ students. Much of the general literature on AAPI students has focused on achievement, perhaps in order to challenge

AR_292943

the model minority myth that all AAPI youth are academically successful. The myth may also promote the notion that they avoid or are exempt from experiencing victimization at school. Further, it may also lead educators and administrators to believe that focusing on their studies prevents AAPI youth from being placed in situations that can lead to experiencing victimization. Yet our findings clearly demonstrate that many AAPI LGBTQ students experience challenges in school and need greater support. Trans/ GNC and multiracial AAPI LGBTQ students may especially need support from school educators and administrators — not only do these students face greater victimization due to their trans/GNC and multiracial status, but they may also be overlooked due to their AAPI status.

We did identify critical resources that were beneficial for AAPI LGBTQ youth. For example, having an LGBTQ-inclusive curriculum and having LGBTQ-supportive educators at school were both associated with AAPI LGBTQ students feeling more connected to their school community and feeling less unsafe regarding their sexual orientation, gender expression, and even their race/ethnicity. Supportive student clubs such as GSAs and ethnic/ cultural clubs were also associated with greater feelings of safety, and those who attended these clubs were more likely to engage in activism in their schools and communities. However, we found that many AAPI LGBTQ students did not have access to these supportive school resources. We also found that LGBTQ students who only identified as AAPI had more supportive school educators and higher level of support from administrators than multiracial AAPI LGBTQ students. This may be due to differences in attitudes toward various racial/ ethnic groups. In this vein, staff and administrators may apply the model minority stereotype to students who only identify as AAPI, and less so to multiracial AAPI students, and therefore treat those who only identify as AAPI more favorably than multiracial AAPI LGBTQ students.

## Recommendations

As educators, advocates, and others concerned with issues of educational equity and access continue to address the myriad forms of oppression found in and out of school, such as racism, heterosexism, homophobia and transphobia, they must also account for the intersections of these forms of oppression. Therefore, addressing the concerns of AAPI LGBTQ students requires a nuanced approach to combating racism, homophobia, and transphobia. Further, it is important to have a greater understanding of the experiences, needs and concerns of AAPI LGBTQ students through specific and focused efforts.

Given the paucity of data on challenges faced by AAPI youth in school and on discussions that involve bullying in schools in this population, information that is critical in policymaking and advocacy for AAPI LGBTQ youth may not always be available. Education researchers must work to obtain diverse and robust samples so that they can explore smaller racial/ethnic populations such as AAPI. This report continues to fill this gap in knowledge, so that educators, policymakers, safe school advocates, and others working to make schools a more inclusive space can continue to seek to understand the multifaceted experiences of AAPI LGBTQ students, particularly with regard to how we can render accessible specific resources that support these students at school and in larger communities outside of school. This report demonstrates the ways in which the availability of supportive student clubs, supportive educators, and other school-based resources for AAPI LGBTQ students can positively affect their school experiences. We recommend school leaders, education policymakers, and other individuals who want to provide safe learning environments for AAPI LGBTQ students to:

- Support student clubs, such as GSAs and ethnic/cultural clubs. Organizations that work with GSAs and ethnic/cultural clubs should also come together to address AAPI LGBTQ students' needs related to their multiple marginalized identities, including sexual orientation, gender, and race/ethnicity.

- Provide professional development for school staff that addresses the intersections of identities and experiences of AAPI LGBTQ students.

- Increase student access to curricular resources that include diverse and positive representations of both AAPI and LGBTQ people, history, and events.

- Establish school policies and guidelines for staff in responding to anti-LGBTQ and racist

behavior, and develop clear and confidential pathways for students to report victimization that they experience. Local, state, and federal education agencies should also hold schools accountable for establishing and implementing these practices and procedures.

- Work to address the inequities in funding at the local, state, and national level to increase access to institutional supports and education in general, and to provide more professional development for educators and school counselors.

Taken together, such measures can move us toward a future in which all students have the opportunity to learn and succeed in school, regardless of sexual orientation, gender identity, gender expression, race, or ethnicity.

**39**

AR_292946

# Endnotes

AR_292948

1   The term Asian American and Pacific Islander (AAPI) is the current term used within the AAPI communities to include persons having origins in any of the original peoples of the Far East, Southeast Asia, or the Indian subcontinent, as well as Native Hawaiian and other Pacific Islands people within and outside of the United States jurisdictions. Prior to this, Asian Pacific Americans (APA) was the term commonly used in the 1990s. For more about the use of "Asian American" and "AAPI," refer to:

Agbayani, A., & Ching, D. (2017). Scholarship, policy, and praxis recommendations for institutional change. In S. D. Museus, A. Agbayani, & D. M. Ching (Eds.), *Focusing on the underserved: Immigrant, refugee, and indigenous Asian American and Pacific Islanders in Higher Education* (pp. 241–253). Charlotte, North Carolina: Information Age Publishing.

Kandil, C. Y. (2018). After 50 years of 'Asian American,' advocates say the term is 'more essential than ever'. NBC News. https://www.nbcnews.com/news/asian-america/after-50-years-asian-american-advocates-say-term-more-essential-n875601

U.S. Census Bureau. Asian-American and Pacific Islander Heritage Month: May 2019. https://www.census.gov/newsroom/facts-for-features/2019/asian-american-pacific-islander.html

2   Ocampo, A. C., & Soodjinda, D. (2016). Invisible Asian Americans: the intersection of sexuality, race, and education among gay Asian Americans. *Race Ethnicity and Education, 19*(3), 480–499.

Only recently was there a report from the AAPI Bullying Prevention Task Force, specifically about bullying against AAPI students. See:

AAPI Task Force. (2016). AAPI Bullying Prevention Task Force Report, 2014–2016. https://sites.ed.gov/aapi/files/2015/02/AAPI-Bullying-Prevention-Task-Force-Report-2014-2016.pdf

3   Tran, N., & Okazaki, S. (2012). Bullying & victimization and Asian American students. Asian American Psychological Association. https://www.apa.org/pi/oema/resources/ethnicity-health/asian-american/bullying-and-victimization.pdf

4   Yi, V. & Museus, S. D. (2016). Model minority myth. *The Wiley Blackwell Encyclopedia of Race, Ethnicity, and Nationalism.* John Wiley & Sons.

5   Kian, L., Huynh, V. W., Cheah, C. S. L., Wang, Y, & Yoshikawa, H. (2017). Moving beyond the model minority. *Asian American Journal of Psychology, 8*(1), 1–6.

6   Rosenbloom, S. R. & Way, N. (2006). Experiences of discrimination among African American, Asian American, and Latino adolescents in an urban high school. *Youth and Society, 35*(4), 420–451.

Siu, S-F. (1996). Asian American students at risk: A literature review. *Center for Research on the Education of Students Placed at Risk (CESPAR).* pp. 1–90.

7   Kosciw, J. G., Greytak, E. A., Zongrone, A. D., Clark, C. M., & Truong, N. L. (2018). *The 2017 National School Climate Survey: The experiences of lesbian, gay, bisexual, transgender, and queer youth in our nation's schools.* New York: GLSEN.

8   Kosciw, J. G., Greytak, E. A., Zongrone, A. D., Clark, C. M., & Truong, N. L. (2018). *The 2017 National School Climate Survey: The experiences of lesbian, gay, bisexual, transgender, and queer youth in our nation's schools.* New York: GLSEN.

9   GSA Network. (2018). LGBTQ youth of color: Discipline disparities, school push-out, and the school-to-prison pipeline. https://gsanetwork.org/wp-content/uploads/2018/08/LGBTQ_brief_FINAL.pdf

Kosciw, J. G., Greytak, E. A., Zongrone, A. D., Clark, C. M., & Truong, N. L. (2018). *The 2017 National School Climate Survey: The experiences of lesbian, gay, bisexual, transgender, and queer youth in our nation's schools.* New York: GLSEN.

10  Kosciw, J. G., Greytak, E. A., Zongrone, A. D., Clark, C. M., & Truong, N. L. (2018). *The 2017 National School Climate Survey: The experiences of lesbian, gay, bisexual, transgender, and queer youth in our nation's schools.* New York: GLSEN.

11  Bowleg, L. (2012). The problem with the phrase women and minorities: Intersectionality—an important theoretical framework for public health. *American Journal of Public Health, 102*(7), 1267–1273.

Crenshaw, K. (1990). Mapping the margins: Intersectionality, identity politics, and violence against women of color. *Stanford Law Review, 43*(6), 1241–1299.

12  For a full discussion of the Methods, refer to page 7 of GLSEN's *2017 National School Climate Survey* report.

13  Sexual orientation was assessed with a multi-check question item (i.e., gay, lesbian, straight/heterosexual, bisexual, pansexual, questioning, queer, and asexual) with an optional write-in item for sexual orientations not listed. Students in the categories Queer, Another Sexual Orientation, and Questioning/Unsure did also indicate that they were gay/lesbian, bisexual, or pansexual.

14  Pansexual identity is commonly defined as experiencing attraction to some people, regardless of their gender identity. This identity may be distinct from a Bisexual identity, which is commonly described as either experiencing attraction to some male-identified people and some female-identified people or as experiencing attraction to some people of the same gender and some people of different genders.

15  Students who indicated that they were asexual and another sexual orientation were categorized as another sexual orientation. Additionally, students who indicated that their only sexual orientation was asexual and also indicated that they were cisgender were not included in the final study sample. Therefore, all students included in the Asexual category also are not cisgender (i.e., are transgender, genderqueer, another nonbinary identity, or questioning their gender).

16  Race/ethnicity was assessed with a single multi-check question item (i.e., African American or Black; Asian or South Asian; Native Hawaiian or other Pacific Islander; Native American, American Indian, or Alaska Native; White or Caucasian; Hispanic or Latino/a; and Middle Eastern or Arab American) with an optional write-in item for race/ethnicities not listed. All participants included in this report identified as "Asian or South Asian" or "Native Hawaiian or Other Pacific Islander." Percentages are listed for students who selected other racial/ethnic identities in addition to "Asian or South Asian" or "Native Hawaiian or Pacific Islander".

