likely to feel distracted (24% compared to 31%); and less likely to feel exhausted (20% compared to 25%). Similar results were found when looking at the impact of domestic partner benefits policies. For example, a 2007 study based on a national survey of LGB employees found that those who were offered domestic partner benefits through their employer reported significantly more organization-based self-esteem (Ragins & Cornwell, 2007). A 2000 study of lesbians and gay men in the Midwest found lower rates of work-home conflict among lesbian and gay employees whose workplaces had nondiscrimination policies in place (Day & Schoenrade, 2000). The study also found less job stress among employees who were covered by a nondiscrimination policy than those who were not, however the difference was not statistically significant.

*LGBT-supportive workplace climate → Improved health and well-being outcomes*

Other studies have found that LGB people who perceive their workplaces to be generally supportive of LGBT people are psychologically healthier than employees who work in unsupportive workplace climates (Driscoll, Kelley, & Fassinger, 1996; Waldo, 1999). A 2005 study based on a survey of lesbians and gay men found that the supportiveness of LGBT people in workplace climates was significantly related to lower job stress, however, this relationship was eliminated when taking into account perceived discrimination (Munoz, 2005). Other results from this study indicated that LGBT-supportive workplace climates had significant and positive effects on job-related variables such as turnover intentions, which suggests an overall beneficial effect of LGBT-supportive workplace climates on the well-being of LGBT employees.

*Increased openness about being LGBT → Improved health and well-being outcomes*

Generally, research has shown that LGBT employees who are out at work also report being psychologically healthier than those who conceal their sexual orientation or gender identity. For example, the Human Rights Campaign (2009) survey found that employees who were out in the workplace were less likely to feel depressed than those who were not out (26% compared to 44%); less likely to feel distracted (25% compared to 31%); less likely to feel exhausted (12% compared to 30%); and less likely to avoid social events (18% compared to 29%). Other studies show similar differences between employees who are out at work and those who are not, including less anxiousness and higher self-esteem reported by those who are out (Griffith & Hebl, 2002; Jordan & Deluty, 1998; Smith & Ingram, 2004). A 2006 study of Dutch lesbians and gay men found similar results for gay men (Sandford, Bos, & Vet, 2006).

Qualitative studies also suggest that LGB employees who are out at work are psychologically healthier. For example, an analysis of responses to a 1995 survey of Harvard Business School alumni found that employees who were not out at work reported higher stress, more discomfort with socializing, and lower self-esteem (Friskopp & Silverstein, 1996). Similar experiences have been described in other qualitative studies (Boatwright, Gilbert, Forrest, & Ketzenberger, 1996).

Two national studies, Driscoll, Kelley, and Fassinger (1996) and Ragins, Singh, and Cornwell (2007), indicate that being out in the workplace is not directly related to psychological well-being. However, other findings from these studies support the theoretical relationship between disclosure and improved health and well-being. Ragins et al. (2007) show that concealment of sexual orientation was associated with greater psychological distress, indicating that the inability

10

to disclose one's sexual orientation in the workplace is associated with negative outcomes. This suggests that policies which support disclosure, thus reducing the need to conceal, may lower the risk of experiencing this distress. Driscoll and colleagues show a significant positive relationship between disclosure and lesbian employees' perceptions of a supportive work environment, suggesting that disclosure has an indirect and positive effect on stress levels through workplace climate. Thus overall, these studies suggest that supporting disclosure of sexual orientation in the workplace has the net effect of improving the health and well-being of LGBT employees.

*Less discrimination → Improved health and well-being outcomes*

Research also shows that experiencing discrimination can affect an individual's mental and physical health (Williams, 2003). Munoz (2005) found that greater perceived workplace discrimination was associated with higher job-related stress among gay men and lesbians, whereas LGBT-supportive workplace climates were linked to lower job-related stress. Similarly, Waldo (1999) found poorer health outcomes among employees who had experienced direct heterosexism.

Other research shows that employees need not have experienced discrimination to feel similar negative effects. Those who work in environments that cause them to fear discrimination also report negative health outcomes (Ragins, Singh, & Cornwell, 2007; Sandfort, Bos, & Vet, 2006; Smith & Ingram, 2004).

**(d) Increased job satisfaction**

Figure 6:  Number of studies showing relationship between LGBT-supportive policies or workplace climates and job satisfaction



*LGBT-supportive policies → Increased job satisfaction*

Studies have found that LGB employees who are covered by a nondiscrimination policy are more satisfied with their jobs than employees who are not covered by a policy. For example, Day and Schoenrade (2000) found that job satisfaction was significantly higher among employees working for organizations that had LGBT nondiscrimination policies in place.

11

AR_292992

Similarly, Tejeda (2006) found that employees who were covered by a nondiscrimination policy reported significantly higher levels of job satisfaction than those who were not covered.

### *LGBT-supportive workplace climate → Increased job satisfaction*

Research has also found that LGB people who perceive their workplace climates to be supportive of LGBT employees are more likely to have positive attitudes about their jobs than people who see their workplaces as unsupportive. For example, Munoz (2005) found that LGBT-supportive workplace climates were associated with higher levels of career satisfaction. Additionally, Waldo (1999) found that employees who perceived their work environment to be heterosexist were significantly less satisfied with their jobs.

Some studies have indicated that overall supportiveness of LGBT people in the workplace may be more relevant to job satisfaction than just the presence of an LGBT-supportive policy. For example, a 2008 study of LGB employees found that informal types of general support from supervisors and work colleagues (rather than organization-level support) predicted job satisfaction and life satisfaction (Huffman, Watrous-Rodriguez, & King, 2008). Similarly, Griffith and Hebl (2002) found that the presence of a written workplace nondiscrimination policy was unrelated to job satisfaction once the researchers accounted for LGBT social support within the organization.

### *Increased openness about being LGBT → Increased job satisfaction*

We were able to find only one study that showed that employees who are open about their sexual orientation are more satisfied with their jobs than employees who are not open. A nationally representative survey of heterosexual and LGBT white-collar employees found that out employees were 31% less likely to feel stalled in their careers and 25% more likely to be satisfied with their rate of advancement or promotion (64% compared to 48%; Hewlett & Sumberg, 2011). The study also found that senior management positions held by LGBT people were much more likely to be held by an out LGBT person (71% compared to 28%).

Conversely, at least three studies have found that disclosure of sexual orientation is not predictive of job satisfaction (Day & Schoenrade, 2000; Driscoll, Kelley, & Fassinger, 1996; Tejeda, 2006). It may be the case that LGBT employees do not evaluate their job satisfaction based on whether or not they have disclosed their sexual orientation. In the context of other findings that link LGBT-supportive policies and workplace climates to increased job satisfaction, it is likely that perceptions of the workplace climate are more significantly related to an LGBT employee's satisfaction on the job than to his or her personal decision to come out.

### *Less discrimination → Increased job satisfaction*

Research has found that LGB employees who have not experienced discrimination are more satisfied with their jobs. For example, Button (2001) found that employees who did not experience discriminatory treatment were significantly more satisfied with their jobs than those who had. Similarly, Munoz (2005) found that those respondents who perceived more workplace discrimination were significantly less satisfied with their jobs and careers. Ragins, Singh, and Cornwell (2007) also found less job satisfaction and less satisfaction with opportunities for

AR_292993

promotion among those employees who were not out and who feared discrimination. Research out of Australia and the Netherlands has reached similar conclusions (Sandford, Bos, & Vet, 2006; Trau & Härtel, 2007).

However, Tejeda (2006) found that workplace hostility was unrelated to satisfaction with work. This sample only included 65 gay men who on average reported few incidents of workplace hostility and thus analyses may not have been able to detect relationships among these variables.

### (e) Improved relationships with co-workers and supervisors

Figure 7: Number of studies showing relationship between LGBT-supportive policies or workplace climates and relationships with co-workers and supervisors



*LGBT-supportive policies → Improved relationships with co-workers and supervisors*

Research has shown that LGB employees who are covered by LGBT-supportive policies are more likely to be socially and altruistically engaged in the workplace. For example, studies show that gay and lesbian employees who are covered by nondiscrimination policies report higher levels of organizational citizenship behaviors (OCBs) than employees who are not covered (Brenner, Lyons, & Fassinger, 2010; Tejeda, 2006). These behaviors relate directly to relationships with coworkers and supervisors. OCBs are "Good Samaritan" behaviors that are not necessarily part of an employee's job duties, but nevertheless positively contribute to the workplace environment (Organ, Podsakoff, & MacKenzie, 2006). Researchers who study OCBs look at the extent to which employees exhibit behaviors that benefit other employees or the company, such as altruism, courtesy, conscientiousness, civic virtue, sportsmanship, peacekeeping, cheerleading, helping, and loyalty, among others (Podsakoff, Whiting, Podsakoff, & Blume, 2009).

*Increased openness about being LGBT → Improved relationships with co-workers and supervisors*

One additional factor that has been shown to be associated with improved interpersonal engagement in the workplace is disclosure of sexual orientation. Ragins, Singh, and Cornwell (2007) reported that greater disclosure was associated with greater participation with others in

the work environment. To our knowledge, this is the only study linking disclosure to workplace engagement or improved interpersonal relationships, and thus additional research is necessary to test the validity of this finding.

### *Improved relationships with co-workers and supervisors → Greater commitment and other positive behaviors and attitudes*

Research has also shown that higher levels of OCBs are related to lower degrees of turnover intentions and lower actual turnover rates. Researchers have hypothesized that turnover is less likely in organizations where employees report high levels of OCBs because helping and supporting behaviors, measured by OCBs, are likely to boost the attractiveness of the job. For example, a 2009 meta-analysis of 168 studies of employee OCBs, a majority of which asked about job withdrawal behaviors, found that employees who exhibited higher levels of OCBs were less likely to say they intended to leave their job, and were less likely to actually have left jobs (Podsakoff, Whiting, Podsakoff, & Blume, 2009). This finding will require replication among a sample of LGBT employees to assess whether the relationship between these variables exists within this population.

### *Improved relationships with co-workers and supervisors → Increased productivity*

Research has shown that employees who exhibit higher levels of OCBs are more productive in the workplace. Podsakoff et al.'s (2009) meta-analysis included seven studies which specifically measured productivity and found that workplaces whose employees exhibited higher levels of OCBs were significantly more productive than workplaces characterized by lower levels of OCBs. Higher organization-level OBCs were also significantly related to increased workplace efficiency and reduced costs. In addition, individual level OBCs were positively related to managers' evaluations of their employees' job performance. Using a sample of gay and lesbian employees, Brenner, Lyons, and Fassinger (2010) found that OCBs were reported to have a strong relationship with organizational performance, accounting for 18% to 38% of the variance in organizational performance.

Additionally, Podsakoff et al. (2009) looked at 199 studies that measured employee engagement using a different model than the OCB model, and those studies also found that employee engagement was related to business performance outcomes. The study found small but significant correlations between levels of employee engagement and the main outcome variables – customer loyalty, profitability, productivity, turnover, safety incidents, absenteeism, lost merchandise, patient safety incidents, and product quality. As is the case with the relationship between OCBs and turnover intentions, these studies will need to be replicated using additional samples of LGBT employees.

14

(f) Greater commitment and other positive workplace behaviors and attitudes

Figure 8:  Number of studies showing relationship between LGBT-supportive policies or workplace climates and job commitment and other positive workplace behaviors and attitudes



*LGBT-supportive policies → Greater commitment and other positive workplace behaviors and attitudes*

Studies have found that LGBT employees are more loyal to employers that have LGBT-supportive policies.  For example, Ragins and Cornwell (2001) found that gay and lesbian employees who were covered by LGBT-supportive policies were significantly more committed to their employers and their careers, and significantly less likely to report that they planned to leave their jobs, than those who were not covered by a policy.  This pattern of relationships was found regardless of whether employees had disclosed their sexual orientation, indicating that these policies can have a positive impact on all gay and lesbian employees.  Further, the relationship between organizational policies and an employee's organizational commitment and turnover intentions was shown to occur independently of perceived workplace discrimination, again suggesting that the positive impact of these policies extends to all gay and lesbian employees, not only individuals who might have used the policies.

Other surveys of LGBT employees have found that employees who were covered by LGBT-supportive policies report higher emotional commitment to their employers (Day & Schoenrade, 2000), less intent to leave their jobs (Ragins & Cornwell, 2007), and are less likely to have searched for a new job within the past year (Human Rights Campaign, 2009), than those employees who were not covered.

However, at least one study suggests that a nondiscrimination policy may not have an effect on retention of gay male employees.  Tejeda (2006) found that employees who were covered by a nondiscrimination policy were as likely to report turnover intentions as those who were not covered by a nondiscrimination policy.  Given the small sample size of this study, there is presently greater empirical support for the existence of a relationship between LGBT-supportive workplace policies and organizational commitment.

AR_292996

*LGBT-supportive workplace climate → Greater commitment and other positive workplace behaviors and attitudes*

Research has also found that LGB people who perceive their workplace climates to be LGBT-supportive are more likely to have positive attitudes about their jobs than LGB people who see their workplaces as unsupportive. For example, Munoz (2005) found that LGBT-supportive organizational climates were significantly related to higher organizational commitment and lower turnover intentions. At least one other quantitative study (Driscoll, Kelley & Fassinger, 1996) has also found a positive relationship between LGBT-supportive climates and turnover intentions or job commitment. Individual employee responses in a qualitative analysis from the U.K. indicated that the employees felt a sense of loyalty to their employers when they perceived their workplace climates to be LGBT-supportive (Guasp & Balfour, 2008).

*Increased openness about being LGBT → Greater commitment and other positive workplace behaviors and attitudes*

Studies have also found that LGBT employees who are open about their sexual orientation in the workplace report fewer turnover intentions than those who are not open. Hewlett and Sumburg (2011) found that out employees were more likely to be satisfied with their rate of advancement or promotion compared to employees who had not disclosed their sexual orientation (64% compared to 48%). Those who were unsatisfied were at least three times more likely to plan to leave their companies within the next year. Similarly, Day and Schoenrade (2000) found that out employees reported more commitment to their employers.

Published qualitative evidence supports these statistics. For example, a qualitative analysis of responses to a 1995 survey of Harvard Business School alumni found that employees who had not disclosed their sexual orientation at work reported reservations about their long-term prospects with the company and less loyalty than employees who had disclosed. A few of the alumni reported that they had left a job, or were thinking about leaving a job, in order to work for a company where they felt comfortable being out (Friskopp & Silverstein, 1996).

Only one paper we identified presents data suggesting the opposite conclusion— that disclosure in the workplace is related to greater turnover. In a sample of gay men, Tejeda (2006) found that employees who were open about their sexual orientation reported greater turnover intentions than employees who were not open. It may be that disclosing one's sexual orientation or gender identity in the workplace increases the vulnerability of an LGBT employee to discrimination, and experiencing these acts may increase turnover intentions. In this case, policies that lessen the occurrence of discrimination (as in Button, 2001; Human Rights Campaign, 2009), and provide employees with recourse in the event of discrimination, provide a remedy that may also reduce the desire to leave one's company.

16

*Less discrimination→ Greater commitment and other positive workplace behaviors and attitudes*

Additionally, research has shown that employees who do not fear discrimination or have not experienced discrimination report fewer turnover intentions and higher levels of commitment to their employers. For example, a 2007 nationally representative survey of people who had quit or been laid off within the five years prior to the survey found that gay and lesbian employees said they left a job only because of workplace unfairness almost twice as often as heterosexual Caucasian men (5.6% compared to 3.0%; Level Playing Field Institute, 2007). Almost half of those gay and lesbian employees said they would have stayed at their job had their employer offered more or better benefits. Additionally, Munoz (2005) found that those respondents who perceived more workplace discrimination reported significantly lower levels of job commitment and significantly higher levels of turnover intentions. Button (2001), Ragins, Singh, and Cornwell (2007), and Trau and Härtel (2007) found a similar relationship between discrimination and job commitment or turnover intentions.

Similarly, a review of literature related to the vocational decision-making of lesbians, highlights that the career decisions of lesbian women may be highly influenced by the perception of the safety of a work environment. The belief that she may be more likely to face discrimination in a certain occupation or be unsupported by the management of an individual company, may cause a lesbian woman to choose alternate career paths or work less hard toward promotions or salary increases in order to shield herself from negative repercussions of being out at work (Hook & Bowman, 2008).

## INDIVIDUAL EFFECTS: TRANSGENDER RESPONDENTS

Only four of the 36 research studies discussed in this report included transgender people in their study samples. Two of those studies, Hewlett and Sumburg (2011) and Harris Interactive/Witeck-Combs Communication (2006), did not report the number of transgender people included in their samples. Hewlett and Sumburg (2011) did note, however, that they could not separately analyze the responses of transgender people because there were too few of them. Two studies, Law et al. (2011) and Human Rights Campaign (2009), separately analyzed responses of transgender employees. These studies suggest that LGBT-supportive policies and workplace climates might have the same effects on transgender employees that they have on LGB employees, which, in turn, have a positive impact on workplace-related outcomes.

*LGBT-supportive workplace climate→ Increased job satisfaction; Greater commitment & other positive behaviors & attitudes; Improved health and well-being outcomes*

In a survey of 88 transgender employees, Law et al. (2011) found that transgender respondents who reported more workplace support were more satisfied with their jobs, reported higher levels of affective and normative commitment, and reported lower levels of job anxiety (although this finding was not significant). Workplace support, however, was not related to turnover intentions.

Affective commitment refers to an employee's desire to stay with an organization because he or she likes working there. Normative commitment refers to an employee's desire to stay at a job due to feelings of obligation to the organization.

Figure 9: Number of studies focused on transgender employees showing relationship between LGBT-supportive policies or workplace climates and economic outcomes



*Increased openness about being LGBT→ Increased job satisfaction; Greater commitment & other positive behaviors & attitudes; Improved health and well-being outcomes*

Law et al. (2011) found that transgender respondents who had disclosed their transgender status at work were more satisfied with their jobs and reported higher levels of affective commitment than those who had not disclosed.  The study also found that transgender respondents who had disclosed their gender identity at work experienced less job anxiety.  Disclosure was not found to be related to normative commitment.

Figure 10: Number of studies focused on transgender employees showing relationship between more openness about being transgender and economic outcomes



Additionally, in a survey of LGBT people that included 23 transgender employees, the Human Rights Campaign (2009) found that many transgender respondents concealed their transgender

18

status at work out of safety concerns or fear of being fired. Forty-percent of transgender respondents reported that fear was the reason they were not out at work, compared to 20% of gay men (the next more likely group to report fear as the reason they were not out at work). Transgender people were also more likely to fear that they would be fired if they were open about their LGBT-identity at work (42% of transgender people compared to 22% of gay men, the next most likely group to report this fear). As described above, fear of discrimination can have a negative impact on employees' health and well-being, job satisfaction, job commitment, and other workplace attitudes and behaviors.

## INDIVIDUAL EFFECTS: BISEXUAL RESPONDENTS

Research specifically about the workplace attitudes of bisexual people is also lacking. Only 11 of the 36 studies we reviewed included bisexual respondents, and only the Human Rights Campaign (2009) study provided any information about just bisexual respondents. The Human Rights Campaign study does not provide enough information about bisexual respondents to show a relationship between the impact of LGBT-supportive policies or workplace climates on bisexual employees, specifically, and workplace-related outcomes. However, the study indicates that bisexual employees might experience discrimination or fear discrimination at higher levels than gay and lesbian employees. As described above, experiences of discrimination and fear of discrimination can have a negative impact on employees' health and well-being, job satisfaction, job commitment, and other workplace attitudes and behaviors.

Specifically, the Human Rights Campaign (2009) study found that bisexual respondents were less likely than gay and lesbian respondents to have co-workers acknowledge their sexual orientation in a positive way (7% of bisexual respondents, compared to 27% of gay men and 31% of lesbians). Bisexual respondents were also less likely than gay and lesbian respondents to report that they would disclose their sexual orientation on an anonymous, confidential human resources survey (59% compared to 79% of gay men and 77% of lesbians). They were also less likely than gay and lesbian respondents to report that they would feel comfortable providing feedback about the LGBT workplace climate to human resources (59% of bisexuals compared to 83% of gay men and 80% of lesbians).

Among all of the 36 studies we reviewed for this report, the studies described above are the only ones that included bisexual and transgender people's responses. The lack of data on transgender and bisexual employees is a significant limitation of the current research on the impact of LGBT-supportive workplace policies.

## EFFECTS ON ORGANIZATIONAL OUTCOMES

In previous sections, we reviewed evidence that LGBT-supportive policies and workplace climates are associated with positive changes for LGBT employees, including increased job satisfaction, better psychological health, and greater engagement with coworkers. We next consider the impact of these policies on higher-level organizational change. It is important to note that little research exists directly relating LGBT-supportive policies to macro-level organizational change. However, in an effort to provide a more comprehensive review of the

AR_293000

potential costs and benefits of adopting such policies, we outline several proposed theoretical relationships.

### (g) Changes in health insurance costs (through (c) above, and direct changes)

Extending benefits to the same-sex partners of LGBT employees, such as health insurance coverage, will likely result in higher health insurance costs for companies enacting these policies, but that effect is relatively small. Domestic partner benefits for same-sex partners would raise health care costs by well under 1% for the typical firm (Ash & Badgett, 2006). An estimate of the cost of extending healthcare coverage to same-sex spouses suggested that 96% of U.S. firms would see no additional costs, and that approximately 190,000 out of 5 million U.S. firms would have only one new spouse covered by its health benefit programs (Badgett & Gates, 2006).

Where realized, this increase in healthcare expenditures is likely to be at least partially offset by savings in overall healthcare costs and increased productivity resulting from the improved health of LGBT employees, as mentioned earlier. In the general population, lack of health insurance is associated with decreased utilization of preventative services and delays in care among those with chronic poor health, which can lead to an increased likelihood of premature death, poorer quality of life, and greater functional impairment, including reduced work productivity (Institute of Medicine, 2009). As increased coverage can yield improvements in the health of an LGBT employee or their same-sex partner, LGBT employees may show more engagement in the workplace and higher levels of productivity. These direct physical health benefits can be coupled with the psychological benefits of reducing discrimination in the workplace, reviewed earlier, including possible reduction of the use of sick days (Huebner & Davis, 2007).

As part of a set of policies to enhance and support a diverse workforce, employers may provide health benefits that cover transition-related care. Transition-related care includes medically necessary treatments or procedures for an individual to transition to a gender different from the one assigned to that individual at birth.[1] As the transgender population in the United States is quite small (Gates, 2011), the number of transgender employees seeking this type of coverage is also likely to be small. One known estimate comes from the City and County of San Francisco, which reported that over the course of five years (2001-2006), 37 employees filed claims for transition-related care, out of a total of 80,000 insurance plan members (Harmon, 2006). The total expenditures ($383,000) were significantly less than had been anticipated (Harmon, 2006). Emerging social science research suggests that transition-related care results in significant improvements in the mental health of transgender persons (e.g. Ainsworth & Spigel, 2010; Dhejne, Lichtenstein, Boman, et al., 2011; Monstrey et al., 2007; Murad, Elamin, Garcia, et al., 2010), which may reduce healthcare costs associated with *not* providing these types of benefits.

---

[1] Transition-related healthcare encompasses a number of procedures and interventions that are deemed medically necessary in order to treat gender dysphoria and help transgender and gender non-conforming people achieve "lasting personal comfort with their gendered selves, in order to maximize their overall health, psychological well-being, and self-fulfillment" (Coleman et al., 2011, p. 166).

**(h) Lower legal costs from litigation related to discrimination (through (a), above)**

The implementation of LGBT-supportive policies may serve to bring a company in-line with existing federal or state regulations or local ordinances. In doing so, a company may shield itself from legal costs associated with compliance lawsuits, an issue of concern to many employers. However, estimating the costs of addressing compliance issues is challenging and we were unable to find data or studies related to sexual orientation and gender identity.

**(i) Greater access to new customers, such as public sector entities that require contractors to have nondiscrimination policies or domestic partner benefits**

A number of states and localities require employers to adopt LGBT-supportive policies in order to bid on government contracts. A 2011 study identified 68 local governments that have laws requiring their contractors to have LGBT-supportive nondiscrimination policies, affirmative action policies, or to offer equal benefits to employees' domestic partners (Mallory & Sears, 2011). Some states have adopted similar laws (e.g. Cal. Pub. Cont. Code § 10295.3(a)(1), (e)(1)). By adopting LGBT-supportive policies, employers can qualify for potentially lucrative government contracts with these public sector entities. However, no studies have looked directly at the extent to which having the policies increases the likelihood of securing government contracts.

**(j) More business from individual consumers who want to do business with socially responsible companies**

A possible outcome of adopting LGBT-supportive workplace policies is a change in the way a company is viewed by those external to the organization, most notably customers and potential new employees. To the extent that state and local governments require contractors to have LGBT-inclusive nondiscrimination polices or to offer domestic partnership benefits, enacting LGBT-supportive policies may provide a company with greater access to new customers. An organization's customer base may also expand due to consumer preferences for supporting companies that value diversity. For example, an experimental study by Tuten (2005) evaluated consumers' reactions to a company that was described as having "gay-friendly" policies, and to a company that was described as lacking "gay-friendly" policies. Both LGBT and heterosexual participants had significantly more positive reactions to the "gay-friendly" company than to the non-gay friendly company (Tuten, 2005). This finding is complicated, however, by the concurrent result that heterosexual participants reported significantly higher brand commitment to the non-"gay friendly" company than to the "gay-friendly" company. Taken together, these findings suggest that LGBT-supportive policies are only one of a number of factors contributing to customer assessments of existing brands, but also that LGBT-supportive companies are viewed positively by some potential customers.

In addition to directly changing the external perceptions of a given company, LGBT-supportive policies might also indirectly lead to improved customer satisfaction through increased employee engagement. For example, Walz and Niehoff (2000) found that restaurants where employees exhibited higher levels of OCBs (a form of employee engagement) were rated higher in customer satisfaction and received fewer customer complaints. Recent meta-analyses support this

contention, demonstrating a significant correlation between employee engagement and customer loyalty and satisfaction (Harter, Schmidt, Killham, & Agrawal, 2009; Podsakoff, Whiting, Podsakoff, & Blume, 2009).

**(k) More effective recruiting of LGBT and non-LGBT employees who want to work for an employer that values diversity**

*LGBT-supportive policies → More effective recruiting of LGBT and non-LGBT employees*

Survey data from opinion polls suggest the importance of LGBT-supportive policies to LGBT people when they are considering where to work. Results from a 2006 national poll conducted by Harris Interactive/Witeck-Combs Communication indicated that 89% of LGBT respondents said it was important that they work for a company that has a written nondiscrimination policy that includes race, ethnicity, sex, religion, age, sexual orientation and disability (Out & Equal, Harris Interactive, & Witeck Combs Communications, 2006). An even greater percentage of LGBT respondents (91%) said it was important that they work for a company that offers equal benefits. Research conducted among LGB employees in the United Kingdom reports similar findings, with respondents seeking out LGB-inclusive organizations for employment opportunities while steering away from companies they believed were not supportive of the LGB community (Guasp & Balfour, 2008). Company policies such as nondiscrimination protections and domestic partnership benefits were signals to LGB employees that they would be supported in the workplace.

Having LGBT-supportive policies may have a similarly positive impact on the recruitment of non-LGBT employees. In the 2006 Harris poll, 72% of non-LGBT respondents said that, when deciding where to work, it was important that an employer have an LGBT-inclusive nondiscrimination policy, and 79% said that it was important that an employer offer equal benefits (Out & Equal, Harris Interactive, & Witeck Combs Communications, 2006).

*Less discrimination → More effective recruiting of LGBT employees*

Other research suggests another recruitment-related business concern arising from discrimination—that employers limit their available talent pool by discriminating against qualified applicants because of their sexual orientation. For example, a 2011 study that sent out "matched resumes" of two equally qualified job applicants to employers, with the only difference being that one applicant was identifiably gay, found that employers were 40% more likely to callback the heterosexual applicant. Though the difference in callback rates varied by geographic region, gay men were less likely than non-gay men to be called back in every state included in the study, but discrimination was less in cities and states with nondiscrimination laws (Tilcsik, 2011). If this finding extends to voluntarily adopted company-level nondiscrimination policies, then employers who have rejected highly qualified LGBT applicants in the past might reduce their rejection of qualified applicants.

AR_293003

**(l) Increased creativity among employees that could lead to better ideas and innovations**

Though conclusions about the impact of a diverse workforce on business outcomes are varied and the challenges of conducting research in this area complex, there is some evidence to suggest that diversity in the workplace is related to increased innovation (Kochan et al., 2003). We located one qualitative study of LGB employees from 21 public and private sector companies in the U.K. that addressed a related question (Guasp & Balfour, 2008). Employees indicated that having to conceal their sexual orientation at work reduced their levels of creativity and innovation, while being out at work increased their confidence in sharing new ideas (Guasp & Balfour, 2008).

**(m) Greater demand for company stock because of expected benefits of diversity policies**

Based on our review, two published studies have looked at whether implementing LGBT-supportive policies affects stock prices. A 2008 study examined stock prices of 203 companies before and after the release of the Human Rights Campaign's Corporate Equality Index (CEI) to determine if perceptions of LGBT-friendliness would boost companies' stock market performance. (The CEI rates companies on their LGBT-friendliness, including whether they have nondiscrimination and domestic partner benefits policies.) The study found an initial increase in firm value on the day the CEI was released but no net impact over the three-day analysis period (Johnson & Malina 2008). A later study found that the more robust a company's LGBT-friendly policies, the better its stock performed over the course of four years (2002-2006), compared to other companies in the same industry over the same period of time (Wang & Schwarz, 2010). The construction of the stock price variable in that study does not allow for assessing the amount of change in the actual stock price, however.

## EVALUATION OF EVIDENCE AND LIMITATIONS

In a previous review of literature related to the vocational behavior of gay men, lesbians, and bisexual men and women, Croteau (1996) outlined methodological limitations among empirical articles published on the topic between 1980 and 1995. He noted that across the nine studies, all used convenience samples of predominantly white, well-educated, self-identified sexual minorities recruited through connections with the LGBT community. These studies also used measurement tools that had not been previously validated and conducted largely descriptive analyses of the survey data. Though research published since then has improved in the use of validated instruments, such as the Lesbian, Gay, Bisexual, and Transgendered Climate Inventory (Liddle, Luzzo, Hauenstein, & Schuck, 2004), and the use of more complex statistical analyses, such as path analyses, the limitations related to study design, methodology, and sampling remain largely the same.

The majority of studies reviewed in this report are cross-sectional studies using convenience samples of gay men and lesbians, with a smaller number of studies that are inclusive of bisexual men and women and transgender men and women. No study identified in this review presented longitudinal data to assess whether adding supportive policies in one period is associated with

better outcomes in later periods, which would provide stronger evidence that there is a causal relationship between policies and outcomes. In addition, samples were predominantly white and well-educated, and had higher incomes than the general population, limiting the generalizability of reported findings.

Effect sizes found among the current set of studies were generally small and the presence of LGBT-supportive policies accounted for only a limited amount of the variance in outcome measures. This indicates that there are likely other factors impacting employee attitudes, employee behaviors, and a company's bottom line, and that LGBT-supportive policies such as nondiscrimination and benefits policies are only part of what influences the work experiences of LGBT employees.

The challenges of sampling LGBT populations have been reviewed elsewhere and as has been previously noted in the literature, the studies reviewed here used samples predominantly recruited from LGBT-related organizations, including member lists of LGBT rights organizations (e.g. Day & Schoerade, 2000) and LGBT affinity groups (e.g. Sandfort, Bos, & Vet, 2006). This sampling strategy has implications for the conclusions that can be drawn from existing studies, in that what is largely known about LGBT employees is a set of findings about a specific subsample of LGBT people— those who are connected to the LGBT community and willing to self-identify as such. One set of studies identified in this review used a stratified sampling technique to obtain equal numbers of men and women from the same geographic regions (Ragins & Cornwell, 2001; Ragins & Cornwell, 2007; Ragins, Singh, & Cornwell, 2007), however, these participants were recruited from the membership of national LGBT rights organizations. This again limits the findings to a description of LGBT people who may be more likely to have disclosed their sexual orientation at work, who may be more likely to seek out employers who provide domestic partnership benefits or offer protections from discrimination, or other characteristics of individuals who actively affiliate with LGBT political or advocacy organizations.

Another limitation among the studies reviewed for this report is the use of self-report questionnaires as the most frequently used method of assessment. While the use of self-report questionnaires is common to much of social science research and may adequately measure constructs such as work-related attitudes, research on LGBT-supportive workplace policies using this type of methodology relies on participants' accurate knowledge of the presence of these policies. Importantly, between 9.1% and 18% of participants in studies assessing the presence of nondiscrimination policies and/or domestic partnership benefits either did not know or were not sure of whether such policies existed at their organization, a finding which calls into question the reliability of some of the data collected. In addition, this result suggests that for some proportion of LGBT employees, there is no relationship between the presence of LGBT-supportive workplace policies and employee-level outcomes simply because these individuals are unaware that such policies even exist.

Finally, the studies outlined in this review measure a wide variety of constructs, which provides greater breadth than depth of the findings. Among the challenges faced by researchers exploring workplace outcomes is the selection not only of the variables of interest, but of variables which may confound results or better explain the relationships between LGBT-supportive policies,

AR_293005

employee attitudes and behaviors, and company productivity. For example, studies that assess the degree to which an organizational climate is supportive of LGBT individuals may also wish to include assessments of an organization's general support for diversity in order to understand the unique contribution of LGBT-affirmative company environments on LGBT workers. Similarly, a limitation of the published studies is that none have taken into account other types of diversity, such as age, race/ethnicity, or gender, when examining the relationship between workplace policies and outcomes. There may be meaningful differences among LGBT workers who face discrimination based on multiple factors; for example, among lesbian employees who already experience wage discrimination based on their gender. The interaction of different dimensions of diversity will be an important area for further research.

## RESEARCH RECOMMENDATIONS

Based on the present review, there are number of ways in which research on the effects of LGBT-supportive policies could be expanded and improved. As noted in the limitations section, future work in this area would benefit from recruiting more diverse samples of LGBT people. Literature published to-date represents a small subsample of this population and additional research is needed on LGBT people of different racial and ethnic backgrounds, educational attainment, and occupations. Studying the interaction of these different dimensions of diversity will be an important area for future research. Further, the existing literature base predominantly reports on the experiences and beliefs of lesbian and gay employees, and special attention should be paid to recruiting larger samples of bisexual men and women and transgender employees. Care should also be taken to consider the effects of workplace policies related to sexual orientation separate from policies related to gender identity or expression. This is particularly true since a greater number of U.S. states protect employees from discrimination based on sexual orientation than protect them from discrimination based on gender identity (National Gay and Lesbian Task Force, 2012).

In addition to diversifying the characteristics of study participants, future research should employ a greater number of sampling methods and research designs, particularly so that firmer conclusions can be drawn about the relationship between the presence of LGBT-supportive policies and business outcomes. The use of probability samples would allow for greater generalization of study findings, and using time-series, quasi-experimental, and experimental designs would allow researchers to test hypotheses about causal relationships among workplace policies, organizational climate, and outcomes of interest. For example, larger companies with businesses across multiple states provide an opportunity to conduct natural experiments that test the impact of local laws and social climates on LGBT employees, as well as more downstream targets like productivity, customer base, and profitability. It will also be important to include comparison and control groups to assess whether changes in diversity-respecting workplace practices differentially affect subsets of employees. Companies that have existing methods of collecting data on their employees and workplace outcomes, such job satisfaction and work-life balance, already have the infrastructure to support asking specific questions about diversity practices that are supportive of LGBT people. Doing so would allow for greater control of firm-level factors that might confound the results of these earlier studies, such as organization size, climate, and existing diversity practices. Researchers and company officials should collaborate to fully utilize such data and to make findings available to policymakers and the public.

25

Finally, future research should use additional and more direct measures of business outcomes, such as productivity and profit measures. As shown in this report, a number of factors appear to mediate the relationship between the existence of LGBT-supportive policies and business outcomes, such as disclosure of sexual orientation in the workplace, office climate, and job satisfaction and engagement, and more work needs to be done to connect these mediating factors to organization-level costs and benefits.

## SUMMARY AND CONCLUSIONS

On a qualitative level, we find support in the social science research for links between LGBT-supportive policies and outcomes that will benefit employers. Although the number of available studies was small, we are able to draw some tentative conclusions:

- Having LGBT-supportive policies in the workplace is associated with reduced incidence of discrimination, and less discrimination is associated with better psychological health and increased job satisfaction among LGBT employees.
- A supportive workplace climate – which includes both LGBT-supportive policies and more broad support from co-workers and supervisory staff – is associated with a greater likelihood that LGBT employees will feel comfortable disclosing their sexual orientation at work. In turn, increased disclosure of sexual orientation is related to improved psychological health outcomes among LGBT employees.
- LGBT employees report more satisfaction with their jobs when covered by LGBT-supportive policies and working in positive climates.
- The presence of LGBT-supportive policies and workplace climates are associated with improved relationships among LGBT employees and their co-workers and supervisors. In addition, LGBT employees are more engaged in the workplace, are more likely to go above-and-beyond their job description to contribute to the work environment, and report greater commitment to their jobs.
- Although there may be initial costs to enacting LGBT-supportive policies, such as extending health benefits to same-sex partners of LGBT employees, we find that these costs are likely negligible and could be offset by cost savings in other areas. Healthier, more committed LGBT employees are likely to make greater contributions to the workplace.
- Among consumers and job-seekers who value LGBT-inclusive diversity practices, businesses with LGBT-supportive policies may be seen as better companies from which to buy products or for whom to work, thereby increasing their customer base and pool of prospective employees.

Most research in this area supports the contention that in the workplace context, feeling comfortable disclosing one's sexual orientation or gender identity and being shielded from discrimination based on those characteristics are two mediating factors for the other relationships reported in the literature. These may be important mechanisms to explain how LGBT-supportive policies result in better business outcomes. Thus current research suggests that companies who wish to leverage their commitment to diversity to improve their bottom line ought to consider ways in which they can create and sustain LGBT-inclusive workplace climates and foster the safety and wellbeing of their LGBT employees.

AR_293007

# REFERENCES

Ainsworth, T.A., & Spigel, J.H. (2010). Quality of life of individuals with and without facial feminization surgery or gender reassignment surgery. *Quality of Life Research, 19,* 1019-1024

Ash, M. A. & Badgett, M. V. L. (2006). Separate and Unequal: The Effect of Unequal Access to Employment-Based Health Insurance on Same-sex and Unmarried Different-Sex Couples. *Contemporary Economic Policy, 24*, 582-599.

Badgett, M.V.L., & Gates, G.J. (2006). The effect of marriage equality and domestic partnership on business and the economy. Retrieved from The Williams Institute website: http://www.law.ucla.edu/williamsinstitute/publications/MarriageEqualityontheEconomy.pdf

Badgett, M. V. L. (2001). *Money, myths, and change: The economic lives of lesbians and gay men*. Chicago: University of Chicago Press.

Boatwright, K.J., Gilbert, M.S., Forrest, L., & Ketzenberger, K. (1996). Impact of identity development upon career trajectory: Listening to the voices of lesbian women. *Journal of Vocational Behavior, 48,* 210-228.

Bowling, N. A. (2007). Is the job satisfaction-job performance relationship spurious? A meta-analytic examination. *Journal of Vocational Behavior, 71,* 167–185.

Brenner, B.R., Lyons, H.Z., & Fassinger, R.E. (2010). Can heterosexism harm organizations? Predicting the perceived organizational citizenship behaviors of gay and lesbian employees. *The Career Development Quarterly, 58,* 321-335.

Button, S.B. (2001). Organizational efforts to affirm sexual diversity: A cross-level examination. *Journal of Applied Psychology, 86,* 17-28.

Cole, S. W., Kemeny, M. E., Taylor, S. E., & Visscher, B. R. (1996). Elevated physical health risk among gay men who conceal their homosexual identity. *Health Psychology, 15,* 243-251.

Cole, S. W., Kemeny, M. E., Taylor, S. E., Visscher, B. R., & Fahey, J. L. (1996). Accelerated course of human immunodeficiency virus infection in gay men who conceal their homosexual identity. *Psychosomatic Medicine, 58,* 219-231.

Coleman, E. Bockting, W., Botzer, M., Cohen-Kettenis, P., DeCuypere, G., Feldman, J., … Zucker, K (2011). Standards of care for the health of transsexual, transgender, and gender-nonconforming people, version 7. *International Journal of Transgenderism, 13*, 165–232.

AR_293008

Croteau, J.M. (1996). Research on the work experiences of lesbian, gay, and bisexual people: An integrative review of methodology and findings. *Journal of Vocational Behavior, 48,* 195-209.

Crow, S.M., Fok, L.Y., & Hartman, S.J. (1988). Who is at greatest risk of work-related discrimination—women, blacks, or homosexuals? *Employee Responsibilities and Rights Journal, 11,* 15-26.

Currie, J., Madrian, B.C., (1999). Health, health insurance and the labor market. In: O. Ashenfelter, & D. Card (Eds.), *Handbook of a Labor Economics, Vol. 3* (pp. 3309-3407). Amsterdam: Elsevier.

Day, N.E. & Schoenrade, P. (2000). The relationship among reported disclosure of sexual orientation, anti-discrimination policies, top management support and work attitudes of gay and lesbian employees. *Personnel Review, 29,* 346-363.

Dhejne, C., Lichtenstein, P., Boman, M., Johansson, A.L.V., Långström, N., et al., (2011). Long-term follow-up of transsexual persons undergoing sex reassignment surgery: Cohort study in Sweden. *PLoS ONE, 6,* e16885- e16885.

Driscoll, J.M., Kelley, F.A., & Fassinger, R.E. (1996). Lesbian identity and disclosure in the workplace: Relation to occupational stress and satisfaction. *Journal of Vocational Behavior, 48,* 229-242.

Friskopp, A., & Silverstein, S. (1996). *Straight jobs, gay lives: Gay and lesbian professionals, the Harvard Business School, and the American workplace*. New York: Touchstone.

Gates, G. J. (2011). How many people are lesbian, gay, bisexual, and transgender? Retrieved from The Williams Institute website: http://williamsinstitute.law.ucla.edu/wp-content/uploads/Gates-How-Many-People-LGBT-Apr-2011.pdf.

Goldberg, Ramos, & Badgett, M.V.L. (2008). The fiscal impact of extending federal benefits to same-sex domestic partners. Retrieved from The Williams Institute website http://williamsinstitute.law.ucla.edu/wp-content/uploads/Badgett-Goldberg-Ramos-S2521FiscalAnalysis-Sept-2008.pdf

Griffith, K.H., & Hebl, M.R. (2002). The disclosure dilemma for gay men and lesbians: "Coming out" at work. *Journal of Applied Psychology, 87,* 1191-1199.

Guasp, A., & Balfour, J. (2008). Peak performance: Gay people and productivity. Retrieved from Stonewall website: http://www.stonewall.org.uk/documents/peak_performance.pdf.

Harmon, V. (2006). *San Francisco city and county transgender health benefits.* San Francisco: Human Rights Commission.

AR_293009

Harter, J.K, Schmidt, F.L., Asplund, J.W., Killham, E.A., Agrawal, S. (2010). Causal impact of employee work perceptions on the bottom line of organizations. *Perspectives on Psychological Science, 5,* 378-389.

Harter, J.K., Schmidt, F.L., Killham, E.A., & Agrawal, S. (2009). Q12 meta-analysis: The relationship between engagement at work and organizational outcomes (Technical paper). Omaha, NE: Gallup.

Hebl, M.R., Foster, J.B., Mannix, L.M., & Dovidio, J.F. (2002). Formal and interpersonal discrimination: A field study of bias toward homosexual applicants. *Personality and Social Psychology Bulletin, 28,* 815-825.

Hewlett, S.A., & Sumberg, K. (2011, June). *The power of out*. Center for Work-Life Policy.

Huebner, D.M., & Davis, M.C. (2007). Perceived antigay discrimination and physical health outcomes. *Health Psychology, 26,* 627-634.

Hook, M.K., & Bowman, S. (2008). Working for a living: The vocational decision making of lesbians. *Journal of Lesbian Studies, 12,* 85-95.

Horvath, M., & Ryan, A.M. (2003). Antecedents and potential moderators of the relationship between attitudes and hiring discrimination on the basis of sexual orientation. *Sex Roles, 48,* 115-130.

Huffman, A. H., Watrous-Rodriguez, K. M., & King, E. B. (2008). Supporting a diverse workforce: What type of support is most meaningful for lesbian and gay employees? *Human Resource Management, 47,* 237-253.

Human Rights Campaign (2009). *Degrees of equality: A national study examining workplace climate for LGBT employees*. Retrieved from Human Rights Campaign Web site: http://www.hrc.org/files/assets/resources/DegreesOfEquality_2009.pdf.

Human Rights Campaign (1999). *State of the Workplace for Lesbian, Gay, Bisexual and Transgendered Americans.* Retrieved from http://www.hrc.org/documents/sotw1999.pdf.

Iaffaldano, M.T., & Muchinsky, P.M. (1985). Job satisfaction and job performance: A meta-analysis. *Psychological Bulletin, 97,* 251-273.

IOM (Institute of Medicine). (2009). *America's Uninsured Crisis: Consequences for Health and Health Care.* Washington, DC: The National Academies Press.

Jackson, S.E., Joshi, A., & Erhardt, N.L. (2003). Recent research on team and organizational diversity: SWOT analysis and implications. *Journal of Management, 29,* 801-830.

Johnston, D., & Malina, M.A. (2008). Managing sexual orientation diversity: The impact on firm value. *Group and Organization Management, 33,* 602-625.

29

Jordan, K.M., & Deluty, R.H. (2008). Coming out for lesbian women. *Journal of Homosexuality, 35,* 41-63.

Kelly, E., & Dobbin, F. (1998). How affirmative action became diversity management: Employer response to antidiscrimination law, 1961 to 1996. *American Behavioral Scientist, 41,* 960-984.

Kochan, T., Bezrukova, K., Ely, R., Jackson, S., Joshi, A., Jehn, K., Leonard, J., Levine, D., & Thomas, D. (2003). The effects of diversity on business performance: Report of the Diversity Research Network. *Human Resource Management, 42,* 3-21.

Law, C.L., Martinez, L.R., Ruggs, E.N., Hebl, M.R., Akers, E. (2011). Trans-parency in the workplace: How the experiences of transsexual employees can be improved. *Journal of Vocational Behavior, 79,* 710-723.

Level Playing Field Institute (2007). *The cost of employee turnover due solely to unfairness in the workplace*. Retrieved from Level Playing Field Institute website: http://www.lpfi.org/sites/default/files/corporate-leavers-survey.pdf.

Liddle, B.J., Luzzo, D.A., Hauenstein, A.L., & Schuck, K. (2004). Construction and validation of the lesbian, gay, bisexual, and transgendered climate inventory. *Journal of Career Assessment, 12,* 33-50.

Mallory, C., & Sears, B. (2011). An evaluation of local laws requiring government contractors to adopt LGBT-related workplace policies. *Albany Government Law Review, 5,* 478-551.

Monstrey, S., De Cuypere, G., & Ettner, R. (2004). Surgery: General principles. *Principles of Transgender Medicine and Surgery* (pp. 89–104). The Haworth Press.

Munoz, C.S. (2005). A multi-level examination of career barriers for sexual minority employees. *Unpublished doctoral dissertation.*

Murad, M. H., Elamin, M. B., Garcia, M. Z., Mullan, R. J., Murad, A., Erwin, P. J. and Montori, V. M. (2010). Hormonal therapy and sex reassignment: a systematic review and meta-analysis of quality of life and psychosocial outcomes. *Clinical Endocrinology, 72*, 214–231.

National Gay and Lesbian Task Force (2012, January). Nondiscrimination laws map. Retrieved from The National Gay and Lesbian Task Force website: http://www.thetaskforce.org/downloads/reports/issue_maps/non_discrimination_1_12_co lor.pdf.

Organ, D.W., Podsakoff, P.M., & MacKenzie, S.B. (2006). *Organizational citizenship behavior: Its nature, antecedents, and consequences*. Thousand Oaks, CA: Sage.

30

Out & Equal, Harris Interactive, & Witeck Combs Communications (2006). *Majority of Americans: Companies not government should decide benefits offered to same-sex employees* (Press release). Retrieved from Out & Equal website: http://outandequal.org/documents/2006_Workplace_Survey052306.pdf

Pachankis, J. E. (2007). The psychological implications of concealing a stigma: A cognitive-affective-behavioral model. *Psychological Bulletin, 133,* 328-345.

Podsakoff, N.P., Whiting, S.W., Podsakoff, P.M., & Blume, B.D. Individual- and organizational-level consequences of organizational citizenship behaviors: A meta-analysis. *Journal of Applied Psychology, 94,* 122-141.

Raeburn, N.C. (2004). *Changing corporate America from inside out: Lesbian and gay workplace rights.* Minneapolis: University of Minnesota Press.

Ragins, B.R., & Cornwell, J.M. (2001). Pink triangles: Antecedents and consequences of perceived workplace discrimination against gay and lesbian employees. *Journal of Applied Psychology, 86,* 1244-1261.

Ragins, B.R., & Cornwell, J.M. (2007). We are family: The influence of gay family-friendly policies on gay, lesbian, and bisexual employees. In M.V.L. Badgett & J. Frank (Eds.) *Sexual Orientation Discrimination: An International Perspective* (pp. 105-117). New York: Routledge.

Ragins, B.R, Singh, R., & Cornwell, J.M. (2007). Making the invisible visible: Fear and disclosure of sexual orientation at work. *Journal of Applied Psychology, 92,* 1103-1118.

Rostosky, S.S., & Riggle, E.D.B. (2002). out at work: The relations of actor and partner workplace policy and internalized homophobia to disclosure status. *Journal of Counseling Psychology, 49,* 411-419.

Samir Luther. (Sept. 21, 2009). How Fortune-ranked companies stack up on LGBT workplace policies [Web log post]. Retrieved from http://www.hrcbackstory.org/2009/09/how-fortune-ranked-companies-stack-up-on-lgbt-workplace-policies/

Sandfort, T.G.M., Bos, H., & Vet, R. (2006). Lesbians and gay men at work: Consequences of being out. In A.M. Omoto & H.S. Kurtzman (Eds.) *Sexual Orientation and Mental Health: Examining Identity and Development in Lesbian, Gay, and Bisexual People* (pp. 225-244). Washington, D.C.: American Psychological Association.

Sears, B., & Mallory, C. (2011). Economic motives for adopting LGBT-related workplace policies. Retrieved from The Williams Institute website: http://williamsinstitute.law.ucla.edu/wp-content/uploads/Mallory-Sears-Corp-Statements-Oct2011.pdf.

AR_293012

Smith, N.G., & Ingram, K.M. (2004). Workplace heterosexism and adjustment among lesbian, gay, and bisexual individuals: The role of unsupportive social interactions. *Journal of Counseling Psychology, 51,* 57-67.

Tejeda, M.J. (2006). Nondiscrimination policies and sexual identity disclosure: Do they make a difference in employee outcomes? *Employee Responsibilities and Rights Journal, 18,* 45-59.

Tilscik, A. (2011). Pride and prejudice: Employment discrimination against openly gay men in the United States. *Journal of Sociology, 117,* 586-626.

Trau, R.N.C., & Härtel, C.E.J. (2007). Contextual factors affecting quality of work life and career attitudes of gay men. *Employee Responsibilities and Rights Journal, 19,* 207-219.

Tuten, T.L. (2005). The effect of gay-friendly and non-gay-friendly cues on brand attitudes: A comparison of heterosexual and gay/lesbian reactions. *Journal of Marketing Management, 21*, 441-461.

Walz, S.M., & Niehoff, B.P. (2000). Organizational citizenship behaviors: Their relationship to organizational effectiveness. *Journal of Hospitality and Tourism Research, 24,* 301-319.

Waldo, C.R. (1999). Working in a majority context: A structural model of heterosexism as minority stress in the workplace. *Journal of Counseling Psychology, 46,* 218-232.

Wang, P., & Schwarz, J.L. (2010). Stock price reactions to GLBT nondiscrimination policies. *Human Resource Management, 49*, 195– 216.

Williams, D.R., Neighbors, H.W., & Jackson, J.S. (2003). Racial/ethnic discrimination and health: Findings from community studies. *American Journal of Public Health, 93,* 200-2008.

AR_293013

## ABOUT THE AUTHORS

**M.V. Lee Badgett** is the Research Director at the Williams Institute, UCLA School of Law, and Director of the Center for Public Policy and Administration & Professor of Economics at the University of Massachusetts Amherst.

**Laura E. Durso** is a Public Policy Fellow at the Williams Institute, UCLA School of Law.

**Angeliki Kastanis** is a Public Policy Fellow at the Williams Institute, UCLA School of Law.

**Christy Mallory** is the Reid Rasmussen Fellow of Law & Policy at the Williams Institute, UCLA School of Law.

## ABOUT THE WILLIAMS INSTITUTE

The Williams Institute on Sexual Orientation and Gender Identity Law and Public Policy at UCLA School of Law advances law and public policy through rigorous, independent research and scholarship, and disseminates its work through a variety of education programs and media to judges, legislators, lawyers, other policymakers and the public. These studies can be accessed at the Williams Institute website.

## FOR MORE INFORMATION

The Williams Institute, UCLA School of Law
Box 951476
Los Angeles, CA 90095-1476
(310)267-4382
williamsinstitute@law.ucla.edu
www.law.ucla.edu/williamsinstitute

AR_293014

# APPENDIX A

## Methodology

Studies included in our analysis were identified using several methods. First, we collected relevant materials that were cited in previous Williams Institute reports on this topic, including *Documented Evidence of Employment Discrimination & Its Effects on LGBT People* (Sears & Mallory, 2011) and internal memos (on file with the author). Second, we gathered all of the scholarship cited in those materials. Third, we conducted computerized searches between January 16, 2012 and April l, 2013 using Google Scholar and the UCLA Library article search function which gathers relevant scholarship from several databases including EBSCOhost, JSTOR, and LexisNexis, among others. We searched these sources using systematic combinations of the following words:

*Sexual orientation, gender identity, LGBT, LGB, gay, lesbian, bisexual, transgender, transsexual, homosexual, domestic partner, same-sex partner, benefits, discrimination, discriminate, discriminated, employ, employee, employer, employed, employment, work, works, worked, workplace, worker, company, corporate, business, anti-discrimination, nondiscrimination, discrimination, policy, policies, environment, climate, out, outness, disclose, disclosure, OCBs, organizational citizenship behaviors, health, well-being, stress, meta-analysis, recruit, recruitment, retain, retains, retained, retention, quit, quitting, satisfied, satisfaction, creative, creativity, innovate, innovation, innovations, idea, ideas, customer, customers, customer service, customer satisfaction, productive, productivity, better, performance, contract, contractor, ordinance, morale, profit, profitability, bottom line, benefit, economic.*

Fourth, we gathered relevant scholarship cited in the materials identified in the database search. Finally, we used systematic combinations of the terms above to search the Internet (using the Google search engine) for relevant materials produced by research organizations and non-profits focused on LGBT issues or workplace issues. Our research method yielded 33 relevant published articles, books, book chapters, and other written materials produced by research and non-profit organizations that are included in this report.

In addition to compiling relevant written materials, we singled out a set of study characteristics that helped us determine the overall methodological strength of each paper included in this report. Although we did not use a formal rating system, the findings reported in this document were done so in a manner that considered overall study strength. The set of study characteristics included in our detailed review (Table 1) are as follows: 1) sample size 2) LGBT populations included 3) gender 4) race/ethnicity of participants 5) education level of participants 6) response rate 7) recruitment strategy 8) use of validated measures.

AR_293015

Table 1.    Study Characteristics for LGBT Employee Outcomes

| Author (Year) | Sample Size | LGBT | % Female | % White | % College Degree | Response Rate | Recruitment Strategy | Qualitative or Quantitative | Validated Outcome Measures | Sample Reliability Coefficients | Validated Disclosure Measure |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Boatwright et al. (1996) | 10 | L | 100% | 90% | 70% | 100% | Convenience Sample | Qualitative | + | + | + |
| Brenner, Lyons & Fassinger (2010) | 606 | L,G | 55% | 89% | 75% | - | Convenience Sample | Quantitative | Yes | Yes | Yes |
| Button (2001) | 537 | L,G | 34% | 90% | - | 42% | Convenience Sample, Snowball Sampling | Quantitative | Yes | Yes | + |
| Day & Schoenrade (2000) | 744 | L,G | 35% | - | - | 29% | Convenience Sample | Quantitative | Yes | No | No |
| Driscoll, Kelley & Fassinger (1996) | 123 | L | 100% | 85% | - | 69% | Convenience Sample, Snowball Sampling | Quantitative | Yes | Yes | No |
| Griffith & Hebl (2002) | 379 | L,G | 42% | 82% | 69% | - | Convenience Sample | Quantitative | Yes | Yes | Yes |
| Guasp & Balfour (2008) | 107 | L,G,B | - | - | - | - | - | Qualitative | + | + | + |
| Hewlett & Sumberg (2011) | 2,593 | L,G,B, T,H* | - | - | 100% | - | Random Sample | Quantitative, Qualitative | No | No | No |
| Horvath & Ryan (2003) | 236 | - | 77% | 85% | - | - | Convenience Sample | Quantitative | Yes | Yes | + |
| Huffman, Watrous-Rodriguez & King (2008) | 99 | L,G,B | 38% | 84% | 79% | 90% | Convenience Sample | Quantitative | Yes | Yes | Yes |
| Human Rights Campaign (2009) | 831 | LGBT | 46% | 63% | 37% | - | Random Sample from Panel, Outreach Convenience Sample, Snowball Sampling | Qualitative, Quantitative | No | No | No |
| Jordan & Deluty (1998) | 499 | L | 100% | 83% | 95% | 33% | | Quantitative | Yes | No | Yes |

35

| Author (Year) | Sample Size | LGBT | % Female | % White | % College Degree | Response Rate | Recruitment Strategy | Qualitative or Quantitative | Validated Outcome Measures | Sample Reliability Coefficients | Validated Disclosure Measure |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Law, et. al. (2011) | 114 | T | 54%++ | 81% | - | - | Convenience Sample, Snowball Sampling | Quantitative | Yes | Yes | Yes |
| Level Playing Field Institute (2007) | 1780 (100 L,G) | L,G | - | - | - | 88% | Random Digit Dialing | Quantitative | No | No | No |
| Munoz (2005) | 346 | L,G,H | 34% | 89% | 90% | - | Convenience Sample, Snowball Sampling | Quantitative | Yes | Yes | No |
| Out & Equal (2006) | 2,501 (270 LGBT) | L,G,B, T, H | - | - | - | - | Convenience Sample | Quantitative | - | - | - |
| Ragins & Cornwell (2001) | 534 | L,G,B | 32% | 68% | 85% | 30% | Convenience Sample | Quantitative | Yes | Yes | Yes |
| Ragins & Cornwell (2007) | * | * | * | * | *same* | *as* | *above* | * | * | * | * |
| Ragins, Singh & Cornwell (2007) | * | * | * | * | *same* | *as* | *above* | * | * | * | * |
| Rostosky & Riggle (2002) | 261 | - | 54% | 86% | 60% | 68% | Convenience Sample | Quantitative | Yes | Yes | No |
| Sandfort, Bos & Vet (2006) | 320 | L,G,B | 52% | - | 60% | 24% | Network, Random Sample from Panel | Quantitative | Yes | No | No |
| Smith & Ingram (2004) | 97 | L,G,B | 41% | 82% | 66% | - | Convenience Sample, Snowball Sampling | Quantitative | Yes | No | No |
| Tejeda (2006) | 65 | G | 0% | 100% | 81% | 36% | Convenience Sample | Quantitative | Yes | Yes | No |
| Trau & Härtel (2007) | 581 | G | 0% | - | 55% | - | Convenience Sample | Quantitative | Yes | Yes | Yes |
| Waldo (1999) | 287 | L,G,B | 41% | 91% | More than half | 55% | Convenience Sample | Quantitative | Yes | Yes | Yes |

\* *H: Heterosexual*          + *Not Applicable*
- *Information not provided*          ++ *54% transwomen, 24% transmen, 22% did not identify a gender identity*

36

## CHSAA Transgender Inclusion Bylaw & Policy

| Bylaw 300. | EQUITY CODE |
|---|---|

1. The Colorado High School Activities Association is committed to ensuring that all students have equal access and opportunities to participate in CHSAA sponsored activities and athletics.

2. Member schools shall ensure that all students have equal access and opportunities to participate in activities and athletics without unlawful discrimination based on disability, race, creed, color, gender, sexual orientation, religion, age, national origin, or ancestry.

3. The Colorado High School Activities Association recognizes the right of transgender student-athletes to participate in interscholastic activities free from unlawful discrimination based on sexual orientation. In order to insure appropriate gender assignment for purposes of athletic eligibility, a transgender student-athlete's home school will perform a confidential evaluation to determine the gender assignment for the prospective student-athlete. The CHSAA will review athletic eligibility decisions based on gender assignment of transgender student-athletes in accordance with its approved policies and appeals procedures.

---

### CHSAA INCLUSION POLICY & OCR DEAR COLLEAGUE LETTER ON TRANSGENDER STUDENTS

---

The Colorado High School Activities Association (CHSAA) Board of Directors approved this policy and process to address the eligibility of transgender/transitioned/student-participants in CHSAA sanctioned activities/athletics.

For the purposes of this policy, the following definitions will apply:

1. The term "sexual orientation" means a person's orientation toward heterosexuality, homosexuality, bisexuality, transgender status or another person's perception thereof.
2. The term "gender identity" means an individual's internal sense of gender.
3. The term "sex assigned at birth" refers to the sex designation recorded on an infant's birth certificate should such a record be provided at birth.
4. The term "transgender" describes those whose gender identity is different from the sex they were assigned at birth.
5. The term "gender expression" means external appearance, characteristics or behaviors typically associated with a specific gender.
6. The term "gender fluid" means denoting or relating to a person who does not identify themselves as having a fixed gender.
7. The term "detransition" means the cessation or reversal of a transgender identification or gender transition, whether by social, legal or medical means.
8. The term "covered entity" means any person, business, or institution required to comply with the antidiscrimination provisions of the law.

9. Unlawful harassment includes severe or pervasive conduct that creates an environment that is subjectively and objectively hostile, intimidating, or offensive on the basis of gender identity, gender expression, or sexual orientation.  Prohibited conduct includes, but is not limited to, the following:

   a. Asking unwelcome personal questions about an individual's gender identity;
   b. Intentionally causing distress to an individual by disclosing to others the individual's sexual orientation or transgender status;
   c. Using offensive names or terminology regarding an individual's gender identity, gender expression, or sexual orientation; or
   d. Deliberately misusing an individual's preferred name, form of address, or gender-related pronoun.

**Policy Privacy:**
All discussions and documentation in each level of the process either by a member school and/or CHSAA shall be kept confidential unless the student and family make a specific request.

**Procedures:**
The student's member school will be the first point of contact for determining the student's eligibility to participate in CHSAA sanctioned event(s).  The student and parent(s)/guardian must notify the school in writing that the student has a consistent gender identity different than the student's gender assigned at birth and list the sanctioned event(s) in which the student would like to participate.   The consistent gender identity as stated in the school letter will be the gender recognized for the entirety of the students participation in CHSAA athletics/activities.  (See Detransition Policy) A transgender student shall participate in accordance with their gender identity, and CHSAA Bylaw 2850.3 shall still apply.

The school *may* use the following criteria to determine participation:
- Current transcript and school registration information
- A written statement from the student affirming their gender identity.

The school may consider but *may not require* the following information, if it is voluntarily provided by the student or their parent/guardian:
- Documentation from individuals such as, but not limited to, parents, friends, and/or teacher, which affirm that the actions, attitudes, dress and manner demonstrate the student's gender identity.
- Written verification from an appropriate health-care professional (doctor, psychiatrist, psychologist) of the student's gender identity.
- Medical documentation (hormonal therapy, sexual re-assignment surgery, counseling, medical personnel, etc.)

**Gender Fluid:**
Students that want to participate in CHSAA athletics and activities, must select one gender to participate.  The process for gender identification and notification to the school is the same as stated above.  Any subsequent detransition by a gender fluid student must also follow the detransition policy as stated below.

**Detransition Policy:**
Students that detransition after competing in their consistent gender identity at the high school level, must notify the school in writing of their intent to detransition and apply via written request to the school for further eligibility.  The decision to approve the request will be made at the local level.

**Areas of Awareness for Schools:**
- Have a plan in place and be proactive.
- Use correct names/pronouns according to the student's self-identification, and permit the student to dress according to gender identity and or expression.
- Allow restroom and locker room access consistent to gender identity.
- Educate teachers, counselors, coaches, administrators, parents and students on transgender inclusion and awareness.

**Resources:**
- CHSAA Contact:
  Bethany Brookens, Assistant Commissioner
  14855 E. Second Avenue – Aurora, CO  80011
  Office Phone:  303-344-5050
  Office E-mail:  bbrookens@chsaa.org

# FRAMINGHAM HIGH SCHOOL

**ATHLETIC DEPARTMENT**
115 A Street, Framingham, MA 01701
Phone: 508-782-7510   Fax: 508-788-0630
**Website:  www.flyerathletics.com**

# 2022-2023 FRAMINGHAM HIGH SCHOOL

# ATHLETIC HANDBOOK

For Student-Athletes, Coaches, and Parents

**"Success is peace of mind which is a direct result of
self-satisfaction in knowing you did your best to
become the best you are capable of becoming."**
**---- John Wooden**

Paul Spear
Athletic Director
508-782-7650

Ashley Paulsen
Assistant Athletic Director
508-782-7510



# FRAMINGHAM HIGH SCHOOL

**ATHLETIC DEPARTMENT**
115 A Street, Framingham, MA 01701
Phone: 508-782-7510   Fax: 508-788-0630
**Website:  www.flyerathletics.com**

# TABLE OF CONTENTS

Statement of Athletic Philosophy…………………………Page 1

Expectations for Student-Athletes…………………….....Page 2

MIAA Bona Fide Team Rule……………………………..Page 3

Athletic and Co-Curricular Eligibility…………………..Page 4

Registration, Transportation, Varsity Letters…………Page 5

Expectations for Team Captains…………………………Page 6

Expectations for Parents/Spectators……………………..Page 7

Communication for Athletic Concerns…………………..Page 8

Expectations for Coaches………………………………..Page 9

Perspectives on College Scholarships……………………Page 10

Student-Athlete, Coach, Parent Contract………………...Page 11

MIAA Chemical Health Rule…………………………….Appendix A
State Law Regarding Hazing……………………………..Appendix B
Wellness Center Policies and Procedures………………..Appendix C
Expectations of Athletic Trainer…………………………Appendix D

AR_293022

AR_293023



# FRAMINGHAM HIGH SCHOOL

**ATHLETIC DEPARTMENT**
115 A Street, Framingham, MA 01701
Phone: 508-782-7510   Fax: 508-788-0630
**Website:  www.flyerathletics.com**

# STATEMENT OF ATHLETIC PHILOSOPHY

Framingham High School Athletics mission is to support our students as they represent our city in interscholastic athletics.  It is our gopal to develop their skills and passion for athletics so they will have a lifelong love of sport.  Students will learn self-discipline and habits of mind that foster success in all areas of life.

Athletes will serve through community service, accept a role on a team, and serve a purpose larger than themselves.

Athletics teaches wellness. Athletes should learn good habits in the areas of nutrition and exercise. Likewise, athletes learn time management as well as how to balance competition and fatigue.

Athletics teaches the growth mindset. Athletes get better through focused, purposeful practice. Skills and development of a team will be fostered through time dedicated to practice.

Finally, athletics teaches fun. Every athlete should be playing because they love their sport. Every athletic event is an opportunity to create memories and lifelong friendships.

We will not be outcome driven in determining the success of our teams.  We will be driven by effort and it will be our effort, commitment to community service, wellness, and growth by which we judge ourselves.

1



# FRAMINGHAM HIGH SCHOOL

**ATHLETIC DEPARTMENT**
115 A Street, Framingham, MA 01701
Phone: 508-782-7510   Fax: 508-788-0630
**Website:  www.flyerathletics.com**

# EXPECTATIONS FOR STUDENT-ATHLETES

As members of their team, a student athlete serves as a role model. They are admired and respected by many, including younger athletes, and their behavior and actions often have a significant impact on others. The student athlete plays an essential role in the promotion of sportsmanship and they must accept the responsibility to always display high standards of sportsmanship.

1. Accept the responsibility and privilege that a student-athlete has in representing their school and community by learning and showing teamwork, sportsmanship, and discipline in all aspects of the game.

2. Demonstrate respect for self, coach, teammates, opponents, officials and spectators by exhibiting good character and conducting themselves as a positive role model.

3. Win and lose graciously.

4. Abide by all rules of the game as well as relevant school and MIAA policies.

5. Work for the good of the team at all times.

6. Cheer for your team, not against your opponent.

7. Congratulate opponents in a sincere manner following either victory or defeat.

8. Refrain from the use of illegal or unhealthy substances to gain an unfair

   advantage.

9. Leave locker rooms (home and away), buses, and playing facilities clean and in good repair.

2

## MIAA BONA FIDE TEAM MEMBER RULE

A bona fide member of the school team is a student who is consistently present for, and actively participates in, all high school team sessions (e.g. practices, tryouts, competitions). Bona fide members of a school team are precluded from missing a high school practice or competition in order to participate in a non-school athletic activity/event in any sport recognized by the MIAA. Students cannot be given special treatment (late arrival, early dismissal, etc.) for non-school athletic programs.

   **First Offense:** Student-athlete is suspended for 25% of season
   **Second Offense:** Suspension for an additional 25% of the season and
   Ineligible for tournament play immediately upon confirmation of violation

A student-athlete must be a team member for 50% of the regular season schedule for that sport to participate in any MIAA Tournament competition.

If ineligible, cannot be in uniform. Attendance at event to be determined by High School Principal.

A student-athlete shall participate in only one MIAA interscholastic sport in any defined MIAA sport season (Fall, Winter, or Spring), including tournaments or championships in that season. For the purposes of this rule only, a student-athlete officially becomes a member of his/her team for the sport season on the date of that school's first regular season contest in that sport.

   Exception: If a licensed physician recommends that an athlete terminate participation in a sport for medical reasons after the first contest, the athlete will be permitted to join another team if he/she receives the written approval of a licensed physician.
   Exception: A school may approve a varsity or sub-varsity request to join a second varsity or sub-varsity team after terminating his/her member- ship with the first varsity or sub-varsity team, providing written approval is received from the principal, athletic director, and both coaches involved with the change, and it happens within the first ½ of the season.

PENALTIES: If a student-athlete violates this rule, he/she will be ineligible For that season, and all contests in which he/she participated in both sports must be forfeit.

3

# ● Framingham Inclusive Sports Participation Policy

Definitions of words used within this policy: The following definitions intend to create a common vocabulary, understanding that the administrators, school staff, volunteers, students and others who interact with students must be respectful of the ways in which individual people ask to be identified and in general employ the terms that students use to describe themselves. 1. Sexual orientation means a person's romantic or sexual attraction to people of the same sex, different sex or any sex. Transgender and gender expansive people may have any sexual orientation. 2. Gender identity is an individual's sincerely held core belief regarding their gender, whether that individual identifies as male, female, both, neither or in some other way (for example, students who identify in some other way such as nonbinary, queer, genderqueer or gender fluid). 3. Gender expression means an individual's external expression of their gender, through such means as clothing, hairstyling, accessories, voice, behavior and mannerisms. 4. Transgender is an umbrella term for people whose gender identity is different from that traditionally associated with their assigned sex at birth. 5. Gender expansive is an umbrella term used to describe people who expand notions of gender expression and identity beyond what is perceived as the expected gender norms for their society or context. Some gender-expansive people identify with being either male or female, some identify as neither, and others identify as a mix of both. Gender-expansive people include those with transgender and nonbinary identities as well as those whose gender in some way is seen to be stretching society's notions of gender. PHILOSOPHY OF GENDER IDENTITY PARTICIPATION Framingham Public Schools believes that interscholastic athletic and co-curricular participation are valuable to students' physical, intellectual, social, and/or character development and accordingly, we value inclusion. Guided by this value and in compliance with all applicable laws, our policy ensures that students can participate in athletics and co-curricular activities in a manner consistent with their gender identity. POLICY REGARDING GENDER IDENTITY-BASED PARTICIPATION All students shall have the opportunity to participate in Framingham Public Schools athletics and/or co-curricular activities in a manner that is consistent with their gender identity, irrespective of the gender listed on a student's records and without prior medical or mental health care. Eligibility to participate. A student has the right to participate in athletics and co-curricular activities in a manner consistent with the gender listed on their school records. A student whose gender identity is different than the gender listed on the student's registration records shall have the right to participate in a manner consistent with their gender identity. For students whose school records indicate "non-binary" the student has the right to participate in sports team of either gender; however, pursuant to MIAA policy, students are not permitted to try out simultaneously for MIAA sports teams of both genders. ADDITIONAL POLICIES

FOR INCLUSION IN ATHLETICS The Framingham Public Schools endorse the following policies to ensure the full inclusion of students participating in Framingham Public Schools' athletics. 1. Changing Areas, Toilets, and Showers. Student-athletes shall be able to use the locker room, shower, and toilet facilities consistent with the student's gender identity. Every student-athlete has the right to access a private enclosed changing area, shower, and toilet. No student-athlete shall be required to use separate facilities. 2. Hotel Rooms. Student-athletes shall be assigned to share hotel rooms based on their gender identity, with a recognition that any student who needs extra privacy should be accommodated whenever possible. 3. Language: Affirmed Names and Pronouns. A student may have a name and pronouns that are different from what may be indicated by the student's school records. Coaches, administrators, and officials shall use the student's affirmed name and pronouns and shall ensure that the student's name and pronouns are respected by others including teammates, opponents, fans, volunteers, announcers, etc. 4. Dress codes and team uniforms. All team members shall have access to uniforms that are appropriate for their sport and that they feel comfortable wearing provided it maintains compliance with MIAA and National Federation sport specific uniform regulations. No student shall be required to wear a gendered uniform that conflicts with the student's gender identity. Dress codes for athletic teams when traveling or during a game day at school shall be gender-neutral. (Instead of requiring a girls' or women's team to wear dresses or skirts, for example, ask that team members wear dresses or slacks that are clean, neat, well cared for and appropriately "dressy" for representing their school and team.) 5. Competition at another School. When discussing competitions and student expectations, decisions shall be made in consultation with the student and without violating a student's confidentiality or privacy. If requested by the student, school leaders, athletic directors, and coaches should communicate with their counterparts at other schools prior to competitions in which a transgender or gender expansive athlete is participating about expectations for treatment of student-athletes on and off the field, including to ensure access to appropriate changing, showering, or bathroom facilities, and to request the use of affirmed names and pronouns by coaches, opponents, officials, announcers, fans, and media. 6. Training and Education: The District shall provide culturally-competent training regarding this policy to all staff, including but not limited to athletic department staff and coaches, and to all student-athletes, including captains, on an annual basis as well as at the start of each athletic season for the student-athletes.. This policy shall be distributed to all staff, students and parents and posted on the District's website. References: FPS Policy JBD - Gender Identity Support Policy MIAA policy 28.3 and policy clarification http://www.doe.mass.edu/ssce/GenderIdentity.pdf An Act Relative to Gender Identity (Chapter 199 of the Acts of 2011) MGL c.4



# FRAMINGHAM HIGH SCHOOL

**ATHLETIC DEPARTMENT**
115 A Street, Framingham, MA 01701
Phone: 508-782-7510   Fax: 508-788-0630
**Website:  www.flyerathletics.com**

**ATHLETIC AND CO-CURRICULAR ELIGIBILITY Student Eligibility: Academic Requirements 58.1 A student must secure during the last marking period preceding the contest (e.g. second quarter marks and not semester grades determine third quarter eligibility) a passing grade, and full credit, in the equivalent of four traditional year-long major English courses. A transfer student may not gain academic eligibility if student was not, or would not be, eligible at the sending school, unless transfer was necessitated by a move of parents and then eligibility would be determined by receiving schools eligibility standards (see Rule 57.7.1). 58.2 A student cannot at any time represent a school unless that student is taking courses which would provide Carnegie Units equivalent to four traditional year-long major English courses. 58.3 To be eligible for the fall marking period, students are required to have passed and received full credits for the previous academic year the equivalent of four traditional year-long major English courses. 58.4 Academic eligibility of all students shall be considered as official and determined on the published date when the report cards for that ranking period are to be issued to the parents of all students within a particular class. 58.4.1 Senior student-athlete academic eligibility following the third-quarter report cards being issued, will carry through to the conclusion of the spring sport season. Fourth quarter grades can't then render a senior academically eligible.**

(MIAA Chemical Health Policy (see Appendix A).

State Law on Hazing (see Appendix B)

Framingham Public Schools Anti-Bullying Information ( see FHS Student Handbook- page 28)

Use of Internet and Social Media: The Athletic Office encourages safe and responsible behavior with regard to internet use and social media. We highly recommend our students avoid inappropriate use of public websites such as Twitter, Instagram, Snap Chat, Facebook, etc. Any identifiable image, photo, video, or posted on-line conversation which implicates a student-athlete in a violation of our Alcohol and Drug Policy or our Core Values may be investigated by the administration.

4



# FRAMINGHAM HIGH SCHOOL

**ATHLETIC DEPARTMENT**
115 A Street, Framingham, MA 01701
Phone: 508-782-7510   Fax: 508-788-0630
**Website:  www.flyerathletics.com**

**Registration for a sport:** All registrations are conducted on-line through flyerathletics.com. The process must be completed prior to the start of the season. In addition, proof of a physical must be submitted to the athletic office. Students are expected to adhere to the deadlines established. Failure to do so will result in the inability to try out for a sport. Registrations will not be allowed after cuts have been made during the initial week of practice.

**Transportation:** The athletic office works with the Transportation Department to arrange buses for away games and practices. Unfortunately, there have been occasions when events have been postponed due to the inability to find a bus or driver. Students are expected to be respectful of the wishes of the driver and leave the bus clean. We encourage teams to travel together. Parents who wish to transport their child home after an event must obtain prior approval from the coach and athletic director.

**Varsity Letter:** A varsity letter and pin are earned through satisfactory participation at the varsity level for the first time during a particular year. If an athlete letters in more than one sport per year, he/she will be awarded a pin to designate the sport, but not an additional letter. If an athlete letters in the same sport, he/she will receive an additional sport pin indicating years of service at the varsity level in that sport. Coaches will recommend the awarding of letters based on the following criteria:
A) attend practice and games on a consistent basis
B) display a cooperative spirit with the coach, teammates, and opponents
C) display respect for others on and off the playing surface
D) observe all rules and regulations as outlined in this handbook
E) be an actual participant in varsity contests.
F) End the season in good standing
The coach and athletic director will have the prerogative to award varsity status to a senior who has not met the seasonal requirements. A student manager who has successfully met all of his/her responsibilities may be awarded a letter at the discretion of the coach.

5

# FRAMINGHAM HIGH SCHOOL

**ATHLETIC DEPARTMENT**
115 A Street, Framingham, MA 01701
Phone: 508-782-7510   Fax: 508-788-0630
**Website:  www.flyerathletics.com**

## EXPECTATIONS FOR TEAM CAPTAINS AT FRAMINGHAM HIGH SCHOOL

The role of team captain is one of honor and privilege, and brings with it a great deal of responsibility. The leadership necessary to be a successful team captain can be difficult and will be supported by the FHS Administration.

Team Captains will be expected to exhibit the following qualities:

- Honest, strong focus on academics, dedicated, leads by example
- Hard working, selfless, recognizes and values team needs over individual accomplishments
- Respectful, appropriate behavior and conduct in and out of school
- Enthusiastic, dependable, positive outlook

Team Captains will attend Leadership Academy at 6:55am each Thursday morning during their season.

Failure to meet the above leadership expectations may subject a student athlete to lose the privilege of being a "Captain".

The method by which captains are chosen shall be determined by each coach.

6



# FRAMINGHAM HIGH SCHOOL

**ATHLETIC DEPARTMENT**
115 A Street, Framingham, MA 01701
Phone: 508-782-7510   Fax: 508-788-0630
**Website:  www.flyerathletics.com**

## EXPECTATIONS FOR PARENTS/SPECTATORS

As your child's first "coach" in life, we ask for your help in making our athletic program of the highest quality. High School athletics, when done the right way, is a thing of beauty. While winning will always be important as long as a scoreboard exists, we all know that there are more important and enduring lessons to be learned from participation in athletics. In the long run, your child's high school career will not be measured by wins and losses but by how they conduct themselves on the field, court, or track. Together, let us strive to model the virtues of honor, integrity, respect, and character. Specifically, I ask you to keep each sporting event or activity in perspective and pledge that you will:

- Use positive encouragement
- Be respectful of all players, coaches, game officials, and other spectators.
- Never target anyone for abuse- physical, verbal, or emotional.
- Refrain from taunting, harassment, obscene language, or other acts of disrespect.
- Recognize and show appreciation for sportsmanship and fair play by either team
- Respect the judgment of the coach and do not openly criticize players
- Trust that our coaches and administrators have the best interests of your child in mind

7

AR_293032

# FRAMINGHAM HIGH SCHOOL

**ATHLETIC DEPARTMENT**
115 A Street, Framingham, MA 01701
Phone: 508-782-7510   Fax: 508-788-0630
**Website:  www.flyerathletics.com**

# COMMUNICATION PLAN FOR ATHLETIC CONCERNS

Good communication is critical in athletics, on and off the field. A communication plan is in place to assist and to improve communication between parents, coaches and administrators, ultimately for the benefit of the student. Involvement in athletics and activities will allow the students to experience some of the most rewarding times of their lives. However, there will likely be times when things don't go their way or they disagree with a coach. It is important that students and parents realize these difficult situations are as much a part of the learning experience as are the good times. The coaches work hard to do the best they can for all of their athletes, and we ask the students and parents to respect the fact that their decisions are often extremely difficult, and are made based on factors of which students and parents may not be aware. **The student, not the parent, is strongly encouraged to talk to the coach about any issues or problems that arise during the season**. This is not only the most direct and productive means of communication, but also a valuable method of teaching responsibility.

The following protocol will be used for registering concerns:

1. The student-athlete meets with the coach.
2. The parent contacts the coach to set up a meeting with the student-athlete present.
3. If the issue is not resolved, call and set up an appointment with the Athletic Director (508-782-7650).
4. After this step, an additional meeting may be held with the parent, coach, athlete, and AD.

IMPORTANT: PLEASE DO NOT…

1. Confront a coach before, during, or after a practice or contest. These can be emotional times for both parties. Meetings of this nature do not promote resolution.
2. Discuss the following issues with coaches: playing time, play calling, team strategy, other team members. This will only undermine the coach's ability to help your child improve and to develop team harmony and constructive team play.

The intent of this communication plan is to help make the experience in the Framingham High School Athletic program more enjoyable and productive for all athletes, coaches, parents and fans.

8



# FRAMINGHAM HIGH SCHOOL

**ATHLETIC DEPARTMENT**
115 A Street, Framingham, MA 01701
Phone: 508-782-7510   Fax: 508-788-0630
**Website:  www.flyerathletics.com**

# EXPECTATIONS FOR COACHES

## THE IMPACT OF A COACH

I have come to a frightening conclusion.
I am the decisive element at the field, court, or track.
It is my personal approach that creates the climate.
It is my daily mood that makes the weather.
I possess tremendous power to make an athlete's life miserable or joyous.
I can be the tool of torture or an instrument of inspiration.
I can humiliate or humor, hurt or heal.
In all situations, it is my response that decides whether a crisis will be escalated or
De-escalated, and an athlete humanized or dehumanized.
   (An Adaptation of Haim Ginott, published by the Washington State Coaches Assoc.)

## COACHING PHILOSOPHY

The profession of coaching is a profession of teaching. In addition to teaching the mental and physical dimensions of their sport, coaches shall through words and example, strive to build the character of their student athletes by teaching them to be trustworthy, respectful, responsible, and fair. Success in the classroom is the first priority of any student-athlete. This message should be consistently delivered to student-athletes and their parents throughout the season. Coaches must model respectful behavior and demand that their athletes refrain from verbally abusing opponents and officials, profane and belligerent trash-talking, and taunting or inappropriate celebrations.

9

**ADMINISTRATORS' GUIDE FOR INTERPRETING AND ENFORCING**

AR_293034

# MIAA HANDBOOK RULE #62

### *Student (and Coach) Eligibility: Chemical Health/Alcohol/Drugs/Tobacco*

This policy has been developed to assist school administrators in the implementation and administration of the MIAA Chemical Health Rule, (MIAA Handbook Part IV-Rules Affecting an Individual Student Athlete or Coach, Rule #62–Student

(and Coach) Eligibility: Chemical Health/Alcohol/Drugs/Tobacco. Hopefully, it will be of some help when you have to deal with the sometimes difficult task of determining whether or not a student is in violation of the Chemical Health Rule.

## PART I – CHEMICAL HEALTH RULE

### RULE 62: Student (and Coach) Eligibility: Chemical Health/Alcohol/Drugs/Tobacco

**62.1** From the earliest fall practice date, to the conclusion of the academic year or final athletic event (whichever is latest), a student shall not, regardless of the quantity, use, consume, possess, buy/sell, or give away any beverage containing alcohol; any tobacco product (including e-cigarettes); marijuana; steroids; or any controlled substance. This policy includes products such as "NA or near beer". It is not a violation for a student to be in possession of a defined drug specifically prescribed for the student's own use by his/her doctor.

This MIAA statewide minimum standard is not intended to render "guilt by association", e.g. many student athletes might be present at a party where only a few violate this standard. This rule represents only a minimum standard upon which schools may develop more stringent requirements.

If a student in violation of this rule is unable to participate in interscholastic sports due to injury or academics, the penalty will not take effect until that student is able to participate again.

## FIRST VIOLATION MINIMUM PENALTIES*:

*When the Principal confirms, following an opportunity for the student to be heard, that a violation occurred, the student shall lose eligibility for the next consecutive interscholastic contests totaling 25% of all interscholastic contests in that sport. For the student, penalties will be determined by the current or next season of participation. No exception is permitted for a student who becomes a participant in a treatment program. It is recommended that the student be allowed to remain at practice for the purpose of rehabilitation. Any fractional part of an event will be dropped when calculating the 25% of the season.*

**# of Events/Season # of Events/Penalty**

**1-7 1**

**8-11 2**

**12-15 3**

**16-19 4**

**20 or over 5**

*Also see rule 32.8 – Ineligible Students

**SECOND & SUBSEQUENT VIOLATIONS AND MINIMUM PENALTIES:**

*When the Principal confirms, following an opportunity for the student to be heard, that a violation occurred, the student shall lose eligibility for the next consecutive interscholastic contests totaling 60% of all interscholastic contests in that sport. For the student, penalties will be determined by the current or next season of participation. Any fractional part of an event will be dropped when calculating the 60% of the season.*

**# of Events/Season # of Events/Penalty**
**1-3 1**
**4 2**
**5-6 3**
**7-8 4**
**9 5**
**10-11 6**
**12-13 7**
**14 8**
**15-16 9**
**17-18 10**
**19 11**
**20 or over 12**

*If after the second or subsequent violations the student of his/her own volition becomes a participant in an approved chemical dependency program or treatment program, the student may be certified for reinstatement in MIAA activities after a minimum of 40% of events provided the student was fully engaged in the program throughout that penalty period. The high school principal in collaboration with a Chemical Dependency Program or Treatment Program must certify that student is attending or issue a certificate of completion. If student does not complete program, penalty reverts back to 60% of the season. All decimal part of an event will be truncated i.e. All fractional part of an event will be dropped when calculating the 40% of the season.*

**# of Events/Season # of Events/Penalty**
**1-4 1**
**5-7 2**
**8-9 3**
10-12 4
**13-14 5**
**15-17 6**
**18-19 7**
**20 or over 8**

*Penalties shall be cumulative each academic year, but serving the penalty could carry over for one year. Or, if the penalty period is not completed during the season of violation, the penalty shall carry over to the student's next season of actual participation, which may affect the eligibility status of the student during the next academic year. (e.g. A student plays only football: he violates the rule in winter and/or the spring of same academic year: he would serve the penalty(ies) during the fall season of the next academic year.)*

*Appendix A*

## *Hazing*

Section 17. Whoever is a principal organizer or participant in the crime of hazing, as defined herein, shall be punished by a fine of not more than three thousand dollars or by imprisonment in a house of correction for not more than one year, or both such fine and imprisonment.

The term "hazing" as used in this section and in sections eighteen and nineteen, shall mean any conduct or method of initiation into any student organization, whether on public or private property, which willfully or recklessly endangers the physical or mental health of any student or other person. Such conduct shall include whipping, beating, branding, forced calisthenics, exposure to the weather, forced consumption of any food, liquor, beverage, drug or other substance, or any other brutal treatment or forced physical activity which is likely to adversely affect the physical health or safety of any such student or other person, or which subjects such student or other person to extreme mental stress, including extended deprivation of sleep or rest or extended isolation.

Notwithstanding any other provisions of this section to the contrary, consent shall not be available as a defense to any prosecution under this action.

AR_293038

# UCLA
## Other Recent Work

**Title**

Gender Identity Nondiscrimination Laws in Public Accommodations: a Review of Evidence Regarding Safety and Privacy in Public Restrooms, Locker Rooms, and Changing Rooms

**Permalink**

https://escholarship.org/uc/item/4rs4n6h0

**Authors**

Hasenbush, Amira
Flores, Andrew R
Herman, Jody L

**Publication Date**

2018-07-23

**DOI**

10.1007/s13178-018-0335-z

**Data Availability**

The data associated with this publication are not available for this reason: Licensing Restrictions

Peer reviewed

eScholarship.org

Powered by the California Digital Library
University of California

AR_293039

# Gender Identity Nondiscrimination Laws in Public Accommodations: a Review of Evidence Regarding Safety and Privacy in Public Restrooms, Locker Rooms, and Changing Rooms

Amira Hasenbush[1] & Andrew R. Flores[1,2] & Jody L. Herman[1]

## Introduction

North Carolina's Public Facilities Privacy & Security Act, also known as H.B. 2, introduced much of the United States to a debate regarding the use of public restrooms that had previously largely gone unnoticed. In an emergency session, the North Carolina legislature passed H.B. 2 in one day, legally requiring sex-segregated restrooms and changing facilities to be limited to use based on the sex on a person's birth certificate (Philipps, 2016). While this law would have no legal impact on restroom use among cisgender (i.e., nontransgender) people, it meant that transgender people who had transitioned from their sex assigned at birth to a different gender would be required to use the restroom of their sex assigned at birth unless they had legally changed their birth certificate. The new law also opened up the possibility of increased harassment and policing, both social and actual, of gender nonconforming people in public restrooms, whether they were transgender or not. H.B. 2 was passed as a direct reaction to a local nondiscrimination ordinance that the City of Charlotte passed that included gender identity as one of the protected classifications in public accommodations, legally codifying the rights of individuals to use the public restroom that corresponded to their gender identity, even if that did not match their sex assigned at birth (Philipps, 2016). The primary argument levied against the passage of public accommodations nondiscrimination policies that protect trans- gender people is that the policy creates a loophole for sexual predators to access women's public restrooms and locker rooms, thus decreasing women's and girls' safety and privacy in such spaces. For example, at a floor hearing on H.B. 2, Senator E. S. "Buck" Newton stated:

> [T]he City Council of Charlotte lost their mind, and decided to embark upon a very radical course … of radical political correctness. And in so doing, created a real public safety risk … would allow men into the locker rooms and the bathrooms of females − of our daughters, of our wives … And that common sense tells us that men don't belong in the ladies' bathroom. It's a matter of public safety. Under this ordinance that they've put forward, anyone, quite frankly, with − with that intent, could use this Charlotte ordinance as an excuse to be somewhere that we all know they don't belong." (House Bill 2: Senate Floor Session, 2016).

On the other hand, there were those who argued that such nondiscrimination laws had already been enacted in localities across the United States with no noticeable change in criminal activity in public accommodations. For example, Representative Rodney Moore stated in the H.B. 2 House floor debate:

> [W]hat you have here is − you have fear-stoking. The LGB − I've done the research. This ordinance is in over 200 cities, as it was referenced before, and there has not, to my knowledge, been any catastrophic incident of as- saults, of rapes in these bathrooms or anything, and so the argument that this is such a grave challenge or a grave issue of public safety, just doesn't − just doesn't mesh; doesn't − doesn't pan out based upon the data." (House Bill 2: House Floor Debate, 2016).

While H.B. 2 was partially repealed in 2017, the debates, legislation, and litigation about restroom access and safety continue. For example, the Commonwealth of Massachusetts is now facing a ballot measure in the 2018 elections asking its citizens to decide whether to repeal a recently passed statewide public accommodations nondiscrimination law that is inclusive of gender identity. It is important to evaluate the empirical validity of the underlying claims to assess whether nondiscrimination laws are actually related to privacy and safety in restrooms, evidence of which has yet to be provided. We sought to empirically assess such claims through the analysis of police records of safety and privacy crimes in public restrooms, locker rooms, and changing rooms.

---

[1] UCLA School of Law, The Williams Institute, Box 951476, Los Angeles, CA 90095-1476, USA

[2] Department of Public Policy & Political Science, Mills College, Oakland, CA, USA

## Legal Background

State and local employment and public accommodations non- discrimination statutes and ordinances have included gender identity for over 20 years. In 1993, Minnesota passed the first statewide nondiscrimination law that included gender identity (Minn. Stat., 1993). Currently, 20 states and over 200 towns, cities, boroughs, and counties have nondiscrimination laws and ordinances that are inclusive of gender identity (Movement Advancement Project, 2017; Human Rights Campaign, 2016). In theory, employment nondiscrimination laws that include gen- der identity would apply to restroom use in the workplace, and public accommodations nondiscrimination laws that include gender identity would apply to public restrooms; however, the specific language, interpretation, and implementation of such laws and ordinances have varied throughout the country.

There is no federal law that prohibits discrimination in employment or public accommodations based on gender identity. However, some federal agencies and courts[3] have interpreted laws that prohibit discrimination based on sex to include gender identity. For example, the Equal Employment Opportunity Commission held that Title VII's prohibition on sex discrimination in employment also prohibits discrimination based on gender identity in employment, including by requiring that employers allow employees to use restrooms in the workplace that are consistent with their gender identity (Lusardi v. Dep't of the Army, 2015). The Department of Housing and Urban Development has issued regulations to ensure equal access to shelter housing and restrooms without discrimination based on gender identity (Department of Housing and Urban Development, 2016),[4] and the Occupational Safety and Health Administration has issued guidance instructing employers to allow employees to have access to restrooms based on their gender identity (Occupational Safety and Health Administration, 2015). In 2016, the Civil Rights Divisions of the Department of Education and the Department of Justice issued guidance that students should have access to restrooms that correspond to students' self-identified gender identity (U.S. Department of Justice & U.S. Department of Education, 2016). That guidance was repealed less than a year later (U.S. Department of Justice & U.S. Department of Education, 2017). In June of 2017, an instructional letter was sent to Department of Education Civil Rights Office regional directors stating that sex discrimination complaints from transgender stu- dents should be evaluated based on Title IX and its implementing regulations, as interpreted in decisions of federal courts and other Office for Civil Rights guidance documents, but specifically excluding the repealed guidance (Jackson, 2017). By February of 2018, a Department of Education spokesperson asserted that the department would no longer accept discrimination complaints from transgender students who are blocked access to restrooms in accordance with their gender identity (Holden, 2018).

The 2015−2016 state legislative sessions across the country saw increases in proposed legislation seeking to prohibit access to public restrooms based on gender identity (Kralik, 2017). Some of these policies sought to roll back protections granted by municipal governments (Fausset, 2017; Kralik, 2017). In addition, some localities such as Anchorage, Alaska and Houston, Texas sought repeal of protective policies through public ballot measures (Fernandez & Smith, 2015; Kelly, 2016). Additionally, some states that did not have any statewide laws related to public accommodations access, such as North Carolina, sought to pro- actively prohibit any future enactment of gender identity nondiscrimination laws at the state or local level that would allow transgender people to access restrooms that correspond with their gender identity (Kralik, 2017).

At the same time, litigation across the country has sought to determine the extent of state, local, and federal powers to either prohibit or mandate restroom access based on gender identity. For example, after the Departments of Education and Justice issued the initial federal school bathroom guidance in 2016, states and representatives from Texas and 12 other states filed a lawsuit against the federal government. The District Court granted a preliminary injunction against implementation of the guidance in 2016, and in 2017, the federal government withdrew its initial appeal (Texas v. U.S., 2016, 2017). At the same time, a transgender student has been engaged in litigation against his local school board for access to school restrooms in accordance with his gender identity. That case had been accepted to be heard by the Supreme Court but was remanded to the Fourth Circuit Court for reevaluation in response to the repeal of the federal school restroom guidance (G. G. v. Gloucester County School Board, 2017). After the student graduated from high school with- out having a final court decision, he amended his complaint to request a declaration that the school board violated his rights under Title IX and the Equal Protection Clause and to allow him to use male restrooms when he returned to school grounds for alumni activities (American Civil Liberties Union, 2017). Nebraska and nine other states filed a case similar to the Texas case that was stayed pending a ruling in the G.G. case and later was voluntarily dismissed by the plaintiffs without prejudice, in other words, with the right to reinstate the case later (Nebraska v. U.S., 2016, 2017). Several other lawsuits specific to transgender student restroom access are currently winding their way through state and federal courts. Concerns about restroom privacy and/or safety have been considered in all of these cases (G.G. v. Gloucester County School Board, 2015; Nebraska v. U.S. First Amended Complaint, 2016; Texas v. U.S., 2016).

---

[3] See, e.g., EEOC v. Harris Funeral Homes, 2018, which affirmed the Sixth Circuit's previous holdings that discrimination against a transgender individual is illegal sex discrimination under Title VII. In that case, a funeral home director was fired after she told her employer that she was transgender and planned to transition and begin wearing women's work clothing on the job. The court also stated that religious beliefs and the Religious Freedom Restoration Act do not overrule the nondiscrimination requirements of Title VII. The last paragraph in this section discusses court cases that directly address sex discrimination as it applies to transgender individuals in the context of restroom access.

[4] The Department of Housing and Urban Development has slowed support for this Equal Access Rule in the last year. Online training materials meant to support homeless shelters in the implementation of the rule were ordered removed from the department's website (MacGillis, 2017).

## Literature Review

Using new policy proposals continues to be a central strategy between the LGBT rights social movement and countermovement. Stone (2012) describes different forms of tactical innovation the Religious Right has taken on sexual orientation and gender identity public policy. These innovations vary in terms of venue (e.g., local, statewide, or national), strategy (e.g., legislative, direct initiative, or referendum), and issue (e.g., gay teachers, same-sex marriage, transgender inclusion in public accommodations). As such, the Religious Right has played a large role in controlling the issue agenda of the LGBT rights movement (Fetner, 2008). The present case of carving out gender identity protections in public accommodations policies may be seen as another form of tactical innovation. As is the case of other issues of LGBT rights, many times these policies are seen as seeking solutions to problems that may not really exist, which may be linked to social perceptions of sexual and gender minorities as deviants (Fejes, 2008). For example, Anita Bryant's campaign and the Briggs Initiative to prohibit gay and lesbian school teachers are key moments when public policy and the general public were targeted for policy advancement against the rights of LGBT people.

The movement counter to the advancement of LGBT rights has increased its focus on transgender people (Andersen, 2017). The discursive strategy on transgender rights remains similar to gay rights discourses with a focus on the harms gender identity inclusive policies pose primarily to children. A social constructionist framework of social policy (Shneider and Ingram, 1993) would consider both the political power and social favorability of transgender people in the consideration of the types of policies getting passed. As Westbrook and Schilt (2014) identify, issues involving sex- segregated spaces become overly focused on biologic sex and anatomy, which increases the "gender panic" people experience relating to transgender people. By focusing on public accommodations, the discourses focus on sex-segregated spaces in ways that exacerbate "gender panics" which would further lower the social valence of transgender people (see also Miller et al., 2017). Thus, arguments against the inclusion of gender identity protections in such sex-segregated spaces are likely motivated by such social constructions of a politically powerless and negative valence group.

Critiques of anti-LGBT policies are abounding. Fogg Davis (2017), for example, argues for the abolishment of using sex as a criterion for separating facilities. In other LGBT policy areas, scholars have marshaled evidence that the claims made by those advocating against LGBT rights are unfounded in the arenas of marriage and family (Herek, 1991, 2006) and in employment (Badgett, 2001; Herek, 1991). The arguments used to justify anti-LGBT policies tend to be emotionally stirring, though of- ten lack empirical validity.

Given the recently targeted focus on transgender rights, it is important to understand and evaluate both the motivations for policy, as well as its negative externalities. The asserted motivations for proscribing transgender inclusion in public ac- commodations are the perceived negative externalities of in- creased harassment and victimization in public spaces such as bathrooms and locker rooms. The current project examines the policy motivation portion. In essence, we ask: "Are inclusive transgender public accommodations laws associated with these negative externalities?" If not, then public policy may be seeking a policy solution to solve a problem that does not exist or that would exist even if policies changed.

Some research has suggested that states with more supportive gay rights policies overall correlate with lower sexual orientation hate crimes and discrimination (Levy & Levy, 2017; Hasenbush, Flores, Kastanis, Sears, & Gates, 2014). Local gender identity accommodation protections may be one of many indicators that may, counter to arguments against such laws, reduce victimization rates with respect to sexual and gender minorities, which could make a discernable reduction in overall victimization rates. Given this research we propose three hypotheses:

H0: The passage of gender identity accommodations policies will have no effect on victimization rates.
H1: The passage of gender identity accommodations policies will reduce victimization rates.
H2: The passage of gender identity accommodations policies will increase victimization rates.

H0 is motivated both by previous scholarship dispelling myths in other areas of LGBT rights as well as the insufficiency of single policies to lead to vast changes in victimization. H1 is motivated by Levy and Levy (2017) who note that inclusive policies in localities indicate supportive environments where victimizations are lower. H3 is motivated by the standard arguments made by opponents to gender identity inclusive nondiscrimination policies.

## Methods

We sought to empirically assess whether reports of safety or privacy violations in public restrooms, locker rooms, and dressing rooms change in frequency in localities that have gender identity inclusive public accommodations nondiscrimination ordinances (GIPANDOs) as compared to matched localities without GIPANDOs. Massachusetts was selected as a case study for this analysis, because, for a period of time, Massachusetts had a statewide nondiscrimination law that was inclusive of gender identity in employment and housing, but not public accommodations. Thus, these conditions created an optimal context in which to compare rates of public restroom privacy and safety incidents in localities that had passed local GIPANDOs with matched localities that had not. All data col- lection, analysis, and results are inclusive of criminal incidents in public restrooms,

public locker rooms, and public changing rooms. For simplicity's sake, authors may refer to only "restrooms" when describing the results of this study.

Victimization rates can fluctuate both over time and place. Using matched pairs and difference-in-differences analysis allows a comparison between different locations over time in order to determine whether any changes can be attributed to normal fluctuations over time or whether the changes can be attributed to some distinct difference in one location versus the other (see e.g., Dimick & Ryan, 2014; Raifman, Moscoe, Austin, & McConnell, 2017). A difference-in-difference analysis was used in this study to compare similarly-situated localities in MA to determine whether differences in restroom crime rates over time can be attributed to the introduction of a GIPANDO.

Unlike some trends over time, crime rates do not consistently increase or decrease. Small fluctuations in crime rates over time may be based on random variability and may not be attributable to any one specific policy change. Using a matched pairs analysis allows timewise comparisons across policy con- texts to seek out differences that appear to be due to more than just small random fluctuations. The matched pairs analysis ensures that the localities being compared to each other in the difference-in-difference analysis are similar enough to make appropriate comparisons. For example, Fig. 1 shows the violent crime rates across five New England states as documented by the U.S. Department of Justice. The matched pairs design of this study accounts for such temporal instability in crime rates by finding localities that have the most similar trends. In Fig. 1, it would be more appropriate to draw comparisons between Massachusetts and Connecticut because they follow a similar trend, and it would be inappropriate to compare Massachusetts to New Hampshire because they do not. Likewise, the selection of comparison localities was designed in a way to minimize differences to draw accurate comparisons.

**Selection of Localities** The Commonwealth of Massachusetts has had a broad nondiscrimination policy protecting against sexual orientation discrimination since 1989 (Mass. Gen. Laws, 1989). Massachusetts also passed a law in November 2011 extending nondiscrimination protections for transgender people in employment, housing, credit, and services (Gender Identity Act, 2011). However, that extension of the law did not contain any explicit protections for transgender people in public accommodations. Some individual localities within Massachusetts expanded upon state law by incorporating explicit gender identity protections in public accommodations laws, which includes protections in public restrooms, locker rooms, and changing rooms. This allowed for a between- localities study, comparing localities that passed GIPANDOs with matched localities within the state that did not have GIPANDOs, but otherwise had gender identity nondiscrimination protections in employment, housing, credit, and services.[5] The matched pairs strategy means that the distinguishing factor between these localities is the existence or absence of a public accommodations-specific nondiscrimination law that applied to gender identity.

---

[5] Boston and Cambridge both had a GIPANDO prior to the 2011 state law. Neither locality is included in this analysis.

Fig. 1 Violent crime rate across
New England states, 2005 to
2014. Source: Uniform Crime
Reporting Statistics, FBI, U.S.
Department of Justice



Table 1 reports the localities within Massachusetts that have ordinances that contain language that includes gender identity protections and the date when those ordinances went into effect. There were seven localities that had identifiable nondiscrimination ordinances relating to gender identity protections in public accommodations. Two other localities in close geographic proximity to the GIPANDO localities were also identified as having some gender identity protections, though their coverage was not as extensive as the seven other localities. Cambridge law includes gender identity protections in public accommodations except for restroom access, which is of primary concern to this study. Brookline law contains a gender identity resolution, but it is unclear the extent to which this resolution resulted in actionable changes or any enforcement mechanism within the locality.

In October 2016, a new Massachusetts state law went into effect to provide for protection against discrimination in public accommodations based on gender identity (Transgender Anti- Discrimination Act, 2016). However, results of the public re- cords requests in this study did not overlap with the time that Massachusetts had this statewide gender identity inclusive public accommodations nondiscrimination law in effect, and thus, enable this study to focus on the period when localities introduced GIPANDOs in the absence of statewide protections.

Notably, after the law went into effect, enough signatures were gathered to put a repeal measure on the 2018 ballot to allow Massachusetts residents to vote on whether to repeal the non- discrimination law (Young, 2016).

**Matched Pairs Design** After identifying the localities with GIPANDOs, we used quantitative models to identify localities within Massachusetts to match for comparison. Matched localities were in the same geographic regions of Massachusetts as the GIPANDO localities and were matched on demographic and other characteristics that may relate to the likelihood that locations would pass a GIPANDO as well as characteristics that may be predictive of criminal incidents (or a lack thereof) in public restrooms. We started the matched pair locality selection by identifying a full list of localities within Massachusetts that did not have GIPANDOs and that were in the same regions of Massachusetts as the localities with GIPANDOs.[6] We then collected pre- policy introduction information about both the GIPANDO localities and the candidate pool of potential matched localities. These covariates included: population size, the percent of the population over the age of 65, the percent of population that is non- Hispanic white, the percent of population earning more than $200,000, median income, the percent of the population living below the poverty line, the percent of the population that identifies as Born Again, percentage of the vote for Barak Obama in the 2012 presidential election, and a composite crime score based on numerous indices.[7] Since all of the metrics of crime were highly intercorrelated, a composite score was created based on a factor analysis. The researchers then used a covariate balancing approach to create a propensity score to identify the most fitting matched localities for each of the GIPANDO localities (Imai & Ratkovic, 2014). The fitted propensity score was extracted and used in addition to the covariates in a genetic matching procedure (Diamond & Sekhon, 2013; Sekhon, 2011). The genetic matching procedure identifies appropriate comparison localities by examining the full distribution of covariates, which may improve the matching procedure that other matching processes may worsen.

---

[6] The initial design also planned to identify contiguous localities, treating boundary lines as regression discontinuities (Keele & Titiunik, 2015). However, since the occurrence of the crimes sought was rare, there was insufficient analytical power to utilize geographic variation to the full extent possible. Instead, the researchers opted for simpler analytical methods relying on data preprocessing and case selection to reduce analytical assumptions. However, the matched localities were limited to localities that had a shared boundary with at least one of the GIPANDO localities.

[7] The indices were: the Neighborhood Scout Crime Index (retrieved from https://www.neighborhoodscout.com/ma/crime/), violent crimes per 1000 residents and property crimes per 1000 residents, the USA.com Crime Index (retrieved from http://www.usa.com/massachusetts-state-crime-and-crimerate.htm), and the City Data.com 2012 Index (retrieved from http://www.city-data.com/crime/crime-Massachusetts.html).

Table 1 Localities within MA that contain GIPANDOs

| Locality | GIPANDO | Date in effect | Statute |
|---|---|---|---|
| Boston | Yes | October 30, 2002 | Bos., Mass., Code § 12-9.7 (2002). |
| Medford | Yes | December 16, 2014 | Medford, Mass., Rev. Ordinances part 1, ch. 50, div. 2, § 50-61 (2014). |
| Melrose | Yes | December 17, 2014 | Melrose, Mass., Code ch. 15, art. X, § 15-50 (2014). |
| Newton | Yes | October 14, 2014 | Newton, Mass., Ordinances ch. 12, art. V, § 12-50 (2014). |
| Salem | Yes | February 27, 2014 | Salem, Mass., Code part III, ch. 2, art. XVI, §2-2056 (2014). |
| Somerville | Yes | May 29, 2014 | Somerville, Mass., Code ch. 2, art. V, div. 6, § 2-237 (2014). |
| Swampscott | Yes[a] | February, 18, 2015 | Swampscott, Mass. Nondiscrimination Policy (Feb. 18, 2015). |
| Cambridge | Yes, but contains a restroom exception | February 24, 1997 | Cambridge, Mass., Code tit. 2, ch. 2.76, §§ 2.76.030; 2.76.120 (1997). |
| Brookline | Unclear, a gender identity resolution^ exists | November 18, 2014 | Brookline, Mass. Code, part III, art. 3.9 § 3.9.2 (2014). |

Note:

[a] Swampscott was identified as a locality with a GIPANDO for these analyses. Record requests failed because the Swampscott Police Department records division lacked sufficient staff and capacity to perform the requested search. Therefore, public records requests were not sent to their matched localities (Marblehead and Milton)

While Cambridge and Brookline were categorized as limited GIPANDO localities and selected because of their geographic proximity to the clear GIPANDO localities, a few other localities in the state that were not in close geographic proximity to the clear GIPANDO localities also had gender identity ordinances that were unclear or limited as related to restroom access. These were: Northampton, Amherst, and Worcester, and they were not included in this analysis, since it was originally designed to include a boundary regression discontinuity that would have required localities to share physical borders. Northampton, Massachusetts has a Human Rights Commission with a voluntary advisory committee that does not have any investigative or enforcement authority. It is also unclear whether their Human Rights Commission prohibits discrimination based on gender identity (Simmons, 2015). Amherst, Massachusetts prohibits
the denial of "any rights" based on gender identity (Human Rights Bylaw, 2009). However, the town's director of human resources and human rights, who investigates complaints of discrimination, was unable to confirm whether such rights included access to public accommodations and/or public restrooms (Radway, 2015). Worcester, Massachusetts has a local ordinance that states that its policy is "to assure that every individual shall have equal access to and benefit from all public services, accommodations and employment opportunities to protect every individual ..." and that, "behavior which denies equal treatment to any of our citizens as a result of their … gender identity …undermines civil order and deprives persons of the benefits of a free and open society." (Worcester, Mass., Rev. Ordinances §9(c), 2014). However, the local human rights commission only has explicit authority to investigate complaints of discrimination "based on race, color, religious creed, national origin, gender, age, ancestry, marital status, parental status, sexual orientation, disability or source of income." (Worcester, Mass., Rev. Ordinances §18(c)(1), 2014). Matched localities were selected for all of the localities with clear GIPANDOs that applied to public restrooms. The final GIPANDO localities and their matched localities for two different analyses are listed in Table 2.

## Data

Public Record Requests Through a thorough reading of municipal ordinances and consultation with local human rights commissions, town and city clerks, and attorneys, we ascertained an exhaustive list of all of the localities in Massachusetts with GIPANDOs. Localities with GIPANDOs and matched localities received two sets of public records requests from the investigators. In July 2015, a first set of requests under the Massachusetts Public Records Law (M.G.L.A. c. 66, §10, 2016) was sent to target localities. These letters requested, "All records documenting complaints made to [the local police] agency and records of crimes alleged or committed or incidents … that took place in a public bathroom, public restroom, public locker room, or public changing room."

Table 2 Localities with
GIPANDOs and matched
localities

| GIPANDO Locality | Matched locality (1) | Matched locality (2) |
|---|---|---|
| Boston | Cambridge[b] | Chelsea[c] |
| Medford | Beverly | Watertown |
| Melrose | Beverly | Beverly |
| Newton | Brookline | Arlington |
| Salem | Revere[b] | Waltham |
| Somerville | Cambridge[b] | Waltham |
| Swampscott[a] | Marblehead[a] | Milton[a] |
| Brookline (unclear enforceability) | | Arlington |
| Cambridge[b] (restroom exclusion) | | Everett |

Notes:

[a] Swampscott was identified as a locality with a GIPANDO for these analyses. Record requests failed because they lacked sufficient staff and capacity to perform the requested search. Therefore, public records requests were not sent to their matched localities

[b] Cambridge and Revere were unable to supply results of the public records requests after repeated attempts over the course of nine months. Therefore, data from their matched localities, Salem, Somerville, Boston, and Everett were excluded from analyses that required the missing data

[c] Chelsea's results were excluded due to an incomplete response to the request

The request covered a one- to two-year timespan before and after the gender identity inclusive public accommodations nondiscrimination law had gone into effect in the localities that had such an ordinance and the same time period for the localities that were matched localities. In some cases, the local ordinance had been passed less than one or two years prior to the public records request. In those instances, records were requested "through the present." If matched localities were matched to more than one GIPANDO locality, the matched locality records request would cover the matching timespan for both of the GIPANDO localities to which they were matched. The total timespan covered (either two or four years) was selected based on the size and crime rate of the locality; smaller localities or those likely to have fewer incidents were given longer timespans to search, and larger localities or those in which more incidents were likely to occur were given shorter timespans. The investigators requested information on the type of crime/incident alleged, the gender of the victim(s) and the perpetrator(s) (as applicable), the date of the incident, and the address of the public bathroom, restroom, locker room, or changing room in which the alleged incident took place.

After mailing public records requests, follow-up emails and phone calls were placed with all of the records custodians to facilitate the process of data collection. Some larger localities were able to comply with the requests relatively quickly and easily, while others did not have the tools necessary to perform a key word search that would make such a request possible or feasible. Several record clerks noted that the cost to pay for staff time to complete a search by hand would be prohibitively expensive. After assessing the initial completed responses, the investigators noted that the majority of incidents occurring in restrooms were not related to the types of crimes that are the subject of concern related to public accommodations nondiscrimination ordinances. In other words, the fears projected as potential problems related to such ordinances are related to violations of safety and privacy, but most incidents were related to vandalism and drug use in public restrooms and theft in locker rooms.

Given the mismatching scope between the search and the crimes of concern and the challenges for smaller localities to respond to the public records requests, the researchers completed a second round of public records requests with a narrower scope in February 2016. In the second round of requests, the investigators requested, "All records documenting complaints made to [the local police] agency and records of crimes alleged or committed or incidents … involving conduct that took place in a public bathroom, public restroom, public locker room, or public changing room" regarding criminal codes related to: murder, manslaughter and attempts; assault or assault and battery and attempts; theft involving assault or battery and kidnap- ping; rape, stalking, harassment, indecent exposure, public sex and voyeurism; and solicitation. The individual Massachusetts General Law sections were cited in the request. The full updated request was sent to all police departments that had not fully responded to the first round of public records requests. For those who had responded, but for whom the timespan was still continuing until "the present," a modified request was sent for any new records that may have arisen since the first round of requests.

Follow-up phone calls and emails were again used to assist in the facilitation of data collection until all of the localities had either responded with the results of their search or made it clear that they were unable to complete the search. By the end of the second round of data collection, two localities were unable to complete the search at all, and one locality provided an incomplete response. Records were then organized and reviewed to ensure only inclusion of incidents under the narrower scope related to assault, sexual assault, rape, voyeur- ism, public sex (including sex work), lewd behavior, and in- decent exposure.

As a result of the data collection, we received public re- cords of incidents occurring within our selected municipalities. The unit of analysis in this collection is an incident. Consistent with previous research, we transformed these incidents to average annual incident rates per 100,000 individuals. This normalizes our measure accounting for varying size of municipalities and time period.

## Analysis and Results

The first round of analysis was a simple comparison of the average annual number of incidents before and after the pas- sage of GIPANDOs in the localities with such nondiscrimination ordinances and their comparable matched localities. This comparison was made to determine whether the rate of reported incidents in public restrooms and locker rooms over the timespan in which the GIPANDOs were passed was different between the places with the ordinances and their matched localities. Since we use matched pairs for our analyses, we did not employ additional controls, and since time frames were equal between the GIPANDO localities and their matched localities, time is also controlled by design. The results are shown in Table 3. When a matched locality had missing results, the GIPANDO locality's results were excluded from the count.

Table 3 provides a contingency table showing the average number of incidents per year. There were fewer average annual incidents in the localities with clear GIPANDOs when compared to their matched localities. The differences in incident rates over time (comparing before and after GIPANDO passage) were not statistically significant in the GIPANDO localities or among the matched localities. Most importantly, a Fisher's exact test of the difference in crime rates between places with and without GIPANDOs before and after GIPANDOs were passed indicates no statistically significant relationship (at a one-sided alpha level of 0.10) between GIPANDO policy passage and victimization. A comparison of the change in the number of criminal incidents after passage of public accommodations protections between GIPANDO localities and their matched localities also showed no statistically significant difference. In these comparisons, there does not appear to be a relationship between passage of GIPANDOs and criminal incidents in restrooms between localities.

A finding of no difference between the GIPANDO localities and the matched localities may be driven by the small number of localities included in the analysis. However, we are able to assess whether our finding of no difference was a result of our small sample size. A power analysis shows that we would likely still find no statistically significant difference between the GIPANDO localities and matched localities even with a larger sample size. If there was a sample with 50 matched pairs with observed effect size at 90% power, then a one-tailed alpha would be 0.108, suggesting that there is no difference between the GIPANDO localities and the matched localities. By increasing the number of matched pairs, the inference with the observed effect size would increase the probability that GIPANDO localities have *lower* annual crime rates than their matched localities, though this inference would barely satisfy less stringent accounts of statistical significance. Beyond before-and-after differences, we can also assess trends in crime rates in public bathrooms between these localities. This way, it can be assessed whether trends in crime rates increase in GIPANDO localities compared to their matched localities. Figure 2 provides the timeframe from 24 months before to 24 months after the passage of the local GIPANDOs. A 24-month window was chosen because all localities in this analysis were asked to provide incidents within a four-year timeframe. Unlike a change in the annual incident rate before and after the introduction of GIPANDOs, this model com- pared the change in the average monthly incident rates in GIPANDO and matched localities. If the argument about GIPANDOs negatively impacting safety and privacy in restrooms is correct, then an increase in reported incidents among localities with GIPANDOs, above and beyond any increase in localities without GIPANDOs, would be expected after the introduction of such policies.

In Fig. 2, the model included the difference between localities with clear enforceable GIPANDOs that applied to restrooms and their matched localities. As can be seen in the graph, the rates over time showed no significant increases in victimization rates in GIPANDO localities compared to matched localities. To the contrary, localities introducing GIPANDOs had slightly, yet significantly, lower rates of criminal incidents than their matched localities at the time these ordinances were introduced. About 10 to 20 months after GIPANDO passage, the difference appeared to increase; during that time, the average monthly proportion of criminal incidents remained rather stable in GIPANDO localities but slightly increased among matched pairs. By 24 months after GIPANDO passage, rates between the two sets of localities appeared to have little difference.

Table 3    Average number of incidents per year documented by police departments by localities with clear GIPANDOS and matched pairs before and after policy passage

|  | Localities with clear GIPANDOs | Matched localities without GIPANDOs | Difference per 100,000 (clear-matched) |
|---|---|---|---|
| Before passage | 0 (0 per 100,000) [0 per 100,000, 0 per 100,000] | 3.5 (2.54 per 100,000) [2.53 per 100,000, 2.55 per 100,000] | − 2.54 per 100,000 [− 2.55 per 100,000, − 2.53 per 100,000] |
| After passage | 0.5 (0.62 per 100,000) [− 0.49 per 100,000, 1.73 per 100,000] | 5.5 (4.50 per 100,000) [1.22 per 100,000, 7.78 per 100,00] | − 3.88 per 100,00 [− 7.34 per 100,000, − 0.42 per 100,000] |
| Change per 100,000 (After − before) | 0.62 per 100,000 [− 0.49 per 100,00, 1.73 per 100,000] | 1.96 per 100,000 [− 1.32 per 100,000, 5.24 per 100,000] | − 1.35 per 100,000 [− 4.30 per 100,00, 1.60 per 100,000] |
| Total annual average | 0.25 (0.31 per 100,000) [− 0.25 per 100,000, 0.86 per 100,000] | 4.5 (3.52 per 100,000) [1.86 per 100,000, 5.19 per 100,000] |  |

Notes: Average annual crime rate in incidents per 100,000 people are in the parentheses; 90% confidence intervals are in the brackets; $\chi^2_1 = 0.62$; $p = 0.43$; Fisher's exact = 1.00; one-sided Fisher's exact = 0.632.; difference-in-difference = − 1.35 bootstrapped S.E. = 1.80, $p = 0.454$

# Discussion

Opponents of gender identity nondiscrimination laws and policies have cited fears of attacks and privacy violations against women and children in restrooms as one of their main reasons for resistance to them, while proponents have asserted that such laws are necessary to protect transgender people and cause no increase in these kinds of crimes. However, no study, to our knowledge, has examined crime report data to assess changes in rates of crime before and after the introduction of GIPANDOs. This is the first study to do so. While this analysis initially chose Massachusetts as a case study because of its unique legal paradigm, it has taken on more direct importance in that state, because over the course of the data collection and analysis, Massachusetts passed a statewide public accommodations law that includes gender identity and that law is now up for repeal on the November 2018 ballot. By using public records and statistical modeling, we found no evidence that privacy and safety in public restrooms change as a result of the passage of GIPANDOs.[8]

The inclusion of GIPANDOs may signal a more inclusive context and thus relate to lower victimization rates, which we propose in H1. Based on previous empirical work on dispel- ling the myths to oppose LGBT rights in marriage, family, and employment, we suspected in H0 that GIPANDOs would have no relationship with victimization rates. We find greater support for H0. The inclusion of GIPANDOs had little relationship with victimization rates. Complimentary to research on hate crimes policies, sometimes, policy-specific provisions have little relationship to victimization. The cumulative addition of legal inclusion of marginalized groups may, however, reduce victimization rates (Levy & Levy, 2017).

**Limitations** Limitations of this study include issues inherent with the data source. For example, the data used to represent safety and privacy violations in public restrooms were police records of criminal incidents. While these records should have a relatively high level of reliability in their objective accuracy in recording the existence of such incidents, they fail to include any incidents that were not reported to local law enforcement. For example, it is estimated that only 30 to 35% of rapes and sexual assaults are reported to the police (Truman & Langton, 2014). Nevertheless, by assessing trends over time and using a matched pairs analysis, the authors sought to control for any issues related to unreported incidents. There is no reason to assume that incidents are more or less likely to be reported in a locality with a GIPANDO than in a matched locality.

The crime reports also were not recorded in a way that allows a reviewer to distinguish between incidents involving cisgender people and transgender people. Police departments generally do not distinguish between sex assigned at birth and gender identity. Therefore, there is no way to identify if there were any incidents that involved transgender people being attacked in public restrooms because of their externally perceived gender. A 2008 survey of 93 transgender people in the Washington, DC metropolitan area found that 9% reported experiencing physical assault in a public restroom (Herman, 2013). There was also no way to identify if there were incidents of transgender people or people pretending to be transgender accessing restrooms with intent to harm others. Among the incidents that had notes attached providing more detail, there was no evidence of transgender people being either victims or perpetrators of crimes or of people pretending to be transgender in order to harm others in public restrooms.

---

[8] We conducted a second analysis using a matching procedure that included localities with clear GIPANDOs, localities with limited GIPANDOs, and matched localities that clearly did not have a GIPANDO. This second analysis found similar results to the analysis presented above. See Appendix for a description and results of this second analysis

AR_293048

Fig. 2 Difference in the average monthly rate of criminal incidents in public restrooms, lockerrooms, and changing rooms between localities with clear GIPANDOs and matched localities. Note: Dashed lines represent 90% confidence intervals; negative values show lower rates of victimizations in GIPANDO localities compared to matched localities before, during, and after policy introduction



It is also important to note that violent and other privacy- related crimes in public restrooms, locker rooms, and changing rooms are exceedingly rare. As a point of comparison, our findings indicated that reports of privacy or safety violations in these public spaces occurred annually at most at a rate of 4.5 per 100,000 population in the jurisdictions we studied; in the Commonwealth of Massachusetts in 2015, violent crimes were reported at a rate of 390.1 per 100,000 population, and rapes were reported at a rate of 32.6 per 100,000 (Federal Bureau of Investigation, 2016). While this may be comforting to those who have safety and privacy related concerns about these spaces, the rarity of such incidents may act as a limitation to this analysis. Nevertheless, the matched pairs design was used intentionally to compensate for limited data. The data were requested from 15 different police departments of different sizes and geographies. Each had its own individual record keeping system, policy for responding to public records requests, and records clerks. Some departments responded by sending extra data and allowing the researchers to search through to find the relevant incidents, while others sent tables with dates and criminal codes. Some appeared to have the ability to search electronically while others had to search manually. Therefore, we are unable to determine whether every single search was equally thorough and turned up every single incident that matched the researchers' search criteria. For example, the locality that showed the highest limitation to this analysis. Nevertheless, the matched pairs design was used intentionally to compensate for limited data. The data were requested from 15 different police departments of different sizes and geographies. Each had its own individual record keeping system, policy for responding to public records requests, and records clerks. Some departments responded by sending extra data and allowing the researchers to search through to find the relevant incidents, while others sent tables with dates and criminal codes. Some appeared to have the ability to search electronically while others had to search manually. Therefore, we are unable to determine whether every single search was equally thorough and turned up every single incident that matched the researchers' search criteria. For example, the locality that showed the highest number of restroom incidents was the locality in which the police department sent their full criminal logs to the researchers and allowed the researchers to review the records to find incidents that met their search criteria. The higher number of incidents might be more likely to indicate that the researchers performed a more detailed and exhaustive search than the other searches performed within police departments, rather than that there were actually more incidents in that locality. That locality was a matched pair locality, so this may have contributed to the greater number of incidents reported in matched pair localities, as compared to GIPANDO localities. However, the difference-in-difference approach would account for any such bias because we do not rely on the numbers of individual incidents reported for the analyses, but instead rely on the differences within jurisdictions before and after passage of GIPANDOs. We can assume that data collection efforts were consistent within each jurisdiction, and therefore, our calculations produce differences that are comparable across jurisdictions.

AR_293049

Table 4    Average number of incidents per year as documented by police departments by localities with clear GIPANDOs, limited GIPANDOs and matched localities before-and-after policy passage

|  | Localities with clear GIPANDOs | Localities with limited GIPANDOs | Matched localities without GIPANDOs | Difference per 100,000 (clear-matched) |
|---|---|---|---|---|
| Before passage | 1.0 (0.26 per 100,000) [− 0.91 per 100,000, 1.44 per 100,000] | 1.5 (2.55 per 100,000) [− 0.07 per 100,000, 5.18 per 100,000] | 2.5 (1.07 per 100,000) [− 0.00 per 100,000, 2.15 per 100,000] | − 0.81 per 100,000 [−2.40 per 100,000, 0.78 per 100,000] |
| After passage | 1.5 (0.63 per 100,000) [− 0.54 per 100,000, 1.81 per 100,000] | 0.5 (0.85 per 100,000) [− 1.78 per 100,000, 3.48 per 100,000] | 3 (1.32 per 100,000) [0.24 per 100,000, 2.39 per 100,000] | − 0.68 per 100,000 [−2.27 per 100,000, 0.91 per 100,000] |
| Change per 100,000 (after−before) | 0.37 per 100,000 [− 1.29 per 100,000, 2.03 per 100,000] | − 1.70 per 100,00 [− 5.42 per 100,000, 2.01 per 100,000] | 0.24 per 100,000 [− 1.27 per 100,000, 1.76 per 100,000] | 0.13 per 100,000 [−2.12 per 100,000, 2.38 per 100,000] |
| Total annual average | 1.25 (0.45 per 100,000) [0.05 per 100,000, 0.85 per 100,000] | 1.0 (1.70 per 100,000) [0.24 per 100,000, 3.16 per 100,000] | 2.75 (1.19 per 100,000) [0.29 per 100,000, 2.10 per 100,000] | |

Notes: Average annual crime rate in incidents per 100,000 people are in the parentheses; 90% confidence intervals are in the brackets; $\chi^2_2 = 1.42$; $p = 0.49$; Fisher's exact $= 0.658$. Difference-in-difference = 0.41, bootstrapped S.E. = 1.05, $p = 0.699$

Finally, though all of the requests were worded and followed up upon in the same manner, the depth of the results may have varied. Three localities were unable to provide complete incident data, which may decrease the internal validity of the current study. Cases where there was missing data from a matched locality led to the exclusion of the locality with a GIPANDO from the analysis because of the lack of comparable data, which may impact the external validity of the current study.

Despite these limitations, this study is able to empirically assess the relationship between nondiscrimination laws that are inclusive of gender identity in public accommodations and safety and privacy in public restrooms. While criminal incidents do, in fact, rarely occur in such spaces, these findings suggest that concerns over the safety in those spaces should be more generally related to community safety and policing, and not related to nondiscrimination laws.

Fig. 3 Differences in the average monthly rate of criminal incidents in public restrooms, locker rooms and changing rooms among localities with clear GIPANDOs and limited GIPANDOs compared to matched localities without GIPANDOs. Notes: 90% confidence intervals represented by dashed lines; negative values show lower rates of victimizations in GIPANDO localities compared to matched localities before, during, and after policy introduction.



## Conclusion

Opponents of gender identity nondiscrimination laws in public accommodations have largely cited fear of safety and privacy violations in public restrooms, locker rooms, and changing rooms if such laws are passed, while proponents have argued that the laws do not increase danger or harm in such spaces. To date, no evidence has been gathered to empirically test the hypothesized effect of these laws. This is the first study to collect public records and analytically compare the safety of public restrooms, locker rooms, and changing rooms in localities that have gender identity inclusive nondiscrimination laws that apply to public restrooms and matched localities that do not have such laws. The results show that the passage of such nondiscrimination laws is not related to the number or frequency of criminal incidents in such public spaces. Additionally, the results show that reports of privacy and safe- ty violations in public restrooms, locker rooms, and changing rooms were exceedingly rare and much lower than statewide rates of reporting violent crimes more generally. This study provides evidence that fears of increased safety and privacy violations as a result of nondiscrimination laws are not empirically grounded.

**Acknowledgements** The authors would like to thank Kerith Conron and Brad Sears for their extensive feedback on analytical approaches and presentation of findings. The authors would also like to thank the records keepers at the police departments throughout Massachusetts who assisted in responding to the public records requests that were a necessary part of the data collection for this project. The authors would also like to thank Chrissy Reinard and Joseph Rocha, who provided assistance in executing one round of public records requests. Thanks also go to Taylor Brown, who provided research assistance on crime rates throughout New England, and Fernanda Miramontes, who copy edited this paper. Finally, thank you to the editor and anonymous reviewers for their feed- back and publication assistance.

## Compliance with Ethical Standards

**Ethical Approval** This article does not contain any studies with human participants or animals performed by any of the authors. An IRB exemption was obtained by the authors for use of de-identified criminal record data (IRB#15-001060).

**Conflict of Interest** Amira Hasenbush declares that she has no conflict of interest. Andrew Flores declares that he has no conflict of interest. Jody Herman declares that she has no conflict of interest.

## Appendix: Placebo Matched Pairs Analysis

The analysis was re-conducted using a second matching procedure. Localities with clear GIPANDOs were matched to localities that clearly did not have a GIPANDO, and localities with limited GIPANDOs (i.e., Brookline and Cambridge) were also matched to localities that clearly did not have a GIPANDO (see Table 2). The limited GIPANDOs offer a type of placebo comparison, where a policy was introduced but not clearly inclusive of the protections that are afforded in localities with clear GIPANDOs.

Table 4 provides a contingency table showing the average annual number of incidents, similar to the analysis in the re- port. For this analysis, there were three levels of treatment: a group of localities with clear GIPANDOs, a limited GIPANDO group that introduced a gender identity policy, but made exceptions or lacked clarity on restrooms, and the matched localities group without GIPANDOs. There were fewer overall incidents in the group with clear GIPANDOs when compared to the matched localities, but there were no apparent patterns of an increase in victimization in the timeframe after passage. These differences were also not significantly different from one another. A Fisher's exact test indicated that there was no significant relationship between GIPANDOs and restroom crimes. An estimate of the before- and-after changes between the localities with clear GIPANDOs and their matched pairs of the average proportion of monthly incidents in locations also showed no statistically significant difference. There does not appear to be a relation- ship between policy introduction and restroom incidents. Again, here, even if there were many more localities, a statistical power analysis found that it is unlikely that there would be a statistically significant difference between GIPANDO localities and matched localities. If there was a sample with 50 matched pairs with observed effect size at 90% power, then a one-tailed alpha would be 0.85, suggesting that the null hypothesis of no difference would also fail to be rejected with a greater number of matched pairs.

Similar to before, we assessed trends in crime rates be- tween these localities. This way, it could be assessed whether trends in crime rates increased in clear GIPANDO localities and limited GIPANDO localities, as compared to their matched localities. The figure limits the timeframe to 12 months before and 12 months after the passage of the local GIPANDOs. A 12-month window was chosen because some localities in this analysis were asked to provide incidents with- in a two-year timeframe, so we restrict the plot to the timeframe common to all localities.

In Fig. 3, the model included differences between localities with clear enforceable GIPANDOs that applied to restrooms and their matched localities (black line), and differences be- tween the limited GIPANDOs with unclear enforceability or restroom exceptions and their matched localities (gray line). The local regressions showed a lot of overlap between and across these three groups. As opposed to the analysis in the body of the report, which showed slightly lower crime rates in the GIPANDO localities as compared to their matched pairs after policy introduction, there was no statistically significant difference in the average monthly proportion of criminal incidents in restrooms both over time and across contexts.

These results indicate that changes in the average rate of criminal incidents are not related to the passage of GIPANDOs. The limited GIPANDOs provide another source of comparison, and these additional comparisons indicate that clear GIPANDOs are not uniquely related to increases in aver- age rates of criminal incidents.

# References

American Civil Liberties Union. (2017). G.G. v. Gloucester County School Board. Retrieved March 16, 2018, from https://www.aclu. org/cases/gg-v-gloucester-county-school-board.

Andersen, E. A. (2017). Transformative events in the LGBTQ rights movement. *Indiana Journal of Law and Social Equality, 5*(2), 441–475.

Badgett, M. V. L. (2001). *Money, myths and change: Economic lives of lesbians and gay men*. Chicago: University of Chicago Press.

Department of Housing and Urban Development (2016, September 20). HUD issues final rule to ensure equal access to housing and services regardless of gender identity. Retrieved May 25, 2017, from https:// portal.hud.gov/hudportal/HUD?src=/press/press_releases_media_advisories/2016/HUDNo_16-137

Diamond, A., & Sekhon, J. S. (2013). Genetic matching for estimating causal effects: A general multivariate matching method for achiev- ing balance in observational studies. *The Review of Economics and Statistics, 95*(3), 932–945.

Dimick, J. B., & Ryan, A. M. (2014). Methods for evaluating changes in health care policy: The difference-in-differences approach. *Journal of the American Medical Association, 312*(22), 2401–2402.

Equal Employment Opportunity Commission v. Harris Funeral Homes, 884 F.3d 560 (6th Cir. 2018)

Fausset, R. (2017, March 29). Retrieved May 2, 2017, from https://www. nytimes.com/2017/03/29/us/north-carolina-lawmakers-reach-deal- to-repeal-so-called-bathroom-bill.html.

Federal Bureau of Investigation. (2016). Crime in the United States by region, geographic division, and state, 2014–201. Retrieved February 2, 2017, from https://ucr.fbi.gov/crime-in-the-u.s/2015/ crime-in-the-u.s.-2015/tables/table-4.

Fejes, F. (2008). *Gay rights and moral panic: The origins of America's debate on homosexuality*. New York: Palgrave Macmillan.

Fernandez, M., & Smith, M. (2015, November 3). Retrieved May 2, 2017, from http://www.nytimes.com/2015/11/04/us/houston- voters-repeal-anti-bias-measure.html?_r=0.

Fetner, T. (2008). *How the religious right shaped lesbian and gay activism*. Minneapolis: University of Minnesota Press.

Fogg Davis, H. (2017). Why the ʙtransgenderᴧ bathroom controversy should make us rethink sex-segregated public bathrooms. *Politics, Groups, and Identities*, 1–18. https://doi.org/10.1080/21565503. 2017.1338971.

G. G. v. Gloucester County School Board, 137 S. Ct. 1239 (2017).

G.G. v. Gloucester County School Board, 132 F. Supp. 3d 736, 750 (E.D. Va. 2015)

Gender Identity Act, H.B. 3810, 187th Gen. Court (Mass. 2011). Hasenbush, A., Flores, A. R., Kastanis, A., Sears, B., & Gates, G. J. (2014). The LGBT divide: A data portrait of LGBT people in the Midwestern, Mountain & Southern states. The Williams Institute. Available from https://williamsinstitute.law.ucla.edu/wp-content/ uploads/LGBT-divide-Dec-2014.pdf.

Herek, G. M. (1991). Myths about sexual orientation: A lawyer's guide to social science research. *Law & Sexuality, 1*(133), 133–172.

Herek, G. M. (2006). Legal recognition of same-sex relationships in the United States: A social science perspective. *American Psychologist, 61*(6), 607–621.

Herman, J. L. (2013). Gendered restrooms and minority stress: The public regulation of gender and its impact on transgender people's lives. *Journal of Public Management and Social Policy*, 65–80.

Holden, D. (2018, February 12). Retrieved March 16, 2018, from https:// www.buzzfeed.com/dominicholden/edu-dept-trans-student- bathrooms?utm_term=.mvmwQx3mb#.bwlqp5QlV.

House Bill 2: House Floor Debate on H.B. 2, 2015–2016 Gen. Assemb., 2016 Extra Sess. 2 43 (2016) (testimony of Rodney W. Moore).

House Bill 2: Senate Floor Session on H.B. 2, 2015–2016 Gen. Assemb., 2016 Extra Sess. 2 14–16 (2016) (testimony of E. S. ʙBuckᴧ Newton).

Human Rights Bylaw, Amherst, Mass., Gen. Bylaws Art. 1 (1999).

Human Rights Campaign. (2016). Cities and counties with non- discrimination ordinances that include gender identity. Retrieved May 24, 2017, from http://www.hrc.org/resources/cities-and- counties-with-non-discrimination-ordinances-that-include-gender.

Imai, K., & Ratkovic, M. (2014). Covariate balancing propensity score. *Journal of the Royal Statistical Society, 76*(1), 243–263.

Jackson, C. (2017, June 6). OCR instructions to the field re complaints involving transgender students [memorandum]. Washington, DC: Office for Civil Rights, Department of Education Retrieved July 11, 2017, from https://assets.documentcloud.org/documents/ 3866816/OCR-Instructions-to-the-Field-Re-Transgender.pdf

Keele, L., & Titiunik, R. (2015). Geographic boundaries as regression discontinuities. *Political Analysis, 23*(1), 127–155.

Kelly, D. (2016, March 28). Anchorage LGBT rights law opponents seek amendments through initiative. Alaska Dispatch News. Retrieved May 2, 2017, from https://www.adn.com/alaska-news/article/ opponents-anchorage-equal-rights-law-seek-amendments/2016/03/29/.

Kralik, J. (2017, April 12). ʙBathroom billᴧ legislative tracking. Retrieved May 2, 2017, from http://www.ncsl.org/research/ education/-bathroom-bill-legislative-tracking635951130.aspx.

explaining the relationship between public opinion and policy in the states. *American Politics and Diversity. Social Science Research, 61*, 142–159.

Lusardi v. Dep't of the Army, EEOC Appeal No. 0120133395, 2015 WL 1607756 (Mar. 27, 2015).

MacGillis, A. (2017, August 22). Is anybody home at HUD? New York Magazine. Available from http://nymag.com/daily/intelligencer/2017/08/ben-carson-hud-secretary.html.

Mass. Gen. Laws ch. 151B § 4 (1989). Mass. Gen. Laws. ch. 66, §10 (2016).

Miller, P. R., Flores, A. R., Haider-Markel, D. P., Lewis, D. C., Tadlock,
B. L., & Taylor, J. K. (2017). Transgender politics as body politics: Effects of disgust sensitivity and authoritarianism on transgender rights attitudes. *Politics, Groups, and Identities, 5*(1),4–24.

Minn. Stat. § 363A.11 (1993).

Movement Advancement Project. (2017). Non-discrimination laws. Retrieved May 24, 2017, from http://www.lgbtmap.org/equality-maps/non_discrimination_laws.

Nebraska v. U.S., No. 4:16-CV-03117, first amended complaint for de- claratory and injunctive relief (U.S.D. Neb. Oct. 21, 2016).

Nebraska v. U.S., No. 4:16-cv-03117-JMG-CRZ (U.S.D. Neb. Mar. 16, 2017).

Nebraska v. U.S., No. 4:16CV3117 (U.S.D. Neb. Nov. 23, 2016).

Occupational Safety and Health Administration. (2015). Best practices: A guide to restroom access for transgender workers. Retrieved May 25, 2017, from https://www.osha.gov/Publications/ OSHA3795.pdf.

Philipps, D. (2016, March 23). Retrieved May 25, 2017, from https:// www.nytimes.com/2016/03/24/us/north-carolina-to-limit- bathroom-use-by-birth-gender.html.

Radway, D. B., Town of Amherst, Mass. Director of Human Resources & Human Rights. (2015 April 23). [E-mail correspondence]. On file with the author.

Raifman, J., Moscoe, E., Austin, S. B., & McConnell, M. (2017). Difference-in-differences analysis of the association between state same-sex marriage policies and adolescent suicide attempts. *Journal of the American Medical Association Pediatrics, 171*(4),350–356.

Schneider, A., & Ingram, H. (1993). Social construction of target popu- lation: Implications for politics and policy. *American Political Science Review, 87*(2), 334–347.

Sekhon, J. S. (2011). Multivariate and propensity score matching soft- ware with automated balance optimization: The matching package for R. *Journal of Statistical Software, 42*(7), 1–52.

Simmons, L. N., Chief of Staff, City of Northampton, Mass. Office of the Mayor. (2015, April 23–May 12). [E-mail correspondence]. On file with the author.

Stone, A. L. (2012). *Gay rights at the ballot box*. Minneapolis: University of Minnesota Press.

Texas v. U.S., 201 F. Supp. 3d 810 (N.D. Tex. Aug. 21, 2016).

Texas v. U.S., No. 16-11534, defendants-aAppellants' nNotice of wWithdrawal of mMotion for pPartial sStay pPending aAppeal and jJoint mMotion to eCancel oOral aArgument (2017).

Transgender Anti-Discrimination Act, Mass. Gen. Laws ch. 272 §§92A, 98 (2016).

Truman, J. L., & Langton, L. (2014). Criminal victimization, 2013. Retrieved from Bureau of Justice Statistics website May 2, 2017, http://www.bjs.gov/content/pub/pdf/cv13.pdf.

U.S. Department of Justice & U.S. Department of Education. (2016). . Retrieved May 2, 2017, from http://www2.ed.gov/about/offices/list/ocr/letters/colleague-201605-title-ix-transgender.pdf.

U.S. Department of Justice & U.S. Department of Education. (2017). . Retrieved May 2, 2017, from https://www.justice.gov/crt/page/file/942021/download.

Westbrook, L., & Schilt, K. (2014). Doing gender, determining gender: Transgender people, gender panics, and the maintenance of the sex/gender/sexuality system. *Gender and Society, 28*(1), 32–57.

Worcester, Mass., Rev. Ordinances part 2, art. 10 §18(c)(1) (2014). Worcester, Mass., Rev. Ordinances Part 2, art. 10 §9(c) (2014).

Young, C. A. (2016, October 11). Question to repeal transgender accom- modations law qualifies for 2018 ballot. Retrieved May 2, 2017, from http://www.wbur.org/news/2016/10/11/ballot-question- transgender-accommodations-law.

AR_293053



AR_293056

# SHUT OUT

**HUMAN RIGHTS WATCH**

Restrictions on Bathroom and Locker Room Access
for Transgender Youth in US Schools

AR_293057



# Shut Out

Restrictions on Bathroom and Locker Room Access for Transgender Youth in US Schools

AR_293058

Copyright © 2016 Human Rights Watch
All rights reserved.
Printed in the United States of America
ISBN: 978-1-6231-34037
Cover design by Rafael Jimenez

Human Rights Watch defends the rights of people worldwide. We scrupulously investigate abuses, expose the facts widely, and pressure those with power to respect rights and secure justice. Human Rights Watch is an independent, international organization that works as part of a vibrant movement to uphold human dignity and advance the cause of human rights for all.

Human Rights Watch is an international organization with staff in more than 40 countries, and offices in Amsterdam, Beirut, Berlin, Brussels, Chicago, Geneva, Goma, Johannesburg, London, Los Angeles, Moscow, Nairobi, New York, Paris, San Francisco, Sao Paulo, Sydney, Tokyo, Toronto, Tunis, Washington DC, and Zurich.

For more information, please visit our website:  http://www.hrw.org



SEPTEMBER 2016

ISBN: 978-1-6231-34037

# Shut Out

## Restrictions on Bathroom and Locker Room Access for Transgender Youth in US Schools

**Glossary**.................................................................................................................................I

**Summary** ..............................................................................................................................1

**Recommendations**................................................................................................................3
    To the US Congress..........................................................................................................3
    To State Legislatures .......................................................................................................3
    To School Administrators..................................................................................................3

**Methodology**.......................................................................................................................5

**Background**..........................................................................................................................6

**I. Students at Risk**..............................................................................................................9
    Safety.............................................................................................................................9
    Health ...........................................................................................................................10
    Privacy .........................................................................................................................12
    Education ......................................................................................................................14

**II. Discipline** .....................................................................................................................17

**III. All-Gender Options** .....................................................................................................18

**IV. Human Rights Analysis**...............................................................................................20

**Acknowledgments**............................................................................................................23

AR_293061

# Glossary

**Agender:** A descriptor used by people who do not identify with any gender.

**Cisgender:** The gender identity of people whose sex assigned at birth conforms to their identified or lived gender.

**Genderfluid:** A gender identity in which one's gender fluctuates and may differ over time.

**Gender Identity:** A person's internal, deeply felt sense of being female or male, neither, both, or something other than female and male. A person's gender identity does not necessarily correspond to their sex assigned at birth.

**Gender Non-Conforming:** A descriptor for people who do not conform to stereotypical appearances, behaviors, or traits associated with their sex assigned at birth.

**LGBT:** The umbrella term to describe those who are lesbian, gay, bisexual, or transgender.

**Non-Binary:** The gender identity of people who identify as neither male nor female.

**Sexual Orientation:** A person's sense of attraction to, or sexual desire for, individuals of the same sex, another sex, both, or neither.

**Transgender:** The gender identity of people whose sex assigned at birth does not conform to their identified or lived gender.

AR_293062

AR_293063

# Summary

Over the past year, transgender individuals' access to bathrooms, locker rooms, and other facilities has erupted as a divisive and sensationalized issue in political debates, statehouses, courts, and communities across the United States. Efforts to limit transgender people's access to facilities that correspond with their gender identity have had a particular focus on public schools and universities, typically under the guise of protecting children.

To date in 2016, at least 18 state legislatures considered bills that would have restricted transgender students' access to bathrooms, locker rooms, and other facilities not in accordance with their gender identity. When the state of North Carolina enacted a set of sweeping restrictions, the federal Department of Justice and Department of Education issued guidance clarifying that treating transgender students differently from other students constitutes sex discrimination under Title IX of the Education Amendments of 1972. A number of states and state officials subsequently sued to challenge the Departments' interpretation of Title IX, and state officials and school administrators in many places signaled they would not require schools to allow transgender students to access facilities in accordance with their gender identity. On August 21, 2016, a federal judge in Texas issued a preliminary injunction blocking the federal guidance from taking effect nationwide while the lawsuit proceeds.

As these battles play out, transgender youth are struggling to meet basic physical needs in their school environments. For these students, being barred from facilities is not an abstract legal question, but a daily source of frustration and isolation. In an interview with Human Rights Watch in Texas, Tanya H., the mother of a nine-year-old transgender boy named Elijah, recalled: "A year ago at this time, he was having a really hard time, and he'd go into the girl's bathroom and girls would yell, 'There's a boy in here!' and he couldn't go to the boys' bathroom, and so he stopped going to the bathroom. There were a lot of meltdowns." When Elijah mentioned suicide and was briefly hospitalized, his mother spoke to administrators to ensure that he would be treated as a boy when he started at a new school in the fall. Tanya recalled: "He was kind of worried about going to a new school, and he said, 'If I can go as a boy, okay.' He's just fallen into it, and he's so much happier.… He's making friends who know him as a boy." For Elijah and other transgender

AR_293064

youth, access to bathrooms and locker rooms is an urgent issue that affects their safety, health, privacy, and ability to learn.

This report documents how restrictions on access to shared facilities directly affect transgender youth. From November 2015 to May 2016, researchers interviewed 74 current or former transgender students in Alabama, Pennsylvania, South Dakota, Texas, and Utah as part of a larger project on LGBT issues in US schools. The five states examined have not enacted sweeping restrictions like those of North Carolina. Yet in the absence of clear and inclusive nondiscrimination laws, policies at the school and school district level, and training for teachers and administrators, transgender students face access issues in these states as well.

The results of this research illustrate why restricting transgender students' access to shared spaces is not only unnecessary, but discriminatory and dangerous. Barring transgender students from facilities that are safe, comfortable, and gender affirming is discriminatory, and that discrimination causes real harm. It places transgender students at heightened risk of harassment, assault, and bullying, impedes their ability to secure an education and participate fully in the life of their schools, and can cause damage to their physical and emotional health. Conversely, there is no evidence that allowing transgender students to choose bathroom or locker room facilities that correspond to their gender identity puts other students at risk. As the new school year begins, it is imperative that schools and school districts implement measures that advance the rights of all their students, regardless of their gender identity or expression.

AR_293065

# Recommendations

## To the US Congress

- Enact the Equality Act or similar legislation to prohibit discrimination on the basis of sexual orientation and gender identity in education, employment, and public accommodations;
- Enact the Student Non-Discrimination Act or similar legislation to prohibit discrimination on the basis of sexual orientation and gender identity in public schools.

## To State Legislatures

- Ensure that state nondiscrimination laws include explicit protections from discrimination on the basis of sexual orientation and gender identity, particularly in education, employment, and public accommodations;
- Require schools and school districts to allow transgender students to access bathrooms, locker rooms, and other gender-segregated facilities in accordance with their gender identity;
- Ease any building regulations that require particular numbers or percentages of gendered bathrooms in public or commercial buildings to permit the designation of all-gender bathrooms.

## To School Administrators

- Ensure that students are able to access bathrooms, locker rooms, and other gender-segregated facilities in accordance with their gender identity;
- Train staff on accessibility issues related to transgender students, emphasizing that staff should not question or discipline students who choose to use all-gender bathrooms or other facilities made available to them—for example, nurse or faculty bathrooms—and should recognize that such facilities may be distant from classrooms and require extra time;
- Consider erecting stalls, barriers, and privacy curtains to maximize student privacy in bathrooms, locker rooms, and shared facilities;

AR_293066

- Designate all-gender bathrooms in easily accessible locations throughout the school wherever feasible, particularly in instances where single-user bathrooms are currently gendered;
- Incorporate all-gender bathrooms and private changing and shower areas into planned renovations or any construction of new facilities.

AR_293067

# Methodology

Human Rights Watch conducted the research for this report between November 2015 and May 2016 in five US states: Alabama, Pennsylvania, South Dakota, Texas, and Utah. Human Rights Watch contacted potential interviewees through nongovernmental organizations, LGBT organizations in high schools and middle schools, and LGBT organizations in postsecondary institutions where recent graduates reflected on their high school experiences. Researchers spoke about accessibility issues in schools with 74 transgender students or recent graduates, as well as with more than 50 teachers, administrators, parents, service providers, and advocates for transgender youth.[1]

All interviews were conducted in English. No compensation was paid to interviewees. Whenever possible, interviews were conducted one-on-one in a private setting. Researchers also spoke with interviewees in pairs, trios, or small groups when students asked to meet together or when time and space constraints required meeting with members of student organizations simultaneously. Researchers obtained oral informed consent from interviewees, and notified interviewees why Human Rights Watch was conducting the research and how it would use their accounts, that they did not need to answer any questions they preferred not to answer, and that they could stop the interview at any time. When students were interviewed in groups, those who were present but did not actively participate and volunteer information were not recorded or counted in our final pool of interviewees.

In this report, pseudonyms are used for interviewees who are students, teachers, or administrators in schools. Pseudonyms are not used for individuals and organizations who work in a public capacity on the issues discussed in this report.

---

[1] Here, the umbrella term "transgender" is used to broadly encompass students who identify as transgender boys or transgender girls as well as those who identified as agender, genderfluid, non-binary, or other gender identities that differ from their sex assigned at birth.

AR_293068

# Background

In 2016, legislatures in at least 18 states considered bills that would have prohibited transgender students from accessing bathrooms and locker rooms consistent with their gender identity.[2] The majority of these bills were withdrawn, were defeated or stalled in committee, or otherwise failed to garner legislative approval, with the exceptions of bills in South Dakota and North Carolina. In South Dakota, legislators approved a bill restricting access for transgender youth in schools, but it was vetoed by Governor Dennis Daugaard and did not become law.[3] In North Carolina, legislators convened for a special, daylong session on March 23, 2016, where they introduced, debated, and passed a sweeping law restricting access to facilities and repealing local ordinances that prohibited discrimination on the basis of sexual orientation and gender identity. The same evening, Governor Pat McCrory signed the law, which took immediate effect.[4]

The passage of North Carolina's law put the state's regulation of shared facilities in conflict with the positions of the federal Department of Justice and Department of Education. In enforcement actions, both agencies had taken the position that Title IX of the Education Amendments of 1972, which prohibits sex discrimination in educational programs or activities that receive federal funding, encompasses discrimination on the basis of gender identity. On May 9, 2016, the Department of Justice sued North Carolina, arguing the state's law constituted discrimination on the basis of sex under Title IX, Title VII of the Civil Rights Act of 1964, and provisions of the Violence Against Women Reauthorization Act of 2013.[5] The same day, officials in North Carolina sued the Department of Justice in a federal

---

[2] Bills restricting access to shared facilities were introduced in Illinois, Indiana, Kansas, Kentucky, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, New York, North Carolina, Oklahoma, South Carolina, South Dakota, Tennessee, Virginia, Washington, and Wisconsin. See National Center for Transgender Equality, "Action Center," http://www.transequality.org/action-center (accessed August 22, 2016).

[3] Office of Gov. David Daugaard, "Gov. Daugaard Vetoes HB 1008," March 1, 2016, http://news.sd.gov/newsitem.aspx?id=19926 (accessed August 15, 2016).

[4] Michael Gordon, Mark S. Price, and Katie Peralta, "Understanding HB2: North Carolina's Law Solidifies State's Role in Defining Discrimination," *Charlotte Observer*, March 26, 2016, http://www.charlotteobserver.com/news/politics-government/article68401147.html (accessed August 27, 2016); General Assembly of North Carolina, "House Bill 2," http://ncleg.net/Sessions/2015E2/Bills/House/PDF/H2v4.pdf (accessed August 27, 2016).

[5] Complaint in *United States v. North Carolina*, https://www.justice.gov/opa/file/849946/download (accessed August 27, 2016).

AR_293069

court in North Carolina, challenging its interpretation of sex discrimination under the federal statutes.[6]

On May 13, 2016, the Department of Justice and Department of Education jointly issued guidance for all schools that receive federal assistance, affirming that:

> The Departments interpret Title IX to require that when a student or the student's parent or guardian, as appropriate, notifies the school administration that the student will assert a gender identity that differs from previous representations or records, the school will begin treating the student consistent with the student's gender identity.[7]

The guidance addressed bathrooms and locker rooms, and specified that, "[w]hen a school provides sex-segregated activities and facilities, transgender students must be allowed to participate in such activities and access such facilities consistent with their gender identity."[8]

In the days that followed, officials in at least six states instructed schools and school officials to disregard the federal guidance.[9] On May 25, 2016, a group composed of nine state governments and several other state and local authorities sued the US Department of Justice, Department of Education, Department of Labor, and Equal Employment Opportunity Commission in a federal court in Texas, challenging the agencies' interpretation of Title IX to

---

[6] Complaint in *McCrory v. United States*, http://www.newsobserver.com/news/politics-government/state-politics/article76561707.ece/BINARY/Complaint%20McCrory%20V%20USA (accessed August 27, 2016); Complaint in Berger v. United States, http://media2.newsobserver.com/content/media/2016/5/9/1=Complaint.pdf (accessed August 27, 2016).

[7] US Department of Justice & US Department of Education, "Dear Colleague Letter on Transgender Students," May 13, 2016, http://www2.ed.gov/about/offices/list/ocr/letters/colleague-201605-title-ix-transgender.pdf (accessed September 1, 2016).

[8] Ibid.

[9] Officials in North Carolina, Texas, Mississippi, Kentucky, Utah, and Arkansas all indicated that schools were not bound by or should reject the guidance shortly after it was issued. "States Push Back on Transgender Bathroom Use," CBS News, May 13, 2016, http://www.cbsnews.com/news/states-push-back-on-transgender-bathroom-use (accessed August 27, 2016); Daphne Chen, "Herbert Slams Obama 'Bathroom' Directive as Federal Overreach," *Deseret News*, May 13, 2016, http://www.deseretnews.com/article/865654260/Herbert-slams-Obama-bathroom-directive-as-federal-overreach.html?pg=all (accessed August 27, 2016); Emanuella Grinberg, "Feds Issue Guidance on Transgender Access to School Bathrooms," CNN, May 14, 2016, http://www.cnn.com/2016/05/12/politics/transgender-bathrooms-obama-administration (accessed August 27, 2016); "Bevin: Schools Should Disregard 'Unlawful' Transgender Bathroom Guidance from White House," *WDRB News*, May 31, 2016, http://www.wdrb.com/story/32105292/bevin-schools-should-disregard-unlawful-transgender-bathroom-guidance-from-white-house (accessed August 27, 2016); Greg Gordon and Colin Campbell, "McCrory Says Obama Policy Upends Bathroom Etiquette," McClatchy, May 13, 2016, http://www.mcclatchydc.com/news/politics-government/article77539102.html (accessed August 27, 2016).

AR_293070

prohibit discrimination on the basis of gender identity.[10] Days later, Kentucky and Mississippi joined the suit. On July 8, 2016, 10 additional states brought a similar suit regarding Title IX in a federal court in Nebraska.[11] On August 21, 2016, a federal judge issued a preliminary injunction blocking federal agencies from enforcing their interpretation of Title IX nationwide while the case is under consideration.[12] On August 26, 2016, another federal judge gave credence to the federal guidance, and issued a preliminary injunction blocking North Carolina's law from being applied to three transgender plaintiffs at the University of North Carolina.[13] As these cases about the scope of Title IX proceed through the judicial system, transgender students who need access to bathrooms, locker rooms, and other shared facilities are returning to school across the United States.

---

[10] The states are Alabama, Georgia, Louisiana, Oklahoma, Tennessee, Texas, Utah, West Virginia, and Wisconsin. Arizona's Department of Education, Governor Paul LePage of Maine, and school districts in Arizona and Texas were also plaintiffs in the suit.

[11] The states are Arkansas, Kansas, Michigan, Montana, Nebraska, North Dakota, Ohio, South Carolina, South Dakota, and Wyoming.

[12] *Texas v. United States*, No. 7:16-cv-00054-O (N.D.Tex. Aug. 21, 2016).

[13] Mark Berman, "Federal Judge Says UNC Can't Enforce North Carolina's Transgender Bathroom Restrictions," *Washington Post*, August 26, 2016, https://www.washingtonpost.com/news/post-nation/wp/2016/08/26/federal-judge-says-unc-cant-enforce-restroom-restrictions-in-north-carolinas-bathroom-bill/?utm_term=.bb3b9ecebc03 (accessed September 1, 2016).

AR_293071

# I. Students at Risk

## Safety

One of the most pressing concerns for transgender students is safety in bathrooms and locker rooms. Although proponents of bathroom and locker room restrictions cite student safety as a reason to require students to use facilities according to their sex assigned at birth, the reality is that transgender individuals face high rates of verbal harassment and even physical assault in bathrooms.[14] Because bathrooms and locker rooms are not monitored by teachers, students are often at heightened risk for bullying and harassment in these spaces. When schools require transgender girls to use the men's room or force transgender boys to use the women's room, they put them at risk of physical, verbal, or sexual assault from other students or adults.

Transgender students interviewed by Human Rights Watch said that being made to use facilities that did not correspond to their gender identity made them feel unsafe at school or exposed them to verbal and physical assault. Willow K., a 14-year-old transgender girl in Texas, recalled of her required eighth grade gym class: "I had to strip down into my girly underwear in front of a bunch of guys who would call me these rude names, and I couldn't go to the bathroom [or girls' locker room] to change … and it made me so uncomfortable."[15] The previous year, Willow had been assaulted by a group of football players in the locker room, making the requirement that she use the male locker room particularly difficult. Alexis J., a self-described genderfluid 19-year-old in Texas, recalled a gym class where "I had to strip down to girly underwear in front of a bunch of dudes. And they're like, 'faggot.' And this was freshman year, so they're just vicious."[16]

Transgender students expressed particular concern about physical assault and harassment in boys' bathrooms and locker rooms, but described harassment in girls' bathrooms and locker rooms as well. Kevin I., a 17-year-old transgender boy in Utah, noted

---

[14] Jeff Brady, "When a Transgender Person Uses a Public Bathroom, Who is at Risk?" NPR Weekend Edition, May 15, 2016, http://www.npr.org/2016/05/15/477954537/when-a-transgender-person-uses-a-public-bathroom-who-is-at-risk (accessed August 27, 2016).

[15] Human Rights Watch interview with Willow K. (pseudonym), Texas, November 10, 2015.

[16] Human Rights Watch interview with Alexis J. (pseudonym), Texas, November 10, 2015.

AR_293072

"It was hard for me to be in a female locker room. People would ask if I was a lesbian, or was going to have sex with anyone in the locker room, and it was just very uncomfortable."[17] And while many of the transgender students we interviewed identified strongly as boys or girls and wanted to use the corresponding facilities, many others said they did not feel safe in either space and felt their only option was to forego bathrooms, gym classes, and gendered extracurricular activities with their peers altogether.

## Health

Bathrooms, locker rooms, and other shared facilities are necessary to perform bodily functions or maintain physical hygiene when students are confined to the school environment for significant portions of the day. Restricting access to these facilities negatively affects the physical and mental health of transgender youth.

As noted above, many transgender students told us that when they lacked a safe or accessible bathroom or locker room in school, their standard strategy was to avoid all school bathrooms and locker rooms. Sans N., a 15-year-old transgender boy in Utah, explained: "I just don't go to the bathroom at school. It's just so awkward. I just look at the signs and I'm like, I can't go in the ladies' because it makes it me uncomfortable, and I can't go in the boys' because I'm going to get yelled at."[18] Paisley E., a 15-year-old transgender boy in Texas, found that his school's limited all-gender options were often inaccessible or unavailable: "There's one gender neutral bathroom in the janitor's closet, and they finally put one in the nurse's office. And then there's one in the special needs classroom, and I didn't always feel comfortable walking in when they were doing the lessons. So for about one-and-a-half months I did not go to the bathroom at school."[19]

Avoiding the bathroom for the duration of the school day can have negative repercussions for students' physical and mental health. Research indicates that avoiding bathroom use for extended periods of time is linked to dehydration, urinary tract infections, and kidney problems.[20] Cassidy R., a self-described agender 18-year-old in Utah, recalled: "I know a

---

[17] Human Rights Watch telephone interview with Kevin I. (pseudonym), Utah, January 9, 2016.

[18] Human Rights Watch interview with Sans N. (pseudonym), Utah, December 7, 2015.

[19] Human Rights Watch interview with Paisley E. (pseudonym), Texas, November 15, 2015.

[20] Jody L. Herman, "Gendered Restrooms and Minority Stress: The Public Regulation of Gender and its Impact on Transgender Peoples' Lives," *Journal of Public Management and Social Policy*, Vol. 19 (2013), p. 75-76.

AR_293073

lot of my friends just didn't go to the bathroom and suffered a lot of infections and health problems because of that."[21] Daniel N., a 17-year-old transgender boy in Texas, described the planning it required to take advantage of the sole all-gender bathroom in his school in the face of administrative indifference: "I talked to people at the school and they said I had to use the bathroom in the clinic. It's three minutes to walk to the bathroom, and then I have to pee, and then I have to go back. The teacher is like, where were you, and why were you in the clinic bathroom, and it's awkward. I don't pee during school, which is a very bad habit. Because I don't drink [water] at school, and I'm dehydrated."[22]

In addition to physical health issues, students underscored the mental health repercussions of being denied access to the spaces their peers used because they were transgender, including anxiety and feelings of gender dysphoria.[23] Acanthus R., a 17-year-old transgender student in Utah, pointed out: "If you're assigned female at birth now, you go to the women's room, and it's just a reminder about what you hate most about yourself. And if you go the men's bathroom, it's, 'Am I going to get jumped,' 'Am I going to get suspended,' 'Is someone going to call me a tranny?"[24]

Parents of transgender youth observed the repercussions of that dilemma, particularly in elementary schoolers and middle schoolers. Tanya H. noted that Elijah, the transgender boy whose case is described in the summary of this report, vocalized thoughts of suicide when he was treated as a girl at his former school but was happier and healthier when recognized as a boy by teachers and peers at his new school. Ingrid A., the parent of a transgender girl in Pennsylvania, recalled a similar shift when her daughter transitioned at school: "She was a darker child, prior. When she would be angry, her tantrums would go to a dark place: 'I want to die,' 'God made a mistake,' 'I'm not supposed to be a boy.'... But that year of transition, she just became comfortable with herself and you just saw this kid blossom."[25]

---

[21] Human Rights Watch interview with Cassidy R. (pseudonym), Utah, December 2, 2015.

[22] Human Rights Watch interview with Daniel N. (pseudonym), Texas, November 10, 2015.

[23] The American Psychiatric Association has explained that gender dysphoria occurs when there is "a marked difference between the individual's expressed/experienced gender and the gender others would assign him or her," which "causes clinically significant distress or impairment in social, occupational, or other important areas of functioning." American Psychiatric Association, "Gender Dysphoria," 2013, http://www.dsm5.org/documents/gender%20dysphoria%20fact%20sheet.pdf.

[24] Human Rights Watch interview with Acanthus R. (pseudonym), Utah, December 7, 2015.

[25] Human Rights Watch interview with Ingrid A. (pseudonym), Pennsylvania, May 5, 2016.

AR_293074

The health problems associated with restricting transgender students' bathroom use are not limited to high schoolers, and may occur before parents and teachers are aware that the student is questioning their gender or identifying as transgender and struggling to find safe and accessible options. Jillian Hill, the Director of Operations at the Inclusion Center for Community and Justice in Utah, recounted meeting an elementary school student who avoided the bathroom for the duration of the school day.[26] Susanna K., the mother of a transgender boy in Utah, recalled that when her son came out as transgender: "[H]e told us about junior high and not going to the bathroom all day. He was getting bladder infections and we didn't know why. [He] said if he went into the boys' bathroom, he would have gotten beaten up, and if he went into the girls' bathroom, he would have been teased, and maybe been beaten up."[27] Susanna's son eventually switched to a local charter school, where he was able to use bathrooms consistent with his gender identity. As she recalled, that decision "ended up being the best thing for him. He made a lot of friends and was able to be authentic there."[28]

## Privacy

Proponents of restrictions on bathroom and locker room access often cite privacy as a justification for excluding transgender youth. In this telling, the presence of transgender students in bathrooms that correspond to their gender identity compromises the privacy of cisgender students using the same facilities, and exposes them to feelings of discomfort or insecurity. However, as described above, these concerns are far outweighed by the harmful and potentially dangerous impact on transgender students of policies that deny them the use of facilities that correspond to their gender identity. Such discrimination can also undermine transgender students' right to privacy, by effectively outing them as transgender to peers and school staff.

Some schools have allowed transgender students to use alternative facilities, including faculty bathrooms normally off-limits to students, as an alternative to giving them free access to facilities that correspond with their gender identity. This is not an adequate compromise. Several transgender students told us that requesting or using gender neutral

---

[26] Human Rights Watch interview with Jillian Hill, Director of Operations at the Inclusion Center for Community and Justice, Salt Lake City, Utah, November 25, 2015.

[27] Human Rights Watch interview with Susanna K. (pseudonym), Utah, December 8, 2015.

[28] Human Rights Watch interview with Susanna K. (pseudonym), Utah, December 8, 2015.

AR_293075

options served to convey their transgender status to faculty, staff, and peers as well. Julian L., a 15-year-old transgender boy in South Dakota, noted: "I talked to my counselors and they told me to use the staff bathroom. I once saw three students there and they were like, 'Why are you here? You're a student,' and I told them and they understood. And it would be nice to not have to explain it to them."[29] Silas G., a 15-year-old transgender boy in South Dakota, had a similar experience: "My teacher would grill me, 'Why are you going to the nurse?' 'Why are you going to the nurse?' 'Why are you going to the nurse?' And I got yelled at for using the faculty bathroom."[30] Teagan W., a 16-year-old transgender boy in Texas, noted that, when using the faculty bathroom, "I get a lot of weird looks from teachers. I'll wait until teachers go in so they're not like, 'What are you doing?'"[31]

On the other hand, some transgender students prefer the use of all-gender facilities because they do not feel comfortable in bathrooms that correspond to either gender. In these situations, schools should take steps to minimize the degree of unwanted scrutiny this generates, including by instructing teachers to refrain from interrogating students' use of alternative facilities.

Many transgender students' fear of being "outed" extends beyond the school environment to their own families. Many students who are transgender or are exploring their gender identity are not out to their families, fearing hostility or negative repercussions at home. In some instances, students who have sought accommodations from their schools have been outed to family, classmates, and others without their consent. Henry C., a 16-year-old transgender boy in Pennsylvania, warned: "You can get a staff key for the faculty bathroom, but the last kid I know who asked to do that was outed to their parents by the office staff."[32] For students who feared strong disapprobation, violence, or being kicked out of their house if their transgender status was disclosed to their parents, the threat of disclosure can discourage them from talking with school officials about bathroom access, including discussions of all-gender alternatives.

Privacy is indeed lacking in many school bathroom and locker room facilities. Some schools have removed stall doors from bathrooms in an effort to deter drug use and other

---

[29] Human Rights Watch interview with Julian L. (pseudonym), South Dakota, February 14, 2016.
[30] Human Rights Watch interview with Silas G. (pseudonym), South Dakota, February 12, 2016.
[31] Human Rights Watch interview with Teagan W. (pseudonym), Texas, November 13, 2015.
[32] Human Rights Watch interview with Henry C. (pseudonym), Pennsylvania, April 15, 2016.

AR_293076

prohibited behavior. And many if not most school locker rooms require students to change clothes and/or shower in a shared, communal space without curtains or other barriers. Rather than bar transgender students from accessing bathrooms and locker rooms that correspond to their gender identities out of concern for student privacy, school administrators should consider steps to increase the level of privacy enjoyed by all students when using these facilities. Many transgender students told Human Rights Watch that they wished their schools would adopt such measures.

Some schools have successfully taken these steps. As Harley A., an administrator who has overseen the implementation of such a policy in Pennsylvania, noted: "One of the first things I did when I started this was to go to facilities and say, go around to every bathroom and locker room and make sure there are doors on the stalls."[33] With the inclusive policy in place, they added, "there's a couple kids changing for gym in the locker room of their gender identity, and that's worked fine."[34]

## Education

Restrictions on bathroom usage compromise transgender students' education and their ability to participate fully in the school community on an equal footing with others. Like all students, transgender and gender non-conforming students are in school to learn. When students are preoccupied with the unavailability of safe places to relieve themselves, forego participation in gym classes, or suffer other negative impacts resulting from discriminatory restrictions, they are less able to learn and participate fully in the school community.

Some students noted they had compromised their participation in gym to avoid having to change with their peers. Ursula P., a 16-year-old transgender girl in Alabama, recalled:

> They refused to put me in girls' PE last year, and I was scared to go in the locker room and [change clothes] and wouldn't participate, and so I failed. I requested to do girls' PE and it's been over a month; I don't think they're making the decision. And I need a whole year of PE to graduate. I'm worried about physical bullying and verbal bullying in the locker room, and

---

[33] Human Rights Watch interview with Harley A. (pseudonym), Pennsylvania, April 13, 2016.
[34] Ibid.

harassment; I've experienced harassment every time I went in there, and finally I just couldn't do it anymore.[35]

Silas G., a 15-year-old transgender boy in South Dakota, described a similar problem:

I have to use the female locker room or go in the health teacher's room, which is in the female locker room. When I had health, I was able to change in [the health teacher's] office, but it had a huge window so I'd have to change in the tiny bathroom or in an actual closet. I just stopped changing and I'd get points marked off.[36]

In some instances, students who had been offered the use of all-gender bathrooms noted that these were inconveniently located. Because of the way that schools are designed, all-gender options near the office, nurse, auditorium, or theater were often distant from the classroom wing of the building, and far less prevalent than gendered options. Zack T., a 16-year-old transgender boy in Texas, noted: "I've been trying to get gender-neutral bathrooms this year. I have a problem holding it or having to go to the counselor's restroom or the office's bathroom. It takes probably three minutes to get there, three minutes to use the restroom, three minutes to get back, like ten minutes. And that's out of an hour of classroom time, and is cutting into my learning time. But the nearest guy's room is just down the hallway."[37] Brook E., an 18-year-old agender student in Utah, recalled: "[T]here are technically teacher bathrooms that are single stall and gender neutral, but they're all locked. And I was like, can I just have a key for those bathrooms? And that didn't work, they said no, just walk down to the nurse's office…. I just want to go to the bathroom, not hike across the school."[38]

The unavailability of safe and accessible bathrooms and locker rooms also compromises participation in the school community more generally. Lucas K., an 18-year-old transgender boy in South Dakota, requested access to the single-stall staff bathroom as an all-gender option at the school. When the principal refused the request, he devised an alternative to

---

[35] Human Rights Watch interview with Ursula P. (pseudonym), Alabama, January 28, 2016.

[36] Human Rights Watch interview with Silas G. (pseudonym), South Dakota, February 12, 2016.

[37] Human Rights Watch interview with Zack T. (pseudonym), Texas, November 8, 2015.

[38] Human Rights Watch interview with Brook E. (pseudonym), Utah, November 27, 2015.

AR_293078

avoid having to use the women's bathroom: "I go home for lunch and use the bathroom there. And I don't go for the rest of the day."[39] Other students described similar strategies of leaving the campus entirely to find a bathroom at a gas station, fast food restaurant, or other establishment that they could use safely and comfortably, and, as a result, missing out on opportunities to eat lunch or socialize with peers. Students also explained that they did not participate in extracurricular activities—primarily sports, but also activities like choir—because they expected they would have to participate as their sex assigned at birth in the activity and any associated use of locker rooms or bathrooms for out of town trips.

---

[39] Human Rights Watch interview with Lucas K. (pseudonym), South Dakota, February 13, 2016.

# II. Discipline

Strictly regulating transgender students' access to shared facilities also puts those students at risk of disciplinary action. When students feel there was no bathroom they could safely, privately, and conveniently use, they often break the rules. Willow K., a 14-year-old transgender girl in Texas, recalled: "I've tried going to the girl's bathroom; there's a girl who doesn't like me and she told one of the teachers and I got in trouble and got written up. I talked to the principal and said, 'Hey, I'm this way, and it makes me really uncomfortable,' and he said, 'No, you're a boy.'"[40]

A number of students shared stories of being reprimanded by teachers or administrators, despite the fact that no incidents occurred as a result of their use of the bathroom that matched their gender identity. In one incident, a student in Alabama was dragged from the bathroom by the school principal, and, in many others, students were told they had to stop using the bathroom immediately.[41]

---

[40] Human Rights Watch interview with Willow K. (pseudonym), Texas, November 10, 2015.

[41] Human Rights Watch interview with Lucia Hermo, Outreach Paralegal, ACLU of Alabama, Montgomery, Alabama, January 26, 2016; Human Rights Watch interview with Lacey Kennedy, Youth Advocacy Organizer at AIDS Alabama, Birmingham, Alabama, January 29, 2016.

AR_293080

# III. All-Gender Options

Some students told Human Rights Watch that all-gender facilities, introduced as an option available to all students, would be their preferred solution, and lessen the stress of gender policing by peers and teachers. Schools should consider doing so where possible.

Cassidy R., an 18-year-old agender student in Utah, recalled:

> I would just not go to the bathroom at school. It was just an overall sense of discomfort, and I personally just don't feel that using the women's or the men's bathroom is accurate for who I am, and don't feel comfortable using either. If you go to the men's bathroom, you risk being assaulted, and if you go to the women's bathroom, you get, 'Why are you here?'[42]

Logan J., an 18-year-old student in Utah, similarly noted: "I identify as non-binary and it's difficult to even use a restroom in public. I'm stuck here for eight hours and I don't feel comfortable going to the bathroom because I have to make a choice there, and I'm not comfortable in either and there's no gender neutral option."[43]

Cassidy's and Logan's dilemmas were not uncommon for students who were agender, genderfluid, or non-binary, and even some transgender boys and girls found gendered bathrooms intimidating. As Dominic J., a 13-year-old transgender boy in Pennsylvania, noted: "I've been yelled at in both the men's bathrooms and the women's bathrooms in my school."[44]

In interviews, students lauded a range of approaches that some schools have adopted to expand all-gender options. Some schools simply redesignated gendered, single-stall bathrooms as all-gender bathrooms, and opened them for use by anyone who needs them. As other schools were built or remodeled, they added more single-stall bathrooms, often in the form of family bathrooms or accessible bathrooms that serve the needs of families and

---

[42] Human Rights Watch interview with Cassidy R. (pseudonym), Utah, December 2, 2015.
[43] Human Rights Watch telephone interview with Logan J. (pseudonym), Utah, January 9, 2016.
[44] Human Rights Watch interview with Dominic J. (pseudonym), Pennsylvania, April 15, 2016.

people with disabilities as well as transgender individuals. A third option—increasingly common in colleges and in LGBT spaces—is to designate certain multi-stall bathrooms as all-gender, often by outfitting them to maximize privacy for all patrons with dividers or stalls. Although students should not be forced to use all-gender options and should be able to access facilities according to their gender identity, the provision of additional options provides an alternative to anyone who is uncomfortable in gendered facilities.

AR_293082

# IV. Human Rights Analysis

As the 2016/2017 school year begins, legal challenges to the federal guidance interpreting Title IX are still working their way through the courts, leaving the obligations of state governments and school districts under US federal law unsettled. However, the steps needed to protect and uphold the human rights obligations of transgender students are clear, regardless of the precise scope of federal regulatory power in this space.

State governments are obliged under international human rights law to refrain from discriminating against transgender students. North Carolina's law is an act of affirmative and deliberate discrimination that is in violation of international human rights law; other states should not emulate it. They should instead take steps to encourage school administrations to facilitate transgender students' access to facilities that correspond with their gender identities and, where appropriate, to all-gender facilities they can use safely and comfortably. Such steps are necessary to ensure transgender students' ability to access education on an equal footing with others in an environment that is safe and free of discrimination and fear, and also to protect their health. For its part, the US federal government should continue to take steps to both mandate and encourage state governments to undertake these actions, to the extent possible given the limits of federal legislative and regulatory authority.

The International Covenant on Civil and Political Rights (ICCPR), which the United States has ratified, obliges all levels of the US government[45] to respect and uphold the rights of transgender people to be free from discrimination, to recognition as a person before the law, and to privacy, as well as the right of children to special measures of protection. [46] The Human Rights Committee, the treaty body that monitors and provides guidance to

---

[45] The provisions of the ICCPR "extend to all parts of federal States without any limitations or exceptions." ICCPR, art. 50.

[46] ICCPR arts. 16, 17, 24, 26. The Human Rights Committee, the expert body that guides states in their implementation of the ICCPR, has affirmed that article 24 requires states to adopt "special measures to protect children." Human Rights Committee, "General Comment No. 17: Rights of the Child," April 7, 1989, http://www.refworld.org/docid/45139b464.html, para 1-2. The United States has also signed the Convention on the Rights of the Child (CRC). Although it has not ratified the treaty, as a signatory it is bound to avoid actions that contravene the purpose of the treaty. The Committee on the Rights of the Child, the UN treaty body that interprets and applies the Convention on the Rights of the Child, has concluded that the treaty's prohibited grounds for discrimination "also include sexual orientation, gender identity, and health status." Committee on the Rights of the Child, "General Comment No. 15 (2013) on the Right of the Child to the Enjoyment of the Highest Attainable Standard of Health (Art. 24)," U.N. Doc. CRC/C/GC/15, April 17, 2013, para. 8.

governments on implementation of the ICCPR, has expressed concern about discrimination on the basis of gender identity and lauded states that have taken steps to recognize the gender identity of transgender people.[47]

The right to education under international law is elaborated by the Universal Declaration on Human Rights, the Convention on the Rights of the Child (CRC), and the International Covenant on Economic, Social and Cultural Rights (ICESCR). The United States has signed, but not ratified, both the CRC and the ICESCR, meaning that it is not bound by either treaty but is obliged to act consistently with their object and purpose. The Committee on the Rights of the Child, which guides states in their implementation of the CRC and is an authoritative voice on the rights of children, has rightly explained that the process of fulfilling the right to education must take account of "the environment within which education takes place," and that governments should ensure schools are safe for all students.[48] As this report has explained, the failure of authorities at all levels to enact reasonable accommodations for transgender students creates an environment that negatively impacts their ability to participate fully in the experience of schooling and education, places their health at risk, and places them at heightened risk of violence, harassment, and bullying.

In districts across the US, many schools have recognized that they have or will have transgender students in their care, and have taken proactive steps to ensure their rights are respected.[49] At least eight of the schools or school districts visited by Human Rights Watch have developed policies and proposals to ensure that transgender students are able to access facilities according to their gender identity, and officials or parents of transgender youth told us that those policies have been implemented without incident.[50]

---

[47] See Concluding Observations of the Human Rights Committee on Ireland, U.N. Doc. CCPR/C/IRL/CO/3,July 30, 2008, para. 8; Concluding Observations of the Human Rights Committee on the United Kingdom of Great Britain and Northern Ireland, U.N. Doc. CCPR/C/GBR/CO/6, July 30, 2008, para. 5. The Committee has also indicated that transgender individuals who have undergone gender reassignment procedures have a right under the ICCPR to be issued identity documents that correspond with their gender identity. Concluding Observations on Ireland, para. 8.

[48] UN Committee on the Rights of the Child, "General Comment No. 1, The Aims of Education (Article 29)," U.N. Doc. CRC/GC/2001/1, April 17, 2001, para. 8. The United States has signed, but not ratified, the CRC.

[49] Nearly every school visited by Human Rights Watch had at least one student who identified as transgender, agender, genderfluid, or non-binary. Data on the number of transgender youth are scarce, but a number of teachers and administrators interviewed by Human Rights Watch suggested that policy concerns related to gender identity in schools are arising with greater frequency as awareness increases and merit proactive attention.

[50] Human Rights Watch interview with Tanya H. (pseudonym), Texas, November 14, 2015; Human Rights Watch interview with Susanna K. (pseudonym), Utah, December 8, 2015; Human Rights Watch interview with Pam A. and Chuck A. (pseudonyms), Alabama, January 21, 2016; Human Rights Watch interview with Kent D. (pseudonym), Alabama, January 22, 2016; Human

AR_293084

Schools around the United States should take similar steps to ensure that all students are able to use facilities without discrimination and are equally able to participate and learn.

---

Rights Watch interview with Harley A. (pseudonym), Pennsylvania, April 13, 2016; Human Rights Watch interview with Vanessa M. (pseudonym), Pennsylvania, May 3, 2016; Human Rights Watch interview with Ingrid A. (pseudonym), Pennsylvania, May 5, 2016; Human Rights Watch interview with Lillian D. (pseudonym), Pennsylvania, May 6, 2016.

AR_293085

# Acknowledgments

This report was written and primarily researched by Ryan Thoreson, the Yale Law School Robert L. Bernstein International Human Rights Fellow in the LGBT Rights Program at Human Rights Watch. Additional interviews were conducted by Michael Bochenek, senior counsel in the Children's Rights Division.

The report was reviewed by Boris Dittrich, advocacy director of the LGBT Rights Program; Michael Bochenek, senior counsel in the Children's Rights Division; Megan McLemore, senior researcher in the Health and Human Rights Division; Antonio Ginatta, US advocacy director; Chris Albin-Lackey, senior legal advisor; and Joseph Saunders, deputy program director.

Human Rights Watch would like to thank the experts and organizations that assisted us in reaching out to potential interviewees, especially Youth First in Dallas, TX; LGBTQ Saves in Fort Worth, TX; Hatch Youth in Houston, TX; Out Youth in Austin, TX; the Utah Pride Center in Salt Lake City, UT; Equality Utah in Salt Lake City, UT; the ACLU of South Dakota in Sioux Falls, SD; the Center for Equality in Sioux Falls, SD; the Black Hills Center for Equality in Rapid City, SD; the Magic City Acceptance Project in Birmingham, AL; the Alabama Alliance for Healthy Youth in Birmingham, AL; the Alabama Safe Schools Coalition in Birmingham, AL; Montgomery Pride United in Montgomery, AL; Free2Be in Huntsville, AL; the ACLU of Pennsylvania in Philadelphia, PA; the Mazzoni Center in Philadelphia, PA; the LGBT Center of Central Pennsylvania in Harrisburg, PA; the Bradbury-Sullivan LGBT Community Center in Allentown, PA; and the NEPA Rainbow Alliance in Pittston, PA.

AR_293086



# SHUT OUT

## Restrictions on Bathroom and Locker Room Access for Transgender Youth in US Schools

In 2016, lawmakers across the United States proposed bills to restrict transgender individuals' access to bathrooms and locker rooms consistent with their gender identity. Although only one of these bills became law—in North Carolina—transgender youth face analogous restrictions in schools and school districts across the country. This report, based on interviews with 74 transgender students and over 50 parents, educators, and administrators in Alabama, Pennsylvania, South Dakota, Texas, and Utah, documents how these restrictions expose transgender youth to bullying and harassment, mental and physical health problems, unwanted disclosure of their transgender status, and barriers to participation in the educational environment. It urges federal, state, and local officials to ensure that all students are able to access bathrooms and locker rooms consistent with their gender identity in the school environment.

*(above) Demonstrators protesting passage of legislation limiting bathroom access for transgender people stand in front of the Charlotte-Mecklenburg Government Center in Charlotte, NC on March 31, 2016.*
*© 2016 Skip Foreman/AP Photo*

*(front cover) Students hold stickers about to be placed on a new all-gender bathroom as members of the cheer squad applaud at Nathan Hale High School in Seattle, WA on May 17, 2016.*
*© 2016 Elaine Thompson/AP Photo*

**hrw.org**

# Gendered Restrooms and Minority Stress: The Public Regulation of Gender and its Impact on Transgender People's Lives

Jody L. Herman
*The Williams Institute*
*UCLA School of Law*

The designers of our built environment have created public facilities that are segregated by gender, such as public restrooms, locker rooms, jails, and shelters. Reliance upon gender segregation in our public spaces harms transgender and gender non-conforming people. This paper employs a minority stress framework to discuss findings from an original survey of transgender and gender non-conforming people in Washington, DC about their experiences in gendered public restrooms. Seventy percent of survey respondents reported being denied access, verbally harassed, or physically assaulted in public restrooms. These experiences impacted respondents' education, employment, health, and participation in public life. This paper concludes with a discussion of how public policy and public administration can begin to address these problems by pointing to innovative regulatory language and implementation efforts in Washington, DC and suggests other policies informed by the survey findings.

The concept of two separate and opposing genders – men and women – is entrenched in our society and reflected in our built environment. Public spaces throughout the United States are constructed with gender-segregated facilities, which serve to determine who is and is not allowed to use a particular space. Gender segregation is commonly found in public restrooms, locker rooms, dressing rooms, homeless shelters, jails, and prisons and is intended to provide safety, order, modesty, and security in these facilities. However, the concept of gender that underlies the design of these facilities ignores people who do not fit into a binary gender scheme, particularly transgender and gender non-conforming people. Traditional beliefs about gender are being challenged now more than ever and we must address the inadequacies of our built environment to meet the needs of all people regardless of gender.[1]

Restrooms in particular are an integral and necessary part of the built environment for our daily lives. All people share the real human need for safe restroom facilities when we go to work, go to school, and participate in public life. Since the need is universal, one

---

[1] For the purposes of this paper, "transgender" and "gender non-conforming" describe people whose gender identity or expression is different from those traditionally associated with their assigned sex at birth.

AR_293089

would think that it would be a priority of our society to make sure restrooms are safe and available for all people. Yet, the way gendered public restrooms are designed and constructed harms transgender and gender non-conforming people, some of whom may not conform to reified expectations of how men and women will look and act.

One way to conceptualize this harm is through a minority stress model. Minority stress develops by experiencing major stressors, such as when one is fired from a job, but can also develop through everyday experiences of disrespect and disparate treatment (Meyer 2003). Research on minority stress has found that it negatively impacts the mental health and social well-being of lesbian, gay, and bisexual people (Meyer 1995; Meyer 2003; Kertzner et al. 2009). Furthermore, lesbian, gay, and bisexual people may suffer minority stress as the result of prejudice and discrimination based on their gender non-conformity in addition to their sexual orientation (Gordon and Meyer 2007). Though these studies did not include transgender-identified participants, the findings on minority stress related to gender non-conformity suggest that minority stress models are appropriate to measure the impacts of prejudice and stigma experienced by transgender and gender non-conforming people.

This paper will utilize a minority stress framework to describe the experiences of transgender and gender non-conforming people when accessing and using gendered public restrooms. Data for this paper come from an original survey of transgender and gender non-conforming residents of Washington, DC, conducted in 2008 and follow-up interviews with selected survey participants. This survey collected data from 93 respondents on their experiences in gendered public restrooms in the DC metropolitan area, including experiences of denial of access, verbal harassment, and physical assault, and how those experiences impacted their education, employment, health, and participation in public life. Analysis of the survey data also will outline differences in these experiences based on race, income, and gender. Public restrooms fall under the purview of public policies that govern their design, construction, maintenance, and use. Public policy and public administration, therefore, can address problems that gender segregation creates. This paper will conclude by pointing to innovative public policy and public administration solutions that have created and implemented protections for transgender and gender non-conforming people and by taking a forward look at the role of gender segregation in urban planning and the built environment.

## Gender Segregation and Minority Stress

Ilan Meyer (2003) outlined processes of minority stress as they relate to lesbian, gay, and bisexual (LGB) people. Meyer (2003) locates minority stressors on a range from distal to proximal. Distal minority stressors are those that are based on events external to the individual and unrelated to the individual's self-perception or identity. These could be acute events, such as experiencing an incident of violence or job loss due to being perceived as LGB, or chronic events, such as homelessness due to family rejection. Proximal minority stressors are those that are based in an individual's self-perception and identity. Meyer explains, "Minority identity is linked to a variety of stress processes; some LGB people, for example, may be vigilant in interactions with others (expectations of rejection), hide their identity for fear of harm (concealment), or internalize stigma (internalized homophobia)" (2003, 676).

Meyer has modeled and tested the relationship between these processes of minority stress and mental health outcomes for gay and bisexual people, finding that minority stress is associated with negative outcomes in social well-being and mental health (Meyer 1995; Meyer 2003; Kertzner, Meyer, Frost, and Stirratt 2009). Though Gordon and Meyer (2007)

AR_293090

*Journal of Public Management & Social Policy*                                                                    *Spring 2013*

found that LGB people suffer from prejudice, discrimination, and violence due to gender non-conformity, very little research has applied minority stress models directly to the experiences and health outcomes of transgender individuals and none have focused on gender segregation as a cause of minority stress (see, for example, Effrig, Bieschke, and Locke 2011; Garofalo, Emerson, and Mustanski 2010; Vilain and Sanchez 2009; Kelleher 2009). Without question, transgender and gender non-conforming individuals experience violence, stigmatization, and discrimination (see, for example, Grant et al. 2011; Stotzer 2009, and Lombardi et al. 2001). In the largest survey of trans people to date, transgender and gender non-conforming people reported being fired due to anti-transgender bias (26%), being harassed (78%) and physically assaulted (35%) at school, suffering double the rate of unemployment, and attempting suicide at alarming rates (41%) (Grant et al. 2011). Transgender and gender non-conforming people across the United States certainly are suffering the negative impacts and consequences of distal and proximal minority stressors. Furthermore, as a matter of tradition and policy, we have built minority stressors for transgender and gender non-conforming people into our very environment due to our reliance on gender segregation in public facilities.

The impact of gender segregation in transgender and gender non-conforming people's lives has received little attention or study in scholarly research and, as of this writing, no studies have been published in the fields of Public Policy and Public Administration on this topic. However, research in Sociology and by transgender organizations has provided descriptions of the experiences of transgender and gender non-conforming people in public restrooms. In *Queering Bathrooms: Gender, Sexuality, and the Hygienic Imagination*, sociologist Sheila Cavanagh presents findings from 100 interviews with lesbian, gay, bisexual, transgender, and intersex (LGBTI) people on their thoughts and experiences regarding public restrooms (2010). While Cavanagh's study is mainly a theoretical mapping of how public restrooms reinforce gender and sexuality norms and why LGBTI people are harmed in these spaces, she relates narratives from interview participants that describe instances of harassment, humiliation, arrest, and physical violence in public restrooms.

Organizations that serve the trans community have also conducted research on transgender and gender non-conforming people's experiences in public restrooms. The Transgender Law Center (TLC), in cooperation with the National Center for Lesbian Rights (NCLR), found in a survey of transgender people in San Francisco that 63 percent of 75 respondents to questions regarding experiences in public accommodations experienced denial of access and/or harassment at least once while using public restrooms (Minter and Daley 2003). In a separate, more qualitative survey of transgender people in San Francisco, Dylan Vade found that "out of 116 responses from those who did not identify as male or female, 48 people took the time to write out specific bathroom experiences, all negative. These experiences ranged from harassment to violence to getting fired" (Vade 2002, 2). Respondents reported being physically abused, verbally harassed, fired, arrested, and made ill from avoiding restrooms altogether. A 2007 study in Virginia found that public restroom facilities served as a barrier to health care for some respondents (Xavier, Honnold, and Bradford 2007). Out of the sample of 350 Virginians self-identified as transgender, 37 respondents (11 percent) reported that a "lack of appropriate restroom facilities" had prevented them from seeing a doctor or getting health care (Xavier, Honnold, and Bradford 2007, 17).

AR_293091

Original analysis of the two data sets from the San Francisco surveys revealed that respondents experienced problems differently and at differing rates based on race and ethnicity, gender identity, and income. People of color reported problems using restrooms at a much higher rate than white respondents.[2] People who were transitioning from female-to-male reported problems at a much higher rate than people who were transitioning from male-to-female. Lower income groups reported more restroom problems than higher income groups, though this difference was not significant when tested. These differences suggest that discrimination based on race and ethnicity, class, and gender is intertwined with and may exacerbate experiences of prejudice in gender-segregated spaces. The survey conducted for this study improves on these prior surveys by focusing specifically on gendered restrooms, collecting more detailed quantitative data on a wider range of experiences, while also providing a more nuanced understanding of the impact of problems in gendered restrooms though qualitative data collection.

**Survey Method and Analysis**

Washington, DC served as the site for this survey, which was targeted to transgender and gender non-conforming people who work, live, and/or attend school in the District.[3] As a "hard-to-reach" population, usual sampling techniques for randomization, such as random-digit dialing, were not feasible for this survey. This survey utilized a convenience sampling method designed to reach as many members of the target community as possible. The survey was open for four months beginning November 2008 and advertised and/or distributed directly through seven community organizations, one online community, and two local listserves, all of which serve the LGBT community in Washington, DC. Advertisements for the survey encouraged respondents to forward news of the survey on to others they think are part of the target respondent group. The survey was offered online, in print, and via one-on-one interview in order to be as accessible as possible for people without internet access or low literacy. An incentive to participate was included in the form of a lottery for one of four $50 cash prizes. Follow-up interviews were conducted with six survey participants: two young transgender men, one young and two older transgender women, and one male crossdresser.

Analysis of the survey data was conducted using descriptive statistics, cross tabulations, and where appropriate, Pearson's chi-square and Fisher's exact tests.[4] As noted above, prior research suggests that transgender and gender non-conforming people experience problems at different rates based on race, income, and gender, so analyses of those differences are presented. The survey contained open-ended questions that generated qualitative data, which, along with follow-up interview data, was coded and analyzed. Follow-up interviews conducted for this study offer more detailed qualitative data that

---

[2] Original analysis was conducted by the author. Pearson's chi-square tests were conducted in this prior research. Unless otherwise noted, the findings reported here were found to be significant ($p < 0.05$).

[3] Data collection activities were originally conducted for the author's doctoral dissertation in cooperation with the DC Trans Coalition and received final approval from the George Washington University Institutional Review Board under IRB #080708, and all approval memos and approved documents are on file with the GWU IRB and the author.

[4] Pearson's chi-square tests and Fisher's exact tests are only generalizable with random samples. With a non-random sample, not only is the test not generalizable, but the test's ability to find statistical significance may be limited. Yet the test can be used to crudely measure a statistical relationship between two variables within the sample and provide hypotheses for future research. Chi-square tests of independence were performed when the expected value of each cell was 5 or higher. The Fisher's exact test, a test designed for use with thin cells, was used when any cell had an expected value of 4 or below. Test statistics and p-values are reported and will indicate which test was used.

AR_293092

*Journal of Public Management & Social Policy*                                          *Spring 2013*

allowed for better understanding of how people's experiences have impacted their lives by tracing and linking specific events to any subsequent impacts.

**Survey Sample Demographics**

The target population for the survey was transgender and gender non-conforming people who live, work, or have spent significant time in Washington, DC. Approximately 50 percent (n=47) of survey respondents lived in Washington, DC. DC-resident respondents came from all four quadrants of the city, with the majority living in the northwest quadrant. Only 3 of the 93 respondents lived in zip codes outside the Washington, DC metropolitan area, which includes northern Virginia and the Maryland suburbs.

Table 1 shows the racial/ethnic and age composition of the full survey sample and how it compares to the District of Columbia. Though nearly half of the survey respondents reside outside of Washington, DC, in Virginia or Maryland, this comparison gives a rough idea of how the survey sample differs from the general DC population.[5]  In the survey sample, 67 percent of respondents identified as white only, 17 percent identified as Black or African American only, and 12 percent reported two or more races. This sample appears skewed in favor of white respondents. The survey sample is composed mainly of individuals 44 years old and younger. Compared to the DC population, the survey sample seems much younger overall.

**Table 1. Race and Age of the Survey Sample and the District of Columbia**

| | Survey Sample | | DC |
|---|---|---|---|
| Demographic | Frequency | Percent of Sample | Percent of Population |
| Race/Ethnicity (n=93) | | | |
| Black/African-American alone | 16 | 17% | 54% |
| Hispanic/Latin@ alone[6] | 2 | 2% | 9% |
| Native American/American Indian alone | 0 | 0% | <1% |
| Asian/Pacific Islander alone | 2 | 2% | 2% |
| White/Caucasian alone | 62 | 67% | 34% |
| Two or more races | 11 | 12% | 1% |
| Age (n=93) | | | |
| 18-24 | 34 | 37% | 14% |
| 25-34 | 30 | 32% | 24% |
| 35-44 | 15 | 16% | 18% |
| 45-54 | 8 | 9% | 16% |
| 55-64 | 5 | 5% | 14% |
| 65 and older | 1 | 1% | 14% |

*Source for DC Data: U.S. Census Bureau, Current Population Survey, Annual Social and Economic Supplement, 2008.*

---

[5] An analysis of just the DC-resident respondents did not show any impact on the trends observed in Table 1 except in the case of race. DC residents in the sample seemed slightly less skewed from the DC population than the sample as a whole: 60 percent identified as white only, 29 percent identified as Black or African American only, and 13 percent reported two or more races. Yet, regardless of the residency of the respondents, this sample appears skewed in favor of white respondents.

[6] The use of "@" in the word "Latin@" is sometimes used in written Spanish to make the word gender-neutral in a concise manner.

AR_293093

Table 2 presents the income and educational attainment of the survey sample and the District of Columbia. Nearly half of the survey sample and the population of the District of Columbia had annual individual incomes of $19,999 or less – 46 percent and 48 percent, respectively. While the third and fourth income quintiles seem slightly larger in the survey sample, DC appears to have a larger share in the highest income category, at 9 percent versus 5 percent in the survey sample. While there appears to not be a large difference in income, survey respondents in the survey sample report higher educational attainment than the DC population. The survey sample had fewer people in the three lowest categories of educational attainment, and markedly higher percentages for those who had some college (no degree) and those who completed a bachelor's degree.

**Table 2. Income and Educational Attainment of the Survey Sample and the District of Columbia**

| Demographic | Survey Sample | | DC |
| | Frequency | Percent of Sample | Percent of Population |
|---|---|---|---|
| Income (n=92) | | | |
| $0-$19,999 | 42 | 46% | 48% |
| $20,000-$39,999 | 17 | 18% | 20% |
| $40,000-$59,999 | 15 | 16% | 12% |
| $60,000-$99,999 | 13 | 14% | 11% |
| $100,000+ | 5 | 5% | 9% |
| Educational Attainment (n=93) | | | |
| 8th grade or less | 0 | 0% | 4% |
| Some high school (no diploma) | 6 | 6% | 9% |
| High school/GED | 9 | 10% | 18% |
| Some college (no degree) | 19 | 20% | 12% |
| Associate's degree | 4 | 4% | 3% |
| Bachelor's degree | 26 | 28% | 19% |
| Graduate/professional degree | 17 | 18% | 19% |

*Source for DC Data: U.S. Census Bureau, Current Population Survey, Annual Social and Economic Supplement, 2008. Percentages in each category may not add to 100% due to rounding.*

Table 3 describes the gender identity of the survey respondents in four categories, arranged by respondents' sex assigned at birth and gender identity today. Sixty respondents (65 percent) were assigned female at birth. Thirty-seven of those respondents identified as a man, transgender, transsexual, and/or female-to-male (FTM). Twenty-three respondents assigned female at birth did not identify as transgender in any way, but identified themselves as gender non-conforming and/or genderqueer. Thirty-three respondents (35 percent) were assigned male at birth. Twenty-nine of these respondents identified as a woman, transgender, transsexual, and/or male-to-female (MTF). Four respondents assigned male at birth did not identify as transgender in any way, but identified themselves as gender non-conforming and/or genderqueer.

- 70 -

*Journal of Public Management & Social Policy*    Spring 2013

**Table 3. Self-Identified Gender and Transition Status of the Survey Sample**

| Gender Identity Today | Gender Identity (n=93) | | Has had any medical transition (n=49) | |
|---|---|---|---|---|
| | Frequency | % of Sample | Frequency | Row % |
| Assigned Female at Birth (n=60) | | | | |
| Man / Transgender / Transsexual / FTM | 37 | 40% | 24 | 65% |
| Gender Non-Conforming / Genderqueer (not trans identified) | 23 | 25% | 0 | 0% |
| Assigned Male at Birth (n=33) | | | | |
| Woman / Transgender / Transsexual / MTF | 29 | 31% | 24 | 83% |
| Gender Non-Conforming / Genderqueer (not trans identified) | 4 | 4% | 1 | 25% |

Table 3 above also shows medical transition status by each gender category. Overall, 49 respondents (53 percent) have had medical transition of some sort. Sixty-five percent of those transitioning from female-to-male (FTM) and 83 percent of those transitioning from male-to-female (MTF) have had some form of medical transition, which may include hormone treatment, surgery, and other medical treatments or procedures for purposes of gender transition. The most common medical treatment respondents reported was hormone treatment. Forty-five respondents reported having had hormone treatment; these 45 respondents comprise 48 percent of the sample and 92 percent of those who have had any medical transition.

**Survey Respondents' Experiences with Gendered Public Restrooms**

The survey assessed people's experiences accessing or using gender-segregated public restrooms by asking specifically about denial of access to facilities, verbal harassment, and physical assault. Overall, 65 respondents (70 percent) reported experiencing one or more of these problems. Eighteen percent of respondents have been denied access to a gender-segregated public restroom, while 68 percent have experienced some sort of verbal harassment and 9 percent have experienced some form of physical assault when accessing or using gender-segregated public restrooms. This section reviews the results of questions about denied access, verbal harassment, and physical assault provided through the survey and follow-up interviews and provides an analysis of each based on gender, race/ethnicity, and income.

*Denied Access*

Eighteen percent of respondents have been denied access to at least one gender-segregated public restroom in Washington, DC. Table 4 describes the income, race/ethnicity, and gender of those denied access to gender-segregated public bathrooms. Comparing the rates of those denied access in each of the lowest three income quintiles shows very little difference, at 21 percent, 24 percent, and 20 percent. Twenty-five percent of all Black or African American respondents were denied access to gendered public bathrooms, which is

AR_293095

slightly higher than the share of white respondents (18 percent) and respondents of two or more races (18 percent). Twenty-six percent of all female-to-genderqueer respondents were denied access, which is about 10 points higher than the other two gender categories reporting denied access. There appears to be no significant relationship between being denied access to public restrooms and income (*Fisher's exact* = 0.377), race/ethnicity ($\chi^2$ = 0.36, $p$ = 0.85), or gender ($\chi^2$ = 0.4073, $p$ = 0.816).

**Table 4. Denied Access to Gender-Segregated Public Restrooms by Income, Race/Ethnicity, and Gender**

| Demographic | Denied Access (n=17) | |
|---|---|---|
| | Frequency | % of row category |
| *Income (n=92)* | | |
| $0-$19,999 (n=42) | 9 | 21% |
| $20,000-$39,999 (n=17) | 4 | 24% |
| $40,000-$59,999 (n=15) | 3 | 20% |
| $60,000-$99,999 (n=13) | 1 | 8% |
| $100,000+ (n=5) | 0 | 0% |
| *Race/Ethnicity (n=93)* | | |
| Black/African-American alone (n=16) | 4 | 25% |
| Hispanic/Latin@ alone (n=2) | 0 | 0% |
| Asian/Pacific Islander alone (n=2) | 0 | 0% |
| White/Caucasian alone (n=62) | 11 | 18% |
| Two or more races (n=11) | 2 | 18% |
| *Gender (n=93)* | | |
| Transgender Female-to-Male (n=37) | 6 | 16% |
| Transgender Male-to-Female (n=29) | 5 | 17% |
| Female-to-Genderqueer (n=23) | 6 | 26% |
| Male-to-Genderqueer (n=4) | 0 | 0% |

*Verbal Harassment*

Sixty-eight percent of respondents reported experiencing at least one instance of verbal harassment in gender-segregated public restrooms. For purposes of this survey, "verbal harassment" was defined very broadly. These experiences could include, but were not limited to, having been told they were in the wrong facility (n=39), told to leave the facility (n=12), questioned about their gender (n=34), ridiculed or made fun of (n=19), verbally threatened (n=8), and stared at or given strange looks (n=56). Respondents also reported in qualitative responses having had the police called, having been confronted while using urinals, and being followed after using a facility.

Table 5 describes respondents' verbal harassment experiences by income, race/ethnicity, and gender. Eighty-two percent of those in the second income quintile ($20,000-$39,000) have experienced verbal harassment, which is the highest rate by income category in this sample. Black or African-American respondents reported the second-highest rate of verbal harassment (87 percent) and 64 percent of those reporting two or more races experienced verbal harassment. The percent of those who identified as gender non-conforming or genderqueer who have experienced verbal harassment is 78 percent for those assigned female at birth and 75 percent for those assigned male at birth. The rate of verbal harassment is relatively lower for those who identify as transgender female-to-male (68 percent) or transgender male-to-female (59 percent).

AR_293096

*Journal of Public Management & Social Policy*                                    Spring 2013

**Table 5. Verbal Harassment in Gender-Segregated Public Restrooms by Income, Race, and Gender**

| Demographic | Verbal Harassment (n=63) | |
| --- | --- | --- |
| | Frequency | % of row category |
| Income (n=92) | | |
| $0-$19,999 (n=42) | 29 | 69% |
| $20,000-$39,999 (n=17) | 14 | 82% |
| $40,000-$59,999 (n=15) | 11 | 73% |
| $60,000-$99,999 (n=13) | 7 | 54% |
| $100,000+ (n=5) | 1 | 20% |
| Race/Ethnicity (n=93) | | |
| Black/African-American alone (n=16) | 14 | 87% |
| Hispanic/Latin@ alone (n=2) | 2 | 100% |
| Asian/Pacific Islander alone (n=2) | 1 | 50% |
| White/Caucasian alone (n=62) | 39 | 63% |
| Two or more races (n=11) | 7 | 64% |
| Gender (n=93) | | |
| Transgender Female-to-Male (n=37) | 25 | 68% |
| Transgender Male-to-Female (n=29) | 17 | 59% |
| Female-to-Genderqueer (n=23) | 18 | 78% |
| Male-to-Genderqueer (n=4) | 3 | 75% |

There seems to be no significant relationship between experiencing verbal harassment and one's race/ethnicity (*Fisher's exact* = 0.269) or gender (*Fisher's exact* = 0.517). However, experiencing verbal harassment is related to one's income ($\chi^2$ = 4.396, *p* = 0.036). Survey respondents who made $49,999 or less annually are more likely to experience verbal harassment than survey respondents who made $50,000 or more annually.

*Physical Assault*

Eight respondents (9 percent) reported experiencing at least one instance of physical assault in gender-segregated public restrooms. Like the term "verbal harassment" discussed above, "physical assault" was defined very broadly in this survey to capture a range of experiences respondents had where an altercation involving physical contact with others occurred. These experiences could include, but were not limited to, having been physically removed from the facility (n=4), hit or kicked (n=2), physically intimidated and/or cornered (n=6), and slapped (n=1). One transgender male-to-female respondent reported having been sexually assaulted while using the men's room.

Table 6 describes the distribution of experiences of physical assault by income, race/ethnicity, and gender. In this sample, there is a marginal relationship between race/ethnicity and experiences of physical assault (*Fisher's exact* = 0.078). This suggests that people of color in this sample were more likely than white respondents to experience physical assault. There is also a marginal relationship between income and physical assault in this sample (*Fisher's exact* = 0.056). Respondents making less than $50,000 annually in this sample were more likely to experience physical assault than respondents making $50,000 or above. There seems to be no relationship between gender and physical assault in this sample (*Fisher's exact* = 0.530).

AR_293097

**Table 6 Physical Assault in Gender-Segregated Public Restrooms by Income, Race, and Gender**

| Demographic | Physical Assault (n=8) | |
| --- | --- | --- |
| | Frequency | % of row category |
| Income (n=92) | | |
| 0 to $19,999 (n=42) | 5 | 12% |
| $20,000-$39,999 (n=17) | 2 | 12% |
| $40,000-$59,999 (n=15) | 1 | 7% |
| $60,000-$99,999 (n=13) | 0 | 0% |
| $100,000+ (n=5) | 0 | 0% |
| Race/Ethnicity (n=93) | | |
| Black/African-American alone (n=16) | 3 | 19% |
| Hispanic/Latin@ alone (n=2) | 0 | 0% |
| Asian/Pacific Islander alone (n=2) | 0 | 0% |
| White/Caucasian alone (n=62) | 3 | 5% |
| Two or more races (n=11) | 2 | 18% |
| Gender (n=93) | | |
| Female-to-Male (n=37) | 2 | 5% |
| Male-to-Female (n=29) | 4 | 14% |
| Female-to-Genderqueer (n=23) | 2 | 9% |
| Male-to-Genderqueer (n=4) | 0 | 0% |

**Impact of Gendered Restrooms in Education, Employment, Health and Public Life**

A single experience of denied access, verbal harassment, or physical assault is certainly a problem in its own right. These experiences, however, can have far-reaching effects that impact people's lives. Experiences of discrimination can impact people's lives in many ways, even leading to poverty or to negative health consequences (Grant et al. 2011). This survey sought to assess the impact on people's lives in four areas: education, employment, health, and participation in public life.

*Education*

Thirty-one respondents currently attend or have attended school in Washington, DC. Forty-two percent of these respondents reported being denied access to and/or verbally harassed in restrooms at their school in DC. Ten percent of the 31 respondents reported that incidents of denied access to and/or verbal harassment in restrooms negatively impacted their education in some way. One respondent had excessive absences due to problems with using restroom facilities. Another respondent reported that problems with restrooms caused poor performance as well as excessive absences. One former DC student reported that she had performed poorly in school and had to change schools; she finally dropped out of school due to problems with restrooms.

Although other respondents reported that problems using these facilities at school did not affect their education, some reported that accessing and using restrooms was disruptive to their daily life at school. For example, students reported avoiding going to the restroom at school when they needed to or having to find restrooms that had very little traffic. In a follow-up interview, a young transgender man described the situation at his school where school administration required him to use the restroom in the guidance office instead of the regular men's restrooms. He explains:

The ones in the guidance office are supposed to be unisex, but they're still marked men/women, so I don't feel comfortable using the one

*Journal of Public Management & Social Policy*                                                *Spring 2013*

> marked women and then I have to wait an hour before I can try going
> there again. . . There's not always a line, but we only have ten minutes
> between classes, so if the bathroom is occupied, I don't have any time to
> wait. It's also not easy to leave during class, which means I would have to
> go back at the end of class.

This situation distracted him in class both because of his need to remain continent in the face
of physical discomfort and his anxiety about finding an available restroom at the end of the
class period.

*Employment*

Sixty survey respondents have worked in Washington, DC. Twenty-seven percent
of these respondents reported being denied access and/or verbally harassed while using
restrooms at their place of employment in DC. Thirteen percent reported that problems of
denied access to and/or verbal harassment in restrooms at work affected their employment in
some way. Four of these respondents changed jobs or quit their job. Four respondents
reported that problems using these facilities contributed to poor job performance, excessive
absences, and excessive tardiness.

Other respondents discussed how problems with gender-segregated restrooms at
work caused them other kinds of complications. One respondent described having to deal
with co-worker resentment, "When I transitioned at work, some of the other women
complained behind my back because they didn't want me to use the women's room along
with them, and at least one of them started going to the women's room on a different floor of
the building just to shun me." Another respondent explained how he carefully planned for
restroom use:

> I felt forced to make sure I used the bathroom before I left the house and
> did not use the public restroom unless I was 100% [sure] there was no
> one in there or [I would] go to a different floor that I didn't work on
> where I was less likely to encounter the same jerks, or I waited until I got
> home to use the bathroom [because] I usually didn't feel safe at all using
> the restrooms in public.

Another respondent reported that problems using the restroom caused him to plan out what
time he would use the restroom so he could avoid confrontations.

*Health*

Fifty-four percent of respondents reported having some sort of physical problem
from trying to avoid using public bathrooms, all of whom reported that they "held it" to
avoid public restrooms. Health problems that respondents reported due to avoiding using
public bathrooms include: dehydration (n=9), urinary tract infections (n=7), kidney infection
(n=2), and other kidney-related problems (n=2). Six percent of respondents have seen a
doctor for health problems caused by avoiding public restrooms.

Respondents described additional health problems due to avoiding public
restrooms. One respondent explained, "I had avoided using public bathrooms for so many
years and would hold it when I needed to go that now my bladder is weaker." Another
respondent described how excessive continence might aggravate an existing medical
condition: "I have kidney problems already. I know it's not good for me to hold it, but the
alternative could be much worse."

AR_293099

In addition to the physical problems caused by avoiding public restrooms, some respondents have avoided getting health care when they needed it. Nine percent of respondents have avoided going to a hospital, healthcare facility, or doctor's office because those facilities have gender-segregated restrooms. One respondent avoided going to the doctor when he got a urinary tract infection. He explained: "I knew when I had contracted an infection from holding it daily and [I] drank a lot of prune juice and used a friend's left over prescription to get rid of it. I didn't want to hear the lecture from a medical professional." The lecture he did not want to hear was instruction from a doctor not to avoid using the restroom when he needed to go.

*Participation in Public Life*

Problems or expectation of problems with gender-segregated public facilities can impact a person's participation in public life, causing him or her to refrain from going to public places or attending public events. Fifty-eight percent of respondents reported that they have avoided going out in public due to a lack of safe restroom facilities. Thirty percent of respondents reported not attending a specific event for a variety of reasons related to public restrooms. The most common reasons for avoiding an event were that the length of the event was too long to avoid using the restroom (n=20) and a lack a familiarity with the venue where the event was being held (n=18). Respondents also reported avoiding events because the event was not important enough to risk problems with restrooms (n=17), restrooms at the event seemed unsafe (n=15), and there would be no friends or people the respondent knew at the event who could help navigate the restroom (n=14).

Thirty-eight percent of respondents reported avoiding particular public places because they only have gender-segregated facilities available. The places respondents most frequently avoided include shopping malls, retail stores, restaurants, gyms, and bars, including gay bars. Conversely, 49 percent reported that they will plan their route through certain areas of the city or will go to a specific place because they know there are safe restrooms there to use. One respondent described a similar strategy she used as follows:

> Given that the anti-androgen most MTF [transsexual] folks have to take, Spiro, causes frequent urination, I quickly learned where all the safe bathrooms were when having to go into Washington, DC. Once I found safe places, I plotted my travel routes to be near them, and I avoided going very much beyond those set routes.

Respondents offered other strategies they use to navigate gendered public restrooms. Common strategies involved finding gender-neutral restrooms, having a friend along for a trip to the restroom, using the restroom at home before going out in public, and if necessary, swinging by a nearby friend's house to use the restroom. Other suggestions respondents offered include using the restroom during "off peak" hours when traffic is low and avoiding places where one has previously had problems using the restroom. One respondent uses a strategy that combines several elements: "Stay out in DC for short periods of time. Scout bathroom options. If men's and women's entrances are very close and the bathrooms are not currently in use, I will use them. If there is a line to use the restrooms, I will not. Standing in line usually always results in verbal abuse or denial of access."

Respondents also noted that the ability to "pass" in restrooms is important in avoiding problems when using them. As one respondent put it, "There are tricks to passing in the bathroom. I have never been 'caught.'" One respondent, who self-identified as a butch lesbian, described a strategy that involves singing: "I sing and/or talk to people and feminize my walk every time I enter a public bathroom. I do this to help clue people in to

*Journal of Public Management & Social Policy*                                              *Spring 2013*

the fact that I am a woman without announcing it. It works under 50% of the time. I am often still read as a man."

### Gender Segregation as a Cause of Minority Stress

Minority stressors created by gender segregation range from the distal to the proximal. Seventy percent of survey respondents experienced denied access, verbal harassment, and/or physical assault when trying to access or while using gendered public restrooms. Respondents experienced these problems in public places, at work, and at school. These experiences of distal stressors created expectations of problems in these spaces, causing some to hide from public life. These more proximal stressors that survey participants reported included absences from work and school, poor performance at work or school, choosing to not participate in public life, avoiding particular places or events, and having to develop strategies to navigate gendered restrooms. While some specific negative impacts on physical health were discussed through the survey, such as bladder infections and distress, it is reasonable to assume there is an impact on the mental health of those who suffer this type of minority stress (see, for example, Lombardi and Bettcher 2005).

This survey was not designed to measure mental health outcomes based on the minority stress study participants experienced, but many offered narratives that describe possible impacts on mental health. Experiencing consistent problems in gender-segregated public restrooms can contribute to a sense of stigmatization and ubiquitous discrimination. In a follow-up interview, a participant discussed the dangers of constant harassment:

> There have been plenty of times where, for example, in the women's
> bathrooms when women say mean things about me to their friends but
> not to my face, that's really emotionally damaging, and that, to me,
> that's dangerous. . . . I mean, we are talking about someone's gender
> identity, which is something that is so fundamental to who people are.
> People questioning that, and having that questioned on a daily basis can
> and does lead to self-harm and even suicide and all sorts of things.
> Verbal harassment and even non-verbal harassment, people just staring
> at you, can be dangerous.

No survey respondents reported that problems navigating gendered public facilities directly contributed to any self-harm, but several respondents expressed dismay or sadness due to other people consistently challenging their gender identity. One respondent remarked, "It's depressing to have to often explain my gender identity when others don't have to." Another respondent explained, "I just hope I never have to experience these negative experiences, though it appears this it is all very possible based upon past happenings. I am sad, about all this stuff." One respondent predicted a future threshold where consistent glares would finally cause her to avoid using public restrooms altogether. She stated, "I do not really avoid any place because I am at the moment not at a limit with the uncomfortable stares and glares I get." One respondent offered an apt summary statement to the complexities of problems restrooms create when she stated, "Subtlety is the key to cruelty."

The survey findings presented above describe the minority stressors that result from our reliance on gender segregation in our built environment. Certainly individual actors who would deny access, harass, or physically assault anyone in public spaces are responsible for their actions in those instances, but gender segregation immediately creates a system of surveillance and policing of public spaces based on subjective assessments of a person's gender and gender expression (Cavanagh 2010). Transgender and gender non-conforming

AR_293101

people must navigate a public world organized around gender and be subject to this type of surveillance when using gendered spaces. Minority stress for these groups of people is literally built into our environment. Further research is needed to better understand the mental health impacts of gender segregation for transgender and gender non-conforming people.

**Limitations**

This study should be viewed as an exploratory study, which provides a definition of the problems that gender segregation creates for transgender and gender non-conforming people and seeks to establish this problem as one that public policy and public administration should address. Continued research on this subject is warranted, both to further establish an understanding of the problems related to minority stress for transgender and gender non-conforming people, particularly as it pertains to gender segregation, and the solutions that public policy and public administration can offer. Future research endeavors similar to this study would benefit from improved sampling methods that allow for greater generalizability, better representation of the demographics of the underlying population, and a more sophisticated accounting of gender transition. In over-representing white respondents, the results of this survey are likely biased toward finding fewer reported incidents in gender-segregated restrooms, particularly in the area of physical assault. Since this survey limited responses to experiences in Washington, DC, rather than over the lifetime of the respondents, results may be biased toward fewer reported incidents. Several survey respondents remarked that they had moved to Washington, DC after they transitioned gender and experienced much fewer problems after having transitioned. Researchers would improve upon this study by better accounting for the temporal nature of gender for study participants who have transitioned or will transition gender.

**Conclusion**

Transgender and gender non-conforming people can find themselves in danger in the gendered spaces in our built environment. Until public policy and public administration can meet the challenge to address this problem and rethink our reliance on gender segregation in our built environment, the onus will always be on the individual to try to navigate these spaces safely. In considering the role gender segregation plays in our environment, we should consider whether gender segregation is necessary to organize our public spaces. This is something that many legislators, public officials, and administrators are currently grappling with as transgender and gender non-conforming people have increased their visibility, formed political coalitions in the United States, and organized to make known the issues and problems they encounter in our society. While some jurisdictions have responded to the call to make changes to their policies and public spaces, many have not yet taken on this challenge but undoubtedly must face it in the future.

There are some models of public policy and public administration initiatives that have begun to address the problems gender segregation creates in public restrooms. For instance, statutory language that gives transgender and gender non-conforming people legal protections in restrooms have been adopted in the state of New Jersey, the cities of Oakland, Boston, Denver, and Boulder, and several jurisdictions within the state of Oregon. Enforcement regulations, which are drafted and implemented by government agencies, provide restroom protections in the cities of San Francisco, New York, and Washington, DC. Washington, DC's enforcement regulations contain the strongest language in the

AR_293102

*Journal of Public Management & Social Policy*                                    *Spring 2013*

country in regard to gender-segregated public facilities and serve as a good model for creation of public policy and implementation to address this problem.

In 2005, the DC Human Rights Act was amended to include "gender identity or expression," and enforcement regulations for this amendment were adopted in 2006 that cover gender-segregated public facilities. These enforcement regulations for the DC Human Rights Act not only protect the rights of people to use the public facility consistent with their gender identity, but also mandate the creation of more gender-neutral restrooms in the District. Single-occupancy public restrooms in DC are now required to be gender-neutral. This requirement makes the enforcement regulations in DC the strongest in the country as of this writing. Implementation of the regulations is ongoing, with the DC Office of Human Rights working in conjunction with local advocacy groups, like the DC Trans Coalition and the DC Center, to identify and educate businesses that are out of compliance.

In addition to adopting legal protections for transgender and gender non-conforming people and creating more gender-neutral restrooms, transition-related health care coverage for transgender individuals must be considered as part of any public policy solution to the problems transgender people experience in gendered spaces. Participants in the survey for this paper suggested that medical gender transition decreases instances of denied access, harassment, and physical assault. Indeed in this sample, people who had any medical treatments or procedures to transition were less likely to experience harassment than those who had not transitioned ($\chi^2 = 5.0107$, $p = 0.025$). People assigned male at birth who had undergone electrolysis or laser hair removal for facial hair were less likely to experience verbal harassment than those assigned male at birth who had not ($\chi^2 = 11.2108$, $p = 0.001$). Significant barriers exist to getting medical transition treatments and procedures for those who need them. Fifty-two respondents said they wanted to have some (or more) transition-related medical treatments or procedures, but 63 percent said they cannot afford it. Eighty-five percent of these respondents said they would be more likely to get the medical treatments or procedures they want if they had insurance that covered them. Expanding access to transition-related health care for transgender people would be an important part any public policy initiative to address the problems created by gender segregation.

**Acknowledgements:** The author wishes to thank the DC Trans Coalition for their collaboration in the research for this paper. The author also wishes to thank Ilan Meyer and Brad Sears for their thoughtful reviews.

**Jody L. Herman** holds a Ph.D. in Public Policy and Public Administration from The George Washington University. She currently serves as the Peter J. Cooper Public Policy Fellow and Manager of Transgender Research at the Williams Institute, UCLA School of Law. Before joining the Williams Institute, she served as a co-author on the groundbreaking report *Injustice at Every Turn*, based on the National Transgender Discrimination Survey conducted by the National Gay and Lesbian Task Force and the National Center for Transgender Equality. Her main research interests are the impacts of gender identity-based discrimination and issues related to gender regulation in public space and the built environment. Email: hermanj@law.ucla.edu.

AR_293103

## References

Cavanagh, Sheila L. 2010. *Queering Bathrooms: Gender, Sexuality, and the Hygienic Imagination.* Toronto: University of Toronto Press.

Effrig, Jessica C., Kathleen J. Bieschke, and Benjamin D. Locke. 2011. Examining victimization and psychological distress in transgender college students. *Journal of College Counseling,* 14 (2): 143-157.

Gordon, Allegra R. and Ilan H. Meyer. 2007. Gender nonconformity as a target of prejudice, discrimination, and violence against LGB individuals. *Journal of LGBT Health Research, 3*(3): 55-71.

Grant, Jaime M., Lisa A. Mottet, Justin Tanis, Jack Harrison, Jody L. Herman, and Mara Keisling. 2011. *Injustice at Every Turn: A report of the National Transgender Discrimination Survey.* Washington, DC: National Center for Transgender Equality and National Gay and Lesbian Task Force.

Kelleher, Cathy. 2009. Minority stress and health: Implications for lesbian, gay, bisexual, transgender, and questioning (LGBTQ) young people. *Counselling Psychology Quarterly,* 22(4): 373-379.

Kertzner, Robert M., Ilan H. Meyer, David M. Frost, and Michael J. Stirratt. 2009. Social and psychological well-being in lesbians, gay men, and bisexuals: the effects of race, gender, age, and sexual identity. *The American Journal of Orthopsychiatry,* 79(4): 500-510.

Lombardi, Emilia and Talia Bettcher. 2005. Lesbian, Gay, Bisexual, and Transgender/Transsexual Individuals. In Barry S. Levy and Victor W. Sidel (Eds.), 130-144. *Social Injustice and Public Health,* New York: Oxford University Press.

Lombardi, Emilia L., Riki A. Wilchins, Dana Priesing, and Diana Malouf. 2001. Gender Violence: Transgender Experiences with Violence and Discrimination. *Journal of Homosexuality* 42(1):89-101.

Meyer, Ilan H. 1995. Minority stress and mental health in gay men. *Journal of Health and Social Behavior,* 36:38-56.

Meyer, Ilan H. 2003. Prejudice, social stress, and mental health in lesbian, gay, and bisexual populations: conceptual issues and research evidence. *Psychological Bulletin,* 129(5): 674-697.

Minter, S., & Daley, C. 2003. *Trans Realities: A Legal Needs Assessment of San Francisco's Transgender Communities.* San Francisco: National Center for Lesbian Rights and Transgender Law Center.

Mustanski, Brian S., Robert Garofalo, and Erin M. Emerson. 2010. Mental health disorders, psychological distress, and suicidality in a diverse sample of lesbian, gay, bisexual, and transgender youths. *American Journal of Public Health,* 100(12): 2426-2432.

Sánchez, Francisco J. and Eric Vilain. 2009. Collective self-esteem as a coping resource for male-to-female transsexuals. *Journal of Counseling Psychology* 56(1): 202-209

Stotzer, Rebecca L. 2009. Violence against transgender people: A review of United States data. *Aggression and Violent Behavior,* 14: 170–179.

Vade, Dylan. 2002. *Gender Neutral Bathroom Survey.* Unpublished report on file with author. Factsheet Accessed August 29, 2012 at http://archive.srlp.org/files/documents/toolkit/gnb_survey.pdf

Xavier, Jessica, Julie A. Honnold, and Judith Bradford. 2007. *The Health, Health-related Needs, and Lifecourse Experiences of Transgender Virginians.* Virginia: Virginia HIV Community Planning Committee and Virginia Department of Health.

AR_293104

## Children's Legal Rights Journal

Volume 36 | Issue 2    Article 9

2016

# Education Connection: The Importance of Allowing Students to Use Bathrooms and Locker Rooms Reflecting Their Gender Identity

Katherine Szczerbinski

Follow this and additional works at: https://lawecommons.luc.edu/clrj

 Part of the Family Law Commons, and the Juvenile Law Commons

**Recommended Citation**
Katherine Szczerbinski, *Education Connection: The Importance of Allowing Students to Use Bathrooms and Locker Rooms Reflecting Their Gender Identity*, 36 CHILD. LEGAL RTS. J. 153 (2020).
Available at: https://lawecommons.luc.edu/clrj/vol36/iss2/9

This Article is brought to you for free and open access by LAW eCommons. It has been accepted for inclusion in Children's Legal Rights Journal by an authorized editor of LAW eCommons. For more information, please contact law-library@luc.edu.

*Education Connection:*
## The Importance of Allowing Students to Use Bathrooms and Locker Rooms Reflecting Their Gender Identity
*By: Katherine Szczerbinski*

Transgender children have recently become more visible and outspoken, which has led to a general trend of support in the education system. Calling the child by their preferred name and letting them join the sports team of their identified gender have become more common practices. Unfortunately, there is still a major issue for schools that is the subject of great controversy: whether students should use the bathrooms and locker rooms reflecting their gender identity. The split in viewpoints presents a significant issue in schools and in the courts as equal protection and privacy concerns are considered. Restricting students from using the bathroom reflective of their gender identity can produce negative social consequences, and schools should adjust their policies to better serve their children.

Contemporary media readily discusses transgender issues, and most of this attention has been positive. Children can easily find transgender people, both young and old, on social media and in popular culture. The Internet is filled with "Tumblrs" and YouTube videos chronicling gender transitions, television programs such as "Glee" feature transgender youth, and books such as *Parrotfish* by Ellen Wittlinger are available. The heightened frequency of conversation about the transgender community has affected policies and guidelines, leading to a search for the best practices for interactions with transgender persons.

With the media spotlight on transgender issues, schools have been working to establish best practices for their transgender students. Some districts have aimed to support their transgender students, believing that restricting full access to the facilities of their choosing is denying these children fair and equal treatment. Further, studies have shown that without proper caregiving structures and support, transgender children have a clinically significant increased risk of anxiety, depression, suicidal ideations, and suicide. A school district that supports its transgender students not only attempts to give all students fair and equal treatment, but also supports the mental health of these students.

Some schools have attempted to achieve a solution by giving transgender students access to separate bathrooms or spaces for their private use. Although helpful to students who want such treatment, having separate facilities deprives and further stigmatizes students who want to be in the same facilities as their classmates, ultimately leading to their isolation from their peers.

In Illinois, Barrington Community Unit School District 220 has its officials working with transgender students and their families to ensure an inclusive environment for these students. For example, where a particular transgender middle school student

153

AR_293106

Children's Legal Rights Journal, Vol. 36, Iss. 2 [2020], Art. 9
*Education Connection*

required use of the locker room, that student was given full access to the locker room requested, and further provided a student aide to accompany the student and observe in case issues or questions arise. Illinois' largest school district, Chicago Public Schools, has yet to adopt a comprehensive solution to this issue, instead adopting guidelines for a case-by-case determination of locker room and bathroom use. Neither Chicago nor Barrington has reported an issue.

Although Barrington and Chicago schools have found ways to accommodate transgender students, other school districts, including Township High School District 211 in Illinois ("District 211"), claim they cannot allow full access of facilities reflective of transgender students' gender identity due to privacy concerns. District 211's policy allows transgender students to play on sports teams of their gender and use the bathrooms of that gender, but remains firm that offering these students a private place to change is a proper accommodation. When schools have not been as accommodating, students have found ways to adapt. A student at Lake Forest High School, also in Illinois, was told to use faculty bathrooms that were out of the way, so she chose to use the girls' bathroom stalls to change for physical education.

A fear raised by those wanting students to use the facility of their gender at birth is that allowing students to decide based on their gender identity will lead to children pretending to be transgender to allow them unfettered access to the bathroom of their choosing. This access will result in the opportunity for those pretending to be transgender to commit nefarious acts and that sexual assaults in these places will increase. However, the actual numbers show that this fear is unfounded. As of publication of this article, there has been only one reported instance of a person abusing this access: this instance occurred in Canada, where an already storied sexual predator pretended to be a woman in order to have access to female-only spaces.

This unfounded concern hurts both transgender students and cisgender students (*i.e.*, students who identify with their biological sex). These arguments fail to rely on actual data, instead relying on unsubstantiated fears that portray transgender people as sexual predators and deviants. Gender-nonconforming students are at risk of being removed from bathrooms when their gender expression differs from societal standards. These consequences can weigh heavily on these students and not only isolate them from their peers, but also be harmful to their mental health.

Title IX and its application have a significant impact in regards to transgender students' use of bathrooms and locker rooms. The application of Title IX in cases such as *Grimm v. Gloucester County School Board* and *Johnston v. University of Pittsburgh* held that Title IX does not mandate public schools to allow access for transgender students to the bathroom or locker room of their preference. This interpretation still stands, shifting advocates' focus to determining what mechanisms can be utilized to provide transgender

AR_293107

Case 4:24-cv-00461-O    Document 76    Filed 09/06/24    Page 115 of 290    PageID 3762
Szczerbinski: Education Connection-The Importance of Allowing Students to Use

155                     *Children's Legal Rights Journal*                [Vol.36:2 2016]

students access to bathrooms and locker rooms of their preference. One potential solution is to withhold federal funding until public schools comply with this emerging standard.

Schools need to make a shift towards better practices that give transgender students the same access as their peers to facilities. The social and mental negative consequences of restricting these students are too great to ignore and demand change. Being able to support transgender students can help break stigmas regarding the transgender community and empower children to better accept their peers.

**Sources**

Brynn Tannehill, *Debunking Bathroom Myths*, HUFF. POST (Nov. 28, 2015), http://www.huffingtonpost.com/brynn-tannehill/debunking-bathroom-myths_b_8670438.html.

Duaa Eldeib & Robert McCoppin, *Feds Reject School District's Plan for Transgender Student, Locker Room*, CHI. TRIBUNE (Oct. 13, 2015), http://www.chicagotribune.com/news/local/breaking/ct-transgender-student-locker-room-palatine-met-20151012-story.html.

Eliana T. Baer, *Navigating the Murky Waters of Best Interests with a Transgender Child*, NEW JERSEY L.J., (June 5, 2014), http://www.foxrothschild.com/publications/navigating-the-murky-waters-of-best-interests-with-a-transgender-child/.

Eric Peterson, *Law Professor: Title IX Not Relevant in Dist. 211 Transgender Case*, DAILY HERALD (Oct. 26, 2015), http://www.dailyherald.com/article/20151026/news/151029160/.

G.G. ex rel. Grimm v. Gloucester Cty. Sch. Bd., No. 4:15CV54, 2015 WL 5560190 (E.D. Va. Sept. 17, 2015).

Johnston v. Univ. of Pittsburgh of Com. Sys. of Higher Educ., 97 F. Supp. 3d 657 (W.D. Pa. 2015).

Julie Bosman & Motoko Rich, *As Transgender Students Make Gains, Schools Hesitate at Bathrooms*, N.Y. TIMES (Nov. 3, 2015), http://www.nytimes.com/2015/11/04/us/as-transgender-students-make-gains-schools-hesitate-at-bathrooms.html?_r=0.

Margaret Talbot, *About a Boy: Transgender Surgery at Sixteen*, NEW YORKER (Mar. 18, 2013), http://www.newyorker.com/magazine/2013/03/18/about-a-boy-2.

AR_293108

# NJSIAA

# GUIDELINES,

# POLICIES AND

# PROCEDURES



## 2020 – 2021

AR_293140

# TABLE OF CONTENTS

Anonymous Contact Policy ................................................................................................. 1
Alcoholic Beverages/Illegal Substances ............................................................................. 1
Boy/Girl Competition .......................................................................................................... 2
Broadcasting Rights ............................................................................................................. 2
Chaperones-Team/Individual ........................................................................................... 2-3
Club Programs .................................................................................................................. 3-4
Coaches Certifications & Regulations .............................................................................. 4-5
Coaches Qualifications ......................................................................................................... 5
Commercial Endorsements ................................................................................................ 5-6
Concussion Policy .............................................................................................................. 6-7
Controversies and Disputes .................................................................................................. 7
Cooperative Sports Programs ........................................................................................... 7-10
Disqualification of Coaches/Players ............................................................................... 10-13
Drone Policy ....................................................................................................................... 13
Emergency Medical Procedures ..................................................................................... 14-15
Football Open Recruiting Period Guidelines ..................................................................... 15
Heat Acclimatization Requirements ............................................................................... 15-17
Heat Participation Policy/Cold Water Immersion Tub Policy ......................................... 17-21
Homeschool Guidelines ................................................................................................... 21-22
Infectious Disease Policy ................................................................................................... 22
Junior High Athletics (9th Grade) ................................................................................... 22-25
Labor Disputes ................................................................................................................ 25-26
League/Conference Position Statement ........................................................................... 26-28
Lightning Procedure ......................................................................................................... 28-30
Paraprofessional Aide Positions ........................................................................................ 30
Participation Limitations: School/Coach/Athlete .............................................................. 31
Participation Chart ............................................................................................................. 32
Protests and Forfeits ........................................................................................................... 33
Use of a Prosthesis ............................................................................................................. 34
Review of Officials Chapters .......................................................................................... 34-35
Registration of Officials .................................................................................................. 35-37
Officials Failure to Arrive/Continue .............................................................................. 37-38
Sales and Solicitations ........................................................................................................ 38
Steroid Testing Procedures .............................................................................................. 38-39
Student-Athlete Residency Affidavit .................................................................................. 40
Suspended Football Games ................................................................................................. 41
Terminated Game ............................................................................................................. 41-42
Transgender Policy ............................................................................................................. 42
Unified Sports® Guidelines ............................................................................................. 42-44
Uniforms – Religious Exemption ....................................................................................... 45
Vapor/E-Cigarettes Policy (Interim) .................................................................................. 45

# ANONYMOUS CONTACT POLICY STATEMENT

The high school principal, athletic director and coaches are responsible for assuring conformity with NJSIAA eligibility and other regulations, as evidenced by the eligibility affidavits. The NJSIAA relies on its member schools to self-report any eligibility or other violations that they may encounter, to avoid penalties in addition to forfeitures set forth in Article X, Section 1 of the Bylaws. The NJSIAA discourages anonymous complaints against schools. If anonymous complaints are received, the NJSIAA will convey that complaint to the school in question to investigate. If the school determines that there is a violation, no penalties will be imposed other than forfeiture. However, if at a later time it is determined by the NJSIAA that there was a violation based on competent evidence, then more substantial penalties may be imposed on the school and/or responsible school athletic personnel.

## ALCOHOLIC BEVERAGES/ILLEGAL SUBSANCES AT INTERSCHOLASTIC EVENTS

Players and coaches involved with alcoholic beverages/illegal substances during or after the game at the game site or on school property, including chartered busses, **shall be suspended from NJSIAA tournament play for one year and be denied any championship rights.**

This action was taken in support of the fact that such actions concerning alcoholic beverages/illegal substances are in violation of N.J.S.A. 2C:33-15a, N.J.S.A. 2C:33-16, N.J.S.A. 2C:35-7 and N.J.S.A. 2C:35-10 as noted below.

*N.J.S.A. 2C:33-15a:*
Any person under the legal age to purchase alcoholic beverages who knowingly possesses without legal authority, or who knowingly consumes any alcoholic beverage in any school, public conveyance, public place, or place of public assembly, or motor vehicle, is guilty of a disorderly person's offense and shall be fined not less than $100.00.

*N.J.S.A. 2C:33-16:*
Any person of legal age to purchase alcoholic beverages, who knowingly and without the express written permission of the school board, its delegated authority, or any school Principal, brings or possesses any alcoholic beverages on any property used for school purposes which is owned by any school or school board, is guilty of a disorderly persons offense.

*N.J.S.A. 2C:35-7:*
Any person who violates subsection a. of N.J.S.A. 2C:35-5 by distributing, dispensing or possessing with intent to distribute a controlled dangerous or controlled substance analog while on any school property used for school purposes which is owned by any elementary or secondary school or school board, or within 1,000 feet of any school property or school bus, or while on any school bus, is guilty of a crime of the third degree and shall…

*N.J.S.A. 2C:35-10:*
It is unlawful for any person, knowingly or purposely to obtain, or to possess, actually or constructively, a controlled dangerous substance or controlled substance analog, unless the substance was obtained directly or pursuant to a valid prescription or order form from a practitioner, while acting in the course of his professional practice, or except as otherwise authorized.

1

## BOY/GIRL COMPETITION

Although the implementation of Title 6 and the final decision on Boy/Girl participation in interscholastic athletics in New Jersey is the jurisdiction of the Office of Equal Educational Opportunity (OEEO), New Jersey Department of Education, the NJSIAA Executive Committee has approved the following guidelines for NJSIAA athletic programs:

1. Males shall be excluded from female athletic teams although there are no teams for boys in the same sport.

2. Based on the directives of the Commissioner of Education, girls shall be allowed to participate in any boys' sports teams, on an equal basis with boys, provided that the same sports team is not available to girls at that school.

3. Female athletes are not entitled to participate on boys' teams where there are girls' teams in the same sport. However, if particular events are not provided to girls' teams in the same sport, then girls must be allowed to try out for those events not offered to the female team.

## BROADCASTING RIGHTS

The NJSIAA has granted the exclusive rights to create, distribute and license programming in connection with NJSIAA tournaments (and NJSIAA sporting events to the extent the NJSIAA controls or otherwise has authority to grant such rights with regard to NJSIAA sporting events) in all media currently existing or yet to be developed. This includes, without limitation, network and cable television broadcast, pay-per-view television, radio, webcasting, streaming, podcasting, distribution over wireless telephone networks, optical media including DVD, and print publications. The foregoing shall not be interpreted to restrict NJSIAA member schools from producing print publications (i.e. programs or similar) for distribution on school property during the regular season NJSIAA sports events, or to restrict the NJSIAA from producing print publications (i.e. programs or similar) for distribution during post-season NJSIAA tournaments.

Any third party seeking to create, distribute or otherwise exploit programming in connection with the NJSIAA sporting events in any media will be directed to the NJSIAA's designated broadcast partners, as applicable, by the NJSIAA or the applicable member school. The NJSIAA designated broadcast partners shall have the right to enter into license arrangements with such third parties.

The NJSIAA designated broadcast partners may create NJSIAA programming for distribution via any media distribution means owned or controlled by their parent organization.

Notwithstanding anything herein to the contrary, including but not limited to the information above, NJSIAA member schools may broadcast regular season (but not playoff, post-season tournament, or championship) athletic contests involving such schools' own teams or athletes, without charging any fee to any viewer or other third party, on such schools' own commercial-free television networks, their own commercial-free websites, or on commercial-free public access television channels (provided that any agreement between an NJSIAA member school and a commercial-free public access television channel does not permit sublicense or other use of the telecast).

## CHAPERONES

Chaperones are individuals appointed to accompany teams or individuals to NJSIAA Championships.

2

Member schools are reminded that a team or an individual is not permitted to compete in NJSIAA Championship events unless a properly appointed "coach" is present, and was present at six (6) practices prior to the event. When making these assignments, a public school must be aware of the provisions of the New Jersey Administrative Code, Section 6A:9-5.19, entitled "Athletics Personnel," which mandates the requirements which a board of education must follow when appointing individuals in a coaching capacity. The practice of having a parent, a private instructor, or other adults accompany a student-athlete as the coach is a violation of this provision. Your county superintendent will be able to confirm the certification or lack thereof of the individual you are assigning. A properly appointed coach will thereafter be subject to the Rules and Regulations, Section 11 Out-of-Season Practice.

Although non-public schools are not governed by the provisions of the Administrative Code, it is important that such assignments be made in the best interests of the student-athlete; when a parent, a private instructor, or other adults are appointed as coaches by the principal to accompany student-athletes, such coach will thereafter be subject to the Rules and Regulations, Section 11 Out-of-Season Practice.

Gymnastics "spotters" must be approved coaches within this regulation; therefore, tournament directors are instructed to disqualify any contestant who is accompanied by someone in a coaching/spotting capacity who is not properly certified by the board of education in public schools or appointed by the principal in non-public schools.

A principal's signature on the event entry form certifies that the coach/certified faculty member has been appointed by the board of education within the provisions of the Administrative Code or the rules of the private school.

**If a properly qualified and certified appointment cannot be made, the school should not enter the team or individual in an NJSIAA event.**

Such appointments must be approved by the Board of Education; neither the NJSIAA nor the meet director has the authority or the responsibility for enforcement of this statute, sole jurisdiction rests with the Department of Education, and, therefore, a Principal's signature on the entry form certifies that the coach/certified faculty member has been appointed by the Board of Education within the provisions of Title 6 Education.

## CLUB PROGRAMS

The NJSIAA recognizes twenty (20) separate and distinct sports for which the member schools have approved rules and regulations to govern interscholastic competition. These are listed under Contest Rules, Section 9, Rule 2, Rules and Regulations.

As a pilot program, many member schools have initiated bona fide club programs in a recognized sport to determine the interest and feasibility of seeking Board of Education approval to conduct the program on an interscholastic basis. Most often these programs function with limited financial support from the Board; the coach volunteers his/her services gratis; students, booster clubs, and sometimes the Board provide the equipment; facilities are made available for the program and before long, this club program matures into a skilled, competitive, stature seeking program.

In order to establish a firm credibility for the program, at this point the school agrees to schedule scrimmages or games with schools conducting similar club programs. The misconception is that such scrimmages or games may take place since the Board of Education condones it, even though they have not formally approved the program, without relinquishing the title of a club activity. The moment interschool scrimmages or games take place, the

program is no longer a club activity, and member schools must adhere to all NJSIAA rules and regulations governing the interscholastic program.

The interscholastic status then requires both schools to conduct their programs within the rules and regulations of the NJSIAA and the State Board of Education; i.e., eligibility forms must be on file, physical examinations are required, seasonal guidelines observed, course requirements must be met, and all other regulatory provisions satisfied.

**Question:**     When does a club program become an interscholastic sport?
**Answer:**       The day an interschool scrimmage or game takes place.

All member schools sponsoring programs under the "Club" label and competing in interschool scrimmages or games are reminded they are subject to Executive Committee action within the penalties outlined in the NJSIAA Bylaws, Article X, Section 1 through 3.

## NJSIAA COACHING CERTIFICATION AND REGULATIONS

A person shall be eligible to coach in any interscholastic contest, provided the person satisfies all of the conditions listed below (For the purposes of this section, "coach" shall mean all persons who coach an interscholastic high school athletic team in any way, whether for pay or as a volunteer at the varsity, junior varsity and/or freshman level – ninth grade through twelve grade).

In addition to State Department of Education Regulations, the following regulations must be adhered to:

1.  The person's appointment as coach must be approved by the local educational agency responsible for the member school at which the person coaches.

2.  All new coaches will have 120 days after being hired to register for the NFHS Fundamentals of Coaching (Blended Version) course. Upon completion of the classroom components, coaches will have s sixty (60) days to complete the remaining four (4) components. A certificate of course completion must be submitted to respective athletic supervisors by June 30th to be eligible to coach at an NJSIAA member school for the subsequent school year.

**Under no circumstances may a coach take the NFHS Fundamentals of Coaching Course completely on-line.**

3.  All coaches must hold a current certificate in CPR, AED and Basic First Aid. Online CPR/AED training courses do not satisfy this requirement.

4.  Beginning with the 2016-2017 school year all coaches must successfully complete a basic first aid course when renewing or completing CPR/AED certification.

5.  All coaches must obtain a "Concussion Awareness" certificate or its equivalent, renewed annually.

6.  All coaches must obtain a "Heat Acclimation Awareness and Wellness" certificate or its equivalent, renewed annually.

7.  Coaches currently in place, and/or who have experience coaching in an NJSIAA high school prior to the 2006-2007 school year, will be exempt from provision 2 above. (While experienced coaches will not be

4

required to adhere to provision 2 above, it is recommended that all coaches are encouraged to take the fundamentals of coaching period.)

Note:  The above regulations do not apply to the coaches appointed by the school to accompany student athletes to individual events.

## STATE ADMINISTRATIVE CODE REQUIREMENTS FOR QUALIFICATION OF COACHES

The *New Jersey Administrative Code* sets forth qualifications for the coaching of public school pupils. These qualifications are found at *N.J.A.C. 6A:9-5.16*, as follows:

***N.J.A.C 6A:9B-5.16*** *Athletics* Personnel
    a.  Any teaching staff member employed by a district board of education shall be permitted to organize students for purposes of coaching or for conducting games, events, or contests in physical education or athletics.

    b.  School districts may employ any holder of either a New Jersey teaching certificate or a substitute credential pursuant to     N.J.A.C. 6A:9B-7 to work in the interscholastic athletic program provided the position has been advertised. The 20-day limitation noted in N.J.A.C. 6A:9B-7.4(a) shall not apply to such coaching situations.

## COMMERCIAL ENDORSEMENTS

The following guidelines have been developed to insure that all commercial endorsements meet goals and objectives of the Association, and are undertaken for the benefit of the NJSIAA, its member schools, and their Student-Athletes.

1.  All commercial endorsements must have the approval of the Executive Committee on recommendation of the Finance Committee.

2.  No member of the Executive Committee (including the Finance Committee) or any member of the NJSIAA staff will participate or vote on approving any endorsement of a commercial sponsor if they have any direct ownership interest in such sponsor.

3.  In considering any commercial endorsement, the NJSIAA will apply the following criteria:
    a.  The relationship of the commercial sponsorship to the goals and objectives of the Association.
    b.  The benefits to be derived from the sponsorships or activities by the Association and its member schools.
    c.  The quality of the production or program with appropriate evaluation and references.
    d.  The time length and extent of commitment required by the activities.
    e.  The ultimate educational value of the activities or the beneficial educational effect of conducting the activities (e.g. the support of a particular educational program through sponsorships).
    f.  The possibility of creating a conflict of interest for the Association.
    g.  The clarity of purpose and activities of the program or service to be sponsored.
    h.  The positive nature of a sponsor's product or activity.
    i.  The effect of the financial activities on the maintenance and improvement of the positive image by the Association.
    j.  The willingness of a sponsor to enter into a save-harmless agreement with the Association.

AR_293146

k.  The necessity of avoiding sponsorships or activities which are in any way connected to productions or services of questionable value to or, in fact, detrimental to students (e.g. alcohol and tobacco products, medicines, gambling, etc.).

l.  The prohibition on advocating a religion or political party Termination, or temporary suspension, must always take place when an electrical storm is imminent. The decision to terminate or suspend a game/meet/event when an electrical storm is imminent may be made by either the host school or the official.

## CONCUSSION POLICY

The NJSIAA Concussion Policy mirrors the state law as it pertains to the development of interscholastic athletic head injury safety training program, required measures to protect student athletes with concussions, and the continuing education for athletic trainers.

A student who participates in an interscholastic sports program and who sustains or is suspected of having sustained a concussion or other head injury while engaged in a sports competition or practice shall be immediately removed from the sports competition or practice. A student-athlete who is removed from competition or practice shall not participate in further sports activity until he is evaluated by a physician or other healthcare provider trained in the evaluation and management of concussions, and receives written clearance from a physician trained in the evaluation and management of concussions to return to competition or practice.

Written clearance may take place at game site on game day, if so given by trained physician as stated above. Written release forms, must be present at all practices and competitions. However, once a student-athlete is removed from competition or a practice, only a physician trained in the evaluation and management of concussions can sign off on a written clearance that would allow a concussed or suspected concussed athlete to return. NJSIAA has created a standardized written, RTP, form that will be available on NJSIAA.ORG. When a student athlete is evaluated by a trained physician and is **not** cleared to return to play or practice that day/night, the school district's Return to Play guidelines shall be followed.

Game officials will follow the protocol previously established and disseminated on September 1, 2010, namely upon observing any signs, symptoms or behaviors that are consistent with a concussion, and the signs, symptoms or behaviors are a result of an impact or contact of the player with another person, an object or the ground, the student athlete is immediately removed from play and may not return to play without a written clearance from a physician trained in the evaluation and management of concussions. The mechanics to enforce the rule are as follows:

1.  Using sound game management procedures and judgment, upon observing a player who exhibits the signs, symptoms or behaviors that are consistent with a concussion, the official shall follow the sport specific guidelines for handling an injured player.

2.  When appropriate, call time out. If the player's safety is in jeopardy, call time out immediately.

3.  Beckon the physician/ATC onto the playing surface.

4.  Observe the injured player.

5.  Other game officials keep players/others away from the injured player.

6.  Apprise the physician/ATC of your observations as to the signs, symptoms, behaviors that are consistent with a concussion, including any conversation that you had with the injured player (any questions and answers that took place prior to the physician/ATC arriving).

7.  Note the game time, score, period or half, player name/number, etc. when injury and removal took place (for those sports that officials do not normally keep a game card on their person, begin doing so).

6

8. If the prescribed written clearance form is signed by a physician, and the player returns to play that day/night, the official in charge must obtain a copy of the signed written clearance form and subsequently submit it to the association's keeper of records.

Schools and officials are reminded that NJSIAA is a 100% state, meaning that we follow the playing rules established by the NFHS. Every NFHS sports rule book contains the following:

> *"Any player who exhibits signs, symptoms or behaviors consistent with a concussion (such as loss of consciousness, headache, dizziness, confusion or balance problems) shall be immediately removed from the game and shall not return to play until cleared by an appropriate health-care professional."*

## CONTROVERSIES AND DISPUTES BETWEEN OFFICIALS, SCHOOLS AND LEAGUES/CONFERENCES

Prior, during, or after a New Jersey Interscholastic athletic event if an incident occurs between officials, players, spectators, and/or school personnel and the incident warrants investigation, the following procedures should be followed:

1. Immediate attempt should be made to resolve the incident at the local administrative level with building Principals. A report with request for review should be forwarded to the school administration.

2. If there is no successful resolution of the incident at this level, and the aggrieved party is an official, then all facts should be presented in written form to the president of the official's chapter who will forward a written hearing request to the appropriate league or conference.

3. If the aggrieved party is a member school, then all facts shall be presented in a written form to the league or conference or official's chapter, as the case may be; with a request for a hearing.

4. At this time, the Executive Director of the NJSIAA shall be notified in writing of the hearing request by the aggrieved party's chapter, league or conference.

5. The NJSIAA will become directly involved in the incident; (1) If, after a hearing, the case is referred to the NJSIAA Controversies Committee or (2) If the aggrieved party believes the hearing action to be unsatisfactory and requests further review by the NJSIAA Controversies Committee.

6. Whenever a coach removes a team from the field/court prior to the conclusion of the game, meet or event, an official must report this violation to the NJSIAA immediately; and all disqualifications within seven (7) days.

## GUIDELINES – COOPERATIVE SPORTS PROGRAMS

**Section 10**
**Cooperative Sports Programs**

A. The Executive Committee shall approve all Cooperative Sports Programs (CSP) upon the recommendation of the Cooperative Sports Committee (CSC) or the Cooperative Sports Appeals Committee (CSAC). Such Cooperative Sports Programs will be based upon an agreement between the cooperating schools whereby one of the two schools shall have the complete responsibility as the Local Education Agency (LEA) for the conduct of the specific sport(s), which will be available to the students at both schools.

7

*CL 1: Cooperative Sports Program applications should be signed by an officer of the Participating League or Conference, and indicate whether the League or Conference endorses or not endorses the application. The Participating League or Conference is defined as the entity that schedules the regular season games for that particular sport.*

*CL 2: This section establishes a process by which Cooperative Sports Program applications are processed, reviewed, and appealed. A CSP is an exception to the general requirement that students play sports at the school at which they are enrolled. A CSP is not to be used to place students in another school's program simply because the student(s)' school does not offer the particular sport. Both schools must demonstrate a need for and commitment to the CSP.*

B.  The purpose of a Cooperative Sports Program is to provide opportunities for participation when none would otherwise exist, as for instance when a school lacks a particular program or when a school has declining enrollment in a particular program. Under no circumstances is a CSP to be used for purposes of creating a stronger or more competitive team, or as an excuse for eliminating an otherwise viable athletic program.

Cooperative Sports Programs should be comprised of schools from the same Participating League or Conference or General League or Conference. Crossover to other Leagues or Conferences is only permitted after efforts have been exhausted to partner with a school within the same League or Conference. If a CSP is comprised of schools from different Leagues and Conferences, then approval must be received from all Leagues and Conferences involved.

C.  Schools may enter into a Cooperative Sports Program for any sport and for any Group size. However, the following conditions must be met in order for a Cooperative Sports Program application to be considered by the CSC:

1.  A public high school can only enter into Cooperative Sports Programs with another public high school while non-public high schools can only enter into such programs with another non-public high school.

2.  A member school may enter into Cooperative Sports Programs with more than one other school for more than one sport; however, a member school may only enter into one Cooperative Sports Program for a particular sport.

3.  In Cooperative Sports Programs involving ice hockey, three public schools or three non-public schools may combine to form a tri-school Cooperative Sports Program with a maximum thirty (30) student athlete roster, if their respective leagues approve. Public schools may not combine with non-public schools.

4.  A Cooperative Sports Program is for a two year period with an automatic two year renewal. Written notification of automatic renewal must be submitted by the sports specific deadlines indicated below.

Completed applications and required written documentation must be submitted to the NJSIAA office by the following sports specific deadlines:

**Fall sports – January 15th; Winter sports – April 15th; Spring sports – September 15th**

D.  The total enrollment used for classification purposes of the Cooperative Sports Program will be determined based upon the most current year joint pupil enrollment of grades 9, 10, and 11. One hundred percent (100%) of the partner school's enrollment shall be added to the LEA's enrollment for the purpose of postseason playoff classification. In addition, the Cooperative Sports Committee may place a CSP in a more competitive classification if necessary for competitive balance. Such classification of the CSP will not affect either school's classification in any other sport.

8

E.  Cooperative Sports Committee (CSC):
The President of the Executive Committee shall nominate a Cooperative Sports Committee of no less than five members and a chairperson, none of whom shall be members of the NJSIAA Executive Committee. The CSC will approve or disapprove each Cooperative Sports Program application. Approved applications will be presented at the next Executive Committee for final approval.

The CSC will also make classification determinations at the time of approval of the Cooperative Sports Program. The CSC will take into consideration the combined enrollments as well as other factors determined by the Committee.

The LEA, Partner school or Participating League or Conference may appeal any such decision by the CSC. Such appeal will be heard by the Cooperative Sports Appeal Committee per Article III, Section 10.E.

*CL 2: The CSC will meet three times per year and their decisions will be based on written documentation submitted to the committee. Such meetings will occur within 45 days after each deadline prescribed in Article III, Section 10.B. Decisions of the CSC will be communicated to the applying schools within 10 business days of the meeting date.*

*CL 3: The CSC may change the classification determination previously made. Such change in classification will coincide with the automatic renewal period.*

F.  Cooperative Sports Appeals Committee (CSAC):
The President of the Executive Committee shall nominate a Cooperative Sports Appeals Committee of no less than five members and a chairperson, all of whom shall be members of the NJSIAA Executive Committee. All appeals from initial decisions of the CSC shall be determined by the Cooperative Sports Appeals Committee. The CSAC will not hear appeals of the classification determination made by the CSC.

The CSAC shall consider Cooperative Sports Program matters, in accordance with the following procedures:

    i.   The CSAC shall decide an appeal on either written submission or at a hearing.

    ii.  The CSAC shall meet to determine any pending appeals on days corresponding with the regularly scheduled meetings of the Executive Committee.

    iii. Four members of the CSAC shall constitute a quorum. The Chairperson shall be a non-voting member of the Committee except where there is a tie to vote on any appeal. A member shall not vote on any appeal, the outcome of which would affect the schedule of that member's school.

If the CSAC approves a Cooperative Sports Program application, then they will make the classification determination at the time of approval. The CSAC will take into consideration the combined enrollments as well as other factors determined by the Committee.

G.  The LEA, Partner school or Participating League or Conference may appeal any such decision of the CSAC. Such appeal will be heard by the Executive Committee and such decision will be considered final.

H.  Cooperating schools may include all school names on their uniforms; however, the LEA name will be used by the NJSIAA for classifications and seeding brackets.

I.  Either the LEA or Partner school may exit a Cooperative Sports Program at any time during the time period covered by the approved application. Written notice must be submitted to the NJSIAA and the

9

other participating school(s). Upon early termination, the participating schools will be reclassified to their natural classification as a single school.

J.  A Cooperative Sports Program for a particular sport will cover all levels of competition (i.e. freshman, J.V. and varsity). However, either school may establish a stand-alone sub-varsity team while continuing in the cooperative program in that same sport.

K.  The Executive Committee shall be authorized to adopt appropriate guidelines, not inconsistent with the provisions of this Section, so as to implement the Cooperative Sports Programs.

L.  No Cooperative Sports Program shall be allowed unless approved by the Executive Committee after prior approval by the Boards of Education of the cooperating schools.

## DISQUALIFICATION OF COACHES/PLAYERS

The following guidelines will serve to implement, clarify and interpret the provisions of Note 4: Specific Sport Regulations.

The rules in many sports are now providing explicit instructions as to the removal of a coach/player from the game and the designated area to which they are assigned. **If there are any specific playing rules which require disqualification within a sport, the official must be cognizant of these rules as they apply to that specific sport.** These circumstances have necessitated establishing specific guidelines for officials to follow when a coach/player is disqualified.

Whenever it becomes necessary to disqualify a coach from the game, the official should ascertain the availability of another coach or qualified faculty member who can assume responsibility for the team, and then employ the following procedures:

1.  If the administrator or representative is able to designate such a person, the disqualified coach should be removed from the immediate area;

2.  If the administrator or representative is not able to make this designation, the disqualified coach should be assigned to an area where the coach can visually observe the game and be available to protect the safety and welfare of the team. If the disqualified coach uses this privilege to communicate with the team or is again guilty of an unsportsmanlike act, the game shall be terminated and the Central Office of the NJSIAA notified in writing.

3.  Any coach/player disqualified before, during or after an interscholastic event for unsportsmanlike flagrant verbal or physical misconduct will be disqualified from the next two (2) regularly scheduled games/meets, with the exception of football which will carry a one (1) game disqualification, at that level of competition and all other game(s) meet(s) in the interim at any level in addition to any other penalties which the NJSIAA or a league/conference may assess. Such disqualification prevents a coach/player from being present at the site.

*CL 1: Definition of not being present at the site means the disqualified player or coach is not to be present in the locker room, on the bus, on the sidelines, in the stands or site area before, during or after the game/meet.*

*Any player/coach in violation of this provision will be cause for forfeiture of those games during the period of disqualification.*

10

*CL 2: These NJSIAA procedures will supersede a playing rule which requires a coach or player to leave the premises upon disqualification; therefore, a player will be confined to the bench area to remain under the supervision of the coach. If said player continues to be disruptive or acts in an unsportsmanlike manner, the official may terminate the game/event.*

Officials must use discretion in exercising their prerogative as most often these situations call for a high degree of tact. The unruly coach should be dealt with in a stern but courteous manner the very first time actions prompt any cautioning by an official. This will usually forestall any punitive measures having to be taken at a later and more critical time of the game.

<u>Mechanics at Time of Disqualification</u>:

1. Call time out – stop the action.

2. Do not hurry – if player is disqualified, request player to accompany you to the coach – go directly to coach, if player hesitates – give a direct statement of explanation to the coach/player as to why "player" was disqualified – do not debate the issue – be professional, courteous and assertive. If coach is disqualified, same procedure applies.

3. Go to opposing coach, and give exact same statement.

4. Resume the game.

<u>Upon Conclusion of Game</u>:

1. If conditions permit, include a brief explanation of reason for disqualification, name and/or number of coach/player and offending school in each team's scorebook before signing same, if signature is required.

2. Any questions relative to period of disqualification should be referred to NJSIAA. The official is not an enforcer of the additional game(s) disqualification; however, if the official is aware of the presence of a coach/player at a game during the disqualification period, the offending individual should be reported to the NJSIAA by the official.

3. The coach of the offending team (freshman, junior varsity, varsity has a dual responsibility with the official to report each disqualification to his/her Athletic Director in person or via phone by noon of the next day. Failure of a coach/official to follow the prescribed procedure in reporting the disqualification *does not* void the penalty and, if the official is at fault, it should be reported to the official's Chapter Secretary and the NJSIAA.

4. A disqualification report must be completed online within 48 hours of the disqualification. No other reporting process will be accepted. The online form will be electronically sent to the offending school's principal, athletic director and the NJSIAA. The official should also notify their chapter of the disqualification. **Failure to file these reports will result in punitive action by the chapter and the NJSIAA.**

5. Any disqualification resulting from harassing verbal or physical related to race, gender, ethnicity, disability, sexual orientation or religion at an interscholastic event must be noted on the Disqualification Form, with a description of the offending conduct provided.

11

6. Disqualifications for Federated/Non-Member Schools will not be reported to the NJSIAA. Officials will forward D.Q. forms to the Federated School Ex. Sec. for their records. Any disqualifications for member schools will continue to be reported to the NJSIAA regardless of the opponent's status.

Attention:

1. Once a coach/player has been disqualified, NO appeals will be honored from the player, coach, official or any other party. Disqualification is a judgement call and officials must be certain the act warrants disqualification. All complaints against an official must be directed to the official's Chapter Secretary and the NJSIAA.

2. Any coach who is disqualified a second time in single or multiple sports within a 365 day period will be required to appear before the Controversies Committee.

Clarifications – Disqualification Rule:

The Cardinal Rule is:
> Officials officiate the game.
> Coaches coach the game.
> Players play the game.
> Concentrate on your area of the game.

*CL 1: Officials are reminded that prudent judgement should be utilized prior to any disqualification. An official may not have a "change of mind" after the disqualification has been enforced; there is no such condition as "the act was not serious enough for the player/coach to be disqualified from additional game(s)." All disqualification for flagrant, unsportsmanlike conduct will always carry the additional game(s) penalty; flagrant, unsportsmanlike conduct is not a "playing rule" violation. The determination of disqualification must be made at the time of the violation.*

*CL 2: Flagrant is a glaring action by a player or coach which is excessive physical play or unacceptable conduct as adjudged by the game/meet official(s).*

*CL 3: Regular season, rescheduled or tournament games which are in place prior to the disqualification will be used to satisfy the penalty; any games arranged by the school after the disqualification to be played during the disqualification period will be added to the penalty. Scrimmages cannot be used to satisfy the disqualification rule. The competition must begin in order to fulfill the requirements of the disqualification rule.*

*CL 4: "Not being present at the site" means the disqualified player or coach is not to be present in the locker room, on the sidelines, in the stands or site area before, during or after the game/meet. Any player/coach in violation of this provision will be cause for forfeiture of those games during the period of disqualification.*

*CL 5: Ejection or removal of a player for a specific sport rule will carry the disqualification penalty only when it includes a flagrant unsportsmanlike act.*

*CL 6: Seniors who are disqualified from their last game will serve the penalty in a subsequent sports season. When seniors are disqualified from their last game of their high school careers, member schools are required to take proper administrative action to discipline the offending student.*

12

*CL 7:  Seniors who quit a sport and have not fulfilled their penalty in that sport, must serve it in the new sport before beginning playing in the new sport.*

*CL 8:  Any player/coach disqualified in single or multiple sports for a second time will have the penalty doubled (i.e., in football -disqualified for two (2) games; all other sports – four (4) games. Disqualifications will count for 365 days from the date of the first disqualification.*

*CL 9:  Any player with two or more disqualifications in the current season, prior to the start of an NJSIAA tournament, will be ineligible to compete in said tournament. A second disqualification for an individual in any game/meet/match supersedes NFHS rules in this regard.*

*CL 10:  Any varsity team accumulating three or more player or coach disqualifications for flagrant unsportsmanlike conduct prior to the start of a tournament will not be permitted to participate in same. Seeded teams will forfeit their right to compete if a disqualification limit is reached prior to the start of the tournament for the team.*

*CL 11:  Single/multiple sports – on the third offense; players disqualified will be suspended indefinitely, and must apply, in writing, to the NJSIAA through the office of their Principal for reinstatement. Disqualifications will count for 365 days from the date of the first disqualification.*

*CL 12:  Any coach disqualified a second time in single or multiple sports in a 365 day period from the date of the first disqualification will be required to appear before the Controversies Committee with the Principal and the Athletic Director.*

*CL 13: Any coach who is disqualified and/or has three or more players on a team disqualified during the course of the preceding school year must complete the NFHS Teaching and Modeling Behavior course. This course license must be obtained from the NJSIAA with the course completion certificate due to the NJSIAA within sixty (60) days of initial NJSIAA notification of the disqualification requirement. A disqualified coach must also complete the New Jersey component and submit the Course Completion Certificate to the NJSIAA within 60 days.*

NOTE: Any coach failing to fulfill his/her responsibility as it applies to CL13, would be suspended from coaching in any capacity at any NJSIAA member school until the successful completion of the NFHS Teaching and Modeling Behavior and the New Jersey stand-alone component (located on the NFHS Learn.com website).

## DRONE POLICY

1. Except as provided in paragraph 4 below, the use of unmanned aerial systems ("UAS"), commonly referred to as "drones", by any NJSIAA member school is permitted during practice and at home events in accordance with applicable local, State, and Federal laws and regulations.

2. Member schools are permitted to use UAS at away events with advance written permission of the host school, or, in the event there is no home school, the site manager.

3. If only one school operates a UAS at an event, the UAS video shall be provided to all other participating schools as soon as practicable after the conclusion of the event.

4. The use of UAS at an NJSIAA tournament event is prohibited.

13

## EMERGENCY MEDICAL PROCEDURES

The NJSIAA and the National Federation recommend that a physician be present at athletic contests and available (on call) during practice sessions. With many sports activities in progress at any one time, it is often impossible to have physicians present at all contests. In fact, some small communities in rural areas and inner-city schools may not have the services of a physician. This makes it mandatory for the school administrators and coaches to arrange a procedure to obtain medical care and treatment for emergencies to include athletic trainer where applicable.

Some sources of assistance that may be utilized when physicians are not available are certified athletic trainers, emergency medical technicians usually on emergency vehicles, ambulance vehicle with trained personnel, rescue vehicles with trained first-aid personnel and, in some areas, National Guard or Army Reserve medical personnel assigned to ambulance duty. Schools may also have other school personnel qualified in first-aid, who may be available for duty during activities

Recommended procedures that may be followed in successful emergency care are:

1. Immediate, on the spot first-aid by an individual with adequate training.

2. Communication System.  An available, non-pay telephone with an outside line to contact a physician or ambulance service.  Arrangements should be made in advance to insure availability.

3. Emergency care facility. Arrangements should be made, in advance, with staff personnel of local hospital or clinic to notify, in case of emergency, that emergency service is necessary.

4. Notification. The facility to which the injured player is being transported should be immediately informed of the injured player's status. Necessary personnel and equipment should be available at the facility or physicians, on call, could be notified of the emergency.

5. Transportation. Ambulance, emergency vehicle, first-aid vehicle or rescue vehicle, with appropriate equipment and personnel may be parked at the field or game site. If this procedure is not feasible, prior arrangements should be made to have equipment on call when an emergency develops. Again, an available, non-pay telephone with an outside line should be immediately available.

6. Communities without physicians, medical clinics or hospital service should complete arrangements with medical personnel and hospital facilities in the nearest community where such services are available.

The plan of action specified above should be carefully covered, in advance, with responsibilities of all concerned – trainer, coach, vehicle personnel, school administrators, local police, deputies, or constables – defined. When an emergency does occur, everyone involved can function as an informed, effective team.

Local plans of action to meet emergency situations will vary depending on availability of medical personnel and facilities, the location of the playing field or site and communications. In all cases, the emergency situation plan is best developed through cooperative action of local school personnel, participating professional medical staff and allied groups.

When there is a school physician or community health department providing school health services, the medical people involved should share in the planning. When no such service exists, the school administration should request medical assistance through the local medical professional groups, the county medical society, the community hospital staff or personal contact with a physician. Many doctors may be interested in assisting as

14

team physicians but school administrators should initiate the first contact. Ethics of the medical profession necessitates this procedure.

Understanding is the key to an effective emergency care plan. Everyone involved – school personnel, medical professionals, allied medical groups, transportation staff, and the like – must know exactly what is going to be done in an emergency and who will be responsible for carrying out the various tasks involved. When this procedure has been completed, the players, coaches, administrators, parents, and medical personnel will know that everything possible has been done to protect the health, safety and welfare of a player who may be injured.

## FOOTBALL OPEN RECRUITING PERIOD GUIDELINES

The following are guidelines for all member schools to adhere to during the NCAA Open Recruiting Period:

1.      When a college coach is onsite at a NJSIAA-member high school, the high school coach shall be permitted to administer a football specific evaluation session at the request of a college coach.

2.      High school coaches shall be permitted to attend and assist with any workout observed by the college coach.

3.      The workouts to be observed by a college coach may include:
   a.      Strength training
   b.      Agility, speed and endurance training
   c.      Position specific skills workouts (see details below)

4.      Position specific skills workouts include, but is not limited to, throwing, blocking, running routes, kicking/punting, or defensive positioning.

5.      The workouts SHALL NOT resemble any form of organized practice.  Therefore, no diagramed plays may be executed, no individual skills training may occur, and no scrimmaging of any kind regardless of the number of players participating in the workout.

6.      Each onsite visit/workout may not exceed one hour in length.

7.      No player protective gear may be used.  Protective gear includes, but is not limited to, helmets, shoulder pads, rib pads or thigh/knee pads.

8.      THUD or live contact with another student-athlete is not allowed at any time.  The only football-specific equipment that may be in use are blocking/tackling dummies, blocking/tackling sleds or hand-shields.

A high school coach that violates any part of these guidelines will receive an automatic two-game suspension, such suspension to be served during the first two regular season games during the immediate next season.

## NATIONAL ATHLETIC TRAINER'S ASSOCIATION PRE-SEASON HEAT ACCLIMATIZATION REQUIREMENTS FOR SECONDARY SCHOOL ATHLETICS

Before participating in the preseason practice period, all student-athletes should undergo a pre-participation medical examination administered by a physician (MD or DO) or as required/approved by state law. The examination can identify predisposing factors related to a number of safety concerns, including the identification of youths at particular risk for exertional heat illness.

AR_293156

The heat-acclimatization period is defined as the initial 14 consecutive days of preseason practice for all student-athletes. The goal of the acclimatization period is to enhance exercise heat tolerance and the ability to exercise safely and effectively in warm to hot conditions. This period should begin on the first day of practice or conditioning before the regular season. Any practices or conditioning conducted before this time should not be considered a part of the heat-acclimatization period. Regardless of the conditioning program and conditioning status leading up to the first formal practice, all student-athletes (including those who arrive at preseason practice after the first day of practice) should follow the 14-day heat-acclimatization plan. During the preseason heat acclimatization period, if practice occurs on 6 consecutive days, student-athletes should have 1 day of complete rest (no conditioning, walk-throughs, practices, etc.).

Days on which athletes do not practice due to a scheduled rest day, injury, or illness do not count toward the heat-acclimatization period. For example, an athlete who sits out the third and fourth days of practice during this time (eq, Wednesday and Thursday) will resume practice as if on day 3 of the heat-acclimatization period when returning to play on Friday.

A practice is defined as the period of time a participant engages in a coach-supervised, school-approved, sport- or conditioning-related physical activity. Each individual practice should last no more than 3 hours. Warm-up, stretching, and cool-down activities are included as part of the 3-hour practice time. Regardless of ambient temperature conditions, all conditioning and weight-room activities should be considered part of practice.

A walk-through is defined as a teaching opportunity with the athletes not wearing protective equipment (e.g., helmets, shoulder pads, catcher's gear, shin guards) or using other sport-related equipment (e.g., footballs, lacrosse sticks, blocking sleds, pitching machines, soccer balls, marker cones). The walk-through is not part of the 3-hour practice period, can last no more than 1 hour per day, and does not include conditioning or weight-room activities.

A recovery period is defined as the time between the end of 1 practice or walk-through and the beginning of the next practice or walk-through. During this time, athletes should rest in a cool environment, with no sport- or conditioning-related activity permitted (e.g., speed or agility drills, strength training, conditioning, or walk-through). Treatment with the athletic trainer is permissible.

The 14-Day Heat Acclimatization Period – Core Principles:

1.  Days 1 through 5 of the heat-acclimatization period consist of the first 5 days of formal practice. During this time, athletes may not participate in more than 1 practice per day.

2.  If a practice is interrupted by inclement weather or heat restrictions, the practice should recommence once conditions are deemed safe. Total practice time should not exceed 3 hours in any 1 day.

3.  A 1-hour maximum walk-through is permitted during days 1–5 of the heat-acclimatization period. However, a 3-hour recovery period should be inserted between the practice and walk -through (or vice versa).

4.  During days 1–2 of the heat-acclimatization period, in sports requiring helmets or shoulder pads, a helmet should be the only protective equipment permitted (goalies, as in the case of field hockey and related sports, should not wear full protective gear or perform activities that would require protective equipment). During days 3–5, only helmets and shoulder pads should be worn. Beginning on day 6, all protective equipment may be worn and full contact may begin.

    a.  Football only: On days 3–5, contact with blocking sleds and tackling dummies may be initiated.
    b.  Full-contact sports: 100% live contact drills should begin no earlier than day 6.

16

AR_293157

5.  Beginning no earlier than day 6 and continuing through day 14, double-practice days must be followed by a single-practice day. On single-practice days, 1 walk-through is permitted, separated from the practice by at least 3 hours of continuous rest. When a double practice day is followed by a rest day, another double practice day is permitted after the rest day.

6.  On a double-practice day neither practice should exceed 3 hours in duration, and student-athletes should not participate in more than 5 total hours of practice. Warm-up, stretching, cool-down, walk-through, conditioning, and weight-room activities are included as part of the practice time. The 2 practices should be separated by at least 3 continuous hours in a cool environment.

7.  Because the risk of exertional heat illnesses during the preseason heat-acclimatization period is high, we strongly recommend that an athletic trainer be on site before, during, and after all practices.

## HEAT PARTICIPATION POLICY

Introduction:

History shows that most exertional heat stroke deaths occur during August; however, athletes will be at risk whenever in the presence of elevated ambient temperatures with high humidity. For many years, coaches have utilized the Heat Index to determine safe conditions for exercise in a hot environment. Evidence-based research, first initiated with the military, proves that Wet Bulb Globe Temperature (WBGT) should be the environmental monitoring measure during athletic participation in the heat.

The Heat Index was developed as a measurement of ambient temperatures and relative humidity while resting in the shade. It is intended to provide outdoor restrictions for the elderly and adolescents during times of elevated temperatures. It is not relevant to a athletic activity settings. However; the WBGT is a measurement of ambient temperature, relative humidity, radiant heat from the sun and wind speed. When outdoor activities are conducted in the direct sun, the WBGT is the most pertinent to use. Although read in degrees, the WBGT does not reflect degrees of air temperature. A WBGT reading of 92 F may equate to a Heat Index reading of 104-105 degrees F.

Method:

**The *NJSIAA Heat Participation Policy* will be utilized in conjunction with the *NJSIAA Pre-Season Heat Acclimatization Policy.*** Monitoring the environmental conditions through the WBGT and making the appropriate activity modifications is an effective preventative measure in reducing the risk of exertional heat stroke. The athletic trainer, certified designee or individual (e.g. coach) appointed by the athletic director must use a scientifically-reliable WBGT measuring device and take an on-site reading 30 minutes prior to activity and a minimum of every hour during activity. Readings must be recorded on the *NJSIAA Heat Participation Policy Record Chart*. All corresponding modifications must also be recorded on the chart.

References:

http://ksi.uconn.edu/prevention/wet-bulb-globe-temperature-monitoring/
http://ksi.uconn.edu/high-school-state-policies/wbgt-policies/
ttp://ksi.uconn.edu/prevention/heat-acclimatization/

Frequently Asked Questions:

Is the *NJSIAA Heat Participation Policy* just for football in the fall preseason?

The *NJSIAA Heat Participation Policy* must be followed by all sports and has no specific ending date. Athletic trainers and coaches must follow the policy anytime the Wet Bulb Globe Temperature (WBGT) readings are

AR_293158

at an elevated level. During this time, practices and games must be held in accordance with the *NJSIAA Heat Participation Activity Guidelines.*

<u>What does the Wet Bulb Globe Temperature (WBGT) mean and how is this different from the heat index?</u>

The Heat Index is a measurement of ambient temperatures and relative humidity while resting in the shade. It is intended to provide outdoor restrictions for the elderly and adolescents during times of elevated temperatures. It is not relevant to an athletic practice setting.

The Wet Bulb Globe Temperature (WBGT) is a measurement of ambient temperature, relative humidity, radiant heat from the sun and wind speed. When outdoor activities are conducted in the direct sun, the WBGT is the most pertinent to use. Although read in degrees, it does not reflect degrees of air temperature. A WBGT reading of 92 F may equate to a Heat Index reading of 104 – 105 degrees F.

<u>How frequently should WBGT readings be taken during practices and games?</u>

WBGT readings must be taken on the practice and game site a minimum of every hour, beginning 30 minutes before the beginning of the practices and games. All readings must be recorded on the *NJSIAA Heat Participation Policy Record Chart.*

<u>Does the *NJSIAA Heat Participation Policy* apply to both practices and games?</u>

The *NJSIAA Heat Participation Policy* applies to both practices and games. At least 30 minutes prior to the start of a game, the officials must be informed of the on-site WBGT reading and the recommended modifications if the WBGT reaches an Orange Flag or Red Flag (e.g. built-in water breaks). There have been very few documented catastrophic heat-related incidents during a game; likely due to the nature of games having built in rest breaks already (e.g. quarters and half-time). Therefore, modifications during games should include increased rest breaks, access to fluids, and cooling zones. Protective equipment must be worn during a game according to the rule book. However, for sports requiring protective equipment, the equipment must be removed and active cooling (e.g. cold towel rotation, misting fans) initiated during the built-in water breaks. Keep in mind that scrimmages take place during the preseason acclimatization period and are considered practices; therefore, must also follow the *Heat Participation Activity Guidelines*. If the WBGT reaches a Black Flag during the game, the game must be postponed for 30 minutes followed by another WBGT reading (similar to the lightning rule). The game must not resume until the WBGT falls below a Black Flag.

Heat Participation Policy Guidelines:

Schools must follow this best practice policy when conducting outdoor practices and games in all sports. The policy follows modified guidelines of the American College of Sports Medicine, and is specific to New Jersey, in regard to:

1. The scheduling of practices during times of various Wet Bulb Globe Temperature (WBGT) levels
2. The ratio of workout time to time allotted for rest and hydration during times of various WBGT levels
3. The WBGT levels which will result in practices and contests being modified or terminated.

An instrument scientifically approved to measure WBGT must be utilized at each practice and game. WBGT readings must be taken on the practice and game site a minimum of every hour, beginning 30 minutes before the beginning of practice and game. All readings must be recorded or data logged (e.g. written or electronic

18

form). In the event that a modification or cancellation was required, documentation using the WBGT *NJSIAA Heat Participation Policy Record Chart* must be completed.

| WBGT READING | Flag | Risk for Heat Illness | ACTIVITY GUIDELINES AND REST BREAK GUIDELINES |
|---|---|---|---|
| Under 80.0°F | Green | Very Low | Normal activities – Provide at least three separate rest breaks each hour of minimum duration of 3 minutes each during workout. |
| 80.0° F – 85.0°F | Yellow | Low | Use discretion for intense or prolonged exercise; watch at-risk players carefully; Provide at least three separate rest breaks each hour with a minimum duration of 4 minutes each. |
| 85.1°F – 88.0°F | Orange | Moderate | Maximum practice time is 2 hours, <u>For Football, Lacrosse and Field Hockey</u>: All helmets and shoulder pads must be removed for practice and conditioning activities. If the WBGT rises to this level **during** practice, football players may continue to work out wearing football pants without changing into shorts. <u>For All Sports</u>: provide at least four separate rest breaks each hour with a minimum duration of 4 minutes each. |
| 88.1°F – 90°F | Red | High | Maximum length of practice is 1 hour. <u>For Football, Lacrosse and Field Hockey</u>: No protective equipment may be worn during practice and there must be no conditioning activities. <u>For All Sports</u>: there must be no conditioning and there must be 20 minutes of rest breaks distributed throughout the hour of practice. |
| Over 90°F | Black | Very High | **NO OUTDOOR WORKOUTS.** Delay practice until a cooler WBGT level is reached. |

Guidelines for hydration and rest breaks:

1. Rest time must involve unrestricted access to fluids (e.g. water or electrolyte beverages).
2. With sports requiring helmets (e.g. football, lacrosse, field hockey), the helmets must be removed during rest time.
3. The site of the rest time must be a in a shaded area.
4. When the WBGT reading is >85.0°F
   a. Ice towels, spray bottles filled with ice water or equivalent must be available to aid in the cooling process within the shaded area.

Definitions:

1. Game: any NJSIAA sanctioned event.
2. Practice: the period of time that a participant engages in coach-supervised, school-approved sport or conditioning-related activity. Practices are timed from the time the players report to the field until they leave.
3. Walk through: this period of time shall last no more than one hour and is not considered to be a part of the practice time regulation and may not involve conditioning or weight-room activities. Players may not wear protective equipment.

19

AR_293160

The aforementioned policy must be carried out by the athletic trainer, certified designee or individual as appointed by the athletic director which includes a coach or any individual responsible or sharing duties for making decisions concerning the implementation of modifications or cancellation of practices and games based on WBGT.

In accordance with the current school compliance checks, the compliance monitors checklist will include items specific to:

- Presence of a WBGT device
- Documentation of all practices and games requiring modification on the NJSIAA Heat Participation Policy Record Chart
- Proof of written and signed off Heat Participation Policy document

## COLD WATER IMMERSION TUB POLICY

All schools participating in interscholastic athletics must have a comprehensive, detailed Emergency Action Plan (EAP), including heat injury. When treating a potential Exertional Heat Stroke (EHS), schools must be properly *prepared and equipped* to initiate Cold Water Immersion (CWI) or other approved cooling technique. Cooling techniques must be implemented immediately, and concurrently EMS should be contacted. This must be followed during all summer conditioning, pre-season practices/contests on school grounds, or when a coach, paid or otherwise, is present. This includes the 1st 21 days of fall practice, and any day the temperature is greater than 80 F WBGT.

| WBGT READING | Flag | COLD WATER IMMERSION TUB GUIDELINES |
|---|---|---|
| Under 80.0°F | Green | Mandatory alternative cooling measures of a cooler with ice and towels or a tarp (taco/burrito method) must be available at the practice, game and event site. |
| 80.0°F – 85.0°F | Yellow | It is required a 150 gallon cold water immersion tub or a tarp (taco/burrito method) must be filled with water temperature of less than 60 F and accessible for cooling within 5-10 minutes of the practice/contest site. Remove external clothing/equipment prior to cooling or immediately after entering tub. Aggressively stir water during cooling process. |
| 85.1°F – 88.0°F | Orange | It is required a 150 gallon cold water immersion tub or a tarp (taco/burrito method) must be filled with water temperature of less than 60 F and accessible for cooling within 5-10 minutes of the practice/contest site. Remove external clothing/equipment prior to cooling or immediately after entering tub. Aggressively stir water during cooling process. |
| 88.1°F – 90°F | Red | It is required a 150 gallon cold water immersion tub or a tarp (taco/burrito method) must be filled with water temperature of less than 60 F and accessible for cooling within 5-10 minutes of the practice/contest site. Remove external clothing/equipment prior to cooling or immediately after entering tub. Aggressively stir water during cooling process. |

20



| Over 90°F | Black | **NO OUTDOOR WORKOUTS.** Delay practice until a cooler WBGT level is reached. If the WBGT rises to this level **during** practice, it is required a 150 gallon cold water immersion tub (or a tarp (taco/burrito method) must be filled with water temperature of less than 60 F and accessible for cooling within 5-10 minutes of the practice/contest site. Remove external clothing/equipment prior to cooling or immediately after entering tub. Aggressively stir water during cooling process. |
|---|---|---|

Treatment of Extertional Heat Stroke:

If the athletic trainer/medical staff is onsite, utilize the principle of *Cool First, Transport Second*. When cooling, use CWI or other approved cooling technique, until core temperature is at 103 F. If the athletic trainer/medical staff is not onsite, cool immediately until the athlete starts to shiver, or for a minimum of 20 minutes based upon the known cooling rate of 1 degree per 3 minutes. If athletic trainer/medical staff *is not* present, EMS assumes control of the EHS patient upon arrival and continues cooling for the minimum of 20 minutes or until rectal temperature is obtained.

## NEW JERSEY HOMESCHOOL GUIDELINES

A home schooled student is eligible to participate in interscholastic athletics if the following conditions are met:

1. Approval by the local Board of Education.  Consistent with Department of Education guidelines a home schooled student may participate in interscholastic athletics if the local board of education, in its discretion, approves of the participation of home schooled students on the high school teams.

2. Residency. The home schooled student must reside in the school district that serves the high school and must meet the residency criteria pursuant to N.J.A.C. 6A:22 and provide proof of residence as required by the local school board. In school districts that serve more than more town a home schooled student must be assigned to the school of record in the same manner as other students.

3. Notice and request to Principal. The parents of the home schooled student must submit a written request to the principal of the member school to try out for an athletic team in interscholastic athletics.

4. Compliance with local requirements. The home schooled student must comply with the same physical examination, insurance, age, academic and other requirements for participation as required of all students at that high school. The home schooled student must adhere to the same standards of behavior, responsibilities and performance as other members of the team.

5. Compliance with local requirements. Home schooled students must meet all eligibility requirements established by the NJSIAA, including but not limited to rules relating to amateur status, age, recruitment, academic credits, semesters of eligibility and transfers. Home schooled students will be subject to all rulings and decisions of the NJSIAA, and may appeal any adverse decision to the Commissioner of Education under N.J.A.C. 6A:3-7.1 et seq.

6. Demonstration of equivalent education. The parents of the home schooled student must meet with local school officials to demonstrate that the student is receiving an academically equivalent education.

7. Certification of academic eligibility. The parents of the home schooled student must submit evidence satisfactory to the Principal that the home schooled student has met the requirements of the Academic Credit Rule and the requirements of the school's own academic policy.

AR_293162

8.  <u>Transfer to a home school program.</u>  Any student who withdraws from a public school program to enroll in a home school program, and who is ineligible at the time of withdrawal from the public school program due to his/her failure to meet academic, behavioral or eligibility standards, shall be ineligible to compete in interscholastic athletic competition in the same manner as a student who has transferred from one school to another for athletic advantage.

9.  The rights, privileges and responsibilities associated with all other student athletes attending NJSIAA member schools will apply to home schooled students who have satisfied the requirements above.

## INFECTIOUS DISEASE POLICY
*Presented by the NJSIAA Medical Advisory Committee*

Purpose:
The New Jersey State Interscholastic Athletic Association Executive Committee has adopted this policy in an effort to minimize the possibility of transmission of any infectious disease during a high school athletic practice or contest.

The policy primarily addresses blood borne pathogens such as Hepatitis B Virus (HBV), Hepatitis C Virus (HCV), and the Human Immunodeficiency Virus (HIV). However, it also discusses Methicillin Resistant Staphylococcus Aureus (MRSA) and common sense precautions against the spread of less serious infections such as influenza and the common cold.

Much of this policy has been written with contact sports such as football, wrestling, and basketball in mind. However, it is applicable for all sports.

The entire text of this policy is available upon request.

Guidelines for withdrawal of teams from competition upon diagnosis of infectious diseases:
School administrators should rely solely upon the advice of the school's medical inspector in determining the action to withdraw a team from competition when a member is diagnosed as having an infectious disease.

## JUNIOR HS (9th GRADE) ATHLETICS

**Foreword:**
The philosophy, objectives and regulations under which Junior High Schools (9th grade) may become members of the NJSIAA are not intended to influence expansion of existing athletic programs, nor to promote programs where none exist, nor to exert undue pressures for the establishment of interscholastic athletic programs in the Junior High Schools (9th grade) of the state.

The recommendations which are made are promulgated toward the establishment of policies and practices for athletic programs in Junior High Schools (9th grade) of New Jersey.

**Philosophy:**

22

If athletics are to serve educational ends, they must be wisely guided, developed, and administered as a vital and effective phase of the educational program. Each school district should develop a philosophy of desirable goals and values from which a sound athletic curriculum can be built.

Participation in sound athletic programs contributes to individual development, physical skill, health, strength, self-reliance, emotional maturity, social competencies, and good sportsmanship.

Junior High School (9th grade) athletics shall be an integral part of the Junior High School (9th grade) educational program and the Junior High School (9th grade) Principal shall be responsible for guiding the school athletic program in line with the accepted philosophy of the school. Every school should conduct as complete an athletic program as meets the needs of the Junior High School (9th grade) child. Participation and competition shall be kept at a "readiness level" with the age and physical development of the early adolescent ever in mind.

The intramural program shall be the foundation of the school athletic program providing opportunity for the total school population to meet its athletic needs and interests. The interschool athlete program grows out of and in no way handicaps the intramural program.

In fulfillment of this philosophy member Junior High Schools (9th grade) subscribe to the following:

1. The entire athletic program shall be determined and under the direction of the Principal and faculty of the school.
2. The athletic program shall in no way interfere with the academic program, but rather integrated with other activities essential to Junior High School (9th grade) youth.
3. Interschool athletic participation offers an opportunity for a select group with a special talent to perform.
4. The interschool athletic program through team competition provides children another opportunity to recognize their abilities and limitations.
5. The interschool athletic program provides early opportunities for children to develop and express leadership qualities.
6. The interschool athletic program shall not be a farm or feeder system for high school athletic teams. Improved articulation between Junior (9th grade) and Senior High Schools and community should always be sought.
7. The interschool athletic program should be financed by the local board of education.
8. The interschool athletic program should be administered through established standards and controls. These standards and controls should be established by the schools and administrators or through membership in an association composed of representing groups interested in good wholesome athletic programs for the children of New Jersey.

**Specific regulations to be considered:**
Unless otherwise specified in the paragraphs which here follow, the Rules and Regulations of the New Jersey State Interscholastic Athletic Association for Senior High Schools apply to Junior High School and 9th grade member schools of this Association.

A. Membership
   1. Membership in the Junior High School Division of the New Jersey State Interscholastic Athletic Association is a voluntary one.
   2. Any Junior High School approved by the New Jersey Department of Education as a secondary school shall be eligible to apply for membership.
   3. A school shall become a member of the Junior High School Division of NJSIAA when the membership request has been properly executed and it is officially accepted by action of the NJSIAA Executive Committee.

23

B. Grade Limitation

Students in 6th, 7th or 8th grades who will reach age nineteen (19) prior to September 1 of their senior year while properly enrolled in a member school may request a waiver of the Bylaws, Article V, Section 4.I, Pre-High School Student, to have an opportunity to participate in interscholastic athletics for four (4) years prior to becoming ineligible.

C. Interpretation

This is not meant to restrict grades 7 and 8 from participating with other schools in competition at their own level.

D. Supervision

All pupils on Junior High (9th grade) interscholastic teams must be enrolled in the same school and be under the supervision of the same administrative head.

E. Classification

There will be no classification of Junior High Schools on the basis of enrollment.

F. Eligibility

1. Academic Requirements – The same eligibility requirements for 9th grade pupils will be enforced as applies in the high schools.
2. Age Requirements – An athlete becomes ineligible for Junior High School or 9th grade athletics if he/she attains the age of sixteen prior to September 1. However, any athlete attaining age sixteen on or after September 1 shall be eligible for the ensuing school year.

G. Semester Attendance

A pupil becomes ineligible for Junior High School or 9th grade interscholastic athletic competition after he/she spends two (2) semesters in the 9th grade.

H. Transfers

Article V, Section 4.K of the Bylaws applies.

I. Dues

Each school shall be assessed an annual dues of $60.00 for membership in the Junior High School Division of NJSIAA.

J. Officials

It is urgently suggested that qualified and registered officials be used in all interscholastic games.

K. Safety Measures

In order to assure Junior High School (9th grade) contestant optimum protection against injury to their bodies and their health, the following minimum regulations shall be enforced:

1. Physical Examination – In each school year before a pupil participates in an organized practice session or game of the athletic program, he/she must have a physical examination and present the athletic Participation Form properly signed by himself and his parents (or guardian). This form shall be filed with the administrative head of the school.

2. Conditioning Period – To insure good physical condition of participants each athlete should be given sufficient days of practice and conditioning before engaging in any interscholastic contest.

24

3. Equipment – Proper equipment and safety precautions must be stressed, such as properly fitted and protective clothing, pads, shoes, helmets, etc.

4. Facilities – The physical facilities such as playing areas, locker and shower rooms, bleachers, transportation, etc., shall be designed and maintained to safeguard the health and safety of all participants and spectators.

L. Competition
   1. It is recommended that schools compete with member schools only or with schools following similar regulations.
   2. In contests between Junior and Senior High Schools on a 9th grade level, the Junior High School regulations will be mandatory.

   3. Wrestling weight classes shall be the same as those provided for high schools in the National Federation Wrestling Rules with the following exception:
       a. Add a 90-lb. weight class (Wrestler must weigh at least 75 lbs. to compete at this weight class.)

M. Penalties
   The penalty for violation of these Rules and Regulations may be suspension or expulsion.


## LABOR DISPUTES

It is the philosophy of the NJSIAA Executive Committee that interscholastic athletes should not be used as a pawn during professional negotiations between the Board of Education and the Educational Association. Although athletics is only a part of the total school program, it is obvious that the emotions of people are aroused when anything seems to disrupt the athletic program or deprive young people of an opportunity to participate.

Therefore, we recommend that boards of education, administrators, coaches, and professional organizations begin to plan now in advance of any crisis, i.e., withholding of services, work stoppage, so that rational decisions can be made before serious conflicts and problems develop. Students, advisors, parents, and coaches should know in advance whether co-curricular programs, including athletics, will continue to be postponed during a professional labor dispute. If no planning is done, it is likely that students will suffer most, even though they are the innocent bystanders in the negotiations process.
The NJSIAA Executive Committee has adopted the following guidelines for situations which may arise during a professional labor dispute:

1. The decision whether to continue the athletic program or not must be made at the local level, but the safety and well-being of the participants ought to be the primary factor in reaching that decision. If practices or contests are carried on, the local administration ought to be aware of the responsibility for continuous competent supervision and limitations on practices, scrimmages, etc.

2. When a contest must be postponed, it may, by mutual agreement between the contesting schools, be rescheduled. If a postponed game cannot be rescheduled before the end of the regular season, a forfeit shall be declared.

3. In any state tournament, the records of teams at the time of the cut-off date will determine the eligibility of a team to participate. Games not played up to the cut-off date for tournament qualification must be forfeited.

4. If a school has already entered a state tournament and is unable to compete in any scheduled game, that game shall be declared a forfeit (subject to the procedures listed in 22. **Procedure for filing a protest or declaring a forfeit)** 34 and a win shall be credited to the offended school.

5. Transfer students who are affected by a strike will count those days as if school was in session and games being played provided the regular game schedule has begun.

6. We urge all school districts to plan ahead so that everyone is aware of these responsibilities in case of an emergency. The NJSIAA will continue to be available for advice and consultation whenever requested.

## EXCERPTS FROM LEAGUE/CONFERENCE POSITION STATEMENT
*Adopted by NJSIAA Executive Committee on April 11, 1983, Amended on June 6, 2002*

Guiding Principles:

The Association is charged with establishing *statewide standards* for the conduct of the interscholastic sports which cannot be left to local or regional discretion, including the establishment and enforcement of minimum standards of eligibility of Student-Athletes, as well as the rules and regulations for the various interscholastic sports, the maintenance of standards of sportsmanship; and the conduct of statewide championships in various sports. As such, the Association cannot delegate these vital responsibilities to any member school or group of such schools, whether they be formed as a conference or not. On the other hand, the Executive Committee recognizes that there must be greater home rule among our conferences so as to foster an improvement in both the quantity and quality of athletic programs; convenient and reasonable scheduling of sports activities; and the development of greater sportsmanship and competition. Toward that end, conferences will be given the greatest degree of self-governance, provided that there is not a violation of the Constitution and Bylaws of the Association, as well as the standardized rules and regulations for the conduct of interscholastic sports, and the mandate of the Commissioner of Education that all schools receive an opportunity to have a full schedule of interscholastic sports for their students. While the respective roles of the parent association and the member conferences is not easily discernible, the Executive Committee believes that it must set down certain guidelines, which will hereafter be observed by member schools. In doing so, the Committee wishes to make clear that this statement is intended to clarify the relationship between the State Association and local conferences. Accordingly, the Executive Committee reserves all of its rights under the Association's Constitution and Bylaws.

The Role of NJSIAA:

The role of NJSIAA, principally through its Executive Committee, will continue to exercise the following responsibilities *vis a vis* various conferences and leagues:

1. The determination of eligibility for Student-Athletes.

2. The maintenance of rules and regulations governing the conduct of various interscholastic sports, including contest rules, the calendar for the start of practice, and the start of, and conclusion of, regular seasons, and the minima and maxima of contests in any sport.

3. The determination of state champions in the various sports.

4. Assuring that all students enrolled in member schools, who would otherwise be eligible to participate in interscholastic sports, are not precluded from a full opportunity to do so, irrespective of their race, sex, religion, or the school that they are attending.

AR_293167

5.  Review of all constitution conferences, pursuant to Article XII, Section 2 of the Association Bylaws, and the exercise of other authority granted to it under the Association Constitution and Bylaws.

The Role of Individual Leagues and Conferences:

The Executive Committee strongly believes that our conferences must be strengthened, rather than weakened, if they are to perform the very important tasks for which they were originally created. Therefore, conferences should have exclusive authority over certain functions, which will not be appealable to the Association; while at the same time assuming expanded authority for other responsibilities, with a very limited review by the Association.

1.  Exclusive Responsibilities:
    In addition to the traditional internal matters which have never been appealable to the Association, such as the election of officers and the conduct of meetings, conferences will have the exclusive authority over the following functions:
    a.  Any academic or recreational activity conducted by a conference outside of the interscholastic sports within the jurisdiction or the NJSIAA.
    b.  The determination of conference or league championships.
    c.  Internal finances and administration of league activities.

2.  Responsibilities of Leagues and Conferences Appealable to the NJSIAA:
    The following responsibilities will be vested in conferences, with a limited right to appeal by member schools who are challenging league or conference determinations.
    a.  The Association will continue to exercise its supervisory role to assure *membership* by applicant schools in appropriate conferences and leagues. However, unless it can be shown that there has been a violation of the order of the Commissioner of Education that there be an opportunity for a full schedule of interscholastic sports, there will be no appeals from conference and league *scheduling*.
    b.  Many of the larger conferences and leagues have segmented their membership into "divisions," usually on the basis of geography or size. Unless it can be shown that such divisional breakdowns are violation of the order of the Commissioner of Education or at variance with the "Conference Criteria" established in May, 1981 by the Association, no appeal from such internal divisional alignments will be considered by the NJSIAA.* In that vein, the Executive Committee wants to strongly emphasize that a school should not have the right to appeal its placement in a division because the school believes that it should be given a "weaker" or "stronger" schedule. The ability of member schools to have a winning season, or to obtain state or national prominence in its particular sport, is simply not a concern of the Association.
    c.  To assure full scheduling for all member schools, every member school should be allowed to enter a League or Conference appropriate to size and geography and other factors set forth in the "Conference Criteria," as approved by the Commissioner of Education.* Any school denied entrance into a League or Conference may appeal to the NJSIAA. When a school seeks to transfer membership from one conference to another, any appeal from denial by either Conference must be based on substantial reasons, recognizing the goal of assuring the stability of Conference structures.
    d.  The various conferences are strongly encouraged to adopt disciplinary procedures by which infractions of good sportsmanship can be penalized after there has been an observance of appropriate due process. Toward that end, all conferences which have not done so should set forth in their Constitution and/or Bylaws, specific violations and penalties which may be assessed for such violations, as well as a hearing procedure. Pursuant to Article XIII of the NJSIAA Bylaws, any school or school official or coach penalized by a conference may appeal to the Executive Committee. However, that Committee's role will be limited to determine whether the actions of the conferences were arbitrary or capricious or in violation of the NJSIAA Constitution and Bylaws. The NJSIAA and

27

its Executive Committee will not substitute its judgement concerning such issues for that of the conference.

e.  The conferences are strongly encouraged to maintain appropriate health and safety standards for athletic facilities among their member schools, provided that such standards are not being utilized to exclude schools, contrary to the order of the Commissioner of Education. Accordingly, the Executive Committee's role on appeal will be limited to determine whether the action of the conference is arbitrary and capricious or in violation of the order of the Commissioner of Education concerning the inclusion of minority and non-public schools. Neither the NJSIAA nor its Executive Committee will substitute its judgement on such questions of health and safety for that of the individual conferences.

f.  Article V of the NJSIAA Bylaws incorporates a comprehensive set of minimum eligibility standards for student athletes. While the NJSIAA will continue to exercise exclusive authority in determining the eligibility of students, member schools and conferences will continue to be the free to adopt *higher* eligibility standards. Neither the NJSIAA nor its Executive Committee will interfere in the adoption of such standards, or the enforcement of them by a conference, league or member schools, unless it can be shown these standards are arbitrary or capricious or in violation of the NJSIAA Constitution and Bylaws.

*The Commissioner of Education mandated that the NJSIAA provide an opportunity for public schools with high minority enrollment to join appropriate athletic conferences utilizing Conference Criteria such as enrollment, geography and the impact on the involved conference.*

## PROCEDURE IN THE EVENT OF LIGHTNING

Termination, or temporary suspension, must always take place when an electrical storm is imminent. The decision to terminate or suspend a game/meet/event when an electrical storm is imminent may be made by either the host school or the official.

As noted previously, a chain of command and designated decision-maker should be established for each organized practice and competition.

Recognition: Coaches, certified athletic trainers, athletes and administrators must be educated regarding the signs indicating thunderstorm development. Since the average distance between successive lightning flashes is approximately 2-3 miles, any time that lightning can be seen or thunder heard, the risk is already present. Weather can be monitored using the following methods:

1.  Monitor Weather Patterns - Be aware of potential thunderstorms by monitoring local weather forecasts the day before and morning of the practice or competition, and by scanning the sky for signs of potential thunderstorm activity.

2.  National Weather Service (NWS) - Weather can also be monitored using small, portable weather radios from the NWS. The NWS uses a system of severe storm watches and warnings. A watch indicates conditions are favorable for severe weather to develop in an area; a warning indicates severe weather has been reported in an area and for everyone to take proper precautions.

Management:

1.  Evacuation - If lightning is imminent or a thunderstorm is approaching, all personnel, athletes and spectators must evacuate to available safe structures or shelters. A list of the closest safe structures must be announced and displayed on placards at all athletic venues.

AR_293169

2. Thirty-minute rule - Once lightning/thunder has been recognized, it is mandatory to wait at least 30 minutes after the last flash of lightning is witnessed or thunder is heard. Given the average rates of thunderstorm travel, the storm should move 10-12 miles away from the area. This significantly reduces the risk of local lightning flashes. Any subsequent lightning or thunder after the beginning of the 30-minute count must reset the clock and another count must begin.

3. When one contest is suspended on a site due to thunder being heard and/or lightning being observed, all contests/activities on that site must be suspended.

Education on Lightning Danger:

Coaches, athletic trainers, officials, administrators, as well as athletes, must be educated regarding the signs indicating nearby thunderstorm development. Generally speaking, it is felt that anytime that lightning can be seen, or thunder heard, risk is already present.

Criteria for Suspension and Resumption of Activity

Once lightning has been recognized or thunder heard, by an official, a coach, the host site management personnel, or by a lightning detection system, the game must be suspended immediately with all players, coaches, spectators, and officials directed to appropriate shelters.

After the suspension, the plan should include strict, documented criteria for the resumption of activities. It is mandatory to wait at least 30 minutes after the last flash of lightning is witnessed or thunder is heard. Any subsequent lightning or thunder after the beginning of the 30-minute count must reset the clock and another count must begin.

Once the contest has been suspended, the 30-minute mandatory suspension in play is in effect. If the lightning detection system gives an "all clear signal" prior to the end of the 30-minute suspension time, the contest shall not be resumed until the 30-minute suspension time limit has elapsed, per the NJSIAA and NFHS policy.

However, if a member school has a Board policy that states no play/no activity may resume until the lightning detection system gives the "all clear signal" even though the 30-minute suspension time has elapsed per NJSIAA/NFHS rule, that Board policy shall supersede NJSIAA/NFHS policy.

Evacuation Plan:

All personnel, athletes and spectators must be clearly informed of available safe structures or shelters in the event a thunderstorm approaches. A list of the closest safe structures should be announced and displayed on placards at all athletic venues when applicable. The person in authority must be aware of the amount of time it takes to get to each structure and the number of persons each structure can safely hold. For large events, time needed for evacuation is increased and there must be a method (i.e., announcement over loud speaker) for communicating the need for evacuation and directing both athletes and spectators to the appropriate safe shelters.

Safe Structures: The most ideal structure is a fully enclosed, substantial building with plumbing, electrical wiring and telephone service, which aids in grounding the structure. A fully enclosed automobile with a hard metal roof and rolled up windows is also a reasonable choice. School buses are an excellent lightning shelter that can be utilized for large groups of people. However, it is important to avoid contact with any metal while inside the vehicle.

Avoid using shower facilities for safe shelter and do not use showers or plumbing facilities during a thunderstorm as the current from a local lightning strike can enter the building via the plumbing pipelines or electrical connections. It is also considered unsafe to stand near utilities, use corded telephones or headsets during a

29

thunderstorm, due to the danger of electrical current traveling through the telephone line. Cellular and cordless telephones are considered reasonably safe and can be used to summon help during a thunderstorm.

When caught in a thunderstorm without availability or time to reach safe structures, you can minimize the risk of lightning-related injury by following a few basic guidelines:

1.  Avoid being the highest object. Seek a thick grove of small trees or bushes surrounded by taller trees or a dry ditch.

2.  Avoid contact with anything that would be attractive to lightning. Stay away from freestanding trees, poles, antennas, towers, bleachers, and baseball dugouts, metal fences, standing pools of water and golf carts.

3.  Crouch down with legs together, the weight on the balls of the feet, arms wrapped around knees, and head down with ears covered.

## PARAPROFESSIONAL AIDE POSITIONS

Nothing in the rules governing coaching positions would preclude a board of education from creating, pursuant to N.J.A.C. 6A:32-4.7, paraprofessional aide positions to assist in the supervision of athletic activities under the direction of a certified coach. However, all such positions must be created and maintained in full compliance with the provisions of N.J.A.C. 6A:32-4.7, including requirements for written job descriptions and qualification standards, and approvals by, and annual reporting to, the county superintendent. As with classroom aides employed to assist certified teachers, athletic paraprofessionals may only function under the direct supervision of a certified coach, or if not assisting with coaching duties, under the direct supervision of designated certified staff; they may not independently undertake coaching duties or any other duties requiring educational certification. Additionally, all persons employed by a district in a paraprofessional capacity (i.e., not serving on a volunteer basis) are subject to the criminal history record check law.

If a board contemplates the use of an aide (paid or unpaid), the policies of the local board must be adopted and in place regarding this type of position, and the rules of the league or conference to which the district belongs must be followed.

Please contact your county superintendent of schools should you have any questions.

AR_293171

### NJSIAA INTERPRETIVE GUIDELINES CONCERNING SCHOOL/COACH/ATHLETE PARTICIPATION LIMITATIONS

The NJSIAA Constitution, Bylaws, Rules and Regulations has for all intent and purposes defined the twelve-month sequence of participation in the following manner:

(A) In-Season (B) Out-of-Season and (C) Summer Recess

A. In Season:
   The Constitution clearly stipulates this time frame by our Rules and Regulations and causes few problems with the exception of early season practice and the length of the seasons. The participation limits and association with coaches is clearly established and needs no elaboration here. (Program Regulations, Section 5)

   Athletes in some sections of the State play in <u>out-of-school</u> (non-school sponsored) competition which is not prohibited by our rules during the in-season period. This competition is not sponsored by the schools in any way and the NJSIAA does not sanction said participation which is a local option in that regard. (Student-Athlete Guidelines, Section 8)

B. Out-of-Season:
   During this period athletes may not be involved in intramurals in which they have attained team status. Coaches may participate in these programs as long as their players are not involved. (Student-Athlete Guidelines, Section 2)

   Open-gym and recreation participation are permitted for players as long as their coaches are not present. In the same vein, coaches may be involved but not with their athletes present. (Student-Athlete Guidelines, Section 4 and 5)

   Camp/clinic participation is permitted for players provided their coaches are not involved. (Student-Athlete Guidelines, Section 6)

   While the open-gym programs can be sponsored by the member schools, recreation and camp/clinic sponsorship is prohibited. (Student-Athlete Guidelines, Section 4 and 5)

   A Student-Athlete may be involved with a non-school team with the approval of the school in accordance with our rule. (Student-Athlete Guidelines, Section 8)

   Camp/clinic participation is permitted for players provided that their coaches are spectators only at such.

AR_293172

**Participation Chart (Out-of-Season)**

|  | Athletes | Coaches | School Sponsorship |
|---|---|---|---|
| Intramurals * | No | Yes (w/a) | Yes |
| Open-Gym | Yes (w/c) | Yes (w/a) | Yes |
| Camps | Yes (w/c) | Yes (w/a) | No |
| Clinics/Participatory** | Yes (w/c) | Yes | No |
| Clinics/Non-Participatory | Yes | Yes | Yes |
| Recreation Programs | Yes (w/c) | Yes (w/a) | No |
| Independent Play *** | Yes (w/c) | Yes (w/a) | No |
| (w/c) – without coach    (w/a) – without athletes | | | |

*If student has attained team status in the sport being offered. All freshman are considered to have team status.

**Coaches may be spectators. See Student-Athlete Guidelines, Section 6.

***An athlete may compete on a non-school team (independent) with approval of the school. See Student-Athlete Guidelines, Section 8 for Limitations.

C.  Summer Recess:
   Participation Limitations Summer Recess – Practice sessions during the summer period are the prerogative of the member school within existing regulations.

   A coach/team or Student-Athlete may not be sponsored or supported by a school or school-related group (i.e. Booster Club) when team (interscholastic) or individual competition takes place as part of the activity in camps, clinics, recreation programs or independent play.

**Participation Chart (Summer Recess)**

|  | Athletes | Coaches | School Sponsorship |
|---|---|---|---|
| Camps: | | | |
| Team/Individual Interscholastic Competition | Yes* | Yes* | No |
| Clinics: | | | |
| Team/Individual Interscholastic Competition | Yes* | Yes* | No |
| School's Summer Camp(s): | | | |
| Practice only | Yes | Yes | Yes** |
| Recreation/Independent Programs: | | | |
| Team/Individual | Yes* | Yes* | No |
| Open-Gym Facility: | | | |
| Practice only | Yes | Yes | Yes** |

*Not representing their school.

**Only for that school's athletes/programs involving intra-squad practice.

**Please Note:** The NJSIAA does not regulate or sanction non-school activity and to that extent member schools, for their own protection, are encouraged to inform their coaches and athletes of their independent status when involved in said activities. Information supplied to coaches/athletes should include, but not be limited to, issues dealing with eligibility, injuries, insurance and potential litigation on the part of participants and use of the school name or nickname. In addition, coaches/players must be instructed **not** to use the school name or nickname in any non-school participation.

32

## FILING A PROTEST OR DECLARING A FORFEIT

Protest – The NJSIAA Bylaws, Article VII, Section 1 provides that:

Section 1:   Protests against alleged violations of contracts, violations of the accepted standards of good sportsmanship, or of the Constitution and Bylaws of this Association, must be reported in writing and posted by the Principals of the participating schools or the game officials to the Executive Committee, through the Executive Director, within one hundred twenty (120) hours of the time of such violation, with a copy to the alleged violator. Protests based upon an official's judgement or misinterpretation of the playing rules will not be honored.

The one hundred twenty (120) hour provision will be satisfied, if the school's Principal notifies the League or Conference President, in writing, prior to the expiration of this time period since disputes and controversies involving League or Conference members must be initially heard at that level.

Note:  See CL 1 – Article VII, Section 1.

"Protests based upon an official's judgement or misinterpretation (misapplication) of the playing rules will not be honored" does not preclude a League or Conference from addressing same; however, the NJSIAA will not honor such protests for non-conference games/meets, neither will the NJSIAA hear appeals to a League or Conference decision based upon an official's judgement or misinterpretation of the playing rule.

Forfeit – Schools may not mutually agree to a forfeit; only Leagues or Conferences or the NJSIAA may award forfeits.

When submitting records for tournament qualification, schools listing forfeit wins/losses must attach an explanation for same.
Coaches must be cautioned not to refuse to play or to complete a game/meet. Such decisions are within the jurisdiction of the game/meet officials once game/meet has started, or rest with home management and/or tournament director if the game/meet has not started.

Forfeit – League/Conference – Non-Conference

When a penalty involving a forfeit is assessed against a member school by a League or Conference it is mandatory that the conference/league Secretary submit, immediately in writing, the action taken, reason why, schools involved, ate and site of the game/meet/match to the Central Office. This applies to all sports.

If a member school in a non-conference game/meet/match feels a forfeit might be warranted, relevant information as stated above should be forwarded by the Principal, immediately in writing, to the Central Office for the Executive Director's decision.

*CL:  When forfeits are received, a member school may not compete on the "forfeit day" when such competition would put the school in conflict with the number of games permitted per day/week/season unless the forfeiture is expunged from the record by League or Conference action or by mutual agreement of the schools*

AR_293174

## USE OF A PROSTHESIS (ARTIFICIAL LIMB)

Federal legislation which prohibits discrimination on the basis of a physical handicap makes it difficult for state associations to defend the former blanket prohibition of the use of a prosthesis when challenged in the courts.

Many sports now have revised rules to provide <u>"artificial limbs which, in the judgement of the rules administering officials, are no more dangerous to players than the corresponding human limb and do not place an opponent at a disadvantage may be permitted."</u> The NJSIAA endorses this policy so long as it is not in conflict with the rules for a specific sport.

The NJSIAA procedure for approving the wearing of a prosthesis by a Student-Athlete will be as follows:

1.  The member school must notify the NJSIAA and arrange for a meeting to determine the legality of the prosthesis; present at this meeting must be the school physician, Athletic Director, Principal, coach, a representative from NJSIAA, and the player who must be fully equipped as he/she will be when competing; an athletic trainer or other school representative may also be present.

2.  The criteria recommended as a guideline to follow in determining the legality and suitability of wearing a prosthesis in a contact sport are:

    a.  The prosthesis should be approved at any Juvenile Amputee Clinic listed in the National Directory. Kessler Institute for Rehabilitation, 1199 Pleasant Valley Way, West Orange, New Jersey 07052 is the only New Jersey clinic listed.
    b.  Prosthesis should be properly padded.
    c.  Signed approval by an orthopedic surgeon or physician associated with a juvenile amputee clinic and the school physician. Such approval must be represented to the officials before each game for the official's final inspection and approval of proper padding.

    *CL: A series of photos showing the unpadded, partially padded, and full padding of the approved prosthesis should be included.*

<u>Note</u>: Member schools are given this advance notice to allay the possibility of having a prosthesis declared illegal, thereby preventing the player from participating until approval is granted.

## NJSIAA MINIMUM REQUIREMENTS
## FOR REVIEW OF OFFICIALS CHAPTERS

Certification of an officials' chapter or association is at the discretion of the Executive Committee, which may consider, among other things, the need for a new chapter or association, the number of new officials in the membership of the new chapter or association, and whether the new chapter or association was created as a result of a conflict with an existing chapter or association. In addition, all officials' chapters or associations must meet the following minimum requirements to be eligible for consideration by the Executive Committee.

1.  The chapter must provide evidence of officiating experience of its membership noting league, conference, or levels of competition and years of service.
2.  The chapter must provide a list of its duly elected officers and membership.
3.  The chapter must provide a copy of its Constitution and Bylaws for review by the NJSIAA.
4.  The chapter must agree to grant the NJSIAA the final authority for testing, training, and evaluation

34

procedures adopted by the chapter.
5.  The chapter must provide an outline of its testing, training, and evaluating procedures for certification of prospective and present members. ALL MEMBERS MUST PASS AN ANNUAL WRITTEN RULES EXAMINATION, AS APPROVED BY THE NJSIAA.
6.  The chapter must agree to comply with all provisions of the Constitution, Bylaws, and Rules and Regulations of the NJSIAA; decisions of the Executive Committee of the NJSIAA; and the tenets of agreements effected by the Officials' Councils and the NJSIAA.

## NJSIAA MINIMUM REQUIREMENTS
## FOR REGISTRATION OF OFFICIALS

The Executive Committee, at its discretion, may approve the certification or registration of officials and/or official chapters in all sports, and may establish the minimum requirements for testing, training and evaluating of officials.

I.   NJSIAA Registration
  a.  All officials must be registered with the NJSIAA via the Arbiter to be eligible to officiate ANY level of high school contests the NJSIAA governs.
  b.  All officials must register for each sport each year.
  c.  All officials must have paid the appropriate registration fees based on their current level. All NJSIAA payments must be paid through the Arbiter, which includes both the registration and the background check fees.
  d.  All officials must consent to a yearly background check and pay the background check fee. The background check is required once a year not per sport. Inactive officials are not required to have background checks.
  e.  All background checks will expire in June on the day of the last NJSIAA event regardless of when your background check was submitted.
  f.  All registered NJSIAA officials are considered independent contractors and not employees of the NJSIAA.

II.  NJSIAA Officials Registration Levels:
  a.  **Active** - An active official is defined as any official that is registered with the NJSIAA and affiliated with an NJSIAA approved officials chapter. The active official must have also successfully completed all necessary requirements of the chapter to which they are affiliated with. An active official is permitted to work all NJSIAA contests at any level. All registered "Active" officials are covered by the NFHS Liability Insurance.
  b.  **Cadet** - A cadet is considered an "official in training" and must be registered with the NJSIAA and affiliated with an NJSIAA approved officials chapter. A cadet is not permitted to work any NJSIAA varsity contest but can work all levels under the varsity level. All NJSIAA approved chapters are required to have a cadet training program and will determine the advancement of their cadets within a set period of time. All cadet training must be completed within 3 years, meaning that upon registering in year 4, the official must be either "active" or "inactive". All registered "Cadets" are covered by the NFHS Liability Insurance.
  c.  **Inactive** - An inactive official is defined as any official that is registered with the NJSIAA and may or may not be affiliated with an NJSIAA approved officials chapter. The inactive official is not permitted to work any NJSIAA contest at any level. An inactive official will continue to be covered under the NFHS General Liability and Accident Insurance if they choose to officiate any contest other than NJSIAA, Semi-Pro, and Professional levels. In order for an official to become active again, they must complete all requirements for an "active official".

35

III. Testing
   a. All candidates and members must pass a National Federation Rules Examination or other comprehensive exam approved by the NJSIAA.

IV. Training
   a. Candidates must align themselves with an approved chapter of officials within ninety (90) days of notification of successfully passing the approved exam.
   b. Chapters must designate a rules interpreter who must attend the NJSIAA Rules Interpretation meeting and who must conduct a chapter rules interpretation meeting prior to the opening of the interscholastic sport season for that sport. Attendance at any NJSIAA Regional Rules meetings for those sports in which NJSIAA conducts such regional meetings shall be mandatory for all members. Chapters are encouraged to hold rules interpretation meetings throughout the respective sport season(s).
   c. Chapters shall conduct meetings at which rules, mechanics, and NJSIAA modifications are reviewed for the in-service improvement of officiating. A member shall be required to attend a combination of a NJSIAA meeting and two-chapter meetings, which totals three required meetings.
   d. Cadet and in-service training programs must be established to insure a high caliber of officiating for the member schools. It is highly recommended that officials who are not of legal age (18), even though they may have obtained varsity game status, be assigned to games/matches/meets with mentor officials who are of legal age (18 or older. Officials who are under the age of 18 may not officiate his/her peer group/high school competitions in any sport.

V. Evaluation and Certification
   a. Chapters shall develop a means of evaluating their members for continuing their memberships in good standing
   b. Chapter secretaries shall furnish the NJSIAA with a list of their members in good standing by the NJSIAA designated date.

VI. Chapter Registration
   a. Candidates must provide at least two references attesting to his/her character.
   b. Registration by the chapter will not be issued or renewed for any adult (an adult is defined as any person 18 years of age or older):
      1. Convicted, or adjudicated with a finding of fault, guilt or violation, in regard to an offense against a minor or any sexual offense unless/until such offense has been reversed by proper authority with jurisdiction over the matter; or,
      2. Convicted, or adjudicated with a finding of fault, guilt or violation, in regard to an offense involving any illegal/illicit drug or controlled substance as prescribed by federal or state law or regulation, prior to five (5) years following the completion of any sentence, parole, or probation period imposed for the offense.
   c. Currently Registered Officials
      1. When a currently registered official is indicted or charged with any indictable criminal offense or charged with a violation of any statute pertaining to minors, drugs or a controlled substance, such license will automatically be suspended, pending resolution of the indictment or charge. Conviction or adjudication of fault, guilt or a violation under any such indictment or charge shall result in immediate and automatic forfeiture of the officiating license.
      2. Currently registered officials must inform the local chapter of any such indictment or indictable criminal charge immediately upon receipt of or upon having knowledge of such indictment or charge. Failure to notify the chapter shall itself be a basis for immediate and automatic forfeiture of the officiating license.
   d. Reinstatement/Reapplication for Registration. An official whose registration has been forfeited, suspended or revoked or an applicant who is denied registration, under the provisions of this policy,

36

may petition the chapter for reinstatement/reapplication based on the following:

1. If suspension, revocation or forfeiture of registration is based upon conviction, adjudication or finding of guilt as a result of an indictable offense: The official/applicant may petition the chapter for registration one (1) year after the completion of the parole/probation period; other than conviction of illegal/illicit drugs, controlled substance where a five (5) year probation period is used, or immediately upon dismissal or reversal of the charge or conviction (provided the offense was NOT involving a minor or a sexual offense.

2. If suspension, revocation, forfeiture or denial of registration is based upon any conviction, adjudication or finding of guilt involving a minor or sexual offense, reinstatement/reapplication will not be permitted, unless/until such offense has been reversed by proper authority having jurisdiction over the matter.

## PROCEDURE WHEN OFFICIALS FAIL TO ARRIVE
## OR ARE UNABLE TO CONTINUE

Member schools on a few occasions have been faced with the failure of officials to arrive for a scheduled event. The NJSIAA would like to reemphasize the absolute necessity for having properly executed contracts, in writing, with either the individual official or the chapter assignor. The officials have been repeatedly advised to report to the game site well in advance of the starting time for a pregame meeting and to permit ample time for their pregame duties relative to facility inspection, equipment approval and instructions to game-related aides. Upon arrival at an event, an official should immediately report to the athletic director or site director.

Hopeful, that schools will never have the experience of having teams poised for action, with thousands of spectators awaiting the start of the contest only to discover late arriving or totally absent officials, the following recommendations are provided as a procedural plan in the event officials fail to arrive for the game.

To reassure yourself, a reminder should be forwarded to officials one week prior to the game. Schools must not permit contracted officials to assign substitute officials without the approval of the school.

If the officials have failed to arrive within one-half hour of game time, an attempt should be made to contact the officials or their assignor.

When it becomes apparent that the expected officials will not be present for the game, the following procedure is recommended:

Contact chapter assignor, chapter secretary or local NJSIAA officials for last minute replacements;

If this fails:
Request via the P.A. system that NJSIAA officials (of the sport in question) report to a central location. Assignment to be the responsibility of the home athletic director.

Every attempt should be made to play the game, unless it can be clearly established that to do so would not be in the best interest of the participating schools.

The responsibility for assigning officials and for determining the playing or postponing of a game under these circumstances rests with the Principal and the Athletic Director of the host school-this is not a coaching staff decision. When only one (1) official arrives for game to which two (2) officials-umpires are usually assigned, the game must be played. Same applies when an official is unable to complete the assignment.

37

Schools withholding their teams from competition under these conditions will be subject to severe punitive action under Article X of the Bylaws and officials are required to report the violation to the NJSIAA within seven (7) days.

## SALES AND SOLICITATIONS

Only NJSIAA promotional items will be sold at NJSIAA tournaments. No solicitations, sale of publications or products, or similar activities are permitted without prior authorization from NJSIAA.

The New Jersey State Interscholastic Athletic Association is the sponsoring association for all levels of State Tournaments/Championships. The NJSIAA reserves all rights in regard to the management of these Tournaments/Championships and the sale or distribution of clothing, souvenirs or any other items is strictly prohibited without permission of the NJSIAA.

## STEROID TESTING PROCEDURES

In accordance with Executive Order 72, issued by the Governor of the State of New Jersey, Richard J. Codey, on December 20, 2005, the NJSIAA will test a random selection of student athletes, who have qualified, as individuals or as members of a team, for state championship competition.

1. List of banned_substances – A list of banned substances shall be prepared annually by the Medical Advisory Committee, and approved by the Executive Committee.

2. Consent form – Before participating in interscholastic sports, the student-athlete and the student-athlete's parent or guardian shall consent, in writing, to random testing in accordance with this policy. Failure to sign the consent form renders the student-athlete ineligible.

3. Selection of athletes to be tested – Tested athletes will be selected randomly from all of those athletes participating in championship competition. Testing may occur at any state championship site or at the school whose athletes have qualified for championship competition

4. Administration of tests – Tests shall be administered by a certified laboratory, selected by the Executive Director and approved by the Executive Committee.

5. Testing methodology – The methodology for taking and handling samples shall be in accordance with current legal standards.

6. Sufficiency of results – No test shall be considered a positive result unless the approved laboratory reports a positive result, and the NJSIAA's medical review officer confirms that there was no medical reason for the positive result. A "B" sample shall be available in the event of an appeal.

7. Appeal process – If the certified laboratory reports that a student-athlete's sample has tested positive, and the medical review officer confirms that there is no medical reason for a positive result, a penalty shall be imposed unless the student-athlete proves, by a preponderance of the evidence, that he or she bears no fault or negligence for the violation. Appeals shall be heard by a NJSIAA committee consisting of two members of the Executive Committee, the Executive Director/designee, a trainer and a physician. Appeal of a decision of the Committee shall be to the Commissioner of Education, for public school athletes, and to the superior court, for non-public athletes. Hearings shall be held in accordance with NJSIAA By-Laws, Article XIII, and "Hearing Procedure."

38

8. Penalties – Any person who tests positively in an NJSIAA administered test, or any person who refuses to provide a testing sample, or any person who reports his or her own violation, shall immediately forfeit his or her eligibility to participate in NJSIAA competition for a period of one year from the date of the test. Any such person shall also forfeit any individual honor earned while in violation. No person who tests positive, refuses to provide a test sample, or who reports his or her own violation shall resume eligibility until he or she has undergone counseling and produced a negative test result.

9. Confidentiality – Results of all tests shall be considered confidential and shall only be disclosed to the individual, his or her parents and his or her school.

10. Compilation of results – The Executive Committee shall annually compile and report the results of the testing program.

11. Yearly renewal of the steroid policy – The Executive Committee shall annually determine whether this policy shall be renewed or discontinued.

# NEW JERSEY STATE INTERSCHOLASTIC ATHLETIC ASSOCIATION
## STUDENT-ATHLETE RESIDENCY AFFIDAVIT

_____    _____    _____
Print Student's Full Name                           School                                          Date

I,_____, of full age, being duly sworn to law, upon
my oath depose and say:

1. I am the parent/legal guardian of the above listed student. (circle)
2. I currently reside at: _____

   I have resided at the above address since: _____

3. The above-named student moved with me at my new address on: _____

4. Prior to moving to the new residence address listed above, I resided at the following address:

   _____

5. Prior to moving to the new address listed in #2 above, the student resided at the following address:

   _____

   with named parent/legal guardian _____
6. I hereby authorize the New Jersey State Interscholastic Athletic Association ("NJSIAA") to investigate and confirm any and all Statements made by me in this affidavit. I agree to provide any additional information that may be requested by the NJSIAA.
7. I will notify the present school immediately, in writing, if any of the conditions recited herein are changed.
8. This residence may not be associated with, leased, or provided by anyone associated with the school or acting at the direction of the school, including but not limited to administration, staff, coaches, students, parents, booster clubs, or any organization having a connection with the school.

I hereby certify that the forgoing statements are true, and I am aware that if any of the foregoing statements are willfully false, I am subject to punishment.

_____    _____
Parent/Guardian Signature                                    Print Parent/Guardian Full Name

STATE OF NEW JERSEY, COUNTY OF_____. The above-named affiant appeared before me,
a notary public of the State of New Jersey, on the___day of_____, 20____and I made known to
him/her the contents of the above affidavit which was then sworn and subscribed to by said affiant before me on
this date.

Notary Public: ___

_Copies of this Affidavit must be sent to the New Jersey State Interscholastic Athletic Association upon request_

EC Approved 4/1/20

40

AR_293181

## SUSPENDED FOOTBALL GAMES

Games interrupted/suspended due to reasons beyond anyone's control, e.g., electrical storms, torrential rains and the like. All games to be continued will be at the site of the interrupted game unless otherwise agreed upon by competing schools.

1. If both schools agree, the game will be a completed game or the game will be continued from the point of interruption but no later than Tuesday of the following week.

2. If both schools belong to the same Conference (divisional or inter-divisional game), the Conference must have adopted guidelines in the event the schools do not agree to resolve the issue by mutual agreement; however, if the game is to be continued from the point of interruption, it must be played no later than Tuesday of the following week.

3. If the game is a non-conference game, and the schools do not agree to resolve the issue, the NJSIAA will resolve the issue as follows:

   a. If the point difference is twenty-two (22) points or more, the game shall be a completed game regardless of the point of interruption.
   b. If the interrupted game has completed three (3) quarters, the game will be a completed game.
   c. If the game is interrupted after the completion of the first half and the point difference is fifteen (15) or more points, the game shall be a completed game.
   d. All other games, except as provided in #5, will be continued from the point of interruption no later than Tuesday of the following week. If the schools cannot agree on the date, the game will be continued on the Monday following the game at 3:00 p.m.
   e. Whenever it is not considered prudent to complete an interrupted game, the Executive Director will have the authority to rule on the status of the game.

## BEFORE A GAME IS TERMINATED

The host school management has full responsibility for determining whether or not conditions are such as to postpone or start a game/meet. Schools must know that once a game/meet/event has started, the official(s) have jurisdiction for terminating same prematurely.

Termination, once the game has started, is not the prerogative of a coach or school management, and the action of removing a team from the event prior to the conclusion of the game/meet/event, regardless of the circumstances, will result in severe punitive actions by the NJSIAA controversies or executive committee.

The following procedure should be implemented before termination of the event by the official(s):

1. Coaches and/or players should be penalized for misconduct as provided for in the playing rules;

2. Continued misconduct should result in the coach(es) of the teams being advised to correct the situation or be faced with possible termination of the game;

3. Officials should confer and, if they consider the circumstances warrant, teams should be directed to their respective bench areas while the coaches, Athletic Directors, and administrators of the schools discuss, in the center of the field or in a private area, an attempt to restore control of their teams and/or spectators;

41

4. When it is apparent to the <u>game official(s) and the host school administration</u> that to continue the event would present a clear and present danger to the safety and welfare of any party, the game should be terminated and the schools' head coaches advised accordingly. This should not be a unilateral decision; however, if the responsible parties are unable or unwilling to control their teams and/or spectators, the official(s) must inform the head coach (es) of the teams that the game is terminated;

5. Officials must not rule on forfeiture of any prematurely terminated events; only conferences and/or the NJSIAA have the jurisdiction to determine forfeits. All games terminated due to control problems, will require a comprehensive report to the NJSIAA Central Office and the Chapter Secretaries by the officials and the Principals of the involved schools. Said report from the officials should be forwarded immediately to the NJSIAA with a copy to the principals of the involved schools. The report(s) will be forwarded to the League/Conference for a hearing by them prior to any action by the NJSIAA.

## TRANSGENDER POLICY

1. A transgender student, defined as a student whose gender identity differs from the student's sex assigned at birth, shall be eligible to participate in accordance with either their birth sex or in accordance with their gender identity, but not both. Exceptions to this policy shall be subject to appeal to the Eligibility Appeals Committee.

2. In the event of a positive test result under the NJSIAA's "General Prohibition Against Performance Enhancing Drugs", a transgender student's use of a banned substance for the purposes of hormone therapy may be considered by the NJSIAA medical review officer as a medical reason for the positive result.

3. Any member school may appeal the eligibility of a transgender student on the grounds that the student's participation in interscholastic athletics would adversely affect competition or safety. Any appeal under this paragraph will be heard by the Eligibility Appeals Committee and shall be confidential. The Eligibility Appeals Committee will not consider whether the school has properly determined the student's sex-assignment.

4. If a transgender student has not yet declared their transgender status, this policy shall not apply. If a transgender student, at some point during their high school career, no longer identifies as a transgender student, this policy shall not apply.

## UNIFIED SPORTS®

Unified Sports® is a joint effort between the NJSIAA and Special Olympics New Jersey (SONJ) to incorporate Unified Sports® programs in NJSIAA member schools recognizing and offering opportunities for students with and without disabilities to compete in NJSIAA sanctioned activity. On June 19, 2014, Governor Christie signed legislation regarding the inclusion of students with disabilities in athletic activities. This law requires school districts ensure students with disabilities have equal access and opportunities to participate in athletics.

Unified Sports® was created by Special Olympics International to give individuals with intellectual disabilities the opportunity to train and compete in sports activities alongside their peers. The vision of the joint NJSIAA/SONJ effort is to allow high school students with and without intellectual disabilities the opportunity to represent their high school by participating on Unified Sports® teams, providing the students with a quality experience of sports training and competition. No person shall, on the basis of gender, race, religion, color or national origin, be excluded from participation in, be denied the benefits of, or otherwise be subjected to discrimination under any program or activity of Special Olympics.

42

Section 1. ATHLETE ELIGIBILITY FOR UNIFIED SPORTS®

1. General Statement – A person with an intellectual (ID) or closely related developmental (DD) disability that has satisfied one of the following requirements:
    a. An appropriate agency or professional has identified him/her as having an intellectual disability, with functional limitations in both general learning and adaptive skills;
    b. (S)he is identified as having a cognitive delay after completing an acceptable standardized test or other instrument generally accepted within the professional community as providing a reliable measurement. ie, IQ test.
    c. An appropriate agency or professional has identified him/her as having a closely related developmental disability (DD), which means having functional limitations in both general learning and in adaptive skills (such as recreational, work, independent living, self-direction, or self-care). This includes students on the Autism Spectrum.
    d. Individuals whose functional limitations are based solely on a physical, behavioral, or emotional disability, or a specific learning or sensory disability, are not eligible to participate as Special Olympic athletes, but may be eligible to participate as a Unified partner, coach, manager or volunteer.

Section 2. UNIFIED PARTNER ELIGIBILITY

1. Definition - Unified Sports® is a program that combines approximately equal numbers of Special Olympics athletes and athletes without ID (Unified partners) on sports teams for training and competition.
2. Any student participating in a sport at the **varsity level** at any time during the season is NOT eligible to compete as a Unified partner in the **same sport**. Appropriate participation for such a student-athlete may take place as a manager.
3. Refer to NJSIAA By-Law Article V, Section 1.

Section 3. AGE

1. Unified Student Athlete – A student with ID may participate in Unified Sports® as long as he or she is enrolled in the school.
2. Unified Partner - Refer to NJSIAA By-Law Article V, Section 4, C (Age)

Section 4. CREDITS

1. Unified Student Athlete - Refer to NJSIAA By-Law Article V, Section 4, F (Handicapped/Classified Students)
2. Unified Partner - Refer to NJSIAA By-Law Article V, Section 4, E (Credits)

43

Section 5. SEMESTERS

1. Unified Student Athlete – Students defined by the NJ DOE under IDEA shall be permitted to participate as long as they are properly enrolled in school and maintain other eligibility requirements as per his/her IEP.
2. Unified Partner - Refer to NJSIAA By-Law Article V, Section 4, E, J

Section 6. MEDICAL PHYSICAL REQUIREMENTS

1. Refer to N.J.A.C 6A:16-2.2 – All participants will follow the State administrative code for required health services as well as other school requirements for athletic participation.

Section 7. ALIGNMENT OF SPORTS

1. Unified Sports® shall be aligned in its own division.
2. Unified Sports® shall be contested as co-ed in both team and individual sports.

Section 8. COOPERATIVE SPORTS PROGRAMS

1. Refer to NJSIAA By-Laws Article III, Section 10

Section 9. SPORTS SEASON

1. Refer to NJSIAA Rules and Regulations Section 5 – 8
2. Practices prior to competition – Although highly recommended, the 6 practice and one day of rest rule is waived for Unified Sports.

Section 10. OUT-OF-SEASON GUIDELINES

1. During the out-of-season period (refer to NJSIAA Rules and Regulations Section 2), coaches ARE permitted to work with Unified athletes and Unified partners ONLY when it is being run as a Unified Sports® event and/or a SONJ event.

Section 11. CONTEST RULES

1. Contests played between member schools will be played according to the rules of the NFHS or National Governing Body of that sport. Rules and regulations for Unified Sports® will be jointly published by NJSIAA and SONJ prior to each season, as approved by the NJSIAA Executive Board.

Section 12. COACH REQUIREMENTS

1. Unified Sports® coaches are required to meet all NJSIAA coaching certifications and regulations as outlined in the NJSIAA Guidelines, Policies and Procedures. Additionally, Unified Sports coaches must obtain a Unified Sports coaching certification by completing the online NFHS Coaching Unified Sports course.

## UNIFORMS – RELIGIOUS EXEMPTION

Participant Uniforms:  Schools may modify uniforms for their athletes for religious reasons. The religious group must file a letter with the school. A copy of the letter must accompany the participant at each event to be available for the official to review and approve.

## INTERIM VAPOR/E-CIGARETTES POLICY (under review)

It has come to the attention of NJSIAA that vapor/e-cigarettes maybe/are being used by student athletes and/or coaches prior to, during, or after interscholastic events. The NFHS rule book(s) state "the use of tobacco products" results in a flagrant disqualification, but there is no mention of vapor/e-cigarettes. When contacted, the NFHS replied that vapor/e-cigarettes are to be treated as a traditional cigarette, which is identified as a tobacco/and or nicotine product, and therefore means any use of the vapor/e-cigarettes shall be enforced as a flagrant disqualification. The NJSIAA position on this matter is that we will adhere to the ruling stated above. We will refer this matter to the NJSIAA Medical Advisory Committee for further study and after receiving the Medical Advisory Committees' recommendation(s), we will develop a permanent policy and will distribute such to the member schools of NJSIAA.

AR_293186

# Examples of Policies and Emerging Practices for Supporting Transgender Students



U.S. Department of Education

Office of Elementary and Secondary Education

Office of Safe and Healthy Students

May 2016

AR_293260

U.S. Department of Education
Office of Elementary and Secondary Education
Office of Safe and Healthy Students

Ann Whalen
*Senior Advisor to the Secretary, Delegated the Duties of the Assistant Secretary, Office of Elementary and Secondary Education*

David Esquith
*Director, Office of Safe and Healthy Students*

May 2016
This resource is in the public domain. Authorization to reproduce it in whole or in part is granted. The guide's citation should be:
U.S. Department of Education, Office of Elementary and Secondary Education, Office of Safe and Healthy Students, *Examples of Policies and Emerging Practices for Supporting Transgender Students* (May 2016).

This guide is also available on the Office of Safe and Healthy Students website at www.ed.gov/oese/oshs/emergingpractices.pdf. Any updates to this guide will be available at this website.

If you need technical assistance, please contact the Office of Safe and Healthy Students at:
OESE.Info.SupportingTransgenderStudents@ed.gov

**Availability of Alternate Formats**
Requests for documents in alternate formats such as Braille or large print should be submitted to the Alternate Format Center by calling 202-260-0852 or by contacting the 504 coordinator via e-mail at om_eeos@ed.gov.

**Notice to Limited English Proficient Persons**
If you have difficulty understanding English you may request language assistance services for Department information that is available to the public. These language assistance services are available free of charge. If you need more information about interpretation or translation services, please call 1-800-USA-LEARN (1-800-872-5327) (TTY: 1-800-437-0833), or e-mail us at ED.Language.Assistance@ed.gov. Or write to U.S. Department of Education, Information Resource Center, LBJ Education Building, 400 Maryland Ave. SW, Washington, DC 20202.

**Examples of Policies and Emerging Practices for Supporting Transgender Students**

The U.S. Department of Education ("ED") is committed to providing schools with the information they need to provide a safe, supportive, and nondiscriminatory learning environment for all students.  It has come to ED's attention that many transgender students (*i.e.*, students whose gender identity is different from the sex they were assigned at birth) report feeling unsafe and experiencing verbal and physical harassment or assault in school, and that these students may perform worse academically when they are harassed.  School administrators, educators, students, and parents are asking questions about how to support transgender students and have requested clarity from ED.  In response, ED developed two documents:

- ED's Office for Civil Rights and the U.S. Department of Justice's Civil Rights Division jointly issued a Dear Colleague Letter ("DCL") about transgender students' rights and schools' legal obligations under Title IX of the Education Amendments of 1972.[1]  Any school that has questions related to transgender students or wants to be prepared to address such issues if they arise should review the DCL.

- ED's Office of Elementary and Secondary Education compiled the attached examples of policies[2] and emerging practices[3] that some schools are already using to support transgender students.  We share some common questions on topics such as school records, privacy, and terminology, and then explain how some state and school district policies have answered these questions.  We present this information to illustrate how states and school districts are supporting transgender students.  We also provide information about and links to those policies at the end of the document, along with other resources that may be helpful as educators develop policies and practices for their own schools.

---

[1] 20 U.S.C. §§ 1681-1688; Dear Colleague Letter: Transgender Students (May 13, 2016), www.ed.gov/ocr/letters/colleague-201605-title-ix-transgender.pdf.

[2] In this document, the term *policy* or *policies* refers generally to policies, guidance, guidelines, procedures, regulations, and resource guides issued by schools, school districts, and state educational agencies.

[3] ED considers *emerging practices* to be operational activities or initiatives that contribute to successful outcomes or enhance agency performance capabilities.  Emerging practices are those that have been successfully implemented and demonstrate the potential for replication by other agencies.  Emerging practices typically have not been rigorously evaluated, but still offer ideas that work in specific situations.

i

Each person is unique, so the needs of individual transgender students vary. But a school policy setting forth general principles for supporting transgender students can help set clear expectations for students and staff and avoid unnecessary confusion, invasions of privacy, and other harms. The education community continues to develop and revise policies and practices to address the rights of transgender students and reflect our evolving understanding and the individualized nature of transgender students' needs.

This document contains information from some schools, school districts, and state and federal agencies. Inclusion of this information does not constitute an endorsement by ED of any policy or practice, educational product, service, curriculum or pedagogy. In addition, this document references websites that provide information created and maintained by other entities. These references are for the reader's convenience. ED does not control or guarantee the accuracy, relevance, timeliness, or completeness of this outside information. This document does not constitute legal advice, create legal obligations, or impose new requirements.

AR_293263

**Table of Contents**

**Student Transitions** ............................................................................................ 1

1.  How do schools find out that a student will transition? ................................. 1

2.  How do schools confirm a student's gender identity? .................................... 1

3.  How do schools communicate with the parents of younger students compared to older transgender students? ........................................................................ 2

**Privacy, Confidentiality, and Student Records** ............................................... 4

4.  How do schools protect a transgender student's privacy regarding the student's transgender status? ....................................................................................... 4

5.  How do schools ensure that a transgender student is called by the appropriate name and pronouns? ..................................................................................... 5

6.  How do schools handle requests to change the name or sex designation on a student's records? ...................................................................................................... 6

**Sex-Segregated Activities and Facilities** ......................................................... 7

7.  How do schools ensure transgender students have access to facilities consistent with their gender identity? .................................................................................. 7

8.  How do schools protect the privacy rights of all students in restrooms or locker rooms? ........................................................................................................ 7

9.  How do schools ensure transgender students have the opportunity to participate in physical education and athletics consistent with their gender identity? ...................... 8

10.  How do schools treat transgender students when they participate in field trips and athletic trips that require overnight accommodations? ................................. 9

**Additional Practices to Support Transgender Students** ............................... 10

11.  What can schools do to make transgender students comfortable in the classroom? .. 10

12.  How do school dress codes apply to transgender students? ....................... 10

13.  How do schools address bullying and harassment of transgender students? ............. 11

14.  How do school psychologists, school counselors, school nurses, and school social workers support transgender students? ........................................................ 11

15.  How do schools foster respect for transgender students among members of the broader school community? ......................................................................... 12

16.  What topics do schools address when training staff on issues related to transgender students? ..................................................................................................... 12

17.  How do schools respond to complaints about the way transgender students are treated? ...................................................................................................... 13

**Terminology** ................................................................................................ **14**

    18.   What terms are defined in current school policies on transgender students?............. 14

    19.   How do schools account for individual preferences and the diverse ways that students describe and express their gender?................................................................. 15

**Cited Policies on Transgender Students** .............................................................. **16**

**Select Federal Resources on Transgender Students** .............................................. **18**

AR_293265

**Student Transitions**

1. **How do schools find out that a student will transition?**

Typically, the student or the student's parent or guardian will tell the school and ask that the school start treating the student in a manner consistent with the student's gender identity. Some students transition over a school break, such as summer break.  Other students may undergo a gender transition during the school year, and may ask (or their parents may ask on their behalf) teachers and other school employees to respect their identity as they begin expressing their gender identity, which may include changes to their dress and appearance. Some school district or state policies address how a student or parent might provide the relevant notice to the school.

- Alaska's Matanuska-Susitna Borough School District issued guidelines ("Mat-Su Borough Guidelines") advising  that transgender students or their parents or guardians should contact the building administrator or the student's guidance counselor to schedule a meeting to develop a plan to address the student's particular circumstances and needs.

- The guidelines issued by Washington's Superintendent of Public Instruction ("Washington State Guidelines") offer an example of a student who first attended school as a boy and, about midway through a school year, she and her family decided that she would transition and begin presenting as a girl.  She prefers to dress in stereotypically feminine attire such as dresses and skirts.  Although she is growing her hair out and consistently presents as female at school, her hair is still in a rather short, typically boyish haircut.  The student, her parents, and school administrators asked her friends and teachers to use female pronouns to address her.

2. **How do schools confirm a student's gender identity?**

Schools generally rely on students' (or in the case of younger students, their parents' or guardians') expression of their gender identity.  Although schools sometimes request some form of confirmation, they generally accept the student's asserted gender identity.  Some schools offer additional guidance on this issue.

- Los Angeles Unified School District issued a policy ("LAUSD Policy") noting that "[t]here is no medical or mental health diagnosis or treatment threshold that

1

students must meet in order to have their gender identity recognized and respected" and that evidence may include an expressed desire to be consistently recognized by their gender identity.

- The New York State Education Department issued guidance ("NYSED Guidance") recommending that "schools accept a student's assertion of his/her/their own gender identity" and provides examples of ways to confirm the assertion, such as a statement from the student or a letter from an adult familiar with the student's situation. The same guidance also offers the following example: "In one middle school, a student explained to her guidance counselor that she was a transgender girl who had heretofore only been able to express her female gender identity while at home. The stress associated with having to hide her female gender identity by presenting as male at school was having a negative impact on her mental health, as well as on her academic performance. The student and her parents asked if it would be okay if she expressed her female gender identity at school. The guidance counselor responded favorably to the request. The fact that the student presented no documentation to support her gender identity was not a concern since the school had no reason to believe the request was based on anything other than a sincerely held belief that she had a female gender identity."

- Alaska's Anchorage School District developed administrative guidelines ("Anchorage Administrative Guidelines") noting that being transgender "involves more than a casual declaration of gender identity or expression but does not require proof of a formal evaluation and diagnosis. Since individual circumstances, needs, programs, facilities and resources may differ; administrators and school staff are expected to consider the needs of the individual on a case-by-case basis."

### 3. How do schools communicate with the parents of younger students compared to older transgender students?

Parents are often the first to initiate a conversation with the school when their child is transgender, particularly when younger children are involved. Parents may play less of a role in an older student's transition. Some school policies recommend, with regard to an older student, that school staff consult with the student before reaching out to the student's parents.

- The District of Columbia Public Schools issued guidance ("DCPS Guidance") noting that "students may choose to have their parents participate in the transition process, but parental participation is not required." The guidance further

2

recommends different developmentally appropriate protocols depending on grade level.  The DCPS Guidance suggests that the school work with a young student's family to identify appropriate steps to support the student, but recommends working closely with older students prior to notification of family.  The guidance also provides a model planning document with key issues to discuss with the student or the student's family.

- Similarly, the Massachusetts Department of Elementary and Secondary Education issued guidance ("Massachusetts Guidance") that notes:  "Some transgender and gender nonconforming students are not openly so at home for reasons such as safety concerns or lack of acceptance.  School personnel should speak with the student first before discussing a student's gender nonconformity or transgender status with the student's parent or guardian.  For the same reasons, school personnel should discuss with the student how the school should refer to the student, *e.g.,* appropriate pronoun use, in written communication to the student's parent or guardian."

- Chicago Public Schools' guidelines ("Chicago Guidelines") provide:  "When speaking with other staff members, parents, guardians, or third parties, school staff should not disclose a student's preferred name, pronoun, or other confidential information pertaining to the student's transgender or gender nonconforming status without the student's permission, unless authorized to do so by the Law Department."

- Oregon's Department of Education issued guidance stating, "In a case where a student is not yet able to self-advocate, the request to respect and affirm a student's identity will likely come from the student's parent. However, in other cases, transgender students may not want their parents to know about their transgender identity. These situations should be addressed on a case-by-case basis and school districts should balance the goal of supporting the student with the requirement that parents be kept informed about their children. The paramount consideration in such situations should be the health and safety of the student, while also making sure that the student's gender identity is affirmed in a manner that maintains privacy and confidentiality."

AR_293268

**Privacy, Confidentiality, and Student Records**

4.  **How do schools protect a transgender student's privacy regarding the student's transgender status?**

There are a number of ways schools protect transgender students' interests in keeping their transgender status private, including taking steps to prepare staff to consistently use the appropriate name and pronouns.  Using transgender students' birth names or pronouns that do not match their gender identity risks disclosing a student's transgender status.  Some state and school district policies also address how federal and state privacy laws apply to transgender students and how to keep information about a student's transgender status confidential.

- California's El Rancho Unified School District issued a regulation ("El Rancho Regulation") that provides that students have the right to openly discuss and express their gender identity, but also reminds school personnel to be "mindful of the confidentiality and privacy rights of [transgender] students when contacting parents/legal guardians so as not to reveal, imply, or refer to a student's actual or perceived sexual orientation, gender identity, or gender expression."

- The Chicago Guidelines provide that the school should convene an administrative support team to work with transgender students and/or their parents or guardians to address each student's individual needs and supports.  To protect the student's privacy, this team is limited to "the school principal, the student, individuals the student identifies as trusted adults, and individuals the principal determines may have a legitimate interest in the safety and healthy development of the student."

- The Mat-Su Borough Guidelines state:  "In some cases, a student may want school staff and students to know, and in other cases the student may not want this information to be widely known.  School staff should take care to follow the student's plan and not to inadvertently disclose information that is intended to be kept private or that is protected from disclosure (such as confidential medical information)."

- The Massachusetts Guidance advises schools "to collect or maintain information about students' gender only when necessary" and offers an example:  "One school reviewed the documentation requests it sent out to families and noticed that field trip permission forms included a line to fill in indicating the student's gender.  Upon consideration, the school determined that the requested information was irrelevant to the field trip activities and deleted the line with the gender marker request."

4

**5. How do schools ensure that a transgender student is called by the appropriate name and pronouns?**

One of the first issues that school officials may address when a student notifies them of a gender transition is determining which name and pronouns the student prefers. Some schools have adopted policies to prepare all school staff and students to use a student's newly adopted name, if any, and pronouns that are consistent with a student's gender identity.

- A regulation issued by Nevada's Washoe County School District ("Washoe County Regulation") provides that: "Students have the right to be addressed by the names and pronouns that correspond to their gender identity. Using the student's preferred name and pronoun promotes the safety and wellbeing of the student. When possible, the requested name shall be included in the District's electronic database in addition to the student's legal name, in order to inform faculty and staff of the name and pronoun to use when addressing the student."

- A procedure issued by Kansas City Public Schools in Missouri ("Kansas City Procedure") notes that: "The intentional or persistent refusal to respect the gender identity of an employee or student after notification of the preferred pronoun/name used by the employee or student is a violation of this procedure."

- The NYSED Guidance provides: "As with most other issues involved with creating a safe and supportive environment for transgender students, the best course is to engage the student, and possibly the parent, with respect to name and pronoun use, and agree on a plan to reflect the individual needs of each student to initiate that name and pronoun use within the school. The plan also could include when and how this is communicated to students and their parents."

- The DCPS Guidance includes a school planning guide for principals to review with transgender students as they plan how to ensure the school environment is safe and supportive. The school planning guide allows the student to identify the student's gender identity and preferred name, key contacts at home and at school, as well as develop plans for access to restrooms, locker rooms, and other school activities.

AR_293270

6. **How do schools handle requests to change the name or sex designation on a student's records?**

Some transgender students may legally change their names.  However, transgender students often are unable to obtain identification documents that reflect their gender identity (*e.g.*, due to financial limitations or legal restrictions imposed by state or local law).  Some school district policies specify that they will use the name a student identifies as consistent with the student's gender identity regardless of whether the student has completed a legal name change.

- The NYSED Guidance provides that school records, including attendance records, transcripts, and Individualized Education Programs, be updated with the student's chosen name and offers an example:  "One school administrator dealt with information in the student's file by starting a new file with the student's chosen name, entered previous academic records under the student's chosen name, and created a separate, confidential folder that contained the student's past information and birth name."

- The DCPS Guidance notes:  "A court-ordered name or gender change is not required, and the student does not need to change their official records.  If a student wishes to go by another name, the school's registrar can enter that name into the 'Preferred First' name field of [the school's] database."

- The Kansas City Procedure recognizes that there are certain situations where school staff or administrators may need to report a transgender student's legal name or gender.  The procedure notes that in these situations, "school staff and administrators shall adopt practices to avoid the inadvertent disclosure of such confidential information."

- The Chicago Guidelines state: "Students are not required to obtain a court order and/or gender change or to change their official records as a prerequisite to being addressed by the name and pronoun that corresponds to their gender identity."

- The Massachusetts Guidance also addresses requests to amend records after graduation:  "Transgender students who transition after having completed high school may ask their previous schools to amend school records or a diploma or transcript that include the student's birth name and gender.  When requested, and when satisfied with the gender identity information provided, schools should amend the student's record."

6

**Sex-Segregated Activities and Facilities**

**7. How do schools ensure transgender students have access to facilities consistent with their gender identity?**

Schools often segregate restrooms and locker rooms by sex, but some schools have policies that students must be permitted to access facilities consistent with their gender identity and not be required to use facilities inconsistent with their gender identity or alternative facilities.

- The Washington State Guidelines provide: "School districts should allow students to use the restroom that is consistent with their gender identity consistently asserted at school." In addition, no student "should be required to use an alternative restroom because they are transgender or gender nonconforming."

- The Washoe County Regulation provides: "Students shall have access to use facilities that correspond to their gender identity as expressed by the student and asserted at school, irrespective of the gender listed on the student's records, including but not limited to locker rooms."

- The Anchorage Administrative Guidelines emphasize the following provision: "However, staff should not require a transgender or gender nonconforming student/employee to use a separate, nonintegrated space unless requested by the individual student/employee."

**8. How do schools protect the privacy rights of all students in restrooms or locker rooms?**

Many students seek additional privacy in school restrooms and locker rooms. Some schools have provided students increased privacy by making adjustments to sex-segregated facilities or providing all students with access to alternative facilities.

- The Washington State Guidelines provide that any student who wants increased privacy should be provided access to an alternative restroom or changing area. The guidelines explain: "This allows students who may feel uncomfortable sharing the facility with the transgender student(s) the option to make use of a separate restroom and have their concerns addressed without stigmatizing any individual student."

AR_293272

- The NYSED Guidance gives an example of accommodating all students' interest in privacy: "In one high school, a transgender female student was given access to the female changing facility, but the student was uncomfortable using the female changing facility with other female students because there were no private changing areas within the facility. The principal examined the changing facility and determined that curtains could easily be put up along one side of a row of benches near the group lockers, providing private changing areas for any students who wished to use them. After the school put up the curtains, the student was comfortable using the changing facility."

- Atherton High School, in Jefferson County, Kentucky, issued a policy that offers examples of accommodations to address any student's request for increased privacy: "use of a private area within the public area of the locker room facility (e.g. nearby restroom stall with a door or an area separated by a curtain); use of a nearby private area (e.g. nearby restroom); or a separate changing schedule."

- The DCPS Guidance recommends talking to students to come up with an acceptable solution: "Ultimately, if a student expresses discomfort to any member of the school staff, that staff member should review these options with the student and ask the student permission to engage the school LGBTQ liaison or another designated ally in the building."

## 9. How do schools ensure transgender students have the opportunity to participate in physical education and athletics consistent with their gender identity?

Some school policies explain the procedures for establishing transgender students' eligibility to participate in athletics consistent with their gender identity. Many of those policies refer to procedures established by state athletics leagues or associations.

- The NYSED Guidance explains that "physical education is a required part of the curriculum and an important part of many students' lives. Most physical education classes in New York's schools are coed, so the gender identity of students should not be an issue with respect to these classes. Where there are sex-segregated classes, students should be allowed to participate in a manner consistent with their gender identity."

- The LAUSD Policy provides that "participation in competitive athletics, intramural sports, athletic teams, competitions, and contact sports shall be facilitated in a

AR_293273

manner consistent with the student's gender identity asserted at school and in accordance with the California Interscholastic Federation bylaws." The California Interscholastic Federation establishes a panel of professionals, including at least one person with training or expertise in gender identity health care or advocacy, to make eligibility decisions.

- The Rhode Island Interscholastic League's policy states that all students should have the opportunity to participate in athletics consistent with their gender identity, regardless of the gender listed on school records. The policy provides that the league will base its eligibility determination on the student's current transcript and school registration information, documentation of the student's consistent gender identification (*e.g.*, affirmed written statements from student, parent/guardian, or health care provider), and any other pertinent information.

**10. How do schools treat transgender students when they participate in field trips and athletic trips that require overnight accommodations?**

Schools often separate students by sex when providing overnight accommodations. Some school policies provide that students must be treated consistent with their gender identity in making such assignments.

- Colorado's Boulder Valley School District issued guidelines ("Boulder Valley Guidelines") providing that when a school plans overnight accommodations for a transgender student, it should consider "the goals of maximizing the student's social integration and equal opportunity to participate in overnight activity and athletic trips, ensuring the [transgender] student's safety and comfort, and minimizing stigmatization of the student."

- The Chicago Guidelines remind school staff: "In no case should a transgender student be denied the right to participate in an overnight field trip because of the student's transgender status."

9

**Additional Practices to Support Transgender Students**

**11. What can schools do to make transgender students comfortable in the classroom?**

Classroom practices that do not distinguish or differentiate students based on their gender are the most inclusive for all students, including transgender students.

- The DCPS Guidance suggests that "[w]herever arbitrary gender dividers can be avoided, they should be eliminated."

- The Massachusetts Guidance states that "[a]s a general matter, schools should evaluate all gender-based policies, rules, and practices and maintain only those that have a clear and sound pedagogical purpose."

- Minneapolis Public Schools issued a policy providing that students generally should not be grouped on the basis of sex for the purpose of instruction or study, but rather on bases such as student proficiency in the area of study, student interests, or educational needs for acceleration or enrichment.

- The Maryland State Department of Education issued guidelines that include an example of eliminating gender-based sorting of students: "Old Practice: boys line up over here." New Practice: birthdays between January and June; everybody who is wearing something green, etc."

**12. How do school dress codes apply to transgender students?**

Dress codes that apply the same requirements regardless of gender are the most inclusive for all students and avoid unnecessarily reinforcing sex stereotypes. To the extent a school has a dress code that applies different standards to male and female students, some schools have policies that allow transgender students to dress consistent with their gender identity.

- Wisconsin's Shorewood School District issued guidelines ("Shorewood Guidelines") that allow students to dress in accordance with their gender identity and remind school personnel that they must not enforce a dress code more strictly against transgender and gender nonconforming students than other students.

- The Washington State Guidelines encourage school districts to adopt gender-neutral dress codes that do not restrict a student's clothing choices on the basis of gender: "Dress codes should be based on educationally relevant considerations, apply

AR_293275

consistently to all students, include consistent discipline for violations, and make reasonable accommodations when the situation requires an exception."

**13. How do schools address bullying and harassment of transgender students?**

Unfortunately, bullying and harassment continue to be a problem facing many students, and transgender students are no exception. Some schools make clear in their nondiscrimination statements that prohibited sex discrimination includes discrimination based on gender identity and expression. Their policies also address this issue.

- The NYSED Guidance stresses the importance of protecting students from bullying and harassment because "[the] high rates experienced by transgender students correspond to adverse health and educational consequences," including higher rates of absenteeism, lower academic achievement, and stunted educational aspirations.

- The Shorewood Guidelines specify that harassment based on a student's actual or perceived transgender status or gender nonconformity is prohibited and notes that these complaints are to be handled in the same manner as other discrimination, harassment, and bullying complaints.

- The DCPS Guidance provides examples of prohibited harassment that transgender students sometimes experience, including misusing an individual's preferred name or pronouns on purpose, asking personal questions about a person's body or gender transition, and disclosing private information.

**14. How do school psychologists, school counselors, school nurses, and school social workers support transgender students?**

School counselors can help transgender students who may experience mental health disorders such as depression, anxiety, and posttraumatic stress. Mental health staff may also consult with school administrators to create inclusive policies, programs, and practices that prevent bullying and harassment and ensure classrooms and schools are safe, healthy, and supportive places where all students, including transgender students, are respected and can express themselves. Schools will be in a better position to support transgender students if they communicate to all students that resources are available, and that they are competent to provide support and services to any student who has questions related to gender identity.

AR_293276

- The NYSED Guidance suggests that counselors can serve as a point of contact for transgender students who seek to take initial steps to assert their gender identity in school.

- The Chicago Guidelines convene a student administrative support team to determine the appropriate supports for transgender students. The team consists of the school principal, the student, adults that the student trusts, and individuals the principal determines may have a legitimate interest in the safety and healthy development of the student.

### 15. How do schools foster respect for transgender students among members of the broader school community?

Developing a clear policy explaining how to support transgender students can help communicate the importance the school places on creating a safe, healthy, and nondiscriminatory school climate for all students. Schools can do this by providing educational programs aimed at staff, students, families, and other community members.

- The Massachusetts Guidance informs superintendents and principals that they "need to review existing policies, handbooks, and other written materials to ensure they are updated to reflect the inclusion of gender identity in the student antidiscrimination law, and may wish to inform all members of the school community, including school personnel, students, and families of the recent change to state law and its implications for school policy and practice. This could take the form of a letter that states the school's commitment to being a supportive, inclusive environment for all students."

- The NYSED Guidance states that "school districts are encouraged to provide this guidance document and other resources, such as trainings and information sessions, to the school community including, but not limited to, parents, students, staff and residents."

### 16. What topics do schools address when training staff on issues related to transgender students?

Schools can reinforce commitments to providing safe, healthy, and nondiscriminatory school climates by training all school personnel about appropriate and respectful treatment of all students, including transgender students.

12

- The Massachusetts Guidance suggests including the following topics in faculty and staff training "key terms related to gender identity and expression; the development of gender identity; the experiences of transgender and other gender nonconforming students; risks and resilience data regarding transgender and gender nonconforming students; ways to support transgender students and to improve school climate for gender nonconforming students; [and] gender-neutral language and practices."

- The El Rancho Regulation states that the superintendent or designee "shall provide to employees, volunteers, and parents/guardians training and information regarding the district's nondiscrimination policy; what constitutes prohibited discrimination, harassment, intimidation, or bullying; how and to whom a report of an incident should be made; and how to guard against segregating or stereotyping students when providing instruction, guidance, supervision, or other services to them. Such training and information shall include guidelines for addressing issues related to transgender and gender-nonconforming students."

### 17. How do schools respond to complaints about the way transgender students are treated?

School policies often provide that complaints from transgender students be handled under the same policy used to resolve other complaints of discrimination or harassment.

- The Boulder Valley Guidelines provide that "complaints alleging discrimination or harassment based on a person's actual or perceived transgender status or gender nonconformity are to be handled in the same manner as other discrimination or harassment complaints."

- The Anchorage Administrative Guidelines provide that "students may also use the Student Grievance Process to address any civil rights issue, including transgender issues at school."

AR_293278

**Terminology**

**18. What terms are defined in current school policies on transgender students?**

Understanding the needs of transgender students includes understanding relevant terminology. Most school policies define commonly used terms to assist schools in understanding key concepts relevant to transgender students. The list below is not exhaustive, and only includes examples of some of the most common terms that school policies define.

- *Gender identity* refers to a person's deeply felt internal sense of being male or female, regardless of their sex assigned at birth. (Washington State Guidelines)

- *Sex assigned at birth* refers to the sex designation, usually "male" or "female," assigned to a person when they are born. (NYSED Guidance)

- *Gender expression* refers to the manner in which a person represents or expresses gender to others, often through behavior, clothing, hairstyles, activities, voice or mannerisms. (Washoe County Regulation)

- *Transgender* or *trans* describes a person whose gender identity does not correspond to their assigned sex at birth. (Massachusetts Guidance)

- *Gender transition* refers to the process in which a person goes from living and identifying as one gender to living and identifying as another. (Washoe County Regulation)

- *Cisgender* describes a person whose gender identity corresponds to their assigned sex at birth. (NYSED Guidance)

- *Gender nonconforming* describes people whose gender expression differs from stereotypic expectations. The terms *gender variant* or *gender atypical* are also used. Gender nonconforming individuals may identify as male, female, some combination of both, or neither. (NYSED Guidance)

- *Intersex* describes individuals born with chromosomes, hormones, genitalia and/or other sex characteristics that are not exclusively male or female as defined by the medical establishment in our society. (DCPS Guidance)

- *LGBTQ* is an acronym that stands for "lesbian, gay, bisexual, transgender, and queer/questioning." (LAUSD Policy)

14

- *Sexual orientation* refers to a person's emotional and sexual attraction to another person based on the gender of the other person. Common terms used to describe sexual orientation include, but are not limited to, heterosexual, lesbian, gay, and bisexual. Sexual orientation and gender identity are different. (LAUSD Policy)

**19. How do schools account for individual preferences and the diverse ways that students describe and express their gender?**

Some students may use different terms to identify themselves or describe their situations. For example, a transgender male student may identify simply as male, consistent with his gender identity. The same principles apply even if students use different terms. Some school policies directly address this question and provide additional guidance.

- The Washington State Guidelines recognize how "terminology can differ based on religion, language, race, ethnicity, age, culture and many other factors."

- Washington's Federal Way School District issued a resource guide that states: "Keep in mind that the meaning of gender conformity can vary from culture to culture, so these may not translate exactly to Western ideas of what it means to be transgender. Some of these identities include Hijra (South Asia), Fa'afafine (Samoa), Kathoey (Thailand), Travesti (South America), and Two-Spirit (Native American/First Nations)."

- The Washoe County Regulation, responding to cultural diversity within the state, offers examples of "ways in which transgender and gender nonconforming youth describe their lives and gendered experiences: trans, transsexual, transgender, male-to-female (MTF), female-to-male (FTM), bi-gender, two-spirit, trans man, and trans woman."

- The DCPS Guidance provides this advice to staff: "If you are unsure about a student's preferred name or pronouns, it is appropriate to privately and tactfully ask the student what they prefer to be called. Additionally, when speaking about a student it is rarely necessary to label them as being transgender, as they should be treated the same as the rest of their peers."

15

**Cited Policies on Transgender Students**

- Anchorage School District (AK): *Administrative Guidelines: Working with Transgender and Gender Nonconforming Students and Employees* (2015) (on file with ED)

- Atherton High School, Jefferson County School District (KY), *Policy on School Space* (2014), www.jefferson.k12.ky.us/schools/high/atherton/SBDMDocuments/Policy%20500%20Draft-%20Los%20Angeles%20Unified%20School%20District%20Revised%20Model.pdf

- Boulder Valley School District (CO), Guidelines Regarding the Support of Students and Staff Who Are Transgender and/or Gender Nonconforming (2016), http://www.bvsd.org/policies/Policies/AC-E3.pdf

- California Interscholastic Federation, *Guidelines for Gender Identity Participation* (2015), http://static.psbin.com/m/5/0ndq7wwfgh2em9/Guidelines_for_Gender_Identity_Participation.pdf

- Chicago Public Schools (IL), *Guidelines Regarding the Support of Transgender and Gender Nonconforming Students* (2016), cps.edu/SiteCollectionDocuments/TL_TransGenderNonconformingStudents_Guidelines.pdf

- District of Columbia Public Schools, *Transgender and Gender-Nonconforming Policy Guidance* (2015), dcps.dc.gov/publication/dcps-transgender-and-gender-non-conforming-policy-guidance

- El Rancho Unified School District, *Transgender and Gender-Nonconforming Students* (AR 5145.3) (2014), www.erusd.org/pdf/board_policies/5145_3.pdf

- Federal Way Public Schools (WA), *Working with Transgender and Gender-Nonconforming Students and Staff* (2014-2015), www.fwps.net/districtresources/wp-content/uploads/sites/32/2013/12/FWPS_Transgender3.pdf?7a385a

- Kansas City 33 School District (MO), *Prohibition Against Discrimination, Harassment and Retaliation (Transgender and Gender Nonconforming Employee and Students)* (2013), eboard.eboardsolutions.com/ePolicy/policy.aspx?PC=AC-AP(1)&Sch=228&S=228&RevNo=1.01&C=A&Z=R

- Los Angeles Unified School District (CA), *Transgender Students – Ensuring Equity and Nondiscrimination* (2014), notebook.lausd.net/pls/ptl/docs/PAGE/CA_LAUSD/FLDR_ORGANIZATIONS/FLDR_GENERAL_COUNSEL/BUL-6224.1%20TRANSGENDER%20POLICY,%2008-15-14%20-%20ADDED%20ED%20CODE%20221%205.PDF

16

- Maryland State Department of Education, *Providing Safe Spaces for Transgender and Gender Non-Conforming Youth: Guidelines for Gender Identity Non-Discrimination* (2015), marylandpublicschools.org/MSDE/divisions/studentschoolsvcs/student_services_alt/docs/ProvidingSafeSpacesTransgendergenderNonConformingYouth012016.pdf

- Massachusetts Department of Elementary and Secondary Education, *Guidance for Massachusetts Public Schools Creating a Safe and Supportive School Environment Nondiscrimination on the Basis of Gender Identity* (2014), www.doe.mass.edu/ssce/GenderIdentity.pdf

- Matanuska-Susitna Borough School District (AK), *Transgender Student Guidelines* (2015), www.matsuk12.us/site/handlers/filedownload.ashx?moduleinstanceid=10846&dataid=41646&FileName=Title IX--Transgender Students Guidelines.pdf

- Minneapolis Public Schools (MN), *Permissible Grouping Principles* (2014), policy.mpls.k12.mn.us/uploads/regulation_6135_a.pdf

- New York State Education Department, *Guidance to School Districts for Creating a Safe and Supportive School Environment for Transgender and Gender Nonconforming Students* (2015), www.p12.nysed.gov/dignityact/documents/Transg_GNCGuidanceFINAL.pdf

- Oregon Department of Education, *Guidance to School Districts: Creating a Safe and Supportive School Environment for Transgender Students* (2016), www.ode.state.or.us/groups/supportstaff/hklb/schoolnurses/transgenderstudentguidance.pdf.

- Rhode Island Interscholastic League, *Rules & Regulations* (Article I, Section 22 – Gender Identity), www.riil.org/files/8214/3861/6354/ARTICLE_1_ORGANIZATION_2015.pdf

- Shorewood School District (WI), *Nondiscrimination Guidelines Related to Students Who Are Transgender and Students Nonconforming to Gender Role Stereotypes* (2014), www.shorewood.k12.wi.us/uploaded/Board_Documents/Policies/411_Guidelines_and_Exhibit.pdf?1393865642372

- Washington Office of State Superintendent of Public Instruction, *Prohibiting Discrimination in Washington Public Schools* (2012), www.k12.wa.us/Equity/pubdocs/ProhibitingDiscriminationInPublicSchools.pdf

- Washoe County School District (NV), *Gender Identity and Gender Non-Conformity – Students* (2015), washoecountyschools.net/csi/pdf_files/5161%20Reg%20-%20Gender%20Identity%20v1.pdf

17

## <u>Select Federal Resources on Transgender Students</u>

- **U.S. Department of Education**

  - Office for Civil Rights and U.S. Department of Justice's Civil Rights Division, *Dear Colleague Letter: Transgender Students* (May 13, 2016), www.ed.gov/ocr/letters/colleague-201605-title-ix-transgender.pdf

  - Office for Civil Rights, *Resources for Transgender and Gender-Nonconforming Students*, www.ed.gov/ocr/lgbt.html

  - Office for Civil Rights, *Publications on Title IX*, www.ed.gov/about/offices/list/ocr/publications.html#TitleIX

  - Office for Civil Rights, *How to File a Discrimination Complaint*, www.ed.gov/about/offices/list/ocr/docs/howto.html

  - National Center on Safe Supportive Learning Environments, safesupportivelearning.ed.gov

- **U.S. Department of Health and Human Services**

  - Administration for Children and Families, *Resources for Serving Lesbian, Gay, Bisexual and Transgender Youth*, http://ncfy.acf.hhs.gov/features/serving-lesbian-gay-bisexual-transgender-and-questioning-youth-open-arms/resources-serving

  - Centers for Disease Control and Prevention, *LGBT Youth Resources*, www.cdc.gov/lgbthealth/youth-resources.htm

  - Homelessness Resource Center, *Homeless Populations: LGBTQI2-S Youth*, http://homeless.samhsa.gov/Channel/LGBTQ-153.aspx

  - Stopbullying.gov, *Bullying and LGBT Youth*, http://www.stopbullying.gov/at-risk/groups/lgbt

- **U.S. Department of Housing and Urban Development**

  - *Community-Wide Prevention of LGBTQ Youth Homelessness* (June 2015), https://www.hudexchange.info/resources/documents/LGBTQ-Youth-Homelessness-Prevention-Initiative-Overview.pdf

AR_293283

- U.S. Department of Labor

  - Office of Job Corps, *Directive: Job Corps Program Instruction Notice No. 14-31* (May 1, 2015), https://supportservices.jobcorps.gov/Program Instruction Notices/pi_14_31.pdf

19



**2022**

# U.S. TRANS SURVEY

## EARLY INSIGHTS

AR_293285

# Early Insights:
# A Report of the 2022
# U.S. Transgender Survey

by:

Sandy E. James, Jody L. Herman, Laura E. Durso,
and Rodrigo Heng-Lehtinen

February 2024







AR_293286

# ACKNOWLEDGEMENTS

**T**HE 2022 U.S. Transgender Survey (USTS) team extends our gratitude to all the members of the transgender community who participated in the 2022 USTS and the hundreds of individuals and organizations who assisted with recruitment. We thank the Black Trans Advocacy Coalition, National Queer Asian Pacific Islander Alliance, and TransLatin@ Coalition for partnering with the National Center for Transgender Equality (NCTE) to present the survey. We thank the members of the 2022 USTS Scientific Advisory Council and Outreach Council for their substantial guidance and contributions and without whom the survey would not have been successful. We thank the many experts who assisted with questionnaire development and countless other USTS volunteers who made contributions at every stage of the project. We also thank Chivita Espacial and Aldo Resendiz for providing translations, and we thank Burness, Pickaxe, Qualtrics, Teal Media, and the Williams Institute for their contributions to the project.

Special thanks to Josie Caballero, Alex del Rosario, Sybastian Smith, Leroy Thomas, Tekla Taylor, Illyana Bocanegra and the following NCTE staff and contractors for their significant contributions to the project (in alphabetical order): Will Cole, Andrew Flores, Brendon Holloway, Olivia Hunt, Leesh Menard, Nikki Mia, Lisa Mottet, Devon Ojeda, Kathryn O'Neill, Dakota Strode, Luke Wegener, and Jami Westerhold.

This project would not have been possible without the generous support of the Robert Wood Johnson Foundation and the TAWANI Foundation.

## Recommended Citation

James, S.E., Herman, J.L., Durso, L.E., & Heng-Lehtinen, R. (2024). *Early Insights: A Report of the 2022 U.S. Transgender Survey*. National Center for Transgender Equality, Washington, DC.

© 2024 The National Center for Transgender Equality. We grant permission for the reproduction and distribution of this publication in whole or in part, provided that it is done with attribution to the authors and the National Center for Transgender Equality. Further written permission is not required.

AR_293287

# INTRODUCTION

**T**HIS report provides a first look at the results of the 2022 U.S. Transgender Survey (USTS), a study conducted by the National Center for Transgender Equality (NCTE) in partnership with the Black Trans Advocacy Coalition, National Queer Asian Pacific Islander Alliance, and TransLatin@ Coalition. The 2022 USTS is the follow up to the 2015 USTS, which has been an essential source of data on the experiences of transgender people for advocates, educators, researchers, policymakers, and the general public since the publication of its report in 2016.[1] Building upon the success of the prior study, the 2022 USTS is now the largest survey ever conducted to examine the experiences of binary and nonbinary transgender people in the United States, with an unprecedented 92,329 respondents. The 2022 USTS provides updated information to help the public better understand the lives and experiences of transgender people in the United States and the challenges that many transgender people face. As such, it is an invaluable resource for identifying and addressing issues that are of vital importance to binary and nonbinary transgender people in the United States.

In the years since the 2015 USTS was conducted, the United States has experienced substantial social, political, legal, and other changes that have impacted the lives of binary and nonbinary transgender people. The 2022 USTS was designed to offer updated and expanded perspectives on the experiences of transgender people, including in the areas of education, employment, family life, health care, housing, life satisfaction, and public accommodations. By expanding the scope of the survey and filling the significant gaps in understanding about the lives and challenges faced by transgender people, the USTS will continue to serve as a crucial tool for research, education, advocacy, and policymaking.

This report presents preliminary findings that provide an overview of the experiences of binary and nonbinary transgender people. The findings and information presented are high-level statistics and should be interpreted and contextualized accordingly. For example, although the survey was open to transgender people aged 16 and older, findings in this report are limited to respondents aged 18 and over unless otherwise noted. This report presents select findings from a range of survey topics, but it does not include findings from every issue area covered in the survey. This report also does not present differences in outcomes based on demographic and other characteristics or provide comparisons to the U.S. general population or the 2015 USTS. This report does, however, provide important information and updated perspectives

---

[1] James, S. E., Herman, J. L., Rankin, S., Keisling, M., Mottet, L., & Anafi, M. (2016). *The Report of the 2015 U.S. Transgender Survey.* Washington, DC: National Center for Transgender Equality.

AR_293288

on some of the most substantial issues and experiences impacting transgender people in the United States. With these early insights from the 2022 USTS, readers can better understand some of the challenges that binary and nonbinary transgender adults face in the United States. The forthcoming full report of the 2022 U.S. Transgender Survey will present comprehensive findings of the survey and paint a more complete picture of the diversity, resilience, and strength of the transgender community.

AR_293289

# METHODOLOGY

## Overview

The U.S. Transgender Survey (USTS) was administered online in English and Spanish and open to binary and nonbinary transgender people aged 16 and older residing in the United States, a U.S. territory, or on a U.S. military base overseas. The survey instrument included questions covering a wide range of experiences and issues, such as those related to health care, employment, education, housing, and public accommodations. The survey was hosted by Qualtrics and could be accessed exclusively through the USTS website (USTransSurvey.org). Data were collected over a 48-day period, from October 19 through December 5, 2022. The sample included 92,329 respondents, including 84,170 adults (18 and older), from all fifty states, the District of Columbia, American Samoa, Guam, the Northern Mariana Islands, Puerto Rico, the U.S. Virgin Islands, and U.S. military bases overseas. The following sections provide an overview of the survey methodology. While these sections provide general information about the USTS's methodology, they do not include a detailed discussion of all aspects of the methodology. A detailed description of the methodology will be included in the full report of the 2022 U.S. Transgender Survey.

## History of the U.S. Transgender Survey

The 2022 USTS is the successor to the 2015 USTS, which was conducted by the National Center for Transgender Equality (NCTE) and was previously the largest and most comprehensive survey about the experiences of transgender people in the United States, with 27,715 respondents. The 2015 USTS was developed as the follow-up to the National Transgender Discrimination Survey (NTDS), which was conducted by NCTE and the National LGBTQ Task Force from late 2008 to early 2009. The NTDS was conducted to address the significant lack of data about transgender people in the United States, particularly from federal surveys. The NTDS became the first large, national survey to broadly examine the experiences of transgender people in the United States and the NTDS report, published in 2011, provided groundbreaking findings.[2]

Throughout the long history of developing, conducting, and reporting on the largest, most comprehensive surveys about the experiences and life outcomes of transgender people in the U.S., USTS and NTDS researchers and authors acknowledged the need to evolve and collect data to identify and address both current and emerging needs of transgender people. This included improving upon on survey question design and expanding substantive content to fill remaining knowledge gaps, examine new and underexplored issues, investigate potential changes in experiences and outcomes over time, and improve comparisons between the experiences of transgender people and the U.S. general population. The 2022 USTS was developed with those considerations, and feedback received from researchers, practitioners, and advocates was continuously assessed while constructing and finalizing the questionnaire.

[2] Grant, J. M., Mottet, L. A., Tanis, J., Harrison, J., Herman, J. L., & Keisling, M. (2011). *Injustice at Every Turn: A Report of the National Transgender Discrimination Survey.* DC: National Center for Transgender Equality and National Gay and Lesbian Task Force.

AR_293290

# USTS Respondents

The USTS documents the experiences of transgender people, which the project defines as anyone who identifies with a different gender than they were assigned at birth. As such, the study was inclusive of those with binary and nonbinary transgender identities and other identities on the transgender identity spectrum, regardless of the terminology used by the respondent. The term "transgender" or "trans" was defined broadly for the purposes of this study to include a wide range of identities, but some individuals for whom the study was intended may have assumed that the term did not include them. Accordingly, promotional materials worked to affirm that the survey was inclusive of a range of gender-expansive identities and was open to transgender people at any stage of their lives, journey, or transition.

The study included individuals aged 16 and older at the time of survey completion. This differed from the 2015 USTS sample, which was limited to respondents 18 and older. As with all survey research, it is important to consider the context in which the study is being conducted, and the research team evaluated the context of being transgender in the U.S. at the time of the study when deciding to expand the sample to 16- and 17-year-olds. Since the USTS was last conducted, there have been numerous social, political, and legal developments that impact the experiences of transgender people of all ages in the United States, including those that have had a profound impact on transgender youth. There have also been advancements in research that have improved our understanding of the experiences of transgender youth. These cultural and research-related changes underscored the importance of collecting data about the experiences of transgender youth. Therefore, in consultation with the USTS Scientific Advisory Committee, the research team determined that it was appropriate to include 16- and 17-year-olds in the USTS sample and developed the survey instrument accordingly. As previously noted, however, findings presented in this preliminary report only include respondents aged 18 and over unless otherwise noted.

The study population was limited to individuals currently residing in a U.S. state or territory, or on a U.S. military base overseas, to capture the experiences of transgender people who were subject to laws, policies, and social and cultural environments in the U.S. at the time they completed the survey.

# Developing the Survey Instrument

The 2022 USTS research team worked for more than a year to develop the survey instrument under the advisement of a Scientific Advisory Committee and in collaboration with dozens of individuals with lived experience, advocacy and research experience, and subject matter expertise. Using the 2015 USTS survey instrument as the foundation, it was important to focus on the general goals of collecting updated data on a wide range of topics and to address data collection gaps. It was also critical to develop a survey instrument that expanded the range of topics presented, responded to changing social, environmental, and political landscapes, and responded to feedback about the 2015 iteration. For example, given the unparalleled impact of the COVID-19 pandemic, the research team had to consider how the pandemic might affect respondents'

AR_293291

experiences with respect to USTS-specific measures. Accordingly, the research focused on collecting data that would be comparable to the 2015 USTS while expanding or adding topics and questions for context (e.g., COVID-19), to respond to issues in law and policy (e.g., health care, sports), and to yield new or improved information (e.g., physical health, transition-related health care, education, life satisfaction).

To further refine the survey, nearly 100 people participated in a pilot study to evaluate the questionnaire and were offered a $25 gift card for their participation. Pilot study participants included individuals who were eligible for the survey and who represented a wide range of characteristics and experiences that reflected the diversity of the intended study sample. The pilot study was administered through an online test site using the same platform and format in which the final survey later appeared, and its purpose was to evaluate the substantive content and technical aspects of the survey. Pilot study participants were asked to provide general feedback on individual questions and the entire questionnaire and to address specific questions from the research team as part of their evaluation. Pilot study feedback was compiled, discussed, and used to inform final revisions to the survey instrument.

The final survey questionnaire contained a total of 605 possible questions presented in thirty-eight sections addressing topics across a range of life experiences. This was a significant expansion over the 324 possible questions in the 2015 USTS and reflects efforts to substantially increase knowledge in many issue areas. The additional questions often sought a more nuanced understanding of an issue that only affected some respondents rather than resulting in more questions for all respondents. No respondent received all possible questions, and the online survey platform allowed respondents to move efficiently through the questionnaire using skip logic to ensure that respondents only received questions that were appropriate based on their previous answers. As a result, despite having nearly twice the number of possible questions as in the 2015 USTS, the 2022 USTS maintained an average completion time of 60 minutes, as verified by the pilot study. As with both the 2015 USTS and the NTDS, evaluations of the USTS questionnaire confirmed that the length was appropriate for such a comprehensive survey, and the need for data about the experiences of transgender people outweighed concerns about the survey length.

## Outreach

The primary outreach objective was to raise awareness of the survey and provide opportunities to complete the survey for as many transgender people as possible across the U.S. and its territories. Outreach efforts also focused on connecting with people who are often underrepresented in survey research and those with limited access and opportunity to complete an online survey. This included, but was not limited to, people of color, seniors, people residing in rural areas, and low-income individuals.

The outreach team substantially improved on the 2015 USTS outreach model by expanding efforts on multiple fronts and applying lessons learned, such as the benefits of a longer outreach period and diverse approaches to community engagement. The outreach period began approximately one year before the survey launch, and the outreach team used various strategies to connect with transgender people through multiple

AR_293292

points of access, such as through transgender- or LGBTQ-specific organizations, support groups, health centers, and online communities. The outreach team expanded on the eleven-person 2015 USTS Advisory Committee to assemble a USTS Outreach Council comprised of twenty-two organizations and individuals who advised on and participated in outreach to transgender people in communities across the U.S. and in U.S. territories throughout the outreach period. Working with the Outreach Council significantly increased outreach engagement and served as the bedrock for outreach efforts. The outreach team also contacted nearly 1,900 organizations and individuals to request their support by sharing information about the survey with their members and contacts. The team directly corresponded with more than 250 organizations during the outreach period and while the survey was in the field, and countless other organizations promoted the survey to their communities. The team worked to connect with potential respondents through a variety of methods, including making thousands of phone calls and sending tens of thousands of text messages.

Throughout the outreach period, the team conducted a survey pledge campaign, which was among the most important methods for engaging and communicating with potential respondents. The campaign invited potential participants and allies to pledge to take the survey and/or spread the word about the survey. The survey pledge was designed to raise awareness about the survey and engage potential respondents for a sustained period leading up to the survey launch. Individuals who completed pledge information received email and text communications throughout the outreach period. The pledge was an important component of the outreach and communications strategy in the 2015 USTS, and the large number of pledgers in 2015 (~14,000) was thought to correspond to the eventual large number of respondents (27,715). The 2022 USTS outreach team improved upon the survey pledge campaign to substantially increase connections and engagement, resulting in 34,576 people who pledged to take the survey before it launched, 12,015 of whom also pledged to share the survey with other transgender people in their life.

As an incentive to complete the survey, participants were offered the opportunity to enter into a random drawing for one of three cash prizes upon completion of the survey, including one $500 cash prize and two $250 cash prizes. After completing and submitting their anonymous survey responses, USTS respondents were re-directed away from the survey hosting site to a web page on the NCTE-hosted USTS website to sign up for the random drawing.

The outreach team worked with organizations to reduce barriers to accessing the survey and increase opportunities to take the survey for people who may otherwise not have had access. One such method was by working with organizations to organize "survey-taking events." These were events during which organizations provided a location and resources for attendees to take the survey, such as computers or tablets. These events were intended to provide access to individuals with limited or no computer or internet access, those who may have needed assistance when completing the survey, or those who needed a safe place to take the survey. The team also ran a tablet-loan program to provide another avenue through which organizations could offer survey access.

AR_293293

# Communications

The communications strategy was implemented in coordination with outreach efforts with a goal of reaching a wide range of transgender people, including those in populations that are traditionally underrepresented in surveys. The communications team employed a range of methods to share information about the survey, including email, social media, and print media, and created engaging materials to spread the word about the survey. The USTS website was redesigned to improve functionality and better share information with potential respondents and organizations and individuals interested in promoting the survey. The website included a description of the survey, information about the team working on the survey, frequently asked questions, and an interactive map with information about organizations that supported the survey.

The communications team created promotional materials and messaging to share through email, social media, and other methods. They maintained communication with thousands of individuals and organizations, including people who pledged to take or spread the word about the survey, organizations that committed to support the survey through outreach efforts, and people who had signed up to be in communication with NCTE about the organization's work and projects more generally. They also developed a "partner toolkit" with materials for organizations to download and use, including key messaging, promotional graphics, video scripts, social media posts, event materials, and language for emails. The team provided information through many channels, resulting in the survey being promoted by influencers, organizations, and content creators through social media platforms, such as Instagram, Twitter, Facebook, TikTok, and Tumblr. The team also commissioned videos from key influencers to promote the survey prior to the survey launch and during the data-collection period, including "progress videos" that were embedded in the survey to thank respondents and encourage them to continue completing the survey. In addition to providing materials about the survey, the USTS team held dozens of events to raise awareness about the survey, such as Instagram and Facebook Live events to discuss the survey with influencers and organizations.

# Institutional Review Board and Confidentiality

The USTS was approved by an Institutional Review Board (IRB), which is an entity intended to protect the rights and welfare and ensure confidentiality of individuals participating in a research study. The study underwent an extensive full-board review by the University of California, Los Angeles, North General IRB, which included review and approval of the study design, questionnaire, and all recruitment materials leading up to the launch of the survey and throughout the fielding period in English and Spanish. As required by the IRB, the survey began with a study information sheet describing aspects of the study and participants' rights in the study. Participants were required to consent to taking the survey at the end of the information sheet and before beginning the questionnaire.

The survey was anonymous, and maintaining privacy and confidentiality in the collection and maintenance of survey data was an important component of preserving participants' anonymity. The IRB required the research team

AR_293294

to ensure that confidentiality protections were in place for the study and demonstrate sufficiency of data security protocols. The research team also obtained a Certificate of Confidentiality from the National Institutes of Health, which could be used to legally refuse to disclose information that may identify respondents in any federal, state, or local civil, criminal, administrative, legislative, or other proceedings, such as if there is a court subpoena.

## Survey Hosting, Data Collection, and Cleaning

The survey was programmed and hosted by Qualtrics, and data collection was managed by Qualtrics throughout the 48-day fielding period. Following the end of the survey data-collection period, the database was securely transferred to the USTS research team for cleaning and analysis. The data then underwent cleaning using standard practices and additional cleaning for eligibility to remove responses that did not belong in the sample (e.g., duplicate responses, incomplete responses, illogical responses) and improve the quality of the final sample. The data were then recoded as needed, including recoding of write-in responses for questions with a "not listed above" answer choice. Write-in responses were recoded into existing answer choices when possible, and in some cases, new answer categories were created for frequently repeated write-in responses.

Several survey weights were developed for use in our analyses to reduce sampling biases and be more representative of the U.S. transgender population with regard to age, race/ethnicity, education, and geographical region. Findings in this report for these demographic characteristics reflect the weighted percentages. Separate weights were developed for the full sample (ages 16+) and for the adult sample (ages 18+). The weights were based on the Centers for Disease Control and Prevention's Behavioral Risk Factor Surveillance System (BRFSS), which is one of the few sources of representative data for the U.S. trans population.

As previously noted, the forthcoming full report of the 2022 U.S. Transgender Survey will contain a detailed description of survey methodology, including more information about the cleaning and weighting processes.

## Presentation of Findings

Findings in this early insights report of the 2022 USTS represent the overall findings for each topic examined, presented as weighted percentages of the entire adult sample or of specified subgroups. Results are only reported for respondents aged 18 and older, except as noted for findings that also include 16- and 17-year-olds. This report does not include additional analyses to examine differences in outcomes based on demographic and other characteristics. Comprehensive results, including those for 16- and 17-year-olds and broken down by a variety of characteristics, will be reported in the full report of the 2022 U.S. Transgender Survey.

Percentages are rounded to whole numbers, and results were rounded according to the following convention: findings with 0.50 and above were rounded up, and findings with 0.49 and below were rounded down (e.g., 1.50% rounded to 2% and 1.49% rounded to 1%). Findings of 0.49% or less were labeled "less than 1%" or "<1%." Findings presented in figures and tables may not always add up to 100% due to rounding.

AR_293295

Throughout the survey, respondents answered questions about experiences that occurred within a certain time period prior taking the survey, such as "in the last 12 months" or "in the last 30 days." When time periods are noted in this report, they relate to when the respondent took the survey. For example, "in the last 12 months" in this report means that the respondent had the experience in the 12 months prior to taking the survey.

When interpreting the preliminary findings presented in this report, it is important to note that although the team sought to recruit a sample that was as representative as possible of transgender people in the U.S. and analytic weights reduce sample biases, study respondents were not drawn from a random sample. Therefore, while this sample is a large one, the findings may not be representative of all transgender people.

AR_293296

# RESULTS

## Characteristics of USTS Respondents

■ **Gender:** Thirty-eight percent (38%) of respondents identified as nonbinary, 35% identified as a transgender woman, 25% identified as a transgender man, and 2% identified as a crossdresser.

■ When considering sex assigned at birth, 35% of respondents identified as a transgender woman, 30% identified as nonbinary (assigned female at birth), 25% identified as a transgender man, 8% identified as nonbinary (assigned male at birth), and 2% identified as a crossdresser.









■ **Intersex Status.** Five percent (5%) of respondents reported they were born with a variation in physical sex characteristics or had an intersex variation or Difference of Sex Development, 72% reported they were not, and 23% reported that they did not know.

AR_293297



**Race/Ethnicity**

AIAN (1%)
Asian/NHPI (7%)
Black (8%)
Biracial/Multiracial (13%)
Latino(a)(x)(e) (14%)
MENA (<1%)
White (56%)

- ***Race:*** One percent (1%) of respondents identified as American Indian or Alaska Native ("AIAN"), 7% identified as Asian/Asian American or Native Hawaiian/Pacific Islander ("Asian/NHPI"), 8% identified as Black/African American ("Black"), 14% identified as Latino(a)(x)(e)/Hispanic ("Latino(a)(x)(e)"), less than 1% identified as Middle Eastern/North African ("MENA"), 56% identified as White/European American ("White"), and 13% identified as two or more races ("Biracial/Multiracial"). Additionally, less than 1% identified as "a racial or ethnic identity not listed above."

**Age**



65+ 7%
55-64 6%
45-54 9%
25-44 36%
18-24 43%

- ***Age:*** Forty-three percent (43%) of respondents were age 18 to 24, 36% were age 25 to 44, 9% were age 45 to 54, 6% were age 55 to 64, and 7% were over the age of 65.

- ***Parental Status:*** Seventeen percent (17%) of respondents reported that they were parents and 3% were parents of a transgender or nonbinary child (including adult children).

AR_293298

■ *Geographic location:* USTS respondents were living in all fifty states, the District of Columbia, American Samoa, Guam, the Northern Mariana Islands, Puerto Rico, the U.S. Virgin Islands, and U.S. military bases overseas. Based on Census regions, 41% were living in the South, 23% lived in the West, 19% lived in the Northeast, and 17% lived in the Midwest. Census regional categories do not include U.S. territories or U.S. military bases overseas.



**Location by Region**

South: AL, AR, DE, DC, FL, GA, KY, LA, MD, MS, NC, OK, SC, TN, TX, VA, WV
West: AK, AZ, CA, CO, HI, ID, MT, NM, NV, OR, UT, WA, WY
Northeast: CT, ME, MA, NH, NJ, NY, PA, RI, VT
Midwest: IA, IN, IL, KS, MI, MN, MO, NE, ND, OH, SD, WI

■ *Citizenship Status:* Nearly all respondents were U.S. citizens either by birth (95%) or through naturalization (3%), and 1% were Permanent Residents. One percent (1%) of respondents held another immigration status, such as visa holder (including T, U, HB-1, or other visa), undocumented, Deferred Action for Childhood Arrivals (DACA) recipient, refugee, or asylee.

■ *Educational Attainment:* Thirty-five (35%) percent of respondents had completed high school or obtained a GED, 26% had completed some college, 13% had not completed high school, 11% had a bachelor's degree, 7% had an associate's degree, and 7% had a master's degree or higher.



**Educational Attainment**

AR_293299

# HEALTH AND HEALTH CARE

## Impact of the COVID-19 Pandemic

Respondents were asked questions about their experiences with the COVID-19 pandemic to determine how it impacted the ways in which they move through the world and interact with others.

- Most respondents reported that, in the last 12 months, they went out in public places (such as a grocery store, restaurant, or shopping mall) less than they did before the COVID-19 pandemic, including 27% who went out "somewhat less" than before, 33% who went out "a lot less" than before, and 1% that did not go out at all. Twenty-seven percent (27%) of respondents went out "about the same amount" as before the pandemic, 7% went out "somewhat more" than before, and 5% went out "a lot more" than before.

- Most respondents wore a mask at least some of the time when out in public in the last 12 months, including 28% who wore a mask "all of the time," 33% who wore one "most of the time," and 24% who wore one "some of the time." Twelve percent (12%) wore a mask "a little of the time," and 4% wore a mask "none of the time."

## General Health and Experiences with Health Care Providers

- Approximately two-thirds of respondents reported that their health status was "good" (36%), "very good" (24%), or "excellent" (6%). One-quarter (25%) rated their health status as "fair," and 9% said it was "poor."

- More than one-quarter of respondents (28%) did not see a doctor when they needed to in the last 12 months due to cost.

- Nearly one-quarter of respondents (24%) did not see a doctor when they needed to in the last 12 months due to fear of mistreatment.

- Forty-four percent (44%) of respondents experienced serious psychological distress in the last 30 days (based on the Kessler 6 Psychological Distress Scale).

- Seventy-nine percent (79%) of respondents saw a doctor or health care provider within the last 12 months, and 9% saw a provider between 1 and 2 years ago.

- Of those who saw a health care provider within the last 12 months, nearly one-half (48%) reported having at least one negative experience because they were transgender, such as being refused health care, being misgendered, having a provider use harsh or abusive language when treating them, or having a provider be physically rough or abusive when treating them.

AR_293300

# Health Insurance

- Eighty-seven (87%) percent of respondents had health insurance coverage.

- Approximately 1 in 4 respondents (26%) had at least one issue with their insurance company in the last 12 months, such as being denied coverage for hormone therapy, surgery, or another type of health care related to their gender identity/transition; gender-specific health care because they were transgender; or routine health care because they were transgender.

# Gender Identity and Transition

- Nearly all respondents (94%) who lived at least some of the time in a different gender than the one they were assigned at birth ("gender transition") reported that they were either "a lot more satisfied" (79%) or "a little more satisfied" (15%) with their life. Three percent (3%) reported that transitioning gender made them "neither more nor less satisfied" with their life, 1% were "a little less satisfied," and 2% were "a lot less satisfied" with their life.

**Life Satisfaction Since Transitioning Gender**

| | |
|---|---|
| A Lot More Satisfied | 79% |
| A Little More Satisfied | 15% |
| Neither More Nor Less Satisfied | 3% |
| A Little Less Satisfied | 1% |
| A Lot Less Satisfied | 2% |

AR_293301

■ Nearly all respondents (98%) who were currently receiving hormone treatment reported that receiving hormones for their gender identity/transition made them either "a lot more satisfied" (84%) or "a little more satisfied" (14%) with their life. One percent (1%) reported that hormones made them "neither more nor less satisfied" with their life, and less than 1% said that they were "a little less satisfied" or "a lot less satisfied" with their lives after receiving hormones.



**Life Satisfaction With Receiving Hormone Treatment**

A Lot More Satisfied — 84%

A Little More Satisfied — 14%

Neither More Nor Less Satisfied — 1%

A Little Or A Lot Less Satisfied — <1%

■ Nearly all respondents (97%) who had at least one form of surgery for their gender identity/ transition reported that they were either "a lot more satisfied" (88%) or "a little more satisfied" (9%) with their life. One percent (1%) reported that surgery made them "neither more nor less satisfied" with their life, less than 1% were "a little less satisfied," and 1% were "a lot less satisfied" with their life.

**Life Satisfaction After Gender-Affirming Surgery**

A Lot More Satisfied — 88%

A Little More Satisfied — 9%

Neither More Nor Less Satisfied — 1%

A Little Less Satisfied — <1%

A Lot Less Satisfied — 1%

AR_293302

# FAMILY LIFE

*This section includes some data for 16- and 17-year-old respondents.*

- Thirty-six percent (36%) of adult respondents who said that some or all of their immediate family knew that they were transgender said their family members were "supportive" of them being transgender, and 31% said they were "very supportive." Eight percent (8%) said their immediate family was "unsupportive" of them being transgender, 4% had "very unsupportive" immediate families, and 22% reported that they were "neither supportive nor unsupportive."

- Among 16- and 17-year-old respondents who said that some or all of their immediate family knew that they were transgender, 27% said their family members were "supportive" of them being transgender, and 17% said they were "very supportive." Fifteen percent (15%) said their immediate family was "unsupportive" of them being transgender, 14% had "very unsupportive" immediate families, and 28% reported that they were "neither supportive nor unsupportive."

 **Immediate Family Support by Age**



| | Very Supportive | Supportive | Neither Supportive Nor Unsupportive | Unsupportive | Very Unsupportive |
|---|---|---|---|---|---|
| 16 - 17 | 17% | 27% | 28% | 15% | 14% |
| 18 - 24 | 24% | 42% | 20% | 9% | 4% |
| 25 - 44 | 31% | 37% | 22% | 7% | 3% |
| 45 - 64 | 39% | 26% | 24% | 7% | 3% |
| 65+ | 39% | 24% | 29% | 4% | 4% |
| Adults (18+) | 31% | 36% | 22% | 8% | 4% |

AR_293303

- Thirty-five percent (35%) of adult respondents who said that some or all of their extended family members (such as grandparents, aunts, uncles, and cousins) knew that they were transgender said their family members were "supportive" of them being transgender, and 23% said they were "very supportive." Seven percent (7%) said their extended family was "unsupportive" of them being transgender, 3% had "very unsupportive" extended families, and 32% reported that they were "neither supportive nor unsupportive."

- Among 16- and 17-year-old respondents who said that some or all of their extended family members (such as grandparents, aunts, uncles, and cousins) knew that they were transgender, 35% said their family members were "supportive" of them being transgender, and 13% said they were "very supportive." Seventeen percent (17%) said their extended family was "unsupportive" of them being transgender, 6% had "very unsupportive" extended families, and 29% reported that they were "neither supportive nor unsupportive."



**Extended Family Support by Age**

Very Supportive | Supportive | Neither Supportive Nor Unsupportive | Unsupportive | Very Unsupportive

| Age | Very Supportive | Supportive | Neither Supportive Nor Unsupportive | Unsupportive | Very Unsupportive |
|---|---|---|---|---|---|
| 16 - 17 | 13% | 35% | 29% | 17% | 6% |
| 18 - 24 | 13% | 36% | 39% | 9% | 3% |
| 25 - 44 | 21% | 38% | 32% | 7% | 2% |
| 45 - 64 | 47% | 31% | 16% | 4% | 3% |
| 65+ | 25% | 28% | 43% | 4% | 1% |
| Adults (18+) | 23% | 35% | 32% | 7% | 3% |

- More than one in ten (11%) adult respondents who grew up in the same household with family, guardians, or foster parents said that a family member was violent towards them because they were transgender, and 8% were kicked out of the house because they were transgender.

- Five percent (5%) of 16- and 17-year-old respondents who grew up in the same household with family, guardians, or foster parents said that a family member was violent towards them because they were transgender, and 1% were kicked out of the house because they were transgender.

AR_293304

# Income, Employment, Workplace Experiences, and Housing Stability

- More than one-third (34%) of respondents were experiencing poverty.

- The unemployment rate among USTS respondents was 18%.

- More than one in ten (11%) respondents who had ever held a job said they had been fired, forced to resign, lost the job, or been laid off because of their gender identity or expression.

- Nearly one-third (30%) of respondents had experienced homelessness in their lifetime.

# Experiences In Restrooms

- Four percent (4%) of respondents were denied access to a restroom in a public place, at work, or at school in the last 12 months.

- In the last 12 months, 6% of respondents had been verbally harassed, physically attacked, or experienced unwanted sexual contact when accessing or using a restroom.

# Harassment and Violence

- Nearly one in ten (9%) respondents reported that they were denied equal treatment or service in the last 12 months because of their gender identity or expression.

- Nearly one-third (30%) of respondents reported that they were verbally harassed in the last 12 months because of their gender identity or expression.

- More than one-third (39%) of respondents reported that they were harassed online in the last 12 months because of their gender identity or expression.

- Three percent (3%) of respondents reported that they were physically attacked in the last 12 months because of their gender identity or expression.

AR_293305

## Comfort with Law Enforcement

- Nearly half (47%) of respondents reported that they would feel "very uncomfortable" asking the police for help if they needed it, and 26% reported feeling "somewhat uncomfortable." Ten percent (10%) of respondents reported feeling "somewhat comfortable," 8% felt "very comfortable," and 10% felt "neutral" about asking the police for help when they needed it.

- Sixty-two percent (62%) of respondents reported that they were "very uncomfortable" or "somewhat uncomfortable" asking for help from the police when needed because of their gender identity or expression.

## Identity Documents

- Nearly half (48%) of respondents who had at least one form of identity document (such a birth certificate, passport, or driver's license) said that none of their IDs listed the name they wanted. Twenty percent (20%) had the name they wanted on some of their IDs, and 33% had the name they wanted on all their IDs.

- Fifty-nine percent (59%) of respondents who had at least one ID said that none of their IDs listed the gender they wanted, 23% said some of their IDs listed the gender they wanted, and 19% said that all their IDs listed the gender they wanted.

- Twenty-two percent (22%) of all respondents reported being verbally harassed, assaulted, asked to leave a location, or denied services when they have shown someone an ID with a name or gender that did not match their presentation.

## Experiences at School

*This section includes some data for 16- and 17-year-old respondents.*

- More than three-quarters of adult respondents (80%) and nearly two-thirds of 16- and 17-year-old respondents (60%) who were out or perceived as transgender in K-12 experienced one or more form of mistreatment or negative experience, including verbal harassment, physical attacks, online bullying, being denied the ability to dress according to their gender identity/expression, teachers or staff refusing to use chosen name or pronouns, or being denied the use of restrooms or locker rooms matching their gender identity.

AR_293306

## Impact of Unequal Treatment

- Forty percent (40%) of respondents had thought about moving to another area because they experienced discrimination or unequal treatment where they were living, and 10% of respondents had actually moved to another area because of discrimination.

- Nearly half (47%) of respondents had thought about moving to another state because their state government considered or passed laws that target transgender people for unequal treatment (such as banning access to bathrooms, health care, or sports), and 5% of respondents had actually moved out of state because of such state action.

- The top 10 states from which respondents moved because of state laws targeting transgender people for unequal treatment were (in alphabetical order): Alabama, Arizona, Florida, Georgia, Missouri, North Carolina, Ohio, Tennessee, Texas, and Virginia.



**Top 10 States USTS Respondents Reported Leaving**

*(Presented in alphabetical order)*

Alabama

Arizona

Florida

Georgia

Missouri

North Carolina

Ohio

Tennessee

Texas

Virginia

AR_293307

Superintendent Procedure 3210SP.C
# Nondiscrimination and Affirmative Action: Transgender and Gender-Expansive Student Rights and Supports

Approved by:_____*s/Denise Juneau*_____ Date: __3/5/2020__
### Denise Juneau, Superintendent

This procedure is to advise District staff regarding the rights and supports Seattle Public Schools provides transgender and gender X, gender-expansive, students. Its purpose is to create a safe, welcoming, and inclusive learning environment for all students, and to ensure that every student has equal access to all components of their educational program.

This procedure does not anticipate every situation that might occur. Rather, it offers suggested approaches to specific instances when there may be implications regarding the protection or the safety of transgender and gender X, gender-expansive, students.

## PRIMARY CONTACT

The Manager of Health Education is designated as the District's primary contact regarding this procedure and its associated policy in relation to transgender and gender X students. The primary contact will receive copies of all informal and formal complaints regarding transgender students. As primary contact, the Manager of Health Education will receive training required by RCW 28A.642.080. All questions regarding the application of this procedure should be directed to the Manager of Health Education.

## DEFINITIONS

Note: The following definitions provided are not meant to label students, but instead are intended as functional descriptors.

**"Assigned sex at birth"** refers to the sex a person was given at birth, usually based on anatomy or chromosomes (e.g. male, female, intersex, or X).
**"Cisgender"** is a term used to describe people whose assigned sex at birth matches their gender identity and/or gender expression (e.g., a person who was assigned female at birth and whose gender identity and/or gender expression is also female.
**"Gender identity"** refers to a person's internal and deeply felt sense of being female, male, both, or neither. Persons may identify as nonbinary, gender-expansive, or other -- regardless of their assigned sex at birth. The District records the gender identity of students one of three ways: male, female, or X.
**"Gender-Expansive"** refers to a wider, more flexible range of gender identities than those typically associated with the binary (male or female) gender system. People who are gender-expansive may use a variety of terms including nonbinary or others to describe their gender identity. For the District, the gender X designation is inclusive of all identities associated with a gender-expansive identity.

AR_293376

**"Gender expression"** refers to the way a person expresses their gender, often through behavior, gestures, emotional expression, movement, dress and grooming.

**"Transgender"** is a general term used to describe a person whose gender identity or expression is different from that traditionally associated with the person's assigned sex at birth.

**"Transitioning"** is the process in which a person goes from living and identifying as one gender to living and identifying as another.

## SUMMARY

Washington State law and District policy require that all programs, activities, and employment practices be conducted without discrimination based on sex, sexual orientation, gender expression, or gender identity. Furthermore, and as a general rule, decisions regarding assignment, participation, and use in Seattle Public Schools are determined pursuant to a student's gender identity and not their assigned sex at birth.

Our schools are expected to implement Washington State law and District policy in the following ways:

- Names/Pronouns: Students have the right to be addressed by the name and pronoun that corresponds to their gender identity consistently asserted at school.
- Name on Educational Records: A parent/guardian or eligible student (18 years of age or older) may request to have the legal name changed on their educational record at Enrollment Services located at John Stanford Center for Educational Excellence (JSCEE).
- Gender on Educational Records: A student or their parent/guardian may request to have the gender changed on their educational record at Enrollment Services located at JSCEE.
- Restroom Accessibility: Students have the right to use the restroom that corresponds to the gender identity they consistently assert at school. Students who identify as gender X have the right to use the restroom the student determines to best align with their gender identity.
- Locker Rooms: Students have the right to use the locker room that corresponds to the gender identity they consistently assert at school. Students who identify as gender X have the right to use the locker room the student determines to best align with their gender identity.
- Physical Education Courses and Club Sports: Students have the right to participate in physical education courses and club sports in a manner consistent with the gender identity they consistently assert at school.
- Interscholastic Athletic Teams: Transgender students have the right to participate on the interscholastic athletic team consistent with the gender identity they consistently assert at school.
- Student Dress: Students will not be contacted or disciplined for wearing clothing perceived to be not consistent with their gender identity. All student attire, and the enforcement of student attire is determined by Board Policy No. 3224 and its associated Superintendent Procedure.
- Overnight Field Trips: Students have the right to be assigned to overnight accommodations in accordance with the gender identity they consistently assert at school. Staff will never assign students to shared sleeping accommodations

AR_293377

when they are aware of a romantic interest or relationship between the students assigned.

- <u>Gender Segregation in Other Areas:</u> As a general rule, schools should consider options to avoid separating students by gender unless necessary. In circumstances where students are separated by gender in school activities, students have the right to participate in accordance with the gender identity they consistently assert at school.

## GUIDELINES

### Issues of Privacy:

All persons have a right to privacy; this includes keeping a student's transgender or gender X status private. Information about a student's gender identity, legal name, or assigned sex at birth may constitute confidential medical or educational information. Disclosing this information to others may violate privacy laws, including the federal Family Education Rights and Privacy Act (FERPA) (20 U.S.C. s 1232g; 34 C.F.R. Part 99). Therefore, to ensure student safety and well-being, and to provide identity-safe schools for all, staff should not disclose a student's transgender or gender X status to others unless (1) legally required to do so or (2) the student has authorized disclosure.

Whenever speaking with a transgender or gender X student about a particular issue such as conduct, discipline, grades, attendance, or health, focus on the conduct or particular issue and avoid making assumptions regarding the student's actual or perceived gender identity. Further, when contacting the parents/guardians of a transgender or gender X student and it is unclear whether the student asserts the same gender identity at home, it is best practice to avoid using gender pronouns. For example, one could say, "I am concerned about P.J.'s attendance," rather than, "I am concerned about his attendance."

### Official Records:

The District is required to maintain a permanent student education record which includes the legal name of the student and the student's gender. A parent/guardian (or eligible student over 18 years old) may request a change to a student's recorded legal name. A student or their parent/guardian may request a change to their recorded gender. Requests for name and gender changes are accepted and processed at JSCEE Enrollment Services.

- Legal Name: The District will change a student's legal name on their education record when a parent/guardian or eligible student (over age 18) provides documentation of a legal name change, such as documentation of a court-ordered name change or an affidavit of name change made pursuant to common law. Affidavit of name change templates are available from JSCEE Enrollment Services.
- Gender: A Seattle Public Schools student has the right to have the gender on their educational record reflect their gender identity consistently asserted at school. For educational purposes, there are no legal requirements surrounding gender. The District will change a student's gender on their education record upon request from the student or their parent/guardian upon completion of an enrollment form at JSCEE Enrollment Services.

AR_293378

Upon the receipt of all required documentation, the Admissions Center will ensure that all student systems are updated to reflect changes in name and/or gender, e.g. PowerSchool and The Source.

To the extent that the District is not legally required to use a student's legal name on school records or documents, the District will use the name by which the student identifies. In situations where school staff or administrators are required by law to use or report a student's legal name, such as for standardized testing, school staff should adopt practices to avoid the inadvertent disclosure of such confidential information.

## Names/Pronouns:

Students have the right to be addressed by a name and pronoun corresponding to the gender identity they consistently assert at school. The District uses the term "preferred name" to reference names corresponding to gender identity that are different from a student's legal name on their educational record. A Student or their parent/guardian are not required to change their gender, and a parent/guardian is not required to legally change their student's name, as a prerequisite for the student to be addressed by the name and pronoun that corresponds to their gender identity.

The District acknowledges that initially, inadvertent slips or honest mistakes in the use of the preferred names or pronouns might occur but will not condone an intentional and persistent refusal to respect a student's gender identity. The student's preferred name will be included in the electronic student record system along with the student's legal name to inform teachers of the name and pronoun to use when addressing the student.

## Restroom Accessibility:

Students have the right to use the restroom that is consistent with the gender identity they consistently assert at school. Students who identify as X, gender-expansive, will be provided access to the restroom that the student determines to best align with their gender identity. Further, all students regardless of the underlying reason who have a need or desire for increased privacy should be provided access to an alternative restroom (e.g., staff restroom or health office restroom). This allows students who may feel uncomfortable sharing the facility with transgender or gender X student(s) the option to make use of a separate restroom and have their concerns addressed without stigmatizing any individual student. No student, however, should be required to use an alternative restroom because they are transgender or gender X.

If school administrators have legitimate concerns about the safety or privacy of students, as related to a transgender or gender X (gender-expansive) student's use of the restroom or locker room, school building administrators should bring these concerns to the Manager of Health Education. Such privacy or safety issues should be immediate and reasonably foreseeable, not speculative. School building administrators and/or the Manager of Health Education should meet with the student and/or parents/guardians to determine if there is a need for an alternative facility. The decision to provide an alternative facility for any student will be determined on a case-by-case basis.

## Locker Room Accessibility:

All students have the right to use the locker room that corresponds with the gender identity they consistently assert at school. Students who identify as X (gender-expansive) will be provided access to the locker room that the student determines to

AR_293379

best align with their gender identity. However, if there is a reason or desire for increased privacy and safety, regardless of the underlying reason, any student should be provided access to a reasonable alternative locker room. Reasonable alternative locker rooms include, but are not limited to:

- Use of a private area (e.g., a nearby restroom stall with a door, an area separated by a curtain, an office in the locker room, or a nearby health office restroom).
- A separate changing schedule (either utilizing the locker room before or after the other students).

For transgender and gender X students, any alternative arrangement should be provided in a way that protects the student's ability to keep his or her transgender or gender X status private. However, no student should be required to use a locker room that conflicts with his or her gender identity.

**Physical Education, Club Sports, and Interscholastic Athletics:**
Students have the right to participate in physical education courses and club sports consistent with the gender identity they consistently assert at school.  Further, subject to the participation polices of the Washington Interscholastic Activities Association (WIAA) for high school interscholastic athletics, transgender students have the right to participate on the interscholastic athletic team consistent with the gender identity they consistently assert at school.

In circumstances where physical education courses and club sports are gender specific and there is not a gender X option, students who identify as gender X have the right to participate in the course and/or on the club sport team that the gender X student determines best aligns with their gender identity.

**Student Dress:**
Providing students an environment where they can express their identity through their attire is a value of the District and an important element in providing identity-safe spaces for students. Board Policy No. 3224, Student Dress, provides that all Seattle Public Schools' students have the right to be treated equitably and dress code enforcement will not be more strictly enforced against students because of their gender identity, gender expression, or gender nonconformity.

**Overnight Field Trips:**
In situations where students are separated by gender for overnight accommodations, all students will be assigned to accommodations in accordance with the gender identity they consistently assert at school (M, F, or X). In situations where there are not overnight accommodations identified for gender X students, the student will determine the gendered overnight accommodations that best align with their gender identity. A school will not require transgender or gender X students to stay in single-occupancy accommodations or disclose personal information when not required of other students. However, this does not prevent a school from honoring any student's voluntary request for single-occupancy accommodations if they so choose.

Note: A staff member will never assign students to shared sleeping accommodations when they are aware of a romantic interest or relationship between the students assigned.

Superintendent Procedure 3210SP.C                                                Page 5 of 6

## Gender Segregation in Other Areas:

Teachers/school employees should make every effort to separate students based on factors other than gender when possible. Listed below are examples of common situations where students are separated by gender where there are other reasonable alternatives:

- Class Discussions: Students can be divided by birth month or birth order instead of gender.
- Graduations: Students should be divided their color preference instead of assigned a graduation gown color based on their gender.
- Calling for Students' Attention: Instead of using gendered phrases to get students' attention such as "girls and boys," "you guys," and "ladies and gentlemen," it is recommended to use phrases such as "calling all readers," "could all the athletes/scholars/learners come here."

Activities that may involve the need for accommodations to address student privacy concerns should be addressed on a case-by-case basis. In such circumstances, staff shall make reasonable efforts to provide an accommodation that addresses any such concerns.

## Variations:

Recognizing that this procedure's goal is to provide for the safety and protection of transgender and gender X students, the rules provided may not always be appropriate to apply in every situation. Therefore, for any given situation, the parent/guardian of a transgender or gender X student, a transgender or gender X student, and/or school principal may request a procedure variation from the Manager of Health Education. Upon request for a procedure variation, the Manager of Health Education will consult with District legal counsel and determine whether to grant the variation. A decision to deny a procedure variation may be appealed to the Superintendent. The decision of the Superintendent is final.

Approved: December 2012
Revised: February 2015; August 2016; December 2016; June 2017; March 2020 (typo corrected April 14, 2020)
Cross Reference: Policy Nos. 2145; 3207; 3210; 3224; Supt Proc. 3210SP.A; Supt. Proc. 3210SP.B; Supt. Proc. 3224SP
RCW 28A.642, Discrimination prohibition; WAC 392-190 WAC; RCW 49.60 RCW, Washington Law Against Discrimination; Prohibiting Discrimination in Washington Public Schools - OSPI Guidelines for school districts to implement Chapters 28A.640 and RCW 28A.642 and WAC 392-190 (February 2012); 20 U.S.C. 1232g, Family Education Rights and Privacy Act; 34 C.F.R. Part 99; U.S. Department of Education Office for Civil Rights, Dear Colleague Letter: Transgender Students (May 2016).

AR_293381

# Sex-segregated Bathrooms and Suicidal Ideation in Transgender Youth

Thea A. Schlieben

Numerous studies (Craig & Pepler, 2003; Goldblum, Testa, Pflum, Hendricks, Bradford & Bongar, 2012; Mustanski & Liu, 2013) have found that lesbian, gay, bisexual, and transgender youth are at high risk for depression, anxiety, suicidal ideation, and suicide attempts. It is the view of the current author and others  (McCarthy, 2003) that sexual and gender minority students, lesbian, gay, bisexual, and transgender persons (LGBTQ) are too often considered as a single group or entity. As a result, when addressing discrimination and the community needs for LGBTQ persons, the differences between sexual orientation and transgender issues may be ignored. By not having specific discussions about transgender issues, it may be assumed that transgender students have the same needs as lesbian, gay, and bisexual students (McCarthy, 2003). Even when teachers and researchers recognize inequality in sexual orientation, gender variance is an often-overlooked form of diversity (McCarthy, 2003).

Transgender students are those whose gender expression does not conform to societal expectations and/or whose gender identity does not align entirely with the sex they were assigned at birth. In this context, transgender is used as an umbrella term that may include those who identify as transgender, gender non-conforming, genderqueer, agender, non-binary, queer, and any other non-cisgender individual. Cisgender refers to people whose gender identity aligns with the sex they were assigned at birth.

Almost forty-five percent of transgender or gender non-conforming students report victimization in their schools from peers and teachers, versus 19.9 percent of the general population of students (Goldblum, et al., 2012). Gender minorities are even more likely to experience victimization

AR_293382

*Journal of Advanced Generalist Social Work Practice*

in schools than cisgender (non-transgender) sexual minorities. Seventy-six percent of transgender students reported feeling unsafe in their schools because of their sexual or gender orientation as compared to the 52.9 percent of lesbian, gay, and bisexual students who reported the same feeling (Goldblum, et. al. 2012). If classrooms are going to be fully inclusive, they must allow for a range of gender identities and expressions.

In February 2016, the South Dakota Senate passed a measure that would force schools to make students use bathrooms and locker rooms according to their chromosomes and anatomy (Steinmetz, 2016). The supporters of sex-segregated bathroom bills argue if people are allowed to use a bathroom according to their gender identity, instead of the sex they were assigned at birth, it will increase sexual harassment and voyeurism, especially in women's bathrooms. There is no evidence to support this claim. Those in opposition to this legislation do so with the concern that such laws will encourage further hostility, abuse, and aggression toward transgender people. This form of discrimination has been shown to negatively affect mental health (Wang, Solomaon, Durso, McBride & Cahill, 2016). In fact, it is this adverse impact on the mental health of young persons that makes sex-segregated bathrooms an important social work issue. Protecting and serving vulnerable populations, such as transgender and gender variant youth, are central to the core values and ethics of social work.

## REVIEW OF LITERATURE

The freedom to access public bathrooms is a basic necessity for all people, and mandatory for equal access to education and employment (Wang, Solomon, Durso, McBride, & Cahill, 2016). When faced with consistent problems using gender segregated bathrooms, transgender people may experience a greater sense of stigmatization and discrimination (Herman, 2013). The federal Occupational Safety and Health Administration (2015) released guidelines identifying the risk of marginalization that can occur if transgender employees are forced to use separate bathroom facilities, or facilities inconsistent with their gender identity. Forcing people to use bathrooms inconsistent with their gender identity or separate from their peer group creates a negative environment, whether in the workplace or an educational setting.

**Unequal access.** Anti-transgender bathroom bills, or laws that force people to use public bathrooms according to the gender they were assigned at birth, are written with the intention of increasing public safety.

*28*

Wang, et al. (2016) claim that rather than increasing public safety, these laws increase the risk of harassment and hostility toward transgender people. In 2015, Texas, Kentucky, Florida, Minnesota, and Missouri were considering bills that would regulate transgender and gender non-conforming people's access to public bathrooms and locker rooms. The laws proposed in Minnesota and Kentucky were a reaction to schools in those states that had created transgender inclusive bathroom policies. Even though the bills in those two states were defeated, other states have similar legislation moving through their governing bodies (Wang, et.al, 2016). The legislation passed by South Dakota, similar to the bills in Minnesota and Kentucky, include an exception for gender non-conforming students. It states that if a student cannot use the facilities aligning with the sex they were assigned at birth, and they obtain parental consent, "reasonable accommodations" will be made. Those accommodations are restricted to single occupancy, unisex facilities, or faculty bathrooms (Wang, et al., 2016). Wang, et al. (2016) argue that rather than being an acceptable compromise, this rule requires the student to disclose their transgender status to people who may not be supportive of their gender identity. Furthermore, if the child had begun transitioning before they enrolled in school, they also would be forced to reveal their assigned sex to the school community. This type of forced disclosure leaves gender non-conforming and transgender students vulnerable to bullying and victimization by peers and faculty.

**Negative school environment, bullying and victimization.** Studies have shown that improving the culture in schools around accepting and supporting LGBTQ students reduces both victimization and suicide attempts (DeCamp & Bakken, 2016). In turn, this finding suggests that a school environment that is not supportive of sexual and gender minority students increases the likelihood of victimization and suicidal behavior.

Educational systems in this country have not made significant progress in exploring and meeting the needs of their LGBTQ students (Little, 2001). Data presented by Riley, Sitharthan, Clemson, and Diamond (2013) suggests that even when children try to adhere to stereotyped gender roles, they are often targeted as "the other" by those seeking to marginalize and victimize them. The surveyed parents of LGBTQ children spoke of having to watch their children struggle socially. One-third of parents reported that their children were sad, depressed,

AR_293384

*Journal of Advanced Generalist Social Work Practice*

or suicidal (Riley, Sitharthan, Clemson, & Diamond, 2013).

Victimization of LGBTQ students is widespread and comes from both peers and teachers (Russell, Ryan, Toomey, & Sanchez, 2011). As noted above (Goldblum et.al), nearly 49 percent of transgender students participating in a 2012 study reported having been subject to hostility or insensitivity due to their gender expression. Russell, et al. (2011) showed that even small successes in reducing LGBTQ victimization in middle and high school could significantly improve the long-term health of students. It is thought that the mental health consequences of bullying increase when the victimization is based on these factors (Russell, Ryan, Toomey, & Sanchez, 2011). Participants who reported victimization based on gender were four times as likely to have attempted suicide as those who did not, and 28.5 percent of all respondents reported past suicide attempts (Goldblum, et al., 2012). The findings of this study reinforce the need to promote safer school environments for transgender and gender non-conforming students.

Craig and Pepler (2003) found children were most likely to be bullied at school, especially in areas that are not well supervised, such as school buses, playgrounds, hallways, bathrooms, and locker rooms. In recent years, the problem of school bullying appears to have intensified in severity and prevalence, and behaviors of students towards their peers have become more vicious. On a more hopeful note, more attention is being paid to the bullying of LGBTQ young people who are at a high risk of suicide (Russell, Ryan, Toomey, & Sanchez, 2011).

**Depression, anxiety, isolation, and hopelessness.** There is recognition in the literature that pressuring children to conform to gender roles and stereotypes creates damage and suffering that persists through adolescence and adulthood (Riley, Sitharthan, Clemson, & Diamond, 2013).

When young people are victimized, they report increased levels of anxiety and somatization, as well as problems with forming and maintaining good relationships (Craig & Pepler, 2003). Isolation for LGBTQ youth can be fatal. When isolated, LGBTQ young people are less likely to seek support for fear of rejection (Little, 2001).

Children suffering from depression and anxiety are at increased risk of being victimized (Craig & Pepler, 2003). Forty-one percent of the respondents in the National Transgender Discrimination Survey reported having attempted suicide, compared to 4.6 percent of the general population and 10.2 percent of lesbian, gay, and bisexual identified people. Among the group

of transgender respondents with histories of suicide attempts, several factors contributed to higher suicide rates: a previous attempted suicide, lower levels of education, and having experienced harassment or bullying at school.

Mustanski and Liu (2013) found that hopelessness and depression are determinants of suicidal behavior. LGBTQ youth are not only more likely to attempt suicide, they also are more likely to succeed in their attempts (Little, 2001). Increased rates of depression, sadness, and hopelessness have a significant effect on self-injury and suicidal ideation in all young people, regardless of gender identity or sexual orientation (DeCamp & Bakken, 2016). However, there also are factors specific to LGBTQ youth that may account for higher rates of suicidal behavior in this population (Mustanski & Liu, 2013).

In a longitudinal study examining the predictors of suicide attempts in LGBTQ youth, Mustanski and Liu (2013) found that when they examined suicide attempts by gender, transgender youth had the highest reported rates of hopelessness, victimization, and childhood gender non-conformity. These three elements represent significant risk factors for suicidality. Transgender youth also had the highest rate of suicide attempts (Mustanski & Liu, 2013). The findings of this study also support the belief that thwarted belongingness and isolation are risk factors for suicidality.

While some studies have found that concealing one's sexual orientation is detrimental to mental health for lesbian, gay, and bisexual people, the findings of the National Transgender Discrimination Survey, as reported by Haas, Rogers and Herman (2014), suggest that disclosing gender identity does not have the same effect for transgender people. The findings suggest that it serves as a protective factor and it is safer to be recognized as gender conforming. One-half of the respondents with a history of suicide attempts had previously disclosed their gender identity (Haas, Rodgers, & Herman, 2014).

**CONCLUSION**

Sex-segregated school bathroom laws impact transgender students and the entire school community negatively. The literature, reviewed in this paper, shows that sex-segregated bathrooms increase the likelihood of transgender students becoming depressed, anxious, isolated, and hopeless. They also establish a school environment that stigmatizes transgender students as "different" and "unusual," ultimately leading to social dynamics of being shamed and bullied. As the above literature demonstrates,

AR_293386

*Journal of Advanced Generalist Social Work Practice*

elevated levels of depression and hopelessness may lead to suicidal ideation and attempts.

Laws that require public schools to institute rules that all students must use the bathroom, shower, and locker room in accordance with their biological sex as determined at birth are unjust and discriminatory. Instead of focusing on sex-segregated bathrooms, students, parents, teachers, school administrators, and the entire school community are best served by tolerance and acceptance. Educators and mental health professionals must begin to teach about and fight against gender oppression in the same way they confront racial discrimination and have begun to normalize the conversation around homophobia (McCarthy, 2003).

# References

Craig, W. M., & Pepler, D. J. (2003). Identifying and targeting risk for involvement in bullying and victimization. *Canadian Journal of Psychiatry, 48*(9), 577-582.

DeCamp, W., & Bakken, N. W. (2016). Self-injury, suicide ideation, and sexual orientation: differences in causes and correlates among high school students. *Journal of Injury & Violence Research, 8*(1), 15-24.

Goldblum, P., Testa, R. J., Pflum, S., Hendricks, M. L., Bradford, J., & Bongar, B. (2012). The relationship between gender-based victimization and suicide attempts in transgender people. *Professional Psychology: Research and Practice, 43*, 468-475.

Haas, A., Rodgers, P., & Herman, J. (2014). Suicide attempts among transgender and gender non-conforming adults: Findings of the national transgender discrimination survey. American Foundation for Suicide Prevention and The Williams Institute, UCLA School of Law. Retrieved from http://williamsinstitute.law.ucla.edu/wp-content/uploads/AFSP-Williams-Suicide-Report-Final.pdf

AR_293387

Herman, J. L. (2013). Gendered restrooms and minority stress: The public
regulation of gender and its impact on transgender people's lives.
*Journal of Public Management & Social Policy*, 65-80.

Little, J. N. (2001). Embracing gay, lesbian, bisexual and transgendered
youth in school-based settings. *Child & Youth Care Forum, 30*(2),
99-110.

Mustanski, B., & Liu, R. T. (2013). A longitudinal study of predictors of
suicide attempts among lesbian, gay, bisexual and transgender youth.
*Archives of Sexual Behavior, 42*, 437-448.

Occupational Safety and Health Administration (2015).
OSHA Trade Release. Retrieved from https://www.osha.gov/news/
newsreleases/trade/06012015

Riley, E. A., Sitharthan, G., Clemson, L., & Diamond, M. (2013).
Recognising the needs of gender-varient children and their parents.
*Sex Education, 13*(6), 644-659.

Rogers, A., Rebbe, R., Gardella, C., Worlein, M., & Chamberlin, M.
(2013, August). Older LGBT Adult Training Panels: An Opportunity
to Educate About Issues Faced by the Older LGBT Community.
*Journal of Gerontological Social Work*, 580-595.

Russell, S. T., Ryan, C., Toomey, R. B., & Sanchez, J. (2011, May).
Lesbian, gay, bisexual, and transgender adolescent school
victimization: Implications for young adult health and adjustment.
*Journal of School Health, 81*(5), 223-230.

Wang, T., Solomon, D., Durso, L. E., McBride, S., & Cahill, S. (2016).
State anti-transgender bathroom bills threaten transgender people's
health and participation in public life [PDF file]. Policy Brief,
Fenway Institute and Center for American Progress. Retrieved from
http://fenwayhealth.org/wp-content/uploads/2015/12/COM-2485-
Transgender-Bathroom-Bill-Brief_v8-pages.pdf

AR_293388

LGBT Health
Volume 6, Number 1, 2019
© Mary Ann Liebert, Inc.
DOI: 10.1089/lgbt.2018.0194

Downloaded by 100.24.195.59 from www.liebertpub.com at 08/02/24. For personal use only.

# Sexual Orientation Enumeration in State Antibullying Statutes in the United States: Associations with Bullying, Suicidal Ideation, and Suicide Attempts Among Youth

Ilan H. Meyer, PhD,[1] Feijun Luo, PhD,[2] Bianca D.M. Wilson, PhD,[1] and Deborah M. Stone, ScD, MSW, MPH[3]

## Abstract

*Purpose:* The aim was to assess the associations of antibullying U.S. state statutes that enumerate sexual orientation with exposure to bullying and other stressors and with suicidal ideation and suicide attempts in sexual minority and non sexual minority youth.

*Methods:* We analyzed data from the 2015 national school-based Youth Risk Behavior Survey, representative of 9th through 12th grade students attending public and private schools in the United States. We reviewed each state's antibullying statutes and classified them on enumeration.

*Results:* Antibullying state laws that enumerate sexual orientation were associated with lower risk for suicide attempts and serious attempts requiring medical attention and lower risk for forced sexual intercourse. They were also associated with feeling safe at school or on the way to or from school. Results did not differ by sexual orientation.

*Conclusions:* Enumeration of sexual orientation was associated with reduced stressors and suicide attempts, but it is insufficient to remove significant disparities based on sexual orientation. Additional policies and practices are required to address persistent sexual orientation disparities in exposure to bullying and suicidal behavior.

*Keywords:* bullying, law and policy, schools, sexual minority youth, suicide attempts

## Introduction

HOMOPHOBIC AND TRANSPHOBIC VIOLENCE, including bullying, is a challenge for educators and policy makers internationally as shown by data from Africa, Asia, Europe, Latin America and the Caribbean, North America, and the Pacific.[1] The United States has some of the highest rates of homophobic and transphobic violence.[1] Bullying has been identified as a particular challenge in U.S. schools and is associated with suicide risk factors, including physical and sexual violence, feeling unsafe, depression, thoughts of suicide, and suicidal behavior.[2–4] A comprehensive report by the United Nations Educational, Scientific and Cultural Organization recommended a variety of policy approaches to address homophobic and transphobic violence.[1] For example, a study in Australia has shown that sexual and gender minority students' perceptions of policies that protect them were associated with increased sense of safety and reduced likelihood of thinking about self-harm, actual self-harm, suicidal ideation, and attempted suicide.[5]

In the United States, by 2015, all 50 states and the District of Columbia enacted laws aimed at reducing bullying.[6] However, little research has tested the effectiveness of state antibullying policies in reducing bullying and its ill effects; the research that is available has shown mixed results. One study found lower odds of reported bullying behavior in states that were compliant with U.S. Department of Education guidelines, such as having a clearly defined scope of the law and stated requirements for districts to implement local policies.[7] However, in another study of bullying prevalence in Iowa, researchers found no reduction from before to 3 years after the enactment of the antibullying law.[8]

Sexual and gender minorities are particularly targeted for bullying and suffer its negative effects, including increased risk for suicidal ideation and behavior.[9–11] In 2015, 34% of lesbian, gay, and bisexual (LGB) students had been bullied

[1]The Williams Institute, School of Law, University of California Los Angeles, Los Angeles, California.
Divisions of [2]Analysis, Research, and Practice Integration, [3]Violence Prevention, National Center for Injury Prevention and Control, Centers for Disease Control and Prevention, Atlanta, Georgia.

AR_293389

Downloaded by 100.24.195.59 from www.liebertpub.com at 08/02/24. For personal use only.

at school over a year, compared with 19% of heterosexual students. During this same time frame, 28% of LGB students reported online bullying, compared with 14% of heterosexual students; 43% had seriously considered attempting suicide, and 29% had attempted suicide, compared with 15% and 6%, respectively, of heterosexual students.[9]

Advocates recommend that laws specifically enumerate sexual orientation and gender identity—that is, specifically list these categories in the statute. The argument is that enumeration would impel school personnel to address these specific forms of bullying, which can be otherwise ignored even in the presence of a general anti-bullying law.[12–15] In one study, researchers assessed the role of sexual orientation enumeration in Oregon school districts and found that counties with more school districts that enumerated sexual orientation in their antibullying policies had the lowest rates of suicide attempts among lesbian and gay (but not bisexual) youth.[16]

To fill the gap in understanding the effectiveness of enumerated antibullying laws, we assess whether youth in states that have such enumerated sexual orientation antibullying statutes are exposed to fewer experiences of bullying and other stressors at school and have less suicidal ideation and fewer suicide attempts compared with youth in states whose antibullying statutes do *not* enumerate sexual orientation.[17] We further assess whether such an association, if it exists, is specific to sexual minority youth or whether it is generalized across all students, regardless of sexual orientation.

## Methods

### Sample

The national Youth Risk Behavior Survey (YRBS) is a school-based survey conducted by the Centers for Disease Control and Prevention biannually.[18] Survey responses are representative of 9th through 12th grade students attending public and private schools in the United States. Although schools in all 50 states and the District of Columbia are included in the sampling frame, because the survey uses a three-stage cluster sample design, not all states have schools drawn into the sample.[9] The 2015 national YRBS sample included 15,624 respondents from 27 states. More detailed information about YRBS sampling and weighting is available elsewhere.[9] The study was exempt from institutional review board review as the analyses involved a deidentified data set that is available publicly.

### Measures

Sexual minority status. We defined sexual minority youth based on responses to two items: sexual identity and sexual contact. Youth who endorsed being "gay or lesbian," "bisexual," or "not sure" or who reported that they had any same-sex sexual contact during their lifetime were classified as *sexual minority* youth. Youth not classified as sexual minority were classified as *non sexual minority* youth. Sexual minority status was missing if sexual identity was missing and sexual contact was missing or none ($N = 882$).

Enumerated antibullying law. States were coded as to whether by 2015 they did or did not have an antibullying statute that enumerated sexual orientation. A statute was considered to enumerate sexual orientation if the statute listed

sexual orientation specifically as a focus of the law (Supplementary Table S1; Supplementary Data are available online at www.liebertpub.com/lgbt).

Experienced bullying and related stressors. Two items assessed bullying, asking whether respondents were "bullied" on school property and "electronically bullied." We also assessed five stressful experiences and indicators of victimization: felt unsafe at school or on their way to or from school in the past 30 days; threatened or injured with a weapon such as a gun, knife, or club on school property; in a physical fight; injured and had to be treated by a doctor or nurse after being in a physical fight; and ever physically forced to have sexual intercourse. All responses were dichotomized as "yes," if the outcome occurred, or "no," if the outcome never occurred.

Suicidal ideation and suicide attempts. Respondents answered the following four items related to the year before the interview: seriously considered attempting suicide; made a plan for attempting suicide; actually attempted suicide; and made an attempt that resulted in an injury, poisoning, or overdose that had to be treated by a doctor or nurse. Responses were dichotomized as "yes," if this occurred, or "no," if it never occurred.

Demographic characteristics. Sex (male or female), grade in school (9, 10, 11, or 12), and race/ethnicity (categorized as non-Hispanic American Indian/Alaska Native, Asian, Black or African American, Native Hawaiian/other Pacific Islander, or White; or Hispanic/Latino or non-Hispanic multiple races or Hispanic multiple races) were self-reported by respondents.

### Data analysis

We calculated frequencies to describe the sample and conducted logistic regression to test whether antibullying laws that enumerated sexual orientation were associated with reduced bullying, related stressors, and suicidal ideation and suicide attempts, controlling for demographic characteristics. We calculated odds ratios and 95% confidence intervals for youth attending schools in a state with enumerated antibullying statutes compared with youth attending schools in states that do not have such enumeration, across all respondents, as well as among sexual minority youth compared with non sexual minority youth, across all states. We also tested interactions to assess whether the associations between enumerated antibullying state laws and bullying and other stressors and suicidal ideation and suicide attempts differed based on sexual minority status.

We used SAS software version 9.3 (SAS Institute Inc., Cary, NC) with survey procedures in all statistical analyses to account for the complex sampling design of the YRBS.[19] Missing data were handled using the SAS survey procedure option NOMCAR (not missing completely at random).[20] A weight based on student sex, race/ethnicity, and grade was applied to each record to adjust for school and student nonresponse and oversampling of Black and Hispanic students. The overall weights were scaled so that the weighted count of students equals the total sample size, and the weighted proportions of students in each grade match the national population proportions. Therefore, weighted estimates are

Downloaded by 100.24.195.59 from www.liebertpub.com at 08/02/24. For personal use only.

representative of all students in grades 9–12 attending public and private schools in the United States.[9]

**Results**

The 2015 national YRBS sample included 15,624 respondents from 27 states, in which 12 states had an antibullying statue that enumerated sexual orientation and 15 states did not (Supplementary Table S1). The weighted percentages of male and female students were 51.3% and 48.7%, respectively, and percentages of 9th, 10th, 11th, and 12th grade students were 27.2%, 25.7%, 23.9%, and 23.1%, respectively. White, Black/African American, multiple-Hispanic, and Hispanic/Latino were the leading four race/ethnicity categories, with weighted percentages of 54.5%, 13.6%, 12.3%, and 9.9%, respectively.

Nationwide, 12.8% (standard error [SE] = 0.8%) of students met this study's definition of sexual minority youth. Sexual minority youth were more likely than non sexual minority youth to be female (68.8% vs. 45.7%, Rao–Scott chi square [$Q_{RS}$] = 74.6 [1], $p < 0.001$), and were more likely to be Black/African American (16.9% vs. 13.1%, $Q_{RS}$ = 5.7 [1] $p = 0.017$). Sexual minority youth were less likely than non sexual minority youth to be White (48.0% vs. 55.5%, $Q_{RS}$ = 6.5 [1] $p = 0.011$) and more likely to have multiple race/ethnicities (both Hispanic and non-Hispanic, 14.7% vs. 12.1%, $Q_{RS}$ = 5.8 [1] $p = 0.015$ and 6.8% vs. 4.2%, $Q_{RS}$ = 16.7 [1] $p < 0.001$, respectively). Sexual minority and non sexual minority youth did not differ in the grade they attended in school.

Table 1 shows bullying and other stressors and suicidal ideation and suicide attempts among youth by antibullying law (sexual orientation enumerated vs. not enumerated) and youth sexual orientation (sexual minority vs. non sexual minority). First, across all respondents, regardless of sexual orientation, and controlling for sex, grade, and race/ethnicity, having an antibullying state law that enumerates sexual orientation was associated with reduced odds of bullying, stressors, and suicidal ideation and suicide attempts (Table 1, Column C). Related to stressors, the relationship was significant for feeling unsafe at school or on the way to or from school and ever having been physically forced to have sexual intercourse. Related to suicidal ideation and suicide attempts outcomes, the association was significant for attempting suicide and making a suicide attempt that required being treated by a doctor or nurse.

Second, across all states, compared with non sexual minority youth, more sexual minority youth experienced each of the bullying and other stressors we examined and they were more likely than non sexual minority youth to have suicidal ideation and suicide attempts (Table 1, Column D).

A test of the interaction between sexual minority status and the presence of an enumerated antibullying state law was not significant for any of the outcomes we examined, suggesting that the effect of enumerated state laws on bullying, stressors, and suicide was similar for sexual minority and non sexual minority youth (not shown).

**Discussion**

Our results show that enumeration of sexual orientation in antibullying laws at the state level was associated with fewer suicide attempts, including serious attempts requiring medical attention, compared with state statutes that do not enumerate sexual orientation. Youth in states with enumerated statues also reported feeling safer at school or on the way to or from school, and were less likely to have been physically forced to have sexual intercourse. In considering the significant effects we found, it is important to recall that all states have antibullying laws, which provide some baseline protection. It is, thus, all the more noteworthy that even with the general antibullying laws, evidence shows an impact that is specific for enumerated statutes.

Interestingly, our results show that the effects of having sexual orientation enumeration were the same for sexual minority and non sexual minority youth. An explanation may be that actions taken along with enumeration, such as enactment of specific policies and model programs, have an impact that does not distinguish sexual minority and non sexual minority youth. Because we were limited in testing mechanisms of the associations we detected, this could not be assessed.

Thus, our findings show that while enumeration is effective in reducing suicide attempts and other stressors, it is insufficient at reducing *disparities* between sexual minority and non sexual minority youth in bullying, related stressors, and suicide attempts. That is, while fewer youth attempted suicide in states with enumerated statutes compared with states that do not have enumerated statutes, sexual minority youth have higher prevalence of suicide attempts than non sexual minority youth both in states with and without enumerated statutes.

Our results are consistent with advocates' and other researchers' assertions that sexual orientation enumeration is merely a first step in addressing bullying and its ill effects. For example, Russell et al. suggested that enumeration is "a foundation on which other lesbian, gay, bisexual, transgender, and questioning (LGBTQ) safe school policies and practices can be based."[12] In addition to enumeration, the authors recommended training of teachers on effective intervention strategies, school-based support groups (e.g., Gay–Straight Alliances), inclusion of LGBTQ people or issues in school curricula, and improved access to information and resources. Other strategies and approaches to prevent risk of youth suicide include promoting social connectedness among youth and schools, parents/caregivers, and communities; promoting protective school environments to improve prosocial behaviors and help-seeking behavior; and teaching coping and problem-solving skills to reduce bullying, violence, and suicide risk.[21–23]

*Study limitations*

Among our study limitations are that the cross-sectional data do not allow us to test whether state enumeration of sexual orientation was the cause of the observed differences or whether other correlated state-level factors were at work. For example, states that included enumeration by sexual orientation in their laws may also have made other efforts to address bullying and to improve the social environment. Also, we cannot state that sexual orientation enumeration *per se* explains the results as all states that enumerate sexual orientation also enumerate other characteristics, such as race or religion.

In addition, 27 states were randomly included in the YRBS national sample; we do not know if results would have differed had other states been included. We used a

Downloaded by 100.24.195.59 from www.liebertpub.com at 08/02/24. For personal use only.

TABLE 1. BULLYING, OTHER STRESSORS, AND SUICIDAL IDEATION AND SUICIDE ATTEMPTS AMONG YOUTH FROM THE YOUTH RISK BEHAVIOR SURVEY 2015 (N = 15,624): UNWEIGHTED NUMBERS AND WEIGHTED PROPORTIONS, BY ENUMERATED ANTIBULLYING STATE LAW AND SEXUAL ORIENTATION

| | A—Nonenumerated[a] state statute | | | | B—Enumerated[a] state statute | | | | C—Difference between states with and without enumerated antibullying statute (across all respondents) | D—Difference between sexual minority and non sexual minority youth (across all states) |
| | Non sexual minority youth | | Sexual minority youth | | Non sexual minority youth | | Sexual minority youth | | | |
| | N | % (SE) | N | % (SE) | N | % (SE) | N | % (SE) | OR (95% CI) | OR (95% CI) |
|---|---|---|---|---|---|---|---|---|---|---|
| **Bullying and other stressors** | | | | | | | | | | |
| Felt unsafe at school or on their way to or from school | 276 | 5.4 (0.7) | 99 | 14.1 (1.5) | 385 | 4.1 (0.4) | 149 | 9.8 (1.3) | 0.7 (0.5–0.9) | 2.5 (2.0–3.1) |
| Threatened or injured with a weapon on school property | 284 | 6.2 (0.5) | 79 | 10.5 (1.6) | 386 | 4.3 (0.4) | 126 | 11.3 (1.2) | 0.8 (0.7–1.0) | 2.2 (1.8–2.7) |
| Were in a physical fight | 1024 | 24.8 (1.4) | 225 | 33.2 (2.3) | 1219 | 19.6 (0.8) | 257 | 28.8 (2.7) | 0.8 (0.7–1.0) | 1.8 (1.5–2.2) |
| Were injured in a physical fight | 125 | 2.5 (0.4) | 50 | 7.4 (1.4) | 132 | 2.2 (0.2) | 52 | 5.4 (0.9) | 1.0 (0.7–1.4) | 3.2 (2.4–4.4) |
| Were ever physically forced to have sexual intercourse | 292 | 6.4 (0.7) | 143 | 19.1 (2.1) | 424 | 4.4 (0.5) | 224 | 16.1 (2.3) | 0.7 (0.5–0.9) | 2.8 (2.1–3.7) |
| Were bullied on school property | 788 | 18.5 (1.2) | 239 | 31.4 (3.6) | 1382 | 18.7 (1.1) | 378 | 31.0 (2.0) | 0.9 (0.8–1.1) | 1.8 (1.5–2.2) |
| Were electronically bullied | 546 | 13.0 (0.7) | 194 | 27.4 (2.9) | 1062 | 14.5 (0.9) | 335 | 26.8 (2.2) | 1.0 (0.8–1.2) | 2.0 (1.6–2.4) |
| **Suicidal ideation and suicide attempts** | | | | | | | | | | |
| Seriously considered attempting suicide | 672 | 14.7 (0.6) | 311 | 41.3 (2.8) | 1177 | 14.3 (0.8) | 483 | 37.5 (2.2) | 0.9 (0.7–1.0) | 3.3 (2.8–3.8) |
| Made a plan about how they would attempt suicide | 563 | 12.0 (0.6) | 269 | 35.7 (2.5) | 934 | 11.2 (0.9) | 440 | 34.5 (2.4) | 0.9 (0.7–1.1) | 3.5 (3.0–4.2) |
| Attempted suicide | 298 | 7.2 (0.6) | 174 | 28.2 (2.2) | 417 | 5.5 (0.6) | 233 | 21.7 (1.8) | 0.7 (0.5–0.9) | 4.1 (3.4–5.0) |
| Attempted suicide resulted... treated by a doctor or nurse | 102 | 2.5 (0.5) | 68 | 10.8 (1.2) | 127 | 1.5 (0.3) | 72 | 7.0 (1.1) | 0.6 (0.4–0.9) | 4.1 (3.0–5.5) |

[a]"Enumerated" refers to state statutes that specifically identify sexual orientation as a characteristic that is protected by the law in addition to other characteristics such as gender, race, and religion (see states' categorization in Supplementary Table S1).
SE, standard error; OR, odds ratio.

AR_293392

Downloaded by 100.24.195.59 from www.liebertpub.com at 08/02/24. For personal use only.

broad definition of sexual minority status but do not know if results would vary by other definitions of sexual orientation or separately for sexual minority groups (e.g., bisexual individuals). Another limitation of the study is the potential increase in error introduced by including private school student participants of the YRBS in the study. Not all states with antibullying laws require private schools to adhere to them; although some private schools adopt such state laws voluntarily, it is unclear how the voluntary adoption of regulations among private schools differs between states with and without enumerated antibullying laws. As such, the inclusion of private school participants' data likely adds misclassification error, potentially attenuating true differences between states with and without enumerated laws.

We were also limited to explore sexual orientation but not gender identity and level of conformity to conventional gender roles because, to date, YRBS has no data relevant to transgender and gender nonbinary youth. Other research has shown that gender nonconformity is strongly associated with exposure to victimization among both sexual and gender minority youth.[15]

## Conclusions

Despite improvement in the social environment for sexual minority individuals in the United States, sexual orientation and gender identity disparities in exposure to bullying and its ill effects persist.[23] The results of this analysis show that enumeration of antibullying laws by sexual orientation is associated with significant reduction in exposure to some stressful experiences and suicide attempts among all students. However, enumeration alone has not been sufficient to remove disparities based on sexual orientation in experiences of bullying and suicide attempts. Additional policies and practices to address persistent sexual orientation and gender identity disparities in exposure to bullying and suicidal behavior are promising.[14,21]

## Acknowledgments

The authors thank Christy Mallory, JD, Maxwell Patton, and Akiesha Anderson, JD, for producing Supplementary Table S1, classifying state antibullying statutes. The authors thank Christy Mallory, JD, for her comments on an earlier version of this article.

## Disclaimer

The findings and conclusions in this report are those of the authors and do not necessarily represent the official position of the Centers for Disease Control and Prevention.

## Author Disclosure Statement

No competing financial interests exist.

## References

1. UNESCO: *Out in the Open: Education Sector Responses to Violence Based on Sexual Orientation and Gender Identity/Expression*. Paris, France: United Nations Educational, Scientific and Cultural Organization, 2016.

2. Arseneault L, Bowes L, Shakoor S: Bullying victimization in youths and mental health problems: "much ado about nothing"? Psychol Med 2010;40:717–729.

3. Espelage DL, Basile KC, Hamburger ME: Bullying perpetration and subsequent sexual violence perpetration among middle school students. J Adolesc Health 2012; 50:60–65.

4. Volk A, Craig W, Boyce W, King M: Adolescent risk correlates of bullying and different types of victimization. Int J Adolesc Med Health 2006;18:575–586.

5. Jones TM, Hillier L: Sexuality education school policy for Australian GLBTIQ students. Sex Educ 2012;12:437–454.

6. Stopbullying.gov: Laws & Policies. U.S. Department of Health and Human Services. n.d. Available at https://www.stopbullying.gov/laws/index.html, Accessed December 22, 2017.

7. Hatzenbuehler ML, Schwab-Reese L, Ranapurwala SI, et al.: Associations between antibullying policies and bullying in 25 states. JAMA Pediatr 2015;169:e152411.

8. Ramirez M, Ten Eyck P, Peek-Asa C, et al.: Evaluation of Iowa's anti-bullying law. Injury Epidemiol 2016;3:15.

9. Kann L, Olsen EO, McManus T, et al.: Sexual identity, sex of sexual contacts, and health-related behaviors among students in grades 9–12 - United States and selected sites, 2015. MMWR Surveill Summ 2016;65:1–202.

10. Eisenberg ME, Gower AL, McMorris BJ, et al.: Risk and protective factors in the lives of transgender/gender nonconforming adolescents. J Adolesc Health 2017;61:521–526.

11. Stone DM, Luo F, Ouyang L, et al.: Sexual orientation and suicide ideation, plans, attempts, and medically serious attempts: Evidence from local Youth Risk Behavior Surveys, 2001–2009. Am J Public Health 2014;104:262–271.

12. Russell ST, Kosciw JG, Horn S, Saewyc E: Safe schools policy for LGBTQ students. Soc Policy Rep 2010;24:1–25.

13. GLSEN: Enumeration. GLSEN. n.d. Available at https://www.glsen.org/sites/default/files/Enumeration_0.pdf, Accessed December 9, 2018.

14. Thoreson R: "Like Walking Through a Hailstorm" Discrimination Against LGBT Youth in US Schools. Human Rights Watch. 2016. Available at https://www.hrw.org/report/2016/12/07/walking-through-hailstorm/discrimination-against-lgbt-youth-us-schools#, Accessed December 9, 2018.

15. Toomey RB, Ryan C, Diaz RM, et al.: Gender-nonconforming lesbian, gay, bisexual, and transgender youth: School victimization and young adult psychosocial adjustment. Dev Psychol 2010;46:1580–1589.

16. Hatzenbuehler ML, Keyes KM: Inclusive anti-bullying policies and reduced risk of suicide attempts in lesbian and gay youth. J Adolesc Health 2013;53(1 Suppl):S21–S26.

17. Meyer IH: Prejudice, social stress, and mental health in lesbian, gay, and bisexual populations: Conceptual issues and research evidence. Psychol Bull 2003;129:674–697.

18. Centers for Disease Control and Prevention: Youth Risk Behavior Surveillance System (YRBSS) Overview. 2017. Available at https://www.cdc.gov/healthyyouth/data/yrbs/overview.htm, Accessed March 21, 2018.

19. Centers for Disease Control and Prevention: Software for Analysis of YRBS Data. Available at https://www.cdc.gov/healthyyouth/data/yrbs/pdf/2015/2015_YRBS_analysis_software.pdf, Accessed February 7, 2017.

20. Gorrell P: Survey Analysis: Options for Missing Data. IMPAQ International, LLC. 2010. Available at https://www.lexjansen.com/nesug/nesug10/sa/sa13.pdf, Accessed December 21, 2017.

Downloaded by 100.24.195.59 from www.liebertpub.com at 08/02/24. For personal use only.

21. Stone DM, Holland KM, Bartholow B, et al.: *Preventing Suicide: A Technical Package of Policies, Programs, and Practices.* Atlanta, GA: National Center for Injury Prevention and Control, Centers for Disease Control and Prevention, 2017.

22. Burton CL, Bonanno GA, Hatzenbuehler ML: Familial social support predicts a reduced cortisol response to stress in sexual minority young adults. Psychoneuroendocrinology 2014;47:241–245.

23. Stone DM, Luo F, Lippy C, McIntosh WL: The role of social connectedness and sexual orientation in the prevention of youth suicide ideation and attempts among sexually active adolescents. Suicide Life Threat Behav 2015;45:415–430.

24. Meyer IH: The elusive promise of LGBT Equality. Am J Public Health 2016;106:1356–1358.

Address correspondence to:
*Ilan H. Meyer, PhD*
*The Williams Institute*
*School of Law*
*University of California Los Angeles*
*Box 951476*
*Los Angeles, CA 90095-1476*

*E-mail:* meyer@law.ucla.edu

AR_293394

Transgender Adults' Access to College Bathrooms and Housing and the Relationship to Suicidality: Journal of Homosexuality: Vol 63 , No 10 - Get Access

Home ▶ All Journals ▶ Journal of Homosexu... ▶ List of Issues ▶ Volume 63, Issue 10 ▶ Transgender Adults ... PageID 3877 Page 230 of 290



Journal of Homosexuality
Volume 63, 2016 - Issue 10

18,530 Views | 111 CrossRef citations to date | 402 Altmetric

Articles

# Transgender Adults' Access to College Bathrooms and Housing and the Relationship to Suicidality

Kristie L. Seelman ⬚ , PhD, MSW

Pages 1378-1399 | Published online: 12 Apr 2016

⬚ Cite this article ⬚ https://doi.org/10.1080/00918369.2016.1157998

⬚ Full Article  ⬚ Figures & data  ⬚ References  ⬚ Citations  ⬚ Metrics  ⬚ Reprints & Permissions  Read this article

# ABSTRACT

Transgender and gender non-conforming people frequently experience discrimination, harassment, and marginalization across college and university campuses (Bilodeau, 2007; Finger, 2010; Rankin et al., 2010; Seelman et al., 2012). The minority stress model (Meyer, 2007) posits that experiences of discrimination often negatively impact the psychological wellbeing of minority groups. However, few scholars have examined whether college institutional climate factors—such as being denied access to bathrooms or gender-appropriate campus housing—are significantly associated with detrimental psychological outcomes for transgender people. Using the National Transgender Discrimination Survey, this study analyzes whether being denied access to these spaces is associated with lifetime suicide attempts, after controlling for interpersonal victimization by students or teachers. Findings from

AR_293395

Case 4:24-cv-00461-O Document 76 Filed 09/06/24 Page 231 of 290 PageID 3878

sequential logistic regression to indicate that access to each is a significant protector against suicidality, even after controlling for interpersonal victimization. This article discusses implications for higher education professionals and researchers.

☐ KEYWORDS: `Bathrooms` `campus housing` `harassment` `higher education` `minority stress model` `suicidality` `transgender`

## Acknowledgments

Thanks to Dr. K. Jurée Capers for reviewing a draft of this article and offering constructive feedback.

The author acknowledges the National LGBTQ Task Force and the National Center for Transgender Equality conducted the National Transgender Discrimination Survey, which generated the data analyzed within this study. Their report on the survey data is available at http://www.thetaskforce.org.

## Notes

[1] Within the present study, *transgender* encompasses those whose gender identity differs from predominant cultural expectations for their sex assigned at birth. This includes people who undergo medical treatment to transition from one gender to another, as well as those who have not or will not undergo such treatment, and is meant to match the definition used by the organizations that conducted the National Transgender Discrimination Survey (Grant et al., 2011). I will often use the term *trans\** to denote inclusion of a broader range of gender non-conforming identities, including those who may not use the term *transgender* for themselves.

[2] This statistic was calculated using the inverse odds ratio: 1 / 0.69 = 1.45.

**Previous** article    **View** issue table of contents    **Next** article

Log in via your institution

☐ Access through your institution

Log in to Taylor & Francis Online

☐ Log in

Restore content access

☐ Restore content access for purchases made as guest

## Purchase options * Save for later

PDF download + Online access
- 48 hours access to article PDF & online version
- Article PDF can be downloaded
- Article PDF can be printed

**USD 53.00**

☐ Add to cart

AR_293396

Transgender Adults' Access to College Bathrooms and Housing and the Relationship to Suicidality: Journal of Homosexuality: Vol 63 , No 10 - Get Access

Case 4:24-cv-00461-O    Document 76    Filed 09/06/24    Page 232 of 290    PageID 3879

**Issue Purchase**

- 30 days online access to complete issue
- Article PDFs can be downloaded
- Article PDFs can be printed

**USD 412.00**

[ 🛒 Add to cart ]

* Local tax will be added as applicable

Related Research ☐

People also read    Recommended articles    Cited by 111



Transgender Adults' Access to College Bathrooms and Housing and the Relationship to Suicidality: Journal of Homosexuality: Vol 63 , No 10 - Get Access

Case 4:24-cv-00461-O    Document 76    Filed 09/06/24    Page 233 of 290    PageID 3880

| Information for | Open access |
|---|---|
| Authors | Overview |
| R&D professionals | Open journals |

Transgender Adults' Access to College Bathrooms and Housing and the Relationship to Suicidality: Journal of Homosexuality: Vol 63 , No 10 - Get Access

Case 4:24-cv-00461-O    Document     Open Select    led 09/06/24    Page 234 of 290    PageID 3881

Editors

Librarians

Societies

**Opportunities**

Reprints and e-prints

Advertising solutions

Accelerated publication

Corporate access solutions

Dove Medical Press

F1000Research

**Help and information**

Help and contact

Newsroom

All journals

Books

Keep up to date

Register to receive personalised research and resources by email

☐ Sign me up

☐  ☐  ☐

☐  ☐

Copyright © 2024   **Informa UK Limited**   Privacy policy   Cookies   Terms & conditions   Accessibility

Taylor & Francis Group
an **informa** business

Registered in England & Wales No. 3099067
5 Howick Place | London | SW1P 1WG

AR_293399

CLINICAL PRACTICE GUIDELINE

Downloaded from https://academic.oup.com/jcem/article/102/11/3869/4157553 by National Library of Education user on 15 August 2024

# Endocrine Treatment of Gender-Dysphoric/ Gender-Incongruent Persons: An Endocrine Society* Clinical Practice Guideline

Wylie C. Hembree,[1] Peggy T. Cohen-Kettenis,[2] Louis Gooren,[3] Sabine E. Hannema,[4] Walter J. Meyer,[5] M. Hassan Murad,[6] Stephen M. Rosenthal,[7] Joshua D. Safer,[8] Vin Tangpricha,[9] and Guy G. T'Sjoen[10]

[1]New York Presbyterian Hospital, Columbia University Medical Center, New York, New York 10032 (Retired); [2]VU University Medical Center, 1007 MB Amsterdam, Netherlands (Retired); [3]VU University Medical Center, 1007 MB Amsterdam, Netherlands (Retired); [4]Leiden University Medical Center, 2300 RC Leiden, Netherlands; [5]University of Texas Medical Branch, Galveston, Texas 77555; [6]Mayo Clinic Evidence-Based Practice Center, Rochester, Minnesota 55905; [7]University of California San Francisco, Benioff Children's Hospital, San Francisco, California 94143; [8]Boston University School of Medicine, Boston, Massachusetts 02118; [9]Emory University School of Medicine and the Atlanta VA Medical Center, Atlanta, Georgia 30322; and [10]Ghent University Hospital, 9000 Ghent, Belgium

> ***Cosponsoring Associations:*** American Association of Clinical Endocrinologists, American Society of Andrology, European Society for Pediatric Endocrinology, European Society of Endocrinology, Pediatric Endocrine Society, and World Professional Association for Transgender Health.

**Objective:** To update the "Endocrine Treatment of Transsexual Persons: An Endocrine Society Clinical Practice Guideline," published by the Endocrine Society in 2009.

**Participants:** The participants include an Endocrine Society–appointed task force of nine experts, a methodologist, and a medical writer.

**Evidence:** This evidence-based guideline was developed using the Grading of Recommendations, Assessment, Development, and Evaluation approach to describe the strength of recommendations and the quality of evidence. The task force commissioned two systematic reviews and used the best available evidence from other published systematic reviews and individual studies.

**Consensus Process:** Group meetings, conference calls, and e-mail communications enabled consensus. Endocrine Society committees, members and cosponsoring organizations reviewed and commented on preliminary drafts of the guidelines.

**Conclusion:** Gender affirmation is multidisciplinary treatment in which endocrinologists play an important role. Gender-dysphoric/gender-incongruent persons seek and/or are referred to endocrinologists to develop the physical characteristics of the affirmed gender. They require a safe and effective hormone regimen that will (1) suppress endogenous sex hormone secretion determined by the person's genetic/gonadal sex and (2) maintain sex hormone levels within the normal range for the person's affirmed gender. Hormone treatment is not recommended for prepubertal gender-dysphoric/gender-incongruent persons. Those clinicians who recommend gender-affirming endocrine treatments—appropriately trained diagnosing clinicians (required), a mental health provider for adolescents (required) and mental health

ISSN Print 0021-972X   ISSN Online 1945-7197
Printed in USA
Copyright © 2017 Endocrine Society
Received 24 July 2017. Accepted 24 August 2017.
First Published Online 13 September 2017

Abbreviations: BMD, bone mineral density; DSD, disorder/difference of sex development; DSM, Diagnostic and Statistical Manual of Mental Disorders; GD, gender dysphoria; GnRH, gonadotropin-releasing hormone; ICD, International Statistical Classification of Diseases and Related Health Problems; MHP, mental health professional; VTE, venous thromboembolism.

AR_293400

**3870** Hembree et al   Guidelines on Gender-Dysphoric/Gender-Incongruent Persons   J Clin Endocrinol Metab, November 2017, 102(11):3869–3903

Downloaded from https://academic.oup.com/jcem/article/102/11/3869/4157558 by National Library of Education user on 15 August 2024

professional for adults (recommended)—should be knowledgeable about the diagnostic criteria and criteria for gender-affirming treatment, have sufficient training and experience in assessing psychopathology, and be willing to participate in the ongoing care throughout the endocrine transition. We recommend treating gender-dysphoric/gender-incongruent adolescents who have entered puberty at Tanner Stage G2/B2 by suppression with gonadotropin-releasing hormone agonists. Clinicians may add gender-affirming hormones after a multidisciplinary team has confirmed the persistence of gender dysphoria/gender incongruence and sufficient mental capacity to give informed consent to this partially irreversible treatment. Most adolescents have this capacity by age 16 years old. We recognize that there may be compelling reasons to initiate sex hormone treatment prior to age 16 years, although there is minimal published experience treating prior to 13.5 to 14 years of age. For the care of peripubertal youths and older adolescents, we recommend that an expert multidisciplinary team comprised of medical professionals and mental health professionals manage this treatment. The treating physician must confirm the criteria for treatment used by the referring mental health practitioner and collaborate with them in decisions about gender-affirming surgery in older adolescents. For adult gender-dysphoric/gender-incongruent persons, the treating clinicians (collectively) should have expertise in transgender-specific diagnostic criteria, mental health, primary care, hormone treatment, and surgery, as needed by the patient. We suggest maintaining physiologic levels of gender-appropriate hormones and monitoring for known risks and complications. When high doses of sex steroids are required to suppress endogenous sex steroids and/or in advanced age, clinicians may consider surgically removing natal gonads along with reducing sex steroid treatment. Clinicians should monitor both transgender males (female to male) and transgender females (male to female) for reproductive organ cancer risk when surgical removal is incomplete. Additionally, clinicians should persistently monitor adverse effects of sex steroids. For gender-affirming surgeries in adults, the treating physician must collaborate with and confirm the criteria for treatment used by the referring physician. Clinicians should avoid harming individuals (via hormone treatment) who have conditions other than gender dysphoria/gender incongruence and who may not benefit from the physical changes associated with this treatment. (*J Clin Endocrinol Metab* 102: 3869–3903, 2017)

## Summary of Recommendations

### 1.0 Evaluation of youth and adults

1.1. We advise that only trained mental health professionals (MHPs) who meet the following criteria should diagnose gender dysphoria (GD)/gender incongruence in adults: (1) competence in using the Diagnostic and Statistical Manual of Mental Disorders (DSM) and/or the International Statistical Classification of Diseases and Related Health Problems (ICD) for diagnostic purposes, (2) the ability to diagnose GD/gender incongruence and make a distinction between GD/gender incongruence and conditions that have similar features (*e.g.*, body dysmorphic disorder), (3) training in diagnosing psychiatric conditions, (4) the ability to undertake or refer for appropriate treatment, (5) the ability to psychosocially assess the person's understanding, mental health, and social conditions that can impact gender-affirming hormone therapy, and (6) a practice of regularly attending relevant professional meetings. (Ungraded Good Practice Statement)

1.2. We advise that only MHPs who meet the following criteria should diagnose GD/gender incongruence in children and adolescents: (1) training in child and adolescent developmental psychology and psychopathology, (2) competence in using the DSM and/or the ICD for diagnostic purposes, (3) the ability to make a distinction between GD/gender incongruence and conditions that have similar features (*e.g.*, body dysmorphic disorder), (4) training in diagnosing psychiatric conditions, (5) the ability to undertake or refer for appropriate treatment, (6) the ability to psychosocially assess the person's understanding and social conditions that can impact gender-affirming hormone therapy, (7) a practice of regularly attending relevant professional meetings, and (8) knowledge of the criteria for puberty blocking and gender-affirming hormone treatment in adolescents. (Ungraded Good Practice Statement)

1.3. We advise that decisions regarding the social transition of prepubertal youths with GD/gender incongruence are made with the assistance of an MHP or another experienced professional. (Ungraded Good Practice Statement).

doi: 10.1210/jc.2017-01658

1.4. We recommend against puberty blocking and gender-affirming hormone treatment in pre-pubertal children with GD/gender incongruence. (1 |⊕⊕○○)

1.5. We recommend that clinicians inform and counsel all individuals seeking gender-affirming medical treatment regarding options for fertility preservation prior to initiating puberty suppression in adolescents and prior to treating with hormonal therapy of the affirmed gender in both adolescents and adults. (1 |⊕⊕⊕○)

## 2.0 Treatment of adolescents

2.1. We suggest that adolescents who meet diagnostic criteria for GD/gender incongruence, fulfill criteria for treatment, and are requesting treatment should initially undergo treatment to suppress pubertal development. (2 |⊕⊕○○)

2.2. We suggest that clinicians begin pubertal hormone suppression after girls and boys first exhibit physical changes of puberty. (2 |⊕⊕○○)

2.3. We recommend that, where indicated, GnRH analogues are used to suppress pubertal hormones. (1 |⊕⊕⊕○)

2.4. In adolescents who request sex hormone treatment (given this is a partly irreversible treatment), we recommend initiating treatment using a gradually increasing dose schedule after a multidisciplinary team of medical and MHPs has confirmed the persistence of GD/gender incongruence and sufficient mental capacity to give informed consent, which most adolescents have by age 16 years. (1 |⊕⊕○○).

2.5. We recognize that there may be compelling reasons to initiate sex hormone treatment prior to the age of 16 years in some adolescents with GD/gender incongruence, even though there are minimal published studies of gender-affirming hormone treatments administered before age 13.5 to 14 years. As with the care of adolescents ≥16 years of age, we recommend that an expert multidisciplinary team of medical and MHPs manage this treatment. (1 |⊕○○○)

2.6. We suggest monitoring clinical pubertal development every 3 to 6 months and laboratory parameters every 6 to 12 months during sex hormone treatment. (2 |⊕⊕○○)

## 3.0 Hormonal therapy for transgender adults

3.1. We recommend that clinicians confirm the diagnostic criteria of GD/gender incongruence and the criteria for the endocrine phase of gender transition before beginning treatment. (1 |⊕⊕⊕○)

3.2. We recommend that clinicians evaluate and address medical conditions that can be exacerbated by hormone depletion and treatment with sex hormones of the affirmed gender before beginning treatment. (1 |⊕⊕⊕○)

3.3. We suggest that clinicians measure hormone levels during treatment to ensure that endogenous sex steroids are suppressed and administered sex steroids are maintained in the normal physiologic range for the affirmed gender. (2 |⊕⊕○○)

3.4. We suggest that endocrinologists provide education to transgender individuals undergoing treatment about the onset and time course of physical changes induced by sex hormone treatment. (2 |⊕○○○)

## 4.0 Adverse outcome prevention and long-term care

4.1. We suggest regular clinical evaluation for physical changes and potential adverse changes in response to sex steroid hormones and laboratory monitoring of sex steroid hormone levels every 3 months during the first year of hormone therapy for transgender males and females and then once or twice yearly. (2 |⊕⊕○○)

4.2. We suggest periodically monitoring prolactin levels in transgender females treated with estrogens. (2 |⊕⊕○○)

4.3. We suggest that clinicians evaluate transgender persons treated with hormones for cardiovascular risk factors using fasting lipid profiles, diabetes screening, and/or other diagnostic tools. (2 |⊕⊕○○)

4.4. We recommend that clinicians obtain bone mineral density (BMD) measurements when risk factors for osteoporosis exist, specifically in those who stop sex hormone therapy after gonadectomy. (1 |⊕⊕○○)

4.5. We suggest that transgender females with no known increased risk of breast cancer follow breast-screening guidelines recommended for non-transgender females. (2 |⊕⊕○○)

4.6. We suggest that transgender females treated with estrogens follow individualized screening according to personal risk for prostatic disease and prostate cancer. (2 |⊕○○○)

4.7. We advise that clinicians determine the medical necessity of including a total hysterectomy and oophorectomy as part of gender-affirming surgery. (Ungraded Good Practice Statement)

Downloaded from https://academic.oup.com/jcem/article/102/11/3869/4157558 by National Library of Education user on 15 August 2024

Downloaded from https://academic.oup.com/jcem/article/102/11/3869/4157558 by National Library of Education user on 15 August 2024

## 5.0 Surgery for sex reassignment and gender confirmation

5.1. We recommend that a patient pursue genital gender-affirming surgery only after the MHP and the clinician responsible for endocrine transition therapy both agree that surgery is medically necessary and would benefit the patient's overall health and/or well-being. (1 |⊕⊕○○)

5.2. We advise that clinicians approve genital gender-affirming surgery only after completion of at least 1 year of consistent and compliant hormone treatment, unless hormone therapy is not desired or medically contraindicated. (Ungraded Good Practice Statement)

5.3. We advise that the clinician responsible for endocrine treatment and the primary care provider ensure appropriate medical clearance of transgender individuals for genital gender-affirming surgery and collaborate with the surgeon regarding hormone use during and after surgery. (Ungraded Good Practice Statement)

5.4. We recommend that clinicians refer hormone-treated transgender individuals for genital surgery when: (1) the individual has had a satisfactory social role change, (2) the individual is satisfied about the hormonal effects, and (3) the individual desires definitive surgical changes. (1 |⊕○○○)

5.5. We suggest that clinicians delay gender-affirming genital surgery involving gonadectomy and/or hysterectomy until the patient is at least 18 years old or legal age of majority in his or her country. (2 |⊕⊕○○).

5.6. We suggest that clinicians determine the timing of breast surgery for transgender males based upon the physical and mental health status of the individual. There is insufficient evidence to recommend a specific age requirement. (2 |⊕○○○)

## Changes Since the Previous Guideline

Both the current guideline and the one published in 2009 contain similar sections. Listed here are the sections contained in the current guideline and the corresponding number of recommendations: Introduction, Evaluation of Youth and Adults (5), Treatment of Adolescents (6), Hormonal Therapy for Transgender Adults (4), Adverse Outcomes Prevention and Long-term Care (7), and Surgery for Sex Reassignment and Gender Confirmation (6). The current introduction updates the diagnostic classification of "gender dysphoria/gender incongruence." It also reviews the development of "gender identity" and summarizes its natural development. The section on

clinical evaluation of both youth and adults, defines in detail the professional qualifications required of those who diagnose and treat both adolescents and adults. We advise that decisions regarding the social transition of prepubertal youth are made with the assistance of a mental health professional or similarly experienced professional. We recommend against puberty blocking followed by gender-affirming hormone treatment of prepubertal children. Clinicians should inform pubertal children, adolescents, and adults seeking gender-confirming treatment of their options for fertility preservation. Prior to treatment, clinicians should evaluate the presence of medical conditions that may be worsened by hormone depletion and/or treatment. A multidisciplinary team, preferably composed of medical and mental health professionals, should monitor treatments. Clinicians evaluating transgender adults for endocrine treatment should confirm the diagnosis of persistent gender dysphoria/gender incongruence. Physicians should educate transgender persons regarding the time course of steroid-induced physical changes. Treatment should include periodic monitoring of hormone levels and metabolic parameters, as well as assessments of bone density and the impact upon prostate, gonads, and uterus. We also make recommendations for transgender persons who plan genital gender-affirming surgery.

## Method of Development of Evidence-Based Clinical Practice Guidelines

The Clinical Guidelines Subcommittee (CGS) of the Endocrine Society deemed the diagnosis and treatment of individuals with GD/gender incongruence a priority area for revision and appointed a task force to formulate evidence-based recommendations. The task force followed the approach recommended by the Grading of Recommendations, Assessment, Development, and Evaluation group, an international group with expertise in the development and implementation of evidence-based guidelines (1). A detailed description of the grading scheme has been published elsewhere (2). The task force used the best available research evidence to develop the recommendations. The task force also used consistent language and graphical descriptions of both the strength of a recommendation and the quality of evidence. In terms of the strength of the recommendation, strong recommendations use the phrase "we recommend" and the number 1, and weak recommendations use the phrase "we suggest" and the number 2. Cross-filled circles indicate the quality of the evidence, such that ⊕○○○ denotes very low–quality evidence; ⊕⊕○○, low quality; ⊕⊕⊕○, moderate quality; and ⊕⊕⊕⊕, high quality. The task force has confidence that persons who receive care according to the strong recommendations will derive, on average, more benefit than harm. Weak recommendations require more careful consideration of the person's circumstances, values, and preferences to determine the best course of action. Linked to each recommendation is a description of the evidence and the

AR_293403

doi: 10.1210/jc.2017-01658

Downloaded from https://academic.oup.com/jcem/article/102/11/3869/4157553 by National Library of Education user on 15 August 2024

values that the task force considered in making the recommendation. In some instances, there are remarks in which the task force offers technical suggestions for testing conditions, dosing, and monitoring. These technical comments reflect the best available evidence applied to a typical person being treated. Often this evidence comes from the unsystematic observations of the task force and their preferences; therefore, one should consider these remarks as suggestions.

In this guideline, the task force made several statements to emphasize the importance of shared decision-making, general preventive care measures, and basic principles of the treatment of transgender persons. They labeled these "Ungraded Good Practice Statement." Direct evidence for these statements was either unavailable or not systematically appraised and considered out of the scope of this guideline. The intention of these statements is to draw attention to these principles.

The Endocrine Society maintains a rigorous conflict-of-interest review process for developing clinical practice guidelines. All task force members must declare any potential conflicts of interest by completing a conflict-of-interest form. The CGS reviews all conflicts of interest before the Society's Council approves the members to participate on the task force and periodically during the development of the guideline. All others participating in the guideline's development must also disclose any conflicts of interest in the matter under study, and most of these participants must be without any conflicts of interest. The CGS and the task force have reviewed all disclosures for this guideline and resolved or managed all identified conflicts of interest.

Conflicts of interest are defined as remuneration in any amount from commercial interests; grants; research support; consulting fees; salary; ownership interests [e.g., stocks and stock options (excluding diversified mutual funds)]; honoraria and other payments for participation in speakers' bureaus, advisory boards, or boards of directors; and all other financial benefits. Completed forms are available through the Endocrine Society office.

The Endocrine Society provided the funding for this guideline; the task force received no funding or remuneration from commercial or other entities.

## Commissioned Systematic Review

The task force commissioned two systematic reviews to support this guideline. The first one aimed to summarize the available evidence on the effect of sex steroid use in transgender individuals on lipids and cardiovascular outcomes. The review identified 29 eligible studies at moderate risk of bias. In transgender males (female to male), sex steroid therapy was associated with a statistically significant increase in serum triglycerides and low-density lipoprotein cholesterol levels. High-density lipoprotein cholesterol levels decreased significantly across all follow-up time periods. In transgender females (male to female), serum triglycerides were significantly higher without any changes in other parameters. Few myocardial infarction, stroke, venous thromboembolism (VTE), and death events were reported. These events were more frequent in transgender females. However, the quality of the evidence was low. The second review summarized the available evidence regarding the effect of sex steroids on bone health in transgender individuals and identified 13 studies. In transgender males, there was no statistically significant difference in the lumbar spine, femoral neck, or total hip BMD at 12 and 24 months compared with baseline values before initiating masculinizing hormone therapy. In transgender females, there was a statistically significant increase in lumbar spine BMD at 12 months and 24 months compared with baseline values before initiation of feminizing hormone therapy. There was minimal information on fracture rates. The quality of evidence was also low.

## Introduction

Throughout recorded history (in the absence of an endocrine disorder) some men and women have experienced confusion and anguish resulting from rigid, forced conformity to sexual dimorphism. In modern history, there have been numerous ongoing biological, psychological, cultural, political, and sociological debates over various aspects of gender variance. The 20th century marked the emergence of a social awakening for men and women with the belief that they are "trapped" in the wrong body (3). Magnus Hirschfeld and Harry Benjamin, among others, pioneered the medical responses to those who sought relief from and a resolution to their profound discomfort. Although the term transsexual became widely known after Benjamin wrote "The Transsexual Phenomenon" (4), it was Hirschfeld who coined the term "transsexual" in 1923 to describe people who want to live a life that corresponds with their experienced gender vs their designated gender (5). Magnus Hirschfeld (6) and others (4, 7) have described other types of trans phenomena besides transsexualism. These early researchers proposed that the gender identity of these people was located somewhere along a unidimensional continuum. This continuum ranged from all male through "something in between" to all female. Yet such a classification does not take into account that people may have gender identities outside this continuum. For instance, some experience themselves as having both a male and female gender identity, whereas others completely renounce any gender classification (8, 9). There are also reports of individuals experiencing a continuous and rapid involuntary alternation between a male and female identity (10) or men who do not experience themselves as men but do not want to live as women (11, 12). In some countries, (e.g., Nepal, Bangladesh, and Australia), these nonmale or nonfemale genders are officially recognized (13). Specific treatment protocols, however, have not yet been developed for these groups.

Instead of the term transsexualism, the current classification system of the American Psychiatric Association uses the term gender dysphoria in its diagnosis of persons who are not satisfied with their designated gender (14). The current version of the World Health Organization's ICD-10 still uses the term transsexualism when diagnosing adolescents and adults. However, for the ICD-11, the World Health Organization has proposed using the term "gender incongruence" (15).

Treating persons with GD/gender incongruence (15) was previously limited to relatively ineffective elixirs or creams. However, more effective endocrinology-based treatments became possible with the availability of testosterone in 1935 and diethylstilbestrol in 1938. Reports of individuals with GD/gender incongruence who were treated with hormones and gender-affirming surgery appeared in the press during the second half of the 20th century. The Harry Benjamin International Gender Dysphoria Association was founded in September 1979 and is now called the World Professional Association for Transgender Health (WPATH). WPATH published its first Standards of Care in 1979. These standards have since been regularly updated, providing guidance for treating persons with GD/gender incongruence (16).

Prior to 1975, few peer-reviewed articles were published concerning endocrine treatment of transgender persons. Since then, more than two thousand articles about various aspects of transgender care have appeared.

It is the purpose of this guideline to make detailed recommendations and suggestions, based on existing medical literature and clinical experience, that will enable treating physicians to maximize benefit and minimize risk when caring for individuals diagnosed with GD/gender incongruence.

In the future, we need more rigorous evaluations of the effectiveness and safety of endocrine and surgical protocols. Specifically, endocrine treatment protocols for GD/gender incongruence should include the careful assessment of the following: (1) the effects of prolonged delay of puberty in adolescents on bone health, gonadal function, and the brain (including effects on cognitive, emotional, social, and sexual development); (2) the effects of treatment in adults on sex hormone levels; (3) the requirement for and the effects of progestins and other agents used to suppress endogenous sex steroids during treatment; and (4) the risks and benefits of gender-affirming hormone treatment in older transgender people.

To successfully establish and enact these protocols, a commitment of mental health and endocrine investigators is required to collaborate in long-term, large-scale studies across countries that use the same diagnostic and inclusion criteria, medications, assay methods, and response assessment tools (*e.g.*, the European Network for the Investigation of Gender Incongruence) (17, 18).

Terminology and its use vary and continue to evolve. Table 1 contains the definitions of terms as they are used throughout this guideline.

# Biological Determinants of Gender Identity Development

One's self-awareness as male or female changes gradually during infant life and childhood. This process of cognitive and affective learning evolves with interactions with parents, peers, and environment. A fairly accurate timetable exists outlining the steps in this process (19). Normative psychological literature, however, does not address if and when gender identity becomes crystallized and what factors contribute to the development of a gender identity that is not congruent with the gender of rearing. Results of studies from a variety of biomedical disciplines—genetic, endocrine, and neuroanatomic—support the concept that gender identity and/or gender expression (20) likely reflect a complex interplay of biological, environmental, and cultural factors (21, 22).

With respect to endocrine considerations, studies have failed to find differences in circulating levels of sex steroids between transgender and nontransgender individuals (23). However, studies in individuals with a disorder/difference of sex development (DSD) have informed our understanding of the role that hormones may play in gender identity outcome, even though most persons with GD/gender incongruence do not have a DSD. For example, although most 46,XX adult individuals with virilizing congenital adrenal hyperplasia caused by mutations in *CYP21A2* reported a female gender identity, the prevalence of GD/gender incongruence was much greater in this group than in the general population without a DSD. This supports the concept that there is a role for prenatal/postnatal androgens in gender development (24–26), although some studies indicate that prenatal androgens are more likely to affect gender behavior and sexual orientation rather than gender identity *per se* (27, 28).

Researchers have made similar observations regarding the potential role of androgens in the development of gender identity in other individuals with DSD. For example, a review of two groups of 46,XY persons, each with androgen synthesis deficiencies and female raised, reported transgender male (female-to-male) gender role changes in 56% to 63% and 39% to 64% of patients, respectively (29). Also, in 46,XY female-raised individuals with cloacal

Downloaded from https://academic.oup.com/jcem/article/102/11/3869/4157558 by National Library of Education user on 15 August 2024

doi: 10.1210/jc.2017-01658

**Table 1.    Definitions of Terms Used in This Guideline**

*Biological sex, biological male or female:* These terms refer to physical aspects of maleness and femaleness. As these may not be in line with each other (*e.g.*, a person with XY chromosomes may have female-appearing genitalia), the terms biological sex and biological male or female are imprecise and should be avoided.

*Cisgender:* This means not transgender. An alternative way to describe individuals who are not transgender is "non-transgender people."

*Gender-affirming (hormone) treatment:* See "gender reassignment"

*Gender dysphoria:* This is the distress and unease experienced if gender identity and designated gender are not completely congruent (see Table 2). In 2013, the American Psychiatric Association released the fifth edition of the DSM-5, which replaced "gender identity disorder" with "gender dysphoria" and changed the criteria for diagnosis.

*Gender expression:* This refers to external manifestations of gender, expressed through one's name, pronouns, clothing, haircut, behavior, voice, or body characteristics. Typically, transgender people seek to make their gender expression align with their gender identity, rather than their designated gender.

*Gender identity/experienced gender:* This refers to one's internal, deeply held sense of gender. For transgender people, their gender identity does not match their sex designated at birth. Most people have a gender identity of man or woman (or boy or girl). For some people, their gender identity does not fit neatly into one of those two choices. Unlike gender expression (see below), gender identity is not visible to others.

*Gender identity disorder:* This is the term used for GD/gender incongruence in previous versions of DSM (see "gender dysphoria"). The ICD-10 still uses the term for diagnosing child diagnoses, but the upcoming ICD-11 has proposed using "gender incongruence of childhood."

*Gender incongruence:* This is an umbrella term used when the gender identity and/or gender expression differs from what is typically associated with the designated gender. Gender incongruence is also the proposed name of the gender identity–related diagnoses in ICD-11. Not all individuals with gender incongruence have gender dysphoria or seek treatment.

*Gender variance:* See "gender incongruence"

*Gender reassignment:* This refers to the treatment procedure for those who want to adapt their bodies to the experienced gender by means of hormones and/or surgery. This is also called gender-confirming or gender-affirming treatment.

*Gender-reassignment surgery (gender-confirming/gender-affirming surgery):* These terms refer only to the surgical part of gender-confirming/gender-affirming treatment.

*Gender role:* This refers to behaviors, attitudes, and personality traits that a society (in a given culture and historical period) designates as masculine or feminine and/or that society associates with or considers typical of the social role of men or women.

*Sex designated at birth:* This refers to sex assigned at birth, usually based on genital anatomy.

*Sex:* This refers to attributes that characterize biological maleness or femaleness. The best known attributes include the sex-determining genes, the sex chromosomes, the H-Y antigen, the gonads, sex hormones, internal and external genitalia, and secondary sex characteristics.

*Sexual orientation:* This term describes an individual's enduring physical and emotional attraction to another person. Gender identity and sexual orientation are not the same. Irrespective of their gender identity, transgender people may be attracted to women (gynephilic), attracted to men (androphilic), bisexual, asexual, or queer.

*Transgender:* This is an umbrella term for people whose gender identity and/or gender expression differs from what is typically associated with their sex designated at birth. Not all transgender individuals seek treatment.

*Transgender male (also: trans man, female-to-male, transgender male):* This refers to individuals assigned female at birth but who identify and live as men.

*Transgender woman (also: trans woman, male-to female, transgender female):* This refers to individuals assigned male at birth but who identify and live as women.

*Transition:* This refers to the process during which transgender persons change their physical, social, and/or legal characteristics consistent with the affirmed gender identity. Prepubertal children may choose to transition socially.

*Transsexual:* This is an older term that originated in the medical and psychological communities to refer to individuals who have permanently transitioned through medical interventions or desired to do so.

Downloaded from https://academic.oup.com/jcem/article/102/11/3869/4157558 by National Library of Education user on 15 August 2024

exstrophy and penile agenesis, the occurrence of transgender male changes was significantly more prevalent than in the general population (30, 31). However, the fact that a high percentage of individuals with the same conditions did not change gender suggests that cultural factors may play a role as well.

With respect to genetics and gender identity, several studies have suggested heritability of GD/gender incongruence (32, 33). In particular, a study by Heylens *et al.* (33) demonstrated a 39.1% concordance rate for gender identity disorder (based on the DSM-IV criteria) in 23 monozygotic twin pairs but no concordance in 21 same-sex dizygotic or seven opposite-sex twin pairs. Although numerous investigators have sought to identify

specific genes associated with GD/gender incongruence, such studies have been inconsistent and without strong statistical significance (34–38).

Studies focusing on brain structure suggest that the brain phenotypes of people with GD/gender incongruence differ in various ways from control males and females, but that there is not a complete sex reversal in brain structures (39).

In summary, although there is much that is still unknown with respect to gender identity and its expression, compelling studies support the concept that biologic factors, in addition to environmental factors, contribute to this fundamental aspect of human development.

## Natural History of Children With GD/Gender Incongruence

With current knowledge, we cannot predict the psychosexual outcome for any specific child. Prospective follow-up studies show that childhood GD/gender incongruence does not invariably persist into adolescence and adulthood (so-called "desisters"). Combining all outcome studies to date, the GD/gender incongruence of a minority of prepubertal children appears to persist in adolescence (20, 40). In adolescence, a significant number of these desisters identify as homosexual or bisexual. It may be that children who only showed some gender nonconforming characteristics have been included in the follow-up studies, because the DSM-IV text revision criteria for a diagnosis were rather broad. However, the persistence of GD/gender incongruence into adolescence is more likely if it had been extreme in childhood (41, 42). With the newer, stricter criteria of the DSM-5 (Table 2), persistence rates may well be different in future studies.

## 1.0 Evaluation of Youth and Adults

Gender-affirming treatment is a multidisciplinary effort. After evaluation, education, and diagnosis, treatment may include mental health care, hormone therapy, and/or surgical therapy. Together with an MHP, hormone-prescribing clinicians should examine the psychosocial impact of the potential changes on people's lives, including mental health, friends, family, jobs, and their role in society. Transgender individuals should be encouraged to experience living in the new gender role and assess whether this improves their quality of life. Although the focus of this guideline is gender-affirming hormone therapy, collaboration with appropriate professionals responsible for each aspect of treatment maximizes a successful outcome.

### Diagnostic assessment and mental health care

GD/gender incongruence may be accompanied with psychological or psychiatric problems (43–51). It is therefore necessary that clinicians who prescribe hormones and are involved in diagnosis and psychosocial assessment meet the following criteria: (1) are competent in using the DSM and/or the ICD for diagnostic purposes, (2) are able to diagnose GD/gender incongruence and make a distinction between GD/gender incongruence and conditions that have similar features (*e.g.*, body dysmorphic disorder), (3) are trained in diagnosing psychiatric conditions, (4) undertake or refer for appropriate treatment, (5) are able to do a psychosocial assessment of the patient's understanding, mental health, and social conditions that can impact gender-affirming hormone therapy, and (6) regularly attend relevant professional meetings.

Because of the psychological vulnerability of many individuals with GD/gender incongruence, it is important that mental health care is available before, during, and sometimes also after transitioning. For children and adolescents, an MHP who has training/experience in child and adolescent gender development (as well as child and adolescent psychopathology) should make the diagnosis, because assessing GD/gender incongruence in children and adolescents is often extremely complex.

During assessment, the clinician obtains information from the individual seeking gender-affirming treatment. In the case

---

**Table 2.    DSM-5 Criteria for Gender Dysphoria in Adolescents and Adults**

A. A marked incongruence between one's experienced/expressed gender and natal gender of at least 6 mo in duration, as manifested by at least two of the following:
  1. A marked incongruence between one's experienced/expressed gender and primary and/or secondary sex characteristics (or in young adolescents, the anticipated secondary sex characteristics)
  2. A strong desire to be rid of one's primary and/or secondary sex characteristics because of a marked incongruence with one's experienced/expressed gender (or in young adolescents, a desire to prevent the development of the anticipated secondary sex characteristics)
  3. A strong desire for the primary and/or secondary sex characteristics of the other gender
  4. A strong desire to be of the other gender (or some alternative gender different from one's designated gender)
  5. A strong desire to be treated as the other gender (or some alternative gender different from one's designated gender)
  6. A strong conviction that one has the typical feelings and reactions of the other gender (or some alternative gender different from one's designated gender)

B. The condition is associated with clinically significant distress or impairment in social, occupational, or other important areas of functioning.
Specify if:
  1. The condition exists with a disorder of sex development.
  2. The condition is posttransitional, in that the individual has transitioned to full-time living in the desired gender (with or without legalization of gender change) and has undergone (or is preparing to have) at least one sex-related medical procedure or treatment regimen—namely, regular sex hormone treatment or gender reassignment surgery confirming the desired gender (*e.g.*, penectomy, vaginoplasty in natal males; mastectomy or phalloplasty in natal females).

Reference: American Psychiatric Association (14).

Downloaded from https://academic.oup.com/jcem/article/102/11/3869/4157558 by National Library of Education user on 15 August 2024

doi: 10.1210/jc.2017-01658

of adolescents, the clinician also obtains information from the parents or guardians regarding various aspects of the child's general and psychosexual development and current functioning. On the basis of this information, the clinician:

- decides whether the individual fulfills criteria for treatment (see Tables 2 and 3) for GD/gender incongruence (DSM-5) or transsexualism (DSM-5 and/or ICD-10);
- informs the individual about the possibilities and limitations of various kinds of treatment (hormonal/surgical and nonhormonal), and if medical treatment is desired, provides correct information to prevent unrealistically high expectations;
- assesses whether medical interventions may result in unfavorable psychological and social outcomes.

In cases in which severe psychopathology, circumstances, or both seriously interfere with the diagnostic work or make satisfactory treatment unlikely, clinicians should assist the adolescent in managing these other issues. Literature on postoperative regret suggests that besides poor quality of surgery, severe psychiatric comorbidity and lack of support may interfere with positive outcomes (52–56).

For adolescents, the diagnostic procedure usually includes a complete psychodiagnostic assessment (57) and an assessment of the decision-making capability of the youth. An evaluation to assess the family's ability to endure stress, give support, and deal with the complexities of the adolescent's situation should be part of the diagnostic phase (58).

### Social transitioning

A change in gender expression and role (which may involve living part time or full time in another gender role that is consistent with one's gender identity) may test the person's resolve, the capacity to function in the affirmed gender, and the adequacy of social, economic, and psychological supports. It assists both the individual and the clinician in their judgments about how to proceed (16). During social transitioning, the person's feelings about the social transformation (including coping with the responses of others) is a major focus of the counseling. The optimal timing for social transitioning may differ between individuals. Sometimes people wait until they start gender-affirming hormone treatment to make social transitioning easier, but individuals increasingly start social transitioning long before they receive medically supervised, gender-affirming hormone treatment.

### Criteria

Adolescents and adults seeking gender-affirming hormone treatment and surgery should satisfy certain criteria before proceeding (16). Criteria for gender-affirming hormone therapy for adults are in Table 4, and criteria for gender-affirming hormone therapy for adolescents are in Table 5. Follow-up studies in adults meeting these criteria indicate a high satisfaction rate with treatment (59). However, the quality of evidence is usually low. A few follow-up studies on adolescents who fulfilled these criteria also indicated good treatment results (60–63).

## Recommendations for Those Involved in the Gender-Affirming Hormone Treatment of Individuals With GD/Gender Incongruence

1.1. We advise that only trained MHPs who meet the following criteria should diagnose GD/gender incongruence in adults: (1) competence in using the DSM and/or the ICD for diagnostic purposes, (2) the ability to diagnose GD/gender incongruence and make a distinction between GD/gender incongruence and conditions that have similar features (*e.g.*, body dysmorphic disorder), (3) training in diagnosing psychiatric conditions, (4) the ability to undertake or refer for appropriate treatment, (5) the ability to psychosocially assess the person's understanding, mental health, and social conditions that can impact gender-affirming hormone therapy, and (6) a practice of regularly attending relevant professional meetings. (Ungraded Good Practice Statement)

1.2. We advise that only MHPs who meet the following criteria should diagnose GD/gender incongruence in children and adolescents: (1) training in child and adolescent developmental psychology and psychopathology, (2) competence in using the DSM and/or ICD for diagnostic

Downloaded from https://academic.oup.com/jcem/article/102/11/3869/4157558 by National Library of Education user on 15 August 2024

---

**Table 3.  ICD-10 Criteria for Transsexualism**

**Transsexualism (F64.0) has three criteria:**

1. The desire to live and be accepted as a member of the opposite sex, usually accompanied by the wish to make his or her body as congruent as possible with the preferred sex through surgery and hormone treatments.
2. The transsexual identity has been present persistently for at least 2 y.
3. The disorder is not a symptom of another mental disorder or a genetic, DSD, or chromosomal abnormality.

**3878**    Hembree et al    Guidelines on Gender-Dysphoric/Gender-Incongruent Persons    J Clin Endocrinol Metab, November 2017, 102(11):3869–3903

---

**Table 4.    Criteria for Gender-Affirming Hormone Therapy for Adults**

---

1. Persistent, well-documented gender dysphoria/gender incongruence
2. The capacity to make a fully informed decision and to consent for treatment
3. The age of majority in a given country (if younger, follow the criteria for adolescents)
4. Mental health concerns, if present, must be reasonably well controlled

---

Reproduced from World Professional Association for Transgender Health (16).

purposes, (3) the ability to make a distinction between GD/gender incongruence and conditions that have similar features (*e.g.*, body dysmorphic disorder), (4) training in diagnosing psychiatric conditions, (5) the ability to undertake or refer for appropriate treatment, (6) the ability to psychosocially assess the person's understanding and social conditions that can impact gender-affirming hormone therapy, (7) a practice of regularly attending relevant professional meetings, and (8) knowledge of the criteria for puberty blocking and gender-affirming hormone treatment in adolescents. (Ungraded Good Practice Statement)

**Evidence**

Individuals with gender identity issues may have psychological or psychiatric problems (43–48, 50, 51, 64, 65). It is therefore necessary that clinicians making the diagnosis are able to make a distinction between GD/gender incongruence and conditions that have similar features. Examples of conditions with similar features are body dysmorphic disorder, body identity integrity disorder (a condition in which individuals have a sense that their anatomical configuration as an able-bodied person is somehow wrong or inappropriate) (66), or certain forms of eunuchism (in which a person is preoccupied with or engages in castration and/or penectomy for

---

**Table 5.    Criteria for Gender-Affirming Hormone Therapy for Adolescents**

---

**Adolescents are eligible for GnRH agonist treatment if:**
1. A qualified MHP has confirmed that:
- the adolescent has demonstrated a long-lasting and intense pattern of gender nonconformity or gender dysphoria (whether suppressed or expressed),
- gender dysphoria worsened with the onset of puberty,
- any coexisting psychological, medical, or social problems that could interfere with treatment (*e.g.*, that may compromise treatment adherence) have been addressed, such that the adolescent's situation and functioning are stable enough to start treatment,
- the adolescent has sufficient mental capacity to give informed consent to this (reversible) treatment,
2. And the adolescent:
- has been informed of the effects and side effects of treatment (including potential loss of fertility if the individual subsequently continues with sex hormone treatment) and options to preserve fertility,
- has given informed consent and (particularly when the adolescent has not reached the age of legal medical consent, depending on applicable legislation) the parents or other caretakers or guardians have consented to the treatment and are involved in supporting the adolescent throughout the treatment process,
3. And a pediatric endocrinologist or other clinician experienced in pubertal assessment
- agrees with the indication for GnRH agonist treatment,
- has confirmed that puberty has started in the adolescent (Tanner stage ≥G2/B2),
- has confirmed that there are no medical contraindications to GnRH agonist treatment.

---

**Adolescents are eligible for subsequent sex hormone treatment if:**
1. A qualified MHP has confirmed:
- the persistence of gender dysphoria,
- any coexisting psychological, medical, or social problems that could interfere with treatment (*e.g.*, that may compromise treatment adherence) have been addressed, such that the adolescent's situation and functioning are stable enough to start sex hormone treatment,
- the adolescent has sufficient mental capacity (which most adolescents have by age 16 years) to estimate the consequences of this (partly) irreversible treatment, weigh the benefits and risks, and give informed consent to this (partly) irreversible treatment,
2. And the adolescent:
- has been informed of the (irreversible) effects and side effects of treatment (including potential loss of fertility and options to preserve fertility),
- has given informed consent and (particularly when the adolescent has not reached the age of legal medical consent, depending on applicable legislation) the parents or other caretakers or guardians have consented to the treatment and are involved in supporting the adolescent throughout the treatment process,
3. And a pediatric endocrinologist or other clinician experienced in pubertal induction:
- agrees with the indication for sex hormone treatment,
- has confirmed that there are no medical contraindications to sex hormone treatment.

---

Reproduced from World Professional Association for Transgender Health (16).

Downloaded from https://academic.oup.com/jcem/article/102/11/3869/4157558 by National Library of Education user on 15 August 2024

doi: 10.1210/jc.2017-01658

reasons that are not gender identity related) (11). Clinicians should also be able to diagnose psychiatric conditions accurately and ensure that these conditions are treated appropriately, particularly when the conditions may complicate treatment, affect the outcome of gender-affirming treatment, or be affected by hormone use.

### Values and preferences

The task force placed a very high value on avoiding harm from hormone treatment in individuals who have conditions other than GD/gender incongruence and who may not benefit from the physical changes associated with this treatment and placed a low value on any potential benefit these persons believe they may derive from hormone treatment. This justifies the good practice statement.

1.3. We advise that decisions regarding the social transition of prepubertal youths with GD/gender incongruence are made with the assistance of an MHP or another experienced professional. (Ungraded Good Practice Statement).

1.4. We recommend against puberty blocking and gender-affirming hormone treatment in prepubertal children with GD/gender incongruence. (1 |⊕⊕○○)

### Evidence

In most children diagnosed with GD/gender incongruence, it did not persist into adolescence. The percentages differed among studies, probably dependent on which version of the DSM clinicians used, the patient's age, the recruitment criteria, and perhaps cultural factors. However, the large majority (about 85%) of prepubertal children with a childhood diagnosis did not remain GD/gender incongruent in adolescence (20). If children have completely socially transitioned, they may have great difficulty in returning to the original gender role upon entering puberty (40). Social transition is associated with the persistence of GD/gender incongruence as a child progresses into adolescence. It may be that the presence of GD/gender incongruence in prepubertal children is the earliest sign that a child is destined to be transgender as an adolescent/adult (20). However, social transition (in addition to GD/gender incongruence) has been found to contribute to the likelihood of persistence.

This recommendation, however, does not imply that children should be discouraged from showing gender-variant behaviors or should be punished for exhibiting such behaviors. In individual cases, an early complete social transition may result in a more favorable outcome, but there are currently no criteria to identify the GD/gender-incongruent children to whom this applies. At the present time, clinical experience suggests that persistence of GD/gender incongruence can only be reliably assessed after the first signs of puberty.

### Values and preferences

The task force placed a high value on avoiding harm with gender-affirming hormone therapy in prepubertal children with GD/gender incongruence. This justifies the strong recommendation in the face of low-quality evidence.

1.5. We recommend that clinicians inform and counsel all individuals seeking gender-affirming medical treatment regarding options for fertility preservation prior to initiating puberty suppression in adolescents and prior to treating with hormonal therapy of the affirmed gender in both adolescents and adults. (1 |⊕⊕⊕○)

### Remarks

Persons considering hormone use for gender affirmation need adequate information about this treatment in general and about fertility effects of hormone treatment in particular to make an informed and balanced decision (67, 68). Because young adolescents may not feel qualified to make decisions about fertility and may not fully understand the potential effects of hormonal interventions, consent and protocol education should include parents, the referring MHP(s), and other members of the adolescent's support group. To our knowledge, there are no formally evaluated decision aids available to assist in the discussion and decision regarding the future fertility of adolescents or adults beginning gender-affirming treatment.

Treating early pubertal youth with GnRH analogs will temporarily impair spermatogenesis and oocyte maturation. Given that an increasing number of transgender youth want to preserve fertility potential, delaying or temporarily discontinuing GnRH analogs to promote gamete maturation is an option. This option is often not preferred, because mature sperm production is associated with later stages of puberty and with the significant development of secondary sex characteristics.

For those designated male at birth with GD/gender incongruence and who are in early puberty, sperm production and the development of the reproductive tract are insufficient for the cryopreservation of sperm. However, prolonged pubertal suppression using GnRH analogs is reversible and clinicians should inform these individuals that sperm production can be initiated following prolonged gonadotropin suppression. This can be accomplished by spontaneous gonadotropin recovery after

Downloaded from https://academic.oup.com/jcem/article/102/11/3869/4157558 by National Library of Education user on 15 August 2024

Case 4:24-cv-00461-O Document 76 Filed 09/06/24 Page 246 of 290 PageID 3893

cessation of GnRH analogs or by gonadotropin treatment and will probably be associated with physical manifestations of testosterone production, as stated above. Note that there are no data in this population concerning the time required for sufficient spermatogenesis to collect enough sperm for later fertility. In males treated for precocious puberty, spermarche was reported 0.7 to 3 years after cessation of GnRH analogs (69). In adult men with gonadotropin deficiency, sperm are noted in seminal fluid by 6 to 12 months of gonadotropin treatment. However, sperm numbers when partners of these patients conceive are far below the "normal range" (70, 71).

In girls, no studies have reported long-term, adverse effects of pubertal suppression on ovarian function after treatment cessation (72, 73). Clinicians should inform adolescents that no data are available regarding either time to spontaneous ovulation after cessation of GnRH analogs or the response to ovulation induction following prolonged gonadotropin suppression.

In males with GD/gender incongruence, when medical treatment is started in a later phase of puberty or in adulthood, spermatogenesis is sufficient for cryopreservation and storage of sperm. *In vitro* spermatogenesis is currently under investigation. Restoration of spermatogenesis after prolonged estrogen treatment has not been studied.

In females with GD/gender incongruence, the effect of prolonged treatment with exogenous testosterone on ovarian function is uncertain. There have been reports of an increased incidence of polycystic ovaries in transgender males, both prior to and as a result of androgen treatment (74–77), although these reports were not confirmed by others (78). Pregnancy has been reported in transgender males who have had prolonged androgen treatment and have discontinued testosterone but have not had genital surgery (79, 80). A reproductive endocrine gynecologist can counsel patients before gender-affirming hormone treatment or surgery regarding potential fertility options (81). Techniques for cryopreservation of oocytes, embryos, and ovarian tissue continue to improve, and oocyte maturation of immature tissue is being studied (82).

## 2.0 Treatment of Adolescents

During the past decade, clinicians have progressively acknowledged the suffering of young adolescents with GD/gender incongruence. In some forms of GD/gender incongruence, psychological interventions may be useful and sufficient. However, for many adolescents with GD/gender incongruence, the pubertal physical changes are unbearable. As early medical intervention may prevent psychological harm, various clinics have decided to start treating young adolescents with GD/gender incongruence with puberty-suppressing medication (a GnRH analog). As compared with starting gender-affirming treatment long after the first phases of puberty, a benefit of pubertal suppression at early puberty may be a better psychological and physical outcome.

In girls, the first physical sign of puberty is the budding of the breasts followed by an increase in breast and fat tissue. Breast development is also associated with the pubertal growth spurt, and menarche occurs ~2 years later. In boys, the first physical change is testicular growth. A testicular volume ≥4 mL is seen as consistent with the initiation of physical puberty. At the beginning of puberty, estradiol and testosterone levels are still low and are best measured in the early morning with an ultrasensitive assay. From a testicular volume of 10 mL, daytime testosterone levels increase, leading to virilization (83). Note that pubic hair and/or axillary hair/odor may not reflect the onset of gonadarche; instead, it may reflect adrenarche alone.

2.1. We suggest that adolescents who meet diagnostic criteria for GD/gender incongruence, fulfill criteria for treatment (Table 5), and are requesting treatment should initially undergo treatment to suppress pubertal development. (2 |⊕⊕○○)

2.2. We suggest that clinicians begin pubertal hormone suppression after girls and boys first exhibit physical changes of puberty (Tanner stages G2/B2). (2 |⊕⊕○○)

**Evidence**

Pubertal suppression can expand the diagnostic phase by a long period, giving the subject more time to explore options and to live in the experienced gender before making a decision to proceed with gender-affirming sex hormone treatments and/or surgery, some of which is irreversible (84, 85). Pubertal suppression is fully reversible, enabling full pubertal development in the natal gender, after cessation of treatment, if appropriate. The experience of full endogenous puberty is an undesirable condition for the GD/gender-incongruent individual and may seriously interfere with healthy psychological functioning and well-being. Treating GD/gender-incongruent adolescents entering puberty with GnRH analogs has been shown to improve psychological functioning in several domains (86).

Another reason to start blocking pubertal hormones early in puberty is that the physical outcome is improved compared with initiating physical transition after puberty has been completed (60, 62). Looking like a man or woman when living as the opposite sex creates difficult

Downloaded from https://academic.oup.com/jcem/article/102/11/3869/4157558 by National Library of Education user on 15 August 2024

Downloaded from https://academic.oup.com/jcem/article/102/11/3869/4157558 by National Library of Education user on 15 August 2024

barriers with enormous life-long disadvantages. We therefore advise starting suppression in early puberty to prevent the irreversible development of undesirable secondary sex characteristics. However, adolescents with GD/gender incongruence should experience the first changes of their endogenous spontaneous puberty, because their emotional reaction to these first physical changes has diagnostic value in establishing the persistence of GD/gender incongruence (85). Thus, Tanner stage 2 is the optimal time to start pubertal suppression. However, pubertal suppression treatment in early puberty will limit the growth of the penis and scrotum, which will have a potential effect on future surgical treatments (87).

Clinicians can also use pubertal suppression in adolescents in later pubertal stages to stop menses in transgender males and prevent facial hair growth in transgender females. However, in contrast to the effects in early pubertal adolescents, physical sex characteristics (such as more advanced breast development in transgender boys and lowering of the voice and outgrowth of the jaw and brow in transgender girls) are not reversible.

### Values and preferences

These recommendations place a high value on avoiding an unsatisfactory physical outcome when secondary sex characteristics have become manifest and irreversible, a higher value on psychological well-being, and a lower value on avoiding potential harm from early pubertal suppression.

### Remarks

Table 6 lists the Tanner stages of breast and male genital development. Careful documentation of hallmarks of pubertal development will ensure precise timing when initiating pubertal suppression once puberty has started. Clinicians can use pubertal LH and sex steroid levels to confirm that puberty has progressed sufficiently before starting pubertal suppression (88). Reference

ranges for sex steroids by Tanner stage may vary depending on the assay used. Ultrasensitive sex steroid and gonadotropin assays will help clinicians document early pubertal changes.

Irreversible and, for GD/gender-incongruent adolescents, undesirable sex characteristics in female puberty are breasts, female body habitus, and, in some cases, relative short stature. In male puberty, they are a prominent Adam's apple; low voice; male bone configuration, such as a large jaw, big feet and hands, and tall stature; and male hair pattern on the face and extremities.

> 2.3. We recommend that, where indicated, GnRH analogues are used to suppress pubertal hormones. (1 |⊕⊕○○)

### Evidence

Clinicians can suppress pubertal development and gonadal function most effectively via gonadotropin suppression using GnRH analogs. GnRH analogs are long-acting agonists that suppress gonadotropins by GnRH receptor desensitization after an initial increase of gonadotropins during ~10 days after the first and (to a lesser degree) the second injection (89). Antagonists immediately suppress pituitary gonadotropin secretion (90, 91). Long-acting GnRH analogs are the currently preferred treatment option. Clinicians may consider long-acting GnRH antagonists when evidence on their safety and efficacy in adolescents becomes available.

During GnRH analog treatment, slight development of secondary sex characteristics may regress, and in a later phase of pubertal development, it will stop. In girls, breast tissue will become atrophic, and menses will stop. In boys, virilization will stop, and testicular volume may decrease (92).

An advantage of using GnRH analogs is the reversibility of the intervention. If, after extensive exploration of his/her transition wish, the individual no longer desires transition, they can discontinue pubertal suppression. In subjects with

---

**Table 6.    Tanner Stages of Breast Development and Male External Genitalia**

The description of Tanner stages for breast development:
  1. Prepubertal
  2. Breast and papilla elevated as small mound; areolar diameter increased
  3. Breast and areola enlarged, no contour separation
  4. Areola and papilla form secondary mound
  5. Mature; nipple projects, areola part of general breast contour
For penis and testes:
  1. Prepubertal, testicular volume <4 mL
  2. Slight enlargement of penis; enlarged scrotum, pink, texture altered, testes 4–6 mL
  3. Penis longer, testes larger (8–12 mL)
  4. Penis and glans larger, including increase in breadth; testes larger (12–15 mL), scrotum dark
  5. Penis adult size; testicular volume > 15 ml

Adapted from Lawrence (56).

**3882** Hembree et al    Guidelines on Gender-Dysphoric/Gender-Incongruent Persons    J Clin Endocrinol Metab, November 2017, 102(11):3869–3903

precocious puberty, spontaneous pubertal development has been shown to resume after patients discontinue taking GnRH analogs (93).

Recommendations 2.1 to 2.3 are supported by a prospective follow-up study from The Netherlands. This report assessed mental health outcomes in 55 transgender adolescents/young adults (22 transgender females and 33 transgender males) at three time points: (1) before the start of GnRH agonist (average age of 14.8 years at start of treatment), (2) at initiation of gender-affirming hormones (average age of 16.7 years at start of treatment), and (3) 1 year after "gender-reassignment surgery" (average age of 20.7 years) (63). Despite a decrease in depression and an improvement in general mental health functioning, GD/gender incongruence persisted through pubertal suppression, as previously reported (86). However, following sex hormone treatment and gender-reassignment surgery, GD/gender incongruence was resolved and psychological functioning steadily improved (63). Furthermore, well-being was similar to or better than that reported by age-matched young adults from the general population, and none of the study participants regretted treatment. This study represents the first long-term follow-up of individuals managed according to currently existing clinical practice guidelines for transgender youth, and it underscores the benefit of the multidisciplinary approach pioneered in The Netherlands; however, further studies are needed.

### Side effects

The primary risks of pubertal suppression in GD/gender-incongruent adolescents may include adverse effects on bone mineralization (which can theoretically be reversed with sex hormone treatment), compromised fertility if the person subsequently is treated with sex hormones, and unknown effects on brain development. Few data are available on the effect of GnRH analogs on BMD in adolescents with GD/gender incongruence. Initial data in GD/gender-incongruent subjects demonstrated no change of absolute areal BMD during 2 years of GnRH analog therapy but a decrease in BMD $z$ scores (85). A recent study also suggested suboptimal bone mineral accrual during GnRH analog treatment. The study reported a decrease in areal BMD $z$ scores and of bone mineral apparent density $z$ scores (which takes the size of the bone into account) in 19 transgender males treated with GnRH analogs from a mean age of 15.0 years (standard deviation = 2.0 years) for a median duration of 1.5 years (0.3 to 5.2 years) and in 15 transgender females treated from 14.9 ($\pm$1.9) years for 1.3 years (0.5 to 3.8 years), although not all changes were statistically significant (94). There was incomplete catch-up at age 22 years after sex hormone treatment from age 16.6 ($\pm$1.4) years for a median duration of 5.8 years (3.0 to 8.0 years) in transgender females and from age 16.4 ($\pm$2.3) years for 5.4 years (2.8 to 7.8 years) in transgender males. Little is known about more prolonged use of GnRH analogs. Researchers reported normal BMD $z$ scores at age 35 years in one individual who used GnRH analogs from age 13.7 years until age 18.6 years before initiating sex hormone treatment (65).

Additional data are available from individuals with late puberty or GnRH analog treatment of other indications. Some studies reported that men with constitutionally delayed puberty have decreased BMD in adulthood (95). However, other studies reported that these men have normal BMD (96, 97). Treating adults with GnRH analogs results in a decrease of BMD (98). In children with central precocious puberty, treatment with GnRH analogs has been found to result in a decrease of BMD during treatment by some (99) but not others (100). Studies have reported normal BMD after discontinuing therapy (69, 72, 73, 101, 102). In adolescents treated with growth hormone who are small for gestational age and have normal pubertal timing, 2-year GnRH analog treatments did not adversely affect BMD (103). Calcium supplementation may be beneficial in optimizing bone health in GnRH analog–treated individuals (104). There are no studies of vitamin D supplementation in this context, but clinicians should offer supplements to vitamin D–deficient adolescents. Physical activity, especially during growth, is important for bone mass in healthy individuals (103) and is therefore likely to be beneficial for bone health in GnRH analog–treated subjects.

GnRH analogs did not induce a change in body mass index standard deviation score in GD/gender-incongruent adolescents (94) but caused an increase in fat mass and decrease in lean body mass percentage (92). Studies in girls treated for precocious puberty also reported a stable body mass index standard deviation score during treatment (72) and body mass index and body composition comparable to controls after treatment (73).

Arterial hypertension has been reported as an adverse effect in a few girls treated with GnRH analogs for precocious/early puberty (105, 106). Blood pressure monitoring before and during treatment is recommended.

Individuals may also experience hot flashes, fatigue, and mood alterations as a consequence of pubertal suppression. There is no consensus on treatment of these side effects in this context.

It is recommended that any use of pubertal blockers (and subsequent use of sex hormones, as detailed below) include a discussion about implications for fertility (see recommendation 1.3). Transgender adolescents may

Downloaded from https://academic.oup.com/jcem/article/102/11/3869/4157558 by National Library of Education user on 15 August 2024

Downloaded from https://academic.oup.com/jcem/article/102/11/3869/4157558 by National Library of Education user on 15 August 2024

want to preserve fertility, which may be otherwise compromised if puberty is suppressed at an early stage and the individual completes phenotypic transition with the use of sex hormones.

Limited data are available regarding the effects of GnRH analogs on brain development. A single cross-sectional study demonstrated no compromise of executive function (107), but animal data suggest there may be an effect of GnRH analogs on cognitive function (108).

### Values and preferences

Our recommendation of GnRH analogs places a higher value on the superior efficacy, safety, and reversibility of the pubertal hormone suppression achieved (as compared with the alternatives) and a relatively lower value on limiting the cost of therapy. Of the available alternatives, depot and oral progestin preparations are effective. Experience with this treatment dates back prior to the emergence of GnRH analogs for treating precocious puberty in papers from the 1960s and early 1970s (109–112). These compounds are usually safe, but some side effects have been reported (113–115). Only two recent studies involved transgender youth (116, 117). One of these studies described the use of oral lynestrenol monotherapy followed by the addition of testosterone treatment in transgender boys who were at Tanner stage B4 or further at the start of treatment (117). They found lynestrenol safe, but gonadotropins were not fully suppressed. The study reported metrorrhagia in approximately half of the individuals, mainly in the first 6 months. Acne, headache, hot flashes, and fatigue were other frequent side effects. Another progestin that has been studied in the United States is medroxyprogesterone. This agent is not as effective as GnRH analogs in lowering endogenous sex hormones either and may be associated with other side effects (116). Progestin preparations may be an acceptable treatment for persons without access to GnRH analogs or with a needle phobia. If GnRH analog treatment is not available (insurance denial, prohibitive cost, or other reasons), postpubertal, transgender female adolescents may be treated with an antiandrogen that directly suppresses androgen synthesis or action (see adult section).

### Remarks

Measurements of gonadotropin and sex steroid levels give precise information about gonadal axis suppression, although there is insufficient evidence for any specific short-term monitoring scheme in children treated with GnRH analogs (88). If the gonadal axis is not completely suppressed—as evidenced by (for example) menses, erections, or progressive hair growth—the interval of GnRH analog treatment can be shortened or the dose increased. During treatment, adolescents should be monitored for negative effects of delaying puberty, including a halted growth spurt and impaired bone mineral accretion. Table 7 illustrates a suggested clinical protocol.

Anthropometric measurements and X-rays of the left hand to monitor bone age are informative for evaluating growth. To assess BMD, clinicians can perform dual-energy X-ray absorptiometry scans.

2.4. In adolescents who request sex hormone treatment (given this is a partly irreversible treatment), we recommend initiating treatment using a gradually increasing dose schedule (see Table 8) after a multidisciplinary team of medical and MHPs has confirmed the persistence of GD/gender incongruence and sufficient mental capacity to give informed consent, which most adolescents have by age 16 years (Table 5). (1 l⊕⊕◯◯)

2.5. We recognize that there may be compelling reasons to initiate sex hormone treatment prior to the age of 16 years in some adolescents with GD/gender incongruence, even though there are minimal published studies of gender-affirming hormone treatments administered before age 13.5 to 14 years. As with the care of adolescents ≥16 years of age, we recommend that an expert multidisciplinary team of medical and MHPs manage this treatment. (1 l⊕◯◯◯)

2.6. We suggest monitoring clinical pubertal development every 3 to 6 months and laboratory parameters every 6 to 12 months during sex hormone treatment (Table 9). (2 l⊕⊕◯◯)

---

**Table 7.  Baseline and Follow-Up Protocol During Suppression of Puberty**

Every 3–6 mo
  Anthropometry: height, weight, sitting height, blood pressure, Tanner stages
Every 6–12 mo
  Laboratory: LH, FSH, E2/T, 25OH vitamin D
Every 1–2 y
  Bone density using DXA
  Bone age on X-ray of the left hand (if clinically indicated)

---

Adapted from Hembree *et al.* (118).

Abbreviations: DXA, dual-energy X-ray absorptiometry; E2, estradiol; FSH, follicle stimulating hormone; LH, luteinizing hormone; T, testosterone;

AR_293414

**3884**    Hembree et al    Guidelines on Gender-Dysphoric/Gender-Incongruent Persons    J Clin Endocrinol Metab, November 2017, 102(11):3869–3903

---

**Table 8.    Protocol Induction of Puberty**

---

Induction of female puberty with oral 17β-estradiol, increasing the dose every 6 mo:
  5 μg/kg/d
  10 μg/kg/d
  15 μg/kg/d
  20 μg/kg/d
  Adult dose = 2–6 mg/d
  *In postpubertal transgender female adolescents, the dose of 17β-estradiol can be increased more rapidly:*
    *1 mg/d for 6 mo*
    *2 mg/d*
Induction of female puberty with transdermal 17β-estradiol, increasing the dose every 6 mo (new patch is placed every 3.5 d):
  6.25–12.5 μg/24 h (cut 25-μg patch into quarters, then halves)
  25 μg/24 h
  37.5 μg/24 h
  Adult dose = 50–200 μg/24 h
  *For alternatives once at adult dose, see Table 11.*
  *Adjust maintenance dose to mimic physiological estradiol levels (see Table 15).*

Induction of male puberty with testosterone esters increasing the dose every 6 mo (IM or SC):
  25 mg/m²/2 wk (or alternatively, half this dose weekly, or double the dose every 4 wk)
  50 mg/m²/2 wk
  75 mg/m²/2 wk
  100 mg/m²/2 wk
  Adult dose = 100–200 mg every 2 wk
  *In postpubertal transgender male adolescents the dose of testosterone esters can be increased more rapidly:*
    *75 mg/2 wk for 6 mo*
    *125 mg/2 wk*
  *For alternatives once at adult dose, see Table 11.*
  *Adjust maintenance dose to mimic physiological testosterone levels (see Table 14).*

---

Adapted from Hembree *et al.* (118).

Abbreviations: IM, intramuscularly; SC, subcutaneously.

## Evidence

Adolescents develop competence in decision making at their own pace. Ideally, the supervising medical professionals should individually assess this competence, although no objective tools to make such an assessment are currently available.

Many adolescents have achieved a reasonable level of competence by age 15 to 16 years (119), and in many countries 16-year-olds are legally competent with regard to medical decision making (120). However, others believe that although some capacities are generally achieved before age 16 years, other abilities (such as good risk assessment) do not develop until well after 18 years (121). They suggest that health care procedures should be divided along a matrix of relative risk, so that younger adolescents can be allowed to decide about low-risk procedures, such as most diagnostic tests and common therapies, but not about high-risk procedures, such as most surgical procedures (121).

Currently available data from transgender adolescents support treatment with sex hormones starting at age 16 years (63, 122). However, some patients may incur potential risks by waiting until age 16 years. These include the potential risk to bone health if puberty is suppressed

---

**Table 9.    Baseline and Follow-up Protocol During Induction of Puberty**

---

Every 3–6 mo
  •Anthropometry: height, weight, sitting height, blood pressure, Tanner stages
Every 6–12 mo
  •In transgender males: hemoglobin/hematocrit, lipids, testosterone, 25OH vitamin D
  •In transgender females: prolactin, estradiol, 25OH vitamin D
Every 1–2 y
  •BMD using DXA
  •Bone age on X-ray of the left hand (if clinically indicated)
*BMD should be monitored into adulthood (until the age of 25–30 y or until peak bone mass has been reached).*
*For recommendations on monitoring once pubertal induction has been completed, see Tables 14 and 15.*

---

Adapted from Hembree *et al.* (118).

Abbreviation: DXA, dual-energy X-ray absorptiometry.

Downloaded from https://academic.oup.com/jcem/article/102/11/3869/4157558 by National Library of Education user on 15 August 2024

doi: 10.1210/jc.2017-01658

for 6 to 7 years before initiating sex hormones (*e.g.*, if someone reached Tanner stage 2 at age 9-10 years old). Additionally, there may be concerns about inappropriate height and potential harm to mental health (emotional and social isolation) if initiation of secondary sex characteristics must wait until the person has reached 16 years of age. However, only minimal data supporting earlier use of gender-affirming hormones in transgender adolescents currently exist (63). Clearly, long-term studies are needed to determine the optimal age of sex hormone treatment in GD/gender-incongruent adolescents.

The MHP who has followed the adolescent during GnRH analog treatment plays an essential role in assessing whether the adolescent is eligible to start sex hormone therapy and capable of consenting to this treatment (Table 5). Support of the family/environment is essential. Prior to the start of sex hormones, clinicians should discuss the implications for fertility (see recommendation 1.5). Throughout pubertal induction, an MHP and a pediatric endocrinologist (or other clinician competent in the evaluation and induction of pubertal development) should monitor the adolescent. In addition to monitoring therapy, it is also important to pay attention to general adolescent health issues, including healthy life style choices, such as not smoking, contraception, and appropriate vaccinations (*e.g.*, human papillomavirus).

For the induction of puberty, clinicians can use a similar dose scheme for hypogonadal adolescents with GD/gender incongruence as they use in other individuals with hypogonadism, carefully monitoring for desired and undesired effects (Table 8). In transgender female adolescents, transdermal 17β-estradiol may be an alternative for oral 17β-estradiol. It is increasingly used for pubertal induction in hypogonadal females. However, the absence of low-dose estrogen patches may be a problem. As a result, individuals may need to cut patches to size themselves to achieve appropriate dosing (123). In transgender male adolescents, clinicians can give testosterone injections intramuscularly or subcutaneously (124, 125).

When puberty is initiated with a gradually increasing schedule of sex steroid doses, the initial levels will not be high enough to suppress endogenous sex steroid secretion. Gonadotropin secretion and endogenous production of testosterone may resume and interfere with the effectiveness of estrogen treatment, in transgender female adolescents (126, 127). Therefore, continuation of GnRH analog treatment is advised until gonadectomy. Given that GD/gender-incongruent adolescents may opt not to have gonadectomy, long-term studies are necessary to examine the potential risks of prolonged GnRH analog treatment. Alternatively, in transgender male adolescents, GnRH analog treatment can be discontinued once an

adult dose of testosterone has been reached and the individual is well virilized. If uterine bleeding occurs, a progestin can be added. However, the combined use of a GnRH analog (for ovarian suppression) and testosterone may enable phenotypic transition with a lower dose of testosterone in comparison with testosterone alone. If there is a wish or need to discontinue GnRH analog treatment in transgender female adolescents, they may be treated with an antiandrogen that directly suppresses androgen synthesis or action (see section 3.0 "Hormonal Therapy for Transgender Adults").

### Values and preferences

The recommendation to initiate pubertal induction only when the individual has sufficient mental capacity (roughly age 16 years) to give informed consent for this partly irreversible treatment places a higher value on the ability of the adolescent to fully understand and oversee the partially irreversible consequences of sex hormone treatment and to give informed consent. It places a lower value on the possible negative effects of delayed puberty. We may not currently have the means to weigh adequately the potential benefits of waiting until around age 16 years to initiate sex hormones vs the potential risks/harm to BMD and the sense of social isolation from having the timing of puberty be so out of sync with peers (128).

### Remarks

Before starting sex hormone treatment, effects on fertility and options for fertility preservation should be discussed. Adult height may be a concern in transgender adolescents. In a transgender female adolescent, clinicians may consider higher doses of estrogen or a more rapid tempo of dose escalation during pubertal induction. There are no established treatments yet to augment adult height in a transgender male adolescent with open epiphyses during pubertal induction. It is not uncommon for transgender adolescents to present for clinical services after having completed or nearly completed puberty. In such cases, induction of puberty with sex hormones can be done more rapidly (see Table 8). Additionally, an adult dose of testosterone in transgender male adolescents may suffice to suppress the gonadal axis without the need to use a separate agent. At the appropriate time, the multidisciplinary team should adequately prepare the adolescent for transition to adult care.

## 3.0 Hormonal Therapy for Transgender Adults

The two major goals of hormonal therapy are (1) to reduce endogenous sex hormone levels, and thus reduce

Downloaded from https://academic.oup.com/jcem/article/102/11/3869/4157558 by National Library of Education user on 15 August 2024

**3886** Hembree et al    Guidelines on Gender-Dysphoric/Gender-Incongruent Persons    J Clin Endocrinol Metab, November 2017, 102(11):3869–3903

the secondary sex characteristics of the individual's designated gender, and (2) to replace endogenous sex hormone levels consistent with the individual's gender identity by using the principles of hormone replacement treatment of hypogonadal patients. The timing of these two goals and the age at which to begin treatment with the sex hormones of the chosen gender is codetermined in collaboration with both the person pursuing transition and the health care providers. The treatment team should include a medical provider knowledgeable in transgender hormone therapy, an MHP knowledgeable in GD/gender incongruence and the mental health concerns of transition, and a primary care provider able to provide care appropriate for transgender individuals. The physical changes induced by this sex hormone transition are usually accompanied by an improvement in mental well-being (129, 130).

3.1. We recommend that clinicians confirm the diagnostic criteria of GD/gender incongruence and the criteria for the endocrine phase of gender transition before beginning treatment. (1 |⊕⊕⊕○)

3.2. We recommend that clinicians evaluate and address medical conditions that can be exacerbated by hormone depletion and treatment with sex hormones of the affirmed gender before beginning treatment (Table 10). (1 |⊕⊕⊕○)

3.3. We suggest that clinicians measure hormone levels during treatment to ensure that endogenous sex steroids are suppressed and administered sex steroids are maintained in the normal physiologic range for the affirmed gender. (2 |⊕⊕○○)

### Evidence

It is the responsibility of the treating clinician to confirm that the person fulfills criteria for treatment. The treating clinician should become familiar with the terms and criteria presented in Tables 1–5 and take a thorough history from the patient in collaboration with the other members of the treatment team. The treating clinician must ensure that the desire for transition is appropriate; the consequences, risks, and benefits of treatment are well understood; and the desire for transition persists. They also need to discuss fertility preservation options (see recommendation 1.3) (67, 68).

### Transgender males

Clinical studies have demonstrated the efficacy of several different androgen preparations to induce masculinization in transgender males (Appendix A) (113, 114, 131–134). Regimens to change secondary sex characteristics follow the general principle of hormone replacement treatment of male hypogonadism (135). Clinicians can use either parenteral or transdermal preparations to achieve testosterone values in the normal male range (this is dependent on the specific assay, but is typically 320 to 1000 ng/dL) (Table 11) (136). Sustained supraphysiologic levels of testosterone increase the risk of adverse reactions (see section 4.0 "Adverse Outcome Prevention and Long-Term Care") and should be avoided.

Similar to androgen therapy in hypogonadal men, testosterone treatment in transgender males results in increased muscle mass and decreased fat mass, increased facial hair and acne, male pattern baldness in those genetically predisposed, and increased sexual desire (137).

### Table 10.    Medical Risks Associated With Sex Hormone Therapy

Transgender female: estrogen
  Very high risk of adverse outcomes:
    •Thromboembolic disease
  Moderate risk of adverse outcomes:
    •Macroprolactinoma
    •Breast cancer
    •Coronary artery disease
    •Cerebrovascular disease
    •Cholelithiasis
    •Hypertriglyceridemia

Transgender male: testosterone
  Very high risk of adverse outcomes:
    •Erythrocytosis (hematocrit > 50%)
  Moderate risk of adverse outcomes:
    •Severe liver dysfunction (transaminases > threefold upper limit of normal)
    •Coronary artery disease
    •Cerebrovascular disease
    •Hypertension
    •Breast or uterine cancer

Downloaded from https://academic.oup.com/jcem/article/102/11/3869/4157558 by National Library of Education user on 15 August 2024

doi: 10.1210/jc.2017-01658

**Table 11.    Hormone Regimens in Transgender Persons**

| | |
|---|---|
| Transgender females[a] | |
|   Estrogen | |
|     Oral | |
|       Estradiol | 2.0–6.0 mg/d |
|     Transdermal | |
|       Estradiol transdermal patch | 0.025–0.2 mg/d |
|       (New patch placed every 3–5 d) | |
|     Parenteral | |
|       Estradiol valerate or cypionate | 5–30 mg IM every 2 wk |
| | 2–10 mg IM every week |
|   Anti-androgens | |
|     Spironolactone | 100–300 mg/d |
|     Cyproterone acetate[b] | 25–50 mg/d |
|   GnRH agonist | 3.75 mg SQ (SC) monthly |
| | 11.25 mg SQ (SC) 3-monthly |
| Transgender males | |
|   Testosterone | |
|     Parenteral testosterone | |
|       Testosterone enanthate or cypionate | 100–200 mg SQ (IM) every 2 wk or SQ (SC) 50% per week |
|       Testosterone undecanoate[c] | 1000 mg every 12 wk |
|     Transdermal testosterone | |
|       Testosterone gel 1.6%[d] | 50–100 mg/d |
|       Testosterone transdermal patch | 2.5–7.5 mg/d |

Abbreviations: IM, intramuscularly; SQ, sequentially; SC, subcutaneously.

[a]Estrogens used with or without antiandrogens or GnRH agonist.

[b]Not available in the United States.

[c]One thousand milligrams initially followed by an injection at 6 wk then at 12-wk intervals.

[d]Avoid cutaneous transfer to other individuals.

In transgender males, testosterone will result in clitoromegaly, temporary or permanent decreased fertility, deepening of the voice, cessation of menses (usually), and a significant increase in body hair, particularly on the face, chest, and abdomen. Cessation of menses may occur within a few months with testosterone treatment alone, although high doses of testosterone may be required. If uterine bleeding continues, clinicians may consider the addition of a progestational agent or endometrial ablation (138). Clinicians may also administer GnRH analogs or depot medroxyprogesterone to stop menses prior to testosterone treatment.

### Transgender females

The hormone regimen for transgender females is more complex than the transgender male regimen (Appendix B). Treatment with physiologic doses of estrogen alone is insufficient to suppress testosterone levels into the normal range for females (139). Most published clinical studies report the need for adjunctive therapy to achieve testosterone levels in the female range (21, 113, 114, 132–134, 139, 140).

Multiple adjunctive medications are available, such as progestins with antiandrogen activity and GnRH agonists (141). Spironolactone works by directly blocking androgens during their interaction with the androgen receptor (114, 133, 142). It may also have estrogenic activity (143). Cyproterone acetate, a progestational compound with antiandrogenic properties (113, 132, 144), is widely used in Europe. 5α-Reductase inhibitors do not reduce testosterone levels and have adverse effects (145).

Dittrich et al. (141) reported that monthly doses of the GnRH agonist goserelin acetate in combination with estrogen were effective in reducing testosterone levels with a low incidence of adverse reactions in 60 transgender females. Leuprolide and transdermal estrogen were as effective as cyproterone and transdermal estrogen in a comparative retrospective study (146).

Patients can take estrogen as oral conjugated estrogens, oral 17β-estradiol, or transdermal 17β-estradiol. Among estrogen options, the increased risk of thromboembolic events associated with estrogens in general seems most concerning with ethinyl estradiol specifically (134, 140, 141), which is why we specifically suggest that it not be used in any transgender treatment plan. Data distinguishing among other estrogen options are less well established although there is some thought that oral routes of administration are more thrombogenic due to the "first pass effect" than are transdermal and parenteral routes, and that the risk of thromboembolic events is dose-dependent. Injectable estrogen and sublingual

Downloaded from https://academic.oup.com/jcem/article/102/11/3869/4157558 by National Library of Education user on 15 August 2024

3888    Hembree et al    Guidelines on Gender-Dysphoric/Gender-Incongruent Persons    J Clin Endocrinol Metab, November 2017, 102(11):3869–3903

estrogen may benefit from avoiding the first pass effect, but they can result in more rapid peaks with greater overall periodicity and thus are more difficult to monitor (147, 148). However, there are no data demonstrating that increased periodicity is harmful otherwise.

Clinicians can use serum estradiol levels to monitor oral, transdermal, and intramuscular estradiol. Blood tests cannot monitor conjugated estrogens or synthetic estrogen use. Clinicians should measure serum estradiol and serum testosterone and maintain them at the level for premenopausal females (100 to 200 pg/mL and <50 ng/dL, respectively). The transdermal preparations and injectable estradiol cypionate or valerate preparations may confer an advantage in older transgender females who may be at higher risk for thromboembolic disease (149).

## Values

Our recommendation to maintain levels of gender-affirming hormones in the normal adult range places a high value on the avoidance of the long-term complications of pharmacologic doses. Those patients receiving endocrine treatment who have relative contraindications to hormones should have an in-depth discussion with their physician to balance the risks and benefits of therapy.

## Remarks

Clinicians should inform all endocrine-treated individuals of all risks and benefits of gender-affirming hormones prior to initiating therapy. Clinicians should strongly encourage tobacco use cessation in transgender females to avoid increased risk of VTE and cardiovascular complications. We strongly discourage the unsupervised use of hormone therapy (150).

Not all individuals with GD/gender incongruence seek treatment as described (*e.g.*, male-to-eunuchs and individuals seeking partial transition). Tailoring current protocols to the individual may be done within the context of accepted safety guidelines using a multidisciplinary approach including mental health. No evidence-based protocols are available for these groups (151). We need prospective studies to better understand treatment options for these persons.

3.4. We suggest that endocrinologists provide education to transgender individuals undergoing treatment about the onset and time course of physical changes induced by sex hormone treatment. (2 |⊕○○○)

## Evidence

### Transgender males

Physical changes that are expected to occur during the first 1 to 6 months of testosterone therapy include cessation of menses, increased sexual desire, increased facial and body hair, increased oiliness of skin, increased muscle, and redistribution of fat mass. Changes that occur within the first year of testosterone therapy include deepening of the voice (152, 153), clitoromegaly, and male pattern hair loss (in some cases) (114, 144, 154, 155) (Table 12).

### Transgender females

Physical changes that may occur in transgender females in the first 3 to 12 months of estrogen and anti-androgen therapy include decreased sexual desire, decreased spontaneous erections, decreased facial and body hair (usually mild), decreased oiliness of skin, increased breast tissue growth, and redistribution of fat mass (114, 139, 149, 154, 155, 161) (Table 13). Breast development is generally maximal at 2 years after initiating hormones (114, 139, 149, 155). Over a long period of time, the prostate gland and testicles will undergo atrophy.

Although the time course of breast development in transgender females has been studied (150), precise information about other changes induced by sex hormones is lacking (141). There is a great deal of variability among individuals, as evidenced during pubertal development. We all know that a major concern for transgender females is breast development. If we work with estrogens, the result will be often not what the transgender female expects.

Alternatively, there are transgender females who report an anecdotal improved breast development, mood, or sexual desire with the use of progestogens. However, there have been no well-designed studies of the role of progestogens in feminizing hormone regimens, so the question is still open.

Our knowledge concerning the natural history and effects of different cross-sex hormone therapies on breast

## Table 12.    Masculinizing Effects in Transgender Males

| Effect | Onset | Maximum |
|---|---|---|
| Skin oiliness/acne | 1–6 mo | 1–2 y |
| Facial/body hair growth | 6–12 mo | 4–5 y |
| Scalp hair loss | 6–12 mo | —[a] |
| Increased muscle mass/strength | 6–12 mo | 2–5 y |
| Fat redistribution | 1–6 mo | 2–5 y |
| Cessation of menses | 1–6 mo | —[b] |
| Clitoral enlargement | 1–6 mo | 1–2 y |
| Vaginal atrophy | 1–6 mo | 1–2 y |
| Deepening of voice | 6–12 mo | 1–2 y |

Estimates represent clinical observations: Toorians *et al.* (149), Asscheman *et al.* (156), Gooren *et al.* (157), Wierckx *et al.* (158).

[a]Prevention and treatment as recommended for biological men.

[b]Menorrhagia requires diagnosis and treatment by a gynecologist.

Downloaded from https://academic.oup.com/jcem/article/102/11/3869/4157553 by National Library of Education user on 15 August 2024

Downloaded from https://academic.oup.com/jcem/article/102/11/3869/4157558 by National Library of Education user on 15 August 2024

**Table 13.    Feminizing Effects in Transgender Females**

| Effect | Onset | Maximum |
|---|---|---|
| Redistribution of body fat | 3–6 mo | 2–3 y |
| Decrease in muscle mass and strength | 3–6 mo | 1–2 y |
| Softening of skin/decreased oiliness | 3–6 mo | Unknown |
| Decreased sexual desire | 1–3 mo | 3–6 mo |
| Decreased spontaneous erections | 1–3 mo | 3–6 mo |
| Male sexual dysfunction | Variable | Variable |
| Breast growth | 3–6 mo | 2–3 y |
| Decreased testicular volume | 3–6 mo | 2–3 y |
| Decreased sperm production | Unknown | >3 y |
| Decreased terminal hair growth | 6–12 mo | >3 y[a] |
| Scalp hair | Variable | —[b] |
| Voice changes | None | —[c] |

Estimates represent clinical observations: Toorians et al. (149), Asscheman et al. (156), Gooren et al. (157).

[a]Complete removal of male sexual hair requires electrolysis or laser treatment or both.

[b]Familial scalp hair loss may occur if estrogens are stopped.

[c]Treatment by speech pathologists for voice training is most effective.

development in transgender females is extremely sparse and based on the low quality of evidence. Current evidence does not indicate that progestogens enhance breast development in transgender females, nor does evidence prove the absence of such an effect. This prevents us from drawing any firm conclusion at this moment and demonstrates the need for further research to clarify these important clinical questions (162).

## Values and preferences

Transgender persons have very high expectations regarding the physical changes of hormone treatment and are aware that body changes can be enhanced by surgical procedures (e.g., breast, face, and body habitus). Clear expectations for the extent and timing of sex hormone–induced changes may prevent the potential harm and expense of unnecessary procedures.

## 4.0 Adverse Outcome Prevention and Long-Term Care

Hormone therapy for transgender males and females confers many of the same risks associated with sex hormone replacement therapy in nontransgender persons. The risks arise from and are worsened by inadvertent or intentional use of supraphysiologic doses of sex hormones, as well as use of inadequate doses of sex hormones to maintain normal physiology (131, 139).

4.1. We suggest regular clinical evaluation for physical changes and potential adverse changes in response to sex steroid hormones and laboratory monitoring of sex steroid hormone levels every

3 months during the first year of hormone therapy for transgender males and females and then once or twice yearly. (2 |⊕⊕○○)

## Evidence

Pretreatment screening and appropriate regular medical monitoring are recommended for both transgender males and females during the endocrine transition and periodically thereafter (26, 155). Clinicians should monitor weight and blood pressure, conduct physical exams, and assess routine health questions, such as tobacco use, symptoms of depression, and risk of adverse events such as deep vein thrombosis/pulmonary embolism and other adverse effects of sex steroids.

### Transgender males

Table 14 contains a standard monitoring plan for transgender males on testosterone therapy (154, 159). Key issues include maintaining testosterone levels in the physiologic normal male range and avoiding adverse events resulting from excess testosterone therapy, particularly erythrocytosis, sleep apnea, hypertension, excessive weight gain, salt retention, lipid changes, and excessive or cystic acne (135).

Because oral 17-alkylated testosterone is not recommended, serious hepatic toxicity is not anticipated with parenteral or transdermal testosterone use (163, 164). Past concerns regarding liver toxicity with testosterone have been alleviated with subsequent reports that indicate the risk of serious liver disease is minimal (144, 165, 166).

### Transgender females

Table 15 contains a standard monitoring plan for transgender females on estrogens, gonadotropin suppression, or antiandrogens (160). Key issues include avoiding supraphysiologic doses or blood levels of estrogen that may lead to increased risk for thromboembolic disease, liver dysfunction, and hypertension. Clinicians should monitor serum estradiol levels using laboratories participating in external quality control, as measurements of estradiol in blood can be very challenging (167).

VTE may be a serious complication. A study reported a 20-fold increase in venous thromboembolic disease in a large cohort of Dutch transgender subjects (161). This increase may have been associated with the use of the synthetic estrogen, ethinyl estradiol (149). The incidence decreased when clinicians stopped administering ethinyl estradiol (161). Thus, the use of synthetic estrogens and conjugated estrogens is undesirable because of the inability to regulate doses by measuring serum levels and the risk of thromboembolic disease. In a German gender clinic, deep vein thrombosis occurred in 1 of 60 of transgender females treated with a GnRH analog and oral

---

**Table 14.    Monitoring of Transgender Persons on Gender-Affirming Hormone Therapy: Transgender Male**

1. Evaluate patient every 3 mo in the first year and then one to two times per year to monitor for appropriate signs of virilization and for development of adverse reactions.
2. Measure serum testosterone every 3 mo until levels are in the normal physiologic male range:[a]
   a. For testosterone enanthate/cypionate injections, the testosterone level should be measured midway between injections. The target level is 400–700 ng/dL to 400 ng/dL. Alternatively, measure peak and trough levels to ensure levels remain in the normal male range.
   b. For parenteral testosterone undecanoate, testosterone should be measured just before the following injection. If the level is <400 ng/dL, adjust dosing interval.
   c. For transdermal testosterone, the testosterone level can be measured no sooner than after 1 wk of daily application (at least 2 h after application).
3. Measure hematocrit or hemoglobin at baseline and every 3 mo for the first year and then one to two times a year. Monitor weight, blood pressure, and lipids at regular intervals.
4. Screening for osteoporosis should be conducted in those who stop testosterone treatment, are not compliant with hormone therapy, or who develop risks for bone loss.
5. If cervical tissue is present, monitoring as recommended by the American College of Obstetricians and Gynecologists.
6. Ovariectomy can be considered after completion of hormone transition.
7. Conduct sub- and periareolar annual breast examinations if mastectomy performed. If mastectomy is not performed, then consider mammograms as recommended by the American Cancer Society.

[a]Adapted from Lapauw et al. (154) and Ott et al. (159).

---

estradiol (141). The patient who developed a deep vein thrombosis was found to have a homozygous C677 T mutation in the methylenetetrahydrofolate reductase gene. In an Austrian gender clinic, administering gender-affirming hormones to 162 transgender females and 89 transgender males was not associated with VTE, despite an 8.0% and 5.6% incidence of thrombophilia (159). A more recent multinational study reported only 10 cases of VTE from a cohort of 1073 subjects (168). Thrombophilia screening of transgender persons initiating hormone treatment should be restricted to those with a personal or family history of VTE (159). Monitoring D-dimer levels during treatment is not recommended (169).

> 4.2. We suggest periodically monitoring prolactin levels in transgender females treated with estrogens. (2 |⊕⊕○○)

**Evidence**

Estrogen therapy can increase the growth of pituitary lactrotroph cells. There have been several reports of prolactinomas occurring after long-term, high-dose estrogen therapy (170–173). Up to 20% of transgender females treated with estrogens may have elevations in prolactin levels associated with enlargement of the pituitary gland (156). In most cases, the serum prolactin levels will return to the normal range with a reduction or discontinuation of the estrogen therapy or discontinuation of cyproterone acetate (157, 174, 175).

The onset and time course of hyperprolactinemia during estrogen treatment are not known. Clinicians should measure prolactin levels at baseline and then at least annually during the transition period and every 2 years thereafter. Given that only a few case studies reported prolactinomas, and prolactinomas were not reported in large cohorts of estrogen-treated persons, the risk is likely to be very low. Because the major presenting findings of microprolactinomas (hypogonadism and sometimes gynecomastia) are not apparent in transgender females, clinicians may perform radiologic examinations of the pituitary in those patients whose prolactin levels persistently increase despite stable or reduced estrogen levels. Some transgender individuals receive psychotropic medications that can increase prolactin levels (174).

---

**Table 15.    Monitoring of Transgender Persons on Gender-Affirming Hormone Therapy: Transgender Female**

1. Evaluate patient every 3 mo in the first year and then one to two times per year to monitor for appropriate signs of feminization and for development of adverse reactions.
2. Measure serum testosterone and estradiol every 3 mo.
   a. Serum testosterone levels should be <50 ng/dL.
   b. Serum estradiol should not exceed the peak physiologic range: 100–200 pg/mL.
3. For individuals on spironolactone, serum electrolytes, particularly potassium, should be monitored every 3 mo in the first year and annually thereafter.
4. Routine cancer screening is recommended, as in nontransgender individuals (all tissues present).
5. Consider BMD testing at baseline (160). In individuals at low risk, screening for osteoporosis should be conducted at age 60 years or in those who are not compliant with hormone therapy.

This table presents strong recommendations and does not include lower level recommendations.

Downloaded from https://academic.oup.com/jcem/article/102/11/3869/4157558 by National Library of Education user on 15 August 2024

doi: 10.1210/jc.2017-01658

4.3. We suggest that clinicians evaluate transgender persons treated with hormones for cardiovascular risk factors using fasting lipid profiles, diabetes screening, and/or other diagnostic tools. (2 |⊕⊕○○)

## Evidence

### *Transgender males*

Administering testosterone to transgender males results in a more atherogenic lipid profile with lowered high-density lipoprotein cholesterol and higher triglyceride and low-density lipoprotein cholesterol values (176–179). Studies of the effect of testosterone on insulin sensitivity have mixed results (178, 180). A randomized, open-label uncontrolled safety study of transgender males treated with testosterone undecanoate demonstrated no insulin resistance after 1 year (181, 182). Numerous studies have demonstrated the effects of sex hormone treatment on the cardiovascular system (160, 179, 183, 184). Long-term studies from The Netherlands found no increased risk for cardiovascular mortality (161). Likewise, a meta-analysis of 19 randomized trials in nontransgender males on testosterone replacement showed no increased incidence of cardiovascular events (185). A systematic review of the literature found that data were insufficient (due to very low–quality evidence) to allow a meaningful assessment of patient-important outcomes, such as death, stroke, myocardial infarction, or VTE in transgender males (176). Future research is needed to ascertain the potential harm of hormonal therapies (176). Clinicians should manage cardiovascular risk factors as they emerge according to established guidelines (186).

### *Transgender females*

A prospective study of transgender females found favorable changes in lipid parameters with increased high-density lipoprotein and decreased low-density lipoprotein concentrations (178). However, increased weight, blood pressure, and markers of insulin resistance attenuated these favorable lipid changes. In a meta-analysis, only serum triglycerides were higher at ≥24 months without changes in other parameters (187). The largest cohort of transgender females (mean age 41 years, followed for a mean of 10 years) showed no increase in cardiovascular mortality despite a 32% rate of tobacco use (161).

Thus, there is limited evidence to determine whether estrogen is protective or detrimental on lipid and glucose metabolism in transgender females (176). With aging, there is usually an increase of body weight. Therefore, as with nontransgender individuals, clinicians should monitor and manage glucose and lipid metabolism and blood pressure regularly according to established guidelines (186).

4.4. We recommend that clinicians obtain BMD measurements when risk factors for osteoporosis exist, specifically in those who stop sex hormone therapy after gonadectomy. (1 |⊕⊕○○)

## Evidence

### *Transgender males*

Baseline bone mineral measurements in transgender males are generally in the expected range for their pretreatment gender (188). However, adequate dosing of testosterone is important to maintain bone mass in transgender males (189, 190). In one study (190), serum LH levels were inversely related to BMD, suggesting that low levels of sex hormones were associated with bone loss. Thus, LH levels in the normal range may serve as an indicator of the adequacy of sex steroid administration to preserve bone mass. The protective effect of testosterone may be mediated by peripheral conversion to estradiol, both systemically and locally in the bone.

### *Transgender females*

A baseline study of BMD reported T scores less than −2.5 in 16% of transgender females (191). In aging males, studies suggest that serum estradiol more positively correlates with BMD than does testosterone (192, 193) and is more important for peak bone mass (194). Estrogen preserves BMD in transgender females who continue on estrogen and antiandrogen therapies (188, 190, 191, 195, 196).

Fracture data in transgender males and females are not available. Transgender persons who have undergone gonadectomy may choose not to continue consistent sex steroid treatment after hormonal and surgical sex reassignment, thereby becoming at risk for bone loss. There have been no studies to determine whether clinicians should use the sex assigned at birth or affirmed gender for assessing osteoporosis (*e.g.*, when using the FRAX tool). Although some researchers use the sex assigned at birth (with the assumption that bone mass has usually peaked for transgender people who initiate hormones in early adulthood), this should be assessed on a case-by-case basis until there are more data available. This assumption will be further complicated by the increasing prevalence of transgender people who undergo hormonal transition at a pubertal age or soon after puberty. Sex for comparison within risk assessment tools may be based on the age at which hormones were initiated and the length of exposure to hormones. In some cases, it may be

Downloaded from https://academic.oup.com/jcem/article/102/11/3869/4157553 by National Library of Education user on 15 August 2024

**3892** Hembree et al   Guidelines on Gender-Dysphoric/Gender-Incongruent Persons   J Clin Endocrinol Metab, November 2017, 102(11):3869–3903

reasonable to assess risk using both the male and female calculators and using an intermediate value. Because all subjects underwent normal pubertal development, with known effects on bone size, reference values for birth sex were used for all participants (154).

> 4.5. We suggest that transgender females with no known increased risk of breast cancer follow breast-screening guidelines recommended for those designated female at birth. (2 |⊕⊕○○)
>
> 4.6. We suggest that transgender females treated with estrogens follow individualized screening according to personal risk for prostatic disease and prostate cancer. (2 |⊕○○○)

## Evidence

Studies have reported a few cases of breast cancer in transgender females (197–200). A Dutch study of 1800 transgender females followed for a mean of 15 years (range of 1 30 years) found one case of breast cancer. The Women's Health Initiative study reported that females taking conjugated equine estrogen without progesterone for 7 years did not have an increased risk of breast cancer as compared with females taking placebo (137).

In transgender males, a large retrospective study conducted at the U.S. Veterans Affairs medical health system identified seven breast cancers (194). The authors reported that this was not above the expected rate of breast cancers in cisgender females in this cohort. Furthermore, they did report one breast cancer that developed in a transgender male patient after mastectomy, supporting the fact that breast cancer can occur even after mastectomy. Indeed, there have been case reports of breast cancer developing in subareolar tissue in transgender males, which occurred after mastectomy (201, 202).

Women with primary hypogonadism (Turner syndrome) treated with estrogen replacement exhibited a significantly decreased incidence of breast cancer as compared with national standardized incidence ratios (203, 204). These studies suggest that estrogen therapy does not increase the risk of breast cancer in the short term (<20 to 30 years). We need long-term studies to determine the actual risk, as well as the role of screening mammograms. Regular examinations and gynecologic advice should determine monitoring for breast cancer.

Prostate cancer is very rare before the age of 40, especially with androgen deprivation therapy (205). Childhood or pubertal castration results in regression of the prostate and adult castration reverses benign prostate hypertrophy (206). Although van Kesteren *et al.* (207) reported that estrogen therapy does not induce hypertrophy or premalignant changes in the prostates of

transgender females, studies have reported cases of benign prostatic hyperplasia in transgender females treated with estrogens for 20 to 25 years (208, 209). Studies have also reported a few cases of prostate carcinoma in transgender females (210–214).

Transgender females may feel uncomfortable scheduling regular prostate examinations. Gynecologists are not trained to screen for prostate cancer or to monitor prostate growth. Thus, it may be reasonable for transgender females who transitioned after age 20 years to have annual screening digital rectal examinations after age 50 years and prostate-specific antigen tests consistent with U.S. Preventive Services Task Force Guidelines (215).

> 4.7. We advise that clinicians determine the medical necessity of including a total hysterectomy and oophorectomy as part of gender-affirming surgery. (Ungraded Good Practice Statement)

## Evidence

Although aromatization of testosterone to estradiol in transgender males has been suggested as a risk factor for endometrial cancer (216), no cases have been reported. When transgender males undergo hysterectomy, the uterus is small and there is endometrial atrophy (217, 218). Studies have reported cases of ovarian cancer (219, 220). Although there is limited evidence for increased risk of reproductive tract cancers in transgender males, health care providers should determine the medical necessity of a laparoscopic total hysterectomy as part of a gender-affirming surgery to prevent reproductive tract cancer (221).

## Values

Given the discomfort that transgender males experience accessing gynecologic care, our recommendation for the medical necessity of total hysterectomy and oophorectomy places a high value on eliminating the risks of female reproductive tract disease and cancer and a lower value on avoiding the risks of these surgical procedures (related to the surgery and to the potential undesirable health consequences of oophorectomy) and their associated health costs.

## Remarks

The sexual orientation and type of sexual practices will determine the need and types of gynecologic care required following transition. Additionally, in certain countries, the approval required to change the sex in a birth certificate for transgender males may be dependent on having a complete hysterectomy. Clinicians should help patients research nonmedical administrative criteria and

Downloaded from https://academic.oup.com/jcem/article/102/11/3869/4157558 by National Library of Education user on 15 August 2024

doi: 10.1210/jc.2017-01658

provide counseling. If individuals decide not to undergo hysterectomy, screening for cervical cancer is the same as all other females.

## 5.0 Surgery for Sex Reassignment and Gender Confirmation

For many transgender adults, genital gender-affirming surgery may be the necessary step toward achieving their ultimate goal of living successfully in their desired gender role. The type of surgery falls into two main categories: (1) those that directly affect fertility and (2) those that do not. Those that change fertility (previously called sex reassignment surgery) include genital surgery to remove the penis and gonads in the male and removal of the uterus and gonads in the female. The surgeries that effect fertility are often governed by the legal system of the state or country in which they are performed. Other gender-conforming surgeries that do not directly affect fertility are not so tightly governed.

Gender-affirming surgical techniques have improved markedly during the past 10 years. Reconstructive genital surgery that preserves neurologic sensation is now the standard. The satisfaction rate with surgical reassignment of sex is now very high (187). Additionally, the mental health of the individual seems to be improved by participating in a treatment program that defines a pathway of gender-affirming treatment that includes hormones and surgery (130, 144) (Table 16).

Surgery that affects fertility is irreversible. The World Professional Association for Transgender Health Standards of Care (222) emphasizes that the "threshold of 18 should not be seen as an indication in itself for active intervention." If the social transition has not been satisfactory, if the person is not satisfied with or is ambivalent about the effects of sex hormone treatment, or if the person is ambivalent about surgery then the individual should not be referred for surgery (223, 224).

Gender-affirming genital surgeries for transgender females that affect fertility include gonadectomy, penectomy, and creation of a neovagina (225, 226). Surgeons often invert the skin of the penis to form the wall of the vagina, and several literatures reviews have

reported on outcomes (227). Sometimes there is inadequate tissue to form a full neovagina, so clinicians have revisited using intestine and found it to be successful (87, 228, 229). Some newer vaginoplasty techniques may involve autologous oral epithelial cells (230, 231).

The scrotum becomes the labia majora. Surgeons use reconstructive surgery to fashion the clitoris and its hood, preserving the neurovascular bundle at the tip of the penis as the neurosensory supply to the clitoris. Some surgeons are also creating a sensate pedicled-spot adding a G spot to the neovagina to increase sensation (232). Most recently, plastic surgeons have developed techniques to fashion labia minora. To further complete the feminization, uterine transplants have been proposed and even attempted (233).

Neovaginal prolapse, rectovaginal fistula, delayed healing, vaginal stenosis, and other complications do sometimes occur (234, 235). Clinicians should strongly remind the transgender person to use their dilators to maintain the depth and width of the vagina throughout the postoperative period. Genital sexual responsivity and other aspects of sexual function are usually preserved following genital gender-affirming surgery (236, 237).

Ancillary surgeries for more feminine or masculine appearance are not within the scope of this guideline. Voice therapy by a speech language pathologist is available to transform speech patterns to the affirmed gender (148). Spontaneous voice deepening occurs during testosterone treatment of transgender males (152, 238). No studies have compared the effectiveness of speech therapy, laryngeal surgery, or combined treatment.

Breast surgery is a good example of gender-confirming surgery that does not affect fertility. In all females, breast size exhibits a very broad spectrum. For transgender females to make the best informed decision, clinicians should delay breast augmentation surgery until the patient has completed at least 2 years of estrogen therapy, because the breasts continue to grow during that time (141, 155).

Another major procedure is the removal of facial and masculine-appearing body hair using either electrolysis or

---

**Table 16.    Criteria for Gender-Affirming Surgery, Which Affects Fertility**

1. Persistent, well-documented gender dysphoria
2. Legal age of majority in the given country
3. Having continuously and responsibly used gender-affirming hormones for 12 mo (if there is no medical contraindication to receiving such therapy)
4. Successful continuous full-time living in the new gender role for 12 mo
5. If significant medical or mental health concerns are present, they must be well controlled
6. Demonstrable knowledge of all practical aspects of surgery (*e.g.*, cost, required lengths of hospitalizations, likely complications, postsurgical rehabilitation)

Downloaded from https://academic.oup.com/jcem/article/102/11/3869/4157558 by National Library of Education user on 15 August 2024

**3894** Hembree et al   Guidelines on Gender-Dysphoric/Gender-Incongruent Persons   J Clin Endocrinol Metab, November 2017, 102(11):3869–3903

laser treatments. Other feminizing surgeries, such as that to feminize the face, are now becoming more popular (239–241).

In transgender males, clinicians usually delay gender-affirming genital surgeries until after a few years of androgen therapy. Those surgeries that affect fertility in this group include oophorectomy, vaginectomy, and complete hysterectomy. Surgeons can safely perform them vaginally with laparoscopy. These are sometimes done in conjunction with the creation of a neopenis. The cosmetic appearance of a neopenis is now very good, but the surgery is multistage and very expensive (242, 243). Radial forearm flap seems to be the most satisfactory procedure (228, 244). Other flaps also exist (245). Surgeons can make neopenile erections possible by reinervation of the flap and subsequent contraction of the muscle, leading to stiffening of the neopenis (246, 247), but results are inconsistent (248). Surgeons can also stiffen the penis by imbedding some mechanical device (*e.g.*, a rod or some inflatable apparatus) (249, 250). Because of these limitations, the creation of a neopenis has often been less than satisfactory. Recently, penis transplants are being proposed (233).

In fact, most transgender males do not have any external genital surgery because of the lack of access, high cost, and significant potential complications. Some choose a metaoidioplasty that brings forward the clitoris, thereby allowing them to void in a standing position without wetting themselves (251, 252). Surgeons can create the scrotum from the labia majora with good cosmetic effect and can implant testicular prostheses (253).

The most important masculinizing surgery for the transgender male is mastectomy, and it does not affect fertility. Breast size only partially regresses with androgen therapy (155). In adults, discussions about mastectomy usually take place after androgen therapy has started. Because some transgender male adolescents present after significant breast development has occurred, they may also consider mastectomy 2 years after they begin androgen therapy and before age 18 years. Clinicians should individualize treatment based on the physical and mental health status of the individual. There are now newer approaches to mastectomy with better outcomes (254, 255). These often involve chest contouring (256). Mastectomy is often necessary for living comfortably in the new gender (256).

5.1. We recommend that a patient pursue genital gender-affirming surgery only after the MHP and the clinician responsible for endocrine transition therapy both agree that surgery is medically

necessary and would benefit the patient's overall health and/or well-being. (1 |⊕⊕○○)

5.2. We advise that clinicians approve genital gender-affirming surgery only after completion of at least 1 year of consistent and compliant hormone treatment, unless hormone therapy is not desired or medically contraindicated. (Ungraded Good Practice Statement)

5.3. We advise that the clinician responsible for endocrine treatment and the primary care provider ensure appropriate medical clearance of transgender individuals for genital gender-affirming surgery and collaborate with the surgeon regarding hormone use during and after surgery. (Ungraded Good Practice Statement)

5.4. We recommend that clinicians refer hormone-treated transgender individuals for genital surgery when: (1) the individual has had a satisfactory social role change, (2) the individual is satisfied about the hormonal effects, and (3) the individual desires definitive surgical changes. (1 |⊕○○○)

5.5. We suggest that clinicians delay gender-affirming genital surgery involving gonadectomy and/or hysterectomy until the patient is at least 18 years old or legal age of majority in his or her country. (2 |⊕⊕○○).

5.6. We suggest that clinicians determine the timing of breast surgery for transgender males based upon the physical and mental health status of the individual. There is insufficient evidence to recommend a specific age requirement. (2 |⊕○○○)

### Evidence

Owing to the lack of controlled studies, incomplete follow-up, and lack of valid assessment measures, evaluating various surgical approaches and techniques is difficult. However, one systematic review including a large numbers of studies reported satisfactory cosmetic and functional results for vaginoplasty/neovagina construction (257). For transgender males, the outcomes are less certain. However, the problems are now better understood (258). Several postoperative studies report significant long-term psychological and psychiatric pathology (259–261). One study showed satisfaction with breasts, genitals, and femininity increased significantly and showed the importance of surgical treatment as a key therapeutic option for transgender females (262). Another analysis demonstrated that, despite the young average age at death following surgery and the relatively larger number of individuals with somatic morbidity, the study does not allow for determination of

Downloaded from https://academic.oup.com/jcem/article/102/11/3869/4157558 by National Library of Education user on 15 August 2024

doi: 10.1210/jc.2017-01658

https://academic.oup.com/jcem

Downloaded from https://academic.oup.com/jcem/article/102/11/3869/4157558 by National Library of Education user on 15 August 2024

causal relationships between, for example, specific types of hormonal or surgical treatment received and somatic morbidity and mortality (263). Reversal surgery in regretful male-to-female transsexuals after sexual reassignment surgery represents a complex, multistage procedure with satisfactory outcomes. Further insight into the characteristics of persons who regret their decision postoperatively would facilitate better future selection of applicants eligible for sexual reassignment surgery. We need more studies with appropriate controls that examine long-term quality of life, psychosocial outcomes, and psychiatric outcomes to determine the long-term benefits of surgical treatment.

When a transgender individual decides to have gender-affirming surgery, both the hormone prescribing clinician and the MHP must certify that the patient satisfies criteria for gender-affirming surgery (Table 16).

There is some concern that estrogen therapy may cause an increased risk for venous thrombosis during or following surgery (176). For this reason, the surgeon and the hormone-prescribing clinician should collaborate in making a decision about the use of hormones before and following surgery. One study suggests that preoperative factors (such as compliance) are less important for patient satisfaction than are the physical postoperative results (56). However, other studies and clinical experience dictate that individuals who do not follow medical instructions and do not work with their physicians toward a common goal do not achieve treatment goals (264) and experience higher rates of postoperative infections and other complications (265, 266). It is also important that the person requesting surgery feels comfortable with the anatomical changes that have occurred during hormone therapy. Dissatisfaction with social and physical outcomes during the hormone transition may be a contraindication to surgery (223).

An endocrinologist or experienced medical provider should monitor transgender individuals after surgery. Those who undergo gonadectomy will require hormone replacement therapy, surveillance, or both to prevent adverse effects of chronic hormone deficiency.

## Financial Disclosures of the Task Force*

**Wylie C. Hembree (chair)**—financial or business/organizational interests: none declared, significant financial interest or leadership position: none declared. **Peggy T. Cohen-Kettenis**—financial or business/organizational interests: none declared, significant financial interest or leadership position: none declared. **Louis Gooren**—financial or business/organizational interests: none declared, significant financial interest or leadership position: none declared. **Sabine E. Hannema**—financial or business/organizational interests: none declared, significant financial interest or leadership position: Ferring Pharmaceuticals Inc. (lecture/conference), Pfizer (lecture). **Walter J. Meyer**—financial or business/organizational interests: none declared, significant financial interest or leadership position: none declared. **M. Hassan Murad****—financial or business/organizational interests: Mayo Clinic, Evidence-based Practice Center, significant financial interest or leadership position: none declared. **Stephen M. Rosenthal**—financial or business/organizational interests: AbbVie (consultant), National Institutes of Health (grantee), significant financial interest or leadership position: Pediatric Endocrine Society (immediate past president). **Joshua D. Safer, FACP**—financial or business/organizational interests: none declared, significant financial interest or leadership position: none declared. **Vin Tangpricha**—financial or business/organizational interests: Cystic Fibrosis Foundation (grantee), National Institutes of Health (grantee), significant financial interest or leadership position, Elsevier *Journal of Clinical and Translational Endocrinology* (editor). **Guy G. T'Sjoen**—financial or business/organizational interests: none declared, significant financial interest or leadership position: none declared.* Financial, business, and organizational disclosures of the task force cover the year prior to publication. Disclosures prior to this time period are archived.**Evidence-based reviews for this guideline were prepared under contract with the Endocrine Society.

## Acknowledgments

*Correspondence and Reprint Requests:*   The Endocrine Society, 2055 L Street NW, Suite 600, Washington, DC 20036. E-mail: publications@endocrine.org; Phone: 202971-3636.

*Disclosure Summary:*   See Financial Disclosures.

*Disclaimer:* The Endocrine Society's clinical practice guidelines are developed to be of assistance to endocrinologists by providing guidance and recommendations for particular areas of practice. The guidelines should not be considered inclusive of all proper approaches or methods, or exclusive of others. The guidelines cannot guarantee any specific outcome, nor do they establish a standard of care. The guidelines are not intended to dictate the treatment of a particular patient. Treatment decisions must be made based on the independent judgement of healthcare providers and each patient's individual circumstances.

The Endocrine Society makes no warranty, express or implied, regarding the guidelines and specifically excludes any warranties of merchantability and fitness for a particular use or purpose. The Society shall not be liable for direct, indirect,

Downloaded from https://academic.oup.com/jcem/article/102/11/3869/4157558 by National Library of Education user on 15 August 2024

special, incidental, or consequential damages related to the use of the information contained herein.

# References

1. Atkins D, Best D, Briss PA, Eccles M, Falck-Ytter Y, Flottorp S, Guyatt GH, Harbour RT, Haugh MC, Henry D, Hill S, Jaeschke R, Leng G, Liberati A, Magrini N, Mason J, Middleton P, Mrukowicz J, O'Connell D, Oxman AD, Phillips B, Schünemann HJ, Edejer T, Varonen H, Vist GE, Williams JW, Jr, Zaza S; GRADE Working Group. Grading quality of evidence and strength of recommendations. *BMJ*. 2004;**328**(7454):1490.

2. Swiglo BA, Murad MH, Schünemann HJ, Kunz R, Vigersky RA, Guyatt GH, Montori VM. A case for clarity, consistency, and helpfulness: state-of-the-art clinical practice guidelines in endocrinology using the grading of recommendations, assessment, development, and evaluation system. *J Clin Endocrinol Metab*. 2008;**93**(3):666–673.

3. Bullough VL. Transsexualism in history. *Arch Sex Behav*. 1975;**4**(5):561–571.

4. Benjamin H. The transsexual phenomenon. *Trans N Y Acad Sci*. 1967;**29**(4):428–430.

5. Meyerowitz J. *How Sex Changed: A History of Transsexuality in the United States*. Cambridge, MA: Harvard University Press; 2002.

6. Hirschfeld M. *Was muss das Volk vom Dritten Geschlecht wissen*. Verlag Max Spohr, Leipzig; 1901.

7. Fisk NM. Editorial: Gender dysphoria syndrome—the conceptualization that liberalizes indications for total gender reorientation and implies a broadly based multi-dimensional rehabilitative regimen. *West J Med*. 1974;**120**(5):386–391.

8. Diamond L. Transgender experience and identity. In: Schwartz SJ, Luyckx K, Vignoles VL, eds. *Handbook of Identity Theory and Research*. New York, NY: Springer; 2011:629–647.

9. Queen C, Schimel L, eds. *PoMoSexuals: Challenging Assumptions About Gender and Sexuality*. San Francisco, CA: Cleis Press; 1997.

10. Case LK, Ramachandran VS. Alternating gender incongruity: a new neuropsychiatric syndrome providing insight into the dynamic plasticity of brain-sex. *Med Hypotheses*. 2012;**78**(5):626–631.

11. Johnson TW, Wassersug RJ. Gender identity disorder outside the binary: when gender identity disorder-not otherwise specified is not good enough. *Arch Sex Behav*. 2010;**39**(3):597–598.

12. Wibowo E, Wassersug R, Warkentin K, Walker L, Robinson J, Brotto L, Johnson T. Impact of androgen deprivation therapy on sexual function: a response. *Asian J Androl*. 2012;**14**(5):793–794.

13. Pasquesoone V. 7 countries giving transgender people fundamental rights the U.S. still won't. 2014. Available at: https://mic.com/articles/87149/7-countries-giving-transgender-people-fundamental-rights-the-u-s-still-won-t. Accessed 26 August 2016.

14. American Psychiatric Association. *Diagnostic and Statistical Manual of Mental Disorders*. 5th ed. Arlington, VA: American Psychiatric Association Publishing.

15. Drescher J, Cohen-Kettenis P, Winter S. Minding the body: situating gender identity diagnoses in the ICD-11. *Int Rev Psychiatry*. 2012;**24**(6):568–577.

16. World Professional Association for Transgender Health. Standards of care for the health of transsexual, transgender, and gender nonconforming people. Available at: http://www.wpath.org/site_page.cfm?pk_association_webpage_menu=1351&pk_association_webpage=3926. Accessed 1 September 2017.

17. Kreukels BP, Haraldsen IR, De Cuypere G, Richter-Appelt H, Gijs L, Cohen-Kettenis PT. A European network for the investigation of gender incongruence: the ENIGI initiative. *Eur Psychiatry*. 2012;**27**(6):445–450.

18. Dekker MJ, Wierckx K, Van Caenegem E, Klaver M, Kreukels BP, Elaut E, Fisher AD, van Trotsenburg MA, Schreiner T, den Heijer M, T'Sjoen G. A European network for the investigation of gender incongruence: endocrine part. *J Sex Med*. 2016;**13**(6):994–999.

19. Ruble DN, Martin CL, Berenbaum SA. Gender development. In: Damon WL, Lerner RM, Eisenberg N, eds. *Handbook of Child Psychology: Social, Emotional, and Personality Development*. Vol. 3. 6th ed. New York, NY: Wiley; 2006;858–931.

20. Steensma TD, Kreukels BP, de Vries AL, Cohen-Kettenis PT. Gender identity development in adolescence. *Horm Behav*. 2013;**64**(2):288–297.

21. Rosenthal SM. Approach to the patient: transgender youth: endocrine considerations. *J Clin Endocrinol Metab*. 2014;**99**(12):4379–4389.

22. Saraswat A, Weinand JD, Safer JD. Evidence supporting the biologic nature of gender identity. *Endocr Pract*. 2015;**21**(2):199–204.

23. Gooren L. The biology of human psychosexual differentiation. *Horm Behav*. 2006;**50**(4):589–601.

24. Berenbaum SA, Meyer-Bahlburg HF. Gender development and sexuality in disorders of sex development. *Horm Metab Res*. 2015;**47**(5):361–366.

25. Dessens AB, Slijper FME, Drop SLS. Gender dysphoria and gender change in chromosomal females with congenital adrenal hyperplasia. *Arch Sex Behav*. 2005;**34**(4):389–397.

26. Meyer-Bahlburg HFL, Dolezal C, Baker SW, Ehrhardt AA, New MI. Gender development in women with congenital adrenal hyperplasia as a function of disorder severity. *Arch Sex Behav*. 2006;**35**(6):667–684.

27. Frisén L, Nordenström A, Falhammar H, Filipsson H, Holmdahl G, Janson PO, Thorén M, Hagenfeldt K, Möller A, Nordenskjöld A. Gender role behavior, sexuality, and psychosocial adaptation in women with congenital adrenal hyperplasia due to CYP21A2 deficiency. *J Clin Endocrinol Metab*. 2009;**94**(9):3432–3439.

28. Meyer-Bahlburg HFL, Dolezal C, Baker SW, Carlson AD, Obeid JS, New MI. Prenatal androgenization affects gender-related behavior but not gender identity in 5–12-year-old girls with congenital adrenal hyperplasia. *Arch Sex Behav*. 2004;**33**(2):97–104.

29. Cohen-Kettenis PT. Gender change in 46,XY persons with 5α-reductase-2 deficiency and 17β-hydroxysteroid dehydrogenase-3 deficiency. *Arch Sex Behav*. 2005;**34**(4):399–410.

30. Reiner WG, Gearhart JP. Discordant sexual identity in some genetic males with cloacal exstrophy assigned to female sex at birth. *N Engl J Med*. 2004;**350**(4):333–341.

31. Meyer-Bahlburg HFL. Gender identity outcome in female-raised 46,XY persons with penile agenesis, cloacal exstrophy of the bladder, or penile ablation. *Arch Sex Behav*. 2005;**34**(4):423–438.

32. Coolidge FL, Thede LL, Young SE. The heritability of gender identity disorder in a child and adolescent twin sample. *Behav Genet*. 2002;**32**(4):251–257.

33. Heylens G, De Cuypere G, Zucker KJ, Schelfaut C, Elaut E, Vanden Bossche H, De Baere E, T'Sjoen G. Gender identity disorder in twins: a review of the case report literature. *J Sex Med*. 2012;**9**(3):751–757.

34. Fernández R, Esteva I, Gómez-Gil E, Rumbo T, Almaraz MC, Roda E, Haro-Mora J-J, Guillamón A, Pásaro E. Association study of ERβ, AR, and CYP19A1 genes and MtF transsexualism. *J Sex Med*. 2014;**11**(12):2986–2994.

35. Henningsson S, Westberg L, Nilsson S, Lundström B, Ekselius L, Bodlund O, Lindström E, Hellstrand M, Rosmond R, Eriksson E, Landén M. Sex steroid-related genes and male-to-female transsexualism. *Psychoneuroendocrinology*. 2005;**30**(7):657–664.

36. Hare L, Bernard P, Sánchez FJ, Baird PN, Vilain E, Kennedy T, Harley VR. Androgen receptor repeat length polymorphism associated with male-to-female transsexualism. *Biol Psychiatry*. 2009;**65**(1):93–96.

37. Lombardo F, Toselli L, Grassetti D, Paoli D, Masciandaro P, Valentini F, Lenzi A, Gandini L. Hormone and genetic study in

AR_293427

doi: 10.1210/jc.2017-01658    https://academic.oup.com/jcem    **3897**

Downloaded from https://academic.oup.com/jcem/article/102/11/3869/4157558 by National Library of Education user on 15 August 2024

male to female transsexual patients. *J Endocrinol Invest.* 2013; 36(8):550–557.

38. Ujike H, Otani K, Nakatsuka M, Ishii K, Sasaki A, Oishi T, Sato T, Okahisa Y, Matsumoto Y, Namba Y, Kimata Y, Kuroda S. Association study of gender identity disorder and sex hormone-related genes. *Prog Neuropsychopharmacol Biol Psychiatry.* 2009;33(7):1241–1244.

39. Kreukels BP, Guillamon A. Neuroimaging studies in people with gender incongruence. *Int Rev Psychiatry.* 2016;28(1): 120–128.

40. Steensma TD, Biemond R, de Boer F, Cohen-Kettenis PT. Desisting and persisting gender dysphoria after childhood: a qualitative follow-up study. *Clin Child Psychol Psychiatry.* 2011;16(4):499–516.

41. Wallien MSC, Cohen-Kettenis PT. Psychosexual outcome of gender-dysphoric children. *J Am Acad Child Adolesc Psychiatry.* 2008;47(12):1413–1423.

42. Steensma TD, McGuire JK, Kreukels BPC, Beekman AJ, Cohen-Kettenis PT. Factors associated with desistence and persistence of childhood gender dysphoria: a quantitative follow-up study. *J Am Acad Child Adolesc Psychiatry.* 2013;52(6):582–590.

43. Cohen-Kettenis PT, Owen A, Kaijser VG, Bradley SJ, Zucker KJ. Demographic characteristics, social competence, and behavior problems in children with gender identity disorder: a cross-national, cross-clinic comparative analysis. *J Abnorm Child Psychol.* 2003;31(1):41–53.

44. Dhejne C, Van Vlerken R, Heylens G, Arcelus J. Mental health and gender dysphoria: a review of the literature. *Int Rev Psychiatry.* 2016;28(1):44–57.

45. Pasterski V, Gilligan L, Curtis R. Traits of autism spectrum disorders in adults with gender dysphoria. *Arch Sex Behav.* 2014; 43(2):387–393.

46. Spack NP, Edwards-Leeper L, Feldman HA, Leibowitz S, Mandel F, Diamond DA, Vance SR. Children and adolescents with gender identity disorder referred to a pediatric medical center. *Pediatrics.* 2012;129(3):418–425.

47. Terada S, Matsumoto Y, Sato T, Okabe N, Kishimoto Y, Uchitomi Y. Factors predicting psychiatric co-morbidity in gender-dysphoric adults. *Psychiatry Res.* 2012;200(2-3):469–474.

48. VanderLaan DP, Leef JH, Wood H, Hughes SK, Zucker KJ. Autism spectrum disorder risk factors and autistic traits in gender dysphoric children. *J Autism Dev Disord.* 2015;45(6):1742–1750.

49. de Vries ALC, Doreleijers TAH, Steensma TD, Cohen-Kettenis PT. Psychiatric comorbidity in gender dysphoric adolescents. *J Child Psychol Psychiatry.* 2011;52(11):1195–1202.

50. de Vries ALC, Noens ILJ, Cohen-Kettenis PT, van Berckelaer-Onnes IA, Doreleijers TA. Autism spectrum disorders in gender dysphoric children and adolescents. *J Autism Dev Disord.* 2010; 40(8):930–936.

51. Wallien MSC, Swaab H, Cohen-Kettenis PT. Psychiatric comorbidity among children with gender identity disorder. *J Am Acad Child Adolesc Psychiatry.* 2007;46(10):1307–1314.

52. Kuiper AJ, Cohen-Kettenis PT. Gender role reversal among postoperative transsexuals. Available at: https://www.atria.nl/ezines/web/IJT/97-03/numbers/symposion/ijtc0502.htm. Accessed 26 August 2016.

53. Landén M, Wålinder J, Hambert G, Lundström B. Factors predictive of regret in sex reassignment. *Acta Psychiatr Scand.* 1998; 97(4):284–289.

54. Olsson S-E, Möller A. Regret after sex reassignment surgery in a male-to-female transsexual: a long-term follow-up. *Arch Sex Behav.* 2006;35(4):501–506.

55. Pfäfflin F, Junge A, eds. *Geschlechtsumwandlung: Abhandlungen zur Transsexualität.* Stuttgart, Germany: Schattauer; 1992.

56. Lawrence AA. Factors associated with satisfaction or regret following male-to-female sex reassignment surgery. *Arch Sex Behav.* 2003;32(4):299–315.

57. Cohen-Kettenis PT, Pfäfflin F. *Transgenderism and Intersexuality in Childhood and Adolescence: Making Choices.* Thousand Oaks, CA: SAGE Publications; 2003.

58. Di Ceglie D, Freedman D, McPherson S, Richardson P. Children and adolescents referred to a specialist gender identity development service: clinical features and demographic characteristics. Available at: https://www.researchgate.net/publication/276061306_Children_and_Adolescents_Referred_to_a_Specialist_Gender_Identity_Development_Service_Clinical_Features_and_Demographic_Characteristics. Accessed 20 July 2017.

59. Gijs L, Brewaeys A. Surgical treatment of gender dysphoria in adults and adolescents: recent developments, effectiveness, and challenges. *Annu Rev Sex Res.* 2007;18:178–224.

60. Cohen-Kettenis PT, van Goozen SHM. Sex reassignment of adolescent transsexuals: a follow-up study. *J Am Acad Child Adolesc Psychiatry.* 1997;36(2):263–271.

61. Smith YLS, van Goozen SHM, Cohen-Kettenis PT. Adolescents with gender identity disorder who were accepted or rejected for sex reassignment surgery: a prospective follow-up study. *J Am Acad Child Adolesc Psychiatry.* 2001;40(4):472–481.

62. Smith YLS, Van Goozen SHM, Kuiper AJ, Cohen-Kettenis PT. Sex reassignment: outcomes and predictors of treatment for adolescent and adult transsexuals. *Psychol Med.* 2005;35(1):89–99.

63. de Vries ALC, McGuire JK, Steensma TD, Wagenaar ECF, Doreleijers TAH, Cohen-Kettenis PT. Young adult psychological outcome after puberty suppression and gender reassignment. *Pediatrics.* 2014;134(4):696–704.

64. Cole CM, O'Boyle M, Emory LE, Meyer WJ III. Comorbidity of gender dysphoria and other major psychiatric diagnoses. *Arch Sex Behav.* 1997;26(1):13–26.

65. Cohen-Kettenis PT, Schagen SEE, Steensma TD, de Vries ALC, Delemarre-van de Waal HA. Puberty suppression in a gender-dysphoric adolescent: a 22-year follow-up. *Arch Sex Behav.* 2011; 40(4):843–847.

66. First MB. Desire for amputation of a limb: paraphilia, psychosis, or a new type of identity disorder. *Psychol Med.* 2005;35(6): 919–928.

67. Wierckx K, Van Caenegem E, Pennings G, Elaut E, Dedecker D, Van de Peer F, Weyers S, De Sutter P, T'Sjoen G. Reproductive wish in transsexual men. *Hum Reprod.* 2012;27(2):483–487.

68. Wierckx K, Stuyver I, Weyers S, Hamada A, Agarwal A, De Sutter P, T'Sjoen G. Sperm freezing in transsexual women. *Arch Sex Behav.* 2012;41(5):1069–1071.

69. Bertelloni S, Baroncelli GI, Ferdeghini M, Menchini-Fabris F, Saggese G. Final height, gonadal function and bone mineral density of adolescent males with central precocious puberty after therapy with gonadotropin-releasing hormone analogues. *Eur J Pediatr.* 2000;159(5):369–374.

70. Büchter D, Behre HM, Kliesch S, Nieschlag E. Pulsatile GnRH or human chorionic gonadotropin/human menopausal gonadotropin as effective treatment for men with hypogonadotropic hypogonadism: a review of 42 cases. *Eur J Endocrinol.* 1998; 139(3):298–303.

71. Liu PY, Turner L, Rushford D, McDonald J, Baker HW, Conway AJ, Handelsman DJ. Efficacy and safety of recombinant human follicle stimulating hormone (Gonal-F) with urinary human chorionic gonadotrophin for induction of spermatogenesis and fertility in gonadotrophin-deficient men. *Hum Reprod.* 1999; 14(6):1540–1545.

72. Pasquino AM, Pucarelli I, Accardo F, Demiraj V, Segni M, Di Nardo R. Long-term observation of 87 girls with idiopathic central precocious puberty treated with gonadotropin-releasing hormone analogs: impact on adult height, body mass index, bone mineral content, and reproductive function. *J Clin Endocrinol Metab.* 2008;93(1):190–195.

73. Magiakou MA, Manousaki D, Papadaki M, Hadjidakis D, Levidou G, Vakaki M, Papaefstathiou A, Lalioti N, Kanaka-Gantenbein C, Piaditis G, Chrousos GP, Dacou-Voutetakis C. The

Case 4:24-cv-00461-O     Document 76     Filed 09/06/24     Page 264 of 290     PageID 3911

**3898** Hembree et al  Guidelines on Gender-Dysphoric/Gender-Incongruent Persons  J Clin Endocrinol Metab, November 2017, 102(11):3869–3903

Downloaded from https://academic.oup.com/jcem/article/102/11/3869/4157558 by National Library of Education user on 15 August 2024

efficacy and safety of gonadotropin-releasing hormone analog treatment in childhood and adolescence: a single center, long-term follow-up study. *J Clin Endocrinol Metab.* 2010;95(1):109–117.

74. Baba T, Endo T, Honnma H, Kitajima Y, Hayashi T, Ikeda H, Masumori N, Kamiya H, Moriwaka O, Saito T. Association between polycystic ovary syndrome and female-to-male transsexuality. *Hum Reprod.* 2007;22(4):1011–1016.

75. Spinder T, Spijkstra JJ, van den Tweel JG, Burger CW, van Kessel H, Hompes PGA, Gooren LJG. The effects of long term testosterone administration on pulsatile luteinizing hormone secretion and on ovarian histology in eugonadal female to male transsexual subjects. *J Clin Endocrinol Metab.* 1989;69(1):151–157.

76. Baba T, Endo T, Ikeda K, Shimizu A, Honnma H, Ikeda H, Masumori N, Ohmura T, Kiya T, Fujimoto T, Koizumi M, Saito T. Distinctive features of female-to-male transsexualism and prevalence of gender identity disorder in Japan. *J Sex Med.* 2011; 8(6):1686–1693.

77. Vujovic S, Popovic S, Sbutega-Milosevic G, Djordjevic M, Gooren L. Transsexualism in Serbia: a twenty-year follow-up study. *J Sex Med.* 2009;6(4):1018–1023.

78. Ikeda K, Baba T, Noguchi H, Nagasawa K, Endo T, Kiya T, Saito T. Excessive androgen exposure in female-to-male transsexual persons of reproductive age induces hyperplasia of the ovarian cortex and stroma but not polycystic ovary morphology. *Hum Reprod.* 2013;28(2):453–461.

79. Trebay G. He's pregnant. You're speechles. New York Times. 22 June 2008.

80. Light AD, Obedin-Maliver J, Sevelius JM, Kerns JL. Transgender men who experienced pregnancy after female-to-male gender transitioning. *Obstet Gynecol.* 2014;124(6):1120–1127.

81. De Sutter P. Donor inseminations in partners of female-to-male transsexuals: should the question be asked? *Reprod Biomed Online.* 2003;6(3):382, author reply 282–283.

82. De Roo C, Tilleman K, T'Sjoen G, De Sutter P. Fertility options in transgender people. *Int Rev Psychiatry.* 2016;28(1):112–119.

83. Wennink JMB, Delemarre-van de Waal HA, Schoemaker R, Schoemaker H, Schoemaker J. Luteinizing hormone and follicle stimulating hormone secretion patterns in boys throughout puberty measured using highly sensitive immunoradiometric assays. *Clin Endocrinol (Oxf).* 1989;31(5):551–564.

84. Cohen-Kettenis PT, Delemarre-van de Waal HA, Gooren LJG. The treatment of adolescent transsexuals: changing insights. *J Sex Med.* 2008;5(8):1892–1897.

85. Delemarre-van de Waal HA, Cohen-Kettenis PT. Clinical management of gender identity disorder in adolescents: a protocol on psychological and paediatric endocrinology aspects. *Eur J Endocrinol.* 2006;155:S131–S137.

86. de Vries ALC, Steensma TD, Doreleijers TAH, Cohen-Kettenis PT. Puberty suppression in adolescents with gender identity disorder: a prospective follow-up study. *J Sex Med.* 2011;8(8):2276–2283.

87. Bouman MB, van Zeijl MCT, Buncamper ME, Meijerink WJHJ, van Bodegraven AA, Mullender MG. Intestinal vaginoplasty revisited: a review of surgical techniques, complications, and sexual function. *J Sex Med.* 2014;11(7):1835–1847.

88. Carel JC, Eugster EA, Rogol A, Ghizzoni L, Palmert MR, Antoniazzi F, Berenbaum S, Bourguignon JP, Chrousos GP, Coste J, Deal S, de Vries L, Foster C, Heger S, Holland J, Jahnukainen K, Juul A, Kaplowitz P, Lahlou N, Lee MM, Lee P, Merke DP, Neely EK, Oostdijk W, Phillip M, Rosenfield RL, Shulman D, Styne D, Tauber M, Wit JM; ESPE-LWPES GnRH Analogs Consensus Conference Group. Consensus statement on the use of gonadotropin-releasing hormone analogs in children. *Pediatrics.* 2009;123(4):e752–e762.

89. Roth CL, Brendel L, Rückert C, Hartmann K. Antagonistic and agonistic GnRH analogue treatment of precocious puberty: tracking gonadotropin concentrations in urine. *Horm Res.* 2005; 63(5):257–262.

90. Roth C. Therapeutic potential of GnRH antagonists in the treatment of precocious puberty. *Expert Opin Investig Drugs.* 2002;11(9):1253–1259.

91. Tuvemo T. Treatment of central precocious puberty. *Expert Opin Investig Drugs.* 2006;15(5):495–505.

92. Schagen SE, Cohen-Kettenis PT, Delemarre-van de Waal HA, Hannema SE. Efficacy and safety of gonadotropin-releasing hormone agonist treatment to suppress puberty in gender dysphoric adolescents. *J Sex Med.* 2016;13(7):1125–1132.

93. Manasco PK, Pescovitz OH, Feuillan PP, Hench KD, Barnes KM, Jones J, Hill SC, Loriaux DL, Cutler GB, Jr. Resumption of puberty after long term luteinizing hormone-releasing hormone agonist treatment of central precocious puberty. *J Clin Endocrinol Metab.* 1988;67(2):368–372.

94. Klink D, Caris M, Heijboer A, van Trotsenburg M, Rotteveel J. Bone mass in young adulthood following gonadotropin-releasing hormone analog treatment and cross-sex hormone treatment in adolescents with gender dysphoria. *J Clin Endocrinol Metab.* 2015;100(2):E270–E275.

95. Finkelstein JS, Klibanski A, Neer RM. A longitudinal evaluation of bone mineral density in adult men with histories of delayed puberty. *J Clin Endocrinol Metab.* 1996;81(3):1152–1155.

96. Bertelloni S, Baroncelli GI, Ferdeghini M, Perri G, Saggese G. Normal volumetric bone mineral density and bone turnover in young men with histories of constitutional delay of puberty. *J Clin Endocrinol Metab.* 1998;83(12):4280–4283.

97. Darelid A, Ohlsson C, Nilsson M, Kindblom JM, Mellström D, Lorentzon M. Catch up in bone acquisition in young adult men with late normal puberty. *J Bone Miner Res.* 2012;27(10): 2198–2207.

98. Mittan D, Lee S, Miller E, Perez RC, Basler JW, Bruder JM. Bone loss following hypogonadism in men with prostate cancer treated with GnRH analogs. *J Clin Endocrinol Metab.* 2002;87(8): 3656–3661.

99. Saggese G, Bertelloni S, Baroncelli GI, Battini R, Franchi G. Reduction of bone density: an effect of gonadotropin releasing hormone analogue treatment in central precocious puberty. *Eur J Pediatr.* 1993;152(9):717–720.

100. Neely EK, Bachrach LK, Hintz RL, Habiby RL, Slemenda CW, Feezle L, Pescovitz OH. Bone mineral density during treatment of central precocious puberty. *J Pediatr.* 1995;127(5):819–822.

101. Bertelloni S, Baroncelli GI, Sorrentino MC, Perri G, Saggese G. Effect of central precocious puberty and gonadotropin-releasing hormone analogue treatment on peak bone mass and final height in females. *Eur J Pediatr.* 1998;157(5):363–367.

102. Thornton P, Silverman LA, Geffner ME, Neely EK, Gould E, Danoff TM. Review of outcomes after cessation of gonadotropin-releasing hormone agonist treatment of girls with precocious puberty. *Pediatr Endocrinol Rev.* 2014;11(3):306–317.

103. Lem AJ, van der Kaay DC, Hokken-Koelega AC. Bone mineral density and body composition in short children born SGA during growth hormone and gonadotropin-releasing hormone analog treatment. *J Clin Endocrinol Metab.* 2013;98(1):77–86.

104. Antoniazzi F, Zamboni G, Bertoldo F, Lauriola S, Mengarda F, Pietrobelli A, Tatò L. Bone mass at final height in precocious puberty after gonadotropin-releasing hormone agonist with and without calcium supplementation. *J Clin Endocrinol Metab.* 2003;88(3):1096–1101.

105. Calcaterra V, Mannarino S, Corana G, Codazzi AC, Mazzola A, Brambilla P, Larizza D. Hypertension during therapy with triptorelin in a girl with precocious puberty. *Indian J Pediatr.* 2013; 80(10):884–885.

106. Siomou E, Kosmeri C, Pavlou M, Vlahos AP, Argyropoulou MI, Siamopoulou A. Arterial hypertension during treatment with triptorelin in a child with Williams-Beuren syndrome. *Pediatr Nephrol.* 2014;29(9):1633–1636.

107. Staphorsius AS, Kreukels BPC, Cohen-Kettenis PT, Veltman DJ, Burke SM, Schagen SEE, Wouters FM, Delemarre-van de Waal

doi: 10.1210/jc.2017-01658
https://academic.oup.com/jcem    3899

HA, Bakker J. Puberty suppression and executive functioning: an fMRI-study in adolescents with gender dysphoria. *Psychoneuroendocrinology*. 2015;**56**:190–199.

108. Hough D, Bellingham M, Haraldsen IR, McLaughlin M, Rennie M, Robinson JE, Solbakk AK, Evans NP. Spatial memory is impaired by peripubertal GnRH agonist treatment and testosterone replacement in sheep. *Psychoneuroendocrinology*. 2017;**75**:173–182.

109. Collipp PJ, Kaplan SA, Boyle DC, Plachte F, Kogut MD. Constitutional Isosexual Precocious Puberty. *Am J Dis Child*. 1964;**108**:399–405.

110. Hahn HB, Jr, Hayles AB, Albert A. Medroxyprogesterone and constitutional precocious puberty. *Mayo Clin Proc*. 1964;**39**:182–190.

111. Kaplan SA, Ling SM, Irani NG. Idiopathic isosexual precocity. *Am J Dis Child*. 1968;**116**(6):591–598.

112. Schoen EJ. Treatment of idiopathic precocious puberty in boys. *J Clin Endocrinol Metab*. 1966;**26**(4):363–370.

113. Gooren L. Hormone treatment of the adult transsexual patient. *Horm Res*. 2005;**64**(Suppl 2):31–36.

114. Moore E, Wisniewski A, Dobs A. Endocrine treatment of transsexual people: a review of treatment regimens, outcomes, and adverse effects. *J Clin Endocrinol Metab*. 2003;**88**(8):3467–3473.

115. Krueger RB, Hembree W, Hill M. Prescription of medroxyprogesterone acetate to a patient with pedophilia, resulting in Cushing's syndrome and adrenal insufficiency. *Sex Abuse*. 2006;**18**(2):227–228.

116. Lynch MM, Khandheria MM, Meyer WJ. Retrospective study of the management of childhood and adolescent gender identity disorder using medroxyprogesterone acetate. *Int J Transgenderism*. 2015;**16**:201–208.

117. Tack LJW, Craen M, Dhondt K, Vanden Bossche H, Laridaen J, Cools M. Consecutive lynestrenol and cross-sex hormone treatment in biological female adolescents with gender dysphoria: a retrospective analysis. *Biol Sex Differ*. 2016;**7**:14.

118. Hembree WC, Cohen-Kettenis P, Delemarre-van de Waal HA, Gooren LJ, Meyer WJ 3rd, Spack NP, Tangpricha V, Montori VM; Endocrine Society. Endocrine treatment of transsexual persons: an Endocrine Society clinical practice guideline. *J Clin Endocrinol Metab*. 2009;**94**(9):3132–3154.

119. Mann L, Harmoni R, Power C. Adolescent decision-making: the development of competence. *J Adolesc*. 1989;**12**(3):265–278.

120. Stultiëns L, Goffin T, Borry P, Dierickx K, Nys H. Minors and informed consent: a comparative approach. *Eur J Health Law*. 2007;**14**(1):21–46.

121. Arshagouni P. "But I'm an adult now … sort of". Adolescent consent in health care decision-making and the adolescent brain. Available at: http://digitalcommons.law.umaryland.edu/cgi/viewcontent.cgi?article=1124&context=jhclp. Accessed 25 June 2017.

122. NHS. Prescribing of cross-sex hormones as part of the gender identity development service for children and adolescents. Available at: https://www.england.nhs.uk/commissioning/wp-content/uploads/sites/12/2016/08/clinical-com-pol-16046p.pdf. Accessed 14 June 2017.

123. Ankarberg-Lindgren C, Kriström B, Norjavaara E. Physiological estrogen replacement therapy for puberty induction in girls: a clinical observational study. *Horm Res Paediatr*. 2014;**81**(4):239–244.

124. Olson J, Schrager SM, Clark LF, Dunlap SL, Belzer M. Subcutaneous testosterone: an effective delivery mechanism for masculinizing young transgender men. *LGBT Health*. 2014;**1**(3):165–167.

125. Spratt DI, Stewart I, Savage C, Craig W, Spack NP, Chandler DW, Spratt LV, Eimicke T, Olshan JS. Subcutaneous injection of testosterone is an effective and preferred alternative to intramuscular injection: demonstration in female-to-male transgender patients. *J Clin Endocrinol Metab*. 2017. doi:10.1210/jc.2017-00359

126. Eisenegger C, von Eckardstein A, Fehr E, von Eckardstein S. Pharmacokinetics of testosterone and estradiol gel preparations in healthy young men. *Psychoneuroendocrinology*. 2013;**38**(2):171–178.

127. de Ronde W, ten Kulve J, Woerdeman J, Kaufman J-M, de Jong FH. Effects of oestradiol on gonadotrophin levels in normal and castrated men. *Clin Endocrinol (Oxf)*. 2009;**71**(6):874–879.

128. Money J, Ehrhardt A. Man & woman, boy & girl: differentiation and dimorphism of gender identity from conception to maturity. Baltimore, MD: Johns Hopkins University Press; 1972:202–206.

129. Heylens G, Verroken C, De Cock S, T'Sjoen G, De Cuypere G. Effects of different steps in gender reassignment therapy on psychopathology: a prospective study of persons with a gender identity disorder. *J Sex Med*. 2014;**11**(1):119–126.

130. Costa R, Colizzi M. The effect of cross-sex hormonal treatment on gender dysphoria individuals' mental health: a systematic review. *Neuropsychiatr Dis Treat*. 2016;**12**:1953–1966.

131. Gooren LJG, Giltay EJ. Review of studies of androgen treatment of female-to-male transsexuals: effects and risks of administration of androgens to females. *J Sex Med*. 2008;**5**(4):765–776.

132. Levy A, Crown A, Reid R. Endocrine intervention for transsexuals. *Clin Endocrinol (Oxf)*. 2003;**59**(4):409–418.

133. Tangpricha V, Ducharme SH, Barber TW, Chipkin SR. Endocrinologic treatment of gender identity disorders. *Endocr Pract*. 2003;**9**(1):12–21.

134. Meriggiola MC, Gava G. Endocrine care of transpeople part I. A review of cross-sex hormonal treatments, outcomes and adverse effects in transmen. *Clin Endocrinol (Oxf)*. 2015;**83**(5):597–606.

135. Bhasin S, Cunningham GR, Hayes FJ, Matsumoto AM, Snyder PJ, Swerdloff RS, Montori VM. Testosterone therapy in adult men with androgen deficiency syndromes: an endocrine society clinical practice guideline. *J Clin Endocrinol Metab*. 2006;**91**(6):1995–2010.

136. Pelusi C, Costantino A, Martelli V, Lambertini M, Bazzocchi A, Ponti F, Battista G, Venturoli S, Meriggiola MC. Effects of three different testosterone formulations in female-to-male transsexual persons. *J Sex Med*. 2014;**11**(12):3002–3011.

137. Anderson GL, Limacher M, Assaf AR, Bassford T, Beresford SA, Black H, Bonds D, Brunner R, Brzyski R, Caan B, Chlebowski R, Curb D, Gass M, Hays J, Heiss G, Hendrix S, Howard BV, Hsia J, Hubbell A, Jackson R, Johnson KC, Judd H, Kotchen JM, Kuller L, LaCroix AZ, Lane D, Langer RD, Lasser N, Lewis CE, Manson J, Margolis K, Ockene J, O'Sullivan MJ, Phillips L, Prentice RL, Ritenbaugh C, Robbins J, Rossouw JE, Sarto G, Stefanick ML, Van Horn L, Wactawski-Wende J, Wallace R, Wassertheil-Smoller S; Women's Health Initiative Steering Committee. Effects of conjugated equine estrogen in postmenopausal women with hysterectomy: the Women's Health Initiative randomized controlled trial. *JAMA*. 2004;**291**(14):1701–1712.

138. Dickersin K, Munro MG, Clark M, Langenberg P, Scherer R, Frick K, Zhu Q, Hallock L, Nichols J, Yalcinkaya TM; Surgical Treatments Outcomes Project for Dysfunctional Uterine Bleeding (STOP-DUB) Research Group. Hysterectomy compared with endometrial ablation for dysfunctional uterine bleeding: a randomized controlled trial. *Obstet Gynecol*. 2007;**110**(6):1279–1289.

139. Gooren LJ, Giltay EJ, Bunck MC. Long-term treatment of transsexuals with cross-sex hormones: extensive personal experience. *J Clin Endocrinol Metab*. 2008;**93**(1):19–25.

140. Prior JC, Vigna YM, Watson D. Spironolactone with physiological female steroids for presurgical therapy of male-to-female transsexualism. *Arch Sex Behav*. 1989;**18**(1):49–57.

141. Dittrich R, Binder H, Cupisti S, Hoffmann I, Beckmann MW, Mueller A. Endocrine treatment of male-to-female transsexuals using gonadotropin-releasing hormone agonist. *Exp Clin Endocrinol Diabetes*. 2005;**113**(10):586–592.

Downloaded from https://academic.oup.com/jcem/article/102/11/3869/4157558 by National Library of Education user on 15 August 2024

**3900** Hembree et al  Guidelines on Gender-Dysphoric/Gender-Incongruent Persons  J Clin Endocrinol Metab, November 2017, 102(11):3869–3903

Case 4:24-cv-00461-O   Document 76   Filed 09/06/24   Page 266 of 290   PageID 3913

Downloaded from https://academic.oup.com/jcem/article/102/11/3869/4157558 by National Library of Education user on 15 August 2024

142. Stripp B, Taylor AA, Bartter FC, Gillette JR, Loriaux DL, Easley R, Menard RH. Effect of spironolactone on sex hormones in man. *J Clin Endocrinol Metab.* 1975;**41**(4):777–781.

143. Levy J, Burshell A, Marbach M, Afllalo L, Glick SM. Interaction of spironolactone with oestradiol receptors in cytosol. *J Endocrinol.* 1980;**84**(3):371–379.

144. Wierckx K, Elaut E, Van Hoorde B, Heylens G, De Cuypere G, Monstrey S, Weyers S, Hoebeke P, T'Sjoen G. Sexual desire in trans persons: associations with sex reassignment treatment. *J Sex Med.* 2014;**11**(1):107–118.

145. Chiriacò G, Cauci S, Mazzon G, Trombetta C. An observational retrospective evaluation of 79 young men with long-term adverse effects after use of finasteride against androgenetic alopecia. *Andrology.* 2016;**4**(2):245–250.

146. Gava G, Cerpolini S, Martelli V, Battista G, Seracchioli R, Meriggiola MC. Cyproterone acetate vs leuprolide acetate in combination with transdermal oestradiol in transwomen: a comparison of safety and effectiveness. *Clin Endocrinol (Oxf).* 2016; **85**(2):239–246.

147. Casper RF, Yen SS. Rapid absorption of micronized estradiol-17 beta following sublingual administration. *Obstet Gynecol.* 1981; **57**(1):62–64.

148. Price TM, Blauer KL, Hansen M, Stanczyk F, Lobo R, Bates GW. Single-dose pharmacokinetics of sublingual versus oral administration of micronized 17β-estradiol. *Obstet Gynecol.* 1997;**89**(3): 340–345.

149. Toorians AWFT, Thomassen MCLGD, Zweegman S, Magdeleyns EJP, Tans G, Gooren LJG, Rosing J. Venous thrombosis and changes of hemostatic variables during cross-sex hormone treatment in transsexual people. *J Clin Endocrinol Metab.* 2003;**88**(12): 5723–5729.

150. Mepham N, Bouman WP, Arcelus J, Hayter M, Wylie KR. People with gender dysphoria who self-prescribe cross-sex hormones: prevalence, sources, and side effects knowledge. *J Sex Med.* 2014; **11**(12):2995–3001.

151. Richards C, Bouman WP, Seal L, Barker MJ, Nieder TO, T'Sjoen G. Non-binary or genderqueer genders. *Int Rev Psychiatry.* 2016; **28**(1):95–102.

152. Cosyns M, Van Borsel J, Wierckx K, Dedecker D, Van de Peer F, Daelman T, Laenen S, T'Sjoen G. Voice in female-to-male transsexual persons after long-term androgen therapy. *Laryngoscope.* 2014;**124**(4):1409–1414.

153. Deuster D, Matulat P, Knief A, Zitzmann M, Rosslau K, Szukaj M, am Zehnhoff-Dinnesen A, Schmidt CM. Voice deepening under testosterone treatment in female-to-male gender dysphoric individuals. *Eur Arch Otorhinolaryngol.* 2016;**273**(4):959–965.

154. Lapauw B, Taes Y, Simoens S, Van Caenegem E, Weyers S, Goemaere S, Toye K, Kaufman J-M, T'Sjoen GG. Body composition, volumetric and areal bone parameters in male-to-female transsexual persons. *Bone.* 2008;**43**(6):1016–1021.

155. Meyer III WJ, Webb A, Stuart CA, Finkelstein JW, Lawrence B, Walker PA. Physical and hormonal evaluation of transsexual patients: a longitudinal study. *Arch Sex Behav.* 1986;**15**(2): 121–138.

156. Asscheman H, Gooren LJ, Assies J, Smits JP, de Slegte R. Prolactin levels and pituitary enlargement in hormone-treated male-to-female transsexuals. *Clin Endocrinol (Oxf).* 1988;**28**(6):583–588.

157. Gooren LJ, Harmsen-Louman W, van Kessel H. Follow-up of prolactin levels in long-term oestrogen-treated male-to-female transsexuals with regard to prolactinoma induction. *Clin Endocrinol (Oxf).* 1985;**22**(2):201–207.

158. Wierckx K, Van Caenegem E, Schreiner T, Haraldsen I, Fisher AD, Toye K, Kaufman JM, T'Sjoen G. Cross-sex hormone therapy in trans persons is safe and effective at short-time follow-up: results from the European network for the investigation of gender incongruence. *J Sex Med.* 2014;**11**(8):1999–2011.

159. Ott J, Kaufmann U, Bentz EK, Huber JC, Tempfer CB. Incidence of thrombophilia and venous thrombosis in transsexuals under cross-sex hormone therapy. *Fertil Steril.* 2010;**93**(4):1267–1272.

160. Giltay EJ, Hoogeveen EK, Elbers JMH, Gooren LJG, Asscheman H, Stehouwer CDA. Effects of sex steroids on plasma total homocysteine levels: a study in transsexual males and females. *J Clin Endocrinol Metab.* 1998;**83**(2):550–553.

161. van Kesteren PJM, Asscheman H, Megens JAJ, Gooren LJG. Mortality and morbidity in transsexual subjects treated with cross-sex hormones. *Clin Endocrinol (Oxf).* 1997;**47**(3): 337–343.

162. Wierckx K, Gooren L, T'Sjoen G. Clinical review: breast development in trans women receiving cross-sex hormones. *J Sex Med.* 2014;**11**(5):1240–1247.

163. Bird D, Vowles K, Anthony PP. Spontaneous rupture of a liver cell adenoma after long term methyltestosterone: report of a case successfully treated by emergency right hepatic lobectomy. *Br J Surg.* 1979;**66**(3):212–213.

164. Westaby D, Ogle SJ, Paradinas FJ, Randell JB, Murray-Lyon IM. Liver damage from long-term methyltestosterone. *Lancet.* 1977; **2**(8032):262–263.

165. Weinand JD, Safer JD. Hormone therapy in transgender adults is safe with provider supervision; a review of hormone therapy sequelae for transgender individuals. *J Clin Transl Endocrinol.* 2015;**2**(2):55–60.

166. Roberts TK, Kraft CS, French D, Ji W, Wu AH, Tangpricha V, Fantz CR. Interpreting laboratory results in transgender patients on hormone therapy. *Am J Med.* 2014;**127**(2):159–162.

167. Vesper HW, Botelho JC, Wang Y. Challenges and improvements in testosterone and estradiol testing. *Asian J Androl.* 2014;**16**(2): 178–184.

168. Asscheman H, T'Sjoen G, Lemaire A, Mas M, Meriggiola MC, Mueller A, Kuhn A, Dhejne C, Morel-Journel N, Gooren LJ. Venous thrombo-embolism as a complication of cross-sex hormone treatment of male-to-female transsexual subjects: a review. *Andrologia.* 2014;**46**(7):791–795.

169. Righini M, Perrier A, De Moerloose P, Bounameaux H. D-dimer for venous thromboembolism diagnosis: 20 years later. *J Thromb Haemost.* 2008;**6**(7):1059–1071.

170. Gooren LJ, Assies J, Asscheman H, de Slegte R, van Kessel H. Estrogen-induced prolactinoma in a man. *J Clin Endocrinol Metab.* 1988;**66**(2):444–446.

171. Kovacs K, Stefaneanu L, Ezzat S, Smyth HS. Prolactin-producing pituitary adenoma in a male-to-female transsexual patient with protracted estrogen administration. A morphologic study. *Arch Pathol Lab Med.* 1994;**118**(5):562–565.

172. Serri O, Noiseux D, Robert F, Hardy J. Lactotroph hyperplasia in an estrogen treated male-to-female transsexual patient. *J Clin Endocrinol Metab.* 1996;**81**(9):3177–3179.

173. Cunha FS, Domenice S, Câmara VL, Sircili MH, Gooren LJ, Mendonça BB, Costa EM. Diagnosis of prolactinoma in two male-to-female transsexual subjects following high-dose cross-sex hormone therapy. *Andrologia.* 2015;**47**(6):680–684.

174. Nota NM, Dekker MJHJ, Klaver M, Wiepjes CM, van Trotsenburg MA, Heijboer AC, den Heijer M. Prolactin levels during short- and long-term cross-sex hormone treatment: an observational study in transgender persons. *Andrologia.* 2017;**49**(6).

175. Bunck MC, Debono M, Giltay EJ, Verheijen AT, Diamant M, Gooren LJ. Autonomous prolactin secretion in two male-to-female transgender patients using conventional oestrogen dosages. *BMJ Case Rep.* 2009;**2009**:bcr0220091589.

176. Elamin MB, Garcia MZ, Murad MH, Erwin PJ, Montori VM. Effect of sex steroid use on cardiovascular risk in transsexual individuals: a systematic review and meta-analyses. *Clin Endocrinol (Oxf).* 2010;**72**(1):1–10.

177. Berra M, Armillotta F, D'Emidio L, Costantino A, Martorana G, Pelusi G, Meriggiola MC. Testosterone decreases adiponectin

doi: 10.1210/jc.2017-01658

Downloaded from https://academic.oup.com/jcem/article/102/11/3869/4157558 by National Library of Education user on 15 August 2024

levels in female to male transsexuals. *Asian J Androl*. 2006;8(6): 725–729.

178. Elbers JMH, Giltay EJ, Teerlink T, Scheffer PG, Asscheman H, Seidell JC, Gooren LJG. Effects of sex steroids on components of the insulin resistance syndrome in transsexual subjects. *Clin Endocrinol (Oxf)*. 2003;58(5):562–571.

179. Giltay EJ, Lambert J, Gooren LJG, Elbers JMH, Steyn M, Stehouwer CDA. Sex steroids, insulin, and arterial stiffness in women and men. *Hypertension*. 1999;34(4 Pt 1):590–597.

180. Polderman KH, Gooren LJ, Asscheman H, Bakker A, Heine RJ. Induction of insulin resistance by androgens and estrogens. *J Clin Endocrinol Metab*. 1994;79(1):265–271.

181. Maraka S. Effect of sex steroids on lipids, venous thromboembolism, cardiovascular disease and mortality in transgender individuals: a systematic review and meta-analysis. Available at: http://press. endocrine.org/doi/abs/10.1210/endo-meetings.2016.RE.15.FRI-136. Accessed 3 July 2017.

182. Meriggiola MC, Armillotta F, Costantino A, Altieri P, Saad F, Kalhorn T, Perrone AM, Ghi T, Pelusi C, Pelusi G. Effects of testosterone undecanoate administered alone or in combination with letrozole or dutasteride in female to male transsexuals. *J Sex Med*. 2008;5(10):2442–2453.

183. Giltay EJ, Toorians AW, Sarabdjitsingh AR, de Vries NA, Gooren LJ. Established risk factors for coronary heart disease are unrelated to androgen-induced changes in female-to-male transsexuals. *J Endocrinol*. 2004;180(1):107–112.

184. Giltay EJ, Verhoef P, Gooren LJG, Geleijnse JM, Schouten EG, Stehouwer CDA. Oral and transdermal estrogens both lower plasma total homocysteine in male-to-female transsexuals. *Atherosclerosis*. 2003;168(1):139–146.

185. Calof OM, Singh AB, Lee ML, Kenny AM, Urban RJ, Tenover JL, Bhasin S. Adverse events associated with testosterone replacement in middle-aged and older men: a meta-analysis of randomized, placebo-controlled trials. *J Gerontol A Biol Sci Med Sci*. 2005; 60(11):1451–1457.

186. Expert Panel on Detection, Evaluation, and Treatment of High Blood Cholesterol in Adults. Executive summary of the Third Report of the National Cholesterol Education Program (NCEP) Expert Panel on Detection, Evaluation, and Treatment of High Blood Cholesterol in Adults (Adult Treatment Panel III). *JAMA*. 2001;285(19):2486–2497.

187. Murad MH, Elamin MB, Garcia MZ, Mullan RJ, Murad A, Erwin PJ, Montori VM. Hormonal therapy and sex reassignment: a systematic review and meta-analysis of quality of life and psychosocial outcomes. *Clin Endocrinol (Oxf)*. 2010;72(2): 214–231.

188. Van Caenegem E, Wierckx K, Taes Y, Schreiner T, Vandewalle S, Toye K, Lapauw B, Kaufman JM, T'Sjoen G. Body composition, bone turnover, and bone mass in trans men during testosterone treatment: 1-year follow-up data from a prospective case-controlled study (ENIGI). *Eur J Endocrinol*. 2015;172(2): 163–171.

189. Turner A, Chen TC, Barber TW, Malabanan AO, Holick MF, Tangpricha V. Testosterone increases bone mineral density in female-to-male transsexuals: a case series of 15 subjects. *Clin Endocrinol (Oxf)*. 2004;61(5):560–566.

190. van Kesteren P, Lips P, Gooren LJG, Asscheman H, Megens J. Long-term follow-up of bone mineral density and bone metabolism in transsexuals treated with cross-sex hormones. *Clin Endocrinol (Oxf)*. 1998;48(3):347–354.

191. Van Caenegem E, Taes Y, Wierckx K, Vandewalle S, Toye K, Kaufman JM, Schreiner T, Haraldsen I, T'Sjoen G. Low bone mass is prevalent in male-to-female transsexual persons before the start of cross-sex hormonal therapy and gonadectomy. *Bone*. 2013;54(1):92–97.

192. Amin S, Zhang Y, Sawin CT, Evans SR, Hannan MT, Kiel DP, Wilson PW, Felson DT. Association of hypogonadism and

estradiol levels with bone mineral density in elderly men from the Framingham study. *Ann Intern Med*. 2000;133(12):951–963.

193. Gennari L, Khosla S, Bilezikian JP. Estrogen and fracture risk in men. *J Bone Miner Res*. 2008;23(10):1548–1551.

194. Khosla S, Melton LJ III, Atkinson EJ, O'Fallon WM, Klee GG, Riggs BL. Relationship of serum sex steroid levels and bone turnover markers with bone mineral density in men and women: a key role for bioavailable estrogen. *J Clin Endocrinol Metab*. 1998;83(7):2266–2274.

195. Mueller A, Dittrich R, Binder H, Kuehnel W, Maltaris T, Hoffmann I, Beckmann MW. High dose estrogen treatment increases bone mineral density in male-to-female transsexuals receiving gonadotropin-releasing hormone agonist in the absence of testosterone. *Eur J Endocrinol*. 2005;153(1):107–113.

196. Ruetsche AG, Kneubuehl R, Birkhaeuser MH, Lippuner K. Cortical and trabecular bone mineral density in transsexuals after long-term cross-sex hormonal treatment: a cross-sectional study. *Osteoporos Int*. 2005;16(7):791–798.

197. Ganly I, Taylor EW. Breast cancer in a trans-sexual man receiving hormone replacement therapy. *Br J Surg*. 1995;82(3):341.

198. Pritchard TJ, Pankowsky DA, Crowe JP, Abdul-Karim FW. Breast cancer in a male-to-female transsexual. A case report. *JAMA*. 1988;259(15):2278–2280.

199. Symmers WS. Carcinoma of breast in trans-sexual individuals after surgical and hormonal interference with the primary and secondary sex characteristics. *BMJ*. 1968;2(5597):83–85.

200. Brown GR. Breast cancer in transgender veterans: a ten-case series. *LGBT Health*. 2015;2(1):77–80.

201. Shao T, Grossbard ML, Klein P. Breast cancer in female-to-male transsexuals: two cases with a review of physiology and management. *Clin Breast Cancer*. 2011;11(6):417–419.

202. Nikolic DV, Djordjevic ML, Granic M, Nikolic AT, Stanimirovic VV, Zdravkovic D, Jelic S. Importance of revealing a rare case of breast cancer in a female to male transsexual after bilateral mastectomy. *World J Surg Oncol*. 2012;10:280.

203. Bősze P, Tóth A, Török M. Hormone replacement and the risk of breast cancer in Turner's syndrome. *N Engl J Med*. 2006;355(24): 2599–2600.

204. Schoemaker MJ, Swerdlow AJ, Higgins CD, Wright AF, Jacobs PA; UK Clinical Cytogenetics Group. Cancer incidence in women with Turner syndrome in Great Britain: a national cohort study. *Lancet Oncol*. 2008;9(3):239–246.

205. Smith RA, Cokkinides V, Eyre HJ. American Cancer Society guidelines for the early detection of cancer, 2006. *CA Cancer J Clin*. 2006;56(1):11–25, quiz 49–50.

206. Wilson JD, Roehrborn C. Long-term consequences of castration in men: lessons from the Skoptzy and the eunuchs of the Chinese and Ottoman courts. *J Clin Endocrinol Metab*. 1999;84(12): 4324–4331.

207. van Kesteren P, Meinhardt W, van der Valk P, Geldof A, Megens J, Gooren L. Effects of estrogens only on the prostates of aging men. *J Urol*. 1996;156(4):1349–1353.

208. Brown JA, Wilson TM. Benign prostatic hyperplasia requiring transurethral resection of the prostate in a 60-year-old male-to-female transsexual. *Br J Urol*. 1997;80(6):956–957.

209. Casella R, Bubendorf L, Schaefer DJ, Bachmann A, Gasser TC, Sulser T. Does the prostate really need androgens to grow? Transurethral resection of the prostate in a male-to-female transsexual 25 years after sex-changing operation. *Urol Int*. 2005;75(3):288–290.

210. Dorff TB, Shazer RL, Nepomuceno EM, Tucker SJ. Successful treatment of metastatic androgen-independent prostate carcinoma in a transsexual patient. *Clin Genitourin Cancer*. 2007;5(5): 344–346.

211. Thurston AV. Carcinoma of the prostate in a transsexual. *Br J Urol*. 1994;73(2):217.

Case 4:24-cv-00461-O    Document 76    Filed 09/06/24    Page 268 of 290    PageID 3915

**3902**  Hembree et al  Guidelines on Gender-Dysphoric/Gender-Incongruent Persons    J Clin Endocrinol Metab, November 2017, 102(11):3869–3903

Downloaded from https://academic.oup.com/jcem/article/102/11/3869/4157558 by National Library of Education user on 15 August 2024

212. van Harst EP, Newling DW, Gooren LJ, Asscheman H, Prenger DM. Metastatic prostatic carcinoma in a male-to-female transsexual. *BJU Int.* 1998;81:776.

213. Turo R, Jallad S, Prescott S, Cross WR. Metastatic prostate cancer in transsexual diagnosed after three decades of estrogen therapy. *Can Urol Assoc J.* 2013;7(7–8):E544–E546.

214. Miksad RA, Bubley G, Church P, Sanda M, Rofsky N, Kaplan I, Cooper A. Prostate cancer in a transgender woman 41 years after initiation of feminization. *JAMA.* 2006;296(19):2316–2317.

215. Moyer VA; U.S. Preventive Services Task Force. Screening for prostate cancer: U.S. Preventive Services Task Force recommendation statement. *Ann Intern Med.* 2012;157(2):120–134.

216. Futterweit W. Endocrine therapy of transsexualism and potential complications of long-term treatment. *Arch Sex Behav.* 1998; 27(2):209–226.

217. Miller N, Bédard YC, Cooter NB, Shaul DL. Histological changes in the genital tract in transsexual women following androgen therapy. *Histopathology.* 1986;10(7):661–669.

218. O'Hanlan KA, Dibble SL, Young-Spint M. Total laparoscopic hysterectomy for female-to-male transsexuals. *Obstet Gynecol.* 2007;110(5):1096–1101.

219. Dizon DS, Tejada-Berges T, Koelliker S, Steinhoff M, Granai CO. Ovarian cancer associated with testosterone supplementation in a female-to-male transsexual patient. *Gynecol Obstet Invest.* 2006; 62(4):226–228.

220. Hage JJ, Dekker JJML, Karim RB, Verheijen RHM, Bloemena E. Ovarian cancer in female-to-male transsexuals: report of two cases. *Gynecol Oncol.* 2000;76(3):413–415.

221. Mueller A, Gooren L. Hormone-related tumors in transsexuals receiving treatment with cross-sex hormones. *Eur J Endocrinol.* 2008;159(3):197–202.

222. Coleman E, Bockting W, Botzer M, Cohen-Kettenis P, DeCuypere G, Feldman J, Fraser L, Green J, Knudson G, Meyer WJ, Monstrey S, Adler RK, Brown GR, Devor AH, Ehrbar R, Ettner R, Eyler E, Garofalo R, Karasic DH, Lev AI, Mayer G, Meyer-Bahlburg H, Hall BP, Pfaefflin F, Rachlin K, Robinson B, Schechter LS, Tangpricha V, van Trotsenburg M, Vitale A, Winter S, Whittle S, Wylie KR, Zucker K. Standards of care for the health of transsexual, transgender, and gender-nonconforming people, version 7. *Int J Transgenderism.* 2012;13:165–232.

223. Colebunders B, D'Arpa S, Weijers S, Lumen N, Hoebeke P, Monstrey S. Female-to-male gender reassignment surgery. In: Ettner R, Monstrey S, Coleman E, eds. *Principles of Transgender Medicine and Surgery.* 2nd ed. New York, NY: Routledge Taylor & Francis Group; 2016:279–317.

224. Monstrey S, Hoebeke P, Dhont M, De Cuypere G, Rubens R, Moerman M, Hamdi M, Van Landuyt K, Blondeel P. Surgical therapy in transsexual patients: a multi-disciplinary approach. *Acta Chir Belg.* 2001;101(5):200–209.

225. Selvaggi G, Ceulemans P, De Cuypere G, VanLanduyt K, Blondeel P, Hamdi M, Bowman C, Monstrey S. Gender identity disorder: general overview and surgical treatment for vaginoplasty in male-to-female transsexuals. *Plast Reconstr Surg.* 2005;116(6):135e–145e.

226. Tugnet N, Goddard JC, Vickery RM, Khoosal D, Terry TR. Current management of male-to-female gender identity disorder in the UK. *Postgrad Med J.* 2007;83(984):638–642.

227. Horbach SER, Bouman M-B, Smit JM, Özer M, Buncamper ME, Mullender MG. Outcome of vaginoplasty in male-to-female transgenders: a systematic review of surgical techniques. *J Sex Med.* 2015;12(6):1499–1512.

228. Wroblewski P, Gustafsson J, Selvaggi G. Sex reassignment surgery for transsexuals. *Curr Opin Endocrinol Diabetes Obes.* 2013; 20(6):570–574.

229. Morrison SD, Satterwhite T, Grant DW, Kirby J, Laub DR, Sr, VanMaasdam J. Long-term outcomes of rectosigmoid neocolporrhaphy in male-to-female gender reassignment surgery. *Plast Reconstr Surg.* 2015;136(2):386–394.

230. Dessy LA, Mazzocchi M, Corrias F, Ceccarelli S, Marchese C, Scuderi N. The use of cultured autologous oral epithelial cells for vaginoplasty in male-to-female transsexuals: a feasibility, safety, and advantageousness clinical pilot study. *Plast Reconstr Surg.* 2014;133(1):158–161.

231. Li FY, Xu YS, Zhou CD, Zhou Y, Li SK, Li Q. Long-term outcomes of vaginoplasty with autologous buccal micromucosa. *Obstet Gynecol.* 2014;123(5):951–956.

232. Kanhai RC. Sensate vagina pedicled-spot for male-to-female transsexuals: the experience in the first 50 patients. *Aesthetic Plast Surg.* 2016;40(2):284–287.

233. Straayer C. Transplants for transsexuals? Ambitions, concerns, ideology. Paper presented at: Trans*Studies: An International Transdisciplinary Conference on Gender, Embodiment, and Sexuality; 7–10 September 2016; University of Arizona, Tucson, AZ.

234. Bucci S, Mazzon G, Liguori G, Napoli R, Pavan N, Bormioli S, Ollandini G, De Concilio B, Trombetta C. Neovaginal prolapse in male-to-female transsexuals: an 18-year-long experience. *Biomed Res Int.* 2014;2014:240761.

235. Raigosa M, Avvedimento S, Yoon TS, Cruz-Gimeno J, Rodriguez G, Fontdevila J. Male-to-female genital reassignment surgery: a retrospective review of surgical technique and complications in 60 patients. *J Sex Med.* 2015;12(8):1837–1845.

236. Green R. Sexual functioning in post-operative transsexuals: male-to-female and female-to-male. *Int J Impot Res.* 1998;10(Suppl 1): S22–S24.

237. Hess J, Rossi Neto R, Panic L, Rübben H, Senf W. Satisfaction with male-to-female gender reassignment surgery. *Dtsch Arztebl Int.* 2014;111(47):795–801.

238. Nygren U, Nordenskjold A, Arver S, Sodersten M. Effects on voice fundamental frequency and satisfaction with voice in trans men during testosterone treatment—a longitudinal study. *J Voice.* 2016;30(6):766.e23-766.e34.

239. Becking AG, Tuinzing DB, Hage JJ, Gooren LJG. Transgender feminization of the facial skeleton. *Clin Plast Surg.* 2007;34(3): 557–564.

240. Giraldo F, Esteva I, Bergero T, Cano G, González C, Salinas P, Rivada E, Lara JS, Soriguer F; Andalusia Gender Team. Corona glans clitoroplasty and urethropreputial vestibuloplasty in male-to-female transsexuals: the vulval aesthetic refinement by the Andalusia Gender Team. *Plast Reconstr Surg.* 2004;114(6): 1543–1550.

241. Goddard JC, Vickery RM, Terry TR. Development of feminizing genitoplasty for gender dysphoria. *J Sex Med.* 2007;4(4 Pt 1): 981–989.

242. Hage JJ, de Graaf FH, Bouman FG, Bloem JJAM. Sculpturing the glans in phalloplasty. *Plast Reconstr Surg.* 1993;92(1):157–161, discussion 162.

243. Thiagaraj D, Gunasegaram R, Loganath A, Peh KL, Kottegoda SR, Ratnam SS. Histopathology of the testes from male transsexuals on oestrogen therapy. *Ann Acad Med Singapore.* 1987; 16(2):347–348.

244. Monstrey SJ, Ceulemans P, Hoebeke P. Sex reassignment surgery in the female-to-male transsexual. *Semin Plast Surg.* 2011;25(3): 229–244.

245. Perovic SV, Djinovic R, Bumbasirevic M, Djordjevic M, Vukovic P. Total phalloplasty using a musculocutaneous latissimus dorsi flap. *BJU Int.* 2007;100(4):899–905, discussion 905.

246. Vesely J, Hyza P, Ranno R, Cigna E, Monni N, Stupka I, Justan I, Dvorak Z, Novak P, Ranno S. New technique of total phalloplasty with reinnervated latissimus dorsi myocutaneous free flap in female-to-male transsexuals. *Ann Plast Surg.* 2007;58(5): 544–550.

247. Ranno R, Veselý J, Hýza P, Stupka I, Justan I, Dvorák Z, Monni N, Novák P, Ranno S. Neo-phalloplasty with re-innervated latissimus dorsi free flap: a functional study of a novel technique. *Acta Chir Plast.* 2007;49(1):3–7.

248. Garcia MM, Christopher NA, De Luca F, Spilotros M, Ralph DJ. Overall satisfaction, sexual function, and the durability of neophallus dimensions following staged female to male genital gender confirming surgery: the Institute of Urology, London U.K. experience. *Transl Androl Urol.* 2014;3(2):156–162.

249. Chen H-C, Gedebou TM, Yazar S, Tang Y-B. Prefabrication of the free fibula osteocutaneous flap to create a functional human penis using a controlled fistula method. *J Reconstr Microsurg.* 2007; 23(3):151–154.

250. Hoebeke PB, Decaestecker K, Beysens M, Opdenakker Y, Lumen N, Monstrey SM. Erectile implants in female-to-male transsexuals: our experience in 129 patients. *Eur Urol.* 2010;57(2): 334–341.

251. Hage JJ. Metaidoioplasty: an alternative phalloplasty technique in transsexuals. *Plast Reconstr Surg.* 1996;97(1):161–167.

252. Cohanzad S. Extensive metoidioplasty as a technique capable of creating a compatible analogue to a natural penis in female transsexuals. *Aesthetic Plast Surg.* 2016;40(1):130–138.

253. Selvaggi G, Hoebeke P, Ceulemans P, Hamdi M, Van Landuyt K, Blondeel P, De Cuypere G, Monstrey S. Scrotal reconstruction in female-to-male transsexuals: a novel scrotoplasty. *Plast Reconstr Surg.* 2009;123(6):1710–1718.

254. Bjerrome Ahlin H, Kölby L, Elander A, Selvaggi G. Improved results after implementation of the Ghent algorithm for subcutaneous mastectomy in female-to-male transsexuals. *J Plast Surg Hand Surg.* 2014;48(6):362–367.

255. Wolter A, Diedrichson J, Scholz T, Arens-Landwehr A, Liebau J. Sexual reassignment surgery in female-to-male transsexuals: an algorithm for subcutaneous mastectomy. *J Plast Reconstr Aesthet Surg.* 2015;68(2):184–191.

256. Richards C, Barrett J. The case for bilateral mastectomy and male chest contouring for the female-to-male transsexual. *Ann R Coll Surg Engl.* 2013;95(2):93–95.

257. Sutcliffe PA, Dixon S, Akehurst RL, Wilkinson A, Shippam A, White S, Richards R, Caddy CM. Evaluation of surgical procedures for sex reassignment: a systematic review. *J Plast Reconstr Aesthet Surg.* 2009;62(3):294–306, discussion 306–308.

258. Selvaggi G, Elander A. Penile reconstruction/formation. *Curr Opin Urol.* 2008;18(6):589–597.

259. Dhejne C, Lichtenstein P, Boman M, Johansson ALV, Långström N, Landén M. Long-term follow-up of transsexual persons undergoing sex reassignment surgery: cohort study in Sweden. *PLoS One.* 2011;6(2):e16885.

260. Kuhn A, Bodmer C, Stadlmayr W, Kuhn P, Mueller MD, Birkhäuser M. Quality of life 15 years after sex reassignment surgery for transsexualism. *Fertil Steril.* 2009;92(5):1685–1689.e3.

261. Papadopulos NA, Lellé JD, Zavlin D, Herschbach P, Henrich G, Kovacs L, Ehrenberger B, Kluger AK, Machens HG, Schaff J. Quality of life and patient satisfaction following male-to-female sex reassignment surgery. *J Sex Med.* 2017;14(5):721–730.

262. Simonsen RK, Hald GM, Kristensen E, Giraldi A. Long-term follow-up of individuals undergoing sex-reassignment surgery: somatic morbidity and cause of death. *Sex Med.* 2016;4(1): e60–e68.

263. Djordjevic ML, Bizic MR, Duisin D, Bouman MB, Buncamper M. Reversal Surgery in regretful male-to-female transsexuals after sex reassignment surgery. *J Sex Med.* 2016;13(6):1000–1007.

264. Liberopoulos EN, Florentin M, Mikhailidis DP, Elisaf MS. Compliance with lipid-lowering therapy and its impact on cardiovascular morbidity and mortality. *Expert Opin Drug Saf.* 2008;7(6):717–725.

265. Forbes SS, Stephen WJ, Harper WL, Loeb M, Smith R, Christoffersen EP, McLean RF. Implementation of evidence-based practices for surgical site infection prophylaxis: results of a pre- and postintervention study. *J Am Coll Surg.* 2008;207(3): 336–341.

266. Davis PJ, Spady D, de Gara C, Forgie SE. Practices and attitudes of surgeons toward the prevention of surgical site infections: a provincial survey in Alberta, Canada. *Infect Control Hosp Epidemiol.* 2008;29(12):1164–1166.

Downloaded from https://academic.oup.com/jcem/article/102/11/3869/4157558 by National Library of Education user on 15 August 2024

# THE TREVOR PROJECT

# NATIONAL SURVEY ON LGBTQ YOUTH MENTAL HEALTH 2021

AR_300195

# TABLE OF CONTENTS

Introduction                                          2

Suicide & Mental Health                               3

Finding Support: Mental Healthcare                    5

Finding Support: Crisis Services                      6

COVID-19                                              7

Supporting Transgender & Nonbinary Youth             10

Food Insecurity                                      11

Conversion Therapy                                   12

Discrimination                                       13

Affirming Spaces                                     14

Finding Joy                                          15

Research                                             16

Methodology                                          17

AR_300196

# INTRODUCTION

The past year has been incredibly difficult for so many, but we also know that lesbian, gay, bisexual, transgender, queer and questioning (LGBTQ) youth have faced unique challenges. The Trevor Project's 2021 National Survey on LGBTQ Youth Mental Health sheds light on many of these challenges by capturing the experiences of nearly 35,000 LGBTQ youth ages 13–24 across the United States.

Our third annual survey provides brand new data on the impacts of the COVID-19 pandemic, mental health care disparities, discrimination, food insecurity, conversion therapy, and suicide — in addition to the benefits of LGBTQ-affirming spaces and respecting the pronouns of transgender and nonbinary youth.

**We are also proud that this sample is our most diverse yet, with 45% being LGBTQ youth of color and 38% being transgender or nonbinary.**

Among some of the key findings of the survey:

- **42% of LGBTQ youth** seriously considered attempting suicide in the past year, including **more than half of transgender and nonbinary youth.**

- **12% of white youth** attempted suicide compared to **31% of Native/Indigenous youth,** 21% of Black youth, 21% of multiracial youth, 18% of **Latinx youth,** and 12% of Asian/Pacific Islander youth.

- **94% of LGBTQ youth** reported that recent politics negatively impacted their mental health.

- **More than 80% of LGBTQ youth** stated that COVID-19 made their living situation more stressful — and **only 1 in 3 LGBTQ youth** found their home to be LGBTQ-affirming.

- **70% of LGBTQ youth** stated that their mental health was "poor" most of the time or always during COVID-19.

- **48% of LGBTQ youth** reported they wanted counseling from a mental health professional but were unable to receive it in the past year.

- **30% of LGBTQ youth** experienced food insecurity in the past month, including half of all Native/Indigenous LGBTQ youth.

- **75% of LGBTQ youth** reported that they had experienced discrimination based on their sexual orientation or gender identity at least once in their lifetime.

- **Half of all LGBTQ youth of color** reported discrimination based on their race/ethnicity in the past year, including **67% of Black LGBTQ youth and 60% of Asian/Pacific Islander LGBTQ youth.**

- **13% of LGBTQ youth** reported being subjected to conversion therapy, with **83% reporting** it occurred when they were under age 18.

- **Transgender and nonbinary youth** who reported having **pronouns respected** by all of the people they lived with attempted suicide at half the rate of those who did not have their pronouns respected by anyone with whom they lived.

- **Transgender and nonbinary youth** who were able to change their name and/or gender marker on **legal documents,** such as driver's licenses and birth certificates, reported **lower rates** of attempting suicide.

- **LGBTQ youth who had access to spaces** that affirmed their sexual orientation and gender identity reported **lower rates** of attempting suicide.

- **An overwhelming majority of LGBTQ youth** said that social media has both positive (96%) and negative (88%) impacts on their mental health and well-being.

This data underscores many of the serious challenges experienced by LGBTQ youth over the last year and should serve as an urgent call to action. But it also speaks to the diversity and resiliency of LGBTQ youth and provides valuable insights into their everyday sources of strength and positivity.

We hope these findings will be used by fellow researchers, policymakers, and other youth-serving organizations to better support LGBTQ youth across the country and around the globe.

Over the next year, The Trevor Project will release new data from this national survey sample in the form of monthly research briefs and quarterly reports related to LGBTQ youth mental health and suicide prevention. Through our research, education, advocacy, and direct services, we strive to amplify the experiences of LGBTQ youth and to facilitate the implementation of comprehensive, intersectional policy solutions.

And as always, we will continue to do all we can to remind LGBTQ youth that they deserve love and support and the ability to live their lives without fear, discrimination, and violence. If you are an LGBTQ young person, please know that you are never alone and The Trevor Project is here to support you 24/7.



**Amit Paley**
CEO & Executive Director
The Trevor Project

AR_300197

SUICIDE & MENTAL HEALTH

## 42% of LGBTQ youth seriously considered attempting suicide in the past year, including more than half of transgender and nonbinary youth.

## 12% of white youth attempted suicide compared to 31% of Native/Indigenous youth, 21% of Black youth, 21% of multiracial youth, 18% of Latinx youth, and 12% of Asian/Pacific Islander youth.

LGBTQ youth who:
◉ Considered suicide  ◎ Attempted suicide

**By gender identity**

Cisgender
- 32%
- 10%

Transgender & nonbinary
- 52%
- 20%

**By age**

13–17
- 48%
- 20%

18–24
- 34%
- 9%

**By race/ethnicity**

Asian/Pacific Islander
- 38%
- 12%

Black
- 47%
- 21%

Latinx
- 43%
- 18%

Native/Indigenous
- 52%
- 31%

White
- 39%
- 12%

More than one race/ethnicity
- 48%
- 21%

AR_300198

## SUICIDE & MENTAL HEALTH

**72% of LGBTQ youth** reported symptoms of generalized anxiety disorder in the past two weeks, including **more than 3 in 4 transgender and nonbinary youth.**

**62% of LGBTQ youth** reported symptoms of major depressive disorder in the past two weeks, including **more than 2 in 3 of transgender and nonbinary youth.**

LGBTQ youth who experienced symptoms of:
Generalized anxiety disorder   Major depressive disorder



By gender identity

Cisgender
65%
53%

Transgender & nonbinary
77%
70%

By age

13–17
73%
67%

18–24
69%
40%

By race/ethnicity

Asian/Pacific Islander
65%
60%

Black
65%
65%

Latinx
70%
64%

Native/Indigenous
76%
71%

White
72%
60%

More than one race/ethnicity
75%
68%

AR_300199

## FINDING SUPPORT: MENTAL HEALTHCARE

# In the past year, **nearly half of LGBTQ youth** have wanted counseling from a mental health professional, but did not receive it.



Received mental health care
36%

Wanted mental health care, but didn't get it
48%

Did not want mental health care
16%

LGBTQ youth who wanted counseling from a mental health professional in the past year:
● Wanted mental health care, but didn't get it
● Received mental health care



By race/ethnicity

Asian/Pacific Islander
51%
28%

Black
53%
27%

Latinx
54%
29%

Native/Indigenous
49%
31%

White
45%
41%

More than one race/ethnicity
51%
35%

AR_300200

FINDING SUPPORT: CRISIS SERVICES

# More than 80% of LGBTQ youth of all races/ethnicities said it was important that a crisis line include a focus on LGBTQ youth, should they need it.

LGBTQ youth who say a focus on LGBTQ youth would be important if they needed to use a crisis line:



Cisgender 76%  88% Transgender & nonbinary

By gender identity



13–17 84%  79% 18–24

By age

By race/ethnicity



Asian/Pacific Islander 82%

Black 86%

Latinx 85%

Native/Indigenous 84%

White 81%

More than one race/ethnicity 82%

Features LGBTQ youth said would be important if they needed to contact a crisis line:



Available 24/7 94%

Available by text 94%

Focuses on LGBTQ youth 82%

Available using web-chat 78%

Available by phone 77%

Available by messaging system 61%
(e.g. WhatsApp or Facebook Messenger)

p.6

AR_300201

## COVID-19

# **70% of LGBTQ youth** stated that their mental health was "poor" most of the time or always during COVID-19.

LGBTQ youth who said:
- COVID-19 negatively impacted their mental health
- Their mental health was "poor" most of the time or always during COVID-19



By gender identity

Cisgender
75%
61%

Transgender & nonbinary
85%
78%

By age

13–17
80%
72%

18–24
81%
67%

By race/ethnicity

Asian/Pacific Islander
76%
63%

Black
77%
68%

Latinx
80%
70%

Native/Indigenous
80%
77%

White
80%
69%

More than one race/ethnicity
82%
75%

p.7

AR_300202

COVID-19

## Nearly half of LGBTQ youth said that COVID-19 impacted their ability to express their sexual orientation.

## Nearly 60% of transgender and nonbinary youth said that COVID-19 impacted their ability to express their gender identity.

LGBTQ youth who said COVID-19 impacted their ability to express their:
● Sexual orientation    ● Gender identity



By age

13–17
50%
65%

18–24
44%
52%

By race/ethnicity

Asian/Pacific Islander
51%
63%

Black
53%
64%

Latinx
51%
64%

Native/Indigenous
46%
55%

White
44%
57%

More than one race/ethnicity
47%
61%

AR_300203

## COVID-19

# Nearly 40% of LGBTQ youth who had a job reported that they lost it during COVID-19.

# More than 80% of LGBTQ youth stated that COVID-19 made their living situation more stressful.

LGBTQ youth who, due to COVID-19:
● Lost a job (if they had one)    ● Experienced a more stressful living situation



By gender identity

Cisgender
37%
78%

Transgender & nonbinary
42%
83%

By age

13–17
24%
81%

18–24
45%
81%

By race/ethnicity

Asian/Pacific Islander
34%
78%

Black
34%
78%

Latinx
37%
81%

Native/Indigenous
42%
82%

White
40%
81%

More than one race/ethnicity
40%
83%

AR_300204

SUPPORTING TRANSGENDER & NONBINARY YOUTH

Affirming **transgender and nonbinary youth** by respecting their **pronouns** and allowing them to change **legal documents** is associated with lower rates of attempting suicide.

Transgender & nonbinary youth who wanted to change their legal documents, such as driver's licenses and birth certificates:



Changed legal documents 7%

Not legally able to change legal documents 57%

Planning to change legal documents 36%

Transgender & nonbinary youth who attempted suicide in the past year, comparison across ability to change legal documents:



Not legally able 25%
Planning 19%
Changed 11%

If you live with other people, how many of them respect your pronouns?



All of the people 29%

None of the people 49%

Some of the people 22%

Transgender & nonbinary youth who attempted suicide in the past year, comparison across the number of people they live with who respected their pronouns:



None 24%
Some 19%
All 13%

p.10

AR_300205

## FOOD INSECURITY

# 30% of LGBTQ youth experienced food insecurity in the past month, including half of all Native/Indigenous LGBTQ youth.

# 27% of LGBTQ youth said they worried that food at home would run out in the last month before they or their family had money to buy more.

LGBTQ youth who had trouble affording enough food in the past month:



Cisgender 24%
Transgender & nonbinary 38%
By gender identity

13–17 31%
18–24 30%
By age

By race/ethnicity

| | |
|---|---|
| Asian/Pacific Islander | 18% |
| Black | 35% |
| Latinx | 36% |
| Native/Indigenous | 50% |
| White | 27% |
| More than one race/ethnicity | 36% |

LGBTQ youth who attempted suicide in the past year, comparison across experiences of food insecurity:



Had trouble 25%
Didn't have trouble 11%

Affording enough food in the past month

19% of LGBTQ youth said that in the last month, they were hungry but didn't eat because they or their family didn't have enough food.

p.11

AR_300206

**CONVERSION THERAPY**

# LGBTQ youth who were subjected to conversion therapy reported more than twice the rate of attempting suicide in the past year compared to those who were not.

LGBTQ youth who reported being subjected to conversion therapy:





LGBTQ youth who attempted suicide in the past year, comparison across those subjected to conversion therapy:



**Transgender and nonbinary youth** reported being subjected to conversion therapy at **twice the rate** of cisgender LGBQ youth.

**LGBTQ youth who reported being subjected to conversion therapy** were an average of 15 years old at the time, with **83% of LGBTQ youth** reporting that it occurred when they were younger than 18.

AR_300207

## DISCRIMINATION

**75% of LGBTQ youth** reported that they had experienced discrimination based on their sexual orientation or gender identity at least once in their lifetime.

**More than half of LGBTQ youth** reporting that they had experienced discrimination based on their sexual orientation or gender identity in the past year.

LGBTQ youth who attempted suicide, comparison across those who have been discriminated against in the past year:



Discriminated against **21%**    Not been **9%** discriminated against
On the basis of sexual orientation

Discriminated against **24%**    Not been **12%** discriminated against
On the basis of gender identity among transgender & nonbinary youth

Discriminated against **23%**    Not been **14%** discriminated against
On the basis of race, ethnicity, or nationality among LGBTQ youth of color

LGBTQ youth who attempted suicide in the past year, comparison across the number of types of discrimination experienced:

By number of types



**36%** 3 types of discrimination
**24%** 2 types of discrimination
**13%** 1 type of discrimination
**7%** 0 types of discrimination

**Half of LGBTQ youth of color** reported discrimination based on their race/ethnicity in the past year, including **67% of Black LGBTQ youth** and **60% of Asian/ Pacific Islander LGBTQ youth.**

p.13

AR_300208

## AFFIRMING SPACES

# Only **1 in 3 LGBTQ youth** found their home to be LGBTQ-affirming.

Where LGBTQ youth access LGBTQ-affirming spaces:



**LGBTQ youth who had access to spaces that affirmed their sexual orientation and gender identity** reported **lower rates** of attempting suicide than those who did not.

Where transgender and nonbinary youth access gender-affirming spaces:



**Most LGBTQ youth** had access to online spaces that affirmed their sexual orientation and gender identity.

LGBTQ youth who attempted suicide in the past year, comparison across access to LGBTQ-affirming spaces:



Social media has both positive and negative impacts on LGBTQ youth. **96% of LGBTQ youth** said social media positively impacted their well-being, and **88% of LGBTQ youth** said it negatively impacted their well-being.

Transgender & nonbinary youth who attempted suicide in the past year, comparison across access to gender-affirming spaces:



● **Affirming**
● **Not affirming**

AR_300209

## FINDING JOY

# Although LGBTQ youth described a number of challenges in their lives, they also listed hundreds of ways they find joy and strength, including:

Affirming parents ・ Anime ・ Chosen family
Educational opportunities ・ Faith & spirituality
Feeling seen ・ Finding community online
Having a pet ・ Having a supportive partner
Learning more about LGBTQ history
LGBTQ support at school ・ Moving away ・ Music
Others who identify in similar ways
Reading & writing ・ Representation in media
Seeing others take pride in being LGBTQ
Seeing rainbow flags & stickers in public
Supportive friends ・ Theater ・ Therapy
Unapologetic embracing of self ・ Video games
Watching LGBTQ people on TikTok & YouTube
Working out

AR_300210

## RESEARCH

The mission of The Trevor Project's Research Department is to **produce and use innovative research** that brings new knowledge and clinical implications to the field of suicidology and LGBTQ youth mental health.

## To address this mission we:

### Advance Scientific Inquiry

Providing empirical data to better understand the lives of LGBTQ youth and suicidality including risk factors, protective factors, and outcomes.

- The Trevor Project will be a leading source of scientific information on the needs and strengths of LGBTQ youth
- The Trevor Project will collaborate with key national and international research teams and agencies to improve the lives of LGBTQ youth

### Support The Trevor Project's Life-Saving Work

Using internal and external data and research findings to advance The Trevor Project's crisis services and peer support programs as well as advocacy and education initiatives.

- The Trevor Project's advocacy and training activities will be supported by data collected directly by The Trevor Project as well as evidence gathered from the broader research literature
- The Trevor Project will embody an evidence-informed culture in which all staff are supported and recognized in the use of research evidence

### Inform Public Knowledge

Ensuring our research and evaluation findings are applicable and widely communicated to the broader public including LGBTQ youth-serving agencies and mental health organizations.

- The Trevor Project will serve as a national model on how to integrate the best research evidence into its practices, programs, and policies
- The Trevor Project will be a leading resource on terminology related to LGBTQ youth

**Recommended Citation**
The Trevor Project. (2021).
2021 National Survey on LGBTQ Youth Mental Health.
West Hollywood, California: The Trevor Project.

For additional information please contact:
Research@TheTrevorProject.org

AR_300211

## METHODOLOGY

# The content and methodology for **The Trevor Project's 2021 National Survey on LGBTQ Youth Mental Health** were approved by an independent Institutional Review Board.

A quantitative cross-sectional design was used to collect data through an online survey platform between October 12, 2020 and December 31, 2020. A sample of individuals ages 13–24 who resided in the United States was recruited via targeted ads on social media. No recruitment was conducted via The Trevor Project website or any of The Trevor Project's social media sites. Respondents were defined as being LGBTQ if they identified with a sexual orientation other than straight/heterosexual, a gender identity other than cisgender, or both. In order to ensure representativeness of the sample, targeted recruitment was conducted to ensure adequate sample sizes with respect to geography, gender identity, and race/ethnicity. Qualified respondents completed a secure online questionnaire that included a maximum of 142 questions. Questions on considering and attempting suicide in the past 12 months were taken from the Centers for Disease Control and Prevention's Youth Risk Behavior Survey to allow for comparisons to their nationally representative sample. Each question related to mental health and suicide was preceded by a message stating.

"If at any time you need to talk to someone about your mental health or thoughts of suicide, please call The Trevor Project at 1-866-488-7386."

Participation was voluntary and informed consent was obtained. No names or personal details were included to ensure anonymity. A total of 82,147 youth from unique IP addresses consented to complete the survey. Eligible youth included those between the ages of 13–24 who identified as LGBTQ and resided in the U.S.

Additionally, in order to develop a sample that more closely approximated the race and ethnicity composition of the United States, quota limits were set for race/ethnicity categories. After providing demographic information -- including their age, state, sex assigned at birth, gender identity, sexual orientation, and race/ethnicity -- 2,158 youth were screened out based on ages outside of the sample range and residency outside of the United States. Additionally, 27,588 youth were screened out of the survey due to quotas for race/ethnicity already being met, resulting in an eligible sample of 54,559 respondents. A validity check was placed midway through the survey which asked participants to select "agree" from a five-point statement with answers ranging from "strongly disagree" to "strongly agree." Youth who did not select "agree" (n=804) or who did not reach the validity question in the mid-point of the survey (18,365) were removed from the analytic sample. More detailed screening of response consistency and quality resulted in the removal of an additional 631 respondents.

The final analytic sample consisted of 34,759 LGBTQ youth between the ages of 13–24 residing in the United States who provided valid and reliable responses to survey questions.

This report uses "transgender and nonbinary" as an umbrella term to encompass non-cisgender youth, which includes young people who identify as transgender and nonbinary as well as other labels outside of the cisgender binary, including genderqueer, agender, genderfluid, gender neutral, bigender, androgynous, and gender non-conforming, among others.

AR_300212

## METHODOLOGY

### Comparability to 2019 Youth Risk Behavior Survey by the Centers for Disease Control and Prevention (CDC):

In order to better understand how our sample compares to a national probabilistic sample, we included questions regarding considering and attempting suicide that were identical to those used by the Centers for Disease Control and Prevention (CDC) in their Youth Risk Behavior Surveillance System (YRBS).

Analyses were conducted to compare rates of seriously considering suicide and attempting suicide in the past 12 months among youth ages 13–18 in our sample to the 2019 YRBS sample of lesbian, gay, and bisexual (LGB) high school students.

YRBS prevalence rates among LGB youth for seriously considering suicide (47%) were comparable to rates among the same age range in our sample (47%).

Additionally, 23% of LGB youth in the 2019 YRBS reported a suicide attempt in the past 12 months compared to 19% in our sample of youth ages 13–18.

Our analytical sample has representation from over 7,500 Latinx LGBTQ youth, over 3,700 Asian/Pacific Islander LGBTQ youth, over 3,400 Black LGBTQ youth, and over 1,700 Native/Indigenous LGBTQ youth who reported their race/ethnicity either exclusively or as part of a multiracial identity.



2021 Trevor Project Survey (13–18)  47%    47%  Most recent CDC YRBS Survey

Considering suicide

2021 Trevor Project Survey (13–18)  19%    23%  Most recent CDC YRBS Survey

Attempting suicide



**Sexual Orientation**

- Bisexual — 37%
- Gay or lesbian — 28%
- Pansexual — 19%
- Queer — 12%
- I am not sure — 4%
- Straight or heterosexual — 1%



**Region**

- South — 35%
- West — 26%
- Midwest — 23%
- Northeast — 16%



**Asexual/Ace Spectrum**

- Not asexual/ace spectrum — 86%
- Asexual/ace spectrum — 14%



**Race/Ethnicity**

- White — 55%
- More than one identity — 18%
- Latinx — 15%
- Asian/Pacific Islander — 6%
- Black — 5%
- Native/Indigenous — 2%



**Gender Identity**

- Girl or woman — 41%
- Nonbinary, gender fluid, or gender non-conforming — 26%
- Boy or man — 23%
- Not sure or questioning — 9%



**Age**

- 13–17 — 57%
- 18–24 — 43%



**Transgender & Nonbinary Identity**

- Cisgender — 44%
- Questioning if transgender or nonbinary — 18%
- Transgender or nonbinary — 38%



**Socioeconomic Status**

- Has more than enough to meet basic needs — 77%
- Has just enough or less than enough to meet basic needs — 23%

AR_300213



**The Trevor Project** is the world's largest suicide prevention and crisis intervention organization for lesbian, gay, bisexual, transgender, queer & questioning young people.

Need Help?
We are here for you 24/7

For over 20 years, we have worked to save young lives by providing support through our free and confidential crisis services programs, including Trevor Lifeline, Trevor Chat, and Trevor Text. We also run Trevor Space, the world's largest safe space social networking site for LGBTQ youth, and operate innovative advocacy, research, and education programs across the country.

TheTrevorProject.org

@TrevorProject
@TheTrevorProject
@TrevorProject



Crisis services.

Direct suicide prevention and crisis intervention services to support LGBTQ youth 24/7 via phone, text, and chat



Peer support.

The world's largest safe space social networking community for LGBTQ youth



Research.

Evaluations and external research that support The Trevor Project in significantly improving its services while maintaining preeminence in scientific inquiry



Advocacy.

Advocacy at the federal, state, and local levels to fight for policies and laws that protect LGBTQ youth



Education and public awareness.

Programs, trainings, and content promoting awareness around issues and policies relevant to LGBTQ youth and the adults who support them

**Sent**:        6/23/2021 3:44:30 PM
**Subject**:    Title IX Anniversary - Dear Educator Letter and Fact Sheet on Anti-LGBTQI+ Harassment in Schools


Dear Colleagues:

It is a pleasure to mark today's 49th anniversary of Title IX with a _Dear Educator Letter_ focused on Title IX and, in conjunction with the U.S. Department of Justice's Civil Rights Division, a new resource for students and families on _Confronting Anti-LGBTQI+ Harassment in Schools_.  The Secretary has also _issued a statement_ recognizing the power of Title IX in supporting equal opportunity for students.

The letter highlights the importance and broad scope of Title IX, with resources available to help ensure schools are free from sex discrimination, including last week's notice related to _Bostock_ and Title IX. The fact sheet includes examples of harassment and discrimination against LGBTQI+ students and information about steps students and families can take if they believe that students have been treated unfairly because of their sexual orientation or gender identity.

As we celebrate Title IX's anniversary and Pride Month, today's letter and fact sheet continue OCR's efforts to provide supportive resources and accessible information to promote safe and inclusive schools for LGBTQI+ students, as underscored by President Biden's Executive Orders on _Guaranteeing an Educational Environment Free from Discrimination on the Basis of Sex, Including Sexual Orientation or Gender Identity_ and _Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation_.

I would appreciate your sharing the letter and fact sheet with your networks and thank you, again, for the work you do every day to ensure that all students are taught in safe, supportive, and welcoming school environments.

Sincerely,

Suzanne

Suzanne B. Goldberg
Acting Assistant Secretary for Civil Rights
Deputy Assistant Secretary for Strategic Operations and Outreach
U.S. Department of Education