# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | |
|---|---|
| **CARROLL INDEPENDENT SCHOOL DISTRICT**, | |
| *Plaintiff*, | |
| v. | **Case No.** 4:24-cv-00461-O |
| **UNITED STATES DEPARTMENT OF EDUCATION; ET AL.**, | |
| *Defendants.* | |

## PLAINTIFF CARROLL INDEPENDENT SCHOOL DISTRICT'S COMBINED OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND REPLY IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

# CONTENTS

Table of Authorities ..................................................................................... ii

Introduction ............................................................................................... 1

Argument ................................................................................................... 1

I.    The gender-identity mandate contravenes Title IX's text, context, and history ............................................................................................... 1

    A.    The new definition of sex discrimination distorts Title IX ..................... 2

    B.    The "de minimis harm" provision—and its new form of discrimination based on gender identity—distorts Title IX .................. 7

        1.    The de minimis harm standard has no basis in Title IX's text ... 7

        2.    The de minimis harm provision runs roughshod over privacy rights ................................................................................... 12

    C.    Constitutional canons of construction prohibit the Rule's gender-identity mandate. ......................................................................... 14

II.    The Rule's other provisions are unlawful ....................................... 15

    A.    The Department's "broader" hostile-environment harassment definition flouts the statute. ................................................... 15

    B.    The hostile-environment harassment standard infringes on First Amendment rights .......................................................................... 17

    C.    The elimination of the actual knowledge requirement, the self-initiation duty, and the gag-order mandate all violate the statute and First Amendment ............................................................. 22

III.    The Rule is arbitrary and capricious. .............................................. 24

IV.    Claim splitting is immaterial. ........................................................ 27

V.    The Court should vacate the Rule or enjoin Defendants. ................. 29

    A.    The Department offers no good reason why vacatur—the default remedy under the APA—shouldn't apply ........................................ 29

    B.    The Court should vacate the entire Rule .......................................... 33

    C.    Carroll ISD also merits equitable relief ............................................ 35

Conclusion ................................................................................................. 37

Certificate of Service .................................................................................. 39

# TABLE OF AUTHORITIES

## Cases

*303 Creative LLC v. Elenis*,
  600 U.S. 570 (2023) .................................................................................. 18

*Adams ex rel. Kasper School Board of St. John's County*,
  57 F.4th 791 (11th Cir. 2022) ................................................................... 26

*Alabama v. United States Secretary of Education.*
  No. 24-12444, 2024 WL 3981994 (11th Cir. Aug. 22, 2024) .................. 1, 16, 19, 34

*Alaska Airlines, Inc. v. Brock*,
  480 U.S. 678 (1987) .................................................................................. 33

*Alliance for Hippocratic Medicine  v. United States Food & Drug Administration*,
  602 U.S. 367 (2024) .................................................................................. 32

*Alliance for Hippocratic Medicine  v. United States Food & Drug Administration*,
  78 F.4th 210 (5th Cir. 2023) .................................................................... 32

*Americans for Beneficiary Choice v. United States Department of Health & Human Services*,
  No. 4:24-cv-00439-O, 2024 WL 3297527 (N.D. Tex. July 3, 2024) ........................ 33

*Bostock v. Clayton County*,
  590 U.S. 644 (2020) ........................................................................... 1, 4, 5, 7

*Braidwood Management Inc. v. Becerra*,
  104 F.4th 930 (5th Cir. 2024) .................................................................. 32

*Brannum v. Overton County School Board*,
  516 F.3d 489 (6th Cir. 2008) ................................................................... 13

*Byrd v. Maricopa County Sheriff's Department*,
  629 F.3d 1135 (9th Cir. 2011) ................................................................. 13

*Career Colleges & Schools  of Texas v. United States Department of Education*,
  98 F.4th 220 (5th Cir. 2024) ............................................................ 31, 32, 35

*Chance v. Rice University*,
  984 F.2d 151 (5th Cir. 1993) ...................................................................... 7

*Cooper Industries Inc. v. Aviall Services, Inc.*,
  543 U.S. 157 (2004) ............................................................................. 17, 21

*Corner Post, Inc. v. Board of Governors of Federal Reserve System,*
144 S. Ct. 2440 (2024) ......................................................................... 30

*Dambrot v. Central Michigan University,*
55 F.3d 1177 (6th Cir. 1995) ................................................................ 17

*Data Marketing Partnership, LP v. United States Department of Labor,*
45 F.4th 846 (5th Cir. 2022) ................................................................ 30

*Davis ex rel. LaShonda D. v. Monroe County Board of Education,*
526 U.S. 629 (1999) ................................................................. 15, 16, 20

*Davis v. Michigan Department of Treasury,*
489 U.S. 803 (1989) ............................................................................... 2

*DeAngelis v. El Paso Municipal Police Officers Association,*
51 F.3d 591 (5th Cir. 1995) .................................................................. 21

*Department of Education v. Louisiana,*
144 S. Ct. 2507 (2024) ..................................................... 1, 5, 25, 35

*Department of Homeland Security v. Regents of the University of California,*
591 U.S. 1 (2020) ........................................................................... 15, 30

*Dothard v. Rawlinson,*
433 U.S. 321 (1977) ............................................................................... 7

*Dubin v. United States,*
599 U.S. 110 (2023) ............................................................................... 2

*eBay Inc. v. MercExchange, L.L.C.,*
547 U.S. 388 (2006) ............................................................................. 35

*Encino Motorcars, LLC v. Navarro,*
579 U.S. 211 (2016) ............................................................................. 24

*Federal Communications Commission v. Fox Television Stations, Inc.,*
556 U.S. 502 (2009) ............................................................................. 24

*Federal Election Commission  v. Cruz,*
596 U.S. 289 (2022) ............................................................................. 32

*Franciscan Alliance, Inc. v. Becerra,*
47 F.4th 368 (5th Cir. 2022) ................................................................ 32

*Gebser v. Lago Vista Indeendent. School District,*
524 U.S. 274 (1998) ............................................................................... 7

*General Land Office  v. Biden*,
   71 F.4th 264 (5th Cir. 2023) ................................................................ 27, 29

*Griffin v. HM Florida-ORL, LLC*,
   144 S. Ct. 1 (2023) ............................................................................ 30, 33

*Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.*,
   527 U.S. 308 (1999) ................................................................................. 33

*Harris v. Forklift Systems, Inc.*,
   510 U.S. 17 (1993 ..................................................................................... 21

*Horton v. Goose Creek ISD*,
   690 F.2d 470 (5th Cir. 1982) ................................................................... 13

*Kentucky v. Yellen*,
   54 F.4th 325 (6th Cir. 2022) .................................................................... 14

*Kleczek ex rel. Kleczek v. Rhode Island Interscholastic League, Inc.*,
   768 F. Supp. 951 (D.R.I. 1991).................................................................. 9

*L.W. ex rel. Williams v. Skrmetti*,
   83 F.4th 460 (6th Cir. 2023) ...................................................................... 9

*Louisiana v. Department of Education*,
   No. 24-30399, 2024 WL 3452887 (5th Cir. July 17, 2024)................................ 1, 36

*Mahanoy Area School District v. B.L.*,
   594 U.S. 180 (2021) ................................................................................. 20

*Mayor of Baltimore v. Azar*,
   973 F.3d 258 (4th Cir. 2020) ................................................................... 34

*Meriwether v. Hartop*,
   992 F.3d 492 (6th Cir. 2021) ................................................................... 18

*Muldrow v. City of St. Louis*,
   601 U.S. 346 (2024) ................................................................................. 11

*Neese v. Beccera*,
   640 F. Supp. 3d 668 (N.D. Tex. 2022).................................................... 13

*Parents Defending Education v. Linn Mar Comunity School District*,
   83 F.4th 658 (8th Cir. 2023) ................................................................... 20

*Peltier v. Charter Day School, Inc.*,
   37 F.4th 104 (4th Cir. 2023) ..................................................................... 8

*Queen v. United States,*
 99 F.4th 750 (5th Cir 2024) .................................................................................... 11

*Saxe v. State College Area School District,*
 240 F.3d 200 (3d Cir. 2001) .................................................................................... 19

*Speech First, Inc. v. Cartwright,*
 32 F.4th 1110 (11th Cir. 2022) ............................................................................... 19

*Tennessee v. Cardona,*
 No. 2:24-cv-72-DCR, 2024 WL 3019146
 (E.D. Ky. June 17, 2024) ............................................................. 6, 11, 15, 20, 21, 34

*Tennessee v. Cardona,*
 No. 25-5588, 2024 WL 3453880 (6th Cir. July 17, 2024) ....................................... 34

*Texas Education Agency v. Houston ISD,*
 660 S.W.3d 108 (Tex. 2023) .................................................................................... 28

*Texas Medical Association v. United States Department of Health & Human Services,*
 110 F.4th 762 (5th Cir. 2024) .................................................................................. 30

*Texas v. Becerra,*
 No. 6:24-cv-00211-JDK, (N.D. Tex. Aug. 30, 2024) ............................................... 32

*Texas v. Cardona,*
 No. 4:23-CV-00604-0, 2024 WL 3658767
 (N.D. Tex. Aug. 5, 2024) ................................... 2–6, 13, 14, 17, 18, 30, 31, 33, 35, 36

*Texas v. Davis,*
 No. 429-01216-2024 (Tex. 429th Dist. Feb. 29, 2024) ............................................ 28

*Texas v. United States,*
 2:24-cv-86-Z (N.D. Tex. Apr. 29, 2024) ............................................................ 28, 29

*Texas v. United States,*
 579 U.S. 547 (2016) ................................................................................................. 28

*Texas v. United States,*
 809 F.3d 134 (5th Cir. 2015) ................................................................................... 28

*United Savings Association of Texas v. Timbers of Inwood Forest Associates, Ltd.,*
 484 U.S. 365 (1988) ................................................................................................... 2

*United States v. Jackson,*
 390 U.S. 570 (1968) ................................................................................................. 34

*United States v. Virginia,*
    518 U.S. 515 (1996) ................................................................................ 4

*Universal Amusement Co. v. Vance,*
    587 F.2d 159 (5th Cir. 1978) .......................................................... 23, 24

*West Virginia v. Environmental Protection Agency,*
    597 U.S. 697 (2022) .............................................................................. 14

*Wood v. Florida Department of Education,*
    No. 4:23-cv-00526, 2024 WL 3380723 (N.D. Fla. June 27, 2024) ........... 18

*Yelling v. St. Vincent's Health System,*
    82 F.4th 1329 (11th Cir. 2023) .............................................................. 21

