IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORTH WORTH DIVISON

| | |
|---|---|
| CARROLL INDEPENDENT SCHOOL DISTRICT, <br><br> Plaintiff, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF EDUCATION, et al., <br><br> Defendants, <br><br> and <br><br> A BETTER BALANCE, <br><br> [Proposed] Intervenor-Defendant. | Case No. 4:24-00461-O |

## DECLARATION OF KATHERINE GREENBERG

I, Katherine Greenberg, declare under penalty of perjury that the following is true and correct, and state:

1. I am the Director of Strategic Litigation at A Better Balance. I have served in this role since 2022.

2. A Better Balance is a national nonprofit legal advocacy organization dedicated to advocating for pregnant, parenting, and caregiving workers and students. We work to protect the rights of these workers and students through legislative advocacy, direct legal services, and strategic litigation, among other avenues.

3. A Better Balance has played a leading role in advocating for dozens of laws and policies. For a decade, we advocated for the federal Pregnant Workers Fairness Act, which passed

with bipartisan support in 2022. The PWFA strengthened critical legal protections for pregnant and postpartum workers nationwide. We played a leading role in passing the federal PUMP for Nursing Mothers Act. And, by working with legislators and fellow advocates across the nation, we have helped pass a wealth of state and local policies, including paid family and medical leave programs in seventeen states and paid sick time policies in sixteen states and dozens of jurisdictions.

4.  We also advocated for the U.S. Department of Education to adopt protections for pregnant and postpartum students as part of its most recent Title IX rulemaking. As part of this effort, in 2022, we submitted two comments on the Department's proposed rule, one on behalf of A Better Balance alone and the other co-authored with allied advocacy organizations. *See* A Better Balance, Comment Letter on Proposed Rule Requiring Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance (Sept. 12, 2022), https://www.abetterbalance.org/wp-content/uploads/2022/09/A-Better-Balance-Comment-Re-ED-2021-OCR-0166.pdf; A Better Balance, et al., Comment Letter on Proposed Rule Requiring Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance (Sept. 12, 2022), https://www.abetterbalance.org/resources/comment-on-title-ix-from-coalition-of-advocates-for-pregnant-and-parenting-students/. The final regulation incorporated some of our recommendations, such as listing specific examples of reasonable modifications pregnant and postpartum students can access, including tutoring.

5.  We also engage in litigation on behalf of pregnant, parenting, and caregiving workers and students. For example, we recently filed a Title IX lawsuit on behalf of a student-plaintiff who experienced pregnancy discrimination at a New York City public school. *See N.S. v. New York City Dep't of Educ.*, No. 1:25-cv-00649 (S.D.N.Y.).

6. A significant portion of our legal work consists of counseling workers and students who contact us through our free legal helpline. As we explain on our website: "Our free and confidential legal helpline can help you understand your rights at work and at school around caring for yourself and your loved ones. . . . We assist students nationwide facing issues at school . . . ." *See Get Help*, A Better Balance, https://www.abetterbalance.org/get-help/ (last visited Mar. 18, 2025) (emphasis removed).

7. We regularly receive helpline calls from pregnant and postpartum students who are facing discrimination at school. These calls come from students in states across the country. Most of these students are enrolled in colleges and universities, but some are K-12 students or students enrolled in vocational programs.

8. Our pregnant and postpartum callers, like other students across the country, face significant barriers to their educations. Some of our callers miss out on significant class time, struggle academically, or even leave school because their school will not provide them adequate accommodations for their pregnancy or the opportunity and space to lactate.

9. A significant part of my job is supervising staff who field helpline calls, including calls from students. After conducting an initial intake, staff will usually consult with me about the best information and guidance to give the student-caller.

10. The Title IX regulation at issue in this lawsuit includes significant protections for pregnant and postpartum students. *See* 34 C.F.R. § 106.40.

