# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

CARROLL INDEPENDENT SCHOOL DISTRICT,

       *Plaintiff,*

   v.

UNITED STATES DEPARTMENT OF EDUCATION;
ET AL.,

       *Defendants.*

**Case No.** 4:24-cv-00461-O

# PLAINTIFF CARROLL INDEPENDENT SCHOOL DISTRICT'S COMBINED OPPOSITION TO MOTIONS TO INTERVENE

# CONTENTS

Table of Authorities ........................................................................................ ii

Introduction ................................................................................................... 1

Factual Background ....................................................................................... 1

I.     This Court preliminarily enjoined part of the Rule, the Fifth Circuit and
       Supreme Court preliminarily held the Rule nonseverable, and this Court
       vacated the Rule—all before any motion to intervene. ................................... 1

II.    ABB advocates for pregnant and parenting students but waited to intervene
       until one month after filing a similar motion in a related case. ...................... 3

III.   VRLC and Doe criticize the Court for vacating the Rule without hearing
       from them yet waited over one month to move to intervene after filing a
       similar motion. ............................................................................................ 6

Argument ....................................................................................................... 7

I.     Proposed Intervenors lack standing to intervene to appeal. ........................... 7

       A.     Proposed Intervenors cannot show actionable injury. ........................... 8

              1.     ABB and VRLC's frustration-of-mission and diversion-of-
                     resources theories collide with binding precedent. ...................... 8

              2.     ABB has no procedural injury. .................................................... 12

              3.     Jane Doe's theory of injury relies on speculation. ...................... 13

       B.     Proposed Intervenors have not shown causation. ................................ 14

       C.     Proposed Intervenors have not shown redressability. ......................... 16

II.    Proposed Intervenors haven't met their burden to intervene as of right. ...... 17

       A.     Proposed Intervenors' motions are not timely. ................................... 18

       B.     Proposed Intervenors assert only an ideological interest. ................... 24

III.   The Court should deny permissive intervention. ........................................... 25

Conclusion .................................................................................................... 25

Certificate of Service ................................................................................... 27

## TABLE OF AUTHORITIES

**<u>Cases</u>**

*Alabama v. United States Secretary of Education*,
  No. 24-12444, 2024 WL 3981994 (11th Cir. Aug. 22, 2024) ............................ 17, 19

*Association of Community Organizations for Reform Now v. Fowler*,
  178 F.3d 350 (5th Cir. 1999) ..................................................................................... 11

*Barber v. Bryant*,
  860 F.3d 345 (5th Cir. 2017) ....................................................................................... 8

*Cameron v. EMW Women's Surgical Center, P.S.C.*,
  595 U.S. 267 (2022) ................................................................................................... 23

*Ceres Gulf v. Cooper*,
  957 F.2d 1199 (5th Cir. 1992) ................................................................................... 23

*City of Houston v. American Traffic Solutions, Inc.*,
  668 F.3d 291 (5th Cir. 2012) ..................................................................................... 25

*Clapper v. Amnesty International USA*,
  568 U.S. 398 (2013) ............................................................................................. 13, 14

*DeOtte v. Azar*,
  332 F.R.D. 173 (N.D. Tex. 2019) ..................................................................... 7, 24, 25

*Department of Education v. Louisiana*,
  603 U.S. 866 (2024) ............................................................................................... 2, 19

*Diamond v. Charles*,
  476 U.S. 54 (1986) ....................................................................................................... 7

*Effjohn International Cruise Holdings, Inc. v. A&L Sales, Inc.*,
  346 F.3d 552 (5th Cir. 2003) ................................................................................. 18, 24

*Fair Housing Center of Metropolitan Detroit v. Singh Senior Living, LLC*,
  124 F.4th 990 (6th Cir. 2025 ..................................................................................... 8, 9

*FDA v. Alliance for Hippocratic Medicine*,
  602 U.S. 367 (2024) ......................................................... 8, 9, 10, 12, 13, 14, 17, 24

*Havens Realty Corp. v. Coleman*,
  455 U.S. 363 (1982) ................................................................................................... 8, 9

*Jansen v. City of Cincinnati*,
  904 F.2d 336 (6th Cir. 1990) ..................................................................................... 21

*Kansas v. United States. Department of Education,*
   739 F. Supp. 3d 902 (D. Kan. 2024)........................................................................... 17

*League of United Latin American Citizens, Council No. 4434 v. Clements,*
   884 F.2d 185 (5th Cir. 1989) ..................................................................................... 25

*Louisiana Fair Housing Action Center, Inc. v. Azalea Garden Properties, L.L.C.,*
   82 F.4th 345 (5th Cir. 2023) ........................................................................... 8, 9, 11

*Louisiana v. Haaland,*
   86 F.4th 663 (5th Cir. 2023) ....................................................................................... 7

*Louisiana v. United States Department of Education,*
   737 F. Supp. 3d 377 (W.D. La. 2024)......................................................................... 2

*Louisiana v. United States Department of Education,*
   No. 24-30399, 2024 WL 3452887 (5th Cir. July 17, 2024)................................. 2, 20

*Louisiana v. United States Department of Education,*
   No. 3:24-CV-00563, 2024 WL 3584382 (W.D. La. July 11, 2024)............................ 2

*N.A.A.C.P. v. City of Kyle,*
   626 F.3d 233 (5th Cir. 2010) ................................................................................. 9, 11

*OCA-Greater Houston v. Texas,*
   867 F.3d 604 (5th Cir. 2017) ..................................................................................... 11

*Preston v. Thompson,*
   589 F.2d 300 (7th Cir. 1978) ..................................................................................... 20

*Purl v. United States Department of Health & Human Services,*
   No. 2:24-CV-228-Z, Memorandum and Order (N.D. Tex. April 15, 2025) ............. 24

*Ross v. Marshall,*
   426 F.3d 745 (5th Cir. 2005) ..................................................................................... 18

*Rotstain v. Mendez,*
   986 F.3d 931 (5th Cir. 2021) ................................................................... 17, 18, 23, 25

*Shrimpers & Fishermen of RGV v. Texas Commission on Environmental Quality,*
   968 F.3d 419 (5th Cir. 2020) ..................................................................................... 13

*Sierra Club v. Babbitt,*
   995 F.2d 571 (5th Cir. 1993) ....................................................................................... 7

*Sierra Club v. Espy,*
   18 F.3d 1202 (5th Cir. 1994) ..................................................................................... 22

*Sprint Communications Co., L.P. v. APCC Services, Inc.,*
    554 U.S. 269 (2008) ................................................................... 17

*Stallworth v. Monsanto Co.,*
    558 F.2d 257 (5th Cir. 1977) .................................................... 18

*Summers v. Earth Island Institute,*
    555 U.S. 488 (2009) ................................................................. 13

*Swoboda v. Manders,*
    665 F. App'x 312 (5th Cir. 2016) ............................................. 23

*Taylor v. KeyCorp.,*
    680 F.3d 609 (6th Cir. 2012) .................................................... 21

*Tennessee v. Cardona,*
    No. 2:24-cv-00072-DCR, 2025 WL 63795 (E.D. Ky. Jan. 9, 2025), *as amended* (Jan.
    10, 2025) ................................................................................... 3

*Tennessee v. Cardona,*
    No. 24-5588, 2024 WL 3453880 (6th Cir. July 17, 2024) ........................ 20

