# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | |
|---|---|
| CARROLL INDEPENDENT SCHOOL DISTRICT, <br><br>       *Plaintiff*, <br><br>    v. <br><br> UNITED STATES DEPARTMENT OF EDUCATION; ET AL., <br><br>       *Defendants*. | **Case No.** 4:24-cv-00461-O |

## APPENDIX IN SUPPORT OF PLAINTIFF CARROLL INDEPENDENT SCHOOL DISTRICT'S OPPOSITION TO PROPOSED INTERVENOR-DEFENDANTS' MOTIONS TO INTERVENE (ECF NOS. 91, 99)

| | |
|---|---|
| Declaration of Mathew W. Hoffmann, dated April 17, 2025 | Opp. MTI App. 1–4 |
| Pregnant Workers Guide: What Should Trans & Non-Binary People Know, A Better Balance (Jan. 23, 2025, updated Apr. 2, 2025) | Opp. MTI App. 5–15 |
| Public Comment Submitted to U.S. Department of Education, Docket ID ED-2021-OCR-0166-0001 (Sept. 12, 2022) Notice of Proposed Rulemaking on Title IX of the Education Amendments of 1972 | Opp. MTI App. 16–35 |
| Fact Sheet: Impact of Legal Challenges to the 2024 Title IX Regulations, A Better Balance (Aug. 6, 2024, updated Aug. 22, 2024) | Opp. MTI App. 36–39 |
| Workplace Rights Hub, A Better Balance | Opp. MTI App. 40–43 |
| State Laws, A Better Balance | Opp. MTI App. 44–48 |
| Statement: A Better Balance Condemns District Court's Decision to Withdraw Title IX Regulations Nationally, Depriving Pregnant Students of Rights - A Better Balance (Jan. 10, 2025) | Opp. MTI App. 49–51 |

| | |
|---|---|
| Resource Library, Victim Rights Law Center | Opp. MTI App. 52–55 |
| Amanda Walsh, Esq. & Shannon Masden, *Preparing for the 2024 Title IX Rule: Briefing for Advocates and Attorneys*, Victim Rights Law Center (May 7, 2024) | Opp. MTI App. 56 |
| September Newsletter, Victim Rights Law Center (2024) | Opp. MTI App. 57–60 |
| Press Release: NWLC Moves to Defend Title IX Protections for Student Survivors, National Women's Law Center (Feb. 28, 2025) | Opp. MTI App. 61–64 |
| Compare report of Malone declarations | Opp. MTI App. 65–84 |
| Compare report of Doe declarations | Opp. MTI App. 85–88 |

## CERTIFICATE OF SERVICE

I certify that on April 17, 2025, this document was served on all counsel of record via the Court's CM/ECF system.

*/s/ Mathew W. Hoffmann*
Mathew W. Hoffmann
**Counsel for Plaintiff Carroll ISD**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | |
|---|---|
| CARROLL INDEPENDENT SCHOOL DISTRICT, | |
| *Plaintiff,* | **Case No.** 4:24-cv-00461-O |
| v. | |
| UNITED STATES DEPARTMENT OF EDUCATION; ET AL., | |
| *Defendants.* | |

## DECLARATION OF MATHEW W. HOFFMANN

I, Mathew W. Hoffmann, declare as follows:

1.      I am above the age of 21, and competent to make this declaration.

2.      I am Legal Counsel at Alliance Defending Freedom (ADF) and counsel of record for Plaintiff Carroll Independent School District. These facts are within my personal knowledge and are true and correct. If called to testify, I could and would testify competently to these facts.

3.      On April 9, 2025, I accessed the first attached document from Proposed Intervenor A Better Balance's website, https://www.abetterbalance.org/resources/pregnant-workers-guide-what-should-trans-non-binary-people-know/. It is a true, accurate, and complete copy of the "Pregnant Workers Guide: What Should Trans & Non-Binary People Know" published by A Better Balance and the Transgender Law Center, posted on January 23, 2025 and updated April 2, 2025.

4.      On April 9, 2025, I access the second attached document from Regulations.gov, https://www.regulations.gov/comment/ED-2021-OCR-0166-209992. It is a true, accurate, and complete copy of a comment submitted by A

1

Better Balance and other groups on September 12, 2022, on the Notice of Proposed Rulemaking on Title IX of the Education Amendments of 1972, Docket ID ED-2021-OCR-0166-0001, https://www.regulations.gov/document/ED-2021-OCR-0166-0001.

5.    On April 1, 2025, I accessed the third attached document from Proposed Intervenor A Better Balance's website, https://www.abetterbalance.org/resources/title-ix-fact-sheet/. It is a true, accurate, and complete copy of fact sheet posted by A Better Balance on August 6, 2024 and updated on August 22, 2024.

6.    On April 9, 2025, I accessed the fourth attached document from Proposed Intervenor A Better Balance's website, https://www.abetterbalance.org/know-your-rights/. It is a true, accurate, and complete copy of the landing page for A Better Balance's online "Workplace Rights Hub."

7.    On April 9, 2025, I accessed the fifth attached document from Proposed Intervenor A Better Balance's website, https://www.abetterbalance.org/tag/state-laws/. It is a true, accurate, and complete copy of the landing page for A Better Balance's online "State Laws" resources. Resources include "Fact Sheet: Pregnancy Discrimination in Tennessee" (Feb. 1, 2015) and "State and City Laws and Regulations on Fair and Flexible Scheduling" (Aug. 10, 2021).

8.    On April 1, 2025, I accessed the sixth attached document from Proposed Intervenor A Better Balance's website, https://www.abetterbalance.org/statement-a-better-balance-condemns-district-courts-decision-to-withdraw-title-ix-regulations-nationally-depriving-pregnant-students-of-rights/. It is a true, accurate, and complete copy of a statement made by

2

A Better Balance regarding the Eastern District of Kentucky's vacatur of the 2024 Title IX Rule.

9.      On April 9, 2025, I accessed the seventh attached document from Proposed Intervenor Victim Rights Law Center's website, https://victimrights.org/resource-library/. It is a true, accurate, and complete copy of the landing page to Victim Rights Law Center's "Resource Library" featuring resources about relevant laws in the 50 states and the District of Columbia.

10.     On April 9, 2025, I accessed the eighth attached document from YouTube.com, https://youtu.be/g5l1sMOKFlc?si=tPqoCuIqwILQ1kRW&t=2. It is a true, accurate, and complete copy of a screenshot of a webinar Proposed Intervenor Victim Rights Law Center (VRLC) hosted on May 7, 2024, titled "Preparing for the 2024 Title IX Rule: Briefing for Advocates and Attorneys." At 4:50 in the video, VRLC's Deputy Director of External Affairs Amanda Walsh discusses that the webinar will be "exploring" the "several lawsuits filed challenging" the Rule as of that date.

11.     On April 9, 2025, I accessed the ninth attached document from Proposed Intervenor VRLC's website, https://victimrights.org/wp-content/uploads/2024/08/September-Newsletter-2024.pdf. It is a true, accurate, and complete copy of VRLC's September 2024 newsletter.

12.     On April 1, 2025, I accessed the tenth attached document from the National Women's Law Center's website, https://nwlc.org/press-release/nwlc-moves-to-defend-title-ix-protections-for-student-survivors/. It is a true, accurate, and complete copy of a press release issued by the National Women's Law Center about the intervention motion it filed in the challenge to the 2024 Title IX Rule in the Eastern District of Kentucky. The phrase "Department of Education announced" is hyperlinked to a *New York Times* article about the Department of Education's

3

January 31, 2025 "Dear Colleague" letter.

13.    The eleventh attached document is a true, accurate, and complete copy omitting page numbers and case headers of a comparison report generated by me showing the changes between the Declaration of Stacy Malone filed by Victim Rights Law Center in *Tennessee v. McMahon*, 2:24-cv-00072-DCR-CJS (E.D. Ky.) and the Declaration of Stacy Malone filed by Proposed Intervenor Victim Rights Law Center in this case. Changes between the two versions are shown in red ink.

14.    The twelfth attached document is a true, accurate, and complete copy omitting page numbers and case headers of a comparison report generated by me showing the changes between the Declaration of Jane Doe filed by Jane Doe in *Tennessee v. McMahon*, 2:24-cv-00072-DCR-CJS (E.D. Ky.) and the Declaration of Jane Doe filed by Proposed Intervenor Jane Doe in this case. Changes between the two versions are shown in red ink.

Under 28 U.S.C. section 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this 17th day of April, 2025, at Loudoun County, Virginia.

*/s/ Mathew W. Hoffmann*
Mathew W. Hoffmann

*Counsel for Plaintiff*
*Carroll Independent School District*

4



# Pregnant Workers Guide

## What Should Trans & Non-Binary People Know?

Transgender Law Center    a better balance

Opp. MTI App. 5

# I. Introduction



**Many transmasculine and non-binary people choose to get pregnant and carry children.**
For some transmasculine and non-binary people, getting pregnant is planned in advance. For other people, pregnancy may be unexpected, and for some, unwanted. Though there is a misconception that transmasculine and non-binary people who have taken or are currently taking testosterone either cannot get pregnant or will have challenging pregnancies, neither of those things are true.[1] While it is true that once pregnant, hormone replacement therapy (HRT) treatments must be paused, emerging evidence shows that transmasculine and non-binary people who have used HRT have fertility rates similar to cisgender women, and have no greater likelihood of negative birth outcomes.[2] Additionally, some transgender and non-binary people lactate and breastfeed/chestfeed their babies. This includes adoptive and non-gestational parents, including transgender women and trans-femmes.[3]

---

1   Sarah Prager, _Transgender Pregnancy: Moving Beyond Misconceptions_, Healthline (Oct. 22, 2020).

2    Trystan Reece, _Trans Fertility: How Does Testosterone Affect Egg Health?_, Family Equality (June 24, 2020).

3    Jojanneke E. van Amesfoort, Norah M. Van Mello, and Renate van Genugten, _Lactation induction in a transgender woman: case report and recommendations for clinical practice_, International Breastfeeding Journal (2024), see also Amy K. Weimer, _Lactation Induction in a Transgender Woman: Macronutrient Analysis and Patient Perspectives_, Journal of Human Lactation, (May 3, 2023).



Opp. MTI App. 6

# I. Introduction

However, transgender and non-binary people do experience far greater instances of stigmatization, discrimination in perinatal (perinatal refers to the time period during pregnancy to around a year after birth) healthcare, workplace discrimination, and other social harms during pregnancy.[4] This is particularly true for transgender and non-binary people of color, as it is well documented that people of color, particularly Black people, experience multiple forms of discrimination when seeking perinatal healthcare.[5]

This guide focuses specifically on helping transgender and non-binary workers understand their rights under the Pregnant Workers Fairness Act (PWFA) and the PUMP Act, including the right to reasonable accommodations at work, a designated space to pump milk and breaks for pumping, and postpartum (the time period following childbirth) health protections.



In addition to the accommodations available under the PWFA and PUMP Act, pregnant and postpartum workers may also be eligible for unpaid leave under the Family and Medical Leave Act (FMLA) and, depending on the state, statewide paid (and unpaid) family and medical leave laws. For more information see our **FMLA guide** and our **Statewide Paid Leave Protections guide**.

This guide also includes a list of resources on other topics related to pregnancy, lactation, and the postpartum experience.

## What does this guide cover?

This guide provides an overview of the PWFA and PUMP Act with a focus on scenarios that transgender and non-binary people may experience before, during, and after pregnancy.

---

4   Bella Isaacs-Thomas, *For Many Pregnant Trans People, Competent Medical Care is Hard to Find*, PBS (May 26, 2021); see also *Pregnant transgender man files an employment discrimination lawsuit against Amazon* and Advocates for Trans Equality: Employment.

5   Latoya Hill, Samantha Artiga, and Usha Ranji, *Racial Disparities in Maternal and Infant Health: Current Status and Efforts to Address Them*, KFF (Nov. 1, 2022).




Opp. MTI App. 7

# II. Overview of the PWFA

## What is the PWFA, and What Does it Provide?

**The Pregnant Workers Fairness Act (PWFA) is a landmark nationwide civil rights law that gives pregnant and postpartum workers the right to reasonable accommodations, or changes to their work, for pregnancy, childbirth and related medical conditions. The PWFA:**

 Covers assisted reproductive technology and other fertility treatments such as intrauterine insemination (IUI) and in vitro fertilization (or IVF) sought for the purpose of becoming pregnant

 Ensures that workers who are pregnant, seeking to become pregnant, or postpartum (the time period following childbirth or loss of pregnancy) are not forced off the job by guaranteeing them the accommodations they need to stay safe and healthy.

 Includes protections for pregnant and postpartum workers from discrimination or retaliation for needing reasonable accommodations. The law ensures that millions of pregnant workers, and those who are seeking to become pregnant or have recently given birth, can protect their health without risking their paycheck.

## Does the PWFA Apply to Me?

All employees (including government employees) who work for an employer with **15 or more employees** are covered under the PWFA regardless of how long they've been working for their employer. There is no waiting period to receive accommodations. You can get reasonable accommodations as soon as you start working at a new employer, or even sooner if you need accommodations during the application/hiring process, as long as you have a health need related to pregnancy or childbirth that requires accommodations.

Some states and cities have their own versions of the PWFA that apply to smaller employers. If you work for a company with fewer than 15 employees, be sure to check out A Better Balance's **Workplace Rights Hub** for information about any applicable rights in your state.

4





# II. Overview of the PWFA

## What is a Reasonable Accomodation?

A reasonable accommodation is a change to an employee's work environment, job duties, or schedule that they need to perform their job while keeping safe and healthy. Covered employers have to provide reasonable accommodations for their employees' pregnancy, childbirth, and related medical conditions unless it would be an "undue hardship" to the employer.

### Examples of potential reasonable accommodations include (but are not limited to):

- Light duty, **including reducing or receiving help with manual labor and lifting or climbing**

- Temporary **transfer** to a less physically demanding or safer position

- Additional, longer, or more flexible **breaks** to drink water, eat, rest, or use the restroom

- **Changing food or drink policies** to allow you to eat or drink water at your workstation

- Providing **additional equipment**, such as a stool to sit on at your workstation

- **Making existing facilities easier to use**, such as relocating your workstation closer to the restroom

- **Changing a uniform or dress code**, like allowing you to wear looser clothes to accommodate your pregnancy

- **Limiting exposure to hazardous chemicals** and other workplace hazards

- **Flexible/modified scheduling**, such as for prenatal or postnatal doctor's appointments or to accommodate morning sickness

- **Remote work or telework**

- **Time off** for **prenatal** appointments or to obtain **postpartum-related care**

- **Time off** for appointments related to **fertility/assisted reproductive care** for the purpose of becoming pregnant

- **Leave or time off to recover from childbirth**, even if you don't qualify for leave under other laws like the federal FMLA

- **Leave or time off for other pregnancy- or postpartum-related health issues**, such as bedrest, recovery from miscarriage, postpartum depression, or mastitis

- **Lactation-related accommodations**, such as providing a worker break time to pump milk or creating a clean, private lactation space (that isn't a bathroom)

5

 

Opp. MTI App. 9

# II. Overview of the PWFA

These are only examples, and there are plenty of other changes you could ask for at work to protect you and your pregnancy. Keep in mind that your employer doesn't necessarily have to provide you with your preferred accommodation, but they do have to provide you with an accommodation that meets your health needs, as long as it would not create an undue hardship for the employer (see more below).

## When is an Accomodation an Undue Hardship?

An accommodation is an undue hardship if it would be **significantly difficult or expensive** for the employer to provide the accommodation.

Whether an accommodation is an undue hardship always depends on the situation in your workplace, taking into account things like the cost of the accommodation, the size of your employer, and your employer's financial resources.

Employers have to be able to explain why a certain accommodation would be an undue hardship, and this is a high bar to meet. An accommodation is not an undue hardship if it will only be moderately difficult or expensive for your employer to provide. Employers may have to make exceptions to their usual policies to accommodate workers, and this isn't automatically an undue hardship. "Unfairness" to other workers or concerns about employee morale are also not undue hardships.



Transgender Law Center



# III. Protections for Lactating and Nursing Workers Under the PWFA and PUMP Act

Workers have rights related to lactation and pumping milk under the PUMP Act and the PWFA, detailed below.

## What Is the PUMP Act and What Does It Provide?

The PUMP Act provides lactating workers nationwide the right to reasonable break time and a place, other than a bathroom, that is shielded from view and free from intrusion, to pump or express milk while at work. This right is available for up to one year after the child's birth. These protections apply regardless of gender or gender identity.

## Am I Protected Under the PUMP Act?

Thanks to the PUMP Act, nearly all workers are now covered by the federal lactation break time and space requirements.

The PUMP Act applies to employees regardless of the size of their employer. In some situations, employers that have fewer than 50 employees may be excused from complying with the law when providing the break time and space required by the PUMP Act would be significantly difficult or expensive (called an "undue hardship"). According to the U.S. Department of Labor, undue hardship is extremely rare in the context of the PUMP Act.[6] In almost all situations, employers with fewer than 50 employees must provide the required break time and space. And there is no undue hardship exemption available for employers with 50 or more employees; they must follow the law without exception.

Special rules apply to certain rail carrier and motorcoach employees. Unfortunately, airline flight crewmembers (flight attendants and pilots) remain uncovered by the law.