17  The racial/ethnic groups reported here are not mutually exclusive categories. Students who identified with more than one racial/ethnic group in addition to identifying as "Asian or South Asian" or "Native Hawaiian or Other Pacific Islander" are counted in each of the relevant categories.

18  It is important to note that we do not know the immigration status of the parents/guardians of students in our survey. Therefore, it is possible that students in the survey who were born outside the U.S. and its territories have U.S. citizenship because one of their parents/guardians does, and would not technically be immigrants to the U.S. Therefore, U.S. citizens born outside the U.S. may include both immigrants and non-immigrants.

19  Gender was assessed via three items: an item assessing sex assigned at birth (i.e., male or female), an item assessing gender identity (i.e., male, female, nonbinary, and an additional write-in option), and a multiple response item assessing sex/gender status (i.e., cisgender, transgender, genderqueer, intersex, and an additional write-in option). Based on responses to these three items, students' gender was categorized as: Cisgender Male, Cisgender Female, Cisgender Unspecified (those who did not provide any assigned sex or gender identity information), Transgender Male, Transgender Female, Transgender Nonbinary, Transgender Unspecified (those who did not provide any gender identity information), Genderqueer, Another Nonbinary Identity (i.e., those who indicated a nonbinary identity but did not indicate that they were transgender or genderqueer, including those who wrote in identities such as "gender fluid" or "demi gender"), or Questioning/Unsure.

20  Receiving educational accommodations was assessed with a question that asked students if they received any educational support services at school, including special education classes, extra time on tests, resource classes, or other accommodations.

21  Students were placed into region based on which state the last school they attended was located in – Northeast: Connecticut, Delaware, Maine, Maryland, Massachusetts, New Hampshire, New Jersey, New York, Pennsylvania, Rhode Island, Vermont, Washington, DC; South: Alabama, Arkansas, Florida, Georgia, Kentucky, Louisiana, Mississippi, North Carolina, Oklahoma, South Carolina, Tennessee, Texas, Virginia, West Virginia; Midwest: Illinois, Indiana, Iowa, Kansas, Michigan, Minnesota, Missouri, Nebraska, North Dakota, Ohio, South Dakota, Wisconsin; West: Alaska, Arizona, California, Colorado, Hawaii, Idaho, Montana, Nevada, New Mexico, Oregon, Utah, Washington, Wyoming; U.S.

**43**

Territories: American Samoa, Guam, Northern Mariana Islands, Puerto Rico, U.S. Virgin Islands.

22 Mean differences in reasons for feeling unsafe were examined using a repeated measures multivariate analysis of variance (MANOVA). The multivariate effect was significant: Pillai's trace = .57, $F$(10, 1470) = 190.87, $p$<.001. Pairwise comparisons were considered at $p$<.05. Significant differences were found between all reasons with the exception of: gender and body size/weight were not different from each other, and; actual or perceived disability and actual or perceived religion were not different from each other. Percentages are shown for illustrative purposes.

23 Mean differences in rates of hearing biased language were examined using a repeated measures multivariate analysis of variance (MANOVA). The multivariate effect was significant: Pillai's trace = .37, $F$(5, 1467) = 171.07, $p$<.001. Pairwise comparisons were considered at $p$<.05. Significant differences were found between all forms of biased language with the exception of: other homophobic remarks and not acting "masculine" enough were not different from each other, and; other homophobic remarks and racist remarks were not different from each other. Percentages are shown for illustrative purposes.

24 Gruber, J. E. & Fineran, S. (2008). Comparing the impact of bullying and sexual harassment victimization on the mental and physical health of adolescents. *Sex Roles, 59*(1–2), 1–13.

Hammig, B. & Jozkowski, K. (2013). Academic achievement, violent victimization, and bullying among U.S. high school students. *Journal of Interpersonal Violence, 28*(7), 1424–1436.

Hase, C. N., Goldberg, S. B., & Smith, D. (2015). Impacts of traditional bullying and cyberbullying on the mental health of middle school and high school students. *Psychology in Schools, 52*(6), 607–617.

Holt, M. K., Vivolo-Kantor, A. M., Polanin, J. R., Holland, K. M., DeGue, S., Matjasko, J. L., Wolfe, M., & Reid, G. (2015). Bullying and suicidal ideation and behaviors: A meta-analysis. *Pediatrics, 135*(2), 496–509.

Strom, I. F., Thoresen, S., Wentzel-Larsen, T., & Dyb, G. (2013). Violence, bullying and academic achievement: A study of 15-year-old adolescents and their school environment. *Child Abuse & Neglect, 37*(4), 243–251.

25 Mean differences in rates of experiencing different forms of victimization were examined using a repeated measures multivariate analysis of variance (MANOVA). The multivariate effect was significant: Pillai's trace = .06, $F$(2, 1436) = 41.42, $p$<.001. Pairwise comparisons were considered at $p$<.05. Significant differences were found between all forms of victimization with exception of victimization based on sexual orientation and victimization based on gender expression. Percentages are shown for illustrative purposes.

26 The relationships between missing school, school belonging, and depression and severity of victimization due to sexual orientation were examined through Pearson correlations. Missing school: $r$(1468) = .46, $p$<.001; school belonging: $r$(1465) = -.45, $p$<.001; depression: $r$(1446) = .38, $p$<.001.

The relationship between educational aspirations and severity of sexual orientation-based victimization was examined using an analysis of variance (ANOVA), with victimization based on sexual orientation as the dependent variable and educational aspirations as the independent variable. The effect was significant: $F$(5, 1448) = 6.21, $p$<.001, $\eta_p^2$ = .02. Post hoc comparisons were considered at $p$<.05. Those not planning to graduate high school or unsure of their high school graduation plans experienced greater levels of victimization than all others, except for vocational school. There were no other observable differences. Percentages are shown for illustrative purposes.

27 The relationship between missing school, school belonging, and depression and severity of victimization due to race/ethnicity was examined through Pearson correlations. Missing school: $r$(1473) = .27, $p$<.001; school belonging: $r$(1471) = -.32, $p$<.001; depression: $r$(1452) = .31, $p$<.001.

The relationship between educational aspirations and severity of race-based victimization was examined using an analysis of variance (ANOVA), with victimization based on race/ethnicity as the dependent variable and educational aspirations as the independent variable. The effect was not significant. There were no observable differences.

28 Toomey, R. B., Ryan, C., Diaz, R. M., Card, N. A., & Russell, S. T. (2013). Gender-nonconforming lesbian, gay, bisexual, and transgender youth: School victimization and young adult psychosocial adjustment. *Psychology of Sexual Orientation and Gender Diversity, 1*(S), 71–80.

29 To test differences in severity of victimization by trans/GNC identity, a series of t-tests were conducted, with trans/GNC identity as the independent variable, and severity of victimization as the dependent variable. The effect was significant for victimization based on sexual orientation and victimization based on gender expression. Victimization based on sexual orientation: $t$(984.48) = 6.13, $p$<.001; victimization based on gender expression: $t$(889.00) = 10.62, $p$<.001. Trans/GNC AAPI students and cisgender LGBQ AAPI students did not differ on victimization based on race/ethnicity. Percentages are shown for illustrative purposes.

30 Lewis, D. C., Flores, A. R., Haider-Markel, D. P., Miller, P. R., Tadlock, B. L., & Taylor, J. K. (2017). Degrees of acceptance: Variation in public attitudes toward segments of the LGBT community. *Political Research Quarterly, 70*(4), 861–875.

31 Herman, M. (2004). Forced to choose: Some determinants of racial identification in multiracial adolescents. *Society for Research in Child Development, 75*(3), 730–748.

32 Renn, K. A. (2000). Patterns of situational identity among biracial and multiracial college students. *The Review of Higher Education, 23*(4), 399–420.

33 To test differences in severity of victimization by multiracial/multiethnic status, a series of t-tests were conducted, with multiracial/multiethnic status as the independent variable, and severity of victimization as the dependent variable. The effect was significant for victimization based on sexual orientation and gender expression. Sexual orientation: $t$(1462.33) = -4.17, $p$<.001; gender expression: $t$(1368.63) = -2.32, $p$<.05. LGBTQ students who only identified as AAPI did not differ from multiracial AAPI LGBTQ students on experiences of victimization based on race/ethnicity. Percentages are shown for illustrative purposes.

34 To examine whether school racial composition moderated the relationship between multiracial/multiethnic status and race-based victimization, a two-way analysis of variance (ANOVA) was conducted, with multiracial/multiethnic status and school racial composition as the independent variables, multiracial/multiethnic status X school racial composition as the interaction term, and severity of race-based victimization as the dependent variable. The univariate effect was significant: $F$(7, 1302) = 5.14, $p$<.001. School racial composition was significantly associated with severity of race-based victimization: $F$(3, 1302) = 3.97, $p$<.01. Multiracial/multiethnic status X school racial composition interaction was significantly associated with severity of race-based victimization: $F$(3, 1302) = 4.68, $p$<.01. No differences were found between multiracial/multiethnic status and race-based victimization.

A similar analysis was conducted to examine whether school racial composition moderated the relationship between multiracial/multiethnic status and anti-LGBTQ victimization. A two-way multivariate analysis of variance (MANOVA) was conducted, with multiracial/multiethnic status and school racial composition as the independent variables, multiracial/multiethnic status X school racial composition as the interaction term, and severity of victimization based on sexual orientation and based on gender expression as the dependent variables. No interaction effects were found for both victimization based on sexual orientation and based on gender expression.

35 The full percentage breakdowns are as follows – did not experience victimization due to sexual orientation or race/ethnicity: 25.3%; experienced victimization due sexual orientation, but not race/ethnicity: 21.0%; experienced victimization due to race/ethnicity, but not sexual orientation: 14.2%; experienced victimization due to both sexual orientation and race/ethnicity: 39.5%.