## Statutes

5 U.S.C. § 706 ......................................................................................... 29

20 U.S.C. § 1232(c) .................................................................................. 32

20 U.S.C § 1681(a) ..................................................................... 2, 34, 36

20 U.S.C. § 1686 ................................................................................. 2, 4

20 U.S.C. § 1687 ....................................................................................... 36

42 U.S.C. § 2000e-2(e) .............................................................................. 6

Educational Amendments of 1972, Pub. L. No. 92-318,
    86 Stat. 373 (June 23, 1972) .................................................................. 4

Educational Amendments of 1974, Pub. L. 93-380 (H.R. 69),
    88 Stat. 484 (Aug. 21, 1974) ................................................................ 12

Tex. Educ. Code § 11.151(a) ..................................................................... 28

Tex. Educ. Code § 11.151(b) ..................................................................... 27

Tex. Educ. Code § 33.0834 ....................................................................... 28

Tex. Fam. Code § 81.009 .......................................................................... 24

Tex. Fam. Code § 83.001 .......................................................................... 24

Tex. Fam. Code § 83.002 .......................................................................... 24

**Rules and Regulations**

34 C.F.R. § 106.10 .................................................................. 5, 14, 19, 25, 34

34 C.F.R. § 106.2 .................................................................................. 36

34 C.F.R. § 106.31(a)(2) ............................................................... 8, 14, 25

34 C.F.R. § 106.33 .................................................................................. 6

34 C.F.R. § 106.34 .................................................................................. 6

34 C.F.R. § 106.41(a) ............................................................................. 27

34 C.F.R. § 106.41(b) ............................................................................. 26

34 C.F.R. § 106.41(a)–(b) ........................................................................ 6

40 Fed. Reg. 24,128 (June 4, 1975) ................................................... 3, 12

85 Fed. Reg. 30,026 (May 19, 2020) ........................................... 16, 22, 23

89 Fed. Reg. 33,474 (April 29, 2024) ..........2–5, 9, 12, 15, 17, 18, 20, 21, 23, 26, 34–36

Fed. R. Civ. P. 12(h) ............................................................................. 29

**Other Authorities**

118 Cong. Rec. 5807 (Feb. 28, 1972) (Sen. Bayh) ....................................... 3

Antonin Scalia & Bryan A. Garner,
   *Reading Law: The Interpretation of Legal Texts* (2012) ................................. 2, 3, 8

John F. Manning, *The Absurdity Doctrine*,
   116 Harv. L. Rev. 2387 (2003) ................................................................ 9

Mila Sohoni, *The Power to Vacate a Rule*,
   88 Geo. Wash. L. Rev. 1121 (2020) ....................................................... 32

Ronald M. Levin, *Vacatur, Nationwide Injunctions, and the Evolving APA*,
   98 Notre Dame L. Rev. 1997 (2023) ................................................. 30, 31, 32

## INTRODUCTION

As this Court and many others have already concluded, the Department's Rule unlawfully transforms Title IX from a statute ensuring equal educational opportunities for women and men into a statute mandating preferences for gender ideology. But Title IX's ban on sex discrimination has not changed since 1972. Nor has Title IX's text suddenly become a speech code mandating gender ideology and requiring students and teachers to affirm that boys can be girls and vice versa. The Rule's interpretation is unlawful. This Court should grant Carroll ISD's summary-judgment motion, deny the Department's cross-motion, and vacate the Rule.

## ARGUMENT

### I. The gender-identity mandate contravenes Title IX's text, context, and history.

The Department says its new definition of sex-based discrimination is a "straightforward application" of *Bostock* to Title IX. Dept. Br. 13, ECF No. 65 (citing *Bostock v. Clayton Cnty.*, 590 U.S. 644 (2020)). The Supreme Court, the Fifth Circuit, and this Court have all rejected that justification. *See Dep't of Educ. v. Louisiana*, 144 S. Ct. 2507 (2024) (per curiam) (*Louisiana II*); *Louisiana v. Dep't of Educ.*, No. 24-30399, 2024 WL 3452887, at *2–3 (5th Cir. July 17, 2024) (per curiam) (*Louisiana I*); Order I at 14, ECF No. 43. So have many others. *See Alabama v. U.S. Sec'y of Educ.*, No. 24-12444, 2024 WL 3981994, *4–5 (11th Cir. Aug. 22, 2024) (per curiam); *id.* at *1 n.2 (collecting cases). As "all Members of the [Supreme] Court" agreed, two district courts properly enjoined the new § 106.10's attempted redefinition of sex to include gender identity, § 106.31(a)(2)'s de minimis harm provision, and § 106.2's hostile-environment harassment definition. *Louisiana II*, 144 S. Ct. at 2509–10; *id.* at 2510 (Sotomayor, J., dissenting in part). The same legal reasoning from the preliminary injunction stage applies now. As this Court recognized in ordering an expedited resolution, Carroll ISD is

1

"substantially certain … to succeed on the merits." Order II at 6, ECF No. 55. The Rule's gender-identity mandate violates Title IX.

### A.     The new definition of sex discrimination distorts Title IX.

**1.**     Title IX's text invalidates the Department's new definition of sex discrimination. Title IX forbids treating one "sex worse than the other." *Texas v. Cardona*, No. 4:23-CV-00604-0, 2024 WL 3658767, at *31 (N.D. Tex. Aug. 5, 2024). Section 1681(a) "must be read in … context" and construed to fit "the overall statutory scheme." *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989); *United Savings Ass'n of Texas v. Timbers of Inwood Forest Assoc. Ltd.*, 484 U.S. 365, 371 (1988) (courts must accept an interpretation that is "compatible with the rest of the law"). That statutory scheme makes clear that "sex" cannot extend to gender identity or sex stereotypes for two reasons. *First*, a nearby provision mandates: "[N]othing [in Title IX] shall be construed to prohibit any educational institution … from maintaining separate living facilities for the different sexes." 20 U.S.C. § 1686. This rule of construction shows that § 1681(a) *itself* allows sex distinctions. *Second*, the exceptions identified in § 1681(a)(1)–(9) show what discrimination *isn't*. *Contra* Dept. Br. 14–15.

The Department treats § 1686's rule of construction as just another exception to § 1681(a). *E.g.,* Dept. Br. 18; Nondiscrimination on the Basis of Sex in Ed. Programs or Activities Receiving Fed. Fin. Assistance, 89 Fed. Reg. 33,474, 33,818 (April 29, 2024). But § 1686 shapes the meaning of the entire statute: Title IX cannot "be construed" to prohibit "separate living facilities for the different sexes." And Congress titled § 1686 an "[i]nterpretation" principle. 20 U.S.C. § 1686. That "reinforces what the text's nouns and verbs independently suggest," *Dubin v. United States*, 599 U.S. 110, 121 (2023)—that § 1681(a) allows some sex distinctions, including to preserve sex-specific spaces. *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 221–24 (2012)

(explaining title-and-headings canon). Section 1686 is not an "exception[ ]," but an interpretive command. *Contra* Dept. Br. 4.

The Department concedes as much later, saying § 1681(a) allows the regulations to provide for sex-specific bathrooms or locker rooms. Dept. Br. 18. If § 1686 were only an exception from § 1681(a)'s non-discrimination rule, then the 1975 regulations could not have provided for sex-specific "toilet, locker room, and shower facilities" unless these private facilities count as "living facilities." *See* Nondiscrimination on the Basis of Sex in Ed. Programs or Activities Receiving Fed. Fin. Assistance, 40 Fed. Reg. 24,128, 24,139–43 (June 4, 1975). As the Department recognizes, to specify one exception is to exclude others. Dept. Br. 15; *see* Scalia & Garner, *supra*, at 107–11. But the Department says bathrooms and locker rooms do not count as living facilities subject to § 1686. *E.g.*, 89 Fed. Reg. at 33,816, 33,821. The Department cannot have it both ways. To apply § 1686 as the interpretive rule it is, one must read § 1681 to allow some distinctions between males and females, as the regulations have done since 1975, even when the exceptions identified in § 1681(a)(1)–(9) are silent. That includes not just living facilities but also locker rooms, restrooms, and showers.

The Department's reading of § 1681(a)'s exceptions leads to the anomalous conclusion that Congress—in a statute designed to eliminate sex discrimination—in fact encouraged sex discrimination. *See* Dept. Br. 14–15, 18. In the Department's words, Congress allowed the imposition of "cognizable harm." *Id.* at 18. The proper reading is that these exceptions "are the authoritative expression of Congress's view that separating the two sexes 'where personal privacy must be preserved' is not the type of discrimination prohibited by the statute." *Texas*, 2024 WL 3658767, at *32 (quoting 118 Cong. Rec. 5807 (Feb. 28, 1972) (Statement of Sen. Birch Bayh)). Far from treating males and females worse, the applications recognize the

"enduring … differences" between them. *United States v. Virginia*, 518 U.S. 515, 533 (1996).

The Javits Amendment proves the point. Section 1681(a) never mentions athletics. In 1975, Congress approved the Department's predecessor's regulations allowing for sex-designated athletic teams. Pl. MSJ Mem. 3, ECF No. 59. That approval did not (and could not) change § 1681. It just affirmed § 1681(a)'s proper meaning. Under the Department's current view, longstanding sports regulations violate § 1681(a) because *any* differentiation between the sexes not provided for by § 1681(a)(1)–(9) or § 1686 is unlawful discrimination. But Congress approved the regulation after six days of hearings. *Id.* The regulation comports with the statute because it understands that "the innate biological variation between men and women … occasionally warrants differentiation—and even separation—to preserve educational opportunities and to promote respect for both sexes." *Texas*, 2024 WL 3658767, at *32. Such differentiation is not discrimination.

**2.**     The Department insists "sex discrimination" occurs any time schools consider sex, so "gender-identity discrimination is sex discrimination even under" the ordinary "binary understanding of sex." Dept. Br. 15 (citing 89 Fed. Reg. at 33,802). That cannot be. While § 106.10's definition hinges on assuming any distinction that notices sex is consequently sex-based discrimination, § 1686, the rest of the statutory context, and longstanding regulations foreclose that assumption. The Department's reading cannot account for distinctions long-accepted under Title IX—from dormitories and showers to sports and P.E. classes.