11. The challenged regulations explicitly and unambiguously grant pregnant and post-partum students a number of important rights. These include, among others, a right to lactation spaces and breaks, 34 C.F.R. §§ 106.40(b)(3)(ii), 106.40(b)(3)(v), and a right to other "reasonable modifications," such as larger desks, permission to eat, drink, or use the restroom; adjusted exam

dates; remote access to classes, and excused absences for prenatal care, 34 C.F.R. § 106.40(b)(3)(ii). The regulations also require schools to provide pregnant and postpartum students information about their Title IX rights and the contact information for the school's Title IX Coordinator, who can help them request and receive the support they need. 34 C.F.R. § 106.40(b)(2).

12. Although the regulation's effective date was August 1, 2024, the regulation was enjoined in most states, and for many schools in other states, before then.

13. Seventy-one percent of the calls we received from students between the effective date of the regulation and its nationwide vacatur were from students not protected by the regulation because they either lived in a state in which the regulation was enjoined (such as North Dakota, South Dakota, Florida, or Georgia) or attended a school for which the regulations were specifically enjoined by the U.S. District Court for the District of Kansas. The remaining calls were from students calling us regarding past discrimination they had experienced before the regulations went into effect.

14. The protections for pregnant and postpartum students contained in the challenged regulation would allow A Better Balance to more efficiently and effectively counsel students who call our helpline, deploying fewer resources with better results.

15. If the regulation's protections for pregnant and postpartum students were in effect, we could quickly point student-callers directly to portions of the regulation that unambiguously protect them from the discrimination they call us about, which they could then use to better understand their rights or advocate for themselves. In the absence of those regulations, we instead have to engage in fact-specific inquiries, conduct legal research, and develop creative theories to provide even basic legal information to student-callers. This process often requires research into alternative

4

enforcement options, including reviewing state and local laws that may supplement Title IX protections. It also often necessitates that I must hold additional meetings with the attorney fielding a student's call to review their findings and recommendations to determine how we can best inform the caller of their rights. These meetings and discussions would not be necessary with clearer regulations in effect. Sometimes, we also need to assist students through back-and-forth communications with their schools, which would likely be resolved more quickly, or avoided entirely, if the callers could benefit from the clarity of the 2024 regulation. All of this takes time and other resources.

16. For example, in the absence of the 2024 regulations, we must expend more resources to help students access modifications (sometimes also called "accommodations" or "adjustments") necessary for them to learn while caring for their pregnancies or recovering from childbirth.

17. We field calls from students across the country who need access to remote instruction or to reschedule an exam because of their pregnancies. Some students ask for these modifications and are denied. On at least one occasion, before the 2024 regulations became final, we spoke with a student who was required to log on to a routine school-required call about an upcoming examination from her hospital bed after giving birth.

18. We also counsel students who request remote instruction or rescheduled exam modifications but are told by their schools that they should instead take a leave of absence. Our callers nearly universally wish to remain in their programs rather than take leave from school, which often sets back their course completion tracks and graduation dates.

19. One student had a midterm exam scheduled on the same day as her due date, which she disclosed at the beginning of the quarter to both her teacher and her program director. The day

5

before the exam, her school called her to say that it would not reschedule the exam, and the student needed to take a leave of absence. Despite offering to take the exam in person or remotely on her due date, she was forced onto a leave of absence. This student called our helpline after the regulations were vacated nationwide. She lives in a state where, prior to that vacatur, the regulations were in effect.

20. Without the 2024 regulations, we often need to conduct extensive research into other state and local laws that may be more protective of pregnant students and offer them these modifications, since the right to reasonable modifications—let alone specifically identified reasonable modifications—was not clearly articulated in past Title IX regulations or law. We also often conduct in depth follow up calls with these student-callers to determine if they have pregnancy-related disabilities or medical conditions that would elevate their pregnancy status to a level protected under federal, state, or local laws beyond Title IX—such as disability laws—granting them the right to rescheduled exams or remote instruction. Our best estimate is that we must spend an average of one to two additional hours per caller conducting legal research on state and local laws to assist student-callers seeking reasonable modifications expressly identified by the regulations—research we would not have to do if the regulations were in place.