*Texas Medical Association v. United States Department of Health & Human
    Services,*
    110 F.4th 762 (5th Cir. 2024) ................................................... 12

*Texas State LULAC v. Elfant,*
    52 F.4th 248 (5th Cir. 2022) ..................................................... 8

*United Airlines, Inc. v. McDonald,*
    432 U.S. 385 (1977) ................................................................. 18

*United States v. Covington County School District,*
    499 F.3d 464 (5th Cir. 2007) .................................................... 21

*US Inventor Inc. v. Hirshfeld,*
    549 F. Supp. 3d 549 (E.D. Tex. 2021) ....................................... 13

*US Inventor Inc. v. Vidal,*
    No. 21-40601, 2022 WL 4595001 (5th Cir. Sept. 30, 2022) .................... 13

*Victim Rights Law Center  v. Cardona,*
    552 F. Supp. 3d 104 (D. Mass. 2021) ....................................... 14

*Vote.Org v. Callanen,*
    89 F.4th 459 (5th Cir. 2023) ..................................................... 11

*Wal-Mart Stores, Inc. v. Texas Alcoholic Beverage Commission*,
  834 F.3d 562 (5th Cir. 2016) ................................................................. 25

**Statutes**

5 U.S.C. § 704 .......................................................................................... 12

5 U.S.C. § 706(2) ..................................................................................... 12

Mass. Gen. Laws Ann. ch. 6, § 168E(b)(vii)(H) ........................................ 16

**Rules**

Fed. R. Civ. P. 24(a)(2) ............................................................................. 18

Fed. R. Civ. P. 24(b) ................................................................................. 25

**Regulations**

34 C.F.R. § 106.45(b)(6)(i) (2020) ......................................................... 14, 16

89 Fed. Reg. 33,474 (April 29, 2024) ...................................................... 1, 4

**Other Authorities**

Application for a Partial Stay of the Injunction Entered by the United States
  District Ct. for the Western District of Louisiana, *Department of Education v.
  Louisiana*, No. 24A78 (July 22, 2024) ................................................... 19

## INTRODUCTION

Proposed Intervenors moved to join this case:

- Over eight months after the Court preliminarily enjoined part of the 2024 Title IX Rule;
- Over seven months after the Supreme Court held the Rule not severable at the preliminary stage;
- Over a month after the Court vacated the Rule; and
- About a month after they filed similar motions in a related case.

The two advocacy organizations—A Better Balance (ABB) and Victim Rights Law Center (VRLC)—claim that vacatur frustrates their missions and diverts their resources by eliminating the Title IX Rule's nationwide requirements. The individual, Jane Doe, claims vacatur will require her to undergo cross-examination at a hearing that has already happened.

The Court should deny these belated requests to intervene. *First*, the Supreme Court recently rejected the "expansive" notion of standing invoked by Proposed Intervenors. As to Doe, appeal will not remedy a past injury. *Second*, Proposed Intervenors waited far too long after learning that their interests were implicated in this lawsuit. Their delay would prejudice Carroll ISD by forcing it to undergo a second round of discovery on Proposed Intervenors' standing and to address Proposed Intervenors' unique arguments for the first time on appeal. *Third*, Proposed Intervenors assert only an ideological interest in having a uniform Rule. Each of these grounds is independently fatal to their motions.

## FACTUAL BACKGROUND

### I.    This Court preliminarily enjoined part of the Rule, the Fifth Circuit and Supreme Court preliminarily held the Rule nonseverable, and this Court vacated the Rule—all before any motion to intervene.

In April 2024, the Department of Education promulgated a new Rule attempting to redefine "sex" throughout Title IX. Nondiscrimination on the Basis of Sex in Educ. Programs or Activities Receiving Fed. Fin. Assistance, 89 Fed. Reg. 33,474 (April 29, 2024). The next month, Carroll ISD sued and moved the Court to

preliminarily enjoin the entire Rule. *See* ECF No. 1; ECF No. 36. On July 11, this Court granted Carroll ISD's motion and preliminarily enjoined part of the Rule, including the hostile-environment harassment definition. ECF No. 43 at 14.

At the same time, court after court preliminarily determined that the Rule wasn't severable. On June 13, the Western District of Louisiana preliminarily enjoined the entire Rule. *See Louisiana v. U.S. Dep't of Educ.*, 737 F. Supp. 3d 377, 410 (W.D. La. 2024). The same day this Court issued its preliminary injunction, that court denied the government's motion for a partial stay pending appeal, holding that the Rule was "not severable because the removal of the unconstitutional provisions would impair the function of the statute as a whole." *Louisiana v. U.S. Dep't of Educ.*, No. 3:24-CV-00563, 2024 WL 3584382, at *3 (W.D. La. July 11, 2024).

The Fifth Circuit then denied the government's motion for a partial stay of the *Louisiana* district court's preliminary injunction. *See Louisiana v. U.S. Dep't of Educ.*, No. 24-30399, 2024 WL 3452887, at *1 (5th Cir. July 17, 2024). The government's severability argument would put the court in the "untenable position" of "pars[ing] the 423-page Rule … to determine the practicability and consequences of a limited stay." *Id.* at *2. The Fifth Circuit refused to allow the Rule's "tangential provisions" to go into effect absent the enjoined "heart of the Rule." *Id.* The Supreme Court likewise rejected the government's motion for a partial stay. *Dep't of Educ. v. Louisiana*, 603 U.S. 866, 868 (2024) (per curiam). It ruled that the government had not "adequately identified which particular provisions, if any, are sufficiently independent of the enjoined definitional provision [34 C.F.R. § 106.10,] and thus might be able to remain in effect." *Id.*

Based on the Fifth Circuit's *Louisiana* decision, Carroll ISD asked this Court to "stay the entire Rule." Pl.'s § 705 Mem. 8 (ECF No. 49). This Court declined to do so, but it ordered the parties to "submit a joint schedule for expedited resolution of this matter" because Carroll ISD was "substantially likely—indeed substantially

certain—to succeed on the merits." Order 6 (ECF No. 55). The parties then negotiated a schedule to produce the administrative record and file cross-motions for summary judgment. *See* ECF No. 56. On August 16 (the same day the Supreme Court ruled), Carroll ISD moved for summary judgment, seeking vacatur of "the entire Rule." Pl.'s Mem. iso MSJ 33 (ECF No. 59). Carroll ISD argued that the government "did not contemplate enforcement of the Rule without *any* of the core provisions." *Id.* at 34. In response, the government repeated the arguments about severability made (unsuccessfully) in other cases challenging the Rule. Defs.' Memo. iso MSJ 42–44 (ECF No. 65).

While summary-judgment motions were pending before this Court, one of those cases reached final judgment. The Eastern District of Kentucky granted summary judgment to the Rule's challengers, explaining that the new definitions of sex-based discrimination and hostile environment harassment not only were unlawful, but "fatally taint[ed] the entire rule." *Tennessee v. Cardona*, No. 2:24-cv-00072-DCR, 2025 WL 63795, at *6 (E.D. Ky. Jan. 9, 2025), *as amended* (Jan. 10, 2025) (*Tennessee* case). The *Tennessee* court refused to sever the procedural requirements that VRLC wishes to defend on appeal, explaining that "it simply is not proper for the Court to rewrite the regulations by excising the offending material." *Id.* So the *Tennessee* court vacated the Rule in its entirety. *See id.* at *7.