Employees may have additional rights to receive break time, space, and modifications at work for lactation under other federal and state laws. See **Section IV** for where to go for help.

---

6    U.S. Department of Labor, Field Assistance Bulletin No. 2023-02, ("Because the law requires only space and time for unpaid breaks for one year after a child's birth, and the employer must be able to demonstrate 'significant' difficulty or expense, employers will be exempt only in limited circumstances.").



Opp. MTI App. 11

# III. Protections for Lactating and Nursing Workers Under the PWFA and PUMP Act

## Does the PWFA Also Cover Nursing or Lactation-Related Accommodations?

 **Yes.**

**Lactation is a medical condition related to pregnancy or childbirth,** so employees can ask for accommodations related to nursing under the PWFA, even if they are not covered by the PUMP Act. Lactating employees may need accommodations to pump at work, prevent infections or mastitis, keep up their milk supply, and more. Some examples of lactation accommodations include (but are not limited to):

| | |
|---|---|
| **Regular breaks to pump milk** | **A private, non-bathroom space that you can pump in** |
| **Temporary transfer to another position to prevent exposure to environmental hazards/chemicals, or to give you access to a pumping location** | **Modifications to your uniform or equipment** |

Transgender Law Center

a better balance

Opp. MTI App. 12

# IV. Enforcement and Other Considerations

## Protection From Employer Interference and Retaliation Under the PWFA and PUMP Act

**If you think your rights have been violated under the PWFA or PUMP Act or need more information, the following options may be useful to you:**



Call A Better Balance's free and confidential legal helpline at **1-833-NEED-ABB** (1-833-633-3222) or complete our **online contact form**.



Contact Transgender Law Center's legal information helpdesk by using our **online intake form**.



9

# IV. Enforcement and Other Considerations

## Additional Protections Against Employment Discrimination

Following the Supreme Court's landmark *Bostock v. Clayton County* decision in 2020, transgender and non-binary people with an employer that has at least 15 employees are protected under federal law against employment discrimination based on sexual orientation or gender identity.  If you believe you have been discriminated against based on your sexual orientation or gender identity you can **file a complaint** with the Federal Equal Employment Opportunity Commission (EEOC).



You may also be able to file a complaint with your state and/or local discrimination enforcement agency. For more information about employment discrimination see Transgender Law Center's online **employment resources**. If you feel that you are experiencing workplace discrimination, the Transgender Law Center's **Legal Information Helpdesk** can provide information about addressing employment discrimination and legal resources.



**File a Complaint** with the Federal Equal Employment Opportunity Commission



Transgender Law Center's **Employment Discrimination Resources**



Transgender Law Center's **Legal Information Helpdesk**



Transgender Law Center    a better balance

Opp. MTI App. 14

# IV. Enforcement and Other Considerations

## Protections Under the FMLA and State Paid Leave Laws

Pregnant workers may also be eligible for leave under the Family & Medical Leave Act (FMLA) and/or statewide paid family and medical leave laws. The FMLA provides eligible employees up to 12 weeks of unpaid, job-protected leave to bond with a new child, recover from their own serious illness, or to care for a seriously ill family member. In a growing number of states, statewide paid family and medical leave laws provide similar or expanded protections. Additionally, many states provide for some level of wage replacement (i.e. paid leave), and many have more expansive definitions of family that include chosen family and other loved ones. For more information about the FMLA, see our guide **here**. For more information about statewide paid family and medical leave, see our guide **here**.

 ## Other Resources

> **Trans Fertility Co.:** A trans-led project containing articles on academic research, videos on many aspects of trans fertility, and opportunities for fertility and family-building practitioners to deepen their commitment to the trans community.

> **Family Equality:** An organization focused on advancing the rights of LGBTQ families, Family Equality has several trans and non-binary specific resources, including:
>
> - Preparing for Pregnancy as a Non-Binary person
> - Trans Fatherhood
> - Transmasculine Fertility
> - LGBTQ+ family building provider directory

> **Transgender Law Center:**
>
> - A Language Guide for Journalists and Communities: Abortion and Reproductive Care

> **What's in A Name? Gender Inclusion in Maternity and Beyond**




Opp. MTI App. 15

September 12, 2022
*Submitted via www.regulations.gov*

Dr. Miguel Cardona                         Catherine E. Lhamon
Secretary of Education                     Assistant Secretary, Office for Civil Rights
U.S. Department of Education               U.S. Department of Education
400 Maryland Ave SW                        400 Maryland Ave SW
Washington, DC 20202                       Washington, DC 20202

**Re: Docket ID ED–2021–OCR–0166, RIN 1870–AA16, Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance**

Dear Secretary Cardona and Assistant Secretary Lhamon:

We are a diverse group of advocates and experts dedicated to advancing civil rights protections and institutional resources for students and/or pregnant and parenting people. Many of the signatories are members of the Advocacy Coalition for Pregnant and Parenting Students, a recently formed national coalition aiming to advance policy changes for pregnant and parenting students in K-12 and Higher Education.

We appreciate that the U.S. Department of Education ("the Department"), for the first time since 1975, is proposing new regulations to effectuate the law's broad and remedial purpose for pregnant and parenting students and workers in education programs and activities. At the same time, we note that the Department's proposed changes do not reach far enough to protect against sex discrimination in education. To that end, we are pleased to submit this comment regarding the proposed Title IX regulations which detail recipients' obligations to pregnant and parenting students, admissions' applicants, and workers.

Section I provides a background on pregnant and parenting people's access to equal educational opportunities. Sections II and III encompass our specific asks for pregnant students. Section IV outlines our recommendations for addressing sex-based harassment against pregnant and parenting students. Section V details our ask for broader protections for parenting students. Section VI suggests changes to the Department's proposal regarding admissions. Section VII outlines recommendations to address the intersection of pregnancy and disability under Title IX and other relevant federal civil rights laws. Finally, section VIII outlines our recommendations for pregnant and parenting workers covered under Title IX.

## I.    BACKGROUND

Becoming pregnant or a parent should not derail a student's education. Unfortunately, pregnant and parenting students are routinely stigmatized, discriminated against, and denied the resources and support they need to thrive in their educational institutions. As a result, only 51% of teenage mothers earn a high school diploma by age 22 compared to 89% of girls who do not have a child as a teen.[1] 33% of Black teen mothers and 54% of Latina teen mothers never obtain a diploma

---

[1] Kate Perper, Kristen Peterson, and Jennifer Manlove, *Diploma attainment among teen mother*s. Child Trends (Jan. 2010), https://www.childtrends.org/wp-content/uploads/2010/01/child_trends-2010_01_22_FS_diplomaattainment.pdf

Opp. MTI App. 16

or GED,[2] and fewer than 2% of all teen mothers graduate college by age 30,[3] leading to decreased opportunities for continuing education and employment. Additionally, lesbian and bisexual teen girls are more likely than straight teens to become pregnant, and transgender youth are just as likely to become pregnant as cisgender youth.[4] Despite this trend, LGBTQI+ pregnant and parenting students' experiences of intersectional discrimination and their unique needs are largely ignored by educational institutions.[5]

At the college level, almost one quarter of all undergraduate students are parents.[6] 44% of student parents work full time while enrolled, and 23% of student parents are single parents working full time while enrolled. 40% of Black women in college are mothers, which means that Black women are more likely to be student parents than their White peers.[7] Despite earning higher GPAs than non-parenting students,[8] parenting college students are less likely to graduate.[9] This is not due to personal failing, but rather a lack of institutional support and recognition of the unique barriers to college completion for parenting students.[10] Parenting students often experience feeling disconnected from the larger education community and are not aware of who they can speak to when they experience discrimination because of their parenting status.[11]

Despite these roadblocks, when educational institutions listen to pregnant and parenting students, support them, and prevent discrimination against them, these students thrive. While balancing their health, caregiving responsibilities, and educational goals is challenging, these added responsibilities often renew students' dedication to their studies.[12]

Likewise, it is critical that pregnant and parenting employees in educational programs and activities are protected from discrimination and have access to the support they need to stay employed. As the COVID-19 pandemic pushes women out of the workforce[13] and teacher

---

[2] *Id.*

[3] Cynthia Costello, *Pathways to postsecondary education for pregnant and parenting teens.* Institute for Women's Policy Research. (May 2014), https://files.eric.ed.gov/fulltext/ED556724.pdf

[4] Nat'l Women's Law Ctr., *A Call to Action to Support LGBTQI Pregnant, Expectant, and Parenting Students* (March 2022), https://nwlc.org/resource/a-call-to-action-to-support-lgbtqi-pregnant-expectant-and-parenting-students/

[5] *Id.*

[6] Institute for Women's Policy and Research, *Parents in College by the Numbers*, (April 11, 2019), https://iwpr.org/iwpr-issues/student-parent-success-initiative/parents-in-college-by-the-numbers

[7] *Id.*

[8] *Id.*

[9] Renee Ryberg, Rachel Rosenberg, Jessica Warren, *Higher Education Can Support Parenting Students and Their Children with Accessible and Equitable Services,* Child Trends (Jan. 2021), https://www.childtrends.org/publications/higher-education-support-parenting-students-and-their-children-with-accessible-equitable-services

[10] *See e.g.* Barbara Gault and Lindsey Reichlin Cruse, *Access to Child Care Can Improve Student Parent Graduation Rates* (2017), Inst. for Women's Pol'y & Res. (May 2017), https://iwpr.org/iwpr-general/access-to-child-care-can-improve-student-parent-graduation-rates

[11] Generation Hope, *National Student Parent Survey Results and Recommendations* (May 2020), https://www.generationhope.org/student-parents-report-2020

[12] Nat'l Women's Law Ctr., *Let Her Learn: Stopping Pushout For Girls Who are Pregnant or Parenting, 1,*(2017) https://nwlc.org/resources/stopping-school-pushout-for-girls-who-are-pregnant-or-parenting/.

[13] Nat'l Women's Law Ctr., *Resilient but not Recovered, After Two Years of the COVID-19 Pandemic, Women are Still Struggling,*(March 2022), https://nwlc.org/resource/resilient-but-not-recovered-after-two-years-of-the-covid-19-crisis-women-are-still-struggling/

Opp. MTI App. 17

shortages impact schools across the country,[14] stronger protections for pregnant and parenting employees in educational settings are essential.[15]

The Supreme Court's recent decision in *Dobbs v. Jackson Women's Health,* 597 U.S. __ (2022), highlights the importance and timeliness of the Department's proposed rule.[16] As access to reproductive health care faces new attacks and criminalization, it is especially crucial that an individual's reproductive decisions do not dictate their educational outcomes. The U.S. Department of Education plays a critical role in advancing and enforcing the civil rights protections of pregnant and parenting students and workers.

## II.   SCOPE OF PROHIBITED DISCRIMINATION

### A.  The Final Rule Should Prohibit Discrimination Against those Perceived or Expected to be Pregnant and Expand the List of Examples of Pregnancy Related Medical Conditions.

While Title IX has always prohibited recipients from discriminating against students based on their pregnancy or pregnancy related medical condition, this type of sex-based discrimination is still a frequent occurrence.[17]

**We strongly support** the Department's proposal to prohibit educational institutions from discriminating against any person (including students and workers, and in the admissions process) based on their "current, potential, or past" pregnancy or related condition[18] and **urge the Department** to include "perceived" and "expected" pregnancy or related conditions to the list. This language will better capture the ways pregnancy stigma and bias prevent equal access to educational opportunities. For example, one signatory supported a high school student who had her academic honors designation revoked simply because false rumors spread that she was pregnant and had an abortion. Students rumored or otherwise perceived to be pregnant deserve equal educational opportunities. This language will also ensure that students seeking fertility care or otherwise planning to become pregnant are not discriminated against on that basis. It will also

---

[14]  Hannah Natanson, " 'Never Seen it This Bad': America Faces Catastrophic Teacher Shortage, Washington Post, (Aug.4 2022), https://www.washingtonpost.com/education/2022/08/03/school-teacher-shortage/

[15]  Hannah Natanson, " 'Never Seen it This Bad': America Faces Catastrophic Teacher Shortage, Washington Post, (Aug.4 2022), https://www.washingtonpost.com/education/2022/08/03/school-teacher-shortage/

[16]  *Dobbs v. Jackson Women's Health*, 597 U.S. ___ (2022).

[17]  *See e.g., Salt Lake Community College*, No. 08-22-2021, Office for Civ. Rts. Ltr. of Findings (U.S. Dep't. Education [June 14, 2022]), https://www2.ed.gov/about/offices/list/ocr/docs/investigations/more/08222021-a.pdf?utm_content=&utm_medium=email&utm_name=&utm_source=govdelivery&utm_term= (finding college violated pregnant student's rights under Title IX and Section 504 of the Rehabilitation Act);  *Cal St. Univ. East Bay*, No. 09-18-2245, Office for Civ. Rts. Ltr. of Findings (U.S. Dep't. Education [Aug. 1, 2018]), https://www2.ed.gov/about/offices/list/ocr/docs/investigations/more/09182245-a.pdf (pregnant student denied accommodations and excused absences); *Fresno City College*, No. 09-18-2013, Office for Civ. Rts. Ltr. of Findings (U.S. Dep't. Education [Apr. 10, 2018]), https://www2.ed.gov/about/offices/list/ocr/docs/investigations/more/09182013-a.pdf (student denied pregnancy related absences); *Conley v. Northwest Florida State Coll., 145 F. Supp.3d 1073* (N.D. Fla. 2015)(denying recipient's motion to dismiss student's Title IX claim alleging pregnancy disscrimination when professor urged pregnant student to not participate in paramedic program)

[18] 87 Fed. Reg. at 41568 (proposed 34 C.F.R. § 106.2) ("pregnancy or related conditions"), 41571 (proposed 34 C.F.R. §§ 106.21(c)(2)(ii), 106.40(b)(1)), 41579 (proposed 34 C.F.R. § 106.57(b)).

Opp. MTI App. 18

ensure that women and girls and others assigned female at birth are not denied opportunities in programs because they might become pregnant.

**We also support** the proposed rule explicitly adding "lactation" as a related condition alongside childbirth and termination of pregnancy.[19] As detailed in section III(C) below, this addition is crucial to ensure lactating students need not choose between their health, the health of their children and their education.

**We urge the Department** to clarify in the regulations that's its enumeration of pregnancy-related conditions is non-exhaustive and that the term "pregnancy-related conditions" also includes mental and physical conditions including, but not limited to gestational diabetes, preeclampsia, mastitis, hyperemesis gravidarum, "morning sickness," fatigue, dehydration, and postpartum depression. Additionally, the Department should clarify that a pregnancy related condition need not qualify as an ADA disability in order to fit this definition of a protected pregnancy related medical condition.

### B. The Department Should Require Recipients to Publicize the Scope of their Obligations and Protect Students' Privacy.

**We support the Department's** proposal to explicitly require recipients to train employees, including Title IX Coordinators, on their obligations to pregnant and parenting students.[20]

**We urge the Department** to require recipients to specifically state in their published notice of nondiscrimination[21] that sex discrimination includes discrimination based on sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, gender identity, and parental, family, caregiver, or marital status. These additions should be required to be made in the notice because students may not know all that "sex discrimination" covers.[22]

The proposed rules would also require employees who know of a student's pregnancy or related condition to give them the Title IX coordinator's contact information[23] and would require Title IX coordinators to then notify the student of their rights if the student or someone with the legal right to act on behalf of the student notifies the Title IX coordinator of the student's pregnancy or related condition.[24] We appreciate the intent behind these requirements but **ask the Department** to instruct educational institutions in the final regulations and in supplemental guidance on how to protect student privacy to ensure that, in states where abortion is criminalized, school records, including school health records, are not used to support abortion-related prosecutions through

---

[19] 87 Fed. Reg. at 41568 (proposed 34 C.F.R. § 106.2) ("pregnancy or related conditions").

[20] 87 Fed. Reg. at 41570 (proposed 34 C.F.R. §106.8(d))

[21] 87 Fed. Reg. at 41570 (proposed 34 C.F.R.  §106.8(c))

[22] See, Nat'l Coal. for Women & Girls in Educ., Title IX at 40: Working to Ensure Gender Equity in Education 55 (2012), http://www.ncwge.org/TitleIX40/TitleIX-print.pdf [https://perma.cc/Q3MD-W56W]; Mangel, supra note 7 ("[T]he pregnant and parenting students aren't the only ones empowered by this information ... teachers, nurses, social service providers and others are always shocked to hear that the law actually is in place to protect the pregnant and parenting student."). 20 Mary Ann Mason, Opinion, Title IX and Babies: The New Frontier?, Chron. Higher Educ. (Nov. 29, 2012), https:// www.chronicle.com/article/Title-IXBabies-The-New/135936 [https://perma.cc/5REJ-HMTW].

[23] 87 Fed. Reg. at 41571 (proposed 34 C.F.R § 106.40(b)(2)).

[24] 87 Fed. Reg. at 41571-72 (proposed 34 C.F.R. § 106.40(b)(3)(i)).

4

Opp. MTI App. 19

documentation that students have been pregnant in the past but are not currently pregnant.[25] Further, **we urge the Department** to instruct and remind recipients that it is a violation of Title IX to discipline or refer students to law enforcement based on termination of pregnancy, contraceptive use, or other reproductive health decisions.