36 To examine differences in number of school days missed, a one-way analysis of covariance (ANCOVA) was conducted, with experiences of sexual orientation-based victimization, race-based victimization, or both as the independent variable, and number of school days missed due to feeling unsafe as the dependent variable, while controlling for school racial composition and racial identification (only AAPI vs. multiracial AAPI). The main effect was significant: $F$(3, 1464) = 43.95, $p$<.001, $\eta_p^2$ = .08. Pairwise comparisons were considered at $p$<.05: students who experienced both forms of victimization missed more days than all others; students who

AR_292950

experienced neither form of victimization missed fewer days than those who only experienced victimization based on sexual orientation and both forms of victimization. All other comparisons were not significant. Percentages are shown for illustrative purposes.

37    To examine differences in levels of school belonging, a one-way analysis of covariance (ANCOVA) was conducted, with experiences of sexual orientation-based victimization, race-based victimization, or both as the independent variable, and school belonging as the dependent variable, while controlling for school racial composition and racial identification (only AAPI vs. multiracial AAPI). The main effect was significant: $F(3, 1462) = 70.93$, $p<.001$, $\eta_p^2 = .13$. Pairwise comparisons were considered at $p<.05$: students who experienced both forms of victimization had lower levels of belonging than all others; students who experienced neither form of victimization had the highest levels of belonging. All other comparisons were not significant. Percentages are shown for illustrative purposes.

38    To examine differences in levels of depression, a one-way analysis of covariance (ANCOVA) was conducted, with experiences of sexual orientation-based victimization, race-based victimization, or both as the independent variable, and depression as the dependent variable, while controlling for school racial composition and racial identification (only AAPI vs multiracial AAPI). The main effect was significant: $F(3, 1443) = 58.84$, $p<.001$, $\eta_p^2 = .11$. Pairwise comparisons were considered at $p<.05$: students who experienced both forms of victimization had higher levels of depression than all others; students who experienced neither form of victimization had the lowest levels of depression. All other comparisons were not significant. Percentages are shown for illustrative purposes.

39    Niwa, E. Y., Way, N., Qin, D. B., & Okazaki, S. (2011). Hostile hallways: Asian American adolescents' experiences of peer discrimination in school. In F. T. Leong, L. Juan, D. B. Qin, & H. E. Fitzgerald (Eds.), *Asian American and Pacific Islander Children and Mental Health* (pp. 193–217). Santa Barbara, CA: Praeger.

40    To examine the interaction between victimization based on sexual orientation and victimization based on race/ethnicity on level of school belonging, a three-step hierarchical regression model was conducted. In the first step, level of school belonging was regressed onto the independent variable, severity of victimization based on sexual orientation. The model accounted for a significant portion of the variance (19.8%) and the model was significant: $F(1, 1461) = 361.21$, Adj. $R^2 = .198$, $p<.001$. Victimization based on sexual orientation was a significant predictor: $\beta = -.07$, $p<.001$. For step two, the moderator, victimization based on race/ethnicity was added. Victimization based on race/ethnicity accounted for an additional 3.0% above and beyond the variance accounted from victimization based on sexual orientation, and the model was significant: $F(2, 1460) = 216.73$, Adj. $R^2 = .228$, $p<.001$. Victimization based on race/ethnicity was a significant predictor: $\beta = -.10$, $p<.001$. For step three, the interaction term between the independent and moderator variables was introduced. The interaction term accounted for an additional 0.5% above and beyond the variance accounted from the independent and moderator variables, and the model was significant: $F(3, 1459) = 149.25$, $p<.001$; Adj. $\Delta R^2 = .233$, $p<.001$. Both forms of victimization remained significant predictors. The interaction was also significant: $\beta = .01$, $p<.001$, indicating that the negative effect of homophobic victimization on school belonging was strongest among AAPI LGBTQ students who experienced higher levels of homophobic victimization and lower levels of racist victimization.

To examine the interaction between victimization based on sexual orientation and victimization based on race/ethnicity on level of depression, a three-step hierarchical regression model was conducted. In the first step, level of depression was regressed onto the independent variable, severity of victimization based on sexual orientation. The model accounted for a significant portion of the variance (14.3%) and the model was significant: $F(1, 1430) = 239.39$, Adj. $R^2 = .143$, $p<.001$. Victimization based on sexual orientation was a significant predictor: $\beta = .07$, $p<.001$. For step two, the moderator, victimization based on race/ethnicity was added. Victimization based on race/ethnicity accounted for an additional 3.2% above and beyond the variance accounted from victimization based on sexual orientation, and the model was significant: $F(2, 1429) = 152.58$, Adj. $R^2 = .175$, $p<.001$. Victimization based on race/ethnicity was a significant predictor: $\beta = .13$, $p<.001$. For step three, the interaction term

between the independent and moderator variables was introduced. The interaction term accounted for an additional 0.5% above and beyond the variance accounted from the independent and moderator variables, and the model was significant: $F(3, 1428) = 105.59$, $p<.001$; Adj. $\Delta R^2 = .180$, $p<.001$. Both forms of victimization remained significant predictors. The interaction was also significant: $\beta = -.01$, $p<.01$, indicating that the negative effect of homophobic victimization on depression was strongest among AAPI LGBTQ students who experienced higher levels of homophobic victimization and lower levels of racist victimization.

A similar three-step hierarchical regression model was conducted to examine the interaction between victimization based on sexual orientation and victimization based on race/ethnicity on missing school due to safety concerns. In the first step, missing school was regressed onto the independent variable, severity of victimization based on sexual orientation. For step two, the moderator, victimization based on race/ethnicity was added. For step three, the interaction between the independent and moderator variables was introduced. The sexual orientation-based victimization X race-based victimization interaction was not related to missing school.

41    It is also relevant to consider the racial socialization that AAPI LGBTQ students may receive from parents, guardians, and other family members in the form of explicit and/or implicit messages about how to operate as an AAPI individual in the U.S. These messages may prepare young people for experiences with racial injustice, and could also possibly be helpful in preparing youth for experiences with other forms of injustice, such as anti-LGBTQ victimization. Read more:

Neblett, E. W. J., White, R. L., Ford, K. R., Philip, C. L., Nguyên, H. X., & Sellers, R. M. (2008). Patterns of racial socialization and psychological adjustment: Can parental communications about race reduce the impact of racial discrimination? *Journal of Research on Adolescence, 18*(3), 477–515.

42    Chi-square tests were performed examining the common types of school staff response by whether it was perceived to be effective or ineffective (a dichotomous variable was created for effectiveness: effective = "very effective" or "somewhat effective"; ineffective = "not at all effective" or "somewhat ineffective"). The only common response perceived to be effective was talking to the perpetrator/telling the perpetrator to stop: $\chi^2(1) = 38.21$, $p<.001$, $\phi = -.318$. The other two common responses were perceived to be ineffective: telling the student to ignore it: $\chi^2(1) = 92.76$, $p<.001$, $\phi = -.495$; did nothing/did not take action: $\chi^2(1) = 86.99$, $p<.001$, $\phi = -.480$.

43    Bacon, J. K. & Causton-Theoharis, J. (2012). 'It should be teamwork': A critical investigation of school practices and parent advocacy in special education. *International Journal of Inclusive Education, 17*(7), 682–699.

Behnke, A. O., & Kelly, C. (2011). Creating programs to help Latino youth thrive at school: The influence of Latino parent involvement programs. *Journal of Extension, 49*(1), 1–11.

Jeynes, W. H. (2005). The effects of parental involvement on the academic achievement of African American youth. *The Journal of Negro Education, 74*(3), 260–274.

Nguyen, J. T., You, S., & Ho, H. Z. (2009). The process of Asian American parental involvement and its relationship to students' academic achievement. In C. C. Park, R. Endo, & X. L. Rong (Eds.), *New Perspectives on Asian American Parents, Students, and Teacher Recruitment* (pp. 25–49). Charlotte, North Carolina: Information Age Publishing.

44    Fu, A. S. & Markus, H. R. (2014). My mother and me: Why tiger mothers motivate Asian Americans but not European Americans. *Personality and Social Psychology, 40*(6), 739–749.

Jaiswal, S. K. & Choudhuri, R. (2017). A review of the relationship between parental involvement and students' academic performance. *The International Journal of Indian Psychology, 4*(3), 110–123.

Okasaki, S. & Lim, N. E. (2011). Academic and educational achievement among Asian American children and youth. In F. T. L., Leon, L., Juang, D. B. Qin, & H. E. Fitzgerald (Eds), *Asian American and Pacific Islander children and mental health* (pp. 143–167). Santa Barbara, California: Praeger.

45    Hill, N. E. & Tyson, D. F. (2009). Parental involvement in middle school: A meta-analytic assessment of the strategies that promote achievement. *Developmental Psychology, 45*(3), 740–763.

45

Shute, V. J., Hansen, E. G., Underwood, J. S., & Razzouk, R., (2011). A review of the relationship between parental involvement and secondary school students' academic achievement. *Educational Research International*, 1–10.

Spera, C. (2005). A review of the relationship among parenting practices, parenting styles, and adolescent school achievement. *Educational Psychology Review, 17*, 125–146.

Wilder, S. (2014). Effects of parental involvement on academic achievement: A meta-synthesis. *Educational Review, 66*(3), 377–397.

Yan, W. & Lin, Q. (2005). Parent involvement and mathematics achievement: Contrast across racial and ethnic groups. *The Journal of Education Research, 99*(2), 116–127.

46     To test differences in frequency of reporting victimization to family members by outness to family members while controlling for respondent's age and gender (cisgender vs. trans/GNC), we conducted an analysis of covariance (ANCOVA), where reporting to family was the dependent variable, outness to family members was the independent variable, and age and gender were covariates. After controlling for age and gender, the main effect for outness to family was significant: $F(1, 809) = 29.82$, $p<.001$.

47     The relationship between family members talking to school staff about the AAPI LGBTQ student's experiences with victimization, and experiences of anti-LGBTQ victimization (victimization based on sexual orientation, victimization based on gender expression), and race-based victimization, while controlling for reporting victimization to family members, outness to parents, and age were examined through partial correlations. The following relationship was significant: gender expression-based victimization: $r(344) = .17$, $p<.01$. Experiences with sexual orientation-based victimization, and race-based victimization were not related to a family members talking to school staff.