As *Bostock* observed, the phrase "sex discrimination" implies "a focus on differential treatment between the two sexes as groups." 590 U.S. at 659. "Sex Discrimination Prohibited" was the original heading for the provision codified at § 1681(a), and Title IX was entitled "Prohibition of Sex Discrimination." Educ. Amends. of 1972, Pub. L. No. 92-318, 86 Stat. 235, 373 (June 23, 1972). A group-

based understanding explains the many provisions providing for comparable treatment of men and women "as groups." *See* Pl. Mem. 10–11. The *Bostock* Court distinguished that group-based understanding with Title VII's "focus … on individuals." 590 U.S. at 658. Title IX prohibits sex discrimination, while Title VII "three times" instructs courts to examine the individual. *See id.* But the Department never engages with Title IX's dispositive protection of males and females as groups.

Instead, the Department shadowboxes against causation standards. *See* Dept. Br. 13–15. The proper statutory analysis, described above, doesn't require parsing the difference between "on the basis of" and "because of." Section 106.10 violates Title IX even under *Bostock*'s causation analysis. Context forecloses applying *Bostock*'s any-consideration-of-sex formula. "[N]othing could be further from Title IX's ordinary meaning" than the Department's argument that "suggests that any distinction or differential treatment based on sex violates Title IX." *Texas*, 2024 WL 3658767, at *31. After all, if every consideration of sex were sex-based discrimination (as *Bostock* says of Title VII), Title IX would *have to* prohibit sex-specific "living facilities," sports, and restrooms. But that's not viable. The Department accepts that Title IX permits separate sports teams—even when it comes to gender identity that differs from sex—so Title IX must also permit separate locker rooms. *See, e.g.,* 89 Fed. Reg. at 33,817; Dept. Br. 16–17 & n.4.

The Department says it takes the word "sex" to mean biological sex. 89 Fed. Reg. at 33,802. But that does not justify why *Bostock*'s sex-blind logic from Title VII should apply to Title IX. Nor does it mean § 106.10 doesn't cause "any harm" to Carroll ISD. *Contra* Dept. Br. 43. Section 106.10 defines "sex-based *discrimination.*" *Accord Louisiana II*, 144 S. Ct. at 2510 (Sotomayor, J., dissenting) (referring to § 106.10 as "defining sex discrimination"). It cannot avoid saying what discrimination means. And what it says deviates from the statute.

Specifically, § 106.10 gives gender identity, sex stereotypes, and other characteristics "more salient consideration" over sex—the one classification covered by Title IX. Order I at 10; *accord id.* at 10–11 ("[W]here gender identity and biological sex are pitted against one another, … gender identity will always win out under the Final Rule" unless there is an explicit § 1681(a) exception). As Carrol ISD has explained, not even *Bostock* justifies that. Pl. Mem. 16–18. *Bostock* did not give gender identity equal billing with sex or create new protected classes. *See Texas*, 2024 WL 3658767, at *31. The Rule does, and that hinders schools from implementing the statute, at least as it has always been understood. If gender identity and sex must receive the same treatment, as § 106.10 requires, schools cannot separate locker rooms or P.E. classes based on gender identity *or* based on sex. Either way, there would be discrimination. But Title IX does not extend to distinctions based on gender identity, "sex stereotypes," or the like. And that makes sense, or else teachers would be in danger of sex "stereotyping" anytime they discuss the differences between men and women. *See Tennessee v. Cardona,* No. 2:24-cv-72-DCR, 2024 WL 3019146, at *11 (E.D. Ky. June 17, 2024) (*Tennessee I*).

To support transplanting *Bostock* onto Title IX, the Department says that "Title VII also contains statutory exceptions" and can protect privacy. Dept. Br. 14–15. But Title IX's rule of construction and § 1681(a)'s longstanding regulations are no mere "exceptions" to the nondiscrimination rule; they govern its interpretation (§ 1686) and reflect the shared understanding (including in 1972) that recognizing sex differences for privacy and sports is not discrimination (*e.g.*, 34 C.F.R. §§ 106.33, 106.34, 106.41(a)–(b)). Moreover, the only Title VII provision the Department cites (at 14)—Title VII's "bona fide occupational qualification" (BFOQ) provision—is inapposite to § 1686 and § 1681(a)'s applications. The BFOQ provision says certain distinctions among "employees" and "any individual" "shall

not be an unlawful employment practice." 42 U.S.C. § 2000e-2(e). Unlike the broad rule of construction in § 1686, the BFOQ is "an extremely narrow exception to the general prohibition of discrimination" in Title VII. *Dothard v. Rawlinson*, 433 U.S. 321, 334 (1977). And the analysis does not revolve around the mere existence of "statutory exceptions," but rather how such provisions inform the statute's meaning. The BFOQ remains consistent with Title VII's focus on the individual, *see Bostock*, 590 U.S. at 658–59, while Title IX contemplates group-based equality.

### B. The "de minimis harm" provision—and its new form of discrimination based on gender identity—distorts Title IX.

The Rule's new form of sex discrimination is unsupported by the statute and violates constitutional privacy protections.

#### 1. The de minimis harm standard has no basis in Title IX's text.

Title IX's text—silent as to any discussion of "de minimis harm"—does not allow the Department's novel interpretation for two reasons. *First*, the new provision turns Title IX into a disparate-impact statute—but only for gender identity. Title IX requires "intentional discrimination," not disparate impact. *See Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998); *Chance v. Rice Univ.*, 984 F.2d 151, 153 (5th Cir. 1993). The Department concedes that its "de minimis harm" provision generally allows long-recognized distinctions based on sex, like restrooms and showers. Dept. Br. 18–19. But as applied to someone who identifies as transgender, these same distinctions turn out to be unlawful discrimination. *Id.* at 18. The Department lacks authority to expand Title IX liability to cover disparate impact. *See* Order I at 11 ("Privileging gender identity over biological sex is in no way authorized by the statutory text."). And even if it did, the agency has never admitted the change, which makes it arbitrary and capricious.

The de minimis harm provision—found nowhere in Title IX's text—cannot "effectuate" that "plain text." *Contra* Dept. Br. 17. Section 106.31(a)(2)'s final sentence reveals what is really at stake: the only sex distinctions that cause cognizable harm are those that "prevent[ ] a person from participating … consistent with the person's gender identity." *Id.* The Department now argues that preventing a person from participating based on gender identity is but "one example of separation or differentiation" that imposes more than de minimis harm. Dept. Br. 20. But the Department has already conceded that the provision doesn't "kick in" unless harm is "based on gender identity." MPI Tr. 89. The Department's backtracking shows the provision at least is arbitrary and capricious for lack of reasoned explanation. Its single example attempting to show that the de minimis harm provision applies beyond gender identity falls flat. *See* Dept. Br. 20 (citing *Peltier v. Charter Day School, Inc.*, 37 F.4th 104, 130 (4th Cir. 2023) (en banc)). That case—decided well before the Department promulgated its novel de minimis harm standard—concluded that Title IX's text "unambiguously applies to sex-based dress codes." *Peltier*, 37 F.4th at 128. It never mentions any alleged de minimis harm.

*Second*, the Department's interpretation fails to harmonize the statutory scheme. *See* Scalia & Garner, *supra*, at 180. Section 106.31(a)(2) illogically carves out exceptions where (according to the Department), sex-based harm is *allowed*. It is unreasonable to conclude that Congress meant to subject students to legally cognizable injury in dorms across the nation, while mandating that girls share showers with boys and wrestle against them in P.E. class. *See supra* Section I.A. The Department still has no explanation for § 106.31(a)(2)'s bizarre patchwork, opting instead to blame Congress. Dept. Br. 18. But the provision's absurdity shows the Department's interpretation is wrong, not that Congress enacted incoherent text. *See* John F. Manning, *The Absurdity Doctrine*, 116 Harv. L. Rev.

2387, 2458–59 (2003). For five decades Title IX has recognized sex-specific spaces, but in the Department's view, these have inflicted "cognizable harm" all along. Dept. Br. 18. That flips Title IX on its head.

   To justify the many provisions allowing sex-specific facilities and programs, the Department offers the example that women's restrooms are discriminatory when applied to males who identify as female but not males who identify as males because "a cisgender male suffers no sex-based harm from being excluded from a comparable women's restroom." Dept. Br. 19 (citing 89 Fed. Reg. at 33,818). That disparate-impact logic is impossible to square with the Department's *Bostock* theory that *any* sex distinction causes harm. *Supra* Section I.A.

   That conclusion is also illogical and unsupported. It's illogical because, for example, a boy who wants to play field hockey but can't because his school only fields a girls' team unquestionably suffers sex-based harm from being "sideline[d]." *See Kleczek ex rel. Kleczek v. R.I. Interscholastic League, Inc.*, 768 F. Supp. 951, 953 (D.R.I. 1991). The same goes for a "cisgender male" who wants to use the girls' bathroom because he is bullied in the boys' bathroom. MPI Tr. 83. It's unsupported because the Rule cites no proof about what Congress thought was de minimis harm in 1972. Instead, the Rule cites medical groups, *e.g.*, 89 Fed. Reg. at 33,819, but their recent policy views cannot change the public understanding of Title IX's text in 1972. Indeed, these groups can and often do change their minds. Under the Department's logic, Title IX's meaning would change too. But purported "expert consensus, whether in the medical profession or elsewhere, is not the North Star of" judicial review. *L.W. ex rel. Williams v. Skrmetti*, 83 F.4th 460, 479 (6th Cir. 2023). Title IX's text did not peg the statute's protections in 1972 to the evolving views of medical advocacy organizations in 2024.

   The Department knew about the growing body of research that contradicts its claim that "substantial evidence" supports treating students inconsistent with

their sex. *See* Dept. Br. 19. One comment (not produced in the administrative record) described research showing the dangers of social transition and attached Dr. Hilary Cass's interim report on "gender identity services for children and young people" in the UK. Pl. MSJ App.483. That report acknowledged that "social transition"—including allowing access to spaces designated for the opposite sex and using pronouns and names inconsistent with sex, as the Rule requires—is "an active intervention" that can "have significant effects on the child or young person in terms of their psychological functioning." Pl. MSJ App.554. Dr. Cass recommended further research to assess the "outcomes" of social transition.[1] Another comment (also not produced in the administrative record) from a teacher urged the Department to consider an expert declaration submitted by Dr. Stephen B. Levine, a professor of psychiatry and one of the founders of what is now the World Professional Association for Transgender Health (WPATH), discussing the dangers of social transition. Pl. MSJ App.740. Dr. Levine offered his expert opinion that "[s]ocial transition of young children is a powerful psychotherapeutic intervention that radically changes outcomes, almost eliminating desistance" to a child's sex. Pl. MSJ App.791. He reviewed evidence that shows "social transition starts a juvenile on a 'conveyor belt' path that almost inevitably leads to the administration of puberty blockers, which in turn almost inevitably leads to the administration of cross-sex hormones." Pl. MSJ App.792–93.[2]

---

[1] Since that time, Dr. Cass has published her final report which concluded that *no reliable evidence* exists that "social transition" improves mental health for children. Pl. MSJ App.879. Worse still, evidence suggests social transition *harms* children by increasing the odds of persisting in a transgender identity, taking hormones to interfere with normal development, and even surgery. *Id.* Other recent research confirms the dangers of social transition. Pl. MSJ App.1237, 1253.
[2] Dr. Levine's current opinions—considering the growing body of evidence—confirm the opinions in this report. Pl. MSJ App.1348.