21. Not only does this additional research and fact-gathering take significant staff time, but so do the extended conversations we then need to have with our callers regarding the nuances of these potential protections. Further, because the previous version of 34 C.F.R. § 106.40 provides less specific and clear rights to reasonable modifications than did the 2024 version, we sometimes need to spend additional hours helping a single caller navigate back-and-forth communications with a school concerning whether the earlier, vaguer regulation requires the accommodation in question—a back-and-forth process that the clarity of the 2024 regulation would avoid. And the

complexity and fact-intensive nature of these callers' inquiries also requires my supervision of our staff attorneys.

22. By contrast, if the 2024 regulation's protections for pregnant and postpartum students were in effect, these students would have explicit rights to both "access to online or homebound education" and "rescheduling of tests and examinations" as reasonable modifications. *See* 34 C.F.R. § 106.40(b)(3)(ii). As a result, some of these students would not need to seek our help at all. We could more quickly and easily counsel our remaining callers seeking accommodations of these kinds. And staff attorneys would not need to consult me for guidance on how to counsel callers, given the straightforward nature of the 2024 regulations' protections.

23. Our assistance to the student I mentioned in paragraph 19 provides one example of how the vacatur of the regulations makes it harder and more resource-intensive for us to assist students. If the regulations had not been vacated, we could have quickly assisted her, because we could have pointed her to the part of the regulation that defines an adjusted exam date as a reasonable accommodation, and she could have advocated for herself. Instead, we have had to expend hours of additional staff time to try to come up with arguments to help her rectify the discrimination she has experienced and re-enroll in school without the penalty imposed on students who return after a leave of absence. To date, we have not been successful; we are still trying.

24. Similarly, the provisions of the 2024 regulation would allow us to more efficiently and effectively counsel students seeking lactation accommodations.

25. A majority of students who call our legal helpline need access to lactation modifications, including lactation breaks and space. Too often, we hear from students who are denied these modifications and are forced to abandon their pumping schedules, which can result in a loss of milk supply.

26. For example, we received a call from a cosmetology student who was not allowed to pump without interruption if walk-in clients arrived. Had the student instead been an employee, she would have been entitled to pump. However, because the regulations were not yet in effect, her school told her that she could not be guaranteed uninterrupted lactation breaks without losing credits for the semester or making up the time through extra hours. The student lost a portion of her milk supply due to her inability to pump according to her needs.

27. Another student-caller requested access to a private, clean lactation space and to short breaks every few hours to pump, as necessary for her to avoid pain, leakage, and mastitis, a painful breast infection. Her school offered to allow her to pump in a "family room" with glass walls and no lock to pump, leaving her with no privacy. As a result, the student was forced to pump in a bathroom stall on more than one occasion. Her school never granted her requested schedule for breaks. Instead, the student had to seek permission for breaks directly from her instructor, who demanded that the student notify the instructor each time she needed to pump, and told the student that she was only allowed to pump on her designated lunch break. As a result, the student was not able to pump on a reasonable schedule, which caused her breasts to be too full of milk, a painful condition that resulted in milk leaking through her shirt. The 2024 regulations expressly require clean, private lactation spaces and define lactation breaks during class as a reasonable modification. But that student could not benefit from the regulations because she attended school before the regulations went into effect. Even if the student had attended school between August 2024 and January 2025, she would not have benefited from the regulations because she attended school in Mississippi, where the regulations were enjoined. And she was not entitled to any relevant protections under Mississippi law. Because of the Court's vacatur of the Rule, other students in similar situations will lack the protections of the regulation.

28. Without the lactation-related provisions in the 2024 regulations, we have to conduct legal research and craft creative arguments for why students should have access to lactation breaks and space to pump (which usually already exist for employees on campus), since no such right is clearly articulated in past Title IX regulations or law. This includes looking into other state and municipal laws that may provide additional protections, requiring individualized research and analysis. The complexity of this work also requires my supervision of the staff attorneys fielding these calls. Our best estimate is that we must spend an average of one to two additional hours per caller conducting legal research on state and local laws to assist student-callers seeking lactation accommodations—research we would not have to do if the regulations were in place. Further, because the previous version of 34 C.F.R. § 106.40 provides less specific and clear lactation-related rights than did the 2024 version, we sometimes need to spend additional hours helping a single caller navigate back-and-forth communications with a school concerning the correct interpretation of the earlier, vaguer regulation—a back-and-forth process that the clarity of the 2024 regulation would avoid.