On February 19, this Court, too, vacated the entire Rule. ECF No. 86.

## II.  ABB advocates for pregnant and parenting students but waited to intervene until one month after filing a similar motion in a related case.

A Better Balance is "a national nonprofit legal advocacy organization" that works to protect the "rights" of "pregnant, parenting, and caregiving workers and students ... through legislative advocacy, direct legal services, and strategic litigation." Greenberg Decl. ¶ 2 (ECF No. 91-1). It "advocated for the federal Pregnant

Workers Fairness Act," "PUMP for Nursing Mothers Act," and "a wealth of state and local policies" in at least seventeen states and dozens of jurisdictions. *Id.* ¶ 3.

ABB doesn't limit its advocacy to women. It has published a "Pregnant Workers Guide" about what "Trans & Non-Binary People" should know. Pl.'s Opp. to MTI App. (Pl.'s App.) 5–15. The Guide says that "[m]any transmasculine and non-binary people choose to get pregnant and carry children." *Id.* at 6. It also contends that "transgender women and trans-femmes" (that is, males) "lactate and breastfeed/chestfeed their babies." *Id.* The Guide notes that the Pregnant Workers Fairness Act and PUMP provide protections for these "lactating workers." *Id.* at 11.

ABB's comment on the Rule aligns with the Rule's gender-identity mandate. *Cf.* Greenberg Decl. ¶ 4 (referencing ABB's two comments). It "**urge[d] the Department** to require recipients to specifically state in their published notice of nondiscrimination that sex discrimination includes discrimination based on sex stereotypes, sex characteristics, ... sexual orientation, [and] gender identity." Pl.'s App.19. And it wanted the Department to "adopt more gender-neutral language" by replacing "breastfeeding" and similar terms with "express milk," "nursing," and "human milk feeding." *Id.* at 24. The Department declined that suggestion, but "emphasize[d] that a recipient must ensure that any student who is lactating can voluntarily access a lactation space ... regardless of a student's gender identity or gender expression." 89 Fed. Reg. 33,788.

A "core part of ABB's mission" is to "counsel[ ] workers and students" on its "free legal helpline." ABB MTI 3 (ECF No. 91). The helpline assists "pregnant and postpartum students" in "understand[ing]" their "rights ... at school." Greenberg Decl. ¶¶ 6–7. ABB claims that the Rule "would allow" it "to more efficiently and effectively counsel students who call [its] helpline, deploying fewer resources with better results." *Id.* ¶ 14. ABB has provided assistance under both the Rule and 2020 Title IX regulations. *See id.* ¶¶ 15–21. ABB provides examples of how it has provided

counseling, but, with one exception, it does not claim that the relevant institutions receive federal financial assistance that makes them subject to Title IX. *See id.* ¶ 30.

Without the Rule, ABB avers it must "review[ ] state and local laws that may supplement Title IX protections." *Id.* ¶ 15. As ABB has recognized elsewhere, "Title IX is a floor, not a ceiling." Pl.'s App.39. So "State and local laws can require schools to do more than Title IX or its regulations require." *Id.* ABB already maintains a "Workplace Rights Hub" on its website, which provides a "state by state guide" to asserting rights related to pregnancy at work for all 50 states and the District of Columbia. *Id.* at 40–43. It also maintains a state law resource page which includes documents like "Fact Sheet: Pregnancy Discrimination in Tennessee" and "State and City Laws and Regulations on Fair and Flexible Scheduling." *Id.* at 44–48.

Since the Rule was issued in April 2024, ABB has tracked the various cases challenging it under the APA—including this one. On August 22, 2024, ABB updated a notice on its website discussing the "eight preliminary injunctions" against the Rule. *Id.* at 37. It understood that the courts had stopped "*all* of the 2024 Rule's provisions from going into effect." *Id.* at 36. And it also noted that the "Supreme Court kept two of these preliminary injunctions in place" while the cases proceeded before "the courts below." *Id.* at 37.

On January 10, 2025, it "[c]ondemn[ed]" the Eastern District of Kentucky's vacatur of the Rule as a "dangerous attack on vulnerable students." *Id.* at 49–50. On February 26, ABB moved to intervene in that case, citing the parties' joint status report agreeing that *this* case was not moot, and attaching one declaration from Katherine Greenberg. *See* ABB *Tennessee* Memo. iso MTI 5 (Doc. 152-1) (citing ECF No. 85). Yet ABB waited nearly another month to file this motion to intervene—again attaching one declaration from Katherine Greenberg.

### III.    VRLC and Doe criticize the Court for vacating the Rule without hearing from them yet waited over one month to move to intervene after filing a similar motion.

VRLC is a "nonprofit organization" with a "mission … to provide legal representation to" victims of "sex-based harassment" and "to promote a national movement committed to seeking justice for every victim." VRLC App.3 (ECF No. 101). VRLC has advised victims under both the Rule and the 2020 regulations. *See id.* at 5–6. It claims that "vacatur of the 2024 Rule … frustrate[s] VRLC's mission and divert[s] its resources." *Id.* at 6. On the one hand, it suggests it has expended fewer resources: it "received 41% fewer requests for legal assistance" post-vacatur. *Id.* at 4. But on the other hand, it says it now has "fewer resources" for "other programs and services," such as a "nationwide education program." *Id.* at 5.

VRLC claims that its attorneys now must "identify alternative state or local laws" that supplement Title IX. *Id.* at 11. It already publishes resources about relevant law from all 50 states. Pl.'s App.3, 52–55. And it cites a Massachusetts law as one of the "best ways to protect student survivors beyond the federal Title IX requirements." VRLC App.5.

Jane Doe is a young woman who filed a Title IX complaint with her "state university" in Massachusetts. *Id.* at 22. She states that she "was told to hold April 3, April 4, and April 11 [2025] as potential dates" for a Title IX hearing, at which she could be cross-examined. *Id.* at 24. Her university's Title IX coordinator told her on January 29 that the Rule was "no longer in effect." *Id.* She wants "to intervene" so that she does "not have to choose between" being cross-examined and not being cross-examined. *Id.* at 25.

Like ABB, VRLC has followed the lawsuits challenging the 2024 Rule from their inception. On May 7, 2024, it held a webinar "exploring" "several lawsuits filed challenging" the Rule. Pl.'s App.3, 56. In September, it issued a newsletter discussing

"injunctions" against the Rule "in 26 states and in many K-12 schools and higher-ed institutions located in other states." *Id.* at 57.

On February 28, 2025, VRLC and Doe moved to intervene in the *Tennessee* case, attaching one declaration from Stacey Malone and one from Doe. *See* Mot. to Intervene *Tennessee* Doc. 164. That same day, their counsel in this case and *Tennessee* released a statement acknowledging that "Trump's Department of Education announced it would immediately revert back to enforcing Trump's 2020 Title IX rule" and linking to a January 31 article about the Department's "Dear Colleague" letter issued that day. Pl.'s App.61. Yet even then, VRLC and Doe took no action for over a month.

Finally, just three weeks before the 60-day deadline to appeal this Court's judgment, they moved to intervene. VRLC and Doe filed declarations that are materially identical to those filed over a month ago in *Tennessee*. *See* Pl.'s App.65–88. Their memo criticizes the Court for "vacat[ing] the entire 2024 Rule … without hearing from" "victims of sex-based harassment." VRLC Mem. 20–21 (ECF No. 100).