### III.    STUDENT ACCESS TO EDUCATION PROGRAMS AND ACTIVITIES

#### A.    The Department Should Protect Pregnant Students from Being Forced into Inferior Alternative Programs.

Despite the Department's long standing requirement that pregnant students can only be placed in separate educational programs or activities if their participation in such programs or activities is voluntary,[26] pregnant and parenting students, particularly those in high school, are routinely forced, coerced or pressured into inferior alternative education programs. Additionally, there is currently no repository of information on which districts or schools have separate programs or services for pregnant and parenting students or the quality of those offerings.[27] As such, **we urge the Department** to explicitly prohibit educational institutions from requiring pregnant or parenting[28] students to participate in separate programs and to specify that such programs must be substantially equal "in purpose, scope, and quality" to those offered to students who are not pregnant or parenting and don't have a pregnancy related condition.

**We also support** the proposed rule prohibiting educational institutions from requiring students who are pregnant or have a related condition to provide certification from their healthcare provider that they can physically participate in a program or activity, unless all students are required to provide such certification and such certification is not used as the basis for discrimination.[29] This is especially important for pregnant students who participate in physically intensive extracurricular activities, or are placed in laboratories or medical facilities as part of their curriculum. In these instances, recipients tend to make blanket assumptions about pregnant students' abilities and prohibit them from participating in such programs all together.[30] Finally, **we support** the proposed change allowing any healthcare provider (not just a physician) to provide certification,[31] as this recognizes that not all students have easy access to a physician.

#### B.    The Department Should Ensure Medically Necessary Leave Does Not Restrict Students' Access to Benefits and Ensure Reasonable Modifications Are Accessible.

---

[25] *See e.g., Bonamici Leads 60 Colleagues in Calling for Pregnant Students to be Protected Under Title IX,* Press Release, (July 2022), https://bonamici.house.gov/media/press-releases/bonamici-leads-60-colleagues-calling-pregnant-students-be-protected-under-title

[26]  87 Fed. Reg. at 41571 (proposed 34 C.F.R. § 106.40(b)(1)).

[27] Nat'l Women's Law Ctr. Mandatory Civil Rights Data Collection Public Comment, Docket No. ED–2021–SCC–0158, at 86 Fed. Reg. 70831, (Feb. 2022) at 32, https://nwlc.org/wp-content/uploads/2022/02/CRDC-comment-2.11.22-vF.pdf

[28] The proposed rule only mentions pregnancy and related conditions despite the reality that parenting students are also pushed into inferior alternative programs.

[29] 87 Fed. Reg. at 41572 (proposed 34 C.F.R. § 106.40(b)(6)).

[30] *See, e.g. Conley v. Northwest Florida State Coll., 145 F. Supp.3d 1073* (N.D. Fla. 2015)

[31] 87 Fed. Reg. at 41572 (proposed C.F.R. § 106.40(b)(6))

Opp. MTI App. 20

Punitive absence policies push pregnant and parenting students out of school by disciplining them for missing class for medical appointments, their own medical recovery and needs, when their children are ill, or if child care arrangements fall through. For example, in a 2017 survey, high school girls who are pregnant or parenting (54%) were more likely than girls overall (25%) to report they had missed 15 days or more of school in a year.[32] When individual schools or instructors have the discretion to create their own attendance policies, it is likely that pregnant and parenting students' needs will not be considered. Pregnant and parenting students should not have to choose between their health and their education.

**We support** the Department providing new regulatory clarity regarding reasonable modifications, voluntary leave absence, and lactation spaces (as discussed further below), but we urge the Department to clarify that the obligation to provide reasonable modifications to address pregnancy or related conditions; to allow a student affected by pregnancy or related conditions to take a voluntary leave of absence; and to ensure the availability of a lactation space are obligations of the *recipient*, not just personal obligations of the Title IX coordinator. The proposed regulations specifically charge the Title IX coordinator with these obligations,[33] which may lead recipients to assert that no other agent or employee of the recipient has a responsibility to comply with these provisions or that the recipient is not responsible for any failure of the Title IX coordinator to meet these obligations.

**We support** the proposed rule requiring educational institutions to allow students who are pregnant or have a related condition to take a voluntary leave of absence for as long as deemed medically necessary by their healthcare provider or for as long as the school's policy allows— whichever is longer—and to reinstate students when they return to their prior academic status and, as practicable, extracurricular status.[34] In particular, we support the proposed change allowing any healthcare provider (not just a physician) to determine how much leave is medically necessary, as this recognizes that not all students have easy access to a physician or that they may receive healthcare from another type of provider. However, the proposed rule does not address the reality that many students in higher education who take a medically necessary "leave" are forced to withdraw or deregister during the leave, which in turn results in ineligibility for critical benefits like housing, financial aid or scholarships, and healthcare. For this reason, **we urge the Department** to require recipients to provide medically-necessary leave without jeopardizing a student's access to benefits. Recipients can achieve this by ensuring the continuation of the student's status and benefits coverage during medically necessary leave, and preserving their scholarships.

The proposed rules would also require educational institutions to "promptly" make "voluntary and reasonable modifications"[35] to their policies, practices, or procedures because of a student's pregnancy or related condition, unless a modification is "so significant" that it "alters the essential

---

[32] Nat'l Women's Law Ctr., *Let Her Learn: Stopping Pushout For Girls Who are Pregnant or Parenting, 7,*(2017) https://nwlc.org/resources/stopping-school-pushout-for-girls-who-are-pregnant-or-parenting/.

[33] 87 Fed. Reg. at 41571 (*proposed 34 C.F.R.* § 106.40(b)(3)(ii), (iii), and(iv))

[34] 87 Fed. Reg. at 41571 (proposed 34 C.F.R. § 106.40(b)(3)), 41572 (proposed 34 C.F.R. § 106.40(b)(3)(ii)).

[35] 87 Fed. Reg. at 41571 (proposed 34 C.F.R. § 106.40(b)(3)), 41572 (proposed 34 C.F.R. § 106.40(b)(3)(ii)).

Opp. MTI App. 21

nature" of the school's program or activity.[36] We appreciate the requirement that the modifications must be voluntary, but we note that as written the language of the proposed rules is somewhat vague as to what is meant by the term and whether it refers to the voluntary acceptance of the modification by the student or the voluntary provision of the modification by the recipient; therefore, **we encourage the Department** to explain what is meant by "voluntary" by explicitly stating in the regulations that a recipient shall not force a student to accept a modification that the student does not want or need. The proposed rule also would create an arbitrary and harmful distinction between medically necessary "leave" (e.g., for recovery from pregnancy)—which would have to be granted if requested—and short "breaks during class" (e.g., for lactation breaks) or "intermittent absences" (e.g. for abortion or recovery therefrom)—which would be classified as "reasonable modifications" and could be approved or denied subject to a Title IX coordinator's discretionary determination that providing such breaks amounts to a "fundamental alteration" of the educational program.

Therefore, **we urge the Department** to require educational institutions to presume that medically necessary absences (e.g., for prenatal care, lactation breaks, abortion care) are inherently "reasonable" modifications and must be granted. Additionally, the Department should clarify that if a modification turns out to be ineffective or "fundamentally alters" the program or activity, then the educational institution must engage in a good faith, interactive dialogue to identify other modifications that would meet the student's needs.

The proposed rule does not clarify whether recipients are allowed to require medical documentation in order to grant requests for reasonable modifications.[37] **We urge the Department** to explicitly state in the regulations that medical documentation is very frequently–indeed, typically–unnecessary. Forcing students to get medical documentation for reasonable modifications, particularly very routine or obvious modifications such as bathroom breaks or a larger desk, is unnecessarily burdensome for students and is often used as a tool for harassment or retaliation.

**We also ask the Department** to add more specific examples of modifications, including access to accessible parking; educational support services such as tutoring, supplemental instruction, academic counseling, and homework assistance to address medically necessary absences; and the modifications listed in sections V(C) and VIII(A) pertaining to parenting and caregiving students and workers.

As detailed in VIII(A) below, **the Department should** extend the same affirmative rights to modifications to workers who are pregnant or have a related condition, or are parenting or caregiving, instead of making such workers' rights dependent on what modifications are provided to workers with temporary disabilities. After all, discrimination based on pregnancy or a related condition is a form of sex discrimination under Title IX, and affected students and employees alike should have affirmative rights under Title IX that are independent of other civil rights laws. Finally, as mentioned in section V(C) below, the Department should make similar modifications available

---

[36] 87 Fed. Reg. at 41572 (proposed 34 C.F.R. § 106.40(b)(4)).

[37] 87 Fed. Reg. at 41525-41526

Opp. MTI App. 22

to all parenting and caregiving students and workers (not just those who are pregnant or have a related condition) for as long as they are caring for a minor child or disabled adult who is sick.[38]

### C.  The Final Rule Should Ensure Access to a Functional Lactation Space.

We support the proposed rules requiring educational institutions to give lactating students and workers reasonable breaks and a clean, private non-bathroom space for expressing breastmilk or feedings. Without adequate space and time to pump, lactating students are forced to choose between the health of themselves and their child, and their education. Pumping breastmilk can take 15 to 40 minutes and requires specialized equipment and supplies.[39] Without expressing breastmilk, lactating students may experience pain and be at risk of health complications such as clogged ducts and mastitis (inflammation of breast tissue that sometimes involves infection).[40] An inability to pump also leads to a reduction in milk supply, making it harder to continue breastfeeding.[41] Because breastmilk can be used to feed a child, a public restroom is not an appropriate space for people to breastfeed, just as one would not expect an adult to eat in a public restroom. A lack of accommodations frustrates the ability of lactating persons to provide nutrition for children.

**We urge the Department** to clarify that lactation spaces must be equipped with a chair, flat surface, and access to an electrical outlet. There should also be nearby access to running water and a refrigerator to store expressed milk. The Department should also explicitly state that lactation spaces must be in reasonable proximity to the student's specific place of study or worker's specific place of work. These are the bare minimum features of a lactation space for it to be functional. What's more, nearly all recipients under Title IX are already required to provide a lactation space to certain employees under the Fair Labor Standards Act. As such, the cost of implementing these spaces is minimal.[42]

**The Department should** also clarify in the regulations and in supplemental guidance that if multiple lactating students or workers need access to a lactation space at the same time, recipients should discuss various options with all parties to create a solution that meets everyone's needs. Such options can include using a signage or scheduling system, or creating a multi-person space by placing partitions or screens in the space.[43]

Finally, **we urge the Department** to explicitly state in the regulations that students and workers still have a right to express milk or breastfeed in places other than designated lactation spaces, if they wish. For example, it may be easier for a professor to express milk in their office, or for a

---

[38] Under the proposed rules, the only parents entitled to modifications would be those who are pregnant, lactating, or recovering from childbirth. Our recommendation is consistent with the proposed rules' definition of "parental status," which applies to all parents of minor children and disabled adults. *See* 87 Fed. Reg. at 41568 (proposed 34 C.F.R. § 106.2)**.**

[39] U.S. Dep't. of Agriculture, Learning to Pump and Hand Express Milk,  https://wicbreastfeeding.fns.usda.gov/learning-pump-and-hand-express-milk

[40] Nat'l Women's Law Ctr.,  *Breastfeeding FAQ* (2016),  https://nwlc.org/resource/faq-breastfeeding-students/.

[41] *Id.*

[42] 29 U.S.C. 207(r)(1).

[43] NYC FAQ: Lactation Accommodations and Model Policy NYC Admin. Code § 8-107(22) at  #21,  https://www1.nyc.gov/site/cchr/law/lactation-faqs.page

Opp. MTI App. 23

student to nurse at a child care facility. Additionally, fully portable breast pumps allow lactating persons to easily express milk in public spaces. Such a regulation would align with laws in all 50 states, the District of Columbia, Puerto Rico, and the Virgin Islands that allow lactating people to breastfeed in any public or private place they are otherwise allowed to be.[44] This language gives agency to the lactating person and challenges outdated messages that it is shameful or indecent to express breastmilk in public.[45] We also suggest the Department adopt more gender-neutral language, such as "lactating person," "express milk," and "nursing."

## IV.    HARASSMENT OF PREGNANT AND PARENTING STUDENTS

Becoming pregnant or a parent can subject students, particularly girls and women, to sexual harassment and unwanted sexual attention, as well as other sex-based harassment based on their pregnancy or related conditions or on their status as parent. Girls who are pregnant or parenting report feeling stigmatized and treated like an outcast in both school and society at large. For example, one young girl in a 2017 focus group explained that her classmates think that "just because you [have] a baby that you are going to sleep with them."[46] Not surprisingly, girls who are pregnant or parenting ranked protection from bullying and harassment among the most important things that schools could do to help them.[47]

**We support** the proposed rules stating that recipients must address harassment based on pregnancy or related conditions as a form of sex-based harassment.[48] In addition, **we ask the Department** to instruct educational institutions in the final regulations and in supplemental guidance on how to protect student privacy to ensure that school records regarding harassment based on pregnancy or related conditions (including termination of pregnancy) are not used to support abortion-related prosecutions in states where abortion and other reproductive healthcare is criminalized. **The Department should** also clarify how the Supreme Court's decision in *Dobbs* interacts with other privacy laws affecting students, like the Family Educational Rights and Privacy Act (FERPA) and the Health Insurance Portability and Accountability Act (HIPAA) and clarify that a student is protected by FERPA if they disclose an abortion to an academic counselor or mental health care provider. Given the growing number of state laws criminalizing and targeting abortion, the **Department should** clarify that Title IX's preemption[49] extends to these state laws, and as such, even in states where abortion is criminalized, recipients must prohibit abortion related discrimination and cannot be subjected to criminalization for doing so. Furthermore, as explained in section V(A) below, **we urge the Department** to include harassment based on parental, family,

---

[44] National Conference of State Legislatures, *State Breastfeeding Laws, https://www.ncsl.org/research/health/breastfeeding-state-laws.aspx*

[45] The Department's language in the preamble that lactating persons should not have to "risk exposing themselves" to their peers (*See* 87 Fed. Reg. at 41522 and 41527) unintentionally suggests lactating in public is indecent or shameful. Lactating persons deserve to express milk or nurse  wherever they are comfortable *and* recipients should ensure they have access to a functional lactation space. *See also, NYC FAQ #23 https://www1.nyc.gov/site/cchr/law/lactation-faqs.page*

[46] Nat'l Women's Law Ctr., *Let Her Learn: Stopping Pushout For Girls Who are Pregnant or Parenting,* at 11,(2017) https://nwlc.org/resources/stopping-school-pushout-for-girls-who-are-pregnant-or-parenting/.

[47] *Id.* at 4.

[48]  87 Fed. Reg. at 41572 (proposed 34 C.F.R. §§ 106.40(b)(3)(i)(F)).

[49] Proposed 34 C.F.R. § 106.6(b)

Opp. MTI App. 24

caregiver, or marital status as a type of sex-based harassment and to require recipients to address it as such.

## V.    PARENTAL, FAMILY, OR MARITAL STATUS

Parenting and caregiving students[50] face unique barriers to accessing and completing their education. Becoming a parent is a primary reason young girls do not complete high school[51] and women account for 72% of students who are parents living with their children.[52] 86.4% of young Black women ages 18 to 24 who are parents are caring for the children on their own[53] and only 11.3% of young women ages 18 to 24 who are parents are in school, compared to 48.9% of young women ages 18 to 24 who are not parents.[54]

Students are caught in a double bind: on the one hand, in a growing number of states, lawmakers are determined to deny them access to reproductive healthcare. On the other hand, if they become pregnant and decide to parent, they are ostracized and pushed out of the classroom by an unsupportive school community. Students deserve an education system that supports them instead of punishing them for their reproductive decisions.

Further, student parents are doubly impacted by the high cost of child care and a lack of accessible options. According to a 2017 survey, 52% of pregnant or parenting students said that not having access to child care was a barrier to going to school and 76% said that schools would be better for them if they provided child care.[55] College campuses often lack on-campus child care, child-friendly on-campus housing, parenting student support groups, and other indicators of a family-friendly campus.[56] Studies have shown that high-quality child care access can triple the chance of on-time graduation for a student parent.[57]

---

[50] *See, e.g.,* Alisha Haridasani, *No Time to be a Child,* New York Times (Sept. 25, 2021), https://www.nytimes.com/2021/09/25/us/young-girls-caregiving-covid.html

[51] Nat'l Women's Law Ctr., *Let Her Learn: Stopping Pushout For Girls Who are Pregnant or Parenting,* at 1,(2017) https://nwlc.org/resources/stopping-school-pushout-for-girls-who-are-pregnant-or-parenting/.

[52]Parents" are those with their own kids living in their household. Data is specific to women ages 18 and older. National Women's Law Center calculations based on August 2021-May 2022 monthly Current Population Survey (CPS) microdata samples, accessed through Sarah Flood, Miriam King, Renae Rodgers, Steven Ruggles, J. Robert Warren, and Michael Westberry, Integrated Public Use Microdata Series Current Population Survey (IPUMS CPS): Version 9.0 (Minneapolis: University of Minnesota, 2021) https://doi.org/10.18128/D030.V8.0.

[53] NWLC calculations using February 2020-April 2022 monthly Current Population Survey (CPS) microdata samples, accessed through Sarah Flood, Miriam King, Renae Rodgers, Steven Ruggles, J. Robert Warren, and Michael Westberry, Integrated Public Use Microdata Series Current Population Survey (IPUMS CPS): Version 9.0 (Minneapolis: University of Minnesota, 2021 https://doi.org/10.18128/D030.V8.0.https://doi.org/10.18128/D030.V8.0;Caring for children on their own means Black women who indicated the age of their own youngest child in the household is under 18 and indicated they are married but their spouse is not present, separated, divorced, widowed, or never married/single.