48     The relationship between family members talking to school staff about their AAPI LGBTQ child's experiences with victimization, and disability status and educational accommodation services, while controlling for reporting victimization to family members, outness to parents, and age were examined through partial correlations. The following relationship was significant: Disability status: $r(344) = .12$, $p<.05$. Receiving education accommodation services was not related to a family members talking to school staff.

49     Kosciw, J. G., Greytak, E. A., Zongrone, A. D., Clark, C. M., & Truong, N. L. (2018). *The 2017 National School Climate Survey: The experiences of lesbian, gay, bisexual, transgender, and queer youth in our nation's schools*. New York: GLSEN.

50     Cholewa, B., Hull, M. F., Babcock, C. R., & Smith, A. D. (2018). Predictors and academic outcomes associated with in-school suspension. *School Psychology Quarterly, 33*(2), 191–199.

      Johnson, M., & Naughton, J. (2019). Just another school? The need to strengthen legal protections for students facing disciplinary transfers. *Notre Dame Journal of Law, Ethics and Public Policy, 33*(1), 1–40.

51     Greytak, E. A., Kosciw, J. G., Villenas, C., & Giga, N. M. (2016). *From Teasing to Torment: School Climate Revisited, A Survey of U.S. Secondary School Students and Teachers*. New York: GLSEN.

      Poteat, V. P., Scheer, J. R., & Chong, E. S. K. (2015). Sexual orientation-based disparities in school and juvenile discipline: A multiple group comparison of contributing factors. *Journal of Educational Psychology, 108*(2).

      Snapp, S., Hoenig, J., Fields, A., & Russell, S. T. (2015). Messy, butch, and queer: LGBTQ youth and the school-to-prison pipeline. *Journal of Adolescent Research, 30*, 57–82.

52     The relationship between experiences with victimization (based on sexual orientation, gender expression, and race/ethnicity) and school disciplinary action, while controlling for race/ethnicity (AAPI only vs. multiracial AAPI), outness to students, and outness to staff, were examined through partial correlations. For in-school discipline, all correlations were significant: Sexual orientation-based victimization: $r(1388) = .26$, $p<.001$; Gender expression-based victimization: $r(1388) = .23$, $p<.001$; Race-based victimization: $r(1388) = .15$, $p<.001$. All correlations were also significant for out-of-school victimization: Sexual orientation-based victimization: $r(1388) = .22$, $p<.001$; Gender expression-based victimization: $r(1388) = .18$, $p<.001$; Race-based victimization: $r(1388) = .10$, $p<.001$. All correlations were also significant

for contact with law enforcement: Sexual orientation-based victimization: $r(1388) = .10$, $p<.001$; Gender expression-based victimization: $r(1388) = .10$, $p<.001$; Race-based victimization: $r(1388) = .08$, $p<.01$.

53     The relationship between missing school and school discipline (in-school discipline, out-of-school discipline, contact with law enforcement), while controlling for race/ethnicity (AAPI only vs. multiracial AAPI) was examined through partial correlations – In-school discipline: $r(1456) = .19$, $p<.001$; out-of-school discipline: $r(1456) = .18$, $p<.001$; contact with law enforcement: $r(1456) = .07$, $p<.01$.

54     The relationship between experiencing any anti-LGBTQ discriminatory policies and practices, and school discipline (in-school discipline, out-of-school discipline, contact with law enforcement), while controlling for race/ethnicity (AAPI only vs. multiracial AAPI), was examined through partial correlations – In-school discipline: $r(1444) = .17$, $p<.001$; out-of-school discipline: $r(1444) = .12$, $p<.001$. Experiences with any anti-LGBTQ discrimination was not related to contact with law enforcement.

55     Kosciw, J. G., Greytak, E. A., Zongrone, A. D., Clark, C. M., & Truong, N. L. (2018). *The 2017 National School Climate Survey: The experiences of lesbian, gay, bisexual, transgender, and queer youth in our nation's schools*. New York: GLSEN.

56     Chi-square tests were performed looking at experiences with school discipline (in-school discipline, out-of-school discipline, and contact with law enforcement) by gender (trans/GNC vs. cisgender LGBQ). In-school discipline: $\chi^2(1) = 6.55$, $p<.05$, $\phi = -.07$; out-of-school discipline: $\chi^2(1) = 7.36$, $p<.01$, $\phi = -.07$. There were no differences in contact with law enforcement between trans/GNC and cisgender LGBQ AAPI students.

57     To test for whether anti-LGBTQ victimization mediated the relationship between trans/gnc status and in-school and out-of-school discipline, six separate regression analyses were conducted, three for in-school discipline and three for out-of-school discipline. All three sets regression analyses must be significant for mediation to occur for each type of school discipline. For both in-school and out-of-school discipline, sexual orientation and gender expression based victimization were significant mediators. Regression analyses between trans/gnc status and victimization: sexual orientation-based victimization: $\beta = -1.38$, $p<.001$; sexual orientation-based victimization: $\beta = -2.47$, $p<.001$. Logistic regression analyses between victimization and discipline: sexual orientation-based victimization and in-school discipline: odds ratio (OR) = 1.16, $p<.001$; gender expression-based victimization and in-school discipline: OR = 1.12, $p<.001$; sexual orientation-based victimization and out-of-school discipline: OR = 1.15, $p<.001$; gender expression-based victimization and out-of-school discipline: OR = 1.13, $p<.001$. Regression analyses between trans/gnc status and discipline: in-school discipline: $\beta = 0.74$, $p<.05$; out-of-school discipline: $\beta = 0.50$, $p<.01$. The Sobel test for mediation was significant for sexual orientation as mediator: in-school discipline: $z = -6.53$, $p<.001$; out-of-school discipline: $z = -4.79$, $p<.001$. The Sobel test for mediation was significant for gender expression-based victimization as mediator: in-school discipline: $z = -7.86$, $p<.001$; out-of-school discipline: $z = -5.29$, $p<.001$.

      The Sobel test was calculated using the Sobel test online interactive calculation tool: http://quantpsy.org/sobel/sobel.htm

58     Ksinan, A. J., Vazsonyi, A. T., Jiskrova, G. K., & Peugh, J. L. (2019). National ethnic and racial disparities in disciplinary practices: A contextual analysis in American secondary schools. *Journal of School Psychology, 74*, 106–125.

      Silverman, T. (2019). School discipline disparities: How we can do better. https://www.iyi.org/school-discipline-disparities-how-we-can-do-better/

59     Chi-square tests were performed looking at experiences with school discipline (in-school discipline, out-of-school discipline, and contact with law enforcement) by race/ethnicity (AAPI only vs. multiracial AAPI). Multiracial AAPI LGBTQ students were more likely to experience all three types of school discipline than those who only identified as AAPI: In-school discipline: $\chi^2(1) = 23.51$, $p<.001$, $\phi = .13$; Out-of-school discipline: $\chi^2(1) = 6.03$, $p<.05$, $\phi = .06$; Contact with law enforcement: $\chi^2(1) = 9.43$, $p<.01$, $\phi = .08$.

60     Chi-square tests were performed looking at educational aspirations in-school discipline, out-of-school discipline, and contact with law enforcement. Students were less likely to plan on pursuing post-secondary education when they experienced: In-school

AR_292952

discipline: $\chi^2(5) = 11.23$, $p<.05$, Cramer's V = .09; Out-of-school discipline: $\chi^2(5) = 14.43$, $p<.05$, Cramer's V = .10; and; Contact with law enforcement: $\chi^2(5) = 36.72$, $p<.001$, Cramer's V = .16.

61    To test differences in GPA by in-school discipline, out-of-school discipline, and contact with law enforcement, while controlling for race/ethnicity (AAPI only vs. multiracial AAPI), partial correlations were conducted. All three types of school discipline were related to lower GPA: In-school discipline: $r(1457)=-.22$, $p<.001$; Out-of-school discipline: $r(1457)=-.16$, $p<.001$; Contact with law enforcement: $r(1457)=-.16$, $p<.001$.

62    Kosciw, J. G., Greytak, E. A., Zongrone, A. D., Clark, C. M., & Truong, N. L. (2018). *The 2017 National School Climate Survey: The experiences of lesbian, gay, bisexual, transgender, and queer youth in our nation's schools*. New York: GLSEN.

63    A chi-square test was performed looking at locale on the availability of GSAs at school: $\chi^2(2) = 78.50$, $p<.001$, Cramer's V = .23. Pairwise comparisons were considered at $p<.05$. AAPI LGBTQ students in suburban schools were more likely to have a GSA than students in urban and rural schools. Students in urban schools were more likely to have a GSA than students in rural schools.

64    A chi-square test was performed looking at region on the availability of GSAs at school: $\chi^2(3) = 80.96$, $p<.001$, Cramer's V = .24. Pairwise comparisons were considered at $p<.05$. Students in the Northeast were more likely to have a GSA than students in the South to have a GSA. Students in the West were more likely to have a GSA than students in the Midwest and South. Students in the Midwest were more likely to have a GSA than students in the South. Students in the Northeast did not differ from students in the Midwest and West on having a GSA at their school.

65    The relationship between school size and the availability of a GSA was examined through a Pearson correlation: $r(1464) = .34$, $p<.001$. AAPI LGBTQ students who attended larger schools were more likely to have a GSA at their school.

66    A chi-square test was performed looking at school racial composition on the availability of a GSA at their school. No differences were found on the availability of a GSA by school racial composition.

67    Porta, C. M., Singer, E., Mehus, C. J., Gower, A. L., Saewyc, E., Fredkove, W., & Eisenberg, M. E. (2017). LGBTQ youth's views on gay-straight alliances: Building community, providing gateways, and representing safety and support. *Journal of School Health*, *87*(7), 489–497.

Toomey, R. B. & Russell, S. T. (2013). Gay-straight alliances, social justice involvement, and school victimization of lesbian, gay, bisexual, and queer youth: Implications for school well-being and plans to vote. *Youth & Society*, *45*(4), 500–522.