Faced with this concerning evidence, the Department cannot punt, as the Rule attempts. The Rule claims that students and their parents have the better position to "weigh any harms and benefits for themselves" over schools. 89 Fed. Reg. at 33,820. But the Rule otherwise disclaims neutrality on the subject. It mandates that schools participate in school transition at the request of students. And it ignores the evidence showing that schools lack the resources and expertise to engage in the "powerful" intervention of social transition, especially because no evidence exists as to what the outcome will be of this high-stakes experiment. Pl. MSJ App.483–84.

At bottom, the Department defends its more-than-de-minimis-harm gloss based on the concept that the word "discrimination" carries an element of harm. Dept. Br. 20. No doubt Title IX "discrimination" means worse treatment. But that shows why Carroll is right, not the Department. *First*, *Muldrow* helps Carroll. *Contra* Dept. Br. 20. As the Fifth Circuit recognized in the Department's cited case, the Supreme Court "recently cautioned lower courts against imposing significance-of-injury tests not established in statutory texts." *Queen v. United States*, 99 F.4th 750, 752 n.3 (5th Cir 2024) (citing *Muldrow v. City of St. Louis*, 601 U.S. 346 (2024)). There, the Supreme Court analyzed Title VII, which makes no distinction between "significant disadvantages" and "not-so-significant ones." *Muldrow*, 601 U.S. at 355. Neither does Title IX. But that's exactly the atextual distinction the Department's de minimis harm standard makes. Worse, the Department's subjective perspective gets to decide what counts. A boy excluded from field hockey suffers merely de minimis harm, even though he can't play his desired sport at all. So too the boy who identifies as a boy excluded from the girls' restroom where he feels safer. But change that to a boy who identifies as a girl and the same harm leaps above the de minimis bar. The de minimis harm standard "is arbitrary in the truest sense of the word." *Tennessee I*, 2024 WL 3019146, at *43.

*Second*, § 1681(a) also bans *exclusions* and *denials of benefit*s based on sex, not just sex discrimination. The Department never even tries to explain why or how that language incorporates notions of harm tied to someone's gender identity. Nor can it. A woman who cannot access a women's only restroom or locker room is effectively "excluded" from an educational program "on the basis of sex" and is "denied the benefits of" that program. That exclusion and loss do not change depending on the gender identity of males accessing these private spaces.

The Department's reading also fails to justify sex-specific sports teams. As even the Rule recognizes, there is no statutory "exception" for athletics. *See* 89 Fed. Reg. at 33,816. While the Javits Amendment instructed the agency to promulgate regulations on "intercollegiate athletic activities," it did not amend the operative statutory text. Educ. Amends. of 1974, Pub. L. 93-380 (H.R. 69), § 844, 88 Stat. 484 (Aug. 21, 1974). And even under the Department's justification, only intercollegiate athletics could be exempted from its de minimis harm rule based on the Javits Amendment. But that cannot justify the 1975 regulations, which apply to elementary and secondary school sports too. 40 Fed. Reg. at 24,134. In other words, the reasoning behind the de-minimis-harm rule would, at minimum and on its own terms, make sex-designated sports illegal in K–12 schools. That is reason enough to reject the agency's theory in favor of Carroll ISD's better reading: the Javits Amendment evinces the contemporaneous understanding that Title IX allows— even requires—sex-specific designations that protect student privacy and women's athletic opportunities. *Supra* Section I.A.

### 2. The de minimis harm provision runs roughshod over privacy rights.

The Department's arguments on privacy ignore the salient injury: students—particularly girls and women—losing access to *their own* sex-designated spaces. After all, a middle school girl does not care whether the male who enters

her shower has an "internal sense" that he is a boy, girl, or something else. That female middle schooler suffers the same privacy loss either way; she loses the same educational benefit (safe access to sex-specific spaces) either way. There is simply no textual basis in Title IX to make the harm women suffer when losing their privacy turn on *someone else's* internal sense of self. *See* Pl. Mem. 20–21.

The Department tries to fault Carroll ISD for not defining this right to privacy. Dept. Br. 23. But this Court and numerous others have held that students in "bathrooms and locker rooms…retain 'a significant privacy interest in their unclothed bodies.'" *Texas*, 2024 WL 3658767, at *34 (quoting *Brannum v. Overton Cnty. Sch. Bd.*, 516 F.3d 489, 494, 496 (6th Cir. 2008)); *see Horton v. Goose Creek ISD*, 690 F.2d 470, 478 (5th Cir. 1982) ("[S]tudents' persons certainly are not the subject of lowered expectations of privacy. On the contrary, society recognizes the interest in the integrity of one's person.").

The Department then pivots to a handful of cases that it claims rejected privacy and safety interests as "unsubstantiated." Dept. Br. 23. That argument ignores two key points. *First*, it contradicts the nature of the privacy right. That right is personal and "impelled by elementary self-respect and personal dignity." *Neese v. Beccera*, 640 F. Supp. 3d 668, 681 n.9 (N.D. Tex. 2022) (quoting *Byrd v. Maricopa Cnty. Sheriff's Dep't*, 629 F.3d 1135, 1141 (9th Cir. 2011)). So the Department cannot dismiss as merely "hypothetical" the privacy concerns of women having to undress next to males. *See* Pl. Mem. 20–21 (comment discussing Lia Thomas). *Second*, the Department's contention ignores one of the primary aims of Title IX's preservation of sex-specific facilities—as identified by Senator Bayh— "privacy." *Texas*, 2024 WL 3658767, at *32. Allowing males into private female spaces—by definition—infringes on privacy, no matter how the Department tries to square it.

13

### C.  Constitutional canons of construction prohibit the Rule's gender-identity mandate.

Not only do both provisions of the Rule's gender-identity mandate violate Title IX's plain text, but the new conditions also do not satisfy constitutional requirements. The Department contends (at 36) that the major-questions doctrine cannot apply because §§ 106.10 and 106.31(a)(2) are just plain-text applications of the statute. That's wrong. *Supra* Sections I.A, I.B. Requiring schools to assign bathrooms, locker rooms, and sports teams based on gender identity instead of sex is a "highly consequential" and "transformative" change. *West Virginia v. EPA*, 597 U.S. 697, 724 (2022). Congress itself must make such major policy determinations.

Conceding that Title IX is Spending Clause legislation subject to a strong clear-statement rule, the Department insists (at 35) that §§ 106.10 and 106.31(a)(2) "merely apply Title IX's unambiguous prohibition on sex discrimination." But the clear-statement rule requires contemporaneous notice to recipients of what action is required or proscribed; it is not enough to give notice that some condition exists. Pl. Mem. 13, 19. And because in 1972 "on the basis of sex" did not mean "on the basis of gender identity," "sex characteristics," or the like, Congress gave no clear notice that these other characteristics were impermissible bases for distinguishing between individuals. *See Texas*, 2024 WL 3658767, at *42. And an agency cannot add conditions or provide the necessary notice—it has to come from Congress. *See Kentucky v. Yellen*, 54 F.4th 325, 352 (6th Cir. 2022). The Rule's failure here is all the clearer because of Title IX's rule of construction allowing respect for sex-specific privacy and the contemporaneous regulations recognizing sex-based distinctions in programs like athletics, P.E. classes, and locker rooms. *See supra* Section I.A.

Further, the Rule itself does not claim that the gender-identity mandate created by § 106.31(a)(2) is found in unambiguous statutory text. Defendants cannot now argue to the contrary. The agency must stand on the reasons stated in

14

the Rule. *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 21–22 (2020). That requires rejecting Defendants' clear-notice rule and major-questions doctrine arguments, both of which presume unambiguous text requires the gender-identity mandate.

## II.   The Rule's other provisions are unlawful.

The Rule's "broader" hostile environment harassment standard violates Title IX and the First Amendment, both alone and along with the gender-identity mandate. So, too, do the statute and First Amendment invalidate the Department's elimination of the actual knowledge or deliberate indifference requirement, duty to self-initiate complaints, and gag-order mandate.

### A.   The Department's "broader" hostile-environment harassment definition flouts the statute.

The Rule's new definition of hostile environment harassment admittedly created a "broader standard" than that established by the Supreme Court in *Davis*. *See* 89 Fed. Reg. at 33,498; *Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629 (1999). The *Davis* Court held that hostile environment harassment could be proscribed when "the funding recipient acts with deliberate indifference to known acts of harassment in its programs or activities … [and] only for harassment that is so severe, pervasive, and objectively offensive that it effectively bars the victim's access to an educational opportunity or benefit." 526 U.S. at 633. As Carroll ISD and other courts have explained, the Rule's new harassment standard departs from *Davis*. Pl. Mem. 27–28 (citing inter alia *Tennessee I*, 2024 WL 3019146, at *26).

*Davis*'s rule extends beyond private lawsuits. *Contra* Dept. Br. 28–29. As the Department recognized in 2020, "Nothing in … *Davis* purports to restrict [its] framework only to private lawsuits for money damages." Nondiscrimination on the Basis of Sex in Ed. Programs or Activities Receiving Fed. Fin. Assistance, 85 Fed.