29. If the 2024 regulations' protections for pregnant and postpartum students were in place, these students—and all our student-callers—would have an explicit right to take breaks to pump and to access a clean, private, non-bathroom lactation space. 34 C.F.R. §§ 106.40(b)(3)(ii), 106.40(b)(3)(v). This would reduce the need for our services and allow us to more efficiently and effectively counsel student-callers. Without consulting me, staff attorneys could quickly point callers to the part of the regulation that gives them the right to lactation breaks and spaces, and they could then advocate for themselves.

30. To provide one example: Shortly after the regulations were vacated nationwide, we received a call from a high school student seeking a private space to pump, among other

9

accommodations. If the 2024 regulations were in place, we could have easily provided this student and her family the provision that explicitly grants postpartum students access to a private space to pump, which should have been very convincing to her school. Instead, we have had to provide this student with advanced assistance, including communicating directly with her school district. Recently, the district's lawyer explicitly told our staff that, in the district's view, Title IX does not include a right to access to a private lactation space—a position that would be impossible if the current regulations were in effect. Rather than reaching a quick resolution that would have been possible if the regulations were in effect, we have had to spend more resources to engage in back-and-forth communications with the district and advocate for this student. To date, we are still working to ensure our client has consistent access to a private space so that she can express milk at school. This student lives in Indiana, which does not offer applicable state law protections.

31. Moreover, we currently spend time providing callers basic information about Title IX that, if the pregnancy-related parts of the 2024 regulation were in effect, students would instead receive from their schools.

32. We field calls from pregnant and postpartum students who do not know about the protections Title IX offers them or the accommodations or resources available to them at their schools. One student called our helpline because she was facing discrimination from her administrators after disclosing her pregnancy, including treatment that set back her graduation date. At no point after disclosing her pregnancy to her teachers and administrators was she told about Title IX. Our initial contact with this student was the first time she learned about Title IX and that the law could protect her.

33. Sometimes we also must search for contact information for a caller's school's designated Title IX Coordinator, because they do not know who to contact at school for support.

34. By contrast, if the 2024 regulations' protections for pregnant and postpartum students were in effect, once students disclosed their pregnancies, their teachers and administrators would be required to inform these students about Title IX and provide the contact information for their school's designated Title IX Coordinator. *See* 34 C.F.R. § 106.40(b)(2). The Title IX Coordinator would then be required to guide the student through a process to seek modifications and prevent discrimination. 34 C.F.R. § 106.40(b)(2). This would eliminate some callers' need for our services, freeing up resources to provide support to other callers.

35. Accordingly, in the absence of the regulations, we have to spend more time and other resources to counsel student-callers. If the regulations went into effect, we could use those resources in a number of ways. For example, we could provide full representation (including drafting demand letters, engaging in pre-suit negotiations, and filing administrative complaints and lawsuits) to more callers, rather than only providing them legal information so they can advocate for themselves. There are currently callers who we believe will only be able to protect their rights if a lawyer is representing them; helpline assistance will not be enough, and they are unlikely to be able to secure representation otherwise. But we do not have the capacity to offer that representation to these callers because of the extra time we spend assisting students over our helpline in the absence of the 2024 regulations. Additionally, if helpline calls from students did not require so much staff time, we could assist more callers on a greater variety of questions and in greater depth and we could engage in more public education.

36. Most of the students who call us seeking help likely achieve worse results because they cannot call on the 2024 regulations for protection. To ABB's knowledge and experience, institutions are more likely to provide pregnant, parenting, and caregiving individuals the protections and accommodations they need if those protections and accommodations are required by law. And

most of the students who call us have needs directly addressed by the 2024 regulations. In the absence of those regulations, we regularly hear from student-callers that, even with the legal information we provided them, they are unable to convince their schools to provide them the pregnancy-related accommodations or other support they need. I have described some of those students' experiences above, including in paragraphs 19, 27, and 30.

37.     As a result, the absence of the regulations not only makes our helpline work less efficient but also makes it less effective.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 24th day of March, 2025.

Katherine Greenberg