## ARGUMENT

## I.    Proposed Intervenors lack standing to intervene to appeal.

Although courts may accept well-pleaded factual allegations as true on deciding a motion to intervene, *see* VRLC Mem. 5 n.4, "status as an intervenor" in the district court "does not confer standing sufficient to keep the case alive" on appeal. *Diamond v. Charles*, 476 U.S. 54, 68 (1986). Because Proposed Intervenors move to intervene to appeal, *see* ABB MTI 1; VRLC Mem. 4, they "must independently demonstrate standing." *Louisiana v. Haaland*, 86 F.4th 663, 666 (5th Cir. 2023); *see DeOtte v. Azar*, 332 F.R.D. 173, 179 (N.D. Tex. 2019). That requires an injury-in-fact caused by "*the judgment below*" that will be redressed by reversal on appeal. *Sierra Club v. Babbitt*, 995 F.2d 571, 575 (5th Cir. 1993). And because this case was decided at the evidentiary stage, standing must be supported by

"specific summary judgment evidence." *Tex. State LULAC v. Elfant*, 52 F.4th 248, 255 n.4 (5th Cir. 2022); *see Barber v. Bryant*, 860 F.3d 345, 352 (5th Cir. 2017).

### A.    Proposed Intervenors cannot show actionable injury.

The Supreme Court recently rejected the "expansive" frustration-of-mission and diversion-of-resources theories argued by the organizations. ABB's procedural injury theory fails—there is no notice-and-comment violation caused by vacatur of the Rule and ABB has no concrete interest at stake anyway. And Doe's theory of injury fails because it assumes her university will *violate* existing law. Proposed Intervenors have no Article III injury.

### 1.    ABB and VRLC's frustration-of-mission and diversion-of-resources theories collide with binding precedent.

The Rule doesn't directly regulate Proposed Intervenors. So ABB and VRLC argue that the Rule, through its regulation of third parties, affects their ability to carry out their respective missions and causes them to divert resources. *See* ABB MTI 1; VRLC Mem. 4. Neither establishes Article III injury.

ABB and VRLC's theory of injury relies on *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982), which the Supreme Court has charitably referred to as "unusual." *See FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 396 (2024) ("*AHM*"). The Supreme Court has limited *Havens* to its "context," and the Fifth Circuit and other courts have abandoned expansive theories of both injury and causation built on overbroad readings of *Havens. See AHM*, 602 U.S. at 396; *La. Fair Hous. Action Ctr., Inc. v. Azalea Garden Props., L.L.C.*, 82 F.4th 345, 354–55 (5th Cir. 2023); *Fair Hous. Ctr. of Metro. Detroit v. Singh Senior Living, LLC*, 124 F.4th 990, 992–93 (6th Cir. 2025). *Havens* applies only when a party's "actions directly affected and interfered with … core business activities—not dissimilar to a retailer who sues a manufacturer for selling defective goods to the retailer." *AHM*, 602 U.S. at 395.

8

As the Supreme Court explained, it is "incorrect" to argue that "standing exists when an organization diverts its resources in response to a defendant's actions." *Id.* at 395. The alleged injury in *Havens* was the provision of false information *to the plaintiff* which then "perceptibly impaired" the organization's activity of providing referrals based on that information. 455 U.S. at 379. The relevant statute "conferred on all persons a legal right to truthful information about available housing." *Id.* at 373 (cleaned up). Thus, the Court explained that the challenged action "directly affected and interfered with [the plaintiff's] core business activities." *AHM*, 602 U.S. at 379.

The Sixth Circuit has further elaborated, "[i]t is not enough to broadly gesture toward 'a drain on an organization's resources' and call it a day, as some … pre-[*AHM*] cases have done." *Singh*, 124 F.4th at 992. Rather, "[t]here must be something more—the court must find that the organization has alleged and shown that the conduct challenged in the suit interfered with the organization's 'core business activities.'" *Id.* at 992–93 (quoting *AHM*, 602 U.S. at 395). And even pre-*AHM*, the Fifth Circuit held "that 'diverting' resources from one core mission activity to another, i.e., prioritizing which 'on-mission' projects, out of many potential activities, an entity chooses to pursue, does not suffice—organizations daily must choose which activities to fund, staff, and prioritize." *La. Fair Hous.*, 82 F.4th at 355; *accord N.A.A.C.P. v. City of Kyle*, 626 F.3d 233, 238 (5th Cir. 2010) ("The mere fact that an organization redirects some of its resources to litigation and legal counseling in response to actions or inactions of another party is insufficient to impart standing upon the organization." (cleaned up)).

Unlike the group in *Havens*, ABB and VRLC do not identify any false information anyone is giving their potential clients that hinders their core business activities. ABB and VRLC instead ask to extend *Havens* to cover the government's failure to provide a uniform national rule, thereby forcing ABB and VRLC to

research local laws that could give their clients relief (something they do as part of their standard mission anyway). But, unlike the *Havens* statute, Title IX provides no comparable "legal right" to a certain rule. Further, this alleged "uniformity harm" is unbounded. Every advocacy group would benefit from a uniform national rule in their field. While the Supreme Court has compared the group in *Havens* to a retailer who sues a manufacturer for selling defective goods to the retailer, *AHM*, 602 U.S. at 395, ABB and VRLC are like retailers suing the government for not uniformly forcing manufacturers to offer a new product line they would like to sell. That would extend *Havens* well beyond its facts.

ABB and VRLC also cannot show any direct interference with their "pre-existing" activities. *Id.* ABB says that *in response* to the vacatur of the Rule, it must "expend more time and other resources" or "conduct research and craft individualized arguments" in favor of accommodations for pregnant and parenting students. ABB MTI 8 (cleaned up). VRLC says that *in response* to vacatur, it must expend resources to compensate for reduced demand for its services or "expend significantly more time and resources to provide legal assistance to its clients." VRLC Mem. 11. But an organization cannot "spend its way into standing simply by expending money to gather information and advocate against the defendant's action." *AHM*, 602 U.S. at 394.

Vacatur of the Rule does not prevent these groups from pursuing their respective missions: "providing legal assistance for pregnant, parenting, and caregiving students and workers," ABB MTI 3, and "redress[ing] and prevent[ing] sex-based harassment" by helping student victims pursue Title IX complaints with their schools, VRLC Mem. 4. ABB argues that its client counseling in the future might be more complex. ABB MTI 8. VRLC worries that it may get fewer calls, students it represents will have access to less favorable procedures (according to

VRLC), and it will have to spend more to help those students. VRLC Mem. 8, 11. But these activities are all part of ABB and VRLC's respective core missions.

Even pre-*AHM*, shifting "resources from one core mission activity to another," didn't qualify as an injury-in-fact. *La. Fair Hous.*, 82 F.4th at 355. As it concedes, ABB has already collected extensive information on state law resources. Greenberg Decl. ¶ 3; Pl.'s App.44–48. Likewise, VRLC has resource sheets for all 50 states. Pl.'s App.3, 52–55. Collecting such resources does not hamper their core missions. And to the extent VRLC receives fewer calls, it doesn't have to divert any resources at all. It can simply allocate unused funds to legal representation. *See N.A.A.C.P.*, 626 F.3d at 239 (advocacy organization lacked standing when it did "not explain[ ]" how "examining and communicating about developments in local zoning and subdivision ordinances, differ[ed] from the [group's] routine lobbying activities"). Both groups can continue to counsel and advise students within the framework of governing law, including the 2020 regulations, with which ABB and VRLC have had much experience. *See* Greenberg Decl. ¶¶ 15–21; VRLC App.5–6.