[54] *Id.* "In school" means they are in high school or college either part time or full time. "Parents" are those with their own kids living in their household.

[55]  Nat'l Women's Law Ctr., *Let Her Learn: Stopping Pushout For Girls Who are Pregnant or Parenting,* at 8,(2017) https://nwlc.org/resources/stopping-school-pushout-for-girls-who-are-pregnant-or-parenting/.

[56] Generation Hope, *National Student Parent Survey Results and Recommendations* (May 2020), https://www.generationhope.org/student-parents-report-2020

[57] Barbara Gault and Lindsey Reichlin Cruse, *Access to Child Care Can Improve Student Parent Graduation Rates,* Inst. for Women's Pol'y & Res. (2017), https://iwpr.org/iwpr-general/access-to-child-care-can-improve-student-parent-graduation-rates

Opp. MTI App. 25

For these reasons, we urge the Department to implement the following changes to the Title IX rule as they pertain to parenting students.

### A. The Final Rule Should Recognize That Discrimination on the Basis of Parental, Familial, and Caregiver Status Will Often Constitute Discrimination on the Basis of Sex.

Both the current and proposed rules do not view discrimination based *solely* on parental, family, or marital status as a type of sex discrimination.[58] Rather, under the existing regulations it is only unlawful to adopt a policy disadvantaging students, workers or applicants based on their parental, family or marital status if the policy "treats persons differently on the basis of sex."[59] This narrow prohibition is incomplete and means that, for example, school administrators believe that they can discriminate against parenting students (versus non-parenting students) or non-birthing parents (versus birthing parents), as long as they do so equally across genders, despite the fact that such discrimination is likely to have a disparate impact on the basis of sex and are often based on sex stereotypes (such as a stereotypes that women or girls who are mothers are likely to neglect their education or that men or boys should not be responsible for providing care to children). As written, the proposed rule would also exclude from protection other students who may be harmed by gender norms related to caregiving, including expectant non-birthing parents, students who are perceived to be parents, and caregivers who are not parents.

The proposed rules prohibition on sex discrimination does not need not be this narrow. In *Tingley-Kelley v. Trustees of Univ. of Pennsylvania*, 677 F. Supp. 2d 764 (E.D. Pa. 2010), the District Court clarified that it is unlawful sex discrimination to use sex-based stereotypes to deny equal education opportunities because of a student's marital or parental status, regardless of how the recipient treats parenting students of a different sex.[60] It is also well established that parenting students experience discrimination that relies on outdated sex stereotypes about caregiving, such as the idea that women must be responsible for home and child care. Additionally, the EEOC has long found that harmful gender stereotypes relating to family responsibilities violate Title VII.[61] Thus, since the Department proposes to include reliance on "sex stereotypes" as unlawful sex-based discrimination under Title IX, the regulations should explicitly include discrimination based on parenting and caregiving as prohibited sex discrimination.

In addition, some signatories have witnessed school staff *already* deterred from supporting young mothers because they fear that accommodating birthing mothers without similarly accommodating fathers and other non-birthing parents violates Title IX and, consequently, decide to not accommodate any student parents at all.Therefore, **we urge the Department** to make clear that providing reasonable modifications and supports to students affected by pregnancy and

---

[58] 87 Fed. Reg. at 41571 (proposed 34 C.F.R. § 106.10).

[59] 87 Fed. Reg. at 41571 (proposed 34 C.F.R. §§ 106.21(c)(2)(i), 106.40(a), 41579 (proposed 34 C.F.R. § 106.57(a)(1)).

[60] *Tingley-Kelley v. Trustees of Univ. of Pennsylvania*, 677 F. Supp. 2d 764 (E.D. Pa. 2010)

[61] See, e.g. U.S. Equal Employment Opportunity Commission, Unlawful Disparate Treatment of Workers with Caregiving Responsibilities, (May 23, 2007), https://www.eeoc.gov/laws/guidance/enforcement-guidance-unlawful-disparate-treatment-workers-caregiving-responsibilities#sexbased; U.S. Equal Employment Opportunity Commission, The Covid-19 Pandemic and Caregiver Discrimination under Federal Employment Discrimination Laws, (March 14, 2022), https://www.eeoc.gov/laws/guidance/covid-19-pandemic-and-caregiver-discrimination-under-federal-employment

Opp. MTI App. 26

related conditions or students with caregiving responsibilities does not constitute discrimination against those not so affected or without such responsibilities.

For all of these reasons, **we also urge the Department** to

- expressly state that educational institutions may not discriminate based on a person's (including students, trainees[62], workers, and applicants) "current, potential, *perceived, expected,* or past parental, family, marital, or *caregiver* status" (full stop);
- add "the domestic partner of a child's parent" to the definition of parental status;
- raise the age of the person receiving care from 18 to 21 in defining "parental status";
- define "family status,"as existing regulations and guidelines do not provide any details and ensure such definition is inclusive of non-traditional families including LGBTQI+ families;[63]
- explicitly state that discrimination based on parental or caregiving status is prohibited throughout the student's participation in the recipient's educational program or activity and not just immediately following the birth or adoption of their child; and
- affirmatively acknowledge that supportive services for pregnant, parenting, and caregiving students are lawful and encouraged.

**B. Upon Notice of a Student's Parental, Family, Marital, or Caregiving Status, the Department Should Require Recipients to Inform Such Students of Their Title IX Rights.**

**We urge the Department** to add that upon notice of a student's parental, family, marital or caregiving status, recipients must promptly take steps to inform such students of their rights and provide these students with the Title IX Coordinator's contact information.

**C. The Final Rule Should Grant Parenting and Caregiving Students Affirmative Access to Leaves of Absence and Reasonable Modifications.**

Again, punitive absence policies push pregnant and parenting students out of school by disciplining them for missing class for medical appointments, their own medical recovery and needs, when their children are ill, or if child care arrangements fall through.

**We urge the Department** to explicitly state that parenting students also have an affirmative right to reasonable modifications and medical leave. Medical leave should be granted as long as medically necessary for birthing parents or to care for dependents. Parenting and caregiving students should also have access to reasonable modifications including time off, without financial or academic penalty, for parent/teacher conferences, and family and child care emergencies. Such leave is essential to ensuring that attendance policies do not have a disparate impact on

---

[62] Jessica Lee, Joan C. Williams, and Su Li, *Parents in the Pipeline: Retaining Postdoctoral Researchers with Families,* The Pregnant Scholar (2017), *https://thepregnantscholar.org/wp-content/uploads/Parents-in-the-Pipeline-Postdoc-Report.pdf*

[63] For e.g., 'family member' can be defined as "either (i) an individual related to the student by blood, marriage, adoption, foster care or legal custody, including an individual related to the student's spouse; (ii) an individual whose close association with the student is equivalent of a family relationship; or (iii) an individual who relies on the student for care." *See also,* Cynthia Thomas Calvert and Jessica Lee, *Caring Locally for Caregivers: How State and Local Laws Protect Family Caregivers from Discrimination at Work,* AARP Public Policy Institute (Feb.2021), at 8, https://worklifelaw.org/wp-content/uploads/2021/02/Caring_Locally_for_Caregivers.pdf

Opp. MTI App. 27

student parents who are playing an active caregiving role—typically women and girls, as well as other parents who give care outside of outdated gender stereotypes.

Additionally, **we urge the Department** to clarify that reasonable modifications for parenting and caregiving students should include, provided directly or by active referral, whichever is reasonable, the following supports:

- Case management;
- Accessible parking and transportation;
- Preventive and primary health services including prenatal and postnatal care, maternal and child health, family planning, substance use services, mental health services, and pediatric care;
- Maternity and baby clothing, baby food and related items (including formula and breast pumps), baby furniture, diapers, wipes, strollers, car seats, and similar items to assist students in meeting the material needs of their children;
- Assistance in accessing affordable, quality, and accessible child care; and
- Assistance in enrolling in public and private health insurance, income security, disability assistance, nutrition assistance, housing, legal aid, and other programs for which students or their children may be eligible.

This is a non-exhaustive list. Without these substantive additions, the protections and supports for parenting students are unnecessarily narrow under Title IX.

## VI. ADMISSIONS

**We support** the Department's proposal to explicitly prohibit recipients from adopting a policy, practice or procedure that discriminates against a person based on their current, potential, or past pregnancy or related conditions in the admissions process.[64] For the reasons outlined in section II(A) above, **we urge the Department** to add "perceived" and "expected" to the list of protected identities.

We understand the proposed rule prohibiting recipients from making pre-admission inquiries as to the marital status of applicants is designed to prevent gender biases from impacting the admissions' process. However, more than 900 colleges across the country use the Common Application, which includes the question "if you have children, how many?"[65] Because family and marital status are not defined in the proposed rules and recipients may view parental, marital and familial status as one of the same, **we urge the Department** to clarify that pre-admission inquiries as to the *parental* status of an applicant are permitted under Title IX, so long as they do not impact the applicant's chance of admission. This will ensure that advocates do not lose access to critical data about this population.

---

[64] 87 Fed. Reg. 41571 (proposed 34 C.F.R. §106.21(c)(2)(ii))

[65] *See,* Common App First-Year Application,
https://commonapp.my.salesforce.com/sfc/p/#d0000000eEna/a/1L000000guQb/ji3AscLUhVXDg8uY.14Opj.3G.8lQqAUP5Oeijly10M

Opp. MTI App. 28

For the reasons mentioned in section V(A) above, **we urge the Department** to explicitly prohibit discrimination based on a person's "current, potential, *perceived, expected,* or past parental, family, marital, or *caregiver* status" in the admissions process. It unnecessarily narrow to only prohibit discrimination that treats parenting applicants differently based on sex.

Finally, because discrimination based on pregnancy or a related condition is a form of sex discrimination under Title IX, admissions applicants should have affirmative protections under Title IX that are independent of other civil rights laws. Additionally, in many signatories' experiences, recipients often falsely believe they are not required to accommodate applicants with temporary disabilities. Therefore, consistent with our requests for pregnant and parenting workers, **we urge the Department** to grant admissions' applicants affirmative rights to reasonable modifications instead of making such rights dependent on what modifications are provided to those with temporary disabilities. These changes will ensure pregnant and parenting persons in the admissions process are afforded the same protections as others under Title IX.

## VII.    PREGNANCY AND DISABILITY

It is a common occurrence that a pregnant person has or develops a disability as the result of their pregnancy or related condition and some of these disabilities endure post-partum. In fact, several complaints filed to the Department's Office for Civil Rights involve pregnant students who alleged violations under Title IX *and* federal disability laws including the IDEA or Section 504.[66]

**We urge** the Department to require recipients to note in their notice of nondiscrimination[67] that in addition to Title IX protections, students may have overlapping protections under other federal, state, or local civil rights laws including, but not limited to, those that protect students on the basis of race, disability, and housing status.

**We support** the Department's proposal to require Title IX Coordinators in elementary and secondary schools to consult with a complainant or respondents' Individualized Education Program (IEP) team or persons responsible for the student's placement decision under 34 CFR 104.35(c) (section 504).[68] If a complainant or respondent is a postsecondary student with a disability, **we urge the Department to require**, rather than suggest,[69] that Title IX Coordinators consult the individual or office that the recipient has designated to provide support to students with disabilities.

Finally, when the Title IX coordinator is administering reasonable modifications to pregnant students,[70] if that student also has a documented disability, **we urge the Department** to require

---

[66] *See e.g., Salt Lake Community College,* No. 08-22-2021, Office for Civ. Rts. Ltr. of Findings (U.S. Dep't. Education [June 14, 2022]), https://www2.ed.gov/about/offices/list/ocr/docs/investigations/more/08222021-a.pdf?utm_content=&utm_medium=email&utm_name=&utm_source=govdelivery&utm_term=; *Cal St. Univ. East Bay,* No. 09-18-2245, Office for Civ. Rts. Ltr. of Findings (U.S. Dep't. Education [Aug. 1, 2018]), https://www2.ed.gov/about/offices/list/ocr/docs/investigations/more/09182245-a.pdf

[67]  87 Fed. Reg. at 41570 (proposed 34 C.F.R. §106.8(c))

[68] 87 Fed. Reg. 41570 (proposed 34 C.F.R. §106.8(e))

[69] *Id.*

[70] 87 Fed. Reg. at 41571 (proposed 34 C.F.R. § 106.40(b)(3)), 41572 (proposed 34 C.F.R. § 106.40(b)(3)(ii)).

Opp. MTI App. 29

recipients to consult with the persons responsible for the student's placement under  CFR 104.35(c) (Section 504 team) or their Individual Education Program (IEP) team, and/or the persons designated to provide support to students with disabilities to help comply with the requirements of the Individuals with Disabilities Education Act, 20 U.S.C. 1400 et seq., and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. 794.

## VIII.    PREGNANT AND PARENTING WORKERS

Chief among the "three . . . different types of [sex] discrimination" that Title IX was passed to combat was "discrimination in *employment* within an institution."[71] Indeed, Congress designed Title IX to be "a strong and comprehensive measure . . . to provide women with solid legal protection as they . . . seek employment commensurate to their education."[72]

To further Title IX's nondiscrimination mandate, **we urge** the Department to issue a final regulation clarifying that:

(A) Workers[73] (like students) have an affirmative right to reasonable modifications for pregnancy and related conditions;

(B) Workers (like students) have, at minimum, a right to all medically necessary time off for pregnancy and related conditions;

(C) Workers (like students) have a right to a lactation space in reasonable proximity to their workstation, with a chair, surface, and access to an electrical outlet, running water, and refrigerator.

Doing so is necessary to fulfill Title IX's promise of equality. As the Department itself recognizes,

> " [A] policy that presents obstacles to the ability of a student or employee who is pregnant, lactating, or experiencing other pregnancy-related conditions to access a recipient's educational program or activity may constitute such discrimination under Title IX. Moreover, precisely because it is difficult to specify the counterfactual—how accommodating would the school have been if the person requesting an accommodation had done so for a condition associated with men rather than women—sex-based discrimination regarding pregnancy and related conditions will often take the form of "subtle discrimination that may be difficult to detect on a case-by-case basis."[74] To prevent such discrimination…proactive measures are necessary to ensure that a

---

[71] 118 Cong. Rec. 5812 (1972) (statement of lead sponsor, Sen. Birch Bayh) (emphasis added)

[72] *Id.* at 5806-07 (statement of Sen. Birch Bayh).

[73] The comment intentionally uses the term 'worker' instead of 'employee' to mean both non-student and student workers. Because Title IX protects any "person," the Department should clarify that its protections extend beyond traditional employees to other workers, such as independent contractors, as well.  *See, e.g., Elwell v. Oklahoma ex rel. Bd. of Regents of Univ. of Oklahoma,* 693 F.3d 1303, 1311 (10th Cir. 2012) ("Title IX does not limit its coverage at all, outlawing discrimination against any 'person'[.]"); *see also North Haven Bd. of Educ. v. Bell,* 456 U.S. 512, 521 (1982) ("There is no doubt that 'if we are to give [Title IX] the scope that its origins dictate, we must accord it a sweep as broad as its language.") (internal quotation marks omitted).

[74] *Hibbs,* 538 U.S. at 736.

Opp. MTI App. 30

recipient affords students *and employees* who are pregnant or experiencing pregnancy related conditions full access throughout their pregnancy and recovery.[75]

In addition, as the Department recognizes repeatedly, harmonizing recipients' obligations to workers with their obligations to students will allow recipients to standardize policies and practices, thereby reducing complexity and lowering compliance costs.

### A. The Department's Final Rule Should Clarify That Workers Have a Right to Reasonable Modifications for Pregnancy and Related Conditions.

First, **we urge the Department** to clarify that workers in educational institutions have the same *affirmative* rights to reasonable modifications for pregnancy and related conditions guaranteed to students.

The section of the Department's proposed regulations applicable to employees takes a comparative rather than an affirmative approach, requiring recipients to treat employees with pregnancy-related conditions only as well (or as poorly) as employees with temporary disabilities. The proposed regulation states:

> (b) *Pregnancy or related conditions.* A recipient shall not discriminate against or exclude from employment any employee or applicant for employment on the basis of current, potential, or past pregnancy or related conditions.

> (c) *Comparable treatment to temporary disabilities or conditions.* A recipient shall treat pregnancy or related conditions or any temporary disability resulting therefrom as any other temporary disability for all job-related purposes[.][76]

By contrast, the portion of the Department's proposed rule applicable to students provides far more robust protections, requiring *affirmative* support of students with pregnancy-related conditions, regardless of how well or how poorly other non-pregnant students are treated. Specifically, the proposed rule requires that recipients promptly provide students "[r]easonable modifications to the recipient's policies, practices, or procedures" on an "individualized and voluntary basis[,]" so long as such modifications would not "fundamentally alter the recipient's education program or activity."[77] The examples of reasonable modifications provided for pregnant students include "changes in physical space or supplies," "elevator access," "breaks . . . to attend to related health needs," "intermittent absences to attend medical appointments," and "other appropriate changes to policies, practices, or procedures,"[78]—all examples of modifications that pregnant and postpartum *workers* may likewise need.