68    To test differences in missing school and feelings of school belonging by the availability of a GSA at their school, independent t-tests were conducted, with GSAs as the independent variable, and missing school and feelings of school belonging as the dependent variables. Students who had a GSA at their school were less likely to miss school in the past month: $t(952.66) = 5.30$, $p<.001$. Students who had a GSA at their school also felt a greater sense of connection to their school community: $t(1052.47) = -8.81$, $p<.001$.

69    Chi-square tests were performed looking at feelings of safety (due to their sexual orientation, gender expression and race/ethnicity) and the availability of a GSA at their school. Students who had a GSA at their school were: less likely to feel unsafe because of their sexual orientation: $\chi^2(1) = 38.17$, $p<.001$, $\varphi = -.16$, and; less likely to feel unsafe because of their gender expression: $\chi^2(1) = 6.42$, $p=.01$, $\varphi = -.07$. Having a GSA at their school did not affect feelings of safety due to their race/ethnicity.

70    A chi-square test was performed looking at school racial composition and the availability of an ethnic/cultural club at their school: $\chi^2(3) = 14.62$, $p<.01$, Cramer's V = .11. Pairwise comparisons were considered at $p<.05$. Students in majority-White schools were less likely to have an ethnic/cultural club than students in majority-AAPI schools. No other differences were observed.

71    A chi-square test was performed looking at region (Northeast, South, Midwest, West) and the availability of an ethnic/cultural club at their school: $\chi^2(3) = 15.94$, $p<.01$, Cramer's V = .11. Pairwise comparisons were considered at $p<.05$. Students who attended schools in the West were more likely to have an ethnic/

cultural club than students in the Northeast and South. Students in the Northeast, Midwest, and South did not differ from each other.

72    A chi-square test was performed looking at school racial composition (majority AAPI, majority White, majority other non-White race, no majority race) and region (Northeast, South, Midwest, and West): $\chi^2(9) = 152.85$, $p<.001$, Cramer's V = .20. Pairwise comparisons were considered at $p<.05$. Students who attended majority-AAPI schools were more likely to be in the West than students in the Northeast, South, and Midwest: Students who attended majority-White schools were: more likely to be in the Midwest than students in the West and South, more likely to be in the Northeast than in the West, and more likely to be in the South than in the West. Students who attended majority other non-White schools were more likely to be in the South than students in the Midwest. No other differences were found.

73    A chi-square test was performed looking at locale (urban, suburban, rural) and the availability of an ethnic/cultural club at their school: $\chi^2(2) = 48.71$, $p<.001$, Cramer's V = .18. Pairwise comparisons were considered at $p<.05$. Students who attended rural schools were less likely to have an ethnic/cultural club than students in urban and suburban schools. No other differences were found.

74    The relationship between school size and availability of an ethnic/ cultural club was examined through a Pearson correlation. AAPI LGBTQ students who attended larger schools were more likely to have an ethnic/cultural club: $r(1454) = .38$, $p<.001$.

75    A chi-square test was performed looking at feelings of safety due to race/ethnicity and the availability of an ethnic/cultural club at their school. Students who had an ethnic cultural club at their school felt safer due to their race/ethnicity: $\chi^2(1) = 11.87$, $p<.001$, $\varphi = -.09$

To test differences in school belonging by presence of an ethnic/ cultural club, an independent t-test was conducted, with availability of an ethnic/cultural club as the independent variable, and feelings of school belonging as the dependent variable. Students who had an ethnic/cultural club at their school had greater feelings of school belonging: $t(1463) = -4.03$, $p<.001$.

76    Toomey, R. B., Ryan, C., Diaz, R. M., & Russell, S. T. (2011). High school Gay-Straight Alliances (GSAs) and young adult well-being: An examination of GSA presence, participation, and perceived effectiveness. *Applied Developmental Science*, *15*(4), 175–185.

77    Ocampo, A. C. & Soodjinda, D. (2016). Invisible Asian Americans: the intersection of sexuality, race, and education among gay Asian Americans. *Race Ethnicity and Education*, *19*(3), 480–499.

78    Museus, S. (2008). The role of ethnic student organizations in fostering African American and Asian American students' cultural adjustment and membership at predominantly White institutions. *Journal of College Student Development*, *49*(6), 568–586.

79    Bowman, N. A., Park, J. J., & Denson, N. (2015). Student involvement in ethnic student organizations: Examining civic outcomes 6 years after graduation. *Research in Higher Education*, *56*(2), 127–145.

Poteat, V. P., Calzo, J. P., & Yoshikawa, Y. (2018). Gay-straight alliance involvement and youths' participation in civic engagement, advocacy, and awareness-raising. *Journal of Applied Developmental Psychology*, *56*, 13–20.

Toomey, R. B. & Russell, S. T. (2013). Gay-straight alliances, social justice involvement, and school victimization of lesbian, gay, bisexual, and queer youth: Implications for school well-being and plans to vote. *Youth & Society*, *45*(4), 500–522.

80    A chi-square test was performed looking at school racial composition and GSA participation. GSA participation was not related to school racial composition.

81    Chi-square tests were performed looking at demographic characteristics (multiracial AAPI vs. AAPI only, and immigration status) and GSA participation. GSA participation was not related to multiracial status and immigration status.

82    To examine differences in school belonging by GSA participation, an analysis of variance (ANOVA) was conducted with level of GSA participation as the independent variable, and feelings of school belonging as the dependent variable. No significant differences were observed.

83    To examine differences in comfort bringing up LGBTQ issues in class by GSA participation, an analysis of variance (ANOVA) was

47

conducted with level of GSA participation as the independent variable, and comfort bringing up LGBTQ issues in class as the dependent variable. The univariate effect was significant: $F(2, 932) = 12.02$, $p<.001$, $\eta^2 = .03$ . Pairwise comparisons were considered at $p<.05$. Students who did not attend GSA meetings were less likely to bring up LGBTQ issues in class than those who attended GSA meetings as non-leaders and as leaders. GSA leaders and non-leaders did not differ on comfort with bringing up LGBTQ issues in class.

84    GLSEN Days of Action (including Ally Week, No Name-Calling Week, and Day of Silence) are national student-led events of school-based LGBTQ advocacy, coordinated by GLSEN. The Day of Silence occurs each year in the spring, and is designed to draw attention to anti-LGBTQ name-calling, bullying, and harassment in schools. Visit www.dayofsilence.org for more information.

85    To examine differences in rates of participation by level of GSA participation, two chi-square tests were conducted: participating in GLSEN Day of Action, and participating in a rally, protest, or demonstration for a cause. The effects for both were significant. GLSEN Day of Action: $\chi^2(2) = 132.02$, $p<.001$, Cramer's V = .38; rally, protest, or demonstration: $\chi^2(2) = 30.43$, $p<.001$, Cramer's V = .18. Pairwise comparisons were considered at $p<.05$. For both activities, GSA members, both leaders and non-leaders, were more likely to participate than students who were not GSA members; and GSA leaders were more likely than GSA non-leaders to participate.

86    To examine differences in rates of participation by level of GSA participation, two chi-square tests were conducted: participating in a boycott against a company, and contacting politicians, governments, or authorities about issues that are important to them. The effects for both were significant. Participating in a boycott against a company: $\chi^2(2) = 132.02$, $p<.001$, Cramer's V = .38; contacting politicians, governments, or authorities: $\chi^2(2) = 132.02$, $p<.001$, Cramer's V = .38. Pairwise comparisons were considered at $p<.05$. For both activities, GSA leaders were more likely to participate than non-members. No differences were found between GSA leaders and GSA non-leaders, and no differences were found between GSA non-leaders and non-members.

87    To examine differences in rates of participation by level of GSA participation, three chi-square tests were conducted: participating in an event where people express their political views, volunteering to campaign for a political cause or candidate, and expressing political views about politics or social issues on social media. The effects for all three were significant. Events for expressing views: $\chi^2(2) = 49.83$, $p<.001$, Cramer's V = .23; volunteering to campaign: $\chi^2(2) = 20.32$, $p<.001$, Cramer's V = .15; expressing political views: $\chi^2(2) = 11.66$, $p<.001$, Cramer's V = .11. Pairwise comparisons were considered at $p<.05$. For all three activities, GSA members, both leaders and non-leaders, were more likely to participate than students who were not GSA members; and no differences were found between GSA non-leaders and leaders on participation.

88    To examine differences in anti-LGBTQ victimization by GSA participation, a multivariate analysis of variance (MANOVA) was conducted with level of GSA participation as the independent variable, and two dependent variables: severity of victimization due to sexual orientation, and severity of victimization due to gender expression. The multivariate effect was significant: Pillai's Trace = .03, $F(4, 1780) = 7.52$. The univariate effects for victimization due to sexual orientation and gender expression were both significant. Sexual orientation: $F(2, 890) = 13.67$, $p<.001$. Gender expression: $F(2, 890) = 12.07$, $p<.001$. Pairwise comparisons were considered at $p<.05$. Sexual orientation: students attending as a leader/officer experienced greater levels of victimization than those who did not attend and those attending as a non-leader; there was no difference between those not attending and those attending as a non-leader. Gender expression: students attending as a leader/officer experienced greater levels of victimization than those who not attending and those attending as a non-leader; there was no difference between those not attending and those attending as a non-leader.

89    A chi-square test was conducted looking at school racial composition and ethnic/cultural club participation. School racial composition was not related to ethnic/cultural club participation.

90    A chi-square test was conducted looking at immigrant status and ethnic/cultural club participation: $\chi^2(2) = 7.57$, $p<.05$, $e = .08$. Comparisons showed the following significant differences at $p<.05$: U.S. born students were less likely to participate than those born

outside the U.S.; U.S. born students were less likely to participate as a leader. U.S. born students did not differ from those born outside the U.S. on participating as a non-leader.

91    A chi-square test was conducted looking at racial identification (multiracial AAPI vs. AAPI only) and ethnic/cultural club participation. Multiracial AAPI LGBTQ students did not differ from those who only identify as AAPI on ethnic/cultural club participation.

92    To examine differences in school belonging by ethnic/cultural club participation, an analysis of variance (ANOVA) was conducted with level of ethnic/cultural club participation as the independent variable, and feelings of school belonging as the dependent variable. No significant differences were observed.