Reg. 30,026, 30,033 (May 19, 2020). The *Davis* Court interpreted "the same word in the same statute to address the same legal question: the meaning of 'discrimination' under Title IX." *Alabama*, 2024 WL 3981994, at *5. The Department offers no good reason "why a different, and significantly broader, definition of 'discrimination' would apply in the administrative context." *Id.* It falls back on its claimed authority to apply an expanded definition in administrative enforcement. Dept. Br. 31. As the Department recognized in 2020, it can apply different definitions of harassment in different contexts, such as involving quid pro quo conduct. 85 Fed. Reg. at 30,033. But any definition as applied to speech must still comport with constitutional requirements. *Id.*

As the Eleventh Circuit held, the Rule "flies in the face of *Davis*." *Alabama*, 2024 WL 3981994, at *5. *Contra* Dept. Br. 25. *Davis* repeatedly discusses the "severe *and* pervasive" requirement and takes seriously First Amendment concerns. "Indeed, the *Davis* majority, in responding to the dissent's concerns that holding schools liable for student-on-student conduct might force them to enact policies that violated the First Amendment, pointed to the 'very real limitations' in its definition—noting that the standard did not include liability for 'teas[ing],' 'name-calling,' isolated incidents, or 'a mere decline in grades.'" *Alabama*, 2024 WL 3981994, at *6 (quoting *Davis*, 526 U.S. at 652) (cleaned up). As the Department recognized in 2020, the *Davis* Court crafted its standard to comport with the First Amendment. 85 Fed. Reg. at 30,162 n.719.

The Department cannot hide behind *Davis*'s references to then-recent agency guidance on sexual harassment, which used the language "severe or pervasive." *Contra* Dept. Br. 28–29. The Court cited the guidance twice for two irrelevant points: that Title IX covers "student-on-student harassment," and that "the ages of the harasser and the victim and the number of individuals involved" are relevant. 526 U.S. at 647–48, 651. The Court repeated the severe-*and*-

pervasive standard, by contrast, five times. Whether "severe *or* pervasive" would fit with the statute (or First Amendment) was, at most, a question that "merely lurk[ed] in the record, neither brought to the attention of the court nor ruled upon." *Cooper Indus., Inc. v. Aviall Servs., Inc.*, 543 U.S. 157, 170 (2004). And in any event, when the Court defined the standard, it required conduct to be "severe *and* pervasive."

### B.   The hostile-environment harassment standard infringes on First Amendment rights.

The new harassment standard violates the First Amendment. *See* Pl. Mem. 25–30. The Department cannot rely on its disclaimers that the Rule does not require schools to "violate anyone's First Amendment rights." *Contra* Dept. Br. 25. That disclaimer is meaningless. *See Dambrot v. Cent. Mich. Univ.*, 55 F.3d 1177, 1183 (6th Cir. 1995). The Department never intimates how to toe that line— because it can't. The terms of the Rule's definition themselves contravene the First Amendment. The radical expansion of what counts as sex discrimination on top of its reinvention of hostile-environment harassment push the Rule far beyond what the First Amendment allows. Not only that, but the Rule's vagueness will chill far more speech than the Department conceives. To comply with the Rule's redefinition, Carroll ISD—and all other recipients—must create policies that compel, restrict, and chill speech while attempting to enforce the Rule's vague and overbroad standards.

The Rule compels and restrains speech based on viewpoint. It all but acknowledges that it requires students and employees to use requested pronouns and to affirm a non-binary and non-biological understanding of gender. 89 Fed. Reg. 33,504, 33,516. This tracks the Department's prior position. *See Texas*, 2024 WL 3658767, at *4–5 (discussing agency guidance documents). The Rule admits that "misgendering" could violate the Rule if it is "persistent" and "limits another

student's … performance," 89 Fed. Reg. at 33,508–09, 33,516, but dismisses First Amendment concerns because (the Department says) violators could be punished in a way that complies with the First Amendment. This argument overlooks the near per se bar against compelled speech. *303 Creative LLC v. Elenis*, 600 U.S. 570, 586 (2023); *Meriwether v. Hartop*, 992 F.3d 492, 503 (6th Cir. 2021) ("Start with the basics … the government may not compel affirmance of a belief with which the speaker disagrees." (cleaned up)).

The government cannot evade its prior arguments that teachers must use pronouns inconsistent with sex. *Contra* Dept. Br. 27. As the Department admits, the government's *Kluge* brief argued that a proposed accommodation for "a teacher's religious objection to using preferred names and pronouns … created Title IX-related litigation risk for the school." *Id.* The Department offers no defense of its recent brief arguing that a policy requiring teachers to use gender-neutral titles like "teacher" or "coach," but not honorifics and pronouns based on gender identity, creates a hostile environment under Title VII. Pl. Mem. 27 (citing Statement of Interest of the United States of America, *Wood v. Fla. Dep't of Educ.*, No. 4:23-cv-00526, 2024 WL 3380723 (N.D. Fla. June 27, 2024)). Carroll ISD didn't "distort[ ]" those filings. *Contra* Dept. Br. 27. They speak for themselves. And they're only one part of the Department's continued insistence that students and teachers use pronouns inconsistent with sex. *See Texas*, 2024 WL 3658767, at *4, 50 (noting the Department's guidance that "referring to a transgender student by a name or pronouns other than those the student prefers would be discrimination under Title IX" and discussing how "the Department has enacted similar guidance in the past and may attempt to do so again").

The Rule also requires schools to implement unconstitutional viewpoint-based speech restrictions. The Rule lowers the standard to any time an experience "limits" an individual's participation or benefit from an educational program. Pl.

18

Mem. 26. The Rule also inquires into subjective feelings of offense that can be based on § 106.10's undefined litany of new characteristics. And the Department makes clear that for gender identity, it is only concerned with offense to people who espouse the Department's views. But it celebrates and even requires silencing those who disagree, such as anyone who wants to state that "there are only two genders." *See* Pl. Mem. 26. This viewpoint-based restriction is unconstitutional and incompatible with equal educational opportunity.

The Rule is overbroad. Pl. Mem. 27–28. The Department asserts that its definition comports with cases like *Speech First, Inc. v. Cartwright*, 32 F.4th 1110 (11th Cir. 2022). Dept. Br. 29–30. But the Eleventh Circuit has already identified the flaws in the Department's position: "the Department's new definition of 'discrimination' is similar in its sweep to the 'discriminatory harassment' policy in *Cartwright*, and thus raises similar First Amendment concerns." *Alabama*, 2024 WL 3981994, at *6. Like the unconstitutional policy in *Cartwright*, the Rule applies to "severe *or* pervasive" speech that merely "*limits*" some educational opportunity. *Id.* (quoting *Cartwright*, 32 F.4th at 1114–15). Those terms "cover substantially more speech than the First Amendment permit[s]." *Id.* (quoting *Cartwright*, 32 F.4th at 1125–27) (cleaned up). And the *Cartwright* policy even extended to a single instance of speech. *Id.* Acknowledging that a "stray remark" may not be harassment, the Department refuses to disclaim that a non-stray single remark in fact meets its definition. *See* Dept. Br. 25. Similarly, then-Judge Alito in *Saxe* repeatedly looked to *Davis* as providing a First-Amendment-compliant harassment definition. *Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 210–11, 217 (3d Cir. 2001). In line with those cases, the Rule's definition suffers from unconstitutional overbreadth.

Exacerbating overbreadth, the Rule fails to limit its reach to on-campus or closely tied activities. *Contra* Dept. Br. 29. The harassment standard can sweep in

online activities and even conduct occurring outside the country. *See* 89 Fed. Reg. 33,532. The Rule only restricts its application to "conduct that is subject to the recipient's disciplinary authority." 89 Fed. Reg. at 33,886. But a school may always discipline a current student or employee, so the Department's limitation is no limitation at all. The Rule "include[s] all the speech a student utters during the full 24-hour day." *Mahanoy Area Sch. Dist. v. B.L.*, 594 U.S. 180, 189 (2021). Yet speech "not expressly and specifically directed at the school" is "almost always beyond" regulation. *Tennessee I*, 2024 WL 3019146, at *26. The Rule unconstitutionally requires recipients to police protected speech at all times and in all places.

As to vagueness, the Department relies on its ipse dixit that its broader standard lists "specific and required elements." Dept. Br. 30 (quoting 89 Fed. Reg. at 33,506). Asserting that doesn't make it so. What the elements condone and restrict is unclear. For example, it is cold comfort that the Rule "simply requires a complainant to 'demonstrate *some impact* on their ability to participate or benefit from the education program or activity.'" Dept. Br. 31 (quoting 89 Fed. Reg. at 33,511) (emphasis added). "[S]ome impact" has no limiting principle. As the Department concedes, the Rule "does not specify any particular limits or denials." *Id.* Schools will have to investigate complaints for minor incidents or comments that would be best handled within the classroom. *But see Davis*, 526 U.S. at 651–52 (hostile-environment harassment liability doesn't extend to "insults, banter, [and] teasing…that [are] upsetting to the students subjected to it").

The Department brushes off the Rule's failure to clarify what it means by undefined concepts, claiming "gender identity" needs no definition because it "is now well understood." Dept. Br. 31 (quoting 89 Fed. Reg. at 33,809). But gender identity is "a capacious concept." *Parents Defending Educ. v. Linn Mar Cmty. Sch. Dist.*, 83 F.4th 658, 669 (8th Cir. 2023). It encompasses a limitless array of

identities, all of which could trigger Title IX liability under the Rule. *E.g.*, 89 Fed. Reg. at 33,803 ("[T]he Department uses the term 'LGBTQI+' as shorthand to describe students who are lesbian, gay, bisexual, transgender, queer, questioning, asexual, intersex, nonbinary, or describe their sex characteristics, sexual orientation, or gender identity in another similar way." (cleaned up)). Thus, the term "gender identity" "offers no guidance whatsoever. Arguably worse, it suggests that this term of vital importance can be subjectively defined by each and every individual…." *Tennessee I*, 2024 WL 3019146, at *24.

To justify its new standard, the Department suggests that courts have "upheld" similar definitions of harassment under Title VII. Dept. Br. 25, 28 (citing inter alia *Harris v. Forklift Sys., Inc.*, 510 U.S. 17 (1993)). But *Harris* didn't involve a First Amendment claim, so it could not establish precedent on that issue. *See Cooper Indus.*, 543 U.S. at 170. And Fifth Circuit precedent *does* establish that the Title VII standard can run afoul of the First Amendment: "Where pure expression is involved, Title VII steers into the territory of the First Amendment. It is no use to deny or minimize this problem because, when Title VII is applied to sexual harassment claims founded solely on verbal insults, pictorial or literary matter, the statute imposes content-based, viewpoint-discriminatory restrictions on speech." *DeAngelis v. El Paso Mun. Police Officers Ass'n*, 51 F.3d 591, 596–97 (5th Cir. 1995); *accord Yelling v. St. Vincent's Health Sys.*, 82 F.4th 1329, 1344 (11th Cir. 2023) (Brasher, J., concurring).