ABB and VRLC's citations to precedent don't establish injury. Their primary case recognizes that organizations suffer no injury from activities "no different from the [group's] daily operations." *OCA-Greater Houston v. Texas*, 867 F.3d 604, 612 (5th Cir. 2017). Post vacatur, ABB and VRLC will continue the same daily operations, just under a different set of regulations (and one with which they are already familiar). And their voting rights cases involved alleged violations of laws that "consumed [the organizations'] time and resources in a way they would not have been spent absent the" alleged violations. *Id.*; *see Vote.Org v. Callanen*, 89 F.4th 459, 468 (5th Cir. 2023); *Ass'n of Cmty. Orgs. for Reform Now v. Fowler*, 178 F.3d 350, 361–62 (5th Cir. 1999). But here Proposed Intervenors claim no injury from a legal violation or from the provision of false information, as in *Havens*. They just want to

provide counseling and legal representation under their preferred Title IX regulations, instead of those that exist after vacatur.

To the extent *OCA-Greater Houston* and other prior Fifth Circuit cases relied on an "expansive" reading of *Havens*, they no longer provide the correct legal standard. *AHM*, 602 U.S. at 395. For the same reason, VRLC's citation to "two previous cases" in which out-of-circuit district courts concluded it had shown diversion of resources has no persuasive authority. VRLC Mem. 10. In sum, Proposed Intervenors' frustration-of-mission and diversion-of-resources theories "would mean that all the organizations in America would have standing to challenge almost every federal policy that they dislike, provided they spend a single dollar opposing those policies." *AHM*, 602 U.S. at 395. But "[a]n organization cannot manufacture its own standing in that way." *Id.* at 394.

### 2.    ABB has no procedural injury.

ABB also claims that vacatur without notice and comment is a procedural injury in itself. ABB MTI 12–14. That theory fails for two independently sufficient reasons. *First*, there's no notice-and-comment violation. The APA does not require agencies to conduct notice-and-comment rulemaking before they comply with an Article III court's judgment setting aside final agency action. Instead, judicial review is part of the APA. *See* 5 U.S.C. § 704. This Court followed controlling law in vacating the rule, *see* 5 U.S.C. § 706(2), and "vacatur … render[s] a challenged agency action void." *Tex. Med. Ass'n v. U.S. Dep't of Health & Hum. Servs.*, 110 F.4th 762, 779 (5th Cir. 2024) (cleaned up). Post vacatur, there is nothing for the agency to do. It's as if it never promulgated the Rule. It had no obligation to offer—and ABB thus had no right to participate in—notice-and-comment rulemaking. If ABB's theory gave it standing here, it's hard to see how any judgment finding agency action contrary to law would reach finality.

12

*Second*, "deprivation of a procedural right without some concrete interest that is affected by the deprivation—a procedural right *in vacuo*—is insufficient to create Article III standing." *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009). The bare opportunity to comment is not enough for standing. A party "can have standing to enforce procedural rights only if the procedures in question are designed to protect some threatened concrete interest that is the ultimate basis of his standing." *Shrimpers & Fishermen of RGV v. Tex. Comm'n on Env't Quality*, 968 F.3d 419, 426 (5th Cir. 2020) (cleaned up).

For example, the *Summers* organizations claimed procedural injury from denial of "the ability to file comments on some Forest Service actions." *Id.* But they failed to show that the Forest Service's actions would "impede a specific and concrete plan of [a plaintiff's member] to enjoy the national forests." *Id.* at 495. Similarly, here, ABB has not established a concrete injury caused by the judgment. *Supra* Section I.A.1. "[S]incere legal, moral, ideological, and policy objections to" agency action "alone do not establish a justiciable case or controversy in federal court." *AHM*, 602 U.S. at 396; *see also US Inventor Inc. v. Hirshfeld*, 549 F. Supp. 3d 549, 555–56 (E.D. Tex. 2021), *aff'd sub nom. US Inventor Inc. v. Vidal*, No. 21-40601, 2022 WL 4595001 (5th Cir. Sept. 30, 2022) (holding that the plaintiffs had not alleged a procedural injury from being deprived of a procedure that they had "no right" to).

### 3.    Jane Doe's theory of injury relies on speculation.

Doe has no actual or imminent injury because her asserted future injury rests on a "highly attenuated chain of possibilities." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013). *First*, it is uncertain whether the April 2025 hearing occurred at all. *Second*, Doe didn't commit to testifying or not, and in any event, the 2020 regulations prohibit her absence from being held against her. VRLC (in a case cited by it here) successfully sued to vacate the portion of the 2020 regulations that prohibited the Title IX decisionmaker from "rely[ing] on any statement of [a] party

13

or witness" who did not "submit to cross-examination" "in reaching a determination regarding responsibility." 34 C.F.R. § 106.45(b)(6)(i) (2020); *Victim Rts. Law Ctr. v. Cardona*, 552 F. Supp. 3d 104, 134 (D. Mass. 2021). *Third*, it's unknown whether unidentified school administrators required her to answer cross-examination questions despite the 2020 regulations' prohibition. *See* 34 C.F.R. § 106.45(b)(6)(i) (2020) (barring Title IX decisionmakers from "draw[ing] an inference about the determination regarding responsibility based solely on a party's … refusal to answer cross-examination or other questions."). *Fourth*, it's uncertain whether the respondent's representative engaged in cross-examination. Doe's injury is thus too "speculative" to support standing as a matter of law. *Clapper*, 568 U.S. at 410.

### B. Proposed Intervenors have not shown causation.

Proposed Intervenors also fail to show specific facts that their alleged harms are traceable to vacatur of the Rule. When parties "challenge[ ] the government's unlawful regulation (or lack thereof) of *someone else*, standing is not precluded, but it is ordinarily substantially more difficult to establish." *AHM*, 602 U.S. at 382 (cleaned up). "The causation requirement precludes speculative links—that is, where it is not sufficiently predictable how third parties would react to government action or cause downstream injury to" Proposed Intervenors. *Id.* at 383. "[T]he causation requirement also rules out attenuated links—that is, where the government action is so far removed from its distant (even if predictable) ripple effects that the plaintiffs cannot establish Article III standing." *Id.* The causal link between Proposed Intervenors' alleged injuries and vacatur is both speculative and attenuated.

What few details ABB gives about the calls it receives show vacatur hasn't caused it injury. ABB reports that 71% of calls "received from students between the effective date of the regulation and its nationwide vacatur were from students not protected by the regulation." Greenberg Decl. ¶ 13. But, since the Rule never took effect in the relevant areas, ABB's factual claim is that it simply continued doing the

work it was voluntarily performing. ABB implicitly confirms that it continued with its regular mission during that time because the "remaining" 29% of "calls were from students" about "past discrimination" before the Rule became effective. *Id.* Moreover, ABB doesn't say how many calls it received. It doesn't say whether the institutions the students attend were subject to Title IX at all. It doesn't say what issues the calls raised specifically or how often each issue came up—or whether the Rule would apply at all. There's no evidence that students called about accommodations that would have been required by the Rule. There is simply no traceability.