---

[75] 87 Fed. Reg. 41390, 41513 (proposed July 12, 2022) (to be codified at 34 C.F.R. § 106) (emphases added).

[76] 87 Fed. Reg. 41390, 41579 (proposed July 12, 2022) (to be codified at 34 C.F.R. § 106). We also note that (c) should refer to "equal" rather than "comparable" treatment in regard to the treatment of pregnancy or related conditions and should refer to "limitations arising from pregnancy and related conditions" rather than assuming that pregnancy is per se disabling.

[77] 87 Fed. Reg. at 41522.

[78] *Id.*

16

Opp. MTI App. 31

Accordingly, **we strongly urge** the Department to issue a final rule clarifying that workers at educational institutions, like students, have an affirmative right to reasonable modifications to the recipient's policies, practices, and procedures, including but not limited to: changes in physical space or supplies; elevator access; adjustments to uniform requirements or dress codes; adjustment of shift start or end time; reduced or modified work schedule; assistance with manual labor or limits on lifting; desk duty or light duty; option for remote work; and temporary transfer to an alternate position. Like for students, such modifications must be provided on an individualized and voluntary basis, and medical documentation should be unnecessary in most cases.[79] Recipients may not require a worker to accept an accommodation that is not requested or desired by the worker. Recipients must offer such modifications unless the modification would fundamentally alter the recipient's education program or activity.

Requiring recipients to offer workers reasonable modifications to school policies, practices, and procedures is necessary to effectuate Title IX's broad nondiscrimination mandate and ensure that no worker is excluded from employment on the basis of sex. As the Department recognized in the context of lactation accommodations, "clearly defined rights" to affirmative accommodation "are essential to prevent different treatment on the basis of sex and exclusion from recipient workplaces,"[80] so too are accommodations for pregnancy and related conditions essential to achieving Title IX's goals. Indeed, when a worker is unable to access the reasonable modifications they need to continue working, they "may have no choice but to leave their employment."[81] Providing workers an affirmative, proactive right to reasonable modification of working conditions will ensure that discrimination against pregnant workers does not enshrine sex-based barriers to participation in federally-funded educational programs and activities.

Further, harmonizing workers' rights with students' rights will reduce the burden and complexity of compliance on recipients.Recipients are already familiar with the "reasonable modification" framework and structure from its use in the disability context under Title II of the ADA, as the Department recognizes.[82]

Moreover, many students, particularly at institutions of higher education, hold paid employment on campus. For example, it would defy logic to guarantee a pregnant student access to a stool to rest while studying in their science lab, but not to provide them the same modification while they perform wage labor as a receptionist for the science department at their university. In both contexts, the modification is necessary to ensure that they can fully access the educational environment like any other student. Of course, the regulation should protect all workers at educational institutions, not only students who hold campus jobs.

Finally, because pregnancy itself is temporary, such workplace accommodations are temporary and often no-cost or low-cost. At the same time, these simple modifications  help keep pregnant

---

79 *See* Section III(B) above.
80 Fed. Reg. at 41527.
81  Fed. Reg. at 41527.
82  87 Fed. Reg. at 41523.

Opp. MTI App. 32

and postpartum people working safely throughout their pregnancies, reducing absenteeism and turnover, and improving worker health.[83]

### B. The Department Should Clarify That Workers Have a Right to All Medically Necessary Time Off.

Second, **the Department should clarify** that, at minimum, workers have a right to all medically necessary time off, including breaks to attend to pregnancy-related health conditions (including lactation), time off to attend medical appointments, and leaves of absence.

While the portion of the proposed regulation applicable to *students* requires recipients to provide affirmative leaves of absence related to pregnancy for as long as medically necessary,[84] the proposal does not offer the same protections to employees. Further, it is unclear whether leave for a "reasonable period of time" would include the time off work necessary for pregnancy-related medical appointments.

**We urge** the Department to clarify that workers be entitled, at minimum, to: a voluntary leave of absence while medically necessary, including but not limited to, leave to recover from childbirth; and any other medically necessary time off, such as for pre- and post-natal appointments, and bedrest. To the extent a recipient maintains a leave policy for employees similar in their ability or inability to work that is more generous, the recipient must permit the employee to take leave under that policy instead if the employee so chooses.  The Department should clarify that recipients may not require doctors' notes or other medical documentation for breaks to attend to basic health needs, such as bathroom breaks.

The Department should not deprive pregnant and postpartum workers at educational institutions of the protections afforded to students. Allowing employers to deny pregnant and postpartum workers job-protected time off would further enshrine the stereotype that motherhood and work are incompatible, enacting the very sex-based exclusion Title IX was meant to eradicate.

### C. The Department Should Clarify That Workers, Like Students, Have Access to a Functional Lactation Space.

Finally, we commend the Department for recognizing the rights of employees, like students, to lactation space and time.  To better effectuate Title IX's nondiscrimination mandate—ensuring that a lactation space is functional to meet a worker's needs—we urge the Department to adopt the same additional parameters for workers' lactation space as those we recommend for students in Section III(C) above.

---

[83] *See, e.g.*, Am. Coll. Obst. & Gyn., *Cmte. Op. No. 733: Employment Considerations During Pregnancy and the Postpartum Period*, 131 Obst. & Gyn. e115 (Apr. 2018), https://www.acog.org/clinical/clinical-guidance/committee-opinion/articles/2018/04/employment-considerations-during-pregnancy-and-the-postpartum-period; Ky. Dep't Pub. Health & Wellness, Pregnant Workers Health Impact Assessment (2019), https://louisvilleky.gov/center-health-equity/document/pregnant-workers-hia-final-02182019pdf; Job Accommodation Network, Workplace Accommodations: Low Cost, High Impact (Oct. 21, 2020), https://askjan.org/publications/Topic-Downloads.cfm?pubid=962628.

[84] 87 Fed. Reg. at 41572.

Opp. MTI App. 33

The Department's proposed regulation states:

> (e) *Lactation time and space.* (1) A recipient must provide reasonable break time for an employee to express breast milk or breastfeed as needed. (2) A recipient must ensure the availability of a lactation space, which must be a space other than a bathroom, that is clean, shielded from view, free from intrusion from others, and may be used by an employee for expressing breast milk or breastfeeding as needed.[85]

**We urge** the Department to additionally specify that the lactation space must:
- Be in reasonable proximity to the worker's place of work;
- Equipped with a chair, flat surface, and access to electricity;
- With nearby access to running water and a refrigerator, or other location in which the worker may store expressed milk.[86]

In addition, as with our recommendation with respect to students above,[87] **the Department should** make clear that workers have a right to express milk or feed in locations other than a designated lactation space, if they so choose.  **We also suggest** the Department adopt more gender-neutral language, such as "express milk," "nursing," and "human milk feeding."

As the Department acknowledges, adopting the same standards for students and workers would allow a recipient to "choose to offer a common space for both students and employees"—with the same functional requirements, e.g., nearby access to running water and refrigerator—"thereby minimizing cost while ensuring civil rights compliance."[88]

<div align="center">********</div>

Thank you for your consideration of our recommendations. If you have any questions, please contact Cassandra Mensah (cmensah@nwlc.org), Lisette Orellana Engel (lisette@nationalcritten.org), Dana Bolger (dbolger@abetterbalance.org), and Jessica Lee (leejessica@uchastings.edu)

Thank you,
The Federal Advocacy Coalition for Pregnant and Parenting Students Members:
> A Better Balance: The Work & Family Legal Center
> Advocates for Youth
> Center for WorkLife Law, Pregnant Scholar Initiative
> Girls Inc.
> Healthy Teen Network
> Know Your IX
> National Crittenton
> National Women's Law Center

---

[85] 87 Fed. Reg. at 41579.

[86] *See, e.g.,* https://www1.nyc.gov/assets/cchr/downloads/pdf/amendments/Local%20Law%20185.pdf; https://www1.nyc.gov/site/cchr/law/lactation-faqs.page.

[87] *See,* Section III(C) above

[88] 87 Fed. Reg. at 41528.

Opp. MTI App. 34

Joined By:

    American Association of University Women
    Clearinghouse on Women's Issues
    Colorado Teen Parent Collaborative
    Day One
    Family Equality
    Feminist Majority Foundation
    Florence Crittenton Programs of SC
    GLSEN
    Higher Learning Advocates
    Imaginable Futures
    My Life My Choice
    National Coalition for Women and Girls in Education
    National Education Association
    NoTeenShame
    Oregonizers
    School Social Work Association of America
    SIECUS: Sex Ed for Social Change
    Student Parent HELP Center
    Women's Law Project

Opp. MTI App. 35

  

 

**On August 1, 2024, the Department of Education's Title IX Rule (the 2024 Rule) went into effect in states across the country. But courts in lawsuits challenging the 2024 Rule have temporarily blocked the Rule from taking effect in 26 states and a number of individual schools across the country. While these cases work their way through the courts, schools should understand their legal obligations, and students should know their rights.[1]**

**Background on the 2024 Rule and litigation.**

**The 2024 Rule clarifies the protections under Title IX,** including for transgender and LGBQIA+ students, pregnant and parenting students, and for all students facing sex-based harassment and assault. The Department recognized that the 2024 Rule was needed to provide schools with definitive guidance on a range of subjects because, without the Rule, non-compliance with Title IX's obligations has been widespread. Some of the issues on which the Rule provides clarification include that Title IX protects LGBTQIA+ students from discrimination, that schools must provide reasonable accommodations for pregnant and postpartum students, and that schools must provide stronger protections for students from harassment and assault.

The 2024 Rule also restores the standard for sex-based harassment to "severe *or* pervasive" conduct, whereas the Department's previous Title IX Rule, issued in 2020, required conduct to be "severe *and* pervasive" to qualify as harassment under Title IX.

**The 2024 Rule is now temporarily enjoined (blocked) in a number of states and individual schools.** Since the Department issued the 2024 Rule, ten lawsuits have sought to stop the Rule from going into effect. These lawsuits focus on the 2024 Rule's protections for transgender students and use these baseless attacks on transgender students to attempt to prevent *all* of the 2024 Rule's provisions from going into effect.

---

[1] This document is not intended to constitute legal advice. It is intended to be general guidance only.

Opp. MTI App. 36

Most of the lawsuits requested a "preliminary injunction," meaning a temporary pause on the 2024 Rule while the cases make their way through the courts. So far, courts have issued eight preliminary injunctions, covering 26 states as well as some additional schools in other states, meaning that the Department cannot implement or enforce the 2024 Rule in these places. The Supreme Court kept two of these preliminary injunctions in place while the courts below decide these cases. The Department is updating its website with information about where injunctions are in effect.

**In areas and schools not covered by an injunction, the 2024 Rule is in effect.**

Schools not covered by an injunction must comply with the new regulations. The Department's Office for Civil Rights (OCR) has made clear that as of August 1, 2024, the 2024 Rule is in effect and OCR will enforce it, except where courts have enjoined it. OCR has released the following resources to assist with compliance with the 2024 Rule:

- Brief Overview of Key Provisions of the Department of Education's 2024 Title IX Final Rule, which summarizes key provisions that were amended in the 2024 Rule.
- 2024 Title IX Regulations: Pointers for Implementation, which assists schools with implementation by listing key components of the 2024 Rule.
- Resource for Drafting Nondiscrimination Policies, Notices of Nondiscrimination, and Grievance Procedures, which helps schools draft compliant policies and procedures.
- Small Entity Compliance Guide, which explains the 2024 Title IX Regulations for small entities.

**In areas and schools where the 2024 Rule is enjoined:**

**These injunctions are temporary, and a higher court could reverse or modify them, requiring schools to come into compliance.** At that point, schools should not expect to receive a significant grace period for compliance. Schools should prepare for compliance now.

**Title IX remains the law.** Even without the clarifications that the 2024 Rule provides, students still have protections from sex-based discrimination directly under Title IX and may bring lawsuits to vindicate these rights. A federal court recently confirmed that the preliminary injunctions on the Rule apply only to the Department's enforcement of its regulations and do not inhibit the ability of private plaintiffs to bring Title IX lawsuits—even

2

against schools where the Department's enforcement has been enjoined.[2] Students and schools should know that:

- **Title IX prohibits discrimination against LGBTQIA+ students**, as several federal courts of appeal have confirmed. Courts in at least the Fourth, Seventh, and Ninth Circuits are bound by precedent in these jurisdictions finding that sex discrimination under Title IX includes discrimination on the basis of sexual orientation, gender identity, or both.[3] And the Supreme Court has recognized that discrimination based on sexual orientation or gender identity is a form of sex discrimination.[4]

- **Schools should comply with the 2024 Rule's provisions regarding the rights of pregnant and postpartum students.** The preliminary injunctions do not affect the Department's determination of how Title IX applies to pregnant and postpartum students. Schools are on notice that the Department has determined that Title IX requires schools to provide, among other things, reasonable accommodations to students who are pregnant or experiencing other pregnancy-related conditions, as well as clean, private lactation spaces. The 2024 Rule also continues to prohibit schools from discriminating against students who have miscarriages or abortions.

  Nothing in the injunctions prevents the Department from finding that a school has violated Title IX where, for example, the school refuses to offer a reasonable accommodation for a pregnant student to reschedule an exam that they missed due to a doctor's appointment or refuses to let a student take a leave of absence to recover from childbirth. Schools that do not follow these requirements thus risk losing their federal funding or other court-imposed repercussions for non-compliance with Title IX.

---

[2] *Doe v. Elkhorn Area School Dist.*, No. 24-CV-354-JPS, 2024 WL 3617470, at *17 (E.D. Wis. Aug. 1, 2024).

[3] *B.P.J. by Jackson v. W. Va. State Bd. of Educ.*, 98 F.4th 542 (4th Cir. 2024), *petition for cert. filed* (July 16, 2024) (24-44); *Grabowski v. Ariz. Bd. of Regents*, 69 F. 4th 1110 (9th Cir. 2024); *A.C. by M.C. v. Metro. Sch. Dist. of Martinsville*, 75 F.4th 760 (7th Cir. 2023), *cert. denied*, 144 S. Ct. 683 (2024); *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586 (4th Cir. 2020), *cert. denied*, 141 S. Ct. 2878 (2021); *Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd of Educ.*, 858 F.3d 1034 (7th Cir. 2017).

[4] *Bostock v. Clayton Cnty., Georgia*, 590 U.S. 644 (2020).

3

Opp. MTI App. 38

**Schools also must comply, at a minimum, with the Department's previous Title IX Regulations, amended in 2020, which remain effective where the 2024 Rule is enjoined.** While the 2024 Rule makes important additions and corrections to the 2020 Rule, including restoring the longstanding "severe or pervasive" standard for sex-based harassment and explicitly requiring schools to address off-campus incidents that have an impact on students' education, the baseline requirements of the 2020 Rule and previously promulgated regulations still apply in jurisdictions where the 2024 Rule is enjoined.

For example, the 2020 Rule required schools to protect students from sex-based stereotyping, to follow certain procedures in student disciplinary proceedings, and to respond promptly to reports of sexual harassment made to any employee of a K–12 school. The 2020 Rule also clarified important protections for survivors and requires schools to offer supportive measures and remedies to restore or preserve survivors' access to educational opportunities. These measures can include retroactive withdrawals, extensions of deadlines, adjustments to transcripts, or tuition reimbursements to survivors. All of these provisions remain in effect.

**Schools can and, in some cases, must continue to provide greater protections against sex discrimination than Title IX regulations require, including for transgender and LGBQIA+ students and survivors.** Title IX is a floor, not a ceiling. State and local laws can require schools to do more than Title IX or its regulations require—and nothing in the preliminary injunctions relieves schools of the need to comply with such state and local laws. Also, nothing in the preliminary injunctions prevents a school from voluntarily offering protections over and above what Title IX regulations require so long as they use fair procedures for all parties in a disciplinary proceeding. For example:

- Schools can and should continue to implement trans-inclusive policies and policies that explicitly prohibit anti-LGBTQIA+ harassment.

- Schools can adopt internal anti-harassment policies that address misconduct that does not constitute sexual harassment under the 2020 regulations, including a policy that uses a "severe or pervasive" standard or addresses conduct that occurs during study abroad programs.

More information on Title IX and how to file a complaint with the Department is available on OCR's website.

4

Opp. MTI App. 39





# Workplace Rights Hub

**A state by state guide to asserting your rights in the workplace as you care yourself and your loved ones.**

Privacy - Terms

Opp. MTI App. 40

# Find Your State



Knowledge is power. You shouldn't have to choose between caring for your health and your loved ones, or your paycheck—there are laws that can help.



Select the state where you work to begin understanding and exercising your rights. Under each state, you'll find five tabs, organized by scenario, on the following types of laws.

- **Caring for Your Heath: Time Off, Accommodations, & Other Rights:** Covers sick time, medical leave, and accommodations around your own health needs.
- **Time Off to Care for a Loved One & Other Rights**: Covers sick time and family leave for caring for a loved one with an illness, injury, or serious health condition.
- **Navigating Pregnancy at Work / Pregnancy Loss**: Covers pregnancy discrimination, pregnancy accommodations, sick leave for prenatal appointments, and protections for workers who have experienced a miscarriage.
- **Time Off for Childbirth & Bonding With a New Child**: Covers leave for childbirth and/or bonding.