93    To examine whether school belonging was related to ethnic/cultural club participation by school racial composition, a two-way analysis of variance (ANOVA) was conducted with ethnic/cultural club participation as the independent variable, ethnic/cultural club participation X school racial composition as the interaction term, and school belonging as the dependent variable. The univariate effect was not significant. No differences were found between participation in ethnic/cultural clubs and school belonging, and no differences were found between the participation in ethnic/cultural clubs X school racial composition interaction and school belonging.

94    We examined differences in rates of participation in the following activities: participating in an event where people express their political views (such as a poetry slam or youth forum); volunteering to campaign for a political cause or candidate; participating in a boycott against a company; expressing views about politics or social issues on social media; participating in a rally, protest, or demonstration for a cause; participating in a GLSEN Day of Action; and contacting politicians, governments, or authorities about issues that are important to the student.

      To examine differences in rates of participation by level of ethnic/cultural club participation, a series of chi-square tests were conducted for each form of activism. The effect was significant for the following forms of activism: Event to express political views: $\chi^2(2) = 43.27$, $p<.001$, Cramer's V = .20; volunteering: $\chi^2(2) = 33.74$, $p<.001$, Cramer's V = .18; boycott: $\chi^2(2) = 19.35$, $p<.001$, Cramer's V = .13; social media: $\chi^2(2) = 18.47$, $p<.001$, Cramer's V = .13; rally: $\chi^2(2) = 24.39$, $p<.001$, Cramer's V = .15; contacting politicians: $\chi^2(2) = 32.77$, $p<.001$, Cramer's V = .17. No differences were found for participating in a GLSEN Day of Action. Pairwise comparisons were considered at $p<.05$. For participating in a boycott, non-leader club members were more likely to participate than students who did not attend club meetings; no differences were found between ethnic/cultural club leaders, and non-leaders and those who did not attend meetings on participation in boycotts. For participating in an event to express political views, volunteering to campaign, expressing views on social media, participating in a rally, and contacting politicians, club leaders were more likely than those who did not attend meetings to: club leaders and non-leaders were more likely to participate in these activities than those who did not attend club meetings; no differences were found between club leaders and non-leaders on participating in these activities.

95    To examine differences in racist victimization by ethnic/cultural club participation, an analysis of variance (ANOVA) was conducted, with frequency of racist victimization as the dependent variable, and level of ethnic/cultural club participation as the independent variable. The effect was not significant. A similar analysis of covariance (ANCOVA) was conducted, controlling for school racial composition. The results did not change.

96    Shelton, S. A. & Barnes, M. E. (2016). "Racism just isn't an issue anymore": Preservice teachers' resistances to the intersections of sexuality and race. Teaching and Teacher Education, 55, 165–174.

97    To test differences in race/ethnicity and supportive school personnel, two separate independent t-tests were conducted, with race/ethnicity (AAPI only vs. multiracial AAPI) as the independent variable, and supportive staff and supportive administrators as the dependent variables. LGBTQ students who only identified as AAPI were more likely to have supportive staff and administrators than multiracial AAPI LGBTQ students: $t(1456) = 2.97$, $p<.01$; supportive administrators: $t(1459) = 2.49$, $p<.05$.

98    The relationship between number of supportive educators, and feelings of school belonging and psychological well-being (self-esteem, depression) were examined through Pearson correlations.

AR_292954

Students who have more supportive staff had greater levels of school belonging, higher levels of self-esteem, and lower levels of depression: Feelings of school belonging: $r(1456) = .49$, $p<.001$; Self-esteem: $r(1439) = .26$, $p<.001$; Depression: $r(1438) = -.28$, $p<.001$

99   The relationship between number of supportive educators and missing school, feeling unsafe (due to sexual orientation, gender expression, and race/ethnicity), and GPA were examined through Pearson correlations. Students who had more supportive staff: were less likely to miss school; were less likely to feel unsafe due to sexual orientation, gender expression, and race/ethnicity; and had higher GPAs. Missing school: $r(1457) = -.28$, $p<.001$; feeling unsafe due to sexual orientation: $r(1458) = -.25$, $p<.001$; feeling unsafe due to gender expression: $r(1458) = -.15$, $p<.001$; feeling unsafe due to race/ethnicity: $r(1458) = -.13$, $p<001$; GPA: $r(1458) = .15$, $p<.001$.

100   To examine differences in educational aspirations by number of supportive educators, an analysis of variance (ANOVA) was conducted with educational aspirations as the independent variable, and number of supportive educators as the dependent variable. The effect was significant: $F(5, 1440) = 43.38$, $p<.001$, $\eta_p^2 = .03$. Post hoc comparisons were considered at $p<.05$. Students who have more supportive staff were more likely to plan to pursue post-secondary education.

101   Chi-square tests were performed looking at feelings of safety due to sexual orientation and gender expression and the availability of inclusive curriculum at their school. Students who had an inclusive curriculum at their school were less likely to feel unsafe due to their sexual orientation: $\chi^2(1) = 43.48$, $p<.001$, $\phi = -.17$, and; less likely to feel unsafe because of their gender expression: $\chi^2(1) = 17.84$, $p<.001$, $\phi = -.11$.

102   To test differences in peer acceptance and having an inclusive curriculum at school, an independent t-test was conducted, with inclusive curriculum as the independent variable, and peer acceptance as the dependent variable. Students who had an inclusive curriculum at their school had greater peer acceptance: $t(881.74) = -15.13$, $p<.001$.

103   To test differences in feelings of school belonging and having an inclusive curriculum at school, an independent t-test was conducted, with inclusive curriculum as the independent variable, and school belonging as the dependent variable. Students who had an inclusive curriculum at their school had greater feelings of school belonging: $t(790.61) = -13.84$, $p<.001$.

104   A chi-square test was performed looking at feelings of safety due race/ethnicity and the availability of inclusive curriculum at their school. Students who had an inclusive curriculum at their school were less likely to feel unsafe due to their race/ethnicity: $\chi^2(1) = 4.22$, $p<.05$, $\phi = -.05$.

105   Givens, J. R., Nasir, N., Ross, K, & McKinney de Royston, M. (2016). Modeling manhood: Reimagining Black male identities in school. *Anthropology and Education Quarterly, 47*(2), 167–185.

AR_292955

**GLSEN**

GLSEN
110 William Street, 30th Floor
New York, NY 10038
www.glsen.org



$15.00
ISBN 978-1-934092-30-9
51500>

OFFICE OF
**Elementary & Secondary Education**

Search 🔍

# Safe & Supportive Schools



Office of Safe and Supportive Schools (OSSS) addresses;

- the health and well-being of students
- school safety, security, and emergency management and preparedness.

OSSS administers, coordinates, and recommends policy as well as administers grant programs and technical assistance centers addressing the overall safe and health school community.

Safe and supportive schools are critical to the well-being of the whole school community as well as the academic success of students. The Department of Education provides schools, school districts, and state education agencies with resources aimed at creating and nurturing positive school climates; preventing school violence; and protecting the whole school community through school safety, security, and emergency management and preparedness planning. The program offices, grant programs, and technical assistance centers all respond to the recommendations put forth by the Federal Commission on School Safety and serve practitioners as they work to continually protect their school community students, staff, and families.

- **Secretary's School Safety Grants Announcement** Currently, the Department is competing grant programs addressing violence prevention, school climate and mental health services.
- **OSSS Programs** (OSSS) is organized into two (2) groups: The *Safe and Supportive Schools Group* and the *Student Support and Academic Enrichment Group*. Together, the groups support grantees across the nation and administer numerous programs including the:
  - **Project Prevent Grant Program**, which enhances schools' and school districts' ability to identify, assess, and serve students exposed to pervasive violence;
  - **School Climate Transformation Grant Program**, which helps schools and school districts develop, enhance, or expand their systems of support related school climate programs; and

2. **Student Support and Academic Enrichment Program** (Title IV, Part A), which addresses well-rounded educational opportunities in both the traditional, in-person setting and virtual setting alike, as well as safe and healthy student programming.

- **Federal Partners in Student Health Resource Hub,** The Student Health Resource hub serves as a portal where K–12 schools, school districts, SEAs, and other stakeholders can access high quality federal and federally supported information, resources, and research that support student health. The goal of this hub is to provide information that supports the physical and mental health of all students as well as healthy, physical school environments. Content for the site is comprised of resources by the Federal Partners in School Health (FPSH) working group, which is an alliance of federal agencies that support healthy school environments.

- **Readiness and Emergency Management for Schools (REMS) Technical Assistance (TA) Center,** The REMSTA Center is the nation's higher ed and K-12 school safety, security, and emergency management and preparedness hub for information and services (e.g., guidance, training, tools, resources). The REMS TA Center serves K-12 schools and institutions of higher education (IHEs), public and private, as well as their local, state, and Federal partners with shared school safety responsibilities. They develop and maintain comprehensive, all-hazard, and high-quality campus and school Emergency Operations Plans (EOPs).  These plans focus on continually protecting the whole school community before, during, and after possible emergencies. In addition to its free virtual trainings, the REMS TA Center offers numerous interactive tools such as its EOP Assist software, which helps generate customized plans and its SITE ASSESS app which facilitate the walk-through and safety inspection of campus and buildings.

- **National Center on Safe and Supportive Learning Environments (NCSSLE),** provides training and technical assistance to schools, school districts, and educational agencies to support efforts aimed at creating and nurturing safe and supportive learning environments. The national center addresses a wide variety of topics that impact school climate, ranging from bullying and violence prevention to tools for measuring and identifying needs for school climate. For example, NCSSLE produced and disseminates ED's School Climate Survey and the School Climate Improvement Resource Package.