What's more, the Department previously recognized the constitutional problems with mechanically applying Title VII standards to Title IX. In 2020, the Department did "not wish to apply the same definition of actionable sexual harassment under Title VII to Title IX because such an application would equate workplaces with educational environments, whereas both the Supreme Court and Congress have noted the unique differences of educational environments from

workplaces and the importance of respecting the unique nature and purpose of educational environments." 85 Fed. Reg. at 30,037. Thus, "applying the same definition of actionable sexual harassment under Title VII to Title IX may continue to cause recipients to chill and infringe upon the First Amendment freedoms of students, teachers, and faculty by broadening the scope of prohibited speech and expression." *Id.* The Department got it right in 2020, and its change of position further shows the definition is arbitrary and capricious. *Infra* Part III.

### C. The elimination of the actual knowledge requirement, the self-initiation duty, and the gag-order mandate all violate the statute and First Amendment.

The Rule's elimination of the actual knowledge or deliberate indifference requirement, the self-initiation duty, and the gag-order requirement are all unlawful. Pl. Mem. 29–32.

The Department doesn't substantively address Carroll ISD's argument that eliminating the actual knowledge or deliberate indifference requirement for sex discrimination violates Title IX. *Id.* at 31. Contrary to the Department's assertion that Carroll's position lacks caselaw support, Carroll cited the Department's own reasoning in 2020, based on the Supreme Court's decisions in *Gesber* and *Davis. Id.* (citing 85 Fed. Reg. at 30,038). And that caselaw shows—as the Department recognized in 2020—that Title IX focuses on the recipient's liability. 85 Fed. Reg. at 30,038. A recipient can't be liable for discrimination it doesn't know about or wasn't deliberately indifferent to.

The elimination of that requirement coupled with the Title IX coordinator's power to self-initiate complaints requires Carroll ISD to investigate claims of even single instances of protected speech or rumors about alleged conduct. Pl. Mem. 29. The Department claims it provides guidance on when to initiate such complaints, but—as in other parts of the Rule—the guidance doesn't limit the application.

*Contra* Dept. Br. 32–33. The Rule requires recipients to make the "fact-specific determination" of "the risk of additional sex discrimination if a complaint is not initiated." Dept. Br. 33 (citing 89 Fed. Reg. at 33,594); *accord* Order I at 5 (Defendants' counsel "evaded … hypotheticals by describing application of the Final Rule as 'a deeply intensive factual inquiry.'" (citing MPI Tr. 30)). That's the problem. The recipient must "end" sex discrimination, so it must investigate—and censor—protected speech. Pl. Mem. 29–30.

As the Department recognized in 2020, the gag-order requirement "impose[s] prior restraints on students' and employees' ability to discuss … the allegations under investigation." 85 Fed. Reg. at 30,295. And those gag orders would prevent the parties—either complainants or respondents—from discussing perceived shortcomings or seeking assistance in the grievance process. *Id.* The Department cannot now claim that the Rule doesn't impose such a prior restraint. *Contra* Dept. Br. 33.

The Department doesn't—and cannot—dispute that courts presume such prior restraints unconstitutional. *See* Pl. Mem. 30. Instead, the Department claims it provides adequate "safeguards" on these restraints, such as preserving parties' ability to gather evidence. Dept. Br. 34. The Department misapprehends what safeguards prior restraints require. They demand both substantive and procedural protections to ensure they survive strict scrutiny and allow the person gagged to challenge their imposition. *See Univ. Amusement Co. v. Vance*, 587 F.2d 159, 168–69 (5th Cir. 1978). The Department cannot show narrow tailoring. As it previously acknowledged, the gag-order requirement prohibits parties from discussing the grievance proceeding with "friend[s], or other source[s] of emotional support, or with an advocacy organization" throughout the "stressful, difficult to navigate, and distressing" process. 85 Fed. Reg. at 30,295. Nor do the Department's "safeguards" protect procedural rights, akin to the protections against restraining orders or

injunctions against speech. Those procedural protections include time-limited gag orders followed by prompt judicial review. *Univ. Amusement*, 587 F.3d at 169; *see, e.g.*, Tex. Fam. Code §§ 81.009, 83.001, 83.002 (requiring a finding of "clear and present danger of family violence" before issuing an ex parte protective order, limiting duration of such an order to 20 days, and allowing for appeal). The Rule's gag-order requirement offers none of those protections and thus is unconstitutional.

### III.   The Rule is arbitrary and capricious.

It is unlawful for an agency to "depart from a prior policy *sub silentio*." *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). The Department's prior interpretation of *Bostock* required gender identity to supersede sex anywhere sex-based differentiation is lawful, including athletic programs and locker rooms. *See* Pl. Mem. 14–15. It does not matter whether this prior position ever "appear[ed]" in the Code of Federal Regulations," as the Department suggests (at 17). An agency must acknowledge a position change even if the original policy appeared outside the regulations. *See, e.g.*, *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 215, 222 (2016) (regulation failed to provide reasoned explanation for departing from position set out by the agency in an interpretive rule); *Fox Television*, 556 U.S. at 515 (change from agency practice not formally published or codified anywhere). Here, if the Department has backed off from applying *Bostock* to sports teams, restrooms, and showers, it fails to "display awareness that it is changing position." *Fox Television*, 556 U.S. at 517.

Carroll ISD has identified many other problems, too. *See* Pl. Mem. 7, 14–15, 20–22, 30–32. The Department's responses are unavailing. *First*, *Bostock* cannot apply to Title IX, so it was arbitrary and capricious for the Rule to enact a new definition of "sex-based discrimination" on that basis. *See supra* Section I.A. Carroll ISD also discussed Title IX's many provisions providing for comparable treatment

of men and women "as groups"—one of the characteristics the *Bostock* Court said was absent from Title VII. *See* Pl. Mem. 10–11. The Department does not even acknowledge this significant difference between the two statutes.

*Second*, the Department insists—without analysis—that the Rule does not "redefine sex discrimination, elevate new protected classes, or encompass characteristics that have nothing to do with sex." Dept. Br. 16. The first claim is puzzling—providing a new definition of "sex-based discrimination" is exactly what § 106.10 does. *See Louisiana II*, 144 S. Ct. at 2510. And this Court has recognized that § 106.10's definition in fact elevates "gender identity" and other attributes above "sex." Order I at 10–11. That improperly provides additional levels of coverage, or, put another way, creates new protected classes.

*Third*, the Department argues it was "not unreasonable" to "declin[e] to address contexts involving sex separation in § 106.10." Dept. Br. 16. As Carroll ISD has explained, the new definition cannot help but put males in girls' sex-specific spaces and programs. Pl. Mem. 12. The two provisions (§ 106.10 and § 106.31(a)(2) are intertwined. More than that, the Rule left in place longstanding provisions allowing sex-based distinctions. The Department cannot legitimately ignore how § 106.10 would impact those regulations. That is particularly important because the Department insists that § 106.10 is severable from § 106.31(a)(2), and thus might go into effect on its own. *See* Dept. Br. 48. If every provision is severable from every other, then the agency must consider and explain how every provision interacts with every other provision, with and without others.

In defense of the bizarre exemptions from § 106.31(a)(2)'s new form of discrimination, the Department repeats the Rule's theory that "toilet, locker room, and shower facilities" are not "living facilities." *See* Dept. Br. 18. But it gives no reasoned justification for respecting privacy in dormitory showers but not the showers in the girls' gym. And if these private facilities are not "living facilities,"

then the Department has no explanation for allowing these sex-based distinctions in the first place. *See supra* Section I.A.

*Fourth*, the Department ignores the problem in claiming that the Rule adequately considered privacy and reliance interests. Dept. Br. 22–24. Rather than account for the traditional and constitutionally protected privacy interests the Rule threatens, the Rule says these are *not* "*legitimate*," and thus ignores them. 89 Fed. Reg. at 33,820 (emphasis added); *see supra* Section I.B.2. From there, it assumes schools, too, will ignore the supposedly illegitimate privacy concerns of parents and young girls, and thus will not have to convert to single-user facilities to protect privacy for all. Dept. Br. 21. With those moves, the Department avoids the "significant cost implications" of complying with the Rule while still protecting privacy. *Id.* All of that is arbitrary and capricious.

So too is the Rule's refusal to acknowledge the logical failure of its interpretation as applied to anyone who identifies as "nonbinary"—that, too, would require significant change. *Contra* Dept. Br. 21. For all its insistence that schools are free to "coordinate with" students and parents, 89 Fed. Reg. at 33,818, the Department has already said it thinks requiring a student to use a single-user facility or one aligned with the student's sex, but not gender identity, is discriminatory. *See Adams ex rel. Kasper Sch. Bd. of St. John's Cnty.*, 57 F.4th 791, 811–17 (11th Cir. 2022) (en banc) (rejecting the Government's argument about school bathrooms). And the Department explicitly declined to "specify how a recipient must provide access to sex-separate facilities for students who do not identify as male or female." 89 Fed. Reg. at 33,818. That leaves recipients with no guidance as to what the Department expects with regard to nonbinary students.

*Fifth*, Carroll ISD explained why the Rule will impact interscholastic and intercollegiate athletics. Pl. Mem. 23–24. The Department offers no rejoinder to this textual analysis. It may have saved § 106.41(b)'s revision for a separate

rulemaking, but it cannot deny that its new definition changes § 106.41(a)'s meaning and applies throughout the regulations. *See* Dept. Br. 17 n.4. It is arbitrary and capricious to refuse to acknowledge this problem or address its implications.

Sixth, the Department offers no reasoned explanation for departing from the 2020 regulations' harassment definition, actual knowledge or deliberate indifference requirement, and rejection of the self-initiation duty and gag-order mandate. Pl. Mem. 30–32. At that time, the Department promulgated its regulations after carefully considering the First Amendment. *Id.* Now, it claims—after adopting the provisions it explicitly rejected in 2020—that its Rule doesn't implicate the First Amendment at all. *See supra* Part II. That defines arbitrary and capricious.