Nor has ABB identified harm to *its* interests traceable to the Rule's vacatur. As ABB asserts only organizational standing, it must show causation as to its claimed injury, not as to injury to the students it advises. ABB offers the examples of three students who allegedly did not receive adequate accommodations. *Id.* ¶¶ 19, 27, 30. One example is irrelevant because—as ABB concedes—it occurred "before the regulations went into effect." *Id.* ¶ 27. As for the other two, ABB admits that it has, consistent with its mission to "advocat[e] for pregnant, parenting, and caregiving workers and students," counseled these students. *Id.* ¶¶ 2, 23 (discussing "assistance" provided); 30 (ABB provided "advanced assistance"). Vacatur has not prevented ABB from carrying out its mission.

VRLC also fails its causation burden by relying on speculative and attenuated claims. Like ABB, it relies on unspecified, undifferentiated allegations about the volume of calls received. *See* VRLC App.4. VRLC claims that "[i]n the first six weeks following the 2024 Rule's vacatur, VRLC received 41% fewer requests for legal assistance than in the first six weeks following the implementation of the 2024 Rule." *Id.* But this statistic establishes no causal link. In many jurisdictions and at many schools, enforcement of the Rule was already enjoined. So there's no way to know if there was any relationship between the number (or type) of requests received and the enforcement of the Rule. VRLC also doesn't say whether the requests it would

expect to receive would come (1) under the Rule but not the 2020 regulations; (2) from institutions subject to Title IX; or (3) from jurisdictions that don't have relevant state law protections, like Massachusetts. And VRLC doesn't say how many requests a 41% difference signifies, so the figure has no statistical value. It also doesn't say what other reasons there might be for the number of requests to vary from one six-week period to another. Finally, a drop in calls frees up VRLC's resources for other projects, and vacatur did not prevent VRLC from advising callers.

Neither has Doe met her causation burden. She asserts that the vacatur of the Rule is responsible for a change in proceedings related to her Title IX complaint, which would now subject her to cross-examination. VRLC App.25. But any such harm is not traceable to vacatur. Her theory depends on her university violating the 2020 regulations and Massachusetts law. *First*, as discussed above, VRLC successfully sued to vacate the 2020 prohibition on decisionmakers relying on statements not subject to cross-examination. *Supra* Section I.A.3. *Second*, the 2020 regulations prohibit decisionmakers from drawing negative inferences from a party refusing cross-examination. *Id.* Doe has the same right to decline to testify that she would have if pursuing her claim in court. *Third*, the 2020 regulations require questions to be "relevant" and explicitly exclude questions "about the complainant's sexual predisposition or prior sexual behavior." 34 C.F.R. § 106.45(b)(6)(i) (2020). That's all consistent with the Massachusetts law VRLC holds up as the gold standard. *See* VRLC App.5. That law requires public universities like Doe's to provide notice of "restrictions on evidence considered by the fact finder including, but not limited to, the use of evidence of prior sexual activity or character witnesses." Mass. Gen. Laws Ann. ch. 6, § 168E(b)(vii)(H).

### C. Proposed Intervenors have not shown redressability.

To show standing, Proposed Intervenors must also show "redressability (i.e., it is likely and not merely speculative that the [party's] injury will be remedied by

the relief [the party] seeks in bringing suit)." *Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 273–74 (2008) (cleaned up). Causation and redressability are typically linked, and Proposed Intervenors' failure on the former element necessitates their failure on the latter. *See AHM*, 602 U.S. at 367, 380–81.

Doe can't show redressability because her hearing dates have passed. VRLC App.24. Any appeal of the vacatur cannot remedy this claimed injury.

ABB and VRLC also fail redressability for an independent reason: in addition to this Court vacating the Rule, other courts have enjoined its enforcement in multiple states and at hundreds of schools and universities. *See Alabama v. U.S. Sec'y of Educ.*, No. 24-12444, 2024 WL 3981994, at *8 (11th Cir. Aug. 22, 2024) (per curiam) (collecting cases); *e.g.*, *Kansas v. U.S. Dep't of Educ.*, 739 F. Supp. 3d 902, 936–37 (D. Kan. 2024) (enjoining the rule at various institutions). Proposed Intervenors have not offered sufficient facts to show that their asserted injuries do not arise in states or institutions covered by these other court orders. Indeed, the reversal of vacatur on appeal would mean that those preliminary injunctions would remain in effect. Yet Proposed Intervenors have not moved to intervene in the preliminary injunction cases. As a result, they have not met their burden to show that a favorable ruling in this litigation would redress their injuries.

## II.    Proposed Intervenors haven't met their burden to intervene as of right.

"A would-be intervenor bears the burden to prove an entitlement to intervene; failure to prove a required element is fatal." *Rotstain v. Mendez*, 986 F.3d 931, 937 (5th Cir. 2021). Four factors control: (1) timeliness; (2) "interest relating to the property or transaction which is the subject of the action; (3) the applicant is so situated that the disposition of the action may, as a practical matter, impair or impede his ability to protect that interest; (4) the applicant's interest is inadequately

represented by the existing parties to the suit." *Id.* at 936–37 (cleaned up); *see* Fed. R. Civ. P. 24(a)(2). Proposed Intervenors fail the first and second factors.

### A.    Proposed Intervenors' motions are not timely.

The timeliness factor has four sub-factors: "the length of time the movant waited to file, the prejudice to the existing parties from any delay, the prejudice to the movant if intervention is denied, and any unusual circumstances." *Rotstain*, 986 F.3d at 937. The "absolute measure of time elapsed is not relevant"; "the length of a delay allowed depends on the particular circumstances." *Effjohn Int'l Cruise Holdings, Inc. v. A&L Sales, Inc.*, 346 F.3d 552, 561 (5th Cir. 2003).

**1.** Proposed Intervenors have waited too long. They should have moved "as soon as it became clear" that their interest "would no longer be protected" by Defendants, and that has been clear for months. *United Airlines, Inc. v. McDonald*, 432 U.S. 385, 394 (1977). Proposed Intervenors' "[a]ctual knowledge" that the government would not appeal "is not required." *See Stallworth v. Monsanto Co.*, 558 F.2d 257, 264 (5th Cir. 1977). *Contra* ABB MTI 6; VRLC Mem. 18. Constructive knowledge suffices. *Ross v. Marshall*, 426 F.3d 745, 755 (5th Cir. 2005).

Proposed Intervenors say their burden to show "inadequate representation" is "minimal." *See* ABB MTI 20; VRLC Mem. 23. As a corollary to that, their timeliness is measured based on actual or constructive knowledge that the representation "*may* be inadequate." Thus, in ABB's cited case, the Fifth Circuit analyzed timeliness from when the proposed intervenor "believed [a judgment] would not be appealed by the existing parties," even though the defendant who the proposed-intervenor thought wouldn't appeal had filed a notice of appeal the same day the proposed intervenor moved to intervene. *See Ross*, 426 F.3d at 750, 755.

Each of the Proposed Intervenors has known for months that the government may not adequately represent its interests in arguing severability and, for VRLC, defending the Rule's definition of hostile environment harassment. *First*, Doe agrees

18

she has been aware of her interest since January 29, when her university's Title IX coordinator told her the Rule was "no longer in effect." VRLC App.24.