Opp. MTI App. 41

- **Returning to Work After Childbirth & Pumping at Work**: Covers pumping at work, sick time for caring for your baby, and caregiver discrimination.

For additional support, **contact A Better Balance's free, confidential legal helpline**.



### Who We Are

### Our Issues

### Know Your Rights

### Get Help

### News

### Take Action with Us!

### In the News

### Jobs

### Privacy Policy

### Contact

**Donate**

**Mailing List**

**Get Help/Reciba Ayuda**

    











---

**Blog Tag**

# State Laws

Privacy - Terms



## REPORT: States Leading on Leave: A Playbook on Winning Paid Family and Medical Leave

READ MORE »

October 5, 2023

## What Tennessee's Public School Educators Need to Know About Paid Parental Leave

READ MORE »

May 18, 2023

## Letter: Public School Educators from Across Tennessee Call for Paid Parental Leave

READ MORE »

April 18, 2023

## Cuidando la salud de su ser querido mientras trabaja: Preguntas frecuentes para los trabajadores de Tennessee

READ MORE »

February 16, 2023

## Cuidando de su salud mientras trabaja: Preguntas frecuentes para trabajadores de Tennessee

READ MORE »

February 16, 2023

## New York State's Lawful Absence Law: Rights, Remedies, and What It Means for Abusive Attendance Policies

READ MORE »

February 15, 2023

## Strengthening and Updating Paid Family and Medical Leave: S2821/A4053 Bill Explainer

READ MORE »

February 14, 2023

## Paid Family Leave is Good Business for Tennessee: Fact Sheet from A Better Balance and ThinkTN

READ MORE »

February 13, 2023

## Best Practices for Paid Family Leave Policies for State Government Employees

READ MORE »

February 10, 2023

« Previous   1   2   3   …   8   Next »



## Recent Posts

- A Better Balance and Transgender Law Center Launch Know-Your-Rights Guides for Transgender and Non-Binary Workers
- VICTORY: Alabama Enacts Paid Parental Leave for State Employees and Educators!
- Celebrating Women's History and Fighting for Equality
- VICTORY: Mississippi Enacts Paid Parental Leave for State Employees!
- We Decry the DoJ and EEOC's False Claims that DEI Programs Can Lead to Illegal Workplace Discrimination
- Colorado's FAMLI Program: A Model of Paid Leave Success for Families and Businesses

## Categories

Select Category



**Who We Are**

**Our Issues**

**Know Your Rights**

**Take Action with Us!**

**In the News**

**Jobs**

Get Help

Privacy Policy

News

Contact

<div style="background-color:green">Donate</div>

<div style="background-color:teal">Mailing List</div>

<div style="background-color:magenta">Get Help/Reciba Ayuda</div>

    











☰

Newsroom

# Statement: A Better Balance Condemns District Court's Decision to Withdraw Title IX

Privacy - Terms

Opp. MTI App. 49

# Regulations Nationally, Depriving Pregnant Students of Rights

Posted: January 10, 2025
Newsroom Categories: Students' Rights & The Emerging Workforce



The U.S. District Court in the Eastern District of Kentucky recently issued a decision vacating the Biden Administration's Title IX regulations nationwide. The regulations, which went into effect on August 1, 2024, clarified and expanded vital protections for students across the country, including for pregnant and postpartum students who need modifications so they can learn while caring for their pregnancies.

The following is a statement from Samantha Hunt, Equal Justice Works Fellow at A Better Balance:

"Today's decision represents another dangerous attack on vulnerable students across the country. The overbroad, nationwide ruling strikes down regulations from the Department of Education clarifying Title IX's protections, and the ruling will have an immediate detrimental impact on all students, including pregnant and parenting students. Now, pregnant and postpartum students will have to fight harder to access the modest

modifications they need to continue learning while caring for their health, such as the ability to reschedule exams they missed while recovering from childbirth and access to remote learning if they are placed on bedrest for their pregnancies.

Students who are concerned should know they still have rights under Title IX. A Better Balance calls on the federal government to continue defending the rights of pregnant and parenting students, and we will continue fighting for the right of all students to access their education while maintaining their health."

A Better Balance's free and confidential legal helpline is available to support pregnant and postpartum students with questions about their rights.



Search News                                              🔍

## Recent Posts

- Celebrating Women's History and Fighting For Equality
- VICTORY: Mississippi Enacts Paid Parental Leave for State Employees!
- We Decry the DoJ and EEOC's False Claims that DEI Programs Can Lead to Illegal Workplace Discrimination
- Colorado's FAMLI Program: A Model of Paid Leave Success for Families and Businesses
- Trump's Attempt to Dismantle the Department of Education Would Have Devastating Consequences for Gender Equity & Families' Economic Security
- A Better Balance & Ms. Magazine Announce New Project Exploring Why the Pregnant Workers Fairness Act Is Essential to Democracy

## Categories

Select Category



- Home
  - About Us
    - Career Opportunities
    - Staff and Board of Directors
    - In the News
    - Blog – Stand Up, Speak Up
    - Newsletters
    - Funding Partners
    - Reports and Financials
  - Legal Help
    - How VRLC Can Help
    - Confidentiality
  - Training and Resources
    - Support and Consultation
    - Resource Library
    - Webinar Archive
    - Upcoming Trainings
    - Conference
  - Make an Impact
    - Giving
    - Get Involved
    - Pro Bono Programs
    - Shining Star Celebration
      - Past Highlights
    - Merchandise
  - Contact

## Resource Library

Home · Resource Library

**Search by Keyword**

[            ] [Go]

**Filter by Category**

Select a Jurisdiction:
[ ------                    ⌄]

Select a Topic:
[ ------                         ⌄]

Select a Population:
[ ------                           ⌄]

Select a Language:
[ ------             ⌄]

Select a Format:
[ ------         ⌄]

[Sort by Filter]

Reset the Form



### Featured Resources

**Safety Planning for Students Responsible for Sexual Misconduct on Campus**

**Designing and Implementing Informal Resolutions: Key Considerations for Colleges and Universities**



**Assessing for Informal Resolution Opportunities in Domestic and Dating Violence, Sexual Assault, and Stalking Cases**



SAFETY EXIT



1  2  3



[Access to Confidential Support Services for Sexual Assault Survivors Who Are Confined: National Focus Group Findings](#)



[Advising a Complainant in a Campus Grievance Process (February 2021)](#)



[Advocating for Sexual Assault Survivors in Higher Education (January 2021)](#)



[Alabama FAQs: Privacy for Minors](#)



[Alabama FAQs: Privacy Laws Impacting Survivors](#)



[Alabama Preguntas frecuentes: Leyes de privacidad para las víctimas](#)



[Alaska FAQs: Privacy for Minors](#)



[Alaska FAQs: Privacy Laws Impacting Survivors](#)



[Alaska Preguntas frecuentes: Leyes de privacidad para las víctimas](#)



[Alcohol-Facilitated Sexual Assault (June 2022)](#)



[Alcohol-Facilitated Sexual Assault, Spanish (June 2022)](#)

Your Search Returned 403 Resources


SAFETY EXIT



[American Samoa FAQs: Privacy for Minors](#)

[American Samoa FAQs: Privacy Laws Impacting Survivors](#)

[Arizona FAQs: Privacy for Minors](#)

[Arizona FAQs: Privacy Laws Impacting Survivors](#)

[Arizona Preguntas frecuentes: Leyes de privacidad para las víctimas](#)

[Arkansas FAQs: Privacy for Minors](#)

[Arkansas FAQs: Privacy Laws Impacting Survivors](#)

[Arkansas Preguntas frecuentes: Leyes de privacidad para las víctimas](#)

[Assessing for Informal Resolution Opportunities in Domestic and Dating Violence, Sexual Assault, and Stalking Cases](#)

1  [2](#)  [3](#)



## CONTACT US

**Massachusetts**
11 Beacon Street, Suite 520
Boston, MA 02108
Phone: (617) 399-6720

**Oregon**
610 SW Broadway, Suite 308
Portland, OR 97205
Phone: (503) 274-5477

## FOLLOW US

Platinum Transparency 2025
Candid.

Charity Navigator
FOUR-STAR

## SIGN UP FOR UPDATES!

**Email** (Required)

By submitting this form, you are consenting to receive marketing emails from: Victim Rights Law Center, 11 Beacon Street, Suite 520, Boston, MA, 02108, US, https://www.victimrights.org. You can revoke your consent to receive emails at any time by using the SafeUnsubscribe® link, found at the bottom of every email. Emails are serviced by Constant Contact.

CAPTCHA

Submit

SAFETY EXIT

Copyright © 2025 Victim Rights Law Center
Victim Rights Law Center's logo is a registered trademark | Tax ID #02-0588944

web design by Gordon Multimedia



Opp. MTI App. 55





# Victim Rights Law Center

## September Newsletter

Dear Friends,

With the excitement of a new school year also comes the uncertainty of the new Title IX regulations, which were due to take effect on August 1st. To date, injunctions are blocking the U.S. Department of Education from enforcing the new regulations in 26 states and in many K-12 schools and higher-ed institutions located in other states.

The good news is that schools currently under an injunction are still required to help survivors by implementing the 2020 Title IX regulations. Students, families, advocates, and allies can hold schools accountable by learning about their schools' Title IX responsibilities and asking administrators about their policies for sexual assault response. Find **National Women's Law Center** and **Advocates for Youth** plain language summaries of Title IX (under the 2020 regulations) in K-12 and higher-education settings **here**. **Stop Sexual Assault in Schools** also provides a **toolkit** and **forms** for gathering information about a school's Title IX policies and for demanding Title IX compliance. Student survivors deserve these protections and more.

In gratitude,
Tiffany Hester
Senior Attorney

## IN THE NEWS

### Raising Sex Ed Standards



With schools back in session, VRLC intern Agripino Kennedy presents the **Healthy Youth Act** as a necessary next step to solidify higher quality sexual education for students in Massachusetts. Read their contribution to our **Stand-Up, Speak Up** blog **here**.

### Advocacy Confidential Continues

VRLC Senior Attorney Carol Schrader continues her *Advocacy Confidential* blog series exploring the complexities

of navigating mandatory reporting for those who provide victim services. Check out this latest blog entry **here**.

**ADVOCACY CONFIDENTIAL**

## NATIONAL TRAINING

### Webinars: Teens, Stalking & Dating Violence

**Know More, Do More - Identifying and Responding to Adolescent Stalking**
**September 20 | 1:00 p.m. ET**

Studies show that teenage and young adult populations are most at risk for becoming victims of stalking. Legal advocates and civil attorneys are invited to join VRLC and **Stalking Prevention, Awareness, & Resource Center (SPARC)** for a conversation focused on the impacts of stalking specific to teens. We'll highlight the intersections of stalking with bullying, teen dating violence, and sexual violence; and offer strategies to better recognize and respond to victims and survivors. Learn more and register to attend this virtual conversation **here**.





**Defining Dating Violence**
**September 25 | 2:00 p.m. ET**

We're honored to host **National Organization for Victim Advocacy (NOVA)** Associate Director of Youth Engagement Jasmine Uribe for a webinar aiming to empower legal advocates and civil attorneys to recognize dating violence among teens within their communities. Through active discussions, reflection, and an exploration of youth realities, participants will better understand the impact dating violence has on the intellectual, physical, social, and emotional development of teens. Learn more and register today **here**.

### Back in Chicago: NSVLC 2025

**National Sexual Violence Law Conference**
**October 21 - 22, 2025 | Chicago, IL**

We are delighted to bring the country's only **National Sexual Violence Law Conference (NSVLC)** back to Chicago!

Join us October 21-22, 2025 for an in-person, two-day legal conference at the historic yet hip **Palmer House Hotel**. This downtown destination is surrounded by the city's vibrant

Opp. MTI App. 58

culture, iconic food, and breathtaking architecture.

The conference gathers lawyers and advocates from across the country interested in utilizing the civil legal justice system to better respond to the needs of sexual assault survivors. Registration opens in January 2025. Learn more **here**.



## DEVELOPMENT



### Tickets Available Now

Tickets for our **Shining Star Celebration** are now available **here**! This year's event will be held on Thursday, October 10th from 6-8pm at **Artists for Humanity EpiCenter** in Boston.

Sponsorship opportunities for individuals and businesses are still available **here**. We have revamped our sponsor benefits. **Check out our new levels and year-long sponsor benefits**!

All proceeds raised help sexual assault survivors access free legal assistance. Find more event info **here**.

## MISC NEWS/FUN STUFF

### Happy Little Trees

Opp. MTI App. 59



VRLC staffers were able to step away for some self-care, enjoying an opportunity to relax and exercise their artistic sides during a virtual paint night get-together last month.

**DONATE**

Massachusetts Office
11 Beacon Street, Suite 520
Boston, MA 02108
Phone: (617) 399-6720
Fax: (617) 399-6722

Oregon Office
610 SW Broadway, Suite 308
Portland, OR 97205.
Phone: (503) 274-5477
Fax: (503) 715-2183

   

Victim Rights Law Center | 11 Beacon Street Suite 520 | Boston, MA 02108 US

Unsubscribe | Update Profile | Constant Contact Data Notice



Try email marketing for free today!

**NATIONAL
WOMEN'S
LAW CENTER**
Justice for Her. Justice for All.

How We Work

About >

Legal Help >

News and Commentary >

Take Action >

Ways to Give >

# DONATE

Abortion

Child Care

Equal Pay & the Wage Gap

General Health Care & Coverage

Poverty & Income Security

Supreme Court

Title IX

**All Topics** >

 Supporter Shop

 Newsletter Signup

 Search

---

📅 February 28, 2025

Issues:  Education & Title IX,  Litigation,  Sexual Harassment in Schools

# NWLC Moves to Defend Title IX Protections for Student Survivors

COVINGTON, Ky. (Feb. 28) — Today, the National Women's Law Center (NWLC) filed a motion in federal court seeking to join a lawsuit to block enforcement of the Trump administration's harmful 2020 Title IX rule regarding sexual harassment on school campuses and reinstate protections under the Biden administration's 2024 Title IX rule.

NWLC seeks to appeal a January ruling by a Kentucky district court that struck down in its entirety the Biden administration's Title IX rule, which was finalized in April 2024. This lawsuit was initially filed by conservative states seeking to undermine Title IX by striking the rule's protections for LGBTQI+ students, particularly transgender students.

Following the ruling, Trump's Department of Education announced it would immediately revert back to enforcing Trump's 2020 Title IX rule, reinstating harmful policies that dismiss and mistreat survivors of sexual assault, including giving schools permission to once again ignore sexual harassment claims.

📄 **NWLC Fact Sheet: DeVos's New Title IX Sexual Harassment Rule, Explained** (2020)

📄 **NLWC Fact Sheet: The Biden Department of Education's New and Final Title IX Rules, Explained** (2024)

"Under an administration led by a president who was found liable for sexual abuse and accused of sexual harassment and assault by dozens of women, students are getting the message that protection against sexual harassment is not a priority. The Department of Education made

Privacy · Terms

that clear when it announced it was reverting to Trump's 2020 Title IX rule as a result of this district court's faulty and broad ruling," said **Shiwali Patel, senior director of safe and inclusive schools at the National Women's Law Center**. "We are proud to represent the Victim Rights Law Center and our client, Jane Doe, who courageously seek to intervene in this case to defend the Biden administration's 2024 Title IX protections and ensure student survivors everywhere are treated fairly by their schools."

**Background on the Intervention**

NWLC and co-counsel Mehri & Skalet and Gatlin Voelker PLLC seek to intervene in *Tennessee v. Cardona* on behalf of the Victim Rights Law Center (VRLC), an organization that provides legal services to sexual assault survivors, and Jane Doe, a student survivor who was sexually assaulted in the fall of 2024. As detailed in the lawsuit, VRLC has found its ability to obtain timely and accurate outcomes for students who have filed complaints severely hampered by the return of Trump's Title IX rule. Jane Doe, who reported her assault to her school, is experiencing harm because of the removal of critical protections following the Kentucky district court ruling and resulting in the Trump administration's reinstatement of the 2020 rule.

The Trump administration's enforcement of the 2020 Title IX rule means that schools may now dismiss Title IX complaints by survivors based on arbitrary standards regarding the "severity" and "pervasiveness" of the assault or harassment. Schools also can easily dismiss complaints of assaults that occurred on private, off-campus locations or during study-abroad programs. The reinstated 2020 rule also forces college students who have reported assault or harassment to undergo unfair and potentially traumatic investigations and/or hearing into their allegations.

**Statements from VRLC and Mehri & Skalet**

"Victim Rights Law Center saw firsthand how the 2020 Trump-era Title IX rule harmed survivors and created significant barriers to reporting. Restoring the 2024 Title IX rule is an essential step toward fostering a safer, more equitable educational environment where survivors are believed, supported, and empowered to seek justice," said **Stacy Malone, executive director of Victim Rights Law Center**. "This is a critical moment to stand in support of and alongside survivors. We are grateful to be represented by a brilliant team of attorneys who deeply understand the importance of preserving student-survivors' educational access."

"All students deserve to learn in an environment that is safe and inclusive. The Biden-era Title IX regulations are essential to preserving their rights," said **Ellen Eardley, managing partner at Mehri & Skalet and a former Title IX coordinator at a large public university.** "The court's decision to throw out these critical safeguards, along with the Trump administration's refusal to defend them, opens the door to more violence and discrimination at school. We are proud to stand with the National Women's Law Center, our clients Jane Doe and the Victim Rights Law Center, and so many courageous survivors in the fight to make campuses safe for generations to come."