## Contact Information

Bryan Williams, Director
Safe & Supportive Schools
U.S. Department of Education, OESE
400 Maryland Ave., SW
Washington D.C. 20202

☎  202-453-6715

✉  E-mail

## Resources

## Announcements

Safe Firearm Storage Template Letter

OSSS TA Center Collaborative Supportive Schools Fact Sheets

Guiding Principles and Best Practices in School Discipline to Support Students' Social, Emotional, Behavioral, and Academic Needs

## Guidance

Dear Colleague Letter: K-12-Resources-for-Afghan-Evacuees

## Reports

FY 2020 ED Performance Summary

FY 2019 ED Performance Summary

FY 2017 ED Performance Summary

**Publications**

Study of State Policies to Prohibit Aiding and Abetting Sexual Misconduct in Schools

Fact-Sheet-Study-of-State-Policies-to-Prohibit-Aiding-and-Abetting-Sexual-Misconduct-in-Schools

Growing Up Drug Free: A Parent's Guide to Substance Use Prevention

Crecer Libre de Drogas: Una Guía Parental para Prevenir el Uso de Estupefacientes

Center to Improve Social and Emotional Learning and School Safety

Grants to States for Emergency Management

Mental Health Service Professional Demonstration Grant Program

Project Prevent

School Climate Transformation LEA

School Climate Transformation SEA

School Emergency Response to Violence (Project SERV)

Student Support and Academic Enrichment / Title IVA

Trauma Recovery Demonstration Grant Program

Expanding Access to Well-Rounded Courses
Demonstration Grants Program

School-Based Mental Health Services Grant Program

# Stronger Connections Technical Assistance and Capacity Building Grant Program

Last Modified: 07/12/2024

HOME

PROGRAMS

GRANTEES & APPLICANTS

FAMILIES

EDUCATORS

RESOURCES

CONTACT OESE

AR_292961



*the*
# Williams
INSTITUTE

# The Business Impact of LGBT-Supportive Workplace Policies

M.V. Lee Badgett, Laura E. Durso, Angeliki Kastanis & Christy Mallory

May 2013

Made possible with grants from



AR_292981

# The Business Impact of LGBT-Supportive Sexual Orientation And Gender Identity Policies



M.V. Lee Badgett, Laura E. Durso, Angeliki Kastanis & Christy Mallory                 May 2013

## EXECUTIVE SUMMARY

Today's workforce is increasingly diverse in terms of personal characteristics such as race, ethnicity, gender, national origin, religion, gender identity, and sexual orientation. The "business case for diversity" suggests that such diversity in the workplace will lead to lower costs and/or higher revenues, improving the bottom line. Not surprisingly, employers have considered the economic benefits of adding lesbian, gay, bisexual, and transgender (LGBT)-supportive policies, including sexual orientation and gender-identity nondiscrimination policies and domestic partner benefits policies.

The present review identifies and evaluates all published research evaluating the impact of LGBT-supportive employment policies and workplace climates on business outcomes in order to answer two primary questions: 1.) Does research show that LGBT-supportive policies bring about the specific benefits mentioned by private companies that enact them, or are they associated with other similar economic benefits that may have an impact on the bottom line?; 2.) If LGBT-supportive policies bring about certain benefits, does research show that these benefits actually have an impact on the bottom line, and if so, is it possible to estimate that effect in quantitative terms?

In total, this study reviews 36 research studies that include findings related to the impact of LGBT-supportive policies or workplace climates on business outcomes. We conclude that this body of research supports the existence of many positive links between LGBT-supportive policies or workplace climates and outcomes that will benefit employers. However, none of the studies provides direct quantitative estimates of the impact on the bottom line.

More specifically, the existing set of studies demonstrates that LGBT-supportive policies and workplace climates are linked to greater job commitment, improved workplace relationships, increased job satisfaction, and improved health outcomes among LGBT employees. Furthermore, LGBT-supportive policies and workplace climates are also linked to less discrimination against LGBT employees and more openness about being LGBT. Less discrimination and more openness, in turn, are also linked to greater job commitment, improved workplace relationships, increased job satisfaction, improved health outcomes, and increased productivity among LGBT employees.

Figure 1 presents the number of studies finding that employers' LGBT-supportive policies and workplace climates lead to positive business outcomes compared to the number of studies that find a negative relationship or no relationship to business outcomes. As shown in the figure,

1

most studies find a positive relationship between LGBT-supportive policies or workplace climates and business-related outcomes, while few or none find a negative or no relationship.

Figure 1: Number of studies showing relationship between LGBT-supportive policies or workplace climates and economic outcomes



We assess the strength of each of the proposed associations between LGBT-supportive policies or climate to workplace outcomes by taking into account the number of studies supporting a particular link, the quality of studies supporting the link, and number of studies that did not support the link. These findings are also summarized in Figure 2.

- *Strongest finding:* LGBT-supportive policies or workplace climates are most strongly linked to more openness about being LGBT.
- *Fairly strong findings:* We see fairly strong links between LGBT-supportive policies and workplace climates to less discrimination, improved health outcomes, increased job satisfaction, and greater job commitment.
- *Findings from a small number of studies:* Other possible links between LGBT-supportive policies or workplace climates and improved workplace relationships, health insurance costs, creativity, and stock prices are not yet strong due to the small number of studies that assess these relationships.
- *No studies:* We have found no studies assessing possible links between LGBT-supportive policies or workplace climates and falling litigation costs, increased public sector customers, more individual consumers, and improved recruitment and retention.
- *Connection to other research on business outcomes:* Other research finds that these business outcomes, which are influenced by LGBT-supportive policies or workplace

AR_292983

outcomes, lead to higher productivity and lower costs for employers, which in turn would enhance business profitability.

Figure 2:  Strength of relationships in the research

We make several recommendations about directions for future research:
- Recruit more racially and ethnically diverse samples of LGBT people.
- Recruit larger samples of bisexual men and women and transgender employees.
- Use more direct measures of business outcomes, such as productivity and profit measures.
- Employ a wider range of sampling methods and research designs.

Finally, researchers and business officials should collaborate to fully utilize data collected by employers and to make findings available to policymakers, the public, and other businesses.



## INTRODUCTION

A well-motivated and productive set of employees is essential for business success.  Today, businesses' employees are increasingly diverse in terms of race, ethnicity, sex, national origin, religion, gender identity, and sexual orientation, among other characteristics.  The impact of that diversity is much discussed in the global economy, and the "business case for diversity" has become a modern business mantra.  In short, the business case posits that a diverse workforce (or in more nuanced versions, a *well-managed* diverse workforce) will lead to lower costs and/or higher revenues, improving the corporate bottom line.  If the business case is correct, then employers have economic incentives to take actions that will create and maintain a diverse workforce.  This briefing paper assesses the research-based evidence related to the business case for diversity related to sexual orientation, and to a lesser extent, gender identity.

The roots of the business case for diversity hypothesis can be found in policies in the United States that were designed to eliminate discrimination and, in effect, to diversify the race and gender composition of the corporate workforce. Kelly and Dobbin (1998) argue that diversity management rhetoric emerged as government pressure on companies to comply with nondiscrimination laws and affirmative action diminished in the 1980's.  During earlier enforcement periods, companies had hired human resources professionals who developed

3

managerial expertise in practices that would result in more diverse workforces. As enforcement pressure lessened, those managers then became champions of retaining practices and internal policies that promote racial, ethnic, and gender diversity, using the argument that those practices were essential to creating a diverse workforce that had become a competitive necessity.

More recently, pressure from LGBT employees and, in some cases, policymakers and unions has pushed employers to end discriminatory practices against LGBT workers (Badgett, 2001; Raeburn, 2004). Those stakeholders often apply the business case for diversity to this newer territory, although the focus is less on increasing representation of LGBT people and more on equal treatment of LGBT employees. Voluntarily enacted sexual orientation and gender identity nondiscrimination policies, domestic partner benefits, transition-related health care benefits, and other related policies are said to be sound business decisions, in addition to be the fair or right thing to do.

Those efforts have been successful, as we see by the rapid growth in the number of corporations adopting LGBT-supportive policies. In 1999, 72% of Fortune 500 companies included sexual orientation in their nondiscrimination policies, and only a handful included gender identity (Human Rights Campaign, 1999). By 2009, 87% of such companies included sexual orientation and 41% included gender identity in their nondiscrimination policies (Luther, 2009). Over the same time period, the percentage of Fortune 500 companies offering domestic partner benefits increased from 14% to 59% (Human Rights Campaign, 1999; Luther, 2009).

A 2011 Williams Institute study found evidence that the business case for diversity motivates employers to take those actions (Sears & Mallory, 2011). The study found that almost all of the top 50 Fortune 500 companies and the top 50 federal government contractors (92%) state that, in general, diversity policies and generous benefit packages are good for their business. In addition, the majority of those companies (53%) have specifically linked policies prohibiting sexual orientation and gender identity discrimination or a decision to extend domestic partner benefits to their employees to improving their bottom line.

The question remains about how well the reality matches the rhetoric. An enormous amount of research over the last few decades has assessed the validity of the business case for diversity related to race, sex, age, experience, and other dimensions of employment diversity. Reviews of those studies have found that support for the business case for diversity is not straightforward (Jackson et al., 2003). Some studies find positive effects of diversity on firms' outcomes, but others find no effect or even a negative impact of diversity on business-related outcomes. One set of influential and highly detailed studies of diversity within particular firms found little direct effect of diversity, positive or negative, on team processes or on team and individual performance measures (Kochan et al., 2003). The "business case" has, instead, increasingly focused on the management of diversity, with an emphasis on cultural competency, training in group process skills, and efforts toward full inclusion of employees from varying social groups as a way to create value from a diverse workforce.

The business case for diversity-respecting policies related to LGBT people has been somewhat different, with a focus on the impact of policies rather than on the sexual orientation and gender identity diversity of an employer's workforce per se. As we discuss in the next section, policies

AR_292985

that equalize compensation or improve the workplace climate might have a direct impact on LGBT employees.