## IV.   Claim splitting is immaterial.

This Court has already rejected the Department's claim-splitting defense. Order I at 3. That argument fares no better now. The rule against claim splitting "prohibits a party or parties in privity from simultaneously prosecuting multiple suits involving the same subject matter against the same defendants." *Gen. Land Off. v. Biden*, 71 F.4th 264, 269–70 (5th Cir. 2023). But "[p]rivity is not established by the mere fact that persons may be interested in the same question or in proving the same set of facts." *Id.* at 270 (cleaned up). Privity cannot exist unless one party's interests are "adequately represented by a party to the original suit." *Id.*

Texas cannot adequately represent Carroll ISD. *Contra* Dept. Br. 10. An independent school district is not a "state agency" represented by the Attorney General. A Texas school district is an independently incorporated body. *See* Tex. Educ. Code ch. 11. A school district's board of trustees—not the state—"ha[s] the exclusive power and duty to govern and oversee the management of the public schools of the district." Tex. Educ. Code § 11.151(b). That includes responsibility for

bringing suit when necessary to protect the district's rights and interests. *See id.* § 11.151(a). If the state wishes to take direct control of an independent school district's governance, it must first replace the independently elected board of trustees with a conservator or board of managers. *See Tex. Educ. Agency v. Houston ISD*, 660 S.W.3d 108, 115 (Tex. 2023). Nor does the Attorney General have authority to issue orders to school districts. If he believes an ISD is violating the law, he must bring an enforcement lawsuit and obtain a court order. *See, e.g., Texas v. Davis*, No. 429-01216-2024 (Tex. 429th Dist. Feb. 29, 2024).

A comparison of Carroll ISD's interests in this lawsuit to the interests raised by Texas in its lawsuit against the Rule shows the absence of privity. As relevant, Texas asserts its "sovereign interest in the power to create and enforce a legal code." *Texas v. United States*, 809 F.3d 134, 153 (5th Cir. 2015), *aff'd by an equally divided Ct.*, 579 U.S. 547 (2016) (cleaned up); Am. Compl., ¶ 160, *Texas v. United States*, 2:24-cv-86-Z (N.D. Tex. Apr. 29, 2024), ECF No. 12. That includes the State's interest in all the Texas laws that the Rule purports to preempt, including policies adopted by school districts as well as statutes like the women's sports protection enacted by the Texas Legislature. *See* Tex. Educ. Code § 33.0834.

Carroll ISD's interest is different. The Rule directly regulates Carroll by requiring it to rescind or amend existing policies and compelling it to adopt others. Pl. Mem. 6–7. Having to do so directly injures Carroll ISD because the school district will have to enact policies that it does not want and that will disserve its students and employees. *See id.* And whether Carroll ISD spends resources complying with the Rule or loses federal funds for failure to do so, it will suffer a pocketbook injury. *See id.* at 7. The State of Texas will not suffer that same pocketbook injury if the Rule goes into effect.

The Department's arguments in the *Texas* case highlight why no privity exists and why claim splitting can't apply. There, the Department asserted that

Texas lacks standing to challenge "grievance procedures" including the self-initiation duty, because "[n]o Plaintiff is a student potentially subject to grievance procedures." Defs.' Br. in Supp. of Resp. 32–35, *Texas*, 2:24-cv-86-Z (N.D. Tex. Apr. 29, 2024) (ECF No. 41). The Department made no such argument in this case, and for good reason. Carroll ISD does have the obligation to self-initiate complaints. *Supra* Section II.C. Additionally, Carroll ISD challenges Rule provisions that Texas doesn't, like the gag-order requirement and elimination of the actual knowledge or deliberate indifference requirement. *See* Defs.' Br. 32–35, *Texas*, 2:24-cv-86-Z. The Department is correct that the Amarillo Court found jurisdiction at the preliminary stage. Dept. Br. 9. But it can raise jurisdictional defenses at any point in the proceeding (as it attempts to do here). *See* Fed. R. Civ. P. 12(h). And the Department's jurisdictional defense shows both that Carroll ISD and Texas lack privity and that their interests and claims do not completely overlap. *See* Order I at 3. Finally, any claim-splitting issue requires consolidation, rather than dismissal. *Gen. Land Off.*, 71 F.4th at 271 n.9.[3]

## V.   The Court should vacate the Rule or enjoin Defendants.

The Rule is unlawful—it misinterprets the statutory text, exceeds constitutional requirements, and is arbitrary and capricious. The Court should vacate it for all these reasons. And because the core unlawful provisions are inextricable from the rest of the Rule, this Court should vacate the entire Rule. In the alternative, the Court should enjoin Defendants from enforcing the Rule.

### A.   The Department offers no good reason why vacatur—the default remedy under the APA—shouldn't apply.

Agency action found contrary to law is to be "h[e]ld unlawful and set aside," or vacated. 5 U.S.C. § 706. That means "the federal court vacates th[e agency's]

---

[3] As previously stated, Carroll ISD does not object to this Court dismissing Counts 5 and 6 of its Complaint without prejudice. *See* Pl. MSJ 1, ECF No. 58.

order—in much the same way that an appellate court vacates the judgment of a trial court." *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 144 S. Ct. 2440, 2462 (2024) (Kavanaugh, J., concurring). Once vacated, it's "treated as though it had never happened." *Griffin v. HM Fla.-ORL, LLC*, 144 S. Ct. 1, 2 n.1 (2023) (Kavanaugh, J., statement respecting denial of application).

To avoid that fate here, the Department first contends that "the APA does not provide for universal vacatur as a remedy." Dept. Br. 38. But as the Department then concedes, that argument contradicts binding Fifth Circuit precedent. Dept. Br. 38 (citing *Texas Med. Ass'n v. U.S. Dep't of Health & Hum. Servs.*, 110 F.4th 762, 779 (5th Cir. 2024)). It also contravenes persuasive authority, *e.g.*, *Corner Post*, 144 S. Ct. at 2462 (Kavanaugh, J., concurring), so it can easily be dismissed. *E.g., Regents*, 591 U.S. at 9 (holding that the unlawful agency action must "be vacated"). The federal government's novel reading ignores decades of practice and Congress's understanding of administrative review. *See* Ronald M. Levin, *Vacatur, Nationwide Injunctions, and the Evolving APA*, 98 Notre Dame L. Rev. 1997, 2016–17 (2023). As long understood, the APA "empower[s] the judiciary to act directly against the challenged agency action." *Griffin*, 144 S. Ct. at 2 n.1 (Kavanaugh, J.). That means vacating agency action found contrary to law. *See Corner Post*, 144 S. Ct. at 2462 (Kavanaugh, J., concurring).

Next, the Department suggests remand without vacatur. Dept. Br. 39 & n.10. But again, under binding Fifth Circuit precedent vacatur is the "default" remedy. *Data Mktg. P'ship, LP v. U.S. Dep't of Lab.*, 45 F.4th 846, 859 (5th Cir. 2022). In "rare cases," a court will remand without vacatur when indicated by two factors: "(1) the seriousness of the deficiencies of the action, that is, how likely it is the agency will be able to justify its decision on remand; and (2) the disruptive consequences of vacatur." *Texas*, 2024 WL 3658767, at *45. Neither applies here.

Remand without vacatur is "inappropriate for situations"—like here—in which the court has found a defect that cannot possibly be repaired, such as a flat legal prohibition on the agency's chosen policy." Levin, *supra*, at 2022. Here, further explanation will not stretch "discrimination … on the basis of sex" to include "sex characteristics" or "preventing a person from participating consistent with their [sic] gender identity." *See Texas*, 2024 WL 3658767, at *46. The text does not mean that, and (unless Congress amends Title IX), it never will, whatever an agency might say. Similarly, the Department considered and rejected its previous definition of hostile-environment harassment. *Supra* Sections II.A–B. It knew about the constitutional infirmities of its current definition but proceeded nonetheless. Finally, the Department has not shown it could remedy the Rule's procedural defects and still reach the Rule's conclusions. The agency cannot explain its deficiencies.

As to disruption, the Department points to "states where [the Rule] has not been enjoined." Dept. Br. 39. But it then goes on to note that many of those states already have policies or laws just like the Rule. *Id.* at 41–42. Vacating the Rule would not prevent schools in those states from maintaining existing policies and practices so long as they comply with Title IX and its existing regulations. If the Rule has engendered policies that do *not* comply, "disruption" is required. Such schools must change their policies, not continue violating Title IX under cover of a Rule already found contrary to law. Remand without vacatur would be improper.

The Department next asks that the Court issue only *in personam* remedies because these can "provide sufficient relief" and be "tailored." Dept. Br. 39–40. To start, Carroll ISD agrees with the Department's implicit concession that under binding precedent vacatur is "not party-restricted." *Career Colls. & Sch. of Tex. v. U.S. Dep't of Educ.*, 98 F.4th 220, 255 (5th Cir. 2024). But that is no reason to eschew vacatur.

*First*, vacatur is "the only statutorily prescribed remedy for a successful APA challenge to a regulation." *Franciscan All., Inc. v. Becerra*, 47 F.4th 368, 374–75 (5th Cir. 2022). It is "the default rule," *All. for Hippocratic Med. v. U.S. Food & Drug Admin.*, 78 F.4th 210, 255 (5th Cir. 2023), *rev'd for lack of jurisdiction*, 602 U.S. 367 (2024), and this case is not exceptional. The Department's regulations must be "uniformly applied and enforced throughout the 50 States," 20 U.S.C. § 1232(c), and it would be absurd to enforce a patchwork of different regulations in schools across the country. Title IX is a circumstance where regulations must be uniform, or administration will be incoherent. *Cf.* Levin, *supra*, at 2005–06. Relief to only one school district would create a confusing patchwork of regulations. *Id.* at 2005.

*Second*, agencies cannot legitimately act unlawfully as to anyone. *See* Mila Sohoni, *The Power to Vacate a Rule*, 88 Geo. Wash. L. Rev. 1121, 1131 (2020); *see, e.g.*, Order Modifying Stay, *Texas v. Becerra*, No. 6:24-cv-00211-JDK, (N.D. Tex. Aug. 30, 2024) (ECF 41). "An agency, after all, literally has no power to act—including under its regulations—unless and until Congress authorizes it to do so by statute." *F.E.C. v. Cruz*, 596 U.S. 289, 301 (2022) (cleaned up). Unlike an action *in personam*, judicial review of rules under the APA is not aimed at setting the relationship between parties, but at ending unlawful agency action. *Cf.* Levin, *supra*, at 2004. That explains why plaintiffs don't have to show irreparable harm or the balance of interests to obtain vacatur of an unlawful rule. *See Braidwood Mgmt., Inc. v. Becerra*, 104 F.4th 930, 951 (5th Cir. 2024). The Rule is unlawful here, so it is unlawful everywhere.

*Third*, when an agency uses universal regulations, rather than individualized adjudications, it cannot claim surprise from relief that has a universal effect. *See Career Colls.*, 98 F.4th at 255 (agency's objections "are incoherent in light of its use of the Rule to prescribe uniform federal standards");

*accord Ams. for Beneficiary Choice v. U.S. Dep't of Health & Hum. Servs.*, No. 4:24-cv-00439-O, 2024 WL 3297527, at *7 (N.D. Tex. July 3, 2024).