*Second*, ABB and VRLC have followed lawsuits against the Rule since their inception. Pl.'s App.3, 36, 56–57. It has been clear since at least August, when the Supreme Court rejected the government's severability arguments, that Proposed Intervenors' asserted interests were at risk. The government argued to the Supreme Court that the Western District of Louisiana erred "by enjoining provisions that respondents had not challenged and that the court had not held to be likely unlawful."[1] In support of its request for a partial stay of the preliminary injunction, the government provided a single paragraph listing provisions it contended were unaffected—including "protections for pregnant and postpartum students" and "recipients' obligations in responding to claims implicating Title IX."[2] So it should have been no surprise to Proposed Intervenors that their asserted interests could depend on the severability question. The Supreme Court rejected the government's stay application, explaining that the government had not "adequately identified which particular provisions, if any, are sufficiently independent of the enjoined definitional provision [34 C.F.R. § 106.10,] and thus might be able to remain in effect." *Louisiana*, 603 U.S. at 868.

It wasn't just the Supreme Court. By August, seven district courts and three courts of appeals—including the Fifth Circuit—all had rejected the government's efforts to carve such provisions out of the preliminary injunctions. *See Alabama*, 2024 WL 3981994, at *8 (collecting cases). In one way or another, each court agreed that "the three provisions that Plaintiffs challenge are 'central provisions' that 'appear to touch every substantive provision of the Rule,' and the Department 'never

---

[1]     Appl. for a Partial Stay of the Inj. Entered by the U.S. Dist. Ct. for the W. Dist. of La. 21, *Dep't of Educ. v. Louisiana*, No. 24A78 (July 22, 2024).

[2]     *Id.* at 21–22.

contemplate[d] enforcement of the [r]ule without any of the core provisions.'" *Id.* (quoting *Tennessee v. Cardona*, No. 24-5588, 2024 WL 3453880, at *3–4 (6th Cir. July 17, 2024)). The government's strategy—cite the Rule's severability clause and a handful of provisions claimed to be unaffected—was not enough to show the Rule was severable. As ABB recognized at the time, each of these courts had stopped "*all* of the 2024 Rule's provisions from going into effect." Pl.'s App.36.

And when it came to summary judgment, the government did nothing more. The same day the Supreme Court rejected the government's preliminary-stage severability arguments, Carroll ISD moved for summary judgment against the "entire Rule." Pl.'s Mem. iso MSJ 33. In response, the government repeated the same argument court after court had rejected. It wrote in a single paragraph that provisions regarding "pregnant and postpartum students" and a recipient's duties concerning "retaliation" showed that the Rule was severable. Defs.' Mem. iso MSJ 43 (ECF No. 65). The government's recycled arguments would have again "involve[d] th[e] court in making predictions without record support from the DOE about the interrelated effects of the remainder of the Rule on thousands of covered educational entities." *Louisiana*, 2024 WL 3452887, at *2.

Proposed Intervenors should have been aware for months that their asserted interests in the Rule's severability were not being adequately represented by the government. *See Preston v. Thompson*, 589 F.2d 300, 304 (7th Cir. 1978) (affirming denial of motion to intervene as untimely when made three weeks after preliminary injunction granted when movants "were aware of the litigation" and "knew that the relief sought by plaintiffs … could impinge on the interests they now assert"). Yet they did nothing.

When it comes to defending the Rule's hostile environment definition, VRLC knew of divergent interests at least eight months ago when this Court ordered the "expedited" resolution of this case because Carroll ISD was "substantially certain"

to succeed on the merits of at least its challenge to the hostile-environment harassment definition. Order 6 (ECF No. 55). Carroll ISD's "substantial[ ] certain[ty]" of winning meant that the government likely wasn't adequately protecting VRLC's asserted interests. *See Jansen v. City of Cincinnati*, 904 F.2d 336, 341 (6th Cir. 1990) (holding that a defendant's "failure to rely on relevant paragraphs of [a] consent decree" in its summary-judgment opposition "alerted the proposed intervenors that their interest was not being adequately protected").

Proposed Intervenors' failure to act has consequences. If ABB, for example, had sought intervention during the summary-judgment stage, it could have made the case "that, even if the challenged provisions are struck down, the provisions related to pregnant and postpartum students should go into effect." ABB MTI 23. (Even though its advocacy on gender identity indicates the provisions are not—in fact—severable.) It could have identified and provided context for these provisions with more than the passing reference offered by the government. And ABB could have articulated some theory for how these provisions could operate sensibly after vacatur. The same goes for the other Proposed Intervenors when it comes to changes in grievance and hearing procedures for alleged sex-based harassment and discrimination. Instead of identifying these provisions and articulating a theory for severing them from the Rule, they waited on the sidelines until it was too late for this Court to take their perspectives into account. Their requests to intervene are untimely. *See United States v. Covington Cnty. Sch. Dist.*, 499 F.3d 464, 466 (5th Cir. 2007) (upholding denial of motion to intervene as untimely when threat to interest was "well-publicized for more than six months"); *Taylor v. KeyCorp.*, 680 F.3d 609, 617 (6th Cir. 2012) (affirming denial of motion to intervene because a "12(b)(1) motion" put the movant "on notice" that the class representative "may not be … adequate" but the movant delayed in filing).

21

Finally, Proposed Intervenors compounded their delay by waiting about a month or more to file here after filing similar motions in the *Tennessee* case. Just one week after this Court vacated the Rule, ABB moved to intervene in the *Tennessee* litigation and cited the February 17 status report from this case in which the parties agreed this case was not moot. Shortly after, VRLC and Doe moved to intervene in the *Tennessee* case, arguing to the court that they "moved quickly after learning that th[e] case affected their rights and that the Department would likely no longer protect their interests." VRLC *Tennessee* Memo. iso MTI 17 (Doc. 164-1). That same day, counsel for VRLC and Doe released a statement conceding that on January 31, the "Department of Education made…clear" that it would "revert[ ] to Trump's 2020 Title IX rule." *See* Pl.'s App.61–62. Proposed Intervenors offer no explanation why it took about a month or more to file such intervention papers here, especially when VRLC and Doe filed materially identical declarations in both cases. Pl.'s App.65–88. And especially when Doe claims injury from a hearing that was set for the first half of April. *See* VRLC App.24. Proposed Intervenors suggest they could not have filed sooner because they needed to assemble their legal teams and research applicable law. ABB Reply 4 (ECF No. 133); VRLC Reply 5–6 (ECF No. 132). Counsel completed that work before seeking intervention in *Tennessee*. Given the sheer number of attorneys on Proposed Intervenors' legal team (they have filed 13 *pro hac vice* motions to date), it's hard to see how counsel needed nearly a month or more to modify intervention papers.

Proposed Intervenors' cited precedent doesn't help them. Unlike in *Sierra Club* where "the status of the [plaintiffs'] claims changed dramatically over the course of the lawsuit," Carroll ISD has asserted the same claims from the beginning. *See Sierra Club v. Espy*, 18 F.3d 1202, 1205 (5th Cir. 1994). Proposed Intervenors didn't move to intervene within two days, two weeks, or even 45 days after learning of their divergent interest. *See Cameron v. EMW Women's Surgical Ctr., P.S.C.*, 595

U.S. 267, 280 (2022) (two days); *Ceres Gulf v. Cooper*, 957 F.2d 1199, 1203 (5th Cir. 1992) (proposed intervenor filed motion to intervene two weeks after learning of interest and one day after final judgment); *Swoboda v. Manders*, 665 F. App'x 312, 314 (5th Cir. 2016) (unpublished) (proposed intervenor filed 45 days after learning of interest but did not seek to disturb a final judgment).