## YOU MAY ALSO BE INTERESTED IN

**BLOG**

**My School's Dress Code Unfairly Targeted Latina Girls, and Yours Probably Does Too**

Jul 12, 2019

**BLOG**

**Pregnant Students' Rights are More Important than Ever**

Jan 24, 2024

**BLOG**

**A Possible Sneak Attack by the Trump Administration to Undermine Nondiscrimination Protections for Women and LGBTQ**

**BLOG**

**#FightingForFam Means Fighting for the Safety of Girls in School**

Dec 6, 2018

**Folks? NWLC Is On It.**

Mar 31, 2017

---



PRESS ROOM

CONTACT

LEGAL HELP

JOBS

**Phone:**
(202) 588 5180

      

© 2025 National Women's Law Center

Privacy Policy    Disclaimer

## DECLARATION OF STACY MALONE (VICTIM RIGHTS LAW CENTER)

I, Stacy Malone, Executive Director, declare as follows:

1. I submit this declaration in support of the motion to intervene filed by Victim Rights Law Center ("VRLC") and Jane Doe in the above-captioned case for the purposes of appealing this Court's vacatur of the Title IX rule issued in 2024 entitled *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Funding Assistance*, 89 Fed. Reg. 33,474 (Apr. 29, 2024) ("2024 Rule"). ~~Mem. Op. & Order (Jan. 9, 2025), ECF No. 143, *as amended* Order, ECF No. 145 (Jan. 10, 2025); *see also* J., ECF No. 144 (Jan. 9, 2025), *as amended* Am. J., ECF No. 146 (Jan. 10, 2025).~~ Order (Feb. 19, 2025), ECF No. 86; Final J., ECF No. 87 (Feb. 19, 2025).

2. After another district court vacated ~~As a result of this Court's vacatur of~~ the 2024 Rule in a similar challenge on January 9, 2025, the U.S. Department of Education ("Department") issued a guidance document clarifying that it has returned to enforcing the Title IX rule issued in 2020 entitled *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Funding Assistance*, 85 Fed. Reg. 30,026 (May 19, 2020) ("2020 Rule~~"), which had previously been rescinded by the 2024 Rule.~~"). *Tennessee v. Cardona*, No. 24-072-DCR, 2025 WL 63795, at *7 (E.D. Ky. Jan. 9, 2025), *as amended* (Jan. 10, 2025); U.S. Dep't of Educ., Office for Civil Rights, Dear Colleague Letter (issued Jan. 31, 2025; revised Feb. 4, 2025), https://www.ed.gov/media/document/title-ix-enforcement-directive-dcl-109477.pdf. The 2024 Rule had previously rescinded the 2020 Rule. This Court's subsequent vacatur of the 2024 Rule on February 19, 2025, in turn requires the Department to return to enforcing the 2020 Rule.

3. The vacated 2024 Rule strengthened and clarified protections for student survivors of

sex-based harassment, among others. In contrast, the reinstated 2020 Rule weakens protections for student survivors of sex-based harassment, including sexual assault, dating violence, domestic violence, and stalking. VRLC moves to intervene specifically to appeal the vacatur of the 2024 Rule's provisions that pertain to sex-based harassment.

4. I have compiled the information in the statements set forth below through personal knowledge. I have also familiarized myself with the 2024 Rule and 2020 Rule in order to understand the immediate impact of the vacatur of the 2024 Rule and resultant reinstatement of the 2020 Rule on VRLC. If I am called as a witness in these proceedings, I could and would testify competently to these facts.

5. I have been employed as VRLC's Executive Director since October 2010. In that position, I manage the strategic direction, operations, and development for VRLC's national programs and direct services. I also oversee the organization's management team, finance, fundraising and development, media relations, human resources, and project development. Consequently, I am familiar with and have participated in the organization's Title IX work as an attorney, mentor, and supervisor. I oversee VRLC's seven attorneys who manage the majority of its Title IX related cases in K-12 and higher education settings.

6. Founded in 2003, VRLC is a nonprofit organization headquartered in Massachusetts dedicated solely to serving the legal needs of victims of sex-based harassment, including survivors of sexual assault, dating violence, and stalking. VRLC's mission is to provide legal representation to such victims to help rebuild their lives and to promote a national movement committed to seeking justice for every victim.

7. VRLC provides legal services to help restore victims' lives after experiencing sex-based harassment. VRLC's services ensure that survivors can stay in school; protect their physical safety and academic needs; protect their privileged and confidential mental

health, medical and education records; preserve their employment and/or scholarships; maintain their safe housing; secure their immigration status; and swiftly access victim compensation and other benefits.

8.  As part of its work, VRLC provides legal services and/or facilitates the provision of legal services to students who have experienced sex-based harassment. Because almost half of VRLC's clients are under the age of 24, a substantial portion of its practice is providing education-related legal consultation and representation. VRLC attorneys represent victims to communicate effectively with school administrators, acquire supportive measures to restore and preserve their education, prepare for and attend grievance proceedings, file appeals, and if necessary, file complaints against their schools with the Department.

*Overview of injuries to VRLC: vacatur of 2024 Rule §§ 106.2, 106.8, 106.11, 106.44, 106.45, and 106.46*

9.  VRLC moves to intervene on its own behalf because it has been, and will continue to be, harmed by the vacatur of the 2024 Rule's provisions pertaining to sex-based harassment and resultant reinstatement of the 2020 Rule.

10. These changes concretely frustrate VRLC's mission of providing legal assistance to student survivors in their schools' Title IX proceedings. For example, as detailed further below, these changes chill many student survivors from reporting sex-based harassment to their schools, and, for many who do report, either foreclose investigation of their Title IX complaints entirely or decrease the likelihood of fair and accurate investigation outcomes for those that survive dismissal. The changes also reduce deterrence of sex-based harassment and bar many of VRLC's clients from filing administrative complaints against their schools with the Department.  In addition, the increased time and resources

necessary to advise each client also means VRLC is able to help significantly fewer students, which in turn further exacerbates underreporting of sex-based harassment.

11. These injuries are not speculative. Because the reinstated 2020 Rule imposes procedures that are unfair and hostile to student survivors, VRLC clients are already more hesitant to continue their pending Title IX complaints that were initiated under the 2024 Rule or to file new Title IX complaints based on incidents of harassment that occurred while the 2024 Rule was in effect (August 1, 2024, to January 8, 2025). In the first six weeks following the 2024 Rule's vacatur, VRLC received 41% fewer requests for legal assistance than in the first six weeks following the implementation of the 2024 Rule.

12. These injuries are also consistent with VRLC's previous experiences when the 2020 Rule was in effect from August 1, 2020, to July 31, 2024. At that time, there was an immediate decline in the number of victims willing to make a report, file a formal complaint, or continue a pending investigation. Consequently, VRLC received fewer requests from students for legal assistance with their school's Title IX proceedings or to file an administrative complaint against their school with the Department. Furthermore, due to unfair and unclear provisions in the 2020 Rule, VRLC spent more time and resources to assist each client, while also achieving fewer beneficial outcomes for them.

13. The 2024 Rule's vacatur and resultant reinstatement of the 2020 Rule have also diverted VRLC's resources. For example, VRLC now spends more time opposing dismissals of new complaints or pending complaints initiated under the 2024 Rule and spends at least four times as much time as before to prepare for a college or graduate student client's grievance process, reducing the overall number of survivors VRLC can represent. In addition, VRLC has been forced to devote fewer resources to its other programs and services; these include a nationwide education program providing training and support to

legal advocates, attorneys, sexual assault nurse examiners, campus administrators, and other stakeholders about legal issues impacting survivors, as well as an advocacy program to educate policymakers on the best ways to protect student survivors beyond the federal Title IX requirements. *See*, *e.g.*, Mass. Gen. Laws Ann. ch. 6, §§ 168D, 168E (West).

14. Again, VRLC also experienced these injuries after the Department first issued the 2020 Rule. For example, in 2020, VRLC was forced to partially reassign an attorney from its education program to also take clients and supervise other staff attorneys in its direct client services program, as preparing for each Title IX proceeding required significantly more supervision, skill, and resources than before. As another example, one institution of higher education assured a VRLC client that her complaint was within the scope of the 2020 Rule, but after conducting an exhausting investigation, the institution suddenly announced that the complaint actually fell outside the scope of the 2020 Rule and summarily dismissed it—causing VRLC to expend more than a year of time and resources with no result for the victim.

15. The following are more specific examples of how the vacatur of the 2024 Rule and resultant reinstatement of the 2020 Rule frustrate VRLC's mission and divert its resources.

***Mandatory dismissal of complaints: vacatur of 2024 Rule's §§ 106.2, 106.11, 106.44(a), and 106.45(a)***

16. The reinstated 2020 Rule's narrow definition of "sexual harassment" and narrow scope of Title IX's jurisdiction require schools to dismiss a Title IX complaint of sex-based harassment if: (i) the incident is so "severe" *or* "pervasive" as to limit a student's access to education but not so "severe" *and* "pervasive" as to "deny" a student's access to

education; or (ii) the harassment causes a *hostile environment* within an educational "program or activity" inside the United States, but the *underlying incident* occurs outside of an educational "program or activity" or outside the United States. These changes frustrate VRLC's mission of representing student survivors, as many incidents of sex-based harassment its clients experience are no longer recognized under the Title IX rules. This is especially harmful because there are over 300 school districts and 130 higher education campuses in Massachusetts, and many of VRLC's student survivors experience sexual assault or dating violence at off-campus parties and apartments; while socializing with students from other local area schools; or going on vacations, spring break, or school-sponsored study abroad trips that are not within the scope of the 2020 Rule. Additionally, many schools may choose to stop providing supportive measures to those complainants whose complaints must now be dismissed—just as they did when the 2020 Rule was previously in effect—leaving VRLC clients with fewer safety, academic, housing, and other critical options to meet their education needs post-assault.

17. These changes in the Title IX rules also divert VRLC's resources from other mission-critical work in order to appeal schools' wrongful dismissals of student survivors' complaints under the reinstated 2020 Rule, including complaints that may have been pending for many months or even more than a year and are close to obtaining a final decision from the school. As they did when the 2020 Rule was previously in effect, VRLC staff must once again spend more time advocating for clients' rights to supportive measures when their complaints are mandatorily dismissed, including by asserting students' rights under other federal laws besides Title IX, which can often require more burdensome and invasive documentation.

*Inequitable dismissal of complaints involving unaffiliated parties: vacatur of 2024 Rule's*
*§§ 106.2, 106.45(d)*

18. These changes frustrate VRLC's mission, as they did when the 2020 Rule was previously
in effect, by: (i) requiring dismissals of complaints filed by student survivors who wait to
file until after they graduate or transfer to another school due to the retaliatory risks
associated with, for example, filing a complaint against an athletics coach or faculty
advisor; (ii) encouraging schools to mistakenly believe that they must dismiss a
complaint whenever a survivor transfers to another school mid-investigation, even if the
survivor had been enrolled in the school at the time they filed the complaint; and (iii)
encouraging schools to mistakenly attempt to end supportive measures to a student
survivor when their complaint is dismissed because the respondent has graduated,
resigned, retired, or transferred to another school mid-investigation. These changes chill
survivors from reporting; put survivors at risk of being deprived of counseling, tutoring,
and other critical supportive measures; ensure no accountability for many incidents of
sex-based harassment; and reduce deterrence by creating a loophole for respondents to
escape accountability under Title IX.

19. They also divert VRLC's resources from other critical work by forcing VRLC to spend
extra time arguing for a student survivor's right to access supportive measures or to
continue their Title IX proceeding instead of being erroneously dismissed, rather than
spending that valuable time advocating for the survivor's rights during their Title IX
proceeding—just as they did when the 2020 Rule was first issued. For example, VRLC
must spend more time educating school officials about ways to prevent future
harassment, even after a respondent has withdrawn from a school, by issuing no-trespass
directives, banning the respondent from future on-campus or alumni activities, or

establishing a policy that the school will restart an investigation if a respondent later re-enrolls.

***Reduced responsibilities for schools and employees: vacatur of 2024 Rule's §§ 106.2, 106.44(a), 106.44(b), 106.44(c), 106.44(d), 106.44(e), and 106.44(f)***

20. First, under the 2020 Rule, employees at institutions of higher education are no longer required to either (i) report possible sex-based harassment to the Title IX coordinator or (ii) tell the disclosing student survivor how to notify the Title IX coordinator. And institutions of higher education are not required to address sexual harassment at all unless the Title IX coordinator or a high-ranking employee has "actual knowledge" of the harassment. These changes frustrate VRLC's mission because VRLC can no longer help student survivors in higher education file administrative complaints with the Department when their institutions do not respond adequately to sex-based harassment simply because it was reported to the "wrong" school official, such as a trusted coach, faculty member, or resident advisor. Just as they did when the 2020 Rule was previously in effect, these changes also divert VRLC's resources from other mission-critical work by requiring staff attorneys to spend additional time filing administrative complaints with state or local agencies under state or local laws that require institutions of higher education to address both known and suspected sex-based harassment and to address sex-based harassment reported to a larger set of school employees.

21. Second, the reinstated 2020 Rule does not include the 2024 Rule's provision allowing schools to designate certain employees as "confidential employees" to whom students could disclose sex-based harassment and from whom they could receive advice without triggering a report or complaint to the Title IX coordinator. This change frustrates VRLC's mission to protect survivors' privacy and autonomy because due to the

confusing timing of the 2024 Rule's vacatur, clients may now inadvertently disclose sexual assault or dating violence to an employee who was previously designated as a confidential employee while the 2024 Rule was in effect (August 1, 2024 to January 8, 2025), and subsequently have the incident reported to the Title IX coordinator without their consent. These changes will also divert VRLC's resources by requiring staff attorneys to spend more time petitioning Title IX coordinators not to pursue formal complaints that are initiated against the wishes of a client as a result of such inadvertent disclosures.

22. Third, the vacatur of the 2024 Rule frustrates VRLC's mission to prevent sex-based harassment and protect survivors' privacy and autonomy because Title IX coordinators are no longer required to: (i) monitor for and address barriers to reporting sex-based harassment, even though VRLC frequently informs schools of specific barriers to reporting based on clients' experiences at those schools; (ii) use information learned at public awareness events about sex-based harassment at an institution of higher education (*e.g.*, Take Back the Night) to inform the institution's prevention efforts; or (iii) consider a set of enumerated factors, including a survivor's reasonable safety concerns, to determine whether to initiate or continue a Title IX complaint against the survivor's wishes, which had provided a safeguard for survivors who reported sex-based harassment but were unsure if they wanted to trigger a formal investigation. Indeed, since the 2024 Rule's vacatur, VRLC has already had multiple clients' requests to withdraw their complaints be denied because the 2020 Rule does not articulate a set of enumerated factors for Title IX coordinators when considering complainants' withdrawal requests. These changes also divert VRLC's resources by requiring staff attorneys to spend more time petitioning Title IX coordinators not to pursue complaints that are initiated against

the wishes of a client.

***Unreasonable standard of care: vacatur of 2024 Rule's §§ 106.44(a), 106.44(f), 106.44(k), 106.45(d), and 106.45(h)***

23. These changes frustrate VRLC's mission to provide survivors with legal assistance because student survivors can no longer file administrative complaints with the Department when their schools respond *unreasonably* to sex-based harassment or fail to respond "promptly and effectively" but must now wait until their schools' responses rise to the level of "*clearly unreasonable*" or "deliberate indifference." This significant shift forces survivors to accept weaker or ineffective responses from their schools, which may include denial of important supportive measures, unnecessary delays, burdensome investigation procedures, and perhaps even punitive measures because schools are now permitted to take "unreasonable" actions toward survivors. For example, when the 2020 Rule was previously in effect, one VRLC client suffered five months of mistreatment, including repeated victim-blaming and retraumatizing questions during her investigation and denial of her request to withdraw her formal complaint. But it was only after her institution prevented her advisor from conducting cross-examination at her live hearing and failed to inform her of the investigation outcome that she had grounds to submit an administrative complaint under the reinstated 2020 Rule's "deliberate indifference" standard.

24. These changes also divert VRLC's resources by requiring staff attorneys to identify alternative state or local laws that require schools to respond "reasonably" to sex-based harassment and to file administrative complaints with state or local agencies instead of with the Department. For example, just as it did when the 2020 Rule was previously in effect, VRLC expects to file many more complaints on behalf of K-12 student survivors

through Massachusetts' Department of Elementary and Secondary Education's Problem

Resolution System, even though the state agency is unfortunately less adept at addressing

complaints of sex-based harassment as it has historically relied on the Department to

address them.

***Required retraumatization of survivors through live cross-examination: vacatur of 2024***
***Rule's §§ 106.45(g) and 106.46(f)***

25. While the 2024 Rule was in effect and the 2020 Rule was not in effect, VRLC's higher

education clients in Massachusetts were not required to be cross-examined in a live

hearing by their respondent's advisor of choice in Title IX proceedings.