As a framework for our review, the next section outlines processes occurring within and outside an organization that could generate positive changes in business outcomes.  After that discussion, the bulk of the report addresses our primary questions:  Does research show that LGBT-supportive policies bring about the specific benefits mentioned by private companies, or other similar economic benefits that may have an impact on the bottom line?  If LGBT-supportive policies bring about certain benefits, does research show that these benefits actually have an impact on the bottom line, and if so, is it possible to estimate that effect in quantitative terms? Various stakeholders and employers have suggested that LGBT-supportive policies would bring about the following specific benefits that would have a positive impact on the corporate bottom line (Sears & Mallory, 2011):

- Improved recruitment and retention of talented employees
- New ideas and innovations generated by drawing on a workforce with a wide range of characteristics and experiences
- Attracting and better serving a diverse customer base
- Increasing employee productivity
- Securing business with public sector clients that require employment nondiscrimination or domestic partner benefits policies
- Boosting morale and employee relations by responding favorably to requests from employees or unions

To answer those questions, we summarize the findings of 36 research studies that assess links between diversity-respecting policies and outcomes.  We find that existing research supports the existence of many of those links at a qualitative level.  LGBT-supportive employment policies lead to outcomes that will benefit employers.  However, some proposed linkages have not yet been the subject of research, and none of the studies provides appropriate and generalizable quantitative estimates of the impact.  Also, most of the studies we found focus in particular on lesbian and gay employees, with less research conducted with samples of bisexual and transgender employees.  Below, we first evaluate research conducted with LGBT people as a group, LGB people, or only with lesbian and gay employees.  The next two sections focus on findings based only upon bisexual and transgender employees.  Because most of the policies discussed could include protection for bisexual and transgender employees, we use "LGBT-supportive" to describe these policies throughout the report, but distinguish the research populations studied.

Finally, we discuss other limitations of the existing research and make some preliminary recommendations for productive directions for future research.

## POTENTIAL LINKS BETWEEN POLICIES AND BUSINESS OUTCOMES

The business case implies a causal relationship between diversity-respecting policies and employers' competitiveness in their product markets.  To put it simply, for improved competitiveness and rising profits, either the costs of doing business fall or revenues rise. Unfortunately, no existing study uses any direct measures of costs or revenues as an outcome

AR_292986

measure. Therefore, we first look for links between workplace policies and individual LGBT worker outcomes and organizational outcomes. We identify two primary possible individual outcomes, and eleven other secondary possible individual and organizational outcomes that have been suggested in the academic literature and in corporate discussions. Below we identify those outcomes with a lower-case letter. Since those outcomes are not measured in dollar terms of costs and revenue, the basic determinants of profit, we next look for evidence that the outcomes would have implications for costs and revenue.

*Diversity-respecting policies:* Prior studies have evaluated different diversity policies, including LGBT-supportive policies, and measures of workplace climate. In this report, we focus on the effect of sexual orientation and gender identity nondiscrimination policies, domestic partner benefits, or some more general measure of the workplace climate for LGBT people.

*Individual outcomes:* LGBT-supportive policies and workplace climates might have several important effects on LGBT employees that will increase their productivity levels or retention rates (effects that would reduce employer costs and increase profits). At the most immediate level, these policies could result in (a) less discrimination and (b) increased openness (or less concealment) in the workplace about being LGBT. Concealment of sexual orientation is associated with increased psychological distress (Pachankis, 2007) and poor immune functioning (Cole, Kemeny, et al., 1996; Cole, Taylor, et al., 1996), suggesting its importance as an outcome variable of interest. Those immediate primary effects, in turn, could have secondary effects on workplace-related outcomes through:

c) Improved health outcomes
d) Increased job satisfaction
e) Improved relationships with co-workers and supervisors
f) Greater commitment and other positive workplace behaviors and attitudes

Those secondary effects are more closely related to potential reductions in employer costs. Job satisfaction, better health outcomes, and improved relationships could increase productivity. All four secondary effects could reduce turnover.

*Organizational outcomes:* Diversity-enhancing policies also have organizational effects that could improve profits, both through lower costs and higher revenue, including:

g) Lower health insurance costs (through c)
h) Lower legal costs from litigation related to discrimination (through a)
i) Greater access to new customers, such as public sector entities that require contractors to have nondiscrimination policies or domestic partner benefits
j) More business from individual consumers who want to do business with socially responsible companies
k) More effective recruiting of LGBT and non-LGBT employees who want to work for an employer that values diversity
l) Increased creativity among employees that could lead to better ideas and innovations
m) Greater demand for company stock because of expected benefits of diversity policies

*Confounding factors:* It is important to note that other aspects of an employer's environment might also influence how the policies result in changes in individual or organizational outcome measures. For example, firm size might matter, since larger firms might have more effective

6

human resource departments. Industry could matter, since if competitors also have LGBT-supportive policies, prospective employees might have other good options for employment, reducing the benefits of the diversity policies by lowering their value as a unique workplace incentive. There are many other potential factors, including the employer's location, the existence of state or local nondiscrimination laws, and employee awareness of policies, that should be taken into account in studies that ask whether policies lead to better business outcomes.

In the next two sections, we look for evidence of these 13 potential links between policies and business-related outcomes for individuals and organizations.

## IMMEDIATE EFFECTS ON EMPLOYEES

### (a) Less discrimination

Figure 3: Number of studies showing relationship between LGBT-supportive policies or workplace climates and discrimination



*LGBT-supportive policies → Less discrimination*

Research suggests that LGBT employees experience less discrimination when their employer has a nondiscrimination policy that includes sexual orientation and gender identity. For example, a 2001 survey of gay men and lesbians from 31 states and the District of Columbia found that employees covered by a sexual orientation workplace nondiscrimination policy were significantly less likely to have experienced discrimination than those who were not covered by a policy (Button, 2001). Additionally, a national survey of LGB employees reported less workplace discrimination if their company had a nondiscrimination or domestic partnership benefits policy in place, or if they lived in a state with legislation prohibiting discrimination on the basis of sexual orientation (Ragins & Cornwell, 2001). Having these types of policies at the organizational level was more strongly related to perceived workplace discrimination than having state-level legislation. One survey, which asked about discriminatory workplace treatment more specifically, found that employees who were covered by a nondiscrimination policy were less likely to have experienced each type of discrimination asked about than those who were not covered (Human Rights Campaign, 2009).

However, at least two studies suggest that LGBT-supportive workplace policies do not make it any less likely that employees will experience discrimination. A 1999 survey of LGB employees found that LGBT-inclusive nondiscrimination policies were unrelated to experiences of discrimination in the workplace (Waldo, 1999). Additionally, a 2006 study of gay men found

that workers who were covered by a LGBT-inclusive nondiscrimination policy rated their employers as significantly more hostile than workers who were not covered by a policy (Tejeda, 2006). The latter study included a small number of respondents (65) and was not able to separate out the possibility that gay men covered by a LGBT-inclusive nondiscrimination policy may have been more likely to report workplace hostility, as they may have felt protected from retaliation in reporting inappropriate behavior. In addition, though not finding a direct link between the existence of LGBT-supportive policies and incidents of discrimination, Waldo (1999) did find that LGBT-supportive workplace climates were significantly related to lower heterosexism in the workplace. In his analysis, Waldo used a measure of workplace climate that asked participants to rate how their workplace would respond to complaints about anti-LGBT behavior, a potential proxy measure for workplace procedures to address discrimination under corporate policies. Given these points, we conclude that these studies do not outweigh the conclusion drawn from the previous paragraph that LGBT-supportive policies appear to reduce discrimination.

**(b) Increased openness (or less hiding) in the workplace about being LGBT**

Figure 4: Number of studies showing relationship between LGBT-supportive policies or workplace climates and openness about being LGBT



*LGBT-supportive policies → Increased openness about being LGBT*

Research indicates that LGBT-supportive policies can create a workplace climate where employees feel comfortable enough to disclose their sexual orientation and gender identity. Four studies have found that LGB people are more likely to disclose their sexual orientation when their employer has an LGBT-inclusive nondiscrimination policy or a domestic partner benefits policy (Badgett, 2001; Rostosky & Riggle, 2002; Tejada, 2006; Ragins & Cornwell, 2007). One of these studies also found that having a partner who was covered by an LGBT nondiscrimination policy increased the likelihood of an employee himself or herself being out in the workplace (Rostosky & Riggle, 2002). In total, these studies surveyed over 800 gay men and lesbians and people in same-sex couples across the country.

However, at least one survey has found that the presence of LGBT-supportive policies does not make it more likely that LGBT employees are out at work. The Human Rights Campaign's (2009) nationally representative survey of LGBT employees found that employees who were not covered by an LGBT-inclusive nondiscrimination policy were about as likely to be out as those who were covered. Though diverging from the literature reviewed above, these findings do not suggest that LGBT employees are *less* likely to be out at work when LGBT-supportive policies

are in place.  Thus at worst, these policies are not a deterrent to disclosure in the workplace and at best may support employees in coming out.

*LGBT-supportive workplace climate→Increased openness about being LGBT*

Research has also found that employees are more likely to be out if they perceive their workplace to be supportive of LGBT people.  Workplace support is measured differently in these studies, but generally it is broader than whether the company has a nondiscrimination or domestic partner benefits policy.  Three studies conducted in the last ten years that together surveyed almost 2,000 people showed that employees are more likely to be out if they perceive their workplaces to supportive of LGBT people (Griffith & Hebl, 2002; Human Rights Campaign, 2009; Ragins, Singh, & Cornwell, 2007).  The most recent of these surveys, the Human Rights Campaign's 2009 survey, found that employees were more likely to be out to everyone at work when they perceived their workplace climate to be supportive of LGBT people (29% compared to 9%).  A 1996 study of lesbian employees also found that supportive workplace climates are significantly related to an employee's openness about his or her sexual orientation at work (Driscoll, Kelley, & Fassinger, 1996).

## Secondary effects for individuals in the workplace

### (c) Improved health and well-being outcomes

Figure 5:  Number of studies showing relationship between LGBT-supportive policies or workplace climates and health outcomes



*LGBT-supportive policies→Improved health and well-being outcomes*

Several studies have found that employees covered by LGBT-supportive policies are psychologically healthier than those who are not covered by these policies.  Studies show that these policies can have broader effects on employees' well-being outside of the workplace, as well as work-specific effects.  A 2009 survey of LGBT employees (Human Rights Campaign, 2009) found that those who were covered by a nondiscrimination policy were less likely to feel depressed than those who were not covered by such a policy (26% compared to 42%); were less

AR_292990