The Department's "tailored" relief option would leave an unlawful Rule in place in broad swaths of the country, including states where Carroll ISD students will travel. Pl. Mem. 33. That is not an option. Whatever the "catalogued" challenges with "nationwide injunction[s]," Dept. Br. 40, in the APA context, *Congress* "empower[ed] the judiciary to act directly against the challenged agency action." *Griffin*, 144 S. Ct. at 2 n.1 (Kavanaugh, J.). Carrying out Congress's directive fulfills—not aggrandizes—a federal court's role.

Finally, any relief limited to Carroll ISD still leaves its students exposed when they travel to states like Oregon and California. Pl. Mem. 33. The Department argues that Carroll ISD doesn't have standing to protect its students. Dept. Br. 40. That's neither here nor there for vacatur. The vacatur remedy Congress enacted "is necessarily universal in scope." *Texas*, 2024 WL 3658767, at *47. Congress can appropriately define remedies. *See Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 329 (1999). And granting the remedies provided for by Congress doesn't violate Article III. In any event, Carroll ISD itself risks liability under Title IX if its students are harmed by sex discrimination on other campuses or in another state, and being forced to forego such interscholastic opportunities is itself a concrete injury to the district, not just to its individual students. *See infra* Section V.C.

### B.    The Court should vacate the entire Rule.

The Department has not shown its Rule is severable, so the Court should vacate it entirely. Severability asks whether a rule can function as intended without the challenged portions. *Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 685 (1987). Sections 106.2, 106.10, and 106.31(a)(2) are central to the Rule's

functioning, and the Department cannot show that a severed Rule would be workable.

The Rule's severability clauses do not meaningfully establish that the Rule can function without the challenged provisions. *United States v. Jackson*, 390 U.S. 570, 585 n.27 (1968). As the Sixth Circuit noted, the Department "did not contemplate enforcement of the Rule without *any* of the core provisions." *Tennessee v. Cardona*, No. 25-5588, 2024 WL 3453880, at *4 (6th Cir. July 17, 2024) (*Tennessee II*). And there is no "suggestion that the cost-benefit analyses underlying the Rule contemplated the idea of allowing these provisions to go into effect with a different definition of sex discrimination." *Id.*; *accord Alabama*, 2024 WL 3981994, at *8. The Department's efforts to contest this conclusion by pointing, for example, to some modifications to the grievance process and retaining records fall short. Dept. Br. 48. That's for the same reason the Rule is non-severable—the challenged provisions are the backbone of the Rule, which operates as a unit. The Rule itself links its "purpose" to the gender-identity mandate and new harassment definition and traces the "[n]eed for [r]egulatory [a]ction" to eliminating gender-identity discrimination. 89 Fed. Reg. at 33,476, 33,859–60. "[S]ubstantial doubt" exists that the Department would have adopted the Rule "without the" gender-identity mandate. *See Mayor of Balt. v. Azar*, 973 F.3d 258, 292–93 (4th Cir. 2020).

Carroll ISD challenges more than just § 106.10's inclusion of gender identity. *Contra* Dept. Br. 48. Section 1681(a) does not encompass "sex characteristics" or "sex stereotypes" any more than gender identity—each of the listed characteristics is a distinct thing from "sex." "[R]ecognizing and respecting biological sex differences does not amount to stereotyping." *Tennessee I*, 2024 WL 3019146, at *11. But, under its gender ideology, the Department considers claims that "there are only two genders" to be proscribable harassment under § 106.10.

34

Finally, the Department argues that the Rule's *Bostock* logic can be severed. Br. 48–49. But extending *Bostock* to Title IX is the backbone of the Rule. As the Rule notes, it sprang from President Biden's direction "to review [the Department's] regulations implementing Title IX" as they pertain to "Gender Identity." 89 Fed. Reg. at 33,859 & nn.105–06; *accord* Order I at 13 (The Department took "more than three years to apply *Bostock* to Title IX, as instructed by President Biden."). And the Department fails to "adequately identif[y] which particular provisions, if any, are sufficiently independent of the enjoined definitional provision and thus might be able to remain in effect" absent the application of *Bostock*'s logic. *Louisiana II*, 144 S. Ct. at 2510. That is because the Rule operates as a unified whole.

### C.    Carroll ISD also merits equitable relief.

Along with vacating the Rule, the Court should issue declaratory relief. *See Texas*, 2024 WL 3658767, at *47–48. And, in the alternative to vacatur, it should issue an injunction enjoining Defendants from enforcing the Rule and the Department's unlawful interpretations of Title IX. Pl. Mem. 32.

A permanent injunction is proper when the plaintiff prevails on the merits, has no adequate legal remedy for its injury, the balance of harms is in its favor, and an injunction would serve the public interest. *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). Carroll ISD meets each requirement, as this Court recognized when granting preliminary relief. *See* Order I.

The Department ignores the irreparable injury Carroll ISD will suffer from having to repeal its policies protecting sex-specific spaces and First Amendment rights. *See* Dept. Br. 44–45; Pl. Mem. 32; *see also Career Colls*, 98 F.4th at 235 (irreparable injury includes "necessary alterations in operating procedures"). Instead, it disputes whether the compliance costs caused by the Rule flow from its unlawful provisions, even though the Department itself estimated those costs on

35

recipients like Carroll ISD. *See* Dept. Br. 44–45. That again ignores that the challenged provisions lie "at the heart of the 423-page Rule." *Louisiana I*, 2024 WL 3452887, at *1. The point was to insert gender identity into Title IX. And, as the record shows, that addition will require Carroll ISD to review the Rule, train staff on it (as mandated by the Rule itself), and repeal its policies. Pl. MSJ App.5–6, ECF No. 60. As this Court has already recognized, those compliance costs inflict irreparable injury. Order I at 11–12.

The Department's claimed interest in enforcing the Rule "is illegitimate, because the federal government has no interest in enforcing an unlawful law or agency action." *Texas*, 2024 WL 3658767, at *49 (cleaned up). The Court will aid the public interest by enjoining the unlawful agency action which contravenes "an Act[ ] of Congress that serve[s] and protect[s] the people of all States." *Contra* Dept. Br. 45. "The public interest is served when administrative agencies comply with their obligations under the APA." *Texas*, 2024 WL 3658767, at *49. Barring the Department from yet again imposing gender ideology on the nation's schools is necessary to *prevent* the sex-based discrimination—and attendant harms—that Title IX was enacted to address. *See* Order I at 7. And Carroll ISD—like all other recipients—"will continue to apply Title IX in the same manner" as it has been understood "for over 50 years." *Id.* at 13.

An injunction limited to Carroll ISD would not provide it full relief. *Contra* Dept. Br. 40. The Department's standing argument misses the mark. *See id.* Both Title IX and the Department provide expansive definitions of an "education program or activity" that triggers a recipient's obligations. *See* 20 U.S.C. § 1681(a). It extends to "all of the operations of" Carroll ISD, including extracurricular activities. *See id.* § 1687; 34 C.F.R. § 106.2. And the Rule's § 106.11 attempts to "remove many geographical limitations on a recipient's responsibilities under Title IX." 89 Fed. Reg. at 33,528. So when Carroll ISD students travel for school-

36

sponsored activities, they remain part of the district's "program or activity." An injunction limited to Carroll ISD will not protect its traveling students (who—by definition—remain within its "program or activity") from sharing sex-designated places with members of the opposite sex, from competing against students of the opposite sex, or from overbroad speech codes. *See* Pl. Mem. 33. Recipients in states like California and Oregon must still apply the Rule. That means Carroll ISD's programs and activities (and its traveling students and staff) remain subject to the Rule's unlawful mandates without a broader injunction.

Neither can the Department object to such harms as "speculative" or not redressable. *Contra* Dept. Br. 41. The Rule allows gender identity to control access to sex-designated facilities. *See* Order I at 10–11. And with an estimated 300,000 transgender-identifying students nationwide, *id.* at 10 n.37, the Department cannot dismiss as "speculative" the risk of encountering a student of the opposite sex in a sex-designated facility. That's the very result the Rule seeks to effect. Finally, regardless of state law, partial redressability suffices, and an injunction against Defendants would accomplish at least that. Pl. Mem. 33.

## CONCLUSION

Carroll ISD respectfully requests that the Court grant its motion for summary judgment, vacate or permanently enjoin the Rule, issue declaratory relief, and enter judgment as a matter of law in its favor.

Respectfully submitted this 16th day of September, 2024.


**Tim Davis**
Texas Bar No. 24086142
**Allison Allman**
Texas Bar No. 24094023
**Trevor Paul**
Texas Bar No. 24133388
**JACKSON WALKER LLP**
777 Main Street, Suite 2100
Fort Worth, Texas 76102
Telephone: (817) 334-7200
tdavis@jw.com
aallman@jw.com
tpaul@jw.com


**Jonathan A. Scruggs\***
Arizona Bar No. 030505
**ALLIANCE DEFENDING FREEDOM**
15100 N. 90th Street
Scottsdale, Arizona 85260
Telephone: (480) 444-0020
Facsimile: (480) 444-0028
jscruggs@ADFLegal.org

/s/ *Mathew W. Hoffmann*

**Tyson C. Langhofer\***
Virginia Bar No. 95204
**Mathew W. Hoffmann\***
Virginia Bar No. 100102
**ALLIANCE DEFENDING FREEDOM**
44180 Riverside Pkwy
Lansdowne, Virginia 20176
Telephone: (571) 707-4655
Facsimile: (571) 707-4656
tlanghofer@ADFlegal.org
mhoffmann@ADFlegal.org


**Natalie D. Thompson\*\***
Texas Bar No. 24088529
**ALLIANCE DEFENDING FREEDOM**
440 First Street NW, Suite 600
Washington, DC 20001
Telephone: (202) 393-8690
Facsimile: (202) 347-3622
nthompson@ADFlegal.org


**Counsel for Plaintiff Carroll ISD**

\**Admitted pro hac vice*

\*\**Practice supervised by one or more D.C. Bar members while D.C. Bar application is pending.*

38

## CERTIFICATE OF SERVICE

I hereby certify that on September 16, 2024, a copy of this document was filed with the Clerk of Court using the CM/ECF system. I further certify that this document was served using the CM/ECF system on all counsel of record.


*/s/ Mathew W. Hoffmann*
Mathew W. Hoffmann
*Counsel for Plaintiff Carroll ISD*