**2.** Allowing intervention would prejudice Carroll ISD. The second factor considers prejudice "as a result of the would-be intervenor's failure to apply for intervention as soon as he actually knew or reasonably should have known of his interest in the case." *Rotstain*, 986 F.3d at 938. "This factor is the most important consideration." *Id.* (cleaned up). Prejudice includes "a second round of fact discovery" that "significantly increas[es] litigation costs." *Id.*

That's exactly what would happen here. In the summer, the parties negotiated the production of the administrative record and a briefing schedule for summary judgment cross-motions. *See* Joint Status Report 1 (ECF No. 56). Had Proposed Intervenors timely moved, "the parties could have negotiated and developed a comprehensive plan for simultaneous fact discovery of all claims." *Rotstain*, 986 F.3d at 938. Carroll ISD could have gathered evidence about Proposed Intervenors' standing. It could have served document requests and interrogatories about Proposed Intervenors' hotline calls, such as their volume, geographic origin, and issue of concern. Depending on those responses, it could have taken deposition testimony about Proposed Intervenors' existing knowledge of the 2020 regulations and relevant state and local laws. Instead, the "belated request for intervention, if granted, would force the existing parties to negotiate and conduct a second round of" discovery on the issue of the Proposed Intervenor's standing, which would impose inefficiencies and "increased costs." *Id.* And if the intervenor-defendants are permitted to appeal, Carroll ISD must confront their arguments—about provisions the government didn't defend, like those for pregnant students and eliminating

23

cross-examination—for the very first time on appeal. Had Proposed Intervenors moved sooner, Carroll ISD could have adequately responded.

**3.** Any prejudice to Proposed Intervenors is at most slight. ABB and VRLC seek only to vindicate an "ideological" interest better suited to "the political and electoral processes." *AHM*, 602 U.S. at 396–97; *supra* Section I.A. They thus lack a cognizable interest and consequent prejudice. *Infra* Section II.B. And intervening will not redress Doe's injuries. *Supra* Section I.A.3. Any prejudice "is not as severe as in many cases in which intervention has been allowed," such as an intervenor-seaman's claims for maintenance and injuries. *Effjohn*, 346 F.3d at 561 (affirming denial of intervention even though movant "would obviously suffer some prejudice").

**4.** No unusual circumstances exist. ABB doesn't claim any and thus can't meet its burden. And VRLC and Doe's claimed "unusual circumstances" show their motion is untimely. They argue that the Court "vacated the entire 2024 Rule … without hearing from" victims "of sex-based harassment." VRLC Mem. 20–21. Yet this lawsuit has sought to vacate that provision all along. Had VRLC and Doe wanted the Court to hear their perspective, they should have offered it much earlier.

### B.    Proposed Intervenors assert only an ideological interest.

ABB and VRLC exist to counsel pregnant students and workers and sexual assault victims, respectively. They can do that—and have done it—under either the 2024 Rule or 2020 regulations. *Supra* Section I.A.1. Their interest thus boils down to a policy preference. But "an intervenor fails to show a sufficient interest when he seeks to intervene solely for ideological, economic, or precedential reasons; that would-be intervenor merely prefers one outcome to the other." *DeOtte*, 332 F.R.D. at 182; *accord* Mem. and Order at 7, *Purl v. U.S. Dep't of Health & Human Srvs.*, No. 2:24-CV-228-Z (N.D. Tex. April 15, 2025), ECF No. 103 (denying intervention because advocacy group was not regulated by the rule and had only an "ideological interest"). Neither can Proposed Intervenors rely on a "unique" case involving an

organization that "engineered the drive that led to" the enactment of a city regulation. *See DeOtte*, 332 F.R.D. at 183 (quoting *City of Houston v. Am. Traffic Sols., Inc.*, 668 F.3d 291, 294 (5th Cir. 2012)); *see also Wal-Mart Stores, Inc. v. Tex. Alcoholic Beverage Comm'n*, 834 F.3d 562, 567 (5th Cir. 2016) (discussing *Houston*). ABB and VRLC submitted a few out of the over two hundred thousand comments on the proposed Rule; they didn't prevail in a petition drive "over the nearly unanimous, well funded, and longstanding opposition of the Mayor and City Council." *Houston*, 668 F.3d at 293–94. And Jane Doe has no valid interest because she lacks a redressable injury. *Supra* Part I. The Court should thus deny intervention on this basis.

## III.   The Court should deny permissive intervention.

Rule 24(b) allows for "permissive intervention when (1) timely application is made by the intervenor, (2) the intervenor's claim or defense and the main action have a question of law or fact in common, and (3) intervention will not unduly delay or prejudice the adjudication of the rights of the original parties." *League of United Latin Am. Citizens, Council No. 4434 v. Clements*, 884 F.2d 185, 189 n.2 (5th Cir. 1989); *accord* Fed. R. Civ. P. 24(b).

The Court should deny permissive intervention because Proposed Intervenors did not move timely. *See Rotstain*, 986 F.3d at 942 (affirming denial of permissive intervention based on denial of intervention as of right as untimely); *supra* Section II.A.1. And intervention would unduly delay the case and prejudice Carroll ISD by requiring that it respond to new issues for the first time on appeal, or else open discovery and relitigate summary judgment.

## CONCLUSION

The Court should deny Proposed Intervenors' motions to intervene.

Respectfully submitted this 17th day of April, 2025

/s/ Mathew W. Hoffmann

**Tim Davis**
Texas Bar No. 24086142
**Allison Allman**
Texas Bar No. 24094023
**Trevor Paul**
Texas Bar No. 24133388
**JACKSON WALKER LLP**
777 Main Street, Suite 2100
Fort Worth, Texas 76102
Telephone: (817) 334-7200
tdavis@jw.com
aallman@jw.com
tpaul@jw.com

**Jonathan A. Scruggs***
Arizona Bar No. 030505
**ALLIANCE DEFENDING FREEDOM**
15100 N. 90th Street
Scottsdale, Arizona 85260
Telephone: (480) 444-0020
Facsimile: (480) 444-0028
jscruggs@ADFLegal.org

**Tyson C. Langhofer***
Virginia Bar No. 95204
**Mathew W. Hoffmann***
Virginia Bar No. 100102
**ALLIANCE DEFENDING FREEDOM**
44180 Riverside Pkwy
Lansdowne, Virginia 20176
Telephone: (571) 707-4655
Facsimile: (571) 707-4656
tlanghofer@ADFlegal.org
mhoffmann@ADFlegal.org

**Natalie D. Thompson**
Texas Bar No. 24088529
**ALLIANCE DEFENDING FREEDOM**
440 First Street NW, Suite 600
Washington, DC 20001
Telephone: (202) 393-8690
Facsimile: (202) 347-3622
nthompson@ADFlegal.org

**Counsel for Plaintiff Carroll ISD**

*Admitted pro hac vice*

## CERTIFICATE OF SERVICE

I hereby certify that on April 17, 2025, a copy of this document was filed with the Clerk of Court using the CM/ECF system. I further certify that this document was served using the CM/ECF system on all counsel of record.

*/s/ Mathew W. Hoffmann*
Mathew W. Hoffmann
*Counsel for Plaintiff Carroll ISD*