26. The reinstated 2020 Rule's requirement of live hearings and adversarial cross-

examination in institutions of higher education frustrates VRLC's mission to deter and

redress sex-based harassment by chilling reporting by student survivors who will no

longer file complaints or continue their pending Title IX proceedings because: (i) they

fear being retraumatized by hostile cross-examination by their respondent's advisor, who

is often an attorney, angry parent or fraternity brother, or an athletics coach or professor

with whom the complainant may have a class or future affiliation; (ii) Title IX

respondents' attorneys frequently use cross-examination during a school's Title IX live

hearing as a way to gather impeachment evidence for use against the survivor in a

concurrent criminal proceeding; and (iii) the reinstated 2020 Rule expressly prohibits

schools from excluding unduly prejudicial or misleading questions or questions that

assume facts not in evidence, which may include invasive and humiliating questions

about a survivor's medical or family history. Indeed, both when the 2020 Rule was

previously in effect and now after the vacatur of the 2024 Rule, many VRLC clients were

and are afraid of being subjected to hostile cross-examination by their respondent's advisor and of having their Title IX cross-examination answers weaponized against them in their concurrent criminal proceeding. Furthermore, students who forgo or withdraw from an investigation for any of these reasons are no longer able to file an administrative complaint with the Department.

27. These changes also divert VRLC's resources because it now takes at least four times the amount of time to prepare adversarial cross-examination of each opposing party and all witnesses, thus reducing the overall number of survivors VRLC can represent. This is because a hearing without cross-examination can be completed in as quickly as one hour (and typically requires two to three hours of preparation), but a hearing with adversarial cross-examination can take five to ten hours or even last two days (and can require twelve to twenty-five hours of preparation). In fact, VRLC must now spend more time preparing a client for a Title IX live hearing than preparing a client for testimony in a court proceeding, such as a hearing for a civil protection order (CPO) (Mass. Gen. Laws ch. 209A or ch. 258E two-party hearing), as these court hearings comply with the rules of civil procedure and do not require VRLC attorneys to prepare a student survivor on how to respond to misleading or unduly prejudicial cross-examination questions.

*Unfair, delayed, and inaccurate investigations: vacatur of 2024 Rule's §§ 106.45(b) and 106.45(h)*

28. First, the reinstated 2020 Rule's requirement that two different people as investigator and decisionmaker in each Title IX proceeding frustrates VRLC's mission to provide fair, timely, and accurate outcomes for its clients because: (i) decision-makers are often drawn from a wider pool of school employees than investigators and, therefore, tend to be less

highly trained and skilled at conducting trauma-informed questioning; (ii) decision-makers often ask duplicative questions that were already asked by the investigator (and often answered by a party or witness with greater accuracy while their memories were fresher), which also forces survivors to unnecessarily relive painful memories without any evidentiary benefit to the school; and (iii) decision-making panels are often comprised of three people, so scheduling a live hearing now requires coordinating the schedules of at least eight people (including the investigator and/or Title IX coordinator, the two parties, their advisors, and any additional witnesses), which means hearings can take place months after an investigation ends, eroding the accuracy of all parties' and witnesses' statements and making a timely decision all but impossible. These changes also divert VRLC's resources because staff attorneys must now dedicate more time preparing clients to answer decision-makers' duplicative questions, supplementing decision-makers' knowledge of previous fact-finding already done by investigators, and assisting previous clients with re-opened investigations.

29. Second, schools are no longer prohibited from using a survivor's communications with a confidential employee or a witness's medical or mental health records without their consent, frustrating VRLC's mission of protecting survivors and their supporting witnesses from unnecessary and potentially traumatizing invasions of privacy that can dissuade them from participating in an investigation or seeking medical help or counseling. This change also diverts VRLC's resources, as staff attorneys must now spend more time opposing schools' attempts to use or disclose confidential communications and sensitive medical and mental health records.

30. Third, VRLC's mission to obtain accurate outcomes for its clients is frustrated, as it was when the 2020 Rule was previously in effect, because schools are no longer instructed that a survivor's prior consensual sexual relationship with the respondent does not by itself imply consent to the alleged sexual assault or dating violence. VRLC must also now divert its resources to appeal erroneous decisions made based on a decision-maker's improper belief that prior consent to sexual activity implies or establishes consent to all future sexual activity.

31. Fourth, schools in some cases must now use the more burdensome clear and convincing evidence standard to resolve Title IX complaints against student respondents even if it uses the equitably burdensome preponderance of the evidence standard to resolve complaints of physical assault or race harassment against students. These changes frustrate VRLC's mission because: (i) it tilts the scales against survivors and in favor of accused rapists and abusers, making it harder for survivors to secure a favorable decision; and (ii) chills survivors from reporting in the first place, leading to fewer complaints and reduced deterrence of sex-based harassment. These changes also divert VRLC's resources, because staff attorneys must spend more time obtaining additional evidence and preparing more supporting witnesses in order to meet the higher threshold demanded by the clear and convincing evidence standard.

32. Furthermore, all of the above changes frustrate VRLC's mission to enforce students' Title IX rights as they are no longer able to seek an administrative remedy from the Department for unfair, untimely, and inaccurate investigation procedures that are now permitted under the reinstated 2020 Rule.

***Required harmful actions and prohibited beneficial actions: vacatur of 2024 Rule's §§ 106.2,***

***106.44(h), 106.44(i), 106.44(k), 106.45(k), and 106.46(j)***

33. First, the reinstated requirement that complaints be written frustrates VRLC's mission to redress sex-based harassment, just as it did when the 2020 Rule was previously in effect, because K-12 students and their parents frequently make oral requests for a Title IX investigation that will again go ignored. This causes valuable time to be wasted before students and their parents realize that no investigation will take place, during which the student may have fallen considerably behind in school. This change also diverts VRLC's resources because staff attorneys who are brought in at that later stage must expend significant resources to address the compounded harm caused by the delayed investigation. For example, safety or academic concerns that may have been addressed by sanctions resulting from a prompt investigation may now require special education services, disability accommodations, or civil protection orders.

34. Second, VRLC's mission to protect student survivors is frustrated because schools: (i) can no longer remove a respondent on an emergency basis to prevent foreseeable harm to a survivor until the harm is merely moments away ("immediate"); and (ii) must disregard even an immediate threat that a harasser, rapist, abuser, or stalker may pose to a survivor's psychological health (the 2020 Rule requires harm to be "physical"). For example, when the 2020 Rule was previously in effect, one institution refused to remove a Title IX respondent from campus on an emergency basis even after he was incarcerated for raping VRLC's client because the institution did not consider the threat he posed to be sufficiently "immediate," causing the survivor to suffer significant harm, including socially and academically and generally feeling unsafe on campus. With the 2020 Rule

reinstated, VRLC must again divert its resources from other critical work to petition

school officials for supportive measures that may be less effective than an emergency

removal, such as a mutual no-contact order or a housing transfer, in order to protect its

clients from imminent and serious physical harms or immediate psychological harms.

35. Third, VRLC's mission to prevent sex-based harassment is frustrated because the Title

IX rules no longer explicitly instruct schools that student-employee respondents can be

placed on administrative leave during their investigation, causing institutions to

mistakenly believe that student-employee respondents with pending investigations must

be allowed to continue serving as a resident advisor, teaching assistant, or other position

that enables their further harassment of the survivor—as well as other students. For

example, when the 2020 Rule was previously in effect, one of VRLC's clients had a

resident advisor who used his master key to enter a survivor's dorm room during their

pending investigation, but the institution still refused to place him on administrative

leave. VRLC must again divert its resources to (i) educate school officials about their

ability to put student-employee respondents on paid administrative leave; or (ii) failing

that, petition school officials for supportive measures that may be less effective than

administrative leave in order to protect its clients from further harassment by student-

employee respondents.

36. Fourth, student survivors in higher education can no longer choose to resolve complaints

against an employee harasser through an informal resolution, such as a mediation or

restorative process. Furthermore, survivors at all levels of education can no longer initiate

an informal resolution without filing a written complaint. These changes frustrate

VRLC's mission to redress and prevent sex-based harassment because: (i) employees'

protections—especially tenured faculty's protections—in formal disciplinary proceedings are so extensive and rigorous that most college and graduate students are highly unwilling to report an employee harasser at all unless they have the option of choosing an informal resolution; (ii) reduced reporting of faculty and staff harassers enables more serial assailants and abusers to escape accountability and continue their predation of students; and (iii) many survivors do not want to submit a written complaint against a well-connected, wealthy, or famous respondent due to concerns about defamation liability, privacy, or detrimental impacts on a concurrent criminal proceeding, but they do want to address the harm through an informal resolution. These changes also divert VRLC's resources by requiring staff attorneys to spend more time in employee-on-student cases: (i) seeking additional supportive measures to ensure the survivor can complete their education, as informal resolution is no longer permitted and investigation is not a realistic option; and (ii) protecting from retaliation students who choose, despite the tremendous risks and costs to their academic and professional careers, to endure an investigation against their faculty harasser—who may be their dissertation advisor or department chair—in order to protect their classmates from future abuse.

*Inadequate employee training: vacatur of 2024 Rule's § 106.8(d)*

37. First, because of the vacatur of the 2024 Rule, school employees who are not Title IX personnel are no longer required to be trained on Title IX compliance at all. This change frustrates VRLC's mission to prevent sex-based harassment because school employees are now not only less likely to be able to recognize sex-based harassment when they witness it (*e.g.*, in the classroom, on the playground, during a school trip), but they also will be less likely to report such incidents to the Title IX coordinator, including when

they learn of it from a student. This means more harassment and violence will persist and proliferate in schools without proper intervention. This change also diverts VRLC's resources, as it did when the 2020 Rule was previously in effect, because it forces staff attorneys to expend significant resources, particularly when representing survivors in K-12 schools, to: (i) educate school administrators of their Title IX obligations and prevent and correct procedural missteps; (ii) correct misinformation about Title IX shared by schools to students and families; and (iii) conduct extensive searches for schools' Title IX policies and procedures because they are not available online and/or there are no well-trained staff who can answer Title IX-related questions.

38. Second, Title IX investigators and decision-makers are no longer required to be trained on which types of evidence are impermissible in an investigation (*i.e.*, privileged, treatment records, and sexual history evidence). This change frustrates VRLC's mission to provide student survivors with legal assistance because Title IX investigators and decision-makers are now more likely to traumatize and harm VRLC's clients with invasive and inappropriate questioning and to make inaccurate final decisions in Title IX proceedings. It also diverts VRLC's resources because staff attorneys must now spend more time opposing investigators' and decision-makers' requests for impermissible evidence and preparing clients and their supporting witnesses to refuse to answer questions seeking impermissible evidence.

39. Third, employees who help implement Title IX grievance procedures or who have the authority to modify or terminate supportive measures but are not coordinators, investigators, or decision-makers are no longer required to be trained on Title IX compliance at all. This frustrates VRLC's mission to provide student survivors with legal

assistance because these employees are now more likely make mistakes when implementing investigation procedures or making decisions regarding supportive measures, resulting in more unfair, delayed, inaccurate, and harmful outcomes for VRLC's clients. These changes also divert VRLC's resources by requiring staff attorneys to spend more time informing these employees about how they have violated the Title IX rules and petitioning them to remedy their errors in a timely fashion.

40. Finally, Title IX coordinators are no longer required to be trained on their own responsibilities as coordinators. These changes frustrate VRLC's mission because Title IX coordinators who lack training on critical aspects of their job are more likely to violate complainants' privacy and autonomy when overriding their consent to investigate, more likely to produce mishandled investigations and supportive measures, and more likely to botch their recordkeeping duties, which can also make it more difficult for VRLC to later file an administrative complaint against the school with the Department. These changes also divert VRLC's resources because staff attorneys will need to spend more time explaining and opposing Title IX coordinators' actions that violate the Title IX rules.

*Conclusion*

41. As a whole, the vacatur of the 2024 Rule and resultant reinstatement of the 2020 Rule are injuring VRLC by making it more difficult and resource-intensive—and sometimes impossible—for VRLC to ensure survivors can stay in school; protect their safety and academic needs; protect their privileged and confidential mental health, medical and education records; preserve their employment and/or scholarships; and maintain their safe housing. By chilling reporting of sex-based harassment, reducing the number of investigations that schools are permitted to conduct, allowing schools to respond unreasonably to sex-based harassment, and mandating inequitable grievance procedures

that are skewed in favor of respondents, there is and will be less justice for victims and less deterrence of sex-based harassment. The drain on VRLC's resources is already stretching and will continue to stretch its ability to provide legal services for victims beyond current funding parameters. In VRLC's 21 years of experience providing services to survivors of sex-based harassment, including in Title IX proceedings, the provisions of the 2020 Rule are the most voluminous, drastic, and harmful Title IX provisions that VRLC has seen. These drastic changes to Title IX have harmed and will continue to harm victims of sex-based harassment, including sexual assault, dating violence, domestic violence, and stalking, across the country.

42. I declare under penalty of perjury that the foregoing is true and correct.


Executed on ~~February 28~~March 27, 2025.

Stacy Malone, Esq.

## <u>DECLARATION OF JANE DOE</u>

I, Jane Doe, declare that I am over the age of 18 and competent to testify to the following facts:

**<u>The Sexual Assault</u>**

1.  I was an undergraduate student at a state university ("the University") in Massachusetts from January 2024 to November 2024. During my sophomore year, I was 19 and lived in an on-campus apartment owned by the University.

2.  On October 14, 2024, my friend brought another classmate ("Respondent") to visit my apartment. This was the first time I had met Respondent in person. That same day, Respondent returned to my on-campus apartment and raped and strangled me.

3.  On October 17, my roommate accompanied me to a local hospital to be examined by a sexual assault nurse examiner (SANE). The SANE collected a rape kit from me within the recommended 72-hour window.

4.  On October 18, I reported the rape and strangulation to the University's Title IX office.

**<u>Complete Loss of Education</u>**

5.  After this incident, I hit rock bottom. I had no motivation to do anything, and I couldn't see any way out of my despair. There were many days when I didn't eat anything at all.

6.  I did not feel safe leaving my apartment and stopped going to class starting on October 15, the day after Respondent raped and strangled me. My friends dropped off food for me from campus dining to ensure that I could continue to eat. The only times I left my room were to go with my roommates somewhere off campus, where I felt less afraid of running into Respondent and his friends.

7.  Shortly after the incident, I discovered that Respondent had been living with his friends in my on-campus apartment building at the time of the incident. Our two apartments were the only two apartments on our floor.

8. On October 21, my University issued a mutual no-contact order to Respondent and me. However, the University's no-contact order did not prohibit Respondent's friends from harassing me.

9. Respondent's friends would frequently stare at me menacingly when I left my apartment. They would also yell at me and my roommates and flip us off when they saw us leaving campus. One night, a group of men walked by my apartment window and mocked me for being raped. They yelled loudly so I could hear: "Help me! I'm being raped!"

10. Although the Title IX coordinator asked my professors if they could give me academic supportive measures, such as allowing me to attend class on Zoom or adjusting some assignment deadlines, none of them agreed to do so.

11. Without the option of attending class online to avoid Respondent and his friends, I did not go to class again after October 14. Eventually, when I realized that I was going to fail all of my classes by the end of the semester, I made the difficult decision to withdraw from the University on November 22.

**Effect of 2024 Title IX Rule's Vacatur on My University's Title IX Investigation**

12. On October 23, 2024, the University emailed Respondent and me a letter about our upcoming Title IX investigation.

13. On November 21, a Title IX investigator interviewed me.

14. On December 20, I met with a Title IX coordinator and Title IX investigator to discuss the next steps in my Title IX proceeding. The Title IX coordinator explained that there were two options as next steps in my investigation.

15. According to the University's Title IX policy at the time, the first option was "shuttle questioning," where Respondent and I could propose questions and follow-up questions for each other, and a decision-maker would ask those questions in one-on-one meetings with each of us. The second option was a live hearing, where Respondent and I would

answer questions asked by a decision-maker and could participate virtually from separate physical locations. The Title IX office would decide which option to use.

16. But on January 27, 2025, the Title IX coordinator emailed me to say that I would now have to participate in a live hearing with cross-examination. I was told to hold April 3, April 4, and April 11 as potential dates for my hearing.

17. On January 29, I met with the Title IX coordinator to discuss these changes in person. She explained that the 2024 Title IX Rule is no longer in effect, and the 2020 Title IX Rule is in effect again. Therefore, I will have to submit to cross-examination in a live hearing. According to the University's new Title IX policy, I will be cross-examined by Respondent's advisor.

18. I am scared, anxious, and overwhelmed by the prospect of being cross-examined in a Title IX hearing. I worry that Respondent's advisor will use cross-examination to ask me questions that try to poke holes in my story to make it sound like it was my fault I was raped or that I deserved to be raped. This feels so different from the University's previous process. I think it's cruel to force me to go through cross-examination after everything I've already gone through and having the courage to report.

19. If I had known that I would have to be cross-examined, I never would have reported to the University's Title IX office in the first place.

20. I am considering choosing not to participate in my upcoming Title IX hearing to avoid being cross-examined. But I worry that this could make me look less credible to the Title IX decision-maker, which reduces my chances of holding Respondent accountable.

21. I hope to intervene in this case in order to appeal this Court's vacatur of the 2024 Rule, so that I do not have to choose between being subjected to a distressing cross-

examination or not being cross-examined and therefore reducing my chances of

holding Respondent accountable under the 2020 Rule.

22. I declare under penalty of perjury that the foregoing is true and correct.


Executed on ~~February 28~~March 27, 2025.

Jane Doe